James H.M. Sprayregen, P.C.
Paul M. Basta
Jennifer L. Marines
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

Anup Sathy, P.C. (*pro hac vice* pending)
Marc J. Carmel (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-_____(___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## DECLARATION OF DENNIS CRAVEN, CHIEF FINANCIAL OFFICER OF INNKEEPERS USA TRUST, IN SUPPORT OF FIRST-DAY PLEADINGS[1]

---

1  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: GP AC Sublessee LLC (5992); Grand Prix Addison (RI) LLC (3740); Grand Prix Addison (SS) LLC (3656); Grand Prix Albany LLC (3654); Grand Prix Altamonte LLC (3653); Grand Prix Anaheim Orange Lessee LLC (5925); Grand Prix Arlington LLC (3651); Grand Prix Atlanta (Peachtree Corners) LLC (3650); Grand Prix Atlanta LLC (3649); Grand Prix Atlantic City LLC (3648); Grand Prix Bellevue LLC (3645); Grand Prix Belmont LLC (3643); Grand Prix Binghamton LLC (3642); Grand Prix Bothell LLC (3641); Grand Prix Bulfinch LLC (3639); Grand Prix Campbell / San Jose LLC (3638); Grand Prix Cherry Hill LLC (3634); Grand Prix Chicago LLC (3633); Grand Prix Columbia LLC (3631); Grand Prix Denver LLC (3630); Grand Prix East Lansing LLC (3741); Grand Prix El Segundo LLC (3707); Grand Prix Englewood / Denver South LLC (3701); Grand Prix Fixed Lessee LLC (9979); Grand Prix Floating Lessee LLC (4290); Grand Prix Fremont LLC (3703); Grand Prix Ft. Lauderdale LLC (3705); Grand Prix Ft. Wayne LLC (3704); Grand Prix Gaithersburg LLC (3709); Grand Prix General Lessee LLC (9182); Grand Prix Germantown LLC (3711); Grand Prix Grand Rapids LLC (3713); Grand Prix Harrisburg LLC (3716); Grand Prix Holdings LLC (9317); Grand Prix

(continued on next page)

I, Dennis Craven, declare as follows:

1.     I am the Chief Financial Officer, Treasurer, and Vice President of Innkeepers USA Trust ("**Innkeepers**"), a self-administered real estate investment trust organized under the laws of Maryland and the direct subsidiary of debtor Grand Prix Holdings LLC and the direct or indirect parent of each of the other debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  As of August 1, 2010, my role at Innkeepers will change to consultant to the Debtors.  I joined Innkeepers in 2006 as the Chief Financial Officer.  Prior to joining Innkeepers, I was a principal of Addison Capital Advisors in Memphis, Tennessee, an investment firm specializing in strategic planning, investment analysis, and equity and debt financing for start-up and early stage companies.  Prior to that, I was senior vice president and chief accounting officer of Independent Bank in Memphis, where I specialized in corporate financial planning and analysis.

---

Horsham LLC (3728); Grand Prix IHM, Inc. (7254); Grand Prix Indianapolis LLC (3719); Grand Prix Islandia LLC (3720); Grand Prix Las Colinas LLC (3722); Grand Prix Lexington LLC (3725); Grand Prix Livonia LLC (3730); Grand Prix Lombard LLC (3696); Grand Prix Louisville (RI) LLC (3700); Grand Prix Lynnwood LLC (3702); Grand Prix Mezz Borrower Fixed, LLC (0252); Grand Prix Mezz Borrower Floating, LLC (5924); Grand Prix Mezz Borrower Floating 2, LLC (9972); Grand Prix Mezz Borrower Term LLC (4285); Grand Prix Montvale LLC (3706); Grand Prix Morristown LLC (3738); Grand Prix Mountain View LLC (3737); Grand Prix Mt. Laurel LLC (3735); Grand Prix Naples LLC (3734); Grand Prix Ontario Lessee LLC (9976); Grand Prix Ontario LLC (3733); Grand Prix Portland LLC (3732); Grand Prix Richmond (Northwest) LLC (3731); Grand Prix Richmond LLC (3729); Grand Prix RIGG Lessee LLC  (4960); Grand Prix RIMV Lessee LLC (4287); Grand Prix Rockville LLC (2496); Grand Prix Saddle River LLC (3726); Grand Prix San Jose LLC (3724); Grand Prix San Mateo LLC (3723); Grand Prix Schaumburg LLC (3721); Grand Prix Shelton LLC (3718); Grand Prix Sili I LLC (3714); Grand Prix Sili II LLC (3712); Grand Prix Term Lessee LLC (9180); Grand Prix Troy (Central) LLC (9061); Grand Prix Troy (SE) LLC (9062); Grand Prix Tukwila LLC (9063); Grand Prix West Palm Beach LLC (9065); Grand Prix Westchester LLC (3694); Grand Prix Willow Grove LLC (3697); Grand Prix Windsor LLC (3698); Grand Prix Woburn LLC (3699); Innkeepers Financial Corporation (0715); Innkeepers USA Limited Partnership (3956); Innkeepers USA Trust (3554); KPA HI Ontario LLC (6939); KPA HS Anaheim, LLC (0302); KPA Leaseco Holding Inc. (2887); KPA Leaseco, Inc. (7426); KPA RIGG, LLC (6706); KPA RIMV, LLC (6804); KPA San Antonio, LLC (1251); KPA Tysons Corner RI, LLC (1327); KPA Washington DC, LLC (1164); KPA/GP Ft. Walton LLC (3743); KPA/GP Louisville (HI) LLC (3744); KPA/GP Valencia LLC (9816).   The location of the Debtors' corporate headquarters and the service address for their affiliates is:  c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

2.　　I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' restructuring efforts.  I submit this declaration (this "**Declaration**") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") to assist this Court and parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Pleadings**"); and (c) the DIP Financings (as defined below) that the Debtors are seeking to have approved in the near future.

3.　　The First Day Pleadings seek relief necessary to avoid immediate and irreparable harm to the Debtors by allowing them to continue their operations and minimize disruptions to their business that could otherwise result from the commencement of the Chapter 11 Cases. Specifically, the First Day Pleadings seek relief allowing the Debtors to:　(a) stabilize and maintain their business operations through, among other things, the use of cash collateral; (b) preserve relationships with franchisors, hotel managers, customers, employees, and other key constituencies; (c) limit disruption to the Debtors' business by continuing the use of their prepetition cash management system; and (d) establish certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, the chapter 11 process.

4.　　Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team

and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I would testify to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.     To assist the Court in becoming familiar with the Debtors and the initial relief sought by the Debtors to stabilize operations and facilitate their restructuring, this Declaration is organized into four sections. Section I provides background information with respect to the Debtors' corporate history and their business operations, as well as a summary of the Debtors' prepetition capital structure and describes the plan support agreement entered into with one of the Debtors' key constituents. Section II describes the circumstances leading to the commencement of these Chapter 11 Cases, including the restructuring agreements that the Debtors negotiated with their key constituents. Section III summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings and the DIP Financings. Section IV provides an overview of the exhibits attached hereto that set forth certain additional information about the Debtors, as required by Local Bankruptcy Rule 1007-2.

## <u>INTRODUCTION</u>

6.     Innkeepers, through its indirect subsidiaries, owns and operates an expansive portfolio of 72 upscale and mid-priced extended-stay and select-service hotels, consisting of approximately 10,000 rooms, located in 20 states across the United States. The Debtors operate their hotels under premium, well-recognized brands, such as Marriott, Hyatt, Hilton, and others (collectively, the "**Franchisors**"). The Debtors are able to generate significant value and stable revenues from the broad geographic location of their properties, the diverse mix of brands in their hotel portfolio, and the substantial tenure and comprehensive knowledge of the core management team who oversees the Debtors' hotel enterprise on a consolidated basis.

4

Specifically, the consolidated ownership and management of their 72 properties allows the Debtors to benefit from economies of scale, eliminating many of the duplicative processes and costs that would otherwise apply to properties owned and managed on an individual basis. For example, centralized corporate management and data systems allow the Debtors to significantly reduce corporate overhead costs. The Debtors are also able to negotiate favorable contracts for goods and services by using the leverage gained from their size and ability to enter into comprehensive, national vendor contracts. In addition, the Debtors have been able to negotiate favorable contracts with their Franchisors, who generally prefer to conduct business with owners of multiple hotels. With 72 hotels across the United States and long-term contracts in place with key Franchisors, the Debtors are well positioned to continue to capitalize on their substantial hotel portfolio and to generate positive earnings after their restructuring initiatives are implemented.

7.     While the global economic crisis has certainly affected the hospitality industry, and thus the Debtors' business and overall revenue, the Debtors' operations remain strong and significant opportunities remain for the business in the future. Unfortunately, however, the Debtors have an unmanageable debt load, which has impeded their ability to service funded debt obligations as they come due. As of the Petition Date, the Debtors were in payment default on all 11 of their loan agreements. The Debtors' substantial debt burden has hindered their ability to appropriately maintain hotel properties in compliance with Franchise Agreements (as defined below) and perform other upgrades necessary to increase revenue, meet competitive conditions, and preserve asset value.

8.     As of the Petition Date, the Debtors have incurred approximately $1.29 billion of secured debt. The Debtors' largest secured loan is a securitized mortgage loan with Lehman ALI

Inc. ("**Lehman**") as the original lender in the face amount of $825 million, collateralized by 45 of the Debtors' hotel properties and serviced by Midland Loan Services, Inc. ("**Midland**"). The Debtors' second largest secured loan, to which Lehman is the current lender, is comprised of a floating rate senior mortgage loan in the face amount of $250 million, collateralized by 20 of the Debtors' hotel properties, and a junior mezzanine loan in the face amount of $118 million. Each of the Debtors' seven remaining secured mortgage loans—ranging in amounts from approximately $24 million to $48 million—is secured by individual properties.[2] Apollo Investment Corporation ("**AIC**") owns the membership interests of Debtor Grand Prix Holdings LLC, the direct or indirect parent of all the other Debtors.

9. Over the last several months, the Debtors have engaged in extensive negotiations with certain of their key constituents regarding the parameters of a comprehensive restructuring. These negotiations culminated in the Debtors' and certain of their key constituents' entry into a series of interrelated agreements that, once implemented, will (a) facilitate a successful reorganization of the Debtors' business, (b) allow the Debtors to maintain the existing portfolio of hotel properties with all of the attendant benefits of a comprehensive hotel enterprise, and (c) maximize the value of the Debtors' enterprise for the benefit of the Debtors' estates.

10. The Debtors have successfully negotiated a consensual, integrated restructuring transaction, which includes three separate, yet wholly interrelated, agreements. On June 25, 2010, the Debtors and Marriott International, Inc. ("**Marriott**"), the Franchisor with whom 44 of the Debtors' 72 hotels have entered into Franchise Agreements, entered into an agreement (the "**Marriott Agreement**"), pursuant to which the Debtors agreed to provide adequate

---

2   One of the seven loans includes a mezzanine loan that is secured by the equity in a Debtor-entity that owns a hotel.

assurance of the future completion of certain property improvement programs (as described in Section II.C hereof, the "**PIPs**") on 23 of the Debtors' Marriott-branded hotels in compliance with certain Franchise Agreements. As part of the adequate assurance, the Debtors have committed to procure necessary financing arrangements to complete the PIPs within an aggressive, but reasonable, timeframe. In exchange for the Debtors' commitment, Marriott has agreed to support the Debtors' restructuring and forebear from seeking to exercise potentially significant rights leading up to and during the Debtors' Chapter 11 Cases.

11.     Marriott's agreement to forebear from seeking to exercise its rights with respect to the Debtors' Marriott-branded hotel properties—including its right to remove the Marriott brand from the Debtors' Marriott hotel, the exercise of which would have severely deteriorated the value of the underlying hotel properties—paved the way for the Debtors to negotiate two debtor-in-possession financing facilities (collectively, the "**DIP Financings**"), consisting of the (a) $50.75 million Five Mile DIP Facility, the proceeds of which will be used to perform PIPs on certain hotels securing the Debtors' obligations under the Fixed Rate Mortgage Loan Agreement,[3] the Capmark Mission Valley Loan Agreement, and the Merrill Tysons Corner Loan Agreement (each as defined below); and (b) $17 million Lehman DIP Facility, the proceeds of which will be used to perform PIPs and certain other investments on certain hotels securing the Debtors' obligations under the Floating Rate Mortgage Loan Agreement.

12.     Obtaining Marriott's forbearance with respect to the Debtors' critical hotel properties was also a precursor to the Debtors' successful negotiations with Lehman to reach the terms of a consensual restructuring transaction and prearranged plan. The Debtors and Lehman have entered into a plan support agreement (the "**PSA**"), which incorporates the terms of a

---

3     Five Mile Capital Partners LLC is a lender under the Fixed Rate Mortgage Loan Agreement.

prearranged restructuring and contemplates the Debtors' entry into the DIP Financings.[4]   The

PSA represents a significant achievement for the Debtors because, among other things, it

provides for the significant deleveraging of the Debtors' balance sheet and permits the Debtors to

maintain their Franchise Agreements and existing portfolio of hotel properties.   The Debtors'

prearranged restructuring includes the following:

- Lehman will receive, in full and final satisfaction of its approximately $238 million secured claim with respect to the Floating Rate Mortgage Loan Agreement, 100% of the issued and outstanding new shares of common stock issued by Innkeepers (the "**New Equity**"), subject to dilution by a management equity incentive program;

- The remaining secured lenders under the Debtors' prepetition credit facilities will receive new secured notes with a value that is no less than the value of the collateral securing their prepetition debt, unless the lenders of such facilities otherwise agree;

- Unsecured creditors (other than holders of deficiency claims) not paid pursuant to a "first day" order will receive a share of a cash allocation; and

- Holders of interests in the Debtors, including common and preferred stock, will be cancelled, and no distributions will be made on account of such interests.

13.     The Debtors understand that Lehman's willingness to enter into the PSA is

conditioned on its ability to sell a portion of its distribution of equity in the reorganized

enterprise to a third party on or after the effective date of the Debtors' confirmed chapter 11 plan

of reorganization, allowing Lehman, which is also in bankruptcy, to liquidate a portion of its plan

distributions of New Equity to mitigate the risk of its entire recovery coming in the form of

equity.   The Debtors realize that Lehman's ability to consummate the transactions contemplated

by the PSA is conditioned on Bankruptcy Court approval of such transactions in Lehman's

bankruptcy proceedings.     The Debtors expect Lehman to file a motion to approve the

---

4    A copy of the PSA, which includes and is predicated upon a chapter 11 plan term sheet of the entire enterprise of the Debtors, is attached hereto as **Exhibit A**.

transactions on or immediately after the Petition Date of these Chapter 11 Cases and to seek to obtain Court approval within 45 days of such filing.

14.     The Debtors' proposed restructuring is supported by its significant stakeholders, including Marriott and Lehman, and constitutes an integrated, global resolution among the Debtors and these parties.   For example, Lehman's willingness to support the proposed restructuring and to convert its debt into equity (which is necessary to deleverage the Debtors' balance sheet and provide comfort to the Franchisors that the reorganized Debtors will have a sustainable capital structure) is conditioned on the Debtors' retention of critical Franchise Agreements accomplished through Marriott's forbearance with respect to critical hotel properties.  Marriott's willingness to forego any potential rights to seek to terminate its Franchise Agreements (which forbearance is necessary to maintain the Debtors' existing, integrated portfolio of hotels with franchise arrangements with a premium brand and avoid substantial rebranding costs) is conditioned on the Debtors' procurement of DIP Financings, the proceeds of which will be used to fund critical Marriott-branded hotels.  In turn, the DIP Financings (which are necessary to address Franchise Agreement default issues, as well as to fund necessary capital expenditures on critical properties) are conditioned on Marriott's willingness to support the proposed transaction and to forebear from de-flagging the Debtors' properties, as well as Lehman's commitment to support an expeditious restructuring process.

15.     Accordingly, the negotiation of these various components to the proposed restructuring transaction did not occur in a vacuum.   Rather, each party's agreement to participate was carefully negotiated and, crucially, dependent upon the Debtors' obtaining agreements from the other key parties in interest that would promote a comprehensive restructuring of the Debtors' estates through an expeditious stay in bankruptcy.  To that end, with

the support of their significant constituents, the Debtors anticipate moving expeditiously through this chapter 11 process. As provided for in the PSA, the Debtors intend to file their plan of reorganization and related disclosure statement within 45 days of the Petition Date. In addition, concurrently with the filing of this Declaration, the Debtors have filed two motions seeking the Court's approval of the DIP Financings, which will be set for hearing within 45 days of the Petition Date.

16. The Debtors believe that the terms of the proposed, integrated restructuring, including the DIP Financings, are in the best interest of Debtors' estates and all parties in interest. The proposed restructuring will not only result in the elimination of a substantial portion of the Debtors' funded indebtedness, but will also provide the Debtors with the necessary financing to fund critical hotel maintenance and repair projects, allowing the Debtors to preserve valuable Franchise Agreements, meet competitive conditions, and preserve asset value for the Debtors and their estates.

## I. GENERAL BACKGROUND

### (a) Company Business and Overview

17. Innkeepers is a self-administered Maryland real estate investment trust ("**REIT**") with a primary business focus on acquiring premium-branded upscale extended-stay, mid-priced limited service, and select-service hotels. Innkeepers' indirect, wholly-owned limited liability company subsidiaries, which are Debtors in these Chapter 11 Cases (the "**Property Owners**"),[5]

---

5    Innkeepers, through its indirect subsidiary, KPA Raleigh, LLC, owns a 49% ownership interest in Genwood Raleigh LLC, a joint venture fee owner of the Sheraton in Raleigh, North Carolina. Neither KPA Raleigh, LLC nor Genwood Raleigh LLC are Debtors in these Chapter 11 Cases.

hold title to, or ground leases[6] in, the Debtors' 72 hotel properties. Each of the 72 Property Owners leases its hotel property to one of nine of Innkeepers' indirect, wholly-owned taxable REIT subsidiaries, each of which is a Debtor in these Chapter 11 Cases (the "**Operating Lessees**").[7] The Operating Lessees are responsible for paying hotel operating expenses for the respective Property Owners, including personnel costs, franchise royalties and related fees, utility costs, and general repair and maintenance expenses. The Property Owners remain responsible for ownership costs such as property taxes and insurance, ground rent (where applicable), and capital expenditures.

18.    The Debtors' primary customer base consists of business travelers, employees on temporary work assignments or enrolled in training programs, and individuals engaged in corporate relocations. Consistent with this customer base, the majority of Innkeepers' hotel portfolio consists of extended-stay hotels, which are a hybrid between a hotel and an apartment, offering longer-term accommodations with kitchens at more affordable rates than traditional full service hotels and with more efficiency than apartments. Extended-stay hotels currently comprise more than 68 percent of Innkeepers' hotel portfolio. In general, extended-stay hotels are typically able to generate a more consistent revenue stream than traditional hotels due to historically higher than average occupancy rates, longer average stays, less staff, and lower fixed costs.

---

6    The Debtors have ground leases for the following properties: Courtyard by Marriott in Ft. Lauderdale, Florida; Best Western in Palm Beach, Florida; and Hampton Inn in Woburn, Massachusetts. The minimum annual rent payable under these leases is approximately $600,000 in the aggregate.

7    Innkeepers, through its indirect subsidiary, KPA Raleigh Leaseco LLC, owns a 49% ownership interest in Genwood Raleigh Lessee LLC, the property lessee of the Sheraton in Raleigh, North Carolina. Neither KPA Raleigh Leaseco LLC nor Genwood Raleigh Lessee LLC are Debtors in these Chapter 11 Cases.

K&E 16632089

19.     The Operating Lessees have entered into various hotel management agreements (the "**Hotel Management Agreements**") with Island Hospitality Management, Inc. ("**Island**") and with Dimension Development Company, Inc. ("**Dimension**," and together with Island, the "**Hotel Managers**") to manage the hotel properties.  The Debtors' management is responsible for overseeing the Hotel Managers.  Island manages all of the Debtors' hotels except for the Sheraton Four Points in Ft. Walton Beach, Florida, which is managed by Dimension.  Pursuant to the Hotel Management Agreements, the Hotel Managers generally are required to perform or provide for all operational and management functions necessary to operate the hotels.  Among other things, the Hotel Managers, on behalf of the Debtors, pay all property level expenses of the hotels (including payroll),[8] contract with service providers, and purchase all goods and materials utilized in the operation of the business.  Generally, the Hotel Managers fund the hotel operating expenses out of the Property Lessees' centralized cash account, over which the Hotel Managers have signing authority.  When the Hotel Managers have to fund expenses, the Operating Lessees reimburse the Hotel Managers periodically through hotel expense reimbursement reconciliations.  In addition, the Hotel Managers receive management fees prescribed by the Hotel Management Agreements.

20.     The Debtors seek to affiliate their hotels with premier franchise companies and brands that offer robust marketing support and services and that have demonstrated their ability to command revenue premiums over other brands.  The table below sets forth information regarding the Debtors' hotels by brand (ordered based on the number of rooms by brand):

| Brand | # of Hotels | # of Rooms | % of Total |
|---|---|---|---|
| Residence Inn by Marriott | 40 | 5,194 | 53% |

---

[8]     The Debtors, through the Hotel Managers, employ approximately 2,550 employees in connection with the operation of the hotels.

K&E 16632089

| Brand | # of Hotels | # of Rooms | % of Total |
|---|---|---|---|
| Hampton Inn | 11 | 1,404 | 14% |
| Summerfield Suites by Hyatt | 5 | 650 | 7% |
| Courtyard by Marriott | 3 | 526 | 5% |
| Hilton | 1 | 309 | 3% |
| Hilton Suites | 1 | 230 | 2% |
| Westin | 1 | 224 | 2% |
| Four Points by Sheraton | 1 | 216 | 2% |
| Embassy Suites | 1 | 156 | 2% |
| Sheraton | 1 | 154 | 2% |
| Homewood Suites by Hyatt | 1 | 146 | 1% |
| Gatehouse Inn | 2 | 144 | 1% |
| Best Western | 1 | 135 | 1% |
| Doubletree | 1 | 105 | 1% |
| TownePlace Suites by Marriott | 1 | 95 | 1% |
| Bulfinch Hotel | 1 | 79 | 1% |
| **TOTAL** | **72** | **9,767** | **100%** |

21.     The franchise licenses for the hotels are held by the Operating Lessees and are governed by franchise agreements (collectively, the "**Franchise Agreements**") between the Operating Lessees and the franchise owners.   All hotels in the table above except for the Gatehouse Inns and the Bulfinch Hotel operate under Franchise Agreements.   Under the Franchise Agreements, the Debtors are required to pay franchise fees based on a percentage of hotel room revenue, and must allow Franchisors to inspect their licensed hotels periodically to confirm adherence to stated brand operating standards.   These inspections can result in additional capital expenditure requirements or additional operational, marketing, or repairs and maintenance expenses.   Grand Prix Holdings LLC, Innkeepers' direct parent and a Debtor in these Chapter 11 Cases, has guaranteed certain of the Property Lessees' obligations under certain of the Franchise Agreements.

22.     The Debtors generate a majority of their revenue from guests who stay at the hotel properties.   As such, the Debtors' stream of revenue is dependent on maintaining and improving

key operating metrics, including occupancy, average daily rate ("**ADR**"), and revenue per available room ("**RevPAR**"),[9] of their hotels. In 2009, the Debtors' consolidated revenues were approximately $292 million (down from $348 million in 2008, a 16 percent drop) and their adjusted earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") were approximately $85 million (down from $123 million in 2008, a 31 percent drop). The Debtors' consolidated assets for 2009 totaled approximately $1.5 billion and consolidated liabilities totaled approximately $1.5 billion.

(b)     **The Debtors' Corporate History and Organizational Structure**

23.     In June 2007, AIC, through certain subsidiaries, acquired Innkeepers (the "**Acquisition**"), which was a publicly traded company whose shares were listed on the New York Stock Exchange. The Acquisition was funded with equity invested by AIC (through certain subsidiaries), the assumption of certain secured debt outstanding prior to the Acquisition, and certain secured debt incurred at the time of the Acquisition. All of Innkeepers' common shares outstanding at the time of the Acquisition were acquired for cash and then extinguished. Innkeepers' $145 million 8% Series C Cumulative Preferred Shares (defined below) outstanding prior to the Acquisition remained outstanding after the Acquisition. In consideration for AIC's $250 million equity investment, AIC's subsidiary Grand Prix Holdings LLC, a Debtor in these Chapter 11 Cases, was issued all (except for relatively small amounts currently held by management) of Innkeepers' newly issued (a) common shares and (b) 12% Series A Cumulative Preferred Shares (defined below).

---

9     RevPAR is the product of the average daily rate and occupancy percentage. RevPAR does not include non-room revenues, such as food and beverage, parking, telephone, and other guest service revenues.

24.     The chart below generally depicts the Debtors' prepetition organizational

structure:

# Innkeepers USA Corporate Structure Chart



The information contained herein and on the following pages shall neither constitute an admission of liability by, nor is it binding on, the Debtors.

**Legend:**
- Lessees of Properties from Fee Owners/Ground Lessees
- Mezzanine Loan Borrower
- Mortgage Loan Borrower - Fee Owner/Ground Lessee

General Notes
- All entities are Delaware entities unless otherwise noted.
- All entities are Debtors unless otherwise noted.

Footnotes:
1. The following pages list the names of the Debtor entities that have pledged their assets as collateral under the respective loan agreements as well as the franchisors with whom franchise agreements have been executed for the respective Debtor-entities' hotel.
2. Operating Tenant for hotels securing Fixed Rate Mortgage Loan Agreement.
3. Operating Tenant for hotels securing Floating Rate Senior Mortgage Loan Agreement.
4. Operating Tenant for hotel securing the facility for KPA HS Anaheim, LLC.
5. Operating Tenant for hotel securing the facility for KPA HI Ontario, LLC.
6. Operating Tenant for hotel securing the facility for KPA RIGG, LLC.
7. Operating Tenant for hotel securing the facility for KPA RIMV, LLC.
8. Operating Tenant for hotels securing the facilities for: KPA Washington DC, LLC; KPA Tysons Corner RI, LLC; and KPA San Antonio, LLC.
9. Operating Tenant for hotel securing the facility for Genwood Raleigh LLC.

(c)     **Prepetition Capital Structure**[1]

25.     As of March 31, 2010, the Debtors had incurred aggregate funded secured indebtedness of approximately $1.42 billion, including approximately $1.29 billion of property-level secured debt, approximately $1.05 billion of which was securitized and sold in the commercial mortgage-backed security ("**CMBS**") market.  The Debtors incurred the vast majority of their funded debt in connection with the Acquisition.  The debt is secured by mortgages on the hotels or pledges of the equity of the Property Owners.  The Debtors' funded secured debt is separated into nine general groups, the mortgages of each of which is secured by distinct hotel properties and the mezzanine loans of each of which is secured by related equity interests in the Property Owners.  Each of these groups is discussed below.  Additionally, the Debtors have four issuances of equity, which is also discussed below.

1.     *The $825 Million Fixed Rate CMBS Pool*

26.     Forty-five of the Property Owners, collectively as borrowers, and Lehman, as original lender, are parties to that certain Loan Agreement (as amended, the "**Fixed Rate Mortgage Loan Agreement**"), dated as of June 29, 2007.  The Fixed Rate Loan Agreement provides for mortgage loans to the 45 Property Owners in the original aggregate principal amount of $825 million (the "**Fixed Rate Mortgage Loan Obligations**"), which amount is

---

[1] The descriptions of the Debtors' prepetition debt facilities and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity, priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest, or any other fact with respect thereto, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever except to the extent as set forth in the *Debtors' Motion for the Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use the Adequate Protection Parties' Cash Collateral and (II) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, (B) to the Extent Approved in the Final Order, Granting Senior Secured, Priming Liens on Certain Postpetition Intercompany Claims, (C) to the Extent Approved in the Final Order, Granting Administrative Priority Status to Certain Postpetition Intercompany Claims, and (D) Scheduling a Final Hearing Pursuant to Bankruptcy rule 4001(b)* and in the proposed order attached thereto as Exhibit A, which were filed contemporaneously herewith.

collateralized by the 45 hotel properties owned by the Property Owners that are borrowers under the Fixed Rate Mortgage Loan Agreement. The Fixed Rate Mortgage Loan Obligations have a maturity date of July 9, 2017. The Fixed Rate Mortgage Loan Agreement mortgage loans have been securitized and sold into the CMBS market. Half of the Fixed Rate Mortgage Loan Obligations are part of a mortgage loan pool knows as LB-UBS Commercial Mortgage Trust 2007-C6, for which LaSalle Bank, N.A. ("**LaSalle**") is trustee and Midland serves as special servicer. The other half of the Fixed Rate Mortgage Loan Obligations are part of a mortgage loan pool known as LB-UBS Commercial Mortgage Trust 2007-C7, for which LaSalle is trustee and LNR Property Corp. serves as special servicer.

        2.      *The $250 Million Floating Rate Mortgage Loan and $118 Million Floating Rate Mezzanine Loan*

      27.      Twenty of the Property Owners, collectively as borrower, and Lehman, as lender, are parties to that certain Loan Agreement (as amended, the "**Floating Rate Mortgage Loan Agreement**"), dated as of June 29, 2007. The Floating Rate Mortgage Loan Agreement provides for mortgage loans to the 20 Property Owners in the original principal amount of $250 million (the "**Floating Rate Mortgage Loan Obligations**"), which amount is collateralized by the 20 hotels owned by the Property Owners that are borrowers under the Floating Rate Mortgage Loan Agreement. The Floating Rate Mortgage Loan Obligations matured on July 9, 2010, which maturity date is subject to three conditional one-year extensions. The Floating Rate Mortgage Loan Agreement originally was intended to be securitized and sold into the CMBS market, however, that did not end up occurring.

      28.      Grand Prix Mezz Borrower Floating 2, LLC, the 100 percent owner of the 20 borrowers under the Floating Rate Mortgage Loan Agreement, as borrower, and Lehman, as original lender, are parties to that certain Mezzanine Loan Agreement (as amended, the

"**Floating Rate Mezzanine Loan Agreement**"), dated as of June 29, 2007. The Floating Rate Mezzanine Loan Agreement provides for a junior mezzanine loan in the original principal amount of $118 million (the "**Floating Rate Mezzanine Loan Obligations**"), which amount is collateralized by Grand Prix Mezz Borrower Floating 2, LLC's equity interests in the 20 Property Owners that are borrowers under the Floating Rate Mortgage Loan Agreement. The Floating Rate Mezzanine Loan Agreement Obligations mature on July 9, 2010, which maturity date is subject to three conditional one-year extensions.

3.      *The $13.7 Million Anaheim Mortgage Loan and $21.3 Million Anaheim Mezzanine Loan*

29.      RLJ Anaheim Suites Hotel L.P. ("**RLJ Anaheim**"), as borrower and GMAC Commercial Mortgage Bank, as lender, are parties to that certain Deed of Trust Note (as amended, the "**Anaheim Mortgage Loan Agreement**"), dated as of June 14, 2005. Pursuant to that certain Loan Assumption, Affirmation, and Modification Agreements, dated as of October 4, 2006 and June 29, 2007, KPA HS Anaheim LLC ("**KPA HS Anaheim**") assumed all of RLJ Anaheim's obligations under the Anaheim Mortgage Loan Agreement. As a result, the Anaheim Mortgage Loan Agreement provides that KPA HS Anaheim is obligated under a mortgage loan in the original principal amount of $13.7 million (the "**Anaheim Mortgage Loan Obligation**"), which amount is collateralized by the Hilton Suites in Anaheim, California. The Anaheim Mortgage Loan Obligation matured on July 1, 2010. The Anaheim Mortgage Loan Agreement was sold into the CMBS market and is part of a mortgage loan pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2005-C5, for which Wells Fargo Bank, N.A. ("**Wells Fargo**") is trustee, Capmark Finance Inc. ("**Capmark Finance**"), as successor to GMAC Commercial Mortgage Corporation, serves as master servicer, and CWCapital Asset Management, LLC serves as special servicer.

30.     Grand Prix Mezz Borrower Term, LLC, the 100 percent owner of KPA HS Anaheim, as borrower, and Lehman, as lender, are parties to that certain Mezzanine Loan Agreement (as amended, the "**Anaheim Mezzanine Loan Agreement**"), dated as of June 29, 2007.  The Anaheim Mezzanine Loan Agreement provides for a junior mezzanine loan in the original principal amount of $21.3 million (the "**Anaheim Mezzanine Loan Obligations**"), which amount is collateralized by Grand Prix Mezz Borrower Term, LLC's equity interest in KPA HS Anaheim.  The Anaheim Mezzanine Loan Agreement Obligation matured on July 1, 2010.

31.     Pursuant to that certain Intercreditor Agreement by and between Wells Fargo, as trustee for the registered holders of the Credit Suisse First Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2005-C5, as senior lender, and Lehman, as mezzanine lender, dated as of June 29, 2007, the rights, liens, and security interests created under the Anaheim Mezzanine Loan Agreement, including the right to payment of the Anaheim Mezzanine Loan Obligations and all remedies, terms, and covenants contained in the Anaheim Mezzanine Loan Agreement, are subordinate to the rights, liens, and security interests created under the Anaheim Mortgage Loan Agreement, including the right to payment of the Floating Rate Mortgage Loan Obligations and all remedies, terms, and covenants contained in the Floating Rate Mortgage Loan Agreement.

**4.      *The $47.4 Million Capmark Mission Valley CMBS Mortgage Loan***

32.     KPA RIMV, LLC, as borrower, and Capmark Bank, as lender, are parties to that certain Deed of Trust Note (the "**Capmark Mission Valley Loan Agreement**"), dated as of October 4, 2006.  Pursuant to that certain Loan Assumption, Affirmation, and Modification Agreement, dated June 29, 2007, Grand Prix RIMV Lessee, LLC ("**Grand Prix RIMV**") assumed all of KPA RIMV, LLC's obligations under the Capmark Mission Valley Loan

20

Agreement. As a result, the Capmark Mission Valley Loan Agreement provides that Grand Prix RIMV is obligated under a mortgage loan in the original principal amount of $47.4 million (the "**Capmark Mission Valley Loan Obligation**"), which amount is collateralized by the Residence Inn in San Diego, California. The Capmark Mission Valley Loan Obligation has a maturity date of November 11, 2016. The Capmark Mission Valley Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and LNR Partners, Inc. ("**LNR Parnters**") serves as special servicer.

#### 5.    *The $37.6 Million Capmark Garden Grove CMBS Mortgage Loan*

33.    KPA RIGG, LLC, as borrower, and Capmark Bank, as lender, are parties to that certain Deed of Trust Note (the "**Capmark Garden Grove Loan Agreement**"), dated as of October 4, 2006. Pursuant to that certain Loan Assumption, Affirmation, and Modification Agreement, dated June 29, 2007, Grand Prix RIGG Lessee LLC ("**Grand Prix RIGG**") assumed all of KPA RIGG LLC's obligations under the Capmark Garden Grove Loan Agreement. As a result, the Capmark Garden Grove Loan Agreement provides that Grand Prix RIGG is obligated under a mortgage loan in the original principal amount of $37.6 million (the "**Capmark Garden Grove Loan Obligation**"), which amount is collateralized by the Residence Inn in Garden Grove, California. The Capmark Garden Grove Loan Obligation has a maturity date of November 11, 2016. The Capmark Garden Grove Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and LNR Partners serves as special servicer.

### 6.    *The $35.0 Million Capmark Ontario CMBS Mortgage Loan*

34.    KPA HI Ontario, LLC, as borrower, and Deutsche Banc Mortgage Capital, LLC, as successor in interest to Capmark Bank, as lender, are parties to that certain Deed of Trust Note (the "**Capmark Ontario Loan Agreement**"), dated as of October 4, 2006.  Pursuant to that certain Loan Assumption, Affirmation, and Modification agreement, dated June 29, 2007, Grand Prix Ontario Lessee LLC ("**Grand Prix Ontario**") assumed all of KPA HI Ontario, LLC's obligations under the Capmark Ontario Loan Agreement.  As a result, the Capmark Ontario Loan Agreement provides that Grand Prix Ontario is obligated under a mortgage loan in the original principal amount of $35.0 million (the "**Capmark Ontario Loan Obligation**"), which amount is collateralized by the Hilton in Ontario, California.  The Capmark Ontario Loan Obligation has a maturity date of November 11, 2016.  The Capmark Ontario Loan Obligation was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and Midland serves as special servicer.  As of April 2010, the lender under the Capmark Ontario Loan Agreement installed a receiver that is acting as hotel manager for the Hilton in Ontario, California.

### 7.    *The $25.6 Million Merrill Lynch Washington D.C. CMBS Mortgage Loan*

35.    KPA Washington DC, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc. ("**Merrill Lynch**") as lender, are parties to that certain Loan Agreement (the "**Merrill Lynch Washington D.C. Loan Agreement**"), dated as of September 21, 2006.  The Merrill Lynch Washington D.C. Loan Agreement provides for a mortgage loan in the original principal amount of $25.6 million (the "**Merrill Lynch Washington D.C. Loan Obligations**"), which amount is collateralized by the Doubletree Guest Suites in Washington, D.C.  The Merrill Lynch

Washington D.C. Loan Obligation has a maturity date of October 1, 2016. The Merrill Lynch Washington D.C. Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as ML-CFC Commercial Mortgage Trust 2006-4 ("**ML-CFC 2006-4**"), for which U.S. Bank, N.A. ("**U.S. Bank**") is trustee, Wells Fargo serves as master servicer, and LNR Partners serves as special servicer.

**8.** *The $25.2 Million Merrill Lynch Tysons Corner CMBS Mortgage Loan*

36. KPA Tysons Corner RI, LLC, as borrower, and Merrill Lynch as lender, are parties to that certain Loan Agreement (the "**Merrill Lynch Tysons Corner Loan Agreement**"), dated as of September 19, 2006. The Merrill Lynch Tysons Corner Loan Agreement provides for a mortgage loan in the original principal amount of $25.2 million (the "**Merrill Lynch Tysons Corner Loan Obligations**"), which amount is collateralized by the Residence Inn in Vienna, Virginia. The Merrill Lynch Tysons Corner Loan Obligation has a maturity date of October 1, 2016. The Merrill Lynch Tysons Corner Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank is trustee, Wells Fargo serves as master servicer, and LNR Partners serves as special servicer.

**9.** *The $24.2 Million Merrill Lynch San Antonio CMBS Mortgage Loan*

37. KPA San Antonio, LLC, as borrower, and Merrill Lynch as lender, are parties to that certain Loan Agreement (the "**Merrill Lynch San Antonio Loan Agreement**"), dated as of September 19, 2006. The Merrill Lynch San Antonio Loan Agreement provides for a mortgage loan in the original principal amount of $24.2 million (the "**Merrill Lynch San Antonio Loan Obligations**"), which amount is collateralized by the Homewood Suites in San Antonio, Texas. The Merrill Lynch San Antonio Loan Obligation matures on October 1, 2016. The Merrill Lynch San Antonio Loan Agreement was securitized and sold into the CMBS market and is part

23

of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank is trustee, Wells Fargo serves as master servicer, and LNR Partners serves as special servicer.

### 10. *12% Series A Cumulative Preferred Stock*

38.    As discussed above, AIC's subsidiary Grand Prix Holdings, LLC, whose officers and directors, appointed by AIC, conduct all significant decision-making and board meetings in New York, was issued substantially all of Innkeepers' shares of 12% Series A cumulative preferred stock (the "**12% Series A Cumulative Preferred Shares**") in exchange for AIC's equity contribution in connection with the Acquisition. Since the Acquisition, no distributions have been made on account of the 12% Series A Cumulative Preferred Shares.

### 11. *8% Series C Cumulative Preferred Stock*

39.    In January 2004, Innkeepers completed an offering of 5.8 million shares of 8% Series C cumulative perpetual preferred stock (the "**8% Series C Cumulative Preferred Shares**"). The net proceeds from the offering were approximately $145 million, a portion of which was used by Innkeepers to redeem a previously issued series of preferred stock. The 8% Series C Cumulative Preferred Shares were publicly offered and survived the Acquisition, and the Debtors believe these shares are widely held. Since December 2008, no distributions have been made on account of the 8% Series C Cumulative Preferred Shares.

### 12. *Class D Preferred Units*

40.    Prior to the Acquisition, Innkeepers USA Limited Partnership, a Debtor in these Chapter 11 Cases, issued preferred units of limited partnership interests to certain parties who contributed hotel properties to the Debtors. The holders of approximately 81,000 preferred units elected to continue to hold their investment after the Acquisition, in the form of Class D preferred units of limited partnership interest (the "**Class D Preferred Units**"). The cumulative redemption value of the Class D Preferred Units is $1.4 million, and, pursuant to the relevant

documents, each Class D Preferred Unit is entitled to distributions equal to $0.8875 per share annually. Additionally, holders of the Class D Preferred Units guaranteed approximately $8.1 million of the Debtors' non-recourse debt. Since December 2008, no distributions have been made on account of the Class D Preferred Units.

### 13. *Common Stock*

41. As noted above, at the time of the Acquisition, the then-outstanding shares of Innkeepers' common stock were extinguished and new shares of common stock were issued. As of the Petition Date, Grand Prix Holdings LLC held substantially all of Innkeepers' current outstanding common stock.

## II. EVENTS LEADING TO THE CHAPTER 11 FILING

42. A number of factors have contributed to the Debtors' decision to commence these Chapter 11 Cases. Although the Debtors' business model is sound, their operating losses from decreased room revenue, significant liquidity constraints, and considerable funded debt burden, resulting from unprecedented adverse changes in the economy and hospitality industry generally, have impaired the Debtors' ability to meet their current debt obligations and certain current obligations under their Franchise Agreements.

### (a) Recent Economic Crisis and Its Impact on the Hotel Industry and the Debtors

43. Over the last two years, the global travel and tourism industry has faced one of the most difficult operating environments in a number of decades due to the unparalleled turmoil that beset the global and United States economies. A weak economy and plummeting demand for hotel accommodations, which can be traced to reduced consumer spending, higher fuel prices, increased unemployment, and a severe decline in business travel, have caused one of the deepest and longest recessions in the history of the hospitality and lodging industries. During this time,

supply also increased within the hospitality industry, exacerbating the negative impact of decreased demand within the industry.[2] Unlike previous historic events that hurt the hotel industry, such as September 11 and the SARS outbreak, the fallout from the 2008-2009 recession has lasted significantly longer and has had a far more adverse impact on the hospitality sector.

44.     In the hotel industry, performance is generally measured by RevPAR (revenue per available room). RevPAR identifies trends with respect to room revenues from comparable hotel properties and can be used to evaluate hotel performance on a regional and segment basis. Comparing recent RevPAR against prior years, the magnitude of the rapid and unprecedented deterioration is readily apparent. In 2009, RevPAR in the hotel industry experienced the largest annual decline since the Great Depression, falling by 16.7 percent.

45.     Other operating statistics similarly demonstrate the depth of the industry's decline. Contributing to the RevPAR decline in 2009, the industry's average daily rate, or ADR, fell by 8.8 percent, compared to a 20-year industry annual average *increase* of 2.8 percent. In 2009, the average daily occupancy rate decreased by 8.6 percent, compared to a 20-year industry annual average decline of 0.7 percent. The hotel industry has also suffered a severe decline in food and beverage sales, meeting, conference, and banquette hall rentals, and other guest services that generate additional revenue. Against this background, several of the Debtors' competitors filed for bankruptcy within the last two years, including, among others, Extended Stay Hotels, RM Hotels, Inc., Celebrity Resorts, Inc., Paradise Palms, LLC, River Road Hotel Partners, LLC, and Consolidated Resorts, Inc.

---

2     Based on reports prepared by Smith Travel Research, in 2009, supply increased by 3.2 percent and demand decreased by 5.8 percent, compared to a 20-year average increase in supply and demand of 2 percent and 1.4 percent, respectively.

46.     The Debtors have not been insulated from these multi-year, record-breaking declines plaguing the hotel industry.  In 2009, the Debtors' RevPAR, ADR, and occupancy rate metrics decreased by 16.3 percent, 10.8 percent, and 6.1 percent, respectively.  Due to the Debtors' focus on the business consumer, their hotel portfolio has been especially impacted by an overall tightening on corporate travel, training, and relocation expenditures.  Certainly, the worst recession in 60 years has left corporations intent on saving rather than spending, and, in 2009, domestic and international business travel spending in the United States declined sharply.

**(b)     The Debtors' Substantial Funded Debt Burden and Limited Access to Capital**

47.     In addition to reducing overall demand and significantly impairing the Debtors' overall revenue, the rapid softening of the economy and tightening of the financial markets have limited the Debtors' financial flexibility.  As a result, the Debtors have no real ability to recapitalize or reduce their debt burdens.  Strategies that the Debtors might have previously employed to extend maturities and maintain liquidity are no longer available.  These adverse changes have severely limited the Debtors' ability to satisfy their obligations as they come due.

48.     Limited access to capital is particularly significant in light of the Debtors' large debt service obligations.  Specifically, the Debtors have failed to satisfy their debt service obligations as they came due under the following loan agreements: (a) the payment for the Capmark Ontario Loan Agreement on October 1, 2009; (b) the payment for the Fixed Rate Mortgage Loan Agreement on April 9, 2010; (c) the payments for the Anaheim Mezzanine Loan Agreement, Capmark Mission Valley Loan Agreement, Capmark Garden Grove Loan Agreement, Merrill Lynch Washington D.C. Loan Agreement, Merrill Lynch Tysons Corner Loan Agreement, and Merrill Lynch San Antonio Loan Agreement, each on May 1, 2010; and

(d) the payment for the Anaheim Mortgage Loan Agreement, Floating Rate Mortgage Loan Agreement, and Floating Rate Mezzanine Loan Agreement, each on June 10, 2010.

49.     Given their limited access to capital, the Debtors were forced to depend only on funds generated from operations.  On March 23, 2010, Wachovia, the master servicer of the LB-UBS Commercial Mortgage Trust 2007-C6 mortgage loan pool of the Fixed Rate Mortgage Loan Agreement informed the Debtors that an alleged "Triggering Event" under the June 29, 2007 Cash Management Agreement had occurred and indicated that as a result, Wachovia would need to "spring" certain unidentified lockbox accounts.[3]  A lockbox over the Debtors' accounts would have had disastrous results for Innkeepers.  Approximately 80 percent of the Debtors' revenues come from credit card receipts.  If the Debtors were unable to access funds generated from credit card receivables it would have been unable to pay hotel employees, vendors, or continue to operate the hotels.[4]  A lockbox over the Debtors' credit card receivables alone would have required the Debtors to cease operations for a significant number of hotels, which would have severely impacted the Debtors' enterprise value as well as the value of each affected property.  In light of these concerns, the Debtors directed credit card proceeds to their Cash Management Account until such time as an arrangement could be reached with the loan servicer (or special servicer) that would allow the Debtors to continue to operate the hotels.[5]

---

3   The Cash Management Agreement between various Borrowers, Grand Prix Fixed Lessee LLC as Operating Lessee, Wachovia Bank National Association as Agent, Lehman ALI, Inc. as Lender, and Island Hospitality Management, Inc. as Manager was entered into on June 29, 2007.  The Cash Management Agreement contains various provisions governing the establishment of various Cash Management Accounts and, among other things, the deposit of Gross Income from Operations into certain Lockbox Accounts under certain circumstances defined in the Cash Management Agreement.  Triggering Events are defined in the Cash Management Agreement.

4   Under the relevant loan agreements, the Debtors were permitted, absent an Event of Default, to comingle cash for the benefit of overall the Debtors' enterprise.

5   On April 19, 2010, Wachovia did provide formal notice that it was initiating a lockbox over the Debtors' accounts, including the Debtors' master account over which Wachovia had no security interest.

(continued on next page)

50.     These actions were taken to meet the Debtors' day-to-day business obligations, to preserve the value of their hotel properties for the benefit of their enterprise and constituents, and to keep the Debtors' hotel businesses in operation.  The Debtors subsequently negotiated with Wachovia and then the Special Servicer, Midland, to keep the affected hotels open and operating.  During these negotiations, the Debtors offered to fully reconcile all amounts directed to the Debtors' Cash Management Account and, in fact, did so.  By early May 2010, the Debtors and Midland reached an agreement under which all credit card receivables were paid by the Debtors to Midland, fully reconciling the amounts previously directed to the Cash Management Account, and Midland would pay on a going forward basis the operating expenses of the hotels to permit the Debtors to continue to operate the hotels.  Midland and the Debtors, as of the Petition Date, continue to operate under this arrangement.

51.     The Debtors' level of indebtedness is of significant import in this case because, with essentially all cash flow from operations being directed to debt service, the Debtors' cash is not available for other purposes, such as maintaining the hotel properties in a condition that complies with the Franchise Agreements and performing other upgrades to capitalize on opportunities to increase revenue and to meet competitive conditions and preserve asset value.

**(c)     The Debtors' Inability to Fund PIP Obligations**

52.     In addition to placing a burden on the Debtors' ability to meet debt service obligations and fund day-to-day business operations, the lack of available cash makes it impossible for the Debtors to sufficiently fund capital expenditures on hotel properties necessary to comply with their obligations under the Franchise Agreements.[6]  Certain of the Franchise

---

6     As of the Petition Date, the Debtors have approximately $15.8 million earmarked to perform certain PIP obligations and intends to commence such obligations throughout the bankruptcy process.  But, this amount is

(continued on next page)

Agreements include provisions that require the Debtors to comply with property improvement programs ("**PIPs**"), under which they are obligated to perform certain renovations and other capital improvements to their hotel properties, such as replacing furniture, fixtures, and equipment. While necessary, the required PIP improvements are costly, subject to delays, and disrupt operations and displace revenue at the hotels while rooms under renovation are out of service.

53.     Franchisors periodically inspect the hotels to ensure the Debtors' compliance with their operating standards and the PIPs, the breach of which could result in the termination of a Franchise Agreement. The loss of a Franchise Agreement for a hotel would have an immediate and material adverse effect on the underlying value of the hotel due to the loss of associated name recognition, marketing support, brand loyalty, and centralized reservation systems provided by the Franchisors. Pursuant to prior agreement, in September of 2009, a Residence Inn Franchise Agreement with respect to a hotel property in Columbus, Ohio terminated. Subsequent to termination, revenue precipitously dropped by 50 percent and the property was sold for a fraction of its appraised value from only two years prior.

54.     As of the Petition Date, the Debtors received numerous notices of potential default from Franchisors, including 22 notices of default from Marriott. The Debtors own 44 hotels under Marriott brands, more than half of which are "Generation 1" Residence Inn by Marriott extended-stay hotels. Generation 1 Residence Inn hotels resemble garden style apartments with multiple 2 to 3 story buildings, each comprised of 8 rooms with exterior access to each room. In contrast, subsequent generations of Residence Inn hotels typically feature more

---

significantly less than the amount required to satisfy all the Debtors' PIP obligations under the Franchise Agreements.

rooms in a single multi-story building with interior corridors. Upkeep costs associated with older Generation 1 Residence Inn hotels are typically higher than other types of hotel properties because of their age (generally 20 to 30 years), layout (8 or more buildings located on large parcels of land), and inefficient utilization of heating and other utilities.

55.     As a result, many Generation 1 franchise agreements are not being renewed as they mature or are exiting the Residence Inn system before the maturity of their franchise agreements. As the Residence Inn by Marriott brand grows (with over 600 in the brand system currently), the importance of Generation 1 hotels to the Residence Inn brand will continue to decrease. Maintaining the Franchise Agreements on the Debtors' Generation 1 hotels is critically important for their cash flow and enterprise value. The loss of revenue (and cash flow) associated with an immediate withdrawal of the Debtors' Generation 1 hotels from the Residence Inn system would have a severely detrimental effect on the Debtors' entire enterprise as Generation 1 Residence Inn hotels comprise approximately 31 percent of Innkeepers annual revenue. Recognizing this, the Debtors reached agreement with Marriott in 2007 for the Debtors to (a) complete extensive PIPs on most of its Generation 1 hotels in exchange for Franchise Agreement extensions until at least 2021 and (b) permit the early expiration of the franchise agreements on six smaller Generation 1 Residence Inns located in non-core mid-Western markets.

56.     The dramatic reduction in Innkeepers' RevPAR, coupled with its significant debt burden and an inability to access new capital, have rendered the Debtors unable to comply with their PIP obligations under the Marriott (and other) Franchise Agreements. On March 16, 2010, Marriott sent to the Debtors the default notices referenced above. The Marriott default notices state that if the Debtors failed to perform the required PIP obligations by June 14, 2010, the 22

Marriott Franchise Agreements would immediately terminate as of that date. The PIP deadline has subsequently been extended from time to time by Marriott and is currently July 18, 2010.

57. The Debtors' inability to invest in their hotel properties, along with the collapse of the real estate market, have caused the value of the Debtors' hotels to severely decline, resulting in the overall erosion of the Debtors' enterprise value. As a result, it is clear that a comprehensive restructuring of the entire capital structure is necessary to preserve and maximize value.

**(d)** **Restructuring Efforts**

**1.** *Cost Savings*

58. To address the liquidity constraints caused by the tightening credit markets, decreased consumer demand, and high debt service carrying costs, since the first quarter of 2008, the Debtors' management has taken several proactive steps to reduce costs, restructure their business operations, and address operational cash shortfalls. These initiatives have included:

- a company-wide labor reduction to the minimal staffing levels possible without harming guest satisfaction (including for both the Debtors' and the Hotel Managers' employees);

- a 5 percent salary reduction for all personnel;

- the renegotiation of benefit programs in an effort to lower costs (with employees' share of obligations increased);

- the suspension of the Debtors' discretionary 401(k) plan matching;

- the termination of distributions to Innkeepers' 8% Series C stockholders beginning in December 2008;

- the reduction of certain fixed costs, including the renegotiation of maintenance, grounds cleaning, and vendor contracts; and

32

- the immediate cessation of all non-emergency capital expenditures on the hotel properties beginning in late 2008 and the related settlement for approximately $8.5 million of approximately $13.1 million outstanding capital expenditure obligations for work performed and goods ordered.

59.     The result of the Debtors' efforts has been positive.  From 2008 to 2010, the Debtors were able to reduce their annual costs by approximately $24 million.  However, despite this reduction, due to the current economic climate and ongoing credit crisis, the Debtors have concluded that their liquidity would continue to erode and potentially could be exacerbated by further declines in the hospitality market.  In addition, the Debtors have determined that any new debt or equity investments would be unlikely unless they could restructure their existing debt given the current amount of outstanding debt owed to their lenders.  The Debtors also have concluded that they would need additional liquidity to meets their near term obligations under the Franchise Agreements.

### 2.     *Restructuring Negotiations*

60.     Against this backdrop, the Debtors began to weigh their options with respect to a broad financial restructuring that would provide the Debtors with the flexibility necessary to continue their business on a going forward basis.  To that end, in November 2008, the Debtors hired Marc Beilinson, an independent director of Innkeepers since 2007, as Chief Restructuring Officer to explore alternative restructuring opportunities.[7]  In addition, in early 2010, the Debtors retained Kirkland & Ellis LLP ("**Kirkland**") and Moelis & Co. LLC ("**Moelis**") to initiate discussions with the Debtors' constituents regarding a possible comprehensive restructuring and financial alternatives for improving the Debtors' balance sheet.

---

7     Marc Beilinson is a former restructuring attorney with over 25 years of experience.  In November 2009, Mr. Beilinson was elected to serve as an independent director on the board of directors of Apollo Commercial Real Estate Finance Inc., a publicly traded REIT.  Mr. Beilinson continues to serve on this board as an independent director, as defined under the NYSE *per se* rules on director independence.

61. With the assistance of these advisors, the Debtors reviewed and analyzed their business operations and determined the cash necessary to maintain their operations and work towards a successful restructuring. In undertaking this analysis, the Debtors and their advisors considered the impact of the current economic outlook on the Debtors' near-term projected financial performance, including the demand for hotel accommodations and projected cost to complete the PIPs and other capital improvements necessary to maintain the value of the properties. Because of high levels of current debt, the immediate crisis caused by the impending Marriot defaults, and the Debtors' inability to satisfy their debt service obligations as they came due, it became clear that a comprehensive balance sheet restructuring through a chapter 11 proceeding was the best available restructuring alternative for the Debtors and their estates.

62. Thus, the Debtors engaged several parties, including Marriot, Lehman, and certain prepetition lenders who have agreed to extend the DIP Financings, in extensive negotiations leading up to the filing of these Chapter 11 Cases. Ultimately, these negotiations, which were conducted in good faith and at arm's length, culminated in a series of interrelated agreements that will, among other things: (a) deleverage the Debtors' balance sheet, minimizing interest payments and releasing previously encumbered cash for other purposes; (b) fund PIP and other capital expenditures necessary to retain premium brand affiliations, maintain customer loyalty, and improve the Debtors' industry market share; and (c) avoid any alleged potential change of control defaults that would jeopardize the Debtors' Franchise Agreements.

### III. RELIEF SOUGHT IN THE DEBTORS' FIRST DAY PLEADINGS

63. It is critically important for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their Franchisors, employees, customers, and Property Managers. Achieving this goal is likely to be particularly challenging while operating in chapter 11. To that end, the Debtors have filed the First Day Pleadings seeking relief intended to allow the Debtors

34

to effectively transition into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse immediate and irreparable consequences.

64. Several of the First Day Pleadings request authority to pay certain prepetition claims. I am told by my advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. As part of this, certain relief will be deferred for consideration at a later hearing.

65. I have reviewed each of the First Day Pleadings. The facts stated therein and attached hereto as **Exhibit B** are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.

## IV.  INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

66. Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as **Exhibits C, D, E, F, G, H, I, J, K, L,**

and **M**. Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis), unless otherwise noted:[8]

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit C** hereto provides the following information with respect to each of the holders of the Debtors' 50 largest unsecured claims, excluding claims of insiders: the creditor's name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Exhibit D** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Exhibit E** hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), **Exhibit F** hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Exhibit G** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business. The Debtors' corporate headquarters are located at 340 Royal Poinciana Way, Suite 306, Palm Beach, FL 33480.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Exhibit H** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

---

[8] The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), **Exhibit I** attached hereto provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Exhibit J** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit K** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Exhibit L** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit M** hereto provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of these Chapter 11 Cases, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: <u>July 19</u>, 2010

Respectfully submitted,

_____
Dennis M. Craven
Chief Financial Officer, Treasurer, and Vice
President of Innkeepers USA Trust

**EXHIBIT A**

**Plan Support Agreement**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of July 17, 2010, by and among (i) Innkeepers USA Trust, a Maryland real estate investment trust ("**Innkeepers**" and collectively with its subsidiaries, the "**Company**" or the "**Debtors**"), including each obligor under the Floating Rate Debt (defined below) and (ii) Lehman ALI Inc., a Delaware corporation ("**Lehman**"), as mortgage lender. The Company and Lehman are sometimes collectively referred to herein as the "**Parties**" and individually as a "**Party**."

The following exhibits are attached hereto and incorporated herein:

| | |
|---|---|
| Exhibit A | Plan Term Sheet |
| Exhibit B | Marriott Agreement |
| Exhibit C | Floating Rate DIP Loan Term Sheet |
| Exhibit D | Fixed Rate DIP Loan Term Sheet |
| Exhibit E | Cash Collateral Order |
| Exhibit F | Form of Joinder |
| Exhibit G | Floating Rate Franchise Agreements |

Capitalized terms not defined in this introduction or in the recitals to this Agreement shall have the meanings assigned thereto in Section 1 hereof.

## *RECITALS*

WHEREAS, the Company is a borrower, and has obligations, under that certain mortgage loan agreement (the "**Floating Rate Debt Agreement**"), dated as of June 29, 2007, to Lehman and the parties thereto, as lenders;

WHEREAS, the Parties, with the assistance of their legal and financial advisors, have engaged in good faith negotiations with the objective of reaching an agreement with regard to the conversion of the Floating Rate Debt into significantly all of the equity of the reorganized Company, on substantially the terms and conditions set forth in the Plan Term Sheet attached hereto as Exhibit A (the "**Transaction**");

WHEREAS, it is anticipated and a fundamental assumption and requirement of this Agreement, that the Transaction will be effectuated through a prearranged plan of reorganization (the "**Plan**") in chapter 11 bankruptcy cases under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") filed by the Company (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court presiding over the Chapter 11 Cases and not the Lehman Bankruptcy Cases, the "**Bankruptcy Court**");

WHEREAS, the Company shall use its commercially reasonable efforts to obtain Bankruptcy Court approval and confirmation of the Plan in accordance with the Bankruptcy Code, on terms consistent in all respects with this Agreement;

WHEREAS, Innkeepers has determined that the Transaction is advisable and in the best interests of its creditors and equity holders;

WHEREAS, entry into this Agreement is within the sound business judgment of Innkeepers and is in furtherance of Innkeepers' directors' and officers' fiduciary duties;

WHEREAS, this Agreement sets forth the terms and conditions of the Parties' respective obligations hereunder.

WHEREAS, Lehman Brothers Holding, Inc. and certain of its affiliates have commenced chapter 11 cases in the Southern District of New York (the "**Lehman Bankruptcy Cases**").

NOW, THEREFORE, in consideration of the foregoing, the promises and mutual covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    Definitions.

"*Business Day*" shall mean any day, other than a Saturday, Sunday, or a legal holiday, as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

"*Confirmation Date*" shall mean the date of entry by the Bankruptcy Court of the Confirmation Order.

"*Confirmation Order*" shall have the meaning set forth in Section 6(a)(vi) hereof.

"*Disclosure Statement*" shall mean the disclosure statement related to the Plan to be filed in the Chapter 11 Cases, which shall be in such form and substance as is reasonably satisfactory to Lehman and with any changes or modifications required by the Bankruptcy Court.

"*Effective Date*" shall have the meaning set forth in Section 10 hereof.

"*Fiduciary Out*" shall have the meaning set forth in Section 24 hereof.

"**Firm Alternative Transaction**" shall have the meaning set forth in Section 24 hereof.

"*Fixed Rate Franchise Agreements*" shall mean those certain Residence Inn by Marriott Relicensing Franchise Agreements, between Marriott and Grand Prix Fixed Lessee LLC, a Delaware limited liability company, dated as of June 29, 2007.

***"Fixed Rate Collateral"*** shall mean the forty-five (45) properties securing the Fixed Rate Debt.

***"Fixed Rate Debt"*** shall mean the Company's obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto collateralized by the Fixed Rate Collateral.

***"Fixed Rate DIP Facility"*** shall mean a senior secured super-priority debtor-in-possession credit facility in conformity with the Fixed Rate DIP Loan Term Sheet.

***"Fixed Rate DIP Loan Term Sheet"*** shall mean the Fixed Rate DIP Loan Term Sheet attached to this Agreement as Exhibit D.

***"Floating Rate Collateral"*** shall mean the twenty (20) properties securing the Floating Rate Debt.

***"Floating Rate Debt"*** shall mean the Company's obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto, collateralized by the Floating Rate Collateral.

***"Floating Rate DIP Facility"*** shall mean a senior secured super-priority debtor-in-possession credit facility in conformity with the Floating Rate DIP Loan Term Sheet.

***"Floating Rate DIP Loan Term Sheet"*** shall mean the Floating Rate DIP Loan Term Sheet attached to this Agreement as Exhibit C.

***"Floating Rate Franchise Agreements"*** shall mean those agreements set forth on Exhibit G attached hereto.

***"Franchise Agreements"*** shall mean collectively the Fixed Rate Franchise Agreements, the Floating Rate Franchise Agreements and the LNR Franchise Agreements.

***"Lehman Shares"*** shall mean shares of the New Equity representing 100% of the issued and outstanding New Equity, subject to dilution by the Management Equity Incentive Program (as defined in the Plan Term Sheet) that will be distributed to Lehman pursuant to the Plan.

***"LNR Franchise Agreements"*** shall mean those certain Residence Inn by Marriott Relicensing Franchise Agreements, between Marriott and Grand Prix General Lessee LLC, and Marriott and Grand Prix RIMV Lessee LLC, respectively, dated as of June 29, 2007.

***"Marriott"*** shall mean Marriott International, Inc., a Maryland corporation.

***"Marriott Agreement"*** shall mean the Marriott Agreement attached to this Agreement as Exhibit B.

**"*Milestones Covenant*"** shall mean the covenant by the Company not to take any action, and not to solicit, encourage or support any action by a third party, seeking to amend, annul, modify, or extend the Plan Milestones.

**"*New Equity*"** shall mean the new shares of common stock to be issued by Innkeepers under the Plan.

**"*New Equity Sale Transaction*"** shall have the meaning set forth in Section 6(b) hereof.

**"*New Funding*"** shall mean funding incurred by Innkeepers in the amount of no less than $75 million, plus such additional amounts in form and substance as may be determined by the parties.

**"*Petition Date*"** shall mean the date on which the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court.

**"*PIP Work*"** shall mean the construction labor and materials necessary to satisfy Marriott or any other applicable franchisor that each of the requirements of each of the PIPs has been satisfied, as identified and approved by Lehman.

**"*PIP*"** shall mean the Property Improvement Plans included within and made a part of the Franchise Agreements covering certain of the hotel properties owned by the Borrower, which Property Improvement Plans shall have been approved by Marriott or any other applicable franchisor, and shall have been received and reasonably approved by Lehman, unless such Property Improvement Plans have been previously approved by Lehman in accordance with the terms and conditions of the Floating Rate Debt.

**"*Plan*"** shall mean a prearranged chapter 11 plan of reorganization for the Company consistent in all respects with the terms and conditions contained in the Plan Term Sheet.

**"*Plan Effective Date*"** shall mean the effective date of the Plan.

**"*Plan Milestones*"** shall have the meaning set forth in Section 6 hereof.

**"*Plan Related Documents*"** shall mean the Plan and all documents required to effectuate the Plan or the Transaction, including, but not limited to, all documents and agreements contemplated by the Plan Term Sheet and, to the extent not included in the above, (a) the Disclosure Statement, (b) the materials related to the Solicitation, (c) the proposed Confirmation Order and (d) any other documents or agreements filed with the Bankruptcy Court by Innkeepers or at the Company's direction that are necessary to implement the Plan, including any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement. All Plan Related Documents shall be in form and substance reasonably acceptable to Lehman and materially consistent in all respects with this Agreement, the Plan and the Transaction.

**"*Plan Term Sheet*"** shall mean the term sheet attached hereto as Exhibit A.

"***Pro Forma Capital Structure***" shall mean the capital structure of the reorganized Company following the consummation of the Plan as set forth in the Plan Term Sheet.

"***Solicitation***" shall mean the solicitation of votes in respect of the Plan in the Chapter 11 Cases.

"***Termination Date***" shall mean the date on which this Agreement is terminated in its entirety pursuant to Section 6 hereof.

"***Termination Event***" shall have the meaning set forth in Section 6 hereof.

"***Transfer***" shall have the meaning set forth in Section 30 hereof.

Section 2.        Approval of the Plan Term Sheet and Related Agreements.

(a)        The Parties severally acknowledge and agree that (i) the terms and conditions set forth in the Plan Term Sheet, the Marriott Agreement, the Floating Rate DIP Loan Term Sheet, the Fixed Rate DIP Loan Term Sheet and the Cash Collateral Order are acceptable in all respects to the Parties and their respective counsel and (ii) the Plan Related Documents shall contain terms and conditions consistent in all material respects with those set forth in the Plan Term Sheet, the Marriott Agreement, the Floating Rate DIP Loan Term Sheet and the Fixed Rate DIP Loan Term Sheet.

Section 3.        Bankruptcy Process for Innkeepers.   The Company hereby agrees to use commercially reasonable efforts to obtain approval of this Agreement and confirmation and consummation of the Plan as soon as reasonably practicable on terms consistent in all respects with the Plan Term Sheet and this Agreement, and each Party shall use their commercially reasonable efforts to support confirmation and consummation of the Plan; *provided*, *however*, that the Company and Lehman, may from time to time agree in writing to further extend any time period or deadline set forth herein as provided in this Agreement.

Section 4.        Support of the Transaction; Additional Covenants.   From the Effective Date of the Agreement until the occurrence of a Termination Event (as defined herein), and subject to the conditions set forth in this Agreement, the Company and Lehman, as applicable, agree and covenant that:

(a)        Prior to the Termination Date, no Party will:

(i)        object to confirmation of the Plan or object to or otherwise commence any proceeding to oppose, alter, delay or impede or take any other action, directly or indirectly, to interfere with entry of one or more orders approving the Plan or other Plan Related Documents;

(ii)        directly or indirectly seek, solicit, negotiate, vote for, consent to, support or participate in the formulation of any plan of reorganization or other restructuring other than the Plan;

(iii)     directly or indirectly seek, solicit, negotiate, support or engage in any discussions regarding any chapter 11 plan other than the Plan;

(iv)     object to the Solicitation or support any such objection by a third party; or

(v)     take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan or that is otherwise inconsistent with this Agreement.

(b)     Unless the Termination Date has occurred, (i) so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including but not limited to its receipt of the Disclosure Statement, Lehman agrees to (A) vote (or cause the voting of) its Claims arising from the Floating Rate Debt to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the Solicitation and agrees that the solicitation period may be as short as five (5) Business Days; *provided*, *however*, that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof; and (B) not change or withdraw (or cause to be changed or withdrawn) such vote and (ii) Lehman consents to the treatment of the Floating Rate Debt as set forth in the Plan Term Sheet and the Plan.  The Company hereby agrees that in the event this Agreement terminates by its terms, the Company shall not challenge or otherwise object to (i) the revocation of Lehman's vote pursuant to this section or (ii) any action by Lehman to confirm the revocation or cancellation of its vote.

(c)     Nothing in this Agreement shall be construed to (i) prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and the Transaction and are not for the purpose of and could not reasonably be expected to have the effect of, hindering, delaying or preventing the confirmation of the Plan or consummation of the Transaction pursuant to the Plan and (ii) require Lehman to file any pleadings or take any other action in support of the Plan that would require it to hire and pay for counsel to represent it unless the Company agrees to pay the fees and expenses of such counsel.

Section 5.     Further Agreements.

(b)     Additional Transaction Matters.  The Company hereby agrees (i) to use its reasonable best efforts to prepare or cause the preparation of the Plan and the other Plan Related Documents, (ii) to take all reasonably necessary and appropriate actions to achieve confirmation and consummation of the Plan and the Transaction contemplated therein, and (iii) that it shall provide to Lehman draft copies of all pleadings and other documents (including all "first day" and any other motions, applications and other pleadings and documents, as well as all exhibits, supplements and related orders) it intends to file in connection with the Chapter 11 Cases with the Bankruptcy Court, or any other court, as soon as is reasonably practicable before such documents are filed with such court, all of which documents (a) shall be in form and substance reasonably acceptable to Lehman prior to any such proposed filing and (b) shall be consistent in all respects with the Plan Term Sheet.

(c)     Approvals.  Each Party agrees to use its commercially reasonable efforts to (i) obtain Bankruptcy Court approval of this Agreement, confirmation of the Plan by the Bankruptcy Court and consummate the Transaction pursuant to the Plan and all other actions contemplated under the Plan Related Documents related thereto, (ii) take any and all necessary and appropriate actions in furtherance of the Transaction and the other actions contemplated under this Agreement, the Plan Term Sheet and the Plan Related Documents, (iii) obtain any and all required regulatory approvals and material third-party approvals for the Transaction and (iv) not take any actions inconsistent with this Agreement, the Plan Term Sheet or other Plan Related Documents.  Neither Party shall, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to or enter into any agreements relating to, any restructuring, plan of reorganization, dissolution, winding up, liquidation, reorganization, merger, transaction, sale or disposition (or all or substantially all of their assets or equity) other than as set forth in the Plan Term Sheet and the Plan, nor shall either Party solicit or direct any person or entity, including, without limitation, any member of any of the Parties' board of directors or, as to the Company, any holder of equity in the Company, to undertake any of the foregoing; *provided*, *however*, that the Parties may agree to modifications to the Plan Related Documents as provided herein.

(d)     Professionals.  The Company shall pay all reasonable professional fees and expenses incurred by Lehman in connection with the Transaction.  In connection therewith, prior to the Petition Date, the Company shall pay all reasonable fees and expenses owing to Lehman as invoiced by counsel for Lehman on the date hereof.

(e)     Compliance With Agreements.  The Company shall comply, including to the extent authorized by an order of the Bankruptcy Court, after the Petition Date and through the Plan Effective Date, with the terms and conditions of the Floating Rate Debt Agreement, as such may have been modified by the existing waiver agreements in place as of the date hereof, including the payment of all interest, fees and expenses owing thereunder, *provided*, *however*, that after the Petition Date, (i) the Company shall not be in default under the foregoing agreement for purposes of this Agreement as a result of the filing of the Chapter 11 Cases and (ii) the Company shall not be required to pay interest, fees and expenses absent entry of an order of the Bankruptcy Court permitting such payment or upon consummation of the Plan to the extent authorized by an order of the Bankruptcy Court.

(f)     Automatic Stay Relief.  For the avoidance of doubt, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder solely for purposes of providing any notices, elections, or waivers under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay solely in connection with the giving of any such notice, election, or waiver).  Nothing in this Agreement shall preclude Lehman from delivering any notice of default, waiver, or election to the Company at any time.

Section 6.     Termination of this Agreement.  Upon the occurrence of any of the following events (each, a "**Termination Event**"), this Agreement shall automatically terminate on the first calendar day immediately following one (1) Business Day after the date of such Termination Event, unless (a) Lehman, in its sole discretion, provides the Company with a written waiver of any such Termination Event in this Section 6 within one (1) Business Day from

the date of such Termination Event or (b) Lehman and the Company, in their respective sole discretion, provide the other party with a written waiver of Termination Events in Section 6(r) and 6(s) within one (1) Business Day from the date of such Termination Event:

(a)     Failure to meet any of the following milestones (each a "**Plan Milestone**" and together, the "**Plan Milestones**"):

(i)     Motion to assume this Agreement filed by the Company on the Petition Date;

(ii)     Order entered authorizing the assumption of this Agreement no later than 45 days after the Petition Date;

(iii)     Orders entered on a final (and not interim) basis authorizing the Fixed Rate DIP Facility, Floating Rate DIP Facility, the use of Lehman's cash collateral and the use of the cash collateral securing the Fixed Rate Debt consistent with the terms set forth in the Plan Term Sheet no later than 45 days after the Petition Date;

(iv)     Disclosure Statement and Plan consistent with the terms set forth in the Plan Term Sheet filed no later than 45 days after the Petition Date;

(v)     Disclosure Statement consistent with the terms set forth in the Plan Term Sheet approved by the Bankruptcy Court no later than 120 days after the Petition Date;

(vi)     Lehman and the Company shall have reached mutual agreement no later than 120 days after the Petition Date on the terms of a sale process upon the occurrence of the Termination Event set forth in Section 6(a)(vii) or 6(a)(viii) below;

(vii)     Order confirming the Plan consistent with the terms set forth in the Plan Term Sheet entered by the Bankruptcy Court no later than 240 days after the Petition Date; and

(viii)     Occurrence of the Plan Effective Date no later than 270 days after the Petition Date;

(b)     Lehman has not executed definitive agreements with respect to the sale of 50% of the Lehman Shares for a purchase price of at least $107.5 million (the "**New Equity Sale Transaction**") no later than 45 days after the Petition Date;

(c)     Lehman has not consummated the New Equity Sale Transaction no later than 270 days after the Petition Date;

(d)     The entry by the Bankruptcy Court of an interim order authorizing the use of Lehman's cash collateral in form and substance not acceptable to Lehman;

(e)     The entry of any order of the Bankruptcy Court granting relief from the automatic stay (i) to permit any exercise of remedies by the lenders or special servicer under the

Fixed Rate Debt, the Other Secured Debt or the Mezzanine Debt (as each such term is defined in the Plan Term Sheet) other than limited relief solely to permit the delivery of default notices under the terms of the Fixed Rate Debt, the Other Secured Debt or the Mezzanine Debt and (ii) to permit termination of any Franchise Agreement with Marriott or any other hotel brand other than those Franchise Agreements listed in the Marriott Schedule attached as Exhibit E to the Plan Term Sheet;

(f)     The filing by the Company of any motion or other request for relief seeking to (i) dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (iii) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(g)     (i) The filing by the Company of any motion or other request for relief seeking an extension of the Plan Milestones or any alteration of the remedies upon termination set forth herein without the express written consent of Lehman in its sole discretion; (ii) the filing by the Company of any pleading supporting any motion from any other party to obtain such extension or alteration; (iii) the failure of the Company to oppose any motion from any other party to obtain such extension; or (iv) the violation by the Company of the Milestones Covenant;

(h)     The entry of an order by the Bankruptcy Court (i) dismissing any of the chapter 11 cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases or (iv) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

(i)     The withdrawal, amendment or modification by the Company of, or the filing by the Company of a pleading seeking to amend or modify, the Plan or this Agreement, which withdrawal, amendment, modification or pleading is materially inconsistent with the terms set forth in the Plan Term Sheet or the Plan or is materially adverse to Lehman, in each case in a manner not reasonably acceptable to Lehman, or if the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the terms set forth in the Plan Term Sheet or the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms set forth in the Plan Term Sheet) and such motion or pleading has not been withdrawn within three (3) Business Days;

(j)     The filing of any motion to approve a Disclosure Statement or Plan by the Company that incorporates a Pro Forma Capital Structure or any other terms inconsistent with the terms and conditions set forth Plan Term Sheet;

(k)     The granting by the Bankruptcy Court of relief that is inconsistent with the terms set forth in the Plan Term Sheet or the Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms set forth in the Plan Term Sheet);

(l)     The issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling, determination or order making illegal or otherwise restricting, preventing or enjoining the consummation of a material portion of the Transaction, including an order denying confirmation of the Plan and such ruling, determination or order has not been vacated or reversed within five (5) Business Days of issuance;

(m)     The occurrence and continuation of a default under the Fixed Rate DIP Facility, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder;

(n)     The occurrence and continuation of a default under the Floating Rate DIP Facility, including those set forth on Exhibit B to the Plan Term Sheet, *provided* that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder;

(o)     The occurrence and continuation of a default in connection with the Company's use of Lehman's cash collateral, *provided* that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder; and

(p)     The occurrence after execution of this Agreement of (i) a change that has a material adverse effect on the use, value or condition of the Company, its assets or the legal or financial status or business operations of the Company or (ii) a material disruption or material adverse change in the financial, real estate, banking or capital markets;

(q)     Lehman has determined, in its sole discretion, after completion of its tax due diligence, that the Transaction cannot be structured in a manner acceptable to Lehman, which determination shall be made no later than 45 days after the Petition Date;

(r)     The material breach by any Party of any of their undertakings, representations, warranties or covenants set forth in this Agreement; and

(s)     All Parties agree in writing to terminate this Agreement.

The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; *provided* that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions.

Section 7.     Default Notices.  The Company shall furnish to Lehman prompt written notice of any Termination Event as soon as it becomes aware that the Termination Event will occur, specifying the nature and extent thereof and the corrective action, if any, taken or proposed to be taken with respect thereto.

Section 8.     Effect of Termination.  Upon occurrence of a Termination Event, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertaking, and agreements under or related to this Agreement except (i) to the extent provided in Section 13 of this Agreement and (ii) with respect to the remedies set forth in Sections 8(a) and 8(b) below:

(a)     Upon the occurrence of any of the Termination Events set forth in Section 6(a) through 6(s) hereof, Lehman may terminate this Agreement and the use of its cash collateral.

(b)     As long as this Agreement has not otherwise been terminated, (x) upon the occurrence of a Termination Event set forth in Section 6(a)(vii) or 6(a)(viii); (y) if a trustee is appointed for the Chapter 11 Cases of all of those Debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt, or (z) if the Company files a motion to dismiss all of the Chapter 11 Cases for those Debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt, the Company shall, immediately upon the occurrence of such Termination Event, elect one of the following remedies, *provided*, *however*, that if the Company fails to make such election within one day after the occurrence of the applicable Termination Event, Lehman shall have the right to elect either option:

(i)     The Company will be deemed to have consented to the modification of the automatic stay to permit Lehman to exercise any and all remedies with respect to the Floating Rate Collateral, the automatic stay shall be so modified and no further Bankruptcy Court approval shall be required; or

(ii)     The Company will sell the Floating Rate Collateral pursuant to section 363 of the Bankruptcy Code, subject to the following conditions, which shall be incorporated into any order approving this Agreement: (i) the sale procedures shall be agreed upon no later than 120 days after the Petition Date; (ii) Lehman shall have the right to credit bid the Floating Rate Debt; (iii) if sale proceeds are not paid to Lehman within 60 days of the Termination Event, title to the Floating Rate Collateral shall be conveyed to Lehman free and clear of all liens, claims and encumbrances; (iv) the 60-day period shall not be extended and the Company waives its right to seek any extension such period.

Section 9.     Good Faith Cooperation; Further Assurances; Transaction Documents. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transaction. Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement. Each Party hereby covenants and agrees (a) to negotiate in good faith the Plan Related Documents, each of which shall (i) contain the same economic terms as and other terms consistent in all material respects with, the terms set forth in the Plan Term Sheet, (ii) be in form and substance acceptable in all respects to each of the Company and Lehman and (iii) be consistent with this Agreement in all material respects and (b) to execute the Plan Related Documents subject to the terms of this Agreement (to the extent such Party is a party thereto).

Section 10.     Representations and Warranties. Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof and as of the date of any amendment of this Agreement approved by such Party:

(t)　　No Conflicts.　To the Parties' actual knowledge, the execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(u)　　Governmental Consents.　The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of or notice to or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court.

(v)　　Binding Obligation.　This Agreement is the legally valid and binding obligation of such Party, enforceable against it, and its officers, directors and agents, in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

Section 11.　Effectiveness.　This Agreement shall become effective and binding on each Party upon (i) the payment of all reasonable fees and expenses owing to Lehman as invoiced by counsel for Lehman on the date hereof and (ii) the receipt by Lehman of signature pages executed by the Company, including each obligor under the Floating Rate Debt (the "**Effective Date**"); *provided*, *however*, that this Agreement shall not become binding on Lehman unless and until (a) the Marriott Agreement, in the form attached hereto as Exhibit B, have been executed by all relevant parties thereto, (b) the bankruptcy court presiding over the Lehman Bankruptcy Cases enters an order approving this Agreement, which approval (x) Lehman shall seek as soon as practicable after the Petition Date (by a motion and order in substance subject to the Company's reasonable consent), (y) shall be an order in form and substance reasonably acceptable to Innkeepers and materially consistent in all respects with this Agreement, and (z) shall include provisions that provide, among other things, that: (i) the Agreement is approved without condition or delay, including approval for Lehman to comply with each provision of the Agreement and (ii) the automatic stay in the Lehman Bankruptcy Cases is modified to permit any Party to take any or all of the actions permitted by the Agreement; *provided*, *further*, *however*, that if such if such order approving this Agreement is not entered in the Lehman Bankruptcy Cases by August 27, 2010, the Company has the right to terminate this Agreement upon one (1) Business Day's written notice by the Company.　Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.

Section 12.　GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER.　THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.　BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN

CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL COURT IN THE STATE OF NEW YORK AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT PRESIDING OVER THE CHAPTER 11 CASES AND NOT THE BANKRUPTCY COURT PRESIDING OVER THE LEHMAN BANKRUPTCY CASES SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREIN; *PROVIDED*, *HOWEVER*, THE BANKRUPTCY COURT PRESIDING OVER THE LEHMAN BANKRUPTCY CASES SHALL HAVE EXCLUSIVE JURISDICTION TO DETERMINE WHETHER TO APPROVE LEHMAN'S ENTRY INTO THIS AGREEMENT. THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Section 13.    <u>Specific Performance; Exclusive Remedy</u>.  Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach the other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive relief, without the necessity of securing or posting a bond or other security in connection with such remedy.  Notwithstanding anything to the contrary set forth above, the Parties also agree that the remedy of specific performance shall be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

Section 14.    <u>Survival</u>.    Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Sections 7</u> (effect of termination), <u>11</u> (governing law), <u>12</u> (specific performance), <u>13</u> (survival), <u>15</u> (successors and assigns), <u>16</u> (no third party beneficiaries, <u>21</u> (reservation of rights), <u>22</u> (publicity), <u>24</u> (fiduciary duties), <u>25</u> (indemnification), and <u>26</u> (continued banking practices) hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof.

Section 15.    <u>Headings</u>.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 16.    <u>Successors and Assigns; Severability; Several Obligations</u>.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not

affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 17. <u>No Third Party Beneficiaries</u>. Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

Section 18. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations, but shall not supersede either of the Plans or the other Plan Related Documents.

Section 19. <u>Counterparts</u>. This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

Section 20. <u>Notices</u>. All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties (unless otherwise stated in the Agreement) and deemed given when delivered, if delivered by hand or upon confirmation of transmission, if delivered by email and facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth below:

<u>If to the Company</u>:

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attn: Marc Beilinson
Telephone: (561) 835-1800
Facsimile: (561) 835-0457
email: MBeilinson@BeilinsonPartners.com

with a copy to

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022-4611
Attn: James H.M. Sprayregen
        Paul M. Basta
        Jennifer L. Marines
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

email:  jsprayregen@kirkland.com
        pbasta@kirkland.com
        jmarines@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654-3406
Attn:   Anup Sathy
        Marc J. Carmel
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
email:  asathy@kirkland.com
        mcarmel@kirkland.com

If to Lehman:

Lehman ALI Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn:   Michael Lascher
        Susanne Frey
email:  michael.lascher@lamcollc.com
        susanne.frey@lehmanholdings.com

with a copy to

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attn:   Michael J. Sage
        Brian E. Greer
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
email:  michael.sage@dechert.com
        brian.greer@dechert.com

Section 21.     Rule of Interpretation; Calculation of Time Period.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

Section 22.    Reservation of Rights.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

Section 23.    Publicity; Confidentiality.  The Parties understand and acknowledge that, until publicly disclosed as herein contemplated, the terms of this Agreement and the exhibits hereto are confidential information, and the Parties agree to keep such information confidential and not use it for any purpose except as contemplated hereby or as reasonably necessary in the Chapter 11 Cases.

Section 24.    Representation by Counsel.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Section 25.    Fiduciary Duties.

(a)    Notwithstanding  anything to the contrary herein, at any time prior to the Confirmation Date, the Company or any directors or officers of the Company, in such person's capacity as a director or officer of the Company, shall be entitled to take any action, or to refrain from taking any action, including a decision to terminate this Agreement, that such person determines in good faith, after consultation with counsel, is consistent with its or their fiduciary obligations  under applicable law (the "**Fiduciary Out**").

(b)    At the time this Agreement is entered into, the Company acknowledges and agrees that the Plan Milestones and any remedies in respect thereof set forth in this Agreement constitute the sound business judgment of the Company that comports with the fiduciary duties of the Company's officers and directors.

(c)    The Company agrees that the Fiduciary Out shall not apply, and may not be used, to annul, modify, amend, or otherwise alter any of the Plan Milestones or any of the remedies in respect thereof; provided, however, that if the Company secures a binding and firm written commitment with respect to an alternative transaction that will provide Lehman with a higher and better  recovery than the recovery proposed under the Plan (a "**Firm Alternative Transaction**"), the Company shall provide Lehman with at least ten (10) Business Days to determine whether Lehman will consent to such Firm Alternative  Transaction.  If Lehman does not consent to such Firm Alternative Transaction, the Company may only exercise the Fiduciary Out after it has obtained an order from  the Bankruptcy Court authorizing the Company to exercise the Fiduciary Out in accordance with the terms hereof.  The Company agrees that in determining whether a Firm Alternative Transaction is "higher and better,"  all factors must be considered including contingencies, conditionality, legal and financial execution risk, economics and Lehman's opinion as to whether such Firm Alternative Transaction is "higher and better."

Section 26.  Indemnification.  The Company hereby agrees to indemnify and hold Lehman and its officers, directors, partners, agents, employees, advisors, and successors and assigns, harmless from and against any and all claims, actions, suits, liabilities and judgments, and costs and expenses directly related thereto (including reasonable costs of defense on an as-incurred basis), arising by reason of or resulting from Lehman's execution of this Agreement and performance of its obligations hereunder, but expressly excluding any liability, cost or expense arising from or related to the fraudulent or willful misconduct of Lehman.

Section 27.  Continued Banking Practices.  Notwithstanding anything herein to the contrary, Lehman and its affiliates, may accept deposits from, lend money to and generally engage in any kind of banking, investment banking, trust or other business with or provide debt financing, equity capital or other services (including financial advisory services) to the Company or any affiliate of the Company or any other person, including, but not limited to, any person proposing or entering into a transaction related to or involving the Company or any affiliate thereof.

Section 28.  Acknowledgement.  This Agreement and the Transactions are the product of negotiations among its affiliates, together with their respective representatives.  This Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Lehman's vote(s) will not be solicited until it has received the Disclosure Statement and any other required materials related to the Solicitation.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

Section 29.  No Waiver.  The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity or to insist upon compliance by any other Party hereto with its obligations hereunder and any custom or practice or the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance.

Section 30.  Modification.  This Agreement may only be modified, altered, amended, or supplemented by an agreement in writing signed by the Company and Lehman.

Section 31.  Transfers.  Lehman agrees that until the earlier to occur of (x) termination of this Agreement in accordance with Section 6 and (y) the occurrence of the Plan Effective Date, it shall not sell, transfer, pledge, assign or otherwise hypothecate any of the Floating Rate Debt or any option thereon or any right or interest (voting or otherwise) therein (any such transfer, pledge, assignment, hypothecation or option being referred to as a "**Transfer**"), unless such Transfer is subject to, and the transferee thereof agrees in writing for the benefit of the Parties to be bound by all of the terms of this Agreement by executing and delivering to the Parties a joinder in the form attached hereto as Exhibit E upon no less than five (5) days written notice to the Company.  Any Transfer that is made in violation of the immediately preceding sentence shall be null and void *ab initio*, and the Company shall have the right to enforce the voiding of such transfer. In the event that any Transfer is not fully consummated for any reason,

Lehman shall remain bound by the terms of this Agreement.  After a Transfer, the Company has the right to terminate this Agreement upon one (1) day's written notice by the Company. Notwithstanding the foregoing, if Lehman notifies the Company of a potential Transfer, the Company shall advise Lehman within five business days if it will exercise its termination right with respect to such Transfer.

<div align="center">[Signature Page Follows]</div>

<div align="center">*****</div>

<div align="center">THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK</div>

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

LEHMAN ALI, INC.

By: _____
Name: Nancy Skanik
Title: Vice President
Date: July 17, 2010

[SIGNATURE PAGE TO PLAN SUPPORT AGREEMENT]

**INNKEEPERS USA TRUST**

By: _MBeilinson_
Name: Marc Beilinson
Title:   Chief Restructuring Officer
Date:  July 17, 2010

[SIGNATURE PAGE TO PLAN SUPPORT AGREEMENT]

**GRAND PRIX HOLDINGS LLC**

By: _____

Name:  Marc Murphy

Title:  General Counsel, Secretary

Date:  July <u>17</u>, 2010

**ON BEHALF OF ALL THE DEBTOR
ENTITIES LISTED ON ANNEX A**

By: _____

Name:  Marc Murphy

Title:  General Counsel, Secretary

Date:  July <u>17</u>, 2010

**Annex A**

Debtor Entities[1]

GP AC Sublessee LLC (5992)

Grand Prix Addison (RI) LLC (3740)

Grand Prix Addison (SS) LLC (3656)

Grand Prix Albany LLC (3654)

Grand Prix Altamonte LLC (3653)

Grand Prix Anaheim Orange Lessee LLC (5925)

Grand Prix Arlington LLC (3651)

Grand Prix Atlanta (Peachtree Corners) LLC (3650)

Grand Prix Atlanta LLC (3649)

Grand Prix Atlantic City LLC (3648)

Grand Prix Bellevue LLC (3645)

Grand Prix Belmont LLC (3643)

Grand Prix Binghamton LLC (3642)

Grand Prix Bothell LLC (3641)

Grand Prix Bulfinch LLC (3639)

Grand Prix Campbell / San Jose LLC (3638)

Grand Prix Cherry Hill LLC (3634)

Grand Prix Chicago LLC (3633)

---

[1]    The Debtors Entities are listed with the last four digits of each Debtor Entities' federal tax identification number.

Grand Prix Columbia LLC (3631)

Grand Prix Denver LLC (3630)

Grand Prix East Lansing LLC (3741)

Grand Prix El Segundo LLC (3707)

Grand Prix Englewood / Denver South LLC (3701)

Grand Prix Fixed Lessee LLC (9979)

Grand Prix Floating Lessee LLC (4290)

Grand Prix Fremont LLC (3703)

Grand Prix Ft. Lauderdale LLC (3705)

Grand Prix Ft. Wayne LLC (3704)

Grand Prix Gaithersburg LLC (3709)

Grand Prix General Lessee LLC (9182)

Grand Prix Germantown LLC (3711)

Grand Prix Grand Rapids LLC (3713)

Grand Prix Harrisburg LLC (3716)

Grand Prix Horsham LLC (3728)

Grand Prix IHM, Inc. (7254)

Grand Prix Indianapolis LLC (3719)

Grand Prix Islandia LLC (3720)

Grand Prix Las Colinas LLC (3722)

Grand Prix Lexington LLC (3725)

Grand Prix Livonia LLC (3730)

Grand Prix Lombard LLC (3696)

Grand Prix Louisville (RI) LLC (3700)

Grand Prix Lynnwood LLC (3702)

Grand Prix Mezz Borrower Fixed, LLC (0252)

Grand Prix Mezz Borrower Floating, LLC (5924)

Grand Prix Mezz Borrower Floating 2, LLC (9972)

Grand Prix Mezz Borrower Term LLC (4285)

Grand Prix Montvale LLC (3706)

Grand Prix Morristown LLC (3738)

Grand Prix Mountain View LLC (3737)

Grand Prix Mt. Laurel LLC (3735)

Grand Prix Naples LLC (3734)

Grand Prix Ontario Lessee LLC (9976)

Grand Prix Ontario LLC (3733)

Grand Prix Portland LLC (3732)

Grand Prix Richmond (Northwest) LLC (3731)

Grand Prix Richmond LLC (3729)

Grand Prix RIGG Lessee LLC  (4960)

Grand Prix RIMV Lessee LLC  (4287)

Grand Prix Rockville LLC (2496)

Grand Prix Saddle River LLC (3726)

Grand Prix San Jose LLC (3724)

Grand Prix San Mateo LLC (3723)

Grand Prix Schaumburg LLC (3721)

Grand Prix Shelton LLC (3718)

Grand Prix Sili I LLC (3714)

Grand Prix Sili II LLC (3712)

Grand Prix Term Lessee LLC (9180)

Grand Prix Troy (Central) LLC (9061)

Grand Prix Troy (SE) LLC (9062)

Grand Prix Tukwila LLC (9063)

Grand Prix West Palm Beach LLC (9065)

Grand Prix Westchester LLC (3694)

Grand Prix Willow Grove LLC (3697)

Grand Prix Windsor LLC (3698)

Grand Prix Woburn LLC (3699)

Innkeepers Financial Corporation (0715)

Innkeepers USA Limited Partnership (3956)

KPA HI Ontario LLC (6939)

KPA HS Anaheim, LLC (0302)

KPA Leaseco Holding Inc. (2887)

KPA Leaseco, Inc. (7426)

KPA RIGG, LLC (6706)

KPA RIMV, LLC (6804)

KPA San Antonio, LLC (1251)

KPA Tysons Corner RI, LLC (1327)

KPA Washington DC, LLC (1164)

KPA/GP Ft. Walton LLC (3743)

KPA/GP Louisville (HI) LLC (3744)

KPA/GP Valencia LLC (9816)

EXHIBIT A

**Plan Term Sheet**

**Term Sheet**

**Illustrative Terms of Proposed Restructuring**
**July 17, 2010**

The following are the proposed principal terms of a restructuring transaction between Lehman ALI Inc. ("**Lehman**"), as mortgage lender, and Innkeepers USA Trust ("**Innkeepers**" and, collectively with its subsidiaries, the "**Company**").[1] The transaction (the "**Transaction**") contemplates a conversion of the Company's obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto (the "**Floating Rate Debt**"), collateralized by 20 of the Company's properties (the "**Floating Rate Collateral**") into all the equity of the reorganized Company (as set forth herein). The Transaction would be effectuated through a prearranged plan of reorganization (the "**Plan**") in chapter 11 bankruptcy cases filed by Innkeepers and certain of its subsidiaries (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). This term sheet has been prepared for discussion purposes only and is non-binding, but shall serve as the basis for further negotiations regarding a definitive agreement.

The terms discussed herein constitute an integrated offer, are not divisible except as described herein, and are subject to the terms and conditions hereof. This term sheet is provided in confidence and may be distributed only with the express written consent of Lehman and the Company, as applicable. This term sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation governing such matters, which remain subject to discussion and negotiation to the extent not inconsistent with the specific matters set forth herein. This term sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

Lehman's entry into any definitive transaction on the terms set forth in this term sheet, or otherwise, are subject to approval of the United States Bankruptcy Court administering the chapter 11 case of Lehman Brothers Holdings Inc.

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. ANY SUCH OFFER OR**

---

[1] This term sheet is not being provided on behalf of SASCO 2008-C2, LLC (the "**Mezzanine Lender**") in connection with the mezzanine loan with respect to the collateral securing the Floating Rate Debt or the mezzanine loan with respect to the Anaheim property (the "**Mezzanine Debt**"). Lehman does not make any representations with respect to the Mezzanine Lender.

**SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, IF ANY, AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**Terms:**

| **Treatment of Claims and Equity Interests Under the Plan:** | |
|---|---|
| Floating Rate Debt | Lehman will receive, in full and final satisfaction of its secured mortgage claims in respect of the Floating Rate Debt, 100% of the issued and outstanding new shares of common stock issued by Innkeepers (the "**New Equity**"), subject to dilution by the Management Equity Incentive Program (as defined below) and New Equity distributions, if any, for other Plan uses, as agreed by the parties hereto. |
| Mezzanine Debt | The Mezzanine Debt will be deemed cancelled, and the Mezzanine Lender will not retain any property or interest on account of such debt under the Plan.  The Mezzanine Lender will be deemed to vote against the Plan.  No action by the Mezzanine Lender will be required under this Term Sheet or any definitive documentation with respect to the terms set herein. |
| Fixed Rate Debt | Holders of the claims against the Company for its obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto (the "**Fixed Rate Debt**") collateralized by 45 of the Company's properties (the "**Fixed Rate Collateral**") will receive, in full and final satisfaction of their claims in respect of such debt, new mortgage notes secured by mortgages on the Fixed Rate Collateral either (a) in an aggregate face amount not to exceed $550 million; or (b) if such holders make an election for application of section 1111(b)(2) of the Bankruptcy Code, in the amount of the aggregate amount of such holders' Fixed Rate Debt, with a present value of the new mortgage notes not to exceed $550 million.  The terms of the new Fixed Rate Debt notes and any security interests to be granted in connection therewith are subject to approval, in form and substance, by Lehman and the Company. |
| Other Secured Debt | Holders of claims against the Company for its obligations under those certain secured mortgage loan agreements, not including the Floating Rate Debt or the Fixed Rate Debt (the "**Other Secured Debt**"), collateralized by seven of the Company's properties, not including the Floating Rate Collateral or the Fixed Rate Collateral (the "**Other Secured Debt Collateral**"), will receive, in full and final satisfaction of their claims in respect of such debt, new mortgage notes secured by liens on the respective holder's Other Secured Debt Collateral |

| | |
|---|---|
| | ("**Other Secured Debt New Mortgage Notes**") either (a) in an aggregate face amount not to exceed $150 million; or (b) if a holder of Other Secured Debt claims makes an election for application of section 1111(b)(2) of the Bankruptcy Code, in the amount of the aggregate amount of such holder's claims, with present value of such Other Secured Debt New Mortgage Note equaling the value of the collateral securing such holder's claims, *provided, however*, that the aggregate present value of all Other Secured Debt New Mortgage Notes issued pursuant to (a) and (b) herein shall not exceed $150 million. The terms of the Other Secured Debt New Mortgage Notes are subject to approval, in form and substance, by Lehman and the Company.<br><br>Debt allocation among the Other Secured Debt Collateral and identification of any Other Secured Debt Collateral that should be removed from the Company's portfolio shall be agreed among the parties hereto. |
| General Unsecured Claims | "**General Unsecured Claim**" shall mean any unsecured claim against any of the Debtors that is not: (a) an Administrative Claim; (b) a Priority Claim (tax or otherwise); (c) an intercompany claim; or (d) a section 510(b) claim, if any.<br><br>If a class of General Unsecured Claims votes to accept the Plan and affirmatively release Lehman and its affiliates from all claims and causes of action relating to the Company and/or the Floating Rate Debt, then holders of such General Unsecured Claims shall receive a pro rata distribution of cash in the amount of $500,000. |
| Intercompany Claims | Intercompany claims shall not be entitled to receive any distribution under the Plan on account of such claims and shall be deemed to have voted against the Plan. Such claims will be reinstated, extinguished or cancelled as appropriate in the judgment of Lehman and the Company to effectuate the Transaction contemplated by the Plan. |
| Section 510(b) Claims | Claims subject to subordination pursuant to section 510(b) of the Bankruptcy Code shall not receive any recovery under the Plan and shall be deemed to have voted against the Plan. |
| Deficiency Claims | Unsecured deficiency claims of holders of Floating Rate Debt, Fixed Rate Debt and Other Secured Debt shall not receive any recovery under the Plan or otherwise without the consent of Lehman and the Company, and, if not receiving any recovery, shall be deemed to have voted against the Plan. |
| Administrative | Allowed administrative claims shall be paid in cash in the ordinary |

15798647.8

| | |
|---|---|
| Claims | course of business or upon the effective date of the Plan (the "**Effective Date**"), unless the holders of such Administrative Claims agree to different treatment. |
| Priority Claims | Allowed priority claims shall be paid in cash on the Effective Date; *provided*, that on the Effective Date Lehman and the Company may determine to defer priority tax claims in accordance with the Bankruptcy Code. |
| Existing Equity | On the Effective Date, all prepetition common and preferred shares of Innkeepers will be cancelled, and holders of such interests will not retain any property on account of such interests under the Plan. To the extent Lehman and the Company determine that the Company's existing corporate structure would be the most tax efficient for Lehman and the Company on the Effective Date, the prepetition equity interests of each of Innkeepers' subsidiaries will be deemed reissued in accordance with the Company's prepetition corporate structure on terms mutually acceptable to the parties hereto. If Lehman and the Company determine that a different structure would be more beneficial to Lehman and the Company on the Effective Date, the Plan shall provide for such structure, on terms mutually acceptable to the parties hereto. |

| **Means of Implementation:** | |
| --- | --- |
| Bankruptcy Pleadings | All material pleadings filed by the Company in connection with the Chapter 11 Cases, including all first-day motions, shall be in form and substance reasonably acceptable to Lehman. |
| DIP Financing | DIP financing to be provided in two separate facilities:<br><br>(a) a DIP facility provided in an amount equal to $50.75 million, which is necessary to complete certain Marriott property improvement plan ("**PIP**") requirements for (i) certain of those hotels collateralizing the Fixed Rate Debt; (ii) the hotel collateralizing that certain mortgage loan, dated as of October 4, 2006, by and between KPA RIMV, LLC and Capmark Bank (the "**Residence Inn in San Diego**"); and (iii) the hotel collateralizing that certain mortgage loan, dated as of September 19, 2006, by and between KPA Tysons Corner RI, LLC and Merrill Lynch Mortgage Lending, Inc. (the "**Residence Inn in Tyson's Corner**"), secured by senior, priming liens on the Fixed Rate Collateral, the Residence Inn in San Diego, and the Residence Inn in Tyson's Corner on terms acceptable to Lehman, as substantially set forth on Exhibit A (the "**Fixed Rate DIP Facility**").  On the Effective Date of the Plan, all amounts outstanding under the Fixed Rate DIP Facility shall be repaid from the Exit Funding (as defined below).<br><br>(b) a DIP facility provided by Lehman or any of its affiliates in an amount up to approximately $17.5 million, secured by senior, priming liens on the Floating Rate Collateral on terms to be agreed between the Company and Lehman as substantially set forth on Exhibit B (the "**Floating Rate DIP Facility**").  On the Effective Date of the Plan which is consistent with the terms hereof, all claims outstanding under the Floating Rate DIP Facility shall be extinguished; *provided, however,* if, and to the extent, any claim or cause of action is brought by, or on behalf of, the Company or its estates related to the Floating Rate Debt against Lehman or any of its affiliates is allowed by final order or part of a judgment of a court of competent jurisdiction (the "**Claims or Causes of Actions**"), then the claims arising under the Floating Rate DIP Facility shall be, at Lehman's election either (i) repaid on the Effective Date of the Plan in an amount equal to any allowed Claim or Cause of Action, up to the amount outstanding under the Floating Rate DIP Facility, or (ii) set off against the Claims or Causes of Action, up to the amount outstanding under the Floating Rate DIP Facility. |
| Use of Cash | In addition to providing the Floating Rate DIP Facility, Lehman will consent to the use of its cash collateral pursuant to the terms of the |

| | |
|---|---|
| Collateral | cash collateral order attached hereto as Exhibit C. |
| | The Company shall not take any action, and shall not solicit, encourage or support any action by a third party, seeking to amend, modify or extend the Plan Milestones (as defined below) (the foregoing provision is hereinafter referred to as the "**Milestones Covenant**"). |
| | The Company's use of Lehman's cash collateral will terminate immediately upon the receipt of notice of a Termination Event (as defined below). |
| Exit Funding | Innkeepers will secure additional funding of no less than $75 million, plus such additional amounts in form and substance as may be determined by the parties hereto ("**Exit Funding**"). Prior to any Exit Funding, the reorganized Company shall deliver a comprehensive PIP and cycle renovation budget, which budget shall be (a) prepared with the assistance of, and validated by, a third party expert and (b) acceptable in all respects to the parties hereto (the "**Budget**"). Such Budget shall be updated annually or more frequently as may be requested by any party hereto. |
| New Equity | The Plan shall provide that the issuance of the New Equity and any subsequent transfer of New Equity by Lehman prior to the Effective Date will be exempt from (a) securities laws in accordance with section 1145 of the Bankruptcy Code and (b) transfer taxes in accordance with section 1146 of the Bankruptcy Code. |
| Conditions Precedent to Lehman's Obligations Under PSA | The Transaction will become binding on Lehman when Lehman and the Company execute a plan support agreement (the "**PSA**") that incorporates the Transaction as set forth herein, including: |
| | ■ Receipt by Lehman of a Plan term sheet incorporating the terms set forth herein and otherwise in form and substance acceptable to Lehman; |
| | ■ Agreement reached with Marriott in the form attached hereto as Exhibit D; |
| | ■ Innkeepers and each of its wholly owned subsidiaries, including each obligor under the Floating Rate Debt, shall be a signatory to the PSA; and |
| | ■ Bankruptcy Court approval in the chapter 11 bankruptcy proceedings of Lehman Brothers Holdings Inc. |

15798647.8

| | |
|---|---|
| Termination Events Under PSA and Use of Cash Collateral | Upon the occurrence of any of the following events (each, a "**Termination Event**"), the PSA and the use of Lehman's cash collateral shall automatically terminate on the first calendar day immediately following one (1) business day after the date of such Termination Event, unless (a) Lehman, in its sole discretion, provides the Company with a written waiver of any such Termination Event within one (1) business day from the date of such Termination Event or (b) Lehman and the Company, in their respective sole discretion, provide the other party with a written waiver of Termination Events R and S within one (1) business day from the date of such Termination Event: |

A. Failure to meet any of the following milestones (the "**Plan Milestones**"):

(i) Motion to assume the PSA filed on the petition date;

(ii) Order entered authorizing the assumption of the PSA no later than 45 days after the petition date;

(iii) Orders entered on a final (and not interim) basis authorizing the Fixed Rate DIP Facility, Floating Rate DIP Facility, the use of Lehman's cash collateral and the use of the cash collateral securing the Fixed Rate Debt consistent with the terms hereof no later than 45 days after the petition date;

(iv) Disclosure statement and Plan consistent with the terms hereof filed no later than 45 days after the petition date;

(v) Disclosure statement consistent with the terms hereof approved by the Bankruptcy Court no later than 120 days after the petition date;

(vi) Lehman and the Company shall have reached mutual agreement no later than 120 days after the petition date on the terms of a sale process upon the occurrence of Termination Event A(vii) or A(viii) below;

(vii) Order confirming a Plan consistent with the terms hereof entered no later than 240 days after the petition date; and

(viii) Effective Date of the Plan no later than 270 days after the petition date.

B. Lehman has not executed definitive agreements with respect to the sale of 50% of the New Equity for a

15798647.8

purchase price of at least $107.5 million (the "**New Equity Sale Transaction**") by 45 days after the petition date;

C.  Lehman has not consummated the New Equity Sale Transaction by 270 days after the petition date;

D.  The entry by the Bankruptcy Court of an interim order authorizing the use of Lehman's cash collateral in form and substance not acceptable to Lehman;

E.  The entry of any order of the Bankruptcy Court granting relief from the exercise of the automatic stay (i) to permit any exercise of remedies by the lenders or special servicer under the Fixed Rate Debt, Other Secured Debt or Mezzanine Debt other than limited relief solely to permit the delivery of default notices under the terms of the Fixed Rate Debt, Other Secured Debt or Mezzanine Debt and (ii) to permit termination of any franchise agreement with Marriott or any other hotel brand;

F.  The filing by the Company of any motion or other request for relief seeking to (i) dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (iii) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

G.  (i) The filing by the Company of any motion or other request for relief seeking an extension of the Plan Milestones or any alteration of the remedies upon termination set forth herein without the express written consent of Lehman in its sole discretion; (ii) the filing by the Company of any pleading supporting any motion from any other party to obtain such extension or alteration; (iii) the failure of the Company to oppose any motion from any other party to obtain such extension before the objection deadline of such motion; or (iv) the violation by the Company of the Milestones Covenant;

H.  The entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases or

8

| | | (iv) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company; |
| --- | --- | --- |
| | I. | The withdrawal, amendment or modification by the Company of, or the filing by the Company of a pleading seeking to amend or modify, the Plan or PSA, which withdrawal, amendment, modification or pleading is materially inconsistent with the terms hereof or the Plan or is materially adverse to Lehman, in each case in a manner not reasonably acceptable to Lehman, or if the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the terms hereof or the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn within three (3) business days after Lehman provides written notice to the Company; |
| | J. | The filing of any motion to approve a disclosure statement or Plan by the Company that incorporates a Pro Forma Capital Structure or any other terms inconsistent with the terms and conditions set forth herein; |
| | K. | The granting by the Bankruptcy Court of relief that is inconsistent with the terms hereof or the Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof); |
| | L. | The issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling, determination or order making illegal or otherwise restricting, preventing or enjoining the consummation of a material portion of the Transaction, including an order denying confirmation of the Plan and such ruling, determination or order has not been vacated or reversed within ten (10) business days of issuance; |
| | M. | The occurrence and continuation of a default under the Fixed Rate DIP Facility, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder; |
| | N. | The occurrence and continuation of a default under the Floating Rate DIP Facility, including those set forth on |

Exhibit B, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder;

O. The occurrence and continuation of a default in connection with the Company's use of Lehman's cash collateral, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder; and

P. The occurrence after execution of the PSA of (i) a change that has a material adverse effect on the use, value or condition of the Company, its assets or the legal or financial status or business operations of the Company or (ii) a material disruption or material adverse change in the financial, real estate, banking or capital markets;

Q. Lehman has determined, in its sole discretion, after completion of its tax due diligence, that the Transaction cannot be structured in a manner acceptable to Lehman, which determination shall be made no later than 45 days after the petition date;

R. The material breach by any Party of any of their undertakings, representations, warranties or covenants set forth in the PSA; and

S. All parties agree in writing to terminate the PSA.

15798647.8

| | |
|---|---|
| Remedies Upon Termination | Upon the occurrence of any of Termination Events A through S, Lehman may terminate the PSA and use of cash collateral.<br><br>As long as the PSA has not otherwise been terminated, (a) upon the occurrence of Termination Event A(vii) or A(viii); (b) if a trustee is appointed for the Chapter 11 Cases of all of those debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt; or (c) if the Company files a motion to dismiss all of the Chapter 11 Cases for those debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt, the Company shall, immediately upon the occurrence of such Termination Event, elect one of the following remedies, *provided, however*, that if the Company fails to make such election within one day after the occurrence of the applicable Termination Event, Lehman shall have the right to elect either option:<br><br>(a)      The Company will be deemed to have consented to the modification of the automatic stay to permit Lehman to exercise any and all remedies with respect to the Floating Rate Collateral, the automatic stay shall be so modified and no further court approval shall be required; or<br><br>(b)      The Company will sell the Floating Rate Collateral pursuant to section 363 of the Bankruptcy Code, subject to the following conditions, which shall be incorporated into any order approving the PSA: (i) the sale procedures shall be agreed upon no later than 120 days after the petition date; (ii) Lehman shall have the right to credit bid the Floating Rate Debt; (iii) if sale proceeds are not paid to Lehman within 60 days of the Termination Event, title to the Floating Rate Collateral shall be conveyed to Lehman free and clear of all liens, claims and encumbrances; (iv) the 60-day period shall not be extended and the Company waives its right to seek any extension of such period. |
| Bankruptcy Court Approval of PSA | The Company shall, on or immediately after the commencement of the Chapter 11 Cases, file a motion seeking authorization to assume the PSA. The order approving the PSA shall include provisions that the Company (i) shall not seek an extension of the Plan Milestones or any alteration of the remedies upon termination set forth herein without the express written consent of Lehman in its sole discretion, (ii) shall not support any motion from any other party to obtain such extension or alteration; and (iii) will oppose any motion from any |

15798647.8

| | |
|---|---|
| | other party to obtain such extension or alteration by the objection deadline of such motion. |
| Pro Forma Capital Structure | Following the consummation of the Transaction, the reorganized Company will have, after repayment of the Fixed Rate DIP Facility, (a) funds sufficient to perform Marriott capital expenditures and brand standard work and (b) cash on hand sufficient to operate the business of the Company, and such amounts in (a) and (b) above shall be acceptable to Lehman and the Company and be capitalized as follows:<br><br>Fixed Rate Debt:  present value less than or equal to $550 million<br><br>Other Secured Debt:  present value less than or equal to $150 million<br><br>Exit Funding:   At least $75 million, plus such additional amounts in form and substance as may be determined by the parties hereto.<br><br>Except as set forth above, on the Effective Date, the Company shall not have any debts or liens encumbering the Company's assets, except for permitted liens agreed to by Lehman and the Company. |
| Governance | Prior to the Effective Date, Lehman will determine the requisite number of directors, all of whom will be nominated by Lehman, and voting requirements shall be in form and substance acceptable to Lehman. |
| Management Equity Incentive Program | The Plan shall provide for a management equity incentive program (the "**Management Equity Incentive Program**") in form and substance acceptable to Lehman and the Company providing for a reserve of up to 3% of the New Equity to be allocated to management under the Management Equity Incentive Program as approved by the board of directors of the reorganized Company. |
| REIT Status | Lehman and the Company shall, after the Effective Date, determine whether to maintain Innkeepers' status as a real estate investment trust. |
| Property Manager | Prior to the Effective Date of the Plan, Lehman and the Company shall designate a manager for the reorganized  Company's properties. If Island Hospitality Management, Inc. ("**Island**") is not selected as the manager, the Company will use its reasonable best efforts to effectuate an orderly transition to the replacement manager. |
| Releases | The Plan shall include a full discharge and release of liability by the Company, other than a release of the obligations set forth herein, in |

15798647.8

| | |
|---|---|
| | favor of (a) the Company and each of its subsidiaries, (b) Lehman, and (c) each of their respective principals, employees, affiliates, subsidiaries, members, shareholders, agents, officers, directors, and professionals from: (i) any and all claims and causes of action arising prior to the Effective Date and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction. |
| Professional Fees | The Company shall pay the professional fees and expenses incurred by Lehman in connection with the Transaction. |

13

**EXHIBIT A**

**Fixed Rate DIP Facility**

**[Attached as Exhibit D to the Plan Support Agreement]**

**EXHIBIT B**

**Floating Rate DIP Facility**

**[Attached as Exhibit C to the Plan Support Agreement]**

**EXHIBIT C**

**Cash Collateral Agreement**

**[Attached as Exhibit E to the Plan Support Agreement]**

**EXHIBIT D**

**Marriott Agreement**

**[Attached as Exhibit B to the Plan Support Agreement]**

EXHIBIT B

**Marriott Agreement**

**AGREEMENT FOR ADEQUATE ASSURANCE OF
COMPLETION OF CERTAIN PIPS AND ASSUMPTION OF AGREEMENTS**

This AGREEMENT FOR ADEQUATE ASSURANCE OF FUTURE COMPLETION OF CERTAIN PIPs AND ASSUMPTION OF AGREEMENTS (this "<u>Agreement</u>") is made and entered into as of June 25, 2010, by and among (i) Innkeepers USA Trust, a Maryland real estate investment trust, and all of its direct and indirect subsidiaries and affiliates that may or will constitute one of the debtors in Innkeeper's voluntary reorganization cases, identified on <u>Exhibit 1</u> hereto (collectively, the "<u>Company</u>"), and (ii) Marriott International, Inc., a Delaware corporation (with its affiliates, "<u>Marriott</u>"). The Company and Marriott are sometimes collectively referred to herein as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## RECITALS

WHEREAS, the Company owns forty-four (44) hotels operating under brands owned by Marriott (collectively, the "<u>Marriott Hotels</u>");

WHEREAS, the Marriott Hotels operate subject to franchise and related agreements between Marriott and the Company (collectively, the "<u>Franchise Agreements</u>");

WHEREAS, Marriott has served default and termination notices (collectively, "<u>Default Letters</u>") upon the Company with respect to twenty-three (23) Marriott Hotels (collectively, the "<u>Marriott Defaulted Hotels</u>") purporting to terminate their respective Franchise Agreements for, among other things, the failure to complete the property improvement plans ("<u>PIPs</u>");

WHEREAS, Marriott has represented that it intends to serve a Default Letter with respect to an additional Marriott Hotel;

WHEREAS, the Company and Marriott have entered into that certain Forbearance and Agreement to Maintain the Status Quo, dated June 11, 2010, pursuant to which Marriott agreed to, among other things, forbear from exercising its rights at law or in equity, set forth in the Default Letters, solely with respect to the Continuing Defaults (as defined therein) under the Franchise Agreements described in the Default Letters, from June 14, 2010 until the earlier of June 28, 2010 or the filing of a Chapter 11 Case;

WHEREAS, the Company may (a) file voluntary reorganization cases (collectively, a "<u>Chapter 11 Case</u>") under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court (the "<u>Bankruptcy Court</u>"); and (b) file and use good faith reasonable best efforts to obtain approval and confirmation of a plan of reorganization (the "<u>Plan</u>"), which shall be in form and substance not inconsistent with this Agreement;

WHEREAS, the Company has represented that it will complete the PIPs for certain Marriott Defaulted Hotels in accordance with this Agreement and secure the financing necessary to do so;

WHEREAS, the Parties, with the assistance of their legal and financing advisors, have engaged in negotiations with the objective of reaching an agreement with regard to the Marriott Hotels set forth on <u>Schedule A</u> and <u>Schedule B</u> and the treatment of the Franchise Agreements and Marriott's claims thereunder (collectively, the "<u>Claims</u>"), pursuant to the terms and conditions set forth in this Agreement;

WHEREAS, the Company has received certain Acceptable Financing Commitments (as defined herein) predicated on the filing of a Chapter 11 Case, which are attached hereto as <u>Exhibit 2</u>;

WHEREAS, the Company and Marriott have reviewed, or have had the opportunity to review, this Agreement with the assistance of their respective legal and financial advisors of their own choosing; and

WHEREAS, this Agreement sets forth the terms and conditions of the Parties' respective obligations hereunder.

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.  <u>Acceptable Financing Commitment</u>.  For purposes of this Agreement, an "Acceptable Financing Commitment" means one or more commitments: (a) for at least $45M to complete, on the schedule attached hereto as <u>Schedule A</u> (which includes three separate phases of PIP completion, "Phase 1," "Phase 2," and "Phase 3"), the PIPs for the Marriott Defaulted Hotels; (b) on terms that are no less favorable to the Company than market terms negotiated at arm's-length; (c) not conditioned on obtaining voting or any control rights with respect to the Plan, other than on reasonable and customary debtor-in-possession repayment terms and priority; (d) which terms shall indicate that the sole purpose of the commitment is to complete the PIPs for the Marriott Defaulted Hotels; (e) which may prime existing liens, pursuant to section 364(d) of the Bankruptcy Code; and (f) which will be fully funded upon closing of an Acceptable Financing Commitment after Bankruptcy Court approval (collectively, an "<u>Acceptable Financing Commitment</u>").  Marriott acknowledges and agrees that the financing commitments memorialized in the term sheets attached hereto as <u>Exhibit 2</u>, if consummated, would each constitute an Acceptable Financing Commitment.

(a)  If the Company files a Chapter 11 Case, the Company shall (i) substantially contemporaneously with such filing, file a motion with the Bankruptcy Court seeking authority, pursuant to section 364 of the Bankruptcy Code, to obtain an Acceptable Financing Commitment (the "<u>DIP Motion</u>") and (ii) seek to have the Bankruptcy Court approve the Acceptable Financing Commitment within sixty (60) days thereafter.  The Company shall in good faith use its reasonable best efforts to obtain Bankruptcy Court approval of an Acceptable Financing Commitment within the time periods specified herein and confirmation of a Plan consistent with the terms of this Agreement.

(b)  If the Bankruptcy Court approves an Acceptable Financing Commitment within sixty (60) days after filing a Chapter 11 Case, the Company shall commence, perform,

and fully complete the PIPs in accordance with <u>Schedule A</u>. The Parties agree that time is of the essence with respect to the commencement, performance, and completion of the PIPs.

(c)    The Company represents and warrants that it has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and any and all other agreements, documents or instruments to be executed and/or delivered in connection herewith and to consummate the transactions contemplated herein and therein.

Section 2.    <u>Post-filing Forbearance Period</u>.    During the period commencing on the filing of a Chapter 11 Case, and ending upon the termination of this Agreement in accordance with Section 6 hereof (the "<u>Post-filing Forbearance Period</u>"), with respect to the Marriott Defaulted Hotels listed on <u>Schedule A</u>, Marriott shall, subject to Section 3 and Section 6 hereof, (a) forbear from exercising any and all of its remedies under the Franchise Agreements that arise out of or in connection with the Default Letters, (b) forbear from seeking relief from the automatic stay to exercise any and all of its remedies under the Franchise Agreements that arise out of or in connection with the Default Letters, and (c) permit the Franchise Agreements for the Marriott Defaulted Hotels listed on <u>Schedule A</u> to be assumed in accordance with Section 4 hereof.

Section 3.    <u>Relief from Automatic Stay Upon Default</u>.    Notwithstanding any other Section of this Agreement, at any time after Bankruptcy Court approval of an Acceptable Financing Commitment, in the event that the Company does not satisfy in all material respects the obligations to be performed with respect to a particular Marriott Defaulted Hotel identified on <u>Schedule A</u>, on or before the applicable milestone dates provided therein, Marriott may seek relief from stay or such other relief as may be just and proper with respect to such Marriott Defaulted Hotel and related Franchise Agreement, and the Company agrees that (a) it shall not contest either directly or indirectly, or cause another to contest, a motion, application or request by Marriott for relief from the automatic stay to, *inter alia,* enforce its rights and remedies under the Franchise Agreement for such Marriott Defaulted Hotel, and (b) it shall deem the Post-filing Forbearance Period with respect to such Marriott Defaulted Hotel terminated. In the event the Company fails to complete, in accordance with <u>Schedule A</u>, all of the PIPs under the Franchise Agreements for the Marriott Defaulted Hotel listed under Phase 1, plus the Sili II hotel in Phase 2, Marriott may, in its discretion, serve a notice of default and sixty (60) notice to cure which shall require the Company to complete all PIPs for the Marriott Defaulted Hotels under Phase 1, plus the Sili II hotel under Phase 2 within the sixty (60) day cure period. If the cure by the Company referenced in the previous sentence is not completed within sixty (60) days, then Marriott shall be entitled to seek relief from stay for all Marriott Defaulted Hotels, except those which have already been assumed, and the Company shall be deemed to consent to such relief, and Marriott shall retain any and all of its rights to damages under the relevant Franchise Agreements.

Section 4.    <u>Assumption of Franchise Agreements</u>.    As set forth herein, Marriott shall have the right to consent to the assumption and assignment of any and all Franchise Agreements, including the Franchise Agreements for the Marriott Defaulted Hotels. Immediately upon completion and written approval by Marriott of completion of a PIP for a Marriott Defaulted Hotel in accordance with <u>Schedule A</u>, the Company shall seek to assume the applicable Franchise Agreements. For the avoidance of doubt, assumptions will be on a rolling basis as

PIPs are completed and approved, and Marriott's consent to assumption shall be deemed given if, with respect to a particular Marriott Defaulted Hotel, Marriott determines in its reasonable business judgment that the Company has completed the respective PIP in accordance with Schedule A and the terms of the applicable Franchise Agreement, provided that Marriott shall retain its rights under 11 U.S.C. § 365. With respect to the PIPs on Schedule A for which the Company is in compliance as of the time the Company files a disclosure statement in the Chapter 11 Case, the Company shall assume all such Franchise Agreements listed on Schedule A (except as otherwise assumed in accordance with this Section 4) and Marriott will consent to the Company's assumption of the Franchise Agreements listed on Schedule A. In addition, as of the time the Company files a disclosure statement in the Chapter 11 Case, the Company shall assume all other Franchise Agreements for the Marriott Hotels not listed on Schedule A (the "Marriott Non-Defaulted Hotels"), which shall be set forth on Schedule B, and Marriott will consent to the Company's assumption of the Franchise Agreements for the Marriott Non-Defaulted Hotels, provided that Marriott shall retain its rights under 11 U.S.C. § 365 for such Franchise Agreements. For the sake of clarity, Company's obligation to complete the PIPs for the Marriott Hotels in accordance with the respective Franchise Agreements shall survive confirmation of the Plan.

Section 5.    Resolution of Claims.    If the Company files a Chapter 11 Case, the Company shall cause the Plan to provide that Marriott's Claims shall either be treated as (a) unimpaired or (b) impaired only to the extent and in a manner as consensually agreed upon by Marriott in its sole discretion; provided that Marriott may have claims in the Chapter 11 Case that remain unpaid even if the PIPs for all Marriott Defaulted Hotels are completed and approved and all of the relevant Franchise Agreements are assumed. Marriott will not forbear from filing and pursuing such claims in the Chapter 11 Case. Marriott acknowledges and agrees, subject to review and consideration of any proposed Plan, that it will not vote to reject or otherwise object to, impede, directly or indirectly, or take any action that would unreasonably delay confirmation or consummation of the Plan, unless such Plan contains terms that are inconsistent with the terms of this Agreement and the Franchise Agreements. Marriott represents that it has not conducted an inspection or audit to determine if additional defaults exist as of the date of this Agreement, but to the best of its knowledge, it is not aware of any outstanding defaults other than the Continuing Defaults; provided, however, that Marriott does not waive its rights with respect to any default in existence that Marriott later becomes aware of or could have known upon a reasonable inspection or audit.

Section 6.    Termination of this Agreement.

(a)    Termination Events.    The term "Termination Event," wherever used in this Agreement, means any of the following events (whatever the reason for such Termination Event and whether it is voluntary or involuntary):

(i)    The Company fails to file the DIP Motion with the Bankruptcy Court contemporaneously with the filing of a Chapter 11 Case.

(ii)    An Acceptable Financing Commitment is not approved by the Bankruptcy Court within sixty (60) days of filing a Chapter 11 Case.

(iii)     Termination of an Acceptable Financing Commitment, unless the Company can establish to Marriott's sole satisfaction that the Company has sufficient funds available for completion of the PIPs in accordance with Schedule A, and such funds are held in escrow pending completion of all PIPs.

(iv)     The Company fails to complete one or more PIPs in accordance with Schedule A.

(v)     All Parties agree in writing to terminate this Agreement.

The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; provided that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions. A Termination Event shall be effective on the fifth (5th) business day following written notice and failure to cure a Termination Event occurring under Section 6(a)(i), (iii), or (iv). Termination shall be effective immediately following written notice of a Termination Event occurring under occurring under Section 6(a)(ii), or if the Parties agree to Termination under Section 6(a)(v).

(b)     Effect of Termination. Upon a Termination Event occurring under Section 6(a)(i), (ii), (iii), or (v), this Agreement shall be of no further force and effect, subject to Section 6(c), and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement from the effective date of the Termination Event forward. Upon a Termination Event occurring under Section 6(iv), this Agreement shall be terminated solely with respect to the Marriott Defaulted Hotel for which the PIP or PIPs have not been completed.

(c)     Survival. The rights, duties and obligations of Marriott and the Company that by the express language of the Franchise Agreements and this Agreement survive termination shall remain in full force and effect and survive the termination of this Agreement. Without limiting the foregoing, in the event that either Marriott or the Company terminates this Agreement or the Post-filing Forbearance Period terminates in accordance with Section 3 or Section 6 hereof, Marriott's and the Company's rights and obligations under Sections 3, 6 and 7 (excluding 7(c)), shall survive termination of this Agreement.

Section 7.     Miscellaneous.

(a)     Governing Law; Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in a federal court of competent jurisdiction in the United States District Court for the Southern District of New York. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits to the nonexclusive jurisdiction of such

court, generally and unconditionally, with respect to any such action, suit, or proceeding. Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

(b)     <u>No Waiver of Participation and Preservation of Rights</u>.  This Agreement is part of a proposed settlement of disputes among the Parties.  Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in any plan of reorganization are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests.

(c)     <u>Reimbursement of Fees</u>.  The Company shall remit payment of $20,000 each month to Marriott, such payment representing the cost of Marriott having to dedicate an employee to auditing and overseeing completion of the PIPs and expediting review of all stages of PIP compliance.  The Company shall reimburse Marriott for all reasonable, documented out-of-pocket attorneys' fees and expenses incurred by Marriott in connection with this Agreement and the defaults under the Franchise Agreement within thirty (30) days of invoice.

(d)     <u>Notices</u>.  All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or by courier service, messenger, electronic mail, facsimile, telecopy, or if duly deposited in the mails, by certified or registered mail, postage prepaid-return receipt requested, and shall be deemed to have been duly given or made: (i) upon delivery, if delivered personally or by courier service, or messenger, in each case with record of receipt; (ii) upon transmission with confirmed delivery, if sent by facsimile or telecopy; or (iii) when received after being sent by certified or registered mail, postage pre-paid, return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

<div style="margin-left:2em">

If to the Company:

Innkeepers USA Trust
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida  33480
Attention:     Marc Beilinson
Facsimile: (561) 835-0457
E-mail address:  <u>mbeilinson@beilinsonpartners.com</u>

And

Innkeepers USA Trust
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida  33480
Attention:     Mark Murphy
Facsimile: (561) 835-0457

</div>

E-mail address:  mmurphy@innkeepersusa.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, Illinois  60654
Attention:      Anup Sathy, P.C.
                Gary E. Axelrod, P.C.
Facsimile: (312) 862-2200
E-mail address:  anup.sathy@kirkland.com
                 gary.axelrod@kirkland.com

And

Kirkland & Ellis, LLP
601 Lexington Avenue
New York, New York  10022
Attention:      Paul M. Basta
Facsimile: (212) 446-4900
E-mail address:  paul.basta@kirkland.com


If to Marriott:

Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland  20817
Facsimile:
Attention:  Mark Forseth
E-mail address:  mark.forseth@marriott.com

with a copy (which shall not constitute notice) to:

Sheppard Mullin Richter & Hampton, LLP
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Attention:      Carren Shulman
                David D'Amour
Facsimile: (212) 653-8701
E-mail address:  cshulman@sheppardmullin.com
                 ddamour@sheppardmullin.com

(e)      Complete Agreement.  This Agreement constitutes the full and complete understanding and agreement among the Parties with regard to the subject matter hereof and

supersedes all prior agreements, understandings, or representations by or among the Parties, written or oral, which may have related to the subject matter hereof in any way.

(f)    <u>Interpretation of this Agreement</u>.  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement shall interpret in a neutral manner.  There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

(g)    <u>Headings</u>.  The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

(h)    <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors and assigns <u>provided</u>, <u>however</u>, that nothing contained in this paragraph shall be deemed to permit sales, assignments, or transfers that would otherwise not be in accordance with this Agreement or the Franchise Agreements, and nothing herein waives any such restrictions or requirement that Marriott approve all franchisees.

(i)    <u>Several, Not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

(j)    <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

(k)    <u>No Waiver</u>.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

(l)    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile or email shall be as effective as delivery of a manually executed signature page of this Agreement.

(m)    <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and any such prohibited or unenforceable provision shall be deemed reformed and construed so that it will be valid, legal, and enforceable and not prohibited to the maximum extent permitted by applicable law; <u>provided</u>, <u>however</u>, that in the event Sections 3, 4, or 6 shall be invalidated, this Agreement shall be deemed null and void and of no further force and effect.

(n)     <u>No Third-Party Beneficiaries</u>.     Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

(o)     <u>Settlement Discussions</u>.     This Agreement and the transactions contemplated thereby are part of a proposed settlement of a dispute among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

(p)     <u>Consideration</u>.  It is hereby acknowledged by the Parties hereto that, other than the agreements, covenants, representations, and warranties set forth herein, no consideration shall be due or paid to Marriott for its entry into this Agreement.

(q)     <u>Representation by Counsel</u>.     Each Party acknowledges that it has reviewed, or has had the opportunity to review, this Agreement with the assistance of their respective legal and financial advisors of their own choosing, and that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any party with a defense to the enforcement of the terms of this Agreement against such party shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the Parties.

[**Signature Page Follows**]

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

**MARRIOTT INTERNATIONAL, INC.**

By: _____
Name: Karl J. Grover
Title: Vice President, Franchising
Date:   June 25, 2010

**INNKEEPERS USA TRUST**

By: _____
Name: Marc Beilinson
Title:   Chief Restructuring Officer
Date:  June 25, 2010

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

**MARRIOTT INTERNATIONAL, INC.**

By: _____
Name: Karl J. Grover
Title: Vice President, Franchising
Date:   June 25, 2010

**INNKEEPERS USA TRUST**

By: *Marc Beilinson*
Name:  Marc Beilinson
Title:   Chief Restructuring Officer
Date:  June 25, 2010

**Completion Schedule**

1. Obtain an Acceptable Financing Commitment and receive funding therefrom no later than sixty (60) days after filing a Chapter 11 Case in an amount sufficient to fully complete the PIPS for all twenty-three (23) Defaulted Marriott Hotels.
2. Place orders for furniture, fixtures and equipment ("**FF&E**") required to complete the PIPs for the Phase 1 hotels no later than thirty (30) days after Bankruptcy Court approval of an Acceptable Financing Commitment (the "**Phase 1 Order Deadline**").
3. Place orders for FF&E required to complete the PIPs for the Phase 2 hotels no later than ninety (90) days after the Phase 1 Order Deadline (the **"Phase 2 Order Deadline"**).
4. Place orders for FF&E required to complete the PIPs for the Phase 3 hotels no later than ninety (90) days after the Phase 2 Order Deadline (the "**Phase 3 Order Deadline**").
5. Commence work on the PIPs for the Phase 1 hotels no later than one hundred twenty (120) days after the Phase 1 Order Deadline (the "**Phase 1 Commencement Deadline**").
6. Commence work on the PIPs for the Phase 2 hotels no later than one hundred twenty (120) days after the Phase 2 Order Deadline (the "**Phase 2 Commencement Deadline**").
7. Commence work on the PIPs for the Phase 3 hotels no later than one hundred twenty (120) days after the Phase 3 Order Deadline (the "**Phase 3 Commencement Deadline**").
8. Complete work on the PIPs for the Phase 1 hotels no later than ninety (90) days after the Phase 1 Commencement Deadline; with the exception of Sunnyvale Silicon Valley I, CA, San Diego Mission Valley, CA, and Saddle River, NJ, which must be completed no later than one hundred twenty (120) days after the Phase 1 Commencement Deadline.
9. Complete work on the PIPs for the Phase 2 hotels no later than ninety (90) days after the Phase 2 Commencement Deadline; with the exception of Sunnyvale Silicon Valley II, CA, which must be completed no later than one hundred twenty (120) days after the Phase 1 Commencement Deadline.
10. Complete work on the PIPs for the Phase 3 hotels no later than ninety (90) days after the Phase 3 Commencement Deadline.

---

[1] The Company shall not be in default of this Agreement for failure to complete the PIPs in accordance with this Schedule A if, and to the extent that, the default or delay is caused, directly or indirectly, by (a) fire, explosion, or other casualty, or condemnation; (b) storm, earthquake, hurricane, tornado, drought, flood, or other act of God; (c) war, act of terrorism, sabotage, bombing, insurrection, rebellion, revolution, riot, or other civil commotion or unrest; (d) epidemics, quarantine restrictions, or other public health restrictions or advisories; (e) strikes or lockouts or other labor interruptions; (f) disruption to local, national, or international transport services; (g) embargoes, resulting in a lack of materials, water, power, or telephone transmissions necessary for the development and construction of the PIPs in accordance with the terms of this Agreement; and (h) failure of any applicable governmental authority to issue any material entitlements, or the suspension, termination, or revocation of any material entitlements, required for the completion of the PIPs in accordance with the terms of this Agreement, provided that none of the above may be the result of or caused by the action or inaction of the Company.

**Company shall not deviate from this schedule without the express written consent of Marriott.   The PIPs for all twenty-three (23) Marriott Defaulted Hotels must be completed no later than November 20, 2011.**

## PHASE 1

### Designated Hotels

1. Sunnyvale Silicon Valley I, CA
2. San Diego Mission Valley, CA
3. Tysons Corner Mall, VA
4. San Francisco/San Mateo, CA
5. Saddle River, NJ
6. Palo Alto Mountain View, CA
7. Portland Scarborough, ME
8. Ontario Airport, CA

## PHASE 2

### Designated Hotels

9. Sunnyvale Silicon Valley II, CA
10. Harrisburg, Hershey, PA
11. Binghamton, NY
12. San Jose Campbell, CA
13. Detroit Troy Madison, MI
14. Louisville East, KY
15. Denver Tech Center, CO
16. Lexington North, KY

## PHASE 3

### Designated Hotels

17. Orlando Altamonte Springs, FL
18. Denver Downtown, CO
19. Fremont Silicon Valley, CA
20. Shelton Fairfield County, CT
21. Cherry Hill/Philadelphia, NJ
22. Hartford/Windsor, CT
23. Richmond West End, VA

| No. | Marriott Hotel |
|-----|----------------|
| 1. | Anaheim-Resort Area/Garden Grove - Residence Inn |
| 2. | Arlington  - Residence Inn |
| 3. | Atlanta Downtown - Residence Inn |
| 4. | Atlanta Peachtree Corners - Residence Inn |
| 5. | Atlantic City - Courtyard |
| 6. | Chicago O'Hare/Rosemont - Residence Inn |
| 7. | Dallas Addison - Residence Inn |
| 8. | Detroit Livonia - Residence Inn |
| 9. | Fort Lauderdale-North/Cypress Creek - Courtyard |
| 10. | Ft. Wayne - Residence Inn |
| 11. | Gaithersburg - Residence Inn |
| 12. | New York/Montvale - Courtyard |
| 13. | New York/Morristown - Residence Inn |
| 14. | Philadelphia Horsham - TownePlace Suites |
| 15. | Richmond Northwest - Residence Inn |
| 16. | San Jose South - Residence Inn |

| 17. | Seattle Bellevue - Residence Inn |
|-----|----------------------------------|
| 18. | Seattle-North/Lynnwood Everett - Residence Inn |
| 19. | Seattle-Northeast/Bothell - Residence Inn |
| 20. | Seattle-South/Tukwila - Residence Inn |

# EXHIBIT 1

## Debtor Entities

| No. | Debtor Entities |
|-----|-----------------|
| 1. | GP AC Sublessee LLC (5992) |
| 2. | Grand Prix Addison (RI) LLC (3740) |
| 3. | Grand Prix Addison (SS) LLC (3656) |
| 4. | Grand Prix Albany LLC (3654) |
| 5. | Grand Prix Altamonte LLC (3653) |
| 6. | Grand Prix Anaheim Orange Lessee LLC (5925) |
| 7. | Grand Prix Arlington LLC (3651) |
| 8. | Grand Prix Atlanta (Peachtree Corners) LLC (3650) |
| 9. | Grand Prix Atlanta LLC (3649) |
| 10. | Grand Prix Atlantic City LLC (3648) |
| 11. | Grand Prix Bellevue LLC (3645) |
| 12. | Grand Prix Belmont LLC (3643) |
| 13. | Grand Prix Binghamton LLC (3642) |
| 14. | Grand Prix Bothell LLC (3641) |
| 15. | Grand Prix Bulfinch LLC (3639) |
| 16. | Grand Prix Campbell / San Jose LLC (3638) |
| 17. | Grand Prix Cherry Hill LLC (3634) |
| 18. | Grand Prix Chicago LLC (3633) |
| 19. | Grand Prix Columbia LLC (3631) |
| 20. | Grand Prix Denver LLC (3630) |
| 21. | Grand Prix East Lansing LLC (3741) |

| 22. | Grand Prix El Segundo LLC (3707) |
|---|---|
| 23. | Grand Prix Englewood / Denver South LLC (3701) |
| 24. | Grand Prix Fixed Lessee LLC (9979) |
| 25. | Grand Prix Floating Lessee LLC (4290) |
| 26. | Grand Prix Fremont LLC (3703) |
| 27. | Grand Prix Ft. Lauderdale LLC (3705) |
| 28. | Grand Prix Ft. Wayne LLC (3704) |
| 29. | Grand Prix Gaithersburg LLC (3709) |
| 30. | Grand Prix General Lessee LLC (9182) |
| 31. | Grand Prix Germantown LLC (3711) |
| 32. | Grand Prix Grand Rapids LLC (3713) |
| 33. | Grand Prix Harrisburg LLC (3716) |
| 34. | Grand Prix Holdings LLC (9317) |
| 35. | Grand Prix Horsham LLC (3728) |
| 36. | Grand Prix IHM, Inc. (7254) |
| 37. | Grand Prix Indianapolis LLC (3719) |
| 38. | Grand Prix Islandia LLC (3720) |
| 39. | Grand Prix Las Colinas LLC (3722) |
| 40. | Grand Prix Lexington LLC (3725) |
| 41. | Grand Prix Livonia LLC (3730) |
| 42. | Grand Prix Lombard LLC (3696) |
| 43. | Grand Prix Louisville (RI) LLC (3700) |

| | |
|---|---|
| 44. | Grand Prix Lynnwood LLC (3702) |
| 45. | Grand Prix Mezz Borrower Fixed, LLC (0252) |
| 46. | Grand Prix Mezz Borrower Floating, LLC (5924) |
| 47. | Grand Prix Mezz Borrower Floating 2, LLC (9972) |
| 48. | Grand Prix Mezz Borrower Term LLC (4285) |
| 49. | Grand Prix Montvale LLC (3706) |
| 50. | Grand Prix Morristown LLC (3738) |
| 51. | Grand Prix Mountain View LLC (3737) |
| 52. | Grand Prix Mt. Laurel LLC (3735) |
| 53. | Grand Prix Naples LLC (3734) |
| 54. | Grand Prix Ontario Lessee LLC (9976) |
| 55. | Grand Prix Ontario LLC (3733) |
| 56. | Grand Prix Portland LLC (3732) |
| 57. | Grand Prix Richmond (Northwest) LLC (3731) |
| 58. | Grand Prix Richmond LLC (3729) |
| 59. | Grand Prix RIGG Lessee LLC  (4960) |
| 60. | Grand Prix RIMV Lessee LLC  (4287) |
| 61. | Grand Prix Rockville LLC (2496) |
| 62. | Grand Prix Saddle River LLC (3726) |
| 63. | Grand Prix San Jose LLC (3724) |
| 64. | Grand Prix San Mateo LLC (3723) |
| 65. | Grand Prix Schaumburg LLC (3721) |

| | |
|---|---|
| 66. | Grand Prix Shelton LLC (3718) |
| 67. | Grand Prix Sili I LLC (3714) |
| 68. | Grand Prix Sili II LLC (3712) |
| 69. | Grand Prix Term Lessee LLC (9180) |
| 70. | Grand Prix Troy (Central) LLC (9061) |
| 71. | Grand Prix Troy (SE) LLC (9062) |
| 72. | Grand Prix Tukwila LLC (9063) |
| 73. | Grand Prix West Palm Beach LLC (9065) |
| 74. | Grand Prix Westchester LLC (3694) |
| 75. | Grand Prix Willow Grove LLC (3697) |
| 76. | Grand Prix Windsor LLC (3698) |
| 77. | Grand Prix Woburn LLC (3699) |
| 78. | Innkeepers Financial Corporation (0715) |
| 79. | Innkeepers USA Limited Partnership (3956) |
| 80. | Innkeepers USA Trust (3554) |
| 81. | KPA HI Ontario LLC (6939) |
| 82. | KPA HS Anaheim, LLC (0302) |
| 83. | KPA Leaseco Holding Inc. (2887) |
| 84. | KPA Leaseco, Inc. (7426) |
| 85. | KPA RIGG, LLC (6706) |
| 86. | KPA RIMV, LLC (6804) |
| 87. | KPA San Antonio, LLC (1251) |

| | |
|---|---|
| 88. | KPA Tysons Corner RI, LLC (1327) |
| 89. | KPA Washington DC, LLC (1164) |
| 90. | KPA/GP Ft. Walton LLC (3743) |
| 91. | KPA/GP Louisville (HI) LLC (3744) |
| 92. | KPA/GP Valencia LLC (9816) |

# EXHIBIT 2

## Acceptable Financing Commitments

**EXHIBIT 2**

**Acceptable Financing Commitments**

**[Attached as Exhibits C and D to the Plan Support Agreement]**

EXHIBIT C

**Floating Rate DIP Loan Term Sheet**

July 16, 2010

KPA/GP VALENCIA LLC
GRAND PRIX WEST PALM BEACH LLC
KPA/GP FT. WALTON BEACH LLC
GRAND PRIX FT. WAYNE LLC
GRAND PRIX INDIANAPOLIS LLC
KPA/GP LOUISVILLE (HI) LLC
GRAND PRIX BULFINCH LLC
GRAND PRIX WOBURN LLC
GRAND PRIX ROCKVILLE LLC
GRAND PRIX EAST LANSING LLC
GRAND PRIX GRAND RAPIDS LLC
GRAND PRIX TROY (CENTRAL) LLC
GRAND PRIX TROY (SE) LLC
GRAND PRIX ATLANTIC CITY LLC
GRAND PRIX MONTVALE LLC
GRAND PRIX MORRISTOWN LLC
GRAND PRIX ALBANY LLC
GRAND PRIX ADDISON (SS) LLC
GRAND PRIX HARRISBURG LLC
GRAND PRIX ONTARIO LLC, each a
Delaware limited liability company (individually
and collectively, as applicable, "**Borrower**")
c/o Innkeepers USA
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida 33480

Re:     Senior Secured Super-Priority Debtor-in-Possession Credit Facility secured by
        twenty properties (collectively, the "**Property**")

Gentlemen:

        Solar Finance Inc. ("**Lender**") hereby issues this commitment (the
"**Commitment**") to make the senior secured super-priority debtor-in possession credit facility
described in that certain Summary of Indicative Terms and Conditions Proposed $17,498,095.52
Senior Secured Super-Priority Debtor-in-Possession Credit Facility (the "**DIP Loan Term
Sheet**") attached hereto as Exhibit A (the "**DIP Loan**") to Borrower.  Lender hereby agrees to
lend to Borrower the DIP Loan, upon the occurrence of the entry of the final order in the
bankruptcy case of Borrower and its affiliates approving the DIP Loan, on the terms and subject
to the conditions described in this Commitment and in the DIP Loan Term Sheet.  This
Commitment is expressly subject to (i) the conditions described herein and in the DIP Loan

Term Sheet, (ii) Lender receiving bankruptcy court approval in the Chapter 11 case of Lehman Commercial Paper Inc. to make the DIP Loan and (iii) Lender receiving the approval of the Official Committee of Unsecured Creditors in the Chapter 11 case of Lehman Commercial Paper Inc. to make the DIP Loan (which approval Lender will seek to obtain as soon as practicable).

In the event that the final order is not entered in the bankruptcy case of Borrower and its affiliates approving the DIP Loan on or before August 31, 2010, Lender's obligations under this Commitment and the DIP Loan Term Sheet shall automatically terminate.

Borrower acknowledges that this Commitment and the DIP Loan Term Sheet do not set forth all of the terms of the DIP Loan, but are intended as an outline of the major points of understanding between the parties that will be set forth in the final debtor-in-possession facility documentation, which must be reasonably acceptable to Lender and Borrower in all respects.

Lender's commitment hereunder with respect to the DIP Loan is subject to the negotiation, execution and delivery of definitive documentation with respect to the DIP Loan, which shall be consistent with the DIP Loan Term Sheet and shall be customary and appropriate for transactions of this type.

This Commitment, together with the attachments hereto, contains the entire agreement between Borrower and Lender, and any other agreements shall be deemed to have merged herewith. This Commitment is for the benefit only of the parties hereto and their respective affiliates and no third party shall have any interest herein or in the proceeds of the DIP Loan. This Commitment is not assignable by any party hereto to any other person, entity or corporation, without the written consent of the other parties hereto, provided, however, that Borrower and Lender agree that Lender shall have the right to assign this Commitment to an affiliate of Lender without Borrower's consent. The terms and provisions of this Commitment cannot be waived or modified except in writing and signed by Borrower and Lender. Except as otherwise expressly provided in this Commitment, whenever Lender's judgment or decision is required as to any matter, such judgment or decision of Lender shall be in Lender's reasonable discretion. Except for the provisions concerning fees and expenses, the terms of this Commitment shall not survive the closing of the DIP Loan. This Commitment may be executed in counterparts, each of which when executed and delivered shall be an original and together shall constitute one and the same instrument. This Commitment shall be governed and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws. Each party hereto hereby submits to the exclusive jurisdiction of the courts of the State of New York for any legal action or proceeding resulting from the transaction contemplated herein. This Commitment has been negotiated, issued and accepted in New York City, New York. Each party hereto hereby waives its right to a trial by jury.

The Borrower may file this Commitment, including the DIP Loan Term Sheet with the US Bankruptcy Court pursuant to a motion seeking authority for it to enter into the definitive loan and security documentation with respect to the DIP Loan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

Sincerely yours,

**SOLAR FINANCE INC.**

By: _____
Name: STEVEN COHN
Title: Treasurer

[Signature Page to DIP Commitment Letter]

Please indicate your acceptance of the matters set forth herein by signing in the place provided below.

**BORROWER:**

KPA/GP VALENCIA LLC
GRAND PRIX WEST PALM BEACH LLC
KPA/GP FT. WALTON BEACH LLC
GRAND PRIX FT. WAYNE LLC
GRAND PRIX INDIANAPOLIS LLC
KPA/GP LOUISVILLE (HI) LLC
GRAND PRIX BULFINCH LLC
GRAND PRIX WOBURN LLC
GRAND PRIX ROCKVILLE LLC
GRAND PRIX EAST LANSING LLC
GRAND PRIX GRAND RAPIDS LLC
GRAND PRIX TROY (CENTRAL) LLC
GRAND PRIX TROY (SE) LLC
GRAND PRIX ATLANTIC CITY LLC
GRAND PRIX MONTVALE LLC
GRAND PRIX MORRISTOWN LLC
GRAND PRIX ALBANY LLC
GRAND PRIX ADDISON (SS) LLC
GRAND PRIX HARRISBURG LLC
GRAND PRIX ONTARIO LLC
each a Delaware limited liability company

By: _____
Name:
Title:

# EXHIBIT A

## Summary of Indicative Terms and Conditions Proposed $17,498,095.52 Senior Secured Super-Priority Debtor-in-Possession Credit Facility

(See attached)

**Summary of Indicative Terms and Conditions**
**Proposed $17,498,095.52 Senior Secured Super-Priority**
**Debtor-in-Possession Credit Facility (this "Term Sheet")**

*This Term Sheet is <u>not</u> a commitment to provide the financing described below. This Term Sheet is not meant to be, and should not be construed as, a commitment by DIP Lender (defined below) or any of its affiliates to extend credit or enter into efforts in order to extend credit. Moreover, it does not attempt to describe all terms and conditions that would pertain to the DIP Facility (defined below), and its terms do not suggest the specific phrasing of documentation clauses.*

---

The proposed terms and conditions summarized herein represent the conditions pursuant to which the DIP Lender proposes to enter into a $17,498,095.52 Senior Secured Super-Priority Debtor-in-Possession Credit Facility (the "***DIP Facility***") with the Borrower (defined below).

Reference is made to those certain mortgage loans in the original principal amount of $250,000,000 (the "***Existing Loan***") made by Lehman ALI Inc. to the Borrower (as defined below) and the Released Borrowers (as defined below) pursuant to a certain Loan Agreement dated as of June 29, 2007, among the Borrower, the Released Borrowers and Lehman ALI Inc. (as amended, the "***Existing Loan Agreement***"). The terms, covenants, conditions and provisions which are applicable as of the date of this Term Sheet to the Existing Loan are set forth in the Existing Loan Agreement and the other loan documents entered into in connection therewith. The collateral for the Existing Loan is referred to herein as the "***Pre-Petition Collateral.***" As of the date of this Term Sheet, Borrower (as defined below) is a party to the Existing Loan Agreement.

---

| | |
|---|---|
| **Borrower:** | Collectively, the borrowers set forth on the List of Borrowers attached hereto, which borrowers (individually and collectively, as the context may require, the "***Borrower***") shall be jointly and severally liable for the obligations under the DIP Facility (as defined below). |
| **Released Borrowers:** | Collectively, the borrowers set forth on the List of Released Borrowers attached hereto, which borrowers (collectively, the "***Released Borrowers***") were previously released from their obligations under the Existing Loan Agreement in accordance with the terms and conditions of the Existing Loan Agreement. |
| **DIP Facility:** | After entry of the Final Order, a term facility of up to $17,498,095.52 allocated to 20 properties (the "***Lehman Properties***") securing the Existing Loan (the "***DIP Facility***") shall be extended to the Borrower pursuant to the terms and provisions of a DIP loan agreement (the "***DIP*** |

*Loan Agreement*"). The loan funded by the DIP Lender under the DIP Facility is referred to herein as the "***DIP Loan***."

**Closing Date:**    The date of the effectiveness of the DIP Facility and the funding by the DIP Lender of the first advance under the DIP Facility to the Borrower.

**DIP Lender:**    Solar Finance Inc.

**Carve-Out:**    There shall be no carve-out of any nature whatsoever for professional fees or expenses of the Borrower or any estate professionals. Since the DIP Facility is intended to solely provide funds for the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations, the professional fees and expenses incurred by the Borrower and other estate professionals shall be dealt with in connection with the cash collateral order(s) entered by the Bankruptcy Court.

**Fees:**    A Closing Fee of 0.5% of the amount committed in connection with the DIP Facility shall be paid by the Borrower to the DIP Lender on the closing date of the DIP Facility and shall be fully earned and non-refundable on such date.

The Borrower shall not incur or pay any success fee, transaction fee or financing fee of any kind or character in connection with or in respect of obtaining the issuance and/or funding of the DIP Facility (except for the Closing Fee and Commitment Fee).

A Commitment Fee equal to 1.0% of the amount committed in connection with the DIP Facility shall be paid by the Borrower to the DIP Lender on the closing date of the DIP Facility and shall be fully earned and non-refundable on such date.

The cash collateral order(s) approved by the Bankruptcy Court shall provide that the Closing Fee and the Commitment Fee shall be paid immediately upon the approval of the DIP Facility by the Bankruptcy Court and the closing of the DIP Facility.

**Maturity Date:**    360 days from the Closing Date.

**Termination Date:**    The earliest to occur of: (a) acceleration by the DIP Lender of the obligations under the DIP Loan due to the occurrence

and continuation of an Event of Default with respect to the DIP Loan (i.e., which Event of Default has not otherwise been cured or waived in writing by the DIP Lender); (b) the acceleration of the obligations under any other debtor-in-possession financing provided to the Debtors due to the occurrence and continuation of an event of default under such financings; (c) the effective date of any plan in the bankruptcy proceeding that provides for payment in full in cash of all obligations owing under the DIP Facility or is otherwise acceptable to the DIP Lender; (d) the date that is the closing date of any sale of all or substantially all of any Borrower's assets that constitute collateral for the DIP Facility; (e) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Borrower constituting collateral with respect to the DIP Facility in excess of $1,000,000 in the aggregate (each, a "***Release from Stay***"); or (f) the entry of an order of dismissal or conversion of the Chapter 11 Cases with respect to all of the Borrowers with respect to the DIP Facility.

**Non-Default Interest Rate and Payment Terms:**

Interest on the DIP Loan shall be paid monthly in arrears, accruing at a per annum floating rate equal to the sum of the 30-day LIBOR (subject to a floor of 2.0%) (LIBOR being defined and determined by DIP Lender in a manner as is customary for facilities similar to the DIP Facility) plus the applicable Spread (as defined below) (the "***Non-Default Interest Rate***"). All interest shall be computed on the basis of a 360-day year for the actual number of days elapsed. "***Spread***" means 5.00%.

**Default Interest Rate:**

Effective immediately upon the occurrence and applying during the continuance of any Event of Default (after giving effect to any applicable grace and cure periods with respect thereto), unless and until such Event of Default is waived in writing by the DIP Lender, interest shall accrue on the DIP Loan at a rate that is 3% per annum in excess of the applicable Non-Default Interest Rate.

**Loan Payments:**

All unpaid obligations, including, without limitation, principal and interest on the DIP Facility and any fees and expenses incurred thereon, shall be due and payable in full in cash on the earlier to occur of (i) the Maturity Date and (ii) the Termination Date.

| | |
|---|---|
| **Mandatory Prepayments:** | Upon the receipt by (or on behalf of) any Borrower of insurance proceeds or a condemnation award in excess of $25,000 following a casualty or condemnation event with respect to any assets of such Borrower constituting collateral for the DIP Facility (subject to the use thereof for restoration as is permitted in the DIP Loan Agreement), 100% of any net cash proceeds from such insurance shall be paid to the DIP Lender on the date that such net cash proceeds are received by or on behalf of such Borrower or such subsidiary in the following order of priority: *first*, to accrued and unpaid interest under the DIP Facility, *second*, to all other amounts then due to DIP Lender under the DIP Facility, and *third*, to outstanding principal under the DIP Facility until the DIP Facility is paid in full. |
| **Use of Proceeds:** | Proceeds of the DIP Facility shall be used solely for (1) the Marriott PIP Work in accordance with the PIP Budget, (2) the Other Franchise PIP Work in accordance with the PIP Budget and (3) the Cycle Renovations in accordance with the Cycle Renovations Budget and shall include the following payments: (a) amounts to pay the financing fees owed to the DIP Lender in accordance with the DIP Facility, (b) amounts up to a maximum principal amount of $5,448,771.01 to fund post-petition Marriott PIP Work in accordance with the PIP Budget, (c) amounts up to a maximum principal amount of $7,949,324.51 to fund post-petition Other Franchise PIP Work in accordance with the PIP Budget, and (d) amounts up to a maximum principal amount of $4,100,000.00 to fund post-petition Cycle Renovations in accordance with the Cycle Renovations Budget. |
| **Cash Management:** | The Borrower shall use a segregated cash management system that segregates proceeds of the DIP Facility from cash generated by the Borrower without commingling cash collateral from any other affiliates and such cash management system must be acceptable to the DIP Lender. Additionally, (i) all funds advanced under the DIP Facility shall be held in a segregated disbursement account controlled by the DIP Lender (the "***Controlled Disbursement Account***") and (ii) disbursements from the Controlled Disbursement Account for the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations shall be made in accordance with the disbursement provisions of the Existing Loan Agreement with regard to the disbursements from the Required Capital Improvements Account (as defined in the Existing Loan |

Agreement). On the Closing Date, the DIP Lender shall advance $5,448,771.01 to fund the post-petition Marriott PIP Work in accordance with the PIP Budget, which funds shall be held in the Controlled Disbursement Account. The DIP Lender shall make advances to fund (i) the post-petition Other Franchise PIP Work in accordance with the PIP Budget and (ii) the post-petition Cycle Renovations in accordance with the Cycle Renovations Budget provided that the following conditions with respect to each advance for the Other Franchise PIP Work and Cycle Renovations, respectively, under the DIP Facility have been satisfied: (a) no Event of Default shall have occurred, (b) all previous advances made by the DIP Lender with respect to the Other Franchise PIP Work or the Cycle Renovations, as applicable, shall have been fully disbursed to Borrower and Borrower shall have fully expended such amounts in accordance with the PIP Budget or the Cycle Renovations Budget, respectively, (c) Borrower shall have submitted a written request to the DIP Lender for such advance at least thirty (30) days prior to the date on which Borrower requests that such advance be funded to the Controlled Disbursement Account, which request shall set forth in reasonable detail the Other Franchise PIP Work or Cycle Renovations, as applicable, to be paid in accordance with the PIP Budget or the Cycle Renovations Budget, respectively, (d) the amount of the advance requested by Borrower pursuant to the Other Franchise PIP Budget or the Cycle Renovations Budget, as applicable, shall not exceed the remaining unfunded commitment by the DIP Lender under the DIP Facility with respect to the Other Franchise Work or the Cycle Renovations, respectively and (e) Borrower shall have otherwise satisfied all conditions necessary for funds to be disbursed from the Controlled Disbursement Account pursuant to the DIP Facility.

**Priority Claim:**

Amounts owed by the Borrower to the DIP Lender pursuant to the DIP Facility, including all accrued interest, fees, costs and expenses, shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a super-priority administrative claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code.

**Collateral Security:**

Without any limitation whatsoever, the DIP Facility, including accrued interest, principal, costs and expenses, shall be secured on a super-priority basis in accordance

with sections 364(c)(2) and (d) of the Bankruptcy Code by first priority, senior secured and priming liens on and security interests in (i) all of the Borrower's real property (including the improvements thereon and all furniture, fixtures and equipment used in connection therewith) and the proceeds thereof that secure the Existing Loan, subject only to prepetition liens and other permitted liens to be agreed in the DIP Loan Agreement (the "*Permitted Liens*"), (ii) the Controlled Disbursement Account, the amounts on deposit from time to time therein and the proceeds thereof, and (iii) all chapter 5 causes of action that relate to the Lehman Properties.

**Lien Validation
and Perfection:**

All liens authorized and granted pursuant to the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further notice or act will be required to effect such perfection.

**DIP Facility Documentation:**

The DIP Facility shall be subject to the negotiation, execution and delivery of a definitive DIP Loan Agreement, an account control agreement relating to the Controlled Disbursement Account and related loan documents and other supporting instruments and agreements (collectively, the "*DIP Facility Documentation*") embodying the terms set forth herein mutually acceptable to the Borrower and DIP Lender. Entering into mortgages and other security documents and filings (and obtaining policies of mortgagee title insurance reasonably acceptable to the DIP Lender) shall not be a condition precedent to the Closing Date; provided that, following the occurrence of the Closing Date, the DIP Lender (at the sole cost and expense of Borrower) may require that some or all of the Borrowers enter into mortgages and other security documents and filings (and execute and deliver customary affidavits to the applicable title companies in order to permit the issuance of policies of mortgagee title insurance and customary endorsements thereto reasonably acceptable to the DIP Lender) which the DIP Lender deems reasonably necessary for the continued perfection of the DIP Lender's security interests under the DIP Facility. Notwithstanding the foregoing, the DIP Lender may record and/or file the Final Order in the land records and/or in such other places as may be determined by DIP Lender (although the same shall not be a condition precedent to the Closing Date, all costs and expenses incurred by the DIP Lender in connection with such

recordation and/or filing of the Final Order shall be borne exclusively by the Borrower).

**Fees and Expenses:**

Borrower will pay (i) all documented fees and out-of-pocket expenses of one counsel and financial advisor for the DIP Lender relating to the DIP Facility and the administration and interpretation of the DIP Facility, (ii) all documented out-of-pocket due-diligence expenses of the DIP Lender in connection with the DIP Facility, including but not limited to environmental and tax due diligence, duplication expenses, consultation, travel and attendance at court hearings, and inspections of the Lehman Properties in connection with disbursements from the Controlled Disbursement Account and (iii) other documented out-of-pocket fees and expenses of the DIP Lender in connection with the DIP Facility, in each case, whether or not the DIP Facility is consummated (other than as a result of the DIP Lender failure or refusal to consummate the DIP Facility on the terms set forth herein).

**Audits and Appraisals:**

The Borrower shall allow the DIP Lender (through its officers, senior employees, or agents and advisors) from time to time at the Borrower's expense to periodically inspect and audit the books, records and account statements of the Borrower in order to confirm the Borrower's compliance with the PIP Budget and the Cycle Renovations Budget and the terms and provisions of the DIP Facility Documentation (including, without limitation, in order to verify that funds are being used in accordance with the PIP Budget and the Cycle Renovations Budget); provided that, to the extent that the Termination Date shall not have occurred and there shall exist no Event of Default (or event which would constitute an Event of Default or cause the Termination Date to occur with the giving of notice or lapse of time), any such inspections and audits shall (x) be conducted only if the DIP Lender deems it reasonably necessary, and (y) occur during normal business hours and upon reasonable notice to the Borrower.

**Conditions Precedent:**

The closing of the DIP Facility shall be subject to the DIP Facility Documentation and the Final Order each being acceptable to the DIP Lender.

The closing of the DIP Facility shall also be subject to the condition that no Termination Event or Event of Default shall have occurred and shall be continuing and such other conditions precedent customary and appropriate for

financings of this type, including, but not limited to, (a) satisfaction of all conditions to be set forth in the DIP Facility Documentation, (b) delivery of (i) the PIP Budget and the Cycle Renovations Budget in form and substance satisfactory to the DIP Lender (after consultation with its advisors), each of which shall include the items set forth in the "*Use of Proceeds*" section of the Term Sheet and shall be acceptable to the applicable franchisors, (ii) the Adequate Assurance Agreement (including with respect to the timeline and performance milestones for completion of the Marriott PIP Work) in form and substance satisfactory to the DIP Lender after consultant with its advisors (it being understood and agreed that the draft Adequate Assurances Agreement provided to the DIP Lender on July 14, 2010 is satisfactory to the DIP Lender), (iii) a thirteen (13)-week cash flow projection and (iv) such other financial information with respect to the Borrower delivered (or required to be delivered) to Lehman ALI Inc. in its capacity as lender under the Existing Loan (collectively, the "*Required Financial Information*"), (c) delivery of updated title searches, lien searches and updated so-called "phase 1" environmental reports (and if recommended by the DIP Lender's environmental consultant or otherwise obtained at the closing of the Existing Loan, delivery of new or updated so-called "phase 2" environmental reports), which updated title searches, lien searches and updated "phase 1" (and, if applicable, updated or new "phase 2") environmental reports are, in each case, acceptable to DIP Lender, (d) entry of a Final Order approving the DIP Facility, its senior, first priority, priming liens, super-priority status and all liens securing the DIP Facility and containing such other orders and findings as DIP Lender may reasonably request which Final Order shall not have been modified or amended without approval of the same, and shall not have been reversed or stayed pending appeal, in form and substance satisfactory to the same, (e) the payment of all fees and expenses in accordance with the caption "Fees and Expenses" above, (f) there shall have occurred no material adverse change in the applicable Borrower(s) financial condition, results of operations or properties (which for the avoidance of doubt shall mean all of the Borrowers and properties applicable to the DIP Facility) constituting collateral under the DIP Facility (other than the commencement of the Chapter 11 Case or otherwise in connection therewith) since the date of this Term Sheet that in the reasonable judgment of the DIP

Lender have or would reasonably be expected to have a material adverse effect on the rights and remedies of the DIP Lender or on the ability of the Borrower to perform its respective obligations to them, (g) the representations and warranties contained in the DIP Facility Documentation shall be true and correct in all material respects (except to the extent that any such representations and warranties relate to an earlier date, in which case they shall be true and correct as of such earlier date), (h) the DIP Lender shall have received bankruptcy court approval in the bankruptcy case of Lehman Commercial Paper Inc. to enter into the DIP Facility and (i) the DIP Lender shall have received the approval of the Official Committee of Unsecured Creditors in the bankruptcy case of Lehman Commercial Paper Inc. to enter into the DIP Facility (which approval the DIP Lender will seek to obtain as soon as practicable).

**Affirmative and Negative Covenants:**

Affirmative and negative covenants similar to the type contained in the Existing Loan Agreement (and the other loan documents entered into in connection therewith) to the extent such covenants are customarily included in debtor-in-possession financing agreements, including, but not limited to, (a) delivery to the DIP Lender, on a weekly basis, of a rolling 13 week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior weekly period) of the debtors under the Chapter 11 Case, (b) restrictions on sales of goods and services out of the ordinary course of business (including that all sales, including sales of any hotel properties, shall be on an arm's-length basis to bona fide third-party purchasers and shall be acceptable to the DIP Lender), (c) delivery of the Required Financial Information, (d) use of proceeds solely in accordance with the PIP Budget and the Cycle Renovations Budget, (e) performance and completion by the Borrower of the Marriott PIP Work and the Other Franchise PIP Work in accordance with the PIP Budget and the Adequate Assurance Agreement (including the timeline for the Marriott PIP Work set forth therein) and the performance and completion by the Borrower of the Cycle Renovations in accordance with the Cycle Renovations Budget, (f) unless such action has otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or terminate a franchise agreement or enter into a new franchise agreement upon any hotel that constitutes collateral for the DIP Facility, (g) unless such action has

otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or enter into a new PIP with respect to any hotel that constitutes collateral for the DIP Facility, (h) unless such action has otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or enter into a new Cycle Renovation with respect to any hotel that constitutes collateral for the DIP Facility, (i) unless such action has otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify, terminate or replace the Adequate Assurance Agreement (provided that the Adequate Assurance Agreement may be extended for a period not to exceed 60 days without such approval by the DIP Lender provided that the Adequate Assurance Agreement is not otherwise modified in connection with such extension) and (j) Borrower shall use commercially reasonable efforts to deliver to the DIP Lender so-called "comfort letters" in form and substance reasonably acceptable to the DIP Lender from franchisors (which "comfort letters" shall provide, among other things, that such franchisors will recognize the performance by DIP Lender of the obligations of the Borrower thereunder, including completion of the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations, and that such franchisors will otherwise accept the cure by DIP Lender of defaults by the Borrower thereunder).

**Representations and Warranties:**

The documentation for the DIP Facility shall contain representations and warranties similar to the type contained in the Existing Loan Agreements, but modified to include those customary in the context of the proposed DIP Facility.

**Remedies:**

Upon the Termination Date or the occurrence of an Event of Default, the DIP Lender shall have customary remedies, including, without limitation, (i) the right to realize on all Collateral securing the DIP Facility and the right to exercise any remedy available under the DIP Facility and applicable law (including, without limitation, the right (but not the obligation) to complete the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations and to apply any of the proceeds of the DIP Facility on account thereof) and (ii) any remedies (but not the termination or related events themselves) set forth in any cash collateral order entered by the Bankruptcy Court in the event that

there is an event of default under such cash collateral order, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Automatic Section 362 relief from the stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility; provided, that DIP Lender shall provide the Borrower with 5 days prior notice of its intent to lift the stay, with a copy of such notice to counsel for the Committee.

**Right to Credit Bid:**   Upon entry of a Final Order approving the DIP Facility, the DIP Lender shall have the right to credit-bid the amount of claims of the DIP Facility during a sale of all or substantially all assets of the Borrowers and their debtor affiliates in the chapter 11 cases (collectively, the "*Debtors*") which assets constitute collateral for the DIP Facility, including without limitation, a sale occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

**Events of Default:**   Events of Default limited to the following:

- The Chapter 11 Case shall be converted to cases under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization by any Borrower or any affiliate of the Borrower that does not provide for the payment in full and in cash of such Borrower's obligations outstanding under the DIP Facility on the effective date of such plan of reorganization, unless otherwise consented to by the DIP Lender.

- Entry of a final order confirming a plan of reorganization that does not require repayment in full in cash of the DIP Facility as of the effective date of the plan, unless otherwise consented to by the DIP Lender.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code.

- Other than at the request of the DIP Lender, the appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

- Entry of a final order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility.

- Any attempt by any Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Lender's claims or collateral security under the DIP Facility (including the filing of any motion by any Borrower to (i) obtain financing from any person or entity other than the DIP Lender (x) under Section 364(d) of the Bankruptcy Code, (y) under Section 364(c) of the Bankruptcy Code or (z) with respect to the existence of any charge, in each case which is or which is claimed to be senior to or pari passu with the super-priority of the claims or charges of the DIP Lender (in each of cases (x), (y) and (z), other than with respect to financing used, in whole or part, to repay in full the DIP Loan) or (ii) except for the Permitted Liens, grant or suffer to exist any other lien or charge upon or affecting the collateral for the DIP Loan), or to subject the DIP Lender's collateral under the DIP Facility to any surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Marriott or the other applicable franchisor terminates the franchise agreement (or otherwise has the right to so terminate such franchise agreement and has taken affirmative steps in such regard (including but not limited to proper delivery of notice of intent to terminate)) upon any hotel owned by any Borrower constituting collateral with respect to the DIP Facility.

- Any Borrower supports a request of any party in interest to surcharge collateral of the Pre-Petition Collateral or Post-Petition Collateral that constitutes collateral with respect to the DIP Facility, for any expense.

- Expenditure of any DIP Loan proceeds in a manner or upon a property or project for which it had not been approved; provided that, with respect to any expenditure in violation of the foregoing which was inadvertent and does not exceed $25,000, the Borrower shall have the right to cure the same (but on not more

than one occasion per calendar month) within five (5) business days following any such expenditure.

- Any Borrower shall apply for an order substituting any assets for all or any portion of the Post-Petition Collateral that constitutes collateral with respect to the DIP Facility, except as provided in the instruments evidencing and governing the Existing Loan Agreements and DIP Facility.

- Failure to make all payments under the DIP Facility when due.

- Failure to pay any undisputed, material post-petition taxes or indebtedness.

- Any Cycle Renovations Variance beyond the Cycle Renovations Budget with respect to any property.

  "**Cycle Renovations Variance**" means costs and expenses for completing specific Cycle Renovations at the Lehman Properties owned by Grand Prix Bulfinch LLC and KPA/GP Louisville (HI) LLC as of any date of determination, which costs and expenses exceed the line item for such Cycle Renovations set forth in the Cycle Renovations Budget for such hotel property as of such date (either on an actual spend or on a projected basis).

- Any Variance with respect to any hotel property constituting collateral for the DIP Facility; provided that, any such Variance that does not exceed 10% on a line-item basis shall not constitute an Event of Default hereunder so long as (a) with respect to the PIP Property Group that includes such hotel property, the Borrower has not, in the aggregate, spent more (and is not, in the aggregate, projected to spend more) in respect of completing the Marriott PIP Work and/or the Other Franchise PIP Work with respect to all hotel properties in such PIP Property Group than the amount, in the aggregate, budgeted therefor in the PIP Budgets for such hotel properties and (b) such Variance is fully compensated for by a combination of (i) applying the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property (but in no event to exceed an amount thereof equal to the Maximum Contingency Amount), (ii) reallocating

any unused portion of the PIP Budget for any of the other hotel properties in such hotel property's PIP Property Group for which the Marriott PIP Work and/or the Other Franchise PIP Work has been fully completed and accepted by the applicable franchisor (i.e., not subject to "punch-list" items) in accordance with the applicable franchise agreement and the Adequate Assurance Agreement and approved by the DIP Lender pursuant to the terms and conditions of the DIP Facility and for which complete and final invoices have been submitted by the applicable contractors and fully paid, and (iii) identified and documented savings from budgeted amounts to complete the Marriott PIP Work and/or the Other Franchise PIP Work for any hotel property in such hotel property's PIP Property Group.

"**Maximum Contingency Amount**" means, with respect to any hotel property as of any date of determination, the percentage of the Marriott PIP Work or Other Franchise PIP Work, as applicable, with respect to such hotel property which has been completed as of such date underlined_multiplied by the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property.

"**PIP Property Group**" means, with respect to any hotel property, such hotel property together with one or more other hotel properties (but in no event to exceed 3 such hotel properties in the aggregate) with respect to which the Borrower is then-engaged in Marriott PIP Work and/or Other Franchise PIP Work or have completed Marriott PIP Work and/or Other Franchise PIP Work and which have been designated by the Borrower and reasonably approved by the DIP Lender as a "PIP Property Group".

"**Variance**" means costs and expenses for completing specific Marriott PIP Work or Other Franchise PIP Work, as applicable at any hotel property as of any date of determination, which costs and expenses exceed the line item for such Marriott PIP Work or Other Franchise PIP Work, as applicable set forth in the PIP Budget for such hotel property as of such date (either on an actual spend or on a projected basis).

- Any breach of any covenant of the DIP Facility beyond any applicable grace periods.

- In the event any of the DIP Facility Documentation giving rise to any effective lien or security interest in any collateral for the DIP Loan (including, without limitation, the account control agreement relating to the Controlled Disbursement Account) shall cease to create a valid and perfected lien on and security interest in the collateral purported to be covered thereby.

- Any representation or warranty in the DIP Facility was incorrect or misleading in any material respect when made.

- Any sale of the Lehman Properties without the DIP Lender's consent.

- Any default under any other debtor-in-possession financings.

- Any other events of default as are usual and customary for financings of this kind, and consistent with the events of default contained in the Existing Loan Agreement (as modified to take account of the current financial condition of the Borrower).

| | |
|---|---|
| **Governing Law:** | New York |
| **Chapter 11 Cases:** | Venue for the chapter 11 Cases shall be in the Southern District of New York. |
| **Miscellaneous:** | Release and Waiver by any Borrower of any claims against the DIP Lender under the DIP Facility under Section 510 of the Bankruptcy Code. |
| | Waiver by any Borrower of any rights to assert claims arising under applicable law against the DIP Lender (or related to the DIP Facility). |
| | DIP Lender shall at all times act pursuant to the DIP Loan Agreement. |
| **Indemnification:** | The Borrower shall indemnify and hold the DIP Lender and its respective officers, directors, employees and agents (including all of their professionals) (each an "*Indemnified Party*") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any |

Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with the DIP Facility, the DIP Facility Documentation, any *"Obligation"* under the DIP Loan Agreement or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

**Other Definitions:**

*"Adequate Assurance Agreement"* means that certain agreement (or, if more than one, those certain agreements, collectively) between the Borrower and Marriott providing for the forbearance of the exercise of remedies by the applicable franchisor under its franchise agreement in respect of the Marriott PIP Work, including a timeline and performance milestones for completion of the Marriott PIP Work and certain other matters as more fully set forth therein.

*"Bankruptcy Code"* means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

*"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York.

*"Chapter 11 Case"* means, collectively, the cases filed by the Borrower under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

*"Committee"* means any official committee of the unsecured creditors appointed pursuant Section 1102 of the Bankruptcy Code in Borrower's bankruptcy case.

*"Cycle Renovations"* means the construction, labor and materials necessary to renovate the Lehman Properties owned by Grand Prix Bulfinch LLC and KPA/GP Louisville (HI) LLC, which renovation plans are in scope, form and substance reasonably acceptable to the DIP Lender.

*"Cycle Renovations Budget"* means the budget setting forth the projected expenditures for funding the Cycle Renovations, in form and substance reasonably acceptable to the DIP Lender (after consultant with its advisors).

"*Final Order*" means a final order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, provides (in addition to the rights and benefits afforded to the lenders under the so-called "comfort letters" obtained in connection with the origination of the Existing Loan) that the applicable franchisors shall recognize the performance by the DIP Lender of the obligations of the Borrower under the applicable PIPs (including the completion of the Marriott PIP Work, the Other Franchise PIP Work and Cycle Renovations and that such franchisors will otherwise accept the cure by the DIP Lender of defaults of the Borrower thereunder), is in recordable form, provides that it cannot be vacated, dismissed or converted unless the DIP Facility and all amounts due and owing thereunder have been fully paid, which order is not stayed.

"*Marriott PIP Work*" means the construction, labor and materials necessary to satisfy Marriott that each of the requirements of each of the PIPs has been satisfied, as identified and reasonably approved by the DIP Lender.

"*Other Franchise PIP Work*" means the construction, labor and materials necessary to satisfy each applicable franchisor (other than Marriott) that each of the requirements of each of the PIPs has been satisfied, as identified and reasonably approved by the DIP Lender.

"*Petition Date*" means the date of filing of the Chapter 11 Case.

"*PIP*" means the Property Improvement Plans included within and a made a part of the Franchise Agreements covering certain of the hotel properties owned by the Borrower, which Property Improvement Plans shall have been approved by Marriott or any other applicable franchisor, and shall have been received and reasonably approved by the DIP Lender, unless such Property Improvement Plans have been previously approved by the DIP Lender in accordance with the terms and conditions of the Existing Loan Agreement.

"*PIP Budget*" means, collectively, (i) the existing PIP budget prepared by Borrower and approved by the DIP Lender, which PIP budget is attached and made a part of the Existing Loan Agreement, as adjusted to account for funds previously disbursed to Borrower for the Marriott

PIP Work and the Other Franchise PIP Work in accordance with the terms and conditions of the Existing Loan Agreement and (ii) the budget setting forth the projected expenditures for funding the Mod 14 work at the Lehman Properties owned by Grand Prix Ontario LLC, Grand Prix Troy (SE) LLC, Grand Prix Troy (Central) LLC and Grand Prix Harrisburg LLC, in form and substance reasonably acceptable to the DIP Lender (after consultation with its advisors).

**List of Borrowers:**
**(each a Delaware limited liability company)**

1. KPA/GP VALENCIA LLC
2. GRAND PRIX WEST PALM BEACH LLC
3. KPA/GP FT. WALTON BEACH LLC
4. GRAND PRIX FT. WAYNE LLC
5. GRAND PRIX INDIANAPOLIS LLC
6. KPA/GP LOUISVILLE (HI) LLC
7. GRAND PRIX BULFINCH LLC
8. GRAND PRIX WOBURN LLC
9. GRAND PRIX ROCKVILLE LLC
10. GRAND PRIX EAST LANSING LLC
11. GRAND PRIX GRAND RAPIDS LLC
12. GRAND PRIX TROY (CENTRAL) LLC
13. GRAND PRIX TROY (SE) LLC
14. GRAND PRIX ATLANTIC CITY LLC
15. GRAND PRIX MONTVALE LLC
16. GRAND PRIX MORRISTOWN LLC
17. GRAND PRIX ALBANY LLC
18. GRAND PRIX ADDISON (SS) LLC
19. GRAND PRIX HARRISBURG LLC
20. GRAND PRIX ONTARIO LLC

**List of Released Borrowers:**
**(each a Delaware limited liability company)**

1.     GRAND PRIX WICHITA LLC
2.     GRAND PRIX TALLAHASSEE LLC
3.     GRAND PRIX COLUMBUS LLC

EXHIBIT D

**Fixed Rate DIP Loan Term Sheet**

c/o Five Mile Capital Partners LLC
Three Stamford Plaza
9th Floor
Stamford, CT 06901

**CONFIDENTIAL**

July 16, 2010

The Entities set forth on <u>Schedule I</u>, <u>Schedule II</u> and <u>Schedule III</u> hereto
c/o Innkeepers USA
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida 33480

<u>$50,750,000 Senior Secured Super-Priority Debtor-in-Possession Credit Facility
Commitment Letter</u>

Ladies and Gentlemen:

You have advised Five Mile Capital II Pooling International LLC (together with its successors and assigns, "***Five Mile***" or "***we***" or "***us***") that the entities set forth on <u>Schedule I</u> hereto (collectively, jointly and severally, together with their respective permitted successors and permitted assigns, the "***Tranche A Borrower***"), <u>Schedule II</u> hereto (collectively, jointly and severally, together with their respective permitted successors and assigns, the "***Tranche B Borrower***") and <u>Schedule III</u> hereto (collectively, jointly and severally, together with their respective permitted successors and assigns, the "***Tranche C Borrower***"; the Tranche A Borrower, the Tranche B Borrower and the Tranche C Borrower being collectively referred to herein as the "***Borrowers***" or "***you***") may file voluntary petitions under Title 11 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.) (as amended, the "***Bankruptcy Code***") in the Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"; such cases, collectively, the "***Bankruptcy Case***").

You have further advised us that in connection with the commencement of the Bankruptcy Case you desire to establish a $50,750,000 senior secured super-priority debtor-in-possession credit facility, such credit facility being allocated to three separate tranches (each, a "***Tranche***") as follows: (a) a term loan facility in an aggregate principal amount of $44,350,000 allocated to and secured by the 45 hotel properties securing the Existing Tranche A Loans (as defined in the Term Sheet (as defined below)) (the "***Tranche A Facility***"); (b) a term loan facility in an aggregate principal amount of $4,000,000 allocated to and secured by the hotel property commonly known as "Residence Inn San Diego--Mission Valley" located at 1865 Hotel Circle South, San Diego, California securing the Existing Tranche B Loans (as defined in the Term Sheet) (the "***Tranche B Facility***"); and (c) a term loan facility in an aggregate principal

amount of $2,400,000 allocated to and secured by the hotel property commonly known as "Residence Inn--Tysons Corner" located at 8400 Old Courthouse Road, Vienna, Virginia securing the Existing Tranche C Loans (as defined in the Term Sheet) (the "***Tranche C Facility***"; the Tranche A Facility, the Tranche B Facility and the Tranche C Facility being collectively referred to herein as the "***DIP Facility***"). The proceeds of the DIP Facility will be used solely and exclusively for the PIP Work (as defined in the Term Sheet) in accordance with the PIP Budget and to pay the financing fees owed to the DIP Lenders (as defined below). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Summary of Indicative Terms and Conditions attached hereto as <u>Exhibit A</u> (the "***Term Sheet***").

1. <u>Commitments</u>.

In connection with the foregoing, Five Mile is pleased to advise you of its commitment and does hereby commit (the "***DIP Commitment***") to provide the entire principal amount of the DIP Facility, upon the terms and subject to the conditions set forth or referred to in this commitment letter, including the Term Sheet and other attachments hereto and thereto (this commitment letter and the Term Sheet being collectively referred to herein as, this "***Commitment Letter***").

2. <u>Agency Roles</u>.

You hereby appoint (a) Five Mile to act as the Lead DIP Lender for the DIP Facility and (b) if agreed to by Five Mile and Presidio Investments, Ltd. (together with its successors and assigns, "***Presidio***") subsequent to the date hereof in accordance with the terms and provisions of the Term Sheet and Section 3 hereof, Presidio to act as the Co-Lead DIP Lender for the DIP Facility, in each case on the terms and subject to the conditions set forth or referred to in this Commitment Letter. Five Mile and, if so agreed, Presidio, in such capacities, will perform the duties and exercise the authority customarily performed and exercised by it in such roles and Five Mile will have the sole and exclusive right to select the DIP Agent to serve in such capacity for the DIP Facility. Notwithstanding anything contained in the Term Sheet to the contrary, all fees payable by the Borrowers in respect of the DIP Facility (including, without limitation, the Commitment Fee) shall be paid solely to Five Mile, unless Five Mile and Presidio agree that Presidio shall act as the Co-Lead DIP Lender for the DIP Facility (in which event such fees shall be payable to Five Mile and Presidio as set forth in the Term Sheet or as otherwise agreed to by Five Mile and Presidio).

3. <u>Syndication</u>.

We reserve the right, prior to and/or after the execution of definitive documentation for the DIP Facility, to (i) assign up to 50% of the aggregate DIP Commitment with respect to the DIP Facility to Presidio so long as (a) Presidio and Five Mile agree that Presidio shall act as the Co-Lead DIP Lender for the DIP Facility and (b) Presidio shall have executed a joinder to this Commitment Letter or this Commitment Letter shall have otherwise been amended, in each case in form and substance reasonably satisfactory to Five Mile and the Borrowers, in order to evidence Presidio's DIP Commitment and (ii) to syndicate and/or participate (collectively "***Syndication***") up to 49% of the aggregate DIP Commitment with respect to the DIP Facility

(with Five Mile retaining or, if applicable, with Five Mile and Presidio retaining in the aggregate, not less than 51% of the aggregate DIP Commitment), including, without limitation, to current certificate holders participating in the Existing Loans with the consent of the Lead DIP Lender (which consent shall not be required with respect to any such certificate holders provided the terms and conditions of such Syndication are otherwise acceptable to the Lead DIP Lender) and subject to the limitations as are expressly set forth in this Commitment Letter (including the Term Sheet) (such lenders and participants, together with us and, if applicable, Presidio as Co-Lead DIP Lender, the *"DIP Lenders"*); provided, that, except as is expressly provided in Section 9 hereof, in no event shall any Syndication prior to the Closing Date, release Five Mile or Presidio, as the case may be, from its DIP Commitment under this Commitment Letter (as amended or supplemented). We intend to commence Syndication efforts promptly upon the execution of this Commitment Letter, and you agree to use your commercially reasonable efforts to assist us in our Syndication efforts (it being understood that such assistance shall continue after the execution of definitive documentation for the DIP Facility). Such assistance shall include (a) your using commercially reasonable efforts to enable any Syndication efforts to benefit materially from your existing lending and investment banking relationships; (b) direct contact between senior management, representatives and advisors of each of the Borrowers and the proposed DIP Lenders (including through hosting with Five Mile, one or more meetings of prospective DIP Lenders), in each case at reasonable times, at reasonable intervals and at reasonable locations to be agreed; (c) assistance by each of you in the preparation of a version of the Confidential Information Memorandum and/or other marketing materials and presentations for the DIP Facility to be used in connection with the Syndication as reasonably requested by us; (d) your providing a thirteen-week cash flow forecast; (e) your providing or causing to be provided a detailed business plan or projections of the Borrowers and such other financial information with respect to the Borrowers as is reasonably requested by Five Mile in connection with the Syndication; and (f) your using commercially reasonable efforts to provide or cause to be provided such information with respect to the respective sponsors of the Borrowers as is reasonably requested by the proposed DIP Lenders in connection with the Syndication.

Without limiting any provision of the Term Sheet, Five Mile will manage all aspects of any Syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocation of the DIP Commitment among the DIP Lenders, any naming rights and the amount and distribution of fees among the DIP Lenders. To assist Five Mile in its Syndication efforts, at the request of Five Mile, you agree to promptly prepare and provide to Five Mile all non-privileged information with respect to the Borrowers and their respective sponsors and the transactions contemplated hereby, including all financial information and projections (including budgets) as required under the Term Sheet (the *"Projections"*), as Five Mile may reasonably request.

Without limiting your obligations to assist with the Syndication efforts as set forth herein, the Borrowers and Five Mile hereby agree that Syndication is not a condition to the DIP Commitments.

4.    Information.

You hereby represent and covenant (and it shall be a condition to Five Mile's commitment hereunder and Five Mile's agreement to perform the services described herein) that (a) all information, other than forward-looking statements, third-party generated industry data and information of a general economic nature and the Projections (the "***Information***"), that has been or will be made available to Five Mile by or on behalf of you or any of your representatives is or will be, when furnished and taken as a whole, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) the forward-looking statements and Projections that have been or will be made available to Five Mile by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are reasonable at the time made (it being understood and agreed that such forward-looking statements and Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, and that no assurance can be given that such forward-looking statements and Projections will be realized, and that the forward-looking statements and Projections are not a guarantee of financial performance and actual results may differ from such forward-looking statements and Projections and such differences may be material); provided, however, that nothing contained in this Section 4 shall (or shall be deemed to) amend or modify any provisions hereof or of the Term Sheet with respect to or relating to the PIP Budget, the PIP Work and/or the completion by the Borrowers of the PIP Work in accordance with the PIP Budget (including, without limitation, those set forth in the Term Sheet under the headings "Use of Proceeds," "Cash Management," "Audits and Appraisals," "Conditions Precedent," "Affirmative and Negative Covenants," "Events of Default," "Indemnification" and "Other Definitions"). You agree that if at any time prior to the closing of the DIP Facility, any of the representations in the preceding sentence would be incorrect if the Information, Projections or forward-looking statements were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information, Projections or forward-looking statements so that such representations will be correct under those circumstances. In arranging and syndicating the DIP Facility, Five Mile and the other DIP Lenders will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

5.    Fees and Expenses.

As consideration for Five Mile's commitment hereunder and Five Mile's agreement to perform the services described herein, you agree to pay to Five Mile the fees and expenses, and fulfill the obligations, set forth in this Commitment Letter (including the Term Sheet) and the fee letter with respect to the DIP Facility dated the date hereof and delivered by the Borrowers to Five Mile herewith (the "***Fee Letter***").

6.    Conditions Precedent.

Five Mile's commitment to provide the DIP Facility is subject to (a) with respect to each Tranche, our not having discovered or otherwise becoming aware of any information not previously disclosed to us is inconsistent in a material and adverse manner with our

understanding, based on the information provided to us prior to the date hereof, of the financial condition, results of operations or properties of the Borrowers, taken as a whole (other than the commencement of the Bankruptcy Case or otherwise in connection therewith); (b) our satisfaction that, prior to and during the Syndication of the DIP Facility, there shall be no other issuances of debt or commercial bank, mortgage, mezzanine or other financings of the Borrowers being announced, placed or arranged; and (c) your compliance with the terms of this Commitment Letter and the Fee Letter. Notwithstanding the foregoing and without limiting any of the provisions of Section 15 hereof, the obligation of the DIP Lenders to fund the DIP Facility is subject to the satisfaction by the Borrowers (or the waiver in writing by the Controlling DIP Lenders) of all of the conditions precedent set forth in the Term Sheet (including, without limitation, those set forth in the section thereof entitled "Conditions Precedent") and if the Borrowers shall fail to satisfy any of such conditions precedent set forth in the Term Sheet with respect to any Tranche (which conditions precedent have not been waived in writing by the Controlling DIP Lenders), the DIP Lenders shall have no obligation to fund the portion of the DIP Facility with respect to such Tranche; provided, however, if the Borrowers shall fail to satisfy any conditions precedent set forth in the Term Sheet with respect to the Tranche A Facility, the DIP Lenders shall have no obligation to fund any portion of the DIP Facility (notwithstanding the satisfaction by the Borrowers of all conditions precedent to the Tranche B Facility and/or the Tranche C Facility).

7.    Indemnification; Expenses.

You agree (a) to indemnify and hold harmless Five Mile, the other DIP Lenders and their respective officers, directors, employees, agents, advisors, controlling persons, members and successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the DIP Facility or any related transaction or any claim, litigation, investigation or proceeding relative to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrowers or any of their respective sponsors or any affiliate of any of them), and to reimburse each such Indemnified Person upon demand for any reasonable and documented legal or other expenses incurred in connection with investigating or defending any or the foregoing; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to (i) losses, claims, damages, liabilities or related expenses to the extent they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted solely from the willful misconduct, bad faith or gross negligence of such Indemnified Person or (ii) lost profits of such Indemnified Person, and (b) to reimburse Five Mile and the other DIP Lenders, from time to time, whether or not the DIP Facility is funded, for all fees, costs and expenses of such parties (in each case to the extent provided in, and subject to the limitations of, the Term Sheet) in connection with the DIP Facility and the preparation, negotiation and enforcement of this Commitment Letter, the Fee Letter, the definitive documentation for the DIP Facility and any ancillary documents or security arrangements in connection therewith. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person (and no other party hereto) shall be liable for (a) any damages arising from the unauthorized use by others of information or other materials obtained through electronic, telecommunications or other information transmission system (including the internet,

e-mail and on-line databases) or (b) any indirect, special, punitive or consequential damages, in each case, in connection with its activities related to this Commitment Letter or the DIP Facility.

8.  Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

You acknowledge that Five Mile may provide mortgage, mezzanine and other debt financing, equity capital or other services (including financial advisory and portfolio management services) to other companies in respect of which you may have conflicting interests regarding the transactions contemplated hereby or otherwise. We will not furnish confidential information obtained from you or any of your representatives by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you to other companies, entities or other persons. You also acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by us from other companies, entities or other persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and Five Mile is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether Five Mile has advised or is advising you on other matters, (b) Five Mile, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of Five Mile, (c) you are capable of evaluating and understanding, and you understand, and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that Five Mile is engaged in a broad range of transactions that may involve interests that differ from your interests and that Five Mile has no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, and (e) you waive, to the fullest extent permitted by law, any claims you may have against Five Mile for breach of fiduciary duty or alleged breach of fiduciary duty and agree that Five Mile shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors. Additionally, you acknowledge and agree that Five Mile is not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby, and Five Mile shall have no responsibility or liability to you with respect thereto. Any review by Five Mile of the Borrowers and/or their respective sponsors and affiliates, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of Five Mile and shall not be on behalf of you, your sponsors or any of your or their affiliates.

You further acknowledge that Five Mile may, in the ordinary course of its business, provide investment banking, portfolio management and other financial services to, and/or acquire, hold or sell (for its own accounts and for the accounts of customers or investors) equity, debt and other securities and financial instruments (including direct or participating interests in bank loans, mortgage loans, mezzanine loans and other obligations) of the Borrowers, their respective sponsors and the affiliates of any of them, and companies with which the Borrowers, their respective sponsors and the affiliates of any of them may have commercial or other relationships.

9. <u>Assignments; Amendments; Governing Law; Etc.</u>

This Commitment Letter shall not be assignable by any party hereto without the prior written consent of each other party hereto (and any attempted assignment without such consent shall be null and void <u>ab initio</u>), is intended to be solely for the benefit of the parties hereto, the other DIP Lenders and the Indemnified Persons and is not intended to confer any benefits upon, or create any rights in favor of any person other than the parties hereto, the other DIP Lenders and the Indemnified Persons; provided, that, Five Mile may assign its commitment hereunder (but subject to the limitations and conditions thereto as are expressly set forth in this Commitment Letter and the Term Sheet (including but not limited to Section 3 hereof) to one or more affiliates of Five Mile and to Presidio if Five Mile and Presidio agree that Presidio shall act as the Co-Lead DIP Lender for the DIP Facility, whereupon Five Mile shall be released from the portion of its commitment hereunder so assigned. Any and all obligations of, and services to be provided by Five Mile hereunder (including, without limitation, Five Mile's commitment hereunder) may be performed and any and all rights of Five Mile hereunder may be exercised by or through any of its affiliates. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by Five Mile and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter. Notwithstanding anything in Section 9 to the contrary, Five Mile may, with the consent of the Borrowers not to be unreasonably withheld, place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the internet or worldwide web as it may choose, and circulate similar promotional materials, after the closing of the transactions contemplated hereby in the form of a "tombstone" or otherwise describing the names of the Borrowers, their respective sponsors and the affiliates of any of them), and the amount, type and closing date of such transactions, all at Five Mile's expense. This Commitment Letter and the Fee Letter supersedes all prior understandings, whether written or oral, between you and us with respect to the DIP Facility. Your obligations hereunder and under the Fee Letter shall be joint and several. **THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

10. <u>Jurisdiction</u>.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby and agrees that all claims in respect of any such action or proceeding may be heard and determined only in such New York State court or, to the extent permitted by law, in such Federal court; (b) waives, to the fullest extent it may legally and

effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby in any New York State court or in any such Federal court; (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court; and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Borrowers hereby designate Grand Prix Binghamton LLC, a Delaware limited liability company ("***Borrower Designee***") to irrevocably designate and appoint CT Corporation in New York as its authorized agent (in such capacity, the "***Process Agent***") upon which process may be served in any action, suit or proceeding arising out of or relating to this Commitment Letter and/or the Fee Letter that may be instituted by Five Mile, the other DIP Lenders or any Indemnified Person in any Federal or state court in the State of New York. The Borrowers hereby agree that service of any process, summons, notice or document by U.S. registered mail addressed to the Process Agent, with written notice of said service, to you at the address above, shall be effective service of process on all of the Borrowers (notwithstanding that Process Agent has been retained in such capacity on behalf of Borrower Designee only) for any action, suit or proceeding brought in any such court. The Borrowers further agree to take any and all action, including execution and filing of any and all such documents and instruments, as may be necessary to continue the designation and appointment of the Process Agent for a period of 2 years from the date of this Commitment Letter.

11. <u>Waiver of Jury Trial</u>.

    **EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.**

12. <u>Confidentiality</u>.

    This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter, the Fee Letter nor any of the terms or substance hereof or thereof, nor the activities of Five Mile pursuant hereto or thereto, shall be disclosed, directly or indirectly, to any other person except (a) to your officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis; (b) to the current sponsors and equity holders of the Borrowers; (c) to current franchisors with respect to the hotel properties subject to the Existing Loans; (d) lenders and their respective servicers with respect to the Existing Loans; (e) as required by applicable law, including the Bankruptcy Code or compulsory legal process (in which case you agree to inform us promptly thereof); (f) in connection with any exercise of remedies under or in connection with a breach of this Commitment Letter, the Fee Letter or the definitive financing documentation for the DIP Facility; (g) in connection with the Borrowers seeking required approval from any governmental authority (including a bankruptcy court) for debtor-in-possession financing; (h) in connection with Section 364(d) of the Bankruptcy Code; (i) to any official committees appointed in the

Bankruptcy Case and their respective legal, financial and other advisors; or (j) as otherwise agreed by the parties hereto.

Five Mile agrees that it will not disclose, directly or indirectly, any Confidential Borrower Information to any other person except (a) to DIP Lenders and prospective DIP Lenders provided that such DIP Lenders agree to treat the same as confidential in accordance with the terms and provisions of this paragraph and as evidence thereof execute and deliver a joinder or other written acknowledgement with respect to which the Borrowers are express third-party beneficiaries; (b) to its officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis; (c) to any lenders or prospective lenders with respect to the financing of the DIP Loans made by Five Mile; (d) to the investors in and equity holders of Five Mile; (e) to lenders and their respective servicers with respect to the Existing Loans; (f) as required by applicable law, including the Bankruptcy Code or compulsory legal process (in which case Five Mile agrees to inform you promptly thereof); (g) in connection with any exercise of remedies under or in connection with a breach of this Commitment Letter, the Fee Letter or the definitive financing documentation for the DIP Facility; (h) to any official committees appointed in the Bankruptcy Case and their respective legal, financial and other advisors; or (i) as otherwise agreed by the parties hereto.  As used in this paragraph, "***Confidential Borrower Information***" shall mean any information provided to Five Mile by or on behalf of the Borrowers after the date hereof, which information is identified to Five Mile as confidential and proprietary at the time of delivery and which information has not otherwise been provided to Five Mile as of the date hereof and is not otherwise generally available, and provided that such information is clearly and prominently marked with the legend "Confidential and Proprietary, subject to the terms of a Confidentiality Agreement"; provided, however, that certain Agreement for Adequate Assurance of Completion of Certain PIPs and Assumption of Agreements, dated as of June 25, 2010, by and among Innkeepers USA Trust and certain direct or indirect subsidiaries and affiliates thereof and Marriott International, Inc. shall be deemed to constitute "Confidential Borrower Information" for purposes of this Section 12.

The Borrowers may file this Commitment Letter (including the Term Sheet) and the Fee Letter with the US Bankruptcy Court pursuant to a motion seeking authority for it to enter into the definitive loan and security documentation with respect to the DIP Facility.

Notwithstanding anything herein to the contrary, any party to this Commitment Letter (and any employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Commitment Letter and the Fee Letter and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure, except that (a) tax treatment and tax structure shall not include the identity of any existing or future party (or any affiliate of such party) to this Commitment Letter or the Fee Letter, and (b) no party shall disclose any information relating to such tax treatment and tax structure to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws.  For this purpose, the tax treatment of the transactions contemplated by this Commitment Letter and the Fee Letter is the purported or claimed U.S. federal income tax treatment of such transactions and the tax structure of such transactions is any fact that may be relevant to understanding the purported or claimed U.S. Federal income tax treatment of such transactions.

13.    Surviving Provisions; Conflicts.

       The indemnification, confidentiality, jurisdiction, governing law and waiver of jury trial provisions contained in this Commitment Letter, the terms and provisions of Section 8 hereof and the provisions of "Fees and Expenses" set forth in the Term Sheet, and the terms and provisions of the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or Five Mile's commitment hereunder and Five Mile's agreement to perform the services described herein; provided, that, this Commitment Letter shall in all other respects be superseded by the definitive financing documentation for the DIP Facility upon the effectiveness thereof.  Except as expressly provided herein, in the event of any conflict between the terms and provisions hereof and the terms and provisions of the Term Sheet, the terms and provisions hereof shall govern and control in all respects.

14.    PATRIOT Act Notification.

       Five Mile hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title Ill of Pub. L. 107-56 (signed into law October 26, 2001) (the "**PATRIOT Act**"), Five Mile and each DIP Lender is required to obtain, verify and record information that identifies each borrower under the DIP Facility, which information includes the name, address, tax identification number and other information regarding each borrower that will allow Five Mile or such other DIP Lender to identify each such borrower in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to Five Mile and each such other DIP Lender.

15.    Acceptance and Termination.

       Five Mile's commitment hereunder and Five Mile's agreement hereunder shall expire automatically and without further action or notice (a) at 11:59 p.m. New York City time on July 19, 2010, unless prior to such time the Bankruptcy Case shall have been commenced, (b) unless prior to the time the Bankruptcy Case shall have been commenced, you shall have returned to us executed counterparts of this Commitment Letter and the Fee Letter and you shall have paid (or caused to be paid), via wire transfer in immediately available funds pursuant to the wire transfer instructions previously provided to you, to (i) Five Mile the Commitment Fee (as defined in the Fee Letter) (and Five Mile shall have confirmed receipt thereof) and (ii) Arnold & Porter LLP, our counsel, the fees and disbursements evidenced by their invoice dated July 15, 2010 (and Arnold & Porter shall have confirmed receipt thereof), (c) at 5:00 p.m. New York City time on September 14, 2010, unless prior to such time you shall have delivered to Five Mile and its counsel a copy of the Final Order (which Final Order shall be final and non-appealable and in form and substance satisfactory to us and otherwise in accordance with the terms and provisions of the Term Sheet) entered in the Bankruptcy Case by the US Bankruptcy Court (the "**Approval Order**") and (d) at 5:00 p.m. New York City time on September 29, 2010, unless prior to such time all of the conditions precedent to Five Mile's commitment to provide the Tranche A Facility set forth in this Commitment Letter (including the Term Sheet) have been satisfied or waived in writing by the Controlling DIP Lenders.  In the event of any termination pursuant to this paragraph, this Commitment Letter and the DIP Commitment and Five Mile's agreement to perform the services described herein, shall automatically terminate without further action or

notice and without further obligation to you unless Five Mile shall, in its sole discretion, agree to an extension in writing.  If any Approval Order shall at any time cease to be in full force and effect or shall be reversed or stayed, or modified in a manner that is material and adverse to Five Mile (in the judgment of Five Mile), Five Mile may, in its own discretion, terminate its commitment hereunder, and Five Mile may, in its own discretion, terminate its agreement to perform the services described herein without further obligation or liability hereunder.


[SIGNATURES ON FOLLOWING PAGE]

Five Mile is pleased to have been given the opportunity to assist you in connection with the financing.

Very truly yours,

**LEAD DIP LENDER:**

**FIVE MILE CAPITAL II POOLING INTERNATIONAL LLC**, a Delaware limited liability company

By:    FIVE MILE CAPITAL PARTNERS LLC, a Delaware limited liability company, its Manager

By:    _____

     Name:    Almond L. Nickerson III

     Title:    Managing Director

Accepted and agreed to as of
the date first above written:


**TRANCHE A BORROWER:**

**GRAND PRIX BELMONT LLC**
**GRAND PRIX CAMPBELL/SAN JOSE**
**LLC**
**GRAND PRIX EL SEGUNDO LLC**
**GRAND PRIX FREMONT LLC**
**GRAND PRIX MOUNTAIN VIEW LLC**
**GRAND PRIX SAN JOSE LLC**
**GRAND PRIX SAN MATEO LLC**
**GRAND PRIX SILI I LLC**
**GRAND PRIX SILI II LLC**
**GRAND PRIX DENVER LLC**
**GRAND PRIX ENGLEWOOD/DENVER**
**SOUTH LLC**
**GRAND PRIX SHELTON LLC**
**GRAND PRIX WINDSOR LLC**
**GRAND PRIX ALTAMONTE LLC**
**GRAND PRIX FT. LAUDERDALE LLC**
**GRAND PRIX NAPLES LLC**
**GRAND PRIX ATLANTA LLC**
**GRAND PRIX ATLANTA (PEACHTREE**
**CORNERS) LLC**
**GRAND PRIX LOMBARD LLC**
**GRAND PRIX CHICAGO LLC**
**GRAND PRIX SCHAUMBURG LLC**
**GRAND PRIX WESTCHESTER LLC**
**GRAND PRIX LEXINGTON LLC**
**GRAND PRIX LOUISVILLE (RI) LLC**
**GRAND PRIX COLUMBIA LLC**

**GRAND PRIX GAITHERSBURG LLC**
**GRAND PRIX GERMANTOWN LLC**
**GRAND PRIX PORTLAND LLC**
**GRAND PRIX LIVONIA LLC**
**GRAND PRIX CHERRY HILL LLC**
**GRAND PRIX MT. LAUREL LLC**
**GRAND PRIX SADDLE RIVER LLC**
**GRAND PRIX ISLANDIA LLC**
**GRAND PRIX BINGHAMTON LLC**
**GRAND PRIX HORSHAM LLC**
**GRAND PRIX WILLOW GROVE LLC**
**GRAND PRIX ADDISON (RI) LLC**
**GRAND PRIX ARLINGTON LLC**
**GRAND PRIX LAS COLINAS LLC**
**GRAND PRIX RICHMOND LLC**
**GRAND PRIX RICHMOND**
**(NORTHWEST) LLC**
**GRAND PRIX BELLEVUE LLC**
**GRAND PRIX BOTHELL LLC**
**GRAND PRIX LYNNWOOD LLC**
**GRAND PRIX TUKWILA LLC**
**GRAND PRIX FIXED LESSEE LLC,**
each a Delaware limited liability company

By: _____
    Name:
    Title:

Accepted and agreed to as of
the date first above written:


**TRANCHE B BORROWER:**

**KPA RIMV, LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:


**GRAND PRIX RIMV LESSEE, LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:


**TRANCHE C BORROWER:**

**KPA TYSONS CORNER RI, LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:


**GRAND PRIX GENERAL LESSEE LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:

## Tranche A Borrower
### (each a Delaware limited liability company)

1. Grand Prix Ft. Lauderdale LLC
2. Grand Prix Addison (RI) LLC
3. Grand Prix Altamonte LLC
4. Grand Prix Arlington LLC
5. Grand Prix Atlanta LLC
6. Grand Prix Atlanta (Peachtree Corners) LLC
7. Grand Prix Bellevue LLC
8. Grand Prix Binghamton LLC
9. Grand Prix Bothell LLC
10. Grand Prix Campbell/San Jose LLC
11. Grand Prix Cherry Hill LLC
12. Grand Prix Chicago LLC
13. Grand Prix Denver LLC
14. Grand Prix Englewood/Denver South LLC
15. Grand Prix Fremont LLC
16. Grand Prix Gaithersburg LLC
17. Grand Prix Lexington LLC
18. Grand Prix Livonia LLC
19. Grand Prix Louisville (RI) LLC
20. Grand Prix Lynnwood LLC
21. Grand Prix Mountain View LLC
22. Grand Prix Portland LLC
23. Grand Prix Richmond LLC
24. Grand Prix Richmond (Northwest) LLC
25. Grand Prix Saddle River LLC
26. Grand Prix San Jose LLC
27. Grand Prix San Mateo LLC
28. Grand Prix Shelton LLC
29. Grand Prix Sili I LLC
30. Grand Prix Sili II LLC
31. Grand Prix Tukwila LLC
32. Grand Prix Windsor LLC
33. Grand Prix Horsham LLC
34. Grand Prix Columbia LLC
35. Grand Prix Germantown LLC
36. Grand Prix Islandia LLC
37. Grand Prix Lombard LLC
38. Grand Prix Naples LLC
39. Grand Prix Schaumberg LLC
40. Grand Prix Westchester LLC
41. Grand Prix Willow Grove LLC
42. Grand Prix Belmont LLC
43. Grand Prix El Segundo LLC
44. Grand Prix Las Colinas LLC
45. Grand Prix Mt. Laurel LLC
46. Grand Prix Fixed Lessee LLC [Operating Lessee]

Tranche B Borrower
(each a Delaware limited liability company)

1. KPA RIMV, LLC

2. Grand Prix RIMV Lessee, LLC [Operating Lessee]

<u>Tranche C Borrower</u>
(each a Delaware limited liability company)

1.  KPA Tysons Corner RI, LLC

2.  Grand Prix General Lessee LLC [Operating Lessee]

**CONFIDENTIAL**

**<u>Term Sheet</u>**

**[see attached]**

**Summary of Indicative Terms and Conditions**
**Proposed $50,750,000 Senior Secured Super-Priority**
**Debtor-in-Possession Credit Facility (this "*Term Sheet*")**

---

The proposed terms and conditions summarized herein represent the conditions pursuant to which certain funds managed by the Lead DIP Lender, the Co-Lead DIP Lender and the other "*DIP Lenders*" described below (the foregoing collectively referred to herein as the "*DIP Lenders*") propose to enter into a $50,750,000 Senior Secured Super-Priority Debtor-in-Possession Credit Facility (the "*DIP Facility*") with the Borrower (defined below).

Reference is made to (i) those certain mortgage loans in the original aggregate principal amount of $825,402,542 (the "*Existing Tranche A Loans*") made by Lehman Ali Inc. to the Tranche A Borrower (as defined below), pursuant to a certain Loan Agreement dated as of June 29, 2007, between the Tranche A Borrower and Lehman Ali Inc. (as amended, the "*Existing Tranche A Loan Agreement*"), (ii) those certain mortgage loans in the original aggregate principal amount of $47,500,000 (the "*Existing Tranche B Loans*") made by Capmark Bank to the Tranche B Borrower (as defined below), pursuant to a certain Deed of Trust Note, dated as of October 4, 2006, between the Tranche B Borrower and Capmark Bank (as amended, the "*Existing Tranche B Loan Agreement*") and (iii) those certain mortgage loans in the original aggregate principal amount of $25,200,000 (the "*Existing Tranche C Loans*" and, together with the Existing Tranche A Loans and the Existing Tranche B Loans, the "*Existing Loans*") made by Merrill Lynch Mortgage Lending, Inc. to the Tranche C Borrower (as defined below), pursuant to a certain Loan Agreement, dated as of September 19, 2006, between the Tranche C Borrower and Merrill Lynch Mortgage Lending, Inc. (as amended, the "*Existing Tranche C Loan Agreement*" and, together with the Existing Tranche A Loan Agreement and the Existing Tranche B Loan Agreement, the "*Existing Loan Agreements*"). The terms, covenants, conditions and provisions which are applicable as of the date of this Term Sheet to the respective Existing Loans are set forth in the respective Existing Loan Agreements and the other loan documents entered into in connection therewith. The collateral for the respective Existing Loans is referred to herein as the "*Pre-Petition Collateral.*" As of the date of this Term Sheet, (i) the Tranche A Borrower is a party to the Existing Tranche A Loan Agreement, (ii) the Tranche B Borrower is party to the Existing Tranche B Loan Agreement and (iii) the Tranche C Borrower is party to the Existing Tranche C Loan Agreement.

---

| | |
|---|---|
| **Tranche A Borrower:** | Collectively, the borrowers set forth on the List of Tranche A Borrowers attached hereto, which borrowers (collectively, the "*Tranche A Borrower*") shall be jointly and severally liable for the obligations under the Tranche A Facility (as defined below). |
| **Tranche B Borrower:** | KPA RIMV, LLC and Grand Prix RIMV Lessee, LLC, as borrower (collectively, the "*Tranche B Borrower*") under the Tranche B Facility (as defined below). |
| **Tranche C Borrower:** | KPA Tysons Corner RI, LLC and Grand Prix General Lessee LLC, as borrower (collectively, the "*Tranche C Borrower*") under the Tranche C Facility (as defined below). |

| **Borrower:** | The Tranche A Borrower, the Tranche B Borrower and the Tranche C Borrower are referred to herein individually as a "***Borrower***" and collectively as the "***Borrowers***". |
|---|---|
| **DIP Agent:** | To be Determined. |
| **Term Sheet Sunset:** | To be Determined. |
| **DIP Facilities:** | After entry of the Final Order, term facilities of up to $50,750,000 in the aggregate and segregated as follows (the "***DIP Commitment***") shall be extended to the respective Borrowers pursuant to the terms and provisions of a DIP credit agreement (the "***DIP Credit Agreement***"): |

A. A $44,350,000 facility allocated to 45 properties securing the Existing Tranche A Loans (the "***Tranche A Facility***").

B. A $4,000,000 facility allocated to the property located in San Diego, California securing the Existing Tranche B Loans (the "***Tranche B Facility***").

C. A $2,400,000 facility allocated to the property located in Tysons Corner, Virginia securing the Existing Tranche C Loans (the "***Tranche C Facility***"; the Tranche A Facility, the Tranche B Facility and the Tranche C Facility are referred to herein individually as a "***Tranche***" and collectively as the "***DIP Facility***" and the loans funded by the DIP Lenders under the DIP Facility are referred to herein as the "***DIP Loans***").

| **Closing Date:** | The date of the effectiveness of the DIP Facility and the funding by the DIP Lenders of the full amount of the DIP Loans under the Tranche A Facility, the Tranche B Facility and the Tranche C Facility to the respective Borrowers (which full funding of each Tranche will occur simultaneously on such date). |
|---|---|
| **DIP Lenders:** | Lead DIP Lender, Co-Lead DIP Lender and any other financial institutions from time to time as are acceptable to the Lead DIP Lender and the Co-Lead DIP Lender. DIP Agent may from time to time syndicate or allow participations in up to 49% of the DIP Commitment (including, without limitation, to current certificate holders participating in the relevant tranche of the Existing Loans) with such consent of the Lead DIP Lender as may be required in any commitment letter to which this Term Sheet is attached, provided that so long as no Event of Default has occurred and is continuing, the DIP Agent may not, without the consent of Borrower, so syndicate or participate to any person or entity, the primary business of which person or entity (or of any entity which is controlled by or under common control with such entity) (i.e., 90% or more of the gross revenues of which are |

derived from) the ownership and operation of hotel properties that directly compete in the same market segments with the hotel properties owned by the Borrowers (provided that no such consent shall be required if such person or entity was otherwise a certificate holder as of the Petition Date). In no event shall DIP Agent so syndicate or participate to any person or entity on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

|   |   |
|---|---|
| **Lead DIP Lender:** | Five Mile Capital Partners (or an affiliate thereof). |
| **Co-Lead DIP Lender:** | To be Determined. |
| **Carve-Out:** | There shall be no carve-out of any nature whatsoever for professional fees or expenses of the Borrowers or any estate professionals. Since the DIP Facility is intended to solely provide funds for PIP Work, the professional fees and expenses incurred by the Borrowers and other estate professionals shall be dealt with in connection with the cash collateral order(s) entered by the Bankruptcy Court. |
| **Fees:** | As per Fee Letter. |
| **Maturity Date:** | 360 days from the Closing Date. |
| **Termination Date:** | The earliest to occur of: (a) with respect to the applicable Tranche of the DIP Facility, acceleration by DIP Agent independently or upon the request of the Controlling DIP Lenders of the obligations under such Tranche due to the occurrence and continuation of an Event of Default with respect to any Tranche (i.e., which Event of Default has not otherwise been cured or waived in writing by the Controlling DIP Lenders); (b) the effective date of any plan in the bankruptcy proceeding that provides for payment in full of all obligations owing under the DIP Facility or is otherwise acceptable to the DIP Agent; (c) with respect to the applicable Tranche of the DIP Facility, the date that is the closing date of any sale of all or substantially all of any Borrower's assets that constitute collateral for such Tranche (or, in the case of the Tranche A Facility, the date that more than 22 of the hotel properties that constitute collateral for the Tranche A Facility are sold (whether in one or more transactions)); (d) with respect to the applicable Tranche of the DIP Facility, the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Borrower constituting collateral with respect to such Tranche in excess of $1,000,000 in the aggregate (each, a "**Release from Stay**"), provided that, solely in the case of the Tranche A Facility, the Borrowers shall have failed within ten (10) business days of such Release from |

Stay to prepay the Tranche A Facility in an amount equal to the lesser of (x) $2,000,000 (in respect of each such foreclosure) and (y) the then-outstanding obligations of the Tranche A Borrower under the Tranche A Facility (including the then-outstanding principal balance, accrued and unpaid interest thereon and other amounts then due and owing thereunder); (e) with respect to the applicable Tranche of the DIP Facility, the entry of an order of dismissal or conversion of the Chapter 11 Cases with respect to all of the Borrowers with respect to such Tranche (or, in the case of the Tranche A Facility, such an order with respect to the operating lessee, Grand Prix Fixed Lessee LLC, or with respect to more than 22 of the Tranche A Borrowers (whether pursuant to one or more separate orders)); or (f) acceleration of the obligations under any other debtor-in-possession financing provided to any affiliates of the Borrowers due to the occurrence and continuation of an event of default under such financing (each, an "*Affiliate Debt Financing*"). The date on which the earliest of *clauses (a)* through *(f)* above occurs is hereinafter referred to as the "*Termination Date*".

**Non-Default Interest Rate and Payment Terms:**

Interest on the DIP Loans under each Tranche shall be paid monthly in arrears, accruing at a per annum floating rate equal to the sum of the 30-day LIBOR (subject to a floor of 2.0%) (LIBOR being defined and determined by DIP Agent in a manner as is customary for facilities similar to the DIP Facility) plus the applicable Spread (as defined below) (the "*Non-Default Interest Rate*"). All interest shall be computed on the basis of a 360-day year for the actual number of days elapsed. "*Spread*" means (i) with respect to the Tranche A Facility, 5.00%, (ii) with respect to the Tranche B Facility, 5.00% and (iii) with respect to the Tranche C Facility, 5.00%.

**Default Interest Rate:**

Effective immediately upon the occurrence and continuance of any monetary Event of Default and, after giving effect to all applicable grace and cure periods as may be set forth in the DIP Credit Agreement, any non-monetary Event of Default, unless and until such Event of Default is waived in writing by the Controlling DIP Lenders, interest shall accrue on all Tranches at a rate that is 3% per annum in excess of the applicable Non-Default Interest Rate.

**Loan Payments:**

All unpaid obligations, including, without limitation, principal and interest on the DIP Facility and any fees and expenses incurred thereon, shall be due and payable in full in cash in immediately available funds on the earlier to occur of (i) the Maturity Date and (ii) the Termination Date.

**Mandatory Prepayments:**

Upon (a) the sale of any assets of any Borrower or any of its subsidiaries constituting collateral for a Tranche (other than sales of furniture, fixtures or equipment in the ordinary course in

connection with the replacement thereof (and provided the same are of substantially like character, quality and utility as those replaced) and other than short-term leases and licenses of guest rooms, parking facilities, banquet facilities, gift shops and other accessory retail space in the ordinary course consistent with the use and operation of the applicable property as a hotel), (b) the receipt by (or on behalf of) any Borrower of insurance proceeds or a condemnation award in excess of $25,000 following a casualty or condemnation event with respect to assets of such Borrower constituting collateral for a Tranche (subject to the use thereof for restoration as is permitted in the DIP Credit Agreement), and (c) the issuance by any Borrower of any post-petition debt (except for trade debts or obligations incurred in the ordinary course of business and within the parameters of the PIP Budget) or equity, 100% of any net cash proceeds from such sale, insurance, award or issuance to be paid to DIP Agent on the date that such net cash proceeds are received by or on behalf of such Borrower or such subsidiary, and applied in the following order of priority: *first*, to accrued and unpaid fees and expenses under the applicable Borrower's respective Tranche of the DIP Facility, *second*, to accrued and unpaid interest under the applicable Borrower's respective Tranche of the DIP Facility, *third*, to outstanding principal under the applicable Borrower's respective Tranche of the DIP Facility until such Tranche is paid in full, and *fourth*, provided no Event of Default has occurred and is continuing, any remaining balance to or as directed by the applicable Borrower.

**Use of Proceeds:**

Proceeds of the DIP Facility shall be used solely for PIP Work in accordance with the PIP Budget, which will include the following payments: (a) amounts to pay the financing fees owed to the DIP Lenders in accordance with the DIP Facility (or with respect to any portion thereof and such expenses of Lead DIP Lender previously paid by a third party on behalf of the Borrowers, the reimbursement of such third party in the amount of such fees and expenses previously paid) and (b) amounts to fund post-petition PIP Work in accordance with the PIP Budget.

**Cash Management:**

The Borrowers shall use a segregated cash management system that appropriately segregates proceeds of the DIP Facility from cash generated by the Borrowers without commingling cash collateral from any other affiliates and such cash management system must be acceptable to DIP Agent. Additionally, (i) all funds advanced under the DIP Facility shall be held in a segregated disbursement account controlled by DIP Agent (the "*Controlled Disbursement Account*") and (ii) disbursements from such Controlled Disbursement Account shall be permitted once per week during the term of the DIP Facility (provided no Event of Default shall have occurred and be continuing and the proceeds thereof are used solely for the purposes described above in the caption "Use of Proceeds") upon receipt by the DIP

Agent of a certification signed by an authorized officer of the Borrowers (each, an **"Officer's Certificate"**) specifying the expenditures to be funded by such disbursement (the "**Certified Expenditures**") and, other than with respect to the first two weekly fundings of the Controlled Disbursement Account, provided that the DIP Agent has received the most recent Bi-Monthly Reconciliation (defined below) in form and substance reasonably acceptable to the DIP Agent as provided below. Furthermore, on a bi-monthly basis, the Borrowers shall deliver to the DIP Agent an Officer's Certificate demonstrating that all disbursements made from such Controlled Disbursement Account during the preceding two-week period were actually applied to pay the Certified Expenditures and otherwise were in accordance with the PIP Budget (such Officer's Certificate to detail any variances beyond the PIP Budget) (the "**Bi-Monthly Reconciliation**"), all of which Officer's Certificates delivered pursuant to this paragraph shall be in such detail and shall be accompanied by such supporting material and other information as is reasonably acceptable to the DIP Agent.

**Priority Claim:** Amounts owed by the Borrowers to the DIP Lenders pursuant to the DIP Facility, including all accrued interest, fees, costs and expenses, shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a super-priority administrative claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code.

**Collateral Security:** Without any limitation whatsoever, the DIP Facility, including accrued interest, principal, costs and expenses, shall be secured on a super-priority basis in accordance with sections 364(c)(2) and (d) of the Bankruptcy Code by first priority, senior secured and priming liens on and security interests in (i) all of the Borrowers' real property (including the improvements thereon and all furniture, fixtures and equipment used in connection therewith) and the proceeds thereof that secure the Existing Loans, subject only to prepetition liens and other permitted liens to be agreed in the DIP Credit Agreement (the "**Permitted Liens**"), (ii) the Controlled Disbursement Account, the amounts on deposit from time to time therein and the proceeds thereof; and (iii) all Chapter 5 causes of action that relate to the hotel properties owned by the Borrowers; provided that, the Tranche A Facility, the Tranche B Facility and the Tranche C Facility shall not be cross-collateralized.

**Lien Validation and Perfection:** All liens authorized and granted pursuant to the DIP Facility shall be deemed effective and perfected as of the Petition Date,

and no further notice or act will be required to effect such perfection.

**DIP Facility Documentation:** The DIP Facility shall be subject to the negotiation, execution and delivery of a definitive DIP Credit Agreement, an account control agreement relating to the Controlled Disbursement Account and related loan documents and other supporting instruments and agreements (collectively, the "***DIP Facility Documentation***") embodying the terms set forth herein mutually acceptable to the Borrowers and DIP Agent (including, without limitation, collateral assignments of all contracts (with the acknowledgement and consent of the counterparty thereto) and purchase orders for labor and materials relating to the PIP Work; such agreements and filings as DIP Agent may require to maintain perfected liens on all fixtures, furniture, equipment and materials to be used in completing the PIP Work (whether stored on-site or off-site); if requested by DIP Agent, lien waivers evidencing the lien free completion of the PIP Work; rights on the part of DIP Agent or its consultant to inspect the PIP Work and monitor progress of completion; insurance covering all such fixtures, furniture, equipment and materials (such insurance coverage to be consistent with the insurance program reviewed and approved by DIP Agent in connection with the first phase of the PIP Work); and, if and to the extent required by the applicable franchisors, performance bonds for all contractors performing PIP Work). Entering into mortgages and other security documents and filings (and obtaining policies of mortgagee title insurance) shall not be a condition precedent to the Closing Date; provided that, following the occurrence of the Closing Date, the DIP Agent (at the sole cost and expense of the DIP Agent and the DIP Lenders) may require that some or all of the Borrowers enter into mortgages and other security documents and filings (and execute and deliver customary affidavits to the applicable title companies in order to permit the issuance of policies of mortgagee title insurance and customary endorsements thereto) which the DIP Agent deems reasonably necessary for the continued perfection of the DIP Group's security interests under the DIP Facility. Notwithstanding the foregoing, the DIP Agent may record and/or file the Final Order in the land records and/or in such other places as may be determined by DIP Agent (although the same shall not be a condition precedent to the Closing Date, all costs and expenses incurred by the DIP Agent and the DIP Lenders in connection with such recordation and/or filing of the Final Order shall be borne exclusively by the Borrowers).

**Fees and Expenses:** Borrowers will pay (i) all documented fees and out-of-pocket expenses of one counsel for each of the Lead DIP Lender and the Co-Lead DIP Lender relating to the DIP Facility and the administration and interpretation of the DIP Facility, (ii) all

documented out-of-pocket due-diligence expenses of the Lead DIP Lender and the Co-Lead DIP Lender in connection with the DIP Facility, including but not limited to environmental due diligence, duplication expenses, consultation, travel and attendance at court hearings and inspections of the hotel properties owned by the Borrowers, including in connection with disbursements from the Controlled Disbursement Account and (iii) other documented out-of-pocket fees and expenses of the DIP Group in connection with the DIP Facility (including the fees and expenses of DIP Agent's advisors), whether or not the DIP Facility is consummated (other than as a result of the DIP Lenders failure or refusal to consummate the DIP Facility on the terms set forth herein). The Borrowers will also pay all reasonable and documented fees and out-of-pocket expenses of one counsel for additional DIP Lenders acquiring a syndication or participation interest in the DIP Facility in an amount not to exceed $20,000 per additional DIP Lender.

**Audits and Appraisals:**

The Borrowers shall allow the DIP Agent (through its officers, senior employees, or agents and advisors) from time to time at the Borrowers' expense to periodically inspect and audit the books, records and account statements of the Borrowers in order to confirm the Borrowers' compliance with the PIP Budget and the terms and provisions of the DIP Facility Documentation (including, without limitation, in order to verify that funds are being used in accordance with the PIP Budget); <u>provided</u> that, to the extent that the Termination Date shall not have occurred and there shall exist no Event of Default (or event which would constitute an Event of Default or cause the Termination Date to occur with the giving of notice or lapse of time), any such inspections and audits shall (x) be conducted only if the Controlling DIP Lenders deem it reasonably necessary, and (y) occur during normal business hours and upon reasonable notice to the applicable Borrower(s).

**Conditions Precedent:**

The DIP Facility, DIP Facility Documentation and the Final Order are each acceptable to the DIP Agent.

The closing of the DIP Facility shall be subject to the condition that no Termination Event or Event of Default shall have occurred and shall be continuing and such other conditions precedent customary and appropriate for financings of this type, including, but not limited to, (a) the satisfaction (or waiver in writing by the Controlling DIP Lenders) of all conditions to be set forth in the definitive documentation to be prepared by counsel to DIP Group and the DIP Lenders, (b) delivery of (i) the PIP Budget in form and substance satisfactory to the DIP Agent (after consultation with the DIP Agent's advisors and the applicable special servicers) which shall include the items set forth in the "*Use of Proceeds*" section of this Term Sheet and shall not otherwise be unsatisfactory to the applicable

franchisors, (ii) the Adequate Assurance Agreement (including with respect to the timeline and performance milestones for completion of the PIP Work) in form and substance satisfactory to the DIP Agent (after consultation with the DIP Agent's advisors and the applicable special servicers), (iii) a thirteen (13)-week cash flow projection and (iv) such other financial information with respect to the Borrowers (x) required under the Existing Loan Agreements (except for any provision thereof which requires reporting pursuant to Regulation S-X or is in the nature of a "catch-all" (i.e., a general requirement to deliver additional information as may be requested by the lenders thereunder) unless the same is otherwise delivered to Midland Loan Services, Inc. (or any successor thereto) in its capacity as special servicer and any other applicable special servicer or other servicer in connection with the Existing Loans), (y) required pursuant to any court order and (z) as may be delivered to Midland Loan Services, Inc. (or any successor thereto) in its capacity as special servicer and any other applicable special servicer or other servicer in connection with the Existing Loans (collectively, the "***Required Financial Information***"), (c) delivery of updated title searches, lien searches and updated so-called "phase 1" environmental reports (and if recommended by the DIP Agent's environmental consultant or otherwise obtained at the closing of the Existing Loans, delivery of new or updated so-called "phase 2" environmental reports), which updated title searches, lien searches and updated "phase 1" (and, if applicable, updated or new "phase 2") environmental reports are, in each case, acceptable to DIP Agent, (d) entry of a Final Order approving the DIP Facility and providing, in part, for super-priority administrative claims and first-priority, senior secured and priming liens and the perfection thereof by the DIP Lenders as contemplated herein, which Final Order shall not have been modified or amended without approval of the same, and shall not have been reversed or stayed pending appeal, in form and substance satisfactory to DIP Agent, (e) the payment of all fees and expenses in accordance with the caption "Fees and Expenses" above, (f) with respect to each Tranche, there shall have occurred no material adverse change in the applicable Borrower(s) financial condition, results of operations or properties (which for the avoidance of doubt shall mean all of the Borrowers/properties applicable to such Tranche, collectively) constituting collateral under such Tranche of the DIP Facility (other than the commencement of the Chapter 11 Case or otherwise in connection therewith) since the date of this Term Sheet that in the reasonable judgment of the DIP Agent have or would reasonably be expected to have a material adverse effect on the rights and remedies of DIP Agent or the DIP Lenders or on the ability of the Borrowers to perform their respective obligations to them, (g) the representations and warranties contained in the DIP Facility Documentation shall be true and correct in all material respects (except to the extent that

any such representations and warranties relate to an earlier date, in which case they shall be true and correct as of such earlier date) and (h) with respect to each Tranche, the Borrowers shall have obtained consent from the secured lenders under the Existing Loans (including, without limitation, the respective controlling holders thereunder) to the DIP Facility (and the terms thereof as described herein) or approval of the Bankruptcy Court of the DIP Facility (and the terms thereof as described herein) by the entry of the Final Order in form and substance satisfactory to the DIP Agent.

**Affirmative and Negative Covenants:**

Affirmative and negative covenants similar to the type contained in the Existing Loan Agreements (and the other loan documents entered into in connection therewith) to the extent such covenants are customarily included in debtor-in-possession financing agreements, including, but not limited to, (a) delivery to DIP Agent, on a weekly basis, of Borrowers' and its subsidiaries' rolling 13 week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior weekly period), (b) restrictions on sales of goods and services out of the ordinary course of business (including that all sales, including sales of any hotel properties, shall be on an arm's-length basis to bona fide third-party purchasers), (c) delivery of the Required Financial Information, (d) use of proceeds solely in accordance with the PIP Budget, (e) performance and completion by the Borrowers of the PIP Work in accordance with the PIP Budget and the Adequate Assurance Agreement (including the timeline for the PIP Work set forth therein), (f) unless such action has otherwise been approved by the Controlling DIP Lenders, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or terminate a franchise agreement or enter into a new franchise agreement upon any hotel that constitutes collateral for the DIP Facility, (g) unless such action has otherwise been approved by the Controlling DIP Lenders, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or enter into a new PIP with respect to any hotel that constitutes collateral for the DIP Facility and (h) unless such action has otherwise been approved by the Controlling DIP Lenders, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify, terminate or replace the Adequate Assurance Agreement (provided that the Adequate Assurance Agreement may be extended for a period not to exceed 60 days without such approval by the Controlling DIP Lenders).

**Representations and Warranties:**

The documentation for the DIP Facility shall contain representations and warranties similar to the type contained in

the Existing Loan Agreements, but modified to include those customary in the context of the proposed DIP Facility.

**Remedies:**

Upon the Termination Date or the occurrence of an Event of Default in connection with the respective Tranche of the DIP Facility, the DIP Agent and the DIP Lenders shall have customary remedies, including, without limitation, (i) the right to realize on all Collateral securing such Tranche and the right to exercise any remedy available under the DIP Facility and applicable law (including, without limitation, the right (but not the obligation) to complete the PIP Work and to apply any of the proceeds of the DIP Facility on account thereof) and (ii) any remedies (but not the termination or related events themselves) set forth in any cash collateral order entered by the Bankruptcy Court in the event that there is an event of default under such cash collateral order), without the necessity of obtaining any further relief or order from the Bankruptcy Court. Automatic Section 362 relief from the stay in favor of the DIP Agent and the DIP Lenders shall be embodied in any order approving the DIP Facility; _provided_, that DIP Agent shall provide the Borrowers with 5 days prior notice of its intent to lift the stay, with a copy of such notice to counsel for the Committee.

**Right to Credit Bid:**

Upon entry of a Final Order approving the DIP Facility, the DIP Group shall have the right to credit-bid the amount of claims of the DIP Facility allocable to the applicable Tranche during a sale of all or substantially all of the Debtors' assets constituting collateral for such Tranche, including without limitation, a sale occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

**Events of Default:**

Defaults and events of default limited to the following:

- The Chapter 11 Case shall be converted to cases under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization by any Borrower or any affiliate of the Borrowers that does not provide for the payment in full and in cash of such Borrower's obligations outstanding under the DIP Facility on the effective date of such plan of reorganization, unless otherwise consented to by the Controlling DIP Lenders.

- Entry of a final order confirming a plan of reorganization that does not require repayment in full in cash of the DIP Facility as of the effective date of the plan, unless otherwise consented to by the Controlling DIP Lenders

- Appointment of a trustee under Section 1104 of the Bankruptcy Code.

- Other than at the request of the DIP Agent, the DIP Group, any other DIP Lender or any certificate holder with respect to the Existing Loans, the appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

- Entry of a final order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility.

- Any attempt by any Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Agent's, the Lead DIP Lender's or the DIP Lenders' claims or collateral security under the DIP Facility (including the filing of any motion by any Borrower to (i) obtain financing from any person or entity other than the DIP Lenders (x) under Section 364(d) of the Bankruptcy Code, (y) under Section 364(c) of the Bankruptcy Code or (z) with respect to the existence of any charge, in each case which is or which is claimed to be senior to or pari passu with the super-priority of the claims or charges of the DIP Lenders (in each of cases (x), (y) and (z), other than with respect to financing used, in whole or part, to repay in full the DIP Loans) or (ii) except for the Permitted Liens, grant or suffer to exist any other lien or charge upon or affecting the collateral for the DIP Loans), or to subject the DIP Lenders' collateral under the DIP Facility to any surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- With respect to the applicable Tranche of the DIP Facility, Marriott or other applicable franchisor successfully terminates a franchise agreement upon any hotel owned by any Borrower constituting collateral with respect to such Tranche.

- One or more franchisors have taken affirmative steps after the effective date of the DIP Credit Agreement to terminate (including but not limited to delivery of notice of intent to terminate) 10 or more franchise agreements (in the aggregate during the term of the DIP Facility) upon hotels owned by any of the Borrowers constituting collateral with respect to any Tranche.

- With respect to the applicable Tranche of the DIP Facility, any Borrower supports a request of any party in interest to surcharge collateral of the Pre-Petition Collateral or Post-Petition Collateral that constitutes collateral with respect to such Tranche, for any expense.

- Expenditure of any DIP Loan proceeds in a manner or upon a property or project for which it had not been approved; provided that, with respect to any expenditure in violation of the foregoing which was inadvertent and does not exceed $25,000, the Borrowers shall have the right to cure the same (but on not more than one occasion per calendar month) within five (5) business days following any such expenditure.

- With respect to the applicable Tranche of the DIP Facility, any Borrower shall apply for an order substituting any assets for all or any portion of the Post-Petition Collateral that constitutes collateral with respect to such Tranche, except as provided in the instruments evidencing and governing the Existing Loan Agreements and DIP Facility.

- With respect to the applicable Tranche of the DIP Facility, failure to make all payments under the DIP Facility with respect to such Tranche when due.

- Failure to pay any undisputed, material post-petition taxes or indebtedness.

- With respect to the applicable Tranche of the DIP Facility, any Variance with respect to any hotel property constituting collateral for such Tranche; provided that, any such Variance that does not exceed 10% on a line-item basis shall not constitute an Event of Default hereunder so long as (a) with respect to the PIP Property Group that includes such hotel property, the applicable Borrowers have not, in the aggregate, spent more (and are not, in the aggregate, projected to spend more) in respect of completing the PIP Work with respect to all hotel properties in such PIP Property Group than the amount, in the aggregate, budgeted therefor in the PIP Budgets for such hotel properties and (b) such Variance is fully compensated for by a combination of (i) applying the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property (but in no event to exceed an amount thereof equal to the Maximum Contingency Amount), (ii) reallocating any unused portion of the PIP Budget for any of the other hotel properties in such hotel property's PIP Property Group for which the PIP Work has been fully completed and accepted by the applicable franchisor (i.e., not subject to "punch-list" items) in accordance with the applicable franchise agreement and the Adequate Assurance Agreement and for which complete and final invoices have been submitted by the applicable contractors and fully paid, and (iii) identified and documented savings from budgeted amounts to complete the PIP Work for any hotel property in such hotel property's PIP Property Group.

- With respect to the applicable Tranche of the DIP Facility, breach of any covenant of the DIP Facility applicable to such Tranche beyond any applicable grace periods.

- In the event any of the DIP Facility Documentation giving rise to any effective lien or security interest in any collateral for the DIP Loans (including, without limitation, the account control agreement relating to the Controlled Disbursement Account) shall cease to create a valid and perfected lien on and security interest in the collateral purported to be covered thereby.

- With respect to the applicable Tranche of the DIP Facility, any representation or warranty in the DIP Facility applicable to such Tranche was incorrect or misleading in any material respect when made.

- Any default under an Affiliate DIP Financing.

Notwithstanding anything contained in this Term Sheet to the contrary, each Tranche shall be cross-defaulted with each other Tranche (i.e., an Event of Default under one Tranche shall constitute an Event of Default under the other Tranches), provided, however, that (x) the occurrence and continuation of an Event of Default under the Tranche B Facility (i.e., a default under the Tranche B Facility after the expiration of all applicable grace and cure periods as may be set forth in the Credit Agreement) shall not cross-default the Tranche A Facility or the Tranche C Facility so long as the Borrowers shall have paid in full all of the outstanding obligations under the Tranche B Facility (including the then-outstanding principal balance, accrued and unpaid interest thereon and other amounts then due and owing thereunder) within five (5) business days following the occurrence of such Event of Default under the Tranche B Facility and (y) the occurrence and continuation of an Event of Default under the Tranche C Facility (i.e., a default under the Tranche C Facility after the expiration of all applicable grace and cure periods as may be set forth in the Credit Agreement) shall not cross-default the Tranche A Facility or the Tranche B Facility so long as the Borrowers shall have paid in full all of the outstanding obligations under the Tranche C Facility (including the then-outstanding principal balance, accrued and unpaid interest thereon and other amounts then due and owing thereunder) within five (5) business days following the occurrence of such Event of Default under the Tranche C Facility.

**Governing Law:**  New York

**Chapter 11 Cases:**  Venue for the chapter 11 Cases shall be in the Southern District of New York.

| | |
|---|---|
| **Miscellaneous:** | Release and Waiver by any Borrower of any claims against the DIP Lenders under the DIP Facility under Section 510 of the Bankruptcy Code. |
| | Waiver by any Borrower of any rights to assert claims arising under applicable law against the DIP Lenders (or related to the DIP Facility). |
| | DIP Agent shall at all times act pursuant to the DIP Credit Agreement. |
| **Indemnification:** | The Borrowers shall indemnify and hold DIP Agent and all DIP Lenders and their respective officers, directors, employees and agents (including all of their professionals) (each an *"Indemnified Party"*) harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with the DIP Facility, the credit documents related to the DIP Facility, any *"Obligation"* under the DIP Credit Agreement or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Other Definitions:** | *"Adequate Assurance Agreement"* means that certain agreement (or, if more than one, those certain agreements, collectively) between the Borrowers and Marriott or any other applicable franchisor(s) providing for the forbearance of the exercise of remedies by the applicable franchisor under its franchise agreement in respect of the PIP Work, including a timeline and performance milestones for completion of the PIP Work and certain other matters as more fully set forth therein. |
| | *"Bankruptcy Code"* means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended. |
| | *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York. |
| | *"Chapter 11 Case"* means, collectively, the cases filed by the Borrowers under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. |

**"*Committee*"** means any official committee of the unsecured creditors appointed pursuant Section 1102 of the Bankruptcy Code in Borrowers' bankruptcy case.

**"*Controlling DIP Lenders*"** means DIP Lenders with outstanding DIP Loans exceeding fifty percent (50%) of the aggregate DIP Loans of all DIP Lenders.

**"*DIP Group*"** means the DIP Agent, the Lead DIP Lender and the Co-Lead DIP Lender

**"*Final Order*"** means a final non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, provides (in addition to the other rights and benefits afforded to the lenders under the so-called "comfort letters" obtained in connection with the origination of the Existing Loans) that the applicable franchisors shall provide simultaneous notice to the DIP Agent of any default by any Borrower under any franchise agreement or any agreement related thereto (including, without limitation, the Adequate Assurance Agreement) and recognize the performance by the DIP Agent of the obligations of the Borrowers under such franchise or related agreements (including the applicable PIPs and the completion of the PIP Work) and that such franchisors will otherwise accept the cure by the DIP Agent of defaults of the Borrowers thereunder and allow the DIP Agent an additional cure period of not less than 60 days to effect such performance all without further order of the Bankruptcy Court, is in recordable form, provides that it cannot be vacated and that the Chapter 11 Case may not be dismissed or converted unless the DIP Facility and all amounts due and owing thereunder have been fully paid, which order is not stayed.

**"Maximum Contingency Amount"** means, with respect to any hotel property as of any date of determination, the percentage of the PIP Work with respect to such hotel property which has been completed as of such date <u>multiplied</u> by the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property.

**"*Petition Date*"** means the date of filing of the Chapter 11 Case.

**"*PIP*"** means the Property Improvement Plans included within and a made a part of the Franchise Agreements covering certain of the hotel properties owned by the Borrowers, which Property Improvement Plans shall have been approved by Marriott or any other applicable franchisor.

**"*PIP Budget*"** means, with respect to each Borrower, the budget setting forth the projected expenditures for funding the PIP Work

at the hotel(s) owned by such Borrower, in form and substance acceptable to DIP Agent (after consultation with the DIP Agent's advisors and the applicable special servicers).

"**PIP Property Group**" means, with respect to any hotel property, such hotel property together with one or more other hotel properties (but in no event to exceed 8 such hotel properties in the aggregate) with respect to which the Borrowers are then-engaged in PIP Work or have completed PIP Work and which have been designated by the Borrowers as a "PIP Property Group" prior to commencement of such PIP Work; it being understood that (y) for the Tranche B Facility, the PIP Property Group shall consist solely of the hotel property securing the Tranche B Facility and no other hotel property and (z) for the Tranche C Facility, the PIP Property Group shall consist solely of the hotel property securing the Tranche C Facility and no other hotel properties.

"*PIP Work*" means the construction labor and materials necessary to satisfy Marriott or any other applicable franchisor that each of the requirements of each of the PIPs has been satisfied.

"**Variance**" means costs and expenses for completing specific PIP Work at any hotel property as of any date of determination, which costs and expenses exceed the line item for such PIP Work set forth in the PIP Budget for such hotel property as of such date (either on an actual spend or on a projected basis).

**List of Tranche A Borrowers:**
**(each a Delaware limited liability company)**

1. Grand Prix Ft. Lauderdale LLC

2. Grand Prix Addison (RI) LLC

3. Grand Prix Altamonte LLC

4. Grand Prix Arlington LLC

5. Grand Prix Atlanta LLC

6. Grand Prix Atlanta (Peachtree Corners) LLC

7. Grand Prix Bellevue LLC

8. Grand Prix Binghamton LLC

9. Grand Prix Bothell LLC

10. Grand Prix Campbell/San Jose LLC

11. Grand Prix Cherry Hill LLC

12. Grand Prix Chicago LLC

13. Grand Prix Denver LLC

14. Grand Prix Englewood/Denver South LLC

15. Grand Prix Fremont LLC

16. Grand Prix Gaithersburg LLC

17. Grand Prix Lexington LLC

18. Grand Prix Livonia LLC

19. Grand Prix Louisville (RI) LLC

20. Grand Prix Lynnwood LLC

21. Grand Prix Mountain View LLC

22. Grand Prix Portland LLC

23. Grand Prix Richmond LLC

24. Grand Prix Richmond (Northwest) LLC

25. Grand Prix Saddle River LLC

26. Grand Prix San Jose LLC

27. Grand Prix San Mateo LLC

28. Grand Prix Shelton LLC

29. Grand Prix Sili I LLC

30. Grand Prix Sili II LLC

31. Grand Prix Tukwila LLC

32. Grand Prix Windsor LLC

33. Grand Prix Horsham LLC

34. Grand Prix Columbia LLC

35. Grand Prix Germantown LLC

36. Grand Prix Islandia LLC

37. Grand Prix Lombard LLC

38. Grand Prix Naples LLC

39. Grand Prix Schaumberg LLC

40. Grand Prix Westchester LLC

41. Grand Prix Willow Grove LLC

42. Grand Prix Belmont LLC

43. Grand Prix El Segundo LLC

44. Grand Prix Las Colinas LLC

45. Grand Prix Mt. Laurel LLC

46. Grand Prix Fixed Lessee LLC [Operating Lessee]

EXHIBIT E

**Cash Collateral Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| INNKEEPERS USA TRUST, *et al.*,[1] | Case No. 10-_____(___) |
| Debtors. | Joint Administration Requested |

---

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO (i) USE THE ADEQUATE PROTECTION PARTIES' CASH COLLATERAL AND (ii) PROVIDE ADEQUATE PROTECTION TO THE ADEQUATE PROTECTION PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, AND 363, AND (B) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)**

---

Upon the motion (the "**Motion**")[2] of the above-captioned debtors (collectively, the "**Debtors**") for the entry of an order (the "**Order**") (a) authorizing the Debtors to (i) use the Cash Collateral (as defined below) of the Adequate Protection Parties (as defined below) pursuant to

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: GP AC Sublessee LLC (5992); Grand Prix Addison (RI) LLC (3740); Grand Prix Addison (SS) LLC (3656); Grand Prix Albany LLC (3654); Grand Prix Altamonte LLC (3653); Grand Prix Anaheim Orange Lessee LLC (5925); Grand Prix Arlington LLC (3651); Grand Prix Atlanta (Peachtree Corners) LLC (3650); Grand Prix Atlanta LLC (3649); Grand Prix Atlantic City LLC (3648); Grand Prix Bellevue LLC (3645); Grand Prix Belmont LLC (3643); Grand Prix Binghamton LLC (3642); Grand Prix Bothell LLC (3641); Grand Prix Bulfinch LLC (3639); Grand Prix Campbell / San Jose LLC (3638); Grand Prix Cherry Hill LLC (3634); Grand Prix Chicago LLC (3633); Grand Prix Columbia LLC (3631); Grand Prix Denver LLC (3630); Grand Prix East Lansing LLC (3741); Grand Prix El Segundo LLC (3707); Grand Prix Englewood / Denver South LLC (3701); Grand Prix Fixed Lessee LLC (9979); Grand Prix Floating Lessee LLC (4290); Grand Prix Fremont LLC (3703); Grand Prix Ft. Lauderdale LLC (3705); Grand Prix Ft. Wayne LLC (3704); Grand Prix Gaithersburg LLC (3709); Grand Prix General Lessee LLC (9182); Grand Prix Germantown LLC (3711); Grand Prix Grand Rapids LLC (3713); Grand Prix Harrisburg LLC (3716); Grand Prix Holdings LLC (9317); Grand Prix Horsham LLC (3728); Grand Prix IHM, Inc. (7254); Grand Prix Indianapolis LLC (3719); Grand Prix Islandia LLC (3720); Grand Prix Las Colinas LLC (3722); Grand Prix Lexington LLC (3725); Grand Prix Livonia LLC (3730); Grand Prix Lombard LLC (3696); Grand Prix Louisville (RI) LLC (3700); Grand Prix Lynnwood LLC (3702); Grand Prix Mezz Borrower Fixed, LLC (0252); Grand Prix Mezz Borrower Floating, LLC (5924); Grand Prix Mezz Borrower Floating 2, LLC (9972); Grand Prix Mezz Borrower Term LLC (4285); Grand Prix Montvale LLC (3706); Grand Prix Morristown LLC (3738); Grand Prix Mountain View LLC (3737); Grand Prix Mt. Laurel LLC (3735); Grand Prix Naples LLC (3734); Grand Prix Ontario Lessee LLC (9976); Grand Prix Ontario LLC (3733); Grand Prix Portland LLC (3732); Grand Prix Richmond (Northwest) LLC (3731); Grand Prix Richmond LLC (3729); Grand Prix RIGG Lessee LLC (4960); Grand Prix RIMV Lessee LLC (4287); Grand Prix Rockville LLC (2496); Grand Prix Saddle River LLC (3726); Grand Prix San Jose LLC (3724); Grand Prix San Mateo LLC (3723); Grand Prix Schaumburg LLC (3721); Grand Prix Shelton LLC (3718); Grand Prix Sili I LLC (3714); Grand Prix Sili II LLC (3712); Grand Prix Term Lessee LLC (9180); Grand Prix Troy (Central) LLC (9061); Grand Prix Troy (SE) LLC (9062); Grand Prix Tukwila LLC (9063); Grand Prix West Palm Beach LLC (9065); Grand Prix Westchester LLC (3694); Grand Prix Willow Grove LLC (3697); Grand Prix Windsor LLC (3698); Grand Prix Woburn LLC (3699); Innkeepers Financial Corporation (0715); Innkeepers USA Limited Partnership (3956); Innkeepers USA Trust (3554); KPA HI Ontario LLC (6939); KPA HS Anaheim, LLC (0302); KPA Leaseco Holding Inc. (2887); KPA Leaseco, Inc. (7426); KPA RIGG, LLC (6706); KPA RIMV, LLC (6804); KPA San Antonio, LLC (1251); KPA Tysons Corner RI, LLC (1327); KPA Washington DC, LLC (1164); KPA/GP Ft. Walton LLC (3743); KPA/GP Louisville (HI) LLC (3744); KPA/GP Valencia LLC (9816). The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

sections 361 and 363 of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "**Bankruptcy Code**") and (ii) provide adequate protection to the Adequate Protection Parties with respect to diminution in the value of the Adequate Protection Parties' interests in the Prepetition Collateral (as defined below), whether from the use of the Cash Collateral, the use, sale, lease, or other diminution in value of the Prepetition Collateral other than the Cash Collateral, or the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, pursuant to sections 361, 362, 363, 503(b), and 507 of the Bankruptcy Code; and (b) requesting that a final hearing (the "**Final Hearing**") be scheduled, and that notice procedures in respect of the Final Hearing be established by the Court, to consider entry of a final order (the "**Final Order**") authorizing on a final basis the Debtors' continued use of the Cash Collateral; and upon the Declaration of Dennis Craven, Chief Financial Officer of Innkeepers USA Trust, in Support of First Day Motions and Applications, it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and all objections, if any, to the entry of this Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and sufficient cause appearing therefor,

  **IT IS HEREBY FOUND THAT**:

  A.   <u>Commencement</u>. On the date the Motion was filed (the "**Petition Date**"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors are operating their businesses and

<div align="center">2</div>

managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases.

B. <u>Jurisdiction; Core Proceeding</u>. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. <u>Prepetition Capital Structure</u>. Without prejudice to the rights of non-debtor parties in interest as set forth in paragraph 12 below (and subject thereto):

(1) <u>Fixed Rate Loan</u>. (i) The Debtors listed on Schedule 1 hereto (collectively, the "**Fixed Rate Debtors**") acknowledge and agree that they are party to that certain Loan Agreement, dated as of June 29, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time, and together with such supporting and ancillary documents thereto, the "**Fixed Rate Mortgage Loan Agreement**"), among the Fixed Rate Debtors, as borrowers thereunder, Grand Prix Fixed Lessee LLC, as operating lessee, Grand Prix Holdings, LLC, as guarantor, and Lehman ALI, Inc., as the original lender thereunder (the "**Fixed Rate Lender**"). The Fixed Rate Mortgage Loan Agreement provides for loans to the Fixed Rate Debtors in the aggregate principal amount of $825,402,542 (the "**Fixed Rate Mortgage Loan Obligations**"). The Fixed Rate Mortgage Loan Agreement is evidenced by a certain Replacement Promissory Note A-1 ("**Fixed Rate Note A-1**") and a certain Replacement Promissory Note A-2 ("**Fixed Rate Note A-2**"), each in the principal amount of $412,701,271 and each dated as of August 9, 2007.

<div align="center">3</div>

(ii)     The Fixed Rate Mortgage Loan Agreement, together with Fixed Rate Note A-1 and Fixed Rate Note A-2 and all documents executed and delivered in connection therewith have been sold, assigned and transferred into the commercial mortgage-backed security ("**CMBS**") market.   The Fixed Rate Mortgage Loan Obligations related to the Fixed Rate Note A-1 and all documents executed and delivered in connection therewith are part of a mortgage loan pool knows as LB-UBS Commercial Mortgage Trust 2007-C6, for which LaSalle Bank, National Association ("**LaSalle**") is trustee, and Midland Loan Services, Inc. ("**Midland**") serves as special servicer (the "**Fixed Rate Representative**").   The other half of the Fixed Rate Mortgage Loan Obligations related to the Fixed Rate Note A-2 and all documents executed and delivered in connection therewith are part of a mortgage loan pool known as LB-UBS Commercial Mortgage Trust 2007-C7, for which LaSalle is trustee.  The Fixed Rate Representative is also the special servicer for the Fixed Rate A-2 Note.

(iii)     The Fixed Rate Debtors acknowledge and agree that, pursuant to the Mortgage (or Deed of Trust or Deed to Secure Debt, as applicable) and Security Agreement, dated as of June 29, 2007 executed by each Fixed Rate Debtor in connection with the Fixed Rate Mortgage Loan Agreement (and, together with the Fixed Rate Mortgage Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Fixed Rate Loan Documents**"), the Fixed Rate Debtors granted to the Fixed Rate Lender valid, cross-collateralized and cross-defaulted first priority liens, mortgages, deeds of trust and security interests (collectively, the "**Fixed Rate Mortgages**") on forty-five (45) hotel properties (the "**Fixed Rate Mortgaged Properties**") and in certain of their other assets and property, including, but not limited to, all rents and other cash generated by the Fixed Rate

4

Debtors' hotel and business operations with respect to the Fixed Rate Mortgaged Properties, as more fully set forth in the Fixed Rate Loan Documents (together with the Fixed Rate Mortgaged Properties, the "**Fixed Rate Collateral**") as collateral security for payment and performance when due of the Fixed Rate Mortgage Loan Obligations.

(iv) The Fixed Rate Debtors further acknowledge and agree that the Fixed Rate Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Fixed Rate Cash Collateral**").

(v) The Fixed Rate Debtors further acknowledge and agree that (a) the Fixed Rate Mortgage Loan Obligations are valid, binding, and enforceable obligations of the Fixed Rate Debtors in accordance with the terms set forth in the Fixed Rate Mortgage Loan Documents, and (b) the Fixed Rate Mortgage and other liens and security interests granted to the Fixed Rate Lender with respect to the Fixed Rate Collateral, as security for the Fixed Rate Mortgage Loan Obligations are valid, perfected and enforceable liens, mortgages, deeds of trust, and security interests in accordance with the terms set forth in the Fixed Rate Mortgage Loan Documents.

(2) <u>Floating Rate Loan</u>. (i) The Debtors listed on Schedule 2 hereto (collectively, the "**Floating Rate Debtors**") acknowledge and agree that they are party to that certain Loan Agreement, dated as of June 29, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time, and together with such supporting and ancillary documents thereto, the "**Floating Rate Mortgage Loan Agreement**"), among the Floating Rate Debtors, as borrowers thereunder, Grand Prix Wichita LLC, Grand Prix Tallahassee LLC and Grand Prix Columbus LLC, as borrowers thereunder who were released from their obligations under the Floating Rate Mortgage Loan Agreement in accordance with the

5

terms and conditions of the Floating Rate Mortgage Loan Agreement (the "**Released Borrowers**"), Grand Prix Floating Lessee LLC, as operating lessee, Grand Prix Holdings, LLC, as guarantor and Lehman ALI, Inc., as the lender thereunder (the "**Floating Rate Lender**"). The Floating Rate Mortgage Loan Agreement provides for a loan to the Floating Rate Debtors in the original principal amount of $250,000,000 million (the "**Floating Rate Mortgage Loan Obligations**"). The Floating Rate Mortgage Loan Agreement is evidenced by a certain Promissory Note, dated as of June 29, 2007, by the Floating Rate Debtors and the Released Borrowers for the benefit of the Floating Rate Lender.

(ii)     The Floating Rate Mortgage Loan Agreement was not, as of the Petition Date, sold into the CMBS market.

(iii)     The Floating Rate Debtors acknowledge and agree that, pursuant to the Mortgage (or Deed of Trust or Deed to Secure Debt, as applicable) and Security Agreement, dated as of June 29, 2007, executed by each Floating Rate Debtor in connection with the Floating Rate Mortgage Loan Agreement (and, together with the Floating Rate Loan Agreement, the Floating Rate Mortgages and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Floating Rate Loan Senior Documents**"), the Floating Rate Debtors have granted to the Floating Rate Lender an absolute assignment of rents and leases with respect to the applicable hotel properties, subject to a revocable license to the applicable borrower, as well as cross-collateralized and cross-defaulted first priority liens, mortgages, deeds of trust, deeds to secure debt and security interests (collectively, the "**Floating Rate Mortgages**") on twenty (20) hotel properties (the "**Floating Rate Mortgaged Properties**") and in certain of their other assets and properties, including, but not limited

to, cash generated by the Floating Rate Debtors' hotel and business operations, as more fully set forth in the Floating Rate Loan Documents (together with the Floating Rate Mortgaged Properties, the "**Floating Rate Collateral**") as collateral security for payment and performance when due of the Floating Rate Mortgage Loan Obligations.

(iv)    The Floating Rate Debtors further acknowledge and agree that the Floating Rate Collateral includes rents and proceeds within the meaning of section 552(b) of the Bankruptcy Code and cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Floating Rate Cash Collateral**").

(v)    The Floating Rate Debtors further acknowledge and agree that (a) the Floating Rate Mortgage Loan Obligations are valid, binding, and enforceable obligations of the Floating Rate Debtors in accordance with the terms set forth in the Floating Rate Loan Senior Documents, (b) the Floating Rate Mortgages and other liens and security interests granted to the Floating Rate Lender with respect to the Floating Rate Collateral, as security for the Floating Rate Loan Obligations are valid, perfected, and enforceable liens, mortgages, deeds of trust, deeds to secure debt, and security interests in accordance with the terms set forth in the Floating Rate Loan Senior Documents, and (c) subject to paragraph 20 of this Order, that the Floating Rate Debtors do not have any claims or causes of action against the Floating Rate Lender under any legal or equitable theory, including Avoidance Actions (as defined below).

(vi)    The Floating Rate Debtors further acknowledge and agree that certain non-monetary events of default occurred under the Floating Rate Loan Senior Documents prior to the Petition Date; that the Floating Rate Lender delivered notices of such events of default to the Floating Rate Debtors on May 19, 2010, based on such non-

monetary events of defaults; that as a result thereof, the revocable license to use rents was automatically revoked and the Floating Rate Lender exercised control over rents and the Lockbox Account (as defined in the Floating Rate Loan Agreement); that a monetary event of default occurred when the Floating Rate Debtors failed to pay the total principal amount due under the Floating Rate Loan Agreement on the maturity date; and that the Floating Rate Lenders delivered a notice of such monetary default to the Floating Rate Debtors on July 9, 2010.

(3)     Anaheim Loan.  (i)  The Debtors listed on Schedule 3 hereto (collectively, the "**Anaheim Debtors**") acknowledge and agree that they are party to that certain Deed of Trust, dated as of June 14, 2005 (the "**Anaheim Mortgage Loan Agreement**") among the Anaheim Debtors, as borrower and guarantors, as applicable, thereunder, and GMAC Commercial Mortgage Bank, as original lender thereunder (the "**Anaheim Lender**").   The Anaheim Mortgage Loan Agreement provides for loans for the benefit of the Anaheim Debtors in the aggregate principal amount of $13.7 million (the "**Anaheim Mortgage Loan Obligations**").  Pursuant to Loan Assumption, Affirmation and Modification Agreements, dated as of October 4, 2006 and June 29, 2007, certain of the Anaheim Debtors became liable for certain of Anaheim Mortgage Loan Obligations.

(ii)     The Anaheim Mortgage Loan Agreement was sold into the CMBS market and is part of a mortgage loan pool known as Credit Suisse First Boston Mortgage Security Corp., Commercial Mortgage Pass-Through Certificates, Series 2005-C5, for which Wells Fargo Bank, N.A. ("**Wells Fargo**") is trustee, Capmark Finance Inc., as successor to GMAC Commercial Mortgage Corporation, serves as master servicer, and CW Capital Asset Management, LLC serves as special servicer.

(iii)    The Anaheim Debtors acknowledge and agree that, pursuant to the Deed of Trust, Leasehold Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing, dated as of June 14, 2005, executed by the Anaheim Debtors in connection with the Anaheim Mortgage Loan Agreement (and, together with the Anaheim Mortgage Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Anaheim Loan Documents**"), the Anaheim Debtors have granted to the Anaheim Lender a security interest in certain of their assets and property to the extent and as more fully set forth in the Anaheim Loan Documents (collectively, the "**Anaheim Collateral**") as collateral security for payment and performance when due of the Anaheim Mortgage Loan Obligations.

(iv)    The Anaheim Debtors further acknowledge and agree that the Anaheim Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Anaheim Cash Collateral**").

(v)    The Anaheim Debtors further acknowledge and agree that (a) the Anaheim Mortgage Loan Obligations are valid, binding, and enforceable obligations of the Anaheim Debtors in accordance with the terms set forth in the Anaheim Loan Documents, and (b) the liens and security interest granted to the Anaheim Lenders, or any of them, as security for the Anaheim Mortgage Loan Obligations are valid, perfected, and enforceable liens and security interests in accordance with the terms set forth in the Anaheim Loan Documents.

(4)    <u>Capmark $47.4 Million Loan (Mission Valley)</u>.  (i)  The Debtors listed on Schedule 4 hereto (collectively, the "**Capmark Mission Valley Debtors**") acknowledge and

agree that they are party to that certain Deed of Trust Note, dated as of October 4, 2006 (the "**Capmark Mission Valley Loan Agreement**"), among the Capmark Mission Valley Debtors, as borrower and guarantors, as applicable, thereunder, and Capmark Bank, as the original lender thereunder (the "**Capmark Mission Valley Lender**"). The Capmark Mission Valley Loan Agreement provides for loans to the Capmark Mission Valley Debtors in the aggregate principal amount of $47.4 million (the "**Capmark Mission Valley Loan Obligations**"). Pursuant to that certain Loan Assumption, Affirmation and Modification Agreement, dated as of June 29, 2007, certain of the Capmark Valley Debtors became liable for certain of the Capmark Mission Valley Loan Obligations.

       (ii)     The Capmark Mission Valley Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and LNR Partners, Inc. ("**LNR Partners**") serves as special servicer.

       (iii)     The Capmark Mission Valley Debtors acknowledge and agree that, pursuant to the Deed of Trust, Leasehold Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing, dated as of October 4, 2006, executed by the Capmark Mission Valley Debtors in connection with the Capmark Mission Valley Loan Agreement (and with the Capmark Mission Valley Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Capmark Mission Valley Loan Documents**"), the Capmark Mission Valley Debtors have granted to the Capmark Mission Valley Lender a security interest in certain of their assets and property to the extent and as more fully set forth in the Capmark

Mission Valley Loan Documents (collectively, the "**Capmark Mission Valley Collateral**") as collateral security for payment and performance when due of the Capmark Mission Valley Loan Obligations.

(iv)     The Capmark Mission Valley Debtors further acknowledge and agree that the Capmark Mission Valley Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Capmark Mission Valley Cash Collateral**").

(v)     The Capmark Mission Valley Debtors further acknowledge and agree that (a) the Capmark Mission Valley Loan Obligations are valid, binding, and enforceable obligations of the Capmark Mission Valley Debtors in accordance with the terms set forth in the Capmark Mission Valley Loan Documents, and (b) the liens and security interest granted to the Capmark Mission Valley Lenders, or any of them, as security for the Capmark Mission Valley Loan Obligations are valid, perfected, and enforceable liens and security interests in accordance with the terms set forth in the Capmark Mission Valley Loan Documents.

(5)     Capmark $37.6 Million Loan (Garden Grove). (i) The Debtors listed on Schedule 5 hereto (collectively, the "**Capmark Garden Grove Debtors**") acknowledge and agree that they are party to that certain Deed of Trust Note, dated as of October 4, 2006 (the "**Capmark Garden Grove Loan Agreement**"), among the Capmark Garden Grove Debtors, as borrower and guarantors, as applicable, thereunder, and Capmark Bank, as the original lender thereunder (the "**Capmark Garden Grove Lender**").   The Capmark Garden Grove Loan Agreement provides for loans to the Capmark Garden Grove Debtors in the aggregate principal amount of $37.6 million (the "**Capmark Garden Grove Loan Obligations**").  Pursuant to that

certain Loan Assumption, Affirmation and Modification Agreement, dated as of June 29, 2007, certain of the Capmark Garden Grove Debtors became liable for certain of the Capmark Garden Grove Loan Obligations.

(ii)     The Capmark Garden Grove Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and Midland serves as special servicer.

(iii)     The Capmark Garden Grove Debtors acknowledge and agree that, pursuant to the Deed of Trust, Leasehold Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing, dated as of October 4, 2006, executed by the Capmark Garden Grove Debtors in connection with the Capmark Garden Grove Loan Agreement (and with the Capmark Garden Grove Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Capmark Garden Grove Loan Documents**"), the Capmark Garden Grove Debtors have granted to the Capmark Garden Grove Lender a security interest in certain of their assets and property to the extent and as more fully set forth in the Capmark Garden Grove Loan Documents (collectively, the "**Capmark Garden Grove Collateral**") as collateral security for payment and performance when due of the Capmark Garden Grove Loan Obligations.

(iv)     The Capmark Garden Grove Debtors further acknowledge and agree that the Capmark Garden Grove Collateral includes cash collateral within the

12

meaning of section 363(a) of the Bankruptcy Code (the "**Capmark Garden Grove Cash Collateral**").

(v)     The Capmark Garden Grove Debtors further acknowledge and agree that (a) the Capmark Garden Grove Loan Obligations are valid, binding, and enforceable obligations of the Capmark Garden Grove Debtors in accordance with the terms set forth in the Capmark Garden Grove Loan Documents, and (b) the liens and security interest granted to the Capmark Garden Grove Lenders, or any of them, as security for the Capmark Garden Grove Loan Obligations are valid, perfected, and enforceable liens and security interests in accordance with the terms set forth in the Capmark Garden Grove Loan Documents.

(6)     <u>Capmark $35.0 Million Loan (Ontario)</u>. (i) The Debtors listed on Schedule 6 hereto (collectively, the "**Capmark Ontario Debtors**" and, together with the Capmark Mission Valley Debtors and the Capmark Garden Grove Debtors, the "**Capmark Debtors**") acknowledge and agree that they are party to that certain Deed of Trust Note, dated as of October 4, 2006 (the "**Capmark Ontario Loan Agreement**"), among the Capmark Ontario Debtors, as borrower and guarantors, as applicable, thereunder, and Capmark Bank, as the original lender thereunder (the "**Capmark Ontario Lender**" and, together with the Capmark Mission Valley Lender and the Capmark Garden Grove Lender, the "**Capmark Lenders**").   The Capmark Ontario Loan Agreement provides for loans to the Capmark Ontario Debtors in the aggregate principal amount of $35.0 million (the "**Capmark Ontario Loan Obligations**").   Pursuant to that certain Loan Assumption, Affirmation and Modification Agreement, dated as of June 29, 2007, certain of the Capmark Ontario Debtors became liable for certain of the Capmark Ontario Loan Obligations.

13

(ii)     The Capmark Ontario Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and Midland serves as special servicer.

(iii)    The Capmark Ontario Debtors acknowledge and agree that, pursuant to the Deed of Trust, Leasehold Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing, dated as of October 4, 2006, executed by the Capmark Ontario Debtors in connection with the Capmark Ontario Loan Agreement (and with the Capmark Ontario Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Capmark Ontario Loan Documents**" and, together with the Capmark Mission Valley Loan Documents and the Capmark Garden Grove Loan Documents, the "**Capmark Loan Documents**"), the Capmark Ontario Debtors have granted to the Capmark Ontario Lender a security interest in certain of their assets and property to the extent and as more fully set forth in the Capmark Ontario Loan Documents (collectively, the "**Capmark Ontario Collateral**" and, together with the Capmark Mission Valley Collateral and the Capmark Garden Grove Collateral, the "**Capmark Collateral**") as collateral security for payment and performance when due of the Capmark Ontario Loan Obligations thereunder.

(iv)     The Capmark Ontario Debtors further acknowledge and agree that the Capmark Ontario Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (together with the Capmark Mission Valley Cash

Collateral and the Capmark Garden Grove Cash Collateral, the "**Capmark Cash Collateral**").

(v)     The Capmark Ontario Debtors further acknowledge and agree that (a) the Capmark Ontario Loan Obligations are valid, binding, and enforceable obligations of the Capmark Ontario Debtors in accordance with the terms set forth in the Capmark Ontario Loan Documents, and (b) the liens and security interest granted to the Capmark Ontario Lenders, or any of them, as security for the Capmark Ontario Loan Obligations are valid, perfected, and enforceable liens and security interests in accordance with the terms set forth in the Capmark Ontario Loan Documents.

(7)     Merrill $25.6 Million Loan (Washington D.C.).  (i)  The Debtors listed on Schedule 7 hereto (collectively, the "**Merrill Washington D.C. Debtors**") acknowledge and agree that they are party to that certain Loan Agreement, dated as of September 21, 2006 (the "**Merrill Washington D.C. Loan Agreement**"), among the Merrill Washington D.C. Debtors, as borrower and guarantors, as applicable, thereunder, and Merrill Lynch Mortgage Lending, Inc., as the original lender thereunder (the "**Merrill Washington D.C. Lender**").  The Merrill Washington D.C. Loan Agreement provides for loans to the Merrill Washington D.C. Debtors in the aggregate principal amount of $25.6 million (the "**Merrill Washington D.C. Loan Obligations**").

(ii)     The  Merrill Washington D.C. Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as ML-CFC Commercial Mortgage Trust 2006-4, for which U.S. Bank, N.A. ("**U.S. Bank**") is trustee, Wells Fargo serves as master servicer, and LNR serves as special servicer.

(iii)     The Merrill Washington D.C. Debtors acknowledge and agree that, pursuant to the Fee and Leasehold Deed of Trust and Security Agreement, dated as of September 21, 2006 and executed by the Merrill Washington D.C. Debtors in connection with the Merrill Washington D.C. Loan Agreement (the "**Merrill Washington D.C. Mortgage**" and, together with the Merrill Washington D.C. Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Merrill Washington D.C. Loan Documents**"), the Merrill Washington D.C. Debtors have granted to the Merrill Washington D.C. Lender a security interest in certain of their assets and property to the extent and as more fully set forth in the Merrill Washington D.C. Loan Documents (collectively, the "**Merrill Washington D.C. Collateral**") as collateral security for payment and performance when due of the Merrill Washington D.C. Loan Obligations.

(iv)     The Merrill Washington D.C. Debtors further acknowledge and agree that the $25.6 Million Merrill Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Merrill Washington D.C. Cash Collateral**").

(v)     The Merrill Washington D.C. Debtors further acknowledge and agree that (a) the Merrill Washington D.C. Loan Obligations are valid, binding, and enforceable obligations of the Merrill Washington D.C. Debtors in accordance with the terms set forth in the Merrill Washington D.C. Loan Documents, and (b) the liens and security interest granted to the Merrill Washington D.C. Lenders, or any of them, as security for the Merrill Washington D.C. Loan Obligations are valid, perfected, and

enforceable liens and security interests in accordance with the terms set forth in the Merrill Washington D.C. Loan Documents.

(8)     Merrill $25.2 Million Loan (Tysons Corner).  (i)  The Debtors listed on Schedule 8 hereto (collectively, the "**Merrill Tysons Corner Debtors**") acknowledge and agree that they are party to that certain Loan Agreement, dated as of September 19, 2006 (the "**Merrill Tysons Corner Loan Agreement**"), among the Merrill Tysons Corner Debtors, as borrower and guarantors, as applicable, thereunder, and Merrill Lynch Mortgage Lending, Inc., as the original lender thereunder (the "**Merrill Tysons Corner Lender**").  The Merrill Tysons Corner Loan Agreement provides for loans to the Merrill Tysons Corner Debtors in the aggregate principal amount of $25.2 million (the "**Merrill Tysons Corner Loan Obligations**").

(ii)     The Merrill Tysons Corner Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank is trustee, Wells Fargo serves as master servicer, and LNR Partners serves as special servicer.

(iii)     The Merrill Tysons Corner Debtors acknowledge and agree that, pursuant to the Deed of Trust and Security Agreement, dated as of September 19, 2006 and executed by the Merrill Tysons Corner Debtors in connection with the Merrill Tysons Corner Loan Agreement (the "**Merrill Tysons Corner Mortgage**" and together with the Merrill Tysons Corner Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Merrill Tysons Corner Loan Documents**"), the Merrill Tysons Corner Debtors have granted to the Merrill Tysons Corner Lender a security interest in certain of their assets and property to the extent and as more fully set forth in the Merrill Tysons Corner Loan Documents

17

(collectively, the "**Merrill Tysons Corner Collateral**") as collateral security for payment and performance when due of the Merrill Tysons Corner Loan Obligations.

(iv)     The Merrill Tysons Corner Debtors further acknowledge and agree that the $25.2 Million Merrill Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Merrill Tysons Corner Cash Collateral**").

(v)     The Merrill Tysons Corner Debtors further acknowledge and agree for such Consenting Lenders' benefit (but subject to paragraph 12 below), that (a) the Merrill Tysons Corner Loan Obligations are valid, binding, and enforceable obligations of the Merrill Tysons Corner Debtors in accordance with the terms set forth in the Merrill Tysons Corner Loan Documents, and (b) the liens and security interest granted to the Merrill Tysons Corner Lenders, or any of them, as security for the Merrill Tysons Corner Loan Obligations are valid, perfected, and enforceable liens and security interests in accordance with the terms set forth in the Merrill Tysons Corner Loan Documents.

(9)     <u>Merrill $24.2 Million Loan (San Antonio)</u>.  (i)   The Debtors listed on Schedule 9 hereto (collectively, the "**Merrill San Antonio Debtors**" and, together with the Merrill Washington D.C. Debtors and the Merrill Tysons Corner Debtors, the "**Merrill Debtors**") acknowledge and agree that they are party to that certain Loan Agreement dated as of September 19, 2006, (the "**Merrill San Antonio Loan Agreement**") among the Merrill San Antonio Debtors, as borrower and guarantors, as applicable, thereunder, and Merrill Lynch Mortgage Lending, Inc., as the original lender thereunder (the "**Merrill San Antonio Lender**" and, together with the Merrill Washington D.C. Lender and the Merrill Tysons Corner Lender, the "**Merrill Lenders**").  The Merrill San Antonio Loan Agreement provides for loans to the

Merrill Borrowers in the aggregate principal amount of $24.2 million (the "**Merrill San Antonio Loan Obligations**").

        (ii)    The Merrill San Antonio Loan Agreement was securitized and sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank is trustee, Wells Fargo serves as master servicer, and LNR Partners serves as special servicer.

        (iii)    The Merrill San Antonio Debtors acknowledge and agree that, pursuant to the Deed of Trust and Security Agreement, dated as of September 19, 2006 and executed by the Merrill San Antonio Debtors in connection with the Merrill San Antonio Loan Agreement (the "**Merrill San Antonio Mortgage**" and together with the Merrill San Antonio Loan Agreement and all other loan documents executed in connection therewith prior to the Petition Date, collectively, the "**Merrill San Antonio Loan Documents**" and, together with Merrill Washington D.C. Loan Documents and the Merrill Tysons Corner Loan Documents, the "**Merrill Loan Documents**" and, together with the Fixed Rate Loan Documents, the Floating Rate Loan Documents, the Anaheim Loan Documents and the Capmark Loan Documents, the "**Loan Documents**"), the Merrill San Antonio Debtors have granted to the Merrill San Antonio Lender a security interest in certain of their assets and property to the extent and as more fully set forth in the Merrill San Antonio Loan Documents (collectively, the "**Merrill San Antonio Collateral**" and, together with the Merrill Tysons Corner Collateral and Merrill Washington D.C. Collateral, the "**Merrill Collateral**" and, together with the Fixed Rate Collateral, the Floating Rate Collateral, the Anaheim Collateral and the Capmark

19

Collateral, the "**Prepetition Collateral**") as collateral security for payment and performance when due of the Merrill San Antonio Loan Obligations.

(iv)     The Merrill San Antonio Debtors further acknowledge and agree that the Merrill San Antonio Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (together with the Merrill Washington D.C. Cash Collateral and the Merrill Tysons Corner Cash Collateral, the "**Merrill Cash Collateral**" and, together with the Fixed Rate Cash Collateral, the Floating Rate Cash Collateral, the Anaheim Cash Collateral and the Capmark Cash Collateral, the "**Cash Collateral**").

(v)      The Merrill San Antonio Debtors further acknowledge and agree that (a) the Merrill San Antonio Loan Obligations are valid, binding, and enforceable obligations of the Merrill San Antonio Debtors in accordance with the terms set forth in the Merrill San Antonio Loan Documents, and (b) the liens and security interest granted to the Merrill San Antonio Lenders, or any of them, as security for the Merrill San Antonio Loan Obligations are valid, perfected, and enforceable liens and security interests in accordance with the terms set forth in the Merrill San Antonio Loan Documents.

The term: (a) "**Tranche of Debt**" shall mean, as the context requires, the Fixed Rate Obligations, the Floating Rate Loan Obligations, the Anaheim Loan Obligations, the applicable Capmark Loan Obligations, and the applicable Merrill Loan Obligations (each, a "**Loan Obligation**" and, together, the "**Loan Obligations**"); (b) "**applicable Debtors**" shall mean, collectively, the Debtors with obligations arising under a Tranche of Debt; (c) "**Adequate Protection Party**" or "**applicable Adequate Protection Party**" shall mean the Representative and each secured party who is party to the Loan Documents within a Tranche of Debt and who

has been granted a lien in cash constituting Cash Collateral; (d) "**applicable Loan Documents**" shall mean the Loan Documents relating to the applicable Tranche of Debt; (e) "**applicable Capmark Loan Obligations**" shall refer to the obligations relating to the specific loans and obligations identified in paragraphs 4, 5, and 6 hereof, respectively, and not to all three such loans and obligations collectively; and (e) "**applicable Merrill Loan Obligations**" shall refer to the obligations relating to the specific loans and obligations identified in paragraphs 7, 8, and 9 hereof, respectively, and not to all three such loans and obligations collectively.

D.     <u>Cause Shown</u>.   Good cause has been shown for the entry of this Order.   The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without use of Cash Collateral.   Among other things, entry of this Order will minimize disruption of the Debtors' businesses and operations and permit them to make payroll and other operating expenses, including, without limitation, to honor their obligations under their agreements with the management companies for their hotels, maintain business relationships with their vendors, and retain customer and vendor confidence by demonstrating an ability to maintain normal operations.   The use of the Cash Collateral will, therefore, help preserve and maintain the going concern value of the Debtors and their estates, and will enhance the prospects for a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.

E.     <u>Notice</u>.   Notice of the Preliminary Hearing and the relief requested in the Motion has been given to: (i) the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (ii) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) counsel to each of the Fixed Rate Lender, Floating Rate Lender, Anaheim Lenders, Capmark Lenders and Merrill Lenders, to the extent known, and, as applicable, each of the lenders' Representatives;

21

(iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) the Debtors' Franchisors; (vii) the Office of the Attorney General in all of the states in which the Debtors operate; (viii) any applicable state public utilities commissions required to receive notice under the Bankruptcy Rules or Local Rules; and (viii) each of the Debtors' credit card processing companies.  In view of the urgency of the relief requested, such notice of the Preliminary Hearing complies with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), and Local Bankruptcy Rule 4001-2.

F.      <u>Fair and Reasonable</u>.  Based on the record presented to the Court at the Preliminary Hearing and the consent of the Representative for each Tranche of Debt, the terms of the Debtors' use of the Cash Collateral appear to be fair and reasonable, and to reflect the Debtors' and their respective managers' and directors' exercise of prudent business judgment consistent with their fiduciary duties.

G.      <u>Rule 4001</u>.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2).  The permission granted herein to use the Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Order is in the best interest of the Debtors' estates and creditors.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.      <u>Motion Disposition</u>.  The Motion is GRANTED in its entirety on an interim basis. All objections to the relief sought herein or the entry of this Order that have not been withdrawn or resolved are overruled on their merits.

2.      Effect.  Notwithstanding any provision of the Bankruptcy Code or the Bankruptcy Rules to the contrary, this Order shall take effect immediately upon entry *nunc pro tunc* to the Petition Date and shall remain in effect as to all of the Debtors until the occurrence and continuation of a Termination Event (as defined below) at which point the effectiveness of this Order shall terminate only as to the Cash Collateral of the relevant Debtors as to whom such Termination Event applies (such period being referred the "**Cash Collateral Period**").  The Debtors expressly reserve their rights to seek continued use of Cash Collateral after the expiration of the Cash Collateral Period on the terms set forth herein or on modified terms.  The termination of the Cash Collateral Period for any Debtor or group of Debtors shall not serve, in and of itself, as a termination of the Cash Collateral Period for any other Debtor.

3.      Modifications.  If any or all of the provisions of this Order are hereafter modified, vacated, reversed, or stayed by an order of the Court or another court, such stay, modification, reversal, or vacation shall not affect the validity, perfection, priority, allowability, or enforceability of any lien, security interest, claims, priority, payments, or protection authorized for the benefit of any of the Adequate Protection Parties hereunder that is granted or attaches prior to the effective date of such stay, modification, reversal, or vacation, and any use of the Cash Collateral by the Debtors pursuant to this Order prior to the effective date of such modification, stay, reversal, or vacation shall be governed in all respects by the original provisions of this Order.

4.      No Prejudice.  This Order is without prejudice (i) to the rights of each of the Fixed Rate Representative, the Floating Rate Lender, the Anaheim Lender, the Capmark Million Valley Lender, the Capmark Garden Grove Lender, the Capmark Ontario Lender, the Merrill Washington D.C. Lender, the Merrill Tysons Corner Lender, and the Merrill San Antonio Lender (each, a "**Representative**") at any time to seek a modification of this Order, or a different cash

collateral order, including a request for additional or other adequate protection or the termination of the applicable Debtor's right to use Cash Collateral, after notice and hearing, including a hearing noticed on an emergency basis; and (ii) to the rights of the Debtors at any time to seek modification and/or extension of the Order, including an increased use of Cash Collateral and a modification of adequate protection, or a different order, after notice and hearing, including a hearing noticed on an emergency basis.

5. <u>Use of Cash Collateral</u>. Each Debtor is hereby authorized to use Cash Collateral during such applicable Debtor's Cash Collateral Period, in accordance with, and subject to the conditions and limitations set forth in, this Order and in the Cash Management Motion and related order. In addition, the Floating Rate Debtors are hereby authorized and directed to, and shall, use Cash Collateral of the Floating Rate Lender to pay any commitment and closing fees under the Floating Rate PIP DIP (as defined below) on the closing date thereof and to the extent approved by an order of the Court, to the extent such approval is required.

6. <u>Adequate Protection for Use of Cash Collateral</u>. As adequate protection for, and to the extent of, any diminution in the value of any Adequate Protection Party's interest in the Prepetition Collateral securing obligations owing to it during the Cash Collateral Period resulting from (x) the use of its Cash Collateral pursuant to section 363(c) of the Bankruptcy Code, (y) the use, sale, lease, or other diminution in value of its Prepetition Collateral (other than the Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code, or (z) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (collectively, the "**Adequate Protection Obligations**"), and effective as of the Petition Date, without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or otherwise:

a. <u>Representatives' Expense Reimbursement</u>.

24

(i)       The Debtors shall pay or reimburse, subject to the provisions set forth in paragraph 6(f) hereof, following submission of reasonably detailed invoices or statements (redacted as may be necessary to preserve privilege), the reasonable, documented out-of-pocket fees and expenses of attorneys and other professional advisors retained by the Representatives in connection with matters relating to this Order and to the obligations hereunder, and the plan support agreement among the Floating Rate Lender and the Floating Rate Debtors.  The foregoing obligations shall be referred to herein as the "**Representatives' Expense Reimbursement**".

(ii)      Each professional referred to in paragraph 6(a)(i) hereof, shall submit copies of its professional fee invoices or statements, to respective counsel to the applicable Debtor, the U.S. Trustee, and any official committee appointed in the Chapter 11 Cases (each, a "**Committee**"). Such invoices may be redacted only to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential or proprietary information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.  The Debtors, the U.S. Trustee, and any Committee may object to the reasonableness of the fees and expenses included in any such professional fee invoices.  If an objection to a professional's invoice is filed and served on such professional within 10 days from the date of receipt by such objecting party of the relevant invoice, the Debtors only shall be required to pay the undisputed amount of the applicable invoice, if any, and any such objection shall be resolved by the agreement of the objecting party, the Debtors, and the affected professional or by the Court, with the payment, if any, of the disputed amount only occurring after such resolution.  For the avoidance of doubt, professionals retained by the Representatives shall not be required to file any interim or final fee applications or summaries of fees with respect thereto in connection with the Representatives' Expense Reimbursement provided for herein.

b.        Adequate Protection Liens.

(i)       To the extent of any Adequate Protection Obligations arising under any Tranche of Debt, the applicable Adequate Protection Party shall receive, and hereby is granted, a perfected replacement lien and security interest in and valid, binding, enforceable and perfected liens (the "**Adequate Protection Liens**") on all of the applicable Debtor's rights in, to, and under all present and after-acquired property and assets of the like-kind or type that would constitute Prepetition Collateral of such Adequate Protection Party in accordance with the applicable Loan Documents  of any nature whatsoever whether real or personal, tangible or intangible, wherever located, including, without limitation, all cash and Cash Collateral and any investment of such cash and Cash Collateral, goods, cash-in-advance deposits, contracts, causes of action, general intangibles, accounts receivable, and other rights to payment, whether arising before or

25

after the Petition Date, chattel paper, documents, instruments, interests in leaseholds, real properties, plants, machinery, equipment, patents, copyrights, trademarks, trade names or other intellectual property, licenses, insurance proceeds, and tort claims, and any and all of the proceeds, products, offspring, rents and profits thereof, rights under letters of credit, capital stock and other equity or ownership interests held by the Debtors, including equity interests in subsidiaries and all other investment property, and the proceeds of all of the foregoing (all such property, other than the Prepetition Collateral in existence immediately prior to the Petition Date, being collectively referred to as, the "**Postpetition Collateral**"), which liens and security interests shall be subject only to (A) the Carve Out, (B) liens granted in respect of Permitted DIPs (as defined below), and (C) all valid, enforceable and non-avoidable liens and security interests in the applicable Prepetition Collateral that were perfected prior to the Petition Date (or perfected thereafter to the extent permitted by section 546(c) of the Bankruptcy Code), which are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior to the applicable Adequate Protection Party's liens in such Prepetition Collateral as of the Petition Date (the "**Prior Liens**"). The Postpetition Collateral in favor of any Adequate Protection Party shall not include any claims and causes of action under section 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code (collectively, the "**Avoidance Actions**"), but shall include the proceeds of Avoidance Actions recovered by the applicable Debtor to the extent the Court includes such provision in the Final Order, subject to the limitations set forth herein or in the Final Order. To the extent applicable, all Adequate Protection Liens shall be subject to terms and conditions of any intercreditor agreements. For the avoidance of doubt, such Adequate Protection Liens granted hereunder shall be deemed to be effective and perfected as of the Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

(ii)     The Adequate Protection Liens shall be enforceable against the applicable Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").

(iii)     The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment, or avoidance, for all purposes in the Chapter 11 Cases and any Successor Cases or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.

K&E 16933766.22

c.      <u>Adequate Protection 507(b) Claims</u>.  As further adequate protection for any Adequate Protection Obligations, the applicable Adequate Protection Party shall have an administrative expense claim against the Debtors with obligations arising under the applicable Tranche of Debt under section 507(b) of the Bankruptcy Code with priority over all other administrative expense claims and unsecured claims against such Debtors, now existing or hereafter arising, of any kind whatsoever (collectively, the "**507(b) Claims**"), subject in each case to the Carve Out, and to any superpriority claim in favor of Permitted DIPs.

d.      <u>Reporting</u>.

(i)      The Debtors have delivered to the Representatives a 13-week forecast of cash receipts and disbursements (a "**13-Week Forecast**"), a copy of which is attached hereto as Schedule 10.  The Debtors shall deliver to the Representatives: (A) except as provided in clause (C), below, on the first day of each calendar month (unless such day is not a business day in which case the required delivery date shall be the next succeeding business day) a revised 13-Week Forecast for the 13-week period from the last Saturday of the prior calendar month (each such revised forecast, for the period of its applicability, to be referred to herein as the "**Forecast**"); (B) except as provided in clause (C) below, on the last day of each calendar month (unless such day is not a business day in which case the required delivery date shall be the next succeeding business day), a report showing in reasonable detail a comparison of actual receipts and disbursements for the period from the date of the last such report through and including the last Saturday of the prior calendar month against the receipts and disbursements projected in the Forecast for such period (the "**Variance Report**"); and (C) with respect to the first Forecast and Variance Report following the Petition Date, (1) the Forecast shall be due on the first day of the calendar month (unless such day is not a business day in which case the required delivery date shall be the next succeeding business day), that is at least 30 days from the Petition Date, and (2) the Variance Report shall be delivered on the last day of the calendar month (unless such day is not a business day in which case the required delivery date shall be the next succeeding business day), that is at least 60 days from the Petition Date, and shall set forth the required comparison from the Petition Date through the last Saturday of the calendar month that is at least 30 days prior to the date when such report is required to be delivered.

(ii)      The Debtors also shall provide to each Representative month-end profit and loss statements for each individual hotel property (not consolidated by Tranche of Debt) within 30 days of the end of the month (or, if the 30th day is not a business day, the next succeeding business day), which shall include year-to-year results, comparisons with same period in the immediately preceding year, and key operating metrics consisting of occupancy, so-called ADR and so-called REVPAR.  The

27

Debtors also shall provide on a monthly basis, at the same time as they provide the month-end statements referred to in the first sentence of this paragraph (ii), the so-called STR report for each property.

e.     <u>Cumulative Forecast Variance</u>. Until the entry of the Final Order, the Debtors agree that (x) during each 4-week cumulative period as tested from the last Sunday of such period, the Debtors shall not use Cash Collateral to the extent such use would exceed, for such period, 110% of cash disbursements (excluding those disbursements on account of Professional Fees and any Representatives' Expense Reimbursement) contemplated to be made by such Debtors during such 4-week period in the applicable Forecast, and (y) during each 13-week cumulative period as tested from the last Sunday of such period, the Debtors shall not use Cash Collateral to the extent such use would exceed, for such cumulative period, 106.5% of cash disbursements (excluding those disbursements on account of Professional Fees and any Representatives' Expense Reimbursement) contemplated to be made by such Debtors during such 13-week cumulative period in the applicable Forecast. To the extent that there is a variance, positive or negative (expressed as a percentage), of receipts in any one month period as compared to the receipts for the same period forecasted in the applicable Forecast with respect to any Hotel Operating Expense (as defined below), then the variance from budget permitted pursuant to the preceding sentence on account of such Hotel Operating Expense shall be adjusted by such percentage. "**Hotel Operating Expense**" means any of the following line items listed on the applicable Forecast: (i) payroll and related; (ii) franchise taxes; (iii) utility costs; (iv) third party management and related fees; (v) all other expenses; and (vi) occupancy/sales tax.

f.     <u>Cash Use Covenant; True-Ups</u>. (i) In the ordinary course of operations and consistent with practices in place prior to the Petition Date, the Debtors shall consolidate all cash in a master account owned by one or more Debtors.[3] Such consolidated cash shall be applied as follows:

1)     <u>first</u>, given the timing of cash receipts versus certain disbursements, to establish or increase, as the case may be, an expense reserve in amounts and at times reasonably determined by the Debtors for the purpose of ensuring sufficient cash on-hand to pay accrued expenses of the type contemplated by an applicable Forecast but which expenses are expected to become payable during a period other than the period when cash in excess of then-payable expenses has been generated, in an amount at any time outstanding not to exceed $2,000,000;

---

[3]     For the avoidance of doubt, nothing contained in this Order shall constitute a substantive consolidation of the Debtors' estates.

2)  second, to the extent of any excess, to pay property level costs and expenses of the hotels and the Operating Lessees;

3)  third, to the extent of any excess, to pay corporate overhead charges and expenses of Innkeepers USA Trust and the other Debtors;

4)  fourth, to the extent of any excess, to pay any Professional Fees (to the extent permitted by the Court to be paid at such time), as well as the Representatives' Expense Reimbursement;

5)  fifth, to the extent of any excess, to pay amounts then owing on account of any Permitted DIPs to the extent then payable, but only to the extent such fees and expenses are not payable from the proceeds of such Permitted DIPs; and

6)  sixth, to the extent of any excess, to repay any intercompany loans incurred pursuant to or as a result of the provisions set forth in Paragraph 6(f)(v).

(ii)  The Debtors shall provide to each Representative a so-called "flash report" commencing in August, 2010, (x) on the 15th of each calendar month (or, if such day is not a business day, then on the next succeeding business day), detailing cash disbursements for the Debtors for the period from the 16th through and including the last day of the immediately prior month (except for the report due on August 15, 2010, only for the period from the Petition Date through and including July 31, 2010), and (y) on the 30th of each calendar month (or, if such day is not a business day, then on the next succeeding business day), detailing cash disbursements for the Debtors for the period from the first day through and including the 15th day of such month, and, in each case, including information, to the extent then determined by the Debtors, their anticipated allocation of all or any portion of the cash disbursements made during such period, on a Tranche of Debt by Tranche of Debt basis, and the approximated amount of cash disbursements not yet allocated (it being understood that the Debtors' proposed allocation shall not constitute the Debtors' final allocation (which shall only be included in an Application Report (as defined below), but only their good faith application based upon information then available to the Debtors). At any time following the Debtors' delivery of any flash report, any Representative may, following a reasonable request, seek from the Debtors reasonable information in order to determine, based upon a sampling of such information, the basis for certain of the Debtors' proposed allocations (it being understood that such requests, if any, relative to the information contained in flash reports only, shall not be reasonable to the extent they seek from the Debtors all or substantially all of the Debtors' invoices and similar information used in determining the proposed allocation)

(iii)        Within 45 days (or, if the 45th day is not a business day, the next succeeding business day) after the end of each calendar month, the Debtors shall provide to each Representative a report for such month, on a Tranche of Debt by Tranche of Debt basis, as to the application of the cash in accordance with the waterfall set forth in paragraph 6(f)(i) hereof (the "**Application Report**"), with such Application Report to be based upon (x) the Cash Collateral generated by the applicable Debtors within a Tranche of Debt, <u>plus</u> or <u>minus</u>, as the case may be, the amount deemed loaned or borrowed, as applicable, by the applicable Debtors (to the extent set forth in paragraph 6(f)(iv) hereof), (y) in the case of all of the waterfall items other than "third" and, with respect to Professional Fees, "fourth", in accordance with the amounts actually applicable to the applicable Debtors, and (z) in the case of waterfall items "third" and, with respect to Professional Fees, "fourth", in accordance with the Allocation Percentages (as defined below).  Amounts actually applied in accordance with the waterfall set forth in paragraph 6(f)(i) hereof shall be deemed to have been applied for the benefit of the Debtors within a Tranche of Debt in accordance with the Application Report.  Each Representative shall have the right to audit and challenge any Application Report upon the serving of notice of such challenge (a "**Challenge Notice**") (within 10 days following receipt of such report) on the Debtors, counsel for the Debtors, and counsel for any Committee and the other Representatives. Any such Challenge Notice shall be reasonably detailed as to the nature and basis for the challenge.  Promptly following receipt of a Challenge Notice, the parties shall endeavor in good faith to resolve any disputes and, failing a resolution, shall have the right to apply to the Court for resolution after no less than 15 days after the service of a Challenge Notice.  Upon a resolution, a revised Application Report (if any) shall be distributed to the Representatives (and, for the avoidance of doubt, such revised report shall not be subject to a challenge period).

(iv)        If the Application Report demonstrates that the Cash Collateral generated by the Debtors within a Tranche of Debt exceeded the amount of cash deemed to have been applied in accordance with the waterfall set forth in paragraph 6(f)(i) hereof, then such excess amount shall be paid to the applicable Representatives for the benefit of the applicable Adequate Protection Parties on account of the financial obligations within the applicable Tranche of Debt consisting of interest and principal owing to the applicable Adequate Protection Parties under the applicable Loan Documents.

(v)        If the Application Report demonstrates that the Cash Collateral generated by the Debtors (in such case, the "**Borrower Debtors**") within a Tranche of Debt was less than the amount of cash deemed to have been applied in accordance with the waterfall set forth in paragraph 6(f)(i) hereof, then such shortfall amount shall be deemed to be a loan from one or more Debtors (the "**Lender Debtors**"), in the amount as may be set forth in the Application Report, to the Borrower Debtors, and such loan

shall be, and is hereby, secured on a super-priority basis in accordance with sections 364(c)(2) and (d) of the Bankruptcy Code by senior secured and priming liens on and security interests in all the Borrower Debtors' property, and the obligations of the Borrower Debtors to pay such shortfall amounts shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim having priority over any or all administrative expenses of the kind specified in, among other sections, sections 105, 326, 330, 331, 503(b), 506(c), 507(a) and 726 of the Bankruptcy Code; provided, however, that (A) such loans shall be allocated, in accordance with the Allocation Percentage, among the Debtors without a shortfall, and (B) all interest, liens, and claims on account of such loans shall be junior in right of payment only to all interests, liens and claims of Permitted DIPs and the Carve Out.

(vi)     Notwithstanding anything to the contrary set forth in an Application Report, or otherwise in this Order, all payments to a Representative or an Adequate Protection Party will be made by the Debtors, and, to the extent accepted by an Adequate Protection Party, accepted, subject to recharacterization, refund, disgorgement, or other treatment as may be necessary to give effect to the Application Report at such time, or otherwise, and as may be determined by the Court, and all parties reserve their rights with respect thereto.

(vii)     The term "**Allocation Percentages**" shall mean the percentage determined by multiplying (x) earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") earned in connection with each Tranche of Debt (or, in the case of intercompany loans, with respect to each Tranche of Debt deemed a lender) that as a percentage of total EBITDA for such period by (y) the total amount of corporate overhead charges and expenses of Innkeepers USA Trust and the other Debtors, as well as Professional Fees (to the extent permitted by the Court to be paid at such time) paid during such time.

g.     Right to Inspect and Audit.  In accordance with the applicable Loan Documents, the Debtors shall permit each Representative (through its officers, senior employees, or agents, including but not limited to professionals retained in connection with these cases) to inspect the applicable Prepetition Collateral during business hours upon reasonable advance notice.  In addition, the Debtors shall allow each Representative to periodically inspect and audit the books, records and account statements of the applicable Debtors in order to confirm the applicable Debtors' compliance with this Order and any budget approved in connection with a Permitted DIP.

h.     Right to Credit Bid.  The Adequate Protection Parties shall have the right to credit bid their claims to the fullest extent permitted by law in connection with any sale, auction or other disposition of the applicable Prepetition Collateral pursuant to 11 U.S.C. § 363(k).

31

Notwithstanding anything herein to the contrary, no Adequate Protection Party shall be entitled to adequate protection (and no Adequate Protection Obligations shall arise) with respect to any diminution in value of such Adequate Protection Party's interest in its Prepetition Collateral resulting from any successful Avoidance Action against, or Avoidance Action proceeds recovered from, such Adequate Protection Party, or from or as a result of the payment of any costs, fees or expenses included as part of adequate protection hereunder.

7. <u>Carve Out</u>. (a) As used in this Order, "**Carve Out**" means: (i) unpaid fees of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (ii) in the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, fees and expenses incurred by any trustee and any professionals retained by such trustee, in an aggregate amount not exceeding $75,000; (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Professional Fees**"), incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and any Committee appointed pursuant to section 1103 of the Bankruptcy Code (the "**Professional Persons**"), at any time before or on the first business day following delivery of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) after the first business day following delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $5,500,000. The Carve Out shall be senior to the Replacement Liens, the 507(b) Claims, and any other adequate protection, liens or claims securing the obligations arising under or in connection with the Loan Documents. For purposes of calculating the amount of Professional Fees permitted to be paid to a Professional Person as

part of the Carve Out under subsection (iv) of this paragraph 7, such amount shall be net of all prepetition retainers held by such Professional Person.

(b)     As used herein, "**Carve Out Trigger Notice**" means a Termination Notice (as defined below) delivered by a Representative on any business day (or, if such day of delivery is not a business day, the next succeeding business day), which notice has been preceded by Termination Notices delivered in connection with each Tranche of Debt, and, as a result of the most recently delivered Termination Notice, all Tranches of Debt shall have become subject to continuing Termination Events.

(c)     For the avoidance of doubt, the obligation to pay Professional Fees shall be allocated as among the Debtors in accordance with the Allocation Percentage.

8.     <u>Modification of Automatic Stay</u>.  The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provision of this Order, including, without limitation, to:  (a) permit the Debtors to grant the Adequate Protection Liens and the 507(b) Claims; (b) permit the Debtors and the Adequate Protection Parties to perform such acts as the Adequate Protection Parties may reasonably request the applicable Debtors to take to assure the perfection and priority of the liens granted herein; and (c) authorize the applicable Debtors to make, and the applicable Adequate Protection Parties to receive and retain in accordance with the terms of the applicable Loan Documents, payments on account of fees and expenses in accordance with the terms of this Order; <u>provided</u>, <u>however</u>, any stay relief with respect to the exercise of remedies shall be in accordance with paragraph 11 below or as otherwise ordered by the Court.

9.     <u>Perfection of Adequate Protection Liens</u>.  This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Adequate Protection Liens,

without the necessity of filing or recording any mortgage, deed of trust, financing statement, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Adequate Protection Parties to the priorities granted herein. The applicable Debtors are authorized to execute and deliver promptly to the applicable Adequate Protection Parties or their Representative, as applicable, all such financing statements, mortgages, deeds of trust, notices, and other documents as the applicable Adequate Protection Party may reasonably request. Each of the Adequate Protection Parties or their Representative, as applicable, may file a photocopy of this Order as a financing statement, mortgage, deed of trust, notice of lien or similar instrument evidencing the liens and security interests provided for herein, with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statement, mortgage, deed of trust, notice of lien, or similar instrument.

10. <u>Termination Events</u>. (a) The rights of the Debtors under a Tranche of Debt (but not the rights of any Debtors under any other Tranche of Debt) to use Cash Collateral relating to such Tranche of Debt shall terminate upon the business day immediately following written notice (a "**Termination Notice**") delivered to (i) the applicable Debtors, (ii) counsel to the Debtors, (iii) the U.S. Trustee, (iv) counsel to each Committee, and (v) counsel to each Representative, indicating that one of the events listed below has occurred and is continuing with respect to such applicable Debtors (each, a "**Termination Event**"):

  i. This Order shall (I) not have become a final order within 45 days of the Petition Date or (II) prior to becoming a final order or otherwise replaced or superseded, at any time cease to be in full force and effect, or shall have been vacated, reversed or stayed, or modified or amended in a manner that

is materially adverse to the applicable Adequate Protection Party (taken as a whole) without such party's (or its Representative's) consent;

ii.  The Debtors under such Tranche of Debt shall fail to timely make payments required to be made by them pursuant to the terms of this Order within five (5) business days from when such payment is due;

iii. The Debtors under such Tranche of Debt shall breach any of the covenants or agreements contained in this Order (other than a payment obligation) applicable to them and such breach shall continue unremedied for more than ten (10) business days following notice of such breach;

iv.  The Debtors shall make any misrepresentation of a fact that is materially adverse to the Debtors (taken as a whole) to any of the Representatives or their agents about the financial conditions of the Debtors, the nature, extent, or location of the applicable Prepetition Collateral, or the disposition or use of any of the Postpetition Collateral, including the Cash Collateral;

v.   The Debtors under such Tranche of Debt shall permit any superpriority claim (other than the Carve Out) or shall grant any other lien or security interest (including any other adequate protection lien), that in either case is senior or equal to the claims and liens (including the adequate protection claims and liens) of the applicable Adequate Protection Party, except superpriority claims and liens senior to the Adequate Protection Liens and 507(b) Claim relating to one or more debtor-in-possession financing facilities approved by the Court and provided to some or all of the Debtors (the "**Permitted DIPs**"); provided, however, that with respect to the Fixed Rate Debtors, a Permitted DIP shall only mean that certain debtor in possession financing arrangement provided by Five Mile Capital Partners LLC, and its successors and assigns, approved solely for the purposes set forth therein (the "**Fixed Rate PIP DIP**"), and shall mean no other debtor in possession financing arrangement; provided, further, that, with respect to the Floating Rate Debtors, a Permitted DIP shall only mean that certain debtor-in-possession financing arrangement provided by Lehman ALI Inc. (or an affiliate), and its successors and assigns, approved solely for the purposes set forth therein (the "**Floating Rate PIP DIP**"), and shall mean no other debtor-in-possession financing arrangement;

vi.  Any lien or security interest granted or created under the applicable Loan Documents shall be asserted by any Debtor not to be a valid and perfected lien on or security interest in any of the applicable Postpetition Collateral, with the priority required by the applicable Loan Documents; provided, however, that the immediate foregoing shall not apply with respect to any liens granted under the Permitted DIPs;

vii. Other than payments authorized by the Court and that are (I) approved by the Representative of such Tranche of Debt, (II) in respect of accrued

payroll and related expenses as of the Petition Date, (III) in respect of general unsecured creditors, in each case to the extent authorized by one or more "first day" orders or other orders of the Court (including this Order) to the extent previously provided to the applicable Representative, or (IV) on account of Professional Fees, the Debtors under such Tranche of Debt shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables (including without limitation, reclamation claims);

viii. Lender Debtors under such Tranche of Debt have caused to be loaned to Borrower Debtors an aggregate amount of more than $2,000,000 at any one time outstanding.

ix. With respect to such Tranche of Debt, one or more franchisors have terminated franchise agreements relating to hotels owned by the Debtors under such Tranche of Debt;

x. With respect to such Tranche of Debt, the Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on a hotel constituting Prepetition Collateral and such order shall not be subject to timely appeal;

xi. There shall have occurred and be continuing one or more events of default under the Fixed Rate PIP DIP or the Floating Rate PIP DIP that, individually or in the aggregate, cause or permit the lenders thereunder to cause, the obligations under the Fixed Rate PIP DIP or the Floating Rate PIP DIP, as the case may be, to become immediately due and payable;

xii. The Debtors under such Tranche of Debt shall use Cash Collateral arising under such tranche for a purpose not permitted hereunder unless such non-permitted use was inadvertent, and was not in an amount in excess of $25,000; provided, that, notwithstanding the immediate foregoing, the use of Cash Collateral not permitted hereunder occurring more than five (5) times shall constitute a Termination Event unless such amounts have been repaid or reallocated, as the case may be;

xiii. The Bankruptcy Court shall enter an order granting relief from the automatic stay to permit any exercise of remedies by the lenders or special servicer under a Tranche of Debt other than limited relief solely to permit the delivery of default notices under the terms of the applicable Loan Documents;

xiv. The Debtors shall file any motion or other request for relief seeking to (i) dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appoint a

trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or

xv. The Bankruptcy Court shall enter an order (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (iv) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Debtors;

xvi. There shall have occurred, after the entry of this Order, (i) a change that has a material adverse effect on the use, value or condition of the Debtors, their assets or the legal or financial status or business operations, in each case taken as a whole, or (ii) a material disruption or material adverse change in the financial, real estate, banking or capital markets; or

xvii. For the benefit of the Floating Rate Lenders only, and not for the benefit of any other Adequate Protection Party, prior to the entry of the Final Order, the Floating Rate Debtors breach any of their material obligations arising in connection with the proposed restructuring of the Floating Rate Obligations; provided, however, that the Floating Rate Lenders shall have given three (3) business days' prior written notice setting forth in reasonable detail such material breach; provided, further, that any such notice shall not violate or be deemed to violate the automatic stay in the Debtors' Chapter 11 Cases.

(b)     Notwithstanding anything to the contrary herein, no Termination Event with respect to the Debtors under a Tranche of Debt shall be deemed to constitute a Termination Event with respect to the Debtors under any other Tranche of Debt.

11.     Rights and Remedies Upon Termination Event.    (a)    Immediately upon the occurrence and during the continuation of a Termination Event with respect to a Tranche of Debt, unless waived by a writing signed by the applicable Adequate Protection Party (or its Representative), the applicable Adequate Protection Parties (or their Representative, as applicable) may declare a termination, reduction, or restriction of the ability of the applicable Debtors to use Cash Collateral on the consensual basis provided in this Order, except for the use of Cash Collateral provided in clause (b) of this paragraph 11 (any such declaration, shall be

referred to herein as a "**Termination Declaration**"). The Termination Declaration shall be given by facsimile (or other electronic means) to lead counsel to the Debtors, counsel to each Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "**Termination Declaration Date**"). On the Termination Declaration Date, the applicable Debtors' right to use Cash Collateral on the basis provided in this Order shall automatically cease, except as provided in clause (b) of this paragraph 11. During the five (5) business days after the Termination Declaration Date (the "**Remedies Notice Period**"), the applicable Debtors and/or a Committee shall be entitled to seek an emergency hearing with the Court seeking a determination of whether a Termination Event has occurred and/or any other appropriate relief related to continued use of Cash Collateral on a non-consensual basis, with the rights and objections of all relevant parties reserved with respect thereto. Unless the Court determines otherwise during the Remedies Notice Period, after the Remedies Notice Period, the applicable Debtors shall no longer have the right to use Cash Collateral.

(b) The applicable Debtors may continue to use Cash Collateral (i) for the payment of any unpaid postpetition administrative expenses so long as such expenses were actually incurred prior to the last day of the Remedies Notice Period, (ii) to meet payroll obligations and to pay expenses critical and immediately necessary to the preservation of the applicable Debtors and their estates incurred during the Remedies Notice Period, and (iii) to satisfy any payment obligation senior to the obligations owed to the Adequate Protection Parties (including Professional Fees but, with respect to such fees, to the extent of the Carve Out).

12. <u>Limitations on Cash Collateral and the Carve Out</u>. The Cash Collateral under an applicable Tranche of Debt and Professional Fees payable from such Cash Collateral may not be

used (without the prior written consent of the applicable Representative):  (a) in connection with, or to finance in any way, any action, suit, arbitration, proceeding, application, motion, or other litigation of any type (or the preparation of any such action, suit, arbitration, proceeding, application, motion, or other litigation) (i) against the applicable Adequate Protection Parties seeking relief that would (A) assert, commence, or prosecute any Avoidance Actions against the applicable Adequate Protection Parties, (B) permit the applicable Debtors to prepare or prosecute an objection to, contest in any manner, or raise any defense to, the validity, extent, amount (other than entitlement to postpetition interest), perfection, priority, or enforceability of any of the rights and obligations of the applicable Adequate Protection Parties, or (C) permit the Debtors to pay for any services rendered by the professionals retained by the Debtors in connection with the assertion  of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would otherwise be prohibited pursuant to this paragraph 12, or (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the applicable Loan Documents or any payments made thereunder; (b) to sell, lease, transfer, or otherwise dispose of Collateral without the prior written consent of the applicable Adequate Protection Parties unless in the ordinary course of business, contemplated by the Forecast, or otherwise ordered by the Court; or (c) to pay pre-Petition Date indebtedness unless ordered by the Court.  Notwithstanding the foregoing, the Cash Collateral and the Carve Out may be used by any Committee to investigate the Loan Obligations and the Prepetition Collateral and/or a potential Challenge (as defined below); provided that no more than $150,000 in the aggregate may be spent from Cash Collateral on such investigations.

13.    Challenge to Prepetition Claims.  Upon entry of this Order and subject to the Challenge, (i) the Loan Obligations of the Adequate Protection Parties shall constitute secured

claims against the applicable Debtors and, together with any payments on account thereof, shall not be subject to subordination, avoidance, or objection by the Debtors or any party as to validity, enforceability, priority, or avoidability of the security for such claims and payments made on account thereof, and (ii) the liens and security interests of the Adequate Protection Parties shall be deemed to be valid, perfected, enforceable, and not subject to avoidance, subordination, or objection by the Debtors or any party as to validity, enforceability, or priority. Notwithstanding the foregoing, such determination of the validity, perfection, enforceability, and unavoidability of such liens and security interests, and any payments made on account thereof, is without prejudice to the rights of any Committee to investigate and challenge any such liens or security interests of the Adequate Protection Parties, or to assert any other claims or causes of action, at law or in equity against any of the Adequate Protection Parties (a "**Challenge**"); provided, that any such Challenge not made by commencement of an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001 (an "**Adversary Proceeding**") and served no later than 60 days after the entry of the Final Order Date or 60 days following the formation of the Committee, whichever is later (the "**Challenge Period**"), shall be forever barred. Despite the initiation of any such Adversary Proceeding asserting a Challenge, the Adequate Protection Parties liens, security interests, and any payments made on account thereof, shall be presumed to be valid and entitled to the benefit of this Order pending the entry of a final non-appealable judgment and order in favor of the party in interest with respect to such Challenge. If no such Adversary Proceeding is properly and timely filed and served by such date, the liens and security interests of, and payments made on account thereof to, the Adequate Protection Parties shall not be subject to any other or further Challenge and shall be determined to have been, as of the Petition Date, valid, binding, perfected, enforceable, unavoidable, and having the priority asserted, and the Debtors, their estates and creditors, and any trustee in a

Successor Case shall be bound by Debtors' acknowledgments, stipulations, and agreements set forth in this Order. The Challenge Period may be extended for an authorized party by agreement between the applicable Lenders or their Representative and such authorized party without further order of the Court.

14. **Availability of Collateral; Direction to Financial Institutions and Credit Card Processing Companies.** (a) None of the Adequate Protection Parties shall take any action during the Cash Collateral Period to seize or take control over any of the Cash Collateral or the Debtors' other property, nor shall they impose freezes of assets or seek to exercise any alleged right of setoff or recoupment, or exercise any other right or remedy against the Prepetition Collateral or the Postpetition Collateral, including Cash Collateral, during the Cash Collateral Period. The Adequate Protection parties are hereby directed to release (and, to the extent applicable, direct any third party to release) all Cash Collateral.

(b) Each of the credit card processing companies also are directed not to take, or cease continuing to take, any action during the Cash Collateral Period that is in the nature of a seizure, taking of control, freezing, or exercising of any right of netting, setoff, or recoupment, or exercising any other right or remedy against the Prepetition Collateral or the Postpetition Collateral, including Cash Collateral, during the Cash Collateral Period. For the avoidance of doubt, the Debtors' credit card processing companies shall cease the practice of netting from sums otherwise payable to the Debtors the amount of fees and other charges (excluding valid chargebacks) asserted by such companies unless and until such amounts are overdue and remain unpaid by the Debtors.

15. **Prepetition Subordination Agreements.** All parties' rights with respect to any subordination or intercreditor agreements (if applicable) with respect to any Debtor are not affected by the entry of this Order.

16.     Section 506(c) Claims.   Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against any of the Adequate Protection Parties or any of their respective claims or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the applicable Representative, and no such consent shall be implied from any other action, inaction, or acquiescence by the applicable Representative or its agents.

17.     No Liability to Third Parties.   In not objecting to the Debtors' use of Cash Collateral under the terms set forth herein or in taking any other actions related to this Interim Order, the applicable Representative (i) shall have no liability to any third party and shall not be deemed to be in control of the operations of any Debtors or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of any Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute), and (ii) shall not owe any fiduciary duty to the Debtors, their creditors or their estates and shall not constitute or be deemed to constitute a joint venture or partnership with any Debtor.

18.     No Marshaling/Application of Proceeds.   Upon entry of the Final Order and to the extent provided for therein, neither the Adequate Protection Parties nor the Prepetition Collateral shall be subject to the equitable doctrine of "marshaling" nor any other similar doctrine with respect to any of the Prepetition Collateral, as the case may be, and proceeds shall be received and applied in accordance with this Interim Order notwithstanding any other agreement or provision to the contrary.

19.    Section 552(b).  Upon entry of the Final Order and to the extent provided for therein, the Adequate Protection Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Adequate Protection Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral; provided, however, that the Debtors shall not be permitted to assert the "equities of the case" exception under section 552(b) of the Bankruptcy Code against any of the Adequate Protection Parties from and after entry of this Order until entry of the Final Order.

20.    Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the applicable Representative's and Debtors' right to seek any other or supplemental relief relating to the matters set forth in this Order, including the right to seek additional adequate protection (without prejudice to any other person's right to object to or otherwise oppose such additional adequate protection); (b) any rights of the applicable Representative or  Debtors with respect to any plan of reorganization or liquidation filed in these Chapter 11 Cases; or (c) any of the rights of the applicable Representative or the Debtors (except in the case of the succeeding clause (i)) under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or a Successor Case, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans. This Interim Order shall not be deemed to be an amendment or modification to the applicable Loan Documents, and shall not be deemed to have in any way modified the scope, nature, extent, or amount of the Prepetition Collateral, prepetition

43

liens, prepetition claims, prepetition interests, or prepetition rights held by, granted, or purported to be granted ,to Adequate Protection Parties. Furthermore, nothing contained in this Order shall be treated as an admission by any Adequate Protection Party or Representative, or the Debtors (except as otherwise expressly set forth in this Order) regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal or equitable claim, theory or defense and each Adequate Protection Party or their respective Representatives shall have standing to assert, and shall not be precluded or estopped from asserting, any challenge to any factual representation set forth herein or from asserting any legal or equitable claim, theory or defense against the Debtors or their estates including that rents are not property of the estate and do not constitute cash collateral. All of the parties subject hereto reserve all of their rights and defenses with respect to any of the foregoing.

21. <u>Section 507(b) Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Representatives hereunder is insufficient to compensate for any diminution in value of their respective Prepetition Collateral during the Chapter 11 Cases or any Successor Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgement by any of the Representatives, that the adequate protection granted herein does in fact adequately protect the Adequate Protection Parties against any diminution in value of their respective interest in the Prepetition Collateral.

22. <u>No Lien Alteration</u>. The receipt by the Debtors of any Cash Collateral or other proceeds of Collateral shall not, and shall not be deemed to, affect, alter, or otherwise modify the validity, priority or perfection of any liens in and/or claims against such Cash Collateral or other proceeds and such liens and claims shall continue to exist in and against such Cash Collateral or other proceeds in the possession of the Debtors, in each case with the same validity, priority and

K&E 16933766.22

perfection as existed immediately prior to such receipt by the Debtors; it being agreed that nothing in this paragraph shall limit the Debtors' use of Cash Collateral otherwise permitted hereunder.

23.     Proofs of Claim.  The Representatives will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for the claims relating to their respective Loan Obligations. Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any Chapter 11 Cases or Successor Cases shall not apply to the Representatives.

24.     Good Faith.  The Representatives have acted in good faith in connection with this Interim Order and their reliance on this Order is in good faith.

25.     Binding Effect.  The provisions of this Order shall be binding upon and inure to the benefit of the Adequate Protection Parties, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases or any Successor Cases as a legal representative of the Debtors or the Debtors' estates.

26.     Survival.  Subject to the express reservations set forth in this Order, the Debtors' stipulations set forth in this Order shall survive the Termination Date and/or entry of any order: (a) confirming any plan of reorganization in any of the Chapter 11 Cases unless and to the extent that the applicable confirmation order or confirmed plan of reorganization expressly provides otherwise and such confirmation order has become a final order and the effective date has occurred under such confirmed plan of reorganization; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  Upon entry of the Final Order, to the extent set forth therein, the terms and provisions of the Final Order, including the claims, liens, security interest,

and other protections granted to the Adequate Protection Parties pursuant to such order, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority, validity, and perfection as provided by such order until the Adequate Protection Obligations (if any) have been satisfied in accordance with the Bankruptcy Code.

27. <u>Immediate Effect</u>.  This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon execution hereof. The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Order.

28. <u>Notice</u>.  The Debtors shall, within three (3) business days of entry of this Order, mail copies of a notice of the entry of this Order, together with a copy of this Order and a copy of the Motion, to the parties having been given notice of the Preliminary Hearing, to any party which has filed prior to such date a request for notices with this Court and to counsel for any statutory committee appointed pursuant to section 1102 of the Bankruptcy Code.  The notice of entry of this Order shall state that (a) any party in interest objecting to the use of the Cash Collateral and/or entry of the Final Order shall file written objections with the United States Court Clerk for the Southern District of New York no later than 5:00 p.m. prevailing Eastern Time on the business day immediately following fourteen (14) days after the date of entry of this Order,  and objections shall be served so that the same are received on or before such date by: (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attention: Paul M. Basta (paul.basta@kirkland.com)  and Leonard Klingbaum (leonard.klingbaum@kirkland.com), and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attention:  Anup Sathy, P.C. (anup.sathy@kirkland.com) and Marc Carmel (marc.carmel@kirkland.com), counsel to the Debtors; (ii) the Office of the United States Trustee for the Southern District of New York,

46

_____,; (iii) Haynes and Boone, LLP, 1221 Avenue of the Americas, 26th Floor, New York, New York 10020, Attention: Lawrence Mittman (lawrence.mittman@haynesboone.com) and Lenard Parkins (lenard.parkins@haynesboone.com), counsel to the Fixed Rate Representative; (iv) Arnold & Porter LLC, 555 Twelfth Street, NW, Washington, D.C. 20004-1206, Attention Marc A. Daniel, Esq. (marc.daniel@aporter.com), counsel to Five Mile Capital Partners LLC; (v) Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attention: Michael J. Sage (michael.sage@dechert.com) and Brian E. Greer (brian.greer@dechert.com), counsel to Lehman ALI, Inc.; (vi) Duane Morris LLP, One Market Plaza, Spear Tower, Suite 2200, San Francisco, California 94105-1127, Attention: Phillip Wang, Esq. (pwang@duanemorris.com), counsel to LNR Partners, Inc. and Merril Lynch; and (v) Perkins Coie LLP, 1888 Century Park E. Suite 1700, Los Angeles, CA 90067-1721, Attention: Mark Birnbaum (mbirnbaum@perkinscoie.com) and Beth Understahl (BUnderstahl@perkinscoie.com), counsel to CWCapital Performing Loan Management – CMBS and Centerline; and (b) a Final Hearing to consider entry of the Final Order shall be held on **[_____ __, 2010 at _____ _]**.m. prevailing Eastern Time.

Signed this _____ day of _____, 2010.


_____
United States Bankruptcy Judge

# SCHEDULE 1

1.  Grand Prix Ft. Lauderdale LLC
2.  Grand Prix Addison (RI) LLC
3.  Grand Prix Altamonte LLC
4.  Grand Prix Arlington LLC
5.  Grand Prix Atlanta LLC
6.  Grand Prix Atlanta (Peachtree Corners) LLC
7.  Grand Prix Bellevue LLC
8.  Grand Prix Binghamton LLC
9.  Grand Prix Bothell LLC
10. Grand Prix Campbell/San Jose LLC
11. Grand Prix Cherry Hill LLC
12. Grand Prix Chicago LLC
13. Grand Prix Denver LLC
14. Grand Prix Englewood/Denver South LLC
15. Grand Prix Fremont LLC
16. Grand Prix Gaithersburg LLC
17. Grand Prix Lexington LLC
18. Grand Prix Livonia LLC
19. Grand Prix Louisville (RI) LLC
20. Grand Prix Lynnwood LLC
21. Grand Prix Mountain View LLC
22. Grand Prix Portland LLC
23. Grand Prix Richmond LLC
24. Grand Prix Richmond (Northwest) LLC
25. Grand Prix Saddle River LLC
26. Grand Prix San Jose LLC
27. Grand Prix San Mateo LLC
28. Grand Prix Shelton LLC
29. Grand Prix Sili I LLC
30. Grand Prix Sili II LLC
31. Grand Prix Tukwila LLC
32. Grand Prix Windsor LLC
33. Grand Prix Horsham LLC
34. Grand Prix Columbia LLC
35. Grand Prix Germantown LLC
36. Grand Prix Islandia LLC
37. Grand Prix Lombard LLC
38. Grand Prix Naples LLC
39. Grand Prix Schaumberg LLC
40. Grand Prix Westchester LLC
41. Grand Prix Willow Grove LLC
42. Grand Prix Belmont LLC
43. Grand Prix El Segundo LLC
44. Grand Prix Las Colinas LLC
45. Grand Prix Mt. Laurel LLC
46. Grand Prix Fixed Lessee LLC

# SCHEDULE 2

1. KPA/GP Valencia LLC
2. Grand Prix West Palm Beach LLC
3. KPA/GP Ft. Walton Beach LLC
4. Grand Prix Ft. Wayne LLC
5. Grand Prix Indianapolis LLC
6. KPA/GP Louisville (HI) LLC
7. Grand Prix Bulfinch LLC
8. Grand Prix Woburn LLC
9. Grand Prix Rockville LLC
10. Grand Prix East Lansing LLC
11. Grand Prix Grand Rapids LLC
12. Grand Prix Troy (Central) LLC
13. Grand Prix Troy (SE) LLC
14. Grand Prix Atlantic City LLC
15. Grand Prix Montvale LLC
16. Grand Prix Morristown LLC
17. Grand Prix Albany LLC
18. Grand Prix Addison (SS) LLC
19. Grand Prix Harrisburg LLC
20. Grand Prix Ontario LLC
21. Grand Prix Floating Lessee, LLC

## SCHEDULE 3

1.      KPA HS Anaheim LLC
2.      Grand Prix Anaheim Orange Lessee LLC

# SCHEDULE 4

1.    KPA RIMV LLC
2.    Grand Prix RIMV Lessee LLC

# SCHEDULE 5

1.　　KPA RIGG LLC
2.　　Grand Prix RIGG Lessee LLC

# SCHEDULE 6

1.      KPA HI Ontario LLC
2.      Grand Prix Ontario Lessee LLC

# SCHEDULE 7[4]

1.  KPA Washington DC DT LLC
2.  Grand Prix General Lessee LLC

---

[4] For each of the Loan Documents relating to the Merrill Debtors, the operating tenant, Grand Prix General Lessee LLC, did not execute the applicable loan agreement, mortgage or assignment of leases or rents. Such entity only executed the cash management agreement and a subordination and attornment agreement.

# SCHEDULE 8[5]

1. KPA Tysons Corner RI LLC
2. Grand Prix General Lessee LLC

---

[5] For each of the Loan Documents relating to the Merrill Debtors, the operating tenant, Grand Prix General Lessee LLC, did not execute the applicable loan agreement, mortgage or assignment of leases or rents. Such entity only executed the cash management agreement and a subordination and attornment agreement.

## SCHEDULE 9[6]

1.      KPA San Antonio HS LLC
2.      Grand Prix General Lessee LLC

---

[6]     For each of the Loan Documents relating to the Merrill Debtors, the operating tenant, Grand Prix General Lessee LLC, did not execute the applicable loan agreement, mortgage or assignment of leases or rents.   Such entity only executed the cash management agreement and a subordination and attornment agreement.

# SCHEDULE 10

## 13-Week Forecast Attached

# Cash Flow Forecast

($'s in 000's)

| | Forecast 7/24/2010 Week 1 | Forecast 7/31/2010 Week 2 | Forecast 8/7/2010 Week 3 | Forecast 8/14/2010 Week 4 | Forecast 8/21/2010 Week 5 | Forecast 8/28/2010 Week 6 | Forecast 9/4/2010 Week 7 | Forecast 9/11/2010 Week 8 | Forecast 9/18/2010 Week 9 | Forecast 9/25/2010 Week 10 | Forecast 10/2/2010 Week 11 | Forecast 10/9/2010 Week 12 | Forecast 10/16/2010 Week 13 | Forecast Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue and tax receipts** | $ 7,035 | $ 6,977 | $ 6,550 | $ 6,470 | $ 6,403 | $ 6,255 | $ 5,507 | $ 5,229 | $ 6,408 | $ 6,414 | $ 6,073 | $ 6,525 | $ 6,331 | $ 82,178 |
| **Property level** | | | | | | | | | | | | | | |
| Payroll and related | $ 2,300 | $ - | $ 2,372 | $ - | $ 2,334 | $ - | $ 2,305 | $ - | $ 2,278 | $ - | $ 2,336 | $ - | $ 2,376 | 16,302 |
| Franchise fees | - | 78 | - | - | 1,203 | 93 | - | - | 1,652 | 92 | - | - | - | 3,117 |
| Utility costs | 388 | 386 | 393 | 390 | 392 | 386 | 366 | 351 | 398 | 396 | 396 | 413 | 406 | 5,061 |
| Third party management & related fees | - | - | - | - | 679 | - | - | - | - | 656 | - | - | - | 1,335 |
| All other expenses | - | 250 | 156 | 95 | 1,488 | 1,265 | 1,257 | 1,174 | 1,437 | 1,201 | 1,226 | 1,131 | 1,259 | 11,938 |
| **Total property level** | $ 2,688 | $ 637 | $ 2,921 | $ 563 | $ 4,893 | $ 2,855 | $ 4,020 | $ 1,524 | $ 4,112 | $ 3,904 | $ 4,050 | $ 1,544 | $ 4,041 | $ 37,753 |
| **Rent, Taxes and Insurance** | | | | | | | | | | | | | | |
| Ground rent | $ - | $ 18 | $ - | $ - | $ - | $ 18 | $ - | $ - | $ - | $ 18 | $ - | $ - | $ - | 55 |
| Property taxes | - | 823 | - | - | 97 | 653 | - | 111 | - | 1,947 | - | 96 | - | 3,726 |
| Franchise taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Occupancy/sales taxes | 801 | 1,232 | - | 123 | 1,476 | 861 | - | - | 117 | 1,401 | 817 | - | 135 | 6,961 |
| Insurance payments | - | 336 | - | - | - | 166 | - | - | - | 166 | - | - | - | 668 |
| **Total Rent, Taxes and Insurance** | $ 801 | $ 2,408 | $ - | $ 123 | $ 1,572 | $ 1,698 | $ - | $ 111 | $ 117 | $ 3,532 | $ 817 | $ 96 | $ 135 | $ 11,411 |
| **Capital Expenditures and Initiatives** | | | | | | | | | | | | | | |
| Maintenance/emergency CAPEX (c) | $ 96 | $ 95 | $ 89 | $ 88 | $ 87 | $ 85 | $ 75 | $ 71 | $ 87 | $ 87 | $ 83 | $ 89 | $ 86 | 1,121 |
| PIP Renovations - Paid | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PIP Renovations - Funded from escrow | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cycle Renovations | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Capital Expenditures and Initiatives** | $ 96 | $ 95 | $ 89 | $ 88 | $ 87 | $ 85 | $ 75 | $ 71 | $ 87 | $ 87 | $ 83 | $ 89 | $ 86 | $ 1,121 |
| **Corporate Overhead** | | | | | | | | | | | | | | |
| Payroll and related | $ 150 | $ - | $ 145 | $ - | $ 145 | $ - | $ 145 | $ - | $ 145 | $ - | $ 145 | $ - | $ 145 | 1,020 |
| All other overhead | - | - | 115 | 144 | 114 | 43 | 165 | 63 | 189 | 53 | 115 | 63 | 43 | 1,105 |
| **Total Corporate Overhead** | $ 150 | $ - | $ 260 | $ 144 | $ 259 | $ 43 | $ 310 | $ 63 | $ 334 | $ 53 | $ 260 | $ 63 | $ 188 | $ 2,125 |
| **Other Disbursements** | | | | | | | | | | | | | | |
| Utility deposits (d) | $ - | $ - | $ 674 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 674 |
| Vendor deposits (e) | - | 2,073 | - | - | - | - | - | - | - | - | - | - | - | 2,073 |
| DIP fees and interest | - | - | - | - | - | - | - | - | 1,060 | 85 | 85 | 85 | 85 | 1,402 |
| **Total Other Disbursements** | $ - | $ 2,073 | $ 674 | $ - | $ - | $ - | $ - | $ - | $ 1,060 | $ 85 | $ 85 | $ 85 | $ 85 | $ 4,149 |
| Professional fees (f) | - | - | - | - | - | - | - | - | 5,424 | - | - | 2,232 | - | 7,656 |
| **Total Disbursements** | $ 3,734 | $ 5,214 | $ 3,945 | $ 918 | $ 6,811 | $ 4,681 | $ 4,406 | $ 1,770 | $ 11,134 | $ 7,662 | $ 5,296 | $ 4,109 | $ 4,535 | $ 64,214 |
| Beginning cash balance | $ 5,000 | $ 8,301 | $ 10,064 | $ 12,669 | $ 18,221 | $ 17,813 | $ 19,387 | $ 20,488 | $ 23,947 | $ 9,157 | $ 7,909 | $ 8,687 | $ 11,104 | $ 5,000 |
| Net cash flow | 3,301 | 1,763 | 2,605 | 5,552 | (409) | 1,574 | 1,101 | 3,459 | (4,726) | (1,248) | 778 | 2,417 | 1,796 | 17,964 |
| Cash Balance before Excess Cash Distribution | 8,301 | 10,064 | 12,669 | 18,221 | 17,813 | 19,387 | 20,488 | 23,947 | 19,221 | 7,909 | 8,687 | 11,104 | 12,900 | 22,964 |
| Gross Excess Cash to Distribute | | | | | | | | | (10,064) | | | | | (19,387) |
| Less: Expense Reserve | - | - | - | - | - | - | - | - | - | - | - | - | - | 11,487 |
| Distribution of Excess Cash (g) | - | - | - | - | - | - | - | - | (10,064) | - | - | - | (7,900) | (17,964) |
| Ending cash balance | $ 8,301 | $ 10,064 | $ 12,669 | $ 18,221 | $ 17,813 | $ 19,387 | $ 20,488 | $ 23,947 | $ 9,157 | $ 7,909 | $ 8,687 | $ 11,104 | $ 5,000 | $ 5,000 |
| **DIP** | | | | | | | | | | | | | | |
| Outstanding DIP Balance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 65,000 | $ 65,000 | $ 65,000 | $ 65,000 | $ 65,000 | |
| Interest rate on DIP | | | | | | | | | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | |

**Notes:**

a) Operating expenses are highly correlative to occupancy levels at the hotel properties and to the extent that occupancy levels vary from the Company's forecast, expense levels will vary as well.

b) Other operating expenses show current payments for Aetna claims, worker's compensation claims, and health insurance premiums for the first four weeks. After that, payments reflect post-petition payments.

c) Maintenance CAPEX estimated at 1.5% of revenue to represent non-PIP spending for emergencies.

d) Utility deposits based on an estimated two weeks spending using the average of last three months weekly payments.

e) Vendor deposits based on 1 month of deposits needed based on estimated 40% of weekly operating expenses (25% of weekly is F&B plus 15% other).

f) Professional fees assume no fees are paid for the first 60 days, and then payments are based on 80% of estimated costs with a catchup in week 9.

g) Excess cash flow paid out 45 days after the end of every month, beginning on day 75.

EXHIBIT F

**Form of Joinder**

# JOINDER

This Joinder to the Plan Support Agreement, dated as of July __, 2010, by and among the Innkeepers USA Trust and Lehman ALI Inc. (the "**Agreement**"), is executed and delivered by [_____] (the "**Joining Party**") as of [_____], 201_ in connection with the Transfer from Lehman to the Joining Party.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

1.    <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, which is attached to this Joinder as <u>Annex I</u> (as the same may be hereafter amended, restated or otherwise modified from time to time) as if the Joining Party were an original signatory to the Agreement.  From and after the date hereof, the Joining Party shall hereafter be deemed to be "**Lehman**" and a "**Party**" for all purposes under the Agreement.

2.    <u>Representations and Warranties</u>.  With respect to the amount of Floating Rate Debt set forth below its name on the signature page hereof and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Floating Rate Debt, the Joining Party hereby makes the representations and warranties of Lehman set forth in <u>Section 9</u> of the Agreement to each other Party to the Agreement.

3.    <u>GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL COURT IN THE STATE OF NEW YORK AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT PRESIDING OVER THE CHAPTER 11 CASES AND NOT THE BANKRUPTCY COURT PRESIDING OVER THE LEHMAN BANKRUPTCY CASES SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREIN.  THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

[**JOINING PARTY**]

By: _____

Name: _____

Title: _____


Aggregate Principal Amount of Floating Rate Debt Held:  $_____

EXHIBIT G

**Floating Rate Franchise Agreements**

## Floating Rate Franchise Agreements

1.  Residence Inn by Marriott Relicensing Franchise Agreement for Fort Wayne, Indiana between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007, as amended by that certain Extension, Termination and Release Agreement, dated as of September 12, 2008, by and between Marriott International, Inc. and Grand Prix Floating Lessee LLC.

2.  Residence Inn by Marriott Relicensing Franchise Agreement for Grand Rapids, Michigan between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

3.  Residence Inn by Marriott Relicensing Franchise Agreement for Harrisburg, Pennsylvania between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

4.  Residence Inn by Marriott Relicensing Franchise Agreement for Ontario, California between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

5.  Residence Inn by Marriott Relicensing Franchise Agreement for Troy (Central), Michigan between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

6.  Residence Inn by Marriott Relicensing Franchise Agreement for Troy (Southeast/Madison Heights), Michigan between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

7.  Amended & Restated Franchise License Agreement for a Hampton Inn located at Louisville, Kentucky between Promus Hotels, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

8.  Amended & Restated Franchise License Agreement for a Hampton Inn located at Woburn, Massachusetts between Promus Hotels, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

9.  Amended & Restated Franchise License Agreement for a Hampton Inn located at Cohoes, New York between Promus Hotels, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

10. Amended & Restated Franchise License Agreement for a Embassy Suites Hotel located at Valencia, California between Promus Hotels, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

11. Four Points by Sheraton Hotel Change of Ownership License Agreement for Fort Walton Beach, Florida between The Sheraton LLC and Grand Prix Floating Lessee LLC dated June 29, 2007.

12. Sheraton Hotel Change of Ownership License Agreement for Rockville, Maryland between The Sheraton LLC and KPA Leasco, Inc. dated November 10, 2006, as assigned by KPA Leasco, Inc. to Grand Prix Floating Lessee, which assignment was consented to by The Sheraton LLC.

13. Westin Hotel Change of Ownership License Agreement for Morristown, New Jersey between The Westin Hotel Management, L.P. and Grand Prix Floating Lessee LLC dated June 29, 2007.

14. Franchise Agreement for a Hyatt Summerfield Suites Hotel located at Addison, Texas between Summerfield Hotel Company, L.L.C. and Grand Prix Floating Lessee LLC dated June 29, 2007.

15. Courtyard by Marriott Relicensing Franchise Agreement for Atlantic City, New Jersey between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

16. Courtyard by Marriott Relicensing Franchise Agreement for Montvale, New Jersey between Marriott International, Inc. and Grand Prix Floating Lessee LLC dated June 29, 2007.

17. Membership Agreement and License Agreement for West Palm Beach, Florida between Best Western International, Inc. and Grand Prix Floating Lessee LLC effective as of June 29, 2007.

# EXHIBIT B

## Description of First Day Pleadings

## DESCRIPTION OF RELIEF REQUESTED IN
## THE DEBTORS' FIRST DAY PLEADINGS[1]

## FINANCING MOTIONS

**I.**     **Debtors' Motion for the Entry of an Order Authorizing the Debtors to Obtain Postpetition Financing from Five Mile Capital Partners on a Priming Basis Pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3), 364(e) of the Bankruptcy Code.**

**Debtors' Motion for the Entry of an Order Authorizing the Debtors to Obtain Postpetition Financing from an Affiliate of Lehman ALI Inc. on a Priming Basis Pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code.**

1.     As explained in the Declaration, the Debtors own 72 hotel properties subject to Franchise Agreements that provide the nonexclusive right to operate the hotels under a franchisor's "flag." Pursuant to the contemporaneously filed Cash Collateral Motion, the Debtors are seeking the authority to use Cash Collateral to pay the expenses of operating their business and to fund the restructuring while the Debtors operate in chapter 11.

2.     Separately, by these two companion motions for DIP Financing, the Debtors are seeking an aggregate of approximately $68 million in DIP Financing for the specific purpose of funding the PIPs allegedly required under the Franchise Agreements. The DIP Financing from Five Mile Capital Partners or an affiliate thereof primarily will fund the PIPs required under those Franchise Agreements covering the Tranche A Collateral, the Tranche B Collateral, and the Tranche C Collateral, and the DIP Financing from an affiliate of Lehman ALI Inc. primarily will fund the PIPs for the Floating Rate Collateral.

3.     A variety of factors have led to the Debtors being unable to comply with their PIP obligations under certain Franchise Agreements, and the failure to complete the PIPs could result

---

[1]     Capitalized terms used in this Exhibit but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Pleadings. To the extent that there are any discrepancies between the information provided in this Exhibit and the content of the Pleadings, the content of the Pleadings shall prevail.

in the termination of those Franchise Agreements. The loss of these Franchise Agreements would have a damaging and, perhaps, crippling effect on the Debtors' operations and on the underlying value of the Debtors' enterprise due to the loss of associated name recognition, marketing support, brand loyalty, and centralized reservation systems. The DIP Financing will allow the Debtors to complete the PIPs, remain in compliance with the Franchise Agreements, increase the value of those hotels that enjoy capital improvements by virtue of the PIPs, and generally maintain and enhance the value of the Debtors' enterprise.

4.     I believe that the DIP Financing is crucial to the success of the Debtors' restructuring, will allow the Debtors to maintain (and improve) both current revenue and enterprise value, and is structured to minimize, to the extent practicable, the extent to which the Prepetition Lenders are primed. I believe that the DIP Financing is amply justified in these circumstances.

  **II.**  **Debtors' Motion for the Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use the Adequate Protection Parties' Cash Collateral and (II) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, (B) to the Extent Approved in the Final Order, Granting Senior Secured, Priming Liens on Certain Postpetition Intercompany Claims, (C) to the Extent Approved in the Final Order, Granting Administrative Priority Status to Certain Postpetition Intercompany Claims, and (D) Scheduling a Final Hearing Pursuant to Bankruptcy rule 4001(b).**

5.     The Debtors have continued to own and operate their consolidated enterprise of hotel properties across the United States since even before the Debtors' nine mortgage lenders extended them credit in exchange for, among other things, liens on cash. Until certain lenders recently exercised remedies, nothing during the previous three years while the loans have been outstanding has changed in this regard. As part of this, the Debtors have maintained a consolidated cash management system with cash flowing to a centralized account from which their operational expenses have been paid. And now the Debtors simply seek to continue to use

their cash to fund their operations and restructuring for the benefit of all of their constituents. The relief in this Motion has nothing to do with substantive consolidation or any tactic related to the comprehensive restructuring that the Debtors will pursue, and the Interim Cash Collateral Order specifically states that nothing contained therein constitutes a substantive consolidation of the Debtors' estates.

6. Simply put, by this motion the Debtors are seeking to operate their business efficiently for the benefit of all constituents with the cash generated from their hotel assets, which is collateral for their secured (mortgage) lenders. The Debtors recognize that the Bankruptcy Code requires that they either receive consent to use cash collateral or, alternatively, provide "adequate protection." As set forth herein, the Debtors have already received the consent of one of their largest lenders, and the Debtors are in discussions with the other lenders. For all of the lenders with liens on cash, the Motion includes requests for approval that includes the traditional forms of adequate protection with standard protections.

7. The relief requested in the motion relates to the Debtors' seamless transition into bankruptcy to ensure they are able to continue operating. It is about honoring obligations to parties that provide goods and services, including the Debtors' franchisors, employees, hotel management companies, suppliers of hotel-related goods and services, utilities, and taxing authorities. Nobody can credibly argue that the Debtors receiving authority to honor these obligations is anything other than in the Debtors' best interest.

8. By the motion, the Debtors seek entry of the Cash Collateral Order granting the following relief:

> (a) authorizing the applicable Debtors (as described in the Interim Cash Collateral Order) to use the Cash Collateral of the applicable Adequate Protection Parties in accordance with sections 361 and 363 of the Bankruptcy Code;

(b) approving the form of adequate protection provided to the Adequate Protection Parties to the extent of diminution in the value of the Adequate Protection Parties' interests in the Prepetition Collateral, whether from the use of the Cash Collateral, the use, sale, lease, or other diminution in value of the Prepetition Collateral other than the Cash Collateral, or the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, pursuant to sections 361, 362, 363, 503(b), and 507 of the Bankruptcy Code;

(c) to the extent approved in the Final Cash Collateral Order, granting senior secured, priming liens on certain postpetition Intercompany Claims;

(d) to the extent approved in the Final Cash Collateral Order, granting administrative priority status to certain postpetition Intercompany Claims;

(e) scheduling the Final Hearing on the Motion to consider entry of the Final Cash Collateral Order and establishing notice procedures in respect of the Final Hearing by this Court to consider entry of the Final Cash Collateral Order authorizing on a final basis the Debtors' continued use of the Cash Collateral; and

(f) granting related relief.

9. The Debtors' ability to continue to fund their business operations and the restructuring adequately is critical to the outcome of the Chapter 11 Cases. Without the use of Cash Collateral, the Debtors' business would be at risk. Use of the Cash Collateral is, therefore, important to the preservation and maintenance of the value of the Debtors and the continued operations of the Debtors and the restructuring. Thus, it is without question that the Debtors' determination that they require the use of Cash Collateral to allow them to operate their hotel enterprise consistent with their historical past practices.

10. In the ordinary course of business, the Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures, debt service payments, and for other general corporate purposes—all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful reorganization. An

K&E 17218630

inability to use these funds during the Chapter 11 Cases would cripple the Debtors' business operations.

11.     Pursuant to the Hotel Management Agreements, the Hotel Managers generally are required to perform or provide for all operational and management functions necessary to operate the hotels.  Among other things, the Hotel Managers, on behalf of the Debtors, pay all property level expenses of the hotels (including payroll), contract with service providers, and purchase all goods and materials utilized in the operation of the business.  Generally, the Hotel Managers fund the hotel operating expenses out of the Property Lessees' centralized cash account, over which the Hotel Managers have signing authority.  When the Hotel Managers have to fund expenses, the Property Lessees reimburse the Hotel Managers periodically through hotel expense reimbursement reconciliations.  In addition, the Hotel Managers receive management fees prescribed by the Hotel Management Agreements.

12.     The Hotel Managers must continue to be reimbursed for those payments and to receive their management fees so that the Debtors can continue to operate their business and preserve value for creditors during the Chapter 11 Cases.  Accordingly, the Debtors are seeking the use of Cash Collateral to ensure the payment of all obligations owed under the Hotel Management Agreements and to continue the range of services provided to the Debtors' customer base, all as set forth more fully in the Interim Cash Collateral Order.

## Summary of Lenders with Liens on Cash Collateral

13.     As of March 31, 2010, the Debtors had incurred aggregate funded secured indebtedness of approximately $1.42 billion, including approximately $1.29 billion of property-level secured debt, approximately $1.05 billion of which has been securitized and sold in the commercial mortgage-backed security market.  The debt is secured by mortgages on the hotels or pledges of the equity of the Property Owners.  The Debtors' funded secured debt is

5

comprised of nine mortgage loans (two with related mezzanine loans), each of which is secured by distinct hotel properties and/or related equity interests in the Property Owners. The secured debt relevant to the relief requested herein is discussed in the Declaration.

**The Debtors' Cash Collateral**

14.     The Debtors generate and receive funds primarily from payments by guests for stays at the Debtors' hotel properties and for ancillary goods and services provided by the hotels (including occupancy-related tax receipts). The Debtors use the cash they generate to fund the properties' day to day operations and to service other business obligations, including those obligations discussed herein and in more detail in the First Day Declaration. The proposed immediate use of the Cash Collateral is intended to provide working capital while the Debtors operate in chapter 11 pending the Final Hearing.

**Proposed Adequate Protection**

15.     I believe that the Adequate Protection Parties are adequately protected because the Debtors intend to use the Cash Collateral to preserve the value of the Adequate Protection Parties' other collateral. Nonetheless, the Debtors have agreed, in addition to operating in a manner consistent with the Forecast (with the initial Forecast attached to the Interim Cash Collateral Order), to provide additional adequate protection to the extent of any Adequate Protection Obligations that may arise, as follows (in each case, subject to certain exceptions as set forth in the Interim Cash Collateral Order, including the Carve Out):

(a)     the Representatives' Expense Reimbursement (*see* Interim Cash Collateral Order, ¶ 6(a));

(b)     the Adequate Protection Liens, subject to the Carve Out, to liens granted in respect of Permitted DIPs, and to Prior Liens (*see* Interim Cash Collateral Order, ¶ 6(b));

6

<ol type="a" start="3">
<li>certain 507(b) Claims, subject to the Carve Out and to any superpriority claim in favor of Permitted DIPs (*see* Interim Cash Collateral Order, ¶ 6(c));</li>
<li>certain payments limited by the applicable Forecast (*see* Interim Cash Collateral Order, ¶ 6(e)); and</li>
<li>the "Cash Use Covenant" (*see* Interim Cash Collateral Order, ¶ 6(f)).</li>
</ol>

16.     In addition, the Debtors intend to continue to provide the Representatives with certain financial and other reporting as set forth in the Interim Cash Collateral Order.  (See Interim Cash Collateral Order, ¶ 6(d)).

17.     I believe that the Debtors' ability to continue to fund their business operations and the restructuring adequately is critical to the outcome of the Chapter 11 Cases.  Absent the use of Cash Collateral, the Debtors' business would be brought to an immediate halt, with disastrous consequences for the Debtors' reputation, their business, their ability to attract future customers, and their estates and creditors.  Therefore, I believe that the use of the Cash Collateral is of the utmost importance to the preservation and maintenance of the value of the Debtors and essential to the continued operations of the Debtors and the restructuring.

## OPERATIONS MOTIONS PURSUANT TO RULE 6003

**III.    Debtors' Motion for the Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to Continue to Honor Obligations Set Forth in the Hotel Management and Shared Services Agreements.**

18.     Pursuant to the Hotel Management Agreements, the Hotel Managers address employee staffing requirements, implement sales and marketing strategies, supervise property operations, and negotiate and sign purchase orders and national service agreements.  The Hotel Managers also provide management information systems, purchase all operating supplies and operating equipment, ensure that expenses are paid promptly to avoid interruptions of goods and services, and coordinate the maintenance and repair of the Hotels where necessary.  In exchange

for these services, the Hotel Managers receive Monthly Management Fees. On a monthly basis over the prior year, the Debtors have paid approximately $600,000 to Island and approximately $18,000 to Dimension on account of Monthly Management Fees.

19.     In addition, the Operating Lessees are required to reimburse and compensate the Hotel Managers on account of expenses incurred and services performed by the Hotel Managers (including those that arise on account of out of the ordinary course expenses incurred by the Hotel Managers at the direction of the Debtors related to the administration of the Chapter 11 Cases), as well as to indemnify the Hotel Managers for liabilities arising out of the Hotel Managers' performance under the Hotel Management Agreements. While the Debtors currently are not defending the Hotel Managers in any significant litigation, if a party sues the Hotel Managers, the Debtors intend to defend in accordance with their obligations under the Hotel Management Agreements.

20.     Pursuant to the Shared Services Agreement, the Debtors and Island share the costs of certain expenses necessary to manage the Debtors' portfolio of Hotels. Specifically, the Debtors are obligated to pay or reimburse Island for the costs of office space shared by the Debtors and Island, as well as for the services of certain human resource, payroll, purchasing, accounts payable, and tax department employees provided by Island that are critical to the Debtors' ability to manage their Hotels on a portfolio-wide basis. On a monthly basis over the prior year, the Debtors have paid approximately $60,000 to Island on account of the Shared Services Obligations.

21.     The Hotel Managers' willingness to continue to provide the services that are critical to the ability of the Debtors to operate their portfolio of Hotels hinges upon the Debtors' ability to satisfy their Hotel Manager Obligations and Shared Services Obligations. As of the

8

Petition Date, the Debtors do not believe they owe any amounts on account of the Hotel Management Obligations or Shared Services Obligations. However, out of an abundance of caution, and to provide the comfort important to Island and Dimension of future performance, the Debtors are requesting the authority, but not the direction, to continue to perform under the Hotel Management Agreements and the Shared Services Agreement and, on a final basis, to honor, in its discretion, any outstanding prepetition amounts owed on account of the Hotel Manager Obligations or the Shared Services Obligations in accordance with the order granting the relief requested in the Cash Collateral Motion and consistent with their prepetition practices as described in the Cash Management Motion.

22.     The Debtors are mindful of their fiduciary obligations to preserve and maximize the value of their estates. Accordingly, the Debtors have determined that it is critical that they receive the authority, but not the direction, to continue performing under the Hotel Management Agreements and Shared Services Agreement and honor the Hotel Manager Obligations and Shared Services Obligations to effectuate a seamless and successful transition into operating under chapter 11. To the extent the Debtors do not receive authority to do so, the Debtors have determined that the potential loss of the services of the Hotel Managers would cause immediate and irreparable harm to the Debtors' business.

23.     I believe that it is vital to the Debtors' reorganization that their portfolio of Hotels continues to receive uninterrupted and quality services from the Hotel Managers. If the Hotel Managers are not compensated and reimbursed for their services, the Hotel Managers may be hesitant to continue performing their services and may seek to reserve their rights and limit their financial exposure wherever possible. If the Hotel Managers are unable or unwilling to continue performing or providing the critical services relating to the operation and management of the

9

Hotels, it is my belief that the Debtors' ongoing operations will become immediately and irreparably harmed.

24.     Hotel guests and the Debtors' franchisors expect clean, safe, and efficient Hotels, expectations that cannot be met without the continued service of the Hotel Managers at this time. The Hotel Managers possess vast amounts of institutional knowledge due to their long history of working with the Debtors at the Hotels. I believe that this familiarity cannot be matched by other hotel management firms. Further, it is unlikely that the Debtors could locate a single firm to come in and replace the services of Island or Dimension immediately. Instead, the Debtors likely would have to negotiate separate hotel management agreements with multiple parties, which, in my experience, would take time and resources. Moreover, due to the urgent need to find a replacement to keep the Hotels operating, the Debtors would have difficulty obtaining financial terms comparable to those contained in the Hotel Management Agreements and Shared Services Agreements. As a result, I believe that the Hotel Managers could not be replaced immediately without a deterioration in service quality and hotel operating performance. This deterioration could last for a significant period of time and likely would have long-term consequences on the reputations of the Hotels and the Debtors.

25.     Accordingly, absent authority to honor the Hotel Manager Obligations and Shared Services Obligations, there is a significant danger that operations may be interrupted to the detriment of all parties in interest, with the Debtors left scrambling for alternatives that are not likely available without delay or otherwise availing themselves of remedies afforded by the Bankruptcy Code. Neither option is feasible in my opinion. More importantly, neither option is conducive to the seamless ongoing operation of the Debtors' business. Even if the Debtors attempted to enforce the terms of the Hotel Management Agreements and force the Hotel

Managers to perform under the Hotel Management Agreements, such an outcome is not likely to be accomplished in a timely and cost-efficient manner without unduly disrupting the Debtors' business.

26.     The Debtors' business is dependent on the development and maintenance of the loyalty of their Hotels' guests.  In light of any publicity surrounding the Chapter 11 Cases, it is crucial for the Debtors to maintain a positive image.  Therefore, I believe that the benefit of preserving the excellent reputations of the Hotels and maintaining the support of key constituencies (*e.g.*, guests, franchisors, and the Hotel Managers) during the pendency of the Chapter 11 Cases will far exceed any prepetition amounts relating to the honoring of the Hotel Manager Obligations and Shared Services Obligations.

**IV.     Debtors' Motion for the Entry of Interim and Final Orders Authorizing, but Not Directing, the Payment of Prepetition Taxes and Fees.**

27.     In the ordinary course of operating their business, the Debtors, or where appropriate, their Hotel Managers, collect and/or incur income, sales, occupancy, use, franchise, and other taxes, assessments, fees, and similar charges.  The Debtors remit the Taxes and Fees to various federal, state, and local taxing, licensing, and other governmental authorities.  The Debtors pay the Taxes and Fees monthly, quarterly, annually, or biennially to the respective Authorities in accordance with applicable laws and regulations.

*Sales, Occupancy, and Use Taxes*

28.     The Debtors collect and remit sales taxes on a monthly, quarterly, and annual basis (based on jurisdiction) to the Authorities in connection with the sale of their goods and services.  Such goods and services include, without limitation, food and beverages, internet access, and video and telephone services.  Sales Taxes essentially are general consumption taxes

K&E 17218630

charged at the point of purchase for goods and services, which are usually set by the applicable taxing Authority as a percentage of the retail price of the good or service purchased.

29.     Additionally, in the ordinary course of business, the Debtors are required to collect taxes from customers who pay for rooms or space in the Debtors' hotels.  The Debtors file the majority of their returns for Occupancy Taxes on a monthly basis and generally remit the Occupancy Taxes one month in arrears.  However, in some jurisdictions, advance estimate payments are made during the month in which the tax is collected.

30.     While it is my belief that the Debtors are current with respect to their payment of Sales Taxes and Occupancy Taxes, as of the Petition Date, I believe that the Debtors owe approximately $3.3 million in prepetition Sales Taxes and Occupancy Taxes, which are recorded together, that have accrued but have not yet become due and payable, with approximately $2.95 million of which becoming due and owing within 21 days following the Petition Date.

31.     The Debtors are also responsible for remitting Use Taxes on a monthly, quarterly, and annual basis on account of the purchase of various inventory, supplies, or other goods used in the Debtors' business.  Use Taxes typically arise if a supplier does not have business operations in the state in which it is supplying goods and, therefore, does not charge sales tax, but the goods are otherwise taxable to the purchaser.  As a result, the Debtors remit approximately $50,000 in Use Taxes per year to certain of the Authorities—an amount equal to the Sales Taxes that would otherwise be owing had the goods been purchased in-state.  I believe that the Debtors are current with respect to their payment of Use Taxes, and the Debtors estimate that, as of the Petition Date, there are no prepetition Use Taxes that have accrued but have not yet become due and payable.

K&E 17218630

*Franchise Taxes*

32.     The Debtors are required to pay taxes to certain Authorities for the privilege of doing business within a particular jurisdiction.  The Franchise Taxes are invoiced and paid in arrears and may be based on a flat fee, net operating income, or capital employed.  The Debtors pay the Franchise Taxes in most jurisdictions on an annual basis, with the requirement to remit quarterly estimated tax payments in some cases.

33.     The Debtors historically have remitted approximately $675,000 in Franchise Taxes per year to the Authorities.  The Debtors estimate that, as of the Petition Date, they may owe approximately $325,000 to the Authorities on account of prepetition Franchise Taxes.  However, I believe that there are no Franchise Taxes which will become due and owing within 21 days following the Petition Date.

*License and Permit Fees*

34.     The Debtors also are required to obtain various business licenses and permits and pay corresponding fees in the majority of jurisdictions in which they operate.  For example, several states require the Debtors to pay annual reporting fees to remain in good standing for purposes of conducting business within the state.  Other states require the Debtors to pay miscellaneous business taxes simply to operate their business.  In 2009, the total amount owed in connection with the Debtors' obligations for Business License Fees was approximately $375,000.  The Debtors estimate that approximately $200,000 in Business License Fees are due for the remainder of 2010, approximately $40,000 of which will become due and owing within 21 days following the Petition Date.

35.     I believe that, absent the relief requested in this motion, the Debtors' business could be significantly disrupted.  As discussed in the motion, the Debtors could incur penalties, interest, and liens arising from their failure to pay the Taxes and Fees, thereby increasing

13

unnecessarily both the amount and priority of claims against their estates—all to the detriment of the Debtors and their creditors. The Debtors' key personnel could also be exposed to personal liability and needlessly distracted from the present reorganization. In addition, because a vast majority of the amounts at issue likely will be entitled to administrative priority, payment of the Taxes and Fees at this time only affects the timing of the payment and, therefore, should not unduly prejudice the rights of other creditors. Thus, granting the relief requested in this Motion will enhance the likelihood of the Debtors' successful rehabilitation, maximize the value of the estates' assets, and, thus, benefit the estates' creditors.

**V. Debtors' Motion for the Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors To (A) Pay Certain Prepetition Wages, Salaries, and Reimbursable Employee Expenses, (B) Pay and Honor Certain Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs.**

36. The Debtors currently employ 26 employees and also are directly responsible under the Hotel Management Agreements for the compensation and benefits for approximately 2,580 Hotel Employees, who are employees of the Hotel Managers. Twenty-three of the Debtors' Employees and 372 of the Hotel Employees are paid on a salaried basis and three of the Debtors' Employees and 2,183 of the Hotel Employees are paid on an hourly basis.

*Employee Wages*

37. Employees are paid on a bi-weekly basis and payments are one week in arrears from the final date included in the pay period. On average, the Debtors' bi-weekly gross payroll obligations total approximately $140,000 to the Debtors' Employees and $2.75 million to the Hotel Employees.

      (i)      Unpaid Compensation

38. The Debtors estimate that, as of the Petition Date, there may be unpaid amounts of approximately $2.6 million on account of accrued wages, salaries, overtime, and other

14

earnings earned prior to the Petition Date. However, some Employees may be entitled to additional Unpaid Compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and/or (b) some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. The Debtors believe that no Employee is owed more than the $11,725 priority cap imposed by section 507(a)(4) of the Bankruptcy Code on account of Unpaid Compensation.

(ii)    Deductions and Withholding

39.    During each applicable pay period, the Debtors routinely deduct certain amounts from paychecks, including, without limitation, (a) garnishments, child support, and similar deductions and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee Benefit Programs discussed in the motion (such as 401(k) contributions, deferred compensation plan contributions, and premiums for medical insurance) or for union dues. During the most recent pay period, the Deductions totaled approximately $11,000 for the Debtors' Employees and $120,000 for Hotel Employees. The Debtors forward the amount of the Deductions to the appropriate third-party recipients. Due to the commencement of the Chapter 11 Cases, however, approximately $25,000 in Deductions that were withheld from Employees' earnings were not forwarded to the appropriate third-party recipients before the Petition Date. Accordingly, the Debtors seek authority to forward Deductions, including those withheld prepetition, to the applicable recipients on a postpetition basis, in the ordinary course of business, as routinely done before the Petition Date.

40.    Further, the Debtors are required by law to withhold from an Employee's wages amounts for federal, state, and local income taxes, social security, workers' compensation, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority. The

Debtors must then match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance. On average, the Payroll Taxes are approximately $660,000 per pay period. The Debtors seek authority to continue honoring and processing Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done before the Petition Date. The Withheld Amounts constitute "trust fund" taxes, and, thus, the payment of such taxes will not prejudice general unsecured creditors, given that the relevant taxing authorities have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Furthermore, there is significant risk to the Debtors' officers of personal civil or criminal liability if the Payroll Taxes are not funded, which would impact the Debtors' operations severely by creating undue concern and distraction for such officers.

*Honoring Payment of Reimbursable Expenses*

41.     In the ordinary course of business, the Debtors reimburse Employees or pay credit card invoices on behalf of Employees for certain approved, reasonable expenses incurred in the scope of their employment and reimburse non-employee directors for reasonable out-of-pocket expenses incurred in connection with board meeting attendance. Reimbursable Expenses are paid in connection with, among other things, business-related travel expenses, including meals, hotels, flights, and car rentals, business development activities with current or potential clients, and reimbursement for office supplies and other items purchased for use in the Debtors' business operations. If such Reimbursable Expenses remain outstanding, Employees and non-employee directors may be understandably reluctant to undertake necessary business activities that require coming out-of-pocket for related expenses.

16

(i)     Credit Card Program

42.     Eight of the Debtors' Employees have been issued American Express Company corporate cards to pay for certain Reimbursable Expenses. American Express invoices the Debtors directly for the expenses charged by Employees to the American Express corporate credit cards. Once the Debtors have determined that the charges are for legitimate Reimbursable Expenses, they pay American Express directly. In the aggregate, the Employees incur, on average, less than $100,000 per month on account of Reimbursable Expenses that are charged to the American Express corporate credit cards. As of the Petition Date, the Debtors believe they owe approximately $10,000 on account of prepetition Reimbursable Expenses charged to the American Express corporate credit cards.

(ii)     Reimbursable Expenses Paid Through Payroll

43.     Employees may also pay for Reimbursable Expenses by cash or personal credit cards and submit receipts to the Debtors for reimbursement. The Debtors reimburse such Reimbursable Expenses to Employees directly through the payroll system after the processing and approval of receipts. Although the Debtors request that Employees submit reimbursement requests promptly, not all Employees are able to do so, and it is, therefore, difficult for the Debtors to estimate precisely the amount of Reimbursable Expenses outstanding as of the Petition Date. The Debtors thus request authority to reimburse Employees for amounts incurred prior to the Petition Date for Reimbursable Expenses paid through the payroll system.

(iii)     Non-Employee Director Travel Expenses

44.     Each non-employee member of the Debtors' board of directors receives reimbursement of reasonable out-of-pocket expenses incurred in connection with board meeting attendance. As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of non-employee director travel expenses. However, if it is found that there are amounts

17

due and owing on account of Non-Employee Director Travel Expenses, the Debtors request authority to reimburse each non-employee director for such amounts upon entry of a final order on this Motion.

*Incentive Plans*

45.     In the ordinary course of business, the Debtors maintain various incentive plans to encourage their Employees to maximize the value of the Debtors' enterprise, including various sales and service incentive plans and a management incentive plan.  These Incentive Plans are an important component of Employee compensation and provide substantial value to the Debtors' estate because they encourage Employees to achieve important financial performance and service goals.  The Debtors are seeking authority to honor the obligations under the Incentive Plans only to Employees who are not "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.  The Debtors will seek separate approval from the Court prior to making any incentive payments to insiders.  As of the Petition Date, the Debtors will owe approximately $150,000 in payments under the Incentive Plans due and owing to non-insider Employees.

*Employee Benefits Programs*

46.     The Debtors maintain, in the ordinary course of business:  (a) Health Benefits Plans; (b) Other Insurance Benefits; (c) a 401(k) Plan and a Deferred Compensation Plan; (d) a Workers' Compensation Program; (e) Vacation Time and Sick Leave benefits; and (f) Pension Plans.

(iv)     Health Benefits Plans

47.     All Employees are eligible to receive medical, vision, prescription drug, and dental insurance coverage.  The Debtors estimate that, as of the Petition Date, they owe the aggregate amount of approximately $725,000 on account of the Health Benefits Plans.

18

(v)     Other Insurance Benefits

48.     The Debtors provide a number of different types of insurance benefits to their Employees, including life and accidental death and dismemberment insurance, short-term disability insurance, and long-term disability insurance. All of the Other Insurance Benefits are administered through CIGNA and are fully insured, meaning that the Debtors pay the insurance carrier a set premium on a monthly basis and the insurance carrier pays the Employees' claims based on the applicable policy terms. The Debtors estimate that, as of the Petition Date, they do not owe any amounts on account of the Other Insurance Benefits.

(vi)    401(k) Plan and Deferred Compensation Plan

49.     The Debtors maintain a retirement savings plan for the benefit of all eligible Employees that meet the requirements of section 401(k) of the Internal Revenue Code. As discussed above, the Debtors deduct certain amounts from participants' paychecks on account of their 401(k) contributions under the 401(k) Plan. The 401(k) Plan is administered for some Employees by Preferred Pension Solutions, LLC, an affiliate of Nationwide and for other Employees by Principal. The Debtors estimate that, as of the Petition Date, they owe Nationwide and Principal approximately $14,000 in the aggregate on account of fees incurred for administering the 401(k) Plan.

50.     The Debtors also maintain a deferred compensation plan for employees that are not eligible to contribute to the 401(k) Plan. As discussed above, the Debtors deduct certain amounts from participants' paychecks on account of their contributions under the Deferred Compensation Plan. The Deferred Compensation Plan is administered by ING. The Debtors estimate that, as of the Petition Date, there are no amounts owing to ING for administering the Deferred Compensation Plan.

(vii)     Workers' Compensation

51.     The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level for each state in which they have Employees.  The Debtors' Workers' Compensation Program is divided into two components—one for Hotel Employees and one for the Debtors' Employees.   The Workers' Compensation Program for Hotel Employees is self-funded and administered through Gallagher Bassett Services, Inc.  Gallagher collects and processes claims for workers' compensation benefits in exchange for an administrative fee.  The Workers' Compensation Program for the Debtors' Employees is underwritten and administered by Chartis.  Chartis collects, processes, and pays claims submitted for workers' compensation benefits in exchange for a monthly premium paid for by the Debtors.  The Debtors estimate they may potentially owe approximately $1.27 million on account of the Workers' Compensation Program, including amounts owed to Gallagher and Chartis for premiums and administrative fees.

(viii)    Vacation Time and Sick Leave

52.     The Debtors provide vacation time to all Employees as a paid time-off benefit. The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrues is generally determined by the Employee's position and the length of full-time employment with the Debtors.  When an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate.  An Employee is only entitled to a cash payment for unused Vacation Time in the event that such Employee is terminated from the Debtors' employment.  Except for in California, Employees have to use their Vacation Time annually and unused Vacation Time does not carry forward.  As of the Petition Date, the Debtors estimate they owe Employees approximately $1.1 million in accrued Vacation Time.

20

53. In addition, all Employees are eligible for sick leave due to illness or injury. The amount of Sick Leave available to a particular Employee is generally determined by the Employee's position and length of employment with the Debtors. Employees have to use their Sick Leave annually and unused Sick Leave does not carry forward, and Employees may not receive cash for their unused Sick Leave upon termination.

(ix)     Union Pension Plan

54. The Debtors also contribute to pension plans maintained by Unite Here NY Joint Board Local 96 in Morristown, New Jersey and Local 371 UFCW in Shelton, Connecticut. The Debtors contribute a monthly or annual fee to the Pension Plans based on the type of Employee and years of experience. The Debtors estimate they owe $55,000 on account of obligations under the Pension Plans as of the Petition Date.

55. I believe that the relief requested in the motion will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption. In the absence of such payments, I believe that the Debtors' Employees may seek alternative employment opportunities, which would deplete the Debtors' workforce and hinder the Debtors' ability to satisfy customer obligations. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors should be focusing on their restructuring. Any Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements (assuming such replacements can be found), which could severely disrupt the Debtors' operations at an important juncture. Accordingly, the Debtors must be able to pursue all reasonable measures to retain their Employees by, among other things, continuing to honor all wages, benefits, and related obligations, including those that accrued before the Petition Date.

**VI.** **Debtors' Motion for the Entry of Interim and Final Orders (A) Authorizing the Debtors To Grant Administrative Expense Priority to All Undisputed Obligations for Goods Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, (B) Authorizing, but Not Directing, the Debtors To Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen, and (C) Authorizing the Debtors to Pay Prepetition PACA Claims.**

*Outstanding Orders*

56. Prior to the Petition Date, and in the ordinary course of business, the Debtors ordered approximately $4.1 million of goods for which delivery will not occur until after the Petition Date. As a result of the commencement of these Chapter 11 Cases, suppliers may be concerned that goods ordered prior to the Petition Date pursuant to the Outstanding Orders, which are scheduled to be delivered to the Debtors after the Petition Date, will render the suppliers general unsecured creditors of the Debtors' estates with respect to such goods. As a result, suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition or the Court permits the Debtors to meet their obligations under the Outstanding Orders. The Debtors, therefore, seek interim and final orders of the Court (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

*Claims of Shippers, Warehousemen, and Materialmen*

57. The Debtors contract with a number of counterparties for the acquisition of goods necessary for the day-to-day operation of the Debtors' business. Such items include appliances, furniture, and wall coverings for hotels in the Debtors' network, as well as related construction materials necessary for the upkeep of the properties. Timely delivery of these items is vital to the Debtors' efforts to make rooms available for customers and to maintain quality standards

22

under their franchise agreements. In some cases, Shipping Vendors arrange for the transportation or storage of the goods that they sell, at times incorporating shipping charges into the Outstanding Orders. In other instances, the Debtors arrange for a third-party contractor, JMC Global, to facilitate transportation. The Debtors estimate that, as of the Petition Date, they owe approximately $10,000 on account of shipping and logistics charges for goods ordered prepetition, all of which will become due and owing within 21 days following the Petition Date.

58.     To store guest room and other inventory purchased by the Debtors, the Debtors, or, in certain instances, JMC, secure storage space with certain Warehousemen. The Debtors utilize ten warehouses in six states to store goods purchased and owned by the Debtors until the Debtors are able to incorporate those products into their hotels. The availability of these warehoused goods is critical to the Debtors' ongoing efforts to maintain and to improve their properties. In particular, any efforts by the Debtors to successfully cure defaults under their franchise agreements with respect to property improvement program requirements will likely require unfettered access to the warehoused inventory. The Debtors estimate the value of warehoused goods to be approximately $2 million and the outstanding prepetition amounts owed to Warehousemen to be approximately $10,000, all of which will become due and owing within 21 days following the Petition Date.

59.     The Debtors do business with a number of third parties who could potentially assert liens against the Debtors and their property for amounts the Debtors owe to those third parties, including mechanic's liens and materialman's liens. For example, the Debtors use third-party contractors to improve and repair the Debtors' properties. A number of these ongoing projects could result in the filing of liens against the properties if payments are not made in a timely fashion. Indeed, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of

perfecting such a lien, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. Under section 546(b), a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection . . . ." 11 U.S.C. § 546(b)(1)(A). Moreover, property-level managers may engage contractors on an emergency basis without notifying the Debtors' higher-level management teams in the course of the day-to-day management of the Debtors' business. The Debtors estimate that, as of the Petition Date, the outstanding prepetition invoices of the Materialmen are in the amount of approximately $400,000, substantially all of which will become due and owing within 21 days following the Petition Date.

60.     To avoid undue delay and to facilitate the continued operation, maintenance, and improvement of the Debtors' business, the Debtors seek immediate authority to pay and discharge, on a case-by-case basis and in their sole discretion, the claims of all Claimants that have given or could give rise to a lien against the Debtors or the Debtors' customers regardless of whether such Claimants have already have perfected their interests.

*PACA Claims*

61.     In connection with various food service activities undertaken by the Debtors in the operation of their hotels, which generate approximately $15.9 million in revenue, certain vendors may be eligible to assert potential claims under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq* on account of certain goods the PACA Claimants sold to the Debtors that may be deemed "perishable agricultural commodities" under PACA. Under PACA, an unpaid vendor of perishable agricultural commodities may impose a trust on certain of the Debtors' assets. The Debtors believe that certain of their vendors are likely to impose a PACA Trust and to assert their rights, if any, thereunder.

24

62. It is essential to the Debtors' operations that the flow of fresh produce and other goods and merchandise continue unimpeded. Any delays in satisfying PACA Claims could affect adversely the Debtors' ability to obtain such food items in the future, thereby undercutting the Debtors' competitive posture and their ability to reorganize successfully. Moreover, to the extent that a PACA Claimant is entitled to the protection of PACA, corresponding PACA Claims (provided such claims satisfy all applicable statutory requirements) will be entitled to prompt payment from the PACA Trust ahead of secured and unsecured creditors of the Debtors' estates. The Debtors propose to settle any PACA Claims in a manner consistent with the statutory requirements of PACA. Accordingly, payment of PACA Claims, in the Debtors' sole discretion, at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors, and the Debtors submit that the prompt and full payment of all PACA Claims should be authorized by the Court. The Debtors estimate that, as of the Petition Date, they owe approximately $300,000 on account of PACA Claims.

63. It is my opinion that paying Claimants will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. I understand that under some state and federal laws, a Claimant may have a lien on the goods in its possession that secures the charges or expenses incurred in connection with the transportation of the goods. The Claimants may be unwilling to release the goods in their possession to which they may be entitled to liens, because releasing possession of the goods may convert their claims against the Debtors from secured to unsecured. Therefore, unless the Court authorizes the Debtors to pay the Claimants, I believe that it is unlikely the Debtors will continue to obtain the goods currently in transit. If the Claimants possess lien rights or have the ability to exercise "self-help" remedies to secure payment of their claims, failure to satisfy the Claimants' claims

25

could have a material adverse effect that may ultimately devastate the operations of the Debtors' business to the detriment of the Debtors' creditors.

64.     In addition, absent the relief requested in the motion, the Debtors could be subjected to countless actions from PACA Claimants seeking enforcement of their PACA Claims (including payment of attorney's fees as authorized under PACA), which would, I believe, result in the unnecessary expenditure and misallocation of the Debtors' limited financial and human resources.  Moreover, the Debtors' ability to continue operating as debtors in possession depends, in large part, on their ability to procure deliveries of perishable and other goods to supply their hotel properties and to preserve their reputation as reliable customers who pay their vendors in a timely manner.  In my opinion, any delays—perceived or real—in satisfying PACA Claims could affect adversely the Debtors' ability to obtain inventory, thereby bringing their food and beverage service operations to a grinding halt and undercutting their prospects for successfully reorganizing.  If any of this were to occur, the results would likely be far more damaging to the Debtors than any payments to be made on account of PACA Claims.

**VII.    Debtors' Motion for Entry of an Order Authorizing, but Not Directing, the Debtors to Honor Certain Prepetition Obligations to Customers and Otherwise Continue Certain Customer Programs and Practices in the Ordinary Course Of Business.**

65.     A large part of the Debtors' revenue is derived from individual room bookings at the Debtors' hotel properties for short-term stays.  In addition, the Debtors' hotel properties are also reserved for various special events, including weddings and other celebratory occasions, business conferences and conventions, and other large local and national functions.  For Customers to secure a room or event space in the Debtors' hotel properties, certain Customers must provide the Debtors with a deposit, which generally secures a room, or block of rooms, and any catering and other services in connection with a Customer's event reservation.  In my

experience, the Debtors' ability to honor their obligations in connection with the Customer Deposits, including, without limitation, their ability to provide accommodations and certain services related to the Customer Deposits, are an integral part of the Debtors' business and a staple in the hotel industry.

66.     Moreover, I believe that maintaining strong relationships with Customers is important because the Debtors face increasing pressure and competition from other hotels offering similar hotel room accommodations, event space, and packages.  The competitive challenges the Debtors face inevitably are exacerbated by the filing of these Chapter 11 Cases, and the Debtors must ease any anxieties the Customers may have that these Chapter 11 Cases will interfere with the Debtors' ability to fully meet Customer needs and expectations.

67.     The Debtors estimate that they have received approximately $1,100,000 on account of Customer Obligations as of the Petition Date to be honored in the future.  These amounts do not represent out-of-pocket cash costs to the Debtors, as they are honored through hotel stays and other hotel activities.  However, out of an abundance of caution, the Debtors seek to continue to honor the Customer Obligations.  Absent the relief requested in the motion, I believe that the Debtors would be unable to effectively maintain their Customer relationships, which could cause significant harm to the Debtors, their estates, creditors, and all parties in interest at a time when Customer support is critical to the Debtors' operations and restructuring effort.

K&E 17218630

**VIII.** **Debtors' Motion for the Entry of an Order Authorizing the Continued Use of (I) Existing Cash Management System, as Modified Herein, (II) Existing Bank Accounts, (III) Existing Business Forms, and (IV) Certain Existing Investment Guidelines.**

*The Debtors' Prepetition Cash Management System*

68.     To efficiently and seamlessly manage their business, the Debtors, with assistance from the Hotel Managers, utilize an integrated, centralized cash management system similar to those utilized by other large companies to collect and transfer the funds generated by their hotel properties and disburse those funds to satisfy the obligations under their debt documents and those required to operate their business.  In the ordinary course of business, the Debtors work with the Hotel Managers to record accurately such collections, transfers, and disbursements as they are made.  The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of their bank accounts.  A diagram of the Cash Management System is attached to this motion as **Exhibit C**.

69.     The components of the Cash Management System are organized around three principal functions:  cash collection; concentration; and disbursements.

(a)     Cash Collection

70.     The Debtors generate and receive funds primarily from payments by guests for stays at the Debtors' hotel properties and for ancillary goods and services provided by the hotels. The Debtors' receipts are generated from two sources:  (a) payments made by cash, check sales, or direct bill at the Debtors' hotels; and (b) collection of credit card receivables at the Debtors' hotels.  Depending on the source of payment, the revenue is processed by the Debtors either in a local depository account or a collection account at SunTrust Bank.

28

(b)     Concentration

71.     Except as otherwise described in the motion, cash generated and collected by the Debtors (with the exception of the cash swept to the Trimont Account) is ultimately transferred into the Master Concentration Account held in the name of KPA LeaseCo Holding Inc. at SunTrust.

(c)     Disbursements

72.     The Debtors' disbursements relate primarily to (a) corporate payroll, (b) operating expenses, including any management fees owed under the Management Agreements, (c) property taxes, (d) property insurance, (e) corporate general and administrative expenses, and (f) debt service.  The Debtors make all of their disbursements from three accounts funded by the Master Concentration Account, two of which are located at Bank of America and one at Sun Trust.

(d)     Lockbox Agreement

73.     On March 23, 2010, Wachovia Bank, N.A., the master servicer of the LB-UBS Commercial Mortgage Trust 2007-C6 mortgage loan pool of the Fixed Rate Mortgage Loan Agreement, informed the Debtors that a "triggering event" under the June 29, 2007 Cash Management Agreement had occurred and indicated that, as a result, Wachovia would need to "spring" certain unidentified lockbox accounts.  A lockbox over the Debtors' accounts would have had disastrous results for the Debtors.  Approximately 80 percent of the Debtors' revenue comes from credit card receipts.  If the Debtors were unable to access funds generated from credit card receivables, it would have been unable to pay hotel employees, vendors, or continue to operate the hotels.  A lockbox over the Debtors' credit card receivables alone would have required the Debtors to cease operations for a significant number of hotels, which would have

29

severely impacted the Debtors' enterprise value as well as the value of each affected property. In light of these concerns, the Debtors directed credit card proceeds to their Master Concentration Account until such time as an arrangement could be reached with the loan servicer (or special servicer), which would allow the Debtors to continue to operate the hotels.

74. These actions were taken to meet the Debtors' day-to-day business obligations, to preserve the value of their hotel properties for the benefit of shareholders and bondholders, and to keep the Debtors' hotel businesses in operation. The Debtors subsequently negotiated with Wachovia and then the Special Servicer, Midland Loan Services, Inc., to keep the affected hotels open and operating. During these negotiations, the Debtors offered to fully reconcile all amounts directed to the Debtors' Master Concentration Account and, in fact, did so. By early May 2010, the Debtors and Midland reached an agreement under which all credit card receivables were paid by the Debtors to Midland, fully reconciling the amounts previously directed to the Master Concentration Account, and Midland would pay on a going forward basis the operating expenses of the hotels to permit the Debtors to continue to operate the hotels. Midland and the Debtors, as of the Petition Date, continue to operate under this arrangement.

*The Debtors' Existing Business Forms and Checks*

75. In the ordinary course of business, the Debtors use a variety of pre-printed checks and business forms. To minimize expenses to their estates and avoid unnecessary disruption to their operations, the Debtors request authority to continue to use all correspondence and business forms, including, without limitation, letterhead, purchase orders, and invoices as such forms were in existence immediately before the Petition Date, rather than require the Debtors to incur the expense, delay, and business disruption of immediately stopping the use of their existing Business Forms and require them to order and use entirely new business forms that strictly comply with the U.S. Trustee Chapter 11 Guidelines for the Southern District of New York. The

30

Debtors will replace their Business Forms with new forms identifying their status as debtors in possession as their existing stock is depleted. With respect to checks that the Debtors print themselves, the Debtors will begin printing these checks with a "Debtor in Possession" designation as soon as practicable after the Petition Date.

*The Debtors' Investment Practices*

76. Prior to the Petition Date, the Debtors' investment approach consisted of two separate, daily investment practices. First, as described above, the Debtors, at the end of each day, invested all cash held in the Master Concentration Account overnight in SunTrust Promissory Notes. Second, as described above, any cash remaining in the Innkeepers USA LP Account at the end of each day was invested in Repurchase Agreements.

77. I believe that the Debtors' investment practices allow the Debtors to invest their cash with the primary goal of protecting principal and a secondary goal of maximizing yield and liquidity. The Debtors intend to maintain those same investment goals during the Chapter 11 Cases. However, as of the Petition Date, the Debtors have discontinued the practice of investing in Repurchase Agreements and will no longer transfer any amounts into Repurchase Agreements. The Debtors seek authority in this motion only to continue investing in the SunTrust Promissory Notes subject to the objection period set forth in the corresponding order.

*The Debtors' Proposed Postpetition Modification to Their Cash Management System*

78. The Debtors operate and manage their enterprise of 72 properties on a consolidated basis, allowing them to benefit from economies of scale—eliminating many of the duplicative processes and costs that would otherwise apply to properties owned and managed on an individual basis. Because the Debtors' operations are run as such and because of the nature of the Hotel Management Agreements, it is most practical and efficient for the Debtors to continue operating as they have prior to the Petition Date and to collect and allocate all funds from a

single, concentrated account (the Master Concentration Account) and then allocate common expenses to the various properties and pay expenses from the Master Concentration Account. Thus, as described in the Cash Collateral Motion, the Debtors intend to consolidate on a postpetition basis all cash in the Master Concentration Account and apply such cash in a manner consistent with the waterfall set forth in the Interim Cash Collateral Order. At the same time, the Debtors will be able to track revenue and expenses from the prior month on a property-by-property, as well as on a tranche of debt-by-tranche of debt basis, and effect any reconciliation of prior month expenses allocated to specific entities, as necessary.

79. Further, on a monthly basis, the Debtors intend to provide each Representative (as defined in the Interim Cash Collateral Order) with an Application Report (as defined in the Interim Cash Collateral Order) that details, among other things, the Cash Collateral (as defined in the Interim Cash Collateral Order) generated by the applicable Debtors within a Tranche of Debt (as defined in the Interim Cash Collateral Order) and the amount of cash deemed to have been applied under the Waterfall to pay the costs and expenses of those same Debtors.

80. It is my opinion that the operation of the Debtors' business requires that the Cash Management System continue during the pendency of the Chapter 11 Cases. I believe that requiring the Debtors to adopt a new, segmented cash management system at this critical stage of these Chapter 11 Cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of the Debtors' hotel business. There are approximately 100 different Bank Accounts related to the Debtor's operations, and the current Cash Management System has seamlessly and efficiently operated to collect the revenue generated at the property levels and disburse such funds to the appropriate creditors in a timely fashion. Any disruption outside of the limited modifications proposed in the motion could have

a severe and adverse impact on the Debtors' ability to reorganize, as well as on the value of the Debtors' portfolio of hotels. Consequently, maintenance of the existing Cash Management System, as modified in the motion, is essential and in the best interests of all creditors and other parties-in-interest.

<div align="center">**OPERATIONS MOTIONS REFERRED TO A LATER HEARING**</div>

**IX. Debtors' Motion for the Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services.**

81.     In the ordinary course of business, the Debtors' hotels as well as the Debtors' corporate offices incur expenses for gas, water, sewer, electric, and other similar utility services provided by approximately 182 utility providers (as such term is used in section 366 of the Bankruptcy Code). Attached to the motion as **Exhibit B** is a list of the Utility Providers who rendered services to the Debtors' 72 Hotels and the Debtors' corporate offices as of the Petition Date.

82.     As described in the Cash Management Motion and pursuant to Hotel Management Agreements with the Hotel Managers, the Hotel Managers cause to be disbursed on a regular basis, on behalf of the Debtors, funds owed to Utility Providers for operating expenses including utility services provided to the Hotels. The Debtors also make regular payments to Utility Providers out of an account maintained by Innkeepers USA Limited Partnership, one of the Debtors, for utility services provided to the Debtors' corporate offices. Utility costs aggregate approximately $1.6 million each month for the Hotels and the Debtors' corporate offices. As of the Petition Date, the Debtors estimate that approximately $800,000 in utility costs for the Hotels and the Debtors' corporate offices may be outstanding. The Debtors do not believe they owe any past due amounts to the Utility Providers.

<div align="center">33</div>

83.     The Debtors expect that their cash flow from operations and cash on hand will be sufficient to pay postpetition utility service obligations.   Therefore, in accordance with prepetition practices, the Debtors intend to satisfy postpetition obligations owed to the Utility Providers in a timely manner.   Contemporaneously herewith, the Debtors have filed the Cash Collateral Motion to continue using cash on hand to fund operations and the Debtors' restructuring.

84.     Notwithstanding the protections afforded to the Utility Providers by the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business, the Debtors request the Court's approval of certain procedures, annexed to the motion as **Schedule 1** to **Exhibit A**, that will (a) require the Debtors to establish a cash deposit equal to the estimated aggregate cost for two weeks of utility service, calculated as a historical average over the twelve months before the Petition Date, for the benefit of any Utility Provider that requests one and (b) offer an opportunity for Utility Providers to request additional assurance of payment in addition to such cash deposit.

85.     The Debtors request that the Court prohibit the Utility Providers and any Utility Provider subsequently added to the Utility Service List from altering, refusing, or discontinuing utility services to the Debtors, or discriminating against the Debtors, on the basis of the Debtors' bankruptcy filing, that a debt owed to a Utility Provider by the Debtors for service rendered before the Petition Date was not paid when due, or any perceived inadequacy of the Proposed Adequate Assurance.

86.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Indeed, I believe that any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations,

34

franchisor relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 Cases.

X.  **Debtors' Motion for the Entry of an Order Authorizing, but Not Directing, the Debtors to (A) Maintain Prepetition Insurance Policies and Premium Financing Agreements and (B) Pay All Prepetition Obligations in Respect Thereof.**

87.    In the ordinary course of business, the Debtors maintain a number of insurance policies, which provide coverage for, among other things, general liability, fiduciary liability, excess liability, directors and officers' liability, excess directors and officers' liability, property liability, automobile liability, workers' compensation, employment practices liability, and total umbrella liability. The Policies are financed through premium financing agreements (as discussed in further detail below). In addition, certain of the Policies require the Debtors to pay self-insured retentions and deductibles in connection with certain claims under the Policies. A Policy Schedule is attached to the motion as **Exhibit B**. The Policies are essential to the preservation of the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities. Further, the U.S. Trustee's guidelines require debtors to maintain insurance coverage throughout their chapter 11 proceedings.

88.    The Debtors believe that they are current on all payment obligations under the Policies as of the Petition Date. Going forward, however, the Debtors will need to continue to make installment payments under their existing PFAs and to pay any deductibles or self-insured retention amounts necessary to preserve the coverage provided under the Policies.

K&E 17218630

*The Financed Policies*

89.     In the ordinary course of the Debtors' businesses, the Debtors finance the premium payments for certain of the Policies.  Spreading out the cost of the Policies and any related Broker's Fees over the applicable coverage period with the PFAs helps the Debtors manage their cash flow with reasonable financing costs.  Specifically, the Debtors maintain three premium financing agreements.  One PFA, provided through AFCO, finances total premiums of $427,636.25 related to the Debtors' directors and officers' liability and related excess coverage.  A second PFA through AFCO finances total premiums of approximately $1.5 million related to the Debtors' commercial property liability.  The third PFA, provided through Bank Direct Capital Finance, relates to the Debtors' commercial crime, general liability, auto liability, workers' compensation liability, and employers practice liability.

90.     The terms of the D&O PFA provide that the Debtors pay AFCO an initial down payment of $36,156.89, followed by eleven monthly installments, each in the amount of $36,218.46 (bearing an annual interest rate of 3.177 percent), in exchange for AFCO's agreement to pay the insurance premiums to the respective Financed Policies' insurers.  As of the Petition Date, $108,844.38 in installment payments remain outstanding under the D&O PFA.  The Debtors are current on all of their D&O PFA Installments, and the Debtors believe that currently there are no prepetition amounts outstanding under the D&O PFA.

91.     The terms of the Property PFA provide that the Debtors pay AFCO an initial down payment of $133,912.85, followed by eleven monthly installments, each in the amount of $126,184.89 (bearing an annual interest rate of 3.15 percent), in exchange for AFCO's agreement to pay the insurance premiums to the respective Financed Policies' insurers.  As of the Petition Date, $504,739.96 in installment payments remain outstanding under the Property PFA.

The Debtors are current on all of their Property PFA Installments, and the Debtors believe that currently there are no prepetition amounts outstanding under the Property PFA.

92.     The terms of the General Liability PFA provide that the Debtors pay Bank Direct an initial down payment of $345,593.04, followed by nine monthly installments, each in the amount of $168,347.82 (bearing an annual interest rate of 3.59 percent), in exchange for Bank Direct's agreement to pay the insurance premiums to the respective Financed Policies' insurers. As of the Petition Date, $336,695.64 in installment payments remain outstanding under the General Liability PFA.   The Debtors are current on all of their General Liability PFA Installments and the Debtors believe that currently there are no prepetition amounts outstanding under the General Liability PFA.

93.     Pursuant to the PFAs, the Debtors assign unearned or returned premiums, dividends, and loss payments to AFCO and Bank Direct, as applicable, as security for the total amounts payable under the PFAs.  If the Debtors fail to pay the PFA Installments, AFCO and Bank Direct have the right to request cancellation of the insurance policies upon 10-days' written notice to the Debtors subject to the right of the Debtors to cure such payment or other default within such period.  Additionally, upon a default, AFCO and Bank Direct, as applicable, have the right to accelerate the entire amount of unpaid PFA Installments and to assess late charges against the Debtors.  Upon any termination of a PFA, AFCO and Bank Direct, as applicable, have the right to set off any amounts owed by the Debtors against the amount of unearned insurance premiums returned to AFCO and Bank Direct by the insurance carriers.  If AFCO and Bank Direct chose to cancel the Debtors' Policies under the PFAs, the Debtors would be forced to obtain replacement insurance on an expedited basis likely at a significant cost and disruption

to their estates and operations.  Moreover, any non-payment of the PFA Installments could have an adverse impact on the Debtors' ability to finance premiums for future insurance policies.

94.     In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing certain of their insurance premiums, the Debtors believe it is in the best interests of their estates to receive the Court's approval to honor their obligations under the PFAs.

*The Debtors' Surety Bonds*

95.     In addition to the Policies, the Debtors' insurance coverage includes surety bonds in the aggregate amount of approximately $723,000 which guarantee certain identifiable risks related to the Debtors' operations.  The Surety Bonds guarantee the Debtors' performance of obligations owing to third parties (*e.g.*, certain of the Debtors' utility providers and state and local governments).  In many instances, these Surety Bonds are required by applicable law. During the current policy period, the Debtors estimate that the annual aggregate cost to maintain the Surety Bonds will be approximately $20,000.

*The Debtors' Insurance Brokers*

96.     In connection with the Policies, the Debtors obtain services from third-party Insurance Brokers to assist the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in the most cost-effective manner.  In particular, the Insurance Brokers assist the Debtors with the procurement and negotiation of the Policies from insurance carriers, enabling the Debtors to obtain insurance policies on advantageous terms and at competitive rates.

97.     As of the Petition Date, the Debtors' Insurance Brokers are AON Risk Management and Arthur J. Gallagher Brokerage and Risk Management Services.  On account of the services they provide, the Insurance Brokers receive compensation from the Debtors, which

are calculated as a percentage of the PFA Installments. As of the Petition Date, the Debtors do not believe there any prepetition amounts outstanding with respect to the Broker's Fees.

98.     I believe that it is in the best interests of the Debtors' estates to continue maintaining the Policies and to pay any outstanding prepetition insurance premiums necessary to do so, as well as to revise, extend, supplement, or change insurance coverage, as necessary, pursuant to section 363(b)(1) of the Bankruptcy Code.

**XI.    Debtors' Motion for the Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members**

99.     The Debtors are seeking authorization to retain and employ various professionals, including: Kirkland & Ellis LLP, as primary restructuring counsel, and Moelis & Company, as financial advisor and investment banker. The Debtors anticipate they also may retain other professionals during the course of the Chapter 11 Cases as the need arises. Moreover, any official committee formed by the U.S. Trustee to assist in the Chapter 11 Cases likely will retain counsel and may retain other professionals to represent them in connection with the Chapter 11 Cases.

100.    The Debtors propose that the payment of compensation and reimbursement of expenses of the Professionals be governed by the following Compensation Procedures:

(a)     On or before the 25th day of each month following the month for which compensation is sought, or as soon as practicable thereafter (but not earlier than the 15th day of the month), each Professional seeking compensation may file a Monthly Application for interim allowance of compensation for services rendered and reimbursement of expenses incurred during the preceding month. Each Monthly Application must contain a list of the individuals and their respective titles (*e.g.*, attorney, accountant, or paralegal) who provided services during the statement period, their respective billing rates, the aggregate hours spent by each individual, a reasonably detailed breakdown of the disbursements incurred, and contemporaneously maintained time entries for each individual in increments of tenths (1/10) of an hour. Professionals must serve

such Monthly Applications, by hand or overnight delivery, on the following Notice Parties: (i) the Debtors, Innkeepers USA Trust, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480, Attn.: Mark Murphy; (ii) counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Jennifer L. Marines, and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn.: Marc J. Carmel; (iii) counsel for any committee formed by the U.S. Trustee; and (iv) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.: Paul Schwartzberg. Any Professional that fails to file a Monthly Application for a particular month or months may subsequently submit a consolidated Monthly Application that includes a request for compensation earned or expenses incurred during previous months. All Monthly Applications shall comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and applicable Second Circuit law.

(b)     Each Notice Party will have until **4:00 p.m. prevailing Eastern Time on the 20th day (or the next business day if such day is not a business day) following service of the Monthly Application** to object to the requested fees and expenses in accordance with the procedures described in subparagraph (c) below. Regardless of whether a Monthly Application Objection (as defined in the motion) is received by the Objection Deadline, the Debtors are authorized and directed to pay, after the Objection Deadline, the Professional an amount equal to the lesser of: (i) 80 percent of the fees and 100 percent of the expenses requested in the applicable Monthly Application and (ii) 80 percent of the fees and 100 percent of the expenses requested in the applicable Monthly Application that are not subject to a timely filed and served Monthly Application Objection in accordance with subparagraph (c) below.

(c)     For any Notice Party to object to a Professional's Monthly Application, it must (i) file a written Monthly Application Objection with the Court on or before the Objection Deadline and (ii) serve the Monthly Application Objection on the affected Professional and each of the other Notice Parties so that it is received by each of these parties on or before the Objection Deadline. Thereafter, the objecting party and the affected Professional may attempt to resolve the Monthly Application Objection on a consensual basis. If the parties are unable to reach a resolution of the Monthly Application Objection, the affected Professional may forego payment of the difference between the Maximum Monthly Payment and the Actual Monthly Payment made to the affected Professional until the next interim or final fee

K&E 17218630

application hearing, at which time the Court will consider the Monthly Application Objection if requested by the parties.

(d)    At four-month intervals or such other intervals that the Court deems appropriate, each of the Professionals may file with the Court and serve on the Notice Parties an Interim Application for interim Court approval and allowance of the compensation and reimbursement of expenses sought by such Professional in its Monthly Applications, including any holdbacks, filed during the Interim Fee Period, pursuant to section 331 of the Bankruptcy Code on or before 45 days after the end of each Interim Fee Period. The Interim Application, which will be substantially in the form of **Exhibit B** hereto, must include a brief description identifying: (i) the Monthly Applications that are the subject of the request; (ii) the amount of fees and expenses requested; (iii) the amount of fees and expenses paid to date or subject to a Monthly Application Objection; (iv) the deadline for parties other than the Notice Parties to file objections to the Interim Application; and (v) any other information requested by the Court or required by the Local Bankruptcy Rules. Any Interim Application Objection shall be filed and served upon the affected Professional and the Notice Parties so as to be **received on or before the 14th day (or the next business day if such day is not a business day) following service of the applicable Interim Application**. Any Professional who fails to file an Interim Application for compensation and expenses previously paid under a Monthly Application (1) shall be ineligible to receive further monthly payments of fees or expenses as provided in the motion until further order of the Court and (2) may be required to disgorge any fees paid since retention or the previous Monthly Application, whichever is later.

(e)    The Debtors will request that the Court schedule a hearing on the Interim Application at least once every four months or at such other intervals that the Court deems appropriate. If no Monthly Application Objections are pending and no Interim Application Objections are timely filed, the Court may grant an Interim Application without a hearing.

(f)    The pendency of a Monthly Application Objection or Interim Application Objection will not disqualify a Professional from the payment of compensation or reimbursement of expenses under the Compensation Procedures of requests for payment of compensation or reimbursement of expenses not subject to such objection. Any Professional that fails to file a Monthly Application or an Interim Application when due or permitted will be ineligible to receive further interim payments of fees or expenses under the Compensation Procedures until such time as a

Monthly Application or Interim Application is submitted by the Professional. There will be no other penalties for failing to file a Monthly Application or an Interim Application in a timely manner.

(g)    Neither (i) the payment of or the failure to pay, in whole or in part, monthly interim compensation and reimbursement of expenses under the Compensation Procedures requested in a Monthly Application nor (ii) the filing of or failure to file a Monthly Application Objection or Interim Application Objection will bind any party in interest or the Court with respect to the final allowance of applications for compensation and reimbursement of expenses of Professionals. All fees and expenses paid to Professionals under the Compensation Procedures are subject to disgorgement until final allowance by the Court.

101.    The Debtors also request that each member of any official committee formed by the U.S. Trustee be permitted to submit statements of expenses (excluding third-party counsel expenses of individual committee members) and supporting vouchers to the respective official committee's counsel, which counsel will collect and submit the committee members' requests for reimbursement in accordance with the Compensation Procedures. Approval of the Compensation Procedures, however, will not authorize payment of such expenses to the extent that such authorization does not exist under the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, applicable Second Circuit law, or the practices of the Court.

102.    The Debtors further request that the Court limit service of the Interim Application and the final fee application to the Notice Parties. Subject to the Court's approval, other parties that have filed a notice of appearance with the clerk of the Court and requested notice of pleadings in the Chapter 11 Cases will receive only Hearing Notices. Serving the Applications and the Hearing Notices in this manner will permit the parties most active in the Chapter 11 Cases to review and object to the Professionals' fees and will save unnecessary duplication and mailing expenses.

K&E 17218630

103.    I believe that the proposed procedures will enable the Debtors to monitor closely costs of administration, maintain a level of cash flow availability, and implement efficient management procedures.  Moreover, these procedures will allow the Court and key parties in interest to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

### XII.    Debtors' Motion for the Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business

104.    The Debtors employ various professionals in the ordinary course of their business that provide services to the Debtors in a variety of matters unrelated to these Chapter 11 Cases, including, without limitation, legal services.  A list of the Debtors' current OCPs is attached to the motion as **Exhibit B**.

105.    The Debtors also employ, in the ordinary course of business, professional service providers such as public relations, communications, internet technology and general business consultants, and advisors with respect to matters regarding their hotel properties (collectively, the "**Service Providers**").  Although some of the Service Providers have professional degrees and certifications, they provide services to the Debtors that are integral to the day-to-day operation of the Debtors' businesses and do not directly relate to or materially affect the administration of these Chapter 11 Cases.  Additionally, because the Service Providers are not acting as "professional persons" under the Bankruptcy Code, they should be treated on terms consistent with other ordinary course vendors because the Service Providers are providing day-to-day operational assistance to the Debtors' businesses.

106.    I believe that the retention and compensation of the OCPs is in the best interests of their estates, creditors, and other parties in interest.  While some OCPs may wish to continue to represent the Debtors on an ongoing basis, they may be unwilling to do so if the Debtors

43

cannot pay them on a regular basis. Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations. Moreover, in my estimation, the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' businesses.

## PROFESSIONAL RETENTION AND COMPENSATION MOTIONS

**XIII.  Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP as Attorneys for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date**

107.    The Debtors seek to retain K&E because of K&E's recognized expertise and extensive experience and knowledge in the field of debtors' protections, creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code. In preparing for its representation of the Debtors in the Chapter 11 Cases, K&E has become familiar with the Debtors' businesses and many of the potential legal issues that may arise in the context of the Chapter 11 Cases. The Debtors believe that K&E is both well qualified and uniquely able to represent them in the Chapter 11 Cases in an efficient and timely manner

**XIV.  Debtors' Application for the Entry of an Order Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date**

108.    The Debtors seek to retain Moelis as their investment banker and financial advisor because the Debtors believe they require the services of a capable and experienced investment banking and financial advisory firm such as Moelis. Indeed, Moelis's resources and capabilities, together with its prepetition experience advising the Debtors, complements the services offered by the Debtors' other restructuring advisors and its retention is integral to the Debtors' success in these Chapter 11 Cases. Moelis has been working with the Debtors since March 24, 2010.

**XV.    Debtors' Application for the Entry of an Order Authorizing and Approving the Retention and Employment of AP Services, LLC and Designating Nathan J. Cook as Interim Chief Financial Officer to the Debtors Nunc Pro Tunc to the Petition Date**

109.    The Debtors seek to retain and employ AP Services, LLC as their restructuring advisor based upon, among other things, (a) the Debtors' need to retain a restructuring advisory firm to provide advice with respect to the Debtors' restructuring efforts and (b) AP Services' professional standing, excellent reputation, and wealth of experience in providing restructuring advisory services in complex restructurings.  AP Services has been providing the Debtors with restructuring advisory services prepetition and has led operational preparations for the Chapter 11 Cases.

110.    Cook, who will act as interim CFO for the Debtors, has worked as a restructuring and financial consultant for over 15 years serving various industries including, among others, Real Estate, Manufacturing, Energy and Utilities, Construction, Consumer Packaged Goods, and Retail.  Cook has substantial knowledge and experience advising large companies and assisting troubled companies with stabilizing their financial condition, analyzing their options, and developing appropriate business plans to accomplish restructuring initiatives.  His roles have included those as a financial advisor to distressed debtors and their creditors, as well as serving in interim management roles as a CFO, Treasurer, and Accounting Director.  Consequently, I believe that AP Services and Cook are well qualified to address the complex issues that the Debtors are likely to confront during the Chapter 11 Cases.

K&E 17218630

## PROCEDURAL MOTIONS

**XVI.  Debtors' Motion for Entry of an Order Authorizing the Debtors to (a) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (b) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, and (c) Mail Initial Notices**

111.     There are 92 Debtor entities involved in these Chapter 11 Cases.  The Debtors hold an aggregate of approximately $1.6 billion in liabilities.  The Debtors estimate that they have over 5,000 potential creditors or other parties in interest on a consolidated basis.

112.     Contemporaneously with the filing of creditor list motion, and in accordance with Amended General Order M-192, the Debtors are seeking to retain Omni as their Proposed Notice and Claims Agent in these Chapter 11 Cases.  If such application is granted, the Proposed Notice and Claims Agent will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor database and (b) complete the mailing of notices to the parties in such database.

113.     Specifically, the Debtors propose that the Proposed Notice and Claims Agent undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the notice of commencement of these Chapter 11 Cases.  The Debtors believe that using the Proposed Notice and Claims Agent for this purpose will maximize efficiency in administering these Chapter 11 Cases and will ease administrative burdens that otherwise fall upon this Court and the U.S. Trustee.  Additionally, the Proposed Notice and Claims Agent will assist the Debtors in preparing creditor lists and mailing initial notices.

114.     After consultation with the Proposed Notice and Claims Agent, I believe that preparing the consolidated list will be sufficient to permit the Proposed Notice and Claims Agent to promptly provide notices to all applicable parties.  Accordingly, it will maximize efficiency

K&E 17218630

and accuracy and reduce costs, to maintain electronic-format lists of creditors rather than preparing and filing separate matrices.

## XVII. Debtors' Motion for the Entry of an Order Directing Joint Administration of their Chapter 11 Cases.

115.    Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.   Many of the motions, hearings, and orders that will arise in these Chapter 11 Cases will affect each and every Debtor entity.   The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.   Joint administration also will allow the U.S. Trustee, the Court, and all other parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.

116.    Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Motion requests only administrative, not substantive, consolidation of the estates.   Parties in interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of these Chapter 11 Cases. Accordingly, I believe that joint administration of these Chapter 11 Cases is in the best interests of their estates, their creditors, and all other parties in interest.

## XVIII. Debtors' Motion for the Entry of an Order Extending the Deadline to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs.

117.    Pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c), the Debtors ordinarily would be required to file the Schedules and Statements within 14 days after the Petition Date.   The Debtors estimate they have more than 5,000 potential creditors and other parties in interest.   Further, the conduct and operation of the Debtors' business operations

require them to maintain voluminous records and complex accounting systems. Due to the nature of the Debtors' business, the pressure incident to the commencement of these Chapter 11 Cases, and the fact that certain prepetition invoices have not yet been received or entered into the financial accounting system, the Debtors have begun, but have not yet completed, compiling the information required to complete the Schedules and Statements.

118.    Due to the complexity and diversity of their operations and the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of the Chapter 11 Cases, the Debtors anticipate they will be unable to complete the Schedules and Statements in the time required under Bankruptcy Rule 1007(c). Adding to the difficulties in compiling the Schedules and Statements is the nature of the Debtors' business, which consists of operating 72 individual hotel properties scattered across 19 states and the District of Columbia, among the Debtor entities.

119.    While the Debtors' consolidated ownership and management of the 72 properties allows them to benefit from economies of scale, eliminating many of the duplicative processes and costs that would otherwise apply to properties owned and managed on an individual basis, it also comes with its own burdens, especially with respect to compiling the Schedules and Statements. Each individual hotel property has the ability to enter its own contracts and agreements and thus incur liability on an individual basis. Additionally, each Debtor-owned hotel property has its own employees, its own vendors, service providers, and other unique creditors.

120.    Accordingly, I believe that it is in the Debtors' best interests to obtain an extension of 30 days in addition to the 14-day time period provided for under Bankruptcy Rule 1007(c) to file the Schedules and Statements, which would provide the Debtors with a total of

44 days after the Petition Date to file the Schedules and Statements.  The substantial size, scope, and complexity of the Chapter 11 Cases and the volume of material that must be compiled and reviewed by the Debtors' personnel to complete the Schedules and Statements for each entity during the initial days of the Chapter 11 Cases provides ample cause for justifying the requested extension.

**XIX.  Debtors' Motion for the Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures**

121.    As set forth more fully in **Schedule 1** to **Exhibit A** attached to the case management motion, the Case Management Procedures, among other things: (a) establish requirements for filing and serving notices, motions, applications, declarations, objections, replies, responses, memoranda, briefs, supporting documents, documents, and other requests for relief filed in these Chapter 11 Cases; (b) delineate standards for notices of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court.

122.    Given the size and scope of these Chapter 11 Cases, I believe that the Case Management Procedures will facilitate service of Court Papers in a manner that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these Chapter 11 Cases, while at the same time ensuring that appropriate notice is provided, particularly to parties who have expressed an interest in these Chapter 11 Cases and those directly affected by a request for relief. In particular, the Case Management Procedures are intended to:

      (h)     reduce the need for emergency hearings and requests for expedited relief;

      (i)     provide for omnibus hearings for the Court to consider motions, pleadings, applications, and objections and responses thereto;

<div align="center">49</div>

(j)      foster consensual resolution of important matters;

(k)      assure prompt receipt of appropriate notice affecting parties' interests;

(l)      allow for electronic notice in accordance with the Court's electronic filing system;

(m)      provide ample opportunity for parties in interest to prepare for and respond to matters before this Court;

(n)      reduce the substantial administrative and financial burden that would otherwise be placed on the Debtors and other parties in interest who file documents in these Chapter 11 Cases; and

(o)      reduce the administrative burdens on the Court and the office of the Clerk of the Court.

123.     To ensure that parties in interest in these Chapter 11 Cases are made aware of the Case Management Procedures, the Debtors propose to: (a) serve the Case Management Procedures on the Master Service List; (b) publish the Case Management Procedures on the Debtors' restructuring website at www.omnimgt.com/innkeepers; and (c) make the Case Management Procedures readily available on request to the Debtors' Proposed Notice and Claims Agent.  If the Case Management Procedures are modified during these Chapter 11 Cases, the Debtors will ensure updated versions of the Case Management Procedures are available on the Case Website and will file notice of the same electronically on the docket and serve such updated procedures in accordance with the then current Case Management Procedures.

**XX.     Debtors' Application for the Entry of an Order Authorizing the Retention and Employment of Omni Management Group, LLC as Notice and Claims Agent for the Debtors and Debtors in Possession**

124.     The Debtors estimate that they have more than 5,000 potential creditors in these chapter 11 cases.  Accordingly, the Debtors propose to engage Omni to act as the Debtors' notice and claims agent, because this is an effective and efficient manner of providing notice to the thousands of creditors and parties in interest of the filing of the Debtors' Chapter 11 Cases and other developments in these Chapter 11 Cases.

**EXHIBIT C**

**Consolidated List of the Holders of the 50 Largest Unsecured Claims**

# EXHIBIT C

## Consolidated List of the Holders of the 50 Largest Unsecured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the 50 largest unsecured creditors (the "**Consolidated List**") for all of the Debtors, which is based on the Debtors' books and records as of the Petition Date. The Consolidated List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (a) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (b) secured creditors, unless the value of the collateral is such that the unsecured deficiency is expected to place the creditor among the holders of the 50 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor Name | Creditor Address | Nature of Debt | Contingent, Unliquidated, Disputed or Subject to Set Off | Unsecured Amount |
|---|---|---|---|---|
| 1. LNR Property Corporation | 1601 Washington Avenue, Suite 800 Miami Beach, FL 33139 (305) 695-5499 | $825mm Fixed Rate CMBS Pool - LB-UBS 2007-C7 | | UNKNOWN |
| 2. Midland Loan Services, Inc. | P.O. Box 25965 Attn: President Shawnee Mission, KS 66225 (913) 253-9709 | $825mm Fixed Rate CMBS Pool - LB-UBS 2007-C6 | | UNKNOWN |
| 3. Lehman ALI, Inc. | 1271 Avenue of the Americas, 39th Floor Attn: Michael E. Lascher New York, NY 10020 (646) 285-9336 | $250mm Floating Rate Lehman Senior Mortgage Loan | | UNKNOWN |
| 4. Lehman ALI, Inc. | 1271 Avenue of the Americas, 39th Floor Attn: Michael E. Lascher New York, NY 10020 (646) 285-9336 | $121mm Floating Rate Lehman Mezzanine Loan | | UNKNOWN |
| 5. LNR Partners, Inc. | 1601 Washington Avenue, Suite 700 Attn: Chris Brown Miami Beach, FL 33139 (305) 695-5601 and (305) 695-5199 | $47.4mm Capmark CMBS Mortgage Loan | | UNKNOWN |
| 6. LNR Partners, Inc. | 1601 Washington Avenue, Suite 700 Attn: Chris Brown Miami Beach, FL 33139 (305) 695-5601 and (305) 695-5199 | $37.6mm Capmark CMBS Mortgage Loan | | UNKNOWN |
| 7. Centerline Servicing, Inc. | 5221 N O'Connor Blvd., Suite 600 Attn: Steve Oltmann Irving, TX 75039 (972) 868-5705 | $35.0mm Capmark CMBS Mortgage Loan | | UNKNOWN |
| 8. LNR Partners, Inc. | 1601 Washington Avenue, Suite 700 Attn: Chris Brown Miami Beach, FL 33139 (305) 695-5601 and (305) 695-5199 | $25.6mm Merrill Lynch CMBS Mortgage Loan | | UNKNOWN |
| 9. LNR Partners, Inc. | 1601 Washington Avenue, Suite 700 Attn: Chris Brown Miami Beach, FL 33139 (305) 695-5601 and (305) 695-5199 | $25.2mm Merrill Lynch CMBS Mortgage Loan | | UNKNOWN |

1

| Creditor Name | Creditor Address | Nature of Debt | Contingent, Unliquidated, Disputed or Subject to Set Off | Unsecured Amount |
|---|---|---|---|---|
| 10. LNR Partners, Inc. | 1601 Washington Avenue, Suite 700<br>Attn: Chris Brown<br>Miami Beach, FL 33139<br>(305) 695-5601 and (305) 695-5199 | $24.2mm Merrill Lynch CMBS Mortgage Loan | | UNKNOWN |
| 11. CSE Mortgage LLC | 4445 Willard Avenue, 12th Floor<br>Chevy Chase, MD 20815<br>(301) 841-2340 | $24.2mm Capital Source Mortgage Loan | | UNKNOWN |
| 12. CWCapital Asset Management LLC | 18500 Von Karman Avenue, Suite 515<br>Attn: Ira Haynie<br>Irvine, CA 92612<br>(949) 474-0131 | $13.7mm Anaheim CMBS Senior Mortgage Loan | | UNKNOWN |
| 13. MARRIOTT HOTELS | 180 HAWLEY LANE<br>TRUMBULL, CT 06484<br>(203) 378-4958 | Trade | | $1,745,234 |
| 14. HILTON HOTELS CORPORATION | 4649 PAYSPHERE CIRCLE<br>CHICAGO, IL 60674-4649<br>(901) 374-5425 | Trade | | $798,385 |
| 15. OAK ROOFING, INC | 220 HEMLOCK<br>WOOD DALE, IL 60191<br>(630) 238-0288 | Trade | YES | $288,895 |
| 16. SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | FOUR TIMES SQUARE<br>NEW YORK, NY 10036<br>(212) 735-2000 and (212) 735-2001 | Trade | | $181,494 |
| 17. GUEST SUPPLY, INC. | P.O. BOX 910<br>MONMOUTH JUNCTION, NJ 08852<br>(609) 514-2692 | Trade | | $175,515 |
| 18. CARRIER CORP | P.O. BOX 905303<br>CHARLOTTE, NC 28290<br>(860) 622-7331 | Trade | | $157,062 |
| 19. HYATT SUMMERFIELD SUITES | 194 PARK AVE.<br>MORRISTOWN, NJ 07960<br>(973) 971-0013 | Trade | | $144,000 |
| 20. HD SUPPLY FACILITIES | PO BOX 509058<br>MAINTENANCE<br>SAN DIEGO, CA 92150-9058<br>(800) 930-4930 | Trade | | $138,512 |
| 21. MARX REALTY & IMPROVEMENT CO. | 708 THIRD AVE.<br>21ST FLOOR<br>NEW YORK, NY 10017-4146<br>(212) 983-4532 | Trade | | $128,771 |
| 22. STARWOOD HOTELS & RESORTS WORLDWIDE INC | ATTN: SANDY OLSON<br>9841 AIRPORT BLVD STE 812<br>LOS ANGELES, CA 90045<br>(914) 640-8310 | Trade | | $98,000 |
| 23. FIBERCARE | 7701 PILLSBURY AVENUE SOUTH<br>RICHFIELD, MN 55423<br>(612) 277-1514 | Trade | | $91,738 |
| 24. GLOBAL RESTAURANT DESIGN, CORP | 31368 VIA COLINAS<br>SUITE #108<br>WESTLAKE VILLAGE, CA 91362<br>(818) 706-7701 | Trade | YES | $84,510 |
| 25. AMERICAN HOTEL REGISTER CO. | 16458 COLLECTIONS CENTER DRIVE<br>CHICAGO, IL 60693<br>(847) 743-2079 | Trade | | $82,476 |
| 26. WASTE MANAGEMENT | PO BOX 930580<br>ATLANTA, GA 31193<br>(630) 218-1560 | Trade | | $72,541 |
| 27. QUOIZEL, INC. | 6 CORPORATE PKWY.<br>GOOSE CREEK, SC 29445<br>(631) 231-7102 | Trade | | $68,426 |

| | Creditor Name | Creditor Address | Nature of Debt | Contingent, Unliquidated, Disputed or Subject to Set Off | Unsecured Amount |
|---|---|---|---|---|---|
| 28. | LG ELECTRONICS USA INC | PO BOX 905337<br>CHARLOTTE, NC 28290<br>(201) 408-9076 | Trade | | $65,994 |
| 29. | JMC GLOBAL | 7 GROGANS PARK DRIVE STE 11<br>THE WOODLANDS, TX 77380<br>(832) 381-2495 | Trade | | $65,219 |
| 30. | ERIC RYAN CORPORATION | 1 EARLY STREET<br>ELLWOOD CITY, PA 16117<br>(724) 752-8999 | Trade | | $58,259 |
| 31. | OFFICE DEPOT | P.O. BOX 633211<br>CINCINNATI, OH 45263-3211<br>(800) 685-5010 | Trade | | $54,211 |
| 32. | ROMALA STONE, INC. | 315 S. BEVERLY DRIVE<br>SUITE 506<br>BEVERLY HILLS, CA 90212-4316<br>(310) 201-9666 | Trade | | $49,281 |
| 33. | TRIANGLE RENOVATIONS | 3760 LOUISVILLE ROAD<br>LOUISVILLE, TN 37777<br>(856) 983-7549 | Trade | | $47,035 |
| 34. | PDQ CONSULTING, INC | 407 WOODLAKE DRIVE<br>ALLEN, TX 75013<br>(972) 767-3472 | Trade | | $43,153 |
| 35. | ECOLAB | P.O. BOX 905327<br>CHARLOTTE, NC 28290-5327<br>(612) 721-5048 | Trade | | $42,648 |
| 36. | ONYX SEALCOATING, INC. | 15113 S. KILBOURN<br>MIDLOTHIAN, IL 60445<br>(708) 687-6699 | Trade | YES | $37,237 |
| 37. | US WALL DECOR | 487 MYATT DRIVE<br>MADISON, TN 37115<br>(615) 860-9475 | Trade | YES | $33,635 |
| 38. | JENKINS/GALES & MARTINEZ | 5933 WEST CENTURY BLVD<br>SUITE #1000<br>LOS ANGELES, CA 90045<br>(310) 670-8721 | Trade | YES | $32,081 |
| 39. | WESTERN STATE DESIGN, INC. | 25616 NICKEL PLACE<br>HAYWARD, CA 94545<br>(510) 783-9748 | Trade | | $32,004 |
| 40. | SYSCO FOOD | P.O. BOX 1508<br>WALNUT, CA 91788<br>(909) 598-6383 | Trade | | $31,309 |
| 41. | SPRINGFIELD CORPORATION | P.O. BOX 620189<br>ATLANTA, GA 30362<br>(770-) 729-0995 | Trade | | $30,657 |
| 42. | SWANK AUDIO VISUALS, LLC | 639 E. GARVOIS BLUFFS<br>ST. LOUIS, MO 63026<br>(636) 680-2898 | Trade | | $27,829 |
| 43. | ECOLAB PEST ELIMINATION | 3535 S 31ST STREET<br>PO BOX 6007<br>GRAND FORKS, ND 58206<br>(701) 775-2536 | Trade | | $26,255 |
| 44. | FIRE & OAK | 55 ROUTE 17 SOUTH<br>ROCEHLLE PARK, NJ 07662<br>(201) 307-1200 | Trade | | $24,012 |
| 45. | BRICKMAN GROUP, LTD | 3630 SOLUTIONS CENTER<br>CHICAGO, IL 60677<br>(301) 515-9403 | Trade | | $23,008 |
| 46. | ELITE HEATING & AIR | 214 CHERRY AVENUE<br>VOORHEES, NJ 08043<br>(856) 354-8655 | Trade | YES | $21,623 |

| | Creditor Name | Creditor Address | Nature of Debt | Contingent, Unliquidated, Disputed or Subject to Set Off | Unsecured Amount |
|---|---|---|---|---|---|
| 47. | ROYAL CUP DINE-MOR | PO BOX 170971<br>BIRMINGHAM, AL 35217<br>(205) 343-0357 | Trade | | $20,268 |
| 48. | RHS COMMERCIAL LLC | 1003 STAFFORD ROAD<br>KALAMAZOO, MI 49006<br>(248) 928-9248 | Trade | | $20,000 |
| 49. | SUNSET POOLS, INC. | 1808-1 I STREET NW STE 201<br>WASHINGTON, DC 20006<br>(703) 933-0077 | Trade | | $19,343 |
| 50. | CINTAS CORPORATION | 97627 EAGLE WAY<br>CHICAGO, IL 60678-9760<br>(708) 563-0108 | Trade | | $18,383 |

4

**EXHIBIT D**

**Consolidated List of the Holders of the 5 Largest Secured Claims**

# EXHIBIT D

## Consolidated List of the Holders of the 5 Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Creditor | Contact Information | Amount of Claim | Collateral Description & Value | Disputed |
|---|---|---|---|---|---|
| 1. | LB-UBS Commercial Mortgage Trust 2007-C6 | Midland Loan Servicing PO Box 25965 Shawnee Mission, KS 66225 Attn: President | **$412,107,271** | Real property, value undetermined. | |
| 2. | LB-UBS Commercial Mortgage Trust 2007-C7 | LNR Property Corporation 1601 Washington Ave. Suite 700 Miami Beach, FL 33139 Attn: Randy Wolpert, Thomas F Nealon III, Esq. and Javier Benedit | **$412,107,271** | Real property, value undetermined. | |
| 3. | Lehman ALI Inc. | 1271 Avenue of the Americas 39th Floor New York, NY 10020 Attn: Michael E. Lascher | **$238,451,891** | Real property, value undetermined. | |
| 4. | Lehman ALI Inc. | 1271 Avenue of the Americas 39th Floor New York, NY 10020 Attn: Michael E. Lascher | **$128,575,861** | Real property, value undetermined. | |
| 5. | CSFRB Commerical Mortgage Pass-Through Certificates Series 2007-C1 | Centerline Servicing, Inc. 625 Madison Avenue New York, NY 10022 | **$47,168,769** | Real property, value undetermined. | |

1

**EXHIBIT E**

**Summary of the Debtors' Assets and Liabilities**

**Summary of the Debtors' Assets and Liabilities**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors as of May 31, 2010.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.

> **Total Assets (Book Value)**:      $1,500,066,327.00
> **Total Liabilities**:      $1,518,827,295.00

**EXHIBIT F**

**Debtors' Property Held by Third Parties**

**Debtors' Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of May 31, 2010, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical if not impossible.

However, the Debtors maintain certain inventory for the renovation and refurbishment of its hotels in public storage facilities in the locations below. The estimated value of this equipment is approximately $2.0 million.

1) Bridgeton, MO
2) Compton, CA
3) Hayward, CA
4) Aurora, CO
5) San Jose, CA
6) Dallas, TX
7) Springfield, VA
8) San Lorenzo, CA
9) Tampa, FL
10) Corona, CA

K&E 16632089

**EXHIBIT G**

**Debtors' Property**

## Debtors' Property

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Zip | Country | Owned or Leased |
|---|---|---|---|---|---|
| Hampton Inn Albany<br>981 New Louden Road | Cohoes | NY | 12047 | USA | Owned |
| Residence Inn Anaheim/Garden Grove<br>11931 Harbor Boulevard | Garden Grove | CA | 92840 | USA | Owned |
| Hilton Suites Anaheim/Orange<br>400 N. State College Blvd | Orange | CA | 92868 | USA | Owned |
| Residence Inn Arlington DFW South<br>1050 Brookhollow Plaza Dr. | Arlington | TX | 76006 | USA | Owned |
| Residence Inn Atlanta (Peachtree Corners)<br>5500 Triangle Dr. | Norcross | GA | 30092 | USA | Owned |
| Residence Inn Atlanta Downtown<br>134 Peachtree St., NW | Atlanta | GA | 30303 | USA | Owned |
| Courtyard Atlantic City<br>1212 Pacific Ave | Atlantic City | NJ | 08401 | USA | Owned |
| Summerfield Suites Belmont<br>400 Concourse Drive | Belmont | CA | 94002 | USA | Owned |
| Residence Inn Binghamton (Vestal)<br>4610 Vestal Parkway East | Vestal | NY | 13850 | USA | Owned |
| Bulfinch Hotel Boston<br>107 Merrimac Street | Boston | MA | 02109 | USA | Owned |
| Hampton Inn Boston/Woburn<br>315 Mishawum Road | Woburn | MA | 01801 | USA | Ground lease |
| Residence Inn Cherry Hill<br>1821 Old Cuthbert Road | Cherry Hill | NJ | 08034 | USA | Owned |
| Residence Inn Chicago O'Hare (Rosemont)<br>7101 Chestnut Street | Rosemont | IL | 60016 | USA | Owned |

1

| Property Address | City | State | Zip | Country | Owned or Leased |
|---|---|---|---|---|---|
| Hampton Inn Columbia<br>8880 Columbia 100 Parkway | Columbia | MD | 21045 | USA | Owned |
| Residence Inn Dallas (Addison)<br>14975 Quorum Drive | Addison | TX | 75240 | USA | Owned |
| Summerfield Suites Dallas (Addison 2)<br>4900 Edwin Lewis Drive | Addison | TX | 75001 | USA | Owned |
| Residence Inn Denver Downtown<br>2777 Zuni St. | Denver | CO | 80211 | USA | Owned |
| Residence Inn Denver South (Tech)<br>6565 S. Yosemite | Englewood | CO | 80111 | USA | Owned |
| Residence Inn Detroit (Livonia)<br>17250 Fox Drive | Livonia | MI | 48152 | USA | Owned |
| Residence Inn East Lansing<br>1600 E. Grand River Ave. | East Lansing | MI | 48823 | USA | Owned |
| Summerfield Suites El Segundo<br>810 S. Douglas | El Segundo | CA | 90245 | USA | Owned |
| Courtyard Ft. Lauderdale - North<br>2440 W. Cypress Creek Rd. | Ft. Lauderdale | FL | 33309 | USA | Ground lease |
| Residence Inn Ft. Wayne<br>4919 Lima Road | Ft. Wayne | IN | 46808 | USA | Owned |
| Residence Inn Fremont<br>5400 Farwell Place | Fremont | CA | 94536 | USA | Owned |
| Four Points Ft. Walton Beach<br>1325 Miracle Strip Parkway | Ft. Walton Beach | FL | 32548 | USA | Owned |
| Residence Inn Grand Rapids<br>2701 E. Beltline, SE | Grand Rapids | MI | 49546 | USA | Owned |
| Residence Inn Harrisburg<br>4480 Lewis Road | Harrisburg | PA | 17111 | USA | Owned |
| Residence Inn Indianapolis North<br>3553 Founders Road | Indianapolis | IN | 46268 | USA | Owned |
| Hampton Inn Islandia<br>1600 Veterans Memorial Hwy | Islandia | NY | 11722 | USA | Owned |
| Summerfield Suites Las Colinas<br>5901 N MacArthur Blvd. | Irving | TX | 75039 | USA | Owned |

| Property Address | City | State | Zip | Country | Owned or Leased |
|---|---|---|---|---|---|
| Residence Inn Lexington (KY) North<br>1080 Newtown Pike | Lexington | KY | 40511 | USA | Owned |
| Hampton Inn Lombard<br>222 East 22nd Street | Lombard | IL | 60148 | USA | Owned |
| Hampton Inn Louisville Downtown<br>101 East Jefferson Street | Louisville | KY | 40202 | USA | Owned |
| Residence Inn Louisville North<br>120 N. Hurstbourne Pkwy | Louisville | KY | 40222 | USA | Owned |
| Courtyard Montvale<br>100 Chestnut Ridge Road | Montvale | NJ | 07645 | USA | Owned |
| Westin Morristown<br>2 Whippany Road | Morristown | NJ | 07960 | USA | Owned |
| Residence Inn Mountain View<br>1854 EL Camino Real West | Mountain View | CA | 94040 | USA | Owned |
| Summerfield Suites Mt. Laurel<br>3000 Crawford Pl. | Mt. Laurel | NJ | 08054 | USA | Owned |
| Hampton Inn Naples<br>3210 Tamiami Trail North | Naples | FL | 34103 | USA | Owned |
| Hilton Ontario<br>700 North Haven Ave | Ontario | CA | 91764 | USA | Owned |
| Residence Inn Ontario<br>2025 Convention Center Way | Ontario | CA | 91764 | USA | Owned |
| Residence Inn Orlando (Altamonte Springs)<br>270 Douglas Ave. | Altamonte Springs | FL | 32714 | USA | Owned |
| Towne Place Suites Philadelphia/Horsham<br>198 Precision Rd. | Horsham | PA | 19044 | USA | Owned |
| Hampton Inn Philadelphia/Willow Grove<br>1500 Easton Road | Willow Grove | PA | 19090 | USA | Owned |
| Residence Inn Portland (ME) - Scarborough<br>800 Roundwood Drive | Scarborough | ME | 04074 | USA | Owned |
| Sheraton Raleigh - Capital Center<br>421 South Salisbury Street | Raleigh | NC | 27601 | USA | Owned |

K&E 16632089

| Property Address | City | State | Zip | Country | Owned or Leased |
|---|---|---|---|---|---|
| Residence Inn Richmond (Northwest) 3940 Westerre Pkwy. | Richmond | VA | 23233 | USA | Owned |
| Residence Inn Richmond (West End) 2121 Dickens Road | Richmond | VA | 23230 | USA | Owned |
| Sheraton Rockville, MD 920 King Farm Boulevard | Rockville | MD | 20805 | USA | Owned |
| Residence Inn Saddle River 7 Boroline Road | Saddle River | NJ | 07458 | USA | Owned |
| Homewood Suites San Antonio 432 West Market Street | San Antonio | TX | 78205 | USA | Owned |
| Residence Inn San Diego/Mission Valley 1865 Hotel Circle South | San Diego | CA | 92108 | USA | Owned |
| Residence Inn San Jose (Campbell) 2761 South Bascom | Campbell | CA | 95008 | USA | Owned |
| Residence Inn San Jose South 6111 San Ignacio Ave. | San Jose | CA | 95119 | USA | Owned |
| Residence Inn San Mateo 2000 Winward Way | San Mateo | CA | 94404 | USA | Owned |
| Hampton Inn Schaumburg 1300 East Higgins Road | Schaumburg | IL | 60173 | USA | Owned |
| Residence Inn Seattle East (Bellevue) 14455 NE 29th Place | Bellevue | WA | 98007 | USA | Owned |
| Residence Inn Seattle North (Lynnwood) 18200 Alderwood Mall Pkwy. | Lynnwood | WA | 98037 | USA | Owned |
| Residence Inn Seattle Northeast (Bothell) 11920 NE 195th St. | Bothell | WA | 98011 | USA | Owned |
| Residence Inn Seattle South (Tukwila) 16201 W. Valley Hwy. | Seattle | WA | 98188 | USA | Owned |
| Residence Inn Shelton 1001 Bridgeport Ave. | Shelton | CT | 06484 | USA | Owned |

K&E 16632089

| Property Address | City | State | Zip | Country | Owned or Leased |
|---|---|---|---|---|---|
| Residence Inn Silicon Valley I<br>750 Lakeway | Sunnyvale | CA | 94086 | USA | Owned |
| Residence Inn Silicon Valley II<br>1080 Stewart Drive | Sunnyvale | CA | 94086 | USA | Owned |
| Residence Inn Troy - Central<br>2600 Livernois Road | Troy | MI | 48083 | USA | Owned |
| Residence Inn Troy - SE (Madison Heights)<br>32650 Stephenson Hwy | Madison Heights | MI | 48071 | USA | Owned |
| Residence Inn Tyson's Corner - Mall<br>8400 Old Courthouse Road | Vienna | VA | 22182 | USA | Owned |
| Embassy Suites Valencia<br>28508 Westinghouse Place | Santa Clarita | CA | 91355 | USA | Owned |
| Doubletree Washington DC<br>801 New Hampshire Ave, N.W. | Washington | DC | 20037 | USA | Owned |
| Residence Inn Washington DC (Gaithersburg)<br>9721 Washingtonian Blvd. | Gaithersburg | MD | 20878 | USA | Owned |
| Hampton Inn Washington DC (Germantown)<br>20260 Goldenrod Lane | Germantown | MD | 20876 | USA | Owned |
| Best Western West Palm Beach<br>1505 Belvedere Road | West Palm Beach | FL | 33406 | USA | Ground lease |
| Hampton Inn Westchester<br>2222 Enterprise Drive | Westchester | IL | 60154 | USA | Owned |
| Residence Inn Windsor/Hartford<br>100 Dunfey Lane | Windsor | CT | 06095 | USA | Owned |

K&E 16632089

# EXHIBIT H

## Location of Substantial Assets, Books and Records, and Non-U.S. Assets

# EXHIBIT H

## Location of Substantial Assets, Books and Records, and Non-U.S. Assets

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| | |
|---|---|
| **Substantial Assets** | Provided in Exhibit H, above, and incorporated herein by reference. |
| **Books and Records** | 340 Royal Poinciana Way<br>Suite 306<br>Palm Beach, FL 33480 |
| **Non-U.S. Assets** | The Debtors do not have any assets located outside of the territorial limits of the United States. |

1

# EXHIBIT I

# Publicly Held Securities

**EXHIBIT I**

**Publicly Held Securities**

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as if the Petition Date. The debtors' directors and officers own no shares of publicly-held securities of the debtors.

| Type of Security | Number of Shares Outstanding | Approx. Number of Record Shareholders |
|---|---|---|
| Series C Cumulative Preferred Shares | 5,800,000 | 3,000 |

**EXHIBIT J**

**Pending Litigation**

**Pending Litigation**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these Chapter 11 Cases.

| Action or Proceeding | Nature of the Action | Status |
|---|---|---|
| *Innkeepers USA, a FL, REIT v. Global Restaurant Design* | Breach of Contract | Pending |
| *Grand Prix Chciago LLC dba Innkeepers USA v. Oak Roofing, Inc.* | Non-Payment | Pending |
| *Island Hospitality Management Inc; Marriott Int'l., Inc., Courtyard by Marriott, Inc. v. Carol Wittman* | ADA | Pending |
| *Grand Prix Bothell LLC; LaSalle Bank v. North Creek Maintenance District Association* | Claim Failure to Pay Association Assessments | Pending |
| *Margaret Keller* | Workers Compensation | Pending |
| *David Mobley v. Innkeepers USA LP; KPA Ft. Walton LLC; KPA Leaseco, Inc.; F&M Ft. Walton Leasing LLC* | Personal Injury | Pending |
| *Bernie Ritchie* | Workers Compensation | Pending |

**EXHIBIT K**

**Senior Management**

**Senior Management**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name | Title | Relevant Experience | Tenure |
|------|-------|---------------------|--------|
| Marc Beilinson | Chief Restructuring Officer | 25 years experience as bankruptcy attorney and turnaround executive. Prior to joining Innkeepers, Mr. Beilinson was a partner with Pachulski, Stang, Zeihl and Jones LLP. | 11/2008 to Present |
| Tim Walker | President, Chief Executive Officer | 23 years experience in hospitality management and hotel development. | 3/2007 to Present |
| Dennis Craven | Chief Financial Officer | 16 years experience in banking and hospitality accounting and financial management. | 3/2006 to 7/2010 |
| Nathan Cook | Chief Financial Officer | 16 years experience as financial advisor and management consultant. Employed at AlixPartners LLP, since 2001. | 7/2010 to Present |
| Mark Murphy | General Counsel, Secretary | 22 years experience as in-house counsel and outside attorney. Prior to joining Innkeepers, Mr. Murphy was a partner at Hunton & Williams LLP. | 4/1997 to Present |
| Richard Fenton | Vice President – Financial Planning and Analysis | 14 years experience in real estate financial planning and analysis. | 9/1996 to Present |
| Bob Martin | Vice President – Construction and Renovation | 32 years experience in hotel engineering and project management, including 24 years with Marriott Corp. | 4/2006 to Present |
| Linda Price | Vice President - Controller | 14 years experience in real estate accounting and taxes. | 6/1996 to Present |

K&E 16632089

# EXHIBIT L

## Payroll

**EXHIBIT L**

**Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| | |
|---|---|
| **Payments to Employees** <br> **(Not Including Officers, Directors, and Stockholders)** | $4,700,000 for 30 days |
| **Payments to Officers, Stockholders, and Directors** | $168,000 |
| **Payments to Financial and Business Consultants** | $0 |

1

# EXHIBIT M

## Cash Receipts and Disbursements,
## Net Cash Gain or Loss, and Unpaid Obligations and Receivables

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, and Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Description | Estimated Amount |
|---|---|
| Cash Receipts | $24,600,000 |
| Cash Disbursements | $19.400,000 |
| Net Cash Gain/Loss | $5,200,000 |
| Unpaid Obligations (excluding professional fees) | $3,900,000 |
| Unpaid Receivables (excluding professional fees) | $6,300,000 |