James H.M. Sprayregen, P.C.
Paul M. Basta
Jennifer L. Marines
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

Anup Sathy, P.C. (*pro hac vice* pending)
Marc J. Carmel (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-_____(___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING**
**THE DEBTORS TO OBTAIN POSTPETITION FINANCING FROM**
**FIVE MILE CAPITAL PARTNERS ON A PRIMING BASIS PURSUANT TO**
**SECTIONS 364(c)(1), 364(c)(2), 364(c)(3), AND 364(e) OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: GP AC Sublessee LLC (5992); Grand Prix Addison (RI) LLC (3740); Grand Prix Addison (SS) LLC (3656); Grand Prix Albany LLC (3654); Grand Prix Altamonte LLC (3653); Grand Prix Anaheim Orange Lessee LLC (5925); Grand Prix Arlington LLC (3651); Grand Prix Atlanta (Peachtree Corners) LLC (3650); Grand Prix Atlanta LLC (3649); Grand Prix Atlantic City LLC (3648); Grand Prix Bellevue LLC (3645); Grand Prix Belmont LLC (3643); Grand Prix Binghamton LLC (3642); Grand Prix Bothell LLC (3641); Grand Prix Bulfinch LLC (3639); Grand Prix Campbell / San Jose LLC (3638); Grand Prix Cherry Hill LLC (3634); Grand Prix Chicago LLC (3633); Grand Prix Columbia LLC (3631); Grand Prix Denver LLC (3630); Grand Prix East Lansing LLC (3741); Grand Prix El Segundo LLC (3707); Grand Prix Englewood / Denver South LLC (3701); Grand Prix Fixed Lessee LLC (9979); Grand Prix Floating Lessee LLC (4290); Grand Prix Fremont LLC

(continued on next page)

Innkeepers USA Trust and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), file this motion (this "**Motion**") for the entry of an order (the "**DIP Order**")[2] (a) authorizing the Debtors to obtain postpetition financing on a senior secured, priming, superpriority basis and (b) granting such other relief as is just and proper. In support of this Motion, the Debtors respectfully state as follows:[3]

## Introduction

As explained herein, the Debtors own 72 hotel properties subject to franchise agreements (collectively, the "**Franchise Agreements**") that provide the nonexclusive right to

---

(3703); Grand Prix Ft. Lauderdale LLC (3705); Grand Prix Ft. Wayne LLC (3704); Grand Prix Gaithersburg LLC (3709); Grand Prix General Lessee LLC (9182); Grand Prix Germantown LLC (3711); Grand Prix Grand Rapids LLC (3713); Grand Prix Harrisburg LLC (3716); Grand Prix Holdings LLC (9317); Grand Prix Horsham LLC (3728); Grand Prix IHM, Inc. (7254); Grand Prix Indianapolis LLC (3719); Grand Prix Islandia LLC (3720); Grand Prix Las Colinas LLC (3722); Grand Prix Lexington LLC (3725); Grand Prix Livonia LLC (3730); Grand Prix Lombard LLC (3696); Grand Prix Louisville (RI) LLC (3700); Grand Prix Lynnwood LLC (3702); Grand Prix Mezz Borrower Fixed, LLC (0252); Grand Prix Mezz Borrower Floating, LLC (5924); Grand Prix Mezz Borrower Floating 2, LLC (9972); Grand Prix Mezz Borrower Term LLC (4285); Grand Prix Montvale LLC (3706); Grand Prix Morristown LLC (3738); Grand Prix Mountain View LLC (3737); Grand Prix Mt. Laurel LLC (3735); Grand Prix Naples LLC (3734); Grand Prix Ontario Lessee LLC (9976); Grand Prix Ontario LLC (3733); Grand Prix Portland LLC (3732); Grand Prix Richmond (Northwest) LLC (3731); Grand Prix Richmond LLC (3729); Grand Prix RIGG Lessee LLC  (4960); Grand Prix RIMV Lessee LLC (4287); Grand Prix Rockville LLC (2496); Grand Prix Saddle River LLC (3726); Grand Prix San Jose LLC (3724); Grand Prix San Mateo LLC (3723); Grand Prix Schaumburg LLC (3721); Grand Prix Shelton LLC (3718); Grand Prix Sili I LLC (3714); Grand Prix Sili II LLC (3712); Grand Prix Term Lessee LLC (9180); Grand Prix Troy (Central) LLC (9061); Grand Prix Troy (SE) LLC (9062); Grand Prix Tukwila LLC (9063); Grand Prix West Palm Beach LLC (9065); Grand Prix Westchester LLC (3694); Grand Prix Willow Grove LLC (3697); Grand Prix Windsor LLC (3698); Grand Prix Woburn LLC (3699); Innkeepers Financial Corporation (0715); Innkeepers USA Limited Partnership (3956); Innkeepers USA Trust (3554); KPA HI Ontario LLC (6939); KPA HS Anaheim, LLC (0302); KPA Leaseco Holding Inc. (2887); KPA Leaseco, Inc. (7426); KPA RIGG, LLC (6706); KPA RIMV, LLC (6804); KPA San Antonio, LLC (1251); KPA Tysons Corner RI, LLC (1327); KPA Washington DC, LLC (1164); KPA/GP Ft. Walton LLC (3743); KPA/GP Louisville (HI) LLC (3744); KPA/GP Valencia LLC (9816). The location of the Debtors' corporate headquarters and the service address for their affiliates is:  c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2]   The Debtors intend to file the DIP Order no later than fourteen calendar days before the hearing on this Motion or as otherwise ordered by the Court.

[3]   Information regarding the Debtors' business, the background of these Chapter 11 Cases (as defined herein), and further facts and circumstances supporting this Motion are set forth in the *Declaration of Dennis Craven, Chief Financial Officer of Innkeepers USA Trust, in Support of First-Day Pleadings* (the "**First Day Declaration**"), filed contemporaneously herewith.

2

operate the hotels under a franchisors' "flag." Pursuant to the contemporaneously filed Cash Collateral Motion,[4] the Debtors are seeking the authority to use Cash Collateral (as defined herein) to pay the expenses of operating their business and to fund the restructuring while the Debtors operate in chapter 11.

Separately, by this Motion and a companion motion for a separate debtor-in-possession financing facility (collectively, the "**DIP Financing**"), the Debtors are seeking an aggregate of approximately $68.0 million in DIP Financing for the specific purpose of funding the property improvement programs ("**PIPs**") required under the Franchise Agreements. As discussed herein, a variety of factors have led to the Debtors being unable to comply with their PIP obligations under certain Franchise Agreements, and the failure to complete the PIPs could result in the termination of those Franchise Agreements. The loss of these Franchise Agreements would have a damaging and, perhaps, crippling effect on the Debtors' operations and on the underlying value of the Debtors' enterprise due to the loss of associated name recognition, marketing support, brand loyalty, and centralized reservation systems. The DIP Financing will allow the Debtors to complete the PIPs, remain in compliance with the Franchise Agreements, increase the value of those hotels that enjoy capital improvements by virtue of the PIPs, and generally maintain and enhance the value of the Debtors' enterprise.

---

[4] *See Debtors' Motion for the Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use the Adequate Protection Parties' Cash Collateral and (II) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, (B) to the Extent Approved in the Final Order, Granting Senior Secured, Priming Liens on Certain Postpetition Intercompany Claims, (C) to the Extent Approved in the Final Order, Granting Administrative Priority Status to Certain Postpetition Intercompany Claims, and (D) Scheduling a Final Hearing Pursuant to Bankruptcy rule 4001(b)* (the "**Cash Collateral Motion**"); *see also Interim Order (A) Authorizing the Debtors To (I) Use the Adequate Protection Parties' Cash Collateral and (II) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* (the "**Interim Cash Collateral Order**"), which is attached as **Exhibit A** to the **Cash Collateral Motion**.

The DIP Financing is crucial to the success of the Debtors' restructuring, will allow the Debtors to maintain (and improve) both current revenue and enterprise value, and is structured to minimize, to the extent practicable, the extent to which the Debtors' prepetition lenders (the "**Prepetition Lenders**") are primed.  The Debtors respectfully assert that the DIP Financing is amply justified in these circumstances.

## Jurisdiction

1.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## Relief Requested

4.      By this Motion, the Debtors request entry of the DIP Order, among other things, providing the Debtors on a final basis:

> a.      <u>DIP Facility</u>:  authority to obtain postpetition loans in a principal amount not to exceed $50.75 million (the "**DIP Facility**") and other financial accommodations, pursuant to the terms and conditions of a DIP Credit Agreement (the "**DIP Agreement**") by and among the Borrowers, the DIP Agent, and the DIP Lenders (in each case, as defined in the herein defined Term Sheet), consistent with the letter indicating a binding commitment on behalf of the DIP Lenders to provide the entire principal amount of the DIP Facility, upon the terms and subject to the conditions set forth or referred to therein (the "**Commitment Letter**") attached as **Exhibit A**

hereto, and the term sheet attached as **Exhibit B** hereto (the "**Term Sheet**"), and the fee letter (the "**Fee Letter**");[5]

b. <u>DIP Financing Documents</u>:  authority to execute and deliver the DIP Agreement and all agreements, documents, and instruments contemplated by the DIP Agreement (collectively, the "**DIP Financing Documents**"), and to take all actions necessary, appropriate, or required to comply with the Debtors' obligations thereunder and under the DIP Order;

c. <u>DIP Liens and Claims</u>:  authority to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, senior, first priority, priming DIP Liens on the DIP Collateral securing, and the Superpriority Claims in respect of, the DIP Obligations (in each case, as defined in the Term Sheet); and

d. Granting related relief.

**<u>Concise Statement Pursuant to Local Bankruptcy Rule 4001-2</u>**

5. Pursuant to Bankruptcy Rules 4001(b), (c), and (d) and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Financing Documents and the DIP Order:[6]

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
| --- | --- |
| **<u>DIP Agreement Parties</u>**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **<u>Debtor Parties</u>**:<br><br><u>Tranche A Borrower</u>:<br><br>• The borrowers under the Fixed Rate Loans. *See* Exhibit A to Term Sheet for complete list of borrowers.<br><br><u>Tranche B Borrower</u>:<br><br>• The borrowers under the Capmark $47.4 Million Loan (Mission Valley) (KPA RIMV, LLC and Grand Prix RIMV Lessee, LLC).<br><br><u>Tranche C Borrower</u>:<br><br>• The borrowers under the Merrill Lynch $25.2 Million Loan (Tysons Corner) (KPA |

---

[5] The Debtors intend to file the DIP Agreement no later than fourteen calendar days before the hearing on this Motion or as otherwise ordered by the Court.

[6] Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet and the Commitment Letter, as applicable. This summary is qualified in its entirety by reference to the applicable provisions of the Term Sheet or the Commitment Letter. To the extent there exists any conflicts between this summary and the provisions of the Term Sheet or the Commitment Letter, as applicable, the provisions of the Term Sheet or the Commitment Letter, as applicable, shall govern.

K&E 16930185

| | |
|---|---|
| | **MATERIAL TERMS OF THE POSTPETITION FINANCING** |

| | |
|---|---|
| | Tysons Corner RI, LLC and Grand Prix General Lessee, LLC) |
| | **(Term Sheet, at pp. 1-2)** |
| | **Lender Parties**: |
| | DIP Agent: |
| | • To be determined. |
| | Lead DIP Lender: |
| | • Five Mile Capital II Pooling International LLC |
| | **(Commitment Letter, at p. 2)** |
| | DIP Lenders**:** |
| | • Lead DIP Lender and other financial institutions party to the credit agreement from time to time, subject to certain Borrower consent rights. |
| | **(Term Sheet, at pp. 2-3)** |
| **Maturity**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | • 360 days from the Closing Date<br><br>**(Term Sheet, at p. 3)** |
| **Termination Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Termination Date:** The applicable Tranche of the DIP Facility will automatically become due and payable upon:<br><br>• the acceleration of such Tranche by the DIP Lenders due to the occurrence and continuation of an Event of Default with respect to such Tranche;<br><br>• the effective date of any plan in the bankruptcy proceeding that provides for payment in full of all obligations owing under the DIP Facility;<br><br>• the closing date of any sale of all or substantially all of any Borrower's assets that constitute collateral for such Tranche (which in the case of the Tranche A Facility means more than 22 of the hotel properties);<br><br>• the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Borrower constituting collateral with respect to such Tranche in excess of $1,000,000 in the aggregate, subject to certain cure rights;<br><br>• the entry of an order of dismissal or conversion of the Chapter 11 Cases with respect to the Borrowers under such Tranche (which in the case of the Tranche A Facility means more than 22 borrowers); or<br><br>• the acceleration of the obligations under any other debtor-in-possession financing of the debtors.<br><br>**(Term Sheet, at pp. 3-4)** |
| **Purpose and Limitations** | **DIP Facility**:<br><br>• Proceeds of the DIP Facility shall be used solely for (a) payment of the financing |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B), 4001-2(a)(9)* | fees owed to the DIP Lenders and (b) to fund post-petition PIP Work. <br><br> **(Term Sheet, at p. 5; Commitment Letter, at p. 2)** |
| **Interest Rates** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | **Non-Default Interest Rate**: <br><br> • Monthly interest payments accruing at a per annum floating rate equal to the sum of 30-day LIBOR (subject to a floor of 2.0%) *plus* 5.00%. <br><br> **Default Interest Rate** <br><br> • 3% per annum in excess of the Non-Default rate. <br><br> **(Term Sheet, at pp. 4-5)** |
| **DIP Commitments** <br><br> *Local Bankruptcy Rule 4001-2(a)(1); Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Commitments**: <br><br> • $50.75 million aggregate facility separated into the following three tranches: <br><br>    • A $44.35 million facility allocated to 45 properties securing the Fixed Rate Loans; <br><br>    • A $4.0 million facility allocated to the property securing the Capmark $47.4 Million Loan (Mission Valley); and <br><br>    • A $2.4 million facility allocated to the property securing the Merrill Lynch $25.2 Million Loan (Tysons Corner). <br><br> **(Term Sheet, at p. 2)** |
| **Funding Conditions** <br><br> *Local Bankruptcy Rule 4001-2(a)(2); Local Bankruptcy Rule 4001-2(h); Fed. R. Bankr. P. 4001(c)(1)(B)* | **Conditions Precedent to Funding** <br><br> • Delivery of (i) the PIP Budget, (ii) a thirteen (13)-week cash flow projection, (iii) certain other financial information to be determined, and (iv) updated title searches, lien searches, and updated environmental reports; <br><br> • Entry of an order approving the DIP Facility; <br><br> • Payment of all fees and expenses; <br><br> • No material adverse change; and <br><br> • The satisfaction of certain other customary closing conditions. <br><br> **(Term Sheet, at pp. 8-9)** |
| **Fees and Expenses** <br><br> *Local Bankruptcy Rule 4001-2(a)(3); Fed. R. Bankr. P. 4001(c)(1)(B)* | **Closing Fees, Commitment Fees, and Other Fees and Expenses**: <br><br> • A "Closing Fee" equal to 0.5% of the DIP Facility payable on the Closing Date. <br><br> • A "Commitment Fee" equal to 1.0% of the DIP Facility (which fee was paid upon signing of the commitment letter. <br><br> • Payment of certain other fees and expenses of the lenders. <br><br> **(Commitment Letter, at p. 4)** |
| **Liens and Priorities** <br><br> *Local Bankruptcy Rule* | **DIP Liens**: <br><br> • The liens under the DIP Facility shall be first priority, senior secured and priming liens on and security interests in (i) all of the Borrowers' real property and the |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| *4001-2(a)(4);*<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | proceeds thereof that secure the prepetition obligations, (ii) the Controlled Disbursement Account, and (iii) all Chapter 5 causes of action that relate to the hotel properties owned by the Borrowers.<br><br>• The Tranche A Facility, the Tranche B Facility, and the Tranche C Facility shall not be cross-collateralized.<br><br>**(Term Sheet, at pp. 6-7)** |
| **Covenants**<br><br>*Local Bankruptcy Rule*<br>*4001-2(a)(8);*<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | **Affirmative and Negative Covenants:**<br><br>• Delivery to the DIP Agent, on a weekly basis, of Borrowers' and its subsidiaries' rolling 13 week cash flow projections;<br><br>• Restrictions on non-ordinary course asset sales;<br><br>• Delivery of certain required financial information;<br><br>• Compliance with the PIP Budget;<br><br>• Performance and completion by the Borrowers of the PIP Work in accordance with the PIP Budget and the Marriott Adequate Assurance Agreement;<br><br>• No affirmative action to modify or terminate a franchise agreement or enter into a new franchise agreement upon any hotel that constitutes collateral for the DIP Facility;<br><br>• No modification or entry into a new PIP with respect to any hotel that constitutes collateral for the DIP Facility;<br><br>• No modification, termination, or replacement of the Marriott Adequate Assurance Agreement; and<br><br>• Certain other customary affirmative and negative covenants.<br><br>**(Term Sheet, at pp. 9-10)** |
| **Events of Default**<br><br>*Local Bankruptcy Rule*<br>*4001-2(a)(10);*<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | **Events of Default:**<br><br>• Dismissal of the Chapter 11 Cases or conversion into a chapter 7 case;<br><br>• Filing or support of a proposed plan of reorganization by any Borrower or any affiliate of the Borrowers that does not provide for the payment in full and in cash of such Borrower's obligations outstanding under the DIP Facility on the effective date of such plan of reorganization;<br><br>• Entry of a final order confirming a plan of reorganization that does not require repayment in full in cash of the DIP Facility as of the effective date of the plan, unless otherwise consented to by the Controlling DIP Lenders;<br><br>• Appointment of a trustee under section 1104 of the Bankruptcy Code;<br><br>• The appointment of an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;<br><br>• Termination by a franchisor of a franchise agreement upon any hotel owned by any Borrower constituting collateral;<br><br>• One or more franchisors taking steps to terminate 10 or more franchise agreements |

