DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333
Martin J. Bienenstock, Esq.
Irena M. Goldstein, Esq.
Timothy Q. Karcher, Esq.

*Attorneys for Ad Hoc Committee of Preferred Shareholders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11 Case No.** |
| **INNKEEPERS USA TRUST, et al.,** | **Case No. 10 – 13800 (SCC)** |
| **Debtors.** | **(Jointly Administered)** |
| **INNKEEPERS USA TRUST, et al.,** | |
| **Movant,** | |
| **-against-** | |
| **AD HOC COMMITTEE OF PREFERRED SHAREHOLDERS** | |
| **Respondent.** | |

**OBJECTION OF AD HOC COMMITTEE OF PREFERRED**
**SHAREHOLDERS TO (I) DEBTORS' MOTION FOR ORDER**
**AUTHORIZING DEBTORS TO ASSUME PLAN SUPPORT**
**AGREEMENT AND (II) DEBTORS' MOTION FOR ENTRY OF**
**ORDER AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING**
**FROM FIVE MILE CAPITAL PARTNERS ON A PRIMING BASIS**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Committee of Preferred Shareholders (the "Ad Hoc Committee")[1] in the above-captioned chapter 11 cases of Innkeepers USA Trust ("Innkeepers" or the "Company"), its parent corporation Grand Prix Holdings, LLC ("Grand Prix") and a number of their direct and indirect subsidiaries (collectively with Innkeepers and Grand Prix, the "Debtors"),[2] files this objection (the "Objection") to (i) the Debtors' Motion for an Order Authorizing The Debtors to Assume the Plan Support Agreement, dated July 19, 2010 (the "Plan

---

[1] The following holders of approximately 24.0% of Innkeepers' 8% Series C Cumulative Preferred Shares comprise the Ad Hoc Committee: Brencourt Advisors, LLC; Esopus Creek Advisors, LLC; and Plainfield Special Situations Master Fund II Limited.

[2] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: GP AC Sublessee LLC (5992); Grand Prix Addison (RI) LLC (3740); Grand Prix Addison (SS) LLC (3656); Grand Prix Albany LLC (3654); Grand Prix Altamonte LLC (3653); Grand Prix Anaheim Orange Lessee LLC (5925); Grand Prix Arlington LLC (3651); Grand Prix Atlanta (Peachtree Corners) LLC (3650); Grand Prix Atlanta LLC (3649); Grand Prix Atlantic City LLC (3648); Grand Prix Bellevue LLC (3645); Grand Prix Belmont LLC (3643); Grand Prix Binghamton LLC (3642); Grand Prix Bothell LLC (3641); Grand Prix Bulfinch LLC (3639); Grand Prix Campbell / San Jose LLC (3638); Grand Prix Cherry Hill LLC (3634); Grand Prix Chicago LLC (3633); Grand Prix Columbia LLC (3631); Grand Prix Denver LLC (3630); Grand Prix East Lansing LLC (3741); Grand Prix El Segundo LLC (3707); Grand Prix Englewood / Denver South LLC (3701); Grand Prix Fixed Lessee LLC (9979); Grand Prix Floating Lessee LLC (4290); Grand Prix Fremont LLC (3703); Grand Prix Ft. Lauderdale LLC (3705); Grand Prix Ft. Wayne LLC (3704); Grand Prix Gaithersburg LLC (3709); Grand Prix General Lessee LLC (9182); Grand Prix Germantown LLC (3711); Grand Prix Grand Rapids LLC (3713); Grand Prix Harrisburg LLC (3716); Grand Prix Holdings LLC (9317); Grand Prix Horsham LLC (3728); Grand Prix IHM, Inc. (7254); Grand Prix Indianapolis LLC (3719); Grand Prix Islandia LLC (3720); Grand Prix Las Colinas LLC (3722); Grand Prix Lexington LLC (3725); Grand Prix Livonia LLC (3730); Grand Prix Lombard LLC (3696); Grand Prix Louisville (RI) LLC (3700); Grand Prix Lynnwood LLC (3702); Grand Prix Mezz Borrower Fixed, LLC (0252); Grand Prix Mezz Borrower Floating, LLC (5924); Grand Prix Mezz Borrower Floating 2, LLC (9972); Grand Prix Mezz Borrower Term LLC (4285); Grand Prix Montvale LLC (3706); Grand Prix Morristown LLC (3738); Grand Prix Mountain View LLC (3737); Grand Prix Mt. Laurel LLC (3735); Grand Prix Naples LLC (3734); Grand Prix Ontario Lessee LLC (9976); Grand Prix Ontario LLC (3733); Grand Prix Portland LLC (3732); Grand Prix Richmond (Northwest) LLC (3731); Grand Prix Richmond LLC (3729); Grand Prix RIGG Lessee LLC (4960); Grand Prix RIMV Lessee LLC (4287); Grand Prix Rockville LLC (2496); Grand Prix Saddle River LLC (3726); Grand Prix San Jose LLC (3724); Grand Prix San Mateo LLC (3723); Grand Prix Schaumburg LLC (3721); Grand Prix Shelton LLC (3718); Grand Prix Sili I LLC (3714); Grand Prix Sili II LLC (3712); Grand Prix Term Lessee LLC (9180); Grand Prix Troy (Central) LLC (9061); Grand Prix Troy (SE) LLC (9062); Grand Prix Tukwila LLC (9063); Grand Prix West Palm Beach LLC (9065); Grand Prix Westchester LLC (3694); Grand Prix Willow Grove LLC (3697); Grand Prix Windsor LLC (3698); Grand Prix Woburn LLC (3699); Innkeepers Financial Corporation (0715); Innkeepers USA Limited Partnership (3956); Innkeepers USA Trust (3554); KPA HI Ontario LLC (6939); KPA HS Anaheim, LLC (0302); KPA Leaseco Holding Inc. (2887); KPA Leaseco, Inc. (7426); KPA RIGG, LLC (6706); KPA RIMV, LLC (6804); KPA San Antonio, LLC (1251); KPA Tysons Corner RI, LLC (1327); KPA Washington DC, LLC (1164); KPA/GP Ft. Walton LLC (3743); KPA/GP Louisville (HI) LLC (3744); KPA/GP Valencia LLC (9816). The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

