DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333
Martin J. Bienenstock, Esq.
Irena M. Goldstein, Esq.
Timothy Q. Karcher, Esq.

*Attorneys for Ad Hoc Committee of Preferred Shareholders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------ x | |
| **In re:** ) | **Chapter 11 Case No.** |
| ) | |
| **INNKEEPERS USA TRUST, et al.,** ) | **Case No. 10 – 13800** |
| ) | **(SCC)** |
| **Debtors.** ) | |
| ) | **(Jointly Administered)** |
| ------------------------------------ x | |
| **AD HOC COMMITTEE OF PREFERRED** ) | |
| **SHAREHOLDERS,** ) | |
| ) | |
| **Movant,** ) | |
| ) | |
| **-against-** ) | |
| ) | |
| **INNKEEPERS USA TRUST, et al.,** ) | |
| ) | |
| **Respondents.** ) | |
| ) | |
| ------------------------------------ x | |

**MOTION OF AD HOC COMMITTEE OF PREFERRED
SHAREHOLDERS FOR ORDER DIRECTING APPOINTMENT
OF STATUTORY COMMITTEE OF PREFERRED SHAREHOLDERS
PURSUANT TO BANKRUPTCY CODE SECTION 1102(a)(2)**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Committee of Preferred Shareholders (the "Ad Hoc Committee")[1] in the above-captioned chapter 11 cases of Innkeepers USA Trust ("Innkeepers" or the "Company"), its parent corporation Grand Prix Holdings, LLC ("Grand Prix") and their direct and indirect title 11 debtor subsidiaries (collectively with Innkeepers and Grand Prix, the "Debtors"),[2] hereby requests issuance of the proposed order attached hereto as Exhibit A, directing the appointment of a statutory committee of preferred shareholders pursuant to section

---

[1] The following holders of approximately 24.0% of Innkeepers' 8.0% Series C Cumulative Preferred Shares comprise the Ad Hoc Committee: Brencourt Advisors, LLC; Esopus Creek Advisors, LLC; and Plainfield Special Situations Master Fund II Limited.

[2] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: GP AC Sublessee LLC (5992); Grand Prix Addison (RI) LLC (3740); Grand Prix Addison (SS) LLC (3656); Grand Prix Albany LLC (3654); Grand Prix Altamonte LLC (3653); Grand Prix Anaheim Orange Lessee LLC (5925); Grand Prix Arlington LLC (3651); Grand Prix Atlanta (Peachtree Corners) LLC (3650); Grand Prix Atlanta LLC (3649); Grand Prix Atlantic City LLC (3648); Grand Prix Bellevue LLC (3645); Grand Prix Belmont LLC (3643); Grand Prix Binghamton LLC (3642); Grand Prix Bothell LLC (3641); Grand Prix Bulfinch LLC (3639); Grand Prix Campbell / San Jose LLC (3638); Grand Prix Cherry Hill LLC (3634); Grand Prix Chicago LLC (3633); Grand Prix Columbia LLC (3631); Grand Prix Denver LLC (3630); Grand Prix East Lansing LLC (3741); Grand Prix El Segundo LLC (3707); Grand Prix Englewood / Denver South LLC (3701); Grand Prix Fixed Lessee LLC (9979); Grand Prix Floating Lessee LLC (4290); Grand Prix Fremont LLC (3703); Grand Prix Ft. Lauderdale LLC (3705); Grand Prix Ft. Wayne LLC (3704); Grand Prix Gaithersburg LLC (3709); Grand Prix General Lessee LLC (9182); Grand Prix Germantown LLC (3711); Grand Prix Grand Rapids LLC (3713); Grand Prix Harrisburg LLC (3716); Grand Prix Holdings LLC (9317); Grand Prix Horsham LLC (3728); Grand Prix IHM, Inc. (7254); Grand Prix Indianapolis LLC (3719); Grand Prix Islandia LLC (3720); Grand Prix Las Colinas LLC (3722); Grand Prix Lexington LLC (3725); Grand Prix Livonia LLC (3730); Grand Prix Lombard LLC (3696); Grand Prix Louisville (RI) LLC (3700); Grand Prix Lynnwood LLC (3702); Grand Prix Mezz Borrower Fixed, LLC (0252); Grand Prix Mezz Borrower Floating, LLC (5924); Grand Prix Mezz Borrower Floating 2, LLC (9972); Grand Prix Mezz Borrower Term LLC (4285); Grand Prix Montvale LLC (3706); Grand Prix Morristown LLC (3738); Grand Prix Mountain View LLC (3737); Grand Prix Mt. Laurel LLC (3735); Grand Prix Naples LLC (3734); Grand Prix Ontario Lessee LLC (9976); Grand Prix Ontario LLC (3733); Grand Prix Portland LLC (3732); Grand Prix Richmond (Northwest) LLC (3731); Grand Prix Richmond LLC (3729); Grand Prix RIGG Lessee LLC (4960); Grand Prix RIMV Lessee LLC (4287); Grand Prix Rockville LLC (2496); Grand Prix Saddle River LLC (3726); Grand Prix San Jose LLC (3724); Grand Prix San Mateo LLC (3723); Grand Prix Schaumburg LLC (3721); Grand Prix Shelton LLC (3718); Grand Prix Sili I LLC (3714); Grand Prix Sili II LLC (3712); Grand Prix Term Lessee LLC (9180); Grand Prix Troy (Central) LLC (9061); Grand Prix Troy (SE) LLC (9062); Grand Prix Tukwila LLC (9063); Grand Prix West Palm Beach LLC (9065); Grand Prix Westchester LLC (3694); Grand Prix Willow Grove LLC (3697); Grand Prix Windsor LLC (3698); Grand Prix Woburn LLC (3699); Innkeepers Financial Corporation (0715); Innkeepers USA Limited Partnership (3956); Innkeepers USA Trust (3554); KPA HI Ontario LLC (6939); KPA HS Anaheim, LLC (0302); KPA Leaseco Holding Inc. (2887); KPA Leaseco, Inc. (7426); KPA RIGG, LLC (6706); KPA RIMV, LLC (6804); KPA San Antonio, LLC (1251); KPA Tysons Corner RI, LLC (1327); KPA Washington DC, LLC (1164); KPA/GP Ft. Walton LLC (3743); KPA/GP Louisville (HI) LLC (3744); KPA/GP Valencia LLC (9816). The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), and respectfully represents as follows:

**STATEMENT OF THE CASE**

1.     <u>Preferred Shareholders Are Not Behind Creditors of All 92 Debtors</u>. In these chapter 11 cases, the preferred shareholders are not contractually or structurally subordinate to <u>all</u> creditors of each of the ninety-two (92) title 11 Debtors (seventy-two (72) of the Debtors own individual hotels). Rather, the preferred shareholders are entitled to the value of each Debtor having value, notwithstanding that other Debtors may be unable to pay in full all their respective creditors. Appointment of a statutory equity committee is necessary to provide adequate representation of preferred shareholders in each of the Debtors' chapter 11 cases.

