**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                              Chapter 11

    Innkeepers USA Trust, *et al.*,              Case No. 10-13800

                                  Debtors.          Jointly Administered

-------------------------------------------------------------x

### BENCH DECISION DENYING DEBTORS' MOTION
### TO ASSUME PLAN SUPPORT AGREEMENT[1]

A P P E A R A N C E S:

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors and Debtors-in-Possession*
601 Lexington Avenue
New York, NY 10022
By:    Paul M. Basta, Esq.

300 North LaSalle
Chicago, IL 60654
By:    Anup Sathy, P.C., Esq.
         Marc J. Carmel, Esq.

655 Fifteenth Street, N.W.
Washington, DC 20005
By:    Daniel T. Donovan, Esq.

BRYAN CAVE LLP
*Attorneys for LNR Partners, LLC*
1290 Avenue of the Americas
New York, NY 10104
By:    Lawrence P. Gottesman, Esq.

---

[1]    This decision was dictated on the record at the conclusion of the hearing held on September 1, 2010. It has been modified only in the following respects: (i) typographical and transcription errors have been corrected, (ii) full citations have been added, and (iii) defined terms have been added for the purposes of clarity. Because this decision was initially a bench decision dictated in open court and written without the benefit of more leisurely drafting, it has fewer citations and footnotes, and a more conversational tone than a memorandum decision.

DECHERT LLP
*Attorneys for Lehman ALI Inc., and Michael Lascher*
1095 Avenue of the Americas
New York, NY 10036
By:  Michael J. Sage, Esq.
     Kevin J. O'Brien, Esq.
     Brian E. Greer, Esq.

DEWEY & LEBOEUF LLP
*Attorneys for the Ad Hoc Committee of Preferred Shareholders*
1301 Avenue of the Americas
New York, NY 10019
By:  Martin Bienenstock, Esq.
     Irena M. Goldstein, Esq.
     Timothy Q. Karcher, Esq.

HAYNES AND BOONE LLP
*Attorneys for Midland Loan Services, Inc.*
1221 Avenue of the Americas
26th Floor
New York, NY 10020
By:  Lenard M. Parkins, Esq.

201 Main Street, Suite 2200
Forth Worth, TX 76102
By:  John D. Penn, Esq.

2323 Victory Avenue, Suite 700
Dallas, TX 75219
By:  Philip M. Bridwell, Esq.
     Mark Elmore, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for Five Mile Capital Partners LLC*
1633 Broadway
New York, NY 10019
By:  David M. Friedman, Esq.
     Adam L. Shiff, Esq.
     Daniel A. Fliman, Esq.

KILPATRICK STOCKTON LLP
*Attorneys for TriMont Real Estate Advisors, Inc.*
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
By:  Todd C. Meyers, Esq.

MORRISON & FOERSTER LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1290 Avenue of the Americas
New York, NY 10104
By:    Lorenzo Marinuzzi, Esq.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*Attorneys for Apollo Investment Corporation*
1285 Avenue of the Americas
New York, NY 10019
By:    Alan W. Kornberg, Esq.
          Andrew J. Ehrlich, Esq.

PERKINS COIE LLP
*Attorneys for C-III Asset Management and CWCapital Asset Management*
131 S. Dearborn Street
Suite 1700
Chicago, IL 60603
 By:    David M. Neff, Esq.

SIDLEY AUSTIN LLP
*Attorneys for Appaloosa Investment L.P. I*
787 Seventh Avenue
New York, NY 10019
By:    Lee S. Attanasio, Esq.
          John G. Hutchinson, Esq.

U.S. DEPARTMENT OF JUSTICE
Office of the United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004
By:    Paul K. Schwartzberg, Esq.


Before the Court is the motion (the "Motion") of Innkeepers USA Trust and its affiliated debtors and debtors in possession (the "Debtors") for an order authorizing the Debtors to assume a plan support agreement, dated July 17, 2010 (the "PSA"), entered into with Lehman ALI Inc. ("Lehman").  Objections to the Motion were filed by (i) Midland Loan Services, Inc.

