James H.M. Sprayregen, P.C.
Paul M. Basta
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

and

Anup Sathy, P.C.
Marc J. Carmel (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO THE COMMITMENT LETTER WITH FIVE MILE CAPITAL II POOLING REIT LLC, LEHMAN ALI INC., AND MIDLAND LOAN SERVICES, (II) APPROVING THE NEW PARTY/MIDLAND COMMITMENT BETWEEN THE DEBTORS AND MIDLAND LOAN SERVICES, (III) APPROVING BIDDING PROCEDURES, (IV) APPROVING BID PROTECTIONS, (V) AUTHORIZING AN EXPENSE REIMBURSEMENT TO "BIDDER D," AND (VI) MODIFYING CASH COLLATERAL ORDER TO INCREASE EXPENSE RESERVE**

---

[1]  The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436.  The location of the Debtors' corporate headquarters and the service address for their affiliates is:  c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

**PLEASE TAKE NOTICE** that a hearing (the "**Hearing**")[2] for the relief requested in the above-referenced motion (the "**Motion**") will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom No. 610 of the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, on **February 8, 2011 at 10:00 a.m. prevailing Eastern Time** or such other time as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any objections to the Motion:  (a) must be in writing; (b) shall conform to the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), all General Orders of the Court, the Local Rules for the United States Bankruptcy Court for the Southern District of New York, and the *Notice, Case Management, and Administrative Procedures* [Docket No. 68] (the "**Case Management Procedures**") approved by the Court; (c) shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court); and (d) shall be served to as to be actually received no later than **January 28, 2011 at 4:00 p.m. prevailing Eastern Time** by: the entities on the Master Service List (as such term is defined in the Case Management Procedures), which is available at www.omnimgt.com/innkeepers, the website maintained by Omni Management Group, LLC, the Debtors' notice and claims agent.  Only those objections that are timely filed, served, and received will be considered.

**PLEASE TAKE FURTHER NOTICE** that, if no objections to the Motion are timely filed and served in accordance with this notice, the Court may enter an order granting some or all

---

2    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

K&E 18194223

of the relief requested in the Motion as requested by the Debtors without further notice or hearing.

New York, New York
Dated:  January 14, 2011

/s/ Paul M. Basta
James H.M. Sprayregen, P.C.
Paul M. Basta
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

and

Anup Sathy, P.C.
Marc J. Carmel (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone:  (312) 862-2000
Facsimile:    (312) 862-2200


Counsel to the Debtors
and Debtors in Possession

K&E 18194223

James H.M. Sprayregen, P.C.
Paul M. Basta
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

Anup Sathy, P.C.
Marc J. Carmel (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE DEBTORS TO ENTER INTO THE COMMITMENT LETTER WITH FIVE MILE
CAPITAL II POOLING REIT LLC, LEHMAN ALI INC., AND MIDLAND LOAN
SERVICES, (II) APPROVING THE NEW PARTY/MIDLAND COMMITMENT
BETWEEN THE DEBTORS AND MIDLAND LOAN SERVICES,
(III) APPROVING BIDDING PROCEDURES, (IV) APPROVING BID PROTECTIONS,
(V) AUTHORIZING AN EXPENSE REIMBURSEMENT TO "BIDDER D," AND (VI)
MODIFYING CASH COLLATERAL ORDER TO INCREASE EXPENSE RESERVE**

---

[1] The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The

Innkeepers USA Trust ("**Innkeepers**") and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), file this motion (this "**Motion**") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Order**"), (a) authorizing the Debtors to enter into a Commitment Letter with Five Mile Capital II Pooling REIT LLC ("**Five Mile**") and Lehman ALI Inc. ("**Lehman**" and, together with Five Mile, "**Five Mile/Lehman**" and their bid, the "**Five Mile/Lehman Bid**"), and Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the Debtors' fixed rate mortgage loan ("**Midland**"),[2] (b) approving the New Party/Midland Commitment (as defined herein) between the Debtors and Midland, (c) approving the bidding procedures annexed as Exhibit 2 to **Exhibit A** (the "**Bidding Procedures**"), (d) approving certain bid protections set forth in the Term Sheet and the Bidding Procedures, (e) authorizing an expense reimbursement in an amount not to exceed $500,000 for the stalking horse candidate identified to the key constituencies as Bidder D ("**Bidder D**"),[3] and (f) modifying the Final Cash Collateral Order to increase the expense reserve contemplated therein from $4.5 million to $18.5 million.[4] In support of this Motion, the Debtors are filing the *Declaration of William Q. Derrough in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into the Commitment Letter with Five*

---

location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2]    A copy of the letter agreement (including the "**Term Sheet**" attached thereto, the "**Commitment Letter**") memorializing the terms of Five Mile's equity commitment, Lehman's debt to equity conversion, and the other commitments of Five Mile, Lehman, and Midland is annexed as Exhibit 1 to **Exhibit A**.

[3]    As described below, the Debtors held meetings with each of their constituencies to discuss the stalking horse proposals the Debtors had received on a confidential basis. Although the information shared at those meetings was subject to confidentiality agreements, the Debtors did not disclose the identity of any of the stalking horse bidders at those meetings. Instead, the four stalking horse bidders were identified as Bidder A, Bidder B, Bidder C, and Bidder D. In a continued effort to maintain Bidder D's confidentiality, the Debtors have determined not to disclose Bidder D's identity in this Motion.

[4]    A proposed form of order modifying the Final Cash Collateral Order is attached hereto as **Exhibit B**.

*Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the New Party/Midland Commitment Between the Debtors and Midland Loan Services, (III) Approving Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement for "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Expense Reserve* (the "**Derrough Declaration**" or "**Derrough Decl.**"), and respectfully state as follows:[5]

## Preliminary Statement

Over the course of the last several months, the Debtors have undertaken an extensive process to identify a stalking horse bidder to facilitate a path toward a successful conclusion to these Chapter 11 Cases (as defined herein). As a result of these efforts, the Debtors have selected Five Mile and Lehman to fund a chapter 11 plan of reorganization pursuant to the Five Mile/Lehman Bid. The Five Mile/Lehman Bid contemplates an enterprise-level transaction involving the Debtors' entire portfolio, is valued at approximately $1.14 billion, and, if consummated, will achieve a stated goal in these Chapter 11 Cases of effectuating a significant deleveraging of the Debtors' capital structure.

Notably, both Midland and Lehman—the Debtors' two largest secured creditors representing more than $1 billion of the approximately $1.29 billion in prepetition secured claims against the Debtors and holding mortgages on 65 of the Debtors' 72 hotels—support the Five Mile/Lehman Bid. Based upon an agreement between Five Mile and Lehman, Lehman will exchange 100% of its claims against the Debtors on account of the Floating Rate Mortgage Loan in the original principal amount of $250 million for up to 50% of the New Equity (as defined in the Term Sheet) and a distribution of cash.

---

[5] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Commitment Letter or Bidding Procedures, as applicable.

K&E 18194223

And Midland, in its capacity as special servicer for the Fixed Rate Mortgage Loan in the original aggregate principal amount of $825 million, will provide "stapled financing" to fund the Five Mile/Lehman Bid (the debt financing described in the Five Mile / Lehman Bid, together with all of the terms and conditions described in the Five Mile/Lehman Bid regarding the treatment of Midland's claim including the guarantees described therein, the "**Midland Financing**"). The principal amount owing under the Fixed Rate Mortgage Loan will be reduced from $825.4 million to $622.5 million with no change to the interest rate, no amortization for the first 48 months after the effective date, and no prepayment penalty. As a result, if consummated, the transactions embodied by the Five Mile/Lehman Bid would reduce the overall secured debt on the Debtors' assets by over $400 million. Moreover, Midland has agreed pursuant to the Commitment Letter to make the Midland Financing portable to qualified bidders at the auction so long as, among other things, the contemplated debt-to-capitalization ratio for the reorganized enterprise in such bid is no more than 70% and Lehman receives payment in cash of no less than $200.3 million on account of its claims against the Debtors. As such, bidders at the auction will have the opportunity to formulate their bids to take advantage of the attractive terms of the Midland Financing.[6]

In addition, the Debtors and Midland have entered into a separate agreement (the "**New Party/Midland Commitment**"), pursuant to which, if the Five Mile/Lehman Bid is terminated because of a Five Mile breach prior to the auction, Midland has agreed, subject to the terms and conditions of the New Party/Midland Commitment, to support and provide the Midland Financing to other entities that are willing to act as replacement stalking horse bidders

---

[6] The Five Mile/Lehman Bid requires that any debt consideration to Midland in excess of $622.5 million be valued using a net present value analysis with an 8% discount rate.

K&E 18194223

on the same or better terms and conditions as those contained in the Commitment Letter and Term Sheet.[7] A copy of the New Party/Midland Commitment is attached hereto as **Exhibit C**.

By this Motion, the Debtors seek, among other things, authority to enter into the Commitment Letter and approval of the Bidding Procedures and bid protections contemplated therein. The Debtors respectfully submit that entering into the Commitment Letter is a sound exercise of business judgment that warrants Court approval. As an initial matter, with Midland and Lehman on board, secured creditors representing more than $1 billion in claims support the Five Mile/Lehman Bid. The Midland and Lehman commitments to support the Five Mile/Lehman Bid should eliminate certain potentially protracted and contentious litigation. Of course, other parties will still have their own litigation prerogatives. The Debtors, however, believe the Five Mile/Lehman Bid, together with the portability of the Midland Financing, has the potential to generate additional consensus.

The Five Mile/Lehman Bid also provides baseline recoveries for all of the Debtors' constituents, including payment in full or consensual modifications with respect to the loans secured by 69 of the Debtors' 72 hotel properties. Specifically, the Five Mile/Lehman Bid provides as follows:

- LNR Partners, LLC ("**LNR**"), as special servicer for the Residence Inn Mission Valley Mortgage Loan, the Hilton Doubletree Washington D.C. Mortgage Loan, the Residence Inn Tyson's Corner Mortgage Loan, and the Hilton Homewood Suites San Antonio Mortgage Loan, will receive, on behalf of the lenders under such loans, full

---

[7] Specifically, Midland has agreed to support alternative restructuring transactions that are on the same or better terms as contained in the Five Mile-Midland Agreement if (a) one or more Termination Events (as defined in the Five Mile-Midland Agreement) occur under the Five Mile-Midland Agreement as a result of one or more breaches by Five Mile thereunder and no other Termination Event has occurred as a result of a breach by Five Mile thereunder, and the Five Mile-Midland Agreement is terminated by Midland as a result of such Termination Event, (b) on or before the date of the Auction, the Debtors propose a third party acceptable to Midland in its sole but reasonable discretion (a "**New Party**") to consummate the Transaction (as defined in the Five Mile-Midland Agreement) on the same or better terms as contained in the Five Mile-Midland Agreement, and (c) the New Party and Lehman have entered into a written commitment on the same or better terms as those contained in the Five Mile-Lehman Agreement. *See* **Exhibit C.**

payment of principal through new notes on substantially the same terms and conditions as the existing notes, but with extensions of the maturity dates by one year and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived.

- LNR, as special servicer for the Residence Inn Anaheim (Garden Grove) Mortgage Loan and C-III Asset Management LLC, as special servicer for the Hilton Ontario Mortgage Loan, will each receive, on behalf of the lenders thereunder, new notes on substantially the same terms as the existing ones, but with reductions to the outstanding balances to $25.3 million and $8 million, respectively, and extensions of the maturity dates to seven years from the effective date of the plan of reorganization (the "**Effective Date**") that encompasses the provisions of the Five Mile/Lehman Bid and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived.

- CWCapital Asset Management, LLC ("**CWCapital**"), as special servicer for the Anaheim Hilton Mortgage Loan, will receive full payment of principal through a new note on substantially the same terms as the existing one, but with an extension of the maturity date to seven years from the Effective Date and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived.

- TriMont Real Estate Advisors, Inc. ("**TriMont**"), as special servicer for the Anaheim Hilton Mezzanine Loan, will receive, on behalf of the lenders thereunder, a cash payment in the amount of $3.6 million.

- TriMont, as special servicer for the Floating Rate Mezzanine Loan, will receive, on behalf of SASCO 2008 C-2, LLC, as 100% participant and owner of all economic and beneficial interests in the Floating Rate Mezzanine Loan, a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between Lehman, Five Mile, and the Debtors. (The recovery on account of such instrument shall be contingent on the future performance of the reorganized enterprise.)

- Prepetition unsecured creditors in a class that votes in favor of and otherwise supports the plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid will share in $2.5 million in cash that will be set aside for the benefit of unsecured creditors (other than holders of deficiency claims) (the "**Unsecured Claims Fund**") and be entitled to a release of preference actions that may exist against such creditors. Those classes that do not vote in favor of and otherwise support the plan of reorganization will not receive a distribution from the Unsecured Claims Fund and will not receive a release of preference actions. (To be clear, there may be more than one class of prepetition unsecured creditors in the plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid.)

- To the extent they are in a class that votes in favor of and otherwise supports the plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid, the holders of Innkeepers USA Trust's 8.0% Series C Cumulative Preferred Shares (the

**"Series C Preferred Shares"**) will collectively receive under such plan: (a) a co-investment right, of up to 2% of the New Equity (the "**Co-Investment Right**"); and (b) $5.9 million of cash from the approximately $7.4 million currently escrowed in an account held by Innkeepers USA Limited Partnership.

- Holders of common equity interests shall receive no distribution on account of such interests.

Another important aspect of the Commitment Letter is its broad fiduciary out. The Term Sheet provides as follows:

> Upon the determination by the Debtors' directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of this Term Sheet or the Commitment Letter shall prevent, amend, alter, or reduce the Debtors' ability to exercise their fiduciary duties under applicable law.

This broad "fiduciary out" provides the Debtors the flexibility to continue to consider other value-maximizing restructuring transactions, including those that would not be consistent with the Five Mile/Lehman Bid.

Prior to selecting the Five Mile/Lehman Bid, the Debtors, the Debtors' advisors, the Independent Committee (the "**Independent Committee**") of the Board of Trustees of Innkeepers USA Trust (the "**Board**"), and the Board devoted a great deal of time considering the merits and burdens of the Five Mile/Lehman Bid. Among the specific issues the Board and Independent Committee considered were the releases incorporated into the Five Mile/Lehman Bid. A chapter 11 plan that encompasses the Five Mile/Lehman Bid will provide for both Debtor and non-Debtor releases in favor of, among others, the Debtors' directors and officers and Apollo Investment Corporation ("**Apollo**"), the holder of substantially all of (i) Innkeepers USA Trust's 12.0% Series A Cumulative Preferred Shares (the "**Series A Preferred Shares**"), and (ii) the common equity interests in the Debtors. Such releases will be subject to the Court's review and approval in connection with confirmation.

Apollo will receive releases under plan of reorganization that encompasses the Five Mile/Lehman Bid in exchange for its agreement to waive its rights to receive any recovery under the plan, including the right to participate in the Co-Investment Right.[8]  Moreover, Midland, which is the only beneficiary of that certain Required Capital Improvements Guaranty (the "**Apollo Guaranty**") executed by Apollo on June 29, 2007, will release Apollo of all of Midland's claims against Apollo related to the Apollo Guaranty and dismiss any pending actions seeking to collect on the Apollo Guaranty.

The Debtors and their advisors also spent a great amount of time negotiating with Five Mile/Lehman to improve their proposal.  Among the improvements obtained by the Debtors through negotiations with Five Mile/Lehman were an increase in the marketing timeline to 45 days, a distribution for unsecured creditors, the broad fiduciary out, the Midland release in favor of Apollo which eliminates litigation with respect to the Apollo Guaranty and enhances recoveries for holders of the Series C Preferred Shares, and an agreement that Five Mile/Lehman and Midland will not object to expense reimbursement for Bidder D, which the Debtors believe will increase the chances Bidder D will participate in the Auction.  In addition, prior to the entry of an Order approving the Bidding Procedures, nothing in the Term Sheet or the Commitment Letter limits the Debtors' ability to take any action the Debtors believe necessary or appropriate in furtherance of the Debtors' marketing process.

The Debtors, however, did not succeed in all aspects of their negotiations.  At the request of the Independent Committee and the Board, the Debtors repeatedly asked Five Mile/Lehman and Midland to eliminate the requirement that competing bids provide for payment in cash on account of Lehman's claims against the Debtors.  Five Mile/Lehman and Midland advised the

---

[8]     The Series A Preferred Shares rank *pari passu* with the Series C Preferred Shares and are both obligations of Innkeepers USA Trust.

Debtors that, to preserve the overall structure of the transaction, they would not agree to remove this provision. The Debtors, in considering the Five Mile/Lehman Bid in the aggregate and in whole, concluded that the Five Mile/Lehman Bid, when viewed as a complete package, is the best proposal the Debtors have received to date, especially in light of Midland's agreement to accept $622.5 million in new debt on account of the Fixed Rate Mortgage Loan, as well as the fact that the Five Mile/Lehman Bid provides an opportunity to reach consensus and conclusion of these Chapter 11 Cases.

The Five Mile/Lehman Bid represents the result of the Debtors' marketing effort for a stalking horse plan sponsor to date. This process has been, and will continue to be, managed by the Debtors and their advisors in accordance with the protocol described to the Court at the hearing on the Debtors' motion for an extension of their exclusive periods and filed with the Court at Docket No. [691]. As described in the Derrough Declaration, the process began in earnest in October 2010, when the Debtors, in consultation with their financial advisor, Moelis & Company ("**Moelis**"), identified Five Mile and four other potential stalking horse candidates from a list of several dozen potential investors that included large private equity firms and real estate-focused investors. Moelis facilitated the stalking horse candidates' access to diligence information and, ultimately, four of the five stalking horse candidates submitted stalking horse proposals, each of which contemplated an enterprise-level restructuring. The Debtors did not receive any proposals for a non-enterprise-level restructuring prior to the initial November 23, 2010 deadline for submission of stalking horse bids.

After assessing each of the proposals received in November, the Debtors engaged in extensive negotiations with Bidder D and Five Mile/Lehman. Indeed, prior to selecting the Five Mile/Lehman Bid, the Debtors determined that the Bidder D proposal was the best available and

engaged in good faith negotiations with Bidder D.  In an effort to keep their key constituencies apprised of their progress, the Debtors met with representatives from each constituency in early December to inform them that the Debtors would likely seek approval of Bidder D as the stalking horse bidder.

After the Debtors had decided to select Bidder D's proposal, the Debtors were advised that Five Mile had finalized separate commitment agreements that it had been negotiating with Lehman and Midland, and Five Mile/Lehman submitted a revised proposal to the Debtors.  This revised proposal increased value from Five Mile/Lehman's initial proposal by more than $40 million.  Over the past month, the Debtors, Five Mile/Lehman, and Midland have engaged in extensive, hard fought negotiations to finalize the Commitment Letter.  During this time, the terms of the Commitment Letter have become more favorable for the Debtors' estates.

Given the Debtors' diligent marketing efforts to date with respect to the stalking horse selection process, the Debtors respectfully submit that it is appropriate at this time to move to the next and final stage of the Debtors' process—a final marketing process that hopefully will lead to a formal auction at which the Debtors accept the highest or otherwise best bid, followed by a plan confirmation process.  To facilitate the formal auction process, the Debtors, Five Mile/Lehman, and Midland have negotiated comprehensive Bidding Procedures that will subject the Five Mile/Lehman Bid to a market test over the 45-day period following approval of the relief requested in this Motion and result in the highest or otherwise best transaction for these estates.  In connection therewith, Moelis has started to contact potential bidders and intends to contact more than 100 parties.  Moelis will send "teasers" to those parties that express an initial indication of interest.  In the event the Debtors receive qualified competing bids, the Debtors will conduct an auction (the "**Auction**") between Five Mile/Lehman and all other Qualified Bidders

(as defined in the Bidding Procedures), at which they will have the opportunity to participate in a competitive process and submit their final and best offers.

The Commitment Letter and the Bidding Procedures contain the following key aspects and provisions. *First*, the Bidding Procedures are designed to facilitate the submission of enterprise-level bids based on the debt and capital structure and sources and uses of funds outlined in the Commitment Letter.[9] Throughout these Chapter 11 Cases, the Debtors have promoted the value-maximizing virtues of an enterprise-level reorganization. The Debtors respectfully submit that the competitive stalking horse selection process between four potential plan sponsors—each of which proposed an enterprise-level proposal—provides evidence that the Debtors are justified in their preference for an enterprise-level reorganization. For these reasons, unless the Debtors exercise their "fiduciary out," pursuant to the Bidding Procedures, a bidder will only be qualified to participate in the Auction to the extent its bid contemplates an enterprise-level restructuring based substantially on the debt and capital structure and sources and uses of funds outlined in the Commitment Letter. The Debtors respectfully submit that limiting the Auction to bids based on the Five Mile/Lehman Bid is appropriate as it will ensure the Debtors' ability to compare bids on an "apples to apples" basis and bring definition and structure to the Auction.

Even though the Bidding Procedures limit the Auction to bids based on the Five Mile/Lehman Bid, the Debtors will continue to grant diligence access to bidders interested in

---

[9] Specifically, the Term Sheet provides: "All bids and overbids, to be deemed a qualified bid and eligible to participate at the Auction, and whether made prior to or at the Auction, must be made on an enterprise value basis based and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein (including, but not limited to, the guarantees provided to [Midland] and the other terms, conditions, and treatment as set forth in the Five Mile-Midland Commitment and the treatment of claims as set forth in this Term Sheet)." *See* Term Sheet, p. 7.

sponsoring other types of restructuring transactions. Moreover, in accordance with the "fiduciary out" negotiated by the Debtors, the Debtors have the flexibility to—and will—consider other value-maximizing alternatives outside of the context of the Auction, including non-enterprise-level restructuring proposals and proposals that are not based on the Five Mile/Lehman Bid's debt and capital structure and sources and uses of funds (i.e. proposals that contemplate more than a 70% debt-to-capitalization ratio for the reorganized enterprise and do not provide for payment to Lehman in cash of at least $200.3 million).

The Debtors intend to take advantage of this marketing flexibility by continuing to communicate with Bidder D, the other potential stalking horse candidates, and any other entity that expresses an interest in sponsoring a potential value-maximizing transaction prior to the hearing on this Motion.[10] To be clear, however, if the Debtors were to pursue an alternative proposal not based on the Five Mile/Lehman Bid, Midland and Lehman would not be obligated to support the Debtors' restructuring.

*Second*, the Commitment Letter includes customary bid protections for Five Mile/Lehman including a break-up fee in the amount of $7 million (the "**Break-Up Fee**") and reimbursement of up to $3 million in reasonable and documented transaction fees and expenses of Five Mile (the "**Expense Reimbursement**," and together with the Break-Up Fee, the "**Bid Protections**").[11] The Debtors have agreed that they will pay the Bid Protections, to the extent

---

[10] For example, on December 20, 2010 the Debtors received a restructuring proposal from the ad hoc committee of preferred shareholders (the "**Ad Hoc Committee**"), which included a proposed equity investment in five of the Debtors' seven hotels that are subject to individual mortgages and a proposed cram down of a ten year note. On January 12, 2011, the Debtors received a joint restructuring proposal from the Ad Hoc Committee and LNR. The Debtors have notified LNR and members of the Ad Hoc Committee of their intent to seek approval of the Five Mile/Lehman Bid and will continue to have discussions with those parties.

[11] The Debtors will also continue to reimburse Lehman and Midland in accordance with the *Final Order Authorizing the Debtors to (i) Use the Adequate Protection Parties' Cash Collateral and (ii) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363*, entered on September 2, 2010 [Docket No. 402] (the "**Final Cash Collateral Order**").

the Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Commitment Letter), to Five Mile/Lehman in the event of (a) an Overbid (as defined in the Bidding Procedures) in which the Five Mile/Lehman Bid is not the winning bid or (b) the Debtors' execution of an agreement to pursue an alternative restructuring transaction for a material portion of the assets after entry of the Order approving the relief requested herein.[12] The Debtors respectfully submit that the Bid Protections are a relatively modest price to pay in exchange for a firm commitment to fund the Five Mile/Lehman Bid, which sets the highest floor price for the Debtors' assets offered to date.

*Third*, to preserve the overall structure of the transaction, Five Mile/Lehman and Midland have conditioned their support for higher or otherwise better competing bids on Lehman receiving payment in cash on account of its claims in an amount no less than $200.3 million. Therefore, competing bids must provide for a substantial cash distribution to Lehman. As described above, the Debtors, the Independent Committee, and the Board carefully considered the implications of this requirement and understand the potential for this requirement to deter bidding. As described above, at the urging of the Board, the Debtors fought extremely hard to remove this provision from the Five Mile/Lehman proposal but were unsuccessful. Five Mile/Lehman and Midland refused to go forward without inclusion of this provision. Upon final analysis, the Debtors determined that the merits of the Five Mile/Lehman Bid, in the aggregate, outweighed the burdens of requiring competing bidders to satisfy Lehman's claims in cash. In reaching their decision, the Debtors considered the deleveraging associated with the conversion of Lehman's claims to equity and the reduction in the Fixed Rate Loan amount, the fact that their

---

[12] As described in the Commitment Letter, 25% of the Break-Up Fee may be allocated to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Debtors to emerge from these Chapter 11 Cases, as has been mutually agreed between Lehman and Five Mile, with the remainder allocated to Five Mile.

K&E 18194223

two largest secured creditors (representing over $1 billion of $1.29 billion in prepetition secured claims) support the Five Mile/Lehman Bid, and that the Five Mile/Lehman Bid secures baselines recoveries for all of the Debtors' constituents.  In addition, the Debtors considered the portability of the Midland Financing to competing bids that maintain a debt-to-capitalization ratio of no more than 70% and the fiduciary out.  For these reasons, the Debtors determined that, even with inclusion of the provision requiring payment of Lehman's claims in cash, the Five Mile/Lehman Bid is the best and highest offer the Debtors received and that moving forward with the entire package associated with the Five Mile/Lehman Bid is the path most likely to lay the groundwork for an auction for higher or better bids and a consensual plan of reorganization.

*Fourth*, the Commitment Letter provides that neither Five Mile/Lehman nor Midland will object if the Debtors seek authority to reimburse Bidder D up to $500,000 to be paid at the conclusion of the Auction (so long as Bidder D is not the Successful Bidder) on account of reasonable and documented fees that Bidder D incurred in formulating and negotiating its stalking horse proposal prior to December 15, 2010 (the "**Bidder D Expense Reimbursement**").  By this Motion, the Debtors are requesting that authority.  The Debtors respectfully submit this relief is warranted because Bidder D's participation in the stalking horse process generated significant value for these estates by motivating Five Mile/Lehman to increase the value of their bid by more than $40 million.  Additionally, the Debtors are seeking to reimburse Bidder D's fees to increase the likelihood that Bidder D will submit a competing bid in the formal auction process.  The Debtors respectfully assert, in their reasonable business judgment, that this relief is justified under the circumstances.

*Fifth*, the Commitment Letter contemplates two sets of releases—the Midland Release and the Global Release (both as defined herein), both of which are described in detail in

paragraph 57 below. Midland, who is the only beneficiary of the Apollo Guaranty, has agreed to settle, release, and waive all of its claims against Apollo related to the Apollo Guaranty. In addition, to the maximum extent permitted by applicable law, the Debtors, with the support of Five Mile/Lehman and Midland, will include customary release, exculpation, and injunction provisions in the plan of reorganization that encompasses the terms of the Five Mile/Lehman Bid, which provisions will apply to certain parties in interest, including, among others, the Debtors, Midland, Five Mile, Lehman, Apollo, and the Debtors' directors and officers. To be clear, the Debtors are not seeking approval of these provisions at this time. These provisions will be part of a plan of reorganization and subject to the plan confirmation process.

**Sixth**, the Term Sheet requires that the Debtors seek to amend the Final Cash Collateral Order, with the support of Lehman and Midland, to increase the amount of cash that may be held back as an expense reserve from $4.5 million to $18.5 million to provide the Debtors with the flexibility to satisfy certain closing and emergence costs, including potential success fees (the "**Expense Reserve**").[13] This Motion also requests that authority. The Debtors carefully negotiated the increase in the Expense Reserve with Five Mile, Lehman, and Midland and anticipate that the Expense Reserve will be funded largely with excess cash generated by the properties securing the Fixed Rate Mortgage Loan (for which Midland is the special servicer) and the Floating Rate Mortgage Loan (on account of which Lehman holds its claims).

**Seventh**, the Commitment Letter includes certain termination provisions tied to the Debtors' proceeding with the Five Mile/Lehman Bid and Auction in a timely manner. Five Mile/Lehman will be able to terminate the Commitment Letter if the Order approving this Motion is not approved by March 31, 2011. In addition, the Debtors must confirm a plan of

---

[13]  Attached as Exhibit 1 to **Exhibit B** is a chart summarizing the estimated amounts and categories of expenses the increased Expense Reserve is intended to satisfy.

reorganization that encompasses the Five Mile/Lehman Bid by June 30, 2011 and the Effective Date must occur prior to September 15, 2011 (or as otherwise agreed by the Debtors, Five Mile/Lehman and Midland).

For the reasons set forth herein, as supported by the Derrough Declaration, the Debtors submit that approval of the Commitment Letter, the New Party/Midland Commitment, the Bidding Procedures, the Bid Protections, the Bidder D Expense Reimbursement, and the modification to the Final Cash Collateral Order are in the best interests of their estates.

## Jurisdiction

1.     The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105(a), 361, and 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").[14]

## Relief Requested

4.     By this Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to enter into the Commitment Letter; (b) approving the New Party/Midland Commitment; (c) approving the Bidding Procedures; (d) approving the Bid Protections; (e) authorizing the Bidder

---

[14]   To the extent this Motion is subject to the Amended Guidelines for the Conduct of Asset Sales—General Order M-383 ("**General Order M-383**"), the Debtors respectfully submit this Motion complies with General Order M-383.

K&E 18194223

D Expense Reimbursement; and (f) modifying the Final Cash Collateral Order to increase the Expense Reserve from $4.5 million to $18.5 million.

**Background**

5.       On July 19, 2010 (the "**Petition Date**"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee has been made in the Chapter 11 Cases.  On July 28, 2010, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**").

6.       Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the Chapter 11 Cases is contained in the *Amended Declaration of Dennis Craven, Chief Financial Officer of Innkeepers USA Trust, in Support of First-Day Pleadings* [Docket No. 33, as supplemented by Docket No. 516].

**The Debtors' Stalking Horse Selection Process**

7.       As described above and in the Derrough Declaration, the Debtors implemented a multi-step restructuring process beginning in September 2010, which has resulted in the Debtors receiving multiple bids for an enterprise-level restructuring of the Debtors' estates.  Derrough Decl. at ¶¶ 5-41.

*Establishing the Process*

8.       Following a meeting of the Independent Committee on September 20, 2010, and a Board meeting on September 21, 2010, the Debtors began a process of developing plan concepts

17

and a more detailed process timeline to facilitate a restructuring process aimed at maximizing the value of the Debtors' estates for the benefit of all constituents. *Id.* at ¶ 5. The Debtors' management and advisors met over the next four weeks (including several meetings with the Debtors' key constituencies) to discuss and develop restructuring alternatives and the appropriate process to pursue a strategy to maximize value. *Id.*

9.     Following a meeting of the Board on October 19, 2010, where a number of possible restructuring alternatives were discussed, reviewed, and considered, the Board requested that Moelis consider and propose a process to explore an enterprise-level restructuring. *Id.* at ¶ 6.

10.     On October 22, 2010, the Debtors and their advisors presented the Board with, and the Board approved, proposed timelines for selecting a stalking horse bidder and engaging in a process to achieve that. *Id.* at ¶ 7. At the meeting, Moelis proposed a detailed timeline with the goal of selecting a stalking horse for plan sponsorship for an enterprise-level restructuring transaction within four weeks and selecting the winning bidder within approximately 14 weeks. *Id.* After discussion and input, the Board approved the proposed timeline and tasked Moelis and the Debtors' management with executing the stalking horse process and meeting the various milestones set forth therein. *Id.*

### Identifying and Courting of Potential Bidders

11.     On October 26, 2010, the Board held another meeting to discuss the plan process going forward. *Id.* at ¶ 8. The Debtors identified Five Mile and four other stalking horse candidates, which list included large private equity firms and real estate-focused investors.[15] *Id.*

---

[15]   By limiting the stalking horse process to five candidates participating in the stalking horse process, Moelis ensured its ability to adequately respond to each stalking horse candidate's diligence requests and increased the likelihood of receiving more than one stalking horse proposal.   As described below, Moelis has begun to

Five Mile has been a participant in these cases since the Petition Date. *Id.* The Debtors selected the four other stalking horse candidates from a list of potential investors compiled by Moelis, which was narrowed to the four potential bidders based on, among other criteria, the following: (a) availability of funds; (b) breadth and depth of experience within the lodging sector; (c) familiarity with the bankruptcy process; and (d) ability to execute due diligence in a timely manner. *Id.* Following the selection of these stalking horse bidder candidates, the Debtors and their advisors engaged in a process to select the stalking horse bidder. *Id.* Between October 26 and November 3, 2010, the Debtors and their advisors negotiated confidentiality agreements with the stalking horse candidates. *Id.*

12.     Between October 30 and November 9, 2010, the Debtors granted the potential stalking horse bidders access to an electronic data room for the potential bidders to conduct due diligence. *Id.* at ¶ 9. The data room contains detailed information regarding the Debtors' business and finances. *Id.*

13.     After the November 10, 2010, hearing on the Debtors' motion to extend exclusivity, the Debtors distributed a process letter to the stalking horse candidates (the "**Process Letter**") outlining the timeframe and requesting indications of interest on or before November 23, 2010.[16] *Id.* at ¶ 10.

14.     The Debtors and their advisors worked to facilitate the formulation of offers by the stalking horse candidates in a number of ways. *Id.* at ¶ 11. For example, Moelis and the Debtors' management coordinated an aggregate of over 120 site visits by the stalking horse candidates and over 25 diligence calls with sales, general, and/or regional managers of the

---

contact additional parties and intends to solicit indications of interest for competing bids from more than 100 additional potential investors.

[16]     A copy of the Process Letter is attached hereto as **Exhibit D.**

K&E 18194223

Debtors' hotels. *Id.* In addition, Moelis held numerous conference calls with the stalking horse candidates to exchange views, to solicit feedback, and to facilitate the formulation of offers. *Id.* The Debtors' management team also made itself available for a conference call with each stalking horse candidate to discuss the Debtors' revised financial model. *Id.*

15.    Consistent with the Court's suggestion at a status conference relating to the November 10, 2010 exclusivity hearing, the Debtors and their advisors also reached out to all of the Debtors' key constituencies and requested the names and contact information of any other potential investors that the constituencies were aware of that might have an interest in the Debtors' assets. *Id.* at ¶ 12. Moelis has received very few responses but, of course, remains interested in engaging with constituencies to expand the list of potential investors to the extent it will maximize the value of the Debtors' estates. *Id.* Advisors to TriMont, the special servicer for the Debtors' Floating Rate Mezzanine Loan and the Anaheim Mezzanine Loan, have asserted that specific parties are interested in the Debtors' assets. *Id.* In response, the Debtors and their advisors have requested several times that TriMont provide the names of specific parties that are interested in the Debtors' assets. *Id.* TriMont has not provided the Debtors with any names or contact information despite these requests. *Id.*

***The Initial Stalking Horse Proposals***

16.    On or shortly after the November 23, 2010 deadline provided for in the Process Letter, four out of the five stalking horse candidates, including Five Mile/Lehman, responded with proposals. *Id.* at ¶ 13. All indications of interest contemplated some form of enterprise-level restructuring, notwithstanding the Debtors' willingness to entertain non-enterprise-level restructuring proposals as well. *Id.* After evaluating these indications of interest, as well as factors regarding each candidate's ability to close their proposed transaction,

the Debtors, in consultation with their advisors, conducted a side-by-side analysis of the proposals. *Id.* Moelis then followed-up with each of the stalking horse candidates to ask clarifying questions and to better understand the proposals and determine the extent to which each candidate would be flexible in changing certain terms of their offers. *Id.*

17.     Through this process, the Debtors received a verbal offer to modify the structure of one stalking horse proposal. *Id.* at ¶ 14. However, the Debtors and their advisors, in consultation with the Independent Committee, determined that the proposed verbal modification from the potential bidder would not work structurally and was not worth pursuing for a variety of reasons, including the candidate's need for additional diligence. *Id.* Two other stalking horse candidates did not indicate that they would be willing to materially change the terms of their offers at that time. *Id.* As a result, the Debtors were left with two proposals, one from Five Mile/Lehman and the other from Bidder D. *Id.*

***The Selection of Bidder D as the Initial Stalking Horse Bidder***

18.     On December 2, 2010, the Independent Committee met with its counsel, Fried, Frank, Harris, Shriver & Jacobson LLP ("**Fried Frank**"), and the Debtors' management and advisors to discuss the stalking horse proposals. *Id.* at ¶ 15. In advance of the meeting, the members of the Independent Committee received the stalking horse proposals, as well as a presentation by Moelis summarizing the terms of each proposal, including the initial Five Mile/Lehman proposal, and comparing contemplated recoveries under each offer. *Id.* At the Independent Committee meeting, the stalking horse bidders and their proposals were discussed in detail. *Id.* The terms of each proposal, as well as the contemplated recoveries under each, were analyzed for their impact on the Debtors' estates and on the Debtors' constituents. *Id.* In addition, the Independent Committee decided on a process moving forward, as well as a

recommendation to the Board for the selection of a stalking horse bid. *Id.* After considering each of the proposals, the Independent Committee concluded that the Bidder D proposal was the highest and best offer at that time. *Id.*

19. At a Board meeting held on December 3, 2010, the Board agreed with the Independent Committee's assessment and made the determination that Bidder D's proposal represented the highest and best offer presented. *Id.* at ¶ 16. The Board selected Bidder D to be the stalking horse, subject to the Debtors' advisors continuing their efforts to negotiate certain requested modifications with Bidder D that would make the Bidder D proposal even more favorable to the estates, while also instructing the Debtors and their advisors to engage with the constituencies to keep them apprised and solicit feedback on the process and the Bidder D proposal. *Id.*

20. Following further negotiations with Bidder D, the Debtors received a revised Bidder D proposal on December 4, 2010, incorporating certain, but not all, of the Debtors' requested modifications. *Id.* at ¶ 17. The Debtors and Bidder D and their advisors then began the process of negotiating appropriate documentation with Bidder D, while the Debtors and their advisors contacted constituencies to inform them about the Debtors' selection of Bidder D and to solicit feedback from the constituencies about the Bidder D proposal and the process going forward. *Id.*

21. On December 7 and December 8, 2010, the Debtors and their advisors met in person or by telephone with each of the key constituencies, including Midland, Lehman, LNR, CWCapital, TriMont, the Creditors' Committee, and the Ad Hoc Committee, to advise them of the status of the stalking horse bid process and of the Debtors' intentions to move expeditiously

to seek approval of bidding procedures and bid protections.[17] *Id.* at ¶ 19. Prior to these meetings, the Debtors asked each participating constituent to confirm its agreement to keep the information regarding the stalking horse proposals confidential, in accordance with the confidentiality agreements previously executed between each constituent and the Debtors. At these meetings, subject to the confidentiality agreements and after each constituent specifically agreed not to share the information regarding the stalking horse proposals with any stalking horse bidders, the Debtors' management and advisors provided the key constituencies (other than Lehman, given its status as a potential bidder) with documentation summarizing each of the stalking horse proposals (without identifying which bidder had proposed which bid) and explained the analyses that the Debtors, their advisors, and the Board had performed in reaching their conclusions regarding the Bidder D proposal. *Id.* The Debtors and their advisors also solicited input from the key constituencies at these meetings. *Id.* At or around the same time, the Debtors notified the stalking horse candidates, including Five Mile, that they had selected Bidder D's proposal as the stalking horse proposal. *Id.*

22. At the same time, the Debtors and their advisors proceeded to document the Bidder D proposal. On December 9, 2010, the Debtors and their advisors updated the Board on the status of discussions with Bidder D regarding its proposal and the stalking horse process. *Id.* at ¶ 20. In addition to an update on the status of negotiations with Bidder D, the Debtors and their advisors apprised the Board of communications with the Debtors' constituencies regarding the Bidder D proposal and the concerns raised by the constituencies, including Midland and Lehman, about the Bidder D proposal and the Debtors' selection of a stalking horse bidder. *Id.* After this update, the Board directed the Debtors' management and advisors to focus their

---

[17] The Debtors and their advisors did not meet with Five Mile.

resources on attempting to finalize documentation with Bidder D, while also continuing their discussions with the key constituencies to solicit feedback and to incorporate the constituencies' thoughts, to the extent possible, in the process. *Id.*

23.     In addition to these formal communications, Moelis and the Debtors have communicated informally with the Debtors' key constituencies on a regular basis, facilitated further due diligence, and discussed the Debtors' 2010 reforecast and updated operating model. *Id.* at ¶ 21.  The Debtors also informed key constituencies almost immediately after the Board initially selected Bidder D as the stalking horse bidder.  *Id.*

24.     Through the Debtors' stalking horse selection process, the Debtors facilitated an attractive proposal from Bidder D, an experienced and highly-regarded stalking horse candidate. *Id.* at ¶ 22.

### Five Mile/Lehman's Revised Proposal

25.     On December 11, 2010, Five Mile/Lehman informed the Debtors that it had substantially improved its proposal and that commitment letters had been signed between Five Mile and Lehman and Five Mile and Midland.  *Id.* at ¶ 24.  On December 13, 2010, the Debtors met with representatives from Five Mile/Lehman and Midland to discuss their revised offer.  *Id.* In advance of this meeting, Five Mile/Lehman sent the Debtors and their advisors a revised commitment agreement between Lehman and Five Mile, executed as of December 10, 2010, detailing a joint commitment to act as plan sponsors with the support of Midland.[18]  *Id.*

26.     At the December 13, 2010 meeting, Five Mile/Lehman and Midland discussed the revised proposal in detail with the Debtors and their advisors.  *Id.* at ¶ 25.  Following the meeting, the Debtors and their advisors reviewed and analyzed the revised proposal and

---

[18]   A copy of the Five Mile/Lehman proposal, dated December 10, 2010, is attached hereto as **Exhibit E**.

determined that it was a significant improvement over Five Mile/Lehman's previous proposal from November 23, 2010, and that it was competitive with and possibly superior to the Bidder D proposal. *Id.*

27.     On the night of December 13, 2010, the Debtors and their advisors reconvened with Five Mile/Lehman and Midland to further negotiate certain terms of the proposal. *Id.* at ¶ 26. These discussions lasted well into the evening and focused on the Debtors' desire that the Five Mile/Lehman Bid contain significant consideration for other constituencies, including unsecured creditors, preferred shareholders, and lenders for the mezzanine debt on the Floating Rate Pool. *Id.* In addition, the Debtors requested modifications to the proposed bid protections in the proposal. *Id.* These discussions were productive and resulted in agreement from Five Mile/Lehman and Midland to: (a) increase recoveries to unsecured creditors; (b) provide a baseline recovery and the Co-Investment Right to the holders of the Series C Preferred Shares; (c) resolve litigation between Midland and Apollo on account of the Apollo Guaranty thereby enhancing recoveries for Series C Preferred Shareholders;[19] (d) provide some form of structured debt or equity instrument or other consideration for the Floating Rate Mezzanine Lenders; (e) reduce the initial overbid protection to $15 million inclusive of the Break-Up Fee and the Expense Reimbursement; (f) agree not to object to an expense reimbursement of up to $500,000 for Bidder D; and (g) increase the Expense Reserve from $4.5 million to $18.5 million. *Id.*

28.     Following this meeting, the Debtors and their advisors conducted further side-by-side analyses of the Five Mile/Lehman proposal and the other stalking horse bids and concluded that the Five Mile/Lehman proposal, as revised, provided the highest and best offer received to

---

[19]    As described below, Apollo, on account of its holdings of the Series A Preferred Shares (which rank *pari passu* with the Series C Preferred Shares), has agreed to waive its rights to receive any recovery or the right to participate in the Co-Investment Right.

date.  *Id.* at ¶ 27.  On the morning of December 14, 2010, the Debtors and their advisors had a status call with the Board to inform it generally about the updated situation regarding the Five Mile/Lehman proposal.  *Id.*  The Debtors and their advisors then held a separate conference call with the Independent Committee to discuss the Five Mile/Lehman proposal in detail. The Independent Committee considered the Five Mile/Lehman proposal and the Bidder D proposal and concluded that the Five Mile/Lehman proposal was the superior bid.  Among other reasons, the Independent Committee noted that the Five Mile/Lehman proposal was the highest offer received and had the ability to achieve consensus among the constituencies.  *Id.*  The Independent Committee thus decided to recommend the Five Mile/Lehman proposal to the Board.  *Id.*

29.    In a subsequent meeting with the Board on December 14, 2010, the Independent Committee provided its recommendation to the Board.  *Id.* at ¶ 28.  The Board considered the Five Mile/Lehman proposal in detail and agreed with the Independent Committee's assessment that it provided the best and highest offer received to date.  *Id.*  The Board then instructed the Debtors and their advisors to continue negotiations with Five Mile/Lehman and Midland to improve their bid, while working to finalize a commitment.  *Id.*

30.    Between December 14 and December 16, 2010, the Debtors and their advisors informed the other constituencies about the selection of Five Mile/Lehman as the stalking horse bidders and solicited feedback.  *Id.* at ¶ 29.  For example, Moelis communicated with representatives from LNR, the Creditors' Committee, and the Ad Hoc Committee to express the Debtors' evaluation that the Five Mile/Lehman proposal represented an improvement for these respective constituencies.  *Id.*  In addition, the Debtors and their advisors continued negotiations

with Five Mile/Lehman and Midland between December 14 and December 22, 2010, to improve recoveries for most constituencies and to improve the contemplated bid protections. *Id.*

31.     Specifically, the Debtors held negotiations with Five Mile/Lehman and Midland on December 15, 16, and 17, 2010, and reached agreement on the following issues: (a) increasing the Unsecured Claims Fund to $2.5 million in cash and providing for the reorganized Debtors to release those creditors from preference actions; (b) providing a recovery to preferred shareholders of $5.9 million in cash and the Co-Investment Right; and (c) providing an aggregate $20 million deposit from Five Mile and Lehman as part of their bid. *Id.* at ¶ 30.

32.     On December 18, 2010, the Debtors and their advisors met with the Board again to provide another status update on the negotiations with Five Mile/Lehman. *Id.* at ¶ 31. At that meeting, the Debtors advised the Board of the open issues in the negotiations, and the Board requested that the Debtors and their advisors proceed with finalizing the Commitment Letter on the best terms and conditions the Debtors could negotiate. *Id.* The Board expressed serious concerns with respect to, among others things, Five Mile/Lehman's request for a 30-day marketing period and the requirement that competing bidders provide cash to Lehman on account of its claims. *Id.*

33.     Throughout that weekend, the Debtors and their advisors continued to engage in near around-the-clock negotiations with Five Mile/Lehman and Midland to address or otherwise minimize the Board's concerns. *Id.* at ¶ 32. As a result of those negotiations, the Debtors won concessions from Five Mile/Lehman, including an extension of the post-stalking horse selection marketing period to 45 days, with no limitation on the Debtors' ability to market prior to approval of the Bidding Procedures. *Id.* However, Five Mile/Lehman and Midland, to preserve

the overall structure of the transaction, continued to refuse to remove the requirement that competing bidders provide cash to Lehman on account of its claims.

*The Ad Hoc Committee's Offer*

34.     On December 20, 2010, the Debtors received a copy of a proposal that the Ad Hoc Committee sent to counsel to the Independent Committee. *Id.* at ¶ 33. The offer from the Ad Hoc Committee contemplates a non-enterprise-level restructuring based on an equity investment by certain of the preferred shareholders in five of the Debtors' seven hotels that are subject to individual mortgages. *Id.*

35.     Moelis promptly responded to the proposal from the Ad Hoc Committee and informed certain members of the Ad Hoc Committee that the Debtors would consider and respond to the offer in due course. *Id.* at ¶ 34. In furtherance of their efforts to consider all potential restructuring strategies, the Debtors intend to discuss the proposal in further detail with the Ad Hoc Committee and hope to facilitate the Ad Hoc Committee's participation in the Auction. *Id.* The Debtors, however, do not believe it would be in the interests of any of their constituents to risk the benefits of the Five Mile/Lehman Bid by continuing to discuss potential stalking horse status with other potential bidders for non-enterprise level restructuring proposals at this time.

*The Board's Selection of the Five Mile/Lehman Bid*

36.     On December 21, 2010, the Debtors and their advisors met with the Independent Committee and the Board to provide a further update on the status of their negotiations with Five Mile/Lehman, to report on the proposal from the Ad Hoc Committee, and to further discuss the issues of concern that the Board had with the Five Mile/Lehman proposal. *Id.* at ¶ 35. At that

meeting, the Board discussed the proposal from the Ad Hoc Committee and considered it against the entire package presented by Five Mile/Lehman and Midland. *Id.*

37. Despite the concerns described above, the Board determined that it should not risk losing the benefits of the Five Mile/Lehman Bid, including support from the Debtors' two largest creditors representing more than $1 billion in claims, the portability of the Midland Financing to other bidders pursuant to the Commitment Letter, the baseline recoveries for other constituents, and the broad "fiduciary out" in the Commitment Letter. *Id.*

38. With respect to the Bidding Procedures requirement that competing bids be based on an enterprise-level restructuring, the Board expressed a willingness to rely on the broad "fiduciary out" negotiated with Five Mile/Lehman as a means to continue to consider other value-maximizing proposals while proceeding with an enterprise-level restructuring, which based on interest to date, the Board considers to be a sound strategy. *Id.* at ¶ 36.

39. With respect to the requirement that Lehman receive cash in satisfaction of its claims as part of any competing bid pursuant to the Auction, the Debtors note that this requirement should be viewed as counterbalanced by the benefits associated with Midland's corresponding agreement to accept recovery solely in the form of debt (plus any applicable Overbid Allocation (as defined in the Term Sheet)) and to allow competing bidders to avail themselves of the Midland Financing so long as their bids contemplate a debt-to-capitalization ratio of no more than 70% and meet certain other conditions contained in the Commitment Letter. *Id.* at ¶ 37. The Debtors believe that this option will be viewed as an attractive financing option for potential bidders. Moreover, the Debtors recognize the benefits of achieving consensus with all of their constituents, including Lehman and Midland, and believe that the Five Mile/Lehman Bid positions them best to achieve that consensus.

K&E 18194223

40.     With respect to the requirement in the Bidding Procedures that competing bids allocate value in accordance with the capital structure contemplated in the Five Mile/Lehman Bid, the Board determined that the provision is acceptable because it does not prejudice or restrict any creditor's right to raise valuation arguments with respect to the collateral securing its claims in connection with the confirmation process and provides a defined structure for the Auction and the comparison of bids. *Id.* at ¶ 36.

41.     Following that meeting, the Debtors and their advisors continued their ongoing negotiations with Five Mile/Lehman and Midland to finalize the Commitment Letter and related documentation. *Id.* at ¶ 38. Even after multiple discussions, Five Mile/Lehman and Midland continued to insist on the requirement that competing bidders provide cash to Lehman on account of its claims so as to preserve the overall structure of the transaction. *Id.*

42.     On December 23, 2010, the Debtors and their advisors met with the Independent Committee and the Board to provide a further update on the status of their negotiations with Five Mile/Lehman. *Id.* at ¶ 39. In weighing the benefits provided by the Five Mile/Lehman Bid against the requirement that competing bidders provide cash to Lehman on account of its claims, the Independent Committee and the Board, in the exercise of their business judgment and after considering the terms and conditions of the Five Mile/Lehman Bid in the aggregate and in whole, determined that the Staking Horse Bid (a) represents the proposal with the most favorable economics for the Debtors' estates that the Debtors have received to date, (b) provides an opportunity to forge consensus among many of the parties in interest in the Chapter 11 Cases, and (c) should help to facilitate the successful conclusion of these Chapter 11 Cases. The Independent Committee and the Board would have preferred the exclusion of the provision that requires competing bidders to provide cash to Lehman on account of its claims, and understood

that releases of any kind would be the subject of focus and controversy, in particular the releases provided to Apollo under the Apollo Guaranty and the $3 million payment that Five Mile/Lehman will direct the reorganized Debtors to pay to Midland, immediately after the Effective Date, on account of Midland's claims under the Apollo Guaranty. However, after due consideration, and after weighing the benefits and detriments of the Five Mile/Lehman Bid, and after receiving advice and counsel from Kirkland & Ellis LLP, Moelis, and Fried Frank, the Independent Committee unanimously recommended approval of the Five Mile/Lehman Bid to the Board and the Board (with each of the Apollo Board members and the Chief Restructuring Officer supporting the prosecution of this Motion but having recused themselves from voting) determined to move forward with the instant prosecution of this Motion and the Five Mile/Lehman Bid. *Id.* The Board, based on the unanimous recommendation of the Independent Committee, concluded that the interests of the Debtors' estates, the Chapter 11 Cases, all parties in interest, the plan process, and the proposed sale and auction process are and will be best served by presenting to this Court for consideration, after notice and a hearing, the Five Mile/Lehman Bid as representing the best effort of the Debtors, their professionals, the Board, and the Independent Committee. *Id.* By doing so, this Court and all parties in interest in the Chapter 11 Cases will have the opportunity to review, consider, and take action with respect to the Five Mile/Lehman Bid. *Id.*

43.     On January 12, 2011, the Debtors received a joint restructuring proposal from the Ad Hoc Committee and LNR. *Id.* at ¶ 40.

***Allegations of Breach of Confidentiality***

44.     Certain constituents have alleged that Five Mile and Lehman's submission of the Five Mile/Lehman Bid, which contemplates an increased enterprise value from that

contemplated in Bidder D's proposal, may have been facilitated by a breach of confidentiality by one or more of the constituencies in the wake of the Debtors' December 7 and 8, 2010 meetings with constituencies to discuss the stalking horse proposals. The Debtors are not aware of whether any breach of confidentiality has occurred. The Five Mile/Lehman Bid still represents the best proposal available for the Debtors and their estates at this time.

***The Path Forward***

45.     The Board has directed the Debtors and their advisors to begin forthwith transitioning their efforts to the next stage of the Debtors' marketing process. *Id.* at ¶ 41. Moelis is reaching out to more than 100 potential investors over the next couple of weeks to solicit additional bids. *Id.* In preparation for this transition, Moelis has already prepared "teasers," which Moelis intends to send to those potential investors that express an initial indication of interest. *Id.* The Debtors intend to encourage a wide open process and are hopeful that these efforts will lead to the submission of competitive bids through the formal auction process. *Id.*

<u>**The Five Mile/Lehman Bid**</u>

46.     Lehman and Five Mile are both uniquely qualified to consummate the transaction contemplated by the Commitment Letter. Lehman is the second largest secured creditor of the Debtors, as lender under the Floating Rate Mortgage Loan and has provided a debtor-in-possession financing facility to the Debtors for approximately $17.5 million. Five Mile has a substantial investment and rights in the Fixed Rate Mortgage Loan and has funded a debtor-in-possession financing facility to the Debtors for approximately $53 million. Thus, Five Mile/Lehman is familiar with the Debtors' assets and operating performance, derived from Five Mile's long history as a holder of the Debtors' secured debt, Lehman's long history as a secured lender, and Five Mile and Lehman's review of public filings and extensive due diligence. The

32

Five Mile/Lehman Bid is not subject to any further diligence requirements but is subject to approval by the Bankruptcy Court presiding over Lehman's bankruptcy cases.

47.     Midland, also a party to the Commitment Letter, is the special servicer for the $825 million Fixed Rate Mortgage Loan, which is secured by 45 of the Debtors' properties. Midland is the largest secured creditor of the Debtors, with claims larger than the aggregate claims arising out of all of the Debtors' other prepetition mortgage loans.

48.     Pursuant to the Commitment Letter, Five Mile/Lehman has agreed to provide $174.1 million in equity capital and to convert $200.3 million in debt to equity (in addition to a cash distribution) in exchange for up to 100% of the New Equity, subject to the sale of up to 20% of the New Equity to a third-party investor and/or new manager and co-investment rights that will allow the holders of the Series C Preferred Shares to invest in up to an additional 2% of the New Equity at the same valuation as the Stalking Horse Bidder's proposed investment.[20]  Also pursuant to the Commitment Letter, Midland has agreed to support a plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid and the treatment of the Fixed Rate Mortgage Loan thereunder.

49.     In addition to the Commitment Letter, there are two auxiliary agreements between certain of the non-Debtor parties to the Commitment Letter.  Attached as **Exhibit F** hereto is an agreement between Five Mile and Lehman (the "**Five Mile-Lehman Agreement**") and as **Exhibit G** hereto is an agreement between Five Mile and Midland (the "**Five Mile-Midland Agreement**").  The Debtors are not party to either agreement, but both are attached to this Motion in the interest of full disclosure.  The Five Mile-Lehman Agreement governs the rights of

---

[20]    The Five Mile/Lehman Bid provides that Five Mile and Lehman may, subject to the consent of the Debtors, request that up to 20% of the New Equity be distributed to a third-party investor and/or new manager, provided that Five Mile and Lehman will remain liable for the full amount of the commitment regardless.  Five Mile and Lehman have tentatively identified a third party investor that is not a party in interest in these cases.

K&E 18194223

Five Mile and Lehman as they relate to each other with respect to the Debtors' restructuring, including, among other things, with respect to the application of the Deposit and the terms of Five Mile's equity commitment. The Five Mile-Midland Agreement governs the rights of Five Mile and Midland as they relate to each other with respect to the Debtors' restructuring, including, among other things, with respect to the "bad boy guaranty" Five Mile is entering into in connection with the Fixed Rate Mortgage Loan.

50. Midland's support of a plan encompassing the provisions or the Five Mile/Lehman Bid is conditioned on the Five Mile-Midland Agreement not terminating. Thus, the Debtors, Five Mile, and Midland worked diligently to synchronize the provisions, including the termination events, in the Commitment Letter and the Five Mile-Midland Agreement for purposes of consistency. Midland, however, insisted on certain rights vis-à-vis Five Mile under the Five Mile-Midland Agreement.[21] Accordingly, there are termination events in the Five Mile-Midland Agreement that are independent of those in the Commitment Letter. The discrepancies between the Commitment Letter and the Five Mile-Midland Agreement generally fall into the following categories: Five Mile and Midland's ability to mutually terminate the Five Mile-Midland Agreement; the material breach of certain covenants; and events that are within the Debtors' control. Because of this "gap" in termination events, the Debtors secured an accommodation from Five Mile, which is included in the Term Sheet, whereby Five Mile would not, without the Debtors' consent, agree to a mutual termination of the Five Mile-Midland Agreement or otherwise make any modification to any termination event or other provision

---

[21] For example, the Five Mile-Midland Agreement requires, among other things, that Five Mile have at least $300 million available at all times to commit to the plan that encompasses the Five Mile/Lehman Bid and the establishment of a FF&E reserve of $7.8 million for the first year after the effective date of the plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid for the collateral securing the Fixed Rate Mortgage Loan.

under the Five Mile-Midland Agreement that would create a new termination event, affect any termination event, or result in any inconsistency with the Commitment Letter.[22] The Debtors are comfortable that Five Mile's agreement, together with the fact that the termination events under the Five Mile-Midland Agreement are either sufficiently consistent with the Commitment Letter or otherwise in the Debtors' control, locks in Midland's support to the Five Mile/Lehman Bid and any overbid that comports with the conditions of the Commitment Letter.

51.     Five Mile/Lehman's commitments and Midland's support are conditioned on confirmation of a plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid, which will provide for the following recoveries to creditors (subject to receipt of further consideration as a result of the Auction):[23]

| Category of Claims | Treatment |
|---|---|
| **Administrative Expense Claims** | Administrative Expense Claims shall be paid in full in cash on the Effective Date or as soon as practicable after becoming allowed claims. |
| **Priority Claims** | Priority Claims shall be paid in full in cash on the Effective Date or as soon as practicable after becoming allowed claims. |
| **DIP Claims** | DIP Claims shall be paid in full in cash on the Effective Date in the aggregate amount of approximately $70.5 million. |
| **Fixed Rate Mortgage Loan Claim** | The Fixed Rate Mortgage Loan Claim shall be allowed as a secured claim in the amount of $622.5 million and the holders of such claim shall receive a new non-recourse mortgage loan in the full amount of such claim, which shall have the following terms: <br> (i)      no change to the interest rate of 6.71%; <br> (ii)     no change to the maturity date of July 9, 2017; <br> (iii)    during the first 48 months after the Effective Date, interest only will be payable monthly, and amortization will begin 48 months after the Effective Date and |

---

[22]   While the Debtors would have preferred (and, in fact, requested) that all of the rights of Five Mile, Lehman, and Midland that relate to their respective commitments be encompassed in a single agreement, each of the non-Debtor parties informed the Debtors that they had already negotiated agreements amongst themselves that precluded this. The termination events under the Five Mile-Lehman Agreement substantially match the termination events in the Commitment Letter, and the Debtors secured agreements from Five Mile and Lehman that they would not terminate, or modify the termination provisions in, the Five Mile-Lehman Agreement and Five Mile-Midland Agreement without the Debtors' consent. *See* Term Sheet, p. 16.

[23]   This summary is qualified in its entirety by the Commitment Letter. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Commitment Letter. To the extent there are any conflicts between this summary and the Commitment Letter, the terms of the Commitment Letter shall govern.

| Category of Claims | Treatment |
|---|---|
| | (iv) prepayment shall be permitted at par without penalty, and defeasance requirements will be waived; and |
| | (v) property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations, such other provision that is acceptable to Five Mile/Lehman and Midland that is consistent with then-applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. The applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Midland shall reasonably require, as reasonably acceptable to the reorganized Debtors and Five Mile/Lehman and as is consistent with the Commitment Letter and Term Sheet. |
| | In addition, the lenders under the Fixed Rate Mortgage Loan shall receive any applicable Overbid Allocation. |
| | In addition, immediately after the Effective Date, Five Mile/Lehman will direct the reorganized enterprise to make a cash payment of $3 million to Midland, on behalf of the C6 and C7 Trusts, as settlement of Midland's claims against Apollo with respect to the Apollo Guaranty. |
| | The lenders under the Fixed Rate Mortgage Loan will receive a limited guaranty from Five Mile Pooling (as defined in the Five Mile-Midland Commitment) and a limited guaranty from the Parent Company (as defined in and as more fully set forth in the Five Mile-Midland Commitment). |
| **Floating Rate Mortgage Loan Claim** | Lehman, in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan, will receive: |
| | (i) 50.0% of the New Equity and |
| | (ii) $26.2 million in cash, subject, in each case, to adjustment for the Co-Investment Right, *provided, however*, that subject to applicable law and the plan of reorganization encompassing the Five Mile/Lehman Bid, Five Mile/Lehman may, subject to the consent of the Debtors not to be unreasonably withheld, conditioned, or delayed, request the reorganized company to distribute up to 20% of the New Equity to a third-party investor and/or new manager, and, in the event the third party investor and/or new manager pays cash on the Effective Date for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman shall be adjusted accordingly, *provided, further*, however, that notwithstanding any direction by Five Mile/Lehman with respect to the Third Party Investment, Five Mile and Lehman shall remain liable for the full amount of the Commitment. |
| | In the event the Five Mile/Lehman Bid is not the winning bid at the Auction, the Floating Rate Mortgage Loan shall be repaid in cash and in an amount determined in accordance |

| Category of Claims | Treatment |
|---|---|
| | with the Overbid Allocation (assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Five Mile/Lehman Bid, plus additional consideration in accordance with the Overbid Allocation). |
| **Floating Rate Mezzanine Loan Claim** | To the extent SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont, as special servicer, votes in favor of and otherwise supports the plan, SASCO 2008-C2, LLC shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between Lehman, Five Mile, and the Debtors. |
| **Anaheim Hilton Mortgage Loan Claim** | CWCapital, as special servicer for the Anaheim Hilton Mortgage Loan, shall receive, on behalf of the lenders thereunder, a new non-recourse note in the amount of $13 million on substantially the same terms as the existing note, except for an extension of the maturity date to seven years from the Effective Date and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived. |
| **Anaheim Hilton Mezzanine Loan Claim** | TriMont, as special servicer for the Anaheim Hilton Mezzanine Loan, shall receive, on behalf of the lenders thereunder, a cash payment of $3.6 million in full satisfaction of the Anaheim Hilton Mezzanine Loan. |
| **Residence Inn Mission Valley Mortgage Loan Claim** | LNR, as special servicer for the Residence Inn Mission Valley Mortgage Loan, shall receive, on behalf of the lenders thereunder, a new non-recourse note in the amount $47.2 million on substantially the same terms as the existing note, except for an extension of the maturity date by one year and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived. |
| **Residence Inn Anaheim (Garden Grove) Mortgage Loan Claim** | LNR, as special servicer for the Residence Inn Anaheim (Garden Grove) Mortgage Loan, shall receive, on behalf of the lenders thereunder, either: (i) a new non-recourse note in the amount of $25.3 million on substantially the same terms as the existing note, except for the reduction of the outstanding balance from $37.4 million to $25.3 million, an extension of the maturity date to seven years from the Effective Date, no amortization during the loan term, permitted prepayment at par without penalty, and waiver of defeasance requirements; or (ii) such other treatment as set forth in the plan of reorganization that is acceptable in all respects to the Debtors, Five Mile, Lehman, and Midland, in each of their respective reasonable discretion. |
| **Hilton Ontario Mortgage Loan Claim** | C-III Asset Management, LLC, as special servicer for the Hilton Ontario Mortgage Loan, shall receive, on behalf of the lenders thereunder, either: (i) a new non-recourse note in the amount of $8.0 million on substantially the same terms of the existing loan, except for reduction of the outstanding balance from $35.5 million to $8.0 million, an extension of the maturity date to seven years from the Effective Date with no amortization during the loan term, prepayment permitted at par without penalty, and a waiver of defeasance requirements; or (ii) such other treatment as set forth in the plan of reorganization that is acceptable in all respects to the Debtors, Five Mile, Lehman, and Midland, in each of their respective reasonable discretion. |
| **Hilton Doubletree Washington D.C. Mortgage Loan Claim** | LNR, as special servicer for the Hilton Doubletree Washington D.C. Mortgage Loan, shall receive, on behalf of the lenders thereunder, a new non-recourse note in the amount of $25.5 million on substantially the same terms as the existing note, except for an extension of the maturity date by one year and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived. |

37

| Category of Claims | Treatment |
|---|---|
| **Residence Inn Tyson's Corner Mortgage Loan Claim** | LNR, as special servicer for the Residence Inn Tyson's Corner Mortgage Loan, shall receive, on behalf of the lenders thereunder, a new non-recourse note in $25.1 million on substantially the same terms as the existing note, except for an extension of the maturity date by one year and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived. |
| **Hilton Homewood Suites San Antonio Mortgage Loan Claim** | LNR, as special servicer under the Hilton Homewood Suites San Antonio Mortgage Loan shall receive, on behalf of the lenders thereunder, a new non-recourse note in the amount of $24.1 million on substantially the same terms as the existing note, except for an extension of the maturity date by one year and with no amortization during the loan term. Prepayment shall be permitted at par without penalty, and defeasance requirements will be waived. |
| **Unsecured Claims** | To the extent a class(es) of unsecured claims votes in favor of and otherwise supports the plan, the Unsecured Claims Fund will be available for distribution to, collectively, holders of unsecured claims against the Debtors in such class(es) (excluding deficiency claims) that were not paid pursuant to "first day" orders, provided that the Debtors shall release and waive all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code; *provided*, *however*, that those classes that do not vote in favor of and otherwise support the plan will not receive a distribution under the Unsecured Claims Fund and will not receive a waiver of preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code. |
| **Equity Interests** | To the extent as the class of holders of Innkeepers USA Trust's 8.0% Series C Cumulative Preferred Shares votes to accept and otherwise supports the Plan, the holders of Innkeepers USA Trust's 8.0% Series C Cumulative Preferred Shares shall collectively receive: |
| | (i) a Co-Investment Right, subject to exemption from Section 5 of the Securities Act of 1933, limited to 2% of the New Equity; *provided*, *however*, that such equity shall have no minority rights, except to the extent required by section 1123(a)(6) of the Bankruptcy Code, and |
| | (ii) $5.9 million of the approximately $7.4 million currently escrowed in an account held by Innkeepers USA Trust. |
| | The balance of such escrowed funds shall be available to, and shall be the property of, the reorganized Debtors after the Effective Date. |
| | Apollo—as a holder of substantially all of Innkeepers USA Trust's 12.0% Series A Cumulative Preferred Shares and common equity interests—shall receive a global release under the Plan and a release from Midland of all of Midland's claims against Apollo related in any way to the Debtors. In consideration of these releases, Apollo has agreed to waive its rights to receive any recovery under the plan that encompasses the Five Mile/Lehman Bid, including the right to participate in the Co-Investment Right. |
| | Except as expressly provided in the Term Sheet, holders of common, preferred, and any other equity interests in Innkeepers shall receive no distributions on account of their interests. |

K&E 18194223

52.     Pursuant to the Overbid Allocation described in the Term Sheet, any additional value received as a result of the Auction will be allocated among each of the constituencies up to the full amount of their allowed claims against the Debtors.

53.     In connection with Midland's support for the Five Mile/Lehman Bid and the Auction, as described above, the Debtors have also entered into the New Party/Midland Commitment.

54.     Lastly, the Commitment Letter contemplates that the Debtors, with support from Midland and Lehman, will request authority to modify paragraph 6(f)(i) of the Final Cash Collateral Order to increase the Debtors' Expense Reserve for certain closing and emergence costs, including potential success fees, from $4.5 million to $18.5 million. By this Motion, the Debtors are also requesting that authority. The Debtors anticipate that the Expense Reserve will be funded largely with excess cash generated by the properties securing the Fixed Rate Mortgage Loan (for which Midland is the special servicer) and the Floating Rate Mortgage Loan (on account of which Lehman holds its claims). To the extent internally generated excess cash is not used to fund the Expense Reserve, Five Mile/Lehman (and any competing bidder) most likely would need to increase their commitments under the Commitment Letter. With respect to amounts reserved for already existing prepetition real estate taxes and franchise fee claims, the increase in the Expense Reserve shall be final. With respect to amounts reserved for professional fees, additional prepetition obligations, and estimated closing costs, the increase in the Expense Reserve shall remain in effect so long as the Commitment Letter remains in full force and effect. If the Commitment Letter terminates for any reason, any cash reserved on account of professional fees, additional prepetition obligations, or estimated closing costs will be distributed in accordance with ¶ 6(f)(i)(2)-(6) of the Final Cash Collateral Order.

## The Proposed Bidding Procedures

55.     With a bidding floor set by the Five Mile/Lehman Bid, the Debtors believe it is in the best interest of the estates to subject the Five Mile/Lehman Bid to a formal, competitive bidding process.   The Bidding Procedures, which the Debtors have negotiated with Five Mile/Lehman and Midland, allow entities with a potential interest in purchasing the equity in the reorganized Debtors and sponsoring the Debtors' chapter 11 plan both notice and sufficient time to conduct or finalize due diligence and to submit binding Bids by the conclusion of the bidding period.   The Bidding Procedures also allow the Debtors sufficient time to develop and assess such Bids.   The Bidding Procedures and the Auction process are designed to encourage all entities to put their best Bids forward, bring finality to the Debtors' competitive plan process, and create a path towards confirmation of a plan that embodies the highest and best available recoveries to the Debtors' constituents.   The salient points of the Bidding Procedures are as follows:[24]

(a)     The Debtors have established a diligence protocol that consists of clearly defined triggering events that provide for increased access to the Debtors' confidential information, advisors, and members of management as Bidders solidify their Bids.

(b)     The Bidding Procedures prescribe a number of conditions that must be satisfied before a Bid will be considered a Qualified Bid, including, among other things, the following:

(i)     *Enterprise-level Bid.*  To be deemed a Qualified Bid, the Bid must be made on an enterprise value basis and must either (a) be comprised entirely of cash or (b) be based on the debt and capital structure and sources and uses of funds in the Commitment Letter and Term Sheet, on terms substantially similar to the terms provided in the Term Sheet (including, but not limited to, the guarantees provided to Midland and the

---

[24]   This summary is qualified in its entirety by the Bidding Procedures, annexed to **Exhibit A** as Exhibit 2.   All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures.   To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

other terms, conditions, and treatment as set forth in the Commitment Letter and the treatment of claims as set forth in the Term Sheet).

(ii) *Initial Minimum Overbid*:  To be deemed a Qualified Bid, the aggregate consideration proposed by the Bid must have a minimum value of $1,153.7 million.

(iii) *No Credit Bids*:   A Bid submitted by a holder of secured claims against the Debtors shall not be deemed a Qualified Bid if the Bid contemplates the ability of secured creditors to credit bid their claims against the Debtors within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code.[25]

(iv) *Cash Requirements*:   To be deemed a Qualified Bid, the equity consideration of such Bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value of the Five Mile/Lehman Bid and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the effective date of the Debtors' chapter 11 plan of reorganization: (a) $53 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Lehman DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order that are necessary for the Debtors to emerge from bankruptcy;[26] (e) at least $39 million in cash for the reorganized Debtors; (f) with respect only to Qualified Bids other than the Five Mile/Lehman Bid, at least $200.3 million in cash to pay Lehman's claims against the Debtors (plus any applicable Overbid Allocation); and (g) to the extent the Bid is submitted by a Competing Bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement provided for under the Commitment Letter.

(c) Midland has agreed to make the Midland Financing available to Competing Bidders that submit Qualified Bids subject to the terms and conditions outlined in the Commitment Letter and Term Sheet.   The Midland Financing includes incremental financing in the context of any Overbid, provided that, among other

---

[25]  All rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (a) the auction process contemplated in the Bidding Procedures is terminated or abandoned, (b) Midland is no longer obligated to support the Term Sheet or the New Party/Midland Commitment, (c) Lehman terminates the Commitment Letter, (d) the plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid or the winning Bid through the auction process described in (a) is not confirmed, or (e) Effective Date shall not have occurred by the Outside Date (as defined in the Term Sheet).

[26]  For the avoidance of doubt, to the extent the Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

things, the debt to capitalization ratio for the reorganized enterprise does not exceed 70 %.

(d)  In valuing an Overbid that utilizes incremental financing provided by Midland (in addition to the Midland Financing), the Debtors shall apply an 8% discount rate to any debt in excess of $622.5 million that Midland would receive pursuant to the Overbid (the mechanics of such valuation to be agreed upon between Five Mile/Lehman, Midland, and the Debtors).

(i)  For example, if a Qualified Bidder using the Midland Financing increases its Overbid at the Auction by the Minimum Overbid Increment, the Overbid Increment can be comprised of additional cash or a combination of additional cash and debt. If the Overbid Increment consists solely of cash, the Overbid Increment shall be valued at its dollar value. If the Overbid Increment consists of a combination of debt and cash, the Overbid Increment shall not consist of more than 70% debt. In valuing the Overbid Increment, the Debtors will apply the 8% discount rate for the additional debt allocated to Midland. As a result, the Minimum Overbid Increment for a Bidder that uses the Midland Financing and adds debt as part of its Overbid will consist of $3.6 million of incremental debt and $1.5 million of incremental cash for a total overbid face amount of $5.1 million.[27] Likewise, if the Bidder would prefer to increase its Overbid using an Overbid Increment with a dollar value of $10 million, the Overbid Increment shall consist of $7.2 million of incremental debt and $3.1 million of incremental cash for a total overbid face amount of $10.3 million.[28]

(e)  The deadline to submit a Bid is 5:00 p.m. prevailing Eastern Time on the date that is 45 days after the date of entry of the Bidding Procedures Order.

(f)  If one or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct an Auction to determine the Successful Bidder and Backup Bidder; otherwise the Debtors shall designate the Five Mile/Lehman Bid as the Successful Bid.

(g)  During the Auction, any Overbid (after the Initial Minimum Overbid) must be made in increments of value of at least $5.0 million (the "**Minimum Overbid Increment**") and must otherwise remain a Qualified Bid.[29]

---

[27]  This calculation assumes that the new debt is issued to Midland on March 31, 2011. The Debtors and Midland reserve the right to adjust this calculation as necessary to the extent the debt will not be issued until a later date.

[28]  *See* footnote 27.

[29]  Overbid Increments shall be allocated to the Debtors' various constituencies in accordance with the "Overbid Allocation" described on page 8 of the Term Sheet.

K&E 18194223

(h)    The Auction shall continue until there is no Overbid in response to the Qualified Bid that the Debtors determine (after consultation with Midland) is the highest or otherwise best Qualified Bid (such Qualified Bid, the "**Successful Bid**," and such Qualified Bidder, the "**Successful Bidder**") at which point, the Auction will be closed.  The entity with the next-highest or otherwise second best Qualified Bid at the Auction, as determined by the Debtors, shall be required to serve as the Backup Bidder and keep its Qualified Bid (or final Overbid, if applicable) open and irrevocable until the earlier of (a) 120 days after the date of the Auction and (b) the closing of the transaction with the Successful Bidder.

56.    The Bidding Procedures also provide that, although the Five Mile/Lehman Bid contemplates an enterprise-level restructuring, the Debtors remain willing to consider other restructuring alternatives as part of their ongoing effort to maximize value to the extent possible. To that end, the Bidding Procedures provide that the Debtors can modify the Bidding Procedures at any time to facilitate the submission of value-maximizing Bids, to adjourn the Auction one or more times for any reason, or to terminate the Bidding Procedures at any time to pursue an alternative restructuring strategy.

**Extraordinary Provisions in the Commitment Letter and Bidding Procedures**

57.    In the interest of full disclosure and in an effort to comply with Section 1.D of General Order M-383, the Debtors refer the Court to the following provisions in the Commitment Letter and Bidding Procedures, which may be characterized as extraordinary.

| Provision | Summary of Provision |
|---|---|
| Break-Up Fee & Expense Reimbursement | As described herein, the Five Mile/Lehman Bid is conditioned on the Debtors' obtaining approval of Bid Protections for Five Mile/Lehman in the form of a $7 million Break-Up Fee and up to $3 million in Expense Reimbursement.  *See* Exhibit A to Commitment Letter at pp. 8-9.  As described herein and in the Derrough Declaration, the Debtors believe these Bid Protections are within market ranges and acceptable. |
| Global Release | The plan that encompasses the provisions of the Five Mile/Lehman Bid shall include a mutual full discharge, release and exculpation of liability, and injunction (the "**Global Release**"), to the maximum extent of applicable law, by and among the Releasing Parties (each against one another), other than a release of the obligations undertaken in the Plan and other transaction-documents, from the following: (i) any and all claims |

| Provision | Summary of Provision |
|---|---|
| | and causes of action relating to the Debtors arising at any time prior to the Effective Date, and in connection therewith, the Global Release shall confirm and adjudicate the validity, enforceability, and perfection, in all respects, of the liens, claims, interests, mortgages, and encumbrances of the Fixed Rate Mortgage Loan and the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 Cases; *provided*, *however*, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Five Mile/Lehman, the reorganized Debtors, and the new manager. *See* Term Sheet at p. 19. |
| Midland Release | The plan that encompasses the provisions of the Five Mile/Lehman Bid shall provide that Midland, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of Midland's claims against Apollo related in any way to the Apollo Guaranty and (ii) if an action remains pending in the State Courts of New York or elsewhere, Midland shall dismiss its claims against Apollo with prejudice. *See Id.* at p. 18. Immediately after the Effective Date, Five Mile/Lehman will direct the reorganized enterprise to make a cash payment of $3 million to Midland, on behalf of the C6 and C7 Trusts, as settlement of Midland's claims against Apollo with respect to the Apollo Guaranty. |
| Apollo Release | Apollo, on account of its holdings of the Series A Preferred Shares (which rank *pari passu* with the Series C Preferred Shares) or other equity in the Debtors shall agree to (i) waive all rights to receive any recovery under the plan of reorganization that encompasses the Five Mile/Lehman Bid, including the right to participate in the Co-Investment Right; and (ii) settle and provide a complete general release and waiver of any of its claims against the Releasing Parties. Apollo shall provide such waiver of rights and such general release and waiver of claims against the Releasing Parties in exchange for such entities settling, releasing, and waiving any claims they may have against Apollo to the extent provided herein. Such release by the Releasing Parties shall include (but shall not be limited to) Midland, on behalf of the C6 and C7 Trusts, settling, releasing, and waiving all of Midland's claims against Apollo that are related in any way to the Apollo Guaranty. *See Id.* |
| Payment of Lehman in Cash | In the event the winning bidder at the Auction is not Five Mile/Lehman (which includes any wholly-owned subsidiary of Five Mile), the plan of reorganization shall provide that the Floating Rate Loan will be satisfied in cash in an amount determined in accordance with the Overbid Allocation. *See Id.* at p. 2. For the reasons stated herein, the Debtors believe this provision is acceptable. |

K&E 18194223

| Provision | Summary of Provision |
|---|---|
| No Credit Bidding | Pursuant to the Bidding Procedures, holders of secured claims against the Debtors shall not be permitted to credit bid their claims against the Debtors within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code. The Debtors believe it is appropriate to limit credit bidding because, among other things, the plan that encompasses the provisions of the Five Mile/Lehman Bid will not provide for a sale of assets.[30] |
| Payment to Midland | As described in the Term Sheet, on the Effective Date, and as a condition thereto, Five Mile/Lehman shall direct the reorganized Debtors to pay a one-time fee to Midland in the amount of $2.5 million as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan. *See Id.* at p. 3. <br><br> Further, immediately after the Effective Date, Five Mile/Lehman shall direct the reorganized Debtors to make a cash payment of $3 million to Midland as settlement of Midland's claims against Apollo with respect to the Apollo Guaranty. *See Id.* at p. 4. |

58.     Each of these provisions is the result of extensive negotiations involving the Debtors, Five Mile/Lehman, Midland, and Apollo. The Debtors believe that any burden imposed by each of the referenced provisions is substantially outweighed by the benefits the Five Mile/Lehman Bid confers on the Debtors' estates.

**Basis for Relief**

**I.      Section 363(b) of the Bankruptcy Code Governs the Use of Estate Property.**

59.     Authorization to enter into the Commitment Letter and approval of the New Party/Midland Commitment, Bidding Procedures, Bid Protections, and the Bidder D Expense Reimbursement require Court approval pursuant to section 363(b) of the Bankruptcy Code. Section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(b) does not specify a standard for determining when it is

---

[30]    See footnote 25 above.

appropriate for a court to authorize the use, sale, or lease of property of the estate. However, the United States Court of Appeals for the Second Circuit has required that the authorization of such use, sale, or lease of property of the estate, not in the ordinary course of business, must be based upon the sound business judgment of the debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business). In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

60.     Once a debtor articulates a valid business justification for its actions, courts in the Second Circuit "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)); accord *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (presuming, based on the business judgment rule, "that in making a business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985))*; In re Johns-Manville Corp.*, 60 B.R. at 616. Thus, if a

debtor's actions satisfy the business judgment rule, then the transaction in question should be approved and authorized under section 363(b)(1).

### A. Entering into the Commitment Letter Is a Sound Exercise of the Debtors' Business Judgment.

61.     The Debtors respectfully submit that their decision to seek authority to enter into the Commitment Letter is an exercise of sound business judgment.  Derrough Decl. at ¶¶ 42-53. By entering into the Commitment Letter, the Debtors are securing an equity investment of approximately $174.1 million, a debt for equity conversion of approximately $200.3 million (with a cash distribution), and support for the Five Mile/Lehman Bid from their two largest secured creditors. As described above, the Commitment Letter represents the culmination of hard fought negotiations between the Debtors and Five Mile/Lehman and Midland.  The Debtors believe that, as a result of those negotiations, they have obtained the best deal possible for a stalking horse under the circumstances.

62.     The Five Mile/Lehman Bid provides the best available recoveries to the Debtors' constituents, with an opportunity to increase recoveries in accordance with the Bidding Procedures.  Indeed, entering into the Commitment Letter allows the Debtors to move to the next stage of their comprehensive restructuring process while having the benefit of an "insurance policy" that facilitates a successful conclusion to these Chapter 11 Cases.  Moreover, the Debtors believe the Overbid Allocation is reasonable, as it provides a mechanism to allow all constituents to share in any incremental value generated by the Auction.

63.     Moreover, the Debtors believe that entering into the Commitment Letter is a proper exercise of their fiduciary duties.  The Ad Hoc Committee has suggested in the past that the Board only owes fiduciary duties to the preferred shareholders and, therefore, should not balance those duties with a desire to accomplish a global resolution of the competing claims and

interests at the various subsidiaries that Innkeepers USA Trust controls. The Ad Hoc Committee's suggestion is flawed. While it is, of course, true that the Board continues to owe duties to the preferred shareholders, nothing in the applicable fiduciary duty law requires the Board to sacrifice consensus among the overwhelming majority of their constituents to pursue a separate plan for the preferred shareholders. *See e.g., In re Adelphia Comm'ns Corp.*, 327 B.R. 143, 154-55 (Bankr. S.D.N.Y. 2005) (approving a four-way joint settlement on account of, among other things, "appropriate consideration of the good of the enterprise as a whole" and finding that "[a]ny suggestion that the Board's actions were a breach of fiduciary duty would be frivolous"). This is especially true when the proposed Five Mile/Lehman Bid provides the preferred shareholders with value and contains an overbid mechanism to create more value. As stated repeatedly throughout these Chapter 11 Cases, the Board intends to continue to fulfill its fiduciary duties by seeking structures to obtain preferred shareholder support for a plan of reorganization.

64.    Accordingly, the Debtors respectfully submit that entry into the Commitment Letter is a sound exercise of the Debtors' reasonable business judgment.

**B.    Approval of the New Party/Midland Commitment Is in the Best Interests of the Debtors' Estates.**

65.    The Debtors respectfully submit that approval of the New Party/Midland Commitment is in the Debtors' best interests. In certain specified circumstances as set forth in the New Party/Midland Commitment, Midland has agreed to support alternative restructuring transactions that are on the same or better terms as contained in the Five Mile-Midland Agreement. Accordingly, to the extent the Five Mile/Lehman Bid is terminated because of a breach prior to the Auction, if the terms and conditions in the New Party/Midland Commitment are met, Midland will support and provide the Midland Financing to a replacement stalking horse

bidder selected by the Debtors. Accordingly, the Debtors respectfully submit that approval of the New Party/Midland Commitment is warranted.

### C. The Bidding Procedures Will Facilitate a Process that Maximizes Value.

66. The Bidding Procedures are also the product of hard fought negotiations between the Debtors and Five Mile/Lehman and Midland. The Debtors' goal in designing the Bidding Procedures was to enable potential bidders to submit bids that increase recoveries to constituents. The Bidding Procedures also expressly maintain the Debtors' ability to facilitate the submission of Qualified Bids, which the Debtors hope will lead to a spirited Auction between competing bidders.

67. To that end, the Debtors and their advisors have already begun a wider marketing process, which involves reaching out to potential investors. The Debtors will provide relevant information and documentation to entities that express interest. As such, potential bidders, including those already involved and new entities that have or may express interest, will have adequate time to conduct due diligence, arrange financing, and construct and submit informed competing bids.

68. Importantly, the Bidding Procedures expressly preserve the Debtors' ability to exercise their fiduciary duties, if necessary, and pursue an alternate restructuring strategy. Specifically, section 12 of the Bidding Procedures states:

> Upon the determination by the Debtors' directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of this Term Sheet or the Commitment Letter shall prevent, amend, alter, or reduce the Debtors' ability to exercise their fiduciary duties under applicable law. [31]

---

[31] *See* Bidding Procedures at section 12; *Id.* at section 13 ("Notwithstanding anything to the contrary herein and subject to the rights of Five Mile/Lehman and Midland under the Commitment Letter and Term Sheet, the Debtors reserve the right, in their sole discretion, to modify these Bidding Procedures at any time, with notice to Competing Bidders, potential bidders, and Midland that is reasonable under the circumstances, to facilitate the

69.     Accordingly, the Debtors believe the Bidding Procedures and the Auction will provide the Debtors' marketing process with finality and ensure that these Chapter 11 Cases culminate in a chapter 11 plan that maximizes value to the extent practicable.

**D.     The Proposed Bid Protections Are Appropriate Under the Circumstances.**

70.     As described above, Five Mile/Lehman's commitment under the Commitment Letter is conditioned upon approval of the Bid Protections. Courts in the Second Circuit analyze the appropriateness of bidding incentives such as the Bid Protections under the "business judgment rule" standard, and it is well established in this district that courts consider whether (a) the relationship of the parties who negotiated the break-up fee is devoid of taint by self-dealing or manipulation, (b) the fee encourages, rather than hampers, bidding, and (c) the amount of the fee is reasonable relative to the proposed purchase price. *See In re Integrated Res.*, 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing, and in the exercise of honest judgment); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bid protections because, among other factors, "the stalking horse bid brings value to the estate by setting a floor on the price and providing a structure for potential competing bids . . . [and] would provide comfort to the Debtors' employees and customers that the company was entering the auction with a locked-in bid.").

71.     Here, the Debtors respectfully submit that agreeing to pay the Bid Protections is a valid exercise of business judgment. *First*, the Five Mile/Lehman Bid sets the floor with recoveries for all constituents, and the Debtors are hopeful that this will serve as a catalyst to

---

submission of value-maximizing Bids, to adjourn the Auction one or more times for any reason, or to terminate these Bidding Procedures at any time to pursue an alternative restructuring strategy that maximizes value for the Debtors' estates.").

attract higher and better offers and increase recoveries for the Debtors' constituents. By providing a necessary infusion of capital into the Debtors' estates upon which the proposed transaction is premised, Five Mile/Lehman will provide a significant benefit to the Debtors' estates. The Debtors believe that the Bid Protections are a material inducement for, and condition of, Five Mile/Lehman's commitment to purchase and/or convert debt into the reorganized Debtors' equity. Given these circumstances, the Debtors submit that the benefits provided by the Commitment Letter will far outweigh the potential costs associated with the Bid Protections, especially because the Break-Up Fee and the Expense Reimbursement only will be paid, to the extent the Commitment Letter has not terminated as a result of a Plan Sponsor Breach, in the event that (a) an Overbid in which Five Mile/Lehman Bid is not the winning bid or (b) the Debtors consummate an alternative restructuring transaction for a material portion of the Debtors' assets without the participation of Five Mile/Lehman or their respective affiliates. As such, the Debtors believe the Bid Protections should only become payable in the event that a transaction that is more favorable to the Debtors' constituents arises.

72. *Second*, the Debtors believe that the Bid Protections are reasonable and appropriate relative to the size, nature, and complexity of the proposed transaction and the Debtors' Chapter 11 Cases. The potential $7.0 million Break-Up Fee and $3.0 million Expense Reimbursement together represent approximately 2.9% of Five Mile/Lehman's $348.2 million commitment to either purchase equity or convert debt to equity and falls within the range of break-up fees and expense reimbursements approved by courts in this district and elsewhere. *See e.g., In re Neff Corp.,* No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 13, 2010) [Docket No. 267] (approving break-up fee of approximately 2.5% of backstopped rights offering amount and expense reimbursement of up to $1 million); *In re Extended Stay, Inc.* No. 09-13764 (JMP)

K&E 18194223

(Bankr. S.D.N.Y. Apr. 23, 2010) [Docket No. 975] (approving liquidated damages of 10% of overall enterprise value to successful bidder and expense reimbursement of up to $10 million if plan is withdrawn or investment agreement terminated); *In re RathGibson, Inc.*, No. 09-12452 (Bankr. D. Del. Sept. 2, 2009) [Docket No. 254] (approving break-up fee of approximately 6.2% of new equity commitment); *In re Accuride Corp.*, No. 09-13449 (Bankr. D. Del. Nov. 2, 2009) [Docket No. 167] (approving break-up fee of approximately 7.1% of new equity commitment and expense reimbursement); *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Docket No. 369] (approving a break-up fee of approximately 3% of the purchase price and expense reimbursement up to $5,000,000); *In re Silicon Graphics, Inc.*, No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) [Docket No. 55] (approving break-up fee of approximately 2.8% of the purchase price and expense reimbursement up to $750,000); *In re Steve & Barry's Manhattan LLC*, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) [Docket No. 369] (approving break-up fee of 2% of the purchase price and expense reimbursement up to $2 million); *In re Key Plastics L.L.C.*, No. 08-13324 (Bankr. D. Del. Dec. 17, 2008) [Docket No. 46] (approving break-up fee of approximately 5.5% of new equity commitment); *In re Fortunoff Fine Jewelry and Silverware, LLC*, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) [Docket No. 190] (approving break-up fee of approximately 2.8% of the purchase price); *In re Bally Total Fitness of Greater New York, Inc.*, No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] (approving break-up fee of 4.3% of the purchase price and expense reimbursement of up to 2.1% of the purchase price); *In re Solutia Inc.*, No. 03-17949 (PCB) (Bankr. S.D.N.Y. Oct. 19, 2005) [Docket No. 2611] (approving break-up fee of approximately 2.9% of the purchase price and expense reimbursement up to $2 million); *In re Calpine Corp.*,

No. 05-60200 (BRL) (Bankr. S.D.N.Y. Oct. 12, 2006) [Docket No. 2834] (approving break-up fee of approximately 2% of the purchase price).[32]

73.     Accordingly, the Debtors respectfully submit that the Bid Protections are appropriate.

**E.      It Is a Sound Exercise of Business Judgment Under the Circumstances for the Debtors to Agree to Require Competing Bidders to Provide for Payment in Cash of Lehman's Claims.**

74.     As described above, the Debtors, the Independent Committee, and the Board spent considerable time analyzing the benefits and burdens of the Five Mile/Lehman Bid.  The Debtors focused in particular on Lehman's requirement that competing bids provide for payment in cash on account of Lehman's claims.  The Debtors negotiated with Five Mile/Lehman and Midland to have this provision removed but were unsuccessful. In weighing the benefits provided by the Five Mile/Lehman Bid against the requirement that competing bidders provide cash to Lehman on account of its claims, the Independent Committee and the Board, in the exercise of their business judgment and after considering the terms and conditions of the Five Mile/Lehman Bid in the aggregate and in whole, determined that the Staking Horse Bid (a) represents the proposal with the most favorable economics for the Debtors' estates that the Debtors have received to date, (b) provides an opportunity to forge consensus among many of the parties in interest in the Chapter 11 Cases, and (c) should help to facilitate the successful conclusion of these Chapter 11 Cases. Accordingly, the Debtors respectfully submit that it is a sound exercise of business judgment to agree to require competing bidders to satisfy Lehman's claims in cash.

---

[32]   Because of the voluminous nature of the orders cited in this paragraph and in paragraph 76 below, they are not attached to the Motion.  Copies of these orders are available on request of the Debtors' counsel.

K&E 18194223

**F.      The Expense Reimbursement for Bidder D Is Appropriate and Should Be Approved.**

75.      The Debtors submit that reimbursement of the reasonable and documented expenses of Bidder D incurred prior to December 15, 2010, in an amount not to exceed $500,000, is amply justified and within the Debtors' business judgment, in accordance with the requirements of section 363 of the Bankruptcy Code.  *First*, Bidder D's participation in the stalking horse selection process was instrumental in securing Five Mile/Lehman's commitment to fund the Five Mile/Lehman Bid with the recoveries to the constituents as set forth in the Commitment Letter, which locks in the highest floor price for the Debtors' assets offered to date and, in turn, puts the Debtors in the best position to maximize the value of their estates.  Any amount paid to Bidder D on account of the expense reimbursement, which is capped at $500,000, pales in comparison to the benefits that Bidder D's bid has already brought to the Debtors' estates.  As a result of Bidder D's bid, the Debtors now will begin a formal auction process with a baseline bid based on an enterprise value of approximately $1.14 billion.  Derrough Decl. at ¶ 54.      Further, the Debtors believe that paying this expense reimbursement increases the likelihood that Bidder D will participate in the Debtors' process and submit a competing bid at the Auction and, as such, provide further benefit the Debtors' estates.  *Id.*

76.      *Second*, expense reimbursements for prospective lenders and plan sponsors like Bidder D are not uncommon in this and other districts.  *See, e.g., In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Nov. 10, 2009) [Docket No. 870] (authorizing debtors to reimburse due diligence expenses incurred by prospective lenders in connection with financing); *In re Movie Gallery, Inc.*, No. 07-33849 (Bankr. E.D. Va. Dec. 4, 2007) [Docket No.1097] (authorizing debtors to pay fees and expenses of backstop party for proposed rights offering); *In re Sea Containers Ltd.*, No. 06-11156 (Bankr. D. Del. Nov. 20, 2007) [Docket No. 1206]

(authorizing debtors to pay diligence-related fees and expenses of prospective exit lenders up to $1.5 million); *In re Tower Auto., Inc.*, No. 05-10578 (ALG) (Bankr. S.D.N.Y. Dec. 21, 2006) [Docket No. 1883] (authorizing debtors to pay $1.0 million in diligence fees to prospective new-money equity investors and to potential replacement DIP lenders); *In re Tower Auto., Inc.*, No. 05-10578 (Bankr. S.D.N.Y. Oct. 25, 2006) (ALG) [Docket No. 1814] (authorizing debtors to pay up to $1.0 million in diligence fees to prospective new-money equity investors); *In re Meridian Auto. Sys.-Composite Operations, Inc.*, No. 05-11168 (Bankr. D. Del. June 13, 2006) [Docket No. 1155] (authorizing debtors to pay diligence related fees and expenses of prospective exit lenders up to $600,000); *In re Pliant Corp.*, No. 06-10001 (Bankr. D. Del. May 5, 2006) [Docket No. 666] (authorizing debtors to pay up to $500,000 in work fees and to provide a $700,000 deposit for expenses to prospective exit lenders).

77.     In sum, because Bidder D's participation in the plan sponsor auction process has facilitated the Debtors' efforts to pursue a reorganization that maximizes value, the Debtors believe in their reasonable business judgment that the realized benefits resulting from Bidder D's participation far outweigh the corresponding costs to the Debtors' estates and that payment of the Bidder D Expense Reimbursement is reasonable, appropriate, and warranted under the circumstances and in the Debtors' best interests.  As such, the Debtors respectfully assert that they should be authorized to pay the Bidder D Expense Reimbursement in connection with and in furtherance of Bidder D's continued involvement in the plan sponsor auction process.

## II.     The Cash Collateral Order Should Be Modified to Increase the Cash Reserve.

78.     This Court has ample authority to grant the requested modification of the Final Cash Collateral Order.  The express terms of the Final Cash Collateral Order contemplate that the Court has the authority to modify the adequate protection granted by such order, ¶ 20, and a bankruptcy court retains jurisdiction to modify orders previously entered in the case.  *In re*

*Chateaugay Corp.*, 201 B.R. 48, 62 (Bankr.S.D.N.Y.1996) ("Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant under 28 U.S.C. § 1334."). Indeed, this Court already has authorized a modification of the Final Cash Collateral Order.[33]

79. In addition, pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Further, upon the request of an entity that has an interest in property used by the debtor in possession, the court shall condition the use of that property as required by applicable law to provide adequate protection. 11 U.S.C. § 363(e).

80. Lastly, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (quoting 11 U.S.C. § 105(a)). To that end, the Bankruptcy Court has "broad" authority under section 105(a) to "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985); *Ionosphere*, 98 B.R. at 177 (same).

81. The Debtors respectfully submit that the increase in the Expense Reserve is appropriate. The increase is a necessary element of the Commitment Letter and will be funded primarily from excess cash generated by the collateral securing the obligations owing to Midland

---

[33] *See* Order Amending Final Cash Collateral Order, entered on October 1, 2010 [Docket No. 539].

and Lehman. Moreover, Five Mile/Lehman, who are also the Debtors' postpetition lenders, as well as Midland, the Debtors' largest creditor, supports the increase in the Expense Reserve.

## Motion Practice

82.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Bankruptcy Rule 9013-1(a).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

83.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of a property under Bankruptcy Rule 6004(h).

## Debtors' Reservation of Rights

84.     Nothing in this Motion or the Order, nor as a result of the Debtors' payment of claims pursuant to the Order, shall be deemed or construed as: (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim; or (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.

## Notice

85.     The Debtors have provided notice of this Motion to the entities on the Master Service List (as such term is defined in the *Notice, Case Management, and Administrative Procedures* [Docket No. 68]), which is available at www.omnimgt.com/innkeepers, the website maintained by Omni Management Group, LLC, the Debtors' notice and claims agent. The Debtors respectfully submit that no further notice is necessary.

K&E 18194223

## **No Prior Request**

86.     No prior request for the relief sought in this Motion has been made to this or any other court.

K&E 18194223

WHEREFORE, for the reasons stated herein and in the Derrough Declaration, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

New York, New York
Dated: January 14, 2011

/s/ Paul M. Basta
James H.M. Sprayregen, P.C.
Paul M. Basta
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

Anup Sathy, P.C.
Marc J. Carmel (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Debtors and
Debtors in Possession

## EXHIBIT A

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ORDER (I) AUTHORIZING
### THE DEBTORS TO ENTER INTO THE COMMITMENT LETTER WITH FIVE MILE CAPITAL II POOLING REIT LLC, LEHMAN ALI INC., AND MIDLAND LOAN SERVICES, (II) APPROVING THE NEW PARTY/MIDLAND COMMITMENT BETWEEN THE DEBTORS AND MIDLAND LOAN SERVICES, (III) APPROVING BIDDING PROCEDURES, (IV) APPROVING BID PROTECTIONS, (V) AUTHORIZING AN EXPENSE REIMBURSEMENT TO "BIDDER D," AND (VI) MODIFYING CASH COLLATERAL ORDER TO INCREASE EXPENSE RESERVE

Upon the motion (the "**Motion**")[2] of the Debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), for the entry of an order (this "**Order**") (a) authorizing the Debtors to enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, a division of PNC Bank, National Association, (b) approving the New Party/Midland Commitment, (c) approving Bidding Procedures, (d) approving Bid Protections, (e) authorizing an expense reimbursement to a bidder, all as more fully set forth in the Motion, and (f) modifying the Final Cash Collateral Order to increase the expense reserve contemplated therein from $4.5 million to $18.5 million; and upon the

*Declaration of William Q. Derrough in Support of the Debtors' Motion for Entry of an Order (I)*

---

[1] The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

*Authorizing the Debtors to Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the New Party/Midland Commitment, (III) Approving Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement for "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Expense Reserve*; it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Motion is granted to the extent provided herein.

2.     The Debtors are hereby authorized to execute, deliver, implement, and to take any and all actions necessary and proper to implement the Commitment Letter, attached hereto as **Exhibit 1**.

3.     The Bidding Procedures attached hereto as **Exhibit 2** are hereby approved, and the Debtors are authorized to solicit bids and conduct an Auction as set forth in the Bidding Procedures.

4.     The Debtors are authorized to enter into the New Party/Midland Commitment, which is attached hereto as **Exhibit 3**.

5.     The Debtors are authorized to conduct the Auction as set forth in the Bidding Procedures.

K&E 18194223

6.     [_____  __], 2011 at _:00 p.m. (prevailing Eastern Time) shall be the deadline (the "**Bid Deadline**") for the submission of competing bids in accordance with the terms described in the Motion.

7.     Notwithstanding anything to the contrary in this Order, the Commitment Letter, Term Sheet, Motion, or Bidding Procedures, to be deemed a Qualified Bid (as defined in the Bidding Procedures) and qualify to participate in the Auction, (a) the equity value of each Bid and Overbid must have a value of at least $363.3 million (comprised of the $348.2 million of the Five Mile/Lehman Bid and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the effective date of the Debtors' chapter 11 plan of reorganization: (i) $53 million in cash to satisfy claims on account of the Five Mile DIP; (ii) $17.5 million in cash to satisfy claims on account of the Lehman DIP; (iii) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (iv) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order that are necessary for the Debtors to emerge from bankruptcy;[3] (v) at least $39 million in cash for the reorganized Debtors; (vi) at least $200.3 million in cash to pay Lehman's claims against the Debtors (and any applicable Overbid Allocation) in cash; and (vii) to the extent the Bid is submitted by a Competing Bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement provided for under the Commitment Letter, and (b) a Bid that includes the Midland Financing (as defined in the Bidding Procedures) shall not result in a Bid employing a debt-to-capitalization ratio for the reorganized enterprise that exceeds 70 %.

---

[3]   For the avoidance of doubt, to the extent the Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

K&E 18194223

8.      All Bids and Overbids, to be deemed a Qualified Bid and whether made prior to or at the Auction, must be made on an enterprise value basis and must either (a) be comprised entirely of cash or (b) based on the debt and capital structure and sources and uses of funds outlined in the Commitment Letter and the Term Sheet, on terms substantially similar to the terms provided in the Commitment Letter (including, but not limited to, the guarantees provided to Midland and the other terms, conditions, and treatment as set forth in the Commitment Letter and the treatment of claims as set forth in the Term Sheet).

9.      In the event that the application of the Overbid Allocation would cause any prepetition creditor's recovery to exceed such creditor's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure of the Debtors for purposes of determining the ultimate recipient of such overbid value.

10.      To the extent that the Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Commitment Letter), Five Mile/Lehman shall receive a Break-Up Fee in the amount of $7 million (the "**Break-Up Fee**") plus reimbursement of all of Five Mile's reasonable fees and expenses not to exceed $3 million (the "**Expense Reimbursement**") in the event of (a) an Overbid in which the Five Mile/Lehman Bid is not the Successful Bid or (b) the Debtors' execution of an agreement to pursue an alternative restructuring transaction for a material portion of the assets after entry of this Order.  Twenty-five percent (25%) of the Break-Up Fee may be allocated to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Debtors to emerge from bankruptcy, as has been mutually agreed between Lehman and Five Mile, with the remainder allocated to Five Mile.  The Break-Up Fee and Expense Reimbursement, if any, shall be payable by the Debtors upon the earlier of (a) the

K&E 18194223

effective date of the Debtors' plan of reorganization and (b) consummation of an alternative transaction involving a material portion of the Debtors' assets.

11. The determination of the winning bidder at the Auction shall be made by the Debtors only after consulting with Midland relating to the Bids made prior to or at the Auction.

12. All rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (a) the auction process contemplated in the Bidding Procedures is terminated or abandoned, (b) Midland is no longer obligated to support the Term Sheet or the New Party/Midland Commitment, (c) Lehman terminates the Commitment Letter, (d) the plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid or the winning Bid through the auction process described in (a) is not confirmed, or (e) Effective Date shall not have occurred by the Outside Date (as defined in the Term Sheet).

13. To the extent Bidder D is not the Successful Bidder at the Auction, the Debtors are authorized to pay the Bidder D Expense Reimbursement at the conclusion of the Auction in an amount not to exceed $500,000 of reasonable and documented fees incurred by Bidder D prior to December 15, 2010.

14. In the event of any inconsistencies between this Order and the Motion, the Bidding Procedures, the Commitment Letter, or the Term Sheet, this Order shall govern in all respects.

15. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

5

17.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

18.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: _____, 2011

_____
United States Bankruptcy Judge

K&E 18194223

## EXHIBIT 1

**Commitment Letter (with Term Sheet attached)**

**FIVE MILE CAPITAL II POOLING REIT LLC**
c/o Five Mile Capital Partners LLC
Three Stamford Plaza, 9th Floor
Stamford, Connecticut 06901

**LEHMAN ALI INC.**
1271 Avenue of the Americas, 38th Floor
New York, New York 10020

As of January 14, 2011

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attn: Marc Beilinson
      Chief Restructuring Officer

**Binding Commitment Agreement**
**Regarding the Acquisition and Restructuring**
**of Innkeepers USA Trust**

Five Mile Capital II Pooling REIT LLC ("Five Mile Pooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), and Lehman ALI Inc. ("Lehman," together with Five Mile, the "Plan Sponsors") are pleased to present this commitment letter (the "Commitment Letter") to Innkeepers USA Trust and its wholly owned direct and indirect subsidiaries (collectively with Grand Prix Holdings, LLC, "Innkeepers" or the "Company"), which sets forth, among other things, Lehman and Five Mile's binding commitment to provide equity capital and debt conversion capital (the "Commitment") for the restructuring of the debt and equity of Innkeepers, resulting in Five Mile and Lehman directly or indirectly owning a controlling interest in the reorganized Company (the "Transaction"), on the terms and subject to the conditions set forth in the term sheet (the "Term Sheet") attached hereto as Exhibit A. The undersigned hereto are collectively referred to as "Parties," and each a "Party," each in the capacity in which that Party has executed this Commitment Letter.

We believe that the Commitment provides substantial value to the Company and puts the Company on the path towards a consensual emergence from Chapter 11 on an enterprise basis pursuant to a confirmed Chapter 11 plan. The Commitment provides for an auction process on reasonable terms and is supported by the Company's two largest secured creditors holding the vast majority of the debt in these cases. There are no due diligence or financing contingencies of any kind in connection with the Commitment.

The Plan Sponsors are each uniquely qualified to consummate the Transaction. Lehman is the second largest secured creditor of Innkeepers, as lender under the Floating Rate Mortgage Loan

1

of Innkeepers (the "Floating Rate Mortgage Loan"), in the original principal amount of $250 million, and has provided a debtor-in-possession financing to the Company for approximately $17.5 million. Five Mile has a substantial investment and rights in the $825.4 million Fixed Rate Mortgage Loan of Innkeepers (the "Fixed Rate Mortgage Loan") and has funded a debtor-in-possession financing to the Company for $53 million. The Plan Sponsors have completed their due diligence of all of the Company's hotel assets. We are familiar with the Company's assets and operating performance, derived from Five Mile's long history as a rights holder in Innkeepers' secured debt, Lehman's long history as a secured lender, and Five Mile's and Lehman's review of public filings and extensive due diligence. The Plan Sponsors each have broad investment experience in the hospitality area and general expertise in the extended stay lodging sector.

The specific elements of our Commitment are set forth in the Term Sheet. Additional components of our proposal are set forth herein. This Commitment Letter is not an offer or a solicitation with respect to any securities of Innkeepers or a solicitation of acceptances of a Chapter 11 plan.

       1.    <u>Conditions/Required Approvals</u>. The Transaction is subject to the satisfaction of the terms and conditions contained in the Term Sheet, including without limitation the section titled "Lehman Approvals."

       2.    <u>Confidentiality</u>. This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter, the Term Sheet, nor any of the terms or substance hereof or thereof, shall be disclosed, directly or indirectly, to any other person except (i) to your officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis; (ii) as required by applicable law, including the Bankruptcy Code or compulsory legal process (in which case you agree to inform us promptly thereof); (iii) in connection with any exercise of remedies under or in connection with a breach of this Commitment Letter; or (iv) as otherwise agreed by the parties hereto. Notwithstanding the foregoing, this Commitment Letter (including the Term Sheet) may be filed with the United States Bankruptcy Court for the Southern District of New York presiding over the Innkeepers Chapter 11 cases (the "Innkeepers Bankruptcy Court") in connection with the Bid Procedures Motion.

       3.    <u>Due Diligence/Financing</u>. We have completed our diligence review, and the Commitment is not subject to diligence contingencies or financing contingencies of any kind.

       4.    <u>Commitment/Means of Implementation</u>. Each of the undersigned parties to this Commitment Letter acknowledge their agreement to and acceptance of the terms provided in the section of the Term Sheet titled "Commitments." In furtherance thereof, on or before January 14, 2011, the Company shall file the Bid Procedures Motion (as defined in the Term Sheet), which shall be in form and substance reasonably acceptable to the Plan Sponsors and Midland Loan Services, a division of PNC Bank, National Association, or any successor thereto, as special servicer for the Fixed Rate Mortgage Loan (the "Special Servicer") in accordance with and to the extent provided under the Term Sheet and shall, among other things, request approval of the Stalking Horse Fee (as defined in the Term Sheet). The Company shall seek a hearing on

2

approval of the Bid Procedures Motion to be held on February 8, 2011, or as soon thereafter as is convenient for the Innkeepers Bankruptcy Court.

If the Plan Sponsors are the successful/winning bidders, the funding from our Commitment will be used to finance and otherwise implement the restructuring of Innkeepers by means of a confirmed plan of reorganization (as defined in the Term Sheet, the "Plan") to be filed by the Company with the support of the Plan Sponsors and the Special Servicer. The Plan (i) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion, (ii) will provide for the treatment of claims and interests and in all other respects be in accordance with the Term Sheet, and (iii) will otherwise comply with applicable disclosure requirements and rules of procedure and contain terms and treatment of claims and interests consistent with the applicable provisions of the Bankruptcy Code.

5.    Deposit.   Promptly after Bankruptcy Court approval of this Commitment Letter and the entry of an order approving the Bid Procedures Motion, including the Break-Up Fee and Expense Reimbursement (as each such terms are defined in the Term Sheet), the Plan Sponsors shall deposit or cause to be deposited at their respective option, (i) cash and/or (ii) to the extent such loans have been funded to the Company, a pledge from Five Mile or Lehman of the first portion of any recovery on account of their claims under the Five Mile DIP (as defined in the Term Sheet) and the Solar DIP (as defined in the Term Sheet), respectively (collectively, the "DIP Loans"), against the respective Borrowers (as defined in the respective DIP Loans), in an aggregate amount equal to, or having a value of, $20.0 million, to be held in escrow by an escrow agent reasonably acceptable to the Plan Sponsors and the Company (if cash, in an interest bearing account), in either case in accordance with the terms and conditions of an escrow agreement consistent with this Commitment Letter and reasonably acceptable to the Plan Sponsors and the Company. The responsibility for making the deposit shall be allocated among the Plan Sponsors as follows: Five Mile - 50% and Lehman - 50%. The escrow agreement shall specify that (i) on the Effective Date (as defined in the Term Sheet), the full amount of the cash deposit (with interest) deposited (a) by Lehman shall be paid to Lehman and (b) by Five Mile shall be credited against Five Mile's equity commitments, and the pledge of any claim under the DIP Loans shall be released and revoked with respect to such pledging Plan Sponsor, and (ii) upon the occurrence of a termination of this Commitment Letter other than due to a Plan Sponsor Breach (as defined below), or in the event that any of the terms and conditions in the Commitment Letter (including the Term Sheet) are not satisfied timely (unless waived or extended in accordance with the terms hereof) or the Break-Up Fee and Expense Reimbursement become payable to the Plan Sponsors, the full amount of the deposit, plus accrued interest, shall be paid or returned, as applicable, to the Plan Sponsors and any pledge of a Plan Sponsor's claims under the DIP Loans shall be released and revoked. The deposit shall not be considered or become property of the Company's estates unless and until there is a Plan Sponsor Breach or with respect to Five Mile's portion of the deposit, such amounts are credited to Five Mile's equity commitments. In the event that a Plan Sponsor breaches this Commitment Letter and fails to close the Transaction as determined by a final ruling of the Innkeepers Bankruptcy Court (a "Plan Sponsor Breach"), it being understood that the deposit shall remain in escrow pending such final determination, the Company's sole remedy at law and in equity against the Plan Sponsors shall be receipt and retention of the deposit, plus accrued interest (if applicable), as liquidated damages. Nothing herein shall release a breaching Plan Sponsor of its obligation to repay the non-breaching Plan Sponsor for any forfeited deposit caused by the breach of the

3

breaching Plan Sponsor. A breach by Special Servicer of this Commitment Letter or the Five Mile/Midland Commitment that is not caused by a Plan Sponsor Breach shall not result in any forfeiture of the deposit. For the avoidance of doubt, the failure to obtain the approval of the Lehman Bankruptcy Court (as defined in the Term Sheet) is not and shall not be deemed to be a breach of any Plan Sponsor's obligations under this Commitment Letter and shall not result in the forfeiture of the deposit.

       6.    <u>Termination</u>. Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate this Commitment Letter by written notice to the Company and the Special Servicer upon the earliest occurrence of a Termination Event (as defined in the Term Sheet).

       7.    <u>Governing Law</u>. This Commitment Letter shall be governed by, and interpreted and enforced in accordance with, the laws in force in the state of New York. The Parties to this Commitment Letter waive any right to a trial by jury, to the extent lawful, and agree that either of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained-for agreement among each Party irrevocably to waive its right to trial by jury in any claims whatsoever between them relating to this Commitment Letter.

       8.    <u>Jurisdiction</u>. Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Innkeepers Bankruptcy Court, in any action or proceeding arising out of or relating to this Commitment Letter.

       9.    <u>Assignments; No Third Party Beneficiaries</u>. Except as provided by the Transfer Provision in the Term Sheet, this Commitment Letter (i) shall not be assignable by any Party hereto without the prior written consent of each other Party hereto (and any attempted assignment without such consent shall be null and void *ab initio*), (ii) is intended to be solely for the benefit of the Parties hereto, and (iii) is not intended nor shall be construed to confer any benefits upon, or create any rights in favor of any person or entity other than the Parties hereto.

       10.    <u>Amendments/Effectiveness/Counterparts</u>. Notwithstanding anything in the Commitment Letter or the Term Sheet to the contrary, neither this Commitment Letter nor the Term Sheet may be amended or any provision hereof or thereof waived or modified except by an instrument in writing signed by each of the Parties hereto. This Commitment Letter and Term Sheet shall be effective upon delivery of original signature pages or "pdf" or facsimile copies thereof executed by each of the parties. This Commitment Letter and Term Sheet may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

       11.    <u>Other Agreements</u>. The execution of this Commitment Letter shall not modify any of the rights or obligations of each of the respective parties to the Amended and Restated Commitment Agreement between Lehman and Five Mile, dated as of January 14, 2011 (the "Lehman/Five Mile Commitment"), and the Amended and Restated Binding Commitment for the Acquisition of Innkeepers USA Trust between Five Mile Capital II Pooling REIT LLC and Special Servicer, dated as of January 14, 2011 (the "Five Mile/Midland Commitment") attached hereto as Exhibit B and Exhibit C, respectively.

12.     <u>Special Servicer/Lehman</u>.  Provided that there has not been an occurrence of a Termination Event under this Commitment Letter or the Term Sheet or a "Termination Event" (as defined in the Five Mile/Midland Commitment and the Five Mile/Lehman Commitment), the Special Servicer and Lehman undertake to actively support the Term Sheet and the provisions of the Term Sheet (including the Plan, Transaction, Auction, and the Bid Procedures Order, each as set forth in the Term Sheet).

13.     <u>Entire Agreement</u>.  This Commitment Letter and the Term Sheet (and Appendices A, B, and C thereto) and not the Lehman/Five Mile Commitment or the Five Mile/Midland Commitment, represent the entire understanding and agreement among the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings among the Parties, both written and oral, with respect to the subject matter hereof; <u>provided</u>, <u>however</u>, that this Commitment Letter and the Term Sheet are expressly not in derogation of any of the terms, conditions, or limitations contained in either the Lehman/Five Mile Commitment or the Five Mile/Midland Commitment.

14.     <u>Survival</u>.  Notwithstanding the termination of this Commitment Letter in accordance with its terms, the following agreements and obligations of the Parties shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof:  Sections 2 (confidentiality), 5 (deposit), 7 (governing law), 8 (jurisdiction), and 9 (assignments; no third party beneficiaries) of this Commitment Letter.

K&E 18144598

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

**FIVE MILE CAPITAL II POOLING REIT LLC**

**BY: FIVE MILE CAPITAL PARTNERS LLC**

By: _____
Name: Scott Leitman
Title: Managing Director

**LEHMAN ALI INC.**

By: _____
Name:
Title:

Accepted and agreed to as of the first date written above:

**GRAND PRIX HOLDINGS, LLC**

By: _____
Name:
Title:

**INNKEEPERS USA TRUST**
**(for itself and for its wholly owned**
**direct and indirect subsidiaries)**

By: _____
Name:
Title:

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION**
**(as Special Servicer for U.S. Bank, National**
**Association as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage**
**Trust 2007-C6, Commercial Mortgage Pass-**
**Through Certificates successor trustee to**
**Bank of America National Association)**

By: _____
Name:
Title:

SIGNATURE PAGE TO COMMITMENT LETTER

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

**FIVE MILE CAPITAL II POOLING REIT LLC**

**BY: FIVE MILE CAPITAL PARTNERS LLC**

By: _____
Name:
Title:

**LEHMAN ALI INC.**

By: _____
Name:
Title:

Jeffrey Fitts
Authorized Signatory

Accepted and agreed to as of the first date written above:

**GRAND PRIX HOLDINGS, LLC**

By: _____
Name:
Title:

**INNKEEPERS USA TRUST**
**(for itself and for its wholly owned**
**direct and indirect subsidiaries)**

By: _____
Name:
Title:

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION**
**(as Special Servicer for U.S. Bank, National**
**Association as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage**
**Trust 2007-C6, Commercial Mortgage Pass-**
**Through Certificates successor trustee to**
**Bank of America National Association)**

By: _____
Name:
Title:

SIGNATURE PAGE TO COMMITMENT LETTER

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

FIVE MILE CAPITAL II POOLING REIT LLC

BY: FIVE MILE CAPITAL PARTNERS LLC

By: _____
Name:
Title:

LEHMAN ALI INC.

By: _____
Name:
Title:

Accepted and agreed to as of the first date written above:

GRAND PRIX HOLDINGS, LLC

By: _~~~~~~~~~~~~~
Name: Justin Koval
Title: Authorized Signatory

INNKEEPERS USA TRUST
(for itself and for its wholly owned
direct and indirect subsidiaries)

By: _____
Name:
Title:

MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, ~~N.A.~~ National Association
(as Special Servicer for ~~Bank of America,~~ U.S. Bank, National Association
~~N.A.,~~ as Trustee for the Registered Holders
of LB-UBS Commercial Mortgage Trust
2007-C6, Commercial Mortgage Pass-
Through Certificates, ~~Series 2007-C6)~~ successor trustee to Bank of America National Association)

By: _____
Name:
Title:

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

**FIVE MILE CAPITAL II POOLING REIT LLC**

**BY: FIVE MILE CAPITAL PARTNERS LLC**

By: _____
Name:
Title:

**LEHMAN ALI INC.**

By: _____
Name:
Title:

Accepted and agreed to as of the first date written above:

**GRAND PRIX HOLDINGS, LLC**

By: _____
Name:
Title:

**INNKEEPERS USA TRUST**
**(for itself and for its wholly owned**
**direct and indirect subsidiaries)**

By: _~~Mark Murphy~~_____
Name: _Mark A. Murphy_
Title: _VP_

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK,** ~~N.A.~~ National Association
**(as Special Servicer for** ~~Bank of America,~~ U.S. Bank, National Association
~~N.A.~~ **as Trustee for the Registered Holders**
**of LB-UBS Commercial Mortgage Trust**
**2007-C6, Commercial Mortgage Pass-**
**Through Certificates,** ~~Series 2007-C6)~~ successor trustee to Bank of America National Association)

By: _____
Name:
Title:

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

**FIVE MILE CAPITAL II POOLING REIT LLC**

**BY: FIVE MILE CAPITAL PARTNERS LLC**

By: _____
Name:
Title:

**LEHMAN ALI INC.**

By: _____
Name:
Title:

Accepted and agreed to as of the first date written above:

**GRAND PRIX HOLDINGS, LLC**

By: _____
Name:
Title:

**INNKEEPERS USA TRUST**
**(for itself and for its wholly owned**
**direct and indirect subsidiaries)**

By: _____
Name:
Title:

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION**
**(as Special Servicer for U.S. Bank, National**
**Association as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage**
**Trust 2007-C6, Commercial Mortgage Pass-**
**Through Certificates successor trustee to**
**Bank of America National Association)**

By: _____
Name:
Title:
      Kevin C. Donahue
      Senior Vice President
      Servicing Officer

SIGNATURE PAGE TO COMMITMENT LETTER

**TERM SHEET**

*This term sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.*

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF INNKEEPERS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.**

| | |
|---|---|
| **Plan of Reorganization:** | The recapitalization and debt restructuring (the "Transaction")[1] of Grand Prix Holdings, LLC, Innkeepers USA Trust, and its wholly owned direct and indirect subsidiaries (collectively "Innkeepers" or the "Company") is to be effectuated through a plan of reorganization (the "Plan") to be filed in the United States Bankruptcy Court for the Southern District of New York presiding over the Company's bankruptcy cases (jointly administered as Case No. 10-13800) (the "Innkeepers Bankruptcy Court") by the Company with the support of Five Mile Capital II Pooling REIT LLC, through its investment advisor Five Mile Capital Partners LLC ("Five Mile"), Lehman ALI Inc. ("Lehman," and together with Five Mile, the "Plan Sponsors"), and Midland Loan Services, a division of PNC Bank, National Association, or any successor thereto, as special servicer for the Fixed Rate Mortgage Loan (the "Special Servicer"). The Company, Plan Sponsors, and the Special Servicer each acknowledge and agree that any and only a plan of reorganization that is consistent with the terms and conditions contained in this Term Sheet shall be deemed a "Plan."<br><br>The Plan shall be (i) acceptable in all respects to the Company in its reasonable discretion and (ii) acceptable in all respects to the Plan Sponsors and the Special Servicer, in each of their respective reasonable discretion. The Company shall not amend, withdraw, or revoke the Plan or waive or amend any provision thereof without the consent of the Plan Sponsors and the Special Servicer, which consent shall not be unreasonably withheld, conditioned, or delayed. |
| **Treatment of Debt:** | Consummation of the Transaction is subject to the restructuring of the Company's debt in amounts and with the treatment terms provided herein |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Commitment Letter.

| | |
|---|---|
| | and in Appendix A attached hereto, or with such other terms that are: (i) acceptable to the Company; and (ii) acceptable to the Plan Sponsors and the Special Servicer (a) in each of their respective sole discretion with respect to the economic and treatment terms set forth herein and in Appendix A attached hereto and (b) otherwise in each of their respective reasonable discretion. |
| **New Equity:** | Except as expressly provided herein, holders of common, preferred, and any other equity interests in Innkeepers shall receive no distributions on account of their interests. Reorganized Innkeepers will issue equity (the "New Equity") as set forth below upon the effective date of the Plan (the "Effective Date"). The New Equity shall be subject to dilution with respect to the Co-Investment Right (as defined and more fully described below). |
| **Equity Stalking Horse Bid /Treatment of Floating Rate Mortgage Loan:** | On the terms and subject to the conditions contained in this Term Sheet and the Commitment Letter, the Plan Sponsors commit to purchase the New Equity of reorganized Innkeepers as follows (the "Plan Sponsors' Bid"): (i) Five Mile, through one or more of its wholly owned affiliates(s), or through a Five Mile controlled investment vehicle, comprised of limited partners in Five Mile Capital Partners II LP and Five Mile Capital Investment Opportunities LP, will purchase 50.0% of the New Equity for cash in the amount of $174.1 million; and (ii) Lehman, in full and final satisfaction of all of its claims against the Company arising under or in connection with the Floating Rate Mortgage Loan will receive: (a) 50.0% of the New Equity and (b) $26.2 million in cash, in each case, to adjustment for the Co-Investment Right (the "Commitment"); provided, however, that, subject to applicable law and the Plan, the Plan Sponsors may, subject to the consent of the Company not to be unreasonably withheld, conditioned, or delayed, require the Company or the reorganized Company, as applicable, to provide due diligence access (subject to an appropriate confidentiality agreement) and distribute up to 20% of the New Equity to a third-party investor and/or new manager (the "Third-Party Investment"), and, in the event the third party investor and/or new manager pays cash on the Effective Date for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman, shall be adjusted accordingly, provided, further, however, that notwithstanding any direction by the Plan Sponsors with respect to the Third Party Investment, Five Mile and Lehman shall remain liable for the full amount of the Commitment.

In the event the Plan Sponsors' Bid is not the winning bid at the Auction (as defined below), the Floating Rate Mortgage Loan shall be repaid in cash and in an amount determined in accordance with the Overbid |

| | |
|---|---|
| | Allocation (as defined below), assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Plan Sponsors' Bid, plus additional consideration in accordance with the Overbid Allocation. |
| **Treatment of Fixed Rate Mortgage Loan:** | In full and final satisfaction of all claims arising under or in connection with the Fixed Rate Mortgage Loan against the Company, subject to receipt of further consideration as a result of the Auction contemplated herein, the holder of the Fixed Rate Mortgage Loan shall receive the following treatment: |

- New non-recourse mortgage loan of $622.5 million, which shall have the following terms: (i) no change to the interest rate of 6.71%; (ii) no change to the maturity date of July 9, 2017; (iii) during the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iv) prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and (v) property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations, such other provision that is acceptable to the Plan Sponsors and Special Servicer that is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. The applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer shall reasonably require as reasonably acceptable to the reorganized Company and the Plan Sponsors and as is consistent with the Commitment Letter and this Term Sheet.

- In the event the Plan Sponsors' Bid is not the winning bid at the Auction, the holder of the Fixed Rate Mortgage Loan shall receive consideration in accordance with the Overbid Allocation.

- Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct the reorganized Company to make a cash payment of $2.5 million to the Special Servicer as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, the Special Servicer shall continue to be entitled

| | to collect any and all monthly or periodic fees and other compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Company or the reorganized Company to pay any of such fees or other compensation or any other amounts under the Fixed Rate CMBS Mortgage loan documents, including the appropriate review fee to be set forth in the definitive documentation as set forth in the second paragraph of Section II of the Five Mile/Midland Commitment. |
| | |
| | • The lender under the Fixed Rate Mortgage Loan will receive a limited guaranty from Five Mile Pooling and a limited guaranty from the Parent Company as defined in and as more fully set forth in the Five Mile/Midland Commitment. |
| | |
| | • Payment of $3 million and the Global Release (as defined below) as set forth in the "Releases" section herein. |
| **Treatment of Other Property-Related Mortgage and Anaheim Mezzanine Debt:** | • Anaheim Hilton Mortgage Loan (CWCapital Asset Management, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date to seven (7) years from the Effective Date, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived. |
| | |
| | • Anaheim Hilton Mezzanine Loan (TriMont Real Estate Advisors, Inc. as special servicer): A cash payment of $3.6 million by the reorganized Company as full and final satisfaction of all claims arising under or in connection with the Anaheim Hilton Mezzanine Loan. |
| | |
| | • Hilton Ontario Mortgage Loan (C-III Asset Management, LLC as special servicer): (i) Payment through a new non-recourse note on substantially the same terms as the existing loan, except for reduction of the outstanding balance to $8.0 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived; or (ii) such other treatment as set forth in the Plan that is acceptable in all |

| | |
|---|---|
| | respects to the Company, the Plan Sponsors, and the Special Servicer, in each of their respective reasonable discretion. |
| | • Residence Inn Mission Valley Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived. |
| | • Residence Inn Anaheim (Garden Grove) Mortgage Loan (LNR Partners, LLC as special servicer): (i) Payment through a new non-recourse note on substantially the same terms as the existing note, except for reduction of the outstanding balance to $25.3 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived; or (ii) such other treatment as set forth in the Plan that is acceptable in all respects to the Company, the Plan Sponsors, and the Special Servicer, in each of their respective reasonable discretion. |
| | • Hilton Doubletree Washington D.C. Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived. |
| | • Residence Inn Tyson's Corner Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived. |
| | • Hilton Homewood Suites San Antonio Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived. |
| **Treatment of Floating Rate Mezzanine Debt, Unsecured Debt and Preferred** | Following the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, provided that the following classes of claims or interests vote to accept and otherwise support the Plan, they shall receive the following |

| | |
|---|---|
| **Equity:** | treatment: |
| | • SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between each of the Plan Sponsors and the Company; |
| | • A total of $2.5 million cash (the "Unsecured Claims Fund") shall be available for distribution to, collectively, the general unsecured creditors of Innkeepers (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order; provided that the Company shall release and waive all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code; provided, however, that those classes that do not vote in favor of and otherwise support the Plan will not receive a distribution from the Unsecured Claims Fund and will not receive a waiver of preferences under section 547 of the Bankruptcy Code or, to the extent related thereto, section 550 of the Bankruptcy Code; and |
| | • The holders of Innkeepers USA Trust's 8.0% Series C Cumulative Preferred Shares shall collectively receive: (i) a co-investment right, subject to exemption from Section 5 of the Securities Act of 1933, limited to 2% of the New Equity; provided, however, that such equity shall have no minority rights, except to the extent required by section 1123(a)(6) of the Bankruptcy Code (the "Co-Investment Right"); and (ii) $5.9 million of the approximately $7.4 million currently escrowed in an account held by Innkeepers USA Trust. The balance of such escrowed funds shall be available to, and shall be the property of, the reorganized Company after the Effective Date. |
| **Transition Services Agreement:** | The Plan shall provide for a transition services agreement for certain of the Company's current management team and shall be acceptable in all respects to the Plan Sponsors in each of their respective sole discretion. |
| **DIP Financings:** | The debtor-in-possession financings provided by Solar Finance, Inc. (the "Solar DIP") and Five Mile Capital II Pooling International LLC (the "Five Mile DIP") shall be repaid in cash on the Effective Date. |
| **Required Cash:** | Upon consummation of the Transaction and on the Effective Date, the reorganized Company will have at least $22.8 million to fund future PIP work and FF&E reserves (if necessary, as determined by the reorganized Company), sufficient capital to pay off the Solar DIP (in the principal amount then outstanding, of up to approximately $17.5 million) and the |

| | |
|---|---|
| | Five Mile DIP (in the principal amount then outstanding, of up to approximately \$53 million),[2] sufficient capital to pay all administrative and other claims and expenses not paid pursuant to the cash collateral order (as amended and restated) that are necessary for Innkeepers to emerge from bankruptcy, and at least \$39 million of cash on hand. |
| **Bid Procedures:** | The Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Plan through an auction (the "Auction") on the following terms (the "Bid Procedures"): <br><br> • Bids will be solicited for up to forty-five (45) calendar days following the approval of Bid Procedures; <br><br> • Bids, to be deemed a qualified bid and eligible to participate in the Auction, must be accompanied by a deposit of \$20 million in cash to an interest bearing escrow account to be identified, established, and held by and in the name of the Company; <br><br> • Bidders must be qualified on terms reasonably acceptable to the Company after consultation with the Special Servicer, which consultation shall include, subject to confidentiality agreements reasonably acceptable to the Company and the Special Servicer, disclosure of the bidders, their qualifications, and their bids; <br><br> • All bids and overbids, to be deemed a qualified bid and eligible to participate in the Auction, and whether made prior to or at the Auction, must be made on an enterprise-value basis and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein (including but not limited to the guarantees provided to Special Servicer and the other terms, conditions, and treatment as set forth in the Five Mile/Midland Commitment and the treatment of claims as set forth in this Term Sheet); <br><br> • The initial Overbid (as defined below) of the implied enterprise value must be at least \$15 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied enterprise value of the Plan Sponsors' Bid and based on the debt and capital structure and sources and uses of funds outlined herein and in |

---

[2] This number assumes that both the Solar DIP and the Five Mile DIP have been fully funded. If the Solar DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Solar DIP shall be placed into an account held by the Company. Likewise, if the Five Mile DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Five Mile DIP shall be placed into an account held by the Company.

Appendix A (the "Initial Minimum Overbid"), and subsequent bids must be in increments of at least $5 million and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (each qualifying initial and subsequent overbid, an "Overbid");[2]

- The percentage increase in the implied enterprise value of the winning bidder will be allocated to each collateral pool/individual property (the "Overbid Allocation") by increasing the debt or cash consideration that such collateral pool/individual property is receiving under the Plan in proportion to the incremental Overbid amount (e.g., if a collateral pool is receiving a new mortgage under the Plan in the face amount of $100, then a winning Overbid that is 4% greater than the Plan Sponsors' Bid would result in that collateral pool/individual property receiving a mortgage in the face amount of $104; the same would apply to cash consideration); provided, however, that the amount of the incremental Overbid consideration not allocated to collateral pools/individual properties under the Overbid Allocation shall be allocated to each collateral pool/individual property pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools/individual properties against which such respective collateral pool/individual property has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying prepetition claims and interests and determining the ultimate recipients of such Overbid; provided, further, however, that to the extent any winning Overbid includes debt consideration to the Special Servicer in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between the Plan Sponsors, Special Servicer, and the Company);

- In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure for purposes of determining the ultimate recipients of such Overbid value;

- The determination of the winning bidder at the Auction shall be made

---

[2]  Note that the additional consideration included in any Overbid (except for the initial Overbid) must consist of no more than 70% debt consideration.

by the Company only after consulting with the Special Servicer relating to the Bids made at the Auction;

- To be deemed a qualified bid and eligible to participate in the Auction, the equity consideration of such bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value as set forth herein and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the Effective Date: (a) $53 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Solar DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (as amended) [Docket No. 402] that are necessary for the Company to emerge from bankruptcy;[3] (e) at least $39 million in cash for the reorganized Company; (f) with respect only to qualified bids other than the Commitment Letter and this Term Sheet, at least $200.3 million in cash to pay Lehman's claims against the Company (plus any applicable Overbid Allocation); and (g) to the extent the bid is submitted by a competing bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement.

- If there is an Auction and the winning bidder is not the Plan Sponsors, (i) the winning bidder shall be required to execute and agree to the Commitment Letter, the provisions of this Term Sheet, the Plan, the Disclosure Statement, and other Plan-related documents, each as modified to incorporate the results of the Auction and the Overbid Allocation, (ii) such modified documents shall be deemed to be the Commitment Letter, Term Sheet, the Plan, the Disclosure Statement, and the other Plan-related documents as such terms are used in this Term Sheet and the Commitment Letter, and (iii) Lehman (only to the extent the Floating Rate Mortgage Loan receives the treatment contemplated in, and required under, this Term Sheet) and the Special Servicer (only to the extent the Fixed Rate Mortgage Loan receives the treatment contemplated in, and required under, this Term Sheet) shall be required to use such efforts, take such actions, and not take such actions to the extent required under this Term Sheet and the Commitment Letter with respect to the Term Sheet, the Plan, the Disclosure Statement, and the other Plan-related documents of the Company and the Plan Sponsors, each as modified to incorporate the results of the Auction and the Overbid Allocation, including

---

[3] For the avoidance of doubt, to the extent the Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

Lehman's agreement to receive at least $200.3 million in cash (plus any applicable Overbid Servicer Allocation) and the Special Servicer's obligation to provide the Midland Financing (as defined in the Bid Procedures) to the winning bidder (the "Revised Agreements Provision"); and

- A bid submitted by or through a holder of a secured claim against the Company shall not be deemed a qualified bid and eligible to participate in the Auction if the bid contemplates the ability of secured creditors to credit bid their claims against the Company within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code; provided that all rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (i) the auction process contemplated in the Bid Procedures is terminated or abandoned, (ii) the Special Servicer is no longer obligated to support this Term Sheet or the New Party/Midland Commitment (as defined in, and attached as <u>Exhibit C</u> to, the Bid Procedures Motion), (iii) Lehman terminates the Commitment Letter, (iv) the Plan is not confirmed, or (v) the Effective Date shall not have occurred by the Outside Date (as defined below).

- Other terms to be agreed upon by the Company, the Plan Sponsors, and Special Servicer.

Prior to entry of the Bid Procedures Order, nothing in this Term Sheet or the Commitment Letter limits the Company from taking any action the Company believes necessary or appropriate in furtherance of the Company's marketing process.

| | |
|---|---|
| **Stalking Horse Fee:** | The Bid Procedures Order will provide that, to the extent the Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Commitment Letter), in the event of (i) an Overbid in which Plan Sponsors' Bid is not the winning bid (an "Overbid Transaction") or (ii) the Company's execution of an agreement to pursue an alternative transaction for a material portion of the Company's assets after entry of the Bid Procedures Order (the "Alternative Transaction"), the Plan Sponsors will receive a breakup fee in the amount of $7 million (the "Break-Up Fee") plus reimbursement of all of Five Mile's reasonable and documented fees and expenses, not to exceed $3 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Stalking Horse Fee"). Twenty-five percent (25%) of the Break-Up Fee may be allocated to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Company to emerge from bankruptcy, as has been mutually agreed between Lehman and Five Mile, with the remainder allocated to Five Mile. Other than terminating their obligations in accordance with the Term Sheet and Commitment Letter, |

| | |
|---|---|
| | the Plan Sponsors' sole remedy at law and in equity against the Company in the event of an Overbid Transaction or Alternative Transaction shall be receipt of the Break-Up Fee and Expense Reimbursement as liquidated damages, provided, however, that (i) nothing in the "Stalking Horse Fee" section of this Term Sheet shall limit any rights and remedies at law or in equity that the Plan Sponsors have or may have as creditors of the Company and (ii) if there is a material breach by the Company of the Commitment Letter or this Term Sheet that results in a termination of the Commitment Letter, and provided the Plan Sponsors are not entitled to the Stalking Horse Fee, the Plan Sponsor's damages for such material breach shall be capped at $10 million.<br><br>The Stalking Horse Fee, if any, shall be payable by the Company upon the earlier of (i) the Effective Date and (ii) consummation of an Alternative Transaction. |
| **Means For Implementation:** | The Company (i) will file a motion to approve the Bid Procedures and the Stalking Horse Fee (the "Bid Procedures Motion") and request a hearing for approval thereof as soon as is practicable, and (ii) will file the Plan, a disclosure statement for the Plan ("Disclosure Statement"), and request a hearing for approval of the Disclosure Statement and seek confirmation of the Plan.<br><br>Each of the foregoing and subsequent pleadings (including the order approving the Bid Procedures Motion (the "Bid Procedures Order")) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion. The Plan will be filed jointly for all the debtors. |
| **Pro Forma Equity Ownership:** | Following the Effective Date, the New Equity will be allocated among the new ownership as follows:<br><br>• 39.2%-50.0% to Five Mile;<br><br>• 39.2%-50.0% to Lehman;<br><br>• 0.0%-20.0% pursuant to the Third-Party Investment; and<br><br>• 0.0%-2.0% pursuant to the Co-Investment Right. |
| **Governance:** | The board of directors will initially consist of up to 7 members as follows: 2 members nominated by Five Mile, 2 members nominated by Lehman, and 3 independent members to be nominated at the discretion of the Plan Sponsors. |
| **Commitments:** | Subject to the conditions set forth in this Term Sheet, the Plan Sponsors, |

| | |
|---|---|
| | Company, and Special Servicer, as applicable, agree and covenant that:

The Plan Sponsors, Company, and Special Servicer shall (i) use reasonable efforts to prepare or cause the preparation of the Bid Procedures Motion, Plan, Disclosure Statement, other Plan-related documents (collectively, the "Plan Pleadings"), which shall be consistent in all material respects with the Commitment Letter and this Term Sheet, and cause the filing and seek the approval of such pleadings, (ii) take all reasonably necessary and appropriate actions to support and achieve confirmation and consummation of the Plan and the Transaction contemplated in the Commitment Letter and this Term Sheet, and (iii) not take any actions (either by affirmative action or omission) (a) inconsistent with Commitment Letter or this Term Sheet or (b) that would materially delay the confirmation or consummation of the Plan or the Transaction contemplated in the Commitment Letter and this Term Sheet.

The Plan Sponsors, Company, and the Special Servicer each hereby covenant and agree to negotiate in good faith the Plan Pleadings, each of which shall (i) contain the same treatment and economic terms as set forth herein and in Appendix A attached hereto (subject to adjustment as agreed to by the Parties in each of their reasonable sole discretion) and other terms consistent in all respects with the terms set forth in this Term Sheet, and (ii) be acceptable in all other respects to the Plan Sponsors, the Company, and the Special Servicer in each of their respective reasonable discretion.

The Plan Sponsors hereby commit to provide the entire principal amount of the Equity Commitment upon the Effective Date, upon the terms and subject to the conditions set forth in the Commitment Letter and this Term Sheet. |
| **Lehman Approvals:** | Notwithstanding anything to the contrary contained herein or in the Commitment Letter: (a) Lehman's obligations with respect to the Transaction shall be subject to the approval of the United States Bankruptcy Court for the Southern District of New York presiding over the Lehman Brothers Holdings Inc. bankruptcy cases (Case No. 08-13555) (the "Lehman Bankruptcy Court").  Following the entry of the Bid Procedures Order, Lehman will promptly file a motion (the "Lehman Bankruptcy Court Motion") seeking an order from the Lehman Bankruptcy Court authorizing Lehman to enter into the Transaction, which order shall: (x) be entered prior to the Auction; and (y) be in form and substance reasonably acceptable to the Company and materially consistent in all respects with the Commitment Letter and this Term Sheet; and (b) Lehman's obligations with respect to voting in favor of the Plan shall be conditioned in all respects on the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of its votes in a manner |

| | |
|---|---|
| | sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code. |
| **Fiduciary Out:** | Upon the determination by the Company's directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of this Term Sheet or the Commitment Letter shall prevent, amend, alter, or reduce the Company's ability to exercise their fiduciary duties under applicable law (the "Fiduciary Out"). |
| **Termination:** | Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate this Commitment Letter and Term Sheet by written notice to the Company and the Special Servicer upon the earliest occurrence of the following events (each a "Termination Event"): <br><br> • February 11, 2011, which shall be deemed extended for so long as any Plan Pleading that is on file has not been denied by a written order of the Innkeepers Bankruptcy Court, or on the date a written order of the Innkeepers Bankruptcy Court is entered denying any Plan Pleading; <br><br> • Notwithstanding anything contained herein to the contrary, March 31, 2011, if the Bid Procedures (including the Break-Up Fee and the Expense Reimbursement) have not been approved by the Innkeepers Bankruptcy Court as of such date in substantially the form attached hereto as Appendix B; <br><br> • Notwithstanding anything contained herein to the contrary, June 30, 2011, if the Plan has not been confirmed by the Innkeepers Bankruptcy Court, pursuant to an order of the Innkeepers Bankruptcy Court, as of such date; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC; <br><br> • The dismissal or conversion to chapter 7 of the Company's chapter 11 cases; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC; <br><br> • The termination of exclusivity for a substantial or material number of the debtors unless supported or sought by the Plan Sponsors; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC; <br><br> • Approval by the Innkeepers Bankruptcy Court of any bidding procedures, sale procedures for sales other than of *de minimis* assets, disclosure statement, or plan other than the Bid Procedures Motion, |

Disclosure Statement, and Plan;

- The granting of stay relief with respect to a substantial part of the Company's assets; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- Denial of the Lehman Bankruptcy Court Motion or the Lehman Bankruptcy Court's entry of any other order, judgment or decree prohibiting Lehman from consummating the Transaction;

- The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Company taken as a whole; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- In the exercise of the Parties' reasonable best efforts, failure to execute, deliver, or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate (i) the Transaction with respect to the Fixed Rate Mortgage Loan or otherwise affecting the treatment, including the economics, thereof, in each case in form and substance satisfactory to Special Servicer and the Plan Sponsors in each of their respective reasonable discretion and (ii) the Transaction, in such case in form and substance satisfactory to the Plan Sponsors in each of their respective reasonable discretion; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- Termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement reasonably deemed necessary by the Plan Sponsors or the Special Servicer prior to the Effective Date without the Plan Sponsors and the Special Servicer's written approval; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, further, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG,

| | |
|---|---|
| | LLC; |
| | • Failure by Company to assume and, if necessary, assign all franchise agreements pursuant to an order of the Court satisfactory to the Plan Sponsors or the Special Servicer in all material respects on or before the Effective Date; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, further, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC; |
| | • Such earlier date as may be agreed upon in writing by the Company, Lehman and Five Mile; |
| | • The Company terminates the Auction without selecting a winning bidder and without the consent of the Plan Sponsors and the Special Servicer, in each of their respective sole discretion; |
| | • Subject to Lehman and the Special Servicer's compliance with the Revised Agreements Provision, the Plan Sponsors are not selected as the successful bidders at the Auction; or |
| | • A Party materially breaches its obligations under the Term Sheet or Commitment Letter, including, without limitation, if the Company materially breaches its obligations, whether or not through its exercise of the Fiduciary Out. |
| | Time is of the essence with respect to the Termination Events. |
| **Effective Date/Outside Date Termination:** | • The occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including, without limitation, entry of an order confirming the Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable, and the Plan will also include customary provisions with respect to waiver of conditions to the Effective Date. |
| | • Notwithstanding anything contained herein to the contrary, unless otherwise agreed by the Company, the Plan Sponsors, and the Special Servicer in writing, this Commitment Letter and Term Sheet shall automatically terminate and be of no further force or effect and the order confirming the plan will provide that both confirmation and the confirmation order will be automatically revoked (with a reversion to the *status quo ante*) on September 15, 2011 (the "Outside Date") if the Effective Date has not occurred and all of the transactions contemplated under the Commitment Letter, this Term Sheet, and the |

| | |
|---|---|
| | Plan have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "Outside Date Termination Event"); provided, however, that this Outside Date Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC.<br><br>Time is of the essence with respect to the Outside Date Termination Event. |
| **Other:** | • On or after the Effective Date, the reorganized Company shall reimburse Five Mile for the fees and expenses of counsel, provided that the Transaction contemplated by the Plan is consummated.<br><br>• Company shall continue to pay for the fees and expenses of Lehman's advisors and counsel.<br><br>• Without the Company's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed, Lehman and Five Mile agree not to: (i) terminate the Lehman/Five Mile Commitment pursuant to the following termination event in the Lehman/Five Mile Commitment: "Such earlier date as may be agreed upon in writing by the parties hereto"; (ii) make any modification to any termination event under the Lehman/Five Mile Commitment; or (iii) make any other modification to, or addition or deletion of, any other provision in the Lehman/Five Mile Commitment that (a) would create a new termination event under the Lehman/Five Mile Commitment, (b) could affect any termination event under the Lehman/Five Mile Commitment, or (c) would result in any inconsistency with this Term Sheet or the Commitment Letter.<br><br>• Without the Company's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed, Five Mile agrees not to: (i) terminate the Five Mile/Midland Commitment pursuant to the following Termination Event in the Five Mile/Midland Commitment: "mutual agreement of Special Servicer and Five Mile to terminate this Amended Commitment Letter"; (ii) make any modification to any termination event under the Five Mile/Midland Commitment; or (iii) make any other modification to, or addition or deletion of, any other provision in the Five Mile/Midland Commitment that (a) would create a new termination event under the Five Mile/Midland Commitment, (b) could affect any termination event under the Five Mile/Midland Commitment, or (c) would result in any inconsistency with this Term Sheet or the Commitment Letter.<br><br>• Company shall seek to amend the final cash collateral order, with the support of Lehman and the Special Servicer, to increase the amount |

| | |
|---|---|
| | of cash that may be held back as an expense reserve to $18.5 million in order to account for certain closing and emergence costs, including potential success fees, in substantially the form attached hereto as Appendix C. |
| | • In reasonable cooperation with the Plan Sponsors, and subject to confidentiality agreements acceptable to the Company in its reasonable discretion, the Company agrees to share information on a confidential basis with third parties as reasonably necessary for the solicitation of a prospective new manager or other Third Party Investor for the hotel properties. |
| | • To be deemed a qualified bid, a bid that includes the Midland Financing shall not employ a debt-to-capitalization ratio for the reorganized enterprise that exceeds 70 percent. |
| | • If the Company seeks an order requesting authority from the Innkeepers Bankruptcy Court to reimburse the reasonable and documented expenses of "Bidder D," incurred prior to December 15, 2010, in an amount not greater than $500,000, provided that the Break-Up Fee and Expense Reimbursement have been approved by the Innkeepers Bankruptcy Court, the Plan Sponsors, and the Special Servicer shall not object to such request and such expenses shall be paid by the Company at the conclusion of the Auction, so long as Bidder D is not the successful winning bidder at the Auction. |
| | • Unless and until a Termination Event occurs, Lehman shall not sell, transfer, pledge, assign, or otherwise hypothecate any of its claims under the Floating Rate Mortgage Loan or grant any option thereon or any right or interest (voting or otherwise) therein (collectively, a "Transfer"), unless such transfer is to Five Mile or an entity in which Lehman Brothers Holding Inc. directly or indirectly owns at least 51% of the voting interests (a "Lehman Affiliate"), provided that Five Mile or such Lehman Affiliate, as applicable, agrees to the treatment of the Floating Rate Mortgage Loan as set forth in the Commitment Letter and this Term Sheet (the "Transfer Provision"). |
| **Releases:** | Releasing Parties. |
| | • The "Releasing Parties" shall be the Company, the Plan Sponsors, the Special Servicer (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts, and trustees), and Apollo Investment Corporation (and together with its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, and professionals, "Apollo"), and other holders of claims against and interests in the |

Company, and each of the foregoing parties' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

Special Servicer Release.

- The Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo, related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty") and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and such settlement, waiver, and release shall be embodied in, and shall not be effective unless and until the Global Release (as defined herein) has been embodied in, an order confirming the Plan as entered in the Innkeepers Bankruptcy Court that has become final and non-appealable. Immediately after the Effective Date, the Plan Sponsors will direct the reorganized Company to make a cash payment of $3 million to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Plan and shall be in form and substance reasonably satisfactory to Special Servicer and Apollo, and shall be conditioned on the above-described payment and the occurrence of the Effective Date.

Apollo Release.

- Apollo, on account of its holdings of the Series A Preferred Shares, common shares, or other equity in the Company or otherwise shall agree to (i) waive all rights to receive any recovery or distribution under the Plan, including the right to participate in the Co-Investment Right; and (ii) settle and provide a complete general release and waiver of any of its claims against the Releasing Parties. Apollo shall provide such waiver of rights and such general release and waiver of claims against the Releasing Parties in exchange for such entities settling, releasing, and waiving any claims they may have against Apollo to the extent provided herein. Such release by the Releasing Parties shall include (but shall not be limited to) the Special Servicer, on behalf of the C6 and C7 Trusts, settling, releasing, and waiving all of the Special Servicer's claims against Apollo, that are related in any way to the Apollo Guaranty; provided

that, the effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided for herein and shall not be effective until the occurrence of the Effective Date.

Global Release.

- The Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, by and among the Releasing Parties (each against one another), other than a release of the obligations undertaken herein and in the Plan and other Transaction-documents, from the following: (i) any and all claims and causes of action relating to the Company arising at any time prior to the Effective Date, and in connection therewith, the Global Release shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases; provided, however, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Plan Sponsors, the reorganized Company, and new manager. It is expressly understood and agreed, that notwithstanding anything otherwise contained in the Commitment Letter or Term Sheet, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3 million cash payment provided for herein and the occurrence of the Effective Date.

Reservation of Rights.

- Except as otherwise provided in the Commitment Letter and Term Sheet with respect to the Company, the Plan Sponsors, and the Special Servicer, the Releasing Parties, including Apollo, reserve all of their rights to object to any releases by the Releasing Parties of other parties if the terms of the Plan differ materially from those set forth in the Commitment Letter and Term Sheet.

# APPENDIX A[1]

($ in millions)

| DEBT AND PREF. EQUITY | Current Principal Balance[(a)] | Debt Impairment | Adjusted Balance | Pay Down/ Conversion | Pro Forma Principal Balance |
|---|---|---|---|---|---|
| Five Mile DIP | $53.0 | $0.0 | $53.0 | ($53.0) | $0.0 |
| Lehman DIP Loan[(b)] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| Fixed Pool Mortgage[(c)] | 825.4 | (202.9) | 622.5 | 0.0 | 622.5 |
| **Floating Pool Loan** | | | | | |
| Mortgage | 220.2 | (19.9) | 200.3 | (200.3) | 0.0 |
| Mezzanine (PIK interest) | 132.4 | (132.4) | 0.0 | 0.0 | 0.0 |
| Total | 352.6 | (152.3) | 200.3 | (200.3) | 0.0 |
| **Anaheim Hilton Loan** | | | | | |
| Mortgage[(d)] | 13.0 | 0.0 | 13.0 | 0.0 | 13.0 |
| Mezzanine | 22.6 | (19.0) | 3.6 | (3.6) | 0.0 |
| Total | 35.6 | (19.0) | 16.6 | (3.6) | 13.0 |
| Residence Inn Mission Valley Mort.[(e)] | 47.2 | 0.0 | 47.2 | 0.0 | 47.2 |
| Residence Inn Anaheim Mort.[(d)] | 37.4 | (12.1) | 25.3 | 0.0 | 25.3 |
| Hilton Ontario Mort.[(d)] | 35.5 | (27.5) | 8.0 | 0.0 | 8.0 |
| Doubletree Washington D.C. Mort.[(e)] | 25.5 | 0.0 | 25.5 | 0.0 | 25.5 |
| Residence Inn Tyson's Corner Mort.[(e)] | 25.1 | 0.0 | 25.1 | 0.0 | 25.1 |
| Homewood Suites San Antonio Mort.[(e)] | 24.1 | 0.0 | 24.1 | 0.0 | 24.1 |
| Public Preferred Stock | 145.0 | (139.1) | 5.9 | (5.9) | 0.0 |
| **Total Debt and Pref. Stock** | **$1,623.8** | **($553.0)** | **$1,070.8** | **($280.3)** | **$790.5** |
| **Implied Equity[(f)]** | **$7.4** | | | | **$348.2** |
| **Total Capitalization** | **$1,631.2** | | | | **$1,138.7** |

(a) Current Principal Balance represents principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.

(b) Assumes DIP financing facility is fully drawn.

(c) A new non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

(d) A new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date to seven (7) years from the Effective Date and with no amortization during the loan term, prepayment permitted at par without penalty, defeasance requirements will be waived.

(e) A new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year and with no amortization during the loan term, prepayment permitted at par without penalty, defeasance requirements will be waived.

(f) The Company currently has $7.4 million escrowed in an account held by Innkeepers USA Trust. This escrow will be used to make a $5.9 million payment to the holders of Innkeepers USA Trust's 8% Series C Cumulative Preferred Shares and the remaining $1.5 million balance shall be available to the reorganized Company after the Effective Date. This $7.4 million is *not* included in the Pro Forma Implied Equity and the holders of Innkeepers USA Trust's 8% Series C Cumulative Preferred Shares shall not receive any portion of the Overbid Allocation on account of their receipt of the $5.9 million payment from the $7.4 million escrowed funds.

---

[1] Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash[a] | $174.1 | Lehman Mortgage Payment[a] | $26.2 |
| Deposit Account | 7.4 | Repayment of Solar DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 53.0 |
| | | Hilton Anaheim Mezz Payment | 3.6 |
| | | Preferred Equity Payment | 5.9 |
| | | Unsecured Creditors Payment | 2.5 |
| | | Apollo Guaranty Settlement | 3.0 |
| | | Special Servicer Cash Payment | 2.5 |
| | | Balance Sheet Cash[b] | 67.3 |
| **Total** | **$181.5** | | **$181.5** |

(a) Subject to adjustment based on participation in the Third-Party Investment and the Co-Investment Right. For example, if Lehman were to own 40% of the New Equity (*i.e.*, assuming 20% of the New Equity is sold pursuant to the Third-Party Investment and 0% is sold pursuant to the Co-Investment Right), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

(b) Balance sheet cash to be used for, among other purposes, FF&E, PIP, working capital reserves, and closing costs.

<u>APPENDIX B</u>

**Bid Procedures Order**

<u>APPENDIX C</u>

**Amended Cash Collateral Order**

## EXHIBIT B

**Lehman/Five Mile Commitment**

# EXHIBIT C

## Five Mile/Midland Commitment

**EXHIBIT 2**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## BIDDING PROCEDURES

On January [__], 2011, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered the *Order (I) Authorizing the Debtors to Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving Bidding Procedures, (III) Approving Bid Protections, (IV) Authorizing an Expense Reimbursement for "Bidder D," and (V) Modifying Cash Collateral Order to Increase Expense Reserve* [Docket No. __] (the "**Bidding Procedures Order**").

### Five Mile/Lehman Bid

The Bidding Procedures Order authorized Innkeepers USA Trust and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), to execute the commitment letter attached hereto as **Exhibit A** (with the "**Term Sheet**" annexed thereto, the "**Commitment Letter**") between Five Mile Capital II Pooling REIT LLC ("**Five Mile**") and Lehman ALI Inc. ("**Lehman**" and, together with Five Mile, "**Five Mile/Lehman**") and Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the Debtors' fixed rate mortgage loan ("**Midland**").[2]  Pursuant to the Commitment Letter, Five Mile/Lehman has agreed to provide equity capital and to convert debt to equity through a chapter 11 plan of reorganization consistent with the terms set forth in the Commitment Letter (the "**Five Mile/Lehman Bid**").  Midland and Lehman have agreed and consented to the treatment of their claims against the Debtors as set forth in the Five Mile/Lehman Bid.

The Five Mile/Lehman Bid contemplates an enterprise-level transaction involving the Debtors' entire portfolio and is valued at $1,138.7 million.  The Five Mile/Lehman Bid is comprised of a capital structure that includes approximately $790.5 million of debt financing and

---

[1]  The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436.  The location of the Debtors' corporate headquarters and the service address for their affiliates is:  c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2]  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Commitment Letter.

approximately $348.2 million of equity. Of the $790.5 million of debt financing, $622.5 million consists of a new principal amount owing under the Fixed Rate Mortgage Loan, which has been reduced from the pre-petition balance of $825.4 million. The Fixed Rate Mortgage Loan will include, among other things, no change to the interest rate, no amortization for the first 48 months after the effective date, and no prepayment penalty. (See "Midland Financing" defined below).

The Debtors, Five Mile/Lehman, and Midland have agreed to subject the Five Mile/Lehman Bid to a formal auction process, pursuant to which the Debtors will continue to solicit higher or otherwise better proposals ("**Bids**," and entities that submit such Bids, "**Competing Bidders**") for the sponsorship and funding of the Debtors' chapter 11 plan of reorganization. The Five Mile/Lehman Bid is subject to an initial overbid of $15 million in cash, which would increase the minimum enterprise bid to $1,153.7 million. In addition, Midland has agreed to make the debt financing for its debt that is included in the Five Mile/Lehman Bid (together with all of the terms and conditions described in the Five Mile/Lehman Bid regarding the treatment of Midland's claim including the guarantees described therein, the "**Midland Financing**") available to Competing Bidders to the extent such Bids are Qualified Bids (as defined herein) and conform to the relevant terms in the Commitment Letter (see section 4(b)(ii) herein). Specifically, Midland has agreed to make the Midland Financing available to Competing Bidders so long as a Competing Bidder's Bid is (a) a Qualified Bid, (b) meets all of the requirements of these Bid Procedures and the terms of the Commitment Letter, including the treatment of Midland's and Lehman's debt, and (c) the Competing Bidder assumes, and otherwise agrees to be bound by, all of the provisions of the Midland Financing.

The Five Mile/Lehman Bid and any other Qualified Bids must provide at least $363.2 million in equity value (comprised of the $348.2 million equity value of the Five Mile/Lehman Bid and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the effective date of the Debtors' chapter 11 plan of reorganization: (a) $53 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Lehman DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order that are necessary for the Debtors to emerge from bankruptcy;[3] (e) at least $39 million in cash for the reorganized Debtors; (f) with respect only to Qualified Bids other than the Five Mile/Lehman Bid, at least $200.3 million in cash to pay Lehman's claims against the Debtors (plus any applicable Overbid Allocation (as defined below)); and (g) to the extent the Bid is submitted by a Competing Bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement provided for under the Commitment Letter.

Competing Bidders are not required to use the Midland Financing and are invited to make an all-cash Bid (using cash and/or providing their own financing). To illustrate, an all-cash Bid would require a minimum of $1,153.7 million in cash whereas a Bid that uses the Midland

---

[3]    For the avoidance of doubt, to the extent the Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

Financing would require a minimum of $363.2 million in cash and $790.5 million in debt. In evaluating the Bids, the Debtors will, consistent with the exercise of their fiduciary duties, take into account execution risks, costs, delay, litigation, and creditor preferences.

**The Bidding Process**

Pursuant to the Bidding Procedures Order, the Bankruptcy Court also approved the following procedures (the "**Bidding Procedures**"), pursuant to which the Debtors will continue to solicit higher or otherwise better Bids from Competing Bidders. The Debtors have designed the Bidding Procedures to maximize the value of the Debtors' enterprise for the benefit of the Debtors' constituents and their estates.

1.      **Diligence Protocol**

The Bankruptcy Court has approved the following diligence protocol (the "**Diligence Protocol**"), which consists of clearly defined triggering events that provide for successively greater access to the Debtors' confidential information, advisors, and members of management:

(a)     *Level One*:  Any entity interested in submitting a Bid shall be granted access (to the extent access has not already been granted) to a virtual data room containing confidential financial and operational materials, *provided* that such entity (i) executes a confidentiality agreement in a form acceptable to the Debtors and (ii) provides sufficient information to the Debtors demonstrating the entity's wherewithal to consummate a restructuring transaction.

(b)     *Level Two*:  If an entity that is granted access as described in "Level One" of the Diligence Protocol provides a term sheet to the Debtors on or before ____ __, 2011 [the date that is thirty days after the date of entry of the Bidding Procedures Order] that demonstrates such entity's ability and willingness to submit a Bid that is higher or otherwise better than the Five Mile/Lehman Bid, including, without limitation, a non-enterprise level restructuring transaction, the Debtors shall (i) accommodate such entity's reasonable requests to conduct on-site visits and meet with members of management (subject to management's reasonable availability); and (ii) respond timely (under the circumstances) to such entity's reasonable diligence requests.

All due diligence requests by the interested parties shall be directed to Moelis & Company LLC, Attn.: William Derrough (william.derrough@moelis.com, 212-883-3830) and Zul Jamal (zul.jamal@moelis.com, 212-883-3813), 399 Park Avenue, 5th Floor, New York, New York 10022.

The Bankruptcy Court shall have jurisdiction over any dispute that may arise with respect to the implementation of this Diligence Protocol.

By submitting a Bid, each Competing Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct due diligence on the Debtors prior to making its Bid; that it has relied solely upon its own independent review, investigation, and/or inspection

3

of any documents and/or the assets in making its Bid; and that it did not rely upon any written or oral statement, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Debtors, or the completeness of any information provided in connection therewith.

## 2. Bidding Procedures

Each Bid must be submitted in writing and determined by the Debtors to have satisfied the following conditions (collectively, the "**Bid Conditions**"):

(a) *Bid Deadline*: A Bid must be transmitted via e-mail (in .pdf or similar format) to: (i) the Debtors, Attn.: Marc Beilinson (mbeilinson@beilinsonpartners.com) and Mark Murphy (mmurphy@innkeepersusa.com); (ii) Moelis & Company LLC, the Debtors' financial advisors, Attn.: William Derrough (william.derrough@moelis.com) and Zul Jamal (zul.jamal@moelis.com); and (iii) Kirkland & Ellis LLP, the Debtors' restructuring counsel, Attn.: Paul M. Basta (paul.basta@kirkland.com) and Anup Sathy P.C. (anup.sathy@kirkland.com), so as to be **actually received** on or before _____ __, **2011** [the date that is 45 days after the date of entry of the Bidding Procedures Order] **at 5:00 p.m.** (prevailing Eastern Time) (the "**Bid Deadline**").

(b) *Bid Contents*: Each Bid must contain evidence of sufficient cash and/or committed financing (if applicable), as well as the pro forma ownership and structure of the reorganized enterprise. In the event that the Bid is an all-cash Bid, it must also contain the Competing Bidder's proposed pro forma capitalization.

(c) *Deposit*: Each Bid must be accompanied by a deposit (the "**Deposit**") in the form of $20 million in cash to an interest bearing escrow account to be identified, established, and held by and in the name of the Debtors. Additional terms and provisions regarding the Deposits are set forth in Section 9 below.

(d) *Binding and Irrevocable*: The submission of a Bid and a Deposit by the Bid Deadline shall constitute a binding and irrevocable offer and any Bid shall not be subject to, and shall state that it is not subject to, financing, diligence, approvals (other than Bankruptcy Court approval), or other conditions not set forth in the Commitment Letter.

(e) *Investment Documents*: Each Bid must include an executed copy of any and all transaction documents necessary to effectuate the restructuring transactions contemplated in the Bid (the "**Investment Documents**"), a marked copy of the Commitment Letter and Term Sheet that reflects all changes proposed by the Competing Bidder, and all other material documents integral to such Bid.

(f) *Committed Financing*: If applicable, the Bid must include committed financing documented to the Debtors' reasonable satisfaction that demonstrates the Competing Bidder has (i) received sufficient debt (to the extent of an all-cash

4

Bid) and/or equity funding commitments and (ii) adequate working capital financing or resources to finance going concern operations and the proposed restructuring transactions (to the extent of an all-cash Bid). With respect to any equity financing commitments applicable to such Bid, such equity financing commitments shall not (x) contain any conditions or contingencies that are not contained in the Commitment Letter or (y) contain any conditions or contingencies that are more conditional or otherwise beneficial to the provider of the financing than the corresponding condition or contingency contained in the Commitment Letter.

(g) *Identity*: All Bids must fully disclose the identity, contact information, and a description of the financial position and hospitality industry experience of each entity that will be bidding or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Competing Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by the Bid) and the complete terms of any such participation. Under no circumstances shall any undisclosed principals be associated with any Bid. All Bids must also include contact information for the specific person(s) whom Moelis & Company LLC or Kirkland & Ellis LLP should contact regarding the Bid.

(h) *Contingencies - No Financing or Diligence Outs*: A Bid may include covenants and conditions reasonably acceptable to the Debtors, but under no circumstances shall a Bid be conditioned on the obtaining or the sufficiency of financing or any internal or credit committee approval, syndication requirements, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome to the Debtors' estate than those set forth in the Commitment Letter.

(i) *Demonstrated Financial Capacity*: A Competing Bidder must demonstrate to the Debtors' satisfaction the necessary financial capacity to consummate the proposed transactions required by its Bid.

(j) *Irrevocable*: A Bid shall be irrevocable until and unless the Debtors accept a higher or otherwise better Qualified Bid and the Competing Bidder is not selected as the Backup Bidder (as defined herein).

(k) *No Fees and Expenses*: With the exception of Five Mile/Lehman's Break-Up Fee and Expense Reimbursement, no Bid shall contain a right to request or entitlement to any commitment payment, break-up fee, expense reimbursement, or similar type of payment. Each Competing Bidder (other than Five Mile/Lehman, to the extent approved by the Bankruptcy Court) shall bear its own fees and expenses (including those of its advisors) in connection with the proposed transaction. By submitting a Bid, a Competing Bidder shall be deemed to waive the right to assert or seek payment of any administrative expense claim,

5

including a substantial contribution claim under section 503 of the Bankruptcy Code, with respect to its Bid or the marketing or auction process.

(l) *Authorization*:  Bids must contain evidence that the Competing Bidder has obtained all necessary internal authorization or approval, including from its Board of Directors (or comparable governing body), with respect to the submission, execution, delivery, and closing of its Bid and transactions contemplated thereby.

(m) *Consent to Jurisdiction*:  Each Competing Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and/or the Investment Documents, as applicable.

**3.    Bid Review**

(a) *Communications with Competing Bidders*.  The Debtors will communicate with Competing Bidders as follows:

(i)    Prior to the Bid Deadline, the Debtors' advisors will communicate with all potential Competing Bidders in accordance with the Diligence Protocol and will take reasonable efforts, in the Debtors' judgment, to facilitate the submission of Bids.

(ii)    After the Bid Deadline, the Debtors will review those Bids timely submitted and engage in negotiations with entities that submitted Bids satisfying the Bid Conditions and as they deem appropriate, based upon the Debtors' evaluation of the content of each Bid as well as other considerations.   In evaluating the Bids, the Debtors will take into consideration,  among other factors,  the form of consideration, the feasibility of the proposed capital structure for the reorganized Debtors, the value and certainty of recovery provided to constituencies, the confirmability of the chapter 11 plan contemplated by the Bid, the transaction structure and execution risk, including conditions to closing, availability of financing,  and financial wherewithal to meet all commitments under the Bid, approvals required, and the Competing Bidder's ability to manage the Debtors' business.

(b) *Sharing of Bids and Related Information*:  Throughout the marketing process and at any time up to or during the Auction, the Debtors will share information regarding Bids with interested constituencies and third party potential financing sources (i) as required by the Commitment Letter and (ii) to other parties to the extent the Debtors deem appropriate in their sole discretion, *provided* that the Debtors shall promptly provide Midland with copies of any Bids and *provided further* that the Debtors shall not share any information regarding the Bids with any party that has submitted a Bid, except as provided in Section 4 of these Bidding Procedures.

6

(c)     *Qualification of Bids*:

    (i)     The Debtors (in consultation with Midland and in accordance with the Commitment Letter) shall determine if any Competing Bidder has submitted a Bid that qualifies to participate in the Auction (each such party, a "**Qualified Bidder**" and a "**Qualified Bid**," respectively).

    (ii)    To be deemed a Qualified Bid and qualify to participate in the Auction, all Bids and Overbids (as defined below) must satisfy the Bid Conditions set forth in section 2 and meet the following additional requirements:

        (A)     *Enterprise-level Bid.*  To be deemed a Qualified Bid, the Bid must be made on an enterprise value basis and must either be (a) comprised entirely of cash or (b) based on the debt and capital structure and sources and uses of funds in the Commitment Letter and Term Sheet, on terms substantially similar to the terms provided in the Term Sheet (including, but not limited to, the guarantees provided to Midland and the other terms, conditions, and treatment as set forth in the Commitment Letter and the treatment of claims as set forth in the Term Sheet).

        (B)     *Initial Minimum Overbid*:  To be deemed a Qualified Bid, the aggregate consideration proposed by the Bid must have a minimum value of $1,153.7 million.

        (C)     *No Credit Bids*:   A Bid submitted by a holder of secured claims against the Debtors shall not be deemed a Qualified Bid if the Bid contemplates the ability of secured creditors to credit bid their claims against the Debtors within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code.[4]

        (D)     *Cash Requirements*:  To be deemed a Qualified Bid, the equity consideration of such Bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value of the Five Mile/Lehman Bid and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the effective date of the Debtors' chapter 11 plan of reorganization: (a) $53 million in cash to satisfy claims on account

---

[4]   All rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (a) the auction process contemplated in these Bidding Procedures is terminated or abandoned, (b) Midland is no longer obligated to support the Term Sheet or that certain New Party/Midland Commitment, by  and  between the Debtors and Midland, dated as of January 14, 2011, a copy of which is attached to the Bidding Procedures Order as **Exhibit 3**, (c) Lehman terminates the Commitment Letter, (d) the plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid or the winning Bid through the auction process described in (a) is not confirmed, or (e) Effective Date shall not have occurred by the Outside Date (as defined in the Term Sheet).

of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Lehman DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order that are necessary for the Debtors to emerge from bankruptcy;[5] (e) at least $39 million in cash for the reorganized Debtors; (f) with respect only to Qualified Bids other than the Five Mile/Lehman Bid, at least $200.3 million in cash to pay Lehman's claims against the Debtors (plus any applicable Overbid Allocation (as defined below)); and (g) to the extent the Bid is submitted by a Competing Bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement provided for under the Commitment Letter.

(E)   *Financial Assumptions*:  To be considered a Qualified Bidder, each Bidder that intends to use the Midland Financing must provide to the Debtors and Midland information with respect to any differences that may exist between the assumptions that underlie the Debtors' business plan (a copy of which will be provided to Bidders in connection with the diligence  protocol described above) and the assumptions that underlie such Bidder's Bid, including, without limitation, differences with respect to working capital and capital expenditure requirements.

(iii)   The Debtors reserve the right to reject any Bid if the Debtors determine (after consultation with Midland) that such Bid does not constitute a Qualified Bid, is otherwise inadequate or insufficient, or is otherwise contrary to the best interests of the Debtors in the Debtors' judgment.

(iv)   Notwithstanding anything to the contrary in these Bidding Procedures, Five Mile/Lehman is deemed a Qualified Bidder, and the Commitment Letter shall be deemed a Qualified Bid for all applicable purposes under these Bidding Procedures with respect to the Auction and otherwise.

(d)   *Modifications of Qualified Bids Prior to Auction*:  Between the date that the Debtors notify a Competing Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid

---

[5]   For the avoidance of doubt, to the extent the Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

remains binding as specified herein; *provided*, that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must comply with the requirements for Qualified Bids herein.

**4.      Auction**

If one or more Qualified Bids (in addition to the Five Mile/Lehman Bid) are received by the Bid Deadline, the Debtors shall conduct an auction (the "**Auction**") to determine the Successful Bidder. If no Qualified Bids (other than the Five Mile/Lehman Bid) are received by the Bid Deadline, the Debtors shall not conduct the Auction and shall designate the Five Mile/Lehman Bid as the Successful Bid for the purposes of these Bidding Procedures.

Two days before the start of the Auction, the Debtors will notify all Qualified Bidders of the then highest or otherwise best Qualified Bid, as determined in the Debtors' sole discretion (the "**Baseline Bid**"), and provide copies of the Baseline Bid to all Qualified Bidders. The Baseline Bid shall be the initial overbid at the Auction.

The Auction shall take place at 10:00 a.m. (prevailing Eastern Time) on _____ __, 2011 [the date that is five business days after the Bid Deadline], at the offices of the Debtors' counsel, Kirkland & Ellis LLP, at 601 Lexington Avenue, New York, New York 10022, or such later date and time as scheduled by the Debtors in consultation with Qualified Bidders and Midland. The Auction shall be conducted in a timely fashion according to the following procedures:

(a)      *The Debtors Shall Conduct the Auction.*

The Debtors and their advisors shall direct and preside over the Auction in accordance with the following procedures:

(i)      only Qualified Bidders and their legal and financial advisors shall be entitled to bid at the Auction;

(ii)      the Qualified Bidders, including Five Mile/Lehman, shall appear in person and through duly-authorized representatives at the Auction;

(iii)      such authorized representatives of each of the Debtors, Qualified Bidders, Five Mile/Lehman, Midland, LNR Partners, LLC, TriMont Real Estate Advisors, Inc., C-III Asset Management, LLC, CWCapital Asset Management, LLC, SASCO 2008-C2, LLC, the Creditors' Committee, and the Ad Hoc Committee, and each of their respective counsel and financial advisors, shall be permitted to attend the Auction; and

(iv)      such other procedures as may be announced by the Debtor from time to time at the Auction (after consultation with Midland).

K&E 18206730

(b)     *Terms of Overbids*

An "**Overbid**" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid.  To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

(i)     Minimum Overbid Increment

Any Overbid after the Initial Minimum Overbid shall be made in increments (each, an "**Overbid Increment**") of value of at least $5.0 million (the "**Minimum Overbid Increment**") and shall otherwise remain a Qualified Bid.   Any Overbid can be comprised of cash or a combination of cash and additional debt, if it utilizes the Midland Financing.

(ii)     Midland Financing Availability

As described above, Midland has agreed to make the Midland Financing available to Competing Bidders that submit Qualified Bids subject to the terms and conditions outlined in the Commitment Letter and Term Sheet.  The Midland Financing includes incremental financing in the context of any Overbid, provided that, among other things, the debt to capitalization ratio for the reorganized enterprise does not exceed 70 percent.

In valuing an Overbid that utilizes incremental financing provided by Midland (in addition to the Midland Financing), the Debtors shall apply an 8% discount rate to any debt in excess of $622.5 million that Midland would receive pursuant to the Overbid (the mechanics of such valuation to be agreed upon between Five Mile/Lehman, Midland, and the Debtors).

For example, if a Qualified Bidder using the Midland Financing increases its Overbid at the Auction by the Minimum Overbid Increment, the Overbid Increment can be comprised of additional cash or a combination of additional cash and debt.  If the Overbid Increment consists solely of cash, the Overbid Increment shall be valued at its dollar value.  If the Overbid Increment consists of a combination of debt and cash, the Overbid Increment shall not consist of more than 70% debt.  In valuing the Overbid Increment, the Debtors will apply the 8% discount rate for the additional debt allocated to Midland.   As a result, the Minimum Overbid Increment for a Bidder that uses the Midland Financing and adds debt as part of its Overbid will consist of $3.6 million of incremental debt and $1.5 million of incremental cash for a total overbid face amount of $5.1 million.[6]   Likewise, if the Bidder would prefer to increase its Overbid using an Overbid Increment with a dollar value of $10 million, the Overbid Increment shall consist of $7.2 million of incremental debt and $3.1 million of incremental cash for a total overbid face amount of $10.3 million.[7]

---

[6]     This calculation assumes that the new debt is issued to Midland on March 31, 2011.  The Debtors and Midland reserve the right to adjust this calculation as necessary to the extent the debt will not be issued until a later date.

[7]     See footnote 6.

(iii)     Allocation of Overbids

The Debtors, Five Mile/Lehman, and Midland have agreed that the percentage increase in implied enterprise value as the result of any Overbid shall be allocated to creditors of the Debtors' estates in accordance with the "Overbid Allocation" provision of the Term Sheet.

In the event that the application of the Overbid Allocation would cause any prepetition creditor's recovery to exceed such creditor's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure of the Debtors for purposes of determining the ultimate recipient of such overbid value.

For illustrative purposes, a model assuming a $110 million Overbid is attached hereto as **Exhibit A**.

(iv)     Alterations to Baseline Bid

An Overbid shall comply with the terms of these Bidding Procedures and at all times satisfy each of the Bid Conditions set forth above.

Any Overbid shall remain open and binding on the Qualified Bidder until and unless (1) the Debtors accept a higher Qualified Bid as an Overbid and (2) such Overbid is not selected as the Backup Bid.

To the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence demonstrating such Qualified Bidder's ability to close the restructuring transactions proposed by such Overbid.

(c)     *Closing the Auction*

The Auction shall continue until there is no Overbid in response to the Qualified Bid that the Debtors determine is the highest or otherwise best Qualified Bid (such Qualified Bid, the "**Successful Bid**," and such Qualified Bidder, the "**Successful Bidder**") at which point, the Auction will be closed. The determination of the Successful Bidder at the Auction shall be made by the Debtors only after consulting with Midland relating to the Bids made at the Auction. Moreover, the Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid.

If the Successful Bidder (or the Backup Bidder (as defined herein), to the extent the Backup Bidder becomes the Successful Bidder) at the Auction is not an entity comprised of Five Mile/Lehman, (i) the Successful Bidder is required to execute and agree to the Commitment Letter, the Term Sheet, and other related documents, each as modified to incorporate the results of the Auction and the Overbid Allocation, (ii) such modified documents shall be deemed to be the Commitment Letter, the Term Sheet, the Plan, the Disclosure Statement, and the other Plan-related documents as such terms are used in the Term Sheet and the Commitment Letter, and (iii) Lehman (to the extent it receives the Overbid treatment contemplated in the Term Sheet) and Midland are required to use such efforts, take such actions, and not take such actions to the

11

extent required under the Commitment Letter with respect to the Term Sheet, the Five Mile/Lehman Plan, the Disclosure Statement, and the other Five Mile/Lehman Plan-related documents of the Debtors and Five Mile/Lehman, each as modified to incorporate the results of the Auction and the Overbid Allocation.

Acceptance by the Debtors of the Successful Bid is conditioned upon the entry of an order confirming a chapter 11 plan of reorganization incorporating the terms of the Successful Bid.

(d)     *No Collusion; Good Faith Bona Fide Offer*

Each Qualified Bidder participating at the Auction will be required to confirm with respect to its Qualified Bid and each Overbid it submits that (i) it has not engaged in any collusion with respect to the Debtors and (ii) its Qualified Bid or Overbid is a good faith, bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

## 5.     Backup Bidder

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the entity with the next-highest or otherwise second best Qualified Bid at the Auction, as determined by the Debtors, shall be required to serve as a backup bidder (the "**Backup Bidder**").  The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (a) 5:00 p.m. (prevailing Eastern time) on the first business day that is 90 days after the date of the Auction (the "**Outside Backup Date**") and (b) the closing of the transaction with the Successful Bidder.

Unless the Backup Bidder becomes the Successful Bidder earlier, following the hearing to confirm a chapter 11 plan that incorporates the terms of the Successful Bid, if the Successful Bidder fails to consummate the restructuring transactions contemplated in the Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder.  The Debtors will be authorized, but not required, to consummate the restructuring transactions contemplated in the Backup Bid without further order of the Bankruptcy Court or notice to any party.  The Deposit of the Backup Bidder shall be held by the Debtors until the earlier of three (3) business days after (a) the Outside Backup Date and (b) the closing of the transaction with the Successful Bidder.

## 6.     Bid Protections

To the extent the Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Commitment Letter), Five Mile/Lehman shall receive a Break-Up Fee in the amount of $7 million plus an Expense Reimbursement of all of Five Mile's reasonable fees and expenses, not to exceed $3 million (collectively, the "**Stalking Horse Fee**")  in the event of (a) an Overbid in which the Five Mile/Lehman Bid is not the Successful Bid or (b) the Debtors'

12

execution of an agreement to pursue an alternative restructuring transaction for a material portion of the assets after entry of the Bidding Procedures Order (an "**Alternative Transaction**").

The Stalking Horse Fee, if any, shall be payable by the Debtors upon the earlier of (a) the effective date of the Debtors' plan of reorganization and (b) consummation of an Alternative Transaction.

**7.     Highest or Otherwise Best Bid**

Whenever these Bidding Procedures refer to the highest or otherwise best Bid, as compared to the Qualified Bid of Five Mile/Lehman, the Debtors may consider (in consultation with Midland) the following factors in addition to any other factors that they deem appropriate: (a) the feasibility of the chapter 11 plan contemplated by the Bid, including the level of debt on the reorganized Debtors' capital structure; (b) the extent to which the transactions contemplated by the Bid are likely to delay the confirmation and consummation of a chapter 11 plan of reorganization and the cost to the Debtors of any such delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the Qualified Bidder's ability to timely consummate a chapter 11 plan of reorganization incorporating the terms of the Qualified Bidder's Bid; and (e) the net benefit to the Debtors' estates and to the Debtors' constituents of the Bid.

**8.     Commitment Letter**

Notwithstanding anything in these Bidding Procedures to the contrary, the Commitment Letter and related transaction documents shall remain in full force and effect until such agreements have terminated in accordance with their respective terms.

**9.     Deposit**

As provided in Section 2, each Bid must be accompanied by a Deposit.  Deposits shall be held in one or more interest-bearing escrow accounts by the Debtors.  The Deposit shall not be subject to the liens or claims of any creditors of the Debtors and, except as contemplated in these Bidding Procedures, shall not be considered property of the Debtors' estates.

In connection with the Deposit, Competing Bidders must submit any other documentation that may be reasonably required by the escrow agent.

In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors shall cause the return of such Competing Bidder's Deposit and all accumulated interest thereon within five (5) business days after the Bid Deadline.

Other than with respect to the Successful Bidder and the Backup Bidder, the Deposit for Qualified Bids shall be returned with any interest accrued thereon no later than five (5) business days after the Auction.

K&E 18206730

If the Successful Bidder (or the Backup Bidder, if applicable) timely closes the restructuring transactions contemplated in the Successful Bid (or the Backup Bidder, if applicable), its Deposit shall be credited towards its equity commitment.

In the event the Successful Bidder (or the Backup Bidder, if applicable) fails to consummate the restructuring transactions contemplated in the Successful Bid (or the Backup Bidder, if applicable) because of a breach or failure to perform on the part of such Successful Bidder (or the Backup Bidder, if applicable), the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder (or the Backup Bidder, if applicable). Retention of the Deposit, plus accrued interest, as liquidated damages, shall be the Debtors' sole remedy at law and in equity against the Successful Bidder (or the Backup Bidder, if applicable) and the Debtors shall be free to consummate the restructuring transactions proposed by the Backup Bidder (to the extent applicable) without the need for an additional hearing or order of the Bankruptcy Court.

Notwithstanding anything to the contrary herein, the Deposit of Five Mile/Lehman shall be treated as set forth in the Commitment Letter.

### 10. Consultation with Constituents

To the extent practicable, throughout the bidding process and the Auction, the Debtors will conduct their review and analysis of Bids in an appropriate manner and shall consult with representatives of its various constituencies as the Debtors deem appropriate or as required by the Commitment Letter.

### 11. Bids Based on Alternative Restructuring Strategies

The Debtors have determined in their business judgment that, based on the Five Mile/Lehman Bid and other interest received to date, pursuing an enterprise-level restructuring is a sound restructuring strategy and in the best interests of these estates. The Debtors expect to receive competing Bids that contemplate an enterprise-level restructuring. In addition, the support of the Debtors' two largest secured creditors, Midland and Lehman, is conditioned upon a Bid meeting the material requirements of these Bidding Procedures and the terms of the Commitment Letter, including the treatment of Midland's and Lehman's debt. For these reasons, to be deemed a Qualified Bidder and eligible to participate in the Auction process contemplated in these Bidding Procedures, each Bidder is required to submit enterprise-level Bids in accordance with sections 2 and 3(c) above.

Notwithstanding anything contained herein, the Debtors are willing, however, to consider other value-maximizing restructuring proposals and have negotiated the unrestricted ability to do so.

### 12. Fiduciary Out

Upon the determination by the Debtors' directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of the Term Sheet or the Commitment Letter shall

14

prevent, amend, alter, or reduce the Debtors' ability to exercise their fiduciary duties under applicable law.

**13.     Reservation of Rights**

Notwithstanding anything to the contrary herein and subject to the rights of Five Mile/Lehman and Midland under the Commitment Letter and Term Sheet, the Debtors reserve the right, in their sole discretion, to modify these Bidding Procedures at any time, with notice to Competing Bidders, potential bidders, and Midland that is reasonable under the circumstances, to facilitate the submission of value-maximizing Bids, to adjourn the Auction one or more times for any reason, or to terminate these Bidding Procedures at any time to pursue an alternative restructuring strategy that maximizes value for the Debtors' estates.

K&E 18206730

# EXHIBIT A

## Overbid Model

K&E 18206730

# Allocation of Overbids

*($ in millions)*

**FOR ILLUSTRATIVE PURPOSES ONLY - SUBJECT TO MATERIAL MODIFICATION**

## ASSUMPTIONS

**Implied Enterprise Value:**

| | |
|---|---|
| Debt | $790.5 |
| Equity | 348.2 |
| Fixed Pool Debt [2] | $1,138.7 |

**Stalking Horse Fee:**

| | |
|---|---|
| Break Up Fee | $7.0 |
| Expense Reimbursement | 3.0 |
| Total | $10.0 |

**Overbid Amounts [1]:**

| | |
|---|---|
| Initial Overbid | $15.0 |
| Subsequent Overbids | 95.0 |
| Total | $110.0 |

*Implied TEV Increase (Excluding Stalking Horse Fee)*

| | |
|---|---|
| Implied TEV Increase - $ | $100.0 |
| Implied TEV Increase - % | 8.8% |

*Implied TEV Increase (Including Stalking Horse Fee)*

| | |
|---|---|
| Implied TEV Increase - $ | $110.0 |
| Implied TEV Increase - % | 9.7% |

**Overbid Allocations:**

| | |
|---|---|
| Overbid Allocation | $93.5 |
| Remaining Allocation | 6.5 |
| Total | $100.0 |

## MODEL

| | Claims [2] | Appendix A Consideration | Maximum Incremental Consideration [1] | % Overbid Allocation | % Remaining Allocation | $ Overbid Allocation | $ Remaining Allocation | Unsecured Claims [3] | To Mortgage Holders | To Mezzanine Holders [4] | To Unsecured Claims [4] | To Preferred Shareholders | Post-Overbid Consideration |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fixed Pool** | | | | | | | | | | | | | |
| Fixed Pool DIP [2] | $46.6 | $46.6 | -- | 4.4% | 4.4% | -- | -- | -- | $4.4 | -- | -- | -- | $46.6 |
| Fixed Pool Mortgage [1] | 825.4 | 622.5 | 202.9 | 58.5% | 58.5% | 54.7 | 3.8 | 2.5 | -- | -- | -- | -- | 685.3 |
| **Floating Pool** | | | | | | | | | | | | | |
| Floating Pool DIP [2] | 17.5 | 17.5 | -- | 1.6% | 1.6% | -- | -- | -- | 1.1 | 0.6 | -- | -- | 17.5 |
| Floating Pool Mortgage | 220.2 | 200.3 | 19.9 | 18.8% | 18.8% | 17.6 | 1.2 | 1.5 | -- | -- | -- | -- | 220.2 |
| Floating Pool Mezzanine | 132.4 | -- | 132.4 | 0.0% | 0.0% | -- | -- | -- | -- | -- | -- | -- | 0.6 |
| **Anaheim** | | | | | | | | | | | | | |
| Anaheim Mortgage | 13.0 | 13.0 | -- | 1.2% | 1.2% | -- | -- | -- | -- | 1.2 | -- | -- | 13.0 |
| Anaheim Mezzanine | 22.6 | 3.6 | 19.0 | 0.3% | 0.3% | 0.3 | 0.0 | -- | -- | -- | -- | -- | 5.2 |
| **Mission Valley** | | | | | | | | | | | | | |
| Mission Valley DIP [2] | 4.0 | 4.0 | -- | 0.4% | 0.4% | -- | -- | -- | -- | -- | -- | 0.4 | 4.0 |
| Mission Valley Mortgage | 47.2 | 47.2 | -- | 4.4% | 4.4% | 2.2 | 0.2 | 0.5 | -- | -- | 0.5 | 3.9 | 47.2 |
| Garden Grove | 37.4 | 25.3 | 12.1 | 2.4% | 2.4% | 2.2 | 0.2 | 0.5 | -- | -- | -- | -- | 27.7 |
| Ontario Hilton | 35.5 | 8.0 | 27.5 | 0.8% | 0.8% | 0.7 | 0.0 | 0.5 | -- | -- | -- | -- | 8.8 |
| Washington DC | 25.5 | 25.5 | -- | 2.4% | 2.4% | -- | -- | 0.5 | -- | -- | 0.5 | 1.9 | 25.5 |
| **Tysons Corner** | | | | | | | | | | | | | |
| Tysons Corner DIP [2] | 2.4 | 2.4 | -- | 0.2% | 0.2% | -- | -- | -- | -- | -- | -- | 0.2 | 2.4 |
| Tysons Corner Mortgage | 25.1 | 25.1 | -- | 2.4% | 2.4% | -- | -- | 0.5 | -- | -- | 0.5 | 1.9 | 25.1 |
| San Antonio | 24.1 | 24.1 | -- | 2.3% | 2.3% | -- | -- | 0.5 | -- | -- | 0.5 | 1.8 | 24.1 |
| **Total** | $1,478.9 | $1,064.9 | $413.9 | 100.0% | 100.0% | $75.5 | $5.2 | $7.0 | $5.4 | $1.8 | $2.0 | $10.0 | $1,152.9 |

*Step 1: Consideration to Creditors up to Mortgage / DIP Claim Value* — Mortgage / Mezz Consideration Parameters (Claims, Appendix A Consideration, Maximum Incremental Consideration); Allocation of Overbids — % Allocation (Overbid Allocation, Remaining Allocation), $ Allocation (Overbid Allocation, Remaining Allocation); Unsecured Claims.

*Step 2: Consideration to Creditors Beyond Mortgage / DIP Claim Value* — Allocation of Overbids, $ Allocation (To Mortgage Holders, To Mezzanine Holders, To Unsecured Claims, To Preferred Shareholders); Post-Overbid Consideration.

Note: Analysis excludes the required payment of at least $10 million in cash to pay all administrative and other claims and expenses necessary for the Debtors to emerge from bankruptcy that are not paid pursuant to the Final Cash Collateral Order.
(1) Fixed Pool overbid consideration in the form of debt is valued using an 8% discount rate
(2) Claims represent principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges
(3) Unsecured claims are shown for illustrative purposes only. Actual amount of unsecured claims is subject to review by the Company in all respects
(4) Assumes mezzanine claims are senior to unsecured claims for illustrative purposes only. Actual recoveries will depend on the seniority of claims within the individual pools

# Pro Forma Capitalization

*($ in millions)*

FOR ILLUSTRATIVE PURPOSES ONLY - SUBJECT TO MATERIAL MODIFICATION

| | Pro Forma Capitalization | |
| --- | --- | --- |
| | Appendix A [1] | PF $110.0mm in Overbids |
| Fixed Pool Debt [2] | $622.5 | $679.5 |
| Floating Pool Debt | -- | 0.5 |
| Anaheim Debt | 13.0 | 14.3 |
| Mission Valley Debt | 47.2 | 51.3 |
| Garden Grove Debt | 25.3 | 27.4 |
| Ontario Hilton Debt | 8.0 | 8.7 |
| Washington DC Debt | 25.5 | 27.5 |
| Tysons Corner Debt | 25.1 | 27.3 |
| San Antonio Debt | 24.1 | 26.0 |
| **Total Debt** | **$790.5** | **$862.5** |
| | | |
| Equity | $348.2 | $388.7 |
| **Total Capitalization** | **$1,138.7** | **$1,251.2** |

Note: Analysis excludes the required payment of at least $10 million in cash to pay all administrative and other claims and expenses necessary for the Debtors to emerge from bankruptcy that are not paid pursuant to the Final Cash Collateral Order.
(1) Appendix A of the Five Mile Capital II Pooling REIT LLC and Lehman ALI Inc. Binding Commitment Agreement
(2) Overbid consideration in the form of debt is stated at face value

## EXHIBIT 3

## New Party/Midland Commitment

## EXHIBIT B

**Proposed Order Modifying Final Cash Collateral Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| INNKEEPERS USA TRUST, *et al.*,[1] | Case No. 10-13800 (SCC) |
| Debtors. | Jointly Administered |

## ORDER MODIFYING FINAL CASH COLLATERAL ORDER

Upon the motion (the "**Motion**")[2] of the Debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), for the entry of an order (this "**Order**") (a) authorizing the Debtors to enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, a division of PNC Bank, National Association, (b) approving the New Party/Midland Commitment, (c) approving Bidding Procedures, (d) approving Bid Protections, (e) authorizing an expense reimbursement to a bidder, all as more fully set forth in the Motion, and (f) modifying the Final Cash Collateral Order to increase the expense reserve contemplated therein from $4.5 million to $18.5 million; and upon the *Declaration of William Q. Derrough in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the New Party/Midland Commitment, (III) Approving Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement for "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Expense*

---

[1] The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

*Reserve*; and upon the Final Order Authorizing the Debtors to (i) Use the Adequate Protection Parties' Cash Collateral and (ii) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, entered on September 2, 2010 [Docket No. 402, as amended by Docket No. 539] (the "**Final Cash Collateral Order**"); it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.       ¶ 6(f)(i)(1), page 30 of the Final Cash Collateral Order is modified to delete "$4,500,000" and insert "$18,500,000" in its place.

2.       With respect to amounts reserved pursuant to ¶ 6(f)(i)(1) of the Final Cash Collateral Order, as modified by paragraph 1 above (the "**Modified Expense Reserve**"), for expenses in the category labeled "Permanent Modification" (which includes prepetition real estate taxes and prepetition franchise fees), in the chart, attached as **Exhibit 1** hereto, summarizing the estimated amounts and categories of expenses the Modified Expense Reserve is intended to satisfy (the "**Expense Reserve Chart**"), these amounts shall remain in the Modified Expense Reserve regardless of whether the Commitment Letter (as defined in the Motion) terminates for any reason.

3.       With respect to amounts reserved in the Modified Expense Reserve for expenses in the category labeled "Modification Subject to Termination" (which includes professional fees,

2

other secured claims, and 503(b)(9) claims) in the Expense Reserve Chart, these amounts shall remain in the Modified Expense Reserve so long as the Commitment Letter has not been terminated. If the Commitment Letter terminates for any reason, any cash reserved in the Modified Expense Reserve for expenses in the category labeled "Modification Subject to Termination" in the Expense Reserve Chart shall be distributed in accordance with ¶ 6(f)(i)(2)-(6) of the Final Cash Collateral Order.

4. Nothing in this Order or the Expense Reserve Chart attached as **Exhibit 1** hereto shall represent an acknowledgement of the Debtors as to the amount or validity of any claim or expense.

5. Except as specifically set forth in this Order, the Final Cash Collateral Order shall remain in full force and effect.

New York, New York
Dated: _____, 2011

_____
United States Bankruptcy Judge

K&E 18194223

# **EXHIBIT 1**

## **Expense Reserve Chart**

Innkeepers, USA
Assumed Exit 6/30/2011

The schedule below sets forth the estimated line items pursuant to the Company's amended cash collateral reserve. This does not represent any acknowledgement on the amount or validity of any claims

| | Fixed Rate Loan | Floating Rate Loan | Capmark $47.4 Loan (Mission Valley) | Merrill $25.2 Loan (Tysons Corner) | Capmark $37.6 Loan (Garden Grove) | Merrill $25.6 Loan (Washington DC) | Merrill $24.2 Loan (San Antonio) | Anaheim Loan | Unallocated | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Permanent Modification | 3,775,607 | 2,104,860 | 967,624 | 21,245 | 102,711 | 19,800 | 247,151 | 815,399 | - | 8,054,397 |
| Modification Subject to Termination | $ 5,451,464 | $ 2,989,119 | $ 237,439 | $ 211,325 | $ 175,171 | $ 205,540 | $ 152,103 | $ 139,956 | $ 850,000 | $ 10,412,116 |
| Estimated Closing Costs | $ 9,227,070 | $ 5,093,979 | $ 1,205,062 | $ 232,570 | $ 277,882 | $ 225,339 | $ 399,254 | $ 955,354 | $ 850,000 | $ 18,466,512 |

# EXHIBIT C

**New Party/Midland Commitment**

**INNKEEPERS USA TRUST**
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480

As of January 14, 2011

**Midland Loan Services, a division of PNC Bank, National Association**
10851 Mastin, 6th Floor, Overland Park, KS 66210
Attention: Kevin S. Semon
　　　　　Vice President, Special Servicing Manager

  Re:  **Agreement Relating to Midland Commitment to Support Debtor
     Commitment with New Party under Certain Circumstances**

    If (i) one or more Termination Events (as defined in the Five Mile/Midland Commitment (as defined herein)) occur under the Amended and Restated Binding Commitment for the Acquisition of Innkeepers USA Trust entered into by Five Mile Capital II Pooling REIT LLC ("**Five Mile**") and Midland Loan Services, a division of PNC Bank, National Association (as Special Servicer for Bank of America N.A., as Trustee for the Registered Holders of LB-UBS Commercial Mortgage Trust 2007 - C6, Commercial Mortgage Pass-Through Certificates, Series 2007 - C6) (the "**Special Servicer**"), dated January 14, 2011 (the "**Five Mile/Midland Commitment**") as a result of one or more breaches by Five Mile thereunder, and Special Servicer terminates the Five Mile/Midland Commitment, (ii) on or before the date of the Auction (as defined in the Term Sheet attached as Exhibit A to the Debtor Commitment (as defined herein)), Innkeepers USA Trust and its wholly owned direct and indirect subsidiaries (collectively, the "**Company**") proposes a third party acceptable to the Special Servicer in its sole but reasonable discretion ("**New Party**") to consummate the Transaction (as defined in the Five Mile/Midland Commitment) on the same or better terms as contained in the Five Mile/Midland Commitment, including but not limited to, the limited guaranty of each of Five Mile and Parent Entity (as is defined in the Five Mile/Midland Commitment), and (iii) New Party and Lehman ALI Inc. ("**Lehman**") have entered into a written commitment on the same or better terms as that contained in that certain commitment agreement entered into by Five Mile and Lehman, dated January 14, 2011 (the "**Five Mile/Lehman Commitment**"), then, provided that (x) no other Termination Event has occurred (i.e. other than as a result of a breach or breaches by Five Mile), (y) New Party executes and delivers a commitment to the Special Servicer in the same form and substance as the Five Mile/Midland Commitment (containing the guarantees, as referenced above) with such changes that are required to reflect that New Party is replacing Five Mile and any changes to the Transaction that are acceptable to Special Servicer in its sole but reasonable discretion (the "**New Party/Special Servicer Commitment**"), and (z) the Company, New Party, and Lehman confirm in a writing acceptable to the Special Servicer that they are willing to proceed with the transaction as contemplated in the New Party/Special Servicer Commitment and any corresponding modification to the Binding Commitment Agreement regarding the Acquisition and Restructuring of Innkeepers USA Trust entered into by

the Company, Five Mile, Lehman, and the Special Servicer, dated January 14, 2011 (the "**Debtor Commitment**"), the Special Servicer shall support the Debtor Commitment and any corresponding modification to the Debtor Commitment so long as no termination event occurs thereunder or under the New Party/Special Servicer Commitment.  The determination of whether terms are "the same or better" as described herein shall be made by Special Servicer in its sole but reasonable discretion.

Very truly yours,

**GRAND PRIX HOLDINGS, LLC**

By: _____

Name: Justin Korval

Title: Authorized Signatory

**INNKEEPERS USA TRUST**
**(for itself and for its wholly owned**
**direct and indirect subsidiaries)**

By: _____

Name:

Title:

Acknowledged and Agreed:

**Midland Loan Services, a Division of PNC Bank, ~~N.A.~~ National Association,** *d*
*U.S. Bank National Association*
**(as Special Servicer for ~~Bank of America, N.A.,~~ as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage Trust 2007 - C6,**
**Commercial Mortgage Pass-Through Certificates, ~~Series 2007 C6)~~** *Successor trustee to Bank of*
*America National Association)*

By: _____

Name:

Title:

Very truly yours,

**GRAND PRIX HOLDINGS, LLC**

By: _____
Name:
Title:

**INNKEEPERS USA TRUST**
**(for itself and for its wholly owned**
**direct and indirect subsidiaries)**

By: _~Mark Murphy~_
Name: _Mark A. Murphy_
Title: _VP_

Acknowledged and Agreed:

**Midland Loan Services, a Division of PNC Bank, ~N.A.~ National Association,**
~U.S. Bank National Association~
**(as Special Servicer for ~Bank of America, N.A.,~ as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage Trust 2007 - C6,**
**Commercial Mortgage Pass-Through Certificates~, Series 2007- C6)~** successor trustee to Bank of
America National Association)

By: _____
Name:
Title:

Very truly yours,

**GRAND PRIX HOLDINGS, LLC**

By: _____
Name:
Title:

**INNKEEPERS USA TRUST**
**(for itself and for its wholly owned**
**direct and indirect subsidiaries)**

By: _____
Name:
Title:

Acknowledged and Agreed:

**Midland Loan Services, a division of PNC Bank, National Association,**
as Special Servicer for U.S. Bank, National Association as Trustee for the Registered
Holders of LB-UBS Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through
Certificates successor trustee to Bank of America National Association

By: _____
Name:     Kevin C. Donahue
Title:     Senior Vice President
            Servicing Officer

## EXHIBIT D

### Process Letter for Stalking Horse Candidate

# MOELIS & COMPANY

[DATE]

PRIVATE AND CONFIDENTIAL

[COMPANY NAME]
[ADDRESS]
[ADDRESS]

Attention:        [NAME, TITLE]

On behalf of Innkeepers USA Trust ("Innkeepers" or the "Company"), Moelis & Company LLC ("Moelis," "we," "us" or "our") thanks you for your interest in a potential transaction involving the Company (the "Transaction"). We have been retained by the Company as its exclusive financial advisor in connection with the Transaction and, as such, will arrange for appropriate contacts for due diligence purposes. All (i) communications regarding the Transaction, (ii) requests for additional information, and (iii) discussions or questions regarding procedures should be submitted or directed to us.

You have previously confirmed to us that your valuation is above the threshold we discussed for the enterprise and that you have sufficient funds to consummate an equity investment in Innkeepers. The Company requests that your written, non-binding indication of interest (a "Proposal") be submitted **no later than 5:00 PM EDT on Tuesday, November 23, 2010, via email to:**

> Moelis & Company LLC
> 399 Park Avenue, 5th Floor
> New York, NY 10022
> Attention: William Derrough
> Email: william.derrough@moelis.com
> Copy: zul.jamal@moelis.com
> Copy: steve.moore@moelis.com

The timeline and next steps for this process depend on several factors, including the details of your Proposal. However, time is of the essence and, although your response is expected to be non-binding, the Company will place significant weight on a Proposal that is specific with respect to consideration, structure, and timing.

In order to evaluate the proposals on a comparable basis, your Proposal should address the following points, along with any others you feel will be helpful to us in evaluating your Proposal:

(i)    **Valuation / Structure**. The Proposal should indicate the purchase price for up to 100% of the equity in the Company. In addition, we request that you provide an aggregate debt balance range and the associated debt-to-capitalization.

As certain of our constituents may be interested in retaining equity in a reorganized Company and/or an opportunity to co-invest alongside a lead investor, the Proposal should address this and specify the structure of your equity investment and your minimum desired ownership level of the pro forma ownership. Please also indicate any minimum control characteristics or any other limitations that you may have.

(ii)     **Financing**.  The Proposal should include a detailed description of the intended sources of financing for the Transaction, as well as an indication of the structure, timing, and steps required to secure such financing.

Your Proposal should take into consideration that the Company requires a minimum of $100 million in available cash for the following purposes:

- Repayment of Five Mile DIP:               $53 million

- Repayment of Lehman DIP:                 $17 million

- Admin Claims & Cash on Hand:          $30 million

(iii)    **Material Conditions or Assumptions.** You should include a statement regarding any material conditions or assumptions that must be resolved in order to consummate the Transaction.

(iv)    **Approvals.** If applicable, the Proposal should include a list of any corporate, shareholder, or regulatory approvals required to complete the Transaction, the timing to obtain such approvals, and any other facts or circumstances that can reasonably be foreseen that might affect the timing and/or certainty of the closing of the Transaction.

(v)     **Due Diligence**.  The Proposal should include a detailed description of the specific due diligence issues that must be resolved and any additional information that will be required in order to submit a written final and binding offer for the Transaction, as well as the timetable pursuant to which you would expect to complete your due diligence review in order to submit a definitive binding proposal.

(vi)    **Other Conditions.** The Proposal should include a description of any other conditions you anticipate, including anticipated timing of satisfying such conditions.

(vii)   **Advisors and Contacts**.  The Proposal should include a list of the name(s), and respective function(s), of any advisors you have engaged or would plan to engage in connection with the Transaction and the name(s), phone number(s), email(s), and fax number(s) of the parties prepared to answer any questions regarding your Proposal.

Shortly following the submission of Proposals, we will contact all parties who have submitted Proposals regarding whether they will be invited to continue their evaluation of the Transaction. Those invited to the next round will be allowed to conduct further due diligence including access to management, data room materials, and additional business, financial, and legal due diligence. Next steps will be communicated after receipt and consideration of your initial indication of interest. At the conclusion of the due diligence phase, participants will be requested to submit binding proposals (each, an "Offer") to acquire the equity of the reorganized Company.

If you have any questions regarding the procedures and guidelines in this letter or any other matter related to the Transaction, please feel free to contact Moelis & Company (contact information below).  We will be available throughout the process to assist you in your evaluation of the Company.  **In no event should you contact the management, employees, advisors (other than us), suppliers, franchisors, or customers of the Company regarding any matter relating to the Transaction**.  We remind you that you are subject to the terms and conditions outlined in the executed Confidentiality Agreement.

# M O E L I S & C O M P A N Y

On behalf of Innkeepers, we appreciate your continued interest in the Company and your cooperation in complying with these procedures.

Sincerely,

### M O E L I S & C O M P A N Y

| | | |
|---|---|---|
| 399 Park Avenue, 5th Floor<br>New York, NY 10022<br>Tel: (212) 883-3800 | | |
| **William Derrough**<br>*Managing Director*<br>Tel: (212) 883-3830<br>william.derrough@moelis.com | **Alex Rubin**<br>*Managing Director*<br>Tel: (212) 883-4545<br>alex.rubin@moelis.com | **Zul Jamal**<br>*Senior Vice President*<br>Tel: (212) 883-3813<br>zul.jamal@moelis.com |
| **Steve Moore**<br>*Vice President*<br>Tel: (212) 883-3517<br>steve.moore@moelis.com | **Brian Bacal**<br>*Associate*<br>Tel: (212) 883-4548<br>brian.bacal@moelis.com | **Adam Pieczonka**<br>*Analyst*<br>Tel: (212) 883-3547<br>adam.pieczonka@moelis.com |

# EXHIBIT E

## December 10, 2010 Five Mile/Lehman Proposal

## COMMITMENT AGREEMENT
### (Lehman/Five Mile)

December 10, 2010

*This agreement is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.*

*THIS AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF INNKEEPERS USA TRUST OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.*

| | |
|---|---|
| **Plan of Reorganization:** | The recapitalization and debt restructuring (the "Transaction") of Innkeepers USA Trust and its subsidiaries (the "Company") is to be effectuated through a plan of reorganization (the "Plan") to be filed in the United States Bankruptcy Court for the Southern District of New York presiding over the Company's bankruptcy cases (jointly administered as Case No. 10-13800) (the "Innkeepers Bankruptcy Court") by the Company with the support of Five Mile Capital II Pooling REIT LLC, through its investment advisor Five Mile Capital Partners LLC ("Five Mile"), and Lehman ALI Inc. ("Lehman", and together with Five Mile, the "Proponents"). Lehman and Five Mile acknowledge and agree that any and only a plan of reorganization that is consistent with all material terms and conditions herein shall be deemed a "Plan" regardless of who is a plan proponent. |
| **Midland:** | Simultaneously with the execution of this Commitment Agreement (the "Agreement"), Midland Loan Services, Inc. ("Midland") shall execute a commitment letter with Five Mile (the "Commitment Letter"). The executed Commitment Letter is attached hereto as Appendix C, but shall not be incorporated herein. Five Mile agrees not to make any material modifications to or to exercise or to waive any Termination Event under (except Termination Event No. 11) the Commitment Letter without Lehman's prior written consent. To the extent there is any inconsistency between this Agreement and the Commitment Letter, the rights and obligations of Five Mile and Lehman shall be governed by this Agreement. Five Mile will provide Lehman with a copy of any communication between Midland and Five Mile, in its capacity as Plan Sponsor (as defined in the Commitment Letter), with respect to the Commitment Letter. |

| | |
|---|---|
| **New Equity:** | The reorganized Company will issue equity (the "New Equity") as set forth below upon the effective date of the Plan (the "Effective Date"). |
| **Equity Stalking Horse Bid:** | Five Mile, through one or more of its wholly owned affiliates(s), will purchase 40.0% of the New Equity for cash in an amount equal to $138.96 million, including any additional amounts resulting from the Reduction/Surplus (as defined below) (the "Equity Commitment").[1]

Either (a) ████████ REDACTED ████████ will purchase an additional 10% of the New Equity for cash in an amount equal to $34.74 million or (b) an additional 10% of the New Equity will be divided equally between Lehman and Five Mile; 5.0% will be purchased by Five Mile and 5.0% will be retained by Lehman with a corresponding adjustment to the Equity Commitment and the Lehman Payment (as defined below). |
| **Treatment of Floating Rate Mortgage:** | Lehman will receive (i) 40.0% of the New Equity and (ii) $61.04 million in cash (the "Lehman Payment"), in full and final satisfaction of all of its claims arising under or in connection with the floating rate mortgage (the "Lehman Loan"). |
| **Treatment of Other Debt:** | Consummation of the Transaction will be subject to the restructuring of the Company's other debt in amounts and with the treatment terms substantially as outlined in Appendix A, on a non-recourse basis with terms substantially similar to the existing terms, or with such other terms that are mutually acceptable to Lehman and Five Mile.[2] |
| **DIP Financings:** | The debtor-in-possession financings provided by Solar Finance, Inc. (the "Solar DIP") and Five Mile Capital II Pooling International LLC (the "Five Mile DIP") shall be repaid in cash on the Effective Date. |
| **Required Cash:** | Upon consummation of the Transaction and on the Effective Date, the reorganized Company will have at least $22.8 million to fund future PIP work and FF&E reserves, sufficient capital to pay off the Solar DIP (in the principal amount then outstanding, of up to approximately $17.5 |

---

[1]     The percentages reflected above contemplate the equity held by Lehman and Five Mile after the sale of 10% of New Equity to the New Manager and 10% of New Equity to ███ REDACTED ███

[2]     Lehman and Five Mile recognize that the treatment of other claims set forth herein and in Appendix A are approximate and subject to change during the course of discussions relating to the Plan; provided, however, that absent material differences with respect to the treatment of any particular claim, Lehman and Five Mile each shall receive an equal percentage of New Equity, Five Mile shall fund the Equity Commitment, and Lehman shall receive the Lehman Payment.

| | |
|---|---|
| | million) and the Five Mile DIP (in the principal amount then outstanding, of up to approximately $53 million)[3], sufficient capital to pay all administrative and other expenses necessary for Innkeepers to emerge from bankruptcy currently estimated at $20 million, and at least $27.5 million of cash on hand, all to be funded from the purchase of New Equity (collectively, the "Required Cash").[4] |
| **Bid Procedures:** | The Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Plan. Any auction or alternative transaction will be on the following terms (the "Bid Procedures"):<br><br>• Bids will be solicited for up to thirty (30) calendar days following the approval of bidding procedures;<br><br>• Bidders must be qualified on terms reasonably acceptable to the Company and the Proponents and such terms of the bids will be no more onerous than the terms contemplated herein and bids shall only be made on an enterprise value basis (based on the capital structure and sources and uses of funds outlined in the Plan);<br><br>• Initial overbid of the implied enterprise value must be at least $25 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied enterprise value of the Lehman and Five Mile bid as set forth in Appendix A (the "Proponents' Bid") and subsequent bids must be in increments of at least $5 million (an "Overbid");<br><br>• The percentage increase in the implied enterprise value of the winning bidder will be allocated to each prepetition mortgage holder (the "Overbid Allocation") by increasing the debt or cash consideration that such holder is receiving under the Plan in proportion to the Overbid amount (e.g., if a mortgage holder is receiving a new mortgage under the Plan in the face amount of $100, then a winning Overbid that is 4% greater than the Proponents' Bid would result in that holder receiving a mortgage in the face amount of $104; same would apply to cash consideration); |

---

[3]  This number assumes that both the Solar DIP and the Five Mile DIP have been fully funded. If the Solar DIP has not been fully funded, cash in an amount equal to the amount then unfunded under the Solar DIP shall be placed into an account held by the Company. Likewise, if the Five Mile DIP has not been fully funded, cash in an amount equal to the amount then unfunded under the Five Mile DIP shall be placed into an account held by the Company.

[4]  The numbers in this section are all subject to further discussions with the Company in order for Five Mile and Lehman to confirm the amount of Required Cash.

| | |
|---|---|
| | provided, that the amount of the Overbid consideration not allocated to pre-petition creditors under the Overbid Allocation shall be allocated to each pre-petition creditor pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools against which such respective pre-petition creditor has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying pre-petition interests and determining the ultimate recipients of such Overbid; provided, however, that to the extent any winning Overbid includes debt consideration to Midland in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between Lehman, Five Mile and Midland);<br><br>• In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through the corporate structure for purposes of determining the ultimate recipients of such overbid value;<br><br>• In the event the winning bidder is not the Proponents (which includes any wholly-owned subsidiary of Five Mile), the Lehman Loan shall be repaid in cash in an amount determined in accordance with the Overbid Allocation (assuming an allocation of $200 million of value to the Lehman Loan in the Proponents' Bid); and<br><br>• Other terms to be agreed by the Proponents.[5] |
| **Stalking Horse Fee:** | The order approving the Bid Procedures will provide that in the event of an Overbid in which Proponents' Bid is not the winning bid, Five Mile would receive a breakup fee in the amount of $7 million plus reimbursement of all of Five Mile's reasonable fees and expenses (the "Expense Reimbursement"), not to exceed $3 million (collectively, the "Stalking Horse Fee"). In the event Five Mile receives a Stalking Horse Fee, Five Mile agrees to promptly turn over 25% of the Stalking Horse Fee less the Expense Reimbursement to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Company to emerge from bankruptcy as has been mutually agreed between Lehman and Five Mile. |

---

[5]     Note that the additional consideration included in any Overbid (except for the Initial Overbid) must consist of no more than 70% debt consideration.

| | |
|---|---|
| | The Stalking Horse Fee, if any, shall be payable by the Company upon the earlier of (a) the Plan Effective Date, and (b) consummation of a sale of the New Equity. |
| **Means For Implementation:** | The Company and/or the Proponents will (a) file (i) the Plan, (ii) a disclosure statement for the Plan ("Disclosure Statement"), and (iii) a joint motion to approve the Bid Procedures and the Stalking Horse Fee (the "Bid Procedures Motion"), and (b) request a hearing for approval of the Disclosure Statement and the Bid Procedures Motion. Each of the foregoing and subsequent pleadings shall be in form and substance acceptable to the Proponents.<br><br>The Plan will be filed jointly for all the Debtors, subject to modifications with the consent of Lehman and Five Mile.<br><br>If the Company does not file the Plan, Disclosure Statement, and Bid Procedures Motion by January 14, 2011, or at any time files a plan, disclosure statement, or biding procedures motion that is not supported by the Proponents, (i) Lehman agrees (a) promptly thereafter to file or to cause the filing of a motion to terminate exclusivity (the "Exclusivity Motion") in order to file such pleadings and (b) to file or to cause the filing of such pleadings, and (ii) Five Mile agrees to support the Exclusivity Motion and such pleadings. |
| **Minority Investment:** | Prior to the Effective Date, the Proponents will agree to sell, on a pro rata basis, an aggregate of 10% of New Equity to a new third-party investor that will serve as the new manager for the reorganized Company (the "New Manager").<br><br>The Minority Investment will not close until after confirmation of the Plan and the occurrence of the Effective Date, and the effectiveness of the Plan will not be conditioned upon a closing of the Minority Investment.<br><br>The Plan will contain a provision mandating the cooperation of Island Hospitality Management, Inc. with the reorganized Company and the New Manager. |
| **Pro Forma Equity Ownership:** | Following the Minority Investment, the New Equity to be allocated between the new ownership (the "Members") as follows:<br><br>• 40.0% to Five Mile;<br><br>• 40.0% to Lehman;<br><br>• 10.0% to New Manager; and |

| | |
|---|---|
| | - 10.0% to REDACTED<br><br>In the event Lehman and Five Mile agree to any increase or decrease in the percentage of New Equity allocated to the New Manager or REDACTED any resulting surplus or reduction in New Equity (the "Reduction/Surplus") shall be split equally between Lehman and Five Mile. |
| **Governance:** | The board of directors will initially consist of up to 7 members as follows: 2 members nominated by Five Mile, 2 members nominated by Lehman, and 3 independent members: provided, however, that subject to agreement among Lehman and Five Mile, 1 independent member nomination may be allocated to the New Manager, 1 independent member nomination may be allocated to REDACTED and 1 independent member nomination may be allocated in such manner as Lehman and Five Mile mutually agree.<br><br>A super-majority vote of 66 2/3% of the equity interests in the Company will be required for material decisions as outlined in Appendix B (the "Material Decisions").<br><br>Lehman and Five Mile shall negotiate and agree upon required board actions and a process for resolving deadlocked votes on decisions that are non-Material Decisions. |
| **Shareholders Agreement:** | On or prior to the Effective Date, Lehman and Five Mile shall enter into a shareholders'/operating agreement that shall be agreed upon by Lehman and Five Mile and shall contain customary protections mutually acceptable to Lehman and Five Mile. |
| **Commitment:** | From the date of execution of this Agreement until the Termination Date, and subject to the conditions set forth in this Agreement, Five Mile and Lehman, as applicable, agree and covenant that:<br><br>Lehman and Five Mile shall (i) use commercially reasonable efforts to prepare or cause the preparation of the Bid Procedures Motion, Plan, Disclosure Statement, other Plan-related documents, and, if necessary, the Exclusivity Motion (collectively, the "Plan Pleadings") which shall be consistent in all material respects with this Agreement, and to cause the Company to file and to seek approval of such pleadings (other than the Exclusivity Motion), (ii) take all reasonably necessary and appropriate actions to achieve confirmation and consummation of the Plan and the Transaction contemplated in this Agreement, and (iii) not take any actions (a) inconsistent with this Agreement or (b) that would materially delay the confirmation or consummation of the Plan or the Transaction contemplated in this Agreement; |

| | Lehman and Five Mile shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transaction. Furthermore, each of Lehman and Five Mile shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement; |
|---|---|
| | Lehman and Five Mile each hereby covenants and agrees to negotiate in good faith the Plan Pleadings, each of which shall (i) contain the same economic terms (subject to adjustment) as and other terms consistent in all material respects with, the terms set forth in this Agreement and (ii) otherwise be in form and substance acceptable in all respects to each of Lehman and Five Mile; |
| | Five Mile hereby commits to provide the entire principal amount of Equity Commitment upon the Effective Date of the Plan, upon the terms and subject to the conditions set forth in this Agreement; and |
| | Subject to the conditions contained in the section labeled "Lehman Bankruptcy Court," Lehman hereby commits to vote its claims to accept the Plan and consent to the treatment of its claims as set forth in this Agreement. |
| **Non-Solicitation:** | Lehman agrees until the Termination Date (as defined herein), without the written consent of Five Mile, it will not authorize or permit any of its officers, directors, controlled affiliates, subsidiaries, representatives, or advisors to (i) take, directly or indirectly, any action with respect to investing or otherwise participating in any transaction involving, directly or indirectly, any or all of the Debtors' Assets, the businesses of Innkeepers or the Lehman Loan (the "Potential Transactions"), (ii) solicit, initiate or encourage any proposals or offers from any person other than Five Mile relating to a Potential Transaction and Lehman's participation therein, or (iii) reach any agreement or understanding (whether or not such agreement or understanding is absolute, revocable, contingent or conditional) for, or otherwise attempt to consummate, any transaction related to the Potential Transactions other than the Transaction contemplated hereby; and |
| | Five Mile agrees until the Termination Date (as defined herein), without the written consent of Lehman, it will not authorize or permit any of its officers, directors, controlled affiliates, subsidiaries, representatives, or advisors to (i) take, directly or indirectly, any action with respect to investing or otherwise participating in any transaction involving, directly or indirectly, the Potential Transactions, (ii) solicit, initiate or encourage any proposals or offers from any person other than Lehman |

| | |
|---|---|
| | or Midland relating to a Potential Transaction and Five Mile's participation therein, or (iii) reach any agreement or understanding (whether or not such agreement or understanding is absolute, revocable, contingent or conditional) for, or otherwise attempt to consummate, any transaction related to the Potential Transactions other than the Transaction contemplated hereby (the "Non-Solicitation Period"). |
| **Termination:** | Unless otherwise agreed by the parties in writing, this Agreement will terminate upon the earliest of (the "Termination Date"):<br><br>• February 11, 2011, which shall be deemed extended for so long as any Plan Pleading that is on file has not been denied by a written order of the Innkeepers Bankruptcy Court;<br><br>• Notwithstanding anything contained herein to the contrary, March 31, 2011, if the Bid Procedures have not been approved by the Innkeepers Bankruptcy Court as of such date;<br><br>• Notwithstanding anything contained herein to the contrary, June 30, 2011, if the Plan has not been confirmed by the Innkeepers Bankruptcy Court as of such date;<br><br>• The dismissal or conversion to chapter 7 of the Company's chapter 11 cases;<br><br>• The termination of exclusivity for a substantial or material number of the debtors unless supported or sought by Lehman and Five Mile;<br><br>• Approval by the bankruptcy court of any bidding procedures, sale procedures, disclosure statement, or plan other than the Bid Procedures Motion, Disclosure Statement, and Plan;<br><br>• The granting of stay relief with respect to a substantial part of the Company's assets;<br><br>• Termination of the Commitment Letter or Midland's failure to support the Agreement and Transaction contemplated thereby or failure to vote in favor of the Plan;<br><br>• Denial of the Lehman Bankruptcy Court Motion or the Lehman Bankruptcy Court's entry of any other order, judgment or decree prohibiting Lehman from consummating the Transaction;<br><br>• Material modification to the treatment of any claim set forth herein or on Appendix A;<br><br>• Lehman and Five Mile fail to agree on a tax structure for the |

| | |
|---|---|
| | reorganized Company that is agreeable to both Lehman and Five Mile by February 11, 2011; or<br><br>• Such earlier date as may be agreed upon in writing by the parties hereto. |
| **Specific Performance:** | Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the Non-Solicitation provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each party agrees that the other party shall be entitled to an injunction or injunctions to prevent breaches of any of the Non-Solicitation provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter. The only remedy for breach of this Agreement shall be specific performance. |
| **Lehman Bankruptcy Court:** | Notwithstanding anything to the contrary contained herein, Lehman's obligation to vote its claims to accept the Plan and consent to the treatment of its claims as set forth in this Agreement shall be subject to the approval of Lehman's board of directors, the approval of the United States Bankruptcy Court for the Southern District of New York presiding over the Lehman Brothers Holdings Inc. bankruptcy cases (Case No. 08-13555) (the "Lehman Bankruptcy Court"), the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court, and the solicitation of its vote in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code. As soon as reasonably practicable following the approval of the Disclosure Statement, Lehman will (a) seek the approval of Lehman's board of directors for Lehman to vote in favor of the Plan and enter into the Transaction and (b) promptly file a motion (the "Lehman Bankruptcy Court Motion") seeking approval of the Lehman Bankruptcy Court for Lehman to vote in favor of the Plan and enter into the Transaction. Lehman agrees to deliver to Five Mile a draft of the Lehman Bankruptcy Court Motion prior to its filing. The provisions in the Lehman Bankruptcy Court Motion referencing Five Mile, the Agreement or the Transaction shall be reasonably acceptable to Five Mile. |
| **Other:** | • Company shall reimburse Five Mile for the fees and expenses of counsel, provided that the Transaction contemplated by the Plan is consummated.<br><br>• Company shall continue to pay for the fees and expenses of Lehman's advisors and counsel. |

|  | <ul><li>Potential management incentive plan TBD by the Proponents.</li><li>The Plan shall include a full discharge, release and exculpation of liability, other than a release of the obligations described herein, in favor of the Proponents and each of their respective principals, employees, agents, officers, directors, and professionals from the following: (i) any and all claims and causes of action arising prior to the Effective Date and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases, provided that the foregoing will not release or impair Midland's claims in the New York Supreme Court against Apollo Investment Corporation.</li><li>This Agreement may only be modified, altered, amended, or supplemented by an agreement in writing signed by Lehman and Five Mile.</li><li>Company, Five Mile, and/or Lehman shall seek to amend the final cash collateral order to increase the amount of cash held back as an expense reserve, in order to account for certain closing and emergence costs, including potential success fees.</li></ul> |
| --- | --- |

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Commitment Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

LEHMAN ALI INC.

By: _____
Name: Jeff Fitts
Title: Duly Authorized Signatory
Date: December 10, 2010


FIVE MILE CAPITAL II POOLING REIT LLC


By: _____
Name:
Title:
Date: December 10, 2010

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Commitment Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

LEHMAN ALI INC.

By: _____
Name:
Title:
Date:  December 10, 2010

FIVE MILE CAPITAL II POOLING REIT LLC
By:  Five mile Capital Partners LLC,
its manager
By: _____
Name:
Title:
Date:  December 10, 2010

| PRO FORMA CAPITALIZATION | | | | | |
|---|---|---|---|---|---|
| | Current Balance | Debt Impairment | Adjusted Balance | Pay Down/ Conversion | Pro Forma Balance |
| **DEBT AND PREF. EQUITY** | | | | | |
| Five Mile DIP[(a)] | $53.0 | $0.0 | $53.0 | ($53.0) | $0.0 |
| Lehman DIP Loan[(a)] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| Fixed Pool Mortgage | $825.4 | ($202.9) | $622.5 | $0.0 | $622.5 |
| Floating Pool Loan | | | | | |
|   Mortgage | $220.0 | ($20.0) | $200.0 | ($200.0) | $0.0 |
|   Mezzanine (PIK interest) | 112.2 | (112.2) | 0.0 | 0.0 | 0.0 |
|     Total | $332.2 | ($132.2) | $200.0 | ($200.0) | $0.0 |
| Anaheim Hilton Loan | | | | | |
|   Mortgage | $12.8 | $0.0 | $12.8 | $0.0 | $12.8 |
|   Mezzanine | 21.3 | (17.7) | 3.6 | (3.6) | 0.0 |
|     Total | $34.1 | ($17.7) | $16.4 | ($3.6) | $12.8 |
| Residence Inn Mission Valley Mort. | $46.9 | $0.0 | $46.9 | $0.0 | $46.9 |
| Residence Inn Anaheim Mort. | 37.2 | (11.9) | 25.3 | 0.0 | 25.3 |
| Hilton Ontario Mort. | 34.7 | (26.7) | 8.0 | 0.0 | 8.0 |
| Doubletree Washington D.C. Mort. | 25.3 | 0.0 | 25.3 | 0.0 | 25.3 |
| Residence Inn Tyson's Corner Mort. | 24.9 | 0.0 | 24.9 | 0.0 | 24.9 |
| Homewood Suites San Antonio Mort. | 24.0 | 0.0 | 24.0 | 0.0 | 24.0 |
| Public Preferred Stock | 145.0 | (145.0) | 0.0 | 0.0 | 0.0 |
| **Total Debt and Pref. Stock** | $1,600.2 | ($536.4) | $1,063.8 | ($274.1) | $789.7 |
| **Implied Equity** | $0.0 | | | | $347.4 |
| **Total Capitalization** | $1,600.2 | | | | $1,137.1 |

(a)    Assumes DIP financing facility is fully drawn.

---

[6]    Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash | $208.4 | Mortgage Cash Payment to Lehman | $61.0 |
| | | Repayment of Lehman DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 53.0 |
| | | Hilton Anaheim Mezz Payment | 3.6 |
| | | Balance Sheet Cash[a] | 73.3 |
| **Total** | **$208.4** | | **$208.4** |

(a) Balance sheet cash to be used for, among other purposes, FF&E, PIP, working capital reserves and closing costs.

1.       The Sale[7] by the Company or its subsidiaries of assets totaling more than the lesser of (x) $20 million and (y) two hotels, whether in one or more transactions;

2.       Exceeding the amount of operating and capital expenditures in excess of the amount set forth in the Company's approved annual budget, subject to a 3% variance, whether for repositioning, asset improvements, deferred capital expenditure requirements and infrastructure or otherwise, and taking any action that is inconsistent with the approved budget or business plan;

3.       Approval or modification of the Company's annual budget or business plan (provided that until an annual budget is approved, the previously approved annual budget shall govern, with automatic increases (i) for utilities, taxes and insurance (with such increase not to exceed the actual increases in such expense items) and (ii) for all other items, (x) three percent (3%) of the line item for any line item other than capital expenditures, and (y) with respect to capital expenditures, the lesser of (A) three percent (3%) of budgeted line items and (B) $5 million in the aggregate for any year for both budgeted and unbudgeted capital expenditure items); provided, that at all times, whenever the Company's property manager authorizes emergency expenditures (to the extent permitted by the management agreement/shareholders agreement), the annual budget shall be deemed revised and approved to include such expenditures with respect to such period but shall not be included as part of the baseline for determining the annual budget or business plan for future periods;

4.       Commencing, settling or compromising any litigation, arbitration, mediation or other dispute resolution proceeding (x) in excess of $2.5 million, individually or in the aggregate, in any fiscal year, unless such settlement is fully reimbursed by insurance or (y) which may otherwise have a material adverse effect on the Company and its subsidiaries;

5.       (A) The filing of any voluntary petition in bankruptcy on behalf of the Company or any subsidiary, (B) the consenting to the filing of any involuntary petition in bankruptcy against the Company or any subsidiary, (C) the filing by the Company of any petition seeking, or consenting to, the reorganization or relief under any applicable federal or state law relating to bankruptcy or insolvency, (D) the consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, (E) the making of any assignment for the benefit of creditors, (F) the admission in writing of the Company's inability to pay its debts generally as they become due or (G) the taking of any action by the Company in furtherance of any such action;

---

[7] As used herein, the term "Sale" shall mean the direct or indirect sale (by derivative, swap, repurchase or similar transaction), lease, conveyance, disposition or other transfer.

6. Acquisitions of additional properties or material assets except as specifically provided for in the approved annual budget and business plan;

7. Entering into, amending or modifying agreements with cost or liability to the Company or its subsidiaries in excess of $5 million in any fiscal year or which are otherwise material to the business of the Company, provided that for purposes of this provision, the cost of an agreement shall be calculated based only on the period prior to the time that the Company or its subsidiaries shall have the right to freely terminate such agreement, and shall include any fee payable upon termination by the Company or its subsidiaries;

8. Raising new equity for the Company or any of its subsidiaries or admitting any new partner or owner to the Company or any subsidiary;

9. Making distributions to the Members or owners of the Company's subsidiaries;

10. Prepayment of the Company's debt or debt of the Company's subsidiaries, other than as required by the terms of such debt in connection with a property sale consummated pursuant to the approved business plan or as otherwise specifically permitted by the approved business plan;

11. With regard to any subsidiary, approving any decision or taking any action which, if it was being made or taken by the Company, would be a Material Decision as set forth herein;

12. Approving reserves in excess of $2 million, excluding reserves required to be held by lenders of the Company or its subsidiaries, and "FF&E" reserves carried over from the previous approved annual budget;

13. The recapitalization, reclassification, redemption, repurchase or other acquisition by the Company of equity or other interests in the Company;

14. Any amendment or modification of the operating/shareholders agreement (if applicable), the management agreement, or organizational documents (including the operating agreement of a limited liability company and partnership agreement of a partnership) of the Company or any subsidiary of the Company;

15. Entering into, amending or modifying any agreement between the Company or any subsidiary, on the one hand, and a Member or any affiliate of a Member, on the other hand;

16. Merging, consolidating or dissolving the Company or any of its subsidiaries;

17. Making any change to a tax election or accounting principles of the Company or any of its subsidiaries that is materially adverse to any Member or converting the Company or any of its subsidiaries to a corporation;

18. The Company or its subsidiaries refinancing any indebtedness or materially modifying any indebtedness in an amount greater than $15 million in the aggregate;

19. The Company or its subsidiaries incurring or guaranteeing any indebtedness in any amount;

20. The Company holding any assets other than the interests in its subsidiaries existing on the date of hereof, any interest in an entity treated as a corporation for U.S. federal income tax purposes, or any cash reserves intended for distributions to the Members or to pay Company expenses;

21. Removal and replacement of the New Manager as property manager of any of the assets of the Company or its subsidiaries;

22. Any Transfer which may reasonably be expected to cause the assets of the Company to be deemed "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA);

23. Appointing, dismissing, setting or modifying the terms of compensation and benefits for the material officers and employees of the Company or any of its subsidiaries;

24. Any investments (including in the form of loans, guaranties, advances or capital contributions) in any person other than a subsidiary of the Company;

25. Any appointment or removal of the auditors, regular counsel, financial advisors, underwriters, investment bankers or company wide insurance providers of the Company or any of its subsidiaries;

26. The taking of any significant actions, including the making of any significant filing with respect to any governmental or regulatory body, agency, official or authority including application for new regulatory licenses, requests for transfer or assignment of existing regulatory licenses or participation in material rulemaking or policy proceedings;

27. The entry into, or the termination, disposition or material amendment of the terms of any joint venture;

28. Approval of any action or inaction by the Company or any of its subsidiaries that would violate any provision of a loan document or other material agreement or instrument binding on the Company or any of its subsidiaries or any property of the Company or any of its subsidiaries;

29. Enter into any swap, hedge, collar or other interest rate protection agreement, in each case, for a notional amount in excess of $10 million;

30. Entering into any material modification of, or terminating or allowing to expire, any insurance programs covering the Company or its subsidiaries, or their respective assets and personnel (including officers and directors);

31.     Changing the principal banking institutions with which the Company or its subsidiaries maintain deposit, borrowing or other relationships;

32.     Entering into any lease not provided for in the approved annual budget or business plan (other than short term storage leases in connection with a capital program or equipment leases in the ordinary course of business);

33.     Granting any lien, mortgage, pledge or other encumbrance with respect to any material assets of the Company or any of its subsidiaries;

34.     The Company or any subsidiary materially changing its line(s) of business or conducting business in a jurisdiction other than the United States;

35.     Approving any management incentive plan or other equity compensation plan; and

36.     Any rebranding of properties or entry into new franchise agreements.

FIVE MILE CAPITAL PARTNERS

# FIVE
# MILE

THREE STAMFORD PLAZA, 9TH FLOOR
STAMFORD, CONNECTICUT 06901
TELEPHONE 203-905-0950
FACSIMILE 203-905-0954

December 10, 2010

Midland Loan Services, Inc.
10851 Mastin, 6th Floor, Overland Park, KS 66210
Attention:  Kevin S. Semon
              Vice President, Special Servicing Manager

**Binding Commitment for the**
**Acquisition of Innkeepers USA Trust**

Five Mile Capital II Pooling REIT LLC ("Five Mile Pooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), is pleased to submit this letter (this "Commitment Letter") to Midland Loan Services, Inc., as special servicer for the $825.4 million Fixed Rate CMBS Mortgage Loan (together with any successor special servicer, "Special Servicer"), which sets forth, among other things, our binding commitment to provide equity capital (the "Commitment") for the restructuring of the debt and equity of Innkeepers USA Trust ("Innkeepers") and its subsidiaries (collectively with Innkeepers, the "Company"), resulting in Five Mile and Lehman ALI, Inc. ("Lehman" and together with Five Mile Pooling, the "Plan Sponsors") directly or indirectly owning a controlling interest in the reorganized Company (the "Transaction") as more fully set forth in that certain Commitment Agreement between Five Mile Pooling and Lehman dated as of December 10, 2010 (the "Lehman Commitment").  It is expressly acknowledged by the parties hereto that the Special Servicer is not a party to the Lehman Commitment and is not bound by the terms thereof.

If the Plan Sponsors are the successful/winning bidders at the auction, it is intended that the funding from our Commitment will be used to finance and otherwise implement a confirmed plan of reorganization to be filed by Special Servicer, Lehman and Five Mile with or without the Company's support (the "Plan") reasonably acceptable to you (with respect to the treatment of the Fixed Rate CMBS Mortgage Loan under the Plan or otherwise affecting the economics thereof), including the necessity of REMIC compliance and consistency with grantor trust rules and regulations and the pooling and servicing agreement, and reasonably acceptable to us in all material respects, which will provide for the treatment of claims and other terms outlined below and will otherwise comply with applicable disclosure requirements, rules of procedure and contain terms and treatment of claims consistent with the applicable provisions of the Bankruptcy Code.

Five Mile is uniquely qualified to consummate the Transaction, given our substantial investment and the rights we have in certain indebtedness in Innkeepers.  As you know, we have funded a debtor-in-possession financing to the Company for $53 million and have performed our due diligence of all 73

assets. As a result, we are familiar with the Company's assets and operating performance, gleaned from our review of public filings and our own extensive due diligence. We also have broad investment experience in the hospitality area and general expertise in the extended stay lodging sector.

## I.    Value & Proposed Capital Structure

Our Commitment and the Transaction are based on a valuation of the Company of $1,137.1 million and result in a final capital structure of $789.7 million in aggregate indebtedness and $347.4 million in new equity, which will include funding for closing and emergence costs. The details of the reorganized capital structure for the Company are provided in Section IV below.

## II.    Capital Commitments; Guaranties

Subject to the conditions set forth herein, we hereby submit this binding and irrevocable offer to provide $208.4 million of cash to fund the Transaction (a portion of which may be provided by other investors, including an operating partner, who will manage the hotels) pursuant to which, if the Plan Sponsors are the successful winning bidders, Lehman will receive (i) 40.0% of the new equity (the "Converted Equity") and (ii) $61.04 million in cash (the "Lehman Payment"), in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan. It is contemplated that immediately after the effective date of the Plan (the "Effective Date"), Five Mile and Lehman will each own approximately 40% of the equity interests in reorganized Innkeepers (subject to increase in the event other investors are not included in the Transaction). The Transaction will be effectuated consistent with the terms of this Commitment Letter and the Lehman Commitment on the Effective Date. Five Mile's intended investment, as reflected herein, will be used to recapitalize the Company, and more specifically, will be used to retire the existing DIP facilities and provide funds for future property improvement work ("PIP"), furniture, fixtures, and equipment investments ("FF&E"), cash reserves and potential growth opportunities. Five Mile will provide its portion of the cash investment required to consummate the Transaction from our existing investment vehicles.

In addition, in connection with the Fixed Rate CMBS Mortgage Loan, (a) Five Mile Pooling will enter into a new limited "bad boy" guaranty (the "FM Guaranty") which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate CMBS Mortgage Loan, except that Five Mile Pooling will not have any liability under the FM Guaranty unless such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by Five Mile or an affiliate that controls, is controlled by or under common control with Five Mile and (b) the REIT or other holding company entity which owns all of the Innkeepers properties (the "Parent Entity") shall enter into a new "bad boy" guaranty (the "Parent Guaranty"), which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate CMBS Mortgage Loan, except that the beneficiary of the Parent Guaranty shall have no right to enforce such Parent Guaranty unless the Five Mile member of the joint venture between the Plan Sponsors as contemplated by the Lehman Commitment (the "FM/Lehman JV") ceases to have the right to vote at least 34% (which is a blocking right with regards to Super Majority Decisions (as defined below)) of the equity interests in the FM/Lehman JV. Five Mile Pooling's maximum liability under the FM Guaranty shall not exceed 10% of the outstanding principal balance of the restructured Fixed Rate CMBS Mortgage Loan from time to time for which such guaranty is provided. There shall be no

2

such cap on the liability of Parent Entity under the Parent Guaranty. If Five Mile desires to sell or otherwise transfer (i) all of its interests in the FM/Lehman JV or (ii) a portion of its interest in the FM/Lehman JV and with respect to any such partial sale or transfer, Five Mile would cease to have the right to vote at least 34% (which is a blocking right with regards to Super Majority Decisions) of the equity interests in the FM/Lehman JV following such sale or transfer, then, in addition to any other conditions to such sale or transfer set forth in the Fixed Rate CMBS Mortgage Loan documents, as a condition to any such sale or other transfer, an entity, which has a minimum net worth of $135 million and which is otherwise acceptable to the holder of the Fixed Rate CMBS Mortgage Loan in its sole but reasonable discretion shall deliver a guaranty in form and substance substantially similar to the FM Guaranty which covers "bad acts" actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the transferee or an affiliate that controls, is controlled by or under common control with such transferee and Five Mile or the transferee shall pay an appropriate review fee to be set forth in the definitive documentation.

During the term of the Fixed Rate CMBS Mortgage Loan, (x) the corporate or other governance documents of the FM/Lehman JV and the borrowers under the Fixed Rate CMBS Mortgage Loan the operating lessees and such other subsidiaries of the FM/Lehman JV (as may be necessary to effectuate the provisions of this paragraph) shall provide that super-majority voting (i.e., the consent of at least 66 2/3 % of the equity interests in the FM/Lehman JV) shall be required for the decisions identified on Appendix B to the Lehman Commitment if such decision would result in or otherwise constitute a "bad act" under the FM Guaranty (irrespective and independent of whether or not such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by Five Mile or an affiliate that controls, is controlled by or is under common control with Five Mile) and/or the Parent Guaranty, as applicable (collectively, the "Super Majority Decisions") and (y) such Super Majority Decisions may not be amended, waived or modified without the consent of the holder of the Fixed Rate CMBS Mortgage Loan. Nothing contained in this Commitment Letter shall require the Special Servicer to take any action in violation, derogation or contravention of the terms or provisions of the Fixed Rate CMBS Mortgage Loan documents.

The Parties acknowledge that the applicable loan and credit documents evidencing and securing the Fixed Rate CMBS Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer and its counsel shall reasonably require as reasonably acceptable to the reorganized borrowers and the Plan Sponsors in order to implement the proposed treatment of the Fixed Rate CMBS Mortgage Loan, to incorporate the terms herein and to implement the Plan.

In connection with the foregoing, we hereby confirm that we have available, and will have available at all times prior to consummation of the Transaction or the termination of the Commitment Letter, investor commitments that exceed, in the aggregate, $300 million.

## III. Plan Subject to Higher and Better Offers; Five Mile Free to Pursue Other Transactions

Subject to Court approval of the Bid Procedures (as hereinafter defined), Five Mile acknowledges that the creditor treatment proposed herein will be subject to higher and better offers through an auction. For avoidance of doubt, our providing this Commitment Letter does not preclude us in any way from discussing alternate transactions, including competing plans of reorganization, or

engaging in any discussions regarding providing financing or participating in any such alternate transactions (each, an "Alternate Transaction"); provided however, that other than the Lehman Commitment (and the transactions contemplated thereby) we will not enter into a binding commitment with respect to, or otherwise consummate, any Alternate Transaction prior to the occurrence of a Termination Event (as defined in Section VIII hereof).

Special Servicer and Five Mile agree that until a Termination Event (as defined in Section VIII hereof) occurs, Special Servicer and its affiliates and advisors shall be able to participate in discussions regarding an Alternative Transaction; provided however, Special Servicer shall not enter into a binding commitment with respect to, or otherwise consummate, any Alternative Transaction prior to the occurrence of a Termination Event.

**IV.    Restructuring of Debt and Equity of the Company – New Equity, Debt Forgiveness, & Cash Pay Downs**

**A.    *Debt Restructurings***

If the Plan Sponsors are the successful/winning bidders at the auction described in Section V herein, our Commitment for the Plan Sponsors' stalking horse bid contemplates a restructuring implemented through the Plan whereby the current debt holders will realize value totaling $993.3 million or 71.7% of their $1,384.7 million current outstanding obligations. Creditor treatment (excluding unsecured trade creditors) is being implemented through $789.7 million in new debt, $200 million in equity and cash, and $3.6 million in cash to fund certain creditor payments. The new debt also benefits from a capital structure supported by approximately 30.6% in equity value.

An illustration and an explanation of the Plan Sponsors' stalking horse bid and the resultant creditor treatment under the Plan if the Plan Sponsors' stalking horse bid is the winning bid are detailed in Appendix A.

**B. *Cash Sources & Uses***

Our Commitment contemplates that the cash investment of $208.4 million will be used as follows:
- o  Repayment of the Lehman and Five Mile DIP in the amount of up to $70.5 million plus any accrued fees or interest due on such facility;
- o  Payment to the holder of the Hilton Suites Orange/Anaheim Mezzanine loan in the amount of $3.6 million in full satisfaction of its claim;
- o  Payment of fees to the Special Servicer of the Fixed Rate CMBS Mortgage Loan equal to $2.5 million as complete consideration for effecting the restructuring transactions on behalf of the LBUBS 2006-C6 and LBUBS 2006-C7 trusts (the "C6 and C7 Trusts");
- o  $70.3 million of cash to cover 2011 FF&E and future PIP work (currently estimated at approximately $22.8 million and to be verified by the parties), funding of additional cash on the post-Effective Date balance sheet, and closing and emergence costs;
- o  Payment of $500,000 for the various classes of unsecured trade creditors; and

4

- o $61.04 million in cash as the Lehman Payment.

### C. Our Stalking Horse Bid and Resultant Treatment of Claims and Interests

The Plan Sponsors' stalking horse bid is comprised of the following treatment of claims and interests:

1.  Fixed Rate CMBS Mortgage Loan: Reduction of the outstanding balance to $622.5 million.

    a.  Non-Recourse New Mortgage Loan of $622.5 million shall have the following terms:
        i.   No change to the interest rate of 6.71%;
        ii.  No change to maturity date of July 9, 2017;
        iii. During the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; and
        iv.  Prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and

    b.  Property release provision whereby the properties may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then applicable REMIC rules and regulations such other provision that is acceptable to the Company and you which is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement;

    c.  Special Servicer, on behalf of the C6 and C7 Trusts, will receive 100% of the net proceeds from the Apollo guaranty litigation and shall bear all fees, costs and expenses of such litigation. Special Servicer may take the steps necessary to initiate an action in the Bankruptcy Court or another court of competent jurisdiction to facilitate the realization of such net proceeds;

    d.  Special Servicer, on behalf of the C6 and C7 Trusts, will receive a workout fee of $2.5 million as complete consideration of all workout and other fees due pursuant to the pooling and servicing agreement; and

    e.  The lender under the Fixed Rate CMBS Mortgage Loan will receive the FM Guaranty and the Parent Guaranty.

2.  Floating Rate Mortgage Loan: Will receive (i) the Converted Equity and (ii) the Lehman Payment (valued at $200 million in the aggregate), in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan.

3.  Floating Rate Mezzanine Loan (Trimont as special servicer): No distribution; except to the extent the allocated bids at the auction exceed the amount necessary to satisfy the claim of the holders of the Floating Rate Mortgage Loan in full (the "Floating Rate

Excess Allocation"). The holders of the Floating Rate Mezzanine Loan shall be entitled to the Floating Rate Excess Allocation.

4. <u>Anaheim Hilton Mortgage Loan (CWCapital as special servicer):</u> Full payment through a new non-recourse note on substantially the same terms as the Anaheim Hilton Mortgage Loan except for an extension of the maturity date to seven (7) years from the Effective Date and with no amortization during the loan term.

5. <u>Anaheim Hilton Mezzanine Loan (Trimont as special servicer):</u> A cash payment of $3.6 million as full satisfaction of the Anaheim Hilton Mezzanine Loan.

6. <u>Hilton Ontario Mortgage Loan (C-III as special servicer):</u> Payment through a new non-recourse note on substantially the same terms as the Hilton Ontario Mortgage Loan except for reduction of the outstanding balance to $8.0 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term.

7. <u>Residence Inn Mission Valley Mortgage Loan (LNR as special servicer):</u> Full payment through a new non-recourse note on substantially the same terms as the Residence Inn Mission Valley Mortgage Loan except for an extension of the maturity date by one year and with no amortization during the loan term.

8. <u>Residence Inn Anaheim (Garden Grove) Mortgage Loan (LNR as special servicer):</u> Payment through a new non-recourse note on substantially the same terms as the Residence Inn Anaheim (Garden Grove) Mortgage Loan except for reduction of the outstanding balance to $25.3 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term.

9. <u>Hilton Doubletree Washington D.C. Mortgage Loan (LNR as special servicer):</u> Full payment through a new non-recourse note on substantially the same terms as the Hilton Doubletree Washington D.C. Mortgage Loan except for an extension of the maturity date by one year and with no amortization during the loan term.

10. <u>Residence Inn Tysons Corner Mortgage Loan (LNR as special servicer):</u> Full payment through a new non-recourse note on substantially the same terms as the Residence Inn Tysons Corner Mortgage Loan except for an extension of the maturity date by one year and with no amortization during the loan term.

11. <u>Hilton Homewood Suites San Antonio Mortgage Loan (LNR as special servicer):</u> Full payment through a new non-recourse note on substantially the same terms as the Hilton Homewood Suites San Antonio Mortgage Loan except for an extension of the maturity date by one year and with no amortization during the loan term.

12. <u>Unsecured Debt:</u> The various classes of unsecured trade creditors (not including holders of deficiency claims) that are not otherwise paid pursuant to a "first day" order, will receive a $500,000 cash payment.

13. <u>Preferred Equity:</u> All preferred equity interests shall be cancelled and such holders of the preferred equity interests shall receive no distribution on account of such interest.

except to the extent by which an over-bid exceeds the amount required to satisfy claims and interests senior to the preferred equity interests as such overbid amount flows through the corporate structure of the Company.

14. <u>Common Equity of the Company and Holdings:</u> Existing common equity at Holdings and Innkeepers will be eliminated and/or canceled with holders of such common equity receiving no distributions. If the Plan Sponsors are the winning bidder, Lehman will receive approximately 40% of the new equity of Innkeepers issued on the Effective Date and a cash payment, Five Mile will own approximately 40% of the new equity of Innkeepers, in each case subject to increase in the event that additional investors are not included as part of the Transaction. At the option of the Plan Sponsors, the equity structure of the remaining debtors will remain in place or will be reconstituted; provided however, that no reconstitution shall be in derogation of the special purpose entity ("SPE") structure of the applicable Debtors with SPE structures. Further, the Plan may provide for an equity incentive program for management of the reorganized Company.

15. <u>Application of Existing Cash on the Effective Date:</u> Company, the Special Servicer and/or Lehman shall seek to amend the final cash collateral order. Special Servicer and Five Mile agree that any cash in the Company (to include any cash immediately on hand, any cash received on account of receivables existing prior to the Effective Date and revenues earned therefrom) at the Effective Date shall be applied to satisfy administrative claims incurred but unpaid as of the Effective Date and to consummate the transaction contemplated herein pursuant to the waterfall set forth in the Final Cash Collateral Order (as shall be amended to increase the amount of cash held back as an expense reserve, in order to account for certain closing and emergence costs, including potential success fees). After the Effective Date, cash will be administered and applied pursuant to the applicable cash management procedures under the applicable loan documents, and the waterfall set forth in the Final Cash Collateral Order will no longer govern.

## V.  Offer Structure and Protections

As stated, the Transaction will be implemented by the ultimate recapitalization of the Company through the Plan effectuating the winning bid at the auction. Five Mile recognizes that it may be required by applicable law for Special Servicer or another party in interest to seek and obtain a bankruptcy court order in form and substance acceptable to Five Mile in all material respects terminating the Company's plan exclusivity period as to all debtors in these bankruptcy cases - in order for Special Servicer, Lehman and Five Mile to file the Plan with or without the Company's support of the Plan (the "Order Terminating Exclusivity").

We require that there be an auction of the Company on an enterprise basis where the Plan Sponsors will be the stalking horse bidder at that auction with initial stalking horse bids to be as described herein and bid protections set forth below. To that end, we require the Bankruptcy Court's entry of an order (the "Bid Procedures Order") approving bid procedures (the "Bid Procedures") that includes the following terms:

(i) the Company will solicit higher and better offers for 100% of the new equity interests to be issued pursuant to the Plan (the "New Equity");(ii) bids will be solicited for up to thirty (30) calendar days

following the approval of bidding procedures; (iii) bidders must be qualified on terms reasonably acceptable to the Company and such terms of the bids will be no more onerous than the terms contemplated herein and bids shall only be made on an enterprise value basis (based on the capital structure and sources and uses of funds outlined in the Plan); (iv) initial overbid of the implied enterprise value must be at least $25 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied enterprise value of the Lehman and Five Mile bid as set forth in Appendix A (the "Proponents' Bid") and subsequent bids must be in increments of at least $5 million (an "Overbid"); (v) the percentage increase in the implied enterprise value of the winning bidder will be allocated to each prepetition mortgage holder (the "Overbid Allocation") by increasing the debt or cash consideration that such holder is receiving under the Plan in proportion to the Overbid amount (e.g., if a mortgage holder is receiving a new mortgage under the Plan in the face amount of $100, then a winning Overbid that is 4% greater than the Proponents' Bid would result in that holder receiving a mortgage in the face amount of $104; same would apply to cash consideration); provided, that the amount of the Overbid consideration not allocated to pre-petition creditors under the Overbid Allocation shall be allocated to each pre-petition creditor pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools against which such respective pre-petition creditor has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying pre-petition interests and determining the ultimate recipients of such Overbid; provided, however, that to the extent any winning Overbid includes debt consideration to the Fixed Rate CMBS Mortgage Loan in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between Lehman, Five Mile and the Special Servicer); (vi) in the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through the Company's corporate and debt structure for purposes of determining the ultimate recipients of such overbid value; (vii) in the event the winning bidder is not the Plan Sponsors (which includes any wholly-owned subsidiary of Five Mile), the Floating Rate Mortgage Loan shall be repaid in cash in an amount determined in accordance with the Overbid Allocation (assuming an allocation of $200 million of value to the Lehman Loan in the Proponents' Bid); and (viii) other terms to be agreed by the Special Servicer and the Plan Sponsors and approved by the Court.[1]

The Bid Procedures Order will provide that in the event of an Overbid in which the Plan Sponsors are not the winning bidders, Five Mile would receive a breakup fee in the amount of $7 million (as may be further distributed pursuant to the Lehman Commitment) plus a reimbursement of all of Five Mile's reasonable fees and expenses, not to exceed $3 million (collectively, the "Stalking Horse Fee").

The Bid Procedures Order shall be subject to Five Mile's and your prior review and, as entered by the Court, be reasonably acceptable to each of Five Mile and you in all material respects.

---

[1] Note that the additional consideration included in any Overbid (except for the Initial Overbid) must consist of no more than 70% debt consideration with the balance in cash

Special Servicer confirms that, other than the sale of equity interests in the reorganized Company, the Plan will not contemplate or provide for a sale of the Company or any of its assets pursuant to section 1129(b)(2)(a)(ii) or (iii) or section 363 of the Bankruptcy Code.[2] As such, no holder of a lien on any asset of the Company shall be permitted to credit bid its claim as part of the Plan.

## VI.    Strength of the Stalking Horse Bid and the Proposed Plan

We believe the Transaction and the Plan (consistent with the terms of this Commitment Letter) is beneficial to all creditors and is in the best interests of the Company and its bankruptcy estates. The Plan values the Company at $1,137.1 million and the current debt is reduced through debt forgiveness, pay down and equity conversion post-confirmation to approximately $789.7 million. Further, there is high certainty and low execution risk with the Plan, financed by our Commitment, as it will provide for the exit financing component critical to the success and emergence of Innkeepers from bankruptcy. There is no due diligence condition.

We believe the Plan also provides additional stability for the Company by providing adequate cash to pay exit costs, fund $7.8 million of FF&E reserve contribution for the first year of the restructured Fixed Rate CMBS Mortgage Loan (which funds shall be held by the Master Servicer of the Fixed Rate CMBS Mortgage Loan), and provide general cash liquidity to be held at the Company (includes amounts for future PIPs) to manage seasonality within the business, cover operating or interest shortfalls should they occur, and provide funds to pay administrative and priority expenses upon emergence. Further, the Plan shall provide, with respect to actions and omissions in the plan process, the implementation thereof and in respect of the terms thereof, for customary releases, exculpations, and injunction language for you and us and our respective advisors and agents. We are ready to move forward and have all the resources, including available funds, to conclude the transactions outlined in this Commitment Letter.

## VII.    Special Servicer Covenants

Special Servicer hereby covenants and agrees to (a) perform its undertakings set forth in Sections III and V above, (b) in the event the Company does not agree to adopt the auction structure and stalking horse bid protections described herein, use its best efforts to seek a bankruptcy court order to terminate the Company's plan exclusivity period, (c) to (i) file and prosecute a motion seeking entry of the Bid Procedures Order and file and prosecute the Plan which will implement the winning bid at the auction consistent with the terms of this Commitment Letter, (ii) take all reasonable and necessary steps to obtain an order approving a disclosure statement in respect of the Plan, (iii) thereafter solicit votes for the Plan, and (iv) thereafter take all necessary steps to seek confirmation and effectiveness of the Plan, and (d) coordinate and cooperate with the Plan Sponsors in the prosecution and confirmation of the Plan and other transactions contemplated under this Commitment Letter. The Plan, all orders and filings by Special Servicer relating to the Plan or the Transaction shall be subject to our prior review and approval, which approval shall not be unreasonably withheld or delayed.

---

[2] The Parties acknowledge that Special Servicer reserves all rights with respect to its ability to credit bid under both applicable nonbankruptcy and bankruptcy law to the extent the auction process described herein is not approved or the Plan is not confirmed and does not become effective.

## VIII. Termination of Commitment

This Commitment Letter outlines only some of the essential terms regarding the proposed Transaction, is not all-inclusive and does not purport to summarize or contain all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Transaction.

This Commitment Letter shall terminate and be of no further force or effect, and we and you shall no longer be obligated with respect to this Commitment and other agreements set forth herein (including, without limitation, our agreement with respect to Alternate Transactions set forth in Section III hereof), upon the earliest to occur of the following (each, a "Termination Event") and notice from the party with the right to terminate as set forth below:

1. the failure to occur on or before the stated deadline of any of the following with respect to the Plan (the "Target Dates") to occur:

   a. the entry of an order by the Court approving the bid procedures for the auction consistent with the provisions contained herein by March 31, 2011; and

   b. Entry of an order by the Court that is not otherwise subject to a stay confirming the Plan reflecting the highest and best bid for creditor and interest holder treatment at the auction as approved by the Court by June 30, 2011;

2. the occurrence of any material adverse condition, change in or material disruption of conditions in the financial, banking, capital or hospitality markets and extended stay lodging sector that would reasonably impair the viability or success of the Transaction with such Termination Event exercisable only by Five Mile;

3. the occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Company with such Termination Event exercisable only by Five Mile;

4. failure to execute, deliver or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate i) the Transaction with respect to the Fixed Rate CMBS Mortgage Loan or otherwise affecting the economics thereof, in each case in form and substance satisfactory to Special Servicer and Five Mile in our reasonable discretions and ii) the Transaction in each case in form and substance satisfactory to Five Mile in each of our reasonable discretion and provided that they are consistent with the terms set forth herein;

5. any material breach by Special Servicer or Five Mile of, or material, non-compliance with, the covenants set forth in Section VII herein and as a result of which Special Servicer or Five Mile elect to terminate this Commitment Letter;

6. mutual agreement of Special Servicer and Five Mile to terminate this Commitment Letter;

7. termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement deemed necessary by either Five Mile or Special Servicer prior to the Effective Date without Five Mile's written approval; provided however, this shall not be a termination event if Five Mile elects to pursue the transaction contemplated herein with no modifications;

8. failure by Company to assume and assign all franchise agreements pursuant to an order of the Court satisfactory to either Five Mile or Special Servicer in all material respects; provided however, this shall not be a termination event if Five Mile elects to pursue the transaction contemplated herein with no modifications;

9. immediately on or prior to the Effective Date, failure by the Company to enter into a property management agreement reasonably acceptable to Special Servicer and Five Mile in all material respects for the management of the hotels pursuant to an order of the Court reasonably satisfactory to Special Servicer and Five Mile in all material respects;

10. prior to the Effective Date, the change of any of the Super Majority Decisions and/or voting requirements for Super Majority Decisions as established in the Lehman Commitment; or

11. the occurrence of any termination event under the Lehman Commitment.

Time is of the essence with respect to the Termination Events.

## IX. Miscellaneous

All notices, requests, claims, demands and other communications hereunder shall be given (and shall be deemed to have been duly received if given) by hand delivery in writing or by facsimile transmission with confirmation of receipt, as follows:

> if to Five Mile:
>
> Three Stamford Plaza
> 301 Tresser Boulevard, Ninth Floor
> Stamford, CT 06901
> Attention: James G. Glasgow, Jr.
> Email: jglasgow@fivemilecapital.com
> Facsimile: (203) 905-0954
>
> if to Special Servicer:
>
> Midland Loan Services, Inc.
> 10851 Mastin, 6th Floor
> Overland Park, KS 66210
> Attention: Kevin S. Semon
> Email: kevin.semon@midlandls.com
> Facsimile: (913) 253-9723

This Commitment Letter, the rights of the parties, and all actions arising in whole or part under or in connection herewith will be governed by and construed in accordance with the laws of the State of New York.

This Commitment Letter constitutes the entire agreement between the parties and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, between you (or the Company), on the one hand, and us, on the other hand. No material modification or waiver of any provision hereof shall be enforceable unless approved by you and us in writing; provided, however that you recognize that the proposed stalking horse bid amounts/terms for the Company indebtedness may change (other than this stalking horse bid for the treatment of the Fixed Rate CMBS Mortgage Loan) may change up to the date of the hearing to approve the bid protections described in Section V above and you agree not to unreasonably withhold or delay your consent to such material changes in those stalking horse bid amounts/terms so long as the treatment of the Fixed Rate CMBS Mortgage Loan, the auction process and the terms of the Bid Procedures Order contemplated herein and the relative financial treatment of the Company's indebtedness, in each case as provided herein, remains the same in all material respects. Neither you, on the one hand, nor us, on the other hand, is relying upon any statement or representation made by or on behalf of the other, except as expressly provided in the Commitment Letter. This Commitment Letter will be binding on Five Mile's and the Special Servicer's successors, assigns and/or transferees.

We are prepared to enter into a transaction on the terms set forth herein. Upon receipt of a fully executed counterpart to this Commitment Letter, both parties agree to negotiate in good faith regarding the implementation of the Transaction contemplated in this Commitment Letter, including engaging in the preparation and negotiation of definitive documents, and Special Servicer agrees to move forward with its undertakings described in Section VII herein.

Remainder of Page Intentionally Blank
Signature Pages to Follow

Should you have any questions regarding this Commitment Letter, please do not hesitate to contact James Glasgow (jglasgow@fmcp.com) or Al Nickerson (anickerson@fmcp.com) at (203) 905-0950.

Sincerely yours,

**Five Mile Capital II Pooling REIT LLC,**

By:    Five Mile Capital Partners LLC,
        its manager

By:    _____
        James G. Glasgow
        Portfolio Manager and Managing Director

Acknowledged and Agreed:

**Midland Loan Services, Inc.,**
as Special Servicer for Bank of America, N.A., as Trustee for the Registered
Holders of LB-UBS Commercial Mortgage Trust 2007-C6,
Commercial Mortgage Pass-Through Certificates, Series
2007-C6

By: _____

Name:

Title:

| | Current Balance | Debt Impairment | Adjusted Balance | Pay Down/ Conversion | Pro Forma Balance |
|---|---|---|---|---|---|
| **PRO FORMA CAPITALIZATION** | | | | | |
| **DEBT AND PREF. EQUITY** | | | | | |
| Five Mile DIP[a] | $53.0 | $0.0 | $53.0 | ($53.0) | $0.0 |
| Lehman DIP Loan[a] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| Fixed Pool Mortgage | $825.4 | ($202.9) | $622.5 | $0.0 | $622.5 |
| Floating Pool Loan | | | | | |
|   Mortgage | $220.0 | ($20.0) | $200.0 | ($200.0) | $0.0 |
|   Mezzanine (PIK interest) | 112.2 | (112.2) | 0.0 | 0.0 | 0.0 |
|   Total | $332.2 | ($132.2) | $200.0 | ($200.0) | $0.0 |
| Anaheim Hilton Loan | | | | | |
|   Mortgage | $12.8 | $0.0 | $12.8 | $0.0 | $12.8 |
|   Mezzanine | 21.3 | (17.7) | 3.6 | (3.6) | 0.0 |
|   Total | $34.1 | ($17.7) | $16.4 | ($3.6) | $12.8 |
| Residence Inn Mission Valley Mort. | $46.9 | $0.0 | $46.9 | $0.0 | $46.9 |
| Residence Inn Anaheim Mort. | 37.2 | (11.9) | 25.3 | 0.0 | 25.3 |
| Hilton Ontario Mort. | 34.7 | (26.7) | 8.0 | 0.0 | 8.0 |
| Doubletree Washington D.C. Mort. | 25.3 | 0.0 | 25.3 | 0.0 | 25.3 |
| Residence Inn Tyson's Corner Mort. | 24.9 | 0.0 | 24.9 | 0.0 | 24.9 |
| Homewood Suites San Antonio Mort. | 24.0 | 0.0 | 24.0 | 0.0 | 24.0 |
| Public Preferred Stock | 145.0 | (145.0) | 0.0 | 0.0 | 0.0 |
| **Total Debt and Pref. Stock** | **$1,600.2** | **($536.4)** | **$1,063.8** | **($274.1)** | **$789.7** |
| **Implied Equity** | **$0.0** | | | | **$347.4** |
| **Total Capitalization** | **$1,600.2** | | | | **$1,137.1** |

(a)        Assumes DIP financing facility is fully drawn.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash | $208.4 | Mortgage Cash Payment to Lehman | $61.0 |
| | | Repayment of Lehman DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 53.0 |
| | | Hilton Anaheim Mezz Payment | 3.6 |
| | | Balance Sheet Cash[a] | 73.3 |
| Total | $208.4 | | $208.4 |

[a]    Balance sheet cash to be used for, among other purposes, FF&E, PIP, working capital reserves and closing costs.

# EXHIBIT F

## Five Mile-Lehman Agreement

## AMENDED AND RESTATED

## COMMITMENT AGREEMENT
### (Lehman/Five Mile)

### January 14, 2011

*This agreement is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.*

*THIS AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF INNKEEPERS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. THIS AGREEMENT AMENDS, RESTATES AND SUPERSEDES IN ITS ENTIRETY, IN ACCORDANCE WITH THE TERMS HEREOF, THE COMMITMENT AGREEMENT DATED AS OF DECEMBER 10, 2010.*

| | |
|---|---|
| **Plan of Reorganization:** | The recapitalization and debt restructuring (the "Transaction") of Grand Prix Holdings, LLC, Innkeepers USA Trust and its wholly owned direct and indirect subsidiaries (collectively "Innkeepers" or the "Company") is to be effectuated through a plan of reorganization (the "Plan") to be filed in the United States Bankruptcy Court for the Southern District of New York presiding over the Company's bankruptcy cases (jointly administered as Case No. 10-13800) (the "Innkeepers Bankruptcy Court") by the Company with the support of Five Mile Capital II Pooling REIT LLC, through its investment advisor Five Mile Capital Partners LLC ("Five Mile"), Lehman ALI Inc. ("Lehman," and together with Five Mile, the "Plan Sponsors"), and Midland Loan Services, a division of PNC Bank, N.A. or any successor thereto, as special servicer ("Special Servicer") for the $825.4 million fixed rate mortgage loan (the "Fixed Rate Mortgage Loan"). The Plan Sponsors each acknowledge and agree that any and only a plan of reorganization that is consistent with the terms and conditions contained herein shall be deemed a "Plan." |
| **Amendment/ Other Agreements:** | This Amended and Restated Commitment Agreement (the "Agreement") amends, restates and supersedes in its entirety, in accordance with the terms hereof, that certain Commitment Agreement, dated as of December 10, 2010, between Lehman and Five Mile (the "12/10 Agreement"). |
| | Simultaneously with the execution of this Agreement, Special Servicer |

| | and Five Mile shall execute an amended and restated commitment letter (the "Five Mile/Midland Commitment"), amending and restating that certain Commitment Letter, dated as of December 10, 2010, between Special Servicer and Five Mile (the "12/10 Five Mile/Midland Commitment"). The Five Mile/Midland Commitment is attached hereto as Appendix C, but is not incorporated herein. Five Mile agrees not to make any material modifications to or to exercise or waive any Termination Event under (except Termination Event No. 10) the Five Mile/Midland Commitment without Lehman's prior written consent. To the extent there is any inconsistency between this Agreement and the Five Mile/Midland Commitment, the rights and obligations of Five Mile and Lehman are governed by this Agreement. Five Mile will provide Lehman with a copy of any communication between Special Servicer and Five Mile, in its capacity as Plan Sponsor (as defined in the Five Mile/Midland Commitment), with respect to the Five Mile/Midland Commitment.

Simultaneously with the execution of this Agreement, Plan Sponsors, Special Servicer, and the Company shall execute that certain Binding Commitment Agreement Regarding the Acquisition and Restructuring of Innkeepers USA Trust (together with the term sheet attached thereto, the "Innkeepers Commitment Letter"). The Innkeepers Commitment Letter is attached hereto as Appendix D, but is not incorporated herein. To the extent there is any inconsistency between this Agreement and the Innkeepers Commitment Letter, the rights and obligations of Five Mile and Lehman are governed by this Agreement.

In the event that the Innkeepers Commitment Letter terminates according to its terms, but such termination does not also constitute a termination of the 12/10 Agreement, this Agreement shall become void, the rights and obligations of Lehman and Five Mile shall be governed by the 12/10 Agreement; provided, however, that Lehman and Five Mile shall confer with each other and with Special Servicer prior to taking any action contemplated under the 12/10 Agreement or under the 12/10 Five Mile/Midland Commitment and the deadlines referenced in the 12/10 Agreement shall be extended by the number of days between the date of this Agreement and the date of the termination of the Innkeepers Commitment Letter. |
| **New Equity:** | Except as expressly provided herein, holders of common, preferred, and any other equity interests in Innkeepers shall receive no distributions on account of their interests. Reorganized Innkeepers will issue equity (the "New Equity") as set forth below upon the effective date of the Plan (the "Effective Date"). The New Equity shall be subject to dilution with respect to the Co-Investment Right (as described below). |
| **Equity Stalking** | On the terms and subject to the conditions contained in this Agreement, |

| | |
|---|---|
| **Horse Bid/ Treatment of Floating Rate Mortgage Loan:** | the Plan Sponsors agree to purchase the New Equity of reorganized Innkeepers as follows (the "Plan Sponsors' Bid"): (i) Five Mile, through one or more of its wholly owned affiliates(s) or through a Five Mile controlled investment vehicle, comprised of limited partners in Five Mile Capital Partners II LP and Five Mile Capital Investment Opportunities LP, will purchase up to 50.0% of the New Equity for cash in an amount of up to $174.1 million (the "Five Mile Commitment"); and (ii) Lehman, in full and final satisfaction of all of its claims against the Company arising under or in connection with the approximately $220 million floating rate mortgage loan (the "Floating Rate Mortgage Loan") will receive (a) up to 50.0% of the New Equity and (b) at least $26.2 million in cash (the "Lehman Payment"), subject, in each case, to adjustment for the Co-Investment Right (as defined below) and the Third-Party Investment (as defined below).[1]

The Plan Sponsors may seek to direct the Company or the reorganized Company to distribute up to 20% of the New Equity to a third-party investor and/or new manager (the "Third-Party Investment"), and, in the event the third party investor and/or new manager pays cash on the Effective Date for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman, shall be adjusted accordingly so that Lehman and Five Mile receive equal percentages of New Equity. The Plan Sponsors agree that an affiliate of Hunt Realty Investments (the "Third-Party Investor") may purchase 10% of the New Equity (as part of the Third-Party Investment) for cash in an amount equal to $34.82 million (subject to adjustment for the Co-Investment Right).

In the event the Plan Sponsors' Bid is not the winning bid at the Auction (as defined below), the Floating Rate Mortgage Loan shall be repaid in cash and in an amount determined in accordance with the Overbid Allocation (as defined below), assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Plan Sponsors' Bid, plus additional consideration in accordance with the Overbid Allocation. |
| **Treatment of Debt:** | Consummation of the Transaction is subject to the restructuring of the Company's debt in amounts and with the treatment terms provided herein |

---

[1]     If there is no participation in the Co-Investment Right and full participation in the Third-Party Investment, Five Mile will receive 40.0% of the New Equity for a cash payment of $138.96 million, and Lehman will receive 40.0% of the New Equity and $61.04 million in cash.

| | |
|---|---|
| | and in Appendix A attached hereto, or with such other terms that are mutually acceptable to Lehman and Five Mile.[2] |
| **Treatment of Fixed Rate Mortgage Loan:** | In full and final satisfaction of all claims arising under or in connection with the Fixed Rate Mortgage Loan against the Company, subject to receipt of further consideration as a result of the Auction contemplated herein, the holder of the Fixed Rate Mortgage Loan shall receive the following treatment: |
| | • New non-recourse mortgage loan of $622.5 million, which shall have the following terms: (i) no change to the interest rate of 6.71%; (ii) no change to the maturity date of July 9, 2017; (iii) during the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iv) prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and (v) property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations, such other provision that is acceptable to the Plan Sponsors and Special Servicer that is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. The applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer shall reasonably require as reasonably acceptable to the reorganized Company and the Plan Sponsors and as is consistent with the Innkeepers Commitment Letter. |
| | • In the event the Plan Sponsors' Bid is not the winning bid at the Auction, the holder of the Fixed Rate Mortgage Loan shall receive |

---

[2]  Lehman and Five Mile recognize that the treatment of other claims set forth herein and in Appendix A are approximate and subject to change during the course of discussions relating to the Plan; provided, however, that absent material differences with respect to the treatment of any particular claim, Lehman and Five Mile each shall receive an equal percentage of New Equity, Five Mile shall fund the Five Mile Commitment, and Lehman shall receive the Lehman Payment.

consideration in accordance with the Overbid Allocation.

- Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct the reorganized Company to make a cash payment of $2.5 million as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, the Special Servicer shall continue to be entitled to collect any and all monthly or periodic fees and other compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Company or the reorganized Company to pay any of such fees or other compensation or any other amounts under the Fixed Rate CMBS Mortgage loan documents, including the appropriate review fee to be set forth in the definitive documentation as set forth in the second paragraph of Section II of the Five Mile/Midland Commitment.

- The lender under the Fixed Rate Mortgage Loan will receive a limited guaranty from Five Mile Pooling and a limited guaranty from the Parent Company as defined in and as more fully set forth in the Five Mile/Midland Commitment.

- Payment of $3 million and the Global Release (as defined below) as set forth in the "Releases" section herein.

| | |
|---|---|
| **Treatment of Other Property-Related Mortgage and Anaheim Mezzanine Debt:** | Anaheim Hilton Mortgage Loan (CWCapital Asset Management, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date to seven (7) years from the Effective Date, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

Anaheim Hilton Mezzanine Loan (TriMont Real Estate Advisors, Inc. as special servicer): A cash payment of $3.6 million by the reorganized Company as full and final satisfaction of all claims arising under or in connection with the Anaheim Hilton Mezzanine Loan.

Hilton Ontario Mortgage Loan (C-III Asset Management, LLC as special servicer): (i) Payment through a new non-recourse note on substantially |

the same terms as the existing loan, except for reduction of the outstanding balance to $8.0 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived; or (ii) such other treatment as set forth in the Plan that is acceptable in all respects to the Company, the Plan Sponsors, and the Special Servicer, in each of their respective reasonable discretion.

Residence Inn Mission Valley Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

Residence Inn Anaheim (Garden Grove) Mortgage Loan (LNR Partners, LLC as special servicer): (i) Payment through a new non-recourse note on substantially the same terms as the existing note, except for reduction of the outstanding balance to $25.3 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived; or (ii) such other treatment as set forth in the Plan that is acceptable in all respects to the Company, the Plan Sponsors, and the Special Servicer, in each of their respective reasonable discretion.

Hilton Doubletree Washington D.C. Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

Residence Inn Tyson's Corner Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

Hilton Homewood Suites San Antonio Mortgage Loan (LNR Partners, LLC as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty

| | and defeasance requirements will be waived. |
|---|---|
| **Treatment of Floating Rate Mezzanine Debt, Unsecured Debt and Preferred Equity:** | Following the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, provided that the following classes of claims or interests vote to accept and otherwise support the Plan, they shall receive the following treatment:<br><br>• SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between each of the Plan Sponsors and the Company;<br><br>• A total of $2.5 million cash (the "Unsecured Claims Fund") shall be available for distribution to, collectively, the general unsecured creditors of Innkeepers (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order; provided that the Company shall release and waive all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code; provided, however, that those classes that do not vote in favor of and otherwise support the plan of reorganization will not receive a distribution from the Unsecured Claims Fund and will not receive a waiver of preferences under section 547 of the Bankruptcy Code or, to the extent related thereto, section 550 of the Bankruptcy Code; and<br><br>• The holders of Innkeepers USA Trust's 8.0% Series C Cumulative Preferred Shares shall collectively receive: (i) a co-investment right, subject to exemption from Section 5 of the Securities Act of 1933, limited to 2% of the New Equity; provided, however, that such equity shall have no minority rights, except to the extent required by section 1123(a)(6) of the Bankruptcy Code (the "Co-Investment Right"), and (ii) $5.9 million of the approximately $7.4 million currently escrowed in an account held by Innkeepers USA Trust. The balance of such escrowed funds shall be available to, and shall be the property of, the reorganized Company after the Effective Date. |
| **Transition Services Agreement:** | The Plan shall provide for a transition services agreement for certain of the Company's current management team and shall be acceptable in all respects to the Plan Sponsors in each of their respective sole discretion. |
| **DIP Financings:** | The debtor-in-possession financings provided by Solar Finance, Inc. (the "Solar DIP") and Five Mile Capital II Pooling International LLC (the |

| | |
|---|---|
| | "Five Mile DIP") shall be repaid in cash on the Effective Date. |
| **Required Cash:** | Upon consummation of the Transaction and on the Effective Date, the reorganized Company will have at least $22.8 million to fund future PIP work and FF&E reserves (if necessary, as determined by the reorganized Company), sufficient capital to pay off the Solar DIP (in the principal amount then outstanding, of up to approximately $17.5 million) and the Five Mile DIP (in the principal amount then outstanding, of up to approximately $53 million),[3] sufficient capital to pay all administrative and other claims and expenses not paid pursuant to the final cash collateral order (as amended and restated) (the "Cash Collateral Order") that are necessary for Innkeepers to emerge from bankruptcy, and at least $39 million of cash on hand. |
| **Bid Procedures:** | The Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Plan through an auction (the "Auction") on the following terms (the "Bid Procedures"):<br><br>• Bids will be solicited for up to forty-five (45) calendar days following the approval of the Bid Procedures;<br><br>• Bids, to be deemed a qualified bid and eligible to participate in the Auction, must be accompanied by a deposit of $20 million in cash to an interest bearing escrow account to be identified, established, and held by and in the name of the Company;<br><br>• Bidders must be qualified on terms reasonably acceptable to the Company after consultation with the Special Servicer, which consultation shall include, subject to confidentiality agreements reasonably acceptable to the Company and the Special Servicer, disclosure of the bidders, their qualifications, and their bids;<br><br>• All bids and overbids, to be deemed a qualified bid and eligible to participate in the Auction, and whether made prior to or at the Auction, must be made on an enterprise-value basis and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein |

---

[3] This number assumes that both the Solar DIP and the Five Mile DIP have been fully funded. If the Solar DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Solar DIP shall be placed into an account held by the Company. Likewise, if the Five Mile DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Five Mile DIP shall be placed into an account held by the Company.

(including but not limited to the guarantees provided to Special Servicer and the other terms, conditions, and treatment as set forth in the Five Mile/Midland Commitment and the treatment of claims as set forth in this Agreement);

- The initial Overbid of the implied enterprise value must be at least $15 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied enterprise value of the Plan Sponsors' Bid and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (the "Initial Minimum Overbid"), and subsequent bids must be in increments of at least $5 million and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (each qualifying initial and subsequent overbid, an "Overbid");[4]

- The percentage increase in the implied enterprise value of the winning bidder will be allocated to each collateral pool/individual property (the "Overbid Allocation") by increasing the debt or cash consideration that such collateral pool/individual property is receiving under the Plan in proportion to the incremental Overbid amount (e.g., if a collateral pool is receiving a new mortgage under the Plan in the face amount of $100, then a winning Overbid that is 4% greater than the Plan Sponsors' Bid would result in that collateral pool/individual property receiving a mortgage in the face amount of $104; the same would apply to cash consideration); provided, however, that the amount of the incremental Overbid consideration not allocated to collateral pools/individual properties under the Overbid Allocation shall be allocated to each collateral pool/individual property pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools/individual properties against which such respective collateral pool/individual property has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying prepetition claims and interests and determining the ultimate recipients of such Overbid; provided, further, however, that to the extent any winning Overbid includes debt consideration to the Special Servicer in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value

---

[4]    Note that the additional consideration included in any Overbid (except for the initial Overbid) must consist of no more than 70% debt consideration.

[5]    For the avoidance of doubt, to the extent the Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between the Plan Sponsors, Special Servicer, and the Company);

- In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure for purposes of determining the ultimate recipients of such Overbid value;

- The determination of the winning bidder at the Auction shall be made by the Company only after consulting with the Special Servicer relating to the Bids made at the Auction;

- To be deemed a qualified bid and eligible to participate in the Auction, the equity consideration of such bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value as set forth herein and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the Effective Date: (a) $53 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Solar DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Cash Collateral Order that are necessary for the Company to emerge from bankruptcy;[5] (e) at least $39 million in cash for the reorganized Company; (f) with respect only to qualified bids other than the Innkeepers Commitment Letter, at least $200.3 million in cash to pay Lehman's claims against the Company (plus any applicable Overbid Allocation); and (g) to the extent the bid is submitted by a competing bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement.

- If there is an Auction and the winning bidder is not the Plan Sponsors, (i) the winning bidder shall be required to execute and agree to the Innkeepers Commitment Letter, the Plan, the Disclosure Statement, and other Plan-related documents, each as modified to incorporate the results of the Auction and the Overbid Allocation, (ii) such modified documents shall be deemed to be the Innkeepers Commitment Letter, the Plan, the Disclosure Statement, and the other Plan-related documents as such terms are used in the Innkeepers Commitment Letter, and (iii) Lehman (only to the extent the Floating Rate Mortgage Loan receives the treatment contemplated in, and required under, the Innkeepers Commitment Letter) and the Special

Servicer (only to the extent the Fixed Rate Mortgage Loan receives the treatment contemplated in, and required under, the Innkeepers Commitment Letter) shall be required to use such efforts, take such actions, and not take such actions to the extent required under the Innkeepers Commitment Letter with respect to the Innkeepers Commitment Letter, the Plan, the Disclosure Statement, and the other Plan-related documents of the Company and the Plan Sponsors, each as modified to incorporate the results of the Auction and the Overbid Allocation, including Lehman's agreement to receive at least $200.3 million in cash (plus any applicable Overbid Allocation) and the Special Servicer's obligation to provide the Midland Financing (as defined in the Bidding Procedures attached to the Innkeepers Commitment Letter) to the winning bidder; and

- A bid submitted by or through a holder of a secured claim against the Company shall not be deemed a qualified bid and eligible to participate in the Auction if the bid contemplates the ability of secured creditors to credit bid their claims against the Company within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code; provided that all rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (i) the auction process contemplated in the Bid Procedures is terminated or abandoned, (ii) the Special Servicer is no longer obligated to support the Innkeepers Commitment Letter or the New Party/Midland Commitment (as defined in, and attached as <u>Exhibit C</u> to, the Bid Procedures Motion), (iii) Lehman terminates the Innkeepers Commitment Letter, (iv) the Plan is not confirmed, or (v) the Effective Date shall not have occurred by the Outside Date (as defined below).

- Other terms to be agreed upon by the Company, the Plan Sponsors, and Special Servicer.

| | |
|---|---|
| **Stalking Horse Fee:** | The Bid Procedures Order will provide that, to the extent the Innkeepers Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Innkeepers Commitment Letter), in the event of (i) an Overbid in which Plan Sponsors' Bid is not the winning bid (an "Overbid Transaction") or (ii) the Company's execution of an agreement to pursue an alternative transaction for a material portion of the Company's assets after entry of the Bid Procedures Order (the "Alternative Transaction"), the Plan Sponsors will receive a breakup fee in the amount of $7 million (the "Break-Up Fee") plus reimbursement of all of Five Mile's reasonable and documented fees and expenses, not to exceed $3 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Stalking Horse Fee"). |

| | |
|---|---|
| | Five Mile and Lehman agree that 25% of the Break-Up Fee shall be allocated to Lehman, and promptly turned over to Lehman upon receipt by the Plan Sponsors of the Stalking Horse Fee, as consideration for Lehman's agreement to fund a portion of the capital necessary for the Company to emerge from bankruptcy, with the remainder of the Stalking Horse Fee allocated to Five Mile. |
| | The Stalking Horse Fee, if any, shall be payable by the Company upon the earlier of (i) the Effective Date and (ii) consummation of an Alternative Transaction. |
| **Means For Implementation:** | The Company (i) will file a motion to approve the Bid Procedures and the Stalking Horse Fee (the "Bid Procedures Motion") and request a hearing for approval thereof as soon as is practicable, and (ii) will file the Plan, a disclosure statement for the Plan ("Disclosure Statement"), and request a hearing for approval of the Disclosure Statement and seek confirmation of the Plan. |
| | Each of the foregoing and subsequent pleadings (including the order approving the Bid Procedures Motion (the "Bid Procedures Order")) shall be acceptable in all respects to the Plan Sponsors in each of their respective reasonable discretion. The Plan will be filed jointly for all the debtors. |
| **New Manager:** | Prior to the Effective Date, the Plan Sponsors agree to sell, on a pro rata basis, an aggregate of 10% of New Equity to a new third-party investor that will serve as the new hotel property manager for the reorganized Company (the "New Manager"). |
| | The sale of New Equity to the New Manager will not close until after confirmation of the Plan and the occurrence of the Effective Date, and neither the effectiveness of the Plan nor the occurrence of the Effective Date will be conditioned upon such closing. |
| | The Plan will contain a provision conditioning the grant of the Global Release (defined below) to Island Hospitality Management, Inc. with its cooperation with the Plan Sponsors, the reorganized Company, and the New Manager. |
| **Pro Forma Equity Ownership:** | Following full participation in the Third-Party Investment, the New Equity will be allocated among the new ownership as follows: |
| | • 40% to Five Mile; |
| | • 40% to Lehman; |
| | • 10% to New Manager; and |

| | |
|---|---|
| | • 10% to Third-Party Investor.<br><br>The New Equity is subject to pro rata dilution by up to 2% pursuant to the Co-Investment Right. For the avoidance of doubt, in the event Lehman and Five Mile agree to any increase or decrease in the percentage of New Equity allocated to the New Manager or Third-Party Investor, any resulting surplus or reduction in New Equity shall be split equally between Lehman and Five Mile. |
| **Governance:** | The board of directors will initially consist of up to 7 members as follows: 2 members nominated by Five Mile, 2 members nominated by Lehman, and 3 independent members to be nominated at the discretion of the Plan Sponsors; provided, however, that subject to agreement among Lehman and Five Mile, 1 independent member nomination may be allocated to the New Manager, 1 independent member nomination may be allocated to Third-Party Investor, and 1 independent member nomination may be allocated in such manner as Lehman and Five Mile mutually agree.<br><br>A super-majority vote of 66 2/3% of the equity interests in the Company will be required for material decisions as outlined in Appendix B (the "Material Decisions").<br><br>Lehman and Five Mile shall negotiate and agree upon required board actions and a process for resolving deadlocked votes on decisions that are non-Material Decisions. |
| **Shareholders Agreement:** | On or prior to the Effective Date, Lehman and Five Mile shall enter into a shareholders'/operating agreement that shall be agreed upon by Lehman and Five Mile and shall contain customary protections mutually acceptable to Lehman and Five Mile. |
| **Commitment:** | From the date of execution of this Agreement until the Termination Date, and subject to the conditions set forth in this Agreement, Five Mile and Lehman, as applicable, agree and covenant that:<br><br>Lehman and Five Mile shall (i) use reasonable efforts to prepare or cause the preparation of the Bid Procedures Motion, Plan, Disclosure Statement, other Plan-related documents (collectively, the "Plan Pleadings") which shall be consistent in all material respects with this Agreement, and to cause the Company to file and seek the approval of such pleadings, (ii) take all reasonably necessary and appropriate actions to support and achieve confirmation and consummation of the Plan and the Transaction contemplated in this Agreement, and (iii) not take any actions (either by affirmative action or omission) (a) inconsistent with this Agreement or (b) that would materially delay the confirmation or consummation of the Plan or the Transaction contemplated in this |

| | |
|---|---|
| | Agreement; |
| | Lehman and Five Mile shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transaction.  Furthermore, each of Lehman and Five Mile shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement; |
| | Lehman and Five Mile each hereby covenant and agree to negotiate in good faith the Plan Pleadings, each of which shall (i) contain the same treatment and economic terms as and other terms consistent in all material respects with, the terms set forth in this Agreement (subject to adjustment as agreed to by Lehman and Five Mile in each of their respective sole discretion) and (ii) otherwise be in form and substance acceptable in all respects to Lehman and Five Mile, in each of their respective reasonable discretion; |
| | Five Mile hereby commits to provide the entire principal amount of the Five Mile Commitment on the Effective Date, upon the terms and subject to the conditions set forth in this Agreement; and |
| | Subject to the terms and conditions contained in this Agreement, including but not limited to the section labeled "Lehman Approvals," Lehman hereby commits to consent to the treatment of its claims and vote its claims to accept the Plan, solely on the terms and subject to the conditions contained in this Agreement. |
| **Lehman Approvals:** | Notwithstanding anything to the contrary contained herein: |
| | (a) Lehman's obligations with respect to the Transaction shall be subject to the approval of the United States Bankruptcy Court for the Southern District of New York presiding over the Lehman Brothers Holdings Inc. bankruptcy cases (Case No. 08-13555) (the "Lehman Bankruptcy Court").  Following the entry of the Bid Procedures Order, Lehman will promptly file a motion (the "Lehman Bankruptcy Court Motion") seeking an order from the Lehman Bankruptcy Court authorizing Lehman to enter into the Transaction, which order shall be entered prior to the Auction.  Lehman agrees to deliver to Five Mile a draft of the Lehman Bankruptcy Court Motion prior to its filing.  The provisions in the Lehman Bankruptcy Court Motion referencing Five Mile, the Agreement or the Transaction shall be reasonably acceptable to Five Mile; and |
| | (b) Lehman's obligations with respect to voting in favor of the Plan shall be conditioned in all respects on the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of its votes in a manner |

| | |
|---|---|
| | sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code. |
| **Non-Solicitation:** | Lehman agrees until the Termination Date (as defined herein), without the written consent of Five Mile, it will not authorize or permit any of its officers, directors, controlled affiliates, subsidiaries, representatives, or advisors to (i) take, directly or indirectly, any action with respect to investing or otherwise participating in any transaction involving, directly or indirectly, any or all of the Company's assets, the businesses of Innkeepers or the Floating Rate Mortgage Loan (the "Potential Transactions"), (ii) solicit, initiate or encourage any proposals or offers from any person other than Five Mile relating to a Potential Transaction and Lehman's participation therein, or (iii) reach any agreement or understanding (whether or not such agreement or understanding is absolute, revocable, contingent or conditional) for, or otherwise attempt to consummate, any transaction related to the Potential Transactions other than the Transaction contemplated hereby; and

Five Mile agrees until the Termination Date (as defined herein), without the written consent of Lehman, it will not authorize or permit any of its officers, directors, controlled affiliates, subsidiaries, representatives, or advisors to (i) take, directly or indirectly, any action with respect to investing or otherwise participating in any transaction involving, directly or indirectly, the Potential Transactions, (ii) solicit, initiate or encourage any proposals or offers from any person other than Lehman or Special Servicer relating to a Potential Transaction and Five Mile's participation therein, or (iii) reach any agreement or understanding (whether or not such agreement or understanding is absolute, revocable, contingent or conditional) for, or otherwise attempt to consummate, any transaction related to the Potential Transactions other than the Transaction contemplated hereby (the "Non-Solicitation Period"). |
| **Specific Performance:** | Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the Non-Solicitation provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each party agrees that the other party shall be entitled to an injunction or injunctions to prevent breaches of any of the Non-Solicitation provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter. The only remedy for breach of this Agreement shall be specific performance. |
| **Termination:** | Lehman and Five Mile may terminate this Agreement upon written notice to the other upon the earliest occurrence of the following events (each a "Termination Event" and the date of such notice, the |

"Termination Date"):

- February 11, 2011, which shall be deemed extended for so long as any Plan Pleading that is on file has not been denied by a written order of the Innkeepers Bankruptcy Court, or on the date a written order of the Innkeepers Bankruptcy Court is entered denying any Plan Pleading;

- Notwithstanding anything contained herein to the contrary, March 31, 2011, if the Bid Procedures (including the Break-Up Fee and the Expense Reimbursement) have not been approved by the Innkeepers Bankruptcy Court as of such date in substantially the form attached to the Innkeepers Commitment Letter as Appendix B;

- Notwithstanding anything contained herein to the contrary, June 30, 2011, if the Plan has not been confirmed by the Innkeepers Bankruptcy Court, pursuant to an order of the Innkeepers Bankruptcy Court, as of such date; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- The dismissal or conversion to chapter 7 of the Company's chapter 11 cases; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- The termination of exclusivity for a substantial or material number of the debtors unless supported or sought by the Plan Sponsors; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- Approval by the Innkeepers Bankruptcy Court of any bid procedures, sale procedures for sales other than of *de minimis* assets, disclosure statement, or plan other than the Bid Procedures Motion, Disclosure Statement, and Plan;

- The granting of stay relief with respect to a substantial part of the Company's assets; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- Denial of the Lehman Bankruptcy Court Motion or the Lehman Bankruptcy Court's entry of any other order, judgment or decree prohibiting Lehman from consummating the Transaction;

- The occurrence of any condition, change or development that could

reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Company taken as a whole; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- In the exercise of the Parties' reasonable best efforts, failure to execute, deliver, or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate (i) the Transaction with respect to the Fixed Rate Mortgage Loan or otherwise affecting the treatment, including the economics, thereof, in each case in form and substance satisfactory to Special Servicer and the Plan Sponsors in each of their respective reasonable discretion and (ii) the Transaction, in such case in form and substance satisfactory to the Plan Sponsors in each of their respective reasonable discretion; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- Termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement reasonably deemed necessary by the Plan Sponsors or the Special Servicer prior to the Effective Date without the Plan Sponsors and the Special Servicer's written approval; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, further, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

- Failure by Company to assume and, if necessary, assign all franchise agreements pursuant to an order of the Court satisfactory to the Plan Sponsors or the Special Servicer in all material respects on or before the Effective Date; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, further, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC;

| | |
|---|---|
| | • Such earlier date as may be agreed upon in writing by Lehman and Five Mile;<br><br>• The Company terminates the Auction without selecting a winning bidder and without the consent of the Plan Sponsors and the Special Servicer, in each of their respective sole discretion;<br><br>• Subject to Lehman and the Special Servicer's compliance with the Revised Agreements Provision, the Plan Sponsors are not selected as the successful bidders at the Auction;<br><br>• A Party materially breaches its obligations under the Innkeepers Commitment Letter, including, without limitation, if the Company materially breaches its obligations, whether or not through its exercise of the Fiduciary Out (as defined in the Innkeepers Commitment Letter); or<br><br>• The occurrence of the Outside Date Termination Event (as defined below).<br><br>Time is of the essence with respect to the Termination Events. |
| **Effective Date/Outside Date Termination:** | • The occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including, without limitation, entry of an order confirming the Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable, and the Plan will also include customary provisions with respect to waiver of conditions to the Effective Date.<br><br>• Notwithstanding anything contained herein or in the Innkeepers Commitment Letter to the contrary, unless otherwise agreed by the Company, the Plan Sponsors, and the Special Servicer in writing, the Innkeepers Commitment Letter shall automatically terminate and be of no further force or effect and the order confirming the plan will provide that both confirmation and the confirmation order will be automatically revoked (with a reversion to the *status quo ante*) on September 15, 2011 (the "Outside Date") if the Effective Date has not occurred and all of the transactions contemplated under the Innkeepers Commitment Letter, and the Plan have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "Outside Date Termination Event"); provided, however, that this Outside Date Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC, and KPA RIGG, LLC.<br><br>Time is of the essence with respect to the Outside Date Termination |

| | |
|---|---|
| | Event. |
| **Other:** | • On or after the Effective Date, the reorganized Company shall reimburse Five Mile for the fees and expenses of counsel, provided that the Transaction contemplated by the Plan is consummated.<br><br>• Company shall continue to pay for the fees and expenses of Lehman's advisors and counsel.<br><br>• Company shall seek to amend the Cash Collateral Order, with the support of Lehman and the Special Servicer, to increase the amount of cash that may be held back as an expense reserve to $18.5 million in order to account for certain closing and emergence costs, including potential success fees; substantially in the form attached hereto as Appendix E.<br><br>• Unless and until a Termination Event occurs, Lehman shall not sell, transfer, pledge, assign, or otherwise hypothecate any of its claims under the Floating Rate Mortgage Loan or grant any option thereon or any right or interest (voting or otherwise) therein (collectively, a "Transfer"), unless such transfer is to Five Mile or an entity in which Lehman Brothers Holding Inc. directly or indirectly owns at least 51% of the voting interests (a "Lehman Affiliate"), provided that Five Mile or such Lehman Affiliate agrees to the treatment of the Floating Rate Mortgage Loan as set forth herein (the "Transfer Provision").<br><br>• Each of Five Mile and Lehman shall indemnify the other and hold the other harmless with respect to any loss of the Deposit (as defined in the Innkeepers Commitment Letter) caused by a breach of the Innkeepers Commitment Letter by such party.<br><br>• This Agreement may only be modified, altered, amended, or supplemented by an agreement in writing signed by Lehman and Five Mile. |
| **Releases:** | Releasing Parties.<br><br>The "Releasing Parties" shall be the Company, the Plan Sponsors, the Special Servicer (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts, and trustees), and Apollo Investment Corporation (and together with its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, and professionals, "Apollo"), and other holders of claims against and interests in the Company, and each of the foregoing parties' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, |

trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

Special Servicer Release.

The Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo, related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty") and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and such settlement, waiver, and release shall be embodied in, and shall not be effective unless and until the Global Release (as defined herein) has been embodied in, an order confirming the Plan as entered in the Innkeepers Bankruptcy Court that has become final and non-appealable. Immediately after the Effective Date, the Plan Sponsors will direct the reorganized Company to make a cash payment of $3 million to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Plan and shall be in form and substance reasonably satisfactory to Special Servicer and Apollo, and shall be conditioned on the above-described payment and the occurrence of the Effective Date.

Apollo Release.

Apollo, on account of its holdings of the Series A Preferred Shares, common shares, or other equity in the Company or otherwise shall agree to (i) waive all rights to receive any recovery or distribution under the Plan, including the right to participate in the Co-Investment Right; and (ii) settle and provide a complete general release and waiver of any of its claims against the Releasing Parties. Apollo shall provide such waiver of rights and such general release and waiver of claims against the Releasing Parties in exchange for such entities settling, releasing, and waiving any claims they may have against Apollo to the extent provided herein. Such release by the Releasing Parties shall include (but shall not be limited to) the Special Servicer, on behalf of the C6 and C7 Trusts, settling, releasing, and waiving all of the Special Servicer's claims against Apollo, that are related in any way to the Apollo Guaranty; provided that, the effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided for herein and shall not be effective until the occurrence of the

Effective Date.

Global Release.

The Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, by and among the Releasing Parties (each against one another), other than a release of the obligations undertaken herein and in the Plan and other Transaction-documents, from the following: (i) any and all claims and causes of action relating to the Company arising at any time prior to the Effective Date, and in connection therewith, the Global Release shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases; provided, however, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Plan Sponsors, the reorganized Company, and New Manager. It is expressly understood and agreed, that notwithstanding anything otherwise contained in the Innkeepers Commitment Letter, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3 million cash payment provided for herein and the occurrence of the Effective Date.

Reservation of Rights.

Except as otherwise provided in the Innkeepers Commitment Letter with respect to the Company, the Plan Sponsors, and the Special Servicer, the Releasing Parties, including Apollo, reserve all of their rights to object to any releases by the Releasing Parties of other parties if the terms of the Plan differ materially from those set forth herein.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

**LEHMAN ALI INC.**

By: _____
Name:                 Jeffrey Fitts
Title:              Authorized Signatory
Date:   January 14, 2010

**FIVE MILE CAPITAL II POOLING REIT LLC**

**BY: FIVE MILE CAPITAL PARTNERS LLC**

By: _____
Name:
Title:
Date:   January 14, 2010

SIGNATURE PAGE TO THE AMENDED AND RESTATED COMMITMENT AGREEMENT

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

LEHMAN ALI INC.

By: _____
Name:
Title:
Date:  January 14, 2010

FIVE MILE CAPITAL II POOLING REIT LLC

BY: FIVE MILE CAPITAL PARTNERS LLC

By: _____
Name: *Scott Leitman*
Title: *Managing Director*
Date:  January 14, 2010

| | PRO FORMA CAPITALIZATION | | | | |
|---|---|---|---|---|---|
| ($ in millions) | | | | | |
| | Current | Debt | Adjusted | Pay Down/ | Pro Forma |
| | Principal Balance[(a)] | Impairment | Balance | Conversion | Principal Balance |
| **DEBT AND PREF. EQUITY** | | | | | |
| **Five Mile DIP** | $53.0 | $0.0 | $53.0 | ($53.0) | $0.0 |
| **Lehman DIP Loan**[(b)] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| **Fixed Pool Mortgage**[(c)] | 825.4 | (202.9) | 622.5 | 0.0 | 622.5 |
| **Floating Pool Loan** | | | | | |
| Mortgage | 220.2 | (19.9) | 200.3 | (200.3) | 0.0 |
| Mezzanine (PIK interest) | 132.4 | (132.4) | 0.0 | 0.0 | 0.0 |
| Total | 352.6 | (152.3) | 200.3 | (200.3) | 0.0 |
| **Anaheim Hilton Loan** | | | | | |
| Mortgage[(d)] | 13.0 | 0.0 | 13.0 | 0.0 | 13.0 |
| Mezzanine | 22.6 | (19.0) | 3.6 | (3.6) | 0.0 |
| Total | 35.6 | (19.0) | 16.6 | (3.6) | 13.0 |
| **Residence Inn Mission Valley Mort.**[(e)] | 47.2 | 0.0 | 47.2 | 0.0 | 47.2 |
| **Residence Inn Anaheim Mort.**[(d)] | 37.4 | (12.1) | 25.3 | 0.0 | 25.3 |
| **Hilton Ontario Mort.**[(d)] | 35.5 | (27.5) | 8.0 | 0.0 | 8.0 |
| **Doubletree Washington D.C. Mort.**[(e)] | 25.5 | 0.0 | 25.5 | 0.0 | 25.5 |
| **Residence Inn Tyson's Corner Mort.**[(e)] | 25.1 | 0.0 | 25.1 | 0.0 | 25.1 |
| **Homewood Suites San Antonio Mort.**[(e)] | 24.1 | 0.0 | 24.1 | 0.0 | 24.1 |
| **Public Preferred Stock** | 145.0 | (139.1) | 5.9 | (5.9) | 0.0 |
| **Total Debt and Pref. Stock** | $1,623.8 | ($553.0) | $1,070.8 | ($280.3) | $790.5 |
| **Implied Equity**[(f)] | $7.4 | | | | $348.2 |
| **Total Capitalization** | $1,631.2 | | | | $1,138.7 |

(a) Current Principal Balance represents principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.

(b) Assumes DIP financing facility is fully drawn.

(c) A new non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

(d) A new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date to seven (7) years from the Effective Date and with no amortization during the loan term, prepayment permitted at par without penalty, defeasance requirements will be waived.

(e) A new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year and with no amortization during the loan term, prepayment permitted at par without penalty, defeasance requirements will be waived.

(f) The Company currently has $7.4 million escrowed in an account held by Innkeepers USA Trust. This escrow will be used to make a $5.9 million payment to the holders of Innkeepers USA Trust's 8% Series C Cumulative Preferred Shares and the remaining $1.5 million balance shall be available to the reorganized Company after the Effective Date. This $7.4 million is *not* included in the Pro Forma Implied Equity and the holders of Innkeepers USA Trust's 8% Series C Cumulative Preferred Shares shall not receive any portion of the Overbid Allocation on account of their receipt of the $5.9 million payment from the $7.4 million escrowed funds.

---

[6] Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

### ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash[a] | $174.1 | Lehman Mortgage Payment[a] | $26.2 |
| Deposit Account | 7.4 | Repayment of Solar DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 53.0 |
| | | Hilton Anaheim Mezz Payment | 3.6 |
| | | Preferred Equity Payment | 5.9 |
| | | Unsecured Creditors Payment | 2.5 |
| | | Apollo Guaranty Settlement | 3.0 |
| | | Special Servicer Cash Payment | 2.5 |
| | | Balance Sheet Cash[b] | 67.3 |
| **Total** | **$181.5** | | **$181.5** |

(a) Subject to adjustment based on participation in the Third-Party Investment and the Co-Investment Right. For example, if Lehman were to own 40% of the New Equity (*i.e.*, assuming 20% of the New Equity is sold pursuant to the Third-Party Investment and 0% is sold pursuant to the Co-Investment Right), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

(b) Balance sheet cash to be used for, among other purposes, FF&E, PIP, working capital reserves, and closing costs.

APPENDIX B

Material Decisions

1.        The Sale[7] by the Company or its subsidiaries of assets totaling more than the lesser of (x) $20 million and (y) two hotels, whether in one or more transactions;

2.        Exceeding the amount of operating and capital expenditures in excess of the amount set forth in the Company's approved annual budget, subject to a 3% variance, whether for repositioning, asset improvements, deferred capital expenditure requirements and infrastructure or otherwise, and taking any action that is inconsistent with the approved budget or business plan;

3.        Approval or modification of the Company's annual budget or business plan (provided that until an annual budget is approved, the previously approved annual budget shall govern, with automatic increases (i) for utilities, taxes and insurance (with such increase not to exceed the actual increases in such expense items) and (ii) for all other items, (x) three percent (3%) of the line item for any line item other than capital expenditures, and (y) with respect to capital expenditures, the lesser of (A) three percent (3%) of budgeted line items and (B) $5 million in the aggregate for any year for both budgeted and unbudgeted capital expenditure items); provided, that at all times, whenever the Company's property manager authorizes emergency expenditures (to the extent permitted by the management agreement/shareholders agreement), the annual budget shall be deemed revised and approved to include such expenditures with respect to such period but shall not be included as part of the baseline for determining the annual budget or business plan for future periods;

4.        Commencing, settling or compromising any litigation, arbitration, mediation or other dispute resolution proceeding (x) in excess of $2.5 million, individually or in the aggregate, in any fiscal year, unless such settlement is fully reimbursed by insurance or (y) which may otherwise have a material adverse effect on the Company and its subsidiaries;

5.        (A) The filing of any voluntary petition in bankruptcy on behalf of the Company or any subsidiary, (B) the consenting to the filing of any involuntary petition in bankruptcy against the Company or any subsidiary, (C) the filing by the Company of any petition seeking, or consenting to, the reorganization or relief under any applicable federal or state law relating to bankruptcy or insolvency, (D) the consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, (E) the making of any assignment for the benefit of creditors, (F) the admission in writing of the Company's inability to pay its debts generally as they become due or (G) the taking of any action by the Company in furtherance of any such action;

---

[7] As used herein, the term "Sale" shall mean the direct or indirect sale (by derivative, swap, repurchase or similar transaction), lease, conveyance, disposition or other transfer.

6.      Acquisitions of additional properties or material assets except as specifically provided for in the approved annual budget and business plan;

7.      Entering into, amending or modifying agreements with cost or liability to the Company or its subsidiaries in excess of $5 million in any fiscal year or which are otherwise material to the business of the Company, provided that for purposes of this provision, the cost of an agreement shall be calculated based only on the period prior to the time that the Company or its subsidiaries shall have the right to freely terminate such agreement, and shall include any fee payable upon termination by the Company or its subsidiaries;

8.      Raising new equity for the Company or any of its subsidiaries or admitting any new partner or owner to the Company or any subsidiary;

9.      Making distributions to the Members or owners of the Company's subsidiaries;

10.     Prepayment of the Company's debt or debt of the Company's subsidiaries, other than as required by the terms of such debt in connection with a property sale consummated pursuant to the approved business plan or as otherwise specifically permitted by the approved business plan;

11.     With regard to any subsidiary, approving any decision or taking any action which, if it was being made or taken by the Company, would be a Material Decision as set forth herein;

12.     Approving reserves in excess of $2 million, excluding reserves required to be held by lenders of the Company or its subsidiaries, and "FF&E" reserves carried over from the previous approved annual budget;

13.     The recapitalization, reclassification, redemption, repurchase or other acquisition by the Company of equity or other interests in the Company;

14.     Any amendment or modification of the operating/shareholders agreement (if applicable), the management agreement, or organizational documents (including the operating agreement of a limited liability company and partnership agreement of a partnership) of the Company or any subsidiary of the Company;

15.     Entering into, amending or modifying any agreement between the Company or any subsidiary, on the one hand, and a Member or any affiliate of a Member, on the other hand;

16.     Merging, consolidating or dissolving the Company or any of its subsidiaries;

17.     Making any change to a tax election or accounting principles of the Company or any of its subsidiaries that is materially adverse to any Member or converting the Company or any of its subsidiaries to a corporation;

18.       The Company or its subsidiaries refinancing any indebtedness or materially modifying any indebtedness in an amount greater than $15 million in the aggregate;

19.       The Company or its subsidiaries incurring or guaranteeing any indebtedness in any amount;

20.       The Company holding any assets other than the interests in its subsidiaries existing on the date of hereof, any interest in an entity treated as a corporation for U.S. federal income tax purposes, or any cash reserves intended for distributions to the Members or to pay Company expenses;

21.       Removal and replacement of the New Manager as property manager of any of the assets of the Company or its subsidiaries;

22.       Any Transfer which may reasonably be expected to cause the assets of the Company to be deemed "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA);

23.       Appointing, dismissing, setting or modifying the terms of compensation and benefits for the material officers and employees of the Company or any of its subsidiaries;

24.       Any investments (including in the form of loans, guaranties, advances or capital contributions) in any person other than a subsidiary of the Company;

25.       Any appointment or removal of the auditors, regular counsel, financial advisors, underwriters, investment bankers or company wide insurance providers of the Company or any of its subsidiaries;

26.       The taking of any significant actions, including the making of any significant filing with respect to any governmental or regulatory body, agency, official or authority including application for new regulatory licenses, requests for transfer or assignment of existing regulatory licenses or participation in material rulemaking or policy proceedings;

27.       The entry into, or the termination, disposition or material amendment of the terms of any joint venture;

28.       Approval of any action or inaction by the Company or any of its subsidiaries that would violate any provision of a loan document or other material agreement or instrument binding on the Company or any of its subsidiaries or any property of the Company or any of its subsidiaries;

29.       Enter into any swap, hedge, collar or other interest rate protection agreement, in each case, for a notional amount in excess of $10 million;

30.       Entering into any material modification of, or terminating or allowing to expire, any insurance programs covering the Company or its subsidiaries, or their respective assets and personnel (including officers and directors);

31.     Changing the principal banking institutions with which the Company or its subsidiaries maintain deposit, borrowing or other relationships;

32.     Entering into any lease not provided for in the approved annual budget or business plan (other than short term storage leases in connection with a capital program or equipment leases in the ordinary course of business);

33.     Granting any lien, mortgage, pledge or other encumbrance with respect to any material assets of the Company or any of its subsidiaries;

34.     The Company or any subsidiary materially changing its line(s) of business or conducting business in a jurisdiction other than the United States;

35.     Approving any management incentive plan or other equity compensation plan; and

36.     Any rebranding of properties or entry into new franchise agreements.

Five Mile/Midland Commitment

APPENDIX D

Innkeepers Commitment Letter

<u>APPENDIX E</u>

<u>Order Amending the Cash Collateral Order</u>

# EXHIBIT G

## Five Mile-Midland Agreement

FIVE MILE CAPITAL PARTNERS

# FIVE
# MILE

THREE STAMFORD PLAZA, 9TH FLOOR
STAMFORD, CONNECTICUT 06901
TELEPHONE 203-905-0950
FACSIMILE 203-905-0954

January 14, 2011

Midland Loan Services, a division of PNC Bank, National Association
10851 Mastin, 6th Floor, Overland Park, KS 66210
Attention: Kevin S. Semon
　　　　　　Vice President, Special Servicing Manager

## Amended and Restated Binding Commitment for the
## Acquisition of Innkeepers USA Trust

Five Mile Capital II Pooling REIT LLC ("Five Mile Pooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), is pleased to submit this amended and restated letter (this "Amended Commitment Letter") to Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the $825.4 million Fixed Rate CMBS Mortgage Loan (together with any successor special servicer, "Special Servicer"), which sets forth, among other things, our binding commitment to provide equity capital (the "Commitment") for the restructuring of the debt and equity of Grand Prix Holdings LLC and Innkeepers USA Trust and their wholly owned direct and indirect subsidiaries (collectively "Innkeepers" or the "Company"), resulting in Five Mile and Lehman ALI, Inc. ("Lehman" and together with Five Mile Pooling, the "Plan Sponsors") directly or indirectly owning a controlling interest in the reorganized Company as more fully set forth in that certain Commitment Agreement between Five Mile Pooling and Lehman dated as of January 14, 2011 (the "Lehman Commitment") and that certain Commitment Letter among Lehman, Five Mile, Special Servicer and the Company, dated as of January 14, 2011 (the "Debtor Commitment"). The recapitalization and debt restructuring (the "Transaction") is to be effectuated through a plan of reorganization (the "Plan") to be filed in the United States Bankruptcy Court for the Southern District of New York presiding over the Company's bankruptcy cases (jointly administered as Case No. 10-13800) (the "Innkeepers Bankruptcy Court") by the Company with the support of Lehman, us and you. This Amended Commitment Letter hereby amends and supersedes that certain Binding Commitment for the Acquisition of Innkeepers USA Trust by and between Five Mile Pooling and Special Servicer dated December 10, 2010 as amended (the "December 10 Commitment Letter") except as provided in Section VII herein. It is expressly acknowledged by the parties hereto that the Special Servicer is not a party to the Lehman Commitment and is only a party to the Debtor Commitment to the extent set forth therein.

If the Plan Sponsors are the successful/winning bidders at the auction, it is intended that the funding from our Commitment will be used to finance and otherwise implement a confirmed Plan acceptable in all respects to you in your reasonable discretion, including the necessity of REMIC

compliance and consistency with grantor trust rules and regulations and the pooling and servicing agreement, and acceptable to us in our reasonable discretion, which will provide for the treatment of claims and other terms outlined below and in the Debtor Commitment and will otherwise comply with applicable disclosure requirements, rules of procedure and contain terms and treatment of claims consistent with the applicable provisions of the Bankruptcy Code.

Five Mile is uniquely qualified to consummate the Transaction, given our substantial investment and the rights we have in certain indebtedness in Innkeepers. As you know, we have funded a debtor-in-possession financing to the Company for $53 million and have performed our due diligence of all 73 assets. As a result, we are familiar with the Company's assets and operating performance, gleaned from our review of public filings and our own extensive due diligence. We also have broad investment experience in the hospitality area and general expertise in the extended stay lodging sector.

## I. Value & Proposed Capital Structure

Our Commitment and the Transaction are based on a valuation of the Company of $1,138.7 million and result in a final capital structure of $790.5 million in aggregate indebtedness and $348.2 million in new equity, which will include funding for closing and emergence costs. The details of the reorganized capital structure for the Company are provided in Section IV below.

## II. Capital Commitments; Guaranties

Subject to the conditions set forth herein, we hereby submit this binding and irrevocable offer to provide $174.1 million of cash to fund the Transaction (a portion of which may be provided by other investors, including an operating partner, who will manage the hotels) pursuant to which, if the Plan Sponsors are the successful winning bidders, Five Mile, through one or more of its wholly owned affiliates(s) or a Five Mile controlled investment vehicle, comprised of limited partners in Five Mile Capital Partners II LP and Five Mile Capital Investment Opportunities LP, will purchase 50.0% of the New Equity for cash in an amount of $174.1 million; and (ii) Lehman, in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan will receive, subject to receipt of further consideration as a result of the Auction (defined below) contemplated herein, (a) 50.0% of the New Equity and (b) $26.2 million in cash, subject, in each case, to adjustment for the Co-Investment Right (as defined below); provided, however, that, subject to applicable law and the Plan, the Plan Sponsors may, subject to the consent of the Company not to be unreasonably withheld, conditioned, or delayed, require the Company or the reorganized Company as applicable to provide due diligence access (subject to an appropriate confidentiality agreement) and to distribute up to 20% of the New Equity to a third-party investor and/or new manager (the "Third-Party Investment"), and, in the event the third party investor and/or new manager pays cash on the Effective Date (as defined below) for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman, shall be adjusted accordingly, provided, further, however, that notwithstanding any direction by the Plan Sponsors with respect to the Third Party Investment, Five Mile and Lehman shall remain liable for the full amount of the Commitment. The Transaction will be effectuated consistent with the terms of this Amended Commitment Letter, the Lehman Commitment and the Debtor Commitment on the effective date of the Plan (the "Effective Date") (the occurrence of the Effective Date shall be subject to the satisfaction of customary conditions,

including without limitation entry of an order confirming the Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable and the Transaction contemplated under the Plan having been closed and consummated as contemplated thereunder on or before the Outside Date), and the Plan will also include customary provisions with respect to waiver of conditions to the Effective Date). Five Mile's intended investment, as reflected herein, will be used to recapitalize the Company, and more specifically, will be used to retire the existing DIP facilities and provide funds for future property improvement work ("PIP"), furniture, fixtures, and equipment investments ("FF&E"), cash reserves and potential growth opportunities. Five Mile will provide its portion of the cash investment required to consummate the Transaction from our existing investment vehicles or a Five Mile sponsored and controlled co-investment vehicles.

In addition, in connection with the Fixed Rate CMBS Mortgage Loan, (a) Five Mile Pooling will enter into a new limited "bad boy" guaranty (the "FM Guaranty") which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate CMBS Mortgage Loan, except that Five Mile Pooling will not have any liability under the FM Guaranty unless such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by Five Mile or an affiliate that controls, is controlled by or under common control with Five Mile and (b) the REIT or other holding company entity which owns all of the Innkeepers properties (the "Parent Entity") shall enter into a new "bad boy" guaranty (the "Parent Guaranty"), which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate CMBS Mortgage Loan, except that the beneficiary of the Parent Guaranty shall have no right to enforce such Parent Guaranty unless the Five Mile member of the joint venture between the Plan Sponsors as contemplated by the Lehman Commitment (the "FM/Lehman JV") ceases to have the right to vote at least 34% (which is a blocking right with regards to Super Majority Decisions (as defined below)) of the equity interests in the FM/Lehman JV. Five Mile Pooling's maximum liability under the FM Guaranty shall not exceed 10% of the outstanding principal balance of the restructured Fixed Rate CMBS Mortgage Loan from time to time for which such guaranty is provided. There shall be no such cap on the liability of Parent Entity under the Parent Guaranty. If Five Mile desires to sell or otherwise transfer (i) all of its interests in the FM/Lehman JV or (ii) a portion of its interest in the FM/Lehman JV and with respect to any such partial sale or transfer, Five Mile would cease to have the right to vote at least 34% (which is a blocking right with regards to Super Majority Decisions) of the equity interests in the FM/Lehman JV following such sale or transfer, then, in addition to any other conditions to such sale or transfer set forth in the Fixed Rate CMBS Mortgage Loan documents, as a condition to any such sale or other transfer, an entity, which has a minimum net worth of $135 million and which is otherwise acceptable to the holder of the Fixed Rate CMBS Mortgage Loan in its sole but reasonable discretion shall deliver a guaranty in form and substance substantially similar to the FM Guaranty which covers "bad acts" actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the transferee or an affiliate that controls, is controlled by or under common control with such transferee and Five Mile or the transferee shall pay an appropriate review fee to be set forth in the definitive documentation.

During the term of the Fixed Rate CMBS Mortgage Loan, (x) the corporate or other governance documents of the FM/Lehman JV and the borrowers under the Fixed Rate CMBS Mortgage Loan the operating lessees and such other subsidiaries of the FM/Lehman JV (as may be necessary to effectuate the provisions of this paragraph) shall provide that super-majority voting (i.e., the consent of at least 66 2/3 % of the equity interests in the FM/Lehman JV) shall be required for the decisions

identified on Appendix B to the Lehman Commitment if such decision would result in or otherwise constitute a "bad act" under the FM Guaranty (irrespective and independent of whether or not such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by Five Mile or an affiliate that controls, is controlled by or is under common control with Five Mile) and/or the Parent Guaranty, as applicable (collectively, the "Super Majority Decisions") and (y) such Super Majority Decisions may not be amended, waived or modified without the consent of the holder of the Fixed Rate CMBS Mortgage Loan. Nothing contained in this Amended Commitment Letter shall require the Special Servicer to take any action in violation, derogation or contravention of the terms or provisions of the Fixed Rate CMBS Mortgage Loan documents.

The Parties acknowledge that the applicable loan and credit documents evidencing and securing the Fixed Rate CMBS Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer and its counsel shall reasonably require as reasonably acceptable to the reorganized borrowers and the Plan Sponsors in order to implement the proposed treatment of the Fixed Rate CMBS Mortgage Loan, to incorporate the terms herein and to implement the Plan.

In connection with the foregoing, we hereby confirm that we have available, and will have available at all times prior to consummation of the Transaction or the termination of the Amended Commitment Letter, investor commitments that exceed, in the aggregate, $300 million.

### III. Plan Subject to Higher and Better Offers; Five Mile Free to Pursue Other Transactions

Subject to Court approval of the Bid Procedures (as hereinafter defined), Five Mile acknowledges that the creditor treatment proposed herein will be subject to higher and better offers through an auction. For avoidance of doubt, our providing this Amended Commitment Letter does not preclude us in any way from discussing alternate transactions, including competing plans of reorganization, or engaging in any discussions regarding providing financing or participating in any such alternate transactions (each, an "Alternate Transaction"); provided however, that other than the Lehman Commitment and the Debtor Commitment (and the transactions contemplated respectively thereby) we will not enter into a binding commitment with respect to, or otherwise consummate, any Alternate Transaction prior to the occurrence of a Termination Event (as defined in Section VIII hereof).

Special Servicer and Five Mile agree that until a Termination Event (as defined in Section VIII hereof) occurs, Special Servicer and its affiliates and advisors shall be able to participate in discussions regarding an Alternative Transaction; provided however, Special Servicer shall not enter into a binding commitment with respect to, or otherwise consummate, any Alternative Transaction prior to the occurrence of a Termination Event.

### IV. Restructuring of Debt and Equity of the Company – New Equity, Debt Forgiveness, & Cash Pay Downs

### A. Debt Restructurings

If the Plan Sponsors are the winning bidders at the auction, our Commitment for the Plan Sponsors' stalking horse bid contemplates a restructuring implemented through the Plan whereby the current

4

debt holders will realize value totaling $999.9 million or 71% of their $1,408.3 million current outstanding obligations. Creditor treatment (excluding unsecured creditors) is being implemented through $790.5 million in new debt, $200.3 million in equity and cash, $5.5 million of cash consideration for existing guarantees and servicing fees paid on behalf of the C6 and C7 Trusts and $3.6 million in cash to fund certain creditor payments. The new debt also benefits from a capital structure supported by approximately 30.6% in equity value.

An illustration and an explanation of the Plan Sponsors' stalking horse bid and the resultant creditor treatment under the Plan if the Plan Sponsors' stalking horse bid is the winning bid are detailed in Appendix A.

### B. Cash Sources & Uses

Our Commitment contemplates that the cash investment of $174.1 million will be used as follows:

- o Repayment of the Lehman and Five Mile DIP in the amount of up to $70.5 million plus any accrued fees or interest due on such facility;
- o Payment to the holder of the Hilton Suites Orange/Anaheim Mezzanine loan in the amount of $3.6 million in full satisfaction of its claim;
- o Payment of $3 million to the Special Servicer in connection with the treatment of the Fixed Rate CMBS Mortgage Loan;
- o Payment of fees to the Special Servicer of the Fixed Rate CMBS Mortgage Loan equal to $2.5 million as consideration for effecting the restructuring transactions on behalf of the LBUBS 2006-C6 and LBUBS 2006-C7 trusts (the "C6 and C7 Trusts");
- o $67.3 million of cash to cover 2011 FF&E and future PIP work (currently estimated at approximately $22.8 million and to be verified by the parties), funding of additional cash on the post-Effective Date balance sheet, and closing and emergence costs;
- o Payment of $2.5 million for the various classes of unsecured creditors; and
- o $26.2 million in cash as the Lehman Payment.[1]

### C. Our Stalking Horse Bid and Resultant Treatment of Claims and Interests

The Debtor Commitment and the Plan Sponsors' stalking horse bid is comprised of the following treatment of claims and interests:

1. <u>Fixed Rate CMBS Mortgage Loan</u>: Reduction of the outstanding balance to $622.5 million.

    a. Non-Recourse New Mortgage Loan of $622.5 million shall have the following terms:
        i. No change to the interest rate of 6.71%;
        ii. No change to maturity date of July 9, 2017;

---

[1] Subject to adjustment based on participation in the Third-Party Investment and Co-Investment Right. For example, if Lehman were to own 40% of the New Equity (i.e., assuming 20% of the New Equity is sold pursuant to the Third-Party Investment and 0% is sold pursuant to the Co-Investment Right), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9.

      iii. During the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; and

      iv. Prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and

b. Property release provision whereby the properties may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then applicable REMIC rules and regulations such other provision that is acceptable to the Company and you which is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement;

c. The Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo Investment Corporation ("Apollo"), related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty") and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and shall be embodied in, and shall not be effective unless and until, the Global Release (as defined herein) has been embodied in an order entered in the Innkeepers Bankruptcy Court that has become final and become non-appealable. Immediately after the Effective Date, the Plan Sponsors will direct the reorganized Company to make a cash payment of $3 million to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Global Release in the Plan and shall be in form and substance reasonably satisfactory to Special Servicer and the form of release and waiver shall be in form and substance reasonably satisfactory to Apollo and conditioned on the above-described payment and the occurrence of the Effective Date;

d. Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct the reorganized Company to make a cash payment of a $2.5 million fee to the Special Servicer as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, Special Servicer shall continue to be entitled to collect any and all monthly or periodic fees and other compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal

payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Company or the reorganized Company to pay any of such fees or other compensation or any other amounts under the Fixed Rate CMBS Mortgage loan documents, including the appropriate review fee to be set forth in the definitive documentation as set forth in the second paragraph of Section II herein; and

e. The lender under the Fixed Rate CMBS Mortgage Loan will receive the FM Guaranty and the Parent Guaranty.

2.  <u>Floating Rate Mortgage Loan</u>:  Lehman, in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan will receive:  (a) 50.0% of the New Equity and (b) $26.2 million in cash, subject, in each case, to adjustment for the Co-Investment Right and the Third-Party Investment.

3.  <u>Anaheim Hilton Mortgage Loan (CWCapital as special servicer)</u>:  Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date to seven (7) years from the Effective Date of the Plan, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

4.  <u>Anaheim Hilton Mezzanine Loan (Trimont as special servicer)</u>:  A cash payment of $3.6 million as full satisfaction of the Anaheim Hilton Mezzanine Loan.

5.  <u>Hilton Ontario Mortgage Loan (C-III as special servicer)</u>:  (i) Payment through a new non-recourse note on substantially the same terms as the existing loan, except for reduction of the outstanding balance to $8.0 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived; or (ii) such other treatment as set forth in the Plan that is acceptable in all respects to the Company, the Plan Sponsors, and the Special Servicer, in each of their respective reasonable discretion.

6.  <u>Residence Inn Mission Valley Mortgage Loan (LNR as special servicer)</u>:  Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

7.  <u>Residence Inn Anaheim (Garden Grove) Mortgage Loan (LNR as special servicer)</u>:  (i) Payment through a new non-recourse note on substantially the same terms as the existing note, except for reduction of the outstanding balance to $25.3 million with the maturity date seven (7) years from the Effective Date with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived; or (ii) such other treatment as set forth in the Plan that is acceptable in all respects to the Company, the Plan Sponsors, and the Special Servicer, in each of their respective reasonable discretion.

8.   Hilton Doubletree Washington D.C. Mortgage Loan (LNR as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

9.   Residence Inn Tysons Corner Mortgage Loan (LNR as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

10.   Hilton Homewood Suites San Antonio Mortgage Loan (LNR as special servicer): Full payment through a new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year, with no amortization during the loan term and prepayment shall be permitted at par without penalty and defeasance requirements will be waived.

11.   Additional Treatment for the Following Accepting Classes: Following the approval of the disclosure statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, provided that the following classes of claims or interests vote to accept and otherwise support the Plan, they shall receive the following treatment:

   a.   Floating Rate Mezzanine Loan (Trimont as special servicer): SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between Lehman, Five Mile, and the Company.

   b.   Unsecured Debt: A total of $2.5 million cash shall be available for distribution to, collectively, the general unsecured creditors of Innkeepers (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order; provided that the Company shall release and waive all preferences under section 547 of the Bankruptcy Code and to the extent related thereto, section 550 of the Bankruptcy Code; provided, however, that those classes that do not vote in favor of and otherwise support the plan of reorganization will not received a distribution contemplated herein and will not receive a waiver of preferences under section 547 of the Bankruptcy Code or, to the extent related thereto, section 550 of the Bankruptcy Code.

   c.   Preferred Equity: The holders of Innkeepers USA Trust's 8.0% Series C Cumulative Preferred Shares shall collectively receive: (i) a co-investment right, subject to exemption from Section 5 of the Securities Act of 1933, limited to 2% of the New Equity (as defined herein); provided, however, that such equity shall have no minority rights, except to the extent required by section 1123(a)(6) of

the Bankruptcy Code (the "Co-Investment Right"), and (ii) $5.9 million of the approximately $7.4 million currently escrowed in an account held by Innkeepers USA Trust (the "Baseline Preferred Cash Recovery"). The balance of such escrowed funds shall be available to, and shall be the property of, the reorganized Company after the Effective Date.

12. <u>Existing Equity of the Company and Holdings</u>: Except as expressly provided above, holders of common, preferred and any other equity interests in Innkeepers shall receive no distributions on account of their interests. Reorganized Innkeepers will issue equity (the "New Equity") upon the Effective Date of the Plan, the occurrence of such Effective Date conditioned on customary provisions, including the entry of an order confirming the Plan that has been entered in the Innkeepers Bankruptcy Court and has become final and non-appealable. The New Equity held by the winning bidders shall be subject to dilution with respect to the Co-Investment Right (as described below).

13. <u>Application of Existing Cash on the Effective Date</u>: Company, the Special Servicer and/or Lehman shall seek to amend the final cash collateral order. Special Servicer and Five Mile agree that any cash in the Company (to include any cash immediately on hand, any cash received on account of receivables existing prior to the Effective Date and revenues earned therefrom) at the Effective Date shall be applied to satisfy administrative claims incurred but unpaid as of the Effective Date and to consummate the transaction contemplated herein pursuant to the waterfall set forth in the Final Cash Collateral Order (as shall be amended to increase the amount of cash held back as an expense reserve, in order to account for certain closing and emergence costs, including potential success fees). After the Effective Date, cash will be administered and applied pursuant to the applicable cash management procedures under the applicable loan documents, and the waterfall set forth in the Final Cash Collateral Order will no longer govern.

## V. Offer Structure and Protections

As stated, the Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Plan through an auction (the "Auction") on the terms set forth below. We require that there be an Auction of the Company on an enterprise basis where the Plan Sponsors will be the stalking horse bidder at the Auction with initial stalking horse bids to be as described herein and in the Debtor Commitment and bid protections set forth below. To that end, we require the Bankruptcy Court's entry of an order (the "Bid Procedures Order") approving bid procedures (the "Bid Procedures") which include the following terms:

- Bids will be solicited for up to forty-five (45) calendar days following the approval of bidding procedures;

- Bids, to be deemed a qualified bid, must be accompanied by a deposit of $20 million in cash to an interest bearing escrow account to be identified, established, and held by and in the name of the Company;

- Bidders must be qualified on terms reasonably acceptable to the Company after consultation with the Special Servicer, which consultation shall include, subject to confidentiality agreements reasonably acceptable to the Company and the Special Servicer, disclosure of the bidders, their qualifications, and their bids;

- All bids and overbids, to be deemed a qualified bid and eligible to participate in the Auction and whether made prior to or at the Auction, must be made on an enterprise-value basis and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein (including but not limited to the guarantees provided to Special Servicer and the other terms, conditions, and treatment of claims as set forth in this Amended Commitment Letter);

- The Initial Overbid of the implied enterprise value must be at least $15 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied enterprise value of the Plan Sponsors' Bid and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (the "Initial Minimum Overbid"), and subsequent bids must be in increments of at least $5 million and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (each qualifying initial and subsequent overbid, an "Overbid");[2]

- To be deemed a qualified bid and eligible to participate in the Auction, the equity consideration of such bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value as set forth herein and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the Effective Date: (a) $53 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Solar DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (as amended) [Docket No. 402] that are necessary for the Company to emerge from bankruptcy;[3] (e) at least $39 million in cash for the reorganized Company; (f) with respect only to qualified bids other than the Debtor Commitment, at least $200.3 million in cash to pay Lehman's claims against the Company (plus any applicable Overbid Allocation); and (g) to the extent the bid is submitted by a competing bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement;

- The Bid Procedures and the Bid Procedures Order shall provide that to be deemed a qualified bid, a bid that includes the Midland Financing shall not result in a bid employing a debt-to-capitalization ratio for the reorganized enterprise that exceeds 70 percent;[4]

---

[2]     Note that the additional consideration included in any Overbid (except for the Initial Overbid) must consist of no more than 70% debt consideration.

[3]     For the avoidance of doubt, to the extent the Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

[4]     "Midland Financing" shall mean the debt financing provided for herein (together with all of the terms and conditions described herein regarding the treatment of Special Servicer's claim including the guarantees described herein).

- The percentage increase in the implied enterprise value of the winning bidder will be allocated to each collateral pool/individual property (the "Overbid Allocation") by increasing the debt or cash consideration that such collateral pool/individual property is receiving under the Plan in proportion to the incremental Overbid amount (e.g., if a collateral pool is receiving a new mortgage under the Plan in the face amount of $100, then a winning Overbid that is 4% greater than the Plan Sponsors' Bid would result in that collateral pool/individual property receiving a mortgage in the face amount of $104; the same would apply to cash consideration); provided, however, that the amount of the incremental Overbid consideration not allocated to collateral pools/individual properties under the Overbid Allocation shall be allocated to each collateral pool/individual property pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools/individual properties against which such respective collateral pool/individual property has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying prepetition claims and interests and determining the ultimate recipients of such Overbid; provided, further however, that to the extent any winning Overbid includes debt consideration to the Special Servicer in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between the Plan Sponsors, Special Servicer, and the Company);

- In the event the winning bidder is not the Plan Sponsors (which includes any wholly-owned subsidiary of Five Mile), the Floating Rate Mortgage Loan shall be repaid in cash in an amount determined in accordance with the Overbid Allocation (assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Plan Sponsors' Bid);

- In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the Company's corporate and debt and equity structure for purposes of determining the ultimate recipients of such overbid value;

- The determination of the winning bidder at the Auction shall be made by the Company only after consulting with the Special Servicer relating to the Bids made at the Auction; and

- A bid submitted by or through a holder of a secured claim against the Company shall not be deemed a qualified bid and eligible to participate in the Auction if the bid contemplates the ability of secured creditors to credit bid their claims against the Company within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code; provided that all rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent the Auction is not consummated or the Plan is not confirmed and does not become effective by September 1, 2011.

The Bid Procedures Order will provide that, to the extent the Debtor Commitment has not terminated as a result of a Plan Sponsor Breach (as defined in the Debtor Commitment), in the event of (i) an Overbid in which Plan Sponsors' Bid is not the winning bid (the "Overbid Transaction") or (ii) the Company's execution of an agreement to pursue an alternative transaction for a material portion of the Company's assets after entry of the Bid Procedures Order (the

"Alternative Transaction"), the Plan Sponsors will receive a breakup fee in the amount of $7 million (the "Break-Up Fee") plus reimbursement of all of Five Mile's reasonable and documented fees and expenses, not to exceed $3 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Stalking Horse Fee"). Twenty-five percent (25%) of the Break-Up Fee may be allocated to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Company to emerge from bankruptcy, as has been mutually agreed between Lehman and Five Mile, with the remainder allocated to Five Mile. Other than terminating their obligations in accordance with the Debtor Commitment, the Plan Sponsors' sole remedy at law and in equity against the Company in the event of an Overbid Transaction or Alternative Transaction shall be receipt of the Break-Up Fee and Expense Reimbursement as liquidated damages, provided, however that (i) nothing herein shall limit any rights and remedies at law or in equity that the Plan Sponsors have or may have as creditors of the Company and (ii) if there is a material breach by the Company of the Debtor Commitment that results in a termination of the Commitment Letter, and provided the Plan Sponsors are not entitled to the Stalking Horse Fee, the Plan Sponsor's damages for such material breach shall be capped at $10 million.

The Stalking Horse Fee, if any, shall be payable by the Company upon the earlier of (i) the Effective Date and (ii) consummation of an Alternative Transaction.

The Company (a) will file a motion to approve the Bid Procedures and the Stalking Horse Fee (the "Bid Procedures Motion") and request a hearing for approval thereof as soon as is practicable, and (b) will file the Plan, a disclosure statement for the Plan ("Disclosure Statement"), and request a hearing for approval of the Disclosure Statement and seek confirmation of the Plan.

Each of the foregoing and subsequent pleadings (including the order approving the Bid Procedures Motion (the "Bid Procedures Order")) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion. The Plan will be filed jointly for all the Debtors.

Special Servicer confirms that, other than the sale of equity interests in the reorganized Company, the Plan will not contemplate or provide for a sale of the Company or any of its assets pursuant to section 1129(b)(2)(a)(ii) or (iii) or section 363 of the Bankruptcy Code.[5] As such, no holder of a lien on any asset of the Company shall be permitted to credit bid its claim as part of the Plan.

If the Company seeks an order requesting authority from the Innkeepers Bankruptcy Court to reimburse the reasonable and documented expenses of "Bidder D", incurred prior to December 15, 2010, in an amount not greater than $500,000, provided that the Break-Up Fee and Expense Reimbursement have been approved by the Innkeepers Bankruptcy Court, Five Mile and Special Servicer confirm that they shall not object to such request and such expenses shall be paid by the

---

[5]     The Parties acknowledge that all rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (a) the auction process contemplated in the Bid Procedures is terminated or abandoned, (b) Special Servicer is no longer obligated to support the Term Sheet attached to the Debtor Commitment or the Agreement Relating to Midland Commitment to Support Debtor Commitment with New Party under Certain Circumstances dated as of January 14, 2011 by and among Grand Prix Holdings, LLC, Innkeepers USA Trust and Special Servicer, (c) Lehman terminates the Debtor Commitment, (d) the plan of reorganization that encompasses the provisions provided for herein or the winning Bid through the auction process described in (a) is not confirmed, or (e) Effective Date shall not have occurred by September 15, 2011.

Company at the conclusion of the Auction, so long as Bidder D is not the successful winning bidder at the Auction.

## VI.    Strength of the Stalking Horse Bid and the Proposed Plan

We believe the Transaction and the Plan (consistent with the terms of this Amended Commitment Letter and the Debtor Commitment Letter) is beneficial to all creditors and is in the best interests of the Company and its bankruptcy estates. The Plan values the Company at $1,138.7 million and the current debt is reduced through debt forgiveness, pay down and equity conversion post-confirmation to approximately $790.5 million.  Further, there is high certainty and low execution risk with the Plan, financed by our Commitment, as it will provide for the exit financing component critical to the success and emergence of Innkeepers from bankruptcy. There is no due diligence condition.

We believe the Plan also provides additional stability for the Company by providing adequate cash to pay exit costs, fund $7.8 million of FF&E reserve contribution for the first year of the restructured Fixed Rate CMBS Mortgage Loan (which funds shall be held by the Master Servicer of the Fixed Rate CMBS Mortgage Loan), and provide general cash liquidity to be held at the Company (includes amounts for future PIPs) to manage seasonality within the business, cover operating or interest shortfalls should they occur, and provide funds to pay administrative and priority expenses upon emergence.

Further, the Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, other than a release of the obligations undertaken herein and in the Plan and other Transaction documents, by and among (each against one another) the Company, the Plan Sponsors, Special Servicer, (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts and trustees), Apollo, and other holders of claims against and interests in the Company, each of their respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals from the following: (i) any and all claims and causes of action relating to the Company arising prior to the Effective Date, and in connection therewith, shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases; provided, however, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Plan Sponsors, the reorganized Company, and new manager.  It is expressly understood and agreed, that notwithstanding anything otherwise contained herein or in the Debtor Commitment, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3 million cash payment provided for herein and the occurrence of the Effective Date, which shall include that the Global Release has been embodied in the order confirming the Plan as entered in the Innkeepers Bankruptcy Court that has become final and become non-appealable.

We are ready to move forward and have all the resources, including available funds, to conclude the transactions outlined in this Amended Commitment Letter and the Debtor Commitment.

## VII. Special Servicer Covenants

The Company, Lehman, Five Mile Pooling and the Special Servicer have entered into the Debtor Commitment whereby the Company has agreed to file the Bid Procedures and prosecute the Plan described herein. The Special Servicer by virtue of its execution of the Debtor Commitment intends to proceed and perform its undertakings contained therein. With such understanding, Special Servicer hereby covenants and agrees to the following:

1) For as long as no Termination Event has occurred under the Debtor Commitment, and no Termination Event has occurred hereunder, the Special Servicer will support the provisions of the Term Sheet (the "Term Sheet") as provided for therein, which is included in the Debtor Commitment (including the Plan, Transaction, Auction, and the Bid Procedures Order, each as set forth in the Term Sheet);

2) In the event a Termination Event has occurred under the Debtor Commitment, and unless such Termination Event thereunder constitutes a Termination Event hereunder or in the December 10 Commitment Letter (as amended), Special Servicer shall proceed with the undertakings and commitments as provided under and upon the terms of the December 10 Commitment Letter (as amended).

3) Neither paragraph 1) or 2) above, nor anything else contained herein, shall prevent or otherwise restrict Special Servicer from exercising it rights to terminate this Amended Commitment Letter if there exists a Termination Event under Section VIII herein or the December 10 Commitment Letter (as amended) if there exists a Termination Event under the December 10 Commitment Letter (as amended).

## VIII. Termination of Commitment

This Amended Commitment Letter outlines only some of the essential terms regarding the proposed Transaction, is not all-inclusive and does not purport to summarize or contain all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Transaction.

This Amended Commitment Letter shall terminate and be of no further force or effect, and we and you shall no longer be obligated with respect to this Commitment and other agreements set forth herein (including, without limitation, our agreement with respect to Alternate Transactions set forth in Section III hereof), upon the earliest to occur of the following (each, a "Termination Event") and notice from the party with the right to terminate as set forth below:

1. the failure to occur on or before the stated deadline of any of the following with respect to the Plan (the "Target Dates"):

   a. the Bid Procedures (including the Break-up Fee and the Expense Reimbursement) have not been approved by the Innkeepers Bankruptcy Court as of March 31, 2011;

   b. the Plan has not been confirmed by the Innkeepers Bankruptcy Court pursuant to an order of the Innkeepers Bankruptcy Court by June 30, 2011; and

   c. the Effective Date has not occurred and/or all of the transactions contemplated under the Plan and this Amended Commitment Letter have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "Outside Date"); provided further, unless otherwise agreed by each of the Debtors,

the Plan Sponsors, and the Special Servicer in writing, that upon the occurrence of this Termination Event, the Amended Commitment Letter shall automatically terminate and be of no further force or effect and the order confirming the Plan will provide that both confirmation and the confirmation order will be automatically revoked (with a reversion to the *status quo ante*) on September 15, 2011;

2.   the occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Company taken as a whole with such Termination Event exercisable only by Five Mile; provided that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC and KPA RIGG, LLC;

3.   failure to execute, deliver or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate i) the Transaction with respect to the Fixed Rate CMBS Mortgage Loan or otherwise affecting the treatment, including the economics thereof, in each case in form and substance satisfactory to Special Servicer and Five Mile in our reasonable discretions and ii) the Transaction in each case in form and substance satisfactory to Five Mile in each of our reasonable discretion; provided, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC and KPA RIGG, LLC;

4.   any material breach by Special Servicer or Five Mile of, or material, non-compliance with, the agreements set forth in this Amended Commitment Letter;

5.   mutual agreement of Special Servicer and Five Mile to terminate this Amended Commitment Letter;

6.   termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement deemed necessary by the Plan Sponsors or Special Servicer prior to the Effective Date without the Plan Sponsors and Special Servicer's written approval; provided, however, this shall not be a termination event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment, including the economics thereof, of the Fixed Rate CMBS Mortgage Loan; provided further, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC and KPA RIGG, LLC;

7.   failure by Company to assume and, if necessary, assign all franchise agreements pursuant to an order of the Court satisfactory to the Plan Sponsors or the Special Servicer in all material respects on or before the Effective Date; provided, however, this shall not be a termination event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment, including the economics thereof, of the Fixed Rate CMBS Mortgage Loan; provided further, however, that this Termination Event shall not apply to the Chapter 11 cases of Grand Prix West Palm Beach LLC, KPA HI Ontario, LLC and KPA RIGG, LLC;

8. immediately on or prior to the hearing on the Bidding Procedures as in the Debtor Commitment, failure by the Plan Sponsors to identify a list of property managers reasonably acceptable to Special Servicer and Five Mile in all material respects for the management of the hotels;

9. prior to the Effective Date, the change of any of the Super Majority Decisions and/or voting requirements for Super Majority Decisions as established in the Lehman Commitment;

10. the occurrence of any termination event under the Lehman Commitment.

Time is of the essence with respect to the Termination Events.

## IX.    Miscellaneous

All notices, requests, claims, demands and other communications hereunder shall be given (and shall be deemed to have been duly received if given) by hand delivery in writing or by facsimile transmission with confirmation of receipt, as follows:

> if to Five Mile:
>
> Three Stamford Plaza
> 301 Tresser Boulevard, Ninth Floor
> Stamford, CT  06901
> Attention: James G. Glasgow, Jr.
> Email: jglasgow@fivemilecapital.com
> Facsimile: (203) 905-0954
>
> With a copy to:
>
> Kasowitz, Benson, Torres & Friedman LLP
> 1633 Broadway
> New York, New York 10019
> Attention:  Adam L. Shiff
> Email:  ashiff@kasowitz.com
> Facsimile:  (212) 506-1000
>
> if to Special Servicer:
>
> Midland Loan Services, a division of PNC Bank, National
>  Association
> 10851 Mastin, 6th Floor
> Overland Park, KS 66210
> Attention:  Kevin S. Semon
> Email:  kevin.semon@midlandls.com
> Facsimile:  (913) 253-9723
>
> With a copy to:

Haynes and Boone, LLP
1221 Avenue of the Americas, 26th Floor
New York, New York 10019
Attention: Lenard M. Parkins and Lawrence Mittman
Email: lenard.parkins@haynesboone.com
lawrence.mittman@haynesboone.com
Facsimile: (212) 884-8226
(212) 884-8219

This Amended Commitment Letter, the rights of the parties, and all actions arising in whole or part under or in connection herewith will be governed by and construed in accordance with the laws of the State of New York.

This Amended Commitment Letter constitutes the entire agreement between the parties and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, between you (or the Company), on the one hand, and us, on the other hand. No material modification or waiver of any provision hereof shall be enforceable unless approved by you and us in writing. Neither you, on the one hand, nor us, on the other hand, is relying upon any statement or representation made by or on behalf of the other, except as expressly provided in the Amended Commitment Letter. This Amended Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other party hereto (and any attempted assignment without such consent shall be null and void ab initio).

We are prepared to enter into a transaction on the terms set forth herein. Upon receipt of a fully executed counterpart to this Amended Commitment Letter, both parties agree to negotiate in good faith regarding the implementation of the Transaction contemplated in this Amended Commitment Letter, including engaging in the preparation and negotiation of definitive documents, and Special Servicer agrees to move forward with its undertakings described in Section VII herein.

Remainder of Page Intentionally Blank
Signature Pages to Follow

FIVE MILE CAPITAL PARTNERS

**FIVE**

**MILE**

THREE STAMFORD PLAZA, 9TH FLOOR
STAMFORD, CONNECTICUT 06901
TELEPHONE 203-905-0950
FACSIMILE 203-905-0954

Should you have any questions regarding this Amended Commitment Letter, please do not hesitate to contact James Glasgow (jglasgow@fmcp.com) or Al Nickerson (anickerson@fmcp.com) at (203) 905-0950.

Sincerely yours,

**Five Mile Capital II Pooling REIT LLC**

By:     Five Mile Capital Partners LLC,
        its manager

        By:     _____
                Scott Leitman
                Managing Director

Acknowledged and Agreed:

**Midland Loan Services, a division of PNC Bank, National Association,**
as Special Servicer for U.S. Bank, National Association as Trustee for the Registered
Holders of LB-UBS Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through
Certificates successor trustee to Bank of America National Association

By: 

Name: 
Title: Kevin C. Donahue
Senior Vice President
Servicing Officer

## APPENDIX A[6]

| | Current | Debt | Adjusted | Pay Down/ | Pro Forma |
|---|---|---|---|---|---|
| | Principal Balance[(a)] | Impairment | Balance | Conversion | Principal Balance |
| **DEBT AND PREF. EQUITY** | | | | | |
| Five Mile DIP | $53.0 | $0.0 | $53.0 | ($53.0) | $0.0 |
| Lehman DIP Loan[(b)] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| Fixed Pool Mortgage[(c)] | 825.4 | (202.9) | 622.5 | 0.0 | 622.5 |
| Floating Pool Loan | | | | | |
| Mortgage | 220.2 | (19.9) | 200.3 | (200.3) | 0.0 |
| Mezzanine (PIK interest) | 132.4 | (132.4) | 0.0 | 0.0 | 0.0 |
| Total | 352.6 | (152.3) | 200.3 | (200.3) | 0.0 |
| Anaheim Hilton Loan | | | | | |
| Mortgage[(d)] | 13.0 | 0.0 | 13.0 | 0.0 | 13.0 |
| Mezzanine | 22.6 | (19.0) | 3.6 | (3.6) | 0.0 |
| Total | 35.6 | (19.0) | 16.6 | (3.6) | 13.0 |
| Residence Inn Mission Valley Mort.[(e)] | 47.2 | 0.0 | 47.2 | 0.0 | 47.2 |
| Residence Inn Anaheim Mort.[(d)] | 37.4 | (12.1) | 25.3 | 0.0 | 25.3 |
| Hilton Ontario Mort.[(d)] | 35.5 | (27.5) | 8.0 | 0.0 | 8.0 |
| Doubletree Washington D.C. Mort.[(e)] | 25.5 | 0.0 | 25.5 | 0.0 | 25.5 |
| Residence Inn Tyson's Corner Mort.[(e)] | 25.1 | 0.0 | 25.1 | 0.0 | 25.1 |
| Homewood Suites San Antonio Mort.[(e)] | 24.1 | 0.0 | 24.1 | 0.0 | 24.1 |
| Public Preferred Stock | 145.0 | (139.1) | 5.9 | (5.9) | 0.0 |
| **Total Debt and Pref. Stock** | **$1,623.8** | **($553.0)** | **$1,070.8** | **($280.3)** | **$790.5** |
| **Implied Equity[(f)]** | **$7.4** | | | | **$348.2** |
| **Total Capitalization** | **$1,631.2** | | | | **$1,138.7** |

(a) Current Principal Balance represents principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.

(b) Assumes DIP financing facility is fully drawn.

(c) A new non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

(d) A new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date to seven (7) years from the Effective Date and with no amortization during the loan term, prepayment permitted at par without penalty, defeasance requirements will be waived.

(e) A new non-recourse note on substantially the same terms as the existing note, except for an extension of the maturity date by one year and with no amortization during the loan term, prepayment permitted at par without penalty, defeasance requirements will be waived.

(f) The Company currently has $7.4 million escrowed in an account held by Innkeepers USA Trust. This escrow will be used to make a $5.9 million payment to the holders of Innkeepers USA Trust's 8% Series C Cumulative Preferred Shares and the remaining $1.5 million balance shall be available to the reorganized Company after the Effective Date. This $7.4 million is *not* included in the Pro Forma Implied Equity and the holders of Innkeepers USA Trust's 8% Series C Cumulative Preferred Shares shall not receive any portion of the Overbid Allocation on account of their receipt of the $5.9 million payment from the $7.4 million escrowed funds.

---

[6] Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash[a] | $174.1 | Lehman Mortgage Payment[a] | $26.2 |
| Deposit Account | 7.4 | Repayment of Solar DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 53.0 |
| | | Hilton Anaheim Mezz Payment | 3.6 |
| | | Preferred Equity Payment | 5.9 |
| | | Unsecured Creditors Payment | 2.5 |
| | | Apollo Guaranty Settlement | 3.0 |
| | | Special Servicer Cash Payment | 2.5 |
| | | Balance Sheet Cash[b] | 67.3 |
| **Total** | **$181.5** | | **$181.5** |

(a)  Subject to adjustment based on participation in the Third-Party Investment and the Co-Investment Right. For example, if Lehman were to own 40% of the New Equity (i.e., assuming 20% of the New Equity is sold pursuant to the Third-Party Investment and 0% is sold pursuant to the Co-Investment Right), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

(b)  Balance sheet cash to be used for, among other purposes, FF&E, PIP, working capital reserves, and closing costs.