Lee S. Attanasio
John G. Hutchinson
Benjamin R. Nagin
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

Attorneys for Appaloosa Investment L.P. I,
Palomino Fund Ltd., Thoroughbred Fund L.P.,
and Thoroughbred Master Ltd.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Innkeepers USA Trust, et al., | : | Case No. 10-13800 (SCC) |
| | : | |
| Debtors. | : | Jointly Administered |

--------------------------------------------------------x

**MEMORANDUM OF LAW OF APPALOOSA INVESTMENT L.P. I,
PALOMINO FUND LTD., THOROUGHBRED FUND L.P., AND
THOROUGHBRED MASTER LTD. IN SUPPORT OF THEIR STATUS
<u>AS PARTIES IN INTEREST ENTITLED TO STANDING</u>**

Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd. (collectively, "**Appaloosa**" or the "**Appaloosa Funds**"), all parties in interest in these cases, by and through their counsel, respectfully submit this Memorandum of Law in Support of their Status as Parties in Interest Entitled to Standing. This Memorandum of Law is filed in connection with a request by the Court made at a status conference on the *Motion for an Order (I) Authorizing the Debtors to Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the New Party/Midland Commitment Between the Debtors and Midland Loan Services, (III) Approving Bidding Procedures, (IV) Approving Bid Productions, (V) Authorizing an Expense Reimbursement to "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Expense*

*Reserve* (the "**Stalking Horse Motion**" or **"Motion"**) filed by Innkeepers USA Trust and certain of its affiliates, each as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned jointly-administered chapter 11 proceedings (the "**Bankruptcy Case**").

## INTRODUCTION

Appaloosa is unquestionably a party in interest in this Bankruptcy Case. And as a party in interest, Appaloosa has a statutory right to speak and be heard on "any issue." 11 U.S.C. § 1109(b). Specifically, two of the Appaloosa Funds are lenders under the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated September 1, 2010, among the Debtors, as borrowers, and Five Mile Capital II Pooling International LLC, as administrative agent for itself and the other lenders thereto (the "**Five Mile DIP Loan**"), and, as such, are owed $10 million by the Debtors on a senior secured, super-priority basis. In addition, the Appaloosa Funds collectively own 100 preferred shares in Innkeepers Trust USA (the "**Preferred Shares**"), a Debtor in the Bankruptcy Case and the ultimate parent holding company of the other Debtors herein. Finally, the Appaloosa Funds also have a significant financial stake in the outcome of the Bankruptcy Case arising from their ownership of certificates in the C6 and C7 Trusts (as described and defined below), in the aggregate principal amount of $247,204,000.[1] These various interests – whether viewed as a collective whole or as to any individual holding – confer rights on Appaloosa as a party in interest sufficient to allow it to participate and be heard in the Bankruptcy Case on any issue, including with respect to a hearing on the Motion.

In a transparent attempt to quash opposition to its flawed Stalking Horse Motion, the Debtors have periodically insinuated, without seeking a ruling from the Court, that Appaloosa somehow lacks standing either generally or for specific purposes. Midland Loan

---

[1] The details regarding the holdings of each of the Appaloosa Funds are set forth in the Declaration of James E. Bolin, dated January 25, 2011.

2

Services ("**Midland**") also appears for the first time to have joined the fray, notwithstanding that Midland actively encouraged Appaloosa to participate in opposing the Debtors' ill-fated "plan support agreement" motion filed at the outset of the Bankruptcy Case and itself criticized the very defects that it now endorses. Now that Midland has elected, in violation of its servicing standards, to support the proposed transaction that is at the heart of the Motion – in connection with which Midland will retain lucrative servicing rights and receive restructuring and other fees – Midland suddenly takes the position that Appaloosa should be muzzled.

