Hearing Date: March 8, 2011 at 10:00 a.m. (Eastern)
Objection Deadline: February 25, 2011

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Brett H. Miller
Lorenzo Marinuzzi
Jordan A. Wishnew

*Attorneys for the Official Committee of*
*Unsecured Creditors of Innkeepers USA Trust, et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) Chapter 11 |
| Innkeepers USA Trust, *et al.*, | ) 10-13800 (SCC) |
| Debtors. | ) Jointly Administered |

**LIMITED OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
DEBTORS TO ENTER INTO THE COMMITMENT LETTER WITH FIVE MILE
CAPITAL II POOLING REIT LLC, LEHMAN ALI INC., AND MIDLAND LOAN
SERVICES, (II) APPROVING THE NEW PARTY/MIDLAND COMMITMENT
BETWEEN THE DEBTORS AND MIDLAND LOAN SERVICES,
(III) APPROVING BIDDING PROCEDURES, (IV) APPROVING BID
PROTECTIONS, (V) AUTHORIZING AN EXPENSE REIMBURSEMENT
TO "BIDDER D," AND (VI) MODIFYING CASH COLLATERAL
<u>ORDER TO INCREASE EXPENSE RESERVE</u>**

The Official Committee of Unsecured Creditors (the "Committee") of Innkeepers USA

Trust, et al. (the "Debtors" or the "Company") hereby submits the following limited objection

(the "Objection") to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to

Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC ("Five Mile"),

Lehman ALI Inc. ("Lehman"), and Midland Loan Services ("Midland"), (II) Approving the New

Party/Midland Commitment Between the Debtors and Midland Loan Services, (III) Approving

Bidding Procedures (the "Bidding Procedures"), (IV) Approving Bid Protections,

ny-963886

(V) Authorizing an Expense Reimbursement to "Bidder D" ("Bidder D"), and (VI) Modifying the Cash Collateral Order to Increase Expense Reserve (the "Motion").[1] In support of the Objection, the Committee states as follows:

## PRELIMINARY STATEMENT

1. The Committee supports the Debtors' efforts to obtain the highest and best offers for their assets in the proposed Auction and create a plan structure that maximizes the value of the Debtors' estates and recoveries for unsecured creditors. However, the Committee has concerns regarding the Bidding Procedures, as well as certain concerns regarding the stalking horse plan proposal. The Bidding Procedures fail in certain respects to foster and promote competitive bidding, and propose impediments to third party participation. As discussed in greater detail herein, certain provisions in the Bidding Procedures and the term sheet attached to the Motion (the "Term Sheet") are inappropriate. By the Objection, the Committee requests that the proposed order (the "Order") and related Bidding Procedures be modified to address the following concerns.

2. <u>Bidding Procedures</u>: First, any bidding process should provide potential bidders the option to allocate a portion of their bid package to increase distributions to unsecured creditors; currently, the Bidding Procedures provide only for a waterfall allocation of proceeds to the claims of creditors. The Lehman cash-out provision should be eliminated in its entirety because it creates a significant economic barrier for third parties to participate in the Auction. Third, the discount valuation rate applied to additional debt securities to be allocated to Midland in connection with an Overbid utilizing the Midland Financing is arbitrary, unnecessary, and prejudicial to potential bidders, and should mirror the cost of debt implied in the Term Sheet.

---

[1] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

3. Additionally, the Committee should be granted consultation rights with respect to the review and qualification of bids. The Committee's oversight of the Auction will enhance bidding by helping to ensure that the Auction is conducted in a fair and impartial manner, both in fact and in appearance.

4. <u>Term Sheet</u>: The Committee believes that the Term Sheet outlines an unconfirmable plan that provides for the inequitable treatment of unsecured creditors in a manner inconsistent with the provisions of the Bankruptcy Code. The commitments of Five Mile and Lehman (collectively, the "Plan Sponsors") as set forth in the Motion, along with Midland's support, are conditioned on confirmation of a plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid. Currently, the terms of the proposed plan provide for a $2.5 million payment to unsecured creditors but it is unclear from the Term Sheet whether this sum is meant to be equivalent to or greater than the amount that is rightfully due and owing to unsecured creditors under the terms of the Bankruptcy Code. Moreover, the proposed plan would attempt to grant certain releases of third parties without any explanation or justification as to the necessity or propriety of such releases. While approval of the Term Sheet is not before the Court at this time, to the extent it forms the template against which bids will be evaluated, such plan releases should not be deemed a necessary component for competing bids.

