**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                      Chapter 11

      Innkeepers USA Trust, *et al.*,                      Case No. 10-13800

                            Debtors.            Jointly Administered

------------------------------------------------------------x

**BENCH DECISION (A) DENYING CERTIFICATEHOLDER STANDING AND
(B) GRANTING DEBTORS' BIDDING PROCEDURES MOTION**[1]

A P P E A R A N C E S :

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors and Debtors-in-Possession*
300 North LaSalle
Chicago, IL 60654
By:    Anup Sathy, P.C., Esq.
        Marc J. Carmel, Esq.

655 Fifteenth Street, N.W.
Washington, DC 20005
By:    Daniel T. Donovan, Esq.
        Patrick M. Bryan, Esq.

BRYAN CAVE LLP
*Attorneys for LNR*
1290 Avenue of the Americas
New York, NY 10104
By:    Lawrence P. Gottesman, Esq.
        Michelle McMahon, Esq.

---

[1]      This decision was dictated on the record at the conclusion of the hearing held on March 11, 2011. It has been modified to include full citations and defined terms, and reflects minor additional non-substantive modifications. The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

DECHERT LLP
*Attorneys for Lehman ALI Inc.*
1095 Avenue of the Americas
New York, NY 10036
By:    Michael J. Sage, Esq.
       Brian E. Greer, Esq.

DEWEY & LeBOEUF LLP
*Attorneys for the Ad Hoc Committee of Preferred Shareholders*
1301 Avenue of the Americas
New York, NY 10019
By:    Martin Bienenstock, Esq.

HAYNES AND BOONE LLP
*Attorneys for Midland Loan Services*
30 Rockefeller Plaza
26th Floor
New York, NY 10112
By:    Lenard M. Parkins, Esq.

201 Main Street, Suite 2200
Fort Worth, TX 76102
By:    John D. Penn, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for Five Mile Capital*
1633 Broadway
New York, NY 10019
By:    Howard W. Schub, Esq.
       Adam L. Shiff, Esq.
       Daniel A. Fliman, Esq.

KILPATRICK TOWNSEND & STOCKTON LLP
*Attorneys for TriMont Real Estate Advisors, Inc.*
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
By:    Todd C. Meyers, Esq.

MORRISON & FOERSTER LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1290 Avenue of the Americas
New York, NY 10104
By:    Lorenzo Marinuzzi, Esq.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*Attorneys for Apollo Investment Corporation*
1285 Avenue of the Americas
New York, NY 10019
By:     Andrew J. Ehrlich, Esq.

PERKINS COIE LLP
*Attorneys for C-III Asset Management and CWCapital Asset Management*
131 S. Dearborn Street
Suite 1700
Chicago, IL 60603
 By:    David M. Neff, Esq.

SIDLEY AUSTIN LLP
*Attorneys for Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd.*
787 Seventh Avenue
New York, NY 10019
By:     Lee S. Attanasio, Esq.
        Debra J. Minoff, Esq.

U.S. DEPARTMENT OF JUSTICE
Office of the United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004
By:     Paul K. Schwartzberg, Esq.


Before the Court is the Motion of Innkeepers USA Trust and certain of its debtor

affiliates (collectively, the "Debtors") for entry of an order (i) authorizing the Debtors to enter

into a commitment letter (the "Commitment Letter") with Five Mile Capital II Pooling REIT

LLC ("Five Mile"), Lehman ALI Inc. ("Lehman"), and Midland Loan Services, a division of

PNC Bank, National Association, in its capacity as special servicer for the Debtors' fixed rate

mortgage loan ("Midland"),[2] (ii) approving the New Party/Midland Commitment between the

Debtors and Midland, (iii) approving bidding procedures (the "Bidding Procedures"), (iv)

---

[2]      Midland is the special servicer for that certain secured loan in the amount of not less than $825,402,542 plus interest, costs, and fees (the "Fixed Rate Loan"), owed by certain of the Debtors (the "Fixed Rate Debtors").

approving bid protections, (v) authorizing an expense reimbursement to "Bidder D," and (vi)

modifying cash collateral order to increase expense reserve (the "Motion").

The Court assumes familiarity with the facts and circumstances of these cases, and, in

particular, the events leading up to the Court's September 1, 2010 decision denying approval of

the Plan Support Agreement, which decision was docketed by the Court on December 20, 2010

("Innkeepers I").[3]

What has transpired since Innkeepers I is exactly what is supposed to take place in a

large, complex chapter 11 case.  Over the course of the past six months, the Debtors developed a

process that, in their business judgment, was designed to address the concerns of the Court as

expressed in Innkeepers I and the chorus of objections from their stakeholders.  And they have

worked diligently to achieve near-unanimous consensus among their stakeholders.

## I.    Background:  Events Leading to the Selection of the Stalking Horse Bidder

In late September 2010, the Debtors began working with their advisors to discuss and

develop restructuring alternatives which would maximize value.  In October 2010, Moelis &

Company LLC ("Moelis"), the Debtors' investment banker, proposed and the Board of Trustees

of Innkeepers USA Trust (the "Board") approved a timeline for selecting a stalking horse bidder.

During that period, the Debtors identified five stalking horse candidates, including Five Mile.

On or before the November 23, 2010 deadline established by the Debtors, four of the five

stalking horse candidates responded with proposals.  After further discussions with the

candidates, the Debtors were left with two proposals, one from Five Mile and Lehman (together,

"Five Mile/Lehman") and one from the bidder known as "Bidder D."[4]

---

[3]    See In re Innkeepers USA Trust, et al., 2010 Bankr. LEXIS 5003 (Bankr. S.D.N.Y. December 20, 2010).
[4]    Due to the highly confidential nature of the bid process, the parties early on adopted the convention of
referring to bidders by letter designation.

At a board meeting on December 3, 2010, the Board selected Bidder D as the stalking

horse bidder, subject to certain continuing discussions between the parties regarding

modifications to Bidder D's bid.  On December 11, 2010, Five Mile/Lehman informed the

Debtors that it had substantially improved its proposal and that commitment letters had been

signed between (i) Five Mile and Lehman and (ii) Five Mile and Midland.  After approximately

ten days of negotiation between the Debtors and Five Mile/Lehman, including a weekend of

"near around-the-clock" negotiations regarding modifications to certain terms of the proposed

Commitment Letter,[5] the Independent Committee of the Board and the Board selected Five

Mile/Lehman as the stalking horse bidder.  As set forth in the Declaration of Mr. William Q.

