HAYNES AND BOONE, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Telephone No.: (212) 659-7300
Facsimile No.: (212) 884-8211
Lenard M. Parkins (NY Bar # 4579124)
Mark Elmore (admitted *pro hac vice*)

    -and-

201 Main Street, Suite 2200
Fort Worth, Texas 76102
Telephone No.: (817) 347-6600
Facsimile No.: (817) 347-6650
John D. Penn (NY Bar # 4847208)

*Attorneys for Midland Loan Services,
a division of PNC Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*, | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**MOTION TO REQUIRE DEBTORS TO COMPLY WITH
SECTIONS 363 AND 503 OF THE BANKRUPTCY CODE**

    Midland Loan Services, a division of PNC Bank, N.A., as special servicer for the

Debtors' fixed rate mortgage loan ("Midland"),[1] by its undersigned attorneys, respectfully

---

[1] Midland pursuant to the Servicing Agreement services and administers that certain secured loan in the amount of not less than $825,402,542 plus interest, costs and fees (the "Fixed Rate Mortgage Loan") owed by certain of the Debtors. The Fixed Rate Mortgage Loan was made pursuant to that certain loan agreement dated as of June 29, 2007 (as amended, the "Fixed Rate Mortgage Loan Agreement"), and is evidenced by (i) a certain Replacement Note A-1 and (ii) a certain Replacement Note A-2, each dated as of August 9, 2007, and each in the original principal amount of $412,701,271. Replacement Note A-1 was assigned to LaSalle Bank National Association as trustee for the holders of the LB-UBS Commercial

submits this motion (the "Motion") to Require the Debtors to Comply with Sections 363 and 503 of the Bankruptcy Code and in support thereof, represents as follows:

**JURISDICTION AND VENUE**

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. The predicates for relief requested herein are 11 U.S.C. §§ 363 and 503.

**OVERVIEW**

The Debtors Plans and Disclosure Statement filed on April 8, 2011, note that the Debtors' Board has apparently authorized an "incentive plan" whereby the compensation of the Chief Restructuring Officer ("CRO") could be increased from $900,000 per year (plus certain other benefits) by adding a variety of bonus payments that total an additional $2 million. This "incentive plan" is outside the ordinary course of business for the Debtors, yet it has never been approved by this Court. The Debtors apparently hope that embedding it in their Plan and having it "deemed approved in its entirety without further notice to or action, order or approval of the Bankruptcy Court or any other Entity" will suffice.

The issue of whether an additional $2 million administrative burden on the Estates should be considered separate and apart from the Plans is appropriate, particularly since the payment was neither negotiated as part of the bid procedures nor as part of a funding commitment. It seems logical that bidders should know whether an additional $2 million burden is likely to be imposed before they bid.

---

Mortgage Trust 2007-C6. Bank of America, N.A. was the successor-in-interest to LaSalle Bank National Association and U.S. Bank, National Association is the successor-in-interest to Bank of America, N.A. (the "Fixed Rate Trustee"). Replacement Note A-1 is currently held by the Fixed Rate Trustee. Replacement Note A-2 was assigned to and is currently held by the trustee for the holders of the LB-UBS Commercial Mortgage Trust 2007-C7.

## FACTUAL BACKGROUND

1. On April 8, 2012, the Debtors filed their Plans and Disclosure Statement. The hearing on the adequacy of the Disclosure Statement is scheduled for May 10, 2011 (objections are due on May 6, 2011). As part of the plan process, bids for the right to become the plan sponsor are due on April 25 and if overbids are received, an auction will occur on May 2, 2011.

2. The Plan, on p. 53, provided the following regarding the "Management Incentive Plan:"

> J. Management Incentive Program
>
> Unless otherwise approved during the Chapter 11 Cases, on the Effective Date of the Fixed/Floating Plan, the Management Incentive Program (as described in Article IV.G of the Disclosure Statement and as set forth in the Plan Supplement) shall be deemed approved in its entirety without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity and the Debtors will be authorized to make all payments due under the Management Incentive Program on the Effective Date.

3. The Disclosure Statement, on p. 34, provided the following description of the Management Incentive Plan:

> G. Compensation of the Debtors' Chief Restructuring Officer
>
> On January 31, 2011, the employment agreement between Innkeepers and its Chief Restructuring Officer, Marc Beilinson, expired. The Board determined that the continued employment of Mr. Beilinson was critical to the ongoing restructuring and, at the Board's request, Mr. Beilinson agreed to continue his employment on an at-will basis while the Board considered and negotiated his compensation and incentive package for the current year. During this time, Mr. Beilinson received his current base salary pursuant to Board direction.

