**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

### DISCLOSURE STATEMENT FOR DEBTORS' PLANS OF
### REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

James H.M. Sprayregen, P.C.

Paul M. Basta

Stephen E. Hessler

Brian S. Lennon

KIRKLAND & ELLIS LLP

601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800

Anup Sathy, P.C.
~~Marc J. Carmel (admitted *pro hac vice*)~~**KIRKLAND & ELLIS LLP**
~~KIRKLAND & ELLIS LLP~~**300 North LaSalle Drive**
~~300 North LaSalle Drive~~**Chicago, Illinois 60654-3406**
~~Chicago, Illinois 60654~~**Telephone: (312) 862-~~3406~~2000**
~~Telephone: (312) 862-2000~~

Counsel to the Debtors and Debtors in Possession

Dated: ~~April~~**May** ~~8~~**9,** 2011

---

**PLEASE NOTE THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, AND HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF VOTES WITH RESPECT TO THE PLAN OR AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH SOLICITATION OR OFFER WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT, AND WILL NOT, BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THE INFORMATION CONTAINED HEREIN IS SUBJECT TO CHANGE.**

---

[1] The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

| IMPORTANT INFORMATION FOR YOU TO READ |
| --- |

**THE DEADLINE TO VOTE ON THE PLAN IS** ————— **[JUNE 17]**, **2011, AT 5:00 P.M. EASTERN TIME**.

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this Disclosure Statement for the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (these plans together, the "Plan") to Holders of Claims and Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. <u>Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.</u>

This Disclosure Statement may not be deemed to provide legal, financial, securities, tax, or business advice. The Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee of the accuracy or completeness of the information contained herein. The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the value of their properties other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement, in the Plan, or in the Plan Supplement should not be relied upon by any Holder of a Claim entitled to vote to accept or reject the Plan.

The Debtors urge every Holder of a Claim or Equity Interest entitled to vote on the Plan to (1) read the entire Disclosure Statement and the Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article VIII of this Disclosure Statement and (3) consult with its own advisor(s) with respect to reviewing this Disclosure Statement, the Plan, all documents attached hereto or filed in connection herewith and the proposed transactions contemplated under the Plan <u>before</u> deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtors' Chapter 11 Cases and certain documents related to the Plan. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly noted otherwise. The Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation or waiver. No reliance should be placed on the fact that a particular Claim or potential objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors or Post-Effective Date Debtors may seek to investigate, file and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. ~~Any representation to the contrary is a criminal offense.~~

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Debtors are relying on the private placement exemption under section 4(2) of the Securities Act, or Regulation D promulgated thereunder, and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the **offering and** issuance of new securities ~~*in connection with the solicitation*~~ **and pursuant to** the Plan from registration under the Securities Act and Blue Sky Law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis set forth in <u>Exhibit C</u>, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate. **You should carefully read Article VIII herein titled "Certain Risk Factors to be Considered Prior to Voting."**

<u>Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative.</u> The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' Notice and Claims Agent by: (a) visiting http://www.omnimgt.com/innkeepers; (b) writing to Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California, 91436; or (c) calling (866) 989-6147.

# TABLE OF CONTENTS

Page

**ARTICLE I. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** ....................... 2̶1
    A.      **Introduction** ................................................................................................................ 1
    **B.**      **Marketing and Bidding Process** ...................................................................... 1
    **C.**      **Anaheim and Ontario** ........................................................................................ 5
    **D.**      Summary of the Joint Plans .................................................................................. 2̶5
    B̶**E.**      Questions and Answers Regarding this Disclosure Statement and the Plan ............... 2̶11

**ARTICLE II. THE DEBTORS' BACKGROUND** .......................................................................... 2̶18
    A.      The Debtors' Business ........................................................................................... 2̶18
    B.      Summary of Prepetition Capital Structure .............................................................. 2̶22

**ARTICLE III. THE CHAPTER 11 CASES** ................................................................................. 2̶25
    A.      Events Leading to the Chapter 11 Cases ................................................................ 2̶25
    B.      Restructuring Efforts ............................................................................................ 2̶27

**ARTICLE IV. EVENTS OF THE CHAPTER 11 CASES** ............................................................. 2̶30
    A.      First Day Pleadings and Other Case Matters .......................................................... 2̶30
    B.      **Stipulation Between the Debtors, LNR, and the Ad Hoc Committee** ................. 33
    **C.**      The LP Bank Account ........................................................................................... 2̶35
    C̶**D.**      Claims Bar Date ................................................................................................... 2̶35
    D̶**E.**      Exclusivity ........................................................................................................... 2̶36
    E̶**F.**      Pending Litigation Proceedings ............................................................................. 2̶37
    F̶**G.**      The LNR/CRES Litigation ................................................................................... 2̶37
    G̶.      ̶C̶o̶m̶p̶e̶n̶s̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶t̶h̶e̶ ̶D̶e̶b̶t̶o̶r̶s̶'̶ ̶C̶h̶i̶e̶f̶ ̶R̶e̶s̶t̶r̶u̶c̶t̶u̶r̶i̶n̶g̶ ̶O̶f̶f̶i̶c̶e̶r̶ ............................... 2
    H.      **Deficiency Claims** ............................................................................................. 38
    **I.**      **The Debtors' Management Team** ...................................................................... 38
    **J.**      The Debtors' Plan Process ..................................................................................... 2̶38
    **K.**      **Management Compensation** ............................................................................... 45
    I̶**L.**      Statement of the Committee ................................................................................... 2̶46
    J̶**M.**      Apollo's Participation in the Chapter 11 Cases ....................................................... 2̶46
    **N.**      **LBHI's Succession of TriMont as Special Servicer Under Anaheim Mezzanine Loan** ......... 47
    **O.**      **The Ad Hoc Committee's Objection to the Disclosure Statement and the Debtors'**
         **Response.** ......................................................................................................... 47

**ARTICLE V. SUMMARY OF THE PLAN** ................................................................................. 2̶48
    A.      The Plan's Classification Scheme ........................................................................... 2̶48
    B.      Treatment of Unclassified Claims .......................................................................... 2̶51
    C.      Treatment of Claims and Interests ......................................................................... 2̶54
    D.      Special Provisions ................................................................................................ 2̶71
    E.      Means for Implementation of the Plan .................................................................... 2̶72
    F.      Treatment of Executory Contracts and Unexpired Leases ........................................ 2̶76
    G.      Provisions Governing Distributions ........................................................................ 2̶79
    H.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ................ 2̶82
    I.      Settlement, Release, Injunction, and Related Provisions .......................................... 2̶84
    J.      Midland Release ................................................................................................... 2̶84
    K.      Apollo Release ..................................................................................................... 2̶85
    L.      Fixed/Floating Debtors' Plan General Release ........................................................ 2̶85
    M.      Anaheim Hotel Debtors' Plan General Release ....................................................... 2̶87
    N.      Ontario Hotel Debtors' Plan General Release ......................................................... 2̶88
    O.      Re̶o̶r̶g**ma**i̶n̶izing Debtors' Plan General Release ..................................................... 2̶89
    P.      Exculpation ......................................................................................................... 2̶90

K&E 1̶8̶6̶3̶0̶7̶9̶2̶18930801

| | | |
|---|---|---|
| Q. | Injunction | ~2~**91** |
| R. | Setoffs | ~2~**92** |
| S. | Severability of Plan and Conditions Precedent to the Effective Date | ~2~**92** |
| T. | Modification, Revocation, or Withdrawal of the Plan | ~2~**94** |
| U. | Retention of Jurisdiction | ~2~**94** |
| V. | Miscellaneous Provisions | ~2~**96** |

**ARTICLE VI. VALUATION ~ANALYSIS~ AND FINANCIAL PROJECTIONS** ...... ~2~**99**
| | | |
|---|---|---|
| A. | Valuation ~of the Debtors~ | ~2~ **99** |
| B. | Financial Projections | ~2~**99** |

**ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ...... ~2~**100**
| | | |
|---|---|---|
| A. | Confirmation Hearing | ~2~**100** |
| B. | Confirmation Standards | ~2~**100** |
| C. | Acceptance by Impaired Classes | ~2~**102** |
| D. | Confirmation without Acceptance by All Impaired Classes | ~2~**102** |

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ...... ~2~**103**
| | | |
|---|---|---|
| A. | Certain Bankruptcy Law Considerations | ~2~**103** |
| B. | Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and the Value of Securities to Be Issued Under the Plan | ~2~**105** |
| C. | Risk Factors that Could Negatively Impact the Debtors' Business | ~2~**106** |
| D. | Risks Associated with Forward Looking Statements | ~2~**110** |
| E. | Disclosure Statement Disclaimer | ~2~**110** |
| F. | Liquidation Under Chapter 7 | ~2~**112** |

**ARTICLE IX. IMPORTANT SECURITIES LAW DISCLOSURE** ...... ~2~**112**
| | | |
|---|---|---|
| A. | ~New HoldCo~ Interests ~2~ **of the Post-Effective Date Fixed/Floating Debtors** ...... **112** |
| B. | Issuance and Resale of ~New HoldCo~ Interests **of the Post-Effective Date Fixed/Floating Debtors** under the Plan | ~2~**112** |
| C. | No Registration or Listing of New Interests | ~2~**113** |

**ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...... ~2~**114**
| | | |
|---|---|---|
| A. | Certain United States Federal Income Tax Consequences to the Debtors | ~2~**115** |
| B. | Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims and Interests | ~2~**116** |
| C. | Information Reporting and Backup Withholding | ~2~**120** |

**ARTICLE XI. RECOMMENDATION OF INNKEEPERS** ...... ~2~**122**

**<u>EXHIBITS</u>**

EXHIBIT A        Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code

EXHIBIT B        Financial Projections

EXHIBIT C        Liquidation Analysis

EXHIBIT D        ~~Valuation Analysis~~~~EXHIBIT E~~ Marriott Adequate Assurance Agreement

EXHIBIT ~~F~~**E**        Bidding Procedures Order ~~and Commitment Letter~~[2]

**<u>EXHIBIT F        Chatham Asset Purchase Agreement</u>**

**<u>SCHEDULES</u>**

SCHEDULE 1        Ontario Hotel Mortgage Loan Claims Deed in Lieu of Foreclosure

~~SCHEDULE 2~~   ~~Chief Restructuring Officer Compensation Package~~

---

~~[2]~~ ~~Please take note that the Bidding Procedures Order modified the Commitment Letter.~~

K&E ~~18630792~~**18930801**

**ARTICLE I.**
**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

*4.        Introduction*

        **Innkeepers USA Trust ("Innkeepers") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors** *in connection with the solicitation* **of acceptances with respect to the** *Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* **(the "Plan"), dated May [9], 2011.[2]  A copy of the Plan is** *attached hereto as Exhibit* **A and incorporated herein by reference.**

        The Debtors[3] form a consolidated enterprise that owns and operates an expansive portfolio of 71 upscale and mid-priced extended-stay and select-service hotels, consisting of approximately 10,000 rooms, located in 20 states across the United States.  On July 19, 2010, the Debtors filed voluntary petitions for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

        As provided in greater detail herein, the economic and operational environment in the global travel and tourism industry over the past several years has devastated the hospitality industry.  During this time, supply also increased within the hospitality industry, exacerbating the negative impact of decreased demand within the industry.  Due to the Debtors' focus on the business consumer, their hotel portfolio has been especially impacted by an overall tightening on corporate travel, training, and relocation expenditures.

        As a result of the effects of the economic downturn, the Debtors were forced to dedicate excess cash flow after operations to debt service, causing the Debtors to fall behind on necessary investments in their hard assets and their business generally.  Specifically, certain franchise agreements required the Debtors to make substantial investments in their hotels for which the Debtors did not have the cash or financing.  Failure to perform under the franchise agreements might have caused franchisors to terminate the agreements, which would have had a deleterious effect on the Debtors' entire business model.  As of the Petition Date, a number of franchisors had already provided the Debtors with notices of default under their respective franchise agreements.

        The tightening of financial markets frustrated the Debtors' efforts to arrange an out of court restructuring.  In other macroeconomic circumstances, the Debtors may have had the flexibility to refinance maturing loans, extend maturity dates, obtain new financing, or otherwise maintain liquidity.  Given the restrictions of the marketplace, however, the Debtors determined they had no choice but to file for bankruptcy and become debtors in possession.

        **THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, PROVIDES FOR A LARGER DISTRIBUTION TO THE DEBTORS' CREDITORS AND INTEREST HOLDERS THAN WOULD OTHERWISE RESULT FROM LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, AND MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES.  AT THIS TIME, THE DEBTOR BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

---

[2]  **Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

[3]  ~~Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to those terms in the Plan.~~

## B. Marketing and Bidding Process

~~As debtors in possession, the~~**The** Debtors have pursued an extensive marketing process for all of their assets, on both enterprise level and non-enterprise level bases. Over the course of ~~a seven~~**an eight**-month process, the Debtors ~~have been in contact with~~**contacted** more than 200 potential investors and plan sponsors. As a result of ~~these efforts, the Debtors have determined to enter~~**their robust marketing process, the Debtors received the following bids before the April 25, 2011 bid deadline (the "Bid Deadline") established by the Bidding Procedures Order:**

**A bid for the 45 hotels that serve as collateral for the Debtors' fixed rate mortgage loan and six of the seven hotels commonly referred to as the "Seven Sisters" (which include the five LNR Properties);**

- **Two bids for the LNR Properties;**

- **Six bids on multiple assets;**

- **Six bids on individual assets; and**

- **a bid for the 45 hotels that serve as collateral for the Fixed Rate Mortgage Loan and the 19 hotels that serve as collateral for the Floating Rate Mortgage Loan (collectively, the "Fixed/Floating Properties").**

**After the Bid Deadline, the Debtors reviewed all timely submitted bids and engaged in negotiations with entities that submitted bids satisfying the bid conditions established by the Bidding Procedures Order. After a formal auction at which the Debtors accepted the highest or otherwise best bids for the applicable assets, the Debtors reached agreement with two plan sponsors—Cerberus Capital Management, LP ("Cerberus") and Chatham Lodging Trust (together with Cerberus, "Cerberus/Chatham") for the Fixed/Floating Properties and Chatham Lodging LP ("Chatham LP"), a subsidiary of Chatham, for the LNR Properties.**

### 1. Fixed/Floating Auction Process

**On March 9, 2011, the Fixed/Floating Debtors initially entered** into a commitment letter (the "**Five Mile/Lehman Commitment Letter**") with Five Mile/Lehman and Midland for a stalking horse bid (the "**Five Mile/Lehman Bid**") for ~~64 of the Debtors' 71 hotels (the "~~**the** Fixed/Floating ~~Hotels")~~**Properties**), which ~~was approved by~~ the Bankruptcy Court **approved, in the Bidding Procedures Order,** as the stalking horse bid for the Fixed/Floating ~~Hotels pursuant to the *Order (I) Authorizing the Debtors to Enter into the Amended Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the Amended New Party/Midland Commitment Between the Debtors and Midland Loan Services, (III) Approving Fixed/Floating Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement to "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Expense Reserve*, entered March 11, 2011 [Docket No. 1011] (the "**Bidding Procedures Order**"). The Commitment Letter and the term sheet attached thereto form the basis for the Fixed/Floating Plan (as defined herein).~~ **Properties.**

**On April 8, 2011, per the agreement embodied in the Five Mile/Lehman Commitment Letter, the Debtors filed the Plan and the *Disclosure Statement for Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1093].**

**On April 25, 2011, Cerberus/Chatham submitted an overbid that the Debtors deemed a qualified overbid in accordance with the requirements set forth in the Bidding Procedures. Cerberus/Chatham submitted the only qualified overbid on the Fixed/Floating Properties.**

**On April 29, 2011, the Debtors named the Cerberus/Chatham overbid the baseline bid for the auction in accordance with the Bidding Procedures (the "Cerberus/Chatham Baseline Bid").**

Each of the hotels included in the Five Mile/Lehman Bid is collateral for the Debtors' Fixed Rate Mortgage Loan or Floating Rate Mortgage Loan. The Five Mile/Lehman Bid is valued at $970.7**Consistent with the Fixed/Floating Bidding Procedures, the Cerberus/Chatham Baseline Bid included only the Fixed/Floating Properties (and none of the Seven Sisters). The Cerberus/Chatham Baseline Bid was worth $978.7** million (including approximately $622.5 million of debt financing (the "~~Restructured Fixed Rate Note~~") and approximately $~~348.2~~**356.2** million of equity investment**, by Cerberus/Chatham**). Under the ~~Five Mile/Lehman~~**Cerberus/Chatham Baseline** Bid, **holders of** ~~Fixed Rate~~ **Pool** Mortgage Loan ~~holders will receive~~**Claims would have received** consideration of $622.5 million in the form of ~~the~~**a** ~~R~~restructured Fixed Rate Note and ~~the~~**holders of** Floating Rate Mortgage Loan ~~holder will~~**Claims would** receive consideration of $~~200.3~~**201.5** million in ~~equity and~~ cash. *Id.* **The Cerberus/Chatham Baseline Bid utilized Midland's "stapled financing."**

~~The Five Mile/Lehman Bid is subject to overbids and the Bidding Procedures Order also authorized bidding procedures by which the Debtors will conduct an auction for the Fixed/Floating Hotels. At this time, the Debtors are continuing to market the Fixed/Floating Hotels in order to solicit as many viable bids as possible before the April 25, 2011 bid deadline for bids for the Fixed/Floating Hotels. To the extent there are competing bids that are qualified in accordance with the Bidding Procedures Order, an auction will be held on May 2, 2011 at 10:*00 a.m. prevailing Eastern Time*.~~

~~The Debtors also have the ability to exercise their "fiduciary out" under the Commitment Letter, which allows them to pursue any alternative transaction and decline to pursue the Fixed/Floating Bid if, upon the determination by the Debtors' directors, trustees, or members, as applicable, the Debtors' fiduciary duties require them to do so. If the marketing process does not result in a higher or otherwise better bid for the Fixed/Floating Hotels and the Debtors do not otherwise choose to exercise their fiduciary out, the Debtors currently intend to proceed with the Fixed/Floating Plan. If the marketing process results in a higher or otherwise better bid for the Fixed/Floating Hotels, the Debtors will file amended versions of the Plan and this Disclosure Statement and seek to confirm and consummate such superior bid.~~

~~The Five Mile/Lehman Bid does not include those Debtors that own and/or lease the assets commonly known as the Anaheim Hilton Suites, Hilton Ontario, Residence Inn Mission Valley, Residence Inn Anaheim (Garden Grove), Doubletree Washington, DC, Residence Inn Tyson's Corner, and Homewood Suites San Antonio (commonly referred to collectively as, the "**Seven Sisters**").~~

~~Since approval of the Bidding Procedures Order, the Debtors have been working diligently to develop restructuring proposals for the Seven Sisters, with separate workstreams for the Anaheim Hilton Suites, the Ontario Hilton, and the remaining five of the Seven Sisters—Residence Inn Mission Valley, Residence Inn Anaheim (Garden Grove), Doubletree Washington, DC, Residence Inn Tyson's Corner, and Homewood Suites San Antonio (collectively, the "**Reorganizing Debtors**").~~

**With the receipt of the Cerberus/Chatham Baseline Bid, the Debtors proceeded with an auction for the Fixed/Floating Properties in accordance with the Bidding Procedures Order on May 2, 2011. After twelve rounds of competitive bidding between Five Mile/Lehman and Cerberus/Chatham, the Debtors closed the auction for the Fixed/Floating Properties after an unchallenged bid from Cerberus/Chatham valued at $1.12 billion (the "Cerberus/Chatham Successful Bid"). The auction process thus yielded approximately $154 million in value over and above the Five Mile/Lehman stalking horse bid.**

**2.      LNR Properties Auction Process**

**In the days immediately following the Court's entry of the Bidding Procedures Order, the Debtors continued their efforts to market all of their assets, including the LNR Properties, on both an enterprise level and on an individual property basis, to achieve the most value-maximizing outcome for stakeholders. Moelis & Company LLC ("Moelis"), the Debtors' financial advisor, sent to over 125 potential investors a letter**

**summarizing the process by which the Debtors would solicit and evaluate restructuring proposals, both with respect to overbids to the Five Mile/Lehman Bid and additional bids.[3]**

As ~~to the Anaheim Hilton, the Debtors are considering various restructuring alternatives, which include a sale of the property through the Anaheim Plan or giving the collateral securing the Secured Anaheim Hotel Mezzanine Loan Claims to TriMont Real Estate Advisors, Inc. ("**TriMont**"), the special servicer under the Anaheim Hotel Mezzanine Loan.  The Debtors are working with TriMont and CWCapital Asset Management LLC ("**CWCapital**")—the special servicer under the Anaheim Hilton Mortgage Loan—to refine this process.  If the Debtors reach an agreement to give the collateral securing the Anaheim Hotel Mezzanine Loan to TriMont, TriMont will likely satisfy all claims of the Anaheim Hotel Owner in full in cash, including those of CWCapital and the general unsecured creditors against the Anaheim Hotel Owner.  With respect to a potential sale of the Anaheim Hilton, the Debtors have received several indications of interest.  The Debtors have informed potential investors of their intended process of selecting a stalking horse for purchase of the property through a plan of reorganization.  The Debtors are cautiously optimistic that, based on the indications of interest received to date, they will be able to choose a stalking horse bid for the Anaheim Hilton that will provide sufficient cash to satisfy the allowed claims of CWCapital and the general unsecured claims against the Anaheim Hotel Owner in full in Cash.  The Debtors expect to finalize a strategy with respect to the Anaheim Hilton in the coming weeks.~~ **a result of the Debtors' marketing efforts, the Debtors anticipated they might receive bids for the LNR Properties in connection with bids for the Fixed/Floating Properties and that the winning bid at the auction for the Fixed/Floating Properties could encapsulate the LNR Properties.  On April 12, 2011 by way of an updated process letter,[4] the Debtors informed all potential bidders of the possibility the Debtors could** *hold a concurrent auction for* **the LNR Properties, to the extent the Debtors determined such an auction would be value-maximizing, on May 2, 2011.  The Debtors encouraged potential bidders to submit formal bids on or before April 25 (the bid deadline approved in the Bidding Procedures Order with respect to overbids on the Five Mile/Lehman Bid).**

**Moelis's marketing effort generated several indications of interest for one or more of the LNR Properties.  The Debtors next sent ten potential bidders a form asset purchase agreement and requested preliminary mark-ups by April 18, 2011.**

**On or before April 18, 2011, the Debtors received initial mark-ups of the form asset purchase agreement from eight bidders for the LNR Properties or a subset thereof.  Over the next several days, the Debtors reviewed and analyzed the mark-ups and conducted calls with each bidder to discuss their proposed bids, reiterating their request for final, irrevocable bids by April 25.**

**On or before April 25, 2011, the Debtors received 16 bids (exclusive of the Five Mile/Lehman stalking horse bid) in total, including Cerberus/Chatham's Baseline Bid for the Fixed/Floating Properties and bids for** *a combination of assets different from those contained in the Five Mile/Lehman Bid* **and for individual hotels.  From April 25, 2011 through May 2, 2011, the Debtors and their advisors analyzed each bid, shared each bid with the Creditors Committee, and communicated regularly with bidders to negotiate and resolve open issues.**

**On May 3, 2011, after concluding the auction for the Fixed/Floating Properties, the Debtors commenced the LNR Auction.  Of the bids received for the LNR Properties, the highest and best offer came from Chatham L.P. (the "Chatham Bid").  With a purchase price of $195 million, the Chatham Bid provided baseline recoveries for all constituents holding claims against or interests in the Debtors that currently own the LNR Properties.**

**The Debtors received a competing bid of $72 million for two of the LNR Properties: the Doubletree in Washington, D.C. and the Residence Inn in Tyson's Corner, Virginia.  The Debtors determined, in their**

---

**[3]** *See Notice of Process Update Letter* **[Docket No. 1027].**

**[4]** *See Notice of Process Update Letter* **[Docket No. 1102].**

reasonable business judgment, that the Chatham Bid was a higher or otherwise better bid, and closed the auction on the afternoon of May 3, 2011 after no other bids were received.

      **3.**       **Financing Utilized in Successful Bids**

The Debtors actively assisted bidders in their efforts to obtain financing to fund all or a portion of their bids. In the months leading up to the Auction, the Debtors contacted 11 potential financing sources to explore their willingness to provide financing to potential purchasers. The prepetition secured creditors—Midland and LNR—were the most willing to provide financing on reasonable terms.

Pursuant to the Five Mile/Lehman Commitment Letter and the Five Mile/Midland Commitment, Midland agreed to make "stapled financing" available to competing bidders submitting qualified bids at the Auction. The amount of Midland financing available to a competing bidder was to be determined by a sliding scale beginning at $622.5 million plus 70% of any overbid amount minus $15 million, provided that the debt-capitalization ratio of the Fixed/Floating Debtors would not exceed 70%.

Similarly, LNR established criteria to make financing available for certain bidders submitting bids on all of the LNR Properties.

At the Auction, the Debtors facilitated meetings between both Midland and Cerberus/Chatham (the only qualified bidder for the Fixed/Floating Hotels other than Five Mile/Lehman), as well as LNR and potential bidders on the LNR Properties, to discuss the terms of the respective financing packages.

Cerberus/Chatham utilized the Midland Financing in its successful bid for the Fixed/Floating Hotels. Specifically, Cerberus/Chatham entered into a new non-recourse mortgage loan agreement in an amount of $[___] million that restructured the prior Fixed Rate Mortgage Loan and that included, among others, the following key terms:

- a 6.71% interest rate, which is unchanged from the previous mortgage loan;

- a maturity date of July 9, 2017, which is also unchanged from the previous mortgage loan;

- interest-only payments for the first 48 months of the loan; and

- prepayment of the loan is available at par without penalty.

Chatham L.P. utilized the LNR Financing in its successful bid for the LNR Properties and agreed to pay down the principal balance of the loans secured by the LNR Properties by no less than the following amounts:

- Garden Grove: $5,000,000.00;

- Mission Valley: $7,000,000.00;

- San Antonio: $5,600,000.00;

- Tysons Corner: $2,000,000.00; and

- Washington, D.C.: $5,400,000.00.

Chatham L.P. also agreed to assume the loans secured by the LNR Properties in the following amounts:

- Garden Grove: $32,416,576.45;

- **Mission Valley: $40,168,769.26;**

- **San Antonio: $18,462,695.40;**

- **Tysons Corner: $23,057,021.67; and**

- **Washington, D.C.: $20,054,752.20.**

*C.* **Anaheim and Ontario**

**Simultaneously with the marketing processes for the Fixed/Floating Hotels and the LNR Properties, the Debtors continued to address restructuring alternatives for the Anaheim Hilton Suites and the Ontario Hilton.**

**1. Anaheim Hilton Suites**

**As to the Anaheim Hilton Suites, the Debtors initially engaged in an extensive marketing process— generating five proposals for or including the Anaheim property. The Debtors, however, subsequently reached an agreement-in-principle with Lehman Brothers Holdings, Inc. ("LBHI"), the entity that controls the Anaheim Hotel Mezzanine Loan Agreement, and CWCapital, the special servicer under the Anaheim Hotel Mortgage Loan Agreement, to turn over the Anaheim Hilton Suites to LBHI and to consensually resolve all related claims.**

**LBHI and CWCapital have agreed in principle to enter into a commitment letter and term sheet regarding the restructuring of the Anaheim Hotel Debtors. Under that agreement, all of the assets of the Anaheim Hotel Debtors would be transferred, assumed, and assigned to a newly formed holding company controlled by LBHI. The holding company would assume substantially all of the obligations under the Anaheim Hotel Mortgage Loan Agreement (_subject to certain exceptions_) and CWCapital's Claims would be paid in full in Cash in exchange for releasing its rights, claims, and liens under the Anaheim Hotel Mortgage Loan Agreement and transferring the deed to the Anaheim Hilton Suites to the holding company controlled by LBHI. LBHI has yet to determine the ultimate corporate structure of the holding company, but will have complete authority and control over the management and operations of the Anaheim Hilton Suites. The entry into and execution of the restructuring contemplated by the term sheet are conditioned on the avoidance of certain termination events including the following: (a) LBHI's receipt of and satisfaction with certain due diligence materials; (b) failure to gain entry of an order confirming the Plan with respect to the Anaheim Hotel Debtors on or before July 31, 2011; (c) the dismissal or conversion of the Anaheim Hotel Debtors' chapter 11 cases; or (d) the termination of exclusivity for any of the Anaheim Hotel Debtors unless supported by LBHI and CWCapital. If the commitment letter or term sheet is terminated before LBHI's review of the due diligence is complete or if the due diligence is not acceptable to LBHI, CWCapital and LBHI agree in principle to sell the Anaheim property for Cash through an auction pursuant to section 363 of the Bankruptcy Code following a 45-day marketing process.**

**2. Ontario Hilton**

As to the Ontario Hilton, ~~the Ontario Plan contemplates the turnover of the Ontario Hilton to C-III Asset Management LLC ("C-III")~~ **C-III,** the special servicer under the Ontario ~~Hotel~~**Hilton** Mortgage Loan~~. Over the next several weeks, the Debtors also intend to continue to market the Ontario Hilton and further explore the possibility of a sale of the asset~~**, has agreed to take the Ontario Hilton and make a cash distribution to fund a small percentage recovery for the unsecured creditors with claims related to the Ontario Hilton**.

~~As to the Reorganizing Debtors, the Debtors are presently exploring multiple restructuring options, including, among other things, (a) reinstatement of the Claims against and Interests in the Reorganizing Debtors or (b) the sale of some or all of the Reorganizing Hotels with distributions of the sale(s) made in accordance with the Distribution Waterfall. The Debtors are actively marketing the Reorganizing Hotels pursuant to a thorough process~~

~~designed to generate as many viable bids as possible and maximize value to the Reorganizing Debtors' estates. The Reorganizing Debtor Plan therefore currently contemplates alternate reinstatement or sale strategies.~~

~~In furtherance of these efforts, Moelis has sent out a call for offers to over 200 potential buyers, outlining the timing for bids and encouraging potential buyers to submit bids for any or all of the assets. As a result of these efforts, the Debtors anticipate a number of qualified and non-qualified bids that may be for the entire enterprise, a particular pool, *a combination of assets different from those contained in the Five Mile/Lehman Bid*, or an individual hotel. Moelis has requested that interested bidders submit their irrevocable bids prior to April 25, 2011. To the extent the Debtors believe, in an exercise of their business judgment, that proceeding with an auction including such bids will be value-maximizing, the Debtors may *hold a concurrent auction for* those bids on May 2, 2011. That auction may or may not overlap with the auction for the Fixed/Floating Hotels. Moelis is in the process of informing potential non-qualified bidders that such an auction may take place on May 2, 2011.~~

~~As a result of thorough plan and subsequent marketing processes pursued by the Debtors over the past seven months, the Debtors are hopeful that the results of the continuing marketing process will reflect a robust market test of the value of the Debtors' assets.~~

### **D.** ~~A.~~ *Summary of the Joint Plans*

The Plan contemplates ~~four~~**five** separate Joint Plans of reorganization that together provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases.~~4~~**5** Among other things, the Plan provides for the following recoveries and other transactions:

1. Joint Plan for the Fixed/Floating Debtors

The Fixed/Floating Debtors are primarily Debtors related to the hotels serving as collateral for the Fixed Rate Pool Mortgage Loan and the Floating Rate Pool Mortgage Loan. The Joint Plan for the Fixed/Floating Debtors (the "**Fixed/Floating Plan**") contemplates the recapitalization of the Fixed/Floating Debtors through debt conversion and infusions of new capital. The Fixed/Floating Plan reflects the ~~support of the Debtors' two largest secured creditors, Midland and Lehman, who hold combined prepetition claims in the face amount of~~**results of the Auction held on May 3, 2011, at which the Cerberus and Chatham proposed a successful bid valued at** approximately $~~970 million.5~~**1.12 billion.**

- **Cerberus and Chatham will together contribute $[___] million in cash as an equity investment to fund distributions pursuant to the Fixed/Floating Plan and the post-emergence operations of the Fixed/Floating Debtors.**

- Postpetition secured lender Claims:

  o The $17.5 million postpetition credit facility provided by an affiliate of Lehman (the "**Lehman DIP Facility**") will be repaid in full in Cash; and

  o Tranche A of the $53.0 million postpetition credit facility provided by Five Mile (the "**Five Mile DIP Facility**" and, together with the Lehman DIP Facility, the "**DIP Facilities**"),

---

~~4~~**5** Each of the Joint Plans discussed herein is severable from each other and the Confirmation and Consummation of any one of the four Joint Plans is not conditioned on the Confirmation or Consummation of any one or more of the other Joint Plans.

~~5     The consensual terms of the restructuring are conditioned upon certain requirements and events as set forth in the Commitment Letter attached hereto as **Exhibit F** (which was approved, as amended, by the Bidding Procedures Order [Docket No. 1009], attached hereto as **Exhibit G**), including that the form of the confirmation order for the Fixed/Floating Plan be acceptable to Lehman and Five Mile, whose consent will not be withheld unreasonably.~~

which tranche is secured by liens on hotels owned or operated by the Fixed/Floating Debtors, will be repaid in full in Cash.

- Prepetition secured lender Claims:

  o Midland, the Debtors' largest creditor, will receive **(a)** a new note reducing principal amount owing under the Fixed Rate Mortgage Pool Loan from $825.4 million to ~~at least $622.5~~**$[____]** million with no change to the interest rate, no amortization for the first 48 months after the Effective Date, and no prepayment penalty**, (b) $[____] million in Cash**; and

  o Lehman, the Debtors' second-largest creditor, will receive **a Cash payment of $[____] million** in exchange for 100% of its Claim against the Fixed/Floating Debtors on account of the Floating Rate Pool Mortgage Loan ~~(a) up to 50% of new equity in the Reorganized Fixed/Floating Debtors (subject to adjustment for the Third-Party Investment) and (b) a Cash payment of $26.2 million.~~

- ~~New money:~~

  o ~~Five Mile will receive 50% of the new equity in the Reorganized Fixed/Floating Debtors (subject to adjustment for the Third-Party Investment) in exchange for a new money Cash investment of $174.1 million; and~~

  o ~~A third party may participate in the restructuring by making a Cash purchase of up to 20% of the equity that would otherwise be allocated to Lehman and Five Mile, pursuant to which purchase the amount of new equity and Cash received by Lehman will be adjusted correspondingly.~~

- Certain other Claims and Interests:

  o Holders of Floating Rate Pool Mezzanine Loan Claims will receive a ~~structured note or other debt or equity instrument or other consideration on terms to be agreed upon by Lehman, Five Mile, and the Debtors~~**Cash payment of $[____] million**;

  o Each Holder of General Unsecured Claims against the Fixed/Floating Debtors will receive ~~the lesser of (a)~~ its Pro Rata share of $~~3.75 million and (b) 65% of the face amount of the Holder's Allowed General Unsecured Claims against the Fixed/Floating Debtors~~**4.65 million** (excluding any deficiency Claims)**, with Holders of such Claims against Debtor Grand Prix West Palm Beach LLC receiving only their Pro Rata share of $100,000**;

  o Each Holder of General Unsecured Claims against the Fixed/Floating Debtors will receive a release and waiver by the Reorganized Fixed/Floating Debtors of all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code;

  o Intercompany Claims and Interests will not receive any distributions and will be canceled, except that the Debtors may reinstate Intercompany Interests to the extent necessary to preserve certain elements of the Fixed/Floating Debtors' organizational structure; and

  o There will be no distribution to Holders of existing common or preferred equity interests in the Fixed/Floating Debtors.

- The Fixed/Floating Plan provides for mutual releases by the following parties in their respective capacities as such:  (a) the Lehman DIP Lenders; (b) **Five Mile; (c)** the Five Mile DIP Agent; (~~e~~**d**) the Five Mile DIP Lenders; (~~d) the Debtors, (e) Lehman, in its capacity as Holder of Claims~~ *under the*

~~*Floating Rate*~~ Mortgage Loan Agreement, ~~(f) Five Mile, (g) Midland~~ **e) the Debtors; (f) Lehman; (g) New HoldCo and each of the Fixed/Floating Plan Sponsors; (h) Midland;** (~~h~~**i**) the master servicer for the C6 and C7 Trusts~~;~~ (~~i~~**j**)~~the~~ the trustees for the C6 and C7 Trusts~~, (j~~**; (k)** the C6 and C7 Trusts, ~~(k~~**; (l)** TriMont, in its capacity as special servicer for the Floating Rate Pool Mezzanine Loan Agreement; (~~l~~**m**) Apollo; (~~m~~**n**) the Committee; (~~n~~**o**) the Independent Committee; (~~o~~**p) SASCO, as holder of all economic and beneficial interests or lender of record** *under the Floating Rate* **Pool Mezzanine Loan Agreement; (q)** all other Holders of Claims against or Interests in the Fixed/Floating Debtors; (~~p~~**r**) the officers, directors, trustees, and members of the Debtors; and (~~q~~**r**) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals. **For the avoidance of doubt, certificateholders in the C6 and C7 Trusts, in their capacity as such, are not Fixed/Floating Releasing Parties.**

- To be clear, the **Holders of Innkeepers USA Trust Preferred C Interests (the "Preferred C Shareholders")** are not giving a release to any party under the Fixed/Floating Plan. The release does not include a waiver of rights by any releasing party with respect to the $7.4 million in Cash currently held in the LP Bank Account. The non-~~ ~~Fixed/Floating Debtors are only giving a release to the extent they hold Intercompany Claims against or Intercompany Interests in the Fixed/Floating Debtors. ~~Island Hospitality Management, Inc. will not be entitled to the benefits of the release under the Fixed/Floating Plan unless it reasonably cooperates with Five Mile, Lehman, the Fixed/Floating Debtors, New HoldCo, and any new manager of the Fixed/Floating Debtors' properties.~~ These releases will be granted on the Effective Date of the Fixed/Floating Plan.

- As described in Article IV.~~I~~**L** below, the Plan also provides for Midland to release Apollo in exchange for a Cash payment by the Debtors to Midland of $3.0 million. This release will be effective upon the receipt of the $3.0 million Cash payment, which shall be made on the Effective Date of the Fixed/Floating Plan.

- The Plan also provides for a Cash payment of $2.5 million by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland as consideration for effecting the restructuring of the Fixed Rate Pool Mortgage Loan Agreement on behalf of the C6 and C7 Trusts.

2. <u>Joint Plan for the Anaheim Hotel Debtors</u>

The Anaheim Hotel Debtors are the Debtors that finance, own, and lease the Hilton Suites hotel in Anaheim, California (the "**Anaheim Hotel**"). ~~The Debtors are presently exploring multiple restructuring options for the Anaheim Hotel, which options include, among other things, (a) the sale of the Anaheim Hotel and the distribution of sale proceeds to Holders of applicable Claims or (b) giving the collateral securing the Secured Anaheim Hotel Mezzanine Loan Claims to TriMont, the special servicer under the Anaheim Hotel Mezzanine Loan.~~

~~(a)      Sale of the Anaheim Hotel~~

~~The Debtors are actively marketing the Anaheim Hotel pursuant to a thorough process designed to generate as many viable bids as possible and maximize value to the Anaheim Debtors' estates.~~

- ~~Anaheim Hotel Mezzanine Loan Claims shall receive their entitled Pro Rata distribution of the purchase consideration for the Anaheim Hotel, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Mezzanine Debtor;~~

- ~~Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor shall receive the Holder's entitled Pro Rata distribution of the Anaheim Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Mezzanine Debtor; and~~

- Intercompany Interests in the Anaheim Hotel Owner shall receive the Holder's entitled Pro Rata distribution of the Anaheim Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Owner.

(b) TriMont Receives its Collateral

The Debtors are in negotiations with TriMont and CWCapital, the special servicer under the Anaheim Mortgage Loan, to give the collateral securing the Secured Anaheim Hotel Mezzanine Loan Claims to TriMont in satisfaction of the Secured Anaheim Mezzanine Loan Claims. If the Debtors pursue this strategy, TriMont would agree to satisfy in full in Cash the Secured Anaheim Hotel Mortgage Loan Claims and the General Unsecured Claims against the Anaheim Hotel Owner.

- Holders of Anaheim Hotel Mezzanine Loan Claims receive the collateral securing the Anaheim Hotel Mezzanine Loan Claims;

- Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor will receive a distribution agreed to by the Holder of the Secured Anaheim Mezzanine Loans Claims; and

- Intercompany Interests in the Anaheim Hotel Owner will not receive any distribution on account of such Intercompany Interests; provided that, for the avoidance of doubt, the Holder of the Secured Anaheim Hotel Mezzanine Loan will receive the Intercompany Interests in the Anaheim Hotel Owner as the Intercompany Interests in the Anaheim Hotel Owner are the collateral securing the Secured Anaheim Hotel Mezzanine Loan Claims.

Regardless of whether and to what extent the Anaheim Plan is consummated via the sale of the Anaheim Hotel or through an agreement with TriMont, the Anaheim Plan provides that:
**The Joint Plan for the Anaheim Hotel Debtors contemplates the following:**

- Holders of Anaheim Hotel Mortgage Loan Claims will be paid in full in cash on the Effective Date or as soon as reasonably practical thereafter as a result of sale of the Anaheim Hotel, if consummated, or other transaction;**Mortgage and Mezzanine Claims;**

  o **Holders of Secured Anaheim Hotel Mortgage Loan Claims shall in accordance with the Anaheim Hotel Commitment Letter enter into the assumed, amended, restated, and/or supplemented Anaheim Hotel Mortgage Loan Agreement, the form and terms of which assumption shall include the terms and conditions set forth in the Anaheim Hotel Commitment Letter and substantially be set forth in the Anaheim Hotel Assumption Documents included in the Plan Supplement, pursuant to which the new amended or restated note or notes shall be issued to the Holders of Allowed Anaheim Hotel Mortgage Loan Claims;**

  o **Holders of Secured Anaheim Hotel Mezzanine Loan Claims receive the collateral securing the Anaheim Hotel Mezzanine Loan Claims;**

  o *Anaheim Hotel Mezzanine Loan Deficiency Claims will receive no distribution;*

- *Holders of General Unsecured Claims against the Anaheim Hotel Owner will be paid in full in cash on the Effective Date or as soon as reasonably practical thereafter* as a result of a sale of the Anaheim Hotel, if consummated, or other transaction;**Unsecured Claims**

  o *Holders of General Unsecured Claims against the Anaheim Hotel Owner will be paid in full in cash on the Effective Date or as soon as reasonably practical thereafter***;**

  o **Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor will receive no distribution and will be canceled;**

- o ~~●~~ Holders of General Unsecured Claims against the Anaheim Hotel Lessee will receive such Holders' entitled Pro Rata distribution of the Anaheim Hotel Lessee Unencumbered Assets, if any, which distribution will be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Lessee;

- *~~Anaheim Hotel Mezzanine Loan Deficiency Claims will receive no distribution.~~***Intercompany Claims and Interests**

  - o ~~●~~ Intercompany ~~Claims~~**Interests** in the Anaheim Hotel Debtor~~s~~ will receive no distribution and will be canceled; **and**

- ~~●~~ ~~Intercompany Interests in the Anaheim Hotel Lessee will receive such Holders' entitled Pro Rata distribution of the Anaheim Hotel Lessee Unencumbered Assets, if any, which distribution will be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Lessee;~~

    - o ~~●~~ Intercompany Interests in the Anaheim Mezzanine Debtor **and the Anaheim Hotel Lessee** will be canceled, released, and extinguished as of the Effective Date; and

- The **Anaheim Plan provides for mutual releases by the** following parties ~~will provide mutual releases~~ in their respective capacities as such:  (a) the Debtors, (b)**;** CWCapital, (c) TriMont, in its capacity as servicer for the Anaheim Hotel Mezzanine Loan **Agreement**; (d) Apollo~~, (e~~**; (e)** **SASCO, as holder of all economic and beneficial interests or lender of record under the Anaheim Hotel Mezzanine Loan Agreement; (f)** the Independent Committee~~;~~**;** (~~f~~**g**) all other Holders of Claims against or Interests in the Anaheim Hotel Debtors; (~~e~~**h**) the officers, directors, trustees, and members of the Debtors; and (h**i**) each of the foregoing ~~parties~~**entities'** respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

- To be clear, the Preferred C Shareholders are not giving a release to any party under the Anaheim Plan.  The release does not include a waiver of rights by any releasing party with respect to the $7.4 million in Cash currently held in the LP Bank Account.  Non-Anaheim Debtors are only giving a release to the extent they hold Intercompany Claims against or Intercompany Interests in the Anaheim Hotel Debtors.  These releases will be granted on the Effective Date of the Anaheim Plan.

3.    Joint Plan for the Ontario Hotel Debtors

The Ontario Hotel Debtors are the Debtors that own and lease the Hilton in Ontario, California (the "**Ontario Hotel**").  The Joint Plan for the Ontario Hotel Debtors (the "**Ontario Plan**") contemplates the turnover of the Ontario Hotel to Holders of Claims arising from the Ontario Hotel's mortgage loan in satisfaction of such Claims.

- Holders of Ontario Hotel Mortgage Loan Claims will receive a deed in lieu of foreclosure in the form attached hereto as <u>Schedule I</u> with respect to the collateral (in substantial part, the Ontario Hotel) securing the Ontario Hotel Mortgage Loan;

- All Classes of Claims relating to the Ontario Hotel that are junior to the Class of Ontario Hotel Mortgage Loan Claims will not receive any distributions, except that Holders of General Unsecured Claims against the Ontario Hotel Owner receive their Pro Rata share of the Ontario Hotel Unsecured Claim Fund and General Unsecured Claims against the Ontario Hotel Lessee will receive their Pro Rata share of the Ontario Hotel Unsecured Claim Fund and such Holders' entitled Pro Rata distribution of the Ontario Hotel Lessee Unencumbered Assets, if any, which distribution will be made in accordance with the Distribution Waterfall as it applies to the Ontario Hotel Lessee;  and

- The Ontario Plan provides for mutual releases by the following parties in their respective capacities as such:  (a) the Debtors~~;~~**;** (b) C-III~~;~~**;** (c) Apollo~~;~~**;** (d) the Independent Committee; (e) all other Holders

of Claims against or Interests in the Ontario Hotel Debtors; (f) the officers, directors, trustees, and members of the Debtors; and (g) each of the foregoing ~~parties~~**entities**' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

- To be clear, the Preferred C Shareholders are not giving a release to any party under the Ontario Plan. The release does not include a waiver of rights by any releasing party with respect to the $7.4 million in Cash currently held in the LP Bank Account. Non-Ontario Debtors are only giving a release to the extent they hold Intercompany Claims or Intercompany Interests in the Ontario Hotel Debtors. These releases will be granted on the Effective Date of the Ontario Plan.

4. <u>Joint Plan for the Re~~org~~**main**~~iz~~ing Debtors</u>

The Re~~org~~**main**~~iz~~ing Debtors are primarily those Debtors that own or operate the following five hotels: the Residence Inn in Garden Grove, California; the Residence Inn in San Diego, California; the Doubletree in Washington, District of Columbia; the Residence Inn in Tyson's Corner, Virginia; and the Homewood Suites in San Antonio, Texas (collectively, the "~~Reorganizing Hotels~~**LNR Properties**").

~~The Debtors are presently exploring multiple restructuring options for the Reorganizing Hotels, which options include, among other things, (a) the sale of some or all of the Reorganizing Hotels or (b) reinstatement of Claims and Interests against some or all of the Reorganizing Debtors.~~

~~(a) Sale of some or all of the Reorganizing Hotels~~

~~The Debtors are actively marketing the Reorganizing Hotels pursuant to a thorough process designed to generate as many viable bids as possible and to maximize the value of the Reorganizing Debtors' estates. To the extent such a sale or sales is or are consummated, the Reorganizing Debtor Plan may provide, among others,~~

**On May 3, the Debtors held an auction at which Chatham L.P. proposed a bid for the LNR Properties with a purchase price of $195 million. The Debtors entered into an asset purchase agreement with Chatham LP (the "Chatham APA"), which will serve as a stalking horse bid for the LNR Properties. On May 6, the Debtors filed a motion seeking certain bid protections for Chatham LP [Docket No. 1205] as the Debtors continue to review potential higher and better bids for the LNR Properties. If the Debtors do not receive any superior proposals, the Chatham Bid will become the successful bid for the LNR Properties. Pursuant to the Chatham Bid and the Chatham APA, Chatham LP will purchase the LNR Properties and related assets for a total purchase price of $195 million. In connection with the Chatham Bid, Chatham LP and LNR have agreed to the modification, assumption, and assignment of the mortgage loans serviced by LNR to Chatham.**

**Pursuant to the Chatham Bid and the Chatham APA, the LNR Properties' Plan provides for** the following treatments~~.~~

- ~~Tranche B of the Five Mile DIP Facility, which tranche is secured by liens on the Residence Inn in San Diego, California, will be repaid in full in Cash~~**;**~~.~~

- ~~Tranche C of the Five Mile DIP Facility, which tranche is secured by liens on the Residence Inn in Tyson's Corner, Virginia, will be repaid in full in Cash.~~**Chatham LP will assume amended, restated, and/or supplemented mortgage loan agreements with Holders of secured mortgage loan claims for each of the five LNR Properties in the following amounts:**

  - **Garden Grove: $32,416,576.45;**

  - **Mission Valley: $40,168,769.26;**

  - **San Antonio: $18,462,695.40;**

- o **Tysons Corner: $23,057,021.67; and**

- o **Washington, D.C.: $20,054,752.20.**

- ~~Holders of Claims arising from mortgage loans to the Reorganizing Debtors will receive either (a) their Pro Rata share of Cash generated or debt assumed pursuant to the sale of an applicable Reorganizing Hotel or (b) if no such sale is consummated, the reinstatement of their Claims in accordance with section 1124 of the Bankruptcy Code. Any Cash distributed from the sale of a Reorganizing Hotel will be distributed according to the Distribution Waterfall;~~**Chatham LP will make a Cash payment to the Remaining Debtors in the total amount of approximately $35.8 million.**

- **Generally,** Holders of General Unsecured Claims against the Re~~org~~**ma**~~iniz~~ing Debtors will receive ~~proceeds of the sale of an applicable Reorganizing Hotel~~**the Chatham Hotel Sale Transaction Purchase Consideration receive by the applicable Remaining Debtor through the Distribution Waterfall, as well as other unencumbered assets, if any, also** in accordance with the Distribution Waterfall~~, to the extent that such proceeds are available for distribution after satisfying applicable mortgage loan Claims~~;

- *Intercompany Claims in the* **Remaining Debtors will receive no distribution and will be canceled;**

- *Intercompany Claims in the* ~~Reorganizing Debtors~~**Preferred Equity Interests in Innkeepers USA LP** will receive no distribution and will be canceled; and

- Preferred Equity Interests in Innkeepers USA Trust will receive Cash from the ~~sale of the Reorganizing Hotels~~**Chatham Hotel Sale Transaction Purchase Consideration and certain other assets, if any,** in accordance with the Distribution Waterfall~~, to the extent such proceeds are available for distribution after satisfying applicable mortgage loan Claims~~.

~~(b)        Reinstatement of Claims and Interests against the Reorganizing Debtors~~

~~To the extent the Reorganizing Debtors do not consummate any or all of the sales contemplated by the Reorganizing Debtor Plan, Claims against and Interests in the Reorganizing Debtors will be reinstated and rendered unimpaired.~~

- ~~To the extent the Debtors elect to reinstate Claims and Interests (rather than consummate a sale of the Reorganizing Hotels), all Claims and Interests against the Reorganizing Debtors (except Administrative, Other Priority Claims, and Intercompany Claims), including applicable Five Mile DIP Claims, mortgage loan claims, General Unsecured Claims, and preferred and common equity Interests, will be reinstated and rendered unimpaired. The treatment for the Holders of Innkeepers USA LP Preferred D Interests, whose interests will be reinstated and rendered unimpaired, will include the cooperation of the lenders in permitting the Debtors to provide Holders of Innkeepers USA LP Preferred D Interests with the ability to replace those guaranties in effect as of the Petition Date. Intercompany Claims in the Reorganizing Debtors will receive no distribution.~~

- ~~Regardless of whether and to what extent the Reorganizing Debtor Plan is consummated via the sale of assets or reinstatement, the Reorganizing~~**The Remaining** Debtor Plan provides for mutual releases by the following parties in their respective capacities as such: (a) **Chatham; (b)** the Five Mile DIP Agent; (~~b~~**c**) the Five Mile DIP Lenders; (~~e~~**d**) the Debtors~~;~~**;** (d)~~, LNR; (e) Apollo, (f) the Independent Committee, (g~~ **LNR, in its capacity as special servicer for the Garden Grove Hotel Mortgage Loan Agreement, the San Antonio Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the Washington DC Hotel Mortgage Loan Agreement; (e) the LNR-Serviced Trusts; (f) the master servicer for the Garden Grove Hotel Mortgage Loan Agreement, the San Antonio**

**Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the Washington DC Hotel Mortgage Loan Agreement; (g) Apollo; (h) the Independent Committee; (i)** all other Holders of Claims against or Interests in the Re~~org~~**main**~~iz~~ing Debtors; (h**j**) the officers, directors, trustees, and members of the Debtors; and (i**k**) each of the foregoing ~~parties~~**entities**' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals. ~~If the Preferred C Shareholders are impaired under the Reorganizing Debtor Plan and vote in favor of such plan, they will be bound by the release. If the Preferred C Shareholders are impaired and vote to reject the Reorganizing Debtor Plan, they will not be bound by the release. The release does not include a waiver of rights by any releasing party with respect to the $7.4 million in Cash currently held in the LP Bank Account. These releases will be effective on the Effective Date of the Reorganizing Debtor Plans.~~

5.  Further Information about the Plan

Confirmation and Consummation of the Plan are subject to certain material conditions precedent described in Article IX of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including the Plan (which is expressly incorporated into and made a part of this Disclosure Statement) and Article VIII herein entitled "Certain Risk Factors To Be Considered Prior To Voting" prior to submitting your ballot to vote to accept or reject the Plan. The Debtors urge you to consult with your own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the transactions contemplated thereby.

The Debtors will File a Plan Supplement with the Bankruptcy Court prior to the voting deadline. The Plan Supplement will include documents and forms of documents, schedules, and exhibits to the Plan, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) a list of Causes of Action to be retained by the Post-Effective Date Debtors; (b) a list of Executory Contracts and Unexpired Leases to be assumed by and assigned to the Post-Effective Date Debtors and their respective Cure Obligations; (c) the Corporate Structure Summary; (d) the New Fixed/Floating By-Laws; (e) the New Fixed/Floating Organizational Documents; (f) ~~to the extent contemplated by the Fixed/Floating Successful Bid,~~ the forms of the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Notes, and the New Fixed Rate Pool Mortgage Loan Limited Guaranty; (g) the Hotel Sale Transaction Documents; (h) ~~documents related to a rights offering or new mezzanine financing to the extent the Debtors determine to go forward with a rights offering or new mezzanine financing in connection with the Plan as applicable to the Reorganizing Debtors; (i)~~ the Transition Services Agreement; and (i**i**) to the extent known, with respect to members of the New HoldCo Board and the Post-Effective Date Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.

Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan. If the Plan is confirmed by the Bankruptcy Court and Consummation occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests that do not submit ballots to accept or reject the Plan, or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the proposed transactions contemplated thereby.

The Plan and all documents to be executed and/or delivered in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

**E.** ~~B.~~ *Questions and Answers Regarding this Disclosure Statement and the Plan*

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article V hereof);

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article III hereof);

- events leading to these Chapter 11 Cases, including the Debtors' restructuring negotiations (Article III hereof);

- significant events in the Debtors' chapter 11 cases (Article IV hereof);

- certain important effects of Confirmation of the Plan (Article V hereof);

- certain financial information about the Debtors, including financial projections (Article VI hereof and **Exhibit B** attached hereto);

- the statutory requirements for confirming the Plan (Article VII hereof);

- certain risk factors Holders of Claims should consider before voting to accept or reject and the Plan and information regarding alternatives to Confirmation of the Plan (Article VIII hereof); and

- certain United States federal income tax consequences of the Plan (Article X hereof).

In light of the foregoing, the Debtors believe the Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

**Am I entitled to vote to accept or reject the Plan? What percentage of my Claim will I receive from the Debtors if the Plan is Consummated?**

Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest that you hold. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. The remainder of Claims and Interests are classified into the Classes in the table immediately below.

**The following table is a summary of the classification, treatment, impairment status, voting rights, and potential distributions both under the Plan and pursuant to a liquidation under chapter 7 of the Bankruptcy Code. The amounts set forth below are estimates only. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests. The recoveries set forth below are projected recoveries and are therefore subject to change.**

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| | | | **Fixed/Floating Plan** | | | | |
| Class FF1 | Other Priority Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $[——]**0** | $[——]**0** | 100% | ~~100~~**0**% |
| Class FF2 | Other Secured Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $~~666,349~~**246,731** | $~~246,731~~**668,683** | 100% | ~~100~~**0**% |
| Class FF3A | Secured Fixed Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $839,561,635 | $839,561,635 | ~~75~~**87.7% to 87.8**% | **[**~~68.3%~~ **to 83.3**% |
| Class FF3B | Secured Floating Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $218,504,023 | $~~218,504,023~~**220,232,963** | ~~91~~**100**% | **[**~~82.1% to 99.8~~% |
| Class FF4 | Floating Rate Pool Mezzanine Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $131,345,438 | $131,345,438 | 0% **to 12.0**% | **[**~~0~~% |
| Class FF5 | General Unsecured Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $~~7,352,638~~**4,775,484** | $~~4,845,167~~**7,022,997** | **[**~~67.6% to 99.5~~% | **[**~~0~~% |
| Class FF6 | Mortgage Loan Deficiency Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $[——]**102,761,635** | $[——]**103,361,635** | 0% | **[**~~0~~% |
| Class FF7 | Intercompany Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $[——]**Unliquidated** | $[——]**Unliquidated** | 0% | **[**~~0~~% |
| Class FF8 | Section 510(b) Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $[——]**0** | $[——]**0** | 0% | **[**~~0~~% |
| Class FF9 | Interests in Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $[——]**N/A** | $[——]**N/A** | 0% | **[**~~0~~% |
| | | | **Anaheim Plan** $[——] | | | | |
| Class A1 | Other Priority Claims against Anaheim Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $[——]**0** | $[——]**0** | 100% | ~~100%~~**N/A** |
| Class A2 | Other Secured Claims against Anaheim Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $[——]**0** | $[——]**0** | 100% | ~~100%~~**N/A** |
| Class A3 | Secured Anaheim Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ | $13,172,577 | $13,172,577 | 100% | ~~100%~~**N/A** |

---

[6]  **Secured mortgage loan claim amounts reflect only principal and interest accrued through the Petition Date.**

[6]  ~~As required by section 1129(a)(7) of the Bankruptcy Code, to satisfy the so-called "best interests" test, the Debtors are presently reviewing estimated recoveries.~~[7]  **Estimated recoveries under a chapter 7 liquidation are not available for the Anaheim Plan or the Ontario Plan.  Nevertheless, the Debtors believe the transactions contemplated in the Anaheim Plan and the Ontario Plan provide recoveries greater than what would be available** under a chapter 7 liquidation.

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| Class A4 | Secured Anaheim Hotel Mezzanine Loan Claims | Impaired | Entitled to Vote | $22,640,833 | $22,640,833 | ~~[ ]%~~**N/A**[8] | ~~[ ]%~~**N/A** |
| Class A5A | General Unsecured Claims against Anaheim Hotel Owner | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ | $~~[ ]~~**0** | $~~[ ]~~**0** | ~~[ ]% to [ ]~~**0**% | ~~[ ]%~~**N/A** |
| Class A5B | General Unsecured Claims against Anaheim Mezzanine Debtor | Impaired | Entitled to Vote | $~~[ ]~~**0** | $~~[ ]~~**0** | ~~[ ]% to [ ]~~**0**% | ~~[ ]%~~**N/A** |
| Class A5C | General Unsecured Claims against Anaheim Hotel Lessee | Impaired | Entitled to Vote | $~~251,790~~**239,900** | $~~230,125~~**268,948** | ~~[ ]% to [ ]~~**100**% | ~~[ ]%~~**N/A** |
| Class A6 | Anaheim Hotel Mezzanine Loan Deficiency Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $~~[ ]~~**N/A** | $~~[ ]~~**N/A** | 0% | ~~[ ]%~~**N/A** |
| Class A7 | Intercompany Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $~~[ ]~~**Unliquidated** | $~~[ ]~~**Unliquidated** | 0% | ~~[ ]%~~**N/A** |
| ~~Class A8A~~ | ~~Section 510(b) Claims against Anaheim Hotel Owner~~ | ~~Unimpaired~~ | ~~Not Entitled to Vote (Presumed to Accept)~~ | ~~$[ ]~~ | ~~$[ ]~~ | ~~100%~~ | ~~[ ]%~~ |
| ~~Class A8B~~ | ~~Section 510(b) Claims against Anaheim Mezzanine Debtor~~ | ~~Impaired~~ | ~~Not Entitled to Vote (Deemed to Reject)~~ | ~~$[ ]~~ | ~~$[ ]~~ | ~~0%~~ | ~~[ ]%~~ |
| ~~Class A8C~~ | ~~Section 510(b) Claims against Anaheim Hotel Lessee~~ | ~~Impaired~~ | ~~Entitled to Vote~~ | ~~$[ ]~~ | ~~$[ ]~~ | ~~[ ]% to [ ]%~~ | ~~[ ]%~~ |
| ~~Class A9A~~ | ~~Intercompany Interests in Anaheim Hotel Owner~~ | ~~Unimpaired~~ | ~~Not Entitled to Vote (Presumed to Accept)~~ | ~~$[ ]~~ | ~~$[ ]~~ | ~~100%~~ | ~~[ ]%~~ |
| ~~Class A9B~~ | ~~Intercompany Interests in Anaheim Mezzanine Debtor~~ | ~~Impaired~~ | ~~Not Entitled to Vote (Deemed to Reject)~~ | ~~$[ ]~~ | ~~$[ ]~~ | ~~0%~~ | ~~[ ]%~~ |
| Class A9~~C~~**8** | Intercompany Interests in Anaheim Hotel ~~Lessee~~**Debtors** | Impaired | **Not** Entitled to Vote **(Deemed to Reject)** | $~~[ ]~~**N/A** | $~~[ ]~~**N/A** | ~~[ ]~~**0**% | ~~[ ]%~~**N/A** |
| **Ontario Plan** | | | | | | | |
| Class O1 | Other Priority Claims against Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $~~[ ]~~**0** | $~~[ ]~~**0** | 100% | ~~100%~~**N/A** |
| Class O2 | Other Secured Claims Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $~~[ ]~~**0** | $~~[ ]~~**0** | 100% | ~~100%~~**N/A** |
| Class O3 | Secured Ontario Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $36,855,689 | $36,855,689 | ~~[ ]%~~**N/A**[9] | ~~[ ]%~~**N/A** |
| Class O4A | General Unsecured Claims against Ontario Hotel Owner | Impaired | Entitled to Vote | $~~220,095~~**151,134** | $~~151,134~~**297,228** | ~~[ ]~~**6.3**% to ~~[ ]~~**8.6**% | ~~[ ]%~~**N/A** |

---

[8]  Holders of Claims in Class A4 will receive certain property rather than a dollar recovery (see Article V.C of this Disclosure Statement for additional information concerning the treatment of Classes under the Plan).

[9]  Holders of Claims in Class O3 will receive a deed in lieu of foreclosure rather than a dollar recovery.

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| Class O4B | General Unsecured Claims against Ontario Hotel Lessee | Impaired | Entitled to Vote | $~~214,814~~**175,724** | $~~175,905~~**197,974** | ~~[___]~~**6.3**% to ~~[___]~~**8.6**%[10] | ~~[___]~~**N/A** |
| Class O5 | Mortgage Loan Deficiency Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $~~[___]~~**N/A** | $~~[___]~~**N/A** | 0% | ~~[___]~~**N/A** |
| Class O6 | Intercompany Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $~~[___]~~**Unliquidated** | $~~[___]~~**Unliquidated** | 0% | ~~[___]~~**N/A** |
| Class O7 | Section 510(b) Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $~~[___]~~**0** | $~~[___]~~**0** | 0% | ~~[___]~~**N/A** |
| **Re~~org~~main~~iz~~ing Debtor Plan** | | | | | | | |
| Class R1 | Other Priority Claims against the Re~~org~~main~~iz~~ing Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $~~[___]~~**0** | $~~[___]~~**0** | 100% | 100% |
| Class R2 | Other Secured Claims against the Re~~org~~main~~iz~~ing Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $~~[___]~~**7,354** | $~~[___]~~**7,354** | 100% | 100% |
| Class R3A | Secured Garden Grove Hotel Mortgage Loan Claims | ~~TBD~~**Impaired** | Entitled to Vote ~~on a Provisional Basis~~ | $38,080,751 | $38,080,751 | ~~[___]~~**100**% | ~~[___]~~**75.5% to 91**% |
| Class R3B | Secured San Diego Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ | $48,006,053 | $48,006,053 | ~~[___]~~**100**% | ~~[___]~~**77.2% to 94.8**% |
| Class R3C | Secured Washington DC Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ | $25,918,903 | $25,918,903 | ~~[___]~~**100**% | ~~[___]~~**96.2% to 100.0**% |
| Class R3D | Secured Tysons Corner Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ | $25,513,920 | $25,513,920 | ~~[___]~~**100**% | ~~[___]~~**88.1% to 100.0**% |
| Class R3E | Secured San Antonio Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ | $24,501,463 | $24,501,463 | ~~[___]~~**100**% | ~~[___]~~**90.5% to 100.0**% |
| Class R4 | General Unsecured Claims against the Re~~org~~main~~iz~~ing Debtors | ~~TBD~~**Impaired** | Entitled to Vote ~~on a Provisional Basis~~ | $~~2,189,904~~**651,327** | $~~651,819~~**2,119,281** | ~~[___]~~**% to [___]100**% | ~~[___]~~**51.7% to 100**% |

---

**10**    This figure does not include recoveries on account of the Ontario Hotel Lessee Unencumbered Assets.

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter ~~7~~[6]**7** |
|---|---|---|---|---|---|---|---|
| Class R5 | Intercompany Claims against the Re~~org~~**main**~~iz~~ing Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $[—]**Unliquidated** | $[—]**Unliquidated** | [—]**0**% | [—]**0**% |
| Class R6 | Intercompany Interests in the Re~~org~~**main**~~iz~~ing Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $[—]**N/A** | $[—]**N/A** | [—]**100**% | [—]**0**% |
| Class R7 | Innkeepers USA LP Preferred D Interests | ~~TBD~~**Impaired** | **Not** Entitled to Vote ~~on a Provisional Basis~~ **(Deemed to Reject)** | $[—]**1,621,562** | $[—]**1,621,562** | [—]**0**% | [—]**0**% |

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| Class R8 | Innkeepers USA Trust Preferred C Interests | ~~TBD~~Impaired | Entitled to Vote ~~on a Provisional Basis~~ | $[____]173,136,437 | $[____]173,136,437 | ~~0% to 7.0%~~[11,12] | ~~0%~~ to 3.2% |

---

[11] **This estimate may not be realized, and is inherently subject to uncertainties and contingencies. Indeed, this estimate may change for any of the following reasons, among others, many of which are discussed in more detail in Article VIII herein:**

- **Failure to secure Confirmation of the Plan;**

- **Non-occurance of the Effective Date;**

- **Litigation regarding Confirmation of the Plan or other issues that may arise in these Chapter 11 Cases;**

- **Disputes regarding franchise agreements or PIP obligations;**

- **Actual amounts of Allowed Claims may differ from estimated amounts of Allowed Claims;**

- **Outcomes regarding Disputed Claims are uncertain and may result in additional liability for the Debtors' estates;**

- **The Debtors have not filed objections to all Claims filed against the Remaining Debtors that the Debtors intend to dispute, and the outcome of such objections are uncertain and may result in additional liability for the Debtors' estates;**

- **Certain Claims are unliquidated and the Debtors' liabilities for such Claims are not yet known and may result in additional liability for the Debtors' estates;**

- **Certain Claims for indemnification of the Debtors' management may result in additional liability for the Debtors' estates;**

- **The amounts owed on account of Claims for professional fees are uncertain and may result in additional liability for the Debtors' estates;**

- **There exist disputes regarding whether Claims related to certain of the Debtors' potential guarantee obligations have been waived, the result of which will materially affect recoveries to various constituents;**

- **There exists a dispute where certain of the Debtors' secured creditors contend they have senior claims against the Cash in the LP Account, the result of which will materially affect recoveries to various constituents;**

- **The value of the Debtors' retained Causes of Action is not yet known and may increase or decrease the assets available to distribution;**

- **The financial information contained in the Disclosure Statement and the Financial Projections are based on the Debtors' books and records and has not been audited, are based on numerous assumptions, and are subject to inherent uncertainty;**

- **Acts of God that impact the value of the underlying assets; and**

- **Other events that may impact the Debtors' ability to move toward confirmation in a timely manner or affect the value of the Debtors' hotel properties.**

(Continued…)

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[6][7] |
|---|---|---|---|---|---|---|---|
| Class R9 | Innkeepers USA Trust Preferred A Interests | TBDImpaired | Entitled to Vote on a Provisional Basis | $[---]115,812,294 | $[---]115,812,294 | [---]0% to 7.0%[13] | [0%] to 3.2% |
| Class R10 | Innkeepers USA Trust Common Interests | TBDImpaired | Not Entitled to Vote on a Provisional Basis (Deemed to Reject) | $[---]N/A | $[---]N/A | [---]0% | [0%] |
| Class R11 | Grand Prix Holdings Interests | TBDImpaired | Entitled to Vote on a Provisional Basis | $[---]N/A | $[---]N/A | [---]0% | [0%] |
| Class R12 | Section 510(b) Claims against the Reorganizing Debtors | UnimpairedImpaired | Not Entitled to Vote (Presumed to Accept) | $[---]0 | $[---]0 | [---]0% | [0%] |

Only Holders of Claims or Interests included in one of the Classes entitled to vote to accept or reject the Plan will receive a Solicitation Package (as defined herein) from the Debtors' notice and claims agent, Omni Management Group, LLC (the "**Notice and Claims Agent**"). For more information about the treatment of Claims and Interests, see Article V.C herein entitled "Treatment of Claims and Interests."

**If the Plan provides that I get a distribution, when do I get it, and what do you mean when you refer to "Confirmation," "Effective Date," and "Consummation?"**

Confirmation of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan, there are conditions (described in Article IX of the Plan) that need to be satisfied or waived so that the Plan can be Consummated and become effective. References to the Effective Date mean the date that all conditions to the Plan have been satisfied or waived, at which point the Plan may be "consummated." Distributions only will be made after Consummation of the Plan and will be made only to Holders on account of Claims or Interests that are or become Allowed. See Article VII herein entitled "Statutory Requirements for Confirmation of the Plan," for a discussion of the conditions to Consummation.

**Do all four of the Joint Plans need to be confirmed simultaneously?**

No. The Plan is comprised of the four Joint Plans described above—the Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Reorganizing Debtor Plan. Each of those Joint Plans may be confirmed or consummated separately from the other Joint Plans. The Confirmation or Consummation of any one of the Joint Plans is not contingent upon Confirmation or Consummation of any other Joint Plan.

---

**Any or all of the above scenarios may significantly impact recoveries, and, given the current projected ranges of recoveries, may reduce recoveries to close to zero.**

[12]   **This figure is based on a liquidation preference of $29.85 per share.**

[13]   **This figure is based on a liquidation preference of $38.60 per share.**

**[How will the Post-Effective Date Debtors fund distributions under the Plan?]**

The Post-Effective Date Debtors will fund distributions under the Plan through (a) cash from operations, (b) the ~~New HoldCo~~ Interests **of the Post-Effective Date Fixed/Floating Debtors** issued ~~by~~**to** New HoldCo pursuant to the Plan, (c) the funding obtained from new money investments by ~~Five Mile~~**Cerberus/Chatham** pursuant to the Commitment Letter, ~~(d) proceeds from sales of certain property, if any, (e) third party investments, or (f) a rights offering~~**or (d) the Chatham Hotel Sale Transaction**.

**What materials will be sent to Holders of Claims or Interests who are eligible to vote to accept or reject the Plan?**

Holders of Claims or Interests who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials including (the "**Solicitation Package**"):

- a CD-ROM containing this Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan and the exhibits to the Plan), an order approving the Disclosure Statement, as well as procedures for distributing materials and soliciting votes attached thereto (the "**Solicitation Procedures**");

- a notice of a Confirmation Hearing;

- the appropriate ballot with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;

- a letter from the unsecured creditors Committee recommending that Holders accept the Plan, if they are entitled to vote on the Plan; and

- any supplemental documents that the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be included in the Solicitation Package.

The Solicitation Package may also be obtained (a) from the Debtors' Notice and Claims Agent by: (i) visiting http://www.omnimgt.com/innkeepers; (ii) writing to Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California, 91436; or (iii) calling (866) 989-6147; or (b) for a fee via PACER (except for ballots) at http://www.nysb.uscourts.gov.

**Will the Post-Effective Date Debtors file reports with the SEC?**

The Debtors do not expect that the Post-Effective Date Debtors will file reports with the SEC after emergence from these Chapter 11 Cases because they do not expect to be subject to the public reporting requirements of the Securities Exchange Act of 1934 or the regulations promulgated thereunder.

~~**Who will manage the Post-Effective Date Debtors?**~~

~~After Consummation of the Plan, provided that the transaction set forth in the Commitment Letter is the Fixed/Floating Successful Bid, New HoldCo will directly or indirectly hold the Fixed/Floating Debtors' assets, and Post-Effective Date Innkeepers USA Trust will directly or indirectly hold the Debtors' remaining assets. New HoldCo will be managed by the New HoldCo Board consisting of seven directors, members, or trustees: four nominated by the Fixed/Floating Plan Sponsors in accordance with the terms of the Fixed/Floating Successful Bid, and three independent directors, members, or trustees to be nominated by the Fixed/Floating Plan Sponsors and/or by the Third Party Investors in accordance with the terms of the Fixed/Floating Successful Bid. To the extent known and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will list the members of the New HoldCo Board and the members of the board of directors, members, and trustees of the New HoldCo subsidiaries identified as of the date of the filing thereof.~~

Post-Effective Date Innkeepers USA Trust will be managed by the Post-Effective Date Board. To the extent known and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will list the members of the Post-Effective Date Board and the members of the board of directors, members, and trustees of the subsidiaries of Post-Effective Date Innkeepers USA Trust identified as of the date of the filing thereof.

**What is the deadline to vote on the Plan?**

The deadline to vote on the Plan is June 17, 2011 at 5:00 p.m. Eastern Time (the "**Voting Deadline**").

**How do I vote to accept or reject the Plan?**

The Debtors are distributing this Disclosure Statement, accompanied by a ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan. If you are a Holder of a Claim or Interest in Classes 1FF3A, FF3B, FF4, FF5, A4, A5B, A5C, A8C, A9C, O3, O4A, O4B, R3A, R4, R7, R8, R9, R10, and R11, you may vote to accept or reject the Plan by completing the ballot and returning it in the envelopes provided.

The Debtors have engaged Omni Management Group, LLC to serve as the Notice and Claims Agent. The Notice and Claims Agent is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
| --- |
| Ballots must be actually received by the Notice and Claims Agent by the Voting Deadline, which is June 17, 2011 at 5:00 p.m. prevailing Eastern Time, at the following address: |
| **Innkeepers USA Trust** <br> c/o Omni Management Group, LLC <br> 16161 Ventura Boulevard, Suite C <br> PMB 606 <br> Encino, California 91436 |
| If you have any questions on the procedure for voting on the Plan, please call the Debtors at: |
| (866) 989-6147 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. If you are eligible to vote, for your vote to be counted, your ballot must be completed, signed, and received by the Voting Deadline; provided, however, that ballots received by the Notice and Claims Agent after the Voting Deadline may be counted only in the sole and absolute discretion of the Debtors.

Any ballot that is properly executed by the Holder of a Claim or Interest, but that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan, will not be counted. Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan may cast only one ballot for each Claim or Interest held by such Holder. By signing and returning a ballot, each Holder of a Claim or Interest in Classes 1FF3A, FF3B, FF4, FF5, A4, A5B, A5C, A8C, A9C, O3, O4A, O4B, R3A, R4, R7, R8, R9, R10, and R11 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim or Interest have been cast or, if any other ballots have been cast with respect to such Claim or Interest, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot, as failing to do so may result in your ballot not being counted.

**How can I object to provisions contained in the Plan?**

The Bankruptcy Court has established ~~——————~~**June 10,** 2011 at ~~—:——~~**4:00 p**.m. Eastern Time as the deadline to object to confirmation of the Plan (the "**Plan Objection Deadline**").  All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are *actually received* on or before the Plan Objection Deadline.  The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan prior to a Confirmation Hearing.

**When is the hearing on confirmation of the Plan expected to occur?**

Assuming the requisite acceptances are obtained for any of the four Joint Plans, the Debtors intend to seek confirmation of the Plan at a hearing to be scheduled on ~~—————~~**June 23,** 2011 (with no less than 28 days' notice), before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom No. 610 of the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408 (each such hearing, a "**Confirmation Hearing**").  A Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and prior to a Confirmation Hearing, may put in place additional procedures governing that hearing.  The Plan may be modified, if necessary, prior to, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest.

### ARTICLE II.
### THE DEBTORS' BACKGROUND[714]

*A.    The Debtors' Business*

1.    <u>The Debtors' Business and Overview</u>

Innkeepers USA Trust ("**Innkeepers**") is a self-administered Maryland REIT with a primary business focus of acquiring premium-branded upscale extended-stay, mid-priced limited service, and select-service hotels.  Innkeepers' indirect, wholly-owned limited liability company subsidiaries, which are Debtors in these Chapter 11 Cases, hold title to, or ground leases in 71 hotels.  Indirect, wholly-owned taxable REIT subsidiaries (the "**Operating Lessees**") lease the hotels from the property owners, and have entered into management agreements with third party hotel managers to manage the hotels.  The operating lessees, through the hotel managers, are responsible for paying hotel operating expenses for the respective property owners, including personnel costs, franchise royalties and related fees, utility costs, and general repair and maintenance expenses.  The property owners remain responsible for ownership costs such as property taxes and insurance, ground rent (where applicable), and capital expenditures.

The Debtors' primary customer base consists of business travelers, employees on temporary work assignments or enrolled in training programs, and individuals engaged in corporate relocations.  Consistent with this customer base, the majority of the Debtors' integrated hotel portfolio consists of extended-stay hotels, which are a hybrid between a hotel and an apartment, offering longer-term accommodations with kitchens at more affordable rates than traditional full service hotels and with more efficiency than apartments.  In general, extended-stay hotels are typically able to generate a more consistent revenue stream than traditional hotels due to historically higher than average occupancy rates, longer average stays, less staff, and lower fixed costs.

---

[714]    Additional information about the Debtors' background can be found in the First Day Declaration.

The Operating Lessees have entered into various hotel management agreements with Island Hospitality Management, Inc. and Dimension Development Company, Inc. to manage the Debtors' hotel properties. The Debtors' management is responsible for overseeing the hotel managers. Island manages all of the Debtors' hotels except for the Sheraton Four Points in Ft. Walton Beach, Florida, which is managed by Dimension. The Hilton in Ontario, California is managed by GF Management. Pursuant to the hotel management agreements, the hotel managers generally are required to perform or provide for all operational and management functions necessary to operate the hotels. Among other things, the hotel managers, on behalf of the Debtors, pay all property level expenses of the hotels (including payroll), contract with service providers, and purchase all goods and materials utilized in the operation of the business. Generally, the hotel managers fund the hotel operating expenses out of the property lessees' centralized cash accounts, over which the hotel managers have signing authority. When the hotel managers have to fund expenses, the operating lessees reimburse the hotel managers periodically through hotel expense reimbursement reconciliations. In addition, the hotel managers receive management fees prescribed by the hotel management agreements.

The Debtors seek to affiliate their hotels with premier franchise companies and brands that offer robust marketing support and services and that have demonstrated their ability to command revenue premiums over other brands. The table below sets forth information regarding the Debtors' hotels by brand (ordered based on the number of rooms by brand):

| Brand/Flag | # of Hotels | # of Keys | % of Total Keys |
|---|---|---|---|
| **Marriott** | | | |
| Residence Inn | 37 | 4,862 | 52% |
| Courtyard | 3 | 256 | 3% |
| TownePlace Suites | 1 | 95 | 1% |
| **Hilton** | | | |
| Hampton Inn | 8 | 1,022 | 11% |
| Hilton / Hilton Suites | 2 | 539 | 6% |
| Embassy Suites | 1 | 156 | 2% |
| Homewood Suites | 1 | 146 | 2% |
| Doubletree | 1 | 105 | 1% |
| **Hyatt** | | | |
| Summerfield Suites | 5 | 650 | 7% |
| **Starwood** | | | |
| Westin | 1 | 224 | 2% |
| Four Points by Sheraton | 1 | 216 | 2% |
| Sheraton | 1 | 154 | 2% |
| **Unbranded** | | | |
| N/A | 9 | 937 | 10% |
| **TOTAL** | **71** | **9,362** | **100%** |

The franchise licenses for the hotels are held by the operating lessees and are governed by franchise agreements between the operating lessees and the franchise owners. All but nine of the hotels in the table above operate under franchise agreements. Under the franchise agreements, the Debtors are required to pay franchise fees based on a percentage of hotel room revenue and must allow franchisors to inspect their licensed hotels periodically to confirm adherence to stated brand operating standards. These inspections can result in additional capital expenditure requirements or additional operational, marketing, or repairs and maintenance expenses. Grand Prix Holdings LLC, Innkeepers' direct parent and a Debtor in these Chapter 11 Cases, has guaranteed certain of the property lessees' obligations under certain of the franchise agreements.

The Debtors' stream of revenue is dependent on maintaining and improving key operating metrics, including occupancy, average daily rate ("**ADR**"), and revenue per available room ("**RevPar**") of their hotels. In 2009, the Debtors' consolidated revenues were approximately $292 million (down from $348 million in 2008, a 16% drop) and their adjusted EBITDA was approximately $85 million (down from $123 million in 2008, a 31% drop). The Debtors' consolidated assets for 2009 totaled approximately $1.5 billion and consolidated liabilities totaled approximately $1.5 billion (as calculated according to generally accepted accounting principles). In 2010, the Debtors' consolidated revenues improved to $298 million and their adjusted EBITDA declined to $58 million (which includes $34 million of restructuring costs).

2.     <u>The Debtors' Corporate History and Organizational Structure</u>

In June 2007, Apollo, through certain subsidiaries, acquired Innkeepers, which was a publicly traded company whose shares were listed on the New York Stock Exchange (the "**Acquisition**"). The Acquisition was funded with equity invested by Apollo (through certain subsidiaries), the assumption of certain secured debt outstanding prior to the Acquisition, and certain secured debt incurred at the time of the Acquisition. All of Innkeepers' common shares outstanding at the time of the Acquisition were acquired for cash and then extinguished. Innkeepers' $145 million 8% series C cumulative preferred shares outstanding prior to the Acquisition remained outstanding after the Acquisition. In consideration for Apollo's $250 million equity investment, Apollo's subsidiary Grand Prix Holdings LLC, a Debtor in these Chapter 11 Cases, was issued all (except for relatively small amounts currently held by management) of Innkeepers' newly issued (a) common shares and (b) 12% series A cumulative preferred shares.

A chart generally depicting the Debtors' prepetition organizational structure is provided below.

[*Rest of Page Intentionally Left Blank*]

# Innkeepers USA Corporate Structure Chart



The information contained herein and on the following pages shall neither constitute an admission of liability by, nor is it binding on, the Debtors.

Legend:

☆ Lessees of Properties from Fee Owners/Ground Lessees

○ Mezzanine Loan Borrower

□ Mortgage Loan Borrower – Fee Owner/Ground Lessee

Company Notes:
All entities are Delaware entities unless otherwise noted.
All entities are Debtors unless otherwise noted.

Footnotes:
1. Operating Tenant for hotels securing Fixed Rate Mortgage Loan Agreement
2. Operating Tenant for hotels securing Floating State Mortgage Loan Agreement
3. Operating Tenant for hotel securing the facility for KPA HS Anaheim, LLC.
4. Operating Tenant for hotel securing the facility for KPA HI Ontario LLC.
5. Operating Tenant for hotel securing the facility for KPA RIGG, LLC.
6. Operating Tenant for note securing the facility for KPA RIMV, LLC.
7. Operating Tenant for hotels securing the facilities for KPA Washington DC, LLC; KPA Tysons Corner RI, LLC; and KPA San Antonio, LLC.
8. Operating Tenant for hotel securing the facility for Genwood Raleigh LLC.

Grand Prix Holdings LLC

Innkeepers USA Trust (Maryland REIT)

Innkeepers Financial Corporation (Virginia Corporation)

Innkeepers USA Limited Partnership (Virginia Limited Partnership)

KPA Leaseco Holding Inc.

KPA Raleigh, LLC

Genwood Raleigh LLC (Joint Venture Fee Owner)  40%

KPA Raleigh Leaseco LLC

Genwood Raleigh Leasee LLC (Joint Venture)  40%

KPA Leaseco, Inc.

Grand Prix IHM, Inc.

Grand Prix Fixed Lessee LLC[1]

Grand Prix Floating Lessee LLC[2]

Grand Prix RIGG Lessee LLC[5]

Grand Prix RIMV Lessee LLC[6]

Grand Prix Anaheim Orange Lessee LLC[3]

Grand Prix General Lessee LLC[4]

Grand Prix Ontario Lessee LLC[4]

Grand Prix IHM Term Lessee LLC[7]

GP AC Sublessee LLC

KPA RIMV, LLC
This entity's assets are collateral under the "San Diego Hotel Mortgage Loan Agreement"

KPA RIGG, LLC
This entity's assets are collateral under the "Garden Grove Hotel Mortgage Loan Agreement"

KPA Washington DC, LLC
This entity's assets are collateral under the "Washington DC Hotel Mortgage Loan Agreement"

KPA San Antonio, LLC
This entity's assets are collateral under the "San Antonio Hotel Mortgage Loan Agreement"

KPA Tysons Corner RI, LLC
This entity's assets are collateral under the "Tysons Corner Hotel Mortgage Loan Agreement"

KPA HI Ontario LLC
This entity's assets are collateral under the "Ontario Hotel Mortgage Loan Agreement"

Grand Prix Mezz Borrower Term LLC
This entity's equity interests in the KPA HS Anaheim, LLC, are collateral under the "Anaheim Hotel Mezzanine Loan Agreement"

KPA HS Anaheim, LLC
This entity's assets are collateral under the "Anaheim Hotel Mortgage Loan Agreement"

Grand Prix Mezz Borrower Floating 2, LLC

Grand Prix Mezz Borrower Floating LLC

Grand Prix Mezz Borrower Floating 2, LLC
This entity's equity interests in the 20 fee owners/ground lessees below are collateral under the "Floating Rate Pool Mezzanine Loan Agreement"

Fee Owners/ Ground Lessees (20 LLCs)
These entities' assets are collateral under the "Floating Rate Pool Mortgage Loan Agreement"

Grand Prix Mezz Borrower Fixed LLC

Fee Owners/ Ground Lessees (45 LLCs)
These entities' assets are collateral under the "Fixed Rate Pool Mortgage Loan Agreement"

Non-Debtor Affiliates

B.      *Summary of Prepetition Capital Structure*

As of March 31, 2010, the Debtors had incurred aggregate funded secured indebtedness of approximately $1.42 billion, including approximately $1.29 billion of property-level secured debt, approximately $1.05 billion of which was securitized and sold in the commercial mortgage-backed security market. The Debtors incurred the vast majority of their funded debt in connection with the June 2007 acquisition of Innkeepers by Apollo. The debt is secured by mortgages on the hotels or pledges of the equity of the property owners. The Debtors' funded secured debt is separated into nine general groups, the mortgages of each of which is secured by distinct hotel properties and the mezzanine loans of each of which is secured by related equity interests in the property owners. Each of these groups is discussed below. Additionally, the Debtors have four issuances of equity, which are also discussed below.

1.      The $825 Million Fixed Rate Pool Mortgage Loan

Forty-five of the property owners, collectively as borrowers, and Lehman, as original lender, are parties to the Fixed Rate Pool Mortgage Loan, dated as of June 29, 2007. The Fixed Rate Pool Mortgage Loan provides for mortgage loans to the 45 property owners in the original aggregate principal amount of $825 million, which amount is collateralized by the 45 hotel properties owned by the property owners that are borrowers under the loan. Obligations under the Fixed Rate Pool Mortgage Loan have a maturity date of July 9, 2017. The Fixed Rate Pool Mortgage Loan has been securitized and sold into the CMBS market. Half of the obligations under the Fixed Rate Pool Mortgage Loan are part of a mortgage loan pool known as LB-UBS Commercial Mortgage Trust 2007-C6, for which U.S. Bank, National Association, as successor in interest to LaSalle Bank, N.A., is trustee and Midland Loan Services, Inc. serves as special servicer. The balance of the obligations under the Fixed Rate Pool Mortgage Loan are part of a mortgage loan pool known as LB-UBS Commercial Mortgage Trust 2007-C7, for which U.S. Bank, National Association,, as successor in interest to LaSalle, is trustee and Midland serves as special servicer.

2.      The $250 Million Floating Rate Pool Mortgage Loan and $118 Million Floating Rate Pool Mezzanine Loan

Twenty of the property owners, collectively as borrower, and Lehman, as lender, are parties to the Floating Rate Pool Mortgage Loan, dated as of June 29, 2007. The Floating Rate Pool Mortgage Loan provides for mortgage loans to the 20 property owners in the original principal amount of $250 million, which amount is collateralized by the 19 hotels owned by the property owners that are borrowers under the loan agreement.[8][15] The obligations under the Floating Rate Pool Mortgage Loan matured on July 9, 2010, which maturity date is subject to three conditional one-year extensions.

Grand Prix Mezz Borrower Floating 2, LLC, the 100% owner of the 20 borrowers under the Floating Rate Pool Mortgage Loan, as borrower, and Lehman, as original lender, are parties to the agreement for the Floating Rate Pool Mortgage Loan, dated as of June 29, 2007. The Floating Rate Pool Mezzanine Loan provides for a junior mezzanine loan in the original principal amount of $118 million, which amount is collateralized by Grand Prix Mezz Borrower Floating 2, LLC's equity interests in the 20 property owners that are borrowers under the Floating Rate Pool Mortgage Loan. The obligations under the Floating Rate Pool Mezzanine Loan matured on July 9, 2010, which maturity date is subject to three conditional one-year extensions. TriMont Real Estate Advisors, Inc. serves as special servicer for this loan.

3.      The $13.7 Million Anaheim Hotel Mortgage Loan and $21.3 Million Anaheim Hotel Mezzanine Loan

RLJ Anaheim Suites Hotel L.P., as borrower, and GMAC Commercial Mortgage Bank, as lender, are parties to the agreement for the Anaheim Hotel Mortgage Loan, dated as of June 14, 2005. Pursuant to certain loan

---

[8][15] As provided in further detail in Article IV.A.7 of this Disclosure Statement, during the course of these Chapter 11 Cases, the Debtors ceased operating one unprofitable hotel that had previously secured the Floating Rate Pool Mortgage Loan.

assumption agreements, dated as of October 4, 2006 and June 29, 2007, KPA HS Anaheim, LLC assumed all of RLJ Anaheim's obligations under the Anaheim Hotel Mortgage Loan. As a result, the agreement for the Anaheim Hotel Mortgage Loan provides that KPA HS Anaheim is obligated under a mortgage loan in the original principal amount of $13.7 million, which amount is collateralized by the Hilton Suites in Anaheim, California. Obligations under the Anaheim Hotel Mortgage Loan matured on July 1, 2010. The Anaheim Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage loan pool known as Credit Suisse Commercial Mortgage Trust Series 2005-C5, Commercial Mortgage Pass-Through Certificates, Series 2005-C5, for which Wells Fargo Bank, N.A. is trustee, Capmark Finance Inc., as successor to GMAC Commercial Mortgage Corporation, serves as master servicer, and CWCapital Asset Management, LLC serves as special servicer.

Grand Prix Mezz Borrower Term, LLC, the 100% owner of KPA HS Anaheim, as borrower, and Lehman, as lender, are parties to the agreement for the Anaheim Hotel Mezzanine Loan, dated as of June 29, 2007. The Anaheim Hotel Mezzanine Loan provides for a junior mezzanine loan in the original principal amount of $21.3 million, which amount is collateralized by Grand Prix Mezz Borrower Term, LLC's equity interest in KPA HS Anaheim. The obligations under the Anaheim Hotel Mezzanine Loan matured on July 1, 2010. TriMont Real Estate Advisors, Inc. serves as special servicer for this loan.

Pursuant to that certain Intercreditor Agreement by and between Wells Fargo, as trustee for the registered holders of the Credit Suisse First Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2005-C5, as senior lender, and Lehman, as mezzanine lender, dated as of June 29, 2007, the rights, liens, and security interests created under the Anaheim Hotel Mezzanine Loan, including the right to payment of the obligations under the Anaheim Hotel Mezzanine Loan and all remedies, terms, and covenants contained in the loan agreement, are subordinate to the rights, liens, and security interests created under the agreement for the Anaheim Hotel Mortgage Loan, including the right to payment of the obligations under the Anaheim Hotel Mortgage Loan and all remedies, terms, and covenants contained in the agreement for the Anaheim Hotel Mortgage Loan.

4.      The $47.4 Million San Diego Hotel Mortgage Loan

KPA RIMV, LLC, as borrower, and Capmark Bank, as lender, are parties to the agreement for the San Diego Hotel Mortgage Loan, dated as of October 4, 2006. Pursuant to a loan assumption agreement, dated June 29, 2007, Grand Prix RIMV Lessee, LLC assumed all of KPA RIMV, LLC's obligations under the San Diego Hotel Mortgage Loan. As a result, the agreement for the San Diego Hotel Mortgage Loan provides that Grand Prix RIMV is obligated under a mortgage loan in the original principal amount of $47.4 million, which amount is collateralized by the Residence Inn in San Diego, California. The obligations under the San Diego Hotel Mortgage Loan have a maturity date of November 11, 2016. The San Diego Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and LNR Partners, LLC serves as special servicer.

5.      The $37.6 Million Garden Grove Hotel Mortgage Loan

KPA RIGG, LLC, as borrower, and Capmark Bank, as lender, are parties to an agreement for the Garden Grove Hotel Mortgage Loan, dated as of October 4, 2006. Pursuant to a loan assumption agreement, dated June 29, 2007, Grand Prix RIGG Lessee LLC assumed all of KPA RIGG, LLC's obligations under the Garden Grove Hotel Mortgage Loan. As a result, the agreement for the Garden Grove Hotel Mortgage Loan provides that Grand Prix RIGG is obligated under a mortgage loan in the original principal amount of $37.6 million, which amount is collateralized by the Residence Inn in Garden Grove, California. The obligations under the Garden Grove Hotel Mortgage Loan have a maturity date of November 11, 2016. The Garden Grove Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo Bank, N.A. is trustee, Capmark Finance Inc. serves as master servicer, and LNR Partners, LLC serves as special servicer.

6.      The $35.0 Million Ontario Hotel Mortgage Loan

KPA HI Ontario, LLC, as borrower, and Deutsche Banc Mortgage Capital, LLC, as successor in interest to Capmark Bank, N.A., as lender, are parties to an agreement for the Ontario Hotel Mortgage Loan, dated as of October

4, 2006.  Pursuant to a loan assumption agreement, dated June 29, 2007, Grand Prix Ontario Lessee LLC assumed all of KPA HI Ontario, LLC's obligations under the Ontario Hotel Mortgage Loan.  As a result, the agreement for the Ontario Hotel Mortgage Loan provides that Grand Prix Ontario is obligated under a mortgage loan in the original principal amount of $35.0 million, which amount is collateralized by the Hilton in Ontario, California.  The obligations under the Ontario Hotel Mortgage Loan have a maturity date of November 11, 2016.  The Ontario Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C5, for which Wells Fargo Bank, N.A. is trustee, Capmark Finance Inc. serves as master servicer, and C-III Asset Management, LLC serves as special servicer.  As of April 2010, the lender under the Ontario Hotel Mortgage Loan Agreement installed a receiver, GF Management, to act as hotel manager for the Hilton in Ontario, California.

      7.      <u>The $25.6 Million Washington DC Hotel Mortgage Loan</u>

KPA Washington DC, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, are parties to an agreement for the Washington DC Hotel Mortgage Loan, dated as of September 21, 2006.  The Washington DC Hotel Mortgage Loan carries an original principal amount of $25.6 million, which amount is collateralized by the Doubletree Guest Suites in Washington, D.C.  The obligations under the Washington DC Hotel Mortgage Loan have a maturity date of October 1, 2016.  The Washington DC Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as ML-CFC Commercial Mortgage Trust 2006-4, for which U.S. Bank, N.A. is trustee, Wells Fargo Bank, N.A. serves as master servicer, and LNR Partners, LLC serves as special servicer.

      8.      <u>The $25.2 Tysons Corner Hotel Mortgage Loan</u>

KPA Tysons Corner RI, LLC, as borrower, and Merrill Lynch, as lender, are parties to an agreement for the Tysons Corner Hotel Mortgage Loan, dated as of September 19, 2006.  The Tysons Corner Hotel Mortgage Loan Agreement carries an original principal amount of $25.2 million, which amount is collateralized by the Residence Inn in Vienna, Virginia.  The obligations under the Tysons Corner Hotel Mortgage Loan have a maturity date of October 1, 2016.  The Tysons Corner Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank, N.A. is trustee, Wells Fargo Bank, N.A. serves as master servicer, and LNR Partners, LLC serves as special servicer.

      9.      <u>The $24.2 Million San Antonio Hotel Mortgage Loan</u>

KPA San Antonio, LLC, as borrower, and Merrill Lynch, as lender, are parties to an agreement for the San Antonio Hotel Mortgage Loan, dated as of September 19, 2006.  The San Antonio Hotel Mortgage Loan carries an original principal amount of $24.2 million, which amount is collateralized by the Homewood Suites in San Antonio, Texas.  The obligations under the San Antonio Hotel Mortgage Loan have a maturity date of October 1, 2016.  The San Antonio Hotel Mortgage Loan was securitized and sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank, N.A. is trustee, Wells Fargo Bank, N.A. serves as master servicer, and LNR Partners, LLC serves as special servicer.

      10.      <u>12% Series A Cumulative Preferred Shares</u>

Apollo Investment Corporation's subsidiary Grand Prix Holdings LLC was issued substantially all of Innkeepers' shares of 12% series A cumulative preferred shares in exchange for Apollo Investment Corporation's equity contribution in connection with the acquisition of Innkeepers.  There have never been any distributions on account of the 12% series A cumulative preferred shares.

      11.      <u>8% Series C Cumulative Preferred Shares</u>

In January 2004, Innkeepers completed an offering of 5.8 million shares of 8% series C cumulative perpetual preferred shares.  The net proceeds from the offering were approximately $145 million, a portion of which was used by Innkeepers to redeem a previously issued series of preferred shares.  The Preferred C shares were publicly offered and survived the acquisition of Innkeepers by Apollo, and the Debtors believe these shares are held by various third parties.  No distributions have been made on account of the Preferred C shares since December 2008.

12.     Class D Preferred Units

Prior to the acquisition of Innkeepers by Apollo Investment Corporation, Innkeepers USA Limited Partnership, a Debtor in these Chapter 11 Cases, issued preferred units of limited partnership interests to certain parties who contributed hotel properties to the Debtors. The Holders of approximately 81,000 preferred units elected to continue to hold their investment after the acquisition, in the form of class D preferred units of limited partnership interest. The cumulative redemption value of the class D preferred units is $1.4 million, and, pursuant to the relevant documents, each class D preferred unit is entitled to distributions equal to $0.8875 per share annually. Additionally, Holders of the class D preferred units guaranteed approximately $8.1 million of the Debtors' non-recourse debt. Since December 2008, no distributions have been made on account of the class D preferred units.

13.     Common Shares

At the time of the June 2007 acquisition of Innkeepers by Apollo, the then-outstanding shares of Innkeepers' common shares were extinguished and new shares of common shares were issued. As of the Petition Date, Grand Prix Holdings LLC held substantially all of Innkeepers' current outstanding common shares. There have never been any distributions on account of common shares.

## ARTICLE III.
## THE CHAPTER 11 CASES

The following is a general summary of these Chapter 11 Cases, including the events leading up to the filing of these Chapter 11 Cases and the events that have taken place during these Chapter 11 Cases.

A.     *Events Leading to the Chapter 11 Cases*

A number of factors contributed to the Debtors' decision to commence these Chapter 11 Cases. Although the Debtors' business model is sound, their operating losses from decreased room revenue, significant liquidity constraints, considerable funded debt burden, and unprecedented adverse changes in the economy and hospitality industry generally, impaired the Debtors' ability to meet their debt obligations and certain obligations under their franchise agreements.

1.     Recent Economic Crisis and Its Impact on the Hotel Industry and the Debtors

Over the last two and a half years, the global travel and tourism industry has faced one of the most difficult operating environments in a number of decades due to the unparalleled turmoil that beset the global and United States economies. A weak economy and plummeting demand for hotel accommodations, which can be traced to reduced consumer spending, higher fuel prices, increased unemployment, and a severe decline in business travel, have caused one of the deepest and longest recessions in the history of the hospitality industry. During this time, supply also increased within the hospitality industry, exacerbating the negative impact of decreased demand within the industry.

In the hotel industry, performance is generally measured by RevPar. RevPar identifies trends with respect to room revenues from comparable hotel properties and can be used to evaluate hotel performance on a regional and segment basis. Comparing RevPar against prior years, the magnitude of the rapid and unprecedented deterioration is readily apparent.

Other operating statistics similarly demonstrate the depth of the industry's decline. Contributing to the RevPar decline in 2009, the industry's ADR fell by 8.8%, compared to a 20-year industry annual average *increase* of 2.8%. In 2009, the ADR decreased by 8.6%, compared to a 20-year industry annual average decline of 0.7%. The hotel industry has also suffered a severe decline in food and beverage sales, meeting, conference, and banquette hall rentals, and other guest services that generate additional revenue. Against this background, several of the Debtors' competitors filed for bankruptcy within the last two years.

The Debtors have not been insulated from these multi-year, record-breaking declines plaguing the hotel industry. In 2009, the Debtors' RevPar, ADR, and occupancy rate metrics decreased by 16.3%, 10.8%, and 6.1%,

respectively.  (In 2010, the Debtors' RevPar, ADR, and occupancy rate metrics increased 5.5%, decreased 1.0%, and increased 6.6%, respectively.)  Due to the Debtors' focus on the business consumer, their hotel portfolio has been especially impacted by an overall tightening on corporate travel, training, and relocation expenditures.  Certainly, the worst recession in 60 years has left corporations intent on saving rather than spending, and domestic and international business travel spending in the United States declined sharply.

       2.      The Debtors' Substantial Funded Debt Burden and Limited Access to Capital

In addition to reducing overall demand and significantly impairing the Debtors' overall revenue, the rapid softening of the economy and tightening of the financial markets limited the Debtors' financial flexibility.  As a result, the Debtors had no real ability to recapitalize or reduce their debt burdens.  Strategies that the Debtors might have previously employed to extend maturities, obtain new financing, and maintain liquidity are no longer available.  These adverse changes severely limited the Debtors' ability to satisfy their obligations as they came due.

Limited access to capital is particularly significant in light of the Debtors' large debt service obligations.  Specifically, the Debtors have failed to satisfy their debt service obligations as they came due (or make any subsequent payments) under the following loans: (a) the payment for the Ontario Hotel Mortgage Loan on October 1, 2009; (b) the payment for the Fixed Rate Pool Mortgage Loan on April 9, 2010; (c) the payments for the Anaheim Hotel Mezzanine Loan, San Diego Hotel Mortgage Loan, Garden Grove Hotel Mortgage Loan, Washington DC Hotel Mortgage Loan, Tysons Corner Hotel Mortgage Loan, and San Antonio Hotel Mortgage Loan, each on May 1, 2010; and (d) the payment for the Anaheim Hotel Mortgage Loan, Floating Rate Pool Mortgage Loan, and Floating Rate Pool Mortgage Loan, each on June 10, 2010.

The Debtors' level of indebtedness is of significant importance in these Chapter 11 Cases because, with essentially all cash flow from operations being directed to debt service, the Debtors' cash was not available for other purposes, such as maintaining the hotel properties in a condition that complies with the franchise agreements and performing other upgrades to capitalize on opportunities to increase revenue and to meet competitive conditions and preserve asset value.

       3.      The Debtors' Inability to Fund PIP Obligations

In addition to placing a burden on the Debtors' ability to meet debt service obligations and fund day-to-day business operations, the lack of available cash made it impossible for the Debtors to sufficiently fund capital expenditures on hotel properties necessary to comply with their obligations under the franchise agreements.  Certain of the franchise agreements include provisions that require the Debtors to comply with property improvement plans required under applicable franchise agreements ("**PIPs**"), under which they are obligated to perform certain renovations and other capital improvements to their hotel properties, such as replacing furniture, fixtures, and equipment.  While necessary, the required PIP improvements are costly, subject to delays, and disrupt operations and displace revenue at the hotels while rooms under renovation are out of service.

Franchisors periodically inspect the hotels to ensure the Debtors' compliance with their operating standards and the PIPs, the breach of which could result in the termination of a franchise agreement.  The loss of a franchise agreement for a hotel would have an immediate and material adverse effect on the underlying value of the hotel due to the loss of associated name recognition, marketing support, brand loyalty, and centralized reservation systems provided by the franchisors.  Pursuant to prior agreement, in September of 2009, a Residence Inn franchise agreement with respect to a hotel property in Columbus, Ohio terminated.  Subsequent to termination, revenue precipitously dropped by 50% and the property was sold for a fraction of its appraised value from only two years earlier.

Prior to the Petition Date, the Debtors received numerous notices of potential default from franchisors, including 22 notices of default from Marriott International, Inc. sent on March 16, 2010.  The Debtors own 44 hotels under Marriott brands, more than half of which are "Generation 1" Residence Inn by Marriott extended-stay hotels.  Generation 1 Residence Inn hotels resemble garden style apartments with multiple two- to three-story buildings, each comprised of eight rooms with exterior access to each room.  In contrast, subsequent generations of Residence Inn hotels typically feature more rooms in a single multi-story building with interior corridors.  Upkeep costs associated with older Generation 1 Residence Inn hotels are typically higher than other types of hotel properties because of their

age (generally 20 to 30 years), layout (eight or more buildings located on large parcels of land), and less efficient utilization of heating and other utilities.

As a result, many Generation 1 franchise agreements may not be renewed as they mature or are exiting the Residence Inn system before the maturity of their franchise agreements. As the Residence Inn by Marriott brand grows (with over 600 in the brand system currently), the importance of Generation 1 hotels to the Residence Inn brand will continue to decrease. Maintaining the franchise agreements on the Debtors' Generation 1 hotels is critically important for their cash flow and enterprise value. The loss of revenue (and cash flow) associated with an immediate withdrawal of the Debtors' Generation 1 hotels from the Residence Inn system would have a severely detrimental effect on the Debtors' entire enterprise as Generation 1 Residence Inn hotels comprise approximately 31% of the Debtors' annual revenue. Recognizing this, the Debtors reached agreement with Marriott in 2007 for the Debtors to complete extensive PIPs on most of its Generation 1 hotels in exchange for franchise agreement extensions until at least 2021.

The dramatic reduction in the Debtors' RevPar, coupled with their significant debt burden and an inability to access new capital, have rendered the Debtors unable to comply with their PIP obligations under the Marriott (and other) franchise agreements. The Marriott default notices state that if the Debtors failed to perform the required PIP obligations by June 14, 2010, the 22 Marriott franchise agreements would immediately terminate as of that date The Debtors and Marriott executed certain forbearance agreements, extending the deadline to meet PIP obligations for Marriott hotels (other than a Generation 1 hotel located in Troy, Michigan) according to the schedules provided in the Marriott Adequate Assurance Agreement.

The Debtors' inability to invest in their hotel properties, along with the collapse of the real estate market, have caused the value of the Debtors' hotels to severely decline, resulting in the overall erosion of the Debtors' enterprise value. As a result, it is clear that a comprehensive restructuring of the entire capital structure is necessary to preserve and maximize value.

B.    *Restructuring Efforts*

    1.    Cost Savings

To address the liquidity constraints caused by the tightening credit markets, decreased consumer demand, and high debt service carrying costs, since the first quarter of 2008, the Debtors' management took several proactive steps to reduce costs, restructure their business operations, and address operational cash shortfalls. These initiatives included:

- a company-wide labor reduction to the minimal staffing levels possible without harming guest satisfaction (including for both the Debtors' and the hotel managers' employees);

- a 5% salary reduction for all personnel;

- the renegotiation of benefit programs in an effort to lower costs (with employees' share of obligations increased);

- the suspension of the Debtors' discretionary 401(k) plan matching;

- the suspension of distributions to Holders of Preferred C Interests beginning in December 2008;

- the reduction of certain fixed costs, including the renegotiation of maintenance, grounds cleaning, and vendor contracts; and

- the immediate cessation of all non-emergency capital expenditures on the hotel properties beginning in late 2008 and the related settlement for approximately $8.5 million of approximately $13.1 million of outstanding capital expenditure obligations for work performed and goods ordered.

The results of the Debtors' efforts were positive. From 2008 to 2010, the Debtors were able to reduce their annual costs by approximately $24 million. However, despite this reduction, due to the economic climate and ongoing credit crisis, the Debtors concluded their liquidity would continue to erode and potentially could be exacerbated by further

declines in the hospitality market. In addition, the Debtors determined any new debt or equity investments would be unlikely unless they could restructure their existing debt given the current amount of outstanding debt owed to their lenders. The Debtors also concluded they would need additional liquidity to meet their near term obligations under the franchise agreements.

2.    Marriott Adequate Assurance Agreement

On June 25, 2010, the Debtors and Marriott entered into the Marriott Adequate Assurance Agreement, which is attached hereto as **Exhibit E** and incorporated herein by reference.

Among other things, the terms and conditions of the Marriott Adequate Assurance Agreement provide that Marriott will (a) forbear from exercising its remedies under the franchise agreements, (b) forbear from seeking relief from the automatic stay, and (c) permit the Debtors to assume the franchise agreements for the Marriott hotels that have defaulted under the franchise agreements. In consideration for the foregoing, the Marriott Adequate Assurance Agreement obligates the Debtors to (a) perform certain PIPs for the defaulted Marriott hotels according to a three-phase schedule ending November 20, 2011, and (b) file a motion seeking debtor-in-possession financing approval contemporaneously with the bankruptcy filing which seeks to have the Bankruptcy Court approve the financing within 60 days. The Debtors are in compliance with their obligations at this time, including the PIP completion schedule. The Debtors are assuming the Marriott Consent Agreement, dated June 29, 2007, which was negotiated in connection with Apollo's acquisition of Innkeepers. The Marriott Consent Agreement requires an annual $800,000 payment from the Debtors or the Post-Effective Date Debtors, as applicable, to Marriott through 2013.

The Marriott Adequate Assurance Agreement includes certain provisions relating to the assumption of applicable franchise agreements. Upon completion of a PIP for each Marriott hotel in accordance with the schedule set forth in the Marriott Adequate Assurance Agreement, Marriott's consent to the assumption of the respective franchise agreement shall be deemed given with respect to such Marriott hotel, and the Debtors shall seek to assume the applicable franchise agreement. If, as of the date of the filing of this Disclosure Statement, the Debtors are in compliance with the schedule, Marriott will consent to the assumption of all franchise agreements scheduled in the Marriott Adequate Assurance Agreement. The Debtors will schedule these franchise agreements as part of the Plan Supplement and will assume the franchise agreements as of Consummation of the Plans.

The Marriott Adequate Assurance Agreement terminates, if, among others, the following events occur:

- Termination of the DIP Facilities, unless the Debtors can establish they have sufficient funds to complete the PIPs in accordance with the schedule of PIP completion under the Marriott Adequate Assurance Agreement;

- The Debtors fail to complete a PIP in accordance with the schedule set forth in the Marriott Adequate Assurance Agreement, but termination shall be effective only with respect to such Marriott hotel; and

- All parties agree to terminate the agreement.

Under the Marriott Adequate Assurance Agreement, Marriott has the following additional remedies:

- If the Debtors fail to complete a PIP for a specific Marriott hotel in accordance with the schedule set forth in the Marriott Adequate Assurance Agreement, Marriott may seek relief from the automatic stay with respect to such Marriott hotel and the related franchise agreement. In such instance, the Debtors agree they will not contest a motion seeking relief from the automatic stay and shall deem the forbearance period with respect to such Marriott hotel terminated.

- If the Debtors fail to complete all of the PIPs required during the first phase and two hotels in the second phase, Marriott may serve a notice of default with a 60-day cure period. If, after the 60-day cure period, the Debtors do not come into compliance with the schedule, Marriott may seek relief

from the automatic stay with respect to any or all of the Marriott hotels whose franchise agreements have not already been assumed.

**Notwithstanding the description of the Marriott Adequate Assurance Agreement, franchise agreements, and related agreements in this Disclosure Statement, Marriott has reserved its rights, as more fully set forth in the Bidding Procedures Order [Docket No. 1009], under the franchise agreements and related agreements in connection with any changes in the ownership and management of the Marriott branded hotels and reserves its rights to all remedies, rights and claims available to it at law, in equity or otherwise, to allege defaults under the Marriott Adequate Assurance Agreement, franchise agreements, owner agreements and the Marriott Consent Agreement.  Marriott is currently in discussions with the Debtors to resolve certain alleged defaults under the Marriott Consent Agreement and the Marriott Adequate Assurance Agreement, which the Debtors expect to resolve no later than the Debtors' Sixth Omnibus Hearing on May 24, 2011.  The rights of the Debtors' other franchisors under the terms of their franchise agreements are similarly reserved, subject to applicable law.**

    3.    Prepetition Restructuring Negotiations

    Against the backdrop described above, the Debtors considered their options with respect to a global financial restructuring with the goal of rationalizing the Debtors' secured debt obligations and providing the Debtors with the flexibility necessary to continue their business on a going-forward basis.  Consistent with those goals, in November 2008, the Debtors hired Marc Beilinson, an independent director of Innkeepers since 2007, as Chief Restructuring Officer to explore alternative restructuring opportunities.[16]  In early 2010, the Debtors retained Kirkland & Ellis LLP ("**K&E**") and Moelis ~~& Co. LLC ("**Moelis**")~~ to represent the Debtors in their continued discussions with certain of the Debtors' constituents regarding the evaluation of a possible comprehensive restructuring and other financial alternatives for improving the Debtors' balance sheet.

    The Debtors, with the assistance of their advisors, reviewed and analyzed the Debtors' business operations and determined the cash necessary to work towards a successful restructuring and maintain their operations.   In undertaking this analysis, the Debtors and their advisors considered the impact of the current economic outlook on the Debtors' near-term projected financial performance, including the demand for hotel accommodations and the projected cost to complete the PIPs and other capital improvements necessary to maintain the value of the properties.  Because of the high levels of current debt, the immediate crisis caused by the impending Marriott defaults, and the Debtors' inability to satisfy their debt service obligations as they came due, it became clear that a comprehensive balance-sheet restructuring through a chapter 11 proceeding was the best available restructuring alternative for the Debtors and their estates.

    The Debtors continued to engage several parties, including Marriott, Lehman, and certain prepetition secured lenders, in extensive negotiations leading up to the filing of these Chapter 11 Cases.  Ultimately, these negotiations culminated in a series of interrelated agreements designed to, among other things, (a) fund PIP and other capital expenditures necessary to retain premium brand affiliations, maintain customer loyalty, and improve the Debtors' industry market share and (b) avoid any alleged potential change of control defaults that would jeopardize the Debtors' franchise agreements.

    On July 19, 2010, the Debtors filed for Chapter 11 with a proposed restructuring supported by Lehman, which was intended to eliminate a substantial portion of the Debtors' funded indebtedness, and also provide the Debtors with the necessary financing to fund critical hotel maintenance and repair projects, allowing the Debtors to preserve valuable franchise agreements, meet competitive conditions, and preserve asset value for the Debtors and their estates.

---

[16] Marc Beilinson is a former restructuring attorney with over 25 years of experience.  In November 2009, Mr. Beilinson was elected to serve as an independent director on the board of directors of Apollo Commercial Real Estate Finance Inc., a publicly traded REIT and an affiliate of Apollo Investment Corporation.  Mr. Beilinson no longer serves on this board.

# ARTICLE IV.
## EVENTS OF THE CHAPTER 11 CASES

*A.*     *First Day Pleadings and Other Case Matters*

    1.     <u>First and Second Day Pleadings</u>

To facilitate these Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors' filed certain motions and applications with the Bankruptcy Court on the Petition Date or immediately thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings has facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value.  The first and second day pleadings included the following:

- <u>Customer Programs</u>.  On July 20, 2010, the Bankruptcy Court entered an order authorizing the debtors to honor certain prepetition obligations to customers and otherwise continue certain customer programs and practices in the ordinary course of business [Docket No. 59].  The Debtors did not believe that the obligations at issue represented an out-of-pocket cash cost to the Debtors, but the Debtors believed that honoring the customer programs was the prudent course of action.

- <u>Taxes</u>.  On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to pay certain income, sales and use, franchise, occupancy, and other taxes, assessments, fees, and similar charges in the ordinary course of business [Docket No. 61].  Such payments only affect the timing of payment for the vast majority of the amounts at issue.  The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 184].

- <u>Wages and Employee Benefits</u>.  On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay certain prepetition wages, salaries, and reimbursable employee expenses, (b) pay and honor certain employee medical and other benefits, and (c) continue employee benefits programs [Docket No. 58].  The relief requested and granted by the order allowed the Debtors' business operations to continue without labor-related frustration or interruption.  The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 183].

- <u>Lien Creditors</u>.  On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) grant administrative expense priority to all undisputed obligations for goods ordered prepetition and delivered postpetition and satisfy such obligations in the ordinary course of business, (b) pay prepetition claims of shippers, warehousemen, and materialmen, and (c) pay prepetition PACA claims [Docket No. 60].  The delay and frustration absent an order granting the relief requested could have severely impaired the Debtors' business operations as well as the confidence of counterparties in the Debtors going forward.  The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 185].

- <u>Property Management</u>.  On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to perform under the hotel management agreements and the shared services agreement for services performed that are critical to the ability of the Debtors to operate their portfolio of hotels going forward [Docket No. 62].  The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 190].

- <u>Insurance</u>.  On August 12, 2010, the Bankruptcy Court entered an order authorizing the Debtors to (a) maintain prepetition insurance policies and premium financing agreements and (b) pay all prepetition obligations in respect thereof [Docket No. 186].

- <u>Cash Management</u>.  On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to use their existing cash management system, existing bank accounts, existing business forms, and certain existing investment guidelines [Docket No. 55].  The

Bankruptcy Court entered a final order granting the relief requested on September 2, 2010 [Docket No. 401].

- Cash Collateral. On July 20, 2010, the Bankruptcy Court entered an interim order approving the use of cash collateral to fund operations and restructuring costs [Docket No. 54]. This relief was necessary to ensure the Debtors can continue to operate in the ordinary course during these Chapter 11 Cases. The Bankruptcy Court entered a final order granting the relief requested on September 2, 2010 [Docket No. 402] (amended by subsequent orders entered October 1, 2010 [Docket No. 539] and March 11, 2011 [Docket No. 1008]).

- Lehman DIP. On September 1, 2010, the Bankruptcy Court entered an order authorizing the Debtors to borrow approximately $17.5 million in postpetition debtor-in-possession financing for the specific purpose of funding the PIPs required in the applicable franchise agreements and making certain other investments in properties securing the Floating Rate Pool Mortgage Loan [Docket No. 385]. These funds are critical to the Debtors' ability to meet their obligations under the PIPs.

- Five Mile DIP. On September 2, 2010, the Bankruptcy Court entered an order authorizing the Debtors to borrow approximately $53.0 million in postpetition debtor-in-possession financing for the specific purpose of funding the PIPs and cycle renovations required in the applicable franchise agreements for properties securing the Fixed Rate Pool Mortgage Loan (Tranche A), the San Diego Hotel Mortgage Loan (Tranche B), and the Tysons Corner Hotel Mortgage Loan (Tranche C) [Docket No. 400]. These funds are critical to the Debtors' ability to meet their obligations under the PIPs.

- Plan Support Agreement. On September 2, 2010, the Bankruptcy Court entered an order denying the Debtors' request for approval to enter into a plan support agreement with Lehman [Docket Nos. 403, 776]. Since that date, the Debtors have worked diligently to develop the Plans described in this Disclosure Statement.

2.     Procedural and Administrative Motions

To facilitate the efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the Debtors' chapter 11 cases;

- approving notice, case management, and administrative procedures to govern these Chapter 11 Cases;

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code;

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 50 largest creditors;

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business;

- determining the amount and nature of the adequate assurance payment for future utility service;

- allowing the Debtors to prepare a list of creditors and file a consolidated list of the Debtors' 50 largest unsecured creditors; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in these Chapter 11 Cases.

3.       Retention of Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these Chapter 11 Cases. These professionals include: (a) K&E, as counsel to the Debtors; (b) Moelis, as investment banker to the Debtors; (c) AP Services, LLC, as restructuring advisor to the Debtors; and (d) Omni Management Group, LLC, as the Notice and Claims Agent for the Debtors.

4.       Compensation for the Independent Committee Members and Counsel for Such Committee

The Debtors' plan process required the committee of independent trustees of the Board of Trustees of Innkeepers USA Trust (the "**Independent Committee**") to take on certain special obligations related to the restructuring. To advise it in such endeavors, the Independent Committee hired Fried, Frank, Harris, Shriver & Jacobson LLP ("**Fried Frank**"). On November 10, 2010, the Bankruptcy Court authorized the Debtors to compensate pursuant to section 363 of the Bankruptcy Code (a) the Independent Committee and (b) Fried Frank as counsel to the Independent Committee [Docket No. 701]. Although the Bankruptcy Court authorized the Debtors' compensation of Fried Frank pursuant to section 363 of the Bankruptcy Code, Fried Frank agreed to comply with certain requirements of section 327 of the Bankruptcy Code by filing and serving verified statements of its fees and expenses.

5.       Troy Hotel Dispute

On August 4, 2010, Marriott filed a motion for relief from the automatic stay with regard to a hotel in Troy, Michigan [Docket No. 131] that was not part of the Marriott Adequate Assurance Agreement. In response, the Debtors sought to assume the franchise agreement between the Debtors and Marriott relating to the Troy hotel [Docket No. 172]. After an extensive discovery process, the Debtors determined that the estates were better served by settling with Marriott. The settlement **(the "Troy Settlement Agreement")** included, among other provisions, the Debtors' agreement to allow Marriott to de-identify the Troy hotel in exchange for Marriott's agreement to provide the Debtors with valuable rights related to their PIP obligations, the specifics of which are documented in a confidential settlement agreement disclosed to **and approved by** the Bankruptcy Court [Docket No. 357]. The Debtors also agreed to assume the Marriott Adequate Assurance Agreement [Docket No. 446]. **All of the Debtors' rights and obligations under the Troy Settlement Agreement will be assumed and assigned to New HoldCo.**

6.       Motions Filed by the Ad Hoc Committee of Preferred Shareholders

The Ad Hoc Committee of Preferred Shareholders filed a motion to appoint an examiner in the Debtors' chapter 11 cases on August 11, 2010 [Docket No. 179] as well as a motion, on September 13, 2010, to appoint an official committee of preferred shareholders [Docket No. 435]. After the filing of a number pleadings by various parties in interest, extensive discovery, and contested hearings, the Bankruptcy Court denied both motions without prejudice on October 19, 2010 [Docket Nos. 582 and 583].

7.       Best Western West Palm Beach Dispute

On October 4, 2010, Best Western International, a franchisor for one of the Debtors' hotels, filed a motion seeking relief from the automatic stay to terminate the franchise agreement for the Best Western West Palm Beach Airport Inn in West Palm Beach, Florida [Docket No. 655]. In that motion, Best Western alleged the Debtors were in default of the franchise agreement, and, as a consequence, Best Western should be granted relief from the automatic stay to terminate the franchise agreement. Pursuant to the Bankruptcy Court's oral decision on November 10, 2010, on February 28, 2011, the Bankruptcy Court entered an order denying the relief requested by Best Western [Docket No. 955].

On January 12, 2011, the Debtors filed a motion seeking to reject the franchise agreement at the Best Western West Palm Beach hotel, as well as the related ground lease and other executory contracts on the basis that the property was not profitable [Docket No. 803]. On January 26, 2011, the Bankruptcy Court granted the Debtors' motion, removing the Best Western West Palm Beach hotel from the Debtors portfolio of hotels [Docket No. 865].

8.    Postpetition Insurance Motions

On December 14, 2010, the Bankruptcy Court entered orders permitting the Debtors to enter into certain premium financing agreements [Docket Nos. 759 and 761]. Pursuant to these agreements, AFCO Credit Corporation and IPFS Credit Corporation will provide financing to the Debtors allowing them to meet their premium obligations under their D&O policies, as well as property insurance and workers' compensation policies that are critical to the Debtors business and in some cases required by law. As part of the agreements, AFCO and IPFS received security interests in unearned premiums and dividends that may become payable under the applicable insurance policies.

**9.    Claims Objections**

**In recent weeks, the Debtors have objected to a total of 945 claims for approximately $1.06 billion in liabilities in seven omnibus claims objections. On March 29, 2011, the Debtors filed the first omnibus objection to certain amended and replaced claims [Docket No. 1067] and the second omnibus objection to certain claims that are duplicative of other claims filed against the same Debtors [Docket No. 1068], which were each granted by the Bankruptcy Court [Docket Nos. 1159 and 1160]. On April 19, 2011, the Debtors filed the third omnibus objection to claims filed by affiliates of Chartis, Inc. that lack basis in the Debtors' books and records [Docket No. 1123] and the fourth omnibus objection to (i) claims with insufficient supporting documentation for the Debtors to determine whether they appear in their books and records, (ii) claims that, according to the Debtors' books and records, are against incorrect Debtors, for incorrect amounts, or alleging incorrect priorities, (iii) claims by shareholders more appropriately classified as equity interests, and (iv) claims for which the Debtors' books and records reflect no liability [Docket No. 1125]. On April 20, 2011, the Debtors filed the fifth omnibus objection to claims that, according to the Debtors' books and records, are against an incorrect Debtor or against a single Debtor and should have been asserted against multiple Debtors [Docket No. 1127]; a sixth omnibus objection to redundant claims for which the Debtors' books and records reflect a liability already asserted in a different proof of claim [Docket No. 1129]; and a seventh omnibus objection to certain amended and replaced claims [Docket No. 1131]. A hearing on the third, fourth, fifth, sixth, and seventh omnibus objections is currently scheduled for May 24, 2011 at 11**:00 a.m. prevailing Eastern Time.

**B.    Stipulation Between the Debtors, LNR, and the Ad Hoc Committee**

**On May 3, 2011, after extensive arm's length negotiations between the parties, the Debtors, LNR, and the Ad Hoc Committee entered into a stipulation regarding various issues (the "Stipulation"). The salient terms of the Stipulation are as follows:**

●    **The Trusts serviced by LNR (the "LNR-Serviced Trusts") agree to provide financing to Chatham in connection with their $195 million bid for the LNR Properties.**

●    **The Debtors agree to file, and LNR and the Ad Hoc Committee agree to support, a motion seeking approval of certain bid protections for Chatham.**

●    **The LNR-Serviced Trusts agreed to waive any right in the approximately $7.4 million of cash currently existing in a segregated bank account held in the name of Innkeepers USA Limited Partnership.**

●    **The LNR-Serviced Trusts agreed to waive any and all deficiency, guarantee, and other claims against all of the Debtors they may be entitled on account of the secured mortgage loans for the LNR Properties except as set forth in the Stipulation. More specifically, the LNR-Serviced Trusts' claims against the Debtors are deemed allowed with interest at the non-default rate through the Effective Date, plus fees and expenses, including legal and financial advisor fees and expenses, servicing fees, an assumption fee, and a liquidation fee, as follows:**

○    **Claim No. 1632 in the stated amount of $24,501,947.20, will be an allowed secured claim against KPA San Antonio, LLC in the amount of $24,062,695.40 (a reduction of $439,251.70);**

- o **Claim No. 1634 in the stated amount of $47,787,117.82, will be an allowed secured claim against KPA RIMV, LLC in the amount of $47,168,769.26 (a reduction of $618,348.56);**

- o **Claim No. 1635 in the stated amount of $37,907,080.79, will be an allowed secured claim against KPA RIGG, LLC in the amount of $37,416,576.45 (a reduction of $490,504.34);**

- o **Claim No. 1636 in the stated amount of $25,919,415.27, will be an allowed secured claim against KPA Washington DC, LLC in the amount of $25,454,752.20 (a reduction of $464,663.07); and**

- o **Claim No. 1637 in the stated amount of $25,514,424.38, will be deemed an allowed claim against KPA Tysons Corner RI, LLC in the amount of $25,057,021.67 (a reduction of $457,402.71).**

- • **The Debtors will pay a $2.5 million structuring fee to the LNR-Serviced Trusts on the earlier of the effective date or upon termination of the Stipulation, which fee will be pari passu with the Five Mile DIP Facility (to the extent allowed under the order approving such loan).**

- • **The definition of "Releasing Parties" will be expanded in the applicable plan to include (a) the successful bidder (in this case, Chatham); and (b) LNR, the LNR-Serviced Trusts, and master servicer for each of the loans secured by the LNR Properties (the "Trust Secured Loans").**

- • **The Ad Hoc Committee will release LNR, the LNR-Serviced Trusts, and master servicer for each of the Trust Secured Loans.**

- • **LNR agrees to support approval of the Debtors' disclosure statement for a plan that encompasses the LNR Properties.**

- • **The Debtors agree (a) to file objections to all disputed claims on or before June 15, 2011; (b) to file a motion to estimate any unliquidated claims on or before the effective of the plan; (c) that counsel to the Debtors will participate in a telephonic conference with counsel to the Ad Hoc Committee every other week regarding the outstanding claims; and (d) that counsel to the Debtors would consult with the Ad Hoc Committee prior to settling any claims in excess of $250,000.**

- • **The Debtors agree to provide the Ad Hoc Committee, on or before the 15th day of each month following the effective date with (a) a statement of uses of all proceeds of the LNR Properties and all other assets of the Debtors' estates not subject to blanket mortgages; and (b) an estimate of the ultimate aggregate distributions to the series C Preferred Shareholders.**

**On May 6, 2011, the Debtors filed *Debtors' Motion for Entry of an Order Approving (I) Stipulation By and Between Debtors, LNR Partners LLC, and Ad Hoc Committee of Preferred Shareholders and (II) Break-Up Fee and Expense Reimbursement for Chatham Lodging L.P.* [Docket No. 1205] (the "Bid Protections Motion"). The Bid Protections Motion seeks the Court's approval of certain bid protections for Chatham L.P.—the successful bidder at the Debtors' Auction for the LNR Properties. Specifically, the asset purchase agreement governing the Chatham Bid (the "APA") contemplates (and the Bid Protections Motion seeks approval of) (a) a break-up fee of $2.0 million and (b) an expense reimbursement of up to $500,000, as well as an additional expense reimbursement of up to $500,000 if the Court does not confirm a plan of reorganization before June 30, 2011. The break-up fee and expense reimbursement are payable to Chatham Lodging, L.P. if the closing does not occur by August 5, 2011 or if the Debtors exercise their fiduciary right to terminate the APA.**

## C. B. The LP Bank Account

On the Petition Date, Innkeepers USA Limited Partnership held a bank account that contained, among other things, Cash collected from three sources: (a) the operation of the Debtors' hotels; (b) transfers from Apollo in January and May 2010; and (c) transfers from Lehman just prior to the Petition Date to pay for certain PIP and renovation related expenditures that the Debtors were unable to disburse because of the Debtors' bankruptcy filings. On September 23, 2010, the Debtors communicated to all of their major constituencies that they would separate this Cash, which amounted to approximately $7.4 million, from the Debtors' operating account into a new Bank of

America account in the name of Innkeepers USA Limited Partnership (the "**LP Account**"), that the Debtors would not use funds from this new account without a prior Bankruptcy Court order, and that all parties would retain their right to claim entitlement to these funds.  All parties continue to retain their right to claim entitlement to the funds in the LP Account **(with the exception of LNR, who waived all rights related to the LP Account in the Settlement)**.

**D.**    ~~C.~~ *Claims Bar Date*

On September 1, 2010, the Debtors filed their schedules and statements with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code [Docket No. 390].  The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case.  Any creditor whose Claim is not scheduled in the Debtors' schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim.

On September 16, 2010, the Bankruptcy Court entered an order [Docket No. 440] approving (a) October 29, 2010 as the deadline for filing Claims in the Debtors' Chapter 11 Cases, including Claims under section 503(b)(9) of the Bankruptcy Code; (b) January 18, 2011 as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the Debtors' Chapter 11 Cases; (c) procedures for filing proofs of claim; and (d) the form and manner of notice of the bar dates.

[*Rest of Page Intentionally Left Blank*]

The table below provides summary information about timely Filed and scheduled Claims, the face amount of those Claims, and the Debtors' estimate of the range of Allowed General Unsecured Claims at each Debtor. The estimates of Allowed unsecured Claims below do not include franchisor claims or deficiency claims. **The information contained in the table is based on a preliminary review of Filed Claims and should be considered speculative and subject to material revision. All figures are subject to ongoing review. No information contained in the table is an admission of the validity or Allowed amount of any Claim. The Debtors are providing the information as guidance only.**

| Debtor | ~~Number~~ No. of Filed Claims | ~~Number~~ No. of Scheduled Claims | Face Amount of Filed Claims | Estimated Amount of ~~Allowed Unsecured~~ **Final** Claims ~~Estimated~~ **High** ~~Case~~ | ~~Estimated~~ **Low** ~~Case~~ |
|---|---|---|---|---|---|
| ~~GP~~ **Grand Prix** Fixed Lessee **LLC** | ~~239~~ **264** | 1,203 | $ ~~5,360,802~~ **5,426,398** | $ ~~2,666,611~~ **2,606,286** | $ ~~2,169,733~~ **2,118,679** |
| ~~GP~~ **Grand Prix** Floating Lessee **LLC** | ~~145~~ **159** | 857 | ~~240,299,730~~ **240,493,596** | ~~1,657,557~~ **1,673,489** | ~~1,397,207~~ **1,379,053** |
| ~~GP~~ **Grand Prix** Mezz Borrower Fixed**,** **LLC** | ~~421~~ **405** | 536 | ~~140,880,162~~ **141,195,739** | ~~496,369~~ **343,217** | ~~325,184~~ **325,028** |
| ~~GP~~ **Grand Prix** Mezz **Borrower** Floating**,** LLC | ~~207~~ **202** | 248 | ~~5,064,458,886~~ **5,064,655,336** | ~~2,532,101~~ **2,400,005** | ~~953,043~~ **952,725** |
| **Fixed/Floating Subtotal** | ~~1,012~~ **1,030** | **2,844** | $ ~~5,450,999,580~~ **5,451,771,069** | $ ~~7,352,638~~ **7,022,997** | $ ~~4,845,167~~ **4,775,484** |
| ~~GP~~ **Grand Prix** Anaheim Orange Lessee **LLC** | ~~27~~ **28** | 119 | $ ~~16,531,254~~ **16,554,284** | $ ~~251,790~~ **268,948** | $ ~~230,125~~ **239,900** |
| ~~GP~~ **Grand Prix** General Lessee **LLC** | ~~34~~ **37** | 167 | ~~3,332,818~~ **3,340,771** | ~~240,923~~ **236,452** | ~~151,628~~ **151,152** |
| **Grand Prix Mezz Borrower Term LLC** | **2** | **2** | **24,408,000** | | |
| ~~GP~~ **Grand Prix** Ontario Lessee**,** **LLC** | ~~25~~ **24** | 141 | ~~48,289,385~~ **48,294,534** | ~~214,814~~ **197,974** | ~~175,905~~ **175,724** |
| ~~GP~~ **Grand Prix** RIGG Lessee **LLC** | 29 | 78 | ~~6,366,689~~ **6,375,742** | ~~124,632~~ **114,579** | ~~99,781~~ **99,765** |
| ~~GP~~ **Grand Prix** RIMV Lessee**,** **LLC** | 18 | 84 | 3,210,420 | ~~90,547~~ **90,675** | 70,033 |
| KPA HI Ontario **LLC** | ~~11~~ **12** | 18 | ~~48,217,869~~ **48,347,474** | ~~220,095~~ **297,228** | 151,134 |
| KPA HS Anaheim, LLC | ~~8~~ **7** | 9 | ~~16,823,448~~ **16,950,422** | 0 | 0 |
| ~~KPA Mezz Borrower Term LLC~~ | ~~2~~ | ~~2~~ | ~~24,408,000~~ | ~~0~~ | ~~0~~ |
| KPA RIGG**, LLC** | ~~9~~ **10** | 9 | ~~4,565,175~~ **4,565,307** | 236 | 0 |
| KPA RIMV**, LLC** | 10 | 10 | 3,210,913 | 0 | 0 |
| KPA San Antonio**, LLC** | ~~9~~ **10** | 9 | ~~3,968,409~~ **4,163,096** | 0 | 0 |
| KPA Tysons Corner RI**, LLC** | ~~7~~ **5** | 15 | ~~3,177,473~~ **3,177,595** | 2,498 | 2,498 |
| KPA Washington DC, LLC | 6 | 7 | 3,151,703 | **0** | |
| **Other Subtotal** | ~~195~~ **198** | **668** | $ ~~185,253,556~~ **185,750,262** | $ ~~1,145,535~~ **1,208,589** | $ ~~881,104~~ **890,205** |
| ~~GP~~ **Grand Prix** Holdings **LLC** | 10 | 9 | $ 456,553,719 | $ 0 | $ 0 |
| ~~GP Mezz~~ **Grand Prix** IHM**, Inc** | ~~13~~ **15** | 4 | ~~3,752,106~~ **3,759,721** | ~~15,834~~ **0** | 0 |
| Grand Prix Term Lessee LLC | ~~2~~ **1** | 2 | 3,119,130 | 0 | 0 |
| Innkeepers Financial ~~Corp.~~ **Corporation** | 9 | 5 | 3,125,400 | ~~4,022~~ **0** | 0 |
| Innkeepers USA Limited Partnership | ~~63~~ **64** | 60 | ~~439,813,786~~ **440,338,420** | ~~774,930~~ **772,953** | 208,196 |
| Innkeepers USA Trust | ~~458~~ **462** | 20 | ~~41,440,981~~ **42,230,048** | ~~815,021~~ **780,627** | |
| KPA Leaseco Holding Inc. | 3 | 24 | 3,167,445 | 120,660 | 119,683 |
| KPA Leaseco**,** Inc**.** | ~~10~~ **12** | 5 | ~~203,119,148~~ **203,122** | 601 | 0 |

| | | | $,337 | | | |
|---|---|---|---|---|---|---|
| **Parent Company Subtotal** | 568 576 | 129 | $ 1,154,091,715 1,155,416,220 | $ 1,731,068 1,674,841 | $ | $ 327,879 |
| **TOTAL** | 1,775 1,804 | 3,641 | $ 6,790,344,851 6,792,937,551 | $ | 10,229,241 9,906,428 | $ 6,054,150 5,993,569 |

**E. D. Exclusivity**

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief, which period may be extended by the bankruptcy court for a period of up to 18 months after the petition date.

On October 27, 2010, the Debtors filed a motion seeking to extend the exclusive periods during which only the Debtors may file a chapter 11 plan and solicit acceptances thereof to March 16, 2011 and May 15, 2011, respectively [Docket No. 610]. A number of parties filed responses or objections [Docket Nos. 663, 665, 666, 667, 673, and 675]. After a period of fact development and negotiation, the Debtors and the objecting parties agreed upon an extension of the Debtors' exclusivity periods for an additional 75 days through and including January 30, 2011 and March 31, 2011 for the filing of a plan and the solicitation thereof, respectively. The Bankruptcy Court entered an order giving effect to that negotiated resolution on November 10, 2011 [Docket No. 699].

On January 13, 2011, the Debtors filed a second motion to further extend their exclusive periods for filing a chapter 11 plan and soliciting acceptances thereof through and including May 30, 2011 and July 29, 2011, respectively [Docket No. 805]. On January 26, 2011, the Bankruptcy Court entered a bridge order extending the Debtors' exclusive periods through and until March 29, 2011 [Docket No. 861] when the motion could be heard. Pursuant to the **Five Mile/Lehman** Commitment Letter, the Debtors agreed to modify their original request for a 120-day extension of its exclusive periods and agreed to only seek an extension to June 30, 2011 (subject to further requests), and Five Mile, Lehman, and Midland agreed that they would support such modified request. On March 29, 2011, the Bankruptcy Court further extended the Debtors' exclusive periods for filing a chapter 11 plan to June 30, 2011 [Docket No. 1065]. The Debtors' rights to seek additional extensions of the exclusive periods beyond June 30, 2011, and the rights of Five Mile, Lehman and Midland to oppose additional extensions and to move to terminate exclusivity, are preserved.

During the period established by the above orders of the Bankruptcy Court, no other party in interest may file a competing chapter 11 plan or plans; however, a court may modify the exclusive period upon request of a party in interest and "for cause." The Debtors have filed the Plan and Disclosure Statement within the exclusivity period, as extended by the Bankruptcy Court, and reserve the right to seek extensions of their exclusive right to file a plan or plans and solicit votes thereon if necessary and appropriate.

**E. E. Pending Litigation Proceedings**

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their business. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. Nevertheless, they do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition, or results of operations.

With certain exceptions, the filing of these Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of these Chapter 11 Cases is subject to compromise, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with these Chapter 11 Cases. This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

On March 29, 2011 the Court extended the period during which the Debtors may file notices of removal with respect to any actions that are subject to removal under 28 U.S.C. § 1452 [Docket No. 1063]. Specifically, the Debtors' removal deadline under Bankruptcy Rule 9027 is the latest of: (a) October 10, 2011; (b) the day that is 30 days after the entry of an order terminating the automatic stay provided by section 362 of the Bankruptcy Code with respect to the particular action sought to be removed; and (c) with respect to actions filed during the pendency of these Chapter 11 Cases, the time periods set forth in Bankruptcy Rule 9027(a)(3).

**G.** ~~F.~~ *The LNR/CRES Litigation*

On October 27, 2010, LNR filed a complaint and temporary restraining order in the Supreme Court of the State of New York seeking, among other things, specific performance and/or preliminary injunctive relief requiring CRES Investment No. II, LP ("**CRES**"), to terminate Midland Loan Services, Inc. as special servicer for the Fixed Rate Pool Mortgage Loan and appoint LNR as special servicer for the Fixed Rate Pool Mortgage Loan. See LNR Partners, LLC v. CRES Investment No. II, LP, Case No. 651850-10 (N.Y. Sup. Ct. Oct. 27, 2010). The action was removed to the Bankruptcy Court on November 10, 2010. See LNR Partners, LLC v. CRES Investments No. II, LP, Adv. Proc. No. 10-04237 (the "**LNR/CRES Litigation**"). In the LNR/CRES Litigation, LNR seeks to compel CRES to terminate Midland as the special servicer of the Fixed Rate Pool Mortgage Loan and to pay damages to LNR for CRES's alleged breach of contract in failing to appoint LNR as special servicer. LNR claims that CRES is obligated to exercise its purported right to terminate Midland and name LNR the special servicer of the Fixed Rate Pool Mortgage Loan based on a demand by LNR of April 2010 issued pursuant to a November 30, 2007 Servicer Designation Agreement among CRES, LNR, and others. CRES denies that it has any obligation to appoint LNR as special servicer for the Fixed Rate Pool Mortgage Loan and alleges that the November 30, 2007 Servicer Designation Agreement does not address designation of the special servicer for the Fixed Rate Pool Mortgage Loan. CRES opposed LNR's request for injunctive relief and also filed a motion to dismiss the LNR/CRES Litigation. At a hearing held on December 16, 2010, the Bankruptcy Court denied LNR's request for equitable and injunctive relief, finding that LNR had an adequate remedy at law in the form of monetary damages. The Bankruptcy Court requested further briefing on one issue in order to rule on CRES's motion to dismiss LNR's claim for breach of contract. The parties are currently awaiting a decision by the Bankruptcy Court and the matter remains *sub judice.*

~~G.      *Compensation of the Debtors' Chief Restructuring Officer*~~

**H.       Deficiency Claims**

**Pursuant to the Stipulation, the LNR-Serviced Trusts waived their rights to any distribution on account of any deficiency claim that could be asserted against the Debtors. Each of the Plans contemplates that none of the senior secured mortgage lenders will receive any recovery on account of any deficiency or guaranty claims they may hold against any of the Debtors. The Debtors understand that certain of the Holders of such Claims may disagree with this treatment.**

**I.       The Debtors' Management Team**

**Innkeepers' management team consists of Chief Executive Officer Timothy Walker,** *Chief Restructuring Officer* **Marc Beilinson, and General Counsel Mark Murphy. Mssrs. Walker and Murphy are parties to employment agreements with Innkeepers.** On January 31, 2011, the employment agreement between Innkeepers and its Chief Restructuring Officer, Marc Beilinson, expired. The Board determined that the continued employment of Mr. Beilinson was critical to the ongoing restructuring and, at the Board's request, Mr. Beilinson agreed to continue his employment on an at-will basis while the Board considered and negotiated his compensation and incentive package for the current year. During this time, Mr. Beilinson **has** received his current ~~base salary~~**compensation** pursuant to Board direction.

~~In March 2011, the Board hired~~ *the compensation consultant Johnson Associates, Inc.,* ~~and directed them~~ *to examine compensation structures of comparable real estate and hotel businesses and approved incentive programs of companies in large chapter 11 cases. Based upon the analysis of Johnson Associates, and in consultation with its other advisors, on April 1, 2011, the Compensation Committee and then the Board considered and approved~~ the Management Incentive Program for Mr. Beilinson, including up to $2 million in incentives linked to operating and~~

44

~~restructuring milestones, which are set forth on Schedule 2. The Debtors have shared the compensation proposal with some of their constituents and are currently engaged in discussions regarding the proposal.~~

~~Unless otherwise approved during the Chapter 11 Cases, on the Effective Date of the Fixed/Floating Plan, the Management Incentive Program (as set forth in the Plan Supplement) shall be deemed approved in its entirety without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity and the Debtors will be authorized to make all payments due under the Management Incentive Program on the Effective Date.~~

**J.** ~~H.~~ *The Debtors' Plan Process*

The Debtors have engaged all major stakeholders to solicit input regarding restructuring alternatives with the goal of proposing and filing a consensual plan. To promote meaningful plan development and dialogue, the Debtors created a virtual data room through which potential plan sponsors could perform necessary diligence. The Debtors established a communication protocol to solicit, receive, and consider restructuring proposals. The Debtors also formed a committee of independent trustees of Debtor Innkeepers USA Trust to facilitate the plan consideration process.

The Debtors focused their energy and resources on pursuing a single, comprehensive process—after soliciting input from their key constituencies on the parameters of such process—that was intended to maximize value for the benefit of their estates and creditors. As part of this plan process, the Debtors and their advisors, including Moelis, engaged all of their key constituencies in active discussions regarding the Debtors' restructuring strategy and solicited restructuring proposals from a selected group of potential plan sponsors whose financial wherewithal and experience in the hospitality and real estate industries could have benefited the Debtors' estates. The Debtors provided their key constituencies with multiple and regular status updates and provided the Bankruptcy Court with updates through status reports, chambers conferences, and statements made on the record at the Debtors' hearings.

1. Selection of a Stalking Horse

The Debtors engaged in an intensive stalking horse bidder selection process. Following a meeting of the Independent Committee of the Board on September 20, 2010, and a Board meeting on September 21, 2010, the Debtors began a process of developing plan concepts and a more detailed process timeline to facilitate a restructuring process aimed at maximizing the value of the Debtors' estates for the benefit of all constituents. The Debtors' management and advisors met over the next four weeks (including several meetings with the Debtors' key constituencies) to discuss and develop restructuring alternatives and the appropriate process to pursue a strategy to maximize value.

Following a meeting of the Board on October 19, 2010, where a number of possible restructuring alternatives were discussed, reviewed, and considered, the Board requested that Moelis consider and propose a process to explore an enterprise-level restructuring.

On October 22, 2010, the Debtors and their advisors presented the Board with, and the Board approved, proposed timelines for selecting a stalking horse bidder and engaging in a process to achieve that. At the meeting, Moelis proposed a detailed timeline with the goal of selecting a stalking horse for plan sponsorship for an enterprise-level restructuring transaction within four weeks and selecting the winning bidder within approximately 14 weeks. After discussion and input, the Board approved the proposed timeline and tasked Moelis and the Debtors' management with executing the stalking horse process and meeting the various milestones set forth therein.

On October 26, 2010, the Board held another meeting to discuss the plan process going forward. The Debtors identified Five Mile and four other stalking horse candidates, which list included large private equity firms and real estate-focused investors. The Debtors selected the four other stalking horse candidates from a list of potential investors compiled by Moelis, which was narrowed to the four potential bidders based on, among other criteria, the following: (a) availability of funds; (b) breadth and depth of experience within the lodging sector; (c) familiarity with the bankruptcy process; and (d) ability to execute due diligence in a timely manner. Following the selection of these stalking horse bidder candidates, the Debtors and their advisors engaged in a process to select the stalking horse

bidder. Between October 26 and November 3, 2010, the Debtors and their advisors negotiated confidentiality agreements with the stalking horse candidates.

Between October 30 and November 9, 2010, the Debtors granted the potential stalking horse bidders access to an electronic data room for the potential bidders to conduct due diligence. The data room contains detailed information regarding the Debtors' business and finances.

After the November 10, 2010 hearing on the Debtors' motion to extend exclusivity, the Debtors distributed a process letter to the stalking horse candidates outlining the timeframe and requesting indications of interest on or before November 23, 2010 (the "**Process Letter**").

The Debtors and their advisors worked to facilitate the formulation of offers by the stalking horse candidates in a number of ways. For example, Moelis and the Debtors' management coordinated an aggregate of over 120 site visits by the stalking horse candidates and over 25 diligence calls with sales, general, and/or regional managers of the Debtors' hotels. In addition, Moelis held numerous conference calls with the stalking horse candidates to exchange views, to solicit feedback, and to facilitate the formulation of offers. The Debtors' management team also made itself available for a conference call with each stalking horse candidate to discuss the Debtors' revised financial model.

On or shortly after the November 23, 2010 deadline provided for in the Process Letter, four out of the five stalking horse candidates, including Five Mile/Lehman, responded with proposals. All indications of interest contemplated some form of enterprise-level restructuring, notwithstanding the Debtors' willingness to entertain non-enterprise-level restructuring proposals as well. After evaluating these indications of interest, as well as factors regarding each candidate's ability to close their proposed transaction, the Debtors, in consultation with their advisors, conducted a side-by-side analysis of the proposals. Moelis then followed-up with each of the stalking horse candidates to ask clarifying questions and to better understand the proposals and determine the extent to which each candidate would be flexible in changing certain terms of their offers.

Through this process, the Debtors received a verbal offer to modify the structure of one stalking horse proposal. However, the Debtors and their advisors, in consultation with the Independent Committee, determined the proposed verbal modification from the potential bidder would not work structurally and was not worth pursuing for a variety of reasons, including the candidate's need for additional diligence. Two other stalking horse candidates failed to indicate whether they would be willing to materially change the terms of their offers at that time. As a result, the Debtors were left with two proposals, one from Five Mile/Lehman and the other from the stalking horse candidate identified to the key constituencies as Bidder D ("**Bidder D**").

On December 2, 2010, the Independent Committee met with its counsel, Fried, Frank, and the Debtors' management and advisors to discuss the stalking horse proposals. In advance of the meeting, the members of the Independent Committee received the stalking horse proposals, as well as a presentation by Moelis summarizing the terms of each proposal, including the initial Five Mile/Lehman proposal, and comparing contemplated recoveries under each offer. At the Independent Committee meeting, the stalking horse bidders and their proposals were discussed in detail. The terms of each proposal, as well as the contemplated recoveries under each, were analyzed for their impact on the Debtors' estates and on the Debtors' constituents. In addition, the Independent Committee decided on a process moving forward, as well as a recommendation to the Board for the selection of a stalking horse bid. After considering each of the proposals, the Independent Committee concluded that the Bidder D proposal was the highest and best offer at that time.

At a Board meeting held on December 3, 2010, the Board agreed with the Independent Committee's assessment and made the determination that Bidder D's proposal represented the highest and best offer presented. The Board selected Bidder D to be the stalking horse subject to the Debtors' advisors continuing their efforts to negotiate certain requested modifications with Bidder D that would make the Bidder D proposal even more favorable to the estates, while also instructing the Debtors and their advisors to engage with the constituencies to keep them apprised and solicit feedback on the process and the Bidder D proposal.

Following further negotiations with Bidder D, the Debtors received a revised Bidder D proposal on December 4, 2010, incorporating certain, but not all, of the Debtors' requested modifications. The Debtors and Bidder D and their advisors then began the process of negotiating appropriate documentation with Bidder D, while the

Debtors and their advisors contacted constituencies to inform them about the Debtors' selection of Bidder D and to solicit feedback from the constituencies about the Bidder D proposal and the process going forward.

On December 7 and December 8, 2010, the Debtors and their advisors met in person or by telephone with each of the key constituencies, including Midland, Lehman, LNR Partners, LLC, CWCapital Asset Management, LLC, TriMont, the Creditor's Committee, and the Ad Hoc Committee, to advise them of the status of the stalking horse bid process and of the Debtors' intentions to move expeditiously to seek approval of bidding procedures and bid protections. Prior to these meetings, the Debtors asked each participating constituent to confirm its agreement to keep the information regarding the stalking horse proposals confidential, in accordance with the confidentiality agreements previously executed between each constituent and the Debtors. At these meetings, subject to the confidentiality agreements, the Debtors' management and advisors provided the key constituencies (other than Lehman, given its status as a potential bidder) with documentation summarizing each of the stalking horse proposals (without identifying which bidder had proposed which bid) and explained the analyses that the Debtors, their advisors, and the Board had performed in reaching their conclusions regarding the Bidder D proposal. The Debtors and their advisors also solicited input from the key constituencies at these meetings. At or around the same time, the Debtors notified the stalking horse candidates, including Five Mile, that they had selected Bidder D's proposal as the stalking horse proposal.

At the same time, the Debtors and their advisors proceeded to document the Bidder D proposal. On December 9, 2010, the Debtors and their advisors updated the Board on the status of discussions with Bidder D regarding its proposal and the stalking horse process. In addition to an update on the status of negotiations with Bidder D, the Debtors and their advisors apprised the Board of communications with the Debtors' constituencies regarding the Bidder D proposal and the concerns raised by the constituencies, including Midland and Lehman, about the Bidder D proposal and the Debtors' selection of a stalking horse bidder. After this update, the Board directed the Debtors' management and advisors to focus their resources on attempting to finalize documentation with Bidder D, while also continuing their discussions with the key constituencies to solicit feedback and to incorporate the constituencies' thoughts, to the extent possible, in the process.

Certain constituencies raised concerns with the Debtors' management and advisors that the Debtors were proceeding on an expedited timeline to select Bidder D as the stalking horse bidder without engaging in direct negotiations with Five Mile and Lehman before selecting Bidder D. While the Debtors and their advisors were sensitive to these concerns, they were focused on reaching agreement on a proposal that would lead to an auction process commencing with the best baseline bid.

On December 10, 2010, Five Mile/Lehman informed the Debtors it had substantially improved its proposal and that commitment letters had been signed between Five Mile and Lehman and Five Mile and Midland. On December 13, 2010, the Debtors met with representatives from Five Mile/Lehman and Midland to discuss their revised offer. In advance of this meeting, Five Mile/Lehman sent the Debtors and their advisors a revised commitment agreement between Lehman and Five Mile, executed as of December 10, 2010, detailing a joint commitment to act as plan sponsors with the support of Midland.

At the December 13, 2010 meeting, Five Mile/Lehman and Midland discussed the revised proposal in detail with the Debtors and their advisors. Following the meeting, the Debtors and their advisors reviewed and analyzed the revised proposal and determined that it was a significant improvement over Five Mile/Lehman's previous proposal from November 23, 2010, and that it was competitive with and possibly superior to the Bidder D proposal.

On the night of December 13, 2010, the Debtors and their advisors reconvened with Five Mile/Lehman and Midland to further negotiate certain terms of the proposal. These discussions lasted well into the evening and focused on the Debtors' desire that the Five Mile/Lehman Bid contain significant consideration for other constituencies, including unsecured creditors, preferred shareholders, and lenders for the mezzanine debt on the Floating Rate Pool. In addition, the Debtors requested modifications to the proposed bid protections in the proposal. These discussions were productive and resulted in agreement from Five Mile/Lehman and Midland to: (a) increase recoveries to unsecured creditors; (b) provide a baseline recovery and the Co-Investment Right to the holders of the Series C Preferred Shares; (c) resolve litigation between Midland and Apollo on account of the Apollo Guaranty thereby enhancing recoveries for Series C Preferred Shareholders; (d) provide some form of structured debt or equity instrument or other consideration for the Floating Rate Mezzanine Lenders; (e) reduce the initial overbid protection to

$15 million inclusive of the Break-Up Fee and the Expense Reimbursement; (f) agree not to object to an expense reimbursement of up to $500,000 for Bidder D; and (g) increase the Expense Reserve from $4.5 million to $18.5 million.

Following this meeting, the Debtors and their advisors conducted further side-by-side analyses of the Five Mile/Lehman proposal and the other stalking horse bids and concluded that the Five Mile/Lehman proposal, as revised, provided the highest and best offer received to date. On the morning of December 14, 2010, the Debtors and their advisors had a status call with the Board to inform it generally about the updated situation regarding the Five Mile/Lehman proposal. The Debtors and their advisors then held a separate conference call with the Independent Committee to discuss the Five Mile/Lehman proposal in detail. The Independent Committee considered the Five Mile/Lehman proposal and the Bidder D proposal and concluded that the Five Mile/Lehman proposal was the superior bid. The Independent Committee thus decided to recommend the Five Mile/Lehman proposal to the Board.

In a subsequent meeting with the Board on December 14, 2010, the Independent Committee provided its recommendation to the Board. The Board considered the Five Mile/Lehman proposal in detail, and agreed with the Independent Committee's assessment that it provided the best and highest offer received to date. The Board then instructed the Debtors and their advisors to continue negotiations with Five Mile/Lehman and Midland to improve their bid, while working to finalize a commitment.

Between December 14 and December 16, 2010, the Debtors and their advisors informed the other constituencies about the selection of Five Mile/Lehman as the stalking horse bidders and solicited feedback. In addition, the Debtors and their advisors continued negotiations with Five Mile/Lehman and Midland between December 14 and December 22, 2010, to improve recoveries for most constituencies and to improve the contemplated bid protections.

On December 18, 2010, the Debtors and their advisors met with the Board again to provide another status update on the negotiations with Five Mile/Lehman. At that meeting, the Debtors advised the Board of the open issues in the negotiations and the Board requested that the Debtors and their advisors proceed with finalizing the commitment letter on the best terms and conditions the Debtors could negotiate.

Throughout that weekend, the Debtors and their advisors continued to engage in near around-the-clock negotiations with Five Mile/Lehman and Midland to address or otherwise minimize the Board's concerns. As a result of those negotiations, the Debtors won concessions from Five Mile/Lehman, including an extension of the post-stalking horse selection marketing period to 45-days, with no limitation on the Debtors' ability to market prior to approval of the Bidding Procedures.

On December 21, 2010, the Debtors and their advisors met with the Independent Committee and the Board to provide a further update on the status of their negotiations with Five Mile/Lehman and to discuss the issues of concern that the Board had with the Five Mile/Lehman proposal. At that meeting, the Board discussed the proposal from the Ad Hoc Committee and considered it against the entire package presented by Five Mile/Lehman and Midland. The Board determined that it should not risk losing the benefits of the Five Mile/Lehman Bid, including support from the Debtors' two largest creditors representing more than $1 billion in claims, the portability of the Midland Financing to other bidders pursuant to the **Five Mile/Lehman** Commitment Letter, the baseline recoveries for other constituents, and the broad "fiduciary out" in the **Five Mile/Lehman** Commitment Letter.

Following the December 21 meeting of the Board, the Debtors and their advisors continued their ongoing negotiations with the Five Mile/Lehman and Midland to finalize the **Five Mile/Lehman** Commitment Letter and related documentation.

On December 23, 2010, the Debtors and their advisors met with the Independent Committee and the Board to provide a further update on the status of their negotiations with Five Mile/Lehman. After due consideration, and after weighing the benefits and detriments of the Five Mile/Lehman Bid, and after receiving advice from the Debtors' advisors, the Independent Committee unanimously recommended approval of the Five Mile/Lehman Bid to the Board and the Board (with each of the Apollo Board members and the Chief Restructuring Officer having recused themselves from voting) determined to move forward with the Five Mile/Lehman Bid (the "**Original Stalking Horse**

**Proposal**").  On January    14, 2011, the Debtors filed a motion to, among other things, approve the Original Stalking Horse Proposal and related bidding procedures.

In addition to pursuing the Five Mile/Lehman Bid through the stalking horse process, the Debtors and their advisors continued to engage in a broad marketing process deliberately and carefully designed to maximize the value of the estates.  Consistent with the directions of the Board and the Independent Committee, Moelis and the Debtors' management contacted a broad range of prospective buyers, representing a spectrum of potential interest, from established hotel owners and operators, to large private equity investors, sovereign wealth funds, and individual investors.

As part of this effort, the Debtors' management and Moelis began to circulate a marketing teaser letter (the "**Initial Marketing Letter**") on January 7, 2011 circulated the Initial Marketing Letter to over 100 potential financial, strategic, and other buyers.  The Initial Marketing Letter explains the benefits of becoming a bidder for the Debtors' enterprise or their individual assets, and sets forth in detail the investment opportunity in sponsoring a plan of reorganization for the Debtors or in otherwise offering a proposal to purchase or acquire all or a portion of the Debtors' assets.

On January 24, 2011, the Debtors' management and Moelis began to circulate a more detailed and updated process letter (the "**Follow-Up Process Letter**").  The Follow-Up Process Letter was sent to over 70 potential buyers, including financial and strategic investors.  The Follow-Up Process Letter invited proposals in all forms that will maximize value, and also described the process to conduct due diligence and to submit proposals both in advance of and after the hearing on the Original Stalking Horse Proposal (the "**Stalking Horse Hearing**").

The Debtors also issued a press release on January 24, 2011 announcing the Five Mile/Lehman Bid (the "**Press Release**").  The Press Release described and further highlighted the Debtors' continued pursuit and consideration of all value-maximizing proposals, including non-enterprise based proposals.

On January 24 through January 26, 2011, representatives of Moelis attended The American Lodging Investment Summit Conference in San Diego, California (the "**ALIS Conference**") to promote or generate potential investor interest.  At the ALIS Conference, Moelis representatives engaged with numerous potential buyers to discuss the investment opportunity in acquiring the Debtors' enterprise or their individual assets.  In addition to seven scheduled meetings with prospective investors, Moelis conducted several ad hoc discussions with potentially interested parties during the ALIS Conference.

On February 1, 2011, the Board held a meeting to discuss the ongoing marketing process.  In furtherance of this discussion, the Debtors and their advisors provided a detailed process update to the Board, presented a comparison of restructuring proposals (including the Five Mile/Lehman Bid, the stalking horse proposals of Bidders A-D, and earlier bids from Five Mile), discussed the Initial Marketing Letter, and informed the Board of the status of discussions with potential buyers.

On February 11, 2011, Moelis conducted a meeting with financial advisors to the Debtors' key constituencies.  At the meeting, Moelis provided an update on the Debtors' marketing process in detail and solicited feedback from the financial advisors.

     2.     The **Five Mile/Lehman** Commitment Letter

On February 15, 2011, the Debtors received an offer from Lehman to modify the ~~Initial~~**initial Five Mile/Lehman** Commitment Letter with certain proposed amendments that envision carving out those Debtors from the Initial **Five Mile/Lehman** Commitment Letter and the Five Mile/Lehman Bid that own and/or lease the Seven Sisters—Anaheim Hilton Suites, Hilton Ontario, Residence Inn Mission Valley, Residence Inn Anaheim (Garden Grove), Doubletree Washington, DC, Residence Inn Tyson's Corner, and Homewood Suites San Antonio.

On February 18, 2011, the Debtors' management and their advisors provided an update to the Board on the status of the restructuring and the marketing process.  Specifically, the Debtors and their advisors updated the Board

on the broader marketing process, including a discussion of a letter received from Lehman on February 15, 2011, proposing certain amendments to the Initial Commitment Letter.

On February 21, 2011, the Debtors responded to Lehman's proposal and explained that the proposed amendments to the ~~Initial~~**initial Five Mile/Lehman** Commitment Letter were not acceptable to the Debtors.

On February 22, 2011, Lehman responded to the Debtors' February 21, 2011 letter with a revised proposal for amendments to the ~~Initial~~**initial Five Mile/Lehman** Commitment Letter.

On March 2, 2011, the Debtors' management and advisors provided a further update to the Board on the status of the ongoing marketing process, including that since the filing of the Stalking Horse Motion, Moelis had identified and contacted approximately 200 potential buyers, sent marketing materials to approximately 120 of those parties, and executed non-disclosure agreements with approximately 30 potential bidders. Moelis also provided an update on the five non-enterprise bids received from bidders, as well as the proposed amendment to the ~~Initial~~**initial Five Mile/Lehman** Commitment Letter proposed by Lehman.

After reviewing Lehman's proposal with the Board at the March 2, 2011 Board meeting, the Debtors and their advisors, at the direction of the Board and the Independent Committee, worked to reach an agreement with Lehman, Five Mile, and Midland to modify the Five Mile/Lehman Bid. Simultaneously with these negotiations, the Debtors received an indication of interest from a potential replacement stalking horse bidder. The Debtors explored this option but ultimately decided to proceed with the Five Mile/Lehman Bid, as modified.

Through further negotiation with Five Mile/Lehman and Midland, the Debtors ultimately reached an agreement to modify the Five Mile/Lehman Bid. Among other things, the Debtors and Five Mile/Lehman and Midland agreed to modify the ~~Initial~~**initial Five Mile/Lehman** Commitment Letter to remove the Seven Sisters from the Five Mile/Lehman Bid and to eliminate the $7 million break-up fee for Five Mile/Lehman contemplated by the ~~Initial~~**initial Five Mile/Lehman** Commitment Letter. This agreement was memorialized in the **final Five Mile/Lehman** Commitment Letter with Five Mile, Lehman, and Midland, reflecting revised terms to the Original Stalking Horse Proposal. The **Five Mile/Lehman** Commitment Letter contemplates restructuring the 64 properties that serve as collateral under the Fixed Rate Pool Mortgage Loan Agreement and the Floating Rate Pool Mortgage Loan Agreement.~~10~~**17**

In addition to the **Five Mile/Lehman** Commitment Letter, there ~~are~~**were** two auxiliary agreements between non-Debtor parties to the **Five Mile/Lehman** Commitment Letter. Five Mile entered into an agreement with Lehman and a separate agreement with Midland (the Debtors ~~are~~**were** not party to either agreement). The Lehman/Five Mile Commitment govern~~s~~**ed** the rights of Lehman and Five Mile as they relate to each other with respect to the Fixed/Floating Debtors' restructuring, including, among other things, with respect to the application of the plan sponsor deposit and the terms of Five Mile's equity commitment. The Five Mile/Midland Commitment govern~~s~~**ed** the rights of Five Mile and Midland as they relate to each other with respect to the Fixed/Floating Debtors' restructuring~~, including, among other things, with respect to certain "bad boy" guarantees Five Mile is entering into in connection with the Fixed Rate Mortgage Loan~~.

3.    The Stalking Horse Hearing

On March 11, 2011, the Debtors presented the Stalking Horse Motion to the Bankruptcy Court for entry of a corresponding order approving an auction and related bidding procedures. The Debtors resolved all objections to the Stalking Horse Motion prior to the hearing with the exception of objections filed by Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd ("**Appaloosa**"). Appaloosa is a certificateholder in certain CMBS mortgage trusts secured by the Debtors' assets and serviced by Midland.

---

~~10~~**17**    As noted previously, the Debtors no longer own the Best Western hotel in West Palm Beach, Florida. The ground lessee associated with that property, however, remains a Floating Rate Pool Hotel Debtor and is considered a hotel property for purposes of Plan structure.

On March 11, 2011 (the "**March 11 Hearing**"), the Bankruptcy Court entered the Commitment Letter and Bidding Procedures Order [Docket No. 1009], approving the Debtors' entry into the **Five Mile/Lehman** Commitment Letter, as well as granting authority to reimburse Five Mile/Lehman for up to $3 million in expenses under certain circumstances and approving bidding procedures, according to which the Debtors will conduct an auction (the "**Auction**") to maximize value for creditors of the Fixed/Floating Debtors.

       4.       <u>Ruling as to Certificateholder Standing</u>

Until recently, no court had addressed whether certificateholders in commercial mortgage-backed security ("**CMBS**") REMICs (Real Estate Mortgage Investment Conduits) have standing to be heard in chapter 11 cases under section 1109(b) as "parties in interest."    At the March 11 Hearing, the Bankruptcy Court ruled on the issue. Specifically, Appaloosa, in its capacity as a holder of certificated interests in the two REMICs that hold the Fixed Rate Mortgage Loan urged the Bankruptcy Court to adopt a broad interpretation of "party in interest" under section 1109(b) of the Bankruptcy Code to grant them standing to object to the Stalking Horse Motion.  The Bankruptcy Court denied the standing request, relying both on controlling law and the express terms of the servicing agreement that governs the Fixed Rate Mortgage Loan, which contractually binds Midland, as special servicer under the Fixed Rate Mortgage Loan, to consider the collective interests of all certificateholders, and which enables certificateholders to take separate action in the event of an alleged breach of duty.

**5.       Bids Received by Bid Deadline**

**As a result of the Debtors' robust marketing process for the sale of their assets, the following bids were received prior to the April 25, 2011 bid deadline:**

- **The Cerberus/Chatham Baseline Bid;**

- **A bid for the all of the Fixed/Floating Hotels and six of the Seven Sisters;**

- **Two bids for all of the LNR Properties;**

- **A bid from the Ad Hoc Committee, which the Debtors determined was not the best available transaction;**

- **Six bids on multiple assets; and**

- **Six bids on individuals assets.**

**These bids were the culmination of the Debtors' extensive efforts to maximize value for all stakeholders by encouraging parties to submit proposals for the Debtors on both an enterprise and non-enterprise basis.**

       **6.**       ~~5.~~Auction Outcome

The ~~deadline for overbids related to the Fixed/Floating Debtors is April 25, 2011.  The Debtors have scheduled the Auction for May 2, 2011.~~ **Debtors held the auction for the Fixed/Floating Hotels and the LNR Properties on May 2-3, 2011.  After over 14 hours of competitive bidding between Cerberus/Chatham and Five Mile/Lehman, the Debtors closed the auction for the Fixed/Floating Hotels after the Cerberus/Chatham Successful Bid, valued at approximately $1.12 billion, went unchallenged.  The auction process thus yielded approximately $149 million in value for the Fixed/Floating Hotels over and above the Cerberus/Chatham Baseline Bid and approximately $154 million in value over and above the Five Mile/Lehman stalking horse bid. In connection therewith, the Debtors and Cerberus/Chatham entered into the Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers US Trust (the "Cerberus/Chatham Commitment Agreement") and the Amended and Restated Term Sheet (the "Cerberus/Chatham Term Sheet") attached to the Cerberus/Chatham Commitment Agreement.    The Cerberus/Chatham Term Sheet allocates the Cerberus/Chatham Successful Bid as follows: approximately**

**$400.5 in cash to satisfy New HoldCo's obligations under the Plan; payment of $[___] million in full satisfaction of the Floating Rate Pool Mortgage Loan Claims; the issuance of a $[___] million new non-recourse mortgage loan, payment of (a) $[___] million of cash, (b) $2.5 million to Midland as consideration for effecting the restructuring of the mortgage loan, and (d) payment of $3 million in connection with the global releases described in the Cerberus/Chatham Term Sheet.**

**On May 3, 2011, after concluding the auction for the Fixed/Floating Hotels, the Debtors announced the Chatham Bid as the stalking horse bid for the LNR Properties.  At the auction for the LNR Properties, the Debtors received a competing bid of $72 million for two of the LNR Properties: the Doubletree in Washington, D.C. and the Residence Inn in Tyson's Corner, Virginia.  The Debtors determined, in their reasonable business judgment, that the Chatham Bid was the higher or otherwise better bid, and closed the auction on the afternoon of May 3, 2011 after no further bids were received.**

### *K.        Management Compensation*

**Prior to the Fixed/Floating Auction and the LNR Auction, to assist bidders in formulating their bids, the Debtors provided all of the bidders with a schedule of estimated emergence costs for the enterprise.  The emergence costs schedule included, among other things, estimated administrative costs in the amount of [$390,000], estimated cure costs in the amount of [$2.3 million], and estimated employee costs in the amount of $4 million.  The $4 million estimate for employee costs included bonuses and transition costs related to the Debtors' management team.  The $4 million in estimated employee costs include amounts that would be due and owing under the management incentive program approved by the Board for Innkeeper's Chief Restructuring Officer, Marc Beilinson.  The management incentive plan for Mr. Beilinson was developed by** *the compensation consultant Johnson Associates, Inc.,* **which was hired and directed by the Board in March 2011** *to examine compensation structures of comparable real estate and hotel businesses and approved incentive programs of companies in large chapter 11 cases.  Based upon the analysis of Johnson Associates, and in consultation with its other advisors, on April 1, 2011, the Compensation Committee and then the Board considered and approved* **an incentive compensation program for Mr. Beilinson.**

**As part of their bid, the Fixed/Floating Plan Sponsors agreed to fund the employee-related emergence costs related to the Fixed/Floating Plan in an amount equal to $3.5 million, which amount shall be distributed to members of the Debtors' management team at the direction of, and in the sole and absolute discretion of, the current Board.   The Debtors believe that this resolution should resolve any dispute with respect to the management incentive plan, including, without limitation, the issues raised in the** *Motion to Require Debtors to Comply with Sections 363 and 503 of the Bankruptcy Code* **filed by Midland on April 15, 2011 [Docket No. 1110] and the** *Joinder of Ad Hoc Committee of Preferred Shareholders to Motion of Midland Loan Services to Require Debtors to Comply with Sections 363 and 503 of the Bankruptcy Code and Request for Ancillary Relief,* **dated April 25, 2011 [Docket No. 1147].**

**Approximately $600,000 of the $4 million estimated for employee costs is allocable to the LNR Properties.  As a result of the LNR Auction, the Board may consider the implementation of a compensation program for certain members of the Debtors' management and employees related to the sale of the assets of the Remaining Debtors, which program will likely be in an amount of approximately $500,000.  To the extent implemented, the appropriate details regarding this program will be set forth in the Plan Supplement.**

### *L.*   ~~1.~~ *Statement of the Committee*

The Committee, in fulfillment of its fiduciary duties, undertook an investigation concerning the Acquisition. Following entry by the Court on August 25, 2010 of an Order authorizing the Committee to take discovery pursuant to Federal Rule of Bankruptcy Procedure 2004 ("**Rule 2004**"), the Committee obtained and reviewed in excess of 550,000 pages of information.  These materials were obtained by the Committee from, among others, the Debtors, Apollo, Lehman and Midland.

Utilizing this information, the Committee and its advisors conducted a factual and legal review of potential claims against third parties arising out of the Acquisition.  In addition to investigating whether the Acquisition could

be challenged as a fraudulent conveyance under state or federal law, the Committee also considered whether claims could be asserted against parties that participated in, assisted with, and/or benefited from the Acquisition.

Following its investigation and analysis, the Committee negotiated a settlement with the Fixed/Floating Debtors, Five Mile, Lehman and Midland that was memorialized in the Five Mile/Midland Commitment. The settlement was agreed to by the Committee in large measure because under the Plan, the Fixed/Floating Debtors intend to assume their hotel franchise agreements, which will minimize the amount of unsecured claims against the Fixed/Floating Debtors and potentially increase distributions to claimholders when compared to a proposed plan under which the hotel franchise agreements are rejected. For these reasons, the Committee believes this settlement is fair, reasonable and in the best interests of the general unsecured creditors of the Fixed/Floating Debtors under the circumstances. With respect to the Reorganized Debtors, no such settlement agreement exists.

Finally, as a result of its examination of the validity of the prepetition secured creditors' liens, the Committee concluded that neither CWCapital nor LNR perfected their respective security interests against the assets of Grand Prix General Lessee LLC, Grand Prix RIGG Lessee LLC, Grand Prix RIMV Lessee LLC and Grand Prix Anaheim Orange Lessee LLC (together, the "**Unencumbered Lessees**"). The Committee has not yet commenced an adversary proceeding with respect to the validity of the purported liens against the Unencumbered Lessees. Instead, the Committee will attempt to negotiate an appropriate settlement agreement with the affected secured creditor prior to confirmation of this or any plan of reorganization. In any event, the Committee believes that the assets of these entities will be available to satisfy unsecured claims as set forth in the proposed Plan.

**M.** ~~J.~~ *Apollo's Participation in the Chapter 11 Cases*

Apollo owns 100% of the common equity interests in Debtor Grand Prix Holdings, LLC and the majority of the Innkeepers USA Trust Series A Preferred Interests. Prior to the Petition Date, on June 29, 2007, Apollo entered into the Apollo Guaranty with respect to certain PIPs for the benefit of the lenders under the Fixed Rate Mortgage Loan Agreement. Prior to the Petition Date, on May 21, 2010, Midland sued Apollo in state court, seeking specific performance of the Apollo Guaranty. The specific performance claim was dismissed without prejudice on the pleadings. *Midland Loan Services, Inc. v. Apollo Investment Corporation*, No. 601324/2010 (N.Y. Sup. Ct. Nov. 4, 2010) (granting Apollo's motion to dismiss). However, the Court left open the possibility for Midland to seek damages on its breach of contract claim.

While Apollo has been active in these Chapter 11 Cases, Apollo's role in the development of the Plan was limited. No Apollo employees are members of the Independent Committee. Apollo was not involved in, nor did Apollo influence, the Independent Committee's deliberations, including the Independent Committee's decision to pursue the Fixed/Floating Bid, which contemplates releases for Apollo. In fact, representatives from Apollo recused themselves from voting on the Fixed/Floating Bid. Nevertheless, among other contributions, Apollo has made a corporate representative available to be deposed twice and produced all relevant and non-privileged documents requested. The Debtors believe that Apollo has been acting and continues to act in good faith for the benefit of the estate.

Apollo does support the Fixed/Floating Plan and has agreed to (i) not submit an overbid for the Fixed/Floating Hotels; (ii) contribute $375,000 to the estate, which shall be available for distribution to the holders of General Unsecured Claims against the Fixed/Floating Debtors; and (iii) waive its right to receive any recovery or distribution under the Fixed/Floating Plan. To be clear, Apollo will not receive any distributions under the Fixed/Floating Plan as creditor, ultimate equity holder, or otherwise. Apollo agreed to each of these concessions at the specific request of the Debtors to address and respond to concerns raised by the Debtors and other parties-in-interest during the course of Plan negotiations. As part of the Plan, Apollo will receive a release from certain parties, including a release with respect to claims associated with the Apollo Guaranty. (Additional information regarding releases is provided in Article I.A**D** and Article V.I of this Disclosure Statement.)

Certain parties may contend that the releases Apollo will receive under the Plan from the Debtors are inappropriate because the Debtors have substantial claims against Apollo and because the Debtors are contributing $3 million to Midland to resolve any litigation over the Apollo Guaranty. The Debtors disagree. With respect to the release of claims on account of the Apollo Guaranty, the Debtors and the beneficiaries of the Apollo Guaranty believe

that the Apollo Release is reasonable and provides appropriate value to the Debtors under the circumstances. To be clear, the Debtors do not have any direct claims against Apollo with respect to the Apollo Guaranty. The Debtors are not parties to, direct beneficiaries of, or direct counterparties to the Apollo Guaranty. Rather, Midland directly benefits from the Apollo Guaranty and has the exclusive right to enforce it. The Debtors believe that settlement of all claims relating to the Apollo Guaranty is in the best interests of the estate. By securing the release, the Debtors are insulated from involvement in potentially complex, protracted and costly litigation in the event that Midland renews its lawsuit against Apollo and Apollo seeks indemnification or contribution from the estate. The outcome of such a lawsuit remains uncertain and may, after additional expense, inconvenience and delay, ultimately place a significant liability on the Debtors. Accordingly, the Debtors believe that the Apollo Release is in the best interest of the Debtors, especially when measured against the fact that Apollo will (i) contribute $375,000 to the Fixed/Floating Unsecured Claim Fund; (ii) to waive its right to receive any recovery or distribution under the Fixed/Floating Debtors' Plan; and (iii) grant releases for the benefit of the estates and key parties in interest.

**_N.        LBHI's Succession of TriMont as Special Servicer Under Anaheim Mezzanine Loan_**

**In April 2011, affiliates of LBHI purchased all of the outstanding notes issued by the special purpose entity ("SASCO"), which issued notes secured in part by the Anaheim Hilton Suites Mezzanine Loan. Following the acquisition, those LBHI affiliates controlled 100% of the capital structure of SASCO. After acquiring control, LBHI succeeded TriMont as the special servicer under the Anaheim Hilton Suites Mezzanine Loan.**

**_O.        The Ad Hoc Committee's Objection to the Disclosure Statement and the Debtors' Response._**

**1.        The Ad Hoc Committee's Objection**

**The Ad Hoc Committee filed an objection to the Disclosure Statement [Docket No. 1200], arguing that the Plan improperly provides releases to third-party non-Debtors, including the Debtors' directors and officers, as well as indirect releases by way of exculpation and injunction, without the consent of the Holders of Innkeepers USA Trust Preferred C Interests (who would be providing a release under the Plan). The Ad Hoc Committee argues that, because the Plan effects a sale to third parties, the success of which, the Ad Hoc Committee alleges, is not conditioned on granting these third-party releases, the releases violate the Second Circuit's limitation on releases that may be obtained from non-debtors and thus render the Plan unconfirmable.**

**2.        The Debtors' Response**

**The Second Circuit has upheld a plan's inclusion of third-party releases, concluding that a bankruptcy court has the ability to enjoin a creditor or interest holder from suing a third party, even without the creditor or interest holder's consent, where such releases play an important role in the plan. What constitutes "important" involves a highly-specific, case-by-case analysis. Here, the third-party releases are justified as an integral part of the Debtors' overall restructuring efforts. The non-Debtor releasees have made significant contributions to the Debtors' estate—without which the Debtors could not have proposed a confirmable Plan. Put simply, the Debtors' proposed Plan represents demonstrably unique circumstances that warrant third-party releases.**

**Specifically, the non-Debtor releasees, in the aggregate, have contributed to the Debtors' restructuring in varying forms, including by (a) waiving various Claims they have against the Debtors' estates; (b) contributing funds to provide for an increased recovery for unsecured creditors; (c) assisting with marketing the Debtors' assets to create approximately $160 million of value for the Debtors' stakeholders through the successful auction of nearly all of the Debtors' hotel properties; (d) agreeing to remain with the Debtors through the transition to the reorganized company; and (e) assisting with the negotiation and formulation of a value-maximizing plan of reorganization.**

**The non-Debtor releasees would not have agreed to make these valuable contributions to the Debtors' restructuring in the absence of the proposed releases. Accordingly, the Debtors believe that the releases are justified and comply with applicable Second Circuit law.**

## ARTICLE V.
## SUMMARY OF THE PLAN

*A.      The Plan's Classification Scheme*

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests, other than Five Mile DIP Claims, Lehman DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in connection with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking confirmation or approval of the Plan with respect to all other Debtors.

### Fixed/Floating Debtors

The classification of Claims and Interests against each of the Fixed/Floating Debtors pursuant to the Fixed/Floating Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Fixed/Floating Debtors. All of the potential Classes for the Fixed/Floating Debtors are set forth herein and in the Plan. Certain of the Fixed/Floating Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Fixed/Floating Plan, each Class will contain sub-Classes for each of the Fixed/Floating Debtors (*i.e.*, there will be 71 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class FF2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|---|---|---|---|
| Class FF1 | Other Priority Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF2 | Other Secured Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF3A | Secured Fixed Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF3B | Secured Floating Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF4 | Floating Rate Pool Mezzanine Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF5 | General Unsecured Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF6 | Mortgage Loan Deficiency Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF7 | Intercompany Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF8 | Section 510(b) Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
| --- | --- | --- | --- |
| Class FF9 | Interests in Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

**Anaheim Hotel Debtors**

The classification of Claims and Interests against each of the Anaheim Hotel Debtors pursuant to the Anaheim Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Anaheim Hotel Debtors. All of the potential Classes for the Anaheim Hotel Debtors are set forth herein and in the Plan. Certain of the Anaheim Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Anaheim Plan, each Class will contain sub-Classes for each of the Anaheim Hotel Debtors (*i.e.*, there will be three sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class A2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
| --- | --- | --- | --- |
| Class A1 | Other Priority Claims against Anaheim Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class A2 | Other Secured Claims against Anaheim Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class A3 | Secured Anaheim Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ |
| Class A4 | Secured Anaheim Hotel Mezzanine Loan Claims | Impaired | Entitled to Vote |
| Class A5A | General Unsecured Claims against Anaheim Hotel Owner | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ |
| Class A5B | General Unsecured Claims against Anaheim Mezzanine Debtor | Impaired | **Not** Entitled to Vote **(Deemed to Reject)** |
| Class A5C | General Unsecured Claims against Anaheim Hotel Lessee | Impaired | Entitled to Vote |
| Class A6 | Anaheim Hotel Mezzanine Loan Deficiency Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A7 | Intercompany Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A8~~A~~ | ~~Section 510(b) Claims against~~**Intercompany Interests in** Anaheim Hotel ~~Owner~~**Debtors** | ~~Unimpaired~~**Impaired** | Not Entitled to Vote (~~Presumed~~**Deemed** to ~~Accept~~**Reject**) |
| ~~Class A8B~~ | ~~Section 510(b) Claims against Anaheim Mezzanine Debtor~~ | ~~Impaired~~ | ~~Not Entitled to Vote (Deemed to Reject)~~ |
| ~~Class A8C~~ | ~~Section 510(b) Claims against Anaheim Hotel Lessee~~ | ~~Impaired~~ | ~~Entitled to Vote~~ |
| ~~Class A9A~~ | ~~Intercompany Interests in Anaheim Hotel Owner~~ | ~~Unimpaired~~ | ~~Not Entitled to Vote (Presumed to Accept)~~ |
| ~~Class A9B~~ | ~~Intercompany Interests in Anaheim Mezzanine Debtor~~ | ~~Impaired~~ | ~~Not Entitled to Vote (Deemed to Reject)~~ |
| ~~Class A9C~~ | ~~Intercompany Interests in Anaheim Hotel Lessee~~ | ~~Impaired~~ | ~~Entitled to Vote~~ |

<div align="center">**Ontario Debtors**</div>

The classification of Claims and Interests against each of the Ontario Hotel Debtors pursuant to the Ontario Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Ontario Hotel Debtors. All of the potential Classes for the Ontario Hotel Debtors are set forth herein and in the Plan. Certain of the Ontario Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Ontario Plan, each Class will contain sub-Classes for each of the Ontario Hotel Debtors (*i.e.*, there will be two sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class O2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|---|---|---|---|
| Class O1 | Other Priority Claims against Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O2 | Other Secured Claims Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O3 | Secured Ontario Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class O4A | General Unsecured Claims against Ontario Hotel Owner | Impaired | Entitled to Vote |
| Class O4B | General Unsecured Claims against Ontario Hotel Lessee | Impaired | Entitled to Vote |
| Class O5 | Mortgage Loan Deficiency Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O6 | Intercompany Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O7 | Section 510(b) Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

<div align="center">**Re~~org~~maini~~z~~ing Debtors**</div>

The classification of Claims and Interests against each of the Re~~org~~mai~~niz~~ing Debtors pursuant to the Re~~org~~mai~~niz~~ing Debtor Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Re~~org~~mai~~niz~~ing Debtors. All of the potential Classes for the Re~~org~~mai~~niz~~ing Debtors are set forth herein and in the Plan. Certain of the Re~~org~~mai~~niz~~ing Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Re~~org~~mai~~niz~~ing Debtor Plan, each Class will contain sub-Classes for each of the Re~~org~~mai~~niz~~ing Debtors (*i.e.*, there will be 16 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class R2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|---|---|---|---|
| Class R1 | Other Priority Claims against the Re~~org~~mai~~niz~~ing Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R2 | Other Secured Claims against the Re~~org~~mai~~niz~~ing Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R3A | Secured Garden Grove Hotel Mortgage Loan Claims | ~~TBD~~**Impaired** | Entitled to Vote ~~on a Provisional Basis~~ |
| Class R3B | Secured San Diego Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote ~~(Presumed to Accept)~~ |

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|---|---|---|---|
| Class R3C | Secured Washington DC Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote (Presumed to Accept) |
| Class R3D | Secured Tysons Corner Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote (Presumed to Accept) |
| Class R3E | Secured San Antonio Hotel Mortgage Loan Claims | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote (Presumed to Accept) |
| Class R4 | General Unsecured Claims against the Reorg~~ma~~ni~~z~~ing Debtors | ~~TBD~~**Impaired** | Entitled to Vote ~~on a Provisional Basis~~ |
| Class R5 | Intercompany Claims against the Reorg~~ma~~ni~~z~~ing Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R6 | Intercompany Interests in the Reorg~~ma~~ni~~z~~ing Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R7 | Innkeepers USA LP Preferred D Interests | ~~TBD~~**Impaired** | **Not** Entitled to Vote ~~on a Provisional Basis~~ **(Deemed to Reject)** |
| Class R8 | Innkeepers USA Trust Preferred C Interests | ~~TBD~~**Impaired** | Entitled to Vote ~~on a Provisional Basis~~ |
| Class R9 | Innkeepers USA Trust Preferred A Interests | ~~TBD~~**Impaired** | Entitled to Vote ~~on a Provisional Basis~~ |
| Class R10 | Innkeepers USA Trust Common Interests | ~~TBD~~**Impaired** | **Not** Entitled to Vote ~~on a Provisional Basis~~ **(Deemed to Reject)** |
| Class R11 | Grand Prix Holdings Interests | ~~TBD~~**Impaired** | Entitled to Vote ~~on a Provisional Basis~~ |
| Class R12 | Section 510(b) Claims against the Reorg~~ma~~ni~~z~~ing Debtors | ~~Unimpaired~~**Impaired** | ~~Not~~ Entitled to Vote (Presumed to Accept) |

Any class of Claims that, as of an applicable Confirmation Hearing, does not have at least one Holder of a Claim that is Allowed in an amount greater than zero for voting purposes pursuant to the Solicitation Procedures Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that class.

B.    *Treatment of Unclassified Claims*

1.    <u>Administrative Claims</u>

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in exchange for full and final satisfaction, settlement, release, and compromise of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals **and Governmental Units**, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Post-Effective Date Debtors no later than the Administrative Claims Bar Date applicable to the Debtor against whom the Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date

Debtors, or the property of the Post-Effective Date Debtors and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

       2.      <u>Accrued Professional Compensation Claims</u>

       **(a)**     Professional Fee Escrow Account

In accordance with Article II.B.3 of the Plan, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow Account. The Debtors shall fund the Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or the Post-Effective Date Debtors, as applicable.

       **(b)**     Final Fee Applications and Payment of Accrued Professional Compensation Claims

All final requests for payment of Claims of a Professional shall be Filed no later than 60 days after the latest Effective Date for any of the Joint Plans. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. **<u>To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Allowed Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.</u>** After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders.

       **(c)**     Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five days after the Confirmation Date; <u>provided</u> <u>that</u> such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Reserve Amount.

       **(d)**     Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, the Post-Effective Date Debtors, or the Committee, as applicable. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.       <u>Five Mile DIP Claims</u>

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim against the Fixed/Floating Debtors, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay "Tranche A" of the Allowed Five Mile DIP Claims in full in Cash.

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim, on the Effective Date of the Re~~org~~**main**~~iz~~ing Debtor Plan, the Post-Effective Date San Diego Hotel Debtors shall pay "Tranche B" of the Allowed Five Mile DIP Claims in full in Cash and the Post-Effective Date General Lessee and the Tysons Corner Hotel Owner shall pay "Tranche C" of the Allowed Five Mile DIP Claims in full in Cash.

**The Five Mile DIP Claims shall be Allowed pursuant to the Confirmation Order.**

4.       <u>Lehman DIP Claims</u>

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Lehman DIP Claim, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay the Allowed Lehman DIP Claims in full in Cash.

**The Lehman DIP Claims shall be Allowed pursuant to the Confirmation Order.**

**5.       LNR Structuring Fee**

**On the Effective Date of the Remaining Debtor Plan, the Debtors shall pay the LNR Structuring Fee in full in Cash.**

**6.**       ~~5.~~ <u>Claims Based on Postpetition Intercompany Loans</u>

In exchange for full and final satisfaction, settlement, release, and compromise of each Claim based on a Postpetition Intercompany Loan arising pursuant to the Cash Collateral Order, if any, on the Effective Date of a borrower Debtor's plan, the borrower Debtors shall pay the lender Debtors in full in Cash.

~~6.      Five Mile Counsel Fees and Expenses and Lehman Advisor and Counsel Fees and Expenses~~

~~On or after the Effective Date of the Fixed/Floating Plan, New HoldCo shall reimburse Five Mile for the reasonable and documented fees and expenses of its counsel, provided that the transaction set forth in the Commitment Letter is the Fixed/Floating Successful Bid.~~

~~Lehman's advisors' and counsel's reasonable and documented fees and expenses shall continue to be paid in accordance with the Cash Collateral Orders.~~

~~If the transaction set forth in the Commitment Letter is not the Fixed/Floating Successful Bid, in accordance with the terms of the Bidding Procedures Order, Five Mile and Lehman may be entitled to receive reimbursement of all of Five Mile's reasonable fees and expenses not to exceed $3 million.~~

**7.       Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses**

**Upon the earlier of (i) the Fixed/Floating Plan Effective Date and (ii) consummation of an alternative transaction for any of the Fixed/Floating Debtors' assets, as contemplated in the Bidding Procedures Order, the Fixed/Floating Debtors shall pay to Five Mile the Five Mile Expense Reimbursement Claim in an amount not to exceed $3 million. Notwithstanding any provision herein or in the Plan to the contrary, neither Five Mile nor its counsel shall be required to file any application or other formal request for payment or allowance of the Five Mile Expense Reimbursement Claim"**

**8.** ~~7.~~ Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, (1) Cash, payable by the liable Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the liable Debtors or Post-Effective Date Debtors, as applicable, and such Holder, <u>provided</u> <u>that</u> such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date without any further notice to or action, order, or approval of the Bankruptcy Court, or (3) at the option of the liable Debtor or Post-Effective Date Debtor, as applicable, Cash paid by the liable Post-Effective Date Debtor in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than five years after the Petition Date with payment of interest at the Federal Judgment Rate in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the liable Debtors or Post-Effective Date Debtors, as applicable, and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

*C.* *Treatment of Claims and Interests*

1. The treatment provided to each Class relating to each of the Fixed/Floating Debtors for distribution purposes and voting rights are specified below:

**Class FF1 - Other Priority Claims Against the Fixed/Floating Debtors**

**(a)** *Classification*: Class FF1 consists of all Other Priority Claims against the Fixed/Floating Debtors.

**(b)** *Treatment*: Except to the extent that a Holder of an Allowed Class FF1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

   (i) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

   (ii) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

**(c)** *Voting*: Class FF1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

**Class FF2 - Other Secured Claims Against the Fixed/Floating Debtors**

**(a)** *Classification*: Class FF2 consists of all Other Secured Claims against the Fixed/Floating Debtors. For all purposes under the Fixed/Floating Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class FF2A against Grand Prix Addison (RI) LLC, Class FF2B against Grand Prix Addison (RI) LLC, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself,

except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

**(b)**     *Treatment*:  Except to the extent that a Holder of an Allowed Class FF2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

        (i)     be paid in full in Cash in an amount equal to such Allowed Class FF2 Other Secured Claim by the Debtors on the Effective Date;

        (ii)     receive the collateral securing any such Allowed Class FF2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

        (iii)     otherwise be treated in any other manner such that the Allowed Class FF2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class FF2 Other Secured Claim becomes an Allowed Class FF2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class FF2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

**(c)**     *Voting*:  Class FF2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class FF3A - Secured Fixed Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors

**(a)**     *Classification:*  Class FF3A consists of all Secured Fixed Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

**(b)**     *Treatment:*  Except to the extent that the Holder of Allowed Class FF3A Secured Fixed Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Fixed Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Fixed Rate Pool Mortgage Loan Claims shall **(i) enter into the New Fixed Rate Pool Mortgage Loan and** receive the New Fixed Rate Pool Mortgage Notes **and the New Fixed Rate Pool Mortgage Loan Limited Guaranty, and (ii) receive a payment of Cash in the amount of $[____] million**.  For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Fixed Rate Pool Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Fixed/Floating Plan.

**(c)**     *Voting:*  Class FF3A is Impaired ~~by the Plan~~**,** and the Holder of Secured Fixed Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF3B - Secured Floating Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors**

**(a)**   *Classification:*  Class FF3B consists of all Secured Floating Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

**(b)**   *Treatment:*  Except to the extent that the Holder of Allowed Class FF3B Secured Floating Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Floating Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Floating Rate Pool Mortgage Loan Claims shall receive ~~50% of the New HoldCo Interests (subject to adjustment for the Third Party Investment) and (ii)~~ a payment of Cash in the ~~aggregate~~ amount of ~~not less than $26.2~~**$[__]** million.  For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Floating Rate Pool Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Fixed/Floating Plan.

**(c)**   *Voting:* Class FF3B is Impaired ~~by the Plan~~**,** and the Holder of Secured Floating Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF4 - Floating Rate Pool Mezzanine Loan Claims Against the Fixed/Floating Debtors**

**(a)**   *Classification:*  Class FF4 consists of all Floating Rate Pool Mezzanine Loan Claims against the Fixed/Floating Debtors.

**(b)**   *Treatment:*  Except to the extent that the Holder of Allowed Class FF4 Floating Rate Pool Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Floating Rate Pool Mezzanine Loan Claims, the Holder of Allowed Floating Rate Pool Mezzanine Loan Claims shall receive ~~the New Floating Rate Pool Mezzanine Loan Instrument; provided that the Holder of Allowed Floating Rate Pool Mezzanine Loan Claims shall only receive such treatment in the event that Class FF4 votes to accept and otherwise supports the Fixed/Floating Plan.  In the event that Class FF4 votes to reject the Fixed/Floating Plan or otherwise does not support the Fixed/Floating Plan, the Holder of Allowed Floating Rate Pool Mezzanine Loan Claims shall not receive any distribution on account of such Floating Rate Pool Mezzanine Loan Claims and~~**a payment of Cash in the amount of $[__] million.  For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to** the Floating Rate Pool Mezzanine Loan **Agreement and such** Claims shall **be deemed to** be canceled, released, and extinguished as of the Effective Date **of the Fixed/Floating Plan**.

**(c)**   *Voting:* Class FF4 is Impaired ~~by the Plan~~**,** and the Holder of Allowed Floating Rate Pool Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF5 - General Unsecured Claims Against the Fixed/Floating Debtors**

**(a)**   *Classification:*  Class FF5 consists of all General Unsecured Claims against the Fixed Floating Debtors.

**(b)**   *Treatment:*  Except to the extent that a Holder of an Allowed Class FF5 General Unsecured Claim and the Debtors agree to less favorable treatment to such Holder, in exchange for

full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall ~~receive~~:

(i) ~~the lesser of (A) its~~**(A) if the Holder's General Unsecured Claim is against Debtor Grand Prix West Palm Beach LLC, receive such Holder's** Pro Rata share of **$100,000 of** the Fixed/Floating Unsecured Claim Fund**,** or (B) ~~65% of the face amount of~~**if** the Holder's ~~Allowed~~ General Unsecured Claim ~~against~~**is against a Fixed/Floating Debtor other than Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $4,650,000 of** the Fixed/Floating ~~Debtor~~**Unsecured Claim Fund**; and

(ii) **receive** a release and waiver by the ~~Post-Effective Date Fixed/Floating~~ Debtors of all Claims of the Fixed/Floating Debtors against such Holder to recover preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code.

**(c)** *Voting:* Class FF5 is Impaired ~~by the Plan~~**,** and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

**Class FF6 - Mortgage Loan Deficiency Claims Against the Fixed/Floating Debtors**

**(a)** *Classification:* Class FF6 consists of all Mortgage Loan Deficiency Claims against the Fixed/Floating Debtors.

**(b)** *Treatment:* Holders of Allowed Class FF6 Mortgage Loan Deficiency Claims shall not receive any distribution on account of such Mortgage Loan Deficiency Claims, and Allowed Mortgage Loan Deficiency Claims shall be canceled, released, and extinguished as of the Effective Date.

**(c)** *Voting:* Class FF6 is Impaired ~~by the Plan~~**,** and each Holder of a Mortgage Loan Deficiency Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Mortgage Loan Deficiency Claims are not entitled to vote to accept or reject the Plan.

**Class FF7 - Intercompany Claims Against the Fixed/Floating Debtors**

**(a)** *Classification*: Class FF7 consists of all Intercompany Claims against the Fixed/Floating Debtors.

**(b)** *Treatment*: Holders of Allowed Class FF7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

**(c)** *Voting*: Class FF7 is Impaired ~~by the Plan~~**,** and Holders of Intercompany Claims against the Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims against the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

**Class FF8 - Section 510(b) Claims Against the Fixed/Floating Debtors**

(a)     *Classification*:  Class FF8 consists of all Section 510(b) Claims against the Fixed/Floating Debtors.

(b)     *Treatment*:  Holders of Allowed Class FF8 Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class FF8 is Impaired, and Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**Class FF9 - Interests in the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF9 consists of all Interests in the Fixed/Floating Debtors.

(b)     *Treatment:*  Holders of Allowed Class FF9 Interests shall not receive any distribution on account of such Intercompany Interests~~The~~ **and, except as provided in the immediately following sentence, all such Interests shall be cancelled and of no further force or effect.  Notwithstanding the foregoing, the** Interests may, at the discretion of Fixed/Floating Plan Sponsors, be maintained for the purposes of preserving the organizational structure of certain of the Fixed/Floating Debtors; provided further that the Interests ~~that are the equity in Grand Prix Mezz Borrower Fixed, LLC, Grand Prix Mezz Borrower Floating, LLC, Grand Prix Fixed Lessee, LLC, and Grand Prix Floating Lessee, LLC  shall~~ **of the Post-Effective Date Fixed/Floating Debtors shall, directly or indirectly,** be transferred to New HoldCo pursuant to the Investment **and** in accordance with the Fixed/Floating Successful Bid.

(c)     *Voting:*  Class FF9 is Impaired, and Holders of Intercompany Interests in the Fixed/Floating Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

2.     The treatment provided to each Class relating to each of the Anaheim Hotel Debtors for distribution purposes and voting rights are specified below:

**Class A1 - Other Priority Claims Against the Anaheim Hotel Debtors**

(a)     *Classification*:  Class A1 consists of all Other Priority Claims against the Anaheim Hotel Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Class A1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, as applicable:

(i)     be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)     otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date

on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

**(c)** *Voting*: Class A1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class A1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class A2 - Other Secured Claims Against the Anaheim Hotel Debtors

**(a)** *Classification*: Class A2 consists of all Other Secured Claims against the Anaheim Hotel Debtors. For all purposes under the Anaheim Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class A2A against the Anaheim Hotel Owner, Class A2B the Anaheim Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

**(b)** *Treatment*: Except to the extent that a Holder of an Allowed Class A2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, as applicable:

(i) be paid in full in Cash in an amount equal to such Allowed Class A2 Other Secured Claim by the Debtors on the Effective Date;

(ii) receive the collateral securing any such Allowed Class A2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii) otherwise be treated in any other manner such that the Allowed Class A2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class A2 Other Secured Claim becomes an Allowed Class A2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class A2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

**(c)** *Voting*: Class A2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class A2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class A3 - Secured Anaheim Hotel Mortgage Loan Claims

**(a)** *Classification:* Class A3 consists of all Secured Anaheim Hotel Mortgage Loan Claims.

**(b)** *Treatment:* Except to the extent that the Holder of Allowed Class A3 Secured Anaheim Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mortgage Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mortgage Loan Claims shall ~~be paid in full in cash on the~~

~~Effective Date or as soon as reasonably practical thereafter as a result of the Anaheim Hotel Sale Transaction, if consummated, or other transaction~~**in accordance with the Anaheim Hotel Commitment Letter enter into the assumed, amended, restated, and/or supplemented Anaheim Hotel Mortgage Loan Agreement, the terms and terms of which assumption shall include the terms and conditions set forth in the Anaheim Hotel Commitment Letter and substantially be set forth in the Anaheim Hotel Assumption Documents included in the Plan Supplement, pursuant to which the new amended or restated note or notes shall be issued to the Holder of the Allowed Class A3 Secured Anaheim Hotel Mortgage Loan Claims**. For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of **any deficiency Claim, guaranty Claim, indemnity Claim, and** Claims for Adequate Protection Obligations related to the Anaheim Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Anaheim Plan.

**(c)**     *Voting:* Class A3 is ~~Unimpaired~~**Impaired**, and the Holder of ~~Secured Anaheim Hotel Mortgage Loan Claims is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holder of~~ Class A3 Secured Anaheim Hotel Mortgage Loan Claims is ~~not~~ entitled to vote to accept or reject the Plan.

### Class A4 - Secured Anaheim Hotel Mezzanine Loan Claims

**(a)**     ~~(j)~~ *Classification*:  Class A4 consists of all Secured Anaheim Hotel Mezzanine Loan Claims.

**(b)**     ~~(k)~~ *Treatment*:  Except to the extent that the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mezzanine Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mezzanine Loan Claims shall~~:~~

~~(i)     to the extent that the Anaheim Hotel Sale Transaction is contemplated and consummated, receive the Holder's entitled distribution of the Anaheim Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Mezzanine Debtor; or~~

~~(ii)     to the extent that the Anaheim Hotel Sale Transaction is not contemplated and consummated, receive~~ **have** the collateral securing the Secured Anaheim Hotel Mezzanine Loan Claims **and all of the other assets of the Anaheim Hotel Debtors transferred, conveyed, assumed, and assigned to the New Anaheim HoldCo.  For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Anaheim Hotel Mezzanine Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Anaheim Plan**.

**(c)**     ~~(l)~~ *Voting*:  Class A4 is Impaired ~~by the Plan~~**,** and the Holder of Secured Anaheim Hotel Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

### Class A5A - General Unsecured Claims Against the Anaheim Hotel Owner

**(j)**     ~~(m)~~ *Classification:*  Class A5A consists of all General Unsecured Claims against the Anaheim Hotel Owner.

**(k)** ~~(n)~~ *Treatment:*  Except to the extent that a Holder of an Allowed Class A5A General Unsecured Claim against the Anaheim Hotel Owner and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Anaheim Hotel Owner, each Holder of an Allowed General Unsecured Claim against the Anaheim Hotel Owner shall be paid in full ~~in cash~~ on the Effective Date or as soon as reasonably practical thereafter ~~as a result of the Anaheim Hotel Sale Transaction, if consummated, or other transaction~~.

**(l)** ~~(o)~~ *Voting:*  Class A5A is ~~Unimpaired~~**Impaired**, and ~~Holders~~**each Holder** of ~~a~~ General Unsecured Claim~~s~~ against the Anaheim Hotel Owner ~~are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class A5A General Unsecured Claims against the Anaheim Hotel Owner are not~~**is** entitled to vote to accept or reject the Plan.

## Class A5B - General Unsecured Claims Against the Anaheim Mezzanine Debtor

**(m)** ~~(p)~~ *Classification:*  Class A5B consists of all General Unsecured Claims against the Anaheim Mezzanine Debtor.

**(n)** ~~(q)~~ *Treatment:*  Except to the extent that a Holder of an Allowed Class A5B General Unsecured Claim against the Anaheim Mezzanine Debtor and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Anaheim Mezzanine Debtor, each Holder of an Allowed General Unsecured Claim against the Anaheim Mezzanine Debtor shall~~:~~

~~(i)  to the extent that the Anaheim Hotel Sale Transaction is contemplated and consummated, receive the Holder's entitled Pro Rata distribution of the Anaheim Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Mezzanine Debtor; or~~

~~(ii)  to the extent that the Anaheim Hotel Sale Transaction is not contemplated and consummated and the Holder of the Secured Anaheim Hotel Mezzanine Loan Claims receives the collateral securing its Claims, a distribution agreed to by the Holder of the Secured Anaheim Mezzanine Loans Claims.~~ **not receive any distribution on account of such Allowed General Unsecured Claim against the Anaheim Mezzanine Debtor, and Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.**

**(o)** ~~(r)~~ *Voting:*  Class A5B is Impaired ~~by the Plan~~**,** and ~~each~~**the** Holder~~s~~ of ~~a~~ General Unsecured Claim~~s~~**General Unsecured Claims against the Anaheim Mezzanine Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of General Unsecured Claims** against the Anaheim Mezzanine Debtor ~~is~~**are not** entitled to vote to accept or reject the Plan.

## Class A5C - General Unsecured Claims Against the Anaheim Hotel Lessee

**(p)** ~~(s)~~ *Classification*:  Class A5C consists of all General Unsecured Claims against the Anaheim Hotel Lessee.

**(q)** ~~(t)~~ *Treatment*:  Except to the extent that a Holder of an Allowed Class A5C General Unsecured Claim against the Anaheim Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement,

68

release, discharge, and compromise of each Allowed General Unsecured Claim against the Anaheim Hotel Lessee, each Holder of an Allowed General Unsecured Claim against the Anaheim Hotel Lessee shall ~~receive such Holder's entitled Pro Rata distribution of the Anaheim Hotel Lessee Unencumbered Assets, if any, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Lessee~~**be paid in full on the Effective Date or as soon as reasonably practical thereafter**.

**(r)** ~~(u)~~ *Voting*:  Class A5C is Impaired ~~by the Plan~~**,** and each Holder of a General Unsecured Claim against the Anaheim Hotel Lessee is entitled to vote to accept or reject the Plan.

## Class A6 - Anaheim Hotel Mezzanine Loan Deficiency Claims Against the Anaheim Hotel Debtors

**(s)** ~~(v)~~ *Classification*:  Class A6 consists of all Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors.

**(t)** ~~(w)~~ *Treatment*:  The Holder of Allowed Class A6 Anaheim Hotel Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Anaheim Hotel Mezzanine Loan Deficiency Claims, and Allowed Anaheim Hotel Mezzanine Loan Deficiency Claims shall be canceled, released, and extinguished as of the Effective Date.

**(u)** ~~(x)~~ *Voting*:  Class A6 is Impaired ~~by the Plan~~**,** and the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

## Class A7 - Intercompany Claims Against the Anaheim Hotel Debtors

**(v)** ~~(y)~~ *Classification*:  Class A7 consists of all Intercompany Claims against the Anaheim Hotel Debtors.

**(w)** ~~(z)~~ *Treatment*:  Holders of Allowed Class A7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

**(x)** ~~(aa)~~ *Voting*:  Class A7 is Impaired ~~by the Plan~~**,** and Holders of Intercompany Claims against the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

## Class A8 ~~A   Section 510(b) Claims Against~~ **- Intercompany Interests in** the Anaheim Hotel ~~Owner~~**Debtor**

**(y)** ~~(bb)~~ *Classification*:  Class A8~~A consists of all Section 510(b) Claims against the Anaheim Hotel Owner.~~ **consists of all Intercompany Interests in the Anaheim Hotel Debtors.**

~~(cc)~~ ~~*Treatment*:  Except to the extent that a Holder of an Allowed Class A8A Section 510(b) Claim against the Anaheim Hotel Owner and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Section 510(b) Claims against the Anaheim Hotel Owner, each Holder of an Allowed Section 510(b) Claim against the Anaheim Hotel Owner shall be paid in full in cash on the Effective Date or as soon as reasonably practical~~

thereafter as a result of the Anaheim Hotel Sale Transaction, if consummated, or other transaction.

**(dd)** *Voting*: Class A8A is Unimpaired, and Holders of Section 510(b) Claims against the Anaheim Hotel Owner are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class A8A Section 510(b) Claims against the Anaheim Hotel Owner are not entitled to vote to accept or reject the Plan.

**Class A8B – Section 510(b) Claims Against the Anaheim Mezzanine Debtor**

**(ee)** *Classification*: Class A8B consists of all Section 510(b) Claims against the Anaheim Mezzanine Debtor.

**(ff)** *Treatment*: Holders of Allowed Section 510(b) Claim against the Anaheim Mezzanine Debtor shall not receive any distribution on account of such Section 510(b) Claim against the Anaheim Mezzanine Debtor, and Allowed Section 510(b) Claim against the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.

**(gg)** *Voting:* Class A8B is Impaired by the Plan and each Holder of a Section 510(b) Claim against the Anaheim Mezzanine Debtor is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims against the Anaheim Mezzanine Debtor are not entitled to vote to accept or reject the Plan.

**Class A8C – Section 510(b) Claims Against the Anaheim Hotel Lessee**

**(hh)** *Classification*: Class A8C consists of all Section 510(b) Claims against the Anaheim Hotel Lessee.

**(ii)** *Treatment*: Except to the extent that a Holder of an Allowed Class A8C Section 510(b) Claim against the Anaheim Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Section 510(b) Claims against the Anaheim Hotel Lessee, each Holder of an Allowed Section 510(b) Claim against the Anaheim Hotel Lessee shall receive such Holder's entitled Pro Rata distribution of the Anaheim Hotel Lessee Unencumbered Assets, if any, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Lessee.

**(jj)** *Voting:* Class A8C is Impaired by the Plan and each Holder of a Section 510(b) Claim against the Anaheim Hotel Lessee is entitled to vote to accept or reject the Plan.

**Class A9A – Intercompany Interests in the Anaheim Hotel Owner**

**(kk)** *Classification:* Class A9A consists of all Intercompany Interests in the Anaheim Hotel Owner.

**(ll)** *Treatment:* Except to the extent that a Holder of an Allowed Class A9A Intercompany Interest in the Anaheim Hotel Owner and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Class A9A Intercompany Interest in the Anaheim Hotel Owner, each Holder of an Allowed Class A9A Intercompany Interest in the Anaheim Hotel Owner shall:

(i) to the extent that the Anaheim Hotel Sale Transaction is contemplated and consummated, receive the Holder's entitled Pro Rata distribution of the Anaheim Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Owner; or

(ii) to the extent that the Anaheim Hotel Sale Transaction is not contemplated and consummated and the Holder of the Secured Anaheim Hotel Mezzanine Loan Claims receives the collateral securing its Claims, not receive any distribution on account of such Intercompany Interests; provided that, for the avoidance of doubt, the Holder of the Secured Anaheim Hotel Mezzanine Loan shall receive the Intercompany Interests in the Anaheim Hotel Owner as the Intercompany Interests in the Anaheim Hotel Owner are the collateral securing the Secured Anaheim Hotel Mezzanine Loan Claims.

(mm) *Voting:* Class A9A is Unimpaired, and Holders of Intercompany Interests in the Anaheim Hotel Owner are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class A9A Intercompany Interests in the Anaheim Hotel Owner are not entitled to vote to accept or reject the Plan.

**Class A9B – Intercompany Interests in the Anaheim Mezzanine Debtor**

(nn) *Classification:* Class A9B consists of all Intercompany Interests in the Anaheim Mezzanine Debtor.

(oo) *Treatment:* Except to the extent that a Holder of an Allowed Class A9B Intercompany Interest in the Anaheim Mezzanine Debtor and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Class A9B Intercompany Interest in the Anaheim Mezzanine Debtor, each Holder of an Allowed Class A9B Intercompany Interest in the Anaheim Mezzanine Debtor shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.

**(z)** *Treatment:* **Holders of Allowed Class A8 Intercompany Interests in the Anaheim Hotel Debtor shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.**

**(aa)** (pp) *Voting:* Class A9B8 is Impaired by the Plan, and Holders of Intercompany Interests in the Anaheim Mezzanine DebtorHotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Anaheim Mezzanine Debtor are not entitled to vote to accept or reject the Plan.

**Class A9C – Intercompany Interests in the Anaheim Hotel Lessee**

(qq) *Classification:* Class A9C consists of all Intercompany Interests in the Anaheim Hotel Lessee.

(rr) *Treatment:* Except to the extent that a Holder of an Allowed Class A9C Intercompany Interest in the Anaheim Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Class A9C Intercompany Interest in the Anaheim Hotel Lessee, each Holder of an Allowed Class A9C Intercompany Interest in the Anaheim Hotel Lessee shall receive such Holder's entitled Pro Rata distribution of the Anaheim Hotel

Lessee Unencumbered Assets, if any, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Lessee

(ss)    *Voting*:  Class A9C is Impaired by the Plan and each Holder of an Intercompany Interest in the Anaheim Hotel Lessee is entitled to vote to accept or reject the Plan.

3.    The treatment provided to each Class relating to each of the Ontario Hotel Debtors for distribution purposes and voting rights are specified below:

### Class O1 - Other Priority Claims Against the Ontario Hotel Debtors

**(a)**    *Classification*:  Class O1 consists of all Other Priority Claims against the Ontario Hotel Debtors.

**(b)**    *Treatment*:  Except to the extent that a Holder of an Allowed Class O1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

(i)    be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)    otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

**(c)**    *Voting*:  Class O1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class O2 - Other Secured Claims Against the Ontario Hotel Debtors

**(a)**    *Classification*:  Class O2 consists of all Other Secured Claims against Ontario Hotel Debtors.  For all purposes under the Ontario Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class O2A against the Ontario Hotel Owner, Class O2B against the Ontario Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

**(b)**    *Treatment*:  Except to the extent that a Holder of an Allowed Class O2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

<div style="margin-left: 2em">

(i)       be paid in full in Cash in an amount equal to such Allowed Class O2 Other Secured Claim by the Debtors on the Effective Date;

(ii)      receive the collateral securing any such Allowed Class O2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)     otherwise be treated in any other manner such that the Allowed Class O2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class O2 Other Secured Claim becomes an Allowed Class O2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class O2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

</div>

**(c)**      *Voting*:  Class O2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class O3 - Secured Ontario Hotel Mortgage Loan Claims

**(a)**      *Classification:*  Class O3 consists of all Secured Ontario Hotel Mortgage Loan Claims.

**(b)**      *Treatment:*  Except to the extent that the Holder of Allowed Class O3 Secured Ontario Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Ontario Hotel Mortgage Loan Claims, the Holder of Allowed Secured Ontario Hotel Mortgage Loan Claims shall receive a deed in lieu of foreclosure with respect to the collateral under the Ontario Hotel Mortgage Loan A~~G~~greement.  For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of **any deficiency Claim, guaranty Claim, indemnity Claim, and** Claims for Adequate Protection Obligations related to the Ontario Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Ontario Plan.

**(c)**      *Voting:*  Class O3 is Impaired ~~by the Plan~~**,** and the Holder of Secured Ontario Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

### Class O4A - General Unsecured Claims Against the Ontario Hotel Owner

**(a)**      *Classification:*  Class O4A consists of all General Unsecured Claims against the Ontario Hotel Owner.

**(b)**      *Treatment:*  Except to the extent that a Holder of an Allowed Class O4A General Unsecured Claim against the Ontario Hotel Owner and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Ontario Hotel Owner, each Holder of an Allowed General Unsecured Claim against the Ontario Hotel Owner shall receive its Pro Rata share of the Ontario Hotel Unsecured Claim Fund.

**(c)**      *Voting:*  Class O4A is Impaired ~~by the Plan~~**,** and each Holder of a General Unsecured Claim against the Ontario Hotel Owner is entitled to vote to accept or reject the Plan.

**Class O4B - General Unsecured Claims Against the Ontario Hotel Lessee**

**(a)**     *Classification:*  Class O4B consists of all General Unsecured Claims against the Ontario Hotel Lessee.

**(b)**     *Treatment:*  Except to the extent that a Holder of an Allowed Class O4B General Unsecured Claim against the Ontario Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Ontario Hotel Lessee, each Holder of an Allowed General Unsecured Claim against the Ontario Hotel Lessee shall receive its Pro Rata share of the Ontario Hotel Unsecured Claim Fund and such Holder's entitled Pro Rata distribution of the Ontario Hotel Lessee Unencumbered Assets, if any, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Ontario Hotel Lessee..

**(c)**     *Voting:*  Class O4B is Impaired ~~by the Plan~~, and each Holder of a General Unsecured Claim against the Ontario Hotel Debtors is entitled to vote to accept or reject the Plan.

**Class O5 - Mortgage Loan Deficiency Claims Against Ontario Hotel Debtors**

**(a)**     *Classification:*  Class O5 consists of all Mortgage Loan Deficiency Claims against Ontario Hotel Debtors.

**(b)**     *Treatment:*  The Holder of Allowed Class O5 Mortgage Loan Deficiency Claims shall not receive any distribution on account of such Mortgage Loan Deficiency Claims, and Allowed Mortgage Loan Deficiency Claims shall be canceled, released, and extinguished as of the Effective Date.

**(c)**     *Voting:*  Class O5 is Impaired ~~by the Plan~~, and the Holder of Mortgage Loan Deficiency Claims Against the Ontario Hotel Debtors is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holder of Mortgage Loan Deficiency Claims against Ontario Hotel Debtors is not entitled to vote to accept or reject the Plan.

**Class O6 - Intercompany Claims Against Ontario Hotel Debtors**

**(a)**     *Classification*:   Class O6 consists of all Intercompany Claims against Ontario Hotel Debtors.

**(b)**     *Treatment*:  Holders of Allowed Class O6 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

**(c)**     *Voting*:  Class O6 is Impaired by the Plan and Holders of Intercompany Claims against the Ontario Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

**Class O7 - Section 510(b) Claims Against Ontario Hotel Debtors**

**(a)**     *Classification*:   Class O7 consists of all Section 510(b) Claims against Ontario Hotel Debtors.

**(b)**     *Treatment*:  Holders of Allowed Class O7 Section 510(b) Claims against Ontario Hotel Debtors shall not receive any distribution on account of such Section 510(b) Claims, and

Allowed Section 510(b) Claims against Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

**(c)** *Voting*: Class O7 is Impaired, and Holders of Section 510(b) Claims against Ontario Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims against Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

### Class O8 - Intercompany Interests in Ontario Hotel Debtors

**(a)** *Classification:* Class O8 consists of all Intercompany Interests in Ontario Hotel Debtors.

**(b)** *Treatment:* Holders of Allowed Class O8 Intercompany Interests in Ontario Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

**(c)** *Voting:* Class O8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

4.  The treatment provided to each Class relating to each of the Re~~org~~**main**~~iz~~ing Debtors for distribution purposes and voting rights are specified below:

### Class R1 - Other Priority Claims Against the Re~~org~~**main**~~iz~~ing Debtors

**(a)** *Classification*: Class R1 consists of all Other Priority Claims against the Re~~org~~**main**~~iz~~ing Debtors.

**(b)** *Treatment*: Except to the extent that a Holder of an Allowed Class R1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Re~~org~~**main**~~iz~~ing Debtors, as applicable:

   (i)   be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

   (ii)  otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

**(c)** *Voting*: Class R1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class R2 - Other Secured Claims Against the Re~~org~~**main**~~iz~~ing Debtors

**(a)** *Classification*: Class R2 consists of all Other Secured Claims against the Re~~org~~**main**~~iz~~ing Debtors. For all purposes under the Re~~org~~**main**~~iz~~ing Debtor Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the

sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class R2A ~~Innkeepers USA Trust~~**against the Garden Grove Hotel Owner**, Class R2B ~~Innkeepers USA Trust~~**against the Garden Grove Hotel Owner** and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

**(b)** *Treatment*:  Except to the extent that a Holder of an Allowed Class R2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Reorg~~anizing~~**main**ing Debtors, as applicable:

(i) be paid in full in Cash in an amount equal to such Allowed Class R2 Other Secured Claim by the Debtors on the Effective Date;

(ii) receive the collateral securing any such Allowed Class R2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii) otherwise be treated in any other manner such that the Allowed Class R2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class R2 Other Secured Claim becomes an Allowed Class R2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class R2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

**(c)** *Voting*:  Class R2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class R3A - Secured Garden Grove Hotel Mortgage Loan Claims

**(a)** *Classification:*  Class R3A consists of all Secured Garden Grove Hotel Mortgage Loan Claims.

**(b)** *Treatment:*  Except to the extent that the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall~~:~~

(i) ~~to the extent the Garden Grove Sale Transaction is contemplated and consummated, receive the Holder's entitled distribution of the Garden Grove Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Garden Grove Hotel Owner; or~~

(ii) ~~to the extent no Garden Grove Sale Transaction is contemplated or consummated, have its~~ **in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Garden Grove Hotel Mortgage Loan Agreement, as reasonably required by LNR, the form and terms of**

which shall include the terms and conditions set forth in the LNR Commitment and the May 3 Stipulation and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement, pursuant to which the new amended or note or notes shall be issued to the Holder of the** Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims ~~reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~

(iii)~~.~~**.** For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of **any deficiency Claim, guaranty Claim, indemnity Claim, and** Claims for Adequate Protection Obligations related to the Garden Grove Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the ~~Reorganizing Debtor Plan~~**Remaining Debtor Plan.**

**(c)**     *Voting:* Class R3A is ~~potentially~~ Impaired ~~by the Plan~~**,** and the Holder of ~~Allowed~~ Class R3A Secured Garden Grove Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan ~~on a provisional basis. To the extent that the Holder of Class R3A Secured Garden Grove Hotel Mortgage Loan Claims receives a treatment pursuant to (b)(i) above in an amount less that the amount of its Allowed Secured Garden Grove Hotel Mortgage Loan Claims, such Holder shall be Impaired by the Plan and its vote shall be considered for purposes of Confirmation of the Plan. To the extent that the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims receives a treatment pursuant to (b)(ii) above, such Holder is Unimpaired by the Plan and its vote shall be disregarded.~~**.**

## Class R3B - Secured San Diego Hotel Mortgage Loan Claims

**(a)**     *Classification*:  Class R3B consists of all Secured San Diego Hotel Mortgage Loan Claims.

**(b)**     *Treatment*:  Except to the extent that the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall~~:~~

(i)       ~~to the extent the San Diego Sale Transaction is contemplated and consummated, receive the Holder's entitled distribution of the San Diego Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the San Diego Hotel Owner; or~~

(ii)      ~~to the extent no San Diego Sale Transaction is contemplated or consummated, have its~~**, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Diego Hotel Mortgage Loan Agreement, as reasonably required by LNR, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and the May 3 Stipulation and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement, pursuant to which the new amended or restated note or notes shall be issued to the Holder of the** Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims ~~reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~

(iii)~~.~~**.** For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of **any deficiency Claim, guaranty Claim, indemnity Claim, and**

Claims for Adequate Protection Obligations related to the San Diego Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the ~~Reorganizing Debtor Plan.~~**Remaining Debtor Plan.**

**(c)**     *Voting*:  Class R3B is ~~Unimpaired~~**Impaired**, and the Holder of Class R3B Secured San Diego Hotel Mortgage Loan Claims is ~~conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of Class R3B Secured San Diego Hotel Mortgage Loan Claims is not~~ entitled to vote to accept or reject the Plan.

**Class R3C - Secured Washington DC Hotel Mortgage Loan Claims**

**(a)**     *Classification:*  Class R3C consists of all Secured Washington DC Hotel Mortgage Loan Claims.

**(b)**     *Treatment:*  Except to the extent that the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims, the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall~~:~~

~~(i)        to the extent the Washington DC Sale Transaction is contemplated and consummated, receive the Holder's entitled distribution of the Washington DC Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Washington DC Hotel Owner; or~~

~~(ii)       to the extent no Washington DC Sale Transaction is contemplated or consummated, have its~~ **, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Washington DC Hotel Mortgage Loan Agreement, as reasonably required by LNR, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and the May 3 Stipulation and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement, pursuant to which the new amended or restated note or notes shall be issued to the Holder of the** Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims ~~reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~

~~(iii)~~**.**     For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of **any deficiency Claim, guaranty Claim, indemnity Claim, and** Claims for Adequate Protection Obligations related to the Washington DC Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the ~~Reorganizing Debtor Plan.~~**Remaining Debtor Plan.**

**(c)**     *Voting:*  Class R3C is ~~Unimpaired~~**Impaired**, and the Holder of Class R3C Secured Washington DC Hotel Mortgage Loan Claims is ~~conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of Class R3C Secured Washington DC Hotel Mortgage Loan Claims is not~~ entitled to vote to accept or reject the Plan.

**Class R3D - Secured Tysons Corner Hotel Mortgage Loan Claims**

(a)  *Classification:*  Class R3D consists of all Secured Tysons Corner Hotel Mortgage Loan Claims.

(b)  *Treatment:*  Except to the extent that the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holders, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall:

(i)  ~~to the extent the Tysons Corner Sale Transaction is contemplated and consummated, receive the Holder's entitled distribution of the Tysons Corner Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Tysons Corner Hotel Owner; or~~

(ii)  ~~to the extent no Tysons Corner Sale Transaction is contemplated or consummated, have its~~ **, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Tysons Corner Hotel Mortgage Loan Agreement, as reasonably required by LNR, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and the May 3 Stipulation and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement, pursuant to which the new amended or restated note or notes shall be issued to the Holder of the** Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims ~~reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~

(iii)  ~~.~~ **.** For the avoidance of doubt and notwithstanding anything to the contrary herein ~~or in the Plan~~, such Holder shall not receive any recovery from any of the Debtors on account of **any deficiency Claim, guaranty Claim, indemnity Claim, and** Claims for Adequate Protection Obligations related to the Tysons Corner Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the ~~Reorganizing Debtor Plan.~~ **Remaining Debtor Plan.**

(c)  *Voting:*  Class R3D is ~~Unimpaired~~**Impaired**, and the Holder of Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims is ~~conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims is not~~ entitled to vote to accept or reject the Plan.

**Class R3E - Secured San Antonio Hotel Mortgage Loan Claims**

(a)  *Classification:*  Class R3E consists of all Secured San Antonio Hotel Mortgage Loan Claims.

(b)  *Treatment:*  Except to the extent that the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall:

(i)    ~~to the extent the San Antonio Sale Transaction is contemplated and consummated, receive the Holder's entitled distribution of the San Antonio Hotel Purchase Consideration, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the San Antonio Hotel Owner; or~~

(ii)    ~~to the extent no San Antonio Sale Transaction is contemplated or consummated, have its~~ **, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Antonio Hotel Mortgage Loan Agreement, as reasonably required by LNR, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and the May 3 Stipulation and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement, pursuant to which the new amended or restated note or notes shall be issued to the Holder of the** Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims ~~reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code~~**. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Antonio Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.**

**(c)**    *Voting:*  Class R3E is ~~Unimpaired~~**Impaired**, and the Holder of Class R3E Secured San Antonio Hotel Mortgage Loan Claims is ~~conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holder of Class R3E Secured San Antonio Hotel Mortgage Loan Claims is not~~ entitled to vote to accept or reject the Plan.

### Class R4 - General Unsecured Claims Against the ~~Reorg~~**mai**~~nizing~~**ning** Debtors

**(a)**    *Classification:*  Class R4 consists of all General Unsecured Claims against the ~~Reorg~~**mai**~~nizing~~**ning** Debtors.

**(b)**    *Treatment*:  Except to the extent that a Holder of an Allowed Class R4 General Unsecured Claim **against the Remaining Debtors** and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim **against the Remaining Debtors**, each Holder of an Allowed General Unsecured Claim ~~shall:~~

(i)    ~~to the extent a Hotel Sale Transaction is contemplated and consummated with respect to the Debtor that the Holder has an Allowed General Unsecured Claim against, receive the Holder's entitled Pro Rata distribution of the Hotel~~ **a particular Remaining Debtor shall receive (i) the Chatham Hotel Sale Transaction** Purchase Consideration received by such ~~Debtor, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Debtor;~~

(ii)    ~~to the extent the Garden Grove Sale Transaction is contemplated and consummated and such Holder has an Allowed General Unsecured Claim against the Garden Grove Hotel Lessee, receive the Holder's entitled Pro Rata distribution of the Garden Grove Hotel Lessee Unencumbered Assets, if any, which distribution shall be made in accordance with~~**Remaining Debtor through** the Distribution Waterfall ~~as it applies to the Garden Grove Hotel Lessee; or~~

80

~~(iii)~~ ~~to the extent the San Diego Sale Transaction is contemplated and consummated and such Holder has an Allowed General Unsecured Claim against the San Diego Hotel Lessee, receive the Holder's entitled Pro Rata distribution of the San Diego Hotel Lessee Unencumbered Assets, if any, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the San Diego Hotel Lessee; or~~

~~(iv)~~ ~~to the extent the Washington DC Sale Transaction, Tysons Corner Sale Transaction, and San Antonio Sale Transaction are contemplated and consummated and such Holder has an Allowed General Unsecured Claim against the General Hotel Lessee, receive the Holder's entitled Pro Rata distribution of the General Hotel Lessee Unencumbered Assets, if any, which distribution shall be made in accordance with the Distribution Waterfall as it applies to the General Hotel Lessee,~~

~~(v)~~ ~~to the extent the Holder of an Allowed General Unsecured Claim against one of the Reorganizing Debtors' treatment is not set forth in sections (b)(i) (iv) above, at the sole option of the Reorganizing Debtors, (i) have its Claim rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) receive a Cash distribution on the Effective Date or as soon thereafter as is practicable.~~ **and (ii) other assets, if any, of such Remaining Debtor that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor.**

**(c)** *Voting*: Class R4 is ~~potentially~~ Impaired ~~by the Plan,~~ and **the** Holders of Allowed Class R4 General Unsecured Claims **against the Remaining Debtors** are entitled to vote to accept or reject the Plan ~~on a provisional basis. To the extent that Holders of Allowed Class R4 General Unsecured Claims receive a distribution pursuant to (b)(i) (iv) above equal to the amount of their Allowed Claim or receive the treatment set forth in (b)(v) above, such Holders are Unimpaired by the Plan and their votes shall be disregarded. To the extent that Holders of Allowed Class R4 General Unsecured Claims receive a different treatment and receive less than the amount of their Allowed Claim, such Holders shall be Impaired by the Plan and their votes shall be considered for purposes of Confirmation of the Plan.~~

## Class R5 - Intercompany Claims Against the Re~~org~~**main**~~iz~~ing Debtors

**(d)** *Classification*: Class R5 consists of all Intercompany Claims against the Re~~org~~**main**~~iz~~ing Debtors.

**(e)** *Treatment*: Holders of Allowed Class R5 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

**(f)** *Voting*: Class R5 is Impaired ~~by the Plan,~~ and Holders of Intercompany Claims against the Re~~org~~**main**~~iz~~ing Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims against the Re~~org~~**main**~~iz~~ing Debtors are not entitled to vote to accept or reject the Plan.

## Class R6 - Intercompany Interests in the Re~~org~~**main**~~iz~~ing Debtors

**(a)** *Classification:* Class R6 consists of all Intercompany Interests in the Re~~org~~**main**~~iz~~ing Debtors.

**(b)** *Treatment:* Holders of Allowed Class R6 Intercompany Interests in the Reorg~~majn~~izing Debtors shall have their Interests reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**(c)** *Voting:* Class R6 is Unimpaired, and Holders of Intercompany Interests in the Reorg~~majn~~izing Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Reorg~~majn~~izing Debtors are not entitled to vote to accept or reject the Plan.

## Class R7 - Innkeepers USA LP Preferred D Interests

**(a)** ~~(ee)~~ *Classification:* Class R7 consists of all Innkeepers USA LP Preferred D Interests.

**(b)** ~~(ff)~~ *Treatment:* Holders of Allowed Innkeepers USA LP Preferred D Interests~~, at the election of the Reorganizing Debtors in their sole discretion, shall:~~ **shall not receive any distribution on account of such Allowed Innkeepers USA LP Preferred D Interests, and Allowed Innkeepers USA LP Preferred D Interests shall be canceled, released, and extinguished as of the Effective Date.**

~~(i) to the extent that all of the Hotel Sale Transactions are contemplated and consummated by the Debtors, receive the Holder's entitled Pro Rata distribution of the Hotel Sale Transaction Consideration and assets of Innkeepers USA Limited Partnership (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Limited Partnership; or~~

~~(ii) to the extent that the Holder's treatment is not provided pursuant to (b)(i), have their Innkeepers USA LP Preferred D Interests reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, which treatment shall include (A) for the avoidance of doubt, no distribution on the Effective Date on account of such Innkeepers USA LP Preferred D Interests, (B) the cooperation of the Post-Effective Date Reorganizing Debtors' lenders with the Post-Effective Date Reorganizing Debtors in an effort to provide the Holders of the Innkeepers USA LP Preferred D Interests guarantys in substantially similar form to the guarantys with respect to the Debtors' mortgage loans that the Holders of Innkeepers USA LP Preferred D Interests were party to as of the Petition Date, and (C) for the avoidance of doubt, the maintenance of all distribution, redemption, and other rights provided to the Holders of Innkeepers USA LP Preferred D Interests under the partnership agreement for Innkeepers USA Limited Partnership.~~

**(c)** ~~(gg)~~ *Voting*:  Class R7 is ~~potentially~~ Impaired ~~by the Plan~~, and Holders of Allowed ~~Class R7~~ Innkeepers USA LP Preferred D Interests are **conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Innkeepers USA LP Preferred D Interests are not** entitled to vote to accept or reject the Plan ~~on a provisional basis.  To the extent that Holders of Allowed Class R7 Innkeepers USA LP Preferred D Interests receive a treatment pursuant to (b)(i) above, such Holders shall be Impaired by the Plan and their votes shall be considered for purposes of Confirmation of the Plan.  To the extent that Holders of Allowed Class R7 Innkeepers USA LP Preferred D Interests receive a treatment pursuant to (b)(ii) above, such Holders are Unimpaired by the Plan and their votes shall be disregarded.~~

## Class R8 - Innkeepers USA Trust Preferred C Interests

**(ee)** ~~(hh)~~ *Classification:*  Class R8 consists of all Innkeepers USA Trust Preferred C Interests.

~~(ii)~~ *~~Treatment: Holders of Allowed Innkeepers USA Trust Preferred C Interests~~, at the election of the Reorganizing Debtors in their sole discretion, shall:*

**(ff)** ~~(i) to the extent that all of the Hotel Sale Transactions are contemplated and consummated by the Debtors,~~ *Treatment: Holders of Allowed Innkeepers USA Trust Preferred C Interests* **shall** receive the Holder's entitled Pro Rata distribution of the **Chatham** Hotel Sale Transaction **Purchase** Consideration and assets**, if any,** of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust~~; or~~

> ~~(ii)      to the extent that the Holder's treatment is not provided pursuant to (b)(i), have their Interest be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~**.**

**(gg)** ~~(jj)~~ *Voting:*  Class R8 is ~~potentially~~ Impaired ~~by the Plan~~, and Holders of Allowed Class R8 Innkeepers USA Trust Preferred C Interests are entitled to vote to accept or reject the Plan ~~on a provisional basis.  To the extent that Holders of Allowed Class R8 Innkeepers USA Trust Preferred C Interests receive a treatment pursuant to (b)(i) above, such Holders shall be Impaired by the Plan and their votes shall be considered for purposes of Confirmation of the Plan.  To the extent that Holders of Allowed Class R8 Innkeepers USA Trust Preferred C Interests receive a treatment pursuant to (b)(ii) above, such Holders are Unimpaired by the Plan and their votes shall be disregarded.~~

## Class R9 - Innkeepers USA Trust Preferred A Interests

**(a)** ~~(kk)~~ *Classification:*  Class R9 consists of all Innkeepers USA Trust Preferred A Interests.

~~(ll)~~ *~~Treatment: Holders of Allowed Innkeepers USA Trust Preferred A Interests~~, at the election of the Reorganizing Debtors in their sole discretion, shall:*

**(b)** ~~(i) to the extent that all of the Hotel Sale Transactions are contemplated and consummated by the Debtors,~~ *Treatment: Holders of Allowed Innkeepers USA Trust Preferred A Interests* **shall** receive the Holder's entitled Pro Rata distribution of the **Chatham** Hotel Sale Transaction **Purchase** Consideration and assets**, if any,** of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be

made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust~~;~~**,**
~~or~~**.**

> (ii)    ~~to the extent that the Holder's treatment is not provided pursuant to (b)(i), have their Interest be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~

**(c)**    ~~(mm)~~ *Voting:* Class R9 is ~~potentially~~ Impaired ~~by the Plan~~**,** and Holders of Allowed Class R9 Innkeepers USA Trust Preferred A Interests are entitled to vote to accept or reject the Plan ~~on a provisional basis. To the extent that Holders of Allowed Class R9 Innkeepers USA Trust Preferred A Interests receive a treatment pursuant to (b)(i) above, such Holders shall be Impaired by the Plan and their votes shall be considered for purposes of Confirmation of the Plan. To the extent that Holders of Allowed Class R9 Innkeepers USA Trust Preferred A Interests receive a treatment pursuant to (b)(ii) above, such Holders are Unimpaired by the Plan and their votes shall be disregarded~~.

## Class R10 - Innkeepers USA Trust Common Interests

**(a)**    ~~(nn)~~ *Classification:* Class R10 consists of all Innkeepers USA Trust Common Interests.

**(b)**    ~~(oo)~~ *Treatment:* Holders of Allowed Innkeepers USA Trust Common Interests~~, at the election of the Reorganizing Debtors in their sole discretion, shall:~~ **shall not receive any distribution on account of such Allowed Innkeepers USA Trust Common Interests, and Allowed Innkeepers USA Trust Common Interests shall be canceled, released, and extinguished as of the Effective Date.**

> (i)    ~~to the extent that all of the Hotel Sale Transactions are contemplated and consummated by the Debtors, receive the Holder's entitled Pro Rata distribution of the Hotel Sale Transaction Consideration and assets of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust; or~~

> (ii)    ~~to the extent that the Holder's treatment is not provided pursuant to (b)(i), have their Interest be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~

**(c)**    ~~(pp)~~ *Voting:* Class R10 is ~~potentially~~ Impaired ~~by the Plan~~**,** and Holders of Allowed Class R10 Innkeepers USA Trust Common Interests are *~~entitled to vote to accept or reject the Plan~~* ~~on a provisional basis. To the extent that Holders of Allowed Class R10~~**conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed** Innkeepers USA Trust Common Interests ~~receive a treatment pursuant to (b)(i) above, such Holders shall be Impaired by the Plan and their votes shall be considered for purposes of Confirmation of the Plan. To the extent that Holders of Allowed Class R10 Innkeepers USA Trust Common Interests receive a treatment pursuant to (b)(ii) above, such Holders are Unimpaired by the Plan and their votes shall be disregarded~~**are not** *entitled to vote to accept or reject the Plan*.

## Class R11 - Grand Prix Holdings Interests

**(a)**    ~~(qq)~~ *Classification:* Class R11 consists of all Grand Prix Holdings Interests.

**(rr)** ~~*Treatment: Holders of Allowed Grand Prix Holdings Interests*, at the election of the Reorganizing Debtors in their sole discretion, shall:~~

**(b)** ~~(i) to the extent that all of the Hotel Sale Transactions are contemplated and consummated by the Debtors,~~ *Treatment: Holders of Allowed Grand Prix Holdings Interests* **shall** receive the Holder's entitled Pro Rata distribution of the **Chatham** Hotel Sale Transaction **Purchase** Consideration and assets**, if any,** of the Parent Companies (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings~~; or~~ **.**

**(c)** *Voting***: Class R11 is Impaired, and Holders of Allowed Class R11 Grand Prix Holdings Interests are entitled to vote to accept or reject the Plan.**

**Class R12 - Section 510(b) Claims Against the Remaining Debtors**

**(hh)** *Classification***: Class R12 consists of all Section 510(b) Claims against the Remaining Debtors.**

**(ii)** ~~to the extent that the Holder's treatment is not provided pursuant to (b)(i), have their Interest be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.~~ *Treatment***: Except to the extent that a Holder of an Allowed Class R12 Section 510(b) Claims against the Remaining Debtors and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Section 510(b) Claims against the Remaining Debtors, each Holder of an Allowed Section 510(b) Claims against a particular Remaining Debtor shall receive (a) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor through the Distribution Waterfall and (b) other assets, if any, of such Remaining Debtor that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor.**

**(ss)** ~~*Voting:* Class R11 is potentially Impaired by the Plan and Holders of Allowed Class R11 Grand Prix Holdings Interests are entitled to vote to accept or reject the Plan on a provisional basis. To the extent that Holders of Allowed Class R11 Grand Prix Holdings Interests receive a treatment pursuant to (b)(i) above, such Holders shall be Impaired by the Plan and their votes shall be considered for purposes of Confirmation of the Plan. To the extent that Holders of Allowed Class R11 Grand Prix Holdings Interests receive a treatment pursuant to (b)(ii) above, such Holders are Unimpaired by the Plan and their votes shall be disregarded.~~

~~**Class R12 - Section 510(b) Claims Against the Reorganizing Debtors**~~

**(tt)** ~~*Classification*: Class R12 consists of all Section 510(b) Claims against the Reorganizing Debtors.~~

**(uu)** ~~*Treatment*: Holders of Allowed Class R12 Section 510(b) Claims against the Reorganizing Debtors shall be paid in full in Cash as of the Effective Date.~~

**(ii)** ~~(vv)~~ *Voting*: Class R~~11 is Unimpaired and Holders of Section 510(b) Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of~~**12 is Impaired, and Holders of Allowed Class**

**R12** Section 510(b) Claims against the Re~~org~~**maj**~~ni~~zing Debtors are ~~not~~ entitled to vote to accept or reject the Plan.

D.    *Special Provisions*

1.    <u>Special Provision Governing Unimpaired Claims</u>

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

2.    <u>Elimination of Vacant Classes</u>

Any Class of Claims or Interests that, as of the commencement of ~~an applicable~~**the** Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement and Solicitation Procedures Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.    <u>Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code</u>

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

E.    *Means for Implementation of the Plan*

1.    <u>Substantive Consolidation</u>

The Plan does not contemplate substantive consolidation of any of the Debtors.

2.    <u>Restructuring Transactions and Sources of Consideration for Plan Distributions</u>

The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. With respect to the Fixed/Floating Plan, all amounts of Cash and securities necessary for the Fixed/Floating Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from (a) Cash **on hand** from operations in accordance with the Commitment Letter and, as applicable, **and permitted by** the Cash Collateral Orders~~,~~ **and** (b) the Investment~~, and (c) the New HoldCo Interests issued by New HoldCo pursuant to the Fixed/Floating Plan~~.  With respect to the Anaheim Plan, the Ontario Plan, and the Re~~org~~**maj**~~ni~~zing Debtor**s** Plan, all amounts of Cash and securities necessary for the Debtors that are not the Fixed/Floating Debtors or the Post-Effective Date Debtors that are not the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from (a) Cash from operations, (b) the ~~Hotel Sale Transactions and the Anaheim~~**Chatham** Hotel Sale Transaction ~~(to the extent contemplated by the Debtors), and (c) to the extent contemplated by the Post-Effective Date Reorganizing Debtors, a rights offering or new mezzanine financing~~.

3.    <u>General Settlement of Claims</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

4.      Fixed/Floating Investment

On the Effective Date of the Fixed/Floating Plan, and subject to the terms of the Fixed/Floating Successful Bid, ~~the Investor~~**New HoldCo** shall purchase**, directly or indirectly,** the ~~New HoldCo~~ Interests ~~from New HoldCo as set forth in the~~**of the Post-Effective Date** Fixed/Floating ~~Successful Bid~~**Debtors** in return for the Investment. ~~If the Fixed/Floating Successful Bid is the bid of the Investor and Lehman on the terms set forth in the Commitment Letter, the New HoldCo Interests that Investor shall receive on the Effective Date as a result of the Investment will comprise 50% of the total issued and outstanding New HoldCo Interests as of the Effective Date, subject to New HoldCo Interests distributed on account of the Third-Party Investment, if any. If the Fixed/Floating Successful Bid is not the bid of the Investor and Lehman on the terms set forth in the Commitment Letter, unless otherwise set forth in the Fixed/Floating Successful Bid, the New HoldCo Interests that Investor shall receive on the Effective Date as a result of the Investment will comprise 100% of the total issued and outstanding New HoldCo Interests as of the Effective Date, subject to New HoldCo Interests distributed on account of the Third-Party Investment, if any.~~

If the Fixed/Floating Plan Sponsors determine in their sole and absolute discretion that New HoldCo and the Post-Effective Date Fixed/Floating Debtors shall have an alternate corporate or organizational structure, form or identity **(including, without limitation, as a result of the rejection of the Fixed/Floating Plan by Class FF4)**, the structure of the Investment contemplated in Article IV.D of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form**,** or identity.

**5.      Chatham Hotel Sale Transaction**

**On the Effective Date as applicable to the Remaining Debtors, the Debtors will consummate the Chatham Hotel Sale Transaction in accordance with the Chatham Hotel Sale Transaction Documents.**

**6.**      ~~5.~~ New Fixed Rate Pool Mortgage Loan Limited Guarantys

~~To the extent the Midland Financing is contemplated by the Fixed/Floating Successful Bid, on~~**On** the Effective Date of the Fixed/Floating Plan and in connection with the New Fixed Rate Pool Mortgage Loan**,** the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall be entered into by the parties contemplated in the ~~Fixed/Floating Successful Bid~~**New HoldCo/Midland Commitment** and the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall otherwise be consistent with the terms of the ~~Fixed/Floating Successful Bid~~**New HoldCo/Midland Commitment**.

~~6.      Rights Offering or New Mezzanine Financing~~

~~To raise capital for the Post-Effective Date Reorganizing Debtors, the Debtors may offer constituents an opportunity to purchase rights in the Reorganizing Debtors or seek to raise debt financing from a third party financing source.~~

7.      Special Servicer Payment and Special Servicer Release Payment

Contemporaneously with the occurrence of the Effective Date of the Fixed/Floating Plan, and as a condition thereto, the Fixed/Floating Plan Sponsors shall direct New HoldCo to make the $2.5 million Special Servicer Payment and the $3.0 million Special Servicer Release Payment.

8.      Issuance of ~~New HoldCo~~ Interests **in Post-Effective Date Fixed/Floating Debtors**

The issuance of the ~~New HoldCo~~ Interests by ~~New HoldCo~~**each of the Post-Effective Date Fixed/Floating Debtors** is authorized without the need for any further action and without any further action by the Holders of Claims or Interests or any further notice to or action, order, or approval of the Bankruptcy Court. ~~The organizational documents of New HoldCo shall authorize [____] New HoldCo Interests.~~

On the Effective Date of the Fixed/Floating Plan ~~as applicable to the Fixed/Floating Debtors~~, or as soon as reasonably practicable thereafter, the ~~New HoldCo~~ Interests **in the Post-Effective Date Fixed/Floating Debtors (or**

**such of them as may be designated by New HoldCo)** shall be distributed to ~~the Fixed/Floating Plan Sponsors and the Third Party Investors, if applicable,~~**New HoldCo** in accordance with the Fixed/Floating Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

All of the ~~shares of New HoldCo~~ Interests **in the Post-Effective Date Fixed/Floating Debtors** issued pursuant to the Fixed/Floating Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in ~~Article VI of the Plan~~**[___]** shall be governed by the terms and conditions set forth in the Fixed/Floating Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

~~9. Management Incentive Program~~

~~Unless otherwise approved during the Chapter 11 Cases, on the Effective Date of the Fixed/Floating Plan, the Management Incentive Program (as described in Article IV.G of this Disclosure Statement and as set forth in the Plan Supplement) shall be deemed approved in its entirety without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity and the Debtors will be authorized to make all payments due under the Management Incentive Program on the Effective Date.~~

~~10. Securities Act Exemptions~~

~~Except as set forth in the immediately succeeding sentence, pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New HoldCo Interests shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. In addition, in the case of New HoldCo Interests issued pursuant to Section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated in the Plan, including the New HoldCo Interests, shall be subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval, if any.~~

**9.** ~~11.~~ Listing of New HoldCo Interests; Reporting Obligations

None of the New HoldCo Interests will be listed on a national securities exchange as of the Effective Date of the Fixed/Floating Plan. New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust will not be reporting companies under the Securities Exchange Act, and New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust shall not be required to file reports with the Securities and Exchange Commission or any other entity or party and shall not be required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.

**10.** ~~12.~~ Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Post-Effective Date Debtors and their successors and assigns.

**11.** ~~13.~~ Vesting of Assets in the Post-Effective Date Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate of the Debtors, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the applicable Post-Effective Date Debtors free and clear of all Liens, Claims, charges, or other encumbrances. The Intercompany Interests of Innkeepers USA Limited Partnership in non-Debtor KPA Raleigh, LLC shall vest in Post-Effective Date Innkeepers USA Limited Partnership. The Intercompany Interests of KPA Leaseco Holding, Inc. in non-Debtor KPA Raleigh Leaseco, LLC shall vest in Post-Effective Date KPA Leaseco Holding, Inc. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**12.** ~~14.~~ Cancellation of Securities and Agreements

On the Effective Date, except to the extent otherwise provided, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be canceled and the obligations of the Debtors or the Post-Effective Date Debtors and the non-Debtor affiliates thereunder or in any way related thereto shall be discharged.

**13.** ~~15.~~ Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the directors, members, trustees, officers, and managers for New HoldCo, including the appointment of the Post-Effective Date Board; (2) the issuance and distribution of the ~~New HoldCo~~ Interests ~~;~~ **in the Post-Effective Date Fixed/Floating Debtors,** (3) the execution and approval for ~~New HoldCo and~~ the Post-Effective Date Fixed/Floating Debtors of the New Fixed/Floating By-Laws and New Fixed/Floating Organizational Documents consistent with the terms of the Fixed/Floating Successful Bid ~~; (4) to the extent the Fixed/Floating Successful Bid contemplated the Midland Financing,~~ **, (4)** the execution and delivery of the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Notes, and the New Fixed Rate Pool Mortgage Loan Limited Guarantys consistent with the terms of the ~~Fixed/Floating Successful Bid~~**New HoldCo/Midland Commitment**; and (5) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-~~-~~Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, trustees, officers, or managers of the Debtors or the Post-Effective Date Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.O of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**14.** ~~16.~~ Effectuating Documents; Further Transactions

On and after the Effective Date, the Post-Effective Date Debtors and their directors, members, trustees, officers, and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

## **15.** ~~17.~~ Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, ~~including the issuance of the New HoldCo Interests,~~ recording of any mortgages or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

## **16.** ~~18.~~ D&O Liability Insurance Policies

Notwithstanding anything herein or in the Plan to the contrary, on the Effective Date of the Re~~org~~**ma**~~niz~~**in**g Debtor Plan, the Re~~org~~**ma**~~niz~~**in**g Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtors rights to seek amendment to such D&O Liability Insurance Policies. On the Effective Date of the Fixed/Floating Plan, New HoldCo will purchase new director & officer liability insurance policies as the Fixed/Floating Plan Sponsors determine is necessary. Entry of the Confirmation Order for the Re~~org~~**ma**~~niz~~**in**g Debtor Plan shall constitute the Bankruptcy Court's approval of the Re~~org~~**ma**~~niz~~**in**g Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein or in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Re~~org~~**ma**~~niz~~**in**g Debtors under the Re~~org~~**ma**~~niz~~**in**g Debtor Plan as to which no Proof of Claim need be Filed.

## **17.** ~~19.~~ D&O Tail Insurance Policies

To the extent not already purchased, on the Confirmation Date of the Fixed/Floating Plan, the Debtors are authorized to purchase tail coverage under a directors and officers' liability insurance policy with a term of six years for the current and former officers, directors, trustees, and members containing the same coverage that exists under the Debtors' current D&O Liability Insurance Policies (*i.e.*, a "tail policy"). After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, trustees, and members of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, trustees, and/or members remain in such positions after the Effective Date.

## **18.** ~~20.~~ New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws

On or immediately prior to the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors will file the New Fixed/Floating Organizational Documents, which shall include provisions in accordance with the Fixed/Floating Successful Bid, with the applicable Secretaries of State and/or other applicable authorities in their respective states of organization **as required by and** in accordance with applicable laws. In addition, the provisions of the New Fixed/Floating By-Laws shall include provisions in accordance with the Fixed/Floating Successful Bid. ~~To the extent that New HoldCo is a corporation, pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Fixed/Floating Organizational Documents will prohibit the issuance of non-voting equity securities.~~ After the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors may amend and restate the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws and other constituent documents as permitted by the laws of applicable states of organization and the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws.

**19.** ~~21.~~ Board Representation

**(a)** Fixed/Floating Debtors

New HoldCo shall be managed by the **managing member of** New HoldCo ~~Board which will consist of seven directors, members, or trustees, which will consist of four directors, members, or trustees nominated by the Fixed/Floating Plan Sponsors~~ in accordance with the terms ~~of the Fixed/Floating Successful Bid, and three independent directors, members, or trustees to be nominated by the Fixed/Floating Plan Sponsors and/or by the Third Party Investors in accordance with the terms of the Fixed/Floating Successful Bid.  To the extent known and to~~**and conditions set forth in the New HoldCo limited liability company agreement.  To** the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will ~~list~~**identify** the ~~members~~**managing member** of ~~the~~ New HoldCo ~~Board~~ and the members of the board of directors, members, and trustees of the New HoldCo subsidiaries identified as of the date of the filing thereof.

**(b)** Other Debtors

Post-Effective Date Innkeepers USA Trust **[and Post-Effective Date Grand Prix Holdings, LLC]** shall be managed by the Post-Effective Date Board.  To the extent known and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will list the members of the Post-Effective Date Board and the members of the board of directors, members, and trustees of the subsidiaries of Post-Effective Date Innkeepers USA Trust identified as of the date of the filing thereof.

**20.** ~~22.~~ Indemnification Provisions

Notwithstanding anything herein or in the Plan to the contrary, pursuant to section 365(a) of the Bankruptcy Code or otherwise, and as of the Effective Date, the Debtors shall assume and assign to the Post-Effective Date Debtors all of the Indemnifications Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Indemnification Provisions.  Notwithstanding anything to the contrary contained herein or in the Plan, (i) Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed and assigned by the foregoing assumption and assignment of the Indemnification Provisions, (ii) each such obligation shall be deemed and treated as an Executory Contract that has been assumed and assigned by the Debtors under the Plan as to which no Proof of Claim need be Filed, and (iii) as of the Effective Date, the Indemnifications Provisions shall be binding and enforceable against the Post-Effective Date Debtors.

**21.** **Wind Down**

**On and after the Effective Date, Post-Effective Date Innkeepers USA Trust will oversee the Wind Down, and will fund the Wind Down using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration, and shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Debtors in accordance with the Plan.**

**22.** ~~23.~~ Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article **III.B with respect to Class FF5, Article** VIII.C, Article VIII.D, Article VIII.E, **Article VIII.F, Article VIII.G,** and Article VIII.~~F~~**H**), each of the Post-~~ ~~Effective Date Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the

Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Post-Effective Date Debtors have released any Entity on or prior to the Effective Date (pursuant to any of the release provisions set forth in Article VIII**, Article III.B with respect to Class FF5,** or otherwise), the Debtors or the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Post-Effective Date Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

F.      *Treatment of Executory Contracts and Unexpired Leases*

**1.        Assumption of Franchise Agreements**

**On the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors will assume the franchise agreements set forth in the Plan Supplement with respect to the assets of the Fixed/Floating Debtors. On the Remaining Debtor Plan Effective Date, the Debtors that are party to the Chatham APA will assume and assign to Chatham the franchise agreements set forth in the Plan Supplement with respect to the assets of the Debtors that are party to the Chatham APA.**

**2.**        1.Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the Executory Contracts or Unexpired Leases of a Debtor that are not assumed or rejected pursuant to an Order prior to the Effective Date applicable to such Debtor shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts or Unexpired Leases: (1) identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement; (2) that are the subject of a motion to assume and assign or reject pending on the Effective Date applicable to such Debtor (in which case such assumption and assignment or rejection and the effective date thereof shall remain subject to a Final Order); or (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date applicable to such Debtor. Entry of the Confirmation Order shall constitute an approval of the assumptions and assignment or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, including the assumption and assignment of the Executory Contracts and Unexpired Leases identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement and the rejection of the Executory Contracts and Unexpired Leases identified on the list of rejected Executory Contracts and Unexpired Leases in the Plan Supplement, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions and assignments or rejections of a Debtor's Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date applicable to such Debtor. Notwithstanding anything to the contrary in the Plan, the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the lists of Executory Contracts or Unexpired Leases applicable to the Post-Effective Date Debtors identified in Article V of the Plan and in the Plan Supplement at any time through and including the later of 30 days after the Effective Date .  **(or such later date as provided in Article V.C of the Plan in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).**

**3.**        2.Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases

Any Executory Contracts or Unexpired Leases to be **assumed or** assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the satisfaction of the Cure Obligations or by an agreed-upon waiver of the Cure Obligations on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Post-Effective Date Debtors and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or related Cure Obligations must be Filed, served, and actually received by the Debtors by 30 days after the Effective Date of the Joint Plan applicable to the Debtor that is the counterparty to the Executory Contract or

Unexpired Lease. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption and assignment of such Executory Contract or Unexpired Lease or such Cure Obligations will be deemed to have assented to such matters and shall be forever barred, estopped, and enjoined from asserting such objection against the Debtors.

In the event of a dispute regarding: (1) the Cure Obligations; (2) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed and assigned; or (3) any other matter pertaining to assumption and/or assignment, then the applicable Cure Obligations shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding Cure Obligations without any further notice to any party or any action, order, or approval of the Bankruptcy Court. The Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to reject, or nullify the assumption and assignment of, any Executory Contract or Unexpired Lease no later than 30 days after a Final Order determining the Cure Obligations, any request for adequate assurance of future performance required to assume and assign such Executory Contract or Unexpired Lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment. Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**4.** 3. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) 30 days after the Effective Date of the Joint Plan applicable to the Debtor whom the Claim is against.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan, or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.~~G~~**K** of the Plan, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

**5.** 4. Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Post-Effective Date Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

**6.** ~~5.~~ Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**7.** ~~6.~~ Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption and assignment or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

*G.     Provisions Governing Distributions*

1.     Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Disbursing Agent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan or in this Disclosure Statement, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any postpetition interest on such Claim or Interest payable in accordance with the Plan.

2.     Distributions Generally; Disbursing Agent

All distributions under the Plan that are to be made on the Effective Date shall be made by the Debtors as Disbursing Agent. All other distributions under the Plan shall be made after the Effective Date by the Post-Effective Date Debtors as Disbursing Agent or such other Entity designated by the ~~Post-Effective Date Debtors as a~~ Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

3.     Rights and Powers of Disbursing Agent

**(a)**     Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

**(b)** Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash ~~by the Post-Effective Date Debtors without any further notice to or action, order, or approval of the Bankruptcy Court,~~ **using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration.**

4. <u>Distributions on Account of Claims Allowed After the Effective Date</u>

**(a)** Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**(b)** Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Post-Effective Date Debtors, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

5. <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>

**(a)** Delivery of Distributions in General

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; <u>provided</u> <u>that</u> the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and <u>provided</u> <u>further, that</u> the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

The Five Mile DIP Agent shall be deemed to be the Holder of all Five Mile DIP Claims for purposes of distributions to be made hereunder, and the Disbursing Agent shall make all distributions on account of such Five Mile DIP Claims to or on behalf of the Five Mile DIP Agent. The Five Mile DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Five Mile DIP Claims. The Five Mile DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Five Mile DIP Claims; <u>provided</u> <u>that</u> the Five Mile DIP Agent shall retain all rights as administrative agent under the Five Mile DIP Agreement in connection with delivery of distributions to Five Mile DIP Lenders; <u>provided</u> <u>further, however</u>, that the Debtors' obligations to make such distributions in accordance with Article II.C of the Plan shall be deemed satisfied upon delivery of such distributions to the Five Mile DIP Agent.

The Lehman DIP Lender shall be deemed to be the Holder of all Lehman DIP Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Lehman DIP Claims to or on behalf of the Lehman DIP Lender. The Lehman DIP Lender shall hold or direct such distributions for the benefit of the Holders of Allowed Lehman DIP Claims. The Lehman DIP Lender shall arrange to

deliver such distributions to or on behalf of such Holders of Allowed Lehman DIP Claims; provided that the Lehman DIP Lender shall retain all rights as administrative agent under the Lehman DIP Agreement in connection with delivery of distributions to Lehman DIP Lender; provided further, however, that the Debtors' obligations to make distributions in accordance with Article II.D of the Plan shall be deemed satisfied upon delivery of distributions to the Lehman DIP Lender.

Midland shall be deemed to be the Holder of all Fixed Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Fixed Rate Pool Mortgage Loan Claims to or on behalf of the Special Servicer. Midland shall hold or direct such distributions for the benefit of the Holders of Allowed Fixed Rate Pool Mortgage Loan Claims. Midland shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Fixed Rate Pool Mortgage Loan Claims; provided that that the Debtors' obligations to make distributions in accordance with Article III.B shall be deemed satisfied upon delivery of distributions to Midland.

**(b)** Minimum; De Minimis Distributions

No Cash payment of less than $50.00, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

**(c)** Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the applicable Post-Effective Date Debtor (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

**(d)** Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

6. Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

7. Claims Paid or Payable by Third Parties

**(a)** Claims Paid by Third Parties

The Debtors on or prior to the Effective Date or the Post-Effective Date Debtors after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Post-Effective Date Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Post-Effective Date Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Post-Effective Date Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

**(b)** Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c)** Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Post-Effective Date Debtors, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan or in this Disclosure Statement constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

*H.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims*

1.     <u>Resolution of Disputed Claims</u>

**(a)** Allowance of Claims

On or after the Effective Date, ~~each of the Post-Effective Date Debtors~~**the Disbursing Agent** shall have and shall retain any and all rights and defenses that the applicable Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

**(b)** Prosecution of Objections to Claims

The ~~Debtors or the Post-Effective Date Debtors, as applicable,~~**Disbursing Agent** shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the ~~Post-Effective Date Debtors~~**Disbursing Agent** may settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court. From and after the Effective Date, the ~~Post-Effective Date Debtors~~**Disbursing Agent** shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     Time to File Objections to Claims

Any objections to Claims shall be filed on or before the Claims Objection Bar Date.

(d)     Claims Estimation

The ~~Debtors and the Post-Effective Date Debtors, as applicable~~ **Disbursing Agent** may, at any time, and shall have the exclusive authority to request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Post-Effective Date Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the ~~Debtors or the Post-Effective Date Debtors, as applicable~~ **Disbursing Agent** may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the ~~Post-Effective Date Debtors, as applicable~~ **Disbursing Agent** may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(e)     Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Notice and Claims Agent at the direction of the Debtors or the Post-Effective Date Debtors, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Post-Effective Date Debtors, in all cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

2.      Disallowance of Claims

All Claims or Interests of any Entity from which property is sought by the Debtors or the Post-Effective Date Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Post-Effective Date Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the ~~Debtors or the Post-Effective Date Debtors, as applicable~~ **Disbursing Agent** on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS PROVIDED FOR UNDER THE PLAN OR OTHERWISE AGREED TO BY THE DEBTORS OR THE ~~POST-EFFECTIVE DATE DEBTORS, AS APPLICABLE~~DISBURSING AGENT, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE (THAT DO NOT AMEND TIMELY FILED CLAIMS) SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE OF THE JOINT PLAN OF THE DEBTOR AGAINST WHOM SUCH CLAIM IS ASSERTED WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY**

**DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

3.    Amendments to Claims

On or after the Effective Date, except as provided in Article II.A of the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the ~~Post-Effective Date Debtors~~**Disbursing Agent**, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

I.    *Settlement, Release, Injunction, and Related Provisions*

1.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan or relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Post-Effective Date Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities**; provided that, with respect to the C6 and C7 Trusts and the holders of certificates in the C6 and C7 Trusts, the Plan does not compromise or settle the Claims, interests, and controversies of the C6 and C7 Trusts or the holders of certificates in the C6 and C7 Trusts against Midland, the C6 and C7 Trusts, and Five Mile, whether arising under the applicable pooling and servicing agreement or co-lender agreement**.

2.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein or in the Plan to the contrary, and as provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

J.    *Midland Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS (TO THE EXTENT SET FORTH IN THE PLAN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, MIDLAND, ON BEHALF OF THE C6 AND C7 TRUSTS, (I) DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO APOLLO (AND APOLLO SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY MIDLAND) AND ITS RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR

UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE APOLLO GUARANTY; AND (II) IF AN ACTION REMAINS PENDING IN THE STATE COURTS OF NEW YORK OR ELSEWHERE, MIDLAND SHALL DISMISS ITS CLAIMS AGAINST APOLLO WITH PREJUDICE; PROVIDED THAT THE FOREGOING "**MIDLAND RELEASE**" IS CONDITIONED ON THE OCCURRENCE OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND THE RECEIPT BY MIDLAND OF THE SPECIAL SERVICER RELEASE PAYMENT, THE EMBODIMENT OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE (AS DESCRIBED IN ARTICLE VIII.E OF THE PLAN) IN THE CONFIRMATION ORDER ENTERED BY THE BANKRUPTCY COURT THAT HAS BECOME A FINAL ORDER; PROVIDED FURTHER THAT THE MIDLAND RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF MIDLAND:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER **FOR THE FIXED/FLOATING PLAN** SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE MIDLAND RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE MIDLAND RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE MIDLAND RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO MIDLAND ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE MIDLAND RELEASE.

K.    *Apollo Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, APOLLO, ON ACCOUNT OF ITS HOLDINGS OF COMMON SHARES OR OTHER EQUITY IN THE DEBTORS OR OTHERWISE DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO THE FIXED/FLOATING RELEASING PARTIES (AND THE FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY APOLLO) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE; PROVIDED THAT THE FOREGOING "**APOLLO RELEASE**" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE APOLLO RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE APOLLO RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF

ACTION RELEASED BY THE APOLLO RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO APOLLO ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE APOLLO RELEASE.

L.      *Fixed/Floating Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN ~~OR IN THE PLAN~~ TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE FIXED/FLOATING RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES (AND EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE FIXED/FLOATING RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE FIXED/FLOATING DEBTORS OR THE POST-EFFECTIVE DATE FIXED/FLOATING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER FIXED/FLOATING RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE ~~FIVE MILE/LEHMAN COMMITMENT, THE FIVE MILE~~/**NEW HOLDCO**/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE FIXED/FLOATING RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> IN CONNECTION WITH THE FOREGOING "FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE," THE VALIDITY, ENFORCEABILITY, AND PERFECTION, IN ALL RESPECTS, OF THE LIENS, CLAIMS, INTERESTS, MORTGAGES, AND ENCUMBRANCES OF THE FIXED RATE POOL MORTGAGE LOAN AGREEMENT AND THE C6 AND C7 TRUSTS ARE HEREBY CONFIRMED AND ADJUDICATED BY THE BANKRUPTCY COURT; ~~PROVIDED FURTHER THAT ISLAND HOSPITALITY MANAGEMENT, INC. SHALL NOT BE ENTITLED TO THE BENEFITS OF~~ *~~THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE~~* ~~UNLESS IT REASONABLY COOPERATES WITH THE FIXED/FLOATING PLAN SPONSORS, THE FIXED/FLOATING DEBTORS, NEW HOLDCO, AND ANY NEW MANAGER OF THE FIXED/FLOATING DEBTORS' PROPERTIES;~~ <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE FIXED/FLOATING RELEASING PARTIES:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> (1) THE RELEASES OF APOLLO SET FORTH IN THE MIDLAND RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN

GENERAL RELEASE AND THE STIPULATION OF DISCONTINUANCE OF THE LITIGATION RELATED TO THE APOLLO GUARANTY SET FORTH IN THE MIDLAND RELEASE AND (2) THE WAIVERS AND RELEASES TO BE GIVEN BY APOLLO SET FORTH IN THE APOLLO RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT BE EFFECTIVE UNTIL MIDLAND HAS RECEIVED THE SPECIAL SERVICER RELEASE PAYMENT AND THE OCCURRENCE OF SUCH EFFECTIVE DATE; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE FIXED/FLOATING PLAN; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> ANY CLAIMS THAT THE FIXED/FLOATING RELEASING PARTIES MAY HAVE WITH RESPECT TO THE FUNDS IN THE LP BANK ACCOUNT ARE NOT SUBJECT TO THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE<u>;</u> **<u>PROVIDED FURTHER THAT, NEITHER</u>** *THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE* **<u>OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF THE C6 AND C7 TRUSTS, THE HOLDERS OF CERTIFICATES IN THE C6 AND C7 TRUSTS, OR LNR PARTNERS, LLC, WHETHER ARISING UNDER THE APPLICABLE POOLING AND SERVICING AGREEMENT OR CO-LENDER AGREEMENT AGAINST THE C6 AND C7 TRUSTS, MIDLAND, FIVE MILE, CRES, OR PRESIDIO OR ANY OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, OR PROFESSIONALS</u>**.

ENTRY OF THE CONFIRMATION ORDER **<u>FOR THE FIXED/FLOATING PLAN</u>** SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED ~~IN THE PLAN~~**<u>HEREIN</u>** <u>AND FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE FIXED/FLOATING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE FIXED/FLOATING RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE.

*M.    Anaheim Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ANAHEIM HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ANAHEIM HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ANAHEIM HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE

PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ANAHEIM HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ANAHEIM HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ANAHEIM HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ANAHEIM HOTEL RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE ANAHEIM HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ANAHEIM HOTEL RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS ANAHEIM HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ANAHEIM HOTEL DEBTORS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> ANY CLAIMS THAT THE ANAHEIM HOTEL RELEASING PARTIES MAY HAVE WITH RESPECT TO THE FUNDS IN THE LP BANK ACCOUNT ARE NOT SUBJECT TO THE ANAHEIM HOTEL DEBTORS' PLAN GENERAL RELEASE.

ENTRY OF THE CONFIRMATION ORDER <u>FOR THE ANAHEIM PLAN</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ANAHEIM HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN <u>AND</u> <u>FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ANAHEIM HOTEL GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ANAHEIM HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ANAHEIM HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ANAHEIM HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ANAHEIM HOTEL GENERAL RELEASE.

N.      *Ontario Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ONTARIO HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ONTARIO HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ONTARIO HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR

UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ONTARIO HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ONTARIO HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ONTARIO HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ONTARIO HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ONTARIO HOTEL RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE ONTARIO HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ONTARIO HOTEL RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS ONTARIO HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ONTARIO HOTEL DEBTORS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> ANY CLAIMS THAT THE ONTARIO HOTEL RELEASING PARTIES MAY HAVE WITH RESPECT TO THE FUNDS IN THE LP BANK ACCOUNT ARE NOT SUBJECT TO THE ONTARIO HOTEL DEBTORS' PLAN GENERAL RELEASE.

ENTRY OF THE CONFIRMATION ORDER **FOR THE ONTARIO PLAN** SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ONTARIO HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN <u>AND</u> <u>FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ONTARIO HOTEL GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ONTARIO HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ONTARIO HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ONTARIO HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ONTARIO HOTEL GENERAL RELEASE.

O.    Re<s>org</s><u>**main**</u><s>aining</s> Debtors' Plan General Release

NOTWITHSTANDING ANYTHING CONTAINED HEREIN <s>OR IN THE PLAN</s> TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE RE<s>ORG</s>**MA**IN<s>IZ</s>ING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE <s>REORGANIZING</s>**REMAINING DEBTOR** RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE <s>REORGANIZING</s>**REMAINING DEBTOR** RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER <s>REORGANIZING</s>**REMAINING DEBTOR** RELEASING PARTIES (AND EACH OF THE OTHER <s>REORGANIZING</s>**REMAINING DEBTOR** RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE <s>REORGANIZING</s>**REMAINING DEBTOR** RELEASING PARTIES) AND THEIR

RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE RE~~ORG~~**MAIN**~~IZ~~ING DEBTORS OR THE POST-EFFECTIVE DATE RE~~ORG~~**MA**I~~IZ~~ING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ~~REORGANIZING~~**REMAINING DEBTOR** RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ~~REORGANIZING~~**REMAINING DEBTOR** RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ~~REORGANIZING~~**REMAINING DEBTOR** RELEASING PARTIES; PROVIDED THAT THE ~~REORGANIZING~~**REMAINING DEBTORS' PLAN** GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ~~REORGANIZING~~**REMAINING DEBTOR** RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS ~~REORGANIZING~~**REMAINING DEBTORS' PLAN** GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE RE~~ORG~~**MAIN**~~IZ~~ING DEBTORS; PROVIDED FURTHER THAT ANY CLAIMS THAT THE ~~REORGANIZING~~**REMAINING DEBTOR** RELEASING PARTIES MAY HAVE WITH RESPECT TO THE FUNDS IN THE LP BANK ACCOUNT ARE NOT SUBJECT TO THE RE~~ORG~~**MAIN**~~IZ~~ING DEBTORS' PLAN GENERAL RELEASE**; PROVIDED FURTHER THAT THE HOLDER OF GARDEN GROVE HOTEL MORTGAGE LOAN CLAIMS, SAN ANTONIO HOTEL MORTGAGE LOAN CLAIMS, SAN DIEGO HOTEL MORTGAGE LOAN CLAIMS, TYSONS CORNER HOTEL MORTGAGE LOAN CLAIMS, AND WASHINGTON DC HOTEL MORTGAGE LOAN CLAIMS WAIVE ALL RIGHTS THEY MAY HAVE TO THE FUNDS IN THE LP BANK ACCOUNT**.

ENTRY OF THE CONFIRMATION ORDER **FOR THE REMAINING DEBTOR PLAN** SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ~~REORGANIZING~~**REMAINING DEBTORS' PLAN** GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED ~~IN THE PLAN~~**HEREIN** AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ~~REORGANIZING~~**REMAINING DEBTORS' PLAN** GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ~~REORGANIZING~~**REMAINING DEBTOR** RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ~~REORGANIZING~~**REMAINING DEBTORS' PLAN** GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE RE~~ORG~~**MA**I~~IZ~~ING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ~~REORGANIZING~~**REMAINING DEBTOR** RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ~~REORGANIZING~~**REMAINING DEBTORS' PLAN** GENERAL RELEASE.

P. *Exculpation*

The Exculpated Parties shall neither have, nor incur, any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Commitment Letter, the Disclosure Statement, the issuance, distribution, and/or sale of any of the ~~New HoldCo~~ Interests **of the Post-Effective Date Fixed/Floating Debtors** or any other Security, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the Exculpated Parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each ~~Global Releasing~~**Exculpated** Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement**; provided, further, that this provision shall not exculpate Midland or Five Mile for or from any liability to the C6 and C7 Trusts or any holders of certificates in the C6 or C7 Trusts; provided, further, that this provision shall not operate to expand the scope of the Floating/Fixed Debtors' Plan General Release**.

Q. *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C OF THE PLAN, ARTICLE VIII.D OF THE PLAN, ARTICLE VIII.E OF THE PLAN, ARTICLE VIII.F OF THE PLAN, ARTICLE VIII.G OF THE PLAN, OR ARTICLE VIII.H OF THE PLAN (3**5**) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.I OF THE PLAN; OR (4**6**) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION, OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT

SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN ~~OR IN THE PLAN~~ SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED FURTHER THAT NOTHING CONTAINED **HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW; PROVIDED FURTHER THAT, FOR THE AVOIDANCE OF DOUBT, NOTHING SET FORTH** HEREIN OR IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

*R.      Setoffs*

Except as otherwise provided in the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Post-Effective Date Debtors of any such Claims, rights, and Causes of Action that the Post-Effective Date Debtors may possess against such Holder.

*S.      Severability of Plan and Conditions Precedent to the Effective Date*

1.      Severability of the Plan

The Plan contemplates four separate ~~J~~joint ~~P~~plans of reorganization that together provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases: (a) the Fixed/Floating Plan; (b) the Anaheim Plan; (c) the Ontario Plan; and (d) the Re~~org~~**main**~~iz~~ing Debtor Plan.  The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Re~~org~~**main**~~iz~~ing Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the four ~~J~~joint ~~P~~plans are not conditioned on the Confirmation and Consummation of any of the other three ~~J~~joint ~~P~~plans.

2.      Condition Precedent to Confirmation of the Fixed/Floating Plan

It shall be a condition to Confirmation of the Fixed/Floating Plan that the Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall be acceptable in all respects to the Fixed/Floating Plan Sponsors and Midland in each of their reasonable discretion ~~in accordance with the Fixed/Floating Successful Bid~~.

3.      Conditions Precedent to the Effective Date of Each of the Joint Plans

It shall be a condition to Consummation of the Plan as applicable to a certain Debtor or certain Debtors that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.      Conditions Applicable to ~~All Debtors~~**Each of the Joint Plans**

(i)      The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order**; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules) the Confirmation Order shall not be stayed and shall be effective immediately upon its entry.**

(ii)      All documents and agreements necessary to implement the Joint Plan **(including, without limitation, the Commitment Letter and the New HoldCo/Midland Commitment Letter for the Fixed/Floating Plan)** shall have (a) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

(iii)      All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Joint Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(iv)      The Professional Fee Escrow Account shall have been funded with Cash in the amount of the aggregate Professional Fee Reserve Amount for all Professionals; and

(v)      The "tail policy" for current and former trustees, directors, and officers referenced in Article IV.~~T~~**S** of the Plan shall have been purchased.

2.      Additional Conditions Applicable Only to the Fixed/Floating Plan

(i)      The **"Outside Date" under the Commitment Letter shall not have occurred.**

**(ii)**      **The** Special Servicer Payment~~,~~ **and** the Special Service Release Payment~~, and the *Apollo Unsecured Claim Fund Payment shall have been made.*__ **shall have been made**

**(iii)**      **The** *Apollo Unsecured Claim Fund Payment shall have been made.*

**(iv)**      ~~(vii)~~ The ~~Fixed/Floating Successful Bid~~**Commitment Letter** has not been terminated.

**(v)**      ~~(viii)~~ The ~~Plan as applicable to~~**Confirmation Order,** the Fixed/Floating ~~Debtors~~**Plan,** and the Plan Supplement~~as applicable to the Fixed/Floating Debtors, including~~**, along with** any amendments, modifications, or supplements to any of the foregoing shall be ~~in form and substance reasonably~~ acceptable **in all respects** to the ~~Debtors, the~~**Fixed/Floating** Plan Sponsors~~,~~ and Midland ~~to the extent required by the terms of the Fixed/Floating Successful Bid~~**in each of their reasonable discretion**.

4.      <u>Waiver of Conditions</u>

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article ~~IX~~**IV** of the Plan may be waived only by consent of the Debtors; <u>provided</u> <u>that</u> with respect to the ~~C~~consummation of the

108

Fixed/Floating Plan, the conditions precedent to the Effective Date may be waived **only** by the consent of the Fixed/Floating Plan Sponsors ~~or~~**and** Midland, ~~as applicable,~~ in accordance with the terms of the Fixed/Floating Successful Bid**; provided further that, notwithstanding anything to the contrary in Article IV.D of the Plan, consent shall not be required to waive a condition described in Article IX.C of the Plan from any Entity whose actions (or failure to act) were the proximate cause of the failure of such condition to be satisfied**.

5.    Effective Date

For each Debtor, the Effective Date shall be the date that is a Business Day selected by the Debtors after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect**; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules) the Confirmation Order shall not be stayed and shall be effective immediately upon its entry**; and (b) all conditions precedent applicable to such Debtor specified in Article IX.C of the Plan have been satisfied or waived (in accordance with Article IX.D of the Plan).

6.    Effect of Non-Occurrence of the Effective Date Regarding Fixed/Floating Debtors

~~To~~**Unless and only to** the extent ~~that the bid set forth in the Commitment Letter is the Fixed/Floating Successful Bid, unless~~ otherwise agreed ~~by~~**among** the Debtors, the Fixed/Floating Plan Sponsors, and Midland, if the Effective Date as to the Fixed/Floating Debtors does not occur on or before September 15, 2011 (*i.e.*, the "Outside Date" under the Commitment Letter), the Confirmation Order shall be automatically revoked and the Plan as applicable to the Fixed/Floating Debtors and the Commitment Letter shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Commitment Letter shall:  (1) constitute a waiver or release of any claims by or Claims against or Interests in the Fixed/Floating Debtors; (2) prejudice in any manner the rights of the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests in the Fixed/Floating Debtors, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests, or any other Entity in any respect.

*T.    Modification, Revocation, or Withdrawal of the Plan*

1.    Modification and Amendments

Subject to the limitations contained in the Plan, **and the consent rights available to the Fixed/Floating Plan Sponsors and Midland (as described in Article IX of the Plan),** the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

2.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date or the Effective Date and to file subsequent plans of reorganization.  If the Debtors revoke or

withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity. Nothing contained in Article X of the Plan shall impair the rights and obligations existing under the Commitment Letter.

*U.  Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  Resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V or the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.  Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.  Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.  Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.  Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article V.I of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article V.G.7(a) of the Plan;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to the Plan, the Commitment Letter, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

21.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     Enforce all orders previously entered by the Bankruptcy Court;

23.     To resolve any disputes arising under the Commitment Letter and **Chatham** Hotel Sale Transaction Documents;

~~24.     Adjudicate matters relating to LNR Partners, LLC v. CRES Investment No. II, LP, Adv. Pro. No. 10-04237 (Bankr. S.D.N.Y. 2010).~~

**24.**     ~~25.~~ Hear any other matter not inconsistent with the Bankruptcy Code;

**25.**     ~~26.~~ Enter an order concluding or closing the Chapter 11 Cases; and

**26.**     ~~27.~~ Enforce the injunction, release, and exculpation provisions set forth in I.

*V.*     *Miscellaneous Provisions*

1.     Immediate Binding Effect

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date with respect to any of the Joint Plans, the terms of such plan, the corresponding Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the relevant Debtors, the relevant Post-Effective Date Debtors, and any and all Holders of Claims or Interests against or in the relevant Debtors (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in such plan, each Entity acquiring property under such plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the relevant Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.     Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.     Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Post-Effective Date Debtors (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

4.     Dissolution of Committees

Without considering any of the Chapter 11 Cases that have been converted, dismissed or closed, on the date that is the latest Confirmation Date of a chapter 11 plan applicable to any of the Chapter 11 Cases, the Committees, if any, shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; provided that the Committee shall continue in existence following the Confirmation Date for the sole purpose of prosecuting its applications for fees and expenses.

5.     Reservation of Rights

Except as expressly set forth in the Plan, any of the Joint Plans shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order with respect to such Joint Plan.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

6.     Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

7.     Dissolution of Entities

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, such Debtor shall be deemed dissolved under state law without further action by the Post-Effective Date Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

8.     Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Post-Effective Date Debtors shall be served on:

    **(a)**     if to the Debtors or the Post-Effective Date Debtors, to:

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attention: Marc A. Beilinson

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Facsimile: (212) 446-4900
Attention: Paul M. Basta, Stephen E. Hessler, and Brian S. Lennon
E-mail addresses: paul.basta@kirkland.com, stephen.hessler@kirkland.com,
             and brian.lennon@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Facsimile: (312) 862-2200
Attention: Anup Sathy, P.C. ~~and Marc J. Carmel~~
E-mail address~~es~~: anup.sathy@kirkland.com ~~and marc.carmel@kirkland.com~~

9.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

10.     Entire Agreement

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

11.     Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to

make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

> **(a)** Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, ~~Innkeepers~~**the Debtors** will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, ~~Innkeepers~~**the Debtors** and each of ~~its~~**their** ~~Aa~~ffiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer and issuance of ~~Ss~~ecurities ~~Dd~~istributed under the Plan and any previous plan, and, therefore, such parties, individuals and ~~Reorganized Innkeepers~~**Post-Effective Date Debtors** will not have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer and issuance of the ~~Ss~~ecurities offered and ~~Dd~~istributed under the Plan and any previous plan.

> **(b)** Closing of Chapter 11 Cases.

Innkeepers shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

> **(c)** Waiver or Estoppel.

**The Plan provides that each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with Innkeepers, its counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.** For the avoidance of doubt, this provision in the Plan is not intended to limit a creditor's ability to enter into a consensual post-confirmation resolution of its Claim.

> **(d)** Conflicts.

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

<div align="center">

**ARTICLE VI.**
**VALUATION ~~ANALYSIS~~ AND FINANCIAL PROJECTIONS**

</div>

*A.* ~~*Valuation of the Debtors*~~***Valuation***

~~A valuation analysis of the Debtors will be~~ *attached hereto as* ***Exhibit*** ~~**D**~~

**The Debtors, with the assistance of Moelis, have pursued an extensive marketing process for substantially all of the Company's assets, on both enterprise level and non-enterprise level bases. Over the course of an eight-month process, the Debtors contacted more than 200 potential investors and plan sponsors. After a formal auction at which the Debtors accepted the highest or otherwise best bids for the applicable assets, the Debtors reached agreement with two plan sponsors—Cerberus/Chatham for the Fixed/Floating**

**Properties and Chatham L.P, for the LNR Properties. A detailed description of the marketing process is set forth in Article IV.J of this Disclosure Statement.**

 **Moelis believes the value achieved by the successful conclusion of the auction and as provided under the Plan is a reasonable measure of the Debtors' value in light of, among other things, (i) the robust and exhaustive nature of the marketing process, which benefited from increased creditor support and the Debtors having more liquidity than forecasted prior to commencing the process and (ii) the active bidding that took place during the auction process. Should another party ascribe a higher value to the assets, as noted earlier, the Plan incorporates a "fiduciary out" provision, along with break-up fee and expense reimbursement features, which allow any alternative buyer to present an alternative, higher or otherwise better proposal prior to the Confirmation Date.**

 **Nothing herein constitutes an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.**

B.    *Financial Projections*

As further discussed in Article VII.B.2 of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has developed the financial projections, which are attached hereto as **Exhibit B** and incorporated by reference.

## ARTICLE VII.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided herein.

A.    *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. **The Bankruptcy Court has scheduled a Confirmation Hearing for each Joint Plan for ~~_____~~June 23, 2011.** A Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at a Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures. Any objection to the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any, (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth in Article V.V.8 herein no later than the Plan Objection Deadline. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

B.    *Confirmation Standards*

At a Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will

satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than 30 days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

1.      Best Interests of Creditors Test - Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each Holder of a Claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the Effective Date of the plan, that is not less than the amount that such Holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **<u>Exhibit C</u>**, showing that the value of the distributions provided to Holders of Allowed Claims under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.

2.      Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Post-Effective Date Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. The Debtors believe that the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all distributions required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

C.      *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the Holder of such claim or interest; (2) cures any default, reinstates the original terms of such obligation, and compensates; or (3) provides that, on the Consummation date, the Holder of such claim or interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the Holder of such interest is entitled or to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance, subject to Article III of the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of those interests who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds (2/3) in amount actually voting cast their ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan.

D.      *Confirmation without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan, *provided that* the plan is accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is

"fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

    1.        <u>No Unfair Discrimination.</u>

       The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests that have voted against or are deemed to vote against the Plan. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

    2.        <u>Fair and Equitable Test.</u>

       The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

       **(a)**      Secured Claims

       The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

       **(b)**      Unsecured Claims

       The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

       **(c)**      Interests

       The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (ii) the value of such interest; or (iii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

**ARTICLE VIII.**
**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

*       Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together*

*herewith, referred to or incorporated by reference herein, prior to voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.*

A.      *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      <u>Parties in Interest May Object to the Plan's Classification of Claims and Interests</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      <u>Failure to Satisfy Vote Requirements</u>

With respect to each Joint Plan, if votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan. In the event that sufficient votes are not received for any Joint Plan, the Debtors may still seek to confirm any of the other Joint Plans that does receive sufficient votes.

3.      <u>The Debtors May Not Be Able to Secure Confirmation of the Plan</u>

The Debtors will need to satisfy section 1129 of the Bankruptcy Code for each of the four Joint Plans. With respect to each Joint Plan, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment could include

a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.    <u>Nonconsensual Confirmation</u>

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, with respect to each Joint Plan, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of the entities' commitments to provide support for the Plan, financially or otherwise.

5.    <u>The Debtors May Object to the Amount or Classification of a Claim</u>

Except as specifically provided in the Plan, the Debtors reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection. Any Holder of a Claim that is or may be subject to an objection, thus, may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.    <u>Risk of Non-Occurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date with respect to each Joint Plan, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur. In addition, the Fixed/Floating Plan shall be null and void in all respects if the Effective Date does not occur on or before September 15, 2011 (the "Outside Date" under the Commitment Letter), unless otherwise agreed by the Debtors, Five Mile/Lehman, and Midland in writing .

7.    <u>Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan</u>

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.    *Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and the Value of Securities to Be Issued Under the Plan*

1.    <u>Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Creditors</u>

The estimate of Allowed Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary significantly from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan and the Debtors' and the Post-Effective Date Debtors' abilities to meet the Financial Projections.

2.      The Commitment Letter May Terminate, Thereby Preventing the Debtors From Consummating the Plan as Applicable to the Fixed/Floating Debtors

To the extent that the terms or conditions of the Commitment Letter are not satisfied, or to the extent events giving rise to termination of the Commitment Letter occur, the Commitment Letter may terminate prior to the Confirmation or Consummation of the Fixed/Floating Plan, which could result in the loss of support for the Fixed/Floating Plan by important creditor constituents. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

3.      The Post-Effective Date Debtors May Not Be Able to Meet the Projected Financial Results as Applicable to the Fixed/Floating Debtors

The Post-Effective Date Debtors may not be able to meet the Debtors' current projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects. To the extent that the Post-Effective Date Debtors do not meet the Debtors' projected financial results, the Post-Effective Date Debtors may lack sufficient liquidity to continue operating as planned, may be unable to service its debt obligations, and may not be able to meet its working capital and operational needs. Any one of these failures may preclude the Post-Effective Date Debtors from, among other things: (a) generating and growing revenues; (b) maintaining the physical condition of directly and indirectly owned properties; (c) meeting obligations under various franchise agreements; (d) taking advantage of future business opportunities; and (e) responding to competitive pressures. While the financial projections represent management's view based on current known facts and assumptions about future operations, there is no guarantee that the financial projections will be realized.

4.      A Small Number of Holders or Voting Blocks May Control the Post-Effective Date Debtors

Consummation of the Plan may result in a small number of Holders owning a significant percentage of the shares of the outstanding ~~New HoldCo~~ Interests **of the Post-Effective Date Fixed/Floating Debtors**. These Holders may, among other things, exercise a controlling influence over the business and affairs of the Post-Effective Date Debtors and have the power to elect directors or managers and approve significant mergers and other material corporate transactions.

5.      Certain Tax Implications of the Debtors' Bankruptcy May Increase the Tax Liability of the Purchaser

Holders of Allowed Claims should carefully review Article X herein, "Certain United States Federal Tax Income Consequences" to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Post-Effective Date Debtors.

C.      *Risk Factors that Could Negatively Impact the Debtors' Business*

The Debtors are subject to a number of risks, including (1) bankruptcy-related risk factors and (2) general business and financial risk factors. Any or all such factors, which are enumerated below, could have a materially adverse effect on the business, financial condition, or results of operations of the Debtors and the Post-Effective Date Debtors. Additional risks and uncertainties not currently known to the Debtors or that the Debtors currently deem to be immaterial at this time may also materially adversely affect the Debtors' business, financial condition, or results of operations. Any of the following risks could materially adversely affect the Debtors' business, financial condition, or results of operations.

1.      Bankruptcy Related Risk Factors

For the duration of these Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and their ability to operate while in chapter 11.

- The Chapter 11 Cases and the attendant difficulties of operating the Debtors' business while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' services and attract customers to their business.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for fees and other expenses associated with these Chapter 11 Cases.

- The Chapter 11 Cases may prevent the Debtors from continuing to grow their business and may restrict their ability to pursue other business strategies. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell, or otherwise dispose of assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions they seek to undertake in these Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and the Debtors may have difficulty attracting new employees. In addition, so long as these Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their business and meet future obligations. The Debtors currently are financing their operations during their reorganization using funds from operations. The borrowings under the postpetition credit facilities will be used to fund the PIPs. The Debtors may be unable to operate pursuant to the terms of their DIP Facilities, including the financial covenants and restrictions contained therein, or to negotiate and obtain necessary approvals, amendments, waivers, or other types of modifications, and to otherwise fund and execute the Debtors' business plans throughout the duration of these Chapter 11 Cases.

- There can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate one or more chapter 11 plans with respect to these Chapter 11 Cases that are acceptable to the Bankruptcy Court and the Debtors' creditors, equityholders, and other parties in interest. Additionally, third parties may seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm one or more plans of reorganization, to appoint a chapter 11 trustee, or to convert the cases to chapter 7 cases.

In addition, the uncertainty regarding the eventual outcome of the Debtors' restructuring, and the effect of other unknown adverse factors could threaten the Debtors' existence as a going-concern. Continuing on a going-concern basis is dependent upon, among other things, obtaining Bankruptcy Court approval of a chapter 11 plan, maintaining the support of key vendors, franchisors, and customers, and retaining key personnel, along with financial, business, and other factors, many of which are beyond the Debtors' control. Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise in accordance with the Bankruptcy Code, distributions from the estate for prepetition liabilities and postpetition liabilities must comply with section 1129 of the Bankruptcy Code. The ultimate recovery to Holders of Claims or interests, if any, will not be determined until Confirmation of the Plan or an alternative to a chapter 11 plan. No assurance can be given as to what values, if any, will be ascribed in these Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive.

2.      General Business and Financial Risk Factors

      **(a)**      General Economic Conditions

In the financial projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years. The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Debtors. There is no guarantee that economic conditions will improve in the near term.

      **(b)**      Implementation of Business Plan

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring. However, there are risks that the goals of the Debtors' going-forward business plan and financial restructuring strategy will not be achieved. In such event, the Debtors may be unable to refinance maturing debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.

      **(c)**      Seasonality

The Debtors' principal sources of revenue are revenues generated by their properties. The Debtors' experience seasonal revenue patterns similar to those of the hospitality industry in general. This seasonality can be expected to cause fluctuations in the Debtors' revenues, profit margins and net income.

      **(d)**      Competition

The hospitality industry is highly competitive, which may impact the Debtors' ability to compete successfully for customers with other hotel properties. The Debtors generally operate in markets that contain numerous competitors. The Debtors' ability to remain competitive and to attract and retain business and leisure travelers depends on the Debtors' success in distinguishing the quality, value, and efficiency of the Debtors' hospitality products and services from those offered by others and their access to capital to be used for capital expenditures. If the Debtors are unable to compete successfully in these areas, this could limit the Debtors' operating margins, diminish the Debtors' market share, and reduce their earnings.

      **(e)**      Operating Risks

The Debtors are subject to the range of operating risks common to the hotel industry. The profitability of the hotels that the Debtors own may be adversely affected by a number of factors, including:

- the availability of and demand for hotel rooms;

- international, national, and regional economic and geopolitical conditions;

- the impact of war, actual or threatened terrorist activity and heightened travel security measures instituted in response to war, terrorist activity or threats;

- the desirability of particular locations and changes in travel and/or weather patterns;

- the state of the housing and construction industries;

- travelers' fears of exposure to contagious diseases, such as Avian Flu, Severe Acute Respiratory Syndrome, and H1N1 Flu;

- the occurrence of natural disasters, such as earthquakes, tsunamis, and hurricanes;

- taxes and government regulations that influence or determine wages, prices, interest rates, construction procedures, and costs;

- the costs and administrative burdens associated with compliance with applicable laws and regulations, including, among others, privacy, marketing and sales, licensing, labor, and employment, immigration and environmental laws;

- the availability and cost of capital to allow the Post-Effective Date Debtors to fund investments;

- regional and national development of competing properties;

- increases in wages and other labor costs, energy, healthcare, insurance, transportation and fuel, and other expenses central to the conduct of the Debtors' business or the cost of travel for the Debtors' customers, including recent increases in energy costs and any resulting increase in travel costs or decrease in airline capacity; and

- organized labor activities, which could cause the diversion of business from hotels involved in labor negotiations, loss of group business, and/or increased labor costs. Any one or more of these factors could limit or reduce the demand or the prices of the Debtors' hotels are able to obtain for hotel rooms or could increase their costs and therefore reduce the profit of the Post-Effective Date Debtors' hospitality businesses. Even where such factors do not reduce demand, property-level profit margins may suffer if the Post-Effective Date Debtors is unable to fully recover increased operating costs from its guests. Similarly, the Post-Effective Date Debtors' revenue could be impacted by weak property-level revenue or profitability.

**(f)** National and Regional Conditions

The Debtors' hospitality operations are subject to national and regional conditions. In recent years, the Debtors' business has been hurt by decreases in travel resulting from recent economic conditions. The Post-Effective Date Debtors' future economic performance is similarly subject to the economic environment in the United States and elsewhere, which is uncertain, as evidenced by recent failures and near failures of a number of large financial service companies, the current worldwide recession, the resulting unknown pace of business travel, the occurrence of any future incidents in the United States, and the pace of recovery of any such adverse events or conditions.

**(g)** Property Damage

The Debtors have comprehensive property and liability insurance policies with coverage features and insured limits that the Debtors believe are customary. Market forces beyond the Debtors control may nonetheless limit the scope of insurance coverage that the Post-Effective Date Debtors can obtain, as well as the ability to obtain coverage at reasonable rates. Certain types of losses, generally of a catastrophic nature, such as earthquakes, hurricanes and floods, or terrorist acts, may be uninsurable or too expensive to justify obtaining insurance. As a result, the Debtors may not be successful in obtaining insurance without increases in cost or decreases in coverage levels. In addition, in the event of a substantial loss, the insurance coverage the Debtors carry may not be sufficient to pay the full market value or replacement cost of the Debtors' lost investment or in some cases could result in certain losses being totally uninsured. As a result, the Debtors could lose some or all of the capital they have invested in a property, as well as the anticipated future revenue from the property, and the Debtors could remain obligated for guarantees, debt, or other financial obligations related to the property.

**(h)** Hotel Managers

The Debtors rely on their Hotel Management Agreements with Island and Dimension for the management of their hotel properties. The temporary or permanent inability of Island or Dimension to meet their obligations under the Hotel Management Agreements could severely impact the ability of the Debtors' properties to generate revenues.

**(i)**      Continuing Leverage and Ability to Service Debt

Although the Consummation of the Plan will significantly reduce the Debtors' debt service obligations, the Post-Effective Date Debtors will remain leveraged. The Debtors believe that, following Consummation of the Plan, the Post-Effective Date Debtors will be able to meet its anticipated future operating expenses, capital expenditures, and debt service obligations.  However, the Post-Effective Date Debtors' ability to meet its debt service obligations and to carry out capital spending that is important to its growth and productivity will depend on a number of factors, including future operating performance and ability to achieve the business plan.  These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors beyond the Post-Effective Date Debtors' control.

D.      *Risks Associated with Forward Looking Statements*

1.      <u>Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.</u>

**<u>The financial information contained in this Disclosure Statement has not been audited</u>**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained herein and attached hereto is without inaccuracies.

2.      <u>Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.</u>

This Disclosure Statement contains various projections concerning the financial results of the Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Post-Effective Date Debtors may turn out to be different from the Financial Projections.  The Financial Projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Post-Effective Date Debtors, some of which may not materialize, including, without limitation, assumptions concerning:  (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Post-Effective Date Debtors, including the ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) customer preferences continuing to support the Debtors' operations.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

E.      *Disclosure Statement Disclaimer*

1.      <u>Information Contained Herein Is for Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.     <u>This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission</u>

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein~~, and any representation to the contrary is unlawful~~.

3.     <u>Reliance on Exemptions from Registration Under the Securities Act</u>

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of ~~New HoldCo~~**and sale of** Interests **to New HoldCo** has not been registered under the Securities Act or similar state securities or "blue sky" laws. ~~To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act, and other applicable non-bankruptcy law, the issuance of the New HoldCo Interests or any rights to purchase interests;~~

**Interests to be issued to New HoldCo** will be ~~*exempt from*~~**issued without** registration under the Securities Act ~~by virtue of section 1145 of the Bankruptcy Code~~**or any similar federal, state, or local law in reliance on the exemption set forth in** section 4(2) of the Securities Act or Regulation D promulgated thereunder~~, Rule 701 of the Securities Act, or a "no sale"~~ *~~under the Securities Act.~~***.**

**Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are** *exempt from* **registration** *under the Securities Act.* **Regulation D is a non-***exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.*

*The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.*

*Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A* **under the Securities Act.**

4.     <u>No Legal or Tax Advice Is Provided to You by this Disclosure Statement</u>

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.     <u>No Admissions Made</u>

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Post-Effective Date Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

6.     <u>Failure to Identify Litigation Claims or Projected Objections</u>

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Post-Effective Date Debtors

may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7.   No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors or the Post-Effective Date Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified herein.

8.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.   Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.   No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the United States Trustee for the Southern District of New York, and counsel to the Creditors Committee.

*F.   Liquidation Under Chapter 7*

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' liquidation analysis is set forth in Article VII herein, "Statutory Requirements for Confirmation of the Plan" and the Liquidation Analysis attached hereto as **Exhibit C**.

**ARTICLE IX.**
**IMPORTANT SECURITIES LAW DISCLOSURE**

*A.*   ~~*New HoldCo*~~ *Interests **of the Post-Effective Date Fixed/Floating Debtors***

The Plan provides ~~for New HoldCo to issue New HoldCo Interests~~ **that, on the Effective Date, New HoldCo will receive Interests of the Post-Effective Date Fixed/Floating Debtors. On or prior to the Effective**

127

**Date, the Fixed/Floating Debtors shall reserve for issuance the Interests required to be issued pursuant to the Plan** The Debtors believe that all of the ~~New HoldCo~~ Interests **of the Post-Effective Date Fixed/Floating Debtors** constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

B. *Issuance and Resale of* ~~*New HoldCo*~~ *Interests* **of the Post-Effective Date Fixed/Floating Debtors** *under the Plan*

 1. <u>Exemption from Registration</u>

~~Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state securities laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.~~

~~In reliance on Section 1145 of the Bankruptcy Code, the offer and sale of the New HoldCo Interests will not be registered under the Securities Act or any state securities law. Under section 1145 of the Bankruptcy Code, the New HoldCo Interests may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the New HoldCo Interests generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective securities laws of those states; however, recipients of the New HoldCo Interests are advised to consult with their own legal advisors as to the availability of any such exemption from registration under the federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to such availability.~~

~~2. Resales of New HoldCo Interests; Definition of Underwriter~~

**Interests to be issued to New HoldCo will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.**

Section ~~1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, *subject to certain exceptions,* (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security to be received in exchange for such claim or interest, or (b) offers to sell securities offered or sold under the plan for the Holders of such securities, or (c) offers to buy securities issued under the plan from the Holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the Consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities. In addition, a "person," as defined in section 101(41) of the Bankruptcy Code, who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.~~**4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.**

The term "issuer," as used in section ~~2~~**4**~~(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's~~

~~voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person." To the extent that persons deemed "underwriters" receive securities under the Plan~~**2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.**

**Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result,** resales of such securities ~~would~~**may** not be ~~exempted by section 1145 of the Bankruptcy Code~~**exempt** from ~~the~~ **the** registration ~~under~~**requirements of** the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

### 2. Resales of Interests of the Post-Effective Date Fixed/Floating Debtors

Under certain circumstances, affiliated holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and (ii) an affiliate may sell restricted securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a one-year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system**)**.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF NEW INTERESTS MAY BE AN UNDERWRITER OR AN AFFILIATE OF NEW INNKEEPERS, NEW INNKEEPERS MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE THE NEW INTERESTS TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, NEW INNKEEPERS RECOMMENDS THAT POTENTIAL RECIPIENTS OF NEW INTERESTS UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

~~3.        Exemptions from Registration of Rights~~

~~The Plan contemplates the potential issuance of rights to purchase new equity in certain of the Post-Effective Date Debtors. The issuance of such rights and equity securities pursuant to such rights, if any, may be issued without registration in reliance upon the exemption set forth in Section 4(2) of the Securities Act and will be "restricted securities."~~

~~Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.~~

~~The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.~~

~~Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.~~

*C.      No Registration or Listing of New Interests*

~~New HoldCo~~**Issuers of Interests of the Post-Effective Date Fixed/Floating Debtors** will not be required to file periodic reports under the Securities Exchange Act or seek to list the ~~New HoldCo~~ Interests **of the Post-Effective Date Fixed/Floating Debtors** for trading on a national securities exchange. Consequently, there will not be "current public information" (as such term is defined in Rule 144) regarding ~~New HoldCo~~**Issuers of Interests of the Post-Effective Date Fixed/Floating Debtors**.

**ARTICLE X.**
**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims and Interests. The following discussion does not address the U.S. federal income tax consequences to ~~(i)~~ Holders **(i)** whose Claims or Interests are Unimpaired or otherwise entitled to payment in full in Cash under the Plan~~,~~ **or** (ii) ~~Holders~~ that are deemed to reject the Plan ~~or (iii) the Investor~~. This summary is based on the Internal Revenue Code of 1986 (the "**IRC**"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are not "United States persons" as such term is defined in the IRC or that are otherwise subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, Claims, Interests, ~~the~~ New Fixed Rate Pool Mortgage Notes, ~~the~~ New ~~Floating Rate Pool Mezzanine Loan Instrument,~~**Fixed Rate Pool Mortgage Loan Limited Guarantys, new mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans, or** deeds in lieu of foreclosure~~, or New HoldCo Interests~~, as part of a hedge, straddle, conversion or constructive sale transaction). Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., or other tax law. Lastly, the following discussion assumes (i) each Holder of a Claim or Interest holds its Claim, Interest, New Fixed Rate Pool Mortgage Notes, New ~~Floating Rate Pool Mezzanine Loan Instrument, and New HoldCo Interests~~**Fixed Rate Pool Mortgage Loan Limited Guarantys, or new mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans** as "capital assets" (generally, property held for investment)

within the meaning of Section 1221 of the IRC and (ii) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against.

HOLDERS ACQUIRING NEW HOLDCO INTERESTS IN NEW HOLDCO ARE ADVISED THAT NEW HOLDCO MAY TREATED AS A CORPORATION OR AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES AND THE OPERATIONS OF NEW HOLDCO MAY BE CONDUCTED THROUGH ONE OR MORE PASS THROUGH ENTITIES FOR U.S. FEDERAL INCOME TAX PURPOSES. ACCORDINGLY, ANY U.S. FEDERAL INCOME TAX CONSEQUENCES OF NEW HOLDCO'S ITEMS OF GAIN, INCOME, AND LOSS MAY NOT BE BORNE BY NEW HOLDCO, BUT COULD FLOW UP AND BE ALLOCATED TO NEW HOLDCO'S PARTNERS, REGARDLESS OF WHETHER SUCH PARTNERS RECEIVE CASH DISTRIBUTIONS TO COVER ANY U.S. FEDERAL INCOME TAXES ASSOCIATED WITH THEIR ALLOCATED ITEMS OF GAIN, INCOME, AND/OR LOSS. MOREOVER, SUCH HOLDERS THAT ARE NOT "UNITED STATES PERSONS" OR ARE TAX EXEMPT ORGANIZATIONS MAY BE TREATED AS BEING ENGAGED IN A UNITED STATES TRADE OR BUSINESS AND SUBJECT TO U.S. FEDERAL INCOME TAX AND TAX FILING OBLIGATIONS. IN ADDITION, ALL HOLDERS ACQUIRING NEW HOLDCO INTERESTS IN NEW HOLDCO WILL BE SUBJECT, WHERE APPLICABLE, TO STATE AND LOCAL INCOME TAX AND TAX FILING OBLIGATIONS.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE PLAN.**

---

**IRS CIRCULAR 230 DISCLOSURE**

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

---

A.      *Certain United States Federal Income Tax Consequences to the Debtors*

1.      Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (y) the amount of Cash paid and (z) the fair market value **(or, in the case of the New Fixed Rate Pool Mortgage Notes and new mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans, the "issue price" (see discussion of "Issue Price" below))** of any new consideration (including New HoldCo Interests) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the

debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

Pursuant to the Plan, the certain Claims will be exchanged for new debt instruments. If such exchanges are treated as "significant modifications" for U.S. federal income tax purposes and the adjusted issue prices of the Claims modified are higher than the issue prices of the new debt instruments exchanged therefor, the Debtors may incur COD Income. Moreover, because the Plan provides that certain Holders of certain Claims will receive up to 50% of the New HoldCo Interests **(and in some instances, for both new debt instruments and other consideration). Consequently**, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will also depend on the fair market value of the New HoldCo Interests. **depend on the "issue price" of the New Fixed Rate Pool Mortgage Notes or new mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans exchanged therefor (see discussion of "Issue Price" below).** As this value**price** cannot be known with certainty until after the Effective Date, the amount of COD Income the Debtors may incur is thus uncertain.

Many of the Debtors are treated as "disregarded entities" for U.S. federal income tax purposes, and consequently, the U.S. federal income tax consequences of the Plan described in this section will generally not be borne by such Debtors. Instead, the U.S. federal income tax consequences will be borne by the disregarded Debtors' respective direct or indirect equity Holders (who themselves may be Debtors) which are regarded entities for U.S. federal income tax purposes. Additionally, certain Debtors are treated as partnerships for U.S. federal income tax purposes. When an entity that is taxed as a partnership realizes income (including COD Income), for U.S. federal income tax purposes such income "flows through" and the entity's equity Holders (and not the entity itself) are treated as recognizing their allocable share of such income. If an entity treated as a partnership is owned by another partnership or chain of partnerships, the allocable share of COD Income from the lower level entity would flow through the partnership (or chain or partnerships) up to a U.S. federal income taxpayer (such as an individual or corporation). Thus, the tax consequences of any COD Income incurred by a Debtor treated as a partnership for U.S. federal income tax purposes will generally not be borne by such entity and instead will be borne by the entity's direct and indirect equity Holders (who themselves may be Debtors). Finally, certain other Debtors are classified for U.S. federal income taxes as "taxable REIT subsidiaries" and may be treated as corporations for U.S. federal income tax purposes. As described above, these Debtors may realize COD Income both on their own account and on account of equity interests they hold in lower level Debtors treated as disregarded entities or partnerships. However, as outlined in the third preceding paragraph above, COD Income is excluded from a corporate debtor's gross income to the extent that the debtor is under the jurisdiction of a chapter 11 case and in such case the debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.

2.    Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for certain alternative NOLs generated in taxable years beginning or ending in 2008 and 2009, which can offset 100% of a corporation's AMTI, generally only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause certain of the Reorganized Debtors to owe a modest amount of federal income tax on taxable income in future years even though NOL carryforwards may be available to offset that taxable income.

B.    *Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims and Interests*

1.    Consequences to Holders of Allowed Class FF3A and FF4 Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, (i) Holders of Allowed Class FF3A Claims will receive the New Fixed Rate Pool Mortgage Notes and (ii) Holders of Allowed Class FF4 Claims will, assuming such

132

~~Holders of Class FF4 Claims vote to accept and otherwise support the Plan, receive the New Floating Rate Pool Mezzanine Loan Instrument.~~ *If the Holders of Class FF4 Claims vote to reject the Plan or do not otherwise support the plan, their Class FF4 Claims will be canceled, released, and extinguished as of the Effective Date.* **, New Fixed Rate Pool Mortgage Loan Limited Guarantys, and Cash. Whether a Holder of an Allowed Class FF3A Claim recognizes gain or loss as a result of the exchange of its Claim for New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, and Cash depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the Allowed Class FF3A Claim surrendered is treated as a "security" for the reorganization provisions of the IRC; (b) such Holder previously included in income any accrued but unpaid interest with respect to the Allowed Class FF3A Claim; (c) such Holder has** *claimed a bad debt deduction with respect to* **such Allowed Class FF3A Claim; and (d) such Holder uses the accrual or cash method of accounting for tax purposes.**

**Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Debtors anticipate taking the position that the Fixed Rate Pool Mortgage Loan underlying the Allowed Class FF3A Claims will be treated as a "security" for U.S. federal income tax purposes.**

### (a) Treatment of a Holder of Allowed Class FF3A Claims if the Exchange of its Claims is Treated as a Reorganization

**If the Fixed Rate Pool Mortgage Loan constituting a Holder's surrendered Allowed Class FF3A Claims is treated as a "security" for U.S. federal income tax purposes, the exchange of such Holder's Allowed Class FF3A Claims for New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, and Cash should be treated as a recapitalization, and therefore a reorganization, under the IRC. In general, this means such a Holder will recognize gain, but not loss, on the exchange. Specifically, such a Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the fair market value of the New Fixed Rate Pool Mortgage Loan Limited Guarantys and Cash (*i.e.*, the "other property," that is, property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received, and (b) ordinary interest income to the extent that the New Fixed Rate Pool Mortgage Notes are treated as received in satisfaction of accrued but untaxed interest on the Fixed Rate Pool Mortgage Loan underlying the Allowed Class FF3A Claim (see discussion of "Accrued Interest" below). In such case, such a Holder's tax basis in the New Fixed Rate Pool Mortgage Notes received should be equal to the tax basis of the Fixed Rate Pool Mortgage Loan constituting the Allowed Class FF3A Claims surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of the New Fixed Rate Pool Mortgage Loan Limited Guarantys and Cash (*i.e.*, the "other property") received), and such a Holder's holding period for its New Fixed Rate Pool Mortgage Notes received should include the holding period for the Fixed Rate Pool Mortgage Loan constituting the surrendered Allowed Class FF3A Claims;** *provided* **that the tax basis of any portion of New Fixed Rate Pool Mortgage Notes that is treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such portion of the New Fixed Rate Pool Mortgage Notes should not include the holding period of the Fixed Rate Pool Mortgage Loan constituting the surrendered Allowed Class FF3A Claims.**

### (b) Treatment of a Holder of Allowed Class FF3A Claims if the Exchange of its Claims is not Treated as a Reorganization

**If the Fixed Rate Pool Mortgage Loan constituting a Holder's surrendered Allowed Class FF3A Claims is not treated as a "security" for U. S. federal income tax purposes, such a** *Holder should be treated as*

*exchanging its Allowed Class FF3***A Claims for New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys,** *and Cash in a fully taxable exchange. A Holder of an Allowed Class FF3***A Claims who** *is subject to this treatment should recognize gain or loss equal to the difference between (i) the* **Holder's tax basis in the Allowed Class FF3A Claims surrendered by the Holder in such exchange, and (ii)** *the fair market value of the New* **Fixed Rate Pool Mortgage Loan Limited Guarantys and Cash received** *plus* **the "issue price" (see discussion of "Issue Price" below) of the New Fixed Rate Pool Mortgage Notes** *received that is not allocable to accrued but* **untaxed interest** *Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the* **Fixed Rate Pool Mortgage Loan constituting the surrendered Allowed Class FF3A** *Claims were held for more than one year by the Holder. To the extent that a portion of the New* **Fixed Rate Pool Mortgage Notes is allocable to accrued but untaxed interest, such a Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below). Such a Holder's tax basis in the New Fixed Rate Pool Mortgage Notes received should equal their issue price. Such a Holder's holding period for the New Fixed Rate Pool Mortgage Notes** *received on the Effective Date should begin on the day following the Effective Date.*

**2.** *Consequences to Holders of Allowed Class* **R3A, R3B, R3C, R3D, and R3E Claims**

**Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class R3A, R3B, R3C, R3D, and R3E Claims will receive new mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans (the "New LNR Mortgage Notes").** The U.S. federal income tax consequences of the Plan to such Holders of Claims depends, in part, on whether the exchange of such Claims for ~~either~~ the New ~~Fixed Rate Pool~~**LNR** Mortgage Notes ~~or New Floating Rate Pool Mezzanine Loan Instrument~~ should be treated as a "significant modification" for U.S. federal income tax purposes. Under the applicable Treasury Regulations, a "significant modification" is treated as a "deemed" exchange of an old debt instrument for a new debt instrument. In general, the Treasury Regulations consider a modification a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. The Treasury Regulations also provide certain specific guidance on what may be considered a "significant modification." ~~The Debtors expect~~ **It is possible** that ~~they will take the position that~~**the some or all of** the exchanges of ~~(i)~~ the Allowed Class ~~FF3A Claims for the New Fixed Rate Pool Mortgage Notes and (ii) the Allowed Class FF4~~**R3A, R3B, R3C, R3D, and R3E** Claims for ~~the New Floating Rate Pool Mezzanine Loan Instrument should both~~**New LNR Mortgage Notes will** be treated for U.S. federal income tax purposes as significant modifications of such Claims. **Each Holder of an Allowed Class R3A, R3B, R3C, R3D, or R3E Claims Secured Debt Claim is urged to consult its own tax advisor regarding the possibility that the receipt of New LNR Mortgage Notes in exchange for its Allowed Class R3A, R3B, R3C, R3D, or R3E Claim would constitute a significant modification.**

If such exchanges do not constitute significant modifications, then the exchanges should not result in any significant U.S. federal income tax consequence to the Holders of Allowed Class ~~FF~~**R**3A**, R3B, R3C, R3D,** and ~~FF4~~**R3E** Claims.

The remainder of this discussion assumes that the exchanges of ~~(i)~~ the Allowed Class ~~FF3A~~**R3A, R3B, R3C, R3D, and R3E** Claims for ~~the~~ New ~~Fixed Rate Pool~~**LNR** Mortgage Notes ~~and (ii) the Allowed Class FF4 Claims for the New Floating Rate Pool Mezzanine Loan Instrument each~~ constitute ~~a significant modification. Holders of Allowed Class FF3A and FF4 Claims should consult their tax advisors regarding the possibility that the exchange of their particular Claims for the New Fixed Rate Pool Mortgage Notes or New Floating Rate Pool Mezzanine Loan Instrument constitutes a significant modification of such Claims.A~~**significant modifications. Assuming such treatment, a** Holder of Allowed Class ~~FF3A or FF4~~**R3A, R3B, R3C, R3D, and R3E** Claims should recognize gain or loss on the exchange of its Claim in an amount equal to the difference, if any, between (i) the "issue price" of the New ~~Fixed Rate Pool~~**LNR** Mortgage Notes ~~or New Floating Rate Pool Mezzanine Loan Instrument~~ received (see discussion of "Issue Price" below) and (ii) the Holder's adjusted tax basis in the Claim exchanged therefor that is not allocable to accrued but unpaid interest. To the extent that a portion of the New ~~Fixed Rate Pool~~**LNR** Mortgage Notes ~~or New Floating Rate Pool Mezzanine Loan Instrument~~ received is allocable to accrued but unpaid interest, a Holder of an Allowed Class ~~FF~~**R**3A**, R3B, R3C, R3D,** or ~~FF4~~**R3E** Claim may recognize ordinary interest income (see discussion of "Accrued Interest" below).

A Holder's tax basis in the New ~~Fixed Rate Pool~~**LNR** Mortgage Notes ~~or New Floating Rate Pool Mezzanine Loan Instrument~~ received should equal ~~its~~**their** issue price. A Holder's holding period for such ~~New Fixed Rate Pool Mortgage Notes or New Floating Rate Pool Mezzanine Loan Instrument~~**new mortgage notes** received on the Effective Date should begin on the day following the Effective Date.

~~In the event the Holders of Class FF4 Claims vote to reject the Plan or do not otherwise support the plan and their Class FF4 Claims are canceled, the Holders generally will recognize loss for federal income tax purposes in an amount equal to the Holder's adjusted tax basis in its Claim. The character of such loss as capital or loss or as ordinary loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously *claimed a bad debt deduction with respect to* its Claim.~~

~~2.      *Consequences to Holders of Allowed Class* FF3B Claims~~

~~Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class FF3B Claims will receive New HoldCo Interests and Cash. The *Holder should be treated as exchanging its Allowed Class FF3*B *Claims for New HoldCo Interests and Cash in a fully taxable exchange. A Holder of an Allowed Class FF3*B *that is subject to this treatment, should recognize gain or loss equal to the difference between (i) the* sum of (y) the amount of any Cash received and (z) *the fair market value of the New* HoldCo Interests *received that is not allocable to accrued but* unpaid interest and (ii) the Holder's adjusted tax basis in the Floating Rate Pool Mortgage Loan constituting a Holder's surrendered Allowed Class FF3B Claims. *Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the* Floating Rate Pool Mortgage Loan constituting a Holder's surrendered Allowed Class FF3B *Claims were held for more than one year by the Holder. To the extent that a portion of the New* HoldCo Interests received is allocable to accrued but unpaid interest, the Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below). The Holder's tax basis in the New HoldCo Interests received should equal their fair market value. The Holder's holding period for the New HoldCo Interests *received on the Effective Date should begin on the day following the Effective Date.*~~

3.      Consequences to Holders of Allowed Class FF**3B, FF4, FF**5, A4, A5~~B, A5~~C, A8C, ~~A9C, ~~O3, O4A, O4B, R~~3~~4A, **R4B, R4C,** and R4**D** Claims and Allowed Class R~~7, R~~8, R9, **R11,** and R~~10~~**12** Interests

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class FF**3B, FF4, FF**5, A4, A5~~B, A5~~C, A8C, ~~A9C, ~~O3, O4A, O4B, R3A**4A, R4B, R4C**, and R4**D** Claims and Allowed Class R~~7, ~~R8, R9, **R11,** and R~~10~~**12** Interests will receive (i) Cash, (ii) the collateral securing their Allowed Claims, or (iii) a deed in lieu of foreclosure. ~~In certain limited circumstances, rather than receiving consideration as described above in exchange for their Claims or Interests, Holders of Allowed Class R3A Claims and Allowed Class R7, R8, R9, and R10 Interests may have their Claims or Interests reinstated and rendered Unimpaired.~~ *If the Holders of Class FF4 Claims vote to reject the Plan or do not otherwise support the plan, their Class FF4 Claims will be canceled, released, and extinguished as of the Effective Date.*

Any such Holder who receives consideration in exchange for its Allowed Claims or Interests generally should recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between (a) the sum of the amount of any Cash received plus the fair market value of any consideration received in exchange for its Claim or Interest not allocable to accrued but unpaid interest and (b) the Holder's adjusted tax basis in its Claim or Interest. The character of such gain or loss as capital gain (subject to the "market discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim or Interest in such Holder's hands, the extent that a portion of the consideration received in exchange for the Claims or Interests is allocable to accrued but unpaid interest (see "Accrued Interest" below), whether the Claim or Interest constitutes a capital asset in the hands of the Holder, whether the Claim or Interest was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt or worthlessness deduction with respect to its Claim or Interest.

~~To the extent that a Holder's Allowed Claims or Interests are reinstated and rendered Unimpaired, such Holder should generally not recognize gain or loss.~~

4. <u>Accrued Interest</u>

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

5. <u>Market Discount</u>

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the Holder (unless the holder elected to include "market discount" in income as it accrued).

6. <u>Issue Price</u>

The current Treasury Regulations provide that the "issue price" of any class of debt instruments depends on whether, at any time during the 60-day period ending 30 days after the exchange date, such class of instruments is traded on an "established market" or any debt instrument exchanged (in whole or in part) for such new debt instrument is traded on an established market. If the new debt instrument or the old debt instrument exchanged therefor are treated as traded on an established market (*i.e.*, "publicly traded"), the issue price of the new debt instrument will equal (or approximate) the fair market value of such debt instrument as of the Effective Date. In such event, a debt instrument will be treated as issued with original issue discount (in addition to any original issue discount resulting from the deferred portion of the stated interest thereon) to the extent that its issue price is less than its principal amount. Depending on the fair market value of a debt instrument, the total amount of original issue discount could be substantial.

If neither the Class FF3A**, R3A, R3B, R3C, R3D,** and ~~FF4~~**R3E** Claims nor the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** exchanged therefor are considered traded on an "established market," then the issue price for the New Fixed Rate Pool Mortgage Notes and New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** should generally equal their stated

principal amounts. However, if the Class FF3A**, R3A, R3B, R3C, R3D,** and ~~FF4~~**R3E** Claims or the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** exchanged therefor are considered traded on an "established market," then the issue price for the New Fixed Rate Pool Mortgage Notes and New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** would generally equal their fair market value at the time of the exchange (or deemed exchange). Holders of Class FF3A**, R3A, R3B, R3C, R3D,** and ~~FF4~~**R3E** Claims should consult their tax advisors regarding the issue price for the debt obligations underlying their Claims and the New Fixed Rate Pool Mortgage Notes and New ~~Floating Rate Pool Mezzanine Loan Instrument exchange~~**LNR Mortgage Notes exchanged** therefor.

       7.    Consequences to Holders of the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes**

       **(a)**    Stated Interest and Original Issue Discount

A Holder of ~~the~~ New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** will be required to include stated interest on such debt obligation in income in accordance with the Holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Where stated interest payable on the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** is not payable at least annually (the "deferred" interest), such portion of the stated interest will be included in the determination of the original issue discount on such New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** (as set forth below).

A debt instrument generally has original issue discount if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest. Thus, the deferred portion (if any) of the stated interest payments on the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** will be included in the stated redemption price at maturity and taxed as part of original issue discount.

A Holder of ~~the~~ New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument that is issued~~**LNR Mortgage Notes** with original issue discount generally will be required to include any original issue discount in income over the term of such debt obligation (for so long as the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument continues~~**LNR Mortgage Notes continue** to be owned by the Holder) in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** (other than cash attributable to qualified stated interest). Accordingly, a Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any original issue discount that a Holder includes in income will increase the tax basis of such Holder in its New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument.~~**LNR Mortgage Notes** A Holder of ~~the~~ New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** will not be separately taxable on any cash payments that have already been taxed under the original issue discount rules, but will reduce its tax basis in such debt obligation by the amount of such payments.

       **(b)**    Sale, Exchange, or Other Disposition of the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes**

Except as discussed above with respect to "market discount," any gain or loss recognized by a Holder on a sale, exchange or other disposition of the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** (including the exchange of such debt obligation for the property securing such obligation) generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the Holder and the Holder's adjusted tax basis in the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** immediately before the sale, exchange or other disposition (increased for any original issue discount accrued through the date of disposition, which original issue discount would be includible as ordinary income). Any such gain or loss generally should be long term capital gain or

loss if the Holder's holding period in the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes** is more than one year at that time.

**(c)** Medicare Tax

Certain Holders that are individuals, estates or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of the New Fixed Rate Pool Mortgage Notes or New ~~Floating Rate Pool Mezzanine Loan Instrument~~**LNR Mortgage Notes**.

*C.*     *Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest. Backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**ARTICLE XI.**

Recommendation of Innkeepers

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated: ~~April 8,~~**May 9,** 2011　　　　　　　　Innkeepers USA Trust (for itself and all Debtors)

By: _____

Name: 　Marc ~~C~~**A**. Beilinson

Title: 　Chief Restructuring Officer

Prepared by:

| | |
|---|---|
| James H.M. Sprayregen, P.C. | Anup Sathy, P.C. |
| Paul M. Basta | ~~Marc J. Carmel (admitted *pro hac vice*)~~**KIRKLAND & ELLIS LLP** |
| Stephen E. Hessler | ~~KIRKLAND & ELLIS LLP~~**300 North LaSalle Drive** |
| Brian S. Lennon | ~~300 North LaSalle Drive~~**Chicago, Illinois 60654-3406** |
| KIRKLAND & ELLIS LLP | ~~Chicago, Illinois  60654~~**Telephone:  (312) 862-2000** |
| 601 Lexington Avenue | ~~Telephone:  (312) 862-2000~~ |
| New York, New York  10022-4611 | |
| Telephone:  (212) 446-4800 | |

Counsel to the Debtors and Debtors in Possession

**EXHIBIT A**

**Debtors' Plans of Reorganization
Pursuant to Chapter 11 of the Bankruptcy Code**

**EXHIBIT B**

**Financial Projections**

**EXHIBIT C**

**Liquidation Analysis**

**EXHIBIT D**

~~Valuation Analysis~~**EXHIBIT E**

**Marriott Adequate Assurance Agreement (without exhibits)**

**EXHIBIT ~~F~~E**

**Bidding Procedures Order (without exhibits) and Commitment Letter**

**EXHIBIT F**

**Chatham Asset Purchase Agreement**

## SCHEDULE 1

**Ontario Hotel Mortgage Loan Claims Deed in Lieu of Foreclosure~~SCHEDULE 2~~**

~~**Chief Restructuring Officer Compensation Package**~~