HAYNES AND BOONE, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Telephone: (212) 659-7300
Facsimile: (212) 884-8211

Lenard M. Parkins (NY Bar # 4579124)
John D. Penn (NY Bar # 4847208)
Mark J. Elmore (admitted *pro hac vice*)

*Attorneys for Midland Loan Services,
a division of PNC Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, *et al.*, | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**MIDLAND LOAN SERVICES' LIMITED OBJECTION TO THE DISCLOSURE
STATEMENT FOR THE DEBTORS' PLANS OF REORGANIZATION PURSUANT TO
<u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

Midland Loan Services, a division of PNC Bank, N.A., as special servicer for the Debtors' Fixed Rate Mortgage Loan ("<u>Midland</u>"),[1] by its undersigned attorneys, respectfully submits this limited objection (the "<u>Objection</u>") to the Disclosure Statement for the Debtors'

---

[1] Midland pursuant to the Servicing Agreement services and administers that certain secured loan in the amount of not less than $825,402,542 plus interest, costs and fees (the "<u>Fixed Rate Mortgage Loan</u>") owed by certain of the Debtors. The Fixed Rate Mortgage Loan was made pursuant to that certain loan agreement dated as of June 29, 2007 (as amended, the "<u>Fixed Rate Mortgage Loan Agreement</u>"), and is evidenced by (i) a certain Replacement Note A-1 and (ii) a certain Replacement Note A-2, each dated as of August 9, 2007, and each in the original principal amount of $412,701,271. Replacement Note A-1 was assigned to LaSalle Bank National Association as trustee for the holders of the LB-UBS Commercial Mortgage Trust 2007-C6. Bank of America, N.A. was the successor-in-interest to LaSalle Bank National Association and U.S. Bank, National Association is the successor-in-interest to Bank of America, N.A. (the "<u>Fixed Rate Trustee</u>"). Replacement Note A-1 is currently held by the Fixed Rate Trustee. Replacement Note A-2 was assigned to and is currently held by the trustee for the holders of the LB-UBS Commercial Mortgage Trust 2007-C7.

Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code and in support of thereof, respectfully states as follows:[2]

## INTRODUCTION

1. After reaching agreed upon bidding procedures with its two largest creditors, obtaining a Bidding Procedures Order entered on March 11, 2011, and concluding a successful auction pursuant thereto, the Debtors' latest efforts jeopardize that progress.[3] Midland supports the agreement embodied in the Commitment Letter (with its attachments) and the outcome of the auction. Nothing contained in this Objection seeks to undue the results of the Auction; Midland simply seeks to redress the infirmities in the Debtors' Plans (as filed). Midland's willingness to extend stapled financing in connection with the auction was conditioned upon the strict adherence to the express terms of the Commitment Letter by the Debtors with respect to any filed plan, which terms include the preservation of Midland's guaranty against Grand Prix Holdings LLC. The Plans (as defined below), as filed on May 9, 2011, do not reflect that heavily negotiated agreement embodied in the Commitment Letter. Many of the defects in the current Plans had their genesis in the plans filed on April 8, 2011 and share the common flaw that each was filed with full knowledge of Midland's opposition and lack of consent. What should have been consensual, is instead contested.

2. Perhaps most disturbing is that the proposed Fixed/Floating Debtor and Remaining Debtor Plans, as filed, strip Midland of its guaranty against Holdings thereby making these plans unconfirmable on their face. The effect of such a disenfranchisement of Midland's rights with respect to its guaranty against Holdings provides for millions of dollars to be potentially distributed to Apollo Investment Corporation ("Apollo") in violation of the

---

[2] Terms not defined herein shall have the meaning given to them in the Plans and Disclosure Statement.

[3] A copy of the Bidding Procedures Order is attached hereto as ***Exhibit A.***

Bankruptcy Code's "absolute priority rule." The Debtors' protestations to the contrary notwithstanding, the Debtors' actions indicate a continuing desire to take proceeds from creditors and push them toward Apollo. Midland objects to the Debtors' actions as embodied in the Plans.

## BACKGROUND

3. On July 19, 2010 (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 28, 2010, the United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors.

4. On March 11, 2011, the Bankruptcy Court entered the Bidding Procedures Order, approving the Debtors' entry into the Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust (the "Commitment Letter"), according to which the Debtors were authorized to conduct an auction for the Debtors' assets.

5. On May 2, 2011, the Debtors commenced the auction for the Fixed/Floating Properties with competitive bidding between Five Mile/Lehman and Cerberus/Chatham. The Debtors closed the auction for the Fixed/Floating Properties after Cerberus/Chatham submitted a bid valued at $1.118.7 billion.

