DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Michael J. Sage
Brian E. Greer
Nicole B. Herther-Spiro

*Attorneys for Lehman ALI Inc.*
*and  SASCO 2008-C2, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| INNKEEPERS USA TRUST, *et al.* | : | Case No. 10-13800 (SCC) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

-------------------------------------------------------------

## OBJECTION OF LEHMAN ALI INC. AND SASCO 2008-C2, LLC
## TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER
## APPROVING THE DISCLOSURE STATEMENT

Lehman ALI Inc. ("Lehman ALI") and SASCO 2008-C2, LLC ("SASCO," together with

Lehman ALI, "Lehman"),[1] hereby object to the Debtors' Motion For Entry of an Order

---

[1]    Certain of the Debtors (the "Floating Rate Debtors") in the above-captioned cases are borrowers under that certain Loan Agreement, dated as of June 29, 2007, in the original principal amount of $250,000,000.00, between and among the Floating Rate Debtors, as borrowers, and Lehman ALI, as lender (as amended, the "Floating Rate Loan Agreement"). Grand Prix Mezz Borrower 2 Floating LLC (the "Floating Mezz Debtor") is borrower under that certain Mezzanine Loan Agreement, dated as of June 29, 2007, in the original principal amount of $121,000,000.00, between and among the Floating Mezz Debtor and Lehman ALI, as original lender (as amended, the "Floating Rate Mezz Loan Agreement"). Grand Prix Mezz Borrower Term LLC (the "Anaheim Mezz Debtor") is borrower under that certain Mezzanine Loan Agreement, dated as of June 29, 2007, in the original principal amount of $21,300,000.00, between and among the Anaheim Mezz Debtor and Lehman ALI, as original lender (as amended, the "Anaheim Mezz Loan Agreement"). Lehman ALI is holder of all claims and lender of record under the Floating Rate Mortgage Loan Agreement. SASCO owns 100% of the economic and beneficial interests under (a) the Floating Rate Mezzanine Loan Agreement and (b) the Anaheim Mezzanine Loan Agreement. Lehman Commercial Paper Inc., as the administrative agent for SASCO, has recently retained Dechert LLP to represent SASCO in these cases.

Approving (A) Adequacy of the Disclosure Statement; (B) Certain Dates Related to Confirmation of the Plan; (C) Certain Voting Procedures and the Form of Certain Documents to be Distributed In Connection with Solicitation of the Plan; and (D) Proposed Voting and General Tabulation Procedures [Dkt. No. 1095] (the "Motion"), and respectfully state as follows:

## Summary of Argument[2]

The Debtors' attempt to extinguish the Lehman Guaranty Claims (defined below) under the Plan without Lehman's consent, while at the same time providing for a recovery to Apollo Investment Corporation ("Apollo") on account of its junior equity interests with property belonging to Lehman is inappropriate and renders the Debtors' Plan unconfirmable for several reasons. First, claims cannot be eliminated or challenged without following the process required by and provided under title 11 of the United States Code (the "Bankruptcy Code"). Second, to provide a recovery to Apollo prior to payment in full to senior creditors is a clear and blatant violation of the absolute priority rule. Third, a plan that extinguishes legitimate creditor claims for the benefit of out-of-the-money equity is not proposed in good faith. Fourth, the Global Commitment Letter (defined below) expressly provides that Lehman's rights with respect to Debtors other than the Fixed/Floating Debtors are reserved. Finally, TriMont Loan Services Inc. ("TriMont"), as special servicer for the benefit of SASCO, was not a party to the Global Commitment Letter, and, as a result, could not have agreed to release any claims against any Debtor.

## Background

1.    The Debtors' Disclosure Statement for Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 1093] (the "Initial Disclosure Statement") and the

---

[2]    Capitalized terms not herein defined shall have the meanings assigned them in the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 1210] (the "Plan").

Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 1094] (the "Initial Plan"), were filed with the Motion on April 8, 2011. As the Debtors have acknowledged, the Initial Plan and Initial Disclosure Statement were not acceptable in all respects to Lehman as required under its Court-approved agreement with the Debtors. *See* Notice of Filing Debtors' Disclosure Statement and Plans [Dkt. No. 1096].

2.      Lehman, together with other parties, including Midland Loan Services, Inc., as special servicer for the Debtors' $825 million fixed rate loan ("Midland"), have sent several sets of written comments and mark-ups to the Initial Plan and Initial Disclosure Statement to the Debtors. Promptly following the auction (the "Auction"), held on May 2-3, 2011, for substantially all of the assets of the Fixed/Floating Debtors (at which substantially all of the assets of the Remaining Debtors were also sold), Lehman, as well as Midland, sent the Debtors further comments to the Initial Plan. Despite repeated assurances that revised documents were forthcoming, the Debtors did not send Lehman or Midland the draft revised plan and disclosure statement, which rejected many of Lehman's and Midland's key comments, until after 1:00 a.m. on May 9, 2011.

3.      Because the Debtors only filed the revised Plan and Disclosure Statement for Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 1208] (the "Disclosure Statement") on May 9, 2011, on the objection deadline (May 6, 2011) Lehman filed a reservation of rights [Dkt. No. 1203] (the "Reservation of Rights") with respect to the Motion, reserving Lehman's rights to file this objection and to assert these and other objections at the hearing. Lehman does not consent to the Plan and Disclosure Statement in the form they were filed by the Debtors for the reasons set forth herein, among other reasons.

*The Grand Prix Guarantees*

4.      Lehman's objections herein are based on the treatment of certain guaranty claims against Debtor Grand Prix Holdings LLC ("Grand Prix"). Grand Prix has executed guarantees of, among other obligations, (I) all of the Floating Rate Debtors' obligations under the Floating Rate Loan Agreement pursuant to that certain Guaranty, dated as of June 29, 2007 (the "Mortgage Guaranty"), attached hereto as *Exhibit A*; (II) all of the Floating Mezz Debtor's obligations under the Floating Rate Mezz Loan Agreement pursuant to that certain Guaranty (Mezzanine Loan), dated as of June 29, 2007 (the "Mezz Guaranty"), attached hereto as *Exhibit B*; (III) all of the Anaheim Mezz Debtor's obligations under the Anaheim Mezz Loan Agreement pursuant to (a) that certain Guaranty (Mezzanine Loan), dated as of June 29, 2007, attached hereto as *Exhibit C* and (b) that certain Payment and Performance Guaranty (Term Loan) dated as of June 29, 2007, attached hereto as *Exhibit D* (together, the "Anaheim Guarantees").

5.      The Mortgage Guaranty, Mezz Guaranty, and Anaheim Guarantees (together, the "Lehman Guarantees," and the claims against Grand Prix arising therefrom, the "Lehman Guaranty Claims") are full guarantees of all recourse obligations under the applicable loan agreements and are not subject to any cap.

6.      Grand Prix is the Debtor entity which holds directly or indirectly all of the equity interests in the other Debtors. Grand Prix is wholly owned by Apollo. Grand Prix holds directly both the common equity interests in Innkeepers USA Trust ("Trust") and substantially all of the 12% Series A Preferred Shares (the "Series A Preferred Shares") issued by Trust, which receive recovery, pursuant to their liquidation preference, *pari passu* with the 8% Series C Preferred Shares (the "Series C Preferred Shares") issued by Trust. *See* Innkeepers USA Trust Subscription Agreement with respect to the 12.0% Series A Cumulative Preferred Shares, dated as of June 29,

2007, by and among Innkeepers USA Trust, Grand Prix Holdings, LLC, and Management Investors, attached hereto as *Exhibit E*; Articles Supplementary 8.0% Series C Cumulative Preferred Shares, attached hereto as *Exhibit F*; Articles Supplementary 12.0% Series A Cumulative Preferred Shares (as amended and restated), attached hereto as *Exhibit G*.

*The Plan*

7.      The Plan purports to extinguish all guaranty claims, including the Lehman Guaranty Claims. The treatment sections in the Fixed/Floating Plan and the Anaheim Plan for claims arising from or related to the Floating Rate Loan Agreement, the Floating Rate Mezz Loan Agreement, and the Anaheim Mezz Loan Agreement each contain the following language: "For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder *shall not receive any recovery from any of the Debtors on account of any* deficiency Claim, *guaranty Claim*, indemnity Claim, and claims for Adequate Protection Obligations related to the [applicable] Loan Agreement *and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date* of the [applicable] Plan." *See* Plan, Article III.B, Treatment of Classes FF3, FF4 & A4 (emphasis added).

8.      Notwithstanding the fact that the Plan extinguishes the Lehman Guaranty Claims against Grand Prix, pursuant to the treatment section in the Remaining Debtor Plan, holders of equity interests in Grand Prix are entitled to receive a recovery under the Plan: "Holders of Allowed Grand Prix Holdings Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of the Parent Companies (including any Cash in the LP Bank Account . . . ." *See* Plan, Article III.B, Treatment of Class R11.

9.     Like the equity interests in Grand Prix, the holders of both the Series A Preferred Shares and the Series C Preferred Shares "shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of the Parent Companies . . . ." *See* Plan, Article III.B, Treatment of Classes R8, R9. The only creditors of Grand Prix are holders of guaranty claims, such as the Lehman Guaranty Claims. Because the Plan purports to extinguish those claims, any recovery that is received by Grand Prix as a result of its holdings of Series A Preferred Shares will be passed to the only holder of Grand Prix's equity interests -- Apollo.

*The Auction*

10.     Due to the robust Auction for nearly all of the Debtors' assets, the five hotels that constitute the principal assets of the Remaining Debtors were sold for a purchase price of $195 million in cash and the assumption of certain mortgage obligations. *See* Debtors' Motion For Entry of an Order Approving (I) Stipulation by and Between Debtors, LNR Partners LLC, and Ad Hoc Committee of Preferred Shareholders and (II) Break Up Fee and Expense Reimbursement for Chatham Lodging L.P. Revised Disclosure Statement and Plans [Dkt. 1205]. After satisfaction of certain obligations of the Remaining Debtors, the Debtors anticipate receiving a cash payment of approximately $35.8 million.[3] *Id*. After the payment of senior claims, it appears that most of this cash will remain, resulting in a substantial recovery to the holders of the Series A Preferred Shares and Series C Preferred Shares. Although the recovery on account of the Series A Preferred Shares should inure to the benefit of the creditors of Grand Prix, because of the provisions of the Plan that extinguish guaranty claims against Grand Prix, if this Plan were confirmed, this substantial recovery will inure to the direct benefit of Apollo.

---

[3]     The papers are not clear what claims are satisfied prior to the Debtors' receiving that amount; accordingly, Lehman makes no representation as to whether this number is at all accurate.

<u>Argument</u>

11.    The Plan is patently unconfirmable on its face, because it fails to meet several of the requirements of § 1129 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1129(a)(1) (comply with the Bankruptcy Code), (a)(3) (be proposed in good faith), & (b)(2)(B) (comply with the absolute priority rule). Because the Plan is patently not confirmable, the Disclosure Statement cannot be approved and the Motion must be denied. *See, e.g.*, *In re Quigley Company, Inc.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("[T]his court will not approve a disclosure statement for an admittedly unconfirmable plan.").

*Extinguishing Claims*

12.    One of the requirements for confirmation of a plan under chapter 11 is that the plan must comply with the applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if all of the following requirements are met: (1) The plan complies with the applicable provisions of this title. . . ."). A provision in a chapter 11 plan cannot be used to disallow an otherwise allowable claim, thereby impermissibly side-stepping the claims objection process. *Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 492 (B.A.P. 9th Cir. 2003). As the court in *Dynamic* concluded: "the comprehensive chapter 11 statutory scheme defines the minimum due process for dealing with creditors, requires compliance with the claim objection procedures, and *precludes using a chapter 11 plan provision as the means to reduce a claim that is 'deemed allowed' without the creditor's consent.*" *Id.* (emphasis added).

13.     By attempting to extinguish the otherwise allowed Lehman Guaranty Claims against Grand Prix through provisions in the Plan, rather than by following the claims objection process, the Plan fails to comply with the applicable provisions of the Bankruptcy Code. Thus, the Plan is patently not confirmable. 11 U.S.C. § 1129(a)(1).

*Absolute Priority Rule*

14.     By giving no recovery on account of the Lehman Guaranty Claims against Grand Prix, while at the same time allowing the equity interests in Grand Prix (which are 100% held by Apollo) to receive what may be a substantial recovery, the Plan violates the absolute priority rule. 11 U.S.C. § 1129(b)(2)(B). The absolute priority rule "requires that, if a class of senior claim-holders will not receive the full value of their claims under the plan and the class does not accept the plan, no junior claim- or interest-holder may receive 'any property' 'under the plan on account of such junior claim or interest.'" *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 86 (2d Cir. 2010).

15.     Although the Lehman Guaranty Claims are considered "extinguished" pursuant to the Fixed/Floating Plan and the Anaheim Plan, rather than being treated as receiving no recovery pursuant to the Remaining Debtor Plan, the result is the same. Creditors of Grand Prix are not receiving any recovery while junior equity interests are receiving a substantial recovery, in clear violation of the absolute priority rule. 11 U.S.C. § 1129(b)(2)(B). Accordingly, the Plan is patently not confirmable.

*Lack of Good Faith*

16.     Under the Plan, the substantial recovery that is due to the holders of guaranty claims against Grand Prix, including the Lehman Guaranty Claims, would instead go to the Debtors' out-of-the-money equity holder -- Apollo. A plan that cheats creditors for the benefit of

equity cannot be proposed in good faith. *See* 11. U.S.C. § 1129(a)(3); *see generally Quigley Company*, 377 B.R. at 119; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). Accordingly, the Plan is patently not confirmable.

*The Plan Disregards the Global Commitment*

17.    We have requested the Debtors to provide any justification for the decision to extinguish the Lehman Guaranty Claims against Grand Prix while allowing equity interests a recovery. The only response received is that the Debtors feel that this result was "the spirit of the deal" contained in the Amended and Restated Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust, dated as of March 9, 2011 (the "<u>Global Commitment Letter</u>").[4] Despite the Debtors' apparent recollections about the "spirit of the deal," the Global Commitment Letter expressly and clearly reserved all Lehman ALI's rights, claims and interests with respect to the Excluded Debtors, including without limitation Grand Prix.

18.    Where an agreement is not ambiguous, the Court should not look outside its four corners to determine the intent of the parties. *Union Carbide Corp. v Affiliated FM Ins. Co.*, 2011 NY Slip Op 1317, at 4 (N.Y. Feb. 22, 2011) ("[W]here the meaning of a writing is clear from its text, extrinsic evidence will not be considered."); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002) ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide.").

