# EXHIBIT 1

## Disclosure Statement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

## DISCLOSURE STATEMENT FOR DEBTORS' PLANS OF
## REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

James H.M. Sprayregen, P.C.
Paul M. Basta
Stephen E. Hessler
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800

Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Telephone: (312) 862-2000

Counsel to the Debtors and Debtors in Possession

Dated: May 19, 2011

---

[1] The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

| IMPORTANT INFORMATION FOR YOU TO READ |
|---|

**THE DEADLINE TO VOTE ON THE PLAN IS JUNE 17, 2011, AT 5:00 P.M. EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this Disclosure Statement for the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (these plans together, the "Plan") to Holders of Claims and Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. <u>Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.</u>

This Disclosure Statement may not be deemed to provide legal, financial, securities, tax, or business advice. The Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee of the accuracy or completeness of the information contained herein. The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the value of their properties other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement, in the Plan, or in the Plan Supplement should not be relied upon by any Holder of a Claim entitled to vote to accept or reject the Plan.

The Debtors urge every Holder of a Claim or Equity Interest entitled to vote on the Plan to (a) read the entire Disclosure Statement and the Plan carefully, (b) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article VIII of this Disclosure Statement, and (c) consult with its own advisor(s) with respect to reviewing this Disclosure Statement, the Plan, all documents attached hereto or filed in connection herewith and the proposed transactions contemplated under the Plan <u>before</u> deciding whether to vote to accept or reject the Plan.

The Plan contains a series of releases that are part of the overall settlement of various potential Claims and Interests. In that respect, parties should be aware that, if the Plan is confirmed, they will both be getting and giving releases as set forth in Article VIII of the Plan and Article V of this Disclosure Statement.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtors' Chapter 11 Cases and certain documents related to the Plan. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly noted otherwise. The Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation, or waiver. No reliance should be placed on the fact that a particular Claim or potential objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors or Post-

Effective Date Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Debtors are relying on the private placement exemption under section 4(2) of the Securities Act, or Regulation D promulgated thereunder, and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the offering and issuance of new securities pursuant to the Plan from registration under the Securities Act and Blue Sky Law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis set forth in <u>Exhibit C</u>, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate. You should carefully read Article VIII herein titled "Certain Risk Factors to be Considered Prior to Voting."

<u>Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative.</u> The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' Notice and Claims Agent by: (a) visiting http://www.omnimgt.com/innkeepers; (b) writing to Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California, 91436; or (c) calling (866) 989-6147.

**TABLE OF CONTENTS**

Page

**ARTICLE I. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** .......................... 1
    A.      Introduction .......................................................................................................... 1
    B.      Marketing and Bidding Process ............................................................................ 2
    C.      Anaheim and Ontario ........................................................................................... 6
    D.      Summary of the Joint Plans .................................................................................. 7
    E.      Questions and Answers Regarding this Disclosure Statement and the Plan ............... 12

**ARTICLE II. THE DEBTORS' BACKGROUND** ............................................................................. 20
    A.      The Debtors' Business ........................................................................................ 20
    B.      Summary of Prepetition Capital Structure ......................................................... 24

**ARTICLE III. THE CHAPTER 11 CASES** ...................................................................................... 27
    A.      Events Leading to the Chapter 11 Cases ........................................................... 27
    B.      Restructuring Efforts .......................................................................................... 29

**ARTICLE IV. EVENTS OF THE CHAPTER 11 CASES** ................................................................ 32
    A.      First Day Pleadings and Other Case Matters ..................................................... 32
    B.      Stipulation Between the Debtors, LNR, and the Ad Hoc Committee ................. 35
    C.      The LP Bank Account ......................................................................................... 37
    D.      Claims Bar Date .................................................................................................. 37
    E.      Exclusivity .......................................................................................................... 38
    F.      Pending Litigation Proceedings .......................................................................... 39
    G.      The LNR/CRES Litigation ................................................................................. 39
    H.      Deficiency Claims ............................................................................................... 40
    I.      Disputes Regarding Guaranty Claims ................................................................ 40
    J.      The Debtors' Management Team ........................................................................ 42
    K.      The Debtors' Plan Process .................................................................................. 42
    L.      Management Compensation ................................................................................ 49
    M.      Statement of the Creditors Committee ............................................................... 50
    N.      Apollo's Participation in the Chapter 11 Cases .................................................. 50
    O.      Ad Hoc Committee Administrative Claim .......................................................... 51
    P.      County of San Bernardino's Objection ............................................................... 51
    Q.      LBHI's Purchase of SASCO Notes .................................................................... 52

**ARTICLE V. SUMMARY OF THE PLAN** ..................................................................................... 52
    A.      The Plan's Classification Scheme ...................................................................... 52
    B.      Treatment of Unclassified Claims ...................................................................... 55
    C.      Treatment of Claims and Interests ..................................................................... 58
    D.      Special Provisions ............................................................................................... 77
    E.      Means for Implementation of the Plan ............................................................... 77
    F.      Treatment of Executory Contracts and Unexpired Leases ................................ 82
    G.      Provisions Governing Distributions .................................................................... 85
    H.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims .............. 89
    I.      Settlement, Release, Injunction, and Related Provisions ................................... 90
    J.      Midland Release .................................................................................................. 91
    K.      Apollo Release .................................................................................................... 92
    L.      Fixed/Floating Debtors' Plan General Release ................................................... 93
    M.      Anaheim Hotel Debtors' Plan General Release .................................................. 94
    N.      Ontario Hotel Debtors' Plan General Release .................................................... 96
    O.      Remaining Debtors' Plan General Release ......................................................... 97
    P.      Exculpation ......................................................................................................... 98
    Q.      Injunction ............................................................................................................ 99

R. Setoffs ................................................................................................................... 100
S. Severability of Plan and Conditions Precedent to the Effective Date ...................... 100
T. Modification, Revocation, or Withdrawal of the Plan ............................................. 102
U. Retention of Jurisdiction ......................................................................................... 103
V. Miscellaneous Provisions ........................................................................................ 105

**ARTICLE VI. VALUATION AND FINANCIAL PROJECTIONS** ....................................................... **109**
A. Valuation .................................................................................................................. 109
B. Financial Projections ............................................................................................... 109

**ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ...................... **109**
A. Confirmation Hearing .............................................................................................. 109
B. Confirmation Standards ........................................................................................... 110
C. Acceptance by Impaired Classes .............................................................................. 111
D. Confirmation without Acceptance by All Impaired Classes ..................................... 112

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ...................... **113**
A. Certain Bankruptcy Law Considerations .................................................................. 113
B. Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and the
Value of Securities to Be Issued Under the Plan ....................................................... 115
C. Risk Factors that Could Negatively Impact the Debtors' Business ........................... 116
D. Risks Associated with Forward Looking Statements ................................................ 119
E. Disclosure Statement Disclaimer ............................................................................. 120
F. Liquidation Under Chapter 7 ................................................................................... 122

**ARTICLE IX. IMPORTANT SECURITIES LAW DISCLOSURE** ...................................................... **122**
A. Interests of the Post-Effective Date Fixed/Floating Debtors .................................... 122
B. Issuance and Resale of Interests of the Post-Effective Date Fixed/Floating Debtors under
the Plan .................................................................................................................... 122
C. No Registration or Listing of New Interests ............................................................. 123

**ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...................... **123**
A. Certain United States Federal Income Tax Consequences to the Debtors .................. 124
B. Certain United States Federal Income Tax Consequences to the Holders of Allowed
Claims and Interests ................................................................................................ 125
C. Information Reporting and Backup Withholding ...................................................... 131

**ARTICLE XI. RECOMMENDATION OF INNKEEPERS** ............................................................... **132**

**EXHIBITS**

EXHIBIT A        Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code

EXHIBIT B        Financial Projections

EXHIBIT C        Liquidation Analyses

EXHIBIT D        Marriott Adequate Assurance Agreement

EXHIBIT E        Bidding Procedures Order (with Five Mile/Lehman Commitment as exhibit thereto)

EXHIBIT F        Cerberus/Chatham Commitment Letter

EXHIBIT G        Chatham Asset Purchase Agreement

**SCHEDULES**

SCHEDULE 1     Ontario Hotel Mortgage Loan Claims Deed in Lieu of Foreclosure

K&E 18930801

# ARTICLE I.
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

*A.     Introduction*

Innkeepers USA Trust ("**Innkeepers**") and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**"), dated May 19, 2011.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

The Debtors form a consolidated enterprise that owns and operates an expansive portfolio of 71 upscale and mid-priced extended-stay and select-service hotels, consisting of approximately 10,000 rooms, located in 20 states across the United States.  On July 19, 2010, the Debtors filed voluntary petitions for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

As provided in greater detail herein, the economic and operational environment in the global travel and tourism industry over the past several years has devastated the hospitality industry.  During this time, supply also increased within the hospitality industry, exacerbating the negative impact of decreased demand within the industry.  Due to the Debtors' focus on the business consumer, its hotel portfolio has been especially impacted by an overall tightening on corporate travel, training, and relocation expenditures.

As a result of the effects of the economic downturn, the Debtors were forced to dedicate excess cash flow after operations to debt service, causing the Debtors to fall behind on necessary investments in their hard assets and their business generally.  Specifically, certain franchise agreements required the Debtors to make substantial investments in their hotels for which the Debtors did not have the cash or financing.  Failure to perform under the franchise agreements might have caused franchisors to terminate the agreements, which would have had a deleterious effect on the Debtors' entire business model.  As of the Petition Date, a number of franchisors had already provided the Debtors with notices of default under their respective franchise agreements.

The tightening of financial markets frustrated the Debtors' efforts to arrange an out of court restructuring.  In other macroeconomic circumstances, the Debtors may have had the flexibility to refinance maturing loans, extend maturity dates, obtain new financing, or otherwise maintain liquidity.  Given the restrictions of the marketplace, however, the Debtors determined they had no choice but to file for bankruptcy and become debtors in possession.

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, PROVIDES FOR A LARGER DISTRIBUTION TO THE DEBTORS' CREDITORS AND INTEREST HOLDERS THAN WOULD OTHERWISE RESULT FROM LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, AND MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**THE CREDITORS COMMITTEE AND THE AD HOC COMMITTEE OF PREFERRED SHAREHOLDERS ALSO STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

---

[2]  Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

The Debtors have pursued an extensive marketing process for all of their assets, on both enterprise level and non-enterprise level bases.  Over the course of an eight-month process, the Debtors contacted more than 200 potential investors and plan sponsors.  As a result of their robust marketing process, the Debtors received the following bids before the April 25, 2011 bid deadline (the "**Bid Deadline**") established by the Bidding Procedures Order:

- A bid for the 45 hotels that serve as collateral for the Debtors' fixed rate mortgage loan and six of the seven hotels commonly referred to as the "**Seven Sisters**" (which include the five properties that serve as collateral for the mortgage loans for which LNR is special servicer (the "**LNR Properties**"));

- Two bids for the LNR Properties;

- Six bids on multiple assets;

- Six bids on individual assets; and

- a bid for the 45 hotels that serve as collateral for the Fixed Rate Mortgage Loan and the 19 hotels that serve as collateral for the Floating Rate Mortgage Loan (collectively, the "**Fixed/Floating Properties**").

After the Bid Deadline, the Debtors reviewed all timely submitted bids and engaged in negotiations with entities that submitted bids satisfying the bid conditions established by the Bidding Procedures Order.  After a formal auction at which the Debtors accepted the highest or otherwise best bids for the applicable assets, the Debtors reached agreement with two plan sponsors—Cerberus Capital Management, LP ("**Cerberus**") and Chatham Lodging Trust ("**Chatham Trust**" and, together with Cerberus, "**Cerberus/Chatham**") for the Fixed/Floating Properties and Chatham Lodging LP ("**Chatham**") for the LNR Properties.

1.    Fixed/Floating Auction Process

On March 9, 2011, the Fixed/Floating Debtors initially entered into a commitment letter (the "**Five Mile/Lehman Commitment Letter**") with Five Mile Capital II Pooling REIT LLC ("**Five Mile**") and Lehman ALI Inc. ("**Lehman**" and, together with Five Mile, "**Five Mile/Lehman**") and Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the Debtors' fixed rate mortgage loan ("**Midland**") for a stalking horse bid (the "**Five Mile/Lehman Bid**") for the Fixed/Floating Properties, which the Bankruptcy Court approved, in the Bidding Procedures Order, as the stalking horse bid for the Fixed/Floating Properties.

On April 8, 2011, per the agreement embodied in the Five Mile/Lehman Commitment Letter, the Debtors filed the Plan and the *Disclosure Statement for Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1093].

On April 25, 2011, Cerberus/Chatham submitted an overbid that the Debtors deemed a qualified overbid in accordance with the requirements set forth in the Bidding Procedures.  Cerberus/Chatham submitted the only qualified overbid on the Fixed/Floating Properties.

On April 29, 2011, the Debtors named the Cerberus/Chatham overbid the baseline bid for the auction in accordance with the Bidding Procedures (the "**Cerberus/Chatham Baseline Bid**").

Consistent with the Fixed/Floating Bidding Procedures, the Cerberus/Chatham Baseline Bid included only the Fixed/Floating Properties (and none of the Seven Sisters).  The Cerberus/Chatham Baseline Bid was worth $978.7 million (including approximately $622.5 million of debt financing and approximately $356.2 million of equity investment by Cerberus/Chatham).  Under the Cerberus/Chatham Baseline Bid, holders of Fixed Rate Pool Mortgage Loan Claims would have received consideration of $622.5 million in the form of a restructured Fixed Rate

Note and holders of Floating Rate Mortgage Loan Claims would receive consideration of $201.5 million in cash. The Cerberus/Chatham Baseline Bid utilized Midland's "stapled financing."

With the receipt of the Cerberus/Chatham Baseline Bid, the Debtors proceeded with an auction for the Fixed/Floating Properties in accordance with the Bidding Procedures Order on May 2 and 3, 2011. After twelve rounds of competitive bidding between Five Mile/Lehman and Cerberus/Chatham, the Debtors closed the auction for the Fixed/Floating Properties after an unchallenged bid from Cerberus/Chatham valued at approximately $1.12 billion (the "**Cerberus/Chatham Successful Bid**"). The auction process thus yielded approximately $154 million in value over and above the Five Mile/Lehman stalking horse bid.

2.  LNR Properties Auction Process

In the days immediately following the Court's entry of the Bidding Procedures Order, the Debtors continued their efforts to market all of their assets, including the LNR Properties, on both an enterprise level and on an individual property basis, to achieve the most value-maximizing outcome for stakeholders. Moelis & Company LLC ("**Moelis**"), the Debtors' financial advisor, sent to over 125 potential investors a letter summarizing the process by which the Debtors would solicit and evaluate restructuring proposals, both with respect to overbids to the Five Mile/Lehman Bid and additional bids.[3]

As a result of the Debtors' marketing efforts, the Debtors anticipated they might receive bids for the LNR Properties in connection with bids for the Fixed/Floating Properties and that the winning bid at the auction for the Fixed/Floating Properties could encapsulate the LNR Properties. On April 12, 2011 by way of an updated process letter,[4] the Debtors informed all potential bidders of the possibility the Debtors could hold a concurrent auction for the LNR Properties, to the extent the Debtors determined such an auction would be value-maximizing, on May 2, 2011. The Debtors encouraged potential bidders to submit formal bids on or before April 25 (the bid deadline approved in the Bidding Procedures Order with respect to overbids on the Five Mile/Lehman Bid).

Moelis's marketing effort generated several indications of interest for one or more of the LNR Properties. The Debtors next sent ten potential bidders a form asset purchase agreement and requested preliminary mark-ups by April 18, 2011.

On or before April 18, 2011, the Debtors received initial mark-ups of the form asset purchase agreement from eight bidders for the LNR Properties or a subset thereof. Over the next several days, the Debtors reviewed and analyzed the mark-ups and conducted calls with each bidder to discuss their proposed bids, reiterating their request for final, irrevocable bids by April 25.

On or before April 25, 2011, the Debtors received 16 bids (exclusive of the Five Mile/Lehman stalking horse bid) in total, including Cerberus/Chatham's Baseline Bid for the Fixed/Floating Properties and bids for a combination of assets different from those contained in the Five Mile/Lehman Bid and for individual hotels. From April 25, 2011 through May 2, 2011, the Debtors and their advisors analyzed each bid, shared each bid with the official committee of unsecured creditors (the "**Creditors Committee**"), and communicated regularly with bidders to negotiate and resolve open issues.

On May 3, 2011, after concluding the auction for the Fixed/Floating Properties, the Debtors commenced the LNR Auction. Of the bids received for the LNR Properties, the highest and best offer came from Chatham (the "**Chatham Bid**"). With a purchase price of $195 million, the Chatham Bid provided baseline recoveries for all constituents holding claims against or interests in the Debtors that currently own the LNR Properties.

---

[3]  *See Notice of Process Update Letter* [Docket No. 1027].

[4]  *See Notice of Process Update Letter* [Docket No. 1102].

The Debtors received a competing bid of $72 million for two of the LNR Properties: the Doubletree in Washington, D.C. and the Residence Inn in Tyson's Corner, Virginia. The Debtors determined, in their reasonable business judgment, that the Chatham Bid was a higher or otherwise better bid, and closed the auction on the afternoon of May 3, 2011 after no other bids were received.

    3.   Financing Utilized in Successful Bids

The Debtors actively assisted bidders in their efforts to obtain financing to fund all or a portion of their bids. In the months leading up to the Auction, the Debtors contacted 11 potential financing sources to explore their willingness to provide financing to potential purchasers. The prepetition secured creditors—Midland and LNR—were the most willing to provide financing on reasonable terms.

Pursuant to the Five Mile/Lehman Commitment Letter and the commitment between Five Mile and Midland in support thereof (the "**Five Mile/Midland Commitment**"), Midland agreed to make "stapled financing" available to competing bidders submitting qualified bids at the Auction. The amount of Midland financing available to a competing bidder was to be determined by a sliding scale beginning at $622.5 million plus 70% of any overbid amount minus $8 million, provided that the debt-capitalization ratio of the Fixed/Floating Debtors would not exceed 70%.

Similarly, LNR established criteria to make financing available for certain bidders submitting bids on all of the LNR Properties.

At the Auction, the Debtors facilitated meetings between both Midland and Cerberus/Chatham (the only qualified bidder for the Fixed/Floating Hotels other than Five Mile/Lehman), as well as LNR and potential bidders on the LNR Properties, to discuss the terms of the respective financing packages.

Cerberus/Chatham utilized the Midland Financing in its successful bid for the Fixed/Floating Hotels. Specifically, Cerberus/Chatham agreed to enter into a new non-recourse mortgage loan agreement in an amount of approximately $723.8 million that will restructure the prior Fixed Rate Mortgage Loan and that will include, among others, the following key terms:

- a 6.71% interest rate, which is unchanged from the previous mortgage loan;

- a maturity date of July 9, 2017, which is also unchanged from the previous mortgage loan;

- interest-only payments for the first 48 months of the loan; and

- prepayment of the loan is available at par without penalty.

Chatham utilized the LNR Financing in its successful bid for the LNR Properties and agreed to pay down the principal balance of the loans secured by the LNR Properties by no less than the following amounts:

- Garden Grove: $5,000,000.00;

- Mission Valley: $7,000,000.00;

- San Antonio: $5,600,000.00;

- Tysons Corner: $2,000,000.00; and

- Washington, D.C.: $5,400,000.00.

Chatham also agreed to assume the loans secured by the LNR Properties in the following amounts:

- Garden Grove: $32,416,576.45;

- Mission Valley: $40,168,769.26;

- San Antonio: $18,462,695.40;

- Tysons Corner: $23,057,021.67; and

- Washington, D.C.: $20,054,752.20.

4. <u>Agreement with the Ad Hoc Committee</u>

The following is an integrated agreement among the Debtors and the Ad Hoc Committee (the "**Ad Hoc Committee Agreement**") under which, upon its approval in its entirety, the Ad Hoc Committee, among other things, waives any right to challenge the allowability of the Innkeepers USA Trust Preferred A Interests (held by one of the Debtors or otherwise), including any right to object to or seek to subordinate the Innkeepers USA Trust Preferred A Interests, in exchange for the consideration being provided to the Ad Hoc Committee herein.

The distribution provisions under the Remaining Debtor Plan under which, after payment of certain allowed claims, the Innkeepers USA Trust Preferred C Interests share in the $7.4 million of cash, the proceeds of the Chatham Hotel Sale Transaction, and other available assets, shall not be changed adversely to the Innkeepers USA Trust Preferred C Interests absent the consent of the Ad Hoc Committee.

The Ad Hoc Committee will support the Plan and all its provisions and waive all objections to the Plan, provided that the Ad Hoc Committee Agreement is approved in its entirety. Upon any denial of the whole or any part of the Ad Hoc Committee Agreement (the "**Denial Date**"), the Debtors shall withdraw their request for Confirmation of the Remaining Debtor Plan (the "**Initial Confirmation Hearing**") and shall not request Confirmation of the Remaining Debtor Plan again for 30 days (the "**Subsequent Confirmation Hearing**"); <u>provided</u>, the parties will be required to serve any discovery requests within 10 days after the Denial Date, the parties will work in good faith to respond promptly to document requests and deposition notices, and the Court will schedule the Subsequent Confirmation Hearing, without requiring resolicitation of the non-materially modified Remaining Debtor Plan, as close as practicable to (but no earlier than) 31 days after the Denial Date; <u>provided, further,</u> the Debtors will request approval of the Chatham Hotel Sale Transaction immediately following the Denial Date (in accordance with the terms and conditions set forth in the Chatham APA (as defined herein)), without regard to the scheduling of the Subsequent Confirmation Hearing, and the Ad Hoc Committee will support approval of the Chatham Hotel Sale Transaction.

The Remaining Debtor Plan (and only the Remaining Debtor Plan) shall provide that, upon approval of the Ad Hoc Committee Agreement: (i) Holders of Innkeepers USA Trust Preferred C Interests and the Ad Hoc Committee shall be deemed to be Fixed/Floating Releasing Parties, Anaheim Hotel Releasing Parties, and Ontario Hotel Releasing Parties; and (ii) the Ad Hoc Committee shall be a Remaining Debtor Releasing Party. The Ad Hoc Committee will draft a letter in support of the Plan that will be distributed with the Disclosure Statement and other solicitation materials.

Without limiting the scope of the release, exculpation, and injunction provisions of the Plan, the Ad Hoc Committee waives any right in, and will not assert a claim against or interest in, the recovery distributable to Holders of Innkeepers USA Trust Preferred A Interests or any party in interest asserting rights with respect to such recovery, provided that the Ad Hoc Committee Agreement is approved in its entirety. The Innkeepers USA Trust Preferred A Interests shall be treated as pari passu with the Innkeepers USA Trust Preferred C Interests.

The Ad Hoc Committee and its advisors will receive the Ad Hoc Committee Administrative Claim to be paid in the amount of $3.5 million by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) for its role in the Chapter 11 Cases. The amount will be paid on the Effective Date of the Remaining Debtor Plan. The claim for payment shall be deemed an Allowed administrative priority Claim.

The Debtors will support approval of the Ad Hoc Committee Agreement in its entirety.

The Debtors shall enter into exclusive discussions for 30 days with the Ad Hoc Committee regarding the Ad Hoc Committee becoming a stalking horse bidder for the Raleigh JV interest, subject to Bankruptcy Court approval.

To the extent there are any inconsistencies between the terms of the Ad Hoc Committee Agreement as set forth in this Article I.B.4 and elsewhere, the terms of the Ad Hoc Committee Agreement as set forth in this Article I.B.4 shall govern.

*C.*      *Anaheim and Ontario*

Simultaneously with the marketing processes for the Fixed/Floating Hotels and the LNR Properties, the Debtors continued to address restructuring alternatives for the Anaheim Hilton Suites and the Ontario Hilton.

     1.    <u>Anaheim Hilton Suites</u>

As to the Anaheim Hilton Suites, the Debtors initially engaged in an extensive marketing process—generating five proposals for or including the Anaheim property. Subsequently, however, Lehman Brothers Holdings, Inc. ("**LBHI**"), the entity that controls the Anaheim Hotel Mezzanine Loan Agreement, and CWCapital, the special servicer under the Anaheim Hotel Mortgage Loan Agreement, reached an agreement-in-principle to turn over the Anaheim Hilton Suites to LBHI and to consensually resolve all related claims.

LBHI and CWCapital have entered into a commitment letter and term sheet regarding the restructuring of the Anaheim Hotel Debtors. Under that agreement, all of the assets of the Anaheim Hotel Debtors would be transferred, assumed, and assigned to a newly formed holding company controlled by LBHI. The holding company would assume substantially all of the obligations under the Anaheim Hotel Mortgage Loan Agreement (subject to certain exceptions) and CWCapital's Claims would be paid in full in Cash in exchange for releasing its rights, claims, and liens under the Anaheim Hotel Mortgage Loan Agreement and transferring the deed to the Anaheim Hilton Suites to the holding company controlled by LBHI. LBHI has yet to determine the ultimate corporate structure of the holding company, but will have complete authority and control over the management and operations of the Anaheim Hilton Suites. The entry into and execution of the restructuring contemplated by the commitment letter and the term sheet are conditioned on the avoidance of certain termination events including the following: (a) LBHI's receipt of and satisfaction with certain due diligence materials; (b) failure to gain entry of an order confirming the Plan with respect to the Anaheim Hotel Debtors on or before July 31, 2011; (c) the dismissal or conversion of the Anaheim Hotel Debtors' chapter 11 cases; or (d) the termination of exclusivity for any of the Anaheim Hotel Debtors unless supported by LBHI and CWCapital. If the commitment letter or term sheet is terminated before LBHI's review of the due diligence is complete or if the due diligence is not acceptable to LBHI, CWCapital and LBHI agree in principle to sell the Anaheim property for Cash through an auction for cash following a 45-day marketing process.

     2.    <u>Ontario Hilton</u>

As to the Ontario Hilton, C-III, the special servicer under the Ontario Hilton Mortgage Loan, has agreed to take the Ontario Hilton and make a cash distribution to fund a small percentage recovery for the unsecured creditors with claims related to the Ontario Hilton.

*D.*     *Summary of the Joint Plans*

The Plan contemplates four separate Joint Plans of reorganization that together provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases.[5]  Among other things, the Plan also provides for the following recoveries and other transactions:

1.     Joint Plan for the Fixed/Floating Debtors

The Fixed/Floating Debtors are primarily Debtors related to the hotels serving as collateral for the Fixed Rate Pool Mortgage Loan and the Floating Rate Pool Mortgage Loan.  The Joint Plan for the Fixed/Floating Debtors (the "**Fixed/Floating Plan**") contemplates the recapitalization of the Fixed/Floating Debtors through debt conversion and infusions of new capital.  The Fixed/Floating Plan reflects the results of the Auction held on May 3, 2011, at which Cerberus and Chatham Trust proposed a successful bid valued at approximately $1.12 billion.

- Cerberus and Chatham Trust will together contribute approximately $400.5 million in cash as an equity investment to fund distributions pursuant to the Fixed/Floating Plan and the post-emergence operations of the Fixed/Floating Debtors.

- Postpetition secured lender Claims:

  o The $17.5 million postpetition credit facility provided by an affiliate of Lehman (the "**Lehman DIP Facility**") will be repaid in full in Cash; and

  o Tranche A of the $53.0 million postpetition credit facility provided by Five Mile (the "**Five Mile DIP Facility**" and, together with the Lehman DIP Facility, the "**DIP Facilities**"), which tranche is secured by liens on hotels owned or operated by the Fixed/Floating Debtors, will be repaid in full in Cash.

- Prepetition secured lender Claims:

  o Midland, the Debtors' largest creditor, will receive (a) a new note reducing principal amount owing under the Fixed Rate Mortgage Pool Loan from $825.4 million to approximately $723.8 million with no change to the interest rate, no amortization for the first 48 months after the Effective Date, and no prepayment penalty, (b) approximately $12.8 million in Cash; and

  o Lehman, the Debtors' second-largest creditor, will receive a Cash payment of approximately $233.5 million.

- Certain other Claims and Interests:

  o Holders of Floating Rate Pool Mezzanine Loan Claims will receive a Cash payment of approximately $2.36 million;

  o Each Holder of General Unsecured Claims against the Fixed/Floating Debtors will receive its Pro Rata share of $4.75 million (excluding any deficiency Claims), with Holders of such Claims against Debtor Grand Prix West Palm Beach LLC receiving only their Pro Rata share of $100,000;

---

[5]     Each of the Joint Plans discussed herein is severable from each other and the Confirmation and Consummation of any one of the four Joint Plans is not conditioned on the Confirmation or Consummation of any one or more of the other Joint Plans.

- Each Holder of General Unsecured Claims against the Fixed/Floating Debtors will receive a release and waiver by the Reorganized Fixed/Floating Debtors of all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code;

- Intercompany Claims and Interests will not receive any distributions and will be canceled, except that the Debtors may reinstate Intercompany Interests to the extent necessary to preserve certain elements of the Fixed/Floating Debtors' organizational structure; and

- There will be no distribution to Holders of existing common or preferred equity interests in the Fixed/Floating Debtors.

- The Fixed/Floating Plan provides for mutual releases by the following parties in their respective capacities as such: (a) the Lehman DIP Lenders; (b) Five Mile; (c) the Five Mile DIP Agent; (d) the Five Mile DIP Lenders; (e) the Debtors (other than Grand Prix Holdings LLC solely with respect to any guaranty Claims of Midland, Lehman, LCPI, or SASCO); (f) Lehman; (g) New HoldCo and each of the Fixed/Floating Plan Sponsors; (h) Midland; (i) the master servicer for the C6 and C7 Trusts; (j) trustees for the C6 and C7 Trusts; (k) the C6 and C7 Trusts; (l) TriMont, in its capacity as special servicer for the Floating Rate Pool Mezzanine Loan Agreement; (m) Apollo; (n) the Committee; (o) the Independent Committee; (p) SASCO, as holder of 100% of the economic and beneficial interests under the Floating Rate Pool Mezzanine Loan Agreement; (q) LCPI, as administrative agent for SASCO with respect to the Floating Rate Pool Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO; (r) Island Hospitality Management, Inc. ("**Island**"); (s) all other Holders of Claims against or Interests in the Fixed/Floating Debtors; (t) the officers, directors, trustees, and members of the Debtors; and (u) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals. For the avoidance of doubt, certificateholders in the C6 and C7 Trusts, in their capacity as such, are not Fixed/Floating Releasing Parties. Certain qualifications to these releases relating to applicable pooling and servicing agreements are set forth in Article V.L herein.

- As described in Article IV.M below, the Plan also provides for Midland to release Apollo in exchange for a Cash payment by the Debtors to Midland of $3.0 million. This release will be effective upon the receipt of the $3.0 million Cash payment, which will be made on the Effective Date of the Fixed/Floating Plan.

- The Plan also provides for a Cash payment of $2.5 million by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland as consideration for effecting the restructuring of the Fixed Rate Pool Mortgage Loan Agreement on behalf of the C6 and C7 Trusts.

2. <u>Joint Plan for the Anaheim Hotel Debtors</u>

The Anaheim Hotel Debtors are the Debtors that finance, own, and lease the Hilton Suites hotel in Anaheim, California (the "**Anaheim Hotel**").

The Joint Plan for the Anaheim Hotel Debtors contemplates the following:

- Mortgage and Mezzanine Claims:

  - Holders of Secured Anaheim Hotel Mortgage Loan Claims will, in accordance with the Anaheim Hotel Commitment Letter, either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, have the Anaheim Hotel Mortgage Loan Agreement assumed, amended, restated, and/or supplemented by New Anaheim

HoldCo, in accordance with and as modified by the terms and conditions set forth in the Anaheim Hotel Commitment Letter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution will be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors;

  o Holders of Secured Anaheim Hotel Mezzanine Loan Claims will receive the following: (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, all of the assets of the Anaheim Hotel Debtors will be transferred, conveyed, assumed, and assigned to the New Anaheim HoldCo; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred (as defined in the Anaheim Hotel Commitment Letter), a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution will be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors; and

  o Anaheim Hotel Mezzanine Loan Deficiency Claims will receive no distribution;

- Unsecured Claims

  o Holders of General Unsecured Claims against the Anaheim Hotel Debtors will be paid in full on the Effective Date or as soon as reasonably practical thereafter; provided, however that, if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, such Holders will receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution will be made in accordance with the Distribution Waterfall; and

  o Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor will receive no distribution and will be canceled.

- Intercompany Claims and Interests

  o Intercompany Claims in the Anaheim Hotel Debtors will receive no distribution and will be canceled, released, and extinguished as of the Effective Date; and

  o Intercompany Interests in the Anaheim Hotel Debtors will be canceled, released, and extinguished as of the Effective Date.

- The Anaheim Plan provides for mutual releases by the following parties in their respective capacities as such: (a) the Debtors (other than Grand Prix Holdings LLC solely with respect to any guaranty Claims of Midland, Lehman, LCPI, or SASCO); (b) CWCapital, (c) TriMont, in its capacity as servicer for the Anaheim Hotel Mezzanine Loan Agreement; (d) Apollo; (e) SASCO, as holder of 100% of the economic and beneficial interests under the Anaheim Hotel Mezzanine Loan Agreement; (f) LCPI, as administrative agent for SASCO with respect to the Anaheim Hotel Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO (i) the Independent Committee; (j) all other Holders of Claims against or Interests in the Anaheim Hotel Debtors; (h) the officers, directors, trustees, and members of the Debtors; and (k) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

3. Joint Plan for the Ontario Hotel Debtors

The Ontario Hotel Debtors are the Debtors that own and lease the Hilton in Ontario, California (the "**Ontario Hotel**"). The Joint Plan for the Ontario Hotel Debtors (the "**Ontario Plan**") contemplates the turnover of the Ontario Hotel to Holders of Claims arising from the Ontario Hotel's mortgage loan in satisfaction of such Claims.

- Holders of Ontario Hotel Mortgage Loan Claims may elect either to (a) receive a deed in lieu of foreclosure in the form attached hereto as Schedule I with respect to the collateral (in substantial part, the Ontario Hotel) securing the Ontario Hotel Mortgage Loan or (b) proceed with the state foreclosure proceedings with respect to such collateral. The Ontario Hotel Debtors have agreed to support such foreclosure proceedings.

- All Classes of Claims relating to the Ontario Hotel that are junior to the Class of Ontario Hotel Mortgage Loan Claims will not receive any distributions, except that Holders of General Unsecured Claims against the Ontario Hotel Debtors receive their Pro Rata share of the Ontario Hotel Cash Recovery Fund that remains after satisfaction of priority, administrative, and Secured Claims against the Ontario Hotel Debtors; and

- The Ontario Plan provides for mutual releases by the following parties in their respective capacities as such: (a) the Debtors; (b) C-III; (c) Apollo; (d) the Independent Committee; (e) all other Holders of Claims against or Interests in the Ontario Hotel Debtors; (f) the officers, directors, trustees, and members of the Debtors; and (g) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

4. Joint Plan for the Remaining Debtors

The Remaining Debtors are primarily those Debtors that own or operate the following five hotels: the Residence Inn in Garden Grove, California; the Residence Inn in San Diego, California; the Doubletree in Washington, District of Columbia; the Residence Inn in Tyson's Corner, Virginia; and the Homewood Suites in San Antonio, Texas (collectively, the "**LNR Properties**").

On May 3, the Debtors held an auction at which Chatham proposed a bid for the LNR Properties with a purchase price of $195 million. The Debtors entered into an asset purchase agreement with Chatham (as such agreement may be amended or modified from time to time, the "**Chatham APA**"), which served as the stalking horse bid for the LNR Properties. On May 6, in accordance with the terms of the Chatham APA, the Debtors filed a motion seeking an order approving certain bid protections for Chatham [Docket No. 1205]. If the Debtors do not receive any superior proposals, the Chatham Bid will become the successful bid for the LNR Properties. Pursuant to the Chatham Bid and the Chatham APA, Chatham will purchase the LNR Properties and related assets for a total purchase price of $195 million. In connection with the Chatham Bid, Chatham and LNR have agreed to the modification, assumption, and assignment of the mortgage loans serviced by LNR to Chatham, subject to the terms of the Stipulation.

Pursuant to the Chatham Bid and the Chatham APA, the LNR Properties' Plan provides for the following treatments:

- Chatham will assume amended, restated, and/or supplemented mortgage loan agreements with Holders of secured mortgage loan claims for each of the five LNR Properties in the following amounts:

    o Garden Grove: $32,416,576.45;

    o Mission Valley: $40,168,769.26;

- o San Antonio: $18,462,695.40;

- o Tysons Corner: $23,057,021.67; and

- o Washington, D.C.: $20,054,752.20.

- Chatham will make a Cash payment to the Remaining Debtors in the total amount of approximately $35.8 million.

- LNR, in its capacity as the Holder of the Secured mortgage loan Claims, will also receive payment in full in Cash (A) for the LNR Assumption Fee and the LNR Liquidation Fee and (B) the LNR Servicing Fee, and the fees and expenses of the LNR-Serviced Trusts' financial and legal advisors in accordance with the Stipulation. For the avoidance of doubt, the amounts described in subsection (B) of this subsection will not be payable by Chatham and will not be included in the Chatham Hotel Sale Transaction Purchase Consideration;

- Generally, Holders of General Unsecured Claims against the Remaining Debtors will receive the Chatham Hotel Sale Transaction Purchase Consideration received by the applicable Remaining Debtor through the Distribution Waterfall, as well as other unencumbered assets, if any, also in accordance with the Distribution Waterfall;

- Intercompany Claims in the Remaining Debtors will receive no distribution and will be canceled;

- Preferred Equity Interests in Innkeepers USA LP will receive no distribution and will be canceled; and

- Preferred Equity Interests in Innkeepers USA Trust will receive Cash from the Chatham Hotel Sale Transaction Purchase Consideration and certain other assets, if any, in accordance with the Distribution Waterfall.

- The Remaining Debtor Plan provides for mutual releases by the following parties in their respective capacities as such: (a) Chatham; (b) the Five Mile DIP Agent; (c) the Five Mile DIP Lenders; (d) the Debtors (other than Grand Prix Holdings LLC solely with respect to any guaranty Claims of Midland, Lehman, LCPI, or SASCO); (e) LNR, in its capacity as special servicer for the each of the LNR-Serviced Loans; (f) the LNR-Serviced Trusts; (g) the master servicer for each of the LNR-Serviced Loans; (h) Apollo; (i) the Independent Committee; (j) Island; (k) all other Holders of Claims against or Interests in the Remaining Debtors; (l) the officers, directors, trustees, and members of the Debtors; and (m) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals. The LNR-Serviced Trusts also will be released from avoidance actions and claim objections. In addition, the Ad Hoc Committee will release LNR, the LNR-Serviced Trusts, and related entities from Claims related to the LNR-Serviced Loans and the Debtors.

5.    Further Information about the Plan

Confirmation and Consummation of the Plan are subject to certain material conditions precedent described in Article IX of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including the Plan (which is expressly incorporated into and made a part of this Disclosure Statement) and Article VIII herein entitled "Certain Risk Factors To Be Considered Prior To Voting" prior to submitting your ballot to vote to accept or reject the Plan. The Debtors urge you to consult with your own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the transactions contemplated thereby.

The Debtors will File a Plan Supplement with the Bankruptcy Court prior to the Confirmation Hearing. The Plan Supplement will include documents and forms of documents, schedules, and exhibits to the Plan, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) a list of Causes of Action to be retained by the Post-Effective Date Debtors; (b) a list of Executory Contracts, including any franchise agreements, and Unexpired Leases to be assumed and assigned to the Post-Effective Date Debtors and their respective Cure Obligations, to be Filed by the Voting Deadline, with notices of assumption or rejection mailed to executory contract and unexpired lease counterparties on or before five business days prior to the Voting Deadline; (c) the Corporate Structure Summary; (d) the forms of the New Fixed/Floating By-Laws; (e) the forms of the New Fixed/Floating Organizational Documents; (f) the forms of the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Notes, and the forms of the New Fixed Rate Pool Mortgage Loan Limited Guarantys; (g) the Anaheim Hotel Assumption Documents and the Anaheim Hotel Commitment Letter; (h) the Anaheim Hotel Commitment Letter, the LNR Commitment, and the Chatham Hotel Sale Transaction Documents, including the Chatham Hotel Sale Transaction Loan Assumption Documents; (i) the Transition Services Agreement; (j) to the extent known, with respect to members of the New HoldCo Board and the Post-Effective Date Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (k) information regarding the compensation program related to the Remaining Debtors referenced in Article IV.I of the Plan, if implemented, and; (k) to the extent contemplated by the Ontario Plan, the form of the deed in lieu of foreclosure agreement with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement.

The Plan contains a series of releases that are part of the overall settlement of various potential claims and interests. In that respect, parties should be aware that, if the Plan is confirmed, they will both be getting and giving releases as set forth in Article VIII of the Plan and Article V of this Disclosure Statement.

Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan. If the Plan is confirmed by the Bankruptcy Court and Consummation occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests that do not submit ballots to accept or reject the Plan, or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the proposed transactions contemplated thereby.

The Plan and all documents to be executed and/or delivered in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

E.      *Questions and Answers Regarding this Disclosure Statement and the Plan*

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article V hereof);

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article III hereof);

- events leading to these Chapter 11 Cases, including the Debtors' restructuring negotiations (Article III hereof);

- significant events in the Debtors' chapter 11 cases (Article IV hereof);

- certain important effects of Confirmation of the Plan (Article V hereof);

- releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article V hereof);

- certain financial information about the Debtors, including financial projections (Article VI hereof and **Exhibit B** attached hereto);

- the statutory requirements for confirming the Plan (Article VII hereof);

- certain risk factors Holders of Claims should consider before voting to accept or reject and the Plan and information regarding alternatives to Confirmation of the Plan (Article VIII hereof); and

- certain United States federal income tax consequences of the Plan (Article X hereof).

In light of the foregoing, the Debtors believe the Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

**Am I entitled to vote to accept or reject the Plan?  What percentage of my Claim will I receive from the Debtors if the Plan is Consummated?**

Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest that you hold. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  The remainder of Claims and Interests are classified into the Classes in the table immediately below.

**The following table is a summary of the classification, treatment, impairment status, voting rights, and potential distributions both under the Plan and pursuant to a liquidation under chapter 7 of the Bankruptcy Code.  The amounts set forth below are estimates only.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.  The recoveries set forth below are projected recoveries and are therefore subject to change.**

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| **Fixed/Floating Plan** | | | | | | | |
| Class FF1 | Other Priority Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | $0 | 100% | 0% |
| Class FF2 | Other Secured Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $246,731 | $668,683 | 100% | 0% |
| Class FF3A | Secured Fixed Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $839,561,635 | $839,561,635 | 87.7% to 87.8% | 68.3% to 83.3% |
| Class FF3B | Secured Floating Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $218,504,023 | $246,318,025 | 94.8% to 100% | 82.1% to 99.8% |

---

[6]  Secured mortgage loan claim amounts reflect only principal and interest accrued through the Petition Date.

[7]  Estimated recoveries under a chapter 7 liquidation are not available for the Anaheim Plan or the Ontario Plan.  Nevertheless, the Debtors believe the transactions contemplated in the Anaheim Plan and the Ontario Plan provide recoveries greater than what would be available under a chapter 7 liquidation.

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| Class FF4 | Secured Floating Rate Pool Mezzanine Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $131,345,438 | $131,345,438 | 0% to 1.8% | 0% |
| Class FF5 | General Unsecured Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote | $4,775,484 | $7,022,997 | 67.6% to 99.5% | 0% |
| Class FF6 | Mortgage or Mezzanine Loan Deficiency Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $216,959,309 | $244,773,311[8] | 0% | 0% |
| Class FF7 | Intercompany Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | Unliquidated | Unliquidated | 0% | 0% |
| Class FF8 | Section 510(b) Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | 0% | 0% |
| Class FF9 | Interests in Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | 0% |
| **Anaheim Plan** | | | | | | | |
| Class A1 | Other Priority Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote | $0 | $0 | 100% | N/A |
| Class A2 | Other Secured Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote | $0 | $0 | 100% | N/A |
| Class A3 | Secured Anaheim Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $13,172,577 | $13,172,577 | 100% | N/A |
| Class A4 | Secured Anaheim Hotel Mezzanine Loan Claims | Impaired | Entitled to Vote | $22,640,833 | $22,640,833 | N/A[9] | N/A |
| Class A5A | General Unsecured Claims against Anaheim Hotel Debtors or Anaheim Hotel Lessee | Impaired | Entitled to Vote | $239,900 | $268,948 | 100% | N/A |
| Class A5B | General Unsecured Claims against Anaheim Mezzanine Debtor | Impaired | Deemed to Reject | $0 | $0 | 0% | N/A |
| Class A6 | Anaheim Hotel Mezzanine Loan Deficiency Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | N/A |
| Class A7 | Intercompany Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | N/A |

---

[8] The estimated high amount of Class FF6 Claims includes postpetition accrued interest at a default rate, as well as a potential charge for late payment. The estimated low amount of Class FF6 Claims does not include postpetition interest or the charge for late payment. The Debtors understand Lehman has agreed to waive the late fee in connection with the Fixed/Floating Plan.

[9] Holders of Claims in Class A4 will receive certain property rather than a dollar recovery (see Article V.C of this Disclosure Statement for additional information concerning the treatment of Classes under the Plan).

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| Class A8 | Intercompany Interests in Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | N/A |
| **Ontario Plan** | | | | | | | |
| Class O1 | Other Priority Claims against Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | $0 | 100% | N/A |
| Class O2 | Other Secured Claims Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | $0 | 100% | N/A |
| Class O3 | Secured Ontario Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $36,855,689 | $36,855,689 | N/A[10] | N/A |
| Class O4 | General Unsecured Claims against Ontario Hotel Debtors | Impaired | Entitled to Vote | $326,858 | $495,202 | 6.06% to 9.18% | N/A |
| Class O5 | Ontario Hotel Mortgage Loan Deficiency Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | N/A |
| Class O6 | Intercompany Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | N/A |
| Class O7 | Section 510(b) Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | $0 | 0% | N/A |
| Class O8 | Intercompany Interests in Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | N/A |
| **Remaining Debtor Plan** | | | | | | | |
| Class R1 | Other Priority Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | $0 | 100% | 78.7%-82.9% |
| Class R2 | Other Secured Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $7,354 | $7,354 | 100% | 78.7% - 82.9% |
| Class R3A | Secured Garden Grove Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $37,907,081 | $37,907,081 | 100% | 75.5% to 91% |
| Class R3B | Secured San Diego Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $47,787,118 | $47,787,118 | 100% | 77.2% to 94.8% |
| Class R3C | Secured Washington DC Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $25,919,415 | $25,919,415 | 100% | 96.2% to 100.0% |
| Class R3D | Secured Tysons Corner Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $25,514,424 | $25,514,424 | 100% | 88.1% to 100.0% |
| Class R3E | Secured San Antonio Hotel Mortgage Loan Claims | Impaired | Entitled to Vote | $24,501,947 | $24,501,947 | 100% | 90.5% to 100.0% |
| Class R4A | General Unsecured Claims against the Remaining Debtors Other Than Grand Prix Holdings | Impaired | Entitled to Vote | $651,327 | $2,119,281 | 100% | 51.7% to 100% |

---

[10]   Holders of Claims in Class O3 will receive a deed in lieu of foreclosure or commensurate state foreclosure proceedings rather than receiving a dollar recovery.

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|---|---|---|---|---|---|---|---|
| Class R4B | General Unsecured Claims against Grand Prix Holdings | Impaired | Entitled to Vote | $0 | $244,773,311 | 0% to 3.0% | 0% to 1.2% |
| Class R5 | Intercompany Claims against the Remaining Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | 0% |
| Class R6 | Intercompany Interests in the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | 100% | 0% |
| Class R7 | Innkeepers USA LP Preferred D Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $1,621,562 | $1,621,562 | 0% | 0% |
| Class R8 | Innkeepers USA Trust Preferred C Interests | Impaired | Entitled to Vote | $173,136,437 | $173,136,437 | 0% to 6.0%[11]. | 0% to 3.2% |

---

[11] This estimate is based on a liquidation preference of $29.85 per share, may not be realized, and is inherently subject to uncertainties and contingencies. Indeed, this estimate may change for any of the following reasons, among others, many of which are discussed in more detail in Article VIII herein:

- Failure to secure Confirmation of the Plan;

- Non-occurrence of the Effective Date;

- Litigation regarding Confirmation of the Plan or other issues that may arise in these Chapter 11 Cases;

- Disputes regarding franchise agreements or PIP obligations;

- Actual amounts of Allowed Claims may differ from estimated amounts of Allowed Claims;

- Outcomes regarding Disputed Claims are uncertain and may result in additional liability for the Debtors' estates;

- The Debtors have not filed objections to all Claims filed against the Remaining Debtors that the Debtors intend to dispute, and the outcome of such objections are uncertain and may result in additional liability for the Debtors' estates;

- Certain Claims are unliquidated and the Debtors' liabilities for such Claims are not yet known and may result in additional liability for the Debtors' estates;

- Certain Claims for indemnification of the Debtors' management may result in additional liability for the Debtors' estates;

- The amounts owed on account of Claims for professional fees are uncertain and may result in additional liability for the Debtors' estates;

- There exist disputes regarding whether Claims related to certain of the Debtors' potential guarantee obligations have been waived, the result of which will materially affect recoveries to various constituents;

- There exists a dispute where certain of the Debtors' secured creditors contend they have senior claims against the Cash in the LP Account, the result of which will materially affect recoveries to various constituents;

- The value of the Debtors' retained Causes of Action is not yet known and may increase or decrease the assets available to distribution;

- The financial information contained in the Disclosure Statement and the Financial Projections are based on the Debtors' books and records and has not been audited, are based on numerous assumptions, and are subject to inherent uncertainty;

- Acts of God that impact the value of the underlying assets; and

- Other events that may impact the Debtors' ability to move toward confirmation in a timely manner or affect the value of the Debtors' hotel properties.

(Continued…)

| Class | Claims and Interests | Status | Voting Rights | Estimated Aggregate Low Amount of Allowed Claims / Interests[6] | Estimated Aggregate High Amount of Allowed Claims / Interests | Estimated % Range of Recoveries Under the Plan | Estimated % Recovery Under Chapter 7[7] |
|-------|----------------------|--------|---------------|--------------------------------------------------------|--------------------------------------------------------------|------------------------------------------------|-----------------------------------------|
| Class R9 | Innkeepers USA Trust Preferred A Interests | Impaired | Entitled to Vote | $115,812,294 | $115,812,294 | 0% to 6.0%[12] | 0% to 3.2% |
| Class R10 | Innkeepers USA Trust Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | 0% | 0% |
| Class R11 | Grand Prix Holdings Interests | Impaired | Entitled to Vote | $0 | $6,800,000 | N/A[13] | 0% |
| Class R12 | Section 510(b) Claims against the Remaining Debtors | Impaired | Entitled to Vote | $0 | $0 | 0% | 0% |

Only Holders of Claims or Interests included in one of the Classes entitled to vote to accept or reject the Plan will receive a Solicitation Package (as defined herein) from the Debtors' notice and claims agent, Omni Management Group, LLC (the "**Notice and Claims Agent**"). For more information about the treatment of Claims and Interests, see Article V.C herein entitled "Treatment of Claims and Interests."

**If the Plan provides that I get a distribution, when do I get it, and what do you mean when you refer to "Confirmation," "Effective Date," and "Consummation?"**

Confirmation of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan, there are conditions (described in Article IX of the Plan) that need to be satisfied or waived so that the Plan can be Consummated and become effective. References to the Effective Date mean the date that all conditions to the Plan have been satisfied or waived, at which point the Plan may be "consummated." Distributions only will be made after Consummation of the Plan and will be made only to Holders on account of Claims or Interests that are or become Allowed. See Article VII herein entitled "Statutory Requirements for Confirmation of the Plan," for a discussion of the conditions to Consummation.

**Do all four of the Joint Plans need to be confirmed simultaneously?**

No. The Plan is comprised of the four Joint Plans described above—the Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan. Each of those Joint Plans may be confirmed or consummated separately from the other Joint Plans. The Confirmation or Consummation of any one of the Joint Plans is not contingent upon Confirmation or Consummation of any other Joint Plan.

**How will the Post-Effective Date Debtors fund distributions under the Plan?**

The Post-Effective Date Debtors will fund distributions under the Plan through (a) cash from operations, (b) the Interests of the Post-Effective Date Fixed/Floating Debtors issued to New HoldCo pursuant to the Plan, (c) the funding obtained from new money investments by Cerberus/Chatham pursuant to the Commitment Letter, or (d) the Chatham Hotel Sale Transaction.

---

Any or all of the above scenarios may significantly impact recoveries, and, given the current projected ranges of recoveries, may reduce recoveries to close to zero.

[12] This figure is based on a liquidation preference of $38.60 per share.

[13] As equityholders, Holders of Grand Prix Holdings Interests are only entitled to the residual value in Grand Prix Holdings. As a result, there is no basis for the calculation of a percentage recovery. The aggregate dollar recoveries, however, are expected to be in the range of $0 to approximately $6.8 million.

**What materials will be sent to Holders of Claims or Interests who are eligible to vote to accept or reject the Plan?**

Holders of Claims or Interests who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials including (the "**Solicitation Package**"):

- a CD-ROM containing this Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan and the exhibits to the Plan), an order approving the Disclosure Statement, as well as procedures for distributing materials and soliciting votes attached thereto (the "**Solicitation Procedures**");

- a notice of a Confirmation Hearing;

- the appropriate ballot or master ballot with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;

- a letter from counsel for the unsecured Creditors Committee recommending that Holders accept the Plan, if they are entitled to vote on the Plan;

- a letter from counsel for the Ad Hoc Committee recommending that Holders of Innkeepers USA Trust Preferred C Interests accept the Plan; and

- any supplemental documents that the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be included in the Solicitation Package.

The Solicitation Package may also be obtained (a) from the Debtors' Notice and Claims Agent by: (i) visiting http://www.omnimgt.com/innkeepers; (ii) writing to Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California, 91436; or (iii) calling (866) 989-6147; or (b) for a fee via PACER (except for ballots) at http://www.nysb.uscourts.gov.

**Will the Post-Effective Date Debtors file reports with the SEC?**

The Debtors do not expect that the Post-Effective Date Debtors will file reports with the SEC after emergence from these Chapter 11 Cases because they do not expect to be subject to the public reporting requirements of the Securities Exchange Act of 1934 or the regulations promulgated thereunder.

**What is the deadline to vote on the Plan?**

The deadline to vote on the Plan is June 17, 2011 at 5:00 p.m. Eastern Time (the "**Voting Deadline**").

**How do I vote to accept or reject the Plan?**

The Debtors are distributing this Disclosure Statement, accompanied by a ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan. If you are a Holder of a Claim or Interest in Classes FF3A, FF3B, FF4, FF5, A3, A4, A5A, O3, O4, R3A, R3B, R3C, R3D, R3E, R4A, R4B, R8, R9, R11, and R12, you may vote to accept or reject the Plan by completing the ballot and returning it in the envelopes provided.

The Debtors have engaged Omni Management Group, LLC to serve as the Notice and Claims Agent. The Notice and Claims Agent is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
|---|
| Ballots must be actually received by the Notice and Claims Agent by the Voting Deadline, which is June 17, 2011 at 5:00 p.m. prevailing Eastern Time, at the following address: <br><br> **Innkeepers USA Trust** <br> c/o Omni Management Group, LLC <br> 16161 Ventura Boulevard, Suite C <br> PMB 606 <br> Encino, California 91436 <br><br> If you have any questions on the procedure for voting on the Plan, please call the Debtors at: <br><br> (866) 989-6147 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. If you are eligible to vote, for your vote to be counted, your ballot must be completed, signed, and received by the Voting Deadline; provided, however, that ballots received by the Notice and Claims Agent after the Voting Deadline may be counted only in the sole and absolute discretion of the Debtors.

Any ballot that is properly executed by the Holder of a Claim or Interest, but that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan, will not be counted. Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan may cast only one ballot for each Claim or Interest held by such Holder. By signing and returning a ballot, each Holder of a Claim or Interest in Classes FF3A, FF3B, FF4, FF5, A3, A4, A5A, O3, O4, R3A, R3B, R3C, R3D, R3E, R4A, R4B, R8, R9, R11, and R12 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim or Interest have been cast or, if any other ballots have been cast with respect to such Claim or Interest, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot, as failing to do so may result in your ballot not being counted.

**How can I object to provisions contained in the Plan?**

The Bankruptcy Court has established June 17, 2011 at 4:00 p.m. Eastern Time as the deadline to object to confirmation of the Plan (the "**Plan Objection Deadline**"). All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are *actually received* on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan prior to a Confirmation Hearing.

**Under what circumstances are Holders of Innkeepers USA Trust Series C Preferred Shares that are not members of the Ad Hoc Committee bound by the releases under the Plan?**

The Plan contains a series of releases that are part of the overall settlement of various potential Claims and Interests. In that respect, if the Plan is confirmed, you will be a releasing party that both gives and receives releases as set forth in Article VIII of the Plan and Article V of this Disclosure Statement. Please be aware that a vote to accept the Plan by a Holder of Innkeepers USA Trust Series C Preferred Shares is an affirmative indication that such Holder consents to the releases set forth therein. If a Holder of Innkeepers USA Trust Series C Preferred Shares

does not vote on the Plan at all, and the Bankruptcy Court confirms the Plan, such Holder will be deemed to have provided its consent to become a releasing party that both gives and receives releases as set forth in Article VIII of the Plan and Article V of this Disclosure Statement. If a Holder of Innkeepers USA Trust Series C Preferred Shares votes to reject the Plan and the Plan is confirmed, such Holder will be deemed a releasing party that gives and receives releases as set forth in Article VIII of the Plan and Article V of this Disclosure Statement. If a Holder of Innkeepers USA Trust Series C Preferred Shares objects to the releases, such Holder should vote to reject the Plan and must file an objection to the Plan on or before the Objection Deadline. If a Holder of Innkeepers USA Trust Series C Preferred Shares votes to reject and the Court does not confirm the Plan, such Holder will not give or receive a release under the Plan.

**When is the hearing on confirmation of the Plan expected to occur?**

Assuming the requisite acceptances are obtained for any of the four Joint Plans, the Debtors intend to seek confirmation of the Plan at a hearing to be scheduled on June 23, 2011, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom No. 610 of the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408 (each such hearing, a "**Confirmation Hearing**"). A Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and prior to a Confirmation Hearing, may put in place additional procedures governing that hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest.

### ARTICLE II.
### THE DEBTORS' BACKGROUND[14]

*A.     The Debtors' Business*

1.     The Debtors' Business and Overview

Innkeepers USA Trust ("**Innkeepers**") is a self-administered Maryland REIT with a primary business focus of acquiring premium-branded upscale extended-stay, mid-priced limited service, and select-service hotels. Innkeepers' indirect, wholly-owned limited liability company subsidiaries, which are Debtors in these Chapter 11 Cases, hold title to, or ground leases in 71 hotels. Indirect, wholly-owned taxable REIT subsidiaries (the "**Operating Lessees**") lease the hotels from the property owners, and have entered into management agreements with third party hotel managers to manage the hotels. The operating lessees, through the hotel managers, are responsible for paying hotel operating expenses for the respective property owners, including personnel costs, franchise royalties and related fees, utility costs, and general repair and maintenance expenses. The property owners remain responsible for ownership costs such as property taxes and insurance, ground rent (where applicable), and capital expenditures.

The Debtors' primary customer base consists of business travelers, employees on temporary work assignments or enrolled in training programs, and individuals engaged in corporate relocations. Consistent with this customer base, the majority of the Debtors' integrated hotel portfolio consists of extended-stay hotels, which are a hybrid between a hotel and an apartment, offering longer-term accommodations with kitchens at more affordable rates than traditional full service hotels and with more efficiency than apartments. In general, extended-stay hotels are typically able to generate a more consistent revenue stream than traditional hotels due to historically higher than average occupancy rates, longer average stays, less staff, and lower fixed costs.

---

[14]     Additional information about the Debtors' background can be found in the First Day Declaration.

The Operating Lessees have entered into various hotel management agreements with Island and Dimension Development Company, Inc. to manage the Debtors' hotel properties. The Debtors' management is responsible for overseeing the hotel managers. Island manages all of the Debtors' hotels except for the Sheraton Four Points in Ft. Walton Beach, Florida, which is managed by Dimension. The Hilton in Ontario, California is managed by GF Management. Pursuant to the hotel management agreements, the hotel managers generally are required to perform or provide for all operational and management functions necessary to operate the hotels. Among other things, the hotel managers, on behalf of the Debtors, pay all property level expenses of the hotels (including payroll), contract with service providers, and purchase all goods and materials utilized in the operation of the business. Generally, the hotel managers fund the hotel operating expenses out of the property lessees' centralized cash accounts, over which the hotel managers have signing authority. When the hotel managers have to fund expenses, the operating lessees reimburse the hotel managers periodically through hotel expense reimbursement reconciliations. In addition, the hotel managers receive management fees prescribed by the hotel management agreements.

The Debtors seek to affiliate their hotels with premier franchise companies and brands that offer robust marketing support and services and that have demonstrated their ability to command revenue premiums over other brands. The table below sets forth information regarding the Debtors' hotels by brand (ordered based on the number of rooms by brand):

| Brand/Flag | # of Hotels | # of Keys | % of Total Keys |
|---|---|---|---|
| **Marriott** | | | |
| Residence Inn | 37 | 4,862 | 52% |
| Courtyard | 3 | 256 | 3% |
| TownePlace Suites | 1 | 95 | 1% |
| **Hilton** | | | |
| Hampton Inn | 8 | 1,022 | 11% |
| Hilton / Hilton Suites | 2 | 539 | 6% |
| Embassy Suites | 1 | 156 | 2% |
| Homewood Suites | 1 | 146 | 2% |
| Doubletree | 1 | 105 | 1% |
| **Hyatt** | | | |
| Summerfield Suites | 5 | 650 | 7% |
| **Starwood** | | | |
| Westin | 1 | 224 | 2% |
| Four Points by Sheraton | 1 | 216 | 2% |
| Sheraton | 1 | 154 | 2% |
| **Unbranded** | | | |
| N/A | 9 | 937 | 10% |
| **TOTAL** | **71** | **9,362** | **100%** |

The franchise licenses for the hotels are held by the operating lessees and are governed by franchise agreements between the operating lessees and the franchise owners. All but nine of the hotels in the table above operate under franchise agreements. Under the franchise agreements, the Debtors are required to pay franchise fees based on a percentage of hotel room revenue and must allow franchisors to inspect their licensed hotels periodically to confirm adherence to stated brand operating standards. These inspections can result in additional capital expenditure requirements or additional operational, marketing, or repairs and maintenance expenses. Grand Prix Holdings, Innkeepers' direct parent and a Debtor in these Chapter 11 Cases, has guaranteed certain of the property lessees' obligations under certain of the franchise agreements.

The Debtors' stream of revenue is dependent on maintaining and improving key operating metrics, including occupancy, average daily rate ("**ADR**"), and revenue per available room ("**RevPar**") of their hotels. In 2009, the Debtors' consolidated revenues were approximately $292 million (down from $348 million in 2008, a 16% drop) and their adjusted EBITDA was approximately $85 million (down from $123 million in 2008, a 31% drop). The Debtors' consolidated assets for 2009 totaled approximately $1.5 billion and consolidated liabilities totaled approximately $1.5 billion (as calculated according to generally accepted accounting principles). In 2010, the Debtors' consolidated revenues improved to $298 million and their adjusted EBITDA declined to $58 million (which includes $34 million of restructuring costs).

2.    The Debtors' Corporate History and Organizational Structure

In June 2007, Apollo, through certain subsidiaries, acquired Innkeepers, which was a publicly traded company whose shares were listed on the New York Stock Exchange (the "**Acquisition**"). Apollo is a closed-end, non-diversified management investment company that has elected to be treated as a business development company under the Investment Company Act of 1940. Apollo's common stock is listed and traded on the NASDAQ under the ticker symbol AINV. Apollo is managed by Apollo Investment Management, an affiliate of Apollo Global Management, LLC. Apollo's corporate governance is overseen by an independent board of directors.

The Acquisition was funded with equity invested by Apollo (through certain subsidiaries), the assumption of certain secured debt outstanding prior to the Acquisition, and certain secured debt incurred at the time of the Acquisition. All of Innkeepers' common shares outstanding at the time of the Acquisition were acquired for cash and then extinguished. Innkeepers' $145 million 8% series C cumulative preferred shares outstanding prior to the Acquisition remained outstanding after the Acquisition. In consideration for Apollo's $250 million equity investment, Apollo's subsidiary Grand Prix Holdings LLC, a Debtor in these Chapter 11 Cases, was issued all (except for relatively small amounts currently held by management) of Innkeepers' newly issued (a) common shares and (b) 12% series A cumulative preferred shares.

A chart generally depicting the Debtors' prepetition organizational structure is provided below.

[*Rest of Page Intentionally Left Blank*]

# Innkeepers USA Corporate Structure Chart



B.      *Summary of Prepetition Capital Structure*

As of March 31, 2010, the Debtors had incurred aggregate funded secured indebtedness of approximately $1.42 billion, including approximately $1.29 billion of property-level secured debt, approximately $1.05 billion of which was securitized and sold in the commercial mortgage-backed security market. The Debtors incurred the vast majority of their funded debt in connection with the June 2007 acquisition of Innkeepers by Apollo. The debt is secured by mortgages on the hotels or pledges of the equity of the property owners. The Debtors' funded secured debt is separated into nine general groups, the mortgages of each of which is secured by distinct hotel properties and the mezzanine loans of each of which is secured by related equity interests in the property owners. Each of these groups is discussed below. Additionally, the Debtors have four issuances of equity, which are also discussed below.

1.      The $825 Million Fixed Rate Pool Mortgage Loan

Forty-five of the property owners, collectively as borrowers, and Lehman, as original lender, are parties to the Fixed Rate Pool Mortgage Loan, dated as of June 29, 2007. The Fixed Rate Pool Mortgage Loan provides for mortgage loans to the 45 property owners in the original aggregate principal amount of $825 million, which amount is collateralized by the 45 hotel properties owned by the property owners that are borrowers under the loan. Obligations under the Fixed Rate Pool Mortgage Loan have a maturity date of July 9, 2017. The Fixed Rate Pool Mortgage Loan has been securitized and sold into the CMBS market. Half of the obligations under the Fixed Rate Pool Mortgage Loan are part of a mortgage loan pool known as LB-UBS Commercial Mortgage Trust 2007-C6, for which U.S. Bank, National Association, as successor in interest to LaSalle Bank, N.A., is trustee and Midland Loan Services, Inc. serves as special servicer. The balance of the obligations under the Fixed Rate Pool Mortgage Loan are part of a mortgage loan pool known as LB-UBS Commercial Mortgage Trust 2007-C7, for which U.S. Bank, National Association, as successor in interest to LaSalle, is trustee and Midland serves as special servicer.

2.      The $250 Million Floating Rate Pool Mortgage Loan and $118 Million Floating Rate Pool Mezzanine Loan

Twenty of the property owners, collectively as borrower, and Lehman, as lender, are parties to the Floating Rate Pool Mortgage Loan, dated as of June 29, 2007. The Floating Rate Pool Mortgage Loan provides for mortgage loans to the 20 property owners in the original principal amount of $250 million, which amount is collateralized by the 19 hotels owned by the property owners that are borrowers under the loan agreement.[15] The obligations under the Floating Rate Pool Mortgage Loan matured on July 9, 2010.

Grand Prix Mezz Borrower Floating 2, LLC, the 100% owner of the 20 borrowers under the Floating Rate Pool Mortgage Loan, as borrower, and Lehman, as original lender, are parties to the agreement for the Floating Rate Pool Mortgage Loan, dated as of June 29, 2007. The Floating Rate Pool Mezzanine Loan provides for a junior mezzanine loan in the original principal amount of $118 million, which amount is collateralized by Grand Prix Mezz Borrower Floating 2, LLC's equity interests in the 20 property owners that are borrowers under the Floating Rate Pool Mortgage Loan. The obligations under the Floating Rate Pool Mezzanine Loan matured on July 9, 2010. TriMont Real Estate Advisors, Inc. serves as special servicer for this loan.

3.      The $13.7 Million Anaheim Hotel Mortgage Loan and $21.3 Million Anaheim Hotel Mezzanine Loan

RLJ Anaheim Suites Hotel L.P., as borrower, and GMAC Commercial Mortgage Bank, as lender, are parties to the agreement for the Anaheim Hotel Mortgage Loan, dated as of June 14, 2005. Pursuant to certain loan assumption agreements, dated as of October 4, 2006 and June 29, 2007, KPA HS Anaheim, LLC assumed all of RLJ Anaheim's obligations under the Anaheim Hotel Mortgage Loan. As a result, the agreement for the Anaheim Hotel Mortgage Loan provides that KPA HS Anaheim is obligated under a mortgage loan in the original principal amount

---

[15]     As provided in further detail in Article IV.A.7 of this Disclosure Statement, during the course of these Chapter 11 Cases, the Debtors ceased operating one unprofitable hotel that had previously secured the Floating Rate Pool Mortgage Loan.

of $13.7 million, which amount is collateralized by the Hilton Suites in Anaheim, California. Obligations under the Anaheim Hotel Mortgage Loan matured on July 1, 2010. The Anaheim Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage loan pool known as Credit Suisse Commercial Mortgage Trust Series 2005-C5, Commercial Mortgage Pass-Through Certificates, Series 2005-C5, for which Wells Fargo Bank, N.A. is trustee, Capmark Finance Inc., as successor to GMAC Commercial Mortgage Corporation, serves as master servicer, and CWCapital Asset Management, LLC serves as special servicer.

Grand Prix Mezz Borrower Term, LLC, the 100% owner of KPA HS Anaheim, as borrower, and Lehman, as lender, are parties to the agreement for the Anaheim Hotel Mezzanine Loan, dated as of June 29, 2007. The Anaheim Hotel Mezzanine Loan provides for a junior mezzanine loan in the original principal amount of $21.3 million, which amount is collateralized by Grand Prix Mezz Borrower Term, LLC's equity interest in KPA HS Anaheim. The obligations under the Anaheim Hotel Mezzanine Loan matured on July 1, 2010. TriMont Real Estate Advisors, Inc. serves as special servicer for this loan.

Pursuant to that certain Intercreditor Agreement by and between Wells Fargo, as trustee for the registered holders of the Credit Suisse First Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2005-C5, as senior lender, and Lehman, as mezzanine lender, dated as of June 29, 2007, the rights, liens, and security interests created under the Anaheim Hotel Mezzanine Loan, including the right to payment of the obligations under the Anaheim Hotel Mezzanine Loan and all remedies, terms, and covenants contained in the loan agreement, are subordinate to the rights, liens, and security interests created under the agreement for the Anaheim Hotel Mortgage Loan, including the right to payment of the obligations under the Anaheim Hotel Mortgage Loan and all remedies, terms, and covenants contained in the agreement for the Anaheim Hotel Mortgage Loan.

### 4. The $47.4 Million San Diego Hotel Mortgage Loan

KPA RIMV, LLC, as borrower, and Capmark Bank, as lender, are parties to the agreement for the San Diego Hotel Mortgage Loan, dated as of October 4, 2006. Pursuant to a loan assumption agreement, dated June 29, 2007, Grand Prix RIMV Lessee, LLC assumed all of KPA RIMV, LLC's obligations under the San Diego Hotel Mortgage Loan. As a result, the agreement for the San Diego Hotel Mortgage Loan provides that Grand Prix RIMV is obligated under a mortgage loan in the original principal amount of $47.4 million, which amount is collateralized by the Residence Inn in San Diego, California. The obligations under the San Diego Hotel Mortgage Loan have a maturity date of November 11, 2016. The San Diego Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo is trustee, Capmark Finance serves as master servicer, and LNR Partners, LLC serves as special servicer.

### 5. The $37.6 Million Garden Grove Hotel Mortgage Loan

KPA RIGG, LLC, as borrower, and Capmark Bank, as lender, are parties to an agreement for the Garden Grove Hotel Mortgage Loan, dated as of October 4, 2006. Pursuant to a loan assumption agreement, dated June 29, 2007, Grand Prix RIGG Lessee LLC assumed all of KPA RIGG, LLC's obligations under the Garden Grove Hotel Mortgage Loan. As a result, the agreement for the Garden Grove Hotel Mortgage Loan provides that Grand Prix RIGG is obligated under a mortgage loan in the original principal amount of $37.6 million, which amount is collateralized by the Residence Inn in Garden Grove, California. The obligations under the Garden Grove Hotel Mortgage Loan have a maturity date of November 11, 2016. The Garden Grove Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1, for which Wells Fargo Bank, N.A. is trustee, Capmark Finance Inc. serves as master servicer, and LNR Partners, LLC serves as special servicer.

### 6. The $35.0 Million Ontario Hotel Mortgage Loan

KPA HI Ontario, LLC, as borrower, and Deutsche Banc Mortgage Capital, LLC, as successor in interest to Capmark Bank, N.A., as lender, are parties to an agreement for the Ontario Hotel Mortgage Loan, dated as of October 4, 2006. Pursuant to a loan assumption agreement, dated June 29, 2007, Grand Prix Ontario Lessee LLC assumed all of KPA HI Ontario, LLC's obligations under the Ontario Hotel Mortgage Loan. As a result, the agreement for the Ontario Hotel Mortgage Loan provides that Grand Prix Ontario is obligated under a mortgage loan

in the original principal amount of $35.0 million, which amount is collateralized by the Hilton in Ontario, California. The obligations under the Ontario Hotel Mortgage Loan have a maturity date of November 11, 2016. The Ontario Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C5, for which Wells Fargo Bank, N.A. is trustee, Capmark Finance Inc. serves as master servicer, and C-III Asset Management, LLC serves as special servicer. As of April 2010, the lender under the Ontario Hotel Mortgage Loan Agreement installed a receiver, GF Management, to act as hotel manager for the Hilton in Ontario, California.

7.    The $25.6 Million Washington DC Hotel Mortgage Loan

KPA Washington DC, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, are parties to an agreement for the Washington DC Hotel Mortgage Loan, dated as of September 21, 2006. The Washington DC Hotel Mortgage Loan carries an original principal amount of $25.6 million, which amount is collateralized by the Doubletree Guest Suites in Washington, D.C. The obligations under the Washington DC Hotel Mortgage Loan have a maturity date of October 1, 2016. The Washington DC Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as ML-CFC Commercial Mortgage Trust 2006-4, for which U.S. Bank, N.A. is trustee, Wells Fargo Bank, N.A. serves as master servicer, and LNR Partners, LLC serves as special servicer.

8.    The $25.2 Tysons Corner Hotel Mortgage Loan

KPA Tysons Corner RI, LLC, as borrower, and Merrill Lynch, as lender, are parties to an agreement for the Tysons Corner Hotel Mortgage Loan, dated as of September 19, 2006. The Tysons Corner Hotel Mortgage Loan Agreement carries an original principal amount of $25.2 million, which amount is collateralized by the Residence Inn in Vienna, Virginia. The obligations under the Tysons Corner Hotel Mortgage Loan have a maturity date of October 1, 2016. The Tysons Corner Hotel Mortgage Loan was sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank, N.A. is trustee, Wells Fargo Bank, N.A. serves as master servicer, and LNR Partners, LLC serves as special servicer.

9.    The $24.2 Million San Antonio Hotel Mortgage Loan

KPA San Antonio, LLC, as borrower, and Merrill Lynch, as lender, are parties to an agreement for the San Antonio Hotel Mortgage Loan, dated as of September 19, 2006. The San Antonio Hotel Mortgage Loan carries an original principal amount of $24.2 million, which amount is collateralized by the Homewood Suites in San Antonio, Texas. The obligations under the San Antonio Hotel Mortgage Loan have a maturity date of October 1, 2016. The San Antonio Hotel Mortgage Loan was securitized and sold into the CMBS market and is part of a mortgage pool known as ML-CFC 2006-4, for which U.S. Bank, N.A. is trustee, Wells Fargo Bank, N.A. serves as master servicer, and LNR Partners, LLC serves as special servicer.

10.    12% Series A Cumulative Preferred Shares

Apollo's subsidiary Grand Prix Holdings LLC was issued substantially all of Innkeepers' shares of 12% series A cumulative preferred shares in exchange for Apollo's equity contribution in connection with the acquisition of Innkeepers. There have never been any distributions on account of the 12% series A cumulative preferred shares.

11.    8% Series C Cumulative Preferred Shares

In January 2004, Innkeepers completed an offering of 5.8 million shares of 8% series C cumulative perpetual preferred shares. The net proceeds from the offering were approximately $145 million, a portion of which was used by Innkeepers to redeem a previously issued series of preferred shares. The Preferred C shares were publicly offered and survived the acquisition of Innkeepers by Apollo, and the Debtors believe these shares are held by various third parties. No distributions have been made on account of the Preferred C shares since December 2008.

12. Class D Preferred Units

Prior to the Acquisition of Innkeepers by Apollo, Innkeepers USA Limited Partnership, a Debtor in these Chapter 11 Cases, issued preferred units of limited partnership interests to certain parties who contributed hotel properties to the Debtors. The Holders of approximately 81,000 preferred units elected to continue to hold their investment after the Acquisition, in the form of class D preferred units of limited partnership interest. The cumulative redemption value of the class D preferred units is $1.4 million, and, pursuant to the relevant documents, each class D preferred unit is entitled to distributions equal to $0.8875 per share annually. Additionally, Holders of the class D preferred units guaranteed approximately $8.1 million of the Debtors' non-recourse debt. Since December 2008, no distributions have been made on account of the class D preferred units.

13. Common Shares

At the time of the June 2007 Acquisition of Innkeepers by Apollo, the then-outstanding shares of Innkeepers' common shares were extinguished and new shares of common shares were issued. As of the Petition Date, Grand Prix Holdings LLC held substantially all of Innkeepers' current outstanding common shares. There have never been any distributions on account of common shares.

## ARTICLE III.
## THE CHAPTER 11 CASES

The following is a general summary of these Chapter 11 Cases, including the events leading up to the filing of these Chapter 11 Cases and the events that have taken place during these Chapter 11 Cases.

A.     *Events Leading to the Chapter 11 Cases*

A number of factors contributed to the Debtors' decision to commence these Chapter 11 Cases. Although the Debtors' business model is sound, their operating losses from decreased room revenue, significant liquidity constraints, considerable funded debt burden, and unprecedented adverse changes in the economy and hospitality industry generally, impaired the Debtors' ability to meet their debt obligations and certain obligations under their franchise agreements.

1. Recent Economic Crisis and Its Impact on the Hotel Industry and the Debtors

Over the last two and a half years, the global travel and tourism industry has faced one of the most difficult operating environments in a number of decades due to the unparalleled turmoil that beset the global and United States economies. A weak economy and plummeting demand for hotel accommodations, which can be traced to reduced consumer spending, higher fuel prices, increased unemployment, and a severe decline in business travel, have caused one of the deepest and longest recessions in the history of the hospitality industry. During this time, supply also increased within the hospitality industry, exacerbating the negative impact of decreased demand within the industry.

In the hotel industry, performance is generally measured by RevPar. RevPar identifies trends with respect to room revenues from comparable hotel properties and can be used to evaluate hotel performance on a regional and segment basis. Comparing RevPar against prior years, the magnitude of the rapid and unprecedented deterioration is readily apparent.

Other operating statistics similarly demonstrate the depth of the industry's decline. Contributing to the RevPar decline in 2009, the industry's ADR fell by 8.8%, compared to a 20-year industry annual average *increase* of 2.8%. In 2009, the ADR decreased by 8.6%, compared to a 20-year industry annual average decline of 0.7%. The hotel industry has also suffered a severe decline in food and beverage sales, meeting, conference, and banquette hall rentals, and other guest services that generate additional revenue. Against this background, several of the Debtors' competitors filed for bankruptcy within the last two years.

The Debtors have not been insulated from these multi-year, record-breaking declines plaguing the hotel industry. In 2009, the Debtors' RevPar, ADR, and occupancy rate metrics decreased by 16.3%, 10.8%, and 6.1%, respectively. (In 2010, the Debtors' RevPar, ADR, and occupancy rate metrics increased 5.5%, decreased 1.0%, and increased 6.6%, respectively.) Due to the Debtors' focus on the business consumer, their hotel portfolio has been especially impacted by an overall tightening on corporate travel, training, and relocation expenditures. Certainly, the worst recession in 60 years has left corporations intent on saving rather than spending, and domestic and international business travel spending in the United States declined sharply.

2.    The Debtors' Substantial Funded Debt Burden and Limited Access to Capital

In addition to reducing overall demand and significantly impairing the Debtors' overall revenue, the rapid softening of the economy and tightening of the financial markets limited the Debtors' financial flexibility. As a result, the Debtors had no real ability to recapitalize or reduce their debt burdens. Strategies that the Debtors might have previously employed to extend maturities, obtain new financing, and maintain liquidity are no longer available. These adverse changes severely limited the Debtors' ability to satisfy their obligations as they came due.

Limited access to capital is particularly significant in light of the Debtors' large debt service obligations. Specifically, the Debtors have failed to satisfy their debt service obligations as they came due (or make any subsequent payments) under the following loans: (a) the payment for the Ontario Hotel Mortgage Loan on October 1, 2009; (b) the payment for the Fixed Rate Pool Mortgage Loan on April 9, 2010; (c) the payments for the Anaheim Hotel Mezzanine Loan, San Diego Hotel Mortgage Loan, Garden Grove Hotel Mortgage Loan, Washington DC Hotel Mortgage Loan, Tysons Corner Hotel Mortgage Loan, and San Antonio Hotel Mortgage Loan, each on May 1, 2010; and (d) the payment for the Anaheim Hotel Mortgage Loan, Floating Rate Pool Mortgage Loan, and Floating Rate Pool Mortgage Loan, each on June 10, 2010.

The Debtors' level of indebtedness is of significant importance in these Chapter 11 Cases because, with essentially all cash flow from operations being directed to debt service, the Debtors' cash was not available for other purposes, such as maintaining the hotel properties in a condition that complies with the franchise agreements and performing other upgrades to capitalize on opportunities to increase revenue and to meet competitive conditions and preserve asset value.

3.    The Debtors' Inability to Fund PIP Obligations

In addition to placing a burden on the Debtors' ability to meet debt service obligations and fund day-to-day business operations, the lack of available cash made it impossible for the Debtors to sufficiently fund capital expenditures on hotel properties necessary to comply with their obligations under the franchise agreements. Certain of the franchise agreements include provisions that require the Debtors to comply with property improvement plans required under applicable franchise agreements ("**PIPs**"), under which they are obligated to perform certain renovations and other capital improvements to their hotel properties, such as replacing furniture, fixtures, and equipment. While necessary, the required PIP improvements are costly, subject to delays, and disrupt operations and displace revenue at the hotels while rooms under renovation are out of service.

Franchisors periodically inspect the hotels to ensure the Debtors' compliance with their operating standards and the PIPs, the breach of which could result in the termination of a franchise agreement. The loss of a franchise agreement for a hotel would have an immediate and material adverse effect on the underlying value of the hotel due to the loss of associated name recognition, marketing support, brand loyalty, and centralized reservation systems provided by the franchisors. Pursuant to prior agreement, in September of 2009, a Residence Inn franchise agreement with respect to a hotel property in Columbus, Ohio terminated. Subsequent to termination, revenue precipitously dropped by 50% and the property was sold for a fraction of its appraised value from only two years earlier.

Prior to the Petition Date, the Debtors received numerous notices of potential default from franchisors, including 22 notices of default from Marriott International, Inc. sent on March 16, 2010. The Debtors own 44 hotels under Marriott brands, more than half of which are "Generation 1" Residence Inn by Marriott extended-stay hotels. Generation 1 Residence Inn hotels resemble garden style apartments with multiple two- to three-story buildings, each comprised of eight rooms with exterior access to each room. In contrast, subsequent generations of Residence

Inn hotels typically feature more rooms in a single multi-story building with interior corridors. Upkeep costs associated with older Generation 1 Residence Inn hotels are typically higher than other types of hotel properties because of their age (generally 20 to 30 years), layout (eight or more buildings located on large parcels of land), and less efficient utilization of heating and other utilities.

As a result, many Generation 1 franchise agreements may not be renewed as they mature or are exiting the Residence Inn system before the maturity of their franchise agreements. As the Residence Inn by Marriott brand grows (with over 600 in the brand system currently), the importance of Generation 1 hotels to the Residence Inn brand will continue to decrease. Maintaining the franchise agreements on the Debtors' Generation 1 hotels is critically important for their cash flow and enterprise value. The loss of revenue (and cash flow) associated with an immediate withdrawal of the Debtors' Generation 1 hotels from the Residence Inn system would have a severely detrimental effect on the Debtors' entire enterprise as Generation 1 Residence Inn hotels comprise approximately 31% of the Debtors' annual revenue. Recognizing this, the Debtors reached agreement with Marriott in 2007 for the Debtors to complete extensive PIPs on most of its Generation 1 hotels in exchange for franchise agreement extensions until at least 2021.

The dramatic reduction in the Debtors' RevPar, coupled with their significant debt burden and an inability to access new capital, have rendered the Debtors unable to comply with their PIP obligations under the Marriott (and other) franchise agreements. The Marriott default notices state that if the Debtors failed to perform the required PIP obligations by June 14, 2010, the 22 Marriott franchise agreements would immediately terminate as of that date The Debtors and Marriott executed certain forbearance agreements, extending the deadline to meet PIP obligations for Marriott hotels (other than a Generation 1 hotel located in Troy, Michigan) according to the schedules provided in the Marriott Adequate Assurance Agreement.

The Debtors' inability to invest in their hotel properties, along with the collapse of the real estate market, have caused the value of the Debtors' hotels to severely decline, resulting in the overall erosion of the Debtors' enterprise value. As a result, it is clear that a comprehensive restructuring of the entire capital structure is necessary to preserve and maximize value.

B. *Restructuring Efforts*

1. Cost Savings

To address the liquidity constraints caused by the tightening credit markets, decreased consumer demand, and high debt service carrying costs, since the first quarter of 2008, the Debtors' management took several proactive steps to reduce costs, restructure their business operations, and address operational cash shortfalls. These initiatives included:

- a company-wide labor reduction to the minimal staffing levels possible without harming guest satisfaction (including for both the Debtors' and the hotel managers' employees);

- a 5% salary reduction for all personnel;

- the renegotiation of benefit programs in an effort to lower costs (with employees' share of obligations increased);

- the suspension of the Debtors' discretionary 401(k) plan matching;

- the suspension of distributions to Holders of Preferred C Interests beginning in December 2008;

- the reduction of certain fixed costs, including the renegotiation of maintenance, grounds cleaning, and vendor contracts; and

- the immediate cessation of all non-emergency capital expenditures on the hotel properties beginning in late 2008 and the related settlement for approximately $8.5 million of approximately $13.1 million of outstanding capital expenditure obligations for work performed and goods ordered.

The results of the Debtors' efforts were positive. From 2008 to 2010, the Debtors were able to reduce their annual costs by approximately $24 million. However, despite this reduction, due to the economic climate and ongoing credit crisis, the Debtors concluded their liquidity would continue to erode and potentially could be exacerbated by further declines in the hospitality market. In addition, the Debtors determined any new debt or equity investments would be unlikely unless they could restructure their existing debt given the current amount of outstanding debt owed to their lenders. The Debtors also concluded they would need additional liquidity to meet their near term obligations under the franchise agreements.

2. Marriott Adequate Assurance Agreement

On June 25, 2010, the Debtors and Marriott entered into the Marriott Adequate Assurance Agreement, which is attached hereto as **Exhibit E** and incorporated herein by reference.

Among other things, the terms and conditions of the Marriott Adequate Assurance Agreement provide that Marriott will (a) forbear from exercising its remedies under the franchise agreements, (b) forbear from seeking relief from the automatic stay, and (c) permit the Debtors to assume the franchise agreements for the Marriott hotels that have defaulted under the franchise agreements. In consideration for the foregoing, the Marriott Adequate Assurance Agreement obligated the Debtors to (a) perform certain PIPs for the defaulted Marriott hotels according to a three-phase schedule ending November 20, 2011, and (b) file a motion seeking debtor-in-possession financing approval contemporaneously with the bankruptcy filing which seeks to have the Bankruptcy Court approve the financing within 60 days. The Debtors are in compliance with their obligations at this time, including the PIP completion schedule. The Debtors are assuming the Marriott Consent Agreement, dated June 29, 2007, which was negotiated in connection with Apollo's acquisition of Innkeepers. The Marriott Consent Agreement requires an annual $800,000 payment from the Debtors or the Post-Effective Date Debtors, as applicable, to Marriott through 2013.

The Marriott Adequate Assurance Agreement includes certain provisions relating to the assumption of applicable franchise agreements. Upon completion of a PIP for each Marriott hotel in accordance with the schedule set forth in the Marriott Adequate Assurance Agreement, Marriott's consent to the assumption of the respective franchise agreement shall be deemed given with respect to such Marriott hotel, and the Debtors shall seek to assume the applicable franchise agreement. If, as of the date of the filing of this Disclosure Statement, the Debtors are in compliance with the schedule, Marriott will consent to the assumption of all franchise agreements scheduled in the Marriott Adequate Assurance Agreement. The Debtors will schedule these franchise agreements as part of the Plan Supplement and will assume the franchise agreements as of Consummation of the Plans.

The Marriott Adequate Assurance Agreement terminates, if, among others, the following events occur:

- Termination of the DIP Facilities, unless the Debtors can establish they have sufficient funds to complete the PIPs in accordance with the schedule of PIP completion under the Marriott Adequate Assurance Agreement;

- The Debtors fail to complete a PIP in accordance with the schedule set forth in the Marriott Adequate Assurance Agreement, but termination shall be effective only with respect to such Marriott hotel; and

- All parties agree to terminate the agreement.

Under the Marriott Adequate Assurance Agreement, Marriott has the following additional remedies:

- If the Debtors fail to complete a PIP for a specific Marriott hotel in accordance with the schedule set forth in the Marriott Adequate Assurance Agreement, Marriott may seek relief from the automatic stay with respect to such Marriott hotel and the related franchise agreement. In such instance, the Debtors agree they will not contest a motion seeking relief from the automatic stay and shall deem the forbearance period with respect to such Marriott hotel terminated.

- If the Debtors fail to complete all of the PIPs required during the first phase and two hotels in the second phase, Marriott may serve a notice of default with a 60-day cure period. If, after the 60-

day cure period, the Debtors do not come into compliance with the schedule, Marriott may seek relief from the automatic stay with respect to any or all of the Marriott hotels whose franchise agreements have not already been assumed.

Notwithstanding the description of the Marriott Adequate Assurance Agreement, franchise agreements, and related agreements in this Disclosure Statement, Marriott has reserved its rights, as more fully set forth in the Bidding Procedures Order [Docket No. 1009], under the franchise agreements and related agreements in connection with any changes in the ownership and management of the Marriott branded hotels and reserves its rights to all remedies, rights and claims available to it at law, in equity or otherwise, to allege defaults under the Marriott Adequate Assurance Agreement, franchise agreements, owner agreements and the Marriott Consent Agreement. Marriott is currently in discussions with the Debtors to resolve certain alleged defaults under the Marriott Consent Agreement and the Marriott Adequate Assurance Agreement, which the Debtors expect to resolve no later than the Debtors' Sixth Omnibus Hearing on May 24, 2011. With respect to the Debtors' hotels operating under existing franchise agreements with Hilton Worldwide, Inc. ("**Hilton**"), Hilton has advised the Debtors that any sale, transfer, and/or other assignment of a Hilton franchise agreement may only be accomplished in accordance with the provisions of the applicable Hilton franchise agreement governing same. The rights of the Debtors' other franchisors under the terms of their franchise agreements are similarly reserved, subject to applicable law.

3. Prepetition Restructuring Negotiations

Against the backdrop described above, the Debtors considered their options with respect to a global financial restructuring with the goal of rationalizing the Debtors' secured debt obligations and providing the Debtors with the flexibility necessary to continue their business on a going-forward basis. Consistent with those goals, in November 2008, the Debtors hired Marc Beilinson, an independent director of Innkeepers since 2007, as Chief Restructuring Officer to explore alternative restructuring opportunities.[16] In early 2010, the Debtors retained Kirkland & Ellis LLP ("**K&E**") and Moelis to represent the Debtors in their continued discussions with certain of the Debtors' constituents regarding the evaluation of a possible comprehensive restructuring and other financial alternatives for improving the Debtors' balance sheet.

The Debtors, with the assistance of their advisors, reviewed and analyzed the Debtors' business operations and determined the cash necessary to work towards a successful restructuring and maintain their operations. In undertaking this analysis, the Debtors and their advisors considered the impact of the current economic outlook on the Debtors' near-term projected financial performance, including the demand for hotel accommodations and the projected cost to complete the PIPs and other capital improvements necessary to maintain the value of the properties. Because of the high levels of current debt, the immediate crisis caused by the impending Marriott defaults, and the Debtors' inability to satisfy their debt service obligations as they came due, it became clear that a comprehensive balance-sheet restructuring through a chapter 11 proceeding was the best available restructuring alternative for the Debtors and their estates.

The Debtors continued to engage several parties, including Marriott, Lehman, and certain prepetition secured lenders, in extensive negotiations leading up to the filing of these Chapter 11 Cases. Ultimately, these negotiations culminated in a series of interrelated agreements designed to, among other things, (a) fund PIP and other capital expenditures necessary to retain premium brand affiliations, maintain customer loyalty, and improve the Debtors' industry market share and (b) avoid any alleged potential change of control defaults that would jeopardize the Debtors' franchise agreements.

On July 19, 2010, the Debtors filed these Chapter 11 Cases with a proposed restructuring supported by Lehman, which was intended to eliminate a substantial portion of the Debtors' funded indebtedness, and also provide the Debtors with the necessary financing to fund critical hotel maintenance and repair projects, allowing the

---

16 Marc Beilinson is a former restructuring attorney with over 25 years of experience. In November 2009, Mr. Beilinson was elected to serve as an independent director on the board of directors of Apollo Commercial Real Estate Finance Inc., a publicly traded REIT and an affiliate of Apollo Investment Corporation. Mr. Beilinson no longer serves on this board.

Debtors to preserve valuable franchise agreements, meet competitive conditions, and preserve asset value for the Debtors and their estates.

## ARTICLE IV.
## EVENTS OF THE CHAPTER 11 CASES

*A.*     *First Day Pleadings and Other Case Matters*

1.     First and Second Day Pleadings

To facilitate these Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors' filed certain motions and applications with the Bankruptcy Court on the Petition Date or immediately thereafter seeking certain relief summarized below. The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value. The first and second day pleadings included the following:

- Customer Programs. On July 20, 2010, the Bankruptcy Court entered an order authorizing the debtors to honor certain prepetition obligations to customers and otherwise continue certain customer programs and practices in the ordinary course of business [Docket No. 59]. The Debtors did not believe that the obligations at issue represented an out-of-pocket cash cost to the Debtors, but the Debtors believed that honoring the customer programs was the prudent course of action.

- Taxes. On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to pay certain income, sales and use, franchise, occupancy, and other taxes, assessments, fees, and similar charges in the ordinary course of business [Docket No. 61]. Such payments only affect the timing of payment for the vast majority of the amounts at issue. The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 184].

- Wages and Employee Benefits. On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay certain prepetition wages, salaries, and reimbursable employee expenses, (b) pay and honor certain employee medical and other benefits, and (c) continue employee benefits programs [Docket No. 58]. The relief requested and granted by the order allowed the Debtors' business operations to continue without labor-related frustration or interruption. The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 183].

- Lien Creditors. On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) grant administrative expense priority to all undisputed obligations for goods ordered prepetition and delivered postpetition and satisfy such obligations in the ordinary course of business, (b) pay prepetition claims of shippers, warehousemen, and materialmen, and (c) pay prepetition PACA claims [Docket No. 60]. The delay and frustration absent an order granting the relief requested could have severely impaired the Debtors' business operations as well as the confidence of counterparties in the Debtors going forward. The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 185].

- Property Management. On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to perform under the hotel management agreements and the shared services agreement for services performed that are critical to the ability of the Debtors to operate their portfolio of hotels going forward [Docket No. 62]. The Bankruptcy Court entered a final order granting the relief requested on August 12, 2010 [Docket No. 190].

- Insurance. On August 12, 2010, the Bankruptcy Court entered an order authorizing the Debtors to (a) maintain prepetition insurance policies and premium financing agreements and (b) pay all prepetition obligations in respect thereof [Docket No. 186].

- Cash Management. On July 20, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to use their existing cash management system, existing bank accounts, existing business forms, and certain existing investment guidelines [Docket No. 55]. The Bankruptcy Court entered a final order granting the relief requested on September 2, 2010 [Docket No. 401].

- Cash Collateral. On July 20, 2010, the Bankruptcy Court entered an interim order approving the use of cash collateral to fund operations and restructuring costs [Docket No. 54]. This relief was necessary to ensure the Debtors can continue to operate in the ordinary course during these Chapter 11 Cases. The Bankruptcy Court entered a final order granting the relief requested on September 2, 2010 [Docket No. 402] (amended by subsequent orders entered October 1, 2010 [Docket No. 539] and March 11, 2011 [Docket No. 1008]) (the "**Final Cash Collateral Order**").

- Lehman DIP. On September 1, 2010, the Bankruptcy Court entered an order authorizing the Debtors to borrow approximately $17.5 million in postpetition debtor-in-possession financing for the specific purpose of funding the PIPs required in the applicable franchise agreements and making certain other investments in properties securing the Floating Rate Pool Mortgage Loan [Docket No. 385]. These funds are critical to the Debtors' ability to meet their obligations under the PIPs.

- Five Mile DIP. On September 2, 2010, the Bankruptcy Court entered an order authorizing the Debtors to borrow approximately $53.0 million in postpetition debtor-in-possession financing for the specific purpose of funding the PIPs and cycle renovations required in the applicable franchise agreements for properties securing the Fixed Rate Pool Mortgage Loan (Tranche A), the San Diego Hotel Mortgage Loan (Tranche B), and the Tysons Corner Hotel Mortgage Loan (Tranche C) [Docket No. 400]. These funds are critical to the Debtors' ability to meet their obligations under the PIPs.

- Plan Support Agreement. On September 2, 2010, the Bankruptcy Court entered an order denying the Debtors' request for approval to enter into a plan support agreement with Lehman [Docket Nos. 403, 776]. Since that date, the Debtors have worked diligently to develop the Plans described in this Disclosure Statement.

2. Procedural and Administrative Motions

To facilitate the efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the Debtors' chapter 11 cases;

- approving notice, case management, and administrative procedures to govern these Chapter 11 Cases;

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code;

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 50 largest creditors;

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business;

- determining the amount and nature of the adequate assurance payment for future utility service;

- allowing the Debtors to prepare a list of creditors and file a consolidated list of the Debtors' 50 largest unsecured creditors; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in these Chapter 11 Cases.

3. <u>Retention of Chapter 11 Professionals</u>

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these Chapter 11 Cases. These professionals include: (a) K&E, as counsel to the Debtors; (b) Moelis, as investment banker to the Debtors; (c) AP Services, LLC, as restructuring advisor to the Debtors; and (d) Omni Management Group, LLC, as the Notice and Claims Agent for the Debtors.

4. <u>Compensation for the Independent Committee Members and Counsel for Such Committee</u>

The Debtors' plan process required the committee of independent trustees of the Board of Trustees of Innkeepers USA Trust (the "**Independent Committee**") to take on certain special obligations related to the restructuring. To advise it in such endeavors, the Independent Committee hired Fried, Frank, Harris, Shriver & Jacobson LLP ("**Fried Frank**"). On November 10, 2010, the Bankruptcy Court authorized the Debtors to compensate pursuant to section 363 of the Bankruptcy Code (a) the Independent Committee and (b) Fried Frank as counsel to the Independent Committee [Docket No. 701]. Although the Bankruptcy Court authorized the Debtors' compensation of Fried Frank pursuant to section 363 of the Bankruptcy Code, Fried Frank agreed to comply with certain requirements of section 327 of the Bankruptcy Code by filing and serving verified statements of its fees and expenses.

5. <u>Troy Hotel Dispute</u>

On August 4, 2010, Marriott filed a motion for relief from the automatic stay with regard to a hotel in Troy, Michigan [Docket No. 131] that was not part of the Marriott Adequate Assurance Agreement. In response, the Debtors sought to assume the franchise agreement between the Debtors and Marriott relating to the Troy hotel [Docket No. 172]. After an extensive discovery process, the Debtors determined that the estates were better served by settling with Marriott. The settlement (the "**Troy Settlement Agreement**") included, among other provisions, the Debtors' agreement to allow Marriott to de-flag the Troy hotel in exchange for Marriott's agreement to provide the Debtors with valuable rights related to their PIP obligations, the specifics of which are documented in a confidential settlement agreement disclosed to and approved by the Bankruptcy Court [Docket No. 357]. The Debtors also agreed to assume the Marriott Adequate Assurance Agreement [Docket No. 446]. All of the Debtors' rights and obligations under the Troy Settlement Agreement will be assumed and assigned to New HoldCo.

6. <u>Motions Filed by the Ad Hoc Committee of Preferred Shareholders</u>

The Ad Hoc Committee of Preferred Shareholders filed a motion to appoint an examiner in the Debtors' chapter 11 cases on August 11, 2010 [Docket No. 179] as well as a motion, on September 13, 2010, to appoint an official committee of preferred shareholders [Docket No. 435]. After the filing of a number pleadings by various parties in interest, extensive discovery, and contested hearings, the Bankruptcy Court denied both motions without prejudice on October 19, 2010 [Docket Nos. 582 and 583].

7. <u>Best Western West Palm Beach Dispute</u>

On October 4, 2010, Best Western International, a franchisor for one of the Debtors' hotels, filed a motion seeking relief from the automatic stay to terminate the franchise agreement for the Best Western West Palm Beach Airport Inn in West Palm Beach, Florida [Docket No. 655]. In that motion, Best Western alleged the Debtors were in default of the franchise agreement, and, as a consequence, Best Western should be granted relief from the automatic stay to terminate the franchise agreement. Pursuant to the Bankruptcy Court's oral decision on November 10, 2010, on February 28, 2011, the Bankruptcy Court entered an order denying the relief requested by Best Western [Docket No. 955].

On January 12, 2011, the Debtors filed a motion seeking to reject the franchise agreement at the Best Western West Palm Beach hotel, as well as the related ground lease and other executory contracts on the basis that the property was not profitable [Docket No. 803]. On January 26, 2011, the Bankruptcy Court granted the Debtors' motion, removing the Best Western West Palm Beach hotel from the Debtors portfolio of hotels [Docket No. 865].

   8.   Postpetition Insurance Motions

On December 14, 2010, the Bankruptcy Court entered orders permitting the Debtors to enter into certain premium financing agreements [Docket Nos. 759 and 761]. Pursuant to these agreements, AFCO Credit Corporation and IPFS Credit Corporation will provide financing to the Debtors allowing them to meet their premium obligations under their D&O policies, as well as property insurance and workers' compensation policies that are critical to the Debtors business and in some cases required by law. As part of the agreements, AFCO and IPFS received security interests in unearned premiums and dividends that may become payable under the applicable insurance policies.

   9.   Claims Objections

In recent weeks, the Debtors have objected to a total of 945 claims for approximately $1.06 billion in liabilities in seven omnibus claims objections. On March 29, 2011, the Debtors filed the first omnibus objection to certain amended and replaced claims [Docket No. 1067] and the second omnibus objection to certain claims that are duplicative of other claims filed against the same Debtors [Docket No. 1068], which were each granted by the Bankruptcy Court [Docket Nos. 1159 and 1160]. On April 19, 2011, the Debtors filed the third omnibus objection to claims filed by affiliates of Chartis, Inc. that lack basis in the Debtors' books and records [Docket No. 1123] and the fourth omnibus objection to (i) claims with insufficient supporting documentation for the Debtors to determine whether they appear in their books and records, (ii) claims that, according to the Debtors' books and records, are against incorrect Debtors, for incorrect amounts, or alleging incorrect priorities, (iii) claims by shareholders more appropriately classified as equity interests, and (iv) claims for which the Debtors' books and records reflect no liability [Docket No. 1125]. On April 20, 2011, the Debtors filed a fifth omnibus objection to claims that, according to the Debtors' books and records, are against an incorrect Debtor or against a single Debtor and should have been asserted against multiple Debtors [Docket No. 1127]; a sixth omnibus objection to redundant claims for which the Debtors' books and records reflect a liability already asserted in a different proof of claim [Docket No. 1129]; and a seventh omnibus objection to certain amended and replaced claims [Docket No. 1131]. A hearing on the third, fourth, fifth, sixth, and seventh omnibus objections is currently scheduled for May 24, 2011 at 11:00 a.m. prevailing Eastern Time.

B.   *Stipulation Between the Debtors, LNR, and the Ad Hoc Committee*

On May 3, 2011, after extensive arm's-length negotiations between the parties, the Debtors, LNR, on behalf of the LNR-Serviced Trusts, and the Ad Hoc Committee entered into a stipulation regarding various issues (the "**Stipulation**"). The salient terms of the Stipulation are as follows:

- The Trusts serviced by LNR (the "**LNR-Serviced Trusts**") agree to provide financing to Chatham in connection with their $195 million bid for the LNR Properties.

- The Debtors agree to file, and LNR and the Ad Hoc Committee agree to support, a motion seeking approval of certain bid protections for Chatham.

- The LNR-Serviced Trusts agreed to waive any right in the approximately $7.4 million of cash currently existing in a segregated bank account held in the name of Innkeepers USA Limited Partnership.

- The LNR-Serviced Trusts agreed to waive any and all deficiency, guarantee, and other claims against all of the Debtors they may be entitled on account of the secured mortgage loans for the LNR Properties except as set forth in the Stipulation. More specifically, the LNR-Serviced Trusts' claims against the Debtors are deemed allowed in the following amounts:

- Claim No. 1632 in the stated amount of $24,501,947.20, will be an allowed secured claim against KPA San Antonio, LLC in the principal amount of $24,062,695;

- Claim No. 1634 in the stated amount of $47,787,117.82, will be an allowed secured claim against KPA RIMV, LLC in the principal amount of $47,168,769.26;

- Claim No. 1635 in the stated amount of $37,907,080.79, will be an allowed secured claim against KPA RIGG, LLC in the principal amount of $37,416,576.45;

- Claim No. 1636 in the stated amount of $25,919,415.27, will be an allowed secured claim against KPA Washington DC, LLC in the principal amount of $25,454,752.20; and

- Claim No. 1637 in the stated amount of $25,514,424.38, will be deemed an allowed claim against KPA Tysons Corner RI, LLC in the principal amount of $25,057,021.

plus, accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Assumption Fee, the LNR Liquidation Fee, the LNR Servicing Fee, and the fees and expenses of the LNR-Serviced Trusts, including the fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation.[17]

- The Debtors will pay a $2.5 million structuring fee to the LNR-Serviced Trusts on the earlier of the effective date or upon termination of the Stipulation, which claim for such fee against KPA RIMV, LLC and KPA Tysons Corner RI, LLC will be pari passu with the Five Mile DIP Facility (to the extent allowed under the order approving such loan).

- The definition of "Releasing Parties" will be expanded in the applicable plan to include (a) the successful bidder (in this case, Chatham); and (b) LNR, the LNR-Serviced Trusts, and master servicer for each of the loans secured by the LNR Properties (the "**Trust Secured Loans**").

- The Ad Hoc Committee will release LNR, the LNR-Serviced Trusts, and master servicer for each of the Trust Secured Loans.

- LNR agrees to support approval of the Debtors' disclosure statement for a plan that encompasses the LNR Properties.

- The Debtors agree (a) to file objections to all disputed claims on or before June 15, 2011; (b) to file a motion to estimate any unliquidated claims on or before the effective of the plan; (c) that counsel to the Debtors will participate in a telephonic conference with counsel to the Ad Hoc Committee every other week regarding the outstanding claims; and (d) that counsel to the Debtors would consult with the Ad Hoc Committee prior to settling any claims in excess of $250,000.

- The Debtors agree to provide the Ad Hoc Committee, on or before the 15th day of each month following the effective date with (a) a statement of uses of all proceeds of the LNR Properties and all other assets of the Debtors' estates not subject to blanket mortgages; and (b) an estimate of the ultimate aggregate distributions to the series C Preferred Shareholders.

On May 6, 2011, the Debtors filed *Debtors' Motion for Entry of an Order Approving (I) Stipulation By and Between Debtors, LNR Partners LLC, and Ad Hoc Committee of Preferred Shareholders and (II) Break-Up Fee and Expense Reimbursement for Chatham Lodging L.P.* [Docket No. 1205] (the "**Bid Protections Motion**"). The Bid

---

[17] All payments received by the LNR-Serviced Trusts (the "**Cash Collateral Payments**") pursuant to the Cash Collateral Order shall be credited, to the extent actually made by the Debtors, to the legal fees and disbursements of the LNR-Serviced Trusts' counsel and the monthly fees and disbursements of the LNR-Serviced Trusts' financial advisors and the Allowed Claim for interest at non-default rate. In no event shall any payment be applied to or recharacterized to reduce the principal component of such Allowed Claims. The Cash Collateral Payments shall not be subject to objection, avoidance, recovery, disgorgement, or turnover.

Protections Motion seeks the Court's approval of certain bid protections for Chatham—the successful bidder at the Debtors' Auction for the LNR Properties. Specifically, the asset purchase agreement governing the Chatham Bid (the "**APA**") contemplates (and the Bid Protections Motion seeks approval of) (a) a break-up fee of $2.0 million and (b) an expense reimbursement of up to $500,000, as well as an additional expense reimbursement of up to an additional $500,000 if the Court does not confirm a plan of reorganization before July 31, 2011. The break-up fee and expense reimbursement are payable to Chatham, among other times, if the closing does not occur by August 5, 2011 or if the Debtors exercise their fiduciary right to terminate the APA. The Bankruptcy Court approved the bid protections on May 16, 2011 [Docket No. 1397].

C.      The LP Bank Account

On the Petition Date, Innkeepers USA Limited Partnership held a bank account that contained, among other things, Cash collected from three sources: (a) the operation of the Debtors' hotels; (b) transfers from Apollo in January and May 2010; and (c) transfers from Lehman just prior to the Petition Date to pay for certain PIP and renovation related expenditures that the Debtors were unable to disburse because of the Debtors' bankruptcy filings. On September 23, 2010, the Debtors communicated to all of their major constituencies that they would separate this Cash, which amounted to approximately $7.4 million, from the Debtors' operating account into a new Bank of America account in the name of Innkeepers USA Limited Partnership (the "**LP Bank Account**"), that the Debtors would not use funds from this new account without a prior Bankruptcy Court order, and that all parties would retain their right to claim entitlement to these funds.

On the Effective Date of the Remaining Debtor Plan, the Cash in the LP Bank Account will be deemed to be unencumbered, not subject to a security interest of any lender.

D.      Claims Bar Date

On September 1, 2010, the Debtors filed their schedules and statements with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code [Docket No. 390]. The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case. Any creditor whose Claim is not scheduled in the Debtors' schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim.

On September 16, 2010, the Bankruptcy Court entered an order [Docket No. 440] approving (a) October 29, 2010 as the deadline for filing Claims in the Debtors' Chapter 11 Cases, including Claims under section 503(b)(9) of the Bankruptcy Code; (b) January 18, 2011 as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the Debtors' Chapter 11 Cases; (c) procedures for filing proofs of claim; and (d) the form and manner of notice of the bar dates (the "**Bar Date Order**").

The table below provides summary information about timely Filed and scheduled Claims, the face amount of those Claims, and the Debtors' estimate of the range of Allowed General Unsecured Claims at each Debtor.  **The estimates of Allowed unsecured Claims below do not include franchisor, deficiency, or guarantee claims.**

**The information contained in the table is based on a preliminary review of Filed Claims and should be considered speculative and subject to material revision.  All figures are subject to ongoing review.  No information contained in the table is an admission of the validity or Allowed amount of any Claim.  The Debtors are providing the information for guidance only.**

| Debtor | No. of Filed Claims | No. of Scheduled Claims | Face Amount of Filed Claims | Estimated Amount of Final Claims | |
|---|---|---|---|---|---|
| | | | | High | Low |
| Grand Prix Fixed Lessee LLC | 264 | 1,203 | $ 5,426,398 | $ 2,606,286 | $ 2,118,679 |
| Grand Prix Floating Lessee LLC | 159 | 857 | 240,493,596 | 1,673,489 | 1,379,053 |
| Grand Prix Mezz Borrower Fixed, LLC | 405 | 536 | 141,195,739 | 343,217 | 325,028 |
| Grand Prix Mezz Borrower Floating, LLC | 202 | 248 | 5,064,655,336 | 2,400,005 | 952,725 |
| **Fixed/Floating Subtotal** | **1,030** | **2,844** | **$ 5,451,771,069** | **$ 7,022,997** | **$ 4,775,484** |
| Grand Prix Anaheim Orange Lessee LLC | 28 | 119 | $ 16,554,284 | $ 268,948 | $ 239,900 |
| Grand Prix General Lessee LLC | 37 | 167 | 3,340,771 | 236,452 | 151,152 |
| Grand Prix Mezz Borrower Term LLC | 2 | 2 | 24,408,000 | 0 | 0 |
| Grand Prix Ontario Lessee, LLC | 24 | 141 | 48,294,534 | 197,974 | 175,724 |
| Grand Prix RIGG Lessee LLC | 29 | 78 | 6,375,742 | 114,579 | 99,765 |
| Grand Prix RIMV Lessee, LLC | 18 | 84 | 3,210,420 | 90,675 | 70,033 |
| KPA HI Ontario LLC | 12 | 18 | 48,347,474 | 297,228 | 151,134 |
| KPA HS Anaheim, LLC | 7 | 9 | 16,950,422 | 0 | 0 |
| KPA RIGG, LLC | 10 | 9 | 4,565,307 | 236 | 0 |
| KPA RIMV, LLC | 10 | 10 | 3,210,913 | 0 | 0 |
| KPA San Antonio, LLC | 10 | 9 | 4,163,096 | 0 | 0 |
| KPA Tysons Corner RI, LLC | 5 | 15 | 3,177,595 | 2,498 | 2,498 |
| KPA Washington DC, LLC | 6 | 7 | 3,151,703 | 0 | 0 |
| **Other Subtotal** | **198** | **668** | **$ 185,750,262** | **$ 1,208,589** | **$ 890,205** |
| Grand Prix Holdings LLC | 10 | 9 | $ 456,553,719 | $ 0 | $ 0 |
| Grand Prix IHM, Inc | 15 | 4 | 3,759,721 | 0 | 0 |
| Grand Prix Term Lessee LLC | 1 | 2 | 3,119,130 | 0 | 0 |
| Innkeepers Financial Corporation | 9 | 5 | 3,125,400 | 0 | 0 |
| Innkeepers USA Limited Partnership | 64 | 60 | 440,338,420 | 772,953 | 208,196 |
| Innkeepers USA Trust | 462 | 20 | 42,230,048 | 780,627 | 0 |
| KPA Leaseco Holding Inc. | 3 | 24 | 3,167,445 | 120,660 | 119,683 |
| KPA Leaseco, Inc. | 12 | 5 | 203,122,337 | 601 | 0 |
| **Parent Company Subtotal** | **576** | **129** | **$ 1,155,416,220** | **$ 1,674,841** | **$ 327,879** |
| **TOTAL** | **1,804** | **3,641** | **$ 6,792,937,551** | **$ 9,906,428** | **$ 5,993,569** |

E.     *Exclusivity*

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief, which period may be extended by the bankruptcy court for a period of up to 18 months after the petition date.

On October 27, 2010, the Debtors filed a motion seeking to extend the exclusive periods during which only the Debtors may file a chapter 11 plan and solicit acceptances thereof to March 16, 2011 and May 15, 2011, respectively [Docket No. 610]. A number of parties filed responses or objections [Docket Nos. 663, 665, 666, 667, 673, and 675]. After a period of fact development and negotiation, the Debtors and the objecting parties agreed upon an extension of the Debtors' exclusivity periods for an additional 75 days through and including January 30, 2011 and March 31, 2011 for the filing of a plan and the solicitation thereof, respectively. The Bankruptcy Court entered an order giving effect to that negotiated resolution on November 10, 2011 [Docket No. 699].

On January 13, 2011, the Debtors filed a second motion to further extend their exclusive periods for filing a chapter 11 plan and soliciting acceptances thereof through and including May 30, 2011 and July 29, 2011, respectively [Docket No. 805]. On January 26, 2011, the Bankruptcy Court entered a bridge order extending the Debtors' exclusive periods through and until March 29, 2011 [Docket No. 861] when the motion could be heard. Pursuant to the Five Mile/Lehman Commitment Letter, the Debtors agreed to modify their original request for a 120-day extension of its exclusive periods and agreed to only seek an extension to June 30, 2011 (subject to further requests), and Five Mile, Lehman, and Midland agreed that they would support such modified request. On March 29, 2011, the Bankruptcy Court further extended the Debtors' exclusive periods for filing a chapter 11 plan to June 30, 2011 [Docket No. 1065]. The Debtors' rights to seek additional extensions of the exclusive periods beyond June 30, 2011, and the rights of Five Mile, Lehman and Midland to oppose additional extensions and to move to terminate exclusivity, are preserved.

During the period established by the above orders of the Bankruptcy Court, no other party in interest may file a competing chapter 11 plan or plans; however, the Bankruptcy Court may modify the exclusive period upon request of a party in interest and "for cause." The Debtors have filed the Plan and Disclosure Statement within the exclusivity period, as extended by the Bankruptcy Court, and reserve the right to seek extensions of their exclusive right to file a plan or plans and solicit votes thereon if necessary and appropriate.

F.      *Pending Litigation Proceedings*

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their business. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. Nevertheless, they do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition, or results of operations.

With certain exceptions, the filing of these Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of these Chapter 11 Cases is subject to compromise, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with these Chapter 11 Cases. This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

On March 29, 2011, the Court extended the period during which the Debtors may file notices of removal with respect to any actions that are subject to removal under 28 U.S.C. § 1452 [Docket No. 1063]. Specifically, the Debtors' removal deadline under Bankruptcy Rule 9027 is the latest of: (a) October 10, 2011; (b) the day that is 30 days after the entry of an order terminating the automatic stay provided by section 362 of the Bankruptcy Code with respect to the particular action sought to be removed; and (c) with respect to actions filed during the pendency of these Chapter 11 Cases, the time periods set forth in Bankruptcy Rule 9027(a)(3).

G.      *The LNR/CRES Litigation*

On October 27, 2010, LNR filed a complaint and temporary restraining order in the Supreme Court of the State of New York seeking, among other things, specific performance and/or preliminary injunctive relief requiring CRES Investment No. II, LP ("**CRES**"), to terminate Midland Loan Services, Inc. as special servicer for the Fixed Rate Pool Mortgage Loan and appoint LNR as special servicer for the Fixed Rate Pool Mortgage Loan. See LNR Partners, LLC v. CRES Investment No. II, LP, Case No. 651850-10 (N.Y. Sup. Ct. Oct. 27, 2010). The action was

removed to the Bankruptcy Court on November 10, 2010. See LNR Partners, LLC v. CRES Investments No. II, LP, Adv. Proc. No. 10-04237 (the "**LNR/CRES Litigation**"). In the LNR/CRES Litigation, LNR seeks to compel CRES to terminate Midland as the special servicer of the Fixed Rate Pool Mortgage Loan and to pay damages to LNR for CRES's alleged breach of contract in failing to appoint LNR as special servicer. LNR claims that CRES is obligated to exercise its purported right to terminate Midland and name LNR the special servicer of the Fixed Rate Pool Mortgage Loan based on a demand by LNR of April 2010 issued pursuant to a November 30, 2007 Servicer Designation Agreement among CRES, LNR, and others. CRES denies that it has any obligation to appoint LNR as special servicer for the Fixed Rate Pool Mortgage Loan and alleges that the November 30, 2007 Servicer Designation Agreement does not address designation of the special servicer for the Fixed Rate Pool Mortgage Loan. CRES opposed LNR's request for injunctive relief and also filed a motion to dismiss the LNR/CRES Litigation. At a hearing held on December 16, 2010, the Bankruptcy Court denied LNR's request for equitable and injunctive relief, finding that LNR had an adequate remedy at law in the form of monetary damages. The Bankruptcy Court requested further briefing on one issue in order to rule on CRES's motion to dismiss LNR's claim for breach of contract. The parties are currently awaiting a decision by the Bankruptcy Court and the matter remains *sub judice*.

Nothing in the Plan or Disclosure Statement is intended to impair any rights of LNR, CRES, or any other party with respect to the LNR/CRES Litigation. All parties' rights are reserved with respect to all aspects of the litigation, including with respect to post-Effective Date jurisdiction.

As of the date hereof, the Debtors understand that LNR is no longer seeking to change the special servicer prior to the Effective Date of the Fixed/Floating Plan. Given this understanding, the success of the auction, and the overall posture of these cases, the Debtors believe that the facts and circumstances surrounding the LNR/CRES Litigation do not implicate the Debtors and their estates but rather are commercial disputes between third parties. Parties to the litigation may have different views.

## H.     Deficiency Claims

Pursuant to the Stipulation, the LNR-Serviced Trusts waived their rights to any distribution on account of any deficiency claim that could be asserted against the Debtors.

As discussed in Article IV.I.2 below, the Debtors believe that, pursuant to the Five/Mile/Lehman Commitment Letter, Midland and Lehman waived any right to a recovery that they may have with respect to deficiency claims related to the Fixed Rate Mortgage Loan and the Floating Rate Mortgage Loan.

## I.     Disputes Regarding Guaranty Claims

Significant disputes exist between various constituents with respect to the right to receive recoveries that may be recoverable on account of the Innkeepers USA Trust Preferred A Interests, including the validity of certain guaranty claims and the timeliness of certain proofs of claim related thereto. The Debtors believe that, pursuant to the Five Mile/Lehman Commitment Letter and the Commitment Letter, Midland and Lehman waived any rights they had to assert or pursue any Mortgage Loan Deficiency Claims or any guaranty claims against any of the Debtors arising from or related to the Fixed Rate Pool Mortgage Loan Agreement, the Floating Rate Pool Mortgage Loan Agreement, and the Floating Rate Pool Mezzanine Agreement. The Debtors further believe that the Mortgage Loan Deficiency Claims and any related guaranty claims should be deemed canceled, released, and extinguished as of the Effective Date of the Fixed/Floating Plan. Nothing in the Plan will be deemed to alter, amend, reduce, affect, or limit the Debtors' ability to assert that Midland and Lehman have waived such claims.

Other than as agreed to in the Ad Hoc Committee Agreement and in the Stipulation, the rights and remedies of all parties in interest in the Debtors' chapter 11 cases are expressly preserved with respect to the terms of the Plan, confirmation of the Plan, and consummation of the Plan, including, without limitation: (a) any entity's right to assert that any entity has waived or not waived any rights it may have to a Claim, including Mortgage Loan Deficiency Claims; or (b) any entity's right to object to or respond to any objection to any guaranty claims that may be asserted against Grand Prix Holdings LLC, including, without limitation, guaranty claims on account of the Fixed Rate Mortgage Loan Claims, the Floating Rate Mortgage Loan Claims, the Floating Rate Mezzanine Loan Claims, Anaheim Hotel Mortgage Claims, and Anaheim Hotel Mezzanine Claims, on any grounds, including (i) that the holders of such alleged Claims waived or did not waive their rights to any recovery from Grand Prix Holdings on

account of any Mortgage Loan Deficiency Claims, guaranty Claims or otherwise in connection with the Five Mile/Lehman Commitment Letter, and (ii) the timeliness of any proofs of claim asserting such Claims. For avoidance of doubt, nothing contained in the Fixed/Floating Plan shall be deemed to constitute an admission of any entity as to the validity, allowance, invalidity, or disallowance of any such alleged guaranty claim.

1. Statement of Midland and Lehman Regarding Guaranty Claims

Midland and Lehman dispute the Debtors' belief that there has been any waiver of obligation of Grand Prix Holdings to Midland and Lehman for a number of reasons, including that the documents cited by the Debtors do not support the beliefs being asserted.

Further, Midland and Lehman object to the Debtors expending any estate assets to challenge their respective guaranty claims, including those listed herein. The Innkeepers USA Trust Board and officers should be completely neutral regarding the ultimate recipient(s) of the distribution Grand Prix Holdings will receive as a result of its ownership of the Innkeepers USA Trust Series A Preferred Interests. They have no economic stake in whether the funds are distributed to Midland and Lehman on their guaranty claims, or to Apollo as Grand Prix Holdings' owner. If the Debtors oppose Midland and Lehman receiving distributions based on the guaranty claims, the Debtors' efforts would be for the sole economic benefit of Apollo, the Debtors' corporate parent.

If Apollo seeks to obtain a distribution in these cases (estimated to be worth up to $6.8 million elsewhere in this Disclosure Statement), Apollo should bear that expense rather than consuming estate assets for the benefit of the corporate parent. Midland and Lehman also specifically object to the use of their cash collateral by the Debtors to fund litigation for Apollo's benefit and believe that the same is prohibited by the Final Cash Collateral Order.

2. Debtors' Response to Statement of Midland and Lehman Regarding Guaranty Claims

The "Statement of Midland and Lehman Regarding Guaranty Claims" must be read with the following qualifications. First, Midland and Lehman are taking advantage of the success of the auction for the LNR Properties and trying to obtain a windfall recovery. The Debtors believe that Midland and Lehman waived their right to recoveries on account of deficiency claims and guaranty claims under the Five Mile/Lehman Commitment Letter. The Debtors do not believe that Midland and Lehman should now be entitled to change their minds to capture value generated at the auction for the LNR Properties to the detriment of the Debtors' other stakeholders. Moreover, the Debtors believe that TriMont, as special servicer for the Floating Rate Pool Mezzanine Loan and the Anaheim Hotel Mezzanine Loan, failed to file timely proofs of claim on account of any guaranty claims that may exist with respect to the Floating Rate Pool Mezzanine Loan Claims or the Anaheim Hotel Mezzanine Loan Claims. (TriMont has informed the Debtors that it believes all necessary proofs of claim were filed on a timely basis.)

Second, Midland and Lehman ignore the fact that the Debtors owe fiduciary duties to all of their constituents, including Apollo, which, as described above, is a publicly traded corporation and holds both preferred and common equity interests in Grand Prix Holdings. Midland and Lehman would have the Debtors act in direct contravention of their fiduciary duties by assigning the value of the guaranty claims directly to Midland and Lehman. The Debtors intend to fulfill their fiduciary duties and cannot allow the exercise of those fiduciary duties to be threatened by Midland and Lehman so that those parties may receive an advantage in the dispute over the guaranty claims.

Third, the dispute regarding the validity and allowableness of the guaranty claims only impacts creditors of Grand Prix Holdings, which is the holding company that sits at the top of the Debtors' capital structure. This dispute should not affect the majority of creditors in these Chapter 11 Cases.

The Debtors reserve all of their rights with respect to the Midland and Lehman statement above.

3. Statement of Apollo Regarding Guaranty Claims

Apollo acknowledges that certain parties dispute its right to receive a recovery on account of Grand Prix Holdings' Innkeepers USA Trust Preferred A Interests, and agrees with the Debtors that certain related guaranty

claims were waived and/or not timely filed. Apollo is prepared to take appropriate action to defend its rights. Moreover, Apollo opposes any suggestion that the Debtors should not fulfill their fiduciary duties and be full participants in potential litigation concerning this matter.

*J.     The Debtors' Management Team*

Innkeepers' management team consists of Chief Executive Officer Timothy Walker, Chief Restructuring Officer Marc Beilinson, and General Counsel Mark Murphy. Mssrs. Walker and Murphy are parties to employment agreements with Innkeepers. On January 31, 2011, the employment agreement between Innkeepers and its Chief Restructuring Officer, Marc Beilinson, expired. The Board determined that the continued employment of Mr. Beilinson was critical to the ongoing restructuring and, at the Board's request, Mr. Beilinson agreed to continue his employment on an at-will basis while the Board considered and negotiated his compensation and incentive package for the current year. During this time, Mr. Beilinson has received his current compensation pursuant to Board direction.

*K.     The Debtors' Plan Process*

The Debtors have engaged all major stakeholders to solicit input regarding restructuring alternatives with the goal of proposing and filing a consensual plan. To promote meaningful plan development and dialogue, the Debtors created a virtual data room through which potential plan sponsors could perform necessary diligence. The Debtors established a communication protocol to solicit, receive, and consider restructuring proposals. The Debtors also formed a committee of independent trustees of Debtor Innkeepers USA Trust to facilitate the plan consideration process.

The Debtors focused their energy and resources on pursuing a single, comprehensive process—after soliciting input from their key constituencies on the parameters of such process—that was intended to maximize value for the benefit of their estates and creditors. As part of this plan process, the Debtors and their advisors, including Moelis, engaged all of their key constituencies in active discussions regarding the Debtors' restructuring strategy and solicited restructuring proposals from a selected group of potential plan sponsors whose financial wherewithal and experience in the hospitality and real estate industries could have benefited the Debtors' estates. The Debtors provided their key constituencies with multiple and regular status updates and provided the Bankruptcy Court with updates through status reports, chambers conferences, and statements made on the record at the Debtors' hearings.

1.     Selection of a Stalking Horse

The Debtors engaged in an intensive stalking horse bidder selection process. Following a meeting of the Independent Committee of the Board on September 20, 2010, and a Board meeting on September 21, 2010, the Debtors began a process of developing plan concepts and a more detailed process timeline to facilitate a restructuring process aimed at maximizing the value of the Debtors' estates for the benefit of all constituents. The Debtors' management and advisors met over the next four weeks (including several meetings with the Debtors' key constituencies) to discuss and develop restructuring alternatives and the appropriate process to pursue a strategy to maximize value.

Following a meeting of the Board on October 19, 2010, where a number of possible restructuring alternatives were discussed, reviewed, and considered, the Board requested that Moelis consider and propose a process to explore an enterprise-level restructuring.

On October 22, 2010, the Debtors and their advisors presented the Board with, and the Board approved, proposed timelines for selecting a stalking horse bidder and engaging in a process to achieve that. At the meeting, Moelis proposed a detailed timeline with the goal of selecting a stalking horse for plan sponsorship for an enterprise-level restructuring transaction within four weeks and selecting the winning bidder within approximately 14 weeks. After discussion and input, the Board approved the proposed timeline and tasked Moelis and the Debtors' management with executing the stalking horse process and meeting the various milestones set forth therein.

On October 26, 2010, the Board held another meeting to discuss the plan process going forward. The Debtors identified Five Mile and four other stalking horse candidates, which list included large private equity firms and real estate-focused investors. The Debtors selected the four other stalking horse candidates from a list of potential investors compiled by Moelis, which was narrowed to the four potential bidders based on, among other criteria, the following: (a) availability of funds; (b) breadth and depth of experience within the lodging sector; (c) familiarity with the bankruptcy process; and (d) ability to execute due diligence in a timely manner. Following the selection of these stalking horse bidder candidates, the Debtors and their advisors engaged in a process to select the stalking horse bidder. Between October 26 and November 3, 2010, the Debtors and their advisors negotiated confidentiality agreements with the stalking horse candidates.

Between October 30 and November 9, 2010, the Debtors granted the potential stalking horse bidders access to an electronic data room for the potential bidders to conduct due diligence. The data room contains detailed information regarding the Debtors' business and finances.

After the November 10, 2010 hearing on the Debtors' motion to extend exclusivity, the Debtors distributed a process letter to the stalking horse candidates outlining the timeframe and requesting indications of interest on or before November 23, 2010 (the "**Process Letter**").

The Debtors and their advisors worked to facilitate the formulation of offers by the stalking horse candidates in a number of ways. For example, Moelis and the Debtors' management coordinated an aggregate of over 120 site visits by the stalking horse candidates and over 25 diligence calls with sales, general, and/or regional managers of the Debtors' hotels. In addition, Moelis held numerous conference calls with the stalking horse candidates to exchange views, to solicit feedback, and to facilitate the formulation of offers. The Debtors' management team also made itself available for conference calls with each stalking horse candidate to discuss the Debtors' revised financial model.

On or shortly after the November 23, 2010 deadline provided for in the Process Letter, four out of the five stalking horse candidates, including Five Mile/Lehman, responded with proposals. All indications of interest contemplated some form of enterprise-level restructuring, notwithstanding the Debtors' willingness to entertain non-enterprise-level restructuring proposals as well. After evaluating these indications of interest, as well as factors regarding each candidate's ability to close their proposed transaction, the Debtors, in consultation with their advisors, conducted a side-by-side analysis of the proposals. Moelis then followed-up with each of the stalking horse candidates to ask clarifying questions and to better understand the proposals and determine the extent to which each candidate would be flexible in changing certain terms of their offers.

Through this process, the Debtors received a verbal offer to modify the structure of one stalking horse proposal. However, the Debtors and their advisors, in consultation with the Independent Committee, determined the proposed verbal modification from the potential bidder would not work structurally and was not worth pursuing for a variety of reasons, including the candidate's need for additional diligence. Two other stalking horse candidates failed to indicate whether they would be willing to materially change the terms of their offers at that time. As a result, the Debtors were left with two proposals, one from Five Mile/Lehman and the other from the stalking horse candidate identified to the key constituencies as Bidder D ("**Bidder D**").

On December 2, 2010, the Independent Committee met with its counsel, Fried Frank, and the Debtors' management and advisors to discuss the stalking horse proposals. In advance of the meeting, the members of the Independent Committee received the stalking horse proposals, as well as a presentation by Moelis summarizing the terms of each proposal, including the initial Five Mile/Lehman proposal, and comparing contemplated recoveries under each offer. At the Independent Committee meeting, the stalking horse bidders and their proposals were discussed in detail. The terms of each proposal, as well as the contemplated recoveries under each, were analyzed for their impact on the Debtors' estates and on the Debtors' constituents. In addition, the Independent Committee decided on a process moving forward, as well as a recommendation to the Board for the selection of a stalking horse bid. After considering each of the proposals, the Independent Committee concluded that the Bidder D proposal was the highest and best offer at that time.

At a Board meeting held on December 3, 2010, the Board agreed with the Independent Committee's assessment and made the determination that Bidder D's proposal represented the highest and best offer presented.

The Board selected Bidder D to be the stalking horse subject to the Debtors' advisors continuing their efforts to negotiate certain requested modifications with Bidder D that would make the Bidder D proposal even more favorable to the estates, while also instructing the Debtors and their advisors to engage with the constituencies to keep them apprised and solicit feedback on the process and the Bidder D proposal.

Following further negotiations with Bidder D, the Debtors received a revised Bidder D proposal on December 4, 2010, incorporating certain, but not all, of the Debtors' requested modifications. The Debtors and Bidder D and their advisors then began the process of negotiating appropriate documentation with Bidder D, while the Debtors and their advisors contacted constituencies to inform them about the Debtors' selection of Bidder D and to solicit feedback from the constituencies about the Bidder D proposal and the process going forward.

On December 7 and December 8, 2010, the Debtors and their advisors met in person or by telephone with each of the key constituencies, including Midland, Lehman, LNR Partners, LLC, CWCapital Asset Management, LLC, TriMont, the Creditor's Committee, and the Ad Hoc Committee, to advise them of the status of the stalking horse bid process and of the Debtors' intentions to move expeditiously to seek approval of bidding procedures and bid protections. Prior to these meetings, the Debtors asked each participating constituent to confirm its agreement to keep the information regarding the stalking horse proposals confidential, in accordance with the confidentiality agreements previously executed between each constituent and the Debtors. At these meetings, subject to the confidentiality agreements, the Debtors' management and advisors provided the key constituencies (other than Lehman, given its status as a potential bidder) with documentation summarizing each of the stalking horse proposals (without identifying which bidder had proposed which bid) and explained the analyses that the Debtors, their advisors, and the Board had performed in reaching their conclusions regarding the Bidder D proposal. The Debtors and their advisors also solicited input from the key constituencies at these meetings. At or around the same time, the Debtors notified the stalking horse candidates, including Five Mile, that they had selected Bidder D's proposal as the stalking horse proposal.

At the same time, the Debtors and their advisors proceeded to document the Bidder D proposal. On December 9, 2010, the Debtors and their advisors updated the Board on the status of discussions with Bidder D regarding its proposal and the stalking horse process. In addition to an update on the status of negotiations with Bidder D, the Debtors and their advisors apprised the Board of communications with the Debtors' constituencies regarding the Bidder D proposal and the concerns raised by the constituencies, including Midland and Lehman, about the Bidder D proposal and the Debtors' selection of a stalking horse bidder. After this update, the Board directed the Debtors' management and advisors to focus their resources on attempting to finalize documentation with Bidder D, while also continuing their discussions with the key constituencies to solicit feedback and to incorporate the constituencies' thoughts, to the extent possible, in the process.

Certain constituencies raised concerns with the Debtors' management and advisors that the Debtors were proceeding on an expedited timeline to select Bidder D as the stalking horse bidder without engaging in direct negotiations with Five Mile and Lehman before selecting Bidder D. While the Debtors and their advisors were sensitive to these concerns, they were focused on reaching agreement on a proposal that would lead to an auction process commencing with the best baseline bid.

On December 10, 2010, Five Mile/Lehman informed the Debtors it had substantially improved its proposal and that commitment letters had been signed between Five Mile and Lehman and Five Mile and Midland. On December 13, 2010, the Debtors met with representatives from Five Mile/Lehman and Midland to discuss their revised offer. In advance of this meeting, Five Mile/Lehman sent the Debtors and their advisors a revised commitment agreement between Lehman and Five Mile, executed as of December 10, 2010, detailing a joint commitment to act as plan sponsors with the support of Midland.

At the December 13, 2010 meeting, Five Mile/Lehman and Midland discussed the revised proposal in detail with the Debtors and their advisors. Following the meeting, the Debtors and their advisors reviewed and analyzed the revised proposal and determined that it was a significant improvement over Five Mile/Lehman's previous proposal from November 23, 2010, and that it was competitive with and possibly superior to the Bidder D proposal.

On the night of December 13, 2010, the Debtors and their advisors reconvened with Five Mile/Lehman and Midland to further negotiate certain terms of the proposal. These discussions lasted well into the evening and focused on the Debtors' desire that the Five Mile/Lehman Bid contain significant consideration for other constituencies, including unsecured creditors, preferred shareholders, and lenders for the mezzanine debt on the Floating Rate Pool. In addition, the Debtors requested modifications to the proposed bid protections in the proposal. These discussions were productive and resulted in agreement from Five Mile/Lehman and Midland to: (a) increase recoveries to unsecured creditors; (b) provide a baseline recovery and the Co-Investment Right to the holders of the Series C Preferred Shares; (c) resolve litigation between Midland and Apollo on account of the Apollo Guaranty thereby enhancing recoveries for Series C Preferred Shareholders; (d) provide some form of structured debt or equity instrument or other consideration for the Floating Rate Mezzanine Lenders; (e) reduce the initial overbid protection to $15 million inclusive of the Break-Up Fee and the Expense Reimbursement; (f) agree not to object to an expense reimbursement of up to $500,000 for Bidder D; and (g) increase the Expense Reserve from $4.5 million to $18.5 million.

Following this meeting, the Debtors and their advisors conducted further side-by-side analyses of the Five Mile/Lehman proposal and the other stalking horse bids and concluded that the Five Mile/Lehman proposal, as revised, provided the highest and best offer received to date. On the morning of December 14, 2010, the Debtors and their advisors had a status call with the Board to inform it generally about the updated situation regarding the Five Mile/Lehman proposal. The Debtors and their advisors then held a separate conference call with the Independent Committee to discuss the Five Mile/Lehman proposal in detail. The Independent Committee considered the Five Mile/Lehman proposal and the Bidder D proposal and concluded that the Five Mile/Lehman proposal was the superior bid. The Independent Committee thus decided to recommend the Five Mile/Lehman proposal to the Board.

In a subsequent meeting with the Board on December 14, 2010, the Independent Committee provided its recommendation to the Board. The Board considered the Five Mile/Lehman proposal in detail, and agreed with the Independent Committee's assessment that it provided the best and highest offer received to date. The Board then instructed the Debtors and their advisors to continue negotiations with Five Mile/Lehman and Midland to improve their bid, while working to finalize a commitment.

Between December 14 and December 16, 2010, the Debtors and their advisors informed the other constituencies about the selection of Five Mile/Lehman as the stalking horse bidders and solicited feedback. In addition, the Debtors and their advisors continued negotiations with Five Mile/Lehman and Midland between December 14 and December 22, 2010, to improve recoveries for most constituencies and to improve the contemplated bid protections.

On December 18, 2010, the Debtors and their advisors met with the Board again to provide another status update on the negotiations with Five Mile/Lehman. At that meeting, the Debtors advised the Board of the open issues in the negotiations and the Board requested that the Debtors and their advisors proceed with finalizing the commitment letter on the best terms and conditions the Debtors could negotiate.

Throughout that weekend, the Debtors and their advisors continued to engage in near around-the-clock negotiations with Five Mile/Lehman and Midland to address or otherwise minimize the Board's concerns. As a result of those negotiations, the Debtors won concessions from Five Mile/Lehman, including an extension of the post-stalking horse selection marketing period to 45-days, with no limitation on the Debtors' ability to market prior to approval of the Bidding Procedures.

On December 21, 2010, the Debtors and their advisors met with the Independent Committee and the Board to provide a further update on the status of their negotiations with Five Mile/Lehman and to discuss the issues of concern that the Board had with the Five Mile/Lehman proposal. At that meeting, the Board discussed the proposal from the Ad Hoc Committee and considered it against the entire package presented by Five Mile/Lehman and Midland. The Board determined that it should not risk losing the benefits of the Five Mile/Lehman Bid, including support from the Debtors' two largest creditors representing more than $1 billion in claims, the portability of the Midland Financing to other bidders pursuant to the Five Mile/Lehman Commitment Letter, the baseline recoveries for other constituents, and the broad "fiduciary out" in the Five Mile/Lehman Commitment Letter.

Following the December 21 meeting of the Board, the Debtors and their advisors continued their ongoing negotiations with the Five Mile/Lehman and Midland to finalize the Five Mile/Lehman Commitment Letter and related documentation.

On December 23, 2010, the Debtors and their advisors met with the Independent Committee and the Board to provide a further update on the status of their negotiations with Five Mile/Lehman. After due consideration, and after weighing the benefits and detriments of the Five Mile/Lehman Bid, and after receiving advice from the Debtors' advisors, the Independent Committee unanimously recommended approval of the Five Mile/Lehman Bid to the Board and the Board (with each of the Apollo Board members and the Chief Restructuring Officer having recused themselves from voting) determined to move forward with the Five Mile/Lehman Bid (the "**Original Stalking Horse Proposal**"). On January 14, 2011, the Debtors filed a motion to, among other things, approve the Original Stalking Horse Proposal and related bidding procedures.

In addition to pursuing the Five Mile/Lehman Bid through the stalking horse process, the Debtors and their advisors continued to engage in a broad marketing process deliberately and carefully designed to maximize the value of the estates. Consistent with the directions of the Board and the Independent Committee, Moelis and the Debtors' management contacted a broad range of prospective buyers, representing a spectrum of potential interest, from established hotel owners and operators, to large private equity investors, sovereign wealth funds, and individual investors.

As part of this effort, the Debtors' management and Moelis began to circulate a marketing teaser letter (the "**Initial Marketing Letter**") on January 7, 2011 circulated the Initial Marketing Letter to over 100 potential financial, strategic, and other buyers. The Initial Marketing Letter explained the benefits of becoming a bidder for the Debtors' enterprise or their individual assets, and sets forth in detail the investment opportunity in sponsoring a plan of reorganization for the Debtors or in otherwise offering a proposal to purchase or acquire all or a portion of the Debtors' assets.

On January 24, 2011, the Debtors' management and Moelis began to circulate a more detailed and updated process letter (the "**Follow-Up Process Letter**"). The Follow-Up Process Letter was sent to over 70 potential buyers, including financial and strategic investors. The Follow-Up Process Letter invited proposals in all forms that will maximize value, and also described the process to conduct due diligence and to submit proposals both in advance of and after the hearing on the Original Stalking Horse Proposal (the "**Stalking Horse Hearing**").

The Debtors also issued a press release on January 24, 2011 announcing the Five Mile/Lehman Bid (the "**Press Release**"). The Press Release described and further highlighted the Debtors' continued pursuit and consideration of all value-maximizing proposals, including non-enterprise based proposals.

On January 24 through January 26, 2011, representatives of Moelis attended The American Lodging Investment Summit Conference in San Diego, California (the "**ALIS Conference**") to promote or generate potential investor interest. At the ALIS Conference, Moelis representatives engaged with numerous potential buyers to discuss the investment opportunity in acquiring the Debtors' enterprise or their individual assets. In addition to seven scheduled meetings with prospective investors, Moelis conducted several ad hoc discussions with potentially interested parties during the ALIS Conference.

On February 1, 2011, the Board held a meeting to discuss the ongoing marketing process. In furtherance of this discussion, the Debtors and their advisors provided a detailed process update to the Board, presented a comparison of restructuring proposals (including the Five Mile/Lehman Bid, the stalking horse proposals of Bidders A-D, and earlier bids from Five Mile), discussed the Initial Marketing Letter, and informed the Board of the status of discussions with potential buyers.

On February 11, 2011, Moelis conducted a meeting with financial advisors to the Debtors' key constituencies. At the meeting, Moelis provided an update on the Debtors' marketing process in detail and solicited feedback from the financial advisors.

2. The Five Mile/Lehman Commitment Letter

On February 15, 2011, the Debtors received an offer from Lehman to modify the initial Five Mile/Lehman Commitment Letter with certain proposed amendments that envision carving out those Debtors from the Initial Five Mile/Lehman Commitment Letter and the Five Mile/Lehman Bid that own and/or lease the Seven Sisters—Anaheim Hilton Suites, Hilton Ontario, Residence Inn Mission Valley, Residence Inn Anaheim (Garden Grove), Doubletree Washington, DC, Residence Inn Tyson's Corner, and Homewood Suites San Antonio.

On February 18, 2011, the Debtors' management and their advisors provided an update to the Board on the status of the restructuring and the marketing process. Specifically, the Debtors and their advisors updated the Board on the broader marketing process, including a discussion of a letter received from Lehman on February 15, 2011, proposing certain amendments to the Initial Commitment Letter.

On February 21, 2011, the Debtors responded to Lehman's proposal and explained that the proposed amendments to the initial Five Mile/Lehman Commitment Letter were not acceptable to the Debtors.

On February 22, 2011, Lehman responded to the Debtors' February 21, 2011 letter with a revised proposal for amendments to the initial Five Mile/Lehman Commitment Letter.

On March 2, 2011, the Debtors' management and advisors provided a further update to the Board on the status of the ongoing marketing process, including that since the filing of the motion to approve the Five Mile/Lehman Commitment Letter (the "**Stalking Horse Motion**"), Moelis had identified and contacted approximately 200 potential buyers, sent marketing materials to approximately 120 of those parties, and executed non-disclosure agreements with approximately 30 potential bidders. Moelis also provided an update on the five non-enterprise bids received from bidders, as well as the proposed amendment to the initial Five Mile/Lehman Commitment Letter proposed by Lehman.

After reviewing Lehman's proposal with the Board at the March 2, 2011 Board meeting, the Debtors and their advisors, at the direction of the Board and the Independent Committee, worked to reach an agreement with Lehman, Five Mile, and Midland to modify the Five Mile/Lehman Bid. Simultaneously with these negotiations, the Debtors received an indication of interest from a potential replacement stalking horse bidder. The Debtors explored this option but ultimately decided to proceed with the Five Mile/Lehman Bid, as modified.

Through further negotiation with Five Mile/Lehman and Midland, the Debtors ultimately reached an agreement to modify the Five Mile/Lehman Bid. Among other things, the Debtors and Five Mile/Lehman and Midland agreed to modify the initial Five Mile/Lehman Commitment Letter to remove the Seven Sisters from the Five Mile/Lehman Bid and to eliminate the $7 million break-up fee for Five Mile/Lehman contemplated by the initial Five Mile/Lehman Commitment Letter. This agreement was memorialized in the final Five Mile/Lehman Commitment Letter with Five Mile, Lehman, and Midland, reflecting revised terms to the Original Stalking Horse Proposal. The Five Mile/Lehman Commitment Letter contemplates restructuring the 64 properties that serve as collateral under the Fixed Rate Pool Mortgage Loan Agreement and the Floating Rate Pool Mortgage Loan Agreement.[18]

In addition to the Five Mile/Lehman Commitment Letter, there were two auxiliary agreements between non-Debtor parties to the Five Mile/Lehman Commitment Letter. Five Mile entered into an agreement with Lehman and a separate agreement with Midland (the Debtors were not party to either agreement). The Lehman/Five Mile Commitment governed the rights of Lehman and Five Mile as they relate to each other with respect to the Fixed/Floating Debtors' restructuring, including, among other things, with respect to the application of the plan sponsor deposit and the terms of Five Mile's equity commitment. The Five Mile/Midland Commitment governed

---

[18]   As noted previously, the Debtors no longer own the Best Western hotel in West Palm Beach, Florida. The ground lessee associated with that property, however, remains a Floating Rate Pool Hotel Debtor and is considered a hotel property for purposes of Plan structure.

the rights of Five Mile and Midland as they relate to each other with respect to the Fixed/Floating Debtors' restructuring.

### 3. The Stalking Horse Hearing

On March 11, 2011, the Debtors presented the Stalking Horse Motion to the Bankruptcy Court for entry of a corresponding order approving an auction and related bidding procedures. The Debtors resolved all objections to the Stalking Horse Motion prior to the hearing with the exception of objections filed by Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund L.P., and Thoroughbred Master Ltd ("**Appaloosa**"). Appaloosa is a certificateholder in certain CMBS mortgage trusts secured by the Debtors' assets and serviced by Midland.

On March 11, 2011 (the "**March 11 Hearing**"), the Bankruptcy Court entered the Commitment Letter and Bidding Procedures Order [Docket No. 1009], approving the Debtors' entry into the Five Mile/Lehman Commitment Letter, as well as granting authority to reimburse Five Mile/Lehman for up to $3 million in expenses under certain circumstances and approving bidding procedures, according to which the Debtors will conduct an auction (the "**Auction**") to maximize value for creditors of the Fixed/Floating Debtors.

### 4. Ruling as to Certificateholder Standing

Until recently, no court had addressed whether certificateholders in commercial mortgage-backed security ("**CMBS**") REMICs (Real Estate Mortgage Investment Conduits) have standing to be heard in chapter 11 cases under section 1109(b) as "parties in interest." At the March 11 Hearing, the Bankruptcy Court ruled on the issue. Specifically, Appaloosa, in its capacity as a holder of certificated interests in the two REMICs that hold the Fixed Rate Mortgage Loan urged the Bankruptcy Court to adopt a broad interpretation of "party in interest" under section 1109(b) of the Bankruptcy Code to grant them standing to object to the Stalking Horse Motion. The Bankruptcy Court denied the standing request, relying both on controlling law and the express terms of the servicing agreement that governs the Fixed Rate Mortgage Loan, which contractually binds Midland, as special servicer under the Fixed Rate Mortgage Loan, to consider the collective interests of all certificateholders, and which enables certificateholders to take separate action in the event of an alleged breach of duty.

### 5. Bids Received by Bid Deadline

As a result of the Debtors' robust marketing process for the sale of their assets, the following bids were received prior to the April 25, 2011 bid deadline:

- The Cerberus/Chatham Baseline Bid;

- A bid for the all of the Fixed/Floating Hotels and six of the Seven Sisters;

- Two bids for all of the LNR Properties;

- A bid from the Ad Hoc Committee, which the Debtors determined was not the best available transaction;

- Six bids on multiple assets; and

- Six bids on individuals assets.

These bids were the culmination of the Debtors' extensive efforts to maximize value for all stakeholders by encouraging parties to submit proposals for the Debtors on both an enterprise and non-enterprise basis.

6. Auction Outcome

The Debtors held the auction for the Fixed/Floating Hotels and the LNR Properties on May 2-3, 2011. After over 14 hours of competitive bidding between Cerberus/Chatham and Five Mile/Lehman, the Debtors closed the auction for the Fixed/Floating Hotels after the Cerberus/Chatham Successful Bid, valued at approximately $1.12 billion, went unchallenged. The auction process thus yielded approximately $149 million in value for the Fixed/Floating Hotels over and above the Cerberus/Chatham Baseline Bid and approximately $154 million in value over and above the Five Mile/Lehman stalking horse bid. In connection therewith, the Debtors and Cerberus/Chatham entered into the Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers US Trust (the "**Cerberus/Chatham Commitment Agreement**") and the Amended and Restated Term Sheet (the "**Cerberus/Chatham Term Sheet**") attached to the Cerberus/Chatham Commitment Agreement. The Cerberus/Chatham Term Sheet allocates the Cerberus/Chatham Successful Bid as follows: approximately $400.5 in Cash to satisfy New HoldCo's obligations under the Plan; payment of approximately $233.5 million in full satisfaction of the Floating Rate Pool Mortgage Loan Claims; payment of approximately $2.4 million in partial satisfaction of the Floating Rate Pool Mezzanine Loan Claims; the issuance of a new non-recourse mortgage loan in the amount of approximately $723.8 million, payment of (a) approximately $12.8 million of cash, (b) $2.5 million to Midland as consideration for effecting the restructuring of the mortgage loan, and (d) payment of $3 million in connection with the global releases described in the Cerberus/Chatham Term Sheet.

On May 3, 2011, after concluding the auction for the Fixed/Floating Hotels, the Debtors announced that they selected the Chatham Bid as the baseline bid for the LNR Properties. At the auction for the LNR Properties, the Debtors received a competing bid of $72 million for two of the LNR Properties: the Doubletree in Washington, D.C. and the Residence Inn in Tyson's Corner, Virginia. The Debtors determined, in their reasonable business judgment, that the Chatham Bid was the higher or otherwise better bid, and closed the auction on the afternoon of May 3, 2011 after no further bids were received.

*L. Management Compensation*

Prior to the auction for the Fixed/Floating Properties and the auction for the LNR Properties, to assist bidders in formulating their bids, the Debtors provided all of the bidders with a schedule of estimated emergence costs for the enterprise. The emergence costs schedule included, among other things, estimated administrative costs in the amount of $390,000, estimated cure costs in the amount of $2.3 million, and estimated employee costs in the amount of $4 million. The $4 million estimate for employee costs included bonuses and transition costs related to the Debtors' management team. The $4 million in estimated employee costs include amounts that would be due and owing under the management incentive program approved by the Board for Innkeeper's Chief Restructuring Officer, Marc Beilinson. The management incentive plan for Mr. Beilinson was developed by the compensation consultant Johnson Associates, Inc., which was hired and directed by the Board in March 2011 to examine compensation structures of comparable real estate and hotel businesses and approved incentive programs of companies in large chapter 11 cases. Based upon the analysis of Johnson Associates, and in consultation with its other advisors, on April 1, 2011, the Compensation Committee and then the Board considered and approved an incentive compensation program for Mr. Beilinson.

Subsequent to the Board's approval of the management incentive plan, as part of their bid, the Fixed/Floating Plan Sponsors agreed to fund the employee-related emergence costs related to the Fixed/Floating Plan in an amount equal to $3.5 million, which amount shall be distributed to members of the Debtors' management team at the direction of, and in the sole and absolute discretion of, the current Board. The Board may or may not use the previously approved management incentive program to determine the amounts to be distributed. The Debtors believe that this resolution resolved any dispute with respect to the management incentive plan, including, without limitation, the issues raised in the *Motion to Require Debtors to Comply with Sections 363 and 503 of the Bankruptcy Code* filed by Midland on April 15, 2011 [Docket No. 1110] and the *Joinder of Ad Hoc Committee of Preferred Shareholders to Motion of Midland Loan Services to Require Debtors to Comply with Sections 363 and 503 of the Bankruptcy Code and Request for Ancillary Relief*, dated April 25, 2011 [Docket No. 1147].

Certain employee-related emergence costs related to the Remaining Debtor Plan in an amount equal to $500,000 will be funded by the Chatham Hotel Sale Transaction Purchase Consideration, which amount shall be

distributed on the Effective Date of the Remaining Debtor Plan to certain members of the Debtors' management and employees at the direction of, and in the sole and absolute discretion of, the current board of Innkeepers USA Trust.

---

*M.*      *Statement of the Creditors Committee*

The Creditors Committee, in fulfillment of its fiduciary duties, undertook an investigation concerning the Acquisition. Following entry by the Court on August 25, 2010 of an Order authorizing the Creditors Committee to take discovery pursuant to Federal Rule of Bankruptcy Procedure 2004 ("**Rule 2004**"), the Creditors Committee obtained and reviewed in excess of 550,000 pages of information. These materials were obtained by the Creditors Committee from, among others, the Debtors, Apollo, Lehman and Midland.

Utilizing this information, the Creditors Committee and its advisors conducted a factual and legal review of potential claims against third parties arising out of the Acquisition. In addition to investigating whether the Acquisition could be challenged as a fraudulent conveyance under state or federal law, the Creditors Committee also considered whether claims could be asserted against parties that participated in, assisted with, and/or benefited from the Acquisition.

Following its investigation and analysis, the Creditors Committee negotiated a settlement with the Fixed/Floating Debtors, Five Mile, Lehman and Midland that was memorialized in the Five Mile/Midland Commitment. The settlement was agreed to by the Creditors Committee in large measure because under the Plan, the Fixed/Floating Debtors intend to assume their hotel franchise agreements, which will minimize the amount of unsecured claims against the Fixed/Floating Debtors and potentially increase distributions to claimholders when compared to a proposed plan under which the hotel franchise agreements are rejected. For these reasons, the Creditors Committee believes this settlement is fair, reasonable and in the best interests of the general unsecured creditors of the Fixed/Floating Debtors under the circumstances. With respect to the Reorganized Debtors, no such settlement agreement exists.

Finally, as a result of its examination of the validity of the prepetition secured creditors' liens, the Creditors Committee concluded that neither CWCapital nor LNR perfected their respective security interests against the assets of operating lessees Grand Prix General Lessee LLC, Grand Prix RIGG Lessee LLC, Grand Prix RIMV Lessee LLC and Grand Prix Anaheim Orange Lessee LLC (together, the "**Unencumbered Lessees**"). The Creditors Committee has not yet commenced an adversary proceeding with respect to the validity of the purported liens against the Unencumbered Lessees. Because the Plan contemplates payment in full of the unsecured creditors of the Unencumbered Lessees, pursuit of any avoidance actions associated with the Unencumbered Lessees could not provide any greater recovery than what is contemplated under the Plan.

---

*N.*      *Apollo's Participation in the Chapter 11 Cases*

Apollo owns certain preferred interests and 100% of the common equity interests in Debtor Grand Prix Holdings, LLC, which holds the majority of the Innkeepers USA Trust Series A Preferred Interests. Prior to the Petition Date, on June 29, 2007, Apollo entered into the Apollo Guaranty with respect to certain PIPs for the benefit of the lenders under the Fixed Rate Mortgage Loan Agreement. Prior to the Petition Date, on May 21, 2010, Midland sued Apollo in state court, seeking specific performance of the Apollo Guaranty. The specific performance claim was dismissed without prejudice on the pleadings. *Midland Loan Services, Inc. v. Apollo Investment Corporation*, No. 601324/2010 (N.Y. Sup. Ct. Nov. 4, 2010) (granting Apollo's motion to dismiss). However, the Court left open the possibility for Midland to seek damages on its breach of contract claim.

While Apollo has been active in these Chapter 11 Cases, Apollo's role in the development of the Plan was limited. No Apollo employees are members of the Independent Committee. Apollo was not involved in, nor did Apollo influence, the Independent Committee's deliberations, including the Independent Committee's decision to pursue the Fixed/Floating Bid, which contemplates releases for Apollo. In fact, representatives from Apollo recused themselves from voting on the Fixed/Floating Bid. Nevertheless, among other contributions, Apollo has made a corporate representative available to be deposed twice and produced all relevant and non-privileged documents requested. The Debtors believe that Apollo has been acting and continues to act in good faith for the benefit of the estate.

Apollo supports the Fixed/Floating Plan and has agreed to (i) not submit an overbid for the Fixed/Floating Hotels; (ii) contribute $375,000 to the estate, which shall be available for distribution to the holders of General Unsecured Claims against the Fixed/Floating Debtors; and (iii) waive its right to receive any recovery or distribution under the Fixed/Floating Plan. To be clear, Apollo will not receive any distributions under the Fixed/Floating Plan as creditor, ultimate equity holder, or otherwise. Apollo agreed to each of these concessions at the specific request of the Debtors to address and respond to concerns raised by the Debtors and other parties in interest during the course of plan negotiations. As part of the Plan, Apollo will receive a release from certain parties, including a release with respect to claims associated with the Apollo Guaranty. (Additional information regarding releases is provided in Article I.D and Article V.I of this Disclosure Statement.)

Certain parties may contend that the releases Apollo will receive under the Plan from the Debtors are inappropriate because the Debtors have substantial claims against Apollo and because the Debtors are contributing $3 million to Midland to resolve any litigation over the Apollo Guaranty. The Debtors disagree. With respect to the release of claims on account of the Apollo Guaranty, the Debtors and the beneficiaries of the Apollo Guaranty believe that the Apollo Release is reasonable and provides appropriate value to the Debtors under the circumstances. To be clear, the Debtors do not have any direct claims against Apollo with respect to the Apollo Guaranty. The Debtors are not parties to, direct beneficiaries of, or direct counterparties to the Apollo Guaranty. Rather, Midland directly benefits from the Apollo Guaranty and has the exclusive right to enforce it. The Debtors believe that settlement of all claims relating to the Apollo Guaranty is in the best interests of the estate. By securing the release, the Debtors are insulated from involvement in potentially complex, protracted and costly litigation in the event that Midland renews its lawsuit against Apollo and Apollo seeks indemnification or contribution from the estate. The outcome of such a lawsuit remains uncertain and may, after additional expense, inconvenience and delay, ultimately place a significant liability on the Debtors. Accordingly, the Debtors believe that the Apollo Release is in the best interest of the Debtors, especially when measured against the fact that Apollo will (i) contribute $375,000 to the Fixed/Floating Unsecured Claim Fund; (ii) to waive its right to receive any recovery or distribution under the Fixed/Floating Debtors' Plan; and (iii) grant releases for the benefit of the estates and key parties in interest.

O.      Ad Hoc Committee Administrative Claim

The Ad Hoc Committee Agreement described herein and in the Plan is an integrated agreement among the Debtors and the Ad Hoc Committee under which, upon its approval in its entirety, the Ad Hoc Committee, among other things, waives any right to challenge the allowability of the Innkeepers USA Trust Preferred A Interests (held by one of the Debtors or otherwise), including any right to object to or seek to subordinate the Innkeepers USA Trust Preferred A Interests, in exchange for the consideration being provided to the Ad Hoc Committee in the Plan.

Pursuant to the Ad Hoc Committee Agreement, the Ad Hoc Committee and its advisors will receive an Allowed Administrative Claim in the amount of $3.5 million, which amount shall be paid by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) on the Effective Date of the Remaining Debtor Plan.

Additionally, the Ad Hoc Committee Agreement eliminates any further claims the Ad Hoc Committee may have for substantial contributions for, without limitation, (a) its analysis of the approximately $7.4 million in Cash in the LP Account, (b) its offers to purchase certain of the Debtors' assets, and (c) its active participation throughout these Chapter 11 Cases.

P.      County of San Bernardino's Objection

The San Bernardino County Taxing Authority ("**San Bernardino**") filed an objection to the motion to approve the Disclosure Statement [Docket No. 1204], in which San Bernardino requested that (a) all real and personal property taxes be paid in full, currently and timely as they are incurred and billed with all applicable costs, fees, charges, and interest, (b) its lien be retained until such real and personal property taxes are paid in full, and (c) upon a failure by the Debtors to make a payment to San Bernardino within ten (10) days after service by San Bernardino of written notice of default, San Bernardino be allowed to enforce the entire amount of its claim, plus all penalties and interest accrued under state law, against the Debtor in accordance with applicable state law remedies.

The Debtors do not believe they owe any outstanding amounts to San Bernardino and intend to pay all real and personal property taxes, including those owed to San Bernardino, currently and timely as they are incurred and billed. The Debtors reserve all rights with respect to San Bernardino and the requests set forth in its objection.

Q.      *LBHI's Purchase of SASCO Notes*

In April 2011, affiliates of LBHI purchased all of the outstanding notes issued by the special purpose entity ("**SASCO**"), which issued notes secured in part by the Anaheim Hilton Suites Mezzanine Loan. Following the acquisition, those LBHI affiliates controlled 100% of the capital structure of SASCO. Lehman Commercial Paper Inc., a debtor-affiliate of LBHI, is the administrative agent for SASCO. Counsel for Lehman is now also counsel for SASCO.

# ARTICLE V.
# SUMMARY OF THE PLAN

A.      *The Plan's Classification Scheme*

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests, other than Five Mile DIP Claims, Lehman DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in connection with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking confirmation or approval of the Plan with respect to all other Debtors.

**Fixed/Floating Debtors**

The classification of Claims and Interests against each of the Fixed/Floating Debtors pursuant to the Fixed/Floating Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Fixed/Floating Debtors. All of the potential Classes for the Fixed/Floating Debtors are set forth herein and in the Plan. Certain of the Fixed/Floating Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Fixed/Floating Plan, each Class will contain sub-Classes for each of the Fixed/Floating Debtors (*i.e.*, there will be 71 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class FF2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|-------|------------------------------|----------------|---------------|
| Class FF1 | Other Priority Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF2 | Other Secured Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF3A | Secured Fixed Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF3B | Secured Floating Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF4 | Secured Floating Rate Pool Mezzanine Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|---|---|---|---|
| Class FF5 | General Unsecured Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF6 | Mortgage or Mezzanine Loan Deficiency Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF7 | Intercompany Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF8 | Section 510(b) Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF9 | Interests in Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

### Anaheim Hotel Debtors

The classification of Claims and Interests against each of the Anaheim Hotel Debtors pursuant to the Anaheim Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Anaheim Hotel Debtors. All of the potential Classes for the Anaheim Hotel Debtors are set forth herein and in the Plan. Certain of the Anaheim Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Anaheim Plan, each Class will contain sub-Classes for each of the Anaheim Hotel Debtors (*i.e.*, there will be three sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class A2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|---|---|---|---|
| Class A1 | Other Priority Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A2 | Other Secured Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A3 | Secured Anaheim Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class A4 | Secured Anaheim Hotel Mezzanine Loan Claims | Impaired | Entitled to Vote |
| Class A5A | General Unsecured Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A5B | General Unsecured Claims against Anaheim Mezzanine Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A6 | Anaheim Hotel Mezzanine Loan Deficiency Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A7 | Intercompany Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A8 | Intercompany Interests in Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

### Ontario Debtors

The classification of Claims and Interests against each of the Ontario Hotel Debtors pursuant to the Ontario Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Ontario Hotel Debtors. All of the potential Classes for the Ontario Hotel Debtors are set forth herein and in the Plan. Certain of the Ontario Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Ontario Plan, each Class will contain sub-Classes for each of the Ontario Hotel Debtors (*i.e.*, there will be two sub-Classes in each

Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class O2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|-------|------------------------------|----------------|---------------|
| Class O1 | Other Priority Claims against Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O2 | Other Secured Claims Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O3 | Secured Ontario Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class O4 | General Unsecured Claims against Ontario Hotel Debtors | Impaired | Entitled to Vote |
| Class O5 | Ontario Hotel Mortgage Loan Deficiency Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O6 | Intercompany Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O7 | Section 510(b) Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

**Remaining Debtors**

The classification of Claims and Interests against each of the Remaining Debtors pursuant to the Remaining Debtor Plan is as follows.

The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Remaining Debtors. All of the potential Classes for the Remaining Debtors are set forth herein and in the Plan. Certain of the Remaining Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan. For all purposes under the Remaining Debtor Plan, each Class will contain sub-Classes for each of the Remaining Debtors (*i.e.*, there will be 16 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class R2 are subject to further sub-division as discussed below.

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|-------|------------------------------|----------------|---------------|
| Class R1 | Other Priority Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R2 | Other Secured Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R3A | Secured Garden Grove Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3B | Secured San Diego Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3C | Secured Washington DC Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3D | Secured Tysons Corner Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3E | Secured San Antonio Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R4A | General Unsecured Claims against the Remaining Debtors Other Than Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R4B | General Unsecured Claims against Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R5 | Intercompany Claims against the Remaining Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R6 | Intercompany Interests in the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Classified Claim or Interest | Plan Treatment | Voting Rights |
|---|---|---|---|
| Class R7 | Innkeepers USA LP Preferred D Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R8 | Innkeepers USA Trust Preferred C Interests | Impaired | Entitled to Vote |
| Class R9 | Innkeepers USA Trust Preferred A Interests | Impaired | Entitled to Vote |
| Class R10 | Innkeepers USA Trust Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R11 | Grand Prix Holdings Interests | Impaired | Entitled to Vote |
| Class R12 | Section 510(b) Claims against the Remaining Debtors | Impaired | Entitled to Vote |

Any class of Claims that, as of an applicable Confirmation Hearing, does not have at least one Holder of a Claim that is Allowed in an amount greater than zero for voting purposes pursuant to the Solicitation Procedures Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that class.

B.    *Treatment of Unclassified Claims*

    1.    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in exchange for full and final satisfaction, settlement, release, and compromise of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals and Governmental Units, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Post-Effective Date Debtors no later than the Administrative Claims Bar Date applicable to the Debtor against whom the Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.   Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, or the property of the Post-Effective Date Debtors and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

    2.    Accrued Professional Compensation Claims

        (a)    Professional Fee Escrow Account

In accordance with Article II.B.3 of the Plan, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow Account.  The Debtors shall fund the Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow

Amount for all Professionals. The Professional Fee Escrow Account shall be funded from cash collateral to the extent provided for under the Cash Collateral Orders (or in such greater amounts as may be agreed to by the applicable secured lender) and, to the extent necessary, from the Chatham Hotel Sale Transaction Purchase Consideration or the Investment. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or the Post-Effective Date Debtors, as applicable. Payment of such funds will not reduce the distributions to Midland and Lehman under the Fixed/Floating Plan or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

(b)     Final Fee Applications and Payment of Accrued Professional Compensation Claims

All final requests for payment of Claims of a Professional shall be Filed no later than 60 days after the latest Effective Date for any of the Joint Plans. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders. Additionally, after notice and hearing, the Bankruptcy Court may direct the applicable Post-Effective Date Debtors to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders.

(c)     Professional Fee Escrow Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors, the Fixed/Floating Plan Sponsors, Lehman, and Midland no later than five days after the Confirmation Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Escrow Amount.

(d)     Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, the Post-Effective Date Debtors, or the Creditors Committee, as applicable. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3. <u>Five Mile DIP Claims</u>

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim against the Fixed/Floating Debtors, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay "Tranche A" of the Allowed Five Mile DIP Claims in full in Cash.

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim, on the Effective Date of the Remaining Debtor Plan, the Post-Effective Date San Diego Hotel Debtors shall pay "Tranche B" of the Allowed Five Mile DIP Claims in full in Cash and the Post-Effective Date General Lessee and the Tysons Corner Hotel Owner shall pay "Tranche C" of the Allowed Five Mile DIP Claims in full in Cash.

The Five Mile DIP Claims shall be Allowed pursuant to the Confirmation Order.

4. <u>Lehman DIP Claims</u>

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Lehman DIP Claim, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay the Allowed Lehman DIP Claims in full in Cash.

The Lehman DIP Claims shall be Allowed pursuant to the Confirmation Order.

5. <u>LNR Structuring Fee</u>

On the Effective Date of the Remaining Debtor Plan, the Debtors shall pay the LNR Structuring Fee in full in Cash.

6. <u>Claims Based on Postpetition Intercompany Loans</u>

In exchange for full and final satisfaction, settlement, release, and compromise of each Claim based on a Postpetition Intercompany Loan arising pursuant to the Cash Collateral Order, if any, on the Effective Date of a borrower Debtor's plan, the borrower Debtors shall pay the lender Debtors in full in Cash.

7. <u>Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses</u>

Upon the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors shall pay to Five Mile the Five Mile Expense Reimbursement Claim in an amount not to exceed $3 million. Notwithstanding any provision herein or in the Plan to the contrary, neither Five Mile nor its counsel shall be required to file any application or other formal request for payment or allowance of the Five Mile Expense Reimbursement Claim.

8. <u>Ad Hoc Committee Administrative Claim</u>

Pursuant to the Ad Hoc Committee Agreement, the Ad Hoc Committee and its advisors will receive an Allowed Administrative Claim in the amount of $3.5 million, which amount shall be paid by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) on the Effective Date of the Remaining Debtor Plan.

9. <u>Priority Tax Claims</u>

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, (1) Cash, payable by the liable Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the liable Debtors or Post-Effective Date Debtors, as applicable, and such Holder, <u>provided</u> <u>that</u> such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date without any further notice to or action, order, or

approval of the Bankruptcy Court, or (3) at the option of the liable Debtor or Post-Effective Date Debtor, as applicable, Cash paid by the liable Post-Effective Date Debtor in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than five years after the Petition Date with payment of interest at the Federal Judgment Rate in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the liable Debtors or Post-Effective Date Debtors, as applicable, and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

C.     *Treatment of Claims and Interests*

1.     The treatment provided to each Class relating to each of the Fixed/Floating Debtors for distribution purposes and voting rights are specified below:

**Class FF1 - Other Priority Claims Against the Fixed/Floating Debtors**

(a)     *Classification*: Class FF1 consists of all Other Priority Claims against the Fixed/Floating Debtors.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Class FF1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i)     be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)     otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)     *Voting*: Class FF1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

**Class FF2 - Other Secured Claims Against the Fixed/Floating Debtors**

(a)     *Classification*: Class FF2 consists of all Other Secured Claims against the Fixed/Floating Debtors. For all purposes under the Fixed/Floating Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class FF2A against Grand Prix Addison (RI) LLC, Class FF2B against Grand Prix Addison (RI) LLC, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Class FF2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed

Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i)      be paid in full in Cash in an amount equal to such Allowed Class FF2 Other Secured Claim by the Debtors on the Effective Date;

(ii)      receive the collateral securing any such Allowed Class FF2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)      otherwise be treated in any other manner such that the Allowed Class FF2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class FF2 Other Secured Claim becomes an Allowed Class FF2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class FF2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*: Class FF2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class FF3A - Secured Fixed Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors

(a)      *Classification:* Class FF3A consists of all Secured Fixed Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class FF3A Secured Fixed Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Fixed Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Fixed Rate Pool Mortgage Loan Claims shall (i) enter into the New Fixed Rate Pool Mortgage Loan and receive the New Fixed Rate Pool Mortgage Notes and the New Fixed Rate Pool Mortgage Loan Limited Guarantys, and (ii) receive a payment of Cash in the amount of $12,802,450.37.

(c)      *Voting:* Class FF3A is Impaired, and the Holder of Secured Fixed Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class FF3B - Secured Floating Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors

(a)      *Classification:* Class FF3B consists of all Secured Floating Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class FF3B Secured Floating Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Floating Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Floating Rate Pool Mortgage Loan Claims shall receive a payment of Cash in the amount of $233,489,097.04 subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan. Such increase or decrease in Cash payable to Class FF3B will create a reciprocal increase

or decrease in the recovery of Class FF4 such that the aggregate Cash paid to Classes FF3B and FF4 will not change.

(c)     *Voting:*  Class FF3B is Impaired, and the Holder of Secured Floating Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF4 – Secured Floating Rate Pool Mezzanine Loan Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF4 consists of all Secured Floating Rate Pool Mezzanine Loan Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class FF4 Secured Floating Rate Pool Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Floating Rate Pool Mezzanine Loan Claims, the Holder of Allowed Secured Floating Rate Pool Mezzanine Loan Claims shall receive a payment of Cash in the amount of $2,363,001.42, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan.  Such increase or decrease in Cash payable to Class FF3B will create a reciprocal increase or decrease in the recovery of Class FF4 such that the aggregate Cash paid to Classes FF3B and FF4 will not change

(c)     *Voting:*  Class FF4 is Impaired, and the Holder of Allowed Secured Floating Rate Pool Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF5 - General Unsecured Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF5 consists of all General Unsecured Claims against the Fixed Floating Debtors.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class FF5 General Unsecured Claim and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall:

  (i)     (A) if the Holder's General Unsecured Claim is against Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $100,000.00 of the Fixed/Floating Unsecured Claim Fund, or (B) if the Holder's General Unsecured Claim is against a Fixed/Floating Debtor other than Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $4,650,000.00 of the Fixed/Floating Unsecured Claim Fund; and

  (ii)    receive a release and waiver by the Debtors of all Claims of the Fixed/Floating Debtors against such Holder to recover preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code.

(c)     *Voting:*  Class FF5 is Impaired, and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

**Class FF6 - Mortgage or Mezzanine Loan Deficiency Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF6 consists of all Mortgage or Mezzanine Loan Deficiency Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Holders of Allowed Class FF6 Mortgage or Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Mortgage or Mezzanine Loan Deficiency Claims.

(c)     *Voting:*  Class FF6 is Impaired, and each Holder of a Mortgage or Mezzanine Loan Deficiency Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Mortgage or Mezzanine Loan Deficiency Claims are not entitled to vote to accept or reject the Plan.

**Class FF7 - Intercompany Claims Against the Fixed/Floating Debtors**

(a)     *Classification*:  Class FF7 consists of all Intercompany Claims against the Fixed/Floating Debtors.

(b)     *Treatment*:  Holders of Allowed Class FF7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class FF7 is Impaired, and Holders of Intercompany Claims against the Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

**Class FF8 - Section 510(b) Claims Against the Fixed/Floating Debtors**

(a)     *Classification*:   Class FF8 consists of all Section 510(b) Claims against the Fixed/Floating Debtors.

(b)     *Treatment*:  Holders of Allowed Class FF8 Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class FF8 is Impaired, and Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**Class FF9 - Interests in the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF9 consists of all Interests in the Fixed/Floating Debtors.

(b)     *Treatment:*  Holders of Allowed Class FF9 Interests shall not receive any distribution on account of such Intercompany Interests and, except as provided in the immediately following sentence, all such Interests shall be cancelled and of no further force or effect. Notwithstanding the foregoing, the Interests may, at the discretion of Fixed/Floating Plan Sponsors, be maintained for the purposes of preserving the organizational structure of certain of the Fixed/Floating Debtors; provided further that the Interests of the Post-Effective Date Fixed/Floating Debtors shall, directly or indirectly, be transferred to New HoldCo pursuant to the Investment and in accordance with the Fixed/Floating Successful Bid.

(c)    *Voting:*   Class FF9 is Impaired, and Holders of Intercompany Interests in the Fixed/Floating Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

2. The treatment provided to each Class relating to each of the Anaheim Hotel Debtors for distribution purposes and voting rights are specified below:

### Class A1 - Other Priority Claims Against the Anaheim Hotel Debtors

(a)    *Classification*: Class A1 consists of all Other Priority Claims against the Anaheim Hotel Debtors.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Class A1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall:

(i)    if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or (B) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; or

(ii)    if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan Agreement pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)    *Voting*: Class A1 is Impaired, and Holders of Class A1 Other Priority Claims are entitled to vote to accept or reject the Plan.

### Class A2 - Other Secured Claims Against the Anaheim Hotel Debtors

(a)    *Classification*: Class A2 consists of all Other Secured Claims against the Anaheim Hotel Debtors. For all purposes under the Anaheim Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class A2A against the Anaheim Hotel Owner, Class A2B the Anaheim Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Class A2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final

satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall:

(i)      if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash in an amount equal to such Allowed Class A2 Other Secured Claim by the Debtors on the Effective Date; (B) receive the collateral securing any such Allowed Class A2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or (C) otherwise be treated in any other manner such that the Allowed Class A2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class A2 Other Secured Claim becomes an Allowed Class A2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class A2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code; or

(ii)     if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)      *Voting*:  Class A2 is Impaired, and Holders of Class A2 Other Secured Claims are entitled to vote to accept or reject the Plan.

## Class A3 - Secured Anaheim Hotel Mortgage Loan Claims

(a)      *Classification:*  Class A3 consists of all Secured Anaheim Hotel Mortgage Loan Claims against the Anaheim Hotel Debtors.

(b)      *Treatment:*  Except to the extent that the Holder of Allowed Class A3 Secured Anaheim Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mortgage Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mortgage Loan Claims shall in accordance with the Anaheim Hotel Commitment Letter either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, have the Anaheim Hotel Mortgage Loan Agreement assumed, amended, restated, and/or supplemented by New Anaheim HoldCo, in accordance with and as modified by the terms and conditions set forth in the Anaheim Hotel Commitment Letter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)      *Voting:*  Class A3 is Impaired, and the Holder of Class A3 Secured Anaheim Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class A4 - Secured Anaheim Hotel Mezzanine Loan Claims

(a)      *Classification*:  Class A4 consists of all Secured Anaheim Hotel Mezzanine Loan Claims.

(b)     *Treatment*:  Except to the extent that the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mezzanine Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mezzanine Loan Claims shall receive the following: (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, all of the assets of the Anaheim Hotel Debtors shall be transferred, conveyed, assumed, and assigned to the New Anaheim HoldCo; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred (as defined in the Anaheim Hotel Commitment Letter), a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(d)     *Voting:*  Class A4 is Impaired, and the Holder of Secured Anaheim Hotel Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

### Class A5A - General Unsecured Claims Against the Anaheim Hotel Owner or Anaheim Hotel Lessee

(a)     *Classification:*  Class A5A consists of all General Unsecured Claims against the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class A5A General Unsecured Claim against the Anaheim Hotel Owner and Anaheim Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee, each Holder of an Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee shall either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, be paid in full on the Effective Date or as soon as reasonably practical thereafter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(c)     *Voting:*  Class A5A is Impaired, and each Holder of a General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee is entitled to vote to accept or reject the Plan.

### Class A5B - General Unsecured Claims Against the Anaheim Mezzanine Debtor

(a)     *Classification:*  Class A5B consists of all General Unsecured Claims against the Anaheim Mezzanine Debtor.

(b)     *Treatment:*  Holders of Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall not receive any distribution on account of such Allowed General Unsecured Claim against the Anaheim Mezzanine Debtor, and Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:*  Class A5B is Impaired, and the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are conclusively deemed to have rejected the Plan

pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are not entitled to vote to accept or reject the Plan.

**Class A6 - Anaheim Hotel Mezzanine Loan Deficiency Claims Against the Anaheim Hotel Debtors**

(a)    *Classification:*  Class A6 consists of all Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors.

(b)    *Treatment:*  Holders of Allowed Class A6 Anaheim Hotel Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Anaheim Hotel Mezzanine Loan Deficiency Claims.

(c)    *Voting:*  Class A6 is Impaired, and the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

**Class A7 - Intercompany Claims Against the Anaheim Hotel Debtors**

(a)    *Classification*:  Class A7 consists of all Intercompany Claims against the Anaheim Hotel Debtors.

(b)    *Treatment*:  Holders of Allowed Class A7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class A7 is Impaired, and Holders of Intercompany Claims against the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

**Class A8 - Intercompany Interests in the Anaheim Hotel Debtor**

(a)    *Classification:*  Class A8 consists of all Intercompany Interests in the Anaheim Hotel Debtors.

(b)    *Treatment:*  Holders of Allowed Class A8 Intercompany Interests in the Anaheim Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in the Anaheim Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)    *Voting:*  Class A8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

3.    The treatment provided to each Class relating to each of the Ontario Hotel Debtors for distribution purposes and voting rights are specified below:

### Class O1 - Other Priority Claims Against the Ontario Hotel Debtors

(a)    *Classification*:  Class O1 consists of all Other Priority Claims against the Ontario Hotel Debtors.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Class O1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

   (i)    be paid in full in Cash from the Ontario Hotel Cash Recovery Fund on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

   (ii)    otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)    *Voting*:  Class O1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class O2 - Other Secured Claims Against the Ontario Hotel Debtors

(a)    *Classification*:  Class O2 consists of all Other Secured Claims against Ontario Hotel Debtors.  For all purposes under the Ontario Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class O2A against the Ontario Hotel Owner, Class O2B against the Ontario Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Class O2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

<blockquote>
<blockquote>

(i)      be paid in full in Cash from the Ontario Hotel Cash Recovery Fund in an amount equal to such Allowed Class O2 Other Secured Claim by the Debtors on the Effective Date;

(ii)     receive the collateral securing any such Allowed Class O2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)    otherwise be treated in any other manner such that the Allowed Class O2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class O2 Other Secured Claim becomes an Allowed Class O2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class O2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

</blockquote>
</blockquote>

(c)     *Voting*:  Class O2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class O3 - Secured Ontario Hotel Mortgage Loan Claims

(a)     *Classification:*  Class O3 consists of all Secured Ontario Hotel Mortgage Loan Claims.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class O3 Secured Ontario Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Ontario Hotel Mortgage Loan Claims, the Holder of Allowed Secured Ontario Hotel Mortgage Loan Claims shall, at the election of the Holder of Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, (i) receive a deed in lieu of foreclosure with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement in form and substance reasonably acceptable to both parties, or (ii) elect to proceed with state foreclosure proceedings with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement with the support of the Ontario Debtors, including but not limited to a receiver sale of the collateral or third-party assumption of the Ontario Hotel Mortgage Loan Agreement on terms acceptable to the Holder of the Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, notwithstanding any injunction provisions contained in the Plan.  For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Ontario Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Ontario Plan.

(c)     *Voting:*  Class O3 is Impaired, and the Holder of Secured Ontario Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class O4 - General Unsecured Claims Against the Ontario Hotel Debtors

(a)     *Classification:*  Class O4 consists of all General Unsecured Claims against the Ontario Hotel Debtors.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class O4 General Unsecured Claim against the Ontario Hotel Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and

compromise of each Allowed General Unsecured Claim against the Ontario Hotel Debtor, each Holder of an Allowed General Unsecured Claim against the Ontario Hotel Debtor shall receive its Pro Rata share of the Ontario Hotel Cash Recovery Fund that remains after satisfaction of Claims in Class O1 and Class O2.

(c)     *Voting:* Class O4 is Impaired, and each Holder of a General Unsecured Claim against the Ontario Hotel Debtors is entitled to vote to accept or reject the Plan.

## Class O5 - Ontario Hotel Mortgage Loan Deficiency Claims

(a)     *Classification:* Class O5 consists of all Ontario Hotel Mortgage Loan Deficiency Claims.

(b)     *Treatment:* The Holder of Allowed Class O5 Ontario Hotel Mortgage Loan Deficiency Claims shall not receive any distribution on account of such Ontario Hotel Mortgage Loan Deficiency Claims, and Allowed Ontario Hotel Mortgage Loan Deficiency Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:* Class O5 is Impaired, and the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

## Class O6 - Intercompany Claims Against Ontario Hotel Debtors

(a)     *Classification*: Class O6 consists of all Intercompany Claims against Ontario Hotel Debtors.

(b)     *Treatment*: Holders of Allowed Class O6 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*: Class O6 is Impaired by the Plan and Holders of Intercompany Claims against the Ontario Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims against the Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

## Class O7 - Section 510(b) Claims Against Ontario Hotel Debtors

(a)     *Classification*: Class O7 consists of all Section 510(b) Claims against Ontario Hotel Debtors.

(b)     *Treatment*: Holders of Allowed Class O7 Section 510(b) Claims against Ontario Hotel Debtors shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims against Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*: Class O7 is Impaired, and Holders of Section 510(b) Claims against Ontario Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims against Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

## Class O8 - Intercompany Interests in Ontario Hotel Debtors

(a)     *Classification:* Class O8 consists of all Intercompany Interests in Ontario Hotel Debtors.

(b) *Treatment:* Holders of Allowed Class O8 Intercompany Interests in Ontario Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c) *Voting:* Class O8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

4. The treatment provided to each Class relating to each of the Remaining Debtors for distribution purposes and voting rights are specified below:

### Class R1 - Other Priority Claims Against the Remaining Debtors

(a) *Classification*: Class R1 consists of all Other Priority Claims against the Remaining Debtors.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Class R1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

(i) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c) *Voting*: Class R1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class R2 - Other Secured Claims Against the Remaining Debtors

(a) *Classification*: Class R2 consists of all Other Secured Claims against the Remaining Debtors. For all purposes under the Remaining Debtor Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class R2A against the Garden Grove Hotel Owner, Class R2B against the Garden Grove Hotel Owner and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Class R2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed

Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

(i)      be paid in full in Cash in an amount equal to such Allowed Class R2 Other Secured Claim by the Debtors on the Effective Date;

(ii)     receive the collateral securing any such Allowed Class R2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)    otherwise be treated in any other manner such that the Allowed Class R2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class R2 Other Secured Claim becomes an Allowed Class R2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class R2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*: Class R2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class R3A - Secured Garden Grove Hotel Mortgage Loan Claims[19]

(a)    *Classification:* Class R3A consists of all Secured Garden Grove Hotel Mortgage Loan Claims.

(b)    *Treatment:* Except to the extent that the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Garden Grove Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $32,416,576.45 and a cash principal paydown of $5,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Garden Grove Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Garden Grove Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the

---

[19]  With respect to Classes R3A, R3B, R3C, R3D and R3E, all payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall be credited, to the extent actually made by the Debtors, to the legal fees and disbursements of the LNR-Serviced Trusts' counsel and the monthly fees and disbursements of the LNR-Serviced Trusts' financial advisors and the Allowed Claim for interest at non-default rate, but not principal. In no event shall any payment be applied to or recharacterized to reduce the principal component of such Allowed Claims. The payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall not be subject to objection, avoidance, recovery, disgorgement, or turnover.

LNR Servicing Fee for the Garden Grove Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. The portion of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims for interest at the non-default rate shall be satisfied by the retention of the amounts, if any, paid with respect to interest at the non-default rate on such claim under the Cash Collateral Order. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Garden Grove Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:* Class R3A is Impaired, and the Holder of Class R3A Secured Garden Grove Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class R3B - Secured San Diego Hotel Mortgage Loan Claims

(a)     *Classification*: Class R3B consists of all Secured San Diego Hotel Mortgage Loan Claims.

(b)     *Treatment*: Except to the extent that the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Diego Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage loan liability by Chatham in the following amounts: an assumed loan amount of $40,168,769.26 and a cash principal paydown of $7,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Diego Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the San Diego Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the San Diego Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Salt Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Diego Hotel Mortgage Loan Agreement and

such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)    *Voting*: Class R3B is Impaired, and the Holder of Class R3B Secured San Diego Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

### Class R3C - Secured Washington DC Hotel Mortgage Loan Claims

(a)    *Classification:* Class R3C consists of all Secured Washington DC Hotel Mortgage Loan Claims.

(b)    *Treatment:* Except to the extent that the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims, the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Washington DC Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $20,054,752.20 and a cash principal paydown of $5,400,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Washington DC Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Washington DC Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the Washington DC Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Washington DC Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)    *Voting:* Class R3C is Impaired, and the Holder of Class R3C Secured Washington DC Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

### Class R3D - Secured Tysons Corner Hotel Mortgage Loan Claims

(a)    *Classification:* Class R3D consists of all Secured Tysons Corner Hotel Mortgage Loan Claims.

(b)    *Treatment:* Except to the extent that the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holders, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan

Claims, the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Tysons Corner Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $23,057,021.67 and a cash principal paydown of $2,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Tysons Corner Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Tysons Corner Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the Tysons Corner Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Tysons Corner Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:*  Class R3D is Impaired, and the Holder of Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

### Class R3E - Secured San Antonio Hotel Mortgage Loan Claims

(a)     *Classification:*  Class R3E consists of all Secured San Antonio Hotel Mortgage Loan Claims.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Antonio Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $18,462,695.40. and a cash principal paydown of $5,600,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Antonio Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the San Antonio Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the San Antonio Hotel Mortgage Loan

Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Antonio Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:*  Class R3E is Impaired, and the Holder of Class R3E Secured San Antonio Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class R4A - General Unsecured Claims Against the Remaining Debtors Other Than Grand Prix Holdings

(a)     *Classification:*  Class R4A consists of all General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R4A General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against a particular Remaining Debtor other than Grand Prix Holdings shall receive (i) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor other than Grand Prix Holdings through the Distribution Waterfall and (ii) other assets, if any, of such Remaining Debtor other than Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor other than Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor other than Grand Prix Holdings.

(c)     *Voting:*  Class R4A is Impaired, and the Holders of Allowed Class R4A General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings are entitled to vote to accept or reject the Plan.

## Class R4B - General Unsecured Claims Against Grand Prix Holdings

(a)     *Classification:*  Class R4B consists of all General Unsecured Claims against Grand Prix Holdings.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R4B General Unsecured Claim against Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against Grand Prix Holdings shall receive (i) the Chatham Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the

Holders of Claims against Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings.

(c)    *Voting:* Class R4B is Impaired, and the Holders of Allowed Class R4 General Unsecured Claims against Grand Prix Holdings are entitled to vote to accept or reject the Plan.

**Class R5 - Intercompany Claims Against the Remaining Debtors**

(d)    *Classification*: Class R5 consists of all Intercompany Claims against the Remaining Debtors.

(e)    *Treatment*: Holders of Allowed Class R5 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(f)    *Voting*: Class R5 is Impaired, and Holders of Intercompany Claims against the Remaining Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims against the Remaining Debtors are not entitled to vote to accept or reject the Plan.

**Class R6 - Intercompany Interests in the Remaining Debtors**

(a)    *Classification:* Class R6 consists of all Intercompany Interests in the Remaining Debtors.

(b)    *Treatment:* Holders of Allowed Class R6 Intercompany Interests in the Remaining Debtors shall have their Interests reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting:* Class R6 is Unimpaired, and Holders of Intercompany Interests in the Remaining Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Remaining Debtors are not entitled to vote to accept or reject the Plan.

**Class R7 - Innkeepers USA LP Preferred D Interests**

(a)    *Classification:* Class R7 consists of all Innkeepers USA LP Preferred D Interests.

(b)    *Treatment:* Holders of Allowed Innkeepers USA LP Preferred D Interests shall not receive any distribution on account of such Allowed Innkeepers USA LP Preferred D Interests, and Allowed Innkeepers USA LP Preferred D Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)    *Voting*: Class R7 is Impaired, and Holders of Allowed Innkeepers USA LP Preferred D Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Innkeepers USA LP Preferred D Interests are not entitled to vote to accept or reject the Plan.

**Class R8 - Innkeepers USA Trust Preferred C Interests**

(a)    *Classification:* Class R8 consists of all Innkeepers USA Trust Preferred C Interests.

(b)    *Treatment:* Holders of Allowed Innkeepers USA Trust Preferred C Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the

LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)     *Voting:*  Class R8 is Impaired, and Holders of Allowed Class R8 Innkeepers USA Trust Preferred C Interests are entitled to vote to accept or reject the Plan.

### Class R9 - Innkeepers USA Trust Preferred A Interests

(a)     *Classification:*  Class R9 consists of all Innkeepers USA Trust Preferred A Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Preferred A Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)     *Voting:*  Class R9 is Impaired, and Holders of Allowed Class R9 Innkeepers USA Trust Preferred A Interests are entitled to vote to accept or reject the Plan.

### Class R10 - Innkeepers USA Trust Common Interests

(a)     *Classification:*  Class R10 consists of all Innkeepers USA Trust Common Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Common Interests shall not receive any distribution on account of such Allowed Innkeepers USA Trust Common Interests, and Allowed Innkeepers USA Trust Common Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:*  Class R10 is Impaired, and Holders of Allowed Class R10 Innkeepers USA Trust Common Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Innkeepers USA Trust Common Interests are not entitled to vote to accept or reject the Plan.

### Class R11 - Grand Prix Holdings Interests

(a)     *Classification:*  Class R11 consists of all Grand Prix Holdings Interests.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R11 Grand Prix Holdings Interest and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Grand Prix Holdings Interest, each Holder of an Allowed Grand Prix Holdings Interest shall receive (i) the Chatham Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Allowed Grand Prix Holdings Interests, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings.

(c)     *Voting*:  Class R11 is Impaired, and Holders of Allowed Class R11 Grand Prix Holdings Interests are entitled to vote to accept or reject the Plan.

**Class R12 - Section 510(b) Claims Against the Remaining Debtors**

(a)     *Classification*:  Class R12 consists of all Section 510(b) Claims against the Remaining Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Class R12 Section 510(b) Claims against the Remaining Debtors and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Section 510(b) Claims against the Remaining Debtors, each Holder of an Allowed Section 510(b) Claims against a particular Remaining Debtor shall receive (a) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor through the Distribution Waterfall and (b) other assets, if any, of such Remaining Debtor that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor.

(c)     *Voting*:  Class R12 is Impaired, and Holders of Allowed Class R12 Section 510(b) Claims against the Remaining Debtors are entitled to vote to accept or reject the Plan.

D.     *Special Provisions*

1.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

2.     Elimination of Vacant Classes

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement and Solicitation Procedures Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

E.     *Means for Implementation of the Plan*

1.     Substantive Consolidation

The Plan does not contemplate substantive consolidation of any of the Debtors.

2.     Restructuring Transactions and Sources of Consideration for Plan Distributions

The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  With respect to the Fixed/Floating Plan, all amounts of Cash and securities necessary for the Fixed/Floating Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions

pursuant hereto shall be obtained from (a) Cash on hand from operations in accordance with the Commitment Letter and, as applicable, and permitted by the Cash Collateral Orders and (b) the Investment. With respect to the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan, all amounts of Cash and securities necessary for the Debtors that are not the Fixed/Floating Debtors or the Post-Effective Date Debtors that are not the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from (a) Cash from operations, (b) the Chatham Hotel Sale Transaction. Payments under this provision shall not reduce the distribution to Midland and Lehman or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

3. General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

4. Fixed/Floating Investment

On the Effective Date of the Fixed/Floating Plan, and subject to the terms of the Fixed/Floating Successful Bid, New HoldCo shall purchase, directly or indirectly, the Interests of the Post-Effective Date Fixed/Floating Debtors in return for the Investment.

If the Fixed/Floating Plan Sponsors determine in their sole and absolute discretion that New HoldCo and the Post-Effective Date Fixed/Floating Debtors shall have an alternate corporate or organizational structure, form or identity (including, without limitation, as a result of the rejection of the Fixed/Floating Plan by Class FF4), the structure of the Investment contemplated in Article IV.D of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form, or identity.

5. Chatham Hotel Sale Transaction

On the Effective Date of the Remaining Debtor Plan, and in accordance with the Chatham APA and as applicable to the Remaining Debtors, the Debtors will consummate the Chatham Hotel Sale Transaction in accordance with the Chatham Hotel Sale Transaction Documents, provided, however, that notwithstanding anything contained in the Plan, the Plan Supplement, the Remaining Debtor Plan, this Disclosure Statement or any other document or agreement relating to the foregoing documents, the consideration paid by Chatham to consummate the Chatham Hotel Sale Transaction in accordance with the Chatham APA shall not exceed the Chatham Hotel Sale Transaction Purchase Consideration, provided that Chatham shall, in addition, remain responsible for any fees and expenses Chatham has agreed to pay pursuant to the Chatham APA.

6. Anaheim Hotel Commitment Letter

Unless otherwise agreed by the parties thereto, the restructuring of the Anaheim Hotel Debtors shall be done in accordance with the terms of the Anaheim Hotel Commitment Letter, except as modified in Article III.B.2 of the Plan, Treatment of Class A1.

7. New Fixed Rate Pool Mortgage Loan Limited Guarantys

On the Effective Date of the Fixed/Floating Plan and in connection with the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall be entered into by the parties contemplated in the New HoldCo/Midland Commitment and the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall otherwise be consistent with the terms of the New HoldCo/Midland Commitment.

8.    Special Servicer Payment and Special Servicer Release Payment

Contemporaneously with the occurrence of the Effective Date of the Fixed/Floating Plan, and as a condition thereto, the Fixed/Floating Plan Sponsors shall direct New HoldCo to make the $2.5 million Special Servicer Payment and the $3.0 million Special Servicer Release Payment.

9.    Issuance of Interests in Post-Effective Date Fixed/Floating Debtors

The issuance of the Interests by each of the Post-Effective Date Fixed/Floating Debtors is authorized without the need for any further action and without any further action by the Holders of Claims or Interests or any further notice to or action, order, or approval of the Bankruptcy Court.

On the Effective Date of the Fixed/Floating Plan, or as soon as reasonably practicable thereafter, the Interests in the Post-Effective Date Fixed/Floating Debtors (or such of them as may be designated by New HoldCo) shall be distributed to New HoldCo in accordance with the Fixed/Floating Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

All of the Interests in the Post-Effective Date Fixed/Floating Debtors issued pursuant to the Fixed/Floating Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Fixed/Floating Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

10.    Listing of New HoldCo Interests; Reporting Obligations

None of the New HoldCo Interests will be listed on a national securities exchange as of the Effective Date of the Fixed/Floating Plan. New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust will not be reporting companies under the Securities Exchange Act, and New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust shall not be required to file reports with the Securities and Exchange Commission or any other entity or party and shall not be required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.

11.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Post-Effective Date Debtors and their successors and assigns.

12.    Vesting of Assets in the Post-Effective Date Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate of the Debtors, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the applicable Post-Effective Date Debtors free and clear of all Liens, Claims, charges, or other encumbrances. The Intercompany Interests of Innkeepers USA Limited Partnership in non-Debtor KPA Raleigh, LLC shall vest in Post-Effective Date Innkeepers USA Limited Partnership. The Intercompany Interests of KPA Leaseco Holding, Inc. in non-Debtor KPA Raleigh Leaseco, LLC shall vest in Post-Effective Date KPA Leaseco Holding, Inc. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose

of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

13. <u>Cancellation of Securities and Agreements</u>

On the Effective Date, except to the extent otherwise provided, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be canceled and the obligations of the Debtors or the Post-Effective Date Debtors and the non-Debtor affiliates thereunder or in any way related thereto shall be discharged.

14. <u>Corporate Action</u>

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the directors, members, trustees, officers, and managers for New HoldCo, including the appointment of the Post-Effective Date Board; (2) the issuance and distribution of the Interests in the Post-Effective Date Fixed/Floating Debtors, (3) the execution and approval for the Post-Effective Date Fixed/Floating Debtors of the New Fixed/Floating By-Laws and New Fixed/Floating Organizational Documents consistent with the terms of the Fixed/Floating Successful Bid, (4) the execution and delivery of the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Notes, and the New Fixed Rate Pool Mortgage Loan Limited Guarantys consistent with the terms of the New HoldCo/Midland Commitment; (5) assumption of the LNR-Serviced Loans consistent with the terms of the LNR Commitment and the Stipulation; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, trustees, officers, or managers of the Debtors or the Post-Effective Date Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.O of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

15. <u>Effectuating Documents; Further Transactions</u>

On and after the Effective Date, the Post-Effective Date Debtors and their directors, members, trustees, officers, and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

16. <u>Exemption from Certain Taxes and Fees</u>

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, recording of any mortgages or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

17. D&O Liability Insurance Policies

Notwithstanding anything herein or in the Plan to the contrary, on the Effective Date of the Remaining Debtor Plan, the Remaining Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtors rights to seek amendment to such D&O Liability Insurance Policies. On the Effective Date of the Fixed/Floating Plan, New HoldCo will purchase new director & officer liability insurance policies as the Fixed/Floating Plan Sponsors determine is necessary. Entry of the Confirmation Order for the Remaining Debtor Plan shall constitute the Bankruptcy Court's approval of the Remaining Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein or in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Remaining Debtors under the Remaining Debtor Plan as to which no Proof of Claim need be Filed.

18. D&O Tail Insurance Policies

To the extent not already purchased, on the Confirmation Date of the Fixed/Floating Plan, the Debtors are authorized to purchase tail coverage under a directors and officers' liability insurance policy with a term of six years for the current and former officers, directors, trustees, and members containing the same coverage that exists under the Debtors' current D&O Liability Insurance Policies (*i.e.*, a "tail policy"). After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, trustees, and members of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, trustees, and/or members remain in such positions after the Effective Date.

19. New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws

On or immediately prior to the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors will file the New Fixed/Floating Organizational Documents, which shall include provisions in accordance with the Fixed/Floating Successful Bid, with the applicable Secretaries of State and/or other applicable authorities in their respective states of organization as required by and in accordance with applicable laws. In addition, the provisions of the New Fixed/Floating By-Laws shall include provisions in accordance with the Fixed/Floating Successful Bid. After the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors may amend and restate the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws and other constituent documents as permitted by the laws of applicable states of organization and the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws.

20. Board Representation

(a) Fixed/Floating Debtors

New HoldCo shall be managed by the managing member of New HoldCo in accordance with the terms and conditions set forth in the New HoldCo limited liability company agreement. To the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will identify the managing member of New HoldCo and the members of the board of directors, members, and trustees of the New HoldCo subsidiaries identified as of the date of the filing thereof.

(b) Other Debtors

Post-Effective Date Innkeepers USA Trust and Post-Effective Date Grand Prix Holdings, LLC shall be managed by the Post-Effective Date Board. To the extent known and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will list the members of the Post-Effective Date Board and the members

of the board of directors, members, and trustees of the subsidiaries of Post-Effective Date Innkeepers USA Trust identified as of the date of the filing thereof.

21. Indemnification Provisions

Notwithstanding anything herein or in the Plan to the contrary, pursuant to section 365(a) of the Bankruptcy Code or otherwise, and as of the Effective Date, the Debtors shall assume and assign to the Post-Effective Date Debtors all of the Indemnifications Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Indemnification Provisions. Notwithstanding anything to the contrary contained herein or in the Plan, (i) Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed and assigned by the foregoing assumption and assignment of the Indemnification Provisions, (ii) each such obligation shall be deemed and treated as an Executory Contract that has been assumed and assigned by the Debtors under the Plan as to which no Proof of Claim need be Filed, and (iii) as of the Effective Date, the Indemnifications Provisions shall be binding and enforceable against the Post-Effective Date Debtors.

22. Wind Down

On and after the Effective Date, Post-Effective Date Innkeepers USA Trust will oversee the Wind Down, and will fund the Wind Down using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration, and shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Debtors in accordance with the Plan.

23. Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article III.B of the Plan with respect to Class FF5, Article VIII.C of the Plan, Article VIII.D of the Plan, Article VIII.E of the Plan, Article VIII.F of the Plan, Article VIII.G of the Plan, and Article VIII.H of the Plan), each of the Post-Effective Date Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Post-Effective Date Debtors have released any Entity on or prior to the Effective Date (pursuant to any of the release provisions set forth in Article VIII of the Plan, Article III.B of the Plan with respect to Class FF5, or otherwise), the Debtors or the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Post-Effective Date Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

F.    *Treatment of Executory Contracts and Unexpired Leases*

1. Assumption of Franchise Agreements

On the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors will assume the franchise agreements set forth in the Plan Supplement with respect to the assets of the Fixed/Floating Debtors. On the

Remaining Debtor Plan Effective Date, the Debtors that are party to the Chatham APA will either (i) assume and assign to Chatham (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the assets of the Debtors that are party to the Chatham APA or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and Chatham (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims. On the Anaheim Plan Effective Date, the Anaheim Hotel Debtors will either (i) assume and assign to New Anaheim HoldCo (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the Anaheim Hotel Debtors or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and New Anaheim HoldCo (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims.

2.  Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the Executory Contracts or Unexpired Leases of a Debtor that are not assumed or rejected pursuant to an Order prior to the Effective Date applicable to such Debtor shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts or Unexpired Leases: (1) identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement to be filed by the Voting Deadline, with notices of assumption or rejection mailed to executory contract and unexpired lease counterparties on or before five business days prior to the Voting Deadline; (2) that are the subject of a motion to assume and assign or reject pending on the Effective Date applicable to such Debtor (in which case such assumption and assignment or rejection and the effective date thereof shall remain subject to a Final Order); or (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date applicable to such Debtor. Entry of the Confirmation Order shall constitute an approval of the assumptions and assignment or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, including the assumption and assignment of the Executory Contracts and Unexpired Leases identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement and the rejection of the Executory Contracts and Unexpired Leases identified on the list of rejected Executory Contracts and Unexpired Leases in the Plan Supplement, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions and assignments or rejections of a Debtor's Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date applicable to such Debtor. Notwithstanding anything to the contrary in the Plan, the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the lists of Executory Contracts or Unexpired Leases applicable to the Post-Effective Date Debtors identified in Article V of the Plan and in the Plan Supplement at any time through and including the later of 30 days after the Effective Date (or such later date as provided in Article V.C of the Plan in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).

3.  Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases

Any Executory Contracts or Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the satisfaction of the Cure Obligations or by an agreed-upon waiver of the Cure Obligations on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Post-Effective Date Debtors and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or related Cure Obligations must be Filed, served, and actually received by the Debtors by 30 days after the Effective Date of the Joint Plan applicable to the Debtor that is the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption and assignment of such Executory Contract or Unexpired Lease or such Cure Obligations will be deemed to have assented to such matters and shall be forever barred, estopped, and enjoined from asserting such objection against the Debtors.

In the event of a dispute regarding: (1) the Cure Obligations; (2) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" within the meaning of section 365(b) of the

Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed and assigned; or (3) any other matter pertaining to assumption and/or assignment, then the applicable Cure Obligations shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding Cure Obligations without any further notice to any party or any action, order, or approval of the Bankruptcy Court. The Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to reject, or nullify the assumption and assignment of, any Executory Contract or Unexpired Lease no later than 30 days after a Final Order determining the Cure Obligations, any request for adequate assurance of future performance required to assume and assign such Executory Contract or Unexpired Lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment. Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

4. <u>Claims Based on Rejection of Executory Contracts and Unexpired Leases</u>

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) 30 days after the Effective Date of the Joint Plan applicable to the Debtor whom the Claim is against.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan, or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.K of the Plan, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

5. <u>Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases</u>

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Post-Effective Date Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

6. <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

7. Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption and assignment or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

G. *Provisions Governing Distributions*

1. Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Disbursing Agent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan or in this Disclosure Statement, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any postpetition interest on such Claim or Interest payable in accordance with the Plan.

2. Distributions Generally; Disbursing Agent

All distributions under the Plan that are to be made on the Effective Date shall be made by the Debtors as Disbursing Agent. All other distributions under the Plan shall be made after the Effective Date by the Post-Effective Date Debtors as Disbursing Agent or such other Entity designated by the Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

3. Rights and Powers of Disbursing Agent

(a) Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)     Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration.

4.     Distributions on Account of Claims Allowed After the Effective Date

(a)     Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

(b)     Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Post-Effective Date Debtors, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)     Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), the Disbursing Agent shall deposit in the Disputed Claims Reserve the amount of Cash that would have been distributed to the Holders of all Disputed Claims or Interests against the Remaining Debtors and the Anaheim Hotel Debtors as if such Disputed Claims or Interests had been Allowed on the Effective Date, with the amount of such Allowed Claims or Interests to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or (c) amount otherwise agreed to by the relevant Debtor and the Holder of such Disputed Claim or Interest for reserve purposes.  To the extent the amount of Cash deposited in the Disputed Claims Reserve on account of Disputed Claims or Interests against the Anaheim Hotel Debtors exceeds the amount of Disputed Claims or Interests against the Anaheim Hotel Debtors (as of the funding of the Disputed Claims Reserve) that later become Allowed, the excess shall be returned to LCPI/SASCO.

5.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

(a)     Delivery of Distributions in General

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

The Five Mile DIP Agent shall be deemed to be the Holder of all Five Mile DIP Claims for purposes of distributions to be made hereunder, and the Disbursing Agent shall make all distributions on account of such Five Mile DIP Claims to or on behalf of the Five Mile DIP Agent. The Five Mile DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Five Mile DIP Claims.  The Five Mile DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Five Mile DIP Claims; provided that

the Five Mile DIP Agent shall retain all rights as administrative agent under the Five Mile DIP Agreement in connection with delivery of distributions to Five Mile DIP Lenders; provided further, however, that the Debtors' obligations to make such distributions in accordance with Article II.C of the Plan shall be deemed satisfied upon delivery of such distributions to the Five Mile DIP Agent.

The Lehman DIP Lender shall be deemed to be the Holder of all Lehman DIP Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Lehman DIP Claims to or on behalf of the Lehman DIP Lender. The Lehman DIP Lender shall hold or direct such distributions for the benefit of the Holders of Allowed Lehman DIP Claims. The Lehman DIP Lender shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Lehman DIP Claims; provided that the Debtors' obligations to make distributions in accordance with Article II.D of the Plan shall be deemed satisfied upon delivery of distributions to the Lehman DIP Lender.

Midland shall be deemed to be the Holder of all Fixed Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Fixed Rate Pool Mortgage Loan Claims to or on behalf of Midland; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Midland.

LNR shall be deemed to be the Holder of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, and the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Allowed Claims to or as directed by LNR. LNR shall hold or direct such distributions for the benefit of the LNR-Serviced Trusts. LNR shall arrange to deliver such distributions to or on behalf of the LNR-Serviced Trusts; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to or as directed by LNR.

Lehman shall be deemed to be the Holder of all Floating Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Floating Rate Pool Mortgage Loan Claims to or on behalf of Lehman. Lehman shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mortgage Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Lehman.

SASCO shall be deemed to be the Holder of all Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims to or on behalf of SASCO. SASCO shall hold or direct such distributions for the benefit of the Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims. SASCO shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to SASCO.

(b) Minimum; De Minimis Distributions

No Cash payment of less than $50.00, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

(c) Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at

which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert to the applicable Post-Effective Date Debtor (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

(d)    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

6.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

7.    Claims Paid or Payable by Third Parties

(a)    Claims Paid by Third Parties

The Debtors on or prior to the Effective Date or the Post-Effective Date Debtors after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Post-Effective Date Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Post-Effective Date Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Post-Effective Date Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(b)    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Post-Effective Date Debtors, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan or in this Disclosure Statement constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

H.     *Procedures for Resolving Contingent, Unliquidated, and Disputed Claims*

1.     Resolution of Disputed Claims

(a)     Allowance of Claims

On or after the Effective Date, the Disbursing Agent shall have and shall retain any and all rights and defenses that the applicable Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

(b)     Prosecution of Objections to Claims

The Disbursing Agent shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Disbursing Agent may settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  From and after the Effective Date, the Disbursing Agent shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     Time to File Objections to Claims

Any objections to Claims shall be filed on or before the Claims Objection Bar Date.

(d)     Claims Estimation

The Disbursing Agent may, at any time, and shall have the exclusive authority to request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Post-Effective Date Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Disbursing Agent may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Disbursing Agent may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been

estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(e) Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Notice and Claims Agent at the direction of the Debtors or the Post-Effective Date Debtors, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Post-Effective Date Debtors, in all cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

2. Disallowance of Claims

All Claims or Interests of any Entity from which property is sought by the Debtors or the Post-Effective Date Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Post-Effective Date Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Disbursing Agent on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS PROVIDED FOR UNDER THE PLAN OR OTHERWISE AGREED TO BY THE DEBTORS OR THE DISBURSING AGENT, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE (THAT DO NOT AMEND TIMELY FILED CLAIMS) SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE OF THE JOINT PLAN OF THE DEBTOR AGAINST WHOM SUCH CLAIM IS ASSERTED WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

3. Amendments to Claims

On or after the Effective Date, except as provided in Article II.A of the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Disbursing Agent, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

I. *Settlement, Release, Injunction, and Related Provisions*

1. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan or relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the

provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Post-Effective Date Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities; provided that, with respect to the C6 and C7 Trusts and the holders of certificates in the C6 and C7 Trusts, in their capacity as such, the Plan does not compromise or settle the Claims, interests, and controversies, if any, of the C6 and C7 Trusts or the holders of certificates in the C6 and C7 Trusts against Midland, the C6 and C7 Trusts, and any holder of certificates in the C6 and C7 Trusts, in its capacity as such, and the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, or professionals, whether arising under the applicable pooling and servicing agreement, side letter, co-lender agreement, or related documents; provided, further, that, with respect to SASCO or LCPI, the Plan does not compromise or settle any Claims, interests, and controversies of SASCO or LCPI against TriMont or any of its advisors arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

2.   Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein or in the Plan to the contrary, and as provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

J.    *Midland Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS (TO THE EXTENT SET FORTH IN THE PLAN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, MIDLAND, AS SPECIAL SERVICER AND ON BEHALF OF THE C6 AND C7 TRUSTS, (I) DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO APOLLO (AND APOLLO SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY MIDLAND) AND ITS RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE APOLLO GUARANTY; AND (II) IF AN ACTION REMAINS PENDING IN THE STATE COURTS OF NEW YORK OR ELSEWHERE, MIDLAND SHALL DISMISS ITS CLAIMS AGAINST APOLLO WITH PREJUDICE; PROVIDED THAT THE FOREGOING "**MIDLAND RELEASE**" IS CONDITIONED ON THE OCCURRENCE OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND THE RECEIPT BY MIDLAND OF THE SPECIAL SERVICER RELEASE PAYMENT, THE EMBODIMENT OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE (AS DESCRIBED IN ARTICLE VIII.E OF THE PLAN) IN THE CONFIRMATION ORDER ENTERED BY THE BANKRUPTCY COURT THAT HAS BECOME A FINAL ORDER; PROVIDED FURTHER THAT THE MIDLAND RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF MIDLAND:  (1) ARISING UNDER

ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE MIDLAND RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE MIDLAND RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE MIDLAND RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO MIDLAND ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE MIDLAND RELEASE.

*K.    Apollo Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, APOLLO, ON ACCOUNT OF ITS HOLDINGS OF COMMON SHARES OR OTHER EQUITY IN THE DEBTORS OR OTHERWISE DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO THE FIXED/FLOATING RELEASING PARTIES (AND THE FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY APOLLO) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE RELEASING PARTIES; PROVIDED THAT THE FOREGOING "**APOLLO RELEASE**" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE APOLLO RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN

AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE APOLLO RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE APOLLO RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO APOLLO ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE APOLLO RELEASE.

L.    *Fixed/Floating Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE FIXED/FLOATING RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES (AND EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE FIXED/FLOATING RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE FIXED/FLOATING DEBTORS OR THE POST-EFFECTIVE DATE FIXED/FLOATING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER FIXED/FLOATING RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE FIXED/FLOATING RELEASING PARTIES; PROVIDED THAT IN CONNECTION WITH THE FOREGOING FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, THE VALIDITY, ENFORCEABILITY, AND PERFECTION, IN ALL RESPECTS, OF THE LIENS, CLAIMS, INTERESTS, MORTGAGES, AND ENCUMBRANCES OF THE FIXED RATE POOL MORTGAGE LOAN AGREEMENT AND THE C6 AND C7 TRUSTS ARE HEREBY CONFIRMED AND ADJUDICATED BY THE BANKRUPTCY COURT; PROVIDED FURTHER THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE FIXED/FLOATING RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT (1) THE RELEASES OF APOLLO SET FORTH IN THE MIDLAND RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE AND THE STIPULATION OF

DISCONTINUANCE OF THE LITIGATION RELATED TO THE APOLLO GUARANTY SET FORTH IN THE MIDLAND RELEASE AND (2) THE WAIVERS AND RELEASES TO BE GIVEN BY APOLLO SET FORTH IN THE APOLLO RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT BE EFFECTIVE UNTIL MIDLAND HAS RECEIVED THE SPECIAL SERVICER RELEASE PAYMENT AND THE OCCURRENCE OF SUCH EFFECTIVE DATE; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE FIXED/FLOATING PLAN; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u>, NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES , IF ANY, OF THE C6 AND C7 TRUSTS, THE HOLDERS OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN THEIR CAPACITY AS SUCH, OR LNR PARTNERS, LLC (OR ITS AFFILIATES), LNR SECURITIES HOLDINGS LLC (OR ITS AFFILIATES) WHETHER ARISING UNDER THE APPLICABLE POOLING AND SERVICING AGREEMENT, SIDE LETTER, CO-LENDER AGREEMENT, OR RELATED AGREEMENT AGAINST THE C6 AND C7 TRUSTS, MIDLAND, ANY HOLDER OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN ITS CAPACITY AS SUCH, OR ANY OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, OR PROFESSIONALS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u>, NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN <u>AND</u> <u>FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE FIXED/FLOATING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE FIXED/FLOATING RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE.

M.    *Anaheim Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ANAHEIM HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ANAHEIM HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ANAHEIM HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER

SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ANAHEIM HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ANAHEIM HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ANAHEIM HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ANAHEIM HOTEL RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE ANAHEIM HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ANAHEIM HOTEL RELEASING PARTIES:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS ANAHEIM HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ANAHEIM HOTEL DEBTORS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u>, NEITHER THE ANAHEIM HOTEL DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS.

ENTRY OF THE CONFIRMATION ORDER FOR THE ANAHEIM PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ANAHEIM HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN <u>AND FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ANAHEIM HOTEL GENERAL RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ANAHEIM HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ANAHEIM HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ANAHEIM HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ANAHEIM HOTEL GENERAL RELEASE.

### N.        *Ontario Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN OR IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ONTARIO HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ONTARIO HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ONTARIO HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ONTARIO HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ONTARIO HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ONTARIO HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ONTARIO HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ONTARIO HOTEL RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE ONTARIO HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ONTARIO HOTEL RELEASING PARTIES:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS ONTARIO HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ONTARIO HOTEL DEBTORS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE ONTARIO HOTEL GENERAL RELEASE WILL NOT IMPACT C-III'S ABILITY TO PROCEED WITH STATE FORECLOSURE PROCEEDINGS AS DESCRIBED IN ARTICLE III.B.3(B) OF THE PLAN.

ENTRY OF THE CONFIRMATION ORDER FOR THE ONTARIO PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ONTARIO HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN <u>AND</u> <u>FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ONTARIO HOTEL GENERAL RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ONTARIO HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ONTARIO HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER

DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ONTARIO HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ONTARIO HOTEL GENERAL RELEASE.

O.     *Remaining Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE REMAINING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE REMAINING DEBTOR RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES (AND EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE REMAINING DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE REMAINING DEBTORS OR THE POST-EFFECTIVE DATE REMAINING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER REMAINING DEBTOR RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE REMAINING DEBTOR RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE REMAINING DEBTOR RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE REMAINING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE REMAINING DEBTOR RELEASING PARTIES:   (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS REMAINING DEBTORS' PLAN GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE REMAINING DEBTORS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE HOLDER OF GARDEN GROVE HOTEL MORTGAGE LOAN CLAIMS, SAN ANTONIO HOTEL MORTGAGE LOAN CLAIMS, SAN DIEGO HOTEL MORTGAGE LOAN CLAIMS, TYSONS CORNER HOTEL MORTGAGE LOAN CLAIMS, AND WASHINGTON DC HOTEL MORTGAGE LOAN CLAIMS WAIVE ALL RIGHTS THEY MAY HAVE TO THE FUNDS IN THE LP BANK ACCOUNT; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE AD HOC COMMITTEE SHALL RELEASE LNR, THE LNR-SERVICED TRUSTS AND THE MASTER SERVICER FOR EACH OF THE LNR-SERVICED LOANS, AND EACH OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, MASTER

SERVICES, SPECIAL SERVICERS, TRUSTS AND TRUSTEES, AND PROFESSIONALS, INCLUDING LEGAL AND FINANCIAL ADVISORS, FROM ALL CLAIMS RELATED TO THE LNR-SERVICED LOANS AND THE DEBTORS, WHETHER ARISING BEFORE OR AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES; PROVIDED FURTHER THAT, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE LNR-SERVICED TRUSTS SHALL BE RELEASED FROM AND NOT SUBJECT TO ANY AND ALL AVOIDANCE ACTIONS UNDER CHAPTER 5 OF THE BANKRUPTCY CODE OR CLAIM OBJECTIONS UNDER SECTION 502(D) OF THE BANKRUPTCY CODE BROUGHT BY ANY ENTITY, INCLUDING BUT NOT LIMITED TO THE COMMITTEE, THE AH HOC COMMITTEE, OR ANY SUCCESSOR IN INTEREST THERETO.

ENTRY OF THE CONFIRMATION ORDER FOR THE REMAINING DEBTOR PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE REMAINING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE REMAINING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE REMAINING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE REMAINING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE REMAINING DEBTOR RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE REMAINING DEBTORS' PLAN GENERAL RELEASE.

UPON APPROVAL OF THE AD HOC COMMITTEE AGREEMENT: (I) HOLDERS OF INNKEEPERS USA TRUST PREFERRED C INTERESTS AND THE AD HOC COMMITTEE SHALL BE DEEMED TO BE FIXED/FLOATING RELEASING PARTIES, ANAHEIM HOTEL RELEASING PARTIES, AND ONTARIO HOTEL RELEASING PARTIES; AND (II) THE AD HOC COMMITTEE SHALL BE A REMAINING DEBTOR RELEASING PARTY.

*P.    Exculpation*

The Exculpated Parties shall neither have, nor incur, any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Commitment Letter, the Disclosure Statement, the issuance, distribution, and/or sale of any of the Interests of the Post-Effective Date Fixed/Floating Debtors or any other Security, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the Exculpated Parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that  neither this provision nor any other portion of the Plan shall exculpate Midland or any holder of certificates in the C6 and C7 Trusts, in its capacity as such, for any liability, if any, to the C6 and C7 Trusts or any holders of certificates in the C6 or C7 Trusts, in their capacity as such; provided, further, that this provision shall not operate to expand the scope of the Floating/Fixed Debtors' Plan General Release; provided, further, that, this provision shall not exculpate TriMont or any of its advisors for or from any liability to SASCO or LCPI arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

*Q.      Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C OF THE PLAN, ARTICLE VIII.D OF THE PLAN, ARTICLE VIII.E OF THE PLAN, ARTICLE VIII.F OF THE PLAN, ARTICLE VIII.G OF THE PLAN, OR ARTICLE VIII.H OF THE PLAN (5) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.I OF THE PLAN; OR (6) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION, OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; <u>PROVIDED</u> <u>THAT</u> NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u>, FOR THE AVOIDANCE OF DOUBT, NOTHING SET FORTH HEREIN OR IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

*R.*     *Setoffs*

Except as otherwise provided in the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Post-Effective Date Debtors of any such Claims, rights, and Causes of Action that the Post-Effective Date Debtors may possess against such Holder.

*S.*     *Severability of Plan and Conditions Precedent to the Effective Date*

1.     Severability of the Plan

The Plan contemplates four separate joint plans of reorganization that together provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases:  (a) the Fixed/Floating Plan; (b) the Anaheim Plan; (c) the Ontario Plan; and (d) the Remaining Debtor Plan.  The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the four joint plans are not conditioned on the Confirmation and Consummation of any of the other three joint plans.

2.     Condition Precedent to Confirmation of the Fixed/Floating Plan

It shall be a condition to Confirmation of the Fixed/Floating Plan that the Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman, and Midland in each of their reasonable discretion.

3.     Condition Precedent to Confirmation of the Remaining Debtor Plan

It shall be a condition to Confirmation of the Remaining Debtor Plan that all of the conditions set forth in the Stipulation shall have been satisfied and that the Confirmation Order, the Remaining Debtor Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall in all respects be in compliance with and consistent with the terms of the Stipulation.

4.     Conditions Precedent to the Effective Date of Each of the Joint Plans

It shall be a condition to Consummation of the Plan as applicable to a certain Debtor or certain Debtors that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.     Conditions Applicable to Each of the Joint Plans

(i)     The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules) the Confirmation Order shall not be stayed and shall be effective immediately upon its entry.

(ii)     All documents and agreements necessary to implement the applicable Joint Plan (including, without limitation, the Commitment Letter and the New HoldCo/Midland Commitment Letter for the Fixed/Floating Plan) shall have (a) all

conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

(iii) All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Joint Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(iv) The Professional Fee Escrow Account shall have been funded with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals; and

(v) The "tail policy" for current and former trustees, directors, and officers referenced in Article IV.S of the Plan shall have been purchased.

2. Additional Conditions Applicable Only to the Fixed/Floating Plan

(i) The "Outside Date" under the Commitment Letter shall not have occurred.

(ii) The Special Servicer Payment and the Special Service Release Payment shall have been made

(iii) The Apollo Unsecured Claim Fund Payment shall have been made.

(iv) The Commitment Letter has not been terminated.

(v) The Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Midland, and Lehman, in each of their reasonable discretion.

(vi) The Cash payments required in accordance with the treatment of Classes FF3B and FF4 under the Fixed/Floating Plan, the Cash payment to the Holders of the Five Mile DIP Claims (in accordance with Article II.C hereof), and the Cash payment to the Holders of the Lehman DIP Claims (in accordance with Article II.D hereof) shall have been made.

3. Additional Condition Applicable Only to the Ontario Plan

(i) The Ontario Debtors have delivered an executed deed in lieu to C-III, provided that such delivery shall not effect C-III's ability to elect to pursue state foreclosure proceedings as described in Article III.B.3(b) of the Plan.

4. Additional Condition Applicable Only to the Remaining Debtor Plan

(i) No Termination Event (under the LNR Commitment) shall have occurred.

(ii) The LNR-Serviced Trusts shall have received payments of all of the amounts provided for in the Stipulation.

(iii) The closing of the Chatham Hotel Sale Transaction occurs.

5. <u>Waiver of Conditions</u>

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IV of the Plan may be waived only by consent of the Debtors; <u>provided that</u> with respect to the consummation of the Fixed/Floating Plan, the conditions precedent to the Effective Date may be waived only by the consent of the Fixed/Floating Plan Sponsors, Lehman, and Midland, in accordance with the terms of the Fixed/Floating Successful Bid; <u>provided further that</u>, notwithstanding anything to the contrary in Article IV.D of the Plan, consent shall not be required to waive a condition described in Article IX.C of the Plan from any Entity whose actions (or failure to act) were the proximate cause of the failure of such condition to be satisfied.

6. <u>Effective Date</u>

For each Debtor, the Effective Date shall be the date that is a Business Day selected by the Debtors after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; <u>provided that</u> in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules) the Confirmation Order shall not be stayed and shall be effective immediately upon its entry; and (b) all conditions precedent applicable to such Debtor specified in Article IX.C of the Plan have been satisfied or waived (in accordance with Article IX.D of the Plan).

7. <u>Effect of Non-Occurrence of the Effective Date Regarding Fixed/Floating Debtors</u>

Unless and only to the extent otherwise agreed among the Debtors, the Fixed/Floating Plan Sponsors, Lehman, and Midland, if the Effective Date as to the Fixed/Floating Debtors does not occur on or before September 15, 2011 (*i.e.*, the "Outside Date" under the Commitment Letter), the Confirmation Order shall be automatically revoked and the Plan as applicable to the Fixed/Floating Debtors and the Commitment Letter shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Commitment Letter shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Fixed/Floating Debtors; (2) prejudice in any manner the rights of the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests in the Fixed/Floating Debtors, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests, or any other Entity in any respect.

8. <u>Effect of Non-Occurrence of the Effective Date Regarding the Ontario Plan</u>

Unless and only to the extent otherwise agreed among the Debtors and C-III, if the Effective Date of the Ontario Plan does not occur on or before July 5, 2011, the Confirmation Order as applicable to the Ontario Plan shall be automatically revoked and the Ontario Plan shall be null and void in all respects. Upon the non-occurrence of the Effective Date for the Ontario Plan, C-III and the Debtors will enter into a stipulation, acceptable to the Debtors and C-III, each in their reasonable discretion, providing for: (1) the lifting of the automatic stay imposed by section 362 of the Bankruptcy Code with respect to the collateral securing the Ontario Hotel Mortgage Loan Agreement; (2) a waiver and release of any claims by or Claims against or Interests in the Ontario Hotel Debtors by C-III as provided for by Article VII.G of the Plan; and (3) the payment by C-III of $30,000, which payment shall be distributed among Holders of Claims against the Ontario Hotel Debtors.

*T.*    *Modification, Revocation, or Withdrawal of the Plan*

1. <u>Modification and Amendments</u>

Subject to the limitations contained in the Plan, and the consent rights available to the Fixed/Floating Plan Sponsors and Midland (as described in Article IX of the Plan), the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter,

amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

 2. Effect of Confirmation on Modifications

 Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

 3. Revocation or Withdrawal of the Plan

 The Debtors reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date or the Effective Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity. Nothing contained in Article X of the Plan shall impair the rights and obligations existing under the Commitment Letter.

*U.* *Retention of Jurisdiction*

 Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

 1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

 2. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

 3. Resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V or the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

 4. Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article V.I of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article V.G.7(a) of the Plan;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to the Plan, the Commitment Letter, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

21.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     Enforce all orders previously entered by the Bankruptcy Court;

23.     To resolve any disputes arising under the Commitment Letter and Chatham Hotel Sale Transaction Documents;

24.     Hear any other matter not inconsistent with the Bankruptcy Code;

25.     Enter an order concluding or closing the Chapter 11 Cases; and

26.     Enforce the injunction, release, and exculpation provisions set forth in I.

*V.     Miscellaneous Provisions*

1.     <u>Immediate Binding Effect</u>

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date with respect to any of the Joint Plans, the terms of such plan, the corresponding Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the relevant Debtors, the relevant Post-Effective Date Debtors, and any and all Holders of Claims or Interests against or in the relevant Debtors (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in such plan, each Entity acquiring property under such plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the relevant Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.     <u>Additional Documents</u>

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.     <u>Payment of Statutory Fees</u>

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Post-Effective Date Debtors (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

4.     <u>Dissolution of Committees</u>

Without considering any of the Chapter 11 Cases that have been converted, dismissed or closed, on the date that is the latest Confirmation Date of a chapter 11 plan applicable to any of the Chapter 11 Cases, the Committees, if any, shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; <u>provided</u> <u>that</u> a Committee shall continue in existence following the Confirmation Date for either (i) addressing matters concerning fees incurred in connection with the administration of the Chapter 11 Cases or (ii) participating in any appeal of the Confirmation Order.

5.   Reservation of Rights

Except as expressly set forth in the Plan, any of the Joint Plans shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order with respect to such Joint Plan.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

6.   Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

7.   Dissolution of Entities

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, such Debtor shall be deemed dissolved under state law without further action by the Post-Effective Date Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

8.   Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Post-Effective Date Debtors shall be served on:

(a)      if to the Debtors or the Post-Effective Date Debtors (other than the Post-Effective Date Fixed/Floating Debtors), to:

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attention:  Marc A. Beilinson

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Facsimile:  (212) 446-4900
Attention:  Paul M. Basta, Stephen E. Hessler, and Brian S. Lennon
E-mail addresses:  paul.basta@kirkland.com, stephen.hessler@kirkland.com, and
                          brian.lennon@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Facsimile:  (312) 862-2200
Attention:  Anup Sathy, P.C.
E-mail address:  anup.sathy@kirkland.com

(b)     if to the Fixed/Floating Plan Sponsors or the Post-Effective Date Fixed/Floating Debtors, to:

INK ACQUISITION LLC
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, New York 10171
Attention:  Tom Wagner

with copies to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Facsimile:  (212) 593-5955
Attention:  Stuart Freedman and Adam Harris
E-mail addresses:  stuart.freedman@srz.com and adam.harris@srz.com

and

INK ACQUISITION LLC
c/o Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Attention:  Jeff Fisher

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile:  (212) 403-2202
Attention:  Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

(c)     if to Chatham, to:

Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Attention:  Jeff Fisher

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile:  (212) 403-2202
Attention:  Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

9.   Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the

Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

10. Entire Agreement

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

11. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

(a)     Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer and issuance of securities distributed under the Plan and any previous plan, and, therefore, such parties, individuals and Post-Effective Date Debtors will not have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer and issuance of the securities offered and distributed under the Plan and any previous plan.

(b)     Closing of Chapter 11 Cases.

Innkeepers shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

(c)     Waiver or Estoppel.

**The Plan provides that each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with Innkeepers, its counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.** For the avoidance of doubt, this provision in the Plan is not intended to limit a creditor's ability to enter into a consensual post-confirmation resolution of its Claim.

(d)     Conflicts.

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

# ARTICLE VI.
## VALUATION AND FINANCIAL PROJECTIONS

*A.      Valuation*

The Debtors, with the assistance of Moelis, have pursued an extensive marketing process for substantially all of the Debtors' assets, on both enterprise level and non-enterprise level bases. Over the course of an eight-month process, the Debtors contacted more than 200 potential investors and plan sponsors. After a formal auction at which the Debtors accepted the highest or otherwise best bids for the applicable assets, the Debtors reached agreement with two plan sponsors—Cerberus/Chatham for the Fixed/Floating Properties and Chatham for the LNR Properties. A detailed description of the marketing process is set forth in Article IV.K of this Disclosure Statement.

Moelis believes the value achieved by the successful conclusion of the auction and as provided under the Plan is a reasonable measure of the Debtors' value in light of, among other things, (1) the robust and exhaustive nature of the marketing process, which benefited from increased creditor support and the Debtors having more liquidity than forecasted prior to commencing the process and (2) the active bidding that took place during the auction process.

Nothing herein constitutes an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

*B.      Financial Projections*

As further discussed in Article VII.B.2 of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has developed the financial projections, which are attached hereto as **<u>Exhibit B</u>** and incorporated by reference.

# ARTICLE VII.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided herein.

*A.      Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. **The Bankruptcy Court has scheduled a Confirmation Hearing for each Joint Plan for June 23, 2011.** A Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at a Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures. Any objection to the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any, (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth in Article V.V.8 herein no later than the Plan Objection Deadline. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

At a Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than 30 days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

1.  Best Interests of Creditors Test - Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each Holder of a Claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the Effective Date of the plan, that is not less than the amount that such Holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit C**, showing that the value of the distributions provided to Holders of Allowed Claims under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.

2.  Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Post-Effective Date Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. The Debtors believe that the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all distributions required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

C.  *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the Holder of such claim or interest; (2) cures any default, reinstates the original terms of such obligation, and compensates; or (3) provides that, on the Consummation date, the Holder of such claim or interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the Holder of such interest is entitled or to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance, subject to Article III of the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of those interests who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds (2/3) in amount actually voting cast their ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan.

*D.*     *Confirmation without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan, *provided that* the plan is accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

1.     No Unfair Discrimination.

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests that have voted against or are deemed to vote against the Plan. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

2.     Fair and Equitable Test.

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

(a)     Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)     Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

(c)     Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (ii) the value of such interest; or (iii) if the class does not receive the

amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

# ARTICLE VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

*Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, prior to voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.*

A.      *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      Failure to Satisfy Vote Requirements

With respect to each Joint Plan, if votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan. In the event that sufficient votes are not received for any Joint Plan, the Debtors may still seek to confirm any of the other Joint Plans that does receive sufficient votes.

3.      The Debtors May Not Be Able to Secure Confirmation of the Plan

The Debtors will need to satisfy section 1129 of the Bankruptcy Code for each of the four Joint Plans. With respect to each Joint Plan, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the

Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.     <u>Nonconsensual Confirmation</u>

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, with respect to each Joint Plan, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of the entities' commitments to provide support for the Plan, financially or otherwise.

5.     <u>The Debtors May Object to the Amount or Classification of a Claim</u>

Except as specifically provided in the Plan, the Debtors reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection. Any Holder of a Claim that is or may be subject to an objection, thus, may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.     <u>Risk of Non-Occurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date with respect to each Joint Plan, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur. In addition, the Fixed/Floating Plan will be null and void in all respects if the Effective Date does not occur on or before September 15, 2011 (the "Outside Date" under the Commitment Letter), unless otherwise agreed by the Debtors, the Plan Sponsors, Lehman, and Midland in writing .

7.     <u>Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan</u>

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.      *Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and the Value of Securities to Be Issued Under the Plan*

1.      Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Creditors

The estimate of Allowed Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary significantly from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan and the Debtors' and the Post-Effective Date Debtors' abilities to meet the Financial Projections.

2.      The Commitment Letter May Terminate, Thereby Preventing the Debtors From Consummating the Plan as Applicable to the Fixed/Floating Debtors

To the extent that the terms or conditions of the Commitment Letter are not satisfied, or to the extent events giving rise to termination of the Commitment Letter occur, the Commitment Letter may terminate prior to the Confirmation or Consummation of the Fixed/Floating Plan, which could result in the loss of support for the Fixed/Floating Plan by important creditor constituents. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

3.      The Post-Effective Date Debtors May Not Be Able to Meet the Projected Financial Results as Applicable to the Fixed/Floating Debtors

The Post-Effective Date Debtors may not be able to meet the Debtors' current projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects. To the extent that the Post-Effective Date Debtors do not meet the Debtors' projected financial results, the Post-Effective Date Debtors may lack sufficient liquidity to continue operating as planned, may be unable to service its debt obligations, and may not be able to meet its working capital and operational needs. Any one of these failures may preclude the Post-Effective Date Debtors from, among other things: (a) generating and growing revenues; (b) maintaining the physical condition of directly and indirectly owned properties; (c) meeting obligations under various franchise agreements; (d) taking advantage of future business opportunities; and (e) responding to competitive pressures. While the financial projections represent management's view based on current known facts and assumptions about future operations, there is no guarantee that the financial projections will be realized.

4.      A Small Number of Holders or Voting Blocks May Control the Post-Effective Date Debtors

Consummation of the Plan may result in a small number of Holders owning a significant percentage of the shares of the outstanding Interests of the Post-Effective Date Fixed/Floating Debtors. These Holders may, among other things, exercise a controlling influence over the business and affairs of the Post-Effective Date Debtors and have the power to elect directors or managers and approve significant mergers and other material corporate transactions.

5.      Certain Tax Implications of the Debtors' Bankruptcy May Increase the Tax Liability of the Purchaser

Holders of Allowed Claims should carefully review Article X herein, "Certain United States Federal Tax Income Consequences" to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Post-Effective Date Debtors.

*C.*    *Risk Factors that Could Negatively Impact the Debtors' Business*

The Debtors are subject to a number of risks, including (1) bankruptcy-related risk factors and (2) general business and financial risk factors. Any or all such factors, which are enumerated below, could have a materially adverse effect on the business, financial condition, or results of operations of the Debtors and the Post-Effective Date Debtors. Additional risks and uncertainties not currently known to the Debtors or that the Debtors currently deem to be immaterial at this time may also materially adversely affect the Debtors' business, financial condition, or results of operations. Any of the following risks could materially adversely affect the Debtors' business, financial condition, or results of operations.

1.    <u>Bankruptcy Related Risk Factors</u>

For the duration of these Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and their ability to operate while in chapter 11.

- The Chapter 11 Cases and the attendant difficulties of operating the Debtors' business while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' services and attract customers to their business.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for fees and other expenses associated with these Chapter 11 Cases.

- The Chapter 11 Cases may prevent the Debtors from continuing to grow their business and may restrict their ability to pursue other business strategies. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell, or otherwise dispose of assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions they seek to undertake in these Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and the Debtors may have difficulty attracting new employees. In addition, so long as these Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their business and meet future obligations. The Debtors currently are financing their operations during their reorganization using funds from operations. The borrowings under the postpetition credit facilities will be used to fund the PIPs. The Debtors may be unable to operate pursuant to the terms of their DIP Facilities, including the financial covenants and restrictions contained therein, or to negotiate and obtain necessary approvals, amendments, waivers, or other types of modifications, and to otherwise fund and execute the Debtors' business plans throughout the duration of these Chapter 11 Cases.

- There can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate one or more of the Plans with respect to these Chapter 11 Cases that are acceptable to the Bankruptcy Court and the Debtors' creditors, equityholders, and other parties in

interest. Additionally, third parties may seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm one or more plans of reorganization, to appoint a chapter 11 trustee, or to convert the cases to chapter 7 cases.

In addition, the uncertainty regarding the eventual outcome of the Debtors' restructuring, and the effect of other unknown adverse factors could threaten the Debtors' existence as a going-concern. Continuing on a going-concern basis is dependent upon, among other things, obtaining Bankruptcy Court approval of a chapter 11 plan, maintaining the support of key vendors, franchisors, and customers, and retaining key personnel, along with financial, business, and other factors, many of which are beyond the Debtors' control. Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise in accordance with the Bankruptcy Code, distributions from the estate for prepetition liabilities and postpetition liabilities must comply with section 1129 of the Bankruptcy Code. The ultimate recovery to Holders of Claims or interests, if any, will not be determined until Confirmation of the Plan or an alternative to a chapter 11 plan. No assurance can be given as to what values, if any, will be ascribed in these Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive.

2.     General Business and Financial Risk Factors

    (a)    General Economic Conditions

In the financial projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years. The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Debtors. There is no guarantee that economic conditions will improve in the near term.

    (b)    Implementation of Business Plan

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring. However, there are risks that the goals of the Debtors' going-forward business plan and financial restructuring strategy will not be achieved. In such event, the Debtors may be unable to refinance maturing debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.

    (c)    Seasonality

The Debtors' principal sources of revenue are revenues generated by their properties. The Debtors' experience seasonal revenue patterns similar to those of the hospitality industry in general. This seasonality can be expected to cause fluctuations in the Debtors' revenues, profit margins and net income.

    (d)    Competition

The hospitality industry is highly competitive, which may impact the Debtors' ability to compete successfully for customers with other hotel properties. The Debtors generally operate in markets that contain numerous competitors. The Debtors' ability to remain competitive and to attract and retain business and leisure travelers depends on the Debtors' success in distinguishing the quality, value, and efficiency of the Debtors' hospitality products and services from those offered by others and their access to capital to be used for capital expenditures. If the Debtors are unable to compete successfully in these areas, this could limit the Debtors' operating margins, diminish the Debtors' market share, and reduce their earnings.

    (e)    Operating Risks

The Debtors are subject to the range of operating risks common to the hotel industry. The profitability of the hotels that the Debtors own may be adversely affected by a number of factors, including:

- the availability of and demand for hotel rooms;

- international, national, and regional economic and geopolitical conditions;

- the impact of war, actual or threatened terrorist activity and heightened travel security measures instituted in response to war, terrorist activity or threats;

- the desirability of particular locations and changes in travel and/or weather patterns;

- the state of the housing and construction industries;

- travelers' fears of exposure to contagious diseases, such as Avian Flu, Severe Acute Respiratory Syndrome, and H1N1 Flu;

- the occurrence of natural disasters, such as earthquakes, tsunamis, and hurricanes;

- taxes and government regulations that influence or determine wages, prices, interest rates, construction procedures, and costs;

- the costs and administrative burdens associated with compliance with applicable laws and regulations, including, among others, privacy, marketing and sales, licensing, labor, and employment, immigration and environmental laws;

- the availability and cost of capital to allow the Post-Effective Date Debtors to fund investments;

- regional and national development of competing properties;

- increases in wages and other labor costs, energy, healthcare, insurance, transportation and fuel, and other expenses central to the conduct of the Debtors' business or the cost of travel for the Debtors' customers, including recent increases in energy costs and any resulting increase in travel costs or decrease in airline capacity; and

- organized labor activities, which could cause the diversion of business from hotels involved in labor negotiations, loss of group business, and/or increased labor costs. Any one or more of these factors could limit or reduce the demand or the prices of the Debtors' hotels are able to obtain for hotel rooms or could increase their costs and therefore reduce the profit of the Post-Effective Date Debtors' hospitality businesses. Even where such factors do not reduce demand, property-level profit margins may suffer if the Post-Effective Date Debtors is unable to fully recover increased operating costs from its guests. Similarly, the Post-Effective Date Debtors' revenue could be impacted by weak property-level revenue or profitability.

(f)     National and Regional Conditions

The Debtors' hospitality operations are subject to national and regional conditions. In recent years, the Debtors' business has been hurt by decreases in travel resulting from recent economic conditions. The Post-Effective Date Debtors' future economic performance is similarly subject to the economic environment in the United States and elsewhere, which is uncertain, as evidenced by recent failures and near failures of a number of large financial service companies, the current worldwide recession, the resulting unknown pace of business travel, the occurrence of any future incidents in the United States, and the pace of recovery of any such adverse events or conditions.

(g)     Property Damage

The Debtors have comprehensive property and liability insurance policies with coverage features and insured limits that the Debtors believe are customary.  Market forces beyond the Debtors control may nonetheless limit the scope of insurance coverage that the Post-Effective Date Debtors can obtain, as well as the ability to obtain coverage at reasonable rates.  Certain types of losses, generally of a catastrophic nature, such as earthquakes, hurricanes and floods, or terrorist acts, may be uninsurable or too expensive to justify obtaining insurance.  As a result, the Debtors may not be successful in obtaining insurance without increases in cost or decreases in coverage levels.  In addition, in the event of a substantial loss, the insurance coverage the Debtors carry may not be sufficient to pay the full market value or replacement cost of the Debtors' lost investment or in some cases could result in certain losses being totally uninsured.  As a result, the Debtors could lose some or all of the capital they have invested in a property, as well as the anticipated future revenue from the property, and the Debtors could remain obligated for guarantees, debt, or other financial obligations related to the property.

(h)     Hotel Managers

The Debtors rely on their Hotel Management Agreements with Island and Dimension for the management of their hotel properties.  The temporary or permanent inability of Island or Dimension to meet their obligations under the Hotel Management Agreements could severely impact the ability of the Debtors' properties to generate revenues.

(i)     Continuing Leverage and Ability to Service Debt

Although the Consummation of the Plan will significantly reduce the Debtors' debt service obligations, the Post-Effective Date Debtors will remain leveraged. The Debtors believe that, following Consummation of the Plan, the Post-Effective Date Debtors will be able to meet its anticipated future operating expenses, capital expenditures, and debt service obligations.  However, the Post-Effective Date Debtors' ability to meet its debt service obligations and to carry out capital spending that is important to its growth and productivity will depend on a number of factors, including future operating performance and ability to achieve the business plan.  These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors beyond the Post-Effective Date Debtors' control.

D.     *Risks Associated with Forward Looking Statements*

1.     Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained herein and attached hereto is without inaccuracies.

2.     Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.

This Disclosure Statement contains various projections concerning the financial results of the Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Post-Effective Date Debtors may turn out to be different from the Financial Projections.  The Financial Projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Post-Effective Date Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Post-Effective Date Debtors, including the ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) customer preferences continuing to support the Debtors' operations.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

E.     *Disclosure Statement Disclaimer*

1.      <u>Information Contained Herein Is for Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.      <u>This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission</u>

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein.

3.      <u>Reliance on Exemptions from Registration Under the Securities Act</u>

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer and sale of Interests to New HoldCo has not been registered under the Securities Act or similar state securities or "blue sky" laws.

Interests to be issued to New HoldCo will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

4.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Post-Effective Date Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

6.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Post-Effective Date Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors or the Post-Effective Date Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified herein.

8.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your

decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the United States Trustee for the Southern District of New York, and counsel to the Creditors Committee.

*F.*      *Liquidation Under Chapter 7*

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' liquidation analysis is set forth in Article VII herein, "Statutory Requirements for Confirmation of the Plan" and the Liquidation Analysis attached hereto as **Exhibit C**.

## ARTICLE IX.
## IMPORTANT SECURITIES LAW DISCLOSURE

*A.*      *Interests of the Post-Effective Date Fixed/Floating Debtors*

The Plan provides that, on the Effective Date, New HoldCo will receive Interests of the Post-Effective Date Fixed/Floating Debtors.  On or prior to the Effective Date, the Fixed/Floating Debtors will reserve for issuance the Interests required to be issued pursuant to the Plan  The Debtors believe that all of the Interests of the Post-Effective Date Fixed/Floating Debtors constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

*B.*      *Issuance and Resale of Interests of the Post-Effective Date Fixed/Floating Debtors under the Plan*

1.      Exemption from Registration

Interests to be issued to New HoldCo will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities."  As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law.  Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

2.      Resales of Interests of the Post-Effective Date Fixed/Floating Debtors

Under certain circumstances, affiliated holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144.  Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act.  Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale;

and (ii) an affiliate may sell restricted securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a one-year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system).

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF NEW INTERESTS MAY BE AN UNDERWRITER OR AN AFFILIATE OF NEW INNKEEPERS, NEW INNKEEPERS MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE THE NEW INTERESTS TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, NEW INNKEEPERS RECOMMENDS THAT POTENTIAL RECIPIENTS OF NEW INTERESTS UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

C.      *No Registration or Listing of New Interests*

Issuers of Interests of the Post-Effective Date Fixed/Floating Debtors will not be required to file periodic reports under the Securities Exchange Act or seek to list the Interests of the Post-Effective Date Fixed/Floating Debtors for trading on a national securities exchange. Consequently, there will not be "current public information" (as such term is defined in Rule 144) regarding Issuers of Interests of the Post-Effective Date Fixed/Floating Debtors.

### ARTICLE X.
### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims and Interests. The following discussion does not address the U.S. federal income tax consequences to Holders (i) whose Claims or Interests are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan. This summary is based on the Internal Revenue Code of 1986 (the "**IRC**"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "**IRS**") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are not "United States persons" as such term is defined in the IRC or that are otherwise subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, trusts, dealers and traders in securities, insurance companies, financial

institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, Claims, Interests, New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, amended mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans or Anaheim Hotel Mortgage Loan, deeds in lieu of foreclosure, or other certain assets, as part of a hedge, straddle, conversion or constructive sale transaction). Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., or other tax law. Lastly, the following discussion assumes (i) each Holder of a Claim or Interest holds its Claim, Interest, New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, or amended mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans or Anaheim Hotel Mortgage Loan as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the IRC and (ii) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE**

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.      *Certain United States Federal Income Tax Consequences to the Debtors*

1.      Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (y) the amount of Cash paid and (z) the fair market value (or, in the case of the New Fixed Rate Pool Mortgage Notes and amended mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans or Anaheim Hotel Mortgage Loan, the "issue price" (see discussion of "Issue Price" below)) of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has

been determined. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

Pursuant to the Plan, certain Claims will be exchanged for new debt instruments (and in some instances, for both new debt instruments and other consideration). Consequently, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the "issue price" of the New Fixed Rate Pool Mortgage Notes or amended mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans or Anaheim Hotel Mortgage Loan exchanged therefor (see discussion of "Issue Price" below). As this price cannot be known with certainty until after the Effective Date, the amount of COD Income the Debtors may incur is thus uncertain.

Many of the Debtors are treated as "disregarded entities" for U.S. federal income tax purposes, and consequently, the U.S. federal income tax consequences of the Plan described in this section will generally not be borne by such Debtors. Instead, the U.S. federal income tax consequences will be borne by the disregarded Debtors' respective direct or indirect equity Holders (who themselves may be Debtors) which are regarded entities for U.S. federal income tax purposes. Additionally, certain Debtors are treated as partnerships for U.S. federal income tax purposes. When an entity that is taxed as a partnership realizes income (including COD Income), for U.S. federal income tax purposes such income "flows through" and the entity's equity Holders (and not the entity itself) are treated as recognizing their allocable share of such income. If an entity treated as a partnership is owned by another partnership or chain of partnerships, the allocable share of COD Income from the lower level entity would flow through the partnership (or chain or partnerships) up to a U.S. federal income taxpayer (such as an individual or corporation). Thus, the tax consequences of any COD Income incurred by a Debtor treated as a partnership for U.S. federal income tax purposes will generally not be borne by such entity and instead will be borne by the entity's direct and indirect equity Holders (who themselves may be Debtors). Finally, certain other Debtors are classified for U.S. federal income taxes as "taxable REIT subsidiaries" and may be treated as corporations for U.S. federal income tax purposes. As described above, these Debtors may realize COD Income both on their own account and on account of equity interests they hold in lower level Debtors treated as disregarded entities or partnerships. However, as outlined in the third preceding paragraph above, COD Income is excluded from a corporate debtor's gross income to the extent that the debtor is under the jurisdiction of a chapter 11 case and in such case the debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.

2.      Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for certain alternative NOLs generated in taxable years beginning or ending in 2008 and 2009, which can offset 100% of a corporation's AMTI, generally only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause certain of the Reorganized Debtors to owe a modest amount of federal income tax on taxable income in future years even though NOL carryforwards may be available to offset that taxable income.

B.      *Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims and Interests*

1.      Consequences to Holders of Allowed Class FF3A Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class FF3A Claims will receive New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, and Cash. Whether a Holder of an Allowed Class FF3A Claim recognizes gain or loss as a result of the exchange of its Claim for New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, and Cash depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the Allowed Class FF3A Claim surrendered is treated as a "security" for the reorganization provisions of the IRC; (b) such Holder previously included in income any accrued but unpaid interest with respect to the Allowed Class FF3A Claim; (c) such Holder has claimed a bad debt deduction with respect to such Allowed Class FF3A Claim; and (d) such Holder uses the accrual or cash method of accounting for tax purposes.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Debtors anticipate taking the position that the Fixed Rate Pool Mortgage Loan underlying the Allowed Class FF3A Claims will be treated as a "security" for U.S. federal income tax purposes.

        (a)        Treatment of a Holder of Allowed Class FF3A Claims if the Exchange of its Claims is Treated as a Reorganization

If the Fixed Rate Pool Mortgage Loan constituting a Holder's surrendered Allowed Class FF3A Claims is treated as a "security" for U.S. federal income tax purposes, the exchange of such Holder's Allowed Class FF3A Claims for New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, and Cash should be treated as a recapitalization, and therefore a reorganization, under the IRC. In general, this means such a Holder will recognize gain, but not loss, on the exchange. Specifically, such a Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the fair market value of the New Fixed Rate Pool Mortgage Loan Limited Guarantys and Cash (*i.e.*, the "other property," that is, property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received, and (b) ordinary interest income to the extent that the New Fixed Rate Pool Mortgage Notes are treated as received in satisfaction of accrued but untaxed interest on the Fixed Rate Pool Mortgage Loan underlying the Allowed Class FF3A Claim (see discussion of "Accrued Interest" below). In such case, such a Holder's tax basis in the New Fixed Rate Pool Mortgage Notes received should be equal to the tax basis of the Fixed Rate Pool Mortgage Loan constituting the Allowed Class FF3A Claims surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of the New Fixed Rate Pool Mortgage Loan Limited Guarantys and Cash (*i.e.*, the "other property") received), and such a Holder's holding period for its New Fixed Rate Pool Mortgage Notes received should include the holding period for the Fixed Rate Pool Mortgage Loan constituting the surrendered Allowed Class FF3A Claims; <u>provided</u> that the tax basis of any portion of New Fixed Rate Pool Mortgage Notes that is treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such portion of the New Fixed Rate Pool Mortgage Notes should not include the holding period of the Fixed Rate Pool Mortgage Loan constituting the surrendered Allowed Class FF3A Claims.

        (b)        Treatment of a Holder of Allowed Class FF3A Claims if the Exchange of its Claims is not Treated as a Reorganization

If the Fixed Rate Pool Mortgage Loan constituting a Holder's surrendered Allowed Class FF3A Claims is not treated as a "security" for U. S. federal income tax purposes, such a Holder should be treated as exchanging its Allowed Class FF3A Claims for New Fixed Rate Pool Mortgage Notes, New Fixed Rate Pool Mortgage Loan Limited Guarantys, and Cash in a fully taxable exchange. A Holder of an Allowed Class FF3A Claims who is subject to this treatment should recognize gain or loss equal to the difference between (i) the Holder's tax basis in the Allowed Class FF3A Claims surrendered by the Holder in such exchange, and (ii) the fair market value of the New Fixed Rate Pool Mortgage Loan Limited Guarantys and Cash received *plus* the "issue price" (see discussion of "Issue Price" below) of the New Fixed Rate Pool Mortgage Notes received that is not allocable to accrued but untaxed interest. Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the Fixed Rate Pool Mortgage Loan constituting the surrendered Allowed Class FF3A Claims were held for more than one year by the Holder. To the extent that a portion of the New Fixed Rate Pool Mortgage Notes is allocable to accrued but untaxed interest, such a Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below). Such a Holder's tax basis in the New Fixed Rate Pool Mortgage Notes received should equal their issue price. Such a Holder's holding period for the New

Fixed Rate Pool Mortgage Notes received on the Effective Date should begin on the day following the Effective Date.

2.   Consequences to Holders of Allowed Class A3 Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, a Holder of Allowed Class A3 Claims will receive either (a) amended mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented Anaheim Hotel Mortgage Loan (the "**Amended Anaheim Hotel Mortgage Notes**") or (b) Cash.

In the event a Holder of Allowed Class A3 Claims receives Amended Anaheim Hotel Mortgage Notes, the U.S. federal income tax consequences of the Plan to such a Holder of Claims depends, in part, on whether the exchange of such Claims for the Amended Anaheim Hotel Mortgage Notes should be treated as a "significant modification" for U.S. federal income tax purposes. Under the applicable Treasury Regulations, a "significant modification" is treated as a "deemed" exchange of an old debt instrument for a new debt instrument. In general, the Treasury Regulations consider a modification a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. The Treasury Regulations also provide certain specific guidance as to what may be considered a "significant modification."

It is possible that the exchange of the Allowed Class A3 Claims for Amended Anaheim Hotel Mortgage Notes will be treated for U.S. federal income tax purposes as a significant modification of such Claims. A Holder of Allowed Class A3 Claims is urged to consult its own tax advisor regarding the possibility that the receipt of Amended Anaheim Hotel Mortgage Notes in exchange for its Allowed Class A3 Claims would constitute a significant modification.

If such exchange does not constitute a significant modification, then the exchange should not result in any significant U.S. federal income tax consequence to a Holder of Allowed Class A3 Claims.

The remainder of this discussion assumes that the exchange of the Allowed Class A3 Claims for Amended Anaheim Hotel Mortgage Notes constitutes a significant modification. Assuming such treatment, a Holder of Allowed Class A3 Claims should recognize gain or loss on the exchange of its Claim in an amount equal to the difference, if any, between (i) the "issue price" of the Amended Anaheim Hotel Mortgage Notes received (see discussion of "Issue Price" below) and (ii) the Holder's adjusted tax basis in the Claim exchanged therefor that is not allocable to accrued but unpaid interest. To the extent that a portion of the Amended Anaheim Hotel Mortgage Notes received is allocable to accrued but unpaid interest, a Holder of an Allowed Class A3 Claim may recognize ordinary interest income (see discussion of "Accrued Interest" below).

A Holder's tax basis in the Amended Anaheim Hotel Mortgage Notes received should equal their issue price. A Holder's holding period for such Amended Anaheim Hotel Mortgage Notes received on the Effective Date should begin on the day following the Effective Date.

In the event a Holder of Allowed Class A3 Claims receives Cash, such a Holder generally should recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between (a) the sum of the amount of any Cash received in exchange for its Claim not allocable to accrued but unpaid interest and (b) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain (subject to the "market discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, the extent that a portion of the consideration received in exchange for the Claims is allocable to accrued but unpaid interest (see "Accrued Interest" below), whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.

3.    Consequences to Holders of Allowed Class R3A, R3B, R3C, R3D, and R3E Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class R3A, R3B, R3C, R3D, and R3E Claims will receive amended mortgage notes issued in connection with the execution of the assumed, amended, restated, and/or supplemented LNR-Serviced Loans (the "**Amended LNR Mortgage Notes**"). The U.S. federal income tax consequences of the Plan to such Holders of Claims depends, in part, on whether the exchange of such Claims for the Amended LNR Mortgage Notes should be treated as a "significant modification" for U.S. federal income tax purposes. As described above, under the applicable Treasury Regulations, a "significant modification" is treated as a "deemed" exchange of an old debt instrument for a new debt instrument.

It is possible that the some or all of the exchanges of the Allowed Class R3A, R3B, R3C, R3D, and R3E Claims for Amended LNR Mortgage Notes will be treated for U.S. federal income tax purposes as significant modifications of such Claims. Each Holder of an Allowed Class R3A, R3B, R3C, R3D, or R3E Claims is urged to consult its own tax advisor regarding the possibility that the receipt of Amended LNR Mortgage Notes in exchange for its Allowed Class R3A, R3B, R3C, R3D, or R3E Claim would constitute a significant modification.

If such exchanges do not constitute significant modifications, then the exchanges should not result in any significant U.S. federal income tax consequence to the Holders of Allowed Class R3A, R3B, R3C, R3D, and R3E Claims.

The remainder of this discussion assumes that the exchanges of the Allowed Class R3A, R3B, R3C, R3D, and R3E Claims for Amended LNR Mortgage Notes constitute significant modifications. Assuming such treatment, a Holder of Allowed Class R3A, R3B, R3C, R3D, and R3E Claims should recognize gain or loss on the exchange of its Claim in an amount equal to the difference, if any, between (i) the "issue price" of the Amended LNR Mortgage Notes received (see discussion of "Issue Price" below) and (ii) the Holder's adjusted tax basis in the Claim exchanged therefor that is not allocable to accrued but unpaid interest. To the extent that a portion of the Amended LNR Mortgage Notes received is allocable to accrued but unpaid interest, a Holder of an Allowed Class R3A, R3B, R3C, R3D, or R3E Claim may recognize ordinary interest income (see discussion of "Accrued Interest" below).

A Holder's tax basis in the Amended LNR Mortgage Notes received should equal their issue price. A Holder's holding period for such Amended LNR Mortgage Notes received on the Effective Date should begin on the day following the Effective Date.

4.    Consequences to Holders of Allowed Class FF3B, FF4, FF5, A1, A2, A4, A5A, O3, O4, R4A, and R4B Claims and Allowed Class R8, R9, R11, and R12 Interests

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class FF3B, FF4, FF5, A1, A2, A4, A5A, O3, O4, R4A, and R4B Claims and Allowed Class R8, R9, R11, and R12 Interests may receive (i) Cash, (ii) the collateral securing their Allowed Claims, (iii) a deed in lieu of foreclosure, and/or (iv) other certain assets. If the Holders of Class FF4 Claims vote to reject the Plan or do not otherwise support the plan, their Class FF4 Claims will be canceled, released, and extinguished as of the Effective Date. In certain limited circumstances, rather than receiving consideration as described above in exchange for their Claims, Holders of Allowed Class A1 and A2 Claims may have their Claims rendered Unimpaired.

Any such Holder who receives consideration in exchange for its Allowed Claims or Interests generally should recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between (a) the sum of the amount of any Cash received plus the fair market value of any consideration received in exchange for its Claim or Interest not allocable to accrued but unpaid interest and (b) the Holder's adjusted tax basis in its Claim or Interest. The character of such gain or loss as capital gain (subject to the "market discount" rules described below) or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim or Interest in such Holder's hands, the extent that a portion of the consideration received in exchange for the Claims or Interests is allocable to accrued but unpaid interest (see "Accrued Interest" below), whether the Claim or Interest constitutes a capital asset in the hands of the Holder, whether the Claim or Interest was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt or worthlessness deduction with respect to its Claim or Interest.

5.    Accrued Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

6.    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the Holder (unless the holder elected to include "market discount" in income as it accrued).

7.    Issue Price

The current Treasury Regulations provide that the "issue price" of any class of debt instruments depends on whether, at any time during the 60-day period ending 30 days after the exchange date, such class of instruments is traded on an "established market" or any debt instrument exchanged (in whole or in part) for such new debt instrument is traded on an established market.  If the new debt instrument or the old debt instrument exchanged therefor are treated as traded on an established market (*i.e.*, "publicly traded"), the issue price of the new debt instrument will equal (or approximate) the fair market value of such debt instrument as of the Effective Date.  In such event, a debt instrument will be treated as issued with original issue discount (in addition to any original issue discount resulting from the deferred portion of the stated interest thereon) to the extent that its issue price is less than its principal amount.  Depending on the fair market value of a debt instrument, the total amount of original issue discount could be substantial.

If neither the Class FF3A, A3, R3A, R3B, R3C, R3D, and R3E Claims nor the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes exchanged therefor are considered traded on an "established market," then the issue price for the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, and Amended LNR Mortgage Notes should generally equal their stated

principal amounts. However, if the Class FF3A, A3, R3A, R3B, R3C, R3D, and R3E Claims or the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes exchanged therefor are considered traded on an "established market," then the issue price for the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, and Amended LNR Mortgage Notes would generally equal their fair market value at the time of the exchange (or deemed exchange). Holders of Class FF3A, A3, R3A, R3B, R3C, R3D, and R3E Claims should consult their tax advisors regarding the issue price for the debt obligations underlying their Claims and the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, and Amended LNR Mortgage Notes exchanged therefor.

8. Consequences to Holders of the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes

(a) Stated Interest and Original Issue Discount

A Holder of New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes will be required to include stated interest on such debt obligation in income in accordance with the Holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Where stated interest payable on the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes is not payable at least annually (the "deferred" interest), such portion of the stated interest will be included in the determination of the original issue discount on such New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes (as set forth below).

A debt instrument generally has original issue discount if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest. Thus, the deferred portion (if any) of the stated interest payments on the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes will be included in the stated redemption price at maturity and taxed as part of original issue discount.

A Holder of New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes with original issue discount generally will be required to include any original issue discount in income over the term of such debt obligation (for so long as the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes continue to be owned by the Holder) in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes (other than cash attributable to qualified stated interest). Accordingly, a Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any original issue discount that a Holder includes in income will increase the tax basis of the Holder in its New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes. A Holder of New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes will not be separately taxable on any cash payments that have already been taxed under the original issue discount rules, but will reduce its tax basis in such debt obligation by the amount of such payments.

(b) Sale, Exchange, or Other Disposition of the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes

Except as discussed above with respect to "market discount," any gain or loss recognized by a Holder on a sale, exchange or other disposition of the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes (including the exchange of such debt obligation for the property securing such obligation) generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the Holder and the Holder's adjusted tax basis in the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes immediately before the sale, exchange or other disposition (increased for any original issue discount accrued through the date of disposition, which original issue discount would be includible as ordinary income). Any such gain or loss generally

should be long term capital gain or loss if the Holder's holding period in the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes is more than one year at that time.

(c)     Medicare Tax

Certain Holders that are individuals, estates or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of the New Fixed Rate Pool Mortgage Notes, Amended Anaheim Hotel Mortgage Notes, or Amended LNR Mortgage Notes.

*C.     Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest.  Backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.  Any amounts withheld under the withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

# ARTICLE XI.
## RECOMMENDATION OF INNKEEPERS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated: May 19, 2011                          Innkeepers USA Trust (for itself and all Debtors)

By:      /s/ *Marc A. Beilinson*
Name:    Marc A. Beilinson
Title:   Chief Restructuring Officer

Prepared by:

James H.M. Sprayregen, P.C.              Anup Sathy, P.C.
Paul M. Basta                            KIRKLAND & ELLIS LLP
Stephen E. Hessler                       300 North LaSalle Drive
Brian S. Lennon                          Chicago, Illinois 60654-3406
KIRKLAND & ELLIS LLP                     Telephone: (312) 862-2000
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800

Counsel to the Debtors and Debtors in Possession

132

**EXHIBIT A**

**Debtors' Plans of Reorganization**
**Pursuant to Chapter 11 of the Bankruptcy Code**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, *et al.*, | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

## DEBTORS' PLANS OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest. This Plan is subject to approval of the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. This is not a solicitation of acceptances or rejections of the Plan. Acceptances or rejections with respect to this Plan may not be solicited until a disclosure statement has been approved by the United States Bankruptcy Court for the Southern District of New York in accordance with section 1125 of the Bankruptcy Code. Such a solicitation will only be made in compliance with applicable provisions of securities and bankruptcy laws. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES) PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

James H.M. Sprayregen, P.C.
Paul M. Basta
Stephen E. Hessler
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800

Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois  60654-3406
Telephone:  (312) 862-2000

Counsel to the Debtors and Debtors in Possession

Dated:  May 19, 2011

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**................................................................................................1
    A.    Defined Terms ............................................................................................1
    B.    Rules of Interpretation ............................................................................20
    C.    Computation of Time ...............................................................................20
    D.    Governing Law ........................................................................................20
    E.    Reference to Monetary Figures ...............................................................21
    F.    Controlling Document .............................................................................21

**ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS**.....................21
    A.    Administrative Claims .............................................................................21
    B.    Accrued Professional Compensation Claims ..........................................21
    C.    Five Mile DIP Claims .............................................................................22
    D.    Lehman DIP Claims ................................................................................23
    E.    LNR Structuring Fee ...............................................................................23
    F.    Claims Based on Postpetition Intercompany Loans .................................23
    G.    Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses ...............................................................................23
    H.    Ad Hoc Committee Administrative Claim ...............................................23
    I.    Priority Tax Claims .................................................................................23

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**............................24
    A.    Summary of Classification ......................................................................24
    B.    Treatment of Claims and Interests ..........................................................28
    B.    Special Provision Governing Unimpaired Claims ...................................48
    C.    Elimination of Vacant Classes ................................................................48
    D.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........48

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ...........................................................48
    A.    Substantive Consolidation.......................................................................48
    B.    Restructuring Transactions and Sources of Consideration for Plan Distributions .........................48
    C.    General Settlement of Claims ..................................................................48
    D.    Fixed/Floating Investment ......................................................................49
    E.    Chatham Hotel Sale Transaction..............................................................49
    F.    Anaheim Hotel Commitment Letter.........................................................49
    G.    New Fixed Rate Pool Mortgage Loan Limited Guarantys .......................49
    H.    Special Servicer Payment and Special Servicer Release Payment.............49
    I.    Issuance of Interests in Post-Effective Date Fixed/Floating Debtors.........49
    J.    Management Compensation......................................................................50
    K.    Listing of New HoldCo Interests; Reporting Obligations .......................50
    L.    Release of Liens ......................................................................................50
    M.    LP Bank Account .....................................................................................50
    N.    Vesting of Assets in the Post-Effective Date Debtors...............................50
    O.    Rights and Obligations Under Troy Settlement Agreement.......................51
    P.    Cancellation of Securities and Agreements ..............................................51
    Q.    Corporate Action.....................................................................................51
    R.    Effectuating Documents; Further Transactions.........................................51
    S.    Exemption from Certain Taxes and Fees ..................................................51
    T.    D&O Liability Insurance Policies .............................................................52
    U.    D&O Tail Insurance Policies ....................................................................52
    V.    New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws.....................52

i

W.     Board Representation ................................................................................................52
X.     Indemnification Provisions .....................................................................................53
Y.     Wind Down ..............................................................................................................53
Z.     Preservation of Rights of Action.............................................................................53
AA.    Ad Hoc Committee Agreement ...............................................................................54

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......55**
    A.     Assumption of Franchise Agreements ....................................................................55
    B.     Rejection of Executory Contracts and Unexpired Leases .......................................55
    C.     Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases ............55
    D.     Claims Based on Rejection of Executory Contracts and Unexpired Leases ..................56
    E.     Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases..........56
    F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements........................57
    G.     Reservation of Rights ..............................................................................................57

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..........................................................57**
    A.     Timing and Calculation of Amounts to Be Distributed .................................................57
    B.     Distributions Generally; Disbursing Agent..............................................................57
    C.     Rights and Powers of Disbursing Agent .................................................................58
    D.     Distributions on Account of Claims Allowed After the Effective Date........................58
    E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions...................59
    F.     Compliance with Tax Requirements/Allocations....................................................60
    G.     Claims Paid or Payable by Third Parties.................................................................60

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS.........................................................................................................61**
    A.     Resolution of Disputed Claims ...............................................................................61
    B.     Disallowance of Claims ..........................................................................................62
    C.     Amendments to Claims ...........................................................................................63

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ......63**
    A.     Compromise and Settlement of Claims, Interests, and Controversies ........................63
    B.     Subordinated Claims ...............................................................................................63
    C.     Midland Release.......................................................................................................63
    D.     Apollo Release .........................................................................................................64
    E.     Fixed/Floating Debtors' Plan General Release ........................................................65
    F.     Anaheim Hotel Debtors' Plan General Release ........................................................67
    G.     Ontario Hotel Debtors' Plan General Release..........................................................68
    H.     Remaining Debtors' Plan General Release ..............................................................69
    I.     Exculpation .............................................................................................................70
    J.     Injunction ................................................................................................................71
    K.     Setoffs ....................................................................................................................72

**ARTICLE IX. SEVERABILITY OF PLAN AND CONDITIONS PRECEDENT TO THE
EFFECTIVE DATE............................................................................................................72**
    A.     Severability of the Plan ...........................................................................................72
    B.     Condition Precedent to Confirmation of the Fixed/Floating Plan................................72
    C.     Condition Precedent to Confirmation of the Remaining Debtor Plan...........................72
    D.     Conditions Precedent to the Effective Date of Each of the Joint Plans........................73
    E.     Waiver of Conditions ..............................................................................................74
    F.     Effective Date .........................................................................................................74
    G.     Effect of Non-Occurrence of the Effective Date Regarding Fixed/Floating Debtors ....................74
    H.     Effect of Non-Occurrence of the Effective Date Regarding the Ontario Plan ................74

K&E 18934861.44

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**...............................75
  A.  Modification and Amendments.............................................................................................75
  B.  Effect of Confirmation on Modifications ..........................................................................75
  C.  Revocation or Withdrawal of the Plan ..............................................................................75

**ARTICLE XI. RETENTION OF JURISDICTION** ................................................................................**75**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ...............................................................................**77**
  A.  Immediate Binding Effect ..................................................................................................77
  B.  Additional Documents ........................................................................................................77
  C.  Payment of Statutory Fees .................................................................................................78
  D.  Dissolution of Committees.................................................................................................78
  E.  Reservation of Rights.........................................................................................................78
  F.  Successors and Assigns......................................................................................................78
  G.  Dissolution of Entities.......................................................................................................78
  H.  Service of Documents ........................................................................................................78
  I.  Term of Injunctions or Stays..............................................................................................80
  J.  Entire Agreement ...............................................................................................................80
  K.  Nonseverability of Plan Provisions ...................................................................................80

K&E 18934861.44

# INTRODUCTION

Innkeepers USA Trust and certain of its affiliates (as defined in section 101(2) of the Bankruptcy Code) as debtors and debtors in possession (collectively, the "**Debtors**")[1] propose the following plans of reorganization. The Plan (as defined herein) is an aggregation of four separate joint plans of reorganization: the Fixed/Floating Plan; the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan (each as defined herein). Together these Joint Plans (as defined herein) provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases. The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the Joint Plans are not conditioned on the Confirmation and Consummation of any of the other Joint Plans.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.     Defined Terms*

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.     "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.     "*Ad Hoc Committee*" means the ad hoc committee of Innkeepers USA Trust Preferred C Interests, which is comprised of: Brencourt Advisors, LLC; Esopus Creek Advisors, LLC; Plainfield Special Situations Master Fund II Limited; Morgens, Waterfall, Vintiadis & Co., Inc.; and P. Schoenfeld Asset Management LP, for and on behalf of certain funds and entities for which it serves as the Investment Advisor.

3.     "*Ad Hoc Committee Administrative Claim*" means the Administrative Claim of the Ad Hoc Committee referenced in Article II.H.

4.     "*Adequate Protection Obligations*" means all outstanding Claims for adequate protection as set forth in the Cash Collateral Orders.

5.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors incurred after the Petition Date and through the Effective Date; (b) Claims of Professionals in the Chapter 11 Cases; (c) amounts owing pursuant to the DIP Orders; (d) amounts owing on account of the Adequate Protection Obligations; (e) fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; and (f) requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

---

[1]     The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

6.　　"*Administrative Claims Bar Date*" means, except for Administrative Claims of Professionals, the first Business Day that is 30 days following the Effective Date of the Joint Plan applicable to the Debtor against whom the Administrative Claim is asserted, except as specifically set forth in the Plan or a Final Order.

7.　　"*Allowed*" means with reference to any Claim or Interest, as may be applicable, (a) any Claim against the Debtors that has been listed on its Schedules (as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not Disputed or contingent and for which (i) no contrary Proof of Claim has been Filed, (ii) no objection to allowance, request for estimation, or other challenge has been interposed, or (iii) no motion to deem the Schedules amended has been Filed, (b) any Proof of Claim or Interest that is timely Filed by the applicable Claims Bar Date, as to which no litigation (whether stayed or unstayed) is pending and to which no objection or other challenge has been or is interposed in accordance with the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the Bankruptcy Court, if any, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order or under the Plan, (e) any Claim that is not otherwise subject to disallowance under section 502(d) of the Bankruptcy Code, (f) any Claim arising from the recovery of property in accordance with sections 550 and 553 of the Bankruptcy Code and Allowed in accordance with section 502(h) of the Bankruptcy Code (unless such Claim is otherwise Disputed), (g) any Claim allowed by stipulation approved by the Bankruptcy Court, or (h) any Interest registered in the ownership register or otherwise on the Debtors' books and records, maintained by, or on behalf of, the Debtors as of the Voting Record Date.  Except as otherwise provided in the Plan, for purposes of determining the amount of an "Allowed Claim," there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset pursuant to applicable non-bankruptcy law or subject to recoupment.  Claims allowed solely for the purpose of voting to accept or reject a Joint Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder unless otherwise specified herein or by order of the Bankruptcy Court.  For any purpose under the Plan, unless specifically provided for herein, a Claim that has been Allowed shall not include amounts constituting interest, penalties, or late charges arising from or relating to the period from and after the Petition Date.  Any Claim or Interest that has been or is hereafter listed in the Schedules as Disputed, contingent, or unliquidated, and for which no Proof of Claim or Interest has been timely Filed, is not considered an Allowed Claim or Allowed Interest and shall be expunged without further action by the Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court.

8.　　"*Anaheim Hotel Commitment Letter*" means that Commitment Letter Regarding the Restructuring of the Hilton Suites in Anaheim, California by and between CWCapital and Lehman Brothers Holdings Inc., dated May 10, 2011.

9.　　"*Anaheim Hotel Debtors*" means Debtors:  (a) KPA HS Anaheim, LLC; (b) Grand Prix Mezz Borrower Term LLC; and (c) Grand Prix Anaheim Orange Lessee, LLC.

10.　　"*Anaheim Hotel Debtors' Plan General Release*" means the release provision set forth in Article VIII.F.

11.　　"*Anaheim Hotel Lessee*" means Grand Prix Anaheim Orange Lessee, LLC.

12.　　"*Anaheim Hotel Mezzanine Loan Agreement*" means that certain Mezzanine Loan Agreement, dated as of June 29, 2007, as amended, by and between Grand Prix Mezz Borrower Term, LLC, the 100% owner of KPA HS Anaheim, LLC, as borrower, and Lehman, as lender, pursuant to which Lehman provided Grand Prix Mezz Borrower Term, LLC a junior mezzanine loan in the original principal amount of $21.3 million, which amount is collateralized by Grand Prix Mezz Borrower Term, LLC's Interests in KPA HS Anaheim, LLC.

13.　　"*Anaheim Hotel Mezzanine Loan Claims*" means all Claims against the Anaheim Hotel Debtors arising under, derived from, or based upon the Anaheim Hotel Mezzanine Loan Agreement.

14.　　"*Anaheim Hotel Mezzanine Loan Deficiency Claims*" means any Anaheim Hotel Mezzanine Loan Claim that is not Secured.

K&E 18934861.44

15.     "*Anaheim Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of June 14, 2005, as amended, by and between RLJ Anaheim Suites Hotel L.P., as borrower, and GMAC Commercial Mortgage Bank, as lender, pursuant to which GMAC Commercial Mortgage Bank provided a mortgage loan in the original principal amount of $13.7 million to RLJ Anaheim Suites Hotel L.P. that was later assumed by KPA HS Anaheim, LLC pursuant to those certain Loan Assumption and Modification Agreements, dated as of October 4, 2006 and June 29, 2007, which amount is collateralized by the Hilton Suites in Anaheim, California.

16.     "*Anaheim Hotel Mortgage Loan Claims*" means all Claims against the Anaheim Hotel Debtors arising under, derived from, or based upon the Anaheim Hotel Mortgage Loan Agreement.

17.     "*Anaheim Hotel Owner*" means Debtor KPA HS Anaheim, LLC.

18.     "*Anaheim Hotel Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, or SASCO); (b) CWCapital, in its capacity as servicer for the Anaheim Hotel Mezzanine Loan Agreement; (d) Apollo; (e) SASCO, as holder of 100% of the economic and beneficial interests under the Anaheim Hotel Mezzanine Loan Agreement; (f) LCPI, as administrative agent for SASCO with respect to the Anaheim Hotel Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO (i) the Independent Committee; (j) all other Holders of Claims against or Interests in the Anaheim Hotel Debtors; (h) the officers, directors, trustees, and members of the Debtors; and (k) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

19.     "*Anaheim Mezzanine Debtor*" means Debtor Grand Prix Mezz Borrower Term LLC.

20.     "*Anaheim Plan*" means the chapter 11 plan of reorganization proposed herein for the Anaheim Hotel Debtors, which shall be in accordance with the Anaheim Hotel Commitment Letter as set forth in Article IV.F.

21.     "*Apollo*" means Apollo Investment Corporation and its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, as well as the principals, employees, agents, officers, directors, and professionals of each such party, each in its capacity as such.

22.     "*Apollo Guaranty*" means that certain Required Capital Improvements Guaranty, executed by Apollo Investment Corporation for the benefit of Lehman ALI Inc., in its capacity as original lender under the Fixed Rate Pool Hotel Mortgage Loan Agreement, dated as of June 29, 2007.

23.     "*Apollo Unsecured Claim Fund Payment*" means the $375,000 payment to be made by Apollo on the Effective Date with respect to the Fixed/Floating Plan and to be included in the Fixed/Floating Unsecured Claim Fund.

24.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

25.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

26.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, as may be amended from time to time.

27.     "*Bidding Procedures Order*" means the Order (I) Authorizing the Debtors to Enter into the Amended Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the Amended New Party/Midland Commitment Between the Debtors and Midland Loan

Services, (III) Approving Fixed/Floating Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement to "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Cash Reserve, entered by the Bankruptcy Court on March 11, 2011 [Docket No. 1009].

28.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.     "*C-III*" means C-III Asset Management, LLC, or any successor thereto, as special servicer for the Ontario Hotel Mortgage Loan Agreement.

30.     "*C6 and C7 Trusts*" means the mortgage loan pools known as LB-UBS Commercial Mortgage Trust 2007-C6 and LB-UBS Commercial Mortgage Trust 2007-C7; provided that the foregoing definition of C6 and C7 Trusts shall not include the holders of certificates in such commercial mortgage backed securitization trusts in their capacity as such.

31.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

32.     "*Cash Collateral Orders*" means the:  Interim Order (A) Authorizing the Debtors to (I) Use the Adequate Protection Parties' Cash Collateral and (II) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, (B) to the Extent Approved in the Final Order, Granting Senior Secured, Priming Liens on Certain Postpetition Intercompany Claims, (C) to the Extent Approved in the Final Order, Granting Administrative Priority Status to Certain Postpetition Intercompany Claims, and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), entered by the Bankruptcy Court on July 20, 2010 [Docket No. 54]; the Final Order Authorizing the Debtors to (i) Use the Adequate Protection Parties' Cash Collateral and (ii) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, entered by the Bankruptcy Court on September 2, 2010 [Docket No. 402]; Order Amending the Cash Collateral Order, entered by the Bankruptcy Court on October 1, 2010 [Docket No. 539]; Stipulation Regarding Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on November 30, 2010 [Docket No. 744]; Stipulation Between The Official Committee of Unsecured Creditors of Innkeepers USA Trust And The Adequate Protection Parties Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on January 4, 2011 (Docket No. 788); Third Stipulation Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on January 28, 2011 [Docket No. 875]; Fourth Stipulation Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on February 28, 2011 [Docket No. 953]; Order Modifying Final Cash Collateral Order, entered by the Bankruptcy Court on March 11, 2011 [Docket No. 1008], and Fifth Stipulation Regarding Further Modification of the Committee's Challenge Deadline in the Cash Collateral Order, entered by the Bankruptcy Court on March 28, 2011 [Docket No. 1060], as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.  The Cash Collateral Orders shall remain in effect between the Confirmation Date and the Effective Date.

33.     "*Causes of Action*" means any Claim, cause of action (including avoidance actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, Secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

34.     "*Certificate*" means any instrument evidencing a Claim against, or an Interest in, one or more of the Debtors.

35.     "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Innkeepers USA Trust, et al., Chapter 11 Case No. 10-13800 (SCC), which are currently pending before the Bankruptcy Court.

4

36.     "*Chatham*" means Chatham Lodging, LP.

37.     "*Chatham APA*" means that certain Agreement of Purchase and Sale, dated as of May 3, 2011 (as such agreement may be amended or modified from time to time), by and among the San Diego Hotel Owner, the Garden Grove Hotel Owner, the Tysons Corner Hotel Owner, the Washington DC Hotel Owner, the San Antonio Hotel Owner, the San Diego Hotel Lessee, the Garden Grove Hotel Lessee, the General Hotel Lessee, and Chatham.

38.     "*Chatham Hotel Sale Transaction*" means the sale transaction set forth in the Chatham APA.

39.     "*Chatham Hotel Sale Transaction Documents*" means the Chatham APA (and ancillary documents related thereto) for the Chatham Hotel Sale Transaction, which shall be included in the Plan Supplement.

40.     "*Chatham Hotel Sale Transaction Purchase Consideration*" means the Garden Grove Hotel Purchase Consideration, the San Diego Hotel Purchase Consideration, the Washington DC Hotel Purchase Consideration, the Tysons Corner Hotel Purchase Consideration, and the San Antonio Hotel Purchase Consideration; provided, however, that notwithstanding anything contained in the Plan, the Plan Supplement, the Remaining Debtor Plan, the Disclosure Statement or any other document or agreement relating to the foregoing documents, the Chatham Hotel Sale Transaction Purchase Consideration shall not exceed $195,000,000.00 in the aggregate (including the assumption of debt as set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents). For the avoidance of doubt, Chatham's payment of the LNR Assumption Fee and LNR Liquidation Fee are not deductions from the Chatham Hotel Sale Transaction Purchase Consideration.

41.     "*Chatham Hotel Sale Transaction Loan Assumption Documents*" means the agreements relating to the assumption by Chatham, in accordance with the LNR Commitment, of the Garden Grove Hotel Mortgage Loan Agreement, the San Antonio Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the Washington DC Hotel Mortgage Loan Agreement, as such loan agreements may be assumed, amended, restated, and/or supplemented in connection with the Chatham Hotel Sale Transaction, which documents shall be included in the Plan Supplement.

42.     "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

43.     "*Claims Bar Date*" means the applicable deadline by which a Proof of Claim must be or must have been Filed, as established by the Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof, entered by the Bankruptcy Court on September 16, 2010 [Docket No. 440].

44.     "*Claims Objection Bar Date*" means the date that is 120 days after the Effective Date of the Joint Plan applicable to the Debtor against whom the Claim is asserted, or such later date as may be fixed by order of the Bankruptcy Court.

45.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

46.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III in accordance with section 1122(a) of the Bankruptcy Code.

47.     "*Commitment Letter*" means that certain Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust, dated May 16, 2011, by and among New HoldCo, the Fixed/Floating Plan Sponsors, Apollo Investment Corporation, the Fixed/Floating Debtors, and Midland, as well as the appendices and exhibits attached thereto.

48.     "*Committee*" or "*Committees*" means any official committee (and any and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

49. "*Confirmation*" means, with respect to any of the Joint Plans, the entry on the docket of the Chapter 11 Cases of a Confirmation Order applicable to such Joint Plan.

50. "*Confirmation Date*" means, with respect to any of the Joint Plans, the date upon which the Bankruptcy Court enters the Confirmation Order (within the meaning of Bankruptcy Rules 5003 and 9021) applicable to such Joint Plan.

51. "*Confirmation Hearing*" means, with respect to any of the Joint Plans, the hearing held by the Bankruptcy Court to consider Confirmation of the Plan applicable to such Joint Plan pursuant to section 1129 of the Bankruptcy Code.

52. "*Confirmation Objection Deadline*" means, with respect to any of the Joint Plans, the deadline for Filing objections to Confirmation of such Joint Plan.

53. "*Confirmation Order*" means, with respect to any or all of the Joint Plans, an order of the Bankruptcy Court confirming such Joint Plan or Joint Plans pursuant to section 1129 of the Bankruptcy Code. The Confirmation Order for the Fixed/Floating Plan shall be in form and substance acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman, and Midland, each in their reasonable discretions, and the Confirmation Order for the Remaining Debtor Plan shall be in form and substance reasonably acceptable to Chatham; and the Confirmation Order for the Anaheim Plan shall be in form and substance reasonably acceptable in all respects to LCPI, SASCO, and CWCapital, each in their reasonable discretions, and the Confirmation Order for the Ontario Plan shall be in form and substance reasonably acceptable in all respects to C-III.

54. "*Consummation*" means, for all purposes with respect to any of the Joint Plans, the occurrence of the Effective Date for such Joint Plan.

55. "*Corporate Structure Summary*" means the description of the ultimate corporate structure for the Post-Effective Date Fixed/Floating Debtors, which description shall be set forth in the Plan Supplement.

56. "*Cure Obligations*" means all (a) amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults and (b) other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

57. "*CWCapital*" means CWCapital Asset Management, LLC, or any successor thereto, as special servicer for the Anaheim Hotel Mortgage Loan Agreement.

58. "*D&O Liability Insurance Policies*" means all insurance policies for directors, members, trustees, officers, and managers' liability maintained by the Debtors as of the Effective Date.

59. "*DIP Orders*" means (a) the Final Order Authorizing the Debtors to Obtain Postpetition Senior Secured Super-Priority Debtor-in-Possession Financing from Five Mile Capital II Pooling International LLC Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d) and 364(e), entered September 2, 2010 [Docket No. 400] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time and (b) the Amended Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, 364 and 507 (I) Authorizing Floating Rate Debtors to Obtain Postpetition Financing and (II) Granting Liens and Super-Priority Claims, entered September 13, 2010 [Docket No. 432] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

60. "*Disbursing Agent*" means the Debtors or their agent or any other Entity or Entities selected by the Debtors in their sole discretion to make or facilitate distributions that are to be made on and after the Effective Date pursuant to the applicable Joint Plan.

6

61.     "*Disclosure Statement*" means, with respect to any of the Joint Plans, the Disclosure Statement for the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated May 19, 2011, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

62.     "*Disclosure Statement and Solicitation Procedures Order*" means, with respect to any of the Joint Plans, the Order Approving (A) Adequacy of the Disclosure Statement, (B) Certain Dates Related to Confirmation of the Plan; (C) Certain Voting Procedures and the Form of Certain Documents to Be Distributed in Connection With Solicitation of the Plan; and (D) Proposed Voting and General Tabulation Procedures, entered by the Bankruptcy Court on [_____], 2011 [Docket No. __], approving the Disclosure Statement and certain procedures for solicitation of votes on such Joint Plan and granting related relief.

63.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

64.     "*Disputed Claims Reserve*" means the reserve to be created by the Disbursing Agent to hold Cash, which reserve shall be held for the benefit of Holders of subsequently Allowed Claims or, to the extent applicable, to Holders of Interests, for distribution according to the procedures set forth in Article VI and Article VII.

65.     "*Distribution Waterfall*" means distributions of a Debtor's property, including the proceeds therof, in satisfaction of Claims and Interests in accordance with all applicable priority principles of the Bankruptcy Code and other applicable law; provided that, for the avoidance of doubt, no Holder of a Claim or Interest shall receive a distribution under the Plan that exceeds the Allowed amount of its Claim or Interest.

66.     "*Effective Date*" means, with respect to any of the Joint Plans, the date that is a Business Day selected by the Debtors after the Confirmation Date applicable to such Joint Plan on which: (a) no stay of the Confirmation Order applicable to such Joint Plan is in effect; and (b) all conditions precedent specified in Article IX.D applicable to such Joint Plan have been satisfied or waived (in accordance with Article IX.E).

67.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

68.     "*Estate*" means, as to each Debtor, the estate created for each Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

69.     "*Exculpated Parties*" means, collectively, the Anaheim Hotel Releasing Parties, the Fixed/Floating Releasing Parties, the Ontario Hotel Releasing Parties, and the Remaining Debtor Releasing Parties; provided that the Anaheim Hotel Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Anaheim Plan; provided further that the Fixed/Floating Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Fixed/Floating Plan; provided further that the Ontario Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Ontario Plan; provided further that the Remaining Debtor Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Remaining Debtor Plan.

70.     "*Exculpation*" means the exculpation provision set forth in Article VIII.I.

71.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

72.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, which was 0.28%.

73.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

K&E 18934861.44

74. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u> <u>further</u> that, with the exception of the Confirmation Order (which is addressed in Article IX), the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to waive any appeal period.

75. "*Five Mile*" means, collectively, Five Mile Capital II Pooling REIT LLC, through its investment advisor Five Mile Capital Partners LLC.

76. "*Five Mile DIP Agent*" means Five Mile Capital II Pooling International LLC, as administrative agent under the Five Mile DIP Facility.

77. "*Five Mile DIP Agreement*" means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of September 24, 2010, among certain of the Debtors, as borrowers, and Five Mile Capital II Pooling International LLC as administrative agent, collateral agent, and Syndication Agent, and the lenders party thereto.

78. "*Five Mile DIP Claims*" means any Claim derived from or based upon the Five Mile DIP Agreement.

79. "*Five Mile DIP Facility*" means that certain $53.0 million debtor in possession credit facility entered into pursuant to the Five Mile DIP Agreement, which credit facility contains three "tranches:" "Tranche A," "Tranche B," and "Tranche C."

80. "*Five Mile DIP Lenders*" means the lenders under the Five Mile DIP Facility.

81. "*Five Mile Expense Reimbursement Claim*" means Five Mile's reasonable and documented fees and expenses paid pursuant to the Bidding Procedures Order.

82. "*Fixed/Floating Debtors*" means (a) the Fixed Rate Pool Hotel Debtors, (b) the Fixed Rate Pool Lessee, (c) the Floating Rate Pool Hotel Debtors, (d) the Floating Rate Pool Lessee; (e) GP AC Sublessee LLC, (f) Grand Prix Mezz Borrower Fixed, LLC; (g) Grand Prix Mezz Borrower Floating, LLC; and (h) Grand Prix Mezz Borrower Floating 2, LLC.

83. "*Fixed/Floating Debtors' Plan General Release*" means the release provision set forth in Article VIII.E.

84. "*Fixed/Floating Plan*" means the chapter 11 plan of reorganization proposed herein for the Fixed/Floating Debtors.

85. "*Fixed/Floating Plan Sponsors*" means Cerberus Series Four Holdings LLC and Chatham Lodging Trust.

86. "*Fixed/Floating Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Lehman DIP Lenders; (b) Five Mile; (c) the Five Mile DIP Agent; (d) the Five Mile DIP Lenders; (e) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, or SASCO); (f) Lehman; (g) New HoldCo and each of the Fixed/Floating Plan Sponsors; (h) Midland; (i) the master servicer for the C6 and C7 Trusts; (j) trustees for the C6 and C7 Trusts; (k) the C6 and C7 Trusts; (l) TriMont, in its capacity as special servicer for the Floating Rate Pool Mezzanine Loan Agreement; (m) Apollo; (n) the Committee; (o) the Independent Committee; (p) SASCO, as holder of 100% of the economic and

beneficial interests under the Floating Rate Pool Mezzanine Loan Agreement; (q) LCPI, as administrative agent for SASCO with respect to the Floating Rate Pool Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO; (r) Island Hospitality Management, Inc.; (s) all other Holders of Claims against or Interests in the Fixed/Floating Debtors; (t) the officers, directors, trustees, and members of the Debtors; and (u) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals. For the avoidance of doubt, certificateholders in the C6 and C7 Trusts, in their capacity as such, are not Fixed/Floating Releasing Parties.

87.     "*Fixed/Floating Successful Bid*" means the bid of New HoldCo on the terms set forth in the Commitment Letter.

88.     "*Fixed/Floating Unsecured Claim Fund*" means a payment of Cash in the aggregate amount of $4.75 million (which amount includes the Apollo Unsecured Claim Fund Payment), which payment shall be shared Pro Rata between Holders of General Unsecured Claims against the Fixed/Floating Debtors (excluding any deficiency claims) in accordance with the treatment of Holders of General Unsecured Claims against the Fixed/Floating Debtors set forth in Article III.B.1.

89.     "*Fixed Rate Pool Hotel Debtors*" means Debtors: (a) Grand Prix Addison (RI) LLC; (b) Grand Prix Altamonte LLC; (c) Grand Prix Arlington LLC; (d) Grand Prix Atlanta (Peachtree Corners) LLC; (e) Grand Prix Atlanta LLC; (f) Grand Prix Bellevue LLC; (g) Grand Prix Belmont LLC; (h) Grand Prix Binghamton LLC; (i) Grand Prix Bothell LLC; (j) Grand Prix Campbell / San Jose LLC; (k) Grand Prix Cherry Hill LLC; (l) Grand Prix Chicago LLC; (m) Grand Prix Columbia LLC; (n) Grand Prix Denver LLC; (o) Grand Prix El Segundo LLC; (p) Grand Prix Englewood / Denver South LLC; (q) Grand Prix Fremont LLC; (r) Grand Prix Ft. Lauderdale LLC; (s) Grand Prix Gaithersburg LLC; (t) Grand Prix Germantown LLC; (u) Grand Prix Horsham LLC; (v) Grand Prix Islandia LLC; (w) Grand Prix Las Colinas LLC; (x) Grand Prix Lexington LLC; (y) Grand Prix Livonia LLC; (z) Grand Prix Lombard LLC; (aa) Grand Prix Louisville (RI) LLC; (bb) Grand Prix Lynnwood LLC; (cc) Grand Prix Mountain View LLC; (dd) Grand Prix Mt. Laurel LLC; (ee) Grand Prix Naples LLC; (ff) Grand Prix Portland LLC; (gg) Grand Prix Richmond (Northwest) LLC; (hh) Grand Prix Richmond LLC; (ii) Grand Prix Saddle River LLC; (jj) Grand Prix San Jose LLC; (kk) Grand Prix San Mateo LLC; (ll) Grand Prix Schaumburg LLC; (mm) Grand Prix Shelton LLC; (nn) Grand Prix Sili I LLC; (oo) Grand Prix Sili II LLC; (pp) Grand Prix Tukwila LLC; (qq) Grand Prix Westchester LLC; (rr) Grand Prix Willow Grove LLC; and (ss) Grand Prix Windsor LLC.

90.     "*Fixed Rate Pool Lessee*" means Debtor Grand Prix Fixed Lessee LLC.

91.     "*Fixed Rate Pool Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of June 29, 2007, as amended, by and among the Fixed Rate Pool Hotel Debtors, as borrowers, the Fixed Rate Pool Lessee, as operating lessee, Grand Prix Holdings, as guarantor, and Lehman, as the original lender, pursuant to which Lehman provided mortgage loans to the Fixed Rate Pool Hotel Debtors in the aggregate principal amount of $825,402,542, which amount is collateralized by the 45 hotel properties owned by the Fixed Rate Pool Hotel Debtors and evidenced by a certain Replacement Promissory Note A-1 and a certain Replacement Promissory Note A-2, each in the principal amount of $412,701,271 and each dated as of August 9, 2007.

92.     "*Fixed Rate Pool Mortgage Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Fixed Rate Pool Mortgage Loan Agreement.

93.     "*Fixed Rate Pool Mortgage Loan Deficiency Claims*" means any Fixed Rate Pool Mortgage Loan Claim that is not Secured.

94.     "*Floating Rate Pool Hotel Debtors*" means Debtors: (a) Grand Prix Addison (SS) LLC; (b) Grand Prix Albany LLC; (c) Grand Prix Atlantic City LLC; (d) Grand Prix Bulfinch LLC; (e) Grand Prix East Lansing LLC; (f) Grand Prix Ft. Wayne LLC; (g) Grand Prix Grand Rapids LLC; (h) Grand Prix Harrisburg LLC; (i) Grand Prix Indianapolis LLC; (j) Grand Prix Montvale LLC; (k) Grand Prix Morristown LLC; (l) Grand Prix Ontario LLC; (m) Grand Prix Rockville LLC; (n) Grand Prix Troy (Central) LLC; (o) Grand Prix Troy (SE) LLC; (p) Grand Prix

West Palm Beach LLC; (q) Grand Prix Woburn LLC; (r) KPA/GP Ft. Walton Beach LLC; (s) KPA/GP Louisville (HI) LLC; and (t) KPA/GP Valencia LLC.

95.     "*Floating Rate Pool Lessee*" means Debtor Grand Prix Floating Lessee LLC.

96.     "*Floating Rate Pool Mezzanine Loan Agreement*" means that certain Mezzanine Loan Agreement, dated as of June 29, 2007, as amended, by and between Grand Prix Mezz Borrower Floating 2, LLC, the 100% owner of the Floating Rate Pool Hotel Debtors, as borrower, and Lehman, as original lender, pursuant to which Lehman provided Grand Prix Mezz Borrower Floating 2, LLC a junior mezzanine loan in the original principal amount of $118.0 million, which amount is collateralized by Grand Prix Mezz Borrower Floating 2, LLC's Interests in the Floating Rate Pool Hotel Debtors.

97.     "*Floating Rate Pool Mezzanine Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Floating Rate Pool Mezzanine Loan Agreement.

98.     "*Floating Rate Pool Mezzanine Loan Deficiency Claims*" means any Floating Rate Pool Mezzanine Loan Claim that is not Secured.

99.     "*Floating Rate Pool Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of June 29, 2007, as amended, by and among the Floating Rate Pool Hotel Debtors, Grand Prix Wichita LLC, Grand Prix Tallahassee LLC, and Grand Prix Columbia LLC, as borrowers, the Floating Rate Pool Lessee, as operating lessee, Grand Prix Holdings, as guarantor, and Lehman, as original lender, pursuant to which Lehman  provided mortgage loans to the borrowers in the original principal amount of $250.0 million, which amount is collateralized by the 20 hotels owned by the Floating Rate Pool Hotel Debtors, and evidenced by a certain Promissory Note, dated as of June 29, 2007, by the Floating Rate Pool Hotel Debtors, Grand Prix Wichita LLC, Grand Prix Tallahassee LLC, and Grand Prix Columbus LLC, for the benefit of Lehman.

100.    "*Floating Rate Pool Mortgage Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Floating Rate Pool Mortgage Loan Agreement.

101.    "*Floating Rate Pool Mortgage Loan Deficiency Claims*" means any Floating Rate Pool Mortgage Loan Claim that is not Secured.

102.    "*Garden Grove Hotel Debtors*" means the Garden Grove Hotel Lessee and the Garden Grove Hotel Owner.

103.    "*Garden Grove Hotel Lessee*" means Debtor Grand Prix RIGG Lessee, LLC.

104.    "*Garden Grove Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of October 4, 2006, by and between KPA RIGG, LLC, as borrower, and Capmark Bank, as lender, pursuant to which Capmark Bank provided a mortgage loan to KPA RIGG, LLC in the original principal amount of $37.6 million, which amount is collateralized by the Residence Inn in Garden Grove, California.

105.    "*Garden Grove Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Garden Grove Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

106.    "*Garden Grove Hotel Owner*" means Debtor KPA RIGG, LLC.

107.    "*Garden Grove Hotel Purchase Consideration*" means the consideration received by the Garden Grove Hotel Owner and the assumption of the obligations under the Garden Grove Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

108.    "*General Hotel Debtors*" means the General Hotel Lessee, the San Antonio Hotel Owner, the Tysons Corner Hotel Owner, and the Washington DC Hotel Owner.

K&E 18934861.44

109.     "*General Hotel Lessee*" means Debtor Grand Prix General Lessee, LLC.

110.     "*General Unsecured Claim*" means any Claim against any Debtor that is not Secured and that is not:   (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Mortgage or Mezzanine Loan Deficiency Claim; (e) an Anaheim Hotel Mezzanine Loan Deficiency Claim; (f) an Ontario Hotel Mortgage Loan Deficiency Claim, (g) an Intercompany Claim; or (h) a Section 510(b) Claim.

111.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

112.     "*Grand Prix Holdings*" means Debtor Grand Prix Holdings LLC.

113.     "*Grand Prix Holdings Interests*" means the common interests in Debtor Grand Prix Holdings and the preferred interests in Debtor Grand Prix Holdings.

114.     "*Holder*" means any Entity holding a Claim or an Interest.

115.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

116.     "*Indemnification Provision*" means each of the Debtors' indemnification provisions in place as of the Effective Date whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, or employment contracts for the current and former directors, members, trustees, officers, and managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors, members, trustees, officers, and managers' respective affiliates.

117.     "*Independent Committee*" means the committee of independent trustees of the board of trustees of Innkeepers USA Trust.

118.     "*Innkeepers USA LP Preferred D Interests*" means the class D preferred limited partnership units in Debtor Innkeepers USA Limited Partnership.

119.     "*Innkeepers USA Trust Common Interests*" means the common shares of Debtor Innkeepers USA Trust that are not Intercompany Interests.

120.     "*Innkeepers USA Trust Preferred A Interests*" means the 12% Series A cumulative preferred shares in Debtor Innkeepers USA Trust.

121.     "*Innkeepers USA Trust Preferred C Interests*" means the 8% Series C cumulative preferred shares in Debtor Innkeepers USA Trust.

122.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor other than a Claim based on a Postpetition Intercompany Loan.

123.     "*Intercompany Interests*" means any Interest held by a Debtor in another Debtor and any Interest held by a Debtor in a non-Debtor affiliate of a Debtor, including the Interests of KPA Raleigh, LLC held by Debtor Innkeepers USA Limited Partnership and the Interests of KPA Raleigh Leaseco, LLC held by Debtor KPA Leaseco Holding, Inc, except for Innkeepers USA Trust Preferred A Interests held by Debtor Grand Prix Holdings.

124.     "*Interests*" means the common stock or shares, limited liability company interests, limited partnership units, preferred interests, and any other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor and options, warrants, rights or other securities or agreements to acquire the common stock or shares, limited liability company interests, or other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

K&E 18934861.44

125. "*Interim Compensation Order*" means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members, entered August 12, 2010 [Docket No. 189] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

126. "*Investment*" means an investment by New HoldCo of $400,527,644.35 in Cash in the aggregate whereby New HoldCo will receive, directly or indirectly, 100% of the Interests of the Post-Effective Date Fixed/Floating Debtors in accordance with the terms of the Fixed/Floating Successful Bid.

127. "*Joint Plan*" or "*Joint Plans*" means, respectively, on an individual basis, and as applicable, the Anaheim Plan, the Fixed/Floating Plan, the Ontario Plan, or the Remaining Debtor Plan, or, collectively, the Anaheim Plan, the Fixed/Floating Plan, the Ontario Plan, and the Remaining Debtor Plan.

128. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

129. "*LCPI*" means Lehman Commercial Paper Inc., in its capacity as administrative agent for SASCO with respect to the (a) Anaheim Hotel Mezzanine Loan Agreement and (b) the Floating Rate Pool Mezzanine Loan Agreement, and Lehman Brothers Holdings Inc. and certain of its affiliates in their capacity as holders of 100% of the economic and beneficial interests in, and preferred shares of, SASCO.

130. "*Lehman*" means Lehman ALI Inc. in its capacity as Holder of all Claims with respect to, and lender of record under, the Floating Rate Pool Mortgage Loan Agreement.

131. "*Lehman DIP Agreement*" means that certain Senior Secured Super Priority Debtor-in-Possession Loan Agreement, dated as of September 17, 2010, among certain of the Debtors, as borrowers, and the Lehman DIP Lender, as lender.

132. "*Lehman DIP Claims*" means any Claim derived from or based upon the Lehman DIP Agreement.

133. "*Lehman DIP Facility*" means that certain $17,498,095.52 debtor in possession credit facility entered into pursuant to the Lehman DIP Agreement.

134. "*Lehman DIP Lenders*" means Solar Finance Inc. together with its successors and assigns.

135. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

136. "*LNR*" means LNR Partners, LLC, or any successor(s) thereto, as special servicer for the Garden Grove Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Washington DC Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the San Antonio Hotel Mortgage Loan Agreement.

137. "*LNR Assumption Fee*" means the fee payable by Chatham in an amount equal to 1% of the amount of the outstanding principal balance of each of the LNR-Serviced Loans after the paydowns as set forth in the Stipulation.

138. "*LNR Commitment*" means that certain letter agreement by and between the LNR-Serviced Trusts and Chatham, dated May 3, 2011, regarding the LNR-Serviced Trusts agreement to provide financing to Chatham in accordance with the terms and conditions set forth in such letter agreement, which shall be included in the Plan Supplement.

139. "*LNR Liquidation Fee*" means the fee payable by Chatham in an amount equal to 1% of the amount of the paydowns of the LNR-Serviced Loans as set forth in the Stipulation.

K&E 18934861.44

140. "*LNR-Serviced Loans*" means the Garden Grove Hotel Mortgage Loan Agreement, San Antonio Hotel Mortgage Loan Agreement, San Diego Hotel Mortgage Loan Agreement, Tysons Corner Hotel Mortgage Loan Agreement, and Washington DC Hotel Mortgage Loan Agreement.

141. "*LNR-Serviced Trusts*" means the trusts holding the Credit Suisse First Boston Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2007-C1 and ML-CFC Commercial Mortgage Trust 2006-4, Commercial Mortgage Pass-Through Certificates, Series 2006-4.

142. "*LNR Servicing Fee*" means the servicing fee set forth in the applicable pooling and servicing agreement with respect to the LNR-Serviced Loans.

143. "*LNR Structuring Fee*" means a payment in Cash in the amount of $2.5 million to the LNR-Serviced Trusts in exchange for the agreement of the LNR-Serviced Trusts to provide the financing in connection with the Chatham Hotel Sale Transaction.

144. "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York, as applicable to the Chapter 11 Cases, as may be amended, modified, or supplemented from time to time.

145. "*LP Bank Account*" means the approximately $7.4 million of Cash currently existing in a segregated bank account in the name of Innkeepers USA Limited Partnership.

146. "*Midland*" means Midland Loan Services, a division of PNC Bank, National Association, or any successor thereto, solely in its capacity as special servicer for the C6 and C7 Trusts that own and hold the Fixed Rate Pool Mortgage Loan Agreement Claims.

147. "*Mortgage or Mezzanine Loan Deficiency Claims*" means all (a) Fixed Rate Pool Mortgage Loan Deficiency Claims, (b) Floating Rate Pool Mezzanine Loan Deficiency Claims, and (c) Floating Rate Pool Mortgage Loan Deficiency Claims.

148. "*New Anaheim HoldCo*" means a special purpose entity controlled by the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims.

149. "*New Fixed/Floating By-Laws*" means the forms of the by-laws of the Post-Effective Date Fixed/Floating Debtors, the forms of which shall be included in the Plan Supplement and consistent with the terms of the Fixed/Floating Successful Bid and shall be acceptable to the Fixed/Floating Plan Sponsors.

150. "*New Fixed/Floating Organizational Documents*" means the forms of the organizational documents for New HoldCo and the Post-Effective Date Fixed/Floating Debtors, the forms of which shall be included in the Plan Supplement and consistent with the terms of the Fixed/Floating Successful Bid and shall be acceptable to the Fixed/Floating Plan Sponsors.

151. "*New Fixed Rate Pool Mortgage Loan*" means the assumed, amended, restated, and/or supplemented Fixed Rate Pool Mortgage Loan Agreement as reasonably required by Midland and as reasonably acceptable to the Debtors, the Fixed/Floating Plan Sponsors, and New HoldCo and consistent with the New HoldCo/Midland Commitment, the form and terms of which shall substantially be set forth in the Plan Supplement and which shall include the terms and conditions set forth in the New HoldCo/Midland Commitment Letter and the New Fixed Rate Pool Mortgage Loan Limited Guarantys, pursuant to which the New Fixed Rate Pool Mortgage Notes shall be issued pursuant to the Fixed/Floating Plan.

152. "*New Fixed Rate Pool Mortgage Loan Limited Guarantys*" means the limited guarantys provided to the lender under the New Fixed Rate Pool Mortgage Loan by New HoldCo and Cerberus Series Four Holdings, LLC, which guarantys shall be consistent with the terms of the New HoldCo/Midland Commitment.

153. "*New Fixed Rate Pool Mortgage Notes*" means the new mortgage notes in the aggregate amount of $723,797,238.03 to be issued in connection with execution of the New Fixed Rate Pool Mortgage Loan, which

shall provide that the Holders of such notes will retain the liens securing the Fixed Rate Pool Mortgage Loan Claims to the extent of the amount of such notes and shall contain the terms set forth in the New HoldCo/Midland Commitment.

154.    "*New HoldCo*" means INK Acquisition LLC (or some other entity or entities formed by the Fixed/Floating Plan Sponsors), a Delaware limited liability company formed by the Fixed/Floating Plan Sponsors that will acquire, directly or indirectly, 100% of the Interests of the Post-Effective Date Fixed/Floating Debtors and such other assets as may be subsequently identified as necessary to the operation of the Fixed/Floating Debtors, on or after the Effective Date; provided that that no assets of the Other Debtors, including without limitation, Cash or Cash equivalents, shall be acquired by New HoldCo, except as contemplated by the Transition Services Agreement.

155.    "*New HoldCo Board*" means the board of directors, members, managers, or trustees of New HoldCo.

156.    "*New HoldCo/Midland Commitment*" means that certain Binding Commitment Regarding the Acquisition of Certain Subsidiaries of Innkeepers USA Trust, dated May 16, 2011, by and between New HoldCo, the Fixed/Floating Plan Sponsors, and Midland.

157.    "*Notice and Claims Agent*" means Omni Management Group, LLC in its capacity as notice, claims, and balloting agent for the Debtors.

158.    "*Ontario Hotel Debtors*" means the Ontario Hotel Owner and the Ontario Hotel Lessee.

159.    "*Ontario Hotel Debtors' Plan General Release*" means the release provision set forth in Article VIII.G.

160.    "*Ontario Hotel Lessee*" means Debtor Grand Prix Ontario Lessee, LLC.

161.    "*Ontario Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of October 4, 2006, by and between KPA HI Ontario, LLC, as borrower, and Deutsche Banc Mortgage Capital, LLC, as successor in interest to Capmark Bank, as lender, pursuant to which Deutsche Banc Mortgage Capital, LLC provided a mortgage loan to KPA HI Ontario, LLC in the original principal amount of $35.0 million, which amount is collateralized by the Hilton in Ontario, California.

162.    "*Ontario Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Ontario Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

163.    "*Ontario Hotel Mortgage Loan Deficiency Claims*" means any Ontario Hotel Mortgage Loan Claim that is not Secured.

164.    "*Ontario Hotel Owner*" means Debtor KPA HI Ontario.

165.    "*Ontario Hotel Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Debtors; (b) C-III; (c) Apollo; (d) the Independent Committee; (e) all other Holders of Claims against or Interests in the Ontario Hotel Debtors; (f) the officers, directors, trustees, and members of the Debtors; and (g) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

166.    "*Ontario Hotel Cash Recovery Fund*" means a payment of Cash in the aggregate amount of $30,000, which payment shall be distributed among Holders of Claims against the Ontario Hotel Debtors.

167.    "*Ontario Plan*" means the chapter 11 plan of reorganization proposed herein for the Ontario Hotel Debtors.

168.     "*Ordinary Course Professional*" means professionals retained and compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

169.     "*Ordinary Course Professionals Order*" means the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business, entered August 12, 2010 [Docket No. 187] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

170.     "*Other Debtors*" means Debtors that are not the Fixed/Floating Debtors.

171.     "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507 of the Bankruptcy Code, other than:  (a) an Administrative Claim or (b) a Priority Tax Claim.

172.     "*Other Secured Claim*" means any Secured Claim against any of the Debtors that is not a:  (a) Five Mile DIP Claim; (b) Lehman DIP Claim; (c) Anaheim Hotel Mortgage Loan Claim; (d) Fixed Rate Pool Mortgage Loan Claim; (e) Floating Rate Pool Mortgage Loan Claim; (f) Garden Grove Hotel Mortgage Loan Claim; (g) Ontario Hotel Mortgage Loan Claim; (h) San Antonio Hotel Mortgage Loan Claim; (i) San Diego Grove Hotel Mortgage Loan Claim; (j) Tysons Corner Hotel Mortgage Loan Claim; (k) Washington DC Hotel Mortgage Loan Claim; or (l) Anaheim Hotel Mezzanine Loan Claim.

173.     "*Parent Companies*" means Debtors Grand Prix Holdings, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership.

174.     "*Petition Date*" means July 19, 2010, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

175.     "*Plan*" means the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

176.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed before the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) a list of Causes of Action to be retained by the Post-Effective Date Debtors; (b) a list of Executory Contracts, including any franchise agreements, and Unexpired Leases to be assumed and assigned to the Post-Effective Date Debtors and their respective Cure Obligations, to be Filed by the Voting Deadline, with notices of assumption or rejection mailed to executory contract and unexpired lease counterparties on or before five business days prior to the Voting Deadline; (c) the Corporate Structure Summary; (d) the forms of the New Fixed/Floating By-Laws; (e) the forms of the New Fixed/Floating Organizational Documents; (f) the forms of the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Notes, and the forms of the New Fixed Rate Pool Mortgage Loan Limited Guarantys; (g) the Anaheim Hotel Commitment Letter; (h) the LNR Commitment and the Chatham Hotel Sale Transaction Documents, including the Chatham Hotel Sale Transaction Loan Assumption Documents; (i) the Transition Services Agreement; (j) to the extent known, with respect to members of the New HoldCo Board and the Post-Effective Date Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (k) information regarding the compensation program related to the Remaining Debtors referenced in Article IV.J, if implemented, and (k) to the extent contemplated by the Ontario Plan, the form of the deed in lieu of foreclosure agreement with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement.

177.     "*Post-Effective Date Anaheim Hotel Debtors*" means, collectively, the Entities holding the assets of the Anaheim Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

178.     "*Post-Effective Date Board*" means the board of directors, members, trustees, managers, or trustees of Post-Effective Date Innkeepers USA Trust.

15

179.    "*Post-Effective Date Debtors*" means, collectively, the Entities holding the assets of the 92 Debtors in the Chapter 11 Cases, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including the Post-Effective Date Anaheim Hotel Debtors, the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Ontario Hotel Debtors, and the Post-Effective Date Remaining Debtors.

180.    "*Post-Effective Date Fixed/Floating Debtors*" means, collectively, the Entities holding the assets of the Fixed/Floating Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

181.    "*Post-Effective Date General Hotel Lessee*" means, collectively, the Entities holding the assets of General Hotel Lessee or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

182.    "*Post-Effective Date Innkeepers USA Limited Partnership*" means Innkeepers USA Limited Partnership or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, which entity, for the avoidance of doubt, is one of the Post-Effective Date Remaining Debtors.

183.    "*Post-Effective Date Innkeepers USA Trust*" means Innkeepers USA Trust or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, which entity, for the avoidance of doubt, is one of the Post-Effective Date Remaining Debtors.

184.    "*Post-Effective Date Ontario Hotel Debtors*" means, collectively, the Entities holding the assets of the Ontario Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

185.    "*Post-Effective Date KPA Leaseco Holding, Inc.*" means KPA Leaseco Holding, Inc., or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

186.    "*Post-Effective Date Remaining Debtors*" means, collectively, the Entities holding the assets of the Remaining Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

187.    "*Post-Effective Date San Diego Hotel Debtors*" means, collectively, the Entities holding the assets of the San Diego Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

188.    "*Post-Effective Date Tysons Corner Hotel Owner*" means, collectively, the Entities holding the assets of the Tysons Corner Hotel Owner or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

189.    "*Postpetition Intercompany Loan*" means any Claim against a Debtor held by another Debtor based on an "Intercompany Loan" arising pursuant to the Cash Collateral Order, which Claim is, pursuant to the terms of the Cash Collateral Order, secured on a superpriority basis in accordance with sections 364(c)(2) and (d) of the Bankruptcy Code by senior secured and priming liens on and security interests in all the borrower Debtors' property, and the obligations of the borrower Debtors to satisfy such Claims is, in accordance with section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense Claim entitled to priority over any or all administrative expenses of the kind specified in, among other sections, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), and 726 of the Bankruptcy Code (as further set forth in the Cash Collateral Order).

190.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

191.    "*Pro Rata*" means (a) the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class or (b) for an Allowed

Claim in a particular Class bears to the aggregate amount of Allowed Claims in that particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

192.    "*Professional*" means an Entity: (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to retention and payment pursuant to the Ordinary Course Professionals Order.

193.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors on or before the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims. Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court. The Professional Fee Escrow Account shall be funded in part from cash collateral to the extent provided for under the Cash Collateral Orders.

194.    "*Professional Fee Escrow Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3.

195.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

196.    "*Remaining Debtors*" means the Debtors that are not Fixed/Floating Debtors, Anaheim Hotel Debtors, or Ontario Hotel Debtors: (a) Grand Prix General Lessee LLC; (b) Grand Prix Holdings; (c) Grand Prix IHM, Inc.; (d) Grand Prix RIGG Lessee LLC; (e) Grand Prix RIMV Lessee, LLC; (f) Grand Prix Term Lessee LLC; (g) Innkeepers Financial Corporation; (h) Innkeepers USA Limited Partnership; (i) Innkeepers USA Trust; (j) KPA Leaseco Holding, Inc.; (k) KPA Leaseco, Inc.; (l) KPA RIGG, LLC; (m) KPA RIMV, LLC; (n) KPA San Antonio, LLC; (o) KPA Tysons Corner RI, LLC; and (p) KPA Washington DC, LLC.

197.    "*Remaining Debtor Plan*" means the chapter 11 plan of reorganization proposed herein for the Remaining Debtors.

198.    "*Remaining Debtor Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) Chatham; (b) the Five Mile DIP Agent; (c) the Five Mile DIP Lenders; (d) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, or SASCO); (e) LNR, in its capacity as special servicer for the each of the LNR-Serviced Loans; (f) the LNR-Serviced Trusts; (g) the master servicer for each of the LNR-Serviced Loans; (h) Apollo; (i) the Independent Committee; (j) Island Hospitality Management, Inc.; (k) all other Holders of Claims against or Interests in the Remaining Debtors; (l) the officers, directors, trustees, and members of the Debtors; and (m) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

199.    "*Remaining Debtors' Plan General Release*" means the release provision set forth in Article VIII.H.

200.    "*San Antonio Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA San Antonio, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided a mortgage loan to KPA San Antonio, LLC in the original principal amount of $24.2 million, which amount is collateralized by the Homewood Suites in San Antonio, Texas.

201.    "*San Antonio Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the San Antonio Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

202.    "*San Antonio Hotel Owner*" means Debtor KPA San Antonio, LLC.

203.    "*San Antonio Hotel Purchase Consideration*" means the consideration received by the San Antonio Hotel Owner and the assumption of the obligations under the San Antonio Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

204.    "*San Diego Hotel Debtors*" means the San Diego Hotel Lessee and the San Diego Hotel Owner.

205.    "*San Diego Hotel Lessee*" means Debtor Grand Prix RIMV Lessee, LLC.

206.    "*San Diego Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of October 4, 2006, by and between KPA RIMV, LLC, as borrower, and Capmark Bank, as lender, pursuant to which Capmark Bank provided KPA RIMV, LLC a mortgage loan in the original principal amount of $47.4 million, which amount is collateralized by the Residence Inn in San Diego, California.

207.    "*San Diego Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the San Diego Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

208.    "*San Diego Hotel Owner*" means Debtor KPA RIMV, LLC.

209.    "*San Diego Hotel Purchase Consideration*" means the consideration received by the San Diego Hotel Owner and the assumption of the obligations under the San Diego Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

210.    "*SASCO*" means SASCO 2008-C2 LLC and/or other affiliates of Lehman Brothers Holdings Inc., who together are the 100% participant and owner of all economic and beneficial interests in, or lender of record under (a) the Floating Rate Pool Mezzanine Loan Agreement and (b) the Anaheim Hotel Mezzanine Loan Agreement.

211.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

212.    "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a Security of any Debtor or an affiliate (as defined in section 101(2) of the Bankruptcy Code) of any Debtor, which Security is not an Interest, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

213.    "*Secured*" means when referring to a Claim:  (a) Secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

214.    "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

215.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

216.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

217. "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

218. "*Special Servicers*" means C-III, CWCapital, LNR, Midland, and TriMont.

219. "*Special Servicer Release Payment*" means a Cash payment of $3.0 million to be made by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland, on behalf of the C6 and C7 Trusts, as settlement of Midland's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court.

220. "*Special Servicer Payment*" means a Cash payment of $2.5 million to be made by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland as consideration for effecting the restructuring of the Fixed Rate Pool Mortgage Loan Agreement on behalf of the C6 and C7 Trusts.

221. "*Stipulation*" means that certain stipulation by and between the Debtors, LNR, on behalf of the LNR-Serviced Trusts, and the Ad Hoc Committee dated May 3, 2011.

222. "*Transition Services Agreement*" means the separation plan and transition services agreement for the Fixed/Floating Debtors and the Other Debtors, which shall address the uses of certain assets including, without limitation, intellectual property, licenses, IT resources, book and records and permits, and address cash management, cash collateral, and other cash issues, which separation plan and transition services agreement shall be contained in the Plan Supplement and be reasonably satisfactory to the Fixed/Floating Plan Sponsors, the Fixed/Floating Debtors, and the Other Debtors.

223. "*TriMont*" means TriMont Real Estate Advisors, Inc., or any successor thereto, in its capacity as (a) special servicer for the Anaheim Hotel Mezzanine Loan Agreement; or (b) special servicer for the Floating Rate Pool Mezzanine Loan Agreement.

224. "*Tysons Corner Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA Tysons Corner RI, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided KPA Tysons Corner RI, LLC a mortgage loan in the original principal amount of $25.2 million, which amount is collateralized by the Residence Inn in Vienna, Virginia.

225. "*Tysons Corner Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Tysons Corner Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

226. "*Tysons Corner Hotel Owner*" means Debtor KPA Tysons Corner RI, LLC.

227. "*Tysons Corner Hotel Purchase Consideration*" means the consideration received by the Tysons Corner Hotel Owner and the assumption of the obligations under the Tysons Corner Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

228. "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

229. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

230. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

231. "*Voting Deadline*" means June 17, 2011 at 5:00 p.m. Eastern Time.

232. "*Voting Record Date*" means the close of business on May 13, 2011.

233.    "*Washington DC Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA Washington DC, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided a mortgage loan to KPA Washington DC, LLC in the original principal amount of $25.6 million, which amount is collateralized by the Doubletree Guest Suites in Washington, D.C.

234.    "*Washington DC Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Washington DC Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

235.    "*Washington DC Hotel Owner*" means Debtor KPA Washington DC, LLC.

236.    "*Washington DC Hotel Purchase Consideration*" means the consideration received by the Washington DC Hotel Owner and the assumption of the obligations under the Washington DC Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

237.    "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates in accordance with the Plan following the Effective Date as set forth in Article IV.Y.

B.    *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; provided that corporate or limited liability company governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Post-Effective Date Debtors, as applicable.

20

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

F.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; provided that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.  The provisions hereof are subject to the provisions of Article IX.B and Article IX.D.2.e.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in exchange for full and final satisfaction, settlement, release, and compromise of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals and Governmental Units, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Post-Effective Date Debtors no later than the Administrative Claims Bar Date applicable to the Debtor against whom the Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, or the property of the Post-Effective Date Debtors and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

B.    *Accrued Professional Compensation Claims*

1.    <u>Professional Fee Escrow Account</u>

In accordance with Article II.B.3, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow Account.  The Debtors shall fund the Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals.  The Professional Fee Escrow Account shall be funded from cash collateral to the extent provided for under the Cash Collateral Orders (or in such greater amounts as may be agreed to by the

applicable secured lender) and, to the extent necessary, on the Effective Date from the Chatham Hotel Sale Transaction Purchase Consideration and/or the Investment. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or the Post-Effective Date Debtors, as applicable. Payment of such funds shall not reduce the distributions to Midland or Lehman under the Fixed/Floating Plan or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

2.     Final Fee Applications and Payment of Accrued Professional Compensation Claims

All final requests for payment of Claims of a Professional shall be Filed no later than 60 days after the latest Effective Date for any of the Joint Plans. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A. After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders. Additionally, after notice and hearing, the Bankruptcy Court may direct the applicable Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders

3.     Professional Fee Escrow Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors, the Fixed/Floating Plan Sponsors, Lehman, and Midland no later than five days after the Confirmation Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Escrow Amount.

4.     Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, the Post-Effective Date Debtors, or the Committee, as applicable. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.     *Five Mile DIP Claims*

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim against the Fixed/Floating Debtors, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating

Debtors or New HoldCo shall pay the outstanding amount of "Tranche A" of the Allowed Five Mile DIP Claims in full in Cash.

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim, on the Effective Date of the Remaining Debtor Plan, the Post-Effective Date San Diego Hotel Debtors shall pay "Tranche B" of the Allowed Five Mile DIP Claims in full in Cash and the Post-Effective Date General Lessee and the Tysons Corner Hotel Owner shall pay "Tranche C" of the Allowed Five Mile DIP Claims in full in Cash.

The Five Mile DIP Claims shall be Allowed pursuant to the Confirmation Order.

D.      *Lehman DIP Claims*

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Lehman DIP Claim, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay the outstanding amount of the Allowed Lehman DIP Claims in full in Cash.

The Lehman DIP Claims shall be Allowed pursuant to the Confirmation Order.

E.      *LNR Structuring Fee*

On the Effective Date of the Remaining Debtor Plan, the Debtors shall pay the LNR Structuring Fee in full in Cash.

F.      *Claims Based on Postpetition Intercompany Loans*

In exchange for full and final satisfaction, settlement, release, and compromise of each Claim based on a Postpetition Intercompany Loan arising pursuant to the Cash Collateral Order, if any, on the Effective Date of a borrower Debtor's plan, the borrower Debtors shall pay the lender Debtors in full in Cash.

G.      *Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses*

Upon the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors shall pay to Five Mile the Five Mile Expense Reimbursement Claim in an amount not to exceed $3 million. Notwithstanding any provision herein to the contrary, neither Five Mile nor its counsel shall be required to file any application or other formal request for payment or allowance of the Five Mile Expense Reimbursement Claim.

Lehman's advisors' and counsel's reasonable and documented fees and expenses through the Effective Date shall continue to be paid in accordance with the Cash Collateral Orders.

H.      *Ad Hoc Committee Administrative Claim*

The Ad Hoc Committee and its advisors will receive an Allowed Administrative Claim in the amount of $3.5 million, which amount shall be paid by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) on the Effective Date of the Remaining Debtor Plan. The Claim for payment shall be deemed an Allowed Administrative Priority Claim.

I.      *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, (1) Cash, payable by the liable Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the liable Debtors or Post-Effective Date Debtors, as applicable, and such Holder, provided that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date without any further notice to or action, order, or

23

approval of the Bankruptcy Court, or (3) at the option of the liable Debtor or Post-Effective Date Debtor, as applicable, Cash paid by the liable Post-Effective Date Debtor in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than five years after the Petition Date with payment of interest at the Federal Judgment Rate in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the liable Debtors or Post-Effective Date Debtors, as applicable, and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article III.

A.      *Summary of Classification*

All Claims and Interests, other than Five Mile DIP Claims, Lehman DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and in connection with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. In addition, subject to the Commitment Letter, the Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking confirmation or approval of the Plan with respect to all other Debtors.

K&E 18934861.44

1.      Class Identification for the Fixed/Floating Debtors

The classification of Claims and Interests against each of the Fixed/Floating Debtors pursuant to the Fixed/Floating Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Fixed/Floating Debtors. All of the potential Classes for the Fixed/Floating Debtors are set forth herein. Certain of the Fixed/Floating Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof. For all purposes under the Fixed/Floating Plan, each Class will contain sub-Classes for each of the Fixed/Floating Debtors (*i.e.*, there will be 71 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class FF2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class FF1 | Other Priority Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF2 | Other Secured Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF3A | Secured Fixed Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF3B | Secured Floating Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF4 | Secured Floating Rate Pool Mezzanine Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF5 | General Unsecured Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF6 | Mortgage or Mezzanine Loan Deficiency Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF7 | Intercompany Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF8 | Section 510(b) Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF9 | Interests in Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 18934861.44

2. <u>Class Identification for the Anaheim Hotel Debtors</u>

The classification of Claims and Interests against each of the Anaheim Hotel Debtors pursuant to the Anaheim Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Anaheim Hotel Debtors. All of the potential Classes for the Anaheim Hotel Debtors are set forth herein. Certain of the Anaheim Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof. For all purposes under the Anaheim Plan, each Class will contain sub-Classes for each of the Anaheim Hotel Debtors (*i.e.*, there will be three sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class A2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class A1 | Other Priority Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A2 | Other Secured Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A3 | Secured Anaheim Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class A4 | Secured Anaheim Hotel Mezzanine Loan Claims | Impaired | Entitled to Vote |
| Class A5A | General Unsecured Claims against Anaheim Hotel Owner or Anaheim Hotel Lessee | Impaired | Entitled to Vote |
| Class A5B | General Unsecured Claims against Anaheim Mezzanine Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A6 | Anaheim Hotel Mezzanine Loan Deficiency Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A7 | Intercompany Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A8 | Intercompany Interests in Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 18934861.44

3.   Class Identification for the Ontario Hotel Debtors

The classification of Claims and Interests against each of the Ontario Hotel Debtors pursuant to the Ontario Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Ontario Hotel Debtors.  All of the potential Classes for the Ontario Hotel Debtors are set forth herein.  Certain of the Ontario Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof.  For all purposes under the Ontario Plan, each Class will contain sub-Classes for each of the Ontario Hotel Debtors (*i.e.*, there will be two sub-Classes in each Class and many of such sub-Classes may be vacant).  In addition, the sub-Classes in Class O2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class O1 | Other Priority Claims against Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O2 | Other Secured Claims Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O3 | Secured Ontario Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class O4 | General Unsecured Claims against Ontario Hotel Debtors | Impaired | Entitled to Vote |
| Class O5 | Ontario Hotel Mortgage Loan Deficiency Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O6 | Intercompany Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O7 | Section 510(b) Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O8 | Intercompany Interests in Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 18934861.44

4.       Class Identification for the Remaining Debtors

The classification of Claims and Interests against each of the Remaining Debtors pursuant to the Remaining Debtor Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Remaining Debtors.  All of the potential Classes for the Remaining Debtors are set forth herein.  Certain of the Remaining Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof.  For all purposes under the Remaining Debtor Plan, each Class will contain sub-Classes for each of the Remaining Debtors (*i.e.*, there will be 16 sub-Classes in each Class and many of such sub-Classes may be vacant).  In addition, the sub-Classes in Class R2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class R1 | Other Priority Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R2 | Other Secured Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R3A | Secured Garden Grove Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3B | Secured San Diego Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3C | Secured Washington DC Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3D | Secured Tysons Corner Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3E | Secured San Antonio Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R4A | General Unsecured Claims against the Remaining Debtors Other than Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R4B | General Unsecured Claims against Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R5 | Intercompany Claims against the Remaining Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R6 | Intercompany Interests in the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R7 | Innkeepers USA LP Preferred D Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R8 | Innkeepers USA Trust Preferred C Interests | Impaired | Entitled to Vote |
| Class R9 | Innkeepers USA Trust Preferred A Interests | Impaired | Entitled to Vote |
| Class R10 | Innkeepers USA Trust Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R11 | Grand Prix Holdings Interests | Impaired | Entitled to Vote |
| Class R12 | Section 510(b) Claims against the Remaining Debtors | Impaired | Entitled to Vote |

B.       *Treatment of Claims and Interests*

1.    The treatment provided to each Class relating to each of the Fixed/Floating Debtors for distribution purposes and voting rights are specified below:

**Class FF1 - Other Priority Claims Against the Fixed/Floating Debtors**

(a)       *Classification*:  Class FF1 consists of all Other Priority Claims against the Fixed/Floating Debtors.

(b)       *Treatment*:  Except to the extent that a Holder of an Allowed Class FF1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final

28

satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c) *Voting*: Class FF1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class FF2 - Other Secured Claims Against the Fixed/Floating Debtors

(a) *Classification*: Class FF2 consists of all Other Secured Claims against the Fixed/Floating Debtors. For all purposes under the Fixed/Floating Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class FF2A against Grand Prix Addison (RI) LLC, Class FF2B against Grand Prix Addison (RI) LLC, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Class FF2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i) be paid in full in Cash in an amount equal to such Allowed Class FF2 Other Secured Claim by the Debtors on the Effective Date;

(ii) receive the collateral securing any such Allowed Class FF2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii) otherwise be treated in any other manner such that the Allowed Class FF2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class FF2 Other Secured Claim becomes an Allowed Class FF2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class FF2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*: Class FF2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

K&E 18934861.44

**Class FF3A - Secured Fixed Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors**

(a)      *Classification:* Class FF3A consists of all Secured Fixed Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class FF3A Secured Fixed Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Fixed Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Fixed Rate Pool Mortgage Loan Claims shall (i) enter into the New Fixed Rate Pool Mortgage Loan and receive the New Fixed Rate Pool Mortgage Notes and the New Fixed Rate Pool Mortgage Loan Limited Guarantys, and (ii) receive a payment of Cash in the amount of $12,802,450.37.

(c)      *Voting:* Class FF3A is Impaired, and the Holder of Secured Fixed Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF3B - Secured Floating Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors**

(a)      *Classification:* Class FF3B consists of all Secured Floating Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class FF3B Secured Floating Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Floating Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Floating Rate Pool Mortgage Loan Claims shall receive a payment of Cash in the amount of $233,489,097.04, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan. Such increase or decrease in Cash payable to Class FF3B will create a reciprocal increase or decrease in the recovery of Class FF4 such that the aggregate Cash paid to Classes FF3B and FF4 will not change.

(c)      *Voting:* Class FF3B is Impaired, and the Holder of Secured Floating Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF4 - Secured Floating Rate Pool Mezzanine Loan Claims Against the Fixed/Floating Debtors**

(a)      *Classification:* Class FF4 consists of all Secured Floating Rate Pool Mezzanine Loan Claims against the Fixed/Floating Debtors.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class FF4 Secured Floating Rate Pool Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Floating Rate Pool Mezzanine Loan Claims, the Holder of Allowed Secured Floating Rate Pool Mezzanine Loan Claims shall receive a payment of Cash in the amount of $2,363,001.42, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan. Such increase or decrease in Cash payable to Class FF4 will create a reciprocal increase or

30

decrease in the recovery of Class FF3B such that the aggregate Cash paid to Classes FF3B and FF4 will not change.

(c)     *Voting:*  Class FF4 is Impaired, and the Holder of Allowed Secured Floating Rate Pool Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

### Class FF5 - General Unsecured Claims Against the Fixed/Floating Debtors

(a)     *Classification:*  Class FF5 consists of all General Unsecured Claims against the Fixed Floating Debtors.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class FF5 General Unsecured Claim and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall:

(i)      (A) if the Holder's General Unsecured Claim is against Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $100,000.00 of the Fixed/Floating Unsecured Claim Fund, or (B) if the Holder's General Unsecured Claim is against a Fixed/Floating Debtor other than Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $4,650,000.00 of the Fixed/Floating Unsecured Claim Fund; and

(ii)     receive a release and waiver by the Debtors of all Claims of the Fixed/Floating Debtors against such Holder to recover preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code.

(c)     *Voting:*  Class FF5 is Impaired, and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

### Class FF6 - Mortgage or Mezzanine Loan Deficiency Claims Against the Fixed/Floating Debtors

(a)     *Classification:*  Class FF6 consists of all Mortgage or Mezzanine Loan Deficiency Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Holders of Allowed Class FF6 Mortgage or Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Mortgage or Mezzanine Loan Deficiency Claims.

(c)     *Voting:*  Class FF6 is Impaired, and each Holder of a Mortgage or Mezzanine Loan Deficiency Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Mortgage or Mezzanine Loan Deficiency Claims are not entitled to vote to accept or reject the Plan.

### Class FF7 - Intercompany Claims Against the Fixed/Floating Debtors

(a)     *Classification*:  Class FF7 consists of all Intercompany Claims against the Fixed/Floating Debtors.

(b)     *Treatment*:  Holders of Allowed Class FF7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

31

(c)    *Voting*:  Class FF7 is Impaired, and Holders of Intercompany Claims against the Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

**Class FF8 - Section 510(b) Claims Against the Fixed/Floating Debtors**

(a)    *Classification*:  Class FF8 consists of all Section 510(b) Claims against the Fixed/Floating Debtors.

(b)    *Treatment*:  Holders of Allowed Class FF8 Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)    *Voting*:  Class FF8 is Impaired, and Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**Class FF9 - Interests in the Fixed/Floating Debtors**

(a)    *Classification:*  Class FF9 consists of all Interests in the Fixed/Floating Debtors.

(b)    *Treatment:*  Holders of Allowed Class FF9 Interests shall not receive any distribution on account of such Intercompany Interests and, except as provided in the immediately following sentence, all such Interests shall be cancelled and of no further force or effect.  Notwithstanding the foregoing, the Interests may, at the discretion of Fixed/Floating Plan Sponsors, be maintained for the purposes of preserving the organizational structure of certain of the Fixed/Floating Debtors; provided further that the Interests of the Post-Effective Date Fixed/Floating Debtors shall, directly or indirectly, be transferred to New HoldCo pursuant to the Investment and in accordance with the Fixed/Floating Successful Bid.

(c)    *Voting:*  Class FF9 is Impaired, and Holders of Intercompany Interests in the Fixed/Floating Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

    2.   The treatment provided to each Class relating to each of the Anaheim Hotel Debtors for distribution purposes and voting rights are specified below:

**Class A1 - Other Priority Claims Against the Anaheim Hotel Debtors**

(a)    *Classification*:  Class A1 consists of all Other Priority Claims against the Anaheim Hotel Debtors.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Class A1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall:

(i)    if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or

as soon as reasonably practical thereafter; or (B) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; or

(ii)      if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan Agreement pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)      *Voting*: Class A1 is Impaired, and Holders of Class A1 Other Priority Claims are entitled to vote to accept or reject the Plan.

### Class A2 - Other Secured Claims Against the Anaheim Hotel Debtors

(a)      *Classification*: Class A2 consists of all Other Secured Claims against the Anaheim Hotel Debtors. For all purposes under the Anaheim Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class A2A against the Anaheim Hotel Owner, Class A2B the Anaheim Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Class A2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall:

(i)      if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash in an amount equal to such Allowed Class A2 Other Secured Claim by the Debtors on the Effective Date; (B) receive the collateral securing any such Allowed Class A2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or (C) otherwise be treated in any other manner such that the Allowed Class A2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class A2 Other Secured Claim becomes an Allowed Class A2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class A2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code; or

K&E 18934861.44

(ii)     if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)     *Voting*:  Class A2 is Impaired, and Holders of Class A2 Other Secured Claims are entitled to vote to accept or reject the Plan.

## Class A3 - Secured Anaheim Hotel Mortgage Loan Claims

(a)     *Classification:*  Class A3 consists of all Secured Anaheim Hotel Mortgage Loan Claims against the Anaheim Hotel Debtors.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class A3 Secured Anaheim Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mortgage Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mortgage Loan Claims shall in accordance with the Anaheim Hotel Commitment Letter either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, have the Anaheim Hotel Mortgage Loan Agreement be assumed, amended, restated, and/or supplemented by New Anaheim HoldCo, in accordance with and as modified by the terms and conditions set forth in the Anaheim Hotel Commitment Letter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)     *Voting:*  Class A3 is Impaired, and the Holder of Class A3 Secured Anaheim Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class A4 - Secured Anaheim Hotel Mezzanine Loan Claims

(a)     *Classification*:  Class A4 consists of all Secured Anaheim Hotel Mezzanine Loan Claims against the Anaheim Hotel Debtors.

(b)     *Treatment*:  Except to the extent that the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mezzanine Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mezzanine Loan Claims shall receive the following: (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, all of the assets of the Anaheim Hotel Debtors shall be transferred, conveyed, assumed, and assigned to the New Anaheim HoldCo; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred (as defined in the Anaheim Hotel Commitment Letter), a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(d)     *Voting:*  Class A4 is Impaired, and the Holder of Secured Anaheim Hotel Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

**Class A5A - General Unsecured Claims Against the Anaheim Hotel Owner or Anaheim Hotel Lessee**

(a)　　*Classification:*　Class A5A consists of all General Unsecured Claims against the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(b)　　*Treatment:*　Except to the extent that a Holder of an Allowed Class A5A General Unsecured Claim against the Anaheim Hotel Owner and Anaheim Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee, each Holder of an Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee shall either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, be paid in full on the Effective Date or as soon as reasonably practical thereafter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(c)　　*Voting:*　Class A5A is Impaired, and each Holder of a General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee is entitled to vote to accept or reject the Plan.

**Class A5B - General Unsecured Claims Against the Anaheim Mezzanine Debtor**

(a)　　*Classification:*　Class A5B consists of all General Unsecured Claims against the Anaheim Mezzanine Debtor.

(b)　　*Treatment:*　Holders of Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall not receive any distribution on account of such Allowed General Unsecured Claim against the Anaheim Mezzanine Debtor, and Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.

(c)　　*Voting:*　Class A5B is Impaired, and the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are not entitled to vote to accept or reject the Plan.

**Class A6 - Anaheim Hotel Mezzanine Loan Deficiency Claims Against the Anaheim Hotel Debtors**

(a)　　*Classification:*　Class A6 consists of all Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors.

(b)　　*Treatment:*　Holders of Allowed Class A6 Anaheim Hotel Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Anaheim Hotel Mezzanine Loan Deficiency Claims.

(c)　　*Voting:*　Class A6 is Impaired, and the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the

Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

### Class A7 - Intercompany Claims Against the Anaheim Hotel Debtors

(a)      *Classification*:  Class A7 consists of all Intercompany Claims against the Anaheim Hotel Debtors.

(b)      *Treatment*:  Holders of Allowed Class A7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)      *Voting*:  Class A7 is Impaired, and Holders of Intercompany Claims against the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

### Class A8 - Intercompany Interests in the Anaheim Hotel Debtors

(a)      *Classification:*  Class A8 consists of all Intercompany Interests in the Anaheim Hotel Debtors.

(b)      *Treatment:*  Holders of Allowed Class A8 Intercompany Interests in the Anaheim Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in the Anaheim Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)      *Voting:*  Class A8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

3.     The treatment provided to each Class relating to each of the Ontario Hotel Debtors for distribution purposes and voting rights are specified below:

### Class O1 - Other Priority Claims Against the Ontario Hotel Debtors

(a)      *Classification*:  Class O1 consists of all Other Priority Claims against the Ontario Hotel Debtors.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Class O1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

K&E 18934861.44

(i)  be paid in full in Cash from the Ontario Hotel Cash Recovery Fund on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)  otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)  *Voting*:  Class O1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class O2 - Other Secured Claims Against the Ontario Hotel Debtors

(a)  *Classification*:  Class O2 consists of all Other Secured Claims against Ontario Hotel Debtors.  For all purposes under the Ontario Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class O2A against the Ontario Hotel Owner, Class O2B against the Ontario Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)  *Treatment*:  Except to the extent that a Holder of an Allowed Class O2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

(i)  be paid in full in Cash from the Ontario Hotel Cash Recovery Fund in an amount equal to such Allowed Class O2 Other Secured Claim by the Debtors on the Effective Date;

(ii)  receive the collateral securing any such Allowed Class O2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)  otherwise be treated in any other manner such that the Allowed Class O2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class O2 Other Secured Claim becomes an Allowed Class O2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class O2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)  *Voting*:  Class O2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

K&E 18934861.44

**Class O3 - Secured Ontario Hotel Mortgage Loan Claims**

(a)    *Classification:* Class O3 consists of all Secured Ontario Hotel Mortgage Loan Claims.

(b)    *Treatment:* Except to the extent that the Holder of Allowed Class O3 Secured Ontario Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Ontario Hotel Mortgage Loan Claims, the Holder of Allowed Secured Ontario Hotel Mortgage Loan Claims shall, at the election of the Holder of Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, (i) receive a deed in lieu of foreclosure with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement in form and substance reasonably acceptable to both parties, or (ii) elect to proceed with state foreclosure proceedings with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement with the support of the Ontario Debtors, including but not limited to a receiver sale of the collateral or third-party assumption of the Ontario Hotel Mortgage Loan Agreement on terms acceptable to the Holder of the Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, notwithstanding any injunction provisions contained herein. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Ontario Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Ontario Plan.

(c)    *Voting:* Class O3 is Impaired, and the Holder of Secured Ontario Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class O4 - General Unsecured Claims Against the Ontario Hotel Debtors**

(a)    *Classification:* Class O4 consists of all General Unsecured Claims against the Ontario Hotel Debtors.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Class O4 General Unsecured Claim against the Ontario Hotel Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Ontario Hotel Debtor, each Holder of an Allowed General Unsecured Claim against the Ontario Hotel Debtor shall receive its Pro Rata share of the Ontario Hotel Cash Recovery Fund that remains after satisfaction of Claims in Class O1 and Class O2.

(c)    *Voting:* Class O4 is Impaired, and each Holder of a General Unsecured Claim against the Ontario Hotel Debtors is entitled to vote to accept or reject the Plan.

**Class O5 - Ontario Hotel Mortgage Loan Deficiency Claims**

(a)    *Classification:* Class O5 consists of all Ontario Hotel Mortgage Loan Deficiency Claims.

(b)    *Treatment:* The Holder of Allowed Class O5 Ontario Hotel Mortgage Loan Deficiency Claims shall not receive any distribution on account of such Ontario Hotel Mortgage Loan Deficiency Claims, and Allowed Ontario Hotel Mortgage Loan Deficiency Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)    *Voting:* Class O5 is Impaired, and the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is conclusively deemed to have rejected the Plan pursuant to section

1126(g) of the Bankruptcy Code. Therefore, the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

**Class O6 - Intercompany Claims Against Ontario Hotel Debtors**

(a)     *Classification*:  Class O6 consists of all Intercompany Claims against Ontario Hotel Debtors.

(b)     *Treatment*:  Holders of Allowed Class O6 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class O6 is Impaired by the Plan and Holders of Intercompany Claims against the Ontario Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

**Class O7 - Section 510(b) Claims Against Ontario Hotel Debtors**

(a)     *Classification*:  Class O7 consists of all Section 510(b) Claims against Ontario Hotel Debtors.

(b)     *Treatment*:  Holders of Allowed Class O7 Section 510(b) Claims against Ontario Hotel Debtors shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims against Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class O7 is Impaired, and Holders of Section 510(b) Claims against Ontario Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims against Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

**Class O8 - Intercompany Interests in Ontario Hotel Debtors**

(a)     *Classification:*  Class O8 consists of all Intercompany Interests in Ontario Hotel Debtors.

(b)     *Treatment:*  Holders of Allowed Class O8 Intercompany Interests in Ontario Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:*  Class O8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

4.   The treatment provided to each Class relating to each of the Remaining Debtors for distribution purposes and voting rights are specified below:

**Class R1 - Other Priority Claims Against the Remaining Debtors**

(a)     *Classification*:  Class R1 consists of all Other Priority Claims against the Remaining Debtors.

K&E 18934861.44

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Class R1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

   (i) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

   (ii) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c) *Voting*:  Class R1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class R2 - Other Secured Claims Against the Remaining Debtors

(a) *Classification*:  Class R2 consists of all Other Secured Claims against the Remaining Debtors.  For all purposes under the Remaining Debtor Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class R2A against the Garden Grove Hotel Owner, Class R2B against the Garden Grove Hotel Owner and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Class R2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

   (i) be paid in full in Cash in an amount equal to such Allowed Class R2 Other Secured Claim by the Debtors on the Effective Date;

   (ii) receive the collateral securing any such Allowed Class R2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

   (iii) otherwise be treated in any other manner such that the Allowed Class R2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class R2 Other Secured Claim becomes an Allowed Class R2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class R2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*:  Class R2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

K&E 18934861.44

Therefore, Holders of Class R2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

**Class R3A - Secured Garden Grove Hotel Mortgage Loan Claims**[2]

(a)     *Classification:*  Class R3A consists of all Secured Garden Grove Hotel Mortgage Loan Claims.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Garden Grove Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement.  Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts:  an assumed loan amount of $32,416,576.45 and a cash principal paydown of $5,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Garden Grove Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Garden Grove Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the Garden Grove Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation.  For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration.  The portion of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims for interest at the non-default rate shall be satisfied by the retention of the amounts, if any, paid with respect to interest at the non-default rate on such claim under the Cash Collateral Order.  For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Garden Grove Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:*  Class R3A is Impaired, and the Holder of Class R3A Secured Garden Grove Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

---

[2]     With respect to Classes R3A, R3B, R3C, R3D and R3E, all payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall be credited, to the extent actually made by the Debtors, to the legal fees and disbursements of the LNR-Serviced Trusts' counsel and the monthly fees and disbursements of the LNR-Serviced Trusts' financial advisors and the Allowed Claim for interest at non-default rate, but not principal.  In no event shall any payment be applied to or recharacterized to reduce the principal component of such Allowed Claims.  The payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall not be subject to objection, avoidance, recovery, disgorgement, or turnover.

**Class R3B - Secured San Diego Hotel Mortgage Loan Claims**

(a)    *Classification*:  Class R3B consists of all Secured San Diego Hotel Mortgage Loan Claims.

(b)    *Treatment*:  Except to the extent that the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Diego Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts:  an assumed loan amount of $40,168,769.26 and a cash principal paydown of $7,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Diego Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the San Diego Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the San Diego Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation.  For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration.  For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Diego Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)    *Voting:* Class R3B is Impaired, and the Holder of Class R3B Secured San Diego Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class R3C - Secured Washington DC Hotel Mortgage Loan Claims**

(a)    *Classification:* Class R3C consists of all Secured Washington DC Hotel Mortgage Loan Claims.

(b)    *Treatment:*  Except to the extent that the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims, the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Washington DC Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment

and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $20,054,752.20 and a cash principal paydown of $5,400,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Washington DC Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Washington DC Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the Washington DC Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Washington DC Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)    *Voting:* Class R3C is Impaired, and the Holder of Class R3C Secured Washington DC Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

### Class R3D - Secured Tysons Corner Hotel Mortgage Loan Claims

(a)    *Classification:* Class R3D consists of all Secured Tysons Corner Hotel Mortgage Loan Claims.

(b)    *Treatment:* Except to the extent that the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holders, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Tysons Corner Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $23,057,021.67 and a cash principal paydown of $2,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Tysons Corner Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Tysons Corner Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the Tysons Corner Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash

K&E 18934861.44

Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Tysons Corner Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)      *Voting:* Class R3D is Impaired, and the Holder of Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class R3E - Secured San Antonio Hotel Mortgage Loan Claims

(a)      *Classification:* Class R3E consists of all Secured San Antonio Hotel Mortgage Loan Claims.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Antonio Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $18,462,695.40. and a cash principal paydown of $5,600,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Antonio Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the San Antonio Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the San Antonio Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Antonio Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)      *Voting:* Class R3E is Impaired, and the Holder of Class R3E Secured San Antonio Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

K&E 18934861.44

**Class R4A - General Unsecured Claims Against the Remaining Debtors Other Than Grand Prix Holdings**

(a) *Classification:* Class R4A consists of all General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings.

(b) *Treatment:* Except to the extent that a Holder of an Allowed Class R4A General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against a particular Remaining Debtor other than Grand Prix Holdings shall receive (i) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor other than Grand Prix Holdings through the Distribution Waterfall and (ii) other assets, if any, of such Remaining Debtor other than Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor other than Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor other than Grand Prix Holdings.

(c) *Voting:* Class R4A is Impaired, and the Holders of Allowed Class R4A General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings are entitled to vote to accept or reject the Plan.

**Class R4B - General Unsecured Claims Against Grand Prix Holdings**

(a) *Classification:* Class R4B consists of all General Unsecured Claims against Grand Prix Holdings.

(b) *Treatment:* Except to the extent that a Holder of an Allowed Class R4B General Unsecured Claim against Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against Grand Prix Holdings shall receive (i) the Chatham Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings.

(c) *Voting:* Class R4B is Impaired, and the Holders of Allowed Class R4 General Unsecured Claims against Grand Prix Holdings are entitled to vote to accept or reject the Plan.

**Class R5 - Intercompany Claims Against the Remaining Debtors**

(a) *Classification*: Class R5 consists of all Intercompany Claims against the Remaining Debtors.

(b) *Treatment*: Holders of Allowed Class R5 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c) *Voting*: Class R5 is Impaired, and Holders of Intercompany Claims against the Remaining Debtors are conclusively deemed to have rejected the Plan pursuant to section

1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims against the Remaining Debtors are not entitled to vote to accept or reject the Plan.

**Class R6 - Intercompany Interests in the Remaining Debtors**

(a)     *Classification:*  Class R6 consists of all Intercompany Interests in the Remaining Debtors.

(b)     *Treatment:*  Holders of Allowed Class R6 Intercompany Interests in the Remaining Debtors shall have their Interests reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting:*  Class R6 is Unimpaired, and Holders of Intercompany Interests in the Remaining Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Remaining Debtors are not entitled to vote to accept or reject the Plan.

**Class R7 - Innkeepers USA LP Preferred D Interests**

(a)     *Classification:*  Class R7 consists of all Innkeepers USA LP Preferred D Interests.

(b)     *Treatment:*  Holders of Allowed Innkeepers USA LP Preferred D Interests shall not receive any distribution on account of such Allowed Innkeepers USA LP Preferred D Interests, and Allowed Innkeepers USA LP Preferred D Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class R7 is Impaired, and Holders of Allowed Innkeepers USA LP Preferred D Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Innkeepers USA LP Preferred D Interests are not entitled to vote to accept or reject the Plan.

**Class R8 - Innkeepers USA Trust Preferred C Interests**

(a)     *Classification:*  Class R8 consists of all Innkeepers USA Trust Preferred C Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Preferred C Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)     *Voting:*  Class R8 is Impaired, and Holders of Allowed Class R8 Innkeepers USA Trust Preferred C Interests are entitled to vote to accept or reject the Plan.

**Class R9 - Innkeepers USA Trust Preferred A Interests**

(a)     *Classification:*  Class R9 consists of all Innkeepers USA Trust Preferred A Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Preferred A Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction

of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)    *Voting:* Class R9 is Impaired, and Holders of Allowed Class R9 Innkeepers USA Trust Preferred A Interests are entitled to vote to accept or reject the Plan.

### Class R10 - Innkeepers USA Trust Common Interests

(a)    *Classification:* Class R10 consists of all Innkeepers USA Trust Common Interests.

(b)    *Treatment:* Holders of Allowed Innkeepers USA Trust Common Interests shall not receive any distribution on account of such Allowed Innkeepers USA Trust Common Interests, and Allowed Innkeepers USA Trust Common Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)    *Voting:* Class R10 is Impaired, and Holders of Allowed Class R10 Innkeepers USA Trust Common Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Innkeepers USA Trust Common Interests are not entitled to vote to accept or reject the Plan.

### Class R11 - Grand Prix Holdings Interests

(a)    *Classification:* Class R11 consists of all Grand Prix Holdings Interests.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Class R11 Grand Prix Holdings Interest and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Grand Prix Holdings Interest, each Holder of an Allowed Grand Prix Holdings Interest shall receive (i) the Chatham Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Allowed Grand Prix Holdings Interests, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings.

(c)    *Voting*: Class R11 is Impaired, and Holders of Allowed Class R11 Grand Prix Holdings Interests are entitled to vote to accept or reject the Plan.

### Class R12 - Section 510(b) Claims Against the Remaining Debtors

(a)    *Classification*: Class R12 consists of all Section 510(b) Claims against the Remaining Debtors.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Class R12 Section 510(b) Claims against the Remaining Debtors and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Section 510(b) Claims against the Remaining Debtors, each Holder of an Allowed Section 510(b) Claims against a particular Remaining Debtor shall receive (a) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor through the Distribution Waterfall and (b) other assets, if any, of such Remaining Debtor that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor.

K&E 18934861.44

(c)     *Voting*:  Class R12 is Impaired, and Holders of Allowed Class R12 Section 510(b) Claims against the Remaining Debtors are entitled to vote to accept or reject the Plan.

B.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

C.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement and Solicitation Procedures Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

D.     *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of each of the Joint Plans for the applicable Debtors pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE IV.
# MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *Substantive Consolidation*

The Plan does not contemplate substantive consolidation of any of the Debtors.

B.     *Restructuring Transactions and Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  With respect to the Fixed/Floating Plan, all amounts of Cash and securities necessary for the Fixed/Floating Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from (a) Cash on hand from operations in accordance with the Commitment Letter and, as applicable, and permitted by the Cash Collateral Orders and (b) the Investment.  With respect to the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan, all amounts of Cash and securities necessary for the Debtors that are not the Fixed/Floating Debtors or the Post-Effective Date Debtors that are not the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from (a) Cash from operations, (b) the Chatham Hotel Sale Transaction.  Payments under this provision shall not reduce the distributions to Midland or Lehman under the Fixed/Floating Plan or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

C.     *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

D.      *Fixed/Floating Investment*

On the Effective Date of the Fixed/Floating Plan, and subject to the terms of the Fixed/Floating Successful Bid, New HoldCo shall purchase, directly or indirectly, the Interests of the Post-Effective Date Fixed/Floating Debtors in return for the Investment.

If the Fixed/Floating Plan Sponsors determine in their sole and absolute discretion that New HoldCo and the Post-Effective Date Fixed/Floating Debtors shall have an alternate corporate or organizational structure, form or identity (including, without limitation, as a result of the rejection of the Fixed/Floating Plan by Class FF4), the structure of the Investment contemplated in this Article IV.D shall be changed to the extent necessary to effectuate any such alternate structure, form, or identity.

E.      *Chatham Hotel Sale Transaction*

On the Effective Date of the Remaining Debtor Plan, and in accordance with the Chatham APA and as applicable to the Remaining Debtors, the Debtors will consummate the Chatham Hotel Sale Transaction in accordance with the Chatham Hotel Sale Transaction Documents, provided, however, that notwithstanding anything contained in the Plan, the Plan Supplement, the Remaining Debtor Plan, the Disclosure Statement or any other document or agreement relating to the foregoing documents, the consideration paid by Chatham to consummate the Chatham Hotel Sale Transaction in accordance with the Chatham APA shall not exceed Chatham Hotel Sale Transaction Purchase Consideration, provided that Chatham shall in addition remain responsible for any fees and expenses Chatham has agreed to pay pursuant to the Chatham APA.

F.      *Anaheim Hotel Commitment Letter*

Unless otherwise agreed by the parties thereto, the restructuring of the Anaheim Hotel Debtors shall be done in accordance with the terms of the Anaheim Hotel Commitment Letter, except as modified herein in Article III.B.2, Treatment of Class A1.

G.      *New Fixed Rate Pool Mortgage Loan Limited Guarantys*

On the Effective Date of the Fixed/Floating Plan and in connection with the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall be entered into by the parties contemplated in the New HoldCo/Midland Commitment and the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall otherwise be consistent with the terms of the New HoldCo/Midland Commitment.

H.      *Special Servicer Payment and Special Servicer Release Payment*

Contemporaneously with the occurrence of the Effective Date of the Fixed/Floating Plan, and as a condition thereto, the Fixed/Floating Plan Sponsors shall direct New HoldCo to make the Special Servicer Payment and the Special Servicer Release Payment.

I.      *Issuance of Interests in Post-Effective Date Fixed/Floating Debtors*

The issuance of the Interests by each of the Post-Effective Date Fixed/Floating Debtors is authorized without the need for any further action and without any further action by the Holders of Claims or Interests or any further notice to or action, order, or approval of the Bankruptcy Court.

On the Effective Date of the Fixed/Floating Plan, or as soon as reasonably practicable thereafter, the Interests in the Post-Effective Date Fixed/Floating Debtors (or such of them as may be designated by New HoldCo) shall be distributed to New HoldCo in accordance with the Fixed/Floating Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

All of the Interests in the Post-Effective Date Fixed/Floating Debtors issued pursuant to the Fixed/Floating Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred

to in Article VI shall be governed by the terms and conditions set forth in the Fixed/Floating Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### J. Management Compensation

As part of their bid, the Fixed/Floating Plan Sponsors agreed to fund certain employee-related emergence costs related to the Fixed/Floating Plan in an amount equal to $3.5 million, which amount shall be distributed on the Effective Date of the Fixed/Floating Plan to certain members of the Debtors' management and employees at the direction of, and in the sole and absolute discretion of, the current board of Innkeepers USA Trust.

In addition, the Debtors also may implement a compensation program for certain members of the Debtors' management and employees related to the sale of the assets of the Remaining Debtors, which program will be in an amount of approximately $500,000. To the extent implemented, the appropriate details regarding this program will be set forth in the Plan Supplement.

### K. Listing of New HoldCo Interests; Reporting Obligations

None of the New HoldCo Interests will be listed on a national securities exchange as of the Effective Date of the Fixed/Floating Plan. New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust will not be reporting companies under the Securities Exchange Act, and New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust shall not be required to file reports with the Securities and Exchange Commission or any other entity or party and shall not be required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.

### L. Release of Liens

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Post-Effective Date Debtors and their successors and assigns.

### M. LP Bank Account

On the Effective Date of the Remaining Debtor Plan, the Cash in the LP Bank Account shall be deemed to be unencumbered, not subject to a security interest of any lender.

### N. Vesting of Assets in the Post-Effective Date Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate of the Debtors, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the applicable Post-Effective Date Debtors free and clear of all Liens, Claims, charges, or other encumbrances. The Intercompany Interests of Innkeepers USA Limited Partnership in non-Debtor KPA Raleigh, LLC shall vest in Post-Effective Date Innkeepers USA Limited Partnership. The Intercompany Interests of KPA Leaseco Holding, Inc. in non-Debtor KPA Raleigh Leaseco, LLC shall vest in Post-Effective Date KPA Leaseco Holding, Inc. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

K&E 18934861.44

O.      *Rights and Obligations Under Troy Settlement Agreement*

All of the Debtors' rights and obligations under that certain Settlement Agreement and Release Relating to the Detroit/Troy Central Residence Inn by Marriott, dated August 24, 2010, by and between certain of the Debtors and Marriott International, Inc., as approved by the Bankruptcy Court pursuant to the So-Ordered Stipulation Between Innkeepers USA Trust and Marriott International, Inc. and Order Approving Settlement of Marriott's Motion for Limited Modification of the Automatic Stay and Debtors' Motion to Assume the Troy Central Franchise Agreement, entered by the Bankruptcy Court on August 31, 2010 [Docket No. 357], shall be assumed and assigned to New HoldCo.

P.      *Cancellation of Securities and Agreements*

On the Effective Date, except to the extent otherwise provided, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be canceled and the obligations of the Debtors or the Post-Effective Date Debtors and the non-Debtor affiliates thereunder or in any way related thereto shall be discharged.

Q.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the directors, members, trustees, officers, and managers for New HoldCo, including the appointment of the Post-Effective Date Board; (2) the issuance and distribution of the Interests in the Post-Effective Date Fixed/Floating Debtors, (3) the execution and approval for the Post-Effective Date Fixed/Floating Debtors of the New Fixed/Floating By-Laws and New Fixed/Floating Organizational Documents consistent with the terms of the Fixed/Floating Successful Bid, (4) the execution and delivery of the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Notes, and the New Fixed Rate Pool Mortgage Loan Limited Guarantys consistent with the terms of the New HoldCo/Midland Commitment; (5) assumption of the LNR-Serviced Loans consistent with the terms of the LNR Commitment and the Stipulation; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, trustees, officers, or managers of the Debtors or the Post-Effective Date Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.Q shall be effective notwithstanding any requirements under non-bankruptcy law.

R.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Post-Effective Date Debtors and their directors, members, trustees, officers, and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

S.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, including the recording of any mortgages or liens or amendments thereto, shall not be subject to any

document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

T.      *D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, on the Effective Date of the Remaining Debtor Plan, the Remaining Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtors rights to seek amendment to such D&O Liability Insurance Policies. On the Effective Date of the Fixed/Floating Plan, New HoldCo will purchase new director & officer liability insurance policies as the Fixed/Floating Plan Sponsors determine is necessary. Entry of the Confirmation Order for the Remaining Debtor Plan shall constitute the Bankruptcy Court's approval of the Remaining Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Remaining Debtors under the Remaining Debtor Plan as to which no Proof of Claim need be Filed.

U.      *D&O Tail Insurance Policies*

To the extent not already purchased, on the Confirmation Date of the Fixed/Floating Plan, the Debtors are authorized to purchase tail coverage under a directors and officers' liability insurance policy with a term of six years for the current and former officers, directors, trustees, and members containing the same coverage that exists under the Debtors' current D&O Liability Insurance Policies (*i.e.*, a "tail policy"). After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, trustees, and members of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, trustees, and/or members remain in such positions after the Effective Date.

V.      *New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws*

On or immediately prior to the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors will file the New Fixed/Floating Organizational Documents, which shall include provisions in accordance with the Fixed/Floating Successful Bid, with the applicable Secretaries of State and/or other applicable authorities in their respective states of organization as required by and in accordance with applicable laws. In addition, the provisions of the New Fixed/Floating By-Laws shall include provisions in accordance with the Fixed/Floating Successful Bid. After the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors may amend and restate the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws and other constituent documents as permitted by the laws of applicable states of organization and the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws.

W.      *Board Representation*

1.      Fixed/Floating Debtors

New HoldCo shall be managed by the managing member of New HoldCo in accordance with the terms and conditions set forth in the New HoldCo limited liability company agreement. To the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will identify the managing member of New HoldCo and the members of the board of directors, members, and trustees of the New HoldCo subsidiaries identified as of the date of the filing thereof.

52

2. Other Debtors

Post-Effective Date Innkeepers USA Trust and Post-Effective Date Grand Prix Holdings, LLC shall be managed by the Post-Effective Date Board. To the extent known and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will list the members of the Post-Effective Date Board and the members of the board of directors, members, and trustees of the subsidiaries of Post-Effective Date Innkeepers USA Trust identified as of the date of the filing thereof.

X.      Indemnification Provisions

Notwithstanding anything herein to the contrary, pursuant to section 365 of the Bankruptcy Code or otherwise, and as of the Effective Date, the Debtors shall assume and assign to the Post-Effective Date Debtors all of the Indemnifications Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Indemnification Provisions. Notwithstanding anything to the contrary contained herein, (i) Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed and assigned by the foregoing assumption and assignment of the Indemnification Provisions, (ii) each such obligation shall be deemed and treated as an Executory Contract that has been assumed and assigned by the Debtors under the Plan as to which no Proof of Claim need be Filed, and (iii) as of the Effective Date, the Indemnifications Provisions shall be binding and enforceable against the Post-Effective Date Debtors.

Y.      Wind Down

On and after the Effective Date, Post-Effective Date Innkeepers USA Trust will oversee the Wind Down, and will fund the Wind Down using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration, and shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Debtors in accordance with the Plan.

Z.      Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article III.B with respect to Class FF5, Article VIII.C, Article VIII.D, Article VIII.E, Article VIII.F, Article VIII.G, and Article VIII.H), each of the Post-Effective Date Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Post-Effective Date Debtors have released any Entity on or prior to the Effective Date (pursuant to any of the release provisions set forth in Article VIII, Article III.B with respect to Class FF5, or otherwise), the Debtors or the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Post-Effective Date Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

K&E 18934861.44

AA.      *Ad Hoc Committee Agreement*

The following is an integrated agreement among the Debtors and the Ad Hoc Committee (the "**Ad Hoc Committee Agreement**") under which, upon its approval in its entirety, the Ad Hoc Committee, among other things, waives any right to challenge the allowability of the Innkeepers USA Trust Preferred A Interests (held by one of the Debtors or otherwise), including any right to object to or seek to subordinate the Innkeepers USA Trust Preferred A Interests, in exchange for the consideration being provided to the Ad Hoc Committee herein.

The distribution provisions under the Remaining Debtor Plan under which, after payment of certain allowed claims, the Innkeepers USA Trust Preferred C Interests share in the $7.4 million of cash, the proceeds of the Chatham Hotel Sale Transaction, and other available assets, shall not be changed adversely to the Innkeepers USA Trust Preferred C Interests absent the consent of the Ad Hoc Committee.

The Ad Hoc Committee will support the Plan and all its provisions and waive all objections to the Plan, provided that the Ad Hoc Committee Agreement is approved in its entirety. Upon any denial of the whole or any part of the Ad Hoc Committee Agreement (the "**Denial Date**"), the Debtors shall withdraw their request for Confirmation of the Remaining Debtor Plan (the "**Initial Confirmation Hearing**") and shall not request Confirmation of the Remaining Debtor Plan again for 30 days (the "**Subsequent Confirmation Hearing**"); provided, the parties will be required to serve any discovery requests within 10 days after the Denial Date, the parties will work in good faith to respond promptly to document requests and deposition notices, and the Court will schedule the Subsequent Confirmation Hearing, without requiring resolicitation of the non-materially modified Remaining Debtor Plan, as close as practicable to (but no earlier than) 31 days after the Denial Date; provided, further, the Debtors shall request approval of the Chatham Hotel Sale Transaction immediately following the Denial Date (in accordance with the terms and conditions set forth in the Chatham APA (as defined herein)), without regard to the scheduling of the Subsequent Confirmation Hearing, and the Ad Hoc Committee will support approval of the Chatham Hotel Sale Transaction.

The Remaining Debtor Plan (and only the Remaining Debtor Plan) shall provide that, upon approval of the Ad Hoc Committee Agreement: (i) Holders of Innkeepers USA Trust Preferred C Interests and the Ad Hoc Committee shall be deemed to be Fixed/Floating Releasing Parties, Anaheim Hotel Releasing Parties, and Ontario Hotel Releasing Parties; and (ii) the Ad Hoc Committee shall be a Remaining Debtor Releasing Party.
The Ad Hoc Committee will draft a letter in support of the Plan that will be distributed with the Disclosure Statement and other solicitation materials.

Without limiting the scope of the release, exculpation, and injunction provisions of the Plan, the Ad Hoc Committee waives any right in, and will not assert a claim against or interest in, the recovery distributable to Holders of Innkeepers USA Trust Preferred A Interests or any party in interest asserting rights with respect to such recovery, provided that the Ad Hoc Committee Agreement is approved in its entirety. The Innkeepers USA Trust Preferred A Interests shall be treated as pari passu with the Innkeepers USA Trust Preferred C Interests.

The Ad Hoc Committee and its advisors will receive the Ad Hoc Committee Administrative Claim to be paid in the amount of $3.5 million by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) for its role in the Chapter 11 Cases. The amount will be paid on the Effective Date of the Remaining Debtor Plan. The claim for payment shall be deemed an Allowed administrative priority Claim.

The Debtors will support approval of the Ad Hoc Committee Agreement in its entirety.

The Debtors shall enter into exclusive discussions for 30 days with the Ad Hoc Committee regarding the Ad Hoc Committee becoming a stalking horse bidder for the Raleigh JV interest, subject to Bankruptcy Court approval.

To the extent there are any inconsistencies between the terms of the Ad Hoc Committee Agreement as set forth in this Article IV.AA and elsewhere, the terms of the Ad Hoc Committee Agreement as set forth in this Article IV.AA shall govern.
.

K&E 18934861.44

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Franchise Agreements*

On the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors will assume the franchise agreements set forth in the Plan Supplement with respect to the assets of the Fixed/Floating Debtors. On the Remaining Debtor Plan Effective Date, the Debtors that are party to the Chatham APA will either (i) assume and assign to Chatham (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the assets of the Debtors that are party to the Chatham APA or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and Chatham (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims. On the Anaheim Plan Effective Date, the Anaheim Hotel Debtors will either (i) assume and assign to New Anaheim HoldCo (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the Anaheim Hotel Debtors or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and New Anaheim HoldCo (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims.

B.      *Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan, the Executory Contracts or Unexpired Leases of a Debtor that are not assumed or rejected pursuant to an Order prior to the Effective Date applicable to such Debtor shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts or Unexpired Leases: (1) identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement; (2) that are the subject of a motion to assume and assign or reject pending on the Effective Date applicable to such Debtor (in which case such assumption and assignment or rejection and the effective date thereof shall remain subject to a Final Order); or (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date applicable to such Debtor. Entry of the Confirmation Order shall constitute an approval of the assumptions and assignment or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, including the assumption and assignment of the Executory Contracts and Unexpired Leases identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement and the rejection of the Executory Contracts and Unexpired Leases identified on the list of rejected Executory Contracts and Unexpired Leases in the Plan Supplement, all pursuant to sections 365 and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions and assignments or rejections of a Debtor's Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date applicable to such Debtor. Notwithstanding anything to the contrary in the Plan, the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the lists of Executory Contracts or Unexpired Leases applicable to the Post-Effective Date Debtors identified in this Article V and in the Plan Supplement at any time through and including the later of 30 days after the Effective Date (or such later date as provided in Article V.C in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).

C.      *Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases*

Any Executory Contracts or Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the satisfaction of the Cure Obligations or by an agreed-upon waiver of the Cure Obligations on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Post-Effective Date Debtors and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or related Cure Obligations must be Filed, served, and actually received by the Debtors by 30 days after the Effective Date of the Joint Plan applicable to the Debtor that is the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to

K&E 18934861.44

the proposed assumption and assignment of such Executory Contract or Unexpired Lease or such Cure Obligations will be deemed to have assented to such matters and shall be forever barred, estopped, and enjoined from asserting such objection against the Debtors.

In the event of a dispute regarding: (1) the Cure Obligations; (2) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed and assigned; or (3) any other matter pertaining to assumption and/or assignment, then the applicable Cure Obligations shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding Cure Obligations without any further notice to any party or any action, order, or approval of the Bankruptcy Court. The Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to reject, or nullify the assumption and assignment of, any Executory Contract or Unexpired Lease no later than 30 days after a Final Order determining the Cure Obligations, any request for adequate assurance of future performance required to assume and assign such Executory Contract or Unexpired Lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment. Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

D.      Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) 30 days after the Effective Date of the Joint Plan applicable to the Debtor whom the Claim is against.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan, or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.J, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

E.      Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Post-Effective Date Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

*F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*G.     Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption and assignment or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.     Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Disbursing Agent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII. Except as otherwise provided herein, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any postpetition interest on such Claim or Interest payable in accordance with the Plan.

*B.     Distributions Generally; Disbursing Agent*

All distributions under the Plan that are to be made on the Effective Date shall be made by the Debtors as Disbursing Agent. All other distributions under the Plan shall be made after the Effective Date by the Post-Effective Date Debtors as Disbursing Agent or such other Entity designated by the Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

*C.*      *Rights and Powers of Disbursing Agent*

1.   Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.   Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration, without any further notice to or action, order, or approval of the Bankruptcy Court.

*D.*      *Distributions on Account of Claims Allowed After the Effective Date*

1.   Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.   Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Post-Effective Date Debtors, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

3.   Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), the Disbursing Agent shall deposit in the Disputed Claims Reserve the amount of Cash that would have been distributed to the Holders of all Disputed Claims or Interests against the Remaining Debtors and the Anaheim Hotel Debtors as if such Disputed Claims or Interests had been Allowed on the Effective Date, with the amount of such Allowed Claims or Interests to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) amount otherwise agreed by the relevant Debtor and the Holder of such Disputed Claim or Interest for reserve purposes. To the extent the amount of Cash deposited in the Disputed Claims Reserve on account of Disputed Claims or Interests against the Anaheim Hotel Debtors exceeds the amount of Disputed Claims or Interests against the Anaheim Hotel Debtors (as of the funding of the Disputed Claims Reserve) that later become Allowed, the excess shall be returned to LCPI/SASCO.

K&E 18934861.44

1.    Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

The Five Mile DIP Agent shall be deemed to be the Holder of all Five Mile DIP Claims for purposes of distributions to be made hereunder, and the Disbursing Agent shall make all distributions on account of such Five Mile DIP Claims to or on behalf of the Five Mile DIP Agent. The Five Mile DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Five Mile DIP Claims.  The Five Mile DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Five Mile DIP Claims; provided that the Five Mile DIP Agent shall retain all rights as administrative agent under the Five Mile DIP Agreement in connection with delivery of distributions to Five Mile DIP Lenders; provided further that the Debtors' obligations to make distributions in accordance with Article II.C shall be deemed satisfied upon delivery of distributions to the Five Mile DIP Agent.

The Lehman DIP Lender shall be deemed to be the Holder of all Lehman DIP Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Lehman DIP Claims to or on behalf of the Lehman DIP Lender. The Lehman DIP Lender shall hold or direct such distributions for the benefit of the Holders of Allowed Lehman DIP Claims.  The Lehman DIP Lender shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Lehman DIP Claims; provided that the Debtors' obligations to make distributions in accordance with Article II.D shall be deemed satisfied upon delivery of distributions to the Lehman DIP Lender.

Midland shall be deemed to be the Holder of all Fixed Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Fixed Rate Pool Mortgage Loan Claims to or on behalf of Midland; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Midland.

LNR shall be deemed to be the Holder of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, and the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Allowed Claims to or as directed by LNR.  LNR shall hold or direct such distributions for the benefit of the LNR-Serviced Trusts. LNR shall arrange to deliver such distributions to or on behalf of the LNR-Serviced Trusts; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to or as directed by LNR.

Lehman shall be deemed to be the Holder of all Floating Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Floating Rate Pool Mortgage Loan Claims to or on behalf of Lehman.  Lehman shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mortgage Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Lehman.

SASCO shall be deemed to be the Holder of all Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent

shall make all distributions on account of such Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims to or on behalf of SASCO. SASCO shall hold or direct such distributions for the benefit of the Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims. SASCO shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to SASCO.

2.    Minimum; De Minimis Distributions

No Cash payment of less than $50.00, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

3.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert to the applicable Post-Effective Date Debtor (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

F.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.    Claims Paid or Payable by Third Parties

1.    Claims Paid by Third Parties

The Debtors on or prior to the Effective Date or the Post-Effective Date Debtors after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Post-Effective Date Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Post-Effective Date Debtors, to the extent the Holder's total recovery on account of such Claim

from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Post-Effective Date Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Post-Effective Date Debtors, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

*A.*      *Resolution of Disputed Claims*

1. Allowance of Claims

On or after the Effective Date, the Disbursing Agent shall have and shall retain any and all rights and defenses that the applicable Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2. Prosecution of Objections to Claims

The Disbursing Agent shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Disbursing Agent may settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court. From and after the Effective Date, the Disbursing Agent shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Time to File Objections to Claims

Any objections to Claims shall be filed on or before the Claims Objection Bar Date.

K&E 18934861.44

4.  Claims Estimation

    The Disbursing Agent may, at any time, and shall have the exclusive authority to, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Post-Effective Date Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Disbursing Agent may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Disbursing Agent may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5.  Expungement or Adjustment to Claims Without Objection

    Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Notice and Claims Agent at the direction of the Debtors or the Post-Effective Date Debtors, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtors or the Post-Effective Date Debtors, in all cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

B.  *Disallowance of Claims*

    All Claims or Interests of any Entity from which property is sought by the Debtors or the Post-Effective Date Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Post-Effective Date Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Disbursing Agent on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

    **EXCEPT AS PROVIDED FOR UNDER THE PLAN OR OTHERWISE AGREED TO BY THE DISBURSING AGENT ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE (THAT DO NOT AMEND TIMELY FILED CLAIMS) SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE OF THE JOINT PLAN OF THE DEBTOR AGAINST WHOM SUCH CLAIM IS ASSERTED WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

C.      *Amendments to Claims*

On or after the Effective Date, except as provided in Article II.A, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Disbursing Agent, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan or relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Post-Effective Date Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities; provided that, with respect to the C6 and C7 Trusts and the holders of certificates in the C6 and C7 Trusts, in their capacity as such, the Plan does not compromise or settle the Claims, interests, and controversies, if any, of the C6 and C7 Trusts or the holders of certificates in the C6 and C7 Trusts against Midland, the C6 and C7 Trusts, and any holder of certificates in the C6 and C7 Trusts, in its capacity as such, and the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, or professionals, whether arising under the applicable pooling and servicing agreement, side letter, co-lender agreement, or related documents; provided, further, that, with respect to SASCO or LCPI, the Plan does not compromise or settle any Claims, interests, and controversies of SASCO or LCPI against TriMont or any of its advisors arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein to the contrary, and as provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

C.      *Midland Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING

DEBTORS (TO THE EXTENT SET FORTH HEREIN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, MIDLAND, AS SPECIAL SERVICER AND ON BEHALF OF THE C6 AND C7 TRUSTS, (I) DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO APOLLO (AND APOLLO SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY MIDLAND) AND ITS RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE APOLLO GUARANTY; AND (II) IF AN ACTION REMAINS PENDING IN THE STATE COURTS OF NEW YORK OR ELSEWHERE, MIDLAND SHALL DISMISS ITS CLAIMS AGAINST APOLLO WITH PREJUDICE; PROVIDED THAT THE FOREGOING "**MIDLAND RELEASE**" IS CONDITIONED ON THE OCCURRENCE OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND THE RECEIPT BY MIDLAND OF THE SPECIAL SERVICER RELEASE PAYMENT, THE EMBODIMENT OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE (AS DESCRIBED IN ARTICLE VIII.E) IN THE CONFIRMATION ORDER ENTERED BY THE BANKRUPTCY COURT THAT HAS BECOME A FINAL ORDER; PROVIDED FURTHER THAT THE MIDLAND RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF MIDLAND:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE MIDLAND RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE MIDLAND RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE MIDLAND RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO MIDLAND ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE MIDLAND RELEASE.

D.     *Apollo Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, APOLLO, ON ACCOUNT OF ITS HOLDINGS OF COMMON SHARES OR OTHER EQUITY IN THE DEBTORS OR OTHERWISE DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO THE FIXED/FLOATING RELEASING PARTIES (AND THE FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY APOLLO) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE

64

PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE RELEASING PARTIES; PROVIDED THAT THE FOREGOING "APOLLO RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE APOLLO RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE APOLLO RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE APOLLO RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO APOLLO ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE APOLLO RELEASE.

E. *Fixed/Floating Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE FIXED/FLOATING RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES (AND EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE FIXED/FLOATING RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE FIXED/FLOATING DEBTORS OR THE POST-EFFECTIVE DATE FIXED/FLOATING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER FIXED/FLOATING RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR

TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE FIXED/FLOATING RELEASING PARTIES; PROVIDED THAT IN CONNECTION WITH THE FOREGOING FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, THE VALIDITY, ENFORCEABILITY, AND PERFECTION, IN ALL RESPECTS, OF THE LIENS, CLAIMS, INTERESTS, MORTGAGES, AND ENCUMBRANCES OF THE FIXED RATE POOL MORTGAGE LOAN AGREEMENT AND THE C6 AND C7 TRUSTS ARE HEREBY CONFIRMED AND ADJUDICATED BY THE BANKRUPTCY COURT; PROVIDED FURTHER THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE FIXED/FLOATING RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT (1) THE RELEASES OF APOLLO SET FORTH IN THE MIDLAND RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE AND THE STIPULATION OF DISCONTINUANCE OF THE LITIGATION RELATED TO THE APOLLO GUARANTY SET FORTH IN THE MIDLAND RELEASE AND (2) THE WAIVERS AND RELEASES TO BE GIVEN BY APOLLO SET FORTH IN THE APOLLO RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT BE EFFECTIVE UNTIL MIDLAND HAS RECEIVED THE SPECIAL SERVICER RELEASE PAYMENT AND THE OCCURRENCE OF SUCH EFFECTIVE DATE; PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE FIXED/FLOATING PLAN; PROVIDED FURTHER THAT, NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, IF ANY, OF THE C6 AND C7 TRUSTS, THE HOLDERS OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN THEIR CAPACITY AS SUCH, OR LNR PARTNERS, LLC (OR ITS AFFILIATES), LNR SECURITIES HOLDINGS LLC (OR ITS AFFILIATES) WHETHER ARISING UNDER THE APPLICABLE POOLING AND SERVICING AGREEMENT, SIDE LETTER, CO-LENDER AGREEMENT, OR RELATED AGREEMENT AGAINST THE C6 AND C7 TRUSTS, MIDLAND, ANY HOLDER OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN ITS CAPACITY AS SUCH, OR ANY OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, OR PROFESSIONALS; PROVIDED FURTHER THAT, NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION

PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE FIXED/FLOATING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE FIXED/FLOATING RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE.

F.      *Anaheim Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ANAHEIM HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ANAHEIM HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ANAHEIM HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ANAHEIM HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ANAHEIM HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ANAHEIM HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ANAHEIM HOTEL RELEASING PARTIES; <u>PROVIDED THAT</u> THE ANAHEIM HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ANAHEIM HOTEL RELEASING PARTIES:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS ANAHEIM HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ANAHEIM HOTEL DEBTORS; PROVIDED FURTHER THAT, NEITHER THE ANAHEIM HOTEL DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING

67

UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS..

ENTRY OF THE CONFIRMATION ORDER FOR THE ANAHEIM PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ANAHEIM HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ANAHEIM HOTEL GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ANAHEIM HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ANAHEIM HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ANAHEIM HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ANAHEIM HOTEL GENERAL RELEASE.

G.      *Ontario Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ONTARIO HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ONTARIO HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ONTARIO HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ONTARIO HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ONTARIO HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ONTARIO HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ONTARIO HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ONTARIO HOTEL RELEASING PARTIES; PROVIDED THAT THE ONTARIO HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS,

K&E 18934861.44

RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ONTARIO HOTEL RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); <u>PROVIDED FURTHER THAT</u> THE EFFECTIVENESS OF THIS ONTARIO HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ONTARIO HOTEL DEBTORS; <u>PROVIDED FURTHER THAT</u> THE ONTARIO HOTEL GENERAL RELEASE WILL NOT IMPACT C-III'S ABILITY TO PROCEED WITH STATE FORECLOSURE PROCEEDINGS AS DESCRIBED IN ARTICLE III.B.3(B).

ENTRY OF THE CONFIRMATION ORDER SHALL FOR THE ONTARIO PLAN CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ONTARIO HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN <u>AND FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ONTARIO HOTEL GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ONTARIO HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ONTARIO HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ONTARIO HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ONTARIO HOTEL GENERAL RELEASE.

*H.  Remaining Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE REMAINING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE REMAINING DEBTOR RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES (AND EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE REMAINING DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE REMAINING DEBTORS OR THE POST-EFFECTIVE DATE REMAINING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER REMAINING DEBTOR RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE REMAINING DEBTOR RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER

INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE REMAINING DEBTOR RELEASING PARTIES; PROVIDED THAT THE REMAINING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE REMAINING DEBTOR RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS REMAINING DEBTORS' PLAN GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE REMAINING DEBTORS; PROVIDED FURTHER THAT THE HOLDER OF GARDEN GROVE HOTEL MORTGAGE LOAN CLAIMS, SAN ANTONIO HOTEL MORTGAGE LOAN CLAIMS, SAN DIEGO HOTEL MORTGAGE LOAN CLAIMS, TYSONS CORNER HOTEL MORTGAGE LOAN CLAIMS, AND WASHINGTON DC HOTEL MORTGAGE LOAN CLAIMS WAIVE ALL RIGHTS THEY MAY HAVE TO THE FUNDS IN THE LP BANK ACCOUNT; PROVIDED FURTHER THAT THE AD HOC COMMITTEE SHALL RELEASE LNR, THE LNR-SERVICED TRUSTS AND THE MASTER SERVICER FOR EACH OF THE LNR-SERVICED LOANS, AND EACH OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, MASTER SERVICES, SPECIAL SERVICERS, TRUSTS AND TRUSTEES, AND PROFESSIONALS, INCLUDING LEGAL AND FINANCIAL ADVISORS, FROM ALL CLAIMS RELATED TO THE LNR-SERVICED LOANS AND THE DEBTORS, WHETHER ARISING BEFORE OR AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES; PROVIDED FURTHER THAT, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE LNR-SERVICED TRUSTS SHALL BE RELEASED FROM AND NOT SUBJECT TO ANY AND ALL AVOIDANCE ACTIONS UNDER CHAPTER 5 OF THE BANKRUPTCY CODE OR CLAIM OBJECTIONS UNDER SECTION 502(D) OF THE BANKRUPTCY CODE BROUGHT BY ANY ENTITY, INCLUDING BUT NOT LIMITED TO THE COMMITTEE, THE AH HOC COMMITTEE, OR ANY SUCCESSOR IN INTEREST THERETO.

ENTRY OF THE CONFIRMATION ORDER FOR THE REMAINING DEBTOR PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE REMAINING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE REMAINING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE REMAINING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE REMAINING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE REMAINING DEBTOR RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE REMAINING DEBTORS' PLAN GENERAL RELEASE.

UPON APPROVAL OF THE AD HOC COMMITTEE AGREEMENT: (I) HOLDERS OF INNKEEPERS USA TRUST PREFERRED C INTERESTS AND THE AD HOC COMMITTEE SHALL BE DEEMED TO BE FIXED/FLOATING RELEASING PARTIES, ANAHEIM HOTEL RELEASING PARTIES, AND ONTARIO HOTEL RELEASING PARTIES; AND (II) THE AD HOC COMMITTEE SHALL BE A REMAINING DEBTOR RELEASING PARTY.

*I.*     *Exculpation*

The Exculpated Parties shall neither have, nor incur, any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting,

preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Commitment Letter, the Disclosure Statement, the issuance, distribution, and/or sale of any of the New HoldCo Interests or any other Security, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the Exculpated Parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that neither this provision nor any other portion of the Plan shall exculpate Midland or any holder of certificates in the C6 and C7 Trusts, in its capacity as such, for any liability, if any, to the C6 and C7 Trusts or any holders of certificates in the C6 or C7 Trusts, in their capacity as such; provided, further, that this provision shall not operate to expand the scope of the Floating/Fixed Debtors' Plan General Release; provided, further, that, this provision shall not exculpate TriMont or any of its advisors for or from any liability to SASCO or LCPI arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

*J.      Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C, ARTICLE VIII.D, ARTICLE VIII.E, ARTICLE VIII.F, ARTICLE VIII.G, OR ARTICLE VIII.H (5) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.I; OR (6) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION, OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF

SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED FURTHER THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

K.      *Setoffs*

Except as otherwise provided herein, the Debtors or the Post-Effective Date Debtors, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Post-Effective Date Debtors of any such Claims, rights, and Causes of Action that the Post-Effective Date Debtors may possess against such Holder.

## ARTICLE IX.
## SEVERABILITY OF PLAN AND CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Severability of the Plan*

The Plan contemplates four separate joint plans of reorganization that together provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases:  (a) the Fixed/Floating Plan; (b) the Anaheim Plan; (c) the Ontario Plan; and (d) the Remaining Debtor Plan.  The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the four joint plans are not conditioned on the Confirmation and Consummation of any of the other three joint plans.

B.      *Condition Precedent to Confirmation of the Fixed/Floating Plan*

It shall be a condition to Confirmation of the Fixed/Floating Plan that the Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman, and Midland in each of their reasonable discretion.

C.      *Condition Precedent to Confirmation of the Remaining Debtor Plan*

It shall be a condition to Confirmation of the Remaining Debtor Plan that all of the conditions set forth in the Stipulation shall have been satisfied and that the Confirmation Order, the Remaining Debtor Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall in all respects be in compliance with and consistent with the terms of the Stipulation.

*D.*     *Conditions Precedent to the Effective Date of Each of the Joint Plans*

It shall be a condition to Consummation of each of the Joints Plans that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.E:

1.     Conditions Applicable to Each of the Joint Plans

   (a)     The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

   (b)     All documents and agreements necessary to implement the applicable Joint Plan (including, without limitation, the Commitment Letter and the New HoldCo/Midland Commitment Letter for the Fixed/Floating Plan) shall have (a) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

   (c)     All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Joint Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

   (d)     The Professional Fee Escrow Account shall have been funded with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals; and

   (e)     The "tail policy" for current and former trustees, directors, and officers referenced in Article IV.U shall have been purchased.

2.     Additional Conditions Applicable Only to the Fixed/Floating Plan

   (a)     The "Outside Date" under the Commitment Letter shall not have occurred.

   (b)     The Special Servicer Payment and the Special Service Release Payment shall have been made.

   (c)     The Apollo Unsecured Claim Fund Payment shall have been made

   (d)     The Commitment Letter has not been terminated.

   (e)     The Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman and Midland in each of their reasonable discretion.

   (f)     The Cash payments required in accordance with the treatment of Classes FF3B and FF4 under the Fixed/Floating Plan, the Cash payment to the Holders of the Five Mile DIP Claims (in accordance with Article II.C hereof), and the Cash payment to the Holders of the Lehman DIP Claims (in accordance with Article II.D hereof) shall have been made.

K&E 18934861.44

3. Additional Condition Applicable Only to the Ontario Plan

(a) The Ontario Debtors have delivered an executed deed in lieu to C-III, provided that such delivery shall not effect C-III's ability to elect to pursue state foreclosure proceedings as described in Article III.B.3(b).

4. Additional Conditions Applicable Only to the Remaining Debtor Plan

(a) No Termination Event (under the LNR Commitment) shall have occurred.

(b) The LNR-Serviced Trusts shall have received payments of all of the amounts provided for in the Stipulation.

(c) The closing of the Chatham Hotel Sale Transaction occurs.

## E.    *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors; provided that with respect to the consummation of the Fixed/Floating Plan, the conditions precedent to the Effective Date may be waived only by the consent of the Fixed/Floating Plan Sponsors, Lehman, and Midland, in accordance with the terms of the Fixed/Floating Successful Bid; provided further that, notwithstanding anything to the contrary in this Article IX.E, consent shall not be required to waive a condition described in Article IX.C from any Entity whose actions (or failure to act) were the proximate cause of the failure of such condition to be satisfied.

## F.    *Effective Date*

For each Debtor, the Effective Date shall be the date that is a Business Day selected by the Debtors after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry; and (b) all conditions precedent applicable to such Debtor specified in Article IX.D have been satisfied or waived (in accordance with Article IX.E).

## G.    *Effect of Non-Occurrence of the Effective Date Regarding Fixed/Floating Debtors*

Unless and only to the extent otherwise agreed among the Debtors, the Fixed/Floating Plan Sponsors, Lehman, and Midland, if the Effective Date as to the Fixed/Floating Debtors does not occur on or before September 15, 2011 (*i.e.*, the "Outside Date" under the Commitment Letter), the Confirmation Order shall be automatically revoked and the Plan as applicable to the Fixed/Floating Debtors and the Commitment Letter shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Commitment Letter shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Fixed/Floating Debtors; (2) prejudice in any manner the rights of the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests in the Fixed/Floating Debtors, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests, or any other Entity in any respect.

## H.    *Effect of Non-Occurrence of the Effective Date Regarding the Ontario Plan*

Unless and only to the extent otherwise agreed among the Debtors and C-III, if the Effective Date of the Ontario Plan does not occur on or before July 5, 2011, the Confirmation Order as applicable to the Ontario Plan shall be automatically revoked and the Ontario Plan shall be null and void in all respects.  Upon the non-occurrence of the Effective Date for the Ontario Plan, C-III and the Debtors will enter into a stipulation, acceptable to the Debtors and C-III, each in their reasonable discretion, providing for:  (1) the lifting of the automatic stay imposed by section 362 of the Bankruptcy Code with respect to the collateral securing the Ontario Hotel Mortgage Loan

Agreement; (2) a waiver and release of any claims by or Claims against or Interests in the Ontario Hotel Debtors by C-III as provided for by Article VIII.G; and (3) the payment by C-III of $30,000, which payment shall be distributed among Holders of Claims against the Ontario Hotel Debtors.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

        Subject to the limitations contained herein and the consent rights available to the Fixed/Floating Plan Sponsors and Midland (as described in Article IX), the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

B.      *Effect of Confirmation on Modifications*

        Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

        The Debtors reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date or the Effective Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.  Nothing contained in this Article X shall impair the rights and obligations existing under the Commitment Letter.

# ARTICLE XI.
## RETENTION OF JURISDICTION

        Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

        1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

K&E 18934861.44

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.G.1;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to the Plan, the Commitment Letter, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

21.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     Enforce all orders previously entered by the Bankruptcy Court;

23.     To resolve any disputes arising under the Commitment Letter and the Chatham Hotel Sale Transaction Documents;

24.     Hear any other matter not inconsistent with the Bankruptcy Code;

25.     Enter an order concluding or closing the Chapter 11 Cases; and

26.     Enforce the injunction, release, and exculpation provisions set forth in Article VIII.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.     *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date with respect to any of the Joint Plans, the terms of such plan, the corresponding Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the relevant Debtors, the relevant Post-Effective Date Debtors, and any and all Holders of Claims or Interests against or in the relevant Debtors (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in such plan, each Entity acquiring property under such plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the relevant Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

K&E 18934861.44

## C.     Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Post-Effective Date Debtors (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

## D.     Dissolution of Committees

Without considering any of the Chapter 11 Cases that have been converted, dismissed or closed, on the date that is the latest Confirmation Date of a chapter 11 plan applicable to any of the Chapter 11 Cases, the Committees, if any, shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; provided that that the Committee shall continue in existence following the Confirmation Date for either (i) addressing matters concerning fees incurred in connection with the administration of the Chapter 11 Cases or (ii) participating in any appeal of the Confirmation Order.

## E.     Reservation of Rights

Except as expressly set forth in the Plan, each of the Joint Plans shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order with respect to such Joint Plan.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

## F.     Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## G.     Dissolution of Entities

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, such Debtor shall be deemed dissolved under state law without further action by the Post-Effective Date Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## H.     Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Post-Effective Date Debtors shall be served on:

1.     if to the Debtors or the Post-Effective Date Debtors (other than the Post-Effective Date Fixed/Floating Debtors), to:

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attention:  Marc A. Beilinson

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611

Facsimile: (212) 446-4900
Attention: Paul M. Basta, Stephen E. Hessler, and Brian S. Lennon
E-mail addresses: paul.basta@kirkland.com, stephen.hessler@kirkland.com, and
                               brian.lennon@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Facsimile: (312) 862-2200
Attention: Anup Sathy, P.C.
E-mail address: anup.sathy@kirkland.com

2.     <u>if to the Fixed/Floating Plan Sponsors or the Post-Effective Date Fixed/Floating Debtors, to:</u>

INK ACQUISITION LLC
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, New York 10171
Attention: Tom Wagner

with copies to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Facsimile: (212) 593-5955
Attention: Stuart Freedman and Adam Harris
E-mail addresses: stuart.freedman@srz.com and adam.harris@srz.com

and

INK ACQUISITION LLC
c/o Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Attention: Jeff Fisher

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile: (212) 403-2202
Attention: Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

3.     <u>if to Chatham, to:</u>

Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Attention: Jeff Fisher

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile: (212) 403-2202
Attention: Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

I.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

K.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

K&E 18934861.44

Respectfully submitted, as of the date first set forth above,

Innkeepers USA Trust (for itself and all Debtors)

By: /s/ *Marc A. Beilinson*
Name: Marc A. Beilinson
Title: Chief Restructuring Officer

**EXHIBIT B**

**Financial Projections**

**EXHIBIT B**

**FINANCIAL PROJECTIONS**

As discussed in Article VI.B of the Disclosure Statement, the Debtors' management prepared financial projections for calendar years 2011 through 2015 (the "**Financial Projections**") to support the feasibility of the *Debtors' First Amended Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**").[1]

1. *Overview of Financial Projections*

As a condition to Confirmation of the Plan, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtors. In connection with developing the Plan and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of the Financial Projections, analyzed the Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business in the ordinary course upon emergence from chapter 11.

The Financial Projections will also assist each Holder of a Claim or Interest in determining whether to accept or reject the Plan. The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management. The estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They are also based on factors such as industry performance, general business, economic, competitive, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that actual and projected results will differ and that actual results may be materially greater or less than those contained in the Financial Projections herein. The Debtors make no representations as to the accuracy of the Financial Projections, Cerberus' and Chatham's ability to achieve the projected results, or Chatham LP's ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to multiple interpretations and periodic revisions based on ongoing and future developments. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. For the foregoing reasons, the Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

In general, as illustrated by the Financial Projections, the Debtors believe that, with a significantly deleveraged capital structure following Consummation of the Plan, the Debtors' business will be a viable business with long-term prospects. The Debtors believe that Cerberus, Chatham, and Chatham LP (collectively, the "**Purchasers**") will have sufficient liquidity to fund obligations as they arise, thereby maintaining the value of their hotel business. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

K&E 18939000.

**THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS. THE DEBTORS' INDEPENDENT AUDITOR HAS NOT COMPILED OR EXAMINED THE FINANCIAL PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. NEITHER THE DEBTORS NOR THE PURCHASERS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated thereby will be consummated by the Effective Date. Any significant delay in the Effective Date may have a material adverse impact on the Debtors' business operations and financial performance, including, among other things, an increased risk of inability to meet revenue forecasts and the incurrence of higher restructuring expenses.

Although the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Debtors believe they have a reasonable basis) of the results of future operations, financial position, and cash flows of the Purchasers, they are only estimates, and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

2. *General Assumptions and Methodology*

The Financial Projections consist of the selected income statement items and selected balance and cash flow items as of December 31 for each year for calendar years 2011 through 2015. The Debtors' Financial Projections set forth the projected consolidated financial position immediately after Consummation of the Plan. The projected consolidated statements of financial position were developed based upon the Debtors' balance sheet projections. The Financial Projections do not reflect the impact of "fresh start" accounting, which could result in a material change to the projected values of assets and liabilities. The Financial Projections are based on financial data derived from the Debtors' business planning process. The business planning process is undertaken annually by the Debtors to provide sales and cost projections which assist the Debtors in managing their working capital needs, planning for anticipated capital expenditures, and developing their capital structure.

The Financial Projections, among other things: (a) are based upon current and projected market conditions; (b) assume emergence from chapter 11 on the Effective Date under the terms expected in the Plan; (c) assume consummation of the sale of the Fixed/Floating Hotels to Cerberus/Chatham pursuant to the Cerberus/Chatham Successful Bid, valued at approximately $1.12 billion on the Effective Date; and (d) assume consummation of the sale of the LNR Hotels to Chatham LP pursuant to the Chatham Bid, valued at approximately $195 million, on the Effective Date.

- *Assumptions*

- <u>General Methodology:</u>  The Financial Projections were developed on a property-by-property, bottom-up basis and reflect a synthesis of numerous information sources, including general business and economic conditions as well as industry and competitive trends.  After completion of this property-by-property buildup, the individual property financials were aggregated to form the consolidated financials.

- <u>Revenue:</u>  Includes Room Revenue, Food & Beverage Revenue, Telephone Revenue, and Other Revenues.  Each of these revenues was derived as follows:

  - <u>Room Revenue:</u>  Driven by Average Daily Rate ("**ADR**") and occupancy.  Management developed assumptions for each of the properties' ADR and occupancy based on historical performance, regional economic and industry trends, the competitive landscape, the customer base, and other external sources.  Furthermore, management tailored each hotel's revenue forecast to operating and investment requirements, such as the timing of property improvement plan investments and cycle renovations.

  - <u>Food & Beverage Revenue:</u>  Generated by the hotel's restaurants, lounges, banquets rooms, and room service.  This revenue is highly correlated with changes in occupancy.

  - <u>Telephone Revenue:</u>  Generated by hotel guests who charge local and long distance calls to their rooms, and by individuals who use the public telephones at the hotels.  With the continued proliferation of cell phones and other wireless communications media, telephone revenue levels are not expected to increase.

  - <u>Other Revenue:</u>  Derived from sources other than guestrooms and telephone services.  The composition of this revenue varies greatly by hotel, and typically grows proportionately with Room Revenue growth.

- <u>Department Expenses:</u>  Includes Rooms Expense, Food & Beverage Expense, Telephone Expense, and Other Department Expense.  Each of these expenses was forecasted as follows:

  - <u>Rooms Expense:</u>  Consists of the costs related to the sale and upkeep of guestrooms and public space, with the largest component consisting of salaries, wages, and employee benefits.

  - <u>Food & Beverage Expense:</u>  Consists of costs necessary for the primary operation of the hotel's food and banquet facilities.

  - <u>Telephone Expense:</u>  Generally varies depending on the size of the hotel.  For small and mid-sized hotels with automated systems, the operation of the telephones is typically the responsibility of the front desk personnel.  At large hotels, generally full-time operators are employed.  The bulk of the telephone expenses consist of the cost of local and long distance calls billed by the telephone companies that provide these services.

- o <u>Other Department Expense:</u>  Consists of the costs associated with Other Revenue, and is dependent on the nature of the revenue.

- <u>Operating Expenses:</u>  Consists of General & Administrative Expense, Sales & Marketing Expense, Repairs & Maintenance Expense, Utilities Expense, Insurance Expense, and Base Management Fees. Each of these expenses was forecasted as follows:

  - o <u>General & Administrative Expense:</u>  Includes the salaries and wages of all administrative personnel who are not directly associated with a particular department.  Expenses related to management and operation of the property are also allocated to this category.  Most General & Administrative Expenses tend to be fixed.

  - o <u>Sales & Marketing Expense:</u>  Consists of all costs associated with advertising, sales and promotion, and franchise fees.  Franchise fees are approximately 10% of revenue, but vary based on each hotel's franchise agreement.

  - o <u>Repairs & Maintenance Expense</u>:  Tends to be a variable expense.  Except for repairs that are necessary to keep the facility open and prevent damage, most maintenance can be deferred for varying lengths of time.

  - o <u>Utilities Expense:</u>  Consists of utilities consumption of several forms, including water and space heating, air conditioning, lighting, cooking fuel, and other miscellaneous power requirements.  The most common sources of hotel utilities are electricity, natural gas, fuel, oil, and steam.  This category also includes the cost of water service.  Total energy cost depends on the source and quantity of fuel used.

  - o <u>Insurance Expense:</u>  Consists of the cost of insuring the hotel and its contents against damage or destruction by fire, weather, sprinkler leakage, boiler explosion, plate glass breakage, and so forth.  General insurance costs also include premiums relating to liability, fidelity, and theft coverage.  Insurance rates are based on many factors, including building design and construction, fire detection and extinguishing equipment, fire district, distance from firehouse, and the area's fire experience.  Insurance expenses generally do not vary with occupancy.

  - o <u>Base Management Fees:</u>  Structured as a combination of a base fee calculated as a percentage of total revenues and an incentive fee calculated as a percentage of gross operating income or net operating income.  The management fee for Innkeepers was projected at 2% of revenue for a majority of the portfolio properties, based on current management agreements with Island Hospitality Management and Dimension Development Company.

- <u>Other Expenses:</u>  Generally consists of Property Taxes, Property Insurance, and Ground Rent.  Each of these expenses was forecasted as follows:

  - o <u>Property Taxes:</u>  These expenses are specific to each hotel's municipality and its assessment system.  Depending on the taxing policy of the municipality, property taxes can be based on the value of the real property or the value of the personal property and the real property.

- o   <u>Property Insurance:</u>  Relates to property insurance on the hotels.  This expense is fixed in nature.

- o   <u>Ground Rent:</u>  Includes ground lease expenses for the following properties: Courtyard by Marriott in Ft. Lauderdale, and Hampton Inn in Woburn, Massachusetts.

- **<u>Corporate Expenses:</u>**  Consists of Corporate General & Administrative Expenses, Insurance Expense, Professional Fees, IT Costs, and Board of Trustee Fees and Expenses.

  - o   <u>Corporate General & Administrative Expenses:</u>  Includes expenses directly attributable to the parent entity, Innkeepers USA Trust.  These expenses are generally fixed in natue and are not attributable to any individual hotel or group of hotels.  The largest component of these expenses are corporate employee costs.

  - o   <u>Insurance Expense:</u>  The largest component related to directors' and officers' liability insurance.

  - o   <u>Professional Fees:</u>  Consists of fees associated with, among other things, the company's auditors, tax professionals, utility administrator, etc.

  - o   <u>IT Costs:</u>  Amounts allocated to the Debtors by its property manager for the maintenance of its information technology systems and needs, including, among other things, the company's accounting system.

- <u>Board of Trustee Fee and Expenses:</u>  Includes fees paid to members of the board of trustees of Innkeepers USA Trust and their related expenses to attend board meetings.

| Consolidated Income Statement | 2010A | 2011B | 2012E | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|---|
| **Revenue** | **$293** | **$303** | **$326** | **$345** | **$356** | **$361** |
| *Growth* | *4.9%* | *3.3%* | *7.7%* | *5.8%* | *3.1%* | *1.4%* |
| Department Expenses | 75 | 76 | 79 | 83 | 85 | 87 |
| **Gross Operating Income** | **$218** | **$227** | **$247** | **$262** | **$271** | **$274** |
| *Margin* | *74.5%* | *75.1%* | *75.7%* | *76.0%* | *76.1%* | *76.0%* |
| Operating Expenses | 99 | 102 | 106 | 110 | 114 | 116 |
| **House Profit** | **$119** | **$125** | **$140** | **$152** | **$157** | **$158** |
| *Margin* | *34.1%* | *35.0%* | *36.9%* | *38.4%* | *39.0%* | *38.6%* |
| Other Expenses | 19 | 19 | 20 | 20 | 18 | 19 |
| **Hotel EBITDA** | **$100** | **$106** | **$120** | **$132** | **$139** | **$139** |
| *Growth* | *4.7%* | *6.1%* | *13.6%* | *9.8%* | *4.8%* | *0.3%* |
| *Margin* | *34.1%* | *35.0%* | *36.9%* | *38.4%* | *39.0%* | *38.6%* |
| Corporate Expenses | 9 | 10 | 10 | 11 | 11 | 11 |
| **Corporate EBITDA** | **$91** | **$96** | **$110** | **$122** | **$128** | **$128** |

Notes:
(1) Actual 2010 results reflect draft unaudited results, and are subject to adjustment pursuant to the company's annual review process.
(2) Actual results and Projections reflect the removal of the Hilton Ontario, Hilton Anaheim Suites, and the Best Western West Palm Beach.
(3) Excludes Restructuring Expenses.
(4) Reflects the expected displacement associated with PIPs and cycle renovations.
(5) Considers the expected impacts associated with de-flagged hotels, and subsequent re-flagging.

**EXHIBIT C**

**Liquidation Analysis**

**INNKEEPERS USA TRUST, et al**

**LIQUIDATION ANALYSIS**

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often referred to as the "**Best Interests Test**"), each holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors' assets were to be liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date. In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in Chapter 7 as of the Effective Date. Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interests Test has been met, further reductions would be required to eliminate cash and asset liquidation proceeds that would be applied to secured claims and amounts necessary to satisfy Administrative, Tax, and other Priority Claims that are senior to General Unsecured Claims, including any incremental Administrative Claims that may result from the termination of the Debtors' business and the liquidation of their assets. Any remaining cash would be available for distribution to general unsecured creditors and shareholders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The Liquidation Analysis below reflects the estimated cash proceeds, net of liquidation related costs, which would be available to the Debtors' creditors and interest holders if they were to be liquidated in Chapter 7 cases. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by Debtors' management and their professionals, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

The Liquidation Analysis was prepared by the Debtors' management with the assistance of their professionals, and assumes each of the Debtors' Chapter 11 cases would convert to Chapter 7 as of July 31, 2011 (the assumed Effective Date of the Plan). It is also assumed that the liquidation of the Debtors would commence under the direction of a Court-appointed Chapter 7 trustee and would continue for a period of six months, during which time all of the Debtors' major assets would either be sold or conveyed to the respective lien holders. The cash proceeds from the liquidation, net of liquidation-related costs, would then be distributed to creditors and interest holders. There can be no assurances that all assets would be completely liquidated during this period.

The Liquidation Analysis was prepared based on a review of the Debtors' assets and estimates of hypothetical liquidation values were determined primarily by assessing classes of assets as opposed to appraising specific assets. For the preparation of this analysis, the Debtors did not retain third party experts to value individual assets.

The Liquidation Analysis is presented as if the Reorganized Debtors and Fixed/Floating Debtors were substantively consolidated, respectively for presentation purposes only. A liquidation analysis was prepared for each of the legal entities in the Reorganizing Debtors and for the consolidated Fixed Debtors and Floating Debtors, respectively. The Ontario Debtors and Anaheim Debtors are not included in the Liquidation Analysis. The Ontario property is being given back to the lender and the Anaheim secured creditors are getting paid in full with the mezzanine lenders getting paid with the collateral, which is better than they would have received under Chapter 7 liquidation.

The Liquidation Analysis necessarily contains an estimate of the amount of claims that will ultimately become allowed claims. Estimates for various classes of claims are based solely upon the Debtors' continuing review of the claims filed in these Chapter 11 cases and the Company's books and records. No

order or finding has been entered by the Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in this Liquidation Analysis.

Liquidation would likely prompt certain other events to occur, including the rejection of remaining executory contracts and unexpired leases not assumed by the purchaser of the going-concern business. Such events would likely create a larger number of unsecured creditors and would subject the Chapter 7 estates to additional damage claims for the rejection of those contracts under the Bankruptcy Code. Such claims would also increase the aggregate amount of unsecured claims against the Debtors, perhaps materially, and would dilute any potential recoveries to holders of the unsecured claims. No attempt has been made to estimate additional unsecured claims that may result from such events.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

**(in Millions)**

| | Notes | Estimated Claims | Estimated Recovery High | Estimated Recovery Low |
|---|---|---|---|---|
| **Proceeds Available for Distribution** | A | | | |
| Hotel Portfolio | | | $ 165.8 | $ 136.5 |
| Cash | | | 11.6 | 11.6 |
| Estimated Cash Generation During Sale Process | | | 4.4 | 4.4 |
| **Total Proceeds Available for Distribution** | | | $ 181.8 | $ 152.5 |
| | | | | |
| Less Chapter 7 Fees: | B | | | |
| Trustee Fees | | | $ 4.1 | $ 3.1 |
| Transaction Fees | C | | 3.3 | 2.7 |
| Other Professional Fees | | | 0.6 | 0.4 |
| Accrued Chapter 11 Professional Fees | | | 0.6 | 0.6 |
| Estimated Wind-Down Costs | | | 0.5 | 0.4 |
| **Net Proceeds Available for Distribution** | | | $ 172.6 | $ 145.2 |
| | | | | |
| Debtor-in-Possession Financing | D | $ 6.5 | $ 6.5 | $ 6.5 |
| *Recovery %* | | | *100.0%* | *100.0%* |
| | | | | |
| **Proceeds Available to Mortgage Claims** | | | **$ 166.1** | **$ 138.7** |
| | | | | |
| Mortgage Claims | E | $ 156.1 | $ 150.4 | $ 130.5 |
| *Recovery %* | | | *96.3%* | *83.6%* |
| | | | | |
| **Proceeds Available to Administrative and Priority Claims** | | | **$ 15.7** | **$ 8.2** |
| | | | | |
| Administrative and Priority Claims | F | $ 8.0 | $ 6.6 | $ 6.3 |
| *Recovery %* | | | *82.9%* | *78.7%* |
| | | | | |
| **Proceeds Available for Unsecured Claims** | | | **$ 9.1** | **$ 2.0** |
| | | | | |
| Grand Prix Holdings LLC - Deficiency Claims | I | $ 230.4 | $ 2.8 | $ - |
| Unsecured Claims | H | 2.1 | 2.1 | 2.0 |
| Total Unsecured Claims | | $ 232.5 | $ 4.9 | $ 2.0 |
| *Recovery %* | | | *2.1%* | *0.8%* |
| | | | | |
| **Proceeds Available for Preferred Stock** | | | **$ 4.2** | **$ -** |
| | | | | |
| Preferred Stock | | $ 220.0 | $ 4.2 | $ - |
| *Recovery %* | | | *1.9%* | *0.0%* |
| | | | | |
| **Proceeds Available to Equity Interests** | | | **$ -** | **$ -** |

**(in Millions)**

| | Notes | Estimated Claims | Estimated Recovery High | Estimated Recovery Low |
|---|---|---|---|---|
| **Proceeds Available for Distribution** | A | | | |
| Hotel Portfolio | | | $ 951.7 | $ 783.8 |
| Cash | | | 20.5 | 20.5 |
| Estimated Cash Generation During Sale Process | | | 11.8 | 11.8 |
| **Total Proceeds Available for Distribution** | | | $ 984.1 | $ 816.1 |
| | | | | |
| Less Chapter 7 Fees: | B | | | |
| Trustee Fees | | | $ 19.7 | $ 16.3 |
| Transaction Fees | C | | 19.0 | 15.7 |
| Other Professional Fees | | | 3.3 | 2.6 |
| Accrued Chapter 11 Professional Fees | | | 4.7 | 4.7 |
| Estimated Wind-Down Costs | | | 3.7 | 2.8 |
| **Net Proceeds Available for Distribution** | | | $ 933.6 | $ 774.1 |
| | | | | |
| Debtor-in-Possession Financing | D | $ 44.8 | $ 44.8 | $ 44.8 |
| *Recovery %* | | | *100.0%* | *100.0%* |
| | | | | |
| **Proceeds Available to Mortgage Claims** | | | **$ 888.8** | **729.2** |
| | | | | |
| Mortgage Claims | E | $ 1,023.7 | $ 888.8 | $ 729.2 |
| *Recovery %* | | | *86.8%* | *71.2%* |
| | | | | |
| **Proceeds Available to Administrative and Priority Claims** | | | $ - | $ - |
| | | | | |
| Administrative and Priority Claims | F | $ 7.0 | $ - | $ - |
| *Recovery %* | | | *0.0%* | *0.0%* |
| | | | | |
| **Proceeds Available to Mezzanine Financing Claims** | | | $ - | $ - |
| | | | | |
| Proceeds Available for Mezzanine Financing Claims | G | $ 132.4 | $ - | $ - |
| *Recovery %* | | | *0.0%* | *0.0%* |
| | | | | |
| **Proceeds Available for Unsecured Claims** | | | $ - | $ - |
| | | | | |
| Deficiency Claims | | $ 214.7 | $ - | $ - |
| Unsecured Claims | H | 7.0 | - | - |
| Total Unsecured Claims | | $ 221.7 | $ - | $ - |
| *Recovery %* | | | *0.0%* | *0.0%* |
| | | | | |
| **Proceeds Available to Equity Interests** | | | $ - | $ - |

4

# FOOTNOTES TO LIQUIDATION ANALYSIS

## *Note A – Proceeds for Distribution*

To maximize total liquidation value, the Liquidation Analysis assumes that the Debtors' hotel properties are sold as a going concern that would be effectuated through a distressed sale of the entire portfolio of hotels or through a series of sales of clusters of hotels, and that all post-petition liabilities of the various hotels existing at the time are assumed by the respective purchasers. Given that the hotels would be sold pursuant to a forced liquidation sale for cash, the Debtors believe that an appropriate range of value for the Fixed/Floating Debtors' hotels would be between $783.8 and $951.7 million and between $136.5 and $165.8 million for the Reorganizing Debtors' hotels, implying a 15% and 30% discount, respectively to the purchase price of the hotels included in the Plan.

The Debtors are estimated to have cash on hand of $32.1 million as of July 31, 2011, including $7.4 million of unencumbered cash at Innkeepers USA Limited Partnership. Additionally, the Debtors are estimated to be able to generate approximately $16.3 million of cash during the sale process from operations.

For purpose of this Liquidation Analysis, it is assumed that the purchaser(s) of the various hotel properties will honor all prepetition contracts. Rejection of these contracts could create a much larger number of unsecured creditors and could subject the Chapter 7 estate to additional claims for damages for beaches of those contracts. Such claims could also materially increase the amount of Administrative, Priority, or General Unsecured Claims against the Debtors.

## *Note B – Trustee Fees, Other Professional Fees, and Wind-Down Costs of Chapter 7 Estates*

Compensation for the Chapter 7 trustee will be limited to fee guidelines in section 326(a) of the Bankruptcy Code. The Debtors' principal assets—their hotel properties—will be sold as a going concern subject to a transaction fee for the purpose of this Liquidation Analysis, and it is assumed that the trustee fees will be 2.0% of gross proceeds available for creditors. It is also assumed that the buyer(s) will assume post-petition liabilities of the hotel properties existing at the time of the transaction.

Once the sale is complete, certain corporate and administrative functions would be required to oversee the distribution of proceeds, and to maintain and close the accounting records for the estates. These wind-down costs are estimated to be between $3.2 and $4.3 million, which is based on a reduced run rate of corporate general and administrative expenses.

Chapter 7 professional fees include legal, financial, and accounting fees expected to be incurred during the liquidation period and are estimated to be between $3.0 and $3.9 million.

In addition, the recovery available to creditors will be reduced by $5.5 million for accrued Chapter 11 professional fees and other expenses, the maximum amount allowable under the carve-out for such items in the Debtors' "Final Order authorizing the Debtors to (i) use the Adequate Protection Parties' Cash Collateral and (ii) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 USC Sec. 361, 362 and 363."

## *Note C – Transaction Fees*

Transaction fees associated with the distressed sales of the Debtors' assets are assumed to be 2.0% of the gross proceeds from the sale of the hotel properties, or approximately $18.4 million and $22.3 million, in the low and high recovery scenarios, respectively.

## *Note D – Debtors-in-Possession Financing ("DIP Financing")*

The DIP Financing included in the Liquidation Analysis of $51.3 million is based on an estimate of the amount that will be utilized through July 31, 2011.

*Note E – Secured Claims*

Secured claims of the Fixed/Floating Debtors consist of the Fixed Rate Mortgage Loan in the amount of $805.3 million and the Floating Rate Pool Mortgage Loan in the amount of $218.4 million.

Secured claims of the Reorganizing Debtors consist of the following mortgage debt:

| Debtor | Amount |
|--------|--------|
| KPA RIGG, LLC | $36.9 |
| KPA RIMV, LLC | 46.3 |
| KPA San Antonio, LLC | 23.5 |
| KPA Tyson's Corner RI, LLC | 24.6 |
| KPA Washington DC, LLC | 24.8 |
| | $156.1 |

The Secured claims have been reduced by approximately $24.9 million, as the actual and expected adequate protection payments made during the course of the Chapter 11 cases through July 31, 2011 are assumed to be re-characterized as principal payments upon conversion to Chapter 7, which will reduce the claim amount.

*Note F – Administrative and Priority Claims*

These claims include Chapter 11 professional fees in excess of the carve out, unpaid prepetition real estate taxes, and other priority claims.

*Note G – Mezzanine Facility Claim*

The Mezzanine Facility Claim of the Debtors is attributable to the Floating rate Pool Mezzanine Loan facility in the amount of $132.4 million.

*Note H – Unsecured Claims*

These claims reflect the estimated amounts of prepetition liabilities based on filed claims as of the date of this report and the financial records of the Debtors.

*Note I – Grand Prix Holdings LLC – Deficiency Claims*

The Liquidation Analysis necessarily includes an estimate of the potential Mortgage Loan Deficiency claims from the Fixed/Floating Debtors and the Reorganizing Debtors against Grand Prix Holdings LLC. The estimate was solely developed for the Liquidation Analysis and should not be used for any other purpose. The assumed recovery is equal to the estimated recovery from its ownership of the 12% Series A Cumulative Preferred Shares in Innkeepers USA Trust.

**<u>EXHIBIT D</u>**

**Marriott Adequate Assurance Agreement (without exhibits)**

# AGREEMENT FOR ADEQUATE ASSURANCE OF
# COMPLETION OF CERTAIN PIPS AND ASSUMPTION OF AGREEMENTS

This AGREEMENT FOR ADEQUATE ASSURANCE OF FUTURE COMPLETION OF CERTAIN PIPs AND ASSUMPTION OF AGREEMENTS (this "<u>Agreement</u>") is made and entered into as of June 25, 2010, by and among (i) Innkeepers USA Trust, a Maryland real estate investment trust, and all of its direct and indirect subsidiaries and affiliates that may or will constitute one of the debtors in Innkeeper's voluntary reorganization cases, identified on <u>Exhibit 1</u> hereto (collectively, the "<u>Company</u>"), and (ii) Marriott International, Inc., a Delaware corporation (with its affiliates, "<u>Marriott</u>"). The Company and Marriott are sometimes collectively referred to herein as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## *RECITALS*

WHEREAS, the Company owns forty-four (44) hotels operating under brands owned by Marriott (collectively, the "<u>Marriott Hotels</u>");

WHEREAS, the Marriott Hotels operate subject to franchise and related agreements between Marriott and the Company (collectively, the "<u>Franchise Agreements</u>");

WHEREAS, Marriott has served default and termination notices (collectively, "<u>Default Letters</u>") upon the Company with respect to twenty-three (23) Marriott Hotels (collectively, the "<u>Marriott Defaulted Hotels</u>") purporting to terminate their respective Franchise Agreements for, among other things, the failure to complete the property improvement plans ("<u>PIPs</u>");

WHEREAS, Marriott has represented that it intends to serve a Default Letter with respect to an additional Marriott Hotel;

WHEREAS, the Company and Marriott have entered into that certain Forbearance and Agreement to Maintain the Status Quo, dated June 11, 2010, pursuant to which Marriott agreed to, among other things, forbear from exercising its rights at law or in equity, set forth in the Default Letters, solely with respect to the Continuing Defaults (as defined therein) under the Franchise Agreements described in the Default Letters, from June 14, 2010 until the earlier of June 28, 2010 or the filing of a Chapter 11 Case;

WHEREAS, the Company may (a) file voluntary reorganization cases (collectively, a "<u>Chapter 11 Case</u>") under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court (the "<u>Bankruptcy Court</u>"); and (b) file and use good faith reasonable best efforts to obtain approval and confirmation of a plan of reorganization (the "<u>Plan</u>"), which shall be in form and substance not inconsistent with this Agreement;

WHEREAS, the Company has represented that it will complete the PIPs for certain Marriott Defaulted Hotels in accordance with this Agreement and secure the financing necessary to do so;

WHEREAS, the Parties, with the assistance of their legal and financing advisors, have engaged in negotiations with the objective of reaching an agreement with regard to the Marriott Hotels set forth on <u>Schedule A</u> and <u>Schedule B</u> and the treatment of the Franchise Agreements and Marriott's claims thereunder (collectively, the "<u>Claims</u>"), pursuant to the terms and conditions set forth in this Agreement;

WHEREAS, the Company has received certain Acceptable Financing Commitments (as defined herein) predicated on the filing of a Chapter 11 Case, which are attached hereto as <u>Exhibit 2</u>;

WHEREAS, the Company and Marriott have reviewed, or have had the opportunity to review, this Agreement with the assistance of their respective legal and financial advisors of their own choosing; and

WHEREAS, this Agreement sets forth the terms and conditions of the Parties' respective obligations hereunder.

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    <u>Acceptable Financing Commitment</u>.    For purposes of this Agreement, an "Acceptable Financing Commitment" means one or more commitments: (a) for at least $45M to complete, on the schedule attached hereto as <u>Schedule A</u> (which includes three separate phases of PIP completion, "Phase 1," "Phase 2," and "Phase 3"), the PIPs for the Marriott Defaulted Hotels; (b) on terms that are no less favorable to the Company than market terms negotiated at arm's-length; (c) not conditioned on obtaining voting or any control rights with respect to the Plan, other than on reasonable and customary debtor-in-possession repayment terms and priority; (d) which terms shall indicate that the sole purpose of the commitment is to complete the PIPs for the Marriott Defaulted Hotels; (e) which may prime existing liens, pursuant to section 364(d) of the Bankruptcy Code; and (f) which will be fully funded upon closing of an Acceptable Financing Commitment after Bankruptcy Court approval (collectively, an "<u>Acceptable Financing Commitment</u>").    Marriott acknowledges and agrees that the financing commitments memorialized in the term sheets attached hereto as <u>Exhibit 2</u>, if consummated, would each constitute an Acceptable Financing Commitment.

(a)    If the Company files a Chapter 11 Case, the Company shall (i) substantially contemporaneously with such filing, file a motion with the Bankruptcy Court seeking authority, pursuant to section 364 of the Bankruptcy Code, to obtain an Acceptable Financing Commitment (the "<u>DIP Motion</u>") and (ii) seek to have the Bankruptcy Court approve the Acceptable Financing Commitment within sixty (60) days thereafter.  The Company shall in good faith use its reasonable best efforts to obtain Bankruptcy Court approval of an Acceptable Financing Commitment within the time periods specified herein and confirmation of a Plan consistent with the terms of this Agreement.

(b)    If the Bankruptcy Court approves an Acceptable Financing Commitment within sixty (60) days after filing a Chapter 11 Case, the Company shall commence, perform,

and fully complete the PIPs in accordance with <u>Schedule A</u>. The Parties agree that time is of the essence with respect to the commencement, performance, and completion of the PIPs.

(c)     The Company represents and warrants that it has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and any and all other agreements, documents or instruments to be executed and/or delivered in connection herewith and to consummate the transactions contemplated herein and therein.

Section 2.     <u>Post-filing Forbearance Period</u>. During the period commencing on the filing of a Chapter 11 Case, and ending upon the termination of this Agreement in accordance with Section 6 hereof (the "<u>Post-filing Forbearance Period</u>"), with respect to the Marriott Defaulted Hotels listed on <u>Schedule A</u>, Marriott shall, subject to Section 3 and Section 6 hereof, (a) forbear from exercising any and all of its remedies under the Franchise Agreements that arise out of or in connection with the Default Letters, (b) forbear from seeking relief from the automatic stay to exercise any and all of its remedies under the Franchise Agreements that arise out of or in connection with the Default Letters, and (c) permit the Franchise Agreements for the Marriott Defaulted Hotels listed on <u>Schedule A</u> to be assumed in accordance with Section 4 hereof.

Section 3.     <u>Relief from Automatic Stay Upon Default</u>. Notwithstanding any other Section of this Agreement, at any time after Bankruptcy Court approval of an Acceptable Financing Commitment, in the event that the Company does not satisfy in all material respects the obligations to be performed with respect to a particular Marriott Defaulted Hotel identified on <u>Schedule A</u>, on or before the applicable milestone dates provided therein, Marriott may seek relief from stay or such other relief as may be just and proper with respect to such Marriott Defaulted Hotel and related Franchise Agreement, and the Company agrees that (a) it shall not contest either directly or indirectly, or cause another to contest, a motion, application or request by Marriott for relief from the automatic stay to, *inter alia,* enforce its rights and remedies under the Franchise Agreement for such Marriott Defaulted Hotel, and (b) it shall deem the Post-filing Forbearance Period with respect to such Marriott Defaulted Hotel terminated. In the event the Company fails to complete, in accordance with <u>Schedule A</u>, all of the PIPs under the Franchise Agreements for the Marriott Defaulted Hotel listed under Phase 1, plus the Sili II hotel in Phase 2, Marriott may, in its discretion, serve a notice of default and sixty (60) notice to cure which shall require the Company to complete all PIPs for the Marriott Defaulted Hotels under Phase 1, plus the Sili II hotel under Phase 2 within the sixty (60) day cure period. If the cure by the Company referenced in the previous sentence is not completed within sixty (60) days, then Marriott shall be entitled to seek relief from stay for all Marriott Defaulted Hotels, except those which have already been assumed, and the Company shall be deemed to consent to such relief, and Marriott shall retain any and all of its rights to damages under the relevant Franchise Agreements.

Section 4.     <u>Assumption of Franchise Agreements</u>. As set forth herein, Marriott shall have the right to consent to the assumption and assignment of any and all Franchise Agreements, including the Franchise Agreements for the Marriott Defaulted Hotels. Immediately upon completion and written approval by Marriott of completion of a PIP for a Marriott Defaulted Hotel in accordance with <u>Schedule A</u>, the Company shall seek to assume the applicable Franchise Agreements. For the avoidance of doubt, assumptions will be on a rolling basis as

PIPs are completed and approved, and Marriott's consent to assumption shall be deemed given if, with respect to a particular Marriott Defaulted Hotel, Marriott determines in its reasonable business judgment that the Company has completed the respective PIP in accordance with Schedule A and the terms of the applicable Franchise Agreement, provided that Marriott shall retain its rights under 11 U.S.C. § 365. With respect to the PIPs on Schedule A for which the Company is in compliance as of the time the Company files a disclosure statement in the Chapter 11 Case, the Company shall assume all such Franchise Agreements listed on Schedule A (except as otherwise assumed in accordance with this Section 4) and Marriott will consent to the Company's assumption of the Franchise Agreements listed on Schedule A. In addition, as of the time the Company files a disclosure statement in the Chapter 11 Case, the Company shall assume all other Franchise Agreements for the Marriott Hotels not listed on Schedule A (the "Marriott Non-Defaulted Hotels"), which shall be set forth on Schedule B, and Marriott will consent to the Company's assumption of the Franchise Agreements for the Marriott Non-Defaulted Hotels, provided that Marriott shall retain its rights under 11 U.S.C. § 365 for such Franchise Agreements. For the sake of clarity, Company's obligation to complete the PIPs for the Marriott Hotels in accordance with the respective Franchise Agreements shall survive confirmation of the Plan.

Section 5.    Resolution of Claims.    If the Company files a Chapter 11 Case, the Company shall cause the Plan to provide that Marriott's Claims shall either be treated as (a) unimpaired or (b) impaired only to the extent and in a manner as consensually agreed upon by Marriott in its sole discretion; provided that Marriott may have claims in the Chapter 11 Case that remain unpaid even if the PIPs for all Marriott Defaulted Hotels are completed and approved and all of the relevant Franchise Agreements are assumed. Marriott will not forbear from filing and pursuing such claims in the Chapter 11 Case. Marriott acknowledges and agrees, subject to review and consideration of any proposed Plan, that it will not vote to reject or otherwise object to, impede, directly or indirectly, or take any action that would unreasonably delay confirmation or consummation of the Plan, unless such Plan contains terms that are inconsistent with the terms of this Agreement and the Franchise Agreements. Marriott represents that it has not conducted an inspection or audit to determine if additional defaults exist as of the date of this Agreement, but to the best of its knowledge, it is not aware of any outstanding defaults other than the Continuing Defaults; provided, however, that Marriott does not waive its rights with respect to any default in existence that Marriott later becomes aware of or could have known upon a reasonable inspection or audit.

Section 6.    Termination of this Agreement.

(a)    Termination Events.    The term "Termination Event," wherever used in this Agreement, means any of the following events (whatever the reason for such Termination Event and whether it is voluntary or involuntary):

(i)    The Company fails to file the DIP Motion with the Bankruptcy Court contemporaneously with the filing of a Chapter 11 Case.

(ii)    An Acceptable Financing Commitment is not approved by the Bankruptcy Court within sixty (60) days of filing a Chapter 11 Case.

(iii)    Termination of an Acceptable Financing Commitment, unless the Company can establish to Marriott's sole satisfaction that the Company has sufficient funds available for completion of the PIPs in accordance with Schedule A, and such funds are held in escrow pending completion of all PIPs.

(iv)    The Company fails to complete one or more PIPs in accordance with Schedule A.

(v)    All Parties agree in writing to terminate this Agreement.

The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; provided that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions.  A Termination Event shall be effective on the fifth (5th) business day following written notice and failure to cure a Termination Event occurring under Section 6(a)(i), (iii), or (iv).   Termination shall be effective immediately following written notice of a Termination Event occurring under occurring under Section 6(a)(ii), or if the Parties agree to Termination under Section 6(a)(v).

(b)    Effect of Termination.   Upon a Termination Event occurring under Section 6(a)(i), (ii), (iii), or (v), this Agreement shall be of no further force and effect, subject to Section 6(c), and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement from the effective date of the Termination Event forward.  Upon a Termination Event occurring under Section 6(iv), this Agreement shall be terminated solely with respect to the Marriott Defaulted Hotel for which the PIP or PIPs have not been completed.

(c)    Survival.  The rights, duties and obligations of Marriott and the Company that by the express language of the Franchise Agreements and this Agreement survive termination shall remain in full force and effect and survive the termination of this Agreement. Without limiting the foregoing, in the event that either Marriott or the Company terminates this Agreement or the Post-filing Forbearance Period terminates in accordance with Section 3 or Section 6 hereof, Marriott's and the Company's rights and obligations under Sections 3, 6 and 7 (excluding 7(c)), shall survive termination of this Agreement.

Section 7.    Miscellaneous.

(a)    Governing Law; Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York.   By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in a federal court of competent jurisdiction in the United States District Court for the Southern District of New York.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits to the nonexclusive jurisdiction of such

court, generally and unconditionally, with respect to any such action, suit, or proceeding. Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

(b)    No Waiver of Participation and Preservation of Rights.  This Agreement is part of a proposed settlement of disputes among the Parties.  Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in any plan of reorganization are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests.

(c)    Reimbursement of Fees.  The Company shall remit payment of $20,000 each month to Marriott, such payment representing the cost of Marriott having to dedicate an employee to auditing and overseeing completion of the PIPs and expediting review of all stages of PIP compliance.  The Company shall reimburse Marriott for all reasonable, documented out-of-pocket attorneys' fees and expenses incurred by Marriott in connection with this Agreement and the defaults under the Franchise Agreement within thirty (30) days of invoice.

(d)    Notices.  All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or by courier service, messenger, electronic mail, facsimile, telecopy, or if duly deposited in the mails, by certified or registered mail, postage prepaid-return receipt requested, and shall be deemed to have been duly given or made: (i) upon delivery, if delivered personally or by courier service, or messenger, in each case with record of receipt; (ii) upon transmission with confirmed delivery, if sent by facsimile or telecopy; or (iii) when received after being sent by certified or registered mail, postage pre-paid, return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the Company:

Innkeepers USA Trust
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida  33480
Attention:    Marc Beilinson
Facsimile: (561) 835-0457
E-mail address:  mbeilinson@beilinsonpartners.com

And

Innkeepers USA Trust
340 Royal Poinciana Way
Suite 306
Palm Beach, Florida  33480
Attention:    Mark Murphy
Facsimile: (561) 835-0457

E-mail address: mmurphy@innkeepersusa.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, Illinois  60654
Attention:     Anup Sathy, P.C.
                       Gary E. Axelrod, P.C.
Facsimile: (312) 862-2200
E-mail address:  anup.sathy@kirkland.com
                           gary.axelrod@kirkland.com

And

Kirkland & Ellis, LLP
601 Lexington Avenue
New York, New York  10022
Attention:     Paul M. Basta
Facsimile: (212) 446-4900
E-mail address:  paul.basta@kirkland.com


If to Marriott:

Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland  20817
Facsimile:
Attention:  Mark Forseth
E-mail address:  mark.forseth@marriott.com

with a copy (which shall not constitute notice) to:

Sheppard Mullin Richter & Hampton, LLP
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Attention:     Carren Shulman
                       David D'Amour
Facsimile: (212) 653-8701
E-mail address:  cshulman@sheppardmullin.com
                           ddamour@sheppardmullin.com

(e)     Complete Agreement.  This Agreement constitutes the full and complete understanding and agreement among the Parties with regard to the subject matter hereof and

supersedes all prior agreements, understandings, or representations by or among the Parties, written or oral, which may have related to the subject matter hereof in any way.

(f) <u>Interpretation of this Agreement</u>. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement shall interpret in a neutral manner. There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

(g) <u>Headings</u>. The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

(h) <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors and assigns <u>provided</u>, <u>however</u>, that nothing contained in this paragraph shall be deemed to permit sales, assignments, or transfers that would otherwise not be in accordance with this Agreement or the Franchise Agreements, and nothing herein waives any such restrictions or requirement that Marriott approve all franchisees.

(i) <u>Several, Not Joint, Obligations</u>. The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

(j) <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

(k) <u>No Waiver</u>. The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

(l) <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by facsimile or email shall be as effective as delivery of a manually executed signature page of this Agreement.

(m) <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and any such prohibited or unenforceable provision shall be deemed reformed and construed so that it will be valid, legal, and enforceable and not prohibited to the maximum extent permitted by applicable law; <u>provided</u>, <u>however</u>, that in the event Sections 3, 4, or 6 shall be invalidated, this Agreement shall be deemed null and void and of no further force and effect.

(n)   <u>No Third-Party Beneficiaries</u>.   Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

(o)   <u>Settlement Discussions</u>.   This Agreement and the transactions contemplated thereby are part of a proposed settlement of a dispute among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

(p)   <u>Consideration</u>.  It is hereby acknowledged by the Parties hereto that, other than the agreements, covenants, representations, and warranties set forth herein, no consideration shall be due or paid to Marriott for its entry into this Agreement.

(q)   <u>Representation by Counsel</u>.   Each Party acknowledges that it has reviewed, or has had the opportunity to review, this Agreement with the assistance of their respective legal and financial advisors of their own choosing, and that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any party with a defense to the enforcement of the terms of this Agreement against such party shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the Parties.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

**MARRIOTT INTERNATIONAL, INC.**

By: _____
Name: Karl J. Grover
Title: Vice President, Franchising
Date:   June 25, 2010

**INNKEEPERS USA TRUST**

By: _____
Name: Marc Beilinson
Title:   Chief Restructuring Officer
Date:   June 25, 2010

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

**MARRIOTT INTERNATIONAL, INC.**


By: _____
Name: Karl J. Grover
Title: Vice President, Franchising
Date:    June 25, 2010

**INNKEEPERS USA TRUST**

By: *Marc Beilinson*
Name:  Marc Beilinson
Title:    Chief Restructuring Officer
Date:  June 25, 2010

**Completion Schedule**

1. Obtain an Acceptable Financing Commitment and receive funding therefrom no later than sixty (60) days after filing a Chapter 11 Case in an amount sufficient to fully complete the PIPS for all twenty-three (23) Defaulted Marriott Hotels.
2. Place orders for furniture, fixtures and equipment ("**FF&E**") required to complete the PIPs for the Phase 1 hotels no later than thirty (30) days after Bankruptcy Court approval of an Acceptable Financing Commitment  (the "**Phase 1 Order Deadline**").
3. Place orders for FF&E required to complete the PIPs for the Phase 2 hotels no later than ninety (90) days after the Phase 1 Order Deadline (the **"Phase 2 Order Deadline"**).
4. Place orders for FF&E required to complete the PIPs for the Phase 3 hotels no later than ninety (90) days after the Phase 2 Order Deadline (the "**Phase 3 Order Deadline**").
5. Commence work on the PIPs for the Phase 1 hotels no later than one hundred twenty (120) days after the Phase 1 Order Deadline (the "**Phase 1 Commencement Deadline**").
6. Commence work on the PIPs for the Phase 2 hotels no later than one hundred twenty (120) days after the Phase 2 Order Deadline (the "**Phase 2 Commencement Deadline**").
7. Commence work on the PIPs for the Phase 3 hotels no later than one hundred twenty (120) days after the Phase 3 Order Deadline (the "**Phase 3 Commencement Deadline**").
8. Complete work on the PIPs for the Phase 1 hotels no later than ninety (90) days after the Phase 1 Commencement Deadline; with the exception of  Sunnyvale Silicon Valley I, CA, San Diego Mission Valley, CA, and Saddle River, NJ, which must be completed no later than one hundred twenty (120) days after the Phase 1 Commencement Deadline.
9. Complete work on the PIPs for the Phase 2 hotels no later than ninety (90) days after the Phase 2 Commencement Deadline; with the exception of  Sunnyvale Silicon Valley II, CA, which must be completed no later than one hundred twenty (120) days after the Phase 1 Commencement Deadline.
10. Complete work on the PIPs for the Phase 3 hotels no later than ninety (90) days after the Phase 3 Commencement Deadline.

---

[1] The Company shall not be in default of this Agreement for failure to complete the PIPs in accordance with this Schedule A if, and to the extent that, the default or delay is caused, directly or indirectly, by (a) fire, explosion, or other casualty, or condemnation; (b) storm, earthquake, hurricane, tornado, drought, flood, or other act of God; (c) war, act of terrorism, sabotage, bombing, insurrection, rebellion, revolution, riot, or other civil commotion or unrest; (d) epidemics, quarantine restrictions, or other public health restrictions or advisories; (e) strikes or lockouts or other labor interruptions; (f) disruption to local, national, or international transport services; (g) embargoes, resulting in a lack of materials, water, power, or telephone transmissions necessary for the development and construction of the PIPs in accordance with the terms of this Agreement; and (h) failure of any applicable governmental authority to issue any material entitlements, or the suspension, termination, or revocation of any material entitlements, required for the completion of the PIPs in accordance with the terms of this Agreement, provided that none of the above may be the result of or caused by the action or inaction of the Company.

**Company shall not deviate from this schedule without the express written consent of Marriott. The PIPs for all twenty-three (23) Marriott Defaulted Hotels must be completed no later than November 20, 2011.**

## PHASE 1

### Designated Hotels

1. Sunnyvale Silicon Valley I, CA
2. San Diego Mission Valley, CA
3. Tysons Corner Mall, VA
4. San Francisco/San Mateo, CA
5. Saddle River, NJ
6. Palo Alto Mountain View, CA
7. Portland Scarborough, ME
8. Ontario Airport, CA

## PHASE 2

### Designated Hotels

9. Sunnyvale Silicon Valley II, CA
10. Harrisburg, Hershey, PA
11. Binghamton, NY
12. San Jose Campbell, CA
13. Detroit Troy Madison, MI
14. Louisville East, KY
15. Denver Tech Center, CO
16. Lexington North, KY

## PHASE 3

### Designated Hotels

17. Orlando Altamonte Springs, FL
18. Denver Downtown, CO
19. Fremont Silicon Valley, CA
20. Shelton Fairfield County, CT
21. Cherry Hill/Philadelphia, NJ
22. Hartford/Windsor, CT
23. Richmond West End, VA

| No. | Marriott Hotel |
|-----|----------------|
| 1. | Anaheim-Resort Area/Garden Grove - Residence Inn |
| 2. | Arlington  - Residence Inn |
| 3. | Atlanta Downtown - Residence Inn |
| 4. | Atlanta Peachtree Corners - Residence Inn |
| 5. | Atlantic City - Courtyard |
| 6. | Chicago O'Hare/Rosemont - Residence Inn |
| 7. | Dallas Addison - Residence Inn |
| 8. | Detroit Livonia - Residence Inn |
| 9. | Fort Lauderdale-North/Cypress Creek - Courtyard |
| 10. | Ft. Wayne - Residence Inn |
| 11. | Gaithersburg - Residence Inn |
| 12. | New York/Montvale - Courtyard |
| 13. | New York/Morristown - Residence Inn |
| 14. | Philadelphia Horsham - TownePlace Suites |
| 15. | Richmond Northwest - Residence Inn |
| 16. | San Jose South - Residence Inn |

| 17. | Seattle Bellevue - Residence Inn |
| 18. | Seattle-North/Lynnwood Everett - Residence Inn |
| 19. | Seattle-Northeast/Bothell - Residence Inn |
| 20. | Seattle-South/Tukwila - Residence Inn |

## EXHIBIT E

**Bidding Procedures Order (without exhibits) and Commitment Letter**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO THE AMENDED COMMITMENT LETTER WITH FIVE MILE CAPITAL II POOLING REIT LLC, LEHMAN ALI INC., AND MIDLAND LOAN SERVICES, (II) APPROVING THE AMENDED NEW PARTY/MIDLAND COMMITMENT BETWEEN THE DEBTORS AND MIDLAND LOAN SERVICES, (III) APPROVING FIXED/FLOATING BIDDING PROCEDURES, (IV) APPROVING BID PROTECTIONS, (V) AUTHORIZING AN EXPENSE REIMBURSEMENT TO "BIDDER D," AND (VI) MODIFYING CASH COLLATERAL ORDER TO INCREASE EXPENSE RESERVE

Upon the motion (the "**Motion**")[2] of the Debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), for the entry of an order (this "**Order**") (a) authorizing the Debtors to enter into the Amended Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc. ("**Lehman**"), Midland Loan Services, a division of PNC Bank, National Association ("**Midland**"), and Apollo Investment Corporation, (b) approving the Amended New Party/Midland Commitment, (c) approving the Fixed/Floating Bidding Procedures, (d) approving Bid Protections, (e) authorizing an expense reimbursement to a bidder,

---

[1]  The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436.  The location of the Debtors' corporate headquarters and the service address for their affiliates is:  c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2]  All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion, the Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust (together with the term sheet attached thereto the "**Amended Commitment Letter**"), attached hereto as **Exhibit A**, or the Bidding Procedures for the Fixed/Floating Debtors (the "**Fixed/Floating Bidding Procedures**"), attached hereto as **Exhibit B**, as applicable.

all as more fully set forth in the Motion, and (f) modifying the Final Cash Collateral Order to increase the expense reserve contemplated therein from $4.5 million to $16.5 million; and upon the Reply;[3] and upon the Derrough Declarations;[4] and upon the Beilinson Declaration;[5] and upon the Ruisi Declaration;[6] and the Official Committee of Unsecured Creditors in these Chapter 11 cases (the "**Committee**"), on the record at the hearing on the Motion, having committed to support the Fixed/Floating Bidding Procedures, the Amended Commitment Letter, and the transactions contemplated thereunder; and the Committee having stated on the record at the hearing that it will prepare a letter in support of the Fixed/Floating Plan and the treatment provided to unsecured creditors thereunder to be included in the solicitation materials for the Fixed/Floating Plan; and thereunder in the solicitation materials for the Fixed/Floating Plan, and, the Committee, in contemplation of the prosecution by the Debtors of the Fixed/Floating Plan containing the treatment of general unsecured claims set forth in the Amended Commitment Letter, having stated on the record its agreement not to seek standing to pursue or otherwise pursue any litigation, including any litigation against either Lehman or Special Servicer,[7] on account of any pre-petition transaction relating to the Fixed/Floating Debtors until the date on which the Amended Commitment Letter is terminated; and it appearing that the relief requested

---

[3] *Debtors' Omnibus Reply in Support of Stalking Horse Motion* [Docket No. 986] (the "**Reply**").

[4] *Declaration of William Q. Derrough in Support of the Motion* [Docket No. 821] (the "**Derrough Declaration**"), the *Supplemental Declaration of William Q. Derrough in Support of the Motion* [Docket No. 916] (the "**Supplemental Derrough Declaration**"), the *Second Supplemental Declaration of William Q. Derrough in Support of the Motion* [Docket No. 987] (the "**Second Supplemental Derrough Declaration**" and, together with the Derrough Declaration and the Supplemental Derrough Declaration, the "**Derrough Declarations**").

[5] *Declaration of Marc Beilinson in Support of the Motion* [Docket No. 988] (the "**Beilinson Declaration**").

[6] *Declaration of Lawrence J. Ruisi in Support of the Motion* [Docket No. 989] (the "**Ruisi Declaration**").

[7] Including actions against the LB-UBS Commercial Mortgage Trust 2007-C6 or to challenge the Fixed Rate Mortgage Loan or liens granted to secure the same.

K&E 18542372

is in the best interests of the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted to the extent provided herein.

2.      The Amended Commitment Letter, as modified by paragraph 13 below, is hereby approved and binding on the Debtors.

3.      The Debtors are hereby authorized to execute, deliver, implement, and to take any and all actions necessary and proper to implement the Amended Commitment Letter, attached hereto as **Exhibit 1**.

4.      The Fixed/Floating Bidding Procedures, attached hereto as **Exhibit 2**, are hereby approved, and the Debtors are authorized to solicit bids and conduct a Fixed/Floating Auction as set forth in the Fixed/Floating Bidding Procedures.

5.      The Debtors are authorized to enter into that certain New Party/Midland Commitment, by and between the Debtors and Midland, dated as of March 9, 2011, as amended (the "**Amended New Party/Midland Commitment**"), a copy of which is attached hereto as **Exhibit 3**.

6.      The Debtors are authorized to conduct the Fixed/Floating Auction as set forth in the Fixed/Floating Bidding Procedures.

K&E 18542372

7.     April 25, 2011 at 5:00 p.m. (prevailing Eastern Time) shall be the deadline (the "**Bid Deadline**") for the submission of competing bids in accordance with the terms described in the Fixed/Floating Bidding Procedures.

8.     Notwithstanding anything to the contrary in this Order, the Amended Commitment Letter and Term Sheet attached as Exhibit B thereto (the "**Amended Term Sheet**"), Motion, Reply, or Fixed/Floating Bidding Procedures, to be deemed a Qualified Bid (as defined in the Fixed/Floating Bidding Procedures) and qualify to participate in the Fixed/Floating Auction, (a) the equity consideration of each Bid and Overbid (each as defined in the Fixed/Floating Bidding Procedures) must have a value of at least $356.2 million (comprised of the $348.2 million equity value of the Five Mile/Lehman Bid, as modified, and $8 million on account of the Initial Minimum Overbid (as defined in the Fixed/Floating Bidding Procedures)) to be used for, among other things, the following on the effective date of the Fixed/Floating Debtors' chapter 11 plan of reorganization (the "**Fixed/Floating Plan**"): (i) $46.6 million in cash to satisfy claims on account of the Five Mile DIP; (ii) $17.5 million in cash to satisfy claims on account of the Lehman DIP; (iii) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (iv) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy; (v) at least $41.6 million in cash for the reorganized Debtors; (vi) with respect only to Qualified Bids other than the Five Mile/Lehman Bid, as modified, at least $200.3 million in cash to pay Lehman's claims against the Debtors (plus any applicable Overbid Allocation (as defined in the Fixed/Floating Bidding Procedures)); and (vii) to the extent the Bid is submitted by a Competing Bidder (as defined in the Fixed/Floating Bidding Procedures), $3.0 million in

4

cash to satisfy the up to $3.0 million Expense Reimbursement provided for under the Amended Commitment Letter, and (b) a Bid that includes the Midland Financing (as defined in the Fixed/Floating Bidding Procedures) shall not result in a Bid employing a debt-to-capitalization ratio for the reorganized enterprise that exceeds 70 %.

9.      The Successful Bidder (as defined in the Fixed/Floating Bidding Procedures) shall be required to fund all unpaid allowed administrative expenses of the Fixed/Floating Debtors' estates that accrue on or before the Effective Date of the Fixed/Floating Plan that encompasses the Successful Bid.

10.      All Bids and Overbids, to be deemed a Qualified Bid and whether made prior to or at the Fixed/Floating Auction, must be made for all of the Fixed/Floating Debtors and must either (a) be comprised entirely of cash or (b) based on the debt and capital structure and sources and uses of funds in the Amended Commitment Letter and Amended Term Sheet, on terms substantially similar to the terms provided in the Amended Term Sheet (including, but not limited to, the guarantees provided to Midland and the other terms, conditions, and treatment as set forth in the Amended Commitment Letter and the treatment of claims as set forth in the Amended Term Sheet).

11.      In the event that the application of the Overbid Allocation would cause any prepetition creditor's recovery to exceed such creditor's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure of the Fixed/Floating Debtors for purposes of determining the ultimate recipient of such overbid value.

12.      To the extent that the Amended Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Amended Commitment Letter), Five Mile/Lehman

shall receive reimbursement of all of Five Mile's reasonable fees and expenses not to exceed $3 million (the "**Expense Reimbursement**") in the event of (a) an Overbid in which the Five Mile/Lehman Bid, as modified, is not the Successful Bid or (b) the Debtors' execution of an agreement to pursue an alternative restructuring transaction for any of the Fixed/Floating Debtors' assets (an "**Alternative Transaction**") after entry of this Order. The Expense Reimbursement, if any, shall be payable by the Debtors upon the earlier of (a) the effective date of the Fixed/Floating Plan and (b) consummation of an Alternative Transaction.

13.     Notwithstanding anything to the contrary in this Order, the Amended Commitment Letter, the Amended Term Sheet, or any other document previously filed with the Court, Five Mile/Lehman shall not be entitled to a break-up fee under any circumstances in connection with the Five Mile/Lehman Bid.

14.     The determination of the Successful Bidder at the Fixed/Floating Auction shall be made by the Debtors only after consulting with Midland relating to the Bids made at the Fixed/Floating Auction.

15.     All rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (a) the auction process requiring Qualified Bids as defined above in the Fixed/Floating Bidding Procedures is terminated or abandoned, (b) Midland is no longer obligated to support the Amended Term Sheet or the Amended Midland/New Party Commitment, (c) Lehman terminates the Amended Commitment Letter, (d) the Fixed/Floating Plan or the plan of reorganization that encompasses the Successful Bid is not confirmed, or (e) the effective date for the Fixed/Floating Plan shall not have occurred by the Outside Date (as defined in the Amended Term Sheet).

16.     To the extent Bidder D is not the Successful Bidder at the Fixed/Floating Auction, the Debtors are authorized to pay the Bidder D Expense Reimbursement at the conclusion of the Fixed/Floating Auction in an amount not to exceed $500,000 of reasonable and documented fees incurred by Bidder D prior to December 15, 2010.

17.     The transaction contemplated by the Amended Commitment Letter shall not be conditioned on any holder of Innkeepers USA Trust 8.0% Series C Cumulative Preferred Shares, in such capacity, releasing claims or interests against any person or entity.

18.     The Ad Hoc Committee's rights to object on any ground to the Fixed/Floating Plan, the disclosure statement related thereto, and the transaction contemplated therein (including any transition or separation agreement), are hereby reserved to the extent not resolved or otherwise rendered moot by this Order (with respect to issues relating to the Fixed/Floating Bidding Procedures or Bid Protections), as are the Debtors' rights to respond or otherwise defend against such objections (including the Debtors' ability to object to any entities' standing to raise such objections).

19.     Marriott International, Inc., as franchisor ("**Marriott**"), is a party to various franchise agreements with certain of the Debtors for the operation of forty-three hotels under brands owned by Marriott (the "**Marriott Franchise Agreements**"), and various owner agreements in connection with each of the Marriott Franchise Agreements (the "**Owner Agreements**").  Subject to the Marriott Adequate Assurance Agreement, and applicable law, Marriott reserves all of its rights under the Marriott Franchise Agreements and Owner Agreements, including, among other things, (i) its right to consent, condition, restrict, or withhold consent to transfers of the Marriott Franchise Agreements or direct or indirect ownership interests in franchisees, in accordance with the terms of the Marriott Franchise

7

Agreements and Owner Agreements; (ii) its right to restrict Transfers to a Competitor (as each such term is defined in the respective Marriott Franchise Agreement) in accordance with the terms of the Marriott Franchise Agreements and Owner Agreements; and (iii) that any replacement operator of the Marriott branded hotels is subject to the prior written approval of Marriott in accordance with the terms of the Marriott Franchise Agreements and the Debtors reserve all of their rights with respect to any such rights of Marriott.

20.     Nothing in the Amended Commitment Letter shall affect the rights, claims, and interests of the Excluded Debtors and their respective creditors.

21.     In the event of any inconsistencies between this Order and the Motion, the Fixed/Floating Bidding Procedures, the Amended Commitment Letter, or the Amended Term Sheet, this Order shall govern in all respects.

22.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

23.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

24.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

25.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated:  March 11, 2011

                              /S/ Shelley C. Chapman
                              United States Bankruptcy Judge

## EXHIBIT 1

**Amended Commitment Letter (with Amended Term Sheet attached)**

# FIVE MILE CAPITAL II POOLING REIT LLC
c/o Five Mile Capital Partners LLC
Three Stamford Plaza, 9th Floor
Stamford, Connecticut 06901

# LEHMAN ALI INC.
1271 Avenue of the Americas, 38th Floor
New York, New York 10020

As of March 9, 2011

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attn: Marc Beilinson
      Chief Restructuring Officer

**Amended and Restated**
**Binding Commitment Agreement**
**Regarding the Acquisition and Restructuring**
**of Certain Subsidiaries of Innkeepers USA Trust**

Five Mile Capital II Pooling REIT LLC ("Five Mile Pooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), and Lehman ALI Inc. ("Lehman," together with Five Mile, the "Plan Sponsors") are pleased to present this amended and restated commitment letter (the "Amended Commitment Letter") to certain wholly owned direct and indirect subsidiaries of Innkeepers USA Trust (together with all of its wholly owned direct and indirect subsidiaries, "Innkeepers" or the "Company"), that are identified on Exhibit A attached hereto (collectively, the "Fixed/Floating Debtors"), which sets forth, among other things, Lehman and Five Mile's binding commitment to provide equity capital and debt conversion capital (the "Commitment") for the restructuring of the debt and equity of the Fixed/Floating Debtors (the "Transaction"), resulting in Five Mile and Lehman directly or indirectly owning a controlling interest in the Fixed/Floating Debtors on the terms and subject to the conditions set forth in the term sheet (the "Term Sheet") attached hereto as Exhibit B. The undersigned hereto are collectively referred to as "Parties," and each a "Party," each in the capacity in which that Party has executed this Amended Commitment Letter. Reference is made to that certain Binding Commitment Agreement Regarding the Acquisition and Restructuring of Innkeepers USA Trust dated January 14, 2011 (the "Original Commitment Letter"). This Amended Commitment Letter amends and restates the Original Commitment Letter, subject to the terms of Section 12 below.

We believe that the Commitment provides substantial value to the Fixed/Floating Debtors and puts the Company on the path towards a consensual emergence from Chapter 11 on an enterprise basis pursuant to a confirmed Chapter 11 plan. The Commitment provides for an auction process on reasonable terms and is supported by the Company's two largest secured creditors, which

hold all of the mortgage debt in the Chapter 11 cases of the Fixed/Floating Debtors. There are no due diligence or financing contingencies of any kind in connection with the Commitment.

The Plan Sponsors are each uniquely qualified to consummate the Transaction. Lehman is the second largest secured creditor of Innkeepers, as lender under the Floating Rate Mortgage Loan of Innkeepers (the "Floating Rate Mortgage Loan"), in the original principal amount of $250 million, and has provided a debtor-in-possession financing to the Company for approximately $17.5 million. Five Mile has a substantial investment and rights in the $825.4 million Fixed Rate Mortgage Loan of Innkeepers (the "Fixed Rate Mortgage Loan") and has funded a debtor-in-possession financing to the Company for $53 million. The Plan Sponsors have completed their due diligence of all of the Fixed/Floating Debtors' hotel assets. We are familiar with the Fixed/Floating Debtors' assets and operating performance, derived from Five Mile's long history as a rights holder in Innkeepers' secured debt, Lehman's long history as a secured lender, and Five Mile's and Lehman's review of public filings and extensive due diligence. The Plan Sponsors each have broad investment experience in the hospitality area and general expertise in the extended stay lodging sector.

The specific elements of our Commitment are set forth in the Term Sheet. Additional components of our proposal are set forth herein. This Amended Commitment Letter is not an offer or a solicitation with respect to any securities of Innkeepers or a solicitation of acceptances of a Chapter 11 plan.

1. <u>Conditions/Required Approvals</u>. The Transaction is subject to the satisfaction of the terms and conditions contained in the Term Sheet, including without limitation the section titled "Lehman Approvals."

2. <u>Confidentiality</u>. This Amended Commitment Letter is delivered to you on the understanding that neither this Amended Commitment Letter, the Term Sheet, nor any of the terms or substance hereof or thereof, shall be disclosed, directly or indirectly, to any other person except (i) to your officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis; (ii) as required by applicable law, including the Bankruptcy Code or compulsory legal process (in which case you agree to inform us promptly thereof); (iii) in connection with any exercise of remedies under or in connection with a breach of this Amended Commitment Letter; or (iv) as otherwise agreed by the Parties hereto. Notwithstanding the foregoing, this Amended Commitment Letter (including the Term Sheet) may be filed with the United States Bankruptcy Court for the Southern District of New York presiding over the Innkeepers Chapter 11 cases (the "Innkeepers Bankruptcy Court") in connection with the Bid Procedures Motion.

3. <u>Due Diligence/Financing</u>. We have completed our diligence review, and the Commitment is not subject to diligence contingencies or financing contingencies of any kind.

4. <u>Commitment</u>. Each of the undersigned Parties to this Amended Commitment Letter acknowledge their agreement to and acceptance of the terms provided in the section of the Term Sheet titled "Commitments." In furtherance thereof, on January 14, 2011, the Company filed the Bid Procedures Motion (as defined in the Term Sheet), with the support of the Plan Sponsors and Midland Loan Services, a division of PNC Bank, National Association, or

any successor thereto, as special servicer for the Fixed Rate Mortgage Loan (the "Special Servicer"). On March 5, 2011, the Company filed their reply brief to the objections to the Bid Procedures Motion, which sets forth certain agreed-upon revised terms to the Original Commitment Letter. This Amended Commitment Letter memorializes those terms.

   5. <u>Means of Implementation</u>. If the Plan Sponsors are the successful/winning bidders, the funding from our Commitment will be used to finance and otherwise implement the restructuring of the Fixed/Floating Debtors by means of a plan of reorganization for the Fixed/Floating Debtors to be filed by the Fixed/Floating Debtors with the support of the Plan Sponsors and the Special Servicer (the "Fixed/Floating Plan"). The Parties agree that the Company may file a global plan of reorganization (a "Global Plan") that includes the Fixed/Floating Plan and Chapter 11 plans of any or all of the other debtors (the "Other Plans") as the Company deems appropriate in its sole discretion. To the extent the Company files a Global Plan or Other Plans, confirmation of the Fixed/Floating Plan shall not be conditioned on confirmation of the Other Plans.

The Fixed/Floating Plan (i) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion; (ii) will provide for the treatment of claims against and interests in the Fixed/Floating Debtors and in all other respects be in accordance with the Term Sheet; and (iii) will otherwise comply with applicable disclosure requirements and rules of procedure and contain terms and treatment of claims and interests consistent with the applicable provisions of the Bankruptcy Code. For the avoidance of doubt, the Other Plans and the Global Plan with respect to the Excluded Debtors (as defined in the Term Sheet), as applicable, are not subject to this Amended Commitment Letter or the Term Sheet.

   6. <u>Exclusivity</u>. The Company currently has a motion pending before the Innkeepers Bankruptcy Court pursuant to which it requests a 120-day extension of its exclusive periods, which is scheduled to be heard at the March 29, 2011 omnibus hearing. Provided that the Bid Procedures are approved by the Innkeepers Bankruptcy Court prior to the hearing on the pending exclusivity motion, the Company agrees to modify its request for an extension of its exclusive periods to June 30, 2011, and Five Mile, Lehman, and the Special Servicer agree that they will support such modified request. The Debtors' rights to seek additional extensions of the exclusive periods beyond June 30, 2011, and the rights of Five Mile, Lehman and Special Servicer to oppose additional extensions and to move to terminate exclusivity, are preserved.

   7. <u>Deposit</u>. Promptly after Bankruptcy Court approval of this Amended Commitment Letter and the entry of an order approving the Bid Procedures Motion, including the Break-Up Fee and Expense Reimbursement (as each such terms are defined in the Term Sheet), the Plan Sponsors shall deposit or cause to be deposited at their respective option, (i) cash and/or (ii) to the extent such loans have been funded to the Company, a pledge from Five Mile or Lehman of the first portion of any recovery on account of their claims under the Five Mile DIP (as defined in the Term Sheet) and the Solar DIP (as defined in the Term Sheet), respectively (collectively, the "DIP Loans"), against the respective Borrowers (as defined in the respective DIP Loans), in an aggregate amount equal to, or having a value of, $20.0 million, to be held in escrow by an escrow agent reasonably acceptable to the Plan Sponsors and the Company (if cash, in an interest bearing account), in either case in accordance with the terms and conditions of an escrow agreement consistent with this Amended Commitment Letter and reasonably acceptable

to the Plan Sponsors and the Company. The responsibility for making the deposit shall be allocated among the Plan Sponsors as follows: Five Mile - 50% and Lehman - 50%. The escrow agreement shall specify that (i) on the Effective Date (as defined in the Term Sheet), the full amount of the cash deposit (with interest) deposited (a) by Lehman shall be paid to Lehman and (b) by Five Mile shall be credited against Five Mile's equity commitments, and the pledge of any claim under the DIP Loans shall be released and revoked with respect to such pledging Plan Sponsor, and (ii) upon the occurrence of a termination of this Amended Commitment Letter other than due to a Plan Sponsor Breach (as defined below), or in the event that any of the terms and conditions in the Amended Commitment Letter (including the Term Sheet) are not satisfied timely (unless waived or extended in accordance with the terms hereof) or the Break-Up Fee and Expense Reimbursement become payable to the Plan Sponsors, the full amount of the deposit, plus accrued interest, shall be paid or returned, as applicable, to the Plan Sponsors and any pledge of a Plan Sponsor's claims under the DIP Loans shall be released and revoked. The deposit shall not be considered or become property of the Fixed/Floating Debtors' or the Company's estates unless and until there is a Plan Sponsor Breach or with respect to Five Mile's portion of the deposit, such amounts are credited to Five Mile's equity commitments. In the event that a Plan Sponsor breaches this Amended Commitment Letter and fails to close the Transaction as determined by a final ruling of the Innkeepers Bankruptcy Court (a "Plan Sponsor Breach"), it being understood that the deposit shall remain in escrow pending such final determination, the Company's sole remedy at law and in equity against the Plan Sponsors shall be receipt and retention of the deposit, plus accrued interest (if applicable), as liquidated damages. Nothing herein shall release a breaching Plan Sponsor of its obligation to repay the non-breaching Plan Sponsor for any forfeited deposit caused by the breach of the breaching Plan Sponsor. A breach by Special Servicer of this Amended Commitment Letter or the Five Mile/Midland Commitment that is not caused by a Plan Sponsor Breach shall not result in any forfeiture of the deposit. For the avoidance of doubt, the failure to obtain the approval of the Lehman Bankruptcy Court (as defined in the Term Sheet) is not and shall not be deemed to be a breach of any Plan Sponsor's obligations under this Amended Commitment Letter and shall not result in the forfeiture of the deposit.

8.     Termination. Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate this Amended Commitment Letter by written notice to the Company and the Special Servicer upon the earliest occurrence of a Termination Event (as defined in the Term Sheet).

9.     Governing Law. This Amended Commitment Letter shall be governed by, and interpreted and enforced in accordance with, the laws in force in the state of New York. The Parties to this Amended Commitment Letter waive any right to a trial by jury, to the extent lawful, and agree that either of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained-for agreement among each Party irrevocably to waive its right to trial by jury in any claims whatsoever between them relating to this Amended Commitment Letter.

10.     Jurisdiction. Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Innkeepers Bankruptcy Court, in any action or proceeding arising out of or relating to this Amended Commitment Letter.

11. <u>Assignments; No Third Party Beneficiaries</u>. Except as provided by the Transfer Provision in the Term Sheet, this Amended Commitment Letter (i) shall not be assignable by any Party hereto without the prior written consent of each other Party hereto (and any attempted assignment without such consent shall be null and void *ab initio*), (ii) is intended to be solely for the benefit of the Parties hereto, and (iii) is not intended nor shall be construed to confer any benefits upon, or create any rights in favor of any person or entity other than the Parties hereto.

12. <u>Amendments/Effectiveness/Counterparts</u>. Notwithstanding anything in this Amended Commitment Letter or the Term Sheet to the contrary, neither this Amended Commitment Letter nor the Term Sheet may be amended or any provision hereof or thereof waived or modified except by an instrument in writing signed by each of the Parties hereto. This Amended Commitment Letter and Term Sheet shall be effective upon delivery of original signature pages or "pdf" or facsimile copies thereof executed by each of the Parties and upon the commencement of the hearing on the Bid Procedures Motion on March 10, 2011 and upon counsel to the Official Committee of the Unsecured Creditors in these Chapter 11 cases (the "Creditors' Committee") memorializing on the record at the hearing on the Bid Procedures Motion its support of the Transactions contemplated by this Amended Commitment Letter and Term Sheet. This Amended Commitment Letter and Term Sheet may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

13. <u>Other Agreements</u>. The execution of this Amended Commitment Letter shall not modify any of the rights or obligations of each of the respective parties to the Further Amended and Restated Commitment Agreement between Lehman and Five Mile, dated as of March 9, 2011 (the "Lehman/Five Mile Commitment"), and the Further Amended and Restated Binding Commitment for the Acquisition of Innkeepers USA Trust between Five Mile Capital II Pooling REIT LLC and Special Servicer, dated as of March 9, 2011 (the "Five Mile/Midland Commitment") attached hereto as Exhibit C and Exhibit D, respectively.

14. <u>Special Servicer/Lehman</u>. Provided that there has not been an occurrence of a Termination Event under this Amended Commitment Letter or the Term Sheet or a "Termination Event" (as defined in the Five Mile/Midland Commitment and the Five Mile/Lehman Commitment), the Special Servicer and Lehman undertake to actively support the Term Sheet and the provisions of the Term Sheet (including the Fixed/Floating Plan, Transaction, Auction, and the Bid Procedures Order, each as set forth in the Term Sheet).

15. <u>Entire Agreement</u>. This Amended Commitment Letter and the Term Sheet (and Appendices A, B, and C thereto) and not the Lehman/Five Mile Commitment or the Five Mile/Midland Commitment, represent the entire understanding and agreement among the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings among the Parties, both written and oral, with respect to the subject matter hereof; <u>provided</u>, <u>however</u>, that this Amended Commitment Letter and the Term Sheet are expressly not in derogation of any of the terms, conditions, or limitations contained in either the Lehman/Five Mile Commitment or the Five Mile/Midland Commitment.

16.     <u>Survival</u>.  Notwithstanding the termination of this Amended Commitment Letter in accordance with its terms, the following agreements and obligations of the Parties shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof:   Sections 2 (confidentiality), 7 (deposit), 9 (governing law), 10 (jurisdiction), and 11 (assignments; no third party beneficiaries) of this Amended Commitment Letter.

Accepted and agreed to as of the first date written above:

**INNKEEPERS USA TRUST**
**(solely on behalf of the Fixed/Floating Debtors, its wholly owned**
**direct and indirect subsidiaries)**

By: _Marc Murphy_____
Name:
Title:

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION**
**(as Special Servicer for U.S. Bank, National**
**Association as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage**
**Trust 2007-C6, Commercial Mortgage Pass-**
**Through Certificates successor trustee to**
**Bank of America National Association)**

By: _____
Name:
Title:

**APOLLO INVESTMENT CORPORATION**

By: _____
Name:
Title:

Accepted and agreed to as of the first date written above:

**INNKEEPERS USA TRUST**
**(solely on behalf of the Fixed/Floating Debtors, its wholly owned**
**direct and indirect subsidiaries)**

By: _____
Name:
Title:

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION**
**(as Special Servicer for U.S. Bank, National**
**Association as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage**
**Trust 2007-C6, Commercial Mortgage Pass-**
**Through Certificates successor trustee to**
**Bank of America National Association)**

By: _____
Name:
Title:
   Kevin C. Donahue
   Senior Vice President
   Servicing Officer

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

Accepted and agreed to as of the first date written above:

**INNKEEPERS USA TRUST**
**(solely on behalf of the Fixed/Floating Debtors, its wholly owned**
**direct and indirect subsidiaries)**

By: _____
Name:
Title:

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION**
**(as Special Servicer for U.S. Bank, National**
**Association as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage**
**Trust 2007-C6, Commercial Mortgage Pass-**
**Through Certificates successor trustee to**
**Bank of America National Association)**

By: _____
Name:
Title:

**APOLLO INVESTMENT CORPORATION**

By: _____
Name: James C. Zalter
Title: Chief Executive officer

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

FIVE MILE CAPITAL II POOLING REIT LLC

BY: FIVE MILE CAPITAL PARTNERS LLC

By: _____
Name:        Almond L. Nickerson III
Title:          Managing Director

LEHMAN ALI INC.

By: _____
Name:
Title:

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

**FIVE MILE CAPITAL II POOLING REIT LLC**

**BY: FIVE MILE CAPITAL PARTNERS LLC**

By: _____
Name:
Title:

**LEHMAN ALI INC.**

By: _____
Name: Jeff Filby
Title: Only Authorized Signatory

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

## FIXED/FLOATING DEBTORS

The "Floating Rate Debtors" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC, and Grand Prix West Palm Beach, LLC.

The "Fixed Rate Debtors" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC.

The "Other Plan Debtors" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; and Grand Prix Mezz Borrower Fixed, LLC.

**The "Fixed/Floating Debtors" are the Floating Rate Debtors, the Fixed Rate Debtors, and the Other Plan Debtors. The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan.**

# TERM SHEET

*THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF INNKEEPERS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.*

| | |
|---|---|
| **Plan of Reorganization:** | The recapitalization and debt restructuring (the "Transaction")[1] of the Fixed/Floating Debtors is to be effectuated through the Fixed/Floating Plan to be filed in the Innkeepers Bankruptcy Court by the Fixed/Floating Debtors with the support of the Plan Sponsors and the Special Servicer. The Company, Plan Sponsors, and the Special Servicer each acknowledge and agree that any and only a plan of reorganization that is consistent with the terms and conditions contained in this Term Sheet shall be deemed a "Fixed/Floating Plan." |
| | The Global Plan shall be acceptable in all respects to the Company in its reasonable discretion. The Fixed/Floating Plan shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion. The Company shall not amend, withdraw, or revoke the Fixed/Floating Plan or waive or amend any provision thereof without the consent of the Plan Sponsors and the Special Servicer, which consent shall not be unreasonably withheld, conditioned, or delayed. |
| **Treatment of Debt:** | Consummation of the Transaction is subject to the restructuring of the Fixed/Floating Debtors' debt in amounts and with the treatment terms provided herein and in Appendix A attached hereto, or with such other terms that are: (i) acceptable to the Company; and (ii) acceptable to the Plan Sponsors and the Special Servicer (a) in each of their respective sole discretion with respect to the economic and treatment terms set forth herein and in Appendix A attached hereto and (b) otherwise in each of their respective reasonable discretion. |
| **New Equity:** | Holders of common, preferred, and any other equity interests in the Fixed/Floating Debtors shall receive no distributions under the Fixed/Floating Plan on account of such interests. An entity that is newly formed by the Plan Sponsors ("New HoldCo") will acquire the indirect and direct equity of reorganized Grand Prix Mezz Borrower Fixed, LLC, reorganized Grand Prix Mezz Borrower Floating, LLC, reorganized Grand Prix Fixed Lessee, LLC, and Grand Prix Floating Lessee, LLC, and such other assets as may be subsequently identified as necessary to |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Commitment Letter.

| | |
|---|---|
| | the operation of the Fixed/Floating Debtors, provided, however, that no assets of the Excluded Debtors (defined below), including, without limitation, cash or cash equivalents, shall be included in the transaction contemplated by this Amended Commitment Letter. New HoldCo will issue equity (the "New Equity") as set forth below upon the effective date of the Fixed/Floating Plan (the "Effective Date"). |
| | The ultimate corporate structure for the reorganized Fixed/Floating Debtors shall be determined by the Plan Sponsors, in their sole discretion, and will be described in a plan supplement document to be filed no later than 10 days before the scheduled date of confirmation of the Fixed/Floating Plan. |
| **Equity Stalking Horse Bid /Treatment of Floating Rate Mortgage Loan:** | On the terms and subject to the conditions contained in this Term Sheet and the Amended Commitment Letter, the Plan Sponsors commit to purchase the New Equity as follows (the "Plan Sponsors' Bid"): (i) Five Mile, through one or more of its wholly owned affiliates(s), or through a Five Mile controlled investment vehicle, comprised of limited partners in Five Mile Capital Partners II LP and Five Mile Capital Investment Opportunities LP, will purchase 50.0% of the New Equity for cash in the amount of $174.1 million; and (ii) Lehman, in full and final satisfaction of all of its claims against the Fixed/Floating Debtors arising under or in connection with the Floating Rate Mortgage Loan will receive: (a) 50.0% of the New Equity and (b) $26.2 million in cash (the "Commitment"); provided, however, that, subject to applicable law and the Fixed/Floating Plan, the Plan Sponsors may, subject to the consent of the Company, such consent not to be unreasonably withheld, conditioned, or delayed, require the Company to provide due diligence access (subject to an appropriate confidentiality agreement) and distribute up to 20% of the New Equity to a third-party investor and/or new manager (the "Third-Party Investment"), and, in the event the third-party investor and/or new manager pays cash on the Effective Date for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman, shall be adjusted accordingly, provided, further, however, that notwithstanding any direction by the Plan Sponsors with respect to the Third Party Investment, Five Mile and Lehman shall remain liable for the full amount of the Commitment. |
| | In the event the Plan Sponsors' Bid is not the winning bid at the Auction (as defined below), the Floating Rate Mortgage Loan shall be repaid in cash and in an amount determined in accordance with the Overbid Allocation (as defined below), assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Plan Sponsors' Bid, |

| | |
|---|---|
| | plus additional consideration in accordance with the Overbid Allocation. |
| **Treatment of Fixed Rate Mortgage Loan:** | In full and final satisfaction of all claims arising under or in connection with the Fixed Rate Mortgage Loan against the Fixed/Floating Debtors, subject to receipt of further consideration as a result of the Auction contemplated herein, the holder of the Fixed Rate Mortgage Loan shall receive the following treatment:<br><br>• New non-recourse mortgage loan of $622.5 million, which shall have the following terms: (i) no change to the interest rate of 6.71%; (ii) no change to the maturity date of July 9, 2017; (iii) during the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iv) prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and (v) property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations, such other provision that is acceptable to the Plan Sponsors and Special Servicer that is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. The applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer shall reasonably require as reasonably acceptable to New HoldCo and the Plan Sponsors and as is consistent with the Amended Commitment Letter and this Term Sheet.<br><br>• In the event the Plan Sponsors' Bid is not the winning bid at the Auction, the holder of the Fixed Rate Mortgage Loan shall receive consideration in accordance with the Overbid Allocation.<br><br>• Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct New HoldCo to make a cash payment of $2.5 million to the Special Servicer as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, the Special Servicer shall continue to be entitled to collect any and all monthly or periodic fees and other |

| | |
|---|---|
| | compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Fixed/Floating Debtors or New HoldCo to pay any of such fees or other compensation or any other amounts under the Fixed Rate Mortgage Loan documents, including the appropriate review fee to be set forth in the definitive documentation as set forth in the second paragraph of Section II of the Five Mile/Midland Commitment. <br><br> • The lender under the Fixed Rate Mortgage Loan will receive a limited guaranty from Five Mile Pooling and a limited guaranty from the New HoldCo as defined in and as more fully set forth in the Five Mile/Midland Commitment. <br><br> • Payment of $3 million and the Global Release (as defined below) as set forth in the "Releases" section herein. |
| **Treatment of Floating Rate Mezzanine Debt and Unsecured Debt:** | Following the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code: <br><br> • SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between each of the Plan Sponsors and the Fixed/Floating Debtors, provided that it votes to accept and otherwise supports the Fixed/Floating Plan; and <br><br> • Cash (of which Apollo Investment Corporation will fund $375,000, subject to receipt of each of the releases described below) in the amount of the lesser of $3.75 million and 65% of the face amount of the general unsecured claims against the Fixed/Floating Debtors (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order (the "Unsecured Claims") shall be available for distribution to the holders of Unsecured Claims (the "Unsecured Claims Fund"); further, the Fixed/Floating Debtors shall release and waive all preferences under section 547 of the |

| | |
|---|---|
| | Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code. |
| **Transition Services Agreement:** | The Company will develop a separation plan and transition services agreement for the Fixed/Floating Debtors and the Excluded Debtors, which shall address the uses of certain assets including, without limitation, intellectual property, licenses, IT resources, book and records and permits, and address cash management, cash collateral, and other cash issues, which separation plan and transition services agreement shall be outlined in the plan supplement and be reasonably satisfactory to the Plan Sponsors, the Fixed/Floating Debtors, and the Excluded Debtors. |
| **DIP Financings:** | The debtor-in-possession financing provided by Solar Finance, Inc. (the "Solar DIP"), which is secured by liens on the assets of the Floating Rate Debtors, and Tranche A of the debtor-in-possession financing provided by Five Mile Capital II Pooling International LLC, which is secured by liens on the assets of the Fixed Rate Debtors (solely with respect to Tranche A, the "Five Mile DIP") shall be repaid in cash on the Effective Date. |
| **Required Cash:** | Upon consummation of the Transaction and on the Effective Date, New HoldCo will have at least $22.8 million to fund future PIP work and FF&E reserves (if necessary, as determined by New HoldCo), sufficient capital to pay off the Solar DIP (in the principal amount then outstanding, of up to approximately $17.5 million) and the Five Mile DIP (in the principal amount then outstanding, of up to approximately $46.6 million),[2] sufficient capital to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order [Docket No. 402], as previously amended (the "Final Cash Collateral Order"), as to be further amended as set forth below, that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy, and at least $41.6 million of cash on hand. |
| **Bid Procedures:** | The Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Fixed/Floating Plan through an auction (the "Auction") on the following terms (the "Bid Procedures"):<br><br>• Bids will be solicited for up to forty-five (45) calendar days following the date of the entry of the Bid Procedures Order and the Auction shall commence no later than 50 days following the date of the entry |

---

[2]     This number assumes that both the Solar DIP and the Five Mile DIP have been fully funded. If the Solar DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Solar DIP shall be placed into an account held by the Company. Likewise, if the Five Mile DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Five Mile DIP shall be placed into an account held by the Company.

of the Bid Procedures Order;

- Bids, to be deemed a qualified bid and eligible to participate in the Auction, must be accompanied by a deposit of $20 million in cash to an interest bearing escrow account to be identified, established, and held by and in the name of the Company.

- Bidders must be qualified on terms reasonably acceptable to the Company after consultation with the Special Servicer and the Creditors' Committee, which consultation shall include, subject to confidentiality agreements reasonably acceptable to the Company and the Special Servicer and the Creditors' Committee, disclosure of the bidders, their qualifications, and their bids;

- All bids and overbids, to be deemed a qualified bid and eligible to participate in the Auction, and whether made prior to or at the Auction, must be enterprise bids for all of and only the assets of the Fixed/Floating Debtors and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein (including but not limited to the guarantees provided to Special Servicer and the other terms, conditions, and treatment as set forth in the Five Mile/Midland Commitment and the treatment of claims as set forth in this Term Sheet);

- The initial Overbid of the implied value must be at least $15 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied value of the Plan Sponsors' Bid and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (the "Initial Minimum Overbid"), and subsequent bids must be in increments of at least $5 million and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (each qualifying initial and subsequent overbid, an "Overbid");[2]

- The percentage increase in the implied enterprise value of the winning bidder will be allocated to each collateral pool (the "Overbid Allocation") by increasing the debt or cash consideration that such collateral pool is receiving under the Fixed/Floating Plan in proportion to the incremental Overbid amount (e.g., if a collateral pool is receiving a new mortgage under the Fixed/Floating Plan in the

---

[2] Note that the Midland Financing shall be no more than $622.5 million plus 70% of the Overbid amount (minus $15 million); provided, however, that the debt-capitalization ratio of the Fixed/Floating Debtors shall never exceed 70%.

face amount of $100, then a winning Overbid that is 4% greater than the Plan Sponsors' Bid would result in that collateral pool receiving a mortgage in the face amount of $104; the same would apply to cash consideration); provided, however, that the amount of the incremental Overbid consideration not allocated to collateral pools under the Overbid Allocation shall be allocated to each collateral pool pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools against which such respective collateral pool has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying prepetition claims and interests and determining the ultimate recipients of such Overbid; provided, further, however, that to the extent any winning Overbid includes debt consideration to the Special Servicer in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between the Plan Sponsors, Special Servicer, and the Company);

- In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure for purposes of determining the ultimate recipients of such Overbid value;

- The determination of the winning bidder at the Auction shall be made by the Company only after consulting with the Special Servicer and the Creditors' Committee relating to the Bids made at the Auction;

- To be deemed a qualified bid and eligible to participate in the Auction, the equity consideration of such bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value as set forth herein and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the Effective Date: (a) $46.6 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Solar DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (as to be amended as set forth below) that

are necessary for the Fixed/Floating Debtors to emerge from bankruptcy;[3] (e) at least $41.6 million in cash for New HoldCo; (f) with respect only to qualified bids other than the Amended Commitment Letter and this Term Sheet, at least $200.3 million in cash to pay Lehman's claims against the Fixed/Floating Debtors (plus any applicable Overbid Allocation); and (g) to the extent the bid is submitted by a competing bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement.

- If there is an Auction and the winning bidder is not the Plan Sponsors, (i) the winning bidder shall be required to execute and agree to the Amended Commitment Letter, the provisions of this Term Sheet, the Fixed/Floating Plan, the Disclosure Statement, and other Fixed/Floating Plan-related documents, each as modified to incorporate the results of the Auction and the Overbid Allocation, (ii) such modified documents shall be deemed to be the Amended Commitment Letter, Term Sheet, the Fixed/Floating Plan, the Disclosure Statement, and the other Fixed/Floating Plan-related documents as such terms are used in this Term Sheet and the Amended Commitment Letter, and (iii) Lehman (only to the extent the Floating Rate Mortgage Loan receives the treatment contemplated in, and required under, this Term Sheet) and the Special Servicer (only to the extent the Fixed Rate Mortgage Loan receives the treatment contemplated in, and required under, this Term Sheet) shall be required to use such efforts, take such actions, and not take such actions to the extent required under this Term Sheet and the Amended Commitment Letter with respect to the Term Sheet, the Fixed/Floating Plan, the Disclosure Statement, and the other Fixed/Floating Plan-related documents of the Company and the Plan Sponsors, each as modified to incorporate the results of the Auction and the Overbid Allocation, including Lehman's agreement to receive at least $200.3 million in cash (plus any applicable Overbid Allocation) and the Special Servicer's obligation to provide the Midland Financing (as defined in the Bid Procedures) to the winning bidder (the "Revised Agreements Provision"); and

- A bid submitted by or through a holder of a secured claim against the Company shall not be deemed a qualified bid and eligible to participate in the Auction if the bid contemplates the ability of secured creditors to credit bid their claims against the Company

---

[3] For the avoidance of doubt, to the extent the Fixed/Floating Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts; further, to the extent the administrative expense claims of the Fixed/Floating Debtors are less than $10 million, any excess cash shall remain with New HoldCo.

| | |
|---|---|
| | within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code; provided that all rights with respect to a creditor's ability to credit bid under both applicable non-bankruptcy and bankruptcy law are expressly reserved to the extent that (i) the auction process contemplated in the Bid Procedures is terminated or abandoned, (ii) the Special Servicer is no longer obligated to support this Term Sheet or the New Party/Midland Commitment (as defined in, and attached as <u>Exhibit C</u> to, the Bid Procedures Motion), (iii) Lehman terminates the Amended Commitment Letter, (iv) the Fixed/Floating Plan is not confirmed, or (v) the Effective Date shall not have occurred by the Outside Date (as defined below). |
| | • Other terms to be agreed upon by the Company, the Plan Sponsors, and Special Servicer. |
| | Prior to entry of the Bid Procedures Order, nothing in this Term Sheet or the Amended Commitment Letter limits the Company from taking any action the Company believes necessary or appropriate in furtherance of the Company's marketing process. |
| **Stalking Horse Fee:** | The Bid Procedures Order will provide that, to the extent the Amended Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Amended Commitment Letter), in the event of (i) an Overbid in which Plan Sponsors' Bid is not the winning bid (an "Overbid Transaction") or (ii) the Company's execution of an agreement to pursue an alternative transaction for any of the Fixed/Floating Debtors' assets after entry of the Bid Procedures Order (the "Alternative Transaction"), the Plan Sponsors will receive a breakup fee in the amount of $7 million (the "Break-Up Fee") plus reimbursement of all of Five Mile's reasonable and documented fees and expenses, not to exceed $3 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Stalking Horse Fee"). Twenty-five percent (25%) of the Break-Up Fee may be allocated to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Fixed/Floating Debtors to emerge from bankruptcy, as has been mutually agreed between Lehman and Five Mile, with the remainder allocated to Five Mile. Other than terminating their obligations in accordance with the Term Sheet and Amended Commitment Letter, the Plan Sponsors' sole remedy at law and in equity against the Company in the event of an Overbid Transaction or Alternative Transaction shall be receipt of the Break-Up Fee and Expense Reimbursement as liquidated damages, <u>provided</u>, <u>however</u>, that (i) nothing in the "Stalking Horse Fee" section of this Term Sheet shall limit any rights and remedies at law or in equity that the Plan Sponsors have or may have as creditors of the Company and (ii) if there is a material breach by the Company of the Amended Commitment Letter or this Term Sheet that results in a termination of the Amended Commitment Letter, and provided the Plan Sponsors are not |

| | |
|---|---|
| | entitled to the Stalking Horse Fee, the Plan Sponsor's damages for such material breach shall be capped at $10 million.<br><br>The Stalking Horse Fee, if any, shall be payable by the Fixed/Floating Debtors upon the earlier of (i) the Effective Date and (ii) consummation of an Alternative Transaction. |
| **Means For Implementation:** | The Company (i) has filed a motion to approve the Bid Procedures and the Stalking Horse Fee (the "Bid Procedures Motion") and requested a hearing for approval thereof and (ii) will file the Fixed/Floating Plan, a disclosure statement for the Fixed/Floating Plan ("Disclosure Statement"), and request a hearing for approval of the Disclosure Statement and seek confirmation of the Fixed/Floating Plan.<br><br>Each of the foregoing and subsequent pleadings (including the order approving the Bid Procedures Motion (the "Bid Procedures Order")) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion. |
| **The Excluded Debtors:** | The Innkeepers debtors other than the Fixed/Floating Debtors (the "Excluded Debtors") are excluded from the Stalking Horse Bid, and the Plan Sponsors will not be the stalking horse for the Excluded Debtors or their assets. The Company may continue to market the assets of the Excluded Debtors independently from the assets of the Fixed/Floating Debtors. |
| **Pro Forma Equity Ownership:** | Following the Effective Date, the New Equity will be allocated among the new ownership as follows:<br><br>• 40.0%-50.0% to Five Mile;<br><br>• 40.0%-50.0% to Lehman; and<br><br>• 0.0%-20.0% pursuant to the Third-Party Investment. |
| **Governance:** | The board of directors for New HoldCo will initially consist of up to 7 members as follows: 2 members nominated by Five Mile, 2 members nominated by Lehman, and 3 independent members to be nominated at the discretion of the Plan Sponsors. |
| **Commitments:** | Subject to the conditions set forth in this Term Sheet, the Plan Sponsors, Company, and Special Servicer, as applicable, agree and covenant that:<br><br>The Plan Sponsors, Company, and Special Servicer shall (i) use reasonable efforts to prepare or cause the preparation of the Fixed/Floating Plan, Disclosure Statement, other Fixed/Floating Plan-related documents, and other Fixed/Floating Plan-related pleadings |

| | |
|---|---|
| | (collectively, and together with the Bid Procedures Motion, the "Fixed/Floating Plan Documents"), which shall be consistent in all material respects with the Amended Commitment Letter and this Term Sheet, and cause the filing and seek the approval of such pleadings, (ii) take all reasonably necessary and appropriate actions to support and achieve confirmation and consummation of the Fixed/Floating Plan and the Transaction contemplated in the Amended Commitment Letter and this Term Sheet, and (iii) not take any actions (either by affirmative action or omission) (a) inconsistent with the Amended Commitment Letter or this Term Sheet or (b) that would materially delay the confirmation or consummation of the Fixed/Floating Plan or the Transaction contemplated in the Amended Commitment Letter and this Term Sheet.<br><br>The Plan Sponsors, Company, and the Special Servicer each hereby covenant and agree to negotiate in good faith the Fixed/Floating Plan Documents, each of which shall (i) contain the same treatment and economic terms as set forth herein and in Appendix A attached hereto (subject to adjustment as agreed to by the Parties in each of their reasonable sole discretion) and other terms consistent in all respects with the terms set forth in this Term Sheet, and (ii) be acceptable in all other respects to the Plan Sponsors, the Company, and the Special Servicer in each of their respective reasonable discretion.<br><br>The Plan Sponsors hereby commit to provide the entire principal amount of the Commitment upon the Effective Date, upon the terms and subject to the conditions set forth in the Amended Commitment Letter and this Term Sheet. |
| **Lehman Approvals:** | Notwithstanding anything to the contrary contained herein or in the Amended Commitment Letter: (a) Lehman's obligations with respect to the Transaction shall be subject to the approval of the United States Bankruptcy Court for the Southern District of New York presiding over the Lehman Brothers Holdings Inc. bankruptcy cases (Case No. 08-13555) (the "Lehman Bankruptcy Court"). Following the entry of the Bid Procedures Order, Lehman will promptly file a motion (the "Lehman Bankruptcy Court Motion") seeking an order from the Lehman Bankruptcy Court authorizing Lehman to enter into the Transaction, which order shall: (x) be entered prior to the Auction; and (y) be in form and substance reasonably acceptable to the Company and materially consistent in all respects with the Amended Commitment Letter and this Term Sheet; and (b) Lehman's obligations with respect to voting in favor of the Fixed/Floating Plan shall be conditioned in all respects on the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of its votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code. |

| | |
|---|---|
| **Fiduciary Out:** | Upon the determination by the Company's directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of this Term Sheet or the Amended Commitment Letter shall prevent, amend, alter, or reduce the Company's ability to exercise its fiduciary duties under applicable law (the "Fiduciary Out"). |
| **Termination:** | Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate the Amended Commitment Letter and Term Sheet by written notice to the Company and the Special Servicer upon the earliest occurrence of the following events (each a "Termination Event"): |

- February 11, 2011, which shall be deemed extended for so long as any Fixed/Floating Plan Document that is on file has not been denied by a written order of the Innkeepers Bankruptcy Court, or on the date a written order of the Innkeepers Bankruptcy Court is entered denying any of the Fixed/Floating Plan Documents;

- Notwithstanding anything contained herein to the contrary, March 31, 2011, if the Bid Procedures (including the Break-Up Fee and the Expense Reimbursement) have not been approved by the Innkeepers Bankruptcy Court as of such date in substantially the form attached hereto as Appendix B;

- Notwithstanding anything contained herein to the contrary, April 8, 2011, if the Fixed/Floating Plan and Disclosure Statement for the Fixed/Floating Debtors have not been filed by such date by the Fixed/Floating Debtors;

- Notwithstanding anything contained herein to the contrary, June 30, 2011, if the Fixed/Floating Plan has not been confirmed by the Innkeepers Bankruptcy Court, pursuant to an order of the Innkeepers Bankruptcy Court, as of such date; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- The dismissal or conversion to Chapter 7 of any of the Fixed/Floating Debtors' Chapter 11 cases or any of the Chapter 11 cases of Grand Prix Holdings LLC, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership (collectively, the "Parent Companies"); provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- The termination of exclusivity for any of the Fixed/Floating Debtors or the Parent Companies unless supported or sought by the Plan Sponsors; provided, however, that this Termination Event shall not

apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Approval by the Innkeepers Bankruptcy Court with respect to the assets of the Fixed/Floating Debtors or the Parent Companies of any bidding procedures, sale procedures for sales other than of *de minimis* assets, disclosure statement, or plan other than the Bid Procedures Motion, Disclosure Statement, and the Fixed/Floating Plan;

- The granting of stay relief with respect to any of the Fixed/Floating Debtors' or the Parent Companies' assets, other than immaterial assets; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Denial of the Lehman Bankruptcy Court Motion or the Lehman Bankruptcy Court's entry of any other order, judgment or decree prohibiting Lehman from consummating the Transaction;

- The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- In the exercise of the Parties' reasonable best efforts, failure to execute, deliver, or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate (i) the Transaction with respect to the Fixed Rate Mortgage Loan or otherwise affecting the treatment, including the economics, thereof, in each case in form and substance satisfactory to Special Servicer and the Plan Sponsors in each of their respective reasonable discretion and (ii) the Transaction, in such case in form and substance satisfactory to the Plan Sponsors in each of their respective reasonable discretion; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement reasonably deemed necessary by the Plan Sponsors or the Special Servicer prior to the Effective Date without the Plan Sponsors and the Special Servicer's written approval with respect to the assets of the Fixed/Floating Debtors; provided, however, that it shall not be a Termination Event

| | |
|---|---|
| | if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC; |
| | • Failure by the Company to assume and, if necessary, assign all franchise agreements pursuant to an order of the Court satisfactory to the Plan Sponsors or the Special Servicer in all material respects on or before the Effective Date with respect to the assets of the Fixed/Floating Debtors; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC; |
| | • Such earlier date as may be agreed upon in writing by the Company, Lehman and Five Mile; |
| | • The Company terminates the Auction without selecting a winning bidder for the Fixed/Floating Debtors and without the consent of the Plan Sponsors and the Special Servicer, in each of their respective sole discretion; |
| | • Subject to Lehman and the Special Servicer's compliance with the Revised Agreements Provision, the Plan Sponsors are not selected as the successful bidders at the Auction; or |
| | • The Company materially breaches its obligations under the Term Sheet or the Amended Commitment Letter, including, without limitation, if the Company materially breaches its obligations, whether or not through its exercise of the Fiduciary Out. |
| | Time is of the essence with respect to the Termination Events. |
| **Effective Date/Outside Date Termination:** | • The occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including, without limitation, entry of an order confirming the Fixed/Floating Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable, and the Fixed/Floating Plan will also include customary provisions with respect to waiver of conditions to the Effective Date. |
| | • Notwithstanding anything contained herein to the contrary, unless otherwise agreed by the Company, the Plan Sponsors, and the Special Servicer in writing, the Amended Commitment Letter and Term Sheet shall automatically terminate and be of no further force or |

| | |
|---|---|
| | effect and the order confirming the Fixed/Floating Plan will provide that both confirmation and the confirmation order will be automatically revoked (with a reversion to the *status quo ante*) on September 15, 2011 (the "Outside Date") if the Effective Date has not occurred and all of the transactions contemplated under the Amended Commitment Letter, this Term Sheet, and the Fixed/Floating Plan have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "Outside Date Termination Event"); provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC.<br><br>Time is of the essence with respect to the Outside Date Termination Event. |
| **Other:** | • On or after the Effective Date, New HoldCo shall reimburse Five Mile for the reasonable and documented fees and expenses of counsel, provided that the Transaction contemplated by the Fixed/Floating Plan is consummated.<br><br>• Lehman's advisors' and counsel's reasonable and documented fees and expenses shall continue to be paid in accordance with the Final Cash Collateral Order.<br><br>• Without the Company's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed, Lehman and Five Mile agree not to: (i) terminate the Lehman/Five Mile Commitment pursuant to the following termination event in the Lehman/Five Mile Commitment: "Such earlier date as may be agreed upon in writing by the parties hereto"; (ii) make any modification to any termination event under the Lehman/Five Mile Commitment; or (iii) make any other modification to, or addition or deletion of, any other provision in the Lehman/Five Mile Commitment that (a) would create a new termination event under the Lehman/Five Mile Commitment, (b) could affect any termination event under the Lehman/Five Mile Commitment, or (c) would result in any inconsistency with this Term Sheet or the Amended Commitment Letter.<br><br>• Without the Company's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed, Five Mile agrees not to: (i) terminate the Five Mile/Midland Commitment pursuant to the following Termination Event in the Five Mile/Midland Commitment: "mutual agreement of Special Servicer and Five Mile to terminate this Amended Commitment Letter"; (ii) make any modification to any termination event under the Five Mile/Midland Commitment; or (iii) make any other modification to, or addition or deletion of, any other provision in the Five Mile/Midland Commitment that (a) would |

create a new termination event under the Five Mile/Midland Commitment, (b) could affect any termination event under the Five Mile/Midland Commitment, or (c) would result in any inconsistency with this Term Sheet or the Amended Commitment Letter.

- The Company shall seek to amend the Final Cash Collateral Order, with the support of Lehman and the Special Servicer, to increase the amount of cash that may be held back as an expense reserve to $16.5 million in order to account for certain closing and emergence costs of the Fixed/Floating Debtors, including potential success fees, $14.9 million of which shall be allocable to and be used for payment of the obligations of the Fixed/Floating Debtors only, in substantially the form attached hereto as Appendix C.

- In reasonable cooperation with the Plan Sponsors, and subject to confidentiality agreements acceptable to the Company in its reasonable discretion, the Company agrees to share information on a confidential basis with third parties as reasonably necessary for the solicitation of a prospective new manager or other Third Party Investor for the Fixed/Floating Debtors' hotel properties.

- The Midland Financing shall be no more than $622.5 million plus 70% of the Overbid amount (minus $15 million); provided, however, that the debt-capitalization ratio of the Fixed/Floating Debtors shall never exceed 70%.

- If the Company seeks an order requesting authority from the Innkeepers Bankruptcy Court to reimburse the reasonable and documented expenses of "Bidder D," incurred prior to December 15, 2010, in an amount not greater than $500,000, provided that the Break-Up Fee and Expense Reimbursement have been approved by the Innkeepers Bankruptcy Court, the Plan Sponsors, and the Special Servicer shall not object to such request and to the payment of such expenses by the Company at the conclusion of the Auction, so long as Bidder D is not the successful winning bidder at the Auction.

- Unless and until a Termination Event occurs, Lehman shall not sell, transfer, pledge, assign, or otherwise hypothecate any of its claims under the Floating Rate Mortgage Loan or grant any option thereon or any right or interest (voting or otherwise) therein (collectively, a "Transfer"), unless such transfer is to Five Mile or an entity in which Lehman Brothers Holding Inc. directly or indirectly owns at least 51% of the voting interests (a "Lehman Affiliate"), provided that Five Mile or such Lehman Affiliate, as applicable, agrees to the treatment of the Floating Rate Mortgage Loan as set forth in the Amended Commitment Letter and this Term Sheet

| | |
|---|---|
| | (the "Transfer Provision"). |
| **Releases:** | Releasing Parties. |
| | • The "Releasing Parties" shall be the Fixed/Floating Debtors, the Plan Sponsors, the Special Servicer (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts, and trustees), and Apollo Investment Corporation (and together with its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, and professionals, "Apollo"), and other holders of claims against and interests in the Fixed/Floating Debtors, and each of the foregoing parties' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers and directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals (including the officers, directors, trustees, and members of the Parent Companies, in their capacity as such). |
| | Special Servicer Release. |
| | • The Fixed/Floating Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo, related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty") and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and such settlement, waiver, and release shall be embodied in, and shall not be effective unless and until the Global Release (as defined herein) has been embodied in, an order confirming the Fixed/Floating Plan as entered in the Innkeepers Bankruptcy Court that has become final and non-appealable. Contemporaneously with the occurrence of the Effective Date, the Plan Sponsors will direct New HoldCo to make a cash payment of $3 million to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Fixed/Floating Plan and shall be in form and substance reasonably satisfactory to Special Servicer and Apollo, and shall be conditioned on the above-described payment and the occurrence of the Effective Date. |
| | Apollo Release. |

- Apollo shall agree to (i) waive all rights to receive any recovery or distribution under the Fixed/Floating Plan; and (ii) settle and provide a complete general release and waiver of any of its claims against the Releasing Parties. Apollo shall provide such waiver of rights and such general release and waiver of claims against the Releasing Parties in exchange for such entities settling, releasing, and waiving any claims they may have against Apollo to the extent provided herein. Such release by the Releasing Parties shall include (but shall not be limited to) the Special Servicer, on behalf of the C6 and C7 Trusts, settling, releasing, and waiving all of the Special Servicer's claims against Apollo, that are related in any way to the Apollo Guaranty; provided that, the effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided for herein and shall not be effective until the occurrence of the Effective Date.

Global Release.

- The Fixed/Floating Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, by and among the Releasing Parties (each against one another), other than a release of the obligations undertaken herein and in the Fixed/Floating Plan and other Transaction-documents, from the following: (i) any and all claims and causes of action relating to the Company arising at any time prior to the Effective Date, and in connection therewith, the Global Release shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases; provided, however, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Plan Sponsors, New HoldCo, and the new manager. It is expressly understood and agreed, that notwithstanding anything otherwise contained in the Amended Commitment Letter or Term Sheet, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3 million cash payment provided for herein and the occurrence of the Effective Date.

Reservation of Rights.

- Except as otherwise provided in the Amended Commitment Letter and Term Sheet, the Releasing Parties reserve all of their rights to object to

| | any releases by the Releasing Parties of other parties if the terms of the Fixed/Floating Plan differ materially from those set forth in the Amended Commitment Letter and Term Sheet. |
| | |
| | • Additionally, the Releasing Parties reserve all of their respective rights, claims, and interests with respect to the Excluded Debtors and all assets of the Excluded Debtors. |
| | |
| | • Whatever rights, claims, and interests the Excluded Debtors may have with respect to the Fixed/Floating Debtors and their assets are also preserved. |

# APPENDIX A[1]

| PRO FORMA CAPITALIZATION | | | | |
|---|---|---|---|---|
| ($ in millions) | | | | |
| **DEBT** | Current Principal Balance[a] | Debt Impairment | Adjusted Balance | Pay Down/ Conversion | Pro Forma Principal Balance |
| **Five Mile Fixed Pool DIP Loan** | $46.6 | $0.0 | $46.6 | ($46.6) | $0.0 |
| **Lehman DIP Loan[b]** | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| **Fixed Pool Mortgage[c]** | 825.4 | (202.9) | 622.5 | 0.0 | 622.5 |
| **Floating Pool Loan** | | | | | |
| Mortgage | 220.2 | (19.9) | 200.3 | (200.3) | 0.0 |
| Mezzanine (PIK interest) | 132.4 | (132.4) | 0.0 | 0.0 | 0.0 |
| Total | 352.6 | (152.3) | 200.3 | (200.3) | 0.0 |
| **Total Debt** | **$1,242.1** | **($355.2)** | **$886.9** | **($264.4)** | **$622.5** |
| **Implied Equity** | **$0.0** | | | | **$348.2** |
| **Total Capitalization** | **$1,242.1** | | | | **$970.7** |

Note: All numbers are rounded to a single decimal place.
(a)  Current Principal Balance represents principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.
(b)  Assumes DIP financing facility is fully drawn.
(c)  A new, non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

---

[1]     Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash[a] | $174.1 | Lehman Mortgage Payment[a] | $26.2 |
| Apollo Contribution | 0.4 | Repayment of Solar DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 46.6 |
| | | Unsecured Creditors Payment | 3.8 |
| | | Apollo Guaranty Settlement | 3.0 |
| | | Special Servicer Cash Payment | 2.5 |
| | | Balance Sheet Cash[b] | 74.9 |
| **Total** | **$174.5** | | **$174.5** |

Note: All numbers are rounded to a single decimal place.

(a)  Subject to adjustment based on participation in the Third-Party Investment. For example, if Lehman were to own 40% of the New Equity (i.e., assuming 20% of the New Equity is sold pursuant to the Third-Party Investment), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

(b)  Balance sheet cash to be used for, among other purposes, the funding of $22.8 million of FF&E, PIP, and working capital reserves, the potential $500,000 payment to Bidder D and closing costs (currently estimated to be approximately $10 million). Insofar as any of these costs are not realized in their full amounts, the balance sheet cash shall stay with the New HoldCo.

**EXHIBIT F**

**Cerberus/Chatham Commitment Letter**

**INK ACQUISITION LLC**
**INK ACQUISITION II LLC**
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, New York  10171

May 16, 2011

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida  33480
Attn:  Marc Beilinson
        Chief Restructuring Officer

**Amended and Restated**
**Binding Commitment Agreement**
**Regarding the Acquisition and Restructuring**
**of Certain Subsidiaries of Innkeepers USA Trust**

INK Acquisition LLC ("INK I") and INK Acquisition II LLC ("INK II", and together with INK I, individually or collectively, as the context may require, "New HoldCo"), Cerberus Series Four Holdings, LLC ("Cerberus") and Chatham Lodging Trust ("Chatham", and together with Cerberus, the "Plan Sponsors"), are pleased to present this amended and restated letter (the "Amended and Restated Commitment Letter") to certain wholly owned direct and indirect subsidiaries of Innkeepers USA Trust (together with all of its wholly owned direct and indirect subsidiaries, "Innkeepers" or the "Company"), that are identified on Exhibit A attached hereto (collectively, the "Fixed/Floating Debtors"), which sets forth, among other things, the Plan Sponsors' binding and irrevocable commitment to provide equity capital (the "Commitment") for the restructuring of the debt and equity of the Fixed/Floating Debtors (the "Transaction"), resulting in New HoldCo directly or indirectly owning all of the equity interests in the Fixed/Floating Debtors on the terms and subject to the conditions set forth in the amended and restated term sheet (the "Amended and Restated Term Sheet") attached hereto as Exhibit B.  This Amended and Restated Commitment Letter, together with the Amended and Restated Term Sheet, the other Exhibits hereto and the other documents submitted herewith, constitute our Investment Documents and Bid (each as defined in the Bidding Procedures Order;[1]  the "Bid").  The undersigned hereto are collectively referred to as "Parties" and each a "Party."

We believe that the Commitment provides substantial value to the Fixed/Floating Debtors and puts the Company on the path towards a consensual emergence from chapter 11 on an enterprise basis pursuant to a confirmed chapter 11 plan.  There are no due diligence or financing contingencies of any kind in connection with the Commitment, other than the availability of the Midland Financing (as defined in the Bidding Procedures Order).

**The Sponsors**

The Plan Sponsors are each uniquely qualified to consummate the Transaction.  Established in 1992, Cerberus Capital Management, L.P. is one of the world's leading private investment firms with approximately $23 billion under management in funds and accounts.  Cerberus' investors include

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated May 12, 2011, (the "Fixed/Floating Plan").

prominent state and local pension funds, charitable foundations, university endowments and insurance companies, as well as family savings. Cerberus is headquartered in New York City, with affiliate and/or advisory offices in the U.S., Europe and Asia. Cerberus' dedicated team of investment and operations professionals is active in private equity, distressed investments (corporate debt, mortgage, NPLs, structured products) lending/loans and real estate. On the lodging side, Cerberus, through an affiliate, currently owns 5,160 keys including the Sheraton Waikiki (Waikiki, HI), Moana Surfrider (Waikiki, HI), Royal Hawaiian (Waikiki, HI), Princess Kaiulani (Waikiki, HI), Sheraton Maui (Maui, HI) and the Palace Hotel (San Francisco, CA). Additionally, Cerberus is in contract to acquire Silverleaf Resorts, a time-share vacation company.

Chatham is a self-advised real estate investment trust that invests in upscale extended-stay hotels and premium-branded select-service hotels. Chatham currently owns 13 hotels with an aggregate of 1,650 rooms/suites in nine states and has one additional hotel under contract to purchase in Pittsburgh, PA. Island Hospitality Management, Inc. and its affiliates (collectively, "IHM") are engaged in the management of hotels throughout the United States and is experienced in the various phases of hotel operations. IHM currently provides comprehensive hotel management services to all but one of the hotels owned by the Fixed/Floating Debtors. Chatham currently has the capacity to invest over $300 million in new hotel assets. Additional information about Chatham may be found at www.chathamlodgingtrust.com.

The specific elements of our Commitment are set forth in this Amended and Restated Commitment Letter, the Amended and Restated Term Sheet and the other Investment Documents. This Amended and Restated Commitment Letter is not an offer or a solicitation with respect to any securities of Innkeepers or a solicitation of acceptances of a chapter 11 plan.

   1. Conditions. The Transaction is subject to the satisfaction of the terms and conditions contained in the Amended and Restated Term Sheet and the Fixed/Floating Plan.

   2. Confidentiality. The Investment Documents are being delivered to you on the understanding that neither the Investment Documents, nor any of the terms or substance thereof, shall be disclosed, directly or indirectly, to any other person except (i) to your officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis; (ii) as required by applicable law, including the Bankruptcy Code or compulsory legal process (in which case you agree to inform us promptly thereof); (iii) in connection with any exercise of remedies under or in connection with a breach of this Amended and Restated Commitment Letter; (iv) to Midland Loan Services, a division of PNC Bank, National Association, or any successor thereto, solely in its capacity as special servicer for the C6 and C7 Trusts that own and hold the Fixed Rate Pool Mortgage Loan Agreement Claims ("Midland") and its officers, directors, employees, attorneys, accountants and financial, legal and other advisors on a confidential and need-to-know basis, and Lehman ALI, Inc. ("Lehman"), or (v) as otherwise agreed by the Parties hereto. Notwithstanding the foregoing, the Investment Documents may be (a) disclosed to other parties in interest in the Chapter 11 Cases in connection with the Fixed/Floating Auction (as defined in the Bidding Procedures Order), and (b) filed with the Bankruptcy Court in connection with approval of the Disclosure Statement and the Fixed/Floating Plan as a result of New HoldCo being declared the Successful Bidder at the Fixed/Floating Auction.

   3. Due Diligence/Financing. We have completed our diligence review, and intend to utilize the Midland Financing. The form of the Binding Commitment Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust addressed to Midland, that we are prepared to execute (the "New HoldCo/Midland Commitment") is attached

hereto as Exhibit C. As a result, the Commitment is not subject to diligence contingencies or financing contingencies of any kind, other than the availability of the Midland Financing.

4.      Commitment; Financial Capability. The Plan Sponsors hereby commit to provide the entire amount of the Commitment upon the Effective Date of the Fixed/Floating Plan, upon the terms and subject to the conditions set forth in this Amended and Restated Commitment Letter, the Amended and Restated Term Sheet and the Fixed/Floating Plan. 100% of the equity of New HoldCo is owned by Cerberus (through CRE-Ink REIT Member, LLC and CRE-INK Member II, Inc., the "Cerberus Members") and Chatham (through Chatham Lodging, LP and Chatham TRS Holding, Inc., the "Chatham Members"), with the Cerberus Members initially owning 90.8% of such equity and the Chatham Members owning the remaining 9.2% of such equity. The current limited liability company agreement of Ink I, executed by the applicable Cerberus Member and the applicable Chatham Member, as amended, is attached hereto as Exhibit D. The aggregate commitment of Cerberus is $363,527,644.35, and the aggregate commitment of Chatham is $37,000,000.00. As discussed above, Cerberus has approximately $23 billion under management and Chatham currently has the capacity to invest over $300 million in new hotel assets, which we believe is sufficient evidence of our financial capability to close the transaction.

5.      Means of Implementation. As the Successful Bidder (as defined in the Bidding Procedures Order), the funding from our Commitment will be used to finance and otherwise implement the restructuring of the Fixed/Floating Debtors pursuant to the Fixed/Floating Plan (as amended to reflect the transactions contemplated by this Bid).

The Fixed/Floating Plan (i) shall be acceptable in all respects to the Plan Sponsors and Midland in each of their respective reasonable discretion; (ii) will provide for the treatment of claims against and interests in the Fixed/Floating Debtors and in all other respects be in accordance with the Amended and Restated Term Sheet; and (iii) will otherwise comply with applicable disclosure requirements and rules of procedure and contain terms and treatment of claims and interests consistent with the applicable provisions of the Bankruptcy Code. For the avoidance of doubt, the Anaheim Plan, the Ontario Plan and the Reorganizing Debtor Plan are not subject to this Amended and Restated Commitment Letter, the Amended and Restated Term Sheet or the other Investment Documents.

6.      Deposit. In accordance with the Bidding Procedures Order, the Plan Sponsors have deposited cash in an amount equal to $20 million (the "Deposit") to:

Wells Fargo Bank, NA
420 Montgomery Street
San Francisco, CA 94163
Swift Code: WFBIUS6S
ABA # 121-000-248
Credit: Corporate Trust Clearing
Account #0001038377
F/F/C/: Innkeepers USA/INK Acq. Escrow
Account # 85503100
Attn: Tim Martin

7.      Structure. The anticipated structure of New HoldCo immediately after consummation of the Fixed/Floating Plan will be as shown on the pro forma structure chart attached hereto as Exhibit E, subject to finalization of the corporate structure as determined by the Plan

Sponsors in their sole discretion and described in a plan supplement document to be filed before the scheduled date of confirmation of the Fixed/Floating Plan, with pro forma capitalization as shown on Exhibit F. We have used the financial, operational and other material assumptions that underlie Innkeepers' business plan with respect to the Fixed/Floating Debtors, except for the differences, including, without limitation, differences with respect to working capital and capital expenditure requirements, set forth on Exhibit G attached hereto.

8.      Approvals. New HoldCo and the Plan Sponsors have obtained all necessary internal authorizations or approvals for the submission, execution, delivery and closing of the Bid, including this Commitment, and the transactions contemplated hereby. Without limiting the foregoing, the Transaction has received the approval of the Members of New HoldCo, the Investment Committee of Cerberus and the Board of Trustees of Chatham.

9.      Termination. Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate this Amended and Restated Commitment Letter by written notice to the Company and Midland upon the earliest occurrence of a Termination Event (as defined in the Amended and Restated Term Sheet).

10.      Governing Law. This Amended and Restated Commitment Letter shall be governed by, and interpreted and enforced in accordance with, the laws in force in the state of New York. The parties to this Amended and Restated Commitment Letter waive any right to a trial by jury, to the extent lawful, and agree that either of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained-for agreement among each Party irrevocably to waive its right to trial by jury in any claims whatsoever between them relating to this Amended and Restated Commitment Letter.

11.      Jurisdiction; Waiver of Jury Trial. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Innkeepers Bankruptcy Court, in any action or proceeding arising out of or relating to this Amended and Restated Commitment Letter, the Term Sheet, the other Investment Documents, the Fixed/Floating Rate Auction, and the construction and enforcement of the Bidding Procedures Order, including the qualification of bids thereunder. Each of the parties acknowledges and agrees that any controversy which may arise under this Amended and Restated Commitment Letter, the Amended and Restated Term Sheet, the other Investment Documents, the Fixed/Floating Rate Auction or the Bidding Procedures Order is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect of any litigation directly or indirectly arising out of or relating to (a) this Amended and Restated Commitment Letter, the Amended and Restated Term Sheet, or the other Investment Documents, (b) the breach, termination or validity of this Amended and Restated Commitment Letter, the Amended and Restated Term Sheet, the other Investment Documents, (c) the Fixed/Floating Rate Auction, or (d) the construction and enforcement of the Bidding Procedures Order, including the qualification of bids thereunder.

12.      Assignments; No Third Party Beneficiaries. This Amended and Restated Commitment Letter (i) shall not be assignable by any party hereto without the prior written consent of each other party hereto (and any attempted assignment without such consent shall be null and void *ab initio*); provided, however, that New HoldCo may, without the consent of any other party hereto, assign its rights and obligations hereunder and under the New HoldCo/Midland Commitment to acquire the equity interests of any or all of the Fixed/Floating Debtors to any entity with the same ownership as New HoldCo, and provided, further, that such assignment shall not be in derogation of the Midland loan documents; (ii) is intended to be solely for the benefit of the Parties hereto; and (iii) is

not intended nor shall be construed to confer any benefits upon, or create any rights in favor of any person or entity other than the Parties hereto. Notwithstanding anything to the contrary contained in this Paragraph 12, any assignment by NewHoldCo as contemplated under this Paragraph 12 shall not relieve New HoldCo of its obligations under the Amended and Restated Commitment Letter or the Amended and Restated Term Sheet attached thereto.

13. **Counterparts.** This Amended and Restated Commitment Letter and Amended and Restated Term Sheet may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

14. **Midland/Lehman.** Provided that there has not been an occurrence of a Termination Event under this Amended and Restated Commitment Letter or the Term Sheet or a "Termination Event" (as defined in the New HoldCo/Midland Commitment), Midland undertakes to actively support the Amended and Restated Term Sheet, the provisions of the Amended and Restated Term Sheet, and approval of the Disclosure Statement and the Fixed/Floating Plan. Lehman has agreed in the amended commitment and term sheet dated as of March 9, 2011 submitted by Lehman and Five Mile Capital II Pooling REIT LLC with respect to the Fixed/Floating Debtors (the "Five Mile/Lehman Bid") to the Revised Agreements Provision (as defined in the Amended and Restated Term Sheet).

15. **Entire Agreement.** This Amended and Restated Commitment Letter and the Amended and Restated Term Sheet, together with the Appendices and Exhibits thereto, represent the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supercedes all prior and contemporaneous agreements and understandings among the parties hereto, both written and oral, with respect to the subject matter hereof, including without limitation the Commitment Letter and Term Sheet dated April 25, 2011 by the Plan Sponsors and New HoldCo.

16. **Survival.** Notwithstanding the termination of this Amended and Restated Commitment Letter in accordance with its terms, the following agreements and obligations of the parties shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof: Sections 2 (Confidentiality), 6 (Deposit), 10 (Governing Law), 11 (Jurisdiction; Waiver of Jury Trial), and 12 (Assignments; No Third Party Beneficiaries) of this Amended and Restated Commitment Letter.

17. **Contacts.** Should you have any questions concerning this Amended and Restated Commitment Letter, the Amended and Restated Term Sheet or the other Investment Documents please contact any of the following individuals:

Cerberus:                                          Chatham:

Tom Wagner                                    Jeff Fisher
Cerberus Real Estate Management,      Chatham Lodging Trust
LLC                                              50 Cocoanut Row
299 Park Avenue, 23nd Floor          Palm Beach, FL 33480
New York, NY 10171                        Phone: (561) 227-1309
Phone: (212) 891-2158                      Email: jfisher@cl-trust.com
Email: twagner@cerberusre.com

Counsel to Cerberus:

Stuart Freedman and
Adam Harris
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Phone:  (212) 756-2000
Email: stuart.freedman@srz.com
      adam.harris@srz.com

Counsel to Chatham:

Scott Charles and
Scott Golenbock
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Phone: (212) 403-1000
Email: SKCharles@wlrk.com
      SWGolenbock@wlrk.com

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Commitment Letter, effective as of the date first above written.

**INK ACQUISITION LLC**

By: Chatham Lodging LP, its Managing Member

By: _Eric J. Kentoff_ (signature)
Name: Eric Kentoff
Title: Vice President

**INK ACQUISITION II LLC**

By: Chatham TRS Holding Inc., its Managing Member

By: _Eric J. Kentoff_ (signature)
Name: Eric Kentoff
Title: Vice President

**CERBERUS SERIES FOUR HOLDINGS, LLC**

By: Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

By: Cerberus Institutional Associates, L.L.C., its General Partner

By: _____
Name:
Title:

**CHATHAM LODGING TRUST**

By: _Eric J. Kentoff_ (signature)
Name: Eric Kentoff
Title: Vice President + General Counsel

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Commitment Letter, effective as of the date first above written.

**INK ACQUISITION LLC**

By: Chatham Lodging LP, its Managing Member

By: _____

     Name:

     Title:

**INK ACQUISITION II LLC**

By: Chatham TRS Holding Inc., its Managing Member

By: _____

     Name:

     Title:

**CERBERUS SERIES FOUR HOLDINGS, LLC**

By: Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

By: Cerberus Institutional Associates, L.L.C., its General Partner

By: _____

     Name: Mark A. Neporent

     Title: Senior Managing Director

**CHATHAM LODGING TRUST**

By: _____

     Name:

     Title:

Accepted and agreed:

**INNKEEPERS USA TRUST**
(solely on behalf of the Fixed/Floating Debtors,
its wholly owned direct and indirect subsidiaries)

By: *Marc A. Beilinson*

Name:

Title:

**MIDLAND LOAN SERVICES, a DIVISION OF PNC BANK,**
**NATIONAL ASSOCIATION** (as Special Servicer for U.S. Bank
National Association as Trustee for the Registered Holders of
LB-UBS Commercial Mortgage Trust 2007-C6, LB-UBS Commercial Mortgage Trust 2007-C7,
Commercial Pass Through Certificates successor trustee to Bank of America
National Association)

By:_____

Name:

Title:

**APOLLO INVESTMENT CORPORATION**

By:_____

Name:

Title:

Accepted and agreed:

**INNKEEPERS USA TRUST**
(solely on behalf of the Fixed/Floating Debtors,
its wholly owned direct and indirect subsidiaries)

By:_____
Name:
Title:

**MIDLAND LOAN SERVICES, a DIVISION OF PNC BANK,
NATIONAL ASSOCIATION** (as Special Servicer for U.S. Bank
National Association as Trustee for the Registered Holders of
LB-UBS Commercial Mortgage Trust 2007-C6, LB-UBS Commercial Mortgage Trust 2007-C7,
Commercial Pass Through Certificates successor trustee to Bank of America
National Association)

By:_____
Name: KEVIN C. DONAHUE
Title: SVP, SERVICING OFFICER

**APOLLO INVESTMENT CORPORATION**

By:_____
Name:
Title:

Accepted and agreed:

**INNKEEPERS USA TRUST**
(solely on behalf of the Fixed/Floating Debtors,
its wholly owned direct and indirect subsidiaries)

By:_____
Name:
Title:

**MIDLAND LOAN SERVICES, a DIVISION OF PNC BANK,**
**NATIONAL ASSOCIATION** (as Special Servicer for U.S. Bank
National Association as Trustee for the Registered Holders of
LB-UBS Commercial Mortgage Trust 2007-C6, LB-UBS Commercial Mortgage Trust 2007-C7,
Commercial Pass Through Certificates successor trustee to Bank of America
National Association)

By:_____
Name:
Title:

**APOLLO INVESTMENT CORPORATION**

By:_____
Name: James Zelter
Title: Managing Partner

Fixed/Floating Debtors

The "Floating Rate Debtors" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC; and Grand Prix West Palm Beach, LLC.

The "Fixed Rate Debtors" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC.

The "Other Plan Debtors" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; Grand Prix Mezz Borrower Fixed, LLC; and GP AC Sublessee LLC.

**The "Fixed/Floating Debtors" are the Floating Rate Debtors, the Fixed Rate Debtors, and the Other Plan Debtors. The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan.**

Amended and Restated Term Sheet

[See Attached]

# AMENDED AND RESTATED
# TERM SHEET

***THIS AMENDED AND RESTATED TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF INNKEEPERS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.***

| | |
|---|---|
| **Plan of Reorganization:** | The recapitalization and debt restructuring (the "<u>Transaction</u>") of the Fixed/Floating Debtors is to be effectuated through the Fixed/Floating Plan filed in the Bankruptcy Court with the support of the Plan Sponsors and Midland.<br><br>The Fixed/Floating Plan shall be acceptable in all respects to the Company, Plan Sponsors and Midland in each of their respective reasonable discretion. The Debtors shall not amend, withdraw, or revoke the Fixed/Floating Plan or waive or amend any provision thereof without the consent of the Plan Sponsors and Midland, which consent shall not be unreasonably withheld, conditioned, or delayed. Any plan(s) filed by the Company with respect to the Excluded Debtors (as defined below) shall be acceptable in all respects to the Company in its reasonable sole discretion. |
| **Treatment of Debt:** | Consummation of the Transaction is subject to the restructuring of the Fixed/Floating Debtors' debt in amounts and with the treatment terms provided herein, or with such other terms that are (i) acceptable to the Debtors, and (ii) acceptable to the Plan Sponsors and Midland (a) in each of the Debtors', Plan Sponsors', and Midland's respective sole discretion with respect to the economic and treatment terms set forth herein and (b) otherwise in each of the Debtors', Plan Sponsors', and Midland's respective reasonable discretion. |
| **New Equity:** | Holders of common, preferred, and any other equity interests in the Fixed/Floating Debtors shall receive no distributions under the Fixed/Floating Plan on account of such interests. INK Acquisition LLC and INK Acquisition II LLC, entities that are newly formed by the Plan Sponsors ( collectively "<u>New HoldCo</u>"), will acquire the indirect and direct equity of reorganized Grand Prix Mezz Borrower Fixed, LLC, reorganized Grand Prix Mezz Borrower Floating, LLC, reorganized Grand Prix Fixed Lessee, LLC, and Grand Prix Floating Lessee, LLC (and their respective subsidiaries), and such other assets as may be subsequently identified as necessary to the operation of the Fixed/Floating Debtors, <u>provided</u>, <u>however</u>, that no assets of the Anaheim Hotel Debtors, the Ontario Hotel Debtors or the Reorganizing Debtors (collectively, the "<u>Excluded Debtors</u>"), including, without limitation, cash or cash equivalents, shall be included in the Transaction, except to the extent provided in the Transition Services Agreement. |

| | |
|---|---|
| | The ultimate corporate structure for the reorganized Fixed/Floating Debtors shall be determined by the Plan Sponsors, in their sole discretion, and will be described in a plan supplement document to be filed before the scheduled date of confirmation of the Fixed/Floating Plan. |
| **Equity Purchase Price /Treatment of Floating Rate Mortgage Loan:** | The Plan Sponsors shall contribute to New HoldCo, as an equity investment, $400,527,644.35 in cash to be used by New HoldCo to, among other things, satisfy its obligations under the Amended and Restated Commitment Letter, this Amended and Restated Term Sheet and the Fixed/Floating Plan.<br><br>In full and final satisfaction of the Floating Rate Pool Mortgage Loan Claims outstanding against the Fixed/Floating Debtors, on the Effective Date New HoldCo shall pay to Lehman, in cash, $233,489,097.04, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan. Such increase or decrease in cash payable in respect of the Floating Rate Mortgage Loan will create a reciprocal increase or decrease in the recovery of the Floating Rate Mezzanine Loan holders such that the aggregate cash paid in respect of the Floating Rate Mortgage Loan and the Floating Rate Mezzanine Loan will not change. |
| **Treatment of Fixed Rate Mortgage Loan:** | In full and final satisfaction of the Fixed Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors outstanding under the Fixed Rate Mortgage Pool Loan Agreement, on the Effective Date the holder of the Fixed Rate Mortgage Loan Claims shall receive the following treatment:<br><br>• A new non-recourse mortgage loan of $723,797,238.03, which shall have the following terms: (i) no change to the interest rate of 6.71%; (ii) no change to the maturity date of July 9, 2017; (iii) during the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iv) prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and (v) property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations, such other provision that is acceptable to the Plan Sponsors and Midland that is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release |

contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. The applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Midland shall reasonably require as reasonably acceptable to New HoldCo and the Plan Sponsors and as is consistent with this Term Sheet.

- $12,802,450.37 of cash.

- Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct New HoldCo to make a cash payment of $2,500,000 to Midland as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, Midland shall continue to be entitled to collect any and all monthly or periodic fees and other compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Fixed/Floating Debtors or New HoldCo to pay any of such fees or other compensation or any other amounts under the Fixed Rate Mortgage Loan documents, including an appropriate review fee.

- The lender under the Fixed Rate Mortgage Loan will receive limited guaranties from each of New HoldCo and Cerberus on terms acceptable to New HoldCo, Cerberus and Midland (and substantially similar to those set forth in the Five Mile/Midland Commitment and with appropriate modifications to reflect the corporate structure of New HoldCo).

- Payment of $3,000,000 and the Global Release (as defined below) as set forth in the "<u>Releases</u>" section herein.

| | |
|---|---|
| **Treatment of Floating Rate Mezzanine Debt and Unsecured Debt:** | SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive $2,363,001.42 in cash, subject to increase or decrease based on accrued default interest and unpaid fees and expenses |

| | due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan. Such increase or decrease in cash payable in respect of the Floating Rate Mezzanine Loan will create a reciprocal increase or decrease in the recovery of Lehman as lender under the Floating Rate Mortgage Loan such that the aggregate cash paid in respect of the Floating Rate Mortgage Loan and the Floating Rate Mezzanine Loan will not change; and |
|---|---|
| | Cash (of which Apollo Investment Corporation will fund $375,000, subject to receipt of each of the releases described below) in the amount of $4,750,000 shall be available for distribution to the holders of general unsecured claims against the Fixed/Floating Debtors (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order (the "<u>Unsecured Claims Fund</u>"); further, the Fixed/Floating Debtors shall release and waive all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code. |
| **Transition Services Agreement:** | The Company will develop a separation plan and transition services agreement for the Fixed/Floating Debtors and the Excluded Debtors, which shall address the uses of certain assets including, without limitation, intellectual property, licenses, IT resources, book and records and permits, and address cash management, cash collateral, and other cash issues, which separation plan and transition services agreement shall be outlined in the plan supplement and be reasonably satisfactory to the Plan Sponsors, the Fixed/Floating Debtors, and the Excluded Debtors. |
| **Employee Costs** | The Plan Sponsors agree to fund at closing $3,500,000 cash in wired funds to certain members of the Company's existing management, officers, and employees, as directed by the existing Board in its sole and absolute discretion. |
| **DIP Financings:** | The debtor-in-possession financing provided by Solar Finance, Inc. (the "<u>Solar DIP</u>"), which is secured by liens on the assets of the Floating Rate Debtors, and Tranche A of the debtor-in-possession financing provided by Five Mile Capital II Pooling International LLC, which is secured by liens on the assets of the Fixed Rate Debtors (solely with respect to Tranche A, the "<u>Five Mile DIP</u>") shall be repaid in cash on the Effective Date. |
| **Payment of Five Mile Expenses:** | In accordance with the Bidding Procedures Order, up to $3,000,000 of the cash provided by New HoldCo will be used to provide Expense Reimbursement to Five Mile. |
| **Payment of Lehman Expenses:** | Lehman's advisors' and counsel's reasonable and documented fees and expenses shall continue to be paid until the Effective Date in accordance with the Final Cash Collateral Order. |

| | |
|---|---|
| **Required Cash:** | Upon consummation of the Transaction and on the Effective Date, New HoldCo will have at least $22,800,000 to fund future PIP work and FF&E reserves (if necessary, as determined by New HoldCo), sufficient capital to pay off the Solar DIP (in the principal amount then outstanding, of up to approximately $17,498,096) and the Five Mile DIP (in the principal amount then outstanding, of up to approximately $46,600,000),[1] sufficient capital to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order [Docket No. 402], as amended (the "Final Cash Collateral Order"), that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy, and at least $41,600,000 of cash on hand. |
| **Reimbursement of Plan Sponsor Expenses:** | On or after the Effective Date, New HoldCo shall reimburse each of the Plan Sponsors for their reasonable and documented fees and expenses. |
| **Pro Forma Equity Ownership:** | Following the Effective Date, the equity of New HoldCo will initially be allocated among the new ownership as follows:<br><br>Cerberus Members: 90.8%<br>Chatham Members:  9.2% |
| **Commitments:** | Subject to the conditions set forth in this Term Sheet, the Plan Sponsors, the Debtors and Midland, as applicable, agree and covenant that:<br><br>The Plan Sponsors, the Debtors and Midland shall (i) use reasonable efforts to prepare or cause the preparation of the Fixed/Floating Plan, Disclosure Statement, other Fixed/Floating Plan related documents, and other Fixed/Floating Plan-related pleadings (collectively, the "Fixed/Floating Plan Documents"), which shall be consistent in all material respects with the Amended and Restated Commitment Letter and this Amended and Restated Term Sheet, and cause the filing and seek the approval of such pleadings, (ii) take all reasonably necessary and appropriate actions to support and achieve confirmation and consummation of the Fixed/Floating Plan and the Transaction contemplated in the Amended and Restated Commitment Letter and this Amended and Restated Term Sheet, and (iii) not take any actions (either by affirmative action or omission) (a) inconsistent with the Amended and Restated Commitment Letter or this Amended and Restated Term Sheet or (b) that would materially delay the confirmation or consummation of the |

---

[1] This number assumes that both the Solar DIP and the Five Mile DIP have been fully funded. If the Solar DIP has not been fully funded, or funded amounts have not been used by the Fixed/Floating Debtors, cash in an amount equal to the amount then unfunded or unused under the Solar DIP shall be placed into an account held by New HoldCo for the benefit of the Post-Effective Date Fixed/Floating Debtors. Likewise, if the Five Mile DIP has not been fully funded, or funded amounts have not been used by the Fixed/Floating Debtors, cash in an amount equal to the amount then unfunded or unused under the Five Mile DIP shall be placed into an account held by New HoldCo for the benefit of the Post-Effective Date Fixed/Floating Debtors.

| | |
|---|---|
| | Fixed/Floating Plan or the Transaction contemplated in the Amended and Restated Commitment Letter and this Amended and Restated Term Sheet.<br><br>The Plan Sponsors, the Debtor, and Midland each hereby covenant and agree to negotiate in good faith the Fixed/Floating Plan Documents, each of which shall (i) contain the same treatment and economic terms as set forth herein (subject to adjustment as agreed to by the Parties in each of their reasonable sole discretion) and other terms consistent in all respects with the terms set forth in the Amended and Restated Commitment Letter and this Amended and Restated Term Sheet, and (ii) be acceptable in all other respects to the Plan Sponsors, the Debtors and Midland in each of their respective reasonable discretion.<br><br>The Plan Sponsors hereby commit to provide the entire principal amount of the Commitment upon the Effective Date, upon the terms and subject to the conditions set forth in the Amended and Restated Commitment Letter and this Amended and Restated Term Sheet. |
| **Fiduciary Out:** | Upon the determination by the Company's directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of this Term Sheet or the Commitment Letter shall prevent, amend, alter, or reduce the Company's ability to exercise its fiduciary duties under applicable law (the "<u>Fiduciary Out</u>"), provided however, that Company shall not exercise such Fiduciary Out except to pursue an Alternative Restructuring Transaction (as defined in the Disclosure Statement and Solicitation Procedures Order) with a party other than the Plan Sponsors. |
| **Bid Protections** | The Plan Sponsors and New HoldCo shall be entitled to the protections contained in the order (a) approving the adequacy of the Disclosure Statement for the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code; (b) approving certain dates related to confirmation of the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code; (c) approving certain voting procedures and the form of certain documents to be distributed in connection with the solicitation of the Plan; (d) approving proposed voting and general tabulation procedures with respect to an Alternative Restructuring Transaction. |
| **Termination:** | Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate the Amended and Restated Commitment Letter and Amended and Restated Term Sheet by written notice to the Debtors and Midland upon the earliest occurrence of the following events (each a "<u>Termination Event</u>"):<br><br>• June 30, 2011, if a Confirmation Order for the Fixed/Floating Plan has not been entered by the Bankruptcy Court; <u>provided</u>, <u>however</u>, |

that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- The dismissal or conversion to chapter 7 of any of the Fixed/Floating Debtors' Chapter 11 cases or any of the Chapter 11 cases of Grand Prix Holdings LLC, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership (collectively, the "Parent Companies"); provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- The termination of exclusivity for any of the Fixed/Floating Debtors or the Parent Companies unless supported or sought by the Plan Sponsors; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- Approval by the Bankruptcy Court with respect to the assets of the Fixed/Floating Debtors of any bidding procedures, sale procedures for sales other than of de minimis assets, disclosure statement, or plan other than the Bidding Procedures Order, the Disclosure Statement, and the Fixed/Floating Plan;

- The granting of stay relief with respect to any of the Fixed/Floating Debtors' assets, other than immaterial assets; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- In the exercise of the Parties' reasonable best efforts, failure to execute, deliver, or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Midland's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate (i) the Transaction with respect to the Fixed Rate Mortgage Loan or otherwise affecting the treatment, including the economics, thereof, in each case in form and substance satisfactory to Midland and the Plan Sponsors in each of their respective reasonable discretion and (ii) the Transaction, in such case

in form and substance satisfactory to the Plan Sponsors in each of their respective reasonable discretion; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- Termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement reasonably deemed necessary by the Plan Sponsors or Midland prior to the Effective Date without the Plan Sponsors and Midland's written approval with respect to the assets of the Fixed/Floating Debtors; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- Failure by the Fixed/Floating Debtors to assume and, if necessary, assign all franchise agreements pursuant to an order of the Bankruptcy Court satisfactory to the Plan Sponsors and Midland in all material respects on or before the Effective Date with respect to the assets of the Fixed/Floating Debtors; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

- Such earlier date as may be agreed upon in writing by the Company and the Plan Sponsors; or

- The Company materially breaches its obligations under the Amended and Restated Term Sheet or the Amended and Restated Commitment Letter, including, without limitation, if the Company materially breaches its obligations, whether or not through its exercise of the Fiduciary Out.

Time is of the essence with respect to the Termination Events.

Upon termination of the Amended and Restated Commitment Letter and Amended and Restated Term Sheet as a result of a Termination Event, the Deposit (as defined in the Bidding Procedures Order) shall be returned to the Plan Sponsors with any interest accrued thereon in accordance with the terms of the escrow agreement among the Company, New HoldCo and the escrow agent with respect to such Deposit.

| | |
|---|---|
| **Effective Date/Outside Date Termination:** | - The occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including, without limitation, entry of a Confirmation Order with respect to the Fixed/Floating Plan by the Bankruptcy Court that has become final and non-appealable, and the Fixed/Floating Plan will also include customary provisions with respect to waiver of conditions to the Effective Date. |

| | |
|---|---|
| | • Notwithstanding anything contained herein to the contrary, unless otherwise agreed by the Company, the Plan Sponsors, and Midland in writing, the Amended and Restated Commitment Letter and Amended and Restated Term Sheet shall automatically terminate and be of no further force or effect and the Confirmation Order for the Fixed/Floating Plan will provide that both confirmation and such Confirmation Order will be automatically revoked (with a reversion to the status quo ante) on September 15, 2011 (the "<u>Outside Date</u>") if the Effective Date has not occurred and all of the transactions contemplated under the Amended and Restated Commitment Letter, this Amended and Restated Term Sheet, and the Fixed/Floating Plan have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "<u>Outside Date Termination Event</u>"); <u>provided</u>, <u>however</u>, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC.<br><br>Time is of the essence with respect to the Outside Date Termination Event. |
| **Releases:** | <u>Releasing Parties</u>.<br><br>• The "<u>Releasing Parties</u>" shall be the Fixed/Floating Debtors, the Plan Sponsors, Midland (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts, and trustees) and Apollo Investment Corporation (and together with its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, and professionals, "<u>Apollo</u>"), and other holders of claims against and interests in the Fixed/Floating Debtors, and each of the foregoing parties' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers and directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals (including the officers, directors, trustees, and members of the Parent Companies, in their capacity as such).<br><br><u>Midland Servicer Release</u>.<br><br>• The Fixed/Floating Plan shall provide that Midland, as special servicer and on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of Midland's claims against Apollo, related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "<u>Apollo Guaranty</u>") and (ii) if an action remains pending in the State Courts of New York or elsewhere, Midland shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Midland of indefeasible payment as |

provided in the next sentence and such settlement, waiver, and release shall be embodied in, and shall not be effective unless and until the Global Release (as defined herein) has been embodied in, a Confirmation Order for the Fixed/Floating Plan entered by the Bankruptcy Court that has become final and non-appealable. Contemporaneously with the occurrence of the Effective Date, the Plan Sponsors will direct New HoldCo to make a cash payment of $3,000,000 to Midland, on behalf of the C6 and C7 Trusts, as settlement of Midland's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Fixed/Floating Plan and shall be in form and substance reasonably satisfactory to Midland and Apollo, and shall be conditioned on the above-described payment and the occurrence of the Effective Date.

Apollo Release.

- Apollo shall agree to (i) waive all rights to receive any recovery or distribution under the Fixed/Floating Plan; and (ii) settle and provide a complete general release and waiver of any of its claims against the Releasing Parties. Apollo shall provide such waiver of rights and such general release and waiver of claims against the Releasing Parties in exchange for such entities settling, releasing, and waiving any claims they may have against Apollo to the extent provided herein. Such release by the Releasing Parties shall include (but shall not be limited to) Midland, as special servicer and on behalf of the C6 and C7 Trusts, settling, releasing, and waiving all of Midland's claims against Apollo, that are related in any way to the Apollo Guaranty; provided that, the effectiveness of such settlement, release, and waiver is conditioned on the receipt by Midland of indefeasible payment as provided for herein and shall not be effective until the occurrence of the Effective Date.

Global Release.

- The Fixed/Floating Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, by and among the Releasing Parties (each against one another), other than a release of the obligations undertaken herein and in the Fixed/Floating Plan and other Transaction documents, from the following: (i) any and all claims and causes of action relating to the Company arising at any time prior to the Effective Date, and in connection therewith, the Global Release shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims,

| | interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases. It is expressly understood and agreed, that notwithstanding anything otherwise contained in this Term Sheet, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until Midland has received the $3,000,000 cash payment provided for herein and the occurrence of the Effective Date. |
|---|---|
| | Reservation of Rights. |
| | • The Releasing Parties reserve all of their respective rights, claims, and interests with respect to the Excluded Debtors and all assets of the Excluded Debtors. |
| | • Whatever rights, claims, and interests the Excluded Debtors may have with respect to the Fixed/Floating Debtors and their assets are also preserved. |

**EXHIBIT C**

Form of New HoldCo/Midland Commitment Letter

[See Attached]

INK Acquisition LLC
INK Acquisition II LLC
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, NY 10171


May 16, 2011

Midland Loan Services, a division of PNC Bank, National Association
10851 Mastin, 6th Floor
Overland Park, KS  66210

Attention:  Kevin S. Semon
            Vice President, Special Servicing Manager

## Binding Commitment Regarding the Acquisition and
## Restructuring of Certain Subsidiaries of Innkeepers USA Trust

INK Acquisition LLC ("INK I") and INK Acquisition II LLC ("INK II", and together with INK I, individually or collectively, as the context may require, "New HoldCo"), Cerberus Series Four Holdings, LLC ("Cerberus") and Chatham Lodging Trust ("Chatham", and together with Cerberus, the "Plan Sponsors"), are pleased to submit this commitment letter (this "Commitment Letter") to Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the $825,400,000 Fixed Rate Mortgage Loan (together with any successor special servicer, "Special Servicer"), which sets forth, among other things, our binding commitment to provide equity capital (the "Commitment") for the restructuring of the debt and equity of certain wholly owned direct and indirect subsidiaries of Innkeepers USA Trust (together with all of its wholly owned direct and indirect subsidiaries, "Innkeepers" or the "Company") that are indentified on Exhibit A attached hereto (collectively, the "Fixed/Floating Debtors"), resulting in the Plan Sponsors directly or indirectly owning all of the equity interests of the Fixed/Floating Debtors as more fully set forth in that certain Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust, dated May 9, 2011, among the parties thereto (the "Plan Sponsors' Commitment"). The recapitalization and debt restructuring (the "Transaction") is to be effectuated through a plan of reorganization for the Fixed/Floating Debtors (the "Fixed/Floating Plan") to be filed in the United States Bankruptcy Court for the Southern District of New York presiding over the Company's bankruptcy cases (jointly administered as Case No. 10-13800) (the "Innkeepers Bankruptcy Court") by the Fixed/Floating Debtors with the support of us and you.

As the successful bidder at the Fixed/Floating Auction (as defined in the Bidding Procedures Order), it is intended that the funding from our Commitment will be used to finance and otherwise implement a confirmed Fixed/Floating Plan acceptable in all respects to you in your reasonable discretion, including the necessity of REMIC compliance and consistency with grantor trust rules and regulations and the pooling and servicing agreement, and acceptable to us in our reasonable discretion, which will provide for the treatment of claims and other terms

outlined below and in the Plan Sponsors' Commitment and the Fixed/Floating Plan and will otherwise comply with applicable disclosure requirements, rules of procedure and contain terms and treatment of claims consistent with the applicable provisions of the Bankruptcy Code.

The Plan Sponsors are each uniquely qualified to consummate the Transaction. Established in 1992, Cerberus Capital Management, L.P. is one of the world's leading private investment firms with approximately $23 billion under management in funds and accounts. Cerberus' investors include prominent state and local pension funds, charitable foundations, university endowments and insurance companies, as well as family savings. Cerberus is headquartered in New York City, with affiliate and/or advisory offices in the U.S., Europe and Asia. Cerberus' dedicated team of investment and operations professionals is active in private equity, distressed investments (corporate debt, mortgage, NPLs, structured products) lending/loans and real estate. On the lodging side, Cerberus, through an affiliate, currently owns 5,160 keys including the Sheraton Waikiki (Waikiki, HI), Moana Surfrider (Waikiki, HI), Royal Hawaiian (Waikiki, HI), Princess Kaiulani (Waikiki, HI), Sheraton Maui (Maui, HI) and the Palace Hotel (San Francisco, CA). Additionally, Cerberus is in contract to acquire Silverleaf Resorts, a time-share vacation company.

Chatham is a self-advised real estate investment trust that invests in upscale extended-stay hotels and premium-branded select-service hotels. Chatham currently owns 13 hotels with an aggregate of 1,650 rooms/suites in nine states and has one additional hotel under contract to purchase in Pittsburgh, PA. Island Hospitality Management, LLC and its affiliates (collectively, "IHM") is engaged in the management of hotels throughout the United States and is experienced in the various phases of hotel operations. IHM currently provides comprehensive hotel management services to all but one of the hotels owned by the Fixed/Floating Debtors. Chatham currently has the capacity to invest over $300 million in new hotel assets. Additional information about Chatham may be found at www.chathamlodgingtrust.com.

## I.      Value & Proposed Capital Structure

Our Commitment and the Transaction are based on a valuation of New HoldCo of $1,124,699,882.38 (including $375,000 to be paid by Apollo Investment Corporation ("Apollo") as described more fully in Section III below) and result in a final capital structure of $723,797,238.03 in aggregate indebtedness and $400,527,644.35 in new equity, which will include funding for closing and emergence costs. The details of the reorganized capital structure for New HoldCo are provided in Section IV below.

## II.     Capital Commitments; Guaranties

Subject to the conditions set forth herein and in the Plan Sponsors' Commitment, we will provide $400,527,644.35 of cash in the aggregate to fund the Transaction, of which (i) Cerberus will contribute cash to Ink I and Ink II in an aggregate amount equal to $363,527,644.35, through CRE-Ink REIT Member, LLC ("Cerberus REIT"), in the case of Ink I, and CRE-INK Member II, Inc. ("Cerberus Inc." and, together with Cerberus REIT, the "Cerberus Members") in the case of Ink II, and each of Cerberus REIT and Cerberus Inc. will own 90.8% of the equity of Ink I and Ink II, respectively; and (ii) Chatham will contribute cash to Ink I and Ink II in an aggregate amount equal to $37,000,000, through Chatham Lodging LP ("Chatham LP") in the case of Ink I, and Chatham Ink II TRS Inc. ("Chatham Inc. and, together with Chatham LP, the "Chatham

Members") in the case of Ink II, and each of Chatham LP and Chatham Inc. will own 9.2% of the equity of Ink I and Ink II, respectively. The Transaction will be effectuated consistent with the terms of this Commitment Letter and the Plan Sponsors' Commitment, on the effective date of the Fixed/Floating Plan (the "Effective Date") (the occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including without limitation entry of an order confirming the Fixed/Floating Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable and the Transaction contemplated under the Fixed/Floating Plan having been closed and consummated as contemplated thereunder on or before September 15, 2011), and the Fixed/Floating Plan will also include customary provisions with respect to waiver of conditions to the Effective Date). The Plan Sponsors' intended investment, as reflected herein, will be used to recapitalize the Fixed/Floating Debtors, and more specifically, will be used to retire the existing DIP facilities (as they relate to the Fixed/Floating Rate Debtors); provide approximately $22,800,000 to fund future property improvement work ("PIP"), and furniture, fixtures, and equipment investments ("FF&E") reserves; pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (Docket No. 402), as amended, that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy; and provide at least $41,600,000 of cash on hand. The Plan Sponsors will provide their portion of the cash investment required to consummate the Transaction from their existing investment vehicles or Plan Sponsors' sponsored and controlled co-investment vehicles.

In addition, in connection with the Fixed Rate Mortgage Loan, (a) Cerberus will enter into a new limited "bad boy" guaranty (the "Cerberus Guaranty") which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate Mortgage Loan, except that Cerberus will not have any liability under the Cerberus Guaranty unless such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the applicable Cerberus Member or an affiliate that controls such Cerberus Member and (b) New HoldCo shall enter into a new "bad boy" guaranty (the "New HoldCo Guaranty"), which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate Mortgage Loan, except that the beneficiary of the New HoldCo Guaranty shall have no right to enforce such New HoldCo Guaranty unless the Cerberus Members cease to have the right to approve Cerberus Decisions (as defined below). Cerberus' maximum liability under the Cerberus Guaranty shall not exceed 10% of the outstanding principal balance of the restructured Fixed Rate Mortgage Loan from time to time for which such guaranty is provided. There shall be no such cap on the liability of New HoldCo under the New HoldCo Guaranty. The forms of the Cerberus Guaranty and the New HoldCo Guaranty are attached hereto as Exhibits A and B, respectively. If a Cerberus Member desires to sell or otherwise transfer (i) all of its interests in New HoldCo or (ii) a portion of its interest in New HoldCo and with respect to any such partial sale or transfer, Cerberus Members would cease to have approval rights over Cerberus Decisions following such sale or transfer, then, in addition to any other conditions to such sale or transfer set forth in the Fixed Rate Mortgage Loan documents, as a condition to any such sale or other transfer, an entity, which has a minimum net worth of $135,000,000 and which is otherwise acceptable to the holder of the Fixed Rate Mortgage Loan in its sole but reasonable discretion, shall deliver a guaranty in form and substance substantially similar to the Cerberus Guaranty which covers "bad acts" actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the transferee or an affiliate that controls, is controlled by or under common control with such transferee, provided that for the purposes of such transferee's

guaranty, New HoldCo shall be deemed not to be an affiliate controlling, controlled by or under common control with such transferee) and Cerberus or the transferee shall pay an appropriate review fee to be set forth in the definitive documentation.

During the term of the Fixed Rate Mortgage Loan, (x) the corporate or other governance documents of New HoldCo and the borrowers under the Fixed Rate Mortgage Loan, the operating lessees and such other subsidiaries of New HoldCo (as may be necessary to effectuate the provisions of this paragraph) shall provide that the decisions identified on Appendix A hereto as Major Decisions as well as the actions identified on Appendix A as Unilateral Actions are Cerberus Decisions, in each case, if such decision or action would result in or otherwise constitute a "bad act" under the Cerberus Guaranty (irrespective and independent of whether or not such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the applicable Cerberus Member or an affiliate that controls such Cerberus Member) and/or the New HoldCo Guaranty, as applicable (collectively, the "Cerberus Decisions") and (y) such Cerberus Decisions may not be amended, waived or modified without the consent of the holder of the Fixed Rate Mortgage Loan. Nothing contained in this Commitment Letter shall require the Special Servicer to take any action in violation, derogation or contravention of the terms or provisions of the Fixed Rate Mortgage Loan documents.

The parties acknowledge that the applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer and its counsel shall reasonably require as reasonably acceptable to the reorganized borrowers and the Plan Sponsors in order to implement the proposed treatment of the Fixed Rate Mortgage Loan, to incorporate the terms herein and to implement the Fixed/Floating Plan.

In connection with the foregoing, we hereby confirm that we have available, and will have available at all times prior to consummation of the Transaction or the termination of the Commitment Letter, investor commitments that exceed, in the aggregate, $400,527,644.35.

## III. Restructuring of Debt and Equity of the Company - New Equity, Debt Forgiveness, & Cash Pay Downs

### A. Debt Restructurings

Our Commitment for the Fixed/Floating Plan Sponsors' bid contemplates a restructuring implemented through the Fixed/Floating Plan whereby the current Fixed/Floating Debtors' debt holders will realize value totaling $1,039,549,882.38 (including the $3,000,000 payment in connection with the Special Servicer's release of Apollo as described below) or 83.7% of their $1,242,137,058.78 current outstanding obligations. The Fixed/Floating Debtors' creditor treatment is being implemented through $723,797,238.03 in new debt, $400,527,644.35 in equity and cash, $5,500,000 of cash consideration for existing guarantees and servicing fees paid on behalf of the LB-UBS 2006-C6 and LB-UBS 2006-C7 trusts (the "C6 and C7 Trusts") and $4,750,000 ($375,000 of which shall come from Apollo) in cash to fund certain creditor payments. The new debt also benefits from a capital structure supported by approximately 35.6% in equity value.

An illustration and an explanation of the Plan Sponsors' bid and the resultant Fixed/Floating Debtors' creditor treatment under the Fixed/Floating Plan are detailed in Appendix B.

**B.**     *Cash Sources & Uses*

Our Commitment contemplates that the cash investment of $400,527,644.35 will be used as follows:

- o     Repayment of the Solar and Five Mile DIPs (as they relate to the Fixed/Floating Debtors) in the amount of up to $64,098,096 plus any accrued fees or interest due on such facility;

- o     Payment of $3,000,000 to the Special Servicer as settlement of Midland's claims against Apollo with respect to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty"), which have been the subject of litigation pending in New York Supreme Court;

- o     Payment of up to $3,000,000 in cash to satisfy the reimbursement of all Five Mile's reasonable and documented fees and expenses;

- o     Payment of fees to the Special Servicer of the Fixed Rate Mortgage Loan equal to $2,500,000 as consideration for effecting the restructuring transactions on behalf of the C6 and C7 Trusts;

- o     $74,900,000 of cash to cover 2011 FF&E and future PIP work (currently estimated at approximately $22,800,000 and to be verified by the parties), funding of additional cash on the post-Effective Date balance sheet, and closing and emergence costs;

- o     Payment of $4,750,000 ($375,000 of which shall come from Apollo) for the various classes of unsecured creditors;

- o     $235,852,098.46 in cash to the Floating Pool creditors; and

- o     $12,802,450.37 in cash consideration to Fixed Rate Mortgage Loan creditors.

**C.**     *Our Bid and Resultant Treatment of Claims and Interests*

The Plan Sponsors' Commitment and the Plan Sponsors' bid is comprised of the following treatment of claims and interests:

1.     <u>Fixed Rate CMBS Mortgage Loan</u>:     Reduction of the outstanding balance to $723,797,238.03.

        a.     Non-Recourse New Mortgage Loan of $723,797,238.03 shall have the following terms:

                i.     No change to the interest rate of 6.71%;

ii.        No change to maturity date of July 9, 2017;

iii.        During the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule;

iv.        Prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and

v.        Property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount which allocated loan amount for each property shall be reasonably acceptable to the Plan Sponsors and the Special Servicer, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations such other provision that is acceptable to the Plan Sponsors and Special Servicer that is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement

The form of Second Amendment to the Fixed Rate Mortgage Loan is attached hereto as <u>Exhibit C</u>.

b.        The Fixed/Floating Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo, related in any way to the Apollo Guaranty and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and shall be embodied in, and shall not be effective unless and until, the Global Release (as defined herein) has been embodied in an order confirming the Fixed/Floating Plan as entered in the Innkeepers Bankruptcy Court that has become final and become non-appealable. Immediately after the Effective Date, the Plan Sponsors will direct New HoldCo to make a cash payment of $3,000,000 to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Global Release in the Fixed/Floating Plan and shall be in form and substance reasonably satisfactory to Special Servicer and the form of release and waiver shall be in form and substance reasonably satisfactory to Apollo and conditioned on the above-described payment and the occurrence of the Effective Date;

c.        Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct New HoldCo to make a cash payment of a $2,500,000 fee to the Special Servicer as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, Special Servicer shall continue to be entitled to collect any and all monthly or periodic fees and other

compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Fixed/Floating Debtors or New HoldCo to pay any of such fees or other compensation or any other amounts under the Fixed Rate Mortgage Loan documents, including the appropriate review fee to be set forth in the definitive documentation as set forth in the second paragraph of Section II herein;

       d.    The lender under the Fixed Rate Mortgage Loan will receive the Cerberus Guaranty and the New HoldCo Guaranty; and

       e.    $12,802,450.37 of additional cash consideration in accordance with the Overbid Allocation.

2.    <u>Floating Rate Mortgage Loan</u>: Lehman, in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan will receive an amount equal to $233,489,097.04 in cash, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan. Such increase or decrease in cash payable in respect of the Floating Rate Mortgage Loan will create a reciprocal increase or decrease in the recovery of the Floating Rate Mezzanine Loan holders such that the aggregate cash paid in respect of the Floating Rate Mortgage Loan and the Floating Rate Mezzanine Loan will not change.

3.    <u>Additional Treatment for the Following Accepting Classes</u>: Following the approval of the disclosure statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, they shall receive the following treatment:

       a.    <u>Floating Rate Mezzanine Loan (TriMont as special servicer)</u>: SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive $2,363,001.42 in cash, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan. Such increase or decrease in cash payable in respect of the Floating Rate Mezzanine Loan will create a reciprocal increase or decrease in the recovery of Lehman as lender under the Floating Rate Mortgage Loan such that the aggregate cash paid in respect of the Floating Rate Mortgage Loan and the Floating Rate Mezzanine Loan will not change.

       b.    <u>Unsecured Debt</u>: Cash (of which Apollo Investment Corporation will fund $375,000, subject to receipt of each of the releases described below) in the amount of $4,750,000 shall be available for distribution to the holders of general unsecured claims against the Fixed/Floating Debtors (excluding any deficiency claims) that are not otherwise paid pursuant to

a "first day" order (the "Unsecured Claims Fund"); further, the Fixed/Floating Debtors shall release and waive all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code.

4.      Existing Equity of the Fixed/Floating Debtors and Issuance of New Equity:  Holders of common, preferred, and any other equity interests in the Fixed/Floating Debtors shall receive no distributions under the Fixed/Floating Plan on account of such interests.  New HoldCo will be issued 100% of the equity of reorganized Grand Prix Mezz Borrower Fixed, LLC, reorganized Grand Prix Mezz Borrower Floating, LLC, reorganized Grand Prix Fixed Lessee, LLC, and Grand Prix Floating Lessee, LLC, and such other assets as may be subsequently identified as necessary to the operation of the Fixed/Floating Debtors provided, however, that no assets of the Excluded Debtors,[1] including, without limitation, cash or cash equivalents, shall be included in the Transaction except to the extent provided in the Transition Services Agreement (as defined in the Fixed/Floating Plan).  The ultimate corporate structure for the reorganized Fixed/Floating Debtors shall be determined prior to the Effective Date of the Fixed/Floating Plan by the Plan Sponsors, in their sole discretion, (and consistent with this Commitment Letter) and will be described in a plan supplement document to be filed before the scheduled date of confirmation of the Fixed/Floating Plan.

5.      Application of Existing Cash on the Effective Date:  Special Servicer and New HoldCo agree that any cash at the Company that is the property of the Fixed/Floating Debtors or as of the Effective Date that is subject to application for disbursement, payment, repayment, or distribution for the Fixed/Floating Debtors under the Final Cash Collateral Order, whether or not applied prior to the Effective Date, shall be applied to satisfy administrative claims incurred but unpaid as of the Effective Date and to consummate the transaction contemplated herein pursuant to the waterfall set forth in the Final Cash Collateral Order (as has been amended to increase the amount of cash held back as an expense reserve, in order to account for certain closing and emergence costs, including potential success fees).  After the Effective Date, cash will be administered and applied pursuant to the applicable cash management procedures under the applicable loan documents, and the waterfall set forth in the Final Cash Collateral Order will no longer govern.

## IV.     Strength of the Bid and the Proposed Plan

We believe the Transaction and the Fixed/Floating Plan (consistent with the terms of this Commitment Letter and the Plan Sponsors' Commitment) is beneficial to all creditors and is in the best interests of the Company and its bankruptcy estates.  The Fixed/Floating Plan values the Fixed/Floating Debtors at $1,124,699,882.38 (including $375,000 to be paid by Apollo) and the current debt is reduced through debt forgiveness to $723,797,238.03.  Further, there is high certainty and low execution risk with the Fixed/Floating Plan, financed by our Commitment, as it will provide for the exit financing component critical to the success and emergence of Innkeepers from bankruptcy.  There is no due diligence condition.

---

[1]      The term "Excluded Debtors" shall have the meaning set forth in the Amended and Restated Term Sheet attached as Exhibit B to the Plan Sponsors' Commitment.  The Excluded Debtors are excluded from the Transaction.

We believe the Fixed/Floating Plan also provides additional stability for the Fixed/Floating Debtors by providing adequate cash to pay exit costs, fund $7,800,000 of FF&E reserve contribution for the first year of the restructured Fixed Rate Mortgage Loan (which funds shall be held by the Master Servicer of the Fixed Rate Mortgage Loan), and provide general cash liquidity to be held at New HoldCo (includes amounts for future PIPs) to manage seasonality within the business, cover operating or interest shortfalls should they occur, and provide funds to pay administrative and priority expenses upon emergence.

Further, the Fixed/Floating Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, other than a release of the obligations undertaken herein and in the Fixed/Floating Plan and other Transaction documents, by and among (each against one another) the Fixed/Floating Debtors, the Plan Sponsors, the Special Servicer (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts and trustees), Apollo, and other holders of claims against and interests in the Fixed/Floating Debtors, each of their respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers and directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals (including the officers, directors, members and trustees of the Parent Companies,[2] in their capacities as such) from the following: (i) any and all claims and causes of action relating to the Fixed/Floating Debtors arising prior to the Effective Date, and in connection therewith, shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the chapter 11 cases. It is expressly understood and agreed, that notwithstanding anything otherwise contained herein or in the Plan Sponsors' Commitment, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3,000,000 cash payment provided for herein and the occurrence of the Effective Date, which shall include that the Global Release has been embodied in the order confirming the Fixed/Floating Plan as entered in the Innkeepers Bankruptcy Court that has become final and become non appealable.

We are ready to move forward and have all the resources, including available funds, to conclude the transactions outlined in this Commitment Letter and the Plan Sponsors' Commitment.

## V.    Special Servicer Covenants

New HoldCo, the Plan Sponsors and the Special Servicer have entered into the this Commitment Letter. For as long as no Termination Event (as defined below in Section VI) has occurred hereunder, the Special Servicer hereby covenants to support the provisions of the Amended and Restated Term Sheet (the "Term Sheet") as provided for in the Plan Sponsors' Commitment.

Unless and until this Commitment Letter is terminated by the Plan Sponsors in accordance with Section VI below as a result of a Termination Event (as defined in Section VI hereof), Special

---

[2]    The term "Parent Companies" shall have the meaning set forth in the Amended and Restated Term Sheet attached as Exhibit B to the Plan Sponsors' Commitment.

Servicer and its affiliates and advisors shall not enter into a binding commitment with respect to, or otherwise consummate, any alternative transaction.

## VI.    Termination of Commitment

This Commitment Letter outlines only some of the essential terms regarding the proposed Transaction, is not all-inclusive and does not purport to summarize or contain all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Transaction.

Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate this Commitment Letter and the Term Sheet by written notice to the Fixed/Floating Debtors and the Special Servicer upon the earliest occurrence of the following events (each a "Termination Event"):

1.     June 30, 2011, if a Confirmation Order for the Fixed/Floating Plan has not been entered by the Innkeepers Bankruptcy Court; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

2.     The dismissal or conversion to chapter 7 of any of the Fixed/Floating Debtors' chapter 11 cases or any of the chapter 11 cases of the Parent Companies; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

3.     The termination of exclusivity for any of the Fixed/Floating Debtors or the Parent Companies unless supported or sought by the Plan Sponsors; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

4.     Approval by the Innkeepers Bankruptcy Court with respect to the assets of the Fixed/Floating Debtors of any bidding procedures, sale procedures for sales other than of *de minimis* assets, disclosure statement, or plan other than the Bidding Procedures Order, the Disclosure Statement, and the Fixed/Floating Plan;

5.     The granting of stay relief with respect to any of the Fixed/Floating Debtors' assets, other than immaterial assets; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

6.     The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

7.     In the exercise of the Parties' reasonable best efforts, failure to execute, deliver, or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by the Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate (i) the Transaction with respect to the Fixed Rate Mortgage Loan or otherwise affecting the treatment, including the

economics, thereof, in each case in form and substance satisfactory to the Special Servicer and the Plan Sponsors in each of their respective reasonable discretion and (ii) the Transaction, in such case in form and substance satisfactory to the Plan Sponsors in each of their respective reasonable discretion; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

8.      Any material breach by the Plan Sponsors or the Special Servicer of, or material, non-compliance with, the agreements set forth in this Commitment Letter;

9.      Mutual agreement of the Plan Sponsors and the Special Servicer to terminate this Commitment Letter;

10.     Termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement reasonably deemed necessary by the Plan Sponsors or the Special Servicer prior to the Effective Date without the Plan Sponsors and the Special Servicer's written approval with respect to the assets of the Fixed/Floating Debtors; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

11.     Failure by the Fixed/Floating Debtors to assume and, if necessary, assign all franchise agreements pursuant to an order of the Bankruptcy Court satisfactory to the Plan Sponsors and the Special Servicer in all material respects on or before the Effective Date with respect to the assets of the Fixed/Floating Debtors; provided, however, that this Termination Event shall not apply to the chapter 11 case of Grand Prix West Palm Beach LLC;

12.     Such earlier date as may be agreed upon in writing by the Company and the Plan Sponsors; or

13.     The Company materially breaches its obligations under the Term Sheet or the Plan Sponsors' Commitment Letter.

Time is of the essence with respect to the Termination Events.


## VII.    Miscellaneous

All notices, requests, claims, demands and other communications hereunder shall be given (and shall be deemed to have been duly received if given) by hand delivery in writing or by facsimile transmission with confirmation of receipt, as follows:

> if to New HoldCo:
>
> c/o Cerberus Real Estate Capital Management, LLC
> 299 Park Avenue, 23rd Floor
> New York, NY 10022
> Attention: Tom Wagner
> Email: twagner@cerberusre.com
> Facsimile: (646) 885-3391

With a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022
Attention:  Stuart Freedman and Adam Harris
Email: stuart.freedman@srz.com
         adam.harris@srz.com
Facsimile:  (212) 593-5955

Chatham Lodging Trust
50 Cocoanut Row, Suite 200
Palm Beach, FL 33480
Attention: Jeffrey Fisher
Email: jfisher@cl-trust.com
Facsimile: (561) 835-4125

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention:  Scott Charles and Scott Golenbock
Email: SKCharles@wlrk.com
         SWGolenbock@wlrk.com
Facsimile: (212) 403-2202


if to Special Servicer:

Midland Loan Services, a division of PNC Bank, National
Association
10851 Mastin, 6th Floor
Overland Park, KS  66210
Attention:  Kevin S. Semon
Email: kevin.semon@midlandls.com
Facsimile:  (913) 253-9723

With a copy to:

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York  10112
Attention:  Lenard M. Parkins and Lawrence Mittman
Email: lenard.parkins@haynesboone.com
         lawrence.mittman@haynesboone.com
Facsimile: (212) 884-8226
         (212) 884-8219

DOC ID-15926666.19

This Commitment Letter, the rights of the parties, and all actions arising in whole or part under or in connection herewith will be governed by and construed in accordance with the laws of the State of New York.

This Commitment Letter constitutes the entire agreement between the parties and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, between you (or the Company), on the one hand, and us, on the other hand. No material modification or waiver of any provision hereof shall be enforceable unless approved by you and us in writing. Neither you, on the one hand, nor us, on the other hand, is relying upon any statement or representation made by or on behalf of the other, except as expressly provided in this Commitment Letter. This Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other party hereto, (and any attempted assignment without such consent shall be null and void ab initio), provided, however, that New HoldCo may assign all or a portion of its rights hereunder to any entity with the same ownership as New HoldCo, provided, further, that such assignment shall not be in derogation of the Midland loan documents. Notwithstanding anything to the contrary contained in this paragraph, any assignment by NewHoldCo as contemplated under this paragraph shall not relieve New HoldCo of its obligations under the Plan Sponsors Commitment or the Term Sheet attached thereto.

We are prepared to enter into a transaction on the terms set forth herein. Upon receipt of a fully executed counterpart to this Commitment Letter, both parties agree to negotiate in good faith regarding the implementation of the Transaction contemplated in this Commitment Letter, including engaging in the preparation and negotiation of definitive documents, and Special Servicer agrees to move forward with its undertakings described in Section V herein.

Remainder of Page Intentionally Blank
Signature Pages to Follow

Should you have any questions regarding this Commitment Letter, please do not hesitate to contact any of the following individuals.

Cerberus:

Tom Wagner
Cerberus Real Estate Management, LLC
299 Park Avenue, 23rd Floor
New York, NY 10171
Phone: (212) 891-2158
Email: twagner@cerberusre.com

Chatham:

Jeff Fisher
Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Phone: (561) 227-1309
Email: jfisher@cl-trust.com

Sincerely yours,

By:    INK Acquisition LLC
        By:  Chatham Lodging LP, its managing member

        By:  _____
            Name:  *Eric Kentoff*
            Title:  *Vice President*

By:    INK Acquisition II LLC
        By:  Chatham TRS Holding Inc., its managing member

        By:  _____
            Name:  *Eric Kentoff*
            Title:  *Vice President*

By:    Cerberus Series Four Holdings, LLC

        By:  Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

        By:  Cerberus Institutional Associates, L.L.C., its General Partner

        By:  _____
            Name:
            Title:

By:    Chatham Lodging Trust

        By:  _____
            Name:  *Eric Kentoff*
            Title:  *Vice President + General Counsel*

Should you have any questions regarding this Commitment Letter, please do not hesitate to contact any of the following individuals.

Cerberus:                                     Chatham:

Tom Wagner                                    Jeff Fisher
Cerberus Real Estate Management,              Chatham Lodging Trust
LLC                                           50 Cocoanut Row
299 Park Avenue, 23rd Floor                   Palm Beach, FL 33480
New York, NY 10171                            Phone: (561) 227-1309
Phone: (212) 891-2158                         Email: jfisher@cl-trust.com
Email: twagner@cerberusre.com

Sincerely yours,

By:   INK Acquisition LLC
      By: Chatham Lodging LP, its managing member


      By:    _____
             Name:
             Title:

By:   INK Acquisition II LLC
      By: Chatham TRS Holding Inc., its managing member


      By:    _____
             Name:
             Title:


By:   Cerberus Series Four Holdings, LLC

      By:   Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

      By:   Cerberus Institutional Associates, L.L.C., its General Partner

      By:    _____
             Name:  Mark A. Neporent
             Title: Senior Managing Director

By:   Chatham Lodging Trust


      By:    _____
             Name:
             Title:

Acknowledged and Agreed:

**Midland Loan Services, a division of PNC Bank, National Association,** as Special Servicer for U.S. Bank, National Association as Trustee for the Registered Holders of each of the LB-UBS Commercial Mortgage Trust 2007-C6 and the LB-UBS Commercial Mortgage Trust 2007-C7, Commercial Mortgage Pass-Through Certificates successor trustee to Bank of America National Association

By: ⟋⟋⟋⟋⟋⟋⟋
      Name:  Kevin C. Donahue
      Title:   Senior Vice President
               Servicing Officer

## FIXED/FLOATING DEBTORS

The "<u>Floating Rate Debtors</u>" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC; and Grand Prix West Palm Beach, LLC.

The "<u>Fixed Rate Debtors</u>" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC.

The "<u>Other Plan Debtors</u>" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; Grand Prix Mezz Borrower Fixed, LLC; and GP AC Sublessee LLC.

**The "<u>Fixed/Floating Debtors</u>" are the Floating Rate Debtors, the Fixed Rate Debtors, and the Other Plan Debtors. The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan.**

## APPENDIX A

### Major Decisions & Unilateral Actions

"<u>Major Decision</u>" means any determination to cause New HoldCo or any subsidiary of New HoldCo to:

1.       directly or indirectly acquire, or execute and deliver any documents, agreements or instruments necessary to close on the direct or indirect acquisition by New HoldCo or any subsidiary of New HoldCo of, any Property, except as set forth in the then approved Operating Budget or the then approved Business Plan;

2.       (A) sell, assign, transfer, encumber or dispose of New HoldCo, any Property Company, any Property, or any revenue-generating business of New HoldCo or any Property Company, or agree to any of the foregoing, or (B) except as expressly provided in this Agreement or in the then-approved Operating Budget or the then-approved Business Plan, improve, design, rehabilitate, alter, or repair (collectively, the "Repairs") any of the Properties, provided, however, that the managing member of New HoldCo (the "Managing Member") may make or caused to be made Repairs not contemplated by the then-approved Operating Budget if (i) any such Repair is required by any franchisor under the applicable franchise agreement or any other agreement with the franchisor (including, but not limited to, that certain Agreement for Adequate Assurance of Completion of Certain PIPS and Assumptions of Agreements, dated June 25, 2010, by and between the Debtors and Marriot International, Inc.), (ii) emergency action or expenditures is necessary to prevent imminent risk to the health and safety of Persons on or about the Properties, imminent material property damage or imminent imposition of criminal or civil sanctions against New HoldCo or any member of New HoldCo (each, an "Emergency Expenditure"), provided that (1) any such Emergency Expenditure made without approval of all Initial Members is, in the Managing Member's commercially reasonable judgment, reasonable and necessary under the circumstances set forth above and (2) the Managing Member endeavors diligently and in good faith (x) to notify the Initial Members of any such Emergency Expenditure, promptly in writing and (y) attempts to obtain verbal approval of the Initial Members for any required Emergency Expenditure or (iii) if the aggregate cost of such Repairs fall within the thresholds set forth in clause 12 below;

3.       except as otherwise expressly permitted by this Agreement, call for capital contributions, approve capital calls or determine the portion of the then-approved Operating Budget that is to be funded by equity and by debt, or raise any new equity for any subsidiary of New HoldCo or admit any new member, partner or owner to New HoldCo or any of its subsidiaries;

4.       make any operating expenditure or incur any operating obligation by or on behalf of New HoldCo that varies materially from the then-approved Operating Budget other than an Emergency Expenditure made pursuant to the procedures set forth in clause 2 above and expenditures that fall within the thresholds set forth in clause 12 below;

5.      execute or modify, amend, supplement, terminate, extend or renew leases with tenants for occupancy of space in any Property, except (i) for any lease with a Property Leaseco or any other TRSs of Chatham REIT and Cerberus or (ii) to the extent delegated to the Hotel Manager pursuant to the Hotel Management Agreements or set forth in the then-approved Operating Budget or the then-approved Business Plan;

6.      enter into, modify or terminate any contractual arrangements with service providers (including lenders, attorneys, consultants, appraisers, third party property managers, brokerage companies, general contractors, accountants, auditors, architects, banks or other depositaries and all other service providers) for services to be rendered in connection with the business of New HoldCo; provided, however, that (i) until further written notice, Cerberus hereby delegates the tasks set forth in this subsection (f) to the Managing Member, so long as all such services are expressly provided for and are not in excess of the amounts budgeted for such services in the then approved Operating Budget and Business Plan and either (x) are terminable, without cause or fee, upon not more than thirty (30) days notice, (y) have a stated term of not more than one year or (z) are expressly approved in writing by Cerberus, (ii) Cerberus hereby authorizes the Managing Member to cause the Property Leasecos to engage Island Hospitality Management to act as the hotel manager of all of the Properties on behalf of the Property Leasecos (the "Hotel Manager") pursuant to the Hotel Management Agreements and (iii) the entry into, modification or termination of any contractual arrangement that requires an annual payment by New HoldCo of $25,000 or less, or the determination to take any of the foregoing actions, shall not be considered a Major Decision;

7.      incur or pay any real estate taxes, insurance premiums, or any assessments or charges with respect to the ownership and operation of any Property, except to the extent provided for in the then-approved Operating Budget or delegated to the Hotel Manager pursuant to the Hotel Management Agreement;

8.      make distributions to the members other than as set forth in the limited liability company agreement of New HoldCo (the "LLC Agreement");

9.      establish reserves, determine reserve levels or make any distributions from any such reserves, except as set forth in the then-approved Operating Budget or the then-approved Business Plan;

10.     except as set forth in the then-approved Operating Budget or the then-approved Business Plan, cause or permit New HoldCo to finance all or any portion of any Property (other than the Midland Loan and trade debt incurred in the ordinary course of business consistent with the then approved Operating Budget), agree to the form, substance, provider or documentation pertaining to any Loan, modify, restructure or terminate any Loan or repay any Loan except in accordance with the express terms of the applicable Loan, or enter into, modify or amend any documents, agreements or instruments relating to any Loan;

11.     except to the extent expressly set forth in the then-approved Operating Budget or the then-approved Business Plan, select or determine any insurance

plans, carriers or coverages to be purchased and maintained by or on behalf of New HoldCo or any Property Company;

12. make any expenditures which are at variance with the then approved Operating Budget or Business Plan(A) (1) with respect to any Operating Expense (as defined in the applicable hotel management agreement) for any Property unless Operating Expenses for such Property would not exceed the estimated Operating Expenses for such Property as set forth in the then-current and approved Operating Budget with respect to such Property by five percent (5%) or more (in the aggregate, but not by line item) and (2) with respect to any other expenditure not described in clause (1), unless the variance in question does not exceed a particular summary line item by the lesser of (x) $50,000 or (y) 10% of that summary line item, and (B) unless the overall Operating Budget is not exceeded in the aggregate by more than 2.5% (excluding, for purposes of the foregoing calculation, the use of any contingency line items set forth in the then approved Operating Budget)), and provided that in any case the Managing Member may make an Emergency Expenditure pursuant to the procedures set forth in clause 2 above);

13. grant or convey any easement, lien, ground lease, mortgage, deed, deed of trust, bill of sale, contract or other instrument purporting to convey or encumber any Property, either wholly or in part;

14. take any Bankruptcy action on behalf of New HoldCo or any of its Subsidiaries;

15. institute any legal or arbitration proceedings in the name of New HoldCo, settle any legal or arbitration proceedings against New HoldCo or confess any judgment against New HoldCo or any Property, other than (i) the institution of an eviction action, a suit for breach of a tenant lease or other similar proceeding contemplated in or provided for in the then approved Operating Budget or the then approved Business Plan or (ii) settlements or compromises for litigation or arbitration providing solely for the payment of money damages where the amount paid (after giving effect to any insurance proceeds) in settlement or compromise does not exceed $50,000;

16. execute, deliver or file any agreement, permit, request, application or filing with any governmental agency, any neighboring property owner, any community organization or any similar regulatory body, or send any correspondence to or have any other material communications with, any governmental agency, which directly binds New HoldCo or any of its Affiliates or any member of New HoldCo or any of its Affiliates, or which advocates a position on behalf of New HoldCo or its Affiliates or any member of New HoldCo or its Affiliate (excluding correspondence, communications and other actions with respect to ministerial matters consistent with the then-approved Operating Budget and the then-approved Business Plan);

17. approve any investment other than as contemplated by the LLC Agreement or approve any renovation or disposition of any Property, except as expressly authorized by the then-approved Business Plan and other than an Emergency Expenditure or Repair made pursuant to the procedures set forth in clause 2 above;

18.     enter into any exclusivity, competition or confidentiality agreement that is or purports to be binding upon any Member of New HoldCo or any of its Affiliates or interest holders;

19.     enter into any settlements with any third party or any consent decree, order (judicial or otherwise) with any Governmental Entity, related to the breach of any environmental law, or the sampling, monitoring, treatment, remediation, removal or clean up of hazardous substances with respect to the Properties;

20.     knowingly take or approve, or refrain from taking or approving, any action that is reasonably likely to lead to a default under any Loan Documents or to a material dispute with any Lender;

21.     knowingly take or approve, or refrain from taking or approving, any action that could trigger a recourse provision under any then-outstanding Loan;

22.     approve any marketing plans or agreements with respect to any Property, except as expressly authorized by the then-approved Business Plan;

23.     require or permit New HoldCo to make any loan to any member of New HoldCo or any of its Affiliates, or require or permit any loan (other than a member loan with respect to a defaulted capital contribution) to be made by any member of New HoldCo to New HoldCo;

24.     cause New HoldCo or any Property Company to execute or deliver any indemnity or guaranty;

25.     change New HoldCo's depreciation and accounting methods and make other decisions with respect to the treatment of various transactions for federal income tax purposes, and change New HoldCo's elections for federal, state or local income tax purposes;

26.     amend the LLC Agreement (or the corresponding organizational documents of any subsidiary of New HoldCo) in any respect;

27.     take or approve any action relating to any tax certiorari proceeding or other tax appeal affecting any Property;

28.     recapitalize, reclassify, redeem, repurchase or otherwise acquire any equity or other interests of New HoldCo or any subsidiary of New HoldCo;

29.     merge, consolidate or dissolve New HoldCo or any of its subsidiaries;

30.     remove and replace Island Hospitality Management as Hotel Manager;

31.     permit or cause any transfer that may reasonably be expected to cause the assets of New HoldCo or any Subsidiary of the New HoldCo to be deemed "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA);

32.     enter into any swap, hedge, collar or other interest rate protection agreement;

33.     enter into any lease, whether as lessor or lessee, other than short term storage leases in connection with a capital program or equipment leases in the ordinary course of business;

34.     take any action that could reasonably be expected to cause New HoldCo to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT;

35.     enter in any transaction that could reasonably be expected to cause Chatham REIT or Cerberus REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6);

36.     cause any rebranding of properties or entry into new franchise agreements;

37.     approve or implement any Operating Budget or Business Plan, as set forth in Section 3.5 of the LLC Agreement;

38.     except as otherwise expressly permitted pursuant to this Agreement or the then-current Operating Budget or Business Plan, enter into, amend or modify agreements with cost or liability to New HoldCo or its subsidiaries in excess of $5 million in any fiscal year or which are otherwise material to the business of New HoldCo, provided, that for purposes of this provision, the cost of an agreement shall be calculated based on only the period prior to the time that New HoldCo or its subsidiaries shall have the right to freely terminate such agreement, and shall include any fee payable upon termination by New HoldCo or its subsidiaries;

39.     enter into any agreement with an Affiliate of a Member other than pursuant to Section 4.4 of the LLC Agreement;

40.     cause New HoldCo or any Subsidiary other than a Property Company or Property Leaseco to hold any assets other than (w) the interests in its subsidiaries as of the closing date of the Transaction after giving effect to the transactions contemplated by the Plan, (x) any interest in an entity treated as a corporation for U.S. federal income tax purposes, (y) any cash reserves intended for distributions to the Members or to pay New HoldCo expenses or (z) any other assets that the Managing Member is permitted to acquire and hold pursuant to the then-effective Operating Budget;

41.     enter into or terminate, dispose of or materially amend the terms of any joint venture to which New HoldCo or any of its subsidiaries is a party;

42.	change the principal banking institutions with which New HoldCo or its subsidiaries maintain deposit, borrowing or other relationships; or

43.	materially change the line(s) of business of New HoldCo and its subsidiaries or conducting business in a jurisdiction other than the United States.

"<u>Unilateral Actions</u>" are the following:

1.	To compel, cause and undertake the liquidation of the Company and take all actions related thereto, including the disposition of all then remaining Properties, at any time following the fifth (5th) anniversary of the date hereof, so long as such liquidation will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause New HoldCo to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT;.

2.	To demand and receive an updated Operating Budget and Business Plan from the Managing Member, at any time and from time to time but in any event no more than once each fiscal quarter, together with such other reporting items or information as Cerberus may reasonably require;

3.	To audit the books and records of the Company and any Property Companies; <u>provided</u>, <u>however</u>, that the Company shall only be required to pay for one such audit per calendar year, and any additional audits requested by Cerberus in any given calendar year shall be paid for by Cerberus;

4.	To compel, cause and undertake the disposition of any Property in an arms length transaction to any Person other than Cerberus or an Affiliate of Cerberus, so long as such disposition will not (A) cause a default under any then-existing loan documents, (B) cause Chatham to incur or suffer any recourse liability under any then-existing loan documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause New HoldCo or any of its members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT;

5.	To take any action which may be reasonably necessary for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware; and

6.	To approve any restructuring plan or take or refraining from taking any other action relating to the restructuring of the Company, any Property or any Loan, so long

as such restructuring will not (A) cause a default under any then existing loan documents, (B) cause Chatham to incur or suffer any recourse liability under any then-existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT.

Capitalized terms used in this Appendix A shall have the following meanings:

"Affiliate" means, with respect to a Person, another Person that directly or indirectly controls, is controlled by or is under common control with such first Person. For the avoidance of doubt, (i) an Affiliate of Cerberus includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that, as of the date hereof, control Cerberus; and (ii) an Affiliate of Chatham includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that control Chatham REIT, and any successor to Chatham REIT, whether by merger, consolidation, sale of substantially all of the assets or otherwise. Additionally, for the avoidance of doubt, Island Hospitality Management shall not be considered to be an Affiliate of Chatham REIT or Chatham.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy". A "Voluntary Bankruptcy" shall mean, with respect to any Person, (a) an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors, (b) the filing of any petition or answer by such Person seeking to adjudicate it bankrupt or insolvent or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of such Person or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking, consenting to or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property, or (c) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" shall mean, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation or the filing of any such petition against such Person which order or petition shall not be dismissed within 90 days or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within 90 days.

"Business Plan" means the comprehensive strategic plan for New HoldCo's ownership, operation, financing and sale of the Properties, as in effect from time to time.

"Carveout Guaranty" means a guaranty of non-recourse carveouts, in form and substance satisfactory to the applicable Lender and approved in advance in writing by the members of New HoldCo (including, without limitation, any such guaranty required by Midland Loan Services in connection with the Midland Loan).

"Chatham REIT" means Chatham Lodging Trust, a Maryland real estate investment trust.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Governmental Entity" means a court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency.

"Hotel Management Agreement" means the Hotel Management Agreements to be executed and delivered on the closing date, between Island Hospitality Management and each Property Leaseco.

"Initial Member" means each of Chatham and Cerberus and their respective permitted transferees.

"Lender" means the lender under any loan documents to be executed by New HoldCo or any of its subsidiaries, as applicable, with respect to a Loan, if any.

"Loan" means a loan obtained or assumed by New HoldCo or any of its subsidiaries, as borrower, secured by all or any portion of the Property, including the Midland Loan.

"Midland Loan" means the new non-recourse mortgage loan in an aggregate principal amount of not less than $723.8 million made by Midland Loan Services, a division of PNC National Bank, in a form approved by the Initial Members the proceeds of which are to be used to satisfy the Debtors' current outstanding fixed rate mortgage loan as part of the transactions contemplated by the Fixed/Floating Plan.

"Operating Budget" means the annual operating budget for the ownership, operation, marketing and sale of the Properties, as in effect from time to time.

"Person" means any individual, corporation, association, partnership (general or limited), joint venture, trust, joint-stock company, estate, limited liability company, series, unincorporated organization or other legal entity or organization.

"Properties" means the properties directly or indirectly owned by the Fixed/Floating Debtors that are the subject of the Fixed/Floating Plan, and any other property (real, personal or mixed) or real estate acquired by New HoldCo.

"Property Company" means a direct or indirect subsidiary of New HoldCo through which New HoldCo indirectly holds one or more Properties.

"Property Leasecos" means each of Grand Prix Fixed Lessee LLC and Grand Prix Floating

Lessee LLC, each a Delaware limited liability company that will either (i) elect to be treated as associations taxable as corporations for federal income tax purpose and as TRSs of Chatham REIT and Cerberus REIT (ii) be wholly owned by a subsidiary of New HoldCo that elects to be a TRS of Chatham REIT and Cerberus REIT or (iii) be owned by a subsidiary of Chatham REIT or Cerberus REIT that elects to be a TRS.

"TRS" means an entity that qualifies as a "taxable REIT subsidiary" under Code Section 856(l).

# APPENDIX B[3]

## *Pro Forma Capitalization*

| | Current Principal Balance[(a)] | Consideration | Cash Consideration | Pro Forma Principal Balance |
|---|---|---|---|---|
| **DEBT** | | | | |
| **Five Mile Fixed Pool DIP Loan** | $46,600,000.00 | $46,600,000.00 | $46,600,000.00 | $0.00 |
| **Lehman DIP Loan**[(b)] | 17,498,095.52 | 17,498,095.52 | 17,498,095.52 | 0.00 |
| **Fixed Pool Mortgage**[(c)] | 825,400,000.00 | 736,599,688.40 | 12,802,450.37 | 723,797,238.03 |
| **Floating Pool Loan**[(d)] | 352,638,963.26 | 235,852,098.46 | 235,852,098.46 | 0.0 |
| **Total Debt** | **$1,242,137,058.78** | | | **$723,797,238.03** |
| **Implied Equity** | | | | **$400,527,644.35** |
| **Total Capitalization** | **$1,242,137,058.78** | | | **$1,124,324,882.38** |

(a)  Current Principal Balance represents principal balance as of the date the Company filed for chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.

(b)  Assumes DIP financing facility is fully drawn.

(c)  A new, non-recourse note having the following terms:  (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

(d)  Includes Floating Pool Mortgage and Mezzanine Loans

---

[3]  Appendix B (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

| Sources | | Uses | |
|---|---|---|---|
| New Cash | $400,527,644.35 | Repayment of Solar DIP Financing | 17,498,095.52 |
| Apollo Contribution | 375,000.00 | Repayment of Five Mile DIP Financing | 46,600,000.00 |
| Overbid Financing[a] | 101,297,238.03 | Consideration to Fixed Rate Mortgage Holders[b] | 114,099,688.40 |
| | | Consideration to Floating Pool Mortgage and Mezzanine Loan Holders | 235,852,098.46 |
| | | Unsecured Creditors Payment | 4,750,000.00 |
| | | Apollo Guaranty Settlement | 3,000,000.00 |
| | | Five Mile/Lehman Expense Reimbursement | 3,000,000.00 |
| | | Special Servicer Cash Payment | 2,500,000.00 |
| | | Balance Sheet Cash[c] | 74,900,000.00 |
| **Total** | **$502,199,882.38** | | **$502,199,882.38** |

---

(a)  Reflects only the portion of financing constituting the overbid amount and does not include the $622,500,000 of financing contained in the stalking horse bid

(b)  Consists of $12,802,450.37 in cash and the remainder in indebtedness.

(c)  Balance sheet to be used for, among other purposes, the funding of $22,800,000.00 of FF&E, PIP, and working capital reserves, the potential $500,000.00 payment to Bidder D and closing costs (currently estimated to be approximately $10,000,000.00).  Insofar as any of these costs are not realized in their full amounts, the balance sheet cash shall stay with the New HoldCo.

Exhibit A
Form of Cerberus Guaranty

[See Attached]

**(Fixed Portfolio)**

# GUARANTY[1]

  **THIS GUARANTY** (this "**Guaranty**") is executed as of this _____ day of _____, 2011 by **CERBERUS SERIES FOUR HOLDINGS, LLC**, a Delaware limited liability company, having an address at c/o Cerberus Real Estate Capital Management, LLC, 299 Park Avenue, 22nd Floor, New York, New York 10022 ("**Guarantor**"), for the benefit of **U.S. BANK, NATIONAL ASSOCIATION AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C6, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C6, SUCCESSOR TRUSTEE TO BANK OF AMERICA NATIONAL ASSOCIATION**, having an address at c/o Wells Fargo Commercial Mortgage Servicing, 201 South College Street, 9th Floor, Charlotte, North Carolina, 28244 ("**Lender**").

## WITNESSETH:

  WHEREAS, pursuant to that certain Loan Agreement, dated as of June 29, 2007, between EACH OF THE PERSON SET FORTH IN SCHEDULE I ATTACHED HERETO, each a Delaware limited liability company (each individually and collectively, as the context requires, "**Borrower**") and Lehman ALI INC. ("**Original Lender**"), as lender (as modified by that certain First Amendment to Loan Agreement, dated as of August 9, 2007, as further modified by that certain [Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement dated as of the date hereof (the "**Omnibus Amendment**")], and as the same may hereafter be amended, modified, restated, renewed or replaced the "**Loan Agreement**"), Original Lender made a Loan (as defined in the Loan Agreement) to Borrower which Loan is evidenced by the Note (as defined in the Loan Agreement), secured by, among other things, the Security Instruments (as defined in the Loan Agreement);

  WHEREAS, in connection with the Omnibus Amendment, Guarantor has agreed to unconditionally guarantee payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

  WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's entering into the Omnibus Amendment.

  NOW, THEREFORE, as an inducement to Lender to enter into the Omnibus Amendment, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

---

[1]   Subject to confirmation of organizational structure.

# ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1** **Guaranty of Obligation.** Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor. Guarantor's maximum liability hereunder shall not exceed ten percent (10%) of the outstanding principal balance of the Loan plus all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.

**1.2** **Definition of Guaranteed Obligations.** As used herein, the term **"Guaranteed Obligations"** means the obligations or liabilities of Borrower to Lender for which Borrower shall be liable pursuant to Section 9.4(b) and (c) of the Loan Agreement, if and to the extent such obligations and liabilities are directly and immediately caused by and/or actually and affirmatively consented to by Cerberus Member (as defined in the Loan Agreement) or any Person that Controls Cerberus Member[2].

Notwithstanding anything to the contrary in any of the Loan Documents, Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 11 1 l(b) or any other provisions of the U.S. Bankruptcy Code to file a claim in any bankruptcy proceeding of Borrower for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

**1.3** **Nature of Guaranty.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4** **Guaranteed Obligations Not Reduced by Offset.** The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

---

[2]        Subject to review of organizational documents for all subsidiaries of New Holdco and the operating agreement for INK Acquisition II LLC and confirmation that Major Decisions can not be taken or otherwise effected by such entities without affirmative action by Cerberus Member or any Person that Controls Cerberus Member.

**1.5    Payment By Guarantor.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity; notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6    No Duty To Pursue Others.** It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**1.7    Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instrument, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

**1.8    Payment of Expenses.** In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations until the expiration of any applicable statute of limitations.

**1.9    Effect of Bankruptcy.** In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or

decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. In addition, if at any time any payment of principal, interest or any other amount payable by Borrower under any Loan Document, is rescinded or must be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be fully reinstated as though such payment has been due but not made.

      **1.10**    **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

      **1.11**    **Borrower.** The term **"Borrower"** as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of or by Borrower, provided that nothing herein shall be deemed to permit any such merger, reorganization, sale, transfer, assignment, devise, gift or bequest of or by Borrower other than in accordance with the terms of the Loan Agreement.

      **1.12**    **Termination.** This Guaranty and the obligations of Guarantor hereunder shall automatically terminate upon the payment in full of the Loan; provided, however, that the Guarantor shall remain liable for any Guaranteed Obligations to Lender that by their terms survive payment in full of the Loan. In addition, upon compliance with the applicable requirements in Section 5.2.11 of the Loan Agreement, this Guaranty and the obligations of Guarantor hereunder shall terminate as more fully set forth in the Loan Agreement.

## ARTICLE II
## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

      Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

2.1    **Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instruments, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

2.2    **Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

2.3    **Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

2.4    **Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Security Instruments, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instruments, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed obligations or any part thereof for any reason.

2.5    **Release of Obligors.** A. full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of aq7 or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6** **Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7** **Release of Collateral.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8** **Care and Diligence.** Other than as a result of Lender's gross negligence, fraud or willful misconduct, the failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9** **Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

**2.10** **Offset.** The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**2.11** **Merger.** The reorganization, merger or consolidation of Borrower into or with any other Person.

**2.12** **Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.13** **Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence,

circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1** **Benefit.** Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2** **Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3** **No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**3.4** **Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6** **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

# ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1** **Subordination of All Guarantor Claims.** As used herein, the term **"Guarantor Claims"** shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2** **Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly, from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3** **Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4** **Liens Subordinate.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or

Lender presently exist or are hereafter created or attached. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower.

**ARTICLE V**
**MISCELLANEOUS**

5.1　**Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.　No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

5.2　**Notices.** Any notice, demand, statement, request or consent made hereunder shall be made in accordance with Section 10.6 of the Loan Agreement. The addresses of the Guarantor is as follows:

> Cerberus Series Four Holdings, LLC
> c/o Cerberus Real Estate Capital Management, LLC
> 299 Park Avenue, 22nd Floor
> New York, NY  10022
> Attention:  Tom Wagner
> Facsimile number:  (646) 885-3391

With a copy to:

> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Attention:  Stuart D. Freedman, Esq.
> Facsimile number:  (212) 593-5955

5.3 <u>Governing Law</u>.  **(a) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY INDEMNITEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY**

OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR AND LENDER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

CT Corporation
111 Eighth Avenue
New York, New York 1 0011

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GUARANTOR (I)SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (11) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (111) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**5.4     Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.5     Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.6     Parties Bound; Assignment; Joint and Several**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

**5.7     Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8     Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

5.9     **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**5.10     Rights and Remedies**. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

**5.11** **Other Defined Terms**. Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

**5.12** **Entirety**. **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

**5.13** **Waiver of Right To Trial By Jury**. **GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT *ANY* SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER**

**5.14** **Reinstatement in Certain Circumstances.** If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[NO FURTHER TEXT ON THIS PAGE]

This Guaranty is EXECUTED as of the day and year first above written.

**GUARANTOR:**

**CERBERUS SERIES FOUR HOLDINGS, LLC**,
a Delaware limited liability company

By:_____
    Name:
    Title:

# SCHEDULE I

## BORROWER

Grand Prix Belmont LLC
Grand Prix Campbell/San Jose LLC
Grand Prix El Segundo LLC
Grand Prix Fremont LLC
Grand Prix Mountain View LLC
Grand Prix San Jose LLC
Grand Prix San Mateo LLC
Grand Prix Sili I LLC
Grand Prix Sili II LLC
Grand Prix Denver LLC
Grand Prix Englewood/Denver South LLC
Grand Prix Shelton LLC
Grand Prix Windsor LLC
Grand Prix Altamonte LLC
Grand Prix Ft. Lauderdale LLC
Grand Prix Naples LLC
Grand Prix Atlanta LLC
Grand Prix Atlanta (Peachtree Corners) LLC
Grand Prix Lombard LLC
Grand Prix Chicago LLC
Grand Prix Schaumburg LLC
Grand Prix Westchester LLC
Grand Prix Lexington LLC
Grand Prix Louisville (RI) LLC
Grand Prix Columbia LLC
Grand Prix Gaithersburg LLC
Grand Prix Germantown LLC
Grand Prix Portland LLC
Grand Prix Livonia LLC
Grand Prix Cherry Hill LLC
Grand Prix Mt. Laurel LLC
Grand Prix Saddle River LLC
Grand Prix Islandia LLC
Grand Prix Binghamton LLC
Grand Prix Horsham LLC
Grand Prix Willow Grove LLC
Grand Prix Addison (RI) LLC
Grand Prix Arlington LLC
Grand Prix Las Colinas LLC
Grand Prix Richmond LLC

Grand Prix Richmond (Northwest) LLC
Grand Prix Bellevue LLC
Grand Prix Bothell LLC
Grand Prix Lynnwood LLC
Grand Prix Tukwila LLC

Exhibit B
Form of New HoldCo Guaranty


[See Attached]

# GUARANTY[1]

      **THIS GUARANTY** (this **"Guaranty"**) is executed as of this ___ day of _____, 2011 by **INK ACQUISITION LLC** and **INK ACQUISITION II LLC**, each a Delaware limited liability company, each having an address c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 (individually and collectively, "**Guarantor**"), for the benefit of **U.S. BANK, NATIONAL ASSOCIATION AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C6, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C6, SUCCESSOR TRUSTEE TO BANK OF AMERICA NATIONAL ASSOCIATION,** having an address at c/o Wells Fargo Commercial Mortgage Servicing, 201 South College Street, 9th Floor, Charlotte, North Carolina, 28244 ("**Lender**").

## WITNESSETH:

      WHEREAS, pursuant to that certain Loan Agreement, dated as of June 29, 2007, between EACH OF THE PERSONS SET FORTH IN SCHEDULE I ATTACHED HERETO, each a Delaware limited liability company (each individually and collectively, as the context requires, **"Borrower"**) and Lehman ALI Inc. ("**Original Lender**"), as lender (as modified by that certain First Amendment to Loan Agreement, dated as of August 9, 2007 as further modified by that certain Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement dated as of the date hereof (the "**Omnibus Amendment**"), and as the same may hereafter be amended, modified, restated, renewed or replaced the **"Loan Agreement"**), Original Lender made a Loan (as defined in the Loan Agreement) to Borrower which Loan is evidenced by the Note (as defined in the Loan Agreement), secured by, among other things, the Security Instruments (as defined in the Loan Agreement);

      WHEREAS, in connection with the Omnibus Amendment, Guarantor has agreed to unconditionally guarantee payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

---

[1]     Subject to confirmation of organizational structure.

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's entering into the Omnibus Amendment.

NOW, THEREFORE, as an inducement to Lender to enter into the Omnibus Amendment, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1** **Guaranty of Obligation.** Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor. Notwithstanding the foregoing, Lender shall have no right to enforce this Guaranty against Guarantor unless the approval or consent of the Cerberus Member (as such term is defined in the Loan Agreement) is not required to effect Major Decisions (as defined in the Loan Agreement).

**1.2** **Definition of Guaranteed Obligations.** As used herein, the term **"Guaranteed Obligations"** means the obligations or liabilities of Borrower to Lender for which Borrower shall be liable pursuant to Section 9.4(b) and (c) of the Loan Agreement.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim in any bankruptcy proceeding of Borrower for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

**1.3** **Nature of Guaranty.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to

the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4** **Guaranteed Obligations Not Reduced by Offset.** The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**1.5** **Payment By Guarantor.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6** **No Duty To Pursue Others.** It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**1.7** **Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instrument, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan

Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

**1.8     Payment of Expenses.**   In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations until the expiration of any applicable statute of limitations.

**1.9     Effect of Bankruptcy.**   In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. In addition, if at any time any payment of principal, interest or any other amount payable by Borrower under any Loan Document, is rescinded or must be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be fully reinstated as though such payment has been due but not made.

**1.10     Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

**1.11     Borrower.** The term **"Borrower"** as used herein shall include any

new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of or by Borrower, provided that nothing herein shall be deemed to permit any such merger, reorganization, sale, transfer, assignment, devise, gift or bequest of or by Borrower other than in accordance with the terms of the Loan Agreement.

      **1.12**    **Termination.** This Guaranty and the obligations of Guarantor hereunder shall automatically terminate upon the payment in full of the Loan; provided, however, that the Guarantor shall remain liable for any Guaranteed Obligations to Lender, including, but not limited to, the Environmental Indemnity, that by their terms survive payment in full of the Loan.  In addition, upon compliance with the applicable requirements in Section 5.2.11 of the Loan Agreement, this Guaranty and the obligations of Guarantor hereunder shall terminate as more fully set forth in the Loan Agreement.

**ARTICLE II**

**EVENTS AND CIRCUMSTANCES NOT REDUCING
OR DISCHARGING GUARANTOR'S OBLIGATIONS**

      Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

      **2.1**    **Modifications.**   Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instruments, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

      **2.2**    **Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

      **2.3**    **Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the

Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4** **Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Security Instruments, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instruments, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5** **Release of Obligors.** Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of any or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6** **Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7** **Release of Collateral.** Any release, surrender, exchange,

subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

      **2.8**    **Care and Diligence.** Other than as a result of Lender's gross negligence, fraud or willful misconduct, the failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

      **2.9**    **Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

      **2.10**    **Offset.** The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

      **2.11**    **Merger.** The reorganization, merger or consolidation of Borrower into or with any other Person.

      **2.12**    **Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

      **2.13**    **Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor

that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## <u>REPRESENTATIONS AND WARRANTIES</u>

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1** **<u>Benefit.</u>** Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2** **<u>Familiarity and Reliance.</u>** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3** **<u>No Representation By Lender.</u>** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**3.4** **<u>Guarantor's Financial Condition.</u>** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **<u>Legality.</u>** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors'

rights.

    **3.6** **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

**ARTICLE IV**

**SUBORDINATION OF CERTAIN INDEBTEDNESS**

    **4.1** **Subordination of All Guarantor Claims**. As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

    **4.2** **Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly -from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

    **4.3** **Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received,

and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4** **Liens Subordinate.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attached. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower.

## ARTICLE V

## MISCELLANEOUS

**5.1** **Waiver.** No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2** **Notices.** Any notice, demand, statement, request or consent made hereunder shall be made in accordance with Section 10.6 of the Loan Agreement. The address of the Guarantor is as follows:

| | |
|---|---|
| If to Guarantor: | INK Acquisition LLC |
| | INK Acquisition II LLC |
| | c/o Chatham Lodging Trust |
| | 50 Cocoanut Row, Suite 200 |
| | Palm Beach, Florida 33480 |
| | Attention: Jeffrey Fisher |
| | Facsimile number: (561) 804-0909 |
| | |
| with a copy to: | Wachtell, Lipton, Rosen & Katz |
| | 51 West 52nd Street |
| | New York, New York 10019 |
| | Attention: Scott K. Charles and David Fishman |
| | Facsimile number: (212) 403-2311 |
| | |
| With a copy to: | Schulte Roth & Zabel LLP |
| | 919 Third Avenue |
| | New York, New York 10022 |
| | Attention: Stuart D. Freedman, Esq. |
| | Facsimile number: (212) 593-595 |

5.3     Governing Law. (a) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY INDEMNITEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW

**YORK GENERAL OBLIGATIONS LAW.**

      **(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR AND LENDER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:**

      CT Corporation
      111 Eighth Avenue
      New York, New York 10011

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW A YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

      **5.4**    **<u>Invalid Provisions.</u>** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and

effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

      **5.5**    **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

      **5.6**    **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

      **5.7**    **Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

      **5.8**    **Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

      **5.9**    **Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

      **5.10**    **Rights and Remedies.** If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

     **5.11**    <u>Other Defined Terms.</u> Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

     **5.12**    <u>Entirety.</u> **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

     **5.13**    <u>Waiver of Right To Trial By Jury.</u> **GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.**

     **5.14**    <u>Reinstatement in Certain Circumstances.</u> If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[NO FURTHER TEXT ON THIS PAGE]

**GUARANTOR:**

**INK ACQUISITION LLC,** a Delaware limited liability company

By:_____
   Name:
   Title:

**INK ACQUISITION II LLC,** a Delaware limited liability company

By:_____
   Name:
   Title:

**SCHEDULE I**

**BORROWER**

Grand Prix Belmont LLC
Grand Prix Campbell/San Jose LLC
Grand Prix El Segundo LLC
Grand Prix Fremont LLC
Grand Prix Mountain View LLC
Grand Prix San Jose LLC
Grand Prix San Mateo LLC
Grand Prix Sili I LLC
Grand Prix Sili II LLC
Grand Prix Denver LLC
Grand Prix Englewood/Denver South LLC
Grand Prix Shelton LLC
Grand Prix Windsor LLC
Grand Prix Altamonte LLC
Grand Prix Ft. Lauderdale LLC
Grand Prix Naples LLC
Grand Prix Atlanta LLC
Grand Prix Atlanta (Peachtree Corners) LLC
Grand Prix Lombard LLC
Grand Prix Chicago LLC
Grand Prix Schaumburg LLC
Grand Prix Westchester LLC
Grand Prix Lexington LLC
Grand Prix Louisville (RI) LLC
Grand Prix Columbia LLC
Grand Prix Gaithersburg LLC
Grand Prix Germantown LLC
Grand Prix Portland LLC
Grand Prix Livonia LLC
Grand Prix Cherry Hill LLC
Grand Prix Mt. Laurel LLC
Grand Prix Saddle River LLC
Grand Prix Islandia LLC
Grand Prix Binghamton LLC
Grand Prix Horsham LLC
Grand Prix Willow Grove LLC
Grand Prix Addison (RI) LLC
Grand Prix Arlington LLC
Grand Prix Las Colinas LLC
Grand Prix Richmond LLC

Grand Prix Richmond (Northwest) LLC
Grand Prix Bellevue LLC
Grand Prix Bothell LLC
Grand Prix Lynnwood LLC
Grand Prix Tukwila LLC

Exhibit C
Form of Second Amendment
to Fixed Rate Mortgage Loan


[See Attached]

## SECOND AMENDMENT TO LOAN AGREEMENT AND OMNIBUS LOAN MODIFICATION AGREEMENT[1]

THIS SECOND AMENDMENT TO LOAN AGREEMENT AND OMNIBUS LOAN MODIFICATION AGREEMENT (this "Amendment") is made and effective as of the [__] day of [_____], 2011 (the "Effective Date"), by and among **U.S. BANK, NATIONAL ASSOCIATION AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C6, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C6, SUCCESSOR TRUSTEE TO BANK OF AMERICA NATIONAL ASSOCIATION**, having an address at c/o Wells Fargo Commercial Mortgage Servicing, 201 South College Street, 9th Floor, Charlotte, North Carolina, 28244 (as Lender and Agent for the Co-Lenders, together with its successors and assigns, "Lender"), **EACH OF THE PERSONS LISTED ON SCHEDULE I ATTACHED HERETO**, each having its principal place of business at Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 (individually or collectively, as the context may require, together with each Borrower's successors and assigns, "Borrower"), **GRAND PRIX FIXED LESSEE LLC**, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("Operating Lessee"), **INK ACQUISITION LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK I"), **INK ACQUISITION II LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK II, and together with INK I, individually or collectively, as the context may require, "New Holdco" and **CERBERUS SERIES FOUR HOLDINGS, LLC**, having its principal place of business at c/o Cerberus Real Estate Capital Management, LLC, 299 Park Avenue, 22nd Floor, New York, New York 10022 ("Cerberus").

### RECITALS:

A.  On June 29, 2007 (the "Closing Date"), Lehman ALI Inc. ("Original Lender") made a loan to Borrower in the original principal amount of $825,402,542 (the "Loan") pursuant to that certain Loan Agreement dated as of the Closing Date, by and among Original Lender, Borrower, Operating Lessee (with respect to Articles 4 and 5 and Section 8.1 thereof only), and Grand Prix Holding, LLC (with respect to Sections 9.1, 9.2 and 9.7 thereof only), (the "Original Loan Agreement"; and as amended by that certain First Amendment to Loan Agreement dated as of August 9, 2007, and this Amendment, the "Loan Agreement"). The Loan is evidenced by that certain Replacement Promissory Note A-1 and that certain Replacement Promissory Note A-2, each dated as of August 9, 2007, and each in the original principal amount of $412,701,271 (collectively, and as further amended hereby, the "Note"), and is secured by, among other things,

---

[1] Lender reserves the right to review and approve any changes to the organizational structure depicted on Schedule IV attached hereto and to make any changes to this Amendment that it determines may be required as a result of any such changes, it being understood and agreed that any such changes to this Amendment required in connection with such organizational changes will be mutually acceptable to the parties hereto.

those certain Security Instruments referred to in the Loan Agreement.

B. On July 19, 2010, Innkeepers USA Trust, together with certain of its wholly owned direct and indirect subsidiaries (collectively, the "Company"), including Borrower, Operating Lessee and Grand Prix Holdings, LLC, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The recapitalization and debt restructuring of Borrower, Operating Lessee and certain of the other debtors in connection with such bankruptcy is being effectuated through a plan of reorganization (the "Plan") which the Bankruptcy Court confirmed on [_____ __, 2011]. Pursuant to the Plan, the equity interests for Borrower and Operating Lessee are being acquired by New Holdco, a principal payment in the amount of Twelve Million Eight Hundred Two Thousand Four Hundred Fifty and 37/100 Dollars ($12,802,450.37) is being made on the Loan and the Loan is being modified to, among other things, reduce the outstanding principal balance of the Loan, as of the date hereof, following such prepayment, to Seven Hundred Twenty-Three Million Seven Hundred Ninety-Seven Thousand Two Hundred Thirty-Eight and 03/100 Dollars ($723,797,238.03) (the "Restructuring").

C. This Amendment is being executed and delivered by the parties hereto in order to amend and modify the Loan Agreement and certain of the other Loan Documents (as defined in the Loan Agreement) to reflect the principal reduction and certain other modifications in connection with the Restructuring.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1. LOAN MODIFICATIONS

Section 1.1 Modification of the Loan Agreement. The Loan Agreement is hereby modified as follows:

(a) Deleted Definitions. The following definitions set forth in Section 1.1 of the Loan Agreement are hereby deleted in their entirety:

(i) "Aggregate Debt Service Coverage Ratio".

(ii) "Aggregate Loan to Value Ratio".

(iii) "California Individual Property".

(iv) "California Transferee".

(v) "Closing Date DSCR".

(vi) "Completion Guaranty".

(vii) "Defeasance Collateral".

(viii) "Defeasance Date".

(ix) "Defeasance Deposit".

(x) "Defeasance Event".

(xi) "Defeased Note".

(xii) "GPAT".

(xiii) "Mezzanine Borrower".

(xiv) "Mezzanine Loan".

(xv) "Outparcel Property".

(xvi) "Outparcel Release".

(xvii) "Outparcel Release Price".

(xviii) "Permitted Defeasance Date".

(xix) "Permitted Prepayment Date".

(xx) "Scheduled Defeasance Payments".

(xxi) "Security Agreement".

(xxii)   "Sponsor Loan".

(xxiii)  "Successor Borrower".

(xxiv)  "Yield Maintenance Premium".

(b)      Additional Definitions.   The following definitions are hereby inserted in Section 1.1 of the Loan Agreement in the appropriate alphabetical position:

(i)  "Adjusted Issue Price" shall mean the adjusted issue price of the Loan within the meaning of section 1.1275-1(b) of the Treasury Regulations; for the avoidance of doubt, the Adjusted Issue Price on the date hereof is $[_____].

(ii) "Adverse REMIC Event" shall mean an action, if taken or not taken, as the case may be, that will (i) disqualify Lender as a REMIC Trust; (ii) result in the imposition of any tax on Lender, including the tax on prohibited transactions as defined in Code Section 860F(a)(2) and the tax on contributions set forth in Code Section 860G(d); or (iii) cause the Loan to cease to be a "qualified mortgage" within the meaning of Code Section 860G(a)(3).

(iii)"Catchall Paydown Amount" shall mean an amount that (i) may be received and applied to the Adjusted Issue Price by Lender in accordance with Section 2.5.2B hereof and will not result in an Adverse REMIC Event pursuant to REMIC Provisions in effect at the time of such application and (ii) is not any of the Tax Net Proceeds, LTV Paydown Amount, the Origination Value Ratio Paydown Amount or the Constant LTV Paydown Amount.

(iv)"Cerberus Affiliate" shall mean one or more entities, funds or accounts, Controlled by or under common Control with Cerberus Real Estate Capital Management, L.P. or Cerberus Capital Management, L.P, or one or more of their respective Affiliates.

(v) "Cerberus Member" shall mean, individually or collectively, as the context may require, CRE-Ink REIT Member, LLC and CRE-Ink Member II Inc.

(vi)"Chatham Member" shall mean, individually or collectively, as the context may require, Chatham Lodging LP and Chatham TRS Holding Inc.

(vii)  "Chatham Lodging" shall mean Chatham Lodging Trust, a Maryland real estate investment trust.

(viii)  "Constant LTV Paydown Amount" shall mean the "qualified amount" determined under Section 5.04(4) of Revenue Procedure 2010-30 (or any successor advice or interpretation thereto) with respect to the transaction in which the lien is released on one or more of the Release Properties (for this purpose, the Tax Fair Market Values shall be used).

(ix) "Current Appraisal" shall mean, with respect to the determination of Tax Fair Market Value as of a particular date, an appraisal of an Individual Property prepared by a Qualified Appraiser and dated as of a date that, in the sole judgment of Lender, reflects the current Tax Fair Market Value of such Individual Property.

(x)  "Innkeepers Filing" shall mean the Chapter 11 bankruptcy filing on July 19, 2010, by Innkeepers USA Trust and certain of its wholly owned direct and indirect subsidiaries, including Borrower, Operating Lessee and Grand Prix Holdings LLC.

(xi) "LTV Paydown Amount" shall mean the minimum principal amount of the Loan necessary to be paid such that, immediately after the lien is released with respect to one or more of the Release Properties, the REMIC LTV of the Remaining Parcels is no greater than one hundred and twenty-five percent (125%).

(xii)  "Major Decisions" shall mean, collectively, the "Major Decisions" as defined in Section 1.6 of the New Holdco Operating Agreement and the decisions described in Section 3.2(g) of the New Holdco Operating Agreement.

(xiii)  "Member Guaranty" shall mean that certain Guaranty, dated as of [_____ __, 2011], given by Cerberus, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

(xiv)  "New Holdco" shall mean individually or collectively, as the context may require, INK Acquisition LLC, a Delaware limited liability company and INK Acquisition II LLC, a Delaware limited liability company.

(xv)  "New Holdco Guaranty" shall mean that certain Guaranty, dated as of [_____ __, 2011], given by New Holdco, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

(xvi)  "New Holdco Member" shall mean, individually or collectively, as the context may require, Cerberus Member and Chatham Member, and their

respective permitted successors and assigns.

(xvii)  "<u>New Holdco Operating Agreement</u>" shall have the meaning set forth in Section 5.1.28 hereof.

(xviii)  "New Holdco Operating Agreement" shall mean a written opinion of counsel selected by the Servicer who is nationally recognized in matters related to the REMIC Provisions.

(xix)  "Origination Value Ratio Paydown Amount" shall mean the "qualified amount" determined under Section 5.04(2) of Revenue Procedure 2010-30 (or any successor advice or interpretation thereto) with respect to the transaction in which the lien is released on one or more of the Release Properties.

(xx)  "Release Property" shall have the meaning set forth in Section 2.5.2A hereof.

(xxi)  "Qualified Appraiser" shall mean an independent nationally recognized professional commercial real estate appraiser who is experienced in appraising commercial real property similar to the relevant Individual Property in the jurisdiction in which the relevant Individual Property is located and shall have no interest in the matter in question and no reason to be biased in favor of either Lender or Borrower.

(xxii)  "Qualified Buyer" shall mean a Person which: (i) is not Borrower, Operating Lessee, New Holdco, Cerberus Member, Chatham Member, Guarantor or any Affiliate of any of the foregoing, (ii) is not and does not have a relationship of the type described in Section 267(b) or 707(b)(1) of the Code with Borrower, Operating Lessee, New Holdco, Guarantor, Cerberus Member, Chatham Member or any Affiliate of any of the foregoing and (iii) is otherwise unrelated to Borrower for purposes of the REMIC Provisions.

(xxiii)  "Qualified Paydown Amount" shall mean with respect to a particular sale of an Individual Property, an amount equal to the lesser of (A) the Tax Net Proceeds from a Qualified Sale, or (B) the lowest of the Origination Value Ratio Paydown Amount, the Constant LTV Paydown Amount, the LTV Paydown Amount or the Catchall Paydown Amount.

(xxiv)  "Qualified Sale" shall mean the consummation and close of escrow for the bona fide arms-length sale of an Individual Property or Individual Properties to one or more Qualified Buyers, negotiated by the parties to said sale,

in good faith and in the exercise of sound and prudent business judgment, taking into account market conditions existing at the time of the sale.

(xxv) "Qualified Transferee" means a Person that is not a Prohibited Person and that is one or more of the following:

(A)     a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)     an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements; or

(C)     an investment fund, limited liability company, limited partnership or an institution substantially similar to any of the foregoing entities described in clauses (A) or (B) of this definition that satisfies the Eligibility Requirements.

For purposes of this definition, "Eligibility Requirements" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

(xxvi) "Remaining Parcels" shall mean the Individual Properties remaining encumbered by the Security Instruments immediately after the Property Release of a Release Property.

(xxvii) "REMIC LTV" shall mean, as of a particular date, the ratio (expressed as a percentage) of (a) the Adjusted Issue Price, as of such date, to (b) the aggregate Tax Fair Market Value of the "real property components" of the Individual Properties in question, as of such date.

(xxviii)     "REMIC Provisions" shall mean the provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Section 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and regulations (including any applicable proposed regulations) and rulings and interpretations promulgated thereunder, as the

foregoing may be in effect from time to time.

(xxix) "<u>Required Release Price</u>" shall mean, with respect to any Individual Property, the greater of (A) the Release Price or (B) the lowest of (i) the Tax Net Proceeds from a Qualified Sale, (ii) the Origination Value Ratio Paydown Amount, (iii) the Constant LTV Paydown Amount, (iv) the LTV Paydown Amount or (v) the Catchall Paydown Amount. For the avoidance of doubt, in no event shall the Required Release Price be less than the Release Price.

(xxx) "<u>Second Amendment</u>" shall mean that certain Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement dated as of [_____ __, 2011].

(xxxi) "<u>Second Amendment Effective Date</u>" shall mean the "Effective Date" as defined in the Second Amendment.

(xxxii)    "<u>Tax Fair Market Value</u>" shall mean, with respect to an Individual Property, the "fair market value" thereof as determined by a Qualified Appraiser designated by Lender pursuant to one or more Current Appraisals obtained at Borrower's expense; for this purpose the Tax Fair Market Value shall only include the "real property" components of such Individual Property within the meaning of the REMIC Provisions, which include land and improvements thereon, such as building or other inherently permanent structures thereon (including items which are structural components of such buildings or structures), and the local law definition shall not be controlling and shall not include assets accessory to the operation of a business even if termed fixtures under local law.

(xxxiii)    "<u>Tax Net Proceeds</u>" shall mean the amount realized for purposes of computing gain or loss under Section 1001 of the Code, including the Tax Net Proceeds, if any, from the receipt of an insurance or tort settlement with respect to the relevant Individual Property.

(xxxiv)    "<u>Treasury Regulations</u>" shall mean those regulations that are promulgated by the United States Department of Treasury pursuant to the Code, as the foregoing may be in effect from time to time.

(c)      Revised Definitions.    The following definitions set forth in Section 1.1 of the Loan Agreement are hereby modified as follows:

(i)  The definition of "<u>Affiliate</u>" is hereby modified to delete the reference therein to "<u>Apollo</u>".

(ii) The definition of "<u>Affiliated Manager</u>" is amended and restated to read as follows:

"<u>Affiliated Manager</u>" shall mean any property manager which is an Affiliate of, or in which Borrower, Principal, Guarantor, Cerberus Member, Chatham Member or New Holdco has, directly or indirectly, any legal, beneficial or economic interest.

(iii)The definition of "<u>Closing Date NOI</u>" is amended and restated to read as follows:

"<u>Closing Date NOI</u>" shall mean, with respect to the Property and any Individual Property, the Net Operating Income as of [_____ __], 2011 (determined on a trailing 12 month basis) as shown on Schedule XIII hereto and which schedule will be modified from time to time in connection with any Property Release in accordance with Section 2.5.2A hereof, to omit the allocated Net Operating Income of the applicable Individual Property on the date of the Property Release of such Individual Property in accordance with the provisions of Section 2.5.2A hereof.

(iv)The definition of "<u>Debt Service</u>" is amended and restated to read as follows:

"<u>Debt Service</u>" shall mean, with respect to any particular period of time, interest and principal payments due under the Note.

(v) Clause (b) of the definition of "<u>Debt Service Coverage Ratio</u>" is hereby amended and restated to read as follows:

"(b)      the denominator is the aggregate amount of Debt Service (assuming amortization on a 30-year schedule) which would be due and payable under the Note."

(vi)The definition of "<u>Environmental Indemnity</u>" is amended and restated to read as follows:

"Environmental Indemnity" shall mean (i) that certain Environmental Indemnity Agreement executed by Borrower and Grand Prix Holdings LLC on the Closing Date and (ii) that certain Environmental Indemnity Agreement executed by Borrower and New Holdco on the Second Amendment Effective Date.

(vii)    The definition of "Guarantor" shall mean New Holdco and Cerberus and any other Person that executes or delivers a guaranty in connection with the Loan.

(viii)    The definition of "Guaranty" is amended and restated to read as follows:

"Guaranty" shall mean (i) the Member Guaranty and (ii) the New Holdco Guaranty.[2]

(ix)The definition of "Manager" is amended and restated to read as follows:

"Manager" shall mean Island Hospitality Management III, Inc., or, if the context requires, a Qualified Manager who is managing the Properties or any Individual Property in accordance with the terms and provisions of this Agreement.[3]

(x) The definition of "Permitted Owner" is amended and restated to read as follows:

"Permitted Owner" shall mean: any other Person (a) that is a Qualified Transferee and reasonably approved by Lender and (b) if a Securitization shall have occurred, regarding which Lender shall have received written confirmation by the Rating Agencies that the transfer to such Person will not, in and of itself, cause a downgrade, withdrawal or qualification of the then current ratings of the Securities issued pursuant to the Securitization.

_____

[2] The Guaranty given by Grand Prix Holding LLC ("Sponsor") and any other obligations of Sponsor under the loan documents will be addressed pursuant to Sponsor's bankruptcy plan of reorganization. Nothing contained herein shall be a release or waiver of or be deemed to be a release or waiver of, the obligations of Sponsor under such Guaranty or any of the other loan documents, or any of the rights of lender with respect to such Guaranty or other loan documents.

[3] Note:  Management Agreement subject to review by Lender.

(xi) The definition of "<u>Release Price</u>" is amended and restated to read as follows:

"<u>Release Price</u>" shall mean, with respect to any Individual Property, 108% of the Allocated Loan Amount set forth opposite such Individual Property on <u>Schedule I</u> attached hereto.

(xii)     The definition of "<u>REMIC Trust</u>" is amended and restated to read as follows:

"<u>REMIC Trust</u>" shall mean a real estate mortgage investment conduit subject to Section 860A through 860G of Subchapter M of Chapter 1 of the Code.

(xiii)    The definition of "<u>Required Amortization</u>" is amended and restated to read as follows:

"<u>Required Amortization</u>" shall mean, for the period from and including the Interest Period beginning in [_____, 2015 [48 MONTHS FROM EFFECTIVE DATE OF PLAN]], an amount determined by Lender which would be necessary to amortize the entire principal balance of the Loan over a period of thirty (30) years.  For purposes of clarification, for the period prior to the Interest Period beginning in [_____, 2015 [48 MONTHS FROM EFFECTIVE DATE OF PLAN]], there is no requirement to amortize the principal balance of the Loan.

(xiv)    The definition of "<u>Restricted Party</u>" is amended and restated to read as follows

"<u>Restricted Party</u>" shall mean Borrower, Principal, New Holdco, Guarantor, Cerberus Member, Chatham Member, Operating Lessee or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, Principal, New Holdco, Guarantor, Cerberus Member, Chatham Member, Operating Lessee or any Affiliated Manager or any non-member manager; provided that neither Chatham Lodging Trust, Cerberus or any Cerberus Affiliate, nor any holders of a direct or indirect interest in Chatham Lodging, Cerberus or any Cerberus Affiliate, shall be a Restricted Party.

(d)     Section 2.3.1 of the Loan Agreement is hereby amended and restated to read as follows:

"**2.3.1** <u>Voluntary Prepayments</u>.

On any Payment Date, Borrower may, at its option and upon thirty (30) days' prior written notice to Lender, prepay the Loan in whole or in part, provided, Borrower pays to Lender all accrued and unpaid interest on the amount of principal being prepaid through and including the date of prepayment."

(e)     Section 2.3.2 of the Loan Agreement is hereby modified by deleting the last sentence thereof.

(f)     Section 2.3.3 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"**2.3.3**  Intentionally Omitted."

(g)     Section 2.4 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"**Section 2.4**  Intentionally Omitted."

(h)     Section 2.5 is hereby modified by deleting the words "Section 2.4 hereof and" from the first sentence of such Section.

(i)     Section 2.5.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"**2.5.1**  Intentionally Omitted."

(j)     Subsection 2.5.2 of the Loan Agreement is hereby amended and restated to read as follows:

"**2.5.2A**  Release of Individual Properties.  Borrower may obtain the release (a "Property Release") of any Individual Property (each, a "Release Property") from the lien of the applicable Security Instrument and the other Loan Documents, upon the satisfaction of each of the following conditions:

(a)     Immediately prior to, and after giving effect to the proposed release, no Event of Default shall have occurred and be continuing (unless the Event of Default would be cured by the release of the Release Property);

(b)     Lender shall have received at least thirty (30) days but no more than ninety (90) days prior written notice of its request to obtain a

release of the proposed Property Release, provided that Borrower shall have the right to revoke such notice or extend the release date upon written notice to Lender and upon payment to Lender of all out of pocket costs and expenses actually incurred by Lender which notice must be received by Lender not less than three (3) Business Days prior to the release date to be extended or revoked and which payment is received by Lender not later than (i) in the case of an extension, the release date as so extended and (ii) in the case of a revocation, three (3) Business Days prior to the release date so revoked; provided, however, that notwithstanding the foregoing notice dates, Borrower shall not be entitled to a Property Release unless and until the conditions set forth in this Agreement have been satisfied;

(c)    Lender shall have received (i) (x) the Hampton Release Price (as hereinafter defined) if the Release Property is a Hampton Hotel (as hereinafter defined) and the conditions set forth in the penultimate paragraph of this <u>Section 2.5.2A</u> are satisfied, or (y) the Release Price if the Release Property is an Early Release Property (as hereinafter defined) and the conditions set forth in the last paragraph of this <u>Section 2.5.2A</u> are satisfied or (z) the Required Release Price for all other Individual Properties plus (ii) payment of all of Lender's reasonable costs and expenses, including reasonable counsel fees and disbursements incurred in connection with the release of the Individual Property from the lien of the Security Instrument and the review and approval of the documents and information required to be delivered in connection therewith and (iii) any other amounts then due and owing to Lender pursuant to this Agreement and the other Loan Documents;

(d)    Borrower shall have submitted to Lender not less than five (5) Business Days prior to the date of such Property Release, a release of the Security Instrument as it relates to the Release Property and related Loan Documents for execution by Lender.  Such release shall be in a form appropriate for the jurisdiction in which the Release Property is located.  In addition, Borrower shall provide such documentation that a prudent lender originating mortgage loans for securitization similar to the Loan would reasonably require to be delivered by Borrower in connection with such Property Release provided the delivery of such documentation is customary in the relevant jurisdiction;

(e)    Lender shall have received an Opinion of Tax Counsel to the effect that no Adverse REMIC Event would result from such Property Release (including, without limitation, any opinion required pursuant to Section 2.5.2B);

(f)    Simultaneously with the Property Release of a Release Property, Borrower shall convey fee simple title or leasehold title, as applicable, to the Release Property to (i) any Person other than Borrower or Operating Lessee or (ii) if the Required Release Price shall be based on the Tax Net Proceeds, a Qualified Buyer pursuant to a Qualified Sale;

(g)     All references in the Loan Documents to Individual Properties shall exclude the relevant Release Property from and after the date the same has been released in accordance with this <u>Section 2.5.2A</u> except to the extent that any liability or obligations under the Loan Documents with respect to such Release Property specifically survive such Property Release;

(h)     If Borrower has specified in the notice delivered pursuant to subsection (b) above that it desires to effectuate a Property Release in a manner which will permit the assignment of a portion of the Note and the applicable Security Instrument in lieu of releasing the same in order to save mortgage recordation tax, Borrower and Lender shall cooperate to effect such proposed assignment provided that (i) such assignment is made by Lender without recourse, covenant, representation or warranty of any nature, express or implied; (ii) Borrower has complied with all other provisions of this <u>Section 2.5.2A</u> to the extent not inconsistent with this <u>subsection (h)</u>; (iii) Borrower pays to Lender (A) Lender's then customary administrative fee for processing assignments of mortgage, (B) the reasonable expenses of Lender incurred in connection therewith, and (C) Lender's reasonable attorney's fees for the preparation and delivery of such an assignment; (iv) such new lender shall materially modify the relevant portion of the assigned Note such that it shall be treated as a new loan for federal tax purposes; (v) such an assignment is not then prohibited by any federal, state or local law, rule, regulation, order or by any other governmental authority; (vi) such assignment has no adverse economic effect on Lender (vii) Borrower shall have caused the delivery to Lender of an executed affidavit under Section 275 of the New York Real Property Law (if such Individual Property is located in New York); and (viii) Borrower shall provide such other opinions, items, information and documents which a prudent lender would reasonably require to effectuate such assignment.  Borrower shall be responsible for all mortgage recording taxes, recording fees and other charges payable in connection with any such assignment.  Lender agrees that such assignment shall be accomplished by an escrow closing conducted through an escrow agent reasonably satisfactory to Lender and pursuant to an escrow agreement reasonably satisfactory to Lender in form and substance; and

(i) the Debt Service Coverage Ratio after giving effect to such Property Release shall be no less than the Debt Service Coverage Ratio immediately prior to such Property Release.

If, in connection with the sale of any of the Individual Properties set forth on Schedule XVI attached hereto (each, a "<u>Hampton Hotel</u>" and collectively, the "<u>Hampton Hotels</u>"), the Tax Net Proceeds are less than the Release Price for the applicable Hampton Hotel, then <u>Section 2.5.2B</u> shall be inapplicable and Lender shall accept the Tax Net Proceeds (the "<u>Hampton Release Price</u>") as the release price to satisfy the condition contained in <u>Section 2.5.2(A)(c)(i)</u> above, provided that (i) the sale is to a Qualified Buyer, (ii) the sale is on market terms acceptable to Lender in its reasonable discretion and (iii) such Property Release otherwise

satisfies all other conditions for a Property Release contained above in this <u>Section 2.5.2A</u>. With respect to any such sale of a Hampton Hotel, if the Tax Net Proceeds are less than the Allocated Loan Amount received for such Hampton Hotel, then the difference between the Allocated Loan Amount and the Tax Net Proceeds received for the sale of such Hampton Hotel shall be allocated proportionally among the Allocated Loan Amounts for the Remaining Parcels.

On or prior to November 1, 2011 Borrower may obtain a Property Release of one or more of the Individual Properties set forth on Schedule XVII attached hereto (each, an "<u>Early Release Property</u>") for a release price equal to the Release Price for the applicable Early Release Property in connection with a sale of such Early Release Property, provided that (i) Lender is not aware of any material change in (x) the Tax Fair Market Value of the Early Release Property in question or (y) the aggregate Tax Fair Market Value of the Remaining Parcels, (ii) the sale and release of such Early Release Property occurs on or prior to November 1, 2011 and (iii) such Property Release otherwise satisfies all other conditions for a Property Release contained above in this <u>Section 2.5.2A</u>.

      **2.5.2B** <u>Required Release Price Determination</u>. In the event Borrower anticipates that the Required Release Price for any Property Release, shall be based on anything but the Tax Net Proceeds, (i) Borrower shall include a statement to such effect in the written notice to Lender pursuant to Section 2.5.2A(b), which notice (although not binding on Borrower) shall allow Lender to expedite the retention of one or more Qualified Appraisers for purposes of obtaining such Current Appraisals as Lender deems necessary in connection with the calculation of the aggregate Tax Fair Market Value of the Remaining Parcels and the Individual Properties in question and (ii) Borrower shall provide a calculation of such amount to Lender in sufficient detail, with all necessary supporting documentation, to enable the counsel designated to provide the Opinion of Tax Counsel to review such calculation and determine whether it will be able to deliver an opinion to the effect that the release of the lien with respect to such Individual Property and application of the Required Release Price by Lender to the Adjusted Issue Price in accordance with such request will not result in an Adverse REMIC Event (which opinion shall be part of the Opinion of Tax Counsel required pursuant to Section 2.5.2A(e)). This <u>Section 2.5.2B</u> shall not be applicable to (i) the release of any Hampton Hotel in accordance with the provisions of the penultimate paragraph of Section 2.5.2A above or (ii) the release of any Early Release Property in accordance with the last paragraph of <u>Section 2.5.2A</u> above.

      **2.5.2C** <u>Opinion of Tax Counsel</u>. If an Opinion of Tax Counsel is required under any provision hereof, upon the written request of Borrower or if determined to be advisable by the Servicer, as the case may be, the Servicer shall promptly select counsel to provide such Opinion of Tax Counsel and Borrower and the Servicer shall use reasonable commercial efforts to (x) provide such counsel with all requested information reasonably available to it to enable such

counsel to determine if it is able to render the requested Opinion of Tax Counsel and, if so, (y) cause such counsel to timely deliver such Opinion of Tax Counsel. All costs and expenses of such counsel shall be paid by Borrower whether or not the requested Opinion of Tax Counsel is ultimately delivered. Borrower agrees that its only remedy under this Section 2.5.2C is for specific performance and it cannot seek money damages or other remedies."

(k)     Section 2.5.4 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"2.5.4. <u>Intentionally Omitted</u>."

(k) The second sentence of Section 3.1(a) of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:

"The Lockbox Account shall be entitled "Island Hospitality Management III, Inc., as agent for [NAME OF APPLICABLE INDIVIDUAL BORROWER], for the benefit of Wells Fargo Commercial Mortgage Servicing, as Master Servicer – Lockbox Account.""

(l)     The first sentence of Section 3.16 of the Loan Agreement is hereby modified by inserting the words "and during the continuance" after the words "upon the occurrence".

(m) The second sentence of Section 3.2(a) of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:

"The Cash Management Account shall be entitled "[U.S. Bank, National Association as Trustee], as Lender, pursuant to a Loan Agreement with Grand Prix El Segundo LLC, et al., as Borrower, dated as of June 29, 2007 – Cash Management Account.""

(n) Section 4.1.6 of the Loan Agreement is hereby modified by deleting the words "No petition under" at the beginning of the sixth sentence thereof and replacing same with "Except for the Innkeepers Filing, no petition under".

(o) Clause (j) of Section 4.1.35 is hereby modified by deleting the references therein to "Apollo" and replacing same with "Cerberus Member or Chatham Member".

(p) Clause (y) of Section 4.1.35 is hereby amended by deleting the reference therein to "Apollo".

(q) Section 4.1.41 is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member".

(r) Section 4.1.43 is hereby modified by adding the words "Chatham Member, Cerberus Member" immediately following each reference therein to "Principal" and deleting the references therein to "Apollo".

(s) Section 5.1.10 of the Loan Agreement is hereby modified by deleting references therein to "GPAT" and replacing same with "New Holdco".

(t) Clause (b) of Section 5.1.10 of the Loan Agreement is hereby amended by adding the following at the end of such Section:

"Cerberus or any replacement guarantor will furnish, or cause to be furnished, to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year a complete copy of Cerberus' or any replacement guarantor's annual financial statements audited by Price Waterhouse Coopers LLP or any other "Big Four" accounting firm or any Approved Accountant and containing an unqualified opinion in accordance with GAAP (or other such accounting basis acceptable to Lender); provided that such annual financial statements of Cerberus or any replacement guarantor that is a Cerberus Affiliate (x) may not include (i) any listed investments, (ii) any changes in partnership capital or (iii) any footnotes and (y) shall not be disclosed (i) to any third party except any Co-Lender and any Servicer (including any master servicer or special servicer of the Loan acting in such capacity for Lender and/or any Co-Lender) or (ii) as required by Applicable Laws; provided that Lender, any Co-Lender or Servicer, as applicable, shall be permitted to disclose the same to their respective directors, officers, employees, counsel, accountants, agents or representatives who need to know such information to permit Lender, any Co-Lender or Servicer to carry out its review or perform its services in connection with the Loan and who are informed of the confidential nature of such information. In addition, within one hundred twenty (120) days following the end of each Fiscal Year, Cerberus or any replacement guarantor that is a Cerberus Affiliate shall furnish to Lender upon request, a certification of Cerberus' or such replacement guarantor's audited net worth and liquidity in the form attached hereto as Schedule XIX (a "<u>Net Worth Certificate</u>")[4], which Net Worth Certificate may be disclosed by Lender, from time to time, to any third party as Lender or Servicer deems necessary or advisable in its sole discretion. Lender (and any Servicer) shall be permitted, from time to time, to consult with the Chief Financial Officer of Cerberus or any replacement guarantor that is a Cerberus Affiliate. Upon the reasonable prior request of Lender (or Servicer), Borrower and Cerberus or any replacement guarantor that is a Cerberus Affiliate, as applicable, shall cooperate with Lender to arrange for such meeting and consultation."

---

[4] Net Worth Certificate will be in the form previously delivered to Lender on April 29, 2011.

(u) Clause (c) of Section 5.1.10 of the Loan Agreement is hereby amended and restated to read as follows:

"Borrower will furnish, or cause to be furnished, to Lender on or before thirty (30) days after the end of each calendar month statements of profits and losses for each Individual Property, accompanied by a certificate of a Responsible Officer or other appropriate officer of Borrower or Principal, as applicable."

(v) The following sentence is hereby added to the end of clause (g) of Section 5.1.10 of the Loan Agreement:

"Notwithstanding anything to the contrary contained in this clause (g), unless required by Applicable Laws, neither Lender nor any Co-Lender or Servicer shall disclose to any Investor (other than a Co-Lender), Rating Agency, potential Investor or other Person (except such Lender's, Co-Lender's or Servicer's respective directors, officers, employees, counsel, accountants, agents or representatives who need to know such information to permit such Lender, Co-Lender or Servicer to carry out its review or perform its services in connection with the Loan and who are informed of the confidential nature of such information), the annual audited financial statements of Cerberus or any replacement guarantor that is a Cerberus Affiliate or any information contained therein, except if such information is contained in the Net Worth Certificate or is otherwise available to the public. It is expressly understood and agreed that Lender is permitted to disclose copies of the Net Worth Certificates to any Investor, Rating Agency or potential Investor."

(w) Clause (l) of Section 5.1.10 of the Loan Agreement is hereby modified by deleting the reference therein to "Indemnitor or Apollo" and replacing same with "New Holdco".

(x) Sections 5.1.20, 5.1.24, 9.1 and 9.7 of the Loan Agreement are hereby modified by deleting the references therein to "Sponsor" and replacing same with "New Holdco.

(y) Clause A of Section 5.1.20 of the Loan Agreement is hereby amended and restated to read as follows:

"a completion guaranty from New Holdco, in the form attached hereto as Exhibit E,"

(z) Section 5.1.25 is hereby modified by deleting the references therein to

"Apollo" and replacing the same with "Chatham Member, Cerberus Member."

(aa)     The following new Subsection 5.1.27 and Subsection 5.1.28 are hereby added to the Loan Agreement immediately following Subsection 5.1.26 thereof:

"Section 5.1.27.     New Holdco Liquidity Covenant.   On the date hereof, New Holdco shall have and subject to the following sentence shall maintain not less than $41,000,000 in cash (the "Closing Date Liquidity").   New Holdco shall be permitted to use up to $21,000,000 of the Closing Date Liquidity to pay for Capital Expenditures and PIP work required by the Franchisors in connection with the acquisition of the equity interests in the Properties by New Holdco.   At all times during the term of the Loan, New Holdco shall have not less than $20,000,000 in cash (the "Required Liquidity"); provided that New Holdco may reduce the Required Liquidity below $20,000,000 during the term of the Loan, if in connection with such reduction, Borrower prepays the Loan on a dollar for dollar basis with such reduction.   For example, if the Required Liquidity is reduced to $18,000,000 the Loan will be required to be prepaid by an amount equal to $2,000,000 and if the Required Liquidity is thereafter further reduced to $15,000,000 an additional prepayment of the Loan in amount equal to $3,000,000 shall be required, and so on.

Section 5.1.28.     New Holdco; Major Decisions.   Borrower represents and warrants that attached hereto as Schedule XVIII is a true, correct and complete copy of (i) the Limited Liability Company Agreement of INK I, dated April 25, 2011 and the Amendment to Limited Liability Company Agreement of New Holdco, dated _____ (as so amended, the "Ink I Operating Agreement") and (ii) the Limited Liability Company Agreement of INK II, dated _____, 2011 (the "Ink II Operating Agreement", and together with the Ink I Operating Agreement, the "New Holdco Operating Agreement").   In no event shall the Major Decisions be amended or otherwise modified without the prior written consent of Lender.   At all times from and after the date of the Second Amendment until payment and performance in full of all obligations of Borrower under the Loan Documents, Major Decisions shall continue to require the approval of the applicable Cerberus Member.   Any Transfer permitted pursuant to the terms of this Agreement or which is otherwise consented to by Lender, in its sole discretion, that results in a Cerberus Member's approval not being required for all Major Decisions, shall be conditioned upon, among other things, the following conditions (i) the transferee shall have a minimum net worth of $135,000,000, (ii) such transferee's approval is required for all Major Decisions, and such transferee is otherwise acceptable to Lender in its sole but reasonable discretion, (iii) such transferee shall execute and deliver a guaranty in form and substance substantially similar to the Member Guaranty, and (iv) Borrower shall pay Lender an administrative review fee and all costs and expenses incurred by Lender in connection therewith."

(bb)     Subsection 5.2.10(c) of the Loan Agreement is hereby modified by deleting clauses (iv) and (v) from the first sentence of such subsection.

(cc)     Subsection 5.2.10(d) of the Loan Agreement is hereby amended and restated to read as follows:

"(d)     Notwithstanding anything to the contrary contained in this Section 5.2.10, (i) Cerberus shall have the right to transfer all or any portion of its interest in Cerberus Member to any Cerberus Affiliate, (ii) Chatham Member shall have the right to transfer all or any portion of its interest in New Holdco to any Person that is directly or indirectly owned and controlled by Chatham Lodging, (iii) Cerberus Members' consent must continue to be required for all Major Decisions and (iv) Cerberus or a Cerberus Affiliate must own, directly or indirectly, at least 51% of the equity interests in New Holdco, Borrower and in Operating Lessee.  At all times following a transfer of the Properties in accordance with the terms and provisions of Section 5.2.11 hereof, the Permitted Owner that wholly owns and controls "Transferee" referenced in such Section 5.2.11 must continue to have the right to make and control Major Decisions (i.e. a Major Decision cannot be taken without the approval of such Permitted Owner) and own, directly or indirectly, at least a 51% interest in New Holdco, in Borrower and in Operating Lessee. Notwithstanding anything to the contrary contained in this Section 5.2.10, the restrictions on Transfers set forth in this Section 5.2.10 shall not apply to (i) the disposition, sale, issuance, or transfer of the publicly traded shares of Chatham Lodging and (ii) the cancellation, surrender, disposition, issuance, sale, grant, transfer or pledge of the operating partnership units of the Chatham Member (an "OPU Transfer"); provided that (x) no OPU Transfer shall be to a Prohibited Person, (y) in the event any OPU Transfer results in any Person and its Affiliates owning in excess of ten percent (10%) of the direct or indirect ownership interest in Borrower, Borrower shall provide to Lender, not less than thirty (30) days prior to such OPU Transfer, the name and identity of each proposed transferee, together with the names of its controlling principals, the social security number or employee identification number of such transferee and controlling principals, and such transferee's and controlling principal's home address or principal place of business, and home or business telephone number, and (z) in the event any OPU Transfer results in any Person and its Affiliates owning forty-nine percent (49%) or more of the direct or indirect ownership interests in Borrower, and a Securitization has occurred, Borrower shall, prior to such OPU Transfer, deliver an updated Insolvency Opinion to Lender, which opinion shall be in form, scope and substance acceptable in all respects to Lender and the Rating Agencies."

(dd)     Subsection 5.2.11(a) of the Loan Agreement is hereby amended by adding the following language at the beginning of such subsection: "Borrower shall pay Lender an assumption fee in the amount of one percent (1%) of the outstanding principal balance

of the Loan.  In addition,".

(ee)        Subsection 5.2.11(d) of the Loan Agreement is hereby amended by deleting the following language from such subsection: "and shall assume all of the obligations of Apollo under the Completion Guaranty".

(ff)        Section 5.2.12 of the Loan Agreement is hereby deleted in its entirety and replacing same with the following:

Section 5.2.12.        <u>Transfer in Connection with an Initial Public Offering</u>.  If Borrower has not exercised its one-time right to sell, assign or otherwise transfer of all of the Properties in accordance with Section 5.2.11 hereof, Lender shall not unreasonably withhold its consent to a transfer in connection with or in anticipation of an initial public offering ("<u>IPO</u>") by New Holdco in lieu of the one-time sale, assignment or other transfer of all of the Properties set forth in Section 5.2.11 herein and upon satisfaction of the following conditions:

(a)        no Default or Event of Default has occurred and is continuing;

(b)        Cerberus Member's consent must continue to be required for all Major Decisions;

(c)        Cerberus or a Cerberus Affiliate must continue to own, directly or indirectly, at least 51% of the equity interests in New Holdco, Borrower and in Operating Lessee;

(d)        Lender shall have received confirmation in writing from the Rating Agencies to the effect that such transfer and IPO will not result in a qualification, downgrade or withdrawal of any rating in effect immediately prior to such transfer and IPO;

(e)        Borrower shall deliver evidence to Lender that such transfer and IPO does not violate the terms of any Ground Lease, Management Agreement or Franchise Agreement;

(g)        Lender receives at least thirty (30) days prior written notice of such transfer and IPO;

(h)        Borrower shall have delivered to Lender an opinion of REMIC counsel which opinion shall be satisfactory to Lender and the Rating Agencies in all respects;

(i)     The Properties shall be managed by a Manager or a Qualified Manager following such transfer and IPO and the Franchise Agreements shall continue in full force and effect;

(i)     Borrower shall pay Lender an assumption fee in the amount of 1/10th of 1% of the outstanding principal balance of the Loan as well as any and all costs incurred in connection with the transfer (including, without limitation, Lender's reasonable counsel fees and disbursements);

(k)     Borrower shall have delivered to Lender an opinion of counsel from an independent law firm with respect to the substantive non-consolidation of the proposed transferee and its constituent entities (partners, members, shareholders), which opinion shall be satisfactory in all respects to Lender and the Rating Agencies;

(l)     Borrower or New Holdco shall deliver to Lender an endorsement to the existing title policy insuring the Security Instruments as a valid first lien on the Properties, which endorsement shall insure that the Properties shall not be subject to any additional exceptions or liens other than those contained in the Title Insurance Policy; and

(m)     The transfer shall occur within one hundred eighty (180) days of the consummation of the IPO.

(gg)     Section 7.2 of the Loan Agreement is hereby modified by deleting the references therein to "During the continuance of a Cash Management Period," and "during the continuance of a Cash Management Period".

(hh)     Section 7.3.1 of the Loan Agreement is hereby modified by deleting the first sentence of such Section and replacing same with the following:

"Commencing on the Payment Date following the first anniversary of the date of the Second Amendment and on each Payment Date thereafter, Borrower shall pay to Lender an amount equal to one-twelfth (1/12) of four percent (4%) of the Gross Income from Operations from the applicable year (or such greater amount if required by the Management Agreement or the Franchise Agreement) (the "Required FF&E Reserve Amount").

(ii)     Section 7.3.1 of the Loan Agreement is hereby modified by deleting the last sentence of such Section and replacing same with the following:

"On the Second Amendment Effective Date, Borrower shall deposit the sum of $7,800,000 into the FF&E Reserve Account. In no event shall funds on deposit in the FF&E Reserve Account be disbursed to pay for FF&E Expenditures that were incurred prior to the date of the Second Amendment."

(jj)    Section 7.4.4 of the Loan Agreement is hereby deleted in its entirety.

(kk)    Section 7.9.4 of the Loan Agreement is hereby modified by deleting (i) "either (a)" and (ii) clause (b) therefrom.

(ll)    Clauses (iv), (xvi) and (xvii) of subsection 8.1(a) of the Loan Agreement are hereby amended and restated to read as follows:

"(iv) if a Transfer in violation of Section 5.2.10 hereof or Article 7 of any of the Security Instrument occurs;"

"(xvi) if a breach or violation of Section 5.1.27 hereof occurs;"

"(xvii) if a breach or violation of Section 5.1.28 hereof occurs."

(mm)   Section 8.1(a) is hereby modified by deleting the references therein to "Apollo".

(nn)    Section 9.1 is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member."

(oo)    Section 9.1(a) is hereby modified by adding the following sentence to the end thereof:

"Notwithstanding anything to the contrary contained in this Section 9.1(a)(i), unless required by Applicable Laws, neither Lender nor any Co-Lender or Servicer shall disclose any annual audited financial statements of Cerberus or any replacement guarantor that is a Cerberus Affiliate pursuant to this Section 9.1(a) nor any information contained therein (except if such information is contained in the Net Worth Certificate or otherwise available to the public), except that Lender shall be permitted to disclose the Net Worth Certificates."

(pp)    Section 9.2(b) is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Cerberus Member" or "Chatham Member".

(qq)    Section 9.4(b) is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member".

(rr)     Section 9.7.3 is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member" and by adding the following sentence to the end of subsection (b) thereof:

"Notwithstanding anything to the contrary contained in this <u>Subsection 9.7.3(b)</u>, neither Cerberus nor any replacement guarantor that is a Cerberus Affiliate shall be required to provide any information pursuant to this <u>Section 9.7.3(b)</u> other than a Net Worth Certificate."

(ss)     Borrower/Operating Lessee's notice address in Section 10.6 of the Loan Agreement is hereby deleted and is replaced in it's entirety with the following:

> c/o Chatham Lodging Trust
> 50 Cocoanut Row, Suite 200
> Palm Beach, Florida 33480
> Attention:  Jeffrey Fisher
> Facsimile number:  (561) 804-0909
>
> with a copy to:
>
> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
> Attention: Scott K. Charles and David Fishman
> Facsimile number:  (212) 403-2311
>
> and a copy to:
>
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Attention: Stuart D. Freedman, Esq.
> Facsimile number: (212) 593-5955

(tt)     Lender/Agent's notice address in Section 10.6 of the Loan Agreement is hereby deleted and is replaced in it's entirety with the following:

> c/o Wells Fargo Commercial Mortgage Servicing
> 201 South College Street, 9th Floor,
> Charlotte, North Carolina, 28244
> MAC D1100-090
> Attention:     Portfolio Manager

Facsimile No.:  (___) ___-____

with a copy to:

Midland Loan Services, a division of PNC Bank,
National Association,
10851 Mastin, 6th Floor
Overland Park, Kansas 66210
Attention:     Kevin S. Semon
Facsimile No.:  (913) 253-9723

and a copy to:

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Attention:     Lenard M. Parkins
Facsimile No.: (212) 884-8226

(uu) Section 10.17 of the Loan Agreement is hereby modified by deleting the reference therein to "Apollo" and replacing the same with "Cerberus"

(vv) Section 10.17(b) of the Loan Agreement is hereby modified by deleting the reference therein to "Borrower" and replacing the same with "Cerberus".

(ww)        Section 10.22 of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:

"10.22 <u>Intentionally Omitted</u>."

(xx) Section 10.23 of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:

"10.23 <u>Intentionally Omitted</u>."

(yy) Section 10.25 of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:

"10.25 <u>Intentionally Omitted</u>."

(zz) Schedule I of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule I attached to this Amendment.

(aaa)　　Schedule II of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule II attached to this Amendment.

(bbb)　　Schedule IV of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule IV attached to this Amendment.

(ccc)　　Schedule X of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule X attached to this Amendment.

(ddd)　　[Schedule XIII of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule XIII attached to this Amendment.][5]

(eee)　　Schedule XIV of the Loan Agreement is hereby deleted in its entirety from the Loan Agreement.

(fff) Schedule XVI attached hereto is hereby added as new Schedule XVI to the Loan Agreement.

(ggg)　　Schedule XVII attached hereto is hereby added as new Schedule XVII to the Loan Agreement.

(hhh)　　Schedule XVIII attached hereto is hereby added as new Schedule XVIII to the Loan Agreement.

(iii) Schedule XIX attached hereto is hereby added as new Schedule XIX to the Loan Agreement.

(jjj) Exhibit A of the Loan Agreement is hereby deleted in its entirety.

(kkk)　　Exhibit B of the Loan Agreement hereby deleted and replaced in its entirety with Exhibit B attached to this Amendment.

Section 1.2.　　<u>Modification of the Note</u>.　　The first paragraph of Note A-1 is hereby modified by deleting the reference therein to "the principal sum of Four Hundred Twelve Million Seven Hundred One Thousand Two Hundred Seventy-One and 00/100 Dollars ($412,701,271)" and replacing the same with "the principal sum of Three Hundred Sixty-One Million Eight Hundred Ninety-Eight Thousand Six Hundred Nineteen and 02/100 Dollars ($361,898,619.02)"

---

[5] Schedule XIII is to be provided by Lender.

and the first paragraph of Note A-2 is hereby modified by deleting the reference therein to "the principal sum of Four Hundred Twelve Million Seven Hundred One Thousand Two Hundred Seventy-One and 00/100 Dollars ($412,701,271)" and replacing the same with "the principal sum of Three Hundred Sixty-One Million Eight Hundred Ninety-Eight Thousand Six Hundred Nineteen and 01/100 Dollars ($361,898,619.01). For the avoidance of doubt, as of the Effective Date the outstanding principal balance of Note A-1 is $361,898,619.02 and the outstanding principal balance of Note A-2 is $361,898,619.01.

Section 1.3.     All references to the Loan Agreement and the Note in any Loan Document shall mean the Loan Agreement or the Note, as applicable, as hereby modified.

Section 1.4     Simultaneously with the execution and delivery of this Second Amendment, (i) Borrower and New Holdco shall execute and deliver to Lender a replacement environmental indemnity agreement in substantially the same form as the Environmental Indemnity Agreement executed by Borrower and Grand Prix Holdings LLC on the Closing Date, and (ii) Borrower, Operating Lessee and Island Hospitality Management III, Inc., in its capacity as Property Manager, shall execute and deliver to Lender, and Lender shall execute and deliver to Borrower and Property Manager, a replacement conditional assignment of management agreement in substantially the same form as the Conditional Assignment of Management Agreement executed by Borrower, Operating Lessee, Island Hospitality Management, Inc., and Original Lender.

## ARTICLE 2. NO IMPAIRMENT; RATIFICATION; REPRESENTATIONS

Section 2.1     No Discharge.     Except as provided in Section 1.2 hereof, this Amendment does not, and shall not be construed to, constitute the creation of a new indebtedness or the satisfaction, discharge or extinguishment of the debt secured by the Loan Documents, or release or impair Borrower's obligations and Lender's rights and remedies under the Loan Documents, nor does it in any way affect or impair the lien of the Loan Documents. Neither this Amendment nor any action undertaken pursuant to this Amendment shall constitute a waiver or a novation of Lender's rights under the Loan Documents. In addition, any and all guaranties and indemnities for the benefit of Lender and agreements subordinating rights and liens to the rights and liens of Lender, including, without limitation, the Guaranty and the Environmental Indemnity, each as modified hereby, are hereby ratified and confirmed in all respects and shall not be released, diminished, impaired, reduced or adversely affected by this Amendment or otherwise.

Section 2.2     Lien Confirmation.     Borrower and Operating Lessee hereby acknowledge the lien of the Loan Documents to be a valid and existing first lien on the Property, and the lien of the Loan Documents is hereby agreed to continue in full force and effect, unaffected and unimpaired by this Amendment.

Section 2.3     No Further Modification; Ratification.     Except as specifically modified and amended hereby, all other terms, conditions, and covenants contained in the Loan Agreement and the other Loan Documents shall remain unmodified and in full force and effect. As amended by this Amendment, all terms, covenants and provisions of the Loan Agreement and each of the other Loan Documents are ratified and confirmed in all respects by Borrower, Operating Lessee

and Guarantor.

Section 2.4.   Representations and Warranties.

(a) Each Individual Borrower and Operating Lessee represents and warrants as of the date hereof that (i) this Amendment and the documents executed in connection herewith have been duly executed and delivered by it and constitutes the legal, valid and binding obligations of Borrower and Operating Lessee, enforceable against Borrower and Operating Lessee in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights, or by the application of the rules of equity; (ii) it has full power, authority and legal right to execute this Amendment and to keep and observe all of the terms of this Amendment on its part to be observed or performed; (iii) it has provided Lender with all information requested by Lender in connection with the Restructuring, and to Borrower and Operating Lessee's knowledge, no information provided by or on behalf of Borrower or Operating Lessee in connection with the Restructuring contains any untrue statement of a material fact or omits to state any material fact necessary to make such information not misleading in any material respect; (iv) this Amendment, Borrower's and Operating Lessee's performance of their obligations hereunder, and under the Loan Documents as amended hereby, and the consummation of the Restructuring have been duly authorized by all requisite organizational action on the part of Borrower and Operating Lessee and will not violate any provision of any applicable legal requirements, decree, injunction or demand of any court or other governmental authority applicable to Borrower or Operating Lessee, any organizational document of Borrower or Operating Lessee or any material indenture, agreement or other instrument to which Borrower or Operating Lessee is a party or by which Borrower or Operating Lessee is bound; (v) all consents, authorizations and approvals required for the execution and delivery by Borrower and Operating Lessee of this Amendment and the documents executed in connection herewith by Borrower and Operating Lessee have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; (vi) the Operating Lease is in full force and effect, has not been amended or modified and there are no defaults or events of default existing with respect to the Operating Lease, (vii) attached hereto as Schedule A is a true, correct and complete copy of the Approved Annual Budget for 2011; (viii) attached hereto as Schedule B is a true, correct and complete schedule which shows, the Required Capital Improvements that have been completed and paid for as of the date hereof, the Required Capital Improvements that have not been completed and the costs to complete such work; and (ix) all Franchise Agreements have been assumed pursuant to the Plan and are in full force and effect as of the date hereof.

(b)    Each Individual Borrower and Operating Lessee hereby represents, warrants, confirms and agrees that (i) each of the representations and warranties made by Borrower and Operating Lessee in the Loan Documents, as amended hereby, are true and correct in all respects as if made on and as of the Effective Date, (ii) except as otherwise disclosed to Lender, Borrower and Operating Lessee have performed in all respects all agreements and satisfied all conditions that the Loan Documents provide shall be performed or satisfied by such party; (iii) upon giving effect to this Amendment, to Borrower's and operating Lessee's knowledge, no Default or Event of Default under the Loan will be continuing and to the extent such Default or Event of Default

exists, Lender reserves all of its rights and remedies under the Loan Documents with respect thereto, (iv) it has no existing defenses, rights of setoff, claims, counterclaims or causes of action of any kind or description against Lender arising under or in respect of the Loan Documents or any related document (whether in contract, tort or otherwise).

(c) Each Guarantor represents and warrants as of the date hereof that (i) this Amendment and the documents executed in connection herewith have been duly executed and delivered by it and constitutes the legal, valid and binding obligations of such party, enforceable against it in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights, or by the application of the rules of equity; (ii) it has full power, authority and legal right to execute this Amendment and to keep and observe all of the terms of this Amendment on its part to be observed or performed; (iii) it has provided Lender with all information requested by Lender in connection with this Amendment, and no information provided by or on behalf of such Guarantor in connection with this Amendment contains any untrue statement of a material fact or omits to state any material fact necessary to make such information not misleading in any material respect; (iv) this Amendment, Guarantor's performance of their obligations hereunder, and under the Loan Documents as amended hereby, to which they are a party have been duly authorized by all requisite organizational action on the part of such party and will not violate any provision of any applicable legal requirements, decree, injunction or demand of any court or other governmental authority applicable to it, any organizational document of such Guarantor or any material indenture, agreement or other instrument to which it is a party or by which it is bound; and (v) all consents, authorizations and approvals required for the execution and delivery by such party of this Amendment and the documents executed in connection herewith by such party have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance.

Section 2.5.   Principal Balance; Reserve Accounts.  On the date hereof, Borrower has deposited the sum of $7,800,000.00 into the FF&E Reserve Account, the sum of $[_____] into the Tax Account and the sum of $[_____] into the Insurance Account[6]. Borrower, Operating Lessee, Sponsor, New Holdco, Guarantor and [_____] acknowledge and agree that, as of the date hereof (i) the outstanding principal amount of the Loan is $[_____], (ii) the amount on deposit in the Tax and Insurance Escrow Fund following the deposit described in the preceding sentence, is $[_____] (consisting of $_____ for Taxes and $_____ for Insurance Premiums), (iii) the amount on deposit in the FF&E Reserve Account following the deposit described in the preceding sentence, is $7,800,000.00, (iv) the amount on deposit in the Required Capital Improvements Account is $[_____], (v) there are no amounts on deposit in the Required Repair Account, (vi) there are no amounts on deposit in the Marriott Termination Fees Reserve Fund, (vii) there are no amounts on deposit in the

---

[6] In addition, unfunded portion of the FM DIP loan to be funded into a segregated account held by New Holdco for the benefit of Borrower to be used for completion of required PIP work undertaken during the bankruptcy cases and not yet completed at the time of closing of this Second Amendment.  Such funds will be in addition to the $41mm closing liquidity.

Ground Rent Account, (viii) there are no amounts on deposit in the Mountainview Litigation Reserve Account and (ix) there are no amounts on deposit in the Germantown Franchise Reserve Account. Lender hereby acknowledges and agrees that Borrower has no further obligations under Section 7.1 or Section 7.5 of the Loan Agreement[7]

Section 2.6    <u>Release</u>.   Each of the Company, Borrower, Operating Lessee, New Holdco, New Holdco Member and Cerberus (the "<u>Releasing Parties</u>") hereby releases, remises, acquits and forever discharges Lender and each of the other Indemnified Parties from any and all actions and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages and expenses of any and every character, including legal fees, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the Indemnified Parties prior to and including the Effective Date that, in any way directly or indirectly, arise out of or in any way are connected to or related to this Amendment, the Restructuring, the Loan or the Loan Documents, including but not limited to, claims relating to any settlement negotiations (all of the foregoing hereinafter called the "<u>Released Matters</u>"). Each of the Indemnified Parties acknowledges that the agreements in this Section are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. Each of the Releasing Parties hereby represents and warrants to Lender that it has not purported to transfer, assign or otherwise convey any of its right, title or interest in any Released Matter to any other Person and that the foregoing constitutes a full and complete release of all Released Matters.

## ARTICLE 3. GENERAL

Section 3.1    <u>Governing Law.</u>   This Amendment shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles.

Section 3.2    <u>Definitions</u>.   All capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed thereto in the Loan Agreement.

Section 3.3    <u>No Waiver</u>.   Except as may be expressly set forth in this Amendment, nothing shall be construed as or deemed to be a waiver by Lender of any rights or remedies available to Lender under the Loan Documents.

Section 3.4    <u>No Oral Modification</u>.   This Amendment and any provisions hereof may not be modified amended, extended, discharged, waived or terminated except by an instrument in writing executed by the party against whom enforcement is sought. Any such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

Section 3.5    <u>Binding Effect</u>.   This Amendment shall inure to the benefit of and be binding upon the Borrower, Operating Lessee, New Holdco and Cerberus and Lender and their respective heirs, successors and assigns.

---

[7] Subject to receipt of satisfactory evidence of resolution of Mountainview litigation.

Section 3.6    Counterparts.    This Amendment may be executed in multiple counterparts, each of which, for all purposes, shall be deemed an original, and all of which together shall constitute one and the same agreement.

Section 3.7    Invalidity.   If any term, covenant or condition of this Amendment is held to be invalid, illegal or unenforceable in any respect, this Amendment shall be construed without such provision.

Section 3.8    Payment of Fees and Expenses.   On or prior to the date hereof, and as a condition precedent to the effectiveness of this Amendment, Borrower shall pay all fees, costs and expenses of Lender and its servicers, attorneys, advisors and consultants in connection with the Restructuring.

Section 3.9    Exculpation.   The provisions of Section 9.4 of the Loan Agreement, as amended hereby, are hereby incorporated by this reference with the same force and effect as if said Section 9.4 was set forth at length herein.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement to be duly executed and delivered as of the day and year first written above.

**BORROWER**:

**GRAND PRIX BELMONT LLC**
**GRAND PRIX CAMPBELL/SAN JOSE LLC**
**GRAND PRIX EL SECUNDO LLC**
**GRAND PRIX FREMONT LLC**
**GRAND PRIX MOUNTAIN VIEW LLC**
**GRAND PRIX SAN JOSE LLC**
**GRAND PRIX SAN MATEO LLC**
**GRAND PRIX SILI I LLC**
**GRAND PRIX SILI II LLC**
**GRAND PRIX DENVER LLC**
**GRAND PRIX ENGLEWOOD/DENVER SOUTH LLC**
**GRAND PRIX SHELTON LLC**
**GRAND PRIX WINDSOR LLC**
**GRAND PRIX ALTAMONTE LLC**
**GRAND PRIX FT. LAUDERDALE LLC**
**GRAND PRIX NAPLES LLC**
**GRAND PRIX ATLANTA LLC**
**GRAND PRIX ATLANTA (PEACHTREE CORNERS) LLC**
**GRAND PRIX LOMBARD LLC**
**GRAND PRIX CHICAGO LLC**
**GRAND PRIX SCHAUMBURG LLC**
**GRAND PRIX WESTCHESTER LLC**
**GRAND PRIX LEXINGTON LLC**
**GRAND PRIX LOUISVILLE (RI) LLC**
**GRAND PRIX COLUMBIA LLC**
**GRAND PRIX GAITHERSBURG LLC**
**GRAND PRIX GERMANTOWN LLC**
**GRAND PRIX PORTLAND LLC**
**GRAND PRIX LIVONIA LLC**
**GRAND PRIX CHERRY HILL LLC**
**GRAND PRIX MT. LAUREL LLC**
**GRAND PRIX SADDLE RIVER LLC**
**GRAND PRIX ISLANIA LLC**
**GRAND PRIX BINGHAMTON LLC**
**GRAND PRIX HORSHAM LLC**
**GRAND PRIX WILLOW GROVE LLC**
**GRAND PRIX ADDISON (RI) LLC**

**GRAND PRIX ARLINGTON LLC**
**GRAND PRIX LAS COLINAS LLC**
**GRAND PRIX RICHMOND LLC**
**GRAND PRIX RICHMOND (NORTHWEST) LLC**
**GRAND PRIX BELLEVUE LLC**
**GRAND PRIX BOTHELL LLC**
**GRAND PRIX LYNNWOOD LLC**
**GRAND PRIX TUKWILA LLC**
each a Delaware limited liability company

By:_____
   Name:
   Title:


**OPERATING LESSEE:**

**GRAND PRIX FIXED LESSEE LLC,**
a Delaware limited liability company


By:_____
   Name:
   Title:

NEW HOLDCO:

**INK ACQUISTION LLC,**
a Delaware limited liability company


By:_____
    Name:
    Title:

**INK ACQUISTION II LLC,**
a Delaware limited liability company


By:_____
    Name:
    Title:


**CERBERUS**:

**CERBERUS SERIES FOUR HOLDINGS, LLC**,
a Delaware limited liability company

By:  Cerberus Institutional Partners, L.P. — Series
      Four, its Managing Member

By:  Cerberus Institutional Associates, L.L.C., its
      General Partner


By:_____
    Name:
    Title:

LENDER:

**MIDLAND LOAN SERVICES**, a division of PNC Bank, National Association, as Special Servicer for U.S. Bank, National Association as Trustee for the Registered Holders of LB-UBS Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through Certificates successor trustee to Bank of America National Association

By:_____

Name:
Title:

## SCHEDULE I

### BORROWER

| Borrower | Individual Property | Allocated Loan Amount |
|---|---|---|
| Grand Prix Belmont LLC | Summerfield Suites, Belmont, CA | |
| Grand Prix Campbell/San Jose LLC | Residence Inn, Cambell, CA | |
| Grand Prix El Segundo LLC | Summerfield Suites, El Segundo, CA | |
| Grand Prix Fremont LLC | Residence Inn. Fremont. CA | |
| Grand Prix Mountain View LLC | Residence Inn, Mountain View, CA | |
| Grand Prix San Jose LLC | Residence Inn San Jose South, San Jose, CA | |
| Grand Prix San Mateo LLC | Residence Inn, San Mateo, CA | |
| Grand Prix Sili I LLC | Residence Inn Silicon Valley I, Sunnyvale, CA | |
| Grand Prix Sili II LLC | Residence Inn Silicon Valley II, Sunnyvale, CA | |
| Grand Prix Denver LLC | Residence Inn Denver Downtown, Denver, CO | |
| Grand Prix Englewood/Denver South LLC | Residence Inn Denver South, Englewood, CO | |
| Grand Prix Shelton LLC | Residence Inn, Shelton, CT | |
| Grand Prix Windsor LLC | Residence Inn, Windsor, CT | |
| Grand Prix Altamonte LLC | Residence Inn, Altamonte Springs, FL | |
| Grand Prix Ft. Lauderdale LLC | Courtyard, Fort Lauderdale, FL | |
| Grand Prix Naples LLC | Hampton Inn, Naples, FL | |
| Grand Prix Atlanta LLC | Residence Inn Atlanta Downtown, Atlanta, GA | |
| Grand Prix Atlanta (Peachtree Corners) LLC | Residence Inn Peachtree Corners, Atlanta, GA | |
| Grand Prix Lombard LLC | Hampton Inn, Lombard, IL | |
| Grand Prix Chicago LLC | Residence Inn Chicago (Rosemont/O'Hare), Rosemont, IL | |
| Grand Prix Schaumburg LLC | Hampton Inn, Schaumburg, IL | |
| Grand Prix Westchester LLC | Hampton Inn, Westchester, IL | |
| Grand Prix Lexington LLC | Residence Inn Lexington North, Lexington, KY | |
| Grand Prix Louisville (RI) LLC | Residence Inn, Louisville, KY | |
| Grand Prix Columbia LLC | Hampton Inn, Columbia, MD | |
| Grand Prix Gaithersburg LLC | Residence Inn, Gaithersburg, MD | |
| Grand Prix Germantown LLC | Hampton Inn, Germantown, MD | |
| Grand Prix Portland LLC | Residence Inn Portland, Scarborough, ME | |
| Grand Prix Livonia LLC | Residence Inn. Livonia. MI | |
| Grand Prix Cherry Hill LLC | Residence Inn, Cherry Hill, NJ | |
| Grand Prix Mt. Laurel LLC | Summerfield Suites, Mount Laurel, NJ | |
| Grand Prix Saddle River LLC | Residence Inn, Upper Saddle River, NJ | |
| Grand Prix Islandia LLC | Hampton Inn, Islandia, NY | |
| Grand Prix Binghamton LLC | Residence Inn Binghamton, Vestal, NY | |
| Grand Prix Horsham LLC | Townplace Suites, Horsham, PA | |
| Grand Prix Willow Grove LLC | Hampton Inn, Willow Grove, PA | |
| Grand Prix Addison (RI) LLC | Residence Inn, Addison, TX | |
| Grand Prix Arlington LLC | Residence Inn, Arlington, TX | |
| Grand Prix Las Colinas LLC | Summerfield Suites Las Colinas, Irving, TX | |
| Grand Prix Richmond LLC | Residence Inn. Richmond. VA | |

| | | |
|---|---|---|
| Grand Prix Richmond (Northwest) LLC | Residence Inn Richmond NW, Richmond, VA | |
| Grand Prix Bellevue LLC | Residence Inn, Bellevue, WA | |
| Grand Prix Bothell LLC | Residence Inn, Bothell, WA | |
| Grand Prix Lynnwood LLC | Residence Inn, Lynwood, WA | |
| Grand Prix Tukwila LLC | Residence Inn Tukwila, Seattle, WA | |

<u>Schedule II</u>

<u>Schedule IV</u>

Pro Forma Structure Chart*



*Subject to change based on the final determination of corporate structure by the Plan Sponsors, in their sole discretion and as described in a plan supplement document to be filed before the scheduled date of confirmation of the Fixed/Floating Plan.

16279922.1

Schedule X

<u>Schedule XIII</u>

[UNDER REVIEW]

Schedule XVI

Hampton Hotels

1. Lombard, IL
2. Schaumburg, IL
3. Westchester, IL

<u>Schedule XVII</u>
<u>Early Release Property</u>

Schedule XVIII

New Holdco Operating Agreement[10]

---

[10] Subject to receipt and approval by Lender of executed Amendment to Limited Liability Company Agreement of Ink I in the form attached and an executed copy of the Limited Liability Company Agreement of Ink II in the form substantially the same as the Limited Liablity Company Agreement of INK I (as amended).

THE TRANSFER OF THE LIMITED LIABILITY COMPANY INTERESTS DESCRIBED IN
THIS AGREEMENT IS RESTRICTED AS DESCRIBED HEREIN.

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**INK ACQUISITION LLC,**

**a Delaware Limited Liability Company**

THIS LIMITED LIABILITY COMPANY AGREEMENT of INK Acquisition LLC, a
Delaware limited liability company (the "Company"), is made as of April 25, 2011 (this
"Agreement"), by and between CRE-Ink REIT Member, LLC ("Cerberus") and Chatham
Lodging LP ("Chatham", and, together with Cerberus and any other Person who becomes a
member of the Company from time to time in accordance with the provisions hereof, the
"Members").

**RECITALS:**

1.      A Certificate of Formation of the Company was filed with the Secretary of
State of the State of Delaware on April 15, 2011;

2.      Upon the terms and subject to the conditions set forth herein, each of the
Persons listed on Schedule A hereto are concurrently with the execution of this Agreement
acquiring a percentage interest in the Company; and

3.      In accordance with the Act (as defined in Section 1.6), the Members desire
to enter into this Agreement to (i) set forth the respective rights, powers and interests of the
Members with respect to the Company; (ii) establish the terms for the issuance of interests
therein; and (iii) provide for the management of the business and operations of the Company.

NOW, THEREFORE, in consideration of the mutual promises and agreements
herein made and intending to be legally bound hereby, the parties hereto agree as follows:

ARTICLE I.

GENERAL PROVISIONS; ORGANIZATION; STRUCTURE

Section 1.1      Registered Office.  The registered agent and office of the Company
in the State of Delaware shall be National Corporate Research, Ltd., 615 South DuPont
Highway, County of Kent, City of Dover, State of Delaware 19901.  The Managing Member,
after giving notice to the other Members, may change the registered office from one location to
another in the State of Delaware.

Section 1.2     Place of Business; Offices.  The principal place of business of the Company, where the books and records of the Company shall be kept, shall be c/o Chatham Lodging LP, 50 Cocoanut Row, Suite 200, Palm Beach, FL  33480.  The Company may, at any time, change the location of the principal office of the Company or have one or more offices as may be established from time to time.

Section 1.3     Purpose; Nature of Business Permitted; Powers; Title to Property.

(a)     The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)     to acquire, own, hold, manage, operate, lease, sell, transfer, service, convey, safekeep, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Business and the Properties and any portion thereof with unrelated third parties or with affiliated entities;

(ii)     to acquire, own, hold, sell, transfer, service, convey, safekeep, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with, publicly or privately issued securities and whether with unrelated third parties or with affiliated entities, in each case in connection with the Business and the Properties;

(iii)     to own equity interests in other limited liability companies, partnerships or other entities whose purposes are restricted to those set forth in clauses (i) and (ii) above; and

(iv)     to engage in any other lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes (including the entering into of interest rate or basis swap, cap, floor or collar agreements, or similar hedging transactions and referral, management, servicing and administration agreements).

(b)     The Company shall not engage in any other business or activity. Except as otherwise provided in Section 1.10 hereof and except for contracts customarily entered into by a property management agent on behalf of a hotel property owner, all property acquired in connection with the business of the Company shall be held by the Company in its own name, and all contracts and leases of real or personal property by or to the Company shall be made in its own name.

(c)     Title to assets of the Company, whether real, personal or mixed, tangible or intangible, shall be deemed to be owned by the Company, and no Member, individually or collectively, shall have any ownership interest in such assets or any portion thereof.

Section 1.4     [Reserved]

Section 1.5     Tax Classification; No State Law Partnership; REIT Qualifications.  (a) The Members intend that the Company shall be treated as a partnership for

federal, state and local tax purposes. Each Member and the Company agree to file all tax returns and otherwise take all tax and financial reporting positions in a manner consistent with such treatment. No provision of this Agreement shall be deemed or construed to constitute the Company (including its subsidiaries) as a partnership (including a limited partnership) or joint venture, or any Member as a partner of or with any other Member for any purposes other than tax purposes.

(b)        As of the Closing Date, Cerberus shall be a REIT and Chatham shall be owned, directly or indirectly, by Chatham REIT. Both Chatham REIT and Cerberus intend to qualify as a REITs, and the Members intend that the Company shall operate the Properties in a manner that will not jeopardize the REIT status of either Chatham REIT or Cerberus. Accordingly, the Company will lease the Properties to the Property Leasecos pursuant to arm's-length leases and the Property Leasecos will engage Island Hospitality Management or another entity that qualifies as an "eligible independent contractor" under Code Section 856(d)(9) to operate the Properties on their behalf.

Section 1.6        Definitions. Unless the context otherwise requires, the terms defined in this Section 1.6 shall, for the purposes of this Agreement, have the meanings herein specified (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

"1933 Act" has the meaning set forth in Section 12.16.

"1940 Act" means the Investment Company Act of 1940, as amended, and the rules and regulations thereunder.

"Act" means the Delaware Limited Liability Company Act (as it may be amended from time to time and any successor to such Act).

"Additional Capital Contribution" means any Capital Contribution made by a Member pursuant to Section 2.2(b) hereof.

"Affiliate" means, with respect to a Person, another Person that directly or indirectly controls, is controlled by or is under common control with such first Person; provided, however, that for purposes only of the term "Permitted Transferee", the term "Affiliate" shall have the meaning ascribed to it therein. For the avoidance of doubt, for purposes of this Agreement, including, without limitation, the definition of "Permitted Transferee," (i) an Affiliate of Cerberus includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that, as of the date hereof, control Cerberus; and (ii) an Affiliate of Chatham includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that control Chatham REIT, and any successor to Chatham REIT, whether by merger, consolidation, sale of substantially all of the assets or otherwise. Additionally, for the avoidance of doubt, Island Hospitality Management shall not be considered to be an Affiliate of Chatham REIT or Chatham.

"Affiliated Individual" means, with respect to a Person, any individual who is an officer, director, shareholder, employee, partner or member of such Person or an individual who is related by blood, marriage or adoption to any of the foregoing.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 5.1(c).

"Approved FATF Country" shall mean any country that is a member of the Financial Action Task Force on Money Laundering, as such list may be amended, from time to time, and as approved in this Agreement.  As of the date of this Agreement, the following countries are Approved FATF Country members:  Argentina, Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Iceland, Ireland, Italy, Japan, Luxembourg, Mexico, Kingdom of the Netherlands, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, Turkey, United Kingdom and the United States.

"Approved Severance Costs" means any severance payable to Chatham Company Personnel to the extent such severance (i) for a senior Chatham Company Employee does not exceed three (3) months of such employee's monthly salary, (ii) for any other Chatham Company Employee is determined by Chatham in accordance with such employee's position and seniority and does not exceed two (2) months of such employee's monthly salary or (iii) otherwise has been approved by Cerberus at the time of grant to the applicable Chatham Company Personnel.

"Asset" means an asset owned by the Company or its Subsidiaries.

"Auction" means the auction of the hotel properties listed on Annex A hereto contemplated by the Bid Procedures.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy".  A "Voluntary Bankruptcy" shall mean, with respect to any Person, (a) an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors, (b) the filing of any petition or answer by such Person seeking to adjudicate it bankrupt or insolvent or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of such Person or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking, consenting to or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property, or (c) corporate action taken by such Person to authorize any of the actions set forth above.  An "Involuntary Bankruptcy" shall mean, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation or the filing of any such petition against such Person which order or petition shall not be dismissed within 90 days or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within 90 days.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Bid" means a proposal submitted by the Company to acquire the Properties listed on Annex A hereto at the Auction through the sponsorship and funding of a chapter 11 plan of reorganization for the Debtors pursuant to and in accordance with the Bidding Procedures.

"Bidding Procedures" means the Bidding Procedures for the Fixed/Floating Debtors attached as Exhibit 2 to the Order (I) Authorizing the Debtors to Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving Bidding Procedures, (III) Approving Bid Protections, (IV) Authorizing an Expense Reimbursement for "Bidder D," and (V) Modifying Cash Collateral Order to Increase Expense Reserve, entered by the Bankruptcy Court in Case No. 10-13800 (SCC).

"Business" means (a) the acquisition, ownership, lease and operation of certain hotel properties as of the date hereof owned, leased and operated by Innkeepers USA Trust and its subsidiaries, (b) the ownership, lease and operation of any other Properties acquired by the Company in accordance with this Agreement, and (c) any other business of the Company, directly or indirectly related, incidental to or connected with the foregoing.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York City are required or permitted by law to be closed.

"Business Plan" means the comprehensive strategic plan for the Company's ownership, operation, financing and sale of the Properties, as in effect from time to time pursuant to Section 3.5 hereof.

"Buy Notice" has the meaning set forth in Section 3.7.

"Buy/Sell Closing Date" has the meaning set forth in Section 3.7.

"Buy/Sell Notice" has the meaning set forth in Section 3.7.

"Buy/Sell Right" has the meaning set forth in Section 3.7.

"Capital Account" has the meaning set forth in Section 2.3(a).

"Capital Call" shall mean a written notice to the Members calling for a Capital Contribution, which written notice shall include (a) the total amount of the Capital Contribution then required, (b) a brief description of the expenditures or obligations giving rise to the requirement for such Capital Contribution, (c) each Member's proportionate share of the total Capital Contribution as then required by this Agreement, (d) the date by which each Member's Capital Contribution is required to be made, which date shall be thirty (30) days (or, with respect to the Capital Call to fund the acquisition of the Properties listed on Annex A hereto, ten (10) days) after such written notice has

been given or such other date as may be agreed to by the Members, and (e) the account of the Company to which such Capital Contributions must be paid.

"Capital Contribution" means, with respect to any Member, the amount of money contributed to the Company in exchange for a Percentage Interest in the Company, including Initial Capital Contributions.

"Carveout Guarantor" has the meaning set forth in Section 1.11(c)(i).

"Carveout Guaranty" means a guaranty of non-recourse carveouts, in form and substance satisfactory to the applicable Lender and approved in advance in writing by the Members, (including, without limitation, any such guaranty required by Midland Loan Services in connection with the Midland Loan).

"Cerberus" has the meaning set forth in the Preamble.

"Cerberus Initial Members" means Cerberus and its Permitted Transferees.

"Certificate of Formation" means the Certificate of Formation referred to in Recital 1 and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Act.

"Chatham" has the meaning set forth in the Preamble.

"Chatham REIT" means Chatham Lodging Trust, a Maryland real estate investment trust.

"Chatham Cap" has the meaning set forth in Section 2.2(a).

"Chatham Company Personnel" means any personnel employed by Chatham (or one of its Affiliates other than the Company) solely for the purpose of providing asset management services to the Company, the employment generally of whom, including compensation and severance other than Approved Severance Costs, if any, payable to such personnel, has been approved by Cerberus.

"Chatham Initial Members" means Chatham and its Permitted Transferees.

"Close Associate" means a Person who is widely and publicly known (or is actually known) to be a close associate of a Senior Foreign Political Figure.

"Closing Date" means the date upon which the transactions contemplated by the Plan and the Investment Agreement are consummated.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" has the meaning set forth in the Preamble.

"Contributing Members" has the meaning set forth in Section 2.2(d).

"Control" means, with respect to any Person, the power of another Person, through ownership of equity, contract rights or otherwise, to direct the management and policies of such Person, and "controlled" and "controlling" have correlative meanings.

"Cure" means, with respect to any action or failure to act triggering a right to Cure, that such action or failure to act, to the extent that it triggered the right to Cure, has been discontinued, and all parties adversely affected by such action or failure to act have been made whole in all material respects as if such action or failure to act had not occurred.

"Debtors" means Innkeepers USA Trust and each of the other debtors and debtors-in-possession in the Bankruptcy Court Chapter 11 Case No. 10-13800 (SCC).

"Deposit" means the cash deposit required by the Bidding Procedures to be put into an interest-bearing escrow account in the name of the Debtors contemporaneously with the submission of the Bid.

"Depreciation" means, for each Fiscal Period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Period, except that if the Gross Asset Value of such asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Tax Matters Member.

"Effective Date" means the date of this Agreement, as set forth in the Preamble.

"Election Notice" has the meaning set forth in Section 3.7(a)(i).

"Environmental Law" means all applicable laws, including, for this purpose, all common law, governing public health or safety, workplace health or safety, pollution or the protection of the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Expense Reimbursement" has the meaning set forth in Section 3.1(c).

"Failed Contribution" has the meaning set forth in Section 2.2(d).

"Family Member" means, with respect to any specified natural person, (a) any parent, child, descendant or sibling of such natural person (including relationships resulting from adoption) or (b) the spouse of such natural person or of any person covered by clause (a).

"Fiscal Period" means (a) the period commencing on the Effective Date and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) any portion of the period described in clauses (a) and (b) of this sentence (i) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article VI and (ii) ending on the date of an adjustment to the Gross Asset Value pursuant to clause (b) of the definition of "Gross Asset Value".

"Fiscal Year" means (a) the period commencing on the Effective Date and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on the immediately preceding January 1 and ending on the date on which all property of the Company is distributed to the Members pursuant to Article X.

"Funded Amount" has the meaning set forth in Section 2.2(d).

"GAAP" means generally accepted accounting principles in the United States,

"Governmental Entity" means a court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

      (a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset at the time it is accepted by the Company, unreduced by any liability secured by such asset, as reasonably determined by the Managing Member;

      (b)     the Gross Asset Values of all Assets shall be adjusted to equal their respective fair market values, unreduced by any liabilities secured by such assets, as reasonably determined by the Managing Member as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; (iii) the grant of more than a de minimis interest in the Company as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity or by a new Member acting in a partner capacity or in anticipation of being a partner; and (iv) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that an adjustment described in clauses (i), (ii) or (iii) of this paragraph shall be made

only if the Managing Member reasonably determines that such an adjustment is necessary to reflect the relative economic interests of the Members;

(c)     the Gross Asset Value of any Asset distributed to any Member shall be adjusted to equal the fair market value of such asset on the date of distribution, unreduced by any liability secured by such asset, as reasonably determined by the Managing Member; and

(d)     the Gross Asset Value of all Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and paragraph (f) of the definition of "Profits" and "Losses" or Section 8.2(g); provided, however, that Gross Asset Value shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (b) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d).

If  the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraphs (a), (b) or (d) of this definition, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Hazardous Substance" means any material, substance or waste as to which liability or standards of conduct may be imposed pursuant to any Environmental Laws.

"Hotel Management Agreement" means the Hotel Management Agreements in the form attached hereto as Exhibit A, to be executed and delivered on the Closing Date, between Island Hospitality Management and each Property Leaseco.

"Hotel Manager" has the meaning set forth in the definition of Major Decision.

"Immediate Family Member" includes the parents, siblings, spouse, children, and spouse's parents and siblings, of a Senior Foreign Political Figure.

"Independent Appraiser" has the meaning set forth in Section 3.7(a)(ii).

"IRS" means the U.S. Internal Revenue Service, or any successor government agency.

"Indebtedness" means (a) the principal, premium (if any), interest and related fees and expenses (if any) in respect of (i) indebtedness for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments, (b) all obligations in respect of outstanding letters of credit, acceptances and similar obligations, (c) that portion of obligations with respect to capital leases not entered into in the ordinary course of business and properly accounted for as a liability, (d) any obligation owed for all or any part of the deferred purchase price of property or services

except for trade liabilities incurred in the ordinary course of business, and (e) a guaranty of any of the obligations described in the foregoing clauses of this definition.

"Indemnifiable Losses" has the meaning set forth in Section 11.1.

"Indemnified Person" has the meaning set forth in Section 11.1.

"Initial Capital Contribution Amount" means as to each Initial Member, the dollar amount that is set forth opposite such Member's name on Schedule A and labeled such Member's "Initial Capital Contribution Amount".

"Initial Capital Contributions" has the meaning set forth in Section 2.2(a).

"Initial Members" means the Chatham Initial Members and Cerberus Initial Members.

"Involuntary Bankruptcy" has the meaning set forth in the definition of Bankruptcy.

"Island Hospitality Management" means Island Hospitality Management III, Inc. or one of its Affiliates.

"Lender" means the lender under any Loan Documents to be executed with respect to a Loan, if any.

"Loan" means a loan obtained or assumed by the Company or any of its Subsidiaries, as borrower, secured by all or any portion of the Property, including the Midland Loan.

"Loan Documents" means any and all loan documents to be executed by the Company or any of its Subsidiaries, as applicable, and the Lender in connection with a Loan, if any.

"Major Decision" means any determination to cause the Company or any Subsidiary of the Company to:

(a)     directly or indirectly acquire, or execute and deliver any documents, agreements or instruments necessary to close on the direct or indirect acquisition by the Company or any Subsidiary of the Company of, any Property, except as set forth in the then-approved Operating Budget or the then-approved Business Plan;

(b)     (A) sell, assign, transfer, encumber or dispose of the Company, any Property Company, any Property, or any revenue-generating business of the Company or any Property Company, or agree to any of the foregoing, or (B) except as expressly provided in this Agreement or in the then-approved Operating Budget or the then-approved Business Plan, improve, design, rehabilitate, alter, or repair (collectively, the "Repairs") of any of the Properties, provided, however, that the Managing Member may make or caused to be made Repairs not contemplated by the then-approved Operating Budget if (i) any such Repair is

required by any franchisor under the applicable franchise agreement or any other agreement with the franchisor (including, but not limited to, that certain Agreement for Adequate Assurance of Completion of Certain PIPS and Assumptions of Agreements, dated June 25, 2010, by and between the Debtors and Marriot International, Inc.), (ii) emergency action or expenditures is necessary to prevent imminent risk to the health and safety of Persons on or about the Properties, imminent material property damage or imminent imposition of criminal or civil sanctions against the Company or any Member (each, an "Emergency Expenditure"), provided that (1) any such Emergency Expenditure made without approval of all Initial Members is, in the Managing Member's commercially reasonable judgment, reasonable and necessary under the circumstances set forth above and (2) the Managing Member endeavors diligently and in good faith (x) to notify the Initial Members of any such Emergency Expenditure promptly in writing and (y) attempts to obtain verbal approval of the Initial Members for any required Emergency Expenditure, or (iii) if the aggregate cost of such Repairs fall within the thresholds set forth in clause (l) of this definition;

(c)      except as otherwise expressly permitted by this Agreement, call for Capital Contributions, approve Capital Calls or determine the portion of the then-approved Operating Budget that is to be funded by equity and by debt, or raise any new equity for any Subsidiary of the Company or admit any new member, partner or owner to the Company or any of its Subsidiaries;

(d)      make any operating expenditure or incur any operating obligation by or on behalf of the Company that varies materially from the then-approved Operating Budget other than an Emergency Expenditure made pursuant to the procedures set forth in clause (b) of this definition and expenditures that fall within the thresholds set forth in clause (l) of this definition;

(e)      execute or modify, amend, supplement, terminate, extend or renew leases with tenants for occupancy of space in any Property, except (i) for any lease with a Property Leaseco or any other TRSs of Chatham REIT and Cerberus or (ii) to the extent delegated to the Hotel Manager pursuant to the Hotel Management Agreements or set forth in the then-approved Operating Budget or the then-approved Business Plan;

(f)      enter into, modify or terminate any contractual arrangements with service providers (including lenders, attorneys, consultants, appraisers, third party property managers, brokerage companies, general contractors, accountants, auditors, architects, banks or other depositaries and all other service providers) for services to be rendered in connection with the business of the Company; provided, however, that (i) until further written notice, Cerberus hereby delegates the tasks set forth in this subsection (f) to the Managing Member, so long as all such services are expressly provided for and are not in excess of the amounts budgeted for such services in the then-approved Operating Budget and Business Plan and either (x) are terminable, without cause or fee, upon not more than thirty (30) days notice, (y) have a stated term of not more than one year, or (z) are expressly approved in writing by Cerberus, (ii) Cerberus hereby authorizes the Managing Member to cause the Property Leasecos to engage Island Hospitality Management to act as the hotel manager of all of the Properties on behalf of the Property Leasecos (the "Hotel Manager") pursuant to the Hotel Management Agreements and (iii) the entry into, modification or termination of any

contractual arrangement that requires an annual payment by the Company of $25,000 or less, or the determination to take any of the foregoing actions, shall not be considered a Major Decision;

(g)     incur or pay any real estate taxes, insurance premiums, or any assessments or charges with respect to the ownership and operation of any Property, except to the extent provided for in the then-approved Operating Budget or delegated to the Hotel Manager pursuant to the Hotel Management Agreement;

(h)     make distributions to the Members other than as set forth in Article VII of this Agreement;

(i)     establish reserves, determine reserve levels or make any distributions from any such reserves, except as set forth in the then-approved Operating Budget or the then-approved Business Plan;

(j)     except as set forth in the then-approved Operating Budget or the then-approved Business Plan, cause or permit the Company to finance all or any portion of any Property (other than the Midland Loan and trade debt incurred in the ordinary course of business consistent with the then-approved Operating Budget), agree to the form, substance, provider or documentation pertaining to any Loan, modify, restructure or terminate any Loan or repay any Loan except in accordance with the express terms of the applicable Loan, or enter into, modify or amend any documents, agreements or instruments relating to any Loan;

(k)     except to the extent expressly set forth in the then-approved Operating Budget or the then-approved Business Plan, select or determine any insurance plans, carriers or coverages to be purchased and maintained by or on behalf of the Company or any Property Company;

(l)     make any expenditures which are at variance with the then-approved Operating Budget or Business Plan (A) (1) with respect to any Operating Expense (as defined in the applicable Hotel Management Agreement) for any Property unless Operating Expenses for such Property would not exceed the estimated Operating Expenses for such Property as set forth in the then-current and approved Operating Budget with respect to such Property by five percent (5%) or more (in the aggregate, but not by line item) and (2) with respect to any other expenditure not described in clause (1), unless the variance in question does not exceed a particular summary line item by the lesser of (x) $50,000 or (y) 10% of that summary line item, and (B) unless the overall Operating Budget for the Company is not exceeded in the aggregate by more than 2.5% (excluding, for purposes of the foregoing calculation, the use of any contingency line items set forth in the then-approved Operating Budget)), and provided that in any case the Managing Member may make an Emergency Expenditure pursuant to the procedures set forth in clause (b) of this definition);

(m)     grant or convey any easement, lien, ground lease, mortgage, deed, deed of trust, bill of sale, contract or other instrument purporting to convey or encumber any Property, either wholly or in part;

(n)    take any Bankruptcy action on behalf of the Company or any of its Subsidiaries;

(o)    institute any legal or arbitration proceedings in the name of the Company, settle any legal or arbitration proceedings against the Company or confess any judgment against the Company or any Property, other than (i) the institution of an eviction action, a suit for breach of a tenant lease or other similar proceeding contemplated in or provided for in the then-approved Operating Budget or the then-approved Business Plan or (ii) settlements or compromises for litigation or arbitration providing solely for the payment of money damages where the amount paid (after giving effect to any insurance proceeds) in settlement or compromise does not exceed $50,000;

(p)    execute, deliver or file any agreement, permit, request, application or filing with any governmental agency, any neighboring property owner, any community organization or any similar regulatory body, or send any correspondence to or have any other material communications with, any governmental agency, which directly binds the Company or any of its Affiliates or any Member or any of its Affiliates, or which advocates a position on behalf of the Company or its Affiliates or any Member or its Affiliate (excluding correspondence, communications and other actions with respect to ministerial matters consistent with the then-approved Operating Budget and the then-approved Business Plan);

(q)    approve any investment other than as contemplated by this Agreement or approve any renovation or disposition of any Property, except as expressly authorized by the then-approved Business Plan and other than an Emergency Expenditure or Repair made pursuant to the procedures set forth in clause (b) of this definition;

(r)    enter into any exclusivity, competition or confidentiality agreement that is or purports to be binding upon any Member or any of its Affiliates or interest holders;

(s)    enter into any settlements with any third party or any consent decree, order (judicial or otherwise) with any Governmental Entity, related to the breach of any Environmental Law, or the sampling, monitoring, treatment, remediation, removal or clean up of Hazardous Substances with respect to the Properties;

(t)    knowingly take or approve, or refrain from taking or approving, any action (other than as a consequence of taking or approving or refraining from taking or approving any action pursuant to a direction, an affirmative veto or a lack of approval after a specific request therefore, in each case from a Member authorized to give such direction, veto or approval) that is reasonably likely to lead to a default under any Loan Documents or to a material dispute with any Lender;

(u)    knowingly take or approve, or refrain from taking or approving, any action (other than as a consequence of taking or approving or refraining from taking or approving any action pursuant to a direction, an affirmative veto or a lack of approval after a specific request therefore, in each case from a Member authorized to give such direction, veto or approval) that could trigger a recourse provision under any then-outstanding Loan;

(v)　approve any marketing plans or agreements with respect to any Property, except as expressly authorized by the then-approved Business Plan;

(w)　require or permit the Company to make any loan to any Member or any of its Affiliates, or require or permit any loan (other than a Member Loan) to be made by any Member to the Company;

(x)　cause the Company or any Property Company to execute or deliver any indemnity or guaranty;

(y)　change the Company's depreciation and accounting methods and make other decisions with respect to the treatment of various transactions for federal income tax purposes, and change the Company's elections for federal, state or local income tax purposes;

(z)　amend this Agreement (or the corresponding organizational documents of any Subsidiary of the Company) in any respect;

(aa)　take or approve any action relating to any tax certiorari proceeding or other tax appeal affecting any Property;

(bb)　recapitalize, reclassify, redeem, repurchase or otherwise acquire any equity or other interests of the Company or any Subsidiary of the Company;

(cc)　merge, consolidate or dissolve the Company or any of its Subsidiaries;

(dd)　remove and replace Island Hospitality Management as Hotel Manager;

(ee)　permit or cause any Transfer that may reasonably be expected to cause the assets of the Company or any Subsidiary of the Company to be deemed "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA);

(ff)　enter into any swap, hedge, collar or other interest rate protection agreement;

(gg)　enter into any lease, whether as lessor or lessee, other than short term storage leases in connection with a capital program or equipment leases in the ordinary course of business;

(hh)　take any action that could reasonably be expected to cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT;

(ii)     enter in any transaction that could reasonably be expected to cause Chatham REIT or Cerberus to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6); or

(jj)     cause any rebranding of properties or entry into new franchise agreements.

"Managing Member" means Chatham, in its capacity as Managing Member of the Company, and any successor thereto appointed in accordance with this Agreement.

"Member" has the meaning set forth in the preamble.

"Member Loan" has the meaning set forth in Section 2.2(d).

"Midland Loan" means the new non-recourse mortgage loan in an aggregate principal amount of not less than $622.5 million made by Midland Loan Services, a division of PNC National Bank, in a form approved by the Initial Members, the proceeds of which are to be used to satisfy the Debtors' current outstanding fixed rate mortgage loan as part of the transactions contemplated by the Bid.

"Minimum Cerberus Multiple" has the meaning set forth in Section 7.1(b).

"Monthly Expense Amount" has the meaning set forth in Section 3.1(c)(i).

"Net Cash Flow" means, during the applicable period, the gross cash proceeds derived by the Company during such period from any source (including financings or refinancings) less the portion thereof used to pay or establish reserves for all Company operating expenses, the Expense Reimbursement, the fees payable under the Hotel Management Agreements, debt payments, taxes, capital improvements, replacements and contingencies or otherwise required to be held by the Company, all as determined by the Managing Member in its reasonable discretion subject to the provisions of this Agreement; provided, however, that Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions of previously established reserves; and provided further that Net Cash Flow shall not include any cash that the Company or its Subsidiaries is prohibited from distributing to the Members by the terms of any Indebtedness of the Company or its Subsidiaries.

"Non-Contributing Member" has the meaning set forth in Section 2.2(d).

"Non-Notifying Member" has the meaning set forth in Section 3.7.

"Notifying Member" has the meaning set forth in Section 3.7.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**OFAC List Sanctions Programs**" means any countries, territories, individuals or entities that are prohibited pursuant to the laws, regulations or Executive Orders administered by OFAC, including the List of Specially Designated Nationals and Blocked Persons administered by OFAC, as such list may be amended from time to time.

"**Officer**" means any officer of the Company or any Subsidiary thereof appointed in accordance with this Agreement or by the manager of such Subsidiary.

"**Operating Budget**" means the annual operating budget for the ownership, operation, marketing and sale of the Properties, as in effect from time to time pursuant to Section 3.5 hereof.

"**Parallel Entities**" has the meaning set forth in Section 1.12.

"**Percentage Interest**" means, with respect to any Member, such Member's ownership interest in the Company, calculated as the percentage obtained by dividing the Capital Contributions of such Member by the aggregate Capital Contributions of all the Members.

"**Person**" means any individual, corporation, association, partnership (general or limited), joint venture, trust, joint-stock company, estate, limited liability company, Series, unincorporated organization or other legal entity or organization.

"**Permitted Transferee**" means (i) with respect to any Member who is not a natural person, any Affiliate of such Member (provided that for purposes of this clause (i), "**Affiliate**" shall mean, with respect to the Member in question, a Person (including any fund or managed account) that such Member solely controls, is controlled solely by or under common control with (and no Person other than the common controlling Person controls such Affiliate) such Member, and provided further that notwithstanding the immediately preceding proviso, Affiliates specified in the second sentence of the definition of Affiliate shall be deemed to be "Affiliates" for purposes of this clause (i)); (ii) with respect to any Member who is a natural person, (x) upon the death of such natural person, any Person in accordance with such natural person's will or the laws of intestacy; (y) the Family Members of such natural person, entities formed for estate or family planning purposes and/or one or more trusts for the sole benefit of the Family Members of such natural person provided that such natural person shall not be released from his obligations under this Agreement as a Member; and (iii) in the event of the dissolution, liquidation or winding up of any Person that is a corporation, partnership or limited liability company, the stockholders, partners or members, as applicable, or a successor corporation, partnership or limited liability company all of the stockholders, partners or members of which, as applicable, are the Persons who were the stockholders, partners or members, as applicable, of such entity immediately prior to the dissolution, liquidation or winding up of such Person; provided further, however, that no such Transfer under any one or more of the foregoing clauses (i) through (iii) to any such Person shall be permitted where such Transfer (x) fails to comply with the terms of Section 5.1, including, without limitation, by reason of a failure to comply in any respect

with any federal or state securities laws, including, without limitation, the 1940 Act, or (y) would result in the Company becoming subject to the Exchange Act.

"Plan" means the amended and restated plan of reorganization of the Debtors in form and substance satisfactory to Chatham and Cerberus and consistent with the terms of the Bid.

"Post-Termination Major Decision" means any determination to cause the Company or any Subsidiary of the Company to take any action described in clauses (h), (n), (r), (t) (solely to the extent such action would trigger a Carveout Guaranty made by Chatham or its Affiliate), (u) (solely to the extent such action would trigger a Carveout Guaranty made by Chatham or its Affiliate), (z), (bb), (hh) or (ii) of the definition of "Major Decisions".

"President and CEO" has the meaning set forth in Section 3.4(d)(i).

"Profits" or "Losses" means for each Fiscal Period, an amount equal to the taxable income or loss for such Fiscal Period. Such amount shall be determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a) any income that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b) any expenditures described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c) in the event the Gross Asset Value of any Asset is adjusted pursuant to paragraphs (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(d) gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e) in lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss there

shall be taken into account Depreciation for such Fiscal Period, computed in accordance with the definition of Depreciation; and

(f)　　to the extent an adjustment to the adjusted tax basis of any Asset pursuant to Code Section 734(b) or 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Promoted Interest" has the meaning set forth in Section 7.1(b).

"Properties" means the hotel properties listed on Annex A hereto, and any other property (real, personal or mixed) or real estate acquired by the Company in accordance with this Agreement.

"Property Company" means a direct or indirect subsidiary of the Company through which the Company indirectly holds one or more Properties.

"Property Leasecos" means each of Grand Prix Fixed Lessee LLC and Grand Prix Floating Lessee LLC, each a Delaware limited liability company that will either (i) elect to be treated as associations taxable as corporations for federal income tax purpose and as TRSs of Chatham REIT and Cerberus, (ii) be wholly owned by a Subsidiary of the Company that elects to be a TRS of Chatham REIT and Cerberus or (iii) be owned by a Subsidiary of Chatham REIT or Cerberus that elects to be a TRS.

"QIB" means a "qualified institutional buyer" within the meaning of Rule 144A under the 1933 Act.

"REIT" means an entity that qualifies as a "real estate investment trust" under Code Sections 856 through 860.

"Regulations" means the federal income tax regulations promulgated by the Treasury Department under the Code, as such regulations may be amended from time to time.  All references herein to a specific section of the Regulations shall be deemed also to refer to any corresponding provisions of succeeding Regulations.

"Representative" has the meaning set forth in Section 10.2.

"Reorganized Debtors" means the Debtors, after giving effect to their reorganization in accordance with the Plan.

"Sell Notice" has the meaning set forth in Section 3.7.

"Senior Foreign Political Figure" means (a) a current or former senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S.

government (whether elected or not), a current or former senior official of a major United States political party or a current or former senior executive of a non-U.S. commercial enterprise, (b) a corporation, business or other entity that has been formed by or for the benefit of a Senior Foreign Political Figure; (c) an immediate family member of a Senior Foreign Political Figure; and (d) a close associate of a Senior Foreign Political Figure. For purposes of this definition, a "senior official or "senior executive" means an individual with substantial authority over policy, operations, or the use of government-owned resources.

"Subsidiary" of a Person means any corporation, partnership, limited liability company, trust and other entity, whether incorporated or unincorporated, with respect to which such Person, directly or indirectly, legally or beneficially, owns (i) a right to a majority of the profits of such entity; or (ii) securities having the power to elect a majority of the board of directors or similar body governing the affairs of such entity.

"TRS" means an entity that qualifies as a "taxable REIT subsidiary" under Code Section 856(l).

"Tax Matters Member" has the meaning set forth in Section 8.1.

"Termination Event" means (a) the occurrence of a Failed Contribution with respect to (i) any Initial Capital Contribution for which Capital Call has been made in accordance with Section 2.2(a), or (ii) any Capital Contribution (other than an Initial Capital Contribution) for which a Capital Call has been made other than pursuant to Section 2.2(b)(ii), (b) any material breach of Chatham's obligations hereunder (other than a Failed Contribution), or any gross negligence, willful misconduct or fraud committed by Chatham or any Person affiliated with Chatham in connection with the performance of Chatham's obligations hereunder, in each case other than such gross negligence, willful misconduct or fraud that, if capable of being Cured, is Cured within thirty (30) days after Chatham receives written notice thereof, (c) the reduction of Chatham's Percentage Interest to a percentage of less than 5% hereof, (d) the failure of Jeffrey Fisher to remain as active in the management and business of Chatham REIT as he is as of the date of this Agreement, (e) any direct or indirect Transfer of an interest in Chatham that is not a Transfer permitted under Article V hereof, unless such Transfer, if capable of being Cured, is Cured within thirty (30) days after the occurrence thereof, or (f) the failure of Chatham to timely satisfy its binding obligation to sell as a selling Member or to purchase as a purchasing Member, as applicable, under and as set forth in Section 3.7 below.

"Third Party Claim" has the meaning set forth in Section 11.6.

"Transfer" means any direct or indirect sale, assignment, pledge, hypothecation or other transfer or encumbrance of an interest in any Member, whether by operation of law or otherwise (including, without limitation, the withdrawal of any Person having any direct or indirect interest in any Member), provided that the sale or transfer of capital stock or other equity interests in Chatham REIT or any successor thereto (whether by merger, consolidation or otherwise) shall not be considered a Transfer of any interests in

Chatham REIT or its Affiliates, including Chatham, <u>provided further</u> that the sale or transfer of capital stock or other equity interests in Cerberus or any successor thereto (whether by merger, consolidation or otherwise) shall not be considered a Transfer of any interests in Cerberus or its Affiliates so long as Cerberus remains under the management and control of the Persons controlling Cerberus as of the date hereof.

"<u>Valuation Amount</u>" has the meaning set forth in Section 3.7.

"<u>Voluntary Bankruptcy</u>" has the meaning set forth in the definition of Bankruptcy.

"<u>Voting Representative</u>" has the meaning set forth in Section 10.2.

"<u>Wind-Down Expenses</u>" has the meaning set forth in Section 3.2(h).

Any capitalized term not defined herein shall have the meaning ascribed to such term in the Act.

Section 1.7    <u>Certificates</u>.  Each Officer of the Company is an authorized Person within the meaning of the Act to execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction within the United States in which the Company may wish to conduct business.  Audra Dowless is hereby designated as an "<u>authorized person</u>" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware.

Section 1.8    <u>Term</u>.  The term of the Company shall begin on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue until terminated in accordance with the provisions hereof or pursuant to the Act.

Section 1.9    <u>Bid</u>.  Each of the Initial Members, by executing this Agreement, authorizes the Company:  (a) to submit the Bid, containing the terms set forth in Exhibit B, to purchase the new common membership interests of the Reorganized Debtors; (b) to enter or cause its Subsidiaries to enter into any other documents necessary to effect the actions contemplated by the Bid; (c) to enter, or cause its Subsidiaries to enter, into documents relating to the financing of the purchase of the Business on terms substantially consistent with the Bid, including without limitation, any credit agreement, note purchase agreement or similar financing agreement, and any agreement, document or instrument to be delivered in connection with such financing; and (d) to open, and cause its Subsidiaries to open, such bank accounts as shall be necessary or appropriate to conduct the operations of the Business.  All actions and decisions of the Company with respect to the Bid, including any modification of the Bid, at the Auction or otherwise, shall be made by the unanimous approval of the Members.  Prior to the execution and submission of the Bid, all of the Members shall agree to the terms and conditions of such Bid. Notwithstanding the foregoing, in the event that a "termination event" (as defined in the Bid) occurs with respect to the Bid, including the terms of the proposed Midland Loan being unacceptable to either Member in accordance with the Bid, then any Member may terminate, and cause the Company to terminate, the Bid in accordance therewith, and the unanimous approval of all Members shall not be required for such termination.

Section 1.10    Property Companies.  To the extent the Company at any time acquires a Property directly rather than acquiring the equity interests of the current owner of a Property, the Company shall, at the election of the Initial Members, form one or more Property Companies to take title to all or any portion of any such Property or Properties.  It is expressly understood that to the extent Properties are acquired through the acquisition of the equity interests of a Property Company, or the Company is directed pursuant to this Section 1.10 to utilize one or more Property Companies for any Properties, the Company shall conduct all of its business with respect to such Properties through such Property Company(ies); provided, however, that the organizational documents of the Property Companies shall provide (and the current organizational documents of all existing Property Companies acquired directly or indirectly by the Company shall be amended as necessary to provide) that the decisions of such Property Companies shall be made by the Company pursuant to the terms of this Agreement. The Managing Member shall perform, with no additional compensation, substantially identical services for each Property Company as the Managing Member performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement.  The Managing Member agrees to perform such duties, and, in such circumstances and with regard to such duties, the Managing Member shall be subject to the same standards of conduct and shall have the same rights and obligations with regard to such duties performed or to be performed on behalf of any such Property Company as are set forth in this Agreement with regard to substantially identical services to be performed for or on behalf of the Company.  Without limiting the generality of the foregoing, the Members agree to make such non-economic changes as any Lender(s) may require with respect to this Agreement and/or to the organizational documents of the Property Companies, including, without limitation, the addition of a non-member manager and/or independent director to the structure of any Property Company to the extent not already in place.

Section 1.11    Liability of Members.

(a)    No Member shall have any duty to any other Member or to the Company beyond those specifically set forth in this Agreement.

(b)    Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company or of any other Member solely by reason of being a member of the Company.  Except as otherwise expressly provided in the Act, the liability of each Member to the Company shall be limited to the amount of Capital Contributions required to be made by such Member, from time to time, in accordance with the provisions of this Agreement.

(c)    Except as otherwise provided in this Agreement or under applicable Laws or Regulations, the Members shall not be required to lend any funds to the Company or, after its Capital Contributions shall have been made, to make any further contributions to the Company or to repay to the Company, any Member or any creditor of the Company all or any portion of any negative amount in their respective Capital Accounts. Subject to the terms of this Agreement, the Managing Member may, on behalf of the Company or any of its Subsidiaries, at any time and from time to time, apply for and secure

one or more Loans, in such amounts, at such rates and on such other terms as are set forth in the then-applicable Operating Budget and then-applicable Business Plan or as may be agreed by the Members then permitted to approve Major Decisions.  The Company shall use commercially reasonable efforts to either obtain such Loan(s) on a nonrecourse basis or to have such Loan(s) provide that any liability for customary recourse "carveouts" will be limited to the Company and its assets; provided, however, that if such efforts are unsuccessful, each of Cerberus and Chatham shall execute and deliver (or cause one of its Affiliates to execute and deliver) a Carveout Guaranty providing for recourse to such Person solely with respect to actions or omissions affirmatively taken or consented to or approved by such Person or its Affiliates (other than the Company and its Subsidiaries) to each Lender requiring such a guaranty in connection with its Loan, it being understood and agreed that the parties will seek for such Carveout Guaranties to be several so that (A) the Chatham Carveout Guaranty will cap Chatham's exposure under such guaranty by an amount equal to Chatham's Percentage Interest of such potential aggregate guaranty exposure (the "Chatham Cap") and (B) the Cerberus Carveout Guaranty will cap Cerberus's exposure under such guaranty by an amount equal to Cerberus's Percentage Interest of such potential aggregate guaranty exposure (the "Cerberus Cap"); provided, however, if such Lender requires a joint and several Carveout Guaranty from Chatham and Cerberus or requires a guaranty from Cerberus but not Chatham or Chatham but not Cerberus, then, subject to the following proviso, Cerberus or Chatham, as the case may be, as guarantor, may seek contribution and repayment from the other party in accordance with the contribution agreement annexed hereto as Exhibit C so that Chatham's and Cerberus's exposure under the Carveout Guaranty shall not exceed each of the Chatham Cap and Cerberus Cap, respectively; and, provided further, that:

(i)     if the guarantor under any Carveout Guaranty (the "Carveout Guarantor") incurs or suffers any guaranty obligations or liabilities as a result of a default or breach of any covenant with respect to any of the Loan(s) that is (x) directly and immediately caused by such Carveout Guarantor through an action or omission taken without the affirmative consent or approval of the Members other than any Affiliate of such Carveout Guarantor, or (y) directly and immediately caused by a breach or default by such Carveout Guarantor of its obligations under such Carveout Guaranty, then such Carveout Guarantor shall be liable for 100% of all such obligations and liabilities, without any right of contribution against the Company or any of its Members, and, in addition, such Carveout Guarantor shall indemnify the Company, and the Members that are not Affiliates of such Carveout Guarantor for any and all losses, costs, liabilities and damages which the Company or such Members may incur or suffer by reason or such conduct on the part of such Carveout Guarantor;

(ii)     if a Carveout Guarantor incurs or suffers any guaranty obligations or liabilities as a result of a default or breach of any covenant with respect to any of the Loan(s) that is attributable solely to a breach of this Agreement by any Member other than such Carveout Guarantor or its Affiliates, then such Member shall be liable for 100% of all such obligations and liabilities, without any right of contribution against the Company or any of its Members, and, in addition, such Member shall indemnify the Company, the Carveout Guarantor and the Members that are not Affiliates of such Member against any and all losses, costs, liabilities and damages which the Company, the Carveout Guarantor or such other Members may incur or suffer by reason of such conduct on the part of such Member; and

(iii)     if any Carveout Guarantor incurs or suffers any obligations or liabilities under a Carveout Guaranty that are (x) not directly and immediately caused by such Carveout Guarantor through an action or omission taken without the affirmative consent or approval of the Members other than any Affiliate of such Carveout Guarantor, (y) not directly and immediately caused by a breach or default by such Carveout Guarantor of its obligations under such Carveout Guaranty, or (z) attributable solely to a breach of this Agreement by any Member other than such Carveout Guarantor or its Affiliates, in addition to any rights the Carveout Guarantor may have under the contribution agreement with respect to such Carveout Guaranty, such Carveout Guarantor shall be entitled to seek reimbursement and indemnification from the Company with respect to all such obligations and liabilities.

Except as otherwise provided in clauses (i)-(ii) above and subject to the second and third provisos of this Section 1.11(c), all obligations or liabilities which are incurred or suffered, at any time and from time to time, by any guarantor under a Carveout Guaranty shall be subject to repayment pursuant to the contribution agreement annexed hereto as Exhibit C. Unless approved by the Members, the terms of each and every Loan shall be such that neither the Loan nor any amounts due thereunder are of the type described in Section 514(c)(9)(B)(ii) of the Code.

Section 1.12   Restructuring. At any time from and after the Effective Date and prior to the Closing Date, Cerberus may require that the Company be restructured to provide that certain of the Properties to be acquired as part of the transactions contemplated by the Bid instead be acquired by a parallel limited liability company (the Company and such parallel company, the "Parallel Entities"), in which event certain Properties as previously agreed between the Members and any other Properties mutually agreed by the Members shall be owned by the parallel limited liability company. The Parallel Entities shall be managed and operated in all material respects on the same basis and subject to the same terms and conditions as set forth herein and shall be owned in the same proportion by the same Member (or Affiliates thereof). All determinations of profits, losses and Net Cash Flow shall be made on a consolidated basis for the Parallel Entities and all caps and other limitations shall apply on an aggregate basis based on the Properties owned by each Parallel Entity.

ARTICLE II.

PERCENTAGE INTERESTS, CAPITAL
CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 2.1   Percentage Interests. Each Member will receive a Percentage Interest in the Company for such Member's Capital Contributions.

Section 2.2   Capital Contributions.

(a)     Initial Contributions. During the period commencing on the date hereof and ending on the Closing Date, Cerberus and Chatham shall make one or more Capital Contributions (collectively, the "Initial Capital Contributions") in respect of their respective Initial Capital Contribution Amounts pursuant to Capital Calls issued from time to time in accordance with this Section 2.2 to fund (i) the Deposit, (ii) on the Closing Date, the purchase price under the Bid, and (iii) any other closing costs, fees and expenses incurred in

connection with the transactions contemplated by the Plan and the Bid, including with respect to any Loans.  All such Initial Capital Contributions shall be made pro rata by Cerberus and Chatham in proportion to their relative Initial Capital Contribution Amounts.  Notwithstanding anything in this Agreement to the contrary, the aggregate amount of Chatham's Initial Capital Contribution shall not exceed the lesser of $37,000,000 and 12.5% of the aggregate Capital Contributions (the "Chatham Cap").  In the event that Chatham's ratable share of all Initial Capital Contributions required to be made pursuant to this Section 2.2 would exceed the Chatham Cap, such excess contribution amount shall be funded by Cerberus and Cerberus' Percentage Interest shall be appropriately increased to reflect its relative contribution to the total amount of Initial Capital Contributions made pursuant to this Section 2.2.  In the event that Cerberus or Chatham does not fund its pro rata portion of any Initial Capital Contribution, (x) in the case of Cerberus, Chatham may, on behalf of the Company, enforce the commitment made by Cerberus Series Four Holdings LLC ("Cerberus Series Four"), or (y) in the case of Chatham, Cerberus may, on behalf of the Company, enforce the commitment made by Chatham REIT, in each case in Cerberus Series Four's or Chatham REIT's, as applicable, capacity as a Plan Sponsor to provide equity capital as set forth, and on the terms and conditions contained in, the Bid, taking into account any modifications made at the Auction or otherwise, in accordance with Section 1.9.

(b)     Additional Capital Contributions.  (i) Subject to the terms and conditions of this Agreement, the Managing Member may issue Capital Calls at any time and from time to time if additional capital is required for the conduct of the business of the Company (including without limitation to fund costs and expenses that would be treated as capital expenditures under GAAP), each Member shall be required to contribute its pro rata share of such additional capital in proportion to its Percentage Interest.

(ii)     Notwithstanding anything in this Agreement to the contrary, Cerberus shall have the right, at any time and from time to time, to make a Capital Call, in lieu of allowing the Managing Member to make such Capital Call, or to require the Managing Member to make a Capital Call at the direction of Cerberus and, in either such event, shall not be subject to the conditions and restrictions which would otherwise apply to a Capital Call made by the Managing Member, if Cerberus determines in good faith that the Company requires additional capital to maintain the Properties or otherwise satisfy its existing obligations.

(c)     Payment of Capital Contributions.  Capital Contributions by the Members shall be made in U.S. dollars by wire transfer of federal funds to an account or accounts of the Company specified by the Company.  Except as otherwise provided herein, no Member shall be entitled to any compensation by reason of its Capital Contribution or by reason of serving as a Member.  No Member shall be required to lend any funds to the Company.

(d)     Failure to Fund Capital Contributions.  If a Member shall fail to timely make any Capital Contribution required pursuant to this Section 2.2 (such Member being hereinafter referred to as a "Non-Contributing Member"), the Managing Member shall give the other Members notice of the amount not funded by the Non-Contributing Member (such amount being hereinafter referred to as the "Failed Contribution"), and if one or more of such other Members shall have funded its ratable share of the Capital Contribution in question (each a "Contributing Member" and collectively, the "Contributing Members"),

each Contributing Member shall have the right to fund its pro rata portion of such Failed Contribution (such amount of all or any part of a Failed Contribution funded by such Contributing Member, the "<u>Funded Amount</u>"), and elect, at its sole election, to (i) treat the Funded Amount as an unsecured loan to the Company (a "<u>Member Loan</u>"), repayable solely out of available cash, and bearing interest at the rate of 15% per annum, compounded monthly as of the end of each calendar month, or (ii) treat such Funded Amount as a Capital Contribution by such Contributing Member, in which event (A) such Contributing Member's Capital Contribution and Capital Account shall be increased by 115% of such Contributing Member's Funded Amount, and (B) the Percentage Interest of such Contributing Member shall be increased by such Funded Amount (valued in accordance with the value of Percentage Interests as of the date hereof) and the Percentage Interest of the Non-Contributing Member shall be correspondingly decreased. Any Member Loan shall be secured by a lien in favor of the Contributing Member(s) on the interests of the Non-Contributing Member that owes such obligations. Any Contributing Member or Members electing to treat its Funded Amount as a Member Loan shall receive all distributions payable to the Non-Contributing Member pursuant to Section 7.1 below until such time as the Member Loan shall be paid in full (including all interest thereon); <u>provided</u> that if more than one Contributing Member has made a Member Loan in respect of such Non-Contributing Member's Failed Contribution, each such Contributing Member shall receive its proportionate share of all such distributions based on such Contributing Member's Member Loan as compared to all Member Loans made in respect of such Failed Contribution. In the event that one or more Contributing Members elect to treat their respective Funded Amounts as capital contributions and the Non-Contributing Member subsequently contributes all or any portion of the Failed Contribution amount to the Company pursuant to the 15-day cure period in Section 3.6(a) below, (x) such contributed amount shall be distributed to the Contributing Member(s) pro rata in accordance with their respective Funded Amounts, and (y)(I) the Contributing Members' Percentage Interests shall be decreased by such distribution in respect of its Funded Amount and (II) the Non-Contributing Member's Percentage Interest shall be correspondingly increased.

Section 2.3    <u>Capital Accounts</u>.

(a)    <u>Capital Accounts</u>. A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with this Section 2.3. Without limiting the generality of the foregoing, a Member's Capital Account shall be increased by (i) the amount of money contributed by the Member to the Company, (ii) the initial Gross Asset Value of property contributed by the Member to the Company, as determined by the contributing Member and the Managing Member (net of liabilities that the Company is considered to assume or take subject to pursuant to Code Section 752), (iii) allocations to the Member of Profits pursuant to Article VI, and (iv) the amount of any Company liability assumed by such Member. A Member's Capital Account shall be decreased by (x) the amount of money distributed to the Member, (y) the Gross Asset Value of any property so distributed to the Member as determined by the distributee Member and the Managing Member (net of any liabilities that such Member is considered to assume or take subject to pursuant to Code Section 752), and (z) allocations to the Member of Losses pursuant to Article VI.

(b)     Negative Capital Account.  No Member shall be required to make up a deficit balance in such Member's Capital Account or to pay to any Member the amount of any such deficit in any such account.

(c)     Credit of Capital Contribution.  For purposes of computing the balance in a Member's Capital Account, no credit shall be given for any Capital Contribution which such Member is to make until such Capital Contribution is actually made.

(d)     Transfer.  In the event of a Transfer of all or a portion of a Member's interest in the Company in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferring Member to the extent it relates to the Transferred interest.

Section 2.4     Admission of New Members.  Unless otherwise permitted under Article V, new Members may only be admitted to membership in the Company with the approval of Cerberus and Chatham.  A new Member must agree in writing to be bound by the terms and provisions of the Certificate of Formation and this Agreement, each as may be amended from time to time, and must execute a counterpart of, or an agreement adopting, this Agreement or other related agreements as Cerberus and Chatham may require.  Upon admission, the new Member shall have all rights and duties of a Member of the Company; provided, however, that such new Member shall only be entitled to such voting rights as are expressly provided pursuant to this Agreement.

Section 2.5     Interest.  No interest shall be paid or credited to the Members on their Capital Accounts or upon any undistributed amounts held by the Company.

Section 2.6     Capital Withdrawal Rights, Interest and Priority.  Except as expressly provided in this Agreement, no Member shall be entitled to withdraw or reduce such Member's Capital Accounts in whole or in part until the dissolution, liquidation and winding-up of the Company, except to the extent that distributions pursuant to Article VII represent returns of capital.  A Member who withdraws or purports to withdraw as a Member of the Company without the consent of all of the Initial Members or as otherwise allowed by this Agreement shall be liable to the Company for any damages suffered by the Company on account of the breach and shall not be entitled to receive any payment in respect of its Percentage Interest in the Company or a return of its Capital Contribution until the time otherwise provided herein for distributions to Members.

ARTICLE III.

MANAGEMENT OF THE COMPANY

Section 3.1     Company Governance.  Each Member and the Company hereby agree that the Business and the Company shall be governed by the provisions of this Article III and that, accordingly, the Company shall cause its Subsidiaries to act in accordance with the determinations of the Company made pursuant to this Article III.

(a)     The Company shall generally be managed by the Managing Member, who shall have the overall responsibility for the management, operation and

administration of the Company. The Managing Member is, to the extent of its rights and powers set forth in this Agreement, an agent of the Company and the actions of the Company by and through the Managing Member taken in accordance with such rights and powers shall bind the Company. Except as authorized by the Managing Member or as set forth in this Agreement, no Member shall participate in the management and control of the Business or the Company nor shall any Member have the right or authority to act on behalf of the Company in connection with any matter.

      (b)   <u>Limitation on Liability of Managing Member</u>. The Managing Member shall not, solely by reason of being Managing Member, be personally liable for the expenses, liabilities or obligations of the Company whether arising in contract, tort or otherwise.

      (c)   <u>Compensation and Reimbursement</u>. (i) Not less than five days before the first Business Day of each month, Chatham shall provide the Members with a notice setting forth (x) its good faith estimate of the expenses that it will incur for such month in connection with its duties in its capacity as Managing Member, including, without limitation, Chatham's reasonable costs and expenses of any Chatham Company Personnel, less (y) any amounts paid to Chatham previously in respect of a Monthly Expense Amount in excess of expenses actually incurred by Chatham for such month, plus (z) any expenses actually incurred by Chatham previously with respect to a given month exceeding the Monthly Expense Amount for such month (together, the "<u>Monthly Expense Amount</u>"). So long as neither Chatham nor any of its Affiliates is in material default of its obligations under this Agreement, and such default has not been cured within thirty (30) days after written notice of such default is delivered to Chatham by any other Member, and provided that Chatham has not been removed as the Managing Member pursuant to Section 3.2(h), the Company shall pay to Chatham in its capacity as Managing Member (or, at the written direction of Chatham, to a designated Affiliate of Chatham), on the first Business Day of each month or as promptly as practicable thereafter, an amount equal to the Monthly Expense Amount submitted for such month (the "<u>Expense Reimbursement</u>").

      (ii)   Except as expressly set forth in clause (i) above or in any separate agreement between the Managing Member and the Company, the Managing Member shall not receive compensation or reimbursement of its expenses for its services performed on behalf of the Company or other benefits it provides to the Company.

      (iii)   At any time in connection with its review of Chatham's proposed Monthly Expense Amount for any month, Cerberus may in its reasonable discretion require that Chatham eliminate the position(s) associated with particular Chatham Company Personnel and no longer include the costs associated with such position(s) as part of Chatham's Monthly Expense Amount, beginning with the Monthly Expense Amount that is three months after Chatham is notified of such requirement from Cerberus; <u>provided</u>, that the Managing Member shall be permitted to include in the applicable Monthly Expense Amount for the month in which such expenses are to be paid all severance and related costs incurred in connection with the termination of such Chatham Company Personnel at Cerberus' request, to the extent the grant to such terminated Chatham Company Personnel of such severance obligation was approved by Cerberus at the time of grant.

Section 3.2    Authority, Duties and Obligations of the Managing Member.

(a)    The Member designated as the Managing Member (i) shall conduct and manage the day-to-day affairs of the Company in accordance with (A) the standard of care required of prudent and experienced joint venture managers and of third party asset and property managers performing similar functions for similar properties, (B) customary industry standards, and (C) the then-approved Operating Budget and the then-approved Business Plan, in each case subject to the limitations on the Managing Member's authority and the rights granted solely to other Members set forth in this Agreement; (ii) shall perform the duties assigned to it hereunder; and (iii) shall use its best efforts to carry out all decisions permitted to be made unilaterally by Cerberus pursuant to this Agreement.  In addition to the foregoing, the authority of the Managing Member shall be limited where (x) any Member's consent or approval is expressly required under this Agreement, (y) the consent or approval of any of the Members is expressly required by a non-waivable provision of applicable law, or (z) the Managing Member's authority is otherwise limited or rights are otherwise granted solely to other Members by the terms of this Agreement.

(b) In furtherance of the foregoing, and subject in each case to the terms of this Agreement, including the restrictions on the Managing Member set forth in Section 3.6(b), the Managing Member shall (i) use commercially reasonable efforts to enforce all agreements entered into by the Company; (ii) use commercially reasonable efforts to cause the Company at all times to perform and comply with the provisions (including, without limitation, any provisions requiring the expenditure of funds) of any loan commitment, agreement, mortgage, lease or other contract, instrument or agreement to which the Company is a party or which affects any Property; (iii) subject to the availability of the funds therefor, pay in a timely manner all non-disputed operating expenses of the Company in accordance with the terms of the then-approved Operating Budget and the then-approved Business Plan; (iv) subject to the availability of the funds therefor, obtain and maintain insurance coverage with respect to the Properties, at customary levels and in any event consistent with the requirements of any Loans, and, subject to the availability of the funds therefor, pay all non-disputed taxes, assessments, charges and fees payable in connection with the ownership, operation and sale of the Properties; (v) devote sufficient time to the performance of its duties hereunder in accordance with good industry practice and this Agreement; and (vi) provide Cerberus with copies of all material correspondence and other communications with any Lender pertaining to any Loan, as and when the same are delivered or received.

(c)    The Managing Member hereby covenants and agrees that it shall cause its personnel, including all Chatham Company Personnel, to perform and/or supervise the performance of, as applicable, all of the day-to-day activities and/or duties required of the Managing Member under the terms of this Agreement; and (ii) no Chatham Company Personnel shall spend any business time as an employee of Chatham on any project(s) other than the Business of the Company and its Subsidiaries.

(d)    Promptly following any request therefor by any Initial Member, the Managing Member shall deliver to such Initial Member a counterpart copy of any agreement, certificate or other document executed and delivered by the Managing Member in

the name of or on behalf of the Company, and shall otherwise make available to any Initial Member all of the books and records of the Company that are in the possession or control of the Managing Member during reasonable business hours; provided, that from and after the occurrence of a Termination Event, this paragraph (d) shall apply only to the Cerberus Initial Members, and the Chatham Initial Members shall no longer have any of the rights set forth in this paragraph (d).

(e)     Provided that Chatham has not been removed as the Managing Member pursuant to Section 3.2(g) hereof, Jeffrey Fisher and the other officers of the Managing Member shall at all times oversee the fulfillment of the duties of the Managing Member hereunder.  Except as expressly provided or permitted herein, the Managing Member shall not delegate any of its rights or powers to manage and control the business and affairs of the Company without the prior written consent of Cerberus.

(f)     The Managing Member hereby covenants and agrees that it shall not hold itself out to any third party as having any authority to act for or on behalf of the Company, or to bind the Company in any manner, other than to the extent that such authority is expressly granted to the Managing Member in Section 3.2(a) or otherwise granted herein or in writing by Cerberus.  The Managing Member hereby acknowledges and agrees that notwithstanding anything set forth in this Section 3.2 to the contrary, the Managing Member shall not have any authority to act on behalf of the Company or to execute any documents, agreements or instruments on behalf of the Company other than to the extent that such authority is set forth in Section 3.2(a) or otherwise expressly granted under this Agreement or in writing by Member, and the Managing Member, acting in such capacity, shall be subject, in all events, to the then-approved Operating Budget and Business Plan of the Company.

(g)     Notwithstanding anything set forth in Section 3.2(a)-(h) hereof to the contrary, Cerberus shall have the power and authority, on behalf of the Company, to request, authorize and approve each of the following without the approval or consent of any other Member:

(i)     Compel, cause and undertake the liquidation of the Company and take all actions related thereto, including the disposition of all then remaining Properties, at any time following the fifth (5th) anniversary of the date hereof, so long as such liquidation will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT; provided, however, that Cerberus shall keep the other Initial Members reasonably informed of any material actions undertaken pursuant to this clause (i) with respect to intended, planned or pending dispositions;

(ii)     Demand and receive an updated Operating Budget and Business Plan from the Managing Member, at any time and from time to time but in any event no more than once each fiscal quarter, together with such other reporting items or information as Cerberus may reasonably require;

(iii)     Audit the books and records of the Company and any Property Companies; provided, however, that the Company shall only be required to pay for one such audit per calendar year, and any additional audits requested by Cerberus in any given calendar year shall be paid for by Cerberus;

(iv)     Compel, cause and undertake the disposition of any Property in an arms length transaction to any Person other than Cerberus or an Affiliate of Cerberus, so long as such disposition will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT; provided, however, that Cerberus shall keep the other Initial Members reasonably informed of any material actions undertaken pursuant to this clause (iv) with respect to intended, planned or pending dispositions;

(v)     Take any action which may be reasonably necessary for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware; provided, however, that Cerberus shall keep the Managing Member reasonably informed of any material actions undertaken pursuant to this clause (v); and

(vi)     Approve any restructuring plan or take or refraining from taking any other action relating to the restructuring of the Company, any Property or any Loan, so long as such restructuring will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), (F) otherwise jeopardize the REIT status of Chatham REIT, or (G) be more adverse to any Member other than Cerberus than it is to Cerberus; provided, that the restrictions contained in this clause (G) shall not apply to a restructuring of the Company, any Property or any Loan to the extent Cerberus has made a good faith determination that such restructuring is reasonably necessary to avoid, or mitigate the effects of, an existing default or an impending or imminent default under any Loan or franchise agreement and that the disproportionately adverse impact is reasonably necessary to consummate the restructuring on terms that, in Cerberus' good faith judgement, are in the aggregate most

favorable to the Company; provided, further, that Cerberus shall keep the Managing Member reasonably informed of any material actions undertaken pursuant to this clause (vi).

(h) Upon the occurrence of a Termination Event, Cerberus shall have the right, in its sole and absolute discretion, to remove Chatham as Managing Member hereunder; provided, that if Cerberus removes Chatham as Managing Member as a result of an event described in clause (b) of the definition of Termination Event, (x) Chatham shall no longer be entitled to any distributions of any Promoted Interest (it being understood that Chatham shall remain entitled to all other distributions contemplated hereby), and (y) Chatham shall not be entitled to receive reimbursement of any Wind-Down Expenses (as defined below). In the event that Cerberus removes Chatham as Managing Member pursuant to this Section 3.2(h), (i) Cerberus shall have the right, in its sole and absolute discretion, to either become or designate an Affiliate to become the Managing Member of the Company or cause the Company to engage a third-party manager for the Company's business, (ii) the consent of Chatham shall no longer be necessary for any Major Decision other than a Post-Termination Major Decision, and (iii) except as set forth above, upon its removal as Managing Member, Chatham may submit to the Company and the other Members a good faith estimate of the amount of expenses (the "Wind-Down Expenses") it will reasonably incur in connection with the wind-down of its duties in its capacity as Managing Member, including without limitation Approved Severance Costs, together with reasonably detailed backup for such estimate, and the Company will promptly pay such amount to Chatham (or, at the written direction of Chatham, to a designated Affiliate of Chatham); provided, that in no event shall the Company be required to pay to Chatham under this Section 3.2(h) Wind-Down Expenses in excess of $500,000 unless such excess amounts result from liabilities or obligations incurred in accordance with the applicable Operating Budget and Business Plan as approved by Cerberus at the time of incurrence as potential Wind-Down Expenses, or as otherwise approved in writing by Cerberus as potential Wind-Down Expenses.

Section 3.3    Managing Member Certifications.  Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate issued by the Company that is signed by the Managing Member or any of the Officers as to any of the following:

(a) the identity of any Member or Officer or other agent of the Company;

(b) the existence or nonexistence of any fact or facts which constitute(s) a condition precedent to acts by the Managing Member or the Members;

(c) the Person or Persons authorized to execute and deliver any instrument or document of the Company; or

(d) any act or failure to act by the Company or any other matter whatsoever involving the Company.

Section 3.4    Officers.

(a) Principal Officers.  The Officers of the Company shall be a President and Chief Executive Officer, and may be a Chief Operating Officer, Chief

Financial Officer, Secretary, Treasurer, one or more Vice Presidents, and one or more Assistant Treasurers or Assistant Secretaries.

(b)     Other Officers.  The Managing Member may also appoint such other Officers and agents as it shall deem necessary who shall hold their offices for such terms and shall, subject to the limitations set forth herein, exercise such powers and perform such duties as shall be determined from time to time by the Managing Member.

(c)     Compensation.  The compensation of all Officers and all officers of the Subsidiaries shall be fixed by, and paid by, the Managing Member; provided, however, that their salaries shall conform to any employment agreement approved by the Members, to the extent required by this Agreement and entered into between the Company or any Subsidiary and any Officer.  In no event shall the Company be required to pay any compensation to any Officer.

(d)     Authority of Officers.

(i)     The President and Chief Executive Officer (or "President and CEO") of the Company shall have general and active management of the Company, shall have the responsibility for the day-to-day management and operation of the Company, and shall see that all lawful orders and resolutions are carried out.  The President and CEO shall execute bonds, mortgages and other contracts except where the signing and execution shall be expressly delegated by the Members or, to the extent permitted by this Agreement, the Managing Member to one or more other officers or agents of the Company.

(ii)     If appointed, the Chief Operating Officer, Chief Financial Officer, Vice Presidents, Treasurer, Secretary, Assistant Treasurers and Assistant Secretaries shall have the powers and duties described in this Section 3.4, as may be modified from time to time by the Managing Member:

1)     Chief Operating Officer.  The Chief Operating Officer shall have responsibility for the day-to-day management and operation of the Business, general oversight of the operation of the Company's operations and employees, and other such duties and responsibilities as determined by the President and CEO or the Managing Member.

2)     Chief Financial Officer.  The Chief Financial Officer shall have responsibility for the day-to-day management and general oversight of the accounting and finance function of the Company and supervision of any Treasurer and Assistant Treasurers, and other such duties and responsibilities as determined by the President and CEO, the Chief Operating Officer or the Managing Member.

3)     The Vice Presidents.  The Vice Presidents shall perform such duties and have such powers as the Managing Member or the President and CEO or the Chief Operating Officer may from time to time prescribe.

4)     The Secretary; Assistant Secretary.  The Secretary shall attend all meetings of the Members and record all the proceedings of the meetings of the Company and of

the Members in a book to be kept for that purpose and shall perform like duties for any standing committees when required. He or she shall give, or cause to be given, notice of all meetings of committees of the Company, and shall perform such other duties as may be prescribed by the Managing Member or the President and CEO, under whose supervision he or she shall be. In the absence of the Secretary or in the event of his or her incapacity or refusal to act, or at the direction of the Secretary, any Assistant Secretary may perform the duties of the Secretary.

5) <u>The Treasurer; Assistant Treasurer</u>. The Treasurer shall have the custody of the Company's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Members. The Treasurer shall disburse the funds of Company as may be ordered by the Members or, to the extent permitted by this Agreement, the Managing Member, President and CEO, Chief Financial Officer or Chief Operating Officer, taking proper vouchers for such disbursements, and shall render to the President and CEO, Chief Operating Officer, Chief Financial Officer and Managing Member, or when any Officer so requires, an account of all transactions as treasurer and of the financial condition of the Company.

(e) <u>Limitations on Officer's Powers</u>. Notwithstanding any other provision contained in this Agreement to the contrary, should a delegation of authority be established by the Managing Member, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by any Officer on behalf of the Company other than in accordance with such delegation of authority.

(f) <u>Term of Officers</u>. (i) An Officer may resign at any time by giving written notice to the Managing Member. The resignation of an Officer shall take effect upon the Managing Member's receipt of written notice of the Officer's resignation or at such later time as shall be specified in the written notice. Unless otherwise specified in the Officer's written notice of resignation, the acceptance of the Officer's resignation shall not be necessary to make it effective. If the Officer also is a Member, the Officer's resignation as an Officer shall not affect the Officer's rights as a Member and shall not constitute a withdrawal of the Officer as a Member.

(ii) The Managing Member may terminate the employment of and/or remove any Officer with or without cause.

(iii) The Managing Member may elect at any time a new or replacement Officer to fill any vacancy.

Section 3.5 <u>Operating Budget and Business Plan</u>. (a) For the period beginning on the Closing Date and ending on December 31, 2011, the Company shall operate in accordance with the current Operating Budget (in the form annexed hereto as Exhibit D) prepared by the Debtors and a Business Plan to be mutually agreed by the Members. Thereafter, the Operating

Budget and Business Plan shall be prepared and submitted annually by the Managing Member (or the Hotel Manager at the direction of the Managing Member) to the Initial Members for approval at least thirty (30) calendar days prior to the end of each fiscal year with respect to the following fiscal year which shall, in the case of the Operating Budget, set forth, *inter alia*, all anticipated revenues, operating expenses, capital expenditures, renovation budgets, renovation schedules and reserves for the Company during such period, and, in the case of the Business Plan shall set forth, *inter alia*, the Company's strategy for the marketing and operation of each of the Properties and an estimate of the amount, timing and reason for all anticipated Capital Contributions from the Members during such period; <u>provided</u>, that if the Managing Member should fail to timely prepare and submit in proposed form any such Operating Budget and Business Plan, Cerberus shall be authorized to prepare such Operating Budget and Business Plan for the approval of the Initial Members. Whenever the Managing Member determines that revisions to the then-approved Operating Budget or Business Plan would be in the best interests of the Company, the Managing Member may submit such proposed revisions to such Operating Budget and/or Business Plan to Cerberus for its review; <u>provided</u>, <u>however</u>, that all amendments and modifications to the then-approved Operating Budget or Business Plan shall require the approval of Cerberus, which approval may be granted or withheld by Cerberus in its sole and absolute discretion.

(b)     Notwithstanding Section 3.5(a), in the event that the Initial Members are unable to agree on all or certain provisions of an Operating Budget or Business Plan for a given year, the Managing Member will conduct the business of the Company pursuant to those provisions of such Operating Budget or Business Plan which are agreed-upon and adopted. With respect to any aspects of the business of Company that are not addressed by the Operating Budget or Business Plan for that given year, the Managing Member is authorized and directed to cause the employees of the Company to conduct such aspect of the business of the Company in accordance with the guidelines set forth in the most recently approved Operating Budget or Business Plan, as applicable, and otherwise in accordance with prior practice; <u>provided</u>, however, that, if applicable, the Managing Member may adjust the annual compensation of the employees of the Company and other expenses of the Company for inflation.

Section 3.6     <u>Voting Rights of Members</u>.

(a)     Members shall have no right or authority to vote on matters other than matters explicitly requiring such vote in this Agreement or in the Act. For matters set forth in this Agreement explicitly requiring a vote of the Initial Members, such matters shall require the vote of all Initial Members. In the event any Initial Member shall transfer less than all of its Percentage Interest to an unaffiliated third party in a transaction or in a series of transactions, then the portion of such Initial Member's votes that is equal to the portion of such Initial Member's Percentage Interest transferred shall be deemed cancelled and the transferee (if an unaffiliated third party) in such transfer shall not have the right to vote on any matter as an "Initial Member". In the event any Initial Member shall transfer its entire Percentage Interest held on the date of such transfer to an unaffiliated third party in a transaction or in a series of transactions, then all of the votes of its Percentage Interest on the date of such transfer shall be deemed to have been transferred to such transferee upon the satisfaction of the conditions contained in Article V and such transferee shall not have the

right to vote on any matter as an "Initial Member". Notwithstanding the foregoing, if at any time a Member (i) shall transfer more than 50% of such Member's Percentage Interest (excluding, however, transfers made by such Member to a Permitted Transferee), or (ii) shall be in default with respect to its obligations to fund additional capital contributions pursuant to Section 2.2 above, the remaining votes of such Member shall be deemed cancelled and such Member shall have no voting rights except as otherwise required by the Act; provided, that in the case of clause (ii), (x) to the extent Contributing Member(s) elect to treat their respective Funded Amounts as loans and such Non-Contributing Member repays all such loans (including all interest thereon) within 15 days, the voting rights of such Member shall be reinstated and (y) to the extent the Contributing Member(s) elect to treat their respective Funded Amounts as capital contributions, the Company shall provide notice to such Non-Contributing Member on the next Business Day indicating such election and the voting rights of such Non-Contributing Member shall be deemed cancelled if the Non-Contributing Member does not provide its capital contribution to the Company within 15 days after receipt of such notice.

(b) Notwithstanding anything to the contrary in this Agreement, unless expressly set forth in this Agreement (including pursuant to Section 3.2(h) above), the Company shall not approve or take, and neither the Managing Member shall take or cause the Company to take or approve, any action with respect to any Major Decision without the affirmative vote or written consent of all of the Initial Members.

Section 3.7    Buy/Sell. At any time on or after the second anniversary of the Effective Date, any Initial Member (a "Notifying Member") has the right (the "Buy/Sell Right") to give written notice to the non-notifying Initial Members (each a "Non-Notifying Member") to require that the Non-Notifying Members (i) buy all, but not less than all, of the Percentage Interest of the Company of the Notifying Member or (ii) sell all, but not less than all, of the Non-Notifying Members' Percentage Interest to the Notifying Member; provided, that no Member shall be entitled to exercise its Buy/Sell Right if, at the time of such Member's election to so exercise, such Member is in default of any of its obligations hereunder. The Buy/Sell Right shall be exercised in accordance with the following provisions:

(i) The Notifying Member shall deliver to the Non-Notifying Member or Members, as the case may be, a written notice (a "Buy/Sell Notice") (by both facsimile and certified mail) setting forth (A) its intention to exercise the Buy/Sell Right contained herein, (B) describing all oral or written offers, if any, received by the Notifying Member during the previous twelve calendar months relating to the acquisition, financing or leasing of all or any portion of the Properties. On or before the 20th day following its receipt of a Buy/Sell Notice, each Non-Notifying Member may notify the Notifying Member (the "Election Notice") whether it elects either (i) to sell its Percentage Interest for an amount equal to the amount that it would be entitled to receive if the Company had sold its assets for the Valuation Amount (as defined below) on the closing date of the Buy/Sell Right transaction, determined in accordance with Section 3.7(a)(iv) (the "Buy/Sell Closing Date") and immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members (a "Sell Notice") or (ii) to buy the Percentage Interest of the Notifying Member at an amount equal to the amount that the Notifying Member would be entitled to receive if the Company had sold its assets for Valuation Amount on the Buy/Sell Closing Date and

immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members (a "<u>Buy Notice</u>"). If a Non-Notifying Member fails to deliver an election notice within that time, it will be deemed to have delivered a Sell Notice.

(ii)     Promptly after a Buy/Sell Notice is delivered, the Notifying Member and the Non-Notifying Member or Members, as the case may be, shall attempt to reach agreement on the value of the assets of the Company as of the Buy/Sell Closing Date, free and clear of all liabilities (the "<u>Valuation Amount</u>"). Within fifteen (15) days after such Buy/Sell Notice is delivered, the Notifying Member on the one hand and the Non-Notifying Member or Members, as the case may be, on the other hand shall submit to the other an estimate of the Valuation Amount. If the estimates vary by ten percent (10%) or less of the greater value, the Valuation Amount shall be determined by calculating the average of the two submitted values. In the event that either the Notifying Member on the one hand and the Non-Notifying Member or Members, as the case may be, on the other hand fail to submit an estimate within the required fifteen (15) day period and if such failure continues for five (5) days after notice of such failure from the other, such failure shall be deemed for all purposes to constitute acceptance of the single estimate submitted in a timely fashion. If the two estimates vary by more than 10%, then such Members shall appoint HVS International or another independent, nationally recognized valuation expert mutually agreeable to such Members as an independent appraiser (the "<u>Independent Appraiser</u>") to determine the Valuation Amount. The Independent Appraiser shall be instructed to determine the Valuation Amount at least fifteen (15) days prior to the Buy/Sell Closing Date, and the determination of the Independent Appraiser shall be final and binding upon the Members; provided that in no event shall the Valuation Amount as determined by the Independent Appraiser be less than the lowest estimate or greater than the highest estimate submitted by the Members pursuant to this Section 3.7(a)(ii). In connection with any valuation process, including the generation and submission of estimates to each other by the Members, (A) the Members shall consult with each other to determine what information shall be provided to the Independent Appraiser, (B) the Members shall provide the Independent Appraiser and the other Members full access during normal business hours to examine all pertinent books, records and files, agreements and other operating agreements, and (C) each Member shall provide the other Members with copies of any information, document, file, agreement or data concurrently with its provision to the Independent Appraiser. The fees and expenses of the Independent Appraiser shall be borne by the Company.

(iii)     If one or more of the Non-Notifying Members deliver or are deemed to have delivered a Sell Notice and one or more Non-Notifying Members deliver or are deemed to have delivered a Buy Notice, then the Notifying Member and each Non-Notifying Member that delivered a Sell Notice will sell their Percentage Interest to the Non-Notifying Member(s) that delivered a Buy Notice, and such Non-Notifying Members shall purchase such Percentage Interests pro rata based on the aggregate Percentage Interest represented by such Non-Notifying Members. Within five (5) Business Days after an election has been made under Section 3.7(a)(i), or, if later, three (3) Business Days after final Valuation Amount is determined, the purchasing Member shall deposit with the selling Member a non-refundable earnest money deposit in an amount equal to 10% of the amount which the selling Member is entitled to receive for its Percentage Interest hereunder. Such deposit shall be applied to the purchase price due to the selling Member at closing; <u>provided</u>, <u>however</u>, that if the purchasing Member should thereafter fail to consummate the transaction, such deposit shall be retained as liquidated

damages by the selling Member, free of all claims of the acquiring Member, and the purchasing Member shall thereafter be permanently barred from initiating the exercise of the Buy/Sell Right pursuant to this Section 3.7.  The Members agree that damages would be suffered by the selling Member as a result of any such default on the purchasing Member's part, that such damages would be difficult or impossible to determine, and that the amount of the deposit represents a reasonable estimate of what such damages would be.

(iv)     The closing date of the purchase and sale shall be the 90th day after the last Election Notice was received or deemed received, (or if that day is not a Business Day, on the next succeeding Business Day), or if later the fifth Business Day after all regulatory approvals required for the purchase and sale have been obtain, or at such other time as the Initial Members may agree.  At that time (x) the selling Member(s) shall sell, assign, and deliver its Percentage Interest, and the selling Member(s) and their Affiliate(s), as applicable, shall sell, assign, and deliver their respective Percentage Interests so specified to the purchasing Member(s) free and clear of all liens, security interests and adverse claims, together with such instruments of transfer, evidence of the absence of all liens, security interests or adverse claims, and evidence of due authorization, execution, and delivery of all related documentation as the purchasing Member(s) reasonably may request; and (y) the purchasing Member(s) shall pay the selling Member(s) the amount that each would be entitled to receive if the Company had sold its assets for Valuation Amount on the Buy/Sell Closing Date and immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members.  Each Member will bear its own costs associated with the purchase and sale.

(v)     On the closing, each selling Member shall cease to be a member of the Company, and its Percentage Interest shall vest in the purchasing Member(s).

(vi)     If any Member fails to purchase and pay for any Percentage Interests as and when provided in the preceding provisions of this Section 3.7, then the selling Members may either (A) pro rata based on their respective Percentage Interests or as they otherwise may agree, at their election by notice to the defaulting Member at any time on or before the 30th day after the date the sale was to have been consummated, elect to purchase the Percentage Interest of the Member so defaulting and its Affiliates for a price calculated by multiplying 75% by the amount that the defaulting Member and its Affiliates would be entitled to receive if the Company had sold its assets for Valuation Amount on the Buy/Sell Closing Date and immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members; provided, that the closing of this purchase and sale otherwise shall occur as provided in Section 3.7(iv), but with any time periods measured from the date of the notice under this Section 3.7(vi); or (B) retain the defaulting Member's earnest money deposit as liquidated damages for such default, the Members hereby acknowledging and agreeing that (1) it would be difficult or impossible to determine the damages suffered by the selling Members on account of the purchasing Member's default, and (2) the amount of the deposit represents a reasonable estimate of such damages; provided, that in the event that the purchasing Member failed to make its earnest money deposit as required by 3.7(a)(iii) hereof, the selling Members shall have the right, in lieu of receiving liquidated damages pursuant to this Section 3.7(a)(vi), to seek and obtain an award or judgment against the purchasing Member in the amount of the required earnest money deposit, together with any reasonable attorneys' fees and disbursements incurred in obtaining such award or judgment.

(vii)     If the selling Member should default in its obligation to sell in accordance with this Section 3.7, the acquiring Member shall be entitled to either (A) demand and receive a return of the earnest money deposit which it previously deposited with the selling Member, and, upon the return of such deposit, the selling Member's default hereunder shall be deemed to have been waived; provided, however, that if the selling Member fails to return such deposit to the acquiring Member, the purchasing Member shall have the right to seek and obtain an award or judgment against the selling Member in the amount of such deposit, together with any reasonable attorneys' fees and disbursements incurred in obtaining such award or judgment; or (B) seek specific performance of the selling Member's obligations under this Section 3.7, the Members hereby acknowledging and agreeing that the remedy at law for breach of the obligations of the selling Member under this Section 3.7 would be inadequate in view of (x) the impossibility of accurately calculating the damages which would be suffered by the acquiring Member upon a default by the selling Member, and (y) the uniqueness of the Properties.

(viii)    The preceding provisions of this Section 3.7 shall not apply to any Percentage Interest from and after the first time Percentage Interests are issued or sold through a registered offering under the Securities Act.

## ARTICLE IV.

## GENERAL GOVERNANCE

Section 4.1     Other Ventures.

(a)     It is expressly agreed that each Initial Member, and any Affiliates, officers, directors, trustees, managers, stockholders, members, partners or employees of such Initial Member, may engage in other business ventures of every nature and description, whether or not in competition with the Company, independently or with others, and neither the Company nor the other Members shall have any rights in and to any independent venture or activity or the income or profits derived therefrom; the pursuit of other ventures and activities by any such Person is hereby consented to by each Member and shall not be deemed wrongful or improper.

(b)     Nothing in this Agreement shall be construed so as to prohibit any Member or its respective Affiliates, officers, directors, managers, stockholders, members, partners or employees from owning, operating or investing in any business of any nature and description, independently or with others and no Member need disclose its intention to make any such investment to the other, nor advise the Company of the opportunity presented by any such prospective investment.

(c)     Notwithstanding the foregoing, in the event that any Member receives an opportunity directly related to any Property, such Member shall first offer such opportunity, to the extent relating to any Property, to Cerberus and Chatham on behalf of the Company.  If either Cerberus or Chatham (i) declines on behalf of the Company to participate in such opportunity or (ii) is deemed to decline on behalf of the Company to participate in such opportunity as a result of a failure to approve participation by the Company within 10 Business Days of such offer, but either Chatham or Cerberus, as

applicable, as the non-presenting Member wishes to participate in such opportunity in its own capacity, Chatham or Cerberus, as applicable and the presenting Member shall participate in such opportunity on such basis as they shall agree or, in the absence of such agreement, in proportion to their then equity percentages in the Company. If the Company and each Member thereof rejects such opportunity, the presenting Member may exploit such opportunity in any manner it sees fit, provided that the presenting Member is not provided materially more favorable terms in the aggregate with respect to such opportunity than were presented to the Company, or the non-presenting Member in connection with their potential participation.

Section 4.2 <u>Information</u>. The Company covenants and agrees, and the Managing Member shall cause the Company, to deliver to each Member (a) consolidated financial reports of the Company audited by PricewaterhouseCoopers LLP or such other independent accounting firm of national reputation for the Company and its subsidiaries, within 90 days after the end of the Fiscal Year of the Company; (b) consolidated quarterly unaudited financial reports for the Company, setting forth (i) an itemized breakdown of all income and expenses of the Company for such quarter, (ii) a reconciliation of actual revenues and expenses as compared with the projected Budget amounts for such items, together with a detailed explanation of any noted discrepancies, (iii) an update on the progress of the Company's business as compared to the then-approved Business Plan, and (iv) such other updates and information as may reasonably be requested by Cerberus within 45 days after the end of each fiscal quarter of the Company; (c) consolidated monthly financial reports for the Company within 30 days after the end of the each month; and (d) such other information and data (including such information and reports made available to any Lender of the Company or any of its Subsidiaries under any credit agreement or otherwise) as from time to time may be reasonably requested by Cerberus. All information provided by the Managing Member pursuant to Sections 4.2 and 4.3 shall be certified by an officer of the Managing Member (or, for so long as Chatham is the Managing Member, by the senior-most employee of Chatham that is a member of the Chatham Company Personnel) as to its truth, completeness and authenticity.

Section 4.3 <u>Access</u>. The Company shall, and shall cause its Subsidiaries, Officers, directors, trustees, members, employees, auditors and other agents to (a) afford the Officers, employees, auditors and other agents of the Members during normal business hours and upon reasonable notice reasonable access to its officers, employees, auditors, legal counsel, properties, offices, plants and other facilities and to all books and records and (b) afford each Initial Member the opportunity to discuss the Company's affairs, finances and accounts with the Officers or Managing Member from time to time as each such Initial Member may reasonably request without creating an undue burden on the Company, including, without limitation, but in particular, upon notice that a vote is required with respect to a Major Decision; provided, that the Company shall not be required to afford any Chatham Initial Member such opportunity from and after the occurrence of a Termination Event except with respect to a Post-Termination Major Decision.

Section 4.4 <u>Affiliate Transactions</u>.

(a) Neither the Company nor any Property Company shall enter into any agreement for the performance of any service or activity, or for the purchase of any item,

with an Affiliate of a Member (other than the Hotel Management Agreements with Island Hospitality Management), without first receiving the prior written approval of the Initial Members, which approval may be withheld in each such Member's sole and absolute discretion; provided, that, from and after the occurrence of a Termination Event, the prior written approval of the Chatham Initial Members shall no longer be required so long as any such arrangement is on an arms' length basis.

(b)     Notwithstanding anything set forth in Section 3.2 or Section 3.6 hereof to the contrary, an Initial Member, acting alone and on behalf of the Company and any then existing Property Companies, may enforce and make all decisions under or in connection with agreements between the Company or any Property Company, on the one hand, and the other Initial Member and/or its Affiliates, on the other hand, provided that for purposes of this Section 4.4(b) Island Hospitality Management shall be considered an Affiliate of Chatham.

ARTICLE V.

TRANSFERS OF INTERESTS

Section 5.1     Restrictions on Transfer.

(a)     No Transfer shall be made by either Chatham or Cerberus with respect to all or any portion of its Interest without the prior written approval of the non-Transferring Member unless such Transfer is (i) pursuant to Section 3.7 of this Agreement, or (ii) to a Permitted Transferee of such Member.  No Member will have the ability to directly or indirectly syndicate its Interest to unaffiliated co-investors.

(b)     The Company, each Member, the Managing Member, the Officers and any other Person or Persons having business with the Company need only deal with Members who are admitted as Members or as additional or substitute Members of the Company, and they shall not be required to deal with any other Person by reason of a Transfer by a Member.  In the absence of a transferee of a transferring Member's Percentage Interest being admitted as a Member as provided herein, any payment to a Member shall release the Company and the Members of all liability to any other Persons who may be interested in such payment by reason of an assignment by such Member.

(c)     Each transferee, as a condition to its admission as a Member, shall execute and deliver to the Company such instruments (including a counterpart of this Agreement), in form and substance reasonably satisfactory to the Managing Member, as the Managing Member shall reasonably deem necessary or desirable to confirm the agreement of such transferee to be bound by all the terms and provisions of this Agreement (as it may be amended in connection with the admission of such transferee as a Member).  The Members agree to amend this Agreement to the extent necessary to reflect the Transfer and admission of the new Member and to continue the Company without dissolution.  Upon execution of such instruments, the transferee shall be admitted to the Company as a Member. Immediately following the admission of the transferee to the Company as a Member, any Person who has thereby transferred all of its ownership interest in the Company shall cease to

be a Member of the Company. Except as set forth herein, any transferee who is admitted to the Company as a Member shall succeed to the rights and powers, and be subject to the restrictions and liabilities, of the transferor Member to the extent of the Percentage Interest transferred.

(d)    In the event that the Members determine to sell all but not less than all of their Percentage Interest in the Company (including pursuant to Section 3.7 hereof), the Tax Matters Member will propose a schedule (the "Allocation Schedule") to the Initial Members of the Company allocating the expected purchase price in accordance with Section 1060 of the Code. Upon the affirmative vote of each of the Initial Members of the Company (or, from and after the occurrence of a Termination Event, the Cerberus Initial Members), such proposed allocation will be the Allocation Schedule that will be proposed by the Members in connection with the potential sale and, if no objection is made to such Allocation Schedule by the third party purchaser of the Percentage Interests, will be final and binding in connection with such sale upon the Members.

Section 5.2    Non-Permitted Transfers.

(a)    Any purported Transfer of all or any portion of a Member's Percentage Interest of the Company or any economic benefit or other interest therein not in compliance with Section 5.1 shall be null and void ab initio, regardless of any notice provided to any of the parties hereto, and shall not create any obligation or liability of any of the parties hereto to the purported transferee, and any Person purportedly acquiring all or any portion of any Percentage Interest or any economic benefit or other interest therein transferred not in compliance with Section 5.1 shall not be entitled to admission to the Company as a substitute Member. In the event of any direct or indirect Transfer of an interest in a Member, other than a Transfer permitted under Article V hereof, the Member that has made such Transfer shall not be necessary for any Major Decision until such Transfer has been rescinded or otherwise nullified, except that the consent of such Member shall still be required to amend this Agreement.

(b)    In the case of an attempted Transfer of all or any portion of any Percentage Interest of the Company or any economic benefit or other interest therein that is not in compliance with Section 5.1, the parties engaging or attempting to engage in such Transfer shall indemnify and hold harmless the other parties hereto and their respective officers, directors, affiliates, members, partners and employees from all cost, liability and damage that any of such indemnified persons may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and the enforcement of this indemnity.

(c)    No Member, including any assignee or successor in interest of any Member, shall Transfer all or any portion of its Percentage Interest of the Company or any economic benefit or other interest therein if such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the Regulations promulgated thereunder.

# ARTICLE VI.

## ALLOCATIONS

Section 6.1    <u>General Rules</u>.

(a)    <u>Allocations of Profits and Losses</u>.  Except as otherwise provided in this Article VI, Profits and Losses for any Fiscal Period shall be allocated among the Members in such manner that, as of the end of such Fiscal Period, the respective Capital Accounts of the Members shall be equal to the respective amounts that would be distributed to them, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Gross Asset Value and (ii) distribute the proceeds of liquidation pursuant to Section 10.3.

Section 6.2    <u>Other Allocation Rules</u>.

(a)    For purposes of determining the Profits, Losses or other items allocable to any Fiscal Period, Profits, Losses and such other items shall be determined on a daily, monthly or other basis as determined by the Tax Matters Member in its reasonable discretion using any permissible method under Code Section 706 and the Regulations thereunder.

(b)    The Members are aware of the United States federal income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

(c)    All items of income, gain, loss, deduction, or credit and any other allocations not otherwise provided for shall be allocated among the Members as determined by the Tax Matters Member in its reasonable discretion.

(d)    If a Member transfers all or a portion of its Percentage Interest during any Fiscal Period, then Profits, Losses, each item thereof and all other items attributable to the transferred interest for such Fiscal Period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests in the Company during the Fiscal Period in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by the Tax Matters Member in its reasonable discretion.

Section 6.3    <u>Tax Allocations:  Code Section 704(c)</u>.

(a)    Subject to Section 6.3(b) and (c), for each Fiscal Year, items of income, deduction, gain, loss and credit shall be allocated for tax purposes among the Members to reflect the amounts which have been credited or debited to the Capital Account of each such Member for such Fiscal Year and prior Fiscal Years.

(b)    In accordance with Code Section 704(c) and the Regulations thereunder, items of income, gain, loss, deduction and credit with respect to any property

contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property at the time of contribution to the Company for federal income tax purposes and its initial Gross Asset Value at the time of contribution using a method permitted by applicable Regulations under Code Section 704(c), as determined by the Tax Matters Member in its reasonable discretion.

(c)     In the event the Gross Asset Value of any Asset is adjusted in accordance with paragraph (b) of the definition of Gross Asset Value hereof, subsequent allocations of items of income, gain, loss, deductions or credit with respect to such asset shall take into account any variation between the adjusted tax basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(d)     Any elections or other decisions relating to allocations for tax purposes, basis adjustments or other tax matters shall be made by the Tax Matters Member in its reasonable discretion.  Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account, share of Profits or Losses, or other items or distributions pursuant to any provision of this Agreement.

(e)     Notwithstanding anything in this Agreement to the contrary, the Tax Matters Member shall not make any determinations or elections, or fail to make any elections reasonably requested by the Managing Member, under this Article VI or the definition of "Depreciation" that could reasonably be expected to disproportionately, materially and adversely affect Chatham or the Chatham REIT without Chatham's prior written consent.

## ARTICLE VII.

## DISTRIBUTIONS AND EXPENSES

Section 7.1     <u>Distributions of Net Cash Flow</u>.  (a) Net Cash Flow shall be reasonably determined by the Managing Member.  Distributions of Net Cash Flow shall be made on a quarterly basis in the following order and priority:

(i)     First, to any Member that has made a Member Loan in the amount of such Member Loan plus a return thereon at 15% per annum, compounded monthly;

(ii)     Second, pari passu to the Members in accordance with their respective Percentage Interests until each Member has received aggregate distributions in an amount sufficient to provide a 12.0% per annum cumulative return, compounded monthly, on its Capital Contributions;

(iii)     Third, pari passu to the Members in accordance with their respective Percentage Interests until all Capital Contributions have been fully recovered;

(iv)     Fourth, 11.4% to Chatham and 88.6% pari passu to the Members in accordance with their respective Percentage Interests until such time as Cerberus has received a 17.0% per annum cumulative return, compounded monthly, on its Capital Contributions;

(v)     Fifth, 17.1% to Chatham and 82.9% pari passu to the Members in accordance with their respective Percentage Interests until such time as Cerberus has received a 22.0% per annum cumulative return, compounded monthly, on its Capital Contributions; and

(vi)     Sixth, 22.9% to Chatham and 77.1% pari passu to the Members in accordance with their respective Percentage Interests.

(b)     Notwithstanding the foregoing, Chatham's receipt of the Promoted Interests (as defined below) will be subject to Cerberus first receiving a minimum return on its on its Capital Contribution of 150% (the "Minimum Cerberus Multiple").  In the event that the Minimum Cerberus Multiple is not met at any given time, distributions shall be made in accordance with the waterfall above provided that the Promoted Interests, if any, payable at such time will be retained by the Company in an escrow account managed by an escrow agent reasonably acceptable to Chatham and Cerberus and may only be distributed to Chatham and deducted from its Capital Account once the Minimum Cerberus Multiple has been achieved for at least two consecutive fiscal quarters.  If Chatham receives distributions of the Promoted Interests, whether pursuant to Section 7.1(a) above or the immediately preceding sentence in this Section 7.1(b) and, at any time subsequent to such receipt, the Minimum Cerberus Multiple is not achieved for any two consecutive quarters, Chatham shall repay to the Company all distributions of Promoted Interests previously received by Chatham.  Such repaid distributions shall be retained by the Company in escrow and shall be distributed to Chatham once the Minimum Cerberus Multiple has been achieved for at least two consecutive fiscal quarters.

The "Promoted Interest" shall mean any and all distributions to Chatham pursuant to clause (iv), (v) or (vi) above, in excess of the distributions that Chatham would have otherwise been entitled to receive had such distribution been made in accordance with the Members' respective Percentage Interests..

Section 7.2     Amounts Withheld.  All amounts withheld or paid pursuant to the Code or any provisions of state, local or foreign tax law with respect to any payment, distribution, allocation or other consideration paid to the Members, including in connection with a contribution of assets to the Company by a Member, shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld or paid pursuant to this Section 7.2 for all purposes under this Agreement.  The Company is authorized to withhold or pay, when required under applicable law, from payments, distributions, or other consideration paid to Members, and with respect to allocations to the Members, and to pay over to any federal, state, local or foreign government any amounts required to be so withheld or paid pursuant to the Code or any provisions of any federal, state, local or foreign law, and shall allocate any such amounts to the Members with respect to which such amounts were withheld or paid.

Section 7.3     Expenses.  Except as otherwise provided in this Agreement, the Company will be responsible for all third party expenses of the Company.  Subject to Section 3.1(c), each Member shall otherwise be responsible for all costs and expenses incurred by such Member in the performance of its obligations under this Agreement.

ARTICLE VIII.

OTHER TAX MATTERS

Section 8.1     Tax Matters Member.  The Company and each Member hereby designate Cerberus as the "tax matters partner" for purposes of Code Section 6231(a)(7)(the "Tax Matters Member").  The Tax Matters Member (after consultation with the Managing Member) shall:  (a) cause to be prepared and timely filed by the Company all United States federal, state and local income tax returns of the Company for each year for which such returns are required to be filed, and (b) determine the appropriate treatment of each item of income, gain, loss, deduction and credit of the Company and the accounting methods and conventions under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of any such item or any other method or procedure related to the preparation of such tax returns.  Subject to the express provisions of this Agreement, Cerberus may in its reasonable discretion cause the Company to make or refrain from making any and all elections permitted by such tax laws, provided that the Tax Matters Member shall not make, or refrain from making any election reasonably requested by the Managing Member, that could reasonably be expected to disproportionately, materially and adversely affect Chatham or the Chatham REIT without Chatham's prior written consent.

Section 8.2     Furnishing Information to Tax Matters Member.  Each Member shall furnish to the Tax Matters Member such information (including information specified in Code Section 6230(e)) as such Tax Matters Member may, at its reasonable discretion, request to permit it to provide the Internal Revenue Service with sufficient information to allow proper notice to the Members in accordance with Code Section 6223 or any other provisions of the Code or the published regulations thereunder which require the Tax Matters Member to obtain information from the Members.

Section 8.3     Tax Claims and Proceedings.  In respect of any income tax audit of any tax return of the Company, the filing of any amended return or claim for refund in connection with any item of income, gain, loss, deduction or credit reflected on any income tax return of the Company, or any administrative or judicial proceedings arising out of or in connection with any such audit, amended return, claim for refund or denial of such claim, (a) all expenses reasonably incurred by the Tax Matters Member in connection therewith shall be expenses of the Company, (b) the Tax Matters Member shall promptly deliver to each other Members a copy of all notices, communications, reports and writings received from the IRS relating to or potentially resulting in an adjustment of Company items, shall promptly advise each of the other Members of the substance of any conversations with the IRS in connection therewith and shall keep the other Members advised of all developments with respect to any proposed adjustments which come to its attention; (c) the Tax Matters Member shall (i) provide the other Members with a draft copy of any correspondence or filing to be submitted by the Company in connection with any administrative or judicial proceedings relating to the

determination of Company items at the Company level reasonably in advance of such submission, (ii) incorporate all reasonable changes or comments to such correspondence or filing requested by the other Members and (iii) provide the other Members with a final copy of correspondence or filing, (d) the Tax Matter Member will provide each Member with notice reasonably in advance of any meetings or conferences with respect to any administrative or judicial proceedings relating to the determination of Company items at the Company level (including any meetings or conferences with counsel or advisors to the Company with respect to such proceedings) and each Member shall have the right to participate, at its sole cost and expense, in any such meetings or conferences. Notwithstanding anything in this Agreement to the contrary, the Tax Matters Member shall not enter into any settlement agreement that is binding upon the other Members with respect to the determination of Company items at the Company level without the prior written consent of the other Members. The Tax Matters Member shall use commercially reasonable efforts to provide tax returns to all Members within 60 days after the end of the relevant fiscal year if the Managing Member has provided the requisite information to the Tax Matters Member or the Company's accountants reasonably in advance of such date.

Section 8.4    <u>Books and Records</u>. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business. The books and records of the Company shall include a record of each transfer of participating interests of the Company. The Fiscal Year of the Company for financial reporting and for federal income tax purposes shall be the calendar year. All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business in the United States, and each Member, and any duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times. The Company's books of account shall be kept on an accrual basis or as otherwise provided by the Managing Member and otherwise in accordance with generally accepted accounting principles, consistently applied, except that for income tax purposes such books shall be kept in accordance with applicable tax accounting principles (including the Regulations).

Section 8.5    <u>Survival</u>. The provisions of this Article VIII shall survive the termination of the Company (as well as any termination, purchase or redemption of any Member's Percentage Interest in the Company for any reason whatsoever), and shall remain binding on the Members and all former Members for a period of time necessary to resolve with the appropriate taxing authorities any and all material matters regarding the taxation of the Company and its Members by reason of their percentage interests.

ARTICLE IX.

REPRESENTATIONS AND WARRANTIES; COVENANTS

Section 9.1    <u>Representations and Warranties of Members</u>. Each of the Members hereby represents and warrants to the Company and to each of the other Members, as of the date hereof that:

(a)        If it is a corporation, a limited liability company or limited partnership, it is duly incorporated or otherwise duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, and if it is a partnership, it is validly constituted and not dissolved, and, in each case, has the power and lawful authority to own its assets and properties and to carry on its business as now conducted.

(b)        It has the full right, power and authority to enter into, execute and deliver this Agreement and to perform fully its obligations hereunder.  This Agreement has been fully executed and delivered by such Member and, assuming the due execution and delivery by the other parties, constitutes the valid and binding obligation of such Member, enforceable in accordance with its terms, except as (i) such enforceability may be limited by bankruptcy, reorganization or moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) the availability of equitable remedies may be limited by equitable principles of general applicability.

(c)        No approval or consent of any governmental authority or of any other Person is required in connection with the execution and delivery by it of this Agreement and the consummation and performance by such member of the transactions contemplated hereunder, except such as have been obtained and are in full force and effect.

(d)        The execution and delivery of this Agreement by it, the consummation of the transactions contemplated hereunder and the performance by such Member of its obligations under this Agreement, in accordance with the terms and conditions hereof, will not conflict with or result in the breach or violation of any of the terms or conditions of, or constitute (or with notice or lapse of time or both would constitute) a default under, (i) the certificate of incorporation, by-laws, certificate of formation, limited liability company agreement or other constitutive documents of such Member; (ii) any instrument or contract to which such Member is a party or by or to which it or its assets or properties are bound or subject; or (iii) any statute or any regulation, order, judgment or decree of any governmental authority, except, in each case, for such breaches violations or defaults that would not, individually or in the aggregate, materially impair the ability of such Member to perform its obligations hereunder.

(e)        It understands that there are substantial risks to an investment in the Company and it has both the sophistication to be able to fully evaluate the risk of an investment in the Company and the capacity to protect its own interests in making such investment.  Such Member fully understands and agrees that the investment in the Company is an illiquid investment.

(f)        It is a QIB or an "accredited investor" within the meaning of the 1933 Act and is able to bear the economic risk of such an investment in the Company for an indefinite period of time, that it has no need for liquidity of this investment and it could bear a complete loss of this investment.  The Member is either (i) a "qualified purchaser" within the meaning of the 1940 Act or (ii) if the Member is an entity formed and is being utilized primarily for the purpose of making an investment in the Company, each beneficial owner of such Member's securities is such a qualified purchaser.

(g)     It is acquiring its percentage interests for investment solely for such Member's own account and not for distribution, transfer or sale to others in connection with any distribution or public offering.  It understands that, irrespective of whether or not the Percentage Interests might be deemed "<u>securities</u>" under applicable laws, the Company is not obligated to register any percentage interests for resale under the 1933 Act or any applicable state securities laws.

(h)     It specifically understands and agrees that no other Member, has made nor will make any representation or warranty with respect to the worthiness, terms, value or any other aspect of the Company, any Percentage Interest or the Business or Properties and it explicitly disclaims any warranty, express or implied, with respect to such matters.  In addition, such Member specifically acknowledges, represents and warrants that (i) it is not relying on any other Member for its own due diligence concerning, or evaluation of, the Company or any related transaction and (ii) that it is not relying on any other Member with respect to tax and other economic considerations involved in an investment in the Company.

(i)     No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Company based upon arrangements made by or on behalf of such Member.

(j)     There are no actions, suits or proceedings pending, or to the knowledge of such Member threatened against such Member or its Affiliates which, if adversely determined, could materially adversely affect the ability of such Member or its Affiliates to perform its obligations under this Agreement or materially adversely affect the Percentage Interest of any other Member.

Section 9.2     <u>ERISA Representation</u>.  Each of the Members represents, warrants and covenants to each other Member and to the Company that no portion of the assets being used by it to purchase and hold its percentage interests constitute assets of a plan within the meaning of Section 3(32) of ERISA.

Section 9.3     <u>AML/OFAC Compliance</u>

(a)     Each Member hereby represents and warrants to each other Members and to the Company, as of the date hereof, as follows:

(i)     To the best of its knowledge, it is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, AML and the OFAC Sanctions Programs, including the reporting, record-keeping and compliance requirements of the Bank Secrecy Act, as amended by the USA PATRIOT Act (collectively, the "<u>BSA/Patriot Act</u>"), and all related applicable Securities and Exchange Commission, self-regulatory organization or other agency rules and regulations, and has internal policies, procedures, internal controls and systems in place that are reasonably designed to ensure such compliance (collectively "<u>AML/OFAC Laws</u>";

(ii) Neither (1) such Member nor any nor any Affiliate of such Member, nor (2) to the best of such Member's knowledge, after conducting reasonable due diligence, any Person having a direct or indirect beneficial interest in such Member, nor (3) any person for whom such Member is acting as agent or nominee in connection with this investment is prohibited pursuant to the OFAC Sanctions Programs;

(iii) Unless disclosed in writing to the other Members on or before the date hereof, (1) it is not a Senior Foreign Political Figure, or an Immediate Family Member or a Close Associate of a Senior Foreign Political Figure, (2) it is not controlled by a Senior Foreign Political Figure, or an Immediate Family Member or Close Associate of a Senior Foreign Political Figure, and (3) to the best of such Member's knowledge, after conducting reasonable due diligence, none of the direct or indirect owners of such Member is a Senior Foreign Political Figure, or an Immediate Family Member or a Close Associate of a Senior Foreign Political Figure;

(iv) It is not a foreign financial institution or a Person located in a foreign jurisdiction that has been designated by the U.S. Department of the Treasury as being subject to any special measures imposed on such financial institutions and jurisdictions pursuant to Section 311 of the BSA/Patriot Act;

(v) It is not a "foreign shell bank" and it is not being used to provide services to a "foreign shell bank", as that term is defined for purposes of Sections 313 and 319 of the BSA/Patriot Act;

(b) Each Member hereby covenants to the Company and the other Members as follows:

(i) Such Member will not engage in any activities that contravene federal state or international regulations, including all applicable AML/OFAC Laws;

(ii) Such Member will ensure that the cash or other assets contributed to the Company by such Member will not be directly or indirectly derived from activities that contravene federal, state or international regulations, including applicable AML/OFAC Laws;

(iii) Such Member will not utilize any funds received by the Company for any purpose that contravenes federal, state or international regulations, including applicable AML/OFAC Laws;

(iv) All funds contributed to or received from the Company by such Member will be wired to or from a bank located in an Approved FATF Country ("Wiring Bank") where such Member is a customer of the Wiring Bank;

(v) All transactions, negotiations, discussions and dealings by such Member in connection with the Company will be in full compliance with all applicable AML/OFAC Laws;

(vi)     Upon receiving a request from the Company or another Member, such Member shall provide such information as may be reasonably required by the Company or such other Member to confirm that the representations, warranties and covenants contained in this Section 9.3(c) continue to be true and to comply with all applicable anti-money laundering and anti-terrorist laws, regulations and executive orders;

(vii)     Such Member consents to the disclosure to United States regulators and law enforcement authorities by the Company or any other Member and its Affiliates of such information about such Member as the Company or such other Member or any of its Affiliates reasonably deems necessary or appropriate to comply with applicable anti-money laundering and anti-terrorist laws, regulations and executive orders;

(viii)     As a condition to any Transfer of such Member's direct or indirect interest in the Company, the Company and the other Members have the right to require full compliance with the representations, warranties and covenants contained in this Section 9.3;

(ix)     Such Member will notify the Company and the other Members promptly if there is any change with respect to any of the representations or warranties (or any breach of a covenant) contained in this Section 9.3; and

(x)     Such Member is a "United States person" for United States federal income tax purposes.

(c)     Each Member hereby acknowledges and agrees that the Company and the other Members have relied on the truthfulness of (and compliance by such Member with) each and every provision of this Section 9.3, and that any breach of such representations, warranties or covenants, including, without limitation, one that causes a breach or violation of, or a failed condition under, any documents by which the Company is bound (such as loan documents), is likely to result in substantial loss for the Company and/or the other Members.

(d)     Each Member hereby acknowledges and agrees that if, following its investment in the Company, the Company or any other Member reasonably believes that such Member has breached any of its representations, warranties or covenants set forth in this Section 9.3, or that any action is otherwise required by law or regulation, the Company and the other Members have the right or may be obligated to freeze or block such Member's investment in the Company, to prohibit additional investments by such Member in the Company, to segregate the assets constituting such Member's investment in accordance with applicable AML/OFAC Laws and regulations, to decline any redemption or transfer requests made by or on behalf of such Member, to redeem such Member's investment, and/or to report any such action to the applicable governmental authorities. Each Member further acknowledges and agrees that it will have no claim against the Company and/or any other Member or any of their respective Affiliates for any form of damages as a result of any of the foregoing actions.

Section 9.4     Survival.  The representations and warranties of the Members contained in this Agreement shall survive the Effective Date.

# ARTICLE X.

## DISSOLUTION AND TERMINATION OF THE COMPANY

Section 10.1    Dissolution.  The Company shall be dissolved and its business wound up upon the earliest to occur of any one of the following events, unless the Members vote to continue the life of the Company upon the occurrence of such an event:

(a)    The written determination of Cerberus and Chatham to terminate the Company;

(b)    Twenty-four (24) months after the sale, condemnation or other disposition of all Properties and the receipt of all consideration therefor; or

(c)    The entry of a decree of judicial dissolution of the Company pursuant to the provisions of the Act.

Without limiting the generality of the foregoing, the permitted Transfer of a Member's Interest will not result in the dissolution of the Company.  Except as otherwise specifically provided in this Agreement, each Member agrees that, without the consent of the other Members, no Member may withdraw from, terminate or cause a voluntary dissolution of the Company, and, in the event that a Member withdraws from the Company or causes a dissolution of the Company in contravention of this Agreement, such withdrawal or dissolution shall not reduce or otherwise affect such Member's continuing liability for the obligations and liabilities of the Company.

Section 10.2    Continuation of Interest of Member's Representative.  Notwithstanding anything contained herein, upon the expulsion, receivership, dissolution or Bankruptcy of a Member, the personal representative, trustee-in-bankruptcy, debtor-in-possession, receiver, other representative, successor, heir or legatee (each a "Representative") of such Member shall, subject to the provisions of Section 5.1, immediately succeed to the Percentage Interest of such Member in the Company.  Such Representative shall appoint an individual (which may be such Representative) who will represent the Representative's voting interest, if any. (the "Voting Representative").

Section 10.3    Dissolution, Winding Up and Liquidation.

(a)    Upon a dissolution of the Company, the Company shall continue solely for purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying claims of its creditors.  The liquidator of the Company shall take full account of the Company's liabilities and property and shall cause the property or the proceeds from the sale thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(i)    first, to creditors (including Members who are creditors) in satisfaction of all of the Company's debts and other liabilities, including the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable reserves to provide for payment thereof); and

     (ii)   second, to the Members in accordance with Section 7.1.

     (b)   Distributions pursuant to this Section 10.3 shall be made no later than the end of the Fiscal Year during which the Company is liquidated (or, if later, 90 days after the date on which the Company is liquidated).

     Section 10.4  <u>Member Bankruptcy</u>.

     (a)   Notwithstanding any other provision of this Agreement, the Bankruptcy of a Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

     (b)   Notwithstanding any other provision of this Agreement, each of the Members waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Members, or the occurrence of an event that causes the Member to cease to be a member of the Company.

ARTICLE XI.

INDEMNIFICATION AND CONTRIBUTION

     Section 11.1  <u>Indemnity by the Company</u>. Subject to the provisions of Section 11.4, the Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such Person is or was a Member, Officer, director, Managing Member, Hotel Manager, controlling person, employee, legal representative or agent of the Company, or is or was serving at the request of the Company as manager, director, Managing Member, Hotel Manager, officer, partner, member, shareholder, controlling person, employee, legal representative or agent of another limited liability company, partnership, corporation, joint venture, trust or other enterprise (an "<u>Indemnified Person</u>"), from and against any and all claims, actions, suits, proceedings, liabilities, obligations, losses, damages, judgments, fines, penalties, amounts paid in settlement, interest, costs and expenses (including reasonable attorney's and accountant's fees, court costs and other out-of-pocket expenses actually and reasonably incurred in investigating, preparing or defending the foregoing) (including any such brought by or in the right of the Company) suffered or incurred by such Indemnified Person while serving in such capacity or that otherwise in any way relate to or arise out of any action or inaction by such Indemnified Person or the Company (collectively, "<u>Indemnifiable Losses</u>"), if such Indemnified Person acted in good faith and in a manner that such Indemnified Person reasonably believed to be in or not opposed to the best interests of the Company and not in violation of this Agreement or outside the scope of such Person's authority, and, with respect to a criminal action or proceeding, had no reasonable cause to believe such Person's conduct was unlawful; provided, that the Company shall have no obligation to indemnify or defend hereunder to the extent such action, suit or proceeding arises from fraud, bad faith, willful misconduct or gross negligence on the part of such Indemnified Person.

Section 11.2   Exculpation.  No Indemnified Person shall be liable to any Member of the Company for any act or failure to act on behalf of the Company, unless such act or failure to act resulted from fraud, bad faith, willful misconduct or gross negligence of the Indemnified Person.  Each Indemnified Person may consult with legal counsel and accountants in respect of the Company's affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants.

Section 11.3   Expenses.  Any indemnification under Section 11.1, as well as the advance payment of expenses permitted under Section 11.4 shall be made by the Company to the fullest extent permitted under the Act.

Section 11.4   Advance Payment of Expenses.  The expenses of any Member incurred in defending a civil or criminal action, suit or proceeding may be paid by the Company as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of such Member (in form and substance, from an indemnitor, reasonably satisfactory to all of the Initial Members), to repay the amount if it is ultimately determined by a court of competent jurisdiction that such Member is not entitled to be indemnified by the Company.  The provisions of this Section 11.4 do not affect and shall not be deemed exclusive of any other rights, including, without, limitation, any rights to indemnification or advancement of expenses to which any such Indemnified Person other than the Members may be entitled under any contract, pursuant to approval of the Members, or otherwise by law.

Section 11.5   Beneficiaries.  The indemnification and advancement of expenses authorized in or ordered by a court pursuant to this Article XI continues for a Person who has ceased to be a Member, officer, employee or agent and inures to the benefit of the heirs, executors and administrators of such Person.

Section 11.6   Indemnification Procedure for Third Party and Other Claims.  The Company shall have the right, but not the obligation, exercisable by written notice to the Indemnified Person seeking such indemnification hereunder promptly but in any event no later than 30 days after receipt of  written notice from the Indemnified Person of the commencement of or assertion of any claim, action, suit or proceeding by a third party in respect of which indemnity may be sought hereunder (a "Third Party Claim"), to assume the defense and control the settlement of such Third Party Claim that (a) involves (and continues to involve) solely money damages or (b) involves (and continues to involve) claims for both money damages and equitable relief against the Indemnified Party that cannot be severed, where the claims for money damages are the primary claims asserted by the third party and the claims for equitable relief are incidental to the claims for money damages. The Indemnified Person shall have the right to assume the defense and control the settlement of any Third Party Claim (i) not described in clauses (a) or (b) of the preceding sentence or (ii) described in clauses (a) or (b) of the preceding sentence whose defense and control of settlement has not been promptly assumed by the Company. The Company or the Indemnified Person, as the case may be, shall have the right to participate in (but not control), at its own expense, the defense of any Third Party Claim that the other is defending, as provided in this Agreement.  The Company, if it has assumed the defense of any Third Party Claim as provided in this Agreement, shall not consent to a settlement of, or the entry of any judgment arising from, any such Third Party Claim without the Indemnified

Person's prior written consent (which consent shall not be unreasonably withheld).  The Company shall not, without the Indemnified Person's prior written consent, enter into any compromise or settlement which (A) commits the Indemnified Person to take, or to forbear to take, any action or (B) does not provide for a complete release by such Third Party of the Indemnified Person. The Indemnified Person shall have the sole and exclusive right to settle any Third Party Claim, on such terms and conditions as it deems reasonably appropriate, to the extent such Third Party Claim involves equitable or other non-monetary relief against the Indemnified Person, and shall have the right to settle any Third Party Claim involving money damages for which the Company has not assumed the defense pursuant to this Section 11.6 with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

Section 11.7   <u>Other Claims</u>.  In the event an Indemnified Person shall claim a right to payment pursuant to this Agreement for other than a Third Party Claim, such Indemnified Person shall send written notice of such claim to the Indemnifying Party.  Such notice shall specify the basis for such claim.  As promptly as possible after the Indemnified Person has given such notice, the Indemnified Person and the Company shall attempt to resolve such claim by mutual agreement before resorting to other legal means to resolve such claim.

Section 11.8   <u>Limitation on Damages</u>.  Notwithstanding anything contained in this Agreement to the contrary, no party shall be liable to the other party for any indirect, special, punitive, exemplary or consequential loss or damage (including any loss of revenue or profit) arising out of this Agreement including, without limitation, in respect of any breach by any Member of this Agreement; provided, that the foregoing shall not be construed to preclude recovery by the Indemnified Person in respect of Indemnifiable Losses directly incurred from Third Party Claims.  Any Indemnified Person shall take commercially reasonable actions to mitigate his, her, its or their damages.  The obligation of the Company to indemnify any Indemnified Person with respect to any Indemnifiable Losses hereunder resulting from any action, suit or proceeding shall not exceed the value of the Business and the Properties.

ARTICLE XII.

MISCELLANEOUS PROVISIONS

Section 12.1   <u>Entire Agreement</u>.  This Agreement and the Certificate of Formation constitute the complete and exclusive statement of the agreement among the Members with respect to the subject matter contained herein and therein.  This Agreement and the Certificate of Formation replace and supersede all prior agreements by and among the Members with respect to the subject matter contained herein and therein.

Section 12.2   <u>Amendments</u>.  This Agreement may be amended only by the unanimous written consent of the Initial Members.

Section 12.3    Applicable Law; Venue.

(a)    The Certificate of Formation and this Agreement shall be governed exclusively by their respective terms and the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.

(b)    Any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, and, by execution and delivery of this Agreement, each Member hereby accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and the appellate courts thereof. Each Member irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party at the address for notices set forth herein. Each Member hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

Section 12.4    Enforcement. In the event of an action, suit or proceeding initiated by one Member against another Member or the Company involving the enforcement of its rights hereunder, the prevailing party shall be entitled to indemnification from the other party of reasonable attorneys' fees and expenses incurred in enforcing its rights in such action, suit or proceeding in accordance with this Section.

Section 12.5    Headings. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provisions contained herein.

Section 12.6    Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be deemed invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 12.7    Counterparts. This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

Section 12.8    Filings. Following the execution and delivery of this Agreement, representatives of the Company, shall promptly prepare any documents required to be filed and recorded under the Act, and such representatives shall promptly cause each such document to be filed and recorded in accordance with the Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Company may hereafter establish a place of business. Such representatives, under shall also promptly cause to be filed, recorded and published such statements of fictitious

business name and any other notices, certificates, statements or other instruments required by any provision of any applicable law of the United States or any state or other jurisdiction which governs the conduct of its business from time to time.

        Section 12.9  <u>Additional Documents</u>.  Each Member agrees to perform all further acts and to execute, acknowledge and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

        Section 12.10  <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile) and shall be effective and deemed delivered or given, as the case may be, (a) if given by facsimile, when transmitted and the appropriate confirmation is received from the machine transmitting such facsimile, and followed by hard copy via overnight mail or reputable overnight courier for receipt the next Business Day, (b) if given by reputable overnight courier, on the next Business Day, (c) by hand delivery, when delivered or (d) if mailed, on the second Business following the day on which sent by first class mail:

        If to Cerberus, addressed as follows:

        c/o Cerberus Real Estate Capital Management, LLC
        299 Park Avenue, 22nd Floor
        New York, NY  10022
        Attention:  Tom Wagner
        Facsimile number:  (646) 885-3391

        With a copy to:

        Schulte Roth & Zabel LLP
        919 Third Avenue
        New York, New York 10022
        Attention:  Stuart D. Freedman, Esq.
        Facsimile number:  (212) 593-5955

        If to Chatham, addressed as follows:

        c/o Chatham Realty Trust
        50 Cocoanut Row, Suite 200
        Palm Beach, FL  33480
        Attention:  Jeffrey Fisher
        Facsimile number:  (561) 835-4125

        With a copy to:

        Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, NY  10019
        Attention:  Scott K. Charles, Esq.

Robin Panovka, Esq.
Facsimile number: (212) 403-2000

If to any other Member, at the addresses or facsimile numbers set forth on the signature page to this Agreement or such other addresses or facsimile numbers as such Member may hereafter specify to the Managing Member, who shall so notify the other Members.

Section 12.11 <u>Waiver of Right to Partition and Bill of Accounting</u>. To the fullest extent permitted by applicable law, each Member covenants that it will not, and hereby waives any right to, file a bill for partnership accounting. Each Member irrevocably waives any right that it may have to maintain any action for dissolution of the Company (unless the Company is dissolved pursuant to Section 10.1).

Section 12.12 <u>Confidentiality; Press Releases</u>. Each Member shall keep confidential all information of a confidential nature obtained pursuant to this Agreement, except that a Member shall be entitled to disclose such confidential information to (a) its advisors, agents, employees, trustees, lenders, franchisors, consultants, lawyers, accountants and other service providers as reasonably necessary in the furtherance of such Member's bona fide interests, as otherwise required by law or judicial process and to comply with reporting requirements, and to potential transferees of its percentage interests provided that such potential transferees enter into customary confidentiality agreements, with the Company expressly stated therein to be a third party beneficiary thereof, (b) its investors provided that such investors are subject to confidentiality obligations, and (c) the extent required to comply with applicable reporting requirements under the Federal securities laws. Notwithstanding anything in this Agreement to the contrary, to comply with Regulations 1.6011-4(b)(3)(i), each Member (and any employee, representative or other agent of such Member) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of the Company or any transactions undertaken by the Company, it being understood and agreed, for this purpose, (a) the name of, or any other identifying information regarding (i) the Company or any existing or future Member (or any affiliate thereof) in the Company, or (ii) any investment or transaction entered into by the Company; and (b) any performance information relating to the Company, does not constitute such tax treatment or tax structure information. No Member shall publicly make any public announcements regarding this Agreement or the Company or its business; provided, however, each Initial Member may consult with and obtain the approval of the other Initial Members before issuing a press release or other public announcement with respect to this Agreement and may issue a press release or make a public announcement following such consultation and approval.

Section 12.13 <u>Uniform Commercial Code</u>. Each limited liability company interest in the Company shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8 102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

Section 12.14  <u>Binding Agreement</u>.  Notwithstanding any other provision of this Agreement, the Members agree that this Agreement constitutes a legal, valid and binding agreement of the Members, and is enforceable against the Members by the Company in accordance with its terms.

Section 12.15  <u>Waiver</u>.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

Section 12.16  <u>DISCLOSURES</u>.  THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>1933 ACT</u>"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND SUCH LAWS.  THE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT AND SUCH LAWS PURSUANT TO EXEMPTION FROM REGISTRATION THEREUNDER.  THERE WILL NOT BE ANY PUBLIC MARKET FOR THE INTERESTS.  IN ADDITION, THE TERMS OF THIS AGREEMENT RESTRICT THE TRANSFERABILITY OF INTERESTS.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, effective as of the date first above written.

**MEMBERS:**

CRE-INK REIT MEMBER, LLC

By: _Thomas E. Wagner_

    Name: Thomas E. Wagner

    Title: Authorized Signatory

[Signature Page of INK Acquisition LLC Operating Agreement]

**CHATHAM LODGING LP**

By: _____

Name: Eric Kentoff

Title: VP & General Counsel

[Signature Page of INK Acquisition LLC Operating Agreement]

SCHEDULE A

## MEMBERS

| MEMBER'S NAME | INITIAL CAPITAL CONTRIBUTION AMOUNT | PERCENTAGE INTEREST |
|---|---|---|
| CRE-Ink REIT Member, LLC | $ 319,200,000 | 89.6% |
| Chatham Lodging LP | $ 37,000,000 | 10.4% |
| TOTAL | $356,200,000 | 100.0% |

EXHIBIT A

Hotel Management Agreement

[To be attached]

# EXHIBIT B

## The Bid

[See Innkeepers Commitment Letter and Exhibits attached thereto]

EXHIBIT C

Contribution Agreement

[See attached]

# FORM OF
## CONTRIBUTION AND INDEMNITY AGREEMENT

THIS CONTRIBUTION AND INDEMNITY AGREEMENT (this "Agreement"), dated as of _____, 20__, is made by and among CRE-Ink REIT Member, LLC, a Delaware limited liability company ("Cerberus Member") and Cerberus Series Four Holdings LLC, a Delaware limited liability company ("Cerberus", and together with Cerberus Member, each a "Cerberus Contributor"), and [Chatham Lodging LP], a Delaware limited partnership ("Chatham Member") and Chatham Lodging Trust, a Maryland real estate investment trust ("Chatham REIT" and together with Chatham Member, each a "Chatham Contributor") (each Cerberus Contributor and each Chatham Contributor, each individually, a "Contributor", and collectively, the "Contributors").

WITNESSETH:

WHEREAS, Cerberus is an affiliate of Cerberus Member and Chatham REIT is an affiliate of Chatham Member;

WHEREAS, Cerberus Member and Chatham Member are members in INK Acquisition LLC, a Delaware limited liability company (the "Company"), pursuant to that certain Limited Liability Company Agreement of the Company dated as of April 25, 2011 (the "LLC Agreement"), for the purpose of indirectly acquiring certain real property currently owned by Innkeepers USA Trust and its direct and indirect subsidiaries through the implementation of a plan of reorganization resulting in the Company acquiring the equity interests of certain direct and indirect subsidiaries (the "Fixed/Floating Debtors") of Innkeepers USA Trust (the "Transaction");

WHEREAS, in connection with the Transaction, the Fixed/Floating Debtors will restructure (the "Restructuring") the existing $825.4 million Fixed Rate Mortgage Loan into a new non-recourse mortgage loan of $622.5 million (the "Fixed Rate Mortgage Loan") from Midland Loan Services, a division of PNC Bank, National Association ("Midland");

WHEREAS, as part of the Restructuring Midland is requiring that (i) Cerberus provide to Midland a limited guaranty with respect to certain "bad boy" acts under the Fixed Rate Mortgage Loan, and (ii) the Company provide to Midland a limited guaranty with respect to such "bad boy" acts under the Fixed Rate Mortgage Loan;

WHEREAS, pursuant to Section 1.11(c) of the LLC Agreement the Cerberus Member and the Chatham Member have agreed to provide or cause their respective Affiliates to provide certain guaranties and indemnities;

WHEREAS, in connection with the consummation of the Transaction, Cerberus has entered into the Guaranty dated as of _____, 2011 for the benefit of Midland (the "Guaranty");

WHEREAS, each of Cerberus Member and Chatham Member has agreed pursuant to the LLC Agreement to pay its pro rata share of any Guaranty Payments (as hereinafter defined) paid or required to be paid by Cerberus, all as herein provided; and

WHEREAS, Chatham REIT, as an affiliate of Chatham Member, has agreed to be jointly and severally liable for Chatham Member's obligations with respect to its pro rata share of any Guaranty Payments.

NOW, THEREFORE, in consideration of the execution and delivery of the Guaranty by Cerberus, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.     Payment of Amounts under the Guaranties.[1]

(a)     Any payment made or required to be made by Cerberus under the Guaranty shall be referred to herein as a "Guaranty Payment", and Midland, as the guaranteed party under the Guaranty shall be referred to herein as a "Guarantied Party".

(b)     If Cerberus pays or is required to pay a Guaranty Payment to a Guarantied Party, then Chatham Member shall (or if Chatham Member does not, Chatham REIT shall), within ten (10) Business Days (as defined in the LLC Agreement) after written demand therefor, pay to Cerberus an amount in cash equal to Chatham Member's pro rata portion of such Guaranty Payment, based on the relative aggregate distributions received by each of Chatham Member and Cerberus Member under the LLC Agreement (or, if no distributions have been paid, each Member's Percentage Interest at the time of payment of such Guaranty Payment by Cerberus) (the "Chatham Amount"), provided, that the Chatham Amount shall not exceed (i) the product of (x) the Guaranty Payment and (y) Chatham's Percentage Interest (as defined in the LLC Agreement) plus (ii) if Chatham has received distributions in respect of the Promoted Interest (as defined in the LLC Agreement), the product of (x) the aggregate of all amounts distributed to Chatham in respect of the Promoted Interest and not repaid to the Company in accordance with the LLC Agreement and (y) one (1) minus Chatham's Percentage Interest (as defined in the LLC Agreement), in each case with Percentage Interest treated as a decimal with a value between zero and one; provided, further, that notwithstanding the foregoing or anything else contained in this Agreement, no payment shall be required to be made by Chatham Member or Chatham REIT under this Section l(b) with respect to any Guaranty Payment under the Guaranty to the extent that the event or circumstance giving rise to such Guaranty Payment was as a result of a default or breach of any covenant with respect to the Fixed Rate Mortgage Loan which was directly and immediately caused by Cerberus or Cerberus Member, and the action or failure to take action giving rise to such default or breach of covenant was not affirmatively consented to or approved by Chatham Member (each a "Cerberus Act")

(c)     Chatham Member hereby agrees to pay (or if Chatham Member does not pay, Chatham REIT hereby agrees to pay) to Cerberus within ten (10) Business Days after

_____

[1]  In the event that Chatham Member or any other Chatham affiliate provides a guaranty with respect to the Company or any of its subsidiaries, this section to be modified to reflect Cerberus' and Cerberus Member's obligations to Chatham Member or such Chatham affiliate with respect thereto, as set forth in Section 1.11(c) of the LLC Agreement.

written demand therefor an amount in cash equal to 100% of any Guaranty Payment made or required to be made by Cerberus under the Guaranty as a result of a default or breach of a covenant under the Fixed Rate Mortgage Loan, but only to the extent that the event or circumstance giving rise to such Guaranty Payment was caused solely by a material breach by Chatham Member or Chatham REIT or any affiliate thereof (other than the Company) of Chatham Member's obligations under the LLC Agreement.

(d)     If Chatham Member or Chatham REIT fails to pay within ten (10) Business Days after demand therefor by Cerberus such amount Chatham Member or Chatham REIT is required to pay to Cerberus under Sections 1(b) or 1(c) of this Agreement, then such amount shall bear interest from the date of any Guaranty Payment made by Cerberus at the rate of 15% per annum, compounded quarterly, until the date Chatham Member or Chatham REIT makes such payment to Cerberus.

(e)     Unless any applicable Guaranty Payment has been previously paid to the Guarantied Party, each Contributor shall have the right to make any payment required to be made by such Contributor under this Section 1 directly to the Guarantied Party.

2.     Representations and Warranties.  Each of Cerberus and Cerberus Member hereby represents and warrants to Chatham Member and Chatham REIT, and each of Chatham Member and Chatham REIT hereby represents and warrants to Cerberus and Cerberus Member, as follows:

(a)     it is not insolvent (as such term is defined in the debtor/creditor laws of the jurisdiction of its organization);

(b)     the execution, delivery and performance of this Agreement will not (i) make such Contributor insolvent (as such term is defined in the debtor/creditor laws of the jurisdiction of its organization), or (ii) violate any provision of any requirement of law or contractual obligation of such Contributor, and will not result in or require the creation or imposition of any lien on any of the properties or revenues of such Contributor pursuant to any requirement of law or contractual obligation of such Contributor;

(c)     it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement;

(d)     it (and the undersigned representative of such Contributor) has full power, authority and legal right to execute and deliver this Agreement, and such Contributor has full power, authority and legal right to perform its obligations hereunder, and such execution, delivery and performance by such Contributor of its obligations hereunder does not and will not contravene, violate or conflict with any requirement of law, and does not and will not contravene, violate or conflict with, or result in a breach of or default under, any of the organizational documents of such Contributor, or any contractual obligation to which such Contributor or its assets is or are subject, and does not require or result in the creation or imposition of any lien in favor of any person; and

(e)     this Agreement has been duly executed and delivered by such Contributor and the legal, valid and binding obligation of such Contributor, enforceable against such

Contributor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, moratorium, insolvency, reorganization or similar laws affecting creditors' rights generally.

3. <u>Expenses</u>. The non-prevailing party shall reimburse the prevailing party, on demand, for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by the prevailing party in enforcing the provisions of this Agreement.

4. <u>Waiver of Notice of Acceptance</u>. Each Contributor hereby waives notice of acceptance of this Agreement.

5. <u>GOVERNING LAW</u>. THIS INSTRUMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

6. <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile) and shall be effective and deemed delivered or given, as the case may be, (a) if given by facsimile, when transmitted and the appropriate confirmation is received from the machine transmitting such facsimile, and followed by hard copy via overnight mail or reputable overnight courier for receipt the next Business Day, (b) if given by reputable overnight courier, on the next Business Day, (c) by hand delivery, when delivered or (d) if mailed, on the second Business following the day on which sent by first class mail:

If to Cerberus or Cerberus Member, addressed as follows:

c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 22nd Floor
New York, NY 10022
Attention: Tom Wagner
Facsimile number: (646) 885-3391

With a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention: Stuart D. Freedman, Esq.
Facsimile number: (212) 593-5955

If to Chatham Member or Chatham REIT, addressed as follows:

c/o Chatham Lodging Trust
50 Cocoanut Row, Suite 200
Palm Beach, FL 33480
Attention: Jeffrey Fisher
Facsimile number:

With a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention: Scott K. Charles, Esq.
          Robin Panovka, Esq.
Facsimile number: (212) 403-2000

7. <u>No Waiver, Remedies</u>. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition. No Contributor shall be required to pursue any rights or remedies against any other person prior to demanding payment from such other Contributor under this Agreement. The remedies herein provided are cumulative and not exclusive of any remedies provided by law. Any amendments to, revisions of, or waivers of any provisions of this Agreement must be in writing to be effective.

8. <u>Release; Bankruptcy</u>. (a) Each Contributor hereby expressly waives and releases (i) the right to interpose all substantive and procedural defenses of the law of guarantee, indemnification and suretyship, but not (x) the defenses of prior payment or prior performance by Contributor or (y) the assertion of a defense that the event or circumstance giving rise to the liability under the Guaranty in question was caused, by the gross negligence, willful misconduct or fraud of such other Contributor; (ii) the right to interpose any set off or non-compulsory counterclaim of any nature or description in any action or proceedings; and (iii) any right or claim or right to cause a marshaling of the Contributor's assets.

(b) If a Contributor shall be obligated by reason of any bankruptcy, insolvency or other legal proceeding to pay or repay to such other Contributor or to any trustee, receiver or other representative of such other Contributor, any amounts previously paid by Contributor pursuant to this Agreement, such other Contributor shall reimburse Contributor for any such payment or repayment and this Agreement shall extend to the extent of such payment or repayment made by the Contributor. Contributor shall not be required to litigate or otherwise dispute its obligation or make such payment or repayment if in good faith and on written advice of counsel it believes that such obligation exists.

9. <u>Severability</u>. If any term, covenant, condition or provision of this Agreement or the application thereof to any circumstance or to any Contributor shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions and provisions of this Agreement or the application thereof to any circumstances or to any Contributor other than those as to which any term, covenant, condition or provision is held invalid or unenforceable, shall not be affected thereby and each remaining term, covenant, condition and provision of this Agreement shall be valid and shall be enforceable to the fullest extent permitted by law.

10. <u>Payments</u>. All payments due hereunder shall be paid in immediately available funds in lawful money of the United States.

11. WAIVER OF TRIAL BY JURY. EACH CONTRIBUTOR (BY THEIR ACCEPTANCE HEREOF) WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDINGS, CLAIM OR COUNTERCLAIM, WHETHER CONTRACT OR TORT, AT LAW OR IN EQUITY, WITH RESPECT TO, CONNECTION WITH OR ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

12. Jurisdiction. Any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, and, by execution and delivery of this Agreement, each Contributor hereby accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and the appellate courts thereof. Each Contributor irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party at the address for notices set forth herein. Each Contributor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

13. Exculpation. No Contributor shall enforce, the liability and obligation of such other Contributor contained in this Agreement by any action or proceeding against the partners, members, shareholders, managers, directors, officers, agents, affiliates or employees of such other Contributor (or any member, shareholder, partner or other owner of such partners, members, shareholders, managers, directors, officers, agents, affiliates or employees of such other Contributor or any director, officer, employee, agent, manager or trustee of any of the foregoing).

14. Successors and Assigns. This Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Contributor has executed this Agreement as of the date and year set forth above.

**CERBERUS SERIES FOUR HOLDINGS, LLC**

By:  Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

By:  Cerberus Institutional Associates, L.L.C., its General Partner

By: _____
     Name:
     Title:


**CRE-INK REIT MEMBER, LLC**


By: _____
     Name:
     Title:


**[CHATHAM LODGING LP]**


By: _____
     Name:
     Title:


**CHATHAM LODGING TRUST**


By: _____
     Name:
     Title:

EXHIBIT D

Operating Budget

[To be attached]

ANNEX A

<u>Properties</u>

<u>Marriott Properties</u>

Denver, CO (Downtown) Residence Inn by Marriott
Campbell, CA Residence Inn by Marriott
Cherry Hill, NJ Residence Inn by Marriott
Binghamton, NY Residence Inn by Marriott
Bothell, WA Residence Inn by Marriott
Altamonte Springs, FL Residence Inn by Marriott
Arlington, TX Residence Inn by Marriott
Atlanta, GA (Downtown) Residence Inn by Marriott
Atlanta, GA (Peachtree Corners) Residence Inn by Marriott
Atlantic City, NJ Courtyard by Marriott
Bellevue, WA Residence Inn by Marriott
Addison, TX Residence Inn by Marriott
Englewood, CO Residence Inn by Marriott
Fort Lauderdale, FL Courtyard by Marriott
Fort Wayne, IN Residence Inn by Marriott
Fremont, CA Residence Inn by Marriott
Gaithersburg, MD Residence Inn by Marriott
Harrisburg, PA Residence Inn by Marriott
Horsham, PA Towneplace Suites by Marriott
Lexington, KY Residence Inn by Marriott
Livonia, MI Residence Inn by Marriott
Louisville, KY Residence Inn by Marriott
Lynnwood, WA Residence Inn by Marriott
Montvale, NJ Courtyard by Marriott
Mountain View, CA Residence Inn by Marriott
Ontario, CA Residence Inn by Marriott
Portland Scarborough, ME Residence Inn by Marriott
Richmond, VA (NW) Residence Inn by Marriott
Richmond, VA (West End) Residence Inn by Marriott
Rosemont, IL Residence Inn by Marriott
Saddle River, NJ Residence Inn by Marriott
San Jose, CA Residence Inn by Marriott
San Mateo, CA Residence Inn by Marriott
Shelton, CT Residence Inn by Marriott
Silicon Valley, CA I Residence Inn by Marriott
Silicon Valley, CA II Residence Inn by Marriott

Troy, MI (SE) Residence Inn by Marriott
Tukwila, WA Residence Inn by Marriott
Windsor, CT Residence Inn by Marriott

Hilton Properties
 Albany, NY Hampton Inn by Hilton
 Columbia, MD Hampton Inn by Hilton
 Germantown, MD Hampton Inn by Hilton
 Islandia, NY Hampton Inn by Hilton
 Louisville, KY Hampton Inn by Hilton
 Naples, FL Hampton Inn by Hilton
 Valencia, CA Embassy Suites by Hilton
 Westchester, IL Hampton Inn by Hilton
 Willow Grove, PA Hampton Inn by Hilton
 Woburn, MA Hampton Inn by Hilton

Hyatt Properties
 Addison, TX Hyatt Summerfield Suites
 Belmont, CA Hyatt Summerfield Suites
 El Segundo, CA Hyatt Summerfield Suites
 Las Colinas, TX Hyatt Summerfield Suites
 Mt. Laurel, NJ Hyatt Summerfield Suites

Starwood Properties
 Fort Walton Beach, FL Four Points by Sheraton
 Morristown, NJ Westin
 Rockville, MD Sheraton

Unaffiliated Properties
 107 Merrimac Street, Boston, MA 02114
 1600 East Grand River Avenue, East Lansing, MI 48823
 2701 East Beltline Avenue SE, Grand Rapids, MI 49546
 3553 Founders Road, Indianapolis, IN 46268
 222 East 22nd Street, Lombard, IL 60148
 1300 E. Higgins Road, Schaumburg, IL 60173
 2600 Livernois Road, Troy, MI 48083

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**INK ACQUISITION LLC**

<u>Table of Contents</u>

<u>Page</u>

ARTICLE I. GENERAL PROVISIONS; ORGANIZATION; STRUCTURE ............................ 1
Section 1.1     Registered Office ...................................................................................... 1
Section 1.2     Place of Business; Offices ......................................................................... 2
Section 1.3     Purpose; Nature of Business Permitted; Powers; Title to Property ................. 2
Section 1.4     [Reserved] ............................................................................................... 2
Section 1.5     Tax Classification; No State Law Partnership; REIT Qualifications ............... 2
Section 1.6     Definitions ................................................................................................ 3
Section 1.7     Certificates ............................................................................................... 20
Section 1.8     Term ........................................................................................................ 20
Section 1.9     Bid .......................................................................................................... 20
Section 1.10    Property Companies .................................................................................. 21
Section 1.11    Liability of Members ................................................................................. 21
Section 1.12    Restructuring ............................................................................................ 23

ARTICLE II. PERCENTAGE INTERESTS, CAPITAL  CONTRIBUTIONS AND
                 CAPITAL ACCOUNTS ................................................................................... 23
Section 2.1     Percentage Interests .................................................................................. 23
Section 2.2     Capital Contributions ................................................................................ 23
Section 2.3     Capital Accounts ...................................................................................... 25
Section 2.4     Admission of New Members ...................................................................... 26
Section 2.5     Interest ..................................................................................................... 26
Section 2.6     Capital Withdrawal Rights, Interest and Priority ......................................... 26

ARTICLE III. MANAGEMENT OF THE COMPANY ......................................................... 26
Section 3.1     Company Governance ................................................................................ 26
Section 3.2     Authority, Duties and Obligations of the Managing Member ........................ 28
Section 3.3     Managing Member Certifications ............................................................... 31
Section 3.4     Officers .................................................................................................... 31
Section 3.5     Operating Budget and Business Plan ........................................................... 33
Section 3.6     Voting Rights of Members .......................................................................... 34
Section 3.7     Buy/Sell ................................................................................................... 35

ARTICLE IV. GENERAL GOVERNANCE ........................................................................ 38
Section 4.1     Other Ventures ......................................................................................... 38
Section 4.2     Information ............................................................................................... 39
Section 4.3     Access ...................................................................................................... 39
Section 4.4     Affiliate Transactions ................................................................................ 39

ARTICLE V. TRANSFERS OF INTERESTS ...................................................................... 40
Section 5.1     Restrictions on Transfer ............................................................................ 40
Section 5.2     Non-Permitted Transfers ............................................................................ 41

ARTICLE VI. ALLOCATIONS ........................................................................................... 42
    Section 6.1    General Rules........................................................................................ 42
    Section 6.2    Other Allocation Rules ........................................................................ 42
    Section 6.3    Tax Allocations:  Code Section 704(c)................................................ 42

ARTICLE VII. DISTRIBUTIONS AND EXPENSES ..................................................... 43
    Section 7.1    Distributions of Net Cash Flow .......................................................... 43
    Section 7.2    Amounts Withheld ............................................................................... 44
    Section 7.3    Expenses .............................................................................................. 45

ARTICLE VIII. OTHER TAX MATTERS......................................................................... 45
    Section 8.1    Tax Matters Member............................................................................ 45
    Section 8.2    Furnishing Information to Tax Matters Member ................................. 45
    Section 8.3    Tax Claims and Proceedings................................................................ 45
    Section 8.4    Books and Records .............................................................................. 46
    Section 8.5    Survival ............................................................................................... 46

ARTICLE IX. REPRESENTATIONS AND WARRANTIES; COVENANTS ........................... 46
    Section 9.1    Representations and Warranties of Members ................................. 46
    Section 9.2    ERISA Representation .......................................................................... 48
    Section 9.3    AML/OFAC Compliance...................................................................... 48
    Section 9.4    Survival ............................................................................................... 50

ARTICLE X. DISSOLUTION AND TERMINATION OF THE COMPANY ........................... 51
    Section 10.1    Dissolution .......................................................................................... 51
    Section 10.2    Continuation of Interest of Member's Representative...................... 51
    Section 10.3    Dissolution, Winding Up and Liquidation....................................... 51
    Section 10.4    Member Bankruptcy. .......................................................................... 52

ARTICLE XI. INDEMNIFICATION AND CONTRIBUTION................................................... 52
    Section 11.1    Indemnity by the Company.................................................................. 52
    Section 11.2    Exculpation ......................................................................................... 53
    Section 11.3    Expenses .............................................................................................. 53
    Section 11.4    Advance Payment of Expenses............................................................ 53
    Section 11.5    Beneficiaries ....................................................................................... 53
    Section 11.6    Indemnification Procedure for Third Party and Other Claims....................... 53
    Section 11.7    Other Claims ....................................................................................... 54
    Section 11.8    Limitation on Damages........................................................................ 54

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................. 54
    Section 12.1    Entire Agreement ................................................................................ 54
    Section 12.2    Amendments ........................................................................................ 54
    Section 12.3    Applicable Law; Venue ....................................................................... 55

Table of Contents
(continued)

Section 12.4    Enforcement ................................................................................................ 55
Section 12.5    Headings ..................................................................................................... 55
Section 12.6    Severability ................................................................................................. 55
Section 12.7    Counterparts ............................................................................................... 55
Section 12.8    Filings ......................................................................................................... 55
Section 12.9    Additional Documents ............................................................................... 56
Section 12.10   Notices ........................................................................................................ 56
Section 12.11   Waiver of Right to Partition and Bill of Accounting .................................. 57
Section 12.12   Confidentiality; Press Releases .................................................................. 57
Section 12.13   Uniform Commercial Code .......................................................................... 57
Section 12.14   Binding Agreement ..................................................................................... 58
Section 12.15   Waiver .......................................................................................................... 58
Section 12.16   DISCLOSURES ............................................................................................ 58

Schedule XIX

Net Worth Certificate

Schedule A

(2011 Annual Budget)

Schedule B

(PIP Work)

Exhibit B

(Lockbox Banks)

<u>Limited Liability Company Agreement of Ink I
and Amendment Thereto</u>

[See Attached]

THE TRANSFER OF THE LIMITED LIABILITY COMPANY INTERESTS DESCRIBED IN THIS AGREEMENT IS RESTRICTED AS DESCRIBED HEREIN.

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## INK ACQUISITION LLC,

## a Delaware Limited Liability Company

THIS LIMITED LIABILITY COMPANY AGREEMENT of INK Acquisition LLC, a Delaware limited liability company (the "Company"), is made as of April 25, 2011 (this "Agreement"), by and between CRE-Ink REIT Member, LLC ("Cerberus") and Chatham Lodging LP ("Chatham", and, together with Cerberus and any other Person who becomes a member of the Company from time to time in accordance with the provisions hereof, the "Members").

## RECITALS:

1.      A Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware on April 15, 2011;

2.      Upon the terms and subject to the conditions set forth herein, each of the Persons listed on Schedule A hereto are concurrently with the execution of this Agreement acquiring a percentage interest in the Company; and

3.      In accordance with the Act (as defined in Section 1.6), the Members desire to enter into this Agreement to (i) set forth the respective rights, powers and interests of the Members with respect to the Company; (ii) establish the terms for the issuance of interests therein; and (iii) provide for the management of the business and operations of the Company.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I.

## GENERAL PROVISIONS; ORGANIZATION; STRUCTURE

Section 1.1    Registered Office.  The registered agent and office of the Company in the State of Delaware shall be National Corporate Research, Ltd., 615 South DuPont Highway, County of Kent, City of Dover, State of Delaware 19901.  The Managing Member, after giving notice to the other Members, may change the registered office from one location to another in the State of Delaware.

Section 1.2    Place of Business; Offices.  The principal place of business of the Company, where the books and records of the Company shall be kept, shall be c/o Chatham Lodging LP, 50 Cocoanut Row, Suite 200, Palm Beach, FL  33480.  The Company may, at any time, change the location of the principal office of the Company or have one or more offices as may be established from time to time.

Section 1.3    Purpose; Nature of Business Permitted; Powers; Title to Property.

(a)    The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)    to acquire, own, hold, manage, operate, lease, sell, transfer, service, convey, safekeep, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Business and the Properties and any portion thereof with unrelated third parties or with affiliated entities;

(ii)    to acquire, own, hold, sell, transfer, service, convey, safekeep, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with, publicly or privately issued securities and whether with unrelated third parties or with affiliated entities, in each case in connection with the Business and the Properties;

(iii)    to own equity interests in other limited liability companies, partnerships or other entities whose purposes are restricted to those set forth in clauses (i) and (ii) above; and

(iv)    to engage in any other lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes (including the entering into of interest rate or basis swap, cap, floor or collar agreements, or similar hedging transactions and referral, management, servicing and administration agreements).

(b)    The Company shall not engage in any other business or activity.  Except as otherwise provided in Section 1.10 hereof and except for contracts customarily entered into by a property management agent on behalf of a hotel property owner, all property acquired in connection with the business of the Company shall be held by the Company in its own name, and all contracts and leases of real or personal property by or to the Company shall be made in its own name.

(c)    Title to assets of the Company, whether real, personal or mixed, tangible or intangible, shall be deemed to be owned by the Company, and no Member, individually or collectively, shall have any ownership interest in such assets or any portion thereof.

Section 1.4    [Reserved]

Section 1.5    Tax Classification; No State Law Partnership; REIT Qualifications.  (a) The Members intend that the Company shall be treated as a partnership for

federal, state and local tax purposes.  Each Member and the Company agree to file all tax returns and otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  No provision of this Agreement shall be deemed or construed to constitute the Company (including its subsidiaries) as a partnership (including a limited partnership) or joint venture, or any Member as a partner of or with any other Member for any purposes other than tax purposes.

(b)  As of the Closing Date, Cerberus shall be a REIT and Chatham shall be owned, directly or indirectly, by Chatham REIT.  Both Chatham REIT and Cerberus intend to qualify as a REITs, and the Members intend that the Company shall operate the Properties in a manner that will not jeopardize the REIT status of either Chatham REIT or Cerberus.  Accordingly, the Company will lease the Properties to the Property Leasecos pursuant to arm's-length leases and the Property Leasecos will engage Island Hospitality Management or another entity that qualifies as an "eligible independent contractor" under Code Section 856(d)(9) to operate the Properties on their behalf.

Section 1.6   Definitions.  Unless the context otherwise requires, the terms defined in this Section 1.6 shall, for the purposes of this Agreement, have the meanings herein specified (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

"1933 Act" has the meaning set forth in Section 12.16.

"1940 Act" means the Investment Company Act of 1940, as amended, and the rules and regulations thereunder.

"Act" means the Delaware Limited Liability Company Act (as it may be amended from time to time and any successor to such Act).

"Additional Capital Contribution" means any Capital Contribution made by a Member pursuant to Section 2.2(b) hereof.

"Affiliate" means, with respect to a Person, another Person that directly or indirectly controls, is controlled by or is under common control with such first Person; provided, however, that for purposes only of the term "Permitted Transferee", the term "Affiliate" shall have the meaning ascribed to it therein.  For the avoidance of doubt, for purposes of this Agreement, including, without limitation, the definition of "Permitted Transferee," (i) an Affiliate of Cerberus includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that, as of the date hereof, control Cerberus; and (ii) an Affiliate of Chatham includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that control Chatham REIT, and any successor to Chatham REIT, whether by merger, consolidation, sale of substantially all of the assets or otherwise.  Additionally, for the avoidance of doubt, Island Hospitality Management shall not be considered to be an Affiliate of Chatham REIT or Chatham.

"Affiliated Individual" means, with respect to a Person, any individual who is an officer, director, shareholder, employee, partner or member of such Person or an individual who is related by blood, marriage or adoption to any of the foregoing.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" has the meaning set forth in Section 5.1(c).

"<u>Approved FATF Country</u>" shall mean any country that is a member of the Financial Action Task Force on Money Laundering, as such list may be amended, from time to time, and as approved in this Agreement. As of the date of this Agreement, the following countries are Approved FATF Country members: Argentina, Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Iceland, Ireland, Italy, Japan, Luxembourg, Mexico, Kingdom of the Netherlands, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, Turkey, United Kingdom and the United States.

"<u>Approved Severance Costs</u>" means any severance payable to Chatham Company Personnel to the extent such severance (i) for a senior Chatham Company Employee does not exceed three (3) months of such employee's monthly salary, (ii) for any other Chatham Company Employee is determined by Chatham in accordance with such employee's position and seniority and does not exceed two (2) months of such employee's monthly salary or (iii) otherwise has been approved by Cerberus at the time of grant to the applicable Chatham Company Personnel.

"<u>Asset</u>" means an asset owned by the Company or its Subsidiaries.

"<u>Auction</u>" means the auction of the hotel properties listed on Annex A hereto contemplated by the Bid Procedures.

"<u>Bankruptcy</u>" means, with respect to any Person, a "<u>Voluntary Bankruptcy</u>" or an "<u>Involuntary Bankruptcy</u>". A "<u>Voluntary Bankruptcy</u>" shall mean, with respect to any Person, (a) an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors, (b) the filing of any petition or answer by such Person seeking to adjudicate it bankrupt or insolvent or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of such Person or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking, consenting to or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property, or (c) corporate action taken by such Person to authorize any of the actions set forth above. An "<u>Involuntary Bankruptcy</u>" shall mean, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation or the filing of any such petition against such Person which order or petition shall not be dismissed within 90 days or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within 90 days.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Bid" means a proposal submitted by the Company to acquire the Properties listed on Annex A hereto at the Auction through the sponsorship and funding of a chapter 11 plan of reorganization for the Debtors pursuant to and in accordance with the Bidding Procedures.

"Bidding Procedures" means the Bidding Procedures for the Fixed/Floating Debtors attached as Exhibit 2 to the Order (I) Authorizing the Debtors to Enter into the Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving Bidding Procedures, (III) Approving Bid Protections, (IV) Authorizing an Expense Reimbursement for "Bidder D," and (V) Modifying Cash Collateral Order to Increase Expense Reserve, entered by the Bankruptcy Court in Case No. 10-13800 (SCC).

"Business" means (a) the acquisition, ownership, lease and operation of certain hotel properties as of the date hereof owned, leased and operated by Innkeepers USA Trust and its subsidiaries, (b) the ownership, lease and operation of any other Properties acquired by the Company in accordance with this Agreement, and (c) any other business of the Company, directly or indirectly related, incidental to or connected with the foregoing.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York City are required or permitted by law to be closed.

"Business Plan" means the comprehensive strategic plan for the Company's ownership, operation, financing and sale of the Properties, as in effect from time to time pursuant to Section 3.5 hereof.

"Buy Notice" has the meaning set forth in Section 3.7.

"Buy/Sell Closing Date" has the meaning set forth in Section 3.7.

"Buy/Sell Notice" has the meaning set forth in Section 3.7.

"Buy/Sell Right" has the meaning set forth in Section 3.7.

"Capital Account" has the meaning set forth in Section 2.3(a).

"Capital Call" shall mean a written notice to the Members calling for a Capital Contribution, which written notice shall include (a) the total amount of the Capital Contribution then required, (b) a brief description of the expenditures or obligations giving rise to the requirement for such Capital Contribution, (c) each Member's proportionate share of the total Capital Contribution as then required by this Agreement, (d) the date by which each Member's Capital Contribution is required to be made, which date shall be thirty (30) days (or, with respect to the Capital Call to fund the acquisition of the Properties listed on Annex A hereto, ten (10) days) after such written notice has

been given or such other date as may be agreed to by the Members, and (e) the account of the Company to which such Capital Contributions must be paid.

"Capital Contribution" means, with respect to any Member, the amount of money contributed to the Company in exchange for a Percentage Interest in the Company, including Initial Capital Contributions.

"Carveout Guarantor" has the meaning set forth in Section 1.11(c)(i).

"Carveout Guaranty" means a guaranty of non-recourse carveouts, in form and substance satisfactory to the applicable Lender and approved in advance in writing by the Members, (including, without limitation, any such guaranty required by Midland Loan Services in connection with the Midland Loan).

"Cerberus" has the meaning set forth in the Preamble.

"Cerberus Initial Members" means Cerberus and its Permitted Transferees.

"Certificate of Formation" means the Certificate of Formation referred to in Recital 1 and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Act.

"Chatham" has the meaning set forth in the Preamble.

"Chatham REIT" means Chatham Lodging Trust, a Maryland real estate investment trust.

"Chatham Cap" has the meaning set forth in Section 2.2(a).

"Chatham Company Personnel" means any personnel employed by Chatham (or one of its Affiliates other than the Company) solely for the purpose of providing asset management services to the Company, the employment generally of whom, including compensation and severance other than Approved Severance Costs, if any, payable to such personnel, has been approved by Cerberus.

"Chatham Initial Members" means Chatham and its Permitted Transferees.

"Close Associate" means a Person who is widely and publicly known (or is actually known) to be a close associate of a Senior Foreign Political Figure.

"Closing Date" means the date upon which the transactions contemplated by the Plan and the Investment Agreement are consummated.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" has the meaning set forth in the Preamble.

"Contributing Members" has the meaning set forth in Section 2.2(d).

"Control" means, with respect to any Person, the power of another Person, through ownership of equity, contract rights or otherwise, to direct the management and policies of such Person, and "controlled" and "controlling" have correlative meanings.

"Cure" means, with respect to any action or failure to act triggering a right to Cure, that such action or failure to act, to the extent that it triggered the right to Cure, has been discontinued, and all parties adversely affected by such action or failure to act have been made whole in all material respects as if such action or failure to act had not occurred.

"Debtors" means Innkeepers USA Trust and each of the other debtors and debtors-in-possession in the Bankruptcy Court Chapter 11 Case No. 10-13800 (SCC).

"Deposit" means the cash deposit required by the Bidding Procedures to be put into an interest-bearing escrow account in the name of the Debtors contemporaneously with the submission of the Bid.

"Depreciation" means, for each Fiscal Period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Period, except that if the Gross Asset Value of such asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Tax Matters Member.

"Effective Date" means the date of this Agreement, as set forth in the Preamble.

"Election Notice" has the meaning set forth in Section 3.7(a)(i).

"Environmental Law" means all applicable laws, including, for this purpose, all common law, governing public health or safety, workplace health or safety, pollution or the protection of the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Expense Reimbursement" has the meaning set forth in Section 3.1(c).

"Failed Contribution" has the meaning set forth in Section 2.2(d).

"Family Member" means, with respect to any specified natural person, (a) any parent, child, descendant or sibling of such natural person (including relationships resulting from adoption) or (b) the spouse of such natural person or of any person covered by clause (a).

"Fiscal Period" means (a) the period commencing on the Effective Date and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) any portion of the period described in clauses (a) and (b) of this sentence (i) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article VI and (ii) ending on the date of an adjustment to the Gross Asset Value pursuant to clause (b) of the definition of "Gross Asset Value".

"Fiscal Year" means (a) the period commencing on the Effective Date and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on the immediately preceding January 1 and ending on the date on which all property of the Company is distributed to the Members pursuant to Article X.

"Funded Amount" has the meaning set forth in Section 2.2(d).

"GAAP" means generally accepted accounting principles in the United States,

"Governmental Entity" means a court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

    (a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset at the time it is accepted by the Company, unreduced by any liability secured by such asset, as reasonably determined by the Managing Member;

    (b)    the Gross Asset Values of all Assets shall be adjusted to equal their respective fair market values, unreduced by any liabilities secured by such assets, as reasonably determined by the Managing Member as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; (iii) the grant of more than a de minimis interest in the Company as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity or by a new Member acting in a partner capacity or in anticipation of being a partner; and (iv) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that an adjustment described in clauses (i), (ii) or (iii) of this paragraph shall be made

only if the Managing Member reasonably determines that such an adjustment is necessary to reflect the relative economic interests of the Members;

(c) the Gross Asset Value of any Asset distributed to any Member shall be adjusted to equal the fair market value of such asset on the date of distribution, unreduced by any liability secured by such asset, as reasonably determined by the Managing Member; and

(d) the Gross Asset Value of all Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and paragraph (f) of the definition of "Profits" and "Losses" or Section 8.2(g); provided, however, that Gross Asset Value shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (b) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraphs (a), (b) or (d) of this definition, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Hazardous Substance" means any material, substance or waste as to which liability or standards of conduct may be imposed pursuant to any Environmental Laws.

"Hotel Management Agreement" means the Hotel Management Agreements in the form attached hereto as Exhibit A, to be executed and delivered on the Closing Date, between Island Hospitality Management and each Property Leaseco.

"Hotel Manager" has the meaning set forth in the definition of Major Decision.

"Immediate Family Member" includes the parents, siblings, spouse, children, and spouse's parents and siblings, of a Senior Foreign Political Figure.

"Independent Appraiser" has the meaning set forth in Section 3.7(a)(ii).

"IRS" means the U.S. Internal Revenue Service, or any successor government agency.

"Indebtedness" means (a) the principal, premium (if any), interest and related fees and expenses (if any) in respect of (i) indebtedness for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments, (b) all obligations in respect of outstanding letters of credit, acceptances and similar obligations, (c) that portion of obligations with respect to capital leases not entered into in the ordinary course of business and properly accounted for as a liability, (d) any obligation owed for all or any part of the deferred purchase price of property or services

except for trade liabilities incurred in the ordinary course of business, and (e) a guaranty of any of the obligations described in the foregoing clauses of this definition.

"Indemnifiable Losses" has the meaning set forth in Section 11.1.

"Indemnified Person" has the meaning set forth in Section 11.1.

"Initial Capital Contribution Amount" means as to each Initial Member, the dollar amount that is set forth opposite such Member's name on Schedule A and labeled such Member's "Initial Capital Contribution Amount".

"Initial Capital Contributions" has the meaning set forth in Section 2.2(a).

"Initial Members" means the Chatham Initial Members and Cerberus Initial Members.

"Involuntary Bankruptcy" has the meaning set forth in the definition of Bankruptcy.

"Island Hospitality Management" means Island Hospitality Management III, Inc. or one of its Affiliates.

"Lender" means the lender under any Loan Documents to be executed with respect to a Loan, if any.

"Loan" means a loan obtained or assumed by the Company or any of its Subsidiaries, as borrower, secured by all or any portion of the Property, including the Midland Loan.

"Loan Documents" means any and all loan documents to be executed by the Company or any of its Subsidiaries, as applicable, and the Lender in connection with a Loan, if any.

"Major Decision" means any determination to cause the Company or any Subsidiary of the Company to:

(a)     directly or indirectly acquire, or execute and deliver any documents, agreements or instruments necessary to close on the direct or indirect acquisition by the Company or any Subsidiary of the Company of, any Property, except as set forth in the then-approved Operating Budget or the then-approved Business Plan;

(b)     (A) sell, assign, transfer, encumber or dispose of the Company, any Property Company, any Property, or any revenue-generating business of the Company or any Property Company, or agree to any of the foregoing, or (B) except as expressly provided in this Agreement or in the then-approved Operating Budget or the then-approved Business Plan, improve, design, rehabilitate, alter, or repair (collectively, the "Repairs") of any of the Properties, provided, however, that the Managing Member may make or caused to be made Repairs not contemplated by the then-approved Operating Budget if (i) any such Repair is

required by any franchisor under the applicable franchise agreement or any other agreement with the franchisor (including, but not limited to, that certain Agreement for Adequate Assurance of Completion of Certain PIPS and Assumptions of Agreements, dated June 25, 2010, by and between the Debtors and Marriot International, Inc.), (ii) emergency action or expenditures is necessary to prevent imminent risk to the health and safety of Persons on or about the Properties, imminent material property damage or imminent imposition of criminal or civil sanctions against the Company or any Member (each, an "Emergency Expenditure"), provided that (1) any such Emergency Expenditure made without approval of all Initial Members is, in the Managing Member's commercially reasonable judgment, reasonable and necessary under the circumstances set forth above and (2) the Managing Member endeavors diligently and in good faith (x) to notify the Initial Members of any such Emergency Expenditure promptly in writing and (y) attempts to obtain verbal approval of the Initial Members for any required Emergency Expenditure, or (iii) if the aggregate cost of such Repairs fall within the thresholds set forth in clause (l) of this definition;

(c)     except as otherwise expressly permitted by this Agreement, call for Capital Contributions, approve Capital Calls or determine the portion of the then-approved Operating Budget that is to be funded by equity and by debt, or raise any new equity for any Subsidiary of the Company or admit any new member, partner or owner to the Company or any of its Subsidiaries;

(d)     make any operating expenditure or incur any operating obligation by or on behalf of the Company that varies materially from the then-approved Operating Budget other than an Emergency Expenditure made pursuant to the procedures set forth in clause (b) of this definition and expenditures that fall within the thresholds set forth in clause (l) of this definition;

(e)     execute or modify, amend, supplement, terminate, extend or renew leases with tenants for occupancy of space in any Property, except (i) for any lease with a Property Leaseco or any other TRSs of Chatham REIT and Cerberus or (ii) to the extent delegated to the Hotel Manager pursuant to the Hotel Management Agreements or set forth in the then-approved Operating Budget or the then-approved Business Plan;

(f)     enter into, modify or terminate any contractual arrangements with service providers (including lenders, attorneys, consultants, appraisers, third party property managers, brokerage companies, general contractors, accountants, auditors, architects, banks or other depositaries and all other service providers) for services to be rendered in connection with the business of the Company; provided, however, that (i) until further written notice, Cerberus hereby delegates the tasks set forth in this subsection (f) to the Managing Member, so long as all such services are expressly provided for and are not in excess of the amounts budgeted for such services in the then-approved Operating Budget and Business Plan and either (x) are terminable, without cause or fee, upon not more than thirty (30) days notice, (y) have a stated term of not more than one year, or (z) are expressly approved in writing by Cerberus, (ii) Cerberus hereby authorizes the Managing Member to cause the Property Leasecos to engage Island Hospitality Management to act as the hotel manager of all of the Properties on behalf of the Property Leasecos (the "Hotel Manager") pursuant to the Hotel Management Agreements and (iii) the entry into, modification or termination of any

contractual arrangement that requires an annual payment by the Company of $25,000 or less, or the determination to take any of the foregoing actions, shall not be considered a Major Decision;

(g)     incur or pay any real estate taxes, insurance premiums, or any assessments or charges with respect to the ownership and operation of any Property, except to the extent provided for in the then-approved Operating Budget or delegated to the Hotel Manager pursuant to the Hotel Management Agreement;

(h)     make distributions to the Members other than as set forth in Article VII of this Agreement;

(i)     establish reserves, determine reserve levels or make any distributions from any such reserves, except as set forth in the then-approved Operating Budget or the then-approved Business Plan;

(j)     except as set forth in the then-approved Operating Budget or the then-approved Business Plan, cause or permit the Company to finance all or any portion of any Property (other than the Midland Loan and trade debt incurred in the ordinary course of business consistent with the then-approved Operating Budget), agree to the form, substance, provider or documentation pertaining to any Loan, modify, restructure or terminate any Loan or repay any Loan except in accordance with the express terms of the applicable Loan, or enter into, modify or amend any documents, agreements or instruments relating to any Loan;

(k)     except to the extent expressly set forth in the then-approved Operating Budget or the then-approved Business Plan, select or determine any insurance plans, carriers or coverages to be purchased and maintained by or on behalf of the Company or any Property Company;

(l)     make any expenditures which are at variance with the then-approved Operating Budget or Business Plan (A) (1) with respect to any Operating Expense (as defined in the applicable Hotel Management Agreement) for any Property unless Operating Expenses for such Property would not exceed the estimated Operating Expenses for such Property as set forth in the then-current and approved Operating Budget with respect to such Property by five percent (5%) or more (in the aggregate, but not by line item) and (2) with respect to any other expenditure not described in clause (1), unless the variance in question does not exceed a particular summary line item by the lesser of (x) $50,000 or (y) 10% of that summary line item, and (B) unless the overall Operating Budget for the Company is not exceeded in the aggregate by more than 2.5% (excluding, for purposes of the foregoing calculation, the use of any contingency line items set forth in the then-approved Operating Budget)), and provided that in any case the Managing Member may make an Emergency Expenditure pursuant to the procedures set forth in clause (b) of this definition);

(m)     grant or convey any easement, lien, ground lease, mortgage, deed, deed of trust, bill of sale, contract or other instrument purporting to convey or encumber any Property, either wholly or in part;

(n)     take any Bankruptcy action on behalf of the Company or any of its Subsidiaries;

(o)     institute any legal or arbitration proceedings in the name of the Company, settle any legal or arbitration proceedings against the Company or confess any judgment against the Company or any Property, other than (i) the institution of an eviction action, a suit for breach of a tenant lease or other similar proceeding contemplated in or provided for in the then-approved Operating Budget or the then-approved Business Plan or (ii) settlements or compromises for litigation or arbitration providing solely for the payment of money damages where the amount paid (after giving effect to any insurance proceeds) in settlement or compromise does not exceed $50,000;

(p)     execute, deliver or file any agreement, permit, request, application or filing with any governmental agency, any neighboring property owner, any community organization or any similar regulatory body, or send any correspondence to or have any other material communications with, any governmental agency, which directly binds the Company or any of its Affiliates or any Member or any of its Affiliates, or which advocates a position on behalf of the Company or its Affiliates or any Member or its Affiliate (excluding correspondence, communications and other actions with respect to ministerial matters consistent with the then-approved Operating Budget and the then-approved Business Plan);

(q)     approve any investment other than as contemplated by this Agreement or approve any renovation or disposition of any Property, except as expressly authorized by the then-approved Business Plan and other than an Emergency Expenditure or Repair made pursuant to the procedures set forth in clause (b) of this definition;

(r)     enter into any exclusivity, competition or confidentiality agreement that is or purports to be binding upon any Member or any of its Affiliates or interest holders;

(s)     enter into any settlements with any third party or any consent decree, order (judicial or otherwise) with any Governmental Entity, related to the breach of any Environmental Law, or the sampling, monitoring, treatment, remediation, removal or clean up of Hazardous Substances with respect to the Properties;

(t)     knowingly take or approve, or refrain from taking or approving, any action (other than as a consequence of taking or approving or refraining from taking or approving any action pursuant to a direction, an affirmative veto or a lack of approval after a specific request therefore, in each case from a Member authorized to give such direction, veto or approval) that is reasonably likely to lead to a default under any Loan Documents or to a material dispute with any Lender;

(u)     knowingly take or approve, or refrain from taking or approving, any action (other than as a consequence of taking or approving or refraining from taking or approving any action pursuant to a direction, an affirmative veto or a lack of approval after a specific request therefore, in each case from a Member authorized to give such direction, veto or approval) that could trigger a recourse provision under any then-outstanding Loan;

(v)     approve any marketing plans or agreements with respect to any Property, except as expressly authorized by the then-approved Business Plan;

(w)     require or permit the Company to make any loan to any Member or any of its Affiliates, or require or permit any loan (other than a Member Loan) to be made by any Member to the Company;

(x)     cause the Company or any Property Company to execute or deliver any indemnity or guaranty;

(y)     change the Company's depreciation and accounting methods and make other decisions with respect to the treatment of various transactions for federal income tax purposes, and change the Company's elections for federal, state or local income tax purposes;

(z)     amend this Agreement (or the corresponding organizational documents of any Subsidiary of the Company) in any respect;

(aa)     take or approve any action relating to any tax certiorari proceeding or other tax appeal affecting any Property;

(bb)     recapitalize, reclassify, redeem, repurchase or otherwise acquire any equity or other interests of the Company or any Subsidiary of the Company;

(cc)     merge, consolidate or dissolve the Company or any of its Subsidiaries;

(dd)     remove and replace Island Hospitality Management as Hotel Manager;

(ee)     permit or cause any Transfer that may reasonably be expected to cause the assets of the Company or any Subsidiary of the Company to be deemed "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA);

(ff)     enter into any swap, hedge, collar or other interest rate protection agreement;

(gg)     enter into any lease, whether as lessor or lessee, other than short term storage leases in connection with a capital program or equipment leases in the ordinary course of business;

(hh)     take any action that could reasonably be expected to cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT;

(ii)     enter in any transaction that could reasonably be expected to cause Chatham REIT or Cerberus to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6); or

(jj)     cause any rebranding of properties or entry into new franchise agreements.

"Managing Member" means Chatham, in its capacity as Managing Member of the Company, and any successor thereto appointed in accordance with this Agreement.

"Member" has the meaning set forth in the preamble.

"Member Loan" has the meaning set forth in Section 2.2(d).

"Midland Loan" means the new non-recourse mortgage loan in an aggregate principal amount of not less than $622.5 million made by Midland Loan Services, a division of PNC National Bank, in a form approved by the Initial Members, the proceeds of which are to be used to satisfy the Debtors' current outstanding fixed rate mortgage loan as part of the transactions contemplated by the Bid.

"Minimum Cerberus Multiple" has the meaning set forth in Section 7.1(b).

"Monthly Expense Amount" has the meaning set forth in Section 3.1(c)(i).

"Net Cash Flow" means, during the applicable period, the gross cash proceeds derived by the Company during such period from any source (including financings or refinancings) less the portion thereof used to pay or establish reserves for all Company operating expenses, the Expense Reimbursement, the fees payable under the Hotel Management Agreements, debt payments, taxes, capital improvements, replacements and contingencies or otherwise required to be held by the Company, all as determined by the Managing Member in its reasonable discretion subject to the provisions of this Agreement; provided, however, that Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions of previously established reserves; and provided further that Net Cash Flow shall not include any cash that the Company or its Subsidiaries is prohibited from distributing to the Members by the terms of any Indebtedness of the Company or its Subsidiaries.

"Non-Contributing Member" has the meaning set forth in Section 2.2(d).

"Non-Notifying Member" has the meaning set forth in Section 3.7.

"Notifying Member" has the meaning set forth in Section 3.7.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC List Sanctions Programs" means any countries, territories, individuals or entities that are prohibited pursuant to the laws, regulations or Executive Orders administered by OFAC, including the List of Specially Designated Nationals and Blocked Persons administered by OFAC, as such list may be amended from time to time.

"Officer" means any officer of the Company or any Subsidiary thereof appointed in accordance with this Agreement or by the manager of such Subsidiary.

"Operating Budget" means the annual operating budget for the ownership, operation, marketing and sale of the Properties, as in effect from time to time pursuant to Section 3.5 hereof.

"Parallel Entities" has the meaning set forth in Section 1.12.

"Percentage Interest" means, with respect to any Member, such Member's ownership interest in the Company, calculated as the percentage obtained by dividing the Capital Contributions of such Member by the aggregate Capital Contributions of all the Members.

"Person" means any individual, corporation, association, partnership (general or limited), joint venture, trust, joint-stock company, estate, limited liability company, Series, unincorporated organization or other legal entity or organization.

"Permitted Transferee" means (i) with respect to any Member who is not a natural person, any Affiliate of such Member (provided that for purposes of this clause (i), "Affiliate" shall mean, with respect to the Member in question, a Person (including any fund or managed account) that such Member solely controls, is controlled solely by or under common control with (and no Person other than the common controlling Person controls such Affiliate) such Member, and provided further that notwithstanding the immediately preceding proviso, Affiliates specified in the second sentence of the definition of Affiliate shall be deemed to be "Affiliates" for purposes of this clause (i)); (ii) with respect to any Member who is a natural person, (x) upon the death of such natural person, any Person in accordance with such natural person's will or the laws of intestacy; (y) the Family Members of such natural person, entities formed for estate or family planning purposes and/or one or more trusts for the sole benefit of the Family Members of such natural person provided that such natural person shall not be released from his obligations under this Agreement as a Member; and (iii) in the event of the dissolution, liquidation or winding up of any Person that is a corporation, partnership or limited liability company, the stockholders, partners or members, as applicable, or a successor corporation, partnership or limited liability company all of the stockholders, partners or members of which, as applicable, are the Persons who were the stockholders, partners or members, as applicable, of such entity immediately prior to the dissolution, liquidation or winding up of such Person; provided further, however, that no such Transfer under any one or more of the foregoing clauses (i) through (iii) to any such Person shall be permitted where such Transfer (x) fails to comply with the terms of Section 5.1, including, without limitation, by reason of a failure to comply in any respect

with any federal or state securities laws, including, without limitation, the 1940 Act, or (y) would result in the Company becoming subject to the Exchange Act.

"Plan" means the amended and restated plan of reorganization of the Debtors in form and substance satisfactory to Chatham and Cerberus and consistent with the terms of the Bid.

"Post-Termination Major Decision" means any determination to cause the Company or any Subsidiary of the Company to take any action described in clauses (h), (n), (r), (t) (solely to the extent such action would trigger a Carveout Guaranty made by Chatham or its Affiliate), (u) (solely to the extent such action would trigger a Carveout Guaranty made by Chatham or its Affiliate), (z), (bb), (hh) or (ii) of the definition of "Major Decisions".

"President and CEO" has the meaning set forth in Section 3.4(d)(i).

"Profits" or "Losses" means for each Fiscal Period, an amount equal to the taxable income or loss for such Fiscal Period. Such amount shall be determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

      (a)      any income that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

      (b)      any expenditures described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

      (c)      in the event the Gross Asset Value of any Asset is adjusted pursuant to paragraphs (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

      (d)      gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

      (e)      in lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss there

shall be taken into account Depreciation for such Fiscal Period, computed in accordance with the definition of Depreciation; and

(f)     to the extent an adjustment to the adjusted tax basis of any Asset pursuant to Code Section 734(b) or 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Promoted Interest" has the meaning set forth in Section 7.1(b).

"Properties" means the hotel properties listed on Annex A hereto, and any other property (real, personal or mixed) or real estate acquired by the Company in accordance with this Agreement.

"Property Company" means a direct or indirect subsidiary of the Company through which the Company indirectly holds one or more Properties.

"Property Leasecos" means each of Grand Prix Fixed Lessee LLC and Grand Prix Floating Lessee LLC, each a Delaware limited liability company that will either (i) elect to be treated as associations taxable as corporations for federal income tax purpose and as TRSs of Chatham REIT and Cerberus, (ii) be wholly owned by a Subsidiary of the Company that elects to be a TRS of Chatham REIT and Cerberus or (iii) be owned by a Subsidiary of Chatham REIT or Cerberus that elects to be a TRS.

"QIB" means a "qualified institutional buyer" within the meaning of Rule 144A under the 1933 Act.

"REIT" means an entity that qualifies as a "real estate investment trust" under Code Sections 856 through 860.

"Regulations" means the federal income tax regulations promulgated by the Treasury Department under the Code, as such regulations may be amended from time to time.  All references herein to a specific section of the Regulations shall be deemed also to refer to any corresponding provisions of succeeding Regulations.

"Representative" has the meaning set forth in Section 10.2.

"Reorganized Debtors" means the Debtors, after giving effect to their reorganization in accordance with the Plan.

"Sell Notice" has the meaning set forth in Section 3.7.

"Senior Foreign Political Figure" means (a) a current or former senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S.

government (whether elected or not), a current or former senior official of a major United States political party or a current or former senior executive of a non-U.S. commercial enterprise, (b) a corporation, business or other entity that has been formed by or for the benefit of a Senior Foreign Political Figure; (c) an immediate family member of a Senior Foreign Political Figure; and (d) a close associate of a Senior Foreign Political Figure. For purposes of this definition, a "senior official or "senior executive" means an individual with substantial authority over policy, operations, or the use of government-owned resources.

"Subsidiary" of a Person means any corporation, partnership, limited liability company, trust and other entity, whether incorporated or unincorporated, with respect to which such Person, directly or indirectly, legally or beneficially, owns (i) a right to a majority of the profits of such entity; or (ii) securities having the power to elect a majority of the board of directors or similar body governing the affairs of such entity.

"TRS" means an entity that qualifies as a "taxable REIT subsidiary" under Code Section 856(l).

"Tax Matters Member" has the meaning set forth in Section 8.1.

"Termination Event" means (a) the occurrence of a Failed Contribution with respect to (i) any Initial Capital Contribution for which Capital Call has been made in accordance with Section 2.2(a), or (ii) any Capital Contribution (other than an Initial Capital Contribution) for which a Capital Call has been made other than pursuant to Section 2.2(b)(ii), (b) any material breach of Chatham's obligations hereunder (other than a Failed Contribution), or any gross negligence, willful misconduct or fraud committed by Chatham or any Person affiliated with Chatham in connection with the performance of Chatham's obligations hereunder, in each case other than such gross negligence, willful misconduct or fraud that, if capable of being Cured, is Cured within thirty (30) days after Chatham receives written notice thereof, (c) the reduction of Chatham's Percentage Interest to a percentage of less than 5% hereof, (d) the failure of Jeffrey Fisher to remain as active in the management and business of Chatham REIT as he is as of the date of this Agreement, (e) any direct or indirect Transfer of an interest in Chatham that is not a Transfer permitted under Article V hereof, unless such Transfer, if capable of being Cured, is Cured within thirty (30) days after the occurrence thereof, or (f) the failure of Chatham to timely satisfy its binding obligation to sell as a selling Member or to purchase as a purchasing Member, as applicable, under and as set forth in Section 3.7 below.

"Third Party Claim" has the meaning set forth in Section 11.6.

"Transfer" means any direct or indirect sale, assignment, pledge, hypothecation or other transfer or encumbrance of an interest in any Member, whether by operation of law or otherwise (including, without limitation, the withdrawal of any Person having any direct or indirect interest in any Member), provided that the sale or transfer of capital stock or other equity interests in Chatham REIT or any successor thereto (whether by merger, consolidation or otherwise) shall not be considered a Transfer of any interests in

Chatham REIT or its Affiliates, including Chatham, <u>provided further</u> that the sale or transfer of capital stock or other equity interests in Cerberus or any successor thereto (whether by merger, consolidation or otherwise) shall not be considered a Transfer of any interests in Cerberus or its Affiliates so long as Cerberus remains under the management and control of the Persons controlling Cerberus as of the date hereof.

"<u>Valuation Amount</u>" has the meaning set forth in Section 3.7.

"<u>Voluntary Bankruptcy</u>" has the meaning set forth in the definition of Bankruptcy.

"<u>Voting Representative</u>" has the meaning set forth in Section 10.2.

"<u>Wind-Down Expenses</u>" has the meaning set forth in Section 3.2(h).

Any capitalized term not defined herein shall have the meaning ascribed to such term in the Act.

Section 1.7    <u>Certificates</u>.  Each Officer of the Company is an authorized Person within the meaning of the Act to execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction within the United States in which the Company may wish to conduct business.  Audra Dowless is hereby designated as an "<u>authorized person</u>" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware.

Section 1.8    <u>Term</u>.  The term of the Company shall begin on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue until terminated in accordance with the provisions hereof or pursuant to the Act.

Section 1.9    <u>Bid</u>.  Each of the Initial Members, by executing this Agreement, authorizes the Company:  (a) to submit the Bid, containing the terms set forth in Exhibit B, to purchase the new common membership interests of the Reorganized Debtors; (b) to enter or cause its Subsidiaries to enter into any other documents necessary to effect the actions contemplated by the Bid; (c) to enter, or cause its Subsidiaries to enter, into documents relating to the financing of the purchase of the Business on terms substantially consistent with the Bid, including without limitation, any credit agreement, note purchase agreement or similar financing agreement, and any agreement, document or instrument to be delivered in connection with such financing; and (d) to open, and cause its Subsidiaries to open, such bank accounts as shall be necessary or appropriate to conduct the operations of the Business.  All actions and decisions of the Company with respect to the Bid, including any modification of the Bid, at the Auction or otherwise, shall be made by the unanimous approval of the Members.  Prior to the execution and submission of the Bid, all of the Members shall agree to the terms and conditions of such Bid. Notwithstanding the foregoing, in the event that a "termination event" (as defined in the Bid) occurs with respect to the Bid, including the terms of the proposed Midland Loan being unacceptable to either Member in accordance with the Bid, then any Member may terminate, and cause the Company to terminate, the Bid in accordance therewith, and the unanimous approval of all Members shall not be required for such termination.

Section 1.10 <u>Property Companies</u>. To the extent the Company at any time acquires a Property directly rather than acquiring the equity interests of the current owner of a Property, the Company shall, at the election of the Initial Members, form one or more Property Companies to take title to all or any portion of any such Property or Properties. It is expressly understood that to the extent Properties are acquired through the acquisition of the equity interests of a Property Company, or the Company is directed pursuant to this Section 1.10 to utilize one or more Property Companies for any Properties, the Company shall conduct all of its business with respect to such Properties through such Property Company(ies); <u>provided</u>, <u>however</u>, that the organizational documents of the Property Companies shall provide (and the current organizational documents of all existing Property Companies acquired directly or indirectly by the Company shall be amended as necessary to provide) that the decisions of such Property Companies shall be made by the Company pursuant to the terms of this Agreement. The Managing Member shall perform, with no additional compensation, substantially identical services for each Property Company as the Managing Member performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement. The Managing Member agrees to perform such duties, and, in such circumstances and with regard to such duties, the Managing Member shall be subject to the same standards of conduct and shall have the same rights and obligations with regard to such duties performed or to be performed on behalf of any such Property Company as are set forth in this Agreement with regard to substantially identical services to be performed for or on behalf of the Company. Without limiting the generality of the foregoing, the Members agree to make such non-economic changes as any Lender(s) may require with respect to this Agreement and/or to the organizational documents of the Property Companies, including, without limitation, the addition of a non-member manager and/or independent director to the structure of any Property Company to the extent not already in place.

Section 1.11 <u>Liability of Members</u>.

(a) No Member shall have any duty to any other Member or to the Company beyond those specifically set forth in this Agreement.

(b) Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company or of any other Member solely by reason of being a member of the Company. Except as otherwise expressly provided in the Act, the liability of each Member to the Company shall be limited to the amount of Capital Contributions required to be made by such Member, from time to time, in accordance with the provisions of this Agreement.

(c) Except as otherwise provided in this Agreement or under applicable Laws or Regulations, the Members shall not be required to lend any funds to the Company or, after its Capital Contributions shall have been made, to make any further contributions to the Company or to repay to the Company, any Member or any creditor of the Company all or any portion of any negative amount in their respective Capital Accounts. Subject to the terms of this Agreement, the Managing Member may, on behalf of the Company or any of its Subsidiaries, at any time and from time to time, apply for and secure

one or more Loans, in such amounts, at such rates and on such other terms as are set forth in the then-applicable Operating Budget and then-applicable Business Plan or as may be agreed by the Members then permitted to approve Major Decisions.  The Company shall use commercially reasonable efforts to either obtain such Loan(s) on a nonrecourse basis or to have such Loan(s) provide that any liability for customary recourse "carveouts" will be limited to the Company and its assets; provided, however, that if such efforts are unsuccessful, each of Cerberus and Chatham shall execute and deliver (or cause one of its Affiliates to execute and deliver) a Carveout Guaranty providing for recourse to such Person solely with respect to actions or omissions affirmatively taken or consented to or approved by such Person or its Affiliates (other than the Company and its Subsidiaries) to each Lender requiring such a guaranty in connection with its Loan, it being understood and agreed that the parties will seek for such Carveout Guaranties to be several so that (A) the Chatham Carveout Guaranty will cap Chatham's exposure under such guaranty by an amount equal to Chatham's Percentage Interest of such potential aggregate guaranty exposure (the "Chatham Cap") and (B) the Cerberus Carveout Guaranty will cap Cerberus's exposure under such guaranty by an amount equal to Cerberus's Percentage Interest of such potential aggregate guaranty exposure (the "Cerberus Cap"); provided, however, if such Lender requires a joint and several Carveout Guaranty from Chatham and Cerberus or requires a guaranty from Cerberus but not Chatham or Chatham but not Cerberus, then, subject to the following proviso, Cerberus or Chatham, as the case may be, as guarantor, may seek contribution and repayment from the other party in accordance with the contribution agreement annexed hereto as Exhibit C so that Chatham's and Cerberus's exposure under the Carveout Guaranty shall not exceed each of the Chatham Cap and Cerberus Cap, respectively; and, provided further, that:

(i)      if the guarantor under any Carveout Guaranty (the "Carveout Guarantor") incurs or suffers any guaranty obligations or liabilities as a result of a default or breach of any covenant with respect to any of the Loan(s) that is (x) directly and immediately caused by such Carveout Guarantor through an action or omission taken without the affirmative consent or approval of the Members other than any Affiliate of such Carveout Guarantor, or (y) directly and immediately caused by a breach or default by such Carveout Guarantor of its obligations under such Carveout Guaranty, then such Carveout Guarantor shall be liable for 100% of all such obligations and liabilities, without any right of contribution against the Company or any of its Members, and, in addition, such Carveout Guarantor shall indemnify the Company, and the Members that are not Affiliates of such Carveout Guarantor for any and all losses, costs, liabilities and damages which the Company or such Members may incur or suffer by reason or such conduct on the part of such Carveout Guarantor;

(ii)      if a Carveout Guarantor incurs or suffers any guaranty obligations or liabilities as a result of a default or breach of any covenant with respect to any of the Loan(s) that is attributable solely to a breach of this Agreement by any Member other than such Carveout Guarantor or its Affiliates, then such Member shall be liable for 100% of all such obligations and liabilities, without any right of contribution against the Company or any of its Members, and, in addition, such Member shall indemnify the Company, the Carveout Guarantor and the Members that are not Affiliates of such Member against any and all losses, costs, liabilities and damages which the Company, the Carveout Guarantor or such other Members may incur or suffer by reason of such conduct on the part of such Member; and

(iii)     if any Carveout Guarantor incurs or suffers any obligations or liabilities under a Carveout Guaranty that are (x) not directly and immediately caused by such Carveout Guarantor through an action or omission taken without the affirmative consent or approval of the Members other than any Affiliate of such Carveout Guarantor, (y) not directly and immediately caused by a breach or default by such Carveout Guarantor of its obligations under such Carveout Guaranty, or (z) attributable solely to a breach of this Agreement by any Member other than such Carveout Guarantor or its Affiliates, in addition to any rights the Carveout Guarantor may have under the contribution agreement with respect to such Carveout Guaranty, such Carevout Guarantor shall be entitled to seek reimbursement and indemnification from the Company with respect to all such obligations and liabilities.

Except as otherwise provided in clauses (i)-(ii) above and subject to the second and third provisos of this <u>Section 1.11(c)</u>, all obligations or liabilities which are incurred or suffered, at any time and from time to time, by any guarantor under a Carveout Guaranty shall be subject to repayment pursuant to the contribution agreement annexed hereto as Exhibit C.  Unless approved by the Members, the terms of each and every Loan shall be such that neither the Loan nor any amounts due thereunder are of the type described in Section 514(c)(9)(B)(ii) of the Code.

Section 1.12   <u>Restructuring</u>.  At any time from and after the Effective Date and prior to the Closing Date, Cerberus may require that the Company be restructured to provide that certain of the Properties to be acquired as part of the transactions contemplated by the Bid instead be acquired by a parallel limited liability company (the Company and such parallel company, the "<u>Parallel Entities</u>"), in which event certain Properties as previously agreed between the Members and any other Properties mutually agreed by the Members shall be owned by the parallel limited liability company.  The Parallel Entities shall be managed and operated in all material respects on the same basis and subject to the same terms and conditions as set forth herein and shall be owned in the same proportion by the same Member (or Affiliates thereof).  All determinations of profits, losses and Net Cash Flow shall be made on a consolidated basis for the Parallel Entities and all caps and other limitations shall apply on an aggregate basis based on the Properties owned by each Parallel Entity.

ARTICLE II.

PERCENTAGE INTERESTS, CAPITAL
CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 2.1   <u>Percentage Interests</u>.  Each Member will receive a Percentage Interest in the Company for such Member's Capital Contributions.

Section 2.2   <u>Capital Contributions</u>.

(a)     <u>Initial Contributions</u>.  During the period commencing on the date hereof and ending on the Closing Date, Cerberus and Chatham shall make one or more Capital Contributions (collectively, the "<u>Initial Capital Contributions</u>") in respect of their respective Initial Capital Contribution Amounts pursuant to Capital Calls issued from time to time in accordance with this Section 2.2 to fund (i) the Deposit, (ii) on the Closing Date, the purchase price under the Bid, and (iii) any other closing costs, fees and expenses incurred in

connection with the transactions contemplated by the Plan and the Bid, including with respect to any Loans.  All such Initial Capital Contributions shall be made pro rata by Cerberus and Chatham in proportion to their relative Initial Capital Contribution Amounts.  Notwithstanding anything in this Agreement to the contrary, the aggregate amount of Chatham's Initial Capital Contribution shall not exceed the lesser of $37,000,000 and 12.5% of the aggregate Capital Contributions (the "Chatham Cap").  In the event that Chatham's ratable share of all Initial Capital Contributions required to be made pursuant to this Section 2.2 would exceed the Chatham Cap, such excess contribution amount shall be funded by Cerberus and Cerberus' Percentage Interest shall be appropriately increased to reflect its relative contribution to the total amount of Initial Capital Contributions made pursuant to this Section 2.2.  In the event that Cerberus or Chatham does not fund its pro rata portion of any Initial Capital Contribution, (x) in the case of Cerberus, Chatham may, on behalf of the Company, enforce the commitment made by Cerberus Series Four Holdings LLC ("Cerberus Series Four"), or (y) in the case of Chatham, Cerberus may, on behalf of the Company, enforce the commitment made by Chatham REIT, in each case in Cerberus Series Four's or Chatham REIT's, as applicable, capacity as a Plan Sponsor to provide equity capital as set forth, and on the terms and conditions contained in, the Bid, taking into account any modifications made at the Auction or otherwise, in accordance with Section 1.9.

(b)    Additional Capital Contributions.  (i) Subject to the terms and conditions of this Agreement, the Managing Member may issue Capital Calls at any time and from time to time if additional capital is required for the conduct of the business of the Company (including without limitation to fund costs and expenses that would be treated as capital expenditures under GAAP), each Member shall be required to contribute its pro rata share of such additional capital in proportion to its Percentage Interest.

(ii)    Notwithstanding anything in this Agreement to the contrary, Cerberus shall have the right, at any time and from time to time, to make a Capital Call, in lieu of allowing the Managing Member to make such Capital Call, or to require the Managing Member to make a Capital Call at the direction of Cerberus and, in either such event, shall not be subject to the conditions and restrictions which would otherwise apply to a Capital Call made by the Managing Member, if Cerberus determines in good faith that the Company requires additional capital to maintain the Properties or otherwise satisfy its existing obligations.

(c)    Payment of Capital Contributions.  Capital Contributions by the Members shall be made in U.S. dollars by wire transfer of federal funds to an account or accounts of the Company specified by the Company.  Except as otherwise provided herein, no Member shall be entitled to any compensation by reason of its Capital Contribution or by reason of serving as a Member.  No Member shall be required to lend any funds to the Company.

(d)    Failure to Fund Capital Contributions.  If a Member shall fail to timely make any Capital Contribution required pursuant to this Section 2.2 (such Member being hereinafter referred to as a "Non-Contributing Member"), the Managing Member shall give the other Members notice of the amount not funded by the Non-Contributing Member (such amount being hereinafter referred to as the "Failed Contribution"), and if one or more of such other Members shall have funded its ratable share of the Capital Contribution in question (each a "Contributing Member" and collectively, the "Contributing Members"),

each Contributing Member shall have the right to fund its pro rata portion of such Failed Contribution (such amount of all or any part of a Failed Contribution funded by such Contributing Member, the "Funded Amount"), and elect, at its sole election, to (i) treat the Funded Amount as an unsecured loan to the Company (a "Member Loan"), repayable solely out of available cash, and bearing interest at the rate of 15% per annum, compounded monthly as of the end of each calendar month, or (ii) treat such Funded Amount as a Capital Contribution by such Contributing Member, in which event (A) such Contributing Member's Capital Contribution and Capital Account shall be increased by 115% of such Contributing Member's Funded Amount, and (B) the Percentage Interest of such Contributing Member shall be increased by such Funded Amount (valued in accordance with the value of Percentage Interests as of the date hereof) and the Percentage Interest of the Non-Contributing Member shall be correspondingly decreased. Any Member Loan shall be secured by a lien in favor of the Contributing Member(s) on the interests of the Non-Contributing Member that owes such obligations. Any Contributing Member or Members electing to treat its Funded Amount as a Member Loan shall receive all distributions payable to the Non-Contributing Member pursuant to Section 7.1 below until such time as the Member Loan shall be paid in full (including all interest thereon); provided that if more than one Contributing Member has made a Member Loan in respect of such Non-Contributing Member's Failed Contribution, each such Contributing Member shall receive its proportionate share of all such distributions based on such Contributing Member's Member Loan as compared to all Member Loans made in respect of such Failed Contribution. In the event that one or more Contributing Members elect to treat their respective Funded Amounts as capital contributions and the Non-Contributing Member subsequently contributes all or any portion of the Failed Contribution amount to the Company pursuant to the 15-day cure period in Section 3.6(a) below, (x) such contributed amount shall be distributed to the Contributing Member(s) pro rata in accordance with their respective Funded Amounts, and (y)(I) the Contributing Members' Percentage Interests shall be decreased by such distribution in respect of its Funded Amount and (II) the Non-Contributing Member's Percentage Interest shall be correspondingly increased.

Section 2.3    Capital Accounts.

(a)    Capital Accounts. A capital account ("Capital Account") shall be maintained for each Member in accordance with this Section 2.3. Without limiting the generality of the foregoing, a Member's Capital Account shall be increased by (i) the amount of money contributed by the Member to the Company, (ii) the initial Gross Asset Value of property contributed by the Member to the Company, as determined by the contributing Member and the Managing Member (net of liabilities that the Company is considered to assume or take subject to pursuant to Code Section 752), (iii) allocations to the Member of Profits pursuant to Article VI, and (iv) the amount of any Company liability assumed by such Member. A Member's Capital Account shall be decreased by (x) the amount of money distributed to the Member, (y) the Gross Asset Value of any property so distributed to the Member as determined by the distributee Member and the Managing Member (net of any liabilities that such Member is considered to assume or take subject to pursuant to Code Section 752), and (z) allocations to the Member of Losses pursuant to Article VI.

(b)     Negative Capital Account.  No Member shall be required to make up a deficit balance in such Member's Capital Account or to pay to any Member the amount of any such deficit in any such account.

(c)     Credit of Capital Contribution.  For purposes of computing the balance in a Member's Capital Account, no credit shall be given for any Capital Contribution which such Member is to make until such Capital Contribution is actually made.

(d)     Transfer.  In the event of a Transfer of all or a portion of a Member's interest in the Company in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferring Member to the extent it relates to the Transferred interest.

Section 2.4     Admission of New Members.  Unless otherwise permitted under Article V, new Members may only be admitted to membership in the Company with the approval of Cerberus and Chatham.  A new Member must agree in writing to be bound by the terms and provisions of the Certificate of Formation and this Agreement, each as may be amended from time to time, and must execute a counterpart of, or an agreement adopting, this Agreement or other related agreements as Cerberus and Chatham may require.  Upon admission, the new Member shall have all rights and duties of a Member of the Company; provided, however, that such new Member shall only be entitled to such voting rights as are expressly provided pursuant to this Agreement.

Section 2.5     Interest.  No interest shall be paid or credited to the Members on their Capital Accounts or upon any undistributed amounts held by the Company.

Section 2.6     Capital Withdrawal Rights, Interest and Priority.  Except as expressly provided in this Agreement, no Member shall be entitled to withdraw or reduce such Member's Capital Accounts in whole or in part until the dissolution, liquidation and winding-up of the Company, except to the extent that distributions pursuant to Article VII represent returns of capital.  A Member who withdraws or purports to withdraw as a Member of the Company without the consent of all of the Initial Members or as otherwise allowed by this Agreement shall be liable to the Company for any damages suffered by the Company on account of the breach and shall not be entitled to receive any payment in respect of its Percentage Interest in the Company or a return of its Capital Contribution until the time otherwise provided herein for distributions to Members.

ARTICLE III.

MANAGEMENT OF THE COMPANY

Section 3.1     Company Governance.  Each Member and the Company hereby agree that the Business and the Company shall be governed by the provisions of this Article III and that, accordingly, the Company shall cause its Subsidiaries to act in accordance with the determinations of the Company made pursuant to this Article III.

(a)     The Company shall generally be managed by the Managing Member, who shall have the overall responsibility for the management, operation and

administration of the Company. The Managing Member is, to the extent of its rights and powers set forth in this Agreement, an agent of the Company and the actions of the Company by and through the Managing Member taken in accordance with such rights and powers shall bind the Company. Except as authorized by the Managing Member or as set forth in this Agreement, no Member shall participate in the management and control of the Business or the Company nor shall any Member have the right or authority to act on behalf of the Company in connection with any matter.

(b)　　Limitation on Liability of Managing Member. The Managing Member shall not, solely by reason of being Managing Member, be personally liable for the expenses, liabilities or obligations of the Company whether arising in contract, tort or otherwise.

(c)　　Compensation and Reimbursement. (i) Not less than five days before the first Business Day of each month, Chatham shall provide the Members with a notice setting forth (x) its good faith estimate of the expenses that it will incur for such month in connection with its duties in its capacity as Managing Member, including, without limitation, Chatham's reasonable costs and expenses of any Chatham Company Personnel, less (y) any amounts paid to Chatham previously in respect of a Monthly Expense Amount in excess of expenses actually incurred by Chatham for such month, plus (z) any expenses actually incurred by Chatham previously with respect to a given month exceeding the Monthly Expense Amount for such month (together, the "Monthly Expense Amount"). So long as neither Chatham nor any of its Affiliates is in material default of its obligations under this Agreement, and such default has not been cured within thirty (30) days after written notice of such default is delivered to Chatham by any other Member, and provided that Chatham has not been removed as the Managing Member pursuant to Section 3.2(h), the Company shall pay to Chatham in its capacity as Managing Member (or, at the written direction of Chatham, to a designated Affiliate of Chatham), on the first Business Day of each month or as promptly as practicable thereafter, an amount equal to the Monthly Expense Amount submitted for such month (the "Expense Reimbursement").

(ii)　　Except as expressly set forth in clause (i) above or in any separate agreement between the Managing Member and the Company, the Managing Member shall not receive compensation or reimbursement of its expenses for its services performed on behalf of the Company or other benefits it provides to the Company.

(iii)　　At any time in connection with its review of Chatham's proposed Monthly Expense Amount for any month, Cerberus may in its reasonable discretion require that Chatham eliminate the position(s) associated with particular Chatham Company Personnel and no longer include the costs associated with such position(s) as part of Chatham's Monthly Expense Amount, beginning with the Monthly Expense Amount that is three months after Chatham is notified of such requirement from Cerberus; provided, that the Managing Member shall be permitted to include in the applicable Monthly Expense Amount for the month in which such expenses are to be paid all severance and related costs incurred in connection with the termination of such Chatham Company Personnel at Cerberus' request, to the extent the grant to such terminated Chatham Company Personnel of such severance obligation was approved by Cerberus at the time of grant.

Section 3.2    Authority, Duties and Obligations of the Managing Member.

(a)    The Member designated as the Managing Member (i) shall conduct and manage the day-to-day affairs of the Company in accordance with (A) the standard of care required of prudent and experienced joint venture managers and of third party asset and property managers performing similar functions for similar properties, (B) customary industry standards, and (C) the then-approved Operating Budget and the then-approved Business Plan, in each case subject to the limitations on the Managing Member's authority and the rights granted solely to other Members set forth in this Agreement; (ii) shall perform the duties assigned to it hereunder; and (iii) shall use its best efforts to carry out all decisions permitted to be made unilaterally by Cerberus pursuant to this Agreement. In addition to the foregoing, the authority of the Managing Member shall be limited where (x) any Member's consent or approval is expressly required under this Agreement, (y) the consent or approval of any of the Members is expressly required by a non-waivable provision of applicable law, or (z) the Managing Member's authority is otherwise limited or rights are otherwise granted solely to other Members by the terms of this Agreement.

(b) In furtherance of the foregoing, and subject in each case to the terms of this Agreement, including the restrictions on the Managing Member set forth in Section 3.6(b), the Managing Member shall (i) use commercially reasonable efforts to enforce all agreements entered into by the Company; (ii) use commercially reasonable efforts to cause the Company at all times to perform and comply with the provisions (including, without limitation, any provisions requiring the expenditure of funds) of any loan commitment, agreement, mortgage, lease or other contract, instrument or agreement to which the Company is a party or which affects any Property; (iii) subject to the availability of the funds therefor, pay in a timely manner all non-disputed operating expenses of the Company in accordance with the terms of the then-approved Operating Budget and the then-approved Business Plan; (iv) subject to the availability of the funds therefor, obtain and maintain insurance coverage with respect to the Properties, at customary levels and in any event consistent with the requirements of any Loans, and, subject to the availability of the funds therefor, pay all non-disputed taxes, assessments, charges and fees payable in connection with the ownership, operation and sale of the Properties; (v) devote sufficient time to the performance of its duties hereunder in accordance with good industry practice and this Agreement; and (vi) provide Cerberus with copies of all material correspondence and other communications with any Lender pertaining to any Loan, as and when the same are delivered or received.

(c)    The Managing Member hereby covenants and agrees that it shall cause its personnel, including all Chatham Company Personnel, to perform and/or supervise the performance of, as applicable, all of the day-to-day activities and/or duties required of the Managing Member under the terms of this Agreement; and (ii) no Chatham Company Personnel shall spend any business time as an employee of Chatham on any project(s) other than the Business of the Company and its Subsidiaries.

(d)    Promptly following any request therefor by any Initial Member, the Managing Member shall deliver to such Initial Member a counterpart copy of any agreement, certificate or other document executed and delivered by the Managing Member in

the name of or on behalf of the Company, and shall otherwise make available to any Initial Member all of the books and records of the Company that are in the possession or control of the Managing Member during reasonable business hours; provided, that from and after the occurrence of a Termination Event, this paragraph (d) shall apply only to the Cerberus Initial Members, and the Chatham Initial Members shall no longer have any of the rights set forth in this paragraph (d).

(e)     Provided that Chatham has not been removed as the Managing Member pursuant to Section 3.2(g) hereof, Jeffrey Fisher and the other officers of the Managing Member shall at all times oversee the fulfillment of the duties of the Managing Member hereunder.  Except as expressly provided or permitted herein, the Managing Member shall not delegate any of its rights or powers to manage and control the business and affairs of the Company without the prior written consent of Cerberus.

(f)     The Managing Member hereby covenants and agrees that it shall not hold itself out to any third party as having any authority to act for or on behalf of the Company, or to bind the Company in any manner, other than to the extent that such authority is expressly granted to the Managing Member in Section 3.2(a) or otherwise granted herein or in writing by Cerberus.  The Managing Member hereby acknowledges and agrees that notwithstanding anything set forth in this Section 3.2 to the contrary, the Managing Member shall not have any authority to act on behalf of the Company or to execute any documents, agreements or instruments on behalf of the Company other than to the extent that such authority is set forth in Section 3.2(a) or otherwise expressly granted under this Agreement or in writing by Member, and the Managing Member, acting in such capacity, shall be subject, in all events, to the then-approved Operating Budget and Business Plan of the Company.

(g)     Notwithstanding anything set forth in Section 3.2(a)-(h) hereof to the contrary, Cerberus shall have the power and authority, on behalf of the Company, to request, authorize and approve each of the following without the approval or consent of any other Member:

(i)     Compel, cause and undertake the liquidation of the Company and take all actions related thereto, including the disposition of all then remaining Properties, at any time following the fifth (5th) anniversary of the date hereof, so long as such liquidation will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT; provided, however, that Cerberus shall keep the other Initial Members reasonably informed of any material actions undertaken pursuant to this clause (i) with respect to intended, planned or pending dispositions;

(ii)     Demand and receive an updated Operating Budget and Business Plan from the Managing Member, at any time and from time to time but in any event no more than once each fiscal quarter, together with such other reporting items or information as Cerberus may reasonably require;

(iii)     Audit the books and records of the Company and any Property Companies; provided, however, that the Company shall only be required to pay for one such audit per calendar year, and any additional audits requested by Cerberus in any given calendar year shall be paid for by Cerberus;

(iv)     Compel, cause and undertake the disposition of any Property in an arms length transaction to any Person other than Cerberus or an Affiliate of Cerberus, so long as such disposition will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT; provided, however, that Cerberus shall keep the other Initial Members reasonably informed of any material actions undertaken pursuant to this clause (iv) with respect to intended, planned or pending dispositions;

(v)     Take any action which may be reasonably necessary for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware; provided, however, that Cerberus shall keep the Managing Member reasonably informed of any material actions undertaken pursuant to this clause (v); and

(vi)     Approve any restructuring plan or take or refraining from taking any other action relating to the restructuring of the Company, any Property or any Loan, so long as such restructuring will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that the Company were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), (F) otherwise jeopardize the REIT status of Chatham REIT, or (G) be more adverse to any Member other than Cerberus than it is to Cerberus; provided, that the restrictions contained in this clause (G) shall not apply to a restructuring of the Company, any Property or any Loan to the extent Cerberus has made a good faith determination that such restructuring is reasonably necessary to avoid, or mitigate the effects of, an existing default or an impending or imminent default under any Loan or franchise agreement and that the disproportionately adverse impact is reasonably necessary to consummate the restructuring on terms that, in Cerberus' good faith judgement, are in the aggregate most

favorable to the Company; <u>provided</u>, <u>further</u>, that Cerberus shall keep the Managing Member reasonably informed of any material actions undertaken pursuant to this clause (vi).

(h) Upon the occurrence of a Termination Event, Cerberus shall have the right, in its sole and absolute discretion, to remove Chatham as Managing Member hereunder; <u>provided</u>, that if Cerberus removes Chatham as Managing Member as a result of an event described in clause (b) of the definition of Termination Event, (x) Chatham shall no longer be entitled to any distributions of any Promoted Interest (it being understood that Chatham shall remain entitled to all other distributions contemplated hereby), and (y) Chatham shall not be entitled to receive reimbursement of any Wind-Down Expenses (as defined below). In the event that Cerberus removes Chatham as Managing Member pursuant to this Section 3.2(h), (i) Cerberus shall have the right, in its sole and absolute discretion, to either become or designate an Affiliate to become the Managing Member of the Company or cause the Company to engage a third-party manager for the Company's business, (ii) the consent of Chatham shall no longer be necessary for any Major Decision other than a Post-Termination Major Decision, and (iii) except as set forth above, upon its removal as Managing Member, Chatham may submit to the Company and the other Members a good faith estimate of the amount of expenses (the "<u>Wind-Down Expenses</u>") it will reasonably incur in connection with the wind-down of its duties in its capacity as Managing Member, including without limitation Approved Severance Costs, together with reasonably detailed backup for such estimate, and the Company will promptly pay such amount to Chatham (or, at the written direction of Chatham, to a designated Affiliate of Chatham); <u>provided</u>, that in no event shall the Company be required to pay to Chatham under this Section 3.2(h) Wind-Down Expenses in excess of $500,000 unless such excess amounts result from liabilities or obligations incurred in accordance with the applicable Operating Budget and Business Plan as approved by Cerberus at the time of incurrence as potential Wind-Down Expenses, or as otherwise approved in writing by Cerberus as potential Wind-Down Expenses.

Section 3.3    <u>Managing Member Certifications</u>.  Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate issued by the Company that is signed by the Managing Member or any of the Officers as to any of the following:

(a) the identity of any Member or Officer or other agent of the Company;

(b) the existence or nonexistence of any fact or facts which constitute(s) a condition precedent to acts by the Managing Member or the Members;

(c) the Person or Persons authorized to execute and deliver any instrument or document of the Company; or

(d) any act or failure to act by the Company or any other matter whatsoever involving the Company.

Section 3.4    <u>Officers</u>.

(a) <u>Principal Officers</u>.  The Officers of the Company shall be a President and Chief Executive Officer, and may be a Chief Operating Officer, Chief

Financial Officer, Secretary, Treasurer, one or more Vice Presidents, and one or more Assistant Treasurers or Assistant Secretaries.

(b)　　Other Officers.  The Managing Member may also appoint such other Officers and agents as it shall deem necessary who shall hold their offices for such terms and shall, subject to the limitations set forth herein, exercise such powers and perform such duties as shall be determined from time to time by the Managing Member.

(c)　　Compensation.  The compensation of all Officers and all officers of the Subsidiaries shall be fixed by, and paid by, the Managing Member; provided, however, that their salaries shall conform to any employment agreement approved by the Members, to the extent required by this Agreement and entered into between the Company or any Subsidiary and any Officer.  In no event shall the Company be required to pay any compensation to any Officer.

(d)　　Authority of Officers.

(i)　　The President and Chief Executive Officer (or "President and CEO") of the Company shall have general and active management of the Company, shall have the responsibility for the day-to-day management and operation of the Company, and shall see that all lawful orders and resolutions are carried out.  The President and CEO shall execute bonds, mortgages and other contracts except where the signing and execution shall be expressly delegated by the Members or, to the extent permitted by this Agreement, the Managing Member to one or more other officers or agents of the Company.

(ii)　　If appointed, the Chief Operating Officer, Chief Financial Officer, Vice Presidents, Treasurer, Secretary, Assistant Treasurers and Assistant Secretaries shall have the powers and duties described in this Section 3.4, as may be modified from time to time by the Managing Member:

1)　　Chief Operating Officer.  The Chief Operating Officer shall have responsibility for the day-to-day management and operation of the Business, general oversight of the operation of the Company's operations and employees, and other such duties and responsibilities as determined by the President and CEO or the Managing Member.

2)　　Chief Financial Officer.  The Chief Financial Officer shall have responsibility for the day-to-day management and general oversight of the accounting and finance function of the Company and supervision of any Treasurer and Assistant Treasurers, and other such duties and responsibilities as determined by the President and CEO, the Chief Operating Officer or the Managing Member.

3)　　The Vice Presidents.  The Vice Presidents shall perform such duties and have such powers as the Managing Member or the President and CEO or the Chief Operating Officer may from time to time prescribe.

4)　　The Secretary; Assistant Secretary.  The Secretary shall attend all meetings of the Members and record all the proceedings of the meetings of the Company and of

the Members in a book to be kept for that purpose and shall perform like duties for any standing committees when required. He or she shall give, or cause to be given, notice of all meetings of committees of the Company, and shall perform such other duties as may be prescribed by the Managing Member or the President and CEO, under whose supervision he or she shall be. In the absence of the Secretary or in the event of his or her incapacity or refusal to act, or at the direction of the Secretary, any Assistant Secretary may perform the duties of the Secretary.

5) The Treasurer; Assistant Treasurer. The Treasurer shall have the custody of the Company's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Members. The Treasurer shall disburse the funds of Company as may be ordered by the Members or, to the extent permitted by this Agreement, the Managing Member, President and CEO, Chief Financial Officer or Chief Operating Officer, taking proper vouchers for such disbursements, and shall render to the President and CEO, Chief Operating Officer, Chief Financial Officer and Managing Member, or when any Officer so requires, an account of all transactions as treasurer and of the financial condition of the Company.

(e) Limitations on Officer's Powers. Notwithstanding any other provision contained in this Agreement to the contrary, should a delegation of authority be established by the Managing Member, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by any Officer on behalf of the Company other than in accordance with such delegation of authority.

(f) Term of Officers. (i) An Officer may resign at any time by giving written notice to the Managing Member. The resignation of an Officer shall take effect upon the Managing Member's receipt of written notice of the Officer's resignation or at such later time as shall be specified in the written notice. Unless otherwise specified in the Officer's written notice of resignation, the acceptance of the Officer's resignation shall not be necessary to make it effective. If the Officer also is a Member, the Officer's resignation as an Officer shall not affect the Officer's rights as a Member and shall not constitute a withdrawal of the Officer as a Member.

(ii) The Managing Member may terminate the employment of and/or remove any Officer with or without cause.

(iii) The Managing Member may elect at any time a new or replacement Officer to fill any vacancy.

Section 3.5 Operating Budget and Business Plan. (a) For the period beginning on the Closing Date and ending on December 31, 2011, the Company shall operate in accordance with the current Operating Budget (in the form annexed hereto as Exhibit D) prepared by the Debtors and a Business Plan to be mutually agreed by the Members. Thereafter, the Operating

Budget and Business Plan shall be prepared and submitted annually by the Managing Member (or the Hotel Manager at the direction of the Managing Member) to the Initial Members for approval at least thirty (30) calendar days prior to the end of each fiscal year with respect to the following fiscal year which shall, in the case of the Operating Budget, set forth, *inter alia*, all anticipated revenues, operating expenses, capital expenditures, renovation budgets, renovation schedules and reserves for the Company during such period, and, in the case of the Business Plan shall set forth, *inter alia*, the Company's strategy for the marketing and operation of each of the Properties and an estimate of the amount, timing and reason for all anticipated Capital Contributions from the Members during such period; <u>provided</u>, that if the Managing Member should fail to timely prepare and submit in proposed form any such Operating Budget and Business Plan, Cerberus shall be authorized to prepare such Operating Budget and Business Plan for the approval of the Initial Members. Whenever the Managing Member determines that revisions to the then-approved Operating Budget or Business Plan would be in the best interests of the Company, the Managing Member may submit such proposed revisions to such Operating Budget and/or Business Plan to Cerberus for its review; <u>provided</u>, <u>however</u>, that all amendments and modifications to the then-approved Operating Budget or Business Plan shall require the approval of Cerberus, which approval may be granted or withheld by Cerberus in its sole and absolute discretion.

(b)  Notwithstanding Section 3.5(a), in the event that the Initial Members are unable to agree on all or certain provisions of an Operating Budget or Business Plan for a given year, the Managing Member will conduct the business of the Company pursuant to those provisions of such Operating Budget or Business Plan which are agreed-upon and adopted. With respect to any aspects of the business of Company that are not addressed by the Operating Budget or Business Plan for that given year, the Managing Member is authorized and directed to cause the employees of the Company to conduct such aspect of the business of the Company in accordance with the guidelines set forth in the most recently approved Operating Budget or Business Plan, as applicable, and otherwise in accordance with prior practice; <u>provided</u>, however, that, if applicable, the Managing Member may adjust the annual compensation of the employees of the Company and other expenses of the Company for inflation.

Section 3.6    <u>Voting Rights of Members</u>.

(a)  Members shall have no right or authority to vote on matters other than matters explicitly requiring such vote in this Agreement or in the Act. For matters set forth in this Agreement explicitly requiring a vote of the Initial Members, such matters shall require the vote of all Initial Members. In the event any Initial Member shall transfer less than all of its Percentage Interest to an unaffiliated third party in a transaction or in a series of transactions, then the portion of such Initial Member's votes that is equal to the portion of such Initial Member's Percentage Interest transferred shall be deemed cancelled and the transferee (if an unaffiliated third party) in such transfer shall not have the right to vote on any matter as an "Initial Member". In the event any Initial Member shall transfer its entire Percentage Interest held on the date of such transfer to an unaffiliated third party in a transaction or in a series of transactions, then all of the votes of its Percentage Interest on the date of such transfer shall be deemed to have been transferred to such transferee upon the satisfaction of the conditions contained in Article V and such transferee shall not have the

right to vote on any matter as an "Initial Member". Notwithstanding the foregoing, if at any time a Member (i) shall transfer more than 50% of such Member's Percentage Interest (excluding, however, transfers made by such Member to a Permitted Transferee), or (ii) shall be in default with respect to its obligations to fund additional capital contributions pursuant to Section 2.2 above, the remaining votes of such Member shall be deemed cancelled and such Member shall have no voting rights except as otherwise required by the Act; provided, that in the case of clause (ii), (x) to the extent Contributing Member(s) elect to treat their respective Funded Amounts as loans and such Non-Contributing Member repays all such loans (including all interest thereon) within 15 days, the voting rights of such Member shall be reinstated and (y) to the extent the Contributing Member(s) elect to treat their respective Funded Amounts as capital contributions, the Company shall provide notice to such Non-Contributing Member on the next Business Day indicating such election and the voting rights of such Non-Contributing Member shall be deemed cancelled if the Non-Contributing Member does not provide its capital contribution to the Company within 15 days after receipt of such notice.

(b)     Notwithstanding anything to the contrary in this Agreement, unless expressly set forth in this Agreement (including pursuant to Section 3.2(h) above), the Company shall not approve or take, and neither the Managing Member shall take or cause the Company to take or approve, any action with respect to any Major Decision without the affirmative vote or written consent of all of the Initial Members.

Section 3.7     Buy/Sell. At any time on or after the second anniversary of the Effective Date, any Initial Member (a "Notifying Member") has the right (the "Buy/Sell Right") to give written notice to the non-notifying Initial Members (each a "Non-Notifying Member") to require that the Non-Notifying Members (i) buy all, but not less than all, of the Percentage Interest of the Company of the Notifying Member or (ii) sell all, but not less than all, of the Non-Notifying Members' Percentage Interest to the Notifying Member; provided, that no Member shall be entitled to exercise its Buy/Sell Right if, at the time of such Member's election to so exercise, such Member is in default of any of its obligations hereunder. The Buy/Sell Right shall be exercised in accordance with the following provisions:

(i)     The Notifying Member shall deliver to the Non-Notifying Member or Members, as the case may be, a written notice (a "Buy/Sell Notice") (by both facsimile and certified mail) setting forth (A) its intention to exercise the Buy/Sell Right contained herein, (B) describing all oral or written offers, if any, received by the Notifying Member during the previous twelve calendar months relating to the acquisition, financing or leasing of all or any portion of the Properties. On or before the 20th day following its receipt of a Buy/Sell Notice, each Non-Notifying Member may notify the Notifying Member (the "Election Notice") whether it elects either (i) to sell its Percentage Interest for an amount equal to the amount that it would be entitled to receive if the Company had sold its assets for the Valuation Amount (as defined below) on the closing date of the Buy/Sell Right transaction, determined in accordance with Section 3.7(a)(iv) (the "Buy/Sell Closing Date") and immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members (a "Sell Notice") or (ii) to buy the Percentage Interest of the Notifying Member at an amount equal to the amount that the Notifying Member would be entitled to receive if the Company had sold its assets for Valuation Amount on the Buy/Sell Closing Date and

immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members (a "Buy Notice"). If a Non-Notifying Member fails to deliver an election notice within that time, it will be deemed to have delivered a Sell Notice.

        (ii)    Promptly after a Buy/Sell Notice is delivered, the Notifying Member and the Non-Notifying Member or Members, as the case may be, shall attempt to reach agreement on the value of the assets of the Company as of the Buy/Sell Closing Date, free and clear of all liabilities (the "Valuation Amount"). Within fifteen (15) days after such Buy/Sell Notice is delivered, the Notifying Member on the one hand and the Non-Notifying Member or Members, as the case may be, on the other hand shall submit to the other an estimate of the Valuation Amount. If the estimates vary by ten percent (10%) or less of the greater value, the Valuation Amount shall be determined by calculating the average of the two submitted values. In the event that either the Notifying Member on the one hand and the Non-Notifying Member or Members, as the case may be, on the other hand fail to submit an estimate within the required fifteen (15) day period and if such failure continues for five (5) days after notice of such failure from the other, such failure shall be deemed for all purposes to constitute acceptance of the single estimate submitted in a timely fashion. If the two estimates vary by more than 10%, then such Members shall appoint HVS International or another independent, nationally recognized valuation expert mutually agreeable to such Members as an independent appraiser (the "Independent Appraiser") to determine the Valuation Amount. The Independent Appraiser shall be instructed to determine the Valuation Amount at least fifteen (15) days prior to the Buy/Sell Closing Date, and the determination of the Independent Appraiser shall be final and binding upon the Members; provided that in no event shall the Valuation Amount as determined by the Independent Appraiser be less than the lowest estimate or greater than the highest estimate submitted by the Members pursuant to this Section 3.7(a)(ii). In connection with any valuation process, including the generation and submission of estimates to each other by the Members, (A) the Members shall consult with each other to determine what information shall be provided to the Independent Appraiser, (B) the Members shall provide the Independent Appraiser and the other Members full access during normal business hours to examine all pertinent books, records and files, agreements and other operating agreements, and (C) each Member shall provide the other Members with copies of any information, document, file, agreement or data concurrently with its provision to the Independent Appraiser. The fees and expenses of the Independent Appraiser shall be borne by the Company.

        (iii)    If one or more of the Non-Notifying Members deliver or are deemed to have delivered a Sell Notice and one or more Non-Notifying Members deliver or are deemed to have delivered a Buy Notice, then the Notifying Member and each Non-Notifying Member that delivered a Sell Notice will sell their Percentage Interest to the Non-Notifying Member(s) that delivered a Buy Notice, and such Non-Notifying Members shall purchase such Percentage Interests pro rata based on the aggregate Percentage Interest represented by such Non-Notifying Members. Within five (5) Business Days after an election has been made under Section 3.7(a)(i), or, if later, three (3) Business Days after final Valuation Amount is determined, the purchasing Member shall deposit with the selling Member a non-refundable earnest money deposit in an amount equal to 10% of the amount which the selling Member is entitled to receive for its Percentage Interest hereunder. Such deposit shall be applied to the purchase price due to the selling Member at closing; provided, however, that if the purchasing Member should thereafter fail to consummate the transaction, such deposit shall be retained as liquidated

damages by the selling Member, free of all claims of the acquiring Member, and the purchasing Member shall thereafter be permanently barred from initiating the exercise of the Buy/Sell Right pursuant to this Section 3.7. The Members agree that damages would be suffered by the selling Member as a result of any such default on the purchasing Member's part, that such damages would be difficult or impossible to determine, and that the amount of the deposit represents a reasonable estimate of what such damages would be.

(iv)     The closing date of the purchase and sale shall be the 90th day after the last Election Notice was received or deemed received, (or if that day is not a Business Day, on the next succeeding Business Day), or if later the fifth Business Day after all regulatory approvals required for the purchase and sale have been obtain, or at such other time as the Initial Members may agree. At that time (x) the selling Member(s) shall sell, assign, and deliver its Percentage Interest, and the selling Member(s) and their Affiliate(s), as applicable, shall sell, assign, and deliver their respective Percentage Interests so specified to the purchasing Member(s) free and clear of all liens, security interests and adverse claims, together with such instruments of transfer, evidence of the absence of all liens, security interests or adverse claims, and evidence of due authorization, execution, and delivery of all related documentation as the purchasing Member(s) reasonably may request; and (y) the purchasing Member(s) shall pay the selling Member(s) the amount that each would be entitled to receive if the Company had sold its assets for Valuation Amount on the Buy/Sell Closing Date and immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members. Each Member will bear its own costs associated with the purchase and sale.

(v)     On the closing, each selling Member shall cease to be a member of the Company, and its Percentage Interest shall vest in the purchasing Member(s).

(vi)     If any Member fails to purchase and pay for any Percentage Interests as and when provided in the preceding provisions of this Section 3.7, then the selling Members may either (A) pro rata based on their respective Percentage Interests or as they otherwise may agree, at their election by notice to the defaulting Member at any time on or before the 30th day after the date the sale was to have been consummated, elect to purchase the Percentage Interest of the Member so defaulting and its Affiliates for a price calculated by multiplying 75% by the amount that the defaulting Member and its Affiliates would be entitled to receive if the Company had sold its assets for Valuation Amount on the Buy/Sell Closing Date and immediately thereafter paid all of its liabilities in full and distributed the net proceeds resulting from such sale to the Members; provided, that the closing of this purchase and sale otherwise shall occur as provided in Section 3.7(iv), but with any time periods measured from the date of the notice under this Section 3.7(vi); or (B) retain the defaulting Member's earnest money deposit as liquidated damages for such default, the Members hereby acknowledging and agreeing that (1) it would be difficult or impossible to determine the damages suffered by the selling Members on account of the purchasing Member's default, and (2) the amount of the deposit represents a reasonable estimate of such damages; provided, that in the event that the purchasing Member failed to make its earnest money deposit as required by 3.7(a)(iii) hereof, the selling Members shall have the right, in lieu of receiving liquidated damages pursuant to this Section 3.7(a)(vi), to seek and obtain an award or judgment against the purchasing Member in the amount of the required earnest money deposit, together with any reasonable attorneys' fees and disbursements incurred in obtaining such award or judgment.

(vii)    If the selling Member should default in its obligation to sell in accordance with this Section 3.7, the acquiring Member shall be entitled to either (A) demand and receive a return of the earnest money deposit which it previously deposited with the selling Member, and, upon the return of such deposit, the selling Member's default hereunder shall be deemed to have been waived; provided, however, that if the selling Member fails to return such deposit to the acquiring Member, the purchasing Member shall have the right to seek and obtain an award or judgment against the selling Member in the amount of such deposit, together with any reasonable attorneys' fees and disbursements incurred in obtaining such award or judgment; or (B) seek specific performance of the selling Member's obligations under this Section 3.7, the Members hereby acknowledging and agreeing that the remedy at law for breach of the obligations of the selling Member under this Section 3.7 would be inadequate in view of (x) the impossibility of accurately calculating the damages which would be suffered by the acquiring Member upon a default by the selling Member, and (y) the uniqueness of the Properties.

(viii)    The preceding provisions of this Section 3.7 shall not apply to any Percentage Interest from and after the first time Percentage Interests are issued or sold through a registered offering under the Securities Act.

ARTICLE IV.

GENERAL GOVERNANCE

Section 4.1    Other Ventures.

(a)    It is expressly agreed that each Initial Member, and any Affiliates, officers, directors, trustees, managers, stockholders, members, partners or employees of such Initial Member, may engage in other business ventures of every nature and description, whether or not in competition with the Company, independently or with others, and neither the Company nor the other Members shall have any rights in and to any independent venture or activity or the income or profits derived therefrom; the pursuit of other ventures and activities by any such Person is hereby consented to by each Member and shall not be deemed wrongful or improper.

(b)    Nothing in this Agreement shall be construed so as to prohibit any Member or its respective Affiliates, officers, directors, managers, stockholders, members, partners or employees from owning, operating or investing in any business of any nature and description, independently or with others and no Member need disclose its intention to make any such investment to the other, nor advise the Company of the opportunity presented by any such prospective investment.

(c)    Notwithstanding the foregoing, in the event that any Member receives an opportunity directly related to any Property, such Member shall first offer such opportunity, to the extent relating to any Property, to Cerberus and Chatham on behalf of the Company.  If either Cerberus or Chatham (i) declines on behalf of the Company to participate in such opportunity or (ii) is deemed to decline on behalf of the Company to participate in such opportunity as a result of a failure to approve participation by the Company within 10 Business Days of such offer, but either Chatham or Cerberus, as

applicable, as the non-presenting Member wishes to participate in such opportunity in its own capacity, Chatham or Cerberus, as applicable and the presenting Member shall participate in such opportunity on such basis as they shall agree or, in the absence of such agreement, in proportion to their then equity percentages in the Company. If the Company and each Member thereof rejects such opportunity, the presenting Member may exploit such opportunity in any manner it sees fit, provided that the presenting Member is not provided materially more favorable terms in the aggregate with respect to such opportunity than were presented to the Company, or the non-presenting Member in connection with their potential participation.

Section 4.2    Information.  The Company covenants and agrees, and the Managing Member shall cause the Company, to deliver to each Member (a) consolidated financial reports of the Company audited by PricewaterhouseCoopers LLP or such other independent accounting firm of national reputation for the Company and its subsidiaries, within 90 days after the end of the Fiscal Year of the Company; (b) consolidated quarterly unaudited financial reports for the Company, setting forth (i) an itemized breakdown of all income and expenses of the Company for such quarter, (ii) a reconciliation of actual revenues and expenses as compared with the projected Budget amounts for such items, together with a detailed explanation of any noted discrepancies, (iii) an update on the progress of the Company's business as compared to the then-approved Business Plan, and (iv) such other updates and information as may reasonably be requested by Cerberus within 45 days after the end of each fiscal quarter of the Company; (c) consolidated monthly financial reports for the Company within 30 days after the end of the each month; and (d) such other information and data (including such information and reports made available to any Lender of the Company or any of its Subsidiaries under any credit agreement or otherwise) as from time to time may be reasonably requested by Cerberus.  All information provided by the Managing Member pursuant to Sections 4.2 and 4.3 shall be certified by an officer of the Managing Member (or, for so long as Chatham is the Managing Member, by the senior-most employee of Chatham that is a member of the Chatham Company Personnel) as to its truth, completeness and authenticity.

Section 4.3    Access.  The Company shall, and shall cause its Subsidiaries, Officers, directors, trustees, members, employees, auditors and other agents to (a) afford the Officers, employees, auditors and other agents of the Members during normal business hours and upon reasonable notice reasonable access to its officers, employees, auditors, legal counsel, properties, offices, plants and other facilities and to all books and records and (b) afford each Initial Member the opportunity to discuss the Company's affairs, finances and accounts with the Officers or Managing Member from time to time as each such Initial Member may reasonably request without creating an undue burden on the Company, including, without limitation, but in particular, upon notice that a vote is required with respect to a Major Decision; provided, that the Company shall not be required to afford any Chatham Initial Member such opportunity from and after the occurrence of a Termination Event except with respect to a Post-Termination Major Decision.

Section 4.4    Affiliate Transactions.

(a)    Neither the Company nor any Property Company shall enter into any agreement for the performance of any service or activity, or for the purchase of any item,

with an Affiliate of a Member (other than the Hotel Management Agreements with Island Hospitality Management), without first receiving the prior written approval of the Initial Members, which approval may be withheld in each such Member's sole and absolute discretion; provided, that, from and after the occurrence of a Termination Event, the prior written approval of the Chatham Initial Members shall no longer be required so long as any such arrangement is on an arms' length basis.

(b)     Notwithstanding anything set forth in Section 3.2 or Section 3.6 hereof to the contrary, an Initial Member, acting alone and on behalf of the Company and any then existing Property Companies, may enforce and make all decisions under or in connection with agreements between the Company or any Property Company, on the one hand, and the other Initial Member and/or its Affiliates, on the other hand, provided that for purposes of this Section 4.4(b) Island Hospitality Management shall be considered an Affiliate of Chatham.

ARTICLE V.

TRANSFERS OF INTERESTS

Section 5.1     Restrictions on Transfer.

(a)     No Transfer shall be made by either Chatham or Cerberus with respect to all or any portion of its Interest without the prior written approval of the non-Transferring Member unless such Transfer is (i) pursuant to Section 3.7 of this Agreement, or (ii) to a Permitted Transferee of such Member.  No Member will have the ability to directly or indirectly syndicate its Interest to unaffiliated co-investors.

(b)     The Company, each Member, the Managing Member, the Officers and any other Person or Persons having business with the Company need only deal with Members who are admitted as Members or as additional or substitute Members of the Company, and they shall not be required to deal with any other Person by reason of a Transfer by a Member.  In the absence of a transferee of a transferring Member's Percentage Interest being admitted as a Member as provided herein, any payment to a Member shall release the Company and the Members of all liability to any other Persons who may be interested in such payment by reason of an assignment by such Member.

(c)     Each transferee, as a condition to its admission as a Member, shall execute and deliver to the Company such instruments (including a counterpart of this Agreement), in form and substance reasonably satisfactory to the Managing Member, as the Managing Member shall reasonably deem necessary or desirable to confirm the agreement of such transferee to be bound by all the terms and provisions of this Agreement (as it may be amended in connection with the admission of such transferee as a Member).  The Members agree to amend this Agreement to the extent necessary to reflect the Transfer and admission of the new Member and to continue the Company without dissolution.  Upon execution of such instruments, the transferee shall be admitted to the Company as a Member. Immediately following the admission of the transferee to the Company as a Member, any Person who has thereby transferred all of its ownership interest in the Company shall cease to

be a Member of the Company. Except as set forth herein, any transferee who is admitted to the Company as a Member shall succeed to the rights and powers, and be subject to the restrictions and liabilities, of the transferor Member to the extent of the Percentage Interest transferred.

(d)     In the event that the Members determine to sell all but not less than all of their Percentage Interest in the Company (including pursuant to Section 3.7 hereof), the Tax Matters Member will propose a schedule (the "Allocation Schedule") to the Initial Members of the Company allocating the expected purchase price in accordance with Section 1060 of the Code. Upon the affirmative vote of each of the Initial Members of the Company (or, from and after the occurrence of a Termination Event, the Cerberus Initial Members), such proposed allocation will be the Allocation Schedule that will be proposed by the Members in connection with the potential sale and, if no objection is made to such Allocation Schedule by the third party purchaser of the Percentage Interests, will be final and binding in connection with such sale upon the Members.

Section 5.2     Non-Permitted Transfers.

(a)     Any purported Transfer of all or any portion of a Member's Percentage Interest of the Company or any economic benefit or other interest therein not in compliance with Section 5.1 shall be null and void ab initio, regardless of any notice provided to any of the parties hereto, and shall not create any obligation or liability of any of the parties hereto to the purported transferee, and any Person purportedly acquiring all or any portion of any Percentage Interest or any economic benefit or other interest therein transferred not in compliance with Section 5.1 shall not be entitled to admission to the Company as a substitute Member. In the event of any direct or indirect Transfer of an interest in a Member, other than a Transfer permitted under Article V hereof, the Member that has made such Transfer shall not be necessary for any Major Decision until such Transfer has been rescinded or otherwise nullified, except that the consent of such Member shall still be required to amend this Agreement.

(b)     In the case of an attempted Transfer of all or any portion of any Percentage Interest of the Company or any economic benefit or other interest therein that is not in compliance with Section 5.1, the parties engaging or attempting to engage in such Transfer shall indemnify and hold harmless the other parties hereto and their respective officers, directors, affiliates, members, partners and employees from all cost, liability and damage that any of such indemnified persons may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and the enforcement of this indemnity.

(c)     No Member, including any assignee or successor in interest of any Member, shall Transfer all or any portion of its Percentage Interest of the Company or any economic benefit or other interest therein if such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the Regulations promulgated thereunder.

# ARTICLE VI.

## ALLOCATIONS

Section 6.1    <u>General Rules</u>.

(a)    <u>Allocations of Profits and Losses</u>.  Except as otherwise provided in this Article VI, Profits and Losses for any Fiscal Period shall be allocated among the Members in such manner that, as of the end of such Fiscal Period, the respective Capital Accounts of the Members shall be equal to the respective amounts that would be distributed to them, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Gross Asset Value and (ii) distribute the proceeds of liquidation pursuant to Section 10.3.

Section 6.2    <u>Other Allocation Rules</u>.

(a)    For purposes of determining the Profits, Losses or other items allocable to any Fiscal Period, Profits, Losses and such other items shall be determined on a daily, monthly or other basis as determined by the Tax Matters Member in its reasonable discretion using any permissible method under Code Section 706 and the Regulations thereunder.

(b)    The Members are aware of the United States federal income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

(c)    All items of income, gain, loss, deduction, or credit and any other allocations not otherwise provided for shall be allocated among the Members as determined by the Tax Matters Member in its reasonable discretion.

(d)    If a Member transfers all or a portion of its Percentage Interest during any Fiscal Period, then Profits, Losses, each item thereof and all other items attributable to the transferred interest for such Fiscal Period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests in the Company during the Fiscal Period in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by the Tax Matters Member in its reasonable discretion.

Section 6.3    <u>Tax Allocations:  Code Section 704(c)</u>.

(a)    Subject to Section 6.3(b) and (c), for each Fiscal Year, items of income, deduction, gain, loss and credit shall be allocated for tax purposes among the Members to reflect the amounts which have been credited or debited to the Capital Account of each such Member for such Fiscal Year and prior Fiscal Years.

(b)    In accordance with Code Section 704(c) and the Regulations thereunder, items of income, gain, loss, deduction and credit with respect to any property

contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property at the time of contribution to the Company for federal income tax purposes and its initial Gross Asset Value at the time of contribution using a method permitted by applicable Regulations under Code Section 704(c), as determined by the Tax Matters Member in its reasonable discretion.

(c)     In the event the Gross Asset Value of any Asset is adjusted in accordance with paragraph (b) of the definition of Gross Asset Value hereof, subsequent allocations of items of income, gain, loss, deductions or credit with respect to such asset shall take into account any variation between the adjusted tax basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(d)     Any elections or other decisions relating to allocations for tax purposes, basis adjustments or other tax matters shall be made by the Tax Matters Member in its reasonable discretion.  Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account, share of Profits or Losses, or other items or distributions pursuant to any provision of this Agreement.

(e)     Notwithstanding anything in this Agreement to the contrary, the Tax Matters Member shall not make any determinations or elections, or fail to make any elections reasonably requested by the Managing Member, under this Article VI or the definition of "Depreciation" that could reasonably be expected to disproportionately, materially and adversely affect Chatham or the Chatham REIT without Chatham's prior written consent.

## ARTICLE VII.

## DISTRIBUTIONS AND EXPENSES

Section 7.1     <u>Distributions of Net Cash Flow</u>.  (a) Net Cash Flow shall be reasonably determined by the Managing Member.  Distributions of Net Cash Flow shall be made on a quarterly basis in the following order and priority:

(i)     First, to any Member that has made a Member Loan in the amount of such Member Loan plus a return thereon at 15% per annum, compounded monthly;

(ii)     Second, pari passu to the Members in accordance with their respective Percentage Interests until each Member has received aggregate distributions in an amount sufficient to provide a 12.0% per annum cumulative return, compounded monthly, on its Capital Contributions;

(iii)     Third, pari passu to the Members in accordance with their respective Percentage Interests until all Capital Contributions have been fully recovered;

(iv)     Fourth, 11.4% to Chatham and 88.6% pari passu to the Members in accordance with their respective Percentage Interests until such time as Cerberus has received a 17.0% per annum cumulative return, compounded monthly, on its Capital Contributions;

(v)     Fifth, 17.1% to Chatham and 82.9% pari passu to the Members in accordance with their respective Percentage Interests until such time as Cerberus has received a 22.0% per annum cumulative return, compounded monthly, on its Capital Contributions; and

(vi)     Sixth, 22.9% to Chatham and 77.1% pari passu to the Members in accordance with their respective Percentage Interests.

(b)     Notwithstanding the foregoing, Chatham's receipt of the Promoted Interests (as defined below) will be subject to Cerberus first receiving a minimum return on its on its Capital Contribution of 150% (the "Minimum Cerberus Multiple"). In the event that the Minimum Cerberus Multiple is not met at any given time, distributions shall be made in accordance with the waterfall above provided that the Promoted Interests, if any, payable at such time will be retained by the Company in an escrow account managed by an escrow agent reasonably acceptable to Chatham and Cerberus and may only be distributed to Chatham and deducted from its Capital Account once the Minimum Cerberus Multiple has been achieved for at least two consecutive fiscal quarters. If Chatham receives distributions of the Promoted Interests, whether pursuant to Section 7.1(a) above or the immediately preceding sentence in this Section 7.1(b) and, at any time subsequent to such receipt, the Minimum Cerberus Multiple is not achieved for any two consecutive quarters, Chatham shall repay to the Company all distributions of Promoted Interests previously received by Chatham. Such repaid distributions shall be retained by the Company in escrow and shall be distributed to Chatham once the Minimum Cerberus Multiple has been achieved for at least two consecutive fiscal quarters.

The "Promoted Interest" shall mean any and all distributions to Chatham pursuant to clause (iv), (v) or (vi) above, in excess of the distributions that Chatham would have otherwise been entitled to receive had such distribution been made in accordance with the Members' respective Percentage Interests..

Section 7.2     Amounts Withheld. All amounts withheld or paid pursuant to the Code or any provisions of state, local or foreign tax law with respect to any payment, distribution, allocation or other consideration paid to the Members, including in connection with a contribution of assets to the Company by a Member, shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld or paid pursuant to this Section 7.2 for all purposes under this Agreement. The Company is authorized to withhold or pay, when required under applicable law, from payments, distributions, or other consideration paid to Members, and with respect to allocations to the Members, and to pay over to any federal, state, local or foreign government any amounts required to be so withheld or paid pursuant to the Code or any provisions of any federal, state, local or foreign law, and shall allocate any such amounts to the Members with respect to which such amounts were withheld or paid.

Section 7.3    Expenses.  Except as otherwise provided in this Agreement, the Company will be responsible for all third party expenses of the Company.  Subject to Section 3.1(c), each Member shall otherwise be responsible for all costs and expenses incurred by such Member in the performance of its obligations under this Agreement.

ARTICLE VIII.

OTHER TAX MATTERS

Section 8.1    Tax Matters Member.  The Company and each Member hereby designate Cerberus as the "tax matters partner" for purposes of Code Section 6231(a)(7)(the "Tax Matters Member").  The Tax Matters Member (after consultation with the Managing Member) shall:  (a) cause to be prepared and timely filed by the Company all United States federal, state and local income tax returns of the Company for each year for which such returns are required to be filed, and (b) determine the appropriate treatment of each item of income, gain, loss, deduction and credit of the Company and the accounting methods and conventions under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of any such item or any other method or procedure related to the preparation of such tax returns.  Subject to the express provisions of this Agreement, Cerberus may in its reasonable discretion cause the Company to make or refrain from making any and all elections permitted by such tax laws, provided that the Tax Matters Member shall not make, or refrain from making any election reasonably requested by the Managing Member, that could reasonably be expected to disproportionately, materially and adversely affect Chatham or the Chatham REIT without Chatham's prior written consent.

Section 8.2    Furnishing Information to Tax Matters Member.  Each Member shall furnish to the Tax Matters Member such information (including information specified in Code Section 6230(e)) as such Tax Matters Member may, at its reasonable discretion, request to permit it to provide the Internal Revenue Service with sufficient information to allow proper notice to the Members in accordance with Code Section 6223 or any other provisions of the Code or the published regulations thereunder which require the Tax Matters Member to obtain information from the Members.

Section 8.3    Tax Claims and Proceedings.  In respect of any income tax audit of any tax return of the Company, the filing of any amended return or claim for refund in connection with any item of income, gain, loss, deduction or credit reflected on any income tax return of the Company, or any administrative or judicial proceedings arising out of or in connection with any such audit, amended return, claim for refund or denial of such claim, (a) all expenses reasonably incurred by the Tax Matters Member in connection therewith shall be expenses of the Company, (b) the Tax Matters Member shall promptly deliver to each other Members a copy of all notices, communications, reports and writings received from the IRS relating to or potentially resulting in an adjustment of Company items, shall promptly advise each of the other Members of the substance of any conversations with the IRS in connection therewith and shall keep the other Members advised of all developments with respect to any proposed adjustments which come to its attention; (c) the Tax Matters Member shall (i) provide the other Members with a draft copy of any correspondence or filing to be submitted by the Company in connection with any administrative or judicial proceedings relating to the

determination of Company items at the Company level reasonably in advance of such submission, (ii) incorporate all reasonable changes or comments to such correspondence or filing requested by the other Members and (iii) provide the other Members with a final copy of correspondence or filing, (d) the Tax Matter Member will provide each Member with notice reasonably in advance of any meetings or conferences with respect to any administrative or judicial proceedings relating to the determination of Company items at the Company level (including any meetings or conferences with counsel or advisors to the Company with respect to such proceedings) and each Member shall have the right to participate, at its sole cost and expense, in any such meetings or conferences. Notwithstanding anything in this Agreement to the contrary, the Tax Matters Member shall not enter into any settlement agreement that is binding upon the other Members with respect to the determination of Company items at the Company level without the prior written consent of the other Members. The Tax Matters Member shall use commercially reasonable efforts to provide tax returns to all Members within 60 days after the end of the relevant fiscal year if the Managing Member has provided the requisite information to the Tax Matters Member or the Company's accountants reasonably in advance of such date.

Section 8.4    Books and Records. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business. The books and records of the Company shall include a record of each transfer of participating interests of the Company. The Fiscal Year of the Company for financial reporting and for federal income tax purposes shall be the calendar year. All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business in the United States, and each Member, and any duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times. The Company's books of account shall be kept on an accrual basis or as otherwise provided by the Managing Member and otherwise in accordance with generally accepted accounting principles, consistently applied, except that for income tax purposes such books shall be kept in accordance with applicable tax accounting principles (including the Regulations).

Section 8.5    Survival. The provisions of this Article VIII shall survive the termination of the Company (as well as any termination, purchase or redemption of any Member's Percentage Interest in the Company for any reason whatsoever), and shall remain binding on the Members and all former Members for a period of time necessary to resolve with the appropriate taxing authorities any and all material matters regarding the taxation of the Company and its Members by reason of their percentage interests.

ARTICLE IX.

REPRESENTATIONS AND WARRANTIES; COVENANTS

Section 9.1    Representations and Warranties of Members. Each of the Members hereby represents and warrants to the Company and to each of the other Members, as of the date hereof that:

(a)     If it is a corporation, a limited liability company or limited partnership, it is duly incorporated or otherwise duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, and if it is a partnership, it is validly constituted and not dissolved, and, in each case, has the power and lawful authority to own its assets and properties and to carry on its business as now conducted.

(b)     It has the full right, power and authority to enter into, execute and deliver this Agreement and to perform fully its obligations hereunder.  This Agreement has been fully executed and delivered by such Member and, assuming the due execution and delivery by the other parties, constitutes the valid and binding obligation of such Member, enforceable in accordance with its terms, except as (i) such enforceability may be limited by bankruptcy, reorganization or moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) the availability of equitable remedies may be limited by equitable principles of general applicability.

(c)     No approval or consent of any governmental authority or of any other Person is required in connection with the execution and delivery by it of this Agreement and the consummation and performance by such member of the transactions contemplated hereunder, except such as have been obtained and are in full force and effect.

(d)     The execution and delivery of this Agreement by it, the consummation of the transactions contemplated hereunder and the performance by such Member of its obligations under this Agreement, in accordance with the terms and conditions hereof, will not conflict with or result in the breach or violation of any of the terms or conditions of, or constitute (or with notice or lapse of time or both would constitute) a default under, (i) the certificate of incorporation, by-laws, certificate of formation, limited liability company agreement or other constitutive documents of such Member; (ii) any instrument or contract to which such Member is a party or by or to which it or its assets or properties are bound or subject; or (iii) any statute or any regulation, order, judgment or decree of any governmental authority, except, in each case, for such breaches violations or defaults that would not, individually or in the aggregate, materially impair the ability of such Member to perform its obligations hereunder.

(e)     It understands that there are substantial risks to an investment in the Company and it has both the sophistication to be able to fully evaluate the risk of an investment in the Company and the capacity to protect its own interests in making such investment.  Such Member fully understands and agrees that the investment in the Company is an illiquid investment.

(f)     It is a QIB or an "accredited investor" within the meaning of the 1933 Act and is able to bear the economic risk of such an investment in the Company for an indefinite period of time, that it has no need for liquidity of this investment and it could bear a complete loss of this investment.  The Member is either (i) a "qualified purchaser" within the meaning of the 1940 Act or (ii) if the Member is an entity formed and is being utilized primarily for the purpose of making an investment in the Company, each beneficial owner of such Member's securities is such a qualified purchaser.

(g) It is acquiring its percentage interests for investment solely for such Member's own account and not for distribution, transfer or sale to others in connection with any distribution or public offering. It understands that, irrespective of whether or not the Percentage Interests might be deemed "<u>securities</u>" under applicable laws, the Company is not obligated to register any percentage interests for resale under the 1933 Act or any applicable state securities laws.

(h) It specifically understands and agrees that no other Member, has made nor will make any representation or warranty with respect to the worthiness, terms, value or any other aspect of the Company, any Percentage Interest or the Business or Properties and it explicitly disclaims any warranty, express or implied, with respect to such matters. In addition, such Member specifically acknowledges, represents and warrants that (i) it is not relying on any other Member for its own due diligence concerning, or evaluation of, the Company or any related transaction and (ii) that it is not relying on any other Member with respect to tax and other economic considerations involved in an investment in the Company.

(i) No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Company based upon arrangements made by or on behalf of such Member.

(j) There are no actions, suits or proceedings pending, or to the knowledge of such Member threatened against such Member or its Affiliates which, if adversely determined, could materially adversely affect the ability of such Member or its Affiliates to perform its obligations under this Agreement or materially adversely affect the Percentage Interest of any other Member.

Section 9.2 <u>ERISA Representation</u>. Each of the Members represents, warrants and covenants to each other Member and to the Company that no portion of the assets being used by it to purchase and hold its percentage interests constitute assets of a plan within the meaning of Section 3(32) of ERISA.

Section 9.3 <u>AML/OFAC Compliance</u>

(a) Each Member hereby represents and warrants to each other Members and to the Company, as of the date hereof, as follows:

(i) To the best of its knowledge, it is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, AML and the OFAC Sanctions Programs, including the reporting, record-keeping and compliance requirements of the Bank Secrecy Act, as amended by the USA PATRIOT Act (collectively, the "<u>BSA/Patriot Act</u>"), and all related applicable Securities and Exchange Commission, self-regulatory organization or other agency rules and regulations, and has internal policies, procedures, internal controls and systems in place that are reasonably designed to ensure such compliance (collectively "<u>AML/OFAC Laws</u>";

(ii)    Neither (1) such Member nor any nor any Affiliate of such Member, nor (2) to the best of such Member's knowledge, after conducting reasonable due diligence, any Person having a direct or indirect beneficial interest in such Member, nor (3) any person for whom such Member is acting as agent or nominee in connection with this investment is prohibited pursuant to the OFAC Sanctions Programs;

(iii)    Unless disclosed in writing to the other Members on or before the date hereof, (1) it is not a Senior Foreign Political Figure, or an Immediate Family Member or a Close Associate of a Senior Foreign Political Figure, (2) it is not controlled by a Senior Foreign Political Figure, or an Immediate Family Member or Close Associate of a Senior Foreign Political Figure, and (3) to the best of such Member's knowledge, after conducting reasonable due diligence, none of the direct or indirect owners of such Member is a Senior Foreign Political Figure, or an Immediate Family Member or a Close Associate of a Senior Foreign Political Figure;

(iv)    It is not a foreign financial institution or a Person located in a foreign jurisdiction that has been designated by the U.S. Department of the Treasury as being subject to any special measures imposed on such financial institutions and jurisdictions pursuant to Section 311 of the BSA/Patriot Act;

(v)    It is not a "foreign shell bank" and it is not being used to provide services to a "foreign shell bank", as that term is defined for purposes of Sections 313 and 319 of the BSA/Patriot Act;

(b)    Each Member hereby covenants to the Company and the other Members as follows:

(i)    Such Member will not engage in any activities that contravene federal state or international regulations, including all applicable AML/OFAC Laws;

(ii)    Such Member will ensure that the cash or other assets contributed to the Company by such Member will not be directly or indirectly derived from activities that contravene federal, state or international regulations, including applicable AML/OFAC Laws;

(iii)    Such Member will not utilize any funds received by the Company for any purpose that contravenes federal, state or international regulations, including applicable AML/OFAC Laws;

(iv)    All funds contributed to or received from the Company by such Member will be wired to or from a bank located in an Approved FATF Country ("Wiring Bank") where such Member is a customer of the Wiring Bank;

(v)    All transactions, negotiations, discussions and dealings by such Member in connection with the Company will be in full compliance with all applicable AML/OFAC Laws;

(vi)     Upon receiving a request from the Company or another Member, such Member shall provide such information as may be reasonably required by the Company or such other Member to confirm that the representations, warranties and covenants contained in this Section 9.3(c) continue to be true and to comply with all applicable anti-money laundering and anti-terrorist laws, regulations and executive orders;

(vii)     Such Member consents to the disclosure to United States regulators and law enforcement authorities by the Company or any other Member and its Affiliates of such information about such Member as the Company or such other Member or any of its Affiliates reasonably deems necessary or appropriate to comply with applicable anti-money laundering and anti-terrorist laws, regulations and executive orders;

(viii)     As a condition to any Transfer of such Member's direct or indirect interest in the Company, the Company and the other Members have the right to require full compliance with the representations, warranties and covenants contained in this Section 9.3;

(ix)     Such Member will notify the Company and the other Members promptly if there is any change with respect to any of the representations or warranties (or any breach of a covenant) contained in this Section 9.3; and

(x)     Such Member is a "United States person" for United States federal income tax purposes.

(c)     Each Member hereby acknowledges and agrees that the Company and the other Members have relied on the truthfulness of (and compliance by such Member with) each and every provision of this Section 9.3, and that any breach of such representations, warranties or covenants, including, without limitation, one that causes a breach or violation of, or a failed condition under, any documents by which the Company is bound (such as loan documents), is likely to result in substantial loss for the Company and/or the other Members.

(d)     Each Member hereby acknowledges and agrees that if, following its investment in the Company, the Company or any other Member reasonably believes that such Member has breached any of its representations, warranties or covenants set forth in this Section 9.3, or that any action is otherwise required by law or regulation, the Company and the other Members have the right or may be obligated to freeze or block such Member's investment in the Company, to prohibit additional investments by such Member in the Company, to segregate the assets constituting such Member's investment in accordance with applicable AML/OFAC Laws and regulations, to decline any redemption or transfer requests made by or on behalf of such Member, to redeem such Member's investment, and/or to report any such action to the applicable governmental authorities. Each Member further acknowledges and agrees that it will have no claim against the Company and/or any other Member or any of their respective Affiliates for any form of damages as a result of any of the foregoing actions.

Section 9.4     Survival.  The representations and warranties of the Members contained in this Agreement shall survive the Effective Date.

## ARTICLE X.

## DISSOLUTION AND TERMINATION OF THE COMPANY

Section 10.1    Dissolution.  The Company shall be dissolved and its business wound up upon the earliest to occur of any one of the following events, unless the Members vote to continue the life of the Company upon the occurrence of such an event:

(a)    The written determination of Cerberus and Chatham to terminate the Company;

(b)    Twenty-four (24) months after the sale, condemnation or other disposition of all Properties and the receipt of all consideration therefor; or

(c)    The entry of a decree of judicial dissolution of the Company pursuant to the provisions of the Act.

Without limiting the generality of the foregoing, the permitted Transfer of a Member's Interest will not result in the dissolution of the Company.  Except as otherwise specifically provided in this Agreement, each Member agrees that, without the consent of the other Members, no Member may withdraw from, terminate or cause a voluntary dissolution of the Company, and, in the event that a Member withdraws from the Company or causes a dissolution of the Company in contravention of this Agreement, such withdrawal or dissolution shall not reduce or otherwise affect such Member's continuing liability for the obligations and liabilities of the Company.

Section 10.2    Continuation of Interest of Member's Representative.  Notwithstanding anything contained herein, upon the expulsion, receivership, dissolution or Bankruptcy of a Member, the personal representative, trustee-in-bankruptcy, debtor-in-possession, receiver, other representative, successor, heir or legatee (each a "Representative") of such Member shall, subject to the provisions of Section 5.1, immediately succeed to the Percentage Interest of such Member in the Company.  Such Representative shall appoint an individual (which may be such Representative) who will represent the Representative's voting interest, if any. (the "Voting Representative").

Section 10.3    Dissolution, Winding Up and Liquidation.

(a)    Upon a dissolution of the Company, the Company shall continue solely for purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying claims of its creditors.  The liquidator of the Company shall take full account of the Company's liabilities and property and shall cause the property or the proceeds from the sale thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(i)    first, to creditors (including Members who are creditors) in satisfaction of all of the Company's debts and other liabilities, including the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable reserves to provide for payment thereof); and

(ii)     second, to the Members in accordance with Section 7.1.

(b)     Distributions pursuant to this Section 10.3 shall be made no later than the end of the Fiscal Year during which the Company is liquidated (or, if later, 90 days after the date on which the Company is liquidated).

Section 10.4    Member Bankruptcy.

(a)     Notwithstanding any other provision of this Agreement, the Bankruptcy of a Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(b)     Notwithstanding any other provision of this Agreement, each of the Members waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Members, or the occurrence of an event that causes the Member to cease to be a member of the Company.

ARTICLE XI.

INDEMNIFICATION AND CONTRIBUTION

Section 11.1    Indemnity by the Company.  Subject to the provisions of Section 11.4, the Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such Person is or was a Member, Officer, director, Managing Member, Hotel Manager, controlling person, employee, legal representative or agent of the Company, or is or was serving at the request of the Company as manager, director, Managing Member, Hotel Manager, officer, partner, member, shareholder, controlling person, employee, legal representative or agent of another limited liability company, partnership, corporation, joint venture, trust or other enterprise (an "Indemnified Person"), from and against any and all claims, actions, suits, proceedings, liabilities, obligations, losses, damages, judgments, fines, penalties, amounts paid in settlement, interest, costs and expenses (including reasonable attorney's and accountant's fees, court costs and other out-of-pocket expenses actually and reasonably incurred in investigating, preparing or defending the foregoing) (including any such brought by or in the right of the Company) suffered or incurred by such Indemnified Person while serving in such capacity or that otherwise in any way relate to or arise out of any action or inaction by such Indemnified Person or the Company (collectively, "Indemnifiable Losses"), if such Indemnified Person acted in good faith and in a manner that such Indemnified Person reasonably believed to be in or not opposed to the best interests of the Company and not in violation of this Agreement or outside the scope of such Person's authority, and, with respect to a criminal action or proceeding, had no reasonable cause to believe such Person's conduct was unlawful; provided, that the Company shall have no obligation to indemnify or defend hereunder to the extent such action, suit or proceeding arises from fraud, bad faith, willful misconduct or gross negligence on the part of such Indemnified Person.

Section 11.2    Exculpation.  No Indemnified Person shall be liable to any Member of the Company for any act or failure to act on behalf of the Company, unless such act or failure to act resulted from fraud, bad faith, willful misconduct or gross negligence of the Indemnified Person.  Each Indemnified Person may consult with legal counsel and accountants in respect of the Company's affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants.

Section 11.3    Expenses.  Any indemnification under Section 11.1, as well as the advance payment of expenses permitted under Section 11.4 shall be made by the Company to the fullest extent permitted under the Act.

Section 11.4    Advance Payment of Expenses.  The expenses of any Member incurred in defending a civil or criminal action, suit or proceeding may be paid by the Company as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of such Member (in form and substance, from an indemnitor, reasonably satisfactory to all of the Initial Members), to repay the amount if it is ultimately determined by a court of competent jurisdiction that such Member is not entitled to be indemnified by the Company.  The provisions of this Section 11.4 do not affect and shall not be deemed exclusive of any other rights, including, without, limitation, any rights to indemnification or advancement of expenses to which any such Indemnified Person other than the Members may be entitled under any contract, pursuant to approval of the Members, or otherwise by law.

Section 11.5    Beneficiaries.  The indemnification and advancement of expenses authorized in or ordered by a court pursuant to this Article XI continues for a Person who has ceased to be a Member, officer, employee or agent and inures to the benefit of the heirs, executors and administrators of such Person.

Section 11.6    Indemnification Procedure for Third Party and Other Claims.  The Company shall have the right, but not the obligation, exercisable by written notice to the Indemnified Person seeking such indemnification hereunder promptly but in any event no later than 30 days after receipt of  written notice from the Indemnified Person of the commencement of or assertion of any claim, action, suit or proceeding by a third party in respect of which indemnity may be sought hereunder (a "Third Party Claim"), to assume the defense and control the settlement of such Third Party Claim that (a) involves (and continues to involve) solely money damages or (b) involves (and continues to involve) claims for both money damages and equitable relief against the Indemnified Party that cannot be severed, where the claims for money damages are the primary claims asserted by the third party and the claims for equitable relief are incidental to the claims for money damages. The Indemnified Person shall have the right to assume the defense and control the settlement of any Third Party Claim (i) not described in clauses (a) or (b) of the preceding sentence or (ii) described in clauses (a) or (b) of the preceding sentence whose defense and control of settlement has not been promptly assumed by the Company.  The Company or the Indemnified Person, as the case may be, shall have the right to participate in (but not control), at its own expense, the defense of any Third Party Claim that the other is defending, as provided in this Agreement.  The Company, if it has assumed the defense of any Third Party Claim as provided in this Agreement, shall not consent to a settlement of, or the entry of any judgment arising from, any such Third Party Claim without the Indemnified

Person's prior written consent (which consent shall not be unreasonably withheld). The Company shall not, without the Indemnified Person's prior written consent, enter into any compromise or settlement which (A) commits the Indemnified Person to take, or to forbear to take, any action or (B) does not provide for a complete release by such Third Party of the Indemnified Person. The Indemnified Person shall have the sole and exclusive right to settle any Third Party Claim, on such terms and conditions as it deems reasonably appropriate, to the extent such Third Party Claim involves equitable or other non-monetary relief against the Indemnified Person, and shall have the right to settle any Third Party Claim involving money damages for which the Company has not assumed the defense pursuant to this Section 11.6 with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

Section 11.7    Other Claims.  In the event an Indemnified Person shall claim a right to payment pursuant to this Agreement for other than a Third Party Claim, such Indemnified Person shall send written notice of such claim to the Indemnifying Party.  Such notice shall specify the basis for such claim.  As promptly as possible after the Indemnified Person has given such notice, the Indemnified Person and the Company shall attempt to resolve such claim by mutual agreement before resorting to other legal means to resolve such claim.

Section 11.8    Limitation on Damages.  Notwithstanding anything contained in this Agreement to the contrary, no party shall be liable to the other party for any indirect, special, punitive, exemplary or consequential loss or damage (including any loss of revenue or profit) arising out of this Agreement including, without limitation, in respect of any breach by any Member of this Agreement; provided, that the foregoing shall not be construed to preclude recovery by the Indemnified Person in respect of Indemnifiable Losses directly incurred from Third Party Claims.  Any Indemnified Person shall take commercially reasonable actions to mitigate his, her, its or their damages.  The obligation of the Company to indemnify any Indemnified Person with respect to any Indemnifiable Losses hereunder resulting from any action, suit or proceeding shall not exceed the value of the Business and the Properties.

ARTICLE XII.

MISCELLANEOUS PROVISIONS

Section 12.1    Entire Agreement.  This Agreement and the Certificate of Formation constitute the complete and exclusive statement of the agreement among the Members with respect to the subject matter contained herein and therein.  This Agreement and the Certificate of Formation replace and supersede all prior agreements by and among the Members with respect to the subject matter contained herein and therein.

Section 12.2    Amendments.  This Agreement may be amended only by the unanimous written consent of the Initial Members.

Section 12.3    Applicable Law; Venue.

(a)    The Certificate of Formation and this Agreement shall be governed exclusively by their respective terms and the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.

(b)    Any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York,  and, by execution and delivery of this Agreement, each Member hereby accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and the appellate courts thereof.  Each Member irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party at the address for notices set forth herein.  Each Member hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

Section 12.4    Enforcement.  In the event of an action, suit or proceeding initiated by one Member against another Member or the Company involving the enforcement of its rights hereunder, the prevailing party shall be entitled to indemnification from the other party of reasonable attorneys' fees and expenses incurred in enforcing its rights in such action, suit or proceeding in accordance with this Section.

Section 12.5    Headings.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provisions contained herein.

Section 12.6    Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be deemed invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 12.7    Counterparts.  This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

Section 12.8    Filings.  Following the execution and delivery of this Agreement, representatives of the Company, shall promptly prepare any documents required to be filed and recorded under the Act, and such representatives shall promptly cause each such document to be filed and recorded in accordance with the Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Company may hereafter establish a place of business.  Such representatives, under shall also promptly cause to be filed, recorded and published such statements of fictitious

business name and any other notices, certificates, statements or other instruments required by any provision of any applicable law of the United States or any state or other jurisdiction which governs the conduct of its business from time to time.

Section 12.9 <u>Additional Documents</u>. Each Member agrees to perform all further acts and to execute, acknowledge and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

Section 12.10 <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile) and shall be effective and deemed delivered or given, as the case may be, (a) if given by facsimile, when transmitted and the appropriate confirmation is received from the machine transmitting such facsimile, and followed by hard copy via overnight mail or reputable overnight courier for receipt the next Business Day, (b) if given by reputable overnight courier, on the next Business Day, (c) by hand delivery, when delivered or (d) if mailed, on the second Business following the day on which sent by first class mail:

If to Cerberus, addressed as follows:

c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 22nd Floor
New York, NY 10022
Attention: Tom Wagner
Facsimile number: (646) 885-3391

With a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention: Stuart D. Freedman, Esq.
Facsimile number: (212) 593-5955

If to Chatham, addressed as follows:

c/o Chatham Realty Trust
50 Cocoanut Row, Suite 200
Palm Beach, FL 33480
Attention: Jeffrey Fisher
Facsimile number: (561) 835-4125

With a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention: Scott K. Charles, Esq.

Robin Panovka, Esq.
Facsimile number: (212) 403-2000

If to any other Member, at the addresses or facsimile numbers set forth on the signature page to this Agreement or such other addresses or facsimile numbers as such Member may hereafter specify to the Managing Member, who shall so notify the other Members.

Section 12.11 <u>Waiver of Right to Partition and Bill of Accounting</u>. To the fullest extent permitted by applicable law, each Member covenants that it will not, and hereby waives any right to, file a bill for partnership accounting. Each Member irrevocably waives any right that it may have to maintain any action for dissolution of the Company (unless the Company is dissolved pursuant to Section 10.1).

Section 12.12 <u>Confidentiality; Press Releases</u>. Each Member shall keep confidential all information of a confidential nature obtained pursuant to this Agreement, except that a Member shall be entitled to disclose such confidential information to (a) its advisors, agents, employees, trustees, lenders, franchisors, consultants, lawyers, accountants and other service providers as reasonably necessary in the furtherance of such Member's bona fide interests, as otherwise required by law or judicial process and to comply with reporting requirements, and to potential transferees of its percentage interests provided that such potential transferees enter into customary confidentiality agreements, with the Company expressly stated therein to be a third party beneficiary thereof, (b) its investors provided that such investors are subject to confidentiality obligations, and (c) the extent required to comply with applicable reporting requirements under the Federal securities laws. Notwithstanding anything in this Agreement to the contrary, to comply with Regulations 1.6011-4(b)(3)(i), each Member (and any employee, representative or other agent of such Member) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of the Company or any transactions undertaken by the Company, it being understood and agreed, for this purpose, (a) the name of, or any other identifying information regarding (i) the Company or any existing or future Member (or any affiliate thereof) in the Company, or (ii) any investment or transaction entered into by the Company; and (b) any performance information relating to the Company, does not constitute such tax treatment or tax structure information. No Member shall publicly make any public announcements regarding this Agreement or the Company or its business; provided, however, each Initial Member may consult with and obtain the approval of the other Initial Members before issuing a press release or other public announcement with respect to this Agreement and may issue a press release or make a public announcement following such consultation and approval.

Section 12.13 <u>Uniform Commercial Code</u>. Each limited liability company interest in the Company shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8 102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

Section 12.14  <u>Binding Agreement</u>.  Notwithstanding any other provision of this Agreement, the Members agree that this Agreement constitutes a legal, valid and binding agreement of the Members, and is enforceable against the Members by the Company in accordance with its terms.

Section 12.15  <u>Waiver</u>.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

Section 12.16  <u>DISCLOSURES</u>.  THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>1933 ACT</u>"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND SUCH LAWS.  THE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT AND SUCH LAWS PURSUANT TO EXEMPTION FROM REGISTRATION THEREUNDER. THERE WILL NOT BE ANY PUBLIC MARKET FOR THE INTERESTS.  IN ADDITION, THE TERMS OF THIS AGREEMENT RESTRICT THE TRANSFERABILITY OF INTERESTS.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, effective as of the date first above written.

**MEMBERS:**

CRE-INK REIT MEMBER, LLC

By: _____

Name: Thomas E. Wagner

Title: Authorized Signatory

**CHATHAM LODGING LP**

By: _____

Name: Eric Kentoff

Title: VP & General Counsel

SCHEDULE A

**MEMBERS**

| MEMBER'S NAME | INITIAL CAPITAL CONTRIBUTION AMOUNT | PERCENTAGE INTEREST |
|---|---|---|
| CRE-Ink REIT Member, LLC | $ 319,200,000 | 89.6% |
| Chatham Lodging LP | $ 37,000,000 | 10.4% |
| TOTAL | $356,200,000 | 100.0% |

EXHIBIT A

Hotel Management Agreement

[To be attached]

# EXHIBIT B

## The Bid

[See Innkeepers Commitment Letter and Exhibits attached thereto]

# EXHIBIT C

## Contribution Agreement

[See attached]

# FORM OF
# CONTRIBUTION AND INDEMNITY AGREEMENT

THIS CONTRIBUTION AND INDEMNITY AGREEMENT (this "Agreement"), dated as of _____, 20__, is made by and among CRE-Ink REIT Member, LLC, a Delaware limited liability company ("Cerberus Member") and Cerberus Series Four Holdings LLC, a Delaware limited liability company ("Cerberus", and together with Cerberus Member, each a "Cerberus Contributor"), and [Chatham Lodging LP], a Delaware limited partnership ("Chatham Member") and Chatham Lodging Trust, a Maryland real estate investment trust ("Chatham REIT" and together with Chatham Member, each a "Chatham Contributor") (each Cerberus Contributor and each Chatham Contributor, each individually, a "Contributor", and collectively, the "Contributors").

WITNESSETH:

WHEREAS, Cerberus is an affiliate of Cerberus Member and Chatham REIT is an affiliate of Chatham Member;

WHEREAS, Cerberus Member and Chatham Member are members in INK Acquisition LLC, a Delaware limited liability company (the "Company"), pursuant to that certain Limited Liability Company Agreement of the Company dated as of April 25, 2011 (the "LLC Agreement"), for the purpose of indirectly acquiring certain real property currently owned by Innkeepers USA Trust and its direct and indirect subsidiaries through the implementation of a plan of reorganization resulting in the Company acquiring the equity interests of certain direct and indirect subsidiaries (the "Fixed/Floating Debtors") of Innkeepers USA Trust (the "Transaction");

WHEREAS, in connection with the Transaction, the Fixed/Floating Debtors will restructure (the "Restructuring") the existing $825.4 million Fixed Rate Mortgage Loan into a new non-recourse mortgage loan of $622.5 million (the "Fixed Rate Mortgage Loan") from Midland Loan Services, a division of PNC Bank, National Association ("Midland");

WHEREAS, as part of the Restructuring Midland is requiring that (i) Cerberus provide to Midland a limited guaranty with respect to certain "bad boy" acts under the Fixed Rate Mortgage Loan, and (ii) the Company provide to Midland a limited guaranty with respect to such "bad boy" acts under the Fixed Rate Mortgage Loan;

WHEREAS, pursuant to Section 1.11(c) of the LLC Agreement the Cerberus Member and the Chatham Member have agreed to provide or cause their respective Affiliates to provide certain guaranties and indemnities;

WHEREAS, in connection with the consummation of the Transaction, Cerberus has entered into the Guaranty dated as of _____, 2011 for the benefit of Midland (the "Guaranty");

WHEREAS, each of Cerberus Member and Chatham Member has agreed pursuant to the LLC Agreement to pay its pro rata share of any Guaranty Payments (as hereinafter defined) paid or required to be paid by Cerberus, all as herein provided; and

WHEREAS, Chatham REIT, as an affiliate of Chatham Member, has agreed to be jointly and severally liable for Chatham Member's obligations with respect to its pro rata share of any Guaranty Payments.

NOW, THEREFORE, in consideration of the execution and delivery of the Guaranty by Cerberus, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.      Payment of Amounts under the Guaranties.[1]

(a)      Any payment made or required to be made by Cerberus under the Guaranty shall be referred to herein as a "Guaranty Payment", and Midland, as the guaranteed party under the Guaranty shall be referred to herein as a "Guarantied Party".

(b)      If Cerberus pays or is required to pay a Guaranty Payment to a Guarantied Party, then Chatham Member shall (or if Chatham Member does not, Chatham REIT shall), within ten (10) Business Days (as defined in the LLC Agreement) after written demand therefor, pay to Cerberus an amount in cash equal to Chatham Member's pro rata portion of such Guaranty Payment, based on the relative aggregate distributions received by each of Chatham Member and Cerberus Member under the LLC Agreement (or, if no distributions have been paid, each Member's Percentage Interest at the time of payment of such Guaranty Payment by Cerberus) (the "Chatham Amount"), provided, that the Chatham Amount shall not exceed (i) the product of (x) the Guaranty Payment and (y) Chatham's Percentage Interest (as defined in the LLC Agreement) plus (ii) if Chatham has received distributions in respect of the Promoted Interest (as defined in the LLC Agreement), the product of (x) the aggregate of all amounts distributed to Chatham in respect of the Promoted Interest and not repaid to the Company in accordance with the LLC Agreement and (y) one (1) minus Chatham's Percentage Interest (as defined in the LLC Agreement), in each case with Percentage Interest treated as a decimal with a value between zero and one; provided, further, that notwithstanding the foregoing or anything else contained in this Agreement, no payment shall be required to be made by Chatham Member or Chatham REIT under this Section l(b) with respect to any Guaranty Payment under the Guaranty to the extent that the event or circumstance giving rise to such Guaranty Payment was as a result of a default or breach of any covenant with respect to the Fixed Rate Mortgage Loan which was directly and immediately caused by Cerberus or Cerberus Member, and the action or failure to take action giving rise to such default or breach of covenant was not affirmatively consented to or approved by Chatham Member (each a "Cerberus Act")

(c)      Chatham Member hereby agrees to pay (or if Chatham Member does not pay, Chatham REIT hereby agrees to pay) to Cerberus within ten (10) Business Days after

---

[1]  In the event that Chatham Member or any other Chatham affiliate provides a guaranty with respect to the Company or any of its subsidiaries, this section to be modified to reflect Cerberus' and Cerberus Member's obligations to Chatham Member or such Chatham affiliate with respect thereto, as set forth in Section 1.11(c) of the LLC Agreement.

written demand therefor an amount in cash equal to 100% of any Guaranty Payment made or required to be made by Cerberus under the Guaranty as a result of a default or breach of a covenant under the Fixed Rate Mortgage Loan, but only to the extent that the event or circumstance giving rise to such Guaranty Payment was caused solely by a material breach by Chatham Member or Chatham REIT or any affiliate thereof (other than the Company) of Chatham Member's obligations under the LLC Agreement.

(d)     If Chatham Member or Chatham REIT fails to pay within ten (10) Business Days after demand therefor by Cerberus such amount Chatham Member or Chatham REIT is required to pay to Cerberus under Sections 1(b) or 1(c) of this Agreement, then such amount shall bear interest from the date of any Guaranty Payment made by Cerberus at the rate of 15% per annum, compounded quarterly, until the date Chatham Member or Chatham REIT makes such payment to Cerberus.

(e)     Unless any applicable Guaranty Payment has been previously paid to the Guarantied Party, each Contributor shall have the right to make any payment required to be made by such Contributor under this Section 1 directly to the Guarantied Party.

2.     <u>Representations and Warranties</u>.  Each of Cerberus and Cerberus Member hereby represents and warrants to Chatham Member and Chatham REIT, and each of Chatham Member and Chatham REIT hereby represents and warrants to Cerberus and Cerberus Member, as follows:

(a)     it is not insolvent (as such term is defined in the debtor/creditor laws of the jurisdiction of its organization);

(b)     the execution, delivery and performance of this Agreement will not (i) make such Contributor insolvent (as such term is defined in the debtor/creditor laws of the jurisdiction of its organization), or (ii) violate any provision of any requirement of law or contractual obligation of such Contributor, and will not result in or require the creation or imposition of any lien on any of the properties or revenues of such Contributor pursuant to any requirement of law or contractual obligation of such Contributor;

(c)     it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement;

(d)     it (and the undersigned representative of such Contributor) has full power, authority and legal right to execute and deliver this Agreement, and such Contributor has full power, authority and legal right to perform its obligations hereunder, and such execution, delivery and performance by such Contributor of its obligations hereunder does not and will not contravene, violate or conflict with any requirement of law, and does not and will not contravene, violate or conflict with, or result in a breach of or default under, any of the organizational documents of such Contributor, or any contractual obligation to which such Contributor or its assets is or are subject, and does not require or result in the creation or imposition of any lien in favor of any person; and

(e)     this Agreement has been duly executed and delivered by such Contributor and the legal, valid and binding obligation of such Contributor, enforceable against such

Contributor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, moratorium, insolvency, reorganization or similar laws affecting creditors' rights generally.

3.      <u>Expenses</u>.   The non-prevailing party shall reimburse the prevailing party, on demand, for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by the prevailing party in enforcing the provisions of this Agreement.

4.      <u>Waiver of Notice of Acceptance</u>.   Each Contributor hereby waives notice of acceptance of this Agreement.

5.      <u>GOVERNING LAW</u>.   THIS INSTRUMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

6.      <u>Notices</u>.   All notices, requests and other communications to any party hereunder shall be in writing (including facsimile) and shall be effective and deemed delivered or given, as the case may be, (a) if given by facsimile, when transmitted and the appropriate confirmation is received from the machine transmitting such facsimile, and followed by hard copy via overnight mail or reputable overnight courier for receipt the next Business Day, (b) if given by reputable overnight courier, on the next Business Day, (c) by hand delivery, when delivered or (d) if mailed, on the second Business following the day on which sent by first class mail:

If to Cerberus or Cerberus Member, addressed as follows:

c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 22nd Floor
New York, NY  10022
Attention:  Tom Wagner
Facsimile number:  (646) 885-3391

With a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention:  Stuart D. Freedman, Esq.
Facsimile number:  (212) 593-5955

If to Chatham Member or Chatham REIT, addressed as follows:

c/o Chatham Lodging Trust
50 Cocoanut Row, Suite 200
Palm Beach, FL  33480
Attention:  Jeffrey Fisher
Facsimile number:

With a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
Attention:  Scott K. Charles, Esq.
                   Robin Panovka, Esq.
Facsimile number:  (212) 403-2000


7.    <u>No Waiver, Remedies</u>.   No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition. No Contributor shall be required to pursue any rights or remedies against any other person prior to demanding payment from such other Contributor under this Agreement.   The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  Any amendments to, revisions of, or waivers of any provisions of this Agreement must be in writing to be effective.

8.    <u>Release; Bankruptcy</u>.  (a) Each Contributor hereby expressly waives and releases (i) the right to interpose all substantive and procedural defenses of the law of guarantee, indemnification and suretyship, but not (x) the defenses of prior payment or prior performance by Contributor or (y) the assertion of a defense that the event or circumstance giving rise to the liability under the Guaranty in question was caused, by the gross negligence, willful misconduct or fraud of such other Contributor; (ii) the right to interpose any set off or non-compulsory counterclaim of any nature or description in any action or proceedings; and (iii) any right or claim or right to cause a marshaling of the Contributor's assets.

(b)    If a Contributor shall be obligated by reason of any bankruptcy, insolvency or other legal proceeding to pay or repay to such other Contributor or to any trustee, receiver or other representative of such other Contributor, any amounts previously paid by Contributor pursuant to this Agreement, such other Contributor shall reimburse Contributor for any such payment or repayment and this Agreement shall extend to the extent of such payment or repayment made by the Contributor.  Contributor shall not be required to litigate or otherwise dispute its obligation or make such payment or repayment if in good faith and on written advice of counsel it believes that such obligation exists.

9.    <u>Severability</u>.  If any term, covenant, condition or provision of this Agreement or the application thereof to any circumstance or to any Contributor shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions and provisions of this Agreement or the application thereof to any circumstances or to any Contributor other than those as to which any term, covenant, condition or provision is held invalid or unenforceable, shall not be affected thereby and each remaining term, covenant, condition and provision of this Agreement shall be valid and shall be enforceable to the fullest extent permitted by law.

10.    <u>Payments</u>.  All payments due hereunder shall be paid in immediately available funds in lawful money of the United States.

11.    WAIVER OF TRIAL BY JURY.    EACH CONTRIBUTOR (BY THEIR ACCEPTANCE HEREOF) WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDINGS, CLAIM OR COUNTERCLAIM, WHETHER CONTRACT OR TORT, AT LAW OR IN EQUITY, WITH RESPECT TO, CONNECTION WITH OR ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

12.    Jurisdiction.    Any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, and, by execution and delivery of this Agreement, each Contributor hereby accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and the appellate courts thereof.  Each Contributor irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party at the address for notices set forth herein.  Each Contributor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

13.    Exculpation.    No Contributor shall enforce, the liability and obligation of such other Contributor contained in this Agreement by any action or proceeding against the partners, members, shareholders, managers, directors, officers, agents, affiliates or employees of such other Contributor (or any member, shareholder, partner or other owner of such partners, members, shareholders, managers, directors, officers, agents, affiliates or employees of such other Contributor or any director, officer, employee, agent, manager or trustee of any of the foregoing).

14.    Successors and Assigns.    This Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Contributor has executed this Agreement as of the date and year set forth above.

**CERBERUS SERIES FOUR HOLDINGS, LLC**

By: Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

By: Cerberus Institutional Associates, L.L.C., its General Partner

By: _____
Name:
Title:

**CRE-INK REIT MEMBER, LLC**

By: _____
Name:
Title:

**[CHATHAM LODGING LP]**

By: _____
Name:
Title:

**CHATHAM LODGING TRUST**

By: _____
Name:
Title:

EXHIBIT D

Operating Budget

[To be attached]

ANNEX A

Properties

Marriott Properties

Denver, CO (Downtown) Residence Inn by Marriott
Campbell, CA Residence Inn by Marriott
Cherry Hill, NJ Residence Inn by Marriott
Binghamton, NY Residence Inn by Marriott
Bothell, WA Residence Inn by Marriott
Altamonte Springs, FL Residence Inn by Marriott
Arlington, TX Residence Inn by Marriott
Atlanta, GA (Downtown) Residence Inn by Marriott
Atlanta, GA (Peachtree Corners) Residence Inn by Marriott
Atlantic City, NJ Courtyard by Marriott
Bellevue, WA Residence Inn by Marriott
Addison, TX Residence Inn by Marriott
Englewood, CO Residence Inn by Marriott
Fort Lauderdale, FL Courtyard by Marriott
Fort Wayne, IN Residence Inn by Marriott
Fremont, CA Residence Inn by Marriott
Gaithersburg, MD Residence Inn by Marriott
Harrisburg, PA Residence Inn by Marriott
Horsham, PA Towneplace Suites by Marriott
Lexington, KY Residence Inn by Marriott
Livonia, MI Residence Inn by Marriott
Louisville, KY Residence Inn by Marriott
Lynnwood, WA Residence Inn by Marriott
Montvale, NJ Courtyard by Marriott
Mountain View, CA Residence Inn by Marriott
Ontario, CA Residence Inn by Marriott
Portland Scarborough, ME Residence Inn by Marriott
Richmond, VA (NW) Residence Inn by Marriott
Richmond, VA (West End) Residence Inn by Marriott
Rosemont, IL Residence Inn by Marriott
Saddle River, NJ Residence Inn by Marriott
San Jose, CA Residence Inn by Marriott
San Mateo, CA Residence Inn by Marriott
Shelton, CT Residence Inn by Marriott
Silicon Valley, CA I Residence Inn by Marriott
Silicon Valley, CA II Residence Inn by Marriott

Troy, MI (SE) Residence Inn by Marriott
Tukwila, WA Residence Inn by Marriott
Windsor, CT Residence Inn by Marriott

<u>Hilton Properties</u>
Albany, NY Hampton Inn by Hilton
Columbia, MD Hampton Inn by Hilton
Germantown, MD Hampton Inn by Hilton
Islandia, NY Hampton Inn by Hilton
Louisville, KY Hampton Inn by Hilton
Naples, FL Hampton Inn by Hilton
Valencia, CA Embassy Suites by Hilton
Westchester, IL Hampton Inn by Hilton
Willow Grove, PA Hampton Inn by Hilton
Woburn, MA Hampton Inn by Hilton

<u>Hyatt Properties</u>
Addison, TX Hyatt Summerfield Suites
Belmont, CA Hyatt Summerfield Suites
El Segundo, CA Hyatt Summerfield Suites
Las Colinas, TX Hyatt Summerfield Suites
Mt. Laurel, NJ Hyatt Summerfield Suites

<u>Starwood Properties</u>
Fort Walton Beach, FL Four Points by Sheraton
Morristown, NJ Westin
Rockville, MD Sheraton

<u>Unaffiliated Properties</u>
107 Merrimac Street, Boston, MA 02114
1600 East Grand River Avenue, East Lansing, MI 48823
2701 East Beltline Avenue SE, Grand Rapids, MI 49546
3553 Founders Road, Indianapolis, IN 46268
222 East 22nd Street, Lombard, IL 60148
1300 E. Higgins Road, Schaumburg, IL 60173
2600 Livernois Road, Troy, MI 48083

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**INK ACQUISITION LLC**

ARTICLE I. GENERAL PROVISIONS; ORGANIZATION; STRUCTURE ............................ 1
Section 1.1    Registered Office ............................................................................... 1
Section 1.2    Place of Business; Offices ................................................................. 2
Section 1.3    Purpose; Nature of Business Permitted; Powers; Title to Property ................. 2
Section 1.4    [Reserved] ........................................................................................ 2
Section 1.5    Tax Classification; No State Law Partnership; REIT Qualifications ............... 2
Section 1.6    Definitions ......................................................................................... 3
Section 1.7    Certificates ........................................................................................ 20
Section 1.8    Term ................................................................................................. 20
Section 1.9    Bid .................................................................................................... 20
Section 1.10   Property Companies ........................................................................... 21
Section 1.11   Liability of Members .......................................................................... 21
Section 1.12   Restructuring ..................................................................................... 23

ARTICLE II. PERCENTAGE INTERESTS, CAPITAL  CONTRIBUTIONS AND
              CAPITAL ACCOUNTS .................................................................. 23
Section 2.1    Percentage Interests ........................................................................... 23
Section 2.2    Capital Contributions ......................................................................... 23
Section 2.3    Capital Accounts ................................................................................ 25
Section 2.4    Admission of New Members ............................................................... 26
Section 2.5    Interest............................................................................................... 26
Section 2.6    Capital Withdrawal Rights, Interest and Priority................................... 26

ARTICLE III. MANAGEMENT OF THE COMPANY ............................................... 26
Section 3.1    Company Governance ......................................................................... 26
Section 3.2    Authority, Duties and Obligations of the Managing Member ................. 28
Section 3.3    Managing Member Certifications ........................................................ 31
Section 3.4    Officers ............................................................................................. 31
Section 3.5    Operating Budget and Business Plan .................................................... 33
Section 3.6    Voting Rights of Members................................................................... 34
Section 3.7    Buy/Sell............................................................................................. 35

ARTICLE IV. GENERAL GOVERNANCE ............................................................ 38
Section 4.1    Other Ventures ................................................................................... 38
Section 4.2    Information ........................................................................................ 39
Section 4.3    Access ............................................................................................... 39
Section 4.4    Affiliate Transactions......................................................................... 39

ARTICLE V. TRANSFERS OF INTERESTS ......................................................... 40
Section 5.1    Restrictions on Transfer...................................................................... 40
Section 5.2    Non-Permitted Transfers..................................................................... 41

ARTICLE VI. ALLOCATIONS ............................................................................................ 42
    Section 6.1    General Rules ........................................................................................... 42
    Section 6.2    Other Allocation Rules ........................................................................... 42
    Section 6.3    Tax Allocations:  Code Section 704(c) .................................................... 42

ARTICLE VII. DISTRIBUTIONS AND EXPENSES ........................................................ 43
    Section 7.1    Distributions of Net Cash Flow ............................................................ 43
    Section 7.2    Amounts Withheld .................................................................................. 44
    Section 7.3    Expenses ................................................................................................. 45

ARTICLE VIII. OTHER TAX MATTERS ........................................................................ 45
    Section 8.1    Tax Matters Member ............................................................................ 45
    Section 8.2    Furnishing Information to Tax Matters Member ................................ 45
    Section 8.3    Tax Claims and Proceedings ................................................................ 45
    Section 8.4    Books and Records ................................................................................ 46
    Section 8.5    Survival .................................................................................................. 46

ARTICLE IX. REPRESENTATIONS AND WARRANTIES; COVENANTS .......................... 46
    Section 9.1    Representations and Warranties of Members ................................... 46
    Section 9.2    ERISA Representation .......................................................................... 48
    Section 9.3    AML/OFAC Compliance ....................................................................... 48
    Section 9.4    Survival .................................................................................................. 50

ARTICLE X. DISSOLUTION AND TERMINATION OF THE COMPANY ......................... 51
    Section 10.1    Dissolution ........................................................................................... 51
    Section 10.2    Continuation of Interest of Member's Representative ..................... 51
    Section 10.3    Dissolution, Winding Up and Liquidation ........................................ 51
    Section 10.4    Member Bankruptcy ............................................................................ 52

ARTICLE XI. INDEMNIFICATION AND CONTRIBUTION .............................................. 52
    Section 11.1    Indemnity by the Company ................................................................. 52
    Section 11.2    Exculpation .......................................................................................... 53
    Section 11.3    Expenses ............................................................................................... 53
    Section 11.4    Advance Payment of Expenses ........................................................... 53
    Section 11.5    Beneficiaries ........................................................................................ 53
    Section 11.6    Indemnification Procedure for Third Party and Other Claims ....... 53
    Section 11.7    Other Claims ....................................................................................... 54
    Section 11.8    Limitation on Damages ....................................................................... 54

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................ 54
    Section 12.1    Entire Agreement ................................................................................ 54
    Section 12.2    Amendments ......................................................................................... 54
    Section 12.3    Applicable Law; Venue ....................................................................... 55

Table of Contents
(continued)

Section 12.4   Enforcement .................................................................................................. 55
Section 12.5   Headings ....................................................................................................... 55
Section 12.6   Severability .................................................................................................. 55
Section 12.7   Counterparts ................................................................................................ 55
Section 12.8   Filings .......................................................................................................... 55
Section 12.9   Additional Documents ................................................................................. 56
Section 12.10  Notices ......................................................................................................... 56
Section 12.11  Waiver of Right to Partition and Bill of Accounting .................................... 57
Section 12.12  Confidentiality; Press Releases ................................................................... 57
Section 12.13  Uniform Commercial Code........................................................................... 57
Section 12.14  Binding Agreement ...................................................................................... 58
Section 12.15  Waiver ......................................................................................................... 58
Section 12.16  DISCLOSURES ........................................................................................... 58

**AMENDMENT TO**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**INK ACQUISITION LLC**

THIS AMENDMENT TO THE LIMITED LIABILITY COMPANY AGREEMENT (this "Amendment") of INK ACQUISITION LLC, a Delaware limited liability company (the "Company"), made as of May 16, 2011, by and between CRE-Ink REIT Member, LLC ("Cerberus") and Chatham Lodging LP ("Chatham") amends the Limited Liability Company Agreement of the Company, dated as of April 25, 2011, by and between Cerberus and Chatham (the "LLC Agreement"). All capitalized terms used herein and not otherwise defined herein are used herein as defined in the LLC Agreement.

RECITALS:

WHEREAS, the Initial Members wish to amend the LLC Agreement in accordance with Section 12.2 thereof;

NOW, THEREFORE, for good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby agrees as follows:

**ARTICLE I**
**AMENDMENTS**

Section 1.1     The definition of "Closing Date" in Section 1.6 of the LLC Agreement is hereby amended by deleting the phrase "and the Investment Agreement are" and inserting the word "is" in place thereof.

Section 1.2     The definition of "Major Decisions" in Section 1.6 of the LLC Agreement is hereby amended by:

(a) deleting the word "or" at the end of clause (ii) thereof, replacing the period at the end of clause (jj) thereof with a semi-colon, and inserting the following immediately after clause (jj) thereof:

"(kk)   approve or implement any Operating Budget or Business Plan, as set forth in Section 3.5;

(ll)     except as otherwise expressly permitted pursuant to this Agreement or the then-current Operating Budget or Business Plan, entering into, amending or modifying agreements with cost or liability to the Company or its Subsidiaries in excess of $5 million in any fiscal year or which are otherwise material to the business of the Company, <u>provided</u>, that for purposes of this provision, the cost of an agreement shall be calculated based on only the period prior to the time that the Company or its Subsidiaries shall have the right to freely terminate such agreement, and shall include any fee payable upon termination by the Company or its Subsidiaries.

(mm)   entering into any agreement with an Affiliate of a Member other than pursuant to Section 4.4;

(nn)    causing the Company or any Subsidiary other than a Property Company or Property Leaseco to hold any assets other than (w) the interests in its Subsidiaries as of the Closing Date after giving effect to the transactions contemplated by the Plan, (x) any interest in an entity treated as a corporation for U.S. federal income tax purposes, (y) any cash reserves intended for distributions to the Members or to pay Company expenses or (z) any other assets that the Managing Member is permitted to acquire and hold pursuant to the then-effective Operating Budget;

(oo)    entering into or terminating, disposing of or materially amending the terms of any joint venture to which the Company or any of its Subsidiaries is a party;

(pp)    changing the principal banking institutions with which the Company or its subsidiaries maintain deposit, borrowing or other relationships; or

(qq)    materially changing the line(s) of business of the Company and its Subsidiaries or conducting business in a jurisdiction other than the United States."; and

(b)     deleting the phrase "(other than as a consequence of taking or approving or refraining from taking or approving any action pursuant to a direction, an affirmative veto or a lack of approval after a specific request therefore, in each case from a Member authorized to give such direction, veto or approval)" from clauses (t) and (u) thereof.

Section 1.3     The definition of "Termination Event" in Section 1.6 of the LLC Agreement is hereby amended and restated in its entirety as follows:

"'<u>Termination Event</u>' means (a) the occurrence of a Failed Contribution with respect to (i) any Initial Capital Contribution for which Capital Call has been made in accordance with Section 2.2(a), or (ii) any Capital Contribution (other than an Initial Capital Contribution) for which a Capital Call has been made other than pursuant to Section 2.2(b)(ii), (b) any material breach of Chatham's obligations hereunder (other than a Failed Contribution), or any gross negligence, willful misconduct or fraud committed by Chatham or any Person affiliated with Chatham in connection with the performance of Chatham's obligations hereunder, in each case other than such gross negligence, willful misconduct or fraud that, if capable of being Cured, is

Cured within thirty (30) days after Chatham receives written notice thereof, <u>provided</u>, that, for all purposes under this Agreement, it shall not be a breach of Chatham's obligations hereunder if Chatham takes or approves or refrains from taking or approving an action that would be a Major Decision as defined in clause (t) or (u) of the definition thereof as a consequence of taking or approving or refraining from taking or approving any action pursuant to a direction, an affirmative veto or a lack of approval after a specific request therefore, in each case from any Member other than the Managing Member to the extent such other Member is authorized to give such direction, veto or approval, (c) the reduction of Chatham's Percentage Interest to a percentage of less than 5% hereof, (d) the failure of Jeffrey Fisher to remain as active in the management and business of Chatham REIT as he is as of the date of this Agreement, (e) any direct or indirect Transfer of an interest in Chatham that is not a Transfer permitted under Article V hereof, unless such Transfer, if capable of being Cured, is Cured within thirty (30) days after the occurrence thereof, or (f) the failure of Chatham to timely satisfy its binding obligation to sell as a selling Member or to purchase as a purchasing Member, as applicable, under and as set forth in Section 3.7 below."

Section 1.4    Schedule A to the Agreement is hereby amended and restated in its entirety as set forth on Schedule A to this Amendment.

**ARTICLE II**
**MISCELLANEOUS**

Section 2.1    <u>Counterparts</u>.  This Amendment may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

Section 2.2    <u>Governing Law</u>.  (a) This Amendment shall be governed exclusively by its terms, the terms of the LLC Agreement, and the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.

(b)    Any legal action or proceeding with respect to this Amendment and any action for enforcement of any judgment in respect thereof may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, and, by execution and delivery of this Agreement, each Member hereby accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and the appellate courts thereof.  Each Member irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party at the address for notices set forth herein.  Each Member hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

Section 2.3    <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be deemed invalid, illegal or unenforceable to any extent, the

remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 2.4    <u>Remaining Provisions</u>. Except as and to the extent expressly amended hereby, the LLC Agreement shall continue in full force and effect.

*       *       *

IN WITNESS WHEREOF, the parties hereto have executed this Amendment, effective as of the date first above written.

**MEMBERS:**

CRE-INK REIT MEMBER, LLC

By: _____
      Name:
      Title:

CHATHAM LODGING LP

By: _____
      Name: Eric Kentoff
      Title: VP + General Counsel

SCHEDULE A

**MEMBERS**

| MEMBER'S NAME | INITIAL CAPITAL CONTRIBUTION AMOUNT | PERCENTAGE INTEREST |
|---|---|---|
| CRE-Ink REIT Member, LLC | $ 363,500,000 | 90.8% |
| Chatham Lodging LP | $ 37,000,000 | 9.2% |
| TOTAL | $400,500,000 | 100.0% |

Pro Forma Structure Chart

[See Attached]

Pro Forma Structure Chart*



*Subject to change based on the final determination of corporate structure by the Plan Sponsors, in their sole discretion and as described in a plan supplement document to be filed before the scheduled date of confirmation of the Fixed/Floating Plan.

16279922.1

## Pro Forma Capitalization

| | Current Principal Balance[a] | Consideration | Cash Consideration | Pro Forma Principal Balance |
|---|---|---|---|---|
| **DEBT** | | | | |
| **Five Mile Fixed Pool DIP Loan** | $46,600,000.00 | $46,600,000.00 | $46,600,000.00 | $0.00 |
| **Lehman DIP Loan**[b] | 17,498,095.52 | 17,498,095.52 | 17,498,095.52 | 0.00 |
| **Fixed Pool Mortgage**[c] | 825,400,000.00 | 736,599,688.40 | 12,802,450.37 | 723,797,238.03 |
| **Floating Pool Loan**[d] | 352,638,963.26 | 235,852,098.46 | 235,852,098.46 | 0.0 |
| **Total Debt** | **$1,242,137,058.78** | | | **$723,797,238.03** |
| **Implied Equity** | | | | **$400,527,644.35** |
| **Total Capitalization** | **$1,242,137,058.78** | | | **$1,124,324,882.38** |

(a) Current Principal Balance represents principal balance as of the date the Company filed for chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.

(b) Assumes DIP financing facility is fully drawn.

(c) A new, non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

(d) Includes Floating Pool Mortgage and Mezzanine Loans

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

| Sources | | Uses | |
|---|---|---|---|
| New Cash | $400,527,644.35 | Repayment of Solar DIP Financing | 17,498,095.52 |
| Apollo Contribution | 375,000.00 | Repayment of Five Mile DIP Financing | 46,600,000.00 |
| Overbid Financing[a] | 101,297,238.03 | Consideration to Fixed Rate Mortgage Holders[b] | 114,099,688.40 |
| | | Consideration to Floating Pool Mortgage and Mezzanine Loan Holders | 235,852,098.46 |
| | | Unsecured Creditors Payment | 4,750,000.00 |
| | | Apollo Guaranty Settlement | 3,000,000.00 |
| | | Five Mile/Lehman Expense Reimbursement | 3,000,000.00 |
| | | Special Servicer Cash Payment | 2,500,000.00 |
| | | Balance Sheet Cash[c] | 74,900,000.00 |
| **Total** | **$502,199,882.38** | | **$502,199,882.38** |

(a)  Reflects only the portion of financing constituting the overbid amount and does not include the $622,500,000 of financing contained in the stalking horse bid.

(b)  Consists of $12,802,450.37 in cash and the remainder in indebtedness.

(c)  Balance sheet to be used for, among other purposes, the funding of $22,800,000.00 of FF&E, PIP, and working capital reserves, the potential $500,000.00 payment to Bidder D and closing costs (currently estimated to be approximately $10,000,000.00).  Insofar as any of these costs are not realized in their full amounts, the balance sheet cash shall stay with the New HoldCo.

Differences in Working Capital/Capital Expenditure Requirements

None.

**EXHIBIT G**

**Chatham Asset Purchase Agreement**

AGREEMENT OF PURCHASE

AND SALE

dated as of May 3, 2011

between

KPA RIMV, LLC, KPA RIGG, LLC

KPA TYSONS CORNER RI, LLC,

KPA WASHINGTON DC, LLC and

KPA SAN ANTONIO, LLC

collectively, as SELLERS,

and

CHATHAM LODGING, L.P.,

as PURCHASER

Double Tree, Washington, DC
Homewood Suites, San Antonio, TX
Residence Inn, Tysons Corner, VA
Residence Inn, San Diego, CA
Residence Inn, Anaheim, CA

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS; RULES OF CONSTRUCTION .....................................................1

    1.1     Definitions...........................................................................................1
    1.2     Rules of Construction. ......................................................................8

ARTICLE 2 PURCHASE AND SALE; DEPOSIT; PAYMENT OF PURCHASE
          PRICE ............................................................................................9

    2.1     Purchase and Sale ............................................................................9
    2.2     Deposit .............................................................................................9
    2.3     Payment of Purchase Price...............................................................9
    2.4     Assumption of Assumed Loans ........................................................9

ARTICLE 3 COURT APPROVAL .......................................................................................10

    3.1     Bankruptcy Court Approval/Bid Protections.................................10
    3.2     The Confirmation Order .................................................................10

ARTICLE 4 SELLERS' REPRESENTATIONS, WARRANTIES AND COVENANTS ...........12

    4.1     Organization and Power..................................................................12
    4.2     Authorization and Execution .........................................................12
    4.3     Noncontravention...........................................................................12
    4.4     No Special Taxes ...........................................................................13
    4.5     Compliance with Existing Laws .....................................................13
    4.6     Contracts and Leases......................................................................13
    4.7     Warranties and Guaranties..............................................................13
    4.8     Litigation........................................................................................13
    4.9     Title................................................................................................13
    4.10    Operation of Property ....................................................................14
    4.11    Personal Property ...........................................................................14
    4.12    Independent Audit..........................................................................14
    4.13    Liquor License ...............................................................................14
    4.14    Bankruptcy .....................................................................................15

ARTICLE 5 PURCHASER'S REPRESENTATIONS, WARRANTIES AND
          COVENANTS ...............................................................................15

    5.1     Organization and Power..................................................................15
    5.2     Noncontravention...........................................................................15
    5.3     Litigation........................................................................................15

ARTICLE 6 CONDITIONS AND ADDITIONAL COVENANTS ........................................16

    6.1     Conditions to Purchaser's Obligations...........................................16
    6.2     Conditions to Sellers' Obligations.................................................17

ARTICLE 7 CLOSING .......................................................................................................17

    7.1     Closing ...........................................................................................17

| | | | |
|---|---|---|---|
| 7.2 | Sellers' Deliveries | | 18 |
| 7.3 | Purchaser's Deliveries | | 18 |
| 7.4 | Closing Costs | | 19 |
| 7.5 | Income and Expense Allocations | | 19 |

ARTICLE 8 CONDEMNATION; RISK OF LOSS ...................................................20

| | | | |
|---|---|---|---|
| 8.1 | Condemnation | | 20 |
| 8.2 | Risk of Loss | | 20 |

ARTICLE 9 LIABILITY OF PURCHASER; LIABILITY OF SELLER;
TERMINATION RIGHTS ...................................................21

| | | | |
|---|---|---|---|
| 9.1 | Liability of Purchaser and Seller | | 21 |
| 9.2 | Termination by Purchaser | | 21 |
| 9.3 | Termination by Seller | | 21 |
| 9.4 | Break-Up Fee and Expense Reimbursement | | 22 |

ARTICLE 10 MISCELLANEOUS PROVISIONS ...................................................22

| | | | |
|---|---|---|---|
| 10.1 | Completeness; Modification | | 22 |
| 10.2 | Assignments | | 22 |
| 10.3 | Successors and Assigns | | 22 |
| 10.4 | Days | | 23 |
| 10.5 | Governing Law | | 23 |
| 10.6 | Counterparts | | 23 |
| 10.7 | Severability | | 23 |
| 10.8 | Costs | | 23 |
| 10.9 | Notices | | 23 |
| 10.10 | Incorporation by Reference | | 24 |
| 10.11 | Further Assurances | | 24 |
| 10.12 | No Partnership | | 24 |
| 10.13 | Time of Essence | | 24 |
| 10.14 | No Third-Party Beneficiary | | 24 |
| 10.15 | Waiver of Jury Trial | | 25 |

**[LIST OF EXHIBITS/SCHEDULES]**

Exhibit A    -    Seller and Property
Exhibit B    -    Legal Description of the Real Property
Exhibit C    -    Liquor Licenses
Exhibit D    -    Assumed Loan Modification Terms
Exhibit E    -    Contracts and Leases
Exhibit F    -    Existing Warranties and Guaranties
Exhibit G    -    Assumed Loans
Exhibit H    -    Plans of Reorganization

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement"), dated as of May 3, 2011 ("Effective Date"), between KPA RIMV, LLC, a Delaware limited liability company ("KPA Mission Valley"), KPA RIGG, LLC, a Delaware limited liability Company ("KPA Garden Grove"), KPA TYSONS CORNER RI, LLC, a Delaware limited liability company ("KPA Tysons Corner"), KPA WASHINGTON DC LLC, a Delaware limited liability company ("KPA Washington DC"), and KPA SAN ANTONIO, LLC, a Delaware limited liability company ("KPA San Antonio," and each of KPA Mission Valley, KPA Garden Grove, KPA Tysons Corner and KPA Washington DC, a "Seller," and collectively, the "Sellers"), and CHATHAM LODGING, L.P., a Delaware limited partnership (the "Purchaser").

RECITALS:

WHEREAS, each Seller owns a fee simple interest in its respective Real Property (as defined below), as more particularly described on Exhibit B attached hereto;

WHEREAS, on July 19, 2010, the Sellers, together with the Sellers' Affiliates (defined below), commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing voluntary petitions for relief (the "Sellers' Chapter 11 Cases") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, pursuant to the terms of the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code to which this Agreement is attached as Exhibit H (as amended, revised, modified or supplemented from time to time, the "Plan"), and subject to the terms and conditions set forth in this Agreement, Purchaser desires to acquire from the Sellers and, subject to the entry of the Confirmation Order (as defined in the Plan), Seller desires to sell to Purchaser, the Property for the Purchase Price upon the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS; RULES OF CONSTRUCTION

1.1     Definitions.

The following terms shall have the indicated meanings:

"Affiliate" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"Agreement" has the meaning set forth in the preamble hereto.

"Applicable Laws" means all statutes, laws (including common law), regulations, rules, ordinances, codes and other requirements of any Governmental Body, including any Orders.

"Assignment and Assumption Agreement" means the assignment and assumption agreement pursuant to which the Sellers and each Operating Tenant (notwithstanding its joinder to this Agreement) shall assign and the Purchaser shall assume from the Sellers and each Operating Tenant the Assumed Contracts and the Assumed Leases, in such form and substance as Purchaser, the Operating Tenants, and Sellers shall mutually agree.

"Assignment and Consent Agreement" means an agreement (in a form to be agreed upon) between Purchaser, the Sellers and the Servicer, whereby, amongst other things, the Servicer will consent to the assignment of the Assumed Loans from the Sellers to Purchaser, as such Assumed Loans have been modified in accordance with the Assumed Loan Modification Terms set forth on Exhibit D attached hereto.

"Assumed Contracts" means, collectively, the Contracts set forth in Exhibit E attached hereto, which Contracts shall be assumed by the Sellers and assigned to the Purchaser pursuant to Section 365 of the Bankruptcy Code, the Confirmation Order or other order of the Bankruptcy Court and the Assignment and Assumption Agreement.

"Assumed Leases" means, collectively, the Leases set forth in Exhibit E attached hereto, which Leases shall be assumed by the Sellers and assigned to the Purchaser pursuant to Section 365 of the Bankruptcy Code, the Confirmation Order, or other order of the Bankruptcy Court and the Assignment and Assumption Agreement.

"Assumed Loan Modification Terms" means the modified loan terms of the Assumed Loans previously agreed to by Servicer and Purchaser pursuant to that certain term sheet with respect to the Assumed Loans and set forth on Exhibit D attached hereto.

"Assumed Loans" means the loans identified on Exhibit G attached hereto having an aggregate, current and actual balance equal to (x) One Hundred Fifty Nine Million One Hundred Fifty Nine Thousand Six Hundred Ninety Five and 40/100 Dollars ($159,159,695.40) minus (y) the Paydown Amount, as such Assumed Loans have been modified in accordance with the Assumed Loan Modification Terms, provided, that the Assumed Loans shall not include any Pre-Closing Date Interest/Principal Payments.

"Assumption Application" has the meaning set forth in Section 2.4.

"Authorizations" means all licenses, permits and approvals required by any Governmental Body, quasi-governmental agency, or officer for the ownership, operation and use of such Property or any part thereof.

"Bill of Sale (Inventory)" means the bill of sale conveying title to the Inventory to the Purchaser, it's property manager, lessee or designee, in such form and substance as the Purchaser and each Seller shall mutually agree.

"Bill of Sale (Personal Property)" means the bill of sale conveying title to the Tangible Personal Property, and Intangible Personal Property, to the extent assignable, from each Seller to the Purchaser.

"Break-Up Fee" means an amount in cash equal to Two Million Dollars ($2,000,000.00).

"Break-Up Fee and Expense Reimbursement Motion" has the meaning set forth in Section 3.1.

"Business Day" shall mean any day other than a Saturday, Sunday, any other day on which commercial banks in New York, New York are authorized or obligated to close under Applicable Laws or, for purposes of any provision of this Agreement requiring the filing of papers with the Bankruptcy Court or the entry of an Order by the Bankruptcy Court no later than a specified day, any other day on which the Bankruptcy Court is closed.

"Cash Purchase Price" means a cash amount equal to Thirty Five Million Eight Hundred Forty Thousand Three Hundred and Four Dollars and 60/100 Dollars ($35,840,304.60).

"Claims" means claims, suits, proceedings, causes of action, Liabilities, losses, damages, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever.

"Closing" means a consummation of a purchase and sale of the Property pursuant to this Agreement.

"Closing Date" means the date on which the Closing occurs, but in no event later than the date identified in Section 7.1.

"Commission" has the meaning set forth in Section 4.12.

"Confirmation Order" has the meaning set forth in the preamble hereto.

"Contracts" shall mean any contracts, agreements, licenses and leases (other than the Leases) entered into by each Seller and each Operating Tenant, as applicable (whether oral or written), affecting or related to the Property by which any Seller or the Operating Tenant, as applicable, is bound.

"Deed" means a special warranty deed conveying title to the Real Property from each Seller to the Purchaser, subject only to Permitted Encumbrances, in such form and substance as Purchaser and each Seller shall mutually agree.

"Deposit" has the meaning set forth in Section 2.2.

"Deposit Escrow Agent" means Wells Fargo Bank, N.A.

"Deposit Interest" has the meaning set forth in Section 2.2.

"DIP PIP Payment" has the meaning set forth in Section 6.1(d).

"Effective Date" has the meaning set forth in the preamble hereto.

"Encumbrances" means all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Property or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting the title, current use, occupancy or operation of the Property or any part thereof or interest therein.

"Existing PIP Work Hotels" means the Hotels located in Tysons Corner, VA and Mission Valley, CA.

"Expense Reimbursement" means the reimbursement of any and all reasonable and documented fees (including attorneys' fees), expenses and other costs incurred by Purchaser or its Affiliates in connection with the negotiation, documentation and diligence with respect to the Transaction in an amount not to exceed Five Hundred Thousand Dollars ($500,000.00).

"Final Closing Statement" has the meaning set forth in Section 7.5(e).

"FIRPTA Certificate" means the affidavit of each Seller conveying Real Property under Section 1445 of the Internal Revenue Code certifying that such Seller is not a foreign corporation, foreign partnership, foreign trust, foreign estate or foreign person (as those terms are defined in the Internal Revenue Code and the Income Tax Regulations), in such form and substance as Purchaser and each Seller shall mutually agree.

"Governmental Body" means any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

"Guest Ledger" means the collection of all open balances, whether secured by some form of payment or unsecured, for all in house Hotel guests remaining as of the Closing Date.

"Hearing" means the hearing to be held by the Bankruptcy Court to consider the Confirmation Order and the approval of the Transaction.

"Hotel" means the hotels owned by each Seller (as of the Closing Date), as the case may be, named and set forth on Exhibit A attached hereto and the related amenities and appurtenances thereto.

"Improvements" means the Hotel and all other buildings, improvements, fixtures and other items of real estate located on the Land.

"Intangible Personal Property" means  all intangible personal property owned by the Sellers and used in connection with the ownership, operation, leasing, occupancy or maintenance of the Property, including, without limitation, the right to use the trade name associated with the

Property and all variations thereof, the Authorizations, escrow accounts, insurance policies, general intangibles, business records, plans and specifications, surveys and title insurance policies pertaining to the Real Property and the Personal Property, all licenses, permits and approvals with respect to the construction, ownership, operation, leasing, occupancy or maintenance of the Property, any unpaid award for taking by condemnation or any damage to the Land by reason of a change of grade or location of or access to any street or highway, and the share of the Tray Ledger determined under Section 7.5, excluding (a) any of the aforesaid rights the Purchaser elects not to acquire, (b) the Sellers' cash on hand, in bank accounts and invested with financial institutions and (c) accounts receivable except for the above described share of the Tray Ledger.

"Interim Liquor Agreement" has the meaning set forth in Section 4.13.

"Inventory" means all inventory located at the Hotels and owned by the Sellers, including without limitation, all mattresses, pillows, bed linens, towels, paper goods, soaps, cleaning supplies and other such supplies.

"July 31 Expense Reimbursement" means the sum of One Million Dollars ($1,000,000.00).

"Knowledge" shall mean the actual knowledge of Marc Beilinson, Mark Murphy or Tim Walker after discussions with the manager of the Hotels, without any other duty of inquiry or investigation. For the purposes of this definition, the term "actual knowledge" means, with respect to any Person, the conscious awareness of such Person at the time in question, and expressly excludes any constructive or implied knowledge of such Person.

"KPA Garden Grove" has the meaning set forth in the preamble hereto.

"KPA Mission Valley" has the meaning set forth in the preamble hereto.

"KPA San Antonio" has the meaning set forth in the preamble hereto.

"KPA Tysons Corner" has the meaning set forth in the preamble hereto.

"KPA Washington DC" has the meaning set forth in the preamble hereto.

"Land" means each of the Sellers' land legally described on Exhibit B attached hereto, together with all easements, rights, privileges, remainders, reversions and appurtenances thereunto belonging or in any way appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of each Seller therein, in the streets and ways adjacent thereto and in the beds thereof, either at law or in equity, in possession or expectancy, now or hereafter acquired.

"Leases" means any agreements to lease, leases, renewals of leases, subtenancy agreements and other rights (including licenses) granted by or on behalf of, or to, any Seller or any of its predecessors in title which entitle any Person to possess or occupy any space on or within the Real Property.

"<u>Liability</u>" means any debt, liability, commitment or other obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or not yet due) and including all costs, fees and expenses relating thereto.

"<u>Liquor License</u>" means those certain liquor licenses set forth on <u>Exhibit C</u> attached hereto and any other liquor licenses required by applicable governing bodies for lawful service of liquor at the Hotels.

"<u>Loan Assumption</u>" has the meaning set forth in <u>Section 2.4</u>.

"<u>Operating Tenant</u>" (i) with respect to KPA RIMV, Grand Prix RIMV Lessee LLC, a Delaware limited liability company, (ii) with respect to KPA Washington DC, KPA Washington DC, LLC, a Delaware limited liability company, (iii) with respect to KPA Garden Grove, Grand Prix RIGG Lessee LLC, a Delaware limited liability company, (iv) with respect to KPA San Antonio, Grand Prix General Lessee LLC, a Delaware limited liability company, and (v) with respect to KPA Tysons Corner, Grand Prix General Lessee LLC, a Delaware limited liability company.

"<u>Order</u>" means any order, court order, writ, judgment, injunction, decree, stipulation, determination, decision, verdict, ruling, or award entered by or with any Governmental Body (whether temporary, preliminary or permanent).

"<u>Owner's Title Policy</u>" means an owner's title insurance policy, pro forma, or marked and signed title commitment issued to the Purchaser by the Title Company, pursuant to which the Title Company insures the Purchaser's ownership of fee simple title to the Real Property (including the marketability thereof) subject only to Permitted Encumbrances. The Owner's Title Policy shall insure the Purchaser in the amount of the Purchase Price and shall be acceptable in form and substance to the Purchaser. The description of the Land in the Owner's Title Policy shall be identical to the description shown on the Survey.

"<u>Party</u>" means Seller or Purchaser, individually, and "<u>Parties</u>" means Seller and Purchaser, collectively.

"<u>Paydown Amount</u>" means an amount not to exceed Twenty Five Million Dollars ($25,000,000.00) paid (or caused to be paid) by Purchaser (or its designee) to Servicer (or its designee) on the Closing Date to be applied against the Assumed Loans.

"<u>Permitted Encumbrances</u>" means: (i) the Assumed Loans; (ii) minor discrepancies, conflicts in boundary lines, shortage in area, encroachments and any other state of facts shown on any accurate survey prepared by a professionally licensed land surveyor made available to the Purchaser and any easements, rights of way, covenants, conditions, limitations and restrictions of record that are shown on Schedule B-2 of the Owner's Title Policy (<u>provided</u> that any item set forth therein relating to any Tax, or "claim of lien" shall not be a Permitted Encumbrance from and after the entry of the Confirmation Order); (iii) laws, regulations, resolutions or ordinances, including building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Real Property imposed by any Governmental Body, but only to the extent that such laws, regulations, resolutions or ordinances have not been

violated in any material respect; and (iv) liens for real estate and personal property Taxes not yet due and payable.

"Person" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Body or any other entity.

"Personal Property" means the Tangible Personal Property and the Intangible Personal Property.

"PIP" has the meaning set forth in Section 6.1(d).

"Plan" has the meaning set forth in the recitals.

"Pre-Closing Date Interest/Principal Payments" means the amount (if any) of principal or interest payments owed to the Servicer by the Seller or Sellers, as the case may be, with respect to the Assumed Loans, that accrued with respect to each such Assumed Loan up to and including the Closing Date.

"Property" means collectively the Real Property, the Inventory and the Personal Property owned by each of the Sellers or each Operating Tenant, as applicable.

"Purchase Price" means the sum of the (i) Cash Purchase Price, (ii) Paydown Amount and (iii) Assumed Loans, as such amounts may be reduced in accordance with Sections 6.1(d) and 7.5 herein (or as otherwise provided in this Agreement).

"Purchaser" has the meaning set forth in the preamble hereto.

"Real Property" means the Land and the Improvements.

"Representative" means with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"Seller" or "Sellers" has the meaning set forth in the preamble hereto.

"Sellers' Chapter 11 Cases" has the meaning set forth in the recitals.

"Seller's Organizational Documents" means the current limited liability company or operating agreement and certificate of formation of each Seller.

"Servicer" means LNR Partners, LLC, as special servicer under the Assumed Loans.

"Specified Termination Event" has the meaning set forth in Section 9.4.

"Survey" means each survey ordered by Purchaser prepared delineating the boundary lines of the Land, location of the Improvements, all rights of way and easements and contiguous public roads, the same prepared for the benefit of and certified to Purchaser and the Title

Company; Purchaser shall pay all costs and expenses of, and incurred in connection with, such survey. The Survey shall be adequate for the Title Company to delete any exception for general survey matters in the Owner's Title Policy. If there is a discrepancy between the description of the Land attached hereto as Exhibit B and the description of the Land as shown on the Survey, the survey shall confirm that the property description identifies the Property.

"Tangible Personal Property" means the items of tangible personal property consisting of all furniture, fixtures and equipment situated on, attached to or used in the operation of the Hotels, and all furniture, furnishings, equipment, machinery and other personal property of every kind located on or used in the operation of the Hotels and owned by the Sellers.

"Tax" or "Taxes" means any federal, state, local or foreign net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, unemployment, payroll, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, or environmental tax, escheat payments or any other tax, custom, duty, impost, levy, governmental fee or other like assessment or charge (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto).

"Title Company" means Madison Title Agency, LLC.

"Transaction" means the transactions contemplated by this Agreement to be consummated at the Closing, including, but no limited to, the purchase and sale of the Property.

"Tray Ledger" means the final night's room revenue (revenue from rooms occupied as of 12:01 a.m. on the Closing Date, exclusive of food, beverage, telephone and similar charges which shall be retained by the Seller), including any sales taxes, room taxes or other taxes thereon.

1.2     Rules of Construction.

The following rules shall apply to the construction and interpretation of this Agreement:

(a)     Singular words shall connote the plural number as well as the singular and vice versa, and the masculine shall include the feminine and the neuter.

(b)     All references herein to particular articles, sections, subsections, clauses or exhibits are references to articles, sections, subsections, clauses or exhibits of this Agreement.

(c)     The table of contents and headings contained herein are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

(d)     Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement, and therefore any usual rules of construction requiring that ambiguities are to be resolved against a particular Party shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

## ARTICLE 2
## PURCHASE AND SALE; DEPOSIT; PAYMENT OF PURCHASE PRICE

2.1     Purchase and Sale.  The Sellers agree to sell, transfer, assign, set over and convey to the Purchaser and the Purchaser agrees to purchase, acquire and assume from the Sellers and each Operating Tenant, as applicable, the Property, for the Purchase Price, in accordance with the terms and conditions set forth herein.

2.2     Deposit.  If Purchaser is determined by the Sellers to have made the highest and best bid and declared the "winner" of the auction for the Properties (scheduled to be held on May 3, 2011), then within one (1) Business Day following the conclusion of such auction, the Purchaser will deposit in escrow with the Deposit Escrow Agent (in accordance with an escrow agreement to be negotiated between the Parties and the Deposit Escrow Agent) the sum of Ten Million Dollars ($10,000,000.00) as a deposit (the "Deposit").  The Deposit shall be in the form of cash and shall be invested by the Deposit Escrow Agent in an interest-bearing account reasonably acceptable to the Purchaser and the Sellers.  All interest earned on the Deposit shall be credited against the Purchase Price (the "Deposit Interest").

2.3     Payment of Purchase Price.  On the Closing Date, the Purchaser shall (subject to Section 2.4 and an executed Assignment and Consent Agreement) (A) assume the Assumed Loans, (B) pay an amount equal to the Paydown Amount to the Servicer and (C) pay an amount equal to the Cash Purchase Price to Sellers (for themselves and for the benefit of each Operating Tenant in respect of their interest in the Property, as applicable) less the sum of (i) the Deposit and (ii) the Deposit Interest, and as adjusted in the manner specified in Sections 6.1(d) and 7.5 herein, in cash or by confirmed wire transfer of immediately available federal funds to the account of the Title Company, or as otherwise agreed to by the parties.  Wire instructions shall be sent by the Sellers to the Purchaser at least five (5) Business Days before the Closing Date.

2.4     Assumption of Assumed Loans.  Purchaser shall, subject to the finalization of the Assignment and Consent Agreement, assume the Assumed Loans on the Closing Date.  With respect to Purchaser's assumption of the Assumed Loans, (a) not later than two (2) Business Days after the Effective Date, Purchaser shall, with the cooperation of Seller, use commercially reasonable efforts to commence its efforts to process the assumption of the Assumed Loans by Purchaser ("Loan Assumption"), including, but not limited to, providing to the Servicer all reasonable information concerning the assignment of the Assumed Loans to the Purchaser ("Assumption Application"), (b) Purchaser and Seller shall cooperate and use all reasonable and diligent efforts to cause the Servicer to consent to the Loan Assumption and to cause the applicable Seller and all applicable guarantors, if any, to be released from any and all liability under the Assumed Loans following the Closing Date (but Sellers shall not be required to spend any funds to do so but only to the extent all Sellers are in compliance with this Section 2.4(b)) and (c) Purchaser shall pay all reasonable (i) fees (including all reasonable recording fees and the cost of title insurance endorsements to the existing title insurance policies for the Properties), (ii) assumption fees, and (iii) expenses and/or costs required by the Servicer to process the Assumption Application and the Loan Assumption.

2.5     Instructions to Deposit Escrow Agent.  Whenever the terms of this Agreement provide for the return or the release of the Deposit and Deposit Interest (if any), Purchaser and

Seller agree to promptly notify the Deposit Escrow Agent by sending a Joint Notice (as defined in the escrow agreement to be entered into by the Parties and the Deposit Escrow Agent) in accordance with the terms of the escrow agreement in order to effectuate the return or the release of the Deposit and Deposit Interest (if any).

## ARTICLE 3
## COURT APPROVAL

3.1 <u>Bankruptcy Court Approval/Bid Protections</u>. The Agreement is subject to Bankruptcy Court approval, which the Seller shall promptly seek in connection with confirmation of the Plan and through the Confirmation Order. Purchaser hereby acknowledges that (a) the Hearing is scheduled for June 23, 2011, which such date may be extended in Sellers' sole discretion and (b) the hearing to consider approval of the disclosure statement relative to the Plan is scheduled for May 10, 2011, which such date may be extended in Sellers' sole discretion. Sellers shall use its best efforts to cause the Bankruptcy Court to enter the Confirmation Order as soon as practicable after confirmation of the Plan. The Sellers shall file a motion with the Bankruptcy Court seeking the entry and approval of the Break-Up Fee, the Expense Reimbursement and the July 31 Expense Reimbursement by no later than May 6, 2011 (the "<u>Break-Up Fee and Expense Reimbursement Motion</u>"). The Sellers will use their best efforts to cause the Bankruptcy Court to enter the Break-Up Fee and Expense Reimbursement Motion as soon as practicable after the filing of the Break-Up Fee and Expense Reimbursement Motion, but in no event later than May 24, 2011. Purchaser and the Sellers acknowledge that the Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or best offer for the Property, including giving notice thereof to the creditors of the Sellers and other interested parties, providing information about the Property to prospective bidders entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Property, conducting an auction. The Sellers and the Purchaser agree that the provisions of this Agreement, including this <u>Article 3</u> and <u>Section 9.4</u> are reasonable, were a material inducement to Purchaser to enter into this Agreement and are designed to achieve the highest or best offer for the Property.

3.2 <u>The Confirmation Order</u>. At the Hearing the Sellers shall seek the entry of the Confirmation Order. The Confirmation Order shall, among other matters:

(a) approve this Agreement and the consummation of the Transaction upon the terms and subject to the conditions of this Agreement;

(b) find that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Property to and the assumption of the Assumed Loans by the Purchaser and shall vest the Purchaser with title to the Property free and clear of all Encumbrances other than Permitted Encumbrances;

(c) find that the Assumed Loans have, net of the Paydown Amount, an outstanding principal balance not exceeding One Hundred Thirty Four Million and One Hundred and Fifty-Nine Thousand Eight Hundred and Fifteen Dollars and 40/100 Dollars ($134,159,815.40), and as

of the Closing Date and giving effect to the Paydown Amount (i) the Assumed Loans are in full force and effect, (ii) there is no event of default (or an event that through the passage of time would give rise to an event of default) with respect to the Assumed Loans (iii) the Assumed Loans are secured by duly perfected liens against and security interests in the Property and are enforceable in accordance with their terms and upon the assumption of the Assumed Loans, will be valid, enforceable and binding obligations of Purchaser in accordance with their terms and (iv) from and after the Closing Date until the date of any subsequent default or event of default the Assumed Loans will accrue interest at the non-default rate (as such non-default rates are more particularly described in each Assumed Loan);

(d)    find that the consideration provided by the Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Property;

(e)    (i) authorize the Sellers and each of the Operating Tenants to assume and assign to the Purchaser each of the Assumed Contracts and Assumed Leases, (ii) find that, as of the Closing Date, the Contracts and Leases to be assumed by the Sellers and each Operating Tenant assigned to the Purchaser pursuant to this Agreement and the Assignment and Assumption Agreement will have been duly assigned to the Purchaser in accordance with Section 365 of the Bankruptcy Code and (iii) order that any Cure Costs (as defined in the Confirmation Order) under the Assumed Contracts and Assumed Leases shall be paid by the Sellers as soon as practicable and in no event later than the date on which the Assumed Contract or Assumed Lease is deemed assumed and assigned in accordance with the Cure Procedures (as defined in the Confirmation Order) (unless the Bankruptcy Court orders otherwise);

(f)    find that the Purchaser is a good faith purchaser of the Property pursuant to Section 363(m) of the Bankruptcy Code;

(g)    find that the Purchaser did not engage in any conduct that would cause or permit this Agreement or the consummation of the Transaction to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code;

(h)    order that the Assumed Contracts and the Assumed Leases will be transferred to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any such Contract or Lease or any requirement of Applicable Law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer;

(i)    approve any other agreement to the extent provided by this Agreement;

(j)    find that the Sellers gave due and proper notice of the Transaction to each party entitled thereto;

(k)    find that the Purchaser has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the Assumed Contracts and Assumed Leases and that the Purchaser has guaranteed the obligations of any assign which has assumed each Assumed Contract and Assumed Lease;

(l)      enjoin and forever bar the non-debtor party or parties to each Assumed Contract or Assumed Lease from asserting against the Purchaser or any of the Property: (a) any default, Claim, Liability or other cause of action existing as of the Closing Date whether asserted or not and (b) any objection to the assumption and assignment of such non-debtor party's Assumed Contract and Assumed Lease;

(m)      find that, to the extent permitted by Applicable Law, the Purchaser is not a successor to any Seller or its bankruptcy estate by reason of any theory of law or equity, and the Purchaser shall not assume or in any way be responsible for any Liability of a Seller and/or its bankruptcy estate, except as otherwise expressly provided in this Agreement;

(n)      make this Agreement expressly binding (based upon language satisfactory to the Purchaser) upon any United States bankruptcy court or trustee in the event of conversion of any of the Seller Chapter 11 Cases to chapter 7, appointment of a chapter 11 trustee in any Seller Chapter 11 Case, or transfer of venue of any Seller Chapter 11 Case to a bankruptcy court other than the Bankruptcy Court; and

(o)      order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), the Confirmation Order is effective immediately upon entry.

## ARTICLE 4
## SELLERS' REPRESENTATIONS, WARRANTIES AND COVENANTS

To induce the Purchaser to enter into this Agreement and to purchase the Property, each Seller, hereby makes the following representations, warranties and covenants, upon each of which the Seller acknowledges and agrees that the Purchaser is entitled to rely and has relied. Each such representation shall be materially true and correct on the Effective Date and shall be materially true and correct on the Closing Date.

4.1      <u>Organization and Power</u>.  Each Seller is a limited liability company, duly formed, validly existing and in good standing under the laws of its state of formation and has all requisite powers and all governmental licenses, authorizations, consents and approvals to carry on its business as now conducted and to enter into and perform its obligations hereunder and under any document or instrument required to be executed and delivered on behalf of each Seller hereunder.

4.2      <u>Authorization and Execution</u>.  This Agreement has been duly authorized by all necessary action on the part of each Seller, has been duly executed and delivered by each Seller, constitutes the valid and binding agreement of each Seller and is enforceable in accordance with its terms.  There is no other Person or entity who has an ownership interest in the Property to be sold hereunder by each Seller or whose consent is required in connection with each Seller's performance of its obligations hereunder.

4.3      <u>Noncontravention</u>.  Subject to any consent to the assignment of any particular Assumed Contract or Assumed Lease required by the terms thereof or by Applicable Laws, to each Seller's Knowledge, the execution and delivery of, and the performance by each Seller of its obligations under, this Agreement do not and will not contravene, or constitute a default under, any provision of applicable law or regulation, each Seller's Organizational Documents or

any agreement, judgment, injunction, order, decree or other instrument binding upon each Seller. There are no outstanding agreements (written or oral) pursuant to which any Seller (or any predecessor to or Representative of the Seller) or any Person has agreed to sell or has granted an option or right of first refusal, right of first offer or similar right to purchase or otherwise dispose of the Property or any part thereof.

4.4    No Special Taxes.  Each Seller has no Knowledge of, nor has it received any notice of, any special taxes or assessments relating to the Property to be sold hereunder by the Seller or any part thereof or any planned public improvements that may result in a special tax or assessment against the Property.

4.5    Compliance with Existing Laws.  To each Seller's Knowledge, and except as would not reasonably be expected to have a material adverse effect on the use operation of each Hotel, each Seller possesses all Authorizations, each of which is valid and in full force and effect, and no provision, condition or limitation of any of the Authorizations has been materially breached or violated.

4.6    Contracts and Leases.  Except in the ordinary course of business, the Seller will not (and shall cause the applicable Operating Tenant to not) (i) enter into any new Contract or Lease with respect to the Property and (ii) enter into any agreements modifying any Contract or Lease, unless (a) any such agreement is terminable without any penalty whatsoever to Purchaser upon thirty (30) days' notice, (b) any such agreement or modification will not bind the Purchaser or the Property after the date of Closing or (c) the Seller or the applicable Operating Tenant, as applicable, has obtained the Purchaser's prior written consent to such agreement or modification. All of the Contracts and Leases in force and effect as of the date hereof are listed on Exhibit E attached hereto.

4.7    Warranties and Guaranties.  Each Seller shall not before or after Closing, release or modify any warranties or guarantees, if any, of manufacturers, suppliers and installers relating to the Improvements and the Personal Property or any part thereof, except with the prior written consent of the Purchaser (such consent not to be unreasonably withheld or delayed).  A complete list of all such warranties and guaranties in effect as of this date is attached hereto as Exhibit F.

4.8    Litigation.  Except for all Claims or pending motions that have been asserted or filed prior to the date hereof by third parties against the Sellers in the Sellers' Chapter 11 Cases, including any adversary proceedings in connection therewith, there is not pending or, to the Knowledge of the Sellers, threatened, any action, suit, proceeding, claim, investigation, application or complaint (whether or not purportedly on behalf of a Seller) against or affecting a Seller which in any way could materially and adversely affect the Property, in law or in equity, or which could affect the validity of this Agreement.

4.9    Title.  As of the Effective Date, each Seller has good and marketable fee simple title to, and the exclusive right to possess, use and occupy, consistent with its current use and occupation, its respective Real Property, subject to Permitted Encumbrances.  The Real Property constitutes all of the owned real property of the Sellers, and there is no real property used in connection with the Property which is not part of the Property being sold to Purchaser pursuant to this Agreement.  As of the Closing Date, Purchaser shall have good and marketable title to

each of the Hotels free and clear of all Claims as more fully set forth in the Confirmation Order. As of the Effective Date, each Seller has provided Purchaser with all existing surveys and title insurance policies, pro formas and commitments with respect to the Real Property.

4.10   Operation of Property.  Seller covenants (i) that between the Effective Date and the Closing Date, it will (and it will cause the applicable Operating Tenant to) continue to direct the manager of the Hotels to operate the Hotels in a manner consistent with the use and operations in place at the Hotels as of the Effective Date and (ii) that it shall not (and shall cause the applicable Operating Tenant to not) take any action that would have a material adverse effect on the Property or the Purchaser's ability to continue to use and operate the Hotels after the Closing Date in a manner consistent with the use and operations in place at the Hotels as of the Effective Date.

4.11   Personal Property.  All of the Personal Property and Inventory being conveyed by the Sellers (and the Operating Tenant, as applicable pursuant to the Assignment and Assumption Agreement) to the Purchaser or its designee are free and clear of all liens, leases and other encumbrances and will be so on the Closing Date, and the Sellers have good, merchantable title thereto and the right to convey same in accordance with the terms of the Agreement.

4.12   Independent Audit.  Immediately upon execution of this Agreement, each Seller (and shall cause the applicable Operating Tenant) shall cooperate fully and provide access for Purchaser's Representatives to the Real Property and all financial and other information relating to the Property which would be sufficient to enable them to prepare audited financial statements in conformity with Regulation S-X of the Securities and Exchange Commission (the "Commission") and to enable them to prepare a registration statement, report or disclosure statement for filing with the Commission, all at Purchaser's sole cost and expense.  Each Seller shall also provide to Purchaser's Representatives a signed representative letter which would be sufficient to enable an independent public accountant to render an opinion on the financial statements related to the Property.

4.13   Liquor License.  Only with respect to the Real Property owned by KPA Mission Valley and KPA Tysons Corner, if by the Closing Date the Purchaser is unable to (1) obtain the permanent transfer of the Liquor License; or (2) obtain another arrangement pending the permanent transfer of the Liquor License to the Purchaser, then, on the Closing Date, the Sellers shall use commercially reasonable efforts to enter into an agreement with the Purchaser, to the extent legally permissible and on terms and conditions reasonably acceptable to the Purchaser and the Sellers, providing for an interim arrangement (the "Interim Liquor Agreement") of up to six (6) months whereby the Sellers shall allow the Purchaser, the Purchaser's designee, lessee or the Purchaser's hotel management company, as applicable, to operate all food and beverage areas within the Hotels under the existing Liquor License pending the temporary or permanent transfer of the Liquor License to the Purchaser, the Purchaser's lessee, designee or the Purchaser's hotel management company, as applicable.  The Interim Liquor Agreement may be structured in the form of a short term lease or other agreement to consummate the intent of the parties, cancelable at any time by the Purchaser.  The Purchaser shall indemnify, defend and hold the Seller and its Affiliates harmless against any liabilities incurred in such operation (unless caused by the Seller's willful or grossly negligent conduct or omission or material breach of the

Interim Liquor Agreement) and provide adequate insurance (including, without limitation, liquor liability insurance) naming the Sellers as an additional insured.

4.14 _Bankruptcy._ Subject to the entry of the Confirmation Order and any order approving the assumption and assignment of the Assumed Contracts and Assumed Leases, the Sellers have complied with all requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Property (including the assumption and assignment to Purchaser of any Assumed Contracts and Assumed Leases) to the Purchaser pursuant to this Agreement.

In the event Purchaser obtains actual knowledge on or before Closing of any material inaccuracy in any of the representations and warranties contained in this Article 4, and such material inaccuracy is not promptly corrected or resolved by the Sellers following notice from Purchaser, Purchaser may at Purchaser's sole and exclusive remedy either: (i) terminate this Agreement, whereupon neither Party shall have any further rights or obligations pursuant to this Agreement, other than as set forth herein with respect to rights or obligations that survive termination; or (ii) waive any and all Claims against Seller on account of such inaccuracy and close the transaction.

## ARTICLE 5
## PURCHASER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

To induce the Sellers to enter into this Agreement and to sell the Property, the Purchaser hereby makes the following representations, warranties and covenants, upon each of which the Purchaser acknowledges and agrees that the Sellers are entitled to rely and has relied. Each such representation shall be materially true and correct on the Effective Date and shall be materially true and correct on the Closing Date.

5.1 _Organization and Power._ The Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of the state of Delaware, and has all trust powers and all governmental licenses, authorizations, consents and approvals to carry on its business as now conducted and to enter into and perform its obligations under this Agreement and any document or instrument required to be executed and delivered on behalf of the Purchaser hereunder.

5.2 _Noncontravention._ The execution and delivery of this Agreement and the performance by the Purchaser of its obligations hereunder do not and will not contravene, or constitute a default under, any provisions of Applicable Law, the Purchaser's declaration of trust or other trust document, or any agreement, judgment, injunction, order, decree or other instrument binding upon the Purchaser.

5.3 _Litigation._ To the knowledge of Purchaser, there is no action, suit or proceeding, pending or known by the Purchaser to be threatened against or affecting the Purchaser in any court or before any arbitrator or before any Governmental Body which (a) in any manner raises any question affecting the validity or enforceability of this Agreement or any other agreement or instrument to which the Purchaser is a party or by which it is bound and that is to be used in connection with, or is contemplated by, this Agreement, (b) could affect the ability of the

Purchaser to perform its obligations hereunder, or under any document to be delivered pursuant hereto, (c) could create a lien on the Property, any part thereof or any interest therein or (d) could adversely affect the Property, any part thereof or any interest therein, or the use, operation, condition or occupancy thereof.

# ARTICLE 6
## CONDITIONS AND ADDITIONAL COVENANTS

6.1     <u>Conditions to Purchaser's Obligations</u>. The Purchaser's obligations hereunder are subject to the satisfaction of the following conditions precedent with respect to the Property and the compliance by the Seller with the following covenants, to the extent applicable to the Seller:

(a)     <u>Seller's Deliveries</u>. The Seller shall have delivered to the Title Company or the Purchaser, as the case may be, on or before the date of Closing, all of the documents and other information required of the Seller pursuant to <u>Section 7.2</u>.

(b)     <u>Representations, Warranties and Covenants; Obligations of the Seller; Certificate</u>. All of the Seller's representations and warranties made in this Agreement shall be materially true and correct as of the date hereof and as of the date of Closing as if then made, there shall have occurred no material adverse change in the condition of the Property since the date hereof, each Seller shall have performed all of the covenants and other obligations under this Agreement applicable to each such Seller.

(c)     <u>Condition of Improvements</u>. Except to the extent that repair or restoration of a Property is required hereunder, in which case the Improvements and the Tangible Personal Property shall be in the condition required by this Agreement, the Improvements and the Tangible Personal Property shall be in the same or better condition at Closing as they are as of the date hereof, reasonable wear and tear excepted.  The Sellers shall not (and cause the applicable Operating Tenant to not) have removed or caused or permitted to be removed any material part or material portion of the Real Property or the Tangible Personal Property unless the same is replaced, prior to Closing, with similar items of at least equal quality acceptable to the Purchaser.

(d)     <u>Property Improvement Plans</u>. The Sellers shall provide documentation to Purchaser that Six Million Four Hundred Thousand Dollars ($6,400,000.00) (the "<u>DIP PIP Payment</u>") has been spent on the Property Improvement Plan ("<u>PIP</u>") work at the Existing PIP Work Hotels, <u>provided</u>, <u>however</u>, to the extent the PIP work at the Existing PIP Work Hotels is completed but all of the DIP PIP Payment has not been spent for the PIP work, then the Purchase Price (as otherwise adjusted in accordance with this Agreement) required to be delivered by the Purchaser on the Closing Date will be equal to the Purchase Price less the difference between the DIP PIP Payment and the amount actually spent on the PIP work at the Existing PIP Work Hotels.

(e)     <u>Assumption of the Assumed Loans</u>. The Servicer shall have consented to the Purchaser's assumption of the Assumed Loans pursuant to an executed Assignment and Consent Agreement entered into before or as of the Closing Date, it being understood

and agreed that Purchaser's only obligation (financial or otherwise) with respect to obtaining Servicer's consent to such assumption is set forth in Section 2.4 hereof.

(f) _Independent Audit_. As of the Effective Date, Seller shall cooperate with Purchaser and provide Purchaser and/or Purchaser's Representatives immediate access to the Real Property to allow the timely preparation, at Purchaser's sole cost and expense, of audited financial statements in conformity with Regulation S-X of the Commission.

(g) _Bankruptcy Court Approval_. After notice and a hearing as defined in Section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Confirmation Order (i) shall not have been stayed, stayed pending appeal or vacated and (ii) shall not have been amended, supplemented or otherwise modified in a manner that results in such Confirmation Order no longer being an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Purchaser, authorizing the matters referred to in Section 3.2.

(h) _Assignment of Contracts and Leases; Rejection_. Notwithstanding the joinder to this Agreement by each Operating Tenant, the Sellers or the Operating Tenants, as applicable, shall have assumed and assigned to Purchaser the Assumed Contracts and Assumed Leases in accordance with the Assignment and Assumption Agreement, in each case pursuant to Section 365 of the Bankruptcy Code and the Confirmation Order, subject to Purchaser's provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code.

6.2 _Conditions to Sellers' Obligations_. The Seller's obligations hereunder are subject to the satisfaction of the following conditions precedent with respect to the Property and the compliance by the Purchaser with the following covenants, to the extent applicable to the Purchaser:

(a) _Purchaser's Deliveries_. The Purchaser shall have delivered to the Title Company or the Seller, as the case may be, on or before the date of Closing, all of the documents and other information required of the Seller pursuant to Section 7.3.

(b) _Representations, Warranties and Covenants; Obligations of the Purchaser; Certificate_. All of the Purchaser's representations and warranties made in this Agreement shall be materially true and correct as of the date hereof and as of the date of Closing as if then made, there shall have occurred no material adverse change in the financial condition of the Purchaser since the date hereof, the Purchaser shall have performed all of the covenants and other obligations under this Agreement applicable to the Purchaser.

**ARTICLE 7**
**CLOSING**

7.1 _Closing_. Closing shall take place at 10:00 a.m. on the third Business Day following the date on which all of the conditions set forth in Article 6 and Article 7 hereof have been satisfied or waived (other than any conditions that can only be satisfied as of the Closing, but subject to the satisfaction or waiver of such conditions) (the "Closing Date"), at the offices of

Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at such other time or place as may be mutually agreed to by the Parties.

7.2    <u>Sellers' Deliveries</u>.  Each Seller shall deliver to Purchaser all of the following instruments, each of which shall have been duly executed and, where applicable, acknowledged on behalf of such Seller and shall be dated as of the date of Closing:

(a)    The Deed for each Seller's Real Property;

(b)    The Bill of Sale (Inventory) for each Seller's Inventory;

(c)    The Bill of Sale (Personal Property) for each Seller's Personal Property;

(d)    The Assignment and Assumption Agreement;

(e)    Three certified copies of the Confirmation Order;

(f)    Certificate(s)/Registration of Title for any vehicles owned by the Seller and used in connection with the Property;

(g)    Such agreements, affidavits or other documents as may be required by the Title Company to issue the Owner's Title Policy with affirmative coverage over mechanics' and materialmen's liens;

(h)    The FIRPTA Certificate;

(i)    True, correct and complete copies of all warranties, if any, of manufacturers, suppliers and installers possessed by the Sellers and relating to the Improvements and the Personal Property, or any part thereof;

(j)    An assignment of all warranties and guarantees from all contractors and subcontractors, manufacturers, and suppliers in effect with respect to the Improvements;

(k)    A certificate of good standing from each of the Sellers;

(l)    Any other document or instrument reasonably requested by the Purchaser or required hereby.

7.3    <u>Purchaser's Deliveries</u>.  At Closing, the Purchaser shall pay or deliver to the Seller the following:

(a)    The portion of the Purchase Price described in <u>Section 2.3</u>;

(b)    The Bill of Sale (Inventory) for each Seller's Inventory;

(c)    The Bill of Sale (Personal Property) for each Seller's Personal Property;

(d)    The Assignment and Assumption Agreement; and

(e)     Any other document or instrument reasonably requested by the Seller or required hereby.

7.4     <u>Closing Costs</u>.  Purchaser shall pay for all costs and expenses associated with the conveyance of the Property, including, but not limited to, Survey costs and expenses, title insurance premiums and fees, recording fees and taxes, and all costs associated with the assignment and assumption of the Assumed Contracts and Assumed Leases (including, for purposes of clarity, the assumption fee  and the "paydown" fee owed to Servicer in an amount not to exceed One Million Five Hundred Ninety-One Thousand Five Hundred Ninety-Six Dollars ($1,591,596.00)).  Seller and Purchaser shall be responsible for the payment of its own attorney's fees incurred in connection with transaction which is the subject of this Agreement.

7.5     <u>Income and Expense Allocations</u>.

(a)     All income, except any Intangible Personal Property, and expenses with respect to the Property, and applicable to the period of time before and after Closing, determined in accordance with sound accounting principles consistently applied, shall be allocated between the Seller and the Purchaser.  The Seller shall be entitled to all income and responsible for all expenses for the period of time up to but not including the Closing Date, and the Purchaser shall be entitled to all income and responsible for all expenses for the period of time from, after and including the Closing Date. Without limiting the generality of the foregoing, the following items of income and expense shall be allocated at Closing:

(i)     Current and prepaid rents, including, without limitation, prepaid room receipts, function receipts and other reservation receipts (all of which Purchaser shall honor);

(ii)     Real estate and personal property taxes;

(iii)     Amounts under the Assumed Contracts and Assumed Leases to be assigned to and assumed by Purchaser, Purchaser's property manager, lessee or designee;

(iv)     Utility charges (including but not limited to charges for water, sewer and electricity);

(v)     License and permit fees, where transferable;

(vi)     All prepaid reservations and contracts for rooms confirmed by each Seller prior to the Closing Date for dates after the Closing Date, all of which Purchaser shall honor;

(vii)     The Tray Ledger, which shall be divided equally between the parties; and

(viii)     All secured balances on the Guest Ledger which Purchaser shall purchase at face amount subject to a three percent (3%) discount for any balances secured by credit cards.

(b)     The Seller shall receive a credit for any prepaid expenses accruing to periods on or after the Closing Date.  At Closing, each Seller shall sell to Purchaser, and Purchaser shall purchase from the Seller, all petty cash funds located at the Property.

(c)     Each Seller shall be required to pay all sales taxes, hotel occupancy taxes, and similar impositions through the date of Closing.

(d)     The Purchaser shall not be obligated to collect any accounts receivable or revenues accrued prior to the Closing Date on behalf of each Seller, but if the Purchaser collects same, the Purchaser will promptly remit to each Seller such amounts in the form received.

(e)     If accurate allocations of any item cannot be made at Closing because current bills are not obtainable, the parties shall allocate such income or expenses at Closing on the best available information, subject to adjustment upon receipt of the final bill or other evidence of the applicable income or expense.  Any income received or expense incurred by the Sellers or the Purchaser with respect to the Property after the date of Closing shall be promptly allocated in the manner described herein and the parties shall promptly pay or reimburse any amount due.  Within ninety (90) days following the Closing Date, Seller and Purchaser shall jointly prepare a final closing statement reasonably satisfactory to Seller and Purchaser in form and substance (the "Final Closing Statement") setting forth the final determination of the adjustments and prorations provided for herein.  The net amount due to Seller or Purchaser, if any, as shown in the Final Closing Statement, shall be paid in cash by the Party obligated therefor within ten (10) Business Days following that Party's receipt of the approved Final Closing Statement.  The adjustments, prorations and determinations agreed to by Seller and Purchaser in the Final Closing Statement shall be conclusive and binding on the Parties.

## ARTICLE 8
## CONDEMNATION; RISK OF LOSS

8.1     <u>Condemnation</u>.  In the event of any actual or threatened taking, pursuant to the power of eminent domain, of all or any portion of the Real Property owned by each Seller, or any proposed sale in lieu thereof, the Sellers shall give written notice thereof to the Purchaser promptly after such Seller learns or receives notice thereof.  If all or any part of a Seller's Real Property which would materially adversely interfere with the operation or use of the Hotel is, or is to be, so condemned or sold, the Purchaser shall have the right to terminate this Agreement pursuant to <u>Section 9.3</u>.  If the Purchaser elects not to terminate this Agreement, all proceeds, awards and other payments arising out of such condemnation or sale (actual or threatened) shall be paid or assigned, as applicable, to the Purchaser at Closing.

8.2     <u>Risk of Loss</u>. In the event of any fire or other casualty at any of the Hotels, Seller shall give written notice thereof to Purchaser promptly after Seller learns or receives notice thereof.  Seller shall pay or assign, as applicable, all insurance proceeds and rights to proceeds arising out of such loss or damage to Purchaser at Closing less any reasonable costs incurred by Seller to collect such proceeds and any portion of such proceeds that Seller uses to make temporary or emergency repairs that are reasonably consented to by Purchaser .

## ARTICLE 9
## LIABILITY OF PURCHASER; LIABILITY OF SELLER;
## TERMINATION RIGHTS

9.1    <u>Liability of Purchaser and Seller</u>.  Except for any obligation expressly assumed or agreed to be assumed by the Purchaser hereunder or pursuant to the Confirmation Order, the Purchaser does not assume any obligation of the Seller or any liability for Claims arising out of any occurrence prior to Closing.  Except as provided in this Agreement and by Applicable Law, the Sellers shall not be responsible for any obligation of the Purchaser or any liability for Claims arising out of any occurrence on or after the Closing.

9.2    <u>Termination by Purchaser</u>.  Purchaser may terminate this Agreement (i) in accordance with <u>Section 8.1</u> hereof, (ii) if the Closing has not occurred prior to August 5, 2011, (iii) if the Confirmation Order is not entered on or before July 31, 2011, (iv) if the Sellers do not file the Break-Up Fee and Expense Reimbursement Motion with the Bankruptcy Court by May 6, 2011, (v) if the Bankruptcy Court does not enter an order approving the Break-Up Fee and Expense Reimbursement Motion by May 24, 2011, or (vi) if a Seller materially defaults in performing any of its obligations under this Agreement (including its obligation to sell the Property), and such Seller fails to cure any such matter within ten (10) Business Days after notice thereof from the Purchaser, the Purchaser, at its option, may elect either (a) to terminate this Agreement, in which event the Deposit and the Deposit Interest shall be forthwith returned to the Purchaser and all other rights and obligations of the Seller and the Purchaser hereunder shall terminate immediately (except those which expressly survive the termination of this Agreement), or (b) to waive its right to terminate and, instead, to proceed to Closing.

9.3    <u>Termination by Seller</u>.  If the Purchaser materially defaults in performing any of its obligations under this Agreement (including its obligation to purchase the Property), and the Purchaser fails to cure any such default within ten (10) Business Days after notice thereof from the Seller, then the Seller's sole remedy for such default shall be to terminate this Agreement and retain the Deposit.  The Seller and the Purchaser agree that, in the event of such a default, the damages that the Seller would sustain as a result thereof would be difficult if not impossible to ascertain.  Therefore, the Seller and the Purchaser agree that the Seller shall retain the Deposit as full and complete liquidated damages and as the Seller's sole remedy.

If upon the determination of Seller's directors, trustees, or members, as applicable, and upon advice of counsel, any term or provision of this Agreement shall prevent, amend, alter, or reduce Seller's ability to exercise its fiduciary duties under applicable law, Seller shall have the right to terminate this Agreement, whereupon Seller shall promptly, but no later than three (3) Business Days from the date of such termination, pay to Purchaser (or its designee) the sum of (i) the Deposit, (ii) the Deposit Interest, (iii) the Break-Up Fee and (iv) the Expense Reimbursement, and neither Party shall have any further rights or obligations pursuant to this Agreement, other than as set forth herein with respect to rights or obligations that survive termination.

Seller may terminate this Agreement if the Confirmation Order is not entered on or before July 31, 2011, whereupon Seller shall promptly, but not later than three (3) Business Days from July 31, 2011, pay to Purchaser the sum of (i) the Deposit, (ii) the Deposit Interest, if any,

(iii) the July 31 Expense Reimbursement and (iv) the Break-Up Fee, and neither Party shall have any further rights or obligations pursuant to this Agreement, other than as set forth herein with respect to rights or obligations that survive termination.

9.4     Break-Up Fee and Expense Reimbursement.  In the event that this Agreement is terminated by Purchaser pursuant to any of the rights of termination granted to Purchaser under subsections 9.2(ii)-(iii) or 9.2(vi), or if the Seller terminates this Agreement pursuant to the second paragraph of Section 9.3 hereof, (each of subsections 9.2(ii)-(iii), 9.2(vi) and the second paragraph of Section 9.3 hereof, a "Specified Termination Event"), provided that a breach by Purchaser of any material term or provision of this Agreement was not the material cause of or a material contributing factor to the Specified Termination Event, the Sellers shall pay the Break-Up Fee and the Expense Reimbursement to the Purchaser or its designee not later than three Business Days following any Specified Termination Event; provided, however, to the extent the Sellers shall have used commercially reasonable efforts seeking the entry of the Confirmation Order by July 31 2011, and notwithstanding such efforts, each or all of the Sellers did not cause (or directed to cause), directly or indirectly, the action or contribute, in anyway, to the reason or circumstances that resulted in the failure of the Bankruptcy Court to enter the Confirmation Order by July 31, 2011, then to the extent Purchaser chooses to terminate this Agreement in accordance with Sections 9.4 (ii)-(iii), Seller shall only pay (in accordance with this Section 9.4) to Purchaser the July 31 Expense Reimbursement.

The Seller's obligation to make any payment on account of the Break-Up Fee and the Expense Reimbursement shall have super-priority administrative expense status, senior to all other administrative expense claims (other than Seller's obligations pursuant to the Lehman DIP Facility and the Five Mile DIP Facility and the DIP Orders (as such terms are defined in the Plan), which obligations shall be pari passu with the Seller's obligation to pay the Break-Up and Expense Reimbursement, under Section 364(c)(1) of the Bankruptcy Code, until such payment is made.

## ARTICLE 10
## MISCELLANEOUS PROVISIONS

10.1     Completeness; Modification.  This Agreement constitutes the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior discussions, understandings, agreements and negotiations between the parties hereto. This Agreement may be modified only by a written instrument duly executed by the parties hereto.

10.2     Assignments.  Purchaser may assign its rights hereunder with the consent of Seller (which consent shall not be unreasonably withheld) to any Affiliate of Purchaser; provided, however, that Purchaser shall remain liable under this Agreement and shall not be released from its obligations hereunder.

10.3     Successors and Assigns.  This Agreement shall inure to the benefit of and bind the Purchaser and the Seller and their respective successors and assigns.

10.4    Days.  If any action is required to be performed, or if any notice, consent or other communication is given, on a day that is a Saturday or Sunday or a legal holiday in the jurisdiction in which the action is required to be performed or in which is located the intended recipient of such notice, consent or other communication, such performance shall be deemed to be required, and such notice, consent or other communication shall be deemed to be given, on the first (1st) business day following such Saturday, Sunday or legal holiday.  Unless otherwise specified herein, all references herein to a "day" or "days" shall refer to calendar days and not business days.

10.5    Governing Law.  This Agreement and all documents referred to herein shall be governed by and construed and interpreted in accordance with the laws of the state of New York.

10.6    Counterparts.  To facilitate execution, this Agreement may be executed in as many counterparts as may be required.  It shall not be necessary that the signature on behalf of both parties hereto appear on each counterpart hereof.  All counterparts hereof shall collectively constitute a single agreement.

10.7    Severability.  If any term, covenant or condition of this Agreement, or the application thereof to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such term, covenant or condition to other persons or circumstances, shall not be affected thereby, and each term, covenant or condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10.8    Costs.  Regardless of whether Closing occurs hereunder, and except as otherwise expressly provided herein, each Party shall be responsible for its own costs in connection with this Agreement and the transactions contemplated hereby, including without limitation fees of attorneys, engineers and accountants.

10.9    Notices.  All notices, requests, demands and other communications hereunder shall be in writing and shall be delivered by hand, transmitted by facsimile transmission, sent by electronic mail in ".pdf" format, sent prepaid by Federal Express (or a comparable overnight delivery service) or sent by the United States mail, certified, postage prepaid, return receipt requested, at the addresses and with such copies  as designated below.  Any notice, request, demand or other communication delivered or sent in the manner aforesaid shall be deemed given or made (as the case may be) when actually delivered to the intended recipient.

|  |  |
|---|---|
| If to the Seller: | 304 Royal Poinciana Way |
|  | Suite 306 |
|  | Palm Beach, Florida  33480 |
|  | Attn:   Marc Beilinson and Mark Murphy |
|  | Fax:   (561) 650-0958 |
|  | Email: mbeilinson@beilinsonpartners.com |
|  | Email: mmurphy@innkeepersusa.com |

| with a copy to: | Kirkland & Ellis LLP |
| | 300 North LaSalle |
| | Chicago, Illinois 60654 |
| | Attn: Anup Sathy, P.C. and Brian S. Lennon |
| | Fax: (312) 862-2200 |
| | Email: asathy@kirkland.com |
| | Email: blennon@kirkland.com |

If to the Purchaser: Chatham Lodging Trust
50 Cocoanut Row
Suite 211
Palm Beach, Florida 33480
Attn: Jeffrey H. Fisher
Fax: (561) 659-7318

with a copy to: Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attn: Scott K. Charles
Fax: (212) 403-2202
Attn: David Fischman
Fax: (212) 403-2311

Or to such other address as the intended recipient may have specified in a notice to the other party. Any party hereto may change its address or designate different or other persons or entities to receive copies by notifying the other party in the manner described in this Section.

10.10 <u>Incorporation by Reference</u>. All of the exhibits attached hereto are by this reference incorporated herein and made a part hereof.

10.11 <u>Further Assurances</u>. The Seller and the Purchaser each covenant and agree to sign, execute and deliver, or cause to be signed, executed and delivered, and to do or make, or cause to be done or made, upon the written request of the other Party, any and all agreements, instruments, papers, deeds, acts or things, supplemental, confirmatory or otherwise, as may be reasonably required by either Party for the purpose of or in connection with consummating the transactions described herein.

10.12 <u>No Partnership</u>. This Agreement does not and shall not be construed to create a partnership, joint venture or any other relationship between the parties hereto except the relationship of seller and purchaser specifically established hereby.

10.13 <u>Time of Essence</u>. Time is of the essence with respect to every provision hereof.

10.14 <u>No Third-Party Beneficiary</u>. The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of the Seller and the Purchaser only and are not for the benefit of any third (3rd) party, and accordingly, no

third (3rd) party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

    10.15  <u>Waiver of Jury Trial</u>. The Seller and the Purchaser each hereby waive any right to jury trial in connection with the enforcement by the Purchaser, or the Seller, of any of their respective rights and remedies hereunder.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Agreement to be executed as of the day and year first above written.

**SELLERS:**

KPA RIMV, LLC, a Delaware limited liability company

By: _____
Name: _____Mark A. Murphy_____
Title: _____VP_____

KPA TYSONS CORNER RI, LLC, a Delaware limited liability company

By: _____
Name: _____Mark A. Murphy_____
Title: _____VP_____

KPA WASHINGTON DC DT LLC, a Delaware limited liability company

By: _____
Name: _____Mark A. Murphy_____
Title: _____VP_____

KPA SAN ANTONIO, LLC, a Delaware limited liability company

By: _____
Name: _____Mark A. Murphy_____
Title: _____VP_____

KPA RIGG, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

**PURCHASER:**

CHATHAM LODGING L.P., a Delaware
limited partnership

By: _____
Name:   Dennis Craven
Title:   Vice President

## Joinder of Operating Tenants

The undersigned Operating Tenants hereby join this Agreement for the purpose of transferring each of its interest(s) in the Property, as applicable, and shall be bound to the provisions of this Agreement applicable to each Operating Tenant with respect thereto.

**OPERATING TENANTS:**

GRAND PRIX RIMV LESSEE LLC, a
Delaware limited liability company

By: _____
Name: _____Mark A. Murphy_____
Title: _____VP_____


GRAND PRIX GENERAL LESSEE LLC, a
Delaware limited liability company

By: _____
Name: _____Mark A. Murphy_____
Title: _____VP_____


GRAND PRIX RIGG LESSEE LLC, a
Delaware limited liability company

By: _____
Name: _____Mark A. Murphy_____
Title: _____VP_____

**EXHIBIT A**

SELLER AND PROPERTY

| Seller | Site Name | Location |
|--------|-----------|----------|
| KPA RIMV, LLC | Residence Inn San Diego, Mission Valley | 1865 Hotel Circle South San Diego, CA 92108 |
| KPA San Antonio, LLC | Homewood Suites, San Antonio | 432 West Market Street San Antonio, TX 78205 |
| KPA Tysons Corner RI, LLC | Residence Inn, Tysons Corner Mall | 8400 Old Courthouse Road Vienna, VA 22182 |
| KPA WASHINGTON DC LLC | DoubleTree Guest Suites, Washington DC | 801 New Hampshire Avenue, NW Washington, DC 20005 |
| KPA RIGG, LLC | Residence Inn, Anaheim (Garden Grove) | 11931 Harbor Boulevard, Garden Grove, California |

**EXHIBIT B**

LEGAL DESCRIPTIONS OF THE REAL PROPERTY

See attached.

**EXHIBIT C**

LIQUOR LICENSES

[To be delivered by Seller within three (3) business days following the date of this Agreement.]

**EXHIBIT D**

ASSUMED LOAN MODIFICATION TERMS

## EXHIBIT E

### CONTRACTS AND LEASES

[To be delivered by Seller within three (3) business days following the date of this Agreement.]

## EXHIBIT F

### EXISTING WARRANTIES AND GUARANTIES

[To be delivered by Seller within three (3) business days following the date of this Agreement.]

# EXHIBIT G

## ASSUMED LOANS

| Hotel | Outstanding Principal Amount |
|---|---|
| Residence Inn San Diego, Mission Valley | $47,168,769.26 |
| Homewood Suites, San Antonio | $24,062,695.40 |
| Residence Inn, Tysons Corner Mall | $25,057,021.67 |
| DoubleTree Guest Suites, Washington DC | $25,454,752.20 |
| Residence Inn, Anaheim (Garden Grove) | $37,416,576.45 |

**EXHIBIT H**

PLANS OF REORGANIZATION

## SCHEDULE 1

**Ontario Hotel Mortgage Loan Claims Deed in Lieu of Foreclosure**

## AGREEMENT FOR DEED IN LIEU OF FORECLOSURE

**DEUTSCHE BANC MORTGAGE CAPITAL, LLC**

**LENDER**

**and**

**KPA HI ONTARIO LLC**

**BORROWER**

**DATED:  As of _____, 2011**

## TABLE OF CONTENTS

ARTICLE/SECTION    PAGE

**[to come]**

## AGREEMENT FOR DEED IN LIEU OF FORECLOSURE

This Agreement for Deed In Lieu of Foreclosure ("Agreement") is executed as of _____, 2011, by and among **DEUTSCHE BANC MORTGAGE CAPITAL, LLC**, a Delaware limited liability company ("Lender"), and **KPA HI ONTARIO LLC**, a Delaware limited liability company ("Borrower").

## RECITALS:

A.    Capmark Bank, a Utah industrial bank ("Original Lender") made a loan to Borrower in the original principal amount of Thirty Five Million and No/100 Dollars ($35,000,000.00) (the "Loan"), secured by a first mortgage lien on the hotel, land and personal property located at 700 North Haven Avenue, Ontario, California 91764, as described on Exhibit A attached hereto (collectively, the "Property").  The Loan is evidenced and secured by the documents executed in connection with the Loan, in favor of Original Lender by Borrower, as set forth on Schedule 1 (the "Loan Documents").

B.    Original Lender assigned, sold and transferred its interest in the Loan and all Loan Documents to Lender pursuant to that certain Mortgage Loan Purchase Agreement dated as of March 30, 2007, between Capmark Finance Inc., as seller and German American Capital Corporation as purchaser, an affiliate of Lender, and Lender is the current holder of all of Original Lender's interest in the Loan and Loan Documents.

C.    Borrower believes that the fair market value of the Property is less than the indebtedness owed by Borrower to Lender.

D.    Borrower desires to execute the Quitclaim Deed (in lieu of foreclosure) in favor of Lender (or in favor of an entity designated by Lender), and Borrower and Indemnitor desire to execute and deliver the other documents and perform the other acts required by this Agreement, in consideration of Lender's agreement not to sue Borrower and Indemnitor in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing, mutual promises and agreements hereafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

"Affiliate" means, as to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with that Person, (b) any Person owning or controlling outstanding voting securities of or other ownership interests in that Person, (c) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of that Person, (d) if that Person is an individual, any entity for which that Person directly or indirectly acts as an officer, director, partner, owner, employee or member, (e) any entity in which that Person (together with the members of his or her family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in that entity), or (f) any family member (by blood, marriage, adoption or otherwise) of that Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"Agreement" means this Agreement, including all Exhibits and Schedules (if any) attached to it,

and other written documents signed in connection with this Agreement, all of which are incorporated by reference.

"Applicable Law" means all laws and other requirements of Governmental Authorities that are applicable in the context of the matter under the circumstances.

"Assignments" refers to the documents referred to in Section 3.2(e) assigning the Leases, Security Deposits and Contracts to the Lender (or its designee) in the form of the Assignment and Assumption of Leases, Security Deposits and Contracts attached hereto as EXHIBIT E.

"Assignments of Contracts" has the meaning set forth in Schedule 1.

"Assignments of Rents" has the meaning set forth in Schedule 1.

"Assumed Contracts" means those Contracts which the Lender expressly agrees to assume at the Closing.

"Bill of Sale" refers to the Bill of Sale referred to in Section 3.2(c), in the form of the Bill of Sale which is attached hereto as EXHIBIT C.

"Borrower" has the meaning set forth in the Recitals.

"Borrower's Counsel" means Kirkland & Ellis LLP.

"Carveout Indemnity" has the meaning set forth in Schedule 1.

"Cash Flow" means the NOI of the Property before any subtraction or deduction for (1) interest expense, (2) income taxes, (3) depreciation, (4) amortization, (5) reserves for anticipated utility expenses, maintenance, unit preparation for rental and capital expenditures mutually agreed upon by Borrower and Lender, and (6) any other non-cash deduction from the Property's gross income mutually agreed upon by Borrower and Lender.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Collateral" means the Property and all other assets of every kind and nature (both real and personal, tangible and intangible) in which Borrower or any Affiliate of Borrower has any interest and in or to which Lender or any Affiliate of Lender holds a security interest (regardless of how created or held) for any of the obligations of payment or performance under or pursuant to any Loan Document including, but not limited to, the Mortgage and including all fixtures, furnishings, appliances, machinery, supplies, building and maintenance equipment used or useful in connection with the ownership or operation of the Property.

"Contracts" means those service, maintenance, supply, operating, or employment contracts or other agreements, however termed, written or oral, affecting the use, ownership, maintenance, or operation of all or any part of the Property (but specifically excluding any Leases and any management agreements); any Contracts not assumed by the Lender (or its designee) at the Closing shall be terminated by the Borrower.

"<u>Deed</u>" means the Quitclaim Deed referred to in <u>Section 3.2(b)</u>, the form of which is attached as <u>EXHIBIT B</u>.

"<u>Default</u>" means a Default as defined in the Loan Documents.

"<u>Financing Statements</u>" has the meaning set forth in <u>Schedule 1</u>.

"<u>Governmental Authority</u>" or "<u>Governmental Authorities</u>" means any national, federal, state, regional or local government, or any other political subdivision of any of the foregoing, in each case with jurisdiction over Borrower, the Property, or any Person with jurisdiction over Borrower or the Property exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"<u>Hazardous Materials Indemnity</u>" has the meaning set forth in <u>Schedule 1</u>.

"<u>Indemnitor</u>" has the meaning set forth in <u>Schedule 1</u>.

"<u>Lender</u>" has the meaning set forth in the Recitals.

"<u>Lender Parties</u>" means Lender, its master servicer, Capmark Finance Inc., its special servicer, C-III Asset Management, LLC, the entity or entities designated by Lender as the transferee under the Transfer Documents, and their respective directors, officers, employees, agents, attorneys, and other representatives, and each of their respective successors and assigns.

"<u>Lender's Counsel</u>" means [_____].

"<u>Loan</u>" has the meaning set forth in the Recitals.

"<u>Loan Documents</u>" has the meaning set forth in the Recitals.

"<u>Mortgage</u>" has the meaning set forth in <u>Schedule 1</u>.

"<u>NOI</u>" means for any period, with respect to the Property, all Property Revenues receivable in the ordinary course of business from the Property minus the cost of maintaining the Property, which are the responsibility of the owner and are not paid directly by any tenant or other occupant, including, without limitation, costs and expenses for real estate and personal property ad valorem taxes, insurance, repairs, maintenance and Borrower's reasonable attorneys' fees. NOI shall be determined in accordance with generally accepted accounting principals or other principals approved by Lender. Lender's determination of NOI shall be conclusive absent manifest error.

"<u>Note</u>" has the meaning set forth in <u>Schedule 1</u>.

"<u>Property</u>" has the meaning set forth in the Recitals.

"<u>Property Revenues</u>" means all receipts, deposits, rents, profits and other operating revenues relating to the Property, including all funds relating to the Property which are held in any account of the Borrower or any Affiliate of Borrower which have been otherwise collected by the Borrower or any Affiliate of Borrower prior to the date hereof, such as security or other deposits.

"<u>Resolutions</u>" means authorizing resolutions on behalf of Borrower and/or Indemnitor (and each of their constituent entities having any managerial power or authority or otherwise required by Lender to execute and deliver such a document, in form and substance acceptable to Lender, executed by all

necessary principals or other required parties thereof and duly and fully authorizing by all necessary action the execution and delivery of this Agreement and the performance of the obligations and transactions (including the implementing documents) required by each such entity hereunder, which are to be consistent with the powers the terms of each such entity's organizational documents.

"Title Company" means Chicago Title Insurance Company.

"Transfer Documents" means the Deed, the Bill of Sale and all assignments or other documents signed in connection with this Agreement by which Borrower transfers any of the Property to Lender.

# ARTICLE 2
## PRE-CLOSING AGREEMENTS

2.1 **Acknowledgment of Debt.**

Borrower and Lender acknowledge the following:

(a) As of _____, 2011, Borrower's indebtedness under the Note (excluding costs and reasonable attorney fees) is the principal amount of $35,000,000.00 plus accrued interest of $_____, which has accrued through _____, together with accrued interests, costs and expenses accrued thereafter.

(b) All payments have been appropriately applied and credited on the Note, and the balance indicated is the net of those credits.

(c) Borrower's indebtedness under the Note is a valid and binding obligation and there are no claims, setoffs or defenses to the payment or performance by Borrower of Borrower's indebtedness to Lender.

2.2 **Release of Claims Against Lender.**

Borrower and Indemnitor each waive, release and affirmatively agree not to allege or otherwise pursue any and all defenses, affirmative defenses, counterclaims, claims, causes of action, set-offs or other rights that they may have, or claim to have for any and all claims, harm, injury and damage of any and every kind, known or unknown, legal or equitable, which Borrower and/or Indemnitor have, or may claim to have, against Lender Parties from the date of Borrower's or Indemnitor's first contact with Lender up through the date of this Agreement. Borrower and Indemnitor confirm to Lender that they have reviewed the effect of this waiver, release and covenant not to sue with competent legal counsel of their choice, or have been afforded the opportunity to do so, before signing this Agreement, and each acknowledge and agree that Lender is relying upon this release in entering into this Agreement.

2.3 **Survival of Representations and Agreements.**

The agreements, warranties and representations set forth in this Article 2 are immediately binding upon the parties upon execution of this Agreement regardless of whether or not the Closing provided below occurs, and in any event shall survive the Closing.

## ARTICLE 3
## CLOSING

3.1      **Closing Date, Time and Place.**

The closing ("Closing") on the deed in lieu of foreclosure shall take place on or before [_____, 2011] (the "Closing Date"), (i) through an escrow arrangement satisfactory to Borrower and Lender, or (ii) in such manner and/or at such other date, time, and place, as may be agreed to by the parties in writing.

3.2      **Borrower's Deliveries at Closing.**

Borrower shall execute and deliver, or cause to be executed and delivered, to Lender (or to an entity or entities designated by Lender) on or before the Closing Date, the following documents:

(a)      Resolutions authorizing execution of this Agreement, all documents required or authorized under this Agreement and the consummation of the transactions contemplated by this Agreement.

(b)      A Quitclaim Deed in the form of EXHIBIT B attached hereto for each Property.

(c)      A Bill of Sale in the form of EXHIBIT C attached hereto relating to each Property.

(d)      The Nonforeign Person Affidavit in the form of EXHIBIT D attached hereto.

(e)      An Assignment and Assumption of Leases, Security Deposits and Contracts (the "Assignment") in the form of EXHIBIT E attached hereto for each Property.

3.3      **Lender's Deliveries at Closing**.

Lender shall execute and deliver, or cause to be executed and delivered, to Borrower on or before the Closing Date, the following documents:

(a)      The Lender Parties' Covenant Not to Sue in the form of EXHIBIT F attached hereto.

3.4      **Lender's Conditions to Closing.**

This Agreement and all obligations of Lender under this Agreement are subject to and conditioned upon Borrower delivering the documents to Lender listed in Section 3.2.

3.5      **Borrower's Condition to Closing.**

This Agreement and all obligations of Borrower and Indemnitor under this Agreement are subject to and conditioned upon Lender delivering the documents to Borrower listed in Section 3.3.

## ARTICLE 4
## EFFECT OF TRANSFER DOCUMENTS

The following shall be effected as a result of the Closing of the transactions contemplated by this Agreement:

4.1  **Consideration for Deed in Lieu of Foreclosure.**

Borrower acknowledges that the consideration for the Property conveyed to Lender (or to Lender's designee) of all of Borrower's right, title and interest in and to the Property is the Covenant Not to Sue in the form attached to this Agreement.

4.2  **Absolute Conveyance.**

Borrower acknowledges and agrees that: (1) the conveyance of the Property, and the assignment and transfer of the Collateral, to Lender (or to the designee of the Lender) pursuant to the terms of this Agreement are absolute conveyances of all Borrower's right, title and interest in and to the Property and the Collateral (and the other assets or property conveyed in accordance with the other Transfer Documents) in fact as well as in form, and the Transfer Documents are not intended to be a mortgage, trust conveyance, deed of trust or security interest of any kind; (2) the consideration for that conveyance is exactly as recited in this Agreement; and (3) after delivery of the Transfer Documents to Lender (or to the designee of Lender) pursuant to the terms of this Agreement, Borrower will have no right of redemption, or claims in, to or against the Property, the Collateral or to the proceeds or profits that might be derived from the Property or the Collateral.

4.3  **Waiver of All Redemption Rights and Rights to Contest Foreclosure.**

In consideration of this Agreement, Borrower waives any and all equitable and statutory rights to redemption of the Property should Lender elect to foreclose on the Mortgage, or any of them. If Lender elects to foreclose the Mortgage, Borrower agrees not to oppose, attempt to enjoin or take any other action that would impede or prevent the ordinary process of any such foreclosure. Borrower waives any and all rights it may otherwise have to contest the form of the notice of foreclosure sale, the posting and publication of the sale, the conduct of the sale and all other procedures or conduct with respect to such foreclosure sale.

4.4  **Debt and Mortgage Not Extinguished.**

Borrower's indebtedness under the Note, and the lien of the Mortgage shall not be extinguished as a result of the Closing on the transactions contemplated by this Agreement.

4.5  **No Novation or Release.**

Except as may be expressly provided in this Agreement, neither this Agreement nor any of the exhibits attached to this Agreement is intended to be, and none shall be deemed or construed to be, a reinstatement, novation, amendment, modification or release of the Loan, the Loan Documents, or any of them. Neither this Agreement nor any of the exhibits to this Agreement nor any payments made or any actions taken pursuant to this Agreement shall be deemed to cure any default which may exist under the Loan Documents.

4.6  **Nonmerger.**

This Agreement is not intended and shall not result in a merger of the Mortgage, nor the lien of any other security held by Lender, into the fee of the Property, and the Mortgage, the Note and other Loan Documents remain separate and independent to secure payment of Borrowers Parties' obligations, together with any subsequent disbursements, including interest, made by Lender pursuant to the terms of the Loan Documents (including, by way of example and not limitation, the payment of any real or personal property taxes, or hazard or casualty insurance premiums). The granting, acceptance or

recording of the Deed shall in no way affect the priority of Lender's Mortgage over any other liens, mortgages or encumbrances now existing or subsequently placed on the Property, nor shall the execution, acceptance or recording of the Deed affect in any way Lender's right to foreclose the Mortgage by advertisement or by judicial proceedings.

4.7 **Title and Possession.**

Title to the Property shall pass to Lender (or to the designee of Lender) upon delivery of the Deed at the Closing; delivery shall be deemed to occur upon satisfaction of the requirements for Closing. Lender shall have possession of the Property on the Closing Date, regardless of whether the Deed have been recorded on that date.

4.8 **Survival.**

All of the provisions of this Article 4 shall survive the Closing, the transfer of title to the Property and Collateral, and the other transactions contemplated by this Agreement.

# ARTICLE 5
# BORROWER'S WARRANTIES, REPRESENTATIONS AND COVENANTS

5.1 **Representations by Borrower.**

Borrower represents and warrants to Lender that:

(a)     Borrower owns and holds title in and to the Collateral, including all fixtures and equipment and other property, described in the Bill of Sale and the Assignments.

(b)     The transfers and conveyances made by Borrower pursuant to this Agreement are voluntary and have been made for a fair and equivalent consideration.  Borrower has relied exclusively upon its own knowledge and judgment with regard to the value of the Property and the Collateral.

(c)     Borrower is duly organized and existing in good standing under the laws of its State of organization.  The signing, delivery and performance of this Agreement, and the transactions contemplated by this Agreement are within Borrower's powers, and have been duly authorized.

5.2 **Representations by Borrower and Indemnitor.**

Borrower and Indemnitor each represent and warrant to Lender that:

(a)     Borrower and Indemnitor (i) have consulted with their own counsel with respect to the execution and delivery of this Agreement; (ii) have not relied upon the representations or advice of Lender or Lender's counsel in connection with this Agreement; and, (iii) acknowledge that Lender Parties have not acted as a fiduciary for Borrower or Indemnitor with regard to the transactions described in this Agreement.

(b)     Borrower and Indemnitor, and each of them, at all times have had access to an attorney of their choice in the negotiation of the terms of, and in the preparation and execution of, this Agreement and the related documents.  Borrower and Indemnitor, and each of them,

have had the opportunity to review and analyze this Agreement and related documents for a sufficient period of time prior to the execution and delivery of them.

(c)     No representations or warranties have been made by or on behalf of Lender Parties, or relied upon by Borrower or Indemnitor, pertaining to the subject matter of this Agreement and the related documents.

(d)     All terms of this Agreement and the related documents were negotiated at arms length and were prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the parties upon the others.

5.3     **Covenants.**

Borrower and Indemnitor covenant with Lender that:

(a)     Borrower and Indemnitor shall not take any action which would cause any of the representations or warranties in this Agreement to be materially impaired, materially untrue or materially misleading.

(b)     Borrower and Indemnitor shall sign and deliver to Lender (or to Lender's designee) such further documents, and take such further action as may be reasonably necessary to carry out the intent of this Agreement.  Borrower shall supply to Lender, to the extent in Borrower's possession or control, or shall assist Lender in obtaining (at no cost to Borrower), all titlework, appraisals, surveys, and whatever other documents or information as Lender may request to perfect Lender's security interests.  Because time is of the essence, Borrower shall use its best efforts to obtain such documents and information in an expeditious manner.

## ARTICLE 6
## LENDER'S WARRANTIES AND REPRESENTATIONS

6.1     **Lender's Representations.**

Lender's execution, delivery and performance of this Agreement is within Lender's powers and has been duly authorized.

6.2     **Survival.**

Lender's agreements, obligations, warranties and representations as set forth in this Agreement, and in particular the representations in this Article 6, shall survive the transfer of title to the Property and the other transactions contemplated by this Agreement.

## ARTICLE 7
## GENERAL PROVISIONS

7.1     **Inspection.**

At any time prior to Closing and during Borrower's usual business hours, provided Lender has given Borrower prior notice, Lender may enter upon the Property and inspect and examine the Property and the Collateral.  Lender shall also have the right at any time during Borrower's usual business hours or during the usual business hours of any third-party having control over Borrower's records, provided

Borrower and such third-party (as applicable) have been given prior notice, to inspect and verify Borrower's records as they relate to the operation, condition and maintenance of the Property, in order to verify any aspect of the Property, the revenues and expenses of the Property, the Borrower's financial condition or other similar matters deemed advisable by Lender. Lender shall have the right to examine, copy (by electronic or other means), comprehensively abstract or audit any of the foregoing records as often as may be reasonably desired by Lender. These inspections and examinations may be conducted by Lender, or Lender's authorized attorneys, accountants, appraisers or other authorized representatives.

### 7.2 **No Limitation on Remedies.**

No right, power, or remedy conferred upon or reserved to or by Lender in this Agreement or in the Loan Documents is intended to be exclusive of any other right, power or remedy conferred upon or reserved to or by Lender under this Agreement or any of the Loan Documents or at law or in equity, and each and every remedy shall be cumulative and concurrent, and shall be in addition to each and every other right, power and remedy given under this Agreement, under the Loan Documents or now or later existing at law or in equity.

### 7.3 **No Waivers or Forbearance.**

No forbearance by Lender in exercising any of its rights or remedies under this Agreement or any Loan Document, nor any renewal, extension, or rearrangement of any payment to be made under any Note, nor any acceptance by Lender of any payment in an amount less than the amount then due, shall constitute a waiver of any of the terms or of any of Lender's rights or remedies under this Agreement or any Loan Document. Lender shall not by any act or omission or commission be deemed to waive any of its rights or remedies, or any event of default, unless such waiver is in writing and signed and delivered by an officer of Lender and then only to the extent specifically set forth in the writing. No waiver of any Default or indulgence by Lender shall operate as a waiver of the same Default on a future occasion, or as a waiver of any other Default. No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver. No single or partial exercise by Lender of any right or remedy shall preclude any future exercise of it or the exercise of any other right or remedy.

### 7.4 **Borrower-Creditor Relationship; No Third-Party Beneficiaries.**

The relationship between Borrower and Lender is, and at all times shall remain, solely that of borrower and creditor, and shall not be, or construed to be, a joint venture, equity venture, partnership, fiduciary or other relationship of any nature. Lender neither undertakes nor assumes any responsibility or duty to Borrower, Indemnitor or to any other person with respect to the Collateral, Borrower's financial condition or Borrower's operations. This Agreement grants Lender certain rights as a creditor such as the right to inspect Borrower's Property, review Borrower's records, to approve certain matters and so forth. These rights are granted to Lender for Lender's exclusive benefit, and to preserve Lender's rights as a creditor, and not for the benefit of Borrower, Indemnitor, or any other person. Nothing in this Agreement shall require or obligate Lender to inspect Borrower's Property or Borrower's records. Borrower acknowledges that:

(a) Borrower is relying entirely upon Borrower's own judgment and is solely responsible with regard to Borrower's operations and financial condition, all matters relating to this Agreement, including the conduct of Borrower and its agents and employees;

(b) Acceptance, approval or review by Lender of any documents, information, conditions or performance or any other action by Lender Parties under this Agreement or the Loan Documents are for the sole protection of Lender Parties, and shall not constitute a

representation or warranty by Lender Parties to Borrower, Indemnitor or any other person or be relied upon by Borrower, Indemnitor or any other person for any other purpose; and

(c)     Acceptance by Lender of ownership of the Property (or acceptance of ownership by the designee of Lender) pursuant to the terms of this Agreement and the assignment to Lender (or to the designee of Lender) of various contracts and agreements pertaining to the Property will not create any obligation on the part of Lender (or Lender's designee) to third parties that might have claims against Borrower, Indemnitor, or the Property. Lender does not assume or agree to discharge any liabilities pertaining to the Property that originated before the Closing Date.

This Agreement is made exclusively for the benefit of Lender, its successors, assigns and designees as transferees of the Property, Borrower and Indemnitor, and (except as may be otherwise specifically stated hereunder) no other person shall have any rights of any nature under or by reason of this Agreement or any other Loan Document, or the right to enforce the provisions of this Agreement or any other Loan Document by action or legal proceedings or otherwise, or to rely on any representations, certifications, warranties or determinations which may be made under the Agreement. The Indemnitor is signing this Agreement for the sole purpose of binding the Indemnitor to those sections of this Agreement which benefit Lender and which are specifically applicable to the Indemnitor, and for no other reason. Lender shall not be liable to any trade creditor, materialman, supplier or other person dealing with Borrower. There shall be no third-party beneficiary of this Agreement, express or implied.

7.5     **No Duty.**

All attorneys, accountants, appraisers, consultants and other professional persons (including the firms or other entities on behalf of which any such person may act) retained by any Lender Party with respect to the transactions contemplated by this Agreement shall have the right to act exclusively in the interest of Lender Parties, and shall have no duty of disclosure, duty of loyalty, duty of care or other duty or obligation of any type or nature whatsoever to Borrower, Indemnitor, or to any other person, with respect to any matters within the scope of that representation or related to their activities in connection with that representation. Neither Borrower nor Indemnitor shall assert any claim or counterclaim against any such persons with regard to such matters, and all such claims or counterclaims, if any, now existing or later arising, whether known or unknown, foreseen or unforeseeable, are waived, released and forever discharged.

7.6     **Entire Agreement; Modification.**

This Agreement, including all written agreements, instruments, and documents referred to in this Agreement, and all recitals (which are hereby incorporated as covenants of the parties), is the **entire understanding and final agreement between the parties** relating to the subject matter of this Agreement and supersedes all prior agreements, negotiations or understandings between the parties relating to the subject matter of this Agreement. **This Agreement may not be varied, contradicted, added to or modified by evidence of prior, contemporaneous or subsequent oral agreements. There are no unwritten oral agreements between either Borrower or Indemnitor and/or any Lender Party.** This Agreement may only be amended, supplemented or modified by a subsequent agreement in writing which makes specific reference to this Agreement and which is signed by the party against whom enforcement of any such amendment, supplement or modification is sought.

No representation, promise, inducement, or statement of intention has been made by any party which is not embodied in this Agreement, and no party shall be bound by any representation, promise, inducement or statement of intention not incorporated in this Agreement.

7.7 **Notices.**

All notices, demands or other communications under this Agreement shall be in writing and shall be delivered to the appropriate party at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement). All notices, demands or other communications shall be considered as properly given if delivered personally or sent by certified mail, return receipt requested, or by overnight express mail or by overnight commercial courier service, charges prepaid. Notices so sent shall be effective upon receipt; provided, however, that non-receipt of any communication as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication.

To Lender:                              [_____]

With a courtesy copy to:       [_____]
and

To Borrower                         c/o Innkeepers USA Trust
                                            340 Royal Poinciana Way,
                                            Suite 306
                                            Palm Beach, Florida 33480

To Indemnitor:                      9 West 57th Street
                                            41st Floor
                                            New York, New York 10019

With a courtesy copy to:       Kirkland & Ellis LLP
                                            300 North LaSalle
                                            Chicago, Illinois 60654

7.8      **Assignment and Successors.**

This Agreement and all of Lender's rights, powers, privileges and benefits hereunder or pursuant hereto, are specifically assignable by Lender and its successors and assigns without any prior notice to, or consent of Borrower. Borrower may not assign this Agreement, or any right, privileges or other agreements granted by Lender under this Agreement without Lender's prior written consent. The provisions of this Agreement shall inure to the benefit of Lender and its successors, assigns, designees as transferees of the Property or any holders of the Note. The provisions of this Agreement shall inure to the benefit of Borrower, and shall be binding upon Borrower's successor and assigns, but no successor or assignee shall be entitled to enforce any right or remedy of Borrower under or by reason of this Agreement unless they shall have first obtained Lender's written consent to succeed to such rights and remedies.

7.9      **Time is of the Essence.**

Time is of the essence with regard to each and every provision of this Agreement.

7.10 **Captions.**

The captions contained in this Agreement have been inserted solely for the sake of convenient reference, and are entirely without substantive effect.

7.11 **Construction of Agreement.**

Each party acknowledges that it has participated in the negotiation of this Agreement, and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, dictated or drafted such provision.

7.12 **Partial Illegality.**

The invalidity of any of the provisions or clauses in this Agreement shall not affect any remaining provisions, clauses or applications which can be given effect without the invalid provision or clause. To this end the provisions of this Agreement are declared to be severable.

7.13 **Counterparts.**

This Agreement may be signed in several counterparts, each one of which shall be deemed original, and it is not necessary for each signatory to this Agreement to sign each original Agreement.

7.14 **Applicable Law.**

This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of California and, where applicable, the laws of the United States.

7.15 **Survival.**

All of the provisions of this Article 7 shall survive the Closing, the transfer of title to the Property, and the other transactions contemplated by this Agreement.

7.16 **Cooperation**.

Before and at all times following the Closing Date, Borrower, Indemnitor and Lender shall execute and deliver those documents and to do such other acts and things as may reasonably be requested by any part to this Agreement to ensure that the benefits of this Agreement are realized by the parties.

(SIGNATURES ON FOLLOWING PAGE)

IN WITNESS WHEREOF, the undersigned Borrower and Lender have executed this Agreement for Deed in Lieu of Foreclosure as of the date set forth above.

**LENDER:**

**DEUTSCHE BANC MORTGAGE CAPITAL, LLC**
By: _____
Name:
Title:

**BORROWER:**

**KPA HI ONTARIO LLC**

By: _____
Name:
Title:

The Indemnitor acknowledges, represents, and warrants to Lender that such Indemnitor has read this Agreement, and that the Indemnitor is executing this Agreement solely for the purpose of confirming its agreement to comply with those provisions hereof applicable to the Indemnitor.

**INDEMNITOR:**

**GRAND PRIX HOLDINGS LLC**

By: _____
Name:
Title:

## EXHIBIT A

## DESCRIPTION OF PROPERTY

LOT "A" OF THAT CERTAIN LOT LINE ADJUSTMENT RECORDED ON AUGUST 24, 1989 AS INSTRUMENT NO. 89-311209 OFFICIAL RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL A OF LOT LINE ADJUSTMENT NO. L83-13, IN THE CITY OF ONTARIO, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS APPROVED BY THE CITY COUNCIL OF SAID CITY ON SEPTEMBER 23, 1983, AND RECORDED OCTOBER 10, 1983 AS INSTRUMENT NO. 83-237239 OF OFFICIAL RECORDS, TOGETHER WITH THE SOUTHWESTERLY 145.18 FEET OF PARCEL 1 OF PARCEL MAP NO. 8818, AS SHOWN ON A MAP RECORDED IN BOOK 93, PAGES 97 AND 98 OF PARCEL MAPS, BOTH RECORDS OF SAID COUNTY, AND THAT PORTION OF LOT 3, BLOCK 24, TRACT NO. 2244, AS RECORDED IN BOOK 35, PAGES 50 THROUGH 56 OF MAPS, RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF PARCEL 1 OF PARCEL MAP NO. 8818, AS RECORDED IN BOOK 93, PAGES 97 AND 98 OF PARCEL MAPS, RECORDS OF SAID COUNTY; THENCE SOUTH 44 DEG. 31' 22" EAST, 188.64 FEET ALONG THE SOUTHWESTERLY LINE OF SAID PARCEL 1 TO THE MOST SOUTHERLY CORNER THEREOF; THENCE SOUTH 45 DEG. 28' 38" WEST, 56.16 FEET ALONG THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF SAID PARCEL 1 TO THE NORTHERLY RIGHT-OF-WAY LINE OF THE SAN BERNARDINO FREEWAY (I-10), AS DOCUMENT RECORDED IN BOOK 4589, PAGE 306, ET SEQ. OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY AND AS SHOWN ON CALIFORNIA STATE DIVISION OF HIGHWAYS RIGHT-OF-WAY MAP FILE NO. 987563; THENCE NORTH 44 DEG. 31' 22" WEST, 186.64 FEET ALONG SAID RIGHT-OF-WAY LINE; THENCE NORTH 45 DEG. 28' 38" EAST, 56.16 FEET TO THE POINT OF BEGINNING.

EXCEPTING FROM A PORTION OF SAID LAND ALL OIL, GAS AND OTHER HYDROCARBONS, GEOTHERMAL RESOURCES AS DEFINED IN SECTION 6903 OF THE CALIFORNIA PUBLIC RESOURCES CODE AND ALL OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR THAT MAY BE PRODUCED FROM THE PROPERTY; PROVIDED, HOWEVER, THAT ALL RIGHTS AND INTERESTS IN THE SURFACE OF THE PROPERTY WERE CONVEYED TO GRANTEE, AS SET FORTH IN THE DEED EXECUTED BY CHEVRON LAND AND DEVELOPMENT COMPANY RECORDED JUNE 14, 1984 AS INSTRUMENT NO. 84-140177 OFFICIAL RECORDS.

ALSO EXCEPTING FROM A PORTION OF SAID LAND ALL OIL, GAS AND OTHER HYDROCARBONS, NON-HYDROCARBON GASES OR GASEOUS SUBSTANCES, ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES, AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM THE PROPERTY, AND EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING INDIGENOUS STEAM, HOT WATER AND HOT SPRINGS, STEAM AND OTHER GASSES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS, HEAT OR OTHER ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH, AND

BYPRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING, THE RIGHTS DO NOT INCLUDE AND DO NOT EXCEPT OR RESERVE ANY RIGHT TO USE THE SURFACE OF THE PROPERTY OR THE FIRST 500 FEET BELOW THE SURFACE OF THE PROPERTY OR TO CONDUCT ANY OPERATIONS THEREON OR THEREIN, AS RESERVED IN THE DEED FROM CHEVRON LAND AND DEVELOPMENT COMPANY, RECORDED MARCH 31, 1988 AS INSTRUMENT NO. 88-095116, OFFICIAL RECORDS, AND RESERVED IN THE DEED FROM THE ONTARIO CENTER, A CORPORATION, RECORDED JULY 11, 1989 AS INSTRUMENT NO. 89-251109 OFFICIAL RECORDS.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR PARKING AND ACCESS, FOR INGRESS, EGRESS, PARKING AND MOTOR VEHICLES OVER AND ACROSS A PORTION OF PARCEL 1 OF PARCEL MAP 8818 AS RECORDED IN BOOK 93 PAGES 97 AND 98 OF PARCEL MAPS, UPON THE CONDITIONS AND PROVISIONS SET FORTH IN THAT CERTAIN SHARED; PARKING, ACCESS AND MAINTENANCE AGREEMENT RECORDED DECEMBER 22, 1989 AS INSTRUMENT NO. 89-499243 OFFICIAL RECORDS AND AMENDED BY DOCUMENT RECORDED JULY 23, 1996, INSTRUMENT NO. 96-262990, OFFICIAL RECORDS, AND AS AMENDED BY THAT CERTAIN INSTRUMENT ENTITLED "AMENDMENT TO SHARED PARKING, ACCESS AND MAINTENANCE AGREEMENT" RECORDED JULY 23, 1998 AS INSTRUMENT NO. 98-288448.

PARCEL 3:

RECIPROCAL PARKING EASEMENTS, COMMON AREA EASEMENTS, AND PEDESTRIAN PATHWAYS AS SET FORTH IN THE DECLARATION OF COVENANTS, CONDITIONS, EASEMENTS AND RESTRICTIONS, RECORDED DECEMBER 28, 1983 AS INSTRUMENT NO. 83-304769 OFFICIAL RECORDS AND AMENDED BY DOCUMENTS RECORDED JUNE 25, 1985 AS INSTRUMENT NO. 85-152322, DECEMBER 3, 1985 AS INSTRUMENT NO. 85-305152, MARCH 24, 1986 AS INSTRUMENT NO. 86-075242, NOVEMBER 16, 1987 AS INSTRUMENT NO. 87-406521, AUGUST 15, 1989 AS INSTRUMENT NO. 89-297661, SEPTEMBER 11, 1997 AS INSTRUMENT NO. 97-334117 AND MAY 16, 2003 AS INSTRUMENT NO. 20030330335, OFFICIAL RECORDS.

PARCEL 4:

NON-EXCLUSIVE RIGHT-OF-WAY EASEMENT AS SET FORTH IN THE PRIVATE BROADWAY EASEMENT AND SUPPLEMENT TO DECLARATION, RECORDED JANUARY 14, 1988 AS INSTRUMENT NO. 88-011236 OF OFFICIAL RECORDS.

## FORM OF QUITCLAIM DEED

**RECORDING REQUESTED BY**

_____
_____
_____
_____

When Recorded Mail To:

_____
_____
_____
_____

Title Order  No.
Escrow  No.
(space above for recorder's use only)

---

## QUITCLAIM DEED

The undersigned Grantor(s) Declare(s)

DOCUMENTARY TRANSFER TAX is $
Assessor's Parcel No.
\_\_ unincorporated area\_\_City of
\_\_ computed on full value of property conveyed, or
\_\_ computed on full value less value of liens or
encumbrances remaining at time of sale, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

hereby REMISES, RELEASES AND FOREVER QUITCLAIMS to

the following described real property in the City of _____ ,
County of _____ , State of _____ :

See attached Exhibit A, incorporated by reference to this document.

_____

Dated:

## CERTIFICATE OF ACKNOWLEDGEMENT OF NOTARY PUBLIC

STATE OF CALIFORNIA                               _____

COUNTY OF _____} S.S.        _____

                                                       _____

       On _____ before me, _____, (here insert name and title of the officer), personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

**EXHIBIT C**

**FORM OF BILL OF SALE**

BILL OF SALE

_____ , whose address is c/o _____ ("Seller"), conveys to _____, whose address is _____ ("Buyer"), all personal property (the "Personal Property") as described in **Exhibit A**, attached.

It is expressly understood and agreed that the execution and delivery of this Bill of Sale shall not in any manner be deemed to be a merger with, or the extinguishment of, the security agreement contained in the Mortgage in which the Seller under this Bill of Sale is mortgagor and _____, the sole member of the Buyer, is mortgagee. It is expressly understood and agreed that the security agreement contained in the Mortgage and the indebtedness secured by that security agreement shall be and remain in full force and effect according to the provisions of that security agreement.

In witness whereof, this instrument has been executed this _____, 2011.

_____

By:_____
Name: _____
Title: _____

STATE OF _____    )
                             )
COUNTY OF _____    )

The foregoing Bill of Sale was acknowledged before me this _____, 2011 by _____, the _____, on behalf of the company.

_____
Notary Public
_____ County, _____
My Commission Expires: _____

**<u>EXHIBIT A TO BILL OF SALE</u>**

<u>Description of Personal Property</u>

[to be attached]

**EXHIBIT D**

**NONFOREIGN PERSON AFFIDAVIT**

STATE OF _____)
COUNTY OF _____)

       Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest of _____ ("Transferor"), the undersigned, as _____ of Transferor, certifies the following:

       1.       That he is the _____ of Transferor and, as such, has personal knowledge of the facts and the authority to make this Affidavit.

       2.       Transferor is not a "Foreign Person" as defined in Section 1445(f) of the Internal Revenue Code.

       3.       Transferor's taxpayer identification number is:  _____

       4.       Transferor's address is c/o _____.

       The undersigned understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement made here could be punished by fine, imprisonment, or both.

       Under penalties of perjury the undersigned declares that he has examined this certification and to the best of his knowledge and belief, it is true, correct and complete.

                      _____
                      Name: _____

Subscribed and sworn to before me
this _____ day of _____, 2011.

_____
Notary Public
_____ County, _____
My Commission Expires: _____

**EXHIBIT E**

**LENDER PARTIES' COVENANT NOT TO SUE**

This Lender Parties' Covenant Not to Sue ("<u>Agreement</u>") is granted this _____, 2011 by Lender in favor of Borrower Protected Parties pursuant to the terms of a certain Agreement for Deed in Lieu of Foreclosure dated _____, 2011 (the "<u>Deed in Lieu Agreement</u>").

      1.     **Definitions**.

"<u>Borrower Protected Parties</u>" means _____ ("<u>Borrower</u>") and _____ ("<u>Indemnitors</u>").

"<u>Claims</u>" means any and all manner of debts, accounts, warranties, representations, covenants, contracts, agreements, liabilities, obligations, expenses, damages, actions, claims, counterclaims, demands, causes of action, suits, defenses, offsets against obligations of any nature whatsoever, whether at law or in equity, known or unknown, either now accrued or later maturing, in contract or in tort, at law or in equity, by reason of any matter, cause or thing, from the beginning of the world to and including the date of this Release.

"<u>Lender</u>" means _____.

All other terms not otherwise defined in this Agreement shall have the same meaning as set forth in the Deed in Lieu Agreement.

      2.     **Covenant Not to Sue.**  Lender covenants and agrees never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature against Borrower Protected Parties by reason of any and all Claims arising out of or relating to, in whole or in part, directly or indirectly:

      (a)     The Loan;

      (b)     The Loan Documents or the indebtedness evidenced and secured by the Loan Documents;

      (c)     The Property or the Collateral; or

but specifically excluding any Claims pertaining to:

      (a)     The Deed in Lieu Agreement;

      (b)     Any loans or indebtedness unrelated to the Loan, the Loan Documents or the indebtedness evidenced and secured by the Loan Documents or the Property or the Collateral; or

      (c)     Any representations, warranties or obligations that survive the delivery of the Deed in Lieu Agreement or this Agreement as specifically provided in the Deed in Lieu Agreement.

      3.     **No Borrower Litigation.**  This Agreement shall be void and of no force or effect if any of Borrower Protected Parties institute or cause to be instituted or continue prosecution of, or participate in, any suit or other form of action or proceeding of any kind or nature against Lender, _____ ("<u>Master Servicer</u>"), _____ ("<u>Special Servicer</u>"), the entity or entities designated by the Lender as the transferee(s) under the Transfer Documents, their

participants, affiliates, successors and assigns, or any of their officers, directors, employees, agents, attorneys or other representatives or any and all Claims arising out of or relating to, in whole or in part, directly or indirectly:

(a) The Loan;

(b) The Loan Documents or the indebtedness evidenced and secured by the Loan Documents;

(c) The Property or the Collateral; or

(d) The Deed in Lieu Agreement.

4. **Counterparts.** This Agreement may be signed in any number of counterparts with the same effect as if the signatures were on the same instrument. This Agreement may be signed in more than one document, and all such documents shall be deemed an original.

5. **Governing Law**. This Agreement shall be governed by, construed and enforced with the laws of the State of California.

**LENDER:**

**DEUTSCHE BANC MORTGAGE CAPITAL, LLC**

By: _____

       Name:

       Title:

## ACKNOWLEDGMENT

Borrower Protected Parties hereby acknowledge receipt of the foregoing Covenant Not to Sue and agree to the terms of it:

_____

By:_____
Name: _____
Title: _____

_____

By:_____
Name: _____
Title: _____

**EXHIBIT F**

**ASSIGNMENT AND ASSUMPTION OF LEASES,
SECURITY DEPOSITS AND CONTRACTS**

KNOW ALL MEN BY THESE PRESENTS that _____, ("Seller") in consideration of One ($1.00) Dollar and other good and valuable consideration paid by _____ ("Purchaser"), the receipt and adequacy of which is acknowledged, does grant, assign, transfer, convey to Purchaser all of Seller's right, title and interest in, to and under:

(A) All leases, subleases, tenancy, occupancy, use and license agreements ("Leases") in which Seller holds a landlord's interest, with respect to the real property and improvements thereon described in Exhibit A, attached, and commonly referred to as _____ (the "Property"), which Leases are described on Exhibit B.

(B) All the original Leases, Lease records, and other evidence of the existence and status of the rights of tenants under the Leases being assigned.

(C) All security deposits (including interest thereon, if any) related to the Leases as described on the attached Exhibit B, including, without limitation, the interest, if any, of the Seller in any letters of credit provided as security under the Leases, or any of them, and in any funds obtained as a result of a draw on any letters of credit provided as security under the Leases, or any of them.

(D) All service agreements and other agreements described on the attached Exhibit C (the "Contracts").

To have and to hold the same unto Purchaser, its successors and assigns, forever from _____, 20___, subject to the respective rent, conditions, covenants, and provisions contained in such Leases and Contracts that may be specifically applicable to such agreements.

Seller states the following to Purchaser:

1. All of Seller's obligations under the Leases and Contracts are fully performed through _____, 20___ and, to Seller's actual knowledge, there is no default under any of the Leases and contracts by any party to such agreements or no event which, with the giving of notice or passage of time, or both, would constitute a default, except as set forth on Exhibit B. There are no other security deposits except as identified in Exhibit B.

2. Seller has made no prior assignment or conveyance of the Leases, Security Deposits or Contracts. Seller is the valid holder of landlord's interest in the Leases at the time of this Assignment, and has the full power and authority to assign the Leases, Security Deposits and Contracts to Purchaser.

Purchaser accepts this Assignment and assumes the obligations of the lessor under the Leases and Contracts being assigned, including, but not limited to, the obligation to account for all tenant security deposits as required by law. Purchaser shall defend, indemnify and hold Seller harmless from any and all claims, suits, liabilities and expenses in connection with any acts or omissions by Purchaser relating to any of the Leases and Contracts from and after _____, 20___. Seller shall defend, indemnify and hold Purchaser harmless from any and all claims, suits, liabilities and expenses in connection with any acts or omissions by Seller relating to any of the Leases and Contracts before _____, 20___.

This Assignment shall be construed under and in accordance with the laws of the State of California.

In witness whereof, the parties have signed this Assignment this _____, 2011.

**SELLER:**

_____

By:_____
Name: _____
Title: _____

**<u>Schedule 1</u>**

1. Deed of Trust Note, dated as of October 4, 2006, payable by Borrower to Original Lender in the original principal amount of Thirty Five Million and No/100 Dollars ($35000000.00) (the "<u>Note</u>");

2. Deed of Trust, Leasehold Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing, granted by Borrower and KPA Ontario Lessee LLC, a Delaware limited liability company (the "<u>Original Operating Lessee</u>") to the trustee named thereunder, for the benefit of Original Lender, dated as of October 4, 2006, and recorded on October 6, 2006 as Instrument No 06-684203 in the Official Records of San Bernardino County California (the "<u>Recorders Office</u>") (the "<u>Mortgage</u>");

3. Assignment of Leases, Rents and Profits from Original Operating Lessee to Borrower dated as of October 4, 2006 and recorded as of October 6, 2006 as Instrument No 06-684204 in the Recorders Office (the "<u>Assignment of Rents</u>");

4. Assignment of Assignment of Leases, Rents and Profits from Borrower to Original Lender dated as of October 4, 2006 and recorded as of October 6, 2006 as Instrument No 06-684205 in the Recorders Office (the "<u>Assignment of Assignment of Rents</u>"; together with the Assignment of Rents the "<u>Assignments of Rents</u>");

5. UCC-1 Financing Statement naming Original Operating Lessee as Debtor, Borrower as Assignor Secured Party and Original Lender as Total Assignee of Secured Party, recorded October 6, 2006 as Instrument No 06-684207 in the Recorders Office (as assigned and continued from time to time, the "<u>County Lessee UCC</u>");

6. UCC-1 Financing Statement, naming Borrower as Debtor and Original Lender as Secured Party recorded October 6, 2006 as Instrument No 06-684206 in the Recorders Office (as assigned and continued from time to time, the "<u>County UCC</u>");

7. UCC-1 Financing Statement, naming Original Operating Lessee as Debtor, Borrower as Assignor Secured Party, and Original Lender as Total Assignee of Secured Party filed on or about October 6, 2006, in the Office of the Secretary of State of the State of Delaware (as assigned and continued from time to time the "<u>DE Lessee UCC</u>");

8. UCC-1 Financing Statement naming Borrower as Debtor, Original Operating Lessee as Additional Debtor and Original Lender as Secured Party, filed on or about October 6, 2006, in the Office of the Secretary of State of the State of Delaware as assigned and continued from time to time, the "<u>DE UCC</u>"; the County Lessee UCC, the County UCC, the DE Lessee UCC and the DE UCC are collectively referred to as the "<u>Financing Statements</u>");

9. Guaranty of Recourse Obligations, dated as of October 4, 2006, by Innkeepers USA Trust, a Maryland real estate investment trust (the "<u>Original Indemnitor</u>") for the benefit of Original Lender (the "<u>Carveout Indemnity</u>");

10. Environmental Indemnity Agreement, dated as of October 4, 2006, executed by Borrower and Original Guarantor in favor of the Original Lender (the "<u>Hazardous Materials Indemnity</u>");

11. Consent, Subordination and Recognition Agreement, dated as of October 4, 2006 executed by Original Operating Lessee and Innkeepers Hospitality Management Inc., Florida corporation, in favor of the Original Lender;

12. Assignment of Contracts, Licenses, Permits, Agreements, Warranties and Approvals, dated as of October 4, 2006 from Original Operating Lessee to Borrower (the "Assignment of Contracts");

13. Assignment of Assignment of Contracts, Licenses, Permits, Agreements, Warranties and Approvals, dated as of October 4, 2006 from Borrower to Original Lender (the "Assignment of Assignment of Contracts"; together with the Assignment of Contracts, the "Assignments of Contracts");

14. Loan Assumption, Affirmation and Modification Agreement, dated June 29, 2007, among Borrower, Grand Prix Ontario Lessee LLC, a Delaware limited liability company, Original Operating Lessee and Lender; and

15. Substitution of Indemntior and Assumption of Obligations of Indemnitor, dated June 29, 2007, among Grand Prix Holdings LLC, a Delaware limited liability company (the "Indemnitor"), Borrower, Original Indemnitor and Lender.