**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| INNKEEPERS USA TRUST, *et al.*, | ) | Case No. 10-13800 (SCC) |
|  | ) |  |
| Debtors.[1] | ) | Jointly Administered |
|  | ) |  |
| INNKEEPERS USA TRUST, *et al.*, | ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
| v. | ) | Adversary Proceeding |
|  | ) | Case No. __-_____ |
| CERBERUS SERIES FOUR HOLDINGS, LLC, | ) |  |
| CHATHAM LODGING TRUST, INK | ) |  |
| ACQUISITION LLC, AND INK ACQUISITION II | ) |  |
| LLC, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## COMPLAINT

Plaintiffs Innkeepers USA Trust, and its affiliated debtor entities identified in Paragraph 15 (collectively, "Plaintiffs"), as and for their Complaint against Cerberus Series Four Holdings, LLC ("Cerberus"), Chatham Lodging Trust ("Chatham," and together with Cerberus, the "Plan Sponsors"), INK Acquisition LLC ("INK I"), and INK Acquisition II LLC ("INK II," and together with INK I, individually or collectively, "New HoldCo," and together with all defendants, the "Defendants"), state as follows:

---

[1] The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

# PRELIMINARY STATEMENT

1.      This adversary proceeding is brought against Cerberus, Chatham and New HoldCo for breach of contract and other claims caused by Defendants' improper termination of their binding and irrevocable commitment to purchase the Fixed/Floating Debtors' hotels. Defendants purport to terminate their binding and irrevocable commitment based on an unidentified and unexplained "material adverse effect" on the Debtors' business.  But no such material adverse effect has occurred.  And to this day, neither Cerberus nor Chatham — despite numerous calls and other contacts — has said what the purported "material adverse" event, condition, or effect is.  At most, Cerberus and Chatham have suggested that global financial market volatility may somehow constitute a "material adverse effect" and allow them to back out of the deal at the last moment — literally as the parties were within hours of closing. Importantly, however, general market volatility is wholly irrelevant here.  The parties' binding contract expressly defines "material adverse effect" by reference to a material adverse change in the business of the Fixed/Floating Debtors, taken as a whole, and not general volatility in equity or other markets.  The Fixed/Floating Debtors' business performance is strong and there has been ***no change*** in either the results or prospects of the Fixed/Floating Debtors' business since Cerberus and Chatham signed their "binding and irrevocable commitment" on May 16, 2011. The Defendants' last minute change of heart has nothing to do with any change in the performance or prospects of the Fixed/Floating Debtors' business and everything to do with a calculated effort to renegotiate the terms of the parties' deal.  Plaintiffs seek to hold Cerberus and Chatham accountable for their breach of their "binding and irrevocable" contractual obligations, the Court's Confirmation Order and the underlying Plan of Reorganization.  The Plaintiffs seek

2

specific performance of the Defendants' binding and irrevocable commitments, or, in the alternative, substantial monetary damages.

2.     On May 16, 2011, Cerberus and Chatham executed a "binding and irrevocable commitment" (the "Binding Commitment Letter") to purchase 64 of the Debtors' hotels (the "Fixed/Floating Properties") for $1.12 billion.  The Binding Commitment Letter memorialized the terms of the sale, pursuant to Cerberus' and Chatham's winning bid at a public auction.  In the Binding Commitment Letter, Cerberus and Chatham represented that there was no financing contingency and they had the capacity to fund the transaction from funds in their possession. The parties specifically tailored the terms of the Binding Commitment Letter, including stapled financing provided by the Debtors' largest secured creditor and the requirement that the parties close the transaction by September 14, 2011 (unless amended or otherwise modified by the Court), to facilitate the Debtors' prompt emergence from their chapter 11 bankruptcy cases.

3.     After execution of the Binding Commitment Letter and associated term sheet ("Term Sheet"), Cerberus and Chatham and the Plaintiffs worked diligently to close the transaction by August 5, 2011 — the date specifically requested by the Defendants — including finalizing all necessary closing documents.  In addition, and accommodating Cerberus' and Midland Loan Services' ("Midland") request, the Debtors sought and obtained expedited approval from this Court to complete related lease transactions to clear the way for the August 5 closing that Cerberus requested.  At an August 2 hearing before this Court, counsel for Cerberus advised the Court that "We obviously want to get this deal closed, and want to get it closed this week."  In a subsequent hearing on August 4, Cerberus said nothing to inform the Court or the parties it was considering postponing the closing scheduled for the very next day, much less considering terminating the Binding Commitment Letter.

4.     On August 5, the parties stood at the goal line to consummate the transaction and close the deal.  All closing documents were finalized, including loan assumption documents, franchise agreements, and a detailed funds flow memorandum.  The Debtors had authorized wire transfers and the parties were preparing to initiate payments.  Suddenly changing course, Cerberus informed the Debtors late in the afternoon that they would not close.  Cerberus offered no explanation, while Chatham told the Debtors that it was ready to close, but could not because Cerberus, Chatham's partner in a newly-formed joint venture (the "Cerberus/Chatham Joint Venture"), was refusing to close that day due to purportedly unresolved issues with certain franchise agreements.

5.     Over the next few days, Cerberus remained "radio silent."  On August 9, Cerberus told the Debtors in a telephone conversation that it was considering whether conditions in the equity markets had resulted in a "material adverse effect" that would qualify as a Termination Event.  The following day, Cerberus asked the Debtors to consider a price adjustment.  It said nothing of the Fixed/Floating Debtors' performance.  The Debtors disputed the occurrence of a material adverse effect and told both Cerberus and Chatham they were prepared to close the deal.

