James H.M. Sprayregen, P.C.
Paul M. Basta
Stephen E. Hessler
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**FIXED/FLOATING DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING FIXED/FLOATING DEBTORS TO ENTER INTO**
**SECOND AMENDED COMMITMENT LETTER, (II) APPROVING**
**(A) MODIFICATIONS TO FIXED/FLOATING PLAN AND CONFIRMATION**
**ORDER AND (B) AMENDED NEW HOLDCO/MIDLAND COMMITMENT, AND (III)**
**AUTHORIZING FIXED/FLOATING DEBTORS TO SETTLE ADVERSARY**
**PROCEEDING UPON CONSUMMATION OF MODIFIED FIXED/FLOATING PLAN**

---

[1] The list of debtors in these Chapter 11 Cases (the "**Debtors**") along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

The Fixed/Floating Debtors,[2] as debtors and debtors in possession, file this motion (this "**Motion**") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Order**"), (i) authorizing the Fixed/Floating Debtors to enter into the *Second Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust* (together with all exhibits thereto, the "**Second Amended Commitment Letter**"), by and between Innkeepers USA Trust (solely on behalf of the Fixed/Floating Debtors), INK Acquisition LLC ("**INK I**"), INK Acquisition II LLC ("**INK II**"), INK Acquisition III LLC ("**INK III**" and together with INK I and INK II, "**New HoldCo**"), Cerberus Series Four Holdings, LLC ("**Cerberus**"), Chatham Lodging Trust ("**Chatham**" and, together with Cerberus, "**Cerberus/Chatham**" or the "**Fixed/Floating Plan Sponsors**"), Apollo Investment Corporation ("**AIC**"), Midland Loan Services, a division of PNC Bank, National Association ("**Midland**"), Lehman ALI Inc. ("**Lehman**"), SASCO 2008-C2, LLC ("**SASCO**"), and Five Mile Capital Partners LLC and its affiliates, Five Mile Capital II Pooling REIT LLC and its affiliates, and CRES Investment No. II, LP (collectively, "**Five Mile**"), attached as **Exhibit 1** to **Exhibit A**, (ii) approving the (a) modifications to the *Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, filed on June 29, 2011 [Docket No. 1799] (the "**Confirmed Fixed/Floating Plan**" and, as modified, the "**Modified Fixed/Floating Plan**"), attached as **Exhibit 2** to the Order,[3] and the *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, entered on June 29, 2011 [Docket No. 1804] (the "**Confirmation Order**"), and (b) *Amended and Restated Binding Commitment Regarding the*

---

[2]   All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Modified Fixed/Floating Plan or Second Amended Commitment Letter (both as defined herein), as applicable.

[3]   A comparison of the Modified Plan against the Confirmed Plan is attached hereto as **Exhibit B**.

*Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust*, by and between Cerberus, Chatham, New HoldCo, and Midland (the "**Amended New HoldCo/Midland Commitment**"), attached as **Exhibit 3** to the Order, and (iii) authorizing the Fixed/Floating Debtors to settle the Adversary Proceeding (as defined below) upon consummation of the Modified Fixed/Floating Plan.  In support of this Motion, the Fixed/Floating Debtors respectfully state as follows:

<u>**Preliminary Statement**</u>

The Fixed/Floating Debtors, Midland, Lehman, and SASCO have reached agreement with the Fixed/Floating Plan Sponsors on the Second Amended Commitment Letter, which sets forth the revised terms of a commitment by the Fixed/Floating Plan Sponsors to purchase the equity in the Fixed/Floating Debtors for just over $1 billion, and which, subject to the occurrence of the Effective Date of the Modified Fixed/Floating Plan, resolves the litigation filed by the Fixed/Floating Debtors and the Official Committee of Unsecured Creditors against the Fixed/Floating Plan Sponsors.  Importantly, consummation of the transaction embodied in the Second Amended Commitment Letter is a condition precedent to the settlement of the litigation.[4]

To effectuate the terms of the Second Amended Commitment Letter, and consistent with Article III.B.1 of the Plan, Midland, Lehman, and SASCO have agreed to the following modified Fixed/Floating Plan treatments:

> (i)     Midland, as the Holder of the Class FF3A Fixed Rate Pool Mortgage Loan Claim, will enter into a New Fixed Rate Pool Mortgage Loan Agreement in the amount of $675.0 million, and receive New Fixed Rate Pool Mortgage Notes in such amount and the New Fixed Rate Pool Mortgage

---

[4]     Pursuant to section 5 of the Second Amended Commitment Letter, if the Effective Date of the Modified Fixed/Floating Plan does not occur by the Termination Date (as defined in the Second Amended Commitment Letter) for any reason, the Fixed/Floating Debtors will be permitted (and will have the exclusive right) to, among other things, resume prosecution of the Adversary Proceeding.

Loan Limited Guarantys.

(ii)    Lehman, on account of its Class FF3B Floating Rate Pool Mortgage Loan Claims, will receive a cash payment in the amount of $224.0 million.

(iii)   SASCO will no longer receive any cash distribution on account of its Class FF4 Floating Rate Pool Mezzanine Loan Claims, but will receive the benefit of the release in Article VIII.E of the Confirmed Fixed/Floating Plan.

(iv)    All other Holders of Claims and Interests will continue to receive the treatment set forth in the Confirmed Fixed/Floating Plan.

The Fixed/Floating Debtors respectfully submit that the Modified Fixed/Floating Plan, attached as **Exhibit 2** to the Order, and the necessary amendment to the Confirmation Order, can be approved without the need to resolicit or reopen confirmation. As described above, Midland, Lehman, and SASCO consent to the modified treatment of their claims. And the plan treatments of all other Holders of Claims and Interests remain unchanged. The remaining modifications to the Confirmed Fixed/Floating Plan and Confirmation Order are immaterial insofar as they are limited to those changes necessary to effectuate the modified Fixed/Floating Transaction, and do not adversely affect any claimants not otherwise affirmatively consenting. Moreover, the relief requested herein, if approved, will not modify or affect the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan in any way.

The Fixed/Floating Debtors also request approval of the Amended New HoldCo/Midland Commitment, attached as **Exhibit 3** to the Order, which memorializes, among other things, Midland's support for the Modified Fixed/Floating Plan and their agreement to provide financing to New HoldCo in connection with the Fixed/Floating Transaction—two necessary prerequisites to consummation of the Fixed/Floating Transaction, as modified.

Finally, pursuant to the terms of the Amended Commitment Letter and Bankruptcy Rule 9019, the Fixed/Floating Debtors request that the Court authorize the Fixed/Floating Debtors to

settle the Adversary Proceeding upon consummation of the Modified Fixed/Floating Plan.

For the reasons set forth herein, the Fixed/Floating Debtors respectfully request that the Court approve the relief requested herein on an expedited basis.

## Jurisdiction

1.     The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105(a), 363, 1121(d), and 1127 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (**"Rule 9019"**).

## Relief Requested

4.     By this Motion, the Fixed/Floating Debtors seek the entry of an order: (i) authorizing the Fixed/Floating Debtors' to enter into the Second Amended Commitment Letter, (ii) approving the (a) modifications to the Confirmed Fixed/Floating Plan and the Confirmation Order without need to resolicit and (b) Amended New HoldCo/Midland Commitment, and (iii) authorizing the Fixed/Floating Debtors to settle the Adversary Proceeding upon consummation of the Modified Fixed/Floating Plan. The Fixed/Floating Debtors respectfully request that the Court enter the Order on an expedited basis.

## Background

5.     On July 19, 2010 (the "**Petition Date**"), the Debtors commenced these voluntary cases under chapter 11 of the Bankruptcy Code and are authorized to continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.     On May 2 and 3, 2011, the Debtors proceeded with an auction for 64 of their hotels that serve as collateral for the Fixed Rate Pool Mortgage Loan and the Floating Rate Pool Mortgage Loan Claims (the "**Fixed/Floating Properties**").  The Debtors closed the auction after selecting an unchallenged bid from Cerberus/Chatham valued at approximately $1.12 billion as the winning bid for the Fixed/Floating Properties.

7.     On May 16, 2011, Cerberus, Chatham, INK I, INK II, Innkeepers USA Trust, Midland, and AIC entered into the Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust (together with all Exhibits thereto, the "**Original Commitment Letter**").  The Original Commitment Letter set forth the terms and conditions pursuant to which Cerberus/Chatham committed to provide funding to New HoldCo so as to permit New HoldCo, directly or indirectly, to acquire 100% of the Interests of the Post-Effective Date Fixed/Floating Debtors (as such terms are defined in the Confirmed Fixed/Floating Plan) pursuant to the Fixed/Floating Plan (as defined below).

8.     On June 29, 2011, the Court entered the Confirmation Order confirming the Plan. The Confirmed Plan includes four separate joint plans of reorganization that together provide for the resolution of all claims against and interests in each of the 92 Debtors in these Chapter 11 Cases.

9.     Pursuant to Article III.B.1 of the Confirmed Fixed/Floating Plan, the Holders of Class FF3A Secured Fixed Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors ("**Class FF3A Claims**"), Class FF3B Secured Floating Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors ("**Class FF3B Claims**"), and Class FF4 Secured Floating Rate Pool Mezzanine Loan Claims Against the Fixed/Floating Debtors ("**Class FF4 Claims**"),

K&E 20090494

can each agree with the Fixed/Floating Debtors and the Fixed/Floating Plan Sponsors to accept less favorable treatment than originally contemplated by the Confirmed Fixed/Floating Plan. Midland, as special servicer to the Fixed Rate Mortgage Loan, is the Holder of all Allowed Class FF3A Claims, Lehman, as lender under the Floating Rate Mortgage Loan Agreement, is the Holder of all Allowed Class FF3B Claims, and SASCO, as owner of 100% of the economic and beneficial interests in the Floating Rate Mezzanine Loan, is the Holder of all Allowed Class FF4 Claims.

10.     On August 19, 2011, Cerberus, Chatham, INK I, and INK II provided the Debtors with a notice (the "**Termination Notice**") purporting to terminate the Original Commitment Letter.

11.     On August 29, 2011, the Debtors commenced adversary proceeding, Case No. 11-02557 (the "**Adversary Proceeding**") against Cerberus, Chatham, INK I, and INK II.   The Committee has intervened in the Adversary Proceeding.[5]

12.     On October 19, 2011, the Fixed/Floating Debtors, Cerberus, Chatham, New HoldCo, Midland, Lehman, SASCO, Apollo, and Five Mile executed the Second Amended Commitment Letter, and Cerberus, Chatham, New HoldCo, and Midland executed the Amended New HoldCo/Midland Commitment.

<u>Basis for Relief</u>

I.     **The Fixed/Floating Debtors' Entry into the Second Amended Commitment Letter Is a Sound Exercise of their Business Judgment.**

13.     Section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

---

[5]     The claims asserted and defenses raised in the Adversary Proceeding have been extensively briefed, and the information related thereto is available on the public docket of the Adversary Proceeding.

estate." 11 U.S.C. § 363(b)(1).  Section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate.  The United States Court of Appeals for the Second Circuit, however, has required that the authorization of such use, sale, or lease of property of the estate, not in the ordinary course of business, must be based upon the sound business judgment of the debtor.  *See Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business).  In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

14.     Once a debtor articulates a valid business justification for its actions, courts in the Second Circuit "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (*citing Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)); accord *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (presuming, based on the business judgment rule, "that in making a business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company") (*quoting Smith v. Van*

8

*Gorkom*, 488 A.2d 858, 872 (Del. 1985))*; In re Johns-Manville Corp.*, 60 B.R. at 616. Thus, if a debtor's actions satisfy the business judgment rule, then the transaction merits approval and authorization under section 363(b)(1).

15. The Fixed/Floating Debtors respectfully submit their decision to enter into the Second Amended Commitment Letter is an exercise of sound business judgment. ***First***, the Fixed/Floating Debtors have determined the Second Amended Commitment Letter, which contemplates a sale of the Fixed/Floating Hotels for just over $1 billion—an increase in value to creditors of approximately $75 million when compared to the baseline bid established for the May 2011 auction—is in the best interests of the Debtors' estates. ***Second***, the Second Amended Commitment Letter permits the Debtors to avoid the uncertainty and expense of litigating the claims asserted in the Adversary Proceeding. For these reasons, all of the Fixed/Floating Debtors' major stakeholders—including those whose treatment under the modified Fixed/Floating Plan will be adversely affected—have signed on to the Second Amended Commitment Letter.

## II. Authorizing the Fixed/Floating Debtors to Settle the Adversary Proceeding Is in the Best Interests of the Estate.

16. Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In granting a motion pursuant to Rule 9019(a), a court must find that the proposed settlement is fair and equitable, and in the best interests of the estate. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank and Trust Co. of Chicago (In re Ionospheres Clubs), Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1994).

K&E 20090494

17.     The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994). It is the responsibility of the court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness." *Cosoff v. Rodman, (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

18.     While a court must "evaluate . . . all . . . factors relevant to a full and fair assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a mini-trial of the merits of the claims being settled, *In re W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact . . . . The court need only canvass the settlement to determine whether it is within the acceptable range of reasonableness." *Nellis*, 165 B.R. at 123 (internal citations omitted).

19.     The Fixed/Floating Debtors maintain that the settlement of the Adversary Proceeding contained in the Second Amended Commitment Letter is fair and equitable, and in the best interests of the estates. The Fixed/Floating Debtors carefully negotiated the Second Amended Commitment Letter at arm's length and in good faith. The primary parties affected by the terms of the settlement—namely, the Fixed/Floating Debtors, Cerberus, Chatham, Midland, and Lehman—are all signatories to the Second Amended Commitment Letter, which allows the presumption each is comfortable with the fairness and equitableness of its terms. Further, approval of the Second Amended Commitment Letter authorizes the Fixed/Floating Debtors to

consummate the Modified Fixed/Floating Plan, and successfully conclude these Chapter 11 Cases without contentious and expensive litigation. To be clear, the proposed settlement of the Adversary Proceeding shall take effect only upon consummation of the transaction embodied in the Second Amended Commitment Letter.

20. Notably, pursuant to the Second Amended Commitment Letter, the Fixed/Floating Debtors retain the right to elect to pursue any one of a number of remedies against the Fixed/Floating Plan Sponsors or New HoldCo, including the right to elect to resume prosecution of the Adversary Proceeding, if the Effective Date of the Modified Fixed/Floating Plan does not occur by the Termination Date (as defined in the Second Amended Commitment Letter) due to a breach (by affirmative action or omission) by the Fixed/Floating Plan Sponsors or New HoldCo of their obligations under the Second Amended Commitment Letter or Modified Fixed/Floating Plan.[6] Further, the Fixed/Floating Debtors retain the right to resume prosecution of the Adversary proceeding if the transactions contemplated by the Second Amended Commitment Letter are not consummated by the Termination Date *even if the Fixed/Floating Plan Sponsors are not in breach*. As such, the Fixed/Floating Debtors submit the Second Circuit's standard for authorizing a chapter 11 debtor to effect a compromise or settlement has been met.

**III. The Proposed Modifications to the Confirmed Fixed/Floating Plan Satisfy Section 1127.**

21. The Bankruptcy Code provides a debtor the ability to modify a plan both before and after confirmation, and without the need to resolicit votes thereon, upon satisfying sections 1127(b)-(c) of the Bankruptcy Code. Specifically, sections 1127(b)-(c) of the Bankruptcy Code, in relevant part, provide that:

---

[6] *See* Second Amended Commitment Letter at section 5(iv).

(b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

(c) The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

11 U.S.C. § 1127.

## A. The Proposed Modifications Satisfy Section 1127(b).

22. Under section 1102 of the Bankruptcy Code, substantial consummation means: (a) transfer of all or substantially all of the property proposed by the plan to be transferred; (b) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (c) commencement of distributions under the plan. Next, section 1122 of the Bankruptcy Code relates to the classification of claims and section 1123 of the Bankruptcy Code relates to the necessary elements of a plan of reorganization. Finally, the plan sponsor must show that the circumstances warrant modification. *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 802 (S.D.N.Y. 1995).

23. Here, the Fixed/Floating Debtors submit that the modifications to the Confirmed Fixed/Floating Plan satisfy section 1127(b) of the Bankruptcy Code because the Confirmed Fixed/Floating Plan has not substantially been consummated and, even with the proposed modifications, still satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code. *First*, with respect to the Confirmed Fixed/Floating Plan, the Fixed/Floating Debtors have yet to satisfy any of the elements of substantial consummation as listed above, let alone all three. *Second*, the modifications do not implicate any concerns under section 1122 or 1123 of the

12

Bankruptcy Code—the Modified Fixed/Floating Plan still correctly classifies Claims and includes all the necessary elements of a plan of reorganization. **Third**, the circumstances clearly warrant the modifications. Every modification is narrowly tailored to effect the transaction contemplated by the Second Amended Commitment Letter and will not prejudice any non-consenting party.

### B. The Proposed Modifications Satisfy Section 1127(c).

24. Although section 1127(c) of the Bankruptcy Code requires any proposed modifications to a confirmed plan to comply with the disclosure requirements set forth in section 1125 of the Bankruptcy Code, the legislative history of section 1127(c) makes clear that not all modifications to a confirmed plan require new disclosure. *See* H. Rep. No. 595, 95th Cong., 1st Sess., 411 (1977) ("[I]f the modification were sufficiently minor, the court might determine that additional disclosure was not required under the circumstances"). Indeed, further disclosure is only necessary when the modification ***materially and adversely*** impacts a claimant's treatment. *See Resolution Trust Corp. v. Best Prods. Co.* 177 B.R. 791, 802 (S.D.N.Y. 1995), <u>aff'd</u>, 68 F.3d 26 (2d. Cir. 1995), *dismissing appeal from* 168 B.R. 35 (Bankr. S.D.N.Y. 1994) (noting that the key inquiry was whether the modification materially altered the plan so that a claimant's treatment was adversely affected); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) (non-material plan modifications "do not require resolicitation of the respective impaired classes of creditors and equity security holders"); *see also In re New Power Co.*, 438 F.3d 1113, 1118 (11th Cir. 2006) ("[A]s an initial matter, we consider whether there was any material and adverse modifications from the First Amended Plan."); *In re Century Glove, Inc.*, 1993 WL 239489, *3 (D. Del. Feb. 10, 1993) (upholding bankruptcy court's finding that section 1127 did not require further disclosure and resolicitation of votes on plan modification that altered the treatment to only one creditor when "the modifications at issue did not materially and

13

adversely impact any creditors who voted for the [plan]"); *Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.)*, 201 B.R. 376, 380 (E.D. Pa. 1996) (further disclosure and solicitation not required under sections 1127(b) and (c) where modification to plan is immaterial).

25.     A plan modification is not material unless it "so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." *Best Prods. Co.* 177 B.R. at 824.   Thus, a "clear and obvious improvement to the position of the creditors affected by the modification" will not require resolicitation of the modified plan. *In re Concrete Designers, Inc.*, 173 B.R. 354, 356 (Bankr. S.D. Ohio 1994).   Nor will a modification that is determined to be immaterial require resolicitation. *See In re American Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988). This reading of section 1127(c) is entirely consistent with the disclosure requirements in section 1125 because a modification that is not material is, "by definition one which will not affect an investor's voting decision," and thus, "[a]dditional disclosure would serve no purpose[.]" *Id.*

26.     Numerous courts have permitted post-confirmation modifications without solicitation when the requirements of section 1127(b) are satisfied. *See Cellular Info. Sys.*, 171 B.R. at 929 n.6 ("I find that such changes are nonmaterial modifications which do not require resolicitation of the respective impaired classes of creditors and equity security holders."); *see also In re Global Crossing Ltd.*, No. 02-40188 (Bankr. S.D.N.Y. Dec. 4, 2003) (Gerber, R.) (approving post-confirmation plan modifications to structure of capital facility and intercreditor agreements without solicitation) [Docket No. 3811]; *In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y. Feb. 25, 2004) (approving a post-confirmation plan modification without solicitation where the debtor extended the deadline for which certain conditions

precedent to the Effective Date had to occur and added certain interest rate protections for noteholders) [Docket No. 10944]; *In re Solutia, Inc.*, 2008 WL 611609 (Bankr. S.D.N.Y. Feb. 26, 2008) (Beatty, P.) (approving post-confirmation plan modifications without solicitation to enforce agreement by creditor to waive right to professional fees and to release certain commitment parties from obligations under the plan).

27.    The Fixed/Floating Debtors submit that the modifications to the Confirmed Fixed/Floating Plan do not affect creditors' recoveries, other than those of Midland, Lehman, and SASCO, each of which has consented to such treatment. And the modifications are limited to those necessary to implement the terms of the Second Amended Commitment Letter. Accordingly, the Fixed/Floating Debtors respectfully submit the modifications are either immaterial or consensual, and, therefore, require no further disclosure or resolicitation.

**IV.    Approval of the Amended New HoldCo/Midland Commitment Is In the Best Interests of the Debtors' Estates.**

28.    The Fixed/Floating Debtors respectfully submit that approval of the Amended New HoldCo/Midland Commitment is in the Debtors' best interests. The Amended New HoldCo/Midland Commitment sets forth, among other things, Midland's agreement to support the Modified Fixed/Floating Plan and to provide financing to Cerberus/Chatham to help fund the modified Fixed/Floating Transaction. Having the support of the Debtors' largest creditor, as well as the benefit of their financing, is beneficial to the Debtors. Accordingly, the Fixed/Floating Debtors respectfully submit the Amended New HoldCo/Midland Commitment is in the Debtors' best interests and should be approved.

**V.    The Amendments to the Confirmation Order Merit Approval.**

29.    As described above, section 1127(b) of the Bankruptcy Code contemplates that a chapter 11 plan can be modified after a bankruptcy court has entered its confirmation order with

respect thereto, notwithstanding the fact that the plan specifically confirmed by such order has been changed. 11 U.S.C. § 1127(b). This is not surprising given that section 1127(b) also requires the Court to determine that the plan, as modified, satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

30. With respect to the Confirmed Fixed/Floating Plan, the Court has already made a number of findings of fact and conclusions of law, which are all set forth in the Confirmation Order, and are supported by the extensive factual record in these proceedings. The proposed modifications, because they are "immaterial" or otherwise consensual, do not implicate any of those findings of fact and conclusions of law. Moreover, the Confirmation Order expressly authorized the Debtors to modify the Confirmed Fixed/Floating Plan post-confirmation:

> Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X of the Plan.

*Id.* at ¶ 237. The Fixed/Floating Debtors respectfully submit the requested amendments to the Confirmation Order are necessary and tailored to consummate the Modified Fixed/Floating Plan, and, as such, merit approval.

### Motion Practice

31. This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Fixed/Floating Debtors submit that this Motion satisfies Local

16

Bankruptcy Rule 9013-1(a).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

32.     To implement the foregoing successfully, the Fixed/Floating Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of a property under Bankruptcy Rule 6004(h).

## Debtors' Reservation of Rights

33.     Nothing in this Motion or the Order, nor as a result of the Debtors' payment of claims pursuant to the Order, shall be deemed or construed as:  (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim; or (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.

## Notice

34.     The Fixed/Floating Debtors have provided notice of this Motion consistent with the Confirmation Order [Docket No. 1804], which is available at www.omnimgt.com/innkeepers, the website maintained by Omni Management Group, LLC, the Debtors' notice and claims agent.  The Debtors respectfully submit that no further notice is necessary.

## Basis for Granting Relief on Shortened Notice

35.     Although Local Bankruptcy Rule 9006-1(b) provides 14 days' notice as the time fixed for service of motion papers, Bankruptcy Rule 9006(c) and Local Bankruptcy Rule 9077-1 provide that the Court, for cause shown, may in its discretion (with or without motion or notice) reduce such a period.  In addition, section I.A.(ii) of the *Notice, Case Management, and Administrative Procedures* [Docket No. 68] provides for a hearing on a request for relief with less than 14 days' notice.  Further, pursuant to Bankruptcy Rule 9007, the Court has authority to

17

regulate the time within which, the entities to whom, and the form and matter in which, notice shall be given, which includes the authority to determine appropriate notice for conducting a hearing on the matters presented in this Motion.

36.     Given the nature of the relief requested herein, the incumbent climate of uncertainty, and the consensus among all parties in interest, approval of this Motion is appropriate without further notice.

### No Prior Request

37.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, for the reasons stated herein, the Fixed/Floating Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

New York, New York
Dated:  October 19, 2011

/s/ Brian S. Lennon

James H.M. Sprayregen, P.C.
Paul M. Basta
Stephen E. Hessler
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

and

Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone:  (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors and
Debtors in Possession

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*,[1] | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER (I) AUTHORIZING FIXED/FLOATING DEBTORS TO ENTER INTO SECOND AMENDED COMMITMENT LETTER, (II) APPROVING (A) MODIFICATIONS TO FIXED/FLOATING PLAN AND CONFIRMATION ORDER AND (B) AMENDED NEW HOLDCO/MIDLAND COMMITMENT, (III) AUTHORIZING FIXED/FLOATING DEBTORS TO SETTLE ADVERSARY PROCEEDING UPON CONSUMMATION OF MODIFIED FIXED/FLOATING PLAN

Upon the motion (the "**Motion**")[1] of the Fixed/Floating Debtors, as debtors and debtors in possession (collectively, the "**Fixed/Floating Debtors**"), for the entry of an order (this "**Order**") (i) authorizing the Fixed/Floating Debtors' entry into the Second Amended Commitment Letter, (ii) approving the (a) modifications to the Confirmed Fixed/Floating Plan and Confirmation Order without need to resolicit and (b) Amended New HoldCo/Midland Commitment, and (iii) authorizing the Fixed/Floating Debtors to settle the Adversary Proceeding upon consummation of the Modified Fixed/Floating Plan; it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and, after due deliberation and sufficient cause appearing therefor, it is HEREBY

---

[1]   All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

ORDERED THAT:

1.      The Motion is granted to the extent provided herein.

2.      The Second Amended Commitment Letter, attached hereto as **Exhibit 1**, is hereby approved and binding on all parties thereto to the extent provided therein.

3.      The Modified Fixed/Floating Plan, attached hereto as **Exhibit 2**, is hereby approved to the extent provided therein.

4.      The Amended New HoldCo/Midland Commitment, attached hereto as **Exhibit 3**, is hereby approved and binding on all parties thereto.

5.      Pursuant to the Second Amended Commitment Letter and the Modified Fixed/Floating Plan, the Holder of the Allowed Class FF3A Claims, the Holder of the Allowed Class FF3B Claims, and the Holder of the Allowed Class FF4 Claims have consented to the Modified Fixed/Floating Plan.

6.      Each of the parties to the Second Amended Commitment Letter is directed to use its reasonable best efforts to consummate the transactions set forth in the Second Amended Commitment Letter and the Modified Fixed/Floating Plan in a timely manner.

7.      Subject to the consummation of the transactions contemplated by the Second Amended Commitment Letter and the Modified Fixed/Floating Plan, and in accordance with the terms thereof, the settlement of the Adversary Proceeding is hereby approved. The Adversary Proceeding shall be dismissed with prejudice upon the Effective Date of the Fixed/Floating Plan.

8.      The Fixed/Floating Debtors are not required to resolicit acceptances of the Confirmed Fixed/Floating Plan, as modified, or prepare and distribute a new disclosure statement with respect thereto, and the Confirmed Fixed/Floating Plan, as modified, is deemed accepted by all creditors who have previously voted to accept the Confirmed Fixed/Floating Plan.

9.     This Order is without prejudice to any of the Debtors' rights to seek further modifications to the Confirmed Fixed/Floating Plan in accordance with section 1127 of the Bankruptcy Code and in accordance with the terms of the Confirmed Fixed/Floating Plan or of other parties to seek relief that might be appropriate.

10.    In the event the Second Amended Commitment Letter is terminated for any reason, the Fixed/Floating Debtors shall have the right, pursuant to the terms of the Second Amended Commitment Letter, to withdraw the Modified Fixed/Floating Plan and to treat the Confirmed Fixed/Floating Plan [Docket No. 1799] as being in full force and effect.

11.    Paragraph 235 of the Confirmation Order is hereby modified, as follows:

- On and as a condition to the occurrence of the Effective Date of the Fixed/Floating Plan, (a) on account of its Class FF3B claims against the Fixed/Floating Debtors, Lehman shall, in accordance with the Plan, receive a Cash payment of $224,000,000.00 (the "**Lehman Cash Payment**"); and (b) the Lehman DIP Lender shall receive payment in full in Cash of all claims derived from or based upon the Lehman DIP Agreement (the "**Lehman DIP Cash Payment**"), which are hereby deemed Allowed Claims. The Bankruptcy Court shall have jurisdiction over any dispute with respect to the pay-off amount of the Lehman Cash Payment or the Lehman DIP Cash Payment. Notwithstanding anything to the contrary contained in this Order, the Fixed/Floating Plan, the Disclosure Statement, or the Plan Supplement, Lehman and the Lehman DIP Lender's claims and liens against the applicable Fixed/Floating Debtors and the assets of the applicable Fixed/Floating Debtors shall remain in full force and effect and shall not be extinguished until the Lehman Cash Payment and the Lehman DIP Cash Payment have been received by Lehman and the Lehman DIP Lender, respectively.

12.    Subject to paragraph 10 of this Order, paragraph 155 of the Confirmation Order shall have no further force or effect.

13.    The following paragraph shall be deemed incorporated into the Confirmation Order:

- The transaction contemplated by the Second Amended Commitment Letter involving an investment by the Fixed/Floating Plan Sponsors in the

Fixed/Floating Hotels, including, without limitation, any sale, transfer, assignment, assumption, or modification of a franchise entered into therewith or contemplated thereby (a) shall be deemed to qualify for the large franchise exemptions to the Federal Trade Commission's Franchise Rule disclosure requirements, found at 16 CFR § 436.8(5)(i) and (ii); and (b) may proceed without the necessity of compliance with any state or local statute or ordinance requiring notice, approval, or a waiting period before a franchise can be sold, transferred, assigned, assumed, or modified.

14.     In the event of any inconsistencies between this Order and the Motion, this Order shall govern in all respects.

15.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

18.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: _____, 2011

_____
United States Bankruptcy Judge

K&E 20090494

# **EXHIBIT 1**

## **Second Amended Commitment Letter**

**INK ACQUISITION LLC**
**INK ACQUISITION II LLC**
**INK ACQUISITION III LLC**
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, New York  10171

October 19, 2011

Innkeepers USA Trust,
solely on behalf of the Fixed/Floating Debtors
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida  33480
Attn:  Marc Beilinson
        Chief Restructuring Officer

**Second Amended and Restated**
**Binding Commitment Agreement**
**Regarding the Acquisition and Restructuring**
**of Certain Subsidiaries of Innkeepers USA Trust**

INK Acquisition LLC ("INK I"), INK Acquisition II LLC ("INK II"), and INK Acquisition III LLC ("INK III," and together with INK I and INK II, and any assignees permitted under Section 14 herein, individually or collectively, as the context may require, "New HoldCo"), Cerberus Series Four Holdings, LLC ("Cerberus") and Chatham Lodging Trust ("Chatham," and together with Cerberus, the "Plan Sponsors"), are pleased to present this second amended and restated letter (the "Second Amended and Restated Commitment Letter") to certain wholly owned direct and indirect subsidiaries of Innkeepers USA Trust (together with all of its wholly owned direct and indirect subsidiaries, "Innkeepers" or the "Company"), that are identified on Exhibit A attached hereto (collectively, the "Fixed/Floating Debtors"), which sets forth, among other things, the Plan Sponsors' binding and irrevocable commitment to provide equity capital in the amount of $340,800,000 (the "Commitment") for the restructuring of the debt and equity of the Fixed/Floating Debtors (the "Transaction"), resulting in New HoldCo directly or indirectly owning all of the equity interests in the Fixed/Floating Debtors on the terms and subject to the conditions set forth herein and in the Amended Fixed/Floating Plan (as defined below).  The undersigned hereto are collectively referred to as "Parties" and each a "Party."[1]

The specific elements of our Commitment are set forth in this Second Amended and Restated Commitment Letter and the Exhibits attached hereto.

       1.      Conditions.  The Transaction is subject to the satisfaction of the terms and conditions contained herein and in the Fixed/Floating Plan, as modified to reflect the terms and conditions set forth herein (the "Amended Fixed/Floating Plan"), which is attached hereto as Exhibit B.

       2.      Due Diligence/Financing.  We have completed our diligence review, and intend to utilize the financing to be provided by Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the $825,400,000 Fixed Rate Mortgage Loan (together

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Amended Fixed/Floating Plan.

with any successor special servicer, "Midland") pursuant to the Amended and Restated New HoldCo/Midland Commitment (the "Midland Financing"). The executed Amended and Restated New HoldCo/Midland Commitment is attached hereto as Exhibit C. Other than Midland providing the Midland Financing at the closing of the Transaction, the Commitment is not subject to diligence contingencies or financing contingencies of any kind. The Plan Sponsors, New HoldCo, and the Fixed/Floating Debtors hereby covenant and agree to use their reasonable best efforts to satisfy all conditions precedent with respect to the Midland Financing.

3. <u>Commitment; Financial Capability</u>. The Plan Sponsors hereby commit to provide the entire amount of the Commitment upon the Effective Date of the Amended Fixed/Floating Plan, upon the terms and subject to the conditions set forth in this Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan. 100% of the equity of New HoldCo is owned by Cerberus (through CRE-Ink REIT Member, LLC, CRE-INK Member II, Inc., and CRE-Ink TRS Holding Inc., the "Cerberus Members") and Chatham (through Chatham Lodging, LP and Chatham TRS Holding, Inc., the "Chatham Members"), with the Cerberus Members initially owning 89.1% of such equity and the Chatham Members owning the remaining 10.9% of such equity. The amended and restated limited liability company agreements for each of INK I, INK II, and INK III, executed by the applicable Cerberus Member and the applicable Chatham Member, have previously been furnished to you and remain in full force and effect and will not be amended prior to the Effective Date without the written consent of the Fixed/Floating Debtors, such consent not to be unreasonably withheld or delayed, provided that such amendment is consistent with the New HoldCo/Midland Commitment. The aggregate commitment of Cerberus is $303,800,000, and the aggregate commitment of Chatham is $37,000,000. The Plan Sponsors hereby irrevocably agree to fund their respective Commitments on the terms and subject to the conditions set forth herein. The Plan Sponsors hereby irrevocably agree to cause New HoldCo to fund or cause the Post-Effective Date Fixed/Floating Debtors to fund all amounts of cash necessary to make payments or distributions, including all Administrative Claims, pursuant to the Amended Fixed/Floating Plan. Cerberus represents that, as of the date hereof, it has assets net of liabilities of not less than $8 billion and presently has, and will maintain, uncommitted cash on its balance sheet sufficient to fund its portion of the Commitment through and including the earlier of the Effective Date or the Termination Date (as defined below). Chatham represents that it presently has, and will maintain, the ability to draw down on an existing credit facility in amounts sufficient to fund its portion of the Commitment through and including the earlier of the Effective Date or the Termination Date.

4. <u>Means of Implementation</u>. The Fixed/Floating Debtors shall not later than one business day following the Parties' execution of this Second Amended and Restated Commitment Letter seek Bankruptcy Court approval of this Second Amended and Restated Commitment Letter and approval of the modifications in the Amended Fixed/Floating Plan and shall actively support the approval and implementation of this Second Amended and Restated Commitment Letter. The funding from our Commitment will be used to finance and otherwise implement the restructuring of the Fixed/Floating Debtors pursuant to the Amended Fixed/Floating Plan. The Plan Sponsors and New HoldCo agree to use their reasonable best efforts to close the Transaction within two business days following Midland's confirmation that all conditions to the Midland Financing have been satisfied or waived. For the avoidance of doubt, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are not subject to this Second Amended and Restated Commitment Letter. None of the Parties hereto shall take any action (by affirmative act or omission) inconsistent with this Second Amended and Restated Commitment Letter or the Amended Fixed/Floating Plan or that would materially delay approval of the Second Amended and Restated Commitment Letter or the modifications contained in the Amended Fixed/Floating Plan or consummation of the Transaction. The Parties acknowledge that time is of the essence with respect to closing the Transaction, and the Parties agree to exercise good faith and use reasonable best efforts to close the Transaction.

5.     Deposit; Remedies.  Pursuant to that certain Escrow Agreement (the "April Escrow Agreement"), dated as of April 25, 2011, by and among INK I, Innkeepers USA Trust, and Wells Fargo Bank, National Association (the "Escrow Agent"), INK I has deposited cash in the amount of $20 million to:

> Wells Fargo Bank, NA
> 420 Montgomery Street
> San Francisco, CA 94163
> Swift Code: WFBIUS6S
> ABA # 121-000-248
> Credit: Corporate Trust Clearing
> Account #0001038377
> F/F/C/: Innkeepers USA/INK Acq. Escrow
> Account # 85503100
> Attn: Tim Martin

INK I, Innkeepers USA Trust (solely on behalf of the Fixed/Floating Debtors), and the Escrow Agent have entered into that certain Escrow Agreement, dated as of October 19, 2011 (the "October Escrow Agreement," together with the April Escrow Agreement, the "Escrow Agreements") pursuant to which INK I will deposit within one business day of the Parties executing this Second Amended and Restated Commitment Letter cash in the amount of $30 million to a new escrow account to be held by the Escrow Agent under the October Escrow Agreement so that the Escrow Agent shall hold deposits in the aggregate amount of not less than $50 million (collectively, the "Deposit"), pursuant to the Escrow Agreements.

If the Effective Date of the Amended Fixed/Floating Plan does not occur by the Termination Date due to a breach (by affirmative act or omission) by the Plan Sponsors or New HoldCo of their obligations under this Second Amended and Restated Commitment Letter or the Amended Fixed/Floating Plan, the Fixed/Floating Debtors will be permitted (and will have the exclusive right) to exercise any of the following remedies, which election shall be in the reasonable discretion of the Fixed/Floating Debtors after consultation with Midland, Lehman, and the Official Committee of Unsecured Creditors (the "Committee"), which election shall be made in writing to the Plan Sponsors and shall be irrevocable once made:

(i) to deliver to the Escrow Agent one or more Company Termination Notices (as defined in the Escrow Agreements), subject to INK I's right to deliver a Bidder Objection Notice (as defined in the April Escrow Agreement) and a Plan Sponsor Objection Notice (as defined in the October Escrow Agreement) directing the Escrow Agent to deliver the Deposit to the Fixed/Floating Debtors to be retained as liquidated damages and not as a penalty (the Plan Sponsors and New HoldCo stipulate that the Fixed/Floating Debtors are not required to prove that actual damages are inadequate or incapable of being ascertained) and retention of the Deposit as liquidated damages shall, if elected, be the sole remedy at law or in equity for such breach against the Plan Sponsors and New HoldCo;

(ii) seek specific performance from the Plan Sponsors and New HoldCo with respect to the Plan Sponsors' and New HoldCo's obligations to perform the transactions contemplated in this Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan, including the ability to pursue any other rights, remedies, and causes of action available under this Second Amended and Restated Commitment Letter, including, but not limited to, reasonable professionals' fees and costs (the Plan Sponsors and New HoldCo stipulate that

the Fixed/Floating Debtors are not required to prove that actual damages are inadequate or incapable of being ascertained);

(iii) seek monetary damages from the Plan Sponsors and New HoldCo with respect to the Plan Sponsors' and New HoldCo's obligations to perform the transactions contemplated in this Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan, including the ability to pursue any other rights, remedies, and causes of action available under this Second Amended and Restated Commitment Letter, including, but not limited to, reasonable professionals' fees and costs; provided, however, that to the extent the Fixed/Floating Debtors assert the remedy described in this subsection (iii) of this Section 5, the Fixed/Floating Debtors may only seek (x) recourse against Cerberus, up to an amount not to exceed Cerberus' Commitment ($303,800,000) and (y) recourse against Chatham, up to an amount not to exceed Chatham's Commitment ($37,000,000);

provided, however, that the Deposit shall be credited against (and subject to each Plan Sponsor's respective interest in such Deposit) (A) the purchase price, to the extent the Fixed/Floating Debtors assert the remedy described in subsection (ii) of this Section 5 and (B) damages, to the extent the Fixed/Floating Debtors assert the remedy described in this subsection (iii) of this Section 5; or

(iv) resume prosecution of the Adversary Proceeding (as defined below), in which case the Litigation Stay (as defined below) shall be deemed terminated automatically. In the event the Fixed/Floating Debtors elect the remedy set forth in this subsection (iv) of this Section 5, INK I shall be entitled to deliver a Plan Sponsor Termination Notice (as defined in the October Escrow Agreement) pursuant to Section 4(d) of the October Escrow Agreement to the Escrow Agent directing distribution of $30 million of the Deposit (plus accrued interest), and the Fixed/Floating Debtors agree that they shall not deliver a Company Objection Notice (as defined in the October Escrow Agreement) pursuant to Section 4(d) of the October Escrow Agreement objecting to such distribution.

The Plan Sponsors and New HoldCo reserve their rights to assert that the Fixed/Floating Debtors were in breach of their obligations under this Second Amended and Restated Commitment Letter and/or that such breach proximately caused the Plan Sponsors' or New HoldCo's breach.

If the Effective Date of the Amended Fixed/Floating Plan does not occur by the Termination Date due to a reason other than a breach (by affirmative act or omission) by the Plan Sponsors or New HoldCo of their obligations under the Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan, the Fixed/Floating Debtors will be permitted (and will have the exclusive right), as their sole and exclusive remedy at law or in equity under this Second Amended and Restated Commitment Letter, to resume prosecution of the Adversary Proceeding, in which case the Litigation Stay shall be deemed terminated automatically. In the event the Fixed/Floating Debtors notify in writing New HoldCo and the Plan Sponsors of their election to resume prosecution of the Adversary Proceeding, INK I shall be entitled to deliver a Plan Sponsor Termination Notice pursuant to section 4(d) of the October Escrow Agreement to the Escrow Agent directing distribution of $30 million of the Deposit (plus accrued interest) and the Fixed/Floating Debtors agree that they shall not deliver a Company Objection Notice pursuant to Section 4(d) of the October Escrow Agreement objecting to such distribution.

The Plan Sponsors and New HoldCo waive any right to assert that any of the remedies outlined in subsections (i)-(iii) of this Section 5 are unavailable as a matter of law or contract, provided that, for the avoidance of doubt, such waiver shall not apply to the Adversary Proceeding. Nothing in the

- 4 -

Second Amended and Restated Commitment Letter shall limit the Parties' rights to pursue any remedies against other Parties or entities other than the Plan Sponsors or New HoldCo provided by the Bankruptcy Code and applicable law. The Fixed/Floating Debtors' election of a remedy set forth in subsections (i)-(iv) of this Section 5 shall be the sole and exclusive remedy at law or in equity in the event of a breach by the Plan Sponsors or New HoldCo of their obligations under this Second Amended and Restated Commitment Letter.

Neither Plan Sponsor shall assert in any action brought by the Fixed/Floating Debtors pursuant to subsections (ii) or (iii) of this Section 5 that it does not have liability with respect to its Commitment as a result of the actions or omissions of the other Plan Sponsor.

6. <u>Excess Cash Distributions</u>. Midland and Lehman hereby agree as follows with respect to the distributions of Excess Cash (as defined in the Cash Collateral Orders) to which they would otherwise be entitled under the Cash Collateral Orders for operations during the period from August 1, 2011 through the earlier of the (i) Effective Date and (ii) Termination Date, and the Fixed/Floating Debtors hereby represent and warrant, based on their good faith belief based on projections as of the date hereof that the amount of such Excess Cash shall be sufficient to satisfy, as and when payable, the Five Mile Payment (as defined below):

(i) Five Mile Capital Partners LLC and its affiliates, Five Mile Capital II Pooling REIT LLC and its affiliates, and CRES Investment No. II, LP (collectively, "<u>Five Mile</u>") shall receive within one business day of the entry of an order approving this Second Amended and Restated Commitment Letter and approving the modifications in the Amended Fixed/Floating Plan, a $1 million cash payment (the "<u>Five Mile Payment</u>") in satisfaction of an allowed administrative expense claim, as allocated under the Cash Collateral Order between the Fixed Rate Pool Hotel Debtors and Floating Rate Pool Hotel Debtors. For the avoidance of doubt, the Five Mile Payment shall be in addition to the payments to be made to Five Mile on the Effective Date set forth in <u>Exhibit E</u> hereto. Conditioned upon Five Mile's receipt of the Five Mile Payment and the payment to Five Mile described in the New HoldCo/Midland Commitment, and in consideration therefore, Five Mile (in all of their current and future capacities in any way related to the Company or the C6 and C7 Trusts) hereby (i) consents to the entry by the Bankruptcy Court of an order approving this Second Amended and Restated Commitment Letter and the modifications contained in the Amended Fixed/Floating Plan, (ii) agrees to and approves of Midland's consummation of the transactions contemplated by the Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan, (iii) shall not take any action prior to the Effective Date that could reasonably be expected to interfere in any way with or delay the consummation of the transactions contemplated by the Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan, (iv) shall not seek any damages and agrees to release any and all claims it has or may have against any of the Parties hereto arising from or in any way relating to the circumstances, events, or occurrences that are the subject of the Adversary Proceeding, or the transactions contemplated by the Second Amended and Restated Commitment Letter or the Amended Fixed/Floating Plan, and (v) amends and extends that certain Third Amendment to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of October 3, 2011, between Five Mile and the Fixed Rate Debtors for the sole purpose of extending the maturity of the facility that allowed the Fixed Rate Debtors to borrow secured postpetition financing on a superpriority basis (the "<u>Five Mile DIP Facility</u>") until the earlier of the Effective Date and November 15, 2011; <u>provided</u>, <u>however</u>, that except only for the foregoing maturity date extension, nothing in this Section 6(i) shall be deemed to release, waive, discharge or otherwise affect the Five Mile DIP Facility or to

- 5 -

restrict or limit the exercise of Five Mile's rights and remedies under the Five Mile DIP Facility;

(ii) the Fixed Rate Debtors shall retain, prior to the Effective Date, $1 million of cash collateral which would be allocated to the Fixed Rate Pool Hotel Debtors to pay for necessary and uninsured costs associated with water damage to the Courtyard by Marriott located at West Cypress Creek Road in Ft. Lauderdale, Florida (the "Repair Costs"), and, on the Effective Date, the Fixed Rate Debtors shall have available to them $1 million for the Repair Costs, less any amounts spent prior to the Effective Date on the Repair Costs, based on Innkeepers' Chief Restructuring Officer's assessment on what the necessary Repair Costs are, after consultation with FTI Consulting; and

(iii) any excess cash collateral allocated to the Floating Rate Pool Hotel Debtors, and allocated to the Fixed Rate Pool Hotel Debtors in an amount in excess of the Repair Costs (or not otherwise distributed pursuant to this Section 6) shall be divided as follows: (i) 50% to the Post-Effective Date Fixed/Floating Debtors to pay administrative expenses and (ii) 50% allocated to Midland and Lehman based on the allocation percentages set forth in the Cash Collateral Order.

7.     Structure.   The anticipated structure of New HoldCo immediately after consummation of the Amended Fixed/Floating Plan will be as shown on the pro forma structure chart attached hereto as Exhibit D, with pro forma capitalization as shown on Exhibit E.

8.     Approvals.   With the exception of the Fixed/Floating Debtors receiving Bankruptcy Court approval, all Parties have obtained all necessary internal authorizations or approvals for the submission, execution, delivery, and closing of the Transaction.  Without limiting the foregoing, the Transaction has received the approval of the Members of New HoldCo, the Investment Committee of Cerberus, and the Board of Trustees of Chatham.

9.     Settlement of Claims.   On the Effective Date, consummation of the Transaction shall constitute a full and complete settlement and mutual release of all actual and potential claims and counterclaims, known or unknown, that were or could have been brought in Adversary Proceeding No. 11-02557 pending in the Chapter 11 Cases (the "Adversary Proceeding"), and such settlement and mutual release shall be binding on all Parties hereto.

Upon execution of this Second Amended and Restated Commitment Letter and the New HoldCo/Midland Commitment, the Parties shall consent to the entry of an order staying the Adversary Proceeding through the earlier of (i) the termination of this Second Amended and Restated Commitment Letter or (ii) the Effective Date of the Amended Fixed/Floating Plan (the "Litigation Stay").  In the event the Litigation Stay expires, the parties to the Adversary Proceeding will meet and confer in good faith with respect to the prosecution of the Adversary Proceeding.

10.     Termination.  Immediately upon the Plan Sponsors, New HoldCo, Midland, Lehman, SASCO, Apollo, and Five Mile tendering an executed copy of this Second Amended and Restated Commitment Letter to the Fixed/Floating Debtors, the Second Amended and Restated Commitment Letter shall become binding and irrevocable with respect to the Plan Sponsors, New HoldCo, Midland, Lehman, SASCO, Apollo, and Five Mile and shall remain binding and irrevocable with respect to the Plan Sponsors, New HoldCo, Midland, Lehman, SASCO, Apollo, and Five Mile (with respect to Section 6(i)) until and unless this Second Amended and Restated Commitment Letter terminates on the Termination Date.  Immediately upon, but in no event prior to, Bankruptcy Court approval of this Second Amended and Restated Commitment Letter, this Second Amended and

- 6 -

Restated Commitment Letter shall be binding and irrevocable on the Fixed/Floating Debtors. This Second Amended and Restated Commitment Letter shall automatically terminate at 11:59 p.m., Eastern time, on (x) October 24, 2011 if the Bankruptcy Court shall have not entered an order approving this Second Amended and Restated Commitment Letter and the modifications contained in the Amended Fixed/Floating Plan or (y) November 1, 2011, if the Transaction shall not have been consummated by such date (the earlier of such dates, the "Termination Date"), provided, however, that the Plan Sponsors, the Company, Midland, Lehman, and SASCO may mutually consent in writing to extend the date specified in clause (y) to November 15, 2011, which such consent shall not be unreasonably withheld, conditioned, or delayed, provided further that such consent shall not be required from any Party whose actions (by affirmative act or omission) were the proximate cause of the failure of the closing of the Transaction by the Termination Date.

11.    Press Releases. Upon the execution and delivery of this Second Amended and Restated Commitment Letter by each of the Plan Sponsors, New HoldCo, the Company, Midland, Lehman, Apollo, SASCO, and Five Mile, the Plan Sponsors and the Company shall issue a mutually agreeable joint press release reasonably acceptable to the Parties announcing the agreed-upon terms of the Transaction, and no Party (other than Lehman) shall otherwise make any public statement or issue any press release with respect thereto without the prior written consent of the Plan Sponsors and the Company. As of the date of this Second Amended and Restated Commitment Letter, Lehman does not intend to make any public statement or issue any press release with respect to the Transaction, prior to the close of the Transaction.

12.    Governing Law. This Second Amended and Restated Commitment Letter shall be governed by, and interpreted and enforced in accordance with, the laws in force in the state of New York.

13.    Jurisdiction; Waiver of Jury Trial. Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan. Each of the Parties acknowledges and agrees that any controversy which may arise under this Second Amended and Restated Commitment Letter or the Amended Fixed/Floating Plan is likely to involve complicated and difficult issues, and therefore each such Party hereby irrevocably and unconditionally waives any right such Party may have to a trial by jury in respect of any litigation directly or indirectly arising out of or relating to this Second Amended and Restated Commitment Letter and the Amended Fixed/Floating Plan.

14.    Assignments; No Third Party Beneficiaries. This Second Amended and Restated Commitment Letter shall not be assignable by any Party hereto without the prior written consent of each other Party hereto (and any attempted assignment without such consent shall be null and void ab initio); provided, however, that New HoldCo may, without the consent of any other party hereto, assign its rights and obligations hereunder and under the New HoldCo/Midland Commitment to acquire the equity interests of any or all of the Fixed/Floating Debtors to any entity with the same beneficial ownership as New HoldCo, and, provided, further, that such assignment shall not be in derogation of and shall be in compliance with the New Holdco/Midland Commitment and the documents evidencing the Midland Financing. This Second Amended and Restated Commitment Letter (i) is intended to be solely for the benefit of the Parties hereto; and (ii) is not intended nor shall be construed to confer any benefits upon, or create any rights in favor of any person or entity other than the Parties hereto. Notwithstanding anything to the contrary contained in this Section 14, any assignment by New HoldCo as contemplated under this Section 14 shall not

K&E 20090412

relieve the Plan Sponsors or New HoldCo of their obligations under the Second Amended and Restated Commitment Letter.

15.    Counterparts.  This Second Amended and Restated Commitment Letter may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

16.    Midland/Lehman/SASCO.  Provided that the Termination Date has not occurred, each of Midland, Lehman, and SASCO undertakes to actively support the approval and implementation of this Second Amended and Restated Commitment Letter and Bankruptcy Court approval of the Second Amended and Restated Commitment Letter and the modifications to the Amended Fixed/Floating Plan.  Lehman, Midland, and SASCO each hereby consents to the treatment of its claim under the Amended Fixed/Floating Plan.

17.    Entire Agreement.  This Second Amended and Restated Commitment Letter together with the Exhibits hereto, represent the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings among the parties hereto, both written and oral, with respect to the subject matter hereof, including without limitation the Commitment Letter and Term Sheet dated April 25, 2011, the Amended and Restated Commitment Letter and Amended and Restated Term Sheet dated May 16, 2011 and terminated as of August 19, 2011, the proposal submitted to the Company on August 24, 2011, and the proposal submitted to the Company on September 19, 2011. Nothing in this Section 17 shall alter, amend, or otherwise affect the Parties' actual or potential claims, rights, or defenses, arising under or related to the transactions, events, or occurrences that are the subject of the Adversary Proceeding, including the Amended and Restated Commitment Letter and Amended and Restated Term Sheet dated May 16, 2011.

18.    Survival.  Notwithstanding the termination of this Second Amended and Restated Commitment Letter in accordance with its terms, the following agreements and obligations of the parties shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof: Sections 5 (Deposit; Remedies), 9 (Settlement of Claims), 12 (Governing Law), 13 (Jurisdiction; Waiver of Jury Trial), and 14 (Assignments; No Third Party Beneficiaries) of this Second Amended and Restated Commitment Letter.

19.    Intervention.  If the Fixed/Floating Debtors exercise any of the remedies set forth in subsections (ii) and (iii) of Section 5, each of the Parties hereto and the Committee (in such Party's discretion) shall be entitled to intervene as a plaintiff in the action commenced by the Fixed/Floating Debtors.

20.    Notice.  Any pleading, notice, or other document relating to this Second Amended and Restated Commitment Letter or any the Exhibits attached hereto shall be served on or delivered to the following parties:

Cerberus:                                          Chatham:

Tom Wagner                                    Jeff Fisher
Cerberus Real Estate Management, LLC        Chatham Lodging Trust
299 Park Avenue, 23rd Floor                 50 Cocoanut Row
New York, NY 10171                          Palm Beach, FL 33480
Phone:  (212) 891-2158                      Phone: (561) 227-1309

K&E 20090412

Email: twagner@cerberusre.com

Counsel to Cerberus:

Stuart Freedman and
Adam Harris
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Phone:  (212) 756-2000
Email: stuart.freedman@srz.com
adam.harris@srz.com

Lehman:

Michael Lascher
Legacy Asset Management Company
1271 Avenue of the Americas
New York, NY 10020
Phone: (646) 285-9073
Email: michael.lascher@lamcollc.com

Counsel to Lehman:

Michael J. Sage
Brian E. Greer
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Phone:  (212) 698-3500
Email: michael.sage@dechert.com
brian.greer@dechert.com

Email: jfisher@cl-trust.com

Counsel to Chatham:

Scott Charles and
Scott Golenbock
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Phone: (212) 403-1000
Email: SKCharles@wlrk.com
SWGolenbock@wlrk.com

Midland:

Midland Loan Services, a division of PNC Bank,
National Association
10851 Mastin, 6th Floor
Overland Park, KS  66210
Attention:  Kevin S. Semon
Email:  kevin.semon@midlandls.com
Facsimile:  (913) 253-9723

Counsel to Midland:

Lenard Parkins
Haynes and Boone, LLP
30 Rockefeller Plaza
26th Floor
New York, NY 10112
Phone:  (212) 659-4966
Email: lenard.parkins@haynesboone.com

IN WITNESS WHEREOF, the parties hereto have executed this Second Amended and Restated Commitment Letter, effective as of the date first above written.

INK ACQUISITION LLC
By: Chatham Lodging LP, its managing member

By: _____
Name:
Title:

INK ACQUISITION II LLC
By: Chatham TRS Holding Inc., its managing member

By: _____
Name:
Title:

INK ACQUISITION III LLC
By: Chatham TRS Holding Inc., its managing member

By: _____
Name:
Title:

*Signature Page to Second Amended and Restated Commitment Letter*

**CERBERUS SERIES FOUR HOLDINGS, LLC**
By: Cerberus Institutional Partners, L.P. —
Series Four, its Managing Member

By: Cerberus Institutional Associates, L.L.C.,
its General Partner

By: _____
Name: Mark A. Neporent
Title: Chief Operating Officer
General Counsel

**CHATHAM LODGING TRUST**

By: _____
Name:
Title:

Accepted and agreed:

**INNKEEPERS USA TRUST**
(solely on behalf of the Fixed/Floating Debtors,
its wholly owned direct and indirect subsidiaries)

By: _____
Name:
Title:

*Signature Page to Second Amended and Restated Commitment Letter*

**MIDLAND LOAN SERVICES, a DIVISION OF PNC BANK, NATIONAL ASSOCIATION** (as Special Servicer for U.S. Bank National Association as Trustee for the Registered Holders of LB-UBS Commercial Mortgage Trust 2007-C6, LB-UBS Commercial Mortgage Trust 2007-C7, Commercial Pass Through Certificates successor trustee to Bank of America National Association)

By: _Valerie Nichols_

Name: Valerie Nichols,

Title: senior vice president

*Signature Page to Second Amended and Restated Commitment Letter*

**APOLLO INVESTMENT CORPORATION**

By: _____
Name: James Zelter
Title: Authorized Signatory

*Signature Page to Second Amended and Restated Commitment Letter*

**LEHMAN ALI INC.**

By: _____

Name:

Title:

Jeffrey Fitts
Authorized Signatory

**SASCO 2008-C2, LLC,** a Delaware limited liability company

By:    Lehman Commercial Paper Inc., as Debtor and Debtor
in Possession in its chapter 11 case in the United States
Bankruptcy Court for the Southern District of New York,
Case No. 08-13555, its Managing Member

By:_____
Name:
Title:

        **Jeffrey Fitts**
        **Authorized Signatory**

*Signature Page to Second Amended and Restated Commitment Letter*

**FIVE MILE CAPITAL PARTNERS LLC**

By: _____
Name: James G. Glasgow
Title:   Portfolio Manager and Managing Director


**FIVE MILE CAPITAL II POOLING REIT LLC**

**By: Five Mile Capital Partners LLC, its manager**

By: _____
Name: James G. Glasgow
Title:   Portfolio Manager and Managing Director

**CRES INVESTMENT NO. II, LP**

**By: Five Mile Capital Partners LLC, its general partner**

By: _____
Name: James G. Glasgow
Title:   Portfolio Manager and Managing Director

The above signatories are Parties only to Section 6(i)
of the Second Amended and Restated Commitment Letter

*Signature Page to Second Amended and Restated Commitment Letter*

Fixed/Floating Debtors

The "Floating Rate Debtors" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC; and Grand Prix West Palm Beach, LLC.

The "Fixed Rate Debtors" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC.

The "Other Plan Debtors" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; Grand Prix Mezz Borrower Fixed, LLC; and GP AC Sublessee LLC.

The "Fixed/Floating Debtors" are the Floating Rate Debtors, the Fixed Rate Debtors, and the Other Plan Debtors. The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan.

Amended Fixed/Floating Plan

[See Exhibit 2 to Proposed Order Approving Commitment Letter]

**EXHIBIT C**

Amended and Restated
New HoldCo/Midland Commitment

[See Exhibit 3 to Proposed Order Approving Commitment Letter]

**EXHIBIT D**

<u>Pro Forma Structure Chart</u>

[See Exhibit E to Exhibit 3 to Proposed Order Approving Commitment Letter]

<u>Pro Forma Capitalization</u>

[See Appendix B to Exhibit 3 to Proposed Order Approving Commitment Letter]

## EXHIBIT 2

## Modified Fixed/Floating Plan

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, *et al.*, | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

### DEBTORS' PLANS OF REORGANIZATION
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE
### (WITH MODIFICATIONS TO THE FIXED/FLOATING PLAN)

---

James H.M. Sprayregen, P.C.
Paul M. Basta
Stephen E. Hessler
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800

Anup Sathy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Drive
Chicago, Illinois  60654-3406
Telephone:  (312) 862-2000

Counsel to the Debtors and Debtors in Possession

Dated:  October 19, 2011

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**..................................................................................1
    A.    Defined Terms ...............................................................................1
    B.    Rules of Interpretation .................................................................20
    C.    Computation of Time ...................................................................20
    D.    Governing Law ............................................................................20
    E.    Reference to Monetary Figures ...................................................21
    F.    Controlling Document .................................................................21

**ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS**.....................21
    A.    Administrative Claims .................................................................21
    B.    Accrued Professional Compensation Claims ...............................22
    C.    Five Mile DIP Claims ..................................................................23
    D.    Lehman DIP Claims ....................................................................23
    E.    LNR Structuring Fee ...................................................................23
    F.    Claims Based on Postpetition Intercompany Loans......................23
    G.    Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses ....................................................................................23
    H.    Ad Hoc Committee Administrative Claim ...................................24
    I.    Priority Tax Claims .....................................................................24

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**............................24
    A.    Summary of Classification ..........................................................24
    B.    Treatment of Claims and Interests ..............................................28
    B.    Special Provision Governing Unimpaired Claims ........................47
    C.    Elimination of Vacant Classes ....................................................47
    D.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.............47

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .....................................................47
    A.    Substantive Consolidation...........................................................47
    B.    Restructuring Transactions and Sources of Consideration for Plan Distributions ............47
    C.    General Settlement of Claims ......................................................48
    D.    Fixed/Floating Investment ..........................................................48
    E.    Chatham Hotel Sale Transaction..................................................48
    F.    Anaheim Hotel Commitment Letter.............................................48
    G.    New Fixed Rate Pool Mortgage Loan Limited Guarantys............48
    H.    Special Servicer Payment and Special Servicer Release Payment......................49
    I.    Issuance of Interests in Post-Effective Date Fixed/Floating Debtors.............49
    J.    Management Compensation.........................................................49
    K.    Listing of New HoldCo Interests; Reporting Obligations.............49
    L.    Release of Liens .........................................................................49
    M.    LP Bank Account ........................................................................50
    N.    Vesting of Assets in the Post-Effective Date Debtors...................50
    O.    Rights and Obligations Under Troy Settlement Agreement...........50
    P.    Cancellation of Securities and Agreements .................................50
    Q.    Corporate Action........................................................................50
    R.    Effectuating Documents; Further Transactions............................51
    S.    Exemption from Certain Taxes and Fees .....................................51
    T.    D&O Liability Insurance Policies ................................................51
    U.    D&O Tail Insurance Policies .......................................................51
    V.    New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws....................52

| W. | Board Representation | 52 |
|---|---|---|
| X. | Indemnification Provisions | 52 |
| Y. | Liquidation Trust | 52 |
| Z. | Disbursing Agent for the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee | 55 |
| AA. | Preservation of Rights of Action | 55 |
| BB. | Ad Hoc Committee Agreement | 55 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 57**

| A. | Assumption of Franchise Agreements | 57 |
|---|---|---|
| B. | Rejection of Executory Contracts and Unexpired Leases | 57 |
| C. | Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases | 57 |
| D. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 58 |
| E. | Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 58 |
| F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 59 |
| G. | Reservation of Rights | 59 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................... 59**

| A. | Timing and Calculation of Amounts to Be Distributed | 59 |
|---|---|---|
| B. | Distributions to Holders of Claims Against and Interests in the Trust Debtors | 59 |
| C. | Distributions to Holders of Claims Against and Interests in the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee; Disbursing Agent | 60 |
| D. | Rights and Powers of Disbursing Agent | 60 |
| E. | Distributions on Account of Claims Allowed After the Effective Date | 60 |
| F. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 61 |
| G. | Compliance with Tax Requirements/Allocations | 62 |
| H. | Claims Paid or Payable by Third Parties | 63 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS .................... 63**

| A. | Resolution of Disputed Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, and Anaheim Hotel Lessee. | 63 |
|---|---|---|
| B. | Resolution of Claims Against the Trust Debtors | 65 |
| C. | Disallowance of Claims | 66 |
| D. | Amendments to Claims | 66 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .................... 67**

| A. | Compromise and Settlement of Claims, Interests, and Controversies | 67 |
|---|---|---|
| B. | Subordinated Claims | 67 |
| C. | Midland Release | 67 |
| D. | Apollo Release | 68 |
| E. | Fixed/Floating Debtors' Plan General Release | 69 |
| F. | Anaheim Hotel Debtors' Plan General Release | 71 |
| G. | Ontario Hotel Debtors' Plan General Release | 72 |
| H. | Remaining Debtors' Plan General Release | 73 |
| I. | Exculpation | 74 |
| J. | Injunction | 75 |
| K. | Setoffs | 76 |

**ARTICLE IX. SEVERABILITY OF PLAN AND CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .................... 76**

| A. | Severability of the Plan | 76 |
|---|---|---|
| B. | Condition Precedent to Confirmation of the Fixed/Floating Plan | 76 |
| C. | Condition Precedent to Confirmation of the Remaining Debtor Plan | 76 |
| D. | Conditions Precedent to the Effective Date of Each of the Joint Plans | 76 |

     E.      Waiver of Conditions ...................................................................................................... 78
     F.      Effective Date ................................................................................................................ 78
     G.     Effect of Non-Occurrence of the Effective Date Regarding the Ontario Plan ............... 78

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............................. 79**
     A.     Modification and Amendments ....................................................................................... 79
     B.     Effect of Confirmation on Modifications ....................................................................... 79
     C.     Revocation or Withdrawal of the Plan ........................................................................... 79

**ARTICLE XI. RETENTION OF JURISDICTION ......................................................................... 79**

**ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................................... 81**
     A.     Immediate Binding Effect .............................................................................................. 81
     B.     Additional Documents .................................................................................................... 81
     C.     Payment of Statutory Fees ............................................................................................. 81
     D.     Dissolution of Committees ............................................................................................. 82
     E.      Reservation of Rights .................................................................................................... 82
     F.      Successors and Assigns .................................................................................................. 82
     G.     Dissolution of Entities ................................................................................................... 82
     H.     Service of Documents .................................................................................................... 82
     I.      Term of Injunctions or Stays ......................................................................................... 84
     J.      Entire Agreement ........................................................................................................... 84
     K.     Nonseverability of Plan Provisions ............................................................................... 84

## INTRODUCTION

Innkeepers USA Trust and certain of its affiliates (as defined in section 101(2) of the Bankruptcy Code) as debtors and debtors in possession (collectively, the "**Debtors**")[1] propose the following plans of reorganization. The Plan (as defined herein) is an aggregation of four separate joint plans of reorganization: the Fixed/Floating Plan; the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan (each as defined herein). Together these Joint Plans (as defined herein) provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases. The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the Joint Plans are not conditioned on the Confirmation and Consummation of any of the other Joint Plans.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms*

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.     "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.     "*Ad Hoc Committee*" means the ad hoc committee of Innkeepers USA Trust Preferred C Interests, which is comprised of: Brencourt Advisors, LLC; Esopus Creek Advisors, LLC; Plainfield Special Situations Master Fund II Limited; Morgens, Waterfall, Vintiadis & Co., Inc.; and P. Schoenfeld Asset Management LP, for and on behalf of certain funds and entities for which it serves as the Investment Advisor.

3.     "*Ad Hoc Committee Administrative Claim*" means the Administrative Claim of the Ad Hoc Committee referenced in Article II.H.

4.     "*Adequate Protection Obligations*" means all outstanding Claims for adequate protection as set forth in the Cash Collateral Orders.

5.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors incurred after the Petition Date and through the Effective Date; (b) Claims of Professionals in the Chapter 11 Cases; (c) amounts owing pursuant to the DIP Orders; (d) amounts owing on account of the Adequate Protection Obligations; (e) fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; and (f) requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

---

[1]     The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

6.      "*Administrative Claims Bar Date*" means, except for Administrative Claims of Professionals, the first Business Day that is 30 days following the Effective Date of the Joint Plan applicable to the Debtor against whom the Administrative Claim is asserted, except as specifically set forth in the Plan or a Final Order.

7.      "*Allowed*" means with reference to any Claim or Interest, as may be applicable, (a) any Claim against the Debtors that has been listed on its Schedules (as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not Disputed or contingent and for which (i) no contrary Proof of Claim has been Filed, (ii) no objection to allowance, request for estimation, or other challenge has been interposed, or (iii) no motion to deem the Schedules amended has been Filed, (b)(1) any Proof of Claim or Interest that is timely Filed by the applicable Claims Bar Date, as to which no litigation (whether stayed or unstayed) is pending and to which no objection or other challenge has been or is interposed in accordance with the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the Bankruptcy Court, if any, and (2) any Claim that is not subject to any applicable Claims Bar Date, as to which no objection or other challenge has been or is interposed in accordance with the Plan or such other applicable period of limitation fixed by the Bankruptcy Court, the Bankruptcy Rules, or the Bankruptcy Court, if any, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order or under the Plan, (e) any Claim that is not otherwise subject to disallowance under section 502(d) of the Bankruptcy Code, (f) any Claim arising from the recovery of property in accordance with sections 550 and 553 of the Bankruptcy Code and Allowed in accordance with section 502(h) of the Bankruptcy Code (unless such Claim is otherwise Disputed), (g) any Claim allowed by stipulation approved by the Bankruptcy Court, or (h) any Interest registered in the ownership register or otherwise on the Debtors' books and records, maintained by, or on behalf of, the Debtors as of the Voting Record Date.  Except as otherwise provided in the Plan, for purposes of determining the amount of an "Allowed Claim," there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset pursuant to applicable non-bankruptcy law or subject to recoupment.  Claims allowed solely for the purpose of voting to accept or reject a Joint Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder unless otherwise specified herein or by order of the Bankruptcy Court.  For any purpose under the Plan, unless specifically provided for herein, a Claim that has been Allowed shall not include amounts constituting interest, penalties, or late charges arising from or relating to the period from and after the Petition Date.  Any Claim or Interest that has been or is hereafter listed in the Schedules as Disputed, contingent, or unliquidated for which no Proof of Claim or Interest has been timely Filed and which is not included in subsections (a)-(h) herein, is not considered an Allowed Claim or Allowed Interest and shall be expunged without further action by the Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court.

8.      "*Anaheim Hotel Commitment Letter*" means that Commitment Letter Regarding the Restructuring of the Hilton Suites in Anaheim, California by and between CWCapital and Lehman Brothers Holdings Inc., dated May 10, 2011, as amended.

9.      "*Anaheim Hotel Debtors*" means Debtors:  (a) KPA HS Anaheim, LLC; (b) Grand Prix Mezz Borrower Term LLC; and (c) Grand Prix Anaheim Orange Lessee, LLC.

10.     "*Anaheim Hotel Debtors' Plan General Release*" means the release provision set forth in Article VIII.F.

11.     "*Anaheim Hotel Lessee*" means Grand Prix Anaheim Orange Lessee, LLC.

12.     "*Anaheim Hotel Mezzanine Loan Agreement*" means that certain Mezzanine Loan Agreement, dated as of June 29, 2007, as amended, by and between Grand Prix Mezz Borrower Term, LLC, the 100% owner of KPA HS Anaheim, LLC, as borrower, and Lehman, as lender, pursuant to which Lehman provided Grand Prix Mezz Borrower Term, LLC a junior mezzanine loan in the original principal amount of $21.3 million, which amount is collateralized by Grand Prix Mezz Borrower Term, LLC's Interests in KPA HS Anaheim, LLC.

13.     "*Anaheim Hotel Mezzanine Loan Claims*" means all Claims against the Anaheim Hotel Debtors arising under, derived from, or based upon the Anaheim Hotel Mezzanine Loan Agreement.

14. "*Anaheim Hotel Mezzanine Loan Deficiency Claims*" means any Anaheim Hotel Mezzanine Loan Claim that is not Secured.

15. "*Anaheim Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of June 14, 2005, as amended, by and between RLJ Anaheim Suites Hotel L.P., as borrower, and GMAC Commercial Mortgage Bank, as lender, pursuant to which GMAC Commercial Mortgage Bank provided a mortgage loan in the original principal amount of $13.7 million to RLJ Anaheim Suites Hotel L.P. that was later assumed by KPA HS Anaheim, LLC pursuant to those certain Loan Assumption and Modification Agreements, dated as of October 4, 2006 and June 29, 2007, which amount is collateralized by the Hilton Suites in Anaheim, California.

16. "*Anaheim Hotel Mortgage Loan Claims*" means all Claims against the Anaheim Hotel Debtors arising under, derived from, or based upon the Anaheim Hotel Mortgage Loan Agreement.

17. "*Anaheim Hotel Owner*" means Debtor KPA HS Anaheim, LLC.

18. "*Anaheim Hotel Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (b) CWCapital, (c) TriMont, in its capacity as servicer for the Anaheim Hotel Mezzanine Loan Agreement; (d) Apollo; (e) SASCO, as holder of 100% of the economic and beneficial interests under the Anaheim Hotel Mezzanine Loan Agreement; (f) LCPI, as administrative agent for SASCO with respect to the Anaheim Hotel Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO; (g) the Independent Committee; (h) all other Holders of Claims against or Interests in the Anaheim Hotel Debtors; (i) the officers, directors, trustees, and members of the Debtors; and (j) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

19. "*Anaheim Mezzanine Debtor*" means Debtor Grand Prix Mezz Borrower Term LLC.

20. "*Anaheim Plan*" means the chapter 11 plan of reorganization proposed herein for the Anaheim Hotel Debtors, which shall be in accordance with the Anaheim Hotel Commitment Letter as set forth in Article IV.F.

21. "*Apollo*" means Apollo Investment Corporation and its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, as well as the principals, employees, agents, officers, directors, and professionals of each such party, each in its capacity as such.

22. "*Apollo Guaranty*" means that certain Required Capital Improvements Guaranty, executed by Apollo Investment Corporation for the benefit of Lehman ALI Inc., in its capacity as original lender under the Fixed Rate Pool Hotel Mortgage Loan Agreement, dated as of June 29, 2007.

23. "*Apollo Unsecured Claim Fund Payment*" means the $375,000 payment to be made by Apollo on the Effective Date with respect to the Fixed/Floating Plan and to be included in the Fixed/Floating Unsecured Claim Fund.

24. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

25. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

26. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, as may be amended from time to time.

27.     "*Beneficiaries*" means Holders of Allowed Claims and Interests against the Trust Debtors as beneficiaries of the Liquidation Trust.

28.     "*Bidding Procedures Order*" means the Order (I) Authorizing the Debtors to Enter into the Amended Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the Amended New Party/Midland Commitment Between the Debtors and Midland Loan Services, (III) Approving Fixed/Floating Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement to "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Cash Reserve, entered by the Bankruptcy Court on March 11, 2011 [Docket No. 1009].

29.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

30.     "*C-III*" means C-III Asset Management, LLC, or any successor thereto, as special servicer for the Ontario Hotel Mortgage Loan Agreement.

31.     "*C6 and C7 Trusts*" means the mortgage loan pools known as LB-UBS Commercial Mortgage Trust 2007-C6 and LB-UBS Commercial Mortgage Trust 2007-C7; provided that the foregoing definition of C6 and C7 Trusts shall not include the holders of certificates in such commercial mortgage backed securitization trusts in their capacity as such.

32.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

33.     "*Cash Collateral Orders*" means the:  Interim Order (A) Authorizing the Debtors to (I) Use the Adequate Protection Parties' Cash Collateral and (II) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, (B) to the Extent Approved in the Final Order, Granting Senior Secured, Priming Liens on Certain Postpetition Intercompany Claims, (C) to the Extent Approved in the Final Order, Granting Administrative Priority Status to Certain Postpetition Intercompany Claims, and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), entered by the Bankruptcy Court on July 20, 2010 [Docket No. 54]; the Final Order Authorizing the Debtors to (i) Use the Adequate Protection Parties' Cash Collateral and (ii) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, entered by the Bankruptcy Court on September 2, 2010 [Docket No. 402]; Order Amending the Cash Collateral Order, entered by the Bankruptcy Court on October 1, 2010 [Docket No. 539]; Stipulation Regarding Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on November 30, 2010 [Docket No. 744]; Stipulation Between The Official Committee of Unsecured Creditors of Innkeepers USA Trust And The Adequate Protection Parties Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on January 4, 2011 (Docket No. 788); Third Stipulation Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on January 28, 2011 [Docket No. 875]; Fourth Stipulation Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on February 28, 2011 [Docket No. 953]; Order Modifying Final Cash Collateral Order, entered by the Bankruptcy Court on March 11, 2011 [Docket No. 1008], and Fifth Stipulation Regarding Further Modification of the Committee's Challenge Deadline in the Cash Collateral Order, entered by the Bankruptcy Court on March 28, 2011 [Docket No. 1060], as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.  The Cash Collateral Orders shall remain in effect between the Confirmation Date and the Effective Date.

34.     "*Causes of Action*" means any Claim, cause of action (including avoidance actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, Secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

4

35.    "*Certificate*" means any instrument evidencing a Claim against, or an Interest in, one of more of the Debtors.

36.    "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Innkeepers USA Trust, et al., Chapter 11 Case No. 10-13800 (SCC), which are currently pending before the Bankruptcy Court.

37.    "*Chatham*" means Chatham Lodging, LP.

38.    "*Chatham APA*" means that certain Agreement of Purchase and Sale, dated as of May 3, 2011 (as such agreement may be amended or modified from time to time), by and among the San Diego Hotel Owner, the Garden Grove Hotel Owner, the Tysons Corner Hotel Owner, the Washington DC Hotel Owner, the San Antonio Hotel Owner, the San Diego Hotel Lessee, the Garden Grove Hotel Lessee, the General Hotel Lessee, and Chatham.

39.    "*Chatham Hotel Sale Transaction*" means the sale transaction set forth in the Chatham APA.

40.    "*Chatham Hotel Sale Transaction Documents*" means the Chatham APA (and ancillary documents related thereto) for the Chatham Hotel Sale Transaction, which shall be included in the Plan Supplement.

41.    "*Chatham Hotel Sale Transaction Purchase Consideration*" means the Garden Grove Hotel Purchase Consideration, the San Diego Hotel Purchase Consideration, the Washington DC Hotel Purchase Consideration, the Tysons Corner Hotel Purchase Consideration, and the San Antonio Hotel Purchase Consideration; provided, however, that notwithstanding anything contained in the Plan, the Plan Supplement, the Remaining Debtor Plan, the Disclosure Statement or any other document or agreement relating to the foregoing documents, the Chatham Hotel Sale Transaction Purchase Consideration shall not exceed $195,000,000.00 in the aggregate (including the assumption of debt as set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents). For the avoidance of doubt, Chatham's payment of the LNR Assumption Fee and LNR Liquidation Fee are not deductions from the Chatham Hotel Sale Transaction Purchase Consideration.

42.    "*Chatham Hotel Sale Transaction Loan Assumption Documents*" means the agreements relating to the assumption by Chatham, in accordance with the LNR Commitment, of the Garden Grove Hotel Mortgage Loan Agreement, the San Antonio Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the Washington DC Hotel Mortgage Loan Agreement, as such loan agreements may be assumed, amended, restated, and/or supplemented in connection with the Chatham Hotel Sale Transaction, which documents shall be included in the Plan Supplement.

43.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

44.    "*Claims Bar Date*" means the applicable deadline by which a Proof of Claim must be or must have been Filed, as established by the Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof, entered by the Bankruptcy Court on September 16, 2010 [Docket No. 440].

45.    "*Claims Objection Bar Date*" means the date that is 120 days after the Effective Date of the Joint Plan applicable to the Debtor against whom the Claim is asserted, or such later date as may be fixed by order of the Bankruptcy Court.

46.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

47.    "*Class*" means a category of Holders of Claims or Interests as set forth in Article III in accordance with section 1122(a) of the Bankruptcy Code.

48.    "*Commitment Letter*" means that certain Second Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust, dated

October 19, 2011, by and among New HoldCo, the Fixed/Floating Plan Sponsors, Apollo Investment Corporation, the Fixed/Floating Debtors, Midland, Lehman, and SASCO, as well as the appendices and exhibits attached thereto.

49. "*Committee*" or "*Committees*" means any official committee (and any and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

50. "*Confirmation*" means, with respect to any of the Joint Plans, the entry on the docket of the Chapter 11 Cases of a Confirmation Order applicable to such Joint Plan.

51. "*Confirmation Date*" means, with respect to any of the Joint Plans, the date upon which the Bankruptcy Court enters the Confirmation Order (within the meaning of Bankruptcy Rules 5003 and 9021) applicable to such Joint Plan.

52. "*Confirmation Hearing*" means, with respect to any of the Joint Plans, the hearing held by the Bankruptcy Court to consider Confirmation of the Plan applicable to such Joint Plan pursuant to section 1129 of the Bankruptcy Code.

53. "*Confirmation Objection Deadline*" means, with respect to any of the Joint Plans, the deadline for Filing objections to Confirmation of such Joint Plan.

54. "*Confirmation Order*" means, with respect to any or all of the Joint Plans, the Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Docket. No 1804], as amended in accordance with the Order (I) Extending the Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof, and (II) Approving Modifications to the Fixed/Floating Plan and Related Amendments to the Confirmation Order [Docket No. 2090] and the Order (A) Authorizing Fixed/Floating Debtors to Enter into Amended Commitment Agreement and (B) Approving (I) Modifications to Fixed/Floating Plan and Confirmation Order and (II) Amended New HoldCo/Midland Commitment, dated [_____], 2011 [Docket No. ___].

55. "*Consummation*" means, for all purposes with respect to any of the Joint Plans, the occurrence of the Effective Date for such Joint Plan.

56. "*Corporate Structure Summary*" means the description of the ultimate corporate structure for the Post-Effective Date Fixed/Floating Debtors, which description shall be set forth in the Plan Supplement.

57. "*Cure Obligations*" means all (a) amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults and (b) other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

58. "*CWCapital*" means CWCapital Asset Management, LLC, or any successor thereto, as special servicer for the Anaheim Hotel Mortgage Loan Agreement.

59. "*D&O Liability Insurance Policies*" means all insurance policies for directors, members, trustees, officers, and managers' liability maintained by the Debtors as of the Effective Date.

60. "*DIP Orders*" means (a) the Final Order Authorizing the Debtors to Obtain Postpetition Senior Secured Super-Priority Debtor-in-Possession Financing from Five Mile Capital II Pooling International LLC Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d) and 364(e), entered September 2, 2010 [Docket No. 400] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time and (b) the Amended Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, 364 and 507 (I) Authorizing Floating Rate Debtors to Obtain Postpetition Financing and (II) Granting Liens and Super-Priority Claims, entered September 13, 2010 [Docket No. 432] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

6

61.     "*Disbursing Agent*" means the Debtors or their agent or any other Entity or Entities selected by the Debtors in their sole discretion to make or facilitate distributions that are to be made on and after the Effective Date pursuant to the applicable Joint Plan.

62.     "*Disclosure Statement*" means, with respect to any of the Joint Plans, the Disclosure Statement for the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated May 19, 2011, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

63.     "*Disclosure Statement and Solicitation Procedures Order*" means, with respect to any of the Joint Plans, the Order Approving (A) Adequacy of the Disclosure Statement, (B) Certain Dates Related to Confirmation of the Plan; (C) Certain Voting Procedures and the Form of Certain Documents to Be Distributed in Connection With Solicitation of the Plan; and (D) Proposed Voting and General Tabulation Procedures, entered by the Bankruptcy Court on May 19, 2011 [Docket No. 1441], approving the Disclosure Statement and certain procedures for solicitation of votes on such Joint Plan and granting related relief.

64.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

65.     "*Disputed Claims Reserve*" means the reserve to be created by the Disbursing Agent to hold Cash, which reserve shall be held for the benefit of Holders of subsequently Allowed Claims or, to the extent applicable, to Holders of Interests, for distribution according to the procedures set forth in Article VI and Article VII.

66.     "*Distribution Waterfall*" means distributions of a Debtor's property, including the proceeds therof, in satisfaction of Claims and Interests in accordance with all applicable priority principles of the Bankruptcy Code and other applicable law; provided that, for the avoidance of doubt, no Holder of a Claim or Interest shall receive a distribution under the Plan that exceeds the Allowed amount of its Claim or Interest.

67.     "*Effective Date*" means, with respect to any of the Joint Plans, the date that is a Business Day selected by the Debtors after the Confirmation Date applicable to such Joint Plan on which: (a) no stay of the Confirmation Order applicable to such Joint Plan is in effect; and (b) all conditions precedent specified in Article IX.D applicable to such Joint Plan have been satisfied or waived (in accordance with Article IX.E).

68.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

69.     "*Estate*" means, as to each Debtor, the estate created for each Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

70.     "*Exculpated Parties*" means, collectively, the Anaheim Hotel Releasing Parties, the Fixed/Floating Releasing Parties, the Ontario Hotel Releasing Parties, and the Remaining Debtor Releasing Parties; provided that the Anaheim Hotel Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Anaheim Plan; provided further that the Fixed/Floating Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Fixed/Floating Plan; provided further that the Ontario Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Ontario Plan; provided further that the Remaining Debtor Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Remaining Debtor Plan.

71.     "*Exculpation*" means the exculpation provision set forth in Article VIII.I.

72.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

73.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, which was 0.28%.

74. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

75. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided further that, with the exception of the Confirmation Order (which is addressed in Article IX), the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to waive any appeal period.

76. "*Five Mile*" means, collectively, Five Mile Capital II Pooling REIT LLC, through its investment advisor Five Mile Capital Partners LLC.

77. "*Five Mile DIP Agent*" means Five Mile Capital II Pooling International LLC, as administrative agent under the Five Mile DIP Facility.

78. "*Five Mile DIP Agreement*" means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of September 24, 2010, among certain of the Debtors, as borrowers, and Five Mile Capital II Pooling International LLC as administrative agent, collateral agent, and Syndication Agent, and the lenders party thereto.

79. "*Five Mile DIP Claims*" means any Claim derived from or based upon the Five Mile DIP Agreement.

80. "*Five Mile DIP Facility*" means that certain $53.0 million debtor in possession credit facility entered into pursuant to the Five Mile DIP Agreement, which credit facility contains three "tranches:" "Tranche A," "Tranche B," and "Tranche C."

81. "*Five Mile DIP Lenders*" means the lenders under the Five Mile DIP Facility.

82. "*Five Mile Expense Reimbursement Claim*" means Five Mile's reasonable and documented fees and expenses paid pursuant to the Bidding Procedures Order.

83. "*Fixed/Floating Debtors*" means (a) the Fixed Rate Pool Hotel Debtors, (b) the Fixed Rate Pool Lessee, (c) the Floating Rate Pool Hotel Debtors, (d) the Floating Rate Pool Lessee; (e) GP AC Sublessee LLC, (f) Grand Prix Mezz Borrower Fixed, LLC; (g) Grand Prix Mezz Borrower Floating, LLC; and (h) Grand Prix Mezz Borrower Floating 2, LLC.

84. "*Fixed/Floating Debtors' Plan General Release*" means the release provision set forth in Article VIII.E.

85. "*Fixed/Floating Plan*" means the chapter 11 plan of reorganization proposed herein for the Fixed/Floating Debtors.

86. "*Fixed/Floating Plan Sponsors*" means Cerberus Series Four Holdings LLC and Chatham Lodging Trust.

87. "*Fixed/Floating Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Lehman DIP Lenders; (b) Five Mile; (c) the Five Mile DIP Agent; (d) the Five Mile DIP Lenders; (e) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (f) Lehman; (g) New HoldCo and each of the Fixed/Floating Plan

8

Sponsors; (h) Midland; (i) the master servicer for the C6 and C7 Trusts; (j) trustees for the C6 and C7 Trusts; (k) the C6 and C7 Trusts; (l) TriMont, in its capacity as special servicer for the Floating Rate Pool Mezzanine Loan Agreement; (m) Apollo; (n) the Committee; (o) the Independent Committee; (p) SASCO, as holder of 100% of the economic and beneficial interests under the Floating Rate Pool Mezzanine Loan Agreement; (q) LCPI, as administrative agent for SASCO with respect to the Floating Rate Pool Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO; (r) Island Hospitality Management, Inc.; (s) all other Holders of Claims against or Interests in the Fixed/Floating Debtors; (t) the officers, directors, trustees, and members of the Debtors; and (u) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals. For the avoidance of doubt, certificateholders in the C6 and C7 Trusts, in their capacity as such, are not Fixed/Floating Releasing Parties.

88.    "*Fixed/Floating Unsecured Claim Fund*" means a payment of Cash in the aggregate amount of $4.75 million (which amount includes the Apollo Unsecured Claim Fund Payment), which payment shall be shared Pro Rata between Holders of General Unsecured Claims against the Fixed/Floating Debtors (excluding any deficiency claims) in accordance with the treatment of Holders of General Unsecured Claims against the Fixed/Floating Debtors set forth in Article III.B.1.

89.    "*Fixed Rate Pool Hotel Debtors*" means Debtors:  (a) Grand Prix Addison (RI) LLC; (b) Grand Prix Altamonte LLC; (c) Grand Prix Arlington LLC; (d) Grand Prix Atlanta (Peachtree Corners) LLC; (e) Grand Prix Atlanta LLC; (f) Grand Prix Bellevue LLC; (g) Grand Prix Belmont LLC; (h) Grand Prix Binghamton LLC; (i) Grand Prix Bothell LLC; (j) Grand Prix Campbell / San Jose LLC; (k) Grand Prix Cherry Hill LLC; (l) Grand Prix Chicago LLC; (m) Grand Prix Columbia LLC; (n) Grand Prix Denver LLC; (o) Grand Prix El Segundo LLC; (p) Grand Prix Englewood / Denver South LLC; (q) Grand Prix Fremont LLC; (r) Grand Prix Ft. Lauderdale LLC; (s) Grand Prix Gaithersburg LLC; (t) Grand Prix Germantown LLC; (u) Grand Prix Horsham LLC; (v) Grand Prix Islandia LLC; (w) Grand Prix Las Colinas LLC; (x) Grand Prix Lexington LLC; (y) Grand Prix Livonia LLC; (z) Grand Prix Lombard LLC; (aa) Grand Prix Louisville (RI) LLC; (bb) Grand Prix Lynnwood LLC; (cc) Grand Prix Mountain View LLC; (dd) Grand Prix Mt. Laurel LLC; (ee) Grand Prix Naples LLC; (ff) Grand Prix Portland LLC; (gg) Grand Prix Richmond (Northwest) LLC; (hh) Grand Prix Richmond LLC; (ii) Grand Prix Saddle River LLC; (jj) Grand Prix San Jose LLC; (kk) Grand Prix San Mateo LLC; (ll) Grand Prix Schaumburg LLC; (mm) Grand Prix Shelton LLC; (nn) Grand Prix Sili I LLC; (oo) Grand Prix Sili II LLC; (pp) Grand Prix Tukwila LLC; (qq) Grand Prix Westchester LLC; (rr) Grand Prix Willow Grove LLC; and (ss) Grand Prix Windsor LLC.

90.    "*Fixed Rate Pool Lessee*" means Debtor Grand Prix Fixed Lessee LLC.

91.    "*Fixed Rate Pool Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of June 29, 2007, as amended, by and among the Fixed Rate Pool Hotel Debtors, as borrowers, the Fixed Rate Pool Lessee, as operating lessee, Grand Prix Holdings, as guarantor, and Lehman, as the original lender, pursuant to which Lehman provided mortgage loans to the Fixed Rate Pool Hotel Debtors in the aggregate principal amount of $825,402,542, which amount is collateralized by the 45 hotel properties owned by the Fixed Rate Pool Hotel Debtors and evidenced by a certain Replacement Promissory Note A-1 and a certain Replacement Promissory Note A-2, each in the principal amount of $412,701,271 and each dated as of August 9, 2007.

92.    "*Fixed Rate Pool Mortgage Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Fixed Rate Pool Mortgage Loan Agreement.

93.    "*Fixed Rate Pool Mortgage Loan Deficiency Claims*" means any Fixed Rate Pool Mortgage Loan Claim that is not Secured.

94.    "*Floating Rate Pool Hotel Debtors*" means Debtors:  (a) Grand Prix Addison (SS) LLC; (b) Grand Prix Albany LLC; (c) Grand Prix Atlantic City LLC; (d) Grand Prix Bulfinch LLC; (e) Grand Prix East Lansing LLC; (f) Grand Prix Ft. Wayne LLC; (g) Grand Prix Grand Rapids LLC; (h) Grand Prix Harrisburg LLC; (i) Grand Prix Indianapolis LLC; (j) Grand Prix Montvale LLC; (k) Grand Prix Morristown LLC; (l) Grand Prix Ontario LLC; (m) Grand Prix Rockville LLC; (n) Grand Prix Troy (Central) LLC; (o) Grand Prix Troy (SE) LLC; (p) Grand Prix

9

West Palm Beach LLC; (q) Grand Prix Woburn LLC; (r) KPA/GP Ft. Walton Beach LLC; (s) KPA/GP Louisville (HI) LLC; and (t) KPA/GP Valencia LLC.

95. "*Floating Rate Pool Lessee*" means Debtor Grand Prix Floating Lessee LLC.

96. "*Floating Rate Pool Mezzanine Loan Agreement*" means that certain Mezzanine Loan Agreement, dated as of June 29, 2007, as amended, by and between Grand Prix Mezz Borrower Floating 2, LLC, the 100% owner of the Floating Rate Pool Hotel Debtors, as borrower, and Lehman, as original lender, pursuant to which Lehman provided Grand Prix Mezz Borrower Floating 2, LLC a junior mezzanine loan in the original principal amount of $118.0 million, which amount is collateralized by Grand Prix Mezz Borrower Floating 2, LLC's Interests in the Floating Rate Pool Hotel Debtors.

97. "*Floating Rate Pool Mezzanine Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Floating Rate Pool Mezzanine Loan Agreement.

98. "*Floating Rate Pool Mezzanine Loan Deficiency Claims*" means any Floating Rate Pool Mezzanine Loan Claim that is not Secured.

99. "*Floating Rate Pool Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of June 29, 2007, as amended, by and among the Floating Rate Pool Hotel Debtors, Grand Prix Wichita LLC, Grand Prix Tallahassee LLC, and Grand Prix Columbia LLC, as borrowers, the Floating Rate Pool Lessee, as operating lessee, Grand Prix Holdings, as guarantor, and Lehman, as original lender, pursuant to which Lehman provided mortgage loans to the borrowers in the original principal amount of $250.0 million, which amount is collateralized by the 19 hotels owned by the Floating Rate Pool Hotel Debtors, and evidenced by a certain Promissory Note, dated as of June 29, 2007, by the Floating Rate Pool Hotel Debtors, Grand Prix Wichita LLC, Grand Prix Tallahassee LLC, and Grand Prix Columbus LLC, for the benefit of Lehman.

100. "*Floating Rate Pool Mortgage Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Floating Rate Pool Mortgage Loan Agreement.

101. "*Floating Rate Pool Mortgage Loan Deficiency Claims*" means any Floating Rate Pool Mortgage Loan Claim that is not Secured.

102. "*Garden Grove Hotel Debtors*" means the Garden Grove Hotel Lessee and the Garden Grove Hotel Owner.

103. "*Garden Grove Hotel Lessee*" means Debtor Grand Prix RIGG Lessee, LLC.

104. "*Garden Grove Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of October 4, 2006, by and between KPA RIGG, LLC, as borrower, and Capmark Bank, as lender, pursuant to which Capmark Bank provided a mortgage loan to KPA RIGG, LLC in the original principal amount of $37.6 million, which amount is collateralized by the Residence Inn in Garden Grove, California.

105. "*Garden Grove Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Garden Grove Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

106. "*Garden Grove Hotel Owner*" means Debtor KPA RIGG, LLC.

107. "*Garden Grove Hotel Purchase Consideration*" means the consideration received by the Garden Grove Hotel Owner and the assumption of the obligations under the Garden Grove Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

108. "*General Hotel Debtors*" means the General Hotel Lessee, the San Antonio Hotel Owner, the Tysons Corner Hotel Owner, and the Washington DC Hotel Owner.

109. "*General Hotel Lessee*" means Debtor Grand Prix General Lessee, LLC.

110. "*General Unsecured Claim*" means any Claim against any Debtor that is not Secured and that is not: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Mortgage or Mezzanine Loan Deficiency Claim; (e) an Anaheim Hotel Mezzanine Loan Deficiency Claim; (f) an Ontario Hotel Mortgage Loan Deficiency Claim, (g) an Intercompany Claim; or (h) a Section 510(b) Claim.

111. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

112. "*Grand Prix Holdings*" means Debtor Grand Prix Holdings LLC.

113. "*Grand Prix Holdings Interests*" means the common interests in Debtor Grand Prix Holdings and the preferred interests in Debtor Grand Prix Holdings.

114. "*Holder*" means any Entity holding a Claim or an Interest.

115. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

116. "*Indemnification Provision*" means each of the Debtors' indemnification provisions in place as of the Effective Date whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, or employment contracts for the current and former directors, members, trustees, officers, and managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors, members, trustees, officers, and managers' respective affiliates.

117. "*Independent Committee*" means the committee of independent trustees of the board of trustees of Innkeepers USA Trust.

118. "*Innkeepers USA LP Preferred D Interests*" means the class D preferred limited partnership units in Debtor Innkeepers USA Limited Partnership.

119. "*Innkeepers USA Trust Common Interests*" means the common shares of Debtor Innkeepers USA Trust that are not Intercompany Interests.

120. "*Innkeepers USA Trust Preferred A Interests*" means the 12% Series A cumulative preferred shares in Debtor Innkeepers USA Trust.

121. "*Innkeepers USA Trust Preferred C Interests*" means the 8% Series C cumulative preferred shares in Debtor Innkeepers USA Trust.

122. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor other than a Claim based on a Postpetition Intercompany Loan.

123. "*Intercompany Interests*" means any Interest held by a Debtor in another Debtor and any Interest held by a Debtor in a non-Debtor affiliate of a Debtor, including the Interests of KPA Raleigh, LLC held by Debtor Innkeepers USA Limited Partnership and the Interests of KPA Raleigh Leaseco, LLC held by Debtor KPA Leaseco Holding, Inc, except for Innkeepers USA Trust Preferred A Interests held by Debtor Grand Prix Holdings.

124. "*Interests*" means the common stock or shares, limited liability company interests, limited partnership units, preferred interests, and any other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor and options, warrants, rights or other securities or agreements to acquire the common stock or shares, limited liability company interests, or other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

125. "*Interim Compensation Order*" means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members, entered August 12, 2010 [Docket No. 189] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

126. "*Investment*" means an investment by New HoldCo of $340,800,000.00 in Cash in the aggregate whereby New HoldCo will receive, directly or indirectly, 100% of the Interests of the Post-Effective Date Fixed/Floating Debtors in accordance with the terms of the Commitment Letter.

127. "*Joint Plan*" or "*Joint Plans*" means, respectively, on an individual basis, and as applicable, the Anaheim Plan, the Fixed/Floating Plan, the Ontario Plan, or the Remaining Debtor Plan, or, collectively, the Anaheim Plan, the Fixed/Floating Plan, the Ontario Plan, and the Remaining Debtor Plan.

128. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

129. "*LCPI*" means Lehman Commercial Paper Inc., in its capacity as administrative agent for SASCO with respect to the (a) Anaheim Hotel Mezzanine Loan Agreement and (b) the Floating Rate Pool Mezzanine Loan Agreement, and Lehman Brothers Holdings Inc. and certain of its affiliates in their capacity as holders of 100% of the economic and beneficial interests in, and preferred shares of, SASCO.

130. "*Lehman*" means Lehman ALI Inc. in its capacity as Holder of all Claims with respect to, and lender of record under, the Floating Rate Pool Mortgage Loan Agreement.

131. "*Lehman DIP Agreement*" means that certain Senior Secured Super Priority Debtor-in-Possession Loan Agreement, dated as of September 17, 2010, among certain of the Debtors, as borrowers, and the Lehman DIP Lender, as lender.

132. "*Lehman DIP Claims*" means any Claim derived from or based upon the Lehman DIP Agreement.

133. "*Lehman DIP Facility*" means that certain $17,498,095.52 debtor in possession credit facility entered into pursuant to the Lehman DIP Agreement.

134. "*Lehman DIP Lenders*" means Solar Finance Inc. together with its successors and assigns.

135. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

136. "*Liquidation Trust*" means that certain trust to be created on the Effective Date, as described in Article IV.Y.

137. "*LNR*" means LNR Partners, LLC, or any successor(s) thereto, as special servicer for the Garden Grove Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Washington DC Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the San Antonio Hotel Mortgage Loan Agreement.

138. "*LNR Assumption Fee*" means the fee payable by Chatham in an amount equal to 1% of the amount of the outstanding principal balance of each of the LNR-Serviced Loans after the paydowns as set forth in the Stipulation.

139. "*LNR Commitment*" means that certain letter agreement by and between the LNR-Serviced Trusts and Chatham, dated May 3, 2011, regarding the LNR-Serviced Trusts agreement to provide financing to Chatham in accordance with the terms and conditions set forth in such letter agreement, which shall be included in the Plan Supplement.

140. "*LNR Liquidation Fee*" means the fee payable by Chatham in an amount equal to 1% of the amount of the paydowns of the LNR-Serviced Loans as set forth in the Stipulation.

K&E 20090501

141.     "*LNR-Serviced Loans*" means the Garden Grove Hotel Mortgage Loan Agreement, San Antonio Hotel Mortgage Loan Agreement, San Diego Hotel Mortgage Loan Agreement, Tysons Corner Hotel Mortgage Loan Agreement, and Washington DC Hotel Mortgage Loan Agreement.

142.     "*LNR-Serviced Trusts*" means the trusts holding the Credit Suisse First Boston Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2007-C1 and ML-CFC Commercial Mortgage Trust 2006-4, Commercial Mortgage Pass-Through Certificates, Series 2006-4.

143.     "*LNR Servicing Fee*" means the servicing fee set forth in the applicable pooling and servicing agreement with respect to the LNR-Serviced Loans.

144.     "*LNR Structuring Fee*" means a payment in Cash in the amount of $2.5 million to the LNR-Serviced Trusts in exchange for the agreement of the LNR-Serviced Trusts to provide the financing in connection with the Chatham Hotel Sale Transaction.

145.     "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York, as applicable to the Chapter 11 Cases, as may be amended, modified, or supplemented from time to time.

146.     "*LP Bank Account*" means the approximately $7.4 million of Cash currently existing in a segregated bank account in the name of Innkeepers USA Limited Partnership.

147.     "*Midland*" means Midland Loan Services, a division of PNC Bank, National Association, or any successor thereto, solely in its capacity as special servicer for the C6 and C7 Trusts that own and hold the Fixed Rate Pool Mortgage Loan Agreement Claims.

148.     "*Mortgage or Mezzanine Loan Deficiency Claims*" means all (a) Fixed Rate Pool Mortgage Loan Deficiency Claims, (b) Floating Rate Pool Mezzanine Loan Deficiency Claims, and (c) Floating Rate Pool Mortgage Loan Deficiency Claims.

149.     "*New Anaheim HoldCo*" means a special purpose entity controlled by the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims.

150.     "*New Fixed/Floating By-Laws*" means the forms of the by-laws of the Post-Effective Date Fixed/Floating Debtors, the forms of which shall be included in the Plan Supplement and consistent with the terms of the Commitment Letter and shall be acceptable to the Fixed/Floating Plan Sponsors.

151.     "*New Fixed/Floating Organizational Documents*" means the forms of the organizational documents for New HoldCo and the Post-Effective Date Fixed/Floating Debtors, the forms of which shall be included in the Plan Supplement and consistent with the terms of the Commitment Letter and shall be acceptable to the Fixed/Floating Plan Sponsors.

152.     "*New Fixed Rate Pool Mortgage Loan*" means the non-recourse mortgage loan of $675,000,000.00 as set forth in the New Fixed Rate Pool Mortgage Loan Agreement.

153.     "*New Fixed Rate Pool Mortgage Loan Agreement*" means the Fixed Rate Pool Mortgage Loan Agreement, as amended, modified, or supplemented by that certain Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement, dated ____, 2011.

154.     "*New Fixed Rate Pool Mortgage Loan Limited Guarantys*" means the limited guarantys provided to the lender under the New Fixed Rate Pool Mortgage Loan by New HoldCo and Cerberus Series Four Holdings, LLC, which guarantys shall be consistent with the terms of the New HoldCo/Midland Commitment.

155.     "*New Fixed Rate Pool Mortgage Notes*" means the new mortgage notes in the aggregate amount of $675,000.000.00 to be issued in connection with execution of the New Fixed Rate Pool Mortgage Loan.

13

156.    "*New HoldCo*" means, collectively, INK Acquisition LLC, INK Acquisitions II LLC, and INK Acquisitions III LLC (together with such other parallel acquisition entities as may be formed by the Fixed/Floating Plan Sponsors), which will acquire, directly or indirectly, 100% of the Interests of the Post-Effective Date Fixed/Floating Debtors and such other assets as may be subsequently identified as necessary to the operation of the Fixed/Floating Debtors, on or after the Effective Date; provided that that no assets of the Other Debtors, including without limitation, Cash or Cash equivalents, shall be acquired by New HoldCo.

157.    "*New HoldCo Board*" means the board of directors, members, managers, or trustees of New HoldCo.

158.    "*New HoldCo/Midland Commitment*" means that certain Amended and Restated Binding Commitment Regarding the Acquisition of Certain Subsidiaries of Innkeepers USA Trust, dated October 19, 2011, by and between New HoldCo, the Fixed/Floating Plan Sponsors, and Midland.

159.    "*Notice and Claims Agent*" means Omni Management Group, LLC in its capacity as notice, claims, and balloting agent for the Debtors.

160.    "*Ontario Hotel Debtors*" means the Ontario Hotel Owner and the Ontario Hotel Lessee.

161.    "*Ontario Hotel Debtors' Plan General Release*" means the release provision set forth in Article VIII.G.

162.    "*Ontario Hotel Lessee*" means Debtor Grand Prix Ontario Lessee, LLC.

163.    "*Ontario Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of October 4, 2006, by and between KPA HI Ontario, LLC, as borrower, and Deutsche Banc Mortgage Capital, LLC, as successor in interest to Capmark Bank, as lender, pursuant to which Deutsche Banc Mortgage Capital, LLC provided a mortgage loan to KPA HI Ontario, LLC in the original principal amount of $35.0 million, which amount is collateralized by the Hilton in Ontario, California.

164.    "*Ontario Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Ontario Hotel Mortgage Loan Agreement.

165.    "*Ontario Hotel Mortgage Loan Deficiency Claims*" means any Ontario Hotel Mortgage Loan Claim that is not Secured.

166.    "*Ontario Hotel Mortgage Loan Guaranty Claim*" means the guaranty Claim of C-III against Grand Prix Holdings related to the Ontario Hotel Mortgage Loan Agreement, which Claim shall be Allowed Claims in Class R4B in the amount of $44,738,754.33 minus the greater of (a) $8 million or (b) the amount received by C-III upon a sale of the collateral under the Ontario Hotel Mortgage Loan Agreement; provided that to the extent that any other Allowed unsecured Claim against Grand Prix Holdings includes postpetition interest, the amount of the Allowed Ontario Hotel Mortgage Loan Guaranty Claim established pursuant to the preceding clause may be increased by the amount of postpetition interest accrued on the Allowed Ontario Hotel Mortgage Loan Guaranty Claim, and provided further that in no event shall the recovery on account of the Ontario Hotel Mortgage Loan Guaranty Claim, if any, exceed $1.5 million.

167.    "*Ontario Hotel Owner*" means Debtor KPA HI Ontario.

168.    "*Ontario Hotel Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (b) C-III; (c) Apollo; (d) the Independent Committee; (e) all other Holders of Claims against or Interests in the Ontario Hotel Debtors; (f) the officers, directors, trustees, and members of the Debtors; and (g) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

169.   "*Ontario Hotel Cash Recovery Fund*" means a payment of Cash in the aggregate amount of $30,000, which payment shall be distributed among Holders of Claims against the Ontario Hotel Debtors.

170.   "*Ontario Plan*" means the chapter 11 plan of reorganization proposed herein for the Ontario Hotel Debtors.

171.   "*Ordinary Course Professional*" means professionals retained and compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

172.   "*Ordinary Course Professionals Order*" means the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business, entered August 12, 2010 [Docket No. 187] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

173.   "*Other Debtors*" means Debtors that are not the Fixed/Floating Debtors.

174.   "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507 of the Bankruptcy Code, other than:  (a) an Administrative Claim or (b) a Priority Tax Claim.

175.   "*Other Secured Claim*" means any Secured Claim against any of the Debtors that is not a:  (a) Five Mile DIP Claim; (b) Lehman DIP Claim; (c) Anaheim Hotel Mortgage Loan Claim; (d) Fixed Rate Pool Mortgage Loan Claim; (e) Floating Rate Pool Mortgage Loan Claim; (f) Garden Grove Hotel Mortgage Loan Claim; (g) Ontario Hotel Mortgage Loan Claim; (h) San Antonio Hotel Mortgage Loan Claim; (i) San Diego Grove Hotel Mortgage Loan Claim; (j) Tysons Corner Hotel Mortgage Loan Claim; (k) Washington DC Hotel Mortgage Loan Claim; or (l) Anaheim Hotel Mezzanine Loan Claim.

176.   "*Parent Companies*" means Debtors Grand Prix Holdings, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership.

177.   "*Petition Date*" means July 19, 2010, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

178.   "*Plan*" means the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

179.   "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed before the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) a list of Causes of Action to be retained by the Post-Effective Date Debtors; (b) a list of Executory Contracts, including any franchise agreements, and Unexpired Leases to be assumed and assigned to the Post-Effective Date Debtors and their respective Cure Obligations, to be Filed by the Voting Deadline, with notices of assumption or rejection mailed to executory contract and unexpired lease counterparties on or before five business days prior to the Voting Deadline; (c) the Corporate Structure Summary; (d) the forms of the New Fixed/Floating By-Laws; (e) the forms of the New Fixed/Floating Organizational Documents; (f) the forms of the New Fixed Rate Pool Mortgage Loan and the forms of the New Fixed Rate Pool Mortgage Loan Limited Guarantys; (g) the Anaheim Hotel Commitment Letter; (h)  the LNR Commitment and the Chatham Hotel Sale Transaction Documents, including the Chatham Hotel Sale Transaction Loan Assumption Documents; (i)  to the extent known, with respect to members of the New HoldCo Board and the Post-Effective Date Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (j) information regarding the compensation program related to the Remaining Debtors referenced in Article IV.J, if implemented, and (k) the form of the deed in lieu of foreclosure agreement with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement.

180.    "*Post-Effective Date Anaheim Hotel Debtors*" means, collectively, the Entities holding the assets of the Anaheim Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

181.    "*Post-Effective Date Board*" means the board of directors, members, trustees, managers, or trustees of Post-Effective Date Innkeepers USA Trust.

182.    "*Post-Effective Date Debtors*" means, collectively, the Entities holding the assets of the 92 Debtors in the Chapter 11 Cases, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including the Post-Effective Date Anaheim Hotel Debtors, the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Ontario Hotel Debtors, and the Post-Effective Date Remaining Debtors.

183.    "*Post-Effective Date Fixed/Floating Debtors*" means, collectively, the Entities holding the assets of the Fixed/Floating Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

184.    "*Post-Effective Date General Hotel Lessee*" means, collectively, the Entities holding the assets of General Hotel Lessee or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

185.    "*Post-Effective Date Innkeepers USA Limited Partnership*" means Innkeepers USA Limited Partnership or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, which entity, for the avoidance of doubt, is one of the Post-Effective Date Remaining Debtors.

186.    "*Post-Effective Date Innkeepers USA Trust*" means Innkeepers USA Trust or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, which entity, for the avoidance of doubt, is one of the Post-Effective Date Remaining Debtors.

187.    "*Post-Effective Date Ontario Hotel Debtors*" means, collectively, the Entities holding the assets of the Ontario Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

188.    "*Post-Effective Date KPA Leaseco Holding, Inc.*" means KPA Leaseco Holding, Inc., or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

189.    "*Post-Effective Date Remaining Debtors*" means, collectively, the Entities holding the assets of the Remaining Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

190.    "*Post-Effective Date San Diego Hotel Debtors*" means, collectively, the Entities holding the assets of the San Diego Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

191.    "*Post-Effective Date Tysons Corner Hotel Owner*" means, collectively, the Entities holding the assets of the Tysons Corner Hotel Owner or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

192.    "*Postpetition Intercompany Loan*" means any Claim against a Debtor held by another Debtor based on an "Intercompany Loan" arising pursuant to the Cash Collateral Order, which Claim is, pursuant to the terms of the Cash Collateral Order, secured on a superpriority basis in accordance with sections 364(c)(2) and (d) of the Bankruptcy Code by senior secured and priming liens on and security interests in all the borrower Debtors' property, and the obligations of the borrower Debtors to satisfy such Claims is, in accordance with section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense Claim entitled to priority over any or all administrative expenses of the kind specified in, among other sections, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), and 726 of the Bankruptcy Code (as further set forth in the Cash Collateral Order).

193.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

194.    "*Pro Rata*" means (a) the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class or (b) for an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

195.    "*Professional*" means an Entity:  (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to retention and payment pursuant to the Ordinary Course Professionals Order.

196.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors on or before the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims. Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.  The Professional Fee Escrow Account shall be funded in part from cash collateral to the extent provided for under the Cash Collateral Orders.

197.    "*Professional Fee Escrow Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3.

198.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

199.    "*Remaining Debtors*" means the Debtors that are not Fixed/Floating Debtors, Anaheim Hotel Debtors, or Ontario Hotel Debtors:  (a) Grand Prix General Lessee LLC; (b) Grand Prix Holdings; (c) Grand Prix IHM, Inc.; (d) Grand Prix RIGG Lessee LLC; (e) Grand Prix RIMV Lessee, LLC; (f) Grand Prix Term Lessee LLC; (g) Innkeepers Financial Corporation; (h) Innkeepers USA Limited Partnership; (i) Innkeepers USA Trust; (j) KPA Leaseco Holding, Inc.; (k) KPA Leaseco, Inc.; (l) KPA RIGG, LLC; (m) KPA RIMV, LLC; (n) KPA San Antonio, LLC; (o) KPA Tysons Corner RI, LLC; and (p) KPA Washington DC, LLC.

200.    "*Remaining Debtor Plan*" means the chapter 11 plan of reorganization proposed herein for the Remaining Debtors.

201.    "*Remaining Debtor Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) Chatham; (b) the Five Mile DIP Agent; (c) the Five Mile DIP Lenders; (d) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (e) LNR, in its capacity as special servicer for the each of the LNR-Serviced Loans; (f) the LNR-Serviced Trusts; (g) the master servicer for each of the LNR-Serviced Loans; (h) Apollo; (i) the Independent Committee; (j) Island Hospitality Management, Inc.; (k) all other Holders of Claims against or Interests in the Remaining Debtors; (l) the officers, directors, trustees, and members of the Debtors; and (m) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

202.    "*Remaining Debtors' Plan General Release*" means the release provision set forth in Article VIII.H.

203.    "*San Antonio Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA San Antonio, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided a mortgage loan to KPA San Antonio, LLC in the original principal amount of $24.2 million, which amount is collateralized by the Homewood Suites in San Antonio, Texas.

K&E 20090501

204.	"*San Antonio Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the San Antonio Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

205.	"*San Antonio Hotel Owner*" means Debtor KPA San Antonio, LLC.

206.	"*San Antonio Hotel Purchase Consideration*" means the consideration received by the San Antonio Hotel Owner and the assumption of the obligations under the San Antonio Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

207.	"*San Diego Hotel Debtors*" means the San Diego Hotel Lessee and the San Diego Hotel Owner.

208.	"*San Diego Hotel Lessee*" means Debtor Grand Prix RIMV Lessee, LLC.

209.	"*San Diego Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of October 4, 2006, by and between KPA RIMV, LLC, as borrower, and Capmark Bank, as lender, pursuant to which Capmark Bank provided KPA RIMV, LLC a mortgage loan in the original principal amount of $47.4 million, which amount is collateralized by the Residence Inn in San Diego, California.

210.	"*San Diego Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the San Diego Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

211.	"*San Diego Hotel Owner*" means Debtor KPA RIMV, LLC.

212.	"*San Diego Hotel Purchase Consideration*" means the consideration received by the San Diego Hotel Owner and the assumption of the obligations under the San Diego Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

213.	"*SASCO*" means SASCO 2008-C2 LLC and/or other affiliates of Lehman Brothers Holdings Inc., who together are the 100% participant and owner of all economic and beneficial interests in, or lender of record under (a) the Floating Rate Pool Mezzanine Loan Agreement and (b) the Anaheim Hotel Mezzanine Loan Agreement.

214.	"*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

215.	"*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a Security of any Debtor or an affiliate (as defined in section 101(2) of the Bankruptcy Code) of any Debtor, which Security is not an Interest, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

216.	"*Secured*" means when referring to a Claim:  (a) Secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

217.	"*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

218.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

219.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

220.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

221.    "*Special Servicers*" means C-III, CWCapital, LNR, Midland, and TriMont.

222.    "*Special Servicer Release Payment*" means a Cash payment of $3.0 million to be made by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland, on behalf of the C6 and C7 Trusts, as settlement of Midland's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court.

223.    "*Special Servicer Payment*" means a Cash payment of $3.0 million to be made by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland as consideration for effecting the restructuring of the Fixed Rate Pool Mortgage Loan Agreement on behalf of the C6 and C7 Trusts.

224.    "*Stipulation*" means that certain stipulation by and between the Debtors, LNR, on behalf of the LNR-Serviced Trusts, and the Ad Hoc Committee dated May 3, 2011.

225.    "*TriMont*" means TriMont Real Estate Advisors, Inc., or any successor thereto, in its capacity as (a) special servicer for the Anaheim Hotel Mezzanine Loan Agreement; or (b) special servicer for the Floating Rate Pool Mezzanine Loan Agreement.

226.    "*Trust Assets*" means the Trust Debtors' right, title, and interest in Cash and all other assets remaining in the Trust Debtors' Estates on the Effective Date, including, without limitation, the right to prosecute, settle, withdraw, or resolve in any manner approved by the Bankruptcy Court the Trust Debtors' Causes of Action.

227.    "*Trust Debtors*" means, collectively, the Remaining Debtors, the Anaheim Mezzanine Debtor, and the Ontario Hotel Debtors.

228.    "*Trustee*" means AP Services, LLC, or its agent, as Trustee for the Liquidation Trust.

229.    "*Tysons Corner Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA Tysons Corner RI, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided KPA Tysons Corner RI, LLC a mortgage loan in the original principal amount of $25.2 million, which amount is collateralized by the Residence Inn in Vienna, Virginia.

230.    "*Tysons Corner Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Tysons Corner Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

231.    "*Tysons Corner Hotel Owner*" means Debtor KPA Tysons Corner RI, LLC.

232.    "*Tysons Corner Hotel Purchase Consideration*" means the consideration received by the Tysons Corner Hotel Owner and the assumption of the obligations under the Tysons Corner Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

233.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

234.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

235.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

236.     "*Voting Deadline*" means June 17, 2011 at 5:00 p.m. Eastern Time.

237.     "*Voting Record Date*" means the close of business on May 13, 2011.

238.     "*Washington DC Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA Washington DC, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided a mortgage loan to KPA Washington DC, LLC in the original principal amount of $25.6 million, which amount is collateralized by the Doubletree Guest Suites in Washington, D.C.

239.     "*Washington DC Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Washington DC Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

240.     "*Washington DC Hotel Owner*" means Debtor KPA Washington DC, LLC.

241.     "*Washington DC Hotel Purchase Consideration*" means the consideration received by the Washington DC Hotel Owner and the assumption of the obligations under the Washington DC Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

242.     "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates in accordance with the Plan following the Effective Date.

## B.     *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## C.     *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## D.     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as

otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; underlined provided that corporate or limited liability company governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Post-Effective Date Debtors, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

F.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; underlined provided that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.  The provisions hereof are subject to the provisions of Article IX.B and Article IX.D.2.e.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

A.      *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in exchange for full and final satisfaction, settlement, release, and compromise of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals and Governmental Units, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Post-Effective Date Debtors no later than the Administrative Claims Bar Date applicable to the Debtor against whom the Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, or the property of the Post-Effective Date Debtors and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

*B.*     *Accrued Professional Compensation Claims*

1.     Professional Fee Escrow Account

In accordance with Article II.B.3, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow Account. The Debtors shall fund the Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals. The Professional Fee Escrow Account shall be funded from cash collateral to the extent provided for under the Cash Collateral Orders (or in such greater amounts as may be agreed to by the applicable secured lender) and, to the extent necessary, on the Effective Date from the Chatham Hotel Sale Transaction Purchase Consideration and/or the Investment. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or the Post-Effective Date Debtors, as applicable. Payment of such funds shall not reduce the distributions to Midland or Lehman under the Fixed/Floating Plan or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

2.     Final Fee Applications and Payment of Accrued Professional Compensation Claims

All final requests for payment of Claims of a Professional shall be Filed no later than 60 days after the latest Effective Date for any of the Joint Plans. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A. After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders. Additionally, after notice and hearing, the Bankruptcy Court may direct the applicable Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders

3.     Professional Fee Escrow Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors, the Fixed/Floating Plan Sponsors, Lehman, and Midland no later than five days after the Confirmation Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Escrow Amount.

4.     Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, the Post-Effective Date Debtors, or the Committee, as applicable. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim

Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Five Mile DIP Claims*

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim against the Fixed/Floating Debtors, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay the outstanding amount of "Tranche A" of the Allowed Five Mile DIP Claims in full in Cash.

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim, on the Effective Date of the Remaining Debtor Plan, the Post-Effective Date San Diego Hotel Debtors shall pay "Tranche B" of the Allowed Five Mile DIP Claims in full in Cash and the Post-Effective Date General Lessee and the Tysons Corner Hotel Owner shall pay "Tranche C" of the Allowed Five Mile DIP Claims in full in Cash.

The Five Mile DIP Claims shall be Allowed pursuant to the Confirmation Order.

D.      *Lehman DIP Claims*

In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Lehman DIP Claim, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay the outstanding amount of the Allowed Lehman DIP Claims in full in Cash.

The Lehman DIP Claims shall be Allowed pursuant to the Confirmation Order.

E.      *LNR Structuring Fee*

On the Effective Date of the Remaining Debtor Plan, the LNR Structuring Fee shall be paid by the Remaining Debtors that own or operate the properties that serve as collateral for the LNR-Serviced Loans to LNR in full in Cash with the proceeds of the Chatham Hotel Sale Transaction Purchase Consideration; provided that, for the avoidance of doubt, in the event that the Chatham Hotel Sale Transaction does not close, the LNR Structuring Fee will be payable in accordance with the terms of the Stipulation.

F.      *Claims Based on Postpetition Intercompany Loans*

In exchange for full and final satisfaction, settlement, release, and compromise of each Claim based on a Postpetition Intercompany Loan arising pursuant to the Cash Collateral Order, if any, on the Effective Date of a borrower Debtor's plan, the borrower Debtors shall pay the lender Debtors in full in Cash.

G.      *Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses*

Upon the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors shall pay to Five Mile the Five Mile Expense Reimbursement Claim in an amount not to exceed $3 million.  Notwithstanding any provision herein to the contrary, neither Five Mile nor its counsel shall be required to file any application or other formal request for payment or allowance of the Five Mile Expense Reimbursement Claim.

Lehman's advisors' and counsel's reasonable and documented fees and expenses through the Effective Date shall continue to be paid in accordance with the Cash Collateral Orders.

The Ad Hoc Committee and its advisors will receive an Allowed Administrative Claim in the amount of $3.5 million, which amount shall be paid by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) on the Effective Date of the Remaining Debtor Plan.  The Claim for payment shall be deemed an Allowed Administrative Priority Claim.

I.       *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, (1) Cash, payable by the liable Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the liable Debtors or Post-Effective Date Debtors, as applicable, and such Holder, provided that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date without any further notice to or action, order, or approval of the Bankruptcy Court, or (3) at the option of the liable Debtor or Post-Effective Date Debtor, as applicable, Cash paid by the liable Post-Effective Date Debtor in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than five years after the Petition Date with payment of interest at the Federal Judgment Rate in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the liable Debtors or Post-Effective Date Debtors, as applicable, and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article III.

A.       *Summary of Classification*

All Claims and Interests, other than Five Mile DIP Claims, Lehman DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and in connection with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  In addition, subject to the Commitment Letter, the Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking confirmation or approval of the Plan with respect to all other Debtors.

1.       Class Identification for the Fixed/Floating Debtors

The classification of Claims and Interests against each of the Fixed/Floating Debtors pursuant to the Fixed/Floating Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Fixed/Floating Debtors.  All of the potential Classes for the Fixed/Floating Debtors are set forth herein.  Certain of the Fixed/Floating Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof.  For all purposes under the Fixed/Floating Plan, each Class will contain sub-Classes for each of the Fixed/Floating Debtors (*i.e.*, there will be 71 sub-Classes in each Class and many of such sub-Classes may be vacant).  In addition, the sub-Classes in Class FF2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class FF1 | Other Priority Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF2 | Other Secured Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF3A | Secured Fixed Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF3B | Secured Floating Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF4 | Secured Floating Rate Pool Mezzanine Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF5 | General Unsecured Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF6 | Mortgage or Mezzanine Loan Deficiency Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF7 | Intercompany Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF8 | Section 510(b) Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF9 | Interests in Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 20090501

2.       Class Identification for the Anaheim Hotel Debtors

        The classification of Claims and Interests against each of the Anaheim Hotel Debtors pursuant to the Anaheim Plan is as follows.

        The classification of Claims and Interests set forth herein shall apply separately to each of the Anaheim Hotel Debtors. All of the potential Classes for the Anaheim Hotel Debtors are set forth herein. Certain of the Anaheim Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof. For all purposes under the Anaheim Plan, each Class will contain sub-Classes for each of the Anaheim Hotel Debtors (*i.e.*, there will be three sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class A2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class A1 | Other Priority Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A2 | Other Secured Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A3 | Secured Anaheim Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class A4 | Secured Anaheim Hotel Mezzanine Loan Claims | Impaired | Entitled to Vote |
| Class A5A | General Unsecured Claims against Anaheim Hotel Owner or Anaheim Hotel Lessee | Impaired | Entitled to Vote |
| Class A5B | General Unsecured Claims against Anaheim Mezzanine Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A6 | Anaheim Hotel Mezzanine Loan Deficiency Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A7 | Intercompany Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A8 | Intercompany Interests in Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 20090501

3.     Class Identification for the Ontario Hotel Debtors

The classification of Claims and Interests against each of the Ontario Hotel Debtors pursuant to the Ontario Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Ontario Hotel Debtors.  All of the potential Classes for the Ontario Hotel Debtors are set forth herein.  Certain of the Ontario Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof.  For all purposes under the Ontario Plan, each Class will contain sub-Classes for each of the Ontario Hotel Debtors (*i.e.*, there will be two sub-Classes in each Class and many of such sub-Classes may be vacant).  In addition, the sub-Classes in Class O2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class O1 | Other Priority Claims against Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O2 | Other Secured Claims Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O3 | Secured Ontario Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class O4 | General Unsecured Claims against Ontario Hotel Debtors | Impaired | Entitled to Vote |
| Class O5 | Ontario Hotel Mortgage Loan Deficiency Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O6 | Intercompany Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O7 | Section 510(b) Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O8 | Intercompany Interests in Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 20090501

4. <u>Class Identification for the Remaining Debtors</u>

The classification of Claims and Interests against each of the Remaining Debtors pursuant to the Remaining Debtor Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Remaining Debtors. All of the potential Classes for the Remaining Debtors are set forth herein. Certain of the Remaining Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof. For all purposes under the Remaining Debtor Plan, each Class will contain sub-Classes for each of the Remaining Debtors (*i.e.*, there will be 16 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class R2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class R1 | Other Priority Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R2 | Other Secured Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R3A | Secured Garden Grove Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3B | Secured San Diego Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3C | Secured Washington DC Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3D | Secured Tysons Corner Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3E | Secured San Antonio Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R4A | General Unsecured Claims against the Remaining Debtors Other than Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R4B | General Unsecured Claims against Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R5 | Intercompany Claims against the Remaining Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R6 | Intercompany Interests in the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R7 | Innkeepers USA LP Preferred D Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R8 | Innkeepers USA Trust Preferred C Interests | Impaired | Entitled to Vote |
| Class R9 | Innkeepers USA Trust Preferred A Interests | Impaired | Entitled to Vote |
| Class R10 | Innkeepers USA Trust Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R11 | Grand Prix Holdings Interests | Impaired | Entitled to Vote |
| Class R12 | Section 510(b) Claims against the Remaining Debtors | Impaired | Entitled to Vote |

B. *Treatment of Claims and Interests*

1. The treatment provided to each Class relating to each of the Fixed/Floating Debtors for distribution purposes and voting rights are specified below:

**<u>Class FF1 - Other Priority Claims Against the Fixed/Floating Debtors</u>**

(a) *Classification*: Class FF1 consists of all Other Priority Claims against the Fixed/Floating Debtors.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Class FF1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final

satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i)     be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)    otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)     *Voting*:  Class FF1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class FF2 - Other Secured Claims Against the Fixed/Floating Debtors

(a)     *Classification*:  Class FF2 consists of all Other Secured Claims against the Fixed/Floating Debtors.  For all purposes under the Fixed/Floating Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class FF2A against Grand Prix Addison (RI) LLC, Class FF2B against Grand Prix Addison (RI) LLC, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Class FF2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i)     be paid in full in Cash in an amount equal to such Allowed Class FF2 Other Secured Claim by the Debtors on the Effective Date;

(ii)    receive the collateral securing any such Allowed Class FF2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)   otherwise be treated in any other manner such that the Allowed Class FF2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class FF2 Other Secured Claim becomes an Allowed Class FF2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class FF2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class FF2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

**Class FF3A - Secured Fixed Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF3A consists of all Secured Fixed Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class FF3A Secured Fixed Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Fixed Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Fixed Rate Pool Mortgage Loan Claims shall enter into the New Fixed Rate Pool Mortgage Loan Agreement and receive the New Fixed Rate Pool Mortgage Notes and the New Fixed Rate Pool Mortgage Loan Limited Guarantys.

(c)     *Voting:*  Class FF3A is Impaired, and the Holder of Secured Fixed Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF3B - Secured Floating Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF3B consists of all Secured Floating Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class FF3B Secured Floating Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Floating Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Floating Rate Pool Mortgage Loan Claims shall receive a payment of Cash in the amount of $224,000,000.00.

(c)     *Voting:*  Class FF3B is Impaired, and the Holder of Secured Floating Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF4 - Secured Floating Rate Pool Mezzanine Loan Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF4 consists of all Secured Floating Rate Pool Mezzanine Loan Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  The Holder of Allowed Class FF4 Secured Floating Rate Pool Mezzanine Loan Claims (i) shall receive the benefit of the release in Article VIII.E, and (ii) pursuant to the Commitment Letter, has agreed that it shall not receive any distribution on account of such Secured Floating Rate Pool Mezzanine Loan Claims.

(c)     *Voting:*  Class FF4 is Impaired, and the Holder of Allowed Secured Floating Rate Pool Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF5 - General Unsecured Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF5 consists of all General Unsecured Claims against the Fixed Floating Debtors.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class FF5 General Unsecured Claim and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of

each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall:

(i)      (A) if the Holder's General Unsecured Claim is against Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $100,000.00 of the Fixed/Floating Unsecured Claim Fund, or (B) if the Holder's General Unsecured Claim is against a Fixed/Floating Debtor other than Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $4,650,000.00 of the Fixed/Floating Unsecured Claim Fund; and

(ii)     receive a release and waiver by the Debtors of all Claims of the Fixed/Floating Debtors against such Holder to recover preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code.

(c)     *Voting:*  Class FF5 is Impaired, and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

## Class FF6 - Mortgage or Mezzanine Loan Deficiency Claims Against the Fixed/Floating Debtors

(a)     *Classification:*  Class FF6 consists of all Mortgage or Mezzanine Loan Deficiency Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Holders of Allowed Class FF6 Mortgage or Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Mortgage or Mezzanine Loan Deficiency Claims.

(c)     *Voting:*  Class FF6 is Impaired, and each Holder of a Mortgage or Mezzanine Loan Deficiency Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Mortgage or Mezzanine Loan Deficiency Claims are not entitled to vote to accept or reject the Plan.

## Class FF7 - Intercompany Claims Against the Fixed/Floating Debtors

(a)     *Classification*:  Class FF7 consists of all Intercompany Claims against the Fixed/Floating Debtors.

(b)     *Treatment*:  Holders of Allowed Class FF7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class FF7 is Impaired, and Holders of Intercompany Claims against the Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

## Class FF8 - Section 510(b) Claims Against the Fixed/Floating Debtors

(a)     *Classification*:  Class FF8 consists of all Section 510(b) Claims against the Fixed/Floating Debtors.

(b)     *Treatment*:  Holders of Allowed Class FF8 Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)      *Voting*: Class FF8 is Impaired, and Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

### Class FF9 - Interests in the Fixed/Floating Debtors

(a)      *Classification:* Class FF9 consists of all Interests in the Fixed/Floating Debtors.

(b)      *Treatment:* Holders of Allowed Class FF9 Interests shall not receive any distribution on account of such Intercompany Interests and, except as provided in the immediately following sentence, all such Interests shall be cancelled and of no further force or effect. Notwithstanding the foregoing, the Interests may, at the discretion of Fixed/Floating Plan Sponsors, be maintained for the purposes of preserving the organizational structure of certain of the Fixed/Floating Debtors; provided further that the Interests of the Post-Effective Date Fixed/Floating Debtors shall, directly or indirectly, be transferred to New HoldCo pursuant to the Investment and in accordance with the Commitment Letter.

(c)      *Voting:* Class FF9 is Impaired, and Holders of Intercompany Interests in the Fixed/Floating Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

2.     The treatment provided to each Class relating to each of the Anaheim Hotel Debtors for distribution purposes and voting rights are specified below:

### Class A1 - Other Priority Claims Against the Anaheim Hotel Debtors

(a)      *Classification*: Class A1 consists of all Other Priority Claims against the Anaheim Hotel Debtors.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Class A1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall:

     (i)      if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or (B) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; or

     (ii)      if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan Agreement pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)      *Voting*: Class A1 is Impaired, and Holders of Class A1 Other Priority Claims are entitled to vote to accept or reject the Plan.

K&E 20090501

**Class A2 - Other Secured Claims Against the Anaheim Hotel Debtors**

(a)     *Classification*:  Class A2 consists of all Other Secured Claims against the Anaheim Hotel Debtors.  For all purposes under the Anaheim Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class A2A against the Anaheim Hotel Owner, Class A2B the Anaheim Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Class A2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall:

      (i)     if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash in an amount equal to such Allowed Class A2 Other Secured Claim by the Debtors on the Effective Date; (B) receive the collateral securing any such Allowed Class A2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or (C) otherwise be treated in any other manner such that the Allowed Class A2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class A2 Other Secured Claim becomes an Allowed Class A2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class A2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code; or

      (ii)    if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Hotel Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)     *Voting*:  Class A2 is Impaired, and Holders of Class A2 Other Secured Claims are entitled to vote to accept or reject the Plan.

**Class A3 - Secured Anaheim Hotel Mortgage Loan Claims**

(a)     *Classification:*  Class A3 consists of all Secured Anaheim Hotel Mortgage Loan Claims against the Anaheim Hotel Debtors.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class A3 Secured Anaheim Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mortgage Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mortgage Loan Claims shall in accordance with the Anaheim Hotel Commitment Letter either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, have the Anaheim Hotel Mortgage Loan Agreement be assumed, amended, restated, and/or supplemented by New Anaheim

HoldCo, in accordance with and as modified by the terms and conditions set forth in the Anaheim Hotel Commitment Letter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)     *Voting:*  Class A3 is Impaired, and the Holder of Class A3 Secured Anaheim Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class A4 - Secured Anaheim Hotel Mezzanine Loan Claims

(a)     *Classification*:  Class A4 consists of all Secured Anaheim Hotel Mezzanine Loan Claims against the Anaheim Hotel Debtors.

(b)     *Treatment*:  Except to the extent that the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mezzanine Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mezzanine Loan Claims shall receive the following: (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, all of the assets of the Anaheim Hotel Debtors shall be transferred, conveyed, assumed, and assigned to the New Anaheim HoldCo; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred (as defined in the Anaheim Hotel Commitment Letter), a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(d)     *Voting:*  Class A4 is Impaired, and the Holder of Secured Anaheim Hotel Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

## Class A5A - General Unsecured Claims Against the Anaheim Hotel Owner or Anaheim Hotel Lessee

(a)     *Classification:*  Class A5A consists of all General Unsecured Claims against the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class A5A General Unsecured Claim against the Anaheim Hotel Owner and Anaheim Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee, each Holder of an Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee shall either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, be paid in full on the Effective Date or as soon as reasonably practical thereafter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(c)     *Voting:* Class A5A is Impaired, and each Holder of a General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee is entitled to vote to accept or reject the Plan.

## Class A5B - General Unsecured Claims Against the Anaheim Mezzanine Debtor

(a)     *Classification:* Class A5B consists of all General Unsecured Claims against the Anaheim Mezzanine Debtor.

(b)     *Treatment:* Holders of Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall not receive any distribution on account of such Allowed General Unsecured Claim against the Anaheim Mezzanine Debtor, and Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:* Class A5B is Impaired, and the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are not entitled to vote to accept or reject the Plan.

## Class A6 - Anaheim Hotel Mezzanine Loan Deficiency Claims Against the Anaheim Hotel Debtors

(a)     *Classification:* Class A6 consists of all Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors.

(b)     *Treatment:* Holders of Allowed Class A6 Anaheim Hotel Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Anaheim Hotel Mezzanine Loan Deficiency Claims.

(c)     *Voting:* Class A6 is Impaired, and the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

## Class A7 - Intercompany Claims Against the Anaheim Hotel Debtors

(a)     *Classification*: Class A7 consists of all Intercompany Claims against the Anaheim Hotel Debtors.

(b)     *Treatment*: Holders of Allowed Class A7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*: Class A7 is Impaired, and Holders of Intercompany Claims against the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims against the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

## Class A8 - Intercompany Interests in the Anaheim Hotel Debtors

(a)     *Classification:* Class A8 consists of all Intercompany Interests in the Anaheim Hotel Debtors.

(b)     *Treatment:* Holders of Allowed Class A8 Intercompany Interests in the Anaheim Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in the Anaheim Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:* Class A8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

3.     The treatment provided to each Class relating to each of the Ontario Hotel Debtors for distribution purposes and voting rights are specified below:

## Class O1 - Other Priority Claims Against the Ontario Hotel Debtors

(a)     *Classification*: Class O1 consists of all Other Priority Claims against the Ontario Hotel Debtors.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Class O1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

(i)     be paid in full in Cash from the Ontario Hotel Cash Recovery Fund on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)     otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)     *Voting*: Class O1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class O2 - Other Secured Claims Against the Ontario Hotel Debtors

(a)     *Classification*: Class O2 consists of all Other Secured Claims against Ontario Hotel Debtors. For all purposes under the Ontario Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class O2A against the Ontario Hotel Owner, Class O2B against the Ontario Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Class O2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed

Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

(i)      be paid in full in Cash from the Ontario Hotel Cash Recovery Fund in an amount equal to such Allowed Class O2 Other Secured Claim by the Debtors on the Effective Date;

(ii)     receive the collateral securing any such Allowed Class O2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)    otherwise be treated in any other manner such that the Allowed Class O2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class O2 Other Secured Claim becomes an Allowed Class O2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class O2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*: Class O2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class O3 - Secured Ontario Hotel Mortgage Loan Claims

(a)    *Classification:*  Class O3 consists of all Secured Ontario Hotel Mortgage Loan Claims.

(b)    *Treatment:*  Except to the extent that the Holder of Allowed Class O3 Secured Ontario Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Ontario Hotel Mortgage Loan Claims, the Holder of Allowed Secured Ontario Hotel Mortgage Loan Claims shall, at the election of the Holder of Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, (i) receive a deed in lieu of foreclosure with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement in form and substance reasonably acceptable to both parties, or (ii) elect to proceed with state foreclosure proceedings with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement with the support of the Ontario Debtors, including but not limited to a receiver sale of the collateral or third-party assumption of the Ontario Hotel Mortgage Loan Agreement on terms acceptable to the Holder of the Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, notwithstanding any injunction provisions contained herein.

(c)    *Voting:*  Class O3 is Impaired, and the Holder of Secured Ontario Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class O4 - General Unsecured Claims Against the Ontario Hotel Debtors

(a)    *Classification:*  Class O4 consists of all General Unsecured Claims against the Ontario Hotel Debtors.

(b)    *Treatment:*  Except to the extent that a Holder of an Allowed Class O4 General Unsecured Claim against the Ontario Hotel Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Ontario Hotel Debtor, each Holder of an Allowed General Unsecured Claim against the Ontario Hotel

Debtor shall receive its Pro Rata share of the Ontario Hotel Cash Recovery Fund that remains after satisfaction of Claims in Class O1 and Class O2.

(c)     *Voting:*  Class O4 is Impaired, and each Holder of a General Unsecured Claim against the Ontario Hotel Debtors is entitled to vote to accept or reject the Plan.

**Class O5 - Ontario Hotel Mortgage Loan Deficiency Claims**

(a)     *Classification:*  Class O5 consists of all Ontario Hotel Mortgage Loan Deficiency Claims.

(b)     *Treatment:*  The Holder of Allowed Class O5 Ontario Hotel Mortgage Loan Deficiency Claims shall not receive any distribution on account of such Ontario Hotel Mortgage Loan Deficiency Claims, and Allowed Ontario Hotel Mortgage Loan Deficiency Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:*  Class O5 is Impaired, and the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

**Class O6 - Intercompany Claims Against Ontario Hotel Debtors**

(a)     *Classification*:  Class O6 consists of all Intercompany Claims against Ontario Hotel Debtors.

(b)     *Treatment*:  Holders of Allowed Class O6 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class O6 is Impaired by the Plan and Holders of Intercompany Claims against the Ontario Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

**Class O7 - Section 510(b) Claims Against Ontario Hotel Debtors**

(a)     *Classification*:  Class O7 consists of all Section 510(b) Claims against Ontario Hotel Debtors.

(b)     *Treatment*:  Holders of Allowed Class O7 Section 510(b) Claims against Ontario Hotel Debtors shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims against Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class O7 is Impaired, and Holders of Section 510(b) Claims against Ontario Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims against Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

**Class O8 - Intercompany Interests in Ontario Hotel Debtors**

(a)     *Classification:*  Class O8 consists of all Intercompany Interests in Ontario Hotel Debtors.

(b)     *Treatment:*  Holders of Allowed Class O8 Intercompany Interests in Ontario Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and

the Intercompany Interests in Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c) *Voting:* Class O8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

4. The treatment provided to each Class relating to each of the Remaining Debtors for distribution purposes and voting rights are specified below:

### Class R1 - Other Priority Claims Against the Remaining Debtors

(a) *Classification*: Class R1 consists of all Other Priority Claims against the Remaining Debtors.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Class R1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

(i) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c) *Voting*: Class R1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class R2 - Other Secured Claims Against the Remaining Debtors

(a) *Classification*: Class R2 consists of all Other Secured Claims against the Remaining Debtors. For all purposes under the Remaining Debtor Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class R2A against the Garden Grove Hotel Owner, Class R2B against the Garden Grove Hotel Owner and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Class R2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

39

(i) be paid in full in Cash in an amount equal to such Allowed Class R2 Other Secured Claim by the Debtors on the Effective Date;

(ii) receive the collateral securing any such Allowed Class R2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii) otherwise be treated in any other manner such that the Allowed Class R2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class R2 Other Secured Claim becomes an Allowed Class R2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class R2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*: Class R2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class R3A - Secured Garden Grove Hotel Mortgage Loan Claims[2]

(a) *Classification:* Class R3A consists of all Secured Garden Grove Hotel Mortgage Loan Claims.

(b) *Treatment:* Except to the extent that the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Garden Grove Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $32,416,576.45 and a cash principal paydown of $5,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Garden Grove Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Garden Grove Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the Garden Grove Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the

---

[2] With respect to Classes R3A, R3B, R3C, R3D and R3E, all payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall be credited, to the extent actually made by the Debtors, to the legal fees and disbursements of the LNR-Serviced Trusts' counsel and the monthly fees and disbursements of the LNR-Serviced Trusts' financial advisors and the Allowed Claim for interest at non-default rate, but not principal. In no event shall any payment be applied to or recharacterized to reduce the principal component of such Allowed Claims. The payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall not be subject to objection, avoidance, recovery, disgorgement, or turnover.

amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. The portion of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims for interest at the non-default rate shall be satisfied by the retention of the amounts, if any, paid with respect to interest at the non-default rate on such claim under the Cash Collateral Order. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Garden Grove Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:* Class R3A is Impaired, and the Holder of Class R3A Secured Garden Grove Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class R3B - Secured San Diego Hotel Mortgage Loan Claims

(a)     *Classification*: Class R3B consists of all Secured San Diego Hotel Mortgage Loan Claims.

(b)     *Treatment*: Except to the extent that the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Diego Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $40,168,769.26 and a cash principal paydown of $7,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Diego Hotel Mortgage Loan Agreement, and the LNR Liquidation Fee for the San Diego Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the San Diego Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Diego Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)      *Voting:* Class R3B is Impaired, and the Holder of Class R3B Secured San Diego Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class R3C - Secured Washington DC Hotel Mortgage Loan Claims**

(a)      *Classification:* Class R3C consists of all Secured Washington DC Hotel Mortgage Loan Claims.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims, the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Washington DC Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $20,054,752.20 and a cash principal paydown of $5,400,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Washington DC Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Washington DC Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the Washington DC Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Washington DC Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)      *Voting:* Class R3C is Impaired, and the Holder of Class R3C Secured Washington DC Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class R3D - Secured Tysons Corner Hotel Mortgage Loan Claims**

(a)      *Classification:* Class R3D consists of all Secured Tysons Corner Hotel Mortgage Loan Claims.

(b)      *Treatment:* Except to the extent that the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holders, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan

Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Tysons Corner Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $23,057,021.67 and a cash principal paydown of $2,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Tysons Corner Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Tysons Corner Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the Tysons Corner Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Tysons Corner Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:*  Class R3D is Impaired, and the Holder of Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

### Class R3E - Secured San Antonio Hotel Mortgage Loan Claims

(a)     *Classification:*  Class R3E consists of all Secured San Antonio Hotel Mortgage Loan Claims.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Antonio Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $18,462,695.40. and a cash principal paydown of $5,600,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Antonio Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the San Antonio Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining

<div align="center">43</div>

Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the San Antonio Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Antonio Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:*  Class R3E is Impaired, and the Holder of Class R3E Secured San Antonio Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class R4A - General Unsecured Claims Against the Remaining Debtors Other Than Grand Prix Holdings

(a)     *Classification:*  Class R4A consists of all General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R4A General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against a particular Remaining Debtor other than Grand Prix Holdings shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor other than Grand Prix Holdings through the Distribution Waterfall and (ii) other assets, if any, of such Remaining Debtor other than Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor other than Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor other than Grand Prix Holdings.

(c)     *Voting:*  Class R4A is Impaired, and the Holders of Allowed Class R4A General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings are entitled to vote to accept or reject the Plan.

## Class R4B - General Unsecured Claims Against Grand Prix Holdings

(a)     *Classification:*  Class R4B consists of all General Unsecured Claims against Grand Prix Holdings.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R4B General Unsecured Claim against Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against Grand Prix Holdings shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham

Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings; provided, however, that any recovery on account of the Ontario Hotel Mortgage Loan Guaranty Claim shall not exceed $1.5 million.

(c)     *Voting:*  Class R4B is Impaired, and the Holders of Allowed Class R4 General Unsecured Claims against Grand Prix Holdings are entitled to vote to accept or reject the Plan.

### Class R5 - Intercompany Claims Against the Remaining Debtors

(a)     *Classification*:  Class R5 consists of all Intercompany Claims against the Remaining Debtors.

(b)     *Treatment*:  Holders of Allowed Class R5 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class R5 is Impaired, and Holders of Intercompany Claims against the Remaining Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Remaining Debtors are not entitled to vote to accept or reject the Plan.

### Class R6 - Intercompany Interests in the Remaining Debtors

(a)     *Classification:*  Class R6 consists of all Intercompany Interests in the Remaining Debtors.

(b)     *Treatment:*  Holders of Allowed Class R6 Intercompany Interests in the Remaining Debtors shall have their Interests reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting:*  Class R6 is Unimpaired, and Holders of Intercompany Interests in the Remaining Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Remaining Debtors are not entitled to vote to accept or reject the Plan.

### Class R7 - Innkeepers USA LP Preferred D Interests

(a)     *Classification:*  Class R7 consists of all Innkeepers USA LP Preferred D Interests.

(b)     *Treatment:*  Holders of Allowed Innkeepers USA LP Preferred D Interests shall not receive any distribution on account of such Allowed Innkeepers USA LP Preferred D Interests, and Allowed Innkeepers USA LP Preferred D Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class R7 is Impaired, and Holders of Allowed Innkeepers USA LP Preferred D Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Innkeepers USA LP Preferred D Interests are not entitled to vote to accept or reject the Plan.

### Class R8 - Innkeepers USA Trust Preferred C Interests

(a)     *Classification:*  Class R8 consists of all Innkeepers USA Trust Preferred C Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Preferred C Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)     *Voting:* Class R8 is Impaired, and Holders of Allowed Class R8 Innkeepers USA Trust Preferred C Interests are entitled to vote to accept or reject the Plan.

### Class R9 - Innkeepers USA Trust Preferred A Interests

(a)     *Classification:* Class R9 consists of all Innkeepers USA Trust Preferred A Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Preferred A Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)     *Voting:* Class R9 is Impaired, and Holders of Allowed Class R9 Innkeepers USA Trust Preferred A Interests are entitled to vote to accept or reject the Plan.

### Class R10 - Innkeepers USA Trust Common Interests

(a)     *Classification:* Class R10 consists of all Innkeepers USA Trust Common Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Common Interests shall not receive any distribution on account of such Allowed Innkeepers USA Trust Common Interests, and Allowed Innkeepers USA Trust Common Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:* Class R10 is Impaired, and Holders of Allowed Class R10 Innkeepers USA Trust Common Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Innkeepers USA Trust Common Interests are not entitled to vote to accept or reject the Plan.

### Class R11 - Grand Prix Holdings Interests

(a)     *Classification:* Class R11 consists of all Grand Prix Holdings Interests.

(b)     *Treatment:* Except to the extent that a Holder of an Allowed Class R11 Grand Prix Holdings Interest and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Grand Prix Holdings Interest, each Holder of an Allowed Grand Prix Holdings Interest shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Allowed Grand Prix Holdings Interests, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings.

K&E 20090501

(c)    *Voting*:  Class R11 is Impaired, and Holders of Allowed Class R11 Grand Prix Holdings Interests are entitled to vote to accept or reject the Plan.

**Class R12 - Section 510(b) Claims Against the Remaining Debtors**

(a)    *Classification*:  Class R12 consists of all Section 510(b) Claims against the Remaining Debtors.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Class R12 Section 510(b) Claims against the Remaining Debtors and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Section 510(b) Claims against the Remaining Debtors, each Holder of an Allowed Section 510(b) Claims against a particular Remaining Debtor shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor through the Distribution Waterfall and (ii) other assets, if any, of such Remaining Debtor that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor.

(c)    *Voting*:  Class R12 is Impaired, and Holders of Allowed Class R12 Section 510(b) Claims against the Remaining Debtors are entitled to vote to accept or reject the Plan.

B.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

C.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement and Solicitation Procedures Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

D.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of each of the Joint Plans for the applicable Debtors pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *Substantive Consolidation*

The Plan does not contemplate substantive consolidation of any of the Debtors.

B.    *Restructuring Transactions and Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the

47

Plan.  With respect to the Fixed/Floating Plan, the Fixed/Floating Plan Sponsors hereby irrevocably agree to cause New HoldCo to fund or cause the Post-Effective Date Fixed/Floating Debtors to fund all amounts of cash necessary to make payments or distributions, including all Administrative Claims.  With respect to the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan, all amounts of Cash and securities necessary for the Debtors that are not the Fixed/Floating Debtors or the Post-Effective Date Debtors that are not the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from (a) Cash from operations, (b) the Chatham Hotel Sale Transaction.  Payments under this provision shall not reduce the distributions to Midland or Lehman under the Fixed/Floating Plan or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

C.      *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

D.      *Fixed/Floating Investment*

On the Effective Date of the Fixed/Floating Plan, and subject to the terms of the Commitment Letter, New HoldCo shall purchase, directly or indirectly, the Interests of the Post-Effective Date Fixed/Floating Debtors in return for the Investment.

If the Fixed/Floating Plan Sponsors determine in their sole and absolute discretion that New HoldCo and the Post-Effective Date Fixed/Floating Debtors shall have an alternate corporate or organizational structure, form or identity (including, without limitation, as a result of the rejection of the Fixed/Floating Plan by Class FF4), the structure of the Investment contemplated in this Article IV.D shall be changed to the extent necessary to effectuate any such alternate structure, form, or identity.

E.      *Chatham Hotel Sale Transaction*

On the Effective Date of the Remaining Debtor Plan, and in accordance with the Chatham APA and as applicable to the Remaining Debtors, the Debtors will consummate the Chatham Hotel Sale Transaction in accordance with the Chatham Hotel Sale Transaction Documents, provided, however, that notwithstanding anything contained in the Plan, the Plan Supplement, the Remaining Debtor Plan, the Disclosure Statement or any other document or agreement relating to the foregoing documents, the consideration paid by Chatham to consummate the Chatham Hotel Sale Transaction in accordance with the Chatham APA shall not exceed Chatham Hotel Sale Transaction Purchase Consideration, provided that Chatham shall in addition remain responsible for any fees and expenses Chatham has agreed to pay pursuant to the Chatham APA.

F.      *Anaheim Hotel Commitment Letter*

Unless otherwise agreed by the parties thereto, the restructuring of the Anaheim Hotel Debtors shall be done in accordance with the terms of the Anaheim Hotel Commitment Letter, except as modified herein in Article III.B.2, Treatment of Class A1.

G.      *New Fixed Rate Pool Mortgage Loan Limited Guarantys*

On the Effective Date of the Fixed/Floating Plan and in connection with the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall be entered into by the parties contemplated in the New HoldCo/Midland Commitment and the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall otherwise be consistent with the terms of the New HoldCo/Midland Commitment.

*H. Special Servicer Payment and Special Servicer Release Payment*

Contemporaneously with the occurrence of the Effective Date of the Fixed/Floating Plan, and as a condition thereto, the Fixed/Floating Plan Sponsors shall direct New HoldCo to make the Special Servicer Payment and the Special Servicer Release Payment.

*I. Issuance of Interests in Post-Effective Date Fixed/Floating Debtors*

The issuance of the Interests by each of the Post-Effective Date Fixed/Floating Debtors is authorized without the need for any further action and without any further action by the Holders of Claims or Interests or any further notice to or action, order, or approval of the Bankruptcy Court.

On the Effective Date of the Fixed/Floating Plan, or as soon as reasonably practicable thereafter, the Interests in the Post-Effective Date Fixed/Floating Debtors (or such of them as may be designated by New HoldCo) shall be distributed to New HoldCo in accordance with the Fixed/Floating Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

All of the Interests in the Post-Effective Date Fixed/Floating Debtors issued pursuant to the Fixed/Floating Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI shall be governed by the terms and conditions set forth in the Fixed/Floating Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

*J. Management Compensation*

As part of their bid, the Fixed/Floating Plan Sponsors agreed to fund certain employee-related emergence costs related to the Fixed/Floating Plan in an amount equal to $3.5 million, which amount shall be distributed on the Effective Date of the Fixed/Floating Plan to certain members of the Debtors' management and employees at the direction of, and in the sole and absolute discretion of, the current board of Innkeepers USA Trust.

In addition, the Debtors also may implement a compensation program for certain members of the Debtors' management and employees related to the sale of the assets of the Remaining Debtors, which program will be in an amount of approximately $500,000. To the extent implemented, the appropriate details regarding this program will be set forth in the Plan Supplement.

*K. Listing of New HoldCo Interests; Reporting Obligations*

None of the New HoldCo Interests will be listed on a national securities exchange as of the Effective Date of the Fixed/Floating Plan. New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust will not be reporting companies under the Securities Exchange Act, and New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust shall not be required to file reports with the Securities and Exchange Commission or any other entity or party and shall not be required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date; provided that notwithstanding anything contained herein, each of the Post-Effective Date Debtors shall provide a calculation of their disbursements to the United States Trustee on a quarterly basis until the entry of a final decree pursuant to Bankruptcy Rule 3022 to close the chapter 11 case of such Post-Effective Date Debtor.

*L. Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles,

and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Post-Effective Date Debtors and their successors and assigns.

M.      *LP Bank Account*

On the Effective Date of the Remaining Debtor Plan, the Cash in the LP Bank Account shall be deemed to be unencumbered, not subject to a security interest of any lender.

N.      *Vesting of Assets in the Post-Effective Date Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate of the Debtors, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the applicable Post-Effective Date Debtors free and clear of all Liens, Claims, charges, or other encumbrances.  The Intercompany Interests of Innkeepers USA Limited Partnership in non-Debtor KPA Raleigh, LLC shall vest in Post-Effective Date Innkeepers USA Limited Partnership.  The Intercompany Interests of KPA Leaseco Holding, Inc. in non-Debtor KPA Raleigh Leaseco, LLC shall vest in Post-Effective Date KPA Leaseco Holding, Inc.  On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

O.      *Rights and Obligations Under Troy Settlement Agreement*

All of the Debtors' rights and obligations under that certain Settlement Agreement and Release Relating to the Detroit/Troy Central Residence Inn by Marriott, dated August 24, 2010, by and between certain of the Debtors and Marriott International, Inc., as approved by the Bankruptcy Court pursuant to the So-Ordered Stipulation Between Innkeepers USA Trust and Marriott International, Inc. and Order Approving Settlement of Marriott's Motion for Limited Modification of the Automatic Stay and Debtors' Motion to Assume the Troy Central Franchise Agreement, entered by the Bankruptcy Court on August 31, 2010 [Docket No. 357], shall be assumed by the Debtors that are signatories thereto.

P.      *Cancellation of Securities and Agreements*

On the Effective Date, except to the extent otherwise provided, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be canceled and the obligations of the Debtors or the Post-Effective Date Debtors and the non-Debtor affiliates thereunder or in any way related thereto shall be discharged.

Q.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including:  (1) selection of the directors, members, trustees, officers, and managers for New HoldCo, including the appointment of the Post-Effective Date Board; (2) the issuance and distribution of the Interests in the Post-Effective Date Fixed/Floating Debtors, (3) the execution and approval for the Post-Effective Date Fixed/Floating Debtors of the New Fixed/Floating By-Laws and New Fixed/Floating Organizational Documents consistent with the terms of the Commitment Letter, (4) the execution and delivery of the New Fixed Rate Pool Mortgage Loan Agreement, the New Fixed Rate Pool Mortgage Notes, and the New Fixed Rate Pool Mortgage Loan Limited Guarantys consistent with the terms of the New HoldCo/Midland Commitment; (5) assumption of the LNR-Serviced Loans consistent with the terms of the LNR Commitment and the Stipulation; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, trustees, officers, or managers of the Debtors or the Post-Effective Date Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.  On or (as applicable) prior to the Effective Date, the appropriate

50

officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.Q shall be effective notwithstanding any requirements under non-bankruptcy law.

R.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Post-Effective Date Debtors and their directors, members, trustees, officers, and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

S.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, including the recording of any mortgages or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

T.      D&O Liability Insurance Policies

Notwithstanding anything herein to the contrary, on the Effective Date of the Remaining Debtor Plan, the Remaining Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtors rights to seek amendment to such D&O Liability Insurance Policies. On the Effective Date of the Fixed/Floating Plan, New HoldCo will purchase new director & officer liability insurance policies as the Fixed/Floating Plan Sponsors determine is necessary. Entry of the Confirmation Order for the Remaining Debtor Plan shall constitute the Bankruptcy Court's approval of the Remaining Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Remaining Debtors under the Remaining Debtor Plan as to which no Proof of Claim need be Filed.

U.      D&O Tail Insurance Policies

To the extent not already purchased, on the Confirmation Date of the Fixed/Floating Plan, the Debtors are authorized to purchase tail coverage under a directors and officers' liability insurance policy with a term of six years for the current and former officers, directors, trustees, and members containing the same coverage that exists under the Debtors' current D&O Liability Insurance Policies (*i.e.*, a "tail policy"). After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, trustees, and members of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, trustees, and/or members remain in such positions after the Effective Date.

*V.*     *New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws*

On or immediately prior to the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors will file the New Fixed/Floating Organizational Documents, which shall include provisions in accordance with the Commitment Letter, with the applicable Secretaries of State and/or other applicable authorities in their respective states of organization as required by and in accordance with applicable laws. In addition, the provisions of the New Fixed/Floating By-Laws shall include provisions in accordance with the Commitment Letter. After the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors may amend and restate the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws and other constituent documents as permitted by the laws of applicable states of organization and the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws.

*W.*     *Board Representation*

1.     Fixed/Floating Debtors

New HoldCo shall be managed by the managing member of New HoldCo in accordance with the terms and conditions set forth in the New HoldCo limited liability company agreement. To the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will identify the managing member of New HoldCo and the members of the board of directors, members, and trustees of the New HoldCo subsidiaries identified as of the date of the filing thereof.

2.     Other Debtors

Post-Effective Date Innkeepers USA Trust and Post-Effective Date Grand Prix Holdings, LLC shall be managed by the Post-Effective Date Board. To the extent known and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will list the members of the Post-Effective Date Board and the members of the board of directors, members, and trustees of the subsidiaries of Post-Effective Date Innkeepers USA Trust identified as of the date of the filing thereof.

*X.*     *Indemnification Provisions*

Notwithstanding anything herein to the contrary, pursuant to section 365 of the Bankruptcy Code or otherwise, and as of the Effective Date, the Debtors shall assume and assign to the Post-Effective Date Debtors all of the Indemnifications Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Indemnification Provisions. Notwithstanding anything to the contrary contained herein, (i) Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed and assigned by the foregoing assumption and assignment of the Indemnification Provisions, (ii) each such obligation shall be deemed and treated as an Executory Contract that has been assumed and assigned by the Debtors under the Plan as to which no Proof of Claim need be Filed, and (iii) as of the Effective Date, the Indemnifications Provisions shall be binding and enforceable against the Post-Effective Date Debtors.

*Y.*     *Liquidation Trust*

1.     Formation of the Liquidation Trust

On the Effective Date, the Liquidation Trust will be formed to oversee the Wind Down, and will fund the Wind Down using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration and the LP Bank Account, and shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Remaining Debtors, Post-Effective Date Ontario Hotel Debtors, and Post-Effective Date Anaheim Mezzanine Debtor in accordance with the Plan, including the authority to retain attorneys and consultants.

52

2. Trustee

      AP Services, LLC will serve as the Trustee for the Liquidation Trust.

3. Purpose of the Liquidation Trust

      The Liquidation Trust will be established for the primary purpose of liquidating the Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Upon the transfer by the Trust Debtors of the Trust Assets, the Trust Debtors will have no reversionary or further interest in or with respect to the Trust Assets or the Liquidation Trust. For all federal income tax purposes, the Beneficiaries of the Liquidation Trust will be treated as grantors and owners thereof and it is intended that the Liquidation Trust be classified as a liquidating trust under Section 301.7701 4 of the Treasury Regulations and that such trust is owned by the Beneficiaries of the Liquidation Trust. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries of the Liquidation Trust be treated as if they had received a distribution of an interest in the Trust Assets and then contributed such interests to the Liquidation Trust. Accordingly, the Liquidation Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Trust Assets, make timely distributions to the Beneficiaries of the Liquidation Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidation Trust will not be deemed a successor in interest of the Remaining Debtors, Ontario Hotel Debtors, or Anaheim Mezzanine Debtor for any purpose other than as specifically set forth herein. The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries of the Liquidation Trust treated as grantors and owners of the trust.

4. Transfer of Assets to the Liquidation Trust; Trust Assets Available for Distribution

      The Trustee will establish the Liquidation Trust on behalf of its Beneficiaries, with the Beneficiaries of the Liquidation Trust to be treated as the grantors and deemed owners of the Trust Assets. On the Effective Date, the Trust Debtors will transfer to the Liquidation Trust the Trust Assets for the benefit of the Beneficiaries of the Liquidation Trust in accordance with the provision herein, notwithstanding any prohibition of assignability under non-bankruptcy law. The Liquidation Trust will agree to accept and hold the Trust Assets in the Liquidation Trust for the benefit of the Beneficiaries of the Liquidation Trust, subject to the terms of the Plan.

      The Remaining Debtors, the Anaheim Mezzanine Debtor, the Ontario Hotel Debtors, the Trustee, and the Beneficiaries shall each value the Trust Assets consistently for federal and other income tax purposes. After the Effective Date, the Trustee, in reliance upon such professionals as the Trustee may retain, shall make a good faith valuation of the Trust Assets no later than 180 days following the Effective Date. Such valuation shall be made available from time to time, to the extent necessary or appropriate as reasonably determined by the Trustee in reliance on its professionals (which may include posting such valuation on a website established by the Trust) and used consistently by all parties (including, without limitation, the Remaining Debtors, the Anaheim Mezzanine Debtor, the Ontario Hotel Debtors, the Trustee, and the Beneficiaries) for federal and other income tax purposes.

      The Trust Assets provided by the Remaining Debtors, the Anaheim Mezzanine Debtor, and the Ontario Hotel Debtors, respectively, shall be distributable, in accordance with the Remaining Debtor Plan, the Anaheim Hotel Plan, and the Ontario Hotel Plan, as applicable, only to Beneficiaries holding Allowed Claims against the Remaining Debtors, the Anaheim Mezzanine Debtor, or the Ontario Hotel Debtors, respectively. For example, Trust Assets provided by the Anaheim Mezzanine Debtor shall be distributable, in accordance with the Plan, only to Beneficiaries holding Allowed Claims against the Anaheim Mezzanine Debtor, and not to Beneficiaries holding Allowed Claims solely against the other Trust Debtors. In addition, for the avoidance of doubt, Beneficiaries holding Allowed Claims against multiple Trust Debtors shall receive distributions, in accordance with the applicable Joint Plan, from the Trust Assets provided from each of the Trust Debtors against whom such Beneficiary holds such Allowed Claims in proportion with the amount of such Allowed Claims against each of the Trust Debtors. The Trustee shall take all necessary steps to ensure that Trust Assets are distributed pursuant to the foregoing.

K&E 20090501

5. Distribution; Withholding

The Liquidation Trust will make distributions to the Beneficiaries in accordance with Article IV.Y.4 above. The Liquidation Trust may withhold from amounts distributable to any person or Entity any and all amounts, determined in the sole discretion of the Trustee for the Liquidation Trust, to be required by any law, regulation, rule, ruling, directive, or other governmental requirement.

6. Insurance

The Liquidation Trust will maintain customary insurance coverage, if appropriate and available, for the protection of Persons serving as administrators and overseers of the Liquidation Trust on and after the Effective Date.

7. Liquidation Trust Implementation

On the Effective Date, the Liquidation Trust will be established and become effective for the benefit of the Beneficiaries of the Liquidation Trust entitled to distributions from the Liquidation Trust. The Liquidation Trust is intended to be and remain as a grantor trust, with the Beneficiaries of the Liquidation Trust as the grantors and owners thereof for federal income tax purposes.

8. Settlement of Disputed Claims

The Trustee shall have authority to settle Disputed Claims against the Trust Debtors without further approval of the Bankruptcy Court; provided, however, that settlement of Disputed Claims against the Remaining Debtors, Ontario Hotel Debtors, or Anaheim Mezzanine Debtor pursuant to which the Liquidation Trust will pay $50,000 or more shall require the approval of the Bankruptcy Court.

9. Termination of Liquidation Trust

The Liquidation Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; provided, however, that, on or later than the date that is six months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidation Trust for a finite period if such an extension is necessary to liquidate the Trust Assets. Notwithstanding the foregoing, multiple extensions may be obtained so long as (1) Bankruptcy Court approval is obtained no more than six months prior to the expiration of each extended term and (2) the Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a grantor trust for federal income tax purposes.

10. Termination of the Trustee for the Liquidation Trust

The duties, responsibilities, and powers of the Trustee will terminate upon termination of the Liquidation Trust.

11. Exculpation; Indemnification

The Trustee, the Liquidation Trust, the professionals or consultants of the Liquidation Trust, and their representatives and agents will be exculpated and indemnified as provided herein. Nothing contained in the Plan or the Confirmation Order shall be deemed to be an assumption by the Trustee of any of the liabilities, obligations, or duties of the Trust Debtors or Beneficiaries and shall not be deemed to be or contain a covenant or agreement by the Trustee to assume or accept any such liability, obligation, or duty. Any successor Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Trustee hereunder, and any statement or representation made as to the assets comprising the Trust Assets or as to any other fact bearing upon the prior administration of the Liquidation Trust, so long as it has a good faith basis to do so. The Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement, or representation if it is later proved to be incomplete, inaccurate, or untrue. The Trustee or successor Trustee shall not be liable for any act or omission of any predecessor

54

Trustee, nor have a duty to enforce any claims against any predecessor Trustee on account of any such act or omission, unless directed to do so by the Trustee.

The Trustee and its agents, consultants, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives, and principals shall be indemnified and held harmless by the Liquidation Trust, to the fullest extent permitted by law, solely from the Trust Assets, for any losses, claims, damages, liabilities, and expenses, including, without limitation, reasonable attorneys' fees, disbursements, and related expenses which such indemnified parties may incur or to which such indemnified parties may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against one or more of such indemnified parties on account of the acts or omissions of the Trustee solely in its capacity as such; provided, however, that the Liquidation Trust shall not be liable to indemnify any such indemnified party for any act or omission constituting gross negligence, or willful misconduct. Notwithstanding any provision herein to the contrary, such indemnified parties shall be entitled to obtain advances from the Liquidation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of any such indemnified party in its capacity as such; provided, however, that the parties indemnified pursuant to this Article IV.Y.11 receiving such advances shall repay the amounts so advanced to the Liquidation Trust upon the entry of a Final Order finding that such indemnified parties were not entitled to any indemnity under the provisions of this Article IV.Y.11.

Z.    *Disbursing Agent for the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee*

On the Effective Date, AP Services, LLC shall be appointed the Disbursing Agent for the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee.

AA.    *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article III.B with respect to Class FF5, Article VIII.C, Article VIII.D, Article VIII.E, Article VIII.F, Article VIII.G, and Article VIII.H), each of the Post-Effective Date Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Post-Effective Date Debtors have released any Entity on or prior to the Effective Date (pursuant to any of the release provisions set forth in Article VIII, Article III.B with respect to Class FF5, or otherwise), the Debtors or the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Post-Effective Date Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

BB.    *Ad Hoc Committee Agreement*

The following is an integrated agreement among the Debtors and the Ad Hoc Committee (the "**Ad Hoc Committee Agreement**") under which, upon its approval in its entirety, the Ad Hoc Committee, among other things, waives any right to challenge the allowability of the Innkeepers USA Trust Preferred A Interests (held by one

of the Debtors or otherwise), including any right to object to or seek to subordinate the Innkeepers USA Trust Preferred A Interests, in exchange for the consideration being provided to the Ad Hoc Committee herein.

The distribution provisions under the Remaining Debtor Plan under which, after payment of certain allowed claims, the Innkeepers USA Trust Preferred C Interests share in the $7.4 million of cash, the proceeds of the Chatham Hotel Sale Transaction, and other available assets, shall not be changed adversely to the Innkeepers USA Trust Preferred C Interests absent the consent of the Ad Hoc Committee.

The Ad Hoc Committee will support the Plan and all its provisions and waive all objections to the Plan, provided that the Ad Hoc Committee Agreement is approved in its entirety. Upon any denial of the whole or any part of the Ad Hoc Committee Agreement (the "**Denial Date**"), the Debtors shall withdraw their request for Confirmation of the Remaining Debtor Plan (the "**Initial Confirmation Hearing**") and shall not request Confirmation of the Remaining Debtor Plan again for 30 days (the "**Subsequent Confirmation Hearing**"); provided, the parties will be required to serve any discovery requests within 10 days after the Denial Date, the parties will work in good faith to respond promptly to document requests and deposition notices, and the Court will schedule the Subsequent Confirmation Hearing, without requiring resolicitation of the non-materially modified Remaining Debtor Plan, as close as practicable to (but no earlier than) 31 days after the Denial Date; provided, further, the Debtors shall request approval of the Chatham Hotel Sale Transaction immediately following the Denial Date (in accordance with the terms and conditions set forth in the Chatham APA (as defined herein)), without regard to the scheduling of the Subsequent Confirmation Hearing, and the Ad Hoc Committee will support approval of the Chatham Hotel Sale Transaction.

The Remaining Debtor Plan (and only the Remaining Debtor Plan) shall provide that, upon approval of the Ad Hoc Committee Agreement:  (i) Holders of Innkeepers USA Trust Preferred C Interests and the Ad Hoc Committee shall be deemed to be Fixed/Floating Releasing Parties, Anaheim Hotel Releasing Parties, and Ontario Hotel Releasing Parties; and (ii) the Ad Hoc Committee shall be a Remaining Debtor Releasing Party.
The Ad Hoc Committee will draft a letter in support of the Plan that will be distributed with the Disclosure Statement and other solicitation materials.

Without limiting the scope of the release, exculpation, and injunction provisions of the Plan, the Ad Hoc Committee waives any right in, and will not assert a claim against or interest in, the recovery distributable to Holders of Innkeepers USA Trust Preferred A Interests or any party in interest asserting rights with respect to such recovery, provided that the Ad Hoc Committee Agreement is approved in its entirety.  The Innkeepers USA Trust Preferred A Interests shall be treated as pari passu with the Innkeepers USA Trust Preferred C Interests.

The Ad Hoc Committee and its advisors will receive the Ad Hoc Committee Administrative Claim to be paid in the amount of $3.5 million by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) for its role in the Chapter 11 Cases.  The amount will be paid on the Effective Date of the Remaining Debtor Plan.  The claim for payment shall be deemed an Allowed administrative priority Claim.

The Debtors will support approval of the Ad Hoc Committee Agreement in its entirety.

The Debtors shall enter into exclusive discussions for 30 days with the Ad Hoc Committee regarding the Ad Hoc Committee becoming a stalking horse bidder for the Raleigh JV interest, subject to Bankruptcy Court approval.

To the extent there are any inconsistencies between the terms of the Ad Hoc Committee Agreement as set forth in this Article IV.AA and elsewhere, the terms of the Ad Hoc Committee Agreement as set forth in this Article IV.AA shall govern.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Franchise Agreements*

On the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors will assume the franchise agreements set forth in the Plan Supplement with respect to the assets of the Fixed/Floating Debtors.  On the Remaining Debtor Plan Effective Date, the Debtors that are party to the Chatham APA will either (i) assume and assign to Chatham (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the assets of the Debtors that are party to the Chatham APA or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and Chatham (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims.  On the Anaheim Plan Effective Date, the Anaheim Hotel Debtors will either (i) assume and assign to New Anaheim HoldCo (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the Anaheim Hotel Debtors or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and New Anaheim HoldCo (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims.

B.      *Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan, the Executory Contracts or Unexpired Leases of a Debtor that are not assumed or rejected pursuant to an Order prior to the Effective Date applicable to such Debtor shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts or Unexpired Leases:  (1) identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement; (2) that are the subject of a motion to assume and assign or reject pending on the Effective Date applicable to such Debtor (in which case such assumption and assignment or rejection and the effective date thereof shall remain subject to a Final Order); or (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date applicable to such Debtor.  Entry of the Confirmation Order shall constitute an approval of the assumptions and assignment or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, including the assumption and assignment of the Executory Contracts and Unexpired Leases identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement and the rejection of the Executory Contracts and Unexpired Leases identified on the list of rejected Executory Contracts and Unexpired Leases in the Plan Supplement, all pursuant to sections 365 and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions and assignments or rejections of a Debtor's Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date applicable to such Debtor.  Notwithstanding anything to the contrary in the Plan, the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the lists of Executory Contracts or Unexpired Leases applicable to the Post-Effective Date Debtors identified in this Article V and in the Plan Supplement at any time through and including the later of 30 days after the Effective Date (or such later date as provided in Article V.C in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).

C.      *Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases*

Any Executory Contracts or Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the satisfaction of the Cure Obligations or by an agreed-upon waiver of the Cure Obligations on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Post-Effective Date Debtors and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or related Cure Obligations must be Filed, served, and actually received by the Debtors by 30 days after the Effective Date of the Joint Plan applicable to the Debtor that is the counterparty to the Executory Contract or Unexpired Lease.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to

the proposed assumption and assignment of such Executory Contract or Unexpired Lease or such Cure Obligations will be deemed to have assented to such matters and shall be forever barred, estopped, and enjoined from asserting such objection against the Debtors.

In the event of a dispute regarding: (1) the Cure Obligations; (2) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed and assigned; or (3) any other matter pertaining to assumption and/or assignment, then the applicable Cure Obligations shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding Cure Obligations without any further notice to any party or any action, order, or approval of the Bankruptcy Court. The Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to reject, or nullify the assumption and assignment of, any Executory Contract or Unexpired Lease no later than 30 days after a Final Order determining the Cure Obligations, any request for adequate assurance of future performance required to assume and assign such Executory Contract or Unexpired Lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment. Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## D.     Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) 30 days after the Effective Date of the Joint Plan applicable to the Debtor whom the Claim is against.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan, or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.J, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

## E.     Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Post-Effective Date Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

58

*F.*     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*G.*     *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption and assignment or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

# ARTICLE VI.
# PROVISIONS GOVERNING DISTRIBUTIONS

*A.*     *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Disbursing Agent or the Liquidation Trust, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided herein, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any postpetition interest on such Claim or Interest payable in accordance with the Plan.

*B.*     *Distributions to Holders of Claims Against and Interests in the Trust Debtors*

All distributions that are to be made to the Holders of Claims Against and Interests in the Trust Debtors shall be made pursuant to the terms of Article IV.Y hereof.

C.      *Distributions to Holders of Claims Against and Interests in the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee; Disbursing Agent*

All distributions under the Plan that are to be made on the Effective Date to the Holders of Claims Against or Interests in the Fixed/Floating Debtors, the Anaheim Hotel Debtor, and the Anaheim Hotel Lessee shall be made by the Fixed/Floating Debtors, the Anaheim Hotel Debtor, and the Anaheim Hotel Lessee, as applicable, as Disbursing Agent. All other distributions to Holders of Claims against and Interests in the Fixed/Floating Debtors, the Anaheim Hotel Debtor, and the Anaheim Hotel Lessee under the Plan shall be made after the Effective Date by the Disbursing Agent or such other Entity designated by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration, without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Fixed/Floating Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

3.      Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), the Disbursing Agent or the Trustee, as applicable, shall deposit in the Disputed Claims Reserve the amount of Cash that would have been distributed to the Holders of all Disputed Claims or Interests against the Remaining Debtors (other than Grand Prix Holdings) and the Anaheim Hotel Debtors as if such Disputed Claims or Interests had been Allowed on the Effective Date, with the amount of such Allowed Claims or Interests to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the

Disputed Claim filed with the Bankruptcy Court, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) amount otherwise agreed by the relevant Debtor and the Holder of such Disputed Claim or Interest for reserve purposes.  To the extent the amount of Cash deposited in the Disputed Claims Reserve on account of Disputed Claims or Interests against the Anaheim Hotel Debtors exceeds the amount of Disputed Claims or Interests against the Anaheim Hotel Debtors (as of the funding of the Disputed Claims Reserve) that later become Allowed, the excess shall be returned to LCPI/SASCO.

F.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.     Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent or the Trustee, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Disbursing Agent or the Trustee, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

The Five Mile DIP Agent shall be deemed to be the Holder of all Five Mile DIP Claims for purposes of distributions to be made hereunder, and the Disbursing Agent or the Trustee, as applicable, shall make all distributions on account of such Five Mile DIP Claims to or on behalf of the Five Mile DIP Agent. The Five Mile DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Five Mile DIP Claims. The Five Mile DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Five Mile DIP Claims; provided that the Five Mile DIP Agent shall retain all rights as administrative agent under the Five Mile DIP Agreement in connection with delivery of distributions to Five Mile DIP Lenders; provided further that the Debtors' obligations to make distributions in accordance with Article II.C shall be deemed satisfied upon delivery of distributions to the Five Mile DIP Agent.

The Lehman DIP Lender shall be deemed to be the Holder of all Lehman DIP Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent or the Trustee, as applicable, shall make all distributions on account of such Lehman DIP Claims to or on behalf of the Lehman DIP Lender. The Lehman DIP Lender shall hold or direct such distributions for the benefit of the Holders of Allowed Lehman DIP Claims.  The Lehman DIP Lender shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Lehman DIP Claims; provided that the Debtors' obligations to make distributions in accordance with Article II.D shall be deemed satisfied upon delivery of distributions to the Lehman DIP Lender.

Midland shall be deemed to be the Holder of all Fixed Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Fixed Rate Pool Mortgage Loan Claims to or on behalf of Midland; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Midland.

LNR shall be deemed to be the Holder of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, and the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Trustee shall make all distributions on account of such Allowed Claims to or as directed by LNR.  LNR shall hold or direct such distributions for the benefit of the LNR-Serviced Trusts.  LNR shall arrange to deliver such distributions to or on behalf of the LNR-Serviced Trusts; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to or as directed by LNR.

Lehman shall be deemed to be the Holder of all Floating Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such

K&E 20090501

Floating Rate Pool Mortgage Loan Claims to or on behalf of Lehman. Lehman shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mortgage Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Lehman.

SASCO shall be deemed to be the Holder of all Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims for purposes of distributions to be made hereunder, if any. The Disbursing Agent shall make all distributions on account of such Floating Rate Pool Mezzanine Loan Claims and the Trustee shall make all distributions on account of the Anaheim Hotel Mezzanine Loan Claims to or on behalf of SASCO. SASCO shall hold or direct such distributions for the benefit of the Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims. SASCO shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to SASCO.

2.   Minimum; De Minimis Distributions

No Cash payment of less than $50.00, in the reasonable discretion of the Disbursing Agent or the Trustee, as applicable, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

3.   Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent or the Trustee, as applicable, has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the applicable Post-Effective Date Fixed/Floating Debtor or the Liquidation Trust, as applicable, and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.   Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent or the Trustee, as applicable, by check or by wire transfer.

G.   *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Disbursing Agent or the Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent or the Trustee, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

K&E 20090501

*H.* *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

The Debtors on or prior to the Effective Date or the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Anaheim Hotel Owner, the Post-Effective Date Anaheim Hotel Lessee, or the Trustee, as applicable, after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Post-Effective Date Debtors, or the Trustee on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Anaheim Hotel Owner, the Post-Effective Date Anaheim Hotel Lessee, or the Trustee, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Anaheim Hotel Owner, the Post-Effective Date Anaheim Hotel Lessee, or the Trustee, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Post-Effective Date Debtors, the Trustee, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

*A.* *Resolution of Disputed Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, and Anaheim Hotel Lessee*

1. Allowance of Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee

On or after the Effective Date, the Disbursing Agent shall have and shall retain any and all rights and defenses that the applicable Fixed/Floating Debtor, Anaheim Hotel Owner, or Anaheim Hotel Lessee had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2. Prosecution of Objections to Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee

The Disbursing Agent shall have the exclusive authority to File objections to Claims against the Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims against the Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Disbursing Agent may settle or compromise any Disputed Claim against the Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee without any further notice to or action, order, or approval of the Bankruptcy Court. From and after the Effective Date, the Disbursing Agent shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Disbursing Agent shall consult with New Anaheim HoldCo with respect to the filing, withdrawal, litigation, estimation, settlement, or compromise of any objections to any Claims against the Anaheim Hotel Owner or the Anaheim Hotel Lessee.

3. Time to File Objections to Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee

Any objections to Claims against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee shall be filed on or before the Claims Objection Bar Date.

4. Estimation of Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee s

The Disbursing Agent may, at any time, and shall have the exclusive authority to, request that the Bankruptcy Court estimate (a) any Disputed Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee pursuant to applicable law and (b) any contingent or unliquidated Claim against the Fixed/Floating Debtors pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or the Post-Effective Date Fixed/Floating Debtors, Post-Effective Date Anaheim Hotel Owner, or Post-Effective Date Anaheim Hotel Lessee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, contingent Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or unliquidated Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, including during the litigation concerning any objection to any Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, contingent Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or unliquidated Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Disbursing Agent may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Disbursing Agent may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or

64

Anaheim Hotel Lessee may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5. Expungement or Adjustment to Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee Without Objection

Any Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Notice and Claims Agent at the direction of the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or the Post-Effective Date Fixed/Floating Debtors, Post-Effective Date Anaheim Hotel Owner, or Post-Effective Date Anaheim Hotel Lessee, as applicable, and any Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been amended may be adjusted thereon by the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or the Post-Effective Date Fixed/Floating Debtors, Post-Effective Date Anaheim Hotel Owner, or Post-Effective Date Anaheim Hotel Lessee, in all cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

B. *Resolution of Claims Against the Trust Debtors*

1. Allowance of Claims Against the Trust Debtors

On or after the Effective Date, the Trustee shall have and shall retain any and all rights and defenses that the applicable Trust Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2. Prosecution of Objections to Claims Against the Trust Debtors

The Trustee shall have the exclusive authority to File objections to Claims against the Trust Debtors, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims against the Trust Debtors, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Trustee may settle or compromise any Disputed Claim against the Trust Debtors without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that settlement of Disputed Claims against the Remaining Debtors pursuant to which the Liquidation Trust will pay $50,000 or more shall require the approval of the Bankruptcy Court. From and after the Effective Date, the Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises of Claims against the Trust Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Time to File Objections to Claims Against the Trust Debtors

Any objections to Claims against the Trust Debtors shall be filed on or before the Claims Objection Bar Date.

4. Estimation of Claims Against the Trust Debtors

The Trustee may, at any time, and shall have the exclusive authority to, request that the Bankruptcy Court estimate (a) any Disputed Claim against the Trust Debtors pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Trust Debtors or the Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim against the Trust Debtors, contingent Claim against the Trust Debtors or unliquidated Claim against the Trust Debtors, including during the litigation concerning any objection to any Claim against the Trust Debtors or during the pendency of any appeal relating to any such objection; provided, however,

there shall be no authority to request or obtain the estimation of any guaranty claim against Grand Prix Holdings LLC. Notwithstanding any provision otherwise in the Plan, a Claim against the Trust Debtors that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim against the Trust Debtors, contingent Claim against the Trust Debtors, or unliquidated Claim against the Trust Debtors, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Trustee may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim against the Trust Debtors that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5.  Expungement or Adjustment to Claims Against the Trust Debtors Without Objection

Any Claim against the Trust Debtors that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Notice and Claims Agent at the direction of the Trust Debtors or the Trustee, as applicable, and any Claim that has been amended may be adjusted thereon by the Trust Debtors or the Trustee, in all cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

C.  *Disallowance of Claims*

All Claims against or Interests in the Debtors held by any Entity from which property is sought by the Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS PROVIDED FOR UNDER THE PLAN OR OTHERWISE AGREED TO BY THE DEBTORS, THE POST-EFFECTIVE DATE FIXED/FLOATING DEBTORS, OR THE TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE (THAT DO NOT AMEND TIMELY FILED CLAIMS) SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE OF THE PLAN OF THE DEBTOR AGAINST WHOM SUCH CLAIM IS ASSERTED WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

D.  *Amendments to Claims*

On or after the Effective Date, except as provided in Article II.A, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Disbursing Agent, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan or relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Post-Effective Date Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities; provided that, with respect to the C6 and C7 Trusts and the holders of certificates in the C6 and C7 Trusts, in their capacity as such, the Plan does not compromise or settle the Claims, interests, and controversies, if any, of the C6 and C7 Trusts or the holders of certificates in the C6 and C7 Trusts against Midland, the C6 and C7 Trusts, and any holder of certificates in the C6 and C7 Trusts, in its capacity as such, and the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, or professionals, whether arising under the applicable pooling and servicing agreement, side letter, co-lender agreement, or related documents; provided, further, that, with respect to SASCO or LCPI, the Plan does not compromise or settle any Claims, interests, and controversies of SASCO or LCPI against TriMont or any of its advisors arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein to the contrary, and as provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

C.      *Midland Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS (TO THE EXTENT SET FORTH HEREIN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, MIDLAND, AS SPECIAL SERVICER AND ON BEHALF OF THE C6 AND C7 TRUSTS, (I) DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO APOLLO (AND APOLLO SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY MIDLAND) AND ITS RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER

67

WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE APOLLO GUARANTY; AND (II) IF AN ACTION REMAINS PENDING IN THE STATE COURTS OF NEW YORK OR ELSEWHERE, MIDLAND SHALL DISMISS ITS CLAIMS AGAINST APOLLO WITH PREJUDICE; PROVIDED THAT THE FOREGOING "MIDLAND RELEASE" IS CONDITIONED ON THE OCCURRENCE OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND THE RECEIPT BY MIDLAND OF THE SPECIAL SERVICER RELEASE PAYMENT, THE EMBODIMENT OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE (AS DESCRIBED IN ARTICLE VIII.E) IN THE CONFIRMATION ORDER ENTERED BY THE BANKRUPTCY COURT THAT HAS BECOME A FINAL ORDER; PROVIDED FURTHER THAT THE MIDLAND RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF MIDLAND:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE MIDLAND RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE MIDLAND RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE MIDLAND RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO MIDLAND ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE MIDLAND RELEASE.

D.      *Apollo Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, APOLLO, ON ACCOUNT OF ITS HOLDINGS OF COMMON SHARES OR OTHER EQUITY IN THE DEBTORS OR OTHERWISE DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO THE FIXED/FLOATING RELEASING PARTIES (AND THE FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY APOLLO) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR

BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE FOREGOING "**APOLLO RELEASE**" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE APOLLO RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN <u>AND FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE APOLLO RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE APOLLO RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO APOLLO ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE APOLLO RELEASE.

E.      *Fixed/Floating Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE FIXED/FLOATING RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES (AND EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE FIXED/FLOATING RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE FIXED/FLOATING DEBTORS OR THE POST-EFFECTIVE DATE FIXED/FLOATING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER FIXED/FLOATING RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER

INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE FIXED/FLOATING RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> IN CONNECTION WITH THE FOREGOING FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, THE VALIDITY, ENFORCEABILITY, AND PERFECTION, IN ALL RESPECTS, OF THE LIENS, CLAIMS, INTERESTS, MORTGAGES, AND ENCUMBRANCES OF THE FIXED RATE POOL MORTGAGE LOAN AGREEMENT AND THE C6 AND C7 TRUSTS ARE HEREBY CONFIRMED AND ADJUDICATED BY THE BANKRUPTCY COURT; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE FIXED/FLOATING RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> (1) THE RELEASES OF APOLLO SET FORTH IN THE MIDLAND RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE AND THE STIPULATION OF DISCONTINUANCE OF THE LITIGATION RELATED TO THE APOLLO GUARANTY SET FORTH IN THE MIDLAND RELEASE AND (2) THE WAIVERS AND RELEASES TO BE GIVEN BY APOLLO SET FORTH IN THE APOLLO RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT BE EFFECTIVE UNTIL MIDLAND HAS RECEIVED THE SPECIAL SERVICER RELEASE PAYMENT AND THE OCCURRENCE OF SUCH EFFECTIVE DATE; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u>, THE EFFECTIVENESS OF THIS FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE FIXED/FLOATING PLAN; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, IF ANY, OF THE C6 AND C7 TRUSTS, THE HOLDERS OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN THEIR CAPACITY AS SUCH, OR LNR PARTNERS, LLC (OR ITS AFFILIATES), LNR SECURITIES HOLDINGS LLC (OR ITS AFFILIATES) WHETHER ARISING UNDER THE APPLICABLE POOLING AND SERVICING AGREEMENT, SIDE LETTER, CO-LENDER AGREEMENT, OR RELATED AGREEMENT AGAINST THE C6 AND C7 TRUSTS, MIDLAND, ANY HOLDER OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN ITS CAPACITY AS SUCH, OR ANY OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, OR PROFESSIONALS; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u>, NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN <u>AND</u> <u>FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE FIXED/FLOATING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE FIXED/FLOATING RELEASING PARTIES ASSERTING ANY

CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE.

*F.*     *Anaheim Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ANAHEIM HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ANAHEIM HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ANAHEIM HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ANAHEIM HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ANAHEIM HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ANAHEIM HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ANAHEIM HOTEL RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE ANAHEIM HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ANAHEIM HOTEL RELEASING PARTIES:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE EFFECTIVENESS OF THIS ANAHEIM HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ANAHEIM HOTEL DEBTORS; PROVIDED FURTHER THAT, NEITHER THE ANAHEIM HOTEL DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS.

ENTRY OF THE CONFIRMATION ORDER FOR THE ANAHEIM PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ANAHEIM HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ANAHEIM HOTEL GENERAL RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ANAHEIM HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ANAHEIM HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ANAHEIM HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ANAHEIM HOTEL GENERAL RELEASE.

G.    *Ontario Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ONTARIO HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ONTARIO HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ONTARIO HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ONTARIO HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ONTARIO HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ONTARIO HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ONTARIO HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ONTARIO HOTEL RELEASING PARTIES; PROVIDED THAT THE ONTARIO HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ONTARIO HOTEL RELEASING PARTIES:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS ONTARIO HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES

72

TO THE DEBTORS OTHER THAN THE ONTARIO HOTEL DEBTORS; PROVIDED FURTHER THAT THE ONTARIO HOTEL GENERAL RELEASE WILL NOT IMPACT C-III'S ABILITY TO PROCEED WITH STATE FORECLOSURE PROCEEDINGS AS DESCRIBED IN ARTICLE III.B.3(B).

ENTRY OF THE CONFIRMATION ORDER SHALL FOR THE ONTARIO PLAN CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ONTARIO HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ONTARIO HOTEL GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ONTARIO HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ONTARIO HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ONTARIO HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ONTARIO HOTEL GENERAL RELEASE.

H.      *Remaining Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE REMAINING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE REMAINING DEBTOR RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES (AND EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE REMAINING DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE REMAINING DEBTORS OR THE POST-EFFECTIVE DATE REMAINING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER REMAINING DEBTOR RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE REMAINING DEBTOR RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE REMAINING DEBTOR RELEASING PARTIES; PROVIDED THAT THE REMAINING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE REMAINING DEBTOR RELEASING PARTIES: (1) ARISING UNDER ANY

AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS REMAINING DEBTORS' PLAN GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE REMAINING DEBTORS; PROVIDED FURTHER THAT THE HOLDER OF GARDEN GROVE HOTEL MORTGAGE LOAN CLAIMS, SAN ANTONIO HOTEL MORTGAGE LOAN CLAIMS, SAN DIEGO HOTEL MORTGAGE LOAN CLAIMS, TYSONS CORNER HOTEL MORTGAGE LOAN CLAIMS, AND WASHINGTON DC HOTEL MORTGAGE LOAN CLAIMS WAIVE ALL RIGHTS THEY MAY HAVE TO THE FUNDS IN THE LP BANK ACCOUNT; PROVIDED FURTHER THAT THE AD HOC COMMITTEE SHALL RELEASE LNR, THE LNR-SERVICED TRUSTS AND THE MASTER SERVICER FOR EACH OF THE LNR-SERVICED LOANS, AND EACH OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, MASTER SERVICES, SPECIAL SERVICERS, TRUSTS AND TRUSTEES, AND PROFESSIONALS, INCLUDING LEGAL AND FINANCIAL ADVISORS, FROM ALL CLAIMS RELATED TO THE LNR-SERVICED LOANS AND THE DEBTORS, WHETHER ARISING BEFORE OR AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES; PROVIDED FURTHER THAT, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE LNR-SERVICED TRUSTS SHALL BE RELEASED FROM AND NOT SUBJECT TO ANY AND ALL AVOIDANCE ACTIONS UNDER CHAPTER 5 OF THE BANKRUPTCY CODE OR CLAIM OBJECTIONS UNDER SECTION 502(D) OF THE BANKRUPTCY CODE BROUGHT BY ANY ENTITY, INCLUDING BUT NOT LIMITED TO THE COMMITTEE, THE AH HOC COMMITTEE, OR ANY SUCCESSOR IN INTEREST THERETO.

ENTRY OF THE CONFIRMATION ORDER FOR THE REMAINING DEBTOR PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE REMAINING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE REMAINING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE REMAINING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE REMAINING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE REMAINING DEBTOR RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE REMAINING DEBTORS' PLAN GENERAL RELEASE.

UPON APPROVAL OF THE AD HOC COMMITTEE AGREEMENT: (I) HOLDERS OF INNKEEPERS USA TRUST PREFERRED C INTERESTS AND THE AD HOC COMMITTEE SHALL BE DEEMED TO BE FIXED/FLOATING RELEASING PARTIES, ANAHEIM HOTEL RELEASING PARTIES, AND ONTARIO HOTEL RELEASING PARTIES; AND (II) THE AD HOC COMMITTEE SHALL BE A REMAINING DEBTOR RELEASING PARTY.

I.      *Exculpation*

The Exculpated Parties shall neither have, nor incur, any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, confirming, or effecting the Consummation of the Plan, the Commitment Letter, the Disclosure Statement, the issuance, distribution, and/or sale of any of the New HoldCo Interests or any other Security, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the Exculpated Parties that results from any such act or omission that is determined in

a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that neither this provision nor any other portion of the Plan shall exculpate Midland or any holder of certificates in the C6 and C7 Trusts, in its capacity as such, for any liability, if any, to the C6 and C7 Trusts or any holders of certificates in the C6 or C7 Trusts, in their capacity as such; provided, further, that this provision shall not operate to expand the scope of the Floating/Fixed Debtors' Plan General Release; provided, further, that, this provision shall not exculpate TriMont or any of its advisors for or from any liability to SASCO or LCPI arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

*J.     Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C, ARTICLE VIII.D, ARTICLE VIII.E, ARTICLE VIII.F, ARTICLE VIII.G, OR ARTICLE VIII.H (3) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.I; OR (4) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION, OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR

EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED FURTHER THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

K.      Setoffs

Except as otherwise provided herein, the Debtors or the Post-Effective Date Debtors, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Post-Effective Date Debtors of any such Claims, rights, and Causes of Action that the Post-Effective Date Debtors may possess against such Holder.

## ARTICLE IX.
## SEVERABILITY OF PLAN AND CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Severability of the Plan*

The Plan contemplates four separate joint plans of reorganization that together provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases:  (a) the Fixed/Floating Plan; (b) the Anaheim Plan; (c) the Ontario Plan; and (d) the Remaining Debtor Plan.  The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the four joint plans are not conditioned on the Confirmation and Consummation of any of the other three joint plans.

B.      *Condition Precedent to Confirmation of the Fixed/Floating Plan*

It shall be a condition to Confirmation of the Fixed/Floating Plan that the Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman, and Midland in each of their reasonable discretion.

C.      *Condition Precedent to Confirmation of the Remaining Debtor Plan*

It shall be a condition to Confirmation of the Remaining Debtor Plan that all of the conditions set forth in the Stipulation shall have been satisfied and that the Confirmation Order, the Remaining Debtor Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall in all respects be in compliance with and consistent with the terms of the Stipulation.

D.      *Conditions Precedent to the Effective Date of Each of the Joint Plans*

It shall be a condition to Consummation of each of the Joints Plans that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.E:

1.      Conditions Applicable to Each of the Joint Plans

(a) The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; <u>provided</u> <u>that</u> in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

(b) All documents and agreements necessary to implement the applicable Joint Plan (including, without limitation, the Commitment Letter and the New HoldCo/Midland Commitment Letter for the Fixed/Floating Plan) shall have (a) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

(c) All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Joint Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(d) The Professional Fee Escrow Account shall have been funded with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals; and

(e) The "tail policy" for current and former trustees, directors, and officers referenced in Article IV.U shall have been purchased.

2. Additional Conditions Applicable Only to the Fixed/Floating Plan

(a) The Court shall have approved the Commitment Letter.

(b) The Court shall have approved the modifications requested to the Fixed/Floating Plan and the Confirmation Order necessary to implement the transaction contemplated by the Commitment Letter.

(c) The "Termination Date" under the Commitment Letter shall not have occurred.

(d) The Special Servicer Payment and the Special Service Release Payment shall have been made.

(e) The Apollo Unsecured Claim Fund Payment shall have been made.

(f) The Commitment Letter has not been terminated.

(g) The Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman and Midland in each of their reasonable discretion.

(h) The Cash payments required in accordance with the treatment of Class FF3B under the Fixed/Floating Plan, the Cash payment to the Holders of the Five Mile DIP Claims (in accordance with Article II.C hereof), and the Cash payment to the Holders of the Lehman DIP Claims (in accordance with Article II.D hereof) shall have been made.

77

(i)      Midland shall have executed and delivered to New HoldCo the New Fixed Rate Pool Mortgage Loan Agreement, and all conditions precedent to the consummation of the financing contemplated thereby shall have been satisfied or waived.

3.      Additional Condition Applicable Only to the Ontario Plan

(a)      The Ontario Debtors have delivered an executed deed in lieu to C-III, provided that such delivery shall not effect C-III's ability to elect to pursue state foreclosure proceedings as described in Article III.B.3(b).

4.      Additional Conditions Applicable Only to the Remaining Debtor Plan

(a)      No Termination Event (under the LNR Commitment) shall have occurred.

(b)      The LNR-Serviced Trusts shall have received payments of all of the amounts provided for in the Stipulation.

(c)      The closing of the Chatham Hotel Sale Transaction occurs.

## E.    *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors; provided that with respect to the consummation of the Fixed/Floating Plan, the conditions precedent to the Effective Date may be waived only by the consent of the Fixed/Floating Plan Sponsors, Lehman, and Midland; provided further that, notwithstanding anything to the contrary in this Article IX.E, consent shall not be required to waive a condition described in Article IX.D from any Entity whose actions (or failure to act) were the proximate cause of the failure of such condition to be satisfied.

## F.    *Effective Date*

For each Debtor, the Effective Date shall be the date that is a Business Day selected by the Debtors after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry; and (b) all conditions precedent applicable to such Debtor specified in Article IX.D have been satisfied or waived (in accordance with Article IX.E).

## G.    *Effect of Non-Occurrence of the Effective Date Regarding the Ontario Plan*

Unless and only to the extent otherwise agreed among the Debtors and C-III, if the Effective Date of the Ontario Plan does not occur on or before July 5, 2011, the Confirmation Order as applicable to the Ontario Plan shall be automatically revoked and the Ontario Plan shall be null and void in all respects. Upon the non-occurrence of the Effective Date for the Ontario Plan, C-III and the Debtors will enter into a stipulation, acceptable to the Debtors and C-III, each in their reasonable discretion, providing for: (1) the lifting of the automatic stay imposed by section 362 of the Bankruptcy Code with respect to the collateral securing the Ontario Hotel Mortgage Loan Agreement; (2) a waiver and release of any claims by or Claims against or Interests in the Ontario Hotel Debtors by C-III as provided for by Article VIII.G; and (3) the payment by C-III of $30,000, which payment shall be distributed among Holders of Claims against the Ontario Hotel Debtors.

K&E 20090501

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A. Modification and Amendments

Subject to the limitations contained herein and the consent rights available to the Fixed/Floating Plan Sponsors and Midland (as described in Article IX), the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

### B. Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C. Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date or the Effective Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity. Nothing contained in this Article X shall impair the rights and obligations existing under the Commitment Letter.

# ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. Resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any

manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to the Plan, the Commitment Letter, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

21.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     Enforce all orders previously entered by the Bankruptcy Court;

23.     To resolve any disputes arising under the Commitment Letter and the Chatham Hotel Sale Transaction Documents;

24.     Hear any other matter not inconsistent with the Bankruptcy Code;

25.     Enter an order concluding or closing the Chapter 11 Cases; and

26.     Enforce the injunction, release, and exculpation provisions set forth in Article VIII.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date with respect to any of the Joint Plans, the terms of such plan, the corresponding Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the relevant Debtors, the relevant Post-Effective Date Debtors, and any and all Holders of Claims or Interests against or in the relevant Debtors (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in such plan, each Entity acquiring property under such plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the relevant Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Post-Effective Date Debtors or the Trustee, in its capacity as such (after the Effective

Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### D. Dissolution of Committees

Without considering any of the Chapter 11 Cases that have been converted, dismissed or closed, on the date that is the latest Effective Date of a chapter 11 plan applicable to any of the Chapter 11 Cases or on a date otherwise ordered by the Court, the Committees, if any, shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; provided that the Committee shall continue in existence following the Effective Date (or on the date that is otherwise ordered by the Court) for either (a) addressing matters concerning fees incurred in connection with the administration of the Chapter 11 Cases or (b) participating in any appeal of the Confirmation Order.

### E. Reservation of Rights

Except as expressly set forth in the Plan, each of the Joint Plans shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order with respect to such Joint Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### F. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### G. Dissolution of Entities

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, such Debtor shall be deemed dissolved under state law without further action by the Post-Effective Date Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### H. Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Post-Effective Date Debtors shall be served on:

    1.    if to the Debtors or the Post-Effective Date Debtors (other than the Post-Effective Date Fixed/Floating Debtors), to:

    Innkeepers USA Trust
    340 Royal Poinciana Way, Suite 306
    Palm Beach, Florida 33480
    Attention: Marc A. Beilinson

    with copies to:

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, New York 10022-4611
    Facsimile: (212) 446-4900
    Attention: Paul M. Basta, Stephen E. Hessler, and Brian S. Lennon

E-mail addresses:  paul.basta@kirkland.com, stephen.hessler@kirkland.com, and
brian.lennon@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Facsimile:  (312) 862-2200
Attention:  Anup Sathy, P.C.
E-mail address:  anup.sathy@kirkland.com

2.    if to the Fixed/Floating Plan Sponsors or the Post-Effective Date Fixed/Floating Debtors, to:

INK ACQUISITION LLC
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, New York 10171
Attention:  Tom Wagner

with copies to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Facsimile:  (212) 593-5955
Attention:  Stuart Freedman and Adam Harris
E-mail addresses:  stuart.freedman@srz.com and adam.harris@srz.com

and

INK ACQUISITION LLC
c/o Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Attention:  Jeff Fisher

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile:  (212) 403-2202
Attention:  Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

3.    if to Chatham, to:

Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Attention:  Jeff Fisher

with copies to:

83

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile: (212) 403-2202
Attention: Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

### I. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### J. Entire Agreement

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### K. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

K&E 20090501

Respectfully submitted, as of the date first set forth above,

Innkeepers USA Trust (for itself and all Debtors)

By: /s/ *Marc A. Beilinson*
Name: Marc A. Beilinson
Title: Chief Restructuring Officer

# EXHIBIT 3

**Amended New HoldCo/Midland Commitment**

INK Acquisition LLC
INK Acquisition II LLC
INK Acquisition III LLC
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, NY 10171

October 19, 2011

Midland Loan Services, a division of PNC Bank, National Association
10851 Mastin, 6th Floor
Overland Park, KS 66210

Attention:  Kevin S. Semon
            Vice President, Special Servicing Manager

**Amended and Restated
Binding Commitment Regarding the Acquisition and
Restructuring of Certain Subsidiaries of Innkeepers USA Trust**

INK Acquisition LLC ("INK I"), INK Acquisition II LLC ("INK II") and INK Acquisition III LLC ("INK III", and together with INK I and INK II, and any assignees permitted herein, individually or collectively, as the context may require, "New HoldCo"), Cerberus Series Four Holdings, LLC ("Cerberus") and Chatham Lodging Trust ("Chatham", and together with Cerberus, the "Plan Sponsors"), are pleased to submit this amended and restated commitment letter (this "Amended and Restated Commitment Letter") to Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the $825,400,000 Fixed Rate Mortgage Loan (together with any successor special servicer, "Special Servicer"), which sets forth, among other things, our binding commitment to provide equity capital in the amount of $340,800,000 (the "Commitment") for the restructuring of the debt and equity of certain wholly owned direct and indirect subsidiaries of Innkeepers USA Trust (together with all of its wholly owned direct and indirect subsidiaries, "Innkeepers" or the "Company") that are identified on Exhibit A attached hereto (collectively, the "Fixed/Floating Debtors"), resulting in the Plan Sponsors directly or indirectly owning all of the equity interests of the Fixed/Floating Debtors as more fully set forth in that certain Second Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust, dated October 19, 2011, among the parties thereto (the "Plan Sponsors' Commitment"). The recapitalization and debt restructuring (the "Transaction") is to be effectuated through the modified plan of reorganization for the Fixed/Floating Debtors attached as Exhibit B to the Plan Sponsors' Commitment (the "Amended Fixed/Floating Plan") with the support of us and you.[1]

---

[1]  All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Amended Fixed/Floating Plan.

Subject to the necessity of REMIC compliance and consistency with grantor trust rules and regulations and the pooling and servicing agreement, funding from our Commitment will be used to finance and otherwise implement the Amended Fixed/Floating Plan, which provides for the treatment of claims and other terms outlined below and in the Plan Sponsors' Commitment. The parties hereto each acknowledge and agree that the form of Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement attached hereto as Exhibit B (the "Draft Loan Amendment") is acceptable to the Special Servicer.

**I.**     Value & Proposed Capital Structure

Our Commitment and the Transaction are based on a valuation of New HoldCo of $1,016,175,000 (including $375,000 to be paid by Apollo Investment Corporation ("Apollo") as described more fully in Section III below) and result in a final capital structure of $675,000,000 in aggregate indebtedness and $340,800,000 in new equity, which will include funding for closing and emergence costs. The details of the reorganized capital structure for New HoldCo are provided in Section III below.

**II.**     Capital Commitments; Guaranties

Subject to the conditions set forth herein and in the Plan Sponsors' Commitment, we will provide $340,800,000 of cash in the aggregate to fund the Transaction, of which (i) Cerberus will contribute cash to INK I, INK II and INK III in an aggregate amount equal to $303,800,000, through CRE-INK REIT Member, LLC ("Cerberus REIT"), in the case of INK I, CRE-INK Member II, Inc. ("Cerberus Inc.") in the case of INK II and CRE-Ink TRS Holding Inc. ("Cerberus TRS" and, together with Cerberus REIT and Cerberus Inc., the "Cerberus Members") in the case of INK III, and each of Cerberus REIT, Cerberus Inc. and Cerberus TRS will own 89.1% of the equity of INK I, INK II and INK III, respectively; and (ii) Chatham will contribute cash to INK I, INK II and INK III in an aggregate amount equal to $37,000,000, through Chatham Lodging LP ("Chatham LP") in the case of INK I, and Chatham TRS Holding Inc. ("Chatham Inc. and, together with Chatham LP, the "Chatham Members") in the case of INK II and INK III, and (x) Chatham LP will own 10.9% of the equity of INK I and INK II, and (y) Chatham Inc. will own 10.9% of INK III. The Plan Sponsors hereby irrevocably agree to cause New HoldCo to fund or cause tfhe Post-Effective Date Fixed/Floating Debtors to fund all amounts of cash necessary to make payments or distributions, including all Administrative Claims, pursuant to the Amended Fixed/Floating Plan. The Transaction will be effectuated consistent with the terms of this Amended and Restated Commitment Letter and the Plan Sponsors' Commitment, on the effective date of the Amended Fixed/Floating Plan (the "Effective Date"). The Plan Sponsors' intended investment, as reflected herein, will be used to recapitalize the Fixed/Floating Debtors, and more specifically, will be used to retire the existing DIP facilities (as they relate to the Fixed/Floating Rate Debtors); provide $25,000,000 to fund future property improvement work ("PIP"), and furniture, fixtures, and equipment investments ("FF&E") reserves; and pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (Docket No. 402), as amended, that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy. The Plan Sponsors will provide their portion of the cash investment required to consummate the Transaction from their existing investment vehicles or Plan Sponsors' sponsored and controlled co-investment vehicles.

In addition, in connection with the Fixed Rate Mortgage Loan, (a) Cerberus will enter into a new limited "bad boy" guaranty (the "Cerberus Guaranty") in the form attached hereto as Exhibit C, and (b) New HoldCo shall enter into a new "bad boy" guaranty (the "New HoldCo Guaranty") in the form attached hereto as Exhibit D. The Special Servicer and Plan Sponsors hereby confirm that the forms of the Cerberus Guaranty and the New HoldCo Guaranty are acceptable to the Special Servicer. If a Cerberus Member desires to sell or otherwise transfer (i) all of its interests in New HoldCo or (ii) a portion of its interest in New HoldCo and with respect to any such partial sale or transfer, Cerberus Members would cease to have approval rights over Cerberus Decisions following such sale or transfer, then, in addition to any other conditions to such sale or transfer set forth in the Fixed Rate Mortgage Loan documents, as a condition to any such sale or other transfer, an entity, which has a minimum net worth of $135,000,000 and which is otherwise acceptable to the holder of the Fixed Rate Mortgage Loan in its sole but reasonable discretion, shall deliver a guaranty in form and substance substantially similar to the Cerberus Guaranty which covers "bad acts" actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the transferee or an affiliate that controls, is controlled by or under common control with such transferee, provided that for the purposes of such transferee's guaranty, New HoldCo shall be deemed not to be an affiliate controlling, controlled by or under common control with such transferee) and Cerberus or the transferee shall pay an appropriate review fee to be set forth in the definitive documentation.

During the term of the Fixed Rate Mortgage Loan, the corporate or other governance documents of New HoldCo and the borrowers under the Fixed Rate Mortgage Loan, the operating lessees and such other subsidiaries of New HoldCo (as may be necessary to effectuate the provisions of this paragraph) shall provide that the decisions identified on Appendix A hereto as Major Decisions as well as the actions identified on Appendix A as Unilateral Actions are Cerberus Decisions, in each case, if such decision or action would result in or otherwise constitute a "bad act" under the Cerberus Guaranty (irrespective and independent of whether or not such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the applicable Cerberus Member or an affiliate that controls such Cerberus Member) and/or the New HoldCo Guaranty, as applicable (collectively, the "Cerberus Decisions"), and such Cerberus Decisions may not be amended, waived or modified without the consent of the holder of the Fixed Rate Mortgage Loan. Nothing contained in this Amended and Restated Commitment Letter shall require the Special Servicer to take any action in violation, derogation or contravention of the terms or provisions of the Fixed Rate Mortgage Loan documents.

The parties acknowledge that the applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan (other than the Draft Loan Amendment, which shall be in the form attached hereto as Exhibit B) shall be assumed, amended, restated, and/or supplemented in substantially the forms agreed by the Special Servicer and New HoldCo as of August 5, 2011, as modified to reflect the terms herein and in the Plan Sponsors' Commitment and the closing date of the Transaction. The parties also acknowledge that the availability of the Fixed Rate Mortgage Loan is subject to (i) the execution and delivery, or obtaining, of all documents, in each case substantially in the form and on the terms agreed to by the parties as of August 5, 2011, as modified to reflect the terms herein and in the Plan Sponsors' Commitment and the closing date of the Transaction, and (ii) execution and delivery of franchise agreements with the existing franchisors for the Fixed Rate Debtors and related comfort letters in favor of the Special

3

Servicer substantially in the form and on the terms agreed to by the parties as of August 5, 2011, as modified to reflect the terms herein and in the Plan Sponsors' Commitment and the closing date of the Transaction; provided, however, that, with respect to (i) and (ii), the parties are permitted to make any change in the form and on the terms agreed to by the parties as of August 5, 2011, as modified to reflect the terms herein and in the Plan Sponsors' Commitment and the closing date of the Transaction, so long as such changes are mutually acceptable to the parties.

In connection with the foregoing, we hereby confirm that we have available, and will have available at all times prior to consummation of the Transaction or the termination of this Amended and Restated Commitment Letter, investor commitments that exceed, in the aggregate, $340,800,000.

**III.** Restructuring of Debt and Equity of the Company - New Equity, Debt Forgiveness, & Cash Pay Downs

*A.    Debt Restructurings*

Our Commitment contemplates a restructuring implemented through the Amended Fixed/Floating Plan whereby the current Fixed/Floating Debtors' debt holders will realize value totaling $943,600,000 (including the $3,000,000 payment in connection with the Special Servicer's release of Apollo as described below) or 77.3% of their $1,221,438,936.26 current outstanding obligations. The Fixed/Floating Debtors' creditor treatment is being implemented through $675,000,000 in new debt, $340,800,000 in equity and cash, $6,000,000 of cash consideration for existing guarantees and servicing fees paid on behalf of the LB-UBS 2006-C6 and LB-UBS 2006-C7 trusts (the "C6 and C7 Trusts") and $4,750,000 ($375,000 of which shall come from Apollo) in cash to fund certain creditor payments. The new debt also benefits from a capital structure supported by approximately 33.5% in equity value.

An illustration and an explanation of the Plan Sponsors' bid and the resultant Fixed/Floating Debtors' creditor treatment under the Amended Fixed/Floating Plan are detailed in Appendix B.

*B.    Cash Sources & Uses*

Our Commitment contemplates that the cash investment of $340,800,000 will be used for, among other things:

  o    Repayment of the Solar and Five Mile DIPs (as they relate to the Fixed/Floating Debtors), including any accrued fees, interest, or expenses due on such facility;

  o    Payment of $3,000,000 to the Special Servicer as settlement of Midland's claims against Apollo with respect to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty"), which have been the subject of litigation pending in New York Supreme Court;

  o    Payment of up to $3,000,000 in cash to satisfy the reimbursement of all Five Mile's reasonable and documented fees and expenses;

4

o   Payment of fees to the Special Servicer of the Fixed Rate Mortgage Loan equal to $3,000,000 as consideration for effecting the restructuring transactions on behalf of the C6 and C7 Trusts (consisting of $2,725,000 to be paid to Special Servicer and $275,000 to be paid to Five Mile Capital Partners LLC);

o   $32,800,000 of cash (consisting of $8,000,000 to be held at New HoldCo for current and future PIP work, $17,000,000 to be deposited with and held by the Special Servicer in a reserve for current and future PIP work on the fixed rate properties and $7,800,000 to be deposited with and held by the Special Servicer in a reserve for FF&E for the fixed rate properties);

o   Payment of $4,750,000 ($375,000 of which shall come from Apollo) for the various classes of unsecured creditors; and

o   $224,000,000 in cash to Lehman.

**C.**   *Our Bid and Resultant Treatment of Claims and Interests*

The Plan Sponsors' Commitment is comprised of the following treatment of claims and interests and is not subject to a due diligence condition:

1.   <u>Treatment of Claims</u>: The treatment of claims and interests is set forth in the Amended Fixed/Floating Plan.

2.   <u>Excess Cash Distributions</u>:  The Special Servicer and Lehman hereby agree as follows with respect to the distributions of Excess Cash (as defined in the Cash Collateral Orders) to which they would otherwise be entitled (or to which they allege to be entitled) under the Cash Collateral Orders for operations during the period from August 1, 2011 through the earlier of the (i) Effective Date and (ii) Termination Date (as defined in the Plan Sponsors' Commitment), and the Fixed/Floating Debtors hereby represent and warrant, based on their good faith belief based on projections as of the date hereof that the amount of such Excess Cash shall be sufficient to satisfy, as and when payable, the Five Mile Payment (as defined below):

(a) Five Mile Capital Partners LLC and its affiliates and CRES Investment No. II, LP (collectively, "<u>Five Mile</u>") shall receive within one business day of the entry of an order approving the Plan Sponsors' Commitment and approving the modifications in the amended Fixed/Floating Plan, a $1 million cash payment (the "<u>Five Mile Payment</u>") in satisfaction of an allowed administrative expense claim, as allocated under the Cash Collateral Order between the Fixed Rate Pool Hotel Debtors and Floating Rate Pool Hotel Debtors.  For the avoidance of doubt, the Five Mile Payment shall be in addition to the payments to be made to Five Mile on the Effective Date set forth in Appendix B. Conditioned upon Five Mile's receipt of the Five Mile Payment, the payment to Five Mile described above in Section III.B and in consideration therefore, Five Mile (in all of their current and future capacities in any way related to the Company or the C6 and C7 Trusts) hereby (i) consents to the entry by the Bankruptcy Court of an order approving the Plan Sponsors' Commitment and the modifications contained in the Amended Fixed/Floating Plan, (ii) agrees to and approves of the Special Servicer's consummation of the transactions contemplated by the Plan Sponsors' Commitment and the Amended

Fixed/Floating Plan, (iii) shall not take any action prior to the Effective Date that could reasonably be expected to interfere in any way with or delay the consummation of the transactions contemplated by the Plan Sponsors' Commitment and the Amended Fixed/Floating Plan, (iv) shall not seek any damages and agrees to release any and all claims it has or may have against any of the parties hereto arising from or in any way relating to the Fixed/Floating Debtors, the circumstances, events, or occurrences that are the subject of the Adversary Proceeding (as defined herein), or the transactions contemplated by the Plan Sponsors' Commitment or the Amended Fixed/Floating Plan, and (v) amends and extends that certain Third Amendment to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of October 3, 2011, between Five Mile and the Fixed Rate Debtors for the sole purpose of extending the maturity of the facility that allowed the Fixed Rate Debtors to borrow secured postpetition financing on a superpriority basis (the "Five Mile DIP Facility") until the earlier of the Effective Date and November 15, 2011; provided, however, that except only for the foregoing maturity date extension, nothing in this Section III.C.2(a) shall be deemed to release, waive, discharge or otherwise affect the Five Mile DIP Facility or to restrict or limit the exercise of Five Mile's rights and remedies under the Five Mile DIP Facility

(b) the Fixed Rate Debtors shall retain, prior to the Effective Date, $1 million of cash collateral which would be allocated to the Fixed Rate Pool Hotel Debtors to pay for necessary and uninsured costs associated with water damage to the Courtyard by Marriott located at West Cypress Creek Road in Ft. Lauderdale, Florida (the "Repair Costs"), and, on the Effective Date, the Fixed Rate Pool Hotel Debtors shall have available to them $1 million for the Repair Costs, less any amounts spent prior to the Effective Date on the Repair Costs, based on Innkeepers' Chief Restructuring Officer's assessment on what the necessary Repair Costs are, after consultation with FTI Consulting; and

(c) any excess cash collateral allocated to the Floating Rate Pool Hotel Debtors, and allocated to the Fixed Rate Pool Hotel Debtors in an amount in excess of the Repair Costs (or not otherwise distributed pursuant to this section III.C.2 shall be divided as follows: (i) 50% to the Post-Effective Date Fixed/Floating Debtors to pay administrative expenses and (ii) 50% allocated to the Special Servicer and Lehman based on the allocation percentages set forth in the Cash Collateral Order.

**IV.** Special Servicer Covenants

New HoldCo, the Plan Sponsors and the Special Servicer have entered into this Amended and Restated Commitment Letter. For as long as this Amended and Restated Commitment Letter has not been terminated pursuant to Section V, the Special Servicer hereby undertakes to actively support the approval of this Amended and Restated Commitment Letter and the modifications to the Amended Fixed/Floating Plan as provided for in the Plan Sponsors' Commitment.

Unless and until this Amended and Restated Commitment Letter is terminated by the Plan Sponsors in accordance with Section V below, Special Servicer and its affiliates and advisors shall not enter into a binding commitment with respect to, or otherwise consummate, any alternative transaction.

K&E 20098864

**V.**     Termination of Commitment

This Amended and Restated Commitment Letter shall terminate upon the occurrence of any Termination Date (as defined in the Plan Sponsors' Commitment), as such Termination Date may be extended pursuant to the terms of the Plan Sponsors' Commitment.

**VI.**     Miscellaneous

All notices, requests, claims, demands and other communications hereunder shall be given (and shall be deemed to have been duly received if given) by hand delivery in writing or by facsimile transmission with confirmation of receipt, as follows:

> if to New HoldCo:
>
> c/o Cerberus Real Estate Capital Management, LLC
> 299 Park Avenue, 23rd Floor
> New York, NY 10022
> Attention: Tom Wagner
> Email: twagner@cerberusre.com
> Facsimile: (646) 885-3391
>
>
> With a copy to:
>
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York  10022
> Attention:  Stuart Freedman and Adam Harris
> Email: stuart.freedman@srz.com
>        adam.harris@srz.com
> Facsimile:  (212) 593-5955
>
> Chatham Lodging Trust
> 50 Cocoanut Row, Suite 200
> Palm Beach, FL 33480
> Attention: Jeffrey Fisher
> Email: jfisher@cl-trust.com
> Facsimile: (561) 835-4125
>
> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, NY 10019
> Attention:  Scott Charles and Scott Golenbock
> Email: SKCharles@wlrk.com
>        SWGolenbock@wlrk.com
> Facsimile: (212) 403-2202

if to Special Servicer:

Midland Loan Services, a division of PNC Bank, National
Association
10851 Mastin, 6th Floor
Overland Park, KS 66210
Attention: Kevin S. Semon
Email: kevin.semon@midlandls.com
Facsimile: (913) 253-9723

With a copy to:

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Attention: Lenard M. Parkins
Email: lenard.parkins@haynesboone.com
Facsimile: (212) 884-8226

This Amended and Restated Commitment Letter, the rights of the parties, and all actions arising
in whole or part under or in connection herewith will be governed by and construed in
accordance with the laws of the State of New York. In the event of a breach, material or
otherwise, of this Amended and Restated Commitment by the Plan Sponsors and/or New
Holdco, the only remedies available to the Special Servicer and the liability of the Plan Sponsors
and/or New Holdco are exclusively provided for in Section Five (5) and Section Nineteen (19) of
the Plan Sponsors' Commitment.

This Amended and Restated Commitment Letter and the Plan Sponsors' Commitment, together
with their respective exhibits, represent the entire understanding and agreement between the
parties hereto with respect to the subject matter hereof and supersedes all prior and
contemporaneous agreements and understandings between the parties hereto, both written and
oral, with respect to the subject matter hereof, including without limitation the Commitment
Letter between the parties dated May 16, 2011 and terminated August 19, 2011, the proposal
submitted to the Company on August 24, 2011, and the proposal submitted to the Company on
September 19, 2011. Nothing in this paragraph shall alter, amend, or otherwise affect the
parties' actual or potential claims, rights, or defenses, arising under or related to the transactions,
events, or occurrences that are the subject of Adversary Proceeding No. 11-02557 pending in
Innkeepers chapter 11 cases (the "Adversary Proceeding"), including the Amended and Restated
Commitment Letter and Amended and Restated Term Sheet dated May 16, 2011. No material
modification or waiver of any provision hereof shall be enforceable unless approved by you and
us in writing. Neither you, on the one hand, nor us, on the other hand, is relying upon any
statement or representation made by or on behalf of the other, except as expressly provided in
this Amended and Restated Commitment Letter.

This Amended and Restated Commitment Letter shall not be assignable by any party hereto
without the prior written consent of the other party hereto, (and any attempted assignment
without such consent shall be null and void *ab initio*), provided, however, that New HoldCo may

8

assign all or a portion of its rights hereunder to any entity with the same beneficial ownership as New HoldCo, <u>provided</u>, <u>further</u>, that such assignment shall not be in derogation of the Midland loan documents. This Amended and Restated Commitment Letter (i) is intended solely for the benefits of the parties hereto; and (ii) is not intended nor shall be construed to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding anything to the contrary contained in this paragraph, any assignment by New HoldCo as contemplated under this paragraph shall not relieve the Plan Sponsors or New HoldCo of their obligations under the Plan Sponsors' Commitment or this Amended and Restated Commitment Letter.

We are prepared to enter into a transaction on the terms set forth herein. Upon receipt of a fully executed counterpart to this Amended and Restated Commitment Letter so long as this Amended and Restated Commitment Letter has not been terminated pursuant to Section V, both parties agree to exercise good faith and use reasonable best efforts to close the Transaction contemplated in this Amended and Restated Commitment Letter, including engaging in any necessary modification of the previously agreed definitive documents to reflect the terms set forth herein, and Special Servicer agrees to move forward with its undertakings described in Section IV herein.

<div align="center">Remainder of Page Intentionally Blank<br/>Signature Pages to Follow</div>

Should you have any questions regarding this Amended and Restated Commitment Letter, please do not hesitate to contact any of the following individuals.

<table>
<tr><td>Cerberus:</td><td>Chatham:</td></tr>
<tr><td>

Tom Wagner
Cerberus Real Estate Management, LLC
299 Park Avenue, 23rd Floor
New York, NY 10171
Phone: (212) 891-2158
Email: twagner@cerberusre.com

</td><td>

Jeff Fisher
Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Phone: (561) 227-1309
Email: jfisher@cl-trust.com

</td></tr>
</table>

Sincerely yours,

By:   INK Acquisition LLC
      By: Chatham Lodging LP,
      its managing member

      By:  _____
           Name: Dennis Craven
           Title:

By:   INK Acquisition II LLC
      By: Chatham TRS Holding Inc.,
      its managing member

      By:  _____
           Name: Dennis Craven
           Title:

By:   INK Acquisition III LLC
      By: Chatham TRS Holding Inc.,
      its managing member

      By:  _____
           Name: Dennis Craven
           Title:

By:   Cerberus Series Four Holdings, LLC

      By:   Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

      By:   Cerberus Institutional Associates, L.L.C., its General Partner

      By:  _____
           Name:
           Title:

Should you have any questions regarding this Amended and Restated Commitment Letter, please do not hesitate to contact any of the following individuals.

Cerberus:

Chatham:

Tom Wagner
Cerberus Real Estate Management, LLC
299 Park Avenue, 23rd Floor
New York, NY 10171
Phone: (212) 891-2158
Email: twagner@cerberusre.com

Jeff Fisher
Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Phone: (561) 227-1309
Email: jfisher@cl-trust.com

Sincerely yours,

By:    INK Acquisition LLC
       By: Chatham Lodging LP,
       its managing member

       By:    _____
              Name:
              Title:

By:    INK Acquisition II LLC
       By: Chatham TRS Holding Inc.,
       its managing member

       By:    _____
              Name:
              Title:

By:    INK Acquisition III LLC
       By: Chatham TRS Holding Inc.,
       its managing member

       By:    _____
              Name:
              Title:

By:    Cerberus Series Four Holdings, LLC

       By:    Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

       By:    Cerberus Institutional Associates, L.L.C., its General Partner

       By:    _____
              Name: *Mark A. Neporent*
              Title: *Chief Operating Officer*
                     *General Counsel*

10

By:     Chatham Lodging Trust

By:     _____
        Name:   Dennis Craven
        Title:  CFO

Acknowledged and Agreed:

**Midland Loan Services, a division of PNC Bank, National Association,** as Special Servicer for U.S. Bank, National Association as Trustee for the Registered Holders of each of the LB-UBS Commercial Mortgage Trust 2007-C6 and the LB-UBS Commercial Mortgage Trust 2007-C7, Commercial Mortgage Pass-Through Certificates successor trustee to Bank of America National Association

By: _____
      Name: Kevin C. Donahue
      Title: Senior Vice President
             Servicing Officer

<u>**EXHIBIT A**</u>

**FIXED/FLOATING DEBTORS**

The "<u>Floating Rate Debtors</u>" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC; and Grand Prix West Palm Beach, LLC.

The "<u>Fixed Rate Debtors</u>" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC.

The "<u>Other Plan Debtors</u>" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; Grand Prix Mezz Borrower Fixed, LLC; and GP AC Sublessee LLC.

**The "<u>Fixed/Floating Debtors</u>" are the Floating Rate Debtors, the Fixed Rate Debtors, and the Other Plan Debtors. The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan.**

# APPENDIX A

## Major Decisions & Unilateral Actions

"<u>Major Decision</u>" means any determination to cause New HoldCo or any subsidiary of New HoldCo to:

1.      directly or indirectly acquire, or execute and deliver any documents, agreements or instruments necessary to close on the direct or indirect acquisition by New HoldCo or any subsidiary of New HoldCo of, any Property, except as set forth in the then approved Operating Budget or the then approved Business Plan;

2.      (A) sell, assign, transfer, encumber or dispose of New HoldCo, any Property Company, any Property, or any revenue-generating business of New HoldCo or any Property Company, or agree to any of the foregoing, or (B) except as expressly provided in this Agreement or in the then-approved Operating Budget or the then-approved Business Plan, improve, design, rehabilitate, alter, or repair (collectively, the "Repairs") any of the Properties, <u>provided</u>, <u>however</u>, that the managing member of New HoldCo (the "Managing Member") may make or caused to be made Repairs not contemplated by the then-approved Operating Budget if (i) any such Repair is required by any franchisor under the applicable franchise agreement or any other agreement with the franchisor (including, but not limited to, that certain Agreement for Adequate Assurance of Completion of Certain PIPS and Assumptions of Agreements, dated June 25, 2010, by and between the Debtors and Marriot International, Inc.), (ii) emergency action or expenditures is necessary to prevent imminent risk to the health and safety of Persons on or about the Properties, imminent material property damage or imminent imposition of criminal or civil sanctions against New HoldCo or any member of New HoldCo (each, an "Emergency Expenditure"), provided that (1) any such Emergency Expenditure made without approval of all Initial Members is, in the Managing Member's commercially reasonable judgment, reasonable and necessary under the circumstances set forth above and (2) the Managing Member endeavors diligently and in good faith (x) to notify the Initial Members of any such Emergency Expenditure, promptly in writing and (y) attempts to obtain verbal approval of the Initial Members for any required Emergency Expenditure or (iii) if the aggregate cost of such Repairs fall within the thresholds set forth in clause 12 below;

3.      except as otherwise expressly permitted by this Agreement, call for capital contributions, approve capital calls or determine the portion of the then-approved Operating Budget that is to be funded by equity and by debt, or raise any new equity for any subsidiary of New HoldCo or admit any new member, partner or owner to New HoldCo or any of its subsidiaries;

4.      make any operating expenditure or incur any operating obligation by or on behalf of New HoldCo that varies materially from the then-approved Operating Budget other than an Emergency Expenditure made pursuant to the procedures set forth in clause 2 above and expenditures that fall within the thresholds set forth in clause 12 below;

5.      execute or modify, amend, supplement, terminate, extend or renew leases with tenants for occupancy of space in any Property, except (i) for any lease with a Property Leaseco or any other TRSs of Chatham REIT and Cerberus or (ii) to the extent delegated to the Hotel Manager pursuant to the Hotel Management Agreements or set forth in the then-approved Operating Budget or the then-approved Business Plan;

6.      enter into, modify or terminate any contractual arrangements with service providers (including lenders, attorneys, consultants, appraisers, third party property managers, brokerage companies, general contractors, accountants, auditors, architects, banks or other depositaries and all other service providers) for services to be rendered in connection with the business of New HoldCo; provided, however, that (i) until further written notice, Cerberus hereby delegates the tasks set forth in this subsection (f) to the Managing Member, so long as all such services are expressly provided for and are not in excess of the amounts budgeted for such services in the then approved Operating Budget and Business Plan and either (x) are terminable, without cause or fee, upon not more than thirty (30) days notice, (y) have a stated term of not more than one year or (z) are expressly approved in writing by Cerberus, (ii) Cerberus hereby authorizes the Managing Member to cause the Property Leasecos to engage Island Hospitality Management to act as the hotel manager of all of the Properties on behalf of the Property Leasecos (the "Hotel Manager") pursuant to the Hotel Management Agreements and (iii) the entry into, modification or termination of any contractual arrangement that requires an annual payment by New HoldCo of $25,000 or less, or the determination to take any of the foregoing actions, shall not be considered a Major Decision;

7.      incur or pay any real estate taxes, insurance premiums, or any assessments or charges with respect to the ownership and operation of any Property, except to the extent provided for in the then-approved Operating Budget or delegated to the Hotel Manager pursuant to the Hotel Management Agreement;

8.      make distributions to the members other than as set forth in the limited liability company agreement of New HoldCo (the "LLC Agreement");

9.      establish reserves, determine reserve levels or make any distributions from any such reserves, except as set forth in the then-approved Operating Budget or the then-approved Business Plan;

10.     except as set forth in the then-approved Operating Budget or the then-approved Business Plan, cause or permit New HoldCo to finance all or any portion of any Property (other than the Midland Loan and trade debt incurred in the ordinary course of business consistent with the then approved Operating Budget), agree to the form, substance, provider or documentation pertaining to any Loan, modify, restructure or terminate any Loan or repay any Loan except in accordance with the express terms of the applicable Loan, or enter into, modify or amend any documents, agreements or instruments relating to any Loan;

11.     except to the extent expressly set forth in the then-approved Operating Budget or the then-approved Business Plan, select or determine any insurance

plans, carriers or coverages to be purchased and maintained by or on behalf of New HoldCo or any Property Company;

12.     make any expenditures which are at variance with the then approved Operating Budget or Business Plan(A) (1) with respect to any Operating Expense (as defined in the applicable hotel management agreement) for any Property unless Operating Expenses for such Property would not exceed the estimated Operating Expenses for such Property as set forth in the then-current and approved Operating Budget with respect to such Property by five percent (5%) or more (in the aggregate, but not by line item) and (2) with respect to any other expenditure not described in clause (1), unless the variance in question does not exceed a particular summary line item by the lesser of (x) $50,000 or (y) 10% of that summary line item, and (B) unless the overall Operating Budget is not exceeded in the aggregate by more than 2.5% (excluding, for purposes of the foregoing calculation, the use of any contingency line items set forth in the then approved Operating Budget)), and provided that in any case the Managing Member may make an Emergency Expenditure pursuant to the procedures set forth in clause 2 above);

13.     grant or convey any easement, lien, ground lease, mortgage, deed, deed of trust, bill of sale, contract or other instrument purporting to convey or encumber any Property, either wholly or in part;

14.     take any Bankruptcy action on behalf of New HoldCo or any of its Subsidiaries;

15.     institute any legal or arbitration proceedings in the name of New HoldCo, settle any legal or arbitration proceedings against New HoldCo or confess any judgment against New HoldCo or any Property, other than (i) the institution of an eviction action, a suit for breach of a tenant lease or other similar proceeding contemplated in or provided for in the then approved Operating Budget or the then approved Business Plan or (ii) settlements or compromises for litigation or arbitration providing solely for the payment of money damages where the amount paid (after giving effect to any insurance proceeds) in settlement or compromise does not exceed $50,000;

16.     execute, deliver or file any agreement, permit, request, application or filing with any governmental agency, any neighboring property owner, any community organization or any similar regulatory body, or send any correspondence to or have any other material communications with, any governmental agency, which directly binds New HoldCo or any of its Affiliates or any member of New HoldCo or any of its Affiliates, or which advocates a position on behalf of New HoldCo or its Affiliates or any member of New HoldCo or its Affiliate (excluding correspondence, communications and other actions with respect to ministerial matters consistent with the then-approved Operating Budget and the then-approved Business Plan);

17.     approve any investment other than as contemplated by the LLC Agreement or approve any renovation or disposition of any Property, except as expressly authorized by the then-approved Business Plan and other than an Emergency Expenditure or Repair made pursuant to the procedures set forth in clause 2 above;

18.     enter into any exclusivity, competition or confidentiality agreement that is or purports to be binding upon any Member of New HoldCo or any of its Affiliates or interest holders;

19.     enter into any settlements with any third party or any consent decree, order (judicial or otherwise) with any Governmental Entity, related to the breach of any environmental law, or the sampling, monitoring, treatment, remediation, removal or clean up of hazardous substances with respect to the Properties;

20.     knowingly take or approve, or refrain from taking or approving, any action that is reasonably likely to lead to a default under any Loan Documents or to a material dispute with any Lender;

21.     knowingly take or approve, or refrain from taking or approving, any action that could trigger a recourse provision under any then-outstanding Loan;

22.     approve any marketing plans or agreements with respect to any Property, except as expressly authorized by the then-approved Business Plan;

23.     require or permit New HoldCo to make any loan to any member of New HoldCo or any of its Affiliates, or require or permit any loan (other than a member loan with respect to a defaulted capital contribution) to be made by any member of New HoldCo to New HoldCo;

24.     cause New HoldCo or any Property Company to execute or deliver any indemnity or guaranty;

25.     change New HoldCo's depreciation and accounting methods and make other decisions with respect to the treatment of various transactions for federal income tax purposes, and change New HoldCo's elections for federal, state or local income tax purposes;

26.     amend the LLC Agreement (or the corresponding organizational documents of any subsidiary of New HoldCo) in any respect;

27.     take or approve any action relating to any tax certiorari proceeding or other tax appeal affecting any Property;

28.     recapitalize, reclassify, redeem, repurchase or otherwise acquire any equity or other interests of New HoldCo or any subsidiary of New HoldCo;

29.     merge, consolidate or dissolve New HoldCo or any of its subsidiaries;

30.     remove and replace Island Hospitality Management as Hotel Manager;

31.     permit or cause any transfer that may reasonably be expected to cause the assets of New HoldCo or any Subsidiary of the New HoldCo to be deemed "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA);

32.     enter into any swap, hedge, collar or other interest rate protection agreement;

33.     enter into any lease, whether as lessor or lessee, other than short term storage leases in connection with a capital program or equipment leases in the ordinary course of business;

34.     take any action that could reasonably be expected to cause New HoldCo to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT;

35.     enter in any transaction that could reasonably be expected to cause Chatham REIT or Cerberus REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6);

36.     cause any rebranding of properties or entry into new franchise agreements;

37.     approve or implement any Operating Budget or Business Plan, as set forth in Section 3.5 of the LLC Agreement;

38.     except as otherwise expressly permitted pursuant to this Agreement or the then-current Operating Budget or Business Plan, enter into, amend or modify agreements with cost or liability to New HoldCo or its subsidiaries in excess of $5 million in any fiscal year or which are otherwise material to the business of New HoldCo, provided, that for purposes of this provision, the cost of an agreement shall be calculated based on only the period prior to the time that New HoldCo or its subsidiaries shall have the right to freely terminate such agreement, and shall include any fee payable upon termination by New HoldCo or its subsidiaries;

39.     enter into any agreement with an Affiliate of a Member other than pursuant to Section 4.4 of the LLC Agreement;

40.     cause New HoldCo or any Subsidiary other than a Property Company or Property Leaseco to hold any assets other than (w) the interests in its subsidiaries as of the closing date of the Transaction after giving effect to the transactions contemplated by the Plan, (x) any interest in an entity treated as a corporation for U.S. federal income tax purposes, (y) any cash reserves intended for distributions to the Members or to pay New HoldCo expenses or (z) any other assets that the Managing Member is permitted to acquire and hold pursuant to the then-effective Operating Budget;

41.     enter into or terminate, dispose of or materially amend the terms of any joint venture to which New HoldCo or any of its subsidiaries is a party;

42. change the principal banking institutions with which New HoldCo or its subsidiaries maintain deposit, borrowing or other relationships; or

43. materially change the line(s) of business of New HoldCo and its subsidiaries or conducting business in a jurisdiction other than the United States.

"<u>Unilateral Actions</u>" are the following:

44. To compel, cause and undertake the liquidation of the Company and take all actions related thereto, including the disposition of all then remaining Properties, at any time following the fifth (5th) anniversary of the date hereof, so long as such liquidation will not (A) cause a default under any then existing Loan Documents, (B) cause Chatham to incur or suffer any recourse liability under any then existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its Members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause New HoldCo to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT;.

45. To demand and receive an updated Operating Budget and Business Plan from the Managing Member, at any time and from time to time but in any event no more than once each fiscal quarter, together with such other reporting items or information as Cerberus may reasonably require;

46. To audit the books and records of the Company and any Property Companies; <u>provided</u>, <u>however</u>, that the Company shall only be required to pay for one such audit per calendar year, and any additional audits requested by Cerberus in any given calendar year shall be paid for by Cerberus;

47. To compel, cause and undertake the disposition of any Property in an arms length transaction to any Person other than Cerberus or an Affiliate of Cerberus, so long as such disposition will not (A) cause a default under any then-existing loan documents, (B) cause Chatham to incur or suffer any recourse liability under any then-existing loan documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause New HoldCo or any of its members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT;

48. To take any action which may be reasonably necessary for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware; and

49.     To approve any restructuring plan or take or refraining from taking any other action relating to the restructuring of the Company, any Property or any Loan, so long as such restructuring will not (A) cause a default under any then existing loan documents, (B) cause Chatham to incur or suffer any recourse liability under any then-existing Loan Documents (including, without limitation, any Carveout Guaranty given by Chatham or any of its Affiliates), (C) cause the Company or any of its members (or any of their respective Affiliates) to become the subject of a Bankruptcy, (D) cause the Company to fail to satisfy the gross income and asset tests applicable to REITs under Code Section 856(c)(1)-(4), assuming for this purpose that New HoldCo were a REIT, (E) cause Chatham REIT to incur a liability for the tax on "prohibited transactions" under Code Section 857(b)(6), or (F) otherwise jeopardize the REIT status of Chatham REIT.

Capitalized terms used in this Appendix A shall have the following meanings:

"Affiliate" means, with respect to a Person, another Person that directly or indirectly controls, is controlled by or is under common control with such first Person.  For the avoidance of doubt, (i) an Affiliate of Cerberus includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that, as of the date hereof, control Cerberus; and (ii) an Affiliate of Chatham includes, without limitation, any entity or fund directly or indirectly controlled by the Persons that control Chatham REIT, and any successor to Chatham REIT, whether by merger, consolidation, sale of substantially all of the assets or otherwise.  Additionally, for the avoidance of doubt, Island Hospitality Management shall not be considered to be an Affiliate of Chatham REIT or Chatham.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy".  A "Voluntary Bankruptcy" shall mean, with respect to any Person, (a) an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors, (b) the filing of any petition or answer by such Person seeking to adjudicate it bankrupt or insolvent or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of such Person or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking, consenting to or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property, or (c) corporate action taken by such Person to authorize any of the actions set forth above.  An "Involuntary Bankruptcy" shall mean, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation or the filing of any such petition against such Person which order or petition shall not be dismissed within 90 days or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within 90 days.

"Business Plan" means the comprehensive strategic plan for New HoldCo's ownership,

operation, financing and sale of the Properties, as in effect from time to time.

"Carveout Guaranty" means a guaranty of non-recourse carveouts, in form and substance satisfactory to the applicable Lender and approved in advance in writing by the members of New HoldCo (including, without limitation, any such guaranty required by Midland Loan Services in connection with the Midland Loan).

"Chatham REIT" means Chatham Lodging Trust, a Maryland real estate investment trust.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Governmental Entity" means a court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency.

"Hotel Management Agreement" means the Hotel Management Agreements to be executed and delivered on the closing date, between Island Hospitality Management and each Property Leaseco.

"Initial Member" means each of Chatham and Cerberus and their respective permitted transferees.

"Lender" means the lender under any loan documents to be executed by New HoldCo or any of its subsidiaries, as applicable, with respect to a Loan, if any.

"Loan" means a loan obtained or assumed by New HoldCo or any of its subsidiaries, as borrower, secured by all or any portion of the Property, including the Midland Loan.

"Midland Loan" means the new non-recourse mortgage loan in an aggregate principal amount of not less than $675 million made by Midland Loan Services, a division of PNC National Bank, in a form approved by the Initial Members the proceeds of which are to be used to satisfy the Debtors' current outstanding fixed rate mortgage loan as part of the transactions contemplated by the Amended Fixed/Floating Plan.

"Operating Budget" means the annual operating budget for the ownership, operation, marketing and sale of the Properties, as in effect from time to time.

"Person" means any individual, corporation, association, partnership (general or limited), joint venture, trust, joint-stock company, estate, limited liability company, series, unincorporated organization or other legal entity or organization.

"Properties" means the properties directly or indirectly owned by the Fixed/Floating Debtors that are the subject of the Amended Fixed/Floating Plan, and any other property (real, personal or mixed) or real estate acquired by New HoldCo.

"Property Company" means a direct or indirect subsidiary of New HoldCo through which New HoldCo indirectly holds one or more Properties.

"Property Leasecos" means each of Grand Prix Fixed Lessee LLC and Grand Prix Floating Lessee LLC, each a Delaware limited liability company that will either (i) elect to be treated as associations taxable as corporations for federal income tax purpose and as TRSs of Chatham REIT and Cerberus REIT (ii) be wholly owned by a subsidiary of New HoldCo that elects to be a TRS of Chatham REIT and Cerberus REIT or (iii) be owned by a subsidiary of Chatham REIT or Cerberus REIT that elects to be a TRS.

"TRS" means an entity that qualifies as a "taxable REIT subsidiary" under Code Section 856(l).

# APPENDIX B[2]

## *Pro Forma Capitalization*

| | Current Principal Balance[(a)] | Consideration | Cash Consideration | Pro Forma Principal Balance |
|---|---|---|---|---|
| <u>DEBT</u> | | | | |
| **Five Mile Fixed Pool DIP Loan**[(b)] | $34,200,000.00 | $34,200,000.00 | $34,200,000.00 | $0.00 |
| **Lehman DIP Loan**[(c)] | $9,313,587.79 | $9,313,587.79 | 9,313,587.79 | $0.00 |
| **Fixed Pool Mortgage** | $825,400,000.00 | $675,000,000 | $0.00 | $675,000,000 |
| **Floating Pool Loan**[(d)] | $332,456,809.18 | $224,000,000 | $224,000,000 | $0.00 |
| **Total Debt** | **$1,201,370,396.97** | | | **$675,000,000.00** |
| **Implied Equity** | | | | **$340,800,000.00** |
| **Total Capitalization** | **$1,201,370,396.97** | | | **$1,015,800,000.00** |

(a) Current Principal Balance represents principal balance as of the date the Company filed for chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.

(b) Does not include any accrued or unpaid interest, default interest, expenses, or other fees and charges. Estimated outstanding balance after release of all reserved Five Mile DIP loan proceeds to Five Mile.

(c) To be paid in full, amount stated is as of October 12, 2011 and does not include any accrued or unpaid interest, default interest, expenses, or other fees and charges.

(d) Includes Floating Pool Mortgage and Mezzanine Loans.

---

[2] Appendix B (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

| Sources | | Uses | |
|---|---|---|---|
| New Cash | $340,800,000.00 | Repayment of Solar DIP Financing | $9,313,587.79 |
| Apollo Contribution | $375,000.00 | Repayment of Five Mile DIP Financing[a] | $34,200,000.00 |
| | | Consideration to Floating Pool Mortgage and Mezzanine Loan Holders | $224,000,000.00 |
| | | Unsecured Creditors Payment | $4,750,000.00 |
| | | Apollo Guaranty Settlement | $3,000,000.00 |
| | | Five Mile/Lehman Expense Reimbursement | $3,000,000.00 |
| | | Special Servicer Cash Payment | $3,000,000.00 |
| | | Balance Sheet Cash[b] | $59,911,412.21 |
| **Total** | **$341,175,000.00** | | **$341,175,000.00** |

(a) Does not include any accrued or unpaid interest, default interest, expenses, or other fees and charges. Estimated outstanding balance after release of all reserved Five Mile DIP loan proceeds to Five Mile.

(b) Balance sheet cash to be used for, among things, the funding of $8,000,000 to be held at New Holdco for current and future PIP work, $17,000,000 to be held by Midland as a reserve for current and future PIP work on the fixed rate properties, $7,800,000 to be held by Midland as a reserve for FF&E for the fixed rate properties, and closing costs (inclusive of $3,500,000 of employee bonuses). Insofar as any of these costs are not realized in their full amounts, the balance sheet cash shall stay at New HoldCo.

**<u>Exhibit B</u>**
Draft Loan Amendment

[See Attached]

**SECOND AMENDMENT TO LOAN AGREEMENT AND OMNIBUS LOAN MODIFICATION AGREEMENT**

   THIS SECOND AMENDMENT TO LOAN AGREEMENT AND OMNIBUS LOAN MODIFICATION AGREEMENT (this "Amendment") is made and effective as of the ____ day of October, 2011 (the "Effective Date"), by and among **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C6, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C6, SUCCESSOR TRUSTEE TO BANK OF AMERICA, NATIONAL ASSOCIATION**, having an address at c/o Wells Fargo Commercial Mortgage Servicing, 201 South College Street, 9th Floor, Charlotte, North Carolina, 28244 (as Lender and Agent for the Co-Lenders, together with its successors and assigns, "Lender"), **EACH OF THE PERSONS LISTED ON SCHEDULE I ATTACHED HERETO**, each having its principal place of business at Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 (individually or collectively, as the context may require, together with each Borrower's successors and assigns, "Borrower"), **GRAND PRIX FIXED LESSEE LLC**, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("Operating Lessee"), **INK ACQUISITION LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK I"), **INK ACQUISITION II LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK II"), **INK ACQUISITION III LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK III"), **INK ACQUISITION IV LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK IV"), **INK ACQUISITION V LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK V"), **INK ACQUISITION VI LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK VI"), **INK ACQUISITION VII LLC**, a Delaware limited liability company, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("INK VII"; and together with INK I, INK II, INK III, INK IV, INK V and INK VI, individually or collectively, as the context may require, "New Holdco"), **CERBERUS SERIES FOUR HOLDINGS, LLC**, a Delaware limited liability company, having its principal place of business at c/o Cerberus Real Estate Capital Management, LLC, 299 Park Avenue, 22nd Floor, New York, New York 10022 ("Cerberus") and **CHATHAM LODGING, L.P.**, a Delaware limited partnership, having its principal place of business at c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 ("Chatham").

## RECITALS:

   A. On June 29, 2007 (the "Closing Date"), Lehman ALI Inc. ("Original Lender") made a loan to Borrower in the original principal amount of $825,402,542 (the "Loan") pursuant to that certain Loan Agreement dated as of the Closing Date, by and among Original Lender, Borrower, Operating Lessee (with respect to Articles 4 and 5 and Section 8.1 thereof only), and

Grand Prix Holdings, LLC (with respect to Sections 9.1, 9.2 and 9.7 thereof only), (the "Original Loan Agreement"; and as amended by that certain First Amendment to Loan Agreement dated as of August 9, 2007, and this Amendment, the "Loan Agreement").  The Loan is evidenced by that certain Replacement Promissory Note A-1 and that certain Replacement Promissory Note A-2, each dated as of August 9, 2007, and each in the original principal amount of $412,701,271 (collectively, and as further amended hereby, the "Note"), and is secured by, among other things, those certain Security Instruments referred to in the Loan Agreement.

B. On July 19, 2010, Innkeepers USA Trust, together with certain of its wholly owned direct and indirect subsidiaries (collectively, the "Company"), including Borrower, Operating Lessee and Grand Prix Holdings, LLC, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The recapitalization and debt restructuring of Borrower, Operating Lessee and certain of the other debtors in connection with such bankruptcy is being effectuated through a plan of reorganization (the "Plan") which the Bankruptcy Court confirmed on June 29, 2011, as such Plan was amended and modified pursuant to an order by the Bankruptcy Court confirming such amendment and modification to the Plan entered on [       ] (collectively, the "Amended Plan"). Pursuant to the Amended Plan, the equity interests in Borrower and Operating Lessee are being acquired by New Holdco and the Loan is being modified to, among other things, reduce the outstanding principal balance of the Loan, as of the date hereof, to Six Hundred Seventy-Five Million and 00/100 Dollars ($675,000,000.00) (the "Restructuring").

C.      This Amendment is being executed and delivered by the parties hereto in order to amend and modify the Loan Agreement and certain of the other Loan Documents (as defined in the Loan Agreement) to reflect the principal reduction and certain other modifications in connection with the Restructuring.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1. LOAN MODIFICATIONS

Section 1.1      Modification of the Loan Agreement.    The Loan Agreement is hereby modified as follows:

(a)      Deleted Definitions.    The following definitions set forth in Section 1.1 of the Loan Agreement are hereby deleted in their entirety:

(i)  "Aggregate Debt Service Coverage Ratio".

(ii) "Aggregate Loan to Value Ratio".

(iii) "California Individual Property".

(iv) "California Transferee".

(v) "Closing Date DSCR".

(vi) "Completion Guaranty".

(vii) "Defeasance Collateral".

(viii) "Defeasance Date".

(ix) "Defeasance Deposit".

(x) "Defeasance Event".

(xi) "Defeased Note".

(xii) "GPAT".

(xiii) "Mezzanine Borrower".

(xiv) "Mezzanine Loan".

(xv) "Outparcel Property".

(xvi) "Outparcel Release".

(xvii) "Outparcel Release Price".

(xviii) "Permitted Defeasance Date".

(xix) "Permitted Prepayment Date".

(xx) "Scheduled Defeasance Payments".

(xxi) "Security Agreement".

(xxii)  "Sponsor Loan".

(xxiii)  "Successor Borrower".

(xxiv)  "Yield Maintenance Premium".

(b)      Additional Definitions.    The following definitions are hereby inserted in Section 1.1 of the Loan Agreement in the appropriate alphabetical position:

(i)  "Adjusted Issue Price" shall mean the adjusted issue price of the Loan within the meaning of section 1.1275-1(b) of the Treasury Regulations; for the avoidance of doubt, the Adjusted Issue Price on the Second Amendment Effective Date is $675,000,000.00.

(ii)  "Adverse REMIC Event" shall mean an action, if taken or not taken, as the case may be, that will (i) disqualify Lender as a REMIC Trust; (ii) result in the imposition of any tax on Lender, including the tax on prohibited transactions as defined in Code Section 860F(a)(2) and the tax on contributions set forth in Code Section 860G(d); or (iii) cause the Loan to cease to be a "qualified mortgage" within the meaning of Code Section 860G(a)(3).

(iii) "Catchall Paydown Amount" shall mean an amount that (i) may be received and applied to the Adjusted Issue Price by Lender in accordance with Section 2.5.2B hereof and will not result in an Adverse REMIC Event pursuant to REMIC Provisions in effect at the time of such application and (ii) is not any of the Tax Net Proceeds, LTV Paydown Amount, the Origination Value Ratio Paydown Amount or the Constant LTV Paydown Amount.

(iv) "Cerberus Affiliate" shall mean one or more entities, funds or accounts, Controlled by or under common Control with Cerberus Real Estate Capital Management, L.P. or Cerberus Capital Management, L.P, or one or more of their respective Affiliates.

(v)  "Cerberus Member" shall mean, individually or collectively, as the context may require, CRE-Ink REIT Member, LLC, CRE-Ink REIT Member IV, LLC, CRE-Ink REIT Member V, LLC, CRE-Ink REIT Member VI, LLC, CRE-Ink REIT Member VII, LLC, CRE-Ink TRS Holding, Inc. and CRE-Ink Member II Inc.

(vi) "Chatham" shall mean Chatham Lodging, L.P., a Delaware limited partnership.

(vii)    "Chatham Member" shall mean, individually or collectively, as the context may require, Chatham and Chatham TRS Holding Inc.

(viii)    "Chatham Lodging" shall mean Chatham Lodging Trust, a Maryland real estate investment trust.

(ix) "Constant LTV Paydown Amount" shall mean the "qualified amount" determined under Section 5.04(4) of Revenue Procedure 2010-30 (or any successor advice or interpretation thereto) with respect to the transaction in which the lien is released on one or more of the Release Properties (for this purpose, the Tax Fair Market Values shall be used).

(x) "CRE-Ink REIT Member" shall mean, individually or collectively, as the context may require, CRE-Ink REIT Member, LLC, CRE-Ink REIT Member IV, LLC, CRE-Ink REIT Member V, LLC, CRE-Ink REIT Member VI, LLC and CRE-Ink REIT Member VII, LLC.

(xi) "Current Appraisal" shall mean, with respect to the determination of Tax Fair Market Value as of a particular date, an appraisal of an Individual Property prepared by a Qualified Appraiser and dated as of a date that, in the sole judgment of Lender, reflects the current Tax Fair Market Value of such Individual Property.

(xii)    "Holdco Interest Transfer" shall mean a transfer of the direct and indirect interests in any INK REIT pursuant to Section 5.2.10(d)(C) hereof.

(xiii)    "INK REIT" shall have the meaning set forth in Section 5.2.10(d)(C) hereof.

(xiv)    "Innkeepers Filing" shall mean the Chapter 11 bankruptcy filing on July 19, 2010, by Innkeepers USA Trust and certain of its wholly owned direct and indirect subsidiaries, including Borrower, Operating Lessee and Grand Prix Holdings LLC.

(xv)    "LTV Paydown Amount" shall mean the minimum principal amount of the Loan necessary to be paid such that, immediately after the lien is released with respect to one or more of the Release Properties, the REMIC LTV of the Remaining Parcels is no greater than one hundred and twenty-five percent (125%).

(xvi)    "Major Decisions" shall mean, collectively, the "Major Decisions"

as defined in Section 1.6 of the New Holdco Operating Agreement and the decisions described in Section 3.2(g) of the New Holdco Operating Agreement.

(xvii)  "Member Guaranty" shall mean that certain Guaranty, dated as of the Second Amendment Effective Date, given by Cerberus, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

(xviii) "New Holdco" shall mean individually or collectively, as the context may require, INK Acquisition LLC, INK Acquisition II LLC, INK Acquisition III LLC, INK Acquisition IV LLC, INK Acquisition V LLC, INK Acquisition VI LLC and INK Acquisition VII LLC, each a Delaware limited liability company.

(xix)  "New Holdco Guaranty" shall mean that certain Guaranty, dated as of the Second Amendment Effective Date, given by New Holdco, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

(xx)  "New Holdco Member" shall mean, individually or collectively, as the context may require, Cerberus Member and Chatham Member, and their respective permitted successors and assigns.

(xxi)  "New Holdco Operating Agreement" shall have the meaning set forth in Section 5.1.27 hereof.

(xxii)  "Opinion of Tax Counsel" shall mean a written opinion of counsel selected by the Servicer who is nationally recognized in matters related to the REMIC Provisions.

(xxiii) "Origination Value Ratio Paydown Amount" shall mean the "qualified amount" determined under Section 5.04(2) of Revenue Procedure 2010-30 (or any successor advice or interpretation thereto) with respect to the transaction in which the lien is released on one or more of the Release Properties.

(xxiv) "PIP Account" shall have the meaning set forth in Section 3.1 (b)(xi) hereof.

(xxv)  "PIP Fund" shall have the meaning set forth in Section 7.10 hereof.

(xxvi) "Release Property" shall have the meaning set forth in Section

2.5.2A hereof.

(xxvii) "<u>Qualified Appraiser</u>" shall mean an independent nationally recognized professional commercial real estate appraiser who is experienced in appraising commercial real property similar to the relevant Individual Property in the jurisdiction in which the relevant Individual Property is located and shall have no interest in the matter in question and no reason to be biased in favor of either Lender or Borrower.

(xxviii) "<u>Qualified Buyer</u>" shall mean a Person which: (i) is not Borrower, Operating Lessee, New Holdco, Cerberus Member, Chatham Member, Guarantor or any Affiliate of any of the foregoing, (ii) is not and does not have a relationship of the type described in Section 267(b) or 707(b)(1) of the Code with Borrower, Operating Lessee, New Holdco, Guarantor, Cerberus Member, Chatham Member or any Affiliate of any of the foregoing and (iii) is otherwise unrelated to Borrower for purposes of the REMIC Provisions.

(xxix) "<u>Qualified Paydown Amount</u>" shall mean with respect to a particular sale of an Individual Property, an amount equal to the lesser of (A) the Tax Net Proceeds from a Qualified Sale, or (B) the lowest of the Origination Value Ratio Paydown Amount, the Constant LTV Paydown Amount, the LTV Paydown Amount or the Catchall Paydown Amount.

(xxx) "<u>Qualified Sale</u>" shall mean the consummation and close of escrow for the bona fide arms-length sale of an Individual Property or Individual Properties to one or more Qualified Buyers, negotiated by the parties to said sale, in good faith and in the exercise of sound and prudent business judgment, taking into account market conditions existing at the time of the sale.

(xxxi) "<u>Qualified Transferee</u>" means a Person that is not a Prohibited Person and that is one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this <u>clause (A)</u> satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this <u>clause (B)</u> satisfies the Eligibility Requirements; or

(C)      an investment fund, limited liability company, limited partnership or an institution substantially similar to any of the foregoing entities described in clauses (A) or (B) of this definition that satisfies the Eligibility Requirements.

For purposes of this definition, "Eligibility Requirements" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

(xxxii) "Release Indemnitor" shall have the meaning set forth in Section 5.2.10(d)(C) hereof.

(xxxiii) "Remaining Parcels" shall mean the Individual Properties remaining encumbered by the Security Instruments immediately after the Property Release of a Release Property or a Holdco Interest Transfer, as applicable.

(xxxiv) "REMIC LTV" shall mean, as of a particular date, the ratio (expressed as a percentage) of (a) the Adjusted Issue Price, as of such date, to (b) the aggregate Tax Fair Market Value of the "real property components" of the Individual Properties in question, as of such date.

(xxxv)      "REMIC Provisions" shall mean the provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Section 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and regulations (including any applicable proposed regulations) and rulings and interpretations promulgated thereunder, as the foregoing may be in effect from time to time.

(xxxvi)      "Required Release Price" shall mean, with respect to any Individual Property, the greater of (A) the Release Price or (B) the lowest of (i) the Tax Net Proceeds from a Qualified Sale, (ii) the Origination Value Ratio Paydown Amount, (iii) the Constant LTV Paydown Amount, (iv) the LTV Paydown Amount or (v) the Catchall Paydown Amount.  For the avoidance of doubt, in no event shall the Required Release Price be less than the Release Price.

(xxxvii)      "Second Amendment" shall mean that certain Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement dated as of Second Amendment Effective Date.

(xxxviii)      "Second Amendment Effective Date" shall mean the

"Effective Date" as defined in the Second Amendment.

(xxxix) "Tax Fair Market Value" shall mean, with respect to an Individual Property, the "fair market value" thereof as determined by a Qualified Appraiser designated by Lender pursuant to one or more Current Appraisals obtained at Borrower's expense; for this purpose the Tax Fair Market Value shall only include the "real property" components of such Individual Property within the meaning of the REMIC Provisions, which include land and improvements thereon, such as building or other inherently permanent structures thereon (including items which are structural components of such buildings or structures), and the local law definition shall not be controlling and shall not include assets accessory to the operation of a business even if termed fixtures under local law.

(xl) "Tax Net Proceeds" shall mean the amount realized for purposes of computing gain or loss under Section 1001 of the Code, including the Tax Net Proceeds, if any, from the receipt of an insurance or tort settlement with respect to the relevant Individual Property.

(xli) "Treasury Regulations" shall mean those regulations that are promulgated by the United States Department of Treasury pursuant to the Code, as the foregoing may be in effect from time to time.

(c) Revised Definitions. The following definitions set forth in Section 1.1 of the Loan Agreement are hereby modified as follows:

(i) The definition of "Accounts" is amended and restated to read as follows:

"Accounts" shall mean, collectively, the Lockbox Account, the Tax Account, the Insurance Premium Account, the Required Repair Account, the FF&E Reserve Account, the Required Capital Improvements Account, the Ground Rent Account, the Debt Service Account, the Marriott Termination Fees Reserve Account, the Mountain View Litigation Reserve Account, the Germantown Franchise Reserve Account, the Cash Management Account, the PIP Account or any other escrow accounts or reserve accounts established by the Loan Documents.

(ii) The definition of "Affiliate" is hereby modified to delete the reference therein to "Apollo".

(iii)The definition of "Affiliated Manager" is amended and restated to read as follows:

"Affiliated Manager" shall mean any property manager which is an Affiliate of, or in which Borrower, Principal, Guarantor, Cerberus Member, Chatham Member or New Holdco has, directly or indirectly, any legal, beneficial or economic interest.

(iv) The definition of "Closing Date NOI" is amended and restated to read as follows:

"Closing Date NOI" shall mean, with respect to the Property and any Individual Property, the Net Operating Income as of June 30, 2011 (determined on a trailing 12 month basis) as shown on Schedule XIII hereto and which schedule will be modified from time to time in connection with any Property Release in accordance with Section 2.5.2A hereof or a Holdco Interest Transfer pursuant to Section 5.2.10 hereof, as applicable, to omit the allocated Net Operating Income of the applicable Individual Property or Individual Properties, as applicable, on the date of the Property Release of such Individual Property in accordance with the provisions of Section 2.5.2A hereof or the Holdco Interest Transfer pursuant to Section 5.2.10 hereof, as applicable.

(v) The definition of "Debt Service" is amended and restated to read as follows:

"Debt Service" shall mean, with respect to any particular period of time, interest and principal payments due under the Note.

(vi) Clause (b) of the definition of "Debt Service Coverage Ratio" is hereby amended and restated to read as follows:

"(b)    the denominator is the aggregate amount of Debt Service (assuming amortization on a 30-year schedule) which would be due and payable under the Note."

(vii)    The definition of "Environmental Indemnity" is amended and restated to read as follows:

"Environmental Indemnity" shall mean (i) that certain Environmental Indemnity Agreement executed by Borrower and Grand Prix Holdings LLC on the Closing Date and (ii) that certain Environmental Indemnity Agreement executed by Borrower and New Holdco on the Second Amendment Effective Date.

(viii)    The definition of "Guarantor" shall mean New Holdco and Cerberus and any other Person that executes or delivers a guaranty in connection with the Loan.

(ix) The definition of "<u>Guaranty</u>" is amended and restated to read as follows:

"<u>Guaranty</u>" shall mean (i) the Member Guaranty and (ii) the New Holdco Guaranty.

(x) The definition of "<u>Manager</u>" is amended and restated to read as follows:

"<u>Manager</u>" shall mean Island Hospitality Management, Inc., or, if the context requires, a Qualified Manager who is managing the Properties or any Individual Property in accordance with the terms and provisions of this Agreement.

(xi) The definition of "<u>Permitted Owner</u>" is amended and restated to read as follows:

"<u>Permitted Owner</u>" shall mean: any other Person (a) that is a Qualified Transferee and reasonably approved by Lender and (b) if a Securitization shall have occurred, regarding which Lender shall have received written confirmation by the Rating Agencies that the transfer to such Person will not, in and of itself, cause a downgrade, withdrawal or qualification of the then current ratings of the Securities issued pursuant to the Securitization.

(xii) The definition of "<u>Release Price</u>" is amended and restated to read as follows:

"<u>Release Price</u>" shall mean, with respect to any Individual Property, 108% of the Allocated Loan Amount set forth opposite such Individual Property on <u>Schedule I</u> attached hereto.

(xiii) The definition of "<u>REMIC Trust</u>" is amended and restated to read as follows:

"<u>REMIC Trust</u>" shall mean a real estate mortgage investment conduit subject to Section 860A through 860G of Subchapter M of Chapter 1 of the Code.

(xiv) The definition of "<u>Required Amortization</u>" is amended and restated to read as follows:

"<u>Required Amortization</u>" shall mean, for the period from and including the

Interest Period beginning in October, 2015, an amount determined by Lender which would be necessary to amortize the entire principal balance of the Loan over a period of thirty (30) years. For purposes of clarification, for the period prior to the Interest Period beginning in October, 2015, there is no requirement to amortize the principal balance of the Loan.

(xv)     The definition of "<u>Reserve Funds</u>" is amended and restated to read as follows

"<u>Reserve Funds</u>" shall mean the Tax and Insurance Escrow Fund, the Required Capital Improvements Fund, the Required Repair Fund, the FF&E Reserve Fund, the Ground Lease Escrow Fund, the Marriott Termination Fee Reserve Fund, the Mountain View Litigation Reserve Fund, the Germantown Franchise Reserve Fund, the PIP Fund or any other escrow or reserve fund established by the Loan Documents.

(xvi)    The definition of "<u>Restricted Party</u>" is amended and restated to read as follows

"<u>Restricted Party</u>" shall mean Borrower, Principal, New Holdco, Guarantor, Cerberus Member, Chatham Member, Operating Lessee or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, Principal, New Holdco, Guarantor, Cerberus Member, Chatham Member, Operating Lessee or any Affiliated Manager or any non-member manager; provided that neither Chatham Lodging Trust, Cerberus or any Cerberus Affiliate, nor any holders of a direct or indirect interest in Chatham Lodging, Cerberus or any Cerberus Affiliate, shall be a Restricted Party.

(d)     Section 2.3.1 of the Loan Agreement is hereby amended and restated to read as follows:

"**2.3.1** <u>Voluntary Prepayments</u>.

On any Payment Date, Borrower may, at its option and upon thirty (30) days' prior written notice to Lender, prepay the Loan in whole or in part, provided, Borrower pays to Lender all accrued and unpaid interest on the amount of principal being prepaid through and including the date of prepayment."

(e)     Section 2.3.2 of the Loan Agreement is hereby modified by deleting the last sentence thereof.

(f)     Section 2.3.3 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"**2.3.3**  Intentionally Omitted."

(g)     Section 2.4 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"**Section 2.4**  Intentionally Omitted."

(h)     Section 2.5 is hereby modified by deleting the words "Section 2.4 hereof and" from the first sentence of such Section.

(i)     Section 2.5.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"**2.5.1**  Intentionally Omitted."

(j)     Subsection 2.5.2 of the Loan Agreement is hereby amended and restated to read as follows:

"**2.5.2A**  Release of Individual Properties.  Borrower may obtain the release (a "Property Release") of any Individual Property (each, a "Release Property") from the lien of the applicable Security Instrument and the other Loan Documents, upon the satisfaction of each of the following conditions:

(a)     Immediately prior to, and after giving effect to the proposed release, no Event of Default shall have occurred and be continuing (unless the Event of Default would be cured by the release of the Release Property);

(b)     Lender shall have received at least thirty (30) days but no more than ninety (90) days prior written notice of its request to obtain a release of the proposed Property Release, provided that Borrower shall have the right to revoke such notice or extend the release date upon written notice to Lender and upon payment to Lender of all out of pocket costs and expenses actually incurred by Lender which notice must be received by Lender not less than three (3) Business Days prior to the release date to be extended or revoked and which payment is received by Lender not later than (i) in the case of an extension, the release date as so extended and (ii) in the case of a revocation, three (3) Business Days prior to the release date so revoked; provided, however, that notwithstanding the foregoing notice dates, Borrower shall not be entitled to a Property Release unless and until the conditions set forth in this Agreement have been satisfied;

(c)     Lender shall have received (i) (x) the Stay/Hampton Release Price (as hereinafter defined) if the Release Property is a Stay/Hampton

Hotel (as hereinafter defined) and the conditions set forth in the penultimate paragraph of this Section 2.5.2A are satisfied, or (y) the Release Price if the Release Property is an Early Release Property (as hereinafter defined) and the conditions set forth in the last paragraph of this Section 2.5.2A are satisfied or (z) the Required Release Price for all other Individual Properties plus (ii) payment of all of Lender's reasonable costs and expenses, including reasonable counsel fees and disbursements incurred in connection with the release of the Individual Property from the lien of the Security Instrument and the review and approval of the documents and information required to be delivered in connection therewith and (iii) any other amounts then due and owing to Lender pursuant to this Agreement and the other Loan Documents;

(d)     Borrower shall have submitted to Lender not less than five (5) Business Days prior to the date of such Property Release, a release of the Security Instrument as it relates to the Release Property and related Loan Documents for execution by Lender.  Such release shall be in a form appropriate for the jurisdiction in which the Release Property is located.  In addition, Borrower shall provide such documentation that a prudent lender originating mortgage loans for securitization similar to the Loan would reasonably require to be delivered by Borrower in connection with such Property Release provided the delivery of such documentation is customary in the relevant jurisdiction;

(e)     Lender shall have received an Opinion of Tax Counsel to the effect that no Adverse REMIC Event would result from such Property Release (including, without limitation, any opinion required pursuant to Section 2.5.2B);

(f)     Simultaneously with the Property Release of a Release Property, Borrower shall convey fee simple title or leasehold title, as applicable, to the Release Property to (i) any Person other than Borrower or Operating Lessee or (ii) if the Required Release Price shall be based on the Tax Net Proceeds, a Qualified Buyer pursuant to a Qualified Sale;

(g)     All references in the Loan Documents to Individual Properties shall exclude the relevant Release Property from and after the date the same has been released in accordance with this Section 2.5.2A except to the extent that any liability or obligations under the Loan Documents with respect to such Release Property specifically survive such Property Release;

(h)     If Borrower has specified in the notice delivered pursuant to subsection (b) above that it desires to effectuate a Property Release in a manner which will permit the assignment of a portion of the Note and the applicable Security Instrument in lieu of releasing the same in order to save mortgage recordation tax, Borrower and Lender shall cooperate to effect such proposed assignment provided that (i) such assignment is made by Lender without recourse, covenant, representation or warranty of any nature, express or implied; (ii) Borrower has complied with all other provisions of this Section 2.5.2A to the

extent not inconsistent with this <u>subsection (h)</u>; (iii) Borrower pays to Lender (A) Lender's then customary administrative fee for processing assignments of mortgage, (B) the reasonable expenses of Lender incurred in connection therewith, and (C) Lender's reasonable attorney's fees for the preparation and delivery of such an assignment; (iv) such new lender shall materially modify the relevant portion of the assigned Note such that it shall be treated as a new loan for federal tax purposes; (v) such an assignment is not then prohibited by any federal, state or local law, rule, regulation, order or by any other governmental authority; (vi) such assignment has no adverse economic effect on Lender (vii) Borrower shall have caused the delivery to Lender of an executed affidavit under Section 275 of the New York Real Property Law (if such Individual Property is located in New York); and (viii) Borrower shall provide such other opinions, items, information and documents which a prudent lender would reasonably require to effectuate such assignment.   Borrower shall be responsible for all mortgage recording taxes, recording fees and other charges payable in connection with any such assignment.  Lender agrees that such assignment shall be accomplished by an escrow closing conducted through an escrow agent reasonably satisfactory to Lender and pursuant to an escrow agreement reasonably satisfactory to Lender in form and substance; and

        (i) the Debt Service Coverage Ratio after giving effect to such Property Release shall be no less than the Debt Service Coverage Ratio immediately prior to such Property Release.

If, in connection with the sale of any of the Individual Properties set forth on Schedule XVI attached hereto (each, a "<u>Stay/Hampton Hotel</u>" and collectively, the "<u>Stay/Hampton Hotels</u>"), the Tax Net Proceeds are less than the Release Price for the applicable Stay/Hampton Hotel, then <u>Section 2.5.2B</u> shall be inapplicable and Lender shall accept the Tax Net Proceeds (the "<u>Stay/Hampton Release Price</u>") as the release price to satisfy the condition contained in <u>Section 2.5.2(A)(c)(i)</u> above, provided that (i) the sale is to a Qualified Buyer, (ii) the sale is on market terms acceptable to Lender in its reasonable discretion and (iii) such Property Release otherwise satisfies all other conditions for a Property Release contained above in this <u>Section 2.5.2A</u>.  With respect to any such sale of a Stay/Hampton Hotel, if the Tax Net Proceeds are less than the Allocated Loan Amount received for such Stay/Hampton Hotel, then the difference between the Allocated Loan Amount and the Tax Net Proceeds received for the sale of such Stay/Hampton Hotel shall be allocated proportionally among the Allocated Loan Amounts for the Remaining Parcels.

On or prior to March 31, 2012 Borrower may obtain a Property Release of one or more of the Individual Properties set forth on Schedule XVII attached hereto (each, an "<u>Early Release Property</u>") for a release price equal to the Release Price for the applicable Early Release Property in connection with a sale or Holdco Interest Transfer of such Early Release Property, provided that (i) Lender is not aware of any material change in (x) the Tax Fair Market Value of the Early Release Property in question or (y) the aggregate Tax Fair Market Value of the

Remaining Parcels, (ii) the sale or Holdco Interest Transfer and Property Release of such Early Release Property occurs on or prior to March 31, 2012 and (iii) such Property Release otherwise satisfies all other conditions for a Property Release contained above in this <u>Section 2.5.2A</u>. For the avoidance of doubt, Borrower shall only be permitted to release an Early Release Property pursuant to a Holdco Interest Transfer in accordance with this paragraph if every Individual Property owned by the INK REIT which is the subject of such Holdco Interest Transfer is an Early Release Property.

      **2.5.2B**  <u>Required Release Price Determination</u>. In the event Borrower anticipates that the Required Release Price for any Property Release, shall be based on anything but the Tax Net Proceeds, (i) Borrower shall include a statement to such effect in the written notice to Lender pursuant to Section 2.5.2A(b), which notice (although not binding on Borrower) shall allow Lender to expedite the retention of one or more Qualified Appraisers for purposes of obtaining such Current Appraisals as Lender deems necessary in connection with the calculation of the aggregate Tax Fair Market Value of the Remaining Parcels and the Individual Properties in question and (ii) Borrower shall provide a calculation of such amount to Lender in sufficient detail, with all necessary supporting documentation, to enable the counsel designated to provide the Opinion of Tax Counsel to review such calculation and determine whether it will be able to deliver an opinion to the effect that the release of the lien with respect to such Individual Property and application of the Required Release Price by Lender to the Adjusted Issue Price in accordance with such request will not result in an Adverse REMIC Event (which opinion shall be part of the Opinion of Tax Counsel required pursuant to Section 2.5.2A(e)). This <u>Section 2.5.2B</u> shall not be applicable to (i) the release of any Stay/Hampton Hotel in accordance with the provisions of the penultimate paragraph of Section 2.5.2A above or (ii) the release of any Early Release Property in accordance with the last paragraph of <u>Section 2.5.2A</u> above.

      **2.5.2C**  <u>Opinion of Tax Counsel</u>. If an Opinion of Tax Counsel is required under any provision hereof, upon the written request of Borrower or if determined to be advisable by the Servicer, as the case may be, the Servicer shall promptly select counsel to provide such Opinion of Tax Counsel and Borrower and the Servicer shall use reasonable commercial efforts to (x) provide such counsel with all requested information reasonably available to it to enable such counsel to determine if it is able to render the requested Opinion of Tax Counsel and, if so, (y) cause such counsel to timely deliver such Opinion of Tax Counsel. All costs and expenses of such counsel shall be paid by Borrower whether or not the requested Opinion of Tax Counsel is ultimately delivered. Borrower agrees that its only remedy under this Section 2.5.2C is for specific performance and it cannot seek money damages or other remedies."

(k)        Section 2.5.4 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"2.5.4. Intentionally Omitted."

(l)        The second sentence of Section 3.1(a) of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:

"The Lockbox Account shall be entitled "Island Hospitality Management, Inc., as agent for [NAME OF APPLICABLE INDIVIDUAL BORROWER], for the benefit of Wells Fargo Commercial Mortgage Servicing, as Master Servicer – Lockbox Account.""

(m)The second sentence of Section 3.2(a) of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:

"The Cash Management Account shall be entitled "[U.S. Bank National Association, as Trustee], as Lender, pursuant to a Loan Agreement with Grand Prix Addison (RI) LLC, et al., as Borrower, dated as of June 29, 2007 – Cash Management Account.""

(n)        The following new Section 3.2(b)(xi) is hereby inserted in the Loan Agreement:

"(xi) An account into which the Borrower shall deposit or cause to be deposited, the PIP Fund (the "PIP Account")."

(o)        The first sentence of Section 3.16 of the Loan Agreement is hereby modified by inserting the words "and during the continuance" after the words "upon the occurrence".

(p) Section 4.1.6 of the Loan Agreement is hereby modified by deleting the words "No petition under" at the beginning of the sixth sentence thereof and replacing same with "Except for the Innkeepers Filing, no petition under".

(q) Clause (j) of Section 4.1.35 is hereby modified by deleting the references therein to "Apollo" and replacing same with "Cerberus Member or Chatham Member".

(r) Clause (y) of Section 4.1.35 is hereby amended by deleting the reference therein to "Apollo".

(s) Section 4.1.41 is hereby modified by deleting the references therein to

"Apollo" and replacing the same with "Chatham Member, Cerberus Member".

(t) Section 4.1.43 is hereby modified by adding the words "Chatham Member, Cerberus Member" immediately following each reference therein to "Principal" and deleting the references therein to "Apollo".

(u) Section 5.1.10 of the Loan Agreement is hereby modified by deleting references therein to "GPAT" and replacing same with "New Holdco".

(v) Clause (b) of Section 5.1.10 of the Loan Agreement is hereby amended by adding the following at the end of such Section:

"Cerberus or any replacement guarantor will furnish, or cause to be furnished, to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year a complete copy of Cerberus' or any replacement guarantor's annual financial statements audited by Price Waterhouse Coopers LLP or any other "Big Four" accounting firm or any Approved Accountant and containing an unqualified opinion in accordance with GAAP (or other such accounting basis acceptable to Lender); provided that such annual financial statements of Cerberus or any replacement guarantor that is a Cerberus Affiliate (x) may not include (i) any listed investments, (ii) any changes in partnership capital or (iii) any footnotes and (y) shall not be disclosed (i) to any third party except any Co-Lender and any Servicer (including any master servicer or special servicer of the Loan acting in such capacity for Lender and/or any Co-Lender) or (ii) as required by Applicable Laws; provided that Lender, any Co-Lender or Servicer, as applicable, shall be permitted to disclose the same to their respective directors, officers, employees, counsel, accountants, agents or representatives who need to know such information to permit Lender, any Co-Lender or Servicer to carry out its review or perform its services in connection with the Loan and who are informed of the confidential nature of such information. In addition, within one hundred twenty (120) days following the end of each Fiscal Year, Cerberus or any replacement guarantor that is a Cerberus Affiliate shall furnish to Lender upon request, a certification of Cerberus' or such replacement guarantor's audited net worth and liquidity in the form attached hereto as Schedule XIX (a "Net Worth Certificate"), which Net Worth Certificate may be disclosed by Lender, from time to time, to any third party as Lender or Servicer deems necessary or advisable in its sole discretion. Lender (and any Servicer) shall be permitted, from time to time, to consult with the Chief Financial Officer of Cerberus or any replacement guarantor that is a Cerberus Affiliate. Upon the reasonable prior request of Lender (or Servicer), Borrower and Cerberus or any replacement guarantor that is a Cerberus Affiliate, as applicable, shall cooperate with Lender to arrange for such meeting and consultation. In addition, Chatham shall annually furnish to Lender prior to the March 31st following the end of its Fiscal Year, Chatham's annual financial statements for such Fiscal Year prepared in accordance with GAAP (or other such accounting basis acceptable to Lender) and certified by a duly authorized representative of Chatham."

(w) Clause (c) of Section 5.1.10 of the Loan Agreement is hereby amended and restated to read as follows:

"Borrower will furnish, or cause to be furnished, to Lender on or before thirty (30) days after the end of each calendar month statements of profits and losses for each Individual Property, accompanied by a certificate of a Responsible Officer or other appropriate officer of Borrower or Principal, as applicable."

(x) The following sentence is hereby added to the end of clause (g) of Section 5.1.10 of the Loan Agreement:

"Notwithstanding anything to the contrary contained in this clause (g), unless required by Applicable Laws, neither Lender nor any Co-Lender or Servicer shall disclose to any Investor (other than a Co-Lender), Rating Agency, potential Investor or other Person (except such Lender's, Co-Lender's or Servicer's respective directors, officers, employees, counsel, accountants, agents or representatives who need to know such information to permit such Lender, Co-Lender or Servicer to carry out its review or perform its services in connection with the Loan and who are informed of the confidential nature of such information), the annual audited financial statements of Cerberus or any replacement guarantor that is a Cerberus Affiliate or any information contained therein, except if such information is contained in the Net Worth Certificate or is otherwise available to the public. It is expressly understood and agreed that Lender is permitted to disclose copies of the Net Worth Certificates to any Investor, Rating Agency or potential Investor."

(y) Clause (l) of Section 5.1.10 of the Loan Agreement is hereby modified by deleting the reference therein to "Indemnitor or Apollo" and replacing same with "New Holdco".

(z) Sections 5.1.20, 5.1.24, 9.1 and 9.7 of the Loan Agreement are hereby modified by deleting the references therein to "Sponsor" and replacing same with "New Holdco.

(aa) Clause A of Section 5.1.20 of the Loan Agreement is hereby amended and restated to read as follows:

"a completion guaranty from New Holdco, in the form attached hereto as Exhibit E,"

(bb)    Section 5.1.25 is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member."

(cc)    The following new Subsection 5.1.27 is hereby added to the Loan Agreement immediately following Subsection 5.1.26 thereof:

"Section 5.1.27.    New Holdco; Major Decisions.  Borrower represents and warrants that attached hereto as Schedule XVIII is a true, correct and complete copy of each of (i) the Amended and Restated Limited Liability Company Agreement of INK I, dated as of the Second Amendment Effective Date (the "Ink I Operating Agreement"), (ii) the Limited Liability Company Agreement of INK II, dated as of the Second Amendment Effective Date (the "Ink II Operating Agreement"), (iii) the Limited Liability Company Agreement of INK III, dated as of the Second Amendment Effective Date (the "Ink III Operating Agreement"), (iv) the Limited Liability Company Agreement of INK IV, dated as of the Second Amendment Effective Date (the "Ink IV Operating Agreement"), (v) the Limited Liability Company Agreement of INK V, dated as of the Second Amendment Effective Date (the "Ink V Operating Agreement"), (vi) the Limited Liability Company Agreement of INK VI, dated as of the Second Amendment Effective Date (the "Ink VI Operating Agreement") and (vii) the Limited Liability Company Agreement of INK VII, dated as of the Second Amendment Effective Date (the "Ink VII Operating Agreement"; and together with the Ink I Operating Agreement, the Ink II Operating Agreement, the Ink III Operating Agreement, the Ink IV Operating Agreement, the Ink V Operating Agreement, the Ink VI Operating Agreement and the Ink VII Operating Agreement, collectively, the "New Holdco Operating Agreement").  In no event shall the Major Decisions be amended or otherwise modified without the prior written consent of Lender.  At all times from and after the date of the Second Amendment until payment and performance in full of all obligations of Borrower under the Loan Documents, Major Decisions shall continue to require the approval of the applicable Cerberus Member.  Any Transfer permitted pursuant to the terms of this Agreement or which is otherwise consented to by Lender, in its sole discretion, that results in a Cerberus Member's approval not being required for all Major Decisions, shall be conditioned upon, among other things, the following conditions (i) the transferee shall have a minimum net worth of $135,000,000, (ii) such transferee's approval is required for all Major Decisions, and such transferee is otherwise acceptable to Lender in its sole but reasonable discretion, (iii) such transferee shall execute and deliver a guaranty in form and substance substantially similar to the Member Guaranty, and (iv) Borrower shall pay Lender an administrative review fee and all costs and expenses incurred by Lender in connection therewith."

(dd)    Subsection 5.2.10(c) of the Loan Agreement is hereby modified by deleting clauses (iv) and (v) from the first sentence of such subsection.

(ee)    Subsection 5.2.10(d) of the Loan Agreement is hereby amended and

restated to read as follows:

"(d)    (A)   Notwithstanding anything to the contrary contained in this Section 5.2.10, (i) Cerberus shall have the right to transfer all or any portion of its interest in Cerberus Member to any Cerberus Affiliate, (ii) Chatham Member shall have the right to transfer all or any portion of its interest in New Holdco to any Person that is directly or indirectly owned and controlled by Chatham Lodging, (iii) Cerberus Members' consent must continue to be required for all Major Decisions, (iv) Cerberus or a Cerberus Affiliate must own, directly or indirectly, at least 51% of the equity interests in New Holdco, Borrower and in Operating Lessee and (v) in order to comply with the real estate investment trust provisions of the Code, each CRE-Ink REIT Member shall be permitted to issue up to one hundred twenty-five (125) units of preferred interests in such CRE-Ink REIT Member which have been authorized pursuant to the applicable Limited Liability Company Agreement of each such CRE-Ink REIT Member, at any time prior to [January 31, 2012]; provided same shall not result in a change of voting control in such CRE-Ink REIT Member.    At all times following a transfer of the Properties in accordance with the terms and provisions of Section 5.2.11 hereof, the Permitted Owner that wholly owns and controls "Transferee" referenced in such Section 5.2.11 must continue to have the right to make and control Major Decisions (i.e. a Major Decision cannot be taken without the approval of such Permitted Owner) and own, directly or indirectly, at least a 51% interest in New Holdco, in Borrower and in Operating Lessee.

(B)    Notwithstanding anything to the contrary contained in this Section 5.2.10, the restrictions on Transfers set forth in this Section 5.2.10 shall not apply to (i) the disposition, sale, issuance, or transfer of the publicly traded shares of Chatham Lodging and (ii) the cancellation, surrender, disposition, issuance, sale, grant, transfer or pledge of the operating partnership units of the Chatham Member (an "OPU Transfer"); provided that (x) no OPU Transfer shall be to a Prohibited Person, (y) in the event any OPU Transfer results in any Person and its Affiliates owning in excess of ten percent (10%) of the direct or indirect ownership interest in Borrower, Borrower shall provide to Lender, not less than thirty (30) days prior to such OPU Transfer, the name and identity of each proposed transferee, together with the names of its controlling principals, the social security number or employee identification number of such transferee and controlling principals, and such transferee's and controlling principal's home address or principal place of business, and home or business telephone number, and (z) in the event any OPU Transfer results in any Person and its Affiliates owning forty-nine percent (49%) or more of the direct or indirect ownership interests in Borrower, and a Securitization has occurred, Borrower shall, prior to such OPU Transfer, deliver an updated Insolvency Opinion to Lender, which opinion shall be in form, scope and substance acceptable in all respects to Lender and the Rating Agencies.

(C)     Without limiting any of provisions of clauses (A) and (B) of this Section 5.2.10(d), the restrictions on Transfers set forth in this Section 5.2.10 shall not apply to the transfer of all of the direct or indirect ownership interests in any of INK I, INK IV, INK V, INK VI or INK VII (individually or collectively, as the context may require, an "INK REIT"), may be transferred by the direct or indirect owners of such INK REIT (a "Holdco Interest Transfer"); provided that in connection with the Holdco Interest Transfer: (i) 100% of all of the direct or indirect ownership interests in such INK REIT are simultaneously transferred to any Person other than Borrower, Operating Lessee or New Holdco; (ii) all conditions set forth in Sections 2.5.2A, 2.5.2B and 2.5.2C hereof are satisfied (including, without limitation, all conditions set forth in such sections with respect to each Individual Property owned directly or indirectly by the applicable INK REIT which is the subject of the Holdco Interest Transfer which would be applicable to each such Individual Property if Borrower were obtaining a Property Release of such Individual Property pursuant to Section 2.5.2A) (provided that the conditions for a Property Release set forth in Section 2.5.2A(f) shall not apply in connection with a Holdco Interest Transfer); (iii) Lender shall be provided with copies of the documentation effectuating the applicable Holdco Interest Transfer; (iv) at Lender's option, the Operating Leases applicable to each Individual Property owned directly or indirectly by the applicable INK REIT shall be terminated and (v) all remaining entities comprising New Holdoco (other than the applicable INK REIT subject to such Holdco Interest Transfer) shall ratify and confirm the New Holdco Guaranty as of the date of the Holdco Interest Transfer. Borrower, Cerberus and Chatham (collectively, "Release Indemnitors") shall and hereby agree to jointly and severally indemnify, defend and hold harmless Lender, and the Indemnified Parties, from and against any and all liabilities, obligations, losses, debts, damages, penalties, action, judgments, suits, proceedings, claims, counterclaims, defenses, demands, costs, and expenses and disbursements of any kind or nature whatsoever (including without limitation reasonable attorneys' fees and expenses and costs of settlement) that may be imposed on, incurred by or asserted against Lender and/or the Indemnified Parties in any manner relating to or arising from any Holdco Interest Transfer or any potential Holdco Interest Transfer, including, without limitation any claim that any Holdco Interest Transfer or any potential Holdco Interest Transfer was or would be a fraudulent conveyance or other claim seeking to set aside or unwind any Holdco Interest Transfer or to recover or rescind any amounts paid or to be paid to Lender in connection with any Holdco Interest Transfer. The foregoing indemnification will be binding on Release Indemnitors and will inure to the benefit of the Lender and Indemnified Parties, and all of their respective heirs, personal representatives, successors and assigns. Upon the satisfaction of the conditions set forth in this Section 5.2.10(d)(C) with respect to a Holdco Interest Transfer, Lender agrees that the applicable INK REIT subject to such Holdco Interest Transfer shall be released as a guarantor under the New Holdco Guaranty from all liability arising from acts or omissions first occurring following the date of such applicable Holdco Interest Transfer pursuant to a written release in form and substance reasonably satisfactory to Lender and such INK REIT."

(ff)     Subsection 5.2.11(a) of the Loan Agreement is hereby amended by adding the following language at the beginning of such subsection: "Borrower shall pay Lender an assumption fee in the amount of one percent (1%) of the outstanding principal balance of the Loan.  In addition,".

(gg)     Subsection 5.2.11(d) of the Loan Agreement is hereby amended by deleting the following language from such subsection: "and shall assume all of the obligations of Apollo under the Completion Guaranty".

(hh)     Section 5.2.12 of the Loan Agreement is hereby deleted in its entirety and replacing same with the following:

Section 5.2.12.     <u>Transfer in Connection with an Initial Public Offering</u>.  If Borrower has not exercised its one-time right to sell, assign or otherwise transfer of all of the Properties in accordance with Section 5.2.11 hereof, Lender shall not unreasonably withhold its consent to a transfer in connection with or in anticipation of an initial public offering ("<u>IPO</u>") by New Holdco in lieu of the one-time sale, assignment or other transfer of all of the Properties set forth in Section 5.2.11 herein and upon satisfaction of the following conditions:

(a)     no Default or Event of Default has occurred and is continuing;

(b)     Cerberus Member's consent must continue to be required for all Major Decisions;

(c)     Cerberus or a Cerberus Affiliate must continue to own, directly or indirectly, at least 51% of the equity interests in New Holdco, Borrower and in Operating Lessee;

(d)     Lender shall have received confirmation in writing from the Rating Agencies to the effect that such transfer and IPO will not result in a qualification, downgrade or withdrawal of any rating in effect immediately prior to such transfer and IPO;

(e)     Borrower shall deliver evidence to Lender that such transfer and IPO does not violate the terms of any Ground Lease, Management Agreement or Franchise Agreement;

(g)     Lender receives at least thirty (30) days prior written notice of such transfer and IPO;

(h)     Borrower shall have delivered to Lender an opinion of REMIC counsel which opinion shall be satisfactory to Lender and the Rating Agencies in all respects;

(i)     The Properties shall be managed by a Manager or a Qualified Manager following such transfer and IPO and the Franchise Agreements shall continue in full force and effect;

(i)     Borrower shall pay Lender an assumption fee in the amount of 1/10th of 1% of the outstanding principal balance of the Loan as well as any and all costs incurred in connection with the transfer (including, without limitation, Lender's reasonable counsel fees and disbursements);

(k)     Borrower shall have delivered to Lender an opinion of counsel from an independent law firm with respect to the substantive non-consolidation of the proposed transferee and its constituent entities (partners, members, shareholders), which opinion shall be satisfactory in all respects to Lender and the Rating Agencies;

(l)     Borrower or New Holdco shall deliver to Lender an endorsement to the existing title policy insuring the Security Instruments as a valid first lien on the Properties, which endorsement shall insure that the Properties shall not be subject to any additional exceptions or liens other than those contained in the Title Insurance Policy; and

(m)     The transfer shall occur within one hundred eighty (180) days of the consummation of the IPO.

(ii)     Section 7.2 of the Loan Agreement is hereby modified by deleting the references therein to "During the continuance of a Cash Management Period," and "during the continuance of a Cash Management Period".

(jj)     Section 7.3.1 of the Loan Agreement is hereby modified by deleting the first sentence of such Section and replacing same with the following:

"Commencing on the Payment Date following the first anniversary of the date of the Second Amendment and on each Payment Date thereafter, Borrower shall pay to Lender an amount equal to one-twelfth (1/12) of four percent (4%) of the Gross Income from Operations from the applicable year (or such greater amount if required by the Management Agreement or the Franchise Agreement) (the "Required FF&E Reserve Amount").

(kk)     Section 7.3.1 of the Loan Agreement is hereby modified by deleting the last sentence of such Section and replacing same with the following:

"On the Second Amendment Effective Date, Borrower shall deposit the sum of $7,800,000 into the FF&E Reserve Account.  In no event shall funds on deposit in the FF&E Reserve Account be disbursed to pay for FF&E Expenditures that were

incurred prior to the date of the Second Amendment."

(ll)     Section 7.4.4 of the Loan Agreement is hereby deleted in its entirety.

(mm)   Section 7.9.4 of the Loan Agreement is hereby modified by deleting (i) "either (a)" and (ii) clause (b) therefrom.

(nn)   The following new Section 7.10 is hereby added to the Loan Agreement:

Section 7.10.       PIP Reserve.  On the Second Amendment Effective Date, Borrower shall deposit with Lender the amount of $17,000,000 (the "PIP Fund") to be disbursed by Lender to pay for (x) capital improvements required under property improvement plans set forth in the Franchise Agreements, (y) capital improvements required under property improvement plans that Borrower agreed to perform while it was a debtor in possession prior to the Second Amendment Effective Date and/or (z) any capital improvement work required by the applicable Franchisor with respect to the Individual Properties owned by Grand Prix Denver LLC and Grand Prix Naples LLC (collectively, the "PIP Work").  Lender shall disburse to Borrower the PIP Funds from the PIP Account from time to time upon satisfaction by Borrower of each of the following conditions: (a) Borrower shall submit a written request for payment to Lender at least thirty (30) days prior to the date on which Borrower requests such payment be made and specifies the PIP Work to be paid, (b) on the date such request is received by Lender and on the date such payment is to be made, no Default or Event of Default shall exist and remain uncured, (c) Lender shall have received an Officers' Certificate (i) stating that the PIP Work to be funded by the requested disbursement has been completed in good and workmanlike manner and, to Borrower's knowledge, in accordance with all applicable Legal Requirements and Environmental Laws, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required to commence and/or complete the PIP Work to be funded by the requested disbursement, (ii) identifying each Person that supplied materials or labor in connection with the PIP Work to be funded by the requested disbursement, and (iii) stating that each such Person will be paid in full with the PIP Work to be funded by the requested disbursement upon such disbursement to Borrower, such Officers' Certificate to be accompanied by full or partial lien waivers, as the case may be, or other evidence of payment reasonably satisfactory to Lender, and (d) Lender shall have received such other evidence as Lender shall reasonably request that the PIP Work to be funded by the requested disbursement has been completed and will be paid for upon such disbursement to Borrower, including, without limitation, conditional lien waivers, invoices, receipts and confirmation from such Franchisor as to the completion of such PIP Work or such other evidence reasonably satisfactory to Lender that the same has been completed in accordance with the terms of the applicable Franchise Agreement.  Lender shall not be required to make disbursements from the PIP Account with respect to any Individual Property unless such requested disbursement is in an amount greater than $25,000 (or a lesser amount if the total

amount in the PIP Account is less than $25,000, in which case only one disbursement of the amount remaining in the account shall be made)."

Borrower hereby acknowledges and agrees that for the purposes of Section 7.8 of the Loan Agreement, the PIP Fund is a Reserve Fund and the PIP Account is an Account.

(oo)    Clauses (iv) and (xvi) of subsection 8.1(a) of the Loan Agreement are hereby amended and restated to read as follows:

"(iv) if a Transfer in violation of Section 5.2.10 hereof or Article 7 of any of the Security Instrument occurs;"

"(xvi) if a breach or violation of Section 5.1.27 hereof occurs;"

(pp)    Section 8.1(a) is hereby modified by deleting the references therein to "Apollo".

(qq)    Section 9.1 is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member."

(rr)    Section 9.1(a) is hereby modified by adding the following sentence to the end thereof:

"Notwithstanding anything to the contrary contained in this Section 9.1(a)(i), unless required by Applicable Laws, neither Lender nor any Co-Lender or Servicer shall disclose any annual audited financial statements of Cerberus or any replacement guarantor that is a Cerberus Affiliate pursuant to this Section 9.1(a) nor any information contained therein (except if such information is contained in the Net Worth Certificate or otherwise available to the public), except that Lender shall be permitted to disclose the Net Worth Certificates."

(ss)    Section 9.2(b) is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Cerberus Member" or "Chatham Member".

(tt)    Section 9.4(b) is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member".

(uu)    Section 9.7.3 is hereby modified by deleting the references therein to "Apollo" and replacing the same with "Chatham Member, Cerberus Member" and by adding the following sentence to the end of subsection (b) thereof:

"Notwithstanding anything to the contrary contained in this Subsection 9.7.3(b), neither Cerberus nor any replacement guarantor that is a Cerberus Affiliate shall be

required to provide any information pursuant to this <u>Section 9.7.3(b)</u> other than a Net Worth Certificate."

(vv)  Borrower/Operating Lessee's notice address in Section 10.6 of the Loan Agreement is hereby deleted and is replaced in it's entirety with the following:

> c/o Chatham Lodging Trust
> 50 Cocoanut Row, Suite 200
> Palm Beach, Florida 33480
> Attention:  Jeffrey Fisher
> Facsimile number:  (561) 804-0909
>
> with a copy to:
>
> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
> Attention: Scott K. Charles and David Fischman
> Facsimile number:  (212) 403-2311
>
> and a copy to:
>
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Attention: Stuart D. Freedman, Esq.
> Facsimile number: (212) 593-5955

(ww)  Lender/Agent's notice address in Section 10.6 of the Loan Agreement is hereby deleted and is replaced in it's entirety with the following:

> c/o Wells Fargo Commercial Mortgage Servicing
> 201 South College Street, 9th Floor,
> Charlotte, North Carolina, 28244
> MAC D1100-090
> Attention:      Portfolio Manager
> Facsimile No.:  (704) 715-0034
>
> with a copy to:
>
> Midland Loan Services, a division of PNC Bank,
> National Association,
> 10851 Mastin, 6th Floor
> Overland Park, Kansas 66210

Attention:     Kevin S. Semon
Facsimile No.:  (913) 253-9723

and a copy to:

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Attention:     Lenard M. Parkins
Facsimile No.: (212) 884-8226


(xx) Section 10.17 of the Loan Agreement is hereby modified by deleting the reference therein to "Apollo" and replacing the same with "Cerberus"

(yy) Section 10.17(b) of the Loan Agreement is hereby modified by deleting the reference therein to "Borrower" and replacing the same with "Cerberus".

(zz) Section 10.22 of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:


"10.22 <u>Intentionally Omitted</u>."


(aaa)     Section 10.23 of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:


"10.23 <u>Intentionally Omitted</u>."


(bbb)     Section 10.25 of the Loan Agreement is hereby deleted and is replaced in its entirety with the following:


"10.25 <u>Intentionally Omitted</u>."


(ccc)     Schedule I of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule I attached to this Amendment.

(ddd)     Schedule II of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule II attached to this Amendment.

(eee)     Schedule IV of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule IV attached to this Amendment.

(fff) Schedule X of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule X attached to this Amendment.

(ggg)        Schedule XIII of the Loan Agreement is hereby deleted and replaced in its entirety with Schedule XIII attached to this Amendment.

(hhh)        Schedule XIV of the Loan Agreement is hereby deleted in its entirety from the Loan Agreement.

(iii) Schedule XVI attached hereto is hereby added as new Schedule XVI to the Loan Agreement.

(jjj) Schedule XVII attached hereto is hereby added as new Schedule XVII to the Loan Agreement.

(kkk)        Schedule XVIII attached hereto is hereby added as new Schedule XVIII to the Loan Agreement.

(lll)        Schedule XIX attached hereto is hereby added as new Schedule XIX to the Loan Agreement.

(mmm)        Exhibit A of the Loan Agreement is hereby deleted in its entirety.

(nnn)        Exhibit B of the Loan Agreement hereby deleted and replaced in its entirety with Exhibit B attached to this Amendment.


Section 1.2.        Modification of the Note.        The first paragraph of Note A-1 is hereby modified by deleting the reference therein to "the principal sum of Four Hundred Twelve Million Seven Hundred One Thousand Two Hundred Seventy-One and 00/100 Dollars ($412,701,271)" and replacing the same with "the principal sum of Three Hundred Thirty-Seven Million Five Hundred Thousand and 00/100 Dollars ($337,500,000.00)" and the first paragraph of Note A-2 is hereby modified by deleting the reference therein to "the principal sum of Four Hundred Twelve Million Seven Hundred One Thousand Two Hundred Seventy-One and 00/100 Dollars ($412,701,271)" and replacing the same with "the principal sum of Three Hundred Thirty-Seven Million Five Hundred Thousand and 00/100 Dollars ($337,500,000.00). For the avoidance of doubt, as of the Effective Date the outstanding principal balance of Note A-1 is $337,500,000.00 and the outstanding principal balance of Note A-2 is $337,500,000.00.

Section 1.3.        All references to the Loan Agreement and the Note in any Loan Document shall mean the Loan Agreement or the Note, as applicable, as hereby modified.

Section 1.4        Simultaneously with the execution and delivery of this Second Amendment, (i) Borrower and New Holdco shall execute and deliver to Lender a replacement environmental indemnity agreement in substantially the same form as the Environmental Indemnity Agreement executed by Borrower and Grand Prix Holdings LLC on the Closing Date,

(ii) Borrower, Operating Lessee and Island Hospitality Management, Inc., in its capacity as Property Manager, shall execute and deliver to Lender, and Lender shall execute and deliver to Borrower and Property Manager, a replacement conditional assignment of management agreement in substantially the same form as the Conditional Assignment of Management Agreement executed by Borrower, Operating Lessee, Island Hospitality Management, Inc., and Original Lender, (iii) Borrower, Operating Lessee, Manager, and Wells Fargo Bank, National Association, as agent, shall execute and deliver to Lender an amendment to the Cash Management Agreement in the form agreed to by the parties thereto and (iv) each individual Borrower, Operating Lessee and Lender shall execute and deliver First Amendments to the Security Instruments in the form agreed to by the parties thereto.

Section 1.5     On the Second Amendment Effective Date, New Holdco shall have at least $8,000,000 which shall be utilized for funding capital improvements required under property improvement plans and/or any capital improvement work required by a franchisor with respect to any hotel property owned directly or indirectly by New Holdco which is not subject to the lien of the Security Instrument.

## ARTICLE 2. NO IMPAIRMENT; RATIFICATION; REPRESENTATIONS

Section 2.1     <u>No Discharge.</u>   Except as provided in Section 1.2 hereof, this Amendment does not, and shall not be construed to, constitute the creation of a new indebtedness or the satisfaction, discharge or extinguishment of the debt secured by the Loan Documents, or release or impair Borrower's obligations and Lender's rights and remedies under the Loan Documents, nor does it in any way affect or impair the lien of the Loan Documents.  Neither this Amendment nor any action undertaken pursuant to this Amendment shall constitute a waiver or a novation of Lender's rights under the Loan Documents.  In addition, any and all guaranties and indemnities for the benefit of Lender and agreements subordinating rights and liens to the rights and liens of Lender, including, without limitation, the Guaranty and the Environmental Indemnity, each as modified hereby, are hereby ratified and confirmed in all respects and shall not be released, diminished, impaired, reduced or adversely affected by this Amendment or otherwise.

Section 2.2     <u>Lien Confirmation.</u>   Borrower and Operating Lessee hereby acknowledge the lien of the Loan Documents to be a valid and existing first lien on the Property, and the lien of the Loan Documents is hereby agreed to continue in full force and effect, unaffected and unimpaired by this Amendment.

Section 2.3     <u>No Further Modification; Ratification.</u>   Except as specifically modified and amended hereby, all other terms, conditions, and covenants contained in the Loan Agreement and the other Loan Documents shall remain unmodified and in full force and effect.  As amended by this Amendment, all terms, covenants and provisions of the Loan Agreement and each of the other Loan Documents are ratified and confirmed in all respects by Borrower, Operating Lessee and Guarantor.

Section 2.4.     <u>Representations and Warranties</u>.

(a) Each Individual Borrower and Operating Lessee represents and warrants as of the date hereof that (i) this Amendment and the documents executed in connection herewith have been

duly executed and delivered by it and constitutes the legal, valid and binding obligations of Borrower and Operating Lessee, enforceable against Borrower and Operating Lessee in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights, or by the application of the rules of equity; (ii) it has full power, authority and legal right to execute this Amendment and to keep and observe all of the terms of this Amendment on its part to be observed or performed; (iii) it has provided Lender with all information requested by Lender in connection with the Restructuring, and to Borrower and Operating Lessee's knowledge, no information provided by or on behalf of Borrower or Operating Lessee in connection with the Restructuring contains any untrue statement of a material fact or omits to state any material fact necessary to make such information not misleading in any material respect; (iv) this Amendment, Borrower's and Operating Lessee's performance of their obligations hereunder, and under the Loan Documents as amended hereby, and the consummation of the Restructuring have been duly authorized by all requisite organizational action on the part of Borrower and Operating Lessee and will not violate any provision of any applicable legal requirements, decree, injunction or demand of any court or other governmental authority applicable to Borrower or Operating Lessee, any organizational document of Borrower or Operating Lessee or any material indenture, agreement or other instrument to which Borrower or Operating Lessee is a party or by which Borrower or Operating Lessee is bound; (v) all consents, authorizations and approvals required for the execution and delivery by Borrower and Operating Lessee of this Amendment and the documents executed in connection herewith by Borrower and Operating Lessee have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; (vi) the Operating Lease is in full force and effect, has not been amended or modified and there are no defaults or events of default existing with respect to the Operating Lease, (vii) attached hereto as <u>Schedule A</u> is a true, correct and complete copy of the Approved Annual Budget for 2011; and (viii) all Franchise Agreements set forth on <u>Schedule X</u> are in full force and effect as of the date hereof.

(b)     Each Individual Borrower and Operating Lessee hereby represents, warrants, confirms and agrees that (i) each of the representations and warranties made by Borrower and Operating Lessee in the Loan Documents, as amended hereby, are true and correct in all respects as if made on and as of the Effective Date, (ii) except as otherwise disclosed to Lender, Borrower and Operating Lessee have performed in all respects all agreements and satisfied all conditions that the Loan Documents provide shall be performed or satisfied by such party; (iii) upon giving effect to this Amendment, to Borrower's and operating Lessee's knowledge, no Default or Event of Default under the Loan will be continuing and to the extent such Default or Event of Default exists, Lender reserves all of its rights and remedies under the Loan Documents with respect thereto, (iv) it has no existing defenses, rights of setoff, claims, counterclaims or causes of action of any kind or description against Lender arising under or in respect of the Loan Documents or any related document (whether in contract, tort or otherwise).

(c)     Each Guarantor and Release Indemnitor represents and warrants as of the date hereof that (i) this Amendment and the documents executed in connection herewith have been duly executed and delivered by it and constitutes the legal, valid and binding obligations of such party, enforceable against it in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors'

rights, or by the application of the rules of equity; (ii) it has full power, authority and legal right to execute this Amendment and to keep and observe all of the terms of this Amendment on its part to be observed or performed; (iii) it has provided Lender with all information requested by Lender in connection with this Amendment, and no information provided by or on behalf of such Guarantor or Release Indemnitor in connection with this Amendment contains any untrue statement of a material fact or omits to state any material fact necessary to make such information not misleading in any material respect; (iv) this Amendment, Guarantor's or Release Indemnitor's, as applicable, performance of their obligations hereunder, and under the Loan Documents as amended hereby, to which they are a party have been duly authorized by all requisite organizational action on the part of such party and will not violate any provision of any applicable legal requirements, decree, injunction or demand of any court or other governmental authority applicable to it, any organizational document of such Guarantor or Release Indemnitor or any material indenture, agreement or other instrument to which it is a party or by which it is bound; and (v) all consents, authorizations and approvals required for the execution and delivery by such party of this Amendment and the documents executed in connection herewith by such party have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance.  By executing this Amendment below, each Release Indemnitor acknowledges and agrees that they join the Loan Agreement (as amended by this Amendment) for purposes of Section 5.2.10(d) thereof.

Section 2.5.  <u>Principal Balance; Reserve Accounts</u>.  On the date hereof, Borrower has deposited the sum of $7,800,000.00 into the FF&E Reserve Account, the sum of $[_____] into the Taxes Account, the sum of $[_____] into the Insurance Account and the sum of $17,000,000 into the PIP Account.  Borrower, Operating Lessee, Sponsor, New Holdco and Guarantor acknowledge and agree that, as of the date hereof (i) the outstanding principal amount of the Loan is $675,000,000.00, (ii) the amount on deposit in the Tax and Insurance Escrow Fund following the deposits into the Insurance Account and the Taxes Account described in the preceding sentence, is $[_____], (iii) the amount on deposit in the FF&E Reserve Account following the deposit described in the preceding sentence, is $7,800,000.00, (iv) the amount on deposit in the PIP Account following the deposit described in the preceding sentence, is $17,000,000.00, (v) there are no amounts on deposit in the Required Capital Improvements Account, (vi) there are no amounts on deposit in the Required Repair Account, (vii) there are no amounts on deposit in the Marriott Termination Fees Reserve Fund, (viii) there are no amounts on deposit in the Ground Rent Account, (ix) there are no amounts on deposit in the Mountainview Litigation Reserve Account and (x) there are no amounts on deposit in the Germantown Franchise Reserve Account.  Lender hereby acknowledges and agrees that Borrower has no further obligations under Section 7.1 or Section 7.6 of the Loan Agreement. Lender and Borrower acknowledge and agree that Borrower shall make deposits into the Tax and Insurance Escrow Fund pursuant to Section 7.2 of the Loan Agreement on each Payment Date commencing with the Payment Date occurring in January 2012 and that Section 7.2 of the Loan Agreement shall control the amounts which Borrower is required to deposit into the Tax and Insurance Escrow Fund on each Payment Date thereafter**.**

Section 2.6  <u>Release</u>.  Each of the Company, Borrower, Operating Lessee, New Holdco, New Holdco Member, Cerberus and Chatham (the "<u>Releasing Parties</u>") hereby releases, remises,

acquits and forever discharges Lender and each of the other Indemnified Parties from any and all actions and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages and expenses of any and every character, including legal fees, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the Indemnified Parties prior to and including the Effective Date that, in any way directly or indirectly, arise out of or in any way are connected to or related to this Amendment, the Restructuring, the Loan or the Loan Documents, including but not limited to, claims relating to any settlement negotiations (all of the foregoing hereinafter called the "Released Matters"). Each of the Indemnified Parties acknowledges that the agreements in this Section are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. Each of the Releasing Parties hereby represents and warrants to Lender that it has not purported to transfer, assign or otherwise convey any of its right, title or interest in any Released Matter to any other Person and that the foregoing constitutes a full and complete release of all Released Matters.

## ARTICLE 3. GENERAL

Section 3.1    Governing Law.    This Amendment shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles.

Section 3.2    Definitions.    All capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed thereto in the Loan Agreement.

Section 3.3    No Waiver.    Except as may be expressly set forth in this Amendment, nothing shall be construed as or deemed to be a waiver by Lender of any rights or remedies available to Lender under the Loan Documents.

Section 3.4    No Oral Modification.    This Amendment and any provisions hereof may not be modified amended, extended, discharged, waived or terminated except by an instrument in writing executed by the party against whom enforcement is sought. Any such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

Section 3.5    Binding Effect.    This Amendment shall inure to the benefit of and be binding upon the Borrower, Operating Lessee, New Holdco, Cerberus, Chatham and Lender and their respective heirs, successors and assigns.

Section 3.6    Counterparts.    This Amendment may be executed in multiple counterparts, each of which, for all purposes, shall be deemed an original, and all of which together shall constitute one and the same agreement.

Section 3.7    Invalidity.    If any term, covenant or condition of this Amendment is held to be invalid, illegal or unenforceable in any respect, this Amendment shall be construed without such provision.

Section 3.8    Payment of Fees and Expenses.    On or prior to the date hereof, and as a condition precedent to the effectiveness of this Amendment, Borrower shall pay all fees, costs and expenses of Lender and its servicers, attorneys, advisors and consultants in connection with the Restructuring.

Section 3.9    Exculpation.    The provisions of Section 9.4 of the Loan Agreement, as amended hereby, are hereby incorporated by this reference with the same force and effect as if said Section 9.4 was set forth at length herein.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement to be duly executed and delivered as of the day and year first written above.

**BORROWER**:

**GRAND PRIX BELMONT LLC**
**GRAND PRIX CAMPBELL/SAN JOSE LLC**
**GRAND PRIX FREMONT LLC**
**GRAND PRIX MOUNTAIN VIEW LLC**
**GRAND PRIX SAN JOSE LLC**
**GRAND PRIX SAN MATEO LLC**
**GRAND PRIX FT. LAUDERDALE LLC**
**GRAND PRIX NAPLES LLC**
**GRAND PRIX ATLANTA LLC**
**GRAND PRIX ATLANTA (PEACHTREE CORNERS) LLC**
**GRAND PRIX CHICAGO LLC**
**GRAND PRIX COLUMBIA LLC**
**GRAND PRIX GAITHERSBURG LLC**
**GRAND PRIX PORTLAND LLC**
**GRAND PRIX LIVONIA LLC**
**GRAND PRIX ISLANDIA LLC**
**GRAND PRIX HORSHAM LLC**
**GRAND PRIX WILLOW GROVE LLC**
**GRAND PRIX ADDISON (RI) LLC**
**GRAND PRIX ARLINGTON LLC**
**GRAND PRIX LAS COLINAS LLC**
**GRAND PRIX RICHMOND (NORTHWEST) LLC**
**GRAND PRIX BELLEVUE LLC**
**GRAND PRIX BOTHELL LLC**
**GRAND PRIX LYNNWOOD LLC**
**GRAND PRIX TUKWILA LLC,**
each a Delaware limited liability company

By:    Grand Prix Mezz Borrower Fixed LLC, its sole member

    By:  INK Acquisition LLC, its sole member

        By:   Chatham Lodging, L.P., its managing member

            By:_____
                Name:
                Title:

[signatures continue on next page]

**GRAND PRIX GERMANTOWN LLC**
**GRAND PRIX WESTCHESTER LLC**
**GRAND PRIX SCHAUMBURG LLC**
**GRAND PRIX LOMBARD LLC,**
each a Delaware limited liability company

By: INK Acquisition II LLC, its sole member

By: Chatham TRS Holding, Inc., its managing member

By: _____
Name:
Title

**GRAND PRIX SILI I LLC**
**GRAND PRIX SILI II LLC**
each a Delaware limited liability company

By: INK Acquisition IV LLC, its sole member

By: Chatham Lodging, L.P., its managing member

By: _____
Name:
Title

**GRAND PRIX MT. LAUREL LLC**
**GRAND PRIX EL SEGUNDO LLC,**
each a Delaware limited liability company

By: INK Acquisition V LLC, its sole member

By: Chatham Lodging, L.P., its managing member

By: _____
Name:
Title

[signatures continue on next page]

**GRAND PRIX SADDLE RIVER LLC,**
each a Delaware limited liability company

By:   INK Acquisition VI LLC, its sole member

       By:     Chatham Lodging, L.P., its managing member

             By: _____
                Name:
                Title

**GRAND PRIX RICHMOND LLC**
**GRAND PRIX CHERRY HILL LLC**
**GRAND PRIX BINGHAMTON LLC**
**GRAND PRIX SHELTON LLC**
**GRAND PRIX WINDSOR LLC**
**GRAND PRIX DENVER LLC**
**GRAND PRIX ENGLEWOOD/DENVER SOUTH LLC**
**GRAND PRIX LOUISVILLE (RI) LLC**
**GRAND PRIX LEXINGTON LLC**
**GRAND PRIX ALTAMONTE LLC,**
each a Delaware limited liability company

By:   INK Acquisition VII LLC, its sole member

       By:     Chatham Lodging, L.P., its managing member

             By: _____
                Name:
                Title

**OPERATING LESSEE:**

**GRAND PRIX FIXED LESSEE LLC**,
a Delaware limited liability company

By:   INK Acquisition III LLC, its sole member

       By:   Chatham TRS Holding, Inc., its managing member

             By:_____
                Name:
                 Title:

[signatures continue on next page]

**NEW HOLDCO:**

**INK ACQUISITION LLC,**
a Delaware limited liability company

By:   Chatham Lodging, L.P., its managing member


     By:_____
       Name:
       Title:

**INK ACQUISITION II LLC,**
a Delaware limited liability company

By:   Chatham TRS Holding, Inc., its managing member


     By:_____
       Name:
       Title:

**INK ACQUISITION III LLC,**
a Delaware limited liability company

By:   Chatham TRS Holding, Inc., its managing member


     By:_____
       Name:
       Title:

**INK ACQUISITION IV LLC,**
a Delaware limited liability company

By:   Chatham Lodging, L.P., its managing member


     By:_____
       Name:
       Title:


[signatures continue on next page]

**INK ACQUISITION V LLC,**
a Delaware limited liability company

By:   Chatham Lodging, L.P., its managing member


     By:_____
       Name:
       Title:

**INK ACQUISITION VI LLC,**
a Delaware limited liability company

By:   Chatham Lodging, L.P., its managing member


     By:_____
       Name:
       Title:


**INK ACQUISITION VII LLC,**
a Delaware limited liability company

By:   Chatham Lodging, L.P., its managing member


     By:_____
       Name:
       Title:


[signatures continue on next page]

**CERBERUS**:

**CERBERUS SERIES FOUR HOLDINGS, LLC**,
a Delaware limited liability company

By:     Cerberus Institutional Partners, L.P. — Series Four, its
           Managing Member

           By:  Cerberus Institutional Associates, L.L.C., its General
                  Partner

           By:_____
              Name:
              Title:

    [signatures continue on next page]

**CHATHAM LODGING, L.P.,**
a Delaware limited partnership

By:_____
　　Name:
　　Title:

LENDER:

**MIDLAND LOAN SERVICES**, a division of PNC Bank, National Association, as Special Servicer for U.S. Bank National Association, as Trustee for the Registered Holders of  LB-UBS Commercial Mortgage Trust 2007-C6, LB-UBS Commercial Mortgage Trust 2007-C7, Commercial Pass Through Certificates, successor trustee to Bank of America, National Association

By:_____
Name:
Title:

# SCHEDULE I

## BORROWER

| Borrower | Individual Property | Allocated Loan Amount |
|---|---|---|
| Grand Prix Belmont LLC | Summerfield Suites, Belmont, CA | $30,423,949.14 |
| Grand Prix Campbell/San Jose LLC | Residence Inn, Campbell, CA | $12,696,002.92 |
| Grand Prix El Segundo LLC | Summerfield Suites, El Segundo, CA | $22,685,909.79 |
| Grand Prix Fremont LLC | Residence Inn. Fremont. CA | $5,811,267.66 |
| Grand Prix Mountain View LLC | Residence Inn, Mountain View, CA | $24,919,861.41 |
| Grand Prix San Jose LLC | Residence Inn San Jose South, San Jose, CA | $25,415,755.42 |
| Grand Prix San Mateo LLC | Residence Inn, San Mateo, CA | $25,687,918.18 |
| Grand Prix Sili I LLC | Residence Inn Silicon Valley I, Sunnyvale, CA | $43,323,660.92 |
| Grand Prix Sili II LLC | Residence Inn Silicon Valley II, Sunnyvale, CA | $44,871,330.65 |
| Grand Prix Denver LLC | Residence Inn Denver Downtown, Denver, CO | $18,498,610.59 |
| Grand Prix Englewood/Denver South LLC | Residence Inn Denver South, Englewood, CO | $10,043,913.26 |
| Grand Prix Shelton LLC | Residence Inn, Shelton, CT | $6,494,833.10 |
| Grand Prix Windsor LLC | Residence Inn, Windsor, CT | $6,408,769.11 |
| Grand Prix Altamonte LLC | Residence Inn, Altamonte Springs, FL | $6,544,935.62 |
| Grand Prix Ft. Lauderdale LLC | Courtyard, Fort Lauderdale, FL | $8,523,455.79 |
| Grand Prix Naples LLC | Hampton Inn, Naples, FL | $4,675,259.45 |
| Grand Prix Atlanta LLC | Residence Inn Atlanta Downtown, Atlanta, GA | $19,656,845.83 |
| Grand Prix Atlanta (Peachtree Corners) LLC | Residence Inn Peachtree Corners, Atlanta, GA | $9,751,683.40 |
| Grand Prix Lombard LLC | Stays Inn, Lombard, IL | $3,503,168.47 |
| Grand Prix Chicago LLC | Residence Inn Chicago (Rosemont/O'Hare), Rosemont, IL | $21,019,126.69 |
| Grand Prix Schaumburg LLC | Stays Inn, Schaumburg, IL | $3,503,168.47 |
| Grand Prix Westchester LLC | Hampton Inn, Westchester, IL | $6,766,295.77 |
| Grand Prix Lexington LLC | Residence Inn Lexington North, Lexington, KY | $7,104,581.19 |
| Grand Prix Louisville (RI) LLC | Residence Inn, Louisville, KY | $5,561,696.70 |
| Grand Prix Columbia LLC | Hampton Inn, Columbia, MD | $11,273,150.02 |
| Grand Prix Gaithersburg LLC | Residence Inn, Gaithersburg, MD | $32,297,718.43 |
| Grand Prix Germantown LLC | Hampton Inn, Germantown, MD | $7,942,486.97 |
| Grand Prix Portland LLC | Residence Inn Portland, Scarborough, ME | $9,277,139.08 |
| Grand Prix Livonia LLC | Residence Inn. Livonia. MI | $10,361,922.67 |
| Grand Prix Cherry Hill LLC | Residence Inn, Cherry Hill, NJ | $7,727,827.05 |
| Grand Prix Mt. Laurel LLC | Summerfield Suites, Mount Laurel, NJ | $8,892,508.70 |
| Grand Prix Saddle River LLC | Residence Inn, Upper Saddle River, NJ | $30,127,064.41 |
| Grand Prix Islandia LLC | Hampton Inn, Islandia, NY | $11,298,163.69 |
| Grand Prix Binghamton LLC | Residence Inn Binghamton, Vestal, NY | $6,333,556.52 |
| Grand Prix Horsham LLC | Townplace Suites, Horsham, PA | $7,872,541.87 |
| Grand Prix Willow Grove LLC | Hampton Inn, Willow Grove, PA | $12,628,640.40 |
| Grand Prix Addison (RI) LLC | Residence Inn, Addison, TX | $19,208,525.15 |
| Grand Prix Arlington LLC | Residence Inn, Arlington, TX | $12,116,051.58 |
| Grand Prix Las Colinas LLC | Summerfield Suites Las Colinas, Irving, TX | $16,184,670.36 |
| Grand Prix Richmond LLC | Residence Inn. Richmond. VA | $5,092,239.27 |
| Grand Prix Richmond (Northwest) LLC | Residence Inn Richmond NW, Richmond, VA | $14,570,503.17 |
| Grand Prix Bellevue LLC | Residence Inn, Bellevue, WA | $20,656,325.45 |
| Grand Prix Bothell LLC | Residence Inn, Bothell, WA | $20,641,988.78 |
| Grand Prix Lynnwood LLC | Residence Inn, Lynwood, WA | $18,994,250.80 |
| Grand Prix Tukwila LLC | Residence Inn Tukwila, Seattle, WA | $17,610,726.10 |

**Schedule of Operating Leases**

| No | Property | Lessor | Lessee | Date of Lease |
|---|---|---|---|---|
| 1. | Addison Residence Inn | Grand Prix Addison (RI) LLC | Grand Prix Fixed Lessee LLC | February 1, 2010 |
| 2. | Altamonte Springs– Residence Inn | Grand Prix Altamonte LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 3. | Arlington – Residence Inn | Grand Prix Arlington LLC | Grand Prix Fixed Lessee LLC | February 1, 2010 |
| 4. | Atlanta (Downtown) – Residence Inn | Grand Prix Atlanta LLC | Grand Prix Fixed Lessee LLC | October 25, 2009 |
| 5. | Atlanta (Peachtree) – Residence Inn | Grand Prix Atlanta (Peachtree. Corners) LLC | Grand Prix Fixed Lessee LLC | October 9, 1998 |
| 6. | Bellevue – Residence Inn | Grand Prix Bellevue LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 7, | Belmont – Summerfield Suites | Grand Prix Belmont LLC | Grand Prix Fixed Lessee LLC | April 1, 2004 |
| 8. | Binghamton – Residence Inn | Grand Prix Binghamton LLC | Grand Prix Fixed Lessee LLC | September 23, 2009 |
| 9. | Bothell – Residence Inn | Grand Prix Bothell LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 10. | Cherry Hill – Residence Inn | Grand Prix Cherry Hill LLC | Grand Prix Fixed Lessee LLC | May 6, 2011 |
| 11. | Columbia – Hampton Inn | Grand Prix Columbia LLC | Grand Prix Fixed Lessee LLC | January 5, 2010 |
| 12. | Denver (Downtown) – Residence Inn | Grand Prix Denver LLC | Grand Prix Fixed Lessee LLC | November 1, 2009 |
| 13, | Denver (South) – Residence Inn | Grand Prix Englewood/Denver South LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |

| No | Property | Lessor | Lessee | Date of Lease |
|---|---|---|---|---|
| 14. | El Segundo – Summerfield Suites | Grand Prix El Segundo LLC | Grand Prix Fixed Lessee LLC | April 1, 2004 |
| 15. | Ft. Lauderdale – Courtyard by Marriott | Grand Prix Ft. Lauderdale LLC | Grand Prix Fixed Lessee LLC | September 23, 2009 |
| 16. | Fremont – Residence Inn | Grand Prix Fremont LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 17. | Gaithersburg – Residence Inn | Grand Prix Gaithersburg LLC | Grand Prix Fixed Lessee LLC | July 10, 2011 |
| 18. | Germantown – Hampton Inn | Grand Prix Germantown LLC | Grand Prix Fixed Lessee LLC | May 21, 2010 |
| 19. | Horsham – TownPlace Suites | Grand Prix Horsham LLC | Grand Prix Fixed Lessee LLC | June 1, 1999 |
| 20. | Islandia – Hampton Inn | Grand Prix Islandia LLC | Grand Prix Fixed Lessee LLC | September 23, 2009 |
| 21. | Las Colinas – Summerfield Suites | Grand Prix Las Colinas LLC | Grand Prix Fixed Lessee LLC | April 1, 2004 |
| 22. | Lexington – Residence Inn | Grand Prix Lexington LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 23. | Livonia– Residence Inn | Grand Prix Livonia LLC | Grand Prix Fixed Lessee LLC | March 12, 1999 |
| 24. | Lombard | Grand Prix Lombard LLC | Grand Prix Fixed Lessee LLC | June 26, 2010 |
| 25. | Louisville – Residence Inn | Grand Prix Louisville (RI) LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 26. | Lynnwood – Residence Inn | Grand Prix Lynnwood LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 27. | Mount Laurel – Summerfield Suites | Grand Prix Mt. Laurel LLC | Grand Prix Fixed Lessee LLC | April 1, 2004 |

| No | Property | Lessor | Lessee | Date of Lease |
|---|---|---|---|---|
| 28. | Mountain View – Residence Inn | Grand Prix Mountain View LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 29. | Naples – Hampton Inn | Grand Prix Naples LLC | Grand Prix Fixed Lessee LLC | September 23, 2009 |
| 30. | Richmond – Residence Inn | Grand Prix Richmond LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 31. | Richmond (NW) – Residence Inn | Grand Prix Richmond (Northwest) LLC | Grand Prix Fixed Lessee LLC | January 8, 1999 |
| 32. | Rosemont (O'Hare) – Residence Inn | Grand Prix Chicago LLC | Grand Prix Fixed Lessee LLC | January 8, 1999 |
| 33. | Saddle River – Residence Inn | Grand Prix Saddle River LLC | Grand Prix Fixed Lessee LLC | September 15, 2007 |
| 34. | San Jose – Residence Inn | Grand Prix Campbell/San Jose LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 35. | San Jose (South) – Residence Inn | Grand Prix San Jose LLC | Grand Prix Fixed Lessee LLC | November 6, 1998 |
| 36. | San Mateo – Residence Inn | Grand Prix San Mateo LLC | Grand Prix Fixed Lessee LLC | November 1, 2009 |
| 37. | Scarborough – Residence Inn | Grand Prix Portland LLC | Grand Prix Fixed Lessee LLC | November 1, 2009 |
| 38. | Schaumburg | Grand Prix Schaumburg LLC | Grand Prix Fixed Lessee LLC | June 26, 2010 |
| 39. | Shelton – Residence Inn | Grand Prix Shelton LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 40. | Silicon Valley I – Residence Inn | Grand Prix Sili I LLC | Grand Prix Fixed Lessee LLC | November 1, 2009 |
| 41. | Silicon Valley II – Residence Inn | Grand Prix Sili II LLC | Grand Prix Fixed Lessee LLC | November 1, 2009 |

| No | Property | Lessor | Lessee | Date of Lease |
|---|---|---|---|---|
| 42. | Tukwila – Residence Inn | Grand Prix Tukwila LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |
| 43. | Westchester – Hampton Inn | Grand Prix Westchester LLC | Grand Prix Fixed Lessee LLC | June 26, 2010 |
| 44 | Willow Grove – Hampton Inn | Grand Prix Willow Grove LLC | Grand Prix Fixed Lessee LLC | September 23, 2009 |
| 45 | Windsor – Residence Inn | Grand Prix Windsor LLC | Grand Prix Fixed Lessee LLC | June 1, 2011 |

<u>Schedule IV</u>

Organizational Chart

(see attached)



Pro Forma Structure Chart

SRZ DRAFT 10/10/11

125 REIT Preferred Holders

Cerberus Series Four Holdings LLC and other Cerberus funds and managed accounts

Additional CRE-Ink REIT Member LLCs [see footnote 1 for detail]

Chatham Lodging Trust

125 REIT Preferred Holders

Cerberus Series Four Holdings LLC and other Cerberus funds and managed accounts

CRE-Ink REIT Member, LLC

96%

Chatham Lodging LP

100%

10.9%

CRE-Ink REIT Member IV LLC

100%

89.1%

Chatham TRS Holding Inc.

CRE-Ink Member II Inc.

89.1%

INK Acquisition LLC (Delaware LLC)

4%

CRE-Ink TRS Holding Inc.

10.9%

10.9%

10.9%

89.1%

INK Acquisition IV LLC (Delaware LLC)

INK Acquisition II LLC (Delaware LLC)

Grand Prix Mezz Borrower Floating, LLC

89.1%

10.9%

Grand Prix Mezz Borrower Fixed, LLC

INK Acquisition III LLC[2] (Delaware LLC)

Property Owners (LLCs)

Property Owners (LLCs)

Grand Prix Mezz Borrower 2 Floating, LLC

Property Leases

Grand Prix Fixed Lessee, LLC

Grand Prix Floating Lessee, LLC

Property Leases

Properties

Properties

Property Owners (LLCs)

Property Owners (LLCs)

Properties

Property Leases

Property Owners (LLCs)

Property Leases

Properties

Property Leases

Property Leases

1. Each of CRE-Ink REIT Member IV LLC, CRE-Ink REIT Member V LLC, CRE-Ink REIT Member VI LLC and CRE-Ink REIT Member VII LLC will own a 1% interest in CRE-Ink TRS Holding Inc. This ownership has been consolidated for purposes of this structure chart and the separate ownership of CRE-Ink TRS Holding Inc. by each of these four entities individually is not specifically reflected.
2. Note that Ink Acquisition III LLC has been included on both charts for ease of reference. There is no substantive difference with respect to this entity.



125 REIT Preferred Holders

Cerberus Series Four Holdings LLC & other Cerberus funds and managed accounts

125 REIT Preferred Holders

Chatham Lodging Trust

125 REIT Preferred Holders

Cerberus Series Four Holdings LLC & other Cerberus funds and managed accounts

125 REIT Preferred Holders

CRE-Ink REIT Member V LLC

CRE-Ink REIT Member LLC

Additional CRE-Ink REIT Member LLCs [see footnote 1 for detail]

Chatham Lodging LP

100%

Chatham TRS Holding Inc.

100%

CRE-Ink REIT Member VI LLC

CRE-Ink REIT Member VII LLC

89.1%

10.9%

96%

4%

10.9%

89.1%

INK Acquisition V LLC (Delaware LLC)

CRE-Ink TRS Holding Inc.

INK Acquisition VII LLC (Delaware LLC)

89.1%

10.9%

INK Acquisition III LLC[2] (Delaware LLC)

10.9%

89.1%

INK Acquisition VI LLC (Delaware LLC)

Property Owners (LLCs)

Grand Prix Fixed Lessee, LLC

Grand Prix Floating Lessee, LLC

Property Owners (LLCs)

Property Owners (LLCs)

Property Leases

Property Leases

Property Leases

Property Leases

Properties

Properties

Properties

Properties

1. Each of CRE-Ink REIT Member IV LLC, CRE-Ink REIT Member V LLC, CRE-Ink REIT Member VI LLC and CRE-Ink REIT Member VII LLC will own a 1% interest in CRE-Ink TRS Holding Inc. This ownership has been consolidated for purposes of this structure chart and the separate ownership of CRE-Ink TRS Holding Inc. by each of these four entities individually is not specifically reflected.

2. Note that Ink Acquisition III LLC has been included on both charts for ease of reference. There is no substantive difference with respect to this entity.

<u>Schedule X</u>

| Property | Franchise Agreement | Franchisor |
|---|---|---|
| Summerfield Suites, Belmont, CA | Franchise Agreement as of [October __, 2011] by and between Summerfield Hotel Co., LLC and Grand Prix Fixed Lessee LLC | Summerfield Hotel Co., LLC |
| Residence Inn San Jose, Campbell, CA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Summerfield Suites, El Segundo, CA | Franchise Agreement as of [October __, 2011] by and between Summerfield Hotel Co., LLC and Grand Prix Fixed Lessee LLC | Summerfield Hotel Co., LLC |
| Residence Inn, Fremont, CA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Mountain View, CA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn San Jose South, San Jose, CA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, San Mateo, CA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |

| | | |
|---|---|---|
| Residence Inn Silicon Valley I, Sunnyvale, CA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn Silicon Valley II, Sunnyvale, CA | Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn Denver Downtown, Denver, CO | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence inn Denver South Englewood, CO | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Shelton, CT | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Windsor, CT | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Altamonte Springs, FL | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Courtyard, Fort Lauderdale, FL | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |

| | | |
|---|---|---|
| Hampton Inn, Naples, FL | Amended and Restated Franchise License Agreement as of [October __, 2011] by and between Promus Hotels, Inc. and Grand Prix Fixed Lessee LLC | Promus Hotels, Inc. |
| Residence Inn Atlanta Downtown, Atlanta, GA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn Peachtree Corners, Atlanta, GA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn Chicago (Rosemont/O'Hare), Rosemont, IL | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Hampton Inn, Westchester, IL | Franchise License Agreement as of [October __, 2011] by and between Promus Hotels, Inc. and Grand Prix Fixed Lessee LLC | Promus Hotels, Inc. |
| Residence Inn Lexington North, Lexington, KY | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Jim, Louisville, KY | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Hampton Inn, Columbia, MD | Amended and Restated Franchise License Agreement as of [October __, 2011] by and between Promus Hotels, Inc. and Grand Prix Fixed Lessee LLC | Promus Hotels, Inc. |

| | | |
|---|---|---|
| Residence Inn, Gaithersburg, MD | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Hampton Inn, Germantown, MD | Amended and Restated Franchise License Agreement as of [October __, 2011] by and between Promus Hotels, Inc. and Grand Prix Fixed Lessee LLC | Promus Hotels, Inc. |
| Residence Inn Portland, Scarborough, ME | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Livonia, MI | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Cherry Hill, NJ | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Summerfield Suites, Mount Laurel, NJ | Franchise Agreement as of [October __, 2011] by and between Summerfield Hotel Co., LLC and Grand Prix Fixed Lessee LLC | Summerfield Hotel Co., LLC |
| Residence Inn, Saddle River, NJ | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Hampton Inn, Islandia, NY | Amended and Restated Franchise License Agreement as of [October __, 2011] by and between Promus Hotels, Inc. and Grand Prix Fixed Lessee LLC | Promus Hotels, Inc. |

| | | |
|---|---|---|
| Residence Inn Binghamton, Vestal, NY | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Townplace Suites, Horsham, PA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Hampton Inn, Willow Grove, PA | Amended and Restated Franchise License Agreement as of [October __, 2011] by and between Promus Hotels, Inc. and Grand Prix Fixed Lessee LLC | Promus Hotels, Inc. |
| Residence Inn, Addison, TX | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Arlington, TX | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Summerfield Suites Las Colinas, Irving, TX | Franchise Agreement as of [October __, 2011] by and between Summerfield Hotel Co., LLC and Grand Prix Fixed Lessee LLC | Summerfield Hotel Co., LLC |
| Residence Inn, Richmond, VA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn Richmond NW, Richmond, VA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |

| | | |
|---|---|---|
| Residence Inn, Bellevue, WA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Bothell, WA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn, Lynwood, WA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |
| Residence Inn Tukwila, Seattle, WA | Relicensing Franchise Agreement as of [October __, 2011] by and between Marriott International Inc. and Grand Prix Fixed Lessee LLC | Marriott International Inc. |

<u>Schedule XIII</u>

Closing Date NOI

(see attached)

INNKEEPERS P&L STATEMENT
Monthly Statement
ALL FIXED POOL HOTELS

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.88844086 | 0.87544803 | 0.79166667 | 0.89157706 | 0.83287037 | 0.71012545 | 0.70116487 | 0.84375 | 0.81227599 | 0.78935185 | 0.47446237 | 0.50231481 | 0.75909437 |
| AVERAGE DAILY RATE | 113.658669 | 116.115947 | 116.590936 | 116.833417 | 116.076376 | 112.525918 | 113.305259 | 115.212787 | 118.888991 | 115.113543 | 135.75288 | 123.775207 | 117.023013 |
| REVPAR | 100.979005 | 101.653477 | 92.3011574 | 104.165995 | 96.6765741 | 79.9075179 | 79.4456676 | 97.2107887 | 96.570672 | 90.865088 | 64.4096326 | 62.1741204 | 88.8315103 |
| ROOMS SOLD | 139398.106 | 138655.932 | 127527.849 | 137018.254 | 123229.32 | 105664.006 | 110352.966 | 104686.855 | 127101 | 124313 | 127574 | 133039 | 1498560.29 |
| ROOMS AVAILABLE | 176235 | 176107 | 170678 | 176235 | 170550 | 176235 | 176107 | 159564 | 176235 | 170294 | 176235 | 170550 | 2075025 |
| SALES & INCOME | | | | | | | | | | | | | 5685 |
| ROOM REVENUE | 15097262.8 | 15231925.4 | 14084672 | 15105411.4 | 13303531.5 | 11074320 | 12368368.3 | 11977211.6 | 14465020.1 | 13745714.3 | 14297122.5 | 14985650.1 | 165736211 |
| TELEPHONE REVENUE | 25813.45 | 33017.47 | 25962.73 | 33514.37 | 27911.73 | 24054.76 | 25603.03 | 23467.83 | 26092.86 | 27091.78 | 23537.01 | 24331.5 | 320398.52 |
| OTHER REVENUE | 313202.77 | 257159.55 | 219316.26 | 271286.37 | 216869.13 | 250090.07 | 250879.74 | 193631.93 | 257149.11 | 220691.69 | 251593.62 | 238648.46 | 2940518.7 |
| FOOD & BEVERAGE REVENUE | 42672.42 | 30062.41 | 34451.46 | 28834.55 | 28971.37 | 31340.44 | 47132.86 | 33336.44 | 34767.24 | 33059.85 | 30599.9 | 33986.39 | 409215.33 |
| GROSS INCOME FROM OPERATIONS | 15478951.5 | 15552164.8 | 14364402.4 | 15439046.7 | 13577283.7 | 11379805.2 | 12691983.9 | 12227647.8 | 14783029.4 | 14026557.7 | 14602853 | 15282617.1 | 169406343 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 2968034.23 | 3021321.91 | 2852511.37 | 2931731.14 | 2827422.45 | 2957148.27 | 2690230.18 | 2562261.42 | 2935160.73 | 2930646.52 | 2875694.9 | 2996008.54 | 34548171.7 |
| TELEPHONE EXPENSE | 129797.865 | 135999.215 | 136308.975 | 134751.485 | 124495.525 | 154670.845 | 129420.885 | 140356.695 | 150762.46 | 140815 | 154633.5 | 166508.85 | 1698521.3 |
| OTHER EXPENSE | 117523.8 | 122756.11 | 108554.18 | 113417.5 | 110471.28 | 115351.03 | 91592.37 | 94379.33 | 111041.95 | 92274.46 | 110832.66 | 115948.46 | 1304143.13 |
| FOOD & BEVERAGE EXPENSE | 33667.82 | 31599.89 | 34340.13 | 46411.26 | 33499.71 | 37482.77 | 37342.81 | 32952.88 | 29387.33 | 32316.92 | 26254.32 | 31130.27 | 406386.11 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 3249023.72 | 3311677.12 | 3131714.65 | 3226311.38 | 3095888.97 | 3264652.92 | 2948586.25 | 2829950.32 | 3226352.47 | 3196052.9 | 3167415.38 | 3309596.12 | 37957222.2 |
| GROSS OPERATING INCOME | 12229927.8 | 12240487.7 | 11232687.8 | 12212735.3 | 10481394.8 | 8115152.33 | 9743397.65 | 9397697.52 | 11556676.9 | 10830504.8 | 11435437.7 | 11973021 | 131449121 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 1418145.51 | 1400343.35 | 1348419.38 | 1368853.82 | 1383184.98 | 1341450.63 | 1336375.33 | 1306433.22 | 1564951.64 | 1332486.13 | 1534494.58 | 1355136.74 | 16690275.3 |
| SALES & MARKETING | 1615369.02 | 1589370.36 | 2202370.03 | 1597554.12 | 1434017.35 | 1579409.91 | 1412707.2 | 1355006.75 | 1674640.64 | 1521903.85 | 1571678.76 | 1611864.66 | 19165892.7 |
| REPAIRS & MAINTENANCE | 876384.887 | 856274.779 | 834803.046 | 862608.164 | 786579.755 | 953428.716 | 859845.895 | 852309.119 | 917352.61 | 919393.62 | 841886.16 | 871987.35 | 10432854.1 |
| UTILITIES | 736170.805 | 783783.727 | 806084.852 | 725956.931 | 605210.322 | 760385.171 | 858214.399 | 839426.573 | 772175.62 | 731820.76 | 682861.62 | 704846.92 | 9006937.7 |
| INSURANCE (GL, Van, etc) | 70774.6483 | 70774.6483 | 70774.6483 | 71052.8583 | 72116.8283 | 129879.968 | 98524.5783 | 98524.5783 | 102162.55 | 102162.55 | 102162.55 | 102162.55 | 1091072.96 |
| BASE MANAGEMENT FEES (3%) | 464368.544 | 466564.944 | 430932.073 | 463171.401 | 407318.512 | 341394.157 | 380759.517 | 366829.435 | 443490.881 | 420796.73 | 438085.591 | 458478.513 | 5082190.3 |
| TOTAL OPERATING EXPENSES | 5181213.42 | 5167111.81 | 5693384.03 | 5089197.29 | 4688427.75 | 5105948.56 | 4946426.91 | 4818529.68 | 5474425.85 | 5028304.38 | 5170705.45 | 5103599.67 | 61467274.8 |
| HOUSE PROFIT | 7048714.35 | 7073375.86 | 5539303.74 | 7123538.02 | 5792967.02 | 3009203.77 | 4796970.74 | 4579167.85 | 6082251.03 | 5802200.37 | 6264732.21 | 6869421.3 | 69981846.3 |
| LESS: PROPERTY TAXES | 738122.09 | 781098.5 | 646368.49 | 748839.33 | 697013.04 | 645443.99 | 548181.6 | 790171.09 | 725990.56 | 732240.36 | 718724.51 | 731540.15 | 8503733.71 |
| LESS: PROPERTY INSURANCE | 57900.8 | 57900.8 | 57900.8 | 57900.8 | 57902.95 | 53100.25 | 53100.36 | 53017.21 | 53017.21 | 53017.21 | 53017.21 | 660792.81 | |
| LESS: GROUND RENT | 8284.32 | 8284.32 | 8284.32 | 8569.83 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 100458.71 |
| EBITDA | 6244407.14 | 6226092.24 | 4826750.13 | 6308228.06 | 5029671.54 | 2302280.04 | 4187309.29 | 3727600.06 | 5294863.77 | 5008563.31 | 5484611 | 6076484.45 | 60716861 |
| Less: FFE Reserve (4%) | -619158.059 | -622086.592 | -574576.097 | -617561.868 | -543091.349 | -455192.21 | -507679.356 | -489105.914 | -591321.174 | -561062.306 | -584114.122 | -611304.684 | -6776253.73 |
| Net Operating Income | 5625249.08 | 5604005.65 | 4252174.03 | 5690666.19 | 4486580.19 | 1847087.83 | 3679629.93 | 3238494.14 | 4703542.6 | 4447501 | 4900496.88 | 5465179.77 | 53940607.3 |

INNKEEPERS P&L STATEMENT
Monthly Statement
BINGHAMTON

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.88844086 | 0.87544803 | 0.79166667 | 0.89157706 | 0.83287037 | 0.71012545 | 0.70116487 | 0.84375 | 0.81227599 | 0.78935185 | 0.47446237 | 0.50231481 | 0.75909437 |
| AVERAGE DAILY RATE | 113.658669 | 116.115947 | 116.590936 | 116.833417 | 116.076376 | 112.525918 | 113.305259 | 115.212787 | 118.888991 | 115.113543 | 135.75288 | 123.775207 | 117.023013 |
| REVPAR | 100.979005 | 101.653477 | 92.3011574 | 104.165995 | 96.6765741 | 79.9075179 | 79.4456676 | 97.2107887 | 96.570672 | 90.865088 | 64.4096326 | 62.1741204 | 88.8315103 |
| ROOMS SOLD | 1983 | 1954 | 1710 | 1990 | 1799 | 1585 | 1565 | 1701 | 1813 | 1705 | 1059 | 1085 | 19949 |
| ROOMS AVAILABLE | 2232 | 2232 | 2160 | 2232 | 2160 | 2232 | 2232 | 2016 | 2232 | 2160 | 2232 | 2160 | 26280 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 225385.14 | 226890.56 | 199370.5 | 232498.5 | 208821.4 | 178353.58 | 177322.73 | 195976.95 | 215545.74 | 196268.59 | 143762.3 | 134296.1 | 2334492.09 |
| TELEPHONE REVENUE | 289.99 | 451.1 | 215.14 | 113.75 | 167.76 | 118.31 | 156.04 | 76.51 | 38.03 | 76.99 | 35.94 | 278.38 | 2017.94 |
| OTHER REVENUE | 4035.99 | 2703.64 | 2189.54 | 2439.2 | 3248.28 | 3718.14 | 3361.43 | 2444.09 | 2805.34 | 3496.62 | 2421.62 | 2774.08 | 35637.97 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 229711.12 | 230045.3 | 201775.18 | 235051.45 | 212237.44 | 182190.03 | 180840.2 | 198497.55 | 218389.11 | 199842.2 | 146219.86 | 137348.56 | 2372148 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 41729.97 | 42243.14 | 30379.31 | 42218.42 | 35120.96 | 54746.57 | 40603.13 | 43744.31 | 48112.54 | 45875.98 | 29297.64 | 36554.88 | 490626.85 |
| TELEPHONE EXPENSE | 1427.11 | 1375.2 | 1424.42 | 1430.06 | 1545.08 | 1711.04 | 1440.63 | 1866.33 | 1241.56 | 2026.54 | 1509.83 | 1515.81 | 18513.61 |
| OTHER EXPENSE | 1268.76 | 1911.54 | 994.08 | 1403.31 | 1244.4 | 833.14 | 761.66 | 1534.39 | 1460.65 | 467.44 | 1165.49 | 427.14 | 13472 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 44425.84 | 45529.88 | 32797.81 | 45051.79 | 37910.44 | 57290.75 | 42805.42 | 47145.03 | 50814.75 | 48369.96 | 31972.96 | 38497.83 | 522612.46 |
| GROSS OPERATING INCOME | 185285.28 | 184515.42 | 168977.37 | 189999.66 | 174327 | 124899.28 | 138034.78 | 151352.52 | 167574.36 | 151472.24 | 114246.9 | 98850.73 | 1849535.54 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 24594.27 | 24463.52 | 25702.22 | 23139.82 | 26072.15 | 27356.7 | 23738.72 | 22909.72 | 40366.13 | 26372.61 | 32294.5 | 20167.21 | 317177.57 |
| SALES & MARKETING | 22616.92 | 22195.57 | 22798.95 | 22827.34 | 20690 | 20142.67 | 19411.23 | 19884.06 | 21649.38 | 19644.15 | 17233.83 | 15891.77 | 244985.87 |
| REPAIRS & MAINTENANCE | 8890.01 | 9302.45 | 11410.28 | 12050.81 | 9409.73 | 13313.81 | 9980.04 | 11239.71 | 13192.36 | 13688.58 | 11943.45 | 15071.35 | 139492.58 |
| UTILITIES | 8456.28 | 11516.29 | 9888.15 | 9334.13 | 11338.43 | 11448.8 | 12986.12 | 24082.89 | 15481.17 | 12092.39 | 12740.06 | 6537.63 | 145902.34 |
| INSURANCE (GL, Van, etc) | 912.27 | 912.27 | 912.27 | 918.74 | 947.12 | 1909.16 | 1428.14 | 1428.14 | 1428.14 | 1428.14 | 1428.14 | 1428.14 | 15080.67 |
| BASE MANAGEMENT FEES (3%) | 6891.3336 | 6901.359 | 6053.2554 | 7051.5435 | 6367.1232 | 5465.7009 | 5425.206 | 5954.9265 | 6551.6733 | 5995.266 | 4386.5958 | 4120.4568 | 71164.44 |
| TOTAL OPERATING EXPENSES | 72361.0836 | 75291.459 | 76765.1254 | 75322.3835 | 74824.5532 | 79636.8409 | 72969.456 | 85499.4465 | 98668.8533 | 79221.136 | 80026.5758 | 63216.5568 | 933803.47 |
| HOUSE PROFIT | 112924.196 | 109223.961 | 92212.2446 | 114677.277 | 99502.4468 | 45262.4391 | 65065.324 | 65853.0735 | 68905.5067 | 72251.104 | 34220.3242 | 35634.1732 | 915732.07 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 13355.07 | 13355.07 | 14604.2 | 14136.45 | 13771.45 | 13771.47 | 14837.19 | 14837.19 | 14837.19 | 14837.19 | 14837.19 | 14837.19 | 172016.85 |
| LESS: PROPERTY INSURANCE | 688.64 | 688.64 | 688.64 | 688.64 | 688.68 | 675.07 | 675.07 | 675.07 | 675.07 | 675.07 | 675.07 | 675.07 | 8168.73 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 98880.4864 | 95180.251 | 76919.4046 | 99852.1865 | 85042.3168 | 30815.8991 | 49553.064 | 50340.8135 | 53393.2467 | 56738.844 | 18708.0642 | 20121.9132 | 735546.49 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -9188.4448 | -9201.812 | -8071.0072 | -9402.058 | -8489.4976 | -7287.6012 | -7233.608 | -7939.902 | -8735.5644 | -7993.688 | -5848.7944 | -5493.9424 | -94885.92 |
| | | | | | | | | | | | | | |
| Net Operating Income | 89692.0416 | 85978.439 | 68848.3974 | 90450.1285 | 76552.8192 | 23528.2979 | 42319.456 | 42400.9115 | 44657.6823 | 48745.156 | 12859.2698 | 14627.9708 | 640660.57 |

INNKEEPERS P&L STATEMENT
Monthly Statement
DENVER TECH

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.87046371 | 0.87701613 | 0.78671875 | 0.81779234 | 0.75807292 | 0.67162298 | 0.63230847 | 0.70731027 | 0.77948589 | 0.82421875 | 0.56552419 | 0.59661458 | 0.74086045 |
| AVERAGE DAILY RATE | 90.854198 | 92.0135057 | 89.8369745 | 87.001359 | 85.7834146 | 81.74594 | 86.5675727 | 90.4406469 | 87.3975946 | 86.5475197 | 89.0676515 | 92.4861502 | 88.3415214 |
| REVPAR | 79.0852823 | 80.6973286 | 70.6764323 | 71.1490449 | 65.0300833 | 54.9024521 | 54.7374093 | 63.9695982 | 68.1251915 | 71.3340885 | 50.3699118 | 55.1785859 | 65.4487389 |
| ROOMS SOLD | 3454 | 3480 | 3021 | 3245 | 2911 | 2665 | 2509 | 2535 | 3093 | 3165 | 2244 | 2291 | 34613 |
| ROOMS AVAILABLE | 3968 | 3968 | 3840 | 3968 | 3840 | 3968 | 3968 | 3584 | 3968 | 3840 | 3968 | 3840 | 46720 |
| SALES & INCOME | | | | | | | | | | | | | |
|   ROOM REVENUE | 313810.4 | 320207 | 271397.5 | 282319.41 | 249715.52 | 217852.93 | 217198.04 | 229267.04 | 270320.76 | 273922.9 | 199867.81 | 211885.77 | 3057765.08 |
|   TELEPHONE REVENUE | 1153.56 | 505.46 | 308.82 | 995.32 | 623.55 | 685.05 | 1092.45 | 2755.57 | 858.66 | 2343.07 | 622.64 | 386.11 | 12330.26 |
|   OTHER REVENUE | 4789.05 | 2759.86 | 3163.69 | 3041.1 | 2041.4 | 8340.94 | 3723.46 | 2228.43 | 3127.55 | 2422.64 | 2024.26 | 1187.2 | 38849.58 |
|   FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 319753.01 | 323472.32 | 274870.01 | 286355.83 | 252380.47 | 226878.92 | 222013.95 | 234251.04 | 274306.97 | 278688.61 | 202514.71 | 213459.08 | 3108944.92 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
|   ROOMS EXPENSE | 61148.69 | 64038.18 | 59904.79 | 61378.14 | 57401.58 | 56510.98 | 53380 | 49682.57 | 63067.22 | 54360.04 | 50686.22 | 53449.37 | 685007.78 |
|   TELEPHONE EXPENSE | 2941.44 | 2234.41 | 3069.82 | 3371.62 | 3363.23 | 3638.39 | 3228.52 | 2994.94 | 2931.73 | 2954.89 | 3138.55 | 2985.46 | 36852.99 |
|   OTHER EXPENSE | 955.27 | 866.33 | 2216.27 | 1138.03 | 1828.13 | 1903.6 | 790.11 | 1218.43 | 1390.15 | 1411.79 | 953.15 | 467.55 | 15138.81 |
|   FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 65045.39 | 67138.92 | 65190.88 | 65887.79 | 62592.94 | 62052.97 | 57398.63 | 53895.94 | 67389.1 | 58726.72 | 54777.92 | 56902.38 | 736999.58 |
| GROSS OPERATING INCOME | 254707.62 | 256333.4 | 209679.13 | 220468.04 | 189787.53 | 164825.95 | 164615.32 | 180355.1 | 206917.87 | 219961.89 | 147736.79 | 156556.7 | 2371945.34 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
|   GENERAL & ADMINISTRATIVE | 28670.84 | 29055.44 | 23739.84 | 26786.68 | 28488.19 | 23075.18 | 27779.86 | 22305.46 | 30904.85 | 25479.97 | 27864.33 | 24159.22 | 318309.86 |
|   SALES & MARKETING | 33840.12 | 32757.2 | 28016.55 | 29311.17 | 26838.69 | 26727.99 | 24949.5 | 25694.52 | 29317.37 | 28960.14 | 24434.36 | 26748.22 | 337595.83 |
|   REPAIRS & MAINTENANCE | 14502.38 | 15213.06 | 17593.73 | 19946.33 | 13944.11 | 12976 | 18802.25 | 15605.49 | 14143.45 | 16476.76 | 14935.42 | 15892.6 | 190031.58 |
|   UTILITIES | 14370.55 | 16276.04 | 25786.77 | 26183.15 | 22829.93 | 36204.52 | 25695.65 | 24782.56 | 22171.91 | 21659.06 | 24501.04 | 19836.88 | 280298.06 |
|   INSURANCE (GL, Van, etc) | 1382.77 | 1382.77 | 1382.77 | 1389.24 | 1427.66 | 2823.36 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 22541.63 |
|   BASE MANAGEMENT FEES (3%) | 9592.5903 | 9704.1696 | 8246.1003 | 8590.6749 | 7571.4141 | 6806.3676 | 6660.4185 | 7027.5312 | 8229.2091 | 8360.6583 | 6075.4413 | 6403.7724 | 93268.3476 |
|   TOTAL OPERATING EXPENSES | 102359.25 | 104388.68 | 104765.76 | 112207.245 | 101099.994 | 108613.418 | 106013.189 | 97541.0712 | 106892.299 | 103062.098 | 99936.1013 | 95166.2024 | 1242045.31 |
|   HOUSE PROFIT | 152348.37 | 151944.72 | 104913.37 | 108260.795 | 88687.5359 | 56212.5324 | 58602.1315 | 82814.0288 | 100025.571 | 116899.792 | 47800.6887 | 61390.4976 | 1129900.03 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 13417.16 | 13417.16 | 13417.16 | 13417.16 | 13417.16 | 13417.17 | 16166.87 | 12685.13 | 13561.27 | 13561.27 | 13561.27 | 13561.27 | 163600.05 |
| LESS: PROPERTY INSURANCE | 1146.87 | 1146.87 | 1146.87 | 1146.87 | 1146.83 | 1074 | 1074 | 1074 | 1074 | 1074 | 1074 | 1074 | 13252.31 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 137784.34 | 137380.69 | 90349.3397 | 93696.7651 | 74123.5459 | 41721.3624 | 41361.2615 | 69054.8988 | 85390.3009 | 102264.522 | 33165.4187 | 46755.2276 | 953047.672 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -12790.1204 | -12938.8928 | -10994.8004 | -11454.2332 | -10095.2188 | -9075.1568 | -8880.558 | -9370.0416 | -10972.2788 | -11147.5444 | -8100.5884 | -8538.3632 | -124357.797 |
| | | | | | | | | | | | | | |
| Net Operating Income | 124994.219 | 124441.798 | 79354.5393 | 82242.5319 | 64028.3271 | 32646.2056 | 32480.7035 | 59684.8572 | 74418.0221 | 91116.9773 | 25064.8303 | 38216.8644 | 828689.876 |

INNKEEPERS P&L STATEMENT
Monthly Statement
FREMONT

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.81975806 | 0.8016129 | 0.79583333 | 0.825 | 0.80791667 | 0.66451613 | 0.62782258 | 0.64375 | 0.77379032 | 0.78041667 | 0.85 | 0.85791667 | 0.77130137 |
| AVERAGE DAILY RATE | 83.2631579 | 88.5918511 | 90.3568325 | 94.5974487 | 89.6356988 | 86.0571299 | 99.8797046 | 101.244209 | 98.7081813 | 95.4285638 | 94.9458729 | 94.4941719 | 92.8657868 |
| REVPAR | 68.2556452 | 71.016371 | 71.9089792 | 78.0428952 | 72.418175 | 57.1863508 | 62.7067339 | 65.1759598 | 76.3794355 | 74.4740417 | 80.7039919 | 81.068125 | 71.6275086 |
| ROOMS SOLD | 2033 | 1988 | 1910 | 2046 | 1939 | 1648 | 1557 | 1442 | 1919 | 1873 | 2108 | 2059 | 22522 |
| ROOMS AVAILABLE | 2480 | 2480 | 2400 | 2480 | 2400 | 2480 | 2480 | 2240 | 2480 | 2400 | 2480 | 2400 | 29200 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 169274 | 176120.6 | 172581.55 | 193546.38 | 173803.62 | 141822.15 | 155512.7 | 145994.15 | 189421 | 178737.7 | 200145.9 | 194563.5 | 2091523.25 |
| TELEPHONE REVENUE | 378.49 | 186.13 | 412.78 | 87.32 | 289.55 | 27.2 | 161.04 | 600.09 | 324.33 | 305.67 | 352.45 | 98.39 | 3223.44 |
| OTHER REVENUE | 4045.16 | 3473.36 | 2107.97 | 3408.93 | 2800.41 | 4114.82 | 4257.83 | 4928.59 | 4105.25 | 2214.88 | 3070.24 | 3868.88 | 42396.32 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 173697.65 | 179780.09 | 175102.3 | 197042.63 | 176893.58 | 145964.17 | 159931.57 | 151522.83 | 193850.58 | 181258.25 | 203568.59 | 198530.77 | 2137143.01 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 44526.67 | 45014.18 | 48779.9 | 51818.29 | 46790.01 | 49776.84 | 44656.5 | 38584.06 | 47440.18 | 43680.75 | 48255.15 | 48189.21 | 557511.74 |
| TELEPHONE EXPENSE | 2141.76 | 1420.56 | 2544.53 | 2531.12 | 2546.97 | 2324.99 | 1776.3 | 2719.64 | 2062.64 | 2156.54 | 1892.98 | 2592.37 | 26710.4 |
| OTHER EXPENSE | 549.72 | 303.46 | 850.23 | 1274.81 | 822.89 | 936.23 | 911.19 | 889.9 | 1260.3 | 1184.67 | 1011.77 | 1347.82 | 11342.99 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 47218.15 | 46738.2 | 52174.66 | 55624.22 | 50159.87 | 53038.06 | 47343.99 | 42193.6 | 50763.12 | 47021.96 | 51159.9 | 52129.4 | 595565.13 |
| GROSS OPERATING INCOME | 126479.5 | 133041.89 | 122927.64 | 141418.41 | 126733.71 | 92926.11 | 112587.58 | 109329.23 | 143087.46 | 134236.29 | 152408.69 | 146401.37 | 1541577.88 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 23094.52 | 47399.24 | 46410.45 | 23935.52 | 25474.8 | 24303 | 24853.13 | 26119.84 | 32510.19 | 23113.41 | 2009.79 | 19293.13 | 318517.02 |
| SALES & MARKETING | 22124.38 | 19030.58 | 20358.04 | 20759.25 | 21035.43 | 20915.39 | 22587.81 | 18912.05 | 22794.96 | 22363.77 | 22811.63 | 22455.44 | 256148.73 |
| REPAIRS & MAINTENANCE | 14821.25 | 11442.25 | 11430.23 | 13693.65 | 13051.03 | 14244.77 | 19334.11 | 10906.05 | 16227.42 | 13162.99 | 14172.02 | 13126.57 | 165612.34 |
| UTILITIES | 15708.46 | 15934.65 | 15475.33 | 11681.2 | 7346.56 | 9241.1 | 13798.52 | 13268.38 | 12154.11 | 11384.59 | 13141.98 | 13548.51 | 152683.39 |
| INSURANCE (GL, Van, etc) | 979.43 | 979.43 | 979.43 | 985.9 | 1015.83 | 2039.69 | 1527.76 | 1527.76 | 1527.76 | 1527.76 | 1527.76 | 1527.76 | 16146.27 |
| BASE MANAGEMENT FEES (3%) | 5210.9295 | 5393.4027 | 5253.069 | 5911.2789 | 5306.8074 | 4378.9251 | 4797.9471 | 4545.6849 | 5815.5174 | 5437.7475 | 6107.0577 | 5955.9231 | 64114.2903 |
| TOTAL OPERATING EXPENSES | 81938.9695 | 100179.553 | 99906.549 | 76966.7989 | 73230.4574 | 75122.8751 | 86899.2771 | 75279.7649 | 91029.9574 | 76990.2675 | 59770.2377 | 75907.3331 | 973222.04 |
| HOUSE PROFIT | 44540.5305 | 32862.3373 | 23021.091 | 64451.6111 | 53503.2526 | 17803.2349 | 25688.3029 | 34049.4651 | 52057.5026 | 57246.0225 | 92638.4523 | 70494.0369 | 568355.84 |
| LESS: PROPERTY TAXES | 9047.55 | 9044.21 | 6736.27 | 8276.02 | 8276.02 | 8276.02 | 8276.02 | 13241.62 | 8276.02 | 8276.02 | 8276.02 | 8275.99 | 104277.78 |
| LESS: PROPERTY INSURANCE | 1441.31 | 1441.31 | 1441.31 | 1441.31 | 1441.31 | 1077.67 | 1077.67 | 1077.67 | 1077.67 | 1077.67 | 1077.67 | 1077.67 | 14750.24 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | 34051.6705 | 22376.8173 | 14843.511 | 54734.2811 | 43785.9226 | 8449.5449 | 16334.6129 | 19730.1751 | 42703.8126 | 47892.3325 | 83284.7623 | 61140.3769 | 449327.82 |
| Less: FFE Reserve (4%) | -6947.906 | -7191.2036 | -7004.092 | -7881.7052 | -7075.7432 | -5838.5668 | -6397.2628 | -6060.9132 | -7754.0232 | -7250.33 | -8142.7436 | -7941.2308 | -85485.7204 |
| Net Operating Income | 27103.7645 | 15185.6137 | 7839.419 | 46852.5759 | 36710.1794 | 2610.9781 | 9937.3501 | 13669.2619 | 34949.7894 | 40642.0025 | 75142.0187 | 53199.1461 | 363842.099 |

INNKEEPERS P&L STATEMENT
Monthly Statement
MOUNTAIN VIEW

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.90581797 | 0.93461982 | 0.8860119 | 0.9265553 | 0.86547619 | 0.71428571 | 0.73559908 | 0.57302296 | 0.64400922 | 0.77529762 | 0.87471198 | 0.92232143 | 0.81457926 |
| AVERAGE DAILY RATE | 141.460146 | 146.19731 | 147.948653 | 148.713634 | 143.21814 | 136.067843 | 154.035474 | 161.166405 | 164.727728 | 162.398599 | 167.970382 | 171.260168 | 153.373796 |
| REVPAR | 128.137143 | 136.638903 | 131.084268 | 137.791406 | 123.95189 | 97.1913162 | 113.308353 | 92.3520504 | 106.086175 | 125.907247 | 146.925706 | 157.956923 | 124.935113 |
| ROOMS SOLD | 3145 | 3245 | 2977 | 3217 | 2908 | 2480 | 2554 | 1797 | 2236 | 2605 | 3037 | 3099 | 33300 |
| ROOMS AVAILABLE | 3472 | 3472 | 3360 | 3472 | 3360 | 3472 | 3472 | 3136 | 3472 | 3360 | 3472 | 3360 | 40880 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 444892.16 | 474410.27 | 440443.14 | 478411.76 | 416478.35 | 337448.25 | 393406.6 | 289616.03 | 368331.2 | 423048.35 | 510126.05 | 530735.26 | 5107347.42 |
| TELEPHONE REVENUE | 1395.34 | 3124.33 | 1128.25 | 4265.32 | 4031.41 | 2597.94 | 3255.99 | 2095.11 | -964.39 | 712.89 | 2919.47 | 779.36 | 25341.02 |
| OTHER REVENUE | 5815.46 | 4695.54 | 3029.57 | 7025.35 | 2487.93 | 4753.58 | 10452.14 | 2601.24 | 3655.86 | 4704.63 | 8727.46 | 6167.81 | 64116.57 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 452102.96 | 482230.14 | 444600.96 | 489702.43 | 422997.69 | 344799.77 | 407114.73 | 294312.38 | 371022.67 | 428465.87 | 521772.98 | 537682.43 | 5196805.01 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 66047.31 | 67588.35 | 64732.97 | 73900.33 | 59043.7 | 75142.31 | 74609.76 | 59403.16 | 56856.3 | 62749.21 | 68241.16 | 77891.95 | 806206.51 |
| TELEPHONE EXPENSE | 2376.51 | 2268.23 | 3107.42 | 2881.43 | 3220.91 | 3375.14 | 2647.34 | 2698.17 | 4602.14 | 3766.3 | 2872.06 | 2895.17 | 36710.82 |
| OTHER EXPENSE | 1918.59 | 2163.05 | 2188.86 | 2068.47 | 1903.59 | 2865.69 | 2191.89 | 2177.33 | 1309.02 | 956.89 | 1765.7 | 1108.22 | 22617.3 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 70342.41 | 72019.63 | 70029.25 | 78850.23 | 64168.2 | 81383.14 | 79448.99 | 64278.66 | 62767.46 | 67472.4 | 72878.92 | 81895.34 | 865534.63 |
| GROSS OPERATING INCOME | 381760.55 | 410210.51 | 374571.71 | 410852.2 | 358829.49 | 263416.63 | 327665.74 | 230033.72 | 308255.21 | 360993.47 | 448894.06 | 455787.09 | 4331270.38 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 34705.76 | 34286.14 | 38927.47 | 36411.82 | 39144.51 | 37940.32 | 33723.87 | 28474.09 | 39467.01 | 32866.01 | 34616.2 | 33771.71 | 424334.91 |
| SALES & MARKETING | 43406.19 | 45089.67 | 45352.32 | 44024.76 | 38788.81 | 35360.67 | 40481.46 | 27822.3 | 42791.71 | 41866.37 | 47896.03 | 47876.35 | 500756.64 |
| REPAIRS & MAINTENANCE | 18122.04 | 19655.72 | 20705.14 | 21938.36 | 15834.12 | 18183.7 | 18385.48 | 19120.81 | 18927.62 | 16339.16 | 17133.97 | 19737.59 | 224083.71 |
| UTILITIES | 17243.85 | 22291.15 | 18029.66 | 15510.95 | 8734.89 | 12067.89 | 15137.48 | 14741.31 | 15124.36 | 13934.08 | 13657.7 | 14366 | 180839.32 |
| INSURANCE (GL, Van, etc) | 1248.35 | 1248.35 | 1248.35 | 1254.82 | 1290.41 | 2562.11 | 1926.26 | 1926.26 | 1926.26 | 1926.26 | 1926.26 | 1926.26 | 20409.95 |
| BASE MANAGEMENT FEES (3%) | 13563.0888 | 14466.9042 | 13338.0288 | 14691.0729 | 12689.9307 | 10343.9931 | 12213.4419 | 8829.3714 | 11130.6801 | 12853.9761 | 15653.1894 | 16130.4729 | 155904.15 |
| TOTAL OPERATING EXPENSES | 128289.279 | 137037.934 | 137600.969 | 133831.783 | 116482.671 | 116458.683 | 121867.992 | 100914.141 | 129367.64 | 119785.856 | 130883.349 | 133808.383 | 1506328.68 |
| HOUSE PROFIT | 253471.271 | 273172.576 | 236970.741 | 277020.417 | 242346.819 | 146957.947 | 205797.748 | 129119.579 | 178887.57 | 241207.614 | 318010.711 | 321978.707 | 2824941.7 |
| LESS: PROPERTY TAXES | 23513.56 | 19232.3 | 21907.24 | 21551.03 | 21551.03 | 21551.03 | 21551.03 | 21551.03 | 21551.03 | 21551.03 | 21551.03 | 21551.04 | 258612.38 |
| LESS: PROPERTY INSURANCE | 2034.51 | 2034.51 | 2034.51 | 2034.51 | 2034.58 | 1801.34 | 1801.34 | 1801.34 | 1801.34 | 1801.34 | 1801.34 | 1801.34 | 22782 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | 227923.201 | 251905.766 | 213028.991 | 253434.877 | 218761.209 | 123605.577 | 182445.378 | 105767.209 | | 155535.2 | 217855.244 | 294658.341 | 298626.327 | 2543547.32 |
| Less: FFE Reserve (4%) | -18084.118 | -19289.206 | -17784.038 | -19588.097 | -16919.908 | -13791.991 | -16284.589 | -11772.495 | -14840.907 | -17138.635 | -20870.919 | -21507.297 | -207872.2 |
| Net Operating Income | 209839.083 | | 232616.56 | 195244.953 | | 233846.78 | 201841.302 | 109813.586 | 166160.789 | 93994.7134 | 140694.293 | 200716.609 | 273787.421 | | 277119.03 | 2335675.12 |

5     10/12/20116:23 PM

INNKEEPERS P&L STATEMENT
Monthly Statement
RICHMOND

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.7233871 | 0.69032258 | 0.76083333 | 0.63427419 | 0.68208333 | 0.44556452 | 0.50887097 | 0.51428571 | 0.65120968 | 0.72166667 | 0.36048387 | 0.41 | 0.5919863 |
| AVERAGE DAILY RATE | 88.5648551 | 81.9811273 | 84.8788883 | 80.7726192 | 84.3263714 | 81.5033937 | 81.5144612 | 83.9148698 | 88.7352012 | 83.2303233 | 87.8344519 | 82.6122154 | 84.2417338 |
| REVPAR | 64.0666734 | 56.5934234 | 64.5786875 | 51.2319879 | 57.5176125 | 36.3150202 | 41.4803427 | 43.1562188 | 57.7852218 | 60.06455 | 31.6629032 | 33.8710083 | 49.8699524 |
| ROOMS SOLD | 1794 | 1712 | 1826 | 1573 | 1637 | 1105 | 1262 | 1152 | 1615 | 1732 | 894 | 984 | 17286 |
| ROOMS AVAILABLE | 2480 | 2480 | 2400 | 2480 | 2400 | 2480 | 2480 | 2240 | 2480 | 2400 | 2480 | 2400 | 29200 |
| SALES & INCOME | | | | | | | | | | | | | |
|   ROOM REVENUE | 158885.35 | 140351.69 | 154988.85 | 127055.33 | 138042.27 | 90061.25 | 102871.25 | 96669.93 | 143307.35 | 144154.92 | 78524 | 81290.42 | 1456202.61 |
|   TELEPHONE REVENUE | 350.28 | 87.24 | 96.97 | 147.73 | 37.34 | 108.3 | 278.34 | 83.65 | 97.87 | 742.01 | 73.27 | 643.45 | 2746.45 |
|   OTHER REVENUE | 6662.92 | 2320.48 | 2324.86 | 3263.63 | 2744.98 | 2634.14 | 3391.33 | 2958.65 | 3374.28 | 3322.41 | 1774.55 | 1526.39 | 36298.62 |
|   FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 165898.55 | 142759.41 | 157410.68 | 130466.69 | 140824.59 | 92803.69 | 106540.92 | 99712.23 | 146779.5 | 148219.34 | 80371.82 | 83460.26 | 1495247.68 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
|   ROOMS EXPENSE | 39694.88 | 38461.08 | 37792.3 | 34150.92 | 37834.87 | 36787.39 | 38540.42 | 33092.76 | 39021.44 | 40002.29 | 36004.54 | 32864.46 | 444247.35 |
|   TELEPHONE EXPENSE | 2521.18 | 2948.64 | 3006.95 | 2958.04 | 1626.85 | 4040.02 | 2412.08 | 2785.13 | 3116.88 | 3151.75 | 5544.19 | 6696.7 | 40808.41 |
|   OTHER EXPENSE | 408.88 | 87.44 | 378.62 | 173.07 | 352.64 | 261.74 | 250.9 | 412.66 | 404.29 | 297.05 | 301.89 | 381.47 | 3710.65 |
|   FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 42624.94 | 41497.16 | 41177.87 | 37282.03 | 39814.36 | 41089.15 | 41203.4 | 36290.55 | 42542.61 | 43451.09 | 41850.62 | 39942.63 | 488766.41 |
| GROSS OPERATING INCOME | 123273.61 | 101262.25 | 116232.81 | 93184.66 | 101010.23 | 51714.54 | 65337.52 | 63421.68 | 104236.89 | 104768.25 | 38521.2 | 43517.63 | 1006481.27 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
|   GENERAL & ADMINISTRATIVE | 21353.8 | 20111.78 | 16478.91 | 16298.97 | 18257.64 | 21410.49 | 21402.27 | 17261.48 | 21025.67 | 18570.84 | 29571.62 | 19487.66 | 241231.13 |
|   SALES & MARKETING | 15250.33 | 12035.7 | 16345.8 | 15547.18 | 16051.04 | 14887.98 | 13104.32 | 13199.97 | 22159.15 | 16212.44 | 9542.36 | 12349.62 | 176685.89 |
|   REPAIRS & MAINTENANCE | 12341.25 | 6940.28 | 14336.07 | 9802.76 | 9768.99 | 9758.48 | 9048.38 | 9354.87 | 9331.34 | 10269.76 | 10163.73 | 9734.13 | 120850.04 |
|   UTILITIES | 8939.55 | 8534.42 | 8155.12 | 7156.59 | 8395.64 | 9028.19 | 13202.15 | 13133.57 | 9651.47 | 8396.42 | 6896.88 | 7962.09 | 109452.09 |
|   INSURANCE (GL, Van, etc) | 856.93 | 856.93 | 856.93 | 863.4 | 888.41 | 1912.29 | 1400.35 | 1400.35 | 1400.35 | 1400.35 | 1400.35 | 1400.35 | 14636.99 |
|   BASE MANAGEMENT FEES (3%) | 4976.9565 | 4282.7823 | 4722.3204 | 3914.0007 | 4224.7377 | 2784.1107 | 3196.2276 | 2991.3669 | 4403.385 | 4446.5802 | 2411.1546 | 2503.8078 | 44857.4304 |
|   TOTAL OPERATING EXPENSES | 63718.8165 | 52761.8923 | 60895.1504 | 53582.9007 | 57586.4577 | 59781.5407 | 61353.6976 | 57341.6069 | 67971.365 | 59296.3902 | 59986.0946 | 53437.6578 | 707713.57 |
| HOUSE PROFIT | 59554.7935 | 48500.3577 | 55337.6596 | 39601.7593 | 43423.7723 | -8067.0007 | 3983.8224 | 6080.0731 | 36265.525 | 45471.8598 | -21464.8946 | -9920.0278 | 298767.7 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 5116.59 | 5116.61 | 5483.26 | 5116.61 | 5116.61 | -2883.99 | 5116.61 | 5116.61 | 5116.61 | 4755.76 | -99.33 | 4001.13 | 47073.08 |
| LESS: PROPERTY INSURANCE | 779.1 | 779.1 | 779.1 | 779.1 | 779.19 | 705.17 | 705.17 | 705.17 | 705.17 | 705.17 | 705.17 | 705.17 | 8831.78 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 53659.1035 | 42604.6477 | 49075.2996 | 33706.0493 | 37527.9723 | -5888.1807 | -1837.9576 | 258.2931 | 30443.745 | 40010.9298 | -22070.7346 | -14626.3278 | 242862.84 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -6635.942 | -5710.3764 | -6296.4272 | -5218.6676 | -5632.9836 | -3712.1476 | -4261.6368 | -3988.4892 | -5871.18 | -5928.7736 | -3214.8728 | -3338.4104 | -59809.9072 |
| | | | | | | | | | | | | | |
| Net Operating Income | 47023.1615 | 36894.2713 | 42778.8724 | 28487.3817 | 31894.9887 | -9600.3283 | -6099.5944 | -3730.1961 | 24572.565 | 34082.1562 | -25285.6074 | -17964.7382 | 183052.932 |

# INNKEEPERS P&L STATEMENT
Monthly Statement
SAN JOSE

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.86935484 | 0.86854839 | 0.90541667 | 0.88951613 | 0.86083333 | 0.77298387 | 0.76129032 | 0.79375 | 0.84637097 | 0.75833333 | 0.46048387 | 0.76916667 | 0.79606164 |
| AVERAGE DAILY RATE | 114.513836 | 115.295511 | 116.972895 | 114.075558 | 115.387986 | 113.076943 | 116.82794 | 121.020866 | 120.479924 | 110.731566 | 125.3569 | 111.598402 | 115.963197 |
| REVPAR | 99.5531573 | 100.13973 | 105.909208 | 101.472048 | 99.329825 | 87.4066532 | 88.9399798 | 96.0603125 | 101.97071 | 83.9714375 | 57.7248306 | 85.8377708 | 92.3138531 |
| ROOMS SOLD | 2156 | 2154 | 2173 | 2206 | 2066 | 1917 | 1888 | 1778 | 2099 | 1820 | 1142 | 1846 | 23245 |
| ROOMS AVAILABLE | 2480 | 2480 | 2400 | 2480 | 2400 | 2480 | 2480 | 2240 | 2480 | 2400 | 2480 | 2400 | 29200 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 246891.83 | 248346.53 | 254182.1 | 251650.68 | 238391.58 | 216768.5 | 220571.15 | 215175.1 | 252887.36 | 201531.45 | 143157.58 | 206010.65 | 2695564.51 |
| TELEPHONE REVENUE | 658.39 | 7.26 | 632.34 | 670.02 | 689.36 | 874.52 | 305.1 | 631.47 | 267.53 | 247.01 | -18.18 | 0 | 4964.82 |
| OTHER REVENUE | 3357.71 | 3945.12 | 2741.62 | 4383.45 | 3178.67 | 5247.6 | 6842.25 | 2345.88 | 3123.2 | 3237.95 | 1883.14 | 2032.42 | 42319.01 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 250907.93 | 252298.91 | 257556.06 | 256704.15 | 242259.61 | 222890.62 | 227718.5 | 218152.45 | 256278.09 | 205016.41 | 145022.54 | 208043.07 | 2742848.34 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 48675.78 | 48582.22 | 45521.39 | 56687.29 | 50653.03 | 52744.52 | 50621.14 | 47411.73 | 47412.02 | 51104.34 | 45108.92 | 50811.61 | 595333.99 |
| TELEPHONE EXPENSE | 2305.76 | 2369.17 | 2388.09 | 2479.12 | 2190.52 | 2537.2 | 2783.27 | 2748.21 | 5054.44 | 2907.69 | 2589.12 | 3685.56 | 34038.15 |
| OTHER EXPENSE | 624.56 | 628.07 | 763.13 | 994.23 | 797.46 | 1361.2 | 367.01 | 470.25 | 685.85 | 1474.1 | 996.28 | 1382.83 | 10544.97 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 51606.1 | 51579.46 | 48672.61 | 60160.64 | 53641.01 | 56642.92 | 53771.42 | 50630.19 | 53152.31 | 55486.13 | 48694.32 | 55880 | 639917.11 |
| GROSS OPERATING INCOME | 199301.83 | 200719.45 | 208883.45 | 196543.51 | 188618.6 | 166247.7 | 173947.08 | 167522.26 | 203125.78 | 149530.28 | 96328.22 | 152163.07 | 2102931.23 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 29487.35 | 28054.41 | 24556.24 | 24739.9 | 31353.63 | 24350.09 | 23780.16 | 26999.53 | 24791.58 | 30553.83 | 26671.17 | 23153.03 | 318490.92 |
| SALES & MARKETING | 25982.97 | 25936.31 | 30070.16 | 35644.75 | 22646.45 | 26707.88 | 25191.32 | 17822.71 | 21516.56 | 18697.13 | 12643.03 | 21480.43 | 284339.7 |
| REPAIRS & MAINTENANCE | 10655.48 | 12607.59 | 15415.93 | 6948.11 | 13959.16 | 15282.44 | 11929.92 | 11597.68 | 11182.94 | 12886.37 | 11220.93 | 16702.63 | 150389.18 |
| UTILITIES | 11530.62 | 9618.21 | 14420.77 | 10317.05 | 5679.9 | 2427.24 | 9855.63 | 8317.06 | 8646.21 | 8264.06 | 12342.23 | 11236.84 | 112655.84 |
| INSURANCE (GL, Van, etc) | 979.43 | 979.43 | 979.43 | 985.9 | 1015.83 | 2039.69 | 1527.76 | 1527.76 | 1527.76 | 1527.76 | 1527.76 | 1527.76 | 16146.27 |
| BASE MANAGEMENT FEES (3%) | 7527.2379 | 7568.9673 | 7726.6818 | 7701.1245 | 7267.7883 | 6686.7186 | 6831.555 | 6544.5735 | 7688.3427 | 6150.4923 | 4350.6762 | 6241.2921 | 82285.4502 |
| TOTAL OPERATING EXPENSES | 86163.0879 | 84764.9173 | 93169.2118 | 86336.8345 | 81922.7583 | 77494.0586 | 79116.345 | 72809.3135 | 75353.3927 | 78079.6623 | 68755.7962 | 80341.9821 | 964307.36 |
| HOUSE PROFIT | 113138.742 | 115954.533 | 115714.238 | 110206.676 | 106695.842 | 88753.6414 | 94830.735 | 94712.9465 | 127772.387 | 71450.6177 | 27572.4238 | 71821.0879 | 1138623.87 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 13048.44 | 13048.44 | 14190.01 | 13428.96 | 13428.96 | 13428.97 | 13428.96 | 13428.96 | 13428.96 | 13428.96 | 13428.98 | 13428.96 | 161147.56 |
| LESS: PROPERTY INSURANCE | 1498.4 | 1498.4 | 1498.4 | 1498.4 | 1498.36 | 1213.16 | 1213.16 | 1213.16 | 1213.16 | 1213.16 | 1213.16 | 1213.16 | 15984.08 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 98591.9021 | 101407.693 | 100025.828 | 95279.3155 | 91768.5217 | 74111.5114 | 80188.615 | 80070.8265 | 113130.267 | 56808.4977 | 12930.3038 | 57178.9479 | 961492.23 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -10036.3172 | -10091.9564 | -10302.2424 | -10268.166 | -9690.3844 | -8915.6248 | -9108.74 | -8726.098 | -10251.1236 | -8200.6564 | -5800.9016 | -8321.7228 | -109713.934 |
| | | | | | | | | | | | | | |
| Net Operating Income | 88555.5849 | 91315.7363 | 89723.5858 | 85011.1495 | 82078.1373 | 65195.8866 | 71079.875 | 71344.7285 | 102879.144 | 48607.8413 | 7129.4022 | 48857.2251 | 851778.296 |

INNKEEPERS P&L STATEMENT
Monthly Statement
WINDSOR

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.8578629 | 0.79032258 | 0.71736111 | 0.82795699 | 0.77569444 | 0.60685484 | 0.67977151 | 0.7578125 | 0.82694892 | 0.78819444 | 0.71001344 | 0.80763889 | 0.762129 |
| AVERAGE DAILY RATE | 97.0946298 | 105.961773 | 101.426733 | 102.195548 | 100.501016 | 94.6871816 | 98.5749382 | 107.194497 | 106.486957 | 105.505379 | 107.441136 | 111.024609 | 103.29851 |
| REVPAR | 83.293881 | 83.7439819 | 72.7595938 | 84.6135181 | 77.9580799 | 57.4613743 | 67.0084341 | 81.2333296 | 88.0592742 | 83.1587535 | 76.2846505 | 89.6677917 | 78.72679 |
| ROOMS SOLD | 2553 | 2352 | 2066 | 2464 | 2234 | 1806 | 2023 | 2037 | 2461 | 2270 | 2113 | 2326 | 26705 |
| ROOMS AVAILABLE | 2976 | 2976 | 2880 | 2976 | 2880 | 2976 | 2976 | 2688 | 2976 | 2880 | 2976 | 2880 | 35040 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 247882.59 | 249222.09 | 209547.63 | 251809.83 | 224519.27 | 171005.05 | 199417.1 | 218355.19 | 262064.4 | 239497.21 | 227023.12 | 258243.24 | 2758586.72 |
| TELEPHONE REVENUE | 332.07 | 442.16 | 541.67 | 1104.44 | 967.08 | 706.24 | 834.15 | 242.4 | 1134.3 | 1638.97 | 44.98 | 927.2 | 9227.02 |
| OTHER REVENUE | 5069.43 | 4183.07 | 1277.67 | 3075.11 | 2896.97 | 3592.31 | 3620.58 | 3003.12 | 4371.65 | 2847.1 | 2848.92 | 3342.46 | 40128.39 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 253284.09 | 253847.32 | 211366.97 | 255989.38 | 228383.32 | 175303.6 | 203871.83 | 221600.71 | 267674.61 | 243478.61 | 231511.01 | 261630.68 | 2807942.13 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 47809.54 | 51914.41 | 63259.42 | 62867.57 | 48230.03 | 52425.16 | 53293.95 | 48038.19 | 60539.55 | 59365.5 | 62260.99 | 53160.12 | 663164.43 |
| TELEPHONE EXPENSE | 2732.17 | 2259 | 2074.14 | 2862.93 | 2073.94 | 2842.72 | 2492.81 | 2528.72 | 3537.46 | 2260.31 | 2843.53 | 6139.63 | 34647.36 |
| OTHER EXPENSE | 466.2 | 464.16 | 558.53 | 1366.43 | 753.59 | 628.14 | 575.88 | 1082.42 | 1773.76 | 803.35 | 214.9 | 924.64 | 9612 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 51007.91 | 54637.57 | 65892.09 | 67096.93 | 51057.56 | 55896.02 | 56362.64 | 51649.33 | 65850.77 | 62429.16 | 65319.42 | 60224.39 | 707423.79 |
| GROSS OPERATING INCOME | 202276.18 | 199209.75 | 145474.88 | 188892.45 | 177325.76 | 119407.58 | 147509.19 | 169951.38 | 201823.84 | 181049.45 | 166191.59 | 201406.29 | 2100518.34 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 22964.63 | 27105.16 | 23212.56 | 23789.32 | 25005.45 | 26204.79 | 23535.98 | 22344.18 | 21820.86 | 20984.36 | 30048.64 | 25940.47 | 292956.4 |
| SALES & MARKETING | 25369.87 | 23696.72 | 21565.72 | 24416.95 | 23611.68 | 20405.01 | 20601.03 | 22568.33 | 27557.83 | 24733.05 | 22840.37 | 25267.72 | 282634.28 |
| REPAIRS & MAINTENANCE | 20272.76 | 17239.53 | 15297.72 | 16421.02 | 23158.77 | 31921.57 | 18342.13 | 24929.04 | 18141.69 | 15549.66 | 31118.22 | 17595.77 | 249987.88 |
| UTILITIES | 17444.54 | 14975.37 | 17828.11 | 12469.08 | 22482.3 | 41922.69 | 28531.59 | 31519.62 | 29263.89 | 23468.39 | 14207.97 | 16436.94 | 270550.49 |
| INSURANCE (GL, Van, etc) | 1113.93 | 1113.93 | 1113.93 | 1120.4 | 1153.08 | 2300.94 | 1727.01 | 1727.01 | 1727.01 | 1727.01 | 1727.01 | 1727.01 | 18278.27 |
| BASE MANAGEMENT FEES (3%) | 7598.5227 | 7615.4196 | 6341.0091 | 7679.6814 | 6851.4996 | 5259.108 | 6116.1549 | 6648.0213 | 8030.2383 | 7304.3583 | 6945.3303 | 7848.9204 | 84238.2639 |
| TOTAL OPERATING EXPENSES | 94764.2527 | 91746.1296 | 85359.0491 | 85896.4514 | 102262.78 | 128014.108 | 98853.8949 | 109736.201 | 106541.518 | 93766.8283 | 106887.54 | 94816.8304 | 1198645.58 |
| HOUSE PROFIT | 107511.927 | 107463.62 | 60115.8309 | 102995.999 | 75062.9804 | -8606.528 | 48655.2951 | 60215.1787 | 95282.3217 | 87282.6217 | 59304.0497 | 106589.46 | 901872.756 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 9816.58 | 11238.93 | 119221.31 |
| LESS: PROPERTY INSURANCE | 980.27 | 980.27 | 980.27 | 980.27 | 980.32 | 872.17 | 872.17 | 872.17 | 872.17 | 872.17 | 872.17 | 872.17 | 11006.59 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 96715.0773 | 96666.7704 | 49318.9809 | 92199.1486 | 64266.0804 | -19295.278 | 37966.5451 | 49526.4287 | 84593.5717 | 76593.8717 | 48615.2997 | 94478.3596 | 771644.856 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -10131.3636 | -10153.8928 | -8454.6788 | -10239.5752 | -9135.3328 | -7012.144 | -8154.8732 | -8864.0284 | -10706.9844 | -9739.1444 | -9260.4404 | -10465.2272 | -112317.685 |
| | | | | | | | | | | | | | |
| Net Operating Income | 86583.7137 | 86512.8776 | 40864.3021 | 81959.5734 | 55130.7476 | -26307.422 | 29811.6719 | 40662.4003 | 73886.5873 | 66854.7273 | 39354.8593 | 84013.1324 | 659327.171 |

INNKEEPERS P&L STATEMENT
Monthly Statement
CHERRY HILL

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.88037634 | 0.88407258 | 0.79895833 | 0.78225806 | 0.80277778 | 0.66532258 | 0.71908602 | 0.63504464 | 0.84778226 | 0.83993056 | 0.82459677 | 0.87013889 | 0.79683219 |
| AVERAGE DAILY RATE | 107.149015 | 106.890201 | 104.639287 | 100.341912 | 101.024208 | 99.8709596 | 100.51986 | 106.324165 | 111.636603 | 115.278962 | 118.018858 | 123.797486 | 108.327912 |
| REVPAR | 94.3314583 | 94.4986962 | 83.6024306 | 78.4932695 | 81.0999896 | 66.4464046 | 72.2824261 | 67.5205915 | 94.6435316 | 96.8263229 | 97.317994 | 107.721007 | 86.3191678 |
| ROOMS SOLD | 2620 | 2631 | 2301 | 2328 | 2312 | 1980 | 2140 | 1707 | 2523 | 2419 | 2454 | 2506 | 27921 |
| ROOMS AVAILABLE | 2976 | 2976 | 2880 | 2976 | 2880 | 2976 | 2976 | 2688 | 2976 | 2880 | 2976 | 2880 | 35040 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 280730.42 | 281228.12 | 240775 | 233595.97 | 233567.97 | 197744.5 | 215112.5 | 181495.35 | 281659.15 | 278859.81 | 289618.35 | 310236.5 | 3024623.64 |
| TELEPHONE REVENUE | 276.37 | 734.4 | 397.21 | 1107.03 | 383.89 | 314.69 | 343.75 | 248.9 | 576.93 | 336.18 | 128.87 | 440.16 | 5288.38 |
| OTHER REVENUE | 5217.17 | 4319.55 | 2805.41 | 4530.42 | 3593.72 | 3214.96 | 3109.19 | 1878.18 | 3445.78 | 3897.69 | 3319.54 | 5426.32 | 44757.93 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 286223.96 | 286282.07 | 243977.62 | 239233.42 | 237545.58 | 201274.15 | 218565.44 | 183622.43 | 285681.86 | 283093.68 | 293066.76 | 316102.98 | 3074669.95 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 56643.36 | 67295.65 | 53032.44 | 59251.75 | 58731.99 | 67717.09 | 49358.09 | 52295.94 | 66939.94 | 64734.03 | 62017.8 | 63511.21 | 724529.29 |
| TELEPHONE EXPENSE | 2539.03 | 2416.05 | 2617.87 | 2644.28 | 1701.78 | 2908.26 | 1805.82 | 6405.17 | 4943.44 | 2805.54 | 3298.96 | 3435.85 | 37522.05 |
| OTHER EXPENSE | 806.11 | 1032.79 | 676.63 | 985.8 | 756.85 | 774.61 | 673.23 | 845.58 | 731.45 | 1511.96 | 1503.31 | 2072.45 | 12370.77 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 59988.5 | 70744.49 | 56326.94 | 62881.83 | 61190.62 | 71399.96 | 51837.14 | 59546.69 | 75614.83 | 69051.53 | 66820.07 | 69019.51 | 774422.11 |
| GROSS OPERATING INCOME | 226235.46 | 215537.58 | 187650.68 | 176351.59 | 176354.96 | 129874.19 | 166728.3 | 124075.74 | 210067.03 | 214042.15 | 226246.69 | 247083.47 | 2300247.84 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 32591.48 | 27992.01 | 27034.17 | 26321.75 | 25439.29 | 21564.29 | 20554.61 | 20253.39 | 35075.85 | 32965.36 | 33775.5 | 30713.43 | 334281.13 |
| SALES & MARKETING | 23282.82 | 23303.26 | 19939.34 | 22515.83 | 23070.71 | 24170.32 | 23692.87 | 19429.28 | 28073.58 | 26923.44 | 28531.15 | 26990.15 | 289922.75 |
| REPAIRS & MAINTENANCE | 11134.67 | 13409.32 | 16040.41 | 19219.97 | 19328.2 | 16314.42 | 20059.11 | 23992.27 | 24720.48 | 18965.58 | 20050.08 | 23625.56 | 226860.07 |
| UTILITIES | 15837.09 | 25936.06 | 16107.1 | 18060.04 | 11137.93 | 15777.58 | 13218.49 | 11696.7 | 16603.72 | 18729.52 | 8744.45 | 13948.61 | 185797.29 |
| INSURANCE (GL, Van, etc) | 998.68 | 998.68 | 998.68 | 1005.15 | 1029.41 | 2189.79 | 1609.6 | 1609.6 | 1609.6 | 1609.6 | 1609.6 | 1609.6 | 16877.99 |
| BASE MANAGEMENT FEES (3%) | 8586.7188 | 8588.4621 | 7319.3286 | 7177.0026 | 7126.3674 | 6038.2245 | 6556.9632 | 5508.6729 | 8570.4558 | 8492.8104 | 8792.0028 | 9483.0894 | 92240.0985 |
| TOTAL OPERATING EXPENSES | 92431.4588 | 100227.792 | 87439.0286 | 94299.7426 | 87131.9074 | 86054.6245 | 85691.6432 | 82489.9129 | 114653.686 | 107686.31 | 101502.783 | 106370.439 | 1145979.33 |
| HOUSE PROFIT | 133804.001 | 115309.788 | 100211.651 | 82051.8474 | 89223.0526 | 43819.5655 | 81036.6568 | 41585.8271 | 95413.3442 | 106355.84 | 124743.907 | 140713.031 | 1154268.51 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 19958.98 | 19958.98 | 19958.99 | 19958.98 | 19958.98 | 19958.97 | 24651.9 | 24651.91 | 24851.91 | 24651.9 | 24651.9 | 24651.91 | 267865.3 |
| LESS: PROPERTY INSURANCE | 950.98 | 950.98 | 950.98 | 950.98 | 951.13 | 941.58 | 941.58 | 941.58 | 941.58 | 941.58 | 941.58 | 941.58 | 11346.11 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 112894.041 | 94399.8279 | 79301.6814 | 61141.8874 | 68312.9426 | 22919.0155 | 55443.1768 | 15992.3471 | 69619.8542 | 80762.3596 | 99150.4272 | 115119.541 | 875057.102 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -11448.9584 | -11451.2828 | -9759.1048 | -9569.3368 | -9501.8232 | -8050.966 | -8742.6176 | -7344.8972 | -11427.2744 | -11323.7472 | -11722.6704 | -12644.1192 | -122986.798 |
| | | | | | | | | | | | | | |
| Net Operating Income | 101445.083 | 82948.5451 | 69542.5766 | 51572.5506 | 58811.1194 | 14868.0495 | 46700.5592 | 8647.4499 | 58192.5798 | 69438.6124 | 87427.7568 | 102475.421 | 752070.304 |

INNKEEPERS P&L STATEMENT
Monthly Statement
ATLANTA DOWNTOWN

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.80645161 | 0.72177419 | 0.695 | 0.87762097 | 0.70666667 | 0.52439516 | 0.74657258 | 0.79732143 | 0.84637097 | 0.80166667 | 0.72197581 | 0.7125 | 0.74630137 |
| AVERAGE DAILY RATE | 126.038343 | 123.203975 | 133.317656 | 132.474356 | 131.521807 | 116.97529 | 137.509311 | 124.144415 | 133.342701 | 120.804743 | 118.181312 | 118.117468 | 126.68516 |
| REVPAR | 101.643825 | 88.9254496 | 92.6557708 | 116.262272 | 92.9420771 | 61.3412762 | 102.660681 | 98.9830022 | 112.857391 | 96.8451354 | 85.3240484 | 84.1586958 | 94.5453087 |
| ROOMS SOLD | 4000 | 3580 | 3336 | 4353 | 3392 | 2601 | 3703 | 3572 | 4198 | 3848 | 3581 | 3420 | 43584 |
| ROOMS AVAILABLE | 4960 | 4960 | 4800 | 4960 | 4800 | 4960 | 4960 | 4480 | 4960 | 4800 | 4960 | 4800 | 58400 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 504153.37 | 441070.23 | 444747.7 | 576660.87 | 446121.97 | 304252.73 | 509196.98 | 443443.85 | 559772.66 | 464856.65 | 423207.28 | 403961.74 | 5521446.03 |
| TELEPHONE REVENUE | 833.94 | 655.99 | 620.58 | 1196.85 | 758 | 271.41 | 813.23 | 120.44 | 936.71 | 852.68 | 655.41 | 1200.98 | 8916.22 |
| OTHER REVENUE | 33928.71 | 36421.41 | 35317.35 | 46410.46 | 34439.58 | 33591.48 | 27536.36 | 29535.5 | 37865.02 | 36721.4 | 38935.14 | 29804.2 | 420506.61 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 538916.02 | 478147.63 | 480685.63 | 624268.18 | 481319.55 | 338115.62 | 537546.57 | 473099.79 | 598574.39 | 502430.73 | 462797.83 | 434966.92 | 5950868.86 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 108423.42 | 93661.66 | 92566.17 | 95292.27 | 90291.97 | 109184.93 | 75134.84 | 81355.38 | 102066.58 | 83045.96 | 89891.05 | 83935.75 | 1104849.98 |
| TELEPHONE EXPENSE | 3928.32 | 3614.55 | 3256.03 | 3278.92 | 2744.96 | 3544.36 | 2800.23 | 3874.89 | 2598.12 | 2402.67 | 3695.8 | 3658.55 | 39397.4 |
| OTHER EXPENSE | 27964.93 | 28037.9 | 26637.14 | 26370.08 | 29793.37 | 30376.27 | 28020.77 | 26923.56 | 29983.27 | 16651.32 | 28293.94 | 26592.41 | 325644.96 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 140316.67 | 125314.11 | 122459.34 | 124941.27 | 122830.3 | 143105.56 | 105955.84 | 112153.83 | 134647.97 | 102099.95 | 121880.79 | 114186.71 | 1469892.34 |
| GROSS OPERATING INCOME | 398599.35 | 352833.52 | 358226.29 | 499326.91 | 358489.25 | 195010.06 | 431590.73 | 360945.96 | 463926.42 | 400330.78 | 340917.04 | 320780.21 | 4480976.52 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 44127.64 | 41469.07 | 42790.39 | 52176.81 | 43895.81 | 38082.59 | 48694.77 | 45642.22 | 48008.84 | 43693.2 | 41275.44 | 45071.98 | 534928.76 |
| SALES & MARKETING | 67414.46 | 61583.43 | 104080.5 | 71924.49 | 61292.77 | 62395.85 | 66763.23 | 68276.71 | 68317.77 | 66226.14 | 65479.51 | 63051.4 | 826806.26 |
| REPAIRS & MAINTENANCE | 31259.19 | 29056.71 | 22843.26 | 24666.93 | 23149.79 | 21076.18 | 20378.31 | 27671.22 | 34011.88 | 57255.49 | 26427.96 | 36929.94 | 354726.86 |
| UTILITIES | 27199.59 | 28827.77 | 29442.99 | 29934.47 | 28391.29 | 33425.44 | 41577.21 | 36830.98 | 31611.45 | 32083.67 | 32841.68 | 33459.53 | 385626.07 |
| INSURANCE (GL, Van, etc) | 1529.18 | 1529.18 | 1529.18 | 1535.65 | 1574.82 | 3218.36 | 2396.59 | 2396.59 | 2396.59 | 2396.59 | 2396.59 | 2396.59 | 25295.91 |
| BASE MANAGEMENT FEES (3%) | 16167.4806 | 14344.4289 | 14420.5689 | 18728.0454 | 14439.5865 | 10143.4686 | 16126.3971 | 14192.9937 | 17957.2317 | 15072.9219 | 13883.9349 | 13049.0076 | 178526.066 |
| TOTAL OPERATING EXPENSES | 187697.541 | 176810.589 | 215106.889 | 198966.395 | 172744.067 | 168341.889 | 195936.507 | 195010.714 | 202303.762 | 216728.012 | 182305.115 | 193958.448 | 2305909.93 |
| HOUSE PROFIT | 210901.809 | 176022.931 | 143119.401 | 300360.515 | 185745.184 | 26668.1714 | 235654.223 | 165935.246 | 261622.658 | 183602.768 | 158611.925 | 126821.762 | 2175066.59 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 23371.54 | 19219.61 | 16722.15 | 23294.7 | 23294.7 | 23294.61 | 23294.7 | 23294.7 | 23294.7 | 23294.7 | 23294.7 | 23294.7 | 268965.51 |
| LESS: PROPERTY INSURANCE | 1968.65 | 1968.65 | 1968.65 | 1968.65 | 1968.66 | 1532.32 | 1532.32 | 1532.32 | 1532.32 | 1532.32 | 1532.32 | 1532.32 | 20569.5 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 185561.619 | 154834.671 | 124428.601 | 275097.165 | 160481.824 | 1841.2414 | 210827.203 | 141108.226 | 236795.638 | 158775.748 | 133784.905 | 101994.742 | 1885531.58 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -21556.6408 | -19125.9052 | -19227.4252 | -24970.7272 | -19252.782 | -13524.6248 | -21501.8628 | -18923.9916 | -23942.9756 | -20097.2292 | -18511.9132 | -17398.6768 | -238034.754 |
| | | | | | | | | | | | | | |
| Net Operating Income | 164004.979 | 135708.766 | 105201.176 | 250126.437 | 141229.042 | -11683.3834 | 189325.34 | 122184.235 | 212852.663 | 138678.519 | 115272.992 | 84596.0656 | 1647496.83 |

INNKEEPERS P&L STATEMENT
Monthly Statement
DENVER DOWNTOWN

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.88050314 | 0.81010347 | 0.79874214 | 0.75512274 | 0.74402516 | 0.43842564 | 0.67539055 | 0.64128482 | 0.7151552 | 0.81467505 | 0.81152364 | 0.9327044 | 0.75159817 |
| AVERAGE DAILY RATE | 121.391774 | 121.895224 | 117.754871 | 119.439624 | 115.806433 | 114.352948 | 116.169042 | 106.599306 | 103.047106 | 96.6428101 | 107.681453 | 110.742506 | 112.752791 |
| REVPAR | 106.885839 | 98.747744 | 94.0557778 | 90.1915764 | 86.1628994 | 50.1352648 | 78.4594725 | 68.3605166 | 73.6946744 | 78.7324864 | 87.3860438 | 103.290023 | 84.7447921 |
| ROOMS SOLD | 4340 | 3993 | 3810 | 3722 | 3549 | 2161 | 3329 | 2855 | 3525 | 3886 | 4000 | 4449 | 43619 |
| ROOMS AVAILABLE | 4929 | 4929 | 4770 | 4929 | 4770 | 4929 | 4929 | 4452 | 4929 | 4770 | 4929 | 4770 | 58035 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 526840.3 | 486727.63 | 448646.06 | 444554.28 | 410997.03 | 247116.72 | 386726.74 | 304341.02 | 363241.05 | 375553.96 | 430725.81 | 492693.41 | 4918164.01 |
| TELEPHONE REVENUE | 440.39 | 1088.34 | 376.72 | 687.44 | 271.16 | 312.08 | 569.81 | 559.48 | 277.78 | 470.04 | 279.6 | 753.19 | 6086.03 |
| OTHER REVENUE | 12130.81 | 9537.42 | 4707.11 | 4367.56 | 5418.45 | 8458.49 | 7202.97 | 4881.21 | 5314.11 | 5251.12 | 7948.5 | 7303.68 | 82521.43 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 539411.5 | 497353.39 | 453729.89 | 449609.28 | 416686.64 | 255887.29 | 394499.52 | 309781.71 | 368832.94 | 381275.12 | 438953.91 | 500750.28 | 5006771.47 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 87562.35 | 85584.97 | 78606.4 | 66208.39 | 78755.65 | 75833.08 | 73514.85 | 72978.56 | 84627.98 | 78158.62 | 90567.05 | 87227.4 | 959625.3 |
| TELEPHONE EXPENSE | 2736.67 | 3711.18 | 3145.04 | 3180.63 | 2784.75 | 2862.55 | 2629.31 | 2747.56 | 3733.24 | 2213.76 | 2813.24 | 2809.65 | 35367.58 |
| OTHER EXPENSE | 6336.86 | 4381.28 | 2714.97 | 2179.16 | 3334.27 | 1430.79 | 1775.43 | 1516.52 | 2217.88 | 1906.19 | 1913.47 | 2287.09 | 31993.91 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 96635.88 | 93677.43 | 84466.41 | 71568.18 | 84874.67 | 80126.42 | 77919.59 | 77242.64 | 90579.1 | 82278.57 | 95293.76 | 92324.14 | 1026986.79 |
| GROSS OPERATING INCOME | 442775.62 | 403675.96 | 369263.48 | 378041.1 | 331811.97 | 175760.87 | 316579.93 | 232539.07 | 278253.84 | 298996.55 | 343660.15 | 408426.14 | 3979784.68 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 37184.16 | 35107.78 | 33945.63 | 26890.51 | 40476.88 | 28112.37 | 32972.63 | 28685.83 | 30769.25 | 33381.65 | 34753.03 | 31841.04 | 394120.76 |
| SALES & MARKETING | 59557.59 | 55829.53 | 50686.74 | 47030.23 | 47180.1 | 36304.53 | 46120.91 | 37823.9 | 45454.2 | 46904.76 | 52085.82 | 54307.25 | 579285.56 |
| REPAIRS & MAINTENANCE | 20947.08 | 22756.78 | 18485.63 | 21465.82 | 20934.27 | 17862.48 | 17626.74 | 18905.71 | 20568.6 | 16445.79 | 20016.2 | 20815.71 | 236830.81 |
| UTILITIES | 21532.15 | 21636.12 | 37937.52 | 23986.73 | 30400.17 | 31690.13 | 33437.29 | 32688.47 | 28579.5 | 25910.47 | 22834.24 | 20557.16 | 331189.95 |
| INSURANCE (GL, Van, etc) | 1740.6 | 1740.6 | 1740.6 | 1747.07 | 1795.3 | 3408 | 2601.65 | 2601.65 | 2601.65 | 2601.65 | 2601.65 | 2601.65 | 27782.07 |
| BASE MANAGEMENT FEES (3%) | 16182.345 | 14920.6017 | 13611.8967 | 13488.2784 | 12500.5992 | 7676.6187 | 11834.9856 | 9293.4513 | 11064.9882 | 11438.2536 | 13168.6173 | 15022.5084 | 150203.144 |
| TOTAL OPERATING EXPENSES | 157143.925 | 151991.412 | 156408.017 | 134608.638 | 153287.319 | 125054.129 | 144594.206 | 129999.011 | 139038.188 | 136682.574 | 145459.557 | 145145.318 | 1719412.29 |
| HOUSE PROFIT | 285631.695 | 251684.548 | 212855.463 | 243432.462 | 178524.651 | 50706.7413 | 171985.724 | 102540.059 | 139215.652 | 162313.976 | 198200.593 | 263280.822 | 2260372.39 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 13686.77 | 13686.77 | 13686.77 | 13686.77 | 13686.77 | 13686.77 | -8595.76 | 11972.73 | 11972.73 | 11972.73 | 11972.73 | 11972.73 | 133388.51 |
| LESS: PROPERTY INSURANCE | 1397.56 | 1397.56 | 1397.56 | 1397.56 | 1397.55 | 1374.5 | 1374.5 | 1374.5 | 1374.5 | 1374.5 | 1374.5 | 1374.5 | 16609.29 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 270547.365 | 236600.218 | 197771.133 | 228348.132 | 163440.331 | 35645.4713 | 179206.984 | 89192.8287 | 125868.422 | 148966.746 | 184853.363 | 249933.592 | 2110374.59 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -21576.46 | -19894.1356 | -18149.1956 | -17984.3712 | -16667.4656 | -10235.4916 | -15779.9808 | -12391.2684 | -14753.3176 | -15251.0048 | -17558.1564 | -20030.0112 | -200270.859 |
| | | | | | | | | | | | | | |
| Net Operating Income | 248970.905 | 216706.083 | 179621.938 | 210363.76 | 146772.865 | 25409.9797 | 163427.004 | 76801.5603 | 111115.104 | 133715.742 | 167295.206 | 229903.58 | 1910103.73 |

INNKEEPERS P&L STATEMENT
Monthly Statement
PORTLAND ME

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.93548387 | 0.95244003 | 0.88418803 | 0.87510339 | 0.72521368 | 0.55086849 | 0.48014888 | 0.42857143 | 0.42142266 | 0.42350427 | 0.65550041 | 0.7991453 | 0.67934668 |
| AVERAGE DAILY RATE | 111.590592 | 107.581963 | 105.261885 | 100.790014 | 87.0705657 | 77.9273874 | 76.2027821 | 77.7497329 | 74.4570069 | 92.3994147 | 97.5012934 | 101.826321 | 95.9844465 |
| REVPAR | 104.391199 | 102.465368 | 93.0712991 | 88.2016832 | 63.144765 | 42.9277419 | 36.5886807 | 33.3213141 | 31.3778701 | 39.131547 | 63.9121381 | 81.3740256 | 65.2067151 |
| ROOMS SOLD | 2262 | 2303 | 2069 | 2116 | 1697 | 1332 | 1161 | 936 | 1019 | 991 | 1585 | 1870 | 19341 |
| ROOMS AVAILABLE | 2418 | 2418 | 2340 | 2418 | 2340 | 2418 | 2418 | 2184 | 2418 | 2340 | 2418 | 2340 | 28470 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 252417.92 | 247761.26 | 217786.84 | 213271.67 | 147758.75 | 103799.28 | 88471.43 | 72773.75 | 75871.69 | 91567.82 | 154539.55 | 190415.22 | 1856435.18 |
| TELEPHONE REVENUE | 203.12 | 646.52 | 0 | 249.24 | 261.99 | 73.08 | 267.07 | 530.94 | 41.49 | 946.35 | 266.87 | 58.43 | 3545.1 |
| OTHER REVENUE | 2841.51 | 1885.53 | 2045.46 | 1337.44 | 2203.39 | 2190.48 | 2303.15 | 1041.82 | 1000.38 | 1295.39 | 1266.29 | 2139.41 | 21550.25 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 255462.55 | 250293.31 | 219832.3 | 214858.35 | 150224.13 | 106062.84 | 91041.65 | 74346.51 | 76913.56 | 93809.56 | 156072.71 | 192613.06 | 1881530.53 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 51246.43 | 50831.96 | 44160.51 | 43464.65 | 39484.65 | 39633.94 | 38781.96 | 31775.92 | 34811.37 | 41916.62 | 36291.97 | 44033.51 | 496433.49 |
| TELEPHONE EXPENSE | 1492.45 | 1450.76 | 1525.08 | 1545.16 | 1498.47 | 2005.1 | 2094.31 | 1509.13 | 1675.27 | 1580.8 | 1607.84 | 2676.59 | 20660.96 |
| OTHER EXPENSE | 963.59 | 425.08 | 1248.6 | 724.86 | 1332.45 | 895.08 | 980.65 | 1485.36 | 799.56 | 400 | 575.96 | 833.96 | 10665.15 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 53702.47 | 52707.8 | 46934.19 | 45734.67 | 42315.57 | 42534.12 | 41856.92 | 34770.41 | 37286.2 | 43897.42 | 38475.77 | 47544.06 | 527759.6 |
| GROSS OPERATING INCOME | 201760.08 | 197585.51 | 172898.11 | 169123.68 | 107908.56 | 63528.72 | 49184.73 | 39576.1 | 39627.36 | 49912.14 | 117596.94 | 145069 | 1353770.93 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 26555.62 | 22721.05 | 19287.95 | 20905.84 | 21560.53 | 19555.21 | 17674.16 | 14967.2 | 20006.53 | 18881.82 | 25336.99 | 20252.01 | 247704.91 |
| SALES & MARKETING | 28455.04 | 28749.47 | 28744.86 | 24917.05 | 18233.54 | 22298.04 | 19554.44 | 13310.61 | 24047.48 | 13723.32 | 15013.22 | 18828.11 | 255875.18 |
| REPAIRS & MAINTENANCE | 13094.95 | 15062.88 | 10968.61 | 12991.49 | 11148.88 | 11670.04 | 10084.45 | 11899.24 | 13375.62 | 12213.26 | 10546.56 | 9484.67 | 142541.45 |
| UTILITIES | 8625.93 | 11122.24 | 9657.61 | 8892.38 | 7723.3 | 9658.58 | 10709.94 | 9275.83 | 9888.55 | 8853.73 | 6981.75 | 8225.42 | 109615.26 |
| INSURANCE (GL, Van, etc) | 840.27 | 840.27 | 840.27 | 846.74 | 871.24 | 1879.6 | 1375.42 | 1375.42 | 1375.42 | 1375.42 | 1375.42 | 1375.42 | 14370.91 |
| BASE MANAGEMENT FEES (3%) | 7663.8765 | 7508.7993 | 6594.969 | 6445.7505 | 4506.7239 | 3181.8852 | 2731.2495 | 2230.3953 | 2307.4068 | 2814.2868 | 4682.1813 | 5778.3918 | 56445.9159 |
| TOTAL OPERATING EXPENSES | 85235.6865 | 86004.7093 | 76094.269 | 74999.2505 | 64044.2139 | 68244.1552 | 62129.6595 | 53058.6953 | 71001.0068 | 57861.8368 | 63936.1213 | 63944.0218 | 826553.626 |
| HOUSE PROFIT | 116524.394 | 111580.801 | 96803.841 | 94124.4295 | 43864.3461 | -4715.4352 | -12944.9295 | -13482.5953 | -31373.6468 | -7949.6968 | 53660.8187 | 81124.9782 | 527217.304 |
| LESS: PROPERTY TAXES | 5547.29 | 5547.29 | 6173.23 | 5756.02 | 5756.02 | 5756.26 | 5756.02 | 5756.02 | 5756.02 | 5756.02 | 5756.02 | 5863.37 | 69179.58 |
| LESS: PROPERTY INSURANCE | 794.54 | 794.54 | 794.54 | 794.54 | 794.6 | 732.91 | 732.91 | 732.91 | 732.91 | 732.91 | 732.91 | 732.91 | 9103.13 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | 110182.564 | 105238.971 | 89836.071 | 87573.8695 | 37313.7261 | -11204.6052 | -19433.8595 | -19971.5253 | -37862.5768 | -14438.6268 | 47171.8887 | 74528.6982 | 448934.594 |
| Less: FFE Reserve (4%) | -10218.502 | -10011.7324 | -8793.292 | -8594.334 | -6008.9652 | -4242.5136 | -3641.666 | -2973.8604 | -3076.5424 | -3752.3824 | -6242.9084 | -7704.5224 | -75261.2212 |
| Net Operating Income | 99964.0615 | 95227.2383 | 81042.779 | 78979.5355 | 31304.7609 | -15447.1188 | -23075.5255 | -22945.3857 | -40939.1192 | -18191.0092 | 40928.9803 | 66824.1758 | 373673.373 |

INNKEEPERS P&L STATEMENT
Monthly Statement
SAN MATEO

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.91834677 | 0.91028226 | 0.84395833 | 0.93366935 | 0.899375 | 0.75907258 | 0.72379032 | 0.59419643 | 0.60423387 | 0.85708333 | 0.91552419 | 0.935625 | 0.82583904 |
| AVERAGE DAILY RATE | 119.420252 | 119.306669 | 126.748413 | 118.980391 | 116.620899 | 109.29507 | 121.043877 | 128.39284 | 132.945712 | 132.680817 | 131.325305 | 134.577261 | 124.061962 |
| REVPAR | 109.669204 | 108.602744 | 106.970379 | 111.088345 | 104.885921 | 82.9628911 | 87.6103871 | 76.290567 | 80.3303024 | 113.718517 | 120.231494 | 125.91385 | 102.455212 |
| ROOMS SOLD | 4555 | 4515 | 4051 | 4631 | 4317 | 3765 | 3590 | 2662 | 2997 | 4114 | 4541 | 4491 | 48229 |
| ROOMS AVAILABLE | 4960 | 4960 | 4800 | 4960 | 4800 | 4960 | 4960 | 4480 | 4960 | 4800 | 4960 | 4800 | 58400 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 543959.25 | 538669.61 | 513457.82 | 550998.19 | 503452.42 | 411495.94 | 434547.52 | 341781.74 | 398438.3 | 545848.88 | 596348.21 | 604386.48 | 5983384.36 |
| TELEPHONE REVENUE | 526.82 | 676.79 | 399.43 | 1367.43 | 1163.6 | 1171.27 | 472.89 | 393.63 | 826.25 | 717.98 | 974.99 | 962.82 | 9653.9 |
| OTHER REVENUE | 7466.51 | 4442.22 | 4538.89 | 2416.67 | 2202.68 | 5721.42 | 5720.21 | 4200.08 | 2432.52 | 4020.69 | 5110.31 | 5145.87 | 53418.07 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 551952.58 | 543788.62 | 518396.14 | 554782.29 | 506818.7 | 418388.63 | 440740.62 | 346375.45 | 401697.07 | 550587.55 | 602433.51 | 610495.17 | 6046456.33 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 94298.05 | 85702.47 | 88243.35 | 137875.01 | 83587.49 | 90348.26 | 91076.37 | 80199.94 | 91190.73 | 94440.16 | 141548.76 | 102564.81 | 1181075.4 |
| TELEPHONE EXPENSE | 2497.49 | 2122.66 | 3203.41 | 3248.05 | 2360.91 | 2782.66 | 2513.47 | 2555.24 | 3141.76 | 4818.15 | 4554.08 | 3248.93 | 36158.68 |
| OTHER EXPENSE | 2750.36 | 2146.02 | 2371.47 | 1612.05 | 2226.65 | 1883.24 | 2178.12 | 2215.03 | 1799.46 | 1455.09 | 1314.73 | 1515.91 | 23468.13 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 99545.9 | 89971.15 | 93818.23 | 142735.11 | 88175.05 | 95014.16 | 95767.96 | 84970.21 | 96131.95 | 100713.4 | 147417.57 | 106941.52 | 1241202.21 |
| GROSS OPERATING INCOME | 452406.68 | 453817.47 | 424577.91 | 412047.18 | 418643.65 | 323374.47 | 344972.66 | 261405.24 | 305565.12 | 449874.15 | 455015.94 | 503553.65 | 4805254.12 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 41860.59 | 35583.48 | 32031.54 | 40012.89 | 30611.11 | 37051.93 | 26486.38 | 40903.96 | 32129.57 | 36182.56 | 41568.91 | 36597.2 | 431020.12 |
| SALES & MARKETING | 62126.14 | 61876.88 | 92291.1 | 63145.45 | 57956.67 | 67840.45 | 53322.9 | 43977.96 | 54042.52 | 63194.68 | 67821.03 | 66609.18 | 754204.96 |
| REPAIRS & MAINTENANCE | 27510.14 | 22770.84 | 27862.46 | 24806.09 | 22029.74 | 24008.75 | 22839.82 | 22312.13 | 26622.96 | 25870.24 | 26801.78 | 23496.87 | 296931.85 |
| UTILITIES | 22497.79 | 26344.31 | 21763.46 | 21000 | 13512.19 | 18020.04 | 17758.71 | 18116.72 | 17092.03 | 21514.96 | 35747.27 | 26338.91 | 259706.39 |
| INSURANCE (GL, Van, etc) | 1643.35 | 1643.35 | 1643.35 | 1649.82 | 1693.73 | 3329.77 | 2511.75 | 2511.75 | 2511.75 | 2511.75 | 2511.75 | 2511.75 | 26673.87 |
| BASE MANAGEMENT FEES (3%) | 16558.5774 | 16313.6586 | 15551.8842 | 16643.4687 | 15204.561 | 12551.6589 | 13222.2186 | 10391.2635 | 12050.9121 | 16517.6265 | 18073.0053 | 18314.8551 | 181393.69 |
| TOTAL OPERATING EXPENSES | 172196.587 | 164532.519 | 191143.794 | 167257.719 | 141008.001 | 162802.599 | 136141.779 | 138213.784 | 144449.742 | 165791.847 | 192523.745 | 173868.765 | 1949930.88 |
| HOUSE PROFIT | 280210.093 | 289284.951 | 233434.116 | 244789.461 | 277635.649 | 160571.871 | 208830.881 | 123191.457 | 161115.378 | 284082.304 | 262492.195 | 329684.885 | 2855323.24 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 25436.68 | 25436.68 | 25436.68 | 7561.25 | 20967.82 | 20967.82 | 20967.82 | 20997.82 | 20967.82 | 20967.82 | 20967.82 | 20967.83 | 251643.86 |
| LESS: PROPERTY INSURANCE | 2898.22 | 2898.22 | 2898.22 | 2898.22 | 2898.31 | 2554.25 | 2554.25 | 2554.25 | 2554.25 | 2554.25 | 2554.25 | 2554.25 | 32370.94 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 251875.193 | 260950.051 | 205099.216 | 234329.991 | 253769.519 | 137049.801 | 185308.811 | 99639.3865 | 137593.308 | 260560.234 | 238970.125 | 306162.805 | 2571308.44 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -22078.1032 | -21751.5448 | -20735.8456 | -22191.2916 | -20272.748 | -16735.5452 | -17629.6248 | -13855.018 | -16067.8828 | -22023.502 | -24097.3404 | -24419.8068 | -241858.253 |
| | | | | | | | | | | | | | |
| Net Operating Income | 229797.089 | 239198.507 | 184363.37 | 212138.7 | 233496.771 | 120314.256 | 167679.187 | 85784.3685 | 121525.425 | 238536.732 | 214872.784 | 281742.998 | 2329450.19 |

INNKEEPERS P&L STATEMENT
Monthly Statement
SILICON VALLEY I

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.80938416 | 0.84541265 | 0.7961039 | 0.85630499 | 0.77821068 | 0.65703114 | 0.71372713 | 0.57792208 | 0.65493646 | 0.69105339 | 0.79821254 | 0.87893218 | 0.75587974 |
| AVERAGE DAILY RATE | 128.513789 | 131.042086 | 132.471033 | 129.498222 | 129.875027 | 129.372952 | 137.968382 | 146.219385 | 144.751397 | 142.139025 | 145.682671 | 142.977473 | 136.307452 |
| REVPAR | 104.017026 | 110.784638 | 105.460706 | 110.889973 | 101.070133 | 85.0020584 | 98.4717777 | 84.5034106 | 94.8029675 | 98.2256551 | 116.285735 | 125.667502 | 103.032041 |
| ROOMS SOLD | 5796 | 6054 | 5517 | 6132 | 5393 | 4705 | 5111 | 3738 | 4690 | 4789 | 5716 | 6091 | 63732 |
| ROOMS AVAILABLE | 7161 | 7161 | 6930 | 7161 | 6930 | 7161 | 7161 | 6468 | 7161 | 6930 | 7161 | 6930 | 84315 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 744865.92 | 793328.79 | 730842.69 | 794083.1 | 700416.02 | 608699.74 | 705156.4 | 546568.06 | 678884.05 | 680703.79 | 832722.15 | 870875.79 | 8687146.5 |
| TELEPHONE REVENUE | 2420.56 | 798.81 | 1208.58 | 1999.77 | 896.19 | 820.21 | 1084.2 | 272.58 | 919.68 | 2740.95 | 1840.3 | 1330.77 | 16332.6 |
| OTHER REVENUE | 6509.1 | 7796.61 | 3563.72 | 7825.93 | 4220.6 | 5254.38 | 4371.59 | 4125.32 | 5305.95 | 3956.45 | 5944.95 | 8367.39 | 67241.99 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 753795.58 | 801924.21 | 735614.99 | 803908.8 | 705532.81 | 614774.33 | 710612.19 | 550965.96 | 685109.68 | 687401.19 | 840507.4 | 880573.95 | 8770721.09 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 140041.2 | 123170.94 | 118143.99 | 117904.36 | 108890.61 | 151724.32 | 105748 | 103243.45 | 121636.19 | 122531 | 131336.79 | 137367.06 | 1481737.91 |
| TELEPHONE EXPENSE | 5150.97 | 4601.15 | 4448.59 | 8289.13 | 3942.22 | 6425.91 | 4967.03 | 4474.4 | 4795.52 | 4406.14 | 4714.33 | 6524.73 | 62740.12 |
| OTHER EXPENSE | 3073.92 | 3260.33 | 1774.98 | 2897.27 | 1344.98 | 1987.36 | 1519.07 | 1470.45 | 1461.44 | 1014.79 | 2607.84 | 3076.31 | 25488.74 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 148266.09 | 131032.42 | 124367.56 | 129090.76 | 114177.81 | 160137.59 | 112234.1 | 109188.3 | 127893.15 | 127951.93 | 138658.96 | 146968.1 | 1569966.77 |
| GROSS OPERATING INCOME | 605529.49 | 670891.79 | 611247.43 | 674818.04 | 591355 | 454636.74 | 598378.09 | 441777.66 | 557216.53 | 559449.26 | 701848.44 | 733605.85 | 7200754.32 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 55997.49 | 52684.61 | 55093.83 | 41920.27 | 48454.16 | 47983.93 | 47333.01 | 45769.59 | 50195.2 | 36904.04 | 55771.07 | 45637.91 | 583745.11 |
| SALES & MARKETING | 76602.44 | 80042.99 | 141184.11 | 81948.98 | 72288.36 | 88766.22 | 72957.91 | 59359.58 | 74997.18 | 71949.53 | 83786.7 | 88850.88 | 992734.88 |
| REPAIRS & MAINTENANCE | 59228.24 | 31951.58 | 31359.26 | 30697.05 | 37582.18 | 37148.2 | 31883.5 | 36569.09 | 37845.41 | 28806.48 | 21178.32 | 29794.59 | 414043.9 |
| UTILITIES | 24376.77 | 24136.61 | 27750.25 | 30330.08 | 25360.96 | 26087.59 | 29730.36 | 31557.94 | 38608.14 | 31953.26 | 29216.79 | 25984.92 | 345093.67 |
| INSURANCE (GL, Van, etc) | 2370.85 | 2370.85 | 2370.85 | 2377.32 | 2311.34 | 4505.04 | 3408.19 | 3408.19 | 3408.19 | 3408.19 | 3408.19 | 3408.19 | 36755.39 |
| BASE MANAGEMENT FEES (3%) | 22613.8674 | 24057.7263 | 22068.4497 | 24117.264 | 21165.9843 | 18443.2299 | 21318.3657 | 16528.9788 | 20553.2904 | 20622.0357 | 25215.222 | 26417.2185 | 263121.633 |
| TOTAL OPERATING EXPENSES | 241189.657 | 215244.366 | 279826.75 | 211390.964 | 207162.984 | 222934.21 | 206631.336 | 193193.369 | 225607.41 | 193643.536 | 218576.292 | 220093.709 | 2635494.58 |
| HOUSE PROFIT | 364339.833 | 455647.424 | 331420.68 | 463427.076 | 384192.016 | 231702.53 | 391746.754 | 248584.291 | 331609.12 | 365805.724 | 483272.148 | 513512.142 | 4565259.74 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 34070.96 | 35475.5 | 35922.29 | 35156.26 | 35156.26 | 35156.2 | 35156.26 | 35156.26 | 35156.26 | 35156.26 | 35156.26 | 35156.19 | 421874.96 |
| LESS: PROPERTY INSURANCE | 3764.14 | 3764.14 | 3764.14 | 3764.14 | 3764.13 | 3239.83 | 3239.83 | 3239.83 | 3239.83 | 3239.83 | 3239.83 | 3239.83 | 41499.5 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 326504.733 | 416407.784 | 291734.25 | 424506.676 | 345271.626 | 193306.5 | 353350.664 | 210188.201 | 293213.03 | 327409.634 | 444876.058 | 475116.122 | 4101885.28 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -30151.8232 | -32076.9684 | -29424.5996 | -32156.352 | -28221.3124 | -24590.9732 | -28424.4876 | -22038.6384 | -27404.3872 | -27496.0476 | -33620.296 | -35222.958 | -350828.844 |
| | | | | | | | | | | | | | |
| Net Operating Income | 296352.909 | 384330.815 | 262309.651 | 392350.324 | 317050.313 | 168715.527 | 324926.177 | 188149.563 | 265808.642 | 299913.587 | 411255.762 | 439893.164 | 3751056.44 |

INNKEEPERS P&L STATEMENT
Monthly Statement
SILICON VALLEY II

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.77419355 | 0.84445605 | 0.82523617 | 0.92399112 | 0.83576248 | 0.69831527 | 0.74924905 | 0.81419896 | 0.86848635 | 0.74736842 | 0.6656654 | 0.68488529 | 0.78589097 |
| AVERAGE DAILY RATE | 131.317687 | 130.796499 | 132.776095 | 129.740339 | 130.731313 | 130.046645 | 140.414926 | 142.06086 | 145.033889 | 146.609081 | 142.032221 | 141.420926 | 136.658804 |
| REVPAR | 101.665306 | 110.451895 | 109.571636 | 119.878921 | 109.260327 | 90.8135575 | 105.20575 | 115.665804 | 125.959953 | 109.570997 | 94.5459357 | 96.857112 | 107.398919 |
| ROOMS SOLD | 5928 | 6466 | 6115 | 7075 | 6193 | 5347 | 5737 | 5631 | 6650 | 5538 | 5097 | 5075 | 70852 |
| ROOMS AVAILABLE | 7657 | 7657 | 7410 | 7657 | 7410 | 7657 | 7657 | 6916 | 7657 | 7410 | 7657 | 7410 | 90155 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 778451.25 | 845730.16 | 811925.82 | 917912.9 | 809619.02 | 695359.41 | 805560.43 | 799944.7 | 964475.36 | 811921.09 | 723938.23 | 717711.2 | 9682549.57 |
| TELEPHONE REVENUE | 1065.52 | 2371.66 | 1079.61 | 1389.47 | 1163.64 | 633.74 | 1584.17 | 1336.49 | 2786.48 | 826.27 | 579.64 | 1392.41 | 16209.1 |
| OTHER REVENUE | 12371.62 | 12361.59 | 6727.9 | 10769.3 | 7366.12 | 6399.42 | 5855.91 | 7231 | 8138.7 | 6532.98 | 6875.45 | 6937.71 | 97567.7 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 791888.39 | 860463.41 | 819733.33 | 930071.67 | 818148.78 | 702392.57 | 813000.51 | 808512.19 | 975400.54 | 819280.34 | 731393.32 | 726041.32 | 9796326.37 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 136984.91 | 137127.48 | 135441.22 | 137200.03 | 154612.54 | 137742.35 | 137854.92 | 132189.25 | 141110.97 | 142817.45 | 99514.26 | 119944.14 | 1612539.52 |
| TELEPHONE EXPENSE | 5079.73 | 4926.67 | 4828.78 | 4776.34 | 4896.76 | 5558.6 | 5841.07 | 5248.91 | 7209.76 | 6987.8 | 4234.32 | 6240.05 | 65828.79 |
| OTHER EXPENSE | 4824.41 | 7886.56 | 5082.87 | 4533.82 | 3939.97 | 3065.23 | 3440.99 | 3248.21 | 3519.29 | 2975.74 | 2299.62 | 3014.74 | 47831.45 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 146889.05 | 149940.71 | 145352.87 | 146510.19 | 163449.27 | 146366.18 | 147136.98 | 140686.37 | 151840.02 | 152780.99 | 106048.2 | 129198.93 | 1726199.76 |
| GROSS OPERATING INCOME | 644999.34 | 710522.7 | 674380.46 | 783561.48 | 654699.51 | 556026.39 | 665863.53 | 667825.82 | 823560.52 | 666499.35 | 625345.12 | 596842.39 | 8070126.61 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 56017.14 | 49403.03 | 54332.69 | 52325.71 | 64480.49 | 54691.54 | 102662.49 | 77041.65 | 76202.47 | 53033.67 | 53582.64 | 46828.26 | 740601.78 |
| SALES & MARKETING | 110381.35 | 110594.38 | 181488.77 | 121163.82 | 108503.63 | 131529.69 | 112491.81 | 109487.26 | 151955.68 | 113357.12 | 100335.07 | 100741.52 | 1455030.1 |
| REPAIRS & MAINTENANCE | 48408.09 | 33762.23 | 30917.13 | 36550.4 | 32146.49 | 34077.72 | 35089.94 | 30626.23 | 32152.13 | 30222.82 | 29256.62 | 32584.36 | 405794.16 |
| UTILITIES | 24236.64 | 26666.81 | 29328.75 | 25595.19 | 27396.05 | 27455.55 | 30780.88 | 31836.02 | 25053.43 | 34319.46 | 24072.48 | 29659.95 | 336401.21 |
| INSURANCE (GL, Van, etc) | 2505.27 | 2505.27 | 2505.27 | 2511.74 | 2576.09 | 4893.63 | 3734.86 | 3734.86 | 3734.86 | 3734.86 | 3734.86 | 3734.86 | 39906.43 |
| BASE MANAGEMENT FEES (3%) | 23756.6517 | 25813.9023 | 24591.9999 | 27902.1501 | 24544.4634 | 21071.7771 | 24390.0153 | 24255.3657 | 29262.0162 | 24578.4102 | 21941.7996 | 21781.2396 | 293889.791 |
| TOTAL OPERATING EXPENSES | 265305.142 | 248745.622 | 323164.61 | 266049.01 | 259647.213 | 273719.907 | 309149.995 | 276981.386 | 318360.586 | 259246.34 | 235923.47 | 235330.19 | 3271623.47 |
| HOUSE PROFIT | 379694.198 | 461777.078 | 351215.85 | 517512.47 | 395052.297 | 282306.483 | 356713.535 | 390844.434 | 505199.934 | 407253.01 | 389421.65 | 361512.2 | 4798503.14 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 43333.66 | 43333.66 | 42414.79 | 43027.37 | 43027.37 | 43027.37 | 43027.37 | 43027.37 | 43027.37 | 43027.37 | 43027.37 | 43027.37 | 516328.44 |
| LESS: PROPERTY INSURANCE | 4208.18 | 4208.18 | 4208.18 | 4208.18 | 4208.31 | 3672.34 | 3672.34 | 3672.34 | 3672.34 | 3672.34 | 3672.34 | 3672.34 | 46747.41 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 332152.358 | 414235.238 | 304592.88 | 470276.92 | 347816.617 | 235606.773 | 310013.825 | 344144.724 | 458500.224 | 360553.3 | 342721.94 | 314812.49 | 4235427.29 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -31675.5356 | -34418.5364 | -32789.3332 | -37202.8668 | -32725.9512 | -28095.7028 | -32520.0204 | -32340.4876 | -39016.0216 | -32771.2136 | -29255.7328 | -29041.6528 | -391853.055 |
| | | | | | | | | | | | | | |
| Net Operating Income | 300476.823 | 379816.701 | 271803.547 | 433074.053 | 315090.665 | 207511.07 | 277493.804 | 311804.237 | 419484.202 | 327782.086 | 313466.208 | 285770.838 | 3843574.23 |

INNKEEPERS P&L STATEMENT
Monthly Statement
ADDISON RI

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.70946237 | 0.74408602 | 0.75422222 | 0.78365591 | 0.67444444 | 0.59096774 | 0.61892473 | 0.74547619 | 0.85354839 | 0.83577778 | 0.78645161 | 0.82022222 | 0.74277626 |
| AVERAGE DAILY RATE | 98.4503183 | 100.506737 | 99.9904803 | 100.524443 | 100.358369 | 101.392769 | 108.21607 | 111.704424 | 101.327778 | 100.175424 | 98.5304485 | 102.07084 | 101.76866 |
| REVPAR | 69.8467957 | 74.7856581 | 75.4150422 | 78.7765742 | 67.6861444 | 59.9198559 | 66.9776022 | 83.2729881 | 86.4881613 | 83.7243933 | 77.4894301 | 83.7207711 | 75.5913441 |
| ROOMS SOLD | 3299 | 3460 | 3394 | 3644 | 3035 | 2748 | 2878 | 3131 | 3969 | 3761 | 3657 | 3691 | 40667 |
| ROOMS AVAILABLE | 4650 | 4650 | 4500 | 4650 | 4500 | 4650 | 4650 | 4200 | 4650 | 4500 | 4650 | 4500 | 54750 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 324787.6 | 347753.31 | 339367.69 | 366311.07 | 304587.65 | 278627.33 | 311445.85 | 349746.55 | 402169.95 | 376759.77 | 360325.85 | 376743.47 | 4138626.09 |
| TELEPHONE REVENUE | 200.12 | 197.27 | 389.54 | 551.3 | 220.48 | 163.19 | 107.74 | 243.95 | 565.84 | 573.26 | 140.66 | 677.56 | 4030.91 |
| OTHER REVENUE | 8139.42 | 6496.66 | 6431.45 | 5957.04 | 3836.13 | 5009.03 | 6152.72 | 7055.2 | 7687.17 | 5842.06 | 5865.33 | 8405.27 | 76877.48 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 333127.14 | 354447.24 | 346188.68 | 372819.41 | 308644.26 | 283799.55 | 317706.31 | 357045.7 | 410422.96 | 383175.09 | 366331.84 | 385826.3 | 4219534.48 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 57872.41 | 56221.25 | 57093.28 | 62407.11 | 56467.68 | 54020.72 | 58674.71 | 51412.69 | 73359.92 | 62858.76 | 57984.92 | 62657.54 | 711030.99 |
| TELEPHONE EXPENSE | 2865.78 | 3894.62 | 4120 | 3263.97 | 3354.11 | 3657.1 | 3464.01 | 3988.34 | 6145.53 | 3774.28 | 3772.68 | 3952.03 | 46252.45 |
| OTHER EXPENSE | 3265.73 | 2508.34 | 3845.71 | 4074.36 | 3102.06 | 3416.88 | 3182.39 | 3765.49 | 4268.65 | 4360.88 | 3770.41 | 4962.77 | 44523.67 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 64003.92 | 62624.21 | 65058.99 | 69745.44 | 62923.85 | 61094.7 | 65321.11 | 59166.52 | 83774.1 | 70993.92 | 65528.01 | 71572.34 | 801807.11 |
| GROSS OPERATING INCOME | 269123.22 | 291823.03 | 281129.69 | 303073.97 | 245720.41 | 222704.85 | 252385.2 | 297879.18 | 326648.86 | 312181.17 | 300803.83 | 314253.96 | 3417727.37 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 33844.43 | 28266.62 | 34298.77 | 36029.31 | 34031.72 | 34389.88 | 33967.74 | 31896.82 | 41020.16 | 41566.61 | 34827.81 | 29470.63 | 413610.5 |
| SALES & MARKETING | 42240.34 | 42539.66 | 89560.42 | 43875.53 | 37473.25 | 55184.1 | 37265.45 | 39854.69 | 52654.64 | 44658.79 | 42781.14 | 46154.72 | 574242.73 |
| REPAIRS & MAINTENANCE | 17632.62 | 18177.37 | 17526.6 | 16317.07 | 14718.94 | 15833.37 | 17992.91 | 21352.98 | 28760.24 | 20338.66 | 20101.68 | 16639.97 | 225392.41 |
| UTILITIES | 20185.39 | 16982.85 | 27729.37 | 16768.67 | 14441.84 | 14658.98 | 17426.34 | 15840.35 | 14066.41 | 15764.98 | 16142.08 | 19941 | 209948.26 |
| INSURANCE (GL, Van, etc) | 1567.77 | 1567.77 | 1567.77 | 1574.24 | 1616.35 | 3182.55 | 2399.45 | 2399.45 | 2399.45 | 2399.45 | 2399.45 | 2399.45 | 25473.15 |
| BASE MANAGEMENT FEES (3%) | 9993.8142 | 10633.4172 | 10385.6604 | 11184.5823 | 9259.3278 | 8513.9865 | 9531.1893 | 10711.371 | 12312.6888 | 11495.2527 | 10989.9552 | 11574.789 | 126586.034 |
| TOTAL OPERATING EXPENSES | 125464.364 | 118167.687 | 181068.59 | 125749.402 | 111541.428 | 131762.867 | 118583.079 | 122055.661 | 151213.589 | 136223.743 | 127242.115 | 126180.559 | 1575253.08 |
| HOUSE PROFIT | 143658.856 | 173655.343 | 100061.1 | 177324.568 | 134178.982 | 90941.9835 | 133802.121 | 175823.519 | 175435.271 | 175957.427 | 173561.715 | 188073.401 | 1842474.29 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | -24379.36 | 20580.04 | 21208.19 | 27354.5 | 20580.04 | -19444.88 | 17244.63 | 17244.63 | 22244.63 | 17244.63 | 17244.63 | 17244.63 | 154366.31 |
| LESS: PROPERTY INSURANCE | 1655.4 | 1655.4 | 1655.4 | 1655.4 | 1655.46 | 1444.5 | 1444.5 | 1444.5 | 1444.5 | 1444.5 | 1444.5 | 1444.5 | 18388.56 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 166382.816 | 151419.903 | 77197.5096 | 148314.668 | 111943.482 | 108942.364 | 115112.991 | 157134.389 | 151746.141 | 157268.297 | 154872.585 | 169384.271 | 1669719.42 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -13325.0856 | -14177.8896 | -13847.5472 | -14912.7764 | -12345.7704 | -11351.982 | -12708.2524 | -14281.828 | -16416.9184 | -15327.0036 | -14653.2736 | -15433.052 | -168781.379 |
| | | | | | | | | | | | | | |
| Net Operating Income | 153057.73 | 137242.013 | 63349.9624 | 133401.891 | 99597.7118 | 97590.3815 | 102404.738 | 142852.561 | 135329.223 | 141941.294 | 140219.311 | 153951.219 | 1500938.04 |

INNKEEPERS P&L STATEMENT
Monthly Statement
ARLINGTON

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.83588002 | 0.78381437 | 0.79415205 | 0.87153367 | 0.68888889 | 0.60016978 | 0.60526316 | 0.66510025 | 0.7311828 | 0.74444444 | 0.7696661 | 0.84561404 | 0.74503725 |
| AVERAGE DAILY RATE | 99.9997867 | 101.946845 | 102.257176 | 102.656432 | 100.828756 | 105.924663 | 115.612445 | 137.844748 | 104.416834 | 99.8606795 | 100.044191 | 101.338257 | 105.258264 |
| REVPAR | 83.587824 | 79.9074024 | 81.2077456 | 89.4685371 | 69.4598099 | 63.5727816 | 69.9759536 | 91.6805764 | 76.3477929 | 74.3407281 | 77.0006225 | 85.6930526 | 78.4213276 |
| ROOMS SOLD | 2954 | 2770 | 2716 | 3080 | 2356 | 2121 | 2139 | 2123 | 2584 | 2546 | 2720 | 2892 | 31001 |
| ROOMS AVAILABLE | 3534 | 3534 | 3420 | 3534 | 3420 | 3534 | 3534 | 3192 | 3534 | 3420 | 3534 | 3420 | 41610 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 295399.37 | 282392.76 | 277730.49 | 316181.81 | 237552.55 | 224666.21 | 247295.02 | 292644.4 | 269813.1 | 254245.29 | 272120.2 | 293070.24 | 3263111.44 |
| TELEPHONE REVENUE | 272.35 | 1102.99 | 406.26 | 163.64 | 28.41 | 80.4 | 286.92 | -223.38 | 173.4 | 85.93 | 55.53 | 185.24 | 2617.69 |
| OTHER REVENUE | 7170.1 | 4323.83 | 4331.09 | 4416.52 | 2843.01 | 3602.98 | 5124.78 | 2386.65 | 4758.12 | 4112.21 | 5128.73 | 3439.29 | 51637.31 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 302841.82 | 287819.58 | 282467.84 | 320761.97 | 240423.97 | 228349.59 | 252706.72 | 294807.67 | 274744.62 | 258443.43 | 277304.46 | 296694.77 | 3317366.44 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 55125.19 | 51582.74 | 51612.35 | 58557.45 | 48528.81 | 54138.31 | 43837.47 | 43774.97 | 49091.19 | 55131.56 | 48008.56 | 56865.87 | 616254.47 |
| TELEPHONE EXPENSE | 3540.38 | 3522.71 | 4030.3 | 3720.57 | 3582.97 | 5062.41 | 3894.42 | 4341.01 | 3684.51 | 3925.82 | 3718.28 | 6184.45 | 49207.83 |
| OTHER EXPENSE | 2776.34 | 2612.31 | 2798.67 | 2652.45 | 1371.64 | 4035.62 | 1086.18 | 1371.4 | 2753.05 | 1844.78 | 2065.21 | 1388.39 | 26756.04 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 61441.91 | 57717.76 | 58441.32 | 64930.47 | 53483.42 | 63236.34 | 48818.07 | 49487.38 | 55528.75 | 60902.16 | 53792.05 | 64438.71 | 692218.34 |
| GROSS OPERATING INCOME | 241399.91 | 230101.82 | 224026.52 | 255831.5 | 186940.55 | 165113.25 | 203888.65 | 245320.29 | 219215.87 | 197541.27 | 223512.41 | 232256.06 | 2625148.1 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 25703.94 | 32337.17 | 30160.73 | 33015.73 | 32129.33 | 32117.62 | 28976.96 | 32262.52 | 30751.73 | 31604.82 | 32966.21 | 28469.99 | 370496.75 |
| SALES & MARKETING | 34088.03 | 31714.01 | 51751.34 | 37437.29 | 32356.21 | 32975.18 | 30136.75 | 33610.22 | 31507.65 | 29673.55 | 32039.97 | 31474.85 | 408765.05 |
| REPAIRS & MAINTENANCE | 17322.93 | 15684.91 | 19188.75 | 16167.48 | 12893.78 | 18045.61 | 16259.72 | 17909.81 | 17667.16 | 17839.36 | 14540.82 | 18789.87 | 202310.2 |
| UTILITIES | 12823.62 | 16127.67 | 12774.37 | 12936.6 | 7843.19 | 9565.24 | 10997.11 | 10164.27 | 7640.96 | 8855.72 | 13379.1 | 11334.33 | 134442.18 |
| INSURANCE (GL, Van, etc) | 1265.1 | 1265.1 | 1265.1 | 1271.57 | 1307.5 | 2594.88 | 1951.19 | 1951.19 | 1951.19 | 1951.19 | 1951.19 | 1951.19 | 20676.39 |
| BASE MANAGEMENT FEES (3%) | 9085.2546 | 8634.5874 | 8474.0352 | 9622.8591 | 7212.7191 | 6850.4877 | 7581.2016 | 8844.2301 | 8242.3386 | 7753.3029 | 8319.1338 | 8900.8431 | 99520.9932 |
| TOTAL OPERATING EXPENSES | 100288.875 | 105763.447 | 123614.325 | 110451.529 | 93742.7291 | 102149.018 | 95902.9316 | 104742.24 | 97761.0286 | 97677.9429 | 103196.424 | 100921.073 | 1236211.56 |
| HOUSE PROFIT | 141111.035 | 124338.373 | 100412.195 | 145379.971 | 93197.8209 | 62964.2323 | 107985.718 | 140578.05 | 121454.841 | 99863.3271 | 120315.986 | 131334.987 | 1388936.54 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 15250.66 | 15250.66 | 15250.66 | 13668.07 | 25036.5 | 4920.38 | 14151.24 | 14151.24 | 14151.24 | 14151.24 | 14151.24 | 14151.24 | 174284.37 |
| LESS: PROPERTY INSURANCE | 1474.98 | 1474.98 | 1474.98 | 1474.98 | 1475.06 | 1099.09 | 1099.09 | 1099.09 | 1099.09 | 1099.09 | 1099.09 | 1099.09 | 15068.61 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 124385.395 | 107612.733 | 83686.5548 | 130236.921 | 66686.2609 | 56944.7623 | 92735.3884 | 125327.72 | 106204.511 | 84612.9971 | 105065.656 | 116084.657 | 1199583.56 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -12113.6728 | -11512.7832 | -11298.7136 | -12830.4788 | -9616.9588 | -9133.9836 | -10108.2688 | -11792.3068 | -10989.7848 | -10337.7372 | -11092.1784 | -11867.7908 | -132694.658 |
| | | | | | | | | | | | | | |
| Net Operating Income | 112271.723 | 96099.9494 | 72387.8412 | 117406.442 | 57069.3021 | 47810.7787 | 82627.1196 | 113535.413 | 95214.7266 | 74275.2599 | 93973.4778 | 104216.866 | 1066888.9 |

INNKEEPERS P&L STATEMENT
Monthly Statement
SHELTON

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.84643817 | 0.81922043 | 0.790625 | 0.84744624 | 0.66979167 | 0.64112903 | 0.83501344 | 0.79910714 | 0.86693548 | 0.56979167 | 0.45362903 | 0.48715278 | 0.71917808 |
| AVERAGE DAILY RATE | 102.671973 | 106.746124 | 105.87711 | 108.759148 | 108.170664 | 104.008056 | 102.910801 | 109.186089 | 105.096143 | 109.424771 | 113.379926 | 111.278974 | 106.806569 |
| REVPAR | 86.9054772 | 87.4486055 | 83.7090903 | 92.1675302 | 72.451809 | 66.682584 | 85.9319019 | 87.2513839 | 91.1115759 | 62.3493229 | 51.4324261 | 54.2098611 | 76.8129435 |
| ROOMS SOLD | 2519 | 2438 | 2277 | 2522 | 1929 | 1908 | 2485 | 2148 | 2580 | 1641 | 1350 | 1403 | 25200 |
| ROOMS AVAILABLE | 2976 | 2976 | 2880 | 2976 | 2880 | 2976 | 2976 | 2688 | 2976 | 2880 | 2976 | 2880 | 35040 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 258630.7 | 260247.05 | 241082.18 | 274290.57 | 208661.21 | 198447.37 | 255733.34 | 234531.72 | 271148.05 | 179566.05 | 153062.9 | 156124.4 | 2691525.54 |
| TELEPHONE REVENUE | 942.3 | 1481.01 | 330.98 | 530.88 | 335.13 | 70.04 | 77.49 | 495.88 | 111.06 | 117.68 | 57.88 | 133.57 | 4683.9 |
| OTHER REVENUE | 3651.89 | 4099.95 | 3546.54 | 3810.9 | 2992.65 | 3536.71 | 4403.96 | 1222.02 | 1466.06 | 234.81 | 5898.12 | 1599.85 | 36463.46 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 263224.89 | 265828.01 | 244959.7 | 278632.35 | 211988.99 | 202054.12 | 260214.79 | 236249.62 | 272725.17 | 179918.54 | 159018.9 | 157857.82 | 2732672.9 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 66688.13 | 62922.13 | 71720.99 | 63622.71 | 56580.95 | 84036.19 | 83952.44 | 47513.96 | 61217.72 | 56478.38 | 50810.43 | 48457.67 | 754001.7 |
| TELEPHONE EXPENSE | 2465.35 | 2375.9 | 3531.74 | 4574.04 | 1877.57 | 3353.39 | 2491.75 | 3943.71 | 3466.51 | 2525.6 | 2610.09 | 3003.88 | 36219.53 |
| OTHER EXPENSE | 912.4 | 2125.53 | 289.96 | 290.39 | 467.21 | 602.91 | 1595.69 | 578.03 | 1046.25 | 895.49 | 828.4 | 793.07 | 10425.33 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 70065.88 | 67423.56 | 75542.69 | 68487.14 | 58925.73 | 87992.49 | 88039.88 | 52035.7 | 65730.48 | 59899.47 | 54248.92 | 52254.62 | 800646.56 |
| GROSS OPERATING INCOME | 193159.01 | 198404.45 | 169417.01 | 210145.21 | 153063.26 | 114061.63 | 172174.91 | 184213.92 | 206994.69 | 120019.07 | 104769.98 | 105603.2 | 1932026.34 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 32076.18 | 31560.38 | 26291.6 | 32430.49 | 33117.26 | 26970.82 | 29822.4 | 29028.6 | 31883.31 | 27514.45 | 39207.65 | 20822.79 | 360725.93 |
| SALES & MARKETING | 20999.26 | 20569.84 | 27032.4 | 28283.03 | 22872.63 | 23753.24 | 26895.98 | 24606.55 | 31408.89 | 20431.88 | 18735.42 | 17606.07 | 283195.19 |
| REPAIRS & MAINTENANCE | 22990.46 | 19354.73 | 20636.81 | 20851.15 | 16936.7 | 17477.84 | 19954.85 | 23225.3 | 27857.76 | 24551.97 | 20349.87 | 16494.98 | 250682.42 |
| UTILITIES | 14862.37 | 15450.76 | 18394.2 | 28916.95 | 20416.56 | 27710.83 | 37907.15 | 41198.95 | 27250.53 | 18984.45 | 16914.52 | 12630.87 | 280638.14 |
| INSURANCE (GL, Van, etc) | 1113.93 | 1113.93 | 1113.93 | 1120.4 | 1153.08 | 2300.94 | 1727.01 | 1727.01 | 1727.01 | 1727.01 | 1727.01 | 1727.01 | 18278.27 |
| BASE MANAGEMENT FEES (3%) | 7896.7467 | 7974.8403 | 7348.791 | 8358.9705 | 6359.6697 | 6061.6236 | 7806.4437 | 7087.4886 | 8181.7551 | 5397.5562 | 4770.567 | 4735.7346 | 81980.187 |
| TOTAL OPERATING EXPENSES | 99938.9467 | 96024.4803 | 100817.731 | 119960.991 | 100855.9 | 104275.294 | 124113.834 | 126873.899 | 128309.255 | 98607.3162 | 101705.037 | 74017.4546 | 1275500.14 |
| HOUSE PROFIT | 93220.0633 | 102379.97 | 68599.279 | 90184.2195 | 52207.3603 | 9786.3364 | 48061.0763 | 57340.0214 | 78685.4349 | 21411.7538 | 3064.943 | 31585.7454 | 656526.203 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 11873.66 | 11697.91 | 11697.91 | 11697.91 | 11697.91 | 11761.97 | 11849.63 | 11728.74 | 11728.74 | 11728.74 | 11728.74 | 12554.3 | 141746.16 |
| LESS: PROPERTY INSURANCE | 1051.17 | 1051.17 | 1051.17 | 1051.17 | 1051.21 | 923.17 | 923.17 | 923.17 | 923.17 | 923.17 | 923.17 | 923.17 | 11718.08 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 80295.2333 | 89630.8897 | 55850.199 | 77435.1395 | 39458.2403 | -2898.8036 | 35288.2763 | 44688.1114 | 66033.5249 | 8759.8438 | -9586.967 | 18108.2754 | 503061.963 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -10528.9956 | -10633.1204 | -9798.388 | -11145.294 | -8479.5596 | -8082.1648 | -10408.5916 | -9449.9848 | -10909.0068 | -7196.7416 | -6360.756 | -6314.3128 | -109306.916 |
| | | | | | | | | | | | | | |
| Net Operating Income | 69766.2377 | 78997.7693 | 46051.811 | 66289.8455 | 30978.6807 | -10980.9684 | 24879.6847 | 35238.1266 | 55124.5181 | 1563.1022 | -15947.723 | 11793.9626 | 393755.047 |

# INNKEEPERS P&L STATEMENT
Monthly Statement
ALTAMONTE SPRINGS

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.64465726 | 0.5561996 | 0.50338542 | 0.55367944 | 0.63671875 | 0.70010081 | 0.75478831 | 0.79520089 | 0.84475806 | 0.72447917 | 0.60534274 | 0.70833333 | 0.6682149 |
| AVERAGE DAILY RATE | 84.5305942 | 82.4453104 | 79.869193 | 75.9752253 | 79.5378569 | 77.9249892 | 84.6763205 | 88.0146246 | 99.4808323 | 83.9909597 | 84.3671898 | 81.791375 | 84.1516016 |
| REVPAR | 54.4932611 | 45.8560484 | 40.204987 | 42.0659199 | 50.6432448 | 54.5553478 | 63.9126966 | 69.989308 | 84.0372354 | 60.8497005 | 51.071066 | 57.9355573 | 56.2313538 |
| ROOMS SOLD | 2558 | 2207 | 1933 | 2197 | 2445 | 2778 | 2995 | 2850 | 3352 | 2782 | 2402 | 2720 | 31219 |
| ROOMS AVAILABLE | 3968 | 3968 | 3840 | 3968 | 3840 | 3968 | 3968 | 3584 | 3968 | 3840 | 3968 | 3840 | 46720 |
| SALES & INCOME | | | | | | | | | | | | | |
|   ROOM REVENUE | 216229.26 | 181956.8 | 154387.15 | 166917.57 | 194470.06 | 216475.62 | 253605.58 | 250841.68 | 333459.75 | 233662.85 | 202649.99 | 222472.54 | 2627128.85 |
|   TELEPHONE REVENUE | 123.64 | 71.82 | -5.78 | 0.4 | 1.35 | 2.38 | 2.11 | 2.14 | 11.75 | -7.48 | 0.98 | 1.14 | 194.49 |
|   OTHER REVENUE | 6227.95 | 4838.41 | 2712.77 | 4814.57 | 6016.22 | 6093.36 | 3056.83 | 2831.2 | 4292.21 | 4126.34 | 4957.49 | 4343.76 | 54311.11 |
|   FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 222580.85 | 186867.03 | 157094.14 | 171732.54 | 200487.63 | 222571.36 | 256664.52 | 253675.02 | 337753.71 | 237781.71 | 207608.46 | 226817.48 | 2681634.45 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
|   ROOMS EXPENSE | 53147.08 | 54198.28 | 42729.42 | 51557.11 | 58694.85 | 71598.62 | 58936.74 | 64684.11 | 76225.13 | 59667.27 | 56235.74 | 60305.94 | 707980.29 |
|   TELEPHONE EXPENSE | 1953.88 | 4125.19 | 2693.14 | 2885.92 | 1526.04 | 4143.25 | 1925.14 | 2060.64 | 1966.55 | 1863.01 | 2030.62 | 1863.11 | 29036.5 |
|   OTHER EXPENSE | 1702.01 | 1233.02 | 636.11 | 551.1 | 995.72 | 759.66 | 899.51 | 770.2 | 798.84 | 829.32 | 1423.52 | 1108.71 | 11707.72 |
|   FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 56802.97 | 59556.49 | 46058.67 | 54994.14 | 61216.61 | 76501.53 | 61761.39 | 67514.95 | 78990.52 | 62359.6 | 59689.88 | 63277.76 | 748724.51 |
| GROSS OPERATING INCOME | 165777.88 | 127310.54 | 111035.47 | 116738.4 | 139271.02 | 146069.83 | 194903.13 | 186160.07 | 258763.19 | 175422.11 | 147918.58 | 163539.72 | 1932909.94 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
|   GENERAL & ADMINISTRATIVE | 26535.46 | 28183.9 | 21721.32 | 28528.67 | 21747.27 | 26393.16 | 24407 | 28051.33 | 29053.63 | 26098.73 | 30522.18 | 22860.14 | 314102.79 |
|   SALES & MARKETING | 26949.37 | 24920.67 | 22653.72 | 22071.84 | 25521.6 | 31149.34 | 30775.98 | 30430.96 | 36730.52 | 29774.62 | 25756.5 | 27110.39 | 333845.51 |
|   REPAIRS & MAINTENANCE | 24086.84 | 21099.65 | 17861.78 | 16298.28 | 19006.1 | 19000.35 | 21511.77 | 14421.73 | 23020.01 | 23747.45 | 18264.45 | 20232.66 | 238551.07 |
|   UTILITIES | 19613.37 | 18238.24 | 18614.95 | 15632.65 | 14479.26 | 15198.36 | 17207.08 | 15850.87 | 15612.93 | 15043.33 | 15029.86 | 16119.49 | 196640.39 |
|   INSURANCE (GL, Van, etc) | 1392.43 | 1392.43 | 1392.43 | 1398.9 | 1442.57 | 2835.11 | 2138.84 | 2138.84 | 2138.84 | 2138.84 | 2138.84 | 2138.84 | 22686.91 |
|   BASE MANAGEMENT FEES (3%) | 6677.4255 | 5606.0109 | 4712.8242 | 5151.9762 | 6014.6289 | 6677.1408 | 7699.9356 | 7610.2506 | 10132.6113 | 7133.4513 | 6228.2538 | 6804.5244 | 80449.0335 |
|   TOTAL OPERATING EXPENSES | 105254.896 | 99440.9009 | 86957.0242 | 89082.3162 | 88211.4289 | 101253.461 | 103740.606 | 98503.9806 | 116688.541 | 103936.421 | 97940.0838 | 95266.0444 | 1186275.7 |
|   HOUSE PROFIT | 60522.9845 | 27869.6391 | 24078.4458 | 27656.0838 | 51059.5911 | 44816.3692 | 91162.5244 | 87656.0894 | 142074.649 | 71485.6887 | 49978.4962 | 68273.6756 | 746634.237 |
| | | | | | | | | | | | | | |
|   LESS: PROPERTY TAXES | 13466.61 | 13466.61 | -6743.68 | 8353.61 | 9051.17 | -19702.91 | 9051.17 | 8919.48 | 9051.17 | 9051.17 | 9051.17 | 9051.17 | 72066.74 |
|   LESS: PROPERTY INSURANCE | 1299.05 | 1299.05 | 1299.05 | 1299.05 | 1299.05 | 1182.41 | 1182.41 | 1182.41 | 1182.41 | 1182.41 | 1182.41 | 1182.41 | 14772.12 |
|   LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 45757.3245 | 13103.9791 | 29523.0758 | 18003.4238 | 40709.3711 | 63336.8692 | 80928.9444 | 77554.1994 | 131841.069 | 61252.1087 | 39744.9162 | 58040.0956 | 659795.377 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -8903.234 | -7474.6812 | -6283.7656 | -6869.3016 | -8019.5052 | -8902.8544 | -10266.5808 | -10147.0008 | -13510.1484 | -9511.2684 | -8304.3384 | -9072.6992 | -107265.378 |
| | | | | | | | | | | | | | |
| Net Operating Income | 36854.0905 | 5629.2979 | 23239.3102 | 11134.1222 | 32689.8659 | 54434.0148 | 70662.3636 | 67407.1986 | 118330.92 | 51740.8403 | 31440.5778 | 48967.3964 | 552529.999 |

INNKEEPERS P&L STATEMENT
Monthly Statement
LEXINGTON KY

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.93387097 | 0.92620968 | 0.85833333 | 0.87943548 | 0.75 | 0.41048387 | 0.43629032 | 0.77633929 | 0.83145161 | 0.83583333 | 0.48024194 | 0.46791667 | 0.71489726 |
| AVERAGE DAILY RATE | 98.92 | 97.3197736 | 143.470704 | 154.008024 | 102.687467 | 87.1128389 | 88.4789094 | 87.6674238 | 90.3179389 | 99.492682 | 76.3378254 | 79.1607302 | 104.020277 |
| REVPAR | 92.3785161 | 90.1385161 | 123.145688 | 135.440121 | 77.0156 | 35.7584153 | 38.6024919 | 68.0596652 | 75.094996 | 83.1593 | 36.660625 | 37.040625 | 74.3638113 |
| ROOMS SOLD | 2316 | 2297 | 2060 | 2181 | 1800 | 1018 | 1082 | 1739 | 2062 | 2006 | 1191 | 1123 | 20875 |
| ROOMS AVAILABLE | 2480 | 2480 | 2400 | 2480 | 2400 | 2480 | 2480 | 2240 | 2480 | 2400 | 2480 | 2400 | 29200 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 229098.72 | 223543.52 | 295549.65 | 335891.5 | 184837.44 | 88680.87 | 95734.18 | 152453.65 | 186235.59 | 199582.32 | 90918.35 | 88897.5 | 2171423.29 |
| TELEPHONE REVENUE | 123.19 | 51.4 | 231.48 | 249.35 | 261.39 | 193.76 | 109.57 | 359.51 | 158.29 | 66.01 | 10.52 | 5.19 | 1819.72 |
| OTHER REVENUE | 5107.92 | 3020.27 | 3786.42 | 3137.42 | 1598.37 | 2420.75 | 2511.02 | 1911.81 | 1231.28 | 2326.57 | 1274.56 | 1656.52 | 29982.91 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 234329.83 | 226615.19 | 299567.55 | 339278.27 | 186697.2 | 91295.38 | 98354.77 | 154724.97 | 187625.16 | 201974.9 | 92203.43 | 90559.27 | 2203225.92 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 41351.48 | 44520.25 | 44962.96 | 35605.63 | 77083.74 | 34502.5 | 31143.38 | 35488.54 | 45513.59 | 40046 | 32642.01 | 26174.4 | 489034.48 |
| TELEPHONE EXPENSE | 2218.72 | 2778.34 | 1932.1 | 1939.26 | 1687.74 | 2569.6 | 2765.85 | 2550.82 | 2838.59 | 3351.38 | 4527.06 | 3247.51 | 32406.97 |
| OTHER EXPENSE | 522 | 520.77 | 1688.58 | 1675.26 | 1306.23 | 1354.8 | 251.32 | 419.49 | 420.47 | 557.23 | 185.59 | 207.38 | 9109.12 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 44092.2 | 47819.36 | 48583.64 | 39220.15 | 80077.71 | 38426.9 | 34160.55 | 38458.85 | 48772.65 | 43954.61 | 37354.66 | 29629.29 | 530550.57 |
| GROSS OPERATING INCOME | 190237.63 | 178795.83 | 250983.91 | 300058.12 | 106619.49 | 52868.48 | 64194.22 | 116266.12 | 138852.51 | 158020.29 | 54848.77 | 60929.98 | 1672675.35 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 23169.78 | 22832.21 | 22140.89 | 21330.08 | 18979.46 | 23591.27 | 20015.09 | 22327.36 | 21980.47 | 23014.48 | 24132.89 | 21460.59 | 264974.57 |
| SALES & MARKETING | 24692.86 | 22713.08 | 30227.21 | 30200.68 | 18564.91 | 11725.3 | 12905.49 | 21074.12 | 22154.4 | 20391.31 | 12990.82 | 12652.58 | 240292.76 |
| REPAIRS & MAINTENANCE | 14222.75 | 13738.19 | 11570.74 | 13057.76 | 10333.62 | 14706.89 | 15279.61 | 11467.25 | 11891.99 | 12080.67 | 11190.85 | 10925.73 | 150466.13 |
| UTILITIES | 10347.79 | 10849.6 | 10237.63 | 11713.78 | 8598.19 | 9955.36 | 15831.95 | 14469.1 | 14478.56 | 11172.83 | 11411.15 | 9713.73 | 138779.67 |
| INSURANCE (GL, Van, etc) | 863.02 | 863.02 | 863.02 | 869.49 | 909.5 | 1907.86 | 1408.68 | 1408.68 | 1408.68 | 1408.68 | 1408.68 | 1408.68 | 14727.99 |
| BASE MANAGEMENT FEES (3%) | 7029.8949 | 6798.4557 | 8987.0265 | 10178.3481 | 5600.916 | 2738.8614 | 2950.6431 | 4641.7491 | 5628.7548 | 6059.247 | 2766.1029 | 2716.7781 | 66096.7776 |
| TOTAL OPERATING EXPENSES | 80326.0949 | 77794.5557 | 84026.5165 | 87350.1381 | 62986.596 | 64625.5414 | 68391.5431 | 75388.2591 | 77542.8548 | 74127.217 | 63900.4929 | 58878.0881 | 875337.898 |
| HOUSE PROFIT | 109911.535 | 101001.274 | 166957.394 | 212707.982 | 43632.894 | -11757.0614 | -4197.3231 | 40877.8609 | 61309.6552 | 83893.073 | -9051.7229 | 2051.8919 | 797337.452 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 7059.82 | 7059.82 | -4951.3 | 14815.23 | 7262.52 | 7324.82 | 6383.64 | 62432.86 | 25735.12 | 7324.82 | 7324.82 | 7324.82 | 155096.99 |
| LESS: PROPERTY INSURANCE | 773.97 | 773.97 | 773.97 | 773.97 | 774.02 | 804.76 | 804.76 | 804.76 | 804.76 | 804.76 | 804.76 | 804.76 | 9503.22 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 102077.745 | 93167.4843 | 171134.724 | 197118.782 | 35596.354 | -19886.6414 | -11385.7231 | -22359.7591 | 34769.7752 | 75763.493 | -17181.3029 | -6077.6881 | 632737.242 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -9373.1932 | -9064.6076 | -11982.702 | -13571.1308 | -7467.888 | -3651.8152 | -3934.1908 | -6188.9988 | -7505.0064 | -8078.996 | -3688.1372 | -3622.3708 | -88129.0368 |
| | | | | | | | | | | | | | |
| Net Operating Income | 92704.5519 | 84102.8767 | 159152.022 | 183547.651 | 28128.466 | -23538.4566 | -15319.9139 | -28548.7579 | 27264.7688 | 67684.497 | -20869.4401 | -9700.0589 | 544608.206 |

INNKEEPERS P&L STATEMENT
Monthly Statement
LOUISVILLE RI

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.80544355 | 0.80712366 | 0.80486111 | 0.73958333 | 0.74236111 | 0.60080645 | 0.44086022 | 0.62574405 | 0.67641129 | 0.64097222 | 0.52788978 | 0.41527778 | 0.65251142 |
| AVERAGE DAILY RATE | 78.5376929 | 80.9812989 | 77.7115574 | 80.4292049 | 79.4635454 | 75.8607774 | 73.3732241 | 84.206195 | 83.4727173 | 87.8813651 | 117.683997 | 89.2332441 | 83.3287579 |
| REVPAR | 63.2576781 | 65.361922 | 62.5470104 | 59.4840995 | 58.9906458 | 45.5776445 | 32.3473353 | 52.6915253 | 56.4618884 | 56.3295139 | 62.1241801 | 37.0565833 | 54.3729658 |
| ROOMS SOLD | 2397 | 2402 | 2318 | 2201 | 2138 | 1788 | 1312 | 1682 | 2013 | 1846 | 1571 | 1196 | 22864 |
| ROOMS AVAILABLE | 2976 | 2976 | 2880 | 2976 | 2880 | 2976 | 2976 | 2688 | 2976 | 2880 | 2976 | 2880 | 35040 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 188254.85 | 194517.08 | 180135.39 | 177024.68 | 169893.06 | 135639.07 | 96265.67 | 141634.82 | 168030.58 | 162229 | 184881.56 | 106722.96 | 1905228.72 |
| TELEPHONE REVENUE | 78.9 | 189.85 | 250.53 | 173.12 | 105.66 | 149.34 | 70.55 | 19.03 | 0 | 293.86 | 10.4 | 61.48 | 1402.72 |
| OTHER REVENUE | 5590.38 | 2621.86 | 3086.74 | 2970.01 | 1814.74 | 2753.99 | 2513.65 | 2121.13 | 1672.7 | 2038.36 | 1866.75 | 2410.72 | 31461.03 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 193924.13 | 197328.79 | 183472.66 | 180167.81 | 171813.46 | 138542.4 | 98849.87 | 143774.98 | 169703.28 | 164561.22 | 186758.71 | 109195.16 | 1938092.47 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 43830.55 | 44023.31 | 41665.08 | 42534.67 | 41307.46 | 37972.84 | 29553.8 | 38624.82 | 40782.85 | 45293.54 | 40506.88 | 28541.02 | 474636.82 |
| TELEPHONE EXPENSE | 2400.82 | 1266.1 | 3485.18 | 2800.26 | 2159.87 | 2661.62 | 2573.69 | 2434.36 | 2506.78 | 2595.35 | 2298.31 | 6713.95 | 33896.29 |
| OTHER EXPENSE | 148.07 | 264.91 | 925.71 | 557.46 | 1390.16 | 1828.74 | 630.27 | 314.91 | 1640.83 | 697.05 | 648.94 | 676.23 | 9723.28 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 36.55 | 0 | 0 | 0 | 0 | 0 | 0 | 36.55 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 46379.44 | 45554.32 | 46075.97 | 45892.39 | 44857.49 | 42499.75 | 32757.76 | 41374.09 | 44930.46 | 48585.94 | 43454.13 | 35931.2 | 518292.94 |
| GROSS OPERATING INCOME | 147544.69 | 151774.47 | 137396.69 | 134275.42 | 126955.97 | 96042.65 | 66092.11 | 102400.89 | 124772.82 | 115975.28 | 143304.58 | 73263.96 | 1419799.53 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 23526.43 | 22491.68 | 20866.83 | 25810.11 | 23888.83 | 28120.79 | 24181.31 | 28517.64 | 29542.92 | 29434.38 | 28857.27 | 24197.45 | 309435.64 |
| SALES & MARKETING | 20836.92 | 21010.05 | 18960.25 | 18913.33 | 18216.72 | 17614.79 | 12713.08 | 15950.59 | 18032.78 | 19113.45 | 20420.66 | 14609.37 | 216391.99 |
| REPAIRS & MAINTENANCE | 8087.54 | 11070.87 | 8941.78 | 10399.67 | 9288.52 | 10866.38 | 13657.52 | 12896.97 | 18799.35 | 18008.01 | 12667.07 | 12453.36 | 147137.04 |
| UTILITIES | 8800 | 10661.85 | 8535.84 | 9957.7 | 8616.36 | 10699.71 | 14231.12 | 13861.18 | 12979.1 | 10038.64 | 8779.83 | 8050.18 | 125211.51 |
| INSURANCE (GL, Van, etc) | 998.68 | 998.68 | 998.68 | 1005.15 | 1050.91 | 2168.29 | 1609.6 | 1609.6 | 1609.6 | 1609.6 | 1609.6 | 1609.6 | 16877.99 |
| BASE MANAGEMENT FEES (3%) | 5817.7239 | 5919.8637 | 5504.1798 | 5405.0343 | 5154.4038 | 4156.272 | 2965.4961 | 4313.2494 | 5091.0984 | 4936.8366 | 5602.7613 | 3275.8548 | 58142.7741 |
| TOTAL OPERATING EXPENSES | 68067.2939 | 72152.9937 | 63807.5598 | 71490.9943 | 66215.7438 | 73626.232 | 69358.1261 | 77149.2294 | 86054.8484 | 83140.9166 | 77937.1913 | 64195.8148 | 873196.944 |
| HOUSE PROFIT | 79477.3961 | 79621.4763 | 73589.1302 | 62784.4257 | 60740.2262 | 22416.418 | -3266.0161 | 25251.6606 | 38717.9716 | 32834.3634 | 65367.3887 | 9068.1452 | 546602.586 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 5236.02 | 5632.3 | 5632.3 | 4914.02 | 5376.43 | 842.79 | -16890.53 | 5376.43 | 7887.92 | 5376.43 | 5376.43 | 5376.43 | 40136.97 |
| LESS: PROPERTY INSURANCE | 869.02 | 869.02 | 869.02 | 869.02 | 869.09 | 924.83 | 924.83 | 924.83 | 924.83 | 924.83 | 924.83 | 924.83 | 10818.98 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 73372.3561 | 73120.1563 | 67087.8102 | 57001.3857 | 54494.7062 | 20648.798 | 12699.6839 | 18950.4006 | 29905.2216 | 26533.1034 | 59066.1287 | 2766.8852 | 495646.636 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -7756.9652 | -7893.1516 | -7338.9064 | -7206.7124 | -6872.5384 | -5541.696 | -3953.9948 | -5750.9992 | -6788.1312 | -6582.4488 | -7470.3484 | -4367.8064 | -77523.6988 |
| | | | | | | | | | | | | | |
| Net Operating Income | 65615.3909 | 65227.0047 | 59748.9038 | 49794.6733 | 47622.1678 | 15107.102 | 8745.6891 | 13199.4014 | 23117.0904 | 19950.6546 | 51595.7803 | -1600.9212 | 418122.937 |

INNKEEPERS P&L STATEMENT
Monthly Statement
BOTHELL

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.89516129 | 0.91478495 | 0.795 | 0.83172043 | 0.59916667 | 0.53870968 | 0.57016129 | 0.73869048 | 0.7922043 | 0.80111111 | 0.77768817 | 0.86638889 | 0.76018265 |
| AVERAGE DAILY RATE | 123.527805 | 121.240403 | 122.550664 | 120.317547 | 122.529875 | 116.797101 | 117.28289 | 110.456265 | 106.637513 | 106.906813 | 109.16692 | 113.728932 | 115.969468 |
| REVPAR | 110.577309 | 110.908895 | 97.4277778 | 100.070562 | 73.4158167 | 62.9197285 | 66.870164 | 81.5929911 | 84.4786962 | 85.6442361 | 84.8978226 | 98.5334833 | 88.1579772 |
| ROOMS SOLD | 3330 | 3403 | 2862 | 3094 | 2157 | 2004 | 2121 | 2482 | 2947 | 2884 | 2893 | 3119 | 33296 |
| ROOMS AVAILABLE | 3720 | 3720 | 3600 | 3720 | 3600 | 3720 | 3720 | 3360 | 3720 | 3600 | 3720 | 3600 | 43800 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 411347.59 | 412581.09 | 350740 | 372262.49 | 264296.94 | 234061.39 | 248757.01 | 274152.45 | 314260.75 | 308319.25 | 315819.9 | 354720.54 | 3861319.4 |
| TELEPHONE REVENUE | 1704.6 | 1980.66 | 988.07 | 1140 | 919.03 | 617.34 | 1481.48 | 967.21 | 1516.1 | 1187.21 | 268.33 | 318.14 | 13088.17 |
| OTHER REVENUE | 4371.21 | 4137.78 | 2090.23 | 3646.5 | 3181.85 | 4779.99 | 2591.76 | 2154.07 | 3487.56 | 3037.68 | 3426.67 | 4024.23 | 40929.53 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 417423.4 | 418699.53 | 353818.3 | 377048.99 | 268397.82 | 239458.72 | 252830.25 | 277273.73 | 319264.41 | 312544.14 | 319514.9 | 359062.91 | 3915337.1 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 65507.4 | 67285.76 | 60368.68 | 60722.67 | 56463.46 | 65228.78 | 50636.06 | 49667.93 | 57577.77 | 53816.5 | 57096.04 | 58539.55 | 702910.6 |
| TELEPHONE EXPENSE | 3445 | 3782.34 | 3532.77 | 2971.61 | 9914.51 | 5320.08 | 3774.08 | 6369.31 | 6966.44 | 6553.42 | 5062.62 | 3637.07 | 61329.25 |
| OTHER EXPENSE | 770.27 | 1007.6 | 757.97 | 1880.75 | 895.8 | 1278.41 | 652.24 | 746.85 | 896.01 | 808.09 | 1110.22 | 939.95 | 11744.16 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 69722.67 | 72075.7 | 64659.42 | 65575.03 | 67273.77 | 71827.27 | 55062.38 | 56784.09 | 65440.22 | 61178.01 | 63268.88 | 63116.57 | 775984.01 |
| GROSS OPERATING INCOME | 347700.73 | 346623.83 | 289158.88 | 311473.96 | 201124.05 | 167631.45 | 197767.87 | 220489.64 | 253824.19 | 251366.13 | 256246.02 | 295946.34 | 3139353.09 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 33400.71 | 30588.38 | 29809.84 | 28945.4 | 32168 | 28678.56 | 22889.19 | 29374.23 | 38743.62 | 32616.72 | 37750.42 | 28569.05 | 373534.12 |
| SALES & MARKETING | 38283.34 | 40101.93 | 37118.12 | 34333.61 | 26621.13 | 24898.64 | 22384.98 | 28634.39 | 30453.8 | 30064.53 | 31218.67 | 32634.55 | 376747.69 |
| REPAIRS & MAINTENANCE | 17049.05 | 18292.44 | 18003.07 | 22658.29 | 20044.01 | 29310.92 | 18292.68 | 13500.73 | 21829.64 | 21697.09 | 25774.6 | 18646.14 | 245098.66 |
| UTILITIES | 12464.29 | 16786.2 | 11383.05 | 14041.13 | 15055.46 | 20062.25 | 18128.33 | 18634.55 | 18197.3 | 15732.46 | 15577.49 | 13079.75 | 189142.26 |
| INSURANCE (GL, Van, etc) | 1315.52 | 1315.52 | 1315.52 | 1321.99 | 1358.95 | 2692.81 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 21475.59 |
| BASE MANAGEMENT FEES (3%) | 12522.702 | 12560.9859 | 10614.549 | 11311.4697 | 8051.9346 | 7183.7616 | 7584.9075 | 8318.2119 | 9577.9323 | 9376.3242 | 9585.447 | 10771.8873 | 117460.113 |
| TOTAL OPERATING EXPENSES | 115035.612 | 119645.456 | 108244.149 | 112611.89 | 103299.485 | 112826.942 | 91305.9675 | 100487.992 | 120828.172 | 111513.004 | 121932.507 | 105727.257 | 1323458.43 |
| HOUSE PROFIT | 232665.118 | 226978.374 | 180914.731 | 198862.07 | 97824.5654 | 54804.5084 | 106461.903 | 120001.648 | 132996.018 | 139853.126 | 134313.513 | 190219.083 | 1815894.66 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 12371.06 | 12296.87 | 12794.6 | 12296.87 | 12296.87 | 11441.68 | 12296.87 | 12296.87 | 10350.96 | 11648.24 | 11648.24 | 7750.62 | 139489.75 |
| LESS: PROPERTY INSURANCE | 1222.76 | 1222.76 | 1222.76 | 1222.76 | 1222.83 | 1221.32 | 1221.32 | 1221.32 | 1221.32 | 1221.32 | 1221.32 | 1221.32 | 14663.11 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 219071.298 | 213458.744 | 166897.371 | 185342.44 | 84304.8654 | 42141.5084 | 92943.7125 | 106483.458 | 121423.738 | 126983.566 | 121443.953 | 181247.143 | 1661741.8 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -16696.936 | -16747.9812 | -14152.732 | -15081.9596 | -10735.9128 | -9578.3488 | -10113.21 | -11090.9492 | -12770.5764 | -12501.7656 | -12780.596 | -14362.5164 | -156613.484 |
| | | | | | | | | | | | | | |
| Net Operating Income | 202374.362 | 196710.763 | 152744.639 | 170260.481 | 73568.9526 | 32563.1596 | 82830.5025 | 95392.5089 | 108653.161 | 114481.8 | 108663.357 | 166884.626 | 1505128.31 |

# INNKEEPERS P&L STATEMENT
Monthly Statement
BELLEVUE

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.90268817 | 0.85725806 | 0.86888889 | 0.77096774 | 0.67861111 | 0.48709677 | 0.60322581 | 0.66547619 | 0.76021505 | 0.74277778 | 0.68467742 | 0.93388889 | 0.7463242 |
| AVERAGE DAILY RATE | 124.717117 | 134.336278 | 130.587676 | 131.916883 | 134.386328 | 131.988526 | 139.741823 | 138.799513 | 136.510039 | 132.946208 | 129.323698 | 132.918528 | 132.865117 |
| REVPAR | 112.580667 | 115.160858 | 113.466181 | 101.703661 | 91.1960556 | 64.2911855 | 84.2958737 | 92.3677708 | 103.776987 | 98.7494889 | 88.5450161 | 124.131136 | 99.1604523 |
| ROOMS SOLD | 3358 | 3189 | 3128 | 2868 | 2443 | 1812 | 2244 | 2236 | 2828 | 2674 | 2547 | 3362 | 32689 |
| ROOMS AVAILABLE | 3720 | 3720 | 3600 | 3720 | 3600 | 3720 | 3720 | 3360 | 3720 | 3600 | 3720 | 3600 | 43800 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 418800.08 | 428398.39 | 408478.25 | 378337.62 | 328305.8 | 239163.21 | 313580.65 | 310355.71 | 386050.39 | 355498.16 | 329387.46 | 446872.09 | 4343227.81 |
| TELEPHONE REVENUE | 1308.09 | 896.78 | 1296.55 | 1489.84 | 516.04 | 273 | 526.39 | 704.04 | 2464.46 | 713.14 | 492.16 | 430.79 | 11111.28 |
| OTHER REVENUE | 6164.97 | 4145 | 4451.2 | 5036.21 | 1687.2 | 3276.88 | 5748.08 | 2742.11 | 3199.05 | 3237.17 | 4326.87 | 5200.92 | 49215.66 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 426273.14 | 433440.17 | 414226 | 384863.67 | 330509.04 | 242713.09 | 319855.12 | 313801.86 | 391713.9 | 359448.47 | 334206.49 | 452503.8 | 4403554.75 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 78081.98 | 76297.92 | 76337.75 | 67978.59 | 71076.48 | 63291.91 | 59185.71 | 59130.94 | 72841.89 | 69699.99 | 71178.07 | 85133.74 | 850234.97 |
| TELEPHONE EXPENSE | 4623.64 | 7792.78 | 5063.52 | 3713.45 | 2240.73 | 5241.73 | 4596.88 | 3282.76 | 3308.16 | 3899.22 | 3807.79 | 3719.8 | 51290.46 |
| OTHER EXPENSE | 2285.83 | 3192.33 | 2661.27 | 1761.38 | 888.77 | 1899.33 | 1934.74 | 1113.12 | 1543.24 | 1360.85 | 2027.13 | 3355.7 | 24023.69 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 84991.45 | 87283.03 | 84062.54 | 73453.42 | 74205.98 | 70432.97 | 65717.33 | 63526.82 | 77693.29 | 74960.06 | 77012.99 | 92209.24 | 925549.12 |
| GROSS OPERATING INCOME | 341281.69 | 346157.14 | 330163.46 | 311410.25 | 256303.06 | 172280.12 | 254137.79 | 250275.04 | 314020.61 | 284488.41 | 257193.5 | 360294.56 | 3478005.63 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 33131.34 | 31173.46 | 30193.16 | 31772.34 | 31769.96 | 28077.74 | 24927.35 | 34530.22 | 42305.49 | 20328.42 | 60141.87 | 28822.3 | 397173.65 |
| SALES & MARKETING | 39781.52 | 40580.88 | 40830.77 | 36381.59 | 29640 | 29753.12 | 30430.55 | 31387.52 | 37090.12 | 39223.17 | 34994.19 | 44057.46 | 434150.89 |
| REPAIRS & MAINTENANCE | 25586.57 | 21181.33 | 14765.72 | 17104.36 | 14948.76 | 13428.93 | 20545.79 | 14449.9 | 15380.85 | 14877.55 | 14966.64 | 13855 | 201091.4 |
| UTILITIES | 19984.98 | 16440.58 | 14362.44 | 14043.68 | 15644.05 | 20373.16 | 22976.49 | 22117.68 | 22469.13 | 17153.97 | 15667.43 | 14785.17 | 216018.76 |
| INSURANCE (GL, Van, etc) | 1315.52 | 1315.52 | 1315.52 | 1321.99 | 1358.95 | 2692.81 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 21475.59 |
| BASE MANAGEMENT FEES (3%) | 12788.1942 | 13003.2051 | 12426.78 | 11545.9101 | 9915.2712 | 7281.3927 | 9595.6536 | 9414.0558 | 11751.417 | 10783.4541 | 10026.1947 | 13575.114 | 132106.643 |
| TOTAL OPERATING EXPENSES | 132588.124 | 123694.975 | 113894.39 | 112169.87 | 103276.991 | 101607.153 | 110501.714 | 113925.256 | 131022.887 | 104392.444 | 137822.205 | 117120.924 | 1402016.93 |
| HOUSE PROFIT | 208693.566 | 222462.165 | 216269.07 | 199240.38 | 153026.069 | 70672.9673 | 143636.076 | 136349.784 | 182997.723 | 180095.966 | 119371.295 | 243173.636 | 2075988.7 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 10148.15 | 10148.15 | 10052.88 | 10052.88 | 10100.52 | 10100.52 | 10100.52 | 10037.97 | 9246.2 | 9794.9 | 9794.9 | 10625.59 | 120203.18 |
| LESS: PROPERTY INSURANCE | 1207.17 | 1207.17 | 1207.17 | 1207.17 | 1207.33 | 1263.42 | 1263.42 | 1263.42 | 1263.42 | 1263.42 | 1263.42 | 1263.42 | 14879.95 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 197338.246 | 211106.845 | 205009.02 | 187980.33 | 141718.219 | 59309.0273 | 132272.136 | 125048.394 | 172488.103 | 169037.646 | 108312.975 | 231284.626 | 1940905.57 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -17050.9256 | -17337.6068 | -16569.04 | -15394.5468 | -13220.3616 | -9708.5236 | -12794.2048 | -12552.0744 | -15668.556 | -14377.9388 | -13368.2596 | -18100.152 | -176142.19 |
| | | | | | | | | | | | | | |
| Net Operating Income | 180287.32 | 193769.238 | 188439.98 | 172585.783 | 128497.857 | 49600.5037 | 119477.932 | 112496.32 | 156819.547 | 154659.707 | 94944.7157 | 213184.474 | 1764763.38 |

INNKEEPERS P&L STATEMENT
Monthly Statement
LYNNWOOD

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.93924731 | 0.87553763 | 0.88805556 | 0.77688172 | 0.75638889 | 0.70053763 | 0.6811828 | 0.82142857 | 0.84704301 | 0.85972222 | 0.81370968 | 0.86416667 | 0.818379 |
| AVERAGE DAILY RATE | 132.298131 | 135.345505 | 127.724332 | 126.756183 | 126.124069 | 128.090913 | 125.191219 | 127.806746 | 126.054576 | 126.564779 | 125.129154 | 128.341556 | 128.104463 |
| REVPAR | 124.260664 | 118.500083 | 113.426303 | 98.4745618 | 95.3988444 | 89.7325054 | 85.2781048 | 104.984113 | 106.773648 | 108.810553 | 101.818804 | 110.908494 | 104.838001 |
| ROOMS SOLD | 3494 | 3257 | 3197 | 2890 | 2723 | 2606 | 2534 | 2760 | 3151 | 3095 | 3027 | 3111 | 35845 |
| ROOMS AVAILABLE | 3720 | 3720 | 3600 | 3720 | 3600 | 3720 | 3720 | 3360 | 3720 | 3600 | 3720 | 3600 | 43800 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 462249.67 | 440820.31 | 408334.69 | 366325.37 | 343435.84 | 333804.92 | 317234.55 | 352746.62 | 397197.97 | 391717.99 | 378765.95 | 399270.58 | 4591904.46 |
| TELEPHONE REVENUE | 511.38 | 376.19 | 372.34 | 510.9 | 511.87 | 416.04 | 354.5 | 298.58 | 393.33 | 327.22 | 392.27 | 441.24 | 4905.86 |
| OTHER REVENUE | 5396.91 | 2983.7 | 2669.46 | 2265.75 | 3769.76 | 2855.65 | 4221.7 | 2375.16 | 3772.64 | 3375.05 | 3459.42 | 3936.26 | 41081.46 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 468157.96 | 444180.2 | 411376.49 | 369102.02 | 347717.47 | 337076.61 | 321810.75 | 355420.36 | 401363.94 | 395420.26 | 382617.64 | 403648.08 | 4637891.78 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 70618.81 | 76185.86 | 61297.96 | 60639.32 | 63593.1 | 67595.29 | 64177.62 | 56097.31 | 66764.26 | 64221.55 | 68158.08 | 67388.43 | 786737.59 |
| TELEPHONE EXPENSE | 2567.93 | 2462.62 | 2990.48 | 2625.27 | 2974.7 | 6993.03 | 4578.5 | 2674 | 4201.74 | 3660.87 | 6654.02 | 5746.31 | 48129.47 |
| OTHER EXPENSE | 1706.9 | 798.51 | 916.8 | 805.54 | 1065.99 | 759.61 | 1107.33 | 1381.82 | 1498.24 | 1288.65 | 838.76 | 1869.1 | 14037.25 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 74893.64 | 79446.99 | 65205.24 | 64070.13 | 67633.79 | 75347.93 | 69863.45 | 60153.13 | 72464.24 | 69171.07 | 75650.86 | 75003.84 | 848904.31 |
| GROSS OPERATING INCOME | 393264.32 | 364733.21 | 346171.25 | 305031.89 | 280083.68 | 261728.68 | 251947.3 | 295267.23 | 328899.7 | 326249.19 | 306966.78 | 328644.24 | 3788987.47 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 30483.15 | 30832.34 | 32775.63 | 27647.1 | 31704.61 | 28080.95 | 22227.68 | 30988.75 | 40570.59 | 36424.21 | 37326.79 | 28931.3 | 377993.1 |
| SALES & MARKETING | 45840.41 | 44407.57 | 44183.64 | 38238.68 | 35467.74 | 33448.15 | 30628.91 | 37223.81 | 41760.92 | 40183.12 | 40892.58 | 42044.55 | 474320.08 |
| REPAIRS & MAINTENANCE | 16456.03 | 15851.15 | 24032.81 | 21881.94 | 14033.53 | 17047.08 | 19091.63 | 17208.94 | 19737.58 | 22131.82 | 19165.66 | 21421.56 | 228059.73 |
| UTILITIES | 6776.59 | 13213.74 | 10873.57 | 14125.21 | 10041.28 | 12764.98 | 19138.67 | 13918.17 | 17145.46 | 14546.64 | 14256.51 | 16215.48 | 163016.3 |
| INSURANCE (GL, Van, etc) | 1315.52 | 1315.52 | 1315.52 | 1321.99 | 1358.95 | 2692.81 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 21475.59 |
| BASE MANAGEMENT FEES (3%) | 14044.7388 | 13325.406 | 12341.2947 | 11073.0606 | 10431.5241 | 10112.2983 | 9654.3225 | 10662.6108 | 12040.9182 | 11862.6078 | 11478.5292 | 12109.4424 | 139136.753 |
| TOTAL OPERATING EXPENSES | 114916.439 | 118945.726 | 125522.465 | 114287.981 | 103037.634 | 104146.268 | 102767.093 | 112028.161 | 133281.348 | 127174.278 | 125145.949 | 122748.212 | 1404001.55 |
| HOUSE PROFIT | 278347.881 | 245787.484 | 220648.785 | 190743.909 | 177046.046 | 157582.412 | 149180.208 | 183239.069 | 195618.352 | 199074.912 | 181820.831 | 205896.028 | 2384985.92 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 8058.36 | 8058.36 | 8058.36 | 8058.36 | 8058.36 | 8058.34 | 8205.44 | 8205.44 | 8205.44 | 9814.15 | 8607.48 | 8606.94 | 99995.03 |
| LESS: PROPERTY INSURANCE | 1264.29 | 1264.29 | 1264.29 | 1264.29 | 1264.36 | 1291.83 | 1291.83 | 1291.83 | 1291.83 | 1291.83 | 1291.83 | 1291.83 | 15364.33 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 269025.231 | 236464.834 | 211326.135 | 181421.259 | 167723.326 | 148232.242 | 139682.938 | 173741.799 | 186121.082 | 187968.932 | 171921.521 | 195997.258 | 2269626.56 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -18726.3184 | -17767.208 | -16455.0596 | -14764.0808 | -13908.6988 | -13483.0644 | -12872.43 | -14216.8144 | -16054.5576 | -15816.8104 | -15304.7056 | -16145.9232 | -185515.671 |
| | | | | | | | | | | | | | |
| Net Operating Income | 250298.913 | 218697.626 | 194871.076 | 166657.179 | 153814.627 | 134749.177 | 126810.508 | 159524.985 | 170066.524 | 172152.122 | 156616.815 | 179851.334 | 2084110.89 |

INNKEEPERS P&L STATEMENT
Monthly Statement
TUKWILA

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.89829749 | 0.93660394 | 0.88680556 | 0.79189068 | 0.75300926 | 0.61626344 | 0.70900538 | 0.76909722 | 0.83624552 | 0.90092593 | 0.92741935 | 0.97083333 | 0.83306697 |
| AVERAGE DAILY RATE | 121.32494 | 121.079314 | 118.80847 | 118.71071 | 113.014998 | 115.14201 | 116.314054 | 117.603012 | 119.061891 | 120.714078 | 122.425297 | 127.505565 | 119.687432 |
| REVPAR | 108.985889 | 113.403362 | 105.360012 | 94.005905 | 85.1013403 | 70.9578114 | 82.4672894 | 90.4481498 | 99.5649731 | 108.754442 | 113.53959 | 123.786653 | 99.7076467 |
| ROOMS SOLD | 4010 | 4181 | 3831 | 3535 | 3253 | 2751 | 3165 | 3101 | 3733 | 3892 | 4140 | 4194 | 43786 |
| ROOMS AVAILABLE | 4464 | 4464 | 4320 | 4464 | 4320 | 4464 | 4464 | 4032 | 4464 | 4320 | 4464 | 4320 | 52560 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 486513.01 | 506232.61 | 455155.25 | 419642.36 | 367637.79 | 316755.67 | 368133.98 | 364686.94 | 444458.04 | 469819.19 | 506840.73 | 534758.34 | 5240633.91 |
| TELEPHONE REVENUE | 716.66 | 470.96 | 509.25 | 392.62 | 284.34 | 609.6 | 391.21 | 249.37 | 368.81 | 271.9 | 327.65 | 450.76 | 5043.13 |
| OTHER REVENUE | 8401.77 | 5723.43 | 3541.52 | 3472.65 | 4657.83 | 2694.43 | 4351.7 | 1610.21 | 4433.73 | 3677.18 | 3502.87 | 3974.22 | 50041.54 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 495631.44 | 512427 | 459206.02 | 423507.63 | 372579.96 | 320059.7 | 372876.89 | 366546.52 | 449260.58 | 473768.27 | 510671.25 | 539183.32 | 5295718.58 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 90316.66 | 89066.44 | 80635.69 | 77317.47 | 77490.86 | 78008.4 | 71570.93 | 71620.29 | 79407.02 | 87917.43 | 91775.98 | 112661.2 | 1007788.77 |
| TELEPHONE EXPENSE | 2956.66 | 5392.77 | 2843.4 | 3438.14 | 2094.62 | 6819.7 | 2591.16 | 3320.84 | 5478.71 | 3516.09 | 5556.66 | 5654.91 | 49663.66 |
| OTHER EXPENSE | 2396.15 | 3471.14 | 1368.74 | 1537.82 | 1415.93 | 1110.78 | 1343.45 | 898.46 | 2027.55 | 1845.95 | 1705.12 | 1234.39 | 20355.48 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 95669.47 | 97930.35 | 84847.83 | 82293.43 | 81001.41 | 85939.28 | 75505.54 | 75839.59 | 86913.28 | 93279.47 | 99037.76 | 119550.5 | 1077807.91 |
| GROSS OPERATING INCOME | 399961.97 | 414496.65 | 374358.19 | 341214.2 | 291578.55 | 234120.42 | 297371.35 | 290706.93 | 362347.3 | 380488.8 | 411633.49 | 419632.82 | 4217910.67 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 30853.46 | 50721.89 | 37605.01 | 32505.26 | 34724.93 | 36905.64 | 29911.17 | 35021.86 | 40862.37 | 32626.16 | 43774.52 | 39672.37 | 445184.64 |
| SALES & MARKETING | 46082.1 | 48043.93 | 46152.47 | 41542.63 | 37310.86 | 34713.01 | 37820.39 | 37997.72 | 49141.61 | 47698 | 48511.94 | 53669.96 | 528684.62 |
| REPAIRS & MAINTENANCE | 23641.34 | 25302.09 | 23374.72 | 45001.13 | 22457.89 | 25680.01 | 23591.18 | 25291.64 | 31334.81 | 27188.31 | 22406.65 | 20814.45 | 316084.22 |
| UTILITIES | 19939.5 | 21070.33 | 24861.01 | 22979.97 | 20868.01 | 19521.44 | 27206.12 | 22765.54 | 24111.36 | 22346.38 | 21925.94 | 17044.56 | 264640.16 |
| INSURANCE (GL, Van, etc) | 1517.18 | 1517.18 | 1517.18 | 1523.65 | 1564.99 | 3084.69 | 2324.84 | 2324.84 | 2324.84 | 2324.84 | 2324.84 | 2324.84 | 24673.91 |
| BASE MANAGEMENT FEES (3%) | 14868.9432 | 15372.81 | 13776.1806 | 12705.2289 | 11177.3988 | 9601.791 | 11186.3067 | 10996.3956 | 13477.8174 | 14213.0481 | 15320.1375 | 16175.4996 | 158871.557 |
| TOTAL OPERATING EXPENSES | 136902.523 | 162028.23 | 147286.571 | 156257.869 | 128104.079 | 129506.581 | 132040.007 | 134397.996 | 161252.807 | 146396.738 | 154264.028 | 149701.68 | 1738139.11 |
| HOUSE PROFIT | 263059.447 | 252468.42 | 227071.619 | 184956.331 | 163474.471 | 104613.839 | 165331.343 | 156308.934 | 201094.493 | 234092.062 | 257369.463 | 269931.14 | 2479771.56 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 11992.93 | 11905.87 | 11818.82 | 11905.87 | 11905.87 | 11905.88 | 11905.87 | 11056.17 | 9764.44 | 10908.83 | 10908.83 | 11842.49 | 137821.87 |
| LESS: PROPERTY INSURANCE | 1509.63 | 1509.63 | 1509.63 | 1509.63 | 1509.75 | 1512.17 | 1512.17 | 1512.17 | 1512.17 | 1512.17 | 1512.17 | 1512.17 | 18133.46 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 249556.887 | 239052.92 | 213743.169 | 171540.831 | 150058.851 | 91195.789 | 151913.303 | 143740.594 | 189817.883 | 221671.062 | 244948.463 | 256576.48 | 2323816.23 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -19825.2576 | -20497.08 | -18368.2408 | -16940.3052 | -14903.1984 | -12802.388 | -14915.0756 | -14661.8608 | -17970.4232 | -18950.7308 | -20426.85 | -21567.3328 | -211828.743 |
| | | | | | | | | | | | | | |
| Net Operating Income | 229731.629 | 218555.84 | 195374.929 | 154600.526 | 135155.653 | 78393.401 | 136998.228 | 129078.734 | 171847.459 | 202720.331 | 224521.613 | 235009.148 | 2111987.49 |

INNKEEPERS P&L STATEMENT
Monthly Statement
GAITHERSBURG

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.79374389 | 0.80498534 | 0.79520202 | 0.82086999 | 0.80454545 | 0.57160313 | 0.58651026 | 0.49918831 | 0.75366569 | 0.85227273 | 0.84970674 | 0.88484848 | 0.75259444 |
| AVERAGE DAILY RATE | 132.224658 | 130.916406 | 137.121162 | 135.434421 | 135.001274 | 133.264322 | 145.662271 | 133.75807 | 140.939429 | 126.597481 | 136.126718 | 140.115913 | 135.461058 |
| REVPAR | 104.952515 | 105.385787 | 109.039025 | 111.174052 | 108.614662 | 76.1743035 | 85.4324169 | 66.7704654 | 106.221212 | 107.895581 | 115.667791 | 123.981354 | 101.947238 |
| ROOMS SOLD | 3248 | 3294 | 3149 | 3359 | 3186 | 2339 | 2400 | 1845 | 3084 | 3375 | 3477 | 3504 | 36260 |
| ROOMS AVAILABLE | 4092 | 4092 | 3960 | 4092 | 3960 | 4092 | 4092 | 3696 | 4092 | 3960 | 4092 | 3960 | 48180 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 429465.69 | 431238.64 | 431794.54 | 454924.22 | 430114.06 | 311705.25 | 349589.45 | 246783.64 | 434657.2 | 427266.5 | 473312.6 | 490966.16 | 4911817.95 |
| TELEPHONE REVENUE | 617.29 | 900.36 | 464.23 | 673.12 | 157.41 | 116.28 | 1011.71 | 286.03 | 400.83 | 299.31 | 784.75 | 537.52 | 6248.84 |
| OTHER REVENUE | 15135.92 | 6873.24 | 5139.89 | 6625.92 | 6698.19 | 5544.72 | 6077.86 | 5211.92 | 6836.17 | 6315.21 | 5343.92 | 4483.61 | 80286.57 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | -250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 445218.9 | 439012.24 | 437648.66 | 462223.26 | 436719.66 | 317366.25 | 356679.02 | 252281.59 | 441894.2 | 433881.02 | 479441.27 | 495987.29 | 4998353.36 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 70513.57 | 62551.81 | 57479.49 | 67477.88 | 66204.31 | 65636.28 | 59633.34 | 54125.16 | 58311.47 | 64740.26 | 75754.77 | 66677.02 | 769105.36 |
| TELEPHONE EXPENSE | 2866.49 | 3455.5 | 2914.43 | 2731.48 | 2233.85 | 3280.1 | 2737.94 | 2606.5 | 2857.77 | 2702.1 | 5080.98 | 3805.66 | 37272.8 |
| OTHER EXPENSE | 3112.15 | 2374.18 | 2486.19 | 2620.12 | 2734.18 | 1829.98 | 1817.34 | 1267.16 | 1781.24 | 2107.74 | 2009.24 | 945.58 | 25085.1 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 76492.21 | 68381.49 | 62880.11 | 72829.48 | 71172.34 | 70746.36 | 64188.62 | 57998.82 | 62950.48 | 69550.1 | 82844.99 | 71428.26 | 831463.26 |
| GROSS OPERATING INCOME | 368726.69 | 370630.75 | 374768.55 | 389393.78 | 365547.32 | 246619.89 | 292490.4 | 194282.77 | 378943.72 | 364330.92 | 396596.28 | 424559.03 | 4166890.1 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 35426.35 | 33295.57 | 26546.4 | 28393.01 | 34035.31 | 30417.03 | 28662.64 | 28094.71 | 30433.48 | 23381.89 | 28243.12 | 33760.63 | 360690.14 |
| SALES & MARKETING | 47754.79 | 47815.06 | 80513.21 | 49384.11 | 47609.22 | 50574.47 | 40781.24 | 29226.1 | 48067.05 | 46819.83 | 52605.42 | 56339.56 | 597490.06 |
| REPAIRS & MAINTENANCE | 19154.33 | 21575.86 | 14297.1 | 17332.14 | 15695.75 | 18168.48 | 15666.43 | 14940.19 | 13997.76 | 18550.31 | 25689.18 | 24671.46 | 219738.99 |
| UTILITIES | 24848.42 | 20549.36 | 13414.33 | 32839.72 | 16941.93 | 18471.14 | 19823.84 | 19720.8 | 16816.83 | 21702.41 | 17198.59 | 19519.42 | 241846.79 |
| INSURANCE (GL, Van, etc) | 1416.35 | 1416.35 | 1416.35 | 1422.82 | 1462.01 | 2888.71 | 2175.36 | 2175.36 | 2175.36 | 2175.36 | 2175.36 | 2175.36 | 23074.75 |
| BASE MANAGEMENT FEES (3%) | 13356.567 | 13170.3672 | 13129.4598 | 13866.6978 | 13101.5898 | 9520.9875 | 10700.3706 | 7568.4477 | 13256.826 | 13016.4306 | 14383.2381 | 14879.6187 | 149950.601 |
| TOTAL OPERATING EXPENSES | 141956.807 | 137822.567 | 149316.85 | 143238.498 | 128845.81 | 130040.818 | 117809.881 | 101725.608 | 124747.306 | 125646.231 | 140294.908 | 151346.049 | 1592791.33 |
| HOUSE PROFIT | 226769.883 | 232808.183 | 225451.7 | 246155.282 | 236701.51 | 116579.073 | 174680.519 | 92557.1623 | 254196.414 | 238684.689 | 256301.372 | 273212.981 | 2574098.77 |
| LESS: PROPERTY TAXES | 16981.13 | 16981.13 | 16981.13 | 16560.74 | 16808.82 | 16539.93 | 16808.82 | 16808.82 | 17108.82 | 16808.82 | 16808.82 | 18260.4 | 203457.38 |
| LESS: PROPERTY INSURANCE | 1271.8 | 1271.8 | 1271.8 | 1271.8 | 1271.86 | 1408.17 | 1408.17 | 1408.17 | 1408.17 | 1408.17 | 1408.17 | 1408.17 | 16216.25 |
| LESS: GROUND RENT | 0 | 0 | 0 | 250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | 208516.953 | 214555.253 | 207198.77 | 228322.742 | 218620.83 | 98630.9725 | 156463.529 | 74340.1723 | 235679.424 | 220467.699 | 238084.382 | 253544.411 | 2354425.14 |
| Less: FFE Reserve (4%) | -17808.756 | -17560.4896 | -17505.9464 | -18488.9304 | -17468.7864 | -12694.65 | -14267.1608 | -10091.2636 | -17675.768 | -17355.2408 | -19177.6508 | -19839.4916 | -199934.134 |
| Net Operating Income | 190708.197 | 196994.763 | 189692.824 | 209833.812 | 201152.044 | 85936.3225 | 142196.369 | 64248.9087 | 218003.656 | 203112.459 | 218906.731 | 233704.92 | 2154491 |

INNKEEPERS P&L STATEMENT
Monthly Statement
ATLANTA PEACHTREE

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.91290323 | 0.8077957 | 0.84472222 | 0.79354839 | 0.70472222 | 0.56854839 | 0.64973118 | 0.78125 | 0.82903226 | 0.85333333 | 0.8483871 | 0.84222222 | 0.78611872 |
| AVERAGE DAILY RATE | 78.8214517 | 80.7357537 | 79.5628182 | 81.9129607 | 83.2568427 | 80.6368085 | 80.7498842 | 82.4578971 | 79.8799903 | 79.8328939 | 80.5247307 | 81.3713193 | 80.735668 |
| REVPAR | 71.9563575 | 65.2179946 | 67.2084806 | 65.0018978 | 58.6729472 | 45.8459274 | 52.4657177 | 64.4202321 | 66.2230887 | 68.1240694 | 68.3161425 | 68.5327333 | 63.4678201 |
| ROOMS SOLD | 3396 | 3005 | 3041 | 2952 | 2537 | 2115 | 2417 | 2625 | 3084 | 3072 | 3156 | 3032 | 34432 |
| ROOMS AVAILABLE | 3720 | 3720 | 3600 | 3720 | 3600 | 3720 | 3720 | 3360 | 3720 | 3600 | 3720 | 3600 | 43800 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 267677.65 | 242610.94 | 241950.53 | 241807.06 | 211222.61 | 170546.85 | 195172.47 | 216451.98 | 246349.89 | 245246.65 | 254136.05 | 246717.84 | 2779890.52 |
| TELEPHONE REVENUE | 85.89 | 286.5 | 508.32 | 518.68 | 298.58 | 745.44 | 208.88 | 394.04 | 871.09 | 100.89 | 306.85 | 544.72 | 4869.88 |
| OTHER REVENUE | 8123.53 | 4701.47 | 3819.12 | 4176.97 | 3496.2 | 8940.55 | 8111.5 | 4230.38 | 6680.45 | 5709.89 | 7067.4 | 5933.19 | 70990.65 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 275887.07 | 247598.91 | 246277.97 | 246502.71 | 215017.39 | 180232.84 | 203492.85 | 221076.4 | 253901.43 | 251057.43 | 261510.3 | 253195.75 | 2855751.05 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 59785.43 | 54672.14 | 50974.6 | 54330.49 | 57750.25 | 54644.32 | 46225.88 | 59636.35 | 56780.65 | 54392.9 | 54043.99 | 53952.1 | 657189.1 |
| TELEPHONE EXPENSE | 3471.79 | 2968.07 | 3320.63 | 2853.34 | 2352.9 | 3557.81 | 4240.31 | 5452.4 | 2145.33 | 3080.08 | 3030.57 | 3245.4 | 39718.63 |
| OTHER EXPENSE | 2575.69 | 1444.96 | 1339.55 | 1594.7 | 1177.45 | 1544.05 | 1315.62 | 2576.57 | 2255.88 | 3644.02 | 3518.19 | 2240.57 | 25227.25 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 1215 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1215 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 65832.91 | 59085.17 | 55634.78 | 58778.53 | 62495.6 | 59746.18 | 51781.81 | 67665.32 | 61181.86 | 61117 | 60592.75 | 59438.07 | 723349.98 |
| GROSS OPERATING INCOME | 210054.16 | 188513.74 | 190643.19 | 187724.18 | 152521.79 | 120486.66 | 151711.04 | 153411.08 | 192719.57 | 189940.43 | 200917.55 | 193757.68 | 2132401.07 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 30538.58 | 25445.19 | 32678.23 | 31258.39 | 26238.37 | 26775.21 | 28368.09 | 27127.56 | 38951.1 | 28876.72 | 30984.59 | 29181.65 | 356423.68 |
| SALES & MARKETING | 31923.3 | 28649.05 | 73214.69 | 28080.84 | 25280.89 | 37730.94 | 25326.54 | 26524.52 | 29260.26 | 28730.58 | 29290.45 | 33360.01 | 397372.07 |
| REPAIRS & MAINTENANCE | 21845.92 | 18794.08 | 17847.72 | 21960.04 | 13491.68 | 18101.84 | 20624.84 | 14201.74 | 16764.72 | 25316.79 | 20111.77 | 20291.24 | 229352.38 |
| UTILITIES | 16353.17 | 15512.71 | 13267.03 | 17649.65 | 14680.75 | 13550.21 | 15954.41 | 14188.8 | 16317.7 | 13468.3 | 16890.32 | 16890.32 | 185004.94 |
| INSURANCE (GL, Van, etc) | 1315.52 | 1315.52 | 1315.52 | 1321.99 | 1358.95 | 2692.81 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 2025.88 | 21475.59 |
| BASE MANAGEMENT FEES (3%) | 8276.6121 | 7427.9673 | 7388.3391 | 7395.0813 | 6450.5217 | 5406.9852 | 6104.7855 | 6632.292 | 7617.0429 | 7531.7229 | 7845.309 | 7595.8725 | 85672.5315 |
| TOTAL OPERATING EXPENSES | 110253.102 | 97144.5173 | 145711.529 | 107665.991 | 87501.1617 | 104257.995 | 98404.5455 | 90700.792 | 110936.703 | 105949.993 | 107429.889 | 109344.973 | 1275301.19 |
| HOUSE PROFIT | 99801.0579 | 91369.2227 | 44931.6609 | 80058.1887 | 65020.6283 | 16228.6648 | 53306.4945 | 62710.288 | 81782.8671 | 83990.4371 | 93487.661 | 84412.7075 | 857099.879 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 14403.55 | 10843.49 | -2983.21 | 8820.79 | 8820.79 | 8820.76 | 8820.79 | 8820.79 | 8820.79 | 8820.79 | 8820.79 | 8820.79 | 101650.91 |
| LESS: PROPERTY INSURANCE | 1182.5 | 1182.5 | 1182.5 | 1182.5 | 1182.59 | 1063.5 | 1063.5 | 1063.5 | 1063.5 | 1063.5 | 1063.5 | 1063.5 | 13357.09 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 84215.0079 | 79343.2327 | 46732.3709 | 70054.8987 | 55017.2483 | 6344.4048 | 43422.2045 | 52825.998 | 71898.5771 | 74106.1471 | 83603.371 | 74528.4175 | 742091.879 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -11035.4828 | -9903.9564 | -9851.1188 | -9860.1084 | -8600.6956 | -7209.3136 | -8139.714 | -8843.056 | -10156.0572 | -10042.2972 | -10460.412 | -10127.83 | -114230.042 |
| | | | | | | | | | | | | | |
| Net Operating Income | 73179.5251 | 69439.2763 | 36881.2521 | 60194.7903 | 46416.5527 | -864.9088 | 35282.4905 | 43982.942 | 61742.5199 | 64063.8499 | 73142.959 | 64400.5875 | 627861.837 |

INNKEEPERS P&L STATEMENT
Monthly Statement
SAN JOSE SOUTH

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.84752688 | 0.89139785 | 0.79022222 | 0.85849462 | 0.752 | 0.6827957 | 0.68645161 | 0.77238095 | 0.81505376 | 0.75355556 | 0.8311828 | 0.92 | 0.80027397 |
| AVERAGE DAILY RATE | 108.392418 | 111.909206 | 112.342899 | 112.967791 | 114.025813 | 113.377991 | 119.908076 | 117.946905 | 117.560211 | 114.24739 | 112.43727 | 110.302114 | 113.588695 |
| REVPAR | 91.8654882 | 99.7556258 | 88.7758556 | 96.9822409 | 85.7474111 | 77.4140043 | 82.3110925 | 91.0999429 | 95.8178925 | 86.0917556 | 93.4559247 | 101.477944 | 90.902076 |
| ROOMS SOLD | 3941 | 4145 | 3556 | 3992 | 3384 | 3175 | 3192 | 3244 | 3790 | 3391 | 3865 | 4140 | 43815 |
| ROOMS AVAILABLE | 4650 | 4650 | 4500 | 4650 | 4500 | 4650 | 4650 | 4200 | 4650 | 4500 | 4650 | 4500 | 54750 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 427174.52 | 463863.66 | 399491.35 | 450967.42 | 385863.35 | 359975.12 | 382746.58 | 382619.76 | 445553.2 | 387412.9 | 434570.05 | 456650.75 | 4976888.66 |
| TELEPHONE REVENUE | 863.64 | 605.24 | 705.3 | 590.82 | 305.53 | 1005.23 | 1129.41 | 904.76 | 2835.33 | 822.6 | 0 | 261.24 | 10029.1 |
| OTHER REVENUE | 6575.95 | 7582.75 | 4338.27 | 7091.14 | 9244.27 | 5929.71 | 7799.65 | 7261.16 | 5686.88 | 5100.65 | 6846.4 | 7632.09 | 81088.94 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 434614.11 | 472051.65 | 404534.92 | 458649.38 | 395413.15 | 366910.08 | 391675.64 | 390785.68 | 454075.41 | 393336.15 | 441416.45 | 464544.08 | 5068006.7 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 56380.16 | 76933.68 | 65533.83 | 69365.88 | 61462.39 | 68176.25 | 63558.72 | 67339.95 | 75194.45 | 68534.38 | 64336.42 | 76644.18 | 813460.29 |
| TELEPHONE EXPENSE | 3785.57 | 2508.63 | 3877.75 | 3450.59 | 2894.09 | 3229.82 | 3292.76 | 4039.53 | 3676.31 | 3257.03 | 3822.91 | 3942.64 | 41777.63 |
| OTHER EXPENSE | 2707.1 | 2704.92 | 1675.41 | 2242.03 | 2476.65 | 3248.24 | 1320.78 | 1550.29 | 1591.6 | 1388.78 | 1874.63 | 2435.83 | 25216.26 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 62872.83 | 82147.23 | 71086.99 | 75058.5 | 66833.13 | 74654.31 | 68172.26 | 72929.77 | 80462.36 | 73180.19 | 70033.96 | 83022.65 | 880454.18 |
| GROSS OPERATING INCOME | 371741.28 | 389904.42 | 333447.93 | 383590.88 | 328580.02 | 292255.77 | 323503.38 | 317855.91 | 373613.05 | 320155.96 | 371382.49 | 381521.43 | 4187552.52 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 35434.59 | 36347.1 | 29311.61 | 31563.56 | 41915.39 | 37062.28 | 33002.78 | 31854.08 | 40495.65 | 22964.48 | 39305.59 | 38849.17 | 418106.48 |
| SALES & MARKETING | 53047.81 | 55745.59 | 233925.67 | 54472.35 | 46589.07 | 111023.12 | 50751.15 | 45233.15 | 53645.32 | 47789.48 | 51199.06 | 52546.34 | 855968.11 |
| REPAIRS & MAINTENANCE | 14539.04 | 21184.96 | 17289.85 | 19676.48 | 16348.8 | 19080.34 | 17979.16 | 23205.28 | 20576.65 | 17149.71 | 19695.02 | 17629.97 | 224355.26 |
| UTILITIES | 17109.98 | 19860.69 | 21136.76 | 30034.04 | 8190.57 | 18303.27 | 18594.73 | 14917.38 | 10258.08 | 16059.92 | 15144.65 | 19443.17 | 209053.24 |
| INSURANCE (GL, Van, etc) | 1567.77 | 1567.77 | 1567.77 | 1574.24 | 1616.35 | 3182.55 | 2399.45 | 2399.45 | 2399.45 | 2399.45 | 2399.45 | 2399.45 | 25473.15 |
| BASE MANAGEMENT FEES (3%) | 13038.4233 | 14161.5495 | 12136.0476 | 13759.4814 | 11862.3945 | 11007.3024 | 11750.2692 | 11723.5704 | 13622.2623 | 11800.0845 | 13242.4935 | 13936.3224 | 152040.201 |
| TOTAL OPERATING EXPENSES | 134737.613 | 148867.66 | 315367.708 | 151080.151 | 126522.575 | 199658.862 | 134477.539 | 129332.91 | 140997.412 | 118163.125 | 140986.464 | 144804.422 | 1884996.44 |
| HOUSE PROFIT | 237003.667 | 241036.761 | 18080.2224 | 232510.729 | 202057.446 | 92596.9076 | 189025.841 | 188523 | 232615.638 | 201992.836 | 230396.027 | 236717.008 | 2302556.08 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 31247.81 | 31247.81 | -15164.2 | 15777.14 | 15777.14 | 15777.14 | 15777.14 | 15777.14 | 15777.14 | 15777.14 | 15777.14 | 15777.14 | 189325.68 |
| LESS: PROPERTY INSURANCE | 2625.95 | 2625.95 | 2625.95 | 2625.95 | 2626.06 | 2245.67 | 2245.67 | 2245.67 | 2245.67 | 2245.67 | 2245.67 | 2245.67 | 28849.55 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 203129.907 | 207163.001 | 30618.4724 | 214107.639 | 183654.246 | 74574.0976 | 171003.031 | 170500.19 | 214592.828 | 183970.026 | 212373.217 | 218694.198 | 2084380.85 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -17384.5644 | -18882.066 | -16181.3968 | -18345.9752 | -15816.526 | -14676.4032 | -15667.0256 | -15631.4272 | -18163.0164 | -15733.446 | -17656.658 | -18581.7632 | -202720.268 |
| | | | | | | | | | | | | | |
| Net Operating Income | 185745.342 | 188280.935 | 14437.0756 | 195761.663 | 167837.72 | 59897.6944 | 155336.005 | 154868.762 | 196429.811 | 168236.58 | 194716.559 | 200112.434 | 1881660.58 |

INNKEEPERS P&L STATEMENT
Monthly Statement
RICHMOND NW

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.8383995 | 0.82909429 | 0.76698718 | 0.73045906 | 0.7099359 | 0.48883375 | 0.52171216 | 0.58653846 | 0.73976427 | 0.83621795 | 0.7912531 | 0.85224359 | 0.72468388 |
| AVERAGE DAILY RATE | 90.9886127 | 92.083367 | 89.3720142 | 87.323138 | 87.2149842 | 87.5566624 | 96.9139417 | 94.1129977 | 96.5117191 | 87.4564009 | 91.7380086 | 89.0700639 | 90.7242786 |
| REVPAR | 76.2848077 | 76.345794 | 68.5471891 | 63.785977 | 61.9170481 | 42.8006514 | 50.5611818 | 55.2008929 | 71.3959212 | 73.1326122 | 72.5879839 | 75.909391 | 65.746422 |
| ROOMS SOLD | 2703 | 2673 | 2393 | 2355 | 2215 | 1576 | 1682 | 1708 | 2385 | 2609 | 2551 | 2659 | 27509 |
| ROOMS AVAILABLE | 3224 | 3224 | 3120 | 3224 | 3120 | 3224 | 3224 | 2912 | 3224 | 3120 | 3224 | 3120 | 37960 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 245942.22 | 246138.84 | 213867.23 | 205645.99 | 193181.19 | 137989.3 | 163009.25 | 160745 | 230180.45 | 228173.75 | 234023.66 | 236837.3 | 2495734.18 |
| TELEPHONE REVENUE | 263.16 | 437.24 | 180.42 | 230.95 | 373.36 | 147.11 | 161.08 | 891.09 | 247.07 | 252.05 | -51.48 | 208.09 | 3333.84 |
| OTHER REVENUE | 8543.61 | 5394.95 | 4278.95 | 6204.58 | 4248.62 | 4710.16 | 5267.33 | 3974.58 | 4839.09 | 5217.67 | 5164.72 | 5547.67 | 63391.93 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 254748.99 | 251971.03 | 218326.6 | 212081.52 | 197803.17 | 142846.57 | 168437.66 | 165610.67 | 235260.31 | 233643.47 | 239136.9 | 242593.06 | 2562459.95 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 48745.78 | 48802.13 | 41694.83 | 45212.59 | 37716.26 | 37754.62 | 34890.27 | 37093.72 | 43862.49 | 51700.8 | 48168.01 | 44021.21 | 519662.71 |
| TELEPHONE EXPENSE | 2874.07 | 3248.6 | 3214.71 | 2839.94 | 2093.14 | 3876.71 | 2684.18 | 2564.41 | 2794.04 | 2743.28 | 6873.59 | 6437.36 | 42244.03 |
| OTHER EXPENSE | 2144.44 | 2074.83 | 2305.09 | 2484.68 | 1740.14 | 1210.92 | 1464.96 | 1575.23 | 2535.87 | 2225.81 | 1740.15 | 1402.29 | 22904.41 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 53764.29 | 54125.56 | 47214.63 | 50537.21 | 41549.54 | 42842.25 | 39039.41 | 41233.36 | 49192.4 | 56669.89 | 56781.75 | 51860.86 | 584811.15 |
| GROSS OPERATING INCOME | 200984.7 | 197845.47 | 171111.97 | 161544.31 | 156253.63 | 100004.32 | 129398.25 | 124377.31 | 186067.91 | 176973.58 | 182355.15 | 190732.2 | 1977648.8 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 26020.53 | 25359.51 | 28899.35 | 24502.86 | 23421 | 24435.19 | 22138.74 | 23029.78 | 31693.37 | 25973.87 | 57950.91 | 26074.66 | 339499.77 |
| SALES & MARKETING | 29574.98 | 28738.33 | 34346.03 | 25088.84 | 23608.33 | 24356.52 | 21187.19 | 31981.39 | 32801.74 | 27748.23 | 28598.43 | 28254.38 | 336284.39 |
| REPAIRS & MAINTENANCE | 13664.37 | 16788.4 | 12785.32 | 14794.82 | 12128.54 | 15687.19 | 13600.31 | 11000.26 | 13777.97 | 13923.96 | 15050.4 | 15256.45 | 168457.99 |
| UTILITIES | 11164.81 | 9590.86 | 11225.45 | 6261.38 | 10700.39 | 8697.27 | 10724.03 | 8261.15 | 8204.27 | 7158.6 | 5311.76 | 6907.23 | 104207.2 |
| INSURANCE (GL, Van, etc) | 1181.1 | 1181.1 | 1181.1 | 1187.57 | 1221.87 | 2431.73 | 1826.8 | 1826.8 | 1826.8 | 1826.8 | 1826.8 | 1826.8 | 19345.27 |
| BASE MANAGEMENT FEES (3%) | 7642.4697 | 7559.1309 | 6549.798 | 6362.4456 | 5934.0951 | 4285.3971 | 5053.1298 | 4968.3201 | 7057.8093 | 7009.3041 | 7174.107 | 7277.7918 | 76873.7985 |
| TOTAL OPERATING EXPENSES | 89248.2597 | 89217.3309 | 94987.048 | 78197.9156 | 77014.2251 | 79893.2971 | 74530.1998 | 81067.7001 | 95361.9593 | 83640.7641 | 115912.407 | 85597.3118 | 1044668.42 |
| HOUSE PROFIT | 111736.44 | 108628.139 | 76124.922 | 83346.3944 | 79239.4049 | 20111.0229 | 54868.0502 | 43309.6099 | 90705.9507 | 93332.8159 | 66442.743 | 105134.888 | 932980.382 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 9282.42 | 9282.42 | 9282.42 | 11847.4 | 11883.29 | 9282.4 | 9282.42 | 9282.42 | 9282.42 | 7662.16 | 5490.13 | 8199.91 | 110059.81 |
| LESS: PROPERTY INSURANCE | 975.29 | 975.29 | 975.29 | 975.29 | 975.35 | 968.58 | 968.58 | 968.58 | 968.58 | 968.58 | 968.58 | 968.58 | 11656.57 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 101478.73 | 98370.4291 | 65867.212 | 70523.7044 | 66380.7649 | 9860.0429 | 44617.0502 | 33058.6099 | 80454.9507 | 84702.0759 | 59984.033 | 95966.3982 | 811264.002 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -10189.9596 | -10078.8412 | -8733.064 | -8483.2608 | -7912.1268 | -5713.8628 | -6737.5064 | -6624.4268 | -9410.4124 | -9345.7388 | -9565.476 | -9703.7224 | -102498.398 |
| | | | | | | | | | | | | | |
| Net Operating Income | 91288.7707 | 88291.5879 | 57134.148 | 62040.4436 | 58468.6381 | 4146.1801 | 37879.5438 | 26434.1831 | 71044.5383 | 75356.3371 | 50418.557 | 86262.6758 | 708765.604 |

INNKEEPERS P&L STATEMENT
Monthly Statement
ROSEMONT

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.91918683 | 0.90625 | 0.85399306 | 0.91011425 | 0.93177083 | 0.64969758 | 0.57459677 | 0.62388393 | 0.70430108 | 0.67934028 | 0.86189516 | 0.87690972 | 0.79188071 |
| AVERAGE DAILY RATE | 102.517112 | 106.014308 | 108.587044 | 104.892356 | 105.623272 | 102.052043 | 98.8920029 | 106.244508 | 107.614163 | 104.678888 | 108.509244 | 103.53179 | 105.080503 |
| REVPAR | 94.232379 | 96.0754671 | 92.7325816 | 95.4640272 | 98.416684 | 66.3029654 | 56.8230259 | 66.2842411 | 75.7927705 | 71.1125851 | 93.5235921 | 90.788033 | 83.2112227 |
| ROOMS SOLD | 5471 | 5394 | 4919 | 5417 | 5367 | 3867 | 3420 | 3354 | 4192 | 3913 | 5130 | 5051 | 55495 |
| ROOMS AVAILABLE | 5952 | 5952 | 5760 | 5952 | 5760 | 5952 | 5952 | 5376 | 5952 | 5760 | 5952 | 5760 | 70080 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 560871.12 | 571841.18 | 534139.67 | 568201.89 | 566880.1 | 394635.25 | 338210.65 | 356344.08 | 451118.57 | 409608.49 | 556652.42 | 522939.07 | 5831442.49 |
| TELEPHONE REVENUE | 1552.77 | 2807.89 | 2948.44 | 1610.6 | 3028.85 | 1511.13 | 1497.38 | 1725.59 | 1850.41 | 1804.38 | 2947.78 | 2889.97 | 26175.19 |
| OTHER REVENUE | 23177.29 | 12336.55 | 10847.32 | 19335.73 | 17508.27 | 15001.71 | 5315.53 | 7651.4 | 12786.88 | 9198.36 | 12492.48 | 9618.07 | 155269.59 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 120 | 120 | -240 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 120 |
| GROSS INCOME FROM OPERATIONS | 585601.18 | 586985.62 | 548055.43 | 589268.22 | 587177.22 | 411148.09 | 345023.56 | 365721.07 | 465755.86 | 420611.23 | 572092.68 | 535447.11 | 6012887.27 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 119308.74 | 115596.84 | 111545.57 | 105316.53 | 121682.93 | 109803.03 | 95164.1 | 85746.33 | 101199.42 | 90207.31 | 110216.96 | 109905.27 | 1275693.03 |
| TELEPHONE EXPENSE | 4917.49 | 7014.39 | 4388.3 | 8210.81 | 6448.3 | 4840.86 | 3836.27 | 4221.67 | 6526.57 | 4267.25 | 4500.5 | 6489.06 | 65661.67 |
| OTHER EXPENSE | 7948.77 | 9646.48 | 7059.07 | 8135.29 | 10760.84 | 8510.95 | 3744.31 | 5003.67 | 7514.9 | 5385.18 | 8497.07 | 5671.05 | 87877.58 |
| FOOD & BEVERAGE EXPENSE | 0 | 66.95 | 0 | 0 | 1215 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1281.95 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 132175 | 132324.66 | 122992.94 | 121662.63 | 140107.27 | 123154.84 | 102744.68 | 94971.67 | 115240.89 | 99859.74 | 123214.53 | 122065.38 | 1430514.23 |
| GROSS OPERATING INCOME | 453426.18 | 454660.96 | 425062.49 | 467605.59 | 447069.95 | 287993.25 | 242278.88 | 270749.4 | 350514.97 | 320751.49 | 448878.15 | 413381.73 | 4582373.04 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 36855.23 | 36103.68 | 41567.52 | 36942.8 | 48066.86 | 37749.05 | 34448.43 | 32661.37 | 51719.84 | 35179.1 | 41432.41 | 38112.85 | 470839.14 |
| SALES & MARKETING | 68326.66 | 67536.26 | 111565.98 | 67766.04 | 64893.11 | 71166.04 | 44893.78 | 46511.39 | 57845.79 | 50633.38 | 68080.48 | 63648.09 | 782867 |
| REPAIRS & MAINTENANCE | 28029.42 | 26438.4 | 25447.18 | 35554.62 | 32773.92 | 30693.73 | 27377.02 | 32787.77 | 39172.11 | 32586.08 | 28045.56 | 28657.59 | 367563.4 |
| UTILITIES | 19908.35 | 28101.27 | 42177.4 | 20777.12 | 13112.52 | 16062.99 | 22044.52 | 19699.5 | 17098.45 | 16789.21 | 14946 | 16526.65 | 247243.98 |
| INSURANCE (GL, Van, etc) | 2289.18 | 2289.18 | 2289.18 | 2295.65 | 2231.48 | 4123.18 | 3177.33 | 3177.33 | 3177.33 | 3177.33 | 3177.33 | 3177.33 | 34581.83 |
| BASE MANAGEMENT FEES (3%) | 17568.0354 | 17609.5686 | 16441.6629 | 17678.0466 | 17615.3166 | 12334.4427 | 10350.7068 | 10971.6321 | 13972.6758 | 12618.3369 | 17162.7804 | 16063.4133 | 180386.618 |
| TOTAL OPERATING EXPENSES | 172976.875 | 178078.359 | 239488.923 | 181014.277 | 178693.207 | 172129.433 | 142291.787 | 145808.992 | 182986.196 | 150983.437 | 172844.56 | 166185.923 | 2083481.97 |
| HOUSE PROFIT | 280449.305 | 276582.601 | 185573.567 | 286591.313 | 268376.743 | 115863.817 | 99987.0932 | 124940.408 | 167528.774 | 169768.053 | 276033.59 | 247195.807 | 2498891.07 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 67963.62 | 67963.62 | 67963.62 | 67963.62 | 60069.38 | 67963.62 | 54315.69 | 66913.78 | 66913.78 | 66913.78 | 66913.78 | 66913.78 | 788772.07 |
| LESS: PROPERTY INSURANCE | 1998.38 | 1998.38 | 1998.38 | 1998.38 | 1998.48 | 1858.42 | 1858.42 | 1858.42 | 1858.42 | 1858.42 | 1858.42 | 1858.42 | 23000.94 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 210487.305 | 206620.601 | 115611.567 | 216629.313 | 206308.883 | 46041.7773 | 43812.9832 | 56168.2079 | 98756.5742 | 100995.853 | 207261.39 | 178423.607 | 1687118.06 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -23424.0472 | -23479.4248 | -21922.2172 | -23570.7288 | -23487.0888 | -16445.9236 | -13800.9424 | -14628.8428 | -18630.2344 | -16824.4492 | -22883.7072 | -21417.8844 | -240515.491 |
| | | | | | | | | | | | | | |
| Net Operating Income | 187063.257 | 183141.177 | 93689.3499 | 193058.585 | 182821.795 | 29595.8537 | 30012.0408 | 41539.3651 | 80126.3398 | 84171.4039 | 184377.682 | 157005.722 | 1446602.57 |

INNKEEPERS P&L STATEMENT
Monthly Statement
LIVONIA

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.74913594 | 0.75576037 | 0.83660714 | 0.83150922 | 0.75892857 | 0.68260369 | 0.7281106 | 0.70248724 | 0.62471198 | 0.6702381 | 0.82488479 | 0.95178571 | 0.75971135 |
| AVERAGE DAILY RATE | 89.983441 | 93.1752172 | 87.6729136 | 87.6621857 | 87.9692118 | 84.5283418 | 87.0286076 | 88.7034498 | 88.8915168 | 83.6362345 | 85.4796613 | 88.1869825 | 87.7784039 |
| REVPAR | 67.4098301 | 70.4181365 | 73.3477857 | 72.8919153 | 66.7623482 | 57.6993577 | 63.3664516 | 62.3130421 | 55.5315956 | 56.0561905 | 70.5108727 | 83.9351101 | 66.6862498 |
| ROOMS SOLD | 2601 | 2624 | 2811 | 2887 | 2550 | 2370 | 2528 | 2203 | 2169 | 2252 | 2864 | 3198 | 31057 |
| ROOMS AVAILABLE | 3472 | 3472 | 3360 | 3472 | 3360 | 3472 | 3472 | 3136 | 3472 | 3360 | 3472 | 3360 | 40880 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 234046.93 | 244491.77 | 246448.56 | 253080.73 | 224321.49 | 200332.17 | 220008.32 | 195413.7 | 192805.7 | 188348.8 | 244813.75 | 282021.97 | 2726133.89 |
| TELEPHONE REVENUE | 463.49 | 514.28 | 950.22 | 931.3 | 337.41 | 311.54 | 1611.81 | 1028.35 | 531 | 531.78 | 553.38 | 836 | 8600.56 |
| OTHER REVENUE | 5839.6 | 3284.36 | 2788.84 | 3486.29 | 3468.34 | 2654.54 | 4521.52 | 2898.04 | 3438.41 | 4071.35 | 3971.94 | 8305.37 | 48728.6 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 240350.02 | 248290.41 | 250187.62 | 257498.32 | 228127.24 | 203298.25 | 226141.65 | 199340.09 | 196775.11 | 192951.93 | 249339.07 | 291163.34 | 2783463.05 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 42936.29 | 44867.02 | 46212.85 | 47504.99 | 47267.88 | 53368.15 | 47243.72 | 46197.82 | 48503.07 | 48281.9 | 43701.22 | 50992.86 | 567077.77 |
| TELEPHONE EXPENSE | 4096.6 | 2268.47 | 3107.55 | 3198.4 | 2603.15 | 5165.19 | 2913.13 | 3523.03 | 3017.1 | 2949.98 | 3488.12 | 2970.4 | 39301.12 |
| OTHER EXPENSE | 3479.66 | 1739.9 | 2367.26 | 2076.39 | 2792.61 | 2130.6 | 2739.55 | 2186.05 | 2258.13 | 1861.27 | 2436.27 | 7158.34 | 33226.03 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 50512.55 | 48875.39 | 51687.66 | 52779.78 | 52663.64 | 60663.94 | 52896.4 | 51906.9 | 53778.3 | 53093.15 | 49625.61 | 61121.6 | 639604.92 |
| GROSS OPERATING INCOME | 189837.47 | 199415.02 | 198499.96 | 204718.54 | 175463.6 | 142634.31 | 173245.25 | 147433.19 | 142996.81 | 139858.78 | 199713.46 | 230041.74 | 2143858.13 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 25634.94 | 21288.41 | 25245.74 | 24426.13 | 25888.15 | 25015.16 | 24368.85 | 23767.69 | 26216.6 | 22553.33 | 22874.54 | 25194.07 | 292473.61 |
| SALES & MARKETING | 26527.26 | 26801.29 | 59434.77 | 27757.45 | 25420.44 | 36783.39 | 25768.42 | 24340.69 | 26037.32 | 23234.07 | 28018.2 | 31118.74 | 361242.04 |
| REPAIRS & MAINTENANCE | 13856.07 | 9804.96 | 14735.71 | 19312.74 | 14107.73 | 17074.98 | 15385.34 | 18124.12 | 12439.28 | 12392.28 | 15983.75 | 17208.75 | 180425.71 |
| UTILITIES | 11958.46 | 12423.04 | 11784.62 | 11579.38 | 9792.71 | 7884.69 | 14903.59 | 14371.32 | 15515.9 | 12000.96 | 9919.47 | 10223.92 | 142358.06 |
| INSURANCE (GL, Van, etc) | 1125.85 | 1125.85 | 1125.85 | 1132.32 | 1162.99 | 2434.69 | 1798.84 | 1798.84 | 1798.84 | 1798.84 | 1798.84 | 1798.84 | 18900.59 |
| BASE MANAGEMENT FEES (3%) | 7210.5006 | 7448.7123 | 7505.6286 | 7724.9496 | 6843.8172 | 6098.9475 | 6784.2495 | 5980.2027 | 5903.2533 | 5788.5579 | 7480.1721 | 8734.9002 | 83503.8915 |
| TOTAL OPERATING EXPENSES | 86313.0806 | 78892.2623 | 119832.319 | 91932.9696 | 83215.8372 | 95291.8575 | 89009.2895 | 88382.8627 | 87911.1933 | 77768.0379 | 86074.9721 | 94279.2202 | 1078903.9 |
| HOUSE PROFIT | 103524.389 | 120522.758 | 78667.6414 | 112785.57 | 92247.7628 | 47342.4525 | 84235.9605 | 59050.3273 | 55085.6167 | 62090.7421 | 113638.488 | 135762.52 | 1064954.23 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 15606.23 | 16317.9 | 17029.56 | 16317.9 | 16317.86 | 15275.57 | 15275.57 | 15275.57 | 15275.57 | 15275.57 | 15275.57 | 15872.62 | 189115.49 |
| LESS: PROPERTY INSURANCE | 1160.91 | 1160.91 | 1160.91 | 1160.91 | 1160.96 | 1030.17 | 1030.17 | 1030.17 | 1030.17 | 1030.17 | 1030.17 | 1030.17 | 13015.79 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 86757.2494 | 103043.948 | 60477.1714 | 95306.7604 | 74768.9428 | 31036.7125 | 67930.2205 | 42744.5873 | 38779.8767 | 45785.0021 | 97332.7479 | 118859.73 | 862822.949 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -9614.0008 | -9931.6164 | -10007.5048 | -10299.9328 | -9125.0896 | -8131.93 | -9045.666 | -7973.6036 | -7871.0044 | -7718.0772 | -9973.5628 | -11646.5336 | -111338.522 |
| | | | | | | | | | | | | | |
| Net Operating Income | 77143.2486 | 93112.3313 | 50469.6666 | 85006.8276 | 65643.8532 | 22904.7825 | 58884.5545 | 34770.9837 | 30908.8723 | 38066.9249 | 87359.1851 | 107213.196 | 751484.427 |

INNKEEPERS P&L STATEMENT
Monthly Statement
SADDLE RIVER

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.74842418 | 0.74286244 | 0.70114943 | 0.7500927 | 0.66954023 | 0.57916203 | 0.62031887 | 0.5316092 | 0.50574713 | 0.58754789 | 0.67519466 | 0.75708812 | 0.65649504 |
| AVERAGE DAILY RATE | 128.216757 | 131.002121 | 130.242607 | 126.217548 | 128.188578 | 126.090163 | 117.289038 | 119.865444 | 124.903336 | 127.639778 | 133.431864 | 136.469471 | 127.889379 |
| REVPAR | 95.9605209 | 97.3165554 | 91.3195287 | 94.674861 | 85.82741 | 73.0266352 | 72.7566036 | 63.7215722 | 63.1695032 | 74.9944828 | 90.0924824 | 103.319416 | 83.9587429 |
| ROOMS SOLD | 4037 | 4007 | 3660 | 4046 | 3495 | 3124 | 3346 | 2590 | 2728 | 3067 | 3642 | 3952 | 41694 |
| ROOMS AVAILABLE | 5394 | 5394 | 5220 | 5394 | 5220 | 5394 | 5394 | 4872 | 5394 | 5220 | 5394 | 5220 | 63510 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 517611.05 | 524925.5 | 476687.94 | 510676.2 | 448019.08 | 393905.67 | 392449.12 | 310451.5 | 340736.3 | 391471.2 | 485958.85 | 539327.35 | 5332219.76 |
| TELEPHONE REVENUE | 1045.31 | 1152.48 | 711.37 | 982.93 | 780.77 | 637.32 | 807.94 | 1008.86 | 507.82 | 52.97 | 964.32 | 274.92 | 8927.01 |
| OTHER REVENUE | 12541.99 | 12049.31 | 10483.51 | 6483.89 | 5704.54 | 7978.39 | 7614.68 | 4587.62 | 6230.67 | 4752.63 | 8357.59 | 7311.69 | 94096.51 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 531198.35 | 538127.29 | 487882.82 | 518143.02 | 454504.39 | 402521.38 | 400871.74 | 316047.98 | 347474.79 | 396276.8 | 495280.76 | 546913.96 | 5435243.28 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 91919.64 | 115131.38 | 106130.37 | 86310.69 | 87754.88 | 96721.5 | 73118.89 | 64500.97 | 70329.6 | 75327.25 | 70660.71 | 92760.65 | 1030666.53 |
| TELEPHONE EXPENSE | 5372.76 | 5700.52 | 5391.31 | 2749.68 | 3868.73 | 4690.58 | 4089.62 | 3884.55 | 4121.21 | 3288.63 | 3621.85 | 3906.5 | 50685.94 |
| OTHER EXPENSE | 4188.97 | 10955.22 | 4809.37 | 4035.92 | 3673.62 | 4791.56 | 2319.64 | 3134.37 | 3221.29 | 2681.68 | 4035.43 | 3981.6 | 51828.67 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 101481.37 | 131787.12 | 116331.05 | 93096.29 | 95297.23 | 106203.64 | 79528.15 | 71519.89 | 77672.1 | 81297.56 | 78317.99 | 100648.75 | 1133181.14 |
| GROSS OPERATING INCOME | 429716.98 | 406340.17 | 371551.77 | 425046.73 | 359207.16 | 296317.74 | 321343.59 | 244528.09 | 269802.69 | 314979.24 | 416962.77 | 446265.21 | 4302062.14 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 37929.13 | 35951.22 | 33879.78 | 36587.46 | 36637.15 | 34120.14 | 32599.18 | 32730.58 | 33920.15 | 40574.23 | 40230.93 | 38613.85 | 433773.8 |
| SALES & MARKETING | 52017.2 | 52425.97 | 48654.9 | 49060.38 | 45488.83 | 45371.39 | 39670.49 | 34690.28 | 38855.17 | 43127.2 | 50814.09 | 52140.58 | 552316.48 |
| REPAIRS & MAINTENANCE | 34899.34 | 51539.33 | 36623.28 | 20035.09 | 26984.63 | 42794.74 | 38008.4 | 34288.94 | 40654.91 | 41850.66 | 34163.32 | 34041.88 | 435884.52 |
| UTILITIES | 20906.76 | 26165.82 | 34708.74 | 21064.51 | 16722.15 | 23622.89 | 39696.97 | 41019.97 | 43575.88 | 29986.09 | 20463.67 | 21592.66 | 339526.11 |
| INSURANCE (GL, Van, etc) | 1782.52 | 1782.52 | 1782.52 | 1788.99 | 1829.22 | 3604.1 | 2716.66 | 2716.66 | 2716.66 | 2716.66 | 2716.66 | 2716.66 | 28869.83 |
| BASE MANAGEMENT FEES (3%) | 15935.9505 | 16143.8187 | 14636.4846 | 15544.2906 | 13635.1317 | 12075.6414 | 12026.1522 | 9481.4394 | 10424.2437 | 11888.304 | 14858.4228 | 16407.4188 | 163057.298 |
| TOTAL OPERATING EXPENSES | 163470.901 | 184008.679 | 170285.705 | 144080.721 | 141297.112 | 161588.901 | 164717.852 | 154927.869 | 170147.014 | 170143.144 | 163247.093 | 165513.049 | 1953428.04 |
| HOUSE PROFIT | 266246.08 | 222331.491 | 201266.065 | 280966.009 | 217910.048 | 134728.839 | 156625.738 | 89600.2206 | 99655.6763 | 144836.096 | 253715.677 | 280752.161 | 2348634.1 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 14094 | 14094 | 14094 | 13920 | 13920 | 13920 | 13630 | 13630 | 13630 | 13630 | 13630 | 13630 | 165822 |
| LESS: PROPERTY INSURANCE | 1588.73 | 1588.73 | 1588.73 | 1588.73 | 1588.7 | 1815.74 | 1815.74 | 1815.74 | 1815.74 | 1815.74 | 1815.74 | 1815.74 | 20653.8 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 250563.35 | 206648.761 | 185583.335 | 265457.279 | 202401.348 | 118993.099 | 141179.998 | 74154.4806 | 84209.9363 | 129390.356 | 238269.937 | 265306.421 | 2162158.3 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -21247.934 | -21525.0916 | -19515.3128 | -20725.7208 | -18180.1756 | -16100.8552 | -16034.8696 | -12641.9192 | -13898.9916 | -15851.072 | -19811.2304 | -21876.5584 | -217409.731 |
| | | | | | | | | | | | | | |
| Net Operating Income | 229315.416 | 185123.67 | 166068.023 | 244731.559 | 184221.173 | 102892.243 | 125145.128 | 61512.5614 | 70310.9447 | 113539.284 | 218458.707 | 243429.863 | 1944748.57 |

INNKEEPERS P&L STATEMENT
Monthly Statement
FORT LAUDERDALE

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.59179317 | 0.58135674 | 0.53946078 | 0.61314042 | 0.6377451 | 0.78510436 | 0.86835863 | 0.89154412 | 0.83965844 | 0.70490196 | 0.65512334 | 0.63823529 | 0.69464142 |
| AVERAGE DAILY RATE | 72.7102244 | 75.1829988 | 72.9772876 | 77.9403211 | 77.6743774 | 74.6206284 | 104.620377 | 112.221237 | 111.792446 | 99.9072045 | 81.4910391 | 75.7660599 | 88.3459498 |
| REVPAR | 43.0294141 | 43.7081428 | 39.3683848 | 47.788361 | 49.5364534 | 58.584981 | 90.8480076 | 100.050184 | 93.8674715 | 70.4247843 | 53.3866817 | 48.3565735 | 61.3687558 |
| ROOMS SOLD | 2495 | 2451 | 2201 | 2585 | 2602 | 3310 | 3661 | 3395 | 3540 | 2876 | 2762 | 2604 | 34482 |
| ROOMS AVAILABLE | 4216 | 4216 | 4080 | 4216 | 4080 | 4216 | 4216 | 3808 | 4216 | 4080 | 4216 | 4080 | 49640 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 181412.01 | 184273.53 | 160623.01 | 201475.73 | 202108.73 | 246994.28 | 383015.2 | 380991.1 | 395745.26 | 287333.12 | 225078.25 | 197294.82 | 3046345.04 |
| TELEPHONE REVENUE | 251.77 | 647.68 | 209.14 | 510.21 | 804.46 | 587.14 | 424.83 | 541.03 | 418.93 | 585.19 | 184.93 | 168.64 | 5333.95 |
| OTHER REVENUE | 8558.79 | 6942.24 | 7061.53 | 7105.14 | 6704.42 | 10092.38 | 10146.31 | 8744.64 | 12067.57 | 7782.2 | 7713.25 | 6215.8 | 99134.27 |
| FOOD & BEVERAGE REVENUE | 42672.42 | 30062.41 | 34081.46 | 28714.55 | 29461.37 | 31340.44 | 47132.86 | 33336.44 | 34767.24 | 33059.85 | 30599.9 | 33986.39 | 409215.33 |
| GROSS INCOME FROM OPERATIONS | 232894.99 | 221925.86 | 201975.14 | 237805.63 | 239078.98 | 289014.24 | 440719.2 | 423613.21 | 442999 | 328760.36 | 263576.33 | 237665.65 | 3560028.59 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 52534.09 | 54364.28 | 55531.24 | 62308.45 | 55038.69 | 68051.73 | 67361.04 | 68260.2 | 72032.42 | 67002.74 | 61447.66 | 56219.42 | 740151.96 |
| TELEPHONE EXPENSE | 2531.83 | 3170.3 | 3205.79 | 2870.47 | 2726.08 | 3245.73 | 2366.22 | 2959.1 | 2797.64 | 3370.8 | 2749.3 | 3237.12 | 35230.38 |
| OTHER EXPENSE | 2380.47 | 934.05 | 860.72 | 1866.46 | 1523.47 | 1845.08 | 2515.07 | 2619.09 | 4421.59 | 1971.04 | 1591.94 | 3221.83 | 25750.81 |
| FOOD & BEVERAGE EXPENSE | 33667.82 | 31532.94 | 34166.96 | 46584.43 | 31069.71 | 37446.22 | 37342.81 | 32952.88 | 29387.33 | 32316.92 | 26254.32 | 30630.27 | 403352.61 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 91114.21 | 90001.57 | 93764.71 | 113629.81 | 90357.95 | 110588.76 | 109585.14 | 106791.27 | 108638.98 | 104661.5 | 92043.22 | 93308.64 | 1204485.76 |
| GROSS OPERATING INCOME | 141780.78 | 131924.29 | 108210.43 | 124175.82 | 148721.03 | 178425.48 | 331134.06 | 316821.94 | 334360.02 | 224098.86 | 171533.11 | 144357.01 | 2355542.83 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 29478.11 | 28583.35 | 24152.56 | 33481.03 | 29223.68 | 27339.63 | 29220.87 | 30213.87 | 29913.47 | 27651.48 | 30954.74 | 43677.62 | 363890.41 |
| SALES & MARKETING | 25880.91 | 27680.84 | 26468.12 | 26245.25 | 25336.87 | 32458.42 | 42593.88 | 40220.11 | 42808.59 | 35987.8 | 28492.18 | 25672.42 | 379845.39 |
| REPAIRS & MAINTENANCE | 19994.14 | 28967.64 | 21737.95 | 22229.76 | 20296.87 | 22783.71 | 27778.98 | 26169.99 | 22647.35 | 24337.34 | 18634.33 | 20692.36 | 276270.42 |
| UTILITIES | 24597.94 | 22399.99 | 17607.05 | 18001.13 | 12256.65 | 21207.42 | 23528.78 | 18024.91 | 19945.23 | 19538.52 | 18435.96 | 18898.65 | 234442.29 |
| INSURANCE (GL, Van, etc) | 1485.68 | 1485.68 | 1485.68 | 1492.15 | 1538.3 | 3016 | 2277.15 | 2277.15 | 2277.15 | 2277.15 | 2277.15 | 2277.15 | 24166.39 |
| BASE MANAGEMENT FEES (3%) | 6986.8497 | 6657.7758 | 6059.2542 | 7134.1689 | 7172.3694 | 8670.4272 | 13221.576 | 12708.3963 | 13289.97 | 9862.8108 | 7907.2899 | 7129.9695 | 106800.858 |
| TOTAL OPERATING EXPENSES | 108423.63 | 115775.276 | 97510.6142 | 108583.489 | 95824.7394 | 115475.607 | 138621.236 | 129614.426 | 130881.82 | 119655.101 | 106701.65 | 118348.17 | 1385415.76 |
| HOUSE PROFIT | 33357.1503 | 16149.0142 | 10699.8158 | 15592.3311 | 52896.2906 | 62949.8728 | 192512.824 | 187207.514 | 203478.2 | 104443.759 | 64831.4601 | 26008.8405 | 970127.072 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 15890.04 | 15890.04 | 15890.04 | 16120.16 | 19839.52 | 7881.61 | 15280.21 | 15280.21 | 15280.21 | 15280.21 | 15280.21 | 15280.21 | 183192.67 |
| LESS: PROPERTY INSURANCE | 1283.87 | 1283.87 | 1283.87 | 1283.87 | 1283.91 | 1172.83 | 1172.83 | 1172.83 | 1172.83 | 1172.83 | 1172.83 | 1172.83 | 14629.2 |
| LESS: GROUND RENT | 8284.32 | 8284.32 | 8284.32 | 8569.83 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 8379.49 | 100458.71 |
| | | | | | | | | | | | | | |
| EBITDA | 7898.9203 | -9309.2158 | -14758.4142 | -10381.5289 | 23393.3706 | 45515.9428 | 167680.294 | 162374.984 | 178645.67 | 79611.2292 | 39998.9301 | 1176.3105 | 671846.492 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -9315.7996 | -8877.0344 | -8079.0056 | -9512.2252 | -9563.1592 | -11560.5696 | -17628.768 | -16944.5284 | -17719.96 | -13150.4144 | -10543.0532 | -9506.626 | -142401.144 |
| | | | | | | | | | | | | | |
| Net Operating Income | -1416.8793 | -18186.2502 | -22837.4198 | -19893.7541 | 13830.2114 | 33955.3732 | 150051.526 | 145430.455 | 160925.71 | 66460.8148 | 29455.8769 | -8330.3155 | 529445.349 |

INNKEEPERS P&L STATEMENT
Monthly Statement
HORSHAM

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.81188455 | 0.88488964 | 0.78070175 | 0.84244482 | 0.76035088 | 0.6278438 | 0.62342954 | 0.59586466 | 0.75382003 | 0.77052632 | 0.82546689 | 0.85192982 | 0.76178803 |
| AVERAGE DAILY RATE | 81.9380928 | 86.2615618 | 83.6664494 | 82.3555865 | 81.1681172 | 80.6718551 | 85.6875708 | 87.4592177 | 87.3039054 | 83.5612477 | 83.5103167 | 84.0127801 | 83.9108181 |
| REVPAR | 66.5242716 | 76.3319626 | 65.3185439 | 69.3800374 | 61.7162491 | 50.6493243 | 53.420163 | 52.1138571 | 65.8114329 | 64.3861404 | 68.9350017 | 71.572993 | 63.922257 |
| ROOMS SOLD | 2391 | 2606 | 2225 | 2481 | 2167 | 1849 | 1836 | 1585 | 2220 | 2196 | 2431 | 2428 | 26415 |
| ROOMS AVAILABLE | 2945 | 2945 | 2850 | 2945 | 2850 | 2945 | 2945 | 2660 | 2945 | 2850 | 2945 | 2850 | 34675 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 195913.98 | 224797.63 | 186157.85 | 204324.21 | 175891.31 | 149162.26 | 157322.38 | 138622.86 | 193814.67 | 183500.5 | 203013.58 | 203983.03 | 2216504.26 |
| TELEPHONE REVENUE | 43.09 | 117.74 | 813.36 | 117.87 | 273.34 | 1967.23 | 115.41 | 36.17 | 6.02 | 32.38 | -7.99 | 61.44 | 3576.06 |
| OTHER REVENUE | 3083.16 | 2215.29 | 1805.91 | 1686.83 | 1538.86 | 1650.77 | 3136.67 | 1847.33 | 2747.3 | 2125.92 | 2480.3 | 2081.79 | 26400.13 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 199040.23 | 227130.66 | 188777.12 | 206128.91 | 177703.51 | 152780.26 | 160574.46 | 140506.36 | 196567.99 | 185658.8 | 205485.89 | 206126.26 | 2246480.45 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 42264.6 | 44178.53 | 37052.05 | 46180.62 | 37853.45 | 43201.59 | 46535.26 | 36335.45 | 40825.71 | 45110.24 | 41154.61 | 44987.3 | 505679.41 |
| TELEPHONE EXPENSE | 3092.92 | 2403.52 | 2473.07 | 2274.12 | 1676.52 | 3166.07 | 3986.3 | 4739.11 | 4501.39 | 2542.16 | 2774.68 | 3703.75 | 37333.61 |
| OTHER EXPENSE | 1340.09 | 717.74 | 903.27 | 746.48 | 733.88 | 232.23 | 386.22 | 650.41 | 485.13 | 502.33 | 1134.74 | 1542.04 | 9374.56 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 46697.61 | 47299.79 | 40428.39 | 49201.22 | 40263.85 | 46599.89 | 50907.78 | 41724.97 | 45812.23 | 48154.73 | 45064.03 | 50233.09 | 552387.58 |
| GROSS OPERATING INCOME | 152342.62 | 179830.87 | 148348.73 | 156927.69 | 137439.66 | 106180.37 | 109666.68 | 98781.39 | 150755.76 | 137504.07 | 160421.86 | 155893.17 | 1694092.87 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 25017.06 | 25319.85 | 21714.49 | 25505.06 | 26758.18 | 27342.05 | 26440.43 | 22633.27 | 28352.5 | 20871.41 | 25980.54 | 24801.79 | 300736.63 |
| SALES & MARKETING | 24801.53 | 27100.09 | 28662.46 | 22675.35 | 20751.87 | 23411.59 | 20683.15 | 16429.4 | 23672.76 | 20792.23 | 24115.69 | 23500.47 | 276596.59 |
| REPAIRS & MAINTENANCE | 13408.41 | 17563.79 | 16203.89 | 13678.78 | 17691.8 | 19356.02 | 23821.1 | 28980.89 | 24570.26 | 18160.38 | 14906.88 | 24503.99 | 232846.19 |
| UTILITIES | 11553.3 | 11548.71 | 13267.13 | 9498.2 | 7494.74 | 8008.54 | 12239.05 | 11257.46 | 9256.46 | 9675.83 | 8857.96 | 9519.28 | 122176.66 |
| INSURANCE (GL, Van, etc) | 983.02 | 983.02 | 983.02 | 989.49 | 1017.41 | 2157.61 | 1587.51 | 1587.51 | 1587.51 | 1587.51 | 1587.51 | 1587.51 | 16638.63 |
| BASE MANAGEMENT FEES (3%) | 5971.2069 | 6813.9198 | 5663.3136 | 6183.8673 | 5331.1053 | 4583.4078 | 4817.2338 | 4215.1908 | 5897.0397 | 5569.764 | 6164.5767 | 6183.7878 | 67394.4135 |
| TOTAL OPERATING EXPENSES | 81734.5269 | 89329.3798 | 86494.3036 | 78530.7473 | 79045.1053 | 84859.2178 | 89588.4738 | 85103.7208 | 93336.5297 | 76657.124 | 81613.1567 | 90096.8278 | 1016389.11 |
| HOUSE PROFIT | 70608.0931 | 90501.4902 | 61854.4264 | 78396.9427 | 58394.5547 | 21321.1522 | 20078.2062 | 13677.6692 | 57419.2303 | 60846.946 | 78808.7033 | 65796.3422 | 677703.757 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 12018.93 | 12018.93 | 13397.31 | 12478.39 | 12478.39 | 6408.88 | 12083.81 | 12083.81 | 12008.68 | 12058.77 | 12058.79 | 12058.79 | 141153.46 |
| LESS: PROPERTY INSURANCE | 958.84 | 958.84 | 958.84 | 958.84 | 958.84 | 860.5 | 860.5 | 860.5 | 860.5 | 860.5 | 860.5 | 860.5 | 10817.7 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 57630.3231 | 77523.7202 | 47498.2764 | 64959.7127 | 44957.3247 | 14051.7722 | 7133.8962 | 733.3592 | 44550.0503 | 47927.676 | 65889.4333 | 52877.0522 | 525732.597 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -7961.6092 | -9085.2264 | -7551.0848 | -8245.1564 | -7108.1404 | -6111.2104 | -6422.9784 | -5620.2544 | -7862.7196 | -7426.352 | -8219.4356 | -8245.0504 | -89859.218 |
| | | | | | | | | | | | | | |
| Net Operating Income | 49668.7139 | 68438.4938 | 39947.1916 | 56714.5563 | 37849.1843 | 7940.5618 | 710.9178 | -4886.8952 | 36687.3307 | 40501.324 | 57669.9977 | 44632.0018 | 435873.379 |

INNKEEPERS P&L STATEMENT
Monthly Statement
ISLANDIA

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.80645161 | 0.80510753 | 0.65722222 | 0.61317204 | 0.53888889 | 0.58333333 | 0.39516129 | 0.44583333 | 0.68709677 | 0.71472222 | 0.74677419 | 0.77777778 | 0.64901826 |
| AVERAGE DAILY RATE | 107.53482 | 110.213907 | 114.638242 | 116.434375 | 101.293093 | 92.3472949 | 99.511034 | 103.303838 | 89.4634077 | 94.0837505 | 103.096739 | 116.150361 | 104.471746 |
| REVPAR | 86.721629 | 88.7340457 | 75.3428 | 71.3943038 | 54.5857222 | 53.8692554 | 39.3229086 | 46.0562946 | 61.4700188 | 67.2437472 | 76.9899839 | 90.3391694 | 67.804071 |
| ROOMS SOLD | 3000 | 2995 | 2366 | 2281 | 1940 | 2170 | 1470 | 1498 | 2556 | 2573 | 2778 | 2800 | 28427 |
| ROOMS AVAILABLE | 3720 | 3720 | 3600 | 3720 | 3600 | 3720 | 3720 | 3360 | 3720 | 3600 | 3720 | 3600 | 43800 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 322604.46 | 330090.65 | 271234.08 | 265586.81 | 196508.6 | 200393.63 | 146281.22 | 154749.15 | 228668.47 | 242077.49 | 286402.74 | 325221.01 | 2969818.31 |
| TELEPHONE REVENUE | 81.45 | 484.88 | 69.72 | 16.55 | 0 | 118.79 | 4.1 | 21.6 | 139.71 | 121.32 | 153.8 | 285.71 | 1497.63 |
| OTHER REVENUE | 3329.58 | 2567.09 | 3451.04 | 1856.15 | 1793.38 | 2402.42 | 2844.87 | 1991.17 | 3686.09 | 3180.94 | 6290.95 | 2467.4 | 35861.08 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 326015.49 | 333142.62 | 274754.84 | 267459.51 | 198301.98 | 202914.84 | 149130.19 | 156761.92 | 232494.27 | 245379.75 | 292847.49 | 327974.12 | 3007177.02 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 60504.03 | 71010.44 | 69998.78 | 63323.94 | 50421.11 | 55981.42 | 49111.86 | 42194.98 | 56177.33 | 68287.87 | 62962.44 | 66942.03 | 716916.23 |
| TELEPHONE EXPENSE | 1555.78 | 1566.78 | 1568.58 | 1550.82 | 2771.8 | 1531.75 | 2176.74 | 1569.85 | 1132.88 | 204.04 | 1604.79 | 2434.38 | 19668.19 |
| OTHER EXPENSE | 1278.28 | 1611.15 | 1331.3 | 1326.02 | 1043.11 | 1016.38 | 1007.76 | 930.48 | 928.34 | 1435.52 | 1177.99 | 1382.7 | 14469.03 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 63338.09 | 74188.37 | 72898.66 | 66200.78 | 54236.02 | 58529.55 | 52296.36 | 44695.31 | 58238.55 | 69927.43 | 65745.22 | 70759.11 | 751053.45 |
| GROSS OPERATING INCOME | 262677.4 | 258954.25 | 201856.18 | 201258.73 | 144065.96 | 144385.29 | 96833.83 | 112066.61 | 174255.72 | 175452.32 | 227102.27 | 257215.01 | 2256123.57 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 31274.34 | 26340.57 | 28184.94 | 26362.6 | 21823.14 | 32189.27 | 29574.31 | 27347.72 | 33501.52 | 28087.86 | 33109.98 | 32814.52 | 350610.77 |
| SALES & MARKETING | 30353.92 | 33365.19 | 28505.78 | 27008.79 | 21289.94 | 22036.61 | 18261.75 | 17946.86 | 24564.32 | 23595.21 | 29462.84 | 31951.3 | 308342.51 |
| REPAIRS & MAINTENANCE | 18311.23 | 15903.91 | 29215.93 | 13862.45 | 17501.3 | 19472.92 | 14742.6 | 17017.15 | 17498.08 | 18640.42 | 18616.05 | 19332.59 | 220114.63 |
| UTILITIES | 7851.81 | 17384.59 | 14600.7 | 16593.65 | -4817.59 | 37724.47 | 15094.67 | 18072.12 | 13892.82 | 16336.08 | 7654.73 | 18869.85 | 179257.9 |
| INSURANCE (GL, Van, etc) | 1323.93 | 1323.93 | 1323.93 | 1330.4 | 1240.21 | 2581.73 | 1910.97 | 1910.97 | 1910.97 | 1910.97 | 1910.97 | 1910.97 | 20589.95 |
| BASE MANAGEMENT FEES (3%) | 9780.4647 | 9994.2786 | 8242.6452 | 8023.7853 | 5949.0594 | 6087.4452 | 4473.9057 | 4702.8576 | 6974.8281 | 7361.3925 | 8785.4247 | 9839.2236 | 90215.3106 |
| TOTAL OPERATING EXPENSES | 98895.6947 | 104312.469 | 110073.925 | 93181.6753 | 62986.0594 | 120092.445 | 84058.2057 | 86997.6776 | 98342.5381 | 95931.9325 | 99539.9947 | 114718.454 | 1169131.07 |
| HOUSE PROFIT | 163781.705 | 154641.781 | 91782.2548 | 108077.055 | 81079.9006 | 24292.8448 | 12775.6243 | 25068.9324 | 75913.1819 | 79520.3875 | 127562.275 | 142496.556 | 1086992.5 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 18688.83 | 18688.83 | 18688.85 | 18958.81 | 18688.83 | 18831.57 | 18831.57 | 18831.57 | 18831.57 | 18831.57 | 18831.59 | 18831.55 | 225535.14 |
| LESS: PROPERTY INSURANCE | 1101.11 | 1101.11 | 1101.11 | 1101.11 | 1101.13 | 942.25 | 942.25 | 942.25 | 942.25 | 942.25 | 942.25 | 942.25 | 12101.32 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 143991.765 | 134851.841 | 71992.2948 | 88017.1347 | 61289.9406 | 4519.0248 | -6998.1957 | 5295.1124 | 56139.3619 | 59746.5675 | 107788.435 | 122722.756 | 849356.039 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -13040.6196 | -13325.7048 | -10990.1936 | -10698.3804 | -7932.0792 | -8116.5936 | -5965.2076 | -6270.4768 | -9299.7708 | -9815.19 | -11713.8996 | -13118.9648 | -120287.081 |
| | | | | | | | | | | | | | |
| Net Operating Income | 130951.146 | 121526.137 | 61002.1012 | 77318.7543 | 53357.8614 | -3597.5688 | -12963.4033 | -975.3644 | 46839.5911 | 49931.3775 | 96074.5357 | 109603.792 | 729068.959 |

INNKEEPERS P&L STATEMENT
Monthly Statement
NAPLES

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.37805246 | 0.33795598 | 0.38068536 | 0.36086825 | 0.56292835 | 0.50015074 | 0.57099789 | 0.78070761 | 0.77600241 | 0.68068536 | 0.58004221 | 0.45576324 | 0.52845986 |
| AVERAGE DAILY RATE | 66.9882057 | 62.1002409 | 64.7849345 | 71.0858647 | 75.3466685 | 84.3797227 | 115.885871 | 139.263425 | 142.748819 | 96.179524 | 70.2096933 | 70.6263841 | 94.7349436 |
| REVPAR | 25.3250558 | 20.987148 | 24.662676 | 25.6526319 | 42.4147757 | 42.2025806 | 66.1705879 | 108.724015 | 110.773428 | 65.4679938 | 40.7245855 | 32.1889097 | 50.0636154 |
| ROOMS SOLD | 1254 | 1121 | 1222 | 1197 | 1807 | 1659 | 1894 | 2339 | 2574 | 2185 | 1924 | 1463 | 20639 |
| ROOMS AVAILABLE | 3317 | 3317 | 3210 | 3317 | 3210 | 3317 | 3317 | 2996 | 3317 | 3210 | 3317 | 3210 | 39055 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 84003.21 | 69614.37 | 79167.19 | 85089.78 | 136151.43 | 139985.96 | 219487.84 | 325737.15 | 367435.46 | 210152.26 | 135083.45 | 103326.4 | 1955234.5 |
| TELEPHONE REVENUE | 585.11 | 45.59 | 235.31 | 68.14 | 192.76 | 587.99 | 51.17 | 197.64 | 442.46 | 451.9 | 8.21 | 1013.8 | 3880.08 |
| OTHER REVENUE | 2036.97 | 1220.53 | 1134.73 | 2546.63 | 3113.04 | 2084.86 | 3719.9 | 5497.09 | 4232.64 | 3888.53 | 2340.17 | 2959.23 | 34774.32 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 86625.29 | 70880.49 | 80537.23 | 87704.55 | 139457.23 | 142658.81 | 223258.91 | 331431.88 | 372110.56 | 214492.69 | 137431.83 | 107299.43 | 1993888.9 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 37932.87 | 34405.3 | 17940.75 | 20797.33 | 39547.62 | 44314.09 | 47237.32 | 56825.9 | 65665.67 | 53905.15 | 46634.82 | 45699.6 | 510906.42 |
| TELEPHONE EXPENSE | 1782.54 | 2502.01 | 3184.27 | 1683.52 | 1633.78 | 1772.42 | 1071.02 | 106.5 | 1096.52 | 563.42 | 2179.66 | 1747.09 | 19322.75 |
| OTHER EXPENSE | 1034.86 | 546.14 | 491.69 | 402.75 | 1102.06 | 1120.85 | 1039.12 | 1240.29 | 1703.87 | 1394.59 | 1534.54 | 1266.77 | 12877.53 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 40750.27 | 37453.45 | 21616.71 | 22883.6 | 42283.46 | 47207.36 | 49347.46 | 58172.69 | 68466.06 | 55863.16 | 50349.02 | 48713.46 | 543106.7 |
| GROSS OPERATING INCOME | 45875.02 | 33427.04 | 58920.52 | 64820.95 | 97173.77 | 95451.45 | 173911.45 | 273259.19 | 303644.5 | 158629.53 | 87082.81 | 58585.97 | 1450782.2 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 17788.94 | 17823.83 | 18082.7 | 18923.67 | 19081.13 | 22856.6 | 22744.7 | 24285.15 | 31638.31 | 24867.83 | 28263.53 | 37152.47 | 283508.86 |
| SALES & MARKETING | 7462.11 | 5326.05 | 6000.83 | 7274.45 | 10986.48 | 11261.96 | 17712.23 | 26333.17 | 29501.96 | 17378.95 | 10967.01 | 8416.31 | 158621.51 |
| REPAIRS & MAINTENANCE | 15574.65 | 17798.02 | 9710.47 | 10966.01 | 9690.81 | 13529.78 | 13148.95 | 14105.02 | 23686.61 | 21911.25 | 16173.66 | 13651.22 | 179946.45 |
| UTILITIES | 13728.64 | 11708.24 | 10558.85 | 9476.6 | 9282.51 | 9394.59 | 9546.73 | 10213.54 | 9441.37 | 9920.69 | 11297.79 | 10361.7 | 124931.25 |
| INSURANCE (GL, Van, etc) | 1091.85 | 1091.85 | 1091.85 | 1098.32 | 1132.38 | 2363.08 | 1747.73 | 1747.73 | 1747.73 | 1747.73 | 1747.73 | 1747.09 | 18355.71 |
| BASE MANAGEMENT FEES (3%) | 2598.7587 | 2126.4147 | 2416.1169 | 2631.1365 | 4183.7169 | 4279.7643 | 6697.7673 | 9942.9564 | 11163.3168 | 6434.7807 | 4122.9549 | 3218.9829 | 59816.667 |
| TOTAL OPERATING EXPENSES | 58244.9487 | 55874.4047 | 47860.8169 | 50370.1865 | 54357.0269 | 63685.7743 | 71598.1073 | 86627.5664 | 107179.297 | 82261.2307 | 72572.6749 | 74548.4129 | 825180.447 |
| HOUSE PROFIT | -12369.9287 | -22447.3647 | 11059.7031 | 14450.7635 | 42816.7431 | 31765.6757 | 102313.343 | 186631.624 | 196465.203 | 76368.2993 | 14510.1351 | -15962.4429 | 625601.753 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 6312.49 | 6312.49 | 6312.49 | 6365.37 | 4678.32 | 5103.08 | -2514.08 | 5103.08 | 5103.08 | 5103.08 | 5103.08 | 5103.08 | 58085.56 |
| LESS: PROPERTY INSURANCE | 807.49 | 807.49 | 807.49 | 807.49 | 807.53 | 748.58 | 748.58 | 748.58 | 748.58 | 748.58 | 748.58 | 748.58 | 9277.55 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | -19489.9087 | -29567.3447 | 3939.7231 | 7277.9035 | 37330.8931 | 25914.0157 | 104078.843 | 180779.964 | 190613.543 | 70516.6393 | 8658.4751 | -21814.1029 | 558238.643 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -3465.0116 | -2835.2196 | -3221.4892 | -3508.182 | -5578.2892 | -5706.3524 | -8930.3564 | -13257.2752 | -14884.4224 | -8579.7076 | -5497.2732 | -4291.9772 | -79755.556 |
| | | | | | | | | | | | | | |
| Net Operating Income | -22954.9203 | -32402.5643 | 718.2339 | 3769.7215 | 31752.6039 | 20207.6633 | 95148.4863 | 167522.688 | 175729.121 | 61936.9317 | 3161.2019 | -26106.0801 | 478483.087 |

INNKEEPERS P&L STATEMENT
Monthly Statement
WILLOW GROVE

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.63698925 | 0.75784946 | 0.68777778 | 0.69548387 | 0.64711111 | 0.52795699 | 0.48301075 | 0.55928571 | 0.69677419 | 0.80666667 | 0.73526882 | 0.79533333 | 0.66931507 |
| AVERAGE DAILY RATE | 106.692255 | 102.180014 | 98.686042 | 111.623135 | 106.529701 | 95.9419022 | 107.192418 | 110.913227 | 105.926651 | 100.130868 | 111.776862 | 110.425448 | 105.706746 |
| REVPAR | 67.9618194 | 77.4370688 | 67.8740667 | 77.6320903 | 68.9365533 | 50.6531978 | 51.7750903 | 62.0321833 | 73.806957 | 80.7722333 | 82.1860409 | 87.82504 | 70.7511182 |
| ROOMS SOLD | 2962 | 3524 | 3095 | 3234 | 2912 | 2455 | 2246 | 2349 | 3240 | 3630 | 3419 | 3579 | 36645 |
| ROOMS AVAILABLE | 4650 | 4650 | 4500 | 4650 | 4500 | 4650 | 4650 | 4200 | 4650 | 4500 | 4650 | 4500 | 54750 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 316022.46 | 360082.37 | 305433.3 | 360989.22 | 310214.49 | 235537.37 | 240754.17 | 260535.17 | 343202.35 | 363475.05 | 382165.09 | 395212.68 | 3873623.72 |
| TELEPHONE REVENUE | 84.37 | 0 | 71.74 | 133.04 | 156.64 | 111.59 | 80.26 | 161.7 | 124.54 | 951.87 | 196.88 | 247.48 | 2320.11 |
| OTHER REVENUE | 6524.95 | 6003.53 | 8915.24 | 8070.1 | 6480.84 | 7414.33 | 5692.92 | 6726.73 | 8830.43 | 5640.52 | 7637.06 | 11049.82 | 88986.47 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 322631.78 | 366085.9 | 314420.28 | 369192.36 | 316851.97 | 243063.29 | 246527.35 | 267423.6 | 352157.32 | 370067.44 | 389999.03 | 406509.98 | 3964930.3 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 69009.51 | 84167.18 | 81381.25 | 85180.85 | 71829.38 | 73615.44 | 63653.19 | 58622.11 | 70014.75 | 78959.82 | 82928.59 | 85150.44 | 904512.51 |
| TELEPHONE EXPENSE | 1596.31 | 1645.42 | 1559.89 | 1926.65 | 1639.64 | 1591.91 | 1702.39 | 1350.72 | 1062.79 | 886.42 | 2056.55 | 1520.06 | 18538.75 |
| OTHER EXPENSE | 1142.12 | 2025.34 | 1688.43 | 2148.9 | 1171.55 | 2064.91 | 1191.59 | 889.49 | 1335.68 | 1599.22 | 2675.76 | 4232.95 | 22165.94 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 71747.94 | 87837.94 | 84629.57 | 89256.4 | 74640.57 | 77272.26 | 66547.17 | 60862.32 | 72413.22 | 81445.46 | 87660.9 | 90903.45 | 945217.2 |
| GROSS OPERATING INCOME | 250883.84 | 278247.96 | 229790.71 | 279935.96 | 242211.4 | 165791.03 | 179980.18 | 206561.28 | 279744.1 | 288621.98 | 302338.13 | 315606.53 | 3019713.1 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 35694.34 | 30506.18 | 31433.9 | 32848.1 | 29316.61 | 29243.88 | 32732.14 | 27979.16 | 35373.28 | 29901.61 | 38618.52 | 34464.36 | 388112.08 |
| SALES & MARKETING | 32500.14 | 29251.33 | 30335.13 | 35737.36 | 31212.5 | 30692.37 | 21792.42 | 21381.99 | 28402.59 | 36503.82 | 37753.56 | 39068.04 | 374631.25 |
| REPAIRS & MAINTENANCE | 13001.41 | 16428.99 | 23656.98 | 24759.87 | 16496.18 | 20277.42 | 20371.86 | 16199.62 | 13790.64 | 19545.8 | 20786.7 | 19971.79 | 225287.26 |
| UTILITIES | 19329.74 | 16798.52 | 21355.09 | 5730.01 | 12097.9 | 17096.64 | 22831.68 | 20763.18 | 15687.77 | 12102.68 | 14465.12 | 19233.75 | 197492.08 |
| INSURANCE (GL, Van, etc) | 1445.27 | 1445.27 | 1445.27 | 1451.74 | 1488.93 | 3055.13 | 2272.03 | 2272.03 | 2272.03 | 2272.03 | 2272.03 | 2272.03 | 23963.79 |
| BASE MANAGEMENT FEES (3%) | 9678.9534 | 10982.577 | 9432.6084 | 11075.7708 | 9505.5591 | 7291.8987 | 7395.8205 | 8022.708 | 10564.7196 | 11102.0232 | 11699.9709 | 12195.2994 | 118947.909 |
| TOTAL OPERATING EXPENSES | 111649.853 | 105412.867 | 117658.978 | 111602.851 | 100117.679 | 107657.339 | 107395.951 | 96618.688 | 106091.03 | 111427.963 | 125595.901 | 127205.269 | 1328434.37 |
| HOUSE PROFIT | 139233.987 | 172835.093 | 112131.732 | 168333.109 | 142093.721 | 58133.6913 | 72584.2295 | 109942.592 | 173653.07 | 177194.017 | 176742.229 | 188401.261 | 1691278.73 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 18437.17 | 19496.58 | 19897.15 | 19276.96 | 19276.96 | 37882.12 | 19276.96 | 19276.96 | 19931.65 | 19495.19 | 19495.19 | 19495.19 | 251238.08 |
| LESS: PROPERTY INSURANCE | 1285.41 | 1285.41 | 1285.41 | 1285.41 | 1285.56 | 1121.91 | 1121.91 | 1121.91 | 1121.91 | 1121.91 | 1121.91 | 1121.91 | 14280.57 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 119511.407 | 152053.103 | 90949.1716 | 147770.739 | 121531.201 | 19129.6613 | 52185.3595 | 89543.722 | 152599.51 | 156576.917 | 156125.129 | 167784.161 | 1425760.08 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -12905.2712 | -14643.436 | -12576.8112 | -14767.6944 | -12674.0788 | -9722.5316 | -9861.094 | -10696.944 | -14086.2928 | -14802.6976 | -15599.9612 | -16260.3992 | -158597.212 |
| | | | | | | | | | | | | | |
| Net Operating Income | 106606.135 | 137409.667 | 78372.3604 | 133003.045 | 108857.122 | 9407.1297 | 42324.2655 | 78846.778 | 138513.218 | 141774.219 | 140525.168 | 151523.761 | 1267162.87 |

ISLAND HOSPITALITY
Stay Inn Lombard-TRS

| | MTD 7 2010 | MTD 8 2010 | MTD 9 2010 | MTD 10 2010 | MTD 11 2010 | MTD 12 2010 | MTD 1 2011 | MTD 2 2011 | MTD 3 2011 | MTD 4 2011 | MTD 5 2011 | MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Proforma | Proforma | Proforma | Proforma | Proforma | Proforma | Actual | Actual | Actual | Actual | Actual | Actual | |
| OCCUPANCY % | 0.297 | 0.34506 | 0.34128 | 0.34182 | 0.34614 | 0.31914 | 0.28566 | 0.19278 | 0.14541331 | 0.15206473 | 0.26234679 | 0.38359375 | 0.28483471 |
| AVERAGE DAILY RATE | 58.184 | 61.952 | 59.56 | 60.456 | 60.952 | 60.056 | 59.36 | 56.072 | 72.1739168 | 66.4685505 | 62.0746302 | 55.765336 | 60.3434326 |
| REVPAR | 17.280648 | 21.3771571 | 20.3266368 | 20.6650699 | 21.0979253 | 19.1662718 | 16.9567776 | 10.8095602 | 10.4950479 | 10.1075223 | 16.2852041 | 21.3912344 | 17.1879043 |
| ROOMS SOLD | 1178.496 | 1325.0304 | 1354.19904 | 1356.34176 | 1329.1776 | 1266.34752 | 1096.9344 | 764.95104 | 577 | 545 | 1041 | 1473 | 13307.4778 |
| ROOMS AVAILABLE | 3968 | 3840 | 3968 | 3968 | 3840 | 3968 | 3840 | 3968 | 3968 | 3584 | 3968 | 3840 | 46720 |
| REVENUES | | | | | | | | | | | | | 128 |
| ROOM REVENUE | 68569.6113 | 82088.2833 | 80656.0948 | 81998.9974 | 81016.0331 | 76051.7667 | 65114.026 | 42892.3347 | 41644.35 | 36225.36 | 64619.69 | 82142.34 | 803018.887 |
| TELEPHONE REVENUE | 90 | 100 | 100 | 100 | 100 | 100 | 90 | 80 | 50 | 122.13 | 274.49 | 174.62 | 1281.24 |
| OTHER REVENUE | 2370 | 2670 | 2730 | 2750 | 2700 | 2570 | 2200 | 1530 | 1898.12 | 1086.66 | 2656.61 | 1528.47 | 26689.86 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NET REVENUE | 71029.6113 | 84858.2833 | 83486.0948 | 84848.9974 | 83816.0331 | 78711.7667 | 67394.026 | 44472.3347 | 43542.47 | 37434.15 | 67550.79 | 83845.43 | 830989.987 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 25517.1854 | 24509.5564 | 25849.9348 | 26644.8886 | 25796.0339 | 26643.3016 | 25776.8136 | 21576.7344 | 37742.53 | 20536.57 | 29412.99 | 31194.86 | 321201.399 |
| TELEPHONE EXPENSE | 1380.075 | 1380.075 | 1380.075 | 1380.075 | 1380.075 | 1380.075 | 1380.075 | 1380.075 | -431.88 | 4878.37 | 2413.51 | 1889.51 | 19790.11 |
| OTHER EXPENSE | 490 | 560 | 570 | 570 | 560 | 540 | 460 | 320 | 403.85 | 187.65 | 309.43 | 313.59 | 5284.52 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPE | 27387.2604 | 26449.6314 | 27800.0098 | 28594.9636 | 27736.1089 | 28563.3766 | 27616.8886 | 23276.8094 | 37714.5 | 25602.59 | 32135.93 | 33397.96 | 346276.029 |
| GROSS OPERATING INCOME | 43642.3509 | 58408.652 | 55686.085 | 56254.0338 | 56079.9242 | 50148.3901 | 39777.1374 | 21195.5253 | 5827.97 | 11831.56 | 35414.86 | 50447.47 | 484713.959 |
| UNDISTRIBUTED OPERATING EXPEN | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 19714.8003 | 18999.3116 | 22380.5515 | 20007.3453 | 20623.4904 | 19996.9971 | 19996.8211 | 19278.4065 | 50523.65 | 17529.95 | 16639.34 | 17112.32 | 262802.964 |
| SALES & MARKETING | 5646.82867 | 5187.41396 | 5673.73381 | 5398.09207 | 5617.94843 | 5449.67204 | 5597.58791 | 5592.14598 | 9311.49 | 5477.9 | 7568.32 | 6750.94 | 73272.0729 |
| REPAIRS & MAINTENANCE | 13302.1475 | 12793.5906 | 13273.574 | 14057.9151 | 12019.3433 | 12100.9129 | 12045.1709 | 11686.9185 | 9713.75 | 10734.92 | 9927.67 | 10985.45 | 142641.363 |
| UTILITIES | 12863.7943 | 12614.8457 | 11639.5399 | 9751.16016 | 9525.86894 | 9607.34288 | 11403.7021 | 7563.15529 | 13242.3 | 9049.75 | 6556.49 | 8186.82 | 122004.769 |
| INSURANCE | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 18972.8333 |
| BASE MANAGEMENT FEES (Actual) | 2130.88834 | 2545.7485 | 2504.58284 | 2545.46992 | 2514.48099 | | 2361.353 | 2021.82078 | 1334.17004 | 1306.2741 | 1123.0245 | 2026.5237 | 24929.6996 |
| TOTAL OPERATING EXPENSES | 54967.3082 | 53449.7596 | 56780.8313 | 53068.8317 | 51609.9812 | 50825.1071 | 52373.952 | 46763.6455 | 86222.9741 | 46041.0545 | 44843.8537 | 47676.4029 | 644623.702 |
| HOUSE PROFIT | -11324.957 | 4958.89241 | -1094.7463 | 3185.20212 | 4469.94292 | -676.71702 | -12596.815 | -25568.12 | -80395.004 | -34209.495 | -9428.9937 | 2771.0671 | -159909.74 |
| HOUSE PROFIT % | -0.1594399 | 0.05843734 | -0.0131129 | 0.03753966 | 0.0533304 | -0.0085974 | -0.1869129 | -0.5749219 | -1.8463584 | -0.9138579 | -0.1395838 | 0.03304971 | -0.1924328 |
| Less: Property Taxes | 9637.32 | 9637.32 | 9637.32 | 9637.32 | 9637.32 | 4583.33 | -38488.49 | 4583.33 | 4583.33 | 4583.33 | 4583.33 | 4583.33 | 37198.09 |
| Less: Property Insurance | 936.71 | 936.71 | 936.71 | 936.71 | 936.71 | 936.71 | 936.81 | 901.76 | 901.76 | 901.76 | 901.76 | 901.76 | 11065.87 |
| Less: Ground Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | -21898.987 | -5615.1376 | -11668.776 | -7388.8279 | -6104.0871 | -6196.757 | 24954.8654 | -31053.21 | -85880.094 | -39694.585 | -14914.084 | -2714.0229 | -208173.7 |

ISLAND HOSPITALITY
Stay Inn Schaumburg

| | MTD 7 2010 | MTD 8 2010 | MTD 9 2010 | MTD 10 2011 | MTD 11 2011 | MTD 12 2011 | MTD 1 2011 | MTD 2 2011 | MTD 3 2011 | MTD 4 2011 | MTD 5 2011 | MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 31 | 31 | 30 | 31 | 30 | 31 | 31 | 28 | 31 | 30 | 31 | 30 | |
| | Proforma | Proforma | Proforma | Proforma | Proforma | Proforma | Proforma | Proforma | Actual | Actual | Actual | Actual | |
| OCCUPANCY % | 0.41094 | 0.38556 | 0.35694 | 0.34398 | 0.30186 | 0.21816 | 0.124 | 0.106 | 0.12424395 | 0.10602679 | 0.25806452 | 0.5359375 | 0.27435889 |
| AVERAGE DAILY RATE | 60.944 | 64.088 | 64.184 | 61.912 | 63.28 | 59.696 | 67.72 | 63.53 | 67.7186004 | 63.5323684 | 43.3818262 | 41.7972983 | 58.0769892 |
| REVPAR | 25.0443274 | 24.7097693 | 22.909837 | 21.2964898 | 19.1017008 | 13.0232794 | 8.39728 | 6.73418 | 8.41362651 | 6.73613281 | 11.19531 | 22.4007396 | 15.9339384 |
| ROOMS SOLD | 1630.60992 | 1529.90208 | 1370.6496 | 1364.91264 | 1159.1424 | 865.65888 | 492.032 | 379.904 | 493 | 380 | 1024 | 2058 | 12747.8115 |
| ROOMS AVAILABLE | 3968 | 3968 | 3840 | 3968 | 3840 | 3968 | 3968 | 3584 | 3968 | 3840 | 3968 | 3840 | 46720 |
| REVENUES | | | | | | | | | | | | | 128 |
| ROOM REVENUE | 99375.891 | 98048.3645 | 87973.7739 | 84504.4714 | 73350.5311 | 51676.3725 | 33320.407 | 24135.3011 | 33385.27 | 24142.3 | 44422.99 | 86018.84 | 740354.512 |
| TELEPHONE REVENUE | 240 | 220 | 200 | 200 | 170 | 120 | 70 | 50 | 22.52 | 17.05 | 271.48 | 213.01 | 1794.06 |
| OTHER REVENUE | 2320 | 2180 | 1960 | 1950 | 1640 | 1210 | 660 | 520 | 1228.38 | 1543.28 | 2082.96 | 1437.65 | 18732.27 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NET REVENUE | 101935.891 | 100448.365 | 90133.7739 | 86654.4714 | 75160.5311 | 53006.3725 | 34050.407 | 24705.3011 | 34636.17 | 25702.63 | 46777.43 | 87669.5 | 760880.842 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 33543.8673 | 30429.7636 | 30339.5904 | 31639.3492 | 28740.5006 | 25613.3721 | 23766.2469 | 20693.3819 | 35266.6 | 18992.02 | 25734.36 | 33184.72 | 337943.772 |
| TELEPHONE EXPENSE | 1409.09 | 1409.09 | 1409.09 | 1409.09 | 1409.09 | 1409.09 | 1409.09 | 1409.09 | -606.49 | 5140.83 | 1786.31 | 1833.64 | 19427.01 |
| OTHER EXPENSE | 710 | 670 | 600 | 600 | 500 | 370 | 200 | 150 | 636.6 | -466.54 | 553.48 | 373.7 | 4897.24 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPE | 35662.9573 | 32508.8536 | 32348.6804 | 33648.4392 | 30649.5906 | 27392.4621 | 25375.3369 | 22252.4719 | 35296.71 | 23666.31 | 28074.15 | 35392.06 | 362268.022 |
| GROSS OPERATING INCOME | 66272.9337 | 67939.5109 | 57785.0936 | 53006.0322 | 44510.9405 | 25613.9104 | 8675.07018 | 2452.82924 | -660.54 | 2036.32 | 18703.28 | 52277.44 | 398612.821 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPEN | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 20033.2045 | 18824.4917 | 21827.9691 | 19974.41 | 20746.8314 | 19140.3255 | 18581.154 | 18719.3134 | 24577.11 | 26535.44 | 22253.63 | 14683.04 | 245896.92 |
| SALES & MARKETING | 6246.94119 | 5757.57617 | 6273.84634 | 6284.32224 | 6438.24937 | 6259.98954 | 6417.88885 | 6412.44692 | 3980.35 | 2058.04 | 6479.37 | 8414.83 | 71023.8506 |
| REPAIRS & MAINTENANCE | 12656.7595 | 12085.4886 | 12544.2819 | 11026.4286 | 12266.0318 | 12402.5035 | 12195.3237 | 12072.8403 | 10350.7 | 11683.09 | 12303.96 | 11702.75 | 143290.158 |
| UTILITIES | 12590.1206 | 11878.1108 | 9959.51168 | 7470.41038 | 6645.84301 | 7143.72809 | 7775.66697 | 7883.93758 | 13893.08 | 11625.08 | 5564.52 | 5630 | 108060.009 |
| INSURANCE | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 1308.84917 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 18972.8333 |
| BASE MANAGEMENT FEES (3%) | 3058.07673 | 3013.45094 | 2704.01322 | 2599.63414 | 2254.81593 | 1590.19118 | 1021.51221 | 741.159034 | 1039.0851 | 771.0789 | 1403.3229 | 2630.085 | 22826.4253 |
| TOTAL OPERATING EXPENSES | 55893.9518 | 52867.9674 | 54618.4713 | 48664.0545 | 49660.6207 | 47845.587 | 47300.3949 | 47138.5464 | 55617.74 | 54538.98 | 49666.5 | 44309.15 | 608121.964 |
| HOUSE PROFIT | 10378.9819 | 15071.5435 | 3166.62221 | 4341.97768 | -5149.6802 | -22231.677 | -38625.325 | -44685.717 | -56278.28 | -52502.66 | -30963.22 | 7968.29 | -209509.14 |
| HOUSE PROFIT % | 0.10181872 | 0.1500427 | 0.03513247 | 0.05010679 | -0.0685158 | -0.4194152 | -1.1343572 | -1.8087502 | -1.6248413 | -2.042696 | -0.6619265 | 0.0908901 | -0.2753508 |
| Less: Property Taxes | 18721.32 | 25500 | 25500 | 25500 | 29350 | 25659 | -21830.74 | 25500 | -8126.66 | 27913.33 | 22913.33 | 22913.33 | 219512.91 |
| Less: Property Insurance | 939.66 | 939.66 | 939.66 | 939.66 | 939.66 | 939.66 | 939.67 | 891.57 | 891.57 | 891.57 | 891.57 | 891.57 | 11035.48 |
| Less: Ground Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | -9281.9981 | -11368.117 | -23273.038 | -22097.682 | -35439.34 | -48830.337 | -17734.255 | -71077.287 | -49043.19 | -81307.56 | -54768.12 | -15836.61 | -440057.53 |

INNKEEPERS P&L STATEMENT
Monthly Statement
GERMANTOWN

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.63066328 | 0.51902863 | 0.46629213 | 0.6756071 | 0.59101124 | 0.38093512 | 0.43276549 | 0.4494382 | 0.46321131 | 0.55468165 | 0.66237767 | 0.69681648 | 0.54397414 |
| AVERAGE DAILY RATE | 99.4519282 | 96.2213338 | 101.493189 | 99.9090638 | 101.77506 | 94.9502188 | 94.6544221 | 102.185647 | 106.885509 | 101.6355 | 100.644244 | 110.57197 | 101.185683 |
| REVPAR | 62.7206796 | 49.9416274 | 47.3254757 | 67.4992733 | 60.1502041 | 36.1698731 | 40.9631678 | 45.9261336 | 49.5105763 | 56.3753464 | 66.6644998 | 77.0483708 | 55.0423953 |
| ROOMS SOLD | 3480 | 2864 | 2490 | 3728 | 3156 | 2102 | 2388 | 2240 | 2556 | 2962 | 3655 | 3721 | 35342 |
| ROOMS AVAILABLE | 5518 | 5518 | 5340 | 5518 | 5340 | 5518 | 5518 | 4984 | 5518 | 5340 | 5518 | 5340 | 64970 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 346092.71 | 275577.9 | 252718.04 | 372460.99 | 321202.09 | 199585.36 | 226034.76 | 228895.85 | 273199.36 | 301044.35 | 367854.71 | 411438.3 | 3576104.42 |
| TELEPHONE REVENUE | 584.23 | 740.06 | 222.93 | 1515.49 | 299.26 | 424.19 | 80.67 | 345.73 | 164.15 | 393.09 | 144.24 | 253.82 | 5167.86 |
| OTHER REVENUE | 1588.14 | 12579.9 | 5728.37 | 8378.61 | 7990.5 | 6020.1 | 9739.86 | 4716.99 | 10431.82 | 9148.61 | 7617.82 | 2623.67 | 86564.39 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 348265.08 | 288897.86 | 258669.34 | 382355.09 | 329491.85 | 206029.65 | 235855.29 | 233958.57 | 283795.33 | 310586.05 | 375616.77 | 414315.79 | 3667836.67 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 74288.43 | 66448.38 | 80842.74 | 74762.72 | 76061.56 | 72264.88 | 60209.06 | 63468.76 | 74347.58 | 80137.5 | 81848.29 | 82043.02 | 886722.92 |
| TELEPHONE EXPENSE | 3503.08 | 1351.46 | 2557.03 | 2359.54 | 2743.89 | 2581.53 | 2447.09 | 2617.09 | 1833.25 | 1903.98 | 4244.86 | 3080.23 | 31223.03 |
| OTHER EXPENSE | 1959.57 | 936.05 | 2280.84 | 2096.72 | 3335.85 | 2138.9 | 2563.45 | 1070.48 | 2362.18 | 1387.46 | 2196.03 | 1208.25 | 23535.78 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 79751.08 | 68735.89 | 85680.61 | 79218.98 | 82141.3 | 76985.31 | 65219.6 | 67156.33 | 78543.01 | 83428.94 | 88289.18 | 86331.5 | 941481.73 |
| GROSS OPERATING INCOME | 268514 | 220161.97 | 172988.73 | 303136.11 | 247350.55 | 129044.34 | 170635.69 | 166802.24 | 205252.32 | 227157.11 | 287327.59 | 327984.29 | 2726354.94 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 40119.27 | 35335.91 | 34808.73 | 39140.85 | 33791.31 | 32498.33 | 31021.79 | 28491.45 | 30209.93 | 29540.31 | 32620.29 | 25214.82 | 392792.99 |
| SALES & MARKETING | 35532.98 | 29844.15 | 28407.64 | 35880.46 | 28521.98 | 20965.88 | 27210.59 | 26428.42 | 30774.33 | 35271.51 | 37808.54 | 40416.94 | 377063.42 |
| REPAIRS & MAINTENANCE | 24179.58 | 27379.65 | 19009.82 | 22499.3 | 28765.21 | 106053.31 | 29295.66 | 20634.85 | 22767.65 | 26561.37 | 19261.36 | 23449.48 | 369857.44 |
| UTILITIES | 25884.95 | 26549.46 | 24148.05 | 21245.45 | 25081.89 | 20192.58 | 33526.63 | 30232.45 | 22490.9 | 26603.76 | 25728.01 | 26197.64 | 307881.77 |
| INSURANCE (GL, Van, etc) | 1802.93 | 1802.93 | 1802.93 | 1809.4 | 1856.49 | 3639.53 | 2748.01 | 2748.01 | 2748.01 | 2748.01 | 2748.01 | 2748.01 | 29202.27 |
| BASE MANAGEMENT FEES (3%) | 10447.9524 | 8666.9358 | 7760.0802 | 11470.6527 | 9884.7555 | 6180.8895 | 7075.6587 | 7018.7571 | 8513.8599 | 9317.5815 | 11268.5031 | 12429.4737 | 110035.1 |
| TOTAL OPERATING EXPENSES | 137967.662 | 129579.036 | 115937.25 | 132046.113 | 127901.636 | 189530.52 | 130878.339 | 115553.937 | 117504.68 | 130042.542 | 129434.913 | 130456.364 | 1586832.99 |
| HOUSE PROFIT | 130546.338 | 90582.9342 | 57051.4798 | 171089.997 | 119448.915 | -60486.1795 | 39757.3513 | 51248.3029 | 87747.6401 | 97114.5685 | 157892.677 | 197527.926 | 1139521.95 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 13942.97 | 13942.97 | 21072.31 | 16319.42 | 16319.42 | 16319.42 | 16319.42 | 16319.42 | 16619.42 | 16319.42 | 16319.42 | 17757.9 | 197571.51 |
| LESS: PROPERTY INSURANCE | 1264.73 | 1264.73 | 1264.73 | 1264.73 | 1264.77 | 1250.66 | 1250.66 | 1250.66 | 1250.66 | 1250.66 | 1250.66 | 1250.66 | 15078.31 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 115338.638 | 75375.2342 | 34714.4398 | 153505.847 | 101864.725 | -78056.2595 | 22187.2713 | 33678.2229 | 69877.5601 | 79544.4885 | 140322.597 | 178519.366 | 926872.13 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -13930.6032 | -11555.9144 | -10346.7736 | -15294.2036 | -13179.674 | -8241.186 | -9434.2116 | -9358.3428 | -11351.8132 | -12423.442 | -15024.6708 | -16572.6316 | -146713.467 |
| | | | | | | | | | | | | | |
| Net Operating Income | 101408.034 | 63819.3198 | 24367.6662 | 138211.644 | 88685.0505 | -86297.4455 | 12753.0597 | 24319.8801 | 58525.7469 | 67121.0465 | 125297.926 | 161946.735 | 780158.663 |

INNKEEPERS P&L STATEMENT
Monthly Statement
WESTCHESTER

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.74510369 | 0.75201613 | 0.76964286 | 0.72955069 | 0.68690476 | 0.47148618 | 0.40495392 | 0.4630102 | 0.61146313 | 0.74285714 | 0.81221198 | 0.84345238 | 0.67008317 |
| AVERAGE DAILY RATE | 84.8406069 | 88.2082152 | 90.1494509 | 92.6972246 | 92.4599177 | 87.1965425 | 95.642404 | 96.4779063 | 93.2662553 | 90.5640345 | 93.3028262 | 94.3976147 | 91.3776921 |
| REVPAR | 63.215049 | 66.3340006 | 69.382881 | 67.6273243 | 63.5111577 | 41.1119643 | 38.7307661 | 44.6702551 | 57.0288767 | 67.2761399 | 75.7816734 | 79.6198929 | 61.2306536 |
| ROOMS SOLD | 2587 | 2611 | 2586 | 2533 | 2308 | 1637 | 1406 | 1452 | 2123 | 2496 | 2820 | 2834 | 27393 |
| ROOMS AVAILABLE | 3472 | 3472 | 3360 | 3472 | 3360 | 3472 | 3472 | 3136 | 3472 | 3360 | 3472 | 3360 | 40880 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 219482.65 | 230311.65 | 233126.48 | 234802.07 | 213397.49 | 142740.74 | 134473.22 | 140085.92 | 198004.26 | 226047.83 | 263113.97 | 267522.84 | 2503109.12 |
| TELEPHONE REVENUE | 190.18 | 0.06 | 405.66 | 482.09 | 138.55 | 191.25 | 36.05 | 77.3 | 231.34 | 672.48 | 65.56 | 152.73 | 2643.25 |
| OTHER REVENUE | 5777.15 | 3591.62 | 4163.13 | 2896.47 | 1623.87 | 3006.77 | 2402.59 | 2845.37 | 3118.07 | 4599.47 | 2944.46 | 4913.84 | 41882.81 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 225449.98 | 233903.33 | 237695.27 | 238180.63 | 215159.91 | 145938.76 | 136911.86 | 143008.59 | 201353.67 | 231319.78 | 266123.99 | 272589.41 | 2547635.18 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 54980.4 | 53575.46 | 58561.44 | 53871.53 | 50671.11 | 48766.22 | 39518.79 | 39207.45 | 44782.21 | 52168.03 | 53350.63 | 68022.28 | 617475.55 |
| TELEPHONE EXPENSE | 1481.2 | 1604.22 | 1367.89 | 1557.37 | 1491.92 | 1489.35 | 1610.17 | 1503.61 | 1495.73 | 1369.9 | 2787.92 | 1537.96 | 19297.24 |
| OTHER EXPENSE | 890.17 | 1537.91 | 1224.52 | 1098.52 | 749.09 | 914.73 | 642.88 | 655.89 | 493.29 | 558.47 | 886.61 | 1206.72 | 10858.8 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 57351.77 | 56717.59 | 61153.85 | 56527.42 | 52912.12 | 51170.3 | 41771.84 | 41366.95 | 46771.23 | 54096.4 | 57025.16 | 70766.96 | 647631.59 |
| GROSS OPERATING INCOME | 168098.21 | 177185.74 | 176541.42 | 181653.21 | 162247.79 | 94768.46 | 95140.02 | 101641.64 | 154582.44 | 177223.38 | 209098.83 | 201822.45 | 1900003.59 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 22866.97 | 26243.25 | 25482.51 | 24425.83 | 22623.74 | 21788.25 | 25938.25 | 20833.58 | 26945.62 | 20523.51 | 26034.79 | 23285.79 | 286992.09 |
| SALES & MARKETING | 17765.65 | 24821.1 | 22298.15 | 22566.88 | 21839.11 | 17216.42 | 18686.94 | 15238.79 | 23423.74 | 23102.01 | 26192.7 | 26903.87 | 260055.36 |
| REPAIRS & MAINTENANCE | 16898.34 | 13884.35 | 13534.18 | 11791.32 | 16537.43 | 14978.13 | 10681.29 | 14215.99 | 11779.27 | 13343.1 | 10404.64 | 11214.93 | 159262.97 |
| UTILITIES | 7351.92 | 8356.33 | 7699.77 | 10626.58 | 7384.4 | 11336.62 | 10170.6 | 8367.51 | 8749.43 | 6909.33 | 6382.44 | 7256.22 | 100591.15 |
| INSURANCE (GL, Van, etc) | 1248.35 | 1248.35 | 1248.35 | 1254.82 | 1290.41 | 2562.11 | 1926.26 | 1926.26 | 1926.26 | 1926.26 | 1926.26 | 1926.26 | 20409.95 |
| BASE MANAGEMENT FEES (3%) | 6763.4994 | 7017.0999 | 7130.8581 | 7145.4189 | 6454.7973 | 4378.1628 | 4107.3558 | 4290.2577 | 6040.6101 | 6939.5934 | 7983.7197 | 8177.6823 | 76429.0554 |
| TOTAL OPERATING EXPENSES | 72894.7294 | 81570.4799 | 77393.8181 | 77810.8489 | 76129.8873 | 72259.6928 | 71510.6958 | 64872.3877 | 78864.9301 | 72743.8034 | 78924.5497 | 78764.7523 | 903740.575 |
| HOUSE PROFIT | 95203.4806 | 95615.2601 | 99147.6019 | 103842.361 | 86117.9027 | 22508.7672 | 23629.3242 | 36769.2523 | 75717.5099 | 104479.577 | 130174.28 | 123057.698 | 996263.015 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 24250 | 24250 | 24250 | 24409 | -40456.3 | 24250 | -20302.77 | 20822.86 | 20822.86 | 20822.86 | 20822.86 | 20822.86 | 164764.23 |
| LESS: PROPERTY INSURANCE | 867.07 | 867.07 | 867.07 | 867.07 | 867.11 | 810.5 | 810.5 | 810.5 | 810.5 | 810.5 | 810.5 | 810.5 | 10008.89 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 70086.4106 | 70498.1901 | 74030.5319 | 78566.2911 | 125707.093 | -2551.7328 | 43121.5942 | 15135.8923 | 54084.1499 | 82846.2166 | 108540.92 | 101424.338 | 821489.895 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -9017.9992 | -9356.1332 | -9507.8108 | -9527.2252 | -8606.3964 | -5837.5504 | -5476.4744 | -5720.3436 | -8054.1468 | -9252.7912 | -10644.9596 | -10903.5764 | -101905.407 |
| | | | | | | | | | | | | | |
| Net Operating Income | 61068.4114 | 61142.0569 | 64522.7211 | 69039.0659 | 117100.696 | -8389.2832 | 37645.1198 | 9415.5487 | 46030.0031 | 73593.4254 | 97895.9607 | 90520.7613 | 719584.487 |

INNKEEPERS P&L STATEMENT
Monthly Statement
COLUMBIA

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.76253401 | 0.80645161 | 0.72329317 | 0.73260785 | 0.71124498 | 0.56237855 | 0.58025651 | 0.63209983 | 0.72289157 | 0.7373494 | 0.79712398 | 0.82128514 | 0.71612477 |
| AVERAGE DAILY RATE | 110.900459 | 113.947971 | 118.663232 | 114.61079 | 115.664308 | 105.830173 | 116.831842 | 107.281042 | 118.5945 | 108.11622 | 113.45196 | 120.636929 | 113.955554 |
| REVPAR | 84.5653712 | 91.8935251 | 85.8283052 | 83.9647649 | 82.2656586 | 59.5166187 | 67.7924368 | 67.8123279 | 85.7309639 | 79.7194297 | 90.4352779 | 99.0773173 | 81.6063951 |
| ROOMS SOLD | 1962 | 2075 | 1801 | 1885 | 1771 | 1447 | 1493 | 1469 | 1860 | 1836 | 2051 | 2045 | 21695 |
| ROOMS AVAILABLE | 2573 | 2573 | 2490 | 2573 | 2490 | 2573 | 2573 | 2324 | 2573 | 2490 | 2573 | 2490 | 30295 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 217586.7 | 236442.04 | 213712.48 | 216041.34 | 204841.49 | 153136.26 | 174429.94 | 157595.85 | 220585.77 | 198501.38 | 232689.97 | 246702.52 | 2472265.74 |
| TELEPHONE REVENUE | 41.16 | 25.95 | 103.63 | 37.7 | 42.56 | 38.95 | 66.43 | 61.75 | 177 | 49.07 | 47.75 | 77.72 | 769.67 |
| OTHER REVENUE | 1919.15 | 547.28 | 1829.76 | 1273.8 | 881.33 | 352.93 | 919.73 | 394.12 | 1197.44 | 636.13 | 1581.95 | 1243.36 | 12776.98 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 219547.01 | 237015.27 | 215645.87 | 217352.84 | 205765.38 | 153528.14 | 175416.1 | 158051.72 | 221960.21 | 199186.58 | 234319.67 | 248023.6 | 2485812.39 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 52350.79 | 53744.69 | 54410.44 | 54146.99 | 53727.2 | 46868.21 | 43859.07 | 44704.86 | 49185.94 | 55275.85 | 54477.8 | 57378.19 | 620130.03 |
| TELEPHONE EXPENSE | 1291.17 | 1247.69 | 1158.08 | 1306.76 | 1902 | 1273.71 | 1279.37 | 1285.35 | 1293.17 | 1524.18 | 656.52 | 1284.76 | 15502.76 |
| OTHER EXPENSE | 200 | 319.05 | 600 | -600 | 917.45 | 140 | 126.02 | 180 | 193.55 | 400 | 260.78 | 390.47 | 3127.32 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 53841.96 | 55311.43 | 56168.52 | 54853.75 | 56546.65 | 48281.92 | 45264.46 | 46170.21 | 50672.66 | 57200.03 | 55395.1 | 59053.42 | 638760.11 |
| GROSS OPERATING INCOME | 165705.05 | 181703.84 | 159477.35 | 162499.09 | 149218.73 | 105246.22 | 130151.64 | 111881.51 | 171287.55 | 141986.55 | 178924.57 | 188970.18 | 1847052.28 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 21167.59 | 19682.95 | 25996.48 | 19069.52 | 18182.42 | 23703.29 | 18954.8 | 17793.76 | 23085.81 | 21343.26 | 21020.23 | 21101.83 | 251101.94 |
| SALES & MARKETING | 20967.63 | 22097.03 | 22649.71 | 20630.24 | 20064.84 | 17067.99 | 18769.7 | 16285.87 | 24648.88 | 20590.05 | 25606.8 | 24847.7 | 254226.44 |
| REPAIRS & MAINTENANCE | 14642.77 | 9858.7 | 9969.59 | 11242.64 | 9821.77 | 10947.29 | 14666.7 | 12749.72 | 16552.04 | 13094.36 | 11109.57 | 19433.39 | 154088.54 |
| UTILITIES | 11767.8 | 12502.33 | 11279.03 | -4306.55 | 7280.46 | 10007.01 | 12752.89 | 10869.18 | 10064.41 | 8662.16 | 7906.1 | 9066.29 | 107851.11 |
| INSURANCE (GL, Van, etc) | 882.18 | 882.18 | 882.18 | 888.65 | 914.18 | 1961.38 | 1437.78 | 1437.78 | 1437.78 | 1437.78 | 1437.78 | 1437.78 | 15037.43 |
| BASE MANAGEMENT FEES (3%) | 6586.4103 | 7110.4581 | 6469.3761 | 6520.5852 | 6172.9614 | 4605.8442 | 5262.483 | 4741.5516 | 6658.8063 | 5975.5974 | 7029.5901 | 7440.708 | 74574.3717 |
| TOTAL OPERATING EXPENSES | 76014.3803 | 72133.6481 | 77246.3661 | 54045.0852 | 62436.6314 | 68292.8042 | 71844.353 | 63877.8616 | 82447.7263 | 71103.2074 | 74110.0701 | 83327.698 | 856879.832 |
| HOUSE PROFIT | 89690.6697 | 109570.192 | 82230.9839 | 108454.005 | 86782.0986 | 36953.4158 | 58307.287 | 48003.6484 | 88839.8237 | 70883.3426 | 104814.5 | 105642.482 | 990172.448 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 11246.86 | 11246.86 | -3950.06 | 9558.32 | 9558.32 | 9648.6 | 9558.32 | 9558.32 | 9858.32 | 9558.32 | 9558.32 | 9734.64 | 105135.14 |
| LESS: PROPERTY INSURANCE | 773.54 | 773.54 | 773.54 | 773.54 | 773.61 | 792.59 | 792.59 | 792.59 | 792.59 | 792.59 | 792.59 | 792.59 | 9415.9 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 77670.2697 | 97549.7919 | 85407.5039 | 98122.1448 | 76450.1686 | 26512.2258 | 47956.377 | 37652.7384 | 78188.9137 | 60532.4326 | 94463.5899 | 95115.252 | 875621.408 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -8781.8804 | -9480.6108 | -8625.8348 | -8694.1136 | -8230.6152 | -6141.1256 | -7016.644 | -6322.0688 | -8878.4084 | -7967.4632 | -9372.7868 | -9920.944 | -99432.4956 |
| | | | | | | | | | | | | | |
| Net Operating Income | 68888.3893 | 88069.1811 | 76781.6691 | 89428.0312 | 68219.5534 | 20371.1002 | 40939.733 | 31330.6696 | 69310.5053 | 52564.9694 | 85090.8031 | 85194.308 | 776188.913 |

INNKEEPERS P&L STATEMENT
Monthly Statement
BELMONT

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.96041056 | 0.96676442 | 0.93737374 | 0.96041056 | 0.91717172 | 0.84457478 | 0.80376344 | 0.87094156 | 0.91446725 | 0.87121212 | 0.91471163 | 0.95959596 | 0.91031548 |
| AVERAGE DAILY RATE | 129.773733 | 132.495071 | 133.965795 | 135.507372 | 130.308783 | 129.916568 | 137.144074 | 141.545884 | 140.350094 | 143.444029 | 139.692258 | 142.689479 | 136.303212 |
| REVPAR | 124.636063 | 128.09152 | 125.576018 | 130.14271 | 119.51553 | 109.724257 | 110.231393 | 123.278193 | 128.345565 | 124.970177 | 127.778133 | 136.924247 | 124.078924 |
| ROOMS SOLD | 3930 | 3956 | 3712 | 3930 | 3632 | 3456 | 3289 | 3219 | 3742 | 3450 | 3743 | 3800 | 43859 |
| ROOMS AVAILABLE | 4092 | 4092 | 3960 | 4092 | 3960 | 4092 | 4092 | 3696 | 4092 | 3960 | 4092 | 3960 | 48180 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 510010.77 | 524150.5 | 497281.03 | 532543.97 | 473281.5 | 448991.66 | 451066.86 | 455636.2 | 525190.05 | 494881.9 | 522868.12 | 542220.02 | 5978122.58 |
| TELEPHONE REVENUE | 1531.22 | 3933.52 | 3783.11 | 3962.16 | 4430.36 | 3730.29 | 2976.03 | 2463.75 | 2324.63 | 3088.12 | 3599.1 | 3437.47 | 39259.76 |
| OTHER REVENUE | 7037.09 | 8219.7 | 10927.33 | 14764.04 | 11362.15 | 9798.53 | 11618.82 | 5674.78 | 8877.47 | 10777.96 | 5255.92 | 9543.43 | 113857.22 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 518579.08 | 536303.72 | 511991.47 | 551270.17 | 489074.01 | 462520.48 | 465661.71 | 463774.73 | 536392.16 | 508747.98 | 531723.14 | 555200.92 | 6131239.56 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 100012.8 | 117391.76 | 109000.09 | 104436.09 | 86749.15 | 88699.12 | 114042.88 | 92061.65 | 90461.5 | 107080.13 | 81385.67 | 97727.4 | 1189048.24 |
| TELEPHONE EXPENSE | 3439.79 | 3420.77 | 3163.93 | 3277.06 | 3205.21 | 1233.48 | 3158.99 | 2707.22 | 6414.32 | 4457.91 | 4440.61 | 4469.21 | 43388.5 |
| OTHER EXPENSE | 3662.69 | 5210.04 | 6055.04 | 8915.75 | 3191.64 | 5533.46 | 4307.29 | 4951.69 | 4747.4 | 9302.02 | 7000.69 | 5340.92 | 68218.63 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 107115.28 | 126022.57 | 118219.06 | 116628.9 | 93146 | 95466.06 | 121509.16 | 99720.56 | 101623.22 | 120840.06 | 92826.97 | 107537.53 | 1300655.37 |
| GROSS OPERATING INCOME | 411463.8 | 410281.15 | 393772.41 | 434641.27 | 395928.01 | 367054.42 | 344152.55 | 364054.17 | 434768.93 | 387907.92 | 438896.17 | 447663.39 | 4830584.19 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 46524.24 | 35778.14 | 36004.91 | 42149.69 | 39836.3 | 37247.14 | 37845.39 | 31898.77 | 39284.22 | 37443.45 | 36577.88 | 36049.12 | 456639.25 |
| SALES & MARKETING | 31655.31 | 29106.28 | 33594.27 | 28272.17 | 28171.72 | 27230.63 | 37466.95 | 33477.64 | 43877.35 | 36728.26 | 42005.49 | 42273.52 | 413859.59 |
| REPAIRS & MAINTENANCE | 17261.41 | 18859.63 | 20733.43 | 19545.81 | 19691.87 | 18444.88 | 17630.31 | 26359.19 | 21271.46 | 21793.5 | 18463.52 | 21035.64 | 241090.65 |
| UTILITIES | 20625.73 | 19537.93 | 17236.41 | 18820.41 | 13202.76 | 14303.36 | 12535.72 | 17089.5 | 14099.85 | 14237.39 | 19917.48 | 16362.26 | 197968.8 |
| INSURANCE (GL, Van, etc) | 4905 | 4905 | 4905 | 4911.47 | 4950.64 | 5437.42 | 3868.99 | 3868.99 | 4914.09 | 4914.09 | 4914.09 | 4914.09 | 57408.87 |
| BASE MANAGEMENT FEES (3%) | 15557.3724 | 16089.1116 | 15359.7441 | 16538.1051 | 14672.2203 | 13875.6144 | 13969.8513 | 13913.2419 | 16091.7645 | 15262.4394 | 15951.6942 | 16656.0276 | 183937.187 |
| TOTAL OPERATING EXPENSES | 136529.062 | 124276.092 | 127833.764 | 130237.655 | 120525.51 | 116539.044 | 123317.211 | 126607.332 | 139538.735 | 130379.129 | 137830.154 | 137290.658 | 1550904.35 |
| HOUSE PROFIT | 274934.738 | 286005.058 | 265938.646 | 304403.615 | 275402.5 | 250515.376 | 220835.339 | 237446.838 | 295230.196 | 257528.791 | 301066.016 | 310372.732 | 3279679.84 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 27083.38 | 27083.38 | -3063.75 | 17034.34 | 17034.34 | 17034.34 | 17034.34 | 17064.34 | 17034.34 | 17034.34 | 17034.33 | 17034.33 | 204442.06 |
| LESS: PROPERTY INSURANCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 247851.358 | 258921.678 | 269002.396 | 287369.275 | 258368.16 | 233481.036 | 203800.999 | 220382.498 | 278195.856 | 240494.451 | 284031.676 | 293338.402 | 3075237.78 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -20743.1632 | -21452.1488 | -20479.6588 | -22050.8068 | -19562.9604 | -18500.8192 | -18626.4684 | -18550.9892 | -21455.686 | -20349.9192 | -21268.9256 | -22208.0368 | -245249.582 |
| | | | | | | | | | | | | | |
| Net Operating Income | 227108.194 | 237469.53 | 248522.737 | 265318.468 | 238805.199 | 214980.216 | 185174.53 | 201831.509 | 256740.17 | 220144.531 | 262762.75 | 271130.366 | 2829988.2 |

INNKEEPERS P&L STATEMENT
Monthly Statement
EL SEGUNDO

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.93336859 | 0.92834479 | 0.75081967 | 0.8442623 | 0.7795082 | 0.76229508 | 0.82892649 | 0.90046838 | 0.92913802 | 0.85491803 | 0.86277102 | 0.91311475 | 0.85733214 |
| AVERAGE DAILY RATE | 131.498023 | 133.34503 | 127.173199 | 118.073893 | 120.671805 | 123.521675 | 124.781847 | 127.766469 | 128.40385 | 133.504452 | 133.879286 | 135.832346 | 128.432854 |
| REVPAR | 122.736124 | 123.790164 | 95.4841393 | 99.6853358 | 94.0646612 | 94.1599656 | 103.434979 | 115.049666 | 119.3049 | 114.135363 | 115.507168 | 124.030519 | 110.109613 |
| ROOMS SOLD | 3530 | 3511 | 2748 | 3193 | 2853 | 2883 | 3135 | 3076 | 3514 | 3129 | 3263 | 3342 | 38177 |
| ROOMS AVAILABLE | 3782 | 3782 | 3660 | 3782 | 3660 | 3782 | 3782 | 3416 | 3782 | 3660 | 3782 | 3660 | 44530 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 464188.02 | 468174.4 | 349471.95 | 377009.94 | 344276.66 | 356112.99 | 391191.09 | 393009.66 | 451211.13 | 417735.43 | 436848.11 | 453951.7 | 4903181.08 |
| TELEPHONE REVENUE | 388.97 | 459.67 | 463.08 | 101.93 | 258.02 | 237.25 | 189.96 | 15.73 | 261.55 | 320.3 | 410.18 | 969.9 | 4076.54 |
| OTHER REVENUE | 4915.81 | 5022.35 | 5290.29 | 9110.66 | 5462.65 | 10939.72 | 10291.45 | 8202.53 | 17401.26 | 5496.07 | 13935.99 | 8812.37 | 104881.15 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 469492.8 | 473656.42 | 355225.32 | 386222.53 | 349997.33 | 367289.96 | 401672.5 | 401227.92 | 468873.94 | 423551.8 | 451194.28 | 463733.97 | 5012138.77 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 96500.4 | 102080.07 | 76940.26 | 76371.8 | 78488.58 | 74298.81 | 82513.79 | 73083.35 | 82574.35 | 104286.02 | 79543.49 | 87212.97 | 1013893.89 |
| TELEPHONE EXPENSE | 2899.89 | 3237.4 | 3014.38 | 1672.02 | 2611.57 | 3490.18 | 2640.36 | 3913.3 | 3262.49 | 3439.51 | 3154.21 | 3155.02 | 36490.33 |
| OTHER EXPENSE | 4460.33 | 3073.97 | 1769.59 | 3510.49 | 3991.28 | 6794.43 | 2511.61 | 3944.2 | 3075.81 | 3535.27 | 5775.91 | 5183.34 | 47626.23 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 173.17 | -173.17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 103860.62 | 108391.44 | 81897.4 | 81381.14 | 85091.43 | 84583.42 | 87665.76 | 80940.85 | 88912.65 | 111260.8 | 88473.61 | 95551.33 | 1098010.45 |
| GROSS OPERATING INCOME | 365632.18 | 365264.98 | 273327.92 | 304841.39 | 264905.9 | 282706.54 | 314006.74 | 320287.07 | 379961.29 | 312291 | 362720.67 | 368182.64 | 3914128.32 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 43328.38 | 57561.44 | 29919.65 | 58761.35 | 37079.2 | 37345.55 | 37905.03 | 36905.81 | 44156.57 | 42267.67 | 38438.73 | 49259.12 | 512928.5 |
| SALES & MARKETING | 42208.37 | 39618.03 | 39824.73 | 36276.42 | 33703.66 | 36823.89 | 37745 | 34341.98 | 36309.44 | 35719.7 | 39594.91 | 37579.99 | 449746.12 |
| REPAIRS & MAINTENANCE | 16353.76 | 20310.7 | 16265.75 | 20841.65 | 15044.45 | 18807.46 | 15988.01 | 19199.31 | 17534.04 | 23592.26 | 16895.41 | 18136.72 | 222569.52 |
| UTILITIES | 18429.73 | 20925.4 | 18618.3 | 14332.54 | 13315.78 | 11493.49 | 11770.51 | 10947.76 | 12806.34 | 11534.59 | 12849.4 | 13193.82 | 170217.66 |
| INSURANCE (GL, Van, etc) | 4258.35 | 4258.35 | 4258.35 | 4264.82 | 4301.98 | 5065.72 | 3605.87 | 3605.87 | 4565.42 | 4565.42 | 4565.42 | 4565.42 | 51880.99 |
| BASE MANAGEMENT FEES (3%) | 14084.784 | 14209.6926 | 10656.7596 | 11586.6759 | 10499.9199 | 11018.6988 | 12050.175 | 12036.8376 | 14066.2182 | 12706.554 | 13535.8284 | 13912.0191 | 150364.163 |
| TOTAL OPERATING EXPENSES | 138663.374 | 156883.613 | 119543.54 | 146063.456 | 113944.99 | 120554.809 | 122664.595 | 117037.568 | 129438.028 | 130386.194 | 125879.698 | 136647.089 | 1557706.95 |
| HOUSE PROFIT | 226968.806 | 208381.367 | 153784.38 | 158777.934 | 150960.91 | 162151.731 | 191342.145 | 203249.502 | 250523.262 | 181904.806 | 236840.972 | 231535.551 | 2356421.37 |
| LESS: PROPERTY TAXES | 28307.41 | 28307.41 | 20037.27 | 25550.7 | 25550.7 | 25550.7 | 33065.41 | 24047.76 | 24047.76 | 24047.76 | 24047.76 | 24047.73 | 306608.37 |
| LESS: PROPERTY INSURANCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | 198661.396 | 180073.957 | 133747.11 | 133227.234 | 125410.21 | 136601.031 | 158276.735 | 179201.742 | 226475.502 | 157857.046 | 212793.212 | 207487.821 | 2049813 |
| Less: FFE Reserve (4%) | -18779.712 | -18946.2568 | -14209.0128 | -15448.9012 | -13999.8932 | -14691.5984 | -16066.9 | -16049.1168 | -18754.9576 | -16942.072 | -18047.7712 | -18549.3588 | -200485.551 |
| Net Operating Income | 179881.684 | 161127.701 | 119538.098 | 117778.333 | 111410.317 | 121909.433 | 142209.835 | 163152.626 | 207720.544 | 140914.974 | 194745.44 | 188938.462 | 1849327.45 |

INNKEEPERS P&L STATEMENT
Monthly Statement
LAS COLINAS

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.77068247 | 0.81830151 | 0.75873016 | 0.83124863 | 0.76530612 | 0.61048936 | 0.79613781 | 0.81073858 | 0.78692122 | 0.78526077 | 0.80623217 | 0.83424036 | 0.78089647 |
| AVERAGE DAILY RATE | 93.4457773 | 94.1175543 | 94.2074298 | 97.7443532 | 95.3026074 | 93.7499533 | 101.189394 | 115.701507 | 99.7427189 | 99.4482732 | 102.777292 | 102.198478 | 99.1896716 |
| REVPAR | 72.0170222 | 77.0165372 | 71.4780181 | 81.2498596 | 72.9356689 | 57.2333487 | 80.5607022 | 93.8036759 | 78.4896621 | 78.0928277 | 82.862359 | 85.2580952 | 77.4568642 |
| ROOMS SOLD | 3512 | 3729 | 3346 | 3788 | 3375 | 2782 | 3628 | 3337 | 3586 | 3463 | 3674 | 3679 | 41899 |
| ROOMS AVAILABLE | 4557 | 4557 | 4410 | 4557 | 4410 | 4557 | 4557 | 4116 | 4557 | 4410 | 4557 | 4410 | 53655 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 328181.57 | 350964.36 | 315218.06 | 370255.61 | 321646.3 | 260812.37 | 367115.12 | 386095.93 | 357677.39 | 344389.37 | 377603.77 | 375988.2 | 4155948.05 |
| TELEPHONE REVENUE | 69.24 | 595.62 | 462.08 | -5.32 | 759.99 | 35.05 | 109.87 | 94.96 | 92.65 | 412.71 | 447.32 | 263.23 | 3337.4 |
| OTHER REVENUE | 5154.59 | 3374.38 | 6664.48 | 9885.79 | 2128.54 | 4360.47 | 8754.06 | 8359.47 | 8322.39 | 5814.74 | 5135.22 | 6743.68 | 74697.81 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 333405.4 | 354934.36 | 322344.62 | 380136.08 | 324534.83 | 265207.89 | 375979.05 | 394550.36 | 366092.43 | 350616.82 | 383186.31 | 382995.11 | 4233983.26 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 72975.11 | 79873.25 | 67781.98 | 77028.23 | 67357.94 | 74070.8 | 74100.42 | 78916.97 | 71991.69 | 86455.6 | 73872.72 | 83818.62 | 908243.33 |
| TELEPHONE EXPENSE | 3499.83 | 5427.88 | 5291.33 | 4414.16 | 4405.14 | 5412.32 | 4249.76 | 4546.74 | 4402.3 | 4502.32 | 4462 | 55035.69 | |
| OTHER EXPENSE | 1420.98 | 1575.3 | 2273.89 | 2584.03 | 1311.97 | 1420.11 | 2254.19 | 2380.75 | 2666.09 | 3574.65 | 1681.35 | 3000.09 | 26143.4 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 77895.92 | 86876.43 | 75347.2 | 84026.42 | 73075.05 | 80903.23 | 80604.37 | 85844.46 | 79079.69 | 94432.55 | 80056.39 | 91280.71 | 989422.42 |
| GROSS OPERATING INCOME | 255509.48 | 268057.93 | 246997.42 | 296109.66 | 251459.78 | 184304.66 | 295374.68 | 308705.9 | 287012.74 | 256184.27 | 303129.92 | 291714.4 | 3244560.84 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 31304.57 | 26126.68 | 31032.23 | 33106.33 | 34241.94 | 38441.42 | 35344.55 | 30435.83 | 30179 | 35999.27 | 47754.76 | 32360 | 406326.58 |
| SALES & MARKETING | 31091.36 | 31876.95 | 38798.62 | 33327.92 | 29636.39 | 27681.1 | 31757.28 | 32327.28 | 39550.65 | 32882.81 | 32166.07 | 29400.86 | 390497.29 |
| REPAIRS & MAINTENANCE | 16752.2 | 17016.04 | 21107.53 | 22363.09 | 18072.87 | 17879.55 | 17710.17 | 20434.54 | 18770.11 | 21247.96 | 20369.75 | 21834.29 | 233558.1 |
| UTILITIES | 18800.01 | 16718.43 | 22817.22 | 17643.17 | 13825.1 | 14647.62 | 18158.25 | 21325.6 | 13426.77 | 9383.92 | 13532.33 | 17206.74 | 197485.16 |
| INSURANCE (GL, Van, etc) | 3639.55 | 3639.55 | 3639.55 | 3646.02 | 3547.26 | 5022.43 | 4247.08 | 4247.08 | 4247.08 | 4247.08 | 4247.08 | 4247.08 | 48616.84 |
| BASE MANAGEMENT FEES (3%) | 10002.162 | 10648.0308 | 9670.3386 | 11404.0824 | 9736.0449 | 7956.2367 | 11279.3715 | 11836.5108 | 10982.7729 | 10518.5046 | 11495.5893 | 11489.8533 | 127019.498 |
| TOTAL OPERATING EXPENSES | 111589.852 | 106025.681 | 127065.489 | 121490.612 | 109059.605 | 111628.357 | 118496.702 | 120606.841 | 117156.383 | 114279.545 | 129565.579 | 116538.823 | 1403503.47 |
| HOUSE PROFIT | 143919.628 | 162032.249 | 119931.931 | 174619.048 | 142400.175 | 72676.3033 | 176877.979 | 188099.059 | 169856.357 | 141904.725 | 173564.341 | 175175.577 | 1841057.37 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 19516.48 | 19516.48 | 19516.48 | 19516.48 | 23263.03 | 12673.08 | 18946.19 | 18946.19 | 23946.19 | 18946.19 | 18664.11 | 18923.99 | 232374.89 |
| LESS: PROPERTY INSURANCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 124403.148 | 142515.769 | 100415.451 | 155102.568 | 119137.145 | 60003.2233 | 157931.789 | 169152.869 | 145910.167 | 122958.535 | 154900.231 | 156251.587 | 1608682.48 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -13336.216 | -14197.3744 | -12893.7848 | -15205.4432 | -12981.3932 | -10608.3156 | -15039.162 | -15782.0144 | -14643.6972 | -14024.6728 | -15327.4524 | -15319.8044 | -169359.33 |
| | | | | | | | | | | | | | |
| Net Operating Income | 111066.932 | 128318.395 | 87521.6666 | 139897.124 | 106155.752 | 49394.9077 | 142892.627 | 153370.855 | 131266.47 | 108933.863 | 139572.778 | 140931.782 | 1439323.15 |

INNKEEPERS P&L STATEMENT
Monthly Statement
MOUNT LAUREL

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.89961068 | 0.88570634 | 0.82873563 | 0.87430478 | 0.82126437 | 0.71885428 | 0.62541713 | 0.68318966 | 0.84288098 | 0.87097701 | 0.89961068 | 0.9408046 | 0.82498819 |
| AVERAGE DAILY RATE | 102.404597 | 101.629931 | 99.1209674 | 99.0683365 | 99.6009237 | 99.0126344 | 97.251574 | 96.5399324 | 97.9250412 | 99.2433883 | 99.9726306 | 101.469047 | 99.601848 |
| REVPAR | 92.1242686 | 90.0142742 | 82.1450776 | 86.6159205 | 81.7986897 | 71.1756563 | 60.8228003 | 65.9550831 | 82.5391546 | 86.4387098 | 89.9364461 | 95.462546 | 82.1703484 |
| ROOMS SOLD | 3235 | 3185 | 2884 | 3144 | 2858 | 2585 | 2249 | 2219 | 3031 | 3031 | 3235 | 3274 | 34930 |
| ROOMS AVAILABLE | 3596 | 3596 | 3480 | 3596 | 3480 | 3596 | 3596 | 3248 | 3596 | 3480 | 3596 | 3480 | 42340 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 331278.87 | 323691.33 | 285864.87 | 311470.85 | 284659.44 | 255947.66 | 218718.79 | 214222.11 | 296810.8 | 300806.71 | 323411.46 | 332209.66 | 3479092.55 |
| TELEPHONE REVENUE | 435.04 | 347.59 | 167.35 | 152.93 | 115.66 | 51.86 | 263.85 | 48.16 | 471.16 | -70.93 | 128.84 | 384.83 | 2496.34 |
| OTHER REVENUE | 4185.83 | 4566.72 | 2770.37 | 1785.51 | 1840.18 | 3171.06 | 1619.89 | 953.94 | 2545.47 | 2675.52 | 2819.33 | 3181.4 | 32115.22 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 335899.74 | 328605.64 | 288802.59 | 313409.29 | 286615.28 | 259170.58 | 220602.53 | 215224.21 | 299827.43 | 303411.3 | 326359.63 | 335775.89 | 3513704.11 |
| | | | | | | | | | | | | | |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 58658.29 | 63067.62 | 58320.96 | 58359.15 | 68584.76 | 67943.44 | 53866.73 | 59658.54 | 59296.95 | 59351.25 | 68639.74 | 63243.56 | 738990.99 |
| TELEPHONE EXPENSE | 4040.85 | 3356.82 | 3898.09 | 3626.26 | 4494.24 | 4073.31 | 4061.43 | 3854.62 | 6142.93 | 3738.91 | 3516.78 | 3417.16 | 48221.4 |
| OTHER EXPENSE | 999.6 | 770.41 | 1517.05 | 1454.35 | 1653.69 | 1704.59 | 544.95 | 253.36 | 740.16 | 599.63 | 421.08 | 1481.6 | 12140.47 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 63698.74 | 67194.85 | 63736.1 | 63439.76 | 74732.69 | 73721.34 | 58473.11 | 63766.52 | 66180.04 | 63689.79 | 72577.6 | 68142.32 | 799352.86 |
| GROSS OPERATING INCOME | 272201 | 261410.79 | 225066.49 | 249969.53 | 211882.59 | 185449.24 | 162129.42 | 151457.69 | 233647.39 | 239721.51 | 253782.03 | 267633.57 | 2714351.25 |
| | | | | | | | | | | | | | |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 34064.18 | 35001.97 | 29681.46 | 27753.52 | 30678.77 | 31735 | 29968.45 | 28673.89 | 33792.17 | 36207.15 | 36557.89 | 37182.19 | 391476.64 |
| SALES & MARKETING | 37878.57 | 31303.47 | 31828.46 | 31910.95 | 29322.97 | 30179.96 | 26444.72 | 25743.32 | 41690.84 | 31764.33 | 33063.15 | 35797.23 | 386927.97 |
| REPAIRS & MAINTENANCE | 19795.93 | 20374.34 | 28244.87 | 24141.29 | 21045.46 | 25556.79 | 27566.35 | 17480 | 22313.96 | 22364.22 | 30899.91 | 23419.35 | 283202.47 |
| UTILITIES | 24747.66 | 23019.22 | 18245.85 | 19300.99 | 15759.25 | 16663.65 | 17667.05 | 23968.64 | 13510.04 | 26872.01 | 16546.83 | 26746.58 | 243047.77 |
| INSURANCE (GL, Van, etc) | 2646.57 | 2646.57 | 2646.57 | 2653.04 | 2626.05 | 3878.18 | 3219.08 | 3219.08 | 3219.08 | 3219.08 | 3219.08 | 3219.08 | 36411.46 |
| BASE MANAGEMENT FEES (3%) | 10076.9922 | 9858.1692 | 8664.0777 | 9402.2787 | 8598.4584 | 7775.1174 | 6618.0759 | 6456.7263 | 8994.8229 | 9102.339 | 9790.7889 | 10073.2767 | 105411.123 |
| TOTAL OPERATING EXPENSES | 129209.902 | 122203.739 | 119491.288 | 115162.069 | 108030.958 | 115788.697 | 111483.726 | 105541.656 | 123520.913 | 129529.129 | 130077.649 | 136437.707 | 1446477.43 |
| HOUSE PROFIT | 142991.098 | 139207.051 | 105575.202 | 134807.461 | 103851.632 | 69660.5426 | 50645.6941 | 45916.0337 | 110126.477 | 110192.381 | 123704.381 | 131195.863 | 1267873.82 |
| | | | | | | | | | | | | | |
| LESS: PROPERTY TAXES | 20691.39 | 20691.39 | 20691.4 | 19604.99 | 19604.99 | 19605 | 19260.97 | 19260.97 | 19260.96 | 19260.97 | 19260.97 | 21121.72 | 238315.72 |
| LESS: PROPERTY INSURANCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| EBITDA | 122299.708 | 118515.661 | 84883.8023 | 115202.471 | 84246.6416 | 50055.5426 | 31384.7241 | 26655.0637 | 90865.5171 | 90931.411 | 104443.411 | 110074.143 | 1029558.1 |
| | | | | | | | | | | | | | |
| Less: FFE Reserve (4%) | -13435.9896 | -13144.2256 | -11552.1036 | -12536.3716 | -11464.6112 | -10366.8232 | -8824.1012 | -8608.9684 | -11993.0972 | -12136.452 | -13054.3852 | -13431.0356 | -140548.164 |
| | | | | | | | | | | | | | |
| Net Operating Income | 108863.718 | 105371.435 | 73331.6987 | 102666.1 | 72782.0304 | 39688.7194 | 22560.6229 | 18046.0953 | 78872.4199 | 78794.959 | 91389.0259 | 96643.1077 | 889009.932 |

INNKEEPERS P&L STATEMENT
Monthly Statement
LOMBARD

| | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | ACTUAL | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | MTD 7 2010 | MTD 8 2010 | MTD 9 2010 | MTD 10 2010 | MTD 11 2010 | MTD 12 2010 | MTD 1 2011 | MTD 2 2011 | MTD 3 2011 | MTD 4 2011 | MTD 5 2011 | MTD 6 2011 | |
| OCCUPANCY % | 0.64264113 | 0.55241935 | 0.63932292 | 0.63356855 | 0.56302083 | 0.36517137 | 0.14541331 | 0.15206473 | 0.26234879 | 0.38359375 | 0.47076613 | 0.61432292 | 0.45344606 |
| AVERAGE DAILY RATE | 86.3341451 | 91.2953102 | 87.7355927 | 88.0052267 | 88.5306522 | 80.6946998 | 72.1739168 | 66.4685505 | 62.0746302 | 55.765336 | 52.9448287 | 49.4874565 | 75.7852674 |
| REVPAR | 55.4818725 | 50.4332964 | 56.091375 | 55.7573438 | 49.8446016 | 29.4673942 | 10.4950479 | 10.1075223 | 16.2852041 | 21.3912344 | 24.9246321 | 30.4012786 | 34.364531 |
| ROOMS SOLD | 2550 | 2192 | 2455 | 2514 | 2162 | 1449 | 577 | 545 | 1041 | 1473 | 1868 | 2359 | 21185 |
| ROOMS AVAILABLE | 3968 | 3968 | 3840 | 3968 | 3840 | 3968 | 3968 | 3584 | 3968 | 3840 | 3968 | 3840 | 46720 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 220152.07 | 200119.32 | 215390.88 | 221245.14 | 191403.27 | 116926.62 | 41644.35 | 36225.36 | 64619.69 | 82142.34 | 98900.94 | 116740.91 | 1605510.89 |
| TELEPHONE REVENUE | 39.7 | 107.21 | 335.21 | 299.08 | 127.21 | 22.79 | 0 | 122.13 | 274.49 | 174.62 | 0 | 0 | 1502.44 |
| OTHER REVENUE | 4425.03 | 4336.49 | 4428.33 | 5629.28 | 4910.59 | 4576.6 | 1898.12 | 1086.66 | 2656.61 | 1528.47 | 1479.7 | 2991.39 | 39947.27 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 224616.8 | 204563.02 | 220154.42 | 227173.5 | 196441.07 | 121526.01 | 43542.47 | 37434.15 | 67550.79 | 83845.43 | 100380.64 | 119732.3 | 1646960.6 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 49992.82 | 51950.84 | 59286.79 | 45522.06 | 47848.37 | 60941.81 | 37742.53 | 20536.57 | 29412.99 | 31194.86 | 31555.67 | 40370.11 | 506355.42 |
| TELEPHONE EXPENSE | 1342.37 | 1112.06 | 1082.12 | 1335.29 | 1343.04 | 1361.23 | -431.88 | 4878.37 | 2413.51 | 1889.51 | 1757.36 | 1684.18 | 19767.16 |
| OTHER EXPENSE | 1254.92 | 597.19 | 599.88 | 927.38 | 990.22 | 877.9 | 403.85 | 187.65 | 309.43 | 313.59 | 291.95 | 432.15 | 7186.11 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 52590.11 | 53660.09 | 60968.79 | 47784.73 | 50181.63 | 63180.94 | 37714.5 | 25602.59 | 32135.93 | 33397.96 | 33604.98 | 42486.44 | 533308.69 |
| GROSS OPERATING INCOME | 172026.69 | 150902.93 | 159185.63 | 179388.77 | 146259.44 | 58345.07 | 5827.97 | 11831.56 | 35414.86 | 50447.47 | 66775.66 | 77245.86 | 1113651.91 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 28913.44 | 23637.75 | 23641.26 | 23747.12 | 23574.68 | 23713.47 | 50523.65 | 17529.95 | 16639.34 | 17112.32 | 25236.19 | 16577.12 | 290846.29 |
| SALES & MARKETING | 21322.49 | 19852.32 | 20924.58 | 21310.97 | 17610.85 | 9915.59 | 9311.49 | 5477.9 | 7568.32 | 6750.94 | 6173.63 | 3323.7 | 149542.78 |
| REPAIRS & MAINTENANCE | 11184.54 | 12596.84 | 12789.53 | 12259.82 | 13626.86 | 14414.61 | 9713.75 | 10734.92 | 9927.67 | 10985.45 | 13295.19 | 13213.26 | 144742.44 |
| UTILITIES | 17000.32 | 4210.47 | 14739.78 | 12521.45 | 18037.07 | 4237.88 | 13242.3 | 9049.75 | 6556.49 | 8186.82 | 7409.43 | 7589.97 | 122781.73 |
| INSURANCE (GL, Van, etc) | 1382.77 | 1382.77 | 1382.77 | 1389.24 | 1427.66 | 2823.36 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 22541.63 |
| BASE MANAGEMENT FEES (3%) | 6738.504 | 6136.8906 | 6604.6326 | 6815.205 | 5893.2321 | 3645.7803 | 1306.2741 | 1123.0245 | 2026.5237 | 2515.3629 | 3011.4192 | 3591.969 | 49408.818 |
| TOTAL OPERATING EXPENSES | 86542.064 | 67817.0406 | 80082.5526 | 78043.805 | 80170.3521 | 58750.6903 | 86222.9741 | 46041.0545 | 44843.8537 | 47676.4029 | 57251.3692 | 46421.529 | 779863.688 |
| HOUSE PROFIT | 85484.626 | 83085.8894 | 79103.0774 | 101344.965 | 66089.0879 | -405.6203 | -80395.004 | -34209.495 | -9428.9937 | 2771.0671 | 9524.2908 | 30824.331 | 333788.222 |
| LESS: PROPERTY TAXES | 9637.32 | 9637.32 | 9637.32 | 4583.33 | -38488.49 | 4583.33 | 4583.33 | 4583.33 | 4583.33 | 4583.33 | 4583.33 | 4583.33 | 27090.11 |
| LESS: PROPERTY INSURANCE | 936.71 | 936.71 | 936.71 | 936.71 | 936.81 | 901.76 | 901.76 | 901.76 | 901.76 | 901.76 | 901.76 | 901.76 | 10995.97 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | 74910.596 | 72511.8594 | 68529.0474 | 95824.925 | 103640.768 | -5890.7103 | -85880.094 | -39694.585 | -14914.084 | -2714.0229 | 4039.2008 | 25339.241 | 295702.142 |
| Less: FFE Reserve (4%) | -8984.672 | -8182.5208 | -8806.1768 | -9086.94 | -7857.6428 | -4861.0404 | -1741.6988 | -1497.366 | -2702.0316 | -3353.8172 | -4015.2256 | -4789.292 | -65878.424 |
| Net Operating Income | 65925.924 | 64329.3386 | 59722.8706 | 86737.985 | 95783.1251 | -10751.751 | -87621.793 | -41191.951 | -17616.115 | -6067.8401 | 23.9752 | 20549.949 | 229823.718 |

1                                                                                                                                                      10/12/2011 6:29 PM

INNKEEPERS P&L STATEMENT
Monthly Statement
SCHAUMBURG

| | ACTUAL MTD 7 2010 | ACTUAL MTD 8 2010 | ACTUAL MTD 9 2010 | ACTUAL MTD 10 2010 | ACTUAL MTD 11 2010 | ACTUAL MTD 12 2010 | ACTUAL MTD 1 2011 | ACTUAL MTD 2 2011 | ACTUAL MTD 3 2011 | ACTUAL MTD 4 2011 | ACTUAL MTD 5 2011 | ACTUAL MTD 6 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPANCY % | 0.78402218 | 0.63180444 | 0.68697917 | 0.64919355 | 0.58072917 | 0.40977823 | 0.12424395 | 0.10602679 | 0.25806452 | | 0.5359375 | 0.56174395 | 0.69921875 | 0.50421661 |
| AVERAGE DAILY RATE | 74.4046127 | 81.9629717 | 78.1550114 | 80.6913936 | 85.1592063 | 82.0667589 | 67.7186004 | 63.5323684 | 43.3818262 | 41.7972983 | 37.8913863 | 41.4782384 | 66.1430496 |
| REVPAR | 58.3348664 | 51.7845691 | 53.6908646 | 52.3843322 | 49.4544349 | 33.6291709 | 8.41362651 | 6.73613281 | 11.19531 | 22.4007396 | 21.2852571 | 29.002362 | 33.3504242 |
| ROOMS SOLD | 3111 | 2507 | 2638 | 2576 | 2230 | 1626 | 493 | 380 | 1024 | 2058 | 2229 | 2685 | 23557 |
| ROOMS AVAILABLE | 3968 | 3968 | 3840 | 3968 | 3840 | 3968 | 3968 | 3584 | 3968 | 3840 | 3968 | 3840 | 46720 |
| SALES & INCOME | | | | | | | | | | | | | |
| ROOM REVENUE | 231472.75 | 205481.17 | 206172.92 | 207861.03 | 189905.03 | 133440.55 | 33385.27 | 24142.3 | 44422.99 | 86018.84 | 84459.9 | 111369.07 | 1558131.82 |
| TELEPHONE REVENUE | 536.05 | 156.75 | 629.64 | 969.79 | 132.07 | 210.5 | 22.52 | 17.05 | 271.48 | 213.01 | 181.14 | 51.64 | 3391.64 |
| OTHER REVENUE | 3075.16 | 2327.02 | 2636.81 | 3946.57 | 2522.62 | 2198.27 | 1228.38 | 1543.28 | 2082.96 | 1437.65 | 1543.66 | 3544.69 | 28087.07 |
| FOOD & BEVERAGE REVENUE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS INCOME FROM OPERATIONS | 235083.96 | 207964.94 | 209439.37 | 212777.39 | 192559.72 | 135849.32 | 34636.17 | 25702.63 | 46777.43 | 87669.5 | 86184.7 | 114965.4 | 1589610.53 |
| DEPARTMENT EXPENSES | | | | | | | | | | | | | |
| ROOMS EXPENSE | 61666.03 | 57210.6 | 66906.26 | 53314.68 | 51839.93 | 64718.91 | 35266.6 | 18992.02 | 25734.36 | 33184.72 | 35448.15 | 42351.85 | 546634.11 |
| TELEPHONE EXPENSE | 1557.16 | 1110.15 | 1156.48 | 1658.73 | 1406.27 | 2043.35 | -606.49 | 5140.83 | 1786.31 | 1833.64 | 1812.83 | 1552.25 | 20451.51 |
| OTHER EXPENSE | 1100.58 | 1538.39 | 333.95 | 291.84 | 747.16 | 645.04 | 636.6 | -466.54 | 553.48 | 373.7 | 480.45 | 170.54 | 6405.19 |
| FOOD & BEVERAGE EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL C/S & DEPARTMENTAL EXPENS | 64323.77 | 59859.14 | 68396.69 | 55265.25 | 53993.36 | 67407.3 | 35296.71 | 23666.31 | 28074.15 | 35392.06 | 37741.43 | 44074.64 | 573490.81 |
| GROSS OPERATING INCOME | 170760.19 | 148105.8 | 141042.68 | 157512.14 | 138566.36 | 68442.02 | -660.54 | 2036.32 | 18703.28 | 52277.44 | 48443.27 | 70890.76 | 1016119.72 |
| UNDISTRIBUTED OPERATING EXPENSES | | | | | | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 23883.83 | 21847.04 | 26201.96 | 22996.48 | 20600.03 | 26463.24 | 24577.11 | 26535.44 | 22253.63 | 14683.04 | 20781.55 | 18481.2 | 269304.55 |
| SALES & MARKETING | 22651.41 | 21547.56 | 21108.99 | 20532.84 | 21532.81 | 15590.04 | 3980.35 | 2058.04 | 6479.37 | 8414.83 | 7593.28 | 6786.85 | 158276.37 |
| REPAIRS & MAINTENANCE | 15127.83 | 12937.46 | 13174.89 | 10831.23 | 13334.58 | 13829.11 | 10350.7 | 11683.09 | 12303.96 | 11702.75 | 11413.46 | 12960.49 | 149649.55 |
| UTILITIES | 9708.77 | 9528.59 | 9139.92 | 8948.7 | 8906.74 | 8852.64 | 13893.08 | 11625.08 | 5564.52 | 5630 | 5155.97 | 6734.81 | 103688.82 |
| INSURANCE (GL, Van, etc) | 1382.77 | 1382.77 | 1382.77 | 1389.24 | 1427.66 | 2823.36 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 2125.51 | 22541.63 |
| BASE MANAGEMENT FEES (3%) | 7052.5188 | 6238.9482 | 6283.1811 | 6383.3217 | 5776.7916 | 4075.4796 | 1039.0851 | 771.0789 | 1403.3229 | 2630.085 | 2585.541 | 3448.962 | 47688.3159 |
| TOTAL OPERATING EXPENSES | 79807.1288 | 73482.3682 | 77291.7111 | 71081.8117 | 71578.6116 | 71633.8696 | 55965.8351 | 54798.2389 | 50130.3129 | 45186.215 | 49655.311 | 50537.822 | 751149.236 |
| HOUSE PROFIT | 90953.0612 | 74623.4318 | 63750.9689 | 86430.3283 | 66987.7484 | -3191.8496 | -56626.375 | -52761.919 | -31427.033 | 7091.225 | -1212.041 | 20352.938 | 264970.484 |
| LESS: PROPERTY TAXES | 25500 | 25500 | 29350 | 25659 | -21830.74 | 25500 | -8126.66 | 27913.33 | 22913.33 | 22913.33 | 22913.33 | 22913.33 | 221118.25 |
| LESS: PROPERTY INSURANCE | 939.66 | 939.66 | 939.66 | 939.66 | 939.67 | 891.57 | 891.57 | 891.57 | 891.57 | 891.57 | 891.57 | 891.57 | 10939.3 |
| LESS: GROUND RENT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | 64513.4012 | 48183.7718 | 33461.3089 | 59831.6683 | 87878.8184 | | -29583.42 | -49391.285 | -81566.819 | -55231.933 | -16713.675 | -25016.941 | -3451.962 | 32912.9341 |
| Less: FFE Reserve (4%) | -9403.3584 | -8318.5976 | -8377.5748 | -8511.0956 | -7702.3888 | -5433.9728 | -1385.4468 | -1028.1052 | -1871.0972 | -3506.78 | -3447.388 | -4598.616 | -63584.421 |
| Net Operating Income | 55110.0428 | 39865.1742 | 25083.7341 | 51320.5727 | 80176.4296 | -35017.392 | -50776.732 | -82594.924 | -57103.03 | -20220.455 | -28464.329 | -8050.578 | -30671.487 |

<u>Schedule XVI</u>

<u>Stay/Hampton Hotels</u>

1. Lombard, IL
2. Schaumburg, IL
3. Westchester, IL

<u>Schedule XVII</u>
<u>Early Release Property</u>

1.  El Segundo, CA
2.  Mount Laurel, CA
3.  Mountain View, CA
4.  San Jose, CA
5.  San Mateo, CA
6.  Denver Downtown, CO
7.  Denver Tech, CO
8.  Cherry Hill, NJ
9.  Shelton, CT
10. Altamonte Springs, FL
11. Lexington, KY
12. Binghamton (Vestal), NY
13. Windsor, CT
14. Louisville, KY
15. Richmond, VA
16. Germantown, MD
17. Westchester, IL
18. Lombard, IL
19. Schaumburg, IL

## Schedule XVIII

## New Holdco Operating Agreements

<u>Schedule XIX</u>

<u>Net Worth Certificate</u>

Cerberus Series Four Holdings, LLC
c/o Cerberus Capital Management, L.P.
299 Park Avenue
New York, New York  10171

_____ \_\_\_, 20\_\_

_____

_____

_____

Re:  <u>Cerberus Series Four Holdings, LLC (the "Company")</u>

To Whom It May Concern:

Consistent with the requirements of the Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the laws, regulations and Executive Orders administered by the U.S. Department of Treasury's Office of Foreign Assets Control ("<u>OFAC</u>"), and other applicable U.S. federal anti-money laundering laws and regulations (collectively, the "<u>anti-money laundering/OFAC laws</u>"), we implemented and currently maintain anti-money laundering and OFAC compliance policies and procedures, including certain due diligence procedures with respect to the Company's underlying investors (the "<u>Investors</u>") and their sources of funds.

We hereby represent to you that we have conducted such due diligence, and that if there is a change in the anti-money laundering/OFAC laws, will conduct any additional required due diligence pursuant to the anti-money laundering/OFAC laws in respect of the Investors and their sources of funds.

We hereby confirm that Cerberus Capital Management, L.P. will keep records of such due diligence on the Investors for a period of five years after the cessation of its relationship with any such investors.

As to the financial status of the Company, based on the financial statements of Cerberus Institutional Partners, L.P. — Series Four[1], dated December 31, 20\_\_, audited by [PricewaterhouseCoopers LLP], the Company has a net worth in excess of $_____ and cash and cash equivalents on hand in excess of $_____.

Very truly yours,

---

[1]  The Company is the limited liability company through which Cerberus Institutional Partners, L.P. — Series Four makes all of its investments.

<u>Schedule A</u>

2011 Annual Budget

(see attached)

## Exhibit B

## (Lockbox Banks)

| Individual Property | Lockbox Bank |
| --- | --- |
| 1.  Residence Inn Silicon Valley I, Sunnyvale, CA | Wells Fargo |
| 2.  Residence Inn Silicon Valley II, Sunnyvale, CA | Wells Fargo |
| 3.  Residence Inn San Mateo, San Mateo, CA | Wells Fargo |
| 4.  Residence Inn Mountain View, Mountain View, CA | Wells Fargo |
| 5.  Residence Inn San Jose, Campbell, CA | Wells Fargo |
| 6.  Residence Inn Fremont, Fremont, CA | Wells Fargo |
| 7.  Residence Inn San Jose South, San Jose, CA | Wells Fargo |
| 8.  Summerfield Suites Belmont, Belmont, CA | Wells Fargo |
| 9.  Summerfield Suites El Segundo, El Segundo, CA | Wells Fargo |
| 10. Residence Inn Denver Downtown, Denver, CO | Wells Fargo |
| 11. Residence Inn Denver South, Englewood, CO | Wells Fargo |
| 12. Residence Inn Shelton, Shelton, CT | Bank of America |
| 13. Residence Inn Windsor, Windsor, CT | Bank of America |
| 14. Residence Inn Altamonte Springs, Altamonte Springs, FL | Suntrust |
| 15. Hampton Inn Naples, Naples, FL | Suntrust |
| 16. Courtyard Fort Lauderdale, Fort Lauderdale, FL | Suntrust |
| 17. Residence Inn Atlanta Downtown, Atlanta, GA | Suntrust |
| 18. Residence Inn Peachtree Corners, Norcross, GA | Suntrust |
| 19. Residence Inn O'Hare Rosemont, Rosemont, IL | Fifth Third |
| 20. Hampton Inn Westchester, Westchester, IL | Fifth Third |
| 21. Stay Inn Lombard, Lombard, EL | Fifth Third |
| 22. Stay Inn Schaumburg, Schaumburg, IL | Fifth Third |
| 23. Residence Inn Lexington North, Lexington, KY | Fifth Third |
| 24. Residence Inn Louisville, Louisville, KY | Fifth Third |
| 25. Residence Inn Gaithersburg, Gaithersburg, MD | Suntrust |
| 26. Hampton Inn Germantown, Germantown, MD | Suntrust |
| 27. Hampton Inn Columbia, Columbia, MD | Suntrust |

| | |
|---|---|
| 28.  Residence Inn Portland, Scarborough, ME | Bank of America |
| 29.  Residence Inn Livonia, Livonia, MI | Fifth Third |
| 30.  Residence Inn Cherry Hill, Cherry Hill, NJ | Wells Fargo |
| 31.  Residence Inn Saddle River, Saddle River, NJ | Wells Fargo |
| 32.  Summerfield Suites Mount Laurel, Mount Laurel, NJ | Wells Fargo |
| 33.  Residence Inn Binghamton, Vestal, NY | M&T Bank |
| 34.  Hampton Inn Islandia, Islandia, NY | Bank of America |
| 35.  Hampton Inn Willow Grove, Willow Grove, PA | Bank of America |
| 36.  Towneplace Suites Horsham, Horsham, PA | Bank of America |
| 37.  Residence Inn Addison, Addison, TX | Wells Fargo |
| 38.  Residence Inn Arlington, Arlington, TX | Wells Fargo |
| 39.  Summerfield Suites Las Colinas, Irving, TX | Wells Fargo |
| 40.  Residence Inn Richmond, Richmond, VA | Suntrust |
| 41.  Residence Inn Richmond NW, Richmond, VA | Suntrust |
| 42.  Residence Inn Tukwila, Seattle, WA | Wells Fargo |
| 43.  Residence Inn Bellevue, Bellevue, WA | Wells Fargo |
| 44.  Residence Inn Lynnwood, Lynnwood, WA | Wells Fargo |
| 45.  Residence Inn Bothell, Bothell, WA | Wells Fargo |

**<u>Exhibit C</u>**
Form of Cerberus Guaranty

[See Attached]

## GUARANTY

**THIS GUARANTY** (this "**Guaranty**") is executed as of this ____ day of October, 2011 by **CERBERUS SERIES FOUR HOLDINGS, LLC**, a Delaware limited liability company, having an address at c/o Cerberus Real Estate Capital Management, LLC, 299 Park Avenue, 22nd Floor, New York, New York 10022 ("**Guarantor**"), for the benefit of **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C6, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C6, SUCCESSOR TRUSTEE TO BANK OF AMERICA, NATIONAL ASSOCIATION**, having an address at c/o Wells Fargo Commercial Mortgage Servicing, 201 South College Street, 9th Floor, Charlotte, North Carolina, 28244 ("**Lender**").

## WITNESSETH:

WHEREAS, pursuant to that certain Loan Agreement, dated as of June 29, 2007, between EACH OF THE PERSON SET FORTH IN SCHEDULE I ATTACHED HERETO, each a Delaware limited liability company (each individually and collectively, as the context requires, "**Borrower**") and Lehman ALI INC. ("**Original Lender**"), as lender (as modified by that certain First Amendment to Loan Agreement, dated as of August 9, 2007, as further modified by that certain Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement dated as of the date hereof (the "**Omnibus Amendment**"), and as the same may hereafter be amended, modified, restated, renewed or replaced the "**Loan Agreement**"), Original Lender made a Loan (as defined in the Loan Agreement) to Borrower which Loan is evidenced by the Note (as defined in the Loan Agreement), secured by, among other things, the Security Instruments (as defined in the Loan Agreement);

WHEREAS, in connection with the Omnibus Amendment, Guarantor has agreed to unconditionally guarantee payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's entering into the Omnibus Amendment.

NOW, THEREFORE, as an inducement to Lender to enter into the Omnibus Amendment, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1** **Guaranty of Obligation.** Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a

primary obligor. Guarantor's maximum liability hereunder shall not exceed ten percent (10%) of the outstanding principal balance of the Loan plus all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.

      **1.2**    **Definition of Guaranteed Obligations.** As used herein, the term **"Guaranteed Obligations"** means the obligations or liabilities of Borrower to Lender for which Borrower shall be liable pursuant to Section 9.4(b) and (c) of the Loan Agreement, if and to the extent such obligations and liabilities are directly and immediately caused by and/or actually and affirmatively consented to by Cerberus Member (as defined in the Loan Agreement) or any Person that Controls Cerberus Member.

      Notwithstanding anything to the contrary in any of the Loan Documents, Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 11 1 l(b) or any other provisions of the U.S. Bankruptcy Code to file a claim in any bankruptcy proceeding of Borrower for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

      **1.3**    **Nature of Guaranty.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

      **1.4**    **Guaranteed Obligations Not Reduced by Offset.** The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

      **1.5**    **Payment By Guarantor.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity; notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6** **No Duty To Pursue Others.** It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**1.7** **Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instrument, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

**1.8** **Payment of Expenses.** In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations until the expiration of any applicable statute of limitations.

**1.9** **Effect of Bankruptcy.** In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. In addition, if at any time any payment of principal, interest or any other amount payable by Borrower under any Loan Document, is rescinded or must be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be fully reinstated as though such payment has been due but not made.

**1.10** **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

**1.11** **Borrower.** The term **"Borrower"** as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of or by Borrower, provided that nothing herein shall be deemed to permit any such merger, reorganization, sale, transfer, assignment, devise, gift or bequest of or by Borrower other than in accordance with the terms of the Loan Agreement.

**1.12** **Termination.** This Guaranty and the obligations of Guarantor hereunder shall automatically terminate upon the payment in full of the Loan; provided, however, that the Guarantor shall remain liable for any Guaranteed Obligations to Lender that by their terms survive payment in full of the Loan. In addition, upon compliance with the applicable requirements in Section 5.2.11 of the Loan Agreement, this Guaranty and the obligations of Guarantor hereunder shall terminate as more fully set forth in the Loan Agreement.

## ARTICLE II
## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

**2.1** **Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instruments, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

**2.2** **Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3** **Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of

Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4** **Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Security Instruments, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instruments, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed obligations or any part thereof for any reason.

**2.5** **Release of Obligors.** A. full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of aq7 or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6** **Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7** **Release of Collateral.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8** **Care and Diligence.** Other than as a result of Lender's gross negligence, fraud or willful misconduct, the failure of Lender or any other party to exercise diligence or

reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

2.9    **Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

2.10    **Offset.** The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

2.11    **Merger.** The reorganization, merger or consolidation of Borrower into or with any other Person.

2.12    **Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

2.13    **Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1** **Benefit.** Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2** **Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3** **No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**3.4** **Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6** **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1** **Subordination of All Guarantor Claims.** As used herein, the term **"Guarantor Claims"** shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an

event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2** **Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly, from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3** **Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4** **Liens Subordinate.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attached. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower.

# ARTICLE V
# MISCELLANEOUS

5.1 **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No

modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

5.2     **Notices.**  Any notice, demand, statement, request or consent made hereunder shall be made in accordance with Section 10.6 of the Loan Agreement. The addresses of the Guarantor is as follows:

> Cerberus Series Four Holdings, LLC
> c/o Cerberus Real Estate Capital Management, LLC
> 299 Park Avenue, 22nd Floor
> New York, NY  10022
> Attention:  Thomas Wagner
> Facsimile number:  (646) 885-3391
>
> With a copy to:
>
> Cerberus Capital Management, LP
> 299 Park Avenue
> New York, NY 10171
> Attention: Mark Neporent, General Counsel
> Facsimile number:  (212) 891-1540
>
> and to:
>
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Attention:  Stuart D. Freedman, Esq.
> Facsimile number:  (212) 593-5955

5.3 Governing Law.  **(a)  THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY INDEMNITEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR**

AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR AND LENDER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

CT Corporation
111 Eighth Avenue
New York, New York 1 0011

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GUARANTOR (I)SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (11) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (111) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

5.4    **Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty,

unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

5.5 **Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

5.6 **Parties Bound; Assignment; Joint and Several**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

5.7 **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

5.8 **Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

5.9 **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

5.10 **Rights and Remedies**. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11 **Other Defined Terms**. Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

5.12 **Entirety**. **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE**

SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

       5.13    **Waiver of Right To Trial By Jury.** GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT *ANY* SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER

       5.14   **Reinstatement in Certain Circumstances.** If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

<div align="center">[NO FURTHER TEXT ON THIS PAGE]</div>

This Guaranty is EXECUTED as of the day and year first above written.

**GUARANTOR:**

**CERBERUS SERIES FOUR HOLDINGS, LLC**,
a Delaware limited liability company

By:      Cerberus Institutional Partners, L.P. — Series Four, its Managing Member

       By:   Cerberus Institutional Associates, L.L.C., its General Partner

         By:_____
            Name:
            Title:

[Signature Page to the Fixed Portfolio Guaranty]

**SCHEDULE I**
**BORROWER**

| | |
|---|---|
| Grand Prix Belmont LLC | Grand Prix Lynnwood LLC |
| Grand Prix Campbell/San Jose LLC | Grand Prix Tukwila LLC |
| Grand Prix El Segundo LLC | |
| Grand Prix Fremont LLC | |
| Grand Prix Mountain View LLC | |
| Grand Prix San Jose LLC | |
| Grand Prix San Mateo LLC | |
| Grand Prix Sili I LLC | |
| Grand Prix Sili II LLC | |
| Grand Prix Denver LLC | |
| Grand Prix Englewood/Denver South LLC | |
| Grand Prix Shelton LLC | |
| Grand Prix Windsor LLC | |
| Grand Prix Altamonte LLC | |
| Grand Prix Ft. Lauderdale LLC | |
| Grand Prix Naples LLC | |
| Grand Prix Atlanta LLC | |
| Grand Prix Atlanta (Peachtree Corners) LLC | |
| Grand Prix Lombard LLC | |
| Grand Prix Chicago LLC | |
| Grand Prix Schaumburg LLC | |
| Grand Prix Westchester LLC | |
| Grand Prix Lexington LLC | |
| Grand Prix Louisville (RI) LLC | |
| Grand Prix Columbia LLC | |
| Grand Prix Gaithersburg LLC | |
| Grand Prix Germantown LLC | |
| Grand Prix Portland LLC | |
| Grand Prix Livonia LLC | |
| Grand Prix Cherry Hill LLC | |
| Grand Prix Mt. Laurel LLC | |
| Grand Prix Saddle River LLC | |
| Grand Prix Islandia LLC | |
| Grand Prix Binghamton LLC | |
| Grand Prix Horsham LLC | |
| Grand Prix Willow Grove LLC | |
| Grand Prix Addison (RI) LLC | |
| Grand Prix Arlington LLC | |
| Grand Prix Las Colinas LLC | |
| Grand Prix Richmond LLC | |
| Grand Prix Richmond (Northwest) LLC | |
| Grand Prix Bothell LLC | |

**<u>Exhibit D</u>**
Form of New HoldCo Guaranty

[See Attached]

## GUARANTY

**THIS GUARANTY** (this **"Guaranty"**) is executed as of this _____ day of October, 2011 by **INK ACQUISITION LLC, INK ACQUISITION II LLC, INK ACQUISITION III LLC, INK ACQUISITION IV LLC, INK ACQUISITION V LLC, INK ACQUISITION VI LLC** and **INK ACQUISITION VII LLC**, each a Delaware limited liability company, each having an address c/o Chatham Lodging Trust, 50 Cocoanut Row, Suite 200, Palm Beach, Florida 33480 (individually and collectively, "**Guarantor**"), for the benefit of **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C6, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C6, SUCCESSOR TRUSTEE TO BANK OF AMERICA, NATIONAL ASSOCIATION,** having an address at c/o Wells Fargo Commercial Mortgage Servicing, 201 South College Street, 9th Floor, Charlotte, North Carolina, 28244 ("**Lender**").

### W I T N E S S E T H :

WHEREAS, pursuant to that certain Loan Agreement, dated as of June 29, 2007, between EACH OF THE PERSONS SET FORTH IN SCHEDULE I ATTACHED HERETO, each a Delaware limited liability company (each individually and collectively, as the context requires, **"Borrower"**) and Lehman ALI Inc. ("**Original Lender**"), as lender (as modified by that certain First Amendment to Loan Agreement, dated as of August 9, 2007 as further modified by that certain Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement dated as of the date hereof (the "**Omnibus Amendment**"), and as the same may hereafter be amended, modified, restated, renewed or replaced the **"Loan Agreement"**), Original Lender made a Loan (as defined in the Loan Agreement) to Borrower which Loan is evidenced by the Note (as defined in the Loan Agreement), secured by, among other things, the Security Instruments (as defined in the Loan Agreement);

WHEREAS, in connection with the Omnibus Amendment, Guarantor has agreed to unconditionally guarantee payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's entering into the Omnibus Amendment.

NOW, THEREFORE, as an inducement to Lender to enter into the Omnibus Amendment, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

# ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1** **Guaranty of Obligation.** Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor. Notwithstanding the foregoing, Lender shall have no right to enforce this Guaranty against Guarantor unless the approval or consent of the Cerberus Member (as such term is defined in the Loan Agreement) is not required to effect Major Decisions (as defined in the Loan Agreement).

**1.2** **Definition of Guaranteed Obligations.** As used herein, the term **"Guaranteed Obligations"** means the obligations or liabilities of Borrower to Lender for which Borrower shall be liable pursuant to Section 9.4(b) and (c) of the Loan Agreement.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim in any bankruptcy proceeding of Borrower for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

**1.3** **Nature of Guaranty.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4** **Guaranteed Obligations Not Reduced by Offset.** The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**1.5** **Payment By Guarantor.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within five (5) Business Days of demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.6** **No Duty To Pursue Others.** It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**1.7** **Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instrument, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default

by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

      **1.8**    **Payment of Expenses.**   In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, within five (5) Business Days of demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations until the expiration of any applicable statute of limitations.

      **1.9**    **Effect of Bankruptcy.**   In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. In addition, if at any time any payment of principal, interest or any other amount payable by Borrower under any Loan Document, is rescinded or must be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be fully reinstated as though such payment has been due but not made.

      **1.10**    **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, until the Debt is paid in full, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

      **1.11**    **Borrower.** The term **"Borrower"** as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of or by Borrower, provided that nothing herein shall be deemed to permit any such merger, reorganization, sale, transfer,

assignment, devise, gift or bequest of or by Borrower other than in accordance with the terms of the Loan Agreement.

1.12　**Termination.** This Guaranty and the obligations of Guarantor hereunder shall automatically terminate upon the payment in full of the Loan; provided, however, that the Guarantor shall remain liable for any Guaranteed Obligations to Lender, including, but not limited to, the Environmental Indemnity, that by their terms survive payment in full of the Loan. In addition, upon compliance with the applicable requirements in Section 5.2.11 of the Loan Agreement, this Guaranty and the obligations of Guarantor hereunder shall terminate as more fully set forth in the Loan Agreement.

1.13　**INK REIT Release**. Upon the satisfaction of the conditions set forth in Section 5.2.10(d)(C) of the Loan Agreement with respect to a Holdco Interest Transfer, Lender agrees that the applicable INK REIT subject to such Holdco Interest Transfer shall be released under this Guaranty from all liability arising from acts or omissions first occurring following the date of such applicable Holdco Interest Transfer pursuant to a written release in form and substance reasonably satisfactory to Lender and such INK REIT.

# ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) relating to Guarantor's obligations hereunder which Guarantor might otherwise have as a result of or in connection with any of the following:

2.1　**Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instruments, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

2.2　**Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3** **Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4** **Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Security Instruments, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instruments, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5** **Release of Obligors.** Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof (except for the express release in writing by Lender of any or all of Guarantor's obligations under this Guaranty), it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6** **Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed

Obligations.

**2.7** **Release of Collateral.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8** **Care and Diligence.** Other than as a result of Lender's gross negligence, fraud or willful misconduct, the failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9** **Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

**2.10** **Offset.** The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**2.11** **Merger.** The reorganization, merger or consolidation of Borrower into or with any other Person.

**2.12** **Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.13** **Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security

and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1** **Benefit.** Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2** **Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3** **No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**3.4** **Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or

which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

        **3.6**    **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

<div align="center">

**ARTICLE IV**

**SUBORDINATION OF CERTAIN INDEBTEDNESS**

</div>

        **4.1**    **Subordination of All Guarantor Claims**. As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

        **4.2**    **Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly -from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

        **4.3**    **Payments Held in Trust.** In the event that, notwithstanding anything

to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

4.4    **Liens Subordinate.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attached. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower.

## ARTICLE V

## MISCELLANEOUS

5.1    **Waiver.**  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

5.2    **Notices.**        Any notice, demand, statement, request or consent made hereunder shall be made in accordance with Section 10.6 of the Loan Agreement. The address of the Guarantor is as follows:

<table>
<tr><td>If to Guarantor:</td><td>INK Acquisition LLC<br>INK Acquisition II LLC<br>INK Acquisition III LLC<br>INK Acquisition IV LLC<br>INK Acquisition V LLC<br>INK Acquisition VI LLC<br>INK Acquisition VII LLC</td></tr>
</table>

|  |  |
|---|---|
| If to Guarantor: | INK Acquisition LLC<br>INK Acquisition II LLC<br>INK Acquisition III LLC<br>INK Acquisition IV LLC<br>INK Acquisition V LLC<br>INK Acquisition VI LLC<br>INK Acquisition VII LLC |
| with a copy to: | c/o Chatham Lodging Trust<br>50 Cocoanut Row, Suite 200<br>Palm Beach, Florida 33480<br>Attention:  Jeffrey Fisher<br>Facsimile number:  (561) 804-0909 |
| With a copy to: | Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, New York 10019<br>Attention: Scott K. Charles and David Fischman<br>Facsimile number:  (212) 403-2311 |
|  | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attention: Stuart D. Freedman, Esq.<br>Facsimile number: (212) 593-595 |

**5.3** <u>Governing Law.</u> **(a) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY INDEMNITEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND LENDER EACH**

HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR AND LENDER EACH WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR AND LENDER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

CT Corporation
111 Eighth Avenue
New York, New York 10011

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW A YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**5.4** **Invalid Provisions.** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.5** **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.6** **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

**5.7** **Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8** **Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**5.9** **Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**5.10** **Rights and Remedies.** If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the

rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

      **5.11**    **Other Defined Terms.** Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

      **5.12**    **Entirety.** **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

      **5.13**    **Waiver of Right To Trial By Jury.** **GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND BY ITS ACCEPTANCE HEREOF, LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND GUARANTOR ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.**

      **5.14**    **Reinstatement in Certain Circumstances.** If at any time any payment of the principal of or interest under the Note or any other amount payable by the

Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

<center>[NO FURTHER TEXT ON THIS PAGE]</center>

**GUARANTOR:**

**INK ACQUISITION LLC,**
a Delaware limited liability company

By:   Chatham Lodging, L.P., its managing member


By:_____
    Name:
    Title:

**INK ACQUISITION II LLC,**
a Delaware limited liability company

By:   Chatham TRS Holding, Inc., its managing member


By:_____
    Name:
    Title:

**INK ACQUISITION III LLC,**
a Delaware limited liability company

By:   Chatham TRS Holding, Inc., its managing member


By:_____
    Name:
    Title:

**INK ACQUISITION IV LLC,**
a Delaware limited liability company

By:   Chatham Lodging, L.P., its managing member


By:_____
    Name:
    Title:
    [signatures continue of next page]

**INK ACQUISITION V LLC,**
a Delaware limited liability company

By:  Chatham Lodging, L.P., its managing member


    By:_____
      Name:
      Title:

**INK ACQUISITION VI LLC,**
a Delaware limited liability company

By:  Chatham Lodging, L.P., its managing member


    By:_____
      Name:
      Title:

**INK ACQUISITION VII LLC,**
a Delaware limited liability company

By:  Chatham Lodging, L.P., its managing member


    By:_____
      Name:
      Title:

**SCHEDULE I**

**BORROWER**

Grand Prix Belmont LLC
Grand Prix Campbell/San Jose LLC
Grand Prix El Segundo LLC
Grand Prix Fremont LLC
Grand Prix Mountain View LLC
Grand Prix San Jose LLC
Grand Prix San Mateo LLC
Grand Prix Sili I LLC
Grand Prix Sili II LLC
Grand Prix Denver LLC
Grand Prix Englewood/Denver South LLC
Grand Prix Shelton LLC
Grand Prix Windsor LLC
Grand Prix Altamonte LLC
Grand Prix Ft. Lauderdale LLC
Grand Prix Naples LLC
Grand Prix Atlanta LLC
Grand Prix Atlanta (Peachtree Corners) LLC
Grand Prix Lombard LLC
Grand Prix Chicago LLC
Grand Prix Schaumburg LLC
Grand Prix Westchester LLC
Grand Prix Lexington LLC
Grand Prix Louisville (RI) LLC
Grand Prix Columbia LLC
Grand Prix Gaithersburg LLC
Grand Prix Germantown LLC
Grand Prix Portland LLC
Grand Prix Livonia LLC
Grand Prix Cherry Hill LLC
Grand Prix Mt. Laurel LLC
Grand Prix Saddle River LLC
Grand Prix Islandia LLC
Grand Prix Binghamton LLC
Grand Prix Horsham LLC
Grand Prix Willow Grove LLC
Grand Prix Addison (RI) LLC
Grand Prix Arlington LLC
Grand Prix Las Colinas LLC
Grand Prix Richmond LLC
Grand Prix Richmond (Northwest) LLC
Grand Prix Bellevue LLC

Grand Prix Bothell LLC
Grand Prix Lynnwood LLC
Grand Prix Tukwila LLC

**<u>Exhibit E</u>**
Pro Forma Structure Chart

[See Attached]

\

Pro Forma Structure Chart

SRZ DRAFT 10/10/11





Pro Forma Structure Chart (continued)

SRZ DRAFT 10/10/11

125 REIT Preferred Holders

Cerberus Series Four Holdings LLC & other Cerberus funds and managed accounts

125 REIT Preferred Holders

Chatham Lodging Trust

125 REIT Preferred Holders

Cerberus Series Four Holdings LLC & other Cerberus funds and managed accounts

125 REIT Preferred Holders

100%

Chatham Lodging LP

Additional CRE-Ink REIT Member LLCs [see footnote 1 for detail]

CRE-Ink REIT Member V LLC

CRE-Ink REIT Member LLC

100%

Chatham TRS Holding Inc.

CRE-Ink REIT Member VI LLC

CRE-Ink REIT Member VII LLC

89.1%

10.9%

96%     4%

10.9%

89.1%

INK Acquisition V LLC (Delaware LLC)

CRE-Ink TRS Holding Inc.

INK Acquisition VII LLC (Delaware LLC)

89.1%        10.9%

10.9%        89.1%

INK Acquisition III LLC[2] (Delaware LLC)

INK Acquisition VI LLC (Delaware LLC)

Property Owners (LLCs)

Property Owners (LLCs)

Property Owners (LLCs)

Property Leases

Grand Prix Fixed Lessee, LLC

Grand Prix Floating Lessee, LLC

Property Leases

Property Leases

Properties

Properties

Property Leases

Properties

Properties

1.  Each of CRE-Ink REIT Member IV LLC, CRE-Ink REIT Member V LLC, CRE-Ink REIT Member VI LLC and CRE-Ink REIT Member VII LLC will own a 1% interest in CRE-Ink TRS Holding Inc.  This ownership has been consolidated for purposes of this structure chart and the separate ownership of CRE-Ink TRS Holding Inc. by each of these four entities individually is not specifically reflected.

2.  Note that Ink Acquisition III LLC has been included on both charts for ease of reference.  There is no substantive difference with respect to this entity.

# EXHIBIT B

## Comparison of Modified Plan Against Confirmed Plan

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, *et al.*, | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

**DEBTORS' PLANS OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**
**(WITH MODIFICATIONS TO THE FIXED/FLOATING PLAN)**

---

Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest. This Plan is subject to approval of the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES) PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

James H.M. Sprayregen, P.C.          Anup Sathy, P.C.
Paul M. Basta                        KIRKLAND & ELLIS LLP
Stephen E. Hessler                   300 North LaSalle Drive
Brian S. Lennon                      Chicago, Illinois 60654-3406
KIRKLAND & ELLIS LLP                 Telephone:  (312) 862-2000
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800

Counsel to the Debtors and Debtors in Possession

Dated:  ~~June 29,~~ **October 19,** 2011

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ................................................................................................. 1
A.   Defined Terms ........................................................................................................ 1
B.   Rules of Interpretation ......................................................................................... 20
C.   Computation of Time ........................................................................................ ~~21~~20
D.   Governing Law .................................................................................................. ~~21~~20
E.   Reference to Monetary Figures ............................................................................ 21
F.   Controlling Document ......................................................................................... 21

**ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS** .................... 21
A.   Administrative Claims .......................................................................................... 21
B.   Accrued Professional Compensation Claims ........................................................ 22
C.   Five Mile DIP Claims .......................................................................................... 23
D.   Lehman DIP Claims ............................................................................................. 23
E.   LNR Structuring Fee ............................................................................................ 23
F.   Claims Based on Postpetition Intercompany Loans ............................................. 23
G.   Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses ...................................................................................................... ~~24~~23
H.   Ad Hoc Committee Administrative Claim ............................................................ 24
I.   Priority Tax Claims .............................................................................................. 24

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............................ 24
A.   Summary of Classification ................................................................................... 24
B.   Treatment of Claims and Interests ....................................................................... 28
B.   Special Provision Governing Unimpaired Claims ............................................. ~~48~~47
C.   Elimination of Vacant Classes ......................................................................... ~~48~~47
D.   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .................. ~~48~~47

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ..................................................... ~~48~~47
A.   Substantive Consolidation ............................................................................... ~~48~~47
B.   Restructuring Transactions and Sources of Consideration for Plan Distributions ..................... ~~48~~47
C.   General Settlement of Claims ........................................................................... ~~49~~48
D.   Fixed/Floating Investment ............................................................................... ~~49~~48
E.   Chatham Hotel Sale Transaction ...................................................................... ~~49~~48
F.   Anaheim Hotel Commitment Letter .................................................................. ~~49~~48
G.   New Fixed Rate Pool Mortgage Loan Limited Guarantys .................................. ~~49~~48
H.   Special Servicer Payment and Special Servicer Release Payment ......................... 49
I.   Issuance of Interests in Post-Effective Date Fixed/Floating Debtors ..................... 49
J.   Management Compensation .............................................................................. ~~50~~49
K.   Listing of New HoldCo Interests; Reporting Obligations .................................... ~~50~~49
L.   Release of Liens ............................................................................................... ~~50~~49
M.   LP Bank Account ................................................................................................. 50
N.   Vesting of Assets in the Post-Effective Date Debtors ........................................... 50
O.   Rights and Obligations Under Troy Settlement Agreement ............................... ~~51~~50
P.   Cancellation of Securities and Agreements ...................................................... ~~51~~50
Q.   Corporate Action ............................................................................................. ~~51~~50
R.   Effectuating Documents; Further Transactions ..................................................... 51
S.   Exemption from Certain Taxes and Fees ........................................................... ~~52~~51
T.   D&O Liability Insurance Policies ..................................................................... ~~52~~51
U.   D&O Tail Insurance Policies ........................................................................... ~~52~~51
V.   New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws .................... 52

i

| | | |
|---|---|---|
| W. | Board Representation | 5352 |
| X. | Indemnification Provisions | 5352 |
| Y. | Liquidation Trust | 5352 |
| Z. | Disbursing Agent for the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee | 5655 |
| AA. | Preservation of Rights of Action | 5655 |
| BB. | Ad Hoc Committee Agreement | 5655 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...................... 57

| | | |
|---|---|---|
| A. | Assumption of Franchise Agreements | 57 |
| B. | Rejection of Executory Contracts and Unexpired Leases | 5857 |
| C. | Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases | 5857 |
| D. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 5958 |
| E. | Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 5958 |
| F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 59 |
| G. | Reservation of Rights | 59 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .................................................... 6059

| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed | 6059 |
| B. | Distributions to Holders of Claims Against and Interests in the Trust Debtors | 6059 |
| C. | Distributions to Holders of Claims Against and Interests in the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee; Disbursing Agent | 60 |
| D. | Rights and Powers of Disbursing Agent | 60 |
| E. | Distributions on Account of Claims Allowed After the Effective Date | 6160 |
| F. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 61 |
| G. | Compliance with Tax Requirements/Allocations | 6362 |
| H. | Claims Paid or Payable by Third Parties | 63 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** .......................................................................................................... 6463

| | | |
|---|---|---|
| A. | Resolution of Disputed Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, and Anaheim Hotel Lessee | 6463 |
| B. | Resolution of Claims Against the Trust Debtors | 6665 |
| C. | Disallowance of Claims | 6766 |
| D. | Amendments to Claims | 6766 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** .................... 67

| | | |
|---|---|---|
| A. | Compromise and Settlement of Claims, Interests, and Controversies | 67 |
| B. | Subordinated Claims | 6867 |
| C. | Midland Release | 6867 |
| D. | Apollo Release | 6968 |
| E. | Fixed/Floating Debtors' Plan General Release | 7069 |
| F. | Anaheim Hotel Debtors' Plan General Release | 71 |
| G. | Ontario Hotel Debtors' Plan General Release | 7372 |
| H. | Remaining Debtors' Plan General Release | 7473 |
| I. | Exculpation | 7574 |
| J. | Injunction | 7675 |
| K. | Setoffs | 76 |

**ARTICLE IX. SEVERABILITY OF PLAN AND CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** .......................................................................................................... 7776

| | | |
|---|---|---|
| A. | Severability of the Plan | 7776 |
| B. | Condition Precedent to Confirmation of the Fixed/Floating Plan | 7776 |
| C. | Condition Precedent to Confirmation of the Remaining Debtor Plan | 7776 |
| D. | Conditions Precedent to the Effective Date of Each of the Joint Plans | 7776 |

K&E 18934861.61 20090501

|   | E. | Waiver of Conditions | 78 |
|   | F. | Effective Date | ~~79~~78 |
|   | G. | Effect of Non-Occurrence of the Effective Date Regarding ~~Fixed/Floating Debtors~~ | ~~79~~ |
|   | ~~H.~~ | ~~Effect of Non-Occurrence of the Effective Date Regarding~~ the Ontario Plan | ~~79~~78 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ........................... **79**

|   | A. | Modification and Amendments | 79 |
|   | B. | Effect of Confirmation on Modifications | ~~80~~79 |
|   | C. | Revocation or Withdrawal of the Plan | ~~80~~79 |

**ARTICLE XI. RETENTION OF JURISDICTION** ......................................................................... **~~80~~79**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ........................................................................ **~~82~~81**

|   | A. | Immediate Binding Effect | ~~82~~81 |
|   | B. | Additional Documents | ~~82~~81 |
|   | C. | Payment of Statutory Fees | ~~82~~81 |
|   | D. | Dissolution of Committees | 82 |
|   | E. | Reservation of Rights | 82 |
|   | F. | Successors and Assigns | ~~83~~82 |
|   | G. | Dissolution of Entities | ~~83~~82 |
|   | H. | Service of Documents | ~~83~~82 |
|   | I. | Term of Injunctions or Stays | 84 |
|   | J. | Entire Agreement | ~~85~~84 |
|   | K. | Nonseverability of Plan Provisions | ~~85~~84 |

K&E ~~18934861.61~~20090501

**INTRODUCTION**

Innkeepers USA Trust and certain of its affiliates (as defined in section 101(2) of the Bankruptcy Code) as debtors and debtors in possession (collectively, the "**Debtors**")[1] propose the following plans of reorganization. The Plan (as defined herein) is an aggregation of four separate joint plans of reorganization: the Fixed/Floating Plan; the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan (each as defined herein). Together these Joint Plans (as defined herein) provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases. The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the Joint Plans are not conditioned on the Confirmation and Consummation of any of the other Joint Plans.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*Accrued Professional Compensation Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "*Ad Hoc Committee*" means the ad hoc committee of Innkeepers USA Trust Preferred C Interests, which is comprised of: Brencourt Advisors, LLC; Esopus Creek Advisors, LLC; Plainfield Special Situations Master Fund II Limited; Morgens, Waterfall, Vintiadis & Co., Inc.; and P. Schoenfeld Asset Management LP, for and on behalf of certain funds and entities for which it serves as the Investment Advisor.

3.      "*Ad Hoc Committee Administrative Claim*" means the Administrative Claim of the Ad Hoc Committee referenced in Article II.H.

4.      "*Adequate Protection Obligations*" means all outstanding Claims for adequate protection as set forth in the Cash Collateral Orders.

5.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors incurred after the Petition Date and through the Effective Date; (b) Claims of Professionals in the Chapter 11 Cases; (c) amounts owing pursuant to the DIP Orders; (d) amounts owing on account of the Adequate Protection Obligations; (e) fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; and (f) requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

---

[1]      The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436. The location of the Debtors' corporate headquarters and the service address for their affiliates is: c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

6.        "*Administrative Claims Bar Date*" means, except for Administrative Claims of Professionals, the first Business Day that is 30 days following the Effective Date of the Joint Plan applicable to the Debtor against whom the Administrative Claim is asserted, except as specifically set forth in the Plan or a Final Order.

7.        "*Allowed*" means with reference to any Claim or Interest, as may be applicable, (a) any Claim against the Debtors that has been listed on its Schedules (as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not Disputed or contingent and for which (i) no contrary Proof of Claim has been Filed, (ii) no objection to allowance, request for estimation, or other challenge has been interposed, or (iii) no motion to deem the Schedules amended has been Filed, (b)(1) any Proof of Claim or Interest that is timely Filed by the applicable Claims Bar Date, as to which no litigation (whether stayed or unstayed) is pending and to which no objection or other challenge has been or is interposed in accordance with the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the Bankruptcy Court, if any, and (2) any Claim that is not subject to any applicable Claims Bar Date, as to which no objection or other challenge has been or is interposed in accordance with the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order or under the Plan, (e) any Claim that is not otherwise subject to disallowance under section 502(d) of the Bankruptcy Code, (f) any Claim arising from the recovery of property in accordance with sections 550 and 553 of the Bankruptcy Code and Allowed in accordance with section 502(h) of the Bankruptcy Code (unless such Claim is otherwise Disputed), (g) any Claim allowed by stipulation approved by the Bankruptcy Court, or (h) any Interest registered in the ownership register or otherwise on the Debtors' books and records, maintained by, or on behalf of, the Debtors as of the Voting Record Date.  Except as otherwise provided in the Plan, for purposes of determining the amount of an "Allowed Claim," there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset pursuant to applicable non-bankruptcy law or subject to recoupment.  Claims allowed solely for the purpose of voting to accept or reject a Joint Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder unless otherwise specified herein or by order of the Bankruptcy Court.  For any purpose under the Plan, unless specifically provided for herein, a Claim that has been Allowed shall not include amounts constituting interest, penalties, or late charges arising from or relating to the period from and after the Petition Date.  Any Claim or Interest that has been or is hereafter listed in the Schedules as Disputed, contingent, or unliquidated for which no Proof of Claim or Interest has been timely Filed and which is not included in subsections (a)-(h) herein, is not considered an Allowed Claim or Allowed Interest and shall be expunged without further action by the Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court.

8.        "*Anaheim Hotel Commitment Letter*" means that Commitment Letter Regarding the Restructuring of the Hilton Suites in Anaheim, California by and between CWCapital and Lehman Brothers Holdings Inc., dated May 10, 2011, as amended.

9.        "*Anaheim Hotel Debtors*" means Debtors:  (a) KPA HS Anaheim, LLC; (b) Grand Prix Mezz Borrower Term LLC; and (c) Grand Prix Anaheim Orange Lessee, LLC.

10.        "*Anaheim Hotel Debtors' Plan General Release*" means the release provision set forth in Article VIII.F.

11.        "*Anaheim Hotel Lessee*" means Grand Prix Anaheim Orange Lessee, LLC.

12.        "*Anaheim Hotel Mezzanine Loan Agreement*" means that certain Mezzanine Loan Agreement, dated as of June 29, 2007, as amended, by and between Grand Prix Mezz Borrower Term, LLC, the 100% owner of KPA HS Anaheim, LLC, as borrower, and Lehman, as lender, pursuant to which Lehman provided Grand Prix Mezz Borrower Term, LLC a junior mezzanine loan in the original principal amount of $21.3 million, which amount is collateralized by Grand Prix Mezz Borrower Term, LLC's Interests in KPA HS Anaheim, LLC.

13.        "*Anaheim Hotel Mezzanine Loan Claims*" means all Claims against the Anaheim Hotel Debtors arising under, derived from, or based upon the Anaheim Hotel Mezzanine Loan Agreement.

14.     "*Anaheim Hotel Mezzanine Loan Deficiency Claims*" means any Anaheim Hotel Mezzanine Loan Claim that is not Secured.

15.     "*Anaheim Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of June 14, 2005, as amended, by and between RLJ Anaheim Suites Hotel L.P., as borrower, and GMAC Commercial Mortgage Bank, as lender, pursuant to which GMAC Commercial Mortgage Bank provided a mortgage loan in the original principal amount of $13.7 million to RLJ Anaheim Suites Hotel L.P. that was later assumed by KPA HS Anaheim, LLC pursuant to those certain Loan Assumption and Modification Agreements, dated as of October 4, 2006 and June 29, 2007, which amount is collateralized by the Hilton Suites in Anaheim, California.

16.     "*Anaheim Hotel Mortgage Loan Claims*" means all Claims against the Anaheim Hotel Debtors arising under, derived from, or based upon the Anaheim Hotel Mortgage Loan Agreement.

17.     "*Anaheim Hotel Owner*" means Debtor KPA HS Anaheim, LLC.

18.     "*Anaheim Hotel Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such:  (a) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (b) CWCapital, (c) TriMont, in its capacity as servicer for the Anaheim Hotel Mezzanine Loan Agreement; (d) Apollo; (e) SASCO, as holder of 100% of the economic and beneficial interests under the Anaheim Hotel Mezzanine Loan Agreement; (f) LCPI, as administrative agent for SASCO with respect to the Anaheim Hotel Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO; (g) the Independent Committee; (h) all other Holders of Claims against or Interests in the Anaheim Hotel Debtors; (i) the officers, directors, trustees, and members of the Debtors; and (j) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

19.     "*Anaheim Mezzanine Debtor*" means Debtor Grand Prix Mezz Borrower Term LLC.

20.     "*Anaheim Plan*" means the chapter 11 plan of reorganization proposed herein for the Anaheim Hotel Debtors, which shall be in accordance with the Anaheim Hotel Commitment Letter as set forth in Article IV.F.

21.     "*Apollo*" means Apollo Investment Corporation and its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, as well as the principals, employees, agents, officers, directors, and professionals of each such party, each in its capacity as such.

22.     "*Apollo Guaranty*" means that certain Required Capital Improvements Guaranty, executed by Apollo Investment Corporation for the benefit of Lehman ALI Inc., in its capacity as original lender under the Fixed Rate Pool Hotel Mortgage Loan Agreement, dated as of June 29, 2007.

23.     "*Apollo Unsecured Claim Fund Payment*" means the $375,000 payment to be made by Apollo on the Effective Date with respect to the Fixed/Floating Plan and to be included in the Fixed/Floating Unsecured Claim Fund.

24.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

25.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

26.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, as may be amended from time to time.

K&E 18934861.61 20090501

27.     "*Beneficiaries*" means Holders of Allowed Claims and Interests against the Trust Debtors as beneficiaries of the Liquidation Trust.

28.     "*Bidding Procedures Order*" means the Order (I) Authorizing the Debtors to Enter into the Amended Commitment Letter with Five Mile Capital II Pooling REIT LLC, Lehman ALI Inc., and Midland Loan Services, (II) Approving the Amended New Party/Midland Commitment Between the Debtors and Midland Loan Services, (III) Approving Fixed/Floating Bidding Procedures, (IV) Approving Bid Protections, (V) Authorizing an Expense Reimbursement to "Bidder D," and (VI) Modifying Cash Collateral Order to Increase Cash Reserve, entered by the Bankruptcy Court on March 11, 2011 [Docket No. 1009].

29.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

30.     "*C-III*" means C-III Asset Management, LLC, or any successor thereto, as special servicer for the Ontario Hotel Mortgage Loan Agreement.

31.     "*C6 and C7 Trusts*" means the mortgage loan pools known as LB-UBS Commercial Mortgage Trust 2007-C6 and LB-UBS Commercial Mortgage Trust 2007-C7; provided that the foregoing definition of C6 and C7 Trusts shall not include the holders of certificates in such commercial mortgage backed securitization trusts in their capacity as such.

32.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

33.     "*Cash Collateral Orders*" means the:  Interim Order (A) Authorizing the Debtors to (I) Use the Adequate Protection Parties' Cash Collateral and (II) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, (B) to the Extent Approved in the Final Order, Granting Senior Secured, Priming Liens on Certain Postpetition Intercompany Claims, (C) to the Extent Approved in the Final Order, Granting Administrative Priority Status to Certain Postpetition Intercompany Claims, and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), entered by the Bankruptcy Court on July 20, 2010 [Docket No. 54]; the Final Order Authorizing the Debtors to (i) Use the Adequate Protection Parties' Cash Collateral and (ii) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, entered by the Bankruptcy Court on September 2, 2010 [Docket No. 402]; Order Amending the Cash Collateral Order, entered by the Bankruptcy Court on October 1, 2010 [Docket No. 539]; Stipulation Regarding Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on November 30, 2010 [Docket No. 744]; Stipulation Between The Official Committee of Unsecured Creditors of Innkeepers USA Trust And The Adequate Protection Parties Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on January 4, 2011 (Docket No. 788); Third Stipulation Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on January 28, 2011 [Docket No. 875]; Fourth Stipulation Regarding Further Modification of the Committee's Challenge Deadline In The Cash Collateral Order, entered by the Bankruptcy Court on February 28, 2011 [Docket No. 953]; Order Modifying Final Cash Collateral Order, entered by the Bankruptcy Court on March 11, 2011 [Docket No. 1008], and Fifth Stipulation Regarding Further Modification of the Committee's Challenge Deadline in the Cash Collateral Order, entered by the Bankruptcy Court on March 28, 2011 [Docket No. 1060], as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.  The Cash Collateral Orders shall remain in effect between the Confirmation Date and the Effective Date.

34.     "*Causes of Action*" means any Claim, cause of action (including avoidance actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, Secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

4

35.    "*Certificate*" means any instrument evidencing a Claim against, or an Interest in, one of more of the Debtors.

36.    "*Chapter 11 Cases*" means the jointly administered chapter 11 cases commenced by the Debtors and styled In re Innkeepers USA Trust, et al., Chapter 11 Case No. 10-13800 (SCC), which are currently pending before the Bankruptcy Court.

37.    "*Chatham*" means Chatham Lodging, LP.

38.    "*Chatham APA*" means that certain Agreement of Purchase and Sale, dated as of May 3, 2011 (as such agreement may be amended or modified from time to time), by and among the San Diego Hotel Owner, the Garden Grove Hotel Owner, the Tysons Corner Hotel Owner, the Washington DC Hotel Owner, the San Antonio Hotel Owner, the San Diego Hotel Lessee, the Garden Grove Hotel Lessee, the General Hotel Lessee, and Chatham.

39.    "*Chatham Hotel Sale Transaction*" means the sale transaction set forth in the Chatham APA.

40.    "*Chatham Hotel Sale Transaction Documents*" means the Chatham APA (and ancillary documents related thereto) for the Chatham Hotel Sale Transaction, which shall be included in the Plan Supplement.

41.    "*Chatham Hotel Sale Transaction Purchase Consideration*" means the Garden Grove Hotel Purchase Consideration, the San Diego Hotel Purchase Consideration, the Washington DC Hotel Purchase Consideration, the Tysons Corner Hotel Purchase Consideration, and the San Antonio Hotel Purchase Consideration; provided, however, that notwithstanding anything contained in the Plan, the Plan Supplement, the Remaining Debtor Plan, the Disclosure Statement or any other document or agreement relating to the foregoing documents, the Chatham Hotel Sale Transaction Purchase Consideration shall not exceed $195,000,000.00 in the aggregate (including the assumption of debt as set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents).  For the avoidance of doubt, Chatham's payment of the LNR Assumption Fee and LNR Liquidation Fee are not deductions from the Chatham Hotel Sale Transaction Purchase Consideration.

42.    "*Chatham Hotel Sale Transaction Loan Assumption Documents*" means the agreements relating to the assumption by Chatham, in accordance with the LNR Commitment, of the Garden Grove Hotel Mortgage Loan Agreement, the San Antonio Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the Washington DC Hotel Mortgage Loan Agreement, as such loan agreements may be assumed, amended, restated, and/or supplemented in connection with the Chatham Hotel Sale Transaction, which documents shall be included in the Plan Supplement.

43.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

44.    "*Claims Bar Date*" means the applicable deadline by which a Proof of Claim must be or must have been Filed, as established by the Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof, entered by the Bankruptcy Court on September 16, 2010 [Docket No. 440].

45.    "*Claims Objection Bar Date*" means the date that is 120 days after the Effective Date of the Joint Plan applicable to the Debtor against whom the Claim is asserted, or such later date as may be fixed by order of the Bankruptcy Court.

46.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

47.    "*Class*" means a category of Holders of Claims or Interests as set forth in Article III in accordance with section 1122(a) of the Bankruptcy Code.

48.    "*Commitment Letter*" means that certain **Second** Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust, dated ~~May~~

16.October 19, 2011, by and among New HoldCo, the Fixed/Floating Plan Sponsors, Apollo Investment Corporation, the Fixed/Floating Debtors, and Midland, **Lehman, and SASCO,** as well as the appendices and exhibits attached thereto.

49.　　"*Committee*" or "*Committees*" means any official committee (and any and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

50.　　"*Confirmation*" means, with respect to any of the Joint Plans, the entry on the docket of the Chapter 11 Cases of a Confirmation Order applicable to such Joint Plan.

51.　　"*Confirmation Date*" means, with respect to any of the Joint Plans, the date upon which the Bankruptcy Court enters the Confirmation Order (within the meaning of Bankruptcy Rules 5003 and 9021) applicable to such Joint Plan.

52.　　"*Confirmation Hearing*" means, with respect to any of the Joint Plans, the hearing held by the Bankruptcy Court to consider Confirmation of the Plan applicable to such Joint Plan pursuant to section 1129 of the Bankruptcy Code.

53.　　"*Confirmation Objection Deadline*" means, with respect to any of the Joint Plans, the deadline for Filing objections to Confirmation of such Joint Plan.

54.　　"*Confirmation Order*" means, with respect to any or all of the Joint Plans, an order of the Bankruptcy Court confirming such Joint Plan or Joint Plans pursuant to section 1129 of the Bankruptcy Code. The Confirmation Order for the Fixed/Floating Plan shall be in form and substance acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman, and Midland, each in their reasonable discretions, and the Confirmation Order for the Remaining Debtor Plan shall be in form and substance reasonably acceptable to Chatham; and the Confirmation Order for the Anaheim Plan shall be in form and substance reasonably acceptable in all respects to LCPI, SASCO, and CWCapital, each in their reasonable discretions, and the Confirmation Order for the Ontario Plan shall be in form and substance reasonably acceptable in all respects to C-III.**the Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Docket. No 1804], as amended in accordance with the Order (I) Extending the Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof, and (II) Approving Modifications to the Fixed/Floating Plan and Related Amendments to the Confirmation Order [Docket No. 2090] and the Order (A) Authorizing Fixed/Floating Debtors to Enter into Amended Commitment Agreement and (B) Approving (I) Modifications to Fixed/Floating Plan and Confirmation Order and (II) Amended New HoldCo/Midland Commitment, dated [＿＿＿], 2011 [Docket No.＿＿].**

55.　　"*Consummation*" means, for all purposes with respect to any of the Joint Plans, the occurrence of the Effective Date for such Joint Plan.

56.　　"*Corporate Structure Summary*" means the description of the ultimate corporate structure for the Post-Effective Date Fixed/Floating Debtors, which description shall be set forth in the Plan Supplement.

57.　　"*Cure Obligations*" means all (a) amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults and (b) other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

58.　　"*CWCapital*" means CWCapital Asset Management, LLC, or any successor thereto, as special servicer for the Anaheim Hotel Mortgage Loan Agreement.

59.　　"*D&O Liability Insurance Policies*" means all insurance policies for directors, members, trustees, officers, and managers' liability maintained by the Debtors as of the Effective Date.

60.     "*DIP Orders*" means (a) the Final Order Authorizing the Debtors to Obtain Postpetition Senior Secured Super-Priority Debtor-in-Possession Financing from Five Mile Capital II Pooling International LLC Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d) and 364(e), entered September 2, 2010 [Docket No. 400] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time and (b) the Amended Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, 364 and 507 (I) Authorizing Floating Rate Debtors to Obtain Postpetition Financing and (II) Granting Liens and Super-Priority Claims, entered September 13, 2010 [Docket No. 432] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

61.     "*Disbursing Agent*" means the Debtors or their agent or any other Entity or Entities selected by the Debtors in their sole discretion to make or facilitate distributions that are to be made on and after the Effective Date pursuant to the applicable Joint Plan.

62.     "*Disclosure Statement*" means, with respect to any of the Joint Plans, the Disclosure Statement for the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated May 19, 2011, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

63.     "*Disclosure Statement and Solicitation Procedures Order*" means, with respect to any of the Joint Plans, the Order Approving (A) Adequacy of the Disclosure Statement, (B) Certain Dates Related to Confirmation of the Plan; (C) Certain Voting Procedures and the Form of Certain Documents to Be Distributed in Connection With Solicitation of the Plan; and (D) Proposed Voting and General Tabulation Procedures, entered by the Bankruptcy Court on May 19, 2011 [Docket No. 1441], approving the Disclosure Statement and certain procedures for solicitation of votes on such Joint Plan and granting related relief.

64.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

65.     "*Disputed Claims Reserve*" means the reserve to be created by the Disbursing Agent to hold Cash, which reserve shall be held for the benefit of Holders of subsequently Allowed Claims or, to the extent applicable, to Holders of Interests, for distribution according to the procedures set forth in Article VI and Article VII.

66.     "*Distribution Waterfall*" means distributions of a Debtor's property, including the proceeds therof, in satisfaction of Claims and Interests in accordance with all applicable priority principles of the Bankruptcy Code and other applicable law; provided that, for the avoidance of doubt, no Holder of a Claim or Interest shall receive a distribution under the Plan that exceeds the Allowed amount of its Claim or Interest.

67.     "*Effective Date*" means, with respect to any of the Joint Plans, the date that is a Business Day selected by the Debtors after the Confirmation Date applicable to such Joint Plan on which: (a) no stay of the Confirmation Order applicable to such Joint Plan is in effect; and (b) all conditions precedent specified in Article IX.D applicable to such Joint Plan have been satisfied or waived (in accordance with Article IX.E).

68.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

69.     "*Estate*" means, as to each Debtor, the estate created for each Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

70.     "*Exculpated Parties*" means, collectively, the Anaheim Hotel Releasing Parties, the Fixed/Floating Releasing Parties, the Ontario Hotel Releasing Parties, and the Remaining Debtor Releasing Parties; provided that the Anaheim Hotel Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Anaheim Plan; provided further that the Fixed/Floating Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Fixed/Floating Plan; provided further that the Ontario Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Ontario Plan; provided further that the Remaining Debtor Releasing Parties shall not be deemed Exculpated Parties unless and until the Effective Date of the Remaining Debtor Plan.

7

71. "*Exculpation*" means the exculpation provision set forth in Article VIII.I.

72. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

73. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, which was 0.28%.

74. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

75. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided further that, with the exception of the Confirmation Order (which is addressed in Article IX), the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to waive any appeal period.

76. "*Five Mile*" means, collectively, Five Mile Capital II Pooling REIT LLC, through its investment advisor Five Mile Capital Partners LLC.

77. "*Five Mile DIP Agent*" means Five Mile Capital II Pooling International LLC, as administrative agent under the Five Mile DIP Facility.

78. "*Five Mile DIP Agreement*" means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of September 24, 2010, among certain of the Debtors, as borrowers, and Five Mile Capital II Pooling International LLC as administrative agent, collateral agent, and Syndication Agent, and the lenders party thereto.

79. "*Five Mile DIP Claims*" means any Claim derived from or based upon the Five Mile DIP Agreement.

80. "*Five Mile DIP Facility*" means that certain $53.0 million debtor in possession credit facility entered into pursuant to the Five Mile DIP Agreement, which credit facility contains three "tranches:" "Tranche A," "Tranche B," and "Tranche C."

81. "*Five Mile DIP Lenders*" means the lenders under the Five Mile DIP Facility.

82. "*Five Mile Expense Reimbursement Claim*" means Five Mile's reasonable and documented fees and expenses paid pursuant to the Bidding Procedures Order.

83. "*Fixed/Floating Debtors*" means (a) the Fixed Rate Pool Hotel Debtors, (b) the Fixed Rate Pool Lessee, (c) the Floating Rate Pool Hotel Debtors, (d) the Floating Rate Pool Lessee; (e) GP AC Sublessee LLC, (f) Grand Prix Mezz Borrower Fixed, LLC; (g) Grand Prix Mezz Borrower Floating, LLC; and (h) Grand Prix Mezz Borrower Floating 2, LLC.

84. "*Fixed/Floating Debtors' Plan General Release*" means the release provision set forth in Article VIII.E.

85. "*Fixed/Floating Plan*" means the chapter 11 plan of reorganization proposed herein for the Fixed/Floating Debtors.

8

86. "*Fixed/Floating Plan Sponsors*" means Cerberus Series Four Holdings LLC and Chatham Lodging Trust.

87. "*Fixed/Floating Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Lehman DIP Lenders; (b) Five Mile; (c) the Five Mile DIP Agent; (d) the Five Mile DIP Lenders; (e) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (f) Lehman; (g) New HoldCo and each of the Fixed/Floating Plan Sponsors; (h) Midland; (i) the master servicer for the C6 and C7 Trusts; (j) trustees for the C6 and C7 Trusts; (k) the C6 and C7 Trusts; (l) TriMont, in its capacity as special servicer for the Floating Rate Pool Mezzanine Loan Agreement; (m) Apollo; (n) the Committee; (o) the Independent Committee; (p) SASCO, as holder of 100% of the economic and beneficial interests under the Floating Rate Pool Mezzanine Loan Agreement; (q) LCPI, as administrative agent for SASCO with respect to the Floating Rate Pool Mezzanine Loan Agreement and holder of 100% of the economic and beneficial interests in SASCO; (r) Island Hospitality Management, Inc.; (s) all other Holders of Claims against or Interests in the Fixed/Floating Debtors; (t) the officers, directors, trustees, and members of the Debtors; and (u) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals. For the avoidance of doubt, certificateholders in the C6 and C7 Trusts, in their capacity as such, are not Fixed/Floating Releasing Parties.

88. "*Fixed/Floating Successful Bid*" means the bid of New HoldCo on the terms set forth in the Commitment Letter.

**88.** 89. "*Fixed/Floating Unsecured Claim Fund*" means a payment of Cash in the aggregate amount of $4.75 million (which amount includes the Apollo Unsecured Claim Fund Payment), which payment shall be shared Pro Rata between Holders of General Unsecured Claims against the Fixed/Floating Debtors (excluding any deficiency claims) in accordance with the treatment of Holders of General Unsecured Claims against the Fixed/Floating Debtors Article III.B.1. set forth in Article III.B.1.

**89.** 90. "*Fixed Rate Pool Hotel Debtors*" means Debtors: (a) Grand Prix Addison (RI) LLC; (b) Grand Prix Altamonte LLC; (c) Grand Prix Arlington LLC; (d) Grand Prix Atlanta (Peachtree Corners) LLC; (e) Grand Prix Atlanta LLC; (f) Grand Prix Bellevue LLC; (g) Grand Prix Belmont LLC; (h) Grand Prix Binghamton LLC; (i) Grand Prix Bothell LLC; (j) Grand Prix Campbell / San Jose LLC; (k) Grand Prix Cherry Hill LLC; (l) Grand Prix Chicago LLC; (m) Grand Prix Columbia LLC; (n) Grand Prix Denver LLC; (o) Grand Prix El Segundo LLC; (p) Grand Prix Englewood / Denver South LLC; (q) Grand Prix Fremont LLC; (r) Grand Prix Ft. Lauderdale LLC; (s) Grand Prix Gaithersburg LLC; (t) Grand Prix Germantown LLC; (u) Grand Prix Horsham LLC; (v) Grand Prix Islandia LLC; (w) Grand Prix Las Colinas LLC; (x) Grand Prix Lexington LLC; (y) Grand Prix Livonia LLC; (z) Grand Prix Lombard LLC; (aa) Grand Prix Louisville (RI) LLC; (bb) Grand Prix Lynnwood LLC; (cc) Grand Prix Mountain View LLC; (dd) Grand Prix Mt. Laurel LLC; (ee) Grand Prix Naples LLC; (ff) Grand Prix Portland LLC; (gg) Grand Prix Richmond (Northwest) LLC; (hh) Grand Prix Richmond LLC; (ii) Grand Prix Saddle River LLC; (jj) Grand Prix San Jose LLC; (kk) Grand Prix San Mateo LLC; (ll) Grand Prix Schaumburg LLC; (mm) Grand Prix Shelton LLC; (nn) Grand Prix Sili I LLC; (oo) Grand Prix Sili II LLC; (pp) Grand Prix Tukwila LLC; (qq) Grand Prix Westchester LLC; (rr) Grand Prix Willow Grove LLC; and (ss) Grand Prix Windsor LLC.

**90.** 91. "*Fixed Rate Pool Lessee*" means Debtor Grand Prix Fixed Lessee LLC.

**91.** 92. "*Fixed Rate Pool Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of June 29, 2007, as amended, by and among the Fixed Rate Pool Hotel Debtors, as borrowers, the Fixed Rate Pool Lessee, as operating lessee, Grand Prix Holdings, as guarantor, and Lehman, as the original lender, pursuant to which Lehman provided mortgage loans to the Fixed Rate Pool Hotel Debtors in the aggregate principal amount of $825,402,542, which amount is collateralized by the 45 hotel properties owned by the Fixed Rate Pool Hotel Debtors and evidenced by a certain Replacement Promissory Note A-1 and a certain Replacement Promissory Note A-2, each in the principal amount of $412,701,271 and each dated as of August 9, 2007.

**92.** 93. "*Fixed Rate Pool Mortgage Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Fixed Rate Pool Mortgage Loan Agreement.

9

**93.** ~~94.~~ "*Fixed Rate Pool Mortgage Loan Deficiency Claims*" means any Fixed Rate Pool Mortgage Loan Claim that is not Secured.

**94.** ~~95.~~ "*Floating Rate Pool Hotel Debtors*" means Debtors: (a) Grand Prix Addison (SS) LLC; (b) Grand Prix Albany LLC; (c) Grand Prix Atlantic City LLC; (d) Grand Prix Bulfinch LLC; (e) Grand Prix East Lansing LLC; (f) Grand Prix Ft. Wayne LLC; (g) Grand Prix Grand Rapids LLC; (h) Grand Prix Harrisburg LLC; (i) Grand Prix Indianapolis LLC; (j) Grand Prix Montvale LLC; (k) Grand Prix Morristown LLC; (l) Grand Prix Ontario LLC; (m) Grand Prix Rockville LLC; (n) Grand Prix Troy (Central) LLC; (o) Grand Prix Troy (SE) LLC; (p) Grand Prix West Palm Beach LLC; (q) Grand Prix Woburn LLC; (r) KPA/GP Ft. Walton Beach LLC; (s) KPA/GP Louisville (HI) LLC; and (t) KPA/GP Valencia LLC.

**95.** ~~96.~~ "*Floating Rate Pool Lessee*" means Debtor Grand Prix Floating Lessee LLC.

**96.** ~~97.~~ "*Floating Rate Pool Mezzanine Loan Agreement*" means that certain Mezzanine Loan Agreement, dated as of June 29, 2007, as amended, by and between Grand Prix Mezz Borrower Floating 2, LLC, the 100% owner of the Floating Rate Pool Hotel Debtors, as borrower, and Lehman, as original lender, pursuant to which Lehman provided Grand Prix Mezz Borrower Floating 2, LLC a junior mezzanine loan in the original principal amount of $118.0 million, which amount is collateralized by Grand Prix Mezz Borrower Floating 2, LLC's Interests in the Floating Rate Pool Hotel Debtors.

**97.** ~~98.~~ "*Floating Rate Pool Mezzanine Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Floating Rate Pool Mezzanine Loan Agreement.

**98.** ~~99.~~ "*Floating Rate Pool Mezzanine Loan Deficiency Claims*" means any Floating Rate Pool Mezzanine Loan Claim that is not Secured.

**99.** ~~100.~~ "*Floating Rate Pool Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of June 29, 2007, as amended, by and among the Floating Rate Pool Hotel Debtors, Grand Prix Wichita LLC, Grand Prix Tallahassee LLC, and Grand Prix Columbia LLC, as borrowers, the Floating Rate Pool Lessee, as operating lessee, Grand Prix Holdings, as guarantor, and Lehman, as original lender, pursuant to which Lehman provided mortgage loans to the borrowers in the original principal amount of $250.0 million, which amount is collateralized by the ~~20~~19 hotels owned by the Floating Rate Pool Hotel Debtors, and evidenced by a certain Promissory Note, dated as of June 29, 2007, by the Floating Rate Pool Hotel Debtors, Grand Prix Wichita LLC, Grand Prix Tallahassee LLC, and Grand Prix Columbus LLC, for the benefit of Lehman.

**100.** ~~101.~~ "*Floating Rate Pool Mortgage Loan Claims*" means all Claims against the Fixed/Floating Debtors arising under, derived from, or based upon the Floating Rate Pool Mortgage Loan Agreement.

**101.** ~~102.~~ "*Floating Rate Pool Mortgage Loan Deficiency Claims*" means any Floating Rate Pool Mortgage Loan Claim that is not Secured.

**102.** ~~103.~~ "*Garden Grove Hotel Debtors*" means the Garden Grove Hotel Lessee and the Garden Grove Hotel Owner.

**103.** ~~104.~~ "*Garden Grove Hotel Lessee*" means Debtor Grand Prix RIGG Lessee, LLC.

**104.** ~~105.~~ "*Garden Grove Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of October 4, 2006, by and between KPA RIGG, LLC, as borrower, and Capmark Bank, as lender, pursuant to which Capmark Bank provided a mortgage loan to KPA RIGG, LLC in the original principal amount of $37.6 million, which amount is collateralized by the Residence Inn in Garden Grove, California.

**105.** ~~106.~~ "*Garden Grove Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Garden Grove Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

**106.** ~~107.~~ "*Garden Grove Hotel Owner*" means Debtor KPA RIGG, LLC.

**107.** ~~108.~~ "*Garden Grove Hotel Purchase Consideration*" means the consideration received by the Garden Grove Hotel Owner and the assumption of the obligations under the Garden Grove Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

**108.** ~~109.~~ "*General Hotel Debtors*" means the General Hotel Lessee, the San Antonio Hotel Owner, the Tysons Corner Hotel Owner, and the Washington DC Hotel Owner.

**109.** ~~110.~~ "*General Hotel Lessee*" means Debtor Grand Prix General Lessee, LLC.

**110.** ~~111.~~ "*General Unsecured Claim*" means any Claim against any Debtor that is not Secured and that is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Mortgage or Mezzanine Loan Deficiency Claim; (e) an Anaheim Hotel Mezzanine Loan Deficiency Claim; (f) an Ontario Hotel Mortgage Loan Deficiency Claim, (g) an Intercompany Claim; or (h) a Section 510(b) Claim.

**111.** ~~112.~~ "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

**112.** ~~113.~~ "*Grand Prix Holdings*" means Debtor Grand Prix Holdings LLC.

**113.** ~~114.~~ "*Grand Prix Holdings Interests*" means the common interests in Debtor Grand Prix Holdings and the preferred interests in Debtor Grand Prix Holdings.

**114.** ~~115.~~ "*Holder*" means any Entity holding a Claim or an Interest.

**115.** ~~116.~~ "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

**116.** ~~117.~~ "*Indemnification Provision*" means each of the Debtors' indemnification provisions in place as of the Effective Date whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, or employment contracts for the current and former directors, members, trustees, officers, and managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors, members, trustees, officers, and managers' respective affiliates.

**117.** ~~118.~~ "*Independent Committee*" means the committee of independent trustees of the board of trustees of Innkeepers USA Trust.

**118.** ~~119.~~ "*Innkeepers USA LP Preferred D Interests*" means the class D preferred limited partnership units in Debtor Innkeepers USA Limited Partnership.

**119.** ~~120.~~ "*Innkeepers USA Trust Common Interests*" means the common shares of Debtor Innkeepers USA Trust that are not Intercompany Interests.

**120.** ~~121.~~ "*Innkeepers USA Trust Preferred A Interests*" means the 12% Series A cumulative preferred shares in Debtor Innkeepers USA Trust.

**121.** ~~122.~~ "*Innkeepers USA Trust Preferred C Interests*" means the 8% Series C cumulative preferred shares in Debtor Innkeepers USA Trust.

**122.** ~~123.~~ "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor other than a Claim based on a Postpetition Intercompany Loan.

**123.** ~~124.~~ "*Intercompany Interests*" means any Interest held by a Debtor in another Debtor and any Interest held by a Debtor in a non-Debtor affiliate of a Debtor, including the Interests of KPA Raleigh, LLC held by

Debtor Innkeepers USA Limited Partnership and the Interests of KPA Raleigh Leaseco, LLC held by Debtor KPA Leaseco Holding, Inc, except for Innkeepers USA Trust Preferred A Interests held by Debtor Grand Prix Holdings.

**124.** 125. "*Interests*" means the common stock or shares, limited liability company interests, limited partnership units, preferred interests, and any other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor and options, warrants, rights or other securities or agreements to acquire the common stock or shares, limited liability company interests, or other equity, ownership or profits interests of any Debtor or non-Debtor subsidiary of a Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

**125.** 126. "*Interim Compensation Order*" means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members, entered August 12, 2010 [Docket No. 189] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

**126.** 127. "*Investment*" means an investment by New HoldCo of $~~400,527,644.35~~**340,800,000.00** in Cash in the aggregate whereby New HoldCo will receive, directly or indirectly, 100% of the Interests of the Post-Effective Date Fixed/Floating Debtors in accordance with the terms of the ~~Fixed/Floating Successful Bid~~**Commitment Letter**.

**127.** 128. "*Joint Plan*" or "*Joint Plans*" means, respectively, on an individual basis, and as applicable, the Anaheim Plan, the Fixed/Floating Plan, the Ontario Plan, or the Remaining Debtor Plan, or, collectively, the Anaheim Plan, the Fixed/Floating Plan, the Ontario Plan, and the Remaining Debtor Plan.

**128.** 129. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

**129.** 130. "*LCPI*" means Lehman Commercial Paper Inc., in its capacity as administrative agent for SASCO with respect to the (a) Anaheim Hotel Mezzanine Loan Agreement and (b) the Floating Rate Pool Mezzanine Loan Agreement, and Lehman Brothers Holdings Inc. and certain of its affiliates in their capacity as holders of 100% of the economic and beneficial interests in, and preferred shares of, SASCO.

**130.** 131. "*Lehman*" means Lehman ALI Inc. in its capacity as Holder of all Claims with respect to, and lender of record under, the Floating Rate Pool Mortgage Loan Agreement.

**131.** 132. "*Lehman DIP Agreement*" means that certain Senior Secured Super Priority Debtor-in-Possession Loan Agreement, dated as of September 17, 2010, among certain of the Debtors, as borrowers, and the Lehman DIP Lender, as lender.

**132.** 133. "*Lehman DIP Claims*" means any Claim derived from or based upon the Lehman DIP Agreement.

**133.** 134. "*Lehman DIP Facility*" means that certain $17,498,095.52 debtor in possession credit facility entered into pursuant to the Lehman DIP Agreement.

**134.** 135. "*Lehman DIP Lenders*" means Solar Finance Inc. together with its successors and assigns.

**135.** 136. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

**136.** 137. "*Liquidation Trust*" means that certain trust to be created on the Effective Date, as described in Article IV.Y.

**137.** 138. "*LNR*" means LNR Partners, LLC, or any successor(s) thereto, as special servicer for the Garden Grove Hotel Mortgage Loan Agreement, the San Diego Hotel Mortgage Loan Agreement, the Washington DC Hotel Mortgage Loan Agreement, the Tysons Corner Hotel Mortgage Loan Agreement, and the San Antonio Hotel Mortgage Loan Agreement.

12

**138.** ~~139.~~ "*LNR Assumption Fee*" means the fee payable by Chatham in an amount equal to 1% of the amount of the outstanding principal balance of each of the LNR-Serviced Loans after the paydowns as set forth in the Stipulation.

**139.** ~~140.~~ "*LNR Commitment*" means that certain letter agreement by and between the LNR-Serviced Trusts and Chatham, dated May 3, 2011, regarding the LNR-Serviced Trusts agreement to provide financing to Chatham in accordance with the terms and conditions set forth in such letter agreement, which shall be included in the Plan Supplement.

**140.** ~~141.~~ "*LNR Liquidation Fee*" means the fee payable by Chatham in an amount equal to 1% of the amount of the paydowns of the LNR-Serviced Loans as set forth in the Stipulation.

**141.** ~~142.~~ "*LNR-Serviced Loans*" means the Garden Grove Hotel Mortgage Loan Agreement, San Antonio Hotel Mortgage Loan Agreement, San Diego Hotel Mortgage Loan Agreement, Tysons Corner Hotel Mortgage Loan Agreement, and Washington DC Hotel Mortgage Loan Agreement.

**142.** ~~143.~~ "*LNR-Serviced Trusts*" means the trusts holding the Credit Suisse First Boston Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2007-C1 and ML-CFC Commercial Mortgage Trust 2006-4, Commercial Mortgage Pass-Through Certificates, Series 2006-4.

**143.** ~~144.~~ "*LNR Servicing Fee*" means the servicing fee set forth in the applicable pooling and servicing agreement with respect to the LNR-Serviced Loans.

**144.** ~~145.~~ "*LNR Structuring Fee*" means a payment in Cash in the amount of $2.5 million to the LNR-Serviced Trusts in exchange for the agreement of the LNR-Serviced Trusts to provide the financing in connection with the Chatham Hotel Sale Transaction.

**145.** ~~146.~~ "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York, as applicable to the Chapter 11 Cases, as may be amended, modified, or supplemented from time to time.

**146.** ~~147.~~ "*LP Bank Account*" means the approximately $7.4 million of Cash currently existing in a segregated bank account in the name of Innkeepers USA Limited Partnership.

**147.** ~~148.~~ "*Midland*" means Midland Loan Services, a division of PNC Bank, National Association, or any successor thereto, solely in its capacity as special servicer for the C6 and C7 Trusts that own and hold the Fixed Rate Pool Mortgage Loan Agreement Claims.

**148.** ~~149.~~ "*Mortgage or Mezzanine Loan Deficiency Claims*" means all (a) Fixed Rate Pool Mortgage Loan Deficiency Claims, (b) Floating Rate Pool Mezzanine Loan Deficiency Claims, and (c) Floating Rate Pool Mortgage Loan Deficiency Claims.

**149.** ~~150.~~ "*New Anaheim HoldCo*" means a special purpose entity controlled by the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims.

**150.** ~~151.~~ "*New Fixed/Floating By-Laws*" means the forms of the by-laws of the Post-Effective Date Fixed/Floating Debtors, the forms of which shall be included in the Plan Supplement and consistent with the terms of the ~~Fixed/Floating Successful Bid~~**Commitment Letter** and shall be acceptable to the Fixed/Floating Plan Sponsors.

**151.** ~~152.~~ "*New Fixed/Floating Organizational Documents*" means the forms of the organizational documents for New HoldCo and the Post-Effective Date Fixed/Floating Debtors, the forms of which shall be included in the Plan Supplement and consistent with the terms of the ~~Fixed/Floating Successful Bid~~**Commitment Letter** and shall be acceptable to the Fixed/Floating Plan Sponsors.

**152.** ~~153.~~ "*New Fixed Rate Pool Mortgage Loan*" means the ~~assumed, amended, restated, and/or supplemented *Fixed Rate Pool Mortgage Loan Agreement* as reasonably required by Midland and as reasonably~~

acceptable to the Debtors, the Fixed/Floating Plan Sponsors, and New HoldCo and consistent with the New HoldCo/Midland Commitment, the form and terms of which shall substantially be set forth in the Plan Supplement and which shall include the terms and conditions set forth in the New HoldCo/Midland Commitment Letter and**non-recourse mortgage loan of $675,000,000.00 as set forth in** the New Fixed Rate Pool Mortgage Loan Limited Guarantys, pursuant to which the New Fixed Rate Pool Mortgage Notes shall be issued pursuant to the Fixed/Floating Plan**Agreement**.

**153.** *"New Fixed Rate Pool Mortgage Loan Agreement*" means the Fixed Rate Pool Mortgage Loan Agreement, as amended, modified, or supplemented by that certain Second Amendment to Loan Agreement and Omnibus Loan Modification Agreement, dated _____, 2011.**

154.    "*New Fixed Rate Pool Mortgage Loan Limited Guarantys*" means the limited guarantys provided to the lender under the New Fixed Rate Pool Mortgage Loan by New HoldCo and Cerberus Series Four Holdings, LLC, which guarantys shall be consistent with the terms of the New HoldCo/Midland Commitment.

155.    "*New Fixed Rate Pool Mortgage Notes*" means the new mortgage notes in the aggregate amount of $723,797,238.03**675,000,000.00** to be issued in connection with execution of the New Fixed Rate Pool Mortgage Loan, which shall provide that the Holders of such notes will retain the liens securing the Fixed Rate Pool Mortgage Loan Claims to the extent of the amount of such notes and shall contain the terms set forth in the New HoldCo/Midland Commitment.

156.    "*New HoldCo*" means**, collectively,** INK Acquisition LLC (or some other entity or**, INK Acquisitions II LLC, and INK Acquisitions III LLC (together with such other parallel acquisition** entities **as may be** formed by the Fixed/Floating Plan Sponsors), a Delaware limited liability company formed by the Fixed/Floating Plan Sponsors that**which** will acquire, directly or indirectly, 100% of the Interests of the Post-Effective Date Fixed/Floating Debtors and such other assets as may be subsequently identified as necessary to the operation of the Fixed/Floating Debtors, on or after the Effective Date; provided that that no assets of the Other Debtors, including without limitation, Cash or Cash equivalents, shall be acquired by New HoldCo, except as contemplated by the Transition Services Agreement.

157.    "*New HoldCo Board*" means the board of directors, members, managers, or trustees of New HoldCo.

158.    "*New HoldCo/Midland Commitment*" means that certain **Amended and Restated** Binding Commitment Regarding the Acquisition of Certain Subsidiaries of Innkeepers USA Trust, dated May 16**October 19,** 2011, by and between New HoldCo, the Fixed/Floating Plan Sponsors, and Midland.

159.    "*Notice and Claims Agent*" means Omni Management Group, LLC in its capacity as notice, claims, and balloting agent for the Debtors.

160.    "*Ontario Hotel Debtors*" means the Ontario Hotel Owner and the Ontario Hotel Lessee.

161.    "*Ontario Hotel Debtors' Plan General Release*" means the release provision set forth in Article VIII.G.

162.    "*Ontario Hotel Lessee*" means Debtor Grand Prix Ontario Lessee, LLC.

163.    "*Ontario Hotel Mortgage Loan Agreement*" means that certain Deed of Trust Note, dated as of October 4, 2006, by and between KPA HI Ontario, LLC, as borrower, and Deutsche Banc Mortgage Capital, LLC, as successor in interest to Capmark Bank, as lender, pursuant to which Deutsche Banc Mortgage Capital, LLC provided a mortgage loan to KPA HI Ontario, LLC in the original principal amount of $35.0 million, which amount is collateralized by the Hilton in Ontario, California.

164.    "*Ontario Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Ontario Hotel Mortgage Loan Agreement.

14

165. "*Ontario Hotel Mortgage Loan Deficiency Claims*" means any Ontario Hotel Mortgage Loan Claim that is not Secured.

166. "*Ontario Hotel Mortgage Loan Guaranty Claim*" means the guaranty Claim of C-III against Grand Prix Holdings related to the Ontario Hotel Mortgage Loan Agreement, which Claim shall be Allowed Claims in Class R4B in the amount of $44,738,754.33 minus the greater of (a) $8 million or (b) the amount received by C-III upon a sale of the collateral under the Ontario Hotel Mortgage Loan Agreement; provided that to the extent that any other Allowed unsecured Claim against Grand Prix Holdings includes postpetition interest, the amount of the Allowed Ontario Hotel Mortgage Loan Guaranty Claim established pursuant to the preceding clause may be increased by the amount of postpetition interest accrued on the Allowed Ontario Hotel Mortgage Loan Guaranty Claim, and provided further that in no event shall the recovery on account of the Ontario Hotel Mortgage Loan Guaranty Claim, if any, exceed $1.5 million.

167. "*Ontario Hotel Owner*" means Debtor KPA HI Ontario.

168. "*Ontario Hotel Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such: (a) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (b) C-III; (c) Apollo; (d) the Independent Committee; (e) all other Holders of Claims against or Interests in the Ontario Hotel Debtors; (f) the officers, directors, trustees, and members of the Debtors; and (g) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

169. "*Ontario Hotel Cash Recovery Fund*" means a payment of Cash in the aggregate amount of $30,000, which payment shall be distributed among Holders of Claims against the Ontario Hotel Debtors.

170. "*Ontario Plan*" means the chapter 11 plan of reorganization proposed herein for the Ontario Hotel Debtors.

171. "*Ordinary Course Professional*" means professionals retained and compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

172. "*Ordinary Course Professionals Order*" means the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business, entered August 12, 2010 [Docket No. 187] as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

173. "*Other Debtors*" means Debtors that are not the Fixed/Floating Debtors.

174. "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507 of the Bankruptcy Code, other than: (a) an Administrative Claim or (b) a Priority Tax Claim.

175. "*Other Secured Claim*" means any Secured Claim against any of the Debtors that is not a: (a) Five Mile DIP Claim; (b) Lehman DIP Claim; (c) Anaheim Hotel Mortgage Loan Claim; (d) Fixed Rate Pool Mortgage Loan Claim; (e) Floating Rate Pool Mortgage Loan Claim; (f) Garden Grove Hotel Mortgage Loan Claim; (g) Ontario Hotel Mortgage Loan Claim; (h) San Antonio Hotel Mortgage Loan Claim; (i) San Diego Grove Hotel Mortgage Loan Claim; (j) Tysons Corner Hotel Mortgage Loan Claim; (k) Washington DC Hotel Mortgage Loan Claim; or (l) Anaheim Hotel Mezzanine Loan Claim.

176. "*Parent Companies*" means Debtors Grand Prix Holdings, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership.

177. "*Petition Date*" means July 19, 2010, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

K&E 18934861.61 20090501

178.     "*Plan*" means the Debtors' Plans of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

179.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed before the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) a list of Causes of Action to be retained by the Post-Effective Date Debtors; (b) a list of Executory Contracts, including any franchise agreements, and Unexpired Leases to be assumed and assigned to the Post-Effective Date Debtors and their respective Cure Obligations, to be Filed by the Voting Deadline, with notices of assumption or rejection mailed to executory contract and unexpired lease counterparties on or before five business days prior to the Voting Deadline; (c) the Corporate Structure Summary; (d) the forms of the New Fixed/Floating By-Laws; (e) the forms of the New Fixed/Floating Organizational Documents; (f) the forms of the New Fixed Rate Pool Mortgage Loan and the forms of the New Fixed Rate Pool Mortgage Loan Limited Guaranty; (g) the Anaheim Hotel Commitment Letter; (h) the LNR Commitment and the Chatham Hotel Sale Transaction Documents, including the Chatham Hotel Sale Transaction Loan Assumption Documents; (i) to the extent known, with respect to members of the New HoldCo Board and the Post-Effective Date Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (j) information regarding the compensation program related to the Remaining Debtors referenced in Article IV.J, if implemented, and (k) the form of the deed in lieu of foreclosure agreement with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement.

180.     "*Post-Effective Date Anaheim Hotel Debtors*" means, collectively, the Entities holding the assets of the Anaheim Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

181.     "*Post-Effective Date Board*" means the board of directors, members, trustees, managers, or trustees of Post-Effective Date Innkeepers USA Trust.

182.     "*Post-Effective Date Debtors*" means, collectively, the Entities holding the assets of the 92 Debtors in the Chapter 11 Cases, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including the Post-Effective Date Anaheim Hotel Debtors, the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Ontario Hotel Debtors, and the Post-Effective Date Remaining Debtors.

183.     "*Post-Effective Date Fixed/Floating Debtors*" means, collectively, the Entities holding the assets of the Fixed/Floating Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

184.     "*Post-Effective Date General Hotel Lessee*" means, collectively, the Entities holding the assets of General Hotel Lessee or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

185.     "*Post-Effective Date Innkeepers USA Limited Partnership*" means Innkeepers USA Limited Partnership or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, which entity, for the avoidance of doubt, is one of the Post-Effective Date Remaining Debtors.

186.     "*Post-Effective Date Innkeepers USA Trust*" means Innkeepers USA Trust or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, which entity, for the avoidance of doubt, is one of the Post-Effective Date Remaining Debtors.

187.     "*Post-Effective Date Ontario Hotel Debtors*" means, collectively, the Entities holding the assets of the Ontario Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

188.     "*Post-Effective Date KPA Leaseco Holding, Inc.*" means KPA Leaseco Holding, Inc., or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

K&E 18934861.61 20090501

189.     "*Post-Effective Date Remaining Debtors*" means, collectively, the Entities holding the assets of the Remaining Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

190.     "*Post-Effective Date San Diego Hotel Debtors*" means, collectively, the Entities holding the assets of the San Diego Hotel Debtors or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

191.     "*Post-Effective Date Tysons Corner Hotel Owner*" means, collectively, the Entities holding the assets of the Tysons Corner Hotel Owner or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

192.     "*Postpetition Intercompany Loan*" means any Claim against a Debtor held by another Debtor based on an "Intercompany Loan" arising pursuant to the Cash Collateral Order, which Claim is, pursuant to the terms of the Cash Collateral Order, secured on a superpriority basis in accordance with sections 364(c)(2) and (d) of the Bankruptcy Code by senior secured and priming liens on and security interests in all the borrower Debtors' property, and the obligations of the borrower Debtors to satisfy such Claims is, in accordance with section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense Claim entitled to priority over any or all administrative expenses of the kind specified in, among other sections, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), and 726 of the Bankruptcy Code (as further set forth in the Cash Collateral Order).

193.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

194.     "*Pro Rata*" means (a) the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class or (b) for an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

195.     "*Professional*" means an Entity:  (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; excluding those Entities entitled to retention and payment pursuant to the Ordinary Course Professionals Order.

196.     "*Professional Fee Escrow Account*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors on or before the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.  Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.  The Professional Fee Escrow Account shall be funded in part from cash collateral to the extent provided for under the Cash Collateral Orders.

197.     "*Professional Fee Escrow Amount*" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3.

198.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

199.     "*Remaining Debtors*" means the Debtors that are not Fixed/Floating Debtors, Anaheim Hotel Debtors, or Ontario Hotel Debtors:  (a) Grand Prix General Lessee LLC; (b) Grand Prix Holdings; (c) Grand Prix IHM, Inc.; (d) Grand Prix RIGG Lessee LLC; (e) Grand Prix RIMV Lessee, LLC; (f) Grand Prix Term Lessee LLC; (g) Innkeepers Financial Corporation; (h) Innkeepers USA Limited Partnership; (i) Innkeepers USA Trust; (j) KPA Leaseco Holding, Inc.; (k) KPA Leaseco, Inc.; (l) KPA RIGG, LLC; (m) KPA RIMV, LLC; (n) KPA San Antonio, LLC; (o) KPA Tysons Corner RI, LLC; and (p) KPA Washington DC, LLC.

200.     "*Remaining Debtor Plan*" means the chapter 11 plan of reorganization proposed herein for the Remaining Debtors.

201.    "*Remaining Debtor Releasing Parties*" means, collectively, each of the following parties in their respective capacities as such:  (a) Chatham; (b) the Five Mile DIP Agent; (c) the Five Mile DIP Lenders; (d) the Debtors (other than Grand Prix Holdings solely with respect to any guaranty Claims of Midland, Lehman, LCPI, C-III, TriMont, or SASCO); (e) LNR, in its capacity as special servicer for the each of the LNR-Serviced Loans; (f) the LNR-Serviced Trusts; (g) the master servicer for each of the LNR-Serviced Loans; (h) Apollo; (i) the Independent Committee; (j) Island Hospitality Management, Inc.; (k) all other Holders of Claims against or Interests in the Remaining Debtors; (l) the officers, directors, trustees, and members of the Debtors; and (m) each of the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals.

202.    "*Remaining Debtors' Plan General Release*" means the release provision set forth in Article VIII.H.

203.    "*San Antonio Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA San Antonio, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided a mortgage loan to KPA San Antonio, LLC in the original principal amount of $24.2 million, which amount is collateralized by the Homewood Suites in San Antonio, Texas.

204.    "*San Antonio Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the San Antonio Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

205.    "*San Antonio Hotel Owner*" means Debtor KPA San Antonio, LLC.

206.    "*San Antonio Hotel Purchase Consideration*" means the consideration received by the San Antonio Hotel Owner and the assumption of the obligations under the San Antonio Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

207.    "*San Diego Hotel Debtors*" means the San Diego Hotel Lessee and the San Diego Hotel Owner.

208.    "*San Diego Hotel Lessee*" means Debtor Grand Prix RIMV Lessee, LLC.

209.    "*San Diego Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of October 4, 2006, by and between KPA RIMV, LLC, as borrower, and Capmark Bank, as lender, pursuant to which Capmark Bank provided KPA RIMV, LLC a mortgage loan in the original principal amount of $47.4 million, which amount is collateralized by the Residence Inn in San Diego, California.

210.    "*San Diego Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the San Diego Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

211.    "*San Diego Hotel Owner*" means Debtor KPA RIMV, LLC.

212.    "*San Diego Hotel Purchase Consideration*" means the consideration received by the San Diego Hotel Owner and the assumption of the obligations under the San Diego Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

213.    "*SASCO*" means SASCO 2008-C2 LLC and/or other affiliates of Lehman Brothers Holdings Inc., who together are the 100% participant and owner of all economic and beneficial interests in, or lender of record under (a) the Floating Rate Pool Mezzanine Loan Agreement and (b) the Anaheim Hotel Mezzanine Loan Agreement.

214.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

18

215.    "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a Security of any Debtor or an affiliate (as defined in section 101(2) of the Bankruptcy Code) of any Debtor, which Security is not an Interest, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

216.    "*Secured*" means when referring to a Claim:  (a) Secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

217.    "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

218.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

219.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

220.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

221.    "*Special Servicers*" means C-III, CWCapital, LNR, Midland, and TriMont.

222.    "*Special Servicer Release Payment*" means a Cash payment of $3.0 million to be made by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland, on behalf of the C6 and C7 Trusts, as settlement of Midland's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court.

223.    "*Special Servicer Payment*" means a Cash payment of $~~2.5~~**3.0** million to be made by New HoldCo contemporaneously with the occurrence of the Effective Date to Midland as consideration for effecting the restructuring of the Fixed Rate Pool Mortgage Loan Agreement on behalf of the C6 and C7 Trusts.

224.    "*Stipulation*" means that certain stipulation by and between the Debtors, LNR, on behalf of the LNR-Serviced Trusts, and the Ad Hoc Committee dated May 3, 2011.

~~225.    "*Transition Services Agreement*" means the separation plan and transition services agreement for the Fixed/Floating Debtors and the Other Debtors, which shall address the uses of certain assets including, without limitation, intellectual property, licenses, IT resources, book and records and permits, and address cash management, cash collateral, and other cash issues, which separation plan and transition services agreement shall be contained in the Plan Supplement and be reasonably satisfactory to the Fixed/Floating Plan Sponsors, the Fixed/Floating Debtors, and the Other Debtors.~~

**225.**    ~~226.~~ "*TriMont*" means TriMont Real Estate Advisors, Inc., or any successor thereto, in its capacity as (a) special servicer for the Anaheim Hotel Mezzanine Loan Agreement; or (b) special servicer for the Floating Rate Pool Mezzanine Loan Agreement.

**226.**    ~~227~~ "*Trust Assets*" means the Trust Debtors' right, title, and interest in Cash and all other assets remaining in the Trust Debtors' Estates on the Effective Date, including, without limitation, the right to prosecute, settle, withdraw, or resolve in any manner approved by the Bankruptcy Court the Trust Debtors' Causes of Action.

**227.**    ~~228.~~ "*Trust Debtors*" means, collectively, the Remaining Debtors, the Anaheim Mezzanine Debtor, and the Ontario Hotel Debtors.

19

**228.** ~~229.~~ "*Trustee*" means AP Services, LLC, or its agent, as Trustee for the Liquidation Trust.

**229.** ~~230.~~ "*Tysons Corner Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA Tysons Corner RI, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided KPA Tysons Corner RI, LLC a mortgage loan in the original principal amount of $25.2 million, which amount is collateralized by the Residence Inn in Vienna, Virginia.

**230.** ~~231.~~ "*Tysons Corner Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Tysons Corner Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

**231.** ~~232.~~ "*Tysons Corner Hotel Owner*" means Debtor KPA Tysons Corner RI, LLC.

**232.** ~~233.~~ "*Tysons Corner Hotel Purchase Consideration*" means the consideration received by the Tysons Corner Hotel Owner and the assumption of the obligations under the Tysons Corner Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

**233.** ~~234.~~ "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**234.** ~~235.~~ "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**235.** ~~236.~~ "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**236.** ~~237.~~ "*Voting Deadline*" means June 17, 2011 at 5:00 p.m. Eastern Time.

**237.** ~~238.~~ "*Voting Record Date*" means the close of business on May 13, 2011.

**238.** ~~239.~~ "*Washington DC Hotel Mortgage Loan Agreement*" means that certain Loan Agreement, dated as of September 19, 2006, by and between KPA Washington DC, LLC, as borrower, and Merrill Lynch Mortgage Lending, Inc., as lender, pursuant to which Merrill Lynch Mortgage Lending, Inc. provided a mortgage loan to KPA Washington DC, LLC in the original principal amount of $25.6 million, which amount is collateralized by the Doubletree Guest Suites in Washington, D.C.

**239.** ~~240.~~ "*Washington DC Hotel Mortgage Loan Claims*" means all Claims arising under, derived from, or based upon the Washington DC Hotel Mortgage Loan Agreement, including any guarantees provided by any of the Debtors in connection therewith.

**240.** ~~241.~~ "*Washington DC Hotel Owner*" means Debtor KPA Washington DC, LLC.

**241.** ~~242.~~ "*Washington DC Hotel Purchase Consideration*" means the consideration received by the Washington DC Hotel Owner and the assumption of the obligations under the Washington DC Hotel Mortgage Loan Agreement pursuant to the Chatham APA.

**242.** ~~243.~~ "*Wind Down*" means the wind down, dissolution, and liquidation of the Debtors' Estates in accordance with the Plan following the Effective Date.

*B.     Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument,

K&E ~~18934861.61~~20090501

release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.     *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; underlined that corporate or limited liability company governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Post-Effective Date Debtors, as applicable.

E.     *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

F.     *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; underlined that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence. The provisions hereof are subject to the provisions of Article IX.B and Article IX.D.2.e.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

A.     *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim), will receive in exchange for full and final satisfaction, settlement,

release, and compromise of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals and Governmental Units, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Post-Effective Date Debtors no later than the Administrative Claims Bar Date applicable to the Debtor against whom the Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, or the property of the Post-Effective Date Debtors and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the Filing of the applicable request for payment of Administrative Claims, if applicable.

### B. Accrued Professional Compensation Claims

#### 1. Professional Fee Escrow Account

In accordance with Article II.B.3, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow Account. The Debtors shall fund the Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals. The Professional Fee Escrow Account shall be funded from cash collateral to the extent provided for under the Cash Collateral Orders (or in such greater amounts as may be agreed to by the applicable secured lender) and, to the extent necessary, on the Effective Date from the Chatham Hotel Sale Transaction Purchase Consideration and/or the Investment. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or the Post-Effective Date Debtors, as applicable. Payment of such funds shall not reduce the distributions to Midland or Lehman under the Fixed/Floating Plan or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

#### 2. Final Fee Applications and Payment of Accrued Professional Compensation Claims

All final requests for payment of Claims of a Professional shall be Filed no later than 60 days after the latest Effective Date for any of the Joint Plans. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A. After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders. Additionally, after notice and hearing, the Bankruptcy Court may direct the applicable Post-Effective Date Debtors to direct the escrow agent to return any excess amounts in the Professional Fee Escrow Account to each particular lender whose cash collateral was the source for the funding of the Professional Fee Escrow Account in an amount equal to such lender's interest in the excess Cash in accordance with the Cash Collateral Orders

3.        Professional Fee Escrow Amount

        To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors, the Fixed/Floating Plan Sponsors, Lehman, and Midland no later than five days after the Confirmation Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall comprise the Professional Fee Escrow Amount.

4.        Post-Effective Date Fees and Expenses

        Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, the Post-Effective Date Debtors, or the Committee, as applicable.  Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.        Five Mile DIP Claims

        In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim against the Fixed/Floating Debtors, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay the outstanding amount of "Tranche A" of the Allowed Five Mile DIP Claims in full in Cash.

        In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Five Mile DIP Claim, on the Effective Date of the Remaining Debtor Plan, the Post-Effective Date San Diego Hotel Debtors shall pay "Tranche B" of the Allowed Five Mile DIP Claims in full in Cash and the Post-Effective Date General Lessee and the Tysons Corner Hotel Owner shall pay "Tranche C" of the Allowed Five Mile DIP Claims in full in Cash.

        The Five Mile DIP Claims shall be Allowed pursuant to the Confirmation Order.

D.        Lehman DIP Claims

        In exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Lehman DIP Claim, on the Effective Date of the Fixed/Floating Plan, the Fixed/Floating Debtors or New HoldCo shall pay the outstanding amount of the Allowed Lehman DIP Claims in full in Cash.

        The Lehman DIP Claims shall be Allowed pursuant to the Confirmation Order.

E.        LNR Structuring Fee

        On the Effective Date of the Remaining Debtor Plan, the LNR Structuring Fee shall be paid by the Remaining Debtors that own or operate the properties that serve as collateral for the LNR-Serviced Loans to LNR in full in Cash with the proceeds of the Chatham Hotel Sale Transaction Purchase Consideration; provided that, for the avoidance of doubt, in the event that the Chatham Hotel Sale Transaction does not close, the LNR Structuring Fee will be payable in accordance with the terms of the Stipulation.

23

*F.      Claims Based on Postpetition Intercompany Loans*

In exchange for full and final satisfaction, settlement, release, and compromise of each Claim based on a Postpetition Intercompany Loan arising pursuant to the Cash Collateral Order, if any, on the Effective Date of a borrower Debtor's plan, the borrower Debtors shall pay the lender Debtors in full in Cash.

*G.      Reimbursement of Five Mile Expenses and Lehman Advisor and Counsel Fees and Expenses*

Upon the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors shall pay to Five Mile the Five Mile Expense Reimbursement Claim in an amount not to exceed $3 million.  Notwithstanding any provision herein to the contrary, neither Five Mile nor its counsel shall be required to file any application or other formal request for payment or allowance of the Five Mile Expense Reimbursement Claim.

Lehman's advisors' and counsel's reasonable and documented fees and expenses through the Effective Date shall continue to be paid in accordance with the Cash Collateral Orders.

*H.      Ad Hoc Committee Administrative Claim*

The Ad Hoc Committee and its advisors will receive an Allowed Administrative Claim in the amount of $3.5 million, which amount shall be paid by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) on the Effective Date of the Remaining Debtor Plan.  The Claim for payment shall be deemed an Allowed Administrative Priority Claim.

*I.      Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, (1) Cash, payable by the liable Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount agreed to and paid by the liable Debtors or Post-Effective Date Debtors, as applicable, and such Holder, provided that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date without any further notice to or action, order, or approval of the Bankruptcy Court, or (3) at the option of the liable Debtor or Post-Effective Date Debtor, as applicable, Cash paid by the liable Post-Effective Date Debtor in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than five years after the Petition Date with payment of interest at the Federal Judgment Rate in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the liable Debtors or Post-Effective Date Debtors, as applicable, and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article III.

*A.      Summary of Classification*

All Claims and Interests, other than Five Mile DIP Claims, Lehman DIP Claims, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and in connection with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the

24

extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. In addition, subject to the Commitment Letter, the Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking confirmation or approval of the Plan with respect to all other Debtors.

1.    Class Identification for the Fixed/Floating Debtors

The classification of Claims and Interests against each of the Fixed/Floating Debtors pursuant to the Fixed/Floating Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Fixed/Floating Debtors. All of the potential Classes for the Fixed/Floating Debtors are set forth herein. Certain of the Fixed/Floating Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof. For all purposes under the Fixed/Floating Plan, each Class will contain sub-Classes for each of the Fixed/Floating Debtors (*i.e.*, there will be 71 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class FF2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class FF1 | Other Priority Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF2 | Other Secured Claims Against Fixed/Floating Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class FF3A | Secured Fixed Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF3B | Secured Floating Rate Pool Mortgage Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF4 | Secured Floating Rate Pool Mezzanine Loan Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF5 | General Unsecured Claims Against Fixed/Floating Debtors | Impaired | Entitled to Vote |
| Class FF6 | Mortgage or Mezzanine Loan Deficiency Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF7 | Intercompany Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF8 | Section 510(b) Claims Against Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class FF9 | Interests in Fixed/Floating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

2.    Class Identification for the Anaheim Hotel Debtors

The classification of Claims and Interests against each of the Anaheim Hotel Debtors pursuant to the Anaheim Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Anaheim Hotel Debtors.  All of the potential Classes for the Anaheim Hotel Debtors are set forth herein.  Certain of the Anaheim Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof.  For all purposes under the Anaheim Plan, each Class will contain sub-Classes for each of the Anaheim Hotel Debtors (*i.e.*, there will be three sub-Classes in each Class and many of such sub-Classes may be vacant).  In addition, the sub-Classes in Class A2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class A1 | Other Priority Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A2 | Other Secured Claims against Anaheim Hotel Debtors | Impaired | Entitled to Vote |
| Class A3 | Secured Anaheim Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class A4 | Secured Anaheim Hotel Mezzanine Loan Claims | Impaired | Entitled to Vote |
| Class A5A | General Unsecured Claims against Anaheim Hotel Owner or Anaheim Hotel Lessee | Impaired | Entitled to Vote |
| Class A5B | General Unsecured Claims against Anaheim Mezzanine Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A6 | Anaheim Hotel Mezzanine Loan Deficiency Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A7 | Intercompany Claims against Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A8 | Intercompany Interests in Anaheim Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 18934861.61 20090501

3.      Class Identification for the Ontario Hotel Debtors

The classification of Claims and Interests against each of the Ontario Hotel Debtors pursuant to the Ontario Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Ontario Hotel Debtors.  All of the potential Classes for the Ontario Hotel Debtors are set forth herein.  Certain of the Ontario Hotel Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof.  For all purposes under the Ontario Plan, each Class will contain sub-Classes for each of the Ontario Hotel Debtors (*i.e.*, there will be two sub-Classes in each Class and many of such sub-Classes may be vacant).  In addition, the sub-Classes in Class O2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class O1 | Other Priority Claims against Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O2 | Other Secured Claims Ontario Hotel Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class O3 | Secured Ontario Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class O4 | General Unsecured Claims against Ontario Hotel Debtors | Impaired | Entitled to Vote |
| Class O5 | Ontario Hotel Mortgage Loan Deficiency Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O6 | Intercompany Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O7 | Section 510(b) Claims against Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class O8 | Intercompany Interests in Ontario Hotel Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

K&E 18934861.61 20090501

4. <u>Class Identification for the Remaining Debtors</u>

The classification of Claims and Interests against each of the Remaining Debtors pursuant to the Remaining Debtor Plan is as follows.

The classification of Claims and Interests set forth herein shall apply separately to each of the Remaining Debtors. All of the potential Classes for the Remaining Debtors are set forth herein. Certain of the Remaining Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D hereof. For all purposes under the Remaining Debtor Plan, each Class will contain sub-Classes for each of the Remaining Debtors (*i.e.*, there will be 16 sub-Classes in each Class and many of such sub-Classes may be vacant). In addition, the sub-Classes in Class R2 are subject to further sub-division as discussed below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class R1 | Other Priority Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R2 | Other Secured Claims against the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R3A | Secured Garden Grove Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3B | Secured San Diego Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3C | Secured Washington DC Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3D | Secured Tysons Corner Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R3E | Secured San Antonio Hotel Mortgage Loan Claims | Impaired | Entitled to Vote |
| Class R4A | General Unsecured Claims against the Remaining Debtors Other than Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R4B | General Unsecured Claims against Grand Prix Holdings | Impaired | Entitled to Vote |
| Class R5 | Intercompany Claims against the Remaining Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R6 | Intercompany Interests in the Remaining Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class R7 | Innkeepers USA LP Preferred D Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R8 | Innkeepers USA Trust Preferred C Interests | Impaired | Entitled to Vote |
| Class R9 | Innkeepers USA Trust Preferred A Interests | Impaired | Entitled to Vote |
| Class R10 | Innkeepers USA Trust Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class R11 | Grand Prix Holdings Interests | Impaired | Entitled to Vote |
| Class R12 | Section 510(b) Claims against the Remaining Debtors | Impaired | Entitled to Vote |

*B.*   *Treatment of Claims and Interests*

1.   The treatment provided to each Class relating to each of the Fixed/Floating Debtors for distribution purposes and voting rights are specified below:

**Class FF1 - Other Priority Claims Against the Fixed/Floating Debtors**

(a)   *Classification*:  Class FF1 consists of all Other Priority Claims against the Fixed/Floating Debtors.

(b)   *Treatment*:  Except to the extent that a Holder of an Allowed Class FF1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed

29

Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i)      be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)      otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)      *Voting*: Class FF1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class FF2 - Other Secured Claims Against the Fixed/Floating Debtors

(a)      *Classification*: Class FF2 consists of all Other Secured Claims against the Fixed/Floating Debtors. For all purposes under the Fixed/Floating Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class FF2A against Grand Prix Addison (RI) LLC, Class FF2B against Grand Prix Addison (RI) LLC, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Class FF2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Fixed/Floating Debtors, as applicable:

(i)      be paid in full in Cash in an amount equal to such Allowed Class FF2 Other Secured Claim by the Debtors on the Effective Date;

(ii)      receive the collateral securing any such Allowed Class FF2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)      otherwise be treated in any other manner such that the Allowed Class FF2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class FF2 Other Secured Claim becomes an Allowed Class FF2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class FF2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*: Class FF2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class FF2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

K&E 18934861.61 20090501

**Class FF3A - Secured Fixed Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF3A consists of all Secured Fixed Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class FF3A Secured Fixed Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Fixed Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Fixed Rate Pool Mortgage Loan Claims shall (i) enter into the New Fixed Rate Pool Mortgage Loan **Agreement** and receive the New Fixed Rate Pool Mortgage Notes and the New Fixed Rate Pool Mortgage Loan Limited Guarantys, and (ii) receive a payment of Cash in the amount of $12,802,450.37**.**

(c)     *Voting:*  Class FF3A is Impaired, and the Holder of Secured Fixed Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF3B - Secured Floating Rate Pool Mortgage Loan Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF3B consists of all Secured Floating Rate Pool Mortgage Loan Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class FF3B Secured Floating Rate Pool Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Floating Rate Pool Mortgage Loan Claims, the Holder of Allowed Secured Floating Rate Pool Mortgage Loan Claims shall receive a payment of Cash in the amount of $233,489,097.04, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the Fixed/Floating Plan.  Such increase or decrease in Cash payable to Class FF3B will create a reciprocal increase or decrease in the recovery of Class FF4 such that the aggregate Cash paid to Classes FF3B and FF4 will not change.**224,000,000.00.**

(c)     *Voting:*  Class FF3B is Impaired, and the Holder of Secured Floating Rate Pool Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class FF4 - Secured Floating Rate Pool Mezzanine Loan Claims Against the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF4 consists of all Secured Floating Rate Pool Mezzanine Loan Claims against the Fixed/Floating Debtors.

(b)     *Treatment:*  Except to the extent that the**The** Holder of Allowed Class FF4 Secured Floating Rate Pool Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed**(i) shall receive the benefit of the release in Article VIII.E, and (ii) pursuant to the Commitment Letter, has agreed that it shall not receive any distribution on account of such** Secured Floating Rate Pool Mezzanine Loan Claims. the Holder of Allowed Secured Floating Rate Pool Mezzanine Loan Claims shall receive a payment of Cash in the amount of $2,363,001.42, subject to increase or decrease based on accrued default interest and unpaid fees and expenses due in accordance with the Floating Rate Mortgage Loan Agreement through the Effective Date of the

31

~~Fixed/Floating Plan. Such increase or decrease in Cash payable to Class FF4 will create a reciprocal increase or decrease in the recovery of Class FF3B such that the aggregate Cash paid to Classes FF3B and FF4 will not change~~.

(c)     *Voting:* Class FF4 is Impaired, and the Holder of Allowed Secured Floating Rate Pool Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

## Class FF5 - General Unsecured Claims Against the Fixed/Floating Debtors

(a)     *Classification:* Class FF5 consists of all General Unsecured Claims against the Fixed Floating Debtors.

(b)     *Treatment:* Except to the extent that a Holder of an Allowed Class FF5 General Unsecured Claim and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall:

      (i)     (A) if the Holder's General Unsecured Claim is against Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $100,000.00 of the Fixed/Floating Unsecured Claim Fund, or (B) if the Holder's General Unsecured Claim is against a Fixed/Floating Debtor other than Debtor Grand Prix West Palm Beach LLC, receive such Holder's Pro Rata share of $4,650,000.00 of the Fixed/Floating Unsecured Claim Fund; and

      (ii)     receive a release and waiver by the Debtors of all Claims of the Fixed/Floating Debtors against such Holder to recover preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code.

(c)     *Voting:* Class FF5 is Impaired, and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

## Class FF6 - Mortgage or Mezzanine Loan Deficiency Claims Against the Fixed/Floating Debtors

(a)     *Classification:* Class FF6 consists of all Mortgage or Mezzanine Loan Deficiency Claims against the Fixed/Floating Debtors.

(b)     *Treatment:* Holders of Allowed Class FF6 Mortgage or Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Mortgage or Mezzanine Loan Deficiency Claims.

(c)     *Voting:* Class FF6 is Impaired, and each Holder of a Mortgage or Mezzanine Loan Deficiency Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Mortgage or Mezzanine Loan Deficiency Claims are not entitled to vote to accept or reject the Plan.

## Class FF7 - Intercompany Claims Against the Fixed/Floating Debtors

(a)     *Classification*: Class FF7 consists of all Intercompany Claims against the Fixed/Floating Debtors.

(b)     *Treatment*: Holders of Allowed Class FF7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

K&E ~~18934861.61~~20090501

(c)     *Voting*:  Class FF7 is Impaired, and Holders of Intercompany Claims against the Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

**Class FF8 - Section 510(b) Claims Against the Fixed/Floating Debtors**

(a)     *Classification*:  Class FF8 consists of all Section 510(b) Claims against the Fixed/Floating Debtors.

(b)     *Treatment*:  Holders of Allowed Class FF8 Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class FF8 is Impaired, and Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**Class FF9 - Interests in the Fixed/Floating Debtors**

(a)     *Classification:*  Class FF9 consists of all Interests in the Fixed/Floating Debtors.

(b)     *Treatment:*  Holders of Allowed Class FF9 Interests shall not receive any distribution on account of such Intercompany Interests and, except as provided in the immediately following sentence, all such Interests shall be cancelled and of no further force or effect.  Notwithstanding the foregoing, the Interests may, at the discretion of Fixed/Floating Plan Sponsors, be maintained for the purposes of preserving the organizational structure of certain of the Fixed/Floating Debtors; provided further that the Interests of the Post-Effective Date Fixed/Floating Debtors shall, directly or indirectly, be transferred to New HoldCo pursuant to the Investment and in accordance with the ~~Fixed/Floating Successful Bid~~**Commitment Letter**.

(c)     *Voting:*  Class FF9 is Impaired, and Holders of Intercompany Interests in the Fixed/Floating Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Fixed/Floating Debtors are not entitled to vote to accept or reject the Plan.

2.     The treatment provided to each Class relating to each of the Anaheim Hotel Debtors for distribution purposes and voting rights are specified below:

**Class A1 - Other Priority Claims Against the Anaheim Hotel Debtors**

(a)     *Classification*:  Class A1 consists of all Other Priority Claims against the Anaheim Hotel Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Class A1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall:

(i)     if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as

33

reasonably practical thereafter; or (B) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; or

(ii)     if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan Agreement pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c)     *Voting*:  Class A1 is Impaired, and Holders of Class A1 Other Priority Claims are entitled to vote to accept or reject the Plan.

### Class A2 - Other Secured Claims Against the Anaheim Hotel Debtors

(a)     *Classification*:  Class A2 consists of all Other Secured Claims against the Anaheim Hotel Debtors.  For all purposes under the Anaheim Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class A2A against the Anaheim Hotel Owner, Class A2B the Anaheim Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Class A2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall:

(i)     if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, at the sole option of the Debtors or the Post-Effective Date Anaheim Hotel Debtors, in their reasonable discretion, as applicable, either (A) be paid in full in Cash in an amount equal to such Allowed Class A2 Other Secured Claim by the Debtors on the Effective Date; (B) receive the collateral securing any such Allowed Class A2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or (C) otherwise be treated in any other manner such that the Allowed Class A2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class A2 Other Secured Claim becomes an Allowed Class A2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class A2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code; or

(ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c) *Voting*: Class A2 is Impaired, and Holders of Class A2 Other Secured Claims are entitled to vote to accept or reject the Plan.

## Class A3 - Secured Anaheim Hotel Mortgage Loan Claims

(a) *Classification*: Class A3 consists of all Secured Anaheim Hotel Mortgage Loan Claims against the Anaheim Hotel Debtors.

(b) *Treatment*: Except to the extent that the Holder of Allowed Class A3 Secured Anaheim Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mortgage Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mortgage Loan Claims shall in accordance with the Anaheim Hotel Commitment Letter either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, have the Anaheim Hotel Mortgage Loan Agreement be assumed, amended, restated, and/or supplemented by New Anaheim HoldCo, in accordance with and as modified by the terms and conditions set forth in the Anaheim Hotel Commitment Letter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(c) *Voting*: Class A3 is Impaired, and the Holder of Class A3 Secured Anaheim Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class A4 - Secured Anaheim Hotel Mezzanine Loan Claims

(a) *Classification*: Class A4 consists of all Secured Anaheim Hotel Mezzanine Loan Claims against the Anaheim Hotel Debtors.

(b) *Treatment*: Except to the extent that the Holder of Allowed Class A4 Secured Anaheim Hotel Mezzanine Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Anaheim Hotel Mezzanine Loan Claims, the Holder of Allowed Secured Anaheim Hotel Mezzanine Loan Claims shall receive the following: (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, all of the assets of the Anaheim Hotel Debtors shall be transferred, conveyed, assumed, and assigned to the New Anaheim HoldCo; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred (as defined in the Anaheim Hotel Commitment Letter), a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Debtors.

(d) *Voting*: Class A4 is Impaired, and the Holder of Secured Anaheim Hotel Mezzanine Loan Claims is entitled to vote to accept or reject the Plan.

**Class A5A - General Unsecured Claims Against the Anaheim Hotel Owner or Anaheim Hotel Lessee**

(a)     *Classification:*  Class A5A consists of all General Unsecured Claims against the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class A5A General Unsecured Claim against the Anaheim Hotel Owner and Anaheim Hotel Lessee and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee, each Holder of an Allowed General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee shall either (i) if no Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, be paid in full on the Effective Date or as soon as reasonably practical thereafter; or (ii) if a Termination Event (as defined in the Anaheim Hotel Commitment Letter) has occurred, receive a distribution of the proceeds of a sale of the collateral under the Anaheim Hotel Mortgage Loan pursuant to the Anaheim Plan (along with any other unencumbered property), which distribution shall be made in accordance with the Distribution Waterfall as it applies to the Anaheim Hotel Owner or Anaheim Hotel Lessee.

(c)     *Voting:*  Class A5A is Impaired, and each Holder of a General Unsecured Claim against the Anaheim Hotel Owner or Anaheim Hotel Lessee is entitled to vote to accept or reject the Plan.

**Class A5B - General Unsecured Claims Against the Anaheim Mezzanine Debtor**

(a)     *Classification:*  Class A5B consists of all General Unsecured Claims against the Anaheim Mezzanine Debtor.

(b)     *Treatment:*  Holders of Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall not receive any distribution on account of such Allowed General Unsecured Claim against the Anaheim Mezzanine Debtor, and Allowed General Unsecured Claims against the Anaheim Mezzanine Debtor shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:*  Class A5B is Impaired, and the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of General Unsecured Claims against the Anaheim Mezzanine Debtor are not entitled to vote to accept or reject the Plan.

**Class A6 - Anaheim Hotel Mezzanine Loan Deficiency Claims Against the Anaheim Hotel Debtors**

(a)     *Classification:*  Class A6 consists of all Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors.

(b)     *Treatment:*  Holders of Allowed Class A6 Anaheim Hotel Mezzanine Loan Deficiency Claims shall not receive any distribution on account of such Anaheim Hotel Mezzanine Loan Deficiency Claims.

(c)     *Voting:*  Class A6 is Impaired, and the Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims against the Anaheim Hotel Debtors is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the

Holder of Anaheim Hotel Mezzanine Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

**Class A7 - Intercompany Claims Against the Anaheim Hotel Debtors**

(a) *Classification*:  Class A7 consists of all Intercompany Claims against the Anaheim Hotel Debtors.

(b) *Treatment*:  Holders of Allowed Class A7 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c) *Voting*:  Class A7 is Impaired, and Holders of Intercompany Claims against the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

**Class A8 - Intercompany Interests in the Anaheim Hotel Debtors**

(a) *Classification:*  Class A8 consists of all Intercompany Interests in the Anaheim Hotel Debtors.

(b) *Treatment:*  Holders of Allowed Class A8 Intercompany Interests in the Anaheim Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in the Anaheim Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c) *Voting:*  Class A8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

3.   The treatment provided to each Class relating to each of the Ontario Hotel Debtors for distribution purposes and voting rights are specified below:

**Class O1 - Other Priority Claims Against the Ontario Hotel Debtors**

(a) *Classification*:  Class O1 consists of all Other Priority Claims against the Ontario Hotel Debtors.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Class O1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

(i)      be paid in full in Cash from the Ontario Hotel Cash Recovery Fund on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)     otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)     *Voting*: Class O1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### Class O2 - Other Secured Claims Against the Ontario Hotel Debtors

(a)     *Classification*: Class O2 consists of all Other Secured Claims against Ontario Hotel Debtors. For all purposes under the Ontario Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors. Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class O2A against the Ontario Hotel Owner, Class O2B against the Ontario Hotel Owner, and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Class O2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Ontario Hotel Debtors, as applicable:

(i)      be paid in full in Cash from the Ontario Hotel Cash Recovery Fund in an amount equal to such Allowed Class O2 Other Secured Claim by the Debtors on the Effective Date;

(ii)     receive the collateral securing any such Allowed Class O2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)    otherwise be treated in any other manner such that the Allowed Class O2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class O2 Other Secured Claim becomes an Allowed Class O2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class O2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*: Class O2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class O2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

K&E 18934861.61 20090501

**Class O3 - Secured Ontario Hotel Mortgage Loan Claims**

(a)     *Classification:*  Class O3 consists of all Secured Ontario Hotel Mortgage Loan Claims.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class O3 Secured Ontario Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Secured Ontario Hotel Mortgage Loan Claims, the Holder of Allowed Secured Ontario Hotel Mortgage Loan Claims shall, at the election of the Holder of Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, (i) receive a deed in lieu of foreclosure with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement in form and substance reasonably acceptable to both parties, or (ii) elect to proceed with state foreclosure proceedings with respect to the collateral under the Ontario Hotel Mortgage Loan Agreement with the support of the Ontario Debtors, including but not limited to a receiver sale of the collateral or third-party assumption of the Ontario Hotel Mortgage Loan Agreement on terms acceptable to the Holder of the Allowed O3 Secured Ontario Hotel Mortgage Loan Claims, notwithstanding any injunction provisions contained herein.

(c)     *Voting:*  Class O3 is Impaired, and the Holder of Secured Ontario Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class O4 - General Unsecured Claims Against the Ontario Hotel Debtors**

(a)     *Classification:*  Class O4 consists of all General Unsecured Claims against the Ontario Hotel Debtors.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class O4 General Unsecured Claim against the Ontario Hotel Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Ontario Hotel Debtor, each Holder of an Allowed General Unsecured Claim against the Ontario Hotel Debtor shall receive its Pro Rata share of the Ontario Hotel Cash Recovery Fund that remains after satisfaction of Claims in Class O1 and Class O2.

(c)     *Voting:*  Class O4 is Impaired, and each Holder of a General Unsecured Claim against the Ontario Hotel Debtors is entitled to vote to accept or reject the Plan.

**Class O5 - Ontario Hotel Mortgage Loan Deficiency Claims**

(a)     *Classification:*  Class O5 consists of all Ontario Hotel Mortgage Loan Deficiency Claims.

(b)     *Treatment:*  The Holder of Allowed Class O5 Ontario Hotel Mortgage Loan Deficiency Claims shall not receive any distribution on account of such Ontario Hotel Mortgage Loan Deficiency Claims, and Allowed Ontario Hotel Mortgage Loan Deficiency Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:*  Class O5 is Impaired, and the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holder of Ontario Hotel Mortgage Loan Deficiency Claims is not entitled to vote to accept or reject the Plan.

### Class O6 - Intercompany Claims Against Ontario Hotel Debtors

(a)      *Classification*:  Class O6 consists of all Intercompany Claims against Ontario Hotel Debtors.

(b)      *Treatment*:  Holders of Allowed Class O6 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)      *Voting*:  Class O6 is Impaired by the Plan and Holders of Intercompany Claims against the Ontario Hotel Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

### Class O7 - Section 510(b) Claims Against Ontario Hotel Debtors

(a)      *Classification*:  Class O7 consists of all Section 510(b) Claims against Ontario Hotel Debtors.

(b)      *Treatment*:  Holders of Allowed Class O7 Section 510(b) Claims against Ontario Hotel Debtors shall not receive any distribution on account of such Section 510(b) Claims, and Allowed Section 510(b) Claims against Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)      *Voting*:  Class O7 is Impaired, and Holders of Section 510(b) Claims against Ontario Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims against Ontario Hotel Debtors are not entitled to vote to accept or reject the Plan.

### Class O8 - Intercompany Interests in Ontario Hotel Debtors

(a)      *Classification:*  Class O8 consists of all Intercompany Interests in Ontario Hotel Debtors.

(b)      *Treatment:*  Holders of Allowed Class O8 Intercompany Interests in Ontario Hotel Debtors shall not receive any distribution on account of such Intercompany Interests and the Intercompany Interests in Ontario Hotel Debtors shall be canceled, released, and extinguished as of the Effective Date.

(c)      *Voting:*  Class O8 is Impaired, and Holders of Intercompany Interests in the Anaheim Hotel Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Anaheim Hotel Debtors are not entitled to vote to accept or reject the Plan.

4.    The treatment provided to each Class relating to each of the Remaining Debtors for distribution purposes and voting rights are specified below:

### Class R1 - Other Priority Claims Against the Remaining Debtors

(a)      *Classification*:  Class R1 consists of all Other Priority Claims against the Remaining Debtors.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Class R1 Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed

Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

(i)      be paid in full in Cash on the later of the Effective Date and the date on which such Other Priority Claims becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter; or

(ii)      otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c)      *Voting*:  Class R1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

## Class R2 - Other Secured Claims Against the Remaining Debtors

(a)      *Classification*:  Class R2 consists of all Other Secured Claims against the Remaining Debtors.  For all purposes under the Remaining Debtor Plan, each Other Secured Claim is a separate Secured Claim against the applicable Debtors.  Accordingly, the sub-Class of Other Secured Claims against a particular Debtor will be further sub-divided into its own Class and designated by letters of the alphabet (*e.g.*, Class R2A against the Garden Grove Hotel Owner, Class R2B against the Garden Grove Hotel Owner and so on), so that each Holder of any Other Secured Claim against a particular Debtor is in a Class by itself, except to the extent that there are Other Secured Claims against that same Debtor that are substantially similar to each other and may be included within a single sub-Class of Claims against that particular Debtor.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Class R2 Other Secured Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Post-Effective Date Remaining Debtors, as applicable:

(i)      be paid in full in Cash in an amount equal to such Allowed Class R2 Other Secured Claim by the Debtors on the Effective Date;

(ii)      receive the collateral securing any such Allowed Class R2 Other Secured Claim and be paid interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii)      otherwise be treated in any other manner such that the Allowed Class R2 Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Class R2 Other Secured Claim becomes an Allowed Class R2 Other Secured Claim or as soon as reasonably practicable thereafter have its Class R2 Other Secured Claim be reinstated in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class R2 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class R2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

**Class R3A - Secured Garden Grove Hotel Mortgage Loan Claims**[2]

(a)     *Classification:*  Class R3A consists of all Secured Garden Grove Hotel Mortgage Loan Claims.

(b)     *Treatment:*  Except to the extent that the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Holder of Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Garden Grove Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement.  Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts:  an assumed loan amount of $32,416,576.45 and a cash principal paydown of $5,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Garden Grove Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Garden Grove Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors of the LNR Servicing Fee for the Garden Grove Hotel Mortgage Loan Agreement and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation.  For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration.  The portion of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims for interest at the non-default rate shall be satisfied by the retention of the amounts, if any, paid with respect to interest at the non-default rate on such claim under the Cash Collateral Order.  For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Garden Grove Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:*  Class R3A is Impaired, and the Holder of Class R3A Secured Garden Grove Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class R3B - Secured San Diego Hotel Mortgage Loan Claims**

(a)     *Classification*:  Class R3B consists of all Secured San Diego Hotel Mortgage Loan Claims.

---

[2]  With respect to Classes R3A, R3B, R3C, R3D and R3E, all payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall be credited, to the extent actually made by the Debtors, to the legal fees and disbursements of the LNR-Serviced Trusts' counsel and the monthly fees and disbursements of the LNR-Serviced Trusts' financial advisors and the Allowed Claim for interest at non-default rate, but not principal.  In no event shall any payment be applied to or recharacterized to reduce the principal component of such Allowed Claims. The payments received by the LNR-Serviced Trusts pursuant to the Cash Collateral Orders shall not be subject to objection, avoidance, recovery, disgorgement, or turnover.

K&E ~~18934861.61~~20090501

(b)    *Treatment*:  Except to the extent that the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Holder of Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Diego Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts:  an assumed loan amount of $40,168,769.26 and a cash principal paydown of $7,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Diego Hotel Mortgage Loan Agreement, and the LNR Liquidation Fee for the San Diego Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the San Diego Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation.  For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be payable by Chatham and shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration.  For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Diego Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)    *Voting:*  Class R3B is Impaired, and the Holder of Class R3B Secured San Diego Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class R3C - Secured Washington DC Hotel Mortgage Loan Claims

(a)    *Classification:*  Class R3C consists of all Secured Washington DC Hotel Mortgage Loan Claims.

(b)    *Treatment:*  Except to the extent that the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims, the Holder of Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Washington DC Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement.  Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of

the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $20,054,752.20 and a cash principal paydown of $5,400,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Washington DC Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Washington DC Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the Washington DC Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Washington DC Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c)     *Voting:* Class R3C is Impaired, and the Holder of Class R3C Secured Washington DC Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

## Class R3D - Secured Tysons Corner Hotel Mortgage Loan Claims

(a)     *Classification:* Class R3D consists of all Secured Tysons Corner Hotel Mortgage Loan Claims.

(b)     *Treatment:* Except to the extent that the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holders, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, the Holder of Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented Tysons Corner Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $23,057,021.67 and a cash principal paydown of $2,000,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the Tysons Corner Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the Tysons Corner Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the Tysons Corner Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham

Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the Tysons Corner Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c) *Voting:* Class R3D is Impaired, and the Holder of Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

### Class R3E - Secured San Antonio Hotel Mortgage Loan Claims

(a) *Classification:* Class R3E consists of all Secured San Antonio Hotel Mortgage Loan Claims.

(b) *Treatment:* Except to the extent that the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Holder of Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall, in connection with the Chatham APA, enter into the assumed, amended, restated, and/or supplemented San Antonio Hotel Mortgage Loan Agreement, as reasonably required by LNR and agreed to by Chatham, the form and terms of which shall include the terms and conditions set forth in the LNR Commitment and substantially be set forth in the Chatham Hotel Sale Transaction Loan Assumption Documents included in the Plan Supplement. Consistent with the foregoing, on the Effective Date of the Remaining Debtor Plan, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims shall be satisfied in full by (i) principal paydowns in Cash and assumption of the existing reduced mortgage liability by Chatham in the following amounts: an assumed loan amount of $18,462,695.40. and a cash principal paydown of $5,600,000.00 and the payment in full in Cash by Chatham of the LNR Assumption Fee for the San Antonio Hotel Mortgage Loan Agreement and the LNR Liquidation Fee for the San Antonio Hotel Mortgage Loan Agreement, and (ii) the payment by the Remaining Debtors in full in Cash of accrued interest at the non-default rate through the Effective Date of the Remaining Debtor Plan, the LNR Servicing Fee for the San Antonio Hotel Mortgage Loan Agreement, and the fees and expenses of the LNR-Serviced Trusts, including fees and expenses of their financial advisor (including incentive and transaction fees) and legal advisors, net of any credits with respect to interest at the non-default rate and the fees and expenses of the LNR-Serviced Trusts' legal and financial advisors previously paid pursuant to the Cash Collateral Orders, as provided in the Stipulation. For the avoidance of doubt, the amounts described in subsection (ii) of this subsection (b) shall not be included in the Chatham Hotel Sale Transaction Purchase Consideration. For the avoidance of doubt and notwithstanding anything to the contrary herein, such Holder shall not receive any recovery from any of the Debtors on account of any deficiency Claim, guaranty Claim, indemnity Claim, and Claims for Adequate Protection Obligations related to the San Antonio Hotel Mortgage Loan Agreement and such Claims shall be deemed to be canceled, released, and extinguished as of the Effective Date of the Remaining Debtor Plan.

(c) *Voting:* Class R3E is Impaired, and the Holder of Class R3E Secured San Antonio Hotel Mortgage Loan Claims is entitled to vote to accept or reject the Plan.

**Class R4A - General Unsecured Claims Against the Remaining Debtors Other Than Grand Prix Holdings**

(a)     *Classification:*  Class R4A consists of all General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R4A General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against the Remaining Debtors other than Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against a particular Remaining Debtor other than Grand Prix Holdings shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor other than Grand Prix Holdings through the Distribution Waterfall and (ii) other assets, if any, of such Remaining Debtor other than Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor other than Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor other than Grand Prix Holdings.

(c)     *Voting:* Class R4A is Impaired, and the Holders of Allowed Class R4A General Unsecured Claims against the Remaining Debtors other than Grand Prix Holdings are entitled to vote to accept or reject the Plan.

**Class R4B - General Unsecured Claims Against Grand Prix Holdings**

(a)     *Classification:*  Class R4B consists of all General Unsecured Claims against Grand Prix Holdings.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R4B General Unsecured Claim against Grand Prix Holdings and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed General Unsecured Claim against Grand Prix Holdings, each Holder of an Allowed General Unsecured Claim against Grand Prix Holdings shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against Grand Prix Holdings, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings; provided, however, that any recovery on account of the Ontario Hotel Mortgage Loan Guaranty Claim shall not exceed $1.5 million.

(c)     *Voting:* Class R4B is Impaired, and the Holders of Allowed Class R4 General Unsecured Claims against Grand Prix Holdings are entitled to vote to accept or reject the Plan.

K&E 18934861.61 20090501

**Class R5 - Intercompany Claims Against the Remaining Debtors**

(a)     *Classification*:   Class R5 consists of all Intercompany Claims against the Remaining Debtors.

(b)     *Treatment*:   Holders of Allowed Class R5 Intercompany Claims shall not receive any distribution on account of such Intercompany Claims, and Allowed Intercompany Claims shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class R5 is Impaired, and Holders of Intercompany Claims against the Remaining Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against the Remaining Debtors are not entitled to vote to accept or reject the Plan.

**Class R6 - Intercompany Interests in the Remaining Debtors**

(a)     *Classification:*  Class R6 consists of all Intercompany Interests in the Remaining Debtors.

(b)     *Treatment:*   Holders of Allowed Class R6 Intercompany Interests in the Remaining Debtors shall have their Interests reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting:*  Class R6 is Unimpaired, and Holders of Intercompany Interests in the Remaining Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests in the Remaining Debtors are not entitled to vote to accept or reject the Plan.

**Class R7 - Innkeepers USA LP Preferred D Interests**

(a)     *Classification:*  Class R7 consists of all Innkeepers USA LP Preferred D Interests.

(b)     *Treatment:*  Holders of Allowed Innkeepers USA LP Preferred D Interests shall not receive any distribution on account of such Allowed Innkeepers USA LP Preferred D Interests, and Allowed Innkeepers USA LP Preferred D Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class R7 is Impaired, and Holders of Allowed Innkeepers USA LP Preferred D Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Innkeepers USA LP Preferred D Interests are not entitled to vote to accept or reject the Plan.

**Class R8 - Innkeepers USA Trust Preferred C Interests**

(a)     *Classification:*  Class R8 consists of all Innkeepers USA Trust Preferred C Interests.

(b)     *Treatment:*  Holders of Allowed Innkeepers USA Trust Preferred C Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)     *Voting:*  Class R8 is Impaired, and Holders of Allowed Class R8 Innkeepers USA Trust Preferred C Interests are entitled to vote to accept or reject the Plan.

K&E 18934861.61 20090501

**Class R9 - Innkeepers USA Trust Preferred A Interests**

(a)     *Classification:*  Class R9 consists of all Innkeepers USA Trust Preferred A Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Preferred A Interests shall receive the Holder's entitled Pro Rata distribution of the Chatham Hotel Sale Transaction Purchase Consideration and assets, if any, of Innkeepers USA Limited Partnership, Innkeepers Financial Corporation, and Innkeepers USA Trust (including any Cash in the LP Bank Account that is available for distribution after, among other things, satisfaction of costs of administration of the Chapter 11 Cases), which distribution shall be made in accordance with the Distribution Waterfall as it applies to Innkeepers USA Trust.

(c)     *Voting:*  Class R9 is Impaired, and Holders of Allowed Class R9 Innkeepers USA Trust Preferred A Interests are entitled to vote to accept or reject the Plan.

**Class R10 - Innkeepers USA Trust Common Interests**

(a)     *Classification:*  Class R10 consists of all Innkeepers USA Trust Common Interests.

(b)     *Treatment:* Holders of Allowed Innkeepers USA Trust Common Interests shall not receive any distribution on account of such Allowed Innkeepers USA Trust Common Interests, and Allowed Innkeepers USA Trust Common Interests shall be canceled, released, and extinguished as of the Effective Date.

(c)     *Voting:*  Class R10 is Impaired, and Holders of Allowed Class R10 Innkeepers USA Trust Common Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Innkeepers USA Trust Common Interests are not entitled to vote to accept or reject the Plan.

**Class R11 - Grand Prix Holdings Interests**

(a)     *Classification:*  Class R11 consists of all Grand Prix Holdings Interests.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class R11 Grand Prix Holdings Interest and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and compromise of each Allowed Grand Prix Holdings Interest, each Holder of an Allowed Grand Prix Holdings Interest shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham Hotel Sale Transaction Purchase Consideration received by Grand Prix Holdings and (ii) other assets, if any, of Grand Prix Holdings that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Allowed Grand Prix Holdings Interests, which distribution shall be made in accordance with the Distribution Waterfall as it applies to Grand Prix Holdings.

(c)     *Voting*:  Class R11 is Impaired, and Holders of Allowed Class R11 Grand Prix Holdings Interests are entitled to vote to accept or reject the Plan.

**Class R12 - Section 510(b) Claims Against the Remaining Debtors**

(a)     *Classification*:  Class R12 consists of all Section 510(b) Claims against the Remaining Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Class R12 Section 510(b) Claims against the Remaining Debtors and the Debtors agree to less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release, discharge, and

48

compromise of each Section 510(b) Claims against the Remaining Debtors, each Holder of an Allowed Section 510(b) Claims against a particular Remaining Debtor shall receive the Holder's entitled Pro Rata distribution of (i) the Chatham Hotel Sale Transaction Purchase Consideration received by such Remaining Debtor through the Distribution Waterfall and (ii) other assets, if any, of such Remaining Debtor that are not subject to a Secured Claim of any Entity and are available for distribution to the Holders of Claims against such Remaining Debtor, which distribution shall be made in accordance with the Distribution Waterfall as it applies to such Remaining Debtor.

(c) *Voting*: Class R12 is Impaired, and Holders of Allowed Class R12 Section 510(b) Claims against the Remaining Debtors are entitled to vote to accept or reject the Plan.

B. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

C. *Elimination of Vacant Classes*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement and Solicitation Procedures Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

D. *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of each of the Joint Plans for the applicable Debtors pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A. *Substantive Consolidation*

The Plan does not contemplate substantive consolidation of any of the Debtors.

B. *Restructuring Transactions and Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. With respect to the Fixed/Floating Plan, ~~all amounts of Cash and securities necessary for~~ the Fixed/Floating ~~Debtors or~~ **Plan Sponsors hereby irrevocably agree to cause New HoldCo to fund or cause** the Post-Effective Date Fixed/Floating Debtors, ~~as applicable,~~ **to fund all amounts of cash necessary** to make payments or distributions ~~pursuant hereto shall be obtained from (a) Cash on hand from operations in accordance with the Commitment Letter and, as applicable, and permitted by the Cash Collateral Orders and (b) the Investment~~**, including all Administrative Claims**. With respect to the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan, all amounts of Cash and securities necessary for the Debtors that are not the Fixed/Floating Debtors or the Post-Effective Date Debtors that are not the Post-Effective Date Fixed/Floating Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from (a) Cash from operations, (b) the Chatham Hotel Sale Transaction. Payments under this provision shall not reduce the distributions to Midland or Lehman under the Fixed/Floating Plan or the distribution to the LNR-Serviced Trusts under the Remaining Debtor Plan.

49

C.     *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

D.     *Fixed/Floating Investment*

On the Effective Date of the Fixed/Floating Plan, and subject to the terms of the ~~Fixed/Floating Successful Bid~~**Commitment Letter**, New HoldCo shall purchase, directly or indirectly, the Interests of the Post-Effective Date Fixed/Floating Debtors in return for the Investment.

If the Fixed/Floating Plan Sponsors determine in their sole and absolute discretion that New HoldCo and the Post-Effective Date Fixed/Floating Debtors shall have an alternate corporate or organizational structure, form or identity (including, without limitation, as a result of the rejection of the Fixed/Floating Plan by Class FF4), the structure of the Investment contemplated in this Article IV.D shall be changed to the extent necessary to effectuate any such alternate structure, form, or identity.

E.     *Chatham Hotel Sale Transaction*

On the Effective Date of the Remaining Debtor Plan, and in accordance with the Chatham APA and as applicable to the Remaining Debtors, the Debtors will consummate the Chatham Hotel Sale Transaction in accordance with the Chatham Hotel Sale Transaction Documents, provided, however, that notwithstanding anything contained in the Plan, the Plan Supplement, the Remaining Debtor Plan, the Disclosure Statement or any other document or agreement relating to the foregoing documents, the consideration paid by Chatham to consummate the Chatham Hotel Sale Transaction in accordance with the Chatham APA shall not exceed Chatham Hotel Sale Transaction Purchase Consideration, provided that Chatham shall in addition remain responsible for any fees and expenses Chatham has agreed to pay pursuant to the Chatham APA.

F.     *Anaheim Hotel Commitment Letter*

Unless otherwise agreed by the parties thereto, the restructuring of the Anaheim Hotel Debtors shall be done in accordance with the terms of the Anaheim Hotel Commitment Letter, except as modified herein in Article III.B.2, Treatment of Class A1.

G.     *New Fixed Rate Pool Mortgage Loan Limited Guarantys*

On the Effective Date of the Fixed/Floating Plan and in connection with the New Fixed Rate Pool Mortgage Loan, the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall be entered into by the parties contemplated in the New HoldCo/Midland Commitment and the New Fixed Rate Pool Mortgage Loan Limited Guarantys shall otherwise be consistent with the terms of the New HoldCo/Midland Commitment.

H.     *Special Servicer Payment and Special Servicer Release Payment*

Contemporaneously with the occurrence of the Effective Date of the Fixed/Floating Plan, and as a condition thereto, the Fixed/Floating Plan Sponsors shall direct New HoldCo to make the Special Servicer Payment and the Special Servicer Release Payment.

I.     *Issuance of Interests in Post-Effective Date Fixed/Floating Debtors*

The issuance of the Interests by each of the Post-Effective Date Fixed/Floating Debtors is authorized without the need for any further action and without any further action by the Holders of Claims or Interests or any further notice to or action, order, or approval of the Bankruptcy Court.

On the Effective Date of the Fixed/Floating Plan, or as soon as reasonably practicable thereafter, the Interests in the Post-Effective Date Fixed/Floating Debtors (or such of them as may be designated by New HoldCo) shall be distributed to New HoldCo in accordance with the Fixed/Floating Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

All of the Interests in the Post-Effective Date Fixed/Floating Debtors issued pursuant to the Fixed/Floating Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI shall be governed by the terms and conditions set forth in the Fixed/Floating Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

*J.*     *Management Compensation*

As part of their bid, the Fixed/Floating Plan Sponsors agreed to fund certain employee-related emergence costs related to the Fixed/Floating Plan in an amount equal to $3.5 million, which amount shall be distributed on the Effective Date of the Fixed/Floating Plan to certain members of the Debtors' management and employees at the direction of, and in the sole and absolute discretion of, the current board of Innkeepers USA Trust.

In addition, the Debtors also may implement a compensation program for certain members of the Debtors' management and employees related to the sale of the assets of the Remaining Debtors, which program will be in an amount of approximately $500,000. To the extent implemented, the appropriate details regarding this program will be set forth in the Plan Supplement.

*K.*     *Listing of New HoldCo Interests; Reporting Obligations*

None of the New HoldCo Interests will be listed on a national securities exchange as of the Effective Date of the Fixed/Floating Plan. New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust will not be reporting companies under the Securities Exchange Act, and New HoldCo, Post-Effective Date Innkeepers USA Limited Partnership, and Post-Effective Date Innkeepers USA Trust shall not be required to file reports with the Securities and Exchange Commission or any other entity or party and shall not be required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date; provided that notwithstanding anything contained herein, each of the Post-Effective Date Debtors shall provide a calculation of their disbursements to the United States Trustee on a quarterly basis until the entry of a final decree pursuant to Bankruptcy Rule 3022 to close the chapter 11 case of such Post-Effective Date Debtor.

*L.*     *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Post-Effective Date Debtors and their successors and assigns.

*M.*     *LP Bank Account*

On the Effective Date of the Remaining Debtor Plan, the Cash in the LP Bank Account shall be deemed to be unencumbered, not subject to a security interest of any lender.

*N.*     *Vesting of Assets in the Post-Effective Date Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate of the Debtors, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the applicable Post-Effective Date Debtors free and clear of all

Liens, Claims, charges, or other encumbrances. The Intercompany Interests of Innkeepers USA Limited Partnership in non-Debtor KPA Raleigh, LLC shall vest in Post-Effective Date Innkeepers USA Limited Partnership. The Intercompany Interests of KPA Leaseco Holding, Inc. in non-Debtor KPA Raleigh Leaseco, LLC shall vest in Post-Effective Date KPA Leaseco Holding, Inc. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

O.      *Rights and Obligations Under Troy Settlement Agreement*

All of the Debtors' rights and obligations under that certain Settlement Agreement and Release Relating to the Detroit/Troy Central Residence Inn by Marriott, dated August 24, 2010, by and between certain of the Debtors and Marriott International, Inc., as approved by the Bankruptcy Court pursuant to the So-Ordered Stipulation Between Innkeepers USA Trust and Marriott International, Inc. and Order Approving Settlement of Marriott's Motion for Limited Modification of the Automatic Stay and Debtors' Motion to Assume the Troy Central Franchise Agreement, entered by the Bankruptcy Court on August 31, 2010 [Docket No. 357], shall be assumed by the Debtors that are signatories thereto.

P.      *Cancellation of Securities and Agreements*

On the Effective Date, except to the extent otherwise provided, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be canceled and the obligations of the Debtors or the Post-Effective Date Debtors and the non-Debtor affiliates thereunder or in any way related thereto shall be discharged.

Q.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the directors, members, trustees, officers, and managers for New HoldCo, including the appointment of the Post-Effective Date Board; (2) the issuance and distribution of the Interests in the Post-Effective Date Fixed/Floating Debtors, (3) the execution and approval for the Post-Effective Date Fixed/Floating Debtors of the New Fixed/Floating By-Laws and New Fixed/Floating Organizational Documents consistent with the terms of the ~~Fixed/Floating Successful Bid~~**Commitment Letter**, (4) the execution and delivery of the New Fixed Rate Pool Mortgage Loan **Agreement**, the New Fixed Rate Pool Mortgage Notes, and the New Fixed Rate Pool Mortgage Loan Limited Guarantys consistent with the terms of the New HoldCo/Midland Commitment; (5) assumption of the LNR-Serviced Loans consistent with the terms of the LNR Commitment and the Stipulation; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, trustees, officers, or managers of the Debtors or the Post-Effective Date Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.Q shall be effective notwithstanding any requirements under non-bankruptcy law.

R.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Post-Effective Date Debtors and their directors, members, trustees, officers, and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals,

authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

S.       *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, including the recording of any mortgages or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

T.       *D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, on the Effective Date of the Remaining Debtor Plan, the Remaining Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtors rights to seek amendment to such D&O Liability Insurance Policies.  On the Effective Date of the Fixed/Floating Plan, New HoldCo will purchase new director & officer liability insurance policies as the Fixed/Floating Plan Sponsors determine is necessary.  Entry of the Confirmation Order for the Remaining Debtor Plan shall constitute the Bankruptcy Court's approval of the Remaining Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Remaining Debtors under the Remaining Debtor Plan as to which no Proof of Claim need be Filed.

U.       *D&O Tail Insurance Policies*

To the extent not already purchased, on the Confirmation Date of the Fixed/Floating Plan, the Debtors are authorized to purchase tail coverage under a directors and officers' liability insurance policy with a term of six years for the current and former officers, directors, trustees, and members containing the same coverage that exists under the Debtors' current D&O Liability Insurance Policies (*i.e.*, a "tail policy").  After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, trustees, and members of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, trustees, and/or members remain in such positions after the Effective Date.

V.       *New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws*

On or immediately prior to the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors will file the New Fixed/Floating Organizational Documents, which shall include provisions in accordance with the ~~Fixed/Floating Successful Bid~~**Commitment Letter**, with the applicable Secretaries of State and/or other applicable authorities in their respective states of organization as required by and in accordance with applicable laws.  In addition, the provisions of the New Fixed/Floating By-Laws shall include provisions in accordance with the ~~Fixed/Floating Successful Bid~~**Commitment Letter**.  After the Effective Date, New HoldCo and the Post-Effective Date Fixed/Floating Debtors may amend and restate the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws and other constituent documents as permitted by the laws of applicable states of organization and the New Fixed/Floating Organizational Documents and New Fixed/Floating By-Laws.

*W.*     *Board Representation*

1.     Fixed/Floating Debtors

New HoldCo shall be managed by the managing member of New HoldCo in accordance with the terms and conditions set forth in the New HoldCo limited liability company agreement. To the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will identify the managing member of New HoldCo and the members of the board of directors, members, and trustees of the New HoldCo subsidiaries identified as of the date of the filing thereof.

2.     Other Debtors

Post-Effective Date Innkeepers USA Trust and Post-Effective Date Grand Prix Holdings, LLC shall be managed by the Post-Effective Date Board. To the extent known and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Plan Supplement will list the members of the Post-Effective Date Board and the members of the board of directors, members, and trustees of the subsidiaries of Post-Effective Date Innkeepers USA Trust identified as of the date of the filing thereof.

*X.*     *Indemnification Provisions*

Notwithstanding anything herein to the contrary, pursuant to section 365 of the Bankruptcy Code or otherwise, and as of the Effective Date, the Debtors shall assume and assign to the Post-Effective Date Debtors all of the Indemnifications Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Indemnification Provisions. Notwithstanding anything to the contrary contained herein, (i) Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed and assigned by the foregoing assumption and assignment of the Indemnification Provisions, (ii) each such obligation shall be deemed and treated as an Executory Contract that has been assumed and assigned by the Debtors under the Plan as to which no Proof of Claim need be Filed, and (iii) as of the Effective Date, the Indemnifications Provisions shall be binding and enforceable against the Post-Effective Date Debtors.

*Y.*     *Liquidation Trust*

1.     Formation of the Liquidation Trust

On the Effective Date, the Liquidation Trust will be formed to oversee the Wind Down, and will fund the Wind Down using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration and the LP Bank Account, and shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Remaining Debtors, Post-Effective Date Ontario Hotel Debtors, and Post-Effective Date Anaheim Mezzanine Debtor in accordance with the Plan, including the authority to retain attorneys and consultants.

2.     Trustee

AP Services, LLC will serve as the Trustee for the Liquidation Trust.

3.     Purpose of the Liquidation Trust

The Liquidation Trust will be established for the primary purpose of liquidating the Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Upon the transfer by the Trust Debtors of the Trust Assets, the Trust Debtors will have no reversionary or further interest in or with respect to the Trust Assets or the Liquidation Trust. For all federal income tax purposes, the Beneficiaries of the Liquidation Trust will be treated as grantors and owners thereof and it is intended that the Liquidation Trust be classified as a liquidating trust under Section 301.7701 4 of the Treasury Regulations and that such trust is owned by the Beneficiaries of the Liquidation

Trust. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries of the Liquidation Trust be treated as if they had received a distribution of an interest in the Trust Assets and then contributed such interests to the Liquidation Trust. Accordingly, the Liquidation Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Trust Assets, make timely distributions to the Beneficiaries of the Liquidation Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidation Trust will not be deemed a successor in interest of the Remaining Debtors, Ontario Hotel Debtors, or Anaheim Mezzanine Debtor for any purpose other than as specifically set forth herein. The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries of the Liquidation Trust treated as grantors and owners of the trust.

4.    Transfer of Assets to the Liquidation Trust; Trust Assets Available for Distribution

The Trustee will establish the Liquidation Trust on behalf of its Beneficiaries, with the Beneficiaries of the Liquidation Trust to be treated as the grantors and deemed owners of the Trust Assets. On the Effective Date, the Trust Debtors will transfer to the Liquidation Trust the Trust Assets for the benefit of the Beneficiaries of the Liquidation Trust in accordance with the provisions herein, notwithstanding any prohibition of assignability under non-bankruptcy law. The Liquidation Trust will agree to accept and hold the Trust Assets in the Liquidation Trust for the benefit of the Beneficiaries of the Liquidation Trust, subject to the terms of the Plan.

The Remaining Debtors, the Anaheim Mezzanine Debtor, the Ontario Hotel Debtors, the Trustee, and the Beneficiaries shall each value the Trust Assets consistently for federal and other income tax purposes. After the Effective Date, the Trustee, in reliance upon such professionals as the Trustee may retain, shall make a good faith valuation of the Trust Assets no later than 180 days following the Effective Date. Such valuation shall be made available from time to time, to the extent necessary or appropriate as reasonably determined by the Trustee in reliance on its professionals (which may include posting such valuation on a website established by the Trust) and used consistently by all parties (including, without limitation, the Remaining Debtors, the Anaheim Mezzanine Debtor, the Ontario Hotel Debtors, the Trustee, and the Beneficiaries) for federal and other income tax purposes.

The Trust Assets provided by the Remaining Debtors, the Anaheim Mezzanine Debtor, and the Ontario Hotel Debtors, respectively, shall be distributable, in accordance with the Remaining Debtor Plan, the Anaheim Hotel Plan, and the Ontario Hotel Plan, as applicable, only to Beneficiaries holding Allowed Claims against the Remaining Debtors, the Anaheim Mezzanine Debtor, or the Ontario Hotel Debtors, respectively. For example, Trust Assets provided by the Anaheim Mezzanine Debtor shall be distributable, in accordance with the Plan, only to Beneficiaries holding Allowed Claims against the Anaheim Mezzanine Debtor, and not to Beneficiaries holding Allowed Claims solely against the other Trust Debtors. In addition, for the avoidance of doubt, Beneficiaries holding Allowed Claims against multiple Trust Debtors shall receive distributions, in accordance with the applicable Joint Plan, from the Trust Assets provided from each of the Trust Debtors against whom such Beneficiary holds such Allowed Claims in proportion with the amount of such Allowed Claims against each of the Trust Debtors. The Trustee shall take all necessary steps to ensure that Trust Assets are distributed pursuant to the foregoing.

5.    Distribution; Withholding

The Liquidation Trust will make distributions to the Beneficiaries in accordance with Article IV.Y.4 above. The Liquidation Trust may withhold from amounts distributable to any person or Entity any and all amounts, determined in the sole discretion of the Trustee for the Liquidation Trust, to be required by any law, regulation, rule, ruling, directive, or other governmental requirement.

6.    Insurance

The Liquidation Trust will maintain customary insurance coverage, if appropriate and available, for the protection of Persons serving as administrators and overseers of the Liquidation Trust on and after the Effective Date.

7.    Liquidation Trust Implementation

On the Effective Date, the Liquidation Trust will be established and become effective for the benefit of the Beneficiaries of the Liquidation Trust entitled to distributions from the Liquidation Trust. The Liquidation Trust is

K&E 18934861.6120090501

intended to be and remain as a grantor trust, with the Beneficiaries of the Liquidation Trust as the grantors and owners thereof for federal income tax purposes.

8. Settlement of Disputed Claims

The Trustee shall have authority to settle Disputed Claims against the Trust Debtors without further approval of the Bankruptcy Court; provided, however, that settlement of Disputed Claims against the Remaining Debtors, Ontario Hotel Debtors, or Anaheim Mezzanine Debtor pursuant to which the Liquidation Trust will pay $50,000 or more shall require the approval of the Bankruptcy Court.

9. Termination of Liquidation Trust

The Liquidation Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; provided, however, that, on or later than the date that is six months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidation Trust for a finite period if such an extension is necessary to liquidate the Trust Assets. Notwithstanding the foregoing, multiple extensions may be obtained so long as (1) Bankruptcy Court approval is obtained no more than six months prior to the expiration of each extended term and (2) the Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a grantor trust for federal income tax purposes.

10. Termination of the Trustee for the Liquidation Trust

The duties, responsibilities, and powers of the Trustee will terminate upon termination of the Liquidation Trust.

11. Exculpation; Indemnification

The Trustee, the Liquidation Trust, the professionals or consultants of the Liquidation Trust, and their representatives and agents will be exculpated and indemnified as provided herein. Nothing contained in the Plan or the Confirmation Order shall be deemed to be an assumption by the Trustee of any of the liabilities, obligations, or duties of the Trust Debtors or Beneficiaries and shall not be deemed to be or contain a covenant or agreement by the Trustee to assume or accept any such liability, obligation, or duty. Any successor Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Trustee hereunder, and any statement or representation made as to the assets comprising the Trust Assets or as to any other fact bearing upon the prior administration of the Liquidation Trust, so long as it has a good faith basis to do so. The Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement, or representation if it is later proved to be incomplete, inaccurate, or untrue. The Trustee or successor Trustee shall not be liable for any act or omission of any predecessor Trustee, nor have a duty to enforce any claims against any predecessor Trustee on account of any such act or omission, unless directed to do so by the Trustee.

The Trustee and its agents, consultants, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives, and principals shall be indemnified and held harmless by the Liquidation Trust, to the fullest extent permitted by law, solely from the Trust Assets, for any losses, claims, damages, liabilities, and expenses, including, without limitation, reasonable attorneys' fees, disbursements, and related expenses which such indemnified parties may incur or to which such indemnified parties may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against one or more of such indemnified parties on account of the acts or omissions of the Trustee solely in its capacity as such; provided, however, that the Liquidation Trust shall not be liable to indemnify any such indemnified party for any act or omission constituting gross negligence, or willful misconduct. Notwithstanding any provision herein to the contrary, such indemnified parties shall be entitled to obtain advances from the Liquidation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of any such indemnified party in its capacity as such; provided, however, that the parties indemnified pursuant to this Article IV.Y.11 receiving such advances shall repay the amounts so advanced to the Liquidation Trust upon the entry of a Final Order finding that such indemnified parties were not entitled to any indemnity under the provisions of this Article IV.Y.11.

Z.      *Disbursing Agent for the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee*

On the Effective Date, AP Services, LLC shall be appointed the Disbursing Agent for the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee.

AA.     *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article III.B with respect to Class FF5, Article VIII.C, Article VIII.D, Article VIII.E, Article VIII.F, Article VIII.G, and Article VIII.H), each of the Post-Effective Date Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.   The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors.   No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Post-Effective Date Debtors have released any Entity on or prior to the Effective Date (pursuant to any of the release provisions set forth in Article VIII, Article III.B with respect to Class FF5, or otherwise), the Debtors or the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.   Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Post-Effective Date Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

BB.     *Ad Hoc Committee Agreement*

The following is an integrated agreement among the Debtors and the Ad Hoc Committee (the "**Ad Hoc Committee Agreement**") under which, upon its approval in its entirety, the Ad Hoc Committee, among other things, waives any right to challenge the allowability of the Innkeepers USA Trust Preferred A Interests (held by one of the Debtors or otherwise), including any right to object to or seek to subordinate the Innkeepers USA Trust Preferred A Interests, in exchange for the consideration being provided to the Ad Hoc Committee herein.

The distribution provisions under the Remaining Debtor Plan under which, after payment of certain allowed claims, the Innkeepers USA Trust Preferred C Interests share in the $7.4 million of cash, the proceeds of the Chatham Hotel Sale Transaction, and other available assets, shall not be changed adversely to the Innkeepers USA Trust Preferred C Interests absent the consent of the Ad Hoc Committee.

The Ad Hoc Committee will support the Plan and all its provisions and waive all objections to the Plan, provided that the Ad Hoc Committee Agreement is approved in its entirety.  Upon any denial of the whole or any part of the Ad Hoc Committee Agreement (the "**Denial Date**"), the Debtors shall withdraw their request for Confirmation of the Remaining Debtor Plan (the "**Initial Confirmation Hearing**") and shall not request Confirmation of the Remaining Debtor Plan again for 30 days (the "**Subsequent Confirmation Hearing**"); provided, the parties will be required to serve any discovery requests within 10 days after the Denial Date, the parties will work in good faith to respond promptly to document requests and deposition notices, and the Court will schedule the Subsequent Confirmation Hearing, without requiring resolicitation of the non-materially modified Remaining Debtor Plan, as close as practicable to (but no earlier than) 31 days after the Denial Date; provided, further, the Debtors shall request approval of the Chatham Hotel Sale Transaction immediately following the Denial Date (in accordance with the terms and conditions set forth in the Chatham APA (as defined herein)), without regard to the scheduling of the Subsequent Confirmation Hearing, and the Ad Hoc Committee will support approval of the Chatham Hotel Sale Transaction.

The Remaining Debtor Plan (and only the Remaining Debtor Plan) shall provide that, upon approval of the Ad Hoc Committee Agreement: (i) Holders of Innkeepers USA Trust Preferred C Interests and the Ad Hoc Committee shall be deemed to be Fixed/Floating Releasing Parties, Anaheim Hotel Releasing Parties, and Ontario Hotel Releasing Parties; and (ii) the Ad Hoc Committee shall be a Remaining Debtor Releasing Party.
The Ad Hoc Committee will draft a letter in support of the Plan that will be distributed with the Disclosure Statement and other solicitation materials.

Without limiting the scope of the release, exculpation, and injunction provisions of the Plan, the Ad Hoc Committee waives any right in, and will not assert a claim against or interest in, the recovery distributable to Holders of Innkeepers USA Trust Preferred A Interests or any party in interest asserting rights with respect to such recovery, provided that the Ad Hoc Committee Agreement is approved in its entirety. The Innkeepers USA Trust Preferred A Interests shall be treated as pari passu with the Innkeepers USA Trust Preferred C Interests.

The Ad Hoc Committee and its advisors will receive the Ad Hoc Committee Administrative Claim to be paid in the amount of $3.5 million by a Remaining Debtor (other than Grand Prix Holdings, Innkeepers USA Trust, and Innkeepers Financial Corporation) for its role in the Chapter 11 Cases. The amount will be paid on the Effective Date of the Remaining Debtor Plan. The claim for payment shall be deemed an Allowed administrative priority Claim.

The Debtors will support approval of the Ad Hoc Committee Agreement in its entirety.

The Debtors shall enter into exclusive discussions for 30 days with the Ad Hoc Committee regarding the Ad Hoc Committee becoming a stalking horse bidder for the Raleigh JV interest, subject to Bankruptcy Court approval.

To the extent there are any inconsistencies between the terms of the Ad Hoc Committee Agreement as set forth in this Article IV.AA and elsewhere, the terms of the Ad Hoc Committee Agreement as set forth in this Article IV.AA shall govern.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.     Assumption of Franchise Agreements*

On the Fixed/Floating Plan Effective Date, the Fixed/Floating Debtors will assume the franchise agreements set forth in the Plan Supplement with respect to the assets of the Fixed/Floating Debtors. On the Remaining Debtor Plan Effective Date, the Debtors that are party to the Chatham APA will either (i) assume and assign to Chatham (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the assets of the Debtors that are party to the Chatham APA or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and Chatham (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims. On the Anaheim Plan Effective Date, the Anaheim Hotel Debtors will either (i) assume and assign to New Anaheim HoldCo (or its designee) the franchise agreements set forth in the Plan Supplement with respect to the Anaheim Hotel Debtors or (ii) assume such franchise agreements, enter into a consensual termination of such franchise agreements with the respective franchisors, and New Anaheim HoldCo (or its designee) shall enter into new franchise agreements with each respective franchisor for the related property, provided such termination shall not result in any Claims.

*B.     Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan, the Executory Contracts or Unexpired Leases of a Debtor that are not assumed or rejected pursuant to an Order prior to the Effective Date applicable to such Debtor shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts or Unexpired Leases: (1) identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement; (2) that are the subject of a motion to assume and assign or reject pending on the Effective Date applicable to such Debtor (in which case such assumption and assignment or rejection and the effective date thereof shall remain subject to a Final Order); or (3) that are subject to a motion to reject with a requested effective date of

rejection after the Effective Date applicable to such Debtor. Entry of the Confirmation Order shall constitute an approval of the assumptions and assignment or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, including the assumption and assignment of the Executory Contracts and Unexpired Leases identified on the list of assumed and assigned Executory Contracts and Unexpired Leases in the Plan Supplement and the rejection of the Executory Contracts and Unexpired Leases identified on the list of rejected Executory Contracts and Unexpired Leases in the Plan Supplement, all pursuant to sections 365 and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions and assignments or rejections of a Debtor's Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date applicable to such Debtor. Notwithstanding anything to the contrary in the Plan, the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the lists of Executory Contracts or Unexpired Leases applicable to the Post-Effective Date Debtors identified in this Article V and in the Plan Supplement at any time through and including the later of 30 days after the Effective Date (or such later date as provided in Article V.C in the event of any objection by a counterparty to an Executory Contract or Unexpired Lease to the amount of any Cure Obligation or other matter relating to the proposed assumption and assignment).

C.    *Cure of Defaults for Assumed and Assigned Executory Contracts and Unexpired Leases*

Any Executory Contracts or Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the satisfaction of the Cure Obligations or by an agreed-upon waiver of the Cure Obligations on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Post-Effective Date Debtors and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or related Cure Obligations must be Filed, served, and actually received by the Debtors by 30 days after the Effective Date of the Joint Plan applicable to the Debtor that is the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption and assignment of such Executory Contract or Unexpired Lease or such Cure Obligations will be deemed to have assented to such matters and shall be forever barred, estopped, and enjoined from asserting such objection against the Debtors.

In the event of a dispute regarding: (1) the Cure Obligations; (2) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed and assigned; or (3) any other matter pertaining to assumption and/or assignment, then the applicable Cure Obligations shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that prior to the Effective Date, the Debtors, or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding Cure Obligations without any further notice to any party or any action, order, or approval of the Bankruptcy Court. The Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to reject, or nullify the assumption and assignment of, any Executory Contract or Unexpired Lease no later than 30 days after a Final Order determining the Cure Obligations, any request for adequate assurance of future performance required to assume and assign such Executory Contract or Unexpired Lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption and/or assignment. Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

D.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than the later of (a) 30 days after the effective date of rejection of such Executory Contract or Unexpired Lease and (b) 30 days after the Effective Date of the Joint Plan applicable to the Debtor whom the Claim is against.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan, or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, settled and compromised, and be subject to the permanent injunction set forth in Article VIII.J, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

E.    *Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or the Post-Effective Date Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption and assignment or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.    *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or

Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Disbursing Agent or the Liquidation Trust, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII. Except as otherwise provided herein, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any postpetition interest on such Claim or Interest payable in accordance with the Plan.

B.      *Distributions to Holders of Claims Against and Interests in the Trust Debtors*

        All distributions that are to be made to the Holders of Claims Against and Interests in the Trust Debtors shall be made pursuant to the terms of Article IV.Y hereof.

C.      *Distributions to Holders of Claims Against and Interests in the Fixed/Floating Debtors, the Anaheim Hotel Owner, and the Anaheim Hotel Lessee; Disbursing Agent*

        All distributions under the Plan that are to be made on the Effective Date to the Holders of Claims Against or Interests in the Fixed/Floating Debtors, the Anaheim Hotel Debtor, and the Anaheim Hotel Lessee shall be made by the Fixed/Floating Debtors, the Anaheim Hotel Debtor, and the Anaheim Hotel Lessee, as applicable, as Disbursing Agent. All other distributions to Holders of Claims against and Interests in the Fixed/Floating Debtors, the Anaheim Hotel Debtor, and the Anaheim Hotel Lessee under the Plan shall be made after the Effective Date by the Disbursing Agent or such other Entity designated by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Rights and Powers of Disbursing Agent*

1.      <u>Powers of the Disbursing Agent</u>

        The Disbursing Agent shall be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date</u>

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash using, among other things, the Chatham Hotel Sale Transaction Purchase Consideration, without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      <u>Payments and Distributions on Disputed Claims</u>

        Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

K&E 18934861.6120090501

2.  Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Fixed/Floating Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

3.  Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), the Disbursing Agent or the Trustee, as applicable, shall deposit in the Disputed Claims Reserve the amount of Cash that would have been distributed to the Holders of all Disputed Claims or Interests against the Remaining Debtors (other than Grand Prix Holdings) and the Anaheim Hotel Debtors as if such Disputed Claims or Interests had been Allowed on the Effective Date, with the amount of such Allowed Claims or Interests to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) amount otherwise agreed by the relevant Debtor and the Holder of such Disputed Claim or Interest for reserve purposes. To the extent the amount of Cash deposited in the Disputed Claims Reserve on account of Disputed Claims or Interests against the Anaheim Hotel Debtors exceeds the amount of Disputed Claims or Interests against the Anaheim Hotel Debtors (as of the funding of the Disputed Claims Reserve) that later become Allowed, the excess shall be returned to LCPI/SASCO.

F.  *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.  Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent or the Trustee, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Disbursing Agent or the Trustee, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

The Five Mile DIP Agent shall be deemed to be the Holder of all Five Mile DIP Claims for purposes of distributions to be made hereunder, and the Disbursing Agent or the Trustee, as applicable, shall make all distributions on account of such Five Mile DIP Claims to or on behalf of the Five Mile DIP Agent. The Five Mile DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Five Mile DIP Claims. The Five Mile DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Five Mile DIP Claims; provided that the Five Mile DIP Agent shall retain all rights as administrative agent under the Five Mile DIP Agreement in connection with delivery of distributions to Five Mile DIP Lenders; provided further that the Debtors' obligations to make distributions in accordance with Article II.C shall be deemed satisfied upon delivery of distributions to the Five Mile DIP Agent.

The Lehman DIP Lender shall be deemed to be the Holder of all Lehman DIP Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent or the Trustee, as applicable, shall make all distributions on account of such Lehman DIP Claims to or on behalf of the Lehman DIP Lender. The Lehman DIP Lender shall hold or direct such distributions for the benefit of the Holders of Allowed Lehman DIP Claims. The Lehman DIP Lender shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Lehman DIP Claims; provided that the Debtors' obligations to make distributions in accordance with Article II.D shall be deemed satisfied upon delivery of distributions to the Lehman DIP Lender.

Midland shall be deemed to be the Holder of all Fixed Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such

K&E 18934861.61 20090501

Fixed Rate Pool Mortgage Loan Claims to or on behalf of Midland; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Midland.

LNR shall be deemed to be the Holder of the Allowed Class R3A Secured Garden Grove Hotel Mortgage Loan Claims, the Allowed Class R3E Secured San Antonio Hotel Mortgage Loan Claims, the Allowed Class R3B Secured San Diego Hotel Mortgage Loan Claims, the Allowed Class R3D Secured Tysons Corner Hotel Mortgage Loan Claims, and the Allowed Class R3C Secured Washington DC Hotel Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Trustee shall make all distributions on account of such Allowed Claims to or as directed by LNR.  LNR shall hold or direct such distributions for the benefit of the LNR-Serviced Trusts.  LNR shall arrange to deliver such distributions to or on behalf of the LNR-Serviced Trusts; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to or as directed by LNR.

Lehman shall be deemed to be the Holder of all Floating Rate Pool Mortgage Loan Claims for purposes of distributions to be made hereunder, if any, and the Disbursing Agent shall make all distributions on account of such Floating Rate Pool Mortgage Loan Claims to or on behalf of Lehman.  Lehman shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mortgage Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to Lehman.

SASCO shall be deemed to be the Holder of all Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims for purposes of distributions to be made hereunder, if any.  The Disbursing Agent shall make all distributions on account of such Floating Rate Pool Mezzanine Loan Claims and the Trustee shall make all distributions on account of the Anaheim Hotel Mezzanine Loan Claims to or on behalf of SASCO.  SASCO shall hold or direct such distributions for the benefit of the Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims.  SASCO shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Floating Rate Pool Mezzanine Loan Claims and Anaheim Hotel Mezzanine Loan Claims; provided that the Debtors' obligations to make such distributions in accordance with Article III.B shall be deemed satisfied upon delivery of such distributions to SASCO.

2.    Minimum; De Minimis Distributions

No Cash payment of less than $50.00, in the reasonable discretion of the Disbursing Agent or the Trustee, as applicable, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

3.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent or the Trustee, as applicable, has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the applicable Post-Effective Date Fixed/Floating Debtor or the Liquidation Trust, as applicable, and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent or the Trustee, as applicable, by check or by wire transfer.

*G.*     *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Disbursing Agent or the Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent or the Trustee, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*H.*     *Claims Paid or Payable by Third Parties*

1.     <u>Claims Paid by Third Parties</u>

The Debtors on or prior to the Effective Date or the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Anaheim Hotel Owner, the Post-Effective Date Anaheim Hotel Lessee, or the Trustee, as applicable, after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Post-Effective Date Debtors, or the Trustee on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Anaheim Hotel Owner, the Post-Effective Date Anaheim Hotel Lessee, or the Trustee, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Post-Effective Date Fixed/Floating Debtors, the Post-Effective Date Anaheim Hotel Owner, the Post-Effective Date Anaheim Hotel Lessee, or the Trustee, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.     <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Post-Effective Date Debtors, the Trustee, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

*A.    Resolution of Disputed Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, and Anaheim Hotel Lessee*

1.    Allowance of Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee

On or after the Effective Date, the Disbursing Agent shall have and shall retain any and all rights and defenses that the applicable Fixed/Floating Debtor, Anaheim Hotel Owner, or Anaheim Hotel Lessee had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2.    Prosecution of Objections to Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee

The Disbursing Agent shall have the exclusive authority to File objections to Claims against the Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims against the Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Disbursing Agent may settle or compromise any Disputed Claim against the Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee without any further notice to or action, order, or approval of the Bankruptcy Court.  From and after the Effective Date, the Disbursing Agent shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Disbursing Agent shall consult with New Anaheim HoldCo with respect to the filing, withdrawal, litigation, estimation, settlement, or compromise of any objections to any Claims against the Anaheim Hotel Owner or the Anaheim Hotel Lessee.

3.    Time to File Objections to Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee

Any objections to Claims against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee shall be filed on or before the Claims Objection Bar Date.

4.    Estimation of Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee s

The Disbursing Agent may, at any time, and shall have the exclusive authority to, request that the Bankruptcy Court estimate (a) any Disputed Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee pursuant to applicable law and (b) any contingent or unliquidated Claim against the Fixed/Floating Debtors pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or the Post-Effective Date Fixed/Floating Debtors, Post-Effective Date Anaheim Hotel Owner, or Post-Effective Date Anaheim Hotel Lessee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, contingent Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or unliquidated Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, including during the litigation concerning any objection to any Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a

K&E 18934861.612 20090501

Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, contingent Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or unliquidated Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Disbursing Agent may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Disbursing Agent may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5.   Expungement or Adjustment to Claims Against Fixed/Floating Debtors, Anaheim Hotel Owner, or Anaheim Hotel Lessee Without Objection

Any Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Notice and Claims Agent at the direction of the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or the Post-Effective Date Fixed/Floating Debtors, Post-Effective Date Anaheim Hotel Owner, or Post-Effective Date Anaheim Hotel Lessee, as applicable, and any Claim against the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee that has been amended may be adjusted thereon by the Fixed/Floating Debtors, the Anaheim Hotel Owner, or Anaheim Hotel Lessee or the Post-Effective Date Fixed/Floating Debtors, Post-Effective Date Anaheim Hotel Owner, or Post-Effective Date Anaheim Hotel Lessee, in all cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

B.   *Resolution of Claims Against the Trust Debtors*

1.   Allowance of Claims Against the Trust Debtors

On or after the Effective Date, the Trustee shall have and shall retain any and all rights and defenses that the applicable Trust Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2.   Prosecution of Objections to Claims Against the Trust Debtors

The Trustee shall have the exclusive authority to File objections to Claims against the Trust Debtors, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims against the Trust Debtors, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Trustee may settle or compromise any Disputed Claim against the Trust Debtors without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that settlement of Disputed Claims against the Remaining Debtors pursuant to which the Liquidation Trust will pay $50,000 or more shall require the approval of the Bankruptcy Court. From and after the Effective Date, the Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises of Claims against the Trust Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Time to File Objections to Claims Against the Trust Debtors

Any objections to Claims against the Trust Debtors shall be filed on or before the Claims Objection Bar Date.

4. Estimation of Claims Against the Trust Debtors

The Trustee may, at any time, and shall have the exclusive authority to, request that the Bankruptcy Court estimate (a) any Disputed Claim against the Trust Debtors pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Trust Debtors or the Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim against the Trust Debtors, contingent Claim against the Trust Debtors or unliquidated Claim against the Trust Debtors, including during the litigation concerning any objection to any Claim against the Trust Debtors or during the pendency of any appeal relating to any such objection; provided, however, there shall be no authority to request or obtain the estimation of any guaranty claim against Grand Prix Holdings LLC. Notwithstanding any provision otherwise in the Plan, a Claim against the Trust Debtors that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim against the Trust Debtors, contingent Claim against the Trust Debtors, or unliquidated Claim against the Trust Debtors, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Trustee may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim against the Trust Debtors that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5. Expungement or Adjustment to Claims Against the Trust Debtors Without Objection

Any Claim against the Trust Debtors that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Notice and Claims Agent at the direction of the Trust Debtors or the Trustee, as applicable, and any Claim that has been amended may be adjusted thereon by the Trust Debtors or the Trustee, in all cases without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

C. Disallowance of Claims

All Claims against or Interests in the Debtors held by any Entity from which property is sought by the Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors, the Post-Effective Date Fixed/Floating Debtors, or the Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS PROVIDED FOR UNDER THE PLAN OR OTHERWISE AGREED TO BY THE DEBTORS, THE POST-EFFECTIVE DATE FIXED/FLOATING DEBTORS, OR THE TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE (THAT DO NOT AMEND TIMELY FILED CLAIMS) SHALL BE DEEMED DISALLOWED AND**

**EXPUNGED AS OF THE EFFECTIVE DATE OF THE PLAN OF THE DEBTOR AGAINST WHOM SUCH CLAIM IS ASSERTED WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

D.      *Amendments to Claims*

On or after the Effective Date, except as provided in Article II.A, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Disbursing Agent, and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan or relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Post-Effective Date Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities; provided that, with respect to the C6 and C7 Trusts and the holders of certificates in the C6 and C7 Trusts, in their capacity as such, the Plan does not compromise or settle the Claims, interests, and controversies, if any, of the C6 and C7 Trusts or the holders of certificates in the C6 and C7 Trusts against Midland, the C6 and C7 Trusts, and any holder of certificates in the C6 and C7 Trusts, in its capacity as such, and the foregoing entities' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, trustees, members, or professionals, whether arising under the applicable pooling and servicing agreement, side letter, co-lender agreement, or related documents; provided, further, that, with respect to SASCO or LCPI, the Plan does not compromise or settle any Claims, interests, and controversies of SASCO or LCPI against TriMont or any of its advisors arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Post-Effective Date Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein to the contrary, and as provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

C.       *Midland Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS (TO THE EXTENT SET FORTH HEREIN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, MIDLAND, AS SPECIAL SERVICER AND ON BEHALF OF THE C6 AND C7 TRUSTS, (I) DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO APOLLO (AND APOLLO SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY MIDLAND) AND ITS RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE APOLLO GUARANTY; AND (II) IF AN ACTION REMAINS PENDING IN THE STATE COURTS OF NEW YORK OR ELSEWHERE, MIDLAND SHALL DISMISS ITS CLAIMS AGAINST APOLLO WITH PREJUDICE; <u>PROVIDED</u> <u>THAT</u> THE FOREGOING "**MIDLAND RELEASE**" IS CONDITIONED ON THE OCCURRENCE OF THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND THE RECEIPT BY MIDLAND OF THE SPECIAL SERVICER RELEASE PAYMENT, THE EMBODIMENT OF THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE (AS DESCRIBED IN ARTICLE VIII.E) IN THE CONFIRMATION ORDER ENTERED BY THE BANKRUPTCY COURT THAT HAS BECOME A FINAL ORDER; <u>PROVIDED</u> <u>FURTHER</u> <u>THAT</u> THE MIDLAND RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF MIDLAND:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE MIDLAND RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN <u>AND</u> <u>FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE MIDLAND RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE MIDLAND RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO MIDLAND ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE MIDLAND RELEASE.

D.       *Apollo Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, APOLLO, ON ACCOUNT OF ITS HOLDINGS OF COMMON SHARES OR OTHER EQUITY IN THE DEBTORS OR OTHERWISE DISCHARGES AND RELEASES AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO THE FIXED/FLOATING RELEASING PARTIES (AND THE FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY APOLLO) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR

69

OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE RELEASING PARTIES; <u>PROVIDED</u> <u>THAT</u> THE FOREGOING "**APOLLO RELEASE**" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE RELEASING PARTIES:  (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE APOLLO RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN <u>AND</u> <u>FURTHER</u> SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE APOLLO RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED TO APOLLO; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE APOLLO RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO APOLLO ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE APOLLO RELEASE.

E.      *Fixed/Floating Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE FIXED/FLOATING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE FIXED/FLOATING RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES (AND EACH OF THE OTHER FIXED/FLOATING RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE FIXED/FLOATING RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE

K&E <span style="color:red">18934861.6</span><span style="color:red">1</span><span style="color:red">20090501</span>

FIXED/FLOATING DEBTORS OR THE POST-EFFECTIVE DATE FIXED/FLOATING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER FIXED/FLOATING RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE COMMITMENT LETTER, THE NEW HOLDCO/MIDLAND COMMITMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE FIXED/FLOATING RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE FIXED/FLOATING RELEASING PARTIES; PROVIDED THAT IN CONNECTION WITH THE FOREGOING FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, THE VALIDITY, ENFORCEABILITY, AND PERFECTION, IN ALL RESPECTS, OF THE LIENS, CLAIMS, INTERESTS, MORTGAGES, AND ENCUMBRANCES OF THE FIXED RATE POOL MORTGAGE LOAN AGREEMENT AND THE C6 AND C7 TRUSTS ARE HEREBY CONFIRMED AND ADJUDICATED BY THE BANKRUPTCY COURT; PROVIDED FURTHER THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE FIXED/FLOATING RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT (1) THE RELEASES OF APOLLO SET FORTH IN THE MIDLAND RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE AND THE STIPULATION OF DISCONTINUANCE OF THE LITIGATION RELATED TO THE APOLLO GUARANTY SET FORTH IN THE MIDLAND RELEASE AND (2) THE WAIVERS AND RELEASES TO BE GIVEN BY APOLLO SET FORTH IN THE APOLLO RELEASE AND THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE SHALL NOT BE EFFECTIVE UNTIL MIDLAND HAS RECEIVED THE SPECIAL SERVICER RELEASE PAYMENT AND THE OCCURRENCE OF SUCH EFFECTIVE DATE; PROVIDED FURTHER THAT, THE EFFECTIVENESS OF THIS FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE FIXED/FLOATING PLAN; PROVIDED FURTHER THAT NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, IF ANY, OF THE C6 AND C7 TRUSTS, THE HOLDERS OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN THEIR CAPACITY AS SUCH, OR LNR PARTNERS, LLC (OR ITS AFFILIATES), LNR SECURITIES HOLDINGS LLC (OR ITS AFFILIATES) WHETHER ARISING UNDER THE APPLICABLE POOLING AND SERVICING AGREEMENT, SIDE LETTER, CO-LENDER AGREEMENT, OR RELATED AGREEMENT AGAINST THE C6 AND C7 TRUSTS, MIDLAND, ANY HOLDER OF CERTIFICATES IN THE C6 AND C7 TRUSTS, IN ITS CAPACITY AS SUCH, OR ANY OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, OR PROFESSIONALS; PROVIDED FURTHER THAT, NEITHER THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS.

ENTRY OF THE CONFIRMATION ORDER FOR THE FIXED/FLOATING PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF

THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE FIXED/FLOATING RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE FIXED/FLOATING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE FIXED/FLOATING RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FIXED/FLOATING DEBTORS' PLAN GENERAL RELEASE.

F.      *Anaheim Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ANAHEIM HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ANAHEIM HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ANAHEIM HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ANAHEIM HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ANAHEIM HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ANAHEIM HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ANAHEIM HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE ANAHEIM HOTEL RELEASING PARTIES; PROVIDED THAT THE ANAHEIM HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ANAHEIM HOTEL RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS ANAHEIM HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ANAHEIM HOTEL DEBTORS; PROVIDED FURTHER THAT, NEITHER THE ANAHEIM HOTEL DEBTORS' PLAN

GENERAL RELEASE OR ANYTHING ELSE SET FORTH IN THE PLAN OR IN THE PLAN SUPPLEMENT SHALL RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION AND LIABILITIES OF SASCO OR LCPI AGAINST TRIMONT OR ITS PROFESSIONALS, ARISING UNDER, RELATED TO, OR IN CONNECTION WITH ANY GUARANTY WITH RESPECT TO THE FLOATING RATE POOL MEZZANINE LOAN AGREEMENT OR THE ANAHEIM HOTEL MEZZANINE LOAN AGREEMENT, INCLUDING WITHOUT LIMITATION CLAIMS ARISING FROM OR RELATED TO TRIMONT'S ALLEGED FAILURE TO TIMELY FILE PROOFS OF CLAIM WITH RESPECT TO SUCH GUARANTY CLAIMS.

ENTRY OF THE CONFIRMATION ORDER FOR THE ANAHEIM PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ANAHEIM HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ANAHEIM HOTEL GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ANAHEIM HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ANAHEIM HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ANAHEIM HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ANAHEIM HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ANAHEIM HOTEL GENERAL RELEASE.

G.      *Ontario Hotel Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE ONTARIO HOTEL DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE ONTARIO HOTEL RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES (AND EACH OF THE OTHER ONTARIO HOTEL RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE ONTARIO HOTEL RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE ONTARIO HOTEL DEBTORS OR THE POST-EFFECTIVE DATE ONTARIO HOTEL DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER ONTARIO HOTEL RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE ONTARIO HOTEL RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED

TO ASSERT ON BEHALF OF ANY OF THE ONTARIO HOTEL RELEASING PARTIES; PROVIDED THAT THE ONTARIO HOTEL GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE ONTARIO HOTEL RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS ONTARIO HOTEL GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE ONTARIO HOTEL DEBTORS; PROVIDED FURTHER THAT THE ONTARIO HOTEL GENERAL RELEASE WILL NOT IMPACT C-III'S ABILITY TO PROCEED WITH STATE FORECLOSURE PROCEEDINGS AS DESCRIBED IN ARTICLE III.B.3(B).

ENTRY OF THE CONFIRMATION ORDER SHALL FOR THE ONTARIO PLAN CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE ONTARIO HOTEL GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE ONTARIO HOTEL GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE ONTARIO HOTEL RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE ONTARIO HOTEL GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE ONTARIO HOTEL DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ONTARIO HOTEL RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE ONTARIO HOTEL GENERAL RELEASE.

## H. *Remaining Debtors' Plan General Release*

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE OF THE PLAN AS APPLICABLE TO THE REMAINING DEBTORS AND EFFECTIVE AS OF SUCH EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE REMAINING DEBTOR RELEASING PARTIES, TO THE MAXIMUM EXTENT OF APPLICABLE LAW, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES (AND EACH OF THE OTHER REMAINING DEBTOR RELEASING PARTIES SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE REMAINING DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, LIABILITIES, AND ALL PREFERENCES UNDER SECTION 547 OF THE BANKRUPTCY CODE AND, TO THE EXTENT RELATED THERETO, SECTION 550 OF THE BANKRUPTCY CODE WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF SUCH EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE TRANSACTIONS CONTEMPLATED BY THE PLAN, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE REMAINING DEBTORS OR THE POST-EFFECTIVE DATE REMAINING DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY OF THE DEBTORS AND ANY OF THE OTHER REMAINING DEBTOR RELEASING PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, INSTRUMENTS, OR OTHER DOCUMENTS RELATED TO THE CHAPTER 11 CASES, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER

K&E 18934861.61 20090501

OCCURRENCE TAKING PLACE ON OR BEFORE SUCH EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE REMAINING DEBTOR RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE REMAINING DEBTOR RELEASING PARTIES; PROVIDED THAT THE REMAINING DEBTORS' PLAN GENERAL RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF THE REMAINING DEBTOR RELEASING PARTIES: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS (INCLUDING THE TREATMENT OF CLAIMS HEREUNDER); PROVIDED FURTHER THAT THE EFFECTIVENESS OF THIS REMAINING DEBTORS' PLAN GENERAL RELEASE IS NOT CONDITIONED ON THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS IT APPLIES TO THE DEBTORS OTHER THAN THE REMAINING DEBTORS; PROVIDED FURTHER THAT THE HOLDER OF GARDEN GROVE HOTEL MORTGAGE LOAN CLAIMS, SAN ANTONIO HOTEL MORTGAGE LOAN CLAIMS, SAN DIEGO HOTEL MORTGAGE LOAN CLAIMS, TYSONS CORNER HOTEL MORTGAGE LOAN CLAIMS, AND WASHINGTON DC HOTEL MORTGAGE LOAN CLAIMS WAIVE ALL RIGHTS THEY MAY HAVE TO THE FUNDS IN THE LP BANK ACCOUNT; PROVIDED FURTHER THAT THE AD HOC COMMITTEE SHALL RELEASE LNR, THE LNR-SERVICED TRUSTS AND THE MASTER SERVICER FOR EACH OF THE LNR-SERVICED LOANS, AND EACH OF THE FOREGOING ENTITIES' RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, PRINCIPALS, EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, TRUSTEES, MEMBERS, MASTER SERVICES, SPECIAL SERVICERS, TRUSTS AND TRUSTEES, AND PROFESSIONALS, INCLUDING LEGAL AND FINANCIAL ADVISORS, FROM ALL CLAIMS RELATED TO THE LNR-SERVICED LOANS AND THE DEBTORS, WHETHER ARISING BEFORE OR AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES; PROVIDED FURTHER THAT, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE LNR-SERVICED TRUSTS SHALL BE RELEASED FROM AND NOT SUBJECT TO ANY AND ALL AVOIDANCE ACTIONS UNDER CHAPTER 5 OF THE BANKRUPTCY CODE OR CLAIM OBJECTIONS UNDER SECTION 502(D) OF THE BANKRUPTCY CODE BROUGHT BY ANY ENTITY, INCLUDING BUT NOT LIMITED TO THE COMMITTEE, THE AH HOC COMMITTEE, OR ANY SUCCESSOR IN INTEREST THERETO.

ENTRY OF THE CONFIRMATION ORDER FOR THE REMAINING DEBTOR PLAN SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE REMAINING DEBTORS' PLAN GENERAL RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE REMAINING DEBTORS' PLAN GENERAL RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE REMAINING DEBTOR RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE REMAINING DEBTORS' PLAN GENERAL RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE REMAINING DEBTORS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE REMAINING DEBTOR RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE REMAINING DEBTORS' PLAN GENERAL RELEASE.

UPON APPROVAL OF THE AD HOC COMMITTEE AGREEMENT: (I) HOLDERS OF INNKEEPERS USA TRUST PREFERRED C INTERESTS AND THE AD HOC COMMITTEE SHALL BE DEEMED TO BE FIXED/FLOATING RELEASING PARTIES, ANAHEIM HOTEL RELEASING PARTIES, AND ONTARIO HOTEL RELEASING PARTIES; AND (II) THE AD HOC COMMITTEE SHALL BE A REMAINING DEBTOR RELEASING PARTY.

## I.    Exculpation

The Exculpated Parties shall neither have, nor incur, any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, confirming, or effecting the Consummation of the Plan, the Commitment Letter, the Disclosure Statement, the issuance, distribution, and/or sale of any of the New HoldCo Interests or any other Security, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the Exculpated Parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that neither this provision nor any other portion of the Plan shall exculpate Midland or any holder of certificates in the C6 and C7 Trusts, in its capacity as such, for any liability, if any, to the C6 and C7 Trusts or any holders of certificates in the C6 or C7 Trusts, in their capacity as such; provided, further, that this provision shall not operate to expand the scope of the Floating/Fixed Debtors' Plan General Release; provided, further, that, this provision shall not exculpate TriMont or any of its advisors for or from any liability to SASCO or LCPI arising under, related to, or in connection with any guaranty with respect to the Floating Rate Pool Mezzanine Loan Agreement or the Anaheim Hotel Mezzanine Loan Agreement, including without limitation Claims arising from or related to TriMont's alleged failure to timely file proofs of claim with respect to such guaranty claims.

## J.    Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C, ARTICLE VIII.D, ARTICLE VIII.E, ARTICLE VIII.F, ARTICLE VIII.G, OR ARTICLE VIII.H (3) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.I; OR (4) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES

K&E 18934861.6120090501

UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION, OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED FURTHER THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

K.      *Setoffs*

Except as otherwise provided herein, the Debtors or the Post-Effective Date Debtors, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or the Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Post-Effective Date Debtors of any such Claims, rights, and Causes of Action that the Post-Effective Date Debtors may possess against such Holder.

**ARTICLE IX.**
**SEVERABILITY OF PLAN AND CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A.      *Severability of the Plan*

The Plan contemplates four separate joint plans of reorganization that together provide for the resolution of all Claims against and Interests in each of the 92 Debtors in the Chapter 11 Cases: (a) the Fixed/Floating Plan; (b) the Anaheim Plan; (c) the Ontario Plan; and (d) the Remaining Debtor Plan. The Fixed/Floating Plan, the Anaheim Plan, the Ontario Plan, and the Remaining Debtor Plan are severable from each other and the Confirmation and Consummation of any one of the four joint plans are not conditioned on the Confirmation and Consummation of any of the other three joint plans.

B.      *Condition Precedent to Confirmation of the Fixed/Floating Plan*

It shall be a condition to Confirmation of the Fixed/Floating Plan that the Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman, and Midland in each of their reasonable discretion.

C.      *Condition Precedent to Confirmation of the Remaining Debtor Plan*

It shall be a condition to Confirmation of the Remaining Debtor Plan that all of the conditions set forth in the Stipulation shall have been satisfied and that the Confirmation Order, the Remaining Debtor Plan, and the Plan

Supplement, along with any amendments, modifications, or supplements to any of the foregoing, shall in all respects be in compliance with and consistent with the terms of the Stipulation.

D.    *Conditions Precedent to the Effective Date of Each of the Joint Plans*

It shall be a condition to Consummation of each of the Joints Plans that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.E:

1.    Conditions Applicable to Each of the Joint Plans

(a)    The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

(b)    All documents and agreements necessary to implement the applicable Joint Plan (including, without limitation, the Commitment Letter and the New HoldCo/Midland Commitment Letter for the Fixed/Floating Plan) shall have (a) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

(c)    All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Joint Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(d)    The Professional Fee Escrow Account shall have been funded with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals; and

(e)    The "tail policy" for current and former trustees, directors, and officers referenced in Article IV.U shall have been purchased.

2.    Additional Conditions Applicable Only to the Fixed/Floating Plan

**(a)    The Court shall have approved the Commitment Letter.**

**(b)    The Court shall have approved the modifications requested to the Fixed/Floating Plan and the Confirmation Order necessary to implement the transaction contemplated by the Commitment Letter.**

**(c)**    (a) The "Outside**Termination** Date" under the Commitment Letter shall not have occurred.

**(d)**    (b) The Special Servicer Payment and the Special Service Release Payment shall have been made.

**(e)**    (c) The Apollo Unsecured Claim Fund Payment shall have been made**.**

**(f)**    (d) The Commitment Letter has not been terminated.

78

(g)    (e) The Confirmation Order, the Fixed/Floating Plan, and the Plan Supplement, along with any amendments, modifications, or supplements to any of the foregoing shall be acceptable in all respects to the Fixed/Floating Plan Sponsors, Lehman and Midland in each of their reasonable discretion.

(h)    (f) The Cash payments required in accordance with the treatment of Classes FF3B and FF4 under the Fixed/Floating Plan, the Cash payment to the Holders of the Five Mile DIP Claims (in accordance with Article II.C hereof), and the Cash payment to the Holders of the Lehman DIP Claims (in accordance with Article II.D hereof) shall have been made.

(i)    **Midland shall have executed and delivered to New HoldCo the New Fixed Rate Pool Mortgage Loan Agreement, and all conditions precedent to the consummation of the financing contemplated thereby shall have been satisfied or waived.**

3.    Additional Condition Applicable Only to the Ontario Plan

(a)    The Ontario Debtors have delivered an executed deed in lieu to C-III, provided that such delivery shall not effect C-III's ability to elect to pursue state foreclosure proceedings as described in Article III.B.3(b).

4.    Additional Conditions Applicable Only to the Remaining Debtor Plan

(a)    No Termination Event (under the LNR Commitment) shall have occurred.

(b)    The LNR-Serviced Trusts shall have received payments of all of the amounts provided for in the Stipulation.

(c)    The closing of the Chatham Hotel Sale Transaction occurs.

E.    *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors; provided that with respect to the consummation of the Fixed/Floating Plan, the conditions precedent to the Effective Date may be waived only by the consent of the Fixed/Floating Plan Sponsors, Lehman, and Midland, in accordance with the terms of the Fixed/Floating Successful Bid; provided further that, notwithstanding anything to the contrary in this Article IX.E, consent shall not be required to waive a condition described in Article IX.C**D** from any Entity whose actions (or failure to act) were the proximate cause of the failure of such condition to be satisfied.

F.    *Effective Date*

For each Debtor, the Effective Date shall be the date that is a Business Day selected by the Debtors after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry; and (b) all conditions precedent applicable to such Debtor specified in Article IX.D have been satisfied or waived (in accordance with Article IX.E).

G.    *Effect of Non-Occurrence of the Effective Date Regarding Fixed/Floating Debtors*

Unless and only to the extent otherwise agreed among the Debtors, the Fixed/Floating Plan Sponsors, Lehman, and Midland, if the Effective Date as to the Fixed/Floating Debtors does not occur on or before September 15, 2011 (*i.e.*, the "Outside Date" under the Commitment Letter), the Confirmation Order shall be automatically revoked and the Plan as applicable to the Fixed/Floating Debtors and the Commitment Letter shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Commitment Letter shall:  (1)

79

constitute a waiver or release of any claims by or Claims against or Interests in the Fixed/Floating Debtors; (2) prejudice in any manner the rights of the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests in the Fixed/Floating Debtors, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Fixed/Floating Debtors, the Fixed/Floating Plan Sponsors, any Holders of Claims against or Interests, or any other Entity in any respect.

**G.** ~~H.~~ *Effect of Non-Occurrence of the Effective Date Regarding the Ontario Plan*

Unless and only to the extent otherwise agreed among the Debtors and C-III, if the Effective Date of the Ontario Plan does not occur on or before July 5, 2011, the Confirmation Order as applicable to the Ontario Plan shall be automatically revoked and the Ontario Plan shall be null and void in all respects. Upon the non-occurrence of the Effective Date for the Ontario Plan, C-III and the Debtors will enter into a stipulation, acceptable to the Debtors and C-III, each in their reasonable discretion, providing for: (1) the lifting of the automatic stay imposed by section 362 of the Bankruptcy Code with respect to the collateral securing the Ontario Hotel Mortgage Loan Agreement; (2) a waiver and release of any claims by or Claims against or Interests in the Ontario Hotel Debtors by C-III as provided for by Article VIII.G; and (3) the payment by C-III of $30,000, which payment shall be distributed among Holders of Claims against the Ontario Hotel Debtors.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A.*     *Modification and Amendments*

Subject to the limitations contained herein and the consent rights available to the Fixed/Floating Plan Sponsors and Midland (as described in Article IX), the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

*B.*     *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.*     *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to one or more of the Debtors prior to the Confirmation Date or the Effective Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption and assignment or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity. Nothing contained in this Article X shall impair the rights and obligations existing under the Commitment Letter.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. Resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5. Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

K&E 18934861.61 20090501

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to the Plan, the Commitment Letter, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

21.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     Enforce all orders previously entered by the Bankruptcy Court;

23.     To resolve any disputes arising under the Commitment Letter and the Chatham Hotel Sale Transaction Documents;

24.     Hear any other matter not inconsistent with the Bankruptcy Code;

25.     Enter an order concluding or closing the Chapter 11 Cases; and

26.     Enforce the injunction, release, and exculpation provisions set forth in Article VIII.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date with respect to any of the Joint Plans, the terms of such plan, the corresponding Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the relevant Debtors, the relevant Post-Effective Date Debtors, and any and all Holders of Claims or Interests against or in the relevant Debtors (regardless of whether such Claims or Interests are deemed to have accepted or

rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in such plan, each Entity acquiring property under such plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the relevant Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Post-Effective Date Debtors or the Trustee, in its capacity as such (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Dissolution of Committees*

Without considering any of the Chapter 11 Cases that have been converted, dismissed or closed, on the date that is the latest Effective Date of a chapter 11 plan applicable to any of the Chapter 11 Cases or on a date otherwise ordered by the Court, the Committees, if any, shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; provided that the Committee shall continue in existence following the Effective Date (or on the date that is otherwise ordered by the Court) for either (a) addressing matters concerning fees incurred in connection with the administration of the Chapter 11 Cases or (b) participating in any appeal of the Confirmation Order.

E.      *Reservation of Rights*

Except as expressly set forth in the Plan, each of the Joint Plans shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order with respect to such Joint Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Dissolution of Entities*

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, such Debtor shall be deemed dissolved under state law without further action by the Post-Effective Date Debtors and without any further notice or action, order, or approval of the Bankruptcy Court or any other Entity.

*H.*     *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Post-Effective Date Debtors shall be served on:

1.     <u>if to the Debtors or the Post-Effective Date Debtors (other than the Post-Effective Date Fixed/Floating Debtors), to:</u>

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attention:  Marc A. Beilinson

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Facsimile:  (212) 446-4900
Attention:  Paul M. Basta, Stephen E. Hessler, and Brian S. Lennon
E-mail addresses:  paul.basta@kirkland.com, stephen.hessler@kirkland.com, and
                              brian.lennon@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Facsimile:  (312) 862-2200
Attention:  Anup Sathy, P.C.
E-mail address:  anup.sathy@kirkland.com

2.     <u>if to the Fixed/Floating Plan Sponsors or the Post-Effective Date Fixed/Floating Debtors, to:</u>

INK ACQUISITION LLC
c/o Cerberus Real Estate Capital Management, LLC
299 Park Avenue, 23rd Floor
New York, New York 10171
Attention:  Tom Wagner

with copies to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Facsimile:  (212) 593-5955
Attention:  Stuart Freedman and Adam Harris
E-mail addresses:  stuart.freedman@srz.com and adam.harris@srz.com

and

INK ACQUISITION LLC
c/o Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480

Attention:  Jeff Fisher

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile:  (212) 403-2202
Attention:  Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

3.      if to Chatham, to:

Chatham Lodging Trust
50 Cocoanut Row
Palm Beach, FL 33480
Attention:  Jeff Fisher

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile:  (212) 403-2202
Attention:  Scott Charles and Scott Golenbock
E-mail addresses: SKCharles@wlrk.com and SWGolenbock@wlrk.com

## I.      Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## J.      Entire Agreement

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## K.      Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

K&E 18934861.61 20090501

Respectfully submitted, as of the date first set forth above,

Innkeepers USA Trust (for itself and all Debtors)

By:    /s/ *Marc A. Beilinson*
Name:   Marc A. Beilinson
Title:    Chief Restructuring Officer