| MATERIAL TERMS OF THE POSTPETITION FINANCING | |
|---|---|
| | (in the aggregate during the term of the DIP Facility) upon hotels owned by any of the Borrowers constituting collateral; <br><br> • Variance in the PIP Budget, subject to certain exceptions; <br><br> • Any default under an affiliate's debtor-in-possession financing; and <br><br> • Certain other customary events of default. <br><br> **(Term Sheet, at pp. 11 - 13)** |
| **Automatic Stay & Remedies** <br> *Local Bankruptcy Rule 4001-2(a)(10);* <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | **Remedies:** <br><br> • The DIP Lenders shall have customary remedies following an Event of Default, including: (i) the right to realize on all collateral securing the applicable Tranche of the DIP Facility (including the right to complete the PIP work) and (ii) any remedies set forth in any cash collateral order entered by the Bankruptcy Court in the event that there is an event of default under such cash collateral order). <br><br> **(Term Sheet, at p. 10)** |
| **Repayment** <br> *Local Bankruptcy Rule 4001-2(a)(13)* | **Mandatory Prepayments**: <br><br> • Mandatory prepayments of the applicable Tranche of the DIP Facility as a result of: (a) non-ordinary course asset sales; (b) the receipt of insurance proceeds; and (c) debt and equity issuances, in each case subject to certain limitations. <br><br> **(Term Sheet, at p. 5)** |
| **Joint Liability** <br> *Local Bankruptcy Rule 4001-2(a)(14);* <br> *Local Bankruptcy Rule 4001-2(e)* | • The Tranche A Borrowers shall be jointly and severally liable for the obligations under the Tranche A Facility. <br><br> • The Tranche B Borrowers shall be jointly and severally liable for the obligations under the Tranche B Facility. <br><br> • The Tranche C Borrowers shall be jointly and severally liable for the obligations under the Tranche C Facility. <br><br> **(Term Sheet, at p. 1; Commitment Letter, at p. 1)** |
| **Waivers and Consents** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(v);* <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | **Non-Bankruptcy Law:** <br><br> • All liens authorized and granted pursuant to the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further notice or act will be required to effect such perfection. <br><br> **(Term Sheet, at p. 7)** <br><br> **Miscellaneous:** <br><br> • Release and Waiver by Borrower of any claims against the DIP Lenders under the DIP Facility under section 510 of the Bankruptcy Code. <br><br> • Waiver by Borrower of any rights to assert claims arising under applicable law against the DIP Lenders (or related to the DIP Facility). <br><br> • DIP Agent shall at all times act pursuant to the DIP Credit Agreement. <br><br> **(Term Sheet, at p. 14)** |

| MATERIAL TERMS OF THE POSTPETITION FINANCING |  |
| --- | --- |
| | **Right to Credit Bid:** |
| | • Upon entry of a DIP Order approving the DIP Facility, the DIP Group shall have the right to credit-bid the amount of claims of the DIP Facility allocable to the applicable Tranche during a sale of all or substantially all of the Debtors' assets constituting collateral for such Tranche. |
| | **(Term Sheet, at pp. 10-11)** |
| | **Indemnification:** |
| | • The Borrowers shall indemnify the DIP Lenders pursuant to customary indemnification provisions. |
| | **(Term Sheet, at p. 14, Commitment Letter, at 5-6)** |

## Background

6.        On the date hereof (the "**Petition Date**"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases.

7.        Innkeepers USA Trust ("**Innkeepers**") is a self-administered Maryland real estate investment trust ("**REIT**") with a primary business focus on acquiring premium-branded upscale extended-stay, mid-priced limited service, and select-service hotels.  Innkeepers' indirect, wholly-owned limited liability company subsidiaries, which are Debtors in these Chapter 11 Cases (the "**Property Owners**"),[7] hold title to, or ground leases[8] in, the Debtors' 72 hotel

---

[7]    Innkeepers, through its indirect subsidiary, KPA Raleigh, LLC owns a 49% ownership interest in Genwood Raleigh LLC, a joint venture fee owner of the Sheraton in Raleigh, North Carolina.  Neither KPA Raleigh, LLC nor Genwood Raleigh LLC are Debtors in these Chapter 11 Cases.

properties. Each of the 72 Property Owners leases its hotel property to one of nine of Innkeepers' indirect, wholly-owned taxable REIT subsidiaries, each of which is a Debtor in these Chapter 11 Cases (the "**Property Lessees**").

8. The Debtors seek to affiliate their hotels with premier franchise companies and brands that offer robust marketing support and services and that have demonstrated their ability to command revenue premiums over other brands. The franchise licenses for the hotels are held by the Property Lessees and are governed by Franchise Agreements between the Property Lessees and the franchise owners (collectively, the "**Franchisors**"). Under the Franchise Agreements, among other provisions, the Debtors are required to pay franchise fees based on a percentage of hotel room revenue, and the Debtors must allow Franchisors to inspect their licensed hotels periodically to confirm adherence to stated brand operating standards. These inspections can result in additional capital expenditure requirements or additional operational, marketing, or repairs and maintenance expenses. Specifically, certain of the Franchise Agreements include provisions that require the Debtors to comply with PIPs, under which the Debtors are obligated to perform certain renovations and other capital improvements to their hotel properties, such as replacing furniture, fixtures, and equipment. The DIP Facility will enable the Debtors to complete the PIPs and continue to comply with their Franchise Agreements—without which the Debtors' revenue would inevitably decline precipitously and put the entire restructuring in jeopardy.

---

8 The Debtors have ground leases for the following properties: Courtyard by Marriott in Ft. Lauderdale, Florida; Best Western in Palm Beach, Florida; and Hampton Inn in Woburn, Massachusetts. The minimum annual rent payable under these leases is approximately $600,000 in the aggregate.

K&E 16930185

## Debt Relevant to DIP Facility[9]

9.      As of March 31, 2010, the Debtors had incurred aggregate funded secured indebtedness of approximately $1.42 billion, including approximately $1.29 billion of property-level secured debt, approximately $1.05 billion of which has been securitized and sold in the commercial mortgage-backed security ("**CMBS**") market.   The debt is secured by mortgages on the hotels or pledges of the equity of the Property Owners.   The secured debt relevant to the DIP Facility is discussed below.

### (i)      The Fixed Rate Loan.

10.      Forty-five of the Property Owners, each as a borrower, and Lehman ALI, Inc. ("**Lehman**" or the "**Fixed Rate Lender**"), as original lender, are parties to that certain Loan Agreement, dated as of June 29, 2007 (as amended, restated, replaced, supplemented, or otherwise modified from time to time, and together with such supporting and ancillary documents thereto, the "**Fixed Rate Mortgage Loan Agreement**").   The Fixed Rate Loan Agreement provides for mortgage loans to the 45 Property Owners in the aggregate principal amount of $825,402,542 (the "**Fixed Rate Mortgage Loan Obligations**"), which amount is collateralized by the 45 hotel properties owned by the Property Owners that are borrowers under the Fixed Rate Mortgage Loan Agreement.   The Fixed Rate Mortgage Loan Agreement is evidenced by a certain Replacement Promissory Note A-1 ("**Fixed Rate Note A-1**") and a certain Replacement Promissory Note A-2 ("**Fixed Rate Note A-2**"), each in the principal

---

[9]     Any description of the Debtors' prepetition debt facilities and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity, priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest, or any other fact with respect thereto, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever.  Capitalized terms used within this description of the debt relevant to the DIP Facility but not otherwise defined herein shall have the meanings set forth in the DIP Order or the First Day Declaration, as applicable.

K&E 16930185

amount of $412,701,271 and each dated as of August 9, 2007. The Fixed Rate Mortgage Loan Obligations have a maturity date of July 9, 2017.

11.     The Fixed Rate Mortgage Loan Agreement, together with Fixed Rate Note A-1 and Fixed Rate Note A-2 and all documents executed and delivered in connection therewith have been sold, assigned and transferred into the CMBS market. The Fixed Rate Mortgage Loan Obligations related to the Fixed Rate Note A-1 and all documents executed and delivered in connection therewith are part of a mortgage loan pool knows as LB-UBS Commercial Mortgage Trust 2007-C6, for which LaSalle Bank, National Association ("**LaSalle**") is trustee, and Midland Loan Services, Inc. ("**Midland**") serves as special servicer (the "**Fixed Rate Representative**"). The other half of the Fixed Rate Mortgage Loan Obligations related to the Fixed Rate Note A-2 and all documents executed and delivered in connection therewith are part of a mortgage loan pool known as LB-UBS Commercial Mortgage Trust 2007-C7, for which LaSalle is trustee. The Fixed Rate Representative is also the special servicer for the Fixed Rate A-2 Note.

**(ii)     The Capmark $47.4 Million Loan (Mission Valley).**

12.     KPA RIMV, LLC, as borrower, and Capmark Bank, as lender, are parties to that certain Deed of Trust Note (the "**Capmark Mission Valley Loan Agreement**"), dated as of October 4, 2006. Pursuant to that certain Loan Assumption, Affirmation, and Modification Agreement, dated June 29, 2007, Grand Prix RIMV Lessee, LLC ("**Grand Prix RIMV**") assumed all of KPA RIMV, LLC's obligations under the Capmark Mission Valley Loan Agreement. As a result, the Capmark Mission Valley Loan Agreement provides that Grand Prix RIMV is obligated under a mortgage loan in the original principal amount of $47.4 million (the "**Capmark Mission Valley Loan Obligation**"), which amount is collateralized by the Residence Inn in San Diego, California. The Capmark Mission Valley Loan Obligation have a maturity

13

date of November 11, 2016.  The Capmark Mission Valley Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and LNR Partners serves as special servicer.

### (iii) The Merrill Lynch $25.2 Million Loan (Tysons Corner).

13.     KPA Tysons Corner RI, LLC, as borrower, and Merrill Lynch as lender, are parties to that certain Loan Agreement (the "**Merrill Lynch Tysons Corner Loan Agreement**"), dated as of September 19, 2006.  The Merrill Lynch Tysons Corner Loan Agreement provides for a mortgage loan in the original principal amount of $25.2 million (the "**Merrill Lynch Tysons Corner Loan Obligations**"), which amount is collateralized by the Residence Inn in Vienna, Virginia.  The Merrill Lynch Tysons Corner Loan Obligation matures on October 1, 2016.  The Merrill Lynch Tysons Corner Loan Agreement was sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank is trustee, Wells Fargo serves as master servicer, and LNR Partners serves as special servicer.

### <u>Need for Postpetition Financing</u>

14.     The Debtors' principal source of liquidity is derived from hotel operations, which, as discussed in detail in the First Day Declaration, has been severely impaired recently.  In addition to placing a burden on the Debtors' ability to meet debt service obligations and fund day-to-day business operations, the lack of available liquidity made it impossible for the Debtors to fund capital expenditures sufficiently on hotel properties necessary to comply with their obligations under certain of the Franchise Agreements.  The PIPs are costly, subject to delays, and disrupt operations and displace revenue at the hotels while rooms under renovation are out of service.

K&E 16930185

15.     Franchisors periodically inspect the hotels to ensure the Debtors' compliance with their operating standards and the PIPs, the breach of which could result in the cancellation of a Franchise Agreement.  The loss of a Franchise Agreement for a hotel would have an immediate and material adverse effect on the Debtors' operations and on the underlying value of the affected hotel due to the loss of the myriad of benefits the franchise arrangement provides, such as name recognition, marketing support, brand loyalty, and centralized reservation systems provided by the Franchisors.  Pursuant to prior agreement, in September of 2009, a Residence Inn Franchise Agreement with respect to a hotel property in Columbus, Ohio terminated.  Subsequent to termination, revenue precipitously dropped by 50 percent and the property was sold for a fraction of its appraised value from only two years prior.

16.     As of the Petition Date, the Debtors have received numerous notices of potential default from Franchisors, including 22 notices of default from Marriott International, Inc. ("**Marriott**").  The Debtors own 44 hotels under the Marriott brands, more than half of which are "Generation 1" Residence Inn by Marriott extended-stay hotels.[10]  Generation 1 Residence Inn hotels resemble garden style apartments with multiple two to three story buildings, each comprised of eight rooms and exterior access to each room.  In contrast, subsequent generations of Residence Inn hotels typically feature more rooms in a single multi-story building with interior corridors.  Upkeep costs associated with older Generation 1 Residence Inn hotels are typically higher than other types of hotel properties because of their age (generally 20 to 30 years old), layout (eight or more buildings located on large parcels of land), and inefficient utilization of heating and other utilities.