Support Motion") [Docket No. 15] and (ii) the Debtors' Motion for Entry of an Order

Authorizing The Debtors to Obtain Postpetition Financing From Five Mile Capital Partners on a

Priming Basis, dated July 19, 2010 (the "Five Mile DIP Motion," and together with the Plan

Support Motion, the "Motions") [Docket No. 24].  In support of its Objection, the Ad Hoc

Committee respectfully represents as follows:

## Argument

       1.      The Preferred Shareholders Are Not Behind All Creditors.  The Debtors

comprise 92 entities.  The holding company is not liable for the debts of the subsidiaries or the

blanket mortgage debt.  Therefore, this is not a situation in which the preferred shareholders are

behind all creditors.  Rather, the preferred shareholders obtain the equity value of subsidiaries

whose hotel assets are worth more than their individual mortgage debts and their entities'

unsecured claims even if other entities have unsatisfied unsecured claims.

       2.      Procedural Illegality:  Neither the Bankruptcy Code nor the Bankruptcy

Rules addresses plan support agreements.  They do address, however,  the substantive and

procedural laws and rules applicable to most of the relief and transactions contemplated in the

instant Plan Support Agreement which, if approved, requires confirmation of a particular chapter

11 plan.  No disclosure statement has been approved and the hearing on the interlinked[3] Motions

is not noticed as or labeled as a confirmation hearing pursuant to Bankruptcy Code section 1128.

Moreover,  the Debtors and Lehman ALI, Inc. ("Lehman") have engineered the Motions to result

in stay relief for Lehman, without further notice or order, if the Court grants the Motions and

does not later confirm the chapter 11 plan the Plan Support Motion requires (the "Plan").  Plan

Support Agreement at §§ 6(a)(vii), 8(b).  Therefore, if the Plan is unconfirmable for any reasons

---

[3]    Sections 6(a)(iii) and 8(b) of the Plan Support Agreement create a Termination Event triggering relief from the
automatic stay without further notice or order if the financing motions are not approved.

set forth herein or otherwise, the Debtors' estates get dismembered without further court review, notice, or order. Yet, the September 1 hearing has not been noticed as a stay relief hearing either.

3. Accordingly, the hearing on the Motions is effectively a stay relief hearing and a confirmation hearing without prior satisfaction of any of the procedural safeguards and requirements built into the Bankruptcy Code (i.e., valuations, consideration of plausible plans, disclosure statement, voting, confirmation objections, competing plans, etc.). Indeed, the Debtors' strategy is to take a dive on the stay relief so the Court is forced to confirm the Plan as the only way to avoid dismemberment. Who does this strategy help? Apollo Investment Corp. ("Apollo"). Who does it harm? Everyone else except Lehman.

4. As further explained below, that there may subsequently be a confirmation hearing is absolutely no defense in this situation because if the Court grants the Motions, Lehman obtains stay relief to dismember the estates (without further notice or order) if the Court does not later confirm the Plan. Plan Support Agreement § 6(a)(vii). Significantly, even though the Motions substantively require the Debtors to transfer all the estates to Lehman or to suffer stay relief without further notice or order, they do not even satisfy the requirements for a sale hearing such as describing all the properties to be transferred.[4] Moreover, even though the Motions grant Lehman stay relief without further notice or order, they do not comply with

---

[4]     Bankruptcy Rule 2002(c)(1) provides:

    **(c) Content of notice.**
    (1) Proposed use, sale, or lease of property. Subject to Rule 6004, the notice of a proposed use, sale, or lease of property required by subdivision (a)(2) of this rule shall include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections. The notice of a proposed use, sale, or lease of property, including real estate, is sufficient if it generally describes the property. The notice of a proposed sale or lease of personally identifiable information under § 363(b)(1) of the Code shall state whether the sale is consistent with any policy prohibiting the transfer of the information.