2.     <u>Preferred Shareholders Have No Adequate Representation</u>. The record of these chapter 11 cases is a testament to the need for a statutory committee to represent preferred shareholders. Notably, as shown below, the Debtors have used estate funds to pay for the efforts of its executives, attorneys, and financial advisors to wipe out preferred shareholders while illegally favoring the common shareholder. Moreover, the Debtors simultaneously opposed use of any estate assets to represent preferred shareholders by urging the United States Trustee not to appoint a preferred shareholders' committee. The Debtors' actions prove the absence of representation of preferred shareholders. Specifically:

A.     The Debtors commenced these cases with a proposed Plan Support Agreement and chapter 11 plan term sheet (attached hereto as <u>Exhibit B</u>) extinguishing all preferred shares in exchange for nothing, while the common shareholder, Apollo Investment Corporation ("AIC" or "Apollo") obtained the exclusive right to purchase half the reorganized debtors from the Debtors' hand picked entity (Lehman ALI, Inc. "Lehman"), which was to acquire 100% of the stock of all the reorganized debtors under the plan term sheet.

B.     The statutory creditors' committee (the "Creditors Committee") is by law charged with representing unsecured claimholders and not preferred shareholders, and manifested as much by not objecting to the proposed Plan Support Agreement and

3

plan term sheet even though the plan term sheet provided only $500,000 for distribution to unsecured creditors.[3]

C.    Seventy-two (72) Debtors not subject to Lehman's blanket mortgage proposed to give Lehman full ownership of their reorganized estates, in addition to Lehman's acquisition of the twenty estates owning properties encumbered by the Lehman blanket mortgage, thereby depriving the preferred shareholders of (i) the value of controlling forty-five (45) properties whose mortgage debt would be reduced, where necessary, to their aggregate value, and (ii) the individual values of seven (7) other hotel properties encumbered by individual mortgages, but not blanket mortgages (the "Unencumbered Debtors").  Gifting to Lehman more than all its legal rights takes value away from preferred shareholders.  (Perhaps not coincidentally, Lehman reciprocated for its gift by providing Apollo the exclusive contractual right to purchase half the reorganized debtors for $107.5 million while being off the hook on its guaranty of property improvements.)

D.    The Debtors requested permission from the Bankruptcy Court to lock themselves into their proposed Plan Support Agreement whereby the Debtors could not consider any alternate transaction unless it provided Lehman with a higher and better recovery than that provided under the Debtors' plan term sheet.  *See Plan Support Agreement*, dated June 19, 2010, attached as Exhibit B to *Debtors' Motion for an Order (A) Authorizing the Debtors to Assume the Plan Support Agreement and (B) Granting Related Relief* [Docket No. 15] at ¶ 25(c).  Thus, the Debtors would have been required by court order not to consider any transaction that failed to give Lehman more than it could achieve under state law and more than 100% of everything which the Debtors were already proposing to give Lehman.  When the Debtors argued they could consider other transactions, the Court found Mr. Beilinson's testimony regarding the alleged "fiduciary out" in the Plan Support Agreement simply "was not credible."[4]

E.    The Debtors admitted not having asked counsel to check the validity and perfection of the mortgage debt the Debtors were purportedly satisfying under their proposed plan term sheet. [5]

F.    The Debtors' chief executive officer was unable to specify any actual liabilities at intermediate holding companies that would prevent the preferred shareholders from obtaining value from subsidiaries.[6]

---

[3]    *See* Creditors' Committee's response, dated August 23, 2010 (attached hereto as Exhibit C) to the Debtors' motion dated July 19, 2010 for approval of the plan support agreement [Docket No. 264], and Transcript of September 1, 2010 Proceedings (hereinafter, "September 1 Transcript") pp. 95 lines 12-25, 96 lines 1-2.  Relevant excerpts from the September 1 Transcript are annexed hereto as Exhibit D.

[4]    *See* September 1 Transcript at pp. 418 line 24, 419 lines 1-10 (As the Court noted in its decision, "when questioned by the Court Mr. Beilinson acknowledged that even participating in discussions with Five Mile, on which he now asserts he is ready to embark, may well constitute a termination event under the PSA.").

[5]    *See* September 1 Transcript at pp. 184 line 16-25, 185 line 1.

[6]    *See* September 1 Transcript at pp. 155 line 1-25, 156 lines 1-25, 157 lines 1-6.

G.    The representative of the Debtors' financial advisor, Moelis & Co., testified and admitted that the Debtors were looking for an "internal" reorganization whereby higher and better prices would not be sought from unrelated third parties.[7]

3.    <u>The Preferred Shares Are Plausibly in the Money and Clearly Not Hopelessly Out of the Money</u>.  There are two sources of value for the preferred shares:  the value of controlling fully encumbered properties, and the value of hotels in which there is equity above their mortgage debt.  As the United States Supreme Court demonstrated in *LaSalle*, even when estate property is encumbered by mortgage debt equal to its value, there is value in controlling and owning the estate property.[8]  Additionally, up to five to seven hotels and a joint venture

---

[7]    The Debtors made no effort to market test the value of their assets or obtain an alternative plan sponsor as made clear by Bill Derrough of Moelis & Co., financial advisor to the Debtors, during his testimony on August 12 before this Court:  "I think that [the] substantial amount of our discussions and negotiations have been with people inside the capital structure.… Ultimately, to the extent that we're going to do an internal plan, which is, I think, what we generally all have a bias towards is not trying to have to sell things to other people, if you can avoid it, to working internally...."  Transcript of August 12, 2010 Proceedings at pp. 35 lines 5-6; 47 lines 10-13 [Docket No. 227], attached hereto as Exhibit E.