("Midland"), (ii) the Property Level Lenders,[2] (iii) the Ad Hoc Equity Committee of Preferred Shareholders, (iv) TriMont Real Estate Advisors, Inc., (v) CWCapital Asset Management LLC, (vi) C-III Asset Management LLC, (vii) Five Mile Capital Partners LLC ("Five Mile"), and (viii) Appaloosa Investment L.P. I. Reservations of rights regarding the Motion were also filed by Marriott International, Inc. ("Marriott") and the Official Committee of Unsecured Creditors. The Debtors filed an omnibus reply in support of the Motion and in response to the objections, along with the Declaration of Marc Beilinson, the Debtors' Chief Restructuring Officer. At the hearing, Mr. Beilinson gave additional live testimony. The objectors also presented the testimony of Mr. Ronald Greenspan, Mr. Michael Lascher, and Mr. Kevin Semon.

The PSA supports a plan term sheet that provides, among other things, for Lehman to receive, in satisfaction of its secured mortgage claims of approximately $238 million in floating mortgage loan debt (comprised of approximately $220 million in prepetition debt and an anticipated $17.5 million in DIP financing), 100% of the issued and outstanding new shares of common stock to be issued by the reorganized Debtors. The new shares will include all equity in all ninety-two of the Debtors, notwithstanding that Lehman currently is secured by collateral of only twenty of the Debtors. Under the plan term sheet, the remaining property level secured lenders would receive new secured notes with a value that is not less than the value of the collateral securing their prepetition debt. The plan dictated by the PSA proposes to assign a value to those secured notes, providing Midland, for example, with a $550 million note on account of its approximately $825 million secured claim.

---

[2] The "Property Level Lenders" are comprised of Wells Fargo Bank, N.A., as Trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1 and U.S. Bank National Association, as Trustee for the registered holders of ML-CFC Commercial Mortgage Trust 2006-4, Commercial Mortgage Pass-Through Certificates, Series 2006-4.

Section 6 of the PSA sets forth a list of termination events (the "Termination Events") which include, among other things, (i) the Debtors' failure to meet any of the Plan Milestones[3] set forth in the PSA, (ii) Lehman's failure to execute a definitive agreement with respect to the sale of 50% of its newly received shares for a price of at least $107.5 million, (iii) the filing of any motion to approve a disclosure statement or plan that incorporates a *pro forma* capital structure or any other terms inconsistent with the terms and conditions set forth in the plan term sheet, and (iv) the material breach by any party of any of their undertakings, representations, warranties, or covenants set forth in the PSA.  Upon the occurrence of any of the Termination Events, even those outside of the Debtors' control (such as Lehman's failure to consummate the so-called "New Equity Sale Transaction" no later than 270 days after the Petition Date[4]), Lehman may terminate the PSA and the consensual use of its cash collateral.  Further, upon the occurrence of select Termination Events, the PSA forces the Debtors to choose between (a) immediate stay relief in favor of Lehman (which would permit it to exercise any and all remedies with respect to the Floating Rate Collateral[5] without further Court approval) or (b) a section 363 sale of the Floating Rate Collateral at which Lehman would have the right to credit bid the unpaid balance of the Floating Rate Mortgage Loan.

The parties disagree on whether the Debtors' decision to assume the PSA should be evaluated under the business judgment standard or under the "heightened scrutiny" standard which closely examines transactions involving insiders.  It appears to me that the heightened scrutiny/entire fairness standard, such as that employed by the Bidermann court, may apply in

---

[3] The Plan Milestones are set forth in section 6(a) of the PSA.
[4] The Debtors' chapter 11 petitions were filed on July19, 2010 (the "Petition Date").
[5] The "Floating Rate Collateral" is defined in the PSA as the twenty properties securing the Debtors' obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Debtor parties thereto, collateralized by such properties (and the loan described herein, the "Floating Rate Mortgage Loan").