Of course, standing as a party in interest is grounded in statute, and does not vary based on the position a party in interest is taking. Nor does standing require any threshold level of holdings or interests that pre-date the bankruptcy filing. To the contrary, and as explained below, the law on standing with respect to timing and amount is well-settled: if a party holds any interest in the debtor, then the amount and timing of the purchase of that interest are irrelevant as a matter of law. Appaloosa purchased Preferred Shares for the wholly permissible purpose of bolstering any conceivable challenge to its standing, so as to enable it to protect its significant financial stake in these Bankruptcy Cases. The fact that Midland is now conflicted with respect to its simultaneous servicing of the Trusts and pursuing a course of action for its and Five Mile's financial benefit provides another, independent basis for conferring standing on Appaloosa.[2]

**FACTS**

On July 19, 2010 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

---

[2] In the event the Court did not confirm Appaloosa's standing as set forth herein, the lack of representation in the Bankruptcy Case created by Midland's conflict also supports permissive intervention under Rule 2018 of the Federal Rules of Bankruptcy Procedure, and Appaloosa reserves its rights to file such a motion should it become necessary.

3

**Code**"). The Debtors own and operate dozens of hotels through an extensive corporate "SPV" structure, with a complex capital structure comprised of, in the aggregate, approximately $1.42 billion in secured indebtedness as of the Petition Date, including approximately $1.29 billion of property-level secured debt (*see* 7/19/10 Amended Declaration of Dennis Craven, Chief Financial Officer of Innkeepers USA Trust, In Support of First Day Pleadings ("**Craven Declaration**") [Docket No. 33] ¶¶ 8, 25), including: (a) a securitized mortgage loan in the face amount of $825 million (the "**Fixed Rate Mortgage Loan**"), collateralized by 45 of the Debtors' hotel properties and serviced by Midland; (b) a floating rate senior mortgage loan (the "**Floating Rate Mortgage Loan**") in the face amount of $250 million for which Lehman ALI, Inc. is the sole lender, collateralized by 20 hotel properties, and a junior mezzanine loan in the face amount of $118 million secured by the same 20 hotel properties; and (c) seven additional secured mortgage loans (the **"Individual Mortgages"**) – ranging in amounts from approximately $24 million to $48 million – each secured by individual properties, with one additional mezzanine loan related to one of the Individual Mortgages. *Id.* ¶ 8.

The Fixed Rate Mortgage Loan was securitized and sold into the commercial mortgage-backed securities (**"CMBS"**) market. (Craven Declaration ¶ 26.) As part of the securitization process, the Fixed Rate Mortgage Loan was tranched and sub-divided into two CMBS trust pools, LB-UBS Commercial Mortgage Trust 2007-C6 (the "**C6 Trust**") and LB-UBS Commercial Mortgage Trust 2007-C7 (the "**C7 Trust**" and, collectively with the C6 Trust, the "**Trusts**"), each of which is governed by a pooling and servicing agreement. Midland acts as the special servicer for the Trusts pursuant to the pooling and servicing agreement for the C6 Trust, dated August 13, 2007 (the "**Servicing Agreement**") and certain related agreements.[3] As

---

[3] Appaloosa is aware of the dispute currently pending before the Court regarding the party entitled to name the servicer under the Trusts. LNR Partners, LLC and LNR Securities Holdings, LLC v. CRES Investment No. II, LP,

special servicer, Midland is responsible for servicing and administering the assets in the Trusts "for the benefit of the Certificateholders." (Servicing Agreement, § 3.01(a)). Indeed, the Servicing Agreement specifically provides that the special servicer must exercise reasonable business judgment in the performance of its duties and obligations, and must service the trust's assets with the ultimate objective of maximizing recovery to the holder of the trust certificate (the "**Certificateholders**") "as a collective whole" without regard to, among other things, any compensation the special servicer may be receiving (Servicing Agreement, § 1.01 at 95 (definition of "servicing standard").)