## BACKGROUND

5. On July 19, 2010 (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the above captioned Chapter 11 cases.

6.   On July 28, 2010, the United States Trustee for the Southern District of New York appointed the five (5) member Committee[2] pursuant to section 1102(a)(1) of the Bankruptcy Code.

7.   On January 14, 2011, the Debtors filed the Motion. *[Docket No. 802]*

8.   Pursuant to the Court's January 21, 2011 Order setting certain discovery deadlines and establishing a briefing and hearing schedule for matters related to the Motion *[Docket No. 848]*, the Committee served its preliminary, non-binding objection to the Motion on January 26, 2011.

## ARGUMENT

9.   For the reasons set forth herein, the Committee submits its limited objection to the Motion and asserts that the following changes should be made to the Order and Bidding Procedures:

**A.   PROCEDURAL OBJECTIONS**

10.   Bid procedures must not chill the receipt of higher and better offers and must be consistent with the seller's fiduciary duties. *See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) (rejecting bidding procedures that included a break-up fee on the grounds that it would "'not induce further bidding or bidding generally', but would 'unnecessarily chill[] bidding and potentially deplete[] assets that could be better utilized to help fund a plan of reorganization . . .'") (citations omitted); *In re Bidermann Indus., U.S.A., Inc.*, 203 B.R. 547, 551-53 (Bkrtcy. S.D.N.Y. 1997) (rejecting proposed bidding procedures where "[t]he whole bidding arrangement [was] designed not to encourage but to stifle bidding."); *Official Comm. of Subordinated Bondholders v. Integrated*

---

[2]   The members of the Committee are: (i) JMC Global, (ii) PDQ Consulting, Inc., (iii) Triangle Renovations USA, (iv) American Hotel Register Company, and (v) The Eric Ryan Corporation.

ny-963886                                                4

*Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable.").

### i. The Committee Should Be Granted Consultation and Approval Rights with Respect to the Review and Qualification of Bids.

11. The Bidding Procedures currently provide only Midland with explicit consultation rights as part of the review and qualification of bids. (Bidding Procedures at 11.) The Committee should be granted similar consultation rights. The Bidding Procedures contain a provision that provides that, to the extent practicable, the Debtors will "consult with representatives of its various constituencies as the Debtors deem appropriate" throughout the bidding process and the Auction. (Bidding Procedures at 14.) This generic and non-committal statement is not sufficient, and the Committee should have standard consultation rights and input on the methodology used by Moelis & Company to calculate and compare bids.

12. In recent bankruptcy cases of debtors in real estate and hospitality-related industries, consultation rights routinely have been provided to statutory committees in connection with approved auction procedures. *See, e.g.*, *In re Extended Stay Inc., et al.*, Case No. 09-13764 (JMP), (Bankr. S.D.N.Y., April 23, 2010) *[Docket No. 975]*; *In re General Growth Properties, Inc., et al.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y., May 7, 2010) *[Docket No. 5145]*; *In re DBSI Inc., et al.*, Case No. 08-12687 (PJW), (Bankr. D. Del., May 25, 2010) *[Docket No. 5483]*.

13. Consultation rights for the Committee are especially important in this case because the most significant secured creditor—Midland—is both a part of the stalking horse bid and is providing "stapled financing" for the transaction. Further, other key parties in interest, including LNR Partners, LLC ("LNR") and the ad hoc committee of preferred shareholders, have

previously submitted bids for specific properties. (Motion at ¶¶ 34, 43.) Therefore, there are very few constituents, such as the Committee, not interested in acquiring one or more of the Debtor entities and their assets. Providing the Committee with consultation rights will enhance bidding by ensuring that the Auction is conducted in a fair and impartial manner, both in fact and in appearance.