Derrough of Moelis which was filed in support of the Motion, while the Debtors would have

preferred the exclusion of certain provisions from the bid, the Debtors determined that the Five

Mile/Lehman bid represented the most favorable economic proposal received by the Debtors and

provided an opportunity to forge consensus among the Debtors' constituents.[6]

## A.  **The Motion**

As originally filed with the Court on January 14, 2011, the Motion sought (among other

things) authorization for the Debtors to enter into the Commitment Letter with Five Mile and

Lehman, which contemplated an enterprise-level transaction involving the Debtors' entire

portfolio of 71 hotels.  In connection with this stalking horse proposal (the "Original Five

Mile/Lehman Bid"), Midland agreed to provide "stapled financing" to fund the Original Five

Mile/Lehman Bid or any other qualified bid at the auction which (i) contained a debt-to-

---

[5]      See Motion [Docket No. 820] at ¶ 33.

[6]      See Declaration of William Q. Derrough in Support of Motion [Docket No. 821] at ¶ 39 ("In weighing the
benefits provided by the Five Mile/Lehman Bid against the requirement that competing bidders provide cash to
Lehman on account of its claims, the Independent Committee and the Board, after considering the terms and
conditions of the Five Mile/Lehman Bid in the aggregate and in whole, determined that the Five Mile/Lehman Bid
(a) represents the proposal with the most favorable economics for the Debtors' estates that the Debtors have received
to date, (b) provides an opportunity to forge consensus among many of the parties in interest in the Chapter 11
Cases, and (c) should help to facilitate the successful conclusion of these Chapter 11 Cases.")

capitalization ratio for the reorganized enterprise of not greater than 70% and (ii) provided for payment to Lehman of not less than $200.3 million in cash.  Although the Original Five Mile/Lehman Bid was supported by Lehman (as holder of the Floating Loan[7]) and Midland (as special servicer for the Fixed Rate Loan), together comprising over $1 billion in principal amount of secured debt, the chorus of objections to the Motion remained loud and clear.

After the filing of the Motion, the Debtors and their advisors actively continued the marketing process.  Moelis compiled a list of potential buyers and made contact with over 200 of these parties, sending teasers to nearly 120 of them.  The Debtors also executed more than thirty non-disclosure agreements and responded to detailed diligence requests from approximately thirty potential investors.  Moelis also contacted nine potential financing sources, four of which executed non-disclosure agreements.

On January 24, 2011, the Debtors circulated a more detailed and updated process letter to potential bidders (the "Revised Process Letter").  The Revised Process Letter, which was also filed with the Court,[8] further reminded potential bidders that the Debtors were open to all types of proposals for the Debtors' assets; it stated that the Debtors were willing to consider, in addition to superior enterprise-based transactions, *all* value-maximizing restructuring proposals, including those for pools of assets or individual assets.  That same day, the Debtors also issued a widely-publicized press release announcing the Original Five Mile/Lehman Bid and the related Motion and indicating the Debtors' willingness to consider any and all other bids.

To date, as a result of these efforts, the Debtors have received multiple competing bid proposals, which were described in the sealed pleadings filed with the Court.  Indeed, it appears

---

[7]    The "Floating Rate Loan" is comprised of (a) that certain senior secured loan in the face amount of $250,000,000, plus interest, costs and fees and (b) that certain junior mezzanine loan in the face amount of $118 million, plus interest, costs, and fees, owed by certain of the Debtors (the "Floating Rate Debtors").

[8]    See Docket No. 856.

that, as late as March 10, 2011, the date on which the hearing on the Motion commenced, interested parties continued to contact the Debtors to express interest in the Debtors' assets. The number of bids and their varying structures (each of which was for less than the entire enterprise) are evidence that there was no confusion in the market as to the Debtors' desire to receive bids in varying forms.

On February 25, 2011, formal objections to the Motion were filed by (i) the Ad Hoc Committee of Preferred Shareholders (the "Ad Hoc Committee"), (ii) LNR Securities Holdings, LLC and the ML-CFC 2006-4 and CSFB 2007-C1 Trusts (collectively, "LNR"), (iii) TriMont Real Estate Advisors, Inc. ("TriMont"), (iv) Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd. (collectively, "Appaloosa"), (v) CWCapital Asset Management LLC and CIII Asset Management LLC (together, "CW"), and (vi) the Official Committee of Unsecured Creditors.

A statement in response to the objections was filed by Apollo Investment Corporation ("Apollo"). Midland, in its capacity as special servicer, filed (i) a Statement in Support of the Motion, (ii) an Omnibus Reply to the Objections to the Motion, and (iii) a Supplemental Statement in Support of the Motion. Five Mile also filed a Reply to Objections and Statement in Support of the Motion.[9]

---

[9]     The record also includes the following declarations and affidavits:  (a) in support of the Motion, the Debtors filed (i) the Declaration, Supplemental Declaration, and Second Supplemental Declaration of William Q. Derrough; (ii) the Declaration of Marc Beilinson; and (iii) the Declaration of Lawrence J. Ruisi; (b) in support of the Motion, Midland filed the Declaration of Ronald Greenspan and the Declaration of Kevin Semon; (c) in support of the Motion, Five Mile filed the Declaration of Daniel Fliman; (d) in support of its Objection, LNR filed the Declaration of Ronen Bojmel and the Declaration of Michelle McMahon; (e) in support of its Objection, the Ad Hoc Committee filed the Declaration of George E. Mastoris; and (f) in support of its Objection, TriMont filed the Declaration of Lee Eichen.  At the hearing on March 11, 2011, Midland withdrew the Declaration of Kevin Semon and TriMont withdrew the Declaration of Lee Eichen.  No live testimony was presented at the hearing on the Motion.

**B.  The Revised Five Mile/Lehman Bid and the Final Five Mile/Lehman Bid**

What happened next exemplifies a chapter 11 process at its best.  The Original Five

Mile/Lehman Bid was modified – not once, but twice.  First, it was revised to remove the seven

hotel properties that are secured by individual mortgages (commonly referred to by the parties as

the "Seven Sisters"), leaving only the hotels covered by the Fixed Rate Loan and Floating Rate

Loan in the revised proposed transaction (the "Revised Five Mile/Lehman Bid").  The Revised

Five Mile/Lehman Bid was described for the first time in the Debtors' Omnibus Reply in

Support of the Motion, which was filed on March 6, 2011.  Drafts of the revised Commitment

Letter and Bidding Procedures were served on the Court and the Debtors' key constituents on

March 8, 2011, and the final forms of such documents were filed with the Court on March 10,

2011, the date on which the hearing on the Motion commenced.  Prior to the continuation of the

hearing on March 11, 2011, the Revised Five Mile/Lehman Bid was altered again, and the

Debtors submitted further revised, final documents to the Court (the "Final Five Mile/Lehman

Bid") which eliminated the payment of any break-up fee to Five Mile/Lehman.  Simply put, the

creditors and preferred shareholders spoke and the Debtors listened.