In March 2011, the Board hired[2] the compensation consultant Johnson Associates, Inc., and directed them to examine compensation structures of comparable real estate and hotel businesses and approved incentive programs of companies in large chapter 11 cases. Based upon the analysis of Johnson Associates, and in consultation with its other advisors, on April 1, 2011, the Compensation Committee and then the Board considered and approved the Management Incentive Program for Mr. Beilinson, including up to $2 million in incentives linked to operating and restructuring milestones, which are set forth on Schedule 2. The Debtors have shared the compensation proposal with some of their constituents and are currently engaged in discussions regarding the proposal.

Unless otherwise approved during the Chapter 11 Cases, on the Effective Date of the Fixed/Floating Plan, the Management Incentive Program (as set forth in the Plan Supplement) shall be deemed approved in its entirety without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity and the Debtors will be authorized to make all payments due under the Management Incentive Program on the Effective Date.

4. Midland did not consent to either the Management Incentive Program and or its inclusion in the Plans or Disclosure Statement and advised the Debtors of its opposition to the Management Incentive Program before those documents were filed.

5. During the Plan Support Agreement ("PSA") litigation in the summer of 2010 before Statements of Financial Affairs were filed, it was discovered that the CRO's annual compensation (since September 2008) was $900,000 per year (plus certain expenses). His employment agreement did not specify any incentive-based compensation.

6. It was also discovered that the CRO received bonus payments of $2 million shortly before the bankruptcy filing, while the Debtors were experiencing financial difficulties

---

[2] The Court's docket does not reflect that Johnson Associates has been employed as a professional in these case nor has any application to approve such employment been filed.

and a bankruptcy filing was actively being contemplated. The Statement of Financial Affairs filed thereafter indicated that the CRO received a total of $4 million in bonuses and over $900,000 in salary during the year before these cases were filed. Other findings regarding the CRO's pre-petition conduct and activities are set out in this Court's opinion found at Docket No. 776, Dec. 20, 2010.[3]

7. After the PSA was rejected, Midland did not move to replace the CRO with a trustee or otherwise. This spared the Debtors from the disruption of finding a new CRO or having a trustee appointed and the litigation attendant thereto.

8. The Plans filed on April 8, would also provide the CRO with a release of claims that the Debtors might have against him to set aside those pre-petition payments as fraudulent transfers or otherwise. While Midland agreed to the releases provided pursuant to the Commitment Letter (thereby allowing him to retain the $ 4 million in bonuses), paying the CRO another $2 million on top of such a broad release is further than Midland is willing to do – especially considering that Midland's Cash Collateral bears the vast majority of the administrative expenses.

9. The Commitment Letter approved by this Court in the Bidding Procedures Order (Docket No. 1009) did not include any reference to a Management Incentive Plan. It did, however, represent the culmination of two rounds of extensive negotiations regarding the reserves (including reserves for substantial professional fees) to be funded through amending the Cash Collateral Order – initially in January and again when the Commitment Letter was modified in March. It now appears that the Debtors contemplated these additional payments to

---

[3] A transcript of the CRO's testimony at the PSA hearing (direct and cross-examination) is available upon request if it is not available from the Court's electronic filing system.

the CRO during at least the second round of these negotiations and did not advise the parties of these facts and the possibility of an additional $2 million request by the CRO. If this information was deliberately withheld during the negotiations, it is more offensive conduct of the kind that is reminiscent of the CRO's pre-bankruptcy actions. Notably, an additional $2 million for the CRO was never mentioned during either the extensive bid procedures discovery or hearing process.

10. The Commitment Letter established an "Outside Date" of September 15, 2011, for a plan effective date. Based on the Management Incentive Plan, up to $2 million would therefore be payable based on events that would primarily occur in less than 7 months (April 1 – September 15).

11. Before this Motion was filed, the Debtors were asked whether they would agree for the Management Incentive Plan to be presented to the Court for approval separate and apart from the Plans. While counsel for the Debtors said that they would consider doing the same, there was no commitment to do so.