6. On May 9, 2011 at 8:44 a.m., the Debtors filed their Disclosure Statement for the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Disclosure Statement") (Docket No. 1208) and at 8:52 a.m. the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plans") (Docket No. 1210)

The Debtors have filed the Disclosure Statement and Plans in violation of the Commitment Letter and Bidding Procedures Order.[4]

7. The Disclosure Statement and the Plans were filed without Midland having a reasonable opportunity to review, comment and approve their form and content as required by the Commitment Letter and approved by the Bidding Procedures Order. In fact, drafts were first circulated to the parties at approximately 1:15 a.m. (Eastern) on May 9, 2011 – with too little time to review, provide comments and then confirm that changes had been made. Such an effort to avoid the parties to the Commitment Letter demonstrates the Debtors' lack of sincerity with respect to their obligations under the Commitment Letter and the Bidding Procedures Order.

8. This is unfortunate since Midland and Lehman ALI met with counsel for the Debtors and Cerberus on Tuesday, May 3, 2011 to provide preliminary comments to an early draft of an amended plan. Midland remained ready, willing and able to review and provide comments upon revised drafts of the documents thereafter, including over the past weekend. Instead of allowing a reasonable time to review and comment on a revised version of the Disclosure Statement and the Plans, the Debtors circulated revised drafts overnight and filed these same versions at the beginning of the business day on May 9, 2011 – a mere seven hours later. Moreover, Midland has repeatedly provided suggested language to the Debtors that would resolve Midland's objections to the Disclosure Statement. Midland's suggestions have been summarily rejected.

9. The robust, economic results of the auction process for the Fixed/Floating properties vindicate Midland's efforts for a market test, and as stated Midland supports the

---

[4] The Plans are comprised collectively of four separate and distinct plans of reorganization: the Fixed/Floating Debtor Plan, the Anaheim Plan, the Ontario Plan and the Remaining Debtor Plan. For purposes of this Objection, Midland will refer collectively to the Plans unless specifically noted otherwise.

auction's outcome.  However, the Debtors' failure to meaningfully engage Midland before filing the Disclosure Statement and the Plan forces Midland to file this Objection to protect its rights and interests in these bankruptcy cases.

## OBJECTIONS AND ARGUMENT IN SUPPORT THEREOF

10. Midland objects to the Disclosure Statement because it describes plans of reorganization that violate the express terms of the Commitment Letter and Bidding Procedures Order and are patently not confirmable as a matter of law.  Additionally, with the Debtors' decision to file the Disclosure Statement and Plans on the eve of the Disclosure Statement Hearing, insufficient time has been provided to determine if the Disclosure Statement contains adequate information for it to be approved under 11 U.S.C. § 1125.

11. Courts have consistently held that the disapproval of a disclosure statement is appropriate where it describes a plan of reorganization that is fatally flawed and therefore unconfirmable.  *See In re Quigley*, 377 B.R. 110, 115-116 (Bankr. S.D.N.Y. 2007) (stating "[i]f the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied."); *see also In re 266 Wash. Assocs.*, 141 B.R. 275, 288 (Bankr. S.D.N.Y. 1992) (holding that "[a] disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation.").  Refusing to consider a disclosure statement describing a patently unconfirmable plan "is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never be legally confirmed." *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (internal citations omitted).

*A.*     *Disclosure Statement and the Fixed/Floating and Remaining Debtor Plans Violate the Commitment Letter and Bid Procedures Order and Are Patently Unconfirmable*

12.     The agreement embodied in the Commitment Letter addresses the treatment of the Fixed Rate Mortgage Loan with respect to ***only*** the Fixed/Floating Debtors.[5] *See* **Exhibit A**, Commitment Letter, Term Sheet at "Treatment of Fixed Rate Mortgage Loan."  Additionally, Midland's agreement to provide a general release with respect to certain "Releasing Parties" under the Fixed/Floating Plan was limited to the Fixed/Floating Debtors and such release did not include Holdings.  *See* **Exhibit A**, Commitment Letter, Term Sheet at "Releases."  Finally, Midland expressly reserved its rights, claims and interest against the non-Fixed/Floating Debtors.  *See* Commitment Letter, Term Sheet at "Releases" ("Additionally, the Releasing Parties reserve all of their respective rights, claims, and interests with respect to the Excluded Debtors and all assets of the Excluded Debtors.").