19.    Here, the Global Commitment Letter is clear: "Additionally, the Releasing Parties reserve all of their respective rights, claims, and interests with respect to the Excluded Debtors

---

[4]    In the March Commitment Letter, the parties agreed to revise their prior agreement in order to exclude from the Lehman / Five Mile stalking horse bid those of the Debtors that did not own or operate the hotels covered by the Lehman and Midland blanket mortgages (the "<u>Excluded Debtors</u>").  Grand Prix is one of the Excluded Debtors.

and all assets of the Excluded Debtors." Global Commitment Letter, Term Sheet, p.19. Further, the treatment of claims arising from or related to the Floating Rate Mortgage Loan Agreement is only in satisfaction of such claims "against the Fixed/Floating Debtors." *Id.*, Term Sheet pp.2,3. Finally, the releases agreed to under the agreement are only "by and among" certain parties, including Lehman, but not the Excluded Debtors including Grand Prix. *Id.*, Term Sheet, pp.17,18.

20.     Finally, even if the Debtors could manufacture an argument that the Global Commitment Letter precludes Lehman from asserting claims with respect to the Mortgage Guaranty, the Debtors cannot make the same argument for the Mezzanine Guaranty or the Anaheim Guarantees. Specifically, at the time the Global Commitment Letter was signed by Lehman ALI, the holders of claims under the Anaheim Mezz Loan Agreement and Floating Rate Mezz Loan Agreement were being actively represented by TriMont, as special servicer.[5] Neither TriMont nor its counsel took part in any of the relevant negotiations or signed any of the relevant agreements.[6]

<div align="center">Conclusion</div>

21.     Injecting the Fixed/Floating Plan with these issues unjustifiably places the entire process and all that has been achieved to date at risk, including the very positive results from the Auction. If the Debtors believe they can raise colorable arguments for why the Lehman Guaranty Claims should be extinguished or why they should not be entitled to treatment under the Plan

---

[5]     The Disclosure Statement inaccurately states that Lehman Brothers Holdings Inc. succeeded TriMont as special servicer. This is not the case. TriMont remains special servicer for the benefit of SASCO with respect to the Anaheim Mezz Loan Agreement and the Floating Rate Mezz Loan Agreement.

[6]     If the Debtors feel that there was any uncertainty about the rights of holders of guaranty claims vis-à-vis the rights of Apollo as equity holder, it was due to the Debtors' own mis-statements of fact in the context of negotiations and in pleadings filed with the Court. The Debtors have repeatedly represented that Apollo is the holder of substantially all of the Series A Preferred Shares. *See, e.g.*, Stalking Horse Motion pp.7-8, ¶27 [Dkt. No. 820]; Declaration of William Q. Derrough in Support of the Stalking Horse Motion 8 [Dkt. No. 821]. This statement was and is, in fact, false. Grand Prix is the holder of substantially all of the Series A Preferred Shares.

with respect to Grand Prix, they should do so by proper means in accordance with the Bankruptcy Code.[7]

22.     As there can be no justification for extinguishing the Lehman Guaranty Claims in the Plan while giving a recovery to Apollo, and such provisions violate § 1129 of the Bankruptcy Code, the Plan as proposed is patently unconfirmable on its face. Accordingly, the Disclosure Statement cannot and should not be approved.

23.     Lehman hereby reserves the right to assert additional objections and join objections raised by other parties at the hearing on the Motion.

[Remainder of Page Intentionally Left Blank]

---

[7]     There is no principled reason why these issues should be addressed in the Fixed/Floating Plan at all. They relate solely to the treatment of claims against Grand Prix, and accordingly the provisions extinguishing the Lehman Guaranty Claims should be excised entirely from the Fixed/Floating Plan so as not to delay its confirmation.

**WHEREFORE**, for the foregoing reasons, Lehman respectfully requests that the Court deny the Motion and grant Lehman such other or further relief as the Court deems appropriate.

Dated: New York, New York

May 10, 2011

Respectfully Submitted,

DECHERT LLP

By: */s/ Michael J. Sage*
       Michael J. Sage
       Brian E. Greer
       Nicole B. Herther-Spiro
       1095 Avenue of the Americas
       New York, New York 10036-6797
       Telephone: (212) 698-3500
       Facsimile: (212) 698-3599
       michael.sage@dechert.com
       brian.greer@dechert.com
       nicole.hertherspiro@dechert.com

       *Attorneys for Lehman ALI Inc.*
       *and SASCO 2008-C2, LLC*

**Exhibit A**

## GUARANTY

**THIS GUARANTY** (this "**Guaranty**") is executed as of this 29th day of June, 2007 by **GRAND PRIX HOLDINGS LLC**, a Delaware limited liability company, having an address at c/o Apollo Investment Corporation, 9 West 57th Street, New York, New York 10019 ("**Guarantor**"), for the benefit of **LEHMAN ALI INC.**, having an address at 399 Park Avenue, New York, New York 10022 ("**Lender**").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Loan Agreement, of even date herewith between EACH OF THE PERSONS SET FORTH IN SCHEDULE I ATTACHED HERETO, each a Delaware limited liability company (each individually and collectively, as the context requires, "**Borrower**") and Lender (as the same may hereinafter be amended, modified, restated, renewed or replaced the "**Loan Agreement**"), Lender made a Loan (as defined in the Loan Agreement) to Borrower which Loan is evidenced by the Note (as defined in the Loan Agreement), secured by, among other things, the Security Instruments (as defined in the Loan Agreement);

WHEREAS, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1    Guaranty of Obligation.**    Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**1.2     Definition of Guaranteed Obligations.**     As used herein, the term "**Guaranteed Obligations**" means the obligations or liabilities of Borrower to Lender for which Borrower shall be liable pursuant to Section 9.4(b) and (c) of the Loan Agreement.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim in any bankruptcy proceeding of Borrower for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

**1.3     Nature of Guaranty.**     This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.   This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).   The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.   This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4     Guaranteed Obligations Not Reduced by Offset.**     The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**1.5     Payment By Guarantor.**     If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.   Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations.   Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6     No Duty To Pursue Others.**     It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to

secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

1.7 **Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instrument, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

1.8 **Payment of Expenses.** In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations until the expiration of any applicable statute of limitations.

1.9 **Effect of Bankruptcy.** In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. In addition, if at any time any payment of principal, interest or any other amount payable by Borrower under any Loan Document, is rescinded or must be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be fully reinstated as though such payment has been due but not made.

1.10 **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and

all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

   1.11 **Borrower.** The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of or by Borrower, provided that nothing herein shall be deemed to permit any such merger, reorganization, sale, transfer, assignment, devise, gift or bequest of or by Borrower other than in accordance with the terms of the Loan Agreement.

   1.12 **Termination**. This Guaranty and the obligations of Guarantor hereunder shall automatically terminate upon the payment in full of the Loan; provided, however, that the Guarantor shall remain liable for any Guarantied Obligations to Lender, including, but not limited to, the Environmental Indemnity, that by their terms survive payment in full of the Loan. In addition, upon compliance with the applicable requirements in Section 5.2.10 of the Loan Agreement, this Guaranty and the obligations of Guarantor hereunder shall terminate as more fully set forth in the Loan Agreement.

## ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

   Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

   2.1 **Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instruments, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

   2.2 **Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3    Condition of Borrower or Guarantor.**    The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4    Invalidity of Guaranteed Obligations.**    The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Security Instruments, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instruments, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5    Release of Obligors.**    Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of any or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6    Other Collateral.**    The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7    Release of Collateral.**    Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time

existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8** **Care and Diligence.** Other than as a result of Lender's gross negligence, fraud or willful misconduct, the failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9** **Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

**2.10** **Offset.** The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**2.11** **Merger.** The reorganization, merger or consolidation of Borrower into or with any other Person.

**2.12** **Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.13** **Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1    Benefit.**  Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2    Familiarity and Reliance.**  Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3    No Representation By Lender.**  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**3.4    Guarantor's Financial Condition.**  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5    Legality.**  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor.  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6    Survival.**  All representations and warranties made by Guarantor herein shall survive the execution hereof.

# ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1    Subordination of All Guarantor Claims.**  As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2    Claims in Bankruptcy.**  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3    Payments Held in Trust.**  In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4    Liens Subordinate.**  Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or

Lender presently exist or are hereafter created or attached. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower.

## ARTICLE V

## MISCELLANEOUS

**5.1    Waiver.**  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2    Notices.**    Any notice, demand, statement, request or consent made hereunder shall be made in accordance with Section 10.6 of the Loan Agreement.  The addresses of the Guarantor is as follows:

|  |  |
|---|---|
| If to Guarantor: | Grand Prix Holdings LLC<br>c/o Apollo Investment Corporation<br>9 West 57th Street<br>New York, New York 10019<br>Attention:  Aaron N. Sack<br>Facsimile No.:  212.513.3443 |
| with a copy to: | Apollo Investment Corporation<br>9 West 57th Street<br>New York, New York  10019<br>Attention:  Justin M. Korval<br>Facsimile No.:  212.515.3442 |
| with a copy to: | Innkeepers USA<br>340 Royal Poinciana Way<br>Suite 306<br>Palm Beach, FL  33480<br>Attention:  Dennis Craven & Mark Murphy<br>Facsimile No.:  561.650.0958 |

<pre>
            with a copy to:    Skadden, Arps, Slate, Meagher & Flom LLP
                               Four Times Square
                               New York, New York 10036
                               Attention:  Neil L. Rock, Esq.
                               Facsimile No.: 917.777.3787
</pre>

**5.3 <u>Governing Law</u>.  (a) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY INDEMNITEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR AND LENDER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:**

<pre>
            CT Corporation
            111 Eighth Avenue
            New York, New York  10011
</pre>

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW**

YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**5.4** **Invalid Provisions.** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.5** **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.6** **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

**5.7** **Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8** **Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**5.9** **Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for

more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

5.10 **Rights and Remedies.** If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11 **Other Defined Terms.** Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

5.12 **Entirety.** THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

5.13 **Waiver of Right To Trial By Jury.** GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**5.14** **Reinstatement in Certain Circumstances**. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[NO FURTHER TEXT ON THIS PAGE]

This Guaranty is EXECUTED as of the day and year first above written.

**GUARANTOR:**

**GRAND PRIX HOLDINGS LLC**, a Delaware limited liability company

By: _____
    Name: Justin Korval
    Title: Vice President

## SCHEDULE I

## BORROWER

| |
|---|
| KPA/GP Valencia LLC |
| Grand Prix West Palm Beach LLC |
| KPA/GP Ft. Walton Beach LLC |
| Grand Prix Tallahassee LLC |
| Grand Prix Ft. Wayne LLC |
| Grand Prix Indianapolis LLC |
| Grand Prix Wichita LLC |
| KPA/GP Louisville (HI) LLC |
| Grand Prix Bulfinch LLC |
| Grand Prix Woburn LLC |
| Grand Prix Rockville LLC |
| Grand Prix East Lansing LLC |
| Grand Prix Grand Rapids LLC |
| Grand Prix Troy (Central) LLC |
| Grand Prix Troy (SE) LLC |
| Grand Prix Atlantic City LLC |
| Grand Prix Montvale LLC |
| Grand Prix Morristown LLC |
| Grand Prix Albany LLC |
| Grand Prix Columbus LLC |
| Grand Prix Addison (SS) LLC |
| Grand Prix Harrisburg LLC |
| Grand Prix Ontario LLC |

## **Exhibit B**

16404894

## GUARANTY (MEZZANINE LOAN)

**THIS GUARANTY (MEZZANINE LOAN)** (this "**Guaranty**") is executed as of this 29th day of June, 2007 by **GRAND PRIX HOLDINGS LLC,** a Delaware limited liability company, having an address at c/o Apollo Investment Corporation, 9 West 57th Street, New York, New York 10019 ("**Guarantor**"), for the benefit of **LEHMAN ALI INC.,** having an address at 399 Park Avenue, New York, New York 10022 ("**Lender**").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Mezzanine Loan Agreement, of even date herewith between Grand Prix Mezz Borrower 2 Floating LLC, a Delaware limited liability company ("**Borrower**") and Lender (as the same may hereinafter be amended, modified, restated, renewed or replaced the "**Loan Agreement**"), Lender made a Loan (as defined in the Loan Agreement) to Borrower which Loan is evidenced by the Note (as defined in the Loan Agreement), secured by, among other things, the Pledge Agreement (as defined in the Loan Agreement);

WHEREAS, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1 Guaranty of Obligation.** Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**1.2     Definition of Guaranteed Obligations.**     As used herein, the term "**Guaranteed Obligations**" means the obligations or liabilities of Borrower to Lender for which Borrower shall be liable pursuant to Section 9.4(b) and (c) of the Loan Agreement.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim in any bankruptcy proceeding of Borrower for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

**1.3     Nature of Guaranty.**     This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.   This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).   The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.   This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4     Guaranteed Obligations Not Reduced by Offset.**     The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**1.5     Payment By Guarantor.**     If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6     No Duty To Pursue Others.**     It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to

secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

1.7     **Waivers.**  Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Pledge Agreement, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

1.8     **Payment of Expenses.**  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations until the expiration of any applicable statute of limitations.

1.9     **Effect of Bankruptcy.**  In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect.  It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.  In addition, if at any time any payment of principal, interest or any other amount payable by Borrower under any Loan Document, is rescinded or must be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be fully reinstated as though such payment has been due but not made.

1.10     **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and

all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

1.11    **Borrower.**  The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of or by Borrower, provided that nothing herein shall be deemed to permit any such merger, reorganization, sale, transfer, assignment, devise, gift or bequest of or by Borrower other than in accordance with the terms of the Loan Agreement.

1.12    **Termination**.  This Guaranty and the obligations of Guarantor hereunder shall automatically terminate upon the payment in full of the Loan; provided, however, that the Guarantor shall remain liable for any Guarantied Obligations to Lender, including, but not limited to, the Environmental Indemnity, that by their terms survive payment in full of the Loan. In addition, upon compliance with the applicable requirements in Section 5.2.10 of the Loan Agreement, this Guaranty and the obligations of Guarantor hereunder shall terminate as more fully set forth in the Loan Agreement.

## ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

2.1    **Modifications.**  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Pledge Agreement, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

2.2    **Adjustment.**  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

2.3    **Condition of Borrower or Guarantor.**  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of

Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4    Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Pledge Agreement, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Pledge Agreement, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5    Release of Obligors.** Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of any or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6    Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7    Release of Collateral.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8    Care and Diligence.**  Other than as a result of Lender's gross negligence, fraud or willful misconduct, the failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9    Unenforceability.**  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

**2.10    Offset.**  The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**2.11    Merger.**  The reorganization, merger or consolidation of Borrower into or with any other Person.