6.     On Friday, August 19, Cerberus again asked the Debtors for a price adjustment and said that it would terminate the Binding Commitment Letter if the Debtors were unwilling to negotiate.  The Debtors asked Cerberus to explain the basis for its assertion of a material adverse effect.  Cerberus made only general and pretextual references to Standard & Poor's August 5, 2011 downgrade of the U.S. debt rating and recent declines in hotel REIT equity prices.  It said nothing of any impact either event had on the Debtors' business or prospects in particular.  The Debtors declined the unwarranted invitation to re-price the deal.

7.     After the close of business on Friday, August 19, 2011, Cerberus and Chatham sent a letter by facsimile to the Debtors and Midland and their respective counsel purporting to terminate the Binding Commitment Letter and avoid their "binding and irrevocable commitment" to purchase the Fixed/Floating Properties.  Cerberus and Chatham offered no basis — no explanation, no detail, no evidence — for the purported termination, except to generally reference the "material adverse effect" (or "MAE") provision in the Binding Commitment Letter.

8.     The insurmountable problem for Cerberus and Chatham is that no material adverse effect has occurred.  The material adverse effect provision in the Binding Commitment Letter provides that the Plan Sponsors may only terminate the agreement upon

> The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole . . .

(Binding Commitment Letter at 7.)  There is no so-called "market MAE" provision (*i.e.*, authorizing termination based on general market conditions) in the Binding Commitment Letter and, indeed, a proposed "market MAE" provision was deleted from an earlier draft of the baseline bid upon which Cerberus and Chatham were required to bid.

9.     To be sure, the performance of the Fixed/Floating Properties is solid and Cerberus and Chatham can point to nothing to the contrary.  Instead, Cerberus and Chatham apparently seek to rely on recent volatility in financial markets to avoid their "binding and irrevocable commitment" to purchase the Fixed/Floating Properties.  General financial market volatility, however, has little, if any relevance to the business of the Fixed/Floating Properties, and any such volatility was foreseeable at the time Cerberus and Chatham entered into their binding commitment.  Most significant for the MAE clause at issue here, there has been no change — let alone a material or adverse change — to the Fixed/Floating Debtors' business conditions or

K&E 19629784

prospects since the Plan Sponsors executed their commitment to purchase the Fixed/Floating Properties on May 16, 2011.

10.     Cerberus' and Chatham's failure to provide any evidence of a material adverse effect is not surprising because, as noted above, the Debtors' business and prospects remain strong and on course.  Moreover, even after failing to close, Chatham's CEO, Jeff Fisher, told investors and analysts on an earnings call that as Chatham moves forward "[w]e don't see any effect of what's happening in the financial markets at the hotel level" and that "we are bullish, we remain bullish."  Fisher's statements are especially relevant because he is the CEO of a company that owns and operates several extended stay hotels similar to Innkeepers, Chatham recently closed on the purchase of five of the Debtors' other hotels, and he is also the CEO of the Debtors' hotel management company, Island Hospitality Management ("Island").  Consistent with Chatham's outlook, Island completed and presented to the Fixed/Floating Debtors on August 15 (*i.e.*, after the S&P downgrade and recent equity market volatility) an updated forecast for the Fixed/Floating Debtors through the end of 2011.  The updated forecast remained substantially unchanged from the 2011 budget approved in February.

11.     Even beyond commenting on Chatham's own hotel business and prospects, Fisher remains bullish on the very Fixed/Floating Properties Chatham now contends suffered a "material adverse effect."  In a *Business Wire* article appearing on August 8, Fisher commented favorably on the future prospects for the Fixed/Floating Properties as well as five other hotels Chatham purchased from the Debtors.  Specifically, Fisher was quoted as stating: "To be able to round-trip this investment at a significant discount to both replacement cost and the value we sold at in 2007 means we will be able to generate excellent returns for our shareholders and our partner. . . . With the joint venture [with Cerberus to purchase the Fixed/Floating Properties], we

6

are able to participate in an off balance sheet, higher leveraged investment in hotels that we understand better than anyone, ***hotels we believe will generate strong returns for our shareholders***."

12.     Cerberus' and Chatham's purported termination is nothing more than a calculated effort to apply leverage upon the Debtors and their constituents to renegotiate the terms of the parties' binding contract.  Regardless of their motives, one thing is clear:  Cerberus and Chatham are not excused from their obligations under the plain terms of the Binding Commitment Letter and Term Sheet.  There has been no material adverse effect on the Fixed/Floating Debtors, and general market conditions alone cannot (and do not) provide the basis for a material adverse effect under the Binding Commitment Letter.

13.     Through this action the Debtors seek a declaration and judgment that the Defendants' purported termination is a breach of their obligations under the parties' Binding Commitment Letter and Plan of Reorganization.  Moreover, the Plaintiffs seek an order requiring the Defendants to specifically perform their obligations.   In the alternative to specific performance, the Debtors seek an order requiring Cerberus and Chatham to pay substantial damages.