---

10   Innkeepers earns 31% of its revenue from Generation 1 hotels branded under the Marriott flag.

17.     As the largest Generation 1 Residence Inn franchisee in the country, maintaining the Franchise Agreements on the Debtors' Generation 1 hotels is critically important for their cash flow and enterprise value.   The loss of revenue (and cash flow) associated with an immediate withdrawal of the Debtors' Generation 1 hotels from the Residence Inn system could have a severely detrimental effect on the Debtors' entire enterprise.   No new Generation 1 Residence Inns have been built for many years.   As a result, many Generation 1 franchise agreements are not being renewed as they mature or are exiting the Residence Inn system before the maturity of their franchise agreements.   As the Residence Inn brand grows (with over 600 in the brand system currently), the importance of Generation 1 hotels to the Residence Inn brand will continue to decrease.   Recognizing this, in 2007 the Debtors reached agreement with Marriott to (a) complete extensive PIPs on most of its Generation 1 hotels in exchange for Franchise Agreement extensions until 2021 (or later) and (b) permit the early expiration of the franchise agreements on six smaller Generation 1 Residence Inns located in non-core mid-Western markets.   As such, the DIP Facility, which is going to fund PIPs for 17 Generation 1 hotels, is vital.

18.     As discussed in the First Day Declaration, the dramatic reduction in the Debtors' RevPAR (revenue per available room), coupled with their significant debt burden and an inability to access new capital, has rendered the Debtors unable to comply with their PIP obligations under the Marriott (and other) Franchise Agreements.   On March 16, 2010, Marriott sent default notices to the Debtors indicating that if the Debtors failed to perform the required PIP obligations by June 14, 2010, the 22 Marriott Franchise Agreements would immediately terminate as of that date.[11]

---

19.     The Debtors' inability to invest in their hotel properties, along with the collapse of the real estate market, has caused the value of the Debtors' hotels to severely decline, resulting in the overall erosion of the Debtors' enterprise value.  To stay competitive and to preserve the value of their assets, the Debtors must comply with the PIPs required at certain hotels, the completion of which is vital for the future of their business.[12]  However, the Debtors have been completely dependent on their operating cash flow to pay expenses and debt service, leaving them short of the cash necessary to pay for any of these development and redevelopment costs.

20.     As discussed in the Cash Collateral Motion, the proposed immediate use of cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") is intended to provide sufficient working capital while the Debtors operate in chapter 11.  The DIP Financing, however, is equally important in that it is needed to complete the various PIPs required under the Franchise Agreements.  Without the continued existence of the Franchise Agreements, the Debtors would immediately begin losing revenue and could eventually be forced to shut down entirely.

21.     Further, Marriott may argue that the Debtors need to honor obligations to fund and perform PIPs immediately.  The Debtors believe this argument is contrary to the Bankruptcy Code and other applicable law and would vigorously contest such argument.  That said, the DIP Facility will allow the Debtors to begin performing the PIPs immediately—eliminating the potential distraction from any such Franchisor argument, allowing the Debtors to invest in value-

---

[11]  On June 11, 2010, Marriott extended the deadline to perform the required PIPs until June 28, 2010.  On June 25, 2010, Marriott extended the deadline to perform the required PIPs until July 18, 2010.

[12]  On June 25, 2010, the Debtors entered into that certain Agreement for Adequate Assurance of Future Completion of Certain PIPs and Assumption of Agreements with Marriott (the "**Marriott Adequate Assurance Agreement**").  Pursuant to the Marriott Adequate Assurance Agreement, Marriott has agreed to a rational schedule for the Debtors to commence, perform, and fully complete the PIPs, provided that the Court approves the DIP Financing within 60 days of the Petition Date.

adding capital expenditures, and ensuring protection of the Franchise Agreements. As such, the DIP Facility should be approved.

### The Debtors' Marketing and Negotiating Efforts for Postpetition Financing

22.     In the beginning of 2010, the Debtors retained Moelis & Company ("**Moelis**") as their financial advisor and investment banker. Shortly thereafter, the Debtors and their advisors together determined that, given the Debtors' financial position, it was appropriate to begin exploring strategic options, including, among other things, seeking to borrow additional funds to complete the PIPs and, thus, protect the Franchise Agreements. While negotiating with certain of their prepetition lenders and Franchisors regarding a restructuring, the Debtors began discussions in earnest with certain stakeholders to determine whether they would provide postpetition financing. Moelis also identified other entities that could be willing and able to provide at least $68.0 million in postpetition financing to the Debtors (as that is the approximate amount the Debtors determined would be likely sufficient to fund and complete the PIPs).

23.     The Debtors' ability to obtain postpetition financing from alternative parties, especially on terms other than on a senior secured, superpriority basis, however, is complicated by several factors, including the Debtors' substantial amount of undersecured debt and lack of any significant unencumbered assets, the types of loans sought, the economic challenges facing the hotel industry, and the challenging debtor in possession financing market in general. With these complicating factors in mind and based on an in-depth analysis conducted with the assistance of Moelis and their other advisors, the Debtors believe the two currently proposed DIP Financing lenders—the DIP Lenders and an affiliate of Lehman (the "**Lehman DIP Lender**")—are the appropriate lenders for the DIP Financing. The DIP Facilities of both the DIP Lenders and the Lehman DIP Lender were negotiated in good faith and at arm's-length, and the Debtors and their advisors believe were both proposed on eminently reasonable terms,

K&E 16930185

represent the best potential financings available to the Debtors, and the best way to maximize stakeholder value in the Chapter 11 Cases under the circumstances.

24.     This Motion seeks approval of the DIP Facility offered by Five Mile.  By a separate motion filed contemporaneously, the Debtors are also seeking approval of the financing offered by the Lehman DIP Lender.

## The Postpetition Financing

### I.     The DIP Facility

25.     The DIP Lenders agreed to provide the DIP Facility in three tranches, on the terms provided in the Term Sheet as summarized herein.  The proceeds of the DIP Facility will be used primarily to (a) complete all required PIPs under the Debtors' Franchise Agreements that relate to the Tranche A Collateral, Tranche B Collateral, and Tranche C Collateral and (b) pay certain fees and expenses provided under the DIP Agreement and authorized by the Court.

### II.    Adequate Protection Obligations

26.     The various forms of adequate protection proposed by the Debtors in the Cash Collateral Motion to protect the Prepetition Lenders against diminution in the value of their collateral—namely, Adequate Protection Liens, 507(b) Claims, the reimbursement of the Representatives' Expense Reimbursements, payments subject to forecast constraints, reporting requirements, the "Cash Use Covenant," and superpriority claims and senior secured, priming liens  (subject only to all interests, liens, and claims of Permitted DIPs and to the Carve Out) on account of Intercompany Claims (all as defined and described in the Interim Cash Collateral Order)—also serve as adequate protection for the priming of their liens.  Further, the Prepetition Lenders are adequately protected in that the PIPs add more value to a particular Prepetition Lender's collateral than the amount to which that Prepetition Lender is primed.

K&E 16930185

Basis for Relief

**I.** **The Debtors Should Be Authorized To Obtain Postpetition Financing Through the DIP Financing Documents.**

    **A.** **Entering into the DIP Financing Documents Is an Exercise of the Debtors' Sound Business Judgment.**

27.    For the reasons set forth in greater detail herein, the Court should authorize the Debtors to enter into the DIP Financing Documents and obtain access to the DIP Facility, as an exercise of the Debtors' sound business judgment. At their core, the statutory predicates for a debtor to enter into DIP Financing Documents require the exercise of sound business judgment.

28.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows: That the proposed financing is an exercise of sound and reasonable business judgment . . . .").

K&E 16930185

29.     Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Financing Documents, the Court should consider the economic terms of the DIP Facility in light of current market conditions.  *See, e.g.,* Transcript of Record at 734 35:24 1, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as in the past).   Moreover, it is appropriate for the Court to consider non-economic benefits to the Debtors offered by a proposed postpetition financing facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).[13]

30.     The Debtors' execution of the DIP Financing Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook a thorough analysis as to the Debtors' projected financing needs during the pendency of their Chapter 11 Cases and determined that the Debtors would

---

[13]     Because of the voluminous nature of the orders cited herein and in footnote 15, they are not attached to the Motion.  Copies of these orders are available on request of Debtors' counsel.

K&E 16930185

require significant postpetition financing to fund the PIPs allegedly required under the Franchise Agreements. The decision to enter into the DIP Facility was the culmination of an intense process targeted at procuring the best available financing under the circumstances to meet these needs. The Debtors negotiated the DIP Financing Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside advisors, to obtain the required postpetition financing on terms favorable to the Debtors. Based on the advice of counsel and the Debtors' other advisors, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Financing Documents provide financing on more favorable terms than any other reasonably available alternative.

31.     Specifically, the DIP Financing Documents will provide the Debtors with access to $50.75 million immediately after entry of the DIP Order. The Debtors have determined this should be sufficient to complete the PIPs required under those Franchise Agreements covering the Tranche A Collateral, the Tranche B Collateral, and the Tranche C Collateral, to fund the other obligations under the DIP Facility that will be financed thereunder, and together with the approximately $17.5 million in debtor-in-possession financing sought pursuant to a companion motion, sufficient to complete all required PIPs. As discussed herein, the Franchisors believe that their Franchise Agreements authorize them to terminate their agreements if the Debtors fail to complete the PIPs. Any loss of their key Franchise Agreements would have a material adverse effect on the Debtors' operations and on the underlying value of the affected hotel. By making these PIP investments, the Debtors are both increasing the value of particular properties and preserving the overall value of the enterprise by protecting the Franchise Agreements. Accordingly, entering into the DIP Financing Documents to secure the DIP Facility constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

22

### B. The Debtors Should Be Authorized To Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.

32.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

33.     To satisfy the requirements of section 364(c), a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*) 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames*

*Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

34.     The Debtors believe a series of confounding factors leaves them simply unable to obtain sufficient, or any, postpetition financing in the form of unsecured credit or only as an administrative expense.   The most viable options to provide necessary liquidity to the Debtors and preserve their assets as a going concern are that afforded by the DIP Facility and the debtor in possession facility proposed by the Lehman DIP Lender.   After considerable negotiation and analysis of the two proposals, the Debtors submit that the DIP Facility and the financing offered by the Lehman DIP Lender are the most favorable sources of postpetition financing available to the Debtors under the circumstances.   To supplement such analysis, Moelis intends to solicit interest from a wide range of institutions including traditional financial institutions such as commercial and investment banks, as well as hedge funds and other non-traditional lenders, to provide further support that the terms contemplated by the DIP Facility are not only reasonable in light of market conditions, but represent the best terms available.

### C.     The Debtors Should Be Authorized To Obtain Postpetition Financing Secured by First Priority Priming Liens.

35.     In addition to authorizing financing under section 364(c), courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if a debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.   *See* 11 U.S.C. § 364(d)(1).   Alternatively, a lender's consent to being "primed" satisfies the 364(d)(1) adequate protection requirement as to that lender.   While the Fixed Rate Lender, Capmark Mission Valley Lender and the Merrill Tysons Corner Lender (all as defined in

24

the Interim Cash Collateral Order) have not yet consented to being primed by the DIP Facility as of the filing of the Motion, the Debtors remain hopeful that they will gain their consent. Regardless, however, the Debtors respectfully assert that the Fixed Rate Lender, the Capmark Mission Valley Lender, and the Merrill Tysons Corner Lender are adequately protected so as to justify approval of the DIP Facility under section 364(d)(1).

36.     The Court should, therefore, authorize the Debtors to (a) provide the DIP Agent, on behalf of itself and the other DIP Lenders, first priority, senior secured and priming liens on and security interests in (i) all of the Borrowers' real property (including the improvements thereon and all furniture, fixtures, and equipment used in connection therewith) and the proceeds thereof that secure the Existing Loans, subject only to prepetition liens and other permitted liens to be agreed in the DIP Agreement and (ii) the Controlled Disbursement Account, the amounts on deposit from time to time therein and the proceeds thereof (*provided that* the Tranche A Facility, the Tranche B Facility, and the Tranche C Facility shall not be cross-collateralized) and (b) grant the Debtors' repayment obligations under the DIP Financing Documents superpriority administrative expense status as provided for in section 364(c)(1).

37.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d), courts focus on whether the transaction will enhance the value of the Debtors' assets. Courts consider a number of factors, including, without limitation:

> (a)     whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids, or timely proposals are before the court);
>
> (b)     whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;
>
> (c)     whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s);

<blockquote>
(d)  whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

(e)  whether the proposed financing agreement adequately protects prepetition secured creditors.
</blockquote>

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79, *cited in* Transcript of Record at 733:3-7, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008). The DIP Facility satisfy each of these factors.

38.    First, as described above, the Debtors and their advisors explored possible financing sources, and ultimately determined that the DIP Lenders and the Lehman DIP Lender offered the only viable options for obtaining the postpetition financing the Debtors require. The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Financing Documents, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing. Further, the Debtors are not able to obtain financing from the DIP Lenders other than financing secured by first priority priming liens.

39.    Second, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute their Chapter 11 Cases effectively, and may be required to shut down their operations, which will threaten the Debtors' significant going concern value. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

40. Third, the DIP Facility will provide the Debtors with immediate access to $50.75 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these Chapter 11 Cases. Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

41. Fourth, as described in greater detail herein, the Debtors and the DIP Lenders negotiated the DIP Financing Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Financing Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors, and other parties in interest.

42. Fifth, the respective interests of the Fixed Rate Lender, the Capmark Mission Valley Lender, and the Merrill Tysons Corner Lender in the Prepetition Collateral are adequately protected as referenced below and as detailed in the Cash Collateral Motion.

### D. The Interests of the Prepetition Lenders Are Adequately Protected.

43. What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted). The "most important question" in determining whether a creditor is adequately

protected "is whether the interest of the secured creditor whose lien is to be primed is being unjustifiably jeopardized." *In re Mosello*, 195 B.R. at 289.

(i)      **DIP Facility Structure and Adequate Protection Liens**

44.     As explained herein and as set forth in detail in the Term Sheet and the Interim Cash Collateral Order, the Debtors propose to provide the Prepetition Lenders with adequate protection in a variety of forms. *First*, the Debtors have structured the DIP Facility in Tranches so that a Prepetition Lender is primed only to the extent of the principal amount of the Tranche assigned to that Prepetition Lender—and there is no cross-collateralization among the Tranches. *Second*, the various forms of adequate protection set forth in paragraph 26 herein, the Cash Collateral Motion, and Interim Cash Collateral Order to protect the Prepetition Lenders against diminution in the value of their collateral also serve as adequate protection for the priming of their liens.