Bankruptcy Code section 362(d) as they do not even allege the necessary facts to procure stay relief, and Bankruptcy Rule 4001(d)(1)(B)[5] because they fail to identify the material provisions of the proposed order relating to the Plan Support Agreement such as the proposed order's (i) granting specific performance before a breach exists or (ii) eliminating the stay of enforcement of stay relief otherwise required by Bankruptcy Rule 4001(a)(3).[6]

     5.     <u>The Debtors' 'Fiduciary-Out' Clause Provides No Relief to the Estates' Wrongful Dismemberments</u>.  Section 25(c) of the Plan Support Agreement expressly provides that the Debtors' so-called fiduciary-out clause does not prevent remedies such as relief from the automatic stay (without further notice order) unless Lehman receives "a higher and better recovery" from an alternative transaction.  Therefore, if the Plan is unconfirmable and there is no alternative transaction at the time, Lehman procures stay relief and the Fiduciary-Out clause has no effect.

     6.     <u>The Debtors' Fiduciary-Out Clause is Phony</u>.  Pursuant to the Plan, Lehman obtains 100% of the reorganized debtors inclusive of 51 debtors whose properties are not subject to Lehman's mortgage.  By itself, that makes the Plan unconfirmable because it provides Lehman more than it is entitled to receive at the expense of the preferred shareholders

---

[5]    Bankruptcy Rule 4001(d)(1)B) provides:

    (B) Contents. The motion shall consist of or (if the motion is more than five pages in length) begin with a concise statement of the relief requested, not to exceed five pages, that lists or summarizes, and sets out the location within the relevant documents of, all material provisions of the agreement. In addition, the concise statement shall briefly list or summarize, and identify the specific location of, each provision in the proposed form of order, agreement, or other document of the type listed in subdivision (c)(1)(B). The motion shall also describe the nature and extent of each such provision.

[6]    Bankruptcy Rule 4001(a)(3) provides:

    **(3) Stay of Order.**
An order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise.

who would otherwise receive the values of at least those 6 debtors unencumbered by Lehman mortgages and likely to hold equity value. But failure to confirm the Plan results in stay relief for Lehman unless Lehman obtains "a higher and better recovery." Plan Support Agreement § 25(c). In sum and substance, the only situation under which Lehman would not receive stay relief if an alternate transaction is pursued is a situation under which Lehman receives more than the law allows it to receive and more than 100% of everything! The fiduciary-out clause was carefully crafted to violate the bankruptcy law and the laws of arithmetic at the same time. This is not an exaggeration. This is the fact, and it exposes the illegality of the Motions and the intent to deceive that went into their formulation.

7.  There are three key facts which underlie these Motions, two of which have been mischaracterized, and the third glaringly omitted. These facts, when viewed in the context of the relief sought, demonstrate the illegality of the Debtors' (i) requested relief and (ii) conduct as debtors in possession.

a.  <u>Fact 1</u>: The Plan Support Agreement outlines the Plan that gives Lehman everything – all the estates: 100% ownership of all the reorganized debtors, which includes the 51 debtors owning hotels or joint venture interests in hotels not subject to Lehman's mortgage. Additionally, on the occurrence of anything that may get in the way of confirmation of that Plan or protect parties in interest such as the appointment of a trustee, Lehman can foreclose its mortgage against its collateral, either in the Bankruptcy Court or in state court, depending on which elections the Debtors and Lehman make, as admitted in the Debtors' Plan Support Motion (at ¶ 12(b)). Plan Support Agreement § 8(b). Lehman is not required to satisfy any requirement of Bankruptcy Code section 362(d) to obtain stay relief. The Debtors do not even bother

to allege grounds for stay relief. Indeed, no further Bankruptcy Court approval is required, consistent with the grant in advance to Lehman of the right of specific performance. Plan Support Agreement §§ 8(b)(i), 13.