[8]    In *Bank of America v. 203 North LaSalle Street Partnership*, 119 S. Ct. 1411 (1999), the debtor's chapter 11 plan provided its mortgagee, which the bankruptcy court had determined held a $54.5 million secured claim and a $38.5 million deficiency claim, a 7 to 10 year secured note for its secured claim and installments equal to 16% (present value) of its unsecured claim which was classified separately from other unsecured claims.  Trade claims held by third parties approximated $90,000 and were to be paid in full without interest on the plan's effective date.  The debtor's interest holders would retain ownership of the reorganized debtor having a present value of $4.1 million and would thereby avoid approximately $20 million of taxes chargeable if the mortgagee foreclosed.

The Supreme Court expounded the policies to be served by chapter 11 as:  "preserving going concerns and maximizing property available to satisfy creditors."  119 S. Ct. at 1421.  Then, it explained "[c]ausation between the old equity's holdings and subsequent property substantial enough to disqualify a plan would presumably occur on this view of things whenever old equity's later property would come at a price that failed to provide the greatest possible addition to the bankruptcy estate, and it would always come at a price too low when the equity holders obtained or preserved an ownership interest for less than someone else would have paid.  A truly full value transaction, on the other hand, would pose no threat to the bankruptcy estate not posed by any reorganization, provided of course that the contribution be in cash or be realizable money's worth, just as Ahlers required for application of Case's new value rule."  119 S. Ct. at 1421-22 (footnotes and citations deleted).

The Supreme Court ruled the exclusive right to buy equity is, in and of itself, property and cited authority for the proposition that options to buy interests at market values trade for a positive price.  119 S. Ct. at 1422.  The court also explained the old interest holder's rights to buy interests in the reorganized debtor were exclusive and therefore were property even though the debtor's exclusive opportunity to propose a plan is not itself property within the meaning of subsection 1129(b)(2)(B)(ii).  The logic was that upon confirmation of the plan the old interest holders were in the same position they would have been in had they exercised an exclusive option under the plan to buy the equity in the reorganized entity, or contracted to purchase it from a seller who had first agreed to deal with no one else.  119 S. Ct. at 1422.  Accordingly, the Supreme Court ruled that to avoid violating § 1129(b)(2)(B)(ii), there must be a market test

interest owned by the Debtors' estates have value for the preferred shareholders. The Debtors conducted *no valuation* to support their plan and performed no lien analysis.[9]

4.    To agree to a Plan Support Agreement, without testing the value of the properties or the validity of the underlying security interests, is as reckless as it is unfair from the point of view of creditors and preferred shareholders. But, it was not reckless from the point of view of Apollo (the Debtors' controlling shareholder) because Apollo was benefitting from lack of disclosure through its right to purchase half the reorganized debtor from Lehman. While the Supreme Court expressly ruled the policy to be served under chapter 11 is to maximize property for distribution (*see* footnote 8, *supra*), the Debtors, as controlled by Apollo, were striving for the opposite, namely for Apollo to be able to purchase the reorganized debtors for the lowest possible price.

5.    In other words, without allowing competing offers, without market testing, without performing a valuation, and without reviewing the validity of any of the underlying security interests, the Debtors tried to move forward with a plan designed to destroy equity value

---

Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity, is a question we do not decide here. It is enough to say, assuming a new value corollary, that plans providing for junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).

119 S. Ct. at 1424 (citations and footnotes omitted).

9.    The seven properties are (i) KPA HS Anaheim, LLC, (ii) KPA HI Ontario LLC, (iii) KPA RIMV LLC, (iv) KPA RIGG, LLC, (v) KPA Tysons Corner RI, LLC, (vi) KPA Washington DC, LLC, and (vii) KPA San Antonio, LLC. In addition, KPA Raleigh, LLC ("KPA Raleigh") owns 49% of a Joint venture in Genwood Raleigh LLC ("Genwood"). The Debtors recently filed a Bankruptcy Rule 2015.3 report setting forth nominal net book value for KPA Raleigh and negative equity at Genwood. Given the Debtors' testimony at the September 1 hearing that they performed no valuations or market testing of their properties, the Ad Hoc Committee is not prepared to accept the Debtors' numbers at face value.

for all Debtors (*including Unencumbered Debtors*), and give the sole controlling insider, Apollo, the right to buy back its equity on the cheap.[10]

6.     At the conclusion of the September 1, 2010 hearing, this Court "could not conclude that the debtors exercised due care in electing to move forward with the current plan term sheet and the proposed valuation implied therein."  The Court further found that the Debtors were not "even handed" in their approach and, instead, favored the Lehman/Apollo arrangement over other alternatives.[11]

7.     As a result of the Court's denial of the Debtors' motion for approval of its Plan Support Agreement, the Debtors will now have to meet with its various constituents.  The preferred shareholders are entitled to an even playing field, unlike the last round where the Debtors used estate assets to pay its executives and advisors to pursue a strategy favoring Apollo and harming the preferred shareholders.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

9.     On the Petition Date, each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").  The Debtors' chapter 11 cases are

---

[10]   *See Debtors' Motion for an Order (A) Authorizing The Debtors to Assume The Plan Support Agreement Motion*, dated June 19, 2010 [Docket No. 15] (Paragraph 8(e) provides:  "(e) holders of interests in the Debtors, including common and preferred stock, receiving no distributions on account of such interests, with such interests being cancelled.").

[11]   *See* September 1 Transcript at pp. 420, lines 5-7; 428, line 19.

jointly administered under the above-captioned number, but not substantively consolidated. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

10.     On July 28, 2010, the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the Creditors' Committee in these cases.

11.     By letter dated July 28, 2010, the Ad Hoc Committee requested that the United States Trustee appoint a statutory equity committee in these cases. Both the Debtors and the Creditors' Committee opposed the Ad Hoc Committee's request for a statutory equity committee.

12.     On August 30, 2010, the United States Trustee informed the Ad Hoc Committee of its decision not to appoint a statutory equity committee.[12]

13.     Following oral argument and an all day evidentiary hearing on September 1, 2010, this Court denied the Debtors' motion to assume the Plan Support Agreement entered into with Lehman. The Court found that the Debtors' Chief Restructuring Officer "was not credible" with respect to his testimony regarding the alleged "fiduciary out" contained in the Plan Support Agreement. The Court further found that the Debtors did not perform a valuation of the estate or the shares Lehman would receive, and that ultimately the Debtors "have not shown that they acted in good faith in (i) making the decision to enter into the Plan Support Agreement, and (ii) providing transparency to their creditors." *See* September 1 Transcript at 421, lines 22-24.