5

this situation.  See In re Bidermann Indus. U.S.A., Inc. (In re Bidermann), 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997).  I need not, however, decide which standard is applicable here because I believe that the Debtors have failed to meet their burden for assumption of the PSA under either "heightened scrutiny" or under the less stringent "business judgment" test.

In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration.  The business judgment rule's presumption shields corporate decision makers and their decisions from judicial second-guessing only when the following elements are present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some courts and commentators, no abuse of discretion or waste of corporate assets. See In re: Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  My decision will encompass the components of both standards.

First, the negotiations surrounding the PSA preclude me from finding that it was a disinterested business transaction.  Indeed, it is clear from the evidence presented that, even as early as April 2010, Apollo Investment Corporation ("Apollo"), the holder of 100% of the equity in Debtor Grand Prix Holdings, LLC and the Debtors' ultimate parent, was always intended to receive equity as part of the transaction – either directly, as a back-stop party, or through a side deal with Lehman negotiated just before the Petition Date.  Apollo also appears to have been directly and inextricably involved in the negotiations and concept of the plan-related transactions from the time the deal, as described by Mr. Beilinson, was "a peppercorn."[6]

---

[6]     Tr. of Hrg. of Sept. 1, 2010, at 203-4.

I also cannot conclude that the PSA was entered into with "due care," and I note that the "due care" prong is also directly relevant to the "fair process" inquiry of the entire fairness test. As one objector pointed out, the transaction not only has to be fair, but it has to look fair as well. The testimony of Mr. Beilinson is that the deal embodied in the plan term sheet was not "shopped" in the market prior to signing the PSA, nor did Mr. Beilinson have any intention of shopping it or of disclosing to the other secured parties the potential Lehman deal that was on the table during the prepetition period. It is troubling that, when Mr. Beilinson and his team met with Midland on April 28, they neglected to disclose the potential Lehman deal that had been outlined at a meeting with Lehman and Apollo the prior week, through which Lehman would receive the equity in all of the Debtors, including those securing Midland's debt, and would sell a portion of this equity to an investor.

The Debtors did not run any marketing process, and in fact, Moelis & Company LLC ("Moelis"), the Debtors' investment banker, was told not to pursue other bidders or transactions. While the Debtors state that they communicated with both Midland and Five Mile during the prepetition period, it does not appear that Innkeepers has contacted any potential investors outside the capital structure or meaningfully interacted with their secured creditors regarding plan proposals. Section 5(c) of the PSA specifically prohibits such negotiations by providing that neither party to the PSA shall directly or indirectly seek, solicit, negotiate, support, or engage in any discussions relating to or enter into any agreements relating to, any restructuring or plan of reorganization other than as set forth in the plan term sheet; and section 4(a)(ii) contains a similar restriction, stating that, prior to the Termination Date of the PSA, no party will directly or indirectly seek, solicit, negotiate, vote for, consent to, support, or participate in the formulation of any plan of reorganization or other restructuring other than the Plan. When asked

7

whether he believed the Debtors could provide due diligence materials to Five Mile without violating section 4(a)(ii) of the PSA, Mr. Beilinson stated "probably not,"[7] although he suggested that the Fiduciary Out[8] in section 25(a) of the PSA would protect his conduct because of the "notwithstanding anything to the contrary" opening language. Mr. Beilinson's testimony was not credible on this point. Indeed, when questioned by the Court, Mr. Beilinson acknowledged that even participating in discussions with Five Mile – on which he now asserts he is ready to embark – may well constitute a Termination Event under the PSA.

Moreover, it is not clear to me whether the Debtors have fully analyzed the value of the Floating Rate Mortgage Loan vis-à-vis the value of the new shares Lehman and Apollo will receive. This question goes directly to the "fair price" prong of the entire fairness test. Mr. Beilinson has stated that he has not valued the shares Lehman will receive, only that he believes that Lehman is not getting more than it is entitled to. He did not perform a valuation, nor did he direct his advisors to do so. No value has been ascribed to the new equity other than the $150 million to $190 million estimate contained in the April 22, 2010 presentation given by Moelis. Indeed, notwithstanding that valuation, the imputed value of the new equity would appear to be at least $215 million, based on the price Apollo has agreed to pay to purchase 50% of the equity.