On January 14, 2011, the Debtors filed the Stalking Horse Motion, by which the Debtors are seeking authority to pursue a transaction, to be implemented through a not-yet-filed plan of reorganization, among the Debtors, Five Mile Capital II Pooling REIT LLC ("**Five Mile**") and Lehman ALI, Inc. ("**Lehman**", and such proposed transaction, the "**Five Mile/Lehman Bid**"). Midland has committed to support the Five Mile/Lehman Bid and the bidding procedures related thereto. The terms of the Five Mile/Lehman Bid provide, among other things, that Lehman and Five Mile each will receive 50% of the equity (subject to the terms set forth in the Stalking Horse Motion) in a reorganized "Innkeepers enterprise" – much like Lehman and Apollo Investment Corporation ("**Apollo**") under the Debtors' flawed motion (the "**PSA Motion**") to assume a plan support agreement that launched these Bankruptcy Cases into immediate litigation. At the same time, the principal amount of the Fixed Rate Mortgage Loan and, therefore, value available for Certificateholders, will be reduced by more than $200 million, with no compensation for the equity value in the Fixed Rate Mortgage Loan Debtors to be paid

---

Adv. Pro. 10-04237 (the "Adversary Proceeding"). For purposes of this Motion, Midland is assumed to have special servicing rights as to both Trusts. The Servicing Agreement was filed on the record in the Adversary Proceeding.

to the Trusts or the Certificateholders – again, much like the flawed structure employed in the PSA Motion.

While the Five Mile/Lehman Bid contemplates a "bidding process" and auction, the die already has been cast, because in order to be deemed "qualified" for the auction, not only must all bids be made on an enterprise basis with value allocated as in the Five Mile/Lehman Bid, but any alternative bid also must include a cash payment to Lehman of at least $200.3 million, plus any applicable Overbid Allocation, a term that will fundamentally chill competing bids.[4]  (*See* Exhibit A to Commitment Letter, Term Sheet, at pg. 2-3, 7).  Moreover, Midland has agreed to settle the substantial claim against Apollo on its guaranty for a mere $3 million, *see id.* at 18.  And, in a final insult, Midland would not only retain the lucrative servicing business for these loans and receive contractual restructuring fees, but it also would secure for itself a one-time fee in the amount of $2.5 million as additional consideration for effecting the restructuring of the Fixed Rate Mortgage Loan.  (*See* Term Sheet at pg. 3.)[5]

**ARGUMENT**

### A. Appaloosa Is A Party In Interest For All Purposes Under Section 1109(b) Of The Bankruptcy Code

Any analysis of bankruptcy standing must begin with the unambiguous language of the Bankruptcy Code.  Section 1109(b) of the Bankruptcy Code provides that a "party in interest" may raise any issue and may appear and be heard on any issue in a case under a

---

[4] Ironically, as to the propriety of the value allocation feature, the Board apparently determined that the provision was acceptable because "it does not prejudice or restrict any creditor's right to raise valuation arguments with respect to the collateral securing its claims in connection with the confirmation process . . .." (Motion, ¶ 40).  This is hollow comfort indeed, given that one of the primary value allocation issues most certainly will be the allocation of value as between the Fixed Rate Mortgage Loan and the Floating Rate Mortgage Loan, and the Debtors appear to be taking the position that the only "creditors" who could speak on this issue at confirmation are Midland and Lehman, who already are committed to such allocation.

[5] The terms identified are for background purposes only.  Appaloosa reserves its rights to raise any and all issues regarding Midland's activities in connection with the Five Mile/Lehman Bid and the Bankruptcy Case in this proceeding or elsewhere.

bankruptcy proceeding. 11 U.S.C. § 1109(b). Section 1109(b) also provides a nonexhaustive list of who is a party in interest, including, among others, "an equity security holder," which Appaloosa undeniably is. See Bolin Dec., ¶¶ 2-5. Appaloosa is also a lender under the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated September 29, 2010, among the Debtors, as borrowers, and Five Mile Capital II Pooling International LLC, as administrative agent for itself and the other lenders thereto. Bolin Dec.,¶¶ 2, 4.