14. By way of example, the Committee can provide independent verification that the winning bid selected by the Debtors is in fact the highest and best qualified bid with respect to all classes of creditors, not just Midland and the Debtors' other secured creditors. Such verification can only be provided, however, through the grant to the Committee of explicit consultation rights equivalent to those being granted to Midland.

      ii.    **Potential Bidders Should Be Allowed to Allocate a Portion of Their Bid Package to Increase Distributions to Unsecured Creditors.**

15. Under the current Bidding Procedures, an overbid does not receive any credit for increasing the distribution to unsecured creditors. (Bidding Procedures at 11; Term Sheet at 8.) Instead, any excess value is allocated based on the value ascribed to each "silo" of assets in the Debtors' enterprise, thus precluding a bidder from proposing an alternative allocation of value. The Committee submits that potential bidders should be given the right, if they so choose, to allocate a portion of their bid package to increase distributions to unsecured creditors, rather than relying on a pre-determined and inflexible waterfall allocation.

      iii.   **The Lehman Cash-Out Provision Will Unnecessarily Chill Bidding and Should Be Eliminated from the Bidding Procedures.**

16. Bid protection provisions, such as overbid requirements, must be reviewed to ensure that they are not unduly burdensome to the estate in view of the specific facts and circumstances of the case and that they are in the best interest of the bankruptcy estate, the creditors, and the equity holders. *See In re APP Plus*, 223 B.R. 870, 875 (Bankr. E.D.N.Y.

1998). Among the factors to be considered are: (a) whether the relationship of the parties who negotiated the bid protections is tainted by self-dealing or manipulation; (b) whether the protection hampers, rather than encourages, bidding; and (c) whether, in the case of a proposed fee, the amount of the fee is unreasonable relative to the proposed purchase price. *Id.*; *Integrated Resources*, 147 B.R. at 657. In sum, this Court must consider whether the various bid protections, in conjunction with the other Bidding Procedures requested in this case, will encourage rather than discourage bidding, and whether such provisions will enhance rather than detract from the ultimate maximum recovery to the estate. *Id.*

17.    Under the Bidding Procedures, if a bidder other than the Plan Sponsors successfully wins the Auction, the winning bid must include a cash payment of no less than $200.3 million that will be used to pay down Lehman's claims. (Bidding Procedures at 8.) The Committee believes that the proposed $200.3 million cash-out to Lehman is intended to chill competition among bidders. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18.    The cash-out provision likely will chill bidding and will not otherwise enhance the Auction process or increase the amount of potential bids because it requires third party bids to be artificially cash heavy and to unfairly limit the treatment of the claims of certain creditors.

Accordingly, the cash-out provision does not satisfy the standard of review for bid protection measures and should not be approved.

### iv. The Discount Valuation Rate Applied to Additional Debt Securities Should Be Reduced.

19. The Bidding Procedures require any additional debt consideration allocated to Midland in connection with an Overbid utilizing the Midland Financing to be discounted at an 8% rate. (Bidding Procedures at 10.) This rate appears to be completely arbitrary, and the Debtors do not justify the reasonableness of this provision in the Motion, the Bidding Procedures, or the Term Sheet. In fact, it exceeds the 6.71% interest rate payable to Midland in connection with its secured claims under the Term Sheet. Together with the Lehman cash-out provision, this term creates yet another barrier to third party participation in the Auction. This provision inexplicably reduces the relative value of bids using the Midland Financing submitted by potential third party bidders. Furthermore, to the extent the debt-to-equity ratio permitted in connection with a Qualified Bid is enforced under the Bidding Procedures (*id.*), a discount of debt is unnecessary because the risk of under-capitalization is already minimized. Accordingly, the discount valuation rate applied to additional debt securities allocated to Midland should be modified to reflect the cost of debt implied in the Term Sheet.