It is the Final Five Mile/Lehman Bid and related Bidding Procedures that are before the

Court today.  The Final Five Mile/Lehman Bid proposes the following significant terms:

- The Final Five Mile/Lehman Bid contemplates an enterprise transaction involving the Debtors identified in Exhibit A to the Commitment Letter (the "Fixed/Floating Debtors") and is valued at $970.7 million.[10]  The Final Five Mile/Lehman Bid is comprised of a capital structure that includes approximately $622.5 million of debt financing and approximately $348.2 million of equity.
- The bid covers only the properties securing the Fixed Rate Loan and the Floating Rate Loan, and the Debtors will continue to market the Seven Sisters independent of the Fixed/Floating Debtors.

---

[10]      A list of the Fixed/Floating Debtors, which is comprised of the Fixed Rate Debtors, the Floating Rate Debtors and certain other Debtors, is attached as Exhibit A to the final version of the Commitment Letter.  The final version of the Commitment Letter is annexed as Exhibit 1 to the Court's Order granting the Motion [Docket No. 1009].

- Midland will provide "stapled financing" for the Final Five Mile/Lehman Bid as more fully set forth in the Commitment Letter and its related exhibits.
- General unsecured creditors with claims against the Fixed/Floating Debtors will share in a distribution of up to $3.75 million, but not to exceed a recovery of 65% of the face amount of allowed general unsecured claims against such Debtors.
- Apollo will contribute $375,000, all of which will be included in the amounts distributed to general unsecured creditors of the Fixed/Floating Debtors. Apollo will retain whatever rights it may have with respect to Debtors and property that are not covered by the Final Five Mile/Lehman Bid.
- Nothing in the Final Five Mile/Lehman Bid will impact the rights of any person or entity with respect to the $7.4 million in cash that is currently held in a bank account of Debtor Innkeepers USA Limited Partnership, which is not subject to the Final Five Mile/Lehman Bid. No amount of the cash will be distributed in connection with the bid.
- Confirmation of the plan encompassing the Final Five Mile/Lehman Bid will not be tied to the confirmation of any plan related to the Seven Sisters' Debtors.
- Five Mile/Lehman will receive an expense reimbursement of up to $3.0 million.

## C. **Objections to the Final Five Mile/Lehman Bid**

On March 9 and 10, 2011, each of the objecting parties filed a statement indicating to the Court whether or not it intended to pursue its objection to the Motion in light of the revisions to the Original Five Mile/Lehman Bid. Based on each of the statements and the representations made at the hearing held on March 10 and 11, 2011, only Appaloosa continues to object to the Motion. The bases for its objection can be summarized as follows. Appaloosa believes that the revised Bidding Procedures are an impediment to competitive bidding; it specifically asserts that the revised Bidding Procedures do not permit a non-enterprise bid to be "Qualified"[11] for the purpose of an auction and that, along with the "Overbid Allocation," the Bidding Procedures restrict bidders' ability to separately value and bid on "pool assets." Appaloosa further contends that the Lehman "cash-out" provision is a further deterrent to competitive bidding and that the "fiduciary out" contained in the Bidding Procedures does not cure any of these shortcomings.

---

[11]    The term "Qualified Bid" is defined in Section 3 of the Bid Procedures as a bid that qualifies to participate in the Fixed/Floating Auction (as defined therein), with such qualification to be determined by the Debtors (in consultation with Midland and the Creditors' Committee and in accordance with the Commitment Letter).

Appaloosa further objects on the basis that the revised Bidding Procedures improperly mandate terms of a plan of reorganization.

## II.     <u>Appaloosa's Standing to be Heard</u>

As a preliminary matter, the Court must address whether Appaloosa, as an owner of certificated interests in the Fixed Rate Loan serviced by Midland as special servicer, has standing to be heard and to object to the Motion – specifically, standing to object to the approval of the Final Five Mile/Lehman Bid which now covers only the Fixed/Floating Debtors.

The issue of various parties' standing to raise objections in these cases was raised prior to the Court's decision in <u>Innkeepers I</u>; because the objections of Appaloosa and others were substantially identical to many of the other objections raised at that juncture by the objectors to the Debtors' Plan Support Agreement, it was not necessary to decide the issue at that time. Because Appaloosa – and Appaloosa alone – continues to press its objection to the Final Five Mile/Lehman Bid in connection with the Motion, the issue of its standing in these cases must now be addressed.[12]

On January 25, 2011, Appaloosa filed papers with this Court in support of its status as party in interest entitled to standing in these cases.[13]  In the Appaloosa Memorandum of Law, Appaloosa asserts that its status as a holder of various interests in the Debtors' cases – namely, its preferred shares,[14] its $10 million interest in one of the Debtors' two postpetition debtor-in-

---

[12]      On January 25, 2011, LNR filed the Motion of Trusts and LNR Securities Holdings, LLC Seeking Judicial Determination of Party in Interest Status Under Section 1109(b) of the Bankruptcy Code, or in the Alternative Granting Intervention in These Bankruptcy Cases Pursuant to Federal Rule of Bankruptcy 2018, filed by LNR Securities Holdings, LLC on January 25, 2011 [Docket No. 857].  LNR has since informed that Court that it does not intend to pursue its motion.

[13]      <u>See</u> Memorandum of Law of Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd. in Support of their Status as Parties in Interest Entitled to Standing, filed by Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd. on January 25, 2011 [Docket No. 858] ("Appaloosa Memorandum of Law").

[14]      As reflected in its statement filed pursuant to Bankruptcy Rule 2019, Appaloosa holds 100 preferred shares. <u>See</u> Docket No. 923.  Per the Debtors' Omnibus Limited Objection to Certificateholders' Standing Requests, 100

possession loans, and its certificated interests in the Fixed Rate Loan – confers various rights on it as a party in interest sufficient to allow it to participate and be heard in the Debtors' cases on any issue, including with respect to a hearing on the Motion.[15]  Appaloosa also claims that in supporting the Final Five Mile/Lehman Bid, Midland (as special servicer for the Fixed Rate Loan) is making commitments that place its own financial interests above those of the certificateholders, thereby rendering Midland conflicted and unable to adequately represent certificateholders.  Finally, Appaloosa argues that the language of the "no action" clause contained in the applicable servicing agreement in no way precludes, or even implicates, Appaloosa's participation regarding the Motion, as it is not taking "action" in seeking to be heard on the Motion.