## ARGUMENT

**I.  In Order to Use, Sell, or Lease Estate Property, Other than in the Ordinary Course of Business, the Debtors in Possession Must Comply with Bankruptcy Code Section 363(b)(1).**

The Debtors never sought to assume, extend or renew the CRO's employment agreement or otherwise presented this Court with the opportunity to consider the same. The CRO has not ever subjected his employment agreement to examination (or cross-examination) by the creditor group. Creating a new, $2 million administrative obligation in favor of an insider via the Management Incentive Plan where no incentives existed before is hardly an action within the "ordinary course of business."

In order to engage in a transaction *outside* of the ordinary course of business, like the $2 million Management Incentive Plan, a debtor must satisfy Bankruptcy Code section 363(b)(1).[4] Namely, the Debtors must provide for notice and a hearing. *See* § 11 U.S.C. 3636(b)(1); *see also In re Crystal Apparel, Inc.*, 220 B.R. 816 829, 830 (Bankr. S.D.N.Y. 1998) *citing In re Caldor, Inc.*, 193 B.R. 182, 186 (Bankr. S.D.N.Y. 1996) (stating that "[t]he purpose of requiring notice and hearing if a transaction is outside the ordinary course of business is so that creditors, who have a vital interest in maximizing realization from assets of the estate, have an opportunity to review the terms of the proposed transaction and to object if they deem the terms and conditions are not in their best interest"). As such, Section 363(b)(1) requires that this Court approve – after notice and hearing – such an obligation before it is binding.

The Debtors have never requested Court approval of the Management Incentive Plan that was embedded in the Plans instead of filing a motion for this Court to consider it as a standalone motion. This Court should require the Debtors to comply with Section 363(b)(1) and either obtain approval of the Management Incentive Plan (after notice and hearing) or treat the Board's decision regarding such plan as a nullity.

## II.    Section 503(c) Prohibits the Management Incentive Plan

Section 503(c) was added to the Bankruptcy Code in 2005 to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Mesa Air Group*, 2010 Bankr. LEXIS 3334 at *6 (Bankr. S.D.N.Y. 2010) (citing *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007)). Specifically, Section 503(c)(1) prohibits a debtor from incurring an obligation to or for the benefit of an

---

[4] Inversely, a Debtor, pursuant to Bankruptcy Code sections 1108 and 363(c)(1) may engage in transactions in the ordinary course of business.

insider "for the purpose of inducing such person to remain with the debtor's business" unless certain requirements are met, including that "the transfer or obligation is essential to the retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation." *See* 11 U.S.C. § 503(c)(1)(A). As stated in the Disclosure Statement, the Management Incentive Program was considered because "The Board determined that ***the continued employment of Mr. Beilinson was critical to the ongoing restructuring*** and, at the Board's request, Mr. Beilinson agreed to continue his employment on an at-will basis while the Board considered and negotiated his compensation and incentive package for the current year." (emphasis added). Neither the Plan nor the Disclosure Statement show compliance with the requirements of Section 503(c)(1) though, and despite the description of the compensation as an "incentive" plan, the requirements of section 503(c)(1) must be satisfied. *See In re Dana Corp.*, 351 B.R. 86, 102 n.3 (Bankr. S.D.N.Y. 2006) (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP)"); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (rejecting the "sole purpose" standard and holding that the requirements of Section 503(c)(1) apply when a transfer is made to an insider of the debtor for the *primary* purpose of inducing such person to remain with the debtor's business); *see also In re Dana Corp.*, 358 B.R. 567, 583 (Bankr. S.D.N.Y. 2006) (evaluating whether a plan was an incentive plan or a retention plan based in part on whether the performance targets in the plan were "lay-ups").

While the Management Incentive Plan is clearly a retention plan (and even acknowledged as such in the Disclosure Statement), even if the Court were persuaded that Section 503(c)(1) does not apply, the Management Incentive Plan would still be prohibited under section 503(c)(3) because it is a transfer or obligation to an officer that is outside the ordinary course of business

and not justified by the facts and circumstances of the case. Many of the incentive targets are events a competent CRO would believe to be achievable or he would never have entered into the Commitment Letter – including deadline contemplated by the Commitment Letter for plan effectiveness.

Notably, the Plans and Disclosure Statement indicate an intent by the Debtors for the Management Incentive Program to be approved without notice or hearing or, presumably, the Debtors providing any evidence that Section 503(c) would require before a retention or severance program can be approved. None of the requisites of Section 503(c) are present and it is extremely unlikely that the Debtors could prove that any existed. Presumably, this was a factor in the Debtors attempting an end-run around the Bankruptcy Code's requirements by trying to bury this as one aspect of the Plans.