13.     Notwithstanding these express provisions in the Commitment Letter, the Disclosure Statement and the Fixed/Floating and Remaining Debtor Plans provide for a non-consensual release of Midland's guaranty claim against Holdings.  *See* Plan at Article VIII.E, p. 60 (The "Fixed/Floating Releasing Parties" encompasses all of the Debtors, including Holdings, and is not limited to only the Fixed/Floating Debtors.).  Midland has advised the Debtors on multiple occasions that Midland has not agreed to waive its guaranty claim and release Holdings, and no operative document exists that supports the Debtors' position.

14.     The Commitment Letter amends and supersedes a prior version, which predecessor version involved all of the Debtors – not just the Fixed/Floating Debtors.  The predecessor version provided for all of the value to remain in an integrated transaction thereby preventing any value from flowing outside of the parties to that document.  This concept was superseded in the operative Commitment Letter when the "Seven Sisters" and the "Remaining Debtors" were specifically removed.  The release of Holdings was eliminated at the same time.

---

[5]     The "Fixed/Floating Debtors" do not include Grand Prix Holdings LLC ("Holdings").

The Commitment Letter was amended and includes an integration clause making it abundantly clear that the predecessor version, which included a release of Holdings, is no longer in effect.

15. Midland is the successor beneficiary under that certain Guaranty by Grand Prix Holdings LLC for the benefit of Lehman ALI Inc. executed as of June 29, 2007 (the "Guaranty"). Under the Guaranty, Holdings guaranteed the payment and performance of the borrowers' obligations under the Fixed Rate Mortgage Loan. Accordingly, Midland has a valid unsecured claim against Holdings. Holdings' guaranty obligation to Midland has been acknowledged beyond question since the entry of the Final Cash Collateral Order (Docket No. 402, pp. 4 & 5), which included the following Court findings:

> **(1) Fixed Rate Loan.** (i) The Debtors listed on Schedule 1 hereto (collectively, the "Fixed Rate Debtors") acknowledge and agree that they are party to that certain Loan Agreement, dated as of June 29, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time, and together with such supporting and ancillary documents thereto, the "Fixed Rate Mortgage Loan Agreement"), among the Fixed Rate Debtors, as borrowers thereunder, Grand Prix Fixed Lessee LLC, as operating lessee, Grand Prix Holdings, LLC, as guarantor, and Lehman ALI Inc., as the original lender thereunder (the "Fixed Rate Lender").[6]

16. Midland's deficiency claim against Holdings will be approximately $100 million, which represents the approximate remaining amounts due under the Fixed Rate Mortgage Loan after the plan contemplated in the auction is implemented, and Midland's claim against Holdings is allowable in that amount. Midland's claim against Holdings is significant in these cases because Holdings is the owner of substantially all of the Class A Preferred Shares of Innkeepers USA Trust and under the Plans, value will flow to Holdings that can be captured by Midland.

---

[6] The Challenge Period for any party (including the Creditors Committee) to challenge the Court's findings regarding the Fixed Rate Mortgage Loan has expired and the Court's findings regarding the same are now final.

*See* Amended Declaration of Dennis Craven, Docket No. 33, ¶¶ 23 and 38).[7] Based on the information reflected on p. 15 of the Disclosure Statement, it appears that the estimated distribution to Holdings based on the Series A Preferred shares is between $8.1 million and $3.7 million (being either 7.0% or 3.2% of the estimated interests of $115,812,294). The complete disenfranchisement of Midland's guaranty claim and any recovery therefrom is patently improper. For ease of reference, Holdings' ownership of Class A Preferred Shares and the resulting surplus flow is shown in the chart attached hereto as ***Exhibit B***.

17. This structure effectively places Holdings' creditors (including Midland) with the same priority as the Ad Hoc Committee of Preferred Shareholders and compels Holdings to obtain recoveries for the benefit of its creditors or risk breaching its fiduciary duties. It also violates the absolute priority rule. Instead, the Fixed/Floating and Remaining Debtor Plans eliminate Holdings' obligations to Midland by stripping the Guaranty without compensation through elimination of any recovery for a deficiency claim or guaranty claim.

18. Through the claims objection and resolution process, the Bankruptcy Code provides for procedures and protocols for the Debtors to dispute claims. Further, the Fixed/Floating Debtor and the Remaining Debtor Plans already contemplate a claims resolution process. No reason exists to ignore these processes currently contemplated and instead unilaterally deprive Midland of its guaranty claim.