**2.12    Preference.**  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.13    Other Actions Taken or Omitted.**  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1** **Benefit.** Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2** **Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3** **No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**3.4** **Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6** **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

# ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1** **Subordination of All Guarantor Claims.** As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2** **Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3** **Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4** **Liens Subordinate.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or

Lender presently exist or are hereafter created or attached. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower.

## ARTICLE V

## MISCELLANEOUS

    **5.1**   **Waiver.** No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

    **5.2**   **Notices.**     Any notice, demand, statement, request or consent made hereunder shall be made in accordance with Section 10.6 of the Loan Agreement. The addresses of the Guarantor is as follows:

| | |
|---|---|
| If to Guarantor: | Grand Prix Holdings LLC<br>c/o Apollo Investment Corporation<br>9 West 57th Street<br>New York, New York 10019<br>Attention: Aaron N. Sack<br>Facsimile No.: 212.513.3443 |
| with a copy to: | Apollo Investment Corporation<br>9 West 57th Street<br>New York, New York 10019<br>Attention: Justin M. Korval<br>Facsimile No.: 212.515.3442 |
| with a copy to: | Innkeepers USA<br>340 Royal Poinciana Way<br>Suite 306<br>Palm Beach, FL 33480<br>Attention: Dennis Craven & Mark Murphy<br>Facsimile No.: 561.650.0958 |

with a copy to:     Skadden, Arps, Slate, Meagher & Flom LLP
                    Four Times Square
                    New York, New York 10036
                    Attention: Neil L. Rock, Esq.
                    Facsimile No.: 917.777.3787


**5.3 <u>Governing Law</u>.  (a) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY INDEMNITEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR AND LENDER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:**

              CT Corporation
              111 Eighth Avenue
              New York, New York  10011


**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW**

YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

5.4 **Invalid Provisions.** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

5.5 **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

5.6 **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

5.7 **Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

5.8 **Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

5.9 **Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for

more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

5.10    **Rights and Remedies.**  If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11    **Other Defined Terms.**  Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

5.12    **Entirety.**  THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF.  THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.  THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

5.13    **Waiver of Right To Trial By Jury.**  GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**5.14** <u>**Reinstatement in Certain Circumstances**</u>.  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[NO FURTHER TEXT ON THIS PAGE]

This Guaranty is EXECUTED as of the day and year first above written.

**GUARANTOR:**

**GRAND PRIX HOLDINGS LLC**, a Delaware limited liability company

By: _____
Name: Justin Korval
Title: Vice President

**Exhibit C**

## GUARANTY (MEZZANINE LOAN)

**THIS GUARANTY (MEZZANINE LOAN)** (this "**Guaranty**") is executed as of this 29th day of June, 2007 by **GRAND PRIX HOLDINGS LLC**, a Delaware limited liability company, having an address at c/o Apollo Investment Corporation, 9 West 57th Street, New York, New York 10019 ("**Guarantor**"), for the benefit of **LEHMAN ALI INC.**, having an address at 399 Park Avenue, New York, New York 10022 ("**Lender**").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Mezzanine Loan Agreement, of even date herewith between Grand Prix Mezz Borrower Term LLC, a Delaware limited liability company ("**Borrower**") and Lender (as the same may hereinafter be amended, modified, restated, renewed or replaced the "**Loan Agreement**"), Lender made a Loan (as defined in the Loan Agreement) to Borrower which Loan is evidenced by the Note (as defined in the Loan Agreement), secured by, among other things, the Pledge Agreement (as defined in the Loan Agreement);

WHEREAS, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1** **Guaranty of Obligation.** Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**1.2    Definition of Guaranteed Obligations.**   As used herein, the term "**Guaranteed Obligations**" means the obligations or liabilities of Borrower to Lender for which Borrower shall be liable pursuant to Section 9.4(b) and (c) of the Loan Agreement.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim in any bankruptcy proceeding of Borrower for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

**1.3    Nature of Guaranty.**   This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.   This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).   The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.   This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4    Guaranteed Obligations Not Reduced by Offset.**   The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**1.5    Payment By Guarantor.**   If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations.   Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6    No Duty To Pursue Others.**   It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to

secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

1.7 **Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Pledge Agreement, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

1.8 **Payment of Expenses.** In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations until the expiration of any applicable statute of limitations.

1.9 **Effect of Bankruptcy.** In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. In addition, if at any time any payment of principal, interest or any other amount payable by Borrower under any Loan Document, is rescinded or must be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be fully reinstated as though such payment has been due but not made.

1.10 **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and

all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

      **1.11**    **Borrower.** The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of or by Borrower, provided that nothing herein shall be deemed to permit any such merger, reorganization, sale, transfer, assignment, devise, gift or bequest of or by Borrower other than in accordance with the terms of the Loan Agreement.

      **1.12**    **Termination**. This Guaranty and the obligations of Guarantor hereunder shall automatically terminate upon the payment in full of the Loan; provided, however, that the Guarantor shall remain liable for any Guarantied Obligations to Lender, including, but not limited to, the Environmental Indemnity, that by their terms survive payment in full of the Loan. In addition, upon compliance with the applicable requirements in Section 5.2.10 of the Loan Agreement, this Guaranty and the obligations of Guarantor hereunder shall terminate as more fully set forth in the Loan Agreement.

## ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

      Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

      **2.1**    **Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Pledge Agreement, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

      **2.2**    **Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

      **2.3**    **Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of

Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

2.4 **Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Pledge Agreement, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Pledge Agreement, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

2.5 **Release of Obligors.** Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of any or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

2.6 **Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

2.7 **Release of Collateral.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8    Care and Diligence.**  Other than as a result of Lender's gross negligence, fraud or willful misconduct, the failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9    Unenforceability.**  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

**2.10    Offset.**  The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**2.11    Merger.**  The reorganization, merger or consolidation of Borrower into or with any other Person.

**2.12    Preference.**  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.13    Other Actions Taken or Omitted.**  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1** **Benefit.** Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2** **Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3** **No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**3.4** **Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6** **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

# ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1     Subordination of All Guarantor Claims.**  As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2     Claims in Bankruptcy.**  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3     Payments Held in Trust.**  In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4     Liens Subordinate.**  Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or

Lender presently exist or are hereafter created or attached.  Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower.

## ARTICLE V

## MISCELLANEOUS

**5.1    Waiver.**  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2    Notices.**    Any notice, demand, statement, request or consent made hereunder shall be made in accordance with Section 10.6 of the Loan Agreement.  The addresses of the Guarantor is as follows:

If to Guarantor:    Grand Prix Holdings LLC
c/o Apollo Investment Corporation
9 West 57th Street
New York, New York 10019
Attention:  Aaron N. Sack
Facsimile No.: 212.513.3443

with a copy to:    Apollo Investment Corporation
9 West 57th Street
New York, New York  10019
Attention:  Justin M. Korval
Facsimile No.: 212.515.3442

with a copy to:    Innkeepers USA
340 Royal Poinciana Way
Suite 306
Palm Beach, FL  33480
Attention:  Dennis Craven & Mark Murphy
Facsimile No.:  561.650.0958

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attention: Neil L. Rock, Esq.
Facsimile No.: 917.777.3787

**5.3 <u>Governing Law</u>. (a) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY INDEMNITEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR AND LENDER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:**

CT Corporation
111 Eighth Avenue
New York, New York 10011

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW**

YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

      5.4    **Invalid Provisions.** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

      5.5    **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

      5.6    **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

      5.7    **Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

      5.8    **Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

      5.9    **Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for

more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

5.10 **Rights and Remedies.** If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11 **Other Defined Terms.** Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

5.12 **Entirety.** THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

5.13 **Waiver of Right To Trial By Jury.** GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**5.14** **Reinstatement in Certain Circumstances**.  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[NO FURTHER TEXT ON THIS PAGE]

This Guaranty is EXECUTED as of the day and year first above written.

**GUARANTOR:**

**GRAND PRIX HOLDINGS LLC**, a Delaware limited
liability company

By: _____
Name: Justin Korval
Title: Vice President

**Exhibit D**

## PAYMENT AND PERFORMANCE GUARANTY (TERM LOAN)

THIS **PAYMENT AND PERFORMANCE GUARANTY (TERM LOAN)** (this "**Guaranty**") is executed as of this 29th day of June, 2007 by **GRAND PRIX HOLDINGS, LLC**, having an address at c/o Apollo Investment Corporation, 9 West 57th Street, New York, New York 10019 ("**Guarantor**"), for the benefit of **LEHMAN ALI INC.**, having an address at 399 Park Avenue, New York, New York 10022 ("**Lender**").

W I T N E S S E T H:

WHEREAS, Grand Prix Mezz Borrower Term LLC, a Delaware limited liability company (together with its successors and assigns, "**Borrower**") is indebted to Lender for the loan made to Borrower (the "**Loan**") pursuant to a Loan Agreement dated as of the date hereof (as amended or modified from time to time, the "**Loan Agreement**");

WHEREAS, Lender has required Borrower to deliver this Guaranty as a condition to Lender making the Loan; and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor has directly benefited from Lender's making the Loan to Borrower.

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I.

## NATURE AND SCOPE OF GUARANTY

1.1. **Guaranty of Obligation**. Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

1.2. **Definition of Guaranteed Obligations**. As used herein, the term "**Guaranteed Obligations**" means all obligations and liabilities of Borrower to Lender under the Loan Agreement, the Note and the other Loan Documents, including, without limitation, the full and timely payment of the Loan.

1.3. **Nature of Guaranty**. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be

binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

1.4. **Guaranteed Obligations Not Reduced by Offset**. The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other Person against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

1.5. **Payment By Guarantor**. If all or any part of the Guaranteed Obligations shall not be punctually paid and performed when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment and performance of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

1.6. **No Duty To Pursue Others**. It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

1.7. **Waivers**. Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instruments, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Properties, (v) the occurrence of any breach by Borrower or an Event of Default, (vi)

Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

1.8. **Payment of Expenses**. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

1.9. **Effect of Bankruptcy**. In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

1.10. **Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

1.11. **Termination**. This Guaranty and the obligations of Guarantor hereunder shall terminate upon the payment in full of the Loan.

## ARTICLE II.

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations

hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

**2.1. Modifications**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

**2.2. Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3. Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor, or any reorganization of Borrower or Guarantor.

**2.4. Invalidity of Guaranteed Obligations**. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Security Instrument, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instruments, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5. Release of Obligors**. Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform; guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of any or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without

assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

2.6. **Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

2.7. **Release of Collateral**. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

2.8. **Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or, prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

2.9. **Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

2.10. **Offset**. The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

2.11. **Merger**. The reorganization, merger or consolidation of Borrower into or with any other Person.

2.12. **Preference**. Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

2.13. **Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

3.1. **Benefit**. Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

3.2. **Familiarity and Reliance**. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

3.3. **No Representation By Lender**. Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

3.4. **Guarantor's Financial Condition**. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

3.5. **Legality**. The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is

enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

3.6. **Survival**. All representations and warranties made by Guarantor herein shall survive the execution hereof.

## ARTICLE IV.

## SUBORDINATION OF CERTAIN INDEBTEDNESS

4.1. **Subordination of All Guarantor Claims**. As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

4.2. **Claims in Bankruptcy**. In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to .the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

4.3. **Payments Held in Trust**. In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or

distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the sane to Lender.

4.4. **Liens Subordinate**. Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V.

## MISCELLANEOUS

5.1. **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

5.2. **Notices**. All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

If to Guarantor:   Grand Prix Holdings LLC
       c/o Apollo Investment Corporation
       9 West 57th Street
       New York, New York 10019
       Attention: Aaron N. Sack
       Facsimile No.: (212) 515-3443

| With a copy to: | Grand Prix Holdings LLC |
| | c/o Apollo Investment Corporation |
| | 9 West 57th Street |
| | New York, New York 10019 |
| | Attention: Justin M. Korval |
| | Facsimile No.: (212) 515-3442 |

With a copy to:  Grand Prix Holdings LLC
c/o Apollo Investment Corporation
9 West 57th Street
New York, New York 10019
Attention: Justin M. Korval
Facsimile No.: (212) 515-3442

With a copy to:  Innkeepers USA
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida 33480
Attention: Dennis Craven and Mark Murphy
Facsimile No.: (561) 650-0958

With a copy to:  Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522
Attention: Neil L. Rock, Esq.
Facsimile No.: (917) 777-3787

If to Lender:  Lehman ALI Inc.
399 Park Avenue
New York, New York 10022
Attention: Michael E. Lascher
Facsimile No.: (646) 758-2744

With a copy to:  Lehman ALI Inc.
399 Park Avenue
New York, New York 10022
Attention: Charlene Thomas
Facsimile No.: (646) 758-4544

and

Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19103
Attention: David Forti, Esq.
Facsimile No.: (215) 994-2222

5.3. **Governing Law**. **THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY**

LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY, AND THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

5.4. **Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

5.5. **Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

5.6. **Parties Bound; Assignment; Joint and Several**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written

consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

5.7. **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

5.8. **Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

5.9. **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

5.10. **Rights and Remedies**. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11. **Other Defined Terms**. Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

5.12. **Entirety**. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY,

**SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

5.13. <u>**Waiver of Right To Trial By Jury**</u>. **GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

5.14. <u>**Reinstatement in Certain Circumstances**</u>. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

5.15. <u>**Financial Reports**</u>. Guarantor shall provide or cause to be provided to Lender the following:

(i)     Updated audited annual financial statements of Guarantor in form and content comparable to the financial statements provided to Lender by or on behalf of Guarantor prior to date hereof, for each fiscal year of Guarantor, as soon as reasonably practicable and in any event within one hundred twenty (120) calendar days after the close of each such fiscal year;

(ii)    Copies of Guarantor's federal and state income tax returns for each taxable year, as filed with the appropriate governmental authority, within thirty (30) days after filing of same;

(iii)   Within thirty (30) days after the end of each of the first three quarters of each fiscal year of Guarantor, Guarantor shall deliver to Lender a copy of Guarantor's unaudited balance sheet, income statement and statement of changes in financial position for the period from the beginning of such fiscal year to the end of such quarter in form and content comparable to the financial statements provided to Lender by or on behalf of Guarantor prior to date hereof. Each such quarterly report shall be accompanied by a certification by Guarantor to Lender

that such report presents fairly the financial condition of Guarantor as of the respective dates thereof; and

(iv)     From time to time promptly after Lender's reasonable request, such additional information, reports and statements regarding the business operations and financial condition Guarantor as Lender may reasonably request.

[NO FURTHER TEXT ON THIS PAGE]

EXECUTED as of the day and year first above written.