## THE PARTIES

14.     On July 19, 2010, Innkeepers USA Trust, a Maryland corporation, and its affiliated debtors and debtors in possession, filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  The Plaintiffs continue to operate their business and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     Plaintiffs Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC;

Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC (collectively, the "Fixed Rate Debtors"); and Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC; and Grand Prix West Palm Beach, LLC (collectively, the "Floating Rate Debtors"), and Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; Grand Prix Mezz Borrower Fixed, LLC; and GP AC Sublessee LLC (collectively, the "Other Plan Debtors," and together with the Fixed Rate Debtors and the

Floating Rate Debtors, the "Fixed/Floating Debtors"), are direct and indirect subsidiaries of Innkeepers USA Trust. Collectively, the Fixed/Floating Debtors directly or indirectly own and/or operate the 64 hotels that serve as collateral for the Fixed Rate Mortgage Loan and the Floating Rate Mortgage Loan (the "Fixed/Floating Properties").

16. Defendant Cerberus Series Four Holdings, LLC ("Cerberus"), is a Delaware limited liability company and, upon information belief, is a private investment fund with its principal place of business in New York. Cerberus is an affiliate of the private investment firm Cerberus Capital Management, L.P.

17. Defendant Chatham Lodging Trust ("Chatham") is a Maryland corporation with its principal place of business in Florida. Chatham is a self-advised real estate investment trust that invests in upscale extended-stay hotels and premium-branded select-service hotels.

18. Defendant INK Acquisition LLC is a Delaware limited liability company, which, upon information and belief, was formed for the purpose of acquiring some or all of the Fixed/Floating Properties.

19. Defendant INK Acquisition II LLC is a Delaware limited liability company, which, upon information and belief, was formed for the purpose of acquiring some or all of the Fixed/Floating Properties.

## JURISDICTION AND VENUE

20. This adversary proceeding is brought pursuant to Fed. R. Bankr. P. 7001(1) and 7001(9). This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

21. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This proceeding is a core proceeding under 28 U.S.C. § 157(b) arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532, among other grounds.

22.     On May 19, 2011, the Court entered an order approving the Debtors' entry into the Binding Commitment Letter. That order provided that the Court "retains jurisdiction with respect to all matters arising from or related to the implementation of this Order." Further, the May 16, 2011 Binding Commitment Letter approved by the Court, provides that each of the parties:

> irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Innkeepers Bankruptcy Court, in any action or proceeding arising out of or relating to this Amended and Restated Commitment Letter, the Term Sheet, the other Investment Documents, the Fixed/Floating Rate Auction, and the construction and enforcement of the Bidding Procedures Order, including the qualification of bids thereunder.

## FACTUAL ALLEGATIONS

### A.     The Plan Process

23.     Beginning in early September 2010, the Debtors undertook a marketing process to further the Debtors' goals of maximizing the value of the Debtors' estates for the benefit of all of their constituencies. As part of this process, the Debtors' management and advisors actively engaged with all of their major stakeholders to solicit input regarding restructuring alternatives with the goal of proposing and filing a consensual plan. The Debtors worked diligently to achieve near-unanimous consensus among their stakeholders.

24.     Consistent with these goals, on January 14, 2011, the Debtors filed a motion seeking approval of a stalking horse proposal for an enterprise auction (sponsored jointly by Five Mile Capital Partners LLC ("Five Mile") and Lehman ALI, Inc. ("Lehman")), authority from the Court to enter into commitment letters with Five Mile, Lehman, and Midland, and approval of certain bidding procedures pursuant to which the Debtors would seek proposals superior to the Five Mile/Lehman stalking horse proposal. On that same day, Innkeepers, Five Mile and

Lehman executed a commitment letter and term sheet (the "Five Mile/Lehman January Commitment Letter").

25.      After the Debtors filed a motion seeking approval of the stalking horse motion but before the Court ruled, the Debtors reached an agreement with Five Mile, Lehman, and Midland to modify the Five Mile/Lehman proposal and Five Mile/Lehman January Commitment Letter. The most material amendment was the removal of the seven hotel properties commonly referred to as the "Seven Sisters" from the Five Mile/Lehman proposal.  On March 9, 2011, the parties executed an Amended and Restated Binding Commitment Agreement Between Five Mile/Lehman and Innkeepers reflecting these modifications (the "Five Mile/Lehman March Amended Commitment Letter").

26.      On March 11, 2011, the Court entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to enter into the modified commitment letter and term sheet with Five Mile/Lehman, approved certain bidding procedures for an auction related to the Fixed/Floating Properties, and authorized the Debtors to solicit bids and conduct an auction for the Fixed/Floating Properties.

27.      Prior to the auction, the Debtors' management and advisors contacted a broad range of prospective buyers, representing a spectrum of potential interest, from established hotel owners and operators, to large private equity investors, sovereign wealth funds, and individual investors.  In total, the Debtors contacted more than 200 potential investors and plan sponsors to facilitate restructuring proposals and explore transactional options that would maximize value. The Debtors executed more than thirty non-disclosure agreements, and responded to detailed diligence requests from approximately thirty potential investors.

K&E 19629784

28.     As a result of the robust marketing process, the Debtors received sixteen bids before the April 25, 2011 bid deadline.  One of those bids was a joint bid by Cerberus and Chatham for the Fixed/Floating Properties.  This initial bid by Cerberus and Chatham was the only bid deemed to be a "qualified overbid" on the Fixed/Floating Properties.

29.     A requirement of each bid was that it be submitted with a marked copy of the Five Mile/Lehman March Amended Commitment Letter and Term Sheet (*i.e.*, the baseline bid) reflecting all changes proposed by the competing bidder.  As is typical in any chapter 11 auction process, any new bidder, including Cerberus and Chatham, would step into the shoes of Five Mile/Lehman, unless the new bidder proposed and negotiated terms other than those embodied in the Five Mile/Lehman March Amended Commitment Letter and Term Sheet.