(ii)      **Enhanced Value**

45.     The DIP Facility is divided into three Tranches so that the DIP Funds are allocated only to the Debtors' properties on an as-needed basis to complete the PIPs, and Prepetition Lenders are only primed by the principal amount of the particular Tranche dedicated to funding the PIPs in that Prepetition Lender's collateral pool. Thus, it must only be proven that the collateral of a Prepetition Lender receiving the funds is improved in value by more than the value to which that Prepetition Lender is specifically primed. *See In re 495 Central Park Ave. Corp.* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (holding, in approving a non-consensual priming debtor in possession financing facility, that the creditor's secured position was adequately protected sufficient to support approval of the priming financing facility where the "value of the debtor's property will increase as a result of the renovations funded by the proposed financing."); *see also In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr.

28

E.D.N.Y 1996) (adequate protection sufficient to support approval of the priming of a secured creditor's lien was present where "any improvement to the Debtor's real property by way of clean up…will greatly improve the value of the collateral."); *In re YL W. 87th Holdings I LLC,* 423 BR 421 (Bankr. S.D.N.Y. 2010); *In re Mosello*, 195 B.R. 277.

46.     The DIP Facility will increase the value of each Prepetition Lenders' specific collateral by more than the amount to which that Prepetition Lender is primed.  This appreciation comes in two forms.  *First*, the PIPs will increase the value of each individual property receiving funding in that it will provide new furniture, fixtures, and equipment in those properties, as well as other value-adding improvements.  *Second*, completing the PIPs will result in the Debtors maintaining the Marriott Franchise Agreements for the hotels securing the Prepetition Lenders' claims, which has value in and of itself of more than the total amount of the DIP Facility for such Tranche.

47.     Accordingly, each of the Prepetition Lenders has been adequately protected and/or have consented to being primed by the DIP Facility.  Therefore, the Court should find that the Adequate Protection Obligations are fair and reasonable and satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**II.     The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e).**

48.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so

> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

49.     The Term Sheet and the Commitment Letter are the result of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders, which led to the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing.  The terms and conditions of the Term Sheet and Commitment Letter are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the Term Sheet or the Commitment Letter other than as described herein, in the Term Sheet, and in the Commitment Letter.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) and are entitled to all of the protections afforded by that section.

**III.    Modification of the Automatic Stay Is Warranted.**

50.     The Term Sheet contemplates that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the Term Sheet), rights and remedies provided for in the Term Sheet, and to take certain other actions without further order of or application to the Court.  The Term Sheet provides, however, that the DIP Lenders must provide the Debtors and certain other parties, including the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") and counsel to any committee appointed in these Chapter 11 Cases, with five (5) business days prior written notice before exercising any enforcement rights or remedies,

which will allow the Debtors and other interested parties to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred and is continuing.

51.     Stay modification provisions of this sort are ordinary features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances and were required to secure the DIP Lenders' agreement to enter into the DIP Facility.  *See, e.g.*, *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 15, 2010); *In re Gen. Growth Props. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 29, 2009); *In re Muzak Holdings LLC*, Case No. 09-10422 (Bankr. D. Del. Mar. 12, 2009); *In re Wellman, Inc.*, Case No. 08-10595 (Bankr. S.D.N.Y. Apr. 7, 2008); *In re Musicland Holding Corp.*, Case No. 06-10064 (Bankr. S.D.N.Y. Feb. 21, 2006).

## Motion Practice

52.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Local Bankruptcy Rule 9013-1(a).

## The Debtors' Reservation of Rights

53.     Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any invoice or claim related to the relief requested herein in accordance with applicable non-bankruptcy law.

**Notice**

54.     Bankruptcy Rule 4001 sets forth the notice requirements with respect to a motion

to obtain credit pursuant to section 364 of the Bankruptcy Code.   Specifically, Bankruptcy

Rule 4001(c) provides that a motion pursuant to section 364 must be served on all committees

(or their authorized agents) appointed in the debtor's chapter 11 case pursuant to section 1102 of

the Bankruptcy Code and on such other entities as the court may direct.[14]  Fed. R. Bankr. P.

4001(c)(1).   Bankruptcy Rule 4001 further provides that a hearing on the motion may be held

"no earlier than 14 days after service of the motion."   Fed. R. Bankr. P. 4001(c)(2).   Finally,

Bankruptcy Rule 4001(d) provides that (a) a motion for approval to modify or terminate the

automatic stay shall be served on any official creditors committee or on the creditors included on

the list filed under Bankruptcy Rule 1007(d) if no committee of unsecured creditors has been

appointed, and on other such entities as the court may direct and (b) objections may be filed

within 14 days of the mailing of notice of the motion and the time for filing objections thereto.

Fed. R. Bankr. P. 4001(d)(1) and (2).   The Debtors respectfully assert that they have complied

with these notice requirements of Bankruptcy Rule 4001.

55.     The Debtors have provided notice of this Motion to:  (a) the U.S. Trustee; (b) the

entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims

---

[14]   Bankruptcy Rule 4001(c)(1) provides, among other things, that motions for authority for financing shall be
accompanied by a copy of the credit agreement.   To the extent necessary, the Debtors request that the Court
determine that the attached Term Sheet as satisfies such rule.   While the Debtors do not, at this time, have a
fully executed credit agreement to provide to the Court, the Debtors do have the material terms of such an
agreement in place.   The Debtors have attached hereto the Commitment Letter as Exhibit A and the Term Sheet
as Exhibit B.   The Debtors submit that the Commitment Letter and Term Sheet satisfy Bankruptcy Rule
4001(c)(1)(A) by providing the Court and all parties to receive notice with the terms of the proposed DIP
Financing.  Moreover, the Debtors will file the credit agreement and proposed order no less than 14 days before
the hearing.   Courts in this and other jurisdictions have granted similar financing motions where debtors have
provided commitment letters, term sheets, or both in lieu of executed credit agreements.   *See, e.g., In re
Lyondell Chemical Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. 2009) [Docket No. 62]; *In re Kmart Corp.*, Case
No. 02-B-2474 (Bankr. N.D. Ill. 2002) [Docket No. 93].

filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to each of the Fixed Rate Lender, Floating Rate Lenders, the Anaheim Lenders, the Capmark Lenders, and the Merrill Lenders, to the extent known, and, as applicable, each of the lenders' Representatives (as defined below); (d) known secured lenders with a potential, expected interest in the Prepetition Collateral; (e) applicable taxing authorities (including the Internal Revenue Service); (f) the Securities and Exchange Commission; (g) the Debtors' Franchisors; (h) the Office of the Attorney General in all of the states in which the Debtors operate; and (i) those parties who have formally filed a request for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

## No Prior Request

56.     No prior request for the relief sought in this Motion has been made to this or any other court.

K&E 16930185

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Order granting the relief requested herein, and granting such other relief as is just and proper.

New York, New York
Dated: July 19, 2010

/s/ *Paul M. Basta*

James H.M. Sprayregen, P.C.
Paul M. Basta
Jennifer L. Marines
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

Anup Sathy, P.C.
Marc J. Carmel
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Proposed Counsel to the Debtors
and Debtors in Possession

**EXHIBIT A**

**Commitment Letter**

**CONFIDENTIAL**

July 16, 2010

The Entities set forth on <u>Schedule I</u>, <u>Schedule II</u> and <u>Schedule III</u> hereto
c/o Innkeepers USA
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida 33480

<u>$50,750,000 Senior Secured Super-Priority Debtor-in-Possession Credit Facility
Commitment Letter</u>

Ladies and Gentlemen:

You have advised Five Mile Capital II Pooling International LLC (together with its successors and assigns, "*Five Mile*" or "*we*" or "*us*") that the entities set forth on <u>Schedule I</u> hereto (collectively, jointly and severally, together with their respective permitted successors and permitted assigns, the "*Tranche A Borrower*"), <u>Schedule II</u> hereto (collectively, jointly and severally, together with their respective permitted successors and assigns, the "*Tranche B Borrower*") and <u>Schedule III</u> hereto (collectively, jointly and severally, together with their respective permitted successors and assigns, the "*Tranche C Borrower*"; the Tranche A Borrower, the Tranche B Borrower and the Tranche C Borrower being collectively referred to herein as the "*Borrowers*" or "*you*") may file voluntary petitions under Title 11 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.) (as amended, the "*Bankruptcy Code*") in the Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"; such cases, collectively, the "*Bankruptcy Case*").

You have further advised us that in connection with the commencement of the Bankruptcy Case you desire to establish a $50,750,000 senior secured super-priority debtor-in-possession credit facility, such credit facility being allocated to three separate tranches (each, a "*Tranche*") as follows: (a) a term loan facility in an aggregate principal amount of $44,350,000 allocated to and secured by the 45 hotel properties securing the Existing Tranche A Loans (as defined in the Term Sheet (as defined below)) (the "*Tranche A Facility*"); (b) a term loan facility in an aggregate principal amount of $4,000,000 allocated to and secured by the hotel property commonly known as "Residence Inn San Diego--Mission Valley" located at 1865 Hotel Circle South, San Diego, California securing the Existing Tranche B Loans (as defined in the Term Sheet) (the "*Tranche B Facility*"); and (c) a term loan facility in an aggregate principal

amount of $2,400,000 allocated to and secured by the hotel property commonly known as "Residence Inn--Tysons Corner" located at 8400 Old Courthouse Road, Vienna, Virginia securing the Existing Tranche C Loans (as defined in the Term Sheet) (the "***Tranche C Facility***"; the Tranche A Facility, the Tranche B Facility and the Tranche C Facility being collectively referred to herein as the "***DIP Facility***").  The proceeds of the DIP Facility will be used solely and exclusively for the PIP Work (as defined in the Term Sheet) in accordance with the PIP Budget and to pay the financing fees owed to the DIP Lenders (as defined below). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Summary of Indicative Terms and Conditions attached hereto as <u>Exhibit A</u> (the "***Term Sheet***").

1.    <u>Commitments</u>.

In connection with the foregoing, Five Mile is pleased to advise you of its commitment and does hereby commit (the "***DIP Commitment***") to provide the entire principal amount of the DIP Facility, upon the terms and subject to the conditions set forth or referred to in this commitment letter, including the Term Sheet and other attachments hereto and thereto (this commitment letter and the Term Sheet being collectively referred to herein as, this "***Commitment Letter***").

2.    <u>Agency Roles</u>.

You hereby appoint (a) Five Mile to act as the Lead DIP Lender for the DIP Facility and (b) if agreed to by Five Mile and Presidio Investments, Ltd. (together with its successors and assigns, "***Presidio***") subsequent to the date hereof in accordance with the terms and provisions of the Term Sheet and Section 3 hereof, Presidio to act as the Co-Lead DIP Lender for the DIP Facility, in each case on the terms and subject to the conditions set forth or referred to in this Commitment Letter.  Five Mile and, if so agreed, Presidio, in such capacities, will perform the duties and exercise the authority customarily performed and exercised by it in such roles and Five Mile will have the sole and exclusive right to select the DIP Agent to serve in such capacity for the DIP Facility.  Notwithstanding anything contained in the Term Sheet to the contrary, all fees payable by the Borrowers in respect of the DIP Facility (including, without limitation, the Commitment Fee) shall be paid solely to Five Mile, unless Five Mile and Presidio agree that Presidio shall act as the Co-Lead DIP Lender for the DIP Facility (in which event such fees shall be payable to Five Mile and Presidio as set forth in the Term Sheet or as otherwise agreed to by Five Mile and Presidio).

3.    <u>Syndication</u>.

We reserve the right, prior to and/or after the execution of definitive documentation for the DIP Facility, to (i) assign up to 50% of the aggregate DIP Commitment with respect to the DIP Facility to Presidio so long as (a) Presidio and Five Mile agree that Presidio shall act as the Co-Lead DIP Lender for the DIP Facility and (b) Presidio shall have executed a joinder to this Commitment Letter or this Commitment Letter shall have otherwise been amended, in each case in form and substance reasonably satisfactory to Five Mile and the Borrowers, in order to evidence Presidio's DIP Commitment and (ii) to syndicate and/or participate (collectively "***Syndication***") up to 49% of the aggregate DIP Commitment with respect to the DIP Facility

(with Five Mile retaining or, if applicable, with Five Mile and Presidio retaining in the aggregate, not less than 51% of the aggregate DIP Commitment), including, without limitation, to current certificate holders participating in the Existing Loans with the consent of the Lead DIP Lender (which consent shall not be required with respect to any such certificate holders provided the terms and conditions of such Syndication are otherwise acceptable to the Lead DIP Lender) and subject to the limitations as are expressly set forth in this Commitment Letter (including the Term Sheet) (such lenders and participants, together with us and, if applicable, Presidio as Co-Lead DIP Lender, the *"DIP Lenders"*); provided, that, except as is expressly provided in Section 9 hereof, in no event shall any Syndication prior to the Closing Date, release Five Mile or Presidio, as the case may be, from its DIP Commitment under this Commitment Letter (as amended or supplemented). We intend to commence Syndication efforts promptly upon the execution of this Commitment Letter, and you agree to use your commercially reasonable efforts to assist us in our Syndication efforts (it being understood that such assistance shall continue after the execution of definitive documentation for the DIP Facility). Such assistance shall include (a) your using commercially reasonable efforts to enable any Syndication efforts to benefit materially from your existing lending and investment banking relationships; (b) direct contact between senior management, representatives and advisors of each of the Borrowers and the proposed DIP Lenders (including through hosting with Five Mile, one or more meetings of prospective DIP Lenders), in each case at reasonable times, at reasonable intervals and at reasonable locations to be agreed; (c) assistance by each of you in the preparation of a version of the Confidential Information Memorandum and/or other marketing materials and presentations for the DIP Facility to be used in connection with the Syndication as reasonably requested by us; (d) your providing a thirteen-week cash flow forecast; (e) your providing or causing to be provided a detailed business plan or projections of the Borrowers and such other financial information with respect to the Borrowers as is reasonably requested by Five Mile in connection with the Syndication; and (f) your using commercially reasonable efforts to provide or cause to be provided such information with respect to the respective sponsors of the Borrowers as is reasonably requested by the proposed DIP Lenders in connection with the Syndication.

Without limiting any provision of the Term Sheet, Five Mile will manage all aspects of any Syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocation of the DIP Commitment among the DIP Lenders, any naming rights and the amount and distribution of fees among the DIP Lenders. To assist Five Mile in its Syndication efforts, at the request of Five Mile, you agree to promptly prepare and provide to Five Mile all non-privileged information with respect to the Borrowers and their respective sponsors and the transactions contemplated hereby, including all financial information and projections (including budgets) as required under the Term Sheet (the *"Projections"*), as Five Mile may reasonably request.

Without limiting your obligations to assist with the Syndication efforts as set forth herein, the Borrowers and Five Mile hereby agree that Syndication is not a condition to the DIP Commitments.