The Debtors' Characterization of Lehman's Treatment: The Debtors contend (at Plan Support Motion ¶ 10): "In addition, to convince Lehman to agree to make the extraordinary concessions under the Plan, Lehman required the Debtors to agree to certain provisions in the Plan Support Agreement and the Plan Term Sheet relating to the termination of the Plan Support Agreement…." Let's get this straight. Lehman gets everything under the plan. On any hiccup, Lehman gets stay relief. Since Lehman will own 100% of the reorganized debtors, it agrees to forgive the debtor in possession financing it would otherwise owe itself for improving its own collateral. The Debtors characterize this as Lehman's "extraordinary concessions." What concessions??? Are the Debtors referring to Lehman's agreement to accept the chapter 11 plan that gives it 100% of the common stock in every Debtor, including those Debtors not subject to a Lehman lien? The Debtors nowhere mention that Lehman has not satisfied any criteria for stay relief and the Plan Support Agreement does not let the Bankruptcy Court or any party in interest have any say in the matter. Put differently, if this Court were Lehman, what more could this Court ask for than what Lehman already receives? Indeed, the Lehman bankruptcy court has already approved Lehman's participation in this transaction.[7] How could it not?

---

[7] *See Order Pursuant to Section 363 of the Bankruptcy Code Granting Authority to LCPI to (I) Consent to its Non-Debtor Affiliate Lehman ALI Inc.'s (A) Entry into Plan Support Agreement Related to the Restructuring of Innkeepers USA Trust and (b) Consummation of the Transactions Set Forth in the Plan Term Sheet and (II) Provide Funds to Solar Finance Inc., a Non-Debtor Affiliate, to Provide Debtor-in-Possession Financing, In re*

b.  Fact 2:  As the Debtors admit, their proposed Plan extinguishes all preferred shares and gives holders of the shares nothing.  Plan Support Agreement at ¶ 8(e).

The Debtors' Characterization of the Preferred Shareholders' Treatment:  "Whereas, Innkeepers has determined that the Transaction is advisable and in the best interests of its creditors and equity holders."  Plan Support Agreement at p. 2.  How can receiving nothing and losing 6 entities owning properties whose value would redound to the preferred shareholders be in the preferred shareholders' best interests?  Losing the balance of the estate without any marketing and without any refinancing negotiations is in the preferred shareholders' best interests?  Being excluded from Apollo's exclusive right to repurchase half the estates is in the preferred shareholders' best interests?  Hmmm.  If the Debtors assert giving the preferred shareholders nothing is in their best interest, then will the Debtors agree that giving the Debtors' management and professionals nothing is in their best interest?

c.  Fact 3:  Apollo Investment Corporation ("Apollo"), the Debtors' ultimate common shareholder, obtains the exclusive right to purchase half the reorganized debtors from Lehman.

The Debtors' Nondisclosure of Apollo's Exclusive Rights:  The Debtors 'forgot' to disclose it…in their Plan Support Motion…in their financing motions…in their first day affidavit…?  Oh, we get it!  According to the Debtors, the plan is in Apollo's best interests…and no one else counts!  But, to be consistent, why don't the Debtors assert

*Lehman Brothers Holdings Inc., et. al.,* Case No. 08-13555-JMP (Bankr. S.D.N.Y. Aug. 18, 2010) [Docket No.10877].

8

that giving Apollo nothing is in Apollo's best interests?  The Debtors' actions speak louder than their words.

8.    In substance, the Motions request the Court's permission and blessing for the Debtors and Apollo to violate the Bankruptcy Code, the Bankruptcy Rules, and controlling bankruptcy jurisprudence to provide Apollo a windfall at the expense of the Debtors' creditors (with the notable exception of Lehman, which is needed to give Apollo what it wants), and preferred shareholders.  The Plan Support Motion admits (at ¶ 8(e)) that the Debtors seek this Court's approval of an agreement requiring the Debtors to file a chapter 11 plan extinguishing all preferred shares for nothing.  Before the creditors and preferred shareholders can value all the estates and vindicate their rights under the Bankruptcy Code, for example, by having an examiner or trustee investigate the estates and their plausible reorganizations, and to propose competing chapter 11 plans, the Debtors insist the Court must issue orders providing the Court and all parties in interest a Hobson's choice: confirm the Debtors' plan giving Lehman everything and the preferred shareholders nothing, or Lehman obtains stay relief.  Pursuant to the Plan Support Agreement, Lehman receives 100% of the ownership interest in **all 92** reorganized Debtors even though Lehman's debt is collateralized by property belonging to **only 20** of the Debtors.[8]  By having the stock buy-back in a separate agreement, not subject to this Court's approval (rather than as an investment made under a chapter 11 plan), the Debtors defy, and expects the Court to help them defy, the duties of Innkeepers' officers and directors to their preferred shareholders and the duties of Innkeeper, as debtor in possession, not to prefer Apollo. Innkeepers also ignores the fact that in *Bank of America National Trust & Savings Ass'n v.203 North LaSalle Street Partnership*, 526 U.S. 434, 440 (1999), the chapter 11 estate's sole property