---

[12]    The decision of the United States Trustee not to appoint a statutory equity committee states a conclusion with no explanation in accordance with its normal practice. The Court reviews the United States Trustee's decision *de novo*. *See In re Williams Commc'ns Group*, 281 B.R. 216, 219-20 (Bankr. S.D.N.Y. 2002); *In re McLean Indus.*, 70 B.R. 852, 858 (Bankr. S.D.N.Y. 1987); *In re Texaco*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987).

**RELIEF REQUESTED**

14.     The Ad Hoc Committee requests the Court appoint a statutory preferred shareholders' committee pursuant to section 1102(a)(2) of the Bankruptcy Code.

**ARGUMENT**

15.     Section 1102(a)(2) of the Bankruptcy Code provides that the Court may order the appointment of a statutory equity committee "if necessary to assure adequate representation of . . . equity security holders."  11 U.S.C. § 1102(a)(2).

16.     Courts in this District and elsewhere have developed a number of criteria to consider in determining whether to appoint a statutory equity committee: (i) whether the interest of shareholders are adequately represented absent the appointment of a statutory equity committee; (ii) whether the Debtors appear "hopelessly insolvent" and the likelihood of shareholders receiving a distribution; (iii) the timing of the motion relative to the case; and (iv) whether the administrative costs of the statutory committee outweigh the benefits of adequate representation.  *See e.g.*, *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600 (Bankr. D. Del. 1996); *In re Williams Commc'ns Group*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002); *In re Johns-Manville Corp.*, 68 B.R. 155, 160; *In re Wang Labs., Inc.*, 149 B.R. 1, 2 (Bankr. D. Mass. 1992). In addition to other factors, courts also weigh the size and complexity of the cases.  *See e.g.*, *In re Beker Indus.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985).

17.     As set forth below, each of these factors argues strongly for the appointment of a statutory equity committee.

A.     **Preferred Shareholders Cannot Rely on Any Other Constituency For Adequate  Representation**

18.     Absent a statutory preferred shareholders' committee, preferred shareholders of Innkeepers clearly lack adequate representation in these cases.  Certainly, the

9

preferred shareholders cannot look to the Debtors for representation.  Indeed, while the Debtors' management and board of directors (the "Board") did their best for Apollo (the sole common shareholder), they performed their worst for all preferred shareholders.  The Board approved a Plan Support Agreement that extinguished the interests of preferred shareholders in favor of the common shareholder receiving an exclusive right to purchase half the reorganized debtors. Moreover, the Court found the Debtors were intentionally "down-playing" (or simply hiding) the exclusive side arrangement with Apollo to purchase half of the equity in the reorganized company at a price not subject to market testing.[13]  Apollo controls the Debtors' Board.[14]  Apollo hand picked the Chief Restructuring Officer, first by placing him on the Debtors' Board on which Apollo's CEO also serves, then by placing him on the board of Apollo's real estate investment trust, and finally by having its designees on the Debtors' Board approve Mr. Beilinson as Chief Restructuring Officer of the Debtors.  There is simply no way that current management or the Board is looking out for the interests of anyone but themselves and Apollo.[15]

19.    Nor can the preferred shareholders look towards the Creditors' Committee for help.  Indeed, it is a hornbook principle in bankruptcy law that preferred shareholders cannot

---

[13]    As noted by the Court at the September 1, 2010 hearing: "The intention for Apollo to end up with half of the debtors' equity which has been on the table since April has been, at best, downplayed and, at worst, obfuscated from parties-in-interest."  *See* September 1 Transcript at p. 422, lines 7-10.

[14]    Martin Bienenstock (Counsel to Ad Hoc Committee):  "Apollo has the power to replace all of the directors, does it not?"

Marc Beilinson (Chief Restructuring Officer):  "Theoretically, they do."  *See* September 1 Transcript at p. 261, lines 23-25.

[15]    Notably, after the Debtors missed six preferred dividend payments, the preferred shareholders were entitled to designate a director to the board of Grand Prix.  *See Articles Supplementary of 8.0% Series C Cumulative Preferred Shares*, dated June 29, 2009, at 6, attached hereto as Exhibit G.  Neither Apollo nor the Debtors enabled that to happen.  Indeed, with the exception of Apollo, none of the shareholders has a representative on the Debtors' Board.  Even worse, Apollo delisted and deregistered Innkeepers, thereby depriving the preferred shareholders of the most basic protections of *Sarbanes Oxley*, inclusive of public disclosures.  With a corporate governance scorecard as poor as this one, the Debtors cannot show that management and the Board adequately represent shareholders in these cases.  In fact, the opposite rings true here:  shareholders not only lack adequate representation, they also suffer the Debtors' negative representation dictated by Apollo as the controlling party.

rely upon unsecured creditors to adequately represent their interests throughout the valuation and plan process. *See Pilgrim's Pride Corp.*, 407 B.R. 211, 217, n. 17 (Bankr. N.D. Tex. 2009) ("[W]hen it comes to valuation and determination of future capital structure for plan purposes, their agendas are likely to be very much at odds."); *In re Saxon Indus.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) (stating that "the two committees are separate and distinct entities with the members of the unsecured creditors and equity creditors classes possessing variant priorities and interests with respect to their relationship with the debtor").

20.     In these cases, it is not only case law but the Creditors' Committee's actions thus far in the cases that make crystal clear that the Creditors' Committee cannot and will not protect the interests of preferred shareholders. The Creditors' Committee, which was the *only* creditor at the September 1, 2010 hearing that did not oppose the Plan Support Agreement and the Lehman/Apollo deal, has demonstrated that it is solely interested in protecting the interests of the unsecured claimholders, and if they can obtain acceptable treatment in a sale or under a plan, they are not concerned with the fate of the preferred shareholders.[16]

21.     Indeed, at the September 1, 2010 hearing, the Creditors' Committee was, by its own admission,

> standing up with what parties believe to be the bad guys [the Debtors, Lehman, and Apollo] who put together this PSA and have every intention of wiping out equity and significantly writing down debt as part of this de-leveraging process that's really geared to give the company back to Apollo.
>                         . . .
> the committee just wasn't prepared to take that risk [of objecting to the Plan Support Agreement]. Other parties can take that risk. Parties who have nothing to lose can certainly take that risk.