In light of the substantial limitations in the PSA on the Debtors' ability to engage in discussions regarding a restructuring with any of their other major creditors, I cannot conclude that the Debtors exercised due care in electing to move forward with the current plan term sheet

---

[7] Tr. of Hrg. of Sept. 1, 2010, at 181.

[8] Section 25(a) of the PSA provides that, notwithstanding anything to the contrary therein, at any time prior to the Confirmation Date [as defined in the PSA], the Debtors or any directors or officers of the Debtors, in such person's capacity as a director or officer of the Debtors, shall be entitled to take any action, or to refrain from taking any action, including a decision to terminate the PSA, that such person determines in good faith, after consultation with counsel, is consistent with its or their fiduciary obligations under applicable law (the "Fiduciary Out").

and the proposed valuation implied therein. The testimony of Mr. Beilinson on these points reveals only that Lehman wielded great power in the negotiations and that Mr. Beilinson seems to have succumbed to virtually all of their demands.

With respect to the PSA and the proposed plan, it is difficult to understand what the rush is. The DIPs are now approved.[9] The hotels are generally performing well. The relationship with Marriott is on track. In fact, Mr. Beilinson testified that the need to secure the DIPs and the Marriott agreement, two interrelated transactions, was one key reason why the Debtors entered into the PSA. As each of those agreements has been executed, and the Marriott adequate assurance agreement was in fact only tied to the DIP agreements and not dependent on the PSA, this justification vanishes. The only dark cloud in an otherwise pretty sunny picture (and it is a large dark cloud) is that $1.2 billion in secured debt is extremely unhappy with the proposed plan. They deserve more of a process than what has been provided thus far. The Debtors have not set forth justification as to why, at this very early stage in the cases, the Debtors need to lock themselves into the proposed plan prior to either (a) seeking higher and better offers which may benefit the entire creditor constituency in these cases, and as Mr. Meyers correctly observed, *each* of the Debtors in these cases,[10] or (b) at a minimum, negotiating with their existing creditors regarding a restructuring transaction.

While the Debtors state in their reply that they are aware of no potential alternative that would provide creditors with richer recoveries, it does not appear from the evidence presented that they have canvassed the possible alternatives at this point. Despite the Debtors' failure to

---

[9] On September 1, 2010, the Court entered the Final Order (I) Authorizing Floating Rate Debtors to Obtain Postpetition Financing and (II) Granting Liens and Super-Priority Claims (Docket No. 385). On September 2, 2010, the Court entered the Final Order Authorizing the Debtors to Obtain Postpetition Senior Secured Super-Priority Debtor-In-Possession Financing From Five Mile Capital II Pooling International LLC, which was approved on the record on September 1, 2010 (Docket No. 400).

[10] Tr. of Hrg. of Sept. 1, 2010, at 391-3.

shop for alternatives, attached to the Midland objection[11] is a restructuring proposal submitted by Five Mile, which Mr. Beilinson states he has not yet received or had a chance to really review. It strains credulity to believe that Mr. Beilinson has not really reviewed this proposal or would stand on ceremony and take the position that he has not received it. This is not an appropriate position for a fiduciary of these estates.

Next, I find that the Debtors have not shown that they acted good faith in (i) making the decision to enter into the PSA and (ii) providing transparency to their creditors. The good faith inquiry is relevant to both the heightened scrutiny and business judgment standards. Virtually all of the other parties in interest in the Debtors' capital structure (aside from Lehman) complain of having been shut out of the process, and even those parties who wanted to make a restructuring proposal were denied access to a data room that was set up by the Debtors for Lehman's use only. The intention for Apollo to end up with half of the Debtors' equity, which has been on the table since April, has been, at best, downplayed and, at worst, obfuscated from parties in interest. For example, the Debtors' largest creditor, Midland, was not informed about the agreement to transfer 50% of the new equity to Apollo until just a few days before the Petition Date. Yet email correspondence introduced into evidence clearly reflects Mr. Beilinson's knowledge that Apollo's role in the related transactions was essential. Lehman wanted Apollo in the deal. And Mr. Beilinson knew it.