A party in interest, like Appaloosa, has an "unqualified" right to be heard to protect its financial stake in a bankruptcy case. *Collier on Bankruptcy*, 15th ed. (2009) at ¶ 1109.04 ("[T]he text of section 1109(b) and its legislative history only support the conclusion that the section applies to every issue in every proceeding"); *see also* S. Rep. No. 989, 95th Cong., 2d Sess. 116 (1978) (stating that section 1109(b) provides, "in unqualified terms, that any… equity security holder shall have the right to be heard as a party in interest under this chapter…." ). Under the plain language of section 1109(b) of the Bankruptcy Code, a party in interest has standing to object "to any issue in the bankruptcy case." *See In re SFD @ Hollywood, LLC*, 411 B.R. 453, 454-55 (Bankr. S.D. Fla. 2009) (finding that a party in interest such as an equity security holder has an "unfettered right to be heard on any issue in a chapter 11 case"). In fact, in what is acknowledged by most courts to be a more difficult inquiry – the ability of a party in interest to intervene in an adversary proceeding within a chapter 11 case – both the Second and Third Circuits have concluded that section 1109(b) should be read broadly to encompass such a right. *Term Loan Holder Comm. v. Ozer Grp, LLC (In re Caldor Corp.)*, 303 F.3d 161, 167-69 (2d Cir. 2002) (emphasis added) ('any issue in a case' is all-encompassing and "plainly grants a right to raise, appear and be heard on *any issue*" that arises in a contested matter or an adversary proceeding); *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 451 (3d Cir.

7

1982), *cert. denied*, 459 U.S. 1207 (1983) (a party in interest's right is a "broad, absolute right to appear and be heard.").[6]

Consistent with the broad language of section 1109(b), courts have found that a party in interest is any person or entity whose pecuniary interests may be directly and adversely affected by the proposed action and who has a sufficient stake in the proceedings to require representation. *See, e.g., In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) ("The basic test under section 1109(b) is whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation); *In re First Humanics Corp.*, 124 B.R. 87, 91 (Bankr. W.D. Mo. 1991) ("HCC has a substantial interest in debtor's reorganization process. HCC has played a significant role in debtor's reorganization efforts and has made a substantial financial investment in debtor's reorganization process."); *In re SFD @ Hollywood, LLC*, 411 B.R. at 455 (finding that equity shareholders of the debtor "obviously [have] a direct financial stake in the outcome of the case"). A fundamental purpose of section 1109(b) is to grant a party with a financial stake in the case, precisely like Appaloosa, the right to participate with respect to the judicial determination of any issue bearing on the ultimate disposition of his or her financial interest. *Collier on Bankruptcy*, 15th ed. (2009) ¶ 1109.02; *In re SFD @ Hollywood, LLC*, 411 B.R. at 455 ("[C]hapter 11 was designed to encourage creditors and equity holders to engage in negotiations toward a resolution of their

---

[6] In evaluating whether the terms of an intercreditor agreement precluded the ability of certain second lien lenders to be heard on a bidding procedures motion in *In re Boston Generating, LLC*, this Court recognized the importance of the issue: "The first lien lenders are consenting to and encouraging this process, but this is the Debtor's motion. At this threshold stage, all parties in interest have a right to assert substantial concerns that if meritorious, would suggest fundamental defects in the Debtor's process to date". *In re Boston Generating, LLC, et al.,* Case No. 10-14419, 10/12/2010 Order Approving Bidding Procedures [Docket No. 268, Schedule 2, p. 51]. *See also In the matter of Extended Stay Inc., et al.,* Case no. 09-13764, Transcript from hearing held on June 16, 2009, pg. 25:15-20 (permitting all parties, including certificate holders, to appear and be heard on motion to approve interim use of cash collateral). A copy of the cited portion of the *Extended Stay* transcript is attached as Exhibit A.

8

interests. The ability of individual stakeholders, which have a financial stake in the bankruptcy case, "to have a voice in the chapter 11 process is thus a fundamental one.").