### B. DEAL OBJECTIONS

20. The commitments of the Plan Sponsors under the Term Sheet and Midland's support of the proposed transaction are conditioned on confirmation of a plan of reorganization that encompasses the provisions of the Five Mile/Lehman Bid. (Term Sheet at 12.) In addition, the Bidding Procedures require that a qualified bid be substantially similar to the Term Sheet, which includes provisions related to that plan. (Bidding Procedures at 11-12.) Because the Debtors are seeking to bake these plan-type provisions into any potential Qualified Bid, the

Committee believes it is appropriate to raise confirmation objections at this stage and asserts that such questionable provisions should not be deemed necessary components of competing bids.[3]

### i. The Terms of the Proposed Plan of Reorganization Provide for the Improper Treatment of Unsecured Creditors and Should Be Amended.

21.     According to the Term Sheet, prepetition unsecured creditors that are in a class that votes in favor of and otherwise supports the Five Mile/Lehman Bid will (a) share in $2.5 million in cash (the "Unsecured Claims Fund") that will be set aside for the benefit of unsecured creditors (other than holders of deficiency claims), and (b) be entitled to a release of preference actions that may exist against such creditors. (Term Sheet at 5-6.) Conversely, classes of unsecured creditors that do not vote in favor of the plan will not receive a distribution under the Unsecured Claims Fund and will not receive a waiver of preferences. *Id.*

22.     As a general matter, the Bankruptcy Code does not prohibit a debtor from proscribing different treatment for a class of claims or interests depending on whether the class votes for or against a plan.[4] However, the approval of such "carrot and stick" provisions is only appropriate so long as the inducement is to give that class more than it would be entitled to, rather than threatening to take away rights to which it would otherwise be entitled. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 275 (Bankr. S.D.N.Y. 2007). The all-or-nothing approach embodied in the proposed alternative treatment for unsecured creditors, when considered in conjunction with the proposed plan treatment for other constituencies, does not satisfy this standard.

---

[3]     The Committee reserves its rights to bring any and all objections to any proposed plan at the confirmation hearing.

[4]     *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1992), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) ("There is no prohibition in the [Bankruptcy] Code against a [p]lan proponent offering different treatment to a class depending on whether it votes to accept or reject the [p]lan.").

23. For example, the Term Sheet appears to propose paying certain secured creditors in full by issuing new secured notes,[5] but it does not indicate how any excess value beyond the respective creditor's secured claim will be distributed. *Id.* at 4-5. Any excess value above and beyond the secured creditor's claim must go to satisfy junior claims, including those of unsecured creditors. Currently, as drafted, it is unclear whether any excess value is intended to be included in the Unsecured Claims Fund, or whether such value will be distributed to unsecured creditors in addition to the Unsecured Claims Fund.

24. Similarly, the Term Sheet proposes to pay distributions to equity holders (*i.e.*, holders of Innkeepers USA Trust's 8% Series C Cumulative Preferred Shares) but does not expressly provide for payment in full of senior claims (including general unsecured claims) asserted against Innkeepers USA Trust. *Id.* at 5-6. Again, the Term Sheet does not specify whether any payments that are required first to be made to general unsecured creditors of Innkeepers USA Trust (to permit any distribution to equity in the first instance) will be made from the Unsecured Claims Fund. The plan as proposed violates the absolute priority rule embodied in section 1129(b)(2) of the Bankruptcy Code to the extent the Term Sheet proposes to distribute excess value to classes junior to unsecured creditors before the unsecured creditors have been paid in full.

25. Rather than inducing creditors to vote in favor of a plan, the alternative treatment provided for under the Term Sheet appears to punish creditors for voting against it by depriving them of their rights under the Bankruptcy Code, including the right to receive payment of their

---

[5] For example, CWCapital Asset Management, LLC stands to receive full payment with respect to the Anaheim Hilton Mortgage Loan, and LNR stands to receive full payment with respect to the Residence Inn Mission Valley Mortgage Loan, the Hilton Doubletree Washington D.C. Mortgage Loan, the Residence Inn Tyson's Corner Mortgage Loan, and the Hilton Homewood Suites San Antonio Mortgage Loan, subject in each case to an extension of the respective maturity dates. (Term Sheet at 5-6.)

claims in full before junior classes receive a distribution, and the right to receive any excess value remaining after senior classes have been paid in full. The Committee asserts that this is an impermissible, coercive measure that violates both Bankruptcy Code section 1129(b)(2) as well as the requirement under Bankruptcy Code section 1129(a)(3) that a plan be proposed in good faith.