Oppositions to the Appaloosa Memorandum of Law were filed by the Debtors and by Midland, each of whom argues that Appaloosa, in its capacity as holder of interests in the C-6 and C-7 Trusts (as defined below), has no standing to appear and be heard in the Debtors' cases with respect to the Motion.

A.  **Background**

The Fixed Rate Loan, which is collateralized by forty-five of the Debtors' hotel properties, is evidenced by (i) a certain Replacement Note A-1 (the "A-1 Note") and a certain Replacement Note A-2 (the "A-2 Note"), each in the original principal amount of $412,701,271. The Debtors' prepetition lenders under the Fixed Rate Loan transferred their interests in the A-1

---

preferred shares is less than .02% of the approximately 5.8 million outstanding Innkeepers USA Trust 8% Series C Cumulative Preferred Shares.  See Docket No. 887 at ¶ 22.  In fact, Appaloosa states that it purchased preferred shares "for the wholly permissible purpose of bolstering any conceivable challenge to its standing, so as to enable it to protect its significant financial stake in these Bankruptcy Cases."  See Appaloosa Memorandum of Law at p. 3.

[15]     As noted in the Appaloosa Memorandum of Law, Appaloosa is wearing multiple party-in-interest hats in these cases.  Given that the Seven Sisters have been carved out of the Final Five Mile/Lehman Bid (thereby resolving the loudly-voiced concerns of the Ad Hoc Committee, TriMont, LNR, and CW) and the repayment of the Debtors' DIP loans has never been remotely at risk, it is obvious that Appaloosa's remaining objections to the Motion are made wearing its certificateholder hat.

Note to the trustee for a trust known as the C-6 Trust, and transferred their interests in the A-2

Note to the trustee for a trust known as the C-7 Trust.  Each of the trusts is a real estate mortgage

investment conduit (a "REMIC") – an investment vehicle that holds mortgage loans and

residential and commercial mortgaged-backed securities ("CMBS") in trust and issues securities

to investors in the secondary mortgage market in the form of certificates representing beneficial

interests in these trusts.  As reflected in its statement filed pursuant to Bankruptcy Rule 2019,

Appaloosa holds approximately $263,381,000 face amount of certificates in the C-6 and C-7

Trusts.[16]

REMICS are governed by pooling and servicing agreements ("Servicing Agreements")

that set forth in detail the duties of the servicers that are responsible for administering the loans

and allocating cash flows to different classes of certificateholders.  Servicing agreements

simultaneously protect the tax treatment of REMIC trusts and also balance the sometimes-

conflicting interests of the various classes of certificateholders, as well as those of the issuer(s),

servicer(s), and others.  Typically, upon an event of default under a mortgage loan held by the

REMIC, pursuant to the Servicing Agreement, such mortgage loan is transferred to and

administered by a so-called "special servicer" appointed to represent the interests of the

certificateholders with respect to that loan.

The C-6 and C-7 Trusts are governed by separate Servicing Agreements.[17]  Pursuant to

the terms of the C-6 Servicing Agreement and a separate Co-Lender Agreement, Midland was

---

[16]        The C-6 Trust holds 181 loans totaling approximately $2.95 billion, is secured by 291 properties, and is divided into 27 certificate tranches. The approximately $412 million in Fixed Rate Loan obligations represents approximately 14% of the C-6 Trust.  The C-7 Trust holds 97 loans totaling approximately $3.15 billion, is secured by 154 properties, and is divided into 26 certificate tranches. The approximately $412 million in Fixed Rate Loan obligations represents approximately 13% of the C-7 Trust.

[17]        The C-6 Trust is governed by that certain Pooling and Servicing Agreement, dated August 13, 2007, by and between Structured Asset Securities Corporation II, as depositor, Wachovia Bank, National Association, as master servicer, Midland Loan Services, as special servicer, and LaSalle Bank National Association, as trustee (the "C-6 Servicing Agreement").  The C-7 Trust is governed by that certain Pooling and Servicing Agreement, dated as of

named the special servicer for the C-6 Trust and is authorized to act as special servicer for both

the C-6 and C-7 Trusts.  Each certificateholder agreed to allow Midland to administer and

service the Fixed Rate Loan in the certificateholders' collective best interests, including, where

appropriate, to exercise remedies on behalf of the certificateholders.  Section 1.01 of the C-6

Servicing Agreement sets forth the "servicing standard" which requires Midland to act in the

collective best interests of the certificateholders.

   The C-6 Servicing Agreement contains what may fairly be characterized as a standard

"no action" clause prohibiting a certificateholder from instituting any suit, action, or proceeding

under the C-6 Servicing Agreement or relating to the Fixed Rate Loan unless the following

conditions are met:

> a. A certificateholder gives the trustee under the Servicing Agreement written
> notice of a default under the Servicing Agreement; and
> b. Certificateholders entitled to at least 25% of the voting rights have made a
> written request to the trustee to institute such suit, action, or proceeding and the
> trustee has neglected to take such action for at least 60 days.[18]

The Court has not been made aware of written notice of a default having been given to Midland,

nor have any certificateholders entitled to at least 25% of the voting rights (Appaloosa falls well

short of this requisite ownership amount) made a written request to institute a "suit, action, or

proceeding."  During the March 10 session of the hearing on the Motion, counsel for Appaloosa,

---

November 12, 2007, by and between Structured Asset Securities Corporation II, Wachovia Bank, National
Association, as master servicer, LNR Partners, Inc., as special servicer, and LaSalle Bank National Association, as
trustee.

[18]    See Section 11.03(c) of the C-6 Servicing Agreement, which provides, in pertinent part, that "[n]o
Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or
proceeding in equity or at law upon or under or with respect to this Agreement or any Mortgage Loan, unless, with
respect to any suit, action or proceeding upon or under or with respect to this Agreement, such Person previously
shall have given to the Trustee a written notice of default hereunder, and of the continuance thereof, as hereinbefore
provided, and unless also(except in the case of a default by the Trustee) the Holders of Certificates entitled to at least
25% of the Voting Rights shall have made written request upon the Trustee to institute such action, suit or
proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as
it may require against the costs, expenses and liabilities to be incurred therein or thereby, and (except in the case of a
default by the Trustee) the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall
have neglected or refused to institute any such action, suit or proceeding."

in response to a direct question from the Court, confirmed that Appaloosa has not given Midland

any written notice of default.