## III. The Management Incentive Plan, as Presented, Jeopardizes Both the Auction and Plan Process

The reality is that a bidder will likely view the newly released Management Incentive Program as an additional $2 million burden on the Fixed/Floating Debtors and construct their bid accordingly. This has the effect of diminishing bid amounts to Midland's detriment. (Midland would also be affected if no bids larger were received in that the Management Incentive Program would create an obligation of up to $1.650 million that would be payable on the Effective Date.)

The uncertainty of whether such an additional burden (that would be a substantial sum relative to the requisite overbid amount) should be assumed when bids are submitted could have an impact on bidding and the auction. Having already expended significant amounts of time and professional fees to secure the approval of the auction process, the Debtors' unilateral act of

filing the Plans and Disclosure Statement with the Management Incentive Plan embedded therein should not be permitted to affect the auction.

By embedding the Management Incentive Program in the Plan, the Debtors knowingly jeopardize plan confirmation by exposing it to the objection that the Plan does not comply with Section 1129(a)(1) since it does not comply with the Bankruptcy Code (by violating Section 503) Section 1129(a)(4) since its reasonableness and propriety would not be considered. The decision of the Debtors, their Board and the CRO to place the entire Fixed/Floating Plan at risk with the Management Incentive Plan is tough to justify and should also be carefully examined.

### III. Reservation of Rights Regarding Management Incentive Plan

As noted above, Midland opposes the Management Incentive Plan. Midland reserves a complete listing of the host of reasons for its opposition until such time as the Debtors comply with the Bankruptcy Code and file a motion to seek its approval. Until such a Motion is filed and ruled upon, the Management Incentive Plan should remain a nullity.

### Local Rule 9013-1(a)

This pleading includes citations to the applicable rules and statutory authorities upon which relief requested herein is predicated and a discussion of their application to this pleading. Accordingly, Midland submits that this pleading satisfies Local Bankruptcy Rule 9013-1(a).

### CONCLUSION

WHEREFORE, Midland respectfully requests that this Court enter an order (a) requiring the Debtors to comply with Sections 363 and 503 of the Bankruptcy Code with respect to the Management Incentive Plan to seek this Court's approval of the same, after notice and hearing,

(b) refuse to approve the Management Incentive Plan as proposed, and (c) granting such other relief as is necessary or appropriate.

Dated: April 14, 2011
      New York, New York

                        HAYNES AND BOONE, LLP

                        /s/ John D. Penn
                        Lenard M. Parkins (NY Bar #4579124)
                        Mark Elmore (admitted *pro hac vice*)
                        30 Rockefeller Center, 26th Floor
                        New York, New York 10112
                        Telephone No.: (212) 659-7300
                        Facsimile No.: (212) 884-8211

                                -and-

                        John D. Penn (NY Bar # 4847208)
                        201 Main Street, Suite 2200
                        Fort Worth, Texas 76102
                        Telephone No.: (817) 347-6600
                        Facsimile No.: (817) 347-6650

                        *ATTORNEYS FOR MIDLAND*
                        *LOAN SERVICES, a division of PNC Bank, N.A.*

# CERTIFICATION OF COUNSEL

Pursuant to Federal Rule 37(a)(1) made applicable hereto by Federal Bankruptcy Rule 9014(c) incorporating Federal Bankruptcy Rule 7037, and Local Bankruptcy Rule 7007-1, Midland's counsel hereby certifies that he conferred with counsel for the Debtors, via telephone on April 14, 2011, in an attempt to resolve the issues raised herein. Midland has been unable to resolve the issues raised in the Motion so it is presented to the Court for determination.

Dated: April 14, 2011
New York, New York

                              HAYNES AND BOONE, LLP

                              /s/ John D. Penn
                              Lenard M. Parkins (NY Bar #4579124)
                              Mark Elmore (admitted *pro hac vice*)
                              Jonathan Hook (NY Bar # 4187449)
                              30 Rockefeller Center, 26th Floor
                              New York, New York 10112
                              Telephone No.: (212) 659-7300
                              Facsimile No.: (212) 884-8211

                                    -and-

                              John D. Penn (NY Bar # 4847208)
                              201 Main Street, Suite 2200
                              Fort Worth, Texas 76102
                              Telephone No.: (817) 347-6600
                              Facsimile No.: (817) 347-6650

                              *ATTORNEYS FOR MIDLAND*
                              *LOAN SERVICES, a division of PNC Bank, N.A.*