**B.** ***The Disclosure Statement Describes a Plan that Violates the Absolute Priority Rule***

19. The Debtors' unilateral and uncompensated elimination of Midland's guaranty claim against Holdings, with absolutely no consideration in exchange therefor, has opened the

---

[7] The statement on p. 41 of the original Disclosure Statement that "Apollo owns 100% of the common equity interests in Debtor Grand Prix Holdings, LLC and the majority of the Innkeepers USA Trust Series A Preferred Interests" is apparently incorrect and is refuted by other statements in that Disclosure Statement (see pp. 18 & 22).

door for funds to flow to Apollo, as the equity owner of Holdings, instead of being distributed to Holdings' creditors, including Midland on its guaranty claim. Any proposed distribution scheme under the Remaining Debtor Plan that would result in an equity holder of Holdings receiving value before Midland's unsecured claim against Holdings is paid in full clearly violates the absolute priority rule. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). The Debtors cannot proceed with the fatally flawed Remaining Debtor Plan because it is unconfirmable due to that plan's violation of the absolute priority rule.

### C.   *The Debtors' Plans are Not Confirmable Under 11 U.S.C. §1129(a)(4)*

20.    None of the Debtors' Plans satisfy Bankruptcy Code section 1129(a)(4). In order to confirm a plan of reorganization the Debtors must satisfy all the conditions of 11 U.S.C. § 1129. Bankruptcy Code Section 1129(a)(4) requires that certain professional fees and expenses to be paid by a plan proponent be subject to court review and approval.[8] Courts have held that satisfaction of 1129(a)(4) occurs when the plan provides for court review and approval of professional fees prior to the plan's date of <u>effectiveness</u>. *See In re S. Canaan Cellular Investments, Inc.*, 427 B.R. 44, 83-84 (Bankr. E.D.Pa. 2010) (stating "[w]here a plan provides for court review of professional fees to be paid by the plan proponent for services rendered prior to the *effective date* of the plan, then the requirements of section 1129(a)(4) are met.") (emphasis added); *see also In re Allegheny International, Inc.*, 134 B.R. 814, 818 (Bankr. W.D.Pa. 1991). In fact, this Court recently confirmed a plan involving the Debtors' counsel that required court

---

[8]    "Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).

supervision of professional fees and expenses through the effective date of the plan.[9] Why in this case are the Debtors so stridently avoiding this requirement to file fee applications? Further, the Plans improperly attempt to circumvent the limits for funding of professional fees from cash collateral as reflected in the Commitment Letter and the Cash Collateral Orders, as amended.

21.     The Debtors' Plans fail to require the Court's approval of fees and expenses through the Effective Date.  The Debtors' Plans only require this Court's approval of professional fees and expenses through the Confirmation Date and thereafter, professionals' fees and expenses are paid in the ordinary course of business without supervision.  This fails to satisfy section 1129(a)(4) and therefore renders the Plans fatally flawed.

D.      ***Insufficient Time has been Provided to Determine if the Disclosure Statement Contains Adequate Information Required for Approval***

22.     Because the Debtors waited till the eve of the May 10, 2011 Disclosure Statement Hearing before filing the Disclosure Statement and the Plans, Midland has not had sufficient time to conduct a comprehensive review to insure that the Disclosure Statement contains adequate information as required by 11 U.S.C. § 1125.  As such, Midland reserves its rights to assert additional objections to the Disclosure Statement and Plans.

---

[9]     *See* Section II(B)(4) of the Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code dated September 20, 2010 of *In re Neff Corp.*, et. al. case no. 10-12610 (SCC) (*Neff Corp.* Docket No. 443) that states: "Except as otherwise specifically provided in the Plan, on and after the *Effective Date*, the Debtors or Purchaser, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or Purchaser, as applicable.  Upon the *Effective Date*, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Purchaser may employ an pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court." (emphasis added).

WHEREFORE, Midland requests that the Court enter an order (i) denying approval of the Disclosure Statement and (ii) granting Midland such other and further relief to which it is entitled.

Dated: May 9, 2011
New York, New York

    HAYNES AND BOONE, LLP

    /s/ John D. Penn
    Lenard M. Parkins (NY Bar #4579124)
    Mark Elmore (admitted *pro hac vice*)
    30 Rockefeller Plaza, 26th Floor
    New York, New York 10112
    Telephone No.: (212) 659-7300
    Facsimile No.: (212) 884-8211

    - and –

    John D. Penn (NY Bar # 4847208)
    Haynes and Boone, LLP
    201 Main Street, Suite 2200
    Fort Worth, Texas 76102
    Telephone No.: (817) 347-6610
    Facsimile No.: (817) 348-2300