**GUARANTOR:**

GRAND PRIX HOLDINGS LLC, a Delaware
limited liability company

By: _____
Name: Justin Korval
Title: Vice President

**Exhibit E**

16404894

## SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT, dated as of June 29, 2007 (this *"Agreement"*), by and among Innkeepers USA Trust (f/k/a Grand Prix Acquisition Trust), a Maryland real estate investment trust (the *"Company"*), Grand Prix Holdings LLC, a Delaware limited liability company (*"Grand Prix"*), and the management investors listed on Schedule A attached hereto (collectively, the *"Management Investors"*). Grand Prix and the Management Investors are sometimes hereinafter collectively referred to as the *"Investors"* and each individually as an *"Investor"*.

## W I T N E S S E T H:

WHEREAS, the Company desires to issue and sell to Grand Prix, and Grand Prix desires to purchase from the Company, the number of shares of 12.0% Series A Cumulative Preferred Shares, $0.01 par value per share, of the Company (collectively, the *"Series A Preferred Shares"*) and common shares of beneficial interest, $0.01 par value per share, of the Company (collectively, the *"Common Shares"*) set forth opposite Grand Prix's name on Schedule A attached hereto (the *"Grand Prix Shares"*); and

WHEREAS, the Company desires to issue and sell to each Management Investor, and each Management Investor desires to purchase from the Company, the number of Series A Preferred Shares and the number of Common Shares set forth opposite such Management Investor's name on Schedule A attached hereto (collectively, the *"Management Shares"* and, together with the Grand Prix Shares, the *"Shares"*).

NOW, THEREFORE, in consideration for each Investor's contribution to capital of the Company and of the premises and of the mutual covenants and obligations hereinafter set forth, the parties hereto hereby agree as follows:

SECTION 1. *Definitions*. As used herein, the following terms shall have the following respective meanings:

(a) *"Affiliate"* shall mean (i) in the case of an entity, any Person who or which, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, any specified Person or (ii) in the case of an individual, such individual's spouse, children, grandchildren or parents or a trust primarily for the benefit of any of the foregoing; provided that no securityholder of the Company shall be deemed an Affiliate of any other securityholder solely by reason of an investment in the Company. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(b)　"***Business Day***" shall mean any day that is not a Saturday or Sunday or a day on which banks are required or permitted to be closed in the State of New York.

(c)　"***Bylaws***" shall mean the bylaws of the Company, as they may be amended from time to time.

(d)　"***Closing Date***" shall mean the date upon which the Closing occurs.

(e)　"***Common Shares***" shall have the meaning ascribed to it in the recitals hereto.

(f)　"***Declaration of Trust***" shall mean the Amended and Restated Declaration of Trust of the Company, as it may be amended from time to time, including any Articles Supplementary a part thereof (including the Articles Supplementary governing the Series A Preferred Shares).

(g)　"***Employment Agreements***" shall mean, collectively, (i) the Employment Agreement, dated as of the date hereof, by and between the Company and Dennis M. Craven, (ii) the Employment Agreement, dated as of the date hereof, by and between the Company and Mark A. Murphy and (iii) the Employment Agreement, dated as of the date hereof, by and between the Company and Timothy Walker.

(h)　"***Encumbrance***" shall mean or refer to any lien, claim, charge, pledge, mortgage, encumbrance, security interest, preferential arrangement, restriction on voting or alienation of any kind, adverse interest, or the interest of a third party under any conditional sale agreement, capital lease or other title retention agreement.

(i)　"***Grand Prix Shares***" shall have the meaning ascribed to it in the recitals hereto.

(j)　"***Management Shares***" shall have the meaning ascribed to it in the recitals hereto.

(k)　"***Option Agreements***" shall mean, collectively, (i) the Option Agreement, dated as of the date hereof, by and between the Company and Dennis M. Craven, (ii) the Option Agreement, dated as of the date hereof, by and between the Company and Mark A. Murphy and (iii) the Option Agreement, dated as of the date hereof, by and between the Company and Timothy Walker, in each case, substantially in the form of Exhibit A attached hereto, pursuant to which the Company has granted such employees of the Company that number of Options as set forth in such Option Agreement.

(l)　"***Options***" shall mean the options granted pursuant to the Option Agreements to purchase Common Shares under the Share Option Plan.

(m)　"***Person***" shall mean any individual, partnership, corporation, limited liability company, joint venture, trust, firm, association, unincorporated organization or

2

other entity, including a government or political subdivision or an agency or instrumentality thereof.

(n)    "*SEC*" shall mean the U.S. Securities and Exchange Commission.

(o)    "*Securities Act*" shall mean the Securities Act of 1933, as amended.

(p)    "*Series A Preferred Shares*" shall have the meaning ascribed to it in the recitals hereto.

(q)    "*Share Option Plan*" shall means that certain plan of the Company entitled " Innkeepers USA Trust 2007 Management Incentive Plan," substantially in the form of Exhibit B attached hereto.

(r)    "*Shares*" shall have the meaning ascribed to it in the recitals hereto.

(s)    "*Shareholders Agreement*" shall mean the Shareholders Agreement, dated the date hereof, by and among the Company and the shareholders of the Company party thereto, substantially in the form of Exhibit C attached hereto.

(t)    "*Transaction Documents*" shall mean this Agreement, the Shareholders Agreement, the Share Option Plan, the Option Agreements and the Employment Agreements.

**SECTION 2.**    *Subscription for the Shares*.

(a)    *Authorization*.  The Company has authorized the sale and issuance of an aggregate of (i) 3,000,000 Series A Preferred Shares and (ii) 13,370,000 Common Shares, each having the rights, preferences, privileges and restrictions set forth in the Declaration of Trust and in the Shareholders Agreement.

(b)    *Subscription*.

(i)    At the Closing, subject to the terms and conditions set forth herein, the Company agrees to issue and sell to Grand Prix, and Grand Prix hereby agrees to purchase from the Company, the Grand Prix Shares at an aggregate purchase price as set forth opposite Grand Prix's name on Schedule A attached hereto (the "*Grand Prix Purchase Price*").

(ii)    At the Closing, subject to the terms and conditions set forth herein, the Company agrees to issue and sell to each Management Investor, and the each of the Management Investors, severally and not jointly, hereby agrees to purchase from the Company, the number of Management Shares as set forth opposite each such Management Investor's name on Schedule A attached hereto at an aggregate purchase price as set forth opposite such Management Investor's name on Schedule A attached hereto (collectively, the "*Management Purchase Price*").

3

## SECTION 3.  *The Closing*.

(a)    *Closing*.  The closing with respect to the purchase and sale of the Shares (the "*Closing*") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 at 10:00 a.m. on the date hereof, or at such other location as the parties hereto shall agree, following the satisfaction or waiver of each of the conditions set forth herein.

(b)    *Purchase Price*.

(i)    At the Closing, subject to the terms and conditions set forth herein, as consideration in full for the Grand Prix Shares, Grand Prix shall pay the Grand Prix Purchase Price by wire transfer of immediately available funds to an account designated by the Company.

(ii)    At the Closing, subject to the terms and conditions set forth herein, as consideration in full for the Management Shares being purchased by each Management Investor, each Management Investor, severally and not jointly, shall pay the applicable Management Purchase Price set forth on Schedule A attached hereto by wire transfer of immediately available funds to an account designated by the Company.

(c)    *Share Certificates*.  At the Closing, the Company shall promptly (and in any event within five (5) Business Days following the Closing) issue and deliver to each Investor, one or more share certificates, duly executed by the Company, representing the number of Shares purchased as set forth on Schedule A attached hereto.

## SECTION 4.  *Representations and Warranties of the Company*.  The Company hereby represents and warrants to each Investor as follows:

(a)    *Organization*.  The Company is a real estate investment trust duly organized, validly existing and in good standing under the laws of the State of Maryland and has full corporate power and authority to conduct its business as it is now being conducted and to own, operate or lease the properties and assets it currently owns, operates or holds under lease. The Company is duly qualified to transact business and is in good standing in each jurisdiction where it is so required to be qualified or licensed.  The Company has delivered to each of the Investors true and correct copies of the Declaration of Trust and Bylaws as each is in effect on the date hereof.

(b)    *Authorization*.  The Company has full corporate right, power and authority to enter into this Agreement and the other Transaction Documents and to carry out fully and perform its obligations hereunder and thereunder.  The execution, delivery and performance by the Company of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary corporate action by the Company.  This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, and each of the other Transaction Documents to which the Company is a party, upon its execution and delivery

by the Company will be the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its respective terms.

      (c)   *Capitalization*.

      (i)   The authorized capital stock of the Company consists of (A) 20,000,000 preferred shares of beneficial interest, $0.01 par value per share, of which (1) 3,000,000 have been designated as Series A Preferred Shares, of which no shares are issued and outstanding prior to giving effect to the transactions contemplated by this Agreement and (2) 5,800,000 have been designated as 8.0% Series C Cumulative Preferred Shares of Beneficial Interest, par value $0.01 per share, of which 5,800,000 shares are issued and outstanding as of the date hereof prior to giving effect to the transactions contemplated by this Agreement and (B) 100,000,000 Common Shares, of which 1,000 shares are issued and outstanding as of the date hereof prior to giving effect to the transactions contemplated by this Agreement. On the Closing Date, the authorized, issued and outstanding shares of capital stock of the Company after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents will be as stated in Schedule B attached hereto and, except as set forth on Schedule B attached hereto, there are no outstanding options, warrants, subscriptions, or other rights, convertible securities, agreements or commitments obligating the Company to issue any additional shares of its capital stock.

      (ii)   The Shares, when issued, sold, delivered and paid for in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and non-assessable and, assuming the accuracy of the representations and warranties made by the Investors, will be issued in compliance with all applicable federal and state securities laws and will be free of any Encumbrances except for any restrictions on transfer applicable to the Shares under the Shareholders Agreement.

      (d)   *Private Offering*. The Company has not registered the offer and sale of any of its securities under the Securities Act. No form of general solicitation or general advertising was used by the Company or its representatives in connection with the offer or sale of the Shares or any related transaction. Assuming the accuracy of the representations and warranties of each Investor contained herein, the issuance and sale of the Shares to each Investor pursuant to this Agreement does not require registration under the Securities Act, and otherwise complies with applicable state and federal securities laws.

      (e)   *No Conflict*. Neither the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will (i) violate any provision of law, any provision of the Declaration of Trust or Bylaws, any order of any court or other agency of government or any provision of any indenture, agreement or other instrument to which the Company or any of its properties or assets is bound, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any Encumbrance upon any of the properties or assets of the Company or (ii) require the approval, consent, authorization or act of, or the making by the Company of any

declaration, filing or registration with, any Person, other than filings with the SEC in accordance with the Securities Act.

(f) *Brokers of the Company*. Neither the Company nor any of its Affiliates has any liability or obligation to pay any fees or commissions to any investment banker, broker, finder or placement agent with respect to the transactions contemplated by this Agreement or by any of the other Transaction Documents.

**SECTION 5.** *Representations and Warranties of the Investors*. Each Investor, severally and not jointly, hereby represents and warrants to the Company as follows:

(a) *Organization/Enforceability*.

(i) If such Investor is Grand Prix, Grand Prix is duly organized, validly existing and in good standing under the laws of Delaware.

(ii) If such Investor is a Management Investor, such Management Investor is a natural person and is competent.

(b) *Authorization*.

(i) If such Investor is Grand Prix, Grand Prix has full right, power and authority to enter into this Agreement and any of the other Transaction Documents to which it is a party and to carry out fully and perform its obligations hereunder and thereunder. The execution, delivery and performance by Grand Prix of this Agreement and any of the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary corporate or other action by Grand Prix. This Agreement has been duly executed and delivered by Grand Prix and constitutes the legal, valid and binding obligation of Grand Prix, enforceable against Grand Prix in accordance with its terms, and each of the other Transaction Documents to which Grand Prix is a party, upon its execution and delivery by Grand Prix will be the legal, valid and binding obligation of Grand Prix, enforceable against Grand Prix in accordance with its respective terms.

(ii) If such Investor is a Management Investor, such Management Investor has the legal capacity to execute and deliver this Agreement and any of the other Transaction Documents to which he is a party and to carry out fully and perform his obligations hereunder and thereunder. This Agreement has been duly executed by such Management Investor and constitutes the legal, valid and binding obligation of such Management Investor, enforceable against such Management Investor in accordance with its terms, and each of the other Transaction Documents to which such Management Investor is a party, upon its execution and delivery by such Management Investor will be the legal, valid and binding obligation of such Management Investor, enforceable against such Management Investor in accordance with its respective terms.

(c) *No Conflict*. Neither the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of any of the transactions

contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will (i) (A) if such Investor is Grand Prix, violate any provision of law, any provision of the limited liability company agreement or certificate of formation of Grand Prix, any order of any court or other agency of government or any provision of any indenture, agreement or other instrument to which Grand Prix or any of its properties or assets is bound, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any Encumbrance upon any of the properties or assets of Grand Prix or (B) if such Investor is a Management Investor, violate any provision of law, any order of any court or other agency of government to which such Management Investor is subject or any provision of any indenture, agreement or other instrument to which such Management Investor is a party or by which such Management Investor is bound, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument or other arrangement to which such Management Investor is a party or by which such Management Investor is bound or (ii) require the approval, consent, authorization or act of, or the making by such Investor of any declaration, filing or registration with, any Person, other than filings with the SEC in accordance with the Securities Act.

(d)     *Accredited Investor*.  Such Investor is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act.

(e)     *Acquisition for Own Account*.  Such Investor is acquiring the Shares for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act.

(f)     *Investment Intent*.  Such Investor understands that the Shares have not been, and will not upon issuance be, registered under the Securities Act, and that the certificates evidencing the Shares shall bear any and all legends required under applicable federal and state securities laws, as set forth in the Shareholders Agreement, to that effect.

(g)     *Investor Awareness*.  Such Investor has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of his or its, as the case may be, investment in the Series A Preferred Shares, and he or it, as the case may be, is able to bear the economic risk of his or its, as the case may be, investment and can afford the complete loss of such investment.

(h)     *Access to Information*.  Such Investor is fully familiar with the business and operations, as currently contemplated, of the Company. Such Investor understands or has had an opportunity to ask questions of, and receive answers from, representatives and management of the Company concerning the terms and conditions of the sale of the Shares hereunder and the affairs and business of the Company. Such Investor has had an opportunity to obtain additional information which the Company possesses or can acquire without unreasonable effort or expense that is necessary or desirable to determine an appropriate value for the Shares to be purchased or accepted by such Investor. The foregoing, however, does not limit or modify

7

the representations or warranties of the Company in the Transaction Documents or the right of such Investor to rely upon such representations or warranties.