30.     Notably, the Five Mile/Lehman March Amended Commitment Letter and Term Sheet did not include a "market MAE" provision.  That was no accident.  During the negotiations that led to the Five Mile/Lehman March Amended Commitment Letter and Term Sheet, Five Mile/Lehman specifically requested that the commitment letter include a market MAE termination event in favor of Five Mile and Lehman upon "[t]he occurrence of any material adverse condition, change in or material disruption of conditions in the financial, banking, capital or hospitality markets and extended stay lodging sector that would reasonably impair the viability or success of the Transaction with such Termination Event."  The Debtors would not agree to that term, nor any other that provided a plan sponsor a purported termination right based on general market activity untethered to the specific performance of the Debtors.  And so the provision was deleted.

31.     On April 25, 2011, Cerberus and Chatham submitted to the Debtors along with their bid a marked copy of the Five Mile/Lehman March Amended Commitment Letter and

Term Sheet. Cerberus and Chatham thereafter negotiated with the Plaintiffs to reach an agreed upon commitment letter. The negotiated commitment letter reflected substantial modifications to the Five Mile/Lehman March Amended Commitment Letter and Term Sheet, including the provision regarding the Debtors' available remedies should the successful bidders breach their commitment. Among other edits, the liquidated damages provision from the Five Mile/Lehman March Amended Commitment Letter and Term Sheet was deleted.

32. Cerberus and Chatham proposed no alteration to the MAE provision that was included in the executed Five Mile/Lehman March Amended Commitment Letter and Term Sheet. Thus, the MAE provision in the Binding Commitment Letter and Term Sheet is identical to the final MAE provision in the Five Mile/Lehman March Amended Commitment Letter and Term Sheet — *i.e.*, it contains no market MAE provision.

33. Also on April 25, 2011, the Debtors and New HoldCo executed an Escrow Agreement, pursuant to which the Plan Sponsors' $20 million deposit, required in conjunction with their bid, would be held and governed. Chatham signed the Escrow Agreement on behalf of New HoldCo. The Escrow Agreement provides that the Escrow Agent shall release the funds to Innkeepers upon written notice from Innkeepers that the successful bidder failed to consummate the contemplated restructuring transaction because of a breach or failure to perform by such bidder. If the successful bidder objects to such release in writing, the Escrow Agent shall only release the funds to Innkeepers upon receipt of a court order directing disbursement. Additionally, the Escrow Agreement also provides more generally that the Escrow Agent shall release the funds consistent with a court order directing disbursement.

34. On April 29, 2011, the Debtors named the Cerberus and Chatham overbid the baseline bid for the auction.

K&E 19629784

### B.     The Auction

35.     On May 2 and 3, 2011, the Debtors proceeded with the auction for the Fixed/Floating Properties (the "Fixed/Floating Auction").

36.     At the Fixed/Floating Auction, following twelve rounds of competitive bidding between Five Mile/Lehman and Cerberus/Chatham, the Debtors closed the auction for the Fixed/Floating Properties after an unchallenged bid from Cerberus and Chatham valued at approximately $1.12 billion was determined to be the highest and best bid for sponsorship of the Fixed/Floating Plan.  After the auction, the Plaintiffs and Cerberus and Chatham continued to negotiate the specific terms of the commitment letter.

37.     The auction process yielded approximately $154 million in value over and above the Five Mile/Lehman proposal reflected in the Five Mile/Lehman March Amended Commitment Letter.

### C.     The Binding Commitment Letter and Term Sheet

38.     On May 16, 2011, the Fixed/Floating Debtors entered into the Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust (*i.e.*, the "Binding Commitment Letter") with Cerberus, Chatham, INK I, and INK II.

39.     The Binding Commitment Letter sets forth the terms pursuant to which Cerberus and Chatham committed to purchase the 64 Fixed/Floating Properties.  Along with the Term Sheet accompanying it, the Binding Commitment Letter constitutes a "***binding and irrevocable commitment*** to provide equity capital . . . for the restructuring of the debt and equity of the Fixed/Floating Debtors," and represents "the entire understanding and agreement" among the parties related to the acquisition of the Fixed/Floating Properties.

14

40.     In the Binding Commitment Letter, Cerberus and Chatham committed that no further diligence is required before consummating the transaction.  Cerberus and Chatham also represented that they each have committed funding to consummate the transaction:

> 4.     Commitment; Financial Capability.   .  .  .  The aggregate commitment of Cerberus is $363,527,644.35, and the aggregate commitment of Chatham is $37,000,000.00.   As discussed above, Cerberus has approximately $23 billion under management and Chatham currently has the capacity to invest over $300 million in new hotel assets, which we believe is sufficient evidence of our financial capability to close the transaction.

41.     The Binding Commitment Letter further provides that New HoldCo and the Plan Sponsors have obtained all internal authorizations and approvals they need to close the transaction.

42.     The Binding Commitment Letter also provides that the Plan Sponsors may terminate the Commitment only upon the occurrence of specified events:

> 9.     Termination.  Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate this Amended and Restated Commitment Letter by written notice to the Company and Midland upon the earliest occurrence of a Termination Event (as defined in the Amended and Restated Term Sheet).

43.     The Term Sheet enumerates the only circumstances under which the Plan Sponsors may terminate their obligations, including the occurrence of an event that has a "material adverse effect" on the Fixed/Floating Debtors, taken as a whole:

> Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate the Amended and Restated Commitment Letter and Amended and Restated Term Sheet by written notice to the Debtors and Midland upon the earliest occurrence of the following events (each a "Termination Event"). . . .
>
> The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole …

15

(Term Sheet at 7.)