4.    Information.

You hereby represent and covenant (and it shall be a condition to Five Mile's commitment hereunder and Five Mile's agreement to perform the services described herein) that (a) all information, other than forward-looking statements, third-party generated industry data and information of a general economic nature and the Projections (the "**_Information_**"), that has been or will be made available to Five Mile by or on behalf of you or any of your representatives is or will be, when furnished and taken as a whole, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) the forward-looking statements and Projections that have been or will be made available to Five Mile by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are reasonable at the time made (it being understood and agreed that such forward-looking statements and Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, and that no assurance can be given that such forward-looking statements and Projections will be realized, and that the forward-looking statements and Projections are not a guarantee of financial performance and actual results may differ from such forward-looking statements and Projections and such differences may be material); provided, however, that nothing contained in this Section 4 shall (or shall be deemed to) amend or modify any provisions hereof or of the Term Sheet with respect to or relating to the PIP Budget, the PIP Work and/or the completion by the Borrowers of the PIP Work in accordance with the PIP Budget (including, without limitation, those set forth in the Term Sheet under the headings "Use of Proceeds," "Cash Management," "Audits and Appraisals," "Conditions Precedent," "Affirmative and Negative Covenants," "Events of Default," "Indemnification" and "Other Definitions"). You agree that if at any time prior to the closing of the DIP Facility, any of the representations in the preceding sentence would be incorrect if the Information, Projections or forward-looking statements were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information, Projections or forward-looking statements so that such representations will be correct under those circumstances. In arranging and syndicating the DIP Facility, Five Mile and the other DIP Lenders will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

5.    Fees and Expenses.

As consideration for Five Mile's commitment hereunder and Five Mile's agreement to perform the services described herein, you agree to pay to Five Mile the fees and expenses, and fulfill the obligations, set forth in this Commitment Letter (including the Term Sheet) and the fee letter with respect to the DIP Facility dated the date hereof and delivered by the Borrowers to Five Mile herewith (the "**_Fee Letter_**").

6.    Conditions Precedent.

Five Mile's commitment to provide the DIP Facility is subject to (a) with respect to each Tranche, our not having discovered or otherwise becoming aware of any information not previously disclosed to us is inconsistent in a material and adverse manner with our

understanding, based on the information provided to us prior to the date hereof, of the financial condition, results of operations or properties of the Borrowers, taken as a whole (other than the commencement of the Bankruptcy Case or otherwise in connection therewith); (b) our satisfaction that, prior to and during the Syndication of the DIP Facility, there shall be no other issuances of debt or commercial bank, mortgage, mezzanine or other financings of the Borrowers being announced, placed or arranged; and (c) your compliance with the terms of this Commitment Letter and the Fee Letter. Notwithstanding the foregoing and without limiting any of the provisions of Section 15 hereof, the obligation of the DIP Lenders to fund the DIP Facility is subject to the satisfaction by the Borrowers (or the waiver in writing by the Controlling DIP Lenders) of all of the conditions precedent set forth in the Term Sheet (including, without limitation, those set forth in the section thereof entitled "Conditions Precedent") and if the Borrowers shall fail to satisfy any of such conditions precedent set forth in the Term Sheet with respect to any Tranche (which conditions precedent have not been waived in writing by the Controlling DIP Lenders), the DIP Lenders shall have no obligation to fund the portion of the DIP Facility with respect to such Tranche; provided, however, if the Borrowers shall fail to satisfy any conditions precedent set forth in the Term Sheet with respect to the Tranche A Facility, the DIP Lenders shall have no obligation to fund any portion of the DIP Facility (notwithstanding the satisfaction by the Borrowers of all conditions precedent to the Tranche B Facility and/or the Tranche C Facility).

7.    Indemnification; Expenses.

You agree (a) to indemnify and hold harmless Five Mile, the other DIP Lenders and their respective officers, directors, employees, agents, advisors, controlling persons, members and successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the DIP Facility or any related transaction or any claim, litigation, investigation or proceeding relative to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrowers or any of their respective sponsors or any affiliate of any of them), and to reimburse each such Indemnified Person upon demand for any reasonable and documented legal or other expenses incurred in connection with investigating or defending any or the foregoing; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to (i) losses, claims, damages, liabilities or related expenses to the extent they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted solely from the willful misconduct, bad faith or gross negligence of such Indemnified Person or (ii) lost profits of such Indemnified Person, and (b) to reimburse Five Mile and the other DIP Lenders, from time to time, whether or not the DIP Facility is funded, for all fees, costs and expenses of such parties (in each case to the extent provided in, and subject to the limitations of, the Term Sheet) in connection with the DIP Facility and the preparation, negotiation and enforcement of this Commitment Letter, the Fee Letter, the definitive documentation for the DIP Facility and any ancillary documents or security arrangements in connection therewith. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person (and no other party hereto) shall be liable for (a) any damages arising from the unauthorized use by others of information or other materials obtained through electronic, telecommunications or other information transmission system (including the internet,

e-mail and on-line databases) or (b) any indirect, special, punitive or consequential damages, in each case, in connection with its activities related to this Commitment Letter or the DIP Facility.

8.  Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

You acknowledge that Five Mile may provide mortgage, mezzanine and other debt financing, equity capital or other services (including financial advisory and portfolio management services) to other companies in respect of which you may have conflicting interests regarding the transactions contemplated hereby or otherwise. We will not furnish confidential information obtained from you or any of your representatives by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you to other companies, entities or other persons. You also acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by us from other companies, entities or other persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and Five Mile is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether Five Mile has advised or is advising you on other matters, (b) Five Mile, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of Five Mile, (c) you are capable of evaluating and understanding, and you understand, and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that Five Mile is engaged in a broad range of transactions that may involve interests that differ from your interests and that Five Mile has no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, and (e) you waive, to the fullest extent permitted by law, any claims you may have against Five Mile for breach of fiduciary duty or alleged breach of fiduciary duty and agree that Five Mile shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors. Additionally, you acknowledge and agree that Five Mile is not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby, and Five Mile shall have no responsibility or liability to you with respect thereto. Any review by Five Mile of the Borrowers and/or their respective sponsors and affiliates, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of Five Mile and shall not be on behalf of you, your sponsors or any of your or their affiliates.

You further acknowledge that Five Mile may, in the ordinary course of its business, provide investment banking, portfolio management and other financial services to, and/or acquire, hold or sell (for its own accounts and for the accounts of customers or investors) equity, debt and other securities and financial instruments (including direct or participating interests in bank loans, mortgage loans, mezzanine loans and other obligations) of the Borrowers, their respective sponsors and the affiliates of any of them, and companies with which the Borrowers, their respective sponsors and the affiliates of any of them may have commercial or other relationships.

9.   Assignments; Amendments; Governing Law; Etc.

This Commitment Letter shall not be assignable by any party hereto without the prior written consent of each other party hereto (and any attempted assignment without such consent shall be null and void <u>ab initio</u>), is intended to be solely for the benefit of the parties hereto, the other DIP Lenders and the Indemnified Persons and is not intended to confer any benefits upon, or create any rights in favor of any person other than the parties hereto, the other DIP Lenders and the Indemnified Persons; provided, that, Five Mile may assign its commitment hereunder (but subject to the limitations and conditions thereto as are expressly set forth in this Commitment Letter and the Term Sheet (including but not limited to Section 3 hereof) to one or more affiliates of Five Mile and to Presidio if Five Mile and Presidio agree that Presidio shall act as the Co-Lead DIP Lender for the DIP Facility, whereupon Five Mile shall be released from the portion of its commitment hereunder so assigned.  Any and all obligations of, and services to be provided by Five Mile hereunder (including, without limitation, Five Mile's commitment hereunder) may be performed and any and all rights of Five Mile hereunder may be exercised by or through any of its affiliates. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by Five Mile and you.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.  Notwithstanding anything in Section 9 to the contrary, Five Mile may, with the consent of the Borrowers not to be unreasonably withheld, place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the internet or worldwide web as it may choose, and circulate similar promotional materials, after the closing of the transactions contemplated hereby in the form of a "tombstone" or otherwise describing the names of the Borrowers, their respective sponsors and the affiliates of any of them), and the amount, type and closing date of such transactions, all at Five Mile's expense.  This Commitment Letter and the Fee Letter supersedes all prior understandings, whether written or oral, between you and us with respect to the DIP Facility.  Your obligations hereunder and under the Fee Letter shall be joint and several. **THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**


10.   Jurisdiction.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter  or the transactions contemplated hereby and agrees that all claims in respect of any such action or proceeding may be heard and determined only in such New York State court or, to the extent permitted by law, in such Federal court; (b) waives, to the fullest extent it may legally and

effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby in any New York State court or in any such Federal court; (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court; and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Borrowers hereby designate Grand Prix Binghamton LLC, a Delaware limited liability company ("**_Borrower Designee_**") to irrevocably designate and appoint CT Corporation in New York as its authorized agent (in such capacity, the "**_Process Agent_**") upon which process may be served in any action, suit or proceeding arising out of or relating to this Commitment Letter and/or the Fee Letter that may be instituted by Five Mile, the other DIP Lenders or any Indemnified Person in any Federal or state court in the State of New York. The Borrowers hereby agree that service of any process, summons, notice or document by U.S. registered mail addressed to the Process Agent, with written notice of said service, to you at the address above, shall be effective service of process on all of the Borrowers (notwithstanding that Process Agent has been retained in such capacity on behalf of Borrower Designee only) for any action, suit or proceeding brought in any such court. The Borrowers further agree to take any and all action, including execution and filing of any and all such documents and instruments, as may be necessary to continue the designation and appointment of the Process Agent for a period of 2 years from the date of this Commitment Letter.

11. <u>Waiver of Jury Trial</u>.

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.**

12. <u>Confidentiality</u>.

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter, the Fee Letter nor any of the terms or substance hereof or thereof, nor the activities of Five Mile pursuant hereto or thereto, shall be disclosed, directly or indirectly, to any other person except (a) to your officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis; (b) to the current sponsors and equity holders of the Borrowers; (c) to current franchisors with respect to the hotel properties subject to the Existing Loans; (d) lenders and their respective servicers with respect to the Existing Loans; (e) as required by applicable law, including the Bankruptcy Code or compulsory legal process (in which case you agree to inform us promptly thereof); (f) in connection with any exercise of remedies under or in connection with a breach of this Commitment Letter, the Fee Letter or the definitive financing documentation for the DIP Facility; (g) in connection with the Borrowers seeking required approval from any governmental authority (including a bankruptcy court) for debtor-in-possession financing; (h) in connection with Section 364(d) of the Bankruptcy Code; (i) to any official committees appointed in the

Bankruptcy Case and their respective legal, financial and other advisors; or (j) as otherwise agreed by the parties hereto.

Five Mile agrees that it will not disclose, directly or indirectly, any Confidential Borrower Information to any other person except (a) to DIP Lenders and prospective DIP Lenders provided that such DIP Lenders agree to treat the same as confidential in accordance with the terms and provisions of this paragraph and as evidence thereof execute and deliver a joinder or other written acknowledgement with respect to which the Borrowers are express third-party beneficiaries; (b) to its officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis; (c) to any lenders or prospective lenders with respect to the financing of the DIP Loans made by Five Mile; (d) to the investors in and equity holders of Five Mile; (e) to lenders and their respective servicers with respect to the Existing Loans; (f) as required by applicable law, including the Bankruptcy Code or compulsory legal process (in which case Five Mile agrees to inform you promptly thereof); (g) in connection with any exercise of remedies under or in connection with a breach of this Commitment Letter, the Fee Letter or the definitive financing documentation for the DIP Facility; (h) to any official committees appointed in the Bankruptcy Case and their respective legal, financial and other advisors; or (i) as otherwise agreed by the parties hereto.  As used in this paragraph, "**_Confidential Borrower Information_**" shall mean any information provided to Five Mile by or on behalf of the Borrowers after the date hereof, which information is identified to Five Mile as confidential and proprietary at the time of delivery and which information has not otherwise been provided to Five Mile as of the date hereof and is not otherwise generally available, and provided that such information is clearly and prominently marked with the legend "Confidential and Proprietary, subject to the terms of a Confidentiality Agreement"; provided, however, that certain Agreement for Adequate Assurance of Completion of Certain PIPs and Assumption of Agreements, dated as of June 25, 2010, by and among Innkeepers USA Trust and certain direct or indirect subsidiaries and affiliates thereof and Marriott International, Inc. shall be deemed to constitute "Confidential Borrower Information" for purposes of this Section 12.

The Borrowers may file this Commitment Letter (including the Term Sheet) and the Fee Letter with the US Bankruptcy Court pursuant to a motion seeking authority for it to enter into the definitive loan and security documentation with respect to the DIP Facility.

Notwithstanding anything herein to the contrary, any party to this Commitment Letter (and any employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Commitment Letter and the Fee Letter and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure, except that (a) tax treatment and tax structure shall not include the identity of any existing or future party (or any affiliate of such party) to this Commitment Letter or the Fee Letter, and (b) no party shall disclose any information relating to such tax treatment and tax structure to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws.  For this purpose, the tax treatment of the transactions contemplated by this Commitment Letter and the Fee Letter is the purported or claimed U.S. federal income tax treatment of such transactions and the tax structure of such transactions is any fact that may be relevant to understanding the purported or claimed U.S. Federal income tax treatment of such transactions.

13.     Surviving Provisions; Conflicts.

The indemnification, confidentiality, jurisdiction, governing law and waiver of jury trial provisions contained in this Commitment Letter, the terms and provisions of Section 8 hereof and the provisions of "Fees and Expenses" set forth in the Term Sheet, and the terms and provisions of the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or Five Mile's commitment hereunder and Five Mile's agreement to perform the services described herein; provided, that, this Commitment Letter shall in all other respects be superseded by the definitive financing documentation for the DIP Facility upon the effectiveness thereof.  Except as expressly provided herein, in the event of any conflict between the terms and provisions hereof and the terms and provisions of the Term Sheet, the terms and provisions hereof shall govern and control in all respects.

14.     PATRIOT Act Notification.

Five Mile hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title Ill of Pub. L. 107-56 (signed into law October 26, 2001) (the "**PATRIOT Act**"), Five Mile and each DIP Lender is required to obtain, verify and record information that identifies each borrower under the DIP Facility, which information includes the name, address, tax identification number and other information regarding each borrower that will allow Five Mile or such other DIP Lender to identify each such borrower in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to Five Mile and each such other DIP Lender.