---

[8]    The Debtors' emphasis on "plan support" is deceiving.  Notably, the creditors representing more than $1 billion of the Debtors' $1.29 billion of secured debt are <u>not</u> parties to the Plan Support Agreement.  On the contrary, Lehman is the <u>only</u> creditor to have agreed to the terms of the Plan Support Agreement.

was encumbered under a chapter 11 plan by a new mortgage in the amount of the property's full value as determined by the Bankruptcy Court, thereby leaving no equity value. Yet the Supreme Court required that the value of controlling the fully encumbered asset not go to the equity owner over the objection of a higher class, without market testing of the value of that control. *LaSalle*, 526 U.S. at 458. Indeed, the Supreme Court contemplated virtually the precise situation here and used it as an example of what would be obviously illegal under the Bankruptcy Code:

> …Although the Debtor's exclusive opportunity to propose a plan under *§ 1121(b)* is not itself "property" within the meaning of subsection (b)(2)(B)(ii), the respondent partnership in this case has taken advantage of this opportunity by proposing a plan under which the benefit of equity ownership may be obtained by no one but old equity partners. ***Upon the court's approval of that plan, the partners were in the same position that they would have enjoyed had they exercised an exclusive option under the plan to buy the equity in the reorganized entity, or contracted to purchase it from a seller who had first agreed to deal with no one else.*** It is quite true that the escrow of the partners' proposed investment eliminated any formal need to set out an express option or exclusive dealing provision in the plan itself, since the court's approval that created the opportunity and the partners' action to obtain its advantage were simultaneous. But before the Debtor's plan was accepted no one else could propose an alternative one, and after its acceptance no one else could obtain equity in the reorganized entity. At the moment of the plan's approval the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder. This opportunity should, first of all, be treated as an item of property in its own right.
>
> ***
>
> …While it may be argued that the opportunity has no market value, being significant only to old equity holders owing to their potential tax liability, such an argument avails the Debtor nothing, for several reasons. It is to avoid just such arguments that the law is settled that any otherwise cognizable property interest must be treated as sufficiently valuable to be recognized under the Bankruptcy Code. See *Ahlers, 485 U.S. at 207-208*. Even aside from that rule, the assumption that no one but the Debtor's partners might pay for such an opportunity would obviously support no inference that it is valueless, let alone that it should not be treated as property. ***And, finally, the source in the tax law of the opportunity's value to the partners implies in no way that it lacks value to others. It might, indeed, be valuable to another precisely as a way to keep the Debtor from implementing a plan that would avoid a Chapter 7 liquidation.***
>
> ***

> *Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity, is a question we do not decide here. It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).*

*LaSalle*, 526 U.S. at 454-455, 458 (emphasis supplied). Here, Apollo claims the Debtors' estates have no equity value by ignoring the 51 entities owning properties not subject to a Lehman mortgage. Then, Apollo takes those 51 entities away from the preferred shareholders and gives those 51 entities to Lehman, which has no claim against them. Finally, Apollo defiantly uses its ownership of common stock to negotiate for itself its exclusive procurement of half ownership from Lehman while extinguishing the preferred shares held by members of the Ad Hoc Committee in violation of *Lasalle*. Notably, the existence of the Lehman-Apollo deal may not have been disclosed at all to this Court if a creditor of certain Debtors, Midland Services, Inc. ("Midland") had not first advised the Court of its existence in its objection to the Debtors' motion to use cash collateral.[9] After Midland filed its objection, the Debtors amended their First-Day Declaration to reveal, tongue in cheek: "[i]t is Debtors' understanding that, subject to certain terms and conditions, [Apollo] *may become* the purchaser [of a portion of Lehman's distributions of equity in the reorganized Innkeepers]," First-Day Declaration at ¶ 13 (emphasis supplied).[10] But even this statement is cagey — it implies that Apollo *may or may not* purchase

---

[9] *See Midland Loan Services, Inc.'s, Special Servicer For The Fixed Rate Trustee, Objection To (1) The Motion (A) Authorizing The Debtors To (i) Use The Adequate Protection Parties' Cash Collateral And (ii) Providing Adequate Protection Pursuant To 11 U.S.C. Sections 361, 362, And 363 And (B) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(b) And (2) Motion For Entry Of An Order Authorizing The Continued Use Of (I) Existing Cash Management System, As Modified Herein, (II) Existing Bank Accounts, (III) Existing Business Forms, And (IV) Certain Existing Investment Guidelines* [Docket No. 36] at ¶ 8.