---

[16]     This may explain why, even after hearing the damning testimony of Mr. Beilenson, where he all but admitted to violating his fiduciary duties, the Creditors' Committee continued to "not oppose" the Debtors' request to assume the plan support agreement.

*See* September 1 Transcript at pp. 94, lines 13-18; 95, lines 8-11.

22.     The third major constituency in these cases, the mortgagees, also does not represent the interests of preferred shareholders either, and in fact, may be incentivized to advocate for a lower valuation if it means they will not have to share potential upside with unsecured claims or preferred shares.

23.     Thus, there are no parties in the cases currently working to protect the rights of preferred shareholders.  Congress clearly noted the importance of safeguarding against this divergence of interests when it emphasized:  "[a]s public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected.  Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional creditors who will have their own best interest to look after."  S. Rep. No. 989, 95th Cong., 2d Sess. 10 (1978).  A statutory committee offers preferred shareholders such assurance by facilitating a unified voice against the myriad of competing interests outlined above.  *See In re Finley Kumble*, 85 B.R. 13, 16 (Bankr. S.D.N.Y. 1988) ("The committee structure provided for in Chapter 11 cases offers substantial benefits to the court and the Debtor in the form of a centralized body to be heard and met with.").  Absent a statutory committee, preferred shareholders of Innkeepers cannot receive adequate representation in these cases.

24.     As stated in the legislative history to section 1102, appointment of a statutory preferred shareholders' committee offers shareholders necessary protection against "the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors."  S. Rep. No. 989, 95th Cong., 2d Sess. 10 (1978).   Congress further recognized that appointment of a statutory equity

12

committee preserves one of the main policy objectives of the reorganization process: "[t]he purpose of a business reorganization case, unlike a liquidation, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and *produce a return for its stockholders. . . .*" 115 H.R. Rep. No. 595, 95th Cong. 2d Sess. 220 (1977) (emphasis supplied).

25. Not surprisingly, the Ad Hoc Committee has found no reported decisions with facts as egregious as the facts before the Court. But it is clear that, in circumstances like this, where the Debtors have failed to adequately represent preferred shareholders due to questionable behavior on the part of the Board and management, courts will protect preferred shareholders with the appointment of a statutory equity committee. Indeed, the egregious conduct of the Debtors, the Board, and Apollo, and the serious risks their conduct presents to the interests of preferred shareholders, coupled with the lack of representation from other parties, compels the appointment a statutory preferred shareholders' committee in these cases. It is simply impracticable for a handful of preferred shareholders to invest additional sums to defend against the Debtors' executives and advisors who are paid from the estate.

B. **The Debtors Are Far From "Hopelessly Insolvent" and Retain Equity Value For Preferred Shareholders**

26. The second element courts look to in determining whether to appoint an equity committee is whether *each* of the Debtors is hopelessly insolvent.[17] "[Insolvency] is not a simple matter of statutory construction where the Court can rest with citation to the balance sheet test of 11 U.S.C. 101(32)." *In re Wang Laboratories*, 149 B.R. 1, 7 (Bankr. D. Mass. 1992).

---

[17] Courts typically weigh insolvency as merely one of a variety of factors in their determination of whether to appoint a statutory equity committee – it is by no means dispositive. *See In re Mansfield Ferrous Castings Inc.* 96 B.R. 779, 781 (Bankr. N.D. Ohio 1988) (The court "must be guided by all the facts and not look exclusively to the issue of solvency."); *In re Nat'l R.V. Holdings, Inc.*, 2008 Bankr. LEXIS 3465, at *11 (Bankr. C.D. Cal. Apr. 25, 2008).

Instead, courts rely upon a "confluence of factors [to determine] that the Debtors *appear to be* hopelessly insolvent." *In re Williams*, 281 B.R. at 221.

27.    Above, we provided two solid reasons why equity exists here: the value of controlling up to seventy-two (72) fully encumbered hotels, and the equity in up to seven (7) hotel properties and a joint venture interest. In addition, as discussed below, there is evidence that the Unencumbered Debtors are not hopelessly insolvent, but are generating profits.[18] In *In re Exide Technologies, et al.*, 2002 U.S. Dist. LEXIS 27210 at *5, 6 (D. Del. December 23, 2002), the United States District Court for the District of Delaware found that the Bankruptcy Court did not err in appointing a statutory equity committee where the "motion for appointment of the equity committee came early in [the] complex Chapter 11 proceeding" where the movant "presented credible evidence of equity value of the Debtors on a cash flow basis."

28.    Moreover, the Supreme Court has found that there is value in controlling encumbered property. Finally, the Debtors have not done any lien analysis for any of their seventy-two (72) hotels. Each of these weigh against a finding that all the Debtors are insolvent and that there is no equity value.

a.    <u>There are Unencumbered Debtors, Whose Value Goes Directly to Equity</u>

29.    As demonstrated at the September 1, 2010 hearing, and disclosed in the Organizational Chart filed with the Debtors' first day declaration, at least six (6) of the Debtors (the Unencumbered Debtors) own hotels that are not encumbered by any of the blanket mortgages (other than the mortgages on the individual hotels).[19] If any of those hotels have

---

[18]    It is significant for this element to note that the Debtors' ninety-two (92) cases have not been substantively consolidated.

[19]    The Unencumbered Debtors are (i) KPA RIMV, LLC, (ii) KPA RIGG, LLC, (iii) KPA HI Ontario, LLC, (iv) KPA Washington DC, LLC, (v) KPA Tysons Corner RI, LLC, and (vi) KPA San Antonio, LLC. *See* Amended Declaration of Dennis Craven, Chief Financial Office of Innkeepers, In Support of First-Day Pleadings [Docket No. 33] (the "<u>First-Day Declaration</u>") at 16. A copy of the Debtors' Organization Chart is attached hereto as <u>Exhibit H</u>.

value in excess of their individual mortgages, and the Ad Hoc Committee has reason to believe they do, then the corresponding Unencumbered Debtor has equity value.   Notably, the Debtors' first-day pleadings failed to make clear that Innkeepers, the holding company whose preferred shares are held by the members of the Ad Hoc Committee, is not liable on the blanket Lehman mortgage (or any other debt) and owns the equity in the Unencumbered Debtors, plus the KPA HS Anaheim LLC property (which is encumbered by a $13.7 million mortgage loan and a $21.3 million mezzanine loan), and a non-debtor joint venture (Genwood Raleigh LLC), all of which all have no obligation to Lehman under the blanket Lehman mortgage.[20]  That's a total of seven (7) hotels owned in fee, and one hotel owned in a joint venture.  None of these have been valued by the Debtors.[21]  The Debtors own and operate a total of seventy-two (72) hotels, nearly 10% of which are not subject to any secured financing, other than mortgages, and any one of which may have equity value.