Nor did the Debtors share the specifics of the plan term sheet, including the proposed write-downs of the secured loans in the non-Lehman tranches, with the other secured creditors. Due, at least in part, to the lack of transparency in the process, the proposed PSA has spurred extensive discovery requests and a motion for an examiner. One objector has – in my view,

---

[11] Docket Nos. 260 and 367.

correctly – argued that the PSA breeds contempt rather than fostering negotiations.[12] This is not what chapter 11 is supposed to be about. To the contrary, a number of the objectors point out that a debtor's exclusive period was intended by Congress to provide for an opportunity for the debtor to negotiate with its constituents and reach a consensual plan, a successful plan. Others cite to cases in this District for the proposition that exclusivity should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory. The PSA has had such an effect on the Debtors' estates by tying all parties to a plan which lacks support from nearly the entire capital structure and preventing the Debtors from negotiating in good faith with their numerous constituents who will eventually be required to vote on a plan.

Finally, I will look at the alleged benefit to the Debtors' estates in assumption of the PSA and whether the Debtors have complied with their fiduciary duties in pursuing the proposed plan transaction thus far. The general standard under section 365, which certain of the objectors argue is not applicable here, requires the Court to determine whether assumption of the agreement at issue would be a good business decision, based on a review of the totality of the circumstances. Here, the PSA affords minimal benefit to the Debtors, and there is little basis for me to conclude it is beneficial for the estates of the Debtors, and in particular, the non-floating rate Debtors. The Debtors assert that, by equitizing Lehman's over $200 million in secured debt, this confers a benefit on the estates by (i) creating substantial unencumbered assets and (ii) freeing up substantial cash flow that would otherwise go to pay debt service. In this manner, they assert, equitzation of Lehman's debt would thus allow for the remaining CMBS pools of secured debt to take debt. I do not believe, however, that the alleged advantages conferred by the

---

[12]    Tr. of Hrg. of Sept. 1, 2010, at 391.

equitization outweigh giving Lehman the amount of power over these cases that the PSA confers.

The broad Termination Events contained in the PSA permit Lehman to walk away and terminate the consensual use of its cash collateral upon the occurrence of a laundry list of different events, even in a variety of situations over which the Debtors have no control.  In exchange for Lehman's "support," the Debtors have agreed to (i) refrain from seeking competitive proposals which could maximize the value of these estates, (ii) reimburse Lehman's costs, and (iii) in certain instances, consent to a lifting of the stay to allow Lehman to exercise its remedies without further Court approval.

The Debtors argue that, up until the 240th day after the Petition Date, in the case of a breach, Lehman's only remedies are to terminate consensual use of cash collateral or to seek enforcement of the PSA.  If the Termination Events merely triggered the loss of Lehman's "support" for the proposed restructuring, this would be typical of many plan support agreements approved in this District.  Because, however, such events also trigger a termination of the consensual use of Lehman's cash collateral and, in certain instances, a lifting of the stay, they cannot be sustained.  Simply put, to allow Lehman to wield that much power over the fate of these cases is unacceptable.  Lehman's eleventh hour assurance that Lehman will not exercise a right to terminate in certain instances is of little comfort, nor do I believe it changes the result here dictated.

Finally, and of paramount importance, I believe that the so-called Fiduciary Out, as written, is flawed.  It prohibits the Debtors from taking action consistent with their fiduciary obligations.  Fiduciaries owe duties of care and loyalty, and courts have held that these duties apply with equal or greater force in the context of a sale of assets.  Even without section 25(c) of

the PSA, the fact that the Debtors agreed to this provision causes me to question the Debtors' honest interest in exercising due care.