The court had the opportunity to reviewed multiple bases of standing in *In re First Humanics Corp.*, 124 B.R. 87 (Bankr. W.D. Mo. 1991). There, the bankruptcy court held that Health Care Capital, Inc. ("**HCC**"), a party to a management agreement with the debtor to operate certain of the debtor's facilities, had standing as a party in interest by virtue both of its post-petition purchase of unsecured claims and bonds and its separate, but significant financial interests in the debtor's estate by virtue of its management agreement, which the debtor assumed post-petition. Upon learning that the debtor was considering at least one outside bid for reorganization that would terminate HCC's management agreement, HCC began to formulate its own plan of reorganization, which included, among other things, a provision for continuing the management agreement. *In re First Humanics Corp.*, 124 B.R. at 88-89. To avoid litigation regarding its standing in proposing the plan based solely on its management agreement, HCC purchased three unsecured claims in a *de minimis* amount against the debtor's estate. The court determined that HCC had standing as a party in interest because HCC played a "significant role in the debtor's reorganization efforts" and possessed a "substantial interest in the debtor's reorganization process." *Id*. at 91. The court separately concluded that the post-petition claim purchases, which had been done with the dual goals of avoiding litigation regarding standing and settling any doubts about the ability to file a plan, were done in good faith and "not by any means prohibited by law," and therefore also gave HCC an additional basis for standing as a creditor under section 1109(b). *Id*. at 92-94.

The Stalking Horse Motion directly and unequivocally affects Appaloosa's substantial, and multiple, financial interests, and the Bankruptcy Code and governing case law

specifically sanction Appaloosa's standing as a party in interest to protect those interests. Appaloosa's ownership of Preferred Shares and participation in the Five Mile DIP Loan allow Appaloosa to speak on any issue in the Bankruptcy Case, including those that affect its additional financial stake as a Certificateholder. Interestingly, the "multiple hat" issue already has played out in this case: before its latest participation as a bidder under the Five Mile/Lehman Bid, Five Mile participated actively in the proceedings related to the PSA. And while it was a lender under the Five Mile DIP Loan at that time, there can be no question that the issues raised by Five Mile related to its significant financial stake in the Bankruptcy Case *as a Certificateholder*. Accordingly, given that Appaloosa is a DIP lender – which it was not at the time of the hearing on the PSA Motion – there can no longer be any serious question as to its standing. Indeed, the fact that Five Mile was permitted to challenge the Lehman/Apollo Bid on the basis of its DIP lender status should be the law of this case and should estop the Debtors or anyone else from raising standing objections on that basis.

### B. The Timing and Relative Size of Appaloosa's Various Interests Do Not Affect Its Standing

The amount or value of Appaloosa's holdings, and the fact that its Preferred Shares (and its interest in the Five Mile DIP Loan) were acquired post-petition, do not in any way divest Appaloosa of standing in these proceedings. *Any* equity holder or creditor has status as a party in interest under 11 U.S.C. § 1109(b). Courts repeatedly have determined that "§ 1109 must be construed broadly so that parties affected by chapter 11 proceedings may be heard," and that "even a *de minimis* creditor may be entitled to the rights afforded" under § 1109(b) of the Bankruptcy Code. *In re G-I Holdings Inc.*, 292 B.R. 804, 811, 813 (Bankr. D.N.J. 2003) (finding that legal representative of present and future asbestos claimants is a party in interest and that a party in interest is entitled to all rights afforded by section 1109(b) even if, for

10

example, such party in interest is a creditor with a *de minimis* claim); *see also In re Zaleha*, 162 B.R. 309 (Bankr. D. Idaho 1993) (finding that former employer of debtor who purchased a $300 claim post-petition had standing as a party in interest to object to plan confirmation).