26. In light of these provisions, the Motion seeks to move forward with a process based on what appears to be an unconfirmable plan. Accordingly, the proposed treatment of unsecured creditors must be revised so as to be consistent with the Bankruptcy Code before it can serve as a template for competing bids.

### ii. The Debtors' Proposed Grant of the Global Releases Should Not Be Deemed a Necessary Component of Competing Bids.

27. The Motion proposes that the Five Mile/Lehman Bid will include "a mutual full discharge, release and exculpation of liability" (the "Global Releases") by and among the Releasing Parties of "any and all claims and causes of action relating to the Debtors arising at any time prior to the Effective Date" and "and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 Cases." (Motion at 43-44; Term Sheet at 19.) The definition of "Releasing Parties" includes Grand Prix Holdings, LLC, Innkeepers and its wholly owned direct and indirect subsidiaries, Lehman, Five Mile, Midland, and Apollo, and other holders of claims against and interests in the Company,[6] and each of the foregoing parties' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, professionals. (Term Sheet at 17-18.) The Global Releases are similar in scope to those recently disapproved in *In re Washington*

---

[6] The "Company" refers to Innkeepers USA Trust and its wholly owned direct and indirect subsidiaries collectively with Grand Prix Holdings, LLC.

*Mutual, Inc.*, 2011 Bankr. LEXIS 56 (Bankr. D. Del. Jan. 7, 2011).  In that case, the bankruptcy court held that a plan proponent must demonstrate for each released third party the propriety of a debtor's release of third parties in light of a variety of factors, including, among others, whether the released party made a substantial contribution to the plan and whether the release is necessary to the reorganization.  *Id.* at *75-76 (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

28.	Absent any demonstration that the Global Releases play an important role in any potential reorganization of the Debtors, there is no justification for requiring competing bids to include such overly broad and questionable releases.  The Motion fails to explain in any detail what types of claims and causes of action are being discharged by the Releasing Parties or what, if any, analysis has been performed to determine the validity of such actions.  Similarly, no information has been provided to establish whether such releases are supported by adequate consideration.  Further, the Motion does not detail how the rights of the Debtors' estates and its creditors to challenge (*e.g.*, as paydown of principal) fees paid to Lehman and Midland during the Debtors' cases are affected by the proposed releases.

29.	Although the grant of the Global Releases remains subject to the review and approval of this Court at confirmation, the broad scope and exceptional nature of the Global Releases requires that they be supported by factual evidence supporting their necessity and appropriateness.  In the absence of such evidence, the grant of releases similar to the Global Releases should not be required to be included as a component of a competing bid.

## NOTICE

30.	The Committee has provided notice of this Objection to the entities on the Master Service List (as such term is defined in the *Notice, Case Management, and Administrative*

ny-963886                                    12

*Procedures [Docket No. 68]*), which is available at www.omnimgt.com/innkeepers, the website maintained by Omni Management Group, LLC, the Debtors' notice and claims agent. The Committee respectfully submits that no further notice is necessary.

## CONCLUSION

WHEREFORE, based upon all of the foregoing facts and authorities, the Committee respectfully requests that the Court amend the Order and Bidding Procedures as set forth herein and grant such other relief as just and proper.

Dated: February 25, 2011
      New York, New York

/s/ Lorenzo Marinuzzi
Brett Miller
Lorenzo Marinuzzi
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Attorneys for the Official Committee of Unsecured Creditors of Innkeepers USA Trust, et al.*

**Exhibits A and B to the Objection Have Been Filed Under Seal In Accordance with the** *Stipulated Order Authorizing the Filing of Pleadings with Respect to the Motion for Entry of an Order (I) Authorizing the Debtors to Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI, Inc., and Midland Loan Services, (II) Approving the New Party/Midland Commitment Between the Debtors and Midland Loan Services, (III) Approving Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement to "Bidder D", and (VI) Modifying Cash Collateral Order to Increase Expense Reserve Under Seal*