    **B.**   **Statutory Framework and Caselaw on CMBS/REMIC Certificateholder Standing**

       Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest, including the

debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an

equity security holder, or any indenture trustee, may raise and may appear and be heard on any

issue in a case under this chapter." 11 U.S.C. § 1109(b).  Appaloosa asserts that it has standing in

the Debtors' cases under section 1109(b) as a "party in interest."  This court has held that a party

in interest is one that has a sufficient interest in the outcome of the case that would require

representation, or a pecuniary interest that will be directly affected by the case.  See, e.g., In re

Stone Barn Manhattan LLC, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) (citations omitted).  Courts

in this District, while generally interpreting section 1109(b) broadly, have limited "party in

interest" standing where a party's interest in the proceeding is not a direct one.  See, e.g., In re

Saint Vincent's Catholic Med. Ctrs. of New York, 429 B.R. 139, 149 (Bankr. S.D.N.Y. 2010)

("[t]he 'real party in interest' is the one who, [sic] under the applicable substantive law, has the

legal right which is sought to be enforced or is the party entitled to bring suit") (quoting In re

Comcoach Corp., 698 F.2d 571, 573 (2d Cir. 1983)); Southern Blvd., Inc. v. Martin Paint Stores,

207 B.R. 57, 61 (S.D.N.Y. 1997) (stating that, while a creditor of one of the debtor's creditors

may be "deeply concerned about the bankruptcy proceeding, . . . the party's legal rights and

interests can only be asserted against the debtor's creditor, not against the debtor, and hence is

not a 'party in interest' under the Second Circuit's view of section 1109").

While it appears to be the case that no court has specifically addressed CMBS/REMIC certificateholder standing in a chapter 11 case,[19] several courts have come close.

For example, in <u>In re Shilo Inn</u>, 285 B.R. 726 (Bankr. D. Or. 2002), the debtors were twenty-seven limited liability companies which owned various hotel properties.  Prepetition, the debtors had obtained secured loans on the properties, which were then included in pools of loans held in three trusts.  The debtors filed a motion seeking to allow the certificateholders of certain trusts to vote on a proposed plan.  The court denied the debtors' motion, holding that, because the claims belonged to the trusts, and not to the individual certificateholders who had purchased the beneficial interests in the loans as part of an asset securitization, the servicing agent for the trusts was the appropriate party to vote the trusts' claims.

In its decision, the <u>Shiloh Inn</u> court concluded that (i) the trusts, and not the certificateholders, were the debtors' creditors, (ii) the language of the applicable pooling and servicing agreement gave the servicer the right to vote on a plan, and (iii) the relationship between certificateholders and trusts is distinguishable from the relationship between bondholders and indenture trustees in that, in the case of a corporate bond, the bondholder has a right to payment from the corporation, whereas in a securitization, the investors' relationship is with the special purpose vehicle holding the assets, and the investors' right to payment comes from the cash generated by the assets, not from the originator of the assets itself.  <u>See</u> <u>id.</u> at 727-731.  Judge Perris observed, with respect to the pooling and servicing agreements before her, that

---

[19]    The issue of whether certificateholders are "parties in interest" in chapter 11 cases was not decided in <u>In re Extended Stay Inc.</u>, Case No. 09-13764 (Bankr. S.D.N.Y. 2009), and the facts and circumstances in <u>Extended Stay</u> are entirely distinguishable from those present here.  In <u>Extended Stay</u>, a special servicer had not been appointed prior to the petition date, leaving the <u>Extended Stay</u> debtors no other option but to engage in prepetition negotiations with certificateholders which, by necessity, continued through the "first day" cash collateral hearing.  Under those unique circumstances, Judge Peck permitted all parties, including certificateholders, to appear and be heard on the debtors' motion to approve the interim use of cash collateral.  Here, Midland was appointed as special servicer for the Fixed Rate Loan two months prior to the commencement of the Debtors' cases and has been an active participant since then.

"[they] give the certificate holders rights to advise the special servicer and to enforce their rights against the special servicer and the trustee. However, they do not give the certificate holders the right to enforce the pooled mortgage loans on their own unless the trustee has been requested to do so and has refused." Id. at 731.

Similarly, in In re Refco Inc., Judge Drain held that the investors in a non-debtor segregated portfolio company ("SPC") lacked standing to object to a settlement between the SPC and the official committee of unsecured creditors of the debtor because they were not a "party in interest" under section 1109 of the Bankruptcy Code, notwithstanding their assertions that the settlement was entered into improperly by the SPC and was the product of collusion and fraud. See In re Refco Inc., Case No. 05-60006 (RDD), Transcript of June 8, 2006 Hr'g. Judge Drain's decision was affirmed by the District Court, which held on appeal that the Bankruptcy Court properly determined that the investors did not have standing to object, as they were not "a party in interest." See In re Refco Inc., 2006 WL 3409088 (S.D.N.Y. Nov. 16, 2006). The District Court also found that the investors were "not directly and adversely affected pecuniarily by the challenged ruling of the Bankruptcy Court because they do not hold a direct interest in the Debtor." Id. at *4.

The Second Circuit affirmed the District Court's determinations that the investors did not have standing to contest the settlement between the SPC and the committee. See Krys. v. Official Comm. Of Unsecured Creditors of Refco, Inc. (In re Refco, Inc.), 505 F.3d. 109, 110 (2d Cir. 2007). Finding that the "party in interest in the bankruptcy sense" was the SPC representing the investors' financial interest, the Second Circuit held that only the SPC, not the investors, could assert a claim against the Refco estate. Id. at 117. The court noted that "[i]t may be that the [SPC] directors violated their fiduciary duties by entering [sic] a settlement that was not in

16

the best interests of Investors.  That issue, however, is not for the bankruptcy court."  Id. at 118.

Observing that the term "party in interest" as used in section 1109(b) "is broadly interpreted, but

not infinitely expansive," the court held that the investors, as investors in a creditor of the debtor,

were not a "party in interest" within the meaning of section 1109(b).  See id. at 118-19.  This

Court is bound by the Second Circuit's decision in Refco.