(i)     *Brokers of the Investors*.  Neither such Investor nor any of its Affiliates has any liability or obligation to pay any fees or commissions to any investment banker, broker, finder or placement agent with respect to the transactions contemplated by this Agreement and by the other Transaction Documents.

**SECTION 6.**     *Conditions to Obligations of the Parties Hereto*.  The respective obligations of each of the parties hereto are subject to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)     *No Actions*.  No action, claim, suit, arbitration, inquiry, subpoena, discovery request, proceeding or investigation by or before any court or grand jury, any governmental or other regulatory or administrative entity, agency or commission or any arbitration tribunal shall have been initiated that has the likely effect of enjoining or preventing the consummation of the transactions contemplated by this Agreement or by any of the other Transaction Documents.

(b)     *Purchase Price*.

(i)     At the Closing, Grand Prix shall have tendered the Grand Prix Purchase Price.

(ii)     At the Closing, each of the Management Investors shall have tendered the applicable Management Purchase Price.

(c)     *Shareholders Agreement*.  The Company and each of the Investors shall have delivered an executed copy of the Shareholders Agreement.

(d)     *Employment Agreements*.  The Company and each of Dennis M. Craven, Mark A. Murphy and Timothy Walker shall have delivered an executed copy of their respective Employment Agreements.

(e)     *Share Option Plan*.  The Company shall have adopted the Share Option Plan.

(f)     *Option Agreements*.  The Company and each of Dennis M. Craven, Mark A. Murphy and Timothy Walker shall have delivered an executed copy of their respective Option Agreements.

(g)     *Organizational Documents*.  The Declaration of Trust (including the Articles Supplementary governing the Series A Preferred Shares) shall have been adopted by the Company, and the Declaration of Trust (including the Articles Supplementary governing the Series A Preferred Shares) shall have been filed with, and accepted for record by, the State Department of Assessments and Taxation of the State of Maryland.

**SECTION 7.** *Conditions to Obligations of the Investors*. The obligation of each Investor to purchase the Shares to which he or it, as the case may be, has subscribed under this Agreement is subject to the fulfillment to the reasonable satisfaction (or waiver) of such Investor at or prior to the Closing Date of each of the following conditions:

(a) *Accuracy of Representations and Warranties*. With respect to the Closing, all representations and warranties of the Company shall be true and correct on and as of the Closing Date as if made on and as of the Closing Date, except for those representations and warranties which relate specifically to a particular date, which shall be true and correct as of such date.

(b) *Performance of Agreements*. The Company shall have performed all obligations and agreements, and complied with all covenants and conditions, contained in this Agreement or any of the other Transaction Documents to be performed or complied with by it prior to or at the Closing Date.

**SECTION 8.** *Conditions to Obligations of the Company*. The obligation of the Company to issue, sell and deliver the Shares at the Closing to each Investor is subject to the fulfillment to the reasonable satisfaction (or waiver) of the Company at or prior to the Closing Date of each of the following conditions:

(a) *Accuracy of Representations and Warranties*. The representations and warranties of such Investor contained herein shall be true and correct on and as of the Closing Date as if made on and as of the Closing Date.

(b) *Performance of Agreements*. Each Investor shall have performed all obligations and agreements, and complied with all covenants and conditions, contained in this Agreement or any of the other Transaction Documents to be performed or complied with by such Investor prior to or at the Closing Date.

**SECTION 9.** *Other Agreements*.

(a) *No Public Announcements*. Unless otherwise required by applicable law, prior to the Closing Date, no press release or other public announcement pertaining to the transactions contemplated by this Agreement or by the other Transaction Documents will be made by or on behalf of any party hereto, without the prior written approval of the other parties hereto.

(b) *Expenses*. At the Closing, the Company shall pay all legal fees and other fees and out-of-pocket expenses incurred in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby by Grand Prix. Except as set forth in the preceding sentence, each Investor shall pay its costs and expenses incident to its negotiation and preparation of this Agreement and the other Transaction Documents, and to their performance and compliance with all agreements and conditions contained herein or therein, to be performed or complied with, including the fees, expenses and disbursements of their or its counsel, accountants and other advisors.

9

(c)    *Investor Obligations*. Notwithstanding anything to the contrary contained herein, the obligations of the Investors hereunder or thereunder shall be several and not joint.

(d)    *Integration*. The Company will not offer, sell or solicit offers to buy or otherwise negotiate in respect of any security (as defined in the Securities Act) that will be integrated with the sale of the Shares hereunder in a manner that would require the registration of the any of the Shares under the Securities Act.

**SECTION 10.**    *Survival*. The representations and warranties of the parties hereto set forth in Section 4 and Section 5 of this Agreement shall survive the Closing indefinitely.

**SECTION 11.**    *Governing Law*. This Agreement and each of the Transaction Documents shall be governed by, construed in accordance with, and enforced under, the law of the State of New York applicable to agreements or instruments entered into and performed entirely within such state.

**SECTION 12.**    *Jurisdiction*. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AGREES THAT THE ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OF THE OTHER TRANSACTION DOCUMENTS, THE SHARES OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE BROUGHT IN THE COURTS OF THE STATE OF FLORIDA OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF FLORIDA AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT THE SUCH COURTS ARE AN INCONVENIENT FORUM. EACH PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SET FORTH IN SECTION 15, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING.

**SECTION 13.**    *Waiver of Jury Trial*. EACH OF THE COMPANY AND THE INVESTORS HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT ANY OF THE OTHER TRANSACTION DOCUMENTS OR THE SHARES, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS. EACH OF THE PARTIES HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND (II) ACKNOWLEDGES THAT EACH OTHER PARTY HERETO HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND ANY OF THE OTHER TRANSACTION DOCUMENTS, BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

**SECTION 14.** *Assignability*. This Agreement or any of the rights, interests or obligations hereunder shall not be assigned by any of the parties hereto without the prior written consent of the other parties hereto; provided that Grand Prix may assign any or all of its rights and/or delegate any or all of its obligations hereunder to (a) any successor to all or substantially all of its business or assets, (b) any of its Affiliates or (c) any Affiliates of Apollo Investment Corporation, a Maryland corporation and the sole member of Grand Prix. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, legal representatives and heirs. Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective successors and assigns, legal representatives and heirs, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**SECTION 15.** *Notices*. All notices, demands and other communications provided for or permitted hereunder shall be made in writing and shall be by registered or certified first-class mail, return receipt requested, via facsimile (with receipt confirmed), courier service or personal delivery:

(a)    if to the Company or Grand Prix:

c/o Apollo Investment Corporation
9 West 57th Street, 14th Floor
New York, New York 10019
Facsimile: (212) 515-3467
Attention: Aaron N. Sack

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Facsimile: (212) 735-2000
Attention: Mark C. Smith, Esq.

(b)    if to any other Investor, at the address for such Person on file with the Company;

(c)    or to such other address or addresses as shall have been furnished in writing to the other parties hereto. Each Investor agrees, at all times, to provide the Company with an address for notices hereunder. All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; when delivered by courier, if delivered by commercial overnight courier service; if mailed, five (5) Business Days after being deposited in the mail, postage prepaid; or if sent by facsimile, when receipt is acknowledged.

**SECTION 16.** *Modification*. Except as otherwise provided herein, neither this Agreement nor any provision hereof shall be modified, amended, discharged or terminated except by an instrument in writing signed by each of the parties hereto.

11

SECTION 17. *Waivers*. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof. The failure or delay of any party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

SECTION 18. *Entire Agreement*. This Agreement (including the Exhibits and Schedules hereto) and the other Transaction Documents (including the exhibits and schedules thereto) constitute the entire agreement among the undersigned with respect to the subject matter contained herein and therein and supersedes any and all prior agreements or understandings, oral or written, among any or all of the undersigned relating to such subject matter.

SECTION 19. *Signatures; Counterparts*. Facsimile transmissions of any executed original document and/or retransmission of any executed facsimile transmission shall be deemed to be the same as the delivery of an executed original. At the request of any party hereto, the other parties hereto shall confirm facsimile transmissions by executing duplicate original documents and delivering the same to the requesting party or parties. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 20. *Specific Performance*. The parties hereto agree that the breach by any party hereto of the provisions of this Agreement would result in substantial damage to the other parties hereto which would be difficult, if not impossible, to ascertain, and by reason of that fact the parties hereto agree that in the event of any such breach, the non-breaching parties shall have the right to enforce this Agreement by injunction or other proceeding in equity without the posting of a bond or other security.

SECTION 21. *Severability*. If any one or more of the provisions contained in this Agreement, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions of this Agreement. The parties hereto further agree to replace such invalid, illegal or unenforceable provision of this Agreement with a valid, legal and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid, illegal or unenforceable provision.

SECTION 22. *Additional Actions and Documents*. Each of the parties hereto shall take or cause to be taken such further actions, execute, acknowledge, seal and deliver or cause to be executed, acknowledged, sealed and delivered such further instruments and documents and use such party's reasonable efforts to obtain such requisite consents as any other party hereto may from time to time reasonably request in order to fully effectuate the purposes and fulfill the content of this Agreement and the other Transaction Documents.

12

**SECTION 23.** *Interpretation*. In this Agreement, unless the context clearly indicates otherwise:

(a)     words used in the singular include the plural and words in the plural include the singular;

(b)     reference to any Person includes such Person's successors and assigns, but only if such successors and assigns are permitted by this Agreement;

(c)     reference to any gender includes the other gender;

(d)     the word "including" (and with correlative meaning "include") shall mean "including but not limited to" or "including without limitation;"

(e)     reference to any Section, Exhibit or Schedule shall mean such Section of, or such Exhibit or Schedule to, this Agreement, as the case may be, and reference in any Section or definition to any clause shall mean such clause of such Section or definition;

(f)     the words "herein," "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Section or other provision hereof;

(g)     reference to any agreement, instrument or other document shall mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and by this Agreement;

(h)     reference to any law (including statutes and ordinances) shall mean such law (including all rules and regulations promulgated thereunder) as amended, modified, codified or reenacted, in whole or in part, and in effect at the time of determining compliance or applicability;

(i)     relative to the determination of any period of time, "from" shall mean "from and including," "to" shall mean "to but excluding" and "through" shall mean "through and including;"

(j)     in the event of any conflict between the provisions of the body of this Agreement and the Schedules hereto, the provisions of the body of this Agreement shall control;

(k)     all references to "dollars" or "$" shall mean United States Dollars unless otherwise specifically indicated; and

(l)     the headings of Sections contained in this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of or to affect the meaning or interpretation of this Agreement.

*[Remainder of page left blank intentionally]*

629301.12-New York Server 6A - MSW

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

INNKEEPERS USA TRUST
(f/k/a GRAND PRIX ACQUISITION TRUST)

By: _____
Name: Aaron Sack
Title: Vice President


GRAND PRIX HOLDINGS LLC

By: _____
Name: Aaron Sack
Title: Vice President and Secretary


MANAGEMENT INVESTORS:


_____
DENNIS M. CRAVEN


_____
MARK A. MURPHY


_____
TIMOTHY WALKER

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

INNKEEPERS USA TRUST
(f/k/a GRAND PRIX ACQUISITION TRUST)

By: _____
    Name:  Aaron Sack
    Title:   Vice President


GRAND PRIX HOLDINGS LLC

By: _____
    Name:  Aaron Sack
    Title:   Vice President and Secretary


MANAGEMENT INVESTORS:

_____
DENNIS M. CRAVEN


_____
MARK A. MURPHY


_____
TIMOTHY WALKER

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

INNKEEPERS USA TRUST
(f/k/a GRAND PRIX ACQUISITION TRUST)

By: _____
    Name:  Aaron Sack
    Title:    Vice President


GRAND PRIX HOLDINGS LLC

By: _____
    Name:  Aaron Sack
    Title:    Vice President and Secretary


**MANAGEMENT INVESTORS:**

_____
**DENNIS M. CRAVEN**

_____
**MARK A. MURPHY**

_____
**TIMOTHY WALKER**

*[Signature Page to Subscription Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first above written.

**INNKEEPERS USA TRUST**
**(f/k/a GRAND PRIX ACQUISITION TRUST)**

By: ______________________
Name: Aaron Sack
Title: Vice President

**GRAND PRIX HOLDINGS LLC**

By: ______________________
Name: Aaron Sack
Title: Vice President and Secretary

**MANAGEMENT INVESTORS:**

______________________
**DENNIS M. CRAVEN**

______________________
**MARK A. MURPHY**

______________________
**TIMOTHY WALKER**

*[Signature Page to Subscription Agreement]*

## Schedule A for Mark A. Murphy

| Investor | Series A Preferred Shares | Purchase Price for Series A Preferred Shares | Common Shares | Purchase Price for Common Shares |
|---|---|---|---|---|
| Grand Prix Holdings LLC | 2,989,431 | $74,735,775* | 13,326,423 (including 1,000 shares previously issued but funded on the date hereof) | $133,264,230* |
| **Management Investors:** | | | | |
| Mark A. Murphy | 3,775 | $94,375 | 15,564 | $155,640 |

---

\*   Grand Prix Holdings LLC aggregate consideration of $208,000,005 for all Common Shares and Series A Preferred Shares consists of (a) $162,451,600 in cash and (b) certain monies guaranteed by Apollo Investment Corporation on behalf of Grand Prix Holdings LLC, net of certain cash payments to be received by Grand Prix Holdings LLC for a sum of $45,548,405.

## Schedule A for Dennis M. Craven

| Investor | Series A Preferred Shares | Purchase Price for Series A Preferred Shares | Common Shares | Purchase Price for Common Shares |
|---|---|---|---|---|
| Grand Prix Holdings LLC | 2,989,431 | $74,735,775* | 13,326,423 (including 1,000 shares previously issued but funded on the date hereof) | $133,264,230* |
| **Management Investors:** | | | | |
| Dennis M. Craven | 2,265 | $56,625 | 9,337 | $93,370 |

---

\*    Grand Prix Holdings LLC aggregate consideration of $208,000,005 for all Common Shares and Series A Preferred Shares consists of (a) $162,451,600 in cash and (b) certain monies guaranteed by Apollo Investment Corporation on behalf of Grand Prix Holdings LLC, net of certain cash payments to be received by Grand Prix Holdings LLC for a sum of $45,548,405.