44. The executed Binding Commitment Letter does not contain a "market MAE" provision.

45. The Binding Commitment Letter is fully integrated; the Defendants and Fixed/Floating Debtors expressly agreed that the Binding Commitment Letter, "together with the Appendices and Exhibits thereto, represent the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and super[s]edes all prior and contemporaneous agreements and understandings among the parties hereto, both written and oral, with respect to the subject matter hereof."

46. The Binding Commitment Letter is "governed by, and interpreted and enforced in accordance with, the laws in force in the state of New York."

47. As part of their binding commitment to purchase the Fixed/Floating Properties, the Plan Sponsors committed to "take all reasonably necessary and appropriate actions to support and achieve confirmation and consummation of the Fixed/Floating Plan and the Transaction contemplated in the Amended and Restated Commitment Letter and this Amended and Restated Term Sheet" and "not take any actions (either by affirmative action or omission) . . . that would materially delay the confirmation or consummation of the Fixed/Floating Plan or the Transaction contemplated in the Amended and Restated Commitment Letter and this Amended and Restated Term Sheet."

48. The Term Sheet further provides that the transaction must be completed on or before September 14, 2011 unless amended or otherwise modified by the Court, and makes clear that time is of the essence with respect to the closing of the transaction.

**D. Confirmation of the Fixed/Floating Debtors' Plan**

49.     The Debtors filed on May 9, 2011 a revised Plan and Disclosure Statement reflecting the post-auction negotiations and agreements.  The Court entered the Disclosure Statement Order on May 19, 2011, which, among other things, (a) approved the Disclosure Statement; (b) determined that the bid submitted by the Plan Sponsors and New HoldCo, as evidenced by the Binding Commitment Letter and Term Sheet, was the successful bid for sponsorship of the Fixed/Floating Plan; and (c) authorized the Debtors to enter into the Binding Commitment Letter and all other documents related thereto reflecting the terms of the Fixed/Floating successful bid.  The Debtors filed the final version of the Disclosure Statement and the solicitation version of the Plan on May 20, 2011.

50.     On June 13, 2011, the Debtors filed the Plan Supplement.  The Debtors filed several amendments to the Plan and Plan Supplement through June 29, 2011.  On June 29, 2011, the Court entered an order confirming all four joint plans submitted by the Debtors, including the Fixed/Floating Plan, the foundation of which is the transaction contemplated by the Binding Commitment Letter.

51.     Section Q (paragraph 155) of the Confirmation Order provides that the Confirmation Order shall be automatically revoked solely with respect to the Fixed/Floating Plan, and the Commitment Letter shall be null and void in all respects, if the Effective Date for the Fixed/Floating Plan does not occur by September 15, 2011, unless amended or otherwise modified by the Court.  Article IX, Section G of the Debtors' Plan of Reorganization provides the same.

52.     Both the Binding Commitment Letter and the Fixed/Floating Plan, as embodied in the Debtors' Plan of Reorganization confirmed on June 29, 2011, are contractually binding on Cerberus and Chatham.

17

53.     Within 35 days of confirmation, the Debtors consummated three of the joint plans, completing the restructuring of seven of the Debtors' hotels.  One of the three plans that closed involved the purchase of five of the Debtors' hotels for $195 million by Chatham Lodging, L.P., an affiliate of Chatham.

**E.     The Debtors' Efforts To Close On August 5, 2011**

54.     In late July 2011, Cerberus and Chatham requested the Debtors' assistance to seek and achieve a closing of the transaction by Friday, August 5, 2011.  To that end, the parties jointly endeavored to finalize all of the documents necessary to close on August 5, including loan assumption documents, franchise agreements, and a detailed funds flow memorandum.

55.     Further, on Monday, August 1, 2011, counsel for Cerberus and Midland requested that the Fixed/Floating Debtors obtain approval from the Court of certain post-petition lease transactions entered into by the Fixed/Floating Debtors in the ordinary course of business.  Based on that request, the Debtors sought expedited approval of the relevant motion.  The Debtors also informed the Court of the parties' intention to close on Friday, August 5.

56.     On August 2, during a hearing on Five Mile's application for approval of an administrative expense claim, counsel for Cerberus advised the Court that "We obviously want to get this deal closed, and want to get it closed this week."

57.     On August 5, all of the necessary documents had been executed and were ready to be delivered at closing.  At 11:21 a.m. ET, Chatham's counsel informed the Debtors by e-mail that Cerberus and Chatham intended to close at approximately 2:00 p.m. ET.  Based on this representation, the Fixed/Floating Debtors prepared to initiate wire transfers.  The Fixed/Floating Debtors continued to communicate with Cerberus and Chatham through counsel over the next few hours.  Then, without warning, the Fixed/Floating Debtors learned that Cerberus would not close, upon being copied at 2:32 p.m. ET on an e-mail from Cerberus' counsel to the title

18

company that stated Cerberus did not intend to close until Monday, August 8.

58.     On Friday, August 5, Cerberus did not offer the Fixed/Floating Debtors any explanation for its decision to postpone the closing.  That same day, Midland and Chatham informed the Fixed/Floating Debtors that Cerberus would not close on the date requested by Cerberus because of open issues with the franchise agreements with Hyatt Hotels Corporation and Starwood Hotels & Resorts Worldwide, Inc.