15.     Acceptance and Termination.

Five Mile's commitment hereunder and Five Mile's agreement hereunder shall expire automatically and without further action or notice (a) at 11:59 p.m. New York City time on July 19, 2010, unless prior to such time the Bankruptcy Case shall have been commenced, (b) unless prior to the time the Bankruptcy Case shall have been commenced, you shall have returned to us executed counterparts of this Commitment Letter and the Fee Letter and you shall have paid (or caused to be paid), via wire transfer in immediately available funds pursuant to the wire transfer instructions previously provided to you, to (i) Five Mile the Commitment Fee (as defined in the Fee Letter) (and Five Mile shall have confirmed receipt thereof) and (ii) Arnold & Porter LLP, our counsel, the fees and disbursements evidenced by their invoice dated July 15, 2010 (and Arnold & Porter shall have confirmed receipt thereof), (c) at 5:00 p.m. New York City time on September 14, 2010, unless prior to such time you shall have delivered to Five Mile and its counsel a copy of the Final Order (which Final Order shall be final and non-appealable and in form and substance satisfactory to us and otherwise in accordance with the terms and provisions of the Term Sheet) entered in the Bankruptcy Case by the US Bankruptcy Court (the "*Approval Order*") and (d) at 5:00 p.m. New York City time on September 29, 2010, unless prior to such time all of the conditions precedent to Five Mile's commitment to provide the Tranche A Facility set forth in this Commitment Letter (including the Term Sheet) have been satisfied or waived in writing by the Controlling DIP Lenders.  In the event of any termination pursuant to this paragraph, this Commitment Letter and the DIP Commitment and Five Mile's agreement to perform the services described herein, shall automatically terminate without further action or

notice and without further obligation to you unless Five Mile shall, in its sole discretion, agree to an extension in writing.  If any Approval Order shall at any time cease to be in full force and effect or shall be reversed or stayed, or modified in a manner that is material and adverse to Five Mile (in the judgment of Five Mile), Five Mile may, in its own discretion, terminate its commitment hereunder, and Five Mile may, in its own discretion, terminate its agreement to perform the services described herein without further obligation or liability hereunder.

[SIGNATURES ON FOLLOWING PAGE]

Five Mile is pleased to have been given the opportunity to assist you in connection with the financing.

Very truly yours,

**LEAD DIP LENDER:**

**FIVE MILE CAPITAL II POOLING INTERNATIONAL LLC**, a Delaware limited liability company

By:    FIVE MILE CAPITAL PARTNERS LLC, a Delaware limited liability company, its Manager

By:    _____

       Name:  ~~Almond L. Nickerson III~~

       Title:    Managing Director

Accepted and agreed to as of
the date first above written:


**TRANCHE A BORROWER:**

**GRAND PRIX BELMONT LLC**
**GRAND PRIX CAMPBELL/SAN JOSE LLC**
**GRAND PRIX EL SEGUNDO LLC**
**GRAND PRIX FREMONT LLC**
**GRAND PRIX MOUNTAIN VIEW LLC**
**GRAND PRIX SAN JOSE LLC**
**GRAND PRIX SAN MATEO LLC**
**GRAND PRIX SILI I LLC**
**GRAND PRIX SILI II LLC**
**GRAND PRIX DENVER LLC**
**GRAND PRIX ENGLEWOOD/DENVER SOUTH LLC**
**GRAND PRIX SHELTON LLC**
**GRAND PRIX WINDSOR LLC**
**GRAND PRIX ALTAMONTE LLC**
**GRAND PRIX FT. LAUDERDALE LLC**
**GRAND PRIX NAPLES LLC**
**GRAND PRIX ATLANTA LLC**
**GRAND PRIX ATLANTA (PEACHTREE CORNERS) LLC**
**GRAND PRIX LOMBARD LLC**
**GRAND PRIX CHICAGO LLC**
**GRAND PRIX SCHAUMBURG LLC**
**GRAND PRIX WESTCHESTER LLC**
**GRAND PRIX LEXINGTON LLC**
**GRAND PRIX LOUISVILLE (RI) LLC**
**GRAND PRIX COLUMBIA LLC**

**GRAND PRIX GAITHERSBURG LLC**
**GRAND PRIX GERMANTOWN LLC**
**GRAND PRIX PORTLAND LLC**
**GRAND PRIX LIVONIA LLC**
**GRAND PRIX CHERRY HILL LLC**
**GRAND PRIX MT. LAUREL LLC**
**GRAND PRIX SADDLE RIVER LLC**
**GRAND PRIX ISLANDIA LLC**
**GRAND PRIX BINGHAMTON LLC**
**GRAND PRIX HORSHAM LLC**
**GRAND PRIX WILLOW GROVE LLC**
**GRAND PRIX ADDISON (RI) LLC**
**GRAND PRIX ARLINGTON LLC**
**GRAND PRIX LAS COLINAS LLC**
**GRAND PRIX RICHMOND LLC**
**GRAND PRIX RICHMOND (NORTHWEST) LLC**
**GRAND PRIX BELLEVUE LLC**
**GRAND PRIX BOTHELL LLC**
**GRAND PRIX LYNNWOOD LLC**
**GRAND PRIX TUKWILA LLC**
**GRAND PRIX FIXED LESSEE LLC,**
each a Delaware limited liability company

By: _____
    Name:
    Title:

Accepted and agreed to as of
the date first above written:


**TRANCHE B BORROWER:**

**KPA RIMV, LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:


**GRAND PRIX RIMV LESSEE, LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:


**TRANCHE C BORROWER:**

**KPA TYSONS CORNER RI, LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:


**GRAND PRIX GENERAL LESSEE LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:

## Tranche A Borrower
(each a Delaware limited liability company)

1. Grand Prix Ft. Lauderdale LLC
2. Grand Prix Addison (RI) LLC
3. Grand Prix Altamonte LLC
4. Grand Prix Arlington LLC
5. Grand Prix Atlanta LLC
6. Grand Prix Atlanta (Peachtree Corners) LLC
7. Grand Prix Bellevue LLC
8. Grand Prix Binghamton LLC
9. Grand Prix Bothell LLC
10. Grand Prix Campbell/San Jose LLC
11. Grand Prix Cherry Hill LLC
12. Grand Prix Chicago LLC
13. Grand Prix Denver LLC
14. Grand Prix Englewood/Denver South LLC
15. Grand Prix Fremont LLC
16. Grand Prix Gaithersburg LLC
17. Grand Prix Lexington LLC
18. Grand Prix Livonia LLC
19. Grand Prix Louisville (RI) LLC
20. Grand Prix Lynnwood LLC
21. Grand Prix Mountain View LLC
22. Grand Prix Portland LLC
23. Grand Prix Richmond LLC
24. Grand Prix Richmond (Northwest) LLC
25. Grand Prix Saddle River LLC
26. Grand Prix San Jose LLC
27. Grand Prix San Mateo LLC
28. Grand Prix Shelton LLC
29. Grand Prix Sili I LLC
30. Grand Prix Sili II LLC
31. Grand Prix Tukwila LLC
32. Grand Prix Windsor LLC
33. Grand Prix Horsham LLC
34. Grand Prix Columbia LLC
35. Grand Prix Germantown LLC
36. Grand Prix Islandia LLC
37. Grand Prix Lombard LLC
38. Grand Prix Naples LLC
39. Grand Prix Schaumberg LLC
40. Grand Prix Westchester LLC
41. Grand Prix Willow Grove LLC
42. Grand Prix Belmont LLC
43. Grand Prix El Segundo LLC
44. Grand Prix Las Colinas LLC
45. Grand Prix Mt. Laurel LLC
46. Grand Prix Fixed Lessee LLC [Operating Lessee]

### Tranche B Borrower
(each a Delaware limited liability company)

1. KPA RIMV, LLC

2. Grand Prix RIMV Lessee, LLC [Operating Lessee]

<u>Tranche C Borrower</u>
(each a Delaware limited liability company)

1. KPA Tysons Corner RI, LLC

2. Grand Prix General Lessee LLC [Operating Lessee]

**EXHIBIT B**

**Term Sheet**

**CONFIDENTIAL**

**Summary of Indicative Terms and Conditions
Proposed $50,750,000 Senior Secured Super-Priority
Debtor-in-Possession Credit Facility (this "*Term Sheet*")**

---

The proposed terms and conditions summarized herein represent the conditions pursuant to which certain funds managed by the Lead DIP Lender, the Co-Lead DIP Lender and the other "*DIP Lenders*" described below (the foregoing collectively referred to herein as the "*DIP Lenders*") propose to enter into a $50,750,000 Senior Secured Super-Priority Debtor-in-Possession Credit Facility (the "*DIP Facility*") with the Borrower (defined below).

Reference is made to (i) those certain mortgage loans in the original aggregate principal amount of $825,402,542 (the "*Existing Tranche A Loans*") made by Lehman Ali Inc. to the Tranche A Borrower (as defined below), pursuant to a certain Loan Agreement dated as of June 29, 2007, between the Tranche A Borrower and Lehman Ali Inc. (as amended, the "*Existing Tranche A Loan Agreement*"), (ii) those certain mortgage loans in the original aggregate principal amount of $47,500,000 (the "*Existing Tranche B Loans*") made by Capmark Bank to the Tranche B Borrower (as defined below), pursuant to a certain Deed of Trust Note, dated as of October 4, 2006, between the Tranche B Borrower and Capmark Bank (as amended, the "*Existing Tranche B Loan Agreement*") and (iii) those certain mortgage loans in the original aggregate principal amount of $25,200,000 (the "*Existing Tranche C Loans*" and, together with the Existing Tranche A Loans and the Existing Tranche B Loans, the "*Existing Loans*") made by Merrill Lynch Mortgage Lending, Inc. to the Tranche C Borrower (as defined below), pursuant to a certain Loan Agreement, dated as of September 19, 2006, between the Tranche C Borrower and Merrill Lynch Mortgage Lending, Inc. (as amended, the "*Existing Tranche C Loan Agreement*" and, together with the Existing Tranche A Loan Agreement and the Existing Tranche B Loan Agreement, the "*Existing Loan Agreements*"). The terms, covenants, conditions and provisions which are applicable as of the date of this Term Sheet to the respective Existing Loans are set forth in the respective Existing Loan Agreements and the other loan documents entered into in connection therewith. The collateral for the respective Existing Loans is referred to herein as the "*Pre-Petition Collateral.*" As of the date of this Term Sheet, (i) the Tranche A Borrower is a party to the Existing Tranche A Loan Agreement, (ii) the Tranche B Borrower is party to the Existing Tranche B Loan Agreement and (iii) the Tranche C Borrower is party to the Existing Tranche C Loan Agreement.

---

| | |
|---|---|
| **Tranche A Borrower:** | Collectively, the borrowers set forth on the List of Tranche A Borrowers attached hereto, which borrowers (collectively, the "*Tranche A Borrower*") shall be jointly and severally liable for the obligations under the Tranche A Facility (as defined below). |
| **Tranche B Borrower:** | KPA RIMV, LLC and Grand Prix RIMV Lessee, LLC, as borrower (collectively, the "*Tranche B Borrower*") under the Tranche B Facility (as defined below). |
| **Tranche C Borrower:** | KPA Tysons Corner RI, LLC and Grand Prix General Lessee LLC, as borrower (collectively, the "*Tranche C Borrower*") under the Tranche C Facility (as defined below). |

| | |
|---|---|
| **Borrower:** | The Tranche A Borrower, the Tranche B Borrower and the Tranche C Borrower are referred to herein individually as a "***Borrower***" and collectively as the "***Borrowers***". |
| **DIP Agent:** | To be Determined. |
| **Term Sheet Sunset:** | To be Determined. |
| **DIP Facilities:** | After entry of the Final Order, term facilities of up to $50,750,000 in the aggregate and segregated as follows (the "***DIP Commitment***") shall be extended to the respective Borrowers pursuant to the terms and provisions of a DIP credit agreement (the "***DIP Credit Agreement***"): |
| | A. A $44,350,000 facility allocated to 45 properties securing the Existing Tranche A Loans (the "***Tranche A Facility***"). |
| | B. A $4,000,000 facility allocated to the property located in San Diego, California securing the Existing Tranche B Loans (the "***Tranche B Facility***"). |
| | C. A $2,400,000 facility allocated to the property located in Tysons Corner, Virginia securing the Existing Tranche C Loans (the "***Tranche C Facility***"; the Tranche A Facility, the Tranche B Facility and the Tranche C Facility are referred to herein individually as a "***Tranche***" and collectively as the "***DIP Facility***" and the loans funded by the DIP Lenders under the DIP Facility are referred to herein as the "***DIP Loans***"). |
| **Closing Date:** | The date of the effectiveness of the DIP Facility and the funding by the DIP Lenders of the full amount of the DIP Loans under the Tranche A Facility, the Tranche B Facility and the Tranche C Facility to the respective Borrowers (which full funding of each Tranche will occur simultaneously on such date). |
| **DIP Lenders:** | Lead DIP Lender, Co-Lead DIP Lender and any other financial institutions from time to time as are acceptable to the Lead DIP Lender and the Co-Lead DIP Lender. DIP Agent may from time to time syndicate or allow participations in up to 49% of the DIP Commitment (including, without limitation, to current certificate holders participating in the relevant tranche of the Existing Loans) with such consent of the Lead DIP Lender as may be required in any commitment letter to which this Term Sheet is attached, provided that so long as no Event of Default has occurred and is continuing, the DIP Agent may not, without the consent of Borrower, so syndicate or participate to any person or entity, the primary business of which person or entity (or of any entity which is controlled by or under common control with such entity) (i.e., 90% or more of the gross revenues of which are |

derived from) the ownership and operation of hotel properties that directly compete in the same market segments with the hotel properties owned by the Borrowers (provided that no such consent shall be required if such person or entity was otherwise a certificate holder as of the Petition Date). In no event shall DIP Agent so syndicate or participate to any person or entity on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

**Lead DIP Lender:**

Five Mile Capital Partners (or an affiliate thereof).

**Co-Lead DIP Lender:**

To be Determined.

**Carve-Out:**

There shall be no carve-out of any nature whatsoever for professional fees or expenses of the Borrowers or any estate professionals. Since the DIP Facility is intended to solely provide funds for PIP Work, the professional fees and expenses incurred by the Borrowers and other estate professionals shall be dealt with in connection with the cash collateral order(s) entered by the Bankruptcy Court.

**Fees:**

As per Fee Letter.

**Maturity Date:**

360 days from the Closing Date.

**Termination Date:**

The earliest to occur of: (a) with respect to the applicable Tranche of the DIP Facility, acceleration by DIP Agent independently or upon the request of the Controlling DIP Lenders of the obligations under such Tranche due to the occurrence and continuation of an Event of Default with respect to any Tranche (i.e., which Event of Default has not otherwise been cured or waived in writing by the Controlling DIP Lenders); (b) the effective date of any plan in the bankruptcy proceeding that provides for payment in full of all obligations owing under the DIP Facility or is otherwise acceptable to the DIP Agent; (c) with respect to the applicable Tranche of the DIP Facility, the date that is the closing date of any sale of all or substantially all of any Borrower's assets that constitute collateral for such Tranche (or, in the case of the Tranche A Facility, the date that more than 22 of the hotel properties that constitute collateral for the Tranche A Facility are sold (whether in one or more transactions)); (d) with respect to the applicable Tranche of the DIP Facility, the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Borrower constituting collateral with respect to such Tranche in excess of $1,000,000 in the aggregate (each, a "**Release from Stay**"), provided that, solely in the case of the Tranche A Facility, the Borrowers shall have failed within ten (10) business days of such Release from

Stay to prepay the Tranche A Facility in an amount equal to the lesser of (x) $2,000,000 (in respect of each such foreclosure) and (y) the then-outstanding obligations of the Tranche A Borrower under the Tranche A Facility (including the then-outstanding principal balance, accrued and unpaid interest thereon and other amounts then due and owing thereunder); (e) with respect to the applicable Tranche of the DIP Facility, the entry of an order of dismissal or conversion of the Chapter 11 Cases with respect to all of the Borrowers with respect to such Tranche (or, in the case of the Tranche A Facility, such an order with respect to the operating lessee, Grand Prix Fixed Lessee LLC, or with respect to more than 22 of the Tranche A Borrowers (whether pursuant to one or more separate orders)); or (f) acceleration of the obligations under any other debtor-in-possession financing provided to any affiliates of the Borrowers due to the occurrence and continuation of an event of default under such financing (each, an "*Affiliate Debt Financing*"). The date on which the earliest of *clauses (a)* through *(f)* above occurs is hereinafter referred to as the "*Termination Date*".