[10] During the hearing on the first day motions, counsel for Innkeepers stated that there had been disclosure of the Apollo-Lehman deal in "probably twenty or thirty versions of the [first day declaration]" but that it somehow did not make it into the final version filed with the Court. *See Transcript of July 20 hearing in In re Lehman Brothers Holdings Inc., et. al.,* Case No. 08-13555-JMP (Bankr. S.D.N.Y.), attached hereto as Exhibit A, at 23-24. The disclosure was in twenty or thirty versions but was *inadvertently* dropped from the final version? This would be easier to believe if the Plan Support Motion made reference to the Apollo-Lehman Term Sheet. It does not.

the stock or that Apollo and Lehman *may or may not* reach an agreement on the stock buy-back. In fact, there is a term sheet between Apollo and Lehman (the "Apollo-Lehman Term Sheet") clearly setting forth Apollo's agreement to purchase half of the stock of reorganized Innkeepers from Lehman for $107.5 million, which was filed by Lehman Commercial Paper, Inc. in its bankruptcy cases. *See Motion of Lehman Commercial Paper Inc. for Authority to Consent to Lehman ALI Inc.'s Entry into a Plan Support Agreement in Connection with the Innkeepers Restructuring*, *In re Lehman Brothers Holdings Inc., et. al.,* Case No. 08-13555-JMP (Bankr. S.D.N.Y. July 27, 2010) [Docket No.10465]. Moreover, the Apollo-Lehman deal is not subject to higher and better offers in the Innkeepers' or Lehman's bankruptcy cases,[11] and thus, absent a breach, Apollo will be the purchaser of the stock, not the passive participant in the deal as outlined in the amended First Day Declaration. Lest the obvious go unnoticed, the trade here is clear: Apollo causes the Debtors to give Lehman 100% of all the reorganized debtors. Lehman releases Apollo from its guaranty obligations and allows Apollo to buy back half without any bidding, and the deal is exclusive to Apollo while it shuts out Innkeepers' preferred shareholders. As we explained in the Ad Hoc Committee's examiner motion, Innkeepers and Apollo ignore that deals like theirs have been illegal for 65 years since the United States Supreme Court ruled that preferred shareholders cannot take something for themselves – in this case (a) the exclusive right to repurchase Innkeepers and (b) the right to encumber valuable properties otherwise available to preferred shareholders to secure financing for improvements that Apollo was independently liable to improve – while other preferred shareholders do not obtain the same right. *Young v. Higbee Company*, 324 U.S. 204 (1945).

---

[11] Indeed, neither Apollo nor Lehman has presented any evidence that any party other than Apollo was given the opportunity to negotiate the $107.5 million stock purchase price.

9.     A condition to Apollo's obligation to purchase the stock (which is an asset (a contract that can be sold), not a liability) is Lehman's covenant not to object to the settlement or termination of Apollo's guarantee of the Debtors' obligations with respect to the completion of certain property improvement programs ("PIPs").  *See Apollo-Lehman Term Sheet* at 3.  This covenant dovetails with the Five Mile DIP Motion under which the Debtors seek to pledge hotel properties, in which there is likely equity for preferred shareholders (namely, the Residence Inn San Diego and the Residence Inn Tysons Corner), to support borrowings to improve hotels for which Apollo may be personally liable under a guarantee.

10.     Thus, Apollo has painstakingly, through the Plan Support Agreement, the Five Mile DIP Motion and the Apollo-Lehman Term Sheet, sought to ensure that it is released from its guarantee obligations with respect to the PIPs (obligations which have not been fully disclosed, as the Mariott franchising agreements or PIP agreements were not attached to the Debtors' motion) while regaining control of the reorganized Debtors to the exclusion of all other parties in interest.  Furthermore, the fact that the Five Mile DIP is secured in part by the Residence Inn San Diego and Residence Inn Tyson's Corner properties suggests that there may be value in these two properties well above the value of the existing liens on such properties which would otherwise inure to the benefit of preferred shareholders.

11.     Apollo's directions and the Debtors implementation thereof, violate and compromise the Supreme Court jurisprudence referenced above together with Bankruptcy Code sections  362(d) (grant of stay relief on future events without further court review, notice, or order), 363 (transfer of collateral and unencumbered property to Lehman without marketing, auction, business reason, or fairness to other parties in interest), 1106(a)(1, 3, 4)(reorganization without prior fulfillment of debtor in possession's duties), 1107(a)(same), 1123(a)(4)(Apollo as

controlling common shareholder and preferred shareholder receives exclusive right to purchase half of reorganized debtor while other preferred shareholders receive nothing), 1129(b)(1) and (2)(C)(Apollo, the controlling common shareholder, receives exclusive right to purchase half of reorganized debtors while preferred shareholders receive nothing), and Bankruptcy Rules 2002(c)(1), 4001(a)(3), and 4001(d)(1)(B) as explained above. For these and the other reasons set forth below, the Court should deny the Motions. Indeed, the Debtors do not even attempt to state a claim for stay relief against themselves or for confirmation, notwithstanding that the Plan Support Motion locks in one of those two results.