30.     The Debtors have not been responsive to discovery requests, which have remained outstanding since August 20, 2010.[22]  However, with the limited materials provided to

---

[20]   Martin Bienenstock (Counsel to Ad Hoc Committee):  ". . .[Y]ou're not aware of any specific institutional debt, mortgage debt or bond debt, that those seven entities are on the hook for, other than the mortgages on their individual properties, correct?"

Marc A. Beilinson (Chief Restructuring Officer):  "No, I don't think that is correct.  I believe that, at least with regard to Anaheim, there's a twenty-one million dollar mezz piece to one of the Lehman-affiliated entities.  That comes to mind."

Martin Bienenstock:  "Okay, but for the other six entities, you're not aware of any other institutional bond debt or mortgage debt that they're liable for, are you?"

Marc A. Beilinson:  "I don't believe so."

September 1 Transcript, at p. 155, lines 14-25.

[21]   The Debtors' Chief Restructuring Officer conceded that the Debtors have not performed any appraisals of equity value on the entities holding the six individual hotels and the joint venture interest.  *See* September 1 Transcript, at p. 158, lines 6-7.  ("We have not done any appraisals [of the equity value] with regard to any of those assets.").

[22]   The Debtors did provide the Ad Hoc Committee with additional materials the weekend before the Monday that this motion was filed.  Because of the limited time available, the Ad Hoc Committee's advisors have not finished their review of the information and the Ad Hoc Committee reserves its right to both request additional

date, there is strong evidence that at least four of the hotels owned by the Unencumbered Debtors (Residence Inn in San Diego, California; Doubletree Guest Suites in Washington, D.C.; Residence Inn in Vienna, Virginia; and Homewood Suites in San Antonio, Texas) have equity value exceeding several million dollars *per hotel*. These hotels are each separately capitalized with long-term financing at favorable interest rates and maturities in 2016.

31. Moreover, each of the hotels held by the Unencumbered Debtors appear to generate net operating income leaving funds available to pay principal and interest on their individual mortgage debt. Publicly available financial data on *Bloomberg* demonstrate that properties owned by the Unencumbered Debtors have, during the last several months, generated cash flow in excess of their interest expenses.[23] This is supported by a recent article in the *Wall Street Journal*, indicating that "now [is] considered a good time to sell … because the public markets are relatively optimistic about hotel real estate, boosting prices." The article continues, "hotel buyers are banking on 'a fairly attractive future' for the industry. 'That's leading to prices that are deemed by many [sellers] to be attractive.'"[24] *See also*, "Hotels Lure Investors as Lodging Surpasses U.S. Offices, Retail Share Business" reported in *Bloomberg*, September 9, 2010, (hotel sales increased 139% in the first half of 2010 from a year ago and income from hotels continues to rise as occupancy rates climb), attached hereto as Exhibit F.

**b.** **There is Value in Controlling Encumbered Assets**

32. Even if the value of all of the Debtors' properties is *less than* the amount of the outstanding mortgage, there is *still value* in the ability to control the property. This is the

---

information and submit a supplement to this motion with additional evidentiary support. At the Debtors' request, that supplement will be filed under seal.

[23] The Debt Service Coverage Ratios (DSCRs) for the individual loans exceed a rating of 1 for most periods. Financial analysts will typically interpret any rating above 1 as undisputed evidence of solvency.

[24] *See* "Hotels Poised to Shed Properties" reported in *Wall Street Journal*, September 8, 2010, attached hereto as Exhibit I.

teaching of *LaSalle*, which has been completely ignored by the Debtors in their efforts to strip preferred shares of any interest in the Debtors' estates.

33.     At the September 1, 2010 hearing, Mr. Beilinson, on cross examination, conceded that there could be value in controlling encumbered assets, as demonstrated in the following exchange:

> Martin Bienenstock (Counsel to Ad Hoc Committee): "Okay. Now, isn't it true that if forty-five properties are encumbered by a mortgage in the amount of their value, it is still valuable; someone will still pay to take control and own those forty-five properties?"

> Marc Beilinson (Chief Restructuring Officer): "Only equity has inherent upside and downside, correct."

> Martin Bienenstock: "If those forty-five properties, subject to the mortgage and the amount of their value, were held up for sale, is there any question in your mind that there would be bidding and people would pay money to take those forty-five encumbered properties?"

> Marc Beilinson: "Of course somebody would buy them at some price. Whether that price is well below 500 or above 600 is an issue."

> Martin Bienenstock: "No, I'm not talking about buying them free and clear. I'm talking about buying them subject to the mortgage in the amount of their value. Wouldn't someone pay money to control forty-five hotels even if they're fully encumbered?"

> Marc Beilinson: "Perhaps."

> Martin Bienenstock: "Wouldn't someone pay money to control the other seven properties even if they're fully encumbered?"

> Marc Beilinson: "Some of them might be willing to pay a negligible amount, but I wouldn't see anyone being able to pay anything of meaning."

> Martin Bienenstock: "If the value of – let's say hypothetically the value of the forty-five properties is pegged at 500 million dollars. If the value goes up one percent, what's the increment? What's one percent of 500 million?"

> Marc Beilinson: "I don't know. What is it?"

Martin Bienenstock: "Well, it's five million."

Marc Beilinson: "Okay."

Martin Bienenstock: "You -- will you except that?"

Marc Beilinson: "I'll accept it."

*See* September 1 Transcript at pp. 174, lines 13-25; 175, lines 1-18.

34.     *LaSalle* stands for the proposition that there is value in being able to control a fully encumbered asset. The Debtors (and Apollo) tried to deprive the estates of that value. Apollo knew what it was doing when it kept these assets off the market, and the Debtors, their directors, and their management let them do it. The fact that the Debtors, their board, and management did not seek to capitalize on the potential value of controlling a portfolio of seventy-two (72) marquee hotels (even if they were encumbered) supports the Ad Hoc Committee's request for recognition as a statutory committee.