In a bankruptcy case, it is "Bankruptcy 101" that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor case. As Judge Gerber held in Adelphia, in a case with multiple debtors, the debtors, as fiduciaries, have duties to refrain from favoring or appearing to favor one or another of their estates and its creditors over another. See In re Adelphia Communications Corp., 336 B.R. 610, 669-71 (Bankr. S.D.N.Y. 2006). The Debtors have not done so here.

While the Debtors focus on the "Fiduciary Out" contained in section 25(a) of the PSA, which provides that the Company or its directors or officers shall be entitled to take any action, or refrain from taking any action, including a decision to terminate the PSA, that such person determines in good faith is consistent with its or their fiduciary obligations under applicable law, the Debtors repeatedly seem to ignore the effect of section 25(c) on this provision. Section 25(c) of the PSA is an exception to the Fiduciary Out set forth in section 25(a), and, as asserted by nearly all of the objectors, it curtails its effectiveness and prohibits the Debtors and their directors and officers from fully complying with their fiduciary duties. It provides that the Fiduciary Out shall not apply and cannot be used to "annul, modify, amend, or otherwise alter" any of the Plan Milestones set forth in the PSA unless the Debtors are doing so in pursuit of an alternative transaction that will provide *Lehman* with a higher and better recovery than that proposed under the plan contemplated by the PSA. While the Debtors argue that section 25(c) provides only that the Fiduciary Out cannot be used to amend certain Plan Milestones unilaterally, this is a restriction that I cannot approve, given that it ties the Debtors to the

proposed plan unless Lehman, a creditor, receives a better recovery.  I am aware of no other court-approved plan support agreement which contains such a provision.

Further, I believe that section 25(c) prevents the Debtors from electing to fully exercise their fiduciary duties to maximize the value of each of the Debtors' estates, particularly seventy-two of the ninety-two Debtors who do not count Lehman as one of their creditors.  In fact, Mr. Beilinson testified that he has not permitted other parties (aside from Lehman) to conduct due diligence,[13] despite the fact that he acknowledged that he has fiduciary duties not solely to the Lehman tranche of debt but to all of the Debtors' creditors.  This Court has heard no evidence that the Debtors believe that discussing a plan other than the PSA plan or that providing due diligence access to other parties in compliance with their fiduciary duties would not trigger a Termination Event under the PSA.

As the Debtors have not articulated a sufficient business justification for entry into the PSA, I cannot grant their motion to assume it.  I do not believe this is a case where a smaller group of out-of-the-money constituents is opposing the Debtors' motion in an effort to extract hold-up value from those constituents that are "in the money."  Instead, and I am repeating myself but this point is important, unlike most plan support agreements, the PSA only "locks up" approximately $200 million of the total $1.4 billion in secured debt in these cases – the support of only one creditor among the critical mass of creditors needed to support a successful restructuring in these cases.  After today, without the burden of the restrictions imposed by the PSA, the Debtors will have a wide berth to fulfill their fiduciary duties to conduct a plan process which maximizes value for all of the estates and treats the various tranches of debt with greater neutrality.  And here again I will invoke Adelphia and its substantial teachings regarding the fine

---

[13]    Tr. of Hrg. of Sept. 1, 2010, at 181 and 206-8.

art of being a debtor with multiple, separate tranches of debt secured by separate collateral pools. There is a level of neutrality required; I do not believe the process leading to the PSA reflects the more even-handed approach required in this case.  To be sure, the Debtors do not have to be paralyzed in an attempt to make everyone happy.  If they believe the plan underlying the PSA is a good, confirmable plan, they can and should file it and prosecute it.  It will either survive attacks vis-à-vis valuation, new value, substantive consolidation, and whatever else the creditor body asserts – or it will not.  And, if Lehman still wants to support the plan, it is free to do so.

For the reasons stated above, the Debtors' motion to assume the PSA is denied.


Dated: December 20, 2010              /s/ Shelley C. Chapman
       New York, New York             United States Bankruptcy Judge