For example, in *In re Geriatrics Nursing Home, Inc.*, 195 B.R. 34 (Bankr. D.N.J. 1996), a creditor purchased post-petition an unsecured claim in the *de minimis* amount of $260.10 for the sole purpose of filing a competing plan of reorganization. The bankruptcy court held that purchasing a claim post-petition, even a *de minimis* claim, entitled the creditor to "wholly step into the shoes of assignor" and assert all rights of a creditor. 195 B.R. at 38. The bankruptcy court there firmly rejected the notion that the size of the holding affects the standing analysis: "[A]bsent some improper purpose it is not readily apparent why the purchaser of even a *de minimis* claim should not be able to assert all creditor rights. . . . Filing for Chapter 11 relief cannot, and should not insulate the debtor from every peril of the marketplace." *Id.* Of course, given its multiple interests in this Bankruptcy Case, Appaloosa is anything but a *de minimis* stakeholder.

Courts similarly have held that the timing of a party's acquisition of a claim or interest – whether before a bankruptcy filing, on the day of the filing, or after the filing of a petition – is irrelevant to the determination of whether or not the party has standing under section 1109(b). For example, in *In re Enterprise Fin. Grp.*, 197 B.R. 40, 43 (E.D. Tex. 1996), the bankruptcy court held that a creditor who purchased two unsecured claims almost three years after the debtor filed for bankruptcy had standing as a party in interest, reasoning that the Bankruptcy Code made no distinction on creditor status based on when the claim was purchased. *See, e.g., In re Rook Broadcasting, Inc.*, 154 B.R. 970, 972-73 (Bankr. D. Idaho 1993) (creditor who purchased claims post-petition had standing to propose a plan of reorganization by virtue of

11

his post-petition purchases and that the purchasing a claim, even post-petition, is sufficient to confer standing); *In re First Humanics Corp.*, 124 B.R. at 91 (recognizing the standing of post-petition creditors, even where the purchase was made solely to insure standing).[7]

Moreover, the purpose of Appaloosa's purchase of its Preferred Shares – to remove any conceivable doubt about its standing and enable it to ensure its ability to protect its substantial financial stake in the Debtors – is entirely permissible as a matter of law. A party is absolutely entitled to acquire, either pre-petition or post-petition, interests sufficient to confer (or confirm) standing to protect its economic interest in the health of a debtor. *See First Humanics*, 124 B.R. at 91-92; s*ee* also *Embrace*, 178 B.R. at 121 (finding that a party's purchase post-petition of shares in debtor's company to protect its own self-interest was permissible); *In re Rook Broadcasting, Inc.*, 154 B.R.at 972-73 (finding that a party which purchased claims against the debtor postpetition had standing to present a plan of reorganization, even though the sole reason for the purchase of the claims was to insure such standing).

The only gloss on such analysis – one not present here or *even alleged* – is whether the purchaser acted in bad faith. By law, Appaloosa's actions to protect its financial self-interest clearly refute any theoretical argument of bad faith. *In re Federal Support Co.*, 859 F.2d 17, 20 (4th Cir. 1988) ("One's self-interest . . . does not provide an ulterior motive."); *In re Three Flint Hill Ltd. P'ship*, 213 B.R. 292, 301 (D. Md. 1997) ("[I]t is by now well settled that a creditor does not act in bad faith by pursuing its own self-interest."). It is perfectly permissible

---

[7]*See also, Enterprise Fin. Grp, Inc. v. Curtis Mathes Corp.,* 197 B.R. 40, 43 (E.D. Tex. 1996) (reversing the bankruptcy court's denial of standing to a party that purchased claims post-petition); *In re El Comandante Mgmt. Co. LLC*, 359 B.R. 410, 416 (Bankr. D.P.R. 2006) ("Caribbean purchased a claim postpetition, thus becoming a creditor of ECMC's estate . . . A creditor is specifically listed as a party in interest in section 1109(b); thus, Caribbean is a party in interest in ECMC's case."); *Matter of Embrace Sys. Corp*., 178 B.R. 112, 121 (Bankr. W.D. Mich. 1995) ("case law also supports this court's determination that Guardian, as the purchaser of a claim in the Debtor's bankruptcy case, has standing").

for a party to purchase claims or interests post-petition in order "to settle any doubts about its standing." *First Humanics*, 124 B.R. at 92. As these cases all make clear, the notion of "purchasing standing" is neither novel nor controversial.