### C.  Appaloosa Does Not Have "Party-in-Interest" Standing as a Certificateholder

Appaloosa holds beneficial interests in the REMICs, the C-6 Trust and the C-7 Trust, that

own the Fixed Rate Loan, making it merely an investor in a creditor.  As a result, I find that

Appaloosa cannot be given "party in interest" standing to be heard on the Motion in its capacity

as a certificateholder, although it does have standing to be heard in its capacity as a holder of

preferred shares and as a DIP lender.  In addition to Refco and Shiloh Inn, the terms of the C-6

Servicing Agreement further support this conclusion.

The Court notes that this is not the first time that Appaloosa has attempted to circumvent

a pooling and servicing agreement in order to challenge or override the actions of a CMBS

special servicer.  In Bank of America, N.A. v. PCV ST Owner L.P., Case No. 10-1178

(S.D.N.Y.) ("Stuytown"), Appaloosa, a certificateholder of the CMBS trust in those cases,

sought the right to intervene in a foreclosure action against the borrower of a securitized

mortgage loan in which the applicable documents contained a "no action" clause substantially

similar to the "no action" clause at issue here.[20]  In that proceeding, LNR, describing itself as

"the country's largest special servicer of commercial real estate loans included in [CMBS]

transactions," filed an amicus brief arguing that individual certificateholders have no contractual

---

[20]    See Motion to Add Party(ies) Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd., Case No. 10-1178 (S.D.N.Y.) [Docket No. 16].

right to seek to challenge the actions of a special servicer or to intervene when all

certificateholders have delegated the power to exercise remedies to the special servicer.[21]

In its brief, LNR stated that, as a special servicer, it "has a keen interest in the protection

and the proper recognition of the legal rights and duties of a CMBS special servicer . . . and in

the orderly and efficient resolution and disposition of defaulted loans in the best interests of all

certificateholders."[22]  LNR further argued that

> Individual certificateholders such as Appaloosa have no contractual right to seek
> to challenge or override the actions of a CMBS special servicer or to second guess
> through intervention the special servicer's exercise of remedies . . . . Nor should
> an individual certificateholder such as Appaloosa be permitted to intervene . . .
> when all certificateholders, including those with rights of consultation, have
> delegated the power to exercise remedies to the special servicer.   Allowing
> Appaloosa to intervene in this action would spawn satellite litigation that will clog
> the courts and impair recoveries to CMBS bondholders.[23]

The Stuytown court summarily denied Appaloosa's motion to intervene,[24] which this

Court believes lends even further support to its decision today.

Appaloosa has no privity or other relationship with the Debtors which would confer on it

standing to be heard.  While Appaloosa asserts it that is not a "creditor of a creditor" but rather

that it holds a beneficial interest in the assets of the C-6 and C-7 Trusts, this does not change the

result.  As the court pointed out in Shiloh Inn, in a securitization, the investors' relationship is

with the special purpose vehicle holding the assets (in this case, the C-6 and C-7 Trusts), and the

right to payment comes from the cash generated by the assets, not from the debtor as the

originator of the assets itself.  While Judge Perris recognized that the investors in Shiloh Inn held

certificates evidencing a beneficial interest in the trust funds, she found that the investors, as

---

[21]    See Brief of Amici Curiarum LNR Partners, Inc. and American Capital, Ltd. in Support of CWCapital
Asset Management LLC's Opposition to Motion for Leave to Intervene as a Party-Defendant Filed by Appaloosa
Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd., filed on March 19,
2010, Case No. 10-1178 (S.D.N.Y.) [Docket No. 71].

[22]    See id. at p. 1.

[23]    Id. at p. 10.

[24]    See Summary Order Denying Motion to Intervene, Case No. 10-1178 (S.D.N.Y.) [Docket No. 89].

certificateholders, did not have any direct interest in the obligations of the debtors.  Rather, their

interests were in the assets of the trusts, and the trusts were the debtors' creditors.  See In re

Shiloh Inn, 285 B.R. at 729.  This comports with the Second Circuit's holding in Refco that a

creditor of a creditor is not a "party in interest" within the meaning of section 1109(b) of the

Bankruptcy Code.

        Moreover, this Court finds that Appaloosa is contractually bound by the "no action"

clause of the C-6 Servicing Agreement.  None of the conditions precedent to "action" has been

met such that Appaloosa is entitled to circumvent the special servicer and be afforded

independent standing to be heard on the Motion.  Despite how Appaloosa may characterize its

actions and position here to avoid falling within the "no action" clause or otherwise admit that it

is precluded by the C-6 Servicing Agreement from being heard on the Motion, the fact is that

Appaloosa's goal is to prevent the Debtors' stalking horse transaction from moving forward –

contrary to the position of the duly authorized special servicer for the Fixed Rate Loan.

        Granting standing to a certificateholder would not only override the terms of the C-6

Servicing Agreement and alter the bargained-for terms and risks investors undertook when they

bought certificated interests in the Fixed Rate Loan, but it would also encourage and embolden

other certificateholders to hire their own counsel to challenge the special servicer's authority and

to advance their individual and conflicting pecuniary interests.[25]  This would dramatically alter

the CMBS landscape and render the delegation to a special servicer meaningless.  In addition, it

---

[25]        By definition, CMBS pools have holders with varied and conflicting pecuniary interests.  In response to a
directive of the Court, Appaloosa filed a detailed statement pursuant to Bankruptcy Rule 2019 which reflects that, as
of February 11, 2011, it held some $263 million in various classes of certificates.  Notably, nearly $33 million of
Appaloosa's C-6 and C-7 certificates were acquired in January and February 2011, at a time when Appaloosa's
standing to be heard was uncertain.  Appaloosa's statement filed pursuant to Bankruptcy Rule 2019 reveals that it
continued to purchase certificated interests in the Fixed Rate Loan, notwithstanding the risk that it would not be
afforded standing.  Its varied holdings also underscore the potential for a certificateholder to be pursuing its own
pecuniary interests which may be at odds with the interests of other certificateholders.  There is a clear need for a
special servicer in such an instance.

would inevitably serve to delay and complicate bankruptcy cases as debtors are forced to litigate

issues with additional parties who previously were contractually obligated to speak with one

voice, that of the special servicer.  The Court seeks to avoid such a scenario here.  Although the

Court's ruling with respect to standing is based entirely on controlling law as well as the

applicable language of the C-6 Servicing Agreement, it is worth noting that to hold otherwise

would, in the view of the Court, potentially cause chaos in the already-tumultuous CMBS

market.

Nor does Appaloosa's contention that Midland is "hopelessly and impermissibly

conflicted" [26] and engaging in "self-enriching" behavior[27] change the result.  If Appaloosa

believes that to be the case, then Midland is surely acting at its peril and is answerable to

Appaloosa if Appaloosa pursues an action for breach of the servicing standard.  This Court finds

compelling the significant "check" that exists regarding the conduct of servicers – the "servicing

standard" to which a servicer is contractually bound – and which applies to Midland in this case.