## Schedule A for Timothy Walker

| Investor | Series A Preferred Shares | Purchase Price for Series A Preferred Shares | Common Shares | Purchase Price for Common Shares |
|---|---|---|---|---|
| Grand Prix Holdings LLC | 2,989,431 | $74,735,775* | 13,326,423 (including 1,000 shares previously issued but funded on the date hereof) | $133,264,230* |
| **Management Investors:** | | | | |
| Timothy Walker | 4,529 | $113,225 | 18,676 | $186,760 |

---

\* Grand Prix Holdings LLC aggregate consideration of $208,000,005 for all Common Shares and Series A Preferred Shares consists of (a) $162,451,600 in cash and (b) certain monies guaranteed by Apollo Investment Corporation on behalf of Grand Prix Holdings LLC, net of certain cash payments to be received by Grand Prix Holdings LLC for a sum of $45,548,405.

## Capital Stock of the Company

| Type | Amount Outstanding |
|------|--------------------|
| Common Shares | 13,370,000 shares |
| Series A Preferred Shares | 3,000,000 shares |
| Series C Preferred Shares | 5,800,000 shares |
| Options | 406,045 options for Common Shares |
| Restricted Common Shares | 45,000 restricted Common Shares |
| Warrants, Subscriptions | None |
| Other | None |

**Exhibit A**

## Form of Option Agreement

See attached.

**Exhibit B**

# Form of Share Option Plan

See attached.

**Exhibit C**

## Form of Shareholders Agreement

See attached.

## Exhibit F

# GRAND PRIX ACQUISITION TRUST

## ARTICLES SUPPLEMENTARY

### 8.0% SERIES C CUMULATIVE PREFERRED SHARES
#### (liquidation preference $25.00 per share)

Grand Prix Acquisition Trust, a Maryland real estate investment trust (the "Company"), hereby certifies to the State Department of Assessments and Taxation of Maryland that:

FIRST:     Under a power contained in Article VI of the Amended and Restated Declaration of Trust of the Company (the "Declaration of Trust"), the Board of Trustees of the Company (the "Board of Trustees"), by resolution duly adopted by unanimous written consent classified and designated 5,800,000 Preferred Shares (as defined in the Declaration of Trust) as 8.0% Series C Cumulative Preferred Shares, $.01 par value per share, with the following preferences and other rights, voting powers, restrictions, limitations as to dividends and other distributions, qualifications and terms and conditions of redemption, which, upon any restatement of the Declaration of Trust, shall be deemed to be part of Article VI of the Declaration of Trust with any necessary or appropriate renumbering or relettering of the sections or substitutions hereof:

### 8.0% SERIES C CUMULATIVE PREFERRED SHARES

**A.    TERMS OF THE 8.0% SERIES C CUMULATIVE PREFERRED SHARES.**

1.    **Designation and Number**.  A series of Preferred Shares, designated the "8.0% Series C Cumulative Preferred Shares of Beneficial Interest" (the "Series C Preferred Shares"), is hereby established.  The maximum number of authorized Series C Preferred Shares shall be 5,800,000.

2.    **Rank**.  The Series C Preferred Shares will, with respect to dividend rights and rights upon liquidation, dissolution or winding up of the Company, rank (a) prior or senior to any class or series of Common Shares (as defined in the Declaration of Trust) of the Company and any other class or series of equity securities of the Company, if the holders of Series C Preferred Shares shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up in preference or priority to the holders of shares of such class or series ("Junior Shares"); (b) on a parity with any class or series of equity securities of the Company if, pursuant to the specific terms of such class or series of equity securities, the holders of such class or series of equity securities and the Series C Preferred Shares shall be entitled to the receipt of dividends and of amounts distributable upon liquidation, dissolution or winding up in proportion to their respective amounts of accrued and unpaid dividends per share or liquidation preferences, without preference or priority one over the other ("Parity Shares"); (c) junior to any class or series of equity securities of the Company if, pursuant to the specific terms of such class or series, the holders of such class or series shall be

entitled to the receipt of dividends or amounts distributable upon liquidation, dissolution or winding up in preference or priority to the holders of the Series C Preferred Shares ("Senior Shares"); and (d) junior to all existing and future indebtedness of the Company. The term "equity securities" does not include convertible debt securities, which will rank senior to the Series C Preferred Shares prior to conversion.

3.    **Dividends.**

(a)    Holders of Series C Preferred Shares shall be entitled to receive, when and as authorized by the Board of Trustees and declared by the Company, out of funds of the Company legally available for payment, cash dividends at the rate of 8.0% per annum of the $25 liquidation preference (equivalent to $2.00 per annum per share). Such dividends shall be cumulative from the date of original issue, whether or not in any dividend period or periods (i) such dividends shall be declared, (ii) there shall be funds of the Company legally available for the payment of such dividends or (iii) any agreement of the Company prohibits payment of such dividends, and shall be payable quarterly on or before the last Tuesday of January, April, July and October of each year (or, if not a business day, the next succeeding business day, each a "Dividend Payment Date") for the period ending on such Dividend Payment Date. "Business day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close. Any dividend payable on the Series C Preferred Shares for any partial dividend period will be computed on the basis of twelve 30-day months and a 360-day year. Dividends will be payable in arrears to holders of record as they appear on the share records of the Company at the close of business on the last Friday of March, June, September and December immediately preceding such Dividend Payment Date. Holders of Series C Preferred Shares shall not be entitled to receive any dividends in excess of cumulative dividends on the Series C Preferred Shares. No interest shall be paid in respect of any dividend payment or payments on the Series C Preferred Shares that may be in arrears.

(b)    When dividends are not paid in full upon the Series C Preferred Shares or any other class or series of Parity Shares, or a sum sufficient for such payment is not set apart, all dividends declared upon the Series C Preferred Shares and any other class or series of Parity Shares shall be declared ratably in proportion to the respective amounts of dividends accumulated, accrued and unpaid on the Series C Preferred Shares and accumulated, accrued and unpaid on such Parity Shares. Except as set forth in the preceding sentence, unless dividends on the Series C Preferred Shares equal to the full amount of accumulated, accrued and unpaid dividends have been or contemporaneously are declared and paid, or declared and a sum sufficient for the payment thereof set apart for such payment for all past dividend periods, no dividends shall be declared or paid or set aside for payment by the Company with respect to any class or series of Parity Shares. Unless full cumulative dividends on the Series C Preferred Shares have been paid or declared and set apart for payment for all past dividend periods, no dividends (other than dividends paid in Junior Shares or options, warrants or rights to subscribe for or purchase Junior Shares) shall be declared or paid or set apart for payment by the Company with respect to any Junior Shares, nor shall any Junior Shares or Parity Shares be redeemed,

purchased or otherwise acquired (except for purposes of an employee benefit plan) for any consideration, or any monies be paid to or made available for a sinking fund for the redemption of any Junior Shares or Parity Shares (except by conversion or exchange for Junior Shares, or options, warrants or rights to subscribe for or purchase Junior Shares), nor shall any other cash or property be paid or distributed to or for the benefit of holders of Junior Shares. Notwithstanding the above, the Company shall not be prohibited from (i) declaring or paying or setting apart for payment any dividend or distribution on any Parity Shares or (ii) redeeming, purchasing or otherwise acquiring any Parity Shares, in each case, if such declaration, payment, redemption, purchase or other acquisition is necessary to maintain the Company's qualification as a real estate investment trust under Sections 856 through 860 of the Internal Revenue Code of 1986, as amended (the "Code").

(c)     No dividends on Series C Preferred Shares shall be authorized by the Board of Trustees or declared or paid or set apart for payment by the Company at such time as the terms and provisions of any agreement of the Company, including any agreement relating to its indebtedness, prohibits such declaration, payment or setting apart for payment or provides that such declaration, payment or setting apart for payment would constitute a breach thereof or a default thereunder, or if such declaration or payment shall be restricted or prohibited by law.

(d)     If, for any taxable year, the Company elects to designate as "capital gain dividends" (as defined in Section 857 of the Code) any portion (the "Capital Gains Amount") of the dividends (as determined for federal income tax purposes) paid or made available for the year to holders of all classes of shares (the "Total Dividends"), then the portion of the Capital Gains Amount that shall be allocable to the holders of Series C Preferred Shares shall be the amount that the total dividends (as determined for federal income tax purposes) paid or made available to the holders of the Series C Preferred Shares for the year bears to the Total Dividends. The Company may elect to retain and pay income tax on its net long-term capital gains. In such a case, the holders of Series C Preferred Shares would include in income their appropriate share of the Company's undistributed long-term capital gains, as designated by the Company.

(e)     In determining whether a distribution (other than upon voluntary or involuntary liquidation, dissolution or winding up of the Company), by dividend, redemption or otherwise, is permitted, amounts that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the Liquidation Preference (as defined below) will not be added to the Company's total liabilities.

4.     **Liquidation Preference**.

(a)     Upon any voluntary or involuntary liquidation, dissolution or winding up of the Company, before any payment or distribution by the Company shall be made to or set apart for the holders of any Junior Shares, the holders of Series C Preferred Shares shall be entitled to receive a liquidation preference of $25 per share (the "Liquidation Preference"), plus an amount equal to all accumulated, accrued and unpaid dividends

3

(whether or not earned or declared) to the date of final distribution to such holders, but such holders, as such, shall not be entitled to any further payment. Until the holders of the Series C Preferred Shares have been paid the Liquidation Preference in full, plus an amount equal to all accumulated, accrued and unpaid dividends (whether or not earned or declared) to the date of final distribution to such holders, no payment shall be made to any holder of Junior Shares upon the liquidation, dissolution or winding up of the Company.

(b)     If upon any liquidation, dissolution or winding up of the Company, the assets of the Company, or proceeds thereof, distributable among the holders of Series C Preferred Shares shall be insufficient to pay in full the above described preferential amount and liquidating payments on any other class or series of Parity Shares, then such assets, or the proceeds thereof, shall be distributed among the holders of Series C Preferred Shares and any such other Parity Shares ratably in the same proportion as the respective amounts that would be payable on such Series C Preferred Shares and any such other Parity Shares if all amounts payable thereon were paid in full.

(c)     A voluntary or involuntary liquidation, dissolution or winding up of the Company shall not include a consolidation or merger of the Company with or into one or more entities, a sale or transfer of all or substantially all of the Company's assets, or a statutory share exchange.

(d)     Upon any liquidation, dissolution or winding up of the Company, after payment shall have been made in full to the holders of Series C Preferred Shares and any Parity Shares, any other series or class or classes of Junior Shares shall be entitled to receive any and all assets remaining to be paid or distributed, and the holders of the Series C Preferred Shares and any Parity Shares shall not be entitled to share therein.

5.    **Redemption**.

(a)     Series C Preferred Shares shall not be redeemable prior to January 20, 2009. However, in order to ensure that the Company will continue to meet the requirement for qualification as a REIT, the Series C Preferred Shares will be subject to the provisions of Article VII of the Company's Declaration of Trust pursuant to which any series of Preferred Shares owned by a shareholder in excess of 9.8% of the number of outstanding shares of such series of Preferred Shares (the "Ownership Limit") will automatically be deemed "Shares-in-Trust" (as defined in such Article VII). On and after January 20, 2009, the Company may redeem Series C Preferred Shares, in whole or from time to time in part, at a cash redemption price equal to 100% of the Liquidation Preference plus all accrued and unpaid dividends to the date fixed for redemption (the "Redemption Date"). The Redemption Date shall be selected by the Company and shall not be less than 30 days nor more than 60 days after the date notice of redemption is sent by the Company. If full cumulative dividends on all outstanding Series C Preferred Shares have not been paid or declared and set apart for payment, no Series C Preferred Shares may be redeemed unless all outstanding Series C Preferred Shares are simultaneously redeemed; *provided, however,* that the foregoing shall not prevent the

purchase by the Company of Series C Preferred Shares pursuant to Article VII of the Declaration of Trust or otherwise in order to ensure that the Company remains qualified as a REIT for federal income tax purposes. In addition, unless full cumulative dividends on all outstanding Series C Preferred Shares have been paid or declared or set apart for payment, the Company shall not purchase or otherwise acquire directly or indirectly for any consideration, nor shall any monies be paid to or made available for a sinking fund for the redemption of, any Series C Preferred Shares (except by conversion into or exchange for Junior Shares); *provided. however,* that the foregoing shall not prevent the purchase by the Company of Series C Preferred Shares pursuant to Article VII of the Declaration of Trust or otherwise in order to ensure that the Company remains qualified as a REIT for federal income tax purposes.

(b)     Notice of redemption of the Series C Preferred Shares shall be mailed by the Company to each holder of record of the shares to be redeemed by first class mail, postage prepaid at such holder's address as the same appears on the share records of the Company. Any notice which was mailed as described above shall be conclusively presumed to have been duly given on the date mailed whether or not the holder receives the notice. In addition to any information required by law or by the applicable rules of exchange upon which the Series C Preferred Shares may be listed or admitted to trading, each notice shall state: (i) the Redemption Date; (ii) the redemption price; (iii) the number of Series C Preferred Shares to be redeemed; and (iv) the place or places where certificates for such Series C Preferred Shares are to be surrendered for cash. Any such redemption may be made conditional on such factors as may be determined by the Board of Trustees and set forth in the notice of redemption. From and after the Redemption Date, dividends on the shares of Series C Preferred Shares to be redeemed will cease to accrue, such shares shall no longer be deemed to be outstanding and all rights of the holders thereof shall cease (except the right to receive the cash payable upon such redemption).

(c)     The Series C Preferred Shares have no stated maturity and will not be subject to any sinking fund or mandatory redemption provisions except as provided under Article VII of the Declaration of Trust.

(d)     Subject to applicable law and the limitation on purchases when dividends on the Series C Preferred Shares are in arrears, the Company may, at any time and from time to time, purchase any Series C Preferred Shares in the open market, by tender or by private agreement.

(e)     Any Series C Preferred Shares redeemed, purchased or otherwise acquired by the Company in any manner whatsoever shall become authorized but unissued Preferred Shares of the Company and may be reissued or reclassified by the Company in accordance with the applicable provisions of the Declaration of Trust.

6.     **Voting Rights**.

(a)     Holders of the Series C Preferred Shares will not have any voting rights, except as set forth below.

(b)     If and whenever distributions on any Series C Preferred Shares or any series or class of Parity Shares shall be in arrears for six or more quarterly periods (whether or not consecutive), the number of trustees then constituting the Board of Trustees shall be increased by two and the holders of such Series C Preferred Shares (voting together as a single class with all other Parity Shares of any other class or series which is entitled to similar voting rights (the "Voting Preferred Shares")) will be entitled to vote for the election of the two additional trustees of the Company at any annual meeting of shareholders or at a special meeting of the holders of the Series C Preferred Shares and of the Voting Preferred Shares called for that purpose. The Company must call such special meeting upon the request of any holder of record of Series C Preferred Shares. Whenever dividends in arrears on outstanding Series C Preferred Shares and the Voting Preferred Shares shall have been paid and dividends thereon for the current quarterly dividend period shall have been paid or declared and set apart for payment, then the right of the holders of the Series C Preferred Shares to elect such additional two trustees shall cease and the terms of office of such trustees shall terminate and the number of trustees constituting the Board of Trustees shall be reduced accordingly.