59.     Later that afternoon, the Fixed/Floating Debtors reached out to Cerberus' counsel by e-mail to clarify that the Fixed/Floating Debtors would be available to close the transaction on Monday, August 8.  Cerberus' counsel responded that due to "logistics associated with getting documents re-dated and in some instances re-executed, Monday is no longer possible." Cerberus' counsel did not respond to the Debtors' subsequent request to speak that night and did not raise any purported "material adverse effect" on the Fixed/Floating Debtors.

### F.     Cerberus' and Chatham's Purported Termination of the Binding Commitment Letter

60.     On August 6, the Fixed/Floating Debtors again reached out to Cerberus' counsel, requesting a telephone conference to discuss next steps for closing.  Cerberus' counsel said that Cerberus would not be in a position to discuss a new closing date until at least Monday, August 8.

61.     The Fixed/Floating Debtors next heard from Cerberus on the evening of Monday, August 8, in response to the Debtors' request for a status update.  On the status update call the next day, August 9, the Debtors learned from representatives of the buyers that purported issues with franchise agreements would not hold-up the scheduled closing.  Cerberus also informed the Fixed/Floating Debtors that Cerberus was not in a position to close the transaction or even to discuss the revised timing of closing.  Cerberus further stated that the only open issue with

respect to the Binding Commitment Letter was whether conditions in the equity markets had resulted in a "material adverse effect" that would qualify as a Termination Event.

62.     The Fixed/Floating Debtors next heard from Cerberus late on Wednesday, August 10, when Tom Wagner, Managing Director of Cerberus Real Estate Capital Management, LLC, spoke to Marc Beilinson, the Debtors' Chief Restructuring Officer, and inquired if the Fixed/Floating Debtors would consider a price adjustment under the Binding Commitment Letter.  The Debtors responded that they would not consider a price adjustment given Cerberus' and Chatham's firm commitments and binding obligations under the Binding Commitment Letter.

63.     On Friday, August 19, the Debtors again reiterated their readiness to close. Cerberus again asked the Debtors for a price adjustment and said it would terminate the Binding Commitment Letter if the Debtors were not willing to renegotiate.  The Debtors again responded by explaining that, given Cerberus' and Chatham's firm commitments and binding obligations under the Binding Commitment Letter and their failure to substantiate any purported material adverse effect, negotiations could not be reopened.

64.     After the close of business on Friday, August 19, 2011, the Debtors and Midland and their respective counsel received a facsimile from Cerberus, signed by all Defendants, stating that "due to the occurrence of a 'Termination Event' as defined, with respect to the Innkeepers Commitment Letter, in the sixth bullet under 'Termination' in the Amended and Restated Term Sheet," the Fixed/Floating Plan Sponsors were terminating the Binding Commitment Letter (the "Termination Letter").  The sixth bullet is the "material adverse effect" provision in the Binding Commitment Letter.

65.     The Termination Letter did not identify any material adverse event, condition or

effect. Nor did the Termination Letter provide any factual explanation whatsoever for the Plan Sponsors' assertion.

66. The Debtors have performed all of their obligations under the Binding Commitment Letter. The Fixed/Floating Debtors' financial condition, business, results of operations or prospects, taken as a whole, have not suffered any material adverse event, condition or effect, as defined in the Term Sheet. The Fixed/Floating Debtors' financial condition and operating performance have been consistent with their historic results and projections. The Plan Sponsors are not excused from their obligations under the Binding Commitment Letter or the Debtors' Plan of Reorganization.

### G. The Fixed/Floating Debtors' Performance Remains Strong

67. The Fixed/Floating Debtors' performance metrics and prospects remain strong. On February 20, 2011 — months before the auction — the Debtors prepared a budget for the remainder of 2011 (the "2011 Budget"). This budget was shared with potential bidders, including Cerberus and Chatham.

68. Results from May and June 2011, show that earnings before interest, taxes, depreciation and amortization ("EBITDA") for the Fixed/Floating Debtors was slightly above the 2011 Budget. For the same period, the Fixed/Floating Debtors' revenue per available room ("RevPAR") and occupancy rates were also above budget. In addition, Island completed and presented to the Fixed/Floating Debtors on August 15, 2011 an updated forecast for the Fixed/Floating Debtors through the end of 2011, which remained substantially unchanged from the 2011 Budget approved in February.

69. In short, since the execution of the Binding Commitment Letter on May 16, 2011 through August 19, 2011, when Cerberus and Chatham purportedly terminated the Binding Commitment Letter due to an alleged "material adverse effect" on the Fixed/Floating Debtors,

the Fixed/Floating Properties have performed at, near or above the Debtors' 2011 Budget.

### H. Chatham Remains Positive on the Hospitality Industry Despite Short-Term Market Volatility

70.     During the week of August 8, Chatham's share price dropped with the rest of the REIT market.  Notwithstanding the drop, during its quarterly earnings conference call with investors and the public equity markets on August 9, 2011, Chatham noted positive growth and prospects.  Chatham CEO Jeff Fisher said, "as we move forward into the fourth quarter and beyond our internal growth should be strong."  He further explained that "[w]e don't see any effect of what's happening in the financial markets at the hotel level" and that "we are bullish, we remain bullish."  Asked by an analyst "if the recent economic uncertainty gives you any pause regarding [Chatham's] outlook," Fisher replied with an emphatic no:

> [A]s of last night, August 8, we were exactly on forecast for all the hotels that we own. We, at the, and I spent plenty of time yesterday just going through with our operators hotel by hotel, market by market, looking at the August forecast, looking frankly at some early September forecast numbers. ***We just don't see it, and I'm sure you hear that from other hotel companies as well, we don't see any effect of what's happening in the financial markets at the hotel level.***

During the same call, Chatham's CFO, Dennis Craven (who is also the former CFO of Innkeepers), affirmed Fisher's statements and expressed a positive view for lodging industry prospects generally:  "we believe, [we are] in a great spot to take advantage of what we hope is a lodging up cycle and we're in the beginning stages of that."