**Non-Default Interest Rate and Payment Terms:**

Interest on the DIP Loans under each Tranche shall be paid monthly in arrears, accruing at a per annum floating rate equal to the sum of the 30-day LIBOR (subject to a floor of 2.0%) (LIBOR being defined and determined by DIP Agent in a manner as is customary for facilities similar to the DIP Facility) plus the applicable Spread (as defined below) (the "*Non-Default Interest Rate*"). All interest shall be computed on the basis of a 360-day year for the actual number of days elapsed. "*Spread*" means (i) with respect to the Tranche A Facility, 5.00%, (ii) with respect to the Tranche B Facility, 5.00% and (iii) with respect to the Tranche C Facility, 5.00%.

**Default Interest Rate:**

Effective immediately upon the occurrence and continuance of any monetary Event of Default and, after giving effect to all applicable grace and cure periods as may be set forth in the DIP Credit Agreement, any non-monetary Event of Default, unless and until such Event of Default is waived in writing by the Controlling DIP Lenders, interest shall accrue on all Tranches at a rate that is 3% per annum in excess of the applicable Non-Default Interest Rate.

**Loan Payments:**

All unpaid obligations, including, without limitation, principal and interest on the DIP Facility and any fees and expenses incurred thereon, shall be due and payable in full in cash in immediately available funds on the earlier to occur of (i) the Maturity Date and (ii) the Termination Date.

**Mandatory Prepayments:**

Upon (a) the sale of any assets of any Borrower or any of its subsidiaries constituting collateral for a Tranche (other than sales of furniture, fixtures or equipment in the ordinary course in

connection with the replacement thereof (and provided the same are of substantially like character, quality and utility as those replaced) and other than short-term leases and licenses of guest rooms, parking facilities, banquet facilities, gift shops and other accessory retail space in the ordinary course consistent with the use and operation of the applicable property as a hotel), (b) the receipt by (or on behalf of) any Borrower of insurance proceeds or a condemnation award in excess of $25,000 following a casualty or condemnation event with respect to assets of such Borrower constituting collateral for a Tranche (subject to the use thereof for restoration as is permitted in the DIP Credit Agreement), and (c) the issuance by any Borrower of any post-petition debt (except for trade debts or obligations incurred in the ordinary course of business and within the parameters of the PIP Budget) or equity, 100% of any net cash proceeds from such sale, insurance, award or issuance to be paid to DIP Agent on the date that such net cash proceeds are received by or on behalf of such Borrower or such subsidiary, and applied in the following order of priority: *first*, to accrued and unpaid fees and expenses under the applicable Borrower's respective Tranche of the DIP Facility, *second*, to accrued and unpaid interest under the applicable Borrower's respective Tranche of the DIP Facility, *third*, to outstanding principal under the applicable Borrower's respective Tranche of the DIP Facility until such Tranche is paid in full, and *fourth*, provided no Event of Default has occurred and is continuing, any remaining balance to or as directed by the applicable Borrower.

**Use of Proceeds:**

Proceeds of the DIP Facility shall be used solely for PIP Work in accordance with the PIP Budget, which will include the following payments: (a) amounts to pay the financing fees owed to the DIP Lenders in accordance with the DIP Facility (or with respect to any portion thereof and such expenses of Lead DIP Lender previously paid by a third party on behalf of the Borrowers, the reimbursement of such third party in the amount of such fees and expenses previously paid) and (b) amounts to fund post-petition PIP Work in accordance with the PIP Budget.

**Cash Management:**

The Borrowers shall use a segregated cash management system that appropriately segregates proceeds of the DIP Facility from cash generated by the Borrowers without commingling cash collateral from any other affiliates and such cash management system must be acceptable to DIP Agent. Additionally, (i) all funds advanced under the DIP Facility shall be held in a segregated disbursement account controlled by DIP Agent (the "*Controlled Disbursement Account*") and (ii) disbursements from such Controlled Disbursement Account shall be permitted once per week during the term of the DIP Facility (provided no Event of Default shall have occurred and be continuing and the proceeds thereof are used solely for the purposes described above in the caption "Use of Proceeds") upon receipt by the DIP

Agent of a certification signed by an authorized officer of the Borrowers (each, an *"Officer's Certificate"*) specifying the expenditures to be funded by such disbursement (the *"Certified Expenditures"*) and, other than with respect to the first two weekly fundings of the Controlled Disbursement Account, provided that the DIP Agent has received the most recent Bi-Monthly Reconciliation (defined below) in form and substance reasonably acceptable to the DIP Agent as provided below. Furthermore, on a bi-monthly basis, the Borrowers shall deliver to the DIP Agent an Officer's Certificate demonstrating that all disbursements made from such Controlled Disbursement Account during the preceding two-week period were actually applied to pay the Certified Expenditures and otherwise were in accordance with the PIP Budget (such Officer's Certificate to detail any variances beyond the PIP Budget) (the *"Bi-Monthly Reconciliation"*), all of which Officer's Certificates delivered pursuant to this paragraph shall be in such detail and shall be accompanied by such supporting material and other information as is reasonably acceptable to the DIP Agent.

|  |  |
|---|---|
| **Priority Claim:** | Amounts owed by the Borrowers to the DIP Lenders pursuant to the DIP Facility, including all accrued interest, fees, costs and expenses, shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a super-priority administrative claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code. |
| **Collateral Security:** | Without any limitation whatsoever, the DIP Facility, including accrued interest, principal, costs and expenses, shall be secured on a super-priority basis in accordance with sections 364(c)(2) and (d) of the Bankruptcy Code by first priority, senior secured and priming liens on and security interests in (i) all of the Borrowers' real property (including the improvements thereon and all furniture, fixtures and equipment used in connection therewith) and the proceeds thereof that secure the Existing Loans, subject only to prepetition liens and other permitted liens to be agreed in the DIP Credit Agreement (the *"Permitted Liens"*), (ii) the Controlled Disbursement Account, the amounts on deposit from time to time therein and the proceeds thereof; and (iii) all Chapter 5 causes of action that relate to the hotel properties owned by the Borrowers; <u>provided</u> that, the Tranche A Facility, the Tranche B Facility and the Tranche C Facility shall not be cross-collateralized. |
| **Lien Validation and Perfection:** | All liens authorized and granted pursuant to the DIP Facility shall be deemed effective and perfected as of the Petition Date, |

and no further notice or act will be required to effect such perfection.

**DIP Facility Documentation:** The DIP Facility shall be subject to the negotiation, execution and delivery of a definitive DIP Credit Agreement, an account control agreement relating to the Controlled Disbursement Account and related loan documents and other supporting instruments and agreements (collectively, the "***DIP Facility Documentation***") embodying the terms set forth herein mutually acceptable to the Borrowers and DIP Agent (including, without limitation, collateral assignments of all contracts (with the acknowledgement and consent of the counterparty thereto) and purchase orders for labor and materials relating to the PIP Work; such agreements and filings as DIP Agent may require to maintain perfected liens on all fixtures, furniture, equipment and materials to be used in completing the PIP Work (whether stored on-site or off-site); if requested by DIP Agent, lien waivers evidencing the lien free completion of the PIP Work; rights on the part of DIP Agent or its consultant to inspect the PIP Work and monitor progress of completion; insurance covering all such fixtures, furniture, equipment and materials (such insurance coverage to be consistent with the insurance program reviewed and approved by DIP Agent in connection with the first phase of the PIP Work); and, if and to the extent required by the applicable franchisors, performance bonds for all contractors performing PIP Work). Entering into mortgages and other security documents and filings (and obtaining policies of mortgagee title insurance) shall not be a condition precedent to the Closing Date; provided that, following the occurrence of the Closing Date, the DIP Agent (at the sole cost and expense of the DIP Agent and the DIP Lenders) may require that some or all of the Borrowers enter into mortgages and other security documents and filings (and execute and deliver customary affidavits to the applicable title companies in order to permit the issuance of policies of mortgagee title insurance and customary endorsements thereto) which the DIP Agent deems reasonably necessary for the continued perfection of the DIP Group's security interests under the DIP Facility. Notwithstanding the foregoing, the DIP Agent may record and/or file the Final Order in the land records and/or in such other places as may be determined by DIP Agent (although the same shall not be a condition precedent to the Closing Date, all costs and expenses incurred by the DIP Agent and the DIP Lenders in connection with such recordation and/or filing of the Final Order shall be borne exclusively by the Borrowers).

**Fees and Expenses:** Borrowers will pay (i) all documented fees and out-of-pocket expenses of one counsel for each of the Lead DIP Lender and the Co-Lead DIP Lender relating to the DIP Facility and the administration and interpretation of the DIP Facility, (ii) all

documented out-of-pocket due-diligence expenses of the Lead DIP Lender and the Co-Lead DIP Lender in connection with the DIP Facility, including but not limited to environmental due diligence, duplication expenses, consultation, travel and attendance at court hearings and inspections of the hotel properties owned by the Borrowers, including in connection with disbursements from the Controlled Disbursement Account and (iii) other documented out-of-pocket fees and expenses of the DIP Group in connection with the DIP Facility (including the fees and expenses of DIP Agent's advisors), whether or not the DIP Facility is consummated (other than as a result of the DIP Lenders failure or refusal to consummate the DIP Facility on the terms set forth herein). The Borrowers will also pay all reasonable and documented fees and out-of-pocket expenses of one counsel for additional DIP Lenders acquiring a syndication or participation interest in the DIP Facility in an amount not to exceed $20,000 per additional DIP Lender.

**Audits and Appraisals:**

The Borrowers shall allow the DIP Agent (through its officers, senior employees, or agents and advisors) from time to time at the Borrowers' expense to periodically inspect and audit the books, records and account statements of the Borrowers in order to confirm the Borrowers' compliance with the PIP Budget and the terms and provisions of the DIP Facility Documentation (including, without limitation, in order to verify that funds are being used in accordance with the PIP Budget); provided that, to the extent that the Termination Date shall not have occurred and there shall exist no Event of Default (or event which would constitute an Event of Default or cause the Termination Date to occur with the giving of notice or lapse of time), any such inspections and audits shall (x) be conducted only if the Controlling DIP Lenders deem it reasonably necessary, and (y) occur during normal business hours and upon reasonable notice to the applicable Borrower(s).

**Conditions Precedent:**

The DIP Facility, DIP Facility Documentation and the Final Order are each acceptable to the DIP Agent.

The closing of the DIP Facility shall be subject to the condition that no Termination Event or Event of Default shall have occurred and shall be continuing and such other conditions precedent customary and appropriate for financings of this type, including, but not limited to, (a) the satisfaction (or waiver in writing by the Controlling DIP Lenders) of all conditions to be set forth in the definitive documentation to be prepared by counsel to DIP Group and the DIP Lenders, (b) delivery of (i) the PIP Budget in form and substance satisfactory to the DIP Agent (after consultation with the DIP Agent's advisors and the applicable special servicers) which shall include the items set forth in the *"Use of Proceeds"* section of this Term Sheet and shall not otherwise be unsatisfactory to the applicable

franchisors, (ii) the Adequate Assurance Agreement (including with respect to the timeline and performance milestones for completion of the PIP Work) in form and substance satisfactory to the DIP Agent (after consultation with the DIP Agent's advisors and the applicable special servicers), (iii) a thirteen (13)-week cash flow projection and (iv) such other financial information with respect to the Borrowers (x) required under the Existing Loan Agreements (except for any provision thereof which requires reporting pursuant to Regulation S-X or is in the nature of a "catch-all" (i.e., a general requirement to deliver additional information as may be requested by the lenders thereunder) unless the same is otherwise delivered to Midland Loan Services, Inc. (or any successor thereto) in its capacity as special servicer and any other applicable special servicer or other servicer in connection with the Existing Loans), (y) required pursuant to any court order and (z) as may be delivered to Midland Loan Services, Inc. (or any successor thereto) in its capacity as special servicer and any other applicable special servicer or other servicer in connection with the Existing Loans (collectively, the "*Required Financial Information*"), (c) delivery of updated title searches, lien searches and updated so-called "phase 1" environmental reports (and if recommended by the DIP Agent's environmental consultant or otherwise obtained at the closing of the Existing Loans, delivery of new or updated so-called "phase 2" environmental reports), which updated title searches, lien searches and updated "phase 1" (and, if applicable, updated or new "phase 2") environmental reports are, in each case, acceptable to DIP Agent, (d) entry of a Final Order approving the DIP Facility and providing, in part, for super-priority administrative claims and first-priority, senior secured and priming liens and the perfection thereof by the DIP Lenders as contemplated herein, which Final Order shall not have been modified or amended without approval of the same, and shall not have been reversed or stayed pending appeal, in form and substance satisfactory to DIP Agent, (e) the payment of all fees and expenses in accordance with the caption "Fees and Expenses" above, (f) with respect to each Tranche, there shall have occurred no material adverse change in the applicable Borrower(s) financial condition, results of operations or properties (which for the avoidance of doubt shall mean all of the Borrowers/properties applicable to such Tranche, collectively) constituting collateral under such Tranche of the DIP Facility (other than the commencement of the Chapter 11 Case or otherwise in connection therewith) since the date of this Term Sheet that in the reasonable judgment of the DIP Agent have or would reasonably be expected to have a material adverse effect on the rights and remedies of DIP Agent or the DIP Lenders or on the ability of the Borrowers to perform their respective obligations to them, (g) the representations and warranties contained in the DIP Facility Documentation shall be true and correct in all material respects (except to the extent that

- 9 -

any such representations and warranties relate to an earlier date, in which case they shall be true and correct as of such earlier date) and (h) with respect to each Tranche, the Borrowers shall have obtained consent from the secured lenders under the Existing Loans (including, without limitation, the respective controlling holders thereunder) to the DIP Facility (and the terms thereof as described herein) or approval of the Bankruptcy Court of the DIP Facility (and the terms thereof as described herein) by the entry of the Final Order in form and substance satisfactory to the DIP Agent.