12.     With respect to the Plan Support Agreement, the Debtors boasted they wanted an "inside" deal and have submitted no evidence demonstrating that the Debtors have market tested their assets, made any effort to find a plan sponsor other than Apollo[12] or demonstrated that the Plan Support Agreement has the support of anyone other than Lehman. Indeed, holders of more than $1 billion of the Debtors' $1.29 billion of secured debt are not even parties to the Plan Support Agreement.

13.     Moreover, at its core, the Plan Support Agreement presents a mechanism by which Apollo and Lehman are seeking to force an effective substantive consolidation which imposes a haircut on all creditors but Lehman, extinguishes the preferred shares, and leaves Apollo and Lehman in control of the entire enterprise. It is important to remember that the preferred shareholders are not behind all creditors, as explained above. The Plan, however, gives Lehman all the debtors and prevents the preferred shareholders from obtaining the value of the

---

[12] The Debtors made no effort to market test the value of their assets or obtain an alternative plan sponsor as made clear by Bill Darrough of Moelis & Co., financial advisor to the Debtors, during his testimony on August 12 before this Court: "I think that [the] substantial amount of our discussions and negotiations have been with people inside the capital structure…. Ultimately, to the extent that we're going to do an internal plan, which is, I think, what we generally all have a bias towards is not trying to have to sell things to other people, if you can avoid it, to working internally...." August 12 Hearing Transcript at 35:5-6 (emphasis supplied); 47:10-13 [Docket No. 125].

solvent Debtors. In addition to the foregoing, the Plan Support Motion should be denied for the

following reasons:[13]

- Under section 4(a) of the Plan Support Agreement, the Debtors cannot "directly or indirectly seek, solicit, negotiate, vote for, consent to, support or participate in the formulation of any plan of reorganization or restructuring other than the Plan" or "directly or indirectly seek, solicit, negotiate, support or engage in any discussions regarding any chapter 11 plan other than the Plan." In addition, under Section 5(c)(iv), the Debtors and Lehman have agreed that they cannot "directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to or enter into any agreements relating to, any restructuring, plan or reorganization. . . sale or disposition (or all or substantially all of their assets or equity) other than as set forth in the Plan Term Sheet and the Plan, nor shall either [the Debtors or Lehman] solicit or direct any person or entity . . . to undertake any of the foregoing…"

  - o Previously, we explained why the 'fiduciary-out' clause is phony. The question here, however, is what meaning can section 4(a) have if the fiduciary-out clause were not phony. Clearly, these provisions were intended to have some meaning and can only chill the carrying out of the debtor in possession's duties under the Bankruptcy Code and state law.

  - o By agreeing to these provisions, Innkeepers' senior management and directors have violated their fiduciary duties to equity holders under *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 99, 103 (Del. 2007).

  - o By agreeing to these provisions, the Debtors have violated their fiduciary duties by not seeking to maximize the value of their estates for the benefit of their creditors and non-Apollo shareholders.

  - o By agreeing to these provisions with knowledge of the side-agreement between Apollo and Lehman, the Debtors are seeking to avoid their obligations under *LaSalle*, 526 U.S. 434 (1999), to market test their assets when filing a plan which allows the controlling shareholder to retain control of the Debtors during the Debtors' exclusive periods under section 1121 of the Bankruptcy Code.

- Section 4(b) requires Lehman to vote to accept the Debtors' proposed chapter 11 plan upon the receipt of the Disclosure Statement, even though no disclosure statement has been filed to date, let alone approved in these cases. This provision violates Bankruptcy Code section 1125(b) which requires the approval of a

---

[13] The list is not exhaustive, but identifies the most significant problems with the Plan Support Agreement. The Ad Hoc Committee reserves its right to supplement this list or raise additional issues in Court after it has had an opportunity to review materials produced by Apollo, the Debtors, and Lehman in connection with the Midland dispute.

disclosure statement <u>before</u> the Debtors may solicit acceptances of a plan.  *See In re Century Glove, Inc.*, 860 F.2d 94, 100 (3d Cir. 1988).  (We acknowledge that being granted 100% of all the reorganized debtors is Lehman's 'dream' plan, thereby rendering academic its decision to accept or reject.  Indeed, it was foolish for the Debtors and Lehman to agree to covenants preventing the Debtors from carrying out their duties to parties in interest because their whole deal makes clear that Apollo and the Debtors had not intention of varying from their deal in the first place and there is no deal that could provide Lehman anything more than everything.)

- Section 6(j) provides "the filing of a motion to approve a Disclosure Statement or Plan . . . that incorporates a Pro Forma Capital Structure or any other terms inconsistent with the terms and conditions set forth [in the] Plan Term Sheet" constitutes a Termination Event.  Section 6(q) effectively affords Lehman with a unilateral veto over the entire restructuring process:  "[the transaction terminates if] Lehman has determined . . . that the Transaction cannot be structured in a manner acceptable to Lehman…"  After months of negotiation, the Debtors have rested the success of their chapter 11 plan on the predictable intent of <u>one</u> creditor to grab all it can get.  Indeed, Lehman, as debtor in possession, would argue it has a fiduciary duty to its other creditors to do so.  Moreover, section 5(d) requires the Debtors "pay all reasonable fees and expenses incurred by Lehman in connection with transaction," whether Lehman decides to support the Agreement or not. Why should the Debtors' estates pay Lehman's fees and expenses when the agreement is not subject to higher and better offers?