35.     Three years ago, in 2007, Apollo invested millions in Innkeepers. Now, rather than lose their investment and be stuck with $13 million in guaranty obligations, they deliberately undersold the value of the enterprise, and agreed to give Innkeepers to Lehman with the arrangement that Apollo will take half of it back for $107 million.[25] *At the very least*, the release from the guarantees had value for Apollo, which would have been a component of any bid.

36.     Yet none of that potential value inured to the benefit of the estates. Despite Mr. Beilinson's acknowledgement that there was potential value in controlling encumbered property, and the requirements of *La Salle*, the Debtors did not explore any

---

[25]     In his August 19, 2010 Deposition, Michael Lascher, a representative of Lehman in these cases, confirmed his knowledge of guaranty analysis attached to an email from Apollo's Schuyler Hewes to Marc Beilinson, dated July 17, 2010, which valued Apollo's guaranty liability in excess of $13 million. *See Deposition of Michael Lascher*, dated August 19, 2010, at 135-138, attached hereto as Exhibit J.

alternatives to realize that value.  Indeed, as the following exchange makes clear, the Debtors

undertook no efforts to see if the encumbered property had any value:

> Martin Bienenstock (Counsel to Ad Hoc Committee):  "Mr.
> Beilinson, what I'm trying to -- well, let's -- let me just ask
> you directly.  You clearly did not take any steps to find out
> what someone will pay to control that block of forty-five
> mortgages encumbered by a mortgage and whatever their
> value is?"
>
> Daniel Donovan (Counsel to the Debtors):  "Your Honor,
> objection.  I think we're getting pretty far away from the
> PSA."
>
> Martin Bienenstock:  "I think this is exactly what it's about,
> Your Honor."
>
> The Court:  "Well, I think it's a fair question.  He's trying
> to find out the process, and the process is, I think, what this
> hearing is about.  So – "
>
> Marc Beilinson (Chief Restructuring Officer):  "The
> answer is no."

*See* September 1 Transcript at p. 176, lines 5-7.

> 37.      Rather than foster bidding, the Debtors' Chief Restructuring Officer

testified that he denied Five Mile Capital Partners ("Five Mile") access to due diligence in

connection with a potential acquisition of the company, and neglected to give a thorough review

to Five Mile's proposal:

> David Friedman (Counsel to Five Mile):  "You've looked
> at the Five Mile transaction, those transactions, have you
> not?"
>
> Marc A. Beilinson (Chief Restructuring Officer):  "I've
> taken a little look at it, yes.  I've read it."
>
> David Friedman:  "You haven't spent much time on it,
> have you?"
>
> Marc A. Beilinson:  "No.  I haven't had time during the last
> few days."
>
> David Friedman:  "So from the 23rd of August until today,
> that's nine days, you didn't consider it important to review
> a written proposal from a wealth capitalized third party that

> places a higher enterprise value on the estate than your plan. You didn't think that was worth your time?"

*See* September 1 Transcript at p. 236, lines 12-21.

> David Friedman: "And I think it was your testimony earlier that [Five Mile] asked for access to the data room and you declined to give them that access?"
>
> Marc A. Beilinson: "Yes, I did decline."

*See* September 1 Transcript pp. at 241, lines 23-25; 242, line 1.

38.     Earlier in his testimony, Mr. Beilinson explained that the reason he would not market test the properties as requested by Midland Loan Services, Inc. was because he thought that the agreement with Lehman was "absolutely in the best interest of this bankruptcy estate and it's a bird in[the] hand." September 1 Transcript p. 119, lines 10-12. Of course, we have since learned that the Debtors made no effort to even hunt for other birds (let alone value their properties). Because the Debtors deliberately refused to market test their properties or perform any valuations, there is no way for the Court to find that any of the Debtors are insolvent, and in fact, Apollo's reluctance to put the assets up for market testing supports the assertion that there is real value – not only in the assets, but in controlling the assets. This is especially true for the Unencumbered Debtors, where the only obligations are the obligations of the underlying individual mortgages.[26] This lack of adequate market testing, coupled with the fact that certain of these properties have sufficient cash flow to pay their debt service, indicates that, rather than being "hopelessly insolvent" the Debtors are likely to have equity value.[27]

---

[26]   When asked about other obligations for the Unencumbered Debtors at the September 1, 2010 hearing, the Debtors' Chief Restructuring Officer could not identify any material obligations. *See* September 1 Transcript, at 155-157, *see* footnote 17, *supra*.

[27]   Indeed, one area for future inquiry is whether the Debtors improperly forced profitable hotels to cease making interest payments on their loans precisely to make them delinquent so as to enable the company to transfer the loans to a special servicer and create the false impression that there is no equity value for preferred shareholders. Apollo's efforts to disenfranchise and extinguish preferred shareholders stands in contrast to the pertinent pages of Apollo's Form 10K filed on May 26, 2010, which the Ad Hoc Committee has previously submitted to the Court. Apollo's Form 10K provides that Apollo's preferred equity interests in Grand Prix had a value of $5,268,000 as of March 31, 2010. *See Apollo Investment Corp Form 10-K For The Fiscal Year Ended*

39.	Tellingly, on May 26, 2010, when restructuring preparations had been ongoing for months and all the cash flows and other negative facts were known, Apollo still had its *preferred shares* listed at $5,268,000 in its SEC filings.  These are the same shares the Debtors sought to wipe out in the Plan Support Agreement.  Apollo's admission in its SEC filing on May 26, 2010 clearly demonstrates the existence of equity value for preferred shareholders and further supports the Ad Hoc Committee's contention that the Debtors are far from "hopelessly insolvent."  (In August 2010, after the Debtors filed their motion for approval of the Plan Support Agreement that extinguishes preferred and common shares, Apollo listed its shares as worthless.  That is consistent with its plan that would render them worthless.).