> **C.** **The Role of the Fixed Rate Mortgage Loan Special Servicer, Midland, in the Transaction at Issue Strongly Militates in Favor of Hearing Appaloosa's Concerns and Objections**

The need for Appaloosa to protect its financial self-interest is particularly acute under the circumstances of this Bankruptcy Case. As noted above, Midland is the special servicer for the Fixed Rate Mortgage Loan, which is an asset of the Trusts in which Appaloosa holds certificates in the aggregate amount of $247,204,000. As special servicer, Midland is obligated to honor a contractually-defined "Servicing Standard" under the Servicing Agreement. Among other things, the "Servicing Standard" requires Midland to meet the "higher" of two alternative standards of care, each of which requires the "maximization of recovery" to the Certificateholders "as a collective whole

> without regard to (A) any relationship, including as lender on any other debt" that Midland as "Special Servicer" may have with any of the related Mortgagors, or any Affiliate thereof, or any other party to this Agreement . . . (D) the right of the . . . Special Servicer . . . to receive compensation or reimbursement of costs hereunder generally or with respect to any particular transaction, and (E) the ownership, servicing or management for others of any other mortgage loan or real property not subject to this Agreement by the Master Servicer . . . or the Special Servicer, as the case may be, or any Affiliate thereof.

(Servicing Agreement, § 1.01).

Rather than meet these obligations, Midland has now bound itself to support the Five Mile/Lehman Bid and has made commitments that place its own financial interests above those of the Certificateholders, thereby rendering Midland hopelessly and impermissibly conflicted. Midland's participation in, and its support for, the proposed Five Mile/Lehman Bid is entirely inconsistent with its duty under the Servicing Agreement to maximize Certificateholder

recovery as a collective whole, without regard to the very relationships and conflicts that it has now created.

Under the proposed set of transactions that Midland has committed to support, among other things, Midland will provide what is described as "stapled financing" to fund the Five Mile/Lehman Bid and will make such "financing" available to other bidders under certain circumstances (including to any successful bidder whose bid would provide a $200 million cash payment to Lehman on account of its pre-petition debt). In fact, Midland is doing nothing more than agreeing to take a substantially reduced and less favorable note under the proposed plan.[8] Midland also has agreed to settle the substantial claim against Apollo on its guaranty for a mere $3 million – money that isn't even paid by Apollo, but comes from the reorganized entity. Further, Midland will receive $2.5 million as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan. (*See* Commitment Letter, Exhibit A Term Sheet p. 3).

There can be no question that the interests of Certificateholders through the Trusts – as distinct from Midland's – are impaired under the Five Mile/Lehman Bid. The principal amount of the Fixed Rate Mortgage Loan will be reduced by more than $200 million, among other adverse loan modifications. The Motion also contemplates a substantial increase in the "Expense Reserve" of $14 million, cash that undoubtedly constitutes, in whole or in part, cash collateral in which the Trusts have an interest. Perhaps most egregiously, the equity value attributable to the Fixed Rate Mortgage Loan Debtors will go to Five Mile and Lehman without any compensation for that equity being paid to the Trusts or the Certificateholders. In what is

---

[8] In fact, in justifying the requirement that overbids must pay Lehman $200 million in cash, the Debtors note that such requirement "should be viewed as counterbalanced by the benefits associated with Midland's corresponding agreement to accept recovery solely in the form of debt (plus any applicable Overbid Allocation (as defined in the Term Sheet)) and to allow competing bidders to avail themselves of the Midland Financing so long as their bids contemplate a debt-to-capitalization ratio of no more than 70% and meet certain other conditions contained in the Commitment Letter". (Motion, ¶ 39). Unfortunately, no "counterbalancing" benefit runs to the Trusts at all.