This standard requires a special servicer to consider the interests of all certificateholders as a

collective whole, and a breach of duty may give rise to potential liability.  This check on servicer

conduct does not exist to afford individual certificateholders standing in the event of an alleged

breach, but rather to allow them to take separate action under the terms of the applicable

servicing agreement as they see fit.  Should Appaloosa, as it asserts, believe that Midland is in

breach of the servicing standard, it can pursue its contractual remedies.  As the Second Circuit

stated in <u>Refco</u>, "[b]ankruptcy court is a forum where creditors and debtors can settle their

disputes *with each other*.  Any internal dispute between a creditor and that creditor's investors

belongs elsewhere."  <u>See</u> <u>In re Refco</u>, 505 F.3d at 118 (emphasis in original).

---

[26]    <u>See</u> Appaloosa Memorandum of Law at p. 13.
[27]    <u>See id.</u> at p. 15.

This Court is unpersuaded by Appaloosa's argument that "shutting [it] out of the

Bankruptcy Case inevitably will result in litigation in other venues, which ultimately will impede

the implementation of a confirmable plan."[28]  In light of the consensus the Debtors have

achieved in the week prior to the hearing on the Motion with respect to the Final Five

Mile/Lehman Bid, it appears that the Debtors can and will propose a confirmable plan for the

Fixed/Floating Debtors – and for the Excluded Debtors[29] – in the very near term.

### III.    Decision on the Motion

I will now turn to the ruling on the Motion before the Court.  The standards applicable to

a motion of this character appear in numerous decisions issued by courts in this Circuit, most

significantly (i) the Second Circuit's decision in In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.

1983); (ii) the District Court's opinion in In re Integrated Resources, 147 B.R. 650 (S.D.N.Y.

1992), and (iii) the Bankruptcy Court's decision in In re Global Crossing, 295 B.R. 726 (Bankr.

S.D.N.Y. 2003), in which Judge Gerber discussed the decisions in Lionel and Integrated

Resources.  In each of these decisions, the courts have applied a business judgment test to

evaluate whether a sound business purpose justifies the use, sale, or lease of property under

section 363 of the Bankruptcy Code.

In Lionel, the Court of Appeals for the Second Circuit held that a proposed sale under

section 363(b) of the Bankruptcy Code outside of a plan of reorganization should only be

approved if the proponents of the sale present "some articulated business justification, other than

appeasement of major creditors."  In Integrated Resources, Judge Mukasey concluded that

business judgment rule's presumption shields corporate decision makers and their decisions from

judicial second-guessing only when the following elements are present: (i) a business decision,

---

[28]       See id. at p. 16.
[29]       The term sheet annexed as Exhibit B to the Commitment Letter ("Term Sheet") defines the "Excluded
Debtors" as the "Innkeepers debtors other than the Fixed/Floating Debtors."

(ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some courts and commentators, no abuse of discretion or waste of corporate assets.

I note that today I evaluate only the Debtors' business decision in seeking approval of the stalking horse bid set forth in the final commitment letter, the Bidding Procedures, and the other relief requested in the Motion; plan confirmation issues are not before the Court and all parties' rights are reserved in that regard.

The Court finds that the Debtors have appropriately exercised their business judgment in determining to enter into the Final Five Mile/Lehman Bid and to propose the revised Bidding Procedures.  The Debtors have successfully modified the initial stalking horse bid to achieve consensus among their stakeholders, and the Court has found that the only remaining objector, Appaloosa, does not have standing as a certificateholder to be heard on its objections to the Motion and the Final Five Mile/Lehman Bid.  After reviewing the uncontroverted declarations of Mr. Ruisi, Mr. Derrough, and Mr. Beilinson, the Court find that the Debtors have a sound business justification for entering into the Final Five Mile/Lehman Bid.  Since Five Mile submitted its initial proposal to the Debtors in August 2010, the Debtors have successfully negotiated four subsequent proposals from Five Mile or Five Mile/Lehman, generating approximately $100 million in additional enterprise value.  After months of hard-fought negotiations among the parties, which continued through the hearing on the Motion, the Debtors have demonstrated that the Final Five Mile/Lehman Bid constitutes the best bid received to date for the assets of the Fixed/Floating Debtors.  For the reasons set forth herein, the Court grants the Motion and authorizes the Debtors to enter into the commitment letter supporting the Final Five Mile/Lehman Bid.

Even if the Court had granted standing to Appaloosa to be heard as a certificateholder

with respect to its objections to the Motion, or if the Court considers Appaloosa's objections to

be properly asserted in its capacity as a preferred shareholder or a DIP lender, the Court finds

each of those objections to be without merit, for the following reasons.

First, Appaloosa argues that the revised Bidding Procedures are improper.  Specifically,

Appaloosa criticizes (i) the "enterprise only" limitation on bids, which mandates that all bids be

structured on terms comparable to the Final Five Mile/Lehman Bid and include a debt to

capitalization ratio of not greater than 70%, (ii) the "Overbid Allocation" requiring competing

bids to be allocated in the same manner as the Final Five Mile/Lehman Bid, and (iii) the Leman

"cash-out" provision, which requires payment in cash to Lehman of at least $200.3 million.

Appaloosa asserts that each of these provisions will improperly restrict bidders and "chill"

bidding.

The Court disagrees.  I note that while, ideally, there would be total flexibility on each of

these points in the Debtors' Bidding Procedures, the evidence in the record reveals that the

Debtors by all accounts tried but failed to remove the Lehman cash-out provision.

Notwithstanding the Debtors' inability to remove this provision, the Debtors have demonstrated

to the Court that the other benefits of the Final Five Mile/Lehman Bid, including the fact that it is

supported by the two largest secured creditors of the affected Debtors, outweighed this concern.

Even LNR's financial advisor, Mr. Ronen Bojmel of Miller Buckfire, testified at his deposition

(which, I note, was taken during the period in which LNR strenuously objected to the Motion)

that a serious bidder would not have an issue obtaining the leverage in the market to fund a cash

portion of its bid as required by the Bidding Procedures. [30]

Similarly, Mr. Greenspan's Declaration indicates that the "not greater than 70%"

leverage ratio required for Qualified Bids under the final Bidding Procedures is, if anything,

higher than what a buyer may receive in the market.  According to Mr. Greenspan, typical

financing for hospitality assets in the current marketplace is often limited to 60% or 65% of

market value and is very unlikely to exceed the 70% being offered to overbidders by Midland.[31]

Based on the entirety of the record – including the fact that interested bidders continued to

engage in discussions with the Debtors through the night before the hearing on the Motion – the

Court declines to second-guess the business judgment of the Debtors in agreeing to these terms.

Far from being "chilled," the bidding process appears to be quite heated.

Appaloosa also criticizes the marketing process through which the Final Five

Mile/Lehman Bid was obtained as "flawed" due to the Debtors' "adherence" to an enterprise-

level restructuring.[32]  While the Court does not believe the Debtors' marketing process was

perfect – no such process is – it was not flawed.  Without question, the process has continued

over an extended period of time and substantial concerns of stakeholders have been addressed as

the process evolved.  The allegations that the Debtors sent "mixed messages" which confused

potential bidders as to whether parties could submit non-enterprise bids are unsubstantiated.  To

the contrary, as Mr. Derrough states in his Second Supplemental Declaration, contrary to these

assertions, he has seen no evidence to support a conclusion that the marketplace is confused.  Mr.

Derrough declares that

---

[30]    See Deposition Transcript of Deposition of Ronen Bojmel at pp. 231:23-232:7, relevant portions of which
are annexed as Exhibit B to the Omnibus Reply of Midland Loan Services to Objections to the Motion [Docket No.
985].
[31]    See Declaration of Ronald F. Greenspan in Support of Motion [Docket No. 918] at ¶ 16.
[32]    See Objection of Appaloosa to the Motion [Docket No. 967] at ¶¶ 11-12.

> [P]otential buyers have communicated that they understand the flexibility of the
> Debtors' marketing process and many potential investors are taking advantage of
> that flexibility by working to formulate proposals either on an enterprise or non-
> enterprise basis.  Further, the fact that the Debtors have received multiple bids for
> less than the entire enterprise indicates that potential investors were quite clear
> that the Debtors were, and continue to be, willing to accept bids in all forms.[33]

The Court also notes that the Debtors' assets have been "in play" since September 1,

2010, the date on which the Court declined to approve the Debtors' Plan Support Agreement.

Accordingly, for the past six months, the market has been keenly aware of the availability of

these assets – as an enterprise, as pools, or individually.  There is no evidence that a potential

bidder has sat on the sidelines because of the limitations on what constitutes a "Qualified Bid,"

because it has not had enough time, because the Lehman cash-out provision is a "show-stopper,"

or because it is "confused" by the Bidding Procedures and Revised Process Letter.

Sophisticated investors and bankers who identify an asset that they believe is undervalued

by the marketplace will not be shy about joining the fray here.  Strategic and financial buyers

who want these valuable hotel properties will step forward if they have not done so already.  In

that regard, should other bidders wish to come to the table and bid on all or a portion of the

Debtors' assets, the Debtors still have a marketing period of forty-five days after the approval of

the Motion.  For now, the time has come to give the market and the Debtors the certainty and the

"rules" that they need to complete the auction process and move on to plan confirmation.

Moreover, as in Innkeepers I, the Debtors urge that, in any event, there is a "fiduciary

out" and that the Debtors may and will consider any and all bids whether they are "Qualified

Bids" under the revised Bidding Procedures or not.  Unlike in Innkeepers I, however, the

"fiduciary out" contained in the current transaction trumps every other provision in the

controlling documents.  Contained in Section 11 of the revised Bidding Procedures, it provides

---

[33]     See Second Supplemental Declaration of William Q. Derrough in Support of Motion [Docket No. 987] at ¶
13.

that "[u]pon the determination by the Debtors' directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of the Term Sheet or the Commitment Letter shall prevent, amend, alter, or reduce the Debtors' ability to exercise their fiduciary duties under applicable law."  In other words, if a competing bidder submits a bid that reflects a higher return to either the Debtor obligors under the Fixed Rate Loan, the Floating Rate Loan, or both, albeit comprised of a different mix of cash, debt, and equity than that in the Final Five Mile/Lehman Bid, the Debtors can and should exercise their fiduciary duty to give it their full consideration.

Finally, it is worth noting that the Debtors need not have pursued an auction process at all; they could simply have proceeded directly to a plan.  They ought not to be faulted for attempting to create a framework for additional value to be realized for creditors.  See, e.g., In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. 2010) (debtors' use of "payout event procedures" in plan process resulted in increased return for stakeholders from original proposal).

In that regard, the Court notes that certain of the remaining objections asserted by Appaloosa (and previously asserted by LNR, the Ad Hoc Committee, TriMont, and CW) are best categorized as confirmation objections.  For example, Appaloosa contends that (i) the Final Five Mile/Lehman Bid and the revised Bidding Procedures dictate plan terms that go beyond the scope of the investment terms encompassed by the bid, (ii) the Term Sheet requires that the negotiated terms apply to any successful overbid, and (iii) the release provisions are overly broad and should not be approved absent the consent of each releasing party.

The Court finds that these concerns need not be addressed at this time.  The Debtors are asking the Court to approve Bidding Procedures and a stalking horse bid so that they may conduct an auction. The winner of the auction will gain the right to sponsor a plan of reorganization.  The proposed plan will still be required to meet all confirmation requirements

set forth in the Bankruptcy Code, and parties in interest will be afforded the right to make

relevant objections in the event that they believe the proposed plan falls short of such

requirements.  Ultimately, the transaction contemplated in the Final Five Mile/Lehman Bid, or

any other bid ultimately selected by the Debtors, will not be consummated absent confirmation

of a plan.  The rights of all parties in interest to object to confirmation at the appropriate time are

reserved and preserved.

 With respect to the issue of releases, while releases may be important to the ultimate

success of a plan, it is impossible to properly analyze the releases that have been proposed in the

Term Sheet.  Deciding whether a release is appropriate before a plan has been formulated or filed

has the potential to short-circuit negotiations among the Debtors and their creditors.  It remains

to be seen if the proposed releases, including the Special Servicer Release, the Apollo Release,

and the Global Release (as each is defined in the relevant documents comprising the Final Five

Mile/Lehman Bid) are appropriate.  These issues will be considered if they are raised once a plan

of reorganization is proposed.

 Accordingly, for all of the foregoing reasons, the Motion is granted.[34]

Dated: April 1, 2011                              /s/ Shelley C. Chapman
       New York, New York                  United States Bankruptcy Judge

---

[34]      On March 11, 2011, an order was entered granting the Motion.