(c)     The affirmative vote or consent of at least 66 ⅔% of the votes entitled to be cast by the holders of the outstanding Series C Preferred Shares and the holders of all other classes or series of Preferred Shares entitled to vote on such matters, voting as a single class, will be required to (i) authorize the creation of, the increase in the authorized amount of, or issuance of any shares of any class of Senior Shares or any security convertible into shares of any class of Senior Shares or (ii) amend, alter or repeal any provision of, or add any provision to, the Declaration of Trust, including the Articles Supplementary for the Series C Preferred Shares, if such action would materially adversely affect the voting powers, rights or preferences of the holders of the Series C Preferred Shares. The amendment of the Declaration of Trust to authorize, create, or increase the authorized amount of Junior Shares or any class of Parity Shares, shall not be deemed to materially adversely affect the voting powers, rights or preferences of the holders of Series C Preferred Shares. No such vote of the holders of Series C Preferred Shares as described above shall be required if provision is made to redeem all Series C Preferred Shares at or prior to the time such amendment, alteration or repeal is to take effect, or when the issuance of any such shares or convertible security is to be made, as the case may be.

(d)     With respect to the exercise of the above described voting rights, each Series C Preferred Share shall have one vote per share, except that when any other class or series of Preferred Shares shall have the right to vote with the Series C Preferred Shares as a single class, then the Series C Preferred Shares and such other class or series shall have one vote per $25 of stated Liquidation Preference.

(e)     The foregoing voting provisions will not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be

effected, all outstanding Series C Preferred Shares shall have been redeemed or called for redemption upon proper notice and sufficient funds shall have been deposited in trust to effect such redemption.

7.    **Conversion**.  The Series C Preferred Shares are not convertible into or exchangeable for any other property or securities of the Company.

## B.    EXCLUSION OF OTHER RIGHTS.

Except as may otherwise be required by law, the Series C Preferred Shares shall not have any voting powers, preferences or relative, participating, optional or other special rights, other than those specifically set forth in these Articles Supplementary (as such Articles Supplementary may be amended from time to time) and in the Declaration of Trust.  The Series C Preferred Shares shall have no preemptive or subscription rights, or rights of an objecting shareholder under Title 3, Subtitle 2 of the Maryland General Corporation Law.

## C.    HEADINGS OF SUBDIVISIONS.

The headings of the various subdivisions hereof are for convenience of reference only and shall not affect the interpretation of any of the provisions hereof.

## D.    SEVERABILITY OF PROVISIONS.

If any voting powers, preferences or relative, participating, optional and other special rights of the Series C Preferred Shares or qualifications, limitations or restrictions thereof set forth in these Articles Supplementary (as such Articles Supplementary may be amended from time to time) is invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other voting powers, preferences and relative, participating, optional and other special rights of Series C Preferred Shares and qualifications, limitations and restrictions thereof set forth in these Articles Supplementary (as so amended) which can be given effect without the invalid, unlawful or unenforceable voting powers, preferences or relative, participating, optional or other special rights of Series C Preferred Shares or qualifications, limitations and restrictions thereof shall be given such effect.  None of the voting powers, preferences or relative participating, optional or other special rights of the Series C Preferred Shares or qualifications, limitations or restrictions thereof herein set forth shall be deemed dependent upon any other such voting powers, preferences or relative, participating, optional or other special right of Series C Preferred Shares or qualifications, limitations or restrictions thereof unless so expressed herein.

SECOND:    These Articles Supplementary were duly adopted by the Board of Trustees of the Company in the manner and by the vote required by law.

THIRD:    The Series C Preferred Shares have been classified and designated by the Board of Trustees under the authority contained in the Declaration of Trust.

FOURTH:    These Articles Supplementary shall be effective at the time the State Department of Assessments and Taxation of Maryland accepts these Articles Supplementary for record.

7

\* \* \* \* \* \* \* \*

IN WITNESS WHEREOF, I hereby certify that I, Rick Press, am the President and Treasurer of Grand Prix Acquisition Trust (the "Company") and that as such, I am authorized to execute and file with the State Department of Assessments and Taxation of Maryland these Articles Supplementary on behalf of the Company, and I further certify on behalf of the Company that these Articles Supplementary were authorized by the Board of Trustees by unanimous written consent, and are still in full force and effect as of the date hereof. The undersigned officer acknowledges these Articles Supplementary to be the true act of the Company and, as to all matters or facts required to be verified under oath, the undersigned acknowledges that, to the best of his knowledge, information and belief, the matters and facts set forth herein are true in all material respects and that this statement is made under penalty for perjury.

**GRAND PRIX ACQUISITION TRUST**

By: _____
Rick Press
President and Treasurer

The undersigned, Aaron Sack, the Vice President and Secretary of the Company, hereby certifies that Rick Press is the President and Treasurer of the Company and that the signature set forth above is his genuine signature.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand this 29ᵗʰ day of June , 2007.

_____
Aaron Sack
Vice President and Secretary

**Exhibit G**

# ARTICLES OF AMENDMENT TO

## AMENDED AND RESTATED DECLARATION OF TRUST

### OF

### INNKEEPERS USA TRUST

### (f/k/a GRAND PRIX ACQUISITION TRUST)

### AMENDING THE

### ARTICLES SUPPLEMENTARY FOR

### 12.0% SERIES A CUMULATIVE PREFERRED SHARES

1.      Innkeepers USA Trust (f/k/a Grand Prix Acquisition Trust), a Maryland real estate investment trust (the "Company"), hereby certifies to the State Department of Assessments and Taxation of Maryland that the Amended and Restated Declaration of Trust of the Company (the "Declaration of Trust") is hereby amended so that the Articles Supplementary creating the Series A Cumulative Preferred shares of beneficial interest, $0.01 par value per share (the "Series A Preferred Shares"), as filed with the State Department of Assessments and Taxation of Maryland on June 29, 2007, is deleted in its entirety and replaced with the following:

"FIRST:      Under a power contained in Article VI of the Amended and Restated Declaration of Trust of the Company (the "Declaration of Trust"), the Board of Trustees of the Company (the "Board of Trustees"), by resolution duly adopted by unanimous written consent classified and designated 3,000,000 Preferred Shares (as defined in the Declaration of Trust) as 12.0% Series A Cumulative Preferred Shares, $0.01 par value per share, with the following preferences and other rights, voting powers, restrictions, limitations as to dividends and other distributions, qualifications and terms and conditions of redemption, which, upon any restatement of the Declaration of Trust, shall be deemed to be part of Article VI of the Declaration of Trust with any necessary or appropriate renumbering or relettering of the sections or substitutions hereof:

### INNKEEPERS USA TRUST

### (f/k/a GRAND PRIX ACQUISITION TRUST)

### ARTICLES SUPPLEMENTARY

### 12.0% SERIES A CUMULATIVE PREFERRED SHARES
#### (liquidation preference $25.00 per share)

A.      TERMS OF THE 12.0% SERIES A CUMULATIVE PREFERRED SHARES.

1.     **Designation and Number.**  A series of Preferred Shares, designated the "12.0% Series A Cumulative Preferred Shares of Beneficial Interest" (the "Series A Preferred Shares"), is hereby established.  The maximum number of authorized Series A Preferred Shares shall be 3,000,000.

2.     **Rank.**  The Series A Preferred Shares will, with respect to dividend rights and rights upon liquidation, dissolution or winding up of the Company, rank (a) prior or senior to any class or series of Common Shares (as defined in the Declaration of Trust) of the Company and any other class or series of equity securities of the Company, if the holders of Series A Preferred Shares shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up in preference or priority to the holders of shares of such class or series ("Junior Shares"); (b) on a parity with any class or series of equity securities of the Company if, pursuant to the specific terms of such class or series of equity securities, the holders of such class or series of equity securities and the Series A Preferred Shares shall be entitled to the receipt of dividends and of amounts distributable upon liquidation, dissolution or winding up in proportion to their respective amounts of accrued and unpaid dividends per share or liquidation preferences, without preference or priority one over the other ("Parity Shares"); (c) junior to any class or series of equity securities of the Company if, pursuant to the specific terms of such class or series, the holders of such class or series shall be entitled to the receipt of dividends or amounts distributable upon liquidation, dissolution or winding up in preference or priority to the holders of the Series A Preferred Shares ("Senior Shares"); and (d) junior to all existing and future indebtedness of the Company. The term "equity securities" does not include convertible debt securities, which will rank senior to the Series A Preferred Shares prior to conversion.

3.     **Dividends.**

(a)     Holders of Series A Preferred Shares shall be entitled to receive, when and as authorized by the Board of Trustees and declared by the Company, out of funds of the Company legally available for payment, dividends at the rate of 12.0% per annum of the $25.00 liquidation preference (equivalent to $3.00 per annum per share).  Such dividends shall be cumulative from the date of original issue, whether or not in any dividend period or periods (i) such dividends shall be declared, (ii) there shall be funds of the Company legally available for the payment of such dividends or (iii) any agreement of the Company prohibits payment of such dividends, and shall be payable quarterly on or before the last Tuesday of January, April, July and October of each year (or, if not a business day, the next succeeding business day, each a "Dividend Payment Date") for the period ending on such Dividend Payment Date.  The first dividend will be payable for the period beginning on the date of the first issuance of Series A Preferred Shares.  "Business day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close.  Any dividend payable on the Series A Preferred Shares for any partial dividend period will be computed on the basis of twelve 30-day months and a 360-day year.  Dividends will be payable in arrears to holders of record as they appear on the share records of the

2

Company at the close of business on the last Friday of March, June, September and December immediately preceding such Dividend Payment Date. Each of such quarterly dividends shall be fully cumulative and shall accrue (whether or not declared), from the first day of the applicable dividend period to and including the end of the Dividend Payment Date. Dividends shall accrue on a daily basis without regard to the occurrence of a Dividend Payment Date and whether or not earned or declared, whether or not there are funds legally available for the payment thereof and whether or not restricted by the terms of any of the Company's indebtedness outstanding at any time. If any dividend (or portion thereof) payable on any Dividend Payment Date is not paid or declared and set apart for payment, the amount of such dividend that is payable and that is not so paid or declared and set aside for payment on such date shall accrue additional dividends at the dividend rate then payable on the Series A Preferred Shares, compounded quarterly, from such date until paid or declared and set aside for payment, and references herein to accrued dividends for any period on the Series A Preferred Shares shall for all purposes include any such compounded additional dividends.

(b)     When dividends are not paid in full upon the Series A Preferred Shares or any other class or series of Parity Shares, or a sum sufficient for such payment is not set apart, all dividends declared upon the Series A Preferred Shares and any other class or series of Parity Shares shall be declared ratably in proportion to the respective amounts of dividends accumulated, accrued and unpaid on the Series A Preferred Shares and accumulated, accrued and unpaid on such Parity Shares. Except as set forth in the preceding sentence, unless dividends on the Series A Preferred Shares equal to the full amount of accumulated, accrued and unpaid dividends have been or contemporaneously are declared and paid, or declared and a sum sufficient for the payment thereof set apart for such payment for all past dividend periods, no dividends shall be declared or paid or set aside for payment by the Company with respect to any class or series of Parity Shares. Unless full cumulative dividends on the Series A Preferred Shares have been paid or declared and set apart for payment for all past dividend periods, no dividends (other than dividends paid in Junior Shares or options, warrants or rights to subscribe for or purchase Junior Shares) shall be declared or paid or set apart for payment by the Company with respect to any Junior Shares, nor shall any Junior Shares or Parity Shares be redeemed, purchased or otherwise acquired (except for purposes of an employee benefit plan) for any consideration, or any monies be paid to or made available for a sinking fund for the redemption of any Junior Shares or Parity Shares (except by conversion or exchange for Junior Shares, or options, warrants or rights to subscribe for or purchase Junior Shares), nor shall any other cash or property be paid or distributed to or for the benefit of holders of Junior Shares. Notwithstanding the above or anything herein to the contrary, the Company shall not be prohibited from (i) in the sole discretion of the Board of Trustees, paying or setting apart for payment any dividends on the Series C Preferred Shares (as defined in the Declaration of Trust), irrespective of whether any dividends have been paid or set apart on the Series A Preferred Shares, (ii) declaring or paying or setting apart for payment any dividend or distribution on any Parity Shares or (iii) redeeming, purchasing or otherwise acquiring any Parity Shares, in the case of clauses (ii) or (iii) hereof, if such declaration, payment, redemption, purchase or other acquisition is necessary to maintain the Company's qualification as a real estate investment trust under

3

Sections 856 through 860 of the Internal Revenue Code of 1986, as amended (the "Code").

(c)     No dividends on Series A Preferred Shares shall be authorized by the Board of Trustees or declared or paid or set apart for payment by the Company at such time as the terms and provisions of any agreement of the Company, including any agreement relating to its indebtedness, prohibits such declaration, payment or setting apart for payment or provides that such declaration, payment or setting apart for payment would constitute a breach thereof or a default thereunder, or if such declaration or payment shall be restricted or prohibited by law.

(d)     If, for any taxable year, the Company elects to designate as "capital gain dividends" (as defined in Section 857 of the Code) any portion (the "Capital Gains Amount") of the dividends (as determined for federal income tax purposes) paid or made available for the year to holders of all classes of shares (the "Total Dividends"), then the portion of the Capital Gains Amount that shall be allocable to the holders of Series A Preferred Shares shall be the amount that the total dividends (as determined for federal income tax purposes) paid or made available to the holders of the Series A Preferred Shares for the year bears to the Total Dividends. The Company may elect to retain and pay income tax on its net long-term capital gains. In such a case, the holders of Series A Preferred Shares would include in income their appropriate share of the Company's undistributed long-term capital gains, as designated by the Company.

(e)     In determining whether a distribution (other than upon voluntary or involuntary liquidation, dissolution or winding up of the Company), by dividend, redemption or otherwise, is permitted, amounts that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the Liquidation Preference (as defined below) will not be added to the Company's total liabilities.

4.     **Liquidation Preference.**

(a)     Upon any voluntary or involuntary liquidation, dissolution or winding up of the Company, before any payment or distribution by the Company shall be made to or set apart for the holders of any Junior Shares, the holders of Series A Preferred Shares shall be entitled to receive a liquidation preference of $25.00 per share (the "Liquidation Preference"), plus an amount equal to all accumulated, accrued and unpaid dividends (whether or not earned or declared) to the date of final distribution to such holders. Until the holders of the Series A Preferred Shares have been paid the Liquidation Preference in full, plus an amount equal to all accumulated, accrued and unpaid dividends (whether or not earned or declared) to the date of final distribution to such holders, no payment shall be made to any holder of Junior Shares upon the liquidation, dissolution or winding up of the Company. For the avoidance of doubt, the Series A Preferred Shares shall be pari passu with the Series C Preferred Shares in connection with any voluntary or involuntary liquidation, dissolution or winding up of the Company and shall be deemed Parity Shares in connection with the operation of the provisions of this Section 4.

4

(b)     If upon any liquidation, dissolution or winding up of the Company, the assets of the Company, or proceeds thereof, distributable among the holders of Series A Preferred Shares shall be insufficient to pay in full the above described preferential amount and liquidating payments on any other class or series of Parity Shares, then such assets, or the proceeds thereof, shall be distributed among the holders of Series A Preferred Shares and any such other Parity Shares ratably in the same proportion as the respective amounts that would be payable on such Series A Preferred Shares and any such other Parity Shares if all amounts payable thereon were paid in full.

(c)     A voluntary or involuntary liquidation, dissolution or winding up of the Company shall not include a consolidation or merger of the Company with or into one or more entities, a sale or transfer of all or substantially all of the Company's assets, or a statutory share exchange.

(d)     Upon any liquidation, dissolution or winding up of the Company, after payment shall have been made in full to the holders of Series A Preferred Shares and any Parity Shares, any other series or class or classes of Junior Shares shall be entitled to receive any and all assets remaining to be paid or distributed, and the holders of the Series A Preferred Shares and any Parity Shares shall not be entitled to share therein.

5.     **Redemption**.

(a)     In order to ensure that the Company will continue to meet the requirement for qualification as a REIT, the Series A Preferred Shares will be subject to the provisions of Article VII of the Company's Declaration of Trust pursuant to which any series of Preferred Shares owned by a shareholder in excess of 9.8% of the number of outstanding shares of such series of Preferred Shares (the "Ownership Limit") will automatically be deemed "Shares-in-Trust" (as defined in such Article VII).

(b)     Mandatory Redemption. All of the shares of Series A Preferred Shares will be subject to mandatory redemption by the Company, at a redemption price equal to the Liquidation Preference per share, together with accrued and unpaid dividends thereon to the applicable redemption date, in cash out of legally available funds without interest, on the dates set forth below:

i.     Within 90 days following the date of completion of the sale of Junior Shares pursuant to one or more effective registration statements under the Securities Act of 1933, as amended, other than a registration statement relating to Junior Shares issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company (a "Public Offering"), with gross proceeds to the Company of at least $100 million.

ii.     Simultaneously with the consummation of the direct or indirect sale, lease, exchange or other transfer of all or substantially all of the assets of the Company in one or more related transactions to any Person other than an Affiliate (as defined below) of the Company.

5

iii.     Simultaneously with the liquidation, dissolution or winding up of the Company.

(c)     If, for any reason, the Company shall fail to discharge its mandatory redemption obligations pursuant to Section 5(b), such mandatory redemption obligations shall be discharged as soon as the Company is able to discharge each obligation. If and so long as any mandatory redemption obligations with respect to the shares of the Series A Preferred Shares shall not be fully discharged, the Company shall not, directly or indirectly:

i.     declare, pay or set apart for payment any dividend on the Junior Shares (other than dividends payable solely in Junior Shares) or make any payment on account of, or set apart for payment money for, a sinking or similar fund for, the purchase, redemption or other retirement of, any of the Junior Shares or any warrants, rights, calls or options exercisable for or convertible into any of the Junior Shares (other than such acquisitions pursuant to employee or director incentive or benefit plans or arrangements, or in exchange solely for Junior Shares), or make any distribution or exchange in respect thereof, either directly or indirectly, and whether in cash, obligations, or shares of the Company or other property;

ii.     permit any corporation or other entity directly or indirectly controlled by the Company to purchase or redeem Junior Shares, or any warrants, rights, calls or options exercisable into any Junior Shares;

iii.     purchase or redeem fewer than all of the shares of the Series A Preferred Shares then outstanding, other than pro rata among the holders of the Series A Preferred Shares; or

iv.     permit any corporation or other entity directly or indirectly controlled by the Company to purchase any shares of the Series A Preferred Shares;

provided, however, that none of the foregoing shall prevent the purchase by the Company of Series A Preferred Shares pursuant to Article VII of the Declaration of Trust or otherwise in order to ensure that the Company remains qualified as a REIT for federal income tax purposes.

Notwithstanding the foregoing, dividends shall continue to accrue on any mandatory redemption obligation that has not been discharged by the Company pursuant to this Section 5.

(d)     Optional Redemption.  At any time from and after the date of issuance, the Company, at the option of the Board of Trustees, may redeem Series A Preferred Shares, in whole or from time to time in part, at a cash redemption price equal to 100% of the Liquidation Preference plus all accrued and unpaid dividends to the date fixed for redemption (the "Redemption Date"). The Redemption Date shall be selected by the

6

Company and shall not be less than 30 days nor more than 60 days after the date notice of redemption is sent by the Company. If full cumulative dividends on all outstanding Series A Preferred Shares have not been paid or declared and set apart for payment, no Series A Preferred Shares may be redeemed unless all outstanding Series A Preferred Shares are simultaneously redeemed; provided, however, that the foregoing shall not prevent the purchase by the Company of Series A Preferred Shares pursuant to Article VII of the Declaration of Trust or otherwise in order to ensure that the Company remains qualified as a REIT for federal income tax purposes. In addition, unless full cumulative dividends on all outstanding Series A Preferred Shares have been paid or declared or set apart for payment, the Company shall not purchase or otherwise acquire directly or indirectly for any consideration, nor shall any monies be paid to or made available for a sinking fund for the redemption of, any Series A Preferred Shares (except by conversion into or exchange for Junior Shares); provided, however, that the foregoing shall not prevent the purchase by the Company of Series A Preferred Shares pursuant to Article VII of the Declaration of Trust or otherwise in order to ensure that the Company remains qualified as a REIT for federal income tax purposes.

(e)     Procedure for Redemption. Notice of redemption of the Series A Preferred Shares shall be mailed by the Company to each holder of record of the shares to be redeemed by first class mail, postage prepaid at such holder's address as the same appears on the share records of the Company. Any notice which was mailed as described above shall be conclusively presumed to have been duly given on the date mailed whether or not the holder receives the notice. In addition to any information required by law or by the applicable rules of exchange upon which the Series A Preferred Shares may be listed or admitted to trading, each notice shall state:  (i) the Redemption Date; (ii) the redemption price; (iii) the number of Series A Preferred Shares to be redeemed; and (iv) the place or places where certificates for such Series A Preferred Shares are to be surrendered for cash. Any such redemption may be made conditional on such factors as may be determined by the Board of Trustees and set forth in the notice of redemption. From and after the Redemption Date, dividends on the shares of Series A Preferred Shares to be redeemed will cease to accrue, such shares shall no longer be deemed to be outstanding and all rights of the holders thereof shall cease (except the right to receive the cash payable upon such redemption).

(f)     Any Series A Preferred Shares redeemed, purchased or otherwise acquired by the Company in any manner whatsoever shall become authorized but unissued Preferred Shares of the Company and may be reissued or reclassified by the Company in accordance with the applicable provisions of the Declaration of Trust.

6.     **Voting Rights.**

(a)     Holders of the Series A Preferred Shares will not have any voting rights, except as set forth below.

(b)     The affirmative vote or consent of at least 66 ⅔% of the votes entitled to be cast by the holders of the outstanding Series A Preferred Shares and the holders of all

7

other classes or series of Preferred Shares entitled to vote on such matters, voting as a single class, will be required to (i) authorize the creation of, the increase in the authorized amount of, or issuance of any shares of any class of Senior Shares or any security convertible into shares of any class of Senior Shares or (ii) amend, alter or repeal any provision of, or add any provision to, the Declaration of Trust, including these Articles Supplementary (as such Articles Supplementary may be amended from time to time), if such action would materially adversely affect the voting powers, rights or preferences of the holders of the Series A Preferred Shares. The amendment of the Declaration of Trust to authorize, create, or increase the authorized amount of Junior Shares or any class of Parity Shares, shall not be deemed to materially adversely affect the voting powers, rights or preferences of the holders of Series A Preferred Shares. In the event that the holders of at least 66 ⅔% of the votes entitled to be cast by the holders of the outstanding Series A Preferred Shares approve any of the foregoing actions, without a holder's written consent, no such action shall affect adversely such holder's rights hereunder in a discriminatory manner inconsistent with such action's adverse effects on the rights of other holders of the outstanding Series A Preferred Shares. No such vote of the holders of Series A Preferred Shares as described above shall be required if provision is made to redeem all Series A Preferred Shares at or prior to the time such amendment, alteration or repeal is to take effect, or when the issuance of any such shares or convertible security is to be made, as the case may be.

(d)     With respect to the exercise of the above described voting rights, each Series A Preferred Share shall have one vote per share.

(e)     The foregoing voting provisions will not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding Series A Preferred Shares shall have been redeemed or called for redemption upon proper notice and sufficient funds shall have been deposited in trust to effect such redemption.

7.     **Conversion.** The Series A Preferred Shares are not convertible into or exchangeable for any other property or securities of the Company.

## B.     EXCLUSION OF OTHER RIGHTS.

Except as may otherwise be required by law, the Series A Preferred Shares shall not have any voting powers, preferences or relative, participating, optional or other special rights, other than those specifically set forth in these Articles Supplementary (as such Articles Supplementary may be amended from time to time) and in the Declaration of Trust. The Series A Preferred Shares shall have no preemptive or subscription rights, or rights of an objecting shareholder under Title 3, Subtitle 2 of the Maryland General Corporation Law.

## C.     HEADINGS OF SUBDIVISIONS.

The headings of the various subdivisions hereof are for convenience of reference only and shall not affect the interpretation of any of the provisions hereof.

8

## D. SEVERABILITY OF PROVISIONS.

If any voting powers, preferences or relative, participating, optional and other special rights of the Series A Preferred Shares or qualifications, limitations or restrictions thereof set forth in these Articles Supplementary (as such Articles Supplementary may be amended from time to time) is invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other voting powers, preferences and relative, participating, optional and other special rights of Series A Preferred Shares and qualifications, limitations and restrictions thereof set forth in these Articles Supplementary (as so amended) which can be given effect without the invalid, unlawful or unenforceable voting powers, preferences or relative, participating, optional or other special rights of Series A Preferred Shares or qualifications, limitations and restrictions thereof shall be given such effect. None of the voting powers, preferences or relative participating, optional or other special rights of the Series A Preferred Shares or qualifications, limitations or restrictions thereof herein set forth shall be deemed dependent upon any other such voting powers, preferences or relative, participating, optional or other special right of Series A Preferred Shares or qualifications, limitations or restrictions thereof unless so expressed herein.

SECOND:    These Articles Supplementary were duly approved and advised by the Board of Trustees of the Company, and unanimously approved by the holders of all outstanding common shares of beneficial interest of the Company and by the holders of all outstanding Series A Preferred Shares entitled to vote on the matter, in the manner and by the vote required by law.

THIRD:    The Series A Preferred Shares have been classified and designated by the Board of Trustees under the authority contained in the Declaration of Trust.

FOURTH:    These Articles Supplementary shall be effective at the time the State Department of Assessments and Taxation of Maryland accepts these Articles Supplementary for record."

2.    These Articles of Amendment to the Amended and Restated Declaration of Trust of the Company (these "Articles of Amendment") were approved and advised by the Board of Trustees of the Company and unanimously approved by the holders of all outstanding common shares of beneficial interest of the Company and by the holders of all outstanding Series A Preferred Shares entitled to vote on the matter.

9

• • • • • • • • •

IN WITNESS WHEREOF, I hereby certify that I, Aaron Sack, am a Vice President of Innkeepers USA Trust (f/k/a Grand Prix Acquisition Trust) (the "Company") and that as such, I am authorized to execute and file with the State Department of Assessments and Taxation of Maryland these Articles of Amendment on behalf of the Company, and I further certify on behalf of the Company that these Articles of Amendment were approved and advised by the Board of Trustees of the Company and unanimously approved by the holders of all outstanding common shares of beneficial interest of the Company and by the holders of all outstanding Series A Preferred Shares entitled to vote on the matter. The undersigned officer acknowledges these Articles of Amendment to be the true act of the Company and, as to all matters or facts required to be verified under oath, the undersigned acknowledges that, to the best of his knowledge, information and belief, the matters and facts set forth herein are true in all material respects and that this statement is made under penalty for perjury.

INNKEEPERS USA TRUST
(f/k/a GRAND PRIX ACQUISITION TRUST)

By: _____
Aaron Sack
Vice President

The undersigned, Justin Korval, the Assistant Secretary of the Company, hereby certifies that Aaron Sack is the Vice President of the Company and that the signature set forth above is his genuine signature.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand as of the date hereof.

By: _____
Justin Korval
Assistant Secretary

CUST ID:8082010058
WORK ORDER:0001453086
DATE:08-20-2007 03:11 PM
AMT. PAID:$260.00

63653406-New York Server 6A - MSW

# CORPORATE CHARTER APPROVAL SHEET
## **EXPEDITED SERVICE** ** KEEP WITH DOCUMENT **

DOCUMENT CODE _71_   BUSINESS CODE _13_

# _D11860574_

Close _____   Stock _____   Nonstock _____

P.A. _____   Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

||||||||||||||||||||||||||||||||||||||||||||||
1000361995185711

Affix Barcode Label Here
ID # D11860574 ACK # 1000361995185711
LIBER: B01153 FOLIO: 0421 PAGES: 0011
INNKEEPERS USA TRUST

08/20/2007  AT 10:19 A WO # 0001453096

New Name _____

_____

_____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | _100_ |
| Org. & Cap. Fee: | |
| Expedite Fee: | _70_ |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | _30_ |
| Copy Fee: | |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |
| **TOTAL FEES:** | _200_ |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
_____ and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name
_____
_____

_____ Other Change(s)
_____
_____

Code _007_

Attention: _____

Mail: Name and Address
_____

Credit Card _____   Check _✓_   Cash _____

_____ Documents on _____ Checks

Approved By: _____

Keyed By: _____

COMMENT(S):

THE CORPORATION TRUST INCORPORATED
300 E LOMBARD ST.
BALTIMORE              MD 21202-3219

# CERTIFIED COPY MADE

Stamp Work Order and Customer Number HERE

CUST ID:0002010058
WORK ORDER:0001453096
DATE:08-20-2007 03:11 PM
AMT. PAID:$200.00