71.     In addition, in a *Business Wire* article appearing on August 8, Chatham CEO Jeff Fisher commented favorably on the future prospects for the Fixed/Floating Properties as well as five other hotels Chatham purchased from the Debtors.  Specifically, Fisher was quoted as stating: "To be able to round-trip this investment at a significant discount to both replacement cost and the value we sold at in 2007 means we will be able to generate excellent returns for our

shareholders and our partner. . . . With the joint venture [with Cerberus to purchase the Fixed/Floating Properties], we are able to participate in an off balance sheet, higher leveraged investment in hotels that we understand better than anyone, ***hotels we believe will generate strong returns for our shareholders***."

72.     On August 11, 2011, the STR Hotel Industry Overview projected positive growth in several key metrics for the lodging industry, including increases in RevPAR of 7.8%; increases in average daily rate ("ADR") of 3.7%, and increases in occupancy rates of 3.9% for 2011.  Moreover, the report noted that the prospects for the lodging industry are good:  "Strong revenue growth expected in 2012."

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

73.     Plaintiffs hereby repeat and re-allege the allegations contained in paragraphs 1 through 72 above as if fully set forth herein.

74.     Each of the Defendants entered into the Binding Commitment Letter and the related Term Sheet.

75.     The Binding Commitment Letter is a valid and binding contract.

76.     Among other things, the Plan Sponsors committed to provide equity and debt financing of $1,124,699,882.38 to fund the transaction.

77.     Defendants breached the Binding Commitment Letter as alleged herein.

78.     As a result of the Defendants' conduct as alleged herein, the Fixed/Floating Debtors have suffered and/or will, in the future, suffer damages.

79.     Plaintiffs request a declaration that:

    a)      No material adverse effect, as defined in the Term Sheet, has occurred with respect to the Fixed/Floating Debtors;

b)     No Termination Event, as defined in the Binding Commitment Letter and Term Sheet, has occurred with respect to the Fixed/Floating Debtors;

c)     By terminating the Binding Commitment when in fact no Termination Event has occurred, Defendants have breached their obligations under the Binding Commitment Letter and Term Sheet;

d)     The Defendants are not excused from failing to comply with their obligations under the Binding Commitment Letter and Term Sheet;

e)     The Defendants have no right to recover the funds they deposited pursuant to the Escrow Agreement, and the Escrow Agent should direct such funds to the Plaintiffs, upon final adjudication of Plaintiffs' damages;

f)     The Fixed/Floating Plan, embodied in the Debtors' Plan of Reorganization confirmed on June 29, 2011, is binding on the Plan Sponsors; and

g)     Section Q (paragraph 155) of the Confirmation Order and Article IX, Section G of the Debtors' Plan of Reorganization (confirmed by the Court on June 29, 2011) are stayed until such time as Plaintiffs' claims in this adversary proceeding are fully adjudicated.

## SECOND CAUSE OF ACTION
### (Breach of Contract and Specific Performance)

80.     Plaintiffs hereby repeat and re-allege the allegations contained in paragraphs 1 through 79 above as if fully set forth herein.

81.     Each of the Defendants entered into the Binding Commitment Letter and the related Term Sheet.

82.     The Binding Commitment Letter is a valid and binding contract.

83.     Plaintiffs have fully performed their obligations under the Binding Commitment Letter.

84.     All of the conditions precedent to the Plan Sponsors' commitments have been satisfied.  Any failure to satisfy such conditions is the result of the Plan Sponsors' actions or failure to act.

K&E 19629784

85.     The Fixed/Floating Debtors have not suffered a material adverse effect under the Binding Commitment Letter.

86.     The Defendants purported to terminate the Binding Commitment Letter based on an alleged Termination Event that has not occurred.

87.     The Plan Sponsors' unexcused and unequivocal refusal to provide funding in accordance with their obligations under the Binding Commitment Letter and/or to close the transaction is a breach of the Binding Commitment Letter.

88.     By taking actions that interfere with the Fixed/Floating Debtors' ability to emerge from chapter 11, the Defendants are depriving the Fixed/Floating Debtors and their estates of the benefits under the Binding Commitment Letter.

89.     The Defendants have breached the implied duty of good faith and fair dealing.

90.     The Debtors will be irreparably damaged if the Plan Sponsors do not perform in accordance with the Binding Commitment Letter.  The Fixed/Floating Debtors and the multitude of parties in interest to their chapter 11 bankruptcy case will be left without funding for the Fixed/Floating Plan, which this Court relied upon in its confirmation of the Fixed/Floating Debtors Plan, and which is necessary to give effect to that Plan and the Debtors' emergence from chapter 11.

91.     Given the Plan Sponsors' breach, the Fixed/Floating Debtors will be forced to either:  (a) find a new plan sponsor within a shortened time frame for a large set of hotels, or (b) start the plan process over from square one and formulate, negotiate, and prosecute an entirely new plan.  Either prospect would do substantial harm to the Fixed/Floating Debtors and their estates, and both scenarios would involve damages that may be difficult to ascertain.

92.     The Fixed/Floating Debtors have no adequate remedy at law.

## THIRD CAUSE OF ACTION
### (Breach of Contract and Damages)

93.     The Plaintiffs hereby repeat and re-allege the allegations contained in paragraphs 1 through 92 above as if fully set forth herein.

94.     Each of the Defendants entered into the Binding Commitment Letter and the related Term Sheet.

95.     The Binding Commitment Letter is a valid and binding contract.

96.     Plaintiffs have fully performed their obligations under the Binding Commitment Letter.

97.     All of the conditions precedent to the Plan Sponsors' commitments have been satisfied.  Any failure to satisfy such conditions is the result of the Plan Sponsors' actions or failure to act.

98.     The Fixed/Floating Debtors have not suffered a material adverse effect under the Binding Commitment Letter.

99.     The Defendants purported to terminate the Binding Commitment Letter based on an alleged Termination Event that has not occurred.

100.    The Plan Sponsors' unexcused and unequivocal refusal to provide funding in accordance with their obligations under the Binding Commitment Letter and/or to close the transaction is a breach of the Binding Commitment Letter.

101.    By taking actions that interfere with the Fixed/Floating Debtors' ability to emerge from chapter 11, the Defendants are depriving the Fixed/Floating Debtors and their estates of the benefits under the Binding Commitment Letter.

102.    The Defendants have breached the implied duty of good faith and fair dealing.

K&E 19629784

103.     The Fixed/Floating Debtors have suffered and/or will continue to suffer damages by the Plan Sponsors' breach of the Binding Commitment Letter in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Violation of the Confirmation Order
### and Underlying Plan of Reorganization and Damages)

104.     The Plaintiffs hereby repeat and re-allege the allegations contained in paragraphs 1 through 103 above as if fully set forth herein.

105.     On June 29, 2011 the Court entered an order confirming the Debtors' Plan of Reorganization, including the Fixed/Floating Plan.

106.     The confirmed Fixed/Floating Plan is a valid and binding contract on, among others the Fixed/Floating Debtors, any entity issuing securities under the Fixed/Floating Plan, any entity acquiring property under the plan, including the Defendants, and any creditor.

107.     Plaintiffs have fully performed their obligations under the Fixed/Floating Plan.

108.     All of the conditions precedent to the Plan Sponsors' commitments under the Fixed/Floating Plan have been satisfied.  Any failure to satisfy such conditions is the result of the Plan Sponsors' actions or failure to act.

109.     The Fixed/Floating Debtors have not suffered a material adverse effect as defined in the Binding Commitment Letter.  The Fixed/Floating Debtors have not otherwise breached their obligations under the Fixed/Floating Plan.

110.     The Defendants purported to terminate the Binding Commitment Letter based on an alleged Termination Event that has not occurred.

111.     The Plan Sponsors' unexcused and unequivocal refusal to provide funding in accordance with their obligations under the Fixed/Floating Plan and/or to close the transaction is a breach of the Fixed/Floating Plan.

27

112.     By taking actions that interfere with the Fixed/Floating Debtors' ability to emerge from chapter 11, the Defendants have deprived the Fixed/Floating Debtors and their estates of the benefits under the Fixed/Floating Plan.

113.     The Defendants have breached the implied duty of good faith and fair dealing.

114.     The Fixed/Floating Debtors have suffered and/or will continue to suffer damages by the Plan Sponsors' breach of the Fixed/Floating Plan in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Equitable Estoppel)

115.     The Debtors hereby repeat and re-allege the allegations contained in paragraphs 1 through 114 above as if fully set forth herein.

116.     The Plan Sponsors represented to the Fixed/Floating Debtors that they would fund the transaction absent an event that had a material adverse effect on the Fixed/Floating Debtors as a whole.

117.     The Plan Sponsors intended, or reasonably should have expected, that the Plaintiffs would rely upon their representations.

118.     The Plaintiffs did rely upon the Plan Sponsors' representations, to their detriment, by foregoing the opportunity to seek alternative financing or reorganization plan sponsorship. Had the Plaintiffs known that, contrary to their representations, Cerberus and Chatham would not fund based on reasonably foreseeable market activity, the Fixed/Floating Debtors would have pursued alternative sources of funds and potentially taken other de-leveraging actions to ensure their prompt emergence from bankruptcy.

119.     As a direct and proximate result of the Plan Sponsors' failure to give effect to their own representations and obligations, the Plaintiffs have been injured.

K&E 19629784

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in its favor and:

a) render the declaratory judgments referred to above;

b) order the Defendants to specifically perform their obligations under the Binding Commitment Letter and Term Sheet, and enjoin the Defendants from continuing to breach the Binding Commitment Letter and Term Sheet;

c) or, in the alternative and in the event the Plan Sponsors fail to perform and the transaction does not close by the Effective Date, award the Debtors compensatory damages in an amount to be determined at trial;

d) award the Debtors such pre-judgment and post-judgment interest on its damages, costs of court, and reasonable attorneys' fees as may be allowed by law;

e) award the debtors such other relief the Court deems just and appropriate.

K&E 19629784

New York, New York
Dated:  August 29, 2011

/s/ Daniel T. Donovan
James H.M. Sprayregen, P.C.
Paul M. Basta
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone:  (312) 862-2000

- And -

Daniel T. Donovan (admitted *pro hac vice*)
Patrick M. Bryan (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW, Ste. 1200
Washington, DC 20005-5793
Telephone:  (202) 879-5000
Facsimile:   (202) 879-5200

K&E 19629784