**Affirmative and Negative Covenants:**

Affirmative and negative covenants similar to the type contained in the Existing Loan Agreements (and the other loan documents entered into in connection therewith) to the extent such covenants are customarily included in debtor-in-possession financing agreements, including, but not limited to, (a) delivery to DIP Agent, on a weekly basis, of Borrowers' and its subsidiaries' rolling 13 week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior weekly period), (b) restrictions on sales of goods and services out of the ordinary course of business (including that all sales, including sales of any hotel properties, shall be on an arm's-length basis to bona fide third-party purchasers), (c) delivery of the Required Financial Information, (d) use of proceeds solely in accordance with the PIP Budget, (e) performance and completion by the Borrowers of the PIP Work in accordance with the PIP Budget and the Adequate Assurance Agreement (including the timeline for the PIP Work set forth therein), (f) unless such action has otherwise been approved by the Controlling DIP Lenders, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or terminate a franchise agreement or enter into a new franchise agreement upon any hotel that constitutes collateral for the DIP Facility, (g) unless such action has otherwise been approved by the Controlling DIP Lenders, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or enter into a new PIP with respect to any hotel that constitutes collateral for the DIP Facility and (h) unless such action has otherwise been approved by the Controlling DIP Lenders, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify, terminate or replace the Adequate Assurance Agreement (provided that the Adequate Assurance Agreement may be extended for a period not to exceed 60 days without such approval by the Controlling DIP Lenders).

**Representations and Warranties:**

The documentation for the DIP Facility shall contain representations and warranties similar to the type contained in

the Existing Loan Agreements, but modified to include those customary in the context of the proposed DIP Facility.

**Remedies:**

Upon the Termination Date or the occurrence of an Event of Default in connection with the respective Tranche of the DIP Facility, the DIP Agent and the DIP Lenders shall have customary remedies, including, without limitation, (i) the right to realize on all Collateral securing such Tranche and the right to exercise any remedy available under the DIP Facility and applicable law (including, without limitation, the right (but not the obligation) to complete the PIP Work and to apply any of the proceeds of the DIP Facility on account thereof) and (ii) any remedies (but not the termination or related events themselves) set forth in any cash collateral order entered by the Bankruptcy Court in the event that there is an event of default under such cash collateral order), without the necessity of obtaining any further relief or order from the Bankruptcy Court. Automatic Section 362 relief from the stay in favor of the DIP Agent and the DIP Lenders shall be embodied in any order approving the DIP Facility; provided, that DIP Agent shall provide the Borrowers with 5 days prior notice of its intent to lift the stay, with a copy of such notice to counsel for the Committee.

**Right to Credit Bid:**

Upon entry of a Final Order approving the DIP Facility, the DIP Group shall have the right to credit-bid the amount of claims of the DIP Facility allocable to the applicable Tranche during a sale of all or substantially all of the Debtors' assets constituting collateral for such Tranche, including without limitation, a sale occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

**Events of Default:**

Defaults and events of default limited to the following:

- The Chapter 11 Case shall be converted to cases under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization by any Borrower or any affiliate of the Borrowers that does not provide for the payment in full and in cash of such Borrower's obligations outstanding under the DIP Facility on the effective date of such plan of reorganization, unless otherwise consented to by the Controlling DIP Lenders.

- Entry of a final order confirming a plan of reorganization that does not require repayment in full in cash of the DIP Facility as of the effective date of the plan, unless otherwise consented to by the Controlling DIP Lenders

- Appointment of a trustee under Section 1104 of the Bankruptcy Code.

- Other than at the request of the DIP Agent, the DIP Group, any other DIP Lender or any certificate holder with respect to the Existing Loans, the appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

- Entry of a final order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility.

- Any attempt by any Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Agent's, the Lead DIP Lender's or the DIP Lenders' claims or collateral security under the DIP Facility (including the filing of any motion by any Borrower to (i) obtain financing from any person or entity other than the DIP Lenders (x) under Section 364(d) of the Bankruptcy Code, (y) under Section 364(c) of the Bankruptcy Code or (z) with respect to the existence of any charge, in each case which is or which is claimed to be senior to or pari passu with the super-priority of the claims or charges of the DIP Lenders (in each of cases (x), (y) and (z), other than with respect to financing used, in whole or part, to repay in full the DIP Loans) or (ii) except for the Permitted Liens, grant or suffer to exist any other lien or charge upon or affecting the collateral for the DIP Loans), or to subject the DIP Lenders' collateral under the DIP Facility to any surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- With respect to the applicable Tranche of the DIP Facility, Marriott or other applicable franchisor successfully terminates a franchise agreement upon any hotel owned by any Borrower constituting collateral with respect to such Tranche.

- One or more franchisors have taken affirmative steps after the effective date of the DIP Credit Agreement to terminate (including but not limited to delivery of notice of intent to terminate) 10 or more franchise agreements (in the aggregate during the term of the DIP Facility) upon hotels owned by any of the Borrowers constituting collateral with respect to any Tranche.

- With respect to the applicable Tranche of the DIP Facility, any Borrower supports a request of any party in interest to surcharge collateral of the Pre-Petition Collateral or Post-Petition Collateral that constitutes collateral with respect to such Tranche, for any expense.

- Expenditure of any DIP Loan proceeds in a manner or upon a property or project for which it had not been approved; provided that, with respect to any expenditure in violation of the foregoing which was inadvertent and does not exceed $25,000, the Borrowers shall have the right to cure the same (but on not more than one occasion per calendar month) within five (5) business days following any such expenditure.

- With respect to the applicable Tranche of the DIP Facility, any Borrower shall apply for an order substituting any assets for all or any portion of the Post-Petition Collateral that constitutes collateral with respect to such Tranche, except as provided in the instruments evidencing and governing the Existing Loan Agreements and DIP Facility.

- With respect to the applicable Tranche of the DIP Facility, failure to make all payments under the DIP Facility with respect to such Tranche when due.

- Failure to pay any undisputed, material post-petition taxes or indebtedness.

- With respect to the applicable Tranche of the DIP Facility, any Variance with respect to any hotel property constituting collateral for such Tranche; provided that, any such Variance that does not exceed 10% on a line-item basis shall not constitute an Event of Default hereunder so long as (a) with respect to the PIP Property Group that includes such hotel property, the applicable Borrowers have not, in the aggregate, spent more (and are not, in the aggregate, projected to spend more) in respect of completing the PIP Work with respect to all hotel properties in such PIP Property Group than the amount, in the aggregate, budgeted therefor in the PIP Budgets for such hotel properties and (b) such Variance is fully compensated for by a combination of (i) applying the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property (but in no event to exceed an amount thereof equal to the Maximum Contingency Amount), (ii) reallocating any unused portion of the PIP Budget for any of the other hotel properties in such hotel property's PIP Property Group for which the PIP Work has been fully completed and accepted by the applicable franchisor (i.e., not subject to "punch-list" items) in accordance with the applicable franchise agreement and the Adequate Assurance Agreement and for which complete and final invoices have been submitted by the applicable contractors and fully paid, and (iii) identified and documented savings from budgeted amounts to complete the PIP Work for any hotel property in such hotel property's PIP Property Group.

- With respect to the applicable Tranche of the DIP Facility, breach of any covenant of the DIP Facility applicable to such Tranche beyond any applicable grace periods.

- In the event any of the DIP Facility Documentation giving rise to any effective lien or security interest in any collateral for the DIP Loans (including, without limitation, the account control agreement relating to the Controlled Disbursement Account) shall cease to create a valid and perfected lien on and security interest in the collateral purported to be covered thereby.

- With respect to the applicable Tranche of the DIP Facility, any representation or warranty in the DIP Facility applicable to such Tranche was incorrect or misleading in any material respect when made.

- Any default under an Affiliate DIP Financing.

Notwithstanding anything contained in this Term Sheet to the contrary, each Tranche shall be cross-defaulted with each other Tranche (i.e., an Event of Default under one Tranche shall constitute an Event of Default under the other Tranches), provided, however, that (x) the occurrence and continuation of an Event of Default under the Tranche B Facility (i.e., a default under the Tranche B Facility after the expiration of all applicable grace and cure periods as may be set forth in the Credit Agreement) shall not cross-default the Tranche A Facility or the Tranche C Facility so long as the Borrowers shall have paid in full all of the outstanding obligations under the Tranche B Facility (including the then-outstanding principal balance, accrued and unpaid interest thereon and other amounts then due and owing thereunder) within five (5) business days following the occurrence of such Event of Default under the Tranche B Facility and (y) the occurrence and continuation of an Event of Default under the Tranche C Facility (i.e., a default under the Tranche C Facility after the expiration of all applicable grace and cure periods as may be set forth in the Credit Agreement) shall not cross-default the Tranche A Facility or the Tranche B Facility so long as the Borrowers shall have paid in full all of the outstanding obligations under the Tranche C Facility (including the then-outstanding principal balance, accrued and unpaid interest thereon and other amounts then due and owing thereunder) within five (5) business days following the occurrence of such Event of Default under the Tranche C Facility.

| | |
|---|---|
| **Governing Law:** | New York |
| **Chapter 11 Cases:** | Venue for the chapter 11 Cases shall be in the Southern District of New York. |

| | |
|---|---|
| **Miscellaneous:** | Release and Waiver by any Borrower of any claims against the DIP Lenders under the DIP Facility under Section 510 of the Bankruptcy Code. |
| | Waiver by any Borrower of any rights to assert claims arising under applicable law against the DIP Lenders (or related to the DIP Facility). |
| | DIP Agent shall at all times act pursuant to the DIP Credit Agreement. |
| **Indemnification:** | The Borrowers shall indemnify and hold DIP Agent and all DIP Lenders and their respective officers, directors, employees and agents (including all of their professionals) (each an *"Indemnified Party"*) harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with the DIP Facility, the credit documents related to the DIP Facility, any *"Obligation"* under the DIP Credit Agreement or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Other Definitions:** | *"Adequate Assurance Agreement"* means that certain agreement (or, if more than one, those certain agreements, collectively) between the Borrowers and Marriott or any other applicable franchisor(s) providing for the forbearance of the exercise of remedies by the applicable franchisor under its franchise agreement in respect of the PIP Work, including a timeline and performance milestones for completion of the PIP Work and certain other matters as more fully set forth therein. |
| | *"Bankruptcy Code"* means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended. |
| | *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York. |
| | *"Chapter 11 Case"* means, collectively, the cases filed by the Borrowers under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. |

"*Committee*" means any official committee of the unsecured creditors appointed pursuant Section 1102 of the Bankruptcy Code in Borrowers' bankruptcy case.

"*Controlling DIP Lenders*" means DIP Lenders with outstanding DIP Loans exceeding fifty percent (50%) of the aggregate DIP Loans of all DIP Lenders.

"*DIP Group*" means the DIP Agent, the Lead DIP Lender and the Co-Lead DIP Lender

"*Final Order*" means a final non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, provides (in addition to the other rights and benefits afforded to the lenders under the so-called "comfort letters" obtained in connection with the origination of the Existing Loans) that the applicable franchisors shall provide simultaneous notice to the DIP Agent of any default by any Borrower under any franchise agreement or any agreement related thereto (including, without limitation, the Adequate Assurance Agreement) and recognize the performance by the DIP Agent of the obligations of the Borrowers under such franchise or related agreements (including the applicable PIPs and the completion of the PIP Work) and that such franchisors will otherwise accept the cure by the DIP Agent of defaults of the Borrowers thereunder and allow the DIP Agent an additional cure period of not less than 60 days to effect such performance all without further order of the Bankruptcy Court, is in recordable form, provides that it cannot be vacated and that the Chapter 11 Case may not be dismissed or converted unless the DIP Facility and all amounts due and owing thereunder have been fully paid, which order is not stayed.

"**Maximum Contingency Amount**" means, with respect to any hotel property as of any date of determination, the percentage of the PIP Work with respect to such hotel property which has been completed as of such date <u>multiplied</u> by the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property.

"*Petition Date*" means the date of filing of the Chapter 11 Case.

"*PIP*" means the Property Improvement Plans included within and a made a part of the Franchise Agreements covering certain of the hotel properties owned by the Borrowers, which Property Improvement Plans shall have been approved by Marriott or any other applicable franchisor.

"*PIP Budget*" means, with respect to each Borrower, the budget setting forth the projected expenditures for funding the PIP Work

at the hotel(s) owned by such Borrower, in form and substance acceptable to DIP Agent (after consultation with the DIP Agent's advisors and the applicable special servicers).

"**PIP Property Group**" means, with respect to any hotel property, such hotel property together with one or more other hotel properties (but in no event to exceed 8 such hotel properties in the aggregate) with respect to which the Borrowers are then-engaged in PIP Work or have completed PIP Work and which have been designated by the Borrowers as a "PIP Property Group" prior to commencement of such PIP Work; it being understood that (y) for the Tranche B Facility, the PIP Property Group shall consist solely of the hotel property securing the Tranche B Facility and no other hotel property and (z) for the Tranche C Facility, the PIP Property Group shall consist solely of the hotel property securing the Tranche C Facility and no other hotel properties.

"*PIP Work*" means the construction labor and materials necessary to satisfy Marriott or any other applicable franchisor that each of the requirements of each of the PIPs has been satisfied.

"**Variance**" means costs and expenses for completing specific PIP Work at any hotel property as of any date of determination, which costs and expenses exceed the line item for such PIP Work set forth in the PIP Budget for such hotel property as of such date (either on an actual spend or on a projected basis).

**List of Tranche A Borrowers:**
**(each a Delaware limited liability company)**

1. Grand Prix Ft. Lauderdale LLC

2. Grand Prix Addison (RI) LLC

3. Grand Prix Altamonte LLC

4. Grand Prix Arlington LLC

5. Grand Prix Atlanta LLC

6. Grand Prix Atlanta (Peachtree Corners) LLC

7. Grand Prix Bellevue LLC

8. Grand Prix Binghamton LLC

9. Grand Prix Bothell LLC

10. Grand Prix Campbell/San Jose LLC

11. Grand Prix Cherry Hill LLC

12. Grand Prix Chicago LLC

13. Grand Prix Denver LLC

14. Grand Prix Englewood/Denver South LLC

15. Grand Prix Fremont LLC

16. Grand Prix Gaithersburg LLC

17. Grand Prix Lexington LLC

18. Grand Prix Livonia LLC

19. Grand Prix Louisville (RI) LLC

20. Grand Prix Lynnwood LLC

21. Grand Prix Mountain View LLC

22. Grand Prix Portland LLC

23. Grand Prix Richmond LLC

24. Grand Prix Richmond (Northwest) LLC

25. Grand Prix Saddle River LLC

26. Grand Prix San Jose LLC

27. Grand Prix San Mateo LLC

28. Grand Prix Shelton LLC

29. Grand Prix Sili I LLC

30. Grand Prix Sili II LLC

31. Grand Prix Tukwila LLC

32. Grand Prix Windsor LLC

33. Grand Prix Horsham LLC

34. Grand Prix Columbia LLC

35. Grand Prix Germantown LLC

36. Grand Prix Islandia LLC

37. Grand Prix Lombard LLC

38. Grand Prix Naples LLC

39. Grand Prix Schaumberg LLC

40. Grand Prix Westchester LLC

41. Grand Prix Willow Grove LLC

42. Grand Prix Belmont LLC

43. Grand Prix El Segundo LLC

44. Grand Prix Las Colinas LLC

45. Grand Prix Mt. Laurel LLC

46. Grand Prix Fixed Lessee LLC [Operating Lessee]