- The Debtors refer to the 'fiduciary-out' set forth in section 25 of the Plan Support Agreement to rebut the assertion that the Plan Support Agreement "vitiate[s] the Debtors' fiduciary duties in administering the Chapter 11 Cases."  The reasons the fiduciary-out clause is phony are explained above.  Section 10(t)(i)(A) of the Plan Support Agreement states that the Agreement does not violate "any provision of law, rule or regulation applicable to it or any of its subsidiaries."  For the reasons stated elsewhere in this Objection, this pronouncement is clearly false.  The Court is being asked to grant stay relief and a transfer of all estates, absent compliance with the Bankruptcy Code and Bankruptcy Rules as shown above section by section and rule by rule.

## <u>CONCLUSION</u>

WHEREFORE the Ad Hoc Committee requests the Court to deny the Plan Support Motion and the Five Mile DIP, a financing designed to deprive estates of value to allow the Debtors' ultimate shareholder relief from its obligations, for failure to state a claim for stay relief, sales of all estates, confirmation and for its illegality on all other grounds explained above, and grant it such other and further relief as is just.

Dated: New York, NY
       August 23, 2010

DEWEY & LEBOEUF LLP

/s/ Martin J. Bienenstock
Martin J. Bienenstock, Esq.
Irena M. Goldstein, Esq.
Timothy Q. Karcher, Esq.
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333

Attorneys for Ad Hoc Committee of Preferred
Shareholders

# EXHIBIT A

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 10-13800-SCC

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   INNKEEPERS USA TRUST, et al.,

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14               United States Bankruptcy Court

15               One Bowling Green

16               New York, New York

17

18               July 20, 2010

19               11:11 AM

20

21   B E F O R E:

22   HON. SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25

1          THE COURT:  Okay.

2          MR. SATHY:  Your Honor, there is -- there was one

3     point that I do want to raise with respect to the plan support

4     agreement.  And Midland makes some issue with the relationship

5     between Lehman and Apollo, with respect to their agreement.

6     The agreement with the company and Lehman is that Lehman will

7     be converting a hundred percent of its debt into equity.

8     That's our plan support agreement.  Lehman has reached an

9     agreement with Apollo that allows for Lehman to sell fifty

10    percent of the equity, should this transaction be approved --

11         THE COURT:  To --

12         MR. SATHY:  -- for a fixed price.  And that was

13    Lehman's decision.  Our agreement with Lehman does not require

14    that Apollo receive anything.  Our agreement with Lehman is

15    that they find a purchaser for half of the equity, presumably

16    for the business reasons that they believe is important for

17    them and their estates, and presumably the way that they will

18    present that request to Judge Peck.  It's a termination event

19    under our plan support agreement, if that agreement -- if their

20    agreement -- if they're not able to find a purchaser.  So in

21    some ways they are related.  But our agreement is not that --

22         THE COURT:  And that's the sentence that was added to

23    the new affidavit that I got, correct?

24         MR. SATHY:  That's right, Your Honor.  And I do -- and

25    I should correct that point.  This is, frankly, a mea culpa on

1  us.  We had had that disclosure in probably twenty or thirty

2  versions of the affidavit that we were working on.  We know

3  that's important disclosure, obviously.  In a draft of an

4  affidavit that we sent to Midland last week, it included that

5  disclosure.  And they will agree that on July 14th we sent them

6  an affidavit that includes that disclosure.  And we met with

7  them the very next day and told them about it, obviously.

8         So this is not one of these issues that people are

9  trying to hide.  And I hope that this case does not become "I

10  gotchas".  But that is disclosure that we thought was

11  important --

12         THE COURT:  Okay.

13         MR. SATHY:  -- and it needed to be made.

14         THE COURT:  Fair enough.

15         MR. SATHY:  Your Honor, before I conclude, just a

16  general sense of our next steps.  Obviously, we want to operate

17  the business seamlessly, with our guests not being aware of the

18  Chapter 11 filing or not being affected by it.  We want to

19  build more consensus around our restructuring plan.  And we

20  intend to do so.  And we intend, in the next forty-five days,

21  to reach a resolution on definitive documents with respect to

22  our DIPs, with respect to the plan, and ultimately, assuming

23  that things move forward with Lehman in their court, that we'd

24  be filing our plan within the next forty-five days.

25         The PSA provides for a relatively aggressive time