40.	Moreover, operating metrics (occupancy, average daily rate, RevPar) throughout the mid-price hotel industry have continued to improve since March 31, 2010.[28]

**c.	The Debtors Have Not Performed a Lien Analysis**

41.	In addition to the fact that there are hotel properties unencumbered by blanket mortgages, and the fact that the Debtors have failed to market test their assets, one other point goes to the fact that the Debtors are not hopelessly insolvent -- there is no indication that Lehman or any other purportedly secured claimholder holds a properly perfected lien on any of the hotel properties.  Indeed, on cross examination at the September 1, 2010 hearing, Mr. Beilinson acknowledged that the issue of perfection has not been fully explored by the Debtors.  When questioned by counsel to the Ad Hoc Committee regarding the issues surrounding review

---

*March 31, 2010* at 55-56, attached hereto as <u>Exhibit K</u>.  Notably, Apollo valued its preferred shares at $5.28 million even though the Debtors' Chief Restructuring Officer testified that he informed Apollo in March 2010 that the shares were worthless.  *See* September 1 Transcript, at pp. 128, lines 22-25; 129, line 1 ("March 2010 I had an unbelievably uncomfortable conversation with Apollo telling them that in my view they were out of the money and they would be receiving absolutely no consideration on account of the 250 million dollars they were losing in their equity investment in this enterprise.").

[28]	*See e.g.*, "<u>InterContinental Hotels Says Room Rates Are Rising</u>" reported in the *Wall Street Journal*, August 11, 2010, annexed hereto as <u>Exhibit L</u>.

of the security interests, Mr. Beilinson noted simply that it was an issue raised by the Creditors' Committee and further conceded that "obviously to the extent that they're successful that's going to -- to the extent that they find any deficiencies that may very well impact how the debtor views this plan." *See* September 1 Transcript at p. 185, lines 10-12. Beilinson went on to state:

> Marc Beilinson (Chief Restructuring Officer): "I'm fairly comfortable, based upon discussion with legal counsel, that all the perfection issues -- there are no perfection issues."

> Martin Bienenstock (Counsel to Ad Hoc Committee): "Well then what discussion was that?"

> Marc Beilinson: "I had discussions with Skadden who was my prepetition counsel in connection with a restructure agreement between Innkeepers and Lehman that was conducted between December of '08 and July of '09. And in connection with those discussions there was lien evaluations."

> Martin Bienenstock: "By who?"

> Marc Beilinson: "By Skadden."

> Martin Bienenstock: "Of all of the liens in the estate or just certain ones, or just certain liens?"

> Marc Beilinson: "I believe at that time we were focused only on Lehman since we were restructuring the Lehman pool of party assets."

> Martin Bienenstock: "So you don't have any knowledge of checking any of the other liens for the fifty-two other properties?"

> Marc Beilinson: "I don't have personal knowledge, no."

> Martin Bienenstock: "But you don't even know if it was done, do you?"

> Marc Beilinson: "I have looked at the closing binders in 2007; there were legal opinions and all sorts of documents. Do I believe that it was done and all of the liens are perfected? Absolutely. Do I have personal knowledge as to everything? No, I don't."

> Martin Bienenstock: "In all the cases that you filed as a debtor's attorney or even as a creditor's attorney where you participated, Mr. Beilinson, did you ever accept the fact that there were closing binders as a substitute for checking the valid perfection of all the liens?"

Marc Beilinson: "Not all the time."

*See* September 1 Transcript at pp. 185 lines 18-25, 186 lines 1-23.

42.     Without having reviewed all of the liens for each of the properties, the Debtors cannot, with any certainty, establish that there is no equity value here.

C.     **A Statutory Preferred Shareholders' Committee Appointment Will Not Delay These Cases**

43.     The Ad Hoc Committee's timely application for the appointment of a statutory preferred shareholders' committee will not delay these cases. Extensive plan negotiations and discussions among competing stakeholders regarding plan formulation will likely unfold over the next critical months. The appointment of a statutory committee will ensure preferred shareholders a seat at the negotiating table. Put simply, this is not a case where preferred shareholders have moved for the appointment of a statutory equity committee merely to extract hold-out value from the Debtors and impede the progress of these chapter 11 cases. Indeed, a statutory equity committee will advance a consensual plan that meets all fiduciary obligations.

D.     **The Incremental Administrative Costs of a Statutory Equity Committee Will Not Outweigh The Clear Benefits Statutory Representation Will Yield**

44.     Courts have made it abundantly clear that the administrative costs of a statutory equity committee alone must not bar statutory equity committee recognition. *See In re McClean Indus.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("Cost alone cannot, and should not, deprive . . . security holders of representation."); *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002) ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted."). Appointment of a statutory equity committee will level the playing field for preferred shareholders as they seek to vindicate their rights against constituencies with adverse economic interests and unlimited budgets. When viewed in light of

the overall fees the Debtors' estates will incur throughout these chapter 11 cases, the benefits of recognition of a statutory committee vastly exceed the incremental costs occasioned by such recognition.

E.  **These Cases Are Undeniably Large and Complex**

45.  No one can deny the size and complexity of these chapter 11 cases. By the Debtors' own admission, the Debtors comprise ninety-two (92) entities that own and operate seventy-two (72) hotels consisting of approximately 10,000 rooms, located in twenty (20) states across the United States. *See* First-Day Declaration at ¶ 6. The Debtors' consolidated assets for 2009 totaled approximately $1.5 billion and consolidated liabilities equaled $1.5 billion. *Id.* at ¶ 21. The Debtors' hotels operate under a series of interrelated franchise agreements with premier global franchise companies and brands, such as Marriott, Hilton, and Hyatt.

46.  It is clear that the Debtors desire the myriad of benefits available from a chapter 11 case and plan confirmation such as: debtor in possession financing, free and clear transfers, no stamp taxes, reduction of blanket mortgage debt, elimination of contingent claims, exculpations, and more. It is the opposite of fairness that the Debtors can cherry pick benefits they want, while depriving preferred shareholders of adequate representation, as the Debtors have attempted to date.

[*Remainder of Page Left Intentionally Blank*]

## CONCLUSION

WHEREFORE the Ad Hoc Committee requests the Court issue an order, substantially in the form attached hereto, directing the appointment of a statutory preferred shareholders' committee pursuant to section 1102(a)(2) of the Bankruptcy Code and granting the Ad Hoc Committee of Preferred Shareholders such other and further relief as is just.

Dated: New York, NY
       September 13, 2010

DEWEY & LEBOEUF LLP


/s/ Martin J. Bienenstock
Martin J. Bienenstock, Esq.
Irena M. Goldstein, Esq.
Timothy Q. Karcher, Esq.
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333

*Attorneys for Ad Hoc Committee of Preferred Shareholders*

NY3 3064120.5