perhaps the most stark admission of the conflict that it has created, Midland itself objected to the very same defect in its earlier opposition to the Debtors' proposed PSA:

> The Lehman-Apollo plan is premised on the concept that Lehman, which is not a creditor in the Midland pool, can somehow obtain value from that pool, without paying Midland for it. The Debtors cannot by sleight of hand simply shift assets, values and upside from one estate to another, without regard to the legal rights and preferences of each individual debtor's estate. The fact that the Lehman-Apollo plan may be beneficial to the Lehman asset pool has no bearing whatsoever on whether it is beneficial to Midland with respect to the Midland Debtors. Given that Midland has not consented to the stripping away of the upside in Midland collateral, the Debtors have no right to take it and give it to Lehman and Apollo without compensating Midland.

(Midland Plan Support Objection, ¶ 43.) Apparently, Midland is now willing to provide its consent to such value stripping given the value it is obtaining for itself.

Despite the Servicing Standard and its other obligations to Certificateholders, Midland has taken on an entirely new, self-enriching role having nothing to do with its job as special servicer. As the Court may know, Midland serves at the direction of Five Mile which, upon information and belief, directly or through an affiliate, holds a majority interest in the "Controlling Class" of the C6 Trust. Notwithstanding the rights afforded to Five Mile in such capacity, Midland's actions remain subject to compliance with the Servicing Standard. While it is not necessary at this time to determine whether Midland's irreconcilable conflict and its actions in connection with the Five Mile/Lehman Bid have breached the "Servicing Standard" or other duties, these facts compel full consideration of Appaloosa's concerns. Because Midland's current objective – to obtain confirmation of a plan of reorganization reflecting the Five Mile/Lehman Bid notwithstanding its negative impact on the Fixed Rate Mortgage Loan – is directly at odds with the interests of Certificateholders other than Five Mile, Appaloosa must be

15

heard on these critical issues that directly impact its economic interests. Midland clearly does not adequately represent the interests of Appaloosa.[9]

In this connection, interests of justice and judicial economy also weigh heavily in favor of allowing Appaloosa to participate in these proceedings. Shutting Appaloosa out of the Bankruptcy Case inevitably will result in litigation in other venues, which ultimately will impede the implementation of a confirmable plan. However, if the Bankruptcy Court considers the issues raised by Appaloosa and other Certificateholders, which are inextricably tied to any plan of reorganization that will emerge from the proposed bidding procedures, subsequent litigation may be avoided if, as Appaloosa fully expects will be the case, the Five Mile/Lehman Bid and related bidding procedures do not succeed. Appaloosa respectfully submits that its participation here and now will prevent judicial resources from being used unnecessarily, and will further the development of a confirmable plan. *See generally In re Extended Stay Inc.*, 435 B.R. 139 (Bankr. S.D.N.Y. 2010) (denying motion to remand adversary proceeding between certificateholders for injunctive relief and damages regarding servicing agreement – originally brought in New York State Court – where the dispute and relief sought affected estate administration and the failure to address the issues in the bankruptcy could have created inefficiencies).

---

[9] Indeed, not only does Midland not represent Appaloosa's interests, Midland has taken an actively hostile stance toward Appaloosa on the Motion, issuing substantial discovery requests to Appaloosa, something not even the Debtors – who are the proponents of the Motion – felt necessary. Appaloosa reserves its rights to object to the discovery requests at the appropriate time.

**CONCLUSION**

For the foregoing reasons, the Appaloosa Funds respectfully request that the Court find that they have standing as parties in interest in these proceedings and reject any unsupported claim to the contrary.

Dated: New York, New York
       January 25, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP

By: /s/ Lee S. Attanasio
    Lee S. Attanasio
    John G. Hutchinson
    Benjamin R. Nagin
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300
    Facsimile: (212) 839-5599
    lattanasio@sidley.com
    jhutchinson@sidley.com
    bnagin@sidley.com